UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

*********************************************************************************************************

In re:

PETTERS COMPANY, INC., ET AL,

Debtors.

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

**JOINTLY ADMINISTERED UNDER
CASE NO. 08-45257**

Court File No. 08-45257

Court File Nos:

08-45258 (GFK)
08-45326 (GFK)
08-45327 (GFK)
08-45328 (GFK)
08-45329 (GFK)
08-45330 (GFK)
08-45331 (GFK)
08-45371 (GFK)
08-45392 (GFK)

Chapter 11 Cases
Judge Gregory F. Kishel

*********************************************************************************************************

DOUGLAS A. KELLEY, in his capacity
as the court-appointed Chapter 11
Trustee of Debtors Petters Company, Inc.,
PC Funding, LLC, and SPF Funding, LLC,

Plaintiff,

v.

OPPORTUNITY FINANCE, LLC;
Opportunity Finance Securitization, LLC;
Opportunity Finance Securitization II, LLC;
Opportunity Finance Securitization III, LLC;
International Investment Opportunities, LLC;
Sabes Family Foundation; Sabes Minnesota
Limited Partnership; Robert W. Sabes;
Janet F. Sabes; Jon R. Sabes; Steven Sabes;
Deutsche Zentralgenossenschaftbank AG;
West Landesbank AG; WestLB AG New York
Branch; and The Minneapolis Foundation;

Defendants,

ADV 10-4301

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *06/11/2015*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

and

METRO GEM, INC.; Metro Gem LLC;                          ADV 10-4352
Northwestern Foundation; and
Frank E. Vennes, Jr.,

                Defendants.

********************************************************************************************************************

## ORDER RE: EFFECT OF STATUTORY AMENDMENT
## ON CASE AGAINST CHARITABLE DEFENDANTS

********************************************************************************************************************

At St. Paul, Minnesota
June 11, 2015.

      These adversary proceedings are before the court on motions for dismissal made

by Defendants Sabes Family Foundation ("the Sabes Foundation") and The Minneapolis

Foundation (in ADV 10-4301) and Defendant Northwestern Foundation (in ADV 10-4352).[1]

      In his original and amended complaints, the Plaintiff sought to avoid payments of

money that one or more of the Debtors had made to those three defendants.  The Plaintiff pleaded

Minnesota's enactment of the Uniform Fraudulent Transfer Act ("MUFTA") as his principal legal

authority.  The motions at bar focus on a 2012 amendment to MUFTA.  The movants now assert

the 2012 amendment as a complete defense to the Plaintiff's claims under MUFTA.  Mark D. Larsen

and James A. Lodoen of Lindquist & Vennum PLLP appear for the Plaintiff ("the Trustee").  Joseph

G. Petrosinelli of Williams & Connolly LLP and John R. McDonald of Briggs and Morgan, P.A.

---

[1]All three motions were styled under Fed. R. Civ. P. 12(b)(6), *as incorporated by* Fed. R. Bankr. P.
7012.  Defendant Northwestern Foundation had filed an answer in ADV 10-4352 [Dkt. No. 47], so its
motion probably should have been styled as one for judgment on the pleadings.  *See* Fed. R. Civ. P. 12(c)
("After the pleadings are closed . . . a party may move for judgment on the pleadings.").  The nominal
casting of the motion is not material, however.  The two forms of motion are subject to the same standard,
which goes to the adequacy of the pleading in question.  *McIvor v. Credit Control Servs., Inc.*, 773 F.3d
909, 913 (8th Cir. 2014); *Packard v. Darveau*, 759 F.3d 897, 900 (8th Cir. 2014).  The inquiries are the
same.  On the factual plane, it is "whether the complaint . . . contain[s] sufficient factual matter, accepted
as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
On the legal plane, it is whether "some viable legal theory" would allow the relief sought, were the pleaded
facts proven true and then matched to the elements for that theory.  *E.g.*, *Brooks v. Roy*, 776 F.3d 957,
960 (8th Cir. 2015).

appear for the Sabes Foundation. Thomas C. Atmore of Leonard, O'Brien, Spencer, Gale & Sayre,

Ltd. appears for the Northwestern Foundation. David L. Mitchell of Robins, Kaplan, Miller & Ciresi

L.L.P. appears for The Minneapolis Foundation.

## INTRODUCTION

These adversary proceedings are part of a large docket of avoidance litigation

commenced in the underlying bankruptcy cases. The cases and the litigation address the Ponzi

scheme perpetrated by Thomas J. Petters, which failed in 2008. The Trustee is charged with

remediating the end-damage caused by the scheme. He seeks to do so primarily by recovering

payments that the Debtor-entities made to satisfy parties that had lent to them earlier in the history

of the scheme. As a general matter, the Trustee alleges, lenders made their cash infusions for the

ostensible business activity--pretensed and nonexistent--that served as the cover for the Petters

scheme; but under the classic Ponzi-structure of Tom Petters's operation, such infusions were

largely directed to paying earlier lenders and the later repayment was funded by infusions from later

lenders.[2]

Among the defendants sued were a number of entities that had held themselves out

as charitable organizations during the time they dealt with the Debtors. They had received

payments of money from Debtor Petters Company, Inc. ("PCI") or one of its affiliated debtor-entities.

As part of a settlement effort to reduce the litigation docket, mediation was conducted between the

Trustee and members of several classes of parties sued by him, including the "charity-defendants."

---

[2]Over six years have passed since the failure of the Petters scheme. Its failure cascaded into
bankruptcy or receivership filings for the principal entities in the Petters enterprise structure and most of
the largest late lenders to them. By now, the historical existence of the scheme and the broad contours of
its operation are virtually assumed by multiple federal courts that have presided over litigation from the
trustees and receivers. *See, e.g.*, *Peterson v. Winston & Strawn LLP*, 729 F.3d 750, 751 (7th Cir. 2013);
*Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 744 (7th Cir. 2013); *Varga v. U.S. Bank Nat'l Assoc.*, 764
F.3d 833, 836-837 (8th Cir. 2014); *In re Palm Beach Fin. Partners, L.P.*, 527 B.R. 518, 521 (S.D. Fla.
2015); *In re Palm Beach Fin. Partners, L.P.*, 517 B.R. 310, 319-321 (Bankr. S.D. Fla. 2013). For more
about the scheme and the Trustee's strategy for remediation, *see, e.g.*, *In re Petters Co., Inc.*, 494 B.R.
413, 418-419 (Bankr. D. Minn. 2013).

After the mediation stage, the only charity-defendants[3] still under suit are the three

movants at bar.[4]  All of the movants were sued jointly with other persons or entities that were

associated with them, in their interface with the Petters entity structure.  The Trustee seeks to avoid

specific transfers made to each of the movants.  His claims for avoidance against the movants are

factually distinct from the claims against their co-defendants.

Early in the litigation, the charity-defendants moved for dismissal, in their own right

and solely as to the Trustee's claims against them.  Those motions raised many of the same issues

as the motions made by non-charity defendants.  All of them were subject to the same procedures

order.

During the pendency of the litigation, however, the Minnesota legislature amended

MUFTA in 2012.  The amendments added a retroactively-effective provision to limit the scope and

nature of transfers to a qualifying charitable organization, that may be subjected to avoidance at

the instance of a plaintiff empowered to invoke MUFTA.[5]

---

[3]At this point, the use of this term does not subsume or constitute an adjudication on the actual qualification of any of these defendants as charitable organizations under any law governing such status. As to at least one of the remaining defendants, the Trustee disputes the qualification as such.  That issue is not raised through these motions.

[4]Collectively, the three will be denoted either "the charity-defendants" or "the movants."

[5]The Trustee invokes MUFTA under the authority of 11 U.S.C. § 544(b).  That statute makes certain remedies under state substantive law available to a trustee in bankruptcy--specifically, those to

> . . . avoid any transfer of an interest of the debtor in
> property . . . that is voidable under applicable law by a
> creditor holding an unsecured claim that is allowable
> under [11 U.S.C. §] 502 . . . or that is not allowable only
> under [11 U.S.C. §] 502(e) . . . .

11 U.S.C. § 544(b)(1).  Such substantive authority includes fraudulent transfer statutes.  *E.g., In re Marlar*, 267 F.3d 749, 755-756 (8th Cir. 2001); *In re Popkin & Stern*, 223 F.3d 764, 769 n.11 (8th Cir. 2000); *In re Estate of Graven*, 64 F.3d 453, 456 n.5 (8th Cir. 1995); *In re Graven*, 936 F.2d 378, 383 n.7 (8th Cir. 1991); *In re DLC, Ltd.*, 295 B.R. 593, 601 (B.A.P. 8th Cir. 2003).

Under the procedures order, the broader litigation docket first moved through an effort to address numerous issues common to the defense in most of the adversary proceedings.[6] After that, the Northwestern Foundation insisted on an early treatment of its demand for the protection of the 2012 amendment to MUFTA. The Minneapolis Foundation joined in that demand.[7] The parties stipulated to a further amendment to the Trustee's complaints specific to those issues.[8] After that, the issues were queued up when the movants filed targeted motions for dismissal on the specific ground of shelter under the 2012 amendment. Substantial briefing was submitted. After oral argument, the record was closed. This memorandum sets forth the rulings on the issue submitted.

## ISSUE AT BAR

The issue presented by the movants is somewhat abstruse and esoteric, but it has large consequence for their exposure to the Trustee's avoidance powers.

---

[6]That "consolidated issues" procedure resulted in the issuance of three memoranda containing rulings toward the disposition of multiple motions for dismissal: *see* BKY 08-45257, First Memorandum [Dkt. No. 1951], reported at 494 B.R. 413; Second Memorandum [Dkt. No. 2005, as amended by Dkt. No. 2018], reported at 495 B.R. 887; and Third Memorandum [Dkt. No. 2044], reported at 499 B.R. 342 (all Bankr. D. Minn. 2013).

[7]MUFTA, through § 544(b), is the only pleaded substantive basis for the Trustee's suit against these two movants. The reason for that was obvious; the payments to them that the Trustee sought to avoid were alleged to have been made years before the two-year window of vulnerability to avoidance under the Bankruptcy Code's fraudulent-transfer provision, 11 U.S.C. § 548. As a result, the whole of the Trustee's case against these two defendants rose or fell on the availability of relief under MUFTA. The Trustee sued the Sabes Foundation on payments identified to the two-year period immediately before the Debtors' bankruptcy filings, plus payments alleged to have been made before then. Thus, he pleaded separate counts for avoidance under federal and state law against the Sabes Foundation, each to apply to all transfers within its full temporal ambit. The Sabes Foundation joins in the other two movants' current bid for dismissal; but, obviously, its motion only goes to the Trustee's MUFTA-based counts, and then only to transfers made before the two-year period. Section 548 has an exception for "[a] transfer of a charitable contribution," but it is substantially different from the exception under the 2012 amendment to MUFTA. *See* 11 U.S.C. §§ 548(a)(2) and 548(d)(3).

[8]The statutory amendment was one of the reasons why the Trustee generated second amended complaints in ADV 10-4301 [Dkt. No. 83] (hereafter, "the Opportunity Finance/Sabes Complaint") and in ADV 10-4352 [Dkt. No. 55] (hereafter, "the Metro Gem/Vennes Complaint").

