# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re | **Jointly Administered under<br>Case No. 08-45257** |
| Petters Company, Inc., et al., | Court File No. 08-45257 |
| Debtors. | Court File Nos.: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (GFK) |
| PC Funding, LLC; | 08-45326 (GFK) |
| Thousand Lakes, LLC; | 08-45327 (GFK) |
| SPF Funding, LLC; | 08-45328 (GFK) |
| PL Ltd., Inc.; | 08-45329 (GFK) |
| Edge One LLC; | 08-45330 (GFK) |
| MGC Finance, Inc.; | 08-45331 (GFK) |
| PAC Funding, LLC; | 08-45371 (GFK) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (GFK) |
| | Chapter 11 Cases<br>Judge Gregory F. Kishel |

Douglas A. Kelley, in his capacity as the
court-appointed Chapter 11 Trustee of
Debtors Petters Company, Inc.; PC Funding,
LLC; and SPF Funding, LLC,

          Plaintiff,

vs.                                                         ADV. NO.  10-04301

Opportunity Finance, LLC; Opportunity Finance
Securitization, LLC; Opportunity Finance
Securitization II, LLC; Opportunity Finance
Securitization III, LLC; International Investment
Opportunities, LLC; Sabes Family Foundation;
Sabes Minnesota Limited Partnership; Robert W.
Sabes; Janet F. Sabes; Jon R. Sabes; Steven
Sabes; Deutsche Zentralgenossenschaftbank AG;
West Landesbank AG; WestLB AG New York
Branch; and The Minneapolis Foundation,

          Defendants.

---

## THIRD AMENDED COMPLAINT

---

Douglas A. Kelley, in his capacity as the court-appointed Chapter 11 Trustee of Debtors Petters Company, Inc., PC Funding, LLC, and SPF Funding, by and through his legal counsel, Lindquist & Vennum LLP., as and for his Third Amended Complaint against defendants, Opportunity Finance, LLC, Opportunity Finance Securitization, LLC, Opportunity Finance Securitization II, LLC, Opportunity Finance Securitization III, LLC, International Investment Opportunities, LLC, Sabes Family Foundation, Sabes Minnesota Limited Partnership, Robert W. Sabes, Janet F. Sabes, Jon R. Sabes, Steven Sabes, Deutsche Zentralgenossenschaftbank AG, West Landesbank AG, WestLB AG New York Branch and The Minneapolis Foundation, states and alleges as follows:

### PARTIES

1.      Debtor Petters Company, Inc. ("PCI") is a corporation organized under the laws of the State of Minnesota with its principal place of business at 2005 Cargo Road, Minneapolis, MN 55450.

2.      PCI is, and at all times relevant herein was, wholly owned by Thomas Joseph Petters ("Petters"), an individual and citizen of the state of Minnesota.

3.      Debtor PC Funding, LLC ("PC Funding") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 2005 Cargo Road, Minneapolis, MN 55450.

4.      Debtor SPF Funding, LLC ("SPF Funding"), f/k/a Petters Finance, LLC, is a limited liability company organized under the State of Minnesota with its principal place of business at 2005 Cargo Road, Minneapolis, MN 55450.

5.      Debtors PC Funding and SPF Funding are, and at all times relevant herein were, wholly owned by PCI (PCI, PC Funding, and SPF Funding are collectively referred to in this Amended Complaint as the "Debtors").

6.      Defendant Opportunity Finance, LLC ("Opportunity Finance") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 South 6th Street, Suite 1200, Minneapolis, MN 55402. Opportunity Finance engaged in hundreds of financial transactions with PCI, PC Funding, and SPF Funding.

7.      Defendant Opportunity Finance Securitization, LLC ("Securitization") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 South 6th Street, Suite 1200, Minneapolis, MN 55402.

8.      Defendant Opportunity Finance Securitization II, LLC ("Securitization II") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 South 6th Street, Suite 1200, Minneapolis, MN 55402.

9.      Defendant Opportunity Finance Securitization III, LLC ("Securitization III") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 200 South 6th Street, Suite 1200, Minneapolis, MN 55402. Securitization, Securitization II, and Securitization III funded various transactions by and between Opportunity Finance and PCI, PC Funding, and SPF Funding and held security interests in the proceeds of fictitious commercial transactions, as more fully described below.

10.      International Investment Opportunities, LLC ("IIO") is a limited liability company organized under the laws of the State of Minnesota that served as an investment vehicle

3

for Robert W. Sabes and Janet F. Sabes.  IIO claimed at times pertinent to this Third Amended Complaint to have become defendant Opportunity Finance.

11.    At various points within this Third Amended Complaint, defendants Opportunity Finance, Securitization, Securitization II, Securitization III, and IIO are referred to collectively as the "Opportunity Finance Defendants."

12.    Defendant Sabes Family Foundation is a Minnesota-based trust located at 220 South 6th Street, Minneapolis, MN 55402, c/o Steven Sabes, Trustee.

13.    Defendant Sabes Minnesota Limited Partnership ("Sabes LP") is a family partnership formed by the members of the Sabes family on December 4, 1996 under the laws of the State of Georgia with its principal office at 60 South 6th Street, Suite 950, Minneapolis, MN 55402. Robert W. Sabes is the general partner of Sabes LP, which was registered to do business in Minnesota as a foreign limited partnership on January 8, 1997. Sabes LP engaged in financial transactions with PCI  for the benefit of the Sabes family.

14.    Defendant Robert W. Sabes is a resident of the State of Nevada who formerly resided in the State of Minnesota. Robert W. Sabes is a founder of Opportunity Finance, the Sabes Family Foundation, and IIO. Robert W. Sabes, at times through the Opportunity Finance Defendants, engaged in financial transactions with PCI for the nominal benefit of various trusts. Robert W. Sabes formed and served as a principal of IIO, which also extensively engaged in financial transactions with PCI and which was merged into Opportunity Finance in the late 1990s or early 2000s. Robert W. Sabes served as the primary decision-maker on behalf of the Opportunity Finance Defendants and other entities that he managed and controlled concerning financial transactions undertaken with PCI, PC Funding and SPF Funding, and various companies controlled by Petters. On information and belief, entities managed or controlled by

Robert W. Sabes undertook the financial transactions at issue in this action for the benefit of Robert W. Sabes, members of his family, and trusts formed to fund the lifestyle of the Sabes family. All actions of the Opportunity Finance Defendants, and claims against them, are attributable to Robert W. Sabes, who is responsible at law and in equity for the actions of the Opportunity Finance Defendants.

15.     Defendant Janet F. Sabes is a resident of the State of Nevada who formerly resided in the State of Minnesota. Janet F. Sabes also undertook financial transactions with PCI. Transfers of money by PCI, PC Funding and SPF Funding directly to Robert W. Sabes and/or to Janet F. Sabes are referred to herein as the "Robert and Janet Sabes Transfers."

16.     On or about September 28, 1998, Robert W. Sabes, on behalf of IIO, formed Metro Gem, LLC ("MGLLC"), a Minnesota limited liability company, for the express purpose of providing funds to PCI through loan transactions similar to those in which IIO—and later Opportunity Finance—engaged separately. IIO was the majority owner of MGLLC, and Metro Gem, Inc., a Minnesota corporation owned entirely by Frank E. Vennes, Jr., was a minority owner of MGLLC. Vennes, through Metro Gem, Inc., also separately undertook numerous financial transactions with PCI and various companies controlled by Petters.

17.     Defendant Jon R. Sabes is a resident of the State of Minnesota, an attorney who graduated *cum laude* from the University of Minnesota Law School, and, at various times relevant to this Third Amended Complaint, served as the Chief Executive Officer and President of Opportunity Finance. Jon R. Sabes operated the Opportunity Finance Defendants on a day-to-day basis, but at all times did so subject to the directives of his father, Robert W. Sabes. On information and belief, entities managed or controlled by Jon R. Sabes undertook the financial transactions at issue in this action for the benefit of Jon R. Sabes, members of his family, and

5

trusts formed to fund the lifestyle of the Sabes family. All actions of the Opportunity Finance

Defendants, and claims against them, are attributable to Jon R. Sabes, who is responsible at law

and in equity for the actions of the Opportunity Finance Defendants.

18.    Defendant Steven Sabes is a resident of the State of Minnesota. Steven Sabes

holds a Ph.D. in organic chemistry from the University of Minnesota and formerly served as a

principal of Opportunity Finance and as a trustee of the Sabes Family Foundation. On

information and belief, entities managed or controlled by Steven Sabes undertook the financial

transactions at issue in this action for the benefit of Steven Sabes, members of his family, and

trusts formed to fund the lifestyle of the Sabes family. All actions of the Opportunity Finance

Defendants, and claims against them, are attributable to Steven Sabes who is responsible at law

and in equity for the actions of the Opportunity Finance Defendants.

19.    Defendants Robert W. Sabes, Janet F. Sabes, Jon R. Sabes, Steven Sabes, and

Sabes LP are referred to at various points within this Third Amended Complaint as the "Sabes

Family Defendants."

20.    Defendant Deutsche Zentralgenossenschaftbank AG ("DZ Bank") is a

commercial cooperative bank organized under the laws of Germany with its principal place of

business in Frankfurt, Germany. DZ Bank funded transactions by and between the Opportunity

Finance Defendants and PCI and PC Funding. On information and belief, one or more of the

Opportunity Finance Defendants granted a security interest to DZ Bank in certain accounts

payable owed by PCI and PC Funding. DZ Bank is subject to personal jurisdiction in the District

of Minnesota on the grounds that it routinely conducted business within the State and District of

Minnesota and specifically did so with respect to financial transactions by and between the

Opportunity Finance Defendants, which were managed or controlled by members of the Sabes

6

Family Defendants. DZ Bank utilized a Minnesota bank in the course of business transactions with the Opportunity Finance Defendants. DZ Bank likewise is subject to personal jurisdiction in the District of Minnesota on the grounds that Federal Rule of Bankruptcy Procedure 7004 provides for nationwide service of process. This United States Bankruptcy Court therefore holds personal jurisdiction over any defendant with minimum contacts with the United States, such as DZ Bank.

21.     Defendant West Landesbank AG ("WestLB") is a commercial bank organized under the laws of Germany with its principal place of business in Dusseldorf, Germany. WestLB funded transactions by and between the Opportunity Finance Defendants and PCI and PC Funding. On information and belief, one or more of the Opportunity Finance Defendants granted a security interest in certain accounts payable owed by PCI and PC Funding to WestLB. WestLB is subject to personal jurisdiction in the District of Minnesota on the grounds that it routinely conducted business within the State and District of Minnesota pertaining to financial transactions by and between entities managed or controlled by members of the Sabes Family Defendants and undertook business transactions with Opportunity Finance. WestLB likewise is subject to personal jurisdiction in the District of Minnesota on the grounds that Federal Rule of Bankruptcy Procedure 7004 provides for nationwide service of process. This United States Bankruptcy Court therefore holds personal jurisdiction over any defendant with minimum contacts with the United States, such as WestLB.

22.     Defendant WestLB AG New York Branch ("WestLB NY") is a foreign branch of WestLB and, upon information and belief, is not a separate legal entity from WestLB.  WestLB NY has its principal place of business at 7 World Trade Center, 250 Greenwich Street, New York, NY, 10007.  Upon information and belief, WestLB NY entered into agreements with the

Opportunity Finance Defendants on or about May 2003 and again on or about March 16, 2005 to

fund transactions by and between the Opportunity Finance Defendants and PCI and PC Funding.

On information and belief, one or more of the Opportunity Finance Defendants granted a

security interest in certain accounts payable owed by PCI and PC Funding to WestLB NY.

WestLB NY is subject to personal jurisdiction in the District of Minnesota on the grounds that it

routinely conducted business within the State and District of Minnesota pertaining to financial

transactions by and between entities managed or controlled by members of the Sabes Family

Defendants, undertook business transactions with Opportunity Finance Defendants and sent

executives to Minnesota as part of those business transactions.  WestLB NY likewise is subject

to personal jurisdiction in the District of Minnesota on the grounds that Federal Rule of

Bankruptcy Procedure 7004 provides for nationwide service of process.

23.     Defendant The Minneapolis Foundation is an unincorporated organization located

at 800 IDS Center, 80 South 8th Street, Minneapolis, MN 55402. Certain of the defendants

transferred and/or assigned promissory notes to The Minneapolis Foundation, which received

payments from PCI and SPF Funding.

## PROCEDURAL BACKGROUND

24.     On October 3, 2008, pursuant to 18 U.S.C. § 1345, the United States District

Court of the District of Minnesota (the "District Court") placed PCI, PC Funding, and SPF

Funding into receivership in civil litigation commenced by the United States of America against,

among others, Petters and PCI (Court File No. 08-CV-5348) (the "Receivership Action").

25.     By Order of the District Court in the Receivership Action dated October 6, 2008,

as subsequently amended and restated on December 8, 2008, the District Court appointed

Douglas A. Kelley, Esq. ("Kelley") as equity receiver (the "Receiver") of any affiliates,

subsidiaries, divisions, successors, or assigns owned 100% or controlled by Petters, including PCI, PC Funding, and SPF Funding.

26.     As the court-appointed Receiver, Kelley serves as an agent of the District Court and in that capacity, Kelley had exclusive custody, control, and possession of the property, assets, and estates of PCI, PC Funding, and SPF Funding.

27.     On October 11, 2008 (the "Petition Date"), PCI, at the Receiver's direction, filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in Court File No. 08-45257.

28.     On October 15, 2008, PC Funding, at the Receiver's direction, filed a petition for relief under Chapter 11 of the Bankruptcy Code in Court File No. 08-45326. On October 15, 2008, SPF Funding, also at the Receiver's direction, filed a petition for relief under Chapter 11 of the Bankruptcy Code in Court File No. 08-45328.

29.     On October 22, 2008, this Court ordered the above-captioned bankruptcy cases be administratively consolidated as *In re Petters Company Inc., et al.* under case number 08-45257.

30.     On February 26, 2009, this Court approved the Office of the United States Trustee for the District of Minnesota's appointment of Kelley, as the Chapter 11 Trustee (the "Trustee") for all Chapter 11 debtors in this jointly-administered matter, which specifically included appointing Kelley as the Chapter 11 Trustee of PCI, PC Funding, and SPF Funding.

## JURISDICTION, VENUE AND STANDING

31.     This Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  The claims asserted herein arise under the Bankruptcy Code and are related to cases pending before this Court pursuant to the Bankruptcy Code.

32.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (F), (H), and (O).

33.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

34.     The Trustee has standing to assert the claims herein pursuant to Sections 323, 544, 547, 548, 550, and 1106 of the Bankruptcy Code.

## NATURE OF PROCEEDING

35.     The Trustee brings this adversary proceeding against the defendants pursuant to sections 105(a), 502, 506, 510, 542, 544, 547, 548(a), 550(a), and 551 of the Bankruptcy Code, the Minnesota Fraudulent Transfer Act, Minn. Stat. §§ 513.41-51, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states and other applicable law to recover preferences, fraudulent conveyances, damages, and disgorgement, prevent unjust enrichment, and to impose a constructive trust, in connection with transfers of property by PCI to the defendants—through the artifices of PC Funding and SPF Funding.

36.     Defendant Opportunity Finance is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

37.     Defendant Securitization is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

38.     Defendant Securitization II is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

39.     Defendant Securitization III is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

40.     Defendant IIO is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

41.     Defendant Sabes Family Foundation is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

42.     The Sabes Family Defendants are initial transferees of the fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint, or persons for whose benefit such transfers were made, or immediate or mediate transferees of any initial transferee of such transfers.

43.     Defendants Robert W. Sabes, Janet F. Sabes, Jon R. Sabes, Steven Sabes, Sabes Family Foundation, Sabes LP, The Minneapolis Foundation, and trusts formed, funded,

organized, or instigated at the instruction of the Sabes Family Defendants, or subject to the management or control of the Sabes Family Defendants, are the beneficiaries of fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint in many millions of dollars. The Sabes Family Defendants are responsible at law and in equity for these transactions.

44.    Defendant DZ Bank is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

45.    Defendants WestLB and WestLB NY are initial transferees of the fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint, or persons for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

46.    Defendant The Minneapolis Foundation is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Third Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

47.    At all times relevant hereto, PC Funding and SPF Funding operated as alter ego and shell companies of PCI to the detriment of PCI's creditors. On information and belief, the Sabes Family Defendants managed or controlled two accounts held at U.S. Bank in the name of "PC Funding" and one account held in the name of SPF Funding.  All such property transferred to the defendants by and under the name of PC Funding or SPF Funding—other than a PC

Funding account at U.S. Bank that, on information and belief, was managed and controlled by the Sabes Family Defendants—was property owned and controlled by PCI.

48.    The Trustee seeks to set aside such transfers, recover and preserve the property of PC Funding and the property of SPF Funding—which at all times relevant herein was the de facto property of PCI—for the benefit of defrauded individuals and organizations that are creditors of PCI.

## FACTUAL BACKGROUND

### I.    THE PETTERS PONZI SCHEME

#### A.    Petters and his Associates Utilized PCI and its Alter Egos—PC Funding and SPF Funding—to Conduct the Ponzi Scheme.

49.    This adversary proceeding arises from a massive fraud and Ponzi scheme designed and orchestrated principally by Petters and business organizations that he controlled.

50.    Petters operated the Ponzi scheme with the assistance of other individuals within certain Petters organizations from approximately 1993 through on or about the date of his arrest by federal agents on October 3, 2008. Petters, through various entities that he controlled, including PCI, PC Funding, and SPF Funding, laundered what is estimated to be an amount in excess of $40 billion.

51.    On December 1, 2008, Petters was indicted by a Federal Grand Jury in the District of Minnesota (the "Indictment"). The Indictment charged Petters and PCI with mail and wire fraud, conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering and charged Petters alone with money laundering, all in connection with the perpetration of, and resulting from Petters' and PCI's participation in, the Ponzi scheme. On June 3, 2009, a Superseding Indictment was filed charging Petters and PCI with wire and mail fraud, conspiracy

to commit mail and wire fraud, and money laundering conspiracy and charging Petters alone with money laundering, all in connection with Petters' and PCI's participation in the Ponzi scheme. On December 2, 2009, a jury in the District Court found Petters guilty of all 20 counts charged in the Superseding Indictment. On April 8, 2010, Judge Richard H. Kyle sentenced Petters to 50 years in prison for his crimes.