The movants all received money from one or more of the Debtors, on multiple occasions. The Trustee sues to recapture those monies, on the theory that the payments were transfers fraudulent on the Debtor-transferors' creditors, i.e. the lenders then or later ensnared in the Ponzi scheme and the current and future trade creditors of the Debtors. He sues under theories of actual and constructive fraud, as those concepts would apply to the dynamic of a Ponzi scheme.[9] His theory of suit was that any such payment-transfer worked such a fraud via the relinquishment of the value transferred. The major premise of that theory was an inherent and pervasive fraudulence within any Ponzi scheme and the intrinsic insolvency of such schemes *ab initio.*

Many courts and commentators have observed that Ponzi schemes are sustained on the projected semblance of high success in the pretensed economic activity, which would imply the ability to repay on lending or to produce returns on investment. Under this view, perpetrators bolster the pretense of success by means not directly connected to the falsely-portrayed, ostensible business or investment. Such means include lavish gifts to persons close to the purveyor and large, well-publicized charitable contributions. Kathy Bazoian Phelps and Steven Rhodes, *The Ponzi Book: A Legal Resource for Unraveling Ponzi Schemes* (2012), §§ 2.03[1][d] and 3.02[5]. The notion of such an ancillary pretense is logical. The phenomenon might be called a "luster factor."

At least intuitively, the proposition is reasonable: splashy charitable giving could add such luster to a perpetrator and its ostensible business. Reasons for using it are obvious, however corrupted they may be. Prominent displays of charity attract public attention generally. They can attract new investor-victims through the general semblance of success and a charity-specific "affinity factor." And, they put up a broad cover of good will that can mask the perpetrator's underlying dishonesty. When presented with such giving as a historical fact, those charged with

---

[9]The three consolidated-issues memoranda treated this application, via general rulings on the statute's application in this specific context.

6

remediation of failed frauds feel compelled to seek the disgorgement of monies disbursed under such ostensible benevolence.  Connotatively, there is justification for this: the monies donated were most likely diverted from funds received from third parties in the scheme's operation, to the compounded detriment of earlier and later victim-investors.

Yet recipient-charities have equities of their own to call up.  Absent a case of actual knowledge and collusion, they can claim that they had not been motivated by profit when they took the money, and were only carrying out their own benevolent functions in receiving and using it unwittingly.  By the time they are called to account, charity-recipients have usually expended the donated funds on their mission--many times without capital enhancement from the expenditure. Finally, charities might have to resort to diverting funding received from current donors in order to respond to avoidance.  This could erode their credibility with donors and the public, and frustrate the charitable purposes for which such later donations were made.

With all that in tow, this invocation of fraudulent transfer remedies presents a snarl of conflicting public policy considerations.  It is a troubling conundrum for any court that presides over such litigation.[10]

Starting in 2008, bankruptcy cases and receivership proceedings were commenced in the state and federal courts in Minnesota to address the failure of the Petters Ponzi scheme and several smaller ones locally perpetrated by other persons.  Those responsible for the remediation in these matters sued locally-based charity-recipients for avoidance.  In 2012, the Minnesota Legislature amended MUFTA, with a provision that facially matched to this sort of litigation and all of the policy-based tensions that roil within it.

The change was made to MUFTA's definitional provision, Minn. Stat. § 513.41.  Prior to that, the definition for "transfer," at (12) of the section, read solely:

---

[10]*See Scholes v. Lehmann*, 56 F.3d 750, 759-761 (7th Cir. 1995) for an early recognition of the contending equities argued on this situation.

(12) "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.

The amendment added the following text to Minn. Stat. § 513.41(12):

Transfer does not include a contribution of money or an asset made to a qualified charitable or religious organization or entity unless the contribution was made within two years of commencement of an action under [Minn. Stat. §§] 513.41 to 513.51 against the qualified charitable or religious organization or entity and:

(i) the debtor made the charitable contribution with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(ii) the debtor:

(A) was insolvent at the time of the contribution or would be rendered insolvent by reason of the contribution;

(B) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(C) intended to incur, or the charitable or religious organization or entity believed or had reason to believe that the debtor would incur, debts beyond the debtor's ability to pay as the debts become due.

A transfer of a charitable contribution to a qualified charitable or religious organization or entity is not considered a transfer covered under item (ii) if the amount of that contribution did not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution was made; or the contribution exceeded that amount but the transfer was consistent with practices of the debtor in making charitable contributions.

Transfer does include a return on investment made by a qualified charitable or religious organization or entity. "Qualified charitable or religious organization or entity" means an organization or entity

described in United States Code, title 26, section 170(c)(1), (2), or (3).

The legislation provided that the amendment was "effective on the day following final enactment and applie[d] to a cause of action existing on, or arising on or after, that date." 2012 Minn. Laws 151. The law was enacted via the Governor's signature, on April 3, 2012. Hence, the amendment applied to any litigation pending on April 4, 2012, including these adversary proceedings.

In moving for dismissal, the charity-defendants argue that the Trustee's MUFTA-based case for avoidance against them fails, to the extent that the payments of money on which he sues took place more than two years before the index-point for the limiting cutoff under the 2012 amendment.[11] For the Sabes Foundation, this would terminate the Trustee's right to relief under Counts XIV - XVII, but only in part--i.e. as to those payments it received before the two-year period of vulnerability to avoidance that remains under MUFTA after the 2012 amendment.[12] Counts XII and XIII, premised on 11 U.S.C. § 548, would not be affected at all. However, it would result in the dismissal of the Trustee's full case against The Minneapolis Foundation and the Northwestern Foundation. As to them, all payments in suit under the Trustee's pleading were made before the two-year window of vulnerability.

Under the 2012 amendment, the argument is that the Debtors' payments to the movants are not cognizable as transfers subject to avoidance under MUFTA. As the movants

---

[11]For this litigation, that index-point would be the date of the bankruptcy filing for the debtor-entity as to which a trustee is suing. *In re Petters Co., Inc.*, 494 B.R. 436-441 (Bankr. D. Minn. 2013). (Under an analysis structured by the empowerment provisions of 11 U.S.C. § 544, MUFTA's reference to the "commencement of" the subject "action" is irrelevant in litigation commenced by a bankruptcy trustee.) Under the Trustee's theory of suit in the wake of the grant of substantive consolidation, *see In re Petters Co., Inc.*, 506 B.R. 784 (Bankr. D. Minn. 2013), *appeal dismissed*, ___ B.R. ___, 2015 WL 1880000 (D. Minn. April 23, 2015), the index-point would be October 11, 2008, the date of PCI's filing. 506 B.R. at 852-853.

[12]The "Sabes Family Foundation Transfers" to which the Trustee's MUFTA-based case is directed, are defined in his complaint as all payments received "[f]rom in or about 2001 to the [applicable bankruptcy] Petition Date . . . ." Opportunity Finance/Sabes Complaint, ¶ 121.

would have it, they as recipients were "qualified charitable . . . organizations" within the amendment's contemplation; and the payments of money that PCI or other Debtors made to them were "contribution[s] of money or an asset." Thus, they argue, MUFTA bars the avoidance of all such payments that were not made within the two-year window that the 2012 amendment left intact within the scope of the previous definition. The amendment essentially creates an exception-by-definition; and the charity-defendants argue that the payments they received fall squarely within it.

## MOTIONS AT BAR, IN GENERAL

These are motions for dismissal. The movants argue that the Trustee's MUFTA-based case against them is not legally sustainable on the very facts he pleads. The theory is not that the Trustee is missing a pleaded factual basis for an element of his cause of action. Rather, it is that the law now bars him from maintaining his suit, regardless of whether his pleaded facts would have matched all elements of a case under MUFTA before the 2012 amendment. The movants insist that the 2012 amendment takes all of the pleaded payments made to them before the two-year window, out of the class of "transfers" that otherwise would be subject to avoidance.

In reductionist form, that is the argument. The Trustee's response is that the 2012 amendment requires the receipt of property from a debtor through a specific means--a "contribution" from that debtor--for the subject payments to be excluded from the class of "transfer" subject to avoidance. He points to the means through which the charity-defendants received the payments from the Debtors--under color of a financial instrument through which the movants were entitled as payees to receive money from PCI. He argues that the disbursements that the Debtors made through this structure simply did not qualify as "contributions" under the 2012 amendment.

The Trustee raises an alternate argument by way of belt-and-suspenders: his pleading preserves "transfer" status for all of the subject payments within the very structure of the 2012 amendment, under the rubric of "return on investment made by" a qualifying charity. This classification, he says, is merited because the charity-defendants received Debtor-made promissory

notes from third parties that themselves had originally invested in the Debtors by the lending memorialized in the notes; and then the charity-defendants received payment from the Debtors in the status of assignees from the original payees.  He even argues that two of the movants actively managed the rights under their received notes, as if the notes had been their own investments from their making.

Undeterred, the movants argue broader legislative intent.  The exception, they argue, is a broad shield against liability in avoidance, for any qualified charitable organization such as they characterize themselves.  They insist that legislative history mandates such a broad reading.

All of this high-minded argument about legislative text, intent, and policy does not change the present context of this controversy--which is multiple motions for dismissal by separate defendants.  Under the governing authority--Rule 12(b)(6)--the analysis goes in the first instance to the pleading of fact and the plausibility of it, as the basis for a claim for relief under the law invoked.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Intertwined with that, of course, is the question of whether the invoked law even reaches the acts pleaded and the facts implied by them, as a basis for affixing liability to the movant for dismissal.[13]

The relevant fact-pleading here is lodged in two different complaints.  Both are very lengthy.  The pleading runs to three different defendants, all of which interfaced with PCI and the other Debtors at different times and through many different payments of money.  The Trustee pleads, however, that all three of the charity-defendants received payment from the Debtors through the same transactional sequence:  they had received and then held a specific form of intangible

---

[13]This is the legally-based part of the analysis under Rule 12(b)(6)--i.e. whether "some viable legal theory" would support relief under the facts pleaded.  n.1, *supra*.

asset previously issued by the Debtors, that later generated the payments that they received from the Debtors. To be specific: the Trustee alleges that, prior to receiving the payments, the movants all held rights to payment from a Debtor or Debtors, under promissory notes that the Debtor or Debtors had originally issued ("made," in the term of art applicable to promissory notes) in favor of third parties. The charity-defendants had received their rights to payment under the notes, by taking assignments from the original payees.

However, from that common point the fact-pleading differs somewhat, as to each movant's actions while they held a note or notes after assignment. In particular, the pleading diverges as to whether a particular movant actively managed or exploited the rights under the notes before it received final payment in full. The Trustee now argues that this sort of conduct also bears on the availability of the statutory exception. In his pleading, he does not draw distinctions in that regard among the charity-defendants; he tries to make all of them out as "investors" in the Debtors, that would not be entitled to the shelter of the 2012 amendment.

In the end, it is not as easy as that. To properly focus a party-specific analysis, the pleading must be laid out separately as to each movant. From there, the viability of the Trustee's pleaded causes of action under the 2012 amendment can be determined, through the points common to the movants and those separate among them.