52.     At various times during the course of the Ponzi scheme, Petters was assisted in the operation of the scheme by numerous individuals and conspirators, including Deanna Coleman ("Coleman"), Robert White ("White"), Larry Reynolds ("Reynolds"), Michael Catain ("Catain") and James Wehmhoff ("Wehmhoff") (collectively referred to herein as the "Associates"). Coleman has pleaded guilty to a single count of conspiracy to commit mail fraud. On September 2, 2010, Judge Richard H. Kyle sentenced Coleman to one year and a day of imprisonment for her crime. White has pleaded guilty to a single count of mail fraud. On September 15, 2010, Judge Richard H. Kyle sentenced White to five years imprisonment for his crime. Reynolds and Catain have each pleaded guilty to a single count of conspiracy to commit money laundering. On September 13, 2010, Judge Richard H. Kyle sentenced Catain to seven years and six months of imprisonment for his crime. On September 14, 2010, Judge Richard H. Kyle sentenced Reynolds to ten years and ten months of imprisonment for his crime. Wehmhoff pleaded guilty to conspiracy to commit tax evasion, and one count of aiding and assisting in the filing of a false tax return. On October 18, 2010, Judge Richard H. Kyle sentenced the ailing Wehmhoff to one year of home detention and two years of probation.

53.     The scheme orchestrated by Petters and his Associates was a common species of fraud known as a Ponzi scheme. Petters, through a multitude of entities and with the assistance of his Associates, induced investors into financing the purchase of non-existent electronic

14

equipment purportedly secured by fabricated purchase orders. Petters then took the funds invested by later investors and repaid initial investors not with the earnings from their investments, but with funds obtained from other investors. The payments were comprised of repayment of the principal amount invested (the "Principal") and an amount which exceeded the amount invested (the "False Profits").

54.     Petters, through PCI and a multitude of shell companies through which PCI operated—such as PC Funding and SPF Funding—intended that the payments to early investors would induce ongoing, repeated, greater, and more widespread investment in the Ponzi scheme and thereby further perpetrate and extend the life of the fraud.

55.     By way of example, on or about December 17, 2001, Opportunity Finance entered into a Credit Agreement (the "Credit Agreement") with PC Funding. A true and correct copy of the Credit Agreement is attached hereto as Exhibit A. Plaintiff acknowledges that certain documents attached as exhibits to this Third Amended Complaint are not fully executed. Plaintiff's attached exhibits are provided as materials evidencing the course of dealing and transactions between the parties to this action. Under the Credit Agreement, Opportunity Finance made funds available to PC Funding for the purpose of financing the accounts receivable which would result from the sale of purported electronic goods. Each investment was evidenced by a promissory note. Under the Credit Agreement, PC Funding would make an investment proposal to Opportunity Finance and execute a note in favor of Opportunity Finance in order to receive funds.

56.     The promissory notes were secured by a Security Agreement (the "Security Agreement") entered into by PC Funding and Opportunity Finance on December 17, 2001. The Security Agreement provided Opportunity Finance with a security interest in PC Funding

consisting of all accounts, books and records, chattel paper, contracts, copyrights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, all money, cash or cash equivalents, and all proceeds of the foregoing. A true and correct copy of the Security Agreement is attached hereto as Exhibit B.

57.    PCI and PC Funding also entered into a Sale Agreement (the "Sale Agreement") on December 17, 2001. The Sale Agreement sets forth the terms and conditions under which PCI sells, conveys, transfers and assigns to PC Funding all of PCI's right to title and interest in each receivable owing to PCI from the sale of fictitious goods backed by fabricated purchase orders.

58.    As a part of its transactions with Opportunity Finance, PCI entered into an Assignment Schedule (the "Assignment Schedule") with PC Funding as contemplated by the Sale Agreement. Pursuant to the Assignment Schedule, PCI would assign to PC Funding its right, title, and interest in certain receivables backed by fabricated purchase orders. A true and correct copy of the Assignment Schedule is attached hereto as Exhibit C.

59.    To assist PCI in its fictitious financing of what Petters and his Associates represented to be the acquisition of retail merchandise, and with the affirmative endorsement of the defendants and others, PCI formed a number of wholly-owned special purpose entities ("SPE"). PC Funding and SPF Funding were two of several SPEs that Petters formed to operate the Ponzi scheme.

60.    Petters and his Associates told investors that funds paid to a specific SPE—such as PC Funding or SPF Funding—were to be used to purchase products, when in reality the funds were being funneled to PCI or other entities formed by Petters in order to pay earlier investors with funds received from later investors.

16

61.     To obtain investors in the Ponzi scheme, Petters portrayed PCI or the SPE as a middleman that purchased consumer electronic goods from wholesalers and resold the merchandise to large, "big box" retailers such as Costco, Sam's Club, and B.J.'s Wholesale Club. PCI and PC Funding, through Petters and his Associates, intentionally fabricated the documents to recruit investors into the Ponzi scheme. Petters and his Associates prepared and utilized fabricated documents that were represented to investors to be equipment purchase orders and related documents. The fabricated documents included, but are not limited to, (1) purchase orders from PCI to suppliers purportedly ordering electronic goods, and (2) purchase orders from retailers to PCI purportedly ordering electronic goods for purchase from PC Funding. The purchase orders and the related documents were entirely fabricated.

62.     Each SPE would execute a promissory note in order to obtain funds to finance the acquisition of fictitious merchandise. The promissory note would occasionally be personally guaranteed by Petters. A true and correct copy of a promissory note used by PC Funding to obtain funding from Opportunity Finance is attached hereto as Exhibit D.

63.     The fictitious merchandise was evidenced by fabricated equipment purchase orders in which the investors would acquire a security interest. A true and correct copy of a fabricated purchase order of PCI is attached hereto as Exhibit E, and a true and correct copy of a sample fabricated purchase order of Sam's Club is attached hereto as Exhibit F.

64.     The high rates of return that were promised to investors promoted two essential goals of the Ponzi scheme: (1) to entice investors, such as Opportunity Finance, the Sabes Family Foundation, and The Minneapolis Foundation, to invest without employing reasonable due diligence in Petters, PCI, PC Funding, and SPF Funding; and (2) to extend the life of the fraud and to enable Petters, PCI, and the SPEs to pay earlier investors in the fraudulent scheme.

DOCS-#4740096-V2

**B.      Petters and His Associates Used Middlemen to Conduct the Ponzi Scheme.**

65.      Petters and his Associates knew that investor funds—such as funds received by PC Funding from Opportunity Finance and the remaining defendants or funds received by SPF Funding from Opportunity Finance or the Sabes Family Foundation—would ultimately be transferred to PCI and used by Petters and PCI to conceal and disguise the nature, source, ownership, and control of the funds and to further the Ponzi scheme by paying amounts due to earlier investors. PCI, PC Funding, and SPF Funding did not purchase electronic goods with the funds the Sabes Family Foundation or the Opportunity Finance Defendants provided to them, but rather used the funds to pay off earlier investors who had amounts due, to financially prop up Petters' other businesses, and to fund Petters' lavish lifestyle.

66.      With respect to PCI's use of the SPEs, when investors would wire funds into an SPE that was wholly owned by PCI—such as PC Funding or SPF Funding—these funds were often wired through middlemen whose roles were to create the false and materially fraudulent appearance of acquiring the goods and then forward such funds, less a commission, to PCI.

67.      An illustration of how Petters systematically operated the Ponzi scheme through the SPEs of PCI is as follows:  Funds that were invested in the SPEs generally were transferred to either Nationwide International Resources, Inc. ("Nationwide") or Enchanted Family Buying Company ("Enchanted"). Nationwide is, and at all times relevant herein was, an entity owned and controlled by Reynolds and was used to conceal and disguise the nature, source, ownership, and control of funds used by Petters to further the Ponzi scheme. Enchanted is, and at all times relevant herein was, an entity owned and controlled by Catain and was used to conceal and disguise the nature, source, ownership, and control of funds used by Petters to further the Ponzi scheme.

18

68.     Petters and his Associates intended that Nationwide and Enchanted serve the role of the intermediary "suppliers" of the merchandise purportedly being acquired by PCI for resale.

69.     Petters engaged Catain, a Petters Associate, to open a bank account in the name of Enchanted in order to receive in that account funds derived from investors who were investing money in PCI through its SPEs. Catain, as directed, would immediately redirect money to PCI after deducting a commission from the Enchanted bank account.

70.     Petters similarly engaged Reynolds, another Petters Associate, to receive into a bank account opened in the name of Nationwide funds derived from investors who were investing money in PCI through its SPEs. Reynolds, as instructed, would immediately redirect money to PCI after deducting commissions from the Nationwide bank account.

71.     After extracting commissions for their respective roles in the Ponzi scheme, Reynolds (through Nationwide) or Catain (through Enchanted) would transfer the funds to PCI, which would then transfer some or all of those funds back to the particular SPE involved with the transaction for repayment of Principal and earnings in the form of False Profits, and for the payment of additional funds to PCI.

**C.     PCI Directly or Indirectly Through Its Alter Egos, PC Funding and SPF Funding—Made Payments That Were Fraudulent Transfers.**

72.     PCI would show a "profit" on each transaction because PCI's fabricated purchase order showing a big-box retailer buying the fictitious merchandise was always for an amount greater than that of PCI's fabricated purchase order to Nationwide or Enchanted for the same nonexistent merchandise. Petters and his Associates—through PCI, PC Funding, and SPF Funding—created fictitious profits at will on each and every transaction by simply writing in the appropriate quantity and price information on the two sets of purchase orders to "produce" the

necessary funds. For example, on September 14, 2005, Opportunity Finance entered into note transaction #091405-02 with PC Funding in the amount of $4,955,000. *See* Exhibit D. Opportunity Finance then took a blanket security interest in all the assets of PC Funding. *See* Exhibit B. A fabricated purchase order was produced by Petters, his Associates, and PCI showing that Nationwide was purchasing 2,800 Sony televisions for a total cost of $5,057,500. *See* Exhibit E. Petters and PCI then entered into an Assignment Schedule assigning to PC Funding its interest in the purchase order. *See* Exhibit C. Petters and his Associates correspondingly created another fabricated purchase order in the name of Sam's Club purchasing 2,800 Sony televisions from PCI for a total purchase price of $5,613,804. *See* Exhibit F. PCI ultimately paid Opportunity Finance, through its alter-ego PC Funding, $162,325.80 in False Profits and $4,955,000 in Principal leaving $496,478.20 in "profit" for PCI. Because no electronic goods ever existed in this transaction, funds transferred to Opportunity Finance and to the remaining defendants, and funds transferred by and between the defendants, were obtained from other investors to maintain the Ponzi scheme and to perpetuate the fraud.

73.     Because the transactions described in the fictitious purchase orders in fact did not exist, the only way PCI was able to transfer sufficient funds to the operative SPE was by money obtained from other investors, in other words, through the operation, control, and management of the Ponzi scheme by Petters and his Associates. Repayment of the Principal and interest in the form of False Profits to these investors comprised a Ponzi scheme because the payments consisted primarily, if not exclusively, of funds invested by other PCI investors.

74.     Petters, or Petters and his Associates, completely controlled and exercised adverse domination over PCI, Petters Group Worldwide, LLC ("PGW), and other debtor entities at all times relevant herein and until the Receiver was appointed and placed in control of these entities.

75.    Petters, as the owner, officer, and director of PCI, PGW, and other debtor entities, was a fiduciary of these entities and had a duty to disclose the fraudulent activities alleged in this Third Amended Complaint. Petters, in violation of his fiduciary duty, did not disclose the fraudulent activities to current or prospective investors or to other creditors of PCI, PGW, and other debtor entities.

76.    Petters, or Petters and his Associates, fraudulently and intentionally concealed the ongoing fraud in an effort to hinder and delay authorities and other current and prospective investors and other creditors of PCI, PGW, and other debtor entities from discovering the fraud.

77.    The concealment of the fraud, whether by Petters' silence, the fraudulent and intentional concealment of the facts constituting the fraud, or the adverse domination of PCI, PGW, and other debtor entities by Petters or Petters and his Associates, prevented the discovery of the ongoing fraud until the Receiver was appointed and placed in control of the entities and the Receiver was able to discover facts constituting the fraud alleged in this Third Amended Complaint.

78.    At all times material hereto, there was and is at least one or more creditors who held and who hold unsecured claims against the Debtors, including the following creditors holding allowed or allowable unsecured claims against the Debtors' bankruptcy estates as of the Petition Date (each a "Predicate Creditor"):

The PCI Debtors[1]

| Creditor | Scheduled as undisputed by Debtor | Proof of Claim No. | Allowed by Court Order | Amount |
|---|---|---|---|---|
| Greenpond South, LLC | | | PCI-25 & 26; PAC Funding-9, 10 and 11 | $141,290,116 |
| Theodore Deikel | | | PCI-40 | $6,122,543 |
| Ark Discovery II, LP | | PCI-41 Edge One-1 | | $107,207,101 |
| Interlachen Harriet Investments Limited | | PCI – 83 PC Funding-27 Thousand Lakes-30 SPF Funding-31 PL Ltd.-31 Edge One-33 MGC Finance-31 PAC Funding-33 Palm Beach-31 | | $60,000,000 |
| Leonard McHugh d/b/a Alliance Courier | Y | | | $13.33 |
| AT&T Mobility, LLC | Y | | | $1,392.27 |
| Federal Express Corporation d/b/a Fed Ex Express | Y | | | $130.62 |
| Associated Courier Inc., d/b/a Street Fleet | Y | | | $19.01 |
| T-Mobile US, Inc. | | PCI - 19 | | $139.68 |
| Verizon Wireless | | PCI - 27 | | $461.27 |

---

[1] The term "PCI Debtors" includes the substantively consolidated bankruptcy cases and bankruptcy estates of PCI, PC Funding, LLC ("PC Funding"), Thousand Lakes, LLC ("Thousand Lakes"), SPF Funding, LLC ("SPF Funding"), PL Ltd., Inc. ("PL Ltd."), Edge One, LLC ("Edge One"), MGC Finance, Inc. ("MGC Finance"), PAC Funding, LLC ("PAC Funding") and Palm Beach Finance Holdings, Inc. ("Palm Beach").

The PGW Debtor

| Creditor | Scheduled as undisputed by Debtor | Proof of Claim No. | Allowed by Court Order | Amount |
|---|---|---|---|---|
| Theodore Deikel | | | Y | $2,100,000 |
| Ark Discovery II, LP | | PGW - 9 | | $107,207,101 |
| Ameripride Services Inc. | | PGW - 44 | | $2,479.97 |
| Aquascapes, Inc. | Y | | | $259.23 |
| FedEx Customer Information Service, as Assignee of Federal Express Corporation d/b/a FedEx Express and FedEx Ground Package Systems, Inc. d/b/a FedEx Ground | | PGW - 10 | | $3,422.18 |
| Free Agent Consulting, LLC | Y | | | $472.50 |
| OfficeMax, Inc. f/k/a Boise Cascade Corp. | Y | | | $1,396.24 |
| Servicemaster of St. Cloud, Inc. | Y | | | $7,404.66 |
| Staffing Partners Inc. | | PGW - 40 | | $4,080.62 |
| Treat America Food Services | Y | | | $22,725.21 |
| United Parcel Service | Y | | | $94.28 |
| Verified Credentials, Inc. | | PGW - 42 | | $368.00 |
| Northern States Power Co., a Minnesota Corp., d/b/a Xcel Energy | | PGW - 41 | | $4,022.35 |

Of the Predicate Creditors listed above, the following creditors hold allowed unsecured claims against the Debtors' bankruptcy estates pursuant to court orders as described below:

a.    Greenpond South, LLC.  Between 2002 and the Petition Date, Acorn Capital Group, LLC ("Acorn") entered into multiple note transactions with PCI and PAC Funding (which promissory notes, security agreements and any related documents, certificates, instruments, agreements, and guarantees and all amendments, replacements, extensions or

restatements of any of the foregoing are the "Acorn Loan Documents")."  Asset Based Resource

Group, LLC ("ABRG"), as successor servicer to Acorn, filed proofs of claim against the PCI and

PAC Funding bankruptcy estates.  These proofs of claim were filed as Claim Nos. 25 and 26 in

the PCI bankruptcy case in the amounts of $10,190,873.37 and $20,607,384.33, respectively, and

Claim Nos. 9, 10 and 11 in the PAC Funding bankruptcy case in the amounts of $10,190,873.37,

$20,607,384.33 and $282,167,266.27, respectively.  ABRG holds an allowed unsecured claim

against the PCI and PAC Funding bankruptcy estates in the amount of $141,290,116 pursuant to

an Amended and Restated Settlement Agreement and Mutual Release entered into by and among

Kelley, as Trustee and Receiver; John R. Stoebner, as the Chapter 7 trustee of *In re Polaroid

Corporation, et al*., Bky. No. 08-46617; Petters Aviation, LLC and its wholly-owned subsidiary

Elite Landings, LLC; and ABRG dated January 26, 2011.  This Amended and Restated

Settlement Agreement and Mutual Release was approved by Orders entered in these bankruptcy

cases by the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy

Court") on February 9, 2011 (Dkt. No. 999), by the Bankruptcy Court on February 9, 2011 in *In

re Polaroid Corporation, et al*. (Dkt. No. 1282), and by the District Court in the Receivership

Action on February 8, 2011 (Dkt. No. 1772).  On or about December 2, 2011, ABRG transferred

its claims by assignment to Greenpond South, LLC.

   b.  Theodore Deikel.  PCI, Petters and Theodore Deikel ("Deikel") are parties to a

Promissory Note dated June 3, 2008 (the "Deikel Note").  Pursuant to the Deikel Note, Deikel

advanced a total of $10 million to PCI on or about June 3, 2008.   The Deikel Note matured

August 2, 2008.  On or about September 23, 2008, PGW made a transfer to Deikel in the amount

of $2,600,000 in partial payment on the Deikel Note.  Deikel filed a proof of claim against the

PCI bankruptcy estate as Claim No. 40 in the amount of $10,000,000.  Deikel paid a settlement

payment of $2,100,000 to PGW and holds an allowed unsecured claim against the PCI Debtors'

bankruptcy estate in the amount of $6,122,543 and an allowed unsecured claim against the PGW

bankruptcy estate in the amount of $2,100,000 pursuant to a Settlement Agreement and Mutual

Release entered into by and between Kelley, as Trustee and Receiver, and Deikel dated

December 2, 2010.  This Settlement Agreement and Mutual Release was approved by Orders

entered by the Bankruptcy Court in these bankruptcy cases on December 22, 2010 (Dkt. No.