## CONTENT OF PLEADING

### 1. Against Northwestern Foundation
### [ADV 10-4352]

The pleading against the Northwestern Foundation is in the Metro Gem/Vennes Complaint. It describes the simplest historical sequence of the three.

The Trustee alleges that the Northwestern Foundation received "a transfer or transfers from PCI," in the status of an initial transferee or an immediate or mediate transferee of an initial transferee. Metro Gem/Vennes Complaint, ¶¶ 9, 27. It received these transfers in the right

12

of the payee under two promissory notes, originally given by PCI as maker in favor of separate third

parties.  It ultimately received payment on these notes in two different, lump-sum disbursements

of money.  These payments fully satisfied PCI's obligations under the notes.

The Trustee uses the phrase "the NWF Transfer" to signify the first disbursement.

As to the "NWF Transfer," he pleads:

> On or about December 24, 2001, Northwestern
> Foundation received a payment on a PCI promissory
> note issued to [Metro Gem, Inc.] on or about
> December 16, 2000, and the entirety of this payment
> was false profits as to Northwestern Foundation.

Metro Gem/Vennes Complaint, ¶ 91.

As the Trustee pleads it, the Northwestern Foundation had received the right to

payment under this note from one Frank Vennes.  Vennes is a co-defendant in ADV 10-4352 and

was the original payee under the note:[14]

> The NWF Transfer was comprised of a payment
> made by PCI pursuant to a promissory note payable
> to Northwestern Foundation.   On or about
> December 15, 1999, PCI issued a promissory note in
> the principal sum of $2,000,000, bearing an interest
> rate of 60% per year, that was due and payable to
> [Frank] Vennes on December 15, 2000, unless the
> promissory note remained unpaid, in which case it
> was to be automatically renewed.  The December 15,
> 1999 promissory note was assigned and/or
> transferred for no consideration by Vennes to
> Northwestern Foundation.  In or about December,
> 2000, the December 15, 1999 promissory note
> remained unpaid, and both interest and principal then
> owing on the promissory note was reinvested or
> "rolled" into a new promissory note in the principal
> sum of $3,200,000 issued by PCI dated
> December 16, 2000, payable directly to Northwestern
> Foundation pursuant to the promissory note's terms,
> once again at an interest rate of 60% per year.  The
> December 24, 2001 NWF Transfer was made for the
> purpose of paying the December 16, 2000

---

[14]In its temporal sequence, this paragraph's pleading is somewhat disjointed.

promissory note.

Metro Gem/Vennes Complaint, ¶ 102.  At the end of this paragraph, the Trustee alleges that "[t]he

NWF Transfer was not comprised of a contribution of money or assets of PCI."  *Id.*  The phrasing

of this allegation is cumbersome, but the point seems to put emphasis on the word "contribution."

If that is the case, this usage directly resonates with the 2012 statutory amendment.

In sum, the Trustee pleads that the Northwestern Foundation received a total of

$5,520,547.94, between the sum of $5,120,000.00 paid on the Vennes-associated note and a

second disbursement by PCI.  This latter payment satisfied a separate note, originally made in favor

of someone or something else:

> Of the Transfers [associated with Metro Gem and
> Vennes], $5,120,000 was paid by PCI directly to
> Northwestern Foundation, which as to Northwestern
> Foundation was a payment of false profits.
> Northwestern Foundation also was paid an additional
> $400,547.94 by PCI pursuant to the terms of a
> promissory note issued to a third party (the
> "$400,547.94 Transfer").

Metro Gem/Vennes Complaint, ¶ 93; and

> On or about June 14, 2002, Northwestern Foundation
> was paid an additional $400,547.94 by PCI pursuant
> to the terms of a promissory note issued to a third
> party (the "$400,547.94 Transfer").   The entire
> $400,547.94 also is the payment of a net cash gain
> to Northwestern Foundation.

Metro Gem/Vennes Complaint, ¶ 104.  To like effect, the Trustee then states: "The $400,547.94

Transfer was not comprised of a contribution of money or assets of PCI."  *Id.*

The Trustee characterizes the payment made on the Vennes-associated note as

follows:

> The NWF Transfer was a return on investment made
> by the Northwestern Foundation on the promissory
> note paid by PCI, first as payable pursuant to the
> December 15, 1999 promissory note, which was
> rolled into the December 16, 2000 promissory note as

14

> principal and accrued interest, and then as payable
> pursuant to the December 16, 2000 promissory note.
> The entire NWF Transfer is the payment of a net
> cash gain to Northwestern Foundation, which paid
> nothing for the $5,120,000 it received.

Metro Gem/Vennes Complaint, ¶ 103.  The emphasis here on "return on investment" is obviously in mind of the 2012 statutory amendment.  The Trustee reiterates that the payment was funded by "substantial amounts of other investors' money that, instead of financing legitimate transactions, was used to pay Northwestern Foundation."  Metro Gem/Vennes Complaint, ¶ 101.

As to the second disbursement, the pleading has fewer specifics.  The Trustee does not identify the "third party" that originally received the note on which PCI is alleged to have made this second lump-sum disbursement, said to have been in the amount of $400,547.94.  Nor does he plead any facts as to how PCI legally satisfied its obligation on this note by making payment to the Northwestern Foundation, rather than to the original "third party" (i.e. by the third party previously having assigned the right to payment to the Northwestern Foundation, or through some other means).

The Trustee then pleads a relationship running among these defendants:  Frank Vennes (identified as the CEO, President, and shareholder of Metro Gem, Inc.) "served on the Board of Trustees of Northwestern College in St. Paul, Minnesota."  Metro Gem/Vennes Complaint, ¶¶ 10-11.[15]  In closing, the Trustee prays for judgment in avoidance of these two transfers, under

---

[15]There is no pleading as to a connection between Northwestern College and the Northwestern Foundation.  But despite that, the Trustee pleads, in a very generalized way:

> On information and belief, entities managed or controlled
> by Vennes undertook the financial transactions at issue
> in this action for the benefit of Vennes.  All actions of
> [Metro Gem, Inc., Metro Gem LLC,], and Northwestern
> Foundation, and claims against them, are attributable to
> Vennes, who is responsible at law and in equity for [their]
> actions . . . .

Metro Gem/Vennes Complaint, ¶ 11.  The connectivity within this is somewhat obscure.

four separate theories of fraudulence, active and constructive, under MUFTA.   Metro Gem

Complaint, Counts XVII - XXI.  These counts do not contain additional fact-pleading.

## 2.  Against The Minneapolis Foundation
## [ADV 10-4301]

The Trustee's pleading against the other two charity-defendants lies in the

Opportunity Finance/Sabes Complaint.   As a narrative, the pleading against The Minneapolis

Foundation is more involved than the pleading against the Northwestern Foundation in the Metro

Gem/Vennes complaint.

It is first alleged that "[c]ertain of the defendants [in ADV 10-4301] transferred and/or

assigned promissory notes to The Minneapolis Foundation, which received payments from PCI and

SPF Funding."[16]  Opportunity Finance/Sabes Complaint, ¶ 23.  It is alleged that this receipt made

> . . . The Minneapolis Foundation . . . an initial transferee of the
> fraudulent, preferential, or other avoidable transfers alleged in this
> Second Amended Complaint, or a person for whose benefit such
> transfers were made, or an immediate or mediate transferee of any
> initial transferee of such transfers.

Opportunity Finance/Sabes Complaint, ¶ 46.  The reason for the payments is attributed:

> Beginning on or about June 4, 2001 and continuing through on [sic]
> or about July 30, 2003, The Minneapolis Foundation received
> payments of net cash gains on promissory notes issued to
> Opportunity Finance, the Sabes Family Foundation, and Robert and
> Janet Sabes, individually, and signed by Petters.

Opportunity Finance/Sabes Complaint, ¶ 106.  Getting down to the numbers, the Trustee pleads:

> The Minneapolis Foundation engaged in at least ten note
> transactions in the principal sum of thirty-five million, eight hundred
> eleven thousand, six hundred and two dollars and fifty cents

---

[16]Earlier, the Trustee identifies Debtor SPF Funding, LLC as "an SPE [special purpose entity]
wholly owned by PCI."  Opportunity Finance/Sabes Complaint, ¶ 66.  He alleges that SPF Funding
"operated as [an] alter ego and shell compan[y] of PCI to the detriment of PCI's creditors."  Id., ¶ 47.  (The
Trustee generally describes the joint operation of PCI and its SPEs at ¶¶ 60-71 of the Opportunity
Finance/Sabes Complaint.  Under this description, an SPE like SPF Funding was supposed to function as
a named recipient of funds coming from a lender and as the disburser of them onwards.  The intended
function of the SPEs in the interface between the Petters enterprise structure and some of its lenders is
discussed in In re Petters Co., Inc., 506 B.R. 784, 789-791, 801-803 (Bankr. D. Minn. 2013).)

> ($35,811,602.50)  and received payments from PCI and from SPF
> Funding comprising net cash gains totaling eleven million, eight
> hundred fifty-two thousand, three hundred and seventy dollars
> ($11,852,370).

Opportunity Finance/Sabes Complaint, ¶ 109.  These "net cash gains" are defined:

> During the course of the Ponzi scheme, Opportunity Finance, the
> Sabes Family Foundation, and other entities that provided financing
> to them or that were controlled by the Sabes Family Defendants
> received distributions from PCI and from SPF Funding representing
> a return of the Principal invested by Opportunity Finance and the
> Sabes Family Foundation into the Ponzi scheme through purported
> investments secured by fictitious electronics transactions and also
> distributions representing False Profits. Similarly, The Minneapolis
> Foundation received distributions of net cash gains.

Opportunity Finance/Sabes Complaint, ¶ 107.  The returns that link to the "net cash gains" are

identified:  "The 'interest rates' that SPF Funding paid to The Minneapolis Foundation, utilizing

funds received from Petters through PCI, generally ranged from 18% to 42% on an annualized

basis."  Opportunity Finance/Sabes Complaint, ¶ 110.

Again responding to the 2012 amendment, the Trustee characterizes the relationship

among PCI as note obligor, the co-defendants as assignors, and The Minneapolis Foundation as

assignee and recipient of payment, as follows:

> The Minneapolis Foundation received transfers from PCI and SPF
> Funding that were comprised of payments made by or sourced in
> PCI and SPF Funding to pay promissory notes.  The SPF
> Funding/Minneapolis Foundation Transfers were not comprised of
> PCI or SPF Funding's contributions of money or assets.  The SPF
> Funding/Minneapolis Foundation Transfers were returns on
> investment made by The Minneapolis Foundation.  The SPF
> Funding/Minneapolis Foundation are summarized in Exhibit L,
> attached hereto.

Opportunity Finance/Sabes Complaint, ¶ 128.  The Trustee similarly categorizes The Minneapolis

Foundation as an "investor."  In doing this, he seems to reason out from two allegations:  the

purpose of the high rates of return that PCI promised on its notes[17] and the operation of PCI and

its affiliates as conduits for a massive commingling of lender-infused funds.[18]

The Trustee then makes a very specific allegation of fact that goes to his

characterization of The Minneapolis Foundation under the classification-scheme of the 2012

amendment:

> When confronted with a proposed reduction in "interest rates," The
> Minneapolis Foundation refused to accept a lower rate of return, and
> ultimately was excluded from further "investments" in PCI and SPF
> Funding.