818), and by the District Court in the Receivership Action on December 20, 2010 (Dkt. No.

1721).

79.     Of the Predicate Creditors identified in paragraph 78, the following creditors hold

allowed or allowable unsecured claims against the Debtors' bankruptcy estates.  The claims of

these Predicate Creditors against the Defendants did not arise, exist or accrue at any time until

within the six years before the first date on which a bankruptcy petition was filed by a debtor in

any of the above-captioned cases and such creditor did not discover facts constituting the nature

of the fraudulent activity of Petters' fraud and the Ponzi scheme at any time until within six years

before the first date on which a bankruptcy petition was filed by a debtor in any of the above-

captioned cases as described below:

a.      PCI Debtors Bankruptcy Estates

1.      Ark Discovery.

A.      Ark Discovery II LP ("Ark Discovery") and Edge One are parties

to a Master Loan Agreement dated July 7, 2007 (together with the Security

Agreement and any related notes, documents, certificates, instruments,

agreements and guaranty by PCI, and all amendments, replacements, extensions

or restatements of any of the foregoing, the "Ark Discovery Loan Documents").

Pursuant to the Ark Discovery Loan Documents, between October 1, 2007 and September 3, 2008, Ark Discovery engaged in 29 separate note transactions in an aggregate principal amount of $159,010,000. Beginning on March 11, 2008 and continuing through the Petition Date, PCI repaid six of the Ark Discovery notes in the aggregate amount of $36,302,900. Ark Discovery's investment under the Ark Discovery Loan Documents resulted in a loss in the amount of $122,707,100. Ark Discovery also entered into Loan Purchase Agreements with Ark Royal Capital, LLC, whereby Ark Royal Capital paid $21,500,000 to Ark Discovery for a participation interest in four notes in an aggregate principal amount of $27,500,000.

B.        Ark Discovery filed proofs of claim against the PCI bankruptcy estate as Claim Nos. 7 and 41 in the amounts of $104,609,465 and $107,207,101, respectively, and Claim No. 1 against the Edge One bankruptcy estate in the amount of $107,207,101. Ark Discovery has an allowed claim against the PCI Debtors in the amount claimed, or in an amount to be determined by the Court.

C.        Ark Discovery is an entity that did not exist prior to being formed and registered as a limited partnership in the state of Delaware under the name A to Z Investors, Fund, L.P. on May 29, 2007, which name was later changed to Edge One Capital, L.P. on or about September 17, 2007, and subsequently changed to Ark Discovery II, L.P. on or about February 7, 2008. Ark Discovery could not have discovered the fraud of Petters' Ponzi scheme prior to being formed and registered on May 29, 2007, which date is within six years of the Petition Date.

D.      Ark Discovery was not (i) complicit in the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial loan to the PCI Debtors, (ii) aware of any of the de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial loan to the PCI Debtors, or (iii) aware of anything extrinsic at the time of its initial loan that would cause a reasonable person or creditor to suspect that the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

E.      After investing, Ark Discovery monitored accounts for payments it was to receive on its notes.  The Ark Discovery Loan Documents required that payments be received from retailers rather than from PCI.  Beginning on March 11, 2008, Ark Discovery received payments on its notes from PCI instead of retailers. Ark Discovery became concerned about payment delays in the summer of 2008 and was told by Deanna Coleman that payment delays were due to economic conditions.  Ark Discovery became aware of a lawsuit against Petters and PCI in August 2008 for non-payment and was assured by Petters that everything was fine.   On September 24, 2008, Ark Discovery learned that multiple federal agencies executed search warrants at the PCI/PGW headquarters. Based on the above facts, Ark Discovery had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, on or about March 11, 2008, when it received payments from PCI and not retailers.  At the latest, Ark Discovery had neither actual knowledge nor deemed notice of

DOCS-#4740096-V2

these facts until September 24, 2008, when the federal investigation of PCI and PGW became public.

2.      Interlachen Harriet Investments Limited.

A.      PCI and Interlachen Harriet Investments Limited ("Interlachen"), as Lender and Administrative Agent, are parties to an Amended and Restated Promissory Note dated as of April 18, 2008 in the principal amount of $60,000,000 (the "Interlachen Note") (together with a Note Purchase Agreement, Security Agreement and any related documents, certificates, instruments and agreements and all amendments, replacements, extensions or restatements of any of the foregoing, the "Interlachen Loan Documents"). Pursuant to the Interlachen Loan Documents, Interlachen advanced a total of $60 million to PCI between April 18 and April 22, 2008. The Interlachen Note had a maturity date of October 18, 2008. Interlachen filed a proof of claim against the PCI bankruptcy estate in the amount of its initial principal investment of $60,000,000 as Claim No. 83, as well as against each of the PCI Debtors' bankruptcy estates in the same amount. Interlachen has an allowed claim against the PCI Debtors in the amount claimed, or in an amount to be determined by the Court.

B.      Interlachen is an entity that did not exist prior to being formed and registered as an exempt company under the laws of the Cayman Islands on February 1, 2008. Interlachen could not have discovered the fraud of Petters' Ponzi scheme prior to being formed and registered on February 1, 2008, which date is within six years of the Petition Date.

C.      Interlachen was not (i) complicit in the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial loan to the PCI Debtors, (ii) aware of any of the de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial loan to the PCI Debtors, or (iii) aware of anything extrinsic at the time of its initial loan that would cause a reasonable person to suspect that the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

D.      After investing, Interlachen regularly monitored its investment. The Interlachen Loan Documents required that payments be received from retailers rather than from PCI.  Interlachen participated in bi-weekly status calls during the summer of 2008 to track the status of shipments of goods it purportedly financed in order to anticipate the timing of retailer payments into a designated lockbox account.  During these status calls Coleman, Reynolds and Petters made false representations to Interlachen and did not disclose the fact that Interlachen's funds were not invested in accordance with the Interlachen Loan Documents but instead were stolen to further the Ponzi scheme.  Interlachen became aware of a lawsuit against Petters and PCI in August 2008 for non-payment.  On September 24, 2008, Interlachen learned that multiple federal agencies executed search warrants at the PCI/PGW headquarters.  Interlachen did not receive any payments on the Interlachen Note and the Interlachen Note remained due and owing in full as of the Petition Date.  Based on the above facts, Interlachen had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the

earliest, September 24, 2008, when the federal investigation of PCI and PGW became public.

3.    *Alliance Courier*.   Leonard McHugh d/b/a Alliance Courier ("<u>Alliance Courier</u>") provided courier and package pick-up and delivery services to or for the benefit of the PCI Debtors from April 2008, and possibly earlier, through the Petition Date. Alliance Courier submitted invoices for its services to PCI for payment and PCI remitted payment.  The services Alliance Courier provided to the PCI Debtors had no connection with the fraudulent investment activities of the PCI Debtors.  Alliance Courier did not have knowledge of the PCI Debtors' operations or investment activities.  Alliance Courier also did not have knowledge that the PCI Debtors were not engaged in a *bona fide* business.  As a result, Alliance Courier had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  Either date is within six years of the Petition Date.  PCI scheduled Alliance Courier as having an unsecured claim in the amount of $13.33 and which claim was liquidated, non-contingent and undisputed.  Alliance Courier has an allowed claim against the PCI Debtors in the amount scheduled, or in an amount to be determined by the Court.  Alliance Courier was not (i) complicit in the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to the PCI Debtors, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of  its initial extension of trade credit to the PCI Debtors, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to the PCI Debtors, or at

any time thereafter, that would cause a reasonable person or creditor to suspect that the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

4.    AT&T.    AT&T Mobility, LLC d/b/a The New AT&T, f/k/a Cingular Wireless ("AT&T"), provided wireless telephones and services to or for the benefit of the PCI Debtors from at least November 2000, and possibly earlier, through the Petition Date, including under account nos. 11574944, 732805344, 871283459 and 731540364. AT&T submitted invoices for its goods and services to PCI for payment and PCI or its affiliates remitted payment.  The goods and services AT&T provided to the PCI Debtors had no connection with the fraudulent investment activities of the PCI Debtors. AT&T did not have knowledge of the PCI Debtors' operations or investment activities.  AT&T also did not have knowledge that the PCI Debtors were not engaged in a *bona fide* business.  As a result, AT&T had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  Either date is within six years of the Petition Date.  PCI scheduled AT&T as having an unsecured claim in the amount of $1,392.27 and which claim was liquidated, non-contingent and undisputed.  AT&T has an allowed claim against the PCI Debtors in the amount scheduled, or in an amount to be determined by the Court.  AT&T was not (i) complicit in the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to the PCI Debtors, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of  its initial extension of trade credit to the PCI

Debtors, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to the PCI Debtors, or at any time thereafter, that would cause a reasonable person or creditor to suspect that the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

5.      FedEx.   Federal Express Corporation d/b/a FedEx Express ("FedEx") provided overnight and express package pick-up and delivery services to the PCI Debtors under account number 1611-3137-7 in the name of PCI from at least May 1998, and possibly earlier, through the Petition Date.  FedEx submitted invoices for its services to PCI for payment and PCI remitted payment.  The services FedEx provided to the PCI Debtors had no connection with the fraudulent investment activities of the PCI Debtors. FedEx did not have knowledge of the PCI Debtors' operations or investment activities. FedEx also did not have knowledge that the PCI Debtors were not engaged in a *bona fide* business.  As a result, FedEx had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  Either date is within six years of the Petition Date.  PCI scheduled FedEx as having an unsecured claim in the amount of $130.62 and which claim was liquidated, non-contingent and undisputed.  FedEx has an allowed claim against the PCI Debtors in the amount scheduled, or in an amount to be determined by the Court.  FedEx was not (i) complicit in the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to the PCI Debtors, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of  its initial extension of trade credit to the PCI

Debtors, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its

extension of trade credit to the PCI Debtors, or at any time thereafter, that would cause a

reasonable person or creditor to suspect that the PCI Debtors were engaged in wrongful

conduct that would implicate the use of fraudulent transfer remedies.

6.     <u>Street Fleet</u>.  Associated Courier Inc., d.b.a. Street Fleet ("<u>Street Fleet</u>")

provided courier and package pick-up and delivery services to the PCI Debtors from at

least April 2006, and possibly earlier, through the Petition Date.  Street Fleet submitted

invoices for its services to PCI for payment and PCI remitted payment.  The services

Street Fleet provided to the PCI Debtors had no connection with the fraudulent

investment activities of the PCI Debtors.  Street Fleet did not have knowledge of the PCI

Debtors' operations or investment activities.  Street Fleet also did not have knowledge

that the PCI Debtors were not engaged in a *bona fide* business.  As a result, Street Fleet

had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme

until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW

became public or, at the latest, the Petition Date.  Either date is within six years of the

Petition Date.  PCI scheduled Street Fleet as having an unsecured claim in the amount of

$19.01 and which claim was liquidated, non-contingent and undisputed.  Street Fleet has

an allowed claim against the PCI Debtors in the amount scheduled, or in an amount to be

determined by the Court Street Fleet was not (i) complicit in the fraud at the PCI Debtors

or elsewhere in the Petters operations at the time of its initial extension of trade credit to

the PCI Debtors, or at any time thereafter, (ii) aware of any of the de facto circumstances

of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of  its

initial extension of trade credit to the PCI Debtors, or at any time thereafter, or (iii) aware

of anything extrinsic at the time of its extension of trade credit to the PCI Debtors, or at any time thereafter, that would cause a reasonable person or creditor to suspect that the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

7.    T-Mobile.  T-Mobile US, Inc. ("T-Mobile") provided wireless telephone services to the PCI Debtors from at least December 2000, and possibly earlier, through the Petition Date, including to PCI under account no. 341724234.  T-Mobile submitted invoices for its services to PCI for payment and PCI remitted payment.  The services T-Mobile provided to the PCI Debtors had no connection with the fraudulent investment activities of the PCI Debtors.  T-Mobile did not have knowledge of the PCI Debtors' operations or investment activities.  T-Mobile also did not have knowledge that the PCI Debtors were not engaged in a bona *fide* business.  As a result, T-Mobile had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  Either date is within six years of the Petition Date.  T-Mobile filed a proof of claim against the PCI bankruptcy estate as Claim No. 19 in the amount of $139.68.  T-Mobile has an allowed claim against the PCI Debtors in the amount claimed, or in an amount to be determined by the Court. T-Mobile was not (i) complicit in the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to the PCI Debtors, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of  its initial extension of trade credit to the PCI Debtors, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its

extension of trade credit to the PCI Debtors, or at any time thereafter, that would cause a reasonable person or creditor to suspect that the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

8.    Verizon Wireless. Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless") provided wireless telephone services to or for the benefit of the PCI Debtors from at least December 2000, and possibly earlier, through the Petition Date, including to PCI under account nos. 1003-661570, 1003-8510382, 1003-8480008, 1003-10798974, 508235647 and 780579437-00001.  Verizon Wireless submitted invoices for its services to PCI for payment and PCI remitted payment.  The services Verizon Wireless provided to the PCI Debtors had no connection with the fraudulent investment activities of the PCI Debtors.  Verizon Wireless did not have knowledge of the PCI Debtors' operations or investment activities.  Verizon Wireless also did not have knowledge that the PCI Debtors were not engaged in a *bona fide* business.  As a result, Verizon Wireless had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  Either date is within six years of the Petition Date.  Verizon Wireless filed a proof of claim against the PCI bankruptcy estate as Claim No. 27 in the amount of $461.21. Verizon Wireless has an allowed claim against the PCI Debtors in the amount claimed, or in an amount to be determined by the Court.  Verizon Wireless was not (i) complicit in the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to the PCI Debtors, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of  its

initial extension of trade credit to the PCI Debtors, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to the PCI Debtors, or at any time thereafter, that would cause a reasonable person or creditor to suspect that the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

b.   <u>PGW Debtor Bankruptcy Estate</u>

1.   <u>Ark Discovery</u>.

A.   PGW, Petters and Ark Discovery II, LP ("<u>Ark Discovery</u>") are parties to two Promissory Notes dated February 13 and 15, 2008 in the in the principal amount of $3,000,000 each (collectively, the "<u>Ark Discovery PGW Notes</u>"). Pursuant to the Ark Discovery PGW Notes, Ark Discovery made two separate $3 million advances to PGW as of the same dates in February 2008. Ark Discovery received no payments on the Ark Discovery PGW Notes when the notes matured and the notes remained due and owing as of the Petition Date.

B.   Ark Discovery filed a proof of claim against the PGW bankruptcy estate as Claim No. 9 in the amount of $107,207,101, in which it asserts $6,000,000 is the only amount it advanced directly to PGW pursuant to the Ark Discovery PGW Notes. Ark Discovery has an allowable claim against PGW in the amount claimed, or in an amount to be determined by the Court.

C.   Ark Discovery is an entity that did not exist prior to being formed and registered as a limited partnership in the state of Delaware under the name A to Z Investors, Fund, L.P. on May 29, 2007, which name was later changed to Edge One Capital, L.P. on or about September 17, 2007, and subsequently

36

changed to Ark Discovery II, L.P. on or about February 7, 2008. Ark Discovery could not have discovered the fraud of Petters' Ponzi scheme prior to being formed and registered on May 29, 2007, which date is within six years of the Petition Date.

D.     Ark Discovery was not (i) complicit in the fraud at PGW or elsewhere in the Petters operations at the time of its initial loan to PGW, (ii) aware of any of the de facto circumstances of the fraud at PGW or elsewhere in the Petters operations at the time of its initial loan to PGW, or (iii) aware of anything extrinsic at the time of its initial loan that would cause a reasonable person or creditor to suspect that PGW was engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

E.     In addition to its loans to PGW, Ark Discovery was also a lender to PCI Debtors as described in paragraph 79.a.1 above. The Ark Discovery Loan Documents with the PCI Debtors required that payments be received from retailers rather than from PCI. As a result of its investments with the PCI Debtors, Ark Discovery monitored its accounts for payments it was to receive on its notes with the PCI Debtors. Beginning on March 11, 2008, Ark Discovery received payments on its notes with the PCI Debtors from PCI instead of retailers. Ark Discovery became concerned about payment delays in the summer of 2008 and was told by Deanna Coleman that payment delays were due to economic conditions. Ark Discovery became aware of a lawsuit against Petters in 2008 and was assured by Petters that everything was fine. On September 24, 2008, Ark Discovery learned that multiple federal agencies executed search warrants at the

PCI/PGW headquarters.  Based on the above facts, Ark Discovery had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, on or about March 11, 2008, when it received payments from PCI and not retailers.  At the latest, Ark Discovery had neither actual knowledge nor deemed notice of these facts until September 24, 2008, when the federal investigation of PCI and PGW became public.