Opportunity Finance/Sabes Complaint, ¶ 110.

Lastly, the Trustee lumps The Minneapolis Foundation with all of its co-defendants,

for his pleading of notice and knowledge and his assertion that they have legal exposure from

complicity in the Petters fraud:

> Opportunity Finance, the Sabes Family Foundation, The Minneapolis
> Foundation, and the Sabes Family Defendants, and the entities that
> provided financing to the Opportunity Finance Defendants, including
> DZ Bank, WestLB and WestLB NY, knew or should have known that
> they were benefiting from fraudulent activity, or at a minimum, failed
> to exercise reasonable due diligence with respect to Petters, PCI, PC
> Funding, and SPF Funding in connection with the Ponzi scheme.

Opportunity Finance/Sabes Complaint, ¶ 113.[19] Further in this segment of his pleading, the Trustee

impugns the Opportunity Finance entities and the Sabes individual defendants as having gained

---

[17]Namely, "to entice investors such as . . . The Minneapolis Foundation, to invest [in PCI and its affiliates] without employing reasonable due diligence . . . ." Opportunity Finance/Sabes Complaint, ¶ 64.

[18]"[Tom] Petters . . . expressly authorized and approved commingling of funds by and between numerous entities [in the Petters enterprise structure] . . . used solely as conduits of funds ultimately destined for . . . paying . . . The Minneapolis Foundation, and *other* investors." Opportunity Finance/Sabes Complaint, ¶ 87. The source of the funds used to make payment to The Minneapolis Foundation is identified as "in large part, . . . funds sourced from *other* investors." *Id.* (Emphasis added, in both.)

[19]In the Metro Gem complaint, the Trustee does not make such an allegation-in-the-collective against the Northwestern Foundation. *See* Metro Gem/Vennes Complaint, ¶¶ 92.a. - f. (discussing "Badges of Fraud Ignored by Defendants" but identifying only "Vennes and MGI" as those defendants); 93-95 and 101-106 (discussing payments made to the Northwestern Foundation but with no mention of knowledge or notice of underlying fraud).

actual knowledge of the fraudulence of pretensed transactions.  *Id.*, ¶ 113.a. - d.  He states that the same and other defendants were on notice of the possibility of underlying fraud from various "indicia" including the Petters enterprise's willingness to pay very high rates of interest and the fact that it was bearing them in sustained operation.  *Id.*, ¶ 114.a. - h.  The Minneapolis Foundation is not mentioned by name anywhere in this sequence of fact-allegations.

Again, in four counts that do not contain separate fact-pleading, the Trustee seeks judgment against The Minneapolis Foundation under the alternate statutory theories of fraudulent transfer.  Opportunity Finance/Sabes Complaint, Counts XVIII - XXI.

### 3.  Against Sabes Family Foundation
### (ADV 10-4301)

As among the three charity-defendants, the Trustee's pleading against the Sabes Family Foundation describes the most extended and involved relationship.

Initially, the Sabes Foundation is identified (tersely) as "a Minnesota-based trust . . . ."  Opportunity Finance/Sabes Complaint, ¶ 12.  Three different individual co-defendants, all members of the Sabes family, are identified as having roles relating to the Sabes Foundation: Robert W. Sabes, as "a founder," Opportunity Finance/Sabes Complaint, ¶ 14; Jon R. Sabes, as "a manager of the Sabes Family Foundation," Opportunity Finance/Sabes Complaint, ¶ 113.a.; and Steven Sabes, as "a trustee" of the Sabes Foundation.  Opportunity Finance/Sabes Complaint, ¶ 18.

As with the other two charity-defendants, the Sabes Foundation is characterized in a general sense as "an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Second Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers." Opportunity Finance/Sabes Complaint, ¶ 41.  It is alleged that the Sabes Foundation received its payments from the Petters enterprise structure from, or through, Debtor SPF Funding, LLC, which

19

is identified as a "limited liability company organized under the State of Minnesota [sic]", and "an

SPE wholly owned by PCI." Opportunity Finance/Sabes Complaint, ¶¶ 4, 66.[20]

> With more specifics on the relationship, the Trustee alleges that:
>
> [b]eginning on or about August 13, 2001 and continuing through at least May 9, 2007, the Sabes Family Foundation received SPF Funding's promissory notes signed by Petters as "President" of SPF Funding,

Opportunity Finance/Sabes Complaint, ¶ 105. Expanding on that, it is alleged:

> The Sabes Family Foundation engaged in at least 77 separate note transactions with SPF Funding in a note [sic] amount of two hundred fifty-one million, five hundred and eighty-eight thousand, three hundred ninety-seven dollars and fifty cents ($251,588,397.50).

Opportunity Finance/Sabes Complaint, ¶ 109. It is further pled that:

> [d]uring the course of the Ponzi scheme, . . . the Sabes Family Foundation, . . . received distributions from PCI and from SPF Funding representing a return of the Principal invested by . . . the Sabes Family Foundation into the Ponzi scheme through purported investments secured by fictitious electronics transactions and also distributions representing False Profits.

Opportunity Finance/Sabes Complaint, ¶ 107. The rates of return associated with these

transactions are identified:

> The "interest rates" that SPF Funding paid to . . . the Sabes Family Foundation, utilizing funds received from Petters through PCI, generally ranged from 14% to 42% on an annualized basis.

Opportunity Finance/Sabes Complaint, ¶ 110. As to the actual, transactional numbers, it is pled:

> From in or about [sic] 2001 to the Petition Date, the Sabes Family Foundation was paid at least thirty-four million, seven hundred and thirteen thousand, one hundred and ninety-one dollars, ten cents ($34,713,191.10) by SPF Funding and PCI (the "Sabes Family Foundation Transfers"), including at least $7,000,000 of principal, at least $19,013,191.10 of interest and $8,700,000 in satisfaction of an outstanding balance.

---

[20]Again, the joint operation of PCI and its SPEs is outlined at ¶¶ 60-71 of the Opportunity Finance/Sabes Complaint.

Opportunity Finance/Sabes Complaint, ¶ 121, and

> Of the Sabes Family Foundation Transfers, the Sabes Family
> Foundation received a net cash gain from SPF Funding and PCI in
> the amount of thirty-four million, seven hundred thirteen thousand,
> one hundred and ninety-one dollars and ten cents ($34,713,191.10).

Opportunity Finance/Sabes Complaint, ¶ 122.

The Trustee's attempt to conform his complaint to the 2012 statutory amendment

is the most involved for the Sabes Foundation.

The pleading gets lengthy and somewhat repetitious in an effort to characterize the

Sabes Foundation as an active "investor" in the Petters enterprise's ostensible business operations.

The Trustee classifies the Sabes Foundation as an investor, on the ground that it acquired, held,

and actively managed promissory notes issued by SPF Funding.  He alleges that SPF Funding

received "funds . . . from . . . the Sabes Family Foundation," as "investor funds," and then

channeled them through PCI "to further the Ponzi scheme by paying amounts due to earlier

investors."  Opportunity Finance/Sabes Complaint, ¶ 65.  The "distributions from PCI and from SPF

Funding" that the Sabes Foundation received are termed "a return of the Principal invested by . .

. the Sabes Family Foundation into the Ponzi scheme through purported investments secured by

fictitious electronics transactions[21] and also distributions representing False Profits."  Opportunity

Finance/Sabes Complaint, ¶ 107.  The Sabes Foundation is said to have "continued to invest in

PCI" after defendant DZ Bank stopped its senior lending to Opportunity Finance in mid-2003.

Opportunity Finance/Sabes Complaint, ¶ 114.f.  The Sabes Foundation is said to have been among

those parties engaged in "financing" "the purported purchases of electronic equipment."

Opportunity Finance/Sabes Complaint, ¶ 114.e.  At the end of things, the Sabes Foundation

---

[21]The reference here is to the nature of the pretensed business activity into which the Petters
entities drew lending, as found by several courts:  the purchase and resale of large lots of consumer-
goods inventory, ostensibly between retailers or wholesalers that had overstock and other retailers that
wanted such goods.  *E.g., Ritchie Capital Mgmt., L.L.C. v. Kelley*, ___ F.3d ___, ___, 2015 WL 1963696
*1 (8th Cir. May 4, 2015); *In re Petters Co., Inc.*, 506 B.R. at 789-790.

(collectively with the Opportunity Finance entity-group and the members of the Sabes family) is said

to have "invested no new money with PCI and PC Funding," after early December, 2007.

Opportunity Finance/Sabes Complaint, ¶ 113.d.[22]

In summation to his point on the Sabes Foundation's status under the 2012

amendment, the Trustee avers:

> The Sabes Family Foundation transfers were comprised of payments
> made by or that were sourced in PCI and SPF Funding to satisfy
> promissory notes for the purpose of paying promissory notes.  The
> Sabes Family Foundation transfers were not comprised of PCI's or
> SPF Funding's contributions of money or assets.  Instead, the Sabes
> Family Foundation Transfers were returns on *investment made* by
> the Sabes Family Foundation.  Transfers to the Sabes Family
> Foundation are summarized in Exhibit K, attached hereto.

Opportunity Finance/Sabes Complaint, ¶ 124 (emphasis added).

Beyond these broad averments of "investor" status, the Trustee alleges that during

the time the Sabes Foundation possessed Petters-made notes it held them more actively than

passively.  He pleads that:

> PCI caused PC Funding and SPF Funding to enter into the
> investments with . . .  the Sabes Family Foundation, and also for the
> benefit of the remaining defendants, and in return PCI caused PC
> Funding and SPF Funding to grant purported security interests to
> . . . the Sabes Family Foundation to secure the purchase of fictitious
> goods backed by fabricated invoices. . . . [T]he Sabes Family
> Foundation in turn granted and assigned security interests in the
> fictitious goods to the remaining defendants.

Opportunity Finance/Sabes Complaint, ¶ 96.  He asserts that the Sabes Foundation, in its own

active capacity, received false backup documentation for non-existent transactions.  Opportunity

Finance/Sabes Complaint, ¶ 113.b.[23]  The insinuation is that it received these documents to

---

[22]In passing, the Sabes Foundation is otherwise termed an "investor" in several other places.
*E.g.*, Opportunity Finance/Sabes Complaint, ¶ 87.  It is also termed a recipient of "Principal and False
Profits," in summary fashion.  *E.g.*, Opportunity Finance/Sabes Complaint, ¶ 102.