2.    Ameripride.  Ameripride Services, Inc. ("Ameripride") provided uniforms, facility services and linens to PGW from at least November 2002, and possibly earlier, through the Petition Date.  Ameripride submitted invoices for its goods and services to PGW for payment and PGW remitted payment.  The services Ameripride provided to PGW had no connection with the fraudulent investment activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme. Ameripride did not have knowledge of PGW's operations or investment activities. Ameripride also did not have knowledge that PGW was not engaged in a *bona fide* business. As a result, Ameripride had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  Either date is within six years of the Petition Date. Ameripride filed a proof of claim against the PGW bankruptcy estate as Claim No. 44 in the amount of $2,479.97.  Ameripride has an allowed claim against PGW in the amount scheduled, or in an amount to be determined by the Court. Ameripride was not (i) complicit in the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at PGW and the PCI Debtors or

elsewhere in the Petters operations at the time of  its initial extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to PGW or at any time thereafter, that would cause a reasonable person or creditor to suspect that PGW and the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

3.      Aquascapes.   Aquascapes, Inc. ("Aquascapes") has provided aquarium services to PGW since at least December 2002, and possibly earlier, through the Petition Date.  Aquascapes submitted invoices for its goods and services to PGW for payment and PGW remitted payment.  The goods and services Aquascapes provided to PGW had no connection with the fraudulent investment activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme. Aquascapes did not have knowledge of PGW's operations or investment activities. Aquascapes also did not have knowledge that PGW was not engaged in a *bona fide* business. As a result, Aquascapes had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  Either date is within six years of the Petition Date.  PGW scheduled Aquascapes as having an unsecured claim in the amount of $259.23 and which claim was liquidated, non-contingent and undisputed.  Aquascapes has an allowed claim against PGW in the amount scheduled, or in an amount to be determined by the Court. Aquascapes was not (i) complicit in the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of  its initial

extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to PGW or at any time thereafter, that would cause a reasonable person or creditor to suspect that PGW and the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

4.     FedEx.  Federal Express Corporation d/b/a FedEx Express and FedEx Ground Package Systems, Inc. d/b/a FedEx Ground ("FedEx") provided overnight and express package pick-up and delivery services to PGW under account number 2614-7156-6 from at least November 2002, and possibly earlier, through the Petition Date. FedEx submitted invoices for its services to PGW for payment and PGW remitted payment.  The services FedEx provided to PGW had no connection with the fraudulent investment activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme.  FedEx did not have knowledge of PGW's operations or investment activities. FedEx also did not have knowledge that PGW was not engaged in a *bona fide* business. As a result, FedEx had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  Either date is within six years of the Petition Date.  FedEx filed a proof of claim against the PGW bankruptcy estate as Claim No. 10 in the amount of $3,422.18.  FedEx has an allowed claim against PGW in the amount claimed, or in an amount to be determined by the Court.  FedEx was not (i) complicit in the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, (ii) aware of any of the de facto circumstances of the

fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to PGW or at any time thereafter, that would cause a reasonable person or creditor to suspect that PGW and the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

5.      Free Agent Consulting.    Free Agent Consulting, LLC ("Free Agent Consulting") provided IT consulting and database support services to PGW from at least November 2002, and possibly earlier, through the Petition Date.   During this time, Free Agent Consulting submitted invoices for its services to PGW for payment and PGW remitted payment.    The services Free Agent Consulting provided to PGW had no connection with the fraudulent investment activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme.   Free Agent Consulting did not have knowledge of PGW's operations or investment activities.   Free Agent Consulting also did not have knowledge that PGW was not engaged in a bona fide business.   As a result, Free Agent Consulting had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.   Either date is within six years of the Petition Date.   PGW scheduled Free Agent Consulting as having an unsecured claim in the amount of $472.50 and which claim was liquidated, non-contingent and undisputed.   Free Agent Consulting has an allowed claim against PGW in the amount scheduled, or in an amount to be determined by the Court. Free Agent Consulting was not (i) complicit in the fraud at PGW and the PCI Debtors or elsewhere in

the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to PGW or at any time thereafter, that would cause a reasonable person or creditor to suspect that PGW and the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

6.     OfficeMax.  OfficeMax, Inc. f/k/a Boise Cascade Corp. ("OfficeMax") provided goods and services to PGW from at least December 2002, and possibly earlier, through the Petition Date.   During this time, PGW purchased office supplies from OfficeMax.   OfficeMax submitted invoices for its goods and services to PGW for payment and PGW remitted payment.  The goods and services OfficeMax provided to PGW had no connection with the fraudulent investment activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme.  OfficeMax did not have knowledge of PGW's operations or investment activities.  OfficeMax also did not have knowledge that PGW was not engaged in a bona fide business.  As a result, OfficeMax had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  Either date is within six years of the Petition Date.  PGW scheduled OfficeMax as having an unsecured claim in the amount of $1,396.24 and which claim was liquidated, non-contingent and undisputed.  OfficeMax has an allowed claim against PGW in the amount scheduled, or in an amount to be determined by the Court.  OfficeMax was not (i) complicit in the fraud at PGW and the PCI Debtors or

elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to PGW or at any time thereafter, that would cause a reasonable person or creditor to suspect that PGW and the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

7.     Servicemaster.     Servicemaster of St. Cloud, Inc. ("Servicemaster") provided janitorial and office cleaning services to PGW from at least February 2004, and possibly earlier, through the Petition Date.  During this time, Servicemaster submitted invoices for its services to PGW for payment and PGW remitted payment.  The services Servicemaster provided to PGW had no connection with the fraudulent investment activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme. Servicemaster did not have knowledge of PGW's operations or investment activities. Servicemaster also did not have knowledge that PGW was not engaged in a bona fide business.  As a result, Servicemaster had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date. Either date is within six years of the Petition Date.  PGW scheduled Servicemaster as having an unsecured claim in the amount of $7,404.66 and which claim was liquidated, non-contingent and undisputed.  Servicemaster has an allowed claim against PGW in the amount scheduled, or in an amount to be determined by the Court. Servicemaster was not

43

(i) complicit in the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of  its initial extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to PGW and the PCI Debtors or at any time thereafter, that would cause a reasonable person or creditor to suspect that PGW were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

8.     Staffing Partners.  Staffing Partners Inc. ("Staffing Partners") provided temporary employees to  PGW from July 2004, and possibly earlier through the Petition Date.  During this time, Staffing Partners submitted invoices for its services to PGW for payment and PGW remitted payment.  The services Staffing Partners provided to PGW had no connection with the fraudulent investment activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme.  Staffing Partners did not have knowledge of PGW's operations or investment activities.   Staffing Partners also did not have knowledge that PGW was not engaged in a bona fide business.  As a result, Staffing Partners had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  Either date is within six years of the Petition Date.  Staffing Partners filed a proof of claim against the PGW bankruptcy estate as Claim No. 40 in the amount of $4,080.62.  Staffing Partners has an allowed claim against PGW in the amount claimed, or in an amount to be determined by the Court.  Staffing Partners was not (i) complicit in the fraud at PGW and the PCI Debtors

or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to PGW or at any time thereafter, that would cause a reasonable person or creditor to suspect that PGW and the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

9.     <u>Treat America</u>.   Treat America Food Services and its predecessor entity Swanson Corporation (collectively "<u>Treat America</u>") provided goods and services to PGW from November 2002, and possibly earlier, through the Petition Date.   During this time, Treat America provided food service and vending operations for the PCI/PGW headquarters building.   Treat America submitted invoices for its services to PGW for payment and PGW remitted payment.   The goods and services Treat America provided to PGW had no connection with the fraudulent investment activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme.   Treat America did not have knowledge of PGW's operations or investment activities.   Treat America also did not have knowledge that PGW was not engaged in a bona fide business.   As a result, Treat America had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.   Either date is within six years of the Petition Date.   PGW scheduled Treat America as having an unsecured claim in the amount of $22,725.21 and that such claim was liquidated, non-contingent and

undisputed.  Treat America has an allowed claim against PGW in the amount scheduled, or in an amount to be determined by the Court. Treat America was not (i) complicit in the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of  its initial extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to PGW or at any time thereafter, that would cause a reasonable person or creditor to suspect that PGW and the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

10.     UPS.  United Parcel Service, Inc. ("UPS") provided package pick-up and delivery services to or for the benefit of PGW, including under account number 569516, from January of 2003, and possibly earlier, through the Petition Date.  During this time, UPS submitted invoices for its services to PGW for payment and PGW remitted payment. The services UPS provided to PGW had no connection with the fraudulent investment activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme. UPS did not have knowledge of PGW's operations or investment activities.  UPS also did not have knowledge that PGW was not engaged in a bona fide business.  As a result, UPS had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.  PGW scheduled UPS as having an unsecured claim in the amount of $94.28 and that such claim was liquidated, non-contingent and undisputed.  UPS has an allowed claim against PGW in the amount

scheduled, or in an amount to be determined by the Court. UPS was not (i) complicit in the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of  its initial extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to PGW or at any time thereafter, that would cause a reasonable person or creditor to suspect that PGW and the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

11.     Verified Credentials.    Verified Credentials, Inc. ("Verified Credentials") provided employee background check services to PGW from March 2003, and possibly earlier, through the Petition Date.   During this time, Verified Credentials submitted invoices for its services to PGW for payment and PGW remitted payment.  The services Verified Credentials provided to PGW had no connection with the fraudulent investment activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme. Verified Credentials did not have knowledge of PGW's operations or investment activities.  Verified Credentials also did not have knowledge that PGW was not engaged in a bona fide business.  As a result, Verified Credentials had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public or, at the latest, the Petition Date.   Either date is within six years of the Petition Date. Verified Credentials filed a proof of claim against the PGW bankruptcy estate as Claim No. 42 in the amount of $368.00.  Verified Credentials has an allowed claim against

PGW in the amount claimed, or in an amount to be determined by the Court.  Verified

Credentials was not (i) complicit in the fraud at PGW and the PCI Debtors or elsewhere

in the Petters operations at the time of its initial extension of trade credit to PGW, or at

any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at PGW

and the PCI Debtors or elsewhere in the Petters operations at the time of  its initial

extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything

extrinsic at the time of its extension of trade credit to PGW or at any time thereafter, that

would cause a reasonable person or creditor to suspect that PGW and the PCI Debtors

were engaged in wrongful conduct that would implicate the use of fraudulent transfer

remedies.

        12.    Xcel Energy.  Northern States Power Co., a Minnesota Corp., d/b/a Xcel

Energy ("Xcel Energy") provided utility services to PGW from February 2003, and

possibly earlier, through the Petition Date.  During this time, Xcel Energy submitted

invoices for its services to PGW for payment and PGW remitted payment.  The services

Xcel Energy provided to PGW had no connection with the fraudulent investment

activities of PGW and the PCI Debtors in connection with Petters' Ponzi scheme. Xcel

Energy did not have knowledge of PGW's operations or investment activities.   Xcel

Energy also did not have knowledge that PGW was not engaged in a bona fide business.

As a result, Xcel Energy had neither actual knowledge nor deemed notice of Petters'

fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal

investigation of PCI and PGW became public or, at the latest, the Petition Date.  Xcel

Energy filed a proof of claim against the PGW bankruptcy estate as Claim No. 41 in the

amount of $4,022.35.  Xcel Energy has an allowed claim against PGW in the amount

claimed, or in an amount to be determined by the Court.  Xcel Energy was not (i) complicit in the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of its initial extension of trade credit to PGW, or at any time thereafter, (ii) aware of any of the de facto circumstances of the fraud at PGW and the PCI Debtors or elsewhere in the Petters operations at the time of  its initial extension of trade credit to PGW, or at any time thereafter, or (iii) aware of anything extrinsic at the time of its extension of trade credit to PGW or at any time thereafter, that would cause a reasonable person or creditor to suspect that PGW and the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

80.     The Receiver acted diligently to discover facts constituting the fraud alleged in this Amended Complaint.

81.     Any temporal limitations—statutory or otherwise—on the Trustee's ability to bring the causes of action set forth below are tolled by, among other things, Petters' breach of fiduciary duty in failing to disclose the fraud, the actions of Petters, or Petters and his Associates, in fraudulently and intentionally concealing the fraud, and/or the adverse domination of PCI, PGW, and other debtor entities by Petters, or Petters and his Associates, until the latest date a Predicate Creditor described in paragraphs 78 and 79 above discovered facts constituting the nature of the fraudulent activity of Petters' Ponzi Scheme, until the appointment of the Receiver.

## II.   PC FUNDING AND SPF FUNDING ARE, AND AT ALL TIMES WERE, ALTER EGOS OF PCI

82.     At all times relevant herein, PCI operated PC Funding and SPF Funding as alter egos of PCI. PC Funding and SPF Funding are entities created and utilized by PCI as SPEs through which to funnel funds from Opportunity Finance and the remaining defendants to PCI to

further the Ponzi scheme and by which to funnel funds from PCI to Opportunity Finance, the Opportunity Finance Defendants, and the Sabes Family Foundation to or for the benefit of the Sabes Family Defendants, other entities controlled by the Sabes Family Defendants, and to The Minneapolis Foundation.

83.     PC Funding and SPF Funding, at all relevant times herein, were wholly owned by PCI. 100% of the membership interest in PC Funding and 100% of the membership interest in SPF Funding comprise property of the bankruptcy estate of PCI, pursuant to Section 541 of the Bankruptcy Code.

84.     Petters formed and operated PC Funding and SPF Funding as PCI's SPEs for the sole purpose of receiving loan proceeds from their designated investors, the Opportunity Finance Defendants and the Sabes Family Foundation to further the Ponzi scheme, the funds of which were derived from transactions between and among the Opportunity Finance Defendants, the Sabes Family Foundation, and the remaining defendants.

85.     At all times relevant herein, PC Funding and SPF Funding were nothing more than instrumentalities of PCI to further the Ponzi scheme and were used by PCI for the sole purpose of furthering the fraud orchestrated by Petters through the Ponzi scheme.

86.     Petters and his Associates at all times relevant herein knew that investor funds and accounts were commingled, used, and transferred by Petters and his Associates as necessary to further the Ponzi scheme. Funds that were intended for PC Funding or SPF Funding instead were routed to PCI for subsequent distribution to other investors in other SPEs. For example, PCI would transmit misappropriated funds to its SPEs—including PC Funding and SPF Funding—for ultimate payments to investors in furtherance of the fraud. Petters and his Associates caused monies received from PC Funding and SPF Funding by the fictitious vendors

of Nationwide and Enchanted to be rerouted and transferred directly to PCI accounts for the operations of PCI, repayment of investors, payment of False Profits, and for Petters' personal use.

87.    Petters and his Associates expressly authorized and approved commingling of funds by and between numerous entities, such as between PCI and the SPEs. PC Funding and SPF Funding were used solely as conduits of funds ultimately destined for PCI's and the SPEs' use in paying Opportunity Finance, the Sabes Family Foundation, The Minneapolis Foundation, and other investors. Funds generated by Petters—through PC Funding and SPF Funding—were funneled to PCI, or to Petters individually, and were used by PCI and Petters to pay other investors.  Similarly, funds transferred from PCI into PC Funding and SPF Funding to pay Opportunity Finance, the Sabes Family Foundation, The Minneapolis Foundation, and the other defendants originated, in large part, from funds sourced from other investors.

88.    PCI maintained a number of bank accounts, including a bank account at M&I Bank.  From 2001 to 2008, PCI transferred funds from its M&I bank account to the SPEs— including PC Funding and SPF Funding—in the amount of approximately $32 billion dollars. PCI also received approximately $7.3 billion dollars from its SPEs.  PCI's M&I bank account also received approximately $12.7 billion from Enchanted (owned by Catain, who pleaded guilty to conspiracy to commit money laundering) and approximately $12.1 billion from Nationwide (owned by Reynolds, who pleaded guilty to conspiracy to commit money laundering), co-conspirators in the money laundering scheme. The Sabes Family Defendants also controlled an account at U.S. Bank in the name of PC Funding that received proceeds of the Ponzi scheme. This flow of funds illustrates that funds were routed through and around PC Funding and SPF

Funding to give the appearance of legitimate business activity and that PC Funding and SPF Funding, among other entities, were used as artifices to perpetrate a massive financial fraud.

89.    PC Funding and SPF Funding were never independently or sufficiently capitalized because PC Funding and SPF Funding conducted little or no legitimate business operations, and all funds provided to, or paid on behalf of, PC Funding and SPF Funding were for the sole purpose of furthering the Ponzi scheme and were ultimately forwarded to PCI for distribution.

90.    PCI did not respect or treat PC Funding or SPF Funding as separate legal entities. For example, PC Funding and SPF Funding had no functioning boards or managers. Petters was PC Funding's president and chief executive officer. Petters also was SPF Funding's sole governor, president, chief executive officer, and chief financial officer. There were no bona fide meetings of the board or managers and no corporate minutes. PC Funding and SPF Funding conducted little or no business activities other than the fraud.

91.    Petters directed certain of his Associates and PCI employees, including Coleman and White, to prepare fabricated transactional documents that PC Funding and SPF Funding used to perpetuate the Ponzi scheme.

92.    Petters and his Associates dominated and controlled all aspects of the business operations of PC Funding and SPF Funding at all times relevant herein for the sole and exclusive purpose of furthering the Ponzi scheme that Petters orchestrated through PCI.

93.    At all times relevant herein, PCI, PC Funding, and SPF Funding shared the same corporate offices at 4400 Baker Road, Minnetonka, MN 55343.

94.    PCI oversaw and directed all operations of PC Funding and SPF Funding.

95.      PCI, PC Funding, and SPF Funding did not maintain correct accounting records of their inter-company transfers and obligations.

96.      PCI caused PC Funding and SPF Funding to enter into the investments with Opportunity Finance, the Sabes Family Foundation, and also for the benefit of the remaining defendants, and in return PCI caused PC Funding and SPF Funding to grant purported security interests to Opportunity Finance and the Sabes Family Foundation to secure the purchase of fictitious goods backed by fabricated invoices. Opportunity Finance and the Sabes Family Foundation in turn granted and assigned security interests in the fictitious goods to the remaining defendants.

97.      Petters conflated the multiple entities that he used to operate the Ponzi scheme by, among other things, transferring funds interchangeably among the entities, ultimately for the benefit of PCI and to generate the payment of False Profits pursuant to the promissory notes to perpetrate and further the Ponzi scheme.