[23]The Trustee has previously identified the form of this as forged paper-format purchase orders
from ostensible buyers of consumer-electronics inventory from PCI.

evaluate the status of its ostensible security.  He also implies that the Sabes Foundation, as an *initially-named* payee on some notes issued by Petters-related entities, transferred the payee's rights to a third party, The Minneapolis Foundation.  Opportunity Finance/Sabes Complaint, ¶ 106.[24]

Finally, several aspects of the Trustee's pleading are common to all defendants in ADV 10-4301 and bear repeating.  He asserts the same function for the high interest rates contracted and paid to the Sabes Foundation, and for the commingling of investor funds and their redirection to the satisfaction of earlier investor-lenders.  Opportunity Finance/Sabes Complaint, ¶¶ 64, 87, 102, 114.d.  He characterizes the Sabes Foundation just as he did The Minneapolis Foundation, as a transactor-participant with the Petters operation that had knowledge of fraudulent activity or notice of the possibility of it, on the other side of its transaction; and thus he would have the same duty imputed to it and would have it subjected to the same consequences for breach.  Opportunity Finance/Sabes Complaint, ¶ 113.[25]

Once more, the substantive framing of the Trustee's claims against the Sabes Foundation under MUFTA is set out in four counts, numbered XIV to XVII.  These counts do not contain separate fact-pleading.[26]

---

[24]The facts pled in this paragraph are:

> Beginning on or about June 4, 2001 and continuing through on or about [sic] July 30, 2003, The Minneapolis Foundation received payments of net cash gains on promissory notes issued to . . . the Sabes Family Foundation . . . and signed by [Tom] Petters.

Opportunity Finance/Sabes Complaint, ¶ 106.

[25]Quoted *supra* at p. 16.

[26]As noted earlier, the Trustee invokes federal law to avoid transfers made to the Sabes Foundation within the two-year window of vulnerability under § 548(a)(1).  Those are framed in Counts XII and XIII and they are not germane to the Sabes Foundation's current motion for dismissal.

## DISCUSSION

## I. Introduction

The charity-defendants have moved for dismissal at a pre-pleading, pre-discovery stage of the litigation against them.   This means that their version of material facts is mostly irrelevant, because the Trustee's fact-pleading is assumed to be true.   *Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 730 (8th Cir. 2015); *Varga v. U.S. Bank, N.A.*, 764 F.3d at 836.   Further, at this point all reasonable inferences from the Trustee's fact-pleading are to be drawn in favor of the Trustee, as non-movant.   *Zayed v. Associated Bank, N.A,*, 779 F.3d at 732; *Simes v. Ark. Jud'l. Discipline & Disability Comm'n*, 734 F.3d 830, 834 (8th Cir. 2013).

Notwithstanding this, all three of the charity-defendants pushed the envelope by trying to shoehorn additional points of fact into the record for their motions.   This ploy has become common recently, as motions for dismissal have become the thing to make in the wake of the Supreme Court's recent jurisprudence on Rule 12(b)(6).[27]   However, it feels somewhat disingenuous; after all, the charity-defendants chose to make motions for dismissal as an early end-game strategy, rather than waiting to move for summary judgment after discovery--and they should accept the constraints of that election.   Motions for dismissal necessarily focus on specific *averments* of fact, as made by a party in pleading.   They do not concern the larger universe of possible facts that might be separately found on *evidence that is extrinsic to the pleadings*.[28]

---

[27]The reference here is, of course, to *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009).

[28]The approach under Rule 12(b)(6) in local precedent still is, ". . . the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record . . . as well as materials that are necessarily embraced by the pleadings." *Smithrud v. City of St. Paul*, 746 F.3d 391, 395 (8th Cir. 2014) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)).

Under this procedural posture, there is only one way a defendant moving for dismissal on the face of pleadings may go beyond the pleadings' averments to get more factual points into consideration: a proffer of extrinsic preexisting *documents.*  Such documents are limited to those "necessarily embraced by" the Trustee's fact-pleading.  This means those documents that preexisted the litigation, that are mentioned in or attached to the pleading or that are logically connected and directly relevant to the facts the Trustee avers.  *E.g.*, *Gorog v. Best Buy Co., Inc*, 760 F.3d 787, 791 (8th Cir. 2014); *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (2004).

This latter-day approach to Rule 12(b)(6) expands the consideration beyond the traditional "four corners" of a legal document drafted by attorney or party--i.e., the complaint.  That is defensible when the expanded material *is* the root-source of the litigation, i.e. the contract itself in an action for breach of contract.  *E.g.*, *Gorog v. Best Buy Co., Inc.*, 760 F.3d at 791; *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 876 (8th Cir. 2010); *Stahl v. U.S. Dept. of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).  However, much of the movants' effort to push such material into the record was directed toward peripheral issues--to challenge the Trustee's summary recitations of their forms of legal organization, for instance, or his expressions of doubt as to their true qualification as charitable organizations.  These points had no real bearing on the outcome of these motions for dismissal as they had been framed.  The movants attempted to vindicate themselves on these extraneities by injecting more documents into the record, but in the end this was only an annoyance.  It did not add value to the process.

With that said, the focus can get back to the proper object: the facts pled in two very long complaints.  From that, these motions can go forward on two main channels of argument, both premised on the 2012 amendment.

The movants' first argument is that the 2012 amendment erects an insuperable bar to relief in favor of the Trustee.  As they would have it, the amendment created a flat-out exception

25

from avoidance for *any* receipt of funds by them, as qualified charitable organizations, that they were paid on any promissory notes made by the Debtors, as long as the movants had previously received the notes via assignment from the original payees. For this argument they accept the Trustee's fact-pleading on its face. They argue that those facts establish the exception so undeniably that they never should have been sued on account of payments they received before the two-year window of vulnerability.

As a second argument, the movants strenuously deny that the payments they received were "return on investment" that would be subject to avoidance after the 2012 amendment. As to that, they take the *Twombly/Iqbal* tack: they deny that the Trustee pled a plausible factual basis for investor-status in them.

In sum, as they would have it, all of their receipt of funds outside the two-year window of vulnerability classifies as the fruit of a "contribution" and thus is not cognizable as a "transfer"; and so the Trustee has no right of avoidance against them as a matter of law and his MUFTA-based claims must be dismissed, in whole or in part, right now.[29]

Much densely-worded briefing and extended oral argument was submitted on these two fronts. The movants insist that the 2012 amendment is utterly clear on its face and perforce must be applied to the Trustee's pleading entirely in their favor, toward dismissal. The Trustee argues utter clarity as well--but in his favor.

Obviously, the sheer mass of these submissions undercuts both sides' insistence on a perfunctory resolution. Neither side's theories can be dismissed out of hand. This does require a close parsing of the statute against the face of the pleading. And that gets complicated because the 2012 amendment is clumsily constructed and confusingly placed.

---

[29]As noted earlier, p. 20, the Trustee pleads that the Sabes Foundation continued to receive payments from the Debtors until early 2007. If received within the post-2012 window of vulnerability, such payments would be subject to avoidance under either 11 U.S.C. § 547(a), or MUFTA; and hence the Sabes Foundation would remain a sued defendant even if the full run of transacting between the charity-defendants and the Debtors is subject to the 2012 amendment.

The methodology for that is of special concern, because a state statute is involved and hence the forum state's treatment of its own legislation must be followed. *Hortica-Florists' Mut. Ins. Co. v. Pittman Nursery Corp.*, 729 F.3d 846, 852 (8th Cir. 2013); *Finstuen v. Crutcher*, 496 F.3d 1139, 1148 (10th Cir. 2007); *Gershman v. Am. Cas. Co. of Reading, PA*, 251 F.3d 1159, 1162 (8th Cir. 2001). The movants' primary reliance on "legislative history" in their favor is problematic for one used to the approach in the federal system. This is not just because legislative history is to be consulted only if statutory language is ambiguous, on its face. *Phelps v. Commonwealth Land Title Ins. Co.*, 537 N.W.2d 271, 274 (Minn. 1995). In the ordinary course, the Minnesota state legislature does not seem to use published, comprehensive reports by committees of either house, to the degree that Congress does for much federal legislation. And contrary to the Northwestern Foundation's pitch, the Minnesota Supreme Court has *not* unequivocally endorsed the content of floor statements and debate in either house of the Legislature as controlling evidence of the full Legislature's intent behind particular enactments--however much that material may be currently available via sound recordings accessible on the World Wide Web.[30]

Rather, under Minnesota law the first resort is to the face of the statute itself, to determine whether the words are clear and free from ambiguity. *Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 72-73 (Minn. 2012). If the wording is free from ambiguity, the courts are to apply the words of the statute according to their plain meaning, absent express statutory definitions. *City of*

---

[30]The Northwestern Foundation cites *Amaral v. St. Cloud Hosp.*, 590 N.W. 2d 379 (Minn. 1999) for the proposition that the text of successive draft-versions of legislation and the individual remarks made at legislative-committee hearings on those versions may be used as conclusive or binding evidence of the legislature's intent for the *ultimate* enactment. The opinion contains no such endorsement. Though the *Amaral* court did term such material "legislative history," it noted that the "subcommittee discussion" before it was "limited and somewhat contradictory"; that at most a single (unnamed) participant's comment "implie[d]" a certain conclusion about particular text in the bill; and, most pointedly, "without more information, it [was] difficult to use this . . . to discern with any certainty the intended meaning of the [ultimately-enacted] language . . . ." 598 N.W.2d at 386. With virtually nothing consistent to rely on in a principled fashion, the *Amaral* court could scarcely have used the proffer before it as a platform for applying a particular tool for judicature. The suggested methodology was discussed by the Minnesota Court of Appeals in *Haage v. Steies*, 555 N.W.2d 7, 8-9 (Minn. Ct. App. 1996), but it does not appear that the Minnesota Supreme Court has made as pointed a statement.

*Brainerd v. Brainerd Invs. P'ship*, 827 N.W.2d 752, 755 (Minn. 2013). If a Minnesota statute is

ambiguous--i.e., susceptible to more than one reasonable interpretation--the courts are to apply the

codified guidance for the interpretation of statutes, Minn. Stat. Ch. 645, and the jurisprudence of

the Minnesota Supreme Court. *Alpine Glass, Inc. v. Ill. Farmers Ins. Co.*, 643 F.3d 659, 664-665

(8th Cir. 2011) (applying Minnesota law).

        One or more of the charity-defendants have argued that the 2012 amendment itself

is so clear on its face that further judicial "construction" is not necessary. That phraseology is off-

base. These motions raise issues that implicate the 2012 amendment's place in context, as part

of a full statutory scheme. The Trustee's pleading focuses on specific acts of the Debtors, which

did result in the charity-defendants receiving payments of money from the Debtors. The charity-

defendants argue that the 2012 amendment operates to shelter *their receipt* of the monies. To

different effect, the Trustee insists that the 2012 amendment excepts the factual consequence of

*a debtor's act of payment* from avoidance under the remaining provisions of MUFTA--and then only

a specific kind of act of payment.

        Treating both such positions on their terms brings the analysis to the Trustee's fact-

pleading on the means by which the charity-defendants became entitled to receive the payments

in question, and the right in which they received them. This all requires a broader scope of

inquiry--one that heeds the structure and sense of MUFTA as a whole, and not just the verbiage

of the recently-enacted exception to actionability. That language was added to a longer,

preexisting, and comprehensive statute; and heeding that is a mandate under Minnesota law.

Minn. Stat. § 645.16 ("Every law shall be construed, if possible, to give effect to all of its provisions

. . . ."); *ILHC of Eagan, LLC v. County of Dakota*, 693 N.W.2d 412, 419 (Minn. 2005) (". . . the

legislature must be presumed to have understood the effect of its words and intended the entire

statute to be effective and certain."). The 2012 amendment must be read together with the

unamended general text of MUFTA, reenacted without change from the amendment, as if the

combined text had been originally enacted as one section.  Minn. Stat. § 645.31, Subd. 1; *In re Phillips' Trust*, 90 N.W.2d 522, 529 (Minn. 1958).