98.      Throughout the duration of the Ponzi scheme, PCI account statements reflect that Petters and his Associates caused PCI funds to be transferred into PC Funding and SPF Funding and to be paid out to perpetrate the Ponzi scheme, all to the detriment of PCI's creditors.

99.      The amount of funds provided to PC Funding and to SPF Funding to fund the fraudulent investment activities confirms that PC Funding and SPF Funding were never capitalized to operate apart from, or independent of, PCI, and that PC Funding and SPF Funding, in fact, had no existence separate and apart from PCI and the Ponzi scheme, as was well known to Petters and his Associates.

100.    Injustice, fundamental unfairness, and a violation of an established public policy against fraud would occur if PCI, PC Funding, and SPF Funding's abuses of creating artificial corporate veils to promote and perpetrate a fraud on the creditors and investors of PCI is allowed.

101.    The artificial and fraudulent corporate entity of PC Funding and SPF Funding must be reverse-pierced to reflect the true nature of the structure and operations of PC Funding and SPF Funding, as mere alter egos of PCI at all times relevant herein; and the assets of PC Funding and SPF Funding must be made available to the many creditors and victims of PCI.

102.    For all the foregoing reasons, the Trustee seeks that this Court treat PC Funding and PCI as one entity, and also treat SPF Funding and PCI as one entity for all purposes stated herein and with respect to all causes of action pleaded herein. The creditors of PCI would suffer great injustice if the assets of PC Funding and SPF Funding are not made available to satisfy the debts of PCI, particularly since funds provided to Petters and PCI were not used for their intended purpose but were funneled to repay Principal and False Profits to Opportunity Finance, the Sabes Family Foundation, other entities controlled by the Sabes Family Defendants, The Minneapolis Foundation, DZ Bank, WestLB and WestLB NY and thereby to promote and perpetuate a massive fraudulent scheme through PC Funding and SPF Funding.

## III.    FRAUDULENT TRANSFERS TO THE DEFENDANTS

103.    Opportunity Finance, which was formed in part based upon a merger with IIO, continued where IIO, Robert W. Sabes, and Janet F. Sabes had left off in their pattern and practice of engaging in financial transactions with PCI, which pattern and practice commenced in the late 1990s.  Beginning in or about May 1998, IIO and/or the Sabes Family Defendants transferred money to PCI and received in return one or more of PCI's promissory notes signed

54

by Petters on behalf of PCI.   Beginning on or about January 7, 2002 and continuing through at least December 3, 2007, Opportunity Finance transferred money to PC Funding and received in return one or more of PC Funding's promissory notes signed by Petters as "President" of PC Funding.

104.    Beginning on or about May 11, 2001 and continuing to at least March 14, 2005, Opportunity Finance transferred money to SPF Funding and received in return SPF Funding's promissory notes signed by Petters as "President" of Petters Finance, LLC, n/k/a/ SPF Funding.

105.    Beginning on or about August 13, 2001 and continuing through at least May 9, 2007, the Sabes Family Foundation received SPF Funding's promissory notes signed by Petters as "President" of SPF Funding.

106.    Beginning on or about June 4, 2001 and continuing through on or about July 30, 2003, The Minneapolis Foundation received payments of net cash gains on promissory notes issued to Opportunity Finance, the Sabes Family Foundation, and Robert and Janet Sabes, individually, and signed by Petters.

107.    During the course of the Ponzi scheme, Opportunity Finance, the Sabes Family Foundation, and other entities that provided financing to them or that were controlled by the Sabes Family Defendants received distributions from PCI and from SPF Funding representing a return of the Principal invested by Opportunity Finance and the Sabes Family Foundation into the Ponzi scheme through purported investments secured by fictitious electronics transactions and also distributions representing False Profits. Similarly, The Minneapolis Foundation received distributions of net cash gains.

108.    Pursuant to the fraudulent mechanisms set forth above, which were designed to funnel funds from IIO through PCI and back to IIO at exorbitant rates of return, IIO engaged in note transactions with PCI resulting in transfers exceeding $91 million (the "IIO – PCI Notes).

109.    Pursuant to the fraudulent mechanisms set forth above, which were designed to funnel funds from Opportunity Finance through PCI and back to Opportunity Finance at exorbitant rates of return, Opportunity Finance engaged in at least 546 separate note transactions with PC Funding in the sum of nearly two billion dollars ($2,000,000,000) (the "Opportunity Finance – PC Funding Notes"). A schedule of the Opportunity Finance – PC Funding Notes containing the Note Number, Start Date, Maturity Date, and Note Amount is attached hereto as Exhibit G.

110.    Pursuant to the fraudulent mechanisms set forth above, which were designed to funnel funds from Opportunity Finance and the Sabes Family Foundation through PCI and back to them and The Minneapolis Foundation at exorbitant rates of return, Opportunity Finance engaged in at least 80 separate note transactions with SPF Funding in a note amount of two hundred thirty-eight million, six hundred twenty-three thousand dollars ($238,623,000) (the "Opportunity Finance – SPF Funding Notes"). A schedule of the Opportunity Finance – SPF Funding Notes containing the Note Number, Start Date, Maturity Date, and Note Amount is attached hereto as Exhibit H. The Sabes Family Foundation engaged in at least 77 separate note transactions with SPF Funding in a note amount of two hundred fifty-one million, five hundred and eighty-eight thousand, three hundred ninety-seven dollars and fifty cents ($251,588,397.50) (the "Sabes Family Foundation – SPF Funding Notes"). A schedule of the Sabes Family Foundation - SPF Funding Notes containing the Note Number, Start Date, Maturity Date, and Note Amount is attached hereto as Exhibit H. The Minneapolis Foundation engaged in at least

ten note transactions in the principal sum of thirty-five million, eight hundred eleven thousand, six hundred and two dollars and fifty cents ($35,811,602.50) (the "Minneapolis Foundation – SPF Funding Notes")  and received payments from PCI and from SPF Funding comprising net cash gains totaling eleven million, eight hundred fifty-two thousand, three hundred and seventy dollars ($11,852,370). A schedule of the Minneapolis Foundation - SPF Funding Notes containing the Note Number, Start Date, Maturity Date, and Note Amount is attached hereto as Exhibit H.

111.    The "interest rates" or "profit sharing" that PCI paid to IIO, utilizing funds received from PCI, were exorbitantly high.   The "interest rates" that PC Funding paid to Opportunity Finance, utilizing funds received from Petters through PCI, generally ranged from 14% to 30% on an annualized basis.  The "interest rates" that SPF Funding paid to Opportunity Finance and the Sabes Family Foundation, utilizing funds received from Petters through PCI, generally ranged from 14% to 42% on an annualized basis. The "interest  rates" that SPF Funding paid to The Minneapolis Foundation, utilizing funds received from Petters through PCI, generally ranged from 18% to 42% on an annualized basis. When confronted with a proposed reduction in "interest rates," The Minneapolis Foundation refused to accept a lower rate of return, and ultimately was excluded from further "investments" in PCI and SPF Funding.

112.    In one particular transaction, Robert W. Sabes negotiated to "invest" $2,300,000 in exchange for a PCI promissory note. The note guaranteed repayment of the principal in 6 days along with $100,000 in "profit sharing"—a 261% annual rate of return.

113.    On information and belief, in each instance, every transaction entered into by the Opportunity Finance Defendants, any of their predecessors, the entities that provided financing to them, including DZ Bank, WestLB and WestLB NY, and the Sabes Family Foundation to

invest in PCI and the Ponzi scheme—through PC Funding and SPF Funding—was based upon wholly fraudulent and fictitious documents and financial transactions, as were all payments of funds to each of the defendants.

114.    Opportunity Finance, the Sabes Family Foundation, The Minneapolis Foundation, and the Sabes Family Defendants, and the entities that provided financing to the Opportunity Finance Defendants, including DZ Bank, WestLB and WestLB NY, knew or should have known that they were benefiting from fraudulent activity, or at a minimum, failed to exercise reasonable due diligence with respect to Petters, PCI, PC Funding, and SPF Funding in connection with the Ponzi scheme. Among other things, Opportunity Finance, the Sabes Family Foundation, and the Sabes Family Defendants were on notice of the following indicia of irregularity and fraud but failed to make sufficient inquiry:

a.    Actual Knowledge of the Fraud: Testimony from Deanna Coleman at Petters' criminal trial shows that Opportunity Finance, Securitization, Securitization II, Securitization III, and the Sabes Family Foundation, specifically through Jon R. Sabes, had actual knowledge regarding the purported purchase orders Opportunity Finance and the Sabes Family Foundation were financing. The following testimony by Coleman illustrates that Jon R. Sabes, a principal of Opportunity Finance and a manager of the Sabes Family Foundation, knew that Wal-Mart, doing business as Sam's Club, was using electronic purchase orders since November 6, 2003, yet Opportunity Finance, Securitization, Securitization II, Securitization III, and the Sabes Family Foundation, acting knowingly or in reckless disregard of the fraud, accepted forged paper documents from Petters, PCI, PC Funding, and SPF Funding.

> Q. And do you recall an instance in which one investor
> actually asked you about the kind of form of purchase order
> that you were providing?

A. I do.

Q. Let me just show you -- and tell us who that was that asked about that?

A. That was Bob -- or Steve -- no, I'm sorry, John Sabes.

Q. Okay. And what was the question that he had?

A. He was wondering why we couldn't go online to get purchase orders and go online to see when Sam's was paying us. Most larger companies are everything online. They no longer fax over or e-mail over purchase orders. Everything is online. He was just wondering why we weren't online with them.

Q. I'm going to show you page 737. Do you recall this e-mail?

A. I do.

Q. And he's attached a document. Who sent you an e-mail?

A. John Sabes.

Q. And he attaches a memorandum from Wal-Mart regarding Sam's Club?

A. Right.

Q. That's the next page, page 738. Do you see that?

A. Yep.

Q. And what did this Wal-Mart Corporate Office document show?

A. That as of November 6th, 2003, that it was going to be a PDF file.

Q. Not a paper document?

A. Yes.

Q. So you did the e-mail from John Sabes. What do you do

with that?

A. I forward it on to Tom.

Q. Was this of a concern to you?

A. It was.

Q. And why was it a concern?

A. I did not want to answer his question. There was no reason why we weren't getting online documents instead of paper documents.

Q. Do you know -- did you ever talk to John Sabes or the Sabeses about why they were getting paper documents?

A. No, Tom said he would take care of it; and after I forwarded that e-mail on to Tom, I never heard back from John Sabes.

   b.    <u>Further Actual Knowledge of the Fraud</u>: Upon information and belief, during the course of receiving fraudulent transfers of Principal and False Profits from PCI and its alter-ego PC Funding, Jon R. Sabes also confronted White with the information that Sam's Club only used electronic purchase order documentation while PCI, PC Funding, and SPF Funding provided Opportunity Finance and the Sabes Family Foundation with paper purchase orders. Furthermore, upon information and belief, and as known at the time by one or more agents of Opportunity Finance and the Sabes Family Foundation, the numbering format on the electronic purchase order documentation utilized by Sam's Club did not match the paper purchase order documentation PCI, PC Funding, and SPF Funding were providing to Opportunity Finance and the Sabes Family Foundation. White directed Jon R. Sabes to inquire of Petters regarding the conflicting purchase order numbering and electronic format. White did not hear from Jon R.

Sabes, Opportunity Finance, or the Sabes Family Foundation regarding these serious and material discrepancies after directing Jon R. Sabes to speak with Petters.

        c.        <u>Abrupt Cessation of Business Activity by Opportunity Finance</u>: In or around December 2007, Opportunity Finance significantly altered and ceased its business activities with Petters, PCI, and PC Funding. In November 2007 Opportunity Finance received $74,495,000 in new promissory notes from PC Funding. In comparison, in December 2007, specifically on or about December 3, 2007, Opportunity Finance advanced only $3,725,000 in exchange for new promissory notes from PC Funding, and no further advances were made by Opportunity Finance, Securitization, Securitization II, or Securitization III to PC Funding or any other entity relating to Petters on or after that date.

        d.        <u>Opportunity Finance is Bought Out to Conceal the Fraud</u>: Upon information and belief, in or about December 2007, Opportunity Finance demanded to be repaid at an accelerated rate. On information and belief, this demand resulted from a realization by Opportunity Finance, Securitization, Securitization II, Securitization III, and the Sabes Family Foundation that the Ponzi scheme no longer was able to generate adequate funds to keep current all notes payable. Subsequent to a December 8, 2007 private meeting between Petters and Jon R. Sabes at Petters' home, and beginning in February 2008 and ending in September 2008, Opportunity Finance received from PCI and PC Funding cash in the amount of one hundred sixty-five million, five hundred thirty-seven thousand, seven hundred ninety-four dollars ($165,537,794). These transfers, all of which occurred within two years prior to the Petition Date, are referred to herein as the "Buy Out Transfers." Opportunity Finance, the Sabes Family Foundation, and the Sabes Family Defendants invested no new money with PCI and PC Funding

following the private meeting at Petters' home in December 2007, contrary to the defendants' prior pattern and practice.

115.   Beyond these indicia of fraud regarding the defendants' own transactions with Petters, PCI, PC Funding, and SPF Funding, the defendants ignored numerous other indicia of fraud from the general manner in which Petters, PCI, PC Funding, and SPF Funding operated. Among other things, IIO, Opportunity Finance, the Sabes Family Foundation, the Sabes Family Defendants, DZ Bank, WestLB and WestLB NY were on actual notice of the following additional indicia of fraud and financial irregularity but failed to make sufficient inquiry:

a.   Petters operated PCI, PC Funding, and SPF Funding without investor transparency, leading Robert W. Sabes, while repeatedly referring to Petters as his "Soulmate," to admit when complaining about a proposed reduction in the rate of False Profits to be paid to Opportunity Finance, "based on the risk involved and the lack of transparency, I . . . we didn't want to do it for less." Petters generally declined to provide investors with audited financial statements. He also barred any communication by investors with retailers who Petters represented would be purchasing the fictitious electronics. Petters also prohibited investors and insurers from viewing and inspecting the purported electronic goods they were financing.

b.   Petters, PCI, PC Funding, and SPF Funding did not provide investors with electronic online access to their accounts which—had the investments been legitimate—would have shown important financial information regarding payments by bona fide retailers and shipments of electronics which was and is generally customary in the industry for purchase-order financing with large retailers.

c.   PCI, PC Funding and SPF Funding promised and produced returns that literally were too good to be true, reflecting a pattern of abnormally consistent and significant

profitability that was not credible. Rates of return on funds advanced to PC Funding were commonly 14% to 30% annually, and rates of return on funds advanced to SPF Funding were commonly 14% to 42% annually. By comparison, the prime rate of interest ranged from 4% to 9% on an annual basis during the relevant time period. Graphs comparing market interest rates during the relevant time period to the rates of False Profits charged by Opportunity Finance and the Sabes Family Foundation are attached hereto as Exhibits I and J.

d.      Opportunity Finance and the Sabes Family Foundation received far higher purported annual rates of return on their investments with PC Funding and SPF Funding on an annual basis, as compared to the interest rates PC Funding and SPF Funding could have paid to commercial lenders during the relevant time period. Upon information and belief, the defendants never questioned why Petters accepted their investments in lieu of other available and less expensive financing alternatives, including commercial loans at far lower interest rates, which would have been more lucrative for Petters, PCI, PC Funding, and SPF Funding.

e.      The defendants did not conduct a performance audit of PCI, PC Funding, or SPF Funding or match purchase orders, wire transfer confirmations, or other transactional documents with the purported purchases of electronic equipment Opportunity Finance and the Sabes Family Foundation were financing despite the fact that the defendants provided millions of dollars in financing to PCI, PC Funding, and SPF Funding, and each easily could have afforded to do so.

f.      Defendant DZ Bank, which provided financing to Opportunity Finance to fund its investments in PCI, was unable to obtain adequate assurances from Petters, PCI, and PC Funding regarding the existence of the goods which were the collateral for the business transactions, and thereafter withdrew from providing that financing. Thereafter, Opportunity

Finance, the Sabes Family Foundation, WestLB and WestLB NY nevertheless continued to invest in PCI without the capacity to obtain adequate assurances regarding the existence of the goods.

g.     Defendants WestLB and WestLB NY entered into an agreement with Opportunity Finance Defendants in or about May 2003 to finance up to $150 million to fund the transfers that were part of the aforementioned Ponzi scheme, $50 million more than DZ Bank was financing prior to its withdrawal from funding transfers to Opportunity Finance Defendants. WestLB and WestLB NY did not obtain adequate assurances regarding the existence of the goods.  Specifically, they agreed to lend up to $150 million but were not allowed to inspect the inventory that formed the basis for the funding transfers.  They also agreed that PCI would not provide them with audited financial statements.  WestLB and WestLB NY entered into a similar agreement with Opportunity Finance Defendants on or about March 16, 2005 and, upon information and belief, that agreement similarly prohibited inventory inspections and audited financial statements from PCI.

h.     On or about June 17, 2003, Defendants WestLB and WestLB NY sent at least three representatives from WestLB NY – Vice President Brian Stratfeld, Vice President Alberto Santos and Associate Mark Hammen – to meet with Petters and Jon Sabes in Minnesota. Jon Sabes described the purpose of the trip to see Petters as the "preverbal [sic] smell test trip" regarding the agreement to lend up to $150 million.  Upon information and belief, the WestLB NY representatives met with Jon Sabes and Petters in Petters' corporate offices for approximately one hour, met several of Petters' company leaders, listened to Petters discuss his success, discussed books and then returned to New York without inspecting the inventory that formed the basis for the funding transfers that WestLB and WestLB NY were to finance.

64

### A.    PCI Transfers to IIO

116.    From in or about 1998 to the Petition Date, IIO was paid more than
$91,275,245.01 by PCI (the "PCI Transfers") resulting from note transactions and other
transactions with PCI. The PCI Transfers consisted of substantial amounts of other investors'
money that, instead of financing legitimate transactions, was used to pay prior investors,
including the defendants. The PCI Transfers were made to or for the benefit of IIO and its
principals and including, but are not limited to, the PCI Transfers listed on the documents
attached hereby as Exhibit K.