### 2. Analysis

### a. 2012 Amendment As A Broad Shield?

On various articulations, all three charity-defendants argue that the 2012 amendment created a broad carveout from the statutory classification of "transfer," under the rubric of charitable "contribution."  They characterize the exception as being so broad that all of the payments they received from a Debtor or Debtors through the vehicle of a Debtor-made promissory note would be excepted from the statutory definition of transfer, even if the charity-defendants had not been the original named payees on the notes.  For them, their receipt of a payment from a Debtor qualifies as a sheltered "contribution" as long as the original payees had previously assigned their rights to payment to them as qualified charities, as a "contribution" by those original payees of all of their rights under the notes.

Though they do not articulate it as such, the movants are urging that the two separate passages of property rights under the pleaded scenario be collapsed for judicial analysis. They seem to think that the statute mandates this.

Under this notion, the original "donation of [a] note" to the charity-defendants would be treated as contiguous with the charity-defendants' later enjoyment of the benefit of that assigned status, i.e. the actual financial realization they had when a Debtor paid them.  Put another way, the "contributor-to-charity" parting-with-property would be collapsed into the later "Debtor-to-charity" parting-with-property.  The Debtors would be taken out of legal cognizance as actors, in order to avail a charity-defendant of the exception.  A Debtor's payment on its note would be related back to the original payee's donative act of assignment, to be considered as a fused "contribution" that cannot be an avoidable "transfer."

29

This is rationalized in a number of different ways.  Resort is made to the breadth of the general, pre-amendment definition of "transfer" ("every mode, direct or indirect . . . of parting with an asset or an interest in an asset . . .") to justify mumbling together the two separate acts of "parting" in the pleaded sequence of events.

Stacking on that, there is the conclusory pronouncement--without citation or legal authority--that "[t]he donation of the notes was, effectively, a donation of the funds of PCI and SPF Funding . . . ."  The Minneapolis Foundation's Memorandum, 7 [part of Dkt. No. 88, ADV 10-4301].  *See also* Defendant Northwestern Foundation's Memorandum, 15-16 [Dkt. No. 59, ADV 10-4352].

Finally, this after-the-fact collapsing is defended as consistent with general legislative intent behind the 2012 amendment: to protect charities from *all* exposure to fraudulent-transfer liability that would be based in any way on assets contributed to them more than two years before the initiation of suit.  Memorandum of Sabes Family Foundation, 7 [part of Dkt. No. 87, ADV 10-4301]; Reply Memorandum of Sabes Family Foundation, 3 [part of Dkt. No. 91, ADV 10-4301]; Defendant Northwestern Foundation's Memorandum, 14-16 [Dkt. No. 59, ADV 10-4352]; Defendant Northwestern Foundation's Reply Memorandum, 10 [part of Dkt. No. 61, ADV 10-4352].

The first two propositions are advanced to support a judicial fiction, shoehorning the payments made under the donated notes back into the original donors' acts of assignment. Donation and (much later) realization would be made into one big "contribution," excepted from avoidance at any stage.

The logic of this is facially obscure.  But in any event the notion is contrary to MUFTA's general contemplation of the acts that are subject to avoidance through its remedy.

The notion advanced to support a collapsing is that the original donors' assignment of payee status somehow worked a *contemporaneous* conveyance of actual extrinsic property *then held* by a Debtor-maker of the note, in a value sufficient to satisfy the later-maturing payment

obligation.[31]  No authority is cited for this rather metaphysical notion.  No documents that expressly provide for this corresponding passage are proffered.[32]

But in any event, in MUFTA's broader context the notion of such a matched, retrojected transfer makes no sense.  Under MUFTA, a transfer is effective at the point in time when the passage of property rights is "so far perfected that a creditor on a simple contract cannot acquire a judicial lien" on the subject asset, under applicable law other than MUFTA.  Minn. Stat. § 513.46(1)(ii); *Citizens State Bank Norwood Young America v. Brown*, 849 N.W.2d 55, 62-63 (Minn. 2014).  By the very wording of the movants' argument ("was, *effectively*, a donation"), this deemed, judicially-retrojected pierce-through to the Debtor-maker's own assets would not have been perfected at all.  There is certainly no pleaded factual basis for it.  To all external appearance, all of the assets generally held by the Debtors at the instant of a note-payee's assignment would have remained right with the Debtors.  No money would have passed out of a Debtor's bank account *at that time*, to either payee-assignor or charity-assignee.  No other assets, tangible or intangible, would have been conveyed by an objectively-manifested grant.  And, most crucially, no act of transfer would have been put into a public record, as to *anything*--the payee's right or the underlying assets of the Debtor.

Without such perfection as to the Debtor-maker's contemporaneous interest in its own assets, how could a charity-assignee have prevented a judgment creditor of the Debtor-maker from levying on any or all of the Debtor-maker's assets, then or thereafter?  The charity's status was only that of an assignee-payee, without security for the Debtor's obligation of payment.  It would have no *in rem* remedy against the Debtor's general assets and would be relegated to *in personam* suit on the promise to pay memorialized in the note, to get its due.

---

[31]Both The Minneapolis Foundation and the Northwestern Foundation rely on this argument.

[32]One hates to acknowledge it, but if such documentary support had existed it certainly could have been pushed into the record under the notion of being "necessarily embraced" by the facts pled in the Trustee's complaint.

Under the facts pleaded by the Trustee, assets of the Debtors themselves were *not* contributed when the original donors benefited the charity-defendants by "assigning the notes" to them.  The Debtor-makers' later payout on the note was not a continuous extension or conjunction of any "contribution" through which the charity-defendants originally received the *rights* to such payment.

Another defect in this argument is that MUFTA lacks any express or implied provision for it.  *See Finn v. Alliance Bank*, 860 N.W.2d 638, 647-648 (Minn. 2015) (rejecting judicial recognition of Ponzi scheme presumption for fraudulent-transfer cause of action, on ground that "MUFTA does not contain a provision allowing a court to presume fraudulent intent" in that context).

In actuality, MUFTA's text cuts to the opposite--in both the express language of the 2012 amendment and the statute's general prescriptions for its application.  As the *Finn* court observed, "the focus [of the avoidance remedy under MUFTA] is on individual transfers, rather than a pattern of transactions . . . ." *Finn*, 860 N.W.2d at 647.[33]  This pronouncement was gleaned from a threshold limitation in MUFTA's conceptual structure:  the subject of the avoidance remedy is identified in Minn. Stat. §§ 513.44(a) and 513.45(a), as a "transfer made or obligation incurred *by a debtor*" (emphasis added).  *Id.*  Thus, the burden of the plaintiff in fraudulent-transfer litigation is to prove up all statutory elements, factually linked to the specific transfer that the plaintiff seeks to avoid, rather than "relying on a presumption related to the form of or structure of the entity making the transfer."  *Id.*

---

[33]A disclosure: the closing ellipsis in this quotation takes the place of the words "that are part of a greater 'scheme.'"  The *Finn* court used this observation to buttress its categorical rejection of a "Ponzi scheme presumption." (Numerous federal courts had previously framed and adopted the presumption when applying other states' enactments of the Uniform Fraudulent Transfer Act or 11 U.S.C. § 548(a), to avoidance litigation in bankruptcy or receivership proceedings to remediate failed Ponzi schemes.)  The *Finn* court defined the remedy with a tight, textually-based focus, to reject the presumption as a shortcut for fact-finding.  Whatever the merits of that outcome, the court was unequivocal in identifying the necessary target of avoidance under MUFTA, as *individual transfers of assets*.  That recognition has larger implications that cannot be gainsaid.

This analytic prescription is strongly-voiced and it has an inescapable corollary thrust. The same specificity of focus must be demanded of both sides insofar as the scope of avoidability under MUFTA is concerned. Shortcuts in fact-finding or legal analysis are discouraged, absent specific statutory warrant.[34] The post-hoc fiction of transaction-collapsing urged by the movants has no basis in the text of the 2012 amendment. Thus, it is an impermissible shortcut.

Then there is this. The language of the 2012 amendment is lodged in MUFTA as a comprehensive enactment. That subsidiary placement makes it clear: the exception under the 2012 amendment is limited to direct "contributions" *from a debtor*, *of that debtor's property*, to the qualifying charitable organization that is then to be statutorily-protected. The holistic reading required by statute and *In re Phillips' Trust* leads inescapably to this conclusion, from several components of MUFTA that are extrinsic but foundational to the 2012 amendment.

First, one concession: it is true, as the movants emphasize, that the amendment's words that describe the class of excepted acts, "a contribution of money or an asset made to a qualified charitable or religious organization or entity," do not include the modifying words "by the debtor" or "of the debtor." The movants would assign pivotal significance to this omission. Defendant Northwestern Foundation's Memorandum, 14 [Dkt. No. 59, ADV 10-4352] ("The legislature did not modify the charitable contribution exclusion by limiting it to a "debtor's" contribution").

But this argument is myopic. It was not necessary to add the modifying phrase there, because the amendment itself has a subsidiary position in MUFTA's definitional structure.

---

[34]One such shortcut is the rebuttable presumption of fraudulent intent that arises on the establishment of sufficient circumstantial badges of fraud. It, however, is supported in the statutory text-- specifically, the enumeration of such badges as an aid for fact-finding in Minn. Stat. § 513.44(b). *Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d 857, 861 (8th Cir. 2015) (applying MUFTA; affirming bankruptcy court's finding of actual fraudulent intent on presumption arising from unrebutted proof of multiple badges). *See also Citizens State Bank Norwood Young America v. Brown*, 849 N.W.2d at 65-66 (stating that "presence of several badges of fraud . . . creates an inference of fraud that requires clear evidence of a legitimate purpose to rebut").

The class of "transfer" from which a "contribution" is to be excepted is bounded by the opening language of the definition, and by twinned further definitions: a "transfer" is a "disposing of or parting with an asset or an interest in an asset," Minn. Stat. § 513.41, Subd. 12, and "asset" is defined in turn as "property *of the debtor*," Minn. Stat. § 513.41, Subd. 2 (emphasis added).

The statutory structure, then, is utterly clear: a potentially broader class of events that is not limited by identity of parties is narrowed definitionally to acts involving the property of the referent debtor. The exception under the 2012 amendment necessarily carves out in turn, from that narrower class. Thus, a "contribution of money or an asset" that otherwise transactionally qualifies as a "transfer" also has to be read as a disposing of or a parting with property of the referent debtor. It cannot be otherwise if there is to be any logical sense to the hierarchy of MUFTA's definitions. (Put another way, if "contribution" were to extend to disposings or partings effected by parties other than a debtor, thus necessarily of assets other than the assets of a debtor, the "exception" would cover subject matter that is beyond the original scope of the acts that MUFTA regulates.)

In some respects, this is an application of the set theory of middle-school mathematics, to legislative classification. Through it, the exception only applies to contributions actually made by the referent debtor, of its own assets and to a qualifying charity-recipient.