### B.    PCI and PC Funding Transfers to Opportunity Finance

117.    From in or about 2001 to the Petition Date, Opportunity Finance was paid more
than two billion, two hundred forty-four million, nine hundred twenty-three thousand, six
hundred sixty-two dollars and fourteen cents ($2,244,923,662.14) by PC Funding (the "PC
Funding Transfers") resulting from at least 546 note transactions and other transactions with PC
Funding. The PC Funding Transfers consisted of substantial amounts of other investors' money
that, instead of financing legitimate transactions, was used to pay prior investors, including the
defendants. Approximately $204,978,946.31 of the PC Funding Transfers was ultimately paid or
returned to PCI, through PC Funding, resulting in net transfers retained by Opportunity Finance
in the amount of $2,039,944,715.83. The PC Funding Transfers were made to or for the benefit
of Opportunity Finance and its principals and include, but are not limited to, the PC Funding
Transfers listed on the documents attached hereto as Exhibits L and M.

118.    Of the PC Funding Transfers to Opportunity Finance, Opportunity Finance
received False Profits from PC Funding in the amount of ninety million, four hundred eighty-
eight thousand, seven hundred three dollars ($90,488,703).

119.    Of the PC Funding Transfers to Opportunity Finance, approximately 187 transfers in the collective amount of approximately $777,621,641.62 were made during the two years prior to the Petition Date (the "PC Funding Two-Year Transfers"). *See* Exhibit L.

120.    Of the PC Funding Two-Year Transfers to Opportunity Finance, four (4) transfers in the collective amount of approximately $9,238,419 (the "90-Day Transfers") were made within the 90 days prior to the Petition Date (the "Preference Period"). *See* Exhibit L.

### C.    PCI and SPF Funding Transfers to Opportunity Finance

121.    From in or about 2001 to the Petition Date, Opportunity Finance was paid at least two hundred forty-eight million, one hundred seventy-five thousand, thirty-eight dollars and seventy-five cents ($248,175,038.75) by SPF Funding (the "SPF Funding/Opportunity Finance Transfers"). The SPF Funding/Opportunity Finance Transfers consisted of substantial amounts of other investors' money that, instead of financing legitimate transactions, was used to pay prior investors, including Opportunity Finance.

122.    Of the SPF Funding/Opportunity Finance Transfers, Opportunity Finance received False Profits from SPF Funding in the amount of thirteen million, five hundred fifty-two thousand, thirty-eight dollars and seventy-five cents ($13,552,038.75).

### D.    PCI and SPF Funding Transfers to the Sabes Family Foundation

123.    From in or about 2001 to the Petition Date, the Sabes Family Foundation was paid at least thirty-four million, seven hundred and thirteen thousand, one hundred and ninety-one dollars, ten cents ($34,713,191.10) by SPF Funding and PCI (the "Sabes Family Foundation Transfers"), including at least $7,000,000 of principal, at least $19,013,191.10 of interest and $8,700,000 in satisfaction of an  outstanding balance.   The Sabes Family Foundation Transfers

66

consisted of substantial amounts of other investors' money that, instead of financing legitimate transactions, was used to pay prior investors, including the Sabes Family Foundation.

124.    Of the Sabes Family Foundation Transfers, the Sabes Family Foundation received a net cash gain from SPF Funding and PCI in the amount of thirty-four million, seven hundred thirteen thousand, one hundred and ninety-one dollars and ten cents ($34,713,191.10).

125.    Of the Sabes Family Foundation Transfers, approximately 12 transfers in the collective amount of approximately twelve million, four hundred sixty-nine thousand, five hundred seventy-one dollars ($12,469,571) (the "Sabes Family Foundation Two-Year Transfers") were made during the two years prior to the Petition Date.

126.    The Sabes Family Foundation transfers were comprised of payments made by or that were sourced in PCI and SPF Funding to satisfy promissory notes for the purpose of paying promissory notes.  The Sabes Family Foundation transfers were not comprised of PCI's or SPF Funding's contributions of money or assets.  Instead, the Sabes Family Foundation Transfers were returns on investment made by the Sabes Family Foundation.  Transfers to the Sabes Family Foundation are summarized in Exhibit N, attached hereto.

### E.    PCI and SPF Funding Transfers to The Minneapolis Foundation

127.    From in or about 2001 to the Petition Date, The Minneapolis Foundation was paid more than eleven million, eight hundred and fifty-two thousand, three hundred and seventy dollars ($11,852,370) by SPF Funding and PCI (the "SPF Funding/Minneapolis Foundation Transfers," collectively with the SPF Funding/Opportunity Finance Transfers, the Sabes Family Foundation Transfers, and the Robert and Janet Sabes Transfers referred to herein for all purposes and all causes of action stated as the "Fraudulent Transfers").  The SPF

Funding/Minneapolis Foundation Transfers consisted of substantial amounts of other investors'
money that, instead of financing legitimate transactions, was used to pay The Minneapolis
Foundation.

128.    Of the SPF Funding/Minneapolis Foundation Transfers, SPF Funding paid six
million, nine hundred thousand dollars ($6,900,000) to The Minneapolis Foundation as purported
principal, which underlying promissory notes had been gifted to The Minneapolis Foundation
and, like the transfers described above, was comprised entirely of funds obtained from victims of
the Ponzi scheme.

129.    Of the SPF Funding/Minneapolis Foundation Transfers, The Minneapolis
Foundation received purported interest from PCI and SPF Funding in the amount of four million,
nine hundred fifty-two thousand, three hundred and seventy dollars ($4,952,370) paid on SPF
Funding promissory notes issued to Opportunity Finance, the Sabes Family Foundation, and
Robert W. Sabes and Janet F. Sabes, individually, and that were assigned and/or transferred to
The Minneapolis Foundation.

130.    The Minneapolis Foundation received transfers from PCI and SPF Funding that
were comprised of payments made by or sourced in PCI and SPF Funding to pay promissory
notes.  The SPF Funding/Minneapolis Foundation Transfers were not comprised of PCI or SPF
Funding's contributions of money or assets.   The SPF Funding/Minneapolis Foundation
Transfers were returns on investment made by The Minneapolis Foundation.   The SPF
Funding/Minneapolis Foundation are summarized in Exhibit O, attached hereto.

131.    To the extent that any of the recovery amounts may be inconsistent with each
other, they are to be treated as being pled in the alternative.

132.    During the course of this adversary proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made to one or more defendants named in this Amended Complaint. The Trustee intends to avoid and recover all transfers made by the Debtors of an interest of the Debtors in property to or for the benefit of defendants or any other transferee. The Trustee reserves the right to amend this original Amended Complaint to include: (i) further information regarding the Fraudulent Transfers, (ii) additional Fraudulent Transfers, (iii) modifications or revisions to the names of defendants, (iv) additional defendants, and (v) additional causes of action (i.e., but not exclusively, 11 U.S.C. §§ 542, 544, 545, 547, and 549) (collectively, the "Amendments"), that may become known to the Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Amended Complaint.

## COUNT 1 – FRAUDULENTLY INCURRED OBLIGATIONS

### [Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A) and 1106]

**Against the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, WestLB, WestLB NY and The Minneapolis Foundation**

133.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

134.    The Credit Agreement, Security Agreement, the IIO – PCI Notes, Opportunity Finance – PC Funding Notes, Opportunity Finance – SPF Funding Notes, Sabes Family Foundation – SPF Funding Notes, and Minneapolis Foundation – SPF Funding Notes and any other promissory notes from the debtors to one or more of the Defendants (collectively, the "Fraudulent Obligations") are obligations that were incurred by PCI, PC Funding, and SPF Funding with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the Fraudulent Obligations.

135.    The Fraudulent Obligations were made to or for the benefit of the Opportunity

Finance Defendants, Sabes Family Foundation, DZ Bank, WestLB, WestLB NY and The

Minneapolis Foundation in furtherance of a fraudulent investment scheme.

136.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 548(a)(1)(A) and 1106: (a) avoiding the Fraudulent Obligations free and

clear from any claimed interest of the Opportunity Finance Defendants, Sabes Family

Foundation, DZ Bank, WestLB,  WestLB NY and The Minneapolis Foundation, and (b)

directing that the Fraudulent Obligations be set aside.

## COUNT 2 – FRAUDULENTLY INCURRED OBLIGATIONS

**[Actual Fraud - 11 U.S.C. §§ 544(b) and 1106 & Minn. Stat. §§ 513.44(a)(1) and 513.47 or
Other Governing Fraudulent Transfer Laws]**
**Against the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank,
WestLB, WestLB NY and The Minneapolis Foundation**

137.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Third Amended Complaint as if fully set forth herein.

138.    The Trustee has standing to assert the claims herein because, at all times material

hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78

and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured

claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and

is not allowable only under Bankruptcy Code § 502(e).

139.    The Trustee's claim is timely because, at all times material hereto, there was and

is at least one or more creditors who held and who hold allowed and allowable claims, as

identified in paragraph 79 above, (a) whose claims against the Defendants did not arise, exist or

accrue at any time until within the six years before the first  date on which a bankruptcy petition

was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual

knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and

the Ponzi scheme at any time until within six years before the first date on which a bankruptcy

petition was filed by any debtor in the above-captioned bankruptcy cases.

140.    The Fraudulent Obligations are avoidable under applicable nonbankruptcy law by

a creditor holding an unsecured claim in the bankruptcy case.

141.    The Fraudulent Obligations are obligations that were incurred by PCI, PC

Funding, and SPF Funding with actual intent to hinder, delay, or defraud a creditor to which the

Debtors were or became indebted on or after the date of the Fraudulent Obligations.

142.    The Fraudulent Obligations were made to or for the benefit of the Opportunity

Finance Defendants, Sabes Family Foundation, DZ Bank, WestLB, WestLB NY and The

Minneapolis Foundation in furtherance of a fraudulent investment scheme.

143.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b) and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court

should determine that this action is governed by the laws of other states, the fraudulent transfer

laws of such other states:  (a) avoiding the Fraudulent Obligations free and clear from any

claimed interest of the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank,

WestLB, WestLB NY and The Minneapolis Foundation, and (b) directing that the Fraudulent

Obligations be set aside.

## COUNT 3 – FRAUDULENT TRANSFERS

### [Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A), 550(a), 551, and 1106]

**Against the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY
Regarding the PC Funding Two-Year Transfers**

144.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

145.    The PC Funding Two-Year Transfers, which specifically include but are not limited to the Buy Out Transfers that Opportunity Finance received following its abrupt cessation of investment activity in December 2007, represent transfers that were made or obligations that were incurred with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the Fraudulent Transfers.

146.    The PC Funding Two-Year Transfers were made to or for the benefit of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY in furtherance of a fraudulent investment scheme.

147.    To the extent that the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY are not initial transferees of the PC Funding Two-Year Transfers, they are immediate or mediate transferees of the initial transferees of the PC Funding Two-Year Transfers, and cannot satisfy their burden that they took the PC Funding Two-Year Transfers for value and in good faith and without knowledge of the voidability of the PC Funding Two-Year Transfers.

148.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(A), 550(a), 551, and 1106: (a) avoiding and preserving the PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY (b) directing that the PC Funding Two-Year Transfers be set aside, (c) recovering such PC Funding Two-Year Transfers in the amount of $777,621,641.62 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the estates of PCI and PC Funding, (d) alternatively, recovering such False

72

Profits in the amount of $90,488,703, (e) alternatively, recovering the Buy Out Transfers from the Opportunity Finance Defendants in the amount of $165,537,794, and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY.

## COUNT 4 – FRAUDULENT TRANSFERS

### [Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B), 550(a), 551, and 1106]

### Against the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY Regarding the PC Funding Two-Year Transfers

149.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

150.     At all times material hereto, the Debtors: (a) were insolvent on the dates the PC Funding Two-Year Transfers were made or became insolvent as a result of the PC Funding Two-Year Transfers, and/or (b) were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the PC Funding Two-Year Transfers were effectuated constituted unreasonably small capital, and/or (c) at the time of the PC Funding Two-Year Transfers, intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

151.     The Debtors received less than a reasonably equivalent value in exchange for the PC Funding Two-Year Transfers.

152.     To the extent that the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY are not initial transferees of the PC Funding Two-Year Transfers, they are immediate or mediate transferees of the initial transferees of the PC Funding Two-Year Transfers, and cannot satisfy their burden that they took the PC Funding Two-Year Transfers for

value and in good faith and without knowledge of the voidability of the PC Funding Two-Year Transfers.

153.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a), 551, and 1106:  (a) avoiding and preserving the PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY, (b) directing that the PC Funding Two-Year Transfers be set aside, (c) recovering such PC Funding Two-Year Transfers in the amount of $777,621,641.62 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in the amount of $90,488,703, (e) alternatively, recovering the Buy Out Transfers from the Opportunity Finance Defendants in the amount of $165,537,794, and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY.

## COUNT 5 – FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY Regarding the PCI Transfers and the PC Funding Transfers**

154.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

155.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured

claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

156.   The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases.

157.   The PCI Transfers and the PC Funding Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

158.   The PCI Transfers and the PC Funding Transfers represent transfers that were made or obligations that were incurred with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the PC Funding Transfers.

159.   The PCI Transfers and the PC Funding Transfers were made to or for the benefit of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY in furtherance of a fraudulent investment scheme.

160.   To the extent that the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY are not initial transferees of the PCI Transfers or the PC Funding Transfers, they are immediate or mediate transferees of the initial transferees of the PCI Transfers or the PC

Funding Transfers, and cannot satisfy their burden that they took the PCI Transfers or the PC Funding Transfers for value or in good faith.

161.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the PCI Transfers and the PC Funding Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY, (b) directing that the PCI Transfers and the PC Funding Transfers be set aside, (c) recovering such PCI Transfers and PC Funding Transfers in an amount exceeding $2,244,923,662.14 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the bankruptcy estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in an amount exceeding $90,488,703, (e) alternatively, recovering the Buy Out Transfers in the amount of $165,537,794 from the Opportunity Finance Defendants, and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY.

## COUNT 6 – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat.
§§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY
Regarding the PCI Transfers and the PC Funding Transfers**

162.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

163.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

164.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases.

165.    The PCI Transfers and the PC Funding Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

166.    At all times material hereto, the Debtors were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the PCI Transfers and the PC Funding Transfers were effectuated constituted unreasonably small capital.

167.    The Debtors received less than a reasonably equivalent value in exchange for the PCI Transfers and the PC Funding Transfers.

168.    To the extent that the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY are not initial transferees of the PCI Transfers and the PC Funding Transfers, they are subsequent transferees of the initial transferees of the PCI Transfers and the PC Funding Transfers, and cannot satisfy their burden that they took the PCI Transfers or the PC Funding Transfers for value and in good faith.

169.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the PCI Transfers and the PC Funding Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY, (b) directing that the PCI Transfers and the PC Funding Transfers be set aside, (c) recovering such PCI Transfers and PC Funding Transfers in an amount exceeding $2,244,923,662.14 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the bankruptcy estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in an amount exceeding $90,488,703, (e) alternatively, recovering the Buy Out Transfers in the amount of $165,537,794 from the Opportunity Finance Defendants, and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY.

**COUNT 7 – FRAUDULENT TRANSFERS**

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY Regarding the PCI Transfers and the PC Funding Transfers**

78

170.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

171.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

172.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first  date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases.

173.    The PCI Transfers and  thePC Funding Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

174.    At all times material hereto, the Debtors, at the time of the PCI Transfers and the PC Funding Transfers, intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

175.    The Debtors received less than a reasonably equivalent value in exchange for the PCI Transfers and the PC Funding Transfers.

176.    To the extent that the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY are not initial transferees of the PCI Transfers or the PC Funding Transfers, they are subsequent transferees of the initial transferee of the PCI and the PC Funding Transfers, and can not satisfy their burden that they took the PCI Transfers or PC Funding Transfers for value and in good faith.

177.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the PCI Transfers and the PC Funding Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY, (b) directing that the PCI and the PC Funding Transfers be set aside, (c) recovering such Transfers in an amount exceeding $2,244,923,662.14 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the bankruptcy estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in an amount exceeding $90,488,703, (e) alternatively, recovering the Buy Out Transfers in the amount of $165,537,794 from the Opportunity Finance Defendants, and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY.

## COUNT 8 – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY Regarding the PCI Transfers and the PC Funding Transfers**

178.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

179.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

180.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases.

181.    The PCI Transfers and  the PC Funding Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

182.    At all times material hereto, the Debtors, at the time of the PCI Transfers and the PC Funding Transfers, were insolvent or, in the alternative, the Debtors became insolvent as a result of the PCI Transfers and the PC Funding Transfers.

183.    The Debtors received less than a reasonably equivalent value in exchange for the PCI Transfers and the PC Funding Transfers.

184.    To the extent that the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY are not initial transferees of the PCI Transfers and the PC Funding Transfers, they are subsequent transferees of the initial transferees of the PCI Transfers and the PC Funding Transfers, and can not satisfy their burden that they took the PCI Transfers and the PC Funding Transfers for value and in good faith.

185.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the PCI Transfers and the PC Funding Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY, (b) directing that the PCI Transfers and the PC Funding Transfers be set aside, (c) recovering such PCI Transfers and PC Funding Transfers in an amount exceeding $2,244,923,662.14 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the bankruptcy estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in the amount of $90,488,703, (e) alternatively, recovering the Buy Out Transfers in the amount of $165,537,794 from the Opportunity Finance Defendants, and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY.

## COUNT 9 – PREFERENTIAL TRANSFERS

### [11 U.S.C. §§ 547, 550, 551, and 1106]

### Against the Opportunity Finance Defendants

186.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

187.    At the time of each of the 90-Day Transfers (hereafter, the "Preference Period Transfers"), the Opportunity Finance Defendants were "creditors" of PC Funding within the meaning of Section 101(1) of the Bankruptcy Code.