This conclusion is further reinforced by two aspects of another part of the architecture of the 2012 amendment: the provisions that preserve some exposure to avoidance for charitable contributions via the surviving two-year window of vulnerability. For contributions made within the two-year period, avoidance may lie against a charity-recipient where ". . . *the debtor* made *the* charitable contribution with actual intent." Minn. Stat. § 513.41, Subd. 12(i) (emphasis added). It may also lie where "*the debtor*" was insolvent or otherwise financially distressed per statutory definition, contemporaneously with or after ("by reason of") *the contribution itself*. Minn. Stat. § 513.41, Subd. 12(ii) (emphasis added). However, the "two-year transfer" may be avoided on this latter ground only to the extent that the contribution exceeded certain amounts that are statutorily

34

fixed or determined *exclusively* with reference to *the debtor's* income or *the debtor's* past practice in making charitable contributions.

The substantive requirements in these provisions resonate with MUFTA's extrinsic, broader notions of actual and constructive fraud. The provisions narrow the range of avoidability as to charitable contributions that were made even within the two-year window. In doing that, the structure makes it clear: for the purposes of this continuing exposure, *the debtor* need have made the contribution-transfer with specific effect *on that debtor*, and under the described circumstances that relate *to that debtor*. This all contemplates the "contribution" to the charity having made by the debtor, and this is all a matter of the statute's explicit language.

When that textual analysis is applied to the Trustee's pleading and the extrinsic materials proferred by the movants, the outcome is straightforward. Under the post-2012 structure of MUFTA's governance, neither the relevant transferor- and transferee-parties here, nor the pleaded acts of transfer, are postured so as to trigger the shelter-by-exclusion for charitable contributions.

On the fact-averments of the pleading, there would have been "contributions" in relation to Debtor-made notes, in the limited sense of "giving" gratuitously with donative intent and in support of the charity-defendants' missions, at only one point in the notes' history after the Debtors issued ("made") the notes.[35] The earlier assignment of payee-status under Debtor-made notes, *from* the original payees *to* the charity-defendants, might qualify in the abstract as "contributions" by those assignors, within the statute's general contemplation.[36] But those acts by

---

[35]"Contribution" is not defined in the 2012 amendment, but it is dictionary-defined as "act of contributing." WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (2002 ed.) at 496. In turn, "contribute" is defined as "to give a part to a common fund or store; lend assistance or aid to a common purpose . . . ." *Id.* The use of dictionary definitions is appropriate when "analyzing the plain and ordinary meaning of words or phrases . . . ." *State v. Peck*, 773 N.W.2d 768, 772 (Minn. 2009).

[36]The Trustee's pleading does not use the words "charity," "charitable," or "contribution," in connection with *any* event of assignment, disposition, or parting with rights in the Debtor-made notes. He does not even concede any of the charity-defendants' status as qualifying charities potentially under the

the original payees to part with *their* property would not have involved any of the Debtors as actors--
i.e. *as contributors*. And they would not have been made with property of any Debtor.

In the history of the Debtor-made notes, the only partings-with-property that might
have been charitable contributions in a broad sense . . . are not the transfers that the Trustee seeks
to avoid. He would not even have the legal power to avoid the original assignments: the
transferors--Vennes or Metro Gem, persons or entities among the non-foundation Sabes
defendants, the unnamed second donor to the Northwestern Foundation--are not (per the pleading)
debtors in bankruptcy at all, let alone the debtors in bankruptcy as to whose estates the Trustee
is empowered to exercise avoidance powers.[37]

The Trustee does plead to avoid transfers made by "*his*" Debtors. He pleads no
facts at all, that would support classifying their acts of payment to the movants as charitable
contributions. To the contrary, the Trustee's pleading has only one factual thrust: in making the
payments the Debtors acted in discharge of their facial obligations under the notes. There is no
fact-pleading at all, as to gratuitousness in disbursement or a charitable-donative intent on the
Debtors' part, when they made the payments. And the movants have not submitted any extrinsic
material that would go to that specific point.

---

amendment's protection. Nor does he plead any facts going to a donative intention on the part of the
original payees on their assignment to the charity-defendants. This circumstance is a large hole in the
charity-defendants' procedural structure for this motion. They claim the benefit of a defense founded on
the notion of a contribution to a qualifying charity, and assert that character for their original receipt of
payees' rights and all consequences of it. However, to fit the argument into the *post-Twombly* theory of a
motion for dismissal they needed a basis in *pleaded* fact to make out that character and thus their
defense; and there is none. To get to an outcome now, an inference or inferences to support "contribution"
status might be made from any Trustee-pleading (no matter how vague) that goes to the charity-
defendants' status, plus the extrinsic materials proffered by the charity-defendants as "necessarily
embraced by" the Trustee's pleading. Such bases are scattered and mostly slight, but the inferences can
be conceded to the charity-defendants without diminishing the Trustee's position.

[37]Note, once again, the nature of a trustee's empowerment via 11 U.S.C. § 544(b)(1): he can
"avoid any transfer of an interest of the debtor in property," that debtor being the person or entity in
bankruptcy through the case in which the trustee has sued, 11 U.S.C. § 101(13).

Particularly in light of *Finn*'s focused conception of MUFTA's remedy, the outcome is clear from the full statutory text.  MUFTA as a whole, with the 2012 amendment read in context, is a sufficient basis on which to determine whether the Trustee may maintain suit against the charity-defendants on his pleaded facts, on the acts of the Debtors that he identifies as avoidable transfers.  He is limited to avoiding "transfers" made by the Debtors.  On the facts he pleads--which are necessarily assumed to be true--the Debtors were not making "contributions" of their property when they acted as the makers of the notes to pay the charity-defendants as assignee-payees.  Under the fact-pleading as to all three of the movants, the Debtors' payments would qualify as transfers under the post-2012 text of MUFTA; they would not be excluded from that ambit.  His complaint is not to be dismissed on the ground that the 2012 amendment bars him from avoiding the payments.

### b.  Payments as "Return on Investment"?

Clearly, the Trustee framed his amended pleading in mind of the 2012 amendment, anticipating that the movants would assert the exception for charitable contributions.  He built an alternate part of his framing on an express distinction within the amendment: "[t]ransfer *does* include a return on investment made by a qualified charitable or religious organization or entity."  Minn. Stat. § 513.41, Subd. 12 (emphasis added).

This proviso is in close proximity to the carveout-language for "contribution."  That evidences the legislature's intent to draw a distinction for the purposes of the carveout.  *Dahlberg v. Young*, 42 N.W.2d 570, 575 (Minn. 1950) (function of proviso in legislation is to modify operation of statutory provision immediately preceding it, or to restrict or qualify generality of language that it follows).  The distinction separates between two different origins for a payment made by a potential defendant-in-avoidance to a qualifying charity.  Payments made as "contributions" would not be "transfers" possibly subject to avoidance.  Payments made as "returns on investment made by" the recipient would be "transfers" for the purposes of MUFTA.  And, both parts of that branching

37

apply when the recipient was a qualified charity.

The Trustee pled his facts to call up this distinction, and he did so from two frames of reference.  Anticipatorily, he declared that all payments that the movants had received from a Debtor were "not comprised of a contribution of money or assets of" a Debtor.[38]  Preemptively, he used such words as "investor," "investment," "return on investment," "rate of return," and "net cash gain" to signify the charity-defendants' status and role in the way they held the Debtor-made notes and then received payment as payees.

Taking a page directly from *Twombly* and *Iqbal*, the movants challenge the adequacy of the Trustee's preemptive fact-pleading.  They deny that he has pled enough facts to  make out an "investment" by them and a "return on" it that would still be subject to avoidance.  They attack his phraseology as "[t]hreadbare recitals of 'an' element[ ]" of his legal theory of recovery, and "mere conclusory statements," *Iqbal*, 556 U.S. at 678.  This, they insist, can not suffice as plausible factual support for a transfer potentially subject to avoidance.[39]

As part of this, they challenge the Trustee's pleading of the parties' history--insisting that it fails to describe how they became, or ever were, "investors" in PCI or any other Debtor.  The Minneapolis Foundation's Memorandum, 7.  *See also* Northwestern Foundation's Memorandum, 16 (asserting, responsively, that "NWF did not make an investment in PCI or any related entity").  At most, they say, the Trustee's pleading depicts them as passive recipients of "donations" of promissory notes, who "subsequently . . . received payments of interest and principal on the donated notes."  The Minneapolis Foundation's Memorandum, 7.

---

[38]The phraseology is clunky but the point is reasonably clear.

[39]Another phrase that cropped up at oral argument was "merely parroting the words of the statute."  This is a more accusatory way of expressing the same thought, that solely pleading a "formulaic recitation of the [legal] elements of a cause of action" in the abstract, does not meet muster as plausible. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

The Sabes Foundation takes an even sharper tone on this issue.  It accuses the Trustee of pleading no factual support at all for his characterization of payments to the Sabes Foundation as "returns on investment made by it."[40]  It then asserts that

> . . . we believe the Trustee is well aware that, in fact, starting in 1999 the [Sabes Foundation] received charitable gifts of promissory notes, on which the payee was the donor of the notes, not the [Sabes Foundation].  This is the way in which the charity became entitled to receive repayments of those notes.  Such receipt by a charitable organization of a contributed promissory note, and the payments flowing from that note, do not constitute an "investment made by" the organization for the purposes of [Minn. Stat.] § 513.41.

Memorandum of Sabes Family Foundation [part of Dkt. No. 87, ADV 10-4301], 8-9.

Whether approached as advocate or as court, addressing this issue is hampered by the same root-impediment as the other issue: the sparseness of the language of the 2012 amendment and the summary way in which it sets up its classifications.  The statutory language does not turn the exception from avoidance solely on the character or status of the recipient, i.e. "qualified charitable or religious organization."  A charity-defendant's receipt of a "return on investment" is still a transfer  potentially subject to avoidance.  The difficulty with the statute lies in the verb used to denote the genesis of an investment, the received fruits of which may still be subject to recovery by avoidance: the investment must have been "made by" the charity-recipient.

What does that mean?  Clearly, the received benefit of participation in a market transaction (the "investment") is not to be protected from avoidance like the passive receipt of a gratuitous contribution is.  However, what did the legislature contemplate as an investment "made by" a charity-recipient?  The choice of verb suggests some sort of intentional, volitional activity by the charity toward its receipt of a subject payment; but on its face the chosen verb does not specify

---

[40]In the Second Amended Complaint, ADV 10-4301, ¶ 124.

the *degree* of such activity.  Is the continuing vulnerability to avoidance limited to "investment" made or placed by a charity itself with the debtor-transferor--in the first instance, directly, proactively, and in its own right?  Or does it extend to the payout by a debtor-obligor on an income-producing debt instrument that previously had been donated as an asset to a charity-recipient, by a third party payee?  And finally--and more toward the thrust of the Trustee's argument--could such a donated, income-producing instrument like a promissory note, be deemed to have *become* an investment of the charity-recipient, if a passive receipt was followed by active management (rollover-and-renewal, negotiation toward higher interest rate, etc.) during a period of holding?  If so, what level of management would classify as the "making" anew of such an investment?  Would a more passive act--such as consensual extension by rollover-and-renewal at an original maturity date--be enough for the charity-payee to have "made" an investment?  Or must there have been more active assertion and decision-making during the holding period, like demanding or extracting higher interest, conceding different payment terms, or the like, before an eventual satisfaction of the note?