188.    Each of the Preference Period Transfers constitutes a transfer of an interest of PC Funding in property within the meaning of Section 101(54) of the Bankruptcy Code.

189.    Each of the Preference Period Transfers was to or for the benefit of the Opportunity Finance Defendants.

190.    Each of the Preference Period Transfers was made for or on account of an antecedent debt owed by PC Funding before such transfer was made.

191.    Each of the Preference Period Transfers were made while PC Funding was insolvent.

192.    Each of the Preference Period Transfers were made during the Preference Period under section 547(b)(4) of the Bankruptcy Code.

193.    Each of the Preference Period Transfers enabled the Opportunity Finance Defendants to receive more than the Opportunity Finance Defendants would receive if (i) this case was a case under Chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the Opportunity Finance Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

194.    Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to Section 547(b) of the Bankruptcy Code and recoverable from the Opportunity Finance Defendants pursuant to Section 550(a).

195.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, (b) directing that the Preference Period Transfers be set aside, (c) recovering the Preference Period Transfers in the amount of $9,238,419 from the Opportunity Finance Defendants, for the benefit of the bankruptcy estates of PCI and PC Funding, and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

## COUNT 10 – FRAUDULENT TRANSFERS

### [Actual Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]

### Against the Opportunity Finance Defendants Regarding the SPF Funding/Opportunity Finance Transfers

196.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

197.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

198.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first  date on which a bankruptcy petition

was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual

knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and

the Ponzi scheme at any time until within six years before the first date on which a bankruptcy

petition was filed by any debtor in the above-captioned bankruptcy cases.

199.    The SPF Funding/Opportunity Finance Transfers are avoidable under applicable

nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

200.    The SPF Funding/Opportunity Finance Transfers represent transfers that were

made or obligations that were incurred with actual intent to hinder, delay, or defraud a creditor to

which the Debtors were or became indebted on or after the date of the SPF Funding/Opportunity

Finance Transfers.

201.    The SPF Funding/Opportunity Finance Transfers were made to or for the benefit

of the Opportunity Finance Defendants in furtherance of a fraudulent investment scheme.

202.    To the extent that the Opportunity Finance Defendants are not initial transferees

of the SPF Funding/Opportunity Finance Transfers, they are immediate or mediate transferees of

the initial transferees of the SPF Funding/Opportunity Finance Transfers, and cannot satisfy their

burden that they took the SPF Funding/Opportunity Finance Transfers for value or in good faith.

203.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and

if the Court should determine that this action is governed by the laws of other states, the

fraudulent transfer laws of such other states:    (a) avoiding and preserving the SPF

Funding/Opportunity Finance Transfers free and clear from any claimed interest of the

Opportunity Finance Defendants, (b) directing that the SPF Funding/Opportunity Finance

Transfers be set aside, (c) recovering such SPF Funding/Opportunity Finance Transfers in the

amount of $248,175,038.75 from the Opportunity Finance Defendants for the benefit of the

bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in

the amount of $13,552,038.75, and (e) recovering prejudgment and post-judgment interest,

attorneys' fees, and costs from the Opportunity Finance Defendants.

### COUNT 11 – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat.
§§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**
**Against the Opportunity Finance Defendants Regarding the SPF Funding/Opportunity
Finance Transfers**

204.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Third Amended Complaint as if fully set forth herein.

205.    The Trustee has standing to assert the claims herein because, at all times material

hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78

and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured

claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and

is not allowable only under Bankruptcy Code § 502(e).

206.    The Trustee's claim is timely because, at all times material hereto, there was and

is at least one or more creditors who held and who hold allowed and allowable claims, as

identified in paragraph 79 above, (a) whose claims against the Defendants did not arise, exist or

accrue at any time until within the six years before the first  date on which a bankruptcy petition

was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual

knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and

the Ponzi scheme at any time until within six years before the first date on which a bankruptcy

petition was filed by any debtor in the above-captioned bankruptcy cases.

207.    The SPF Funding/Opportunity Finance Transfers are avoidable under applicable

nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

208.    At all times material hereto, the Debtors were engaged in businesses or

transactions, or were about to engage in businesses or transactions, for which the property

remaining with the Debtors after the SPF Funding/Opportunity Finance Transfers were

effectuated constituted unreasonably small capital.

209.    The Debtors received less than a reasonably equivalent value in exchange for the

SPF Funding/Opportunity Finance Transfers.

210.    To the extent that the Opportunity Finance Defendants are not initial transferees

of the SPF Funding/Opportunity Finance Transfers, they are subsequent transferees of the initial

transferees of the SPF Funding/Opportunity Finance Transfers, and cannot satisfy their burden

that they took the SPF Funding/Opportunity Finance Transfers for value and in good faith.

211.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47,

and if the Court should determine that this action is governed by the laws of other states, the

fraudulent transfer laws of such other states:    (a) avoiding and preserving the SPF

Funding/Opportunity Finance Transfers free and clear from any claimed interest of the

Opportunity Finance Defendants, (b) directing that the SPF Funding/Opportunity Finance

Transfers be set aside, (c) recovering such SPF Funding/Opportunity Finance Transfers in the

amount of $248,175,038.75 from the Opportunity Finance Defendants for the benefit of the

bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of $13,552,038.75, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

## COUNT 12 – FRAUDULENT TRANSFERS

### [Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]

### Against the Opportunity Finance Defendants Regarding the SPF Funding/Opportunity Finance Transfers

212.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

213.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

214.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases.

215.    The SPF Funding/Opportunity Finance Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

216.    At all times material hereto, the Debtors, at the time of the SPF Funding/Opportunity Finance Transfers, intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

217.    The Debtors received less than a reasonably equivalent value in exchange for the SPF Funding/Opportunity Finance Transfers.

218.    To the extent that the Opportunity Finance Defendants are not initial transferees of the SPF Funding/Opportunity Finance Transfers, they are subsequent transferees of the initial transferee of the SPF Funding/Opportunity Finance Transfers, and can not satisfy their burden that they took the SPF Funding/Opportunity Finance Transfers for value and in good faith.

219.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:   (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, (b) directing that the SPF Funding/Opportunity Finance Transfers be set aside, (c) recovering such SPF Funding/Opportunity Finance Transfers in the amount of $248,175,038.75 from the Opportunity Finance Defendants for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of $13,552,038.75, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs.

## COUNT 13 – FRAUDULENT TRANSFERS

### [Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]

### Against the Opportunity Finance Defendants Regarding the SPF Funding/Opportunity Finance Transfers

220.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

221.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

222.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first  date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases.

223.    The SPF Funding/Opportunity Finance Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

224.   At all times material hereto, the Debtors, at the time of the SPF Funding/Opportunity Finance Transfers, were insolvent or, in the alternative, the Debtors became insolvent as a result of the SPF Funding/Opportunity Finance Transfers.

225.   The Debtors received less than a reasonably equivalent value in exchange for the SPF Funding/Opportunity Finance Transfers.

226.   To the extent that the Opportunity Finance Defendants are not initial transferees of the SPF Funding/Opportunity Finance Transfers, they are subsequent transferees of the initial transferees of the SPF Funding/Opportunity Finance Transfers, and cannot satisfy their burden that they took the SPF Funding/Opportunity Finance Transfers for value and in good faith.

227.   As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, (b) directing that the SPF Funding/Opportunity Finance Transfers be set aside, (c) recovering such SPF Funding/Opportunity Finance Transfers in the amount of $248,175,038.75 from the Opportunity Finance Defendants for the benefit of the bankruptcy estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in the amount of $13,552,038.75, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

## COUNT 14 – FRAUDULENT TRANSFERS

### [Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A), 550(a), 551, and 1106]

**Against Defendant Sabes Family Foundation Regarding the Sabes Family Foundation
Two-Year Transfers**

228.    The Trustee realleges and incorporates by reference the preceding paragraphs of
the Third Amended Complaint as if fully set forth herein.

229.    The Sabes Family Foundation Two-Year Transfers represent transfers that were
made or obligations that were incurred with actual intent to hinder, delay, or defraud a creditor to
which the Debtors were or became indebted on or after the date of the Fraudulent Transfers.

230.    The Sabes Family Foundation Two-Year Transfers were made to or for the
benefit of the Sabes Family Foundation in furtherance of a fraudulent investment scheme.

231.    To the extent that the Sabes Family Foundation is not an initial transferee of the
Sabes Family Foundation Two-Year Transfers, it is an immediate or mediate transferee of the
initial transferees of the Sabes Family Foundation Two-Year Transfers, and cannot satisfy its
burden that it took the Sabes Family Foundation Two-Year Transfers for value and in good faith
and without knowledge of the voidability of the Sabes Family Foundation Two-Year Transfers.

232.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to
Bankruptcy Code §§ 548(a)(1)(A), 550(a), 551, and 1106: (a) avoiding and preserving the Sabes
Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes
Family Foundation, (b) directing that the Sabes Family Foundation Two-Year Transfers be set
aside, (c) recovering such Sabes Family Foundation Two-Year Transfers in the amount of
$12,469,571 from the Sabes Family Foundation for the benefit of the estates of PCI and SPF
Funding, (d) alternatively, recovering such False Profits in the amount of $12,469,571, and (e)
recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes
Family Foundation.

## COUNT 15 – FRAUDULENT TRANSFERS

### [Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B), 550(a), 551, and 1106]

### Against Defendant Sabes Family Foundation Regarding the Sabes Family Foundation Two-Year Transfers

233.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

234.    At all times material hereto, the Debtors: (a) were insolvent on the dates the Sabes Family Foundation Two-Year Transfers were made or became insolvent as a result of the Sabes Family Foundation Two-Year Transfers, and/or (b) were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the Sabes Family Foundation Two-Year Transfers were effectuated constituted unreasonably small capital, and/or (c) at the time of the Sabes Family Foundation Two-Year Transfers, intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

235.    The Debtors received less than a reasonably equivalent value in exchange for the Sabes Family Foundation Two-Year Transfers.

236.    To the extent that the Sabes Family Foundation is not an initial transferee of the Sabes Family Foundation Two-Year Transfers, it is an immediate or mediate transferee of the initial transferees of the Sabes Family Foundation Two-Year Transfers, and cannot satisfy its burden that it took the Sabes Family Foundation Two-Year Transfers for value and in good faith and without knowledge of the voidability of the Sabes Family Foundation Two-Year Transfers.

237.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a), 551, and 1106:  (a) avoiding and preserving the Sabes

Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes Family Foundation, (b) directing that the Sabes Family Foundation Two-Year Transfers be set aside, (c) recovering such Sabes Family Foundation Two-Year Transfers in the amount of $12,469,571 from the Sabes Family Foundation for the benefit of the estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of $12,469,571, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

## COUNT 16 – FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant Sabes Family Foundation Regarding the Sabes Family Foundation Transfers**

238.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

239.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

240.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendant did not arise, exist or accrue at any time until within the six years before the first  date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual

knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases.

241.    The Sabes Family Foundation Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

242.    The Sabes Family Foundation Transfers represent transfers that were made or obligations that were incurred with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the Sabes Family Foundation Transfers.

243.    The Sabes Family Foundation Transfers were made to or for the benefit of the Sabes Family Foundation in furtherance of a fraudulent investment scheme.

244.    To the extent that the Sabes Family Foundation is not an initial transferee of the Sabes Family Foundation Transfers, it is an immediate or mediate transferee of the initial transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took the Sabes Family Foundation Transfers for value or in good faith.

245.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation, (b) directing that the Sabes Family Foundation Transfers be set aside, (c) recovering such Sabes Family Foundation Transfers in the amount of at least $34,713,191.10 from the Sabes Family

Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of at least $34,713,191.10, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

## COUNT 17 – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant Sabes Family Foundation Regarding the Sabes Family Foundation Transfers**

246.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

247.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

248.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendant did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases.

249.    The Sabes Family Foundation Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

250.    At all times material hereto, the Debtors were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the Sabes Family Foundation Transfers were effectuated constituted unreasonably small capital.

251.    The Debtors received less than a reasonably equivalent value in exchange for the Sabes Family Foundation Transfers.

252.    To the extent that the Sabes Family Defendants are not initial transferees of the Sabes Family Foundation Transfers, they are subsequent transferees of the initial transferees of the Sabes Family Foundation Transfers, and cannot satisfy their burden that they took the Sabes Family Foundation Transfers for value and in good faith.

253.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Defendants, (b) directing that the Sabes Family Foundation Transfers be set aside, (c) recovering such Sabes Family Foundation Transfers in the amount of at least $34,713,191.10 from the Sabes Family Defendants for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of at least $34,713,191.10, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Defendants.

## COUNT 18 – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat.
§§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant Sabes Family Foundation Regarding the Sabes Family Foundation
Transfers**

254.    The Trustee realleges and incorporates by reference the preceding paragraphs of
the Third Amended Complaint as if fully set forth herein.

255.    The Trustee has standing to assert the claims herein because, at all times material
hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78
and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured
claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and
is not allowable only under Bankruptcy Code § 502(e).

256.    The Trustee's claim is timely because, at all times material hereto, there was and
is at least one or more creditors who held and who hold allowed and allowable claims, as
identified in paragraph 79 above, (a) whose claims against the Defendant did not arise, exist or
accrue at any time until within the six years before the first  date on which a bankruptcy petition
was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual
knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and
the Ponzi scheme at any time until within six years before the first date on which a bankruptcy
petition was filed by any debtor in the above-captioned bankruptcy cases.

257.    The Sabes Family Foundation Transfers are avoidable under applicable
nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

258.   At all times material hereto, the Debtors, at the time of the Sabes Family Foundation Transfers, intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

259.   The Debtors received less than a reasonably equivalent value in exchange for the Sabes Family Foundation Transfers.

260.   To the extent that the Sabes Family Foundation is not an initial transferee of the Sabes Family Foundation Transfers, it is a subsequent transferee of the initial transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took the Sabes Family Foundation Transfers for value and in good faith.

261.   As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:   (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation, (b) directing that the Sabes Family Foundation Transfers be set aside, (c) recovering such Sabes Family Foundation Transfers in the amount of at least $34,713,191.10 from the Sabes Family Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of at least $34,713,191.10, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

## COUNT 19 – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant Sabes Family Foundation Regarding the Sabes Family
Foundation Transfers**

262.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Third Amended Complaint as if fully set forth herein.

263.    The Trustee has standing to assert the claims herein because, at all times material

hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78

and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured

claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and

is not allowable only under Bankruptcy Code § 502(e).

264.    The Trustee's claim is timely because, at all times material hereto, there was and

is at least one or more creditors who held and who hold allowed and allowable claims, as

identified in paragraph 79 above, (a) whose claims against the Defendant did not arise, exist or

accrue at any time until within the six years before the first  date on which a bankruptcy petition

was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual

knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and

the Ponzi scheme at any time until within six years before the first date on which a bankruptcy

petition was filed by any debtor in the above-captioned bankruptcy cases.

265.    The Sabes Family Foundation Transfers are avoidable under applicable

nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

266.    At all times material hereto, the Debtors, at the time of the Sabes Family

Foundation Transfers, were insolvent or, in the alternative, the Debtors became insolvent as a

result of the Sabes Family Foundation Transfers.

267.    The Debtors received less than a reasonably equivalent value in exchange for the Sabes Family Foundation Transfers.

268.    To the extent that the Sabes Family Foundation is not an initial transferee of the Sabes Family Foundation Transfers, it is a subsequent transferee of the initial transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took the Sabes Family Foundation Transfers for value and in good faith.

269.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation, (b) directing that the Sabes Family Foundation Transfers be set aside, (c) recovering such Sabes Family Foundation Transfers in the amount of $34,713,191.10  from the Sabes Family Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of $34,713,191.10, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

## COUNT 20 – FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant The Minneapolis Foundation Regarding the SPF Funding/Minneapolis Foundation Transfers**

270.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

271.   The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

272.   The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendant did not arise, exist or accrue at any time until within the six years before the first  date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases.

273.   The SPF Funding/Minneapolis Foundation Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

274.   The SPF Funding/Minneapolis Foundation Transfers represent transfers that were made or obligations that were incurred with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the SPF Funding/Minneapolis Foundation Transfers.

275.   The SPF Funding/Minneapolis Foundation Transfers were made to or for the benefit of The Minneapolis Foundation in furtherance of a fraudulent investment scheme.

276.     To the extent that The Minneapolis Foundation is not an initial transferee of the SPF Funding/Minneapolis Foundation Transfers, it is an immediate or mediate transferee of the initial transferees of the SPF Funding/Minneapolis Foundation Transfers, and cannot satisfy its burden that it took the SPF Funding/Minneapolis Foundation Transfers for value or in good faith.

277.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:   (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation, (b) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside, (c) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $11,852,370 from The Minneapolis Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation.

## COUNT 21 – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant The Minneapolis Foundation Regarding the SPF Funding/Minneapolis Foundation Transfers**

278.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

279.     The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured

claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

280.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendant did not arise, exist or accrue at any time until within the six years before the first  date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases.

281.    The SPF Funding/Minneapolis Foundation Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

282.    At all times material hereto, the Debtors were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the SPF Funding/Minneapolis Foundation Transfers were effectuated constituted unreasonably small capital.

283.    The Debtors received less than a reasonably equivalent value in exchange for the SPF Funding/Minneapolis Foundation Transfers.

284.    To the extent that The Minneapolis Foundation is not an initial transferee of the SPF Funding/Minneapolis Foundation Transfers, it is a subsequent transferee of the initial transferees of the SPF Funding/Minneapolis Foundation Transfers, and cannot satisfy its burden that it took the SPF Funding/Minneapolis Foundation Transfers for value and in good faith.

285.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:   (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation, (b) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside, (c) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $11,852,370 from The Minneapolis Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation.