The verb "made by" and its active character denote the self-directed exploitation of a market presence.  If one gives a common-sense, plain-English reading to those words, the strongest implication is that a charity-recipient's passive holding of a donated debt instrument until full realization on the original maturity date would not be the "making" of an investment.[41]  But the Trustee does not plead that sort of spartan, non-engaged use of a donated debt instrument, as to any of the three movants.

As noted *supra* at 11-14, the pleaded historical sequence is the simplest as to the Northwestern Foundation.  Even that does not describe utter passivity on the charity's part, i.e. a handling of the Vennes-donated note as no more than a cash-equivalent with a delayed but fixed

---

[41]This does not mean, however, that the receipt of payout on a donated financial vehicle held passively throughout, would be avoidable.  It just means that it would not automatically qualify as a "transfer" on the ground that it had been a "return on investment."

realization.  As the Trustee pleads it, the note was subject to automatic renewal if not timely paid

and satisfied; and (per the pleading) that renewal did occur with a "reinvest[ment]" of accrued

interest and principal alike "into a new promissory note."  The logical inference here--to which the

Trustee is entitled on this motion--is that the Northwestern Foundation at least acquiesced to this

deferred realization and had the subsequent benefit of interest-compounding.  It did not insist on

its due upon the note's maturity; nor did it take its legal remedies at that time.[42]

        As to The Minneapolis Foundation, the pleaded narrative is markedly more

conducive to the inference of an actively-exploited investment during the period of two-plus years

when the charity held Debtor-issued notes.  As the Trustee pleads it, this relationship involved "net

cash gains"--apparently, the Trustee's alternate term for note-structured interest under his "false

profits" characterization--at unusually high marginal rates, plus multiple receipts and/or rollovers

of preexisting notes ("at least ten note transactions").[43]  Most to the point, there is the specific fact-

allegation made toward the inference of an active management of the Debtor-issued notes toward

maximizing the charity's realization: at some point in time The Minneapolis Foundation would not

consent to a proposed reduction of the note-fixed rate of interest--a concession presumably

suggested by the issuing Debtor--and as a result the ongoing relationship between The Minneapolis

Foundation and the Petters structure over the Sabes-donated notes was "ultimately" terminated.

*Supra*, 14-16.

        The Trustee does not plead either directly or inferentially that either the Northwestern

Foundation or The Minneapolis Foundation placed its own funds into the Petters operation in the

---

[42]As the Trustee's counsel noted at oral argument, the Metro Gem/Vennes complaint at Exh. K
sets out the Trustee's mathematically-based allegations as to how principal due and accrued interest were
treated on the "reinvestment."

[43]It should be pointed out, that the Trustee uses the term "rollover" in a summary, unelaborated
fashion.  It seems to designate an extension of the obligation to pay a note in full on its original due date.
However, the Trustee pleads nothing else as to what might have occurred on a "rollover": the execution of
a new note? a change of designated payee to the charity-assignee? an alteration of financial terms? an
execution of a separate consent, and by whom?

first instance, or that either was an original note-payee. All of the fact-pleading depicts both of them as the recipients of preexisting notes from payees that they now characterize as their own contributors. But, the pleading as to the way in which both handled their received payee's rights under the notes is consistent with the factual notion that they managed their notes as income-generators over time, using measures to ensure or increase the amount of money realized out of the holding. That, in turn, would be consistent with a legal theory that they succeeded to a status as investors in the Petters operation, by treating their donated assets toward their own aggrandizement--just as any investor logically would.

That, of course, would hinge on the notion that they "made" an investment at the point when they acceded to changes in the original payee's rights, in lieu of cashing out with the maker's performance when notes were originally due or taking legal action if the maker did not timely perform.

Whether the 2012 amendment would bear the latter proposition as a matter of construction is the issue. However, this is the only issue presented by the Trustee's pleading and it is one of law. If deemed true on its face, the Trustee's fact-pleading holds such a theory together, plausibly, up to that point.

The pleading for the Sabes Foundation, *supra* at 17-21, is the most direct and pointed narrative of an extended, complex, and bilaterally-active transactional relationship with the Petters organization. Much of this is done by lumping the Sabes Foundation together with the other Opportunity Finance defendants. All parties concede that the other Opportunity Finance parties were commercially-minded direct lenders to the Debtors on explicitly-documented credit transactions. The common branding of the Sabes Foundation and the other Opportunity Finance parties as investors is done by broad collective allegations: all of those defendants' "en[try] into . . . investments"; their grant, receipt, and assignment of associated security interests in the electronic-goods inventory ostensibly involved and the associated accounts receivable; their

42

common use of SPF Funding as a special-purpose intermediate entity in their transacting with the Petters structure; and the receipt by all of them of falsified purchase-order documentation in ostensible corroboration of the validity and quality of the "diverting" transactions behind the promissory notes.

To a degree, this mass of pleading tars the Sabes Foundation with investment-structured conduct by a simple association with its Sabes-related co-defendants. But the common averments do make some allegations against the Sabes Foundation specifically: of notes having been issued directly to the Sabes Foundation, *supra* at 21 n.19; direct action by the Sabes Foundation to "finance" the spurious inventory purchases, *supra* at 20; and the Sabes Foundation's termination of all "new" advances of money into the Petters operation after December, 2007, *id.*

Yes, the Trustee's pleading is vague as to the way in which the Sabes Foundation came into payee-status under the notes in question--i.e. whether it had named-payee status on their issuance, or took its rights to payment via assignment from an Opportunity Finance-related entity that had made the original lending and received original-payee status.[44] Nonetheless, an inference that the Sabes Foundation repeatedly "made" "investments" in the Debtors would be supported from the pleading of basic facts. That is so whether this pleading is read as attributing original-payee status, assignee-status, or a combination of both as to multiple notes held over a long relationship. That, too, would hold up plausibly under the Trustee's argument for the construction of the 2012 amendment, as a basis on which "transfer" status could be assigned to the Debtors' note-based payments to the Sabes Foundation.

With the very large number (77) of "note transactions" with SPF Funding that are attributed solely to the Sabes Foundation, *supra* at 18, this fact-pleading would facially support the

---

[44]For instance, ¶ 105 of the Opportunity Finance/Sabes complaint, quoted *supra* at 18, is just a little too cute in its imprecision: it is not pleaded, from just *what* party or by what means the Sabes Foundation "received SPF Funding's promissory note signed by [Tom] Petters . . . ."

inference of an ongoing, active, and direct investment relationship running from the Sabes Foundation into the Debtors. It does so by fairly pointed, direct characterizations as well. Whether this would prove-out under evidence from both sides is not the question at this time. The issue is whether the Trustee has pled enough facts, with deference to be given to him as to assumed truth and all reasonable inferences, on a legal theory that is "viable" under the applicable law.[45]

This brings it back around to the question of whether the active management of a payee's rights under a donated debt instrument is or becomes the "mak[ing]" of an investment by the recipient-charity, within the contemplation of the 2012 amendment. As a matter of interpreting a statute, this would be a question of law. *In re Racing Servs., Inc.*, 779 F.3d 498, 503-504 (8th Cir. 2015). In defending his pleading for the charitable defendants' status as investors, the Trustee did not phrase his argument as such. He was driving at that, particularly as to the Sabes Foundation when he characterized its long, involved transactional history with the Debtors as "evidenc[ing] an ongoing commercial relationship . . . that is the converse of contributions with donative intent." Trustee's Memorandum, 20. This assertion reflects off the statutory dichotomy; and as such, it posits investment-status for the donated rights of payment on an actively-managed holding of a debt instrument, even if the Sabes Foundation originally came into its payee-status via assignment.

---

[45]Again, the movants had a hard time keeping within the strictures of the procedure they chose to attack the Trustee's case against them at the outset. At oral argument, the Sabes Foundation's attorney complained that the Trustee was falsely attributing direct-lender status to his client. He also accused the Trustee of grievously mischaracterizing the way in which his client had received, held, and gotten benefit from payee-status under the many Debtor-issued notes in question. He expressly stated that his--i.e. *counsel's own*--"understanding of what happened here [was] different from" that which the Trustee's counsel had advanced, and that he (the Sabes Foundation's counsel) "[did] know the facts." References like this were out of place in an argument on a motion for dismissal. Any insinuation that the "truth" was entirely to the opposite of the Trustee's allegations is immaterial. The assertion of a different and competing set of facts would have had its place in an answer, a motion for summary judgment, or perhaps even a motion for judgment on the pleadings. But the Sabes Foundation has not yet condescended to responsively plead. Thus, its notion of a different reality on the material facts has no place in the current consideration. The Sabes Foundation chose to take its first salvo by a motion under Rule 12(b)(6)--and that strictly limits the subject matter for analysis to the adequacy of what the Trustee himself has pleaded.

For their own part, the charity-defendants do not recognize or argue this issue. Their denial of investor-status is all premised on an original act of third-party donation that would have impressed the ongoing benefits of holding payee's rights with an indelible and perpetual status of "contribution."

In the end, it is best left as follows: this ultimate substantive issue is not before the court on this motion. It can be raised later, on a motion for summary judgment. Particularly given the recency of the 2012 amendment and the current lack of appellate construction of it, it is best addressed on a developed record of specific historical fact, as to the charity-defendants' acquisition, holding, and intentional exploitation (if any) of the rights to payment under all of the notes before they were satisfied in full. That would set necessary context for an exploration of legislative intent, grounded in real-life considerations. For now, it can be said that the Trustee frames a "viable" legal theory as to the "making" of an investment under the sense of the 2012 amendment. It is not appropriate to go further than that, in the pinched perspective of a motion for dismissal under Rule 12(b)(6). A motion for dismissal is, by its nature, too straitened and skewed by the actual state of a given plaintiff's pleading and its vagaries as to frankness and specificity, to get into the ultimate "viability" of the Trustee's take on a novel statute.

## CONCLUSIONS

The charity-defendants are not entitled to the dismissal of the Trustee's actions for avoidance against them. The Trustee has pled claims on which relief may be granted against the charity-defendants, even in the wake of the 2012 amendment to MUFTA. The language of the amendment, in its context within the comprehensive statute, does not give the charity-defendants a broad shelter from suit as to payments they received in the status of payees under promissory notes made by the Debtors, even if they originally received those rights as a contribution via assignment from a prior holder payee-status. Nor, at this time, can it be held as a matter of law on the Trustee's fact-pleading, that they were not receiving return on investment made by them, when

the Debtors made payments of principal and interest to them.

**ORDER**

IT IS THEREFORE ORDERED:

1.       The motions of defendants The Minneapolis Foundation and the Sabes
Family Foundation in ADV 10-4301, for dismissal of the Plaintiff's Second Amended Complaint as
against them, are denied.

2.       The motion of defendant the Northwestern Foundation in ADV 10-4352, for
dismissal of the Plaintiff's Second Amended Complaint as against it, is denied.

BY THE COURT:

*/e/ Gregory F. Kishel*

_____
GREGORY F. KISHEL
CHIEF UNITED STATES BANKRUPTCY JUDGE