## COUNT 22 – FRAUDULENT TRANSFERS

### [Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]

#### Against Defendant The Minneapolis Foundation Regarding the SPF Funding/Minneapolis Foundation Transfers

286.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

287.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

288.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as

identified in paragraph 79 above, (a) whose claims against the Defendant did not arise, exist or

accrue at any time until within the six years before the first date on which a bankruptcy petition

was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual

knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and

the Ponzi scheme at any time until within six years before the first date on which a bankruptcy

petition was filed by any debtor in the above-captioned bankruptcy cases.

289.    The SPF Funding/Minneapolis Foundation Transfers are avoidable under

applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

290.    At all times material hereto, the Debtors, at the time of the SPF

Funding/Minneapolis Foundation Transfers, intended to incur, or believed that they would incur,

debts that would be beyond their ability to pay as the debts matured.

291.    The Debtors received less than a reasonably equivalent value in exchange for the

SPF Funding/Minneapolis Foundation Transfers.

292.    To the extent that The Minneapolis Foundation is not an initial transferee of the

SPF Funding/Minneapolis Foundation Transfers, it is a subsequent transferee of the initial

transferees of the SPF Funding/Minneapolis Foundation Transfers, and cannot satisfy its burden

that it took the SPF Funding/Minneapolis Foundation Transfers for value and in good faith.

293.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47,

and if the Court should determine that this action is governed by the laws of other states, the

fraudulent transfer laws of such other states:   (a) avoiding and preserving the SPF

Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The

Minneapolis Foundation, (b) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside, (c) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $11,852,370 from The Minneapolis Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation.

## COUNT 23 – FRAUDULENT TRANSFERS

### [Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]

### Against Defendant The Minneapolis Foundation Regarding the SPF Funding/Minneapolis Foundation Transfers

294.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

295.    The Trustee has standing to assert the claims herein because, at all times material hereto, there was and is at least one or more creditors, as specifically identified in paragraphs 78 and 79 above, who hold an allowed unsecured claim and who held and who hold an unsecured claim against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

296.    The Trustee's claim is timely because, at all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in paragraph 79 above, (a) whose claims against the Defendant did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who had neither actual knowledge nor discovery of facts constituting deemed notice of the nature of Petters' fraud and

the Ponzi scheme at any time until within six years before the first date on which a bankruptcy

petition was filed by any debtor in the above-captioned bankruptcy cases.

297.   The SPF Funding/Minneapolis Foundation Transfers are avoidable under

applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

298.   At all times material hereto, the Debtors, at the time of the SPF

Funding/Minneapolis Foundation Transfers, were insolvent or, in the alternative, the Debtors

became insolvent as a result of the SPF Funding/Minneapolis Foundation Transfers.

299.   The Debtors received less than a reasonably equivalent value in exchange for the

SPF Funding/Minneapolis Foundation Transfers.

300.   To the extent that The Minneapolis Foundation is not an initial transferee of the

SPF Funding/Minneapolis Foundation Transfers, it is a subsequent transferee of the initial

transferees of the SPF Funding/Minneapolis Foundation Transfers, and cannot satisfy its burden

that it took the SPF Funding/Minneapolis Foundation Transfers for value and in good faith.

301.   As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if

the Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states:  (a) avoiding and preserving the SPF Funding/Minneapolis

Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation,

(b) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside, (c) recovering

such SPF Funding/Minneapolis Foundation Transfers in the amount of $11,852,370 from The

Minneapolis Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, and

(d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation.

## COUNT 24 – LIEN AVOIDANCE

### [11 U.S.C. § 506(d)]

### Against All Defendants

302.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

303.    To the extent that a lien secures a claim against a debtor that is not an allowed secured claim, such lien is void in accordance with 11 U.S.C. § 506(d).

304.    As a result of the foregoing, declaring and ordering that any lien asserted by defendants is invalid and void.

## COUNT 25 – UNJUST ENRICHMENT/EQUITABLE DISGORGEMENT

### Against All Defendants

305.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Third Amended Complaint as if fully set forth herein.

306.    At all times relevant hereto, all funds received by defendants were inextricably intertwined with the Ponzi scheme and were derived from monies fraudulently obtained by Petters and PCI from other investors or participants in the Ponzi scheme.

307.    Within the context of a Ponzi scheme, such as the one perpetrated through PCI utilizing the artificial corporate entities of PC Funding and SPF Funding, equality to defrauded creditors who lost principal based upon the Ponzi scheme, is equity.

308.    The defendants, as recipients of fraudulently obtained proceeds of the Ponzi scheme, including the Principal and the False Profits, have no rightful or legitimate claim to any monies received from PCI, through PC Funding or through SPF Funding.

309.    The defendants knowingly received monies from the Ponzi scheme, were unjustly enriched through their receipt of said fraudulently obtained monies to the detriment of other investors in PCI, and in equity and good conscience must be required to repay the proceeds received.

310.    The defendants would be unjustly enriched to the extent they are allowed to retain the monies and proceeds received during participation in the Ponzi scheme.

311.    The defendants must, therefore, in equity be required to disgorge all proceeds received through the operation of the Ponzi scheme, so as to allow the Trustee to distribute in equity any such ill-gotten gains among all innocent participants and/or investors and creditors of PCI.

312.    The Trustee re-pleads this count only for the purpose of preserving the record on appeal

**WHEREFORE**, the Trustee respectfully requests this Court enter judgment in favor of Plaintiffs and against the defendants as follows:

A.    That as a matter of law and equity, at all times relevant hereto PC Funding was an alter ego of Debtor PCI, the very purpose of which was to defraud and hinder the detection of the Ponzi scheme by the creditors of PCI, and that as a result the Trustee is entitled to, and has standing to, reverse-pierce PC Funding; that PCI and PC Funding be treated as one entity for all intents and purposes

hereto, and that the assets of PC Funding be therefore made available to the creditors of PCI and the Trustee of PCI for all purposes;

B.        That as a matter of law and equity, at all times relevant hereto SPF Funding was an alter ego of Debtor PCI, the very purpose of which was to defraud and hinder the detection of the Ponzi scheme by the creditors of PCI, and that as a result the Trustee is entitled to, and has standing to, reverse-pierce SPF Funding; that PCI and SPF Funding be treated as one entity for all intents and purposes hereto, and that the assets of SPF Funding be therefore made available to the creditors of PCI and the Trustee of PCI for all purposes;

C.        On Count 1 – Fraudulently Incurred Obligations (Actual Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 1106 as against the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, WestLB, WestLB NY and The Minneapolis Foundation regarding the Fraudulent Obligations:   (a) avoiding the Fraudulent Obligations free and clear from any claimed interest of the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, WestLB, WestLB NY and The Minneapolis Foundation, and (b) directing that the Fraudulent Obligations be set aside.

D.        On Count 2 – Fraudulently Incurred Obligations (Actual Fraud), pursuant to 11 U.S.C. §§ 544(b) and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, WestLB, WestLB NY and The Minneapolis Foundation   regarding the Fraudulent

DOCS-#4740096-V2

Obligations:  (a) avoiding the Fraudulent Obligations free and clear from any claimed interest of the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, WestLB, WestLB NY and The Minneapolis Foundation, and (b) directing that the Fraudulent Obligations be set aside.

E.     On Count 3 – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, 551, and 1106 as against the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY regarding the PC Funding Two-Year Transfers:  (a) avoiding and preserving the PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY, (b) directing that the PC Funding Two-Year Transfers be set aside, (c) recovering such PC Funding Two-Year Transfers in the amount of $777,621,641.62 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in the amount of $90,488,703, (e) alternatively, recovering the Buy Out Transfers in the amount of $165,537,794 from the Opportunity Finance Defendants, and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY;

F.     On Count 4 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550(a), 551, and 1106 as against the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY regarding the PC Funding Two-Year Transfers:  (a) avoiding and preserving the PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity

112

Finance Defendants, DZ Bank, WestLB and WestLB NY, (b) directing that the PC Funding Two-Year Transfers be set aside, (c) recovering such PC Funding Two-Year Transfers in the amount of $777,621,641.62 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in the amount of $90,488,703, (e) alternatively, recovering the Buy Out Transfers in the amount of $165,537,794 from the Opportunity Finance Defendants, and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY;

G.    On Count 5 – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551, and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY regarding the PC Funding Transfers:  (a) avoiding and preserving the PC Funding Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY, (b) directing that the PC Funding Transfers be set aside, (c) recovering such PC Funding Transfers in the amount of $2,244,923,662.14 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the bankruptcy estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in the amount of $90,488,703, (e) alternatively, recovering the Buy Out Transfers in the amount of $165,537,794 from the Opportunity Finance Defendants, and (f) recovering prejudgment and

DOCS-#4740096-V2

post-judgment interest, attorneys' fees, and costs from the Opportunity Finance

Defendants, DZ Bank, WestLB and WestLB NY;

H.      On Count 6 – Fraudulent Transfers (Constructive Fraud), pursuant

to 11 U.S.C. §§ 544(b), 550, 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and

513.47, and if the Court should determine that this action is governed by the laws

of other states, the fraudulent transfer laws of such other states as against the

Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY regarding

the PC Funding Transfers:  (a) avoiding and preserving the PC Funding Transfers

free and clear from any claimed interest of the Opportunity Finance Defendants,

DZ Bank, WestLB and WestLB NY, (b) directing that the PC Funding Transfers

be set aside, (c) recovering such PC Funding Transfers in the amount of

$2,244,923,662.14 from the Opportunity Finance Defendants, DZ Bank, WestLB

and WestLB NY for the benefit of the bankruptcy estates of PCI and PC Funding,

(d) alternatively, recovering such False Profits in the amount of $90,488,703, (e)

alternatively, recovering the Buy Out Transfers in the amount of $165,537,794

from the Opportunity Finance Defendants, and (f) recovering prejudgment and

post-judgment interest, attorneys' fees, and costs from the Opportunity Finance

Defendants, DZ Bank, WestLB and WestLB NY;

I.       On Count 7 – Fraudulent Transfers (Constructive Fraud), pursuant

to 11 U.S.C. §§ 544(b), 550, 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and

513.47, and if the Court should determine that this action is governed by the laws

of other states, the fraudulent transfer laws of such other states as against the

Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY regarding

the PC Funding Transfers:  (a) avoiding and preserving the PC Funding Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY, (b) directing that the PC Funding Transfers be set aside, (c) recovering such Transfers in the amount of $2,244,923,662.14 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the bankruptcy estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in the amount of $90,488,703, (e) alternatively, recovering the Buy Out Transfers in the amount of $165,537,794 from the Opportunity Finance Defendants, and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY;

        J.        On Count 8 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY regarding the PC Funding Transfers:  (a) avoiding and preserving the PC Funding Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY, (b) directing that the PC Funding Transfers be set aside, (c) recovering such PC Funding Transfers in the amount of $2,244,923,662.14 from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY for the benefit of the bankruptcy estates of PCI and PC Funding, (d) alternatively, recovering such False Profits in the amount of $90,488,703, (e)

alternatively, recovering the Buy Out Transfers in the amount of $165,537,794 from the Opportunity Finance Defendants, and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants, DZ Bank, WestLB and WestLB NY;

    K.      On Count 9 – Preferential Transfers, pursuant to 11 U.S.C. §§ 547, 550, 551, and 1106 as against the Opportunity Finance Defendants:  (a) avoiding and preserving the Preference Period Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, (b) directing that the Preference Period Transfers be set aside, (c) recovering the Preference Period Transfers in the amount of $9,238,419 from the Opportunity Finance Defendants, for the benefit of the bankruptcy estates of PCI and PC Funding, and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants;

    L.      On Count 10 – Fraudulent Transfers (Actual Fraud), pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants regarding the SPF Funding/Opportunity Finance Transfers:  (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, (b) directing that the SPF Funding/Opportunity Finance Transfers be set aside, (c) recovering such SPF Funding/Opportunity Finance Transfers in the amount of $248,175,038.75 from the Opportunity Finance Defendants for the

116

benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of $13,552,038.75, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

M.   On Count 11 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants regarding the SPF Funding/Opportunity Finance Transfers:   (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, (b) directing that the SPF Funding/Opportunity Finance Transfers be set aside, (c) recovering such SPF Funding/Opportunity Finance Transfers in the amount of $248,175,038.75 from the Opportunity Finance Defendants for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of $13,552,038.75, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

N.   On Count 12 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants regarding the SPF

Funding/Opportunity Finance Transfers:  (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, (b) directing that the SPF Funding/Opportunity Finance Transfers be set aside, (c) recovering such SPF Funding/Opportunity Finance Transfers in the amount of $248,175,038.75 from the Opportunity Finance Defendants for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of $13,552,038.75, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants;

O.     On Count 13 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551, and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants regarding the SPF Funding/Opportunity Finance Transfers:  (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers free and clear from any claimed interest of the Opportunity Finance Defendants, (b) directing that the SPF Funding/Opportunity Finance Transfers be set aside, (c) recovering such SPF Funding/Opportunity Finance Transfers in the amount of $248,175,038.75 from the Opportunity Finance Defendants for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of $13,552,038.75, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants;

P.      On Count 14 – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, 551, and 1106 as against Defendant Sabes Family Foundation regarding the Sabes Family Foundation Two-Year Transfers:  (a) avoiding and preserving the Sabes Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes Family Foundation, (b) directing that the Sabes Family Foundation Two-Year Transfers be set aside, (c) recovering such Sabes Family Foundation Two-Year Transfers in the amount of $12,469,571 from the Sabes Family Foundation for the benefit of the estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of $12,469,571, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation;

Q.      On Count 15 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550(a), 551, and 1106 as against Defendant Sabes Family Foundation regarding the Sabes Family Foundation Two-Year Transfers:  (a) avoiding and preserving the Sabes Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes Family Foundation, (b) directing that the Sabes Family Foundation Two-Year Transfers be set aside, (c) recovering such Sabes Family Foundation Two-Year Transfers in the amount of $12,469,571 from the Sabes Family Foundation for the benefit of the estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of $12,469,571, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation;

R.      On Count 16 – Fraudulent Transfers (Actual Fraud), pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Sabes Family Foundation regarding the Sabes Family Foundation Transfers: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation, (b) directing that the Sabes Family Foundation Transfers be set aside, (c) recovering such Sabes Family Foundation Transfers in the amount of at least $34,713,191.10 from the Sabes Family Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of at least $34,713,191.10, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

S.      On Count 17 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Sabes Family Foundation regarding the Sabes Family Foundation Transfers: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Defendants, (b) directing that the Sabes Family Foundation Transfers be set aside, (c) recovering such Sabes Family Foundation Transfers in the amount of at least $34,713,191.10 from the Sabes Family Defendants for the benefit of the

bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of at least $34,713,191.10, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Defendants.

T.      On Count 18 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Sabes Family Foundation regarding the Sabes Family Foundation Transfers:  (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation, (b) directing that the Sabes Family Foundation Transfers be set aside, (c) recovering such Sabes Family Foundation Transfers in the amount of at least $34,713,191.10 from the Sabes Family Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of at least $34,713,191.10, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation;

U.      On Count 19 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551, and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendant Sabes Family Foundation regarding the Sabes Family Foundation

Transfers:  (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation, (b) directing that the Sabes Family Foundation Transfers be set aside, (c) recovering such Sabes Family Foundation Transfers in the amount of at least $34,713,191.10 from the Sabes Family Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, (d) alternatively, recovering such False Profits in the amount of at least $34,713,191.10, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation;

V.      On Count 20 – Fraudulent Transfers (Actual Fraud), pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendant The Minneapolis Foundation regarding the SPF Funding/Minneapolis Foundation Transfers:  (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation, (b) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside, (c) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $11,852,370 from The Minneapolis Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation.

W.      On Count 21 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat.

§§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendant The Minneapolis Foundation regarding the SPF Funding/Minneapolis Foundation Transfers:  (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation, (b) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside, (c) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $11,852,370 from The Minneapolis Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation.

X.     On Count 22 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendant The Minneapolis Foundation regarding the SPF Funding/Minneapolis Foundation Transfers:  (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation, (b) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside, (c) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $11,852,370 from The Minneapolis Foundation for the benefit of the bankruptcy estates of PCI

and SPF Funding, and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation;

Y.     On Count 23 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551, and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendant The Minneapolis Foundation regarding the SPF Funding/Minneapolis Foundation Transfers:  (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation, (b) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside, (c) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $11,852,370 from The Minneapolis Foundation for the benefit of the bankruptcy estates of PCI and SPF Funding, and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation;

Z.     On Count 24 – Lien Avoidance, pursuant to 11 U.S.C. § 506(d) as against all defendants:  declaring and ordering that any lien asserted by any defendant is invalid and void;

AA.     On Count 25 - Unjust Enrichment/Equitable Disgorgement as against all defendants:  declaring and ordering that the Trustee shall recover the Principal and False Profits and any other monies received by any defendant, directly or indirectly, from the fraud perpetrated through the Ponzi scheme for the benefit of the bankruptcy estates of the Debtors; and that all defendants shall be

liable to the bankruptcy estates of the Debtors in an amount equal to all monies received and shall be required to disgorge the same for the equitable distribution to all creditors of PCI;

BB.    On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of PCI, PC Funding, and SPF Funding's estate;

CC.    On all Claims for Relief, assignment of any defendant's income tax refunds from the United States, state, and local governments paid on fictitious profits during the course of the Ponzi scheme;

DD.    Awarding the Trustee all applicable interest (including prejudgment and post-judgment interest), attorneys' fees, costs, and disbursements in this action; and

EE.    Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

DOCS-#4740096-V2

DATED:   August 26, 2015

**LINDQUIST & VENNUM** LLP

By:     /s/ Mark D. Larsen
Daryle L. Uphoff (0111831)
Mark D. Larsen (318498)
James A. Lodoen (173605)
Kirstin D. Kanski (0346676)
Adam C. Ballinger (0389058)
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)
www.lindquist.com

**ATTORNEYS FOR
DOUGLAS A. KELLEY
CHAPTER 11 TRUSTEE OF
PETTERS COMPANY, INC.,
PC FUNDING, LLC, AND
SPF FUNDING, LLC**