UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 08-45257** |
| PETTERS COMPANY, INC., ET AL, | Court File No. 08-45257 |
| Debtors. | |

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

Court File Nos:

08-45258 (GFK)
08-45326 (GFK)
08-45327 (GFK)
08-45328 (GFK)
08-45329 (GFK)
08-45330 (GFK)
08-45331 (GFK)
08-45371 (GFK)
08-45392 (GFK)

Chapter 11 Cases
Judge Gregory F. Kishel

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DOUGLAS A. KELLEY, in his capacity
as the court-appointed Chapter 11
Trustee of Debtors Petters Company, Inc.;
PC Funding, LLC; and SPF Funding, LLC,

Plaintiff,

v.                                                    ADV 10-4301

OPPORTUNITY FINANCE, LLC; OPPORTUNITY
FINANCE SECURITIZATION, LLC; OPPORTUNITY
FINANCE SECURITIZATION II, LLC; OPPORTUNITY
FINANCE SECURITIZATION III, LLC; INTERNATIONAL
INVESTMENT OPPORTUNITIES, LLC; SABES FAMILY
FOUNDATION; SABES MINNESOTA LIMITED
PARTNERSHIP; ROBERT W. SABES; JANET F.
SABES; JON R. SABES; STEVEN SABES; DEUTSCHE
ZENTRALGENOSSENSCHAFTBANK AG; WEST
LANDESBANK AG; WESTLB AG NEW YORK BRANCH;
and THE MINNEAPOLIS FOUNDATION,

Defendants.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *05/31/2016*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

*****************************************************************************************************

## MEMORANDUM RE: EFFECT OF *FINN V. ALLIANCE BANK*
## ON PLAINTIFF'S CLAIMS OF FRAUDULENT TRANSFER

*****************************************************************************************************

At St. Paul, Minnesota
May 31, 2016.

## INTRODUCTION

The origin of this adversary proceeding is amply familiar from locally-generated case law. *E.g.*, *In re Petters Co., Inc.*, 401 B.R. 391 (Bankr. D. Minn. 2009), *aff'd*, 620 F.3d 847 (8th Cir. 2010); *In re Petters Co., Inc.*, 440 B.R. 805 (Bankr. D. Minn. 2010); *In re Petters Co., Inc.*, 506 B.R. 784 (Bankr. D. Minn. 2013); *In re Petters Co., Inc.*, 548 B.R. 551 (Bankr. D. Minn. 2016).  *See also In re Polaroid Corp.*, 472 B.R. 22 (Bankr. D. Minn. 2012), *aff'd*, 779 F.3d 857 (8th Cir. 2015).  The Plaintiff, as trustee,[1] was charged with the remediation of a failed, massive Ponzi scheme, perpetrated for over a decade by Thomas J. Petters through Debtor Petters Company, Inc. ("PCI") and related Debtor-entities as instrumentalities.  He undertook to recover monies that had been paid out to past, satisfied investors into the scheme, by suing them for avoidance of the payments under the theory that they had received transfers fraudulent on the Debtors' other creditors.  His primary substantive authority was the Minnesota Enactment of the Uniform Fraudulent Transfer Act, Minn. Stat. §§ 513.41 - 513.51 (2014) ("MUFTA"), under the empowerment of 11 U.S.C. § 544(b).[2] The Trustee used an analysis that other courts had developed to respond to similar remediation efforts for failed Ponzi schemes, relying on their local enactments of the Uniform Fraudulent

--------

[1]Hence, "the Trustee" in all further references.

[2]MUFTA was the statutory source of fraudulent-transfer law in Minnesota when the Trustee commenced this adversary proceeding.  In 2015 the Minnesota legislature amended and retitled MUFTA using a new uniform law, the Uniform Voidable Transactions Act.  2015 Minn. Laws, ch. 17.  The amendment, however, applies only to transactions that occur after August 1, 2015.  2015 Minn. Laws, ch. 17, ¶ 13.  Thus, MUFTA's provisions still apply to this adversary proceeding; and all further citations and references to it will denote the statutory text as of the official 2014 publication.

2

Transfer Act.

Before the great financial downturn of 2007-2008, there had been no litigation effort of this sort and magnitude locally.  There was no local case law, state or federal, in treatment of the theories that the Trustee was invoking.  Because the Trustee sued out more than 200 adversary proceedings on his theory, a "common issues" procedure was ordered to present various threshold questions as matters of law toward filling that gap.  This was staged through the vehicle of motions for dismissal that dozens of defendants had filed.  The procedure resulted in three "common issues" memoranda, *In re Petters Co., Inc.*, 494 B.R. 413; *In re Petters Co., Inc.*, 495 B.R. 887; and *In re Petters Co., Inc.*, 499 B.R. 342 (all Bankr. D. Minn. 2013) (respectively, the First, Second, and Third Memoranda).

Among those rulings, a "Ponzi scheme presumption" on actual fraudulent intent was adopted, 495 B.R. at 912; "reasonably equivalent value" was held to be lacking in the ostensible payment of interest to lenders into a Ponzi scheme, 499 B.R. at 359; and the statutorily-required financial distress of a transferor-entity--insolvency, insufficiency of capital or intent to incur debt beyond repayment ability--was properly pled, and could be proven, by the transferor's operation of a Ponzi scheme and its funding of payments to the transferee through the operation of the scheme, i.e. with money lent by later investors, diverted from the purposes for which the lending was intended, 495 B.R. at 924-925.  These rulings were based on various guiding principles in the earlier case law from federal courts that had presided over similar litigation.

The rulings were applied after that common memorialization, when the motions for dismissal were denied for the majority of the Trustee's fraudulent-transfer actions.  That was done in the adversary proceedings that featured lesser amounts in controversy and similar, more straightforward transactional histories within their fact-pleading.  After that, the rulings were to be applied on motions for summary judgment that the Trustee contemplated bringing en masse after a coordinated discovery process.

3

A smaller number of the Trustee's fraudulent-transfer actions were carved out of that coordinated treatment, due to the "unique issues" posed by fact-pleading of more complicated transactional structures and processes, variance in the nature of the original liabilities running between the Debtors and their particular defendants, and so forth. This adversary proceeding was among the latter group.

As the litigation docket was queuing up to go forward in earnest on these two tracks, the Minnesota Supreme Court issued *Finn v. Alliance Bank*, 860 N.W.2d 638 (Minn. 2015). *Finn* came out of a lawsuit brought in the Minnesota state courts by a court-appointed receiver, in a different remediation effort similar to the Trustee's and styled under the same substantive authority, MUFTA. In *Finn*, however, the receiver-plaintiff was denied relief in avoidance against several banks that had received repayment on debt incurred by the perpetrator of a Ponzi scheme. The perpetrator in *Finn* had incurred debt to investors in legitimate transactions (involving underlying investments that existed in reality and that really performed) and in fraudulent transactions (for which there were no underlying deals in reality, the perpetrator inducing the investor by falsely representing that there were). Both types of investment had been procured with the same sort of business transaction in mind--some existing and the rest bogus.

The receiver-plaintiff in *Finn* had argued for the use of a "Ponzi scheme presumption" from the same federal case law that gave the basis for the common-issues rulings here. He argued that the presumption had to be given "conclusive" effect. And for the application of his urged analysis and the operation of the presumption, the receiver did not see any distinction between transfers in consequence of investment into legitimate, real business transactions and those on investment induced by false pretenses; the common originator-entity and the similarity of the transactions' structures was enough for him.

The *Finn* court outlined a Ponzi scheme presumption in three components, which it gleaned from the prior federal case law. The components went to the intent of the transferor (i.e.

actually fraudulent or not); the transferor's solvency at the time of the transfer; and whether the transferor received a reasonably equivalent value for the interest-component of the payment made to the investor.

The *Finn* court ruled on the viability of the presumption under MUFTA in all three parts. It then treated the concept of reasonably equivalent value as it applied to the record before it; and it made less prominent rulings on the adequacy of pleading for a claim under MUFTA premised on facts involving a Ponzi scheme. The tone and articulation of most of *Finn*'s rulings suggested that they were formulated as a response to the common issues memoranda issued in the PCI litigation docket.[3]

Defense counsel here quickly questioned the viability of this court's rulings in light of *Finn*. They pressed to bring a challenge at an early date. In light of the gravity of the issue, this adversary proceeding was chosen as a sole, free-standing vehicle to bring the issue into the litigation docket in the PCI cases. A motion for dismissal by the Opportunity Finance defendants[4] was still pending and unaddressed when *Finn* was issued. The parties to that motion were ordered to present the issue, connotatively tagged "the effect of *Finn*," under the rubric of that motion.

When the hearing was convened for that presentation, James A. Lodoen, Adam C. Ballinger, and Mark D. Larsen appeared for the Trustee. Joseph G. Petrosinelli and John R. McDonald appeared for the Opportunity Finance defendants. David E. Runck appeared on behalf of the Official Committee of Unsecured Creditors. Michael A. Rosow and H. Peter Haveles, Jr.

---

[3]Even so, the *Finn* court cited this court's rulings only once, and then only to reject a policy-oriented general pronouncement. 860 N.W.2d at 652 (citing *In re Petters Co., Inc.*, 499 B.R. at 356).

[4]That term will denote, as a group, Opportunity Finance, LLC; Opportunity Finance Securitization, LLC; Opportunity Finance Securitization II, LLC; Opportunity Finance Securitization III, LLC; International Investment Opportunities, LLC; Sabes Family Foundation; Sabes Minnesota Limited Partnership; Robert W. Sabes; Janet F. Sabes; Jon R. Sabes; and Steven Sabes. Defendant Deutsche Zentralgenossen-schaftbank will be termed "DZ Bank"; Defendant West Landesbank AG will be termed "West LB." The term "the defense" will denote all of the Defendants collectively, when they have joined forces against the Trustee on specific positions.

appeared for defendant DZ Bank.   Eric R. Sherman, Thomas Kelly, and Darryn Beckstrom appeared for defendant WestLB.  This memorandum is entered to memorialize the disposition of that discrete issue, for later application in the entry of a final order on the motions for dismissal.

### WHAT *FINN* DID REACH AND DO; WHAT IT DID NOT

### 1.  Rejection of Presumptions

*Finn*'s most salient rulings lie in its rejection of the Ponzi scheme presumptions.  The *Finn* court organized the bulk of its discussion around the viability of the presumptions; the tripartite rejection is its one ruling on general principles of law.

A presumption operates as an evidentiary device.  "Through presumptions, the existence of one fact is presumed from proof of another. . . .  The 'true presumption' creates an inference that is mandatory unless rebutted."  John Calvin Jeffries, Jr. and Paul B. Stephan III, *Defenses, Presumptions, and Burden of Proof in the Criminal Law*, 88 Yale L.J. 1325, 1335-1336 (1979).  "A presumption informs the [finder of fact] that once a party has proved A, the basic fact, the jury can or must presume B, the presumed fact."  *Connecticut v. Johnson*, 460 U.S. 73, 96 (1983).  The viability of a presumption "depends on how closely facts *X* and *Y* are related by experience and common sense."  *Jeffries and Stephan*, 88 Yale L.J. at 1336.

It was inevitable that the *Finn* court's discussion, tone, analysis, and conclusions about the Ponzi scheme presumptions were channeled by the specific structure and operation of the Ponzi scheme before it.  The perpetrator of the scheme in *Finn* had conducted business in the real estate finance sector, originating loans for the funding of real estate transactions and then

6

finding institutional lenders to "participate in" the loans.[5]  It[6] used this business engagement as the

vehicle for its Ponzi scheme.  The receiver sought to avoid payments that the perpetrator had made

to bank-creditors of the perpetrator, in their contractual status as loan participants.

The appeal in *Finn* involved two groups of participant-banks.  A number of banks,

there collectively called "the Respondent Banks," each purchased fractional participation interests

in loans that the perpetrator had originated, loans "that were real, not fraudulent," 860 N.W.2d at

642, that "were neither fictitious nor oversold," 860 N.W.2d at 643.  In a different transaction,

Alliance Bank took the assignment of the lender's rights on one originated loan in full, again a loan

"real, not fictitious, and . . . not oversold." *Id.*  The appeal in *Finn* did not involve any bank that had

taken participant status as to a falsely-pretensed, non-existent loan ostensibly originated by the

perpetrator.

To make out a case for avoidance under MUFTA, the receiver had asserted an

irrebuttable or "conclusive" presumption, *Finn*, 860 N.W.2d at 645-649, that would compel specific

findings in his favor "as a matter of law" on summary judgment.  The findings would meet various

factual elements of the receiver's prima facie case, and negate an affirmative defense asserted by

the transferee-defendants.  *Finn*, 860 N.W.2d at 645-646.

---

[5]In the process described in *Finn*, to participate in a loan meant to purchase a portion or all of the
original lender's rights and to assume that lender's post-transaction legal position and rights to payment,
as to the original borrower and its assets.  Obtaining participant-investors would free up capital for the
originator to lend or invest anew.

[6]*Finn* opens by stating,

> [t]his case involves the largely fraudulent lending operations of First
> United Funding, LLC . . . an entity controlled by Corey N. Johnston.

860 N.W.2d at 642.  For the present discussion, the impersonal pronoun will be used to signify the
perpetrator, in the collective persons of the active individual and his corporate vehicle.

Multiple federal courts had previously recognized a Ponzi scheme presumption.[7] On the first level of appeal in *Finn*, the Minnesota Court of Appeals had analyzed the presumption to break it down into three different components. Each of the components applied to separate fact-elements. *Id.*; also, *Finn v. Alliance Bank*, 838 N.W.2d 585, 598 (Minn. Ct. App. 2013).[8] The Minnesota Supreme Court rejected all three component presumptions out of hand.

It started by pointing to the lack of a Ponzi-scheme presumption on the face of MUFTA. *Finn*, 860 N.W.2d at 646-647 ("MUFTA does not contain a provision allowing a court to presume anything based on the mere existence of a Ponzi scheme"). Then, implicitly, it declined to independently recognize the presumption by judicial action.

The *Finn* court performed its analysis from a specific perspective. Its frame of reference sprung from a specific notion of the scope of MUFTA's application, and a tightly-defined focus for MUFTA's remedy of avoidance:

> . . . [T]he focus of the statute is on individual transfers, rather than a pattern of transactions that are part of a greater 'scheme.' . . . [T]he asset-by-asset and transfer-by-transfer nature of the inquiry under MUFTA requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer.

*Id.*

Thus, the *Finn* court held, there could be no presumption, "conclusive[ ], as the Receiver would have it--that fraudulent intent accompanies all transfers in furtherance of a Ponzi

---

[7]In *Ritchie Capital Mgmt., LLC v. Stoebner*, the Eighth Circuit enumerated the five circuits that had done so through 2015.  779 F.3d at 862 n.6.

[8]The prior federal case law had featured principles for the treatment of all three of these fact-elements in a Ponzi scheme context.  However, only the treatment of the element of fraudulent intent was expressly termed a presumption in the earlier authorities.  *Finn* seems to be the first time that any court used the word to classify the devices for deeming as to insolvency and reasonably equivalent value.  The nomenclature did make sense, given what the federal case law contemplated.

scheme," i.e. that "the scheme's operator *invariably* intends to cheat *all* investors." *Id.* (emphasis added).

The quoted characterization of the presumption plus later observations suggest a more fundamental reason for the *Finn* court's disfavor:  the proffered, general factual context--the mere presence of a Ponzi scheme *within* a perpetrator's broader business operation--did not entail the invariability in regular human behavior that justifies the adoption of presumptions in the law of evidence and their use in judicial fact-finding. *E.g.*, ". . . a debtor could have assets or legitimate business operations aside from the Ponzi scheme." *Finn*, 860 N.W.2d at 649.[9]

That observation was made in the treatment of a specific issue (whether a presumption of insolvency should be recognized).  However, the facts before the *Finn* court featured the very factual circumstance used to deny the presumption's viability.  All of the receiver's opponents in the litigation in *Finn* had transacted with the scheme's perpetrator on genuine deals that were real investments in lending or loan participation.  They all had underlying borrowers and assets founded in reality--and thus had concrete prospects of repayment.  One of the receiver's opponents had directly vetted the underlying loan with the original borrower before entering its participation.  *Finn*, 860 N.W.2d at 655 n.3.

Yes, the perpetrator in *Finn* had obtained money from other lenders on separate ostensible transactions that were either presented on a completely false pretense--i.e., there were no such transactions--or on genuine transactions that it "oversold"--i.e., the perpetrator pulled in more money in the aggregate from multiple independent partial participants than the amount of principal it had originally lent as originator.  *Finn*, 860 N.W.2d at 642.  However, none of the receiver's opponents in the lawsuits before the Minnesota appellate courts were in this group of

---

[9]Obviously, the *Finn* court concluded that general human experience would not feature the preponderate, driven linkage between basic fact and the inferrable and hence presumed ultimate fact so as to compel a finding of the ultimate fact. *Supra*, 6.  In arguing for a presumption and a "conclusive one," the receiver was urging that sort of invariability as the justification for a presumption of intent that would go to every single business transaction involving a Ponzi-scheme perpetrator.

defrauded participants.  *Finn*, 860 N.W.2d at 652 (noting that there was "no dispute that [all] the [participant] banks . . . purchased non-oversold participation interests in *actual* loans to *real* borrowers . . ." (emphasis in original)).

The *Finn* court clearly believed that the judicial imposition of a presumption of pervasive intent to defraud creditors was not defensible, where the receiver's ultimate argument for it was reduced to an abstract happenstance:  the genuine deals at bar used the same *structures* as the ostensible but phony ones pretensed to those other investors, and the perpetrator had been involved in all of the participations as the nominal originator, whether actual or ostensible.

Under prior case law from the federal courts, this evidentiary device ran broadly across fraudulent-transfer litigation.  It went to a plaintiff's case in chief under the statutory rubric of constructively-fraudulent transfer, Minn. Stat. §§ 513.44(a)(2) and 513.45(a), for which an essential element is the absence of a reasonably equivalent value received by the debtor for the transfer it made.  It also applied to the affirmative defense to avoidance under either theory of fraudulence--Minn. Stat. § 513.48(a), under which a defendant may avoid liability by proving that it had taken the transfer from the debtor "in good faith and for a reasonably equivalent value."  *See*, in general*, In re Petters Company, Inc.*, 499 B.R. at 353-363 (adopting analysis set forth comprehensively in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), in part on principles first framed in *In re Indep. Clearing House Co.*, 77 B.R. 843 (D. Utah 1987).

When parsing out *Finn*'s holdings, it is crucial to remember that the *Finn* court rejected all three component presumptions because the debtor-transferee transactions in the case took place almost completely outside the fraud-pervasive part of that debtor's business operations, the roost for the Ponzi scheme as traditionally considered.[10]   The transfers challenged by the

---

[10]The *Finn* court felt compelled to point out the lack in general law of a "precise definition of a Ponzi scheme" due to "the multiplicity of different forms that a fraudulent investment scheme can take." *Finn*, 860 N.W.2d at 645-647.  Nonetheless, it noted the way a previous court had identified a "general pattern" of operation: " . . . any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of

receiver in *Finn* had not been made as part of a serial churn of funds propelled sequentially by fraud in the inducement on non-existent underlying investments. All of the defendant-banks had loan-participated on financing for genuine real estate transactions.

Whether the very same dollars could be traced through to the defendant-banks as ultimate transferees, the *Finn* court attached decisive significance to the genuineness of the underlying deals in their own, separate right. It pointedly observed that in any event the actual income-generation from commercially-reasonable transactions featuring real-life underlying investments enabled the satisfaction of the bank-transferees.[11] *Finn*, 860 N.W.2d at 643, 656.[12]

In the posture of debtor and transferee before it, the *Finn* court saw a legitimacy that undercut the justification for a "conclusive," pervasive presumption of fraudulent intent and theft: if, as there, a Ponzi scheme perpetrator could separately carry on legitimate business through the same structure of deal as it falsely pretensed independently to victim-investors, incurring transaction-specific debt and paying it with transaction-generated proceeds, it would not be defensible to presume that every last one of the perpetrator's similarly-structured transactions with its investors was fraudulent and predatory. There was no reason to excuse the receiver from the burden of proof otherwise imposed on a proponent of avoidance remedies, as to specific transfers. *Cf. Finn*, 860 N.W.2d at 648-649 (rejecting presumption that perpetrator of Ponzi scheme is insolvent throughout period of operation of scheme), 651 (criticizing analytic structure through which lack of reasonably-equivalent value in receipt of interest from Ponzi scheme perpetrator would be

_____

the fraud." *Id.* (quoting, ultimately, *In re Bayou Group, LLC*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007). All fussiness aside, this "general pattern" of operation *is* . . . what it *is*.

[11]In fact, as to defendant Alliance Bank, the *Finn* court expressly pointed out that the debtor acted only as a servicer for the participant--passing the payments of principal and interest made by the underlying borrower on the terms of the original loan, right up to the participant. 860 N.W.2d at 656.

[12]The real existence of the underlying loans and the actual, timely performance by the real borrowers on them was gleaned from the receiver's own fact pleading for one group of defendants and as a matter of undisputed, evidence-based fact for the other one. 860 N.W.2d at 643.

11

deemed to every single transaction in which perpetrator had engaged, and rejecting presumption of fact as to same).

The *Finn* court used these conclusions to categorically reject all three components of a Ponzi scheme presumption.

### 2.  Fraudulent Intent

*Finn* does not reject the Ponzi scheme presumption of fraudulent intent on a lack of defensible basis for the presumption's action, or on any consideration of the facts before it.  Rather, it points to the lack of textual provision for it in MUFTA, and the statute's contemplation that each transfer by a financially-distressed debtor be analyzed on its own circumstances for the presence or absence of fraudulent intent.  860 N.W.2d at 647. With the presumption rejected, that analysis relegated any plaintiff under MUFTA to proving intent via direct evidence or inference.

A plaintiff may still plead and prove intent with the aid of an inference, by bringing forward enough indicia of fraud, in surrounding circumstance-—the badges-of-fraud approach specifically provided in MUFTA.  Minn. Stat. § 513.44(b); *Finn*, 860 N.W.2d at 647; *Citizens State Bank Norwood Young America v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014).  And lodged somewhat unobtrusively in the text of *Finn*, 860 N.W.2d at 654, is a ruling: a prima facie case for an actual-fraud claim on transfers by a Ponzi-scheme perpetrator is adequately pled when a pattern of prior fraudulent inducement directed at a particular class of investors, committed by the transferor, is described; the perpetrator was running a Ponzi scheme to defraud just such investors; and the perpetrator made the subject transfers to the defendants sued, with the intent to hinder, delay, or defraud other creditors of the perpetrator.  860 N.W.2d at 654.

From this ruling on the adequacy of pleading, it is clear that a case for avoidance on an actual-fraud theory can be framed and made as to transfers to investors that had infused into the main, rolling transactional sequence of a Ponzi scheme's operation, and that were made with an intent that other creditors not receive the benefit of the funds so transferred.  That intent logically

12

would align with the use of funds snaffled from later investors, diverted away from the investment uses represented to them when they were induced to lend, and hence taken away from any expected function toward their repayment.

It would require an inference to actually satisfy the intent element for a transfer within such a transactional matrix; but, clearly, *Finn* contemplates that it can be made. 860 N.W.2d at 647. The finding would not be through the compelled, shortened arc of a presumption; but the inference could hit the legal mark of the intent element in this way. *See analysis in In re Petters Co., Inc.*, 548 B.R. at 563-565, *cf. Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.2d at 861-863.

Thus, an actual-fraud theory for avoidance is adequately pled for the Ponzi scheme context, when facts are recited to put the challenged transfer into the central processes of such a scheme: the pretense of an active investment operation, projected on the hallmark of a specific sort of economic opportunity; debt to investors incurred by the schemer, on an earlier fraudulent-inducement with the pretense of a real-life business proposal and the ends to which their infusions would be directed there; further fraudulent inducements to new generations of investors; the repayment of earlier debt using funds misdirected from the cash infusions of later investors; and ultimately, real economic harm to the last investors, who are left unpaid when the scheme collapses due to its inability to take in enough new money. If a complaint recites this much to put a challenged transfer into a specific place in the main churn of a Ponzi scheme, it adequately states an actionable claim for avoidance under an actual-fraud theory. *In re Petters Co., Inc.*, 548 B.R. at 564. *Finn* holds essentially that, albeit in more skeletal fashion. 860 N.W.2d at 654.

### 3. Insolvency

As noted earlier, *Finn* prescribed a perspective for the application of the statute: MUFTA compels proponents to prove all essential elements as to each subject transfer, as of the date of each transfer. This perspective drove the rejection of the second component presumption, a compelled inference that a Ponzi scheme is insolvent from its inception. *Finn*, 860 N.W.2d at 649.

13

As the Minnesota Court of Appeals saw it in *Finn*, the process of this presumption would go to the "balance sheet" definition of insolvency under MUFTA, Minn. Stat. § 513.42(a). 838 N.W.2d at 601. But the Minnesota Supreme Court concluded that there could be no "conclusive presumption that a Ponzi scheme is insolvent from its inception." 860 N.W.2d at 648-649. It rejected the presumption on two different grounds.

The first was on a separation-of-powers/judicial restraint rationale--recognizing such a presumption would require the court "to add language to MUFTA, something we cannot do." *Id.*[13] The second rationale stemmed from the basic nature of a presumption:

> . . . as a factual matter it is not at all clear that every fraudulent investment arrangement that is later determined to be a Ponzi scheme necessarily will have been insolvent from its inception. For example, it is not hard to imagine a debtor that begins as a legitimate business and eventually turns to fraud, which the Respondent Banks insist occurred here. Similarly, a debtor could have assets or legitimate business operations aside from the Ponzi scheme, as Alliance Bank argues here, that it uses to stave off insolvency, at least for a while. Such an entity could be financially stable for a time, whether its stability is measured by the technical definition of insolvency in Minn.Stat. §§ 513.42 and 513.45(a), or the alternate methods of measuring financial distress in Minn.Stat. § 513.44(a)(2). Such a Ponzi scheme may be rare, but when the statute requires a creditor to prove a fraudulent-transfer claim, a conclusive presumption that a Ponzi scheme is insolvent from its inception may be incorrect, both as a matter of law and as a matter of fact.

860 N.W.2d at 649.

One could take issue with this reasoning, considering the subject matter. The federal case law inferentially deemed an operational insolvency to the perpetrator of a Ponzi

---

[13]The *Finn* court noted MUFTA already provided for one presumption of insolvency, Minn. Stat. § 513.42(b) (triggered by "a debtor . . . generally not paying debts as they become due"). It concluded that the absence of a second presumption that would be specifically keyed to a failed Ponzi scheme was evidence that the legislature had "purposely omitted or inadvertently overlooked" such a presumption. 860 N.W.2d at 648 (citation and interior quotes omitted).

scheme, on the thought (not ill-founded) that such schemes by their basic structure quickly pile up unsatisfied debt in amounts increasingly beyond their current means to satisfy, because they have no real external business from which to generate a profit and all invested funding is diverted to the payoff of prior investors and the perpetrator's self-enrichment. *In re Petters Co., Inc.*, 495 B.R. at 922-925.

This thought was not specifically classified as a presumption in the Second Memorandum, and certainly not a "conclusive" one as the receiver in *Finn* insisted on. 495 B.R. at 924. Nonetheless, for the pleading-centered purposes of the common-issues treatment, the allegation of insolvency by the place of a transfer in the central operation of a Ponzi scheme was deemed sufficient. 495 B.R. at 925.

*Finn* again goes beyond the context of pleading to reach the substantive viability of a presumption on the insolvency element. It bars the bare reliance on a presumption as sufficient to plead or prove insolvency under MUFTA's definition, for any particular transfer made by the perpetrator of a Ponzi scheme. Since *Finn* mandates a transfer-by-transfer approach to MUFTA's application, 860 N.W.2d at 647, it again would require fact-pleading specific to the statutory elements of insolvency or financial distress under Minn. Stat. §§ 513.44(a)(2) and 513.45(a). In application, this would require some specific statement that the debtor-transferor's state of insolvency was contemporaneous with each transfer that the plaintiff would have avoided. The question is whether this must recite the actual value of the debtor-transferor's assets against the total amount of its debt, in specific to the date of every single transfer.

The defense here drives at just such an exacting requirement for recitation. But even in the wake of *Twombly* and *Iqbal*,[14] Rules 8, 9, and 12(b)(6) still contemplate notice pleading going to the factual dimension of claims in suit. *McDonough v. Anoka County*, 799 F.3d 931, 945

---

[14]*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

15

(8th Cir. 2015).  To be adequate for notice purposes, the Trustee's fact-pleading on insolvency need not be balance-sheet-specific as to the date of each transfer.  If the Trustee's forensic reconstruction for the history of individual Debtor-transferors shows that they slipped into balance-sheet insolvency or another statutory mark of financial distress at a specific point in history and never emerged to solvency, that will be enough.  Any of the defense's concerns over the specifics as to a particular date may be dealt with in discovery.

### 4. Reasonably Equivalent Value

*Finn*'s discussion of the element of reasonably equivalent value presents the largest challenge as to its scope of application.  The text of the opinion goes beyond the internal viability of a presumption based on an invariable cause-and-effect relationship between two facts**.**  It makes a substantive legal assessment of the reasonable equivalence of value received from the payment of contractual interest on a preexisting debt.  These pronouncements on law are sandwiched into the analysis of whether the presumption (a fact-finding device) is viable.  The rejection of the presumption is the most salient function of *Finn*--evidenced in the way that all of *Finn*'s observations are channeled toward three categorical pronouncements of rejection, 860 N.W.2d at 647, 649, and 653.  But the analysis on reasonably equivalent value for the presumption later segues over into a treatment of substance.

Analytically, this creates a sense of disjunction.  One wonders why the discussion went into weighty substantive principles, when the mission undertaken was to correct a plaintiff's over-reliance on a vaguely-framed shortcut of judicature to make out a substantial part of his prima facie case, and his curious insistence that it had to be "conclusive."

But nonetheless, the discussion is there, built out in some detail; and it is there whether it was well-put or was even necessary to do the job of appellate correction of trial-court error.  The discussion is salient enough that it prompted the defense here to adopt it for an attempted hammer-blow at the Trustee's whole theory of suit in avoidance.  That is the genesis of

most of the imbroglio at bar.[15]

As the *Finn* court got into all that, it noted that the statutory question, "whether a debtor has received reasonably equivalent value[,] is a function of the relative value received by the debtor in the underlying exchange" for the property it transferred. *Finn*, 860 N.W.2d at 650. For the *Finn* court, a loan-participation arrangement would entail an antecedent debt in the debtor-servicer's contractual promise to repay loan participants once original borrowers paid the debtor-servicer on the underlying loans. In turn, "satisfaction of that promise would constitute 'value,' as that term is defined in MUFTA." *Id.*

As a broad threshold, that much could not be disputed reasonably. But in opening its analysis, the *Finn* court did qualify these observations--that they operated "[a]bsent the existence of a Ponzi scheme . . . ." *Id.* *Finn* could have expressly reached a broader question: whether "value" was present anywhere, let alone in reasonably-equivalent measure, when a contractually-structured debt for principal and interest was incurred and then satisfied by the perpetrator of a Ponzi scheme, on an investment transaction that is pretensed on a fraudulent inducement. However, in *Finn* the actual issue was more narrow and on a more abstracted plane: whether a lack of reasonably equivalent value so *invariably* lay in a perpetrator's payment of interest on a debt to an investor, that a *presumption* should be imposed, to "effectively negate a transferee's good-faith defense to an actual-fraud claim and conclusively establish a crucial element of a constructive-fraud claim." *Finn*, 860 N.W.2d at 650. The issue before the *Finn* court was whether a *lack* of value and reasonable equivalence, in that *relative* sense, had to be presumed "as a matter of law," as between the interest paid to all investors that lent to the perpetrator of a Ponzi scheme, and the satisfaction of the perpetrator's obligation to pay such interest or "profit" under the terms of the

---

[15]And one thing about *Finn* does not make it any easier to grapple with the issue. The same outcome likely could have been had on the specific facts before the *Finn* court without creating a pitched controversy about whether *Finn*'s arguably-overbroad rulings applied to other, different, legally-distinguishable fact patterns. *See In re Polaroid Corp.*, 543 B.R. 888, 909 n.34 (Bankr. D. Minn. 2016).

parties' original contractual undertaking, regardless of the legitimacy of the underlying investment.

The *Finn* court rejected this third component presumption. Clearly, it did so because the range of factual landscapes to which the presumption would be applied lacked the invariability in essence and outcome in real human experience, that would justify a presumption's constraining operation in adjudication. *Supra*, 6.

The federal courts that previously held that reasonably equivalent value was lacking in the payment of "false profits" out of a Ponzi scheme had done so on application of equitable principles. Through the lens of equity, those courts had rejected the legal enforceability of contractual promises to repay a fraudulently-incurred debt as contrary to public policy; they recast the parties' rights after the fact on an equitable theory of restitution, allowing a recipient sued under the constructive-fraud theory to keep the amount of its original, repaid principal investment under the classification of equitable restitution; and they compelled the surrender of the remaining monies received--that paid under the classification of contractual interest--as the fruit of an unenforceable contract. *In re Petters Co., Inc.*, 499 B.R. at 355-359 (citing analysis in *Scholes v. Lehmann*, 56 F.3d 750, 756-759 (7th Cir. 1995)). With contractual terms thus overridden in a final adjudication under principles of equity, the past payment of interest was not linked to cognizable antecedent debt and thus could not embody value under the statutory definition that was reasonably equivalent under the statutory contemplation.

This much all resonated with a patent fact: for payments received and made that involved a traceable chain of defrauded investors, the repayment of contractually-structured interest to earlier investors was funded from money fraudulently diverted from the contemplations of later investors--essentially *stolen from* other participants. *See Scholes v. Lehman*, 56 F.3d at 757 ("But what was the source of the profit [paid to the defendant]? A theft by [the Ponzi scheme's perpetrator] from other investors.") This diversion would prevent any possibility of future engagement in legitimate business operations, and would further drive the scheme's perpetrator

18

into insolvency. *Id.* ("The paying out of profits to [the defendant] not offset by further investments by him conferred no benefit on the corporations but merely depleted their assets faster.").

The *Finn* court actually acknowledged the reality of that central incident of a Ponzi scheme's core operation; it termed this recognition a "factual observation" and did not gainsay it. *Finn*, 860 N.W.2d at 652. But it rejected this notion of a presumption of lack of reasonably equivalent value that would apply to every single transaction in which a Ponzi-scheme perpetrator was a participant. In the *Finn* court's estimation, such a universally-scoped presumption was not viable because it was inflexible: it would apply despite the obvious possibility that "not every Ponzi scheme lacks a legitimate source of earnings." *Id.* So the *Finn* court held that the transferees before it could not be bound by the toils of such a presumption.

After that, the *Finn* court freed all of the transferees before it from liability in avoidance under the constructive-fraud theory. It performed a case-specific analysis to support its conclusion that the receiver could not make out a lack of reasonably equivalent value as to any of them. As to the suit involving multiple participants on loans, the case failed on the receiver's pleading. In his complaint, the receiver had averred that the "profits . . . paid" by the debtor were not reasonably equivalent in value for what it received, "because [the perpetrator was] engaged in a Ponzi scheme"; but the receiver had pled nothing more than that as to a lack of reasonably equivalent value in the specific exchanges under consideration.[16] For the *Finn* court, this reflected the receiver's exclusive reliance on an impermissible presumption, which for pleading purposes failed to state a claim for avoidance of constructively-fraudulent transfers. *Finn*, 860 N.W.2d at 654.

As to Alliance Bank, the receiver's case failed on the defendant's motion for summary judgment. The court stated that without the benefit of a presumption of lack of reasonably

---

[16]The receiver in *Finn* apparently had not pled facts to support the theory of *Scholes v. Lehmann*, i.e. to deny the enforceability of the original investment contract on ground of fraud in the inducement or public policy.

equivalent value premised on the invalidation of "*all contracts* made with a Ponzi-scheme operator," the receiver had "essentially provid[ed] no reason to invalidate the participation agreement other than the fact that it was a part of a greater Ponzi scheme." *Id.* (emphasis added).   Thus, the satisfaction of the contractual debt (including interest), as a matter of fact, provided "value" as a matter of law.[17]   *Id.*

The *Finn* court cites various long-standing principles in Minnesota case law, developed in construction of the pre-MUFTA law of fraudulent conveyance.   On that basis, it concludes that certain types of transfers, made on certain transactional structures, are not subject to avoidance even if the transferor was contemporaneously acting in parallel to defraud similar parties, in separate pretensed deals that were superficially similar.   That precedent does set limits on the reach of fraudulent-transfer remedies in a commercial context, and specifically where the transfer was made in order to satisfy some kind of legitimate preexisting debt.

However, the cited precedent repeatedly defined the shelter by using a modifying predicate that implied an exclusion from its protection--one that would be triggered on the presence of intentional wrongdoing, dishonesty or fraud of some sort.   *See Finn*, 860 N.W.2d at 651 (citing *Skinner v. Overend*, 252 N.W. 418, 418-419 (Minn. 1934), which was later cited in *Kummet v. Thielen*, 298 N.W. at 246 for proposition that "a transfer . . . *honestly made* in payment of an antecedent debt . . . [is] not fraudulent" (emphasis added)); 860 N.W.2d at 652 (quoting *Thompson v. Schiek*, 213 N.W. 911, 912 (Minn. 1927), re: "[p]ayment of an *honest debt* . . . not [being] fraudulent under the general statutes against fraudulent conveyances" (emphasis added)); 860 N.W.2d at 653 (citing *Aretz v. Kloos*, 95 N.W. 216, 219 (Minn. 1903) for principle that payment to

---

[17]This pronouncement does not speak to the situation where a plaintiff has adequately pled some reason to invalidate the participation agreement, or other underlying contractual agreement.  *Finn* cannot be extended to an avoidance action with that sort of pleading, because the implication from the text of the decision is that the outcome may have been different had those allegations been pled.   Thus the holdings in *Finn* are to be strictly construed, limited to situations where an underlying contractual obligation is otherwise legal, valid, and fully enforceable under applicable law.

"a bona fide creditor" constitutes fair consideration to transferor-debtor "*in the absence of actual fraud*" (emphasis added)).

*Finn* uses the main proposition from this precedent to drive its outcome.  The *Finn* court recognized something undeniable: as a matter of *possibility* within general human experience, the business operations of a Ponzi scheme's perpetrator are not invariably or intrinsically rotten top-to-bottom and side-to-side--even in the specific line of endeavor that the perpetrator fraudulently sells to its victims. A perpetrator could negotiate and consummate genuine business--contractually separate from the main, rolling churn of its scheme.  That could be the case at the beginning of an investment concern's operations, before circumstances change and the operator makes bad choices that cause it to become the perpetrator of a Ponzi scheme.  The *Finn* court cited this as a factual possibility, and the possibility cannot be denied.[18]

On that recognition, the *Finn* court rejected the third component of the Ponzi scheme presumption.  It concluded that reasonably equivalent value could not be lacking as a matter of law for any component of payments made on debt contracted in connection with real, consummated underlying deals even though their financing had been obtained through the involvement of a Ponzi scheme's perpetrator.

When it treated the presumption on reasonably equivalent value, however, the *Finn* court went beyond the defensibility of the presumption as an evidentiary device for fact-finding.  It went into the legal dimension of the statutory element itself, and made a proposition the hingepin of its analysis:  reasonably equivalent value had to be attributed to such a payment, when made on legally-enforceable debt associated with a valid contractual undertaking.[19]  *Finn*, 860 N.W.2d at

---

[18]This was probably the history in the one other local bankruptcy case that involved a failed Ponzi scheme.  *In re Nation-Wide Exchange Servs., Inc.*, 291 B.R. 131, 149-150 n.20 (Bankr. D. Minn. 2003).

[19]The attribution of reasonably equivalent value served two functions in the controversies before the *Finn* court: it conclusively defeated a MUFTA plaintiff's case under the rubric of constructive fraud; and it made out one of the two elements of the affirmative defense under Minn. Stat. § 513.48(a), which could lie against a claim of actual fraud.  *Finn*, 2015 860 N.W.2d at 649-650.

651, 656-657.

After that, the *Finn* court found further justification in principles from longstanding Minnesota jurisprudence: the mere transfer to one creditor of funds from a debtor's limited means is not subject to later avoidance under fraudulent-transfer law at the behest of other creditors not similarly favored.  The rationale is that simply preferring one bona fide creditor is not itself avoidable as fraudulent as to any other creditor, under nonbankruptcy law.  *Finn*, 860 N.W.2d at 653.  (For brevity, this phenomenon and doctrine will be termed "permissible preference," from here on.)

The rejection of the presumption was the first step toward addressing the dispositional dimension of the appeals in *Finn*.  The receiver had argued in the trial court and on appeal that he satisfied his burdens of pleading and proof on the issue of reasonably equivalent value, by relying on the presumption.  With the presumption rejected, the *Finn* court went on to the case-specific tasks before it: whether the trial court had properly granted summary judgment against Alliance Bank on the record and argument before it, including the assertion of the Ponzi scheme presumption on the receiver's actual- and constructive-fraud theories; and whether the Respondent Banks had properly supported their motion for dismissal by denying the viability of the presumption and pointing out that the receiver's other fact-pleading was inadequate to independently support relief under actual- and constructive-fraud theories.  860 N.W.2d at 653.[20]

In doing that, *Finn* loops back around and uses much of the policy-oriented analysis for the rejection of the presumption, for concrete effect in gauging the substantive adequacy of the cases for avoidance that the receiver had presented.  This gets confusing, in the way it pushes the abstract into the broader determination of whether a remedy is available under MUFTA for a harm

---

[20]The trial court had dismissed the receiver's action against the Respondent Banks on statute-of-limitations grounds.  After the Minnesota Supreme Court vacated that disposition, it reached the adequacy of the receiver's pleading on both actual and constructive fraud.  It justified doing that because the Respondent Banks had asserted failure to state a claim under the Minnesota analog to Rule 12(b)(6) as an alternative basis for dismissal.  860 N.W.2d at 656-658, 653.

that identifiable creditor-parties unquestionably suffered.[21]

Finn uses a distinct conceptual structure to bar the use of MUFTA-based remedies against the transferees before it. It casts those parties as no more than the recipients of a permissible preference. But in its strength and length, Finn's phraseology toward that end is deceptive. It unfortunately lends itself to the argument that the analysis is categorical--that the reasoning in Finn compels the same outcome whenever a Ponzi-scheme perpetrator and an investor transact through the same bare documentary structure for lending or investment to support exchanges of funds, i.e. on any debtor-creditor relationship under documentary trappings for which a loan was being repaid. Under such a categorical approach, it would not matter whether the associated deal were real or not, or whether the perpetrator planned to use the later-infused funds for a genuine deal, or whether it was diverting them into the central churn of its scheme in near-contemporaneity.

However, the argument for a categorical application is belied by the qualification that appears in the precedent on which the Finn court relies. That authority cannot be ignored when Finn is parsed for the scope of its pronouncements for possible application to an alternate situation. It is easy to pass over, but it is there: preferences in favor of a bona fide creditor are valid in the absence of actual fraud. Id. (citing Aretz v. Kloos, 95 N.W.2d 216, 219 (Minn. 1903)). "MUFTA does not prohibit a debtor from making a preferential transfer in favor of one bona fide creditor over another so long as the transfer is not fraudulent." Id.

The Finn court did not highlight the fraud-centered qualifier of its cited precedent, or even acknowledge its presence in any pointed way.[22] It did not recognize any nuance stemming from the qualifier, and it gives no guidance for its application. Finn's discussion on reasonably-

---

[21]The reference here is to the other creditors of debtor-transferors, that could sue in avoidance under MUFTA to return fraudulently-transferred assets to their pre-transfer repose.

[22]A direct nexus to fraud on the part of the transferor was absent from the receiver's cases in Finn.

equivalent value is not entirely clear on its face, as to how far it is to apply as precedent.  It might

be read as a focused application of fraudulent transfer law on its merits to the specific payments

in the record before it, entirely apart from the consideration of a presumption; and then going more

broadly, an adoption of generally-applicable principles that were not to be limited to the specific

facts in that case.

This is the effect that the defense here would give to *Finn* as a whole.  That is a

dubious assumption, not the least because it would attribute little or no judicial restraint to the *Finn*

court.[23]

Read in the most principled light, and attributing judicial restraint to the court that

issued it, *Finn* does not establish a broad, all-encompassing, and binding rule of decision for

application to *any and every* payment made by the perpetrator of a Ponzi scheme to *any or all* of

its investors or creditors.  The facts on which the *Finn* court ruled did not have the nuance that runs

across the Petters Company avoidance litigation, as the Trustee here pleads it.

*Finn*'s analysis, its quoted precedent, and its outcome, it stands for only one

proposition in an unequivocal way:  in the context of a perpetrator's business operation that is run

only *partially* as a Ponzi scheme, the use of a second-instance fraud to enable a challenged

payment is not enough *in itself* to trigger the fraud exception to the permissible-preference doctrine.

---

[23]The confusion is compounded by the way the opinion envisions the subject transactions in the
bigger picture of historical fact.  One part of *Finn*'s stylistic phraseology is unfortunate: its offhanded
reference to the *legitimate* transactions before it as "*part of* a greater Ponzi scheme."  *Finn*, 860 N.W.2d at
655 (emphasis added).  This observation lacks precision: arguably, the legitimately-founded transactional
chains addressed in *Finn* were not "part of" that debtor's "greater Ponzi scheme" at all.  They could have
stood and been closed to the debtor's advantage whether the debtor was defrauding other investors or
not.  They had only one, tangential connection with a Ponzi scheme: the perpetrator had commingled the
proceeds of the legitimate deals in question with monies received from other investors on fraudulently
induced or nonexistent deals, and the defendant-participants before the court were paid from funds so
commingled.  860 N.W.2d at 642.  But arguably, because the subject transactions in *Finn* were legitimate,
otherwise contractually self-contained, and facially and factually self-sustaining, they could be classified as
transactions entirely divorced from the main churn of that debtor's Ponzi scheme in its traditionally-
conceived structure, to analyze their vulnerability to avoidance--whether presumptions were applied or not.

*Finn*, 860 N.W.2d at 642 (noting that payment on the genuine transactions before the court had been funded "at least in part" by infusions from defrauded later investors).

*Finn*'s discussion is driven with determination toward a specific outcome for the parties before it, and toward an unequivocal fate for the presumptions being judged. Given that, it is too facile to expand that one undeniable thought to a categorical rule for application throughout the operations of a Ponzi scheme perpetrator: as long as an investor or lender into the business operations of a Ponzi-scheme purveyor makes its investment or lending under regular documentation of a facial tenor that is consistent with legal enforceability, all satisfaction of debt through the purveyor's repayment according to the document's terms gives reasonably equivalent value to the purveyor.[24]

That extension, however, is just not borne out--not the least because *Finn* tacitly acknowledged the fraud-centered exclusion from the shelter given to a permissible preference, that longstanding Minnesota precedent still features.[25]

## APPLICATION TO THE PROCEEDINGS IN THESE CASES

The Trustee seeks to avoid transfers made in satisfaction of contractually-memorialized debt that, *de facto*, was not associated in its inception with real-life transactions in the merchandise-factoring or "diversion" activity for which the Debtors were ostensibly soliciting financing. Rather, as the Trustee pleads it here, the payments in suit were directly and inextricably part of pervasively-fraudulent conduct on the part of the transferor that was making payment, with that fraud running from the inception of the underlying debt to its satisfaction by the payments that

---

[24]And hence, the payment is not avoidable as constructively fraudulent, and an element is established for an affirmative defense to an actual-fraud theory.

[25]It probably need not be said, but the *Finn* court certainly did not abrogate the exclusion. And that is significant, because *Finn* does not say a word about the exclusion. Now *that* certainly was a matter of judicial restraint; because the *Finn* court certainly had no difficulty in pointedly and categorically rejecting a Ponzi scheme presumption, using a complicated analysis, to address the issue that was presented by its record.

the Trustee seeks to avoid. *Finn*'s pronouncements on the matter of reasonably equivalent value do not as a matter of law bar the Trustee on these theories. That outcome is fully justified by the very precedent in Minnesota state law on which the *Finn* court bases its bedrock analysis.

First, a fundamental verity must be recognized. The *Finn* court did not acknowledge this, but only because the facts there did not require it: a Ponzi scheme is a rolling fraud, involving a linear sequence of victims. Its maintenance requires two separate instances of chicanery on the perpetrator's part, as to any particular victim-participant.

In the first instance, a lender or investor is gulled into advancing money by a fraud in the inducement: the perpetrator's representation that the infused funds will be directed toward a particular investment vehicle, use, or purpose, the execution of which will generate profit or capital gain for the lender or investor. The injury of that deception occurs when the infused funds are not used for that purpose; the intention all along was to divert the money to something else.[26]

The second instance of fraud as to any particular transaction is committed at the time that such a lender or investor is contractually due its realization on the fraudulently-pretensed transaction, and is paid. Here is where the *rolling* takes place: a second lender or investor (or more than one such if the perpetrator's needs require) is gulled in a similar fashion, into infusing on the pretense of an investment in a different transaction. Its later-made cash infusion is diverted to the satisfaction of earlier lenders' claims. The perpetration of fraud replicates, but the brunt of

---

[26]The use of the word "injury" here is in the sense of tort law's distinction between the notion of "injury" and the notion of "harm." *See* discussion in *In re Stage*, 321 B.R. 487, 492-493 (B.A.P. 8th Cir. 2005); *In re Duy*, 484 B.R. 742, 751 (Bankr. D. Minn. 2012); *In re Langeslag*, 366 B.R. 51, 58-59 (Bankr. D. Minn. 2007). In the first-instance fraud of a Ponzi scheme's operation, the "injury" would be the violation of the lender's contractual right to real-life participation in a genuine deal. The "harm"--the actual financial or economic loss--would take place when the lender was not paid in line with its expectation and its contractual due. In the mid-stream of a Ponzi scheme's history, the harm does not take place. Any given investor is a victim only in an abstract sense, in that its original expectations had no basis in actuality and the actual risk it bore before receiving payment was different from that which it had assumed to be the case, from the perpetrator's representations and the tenor of the contract. Upon a scheme's failure, the lenders left in without satisfaction are victims in a concrete way. Unsatisfied in a financial sense, they have suffered actual, economically-measurable harm.

the perpetration rolls to a new generation of victim.[27]

But under the facts before it--with no fraud to taint the original creation of the transferees' rights to payment from the debtor, or the repayment in satisfaction of them--the *Finn* court invoked only the main principle--repayment on "honest," valid debt gives reasonably equivalent value.  On a fraud-free template, its reasoning went both to rejecting the presumption and sheltering the transfers before it from avoidance under either theory.[28]  *Finn*, 860 N.W.2d at 652-654.[29]

*Finn* does not acknowledge the actual-fraud exclusion from reasonably-equivalent value for dishonestly-incurred debt or fraudulently-enabled payment.   But there is only one implication from its use of the full text of the precedent as quoted: the exclusion is still a feature of Minnesota law.   *Finn* does not delete the references to the exclusion from its quotations from past case law.   The opinion does not cast a bit of doubt on the continuing vitality of the exclusion, generally or in context.

For the purposes of the Trustee's avoidance litigation here, it is crucial to recognize that *Finn* did not require a deeper inquiry--into the main churn of a Ponzi scheme.  The *Finn* court

---

[27]The Seventh Circuit envisioned just this, when it addressed an appeal out of fraudulent-transfer litigation in the bankruptcy cases of the Lancelot entities that had fed investor funds into the Petters Ponzi scheme:

> [Ponzi] schemes can operate only as long as they pay existing investors' claims.  Once they stop paying old investors, new investments stop coming in and the scams collapse.  Thus ongoing payments are integral to the fraud.

*Peterson v. Somers Dublin, Ltd.*, 729 F.3d 741, 748 (7th Cir. 2013).

[28]Which is to say, on the case in chief for constructive fraud and as a conclusive affirmative defense for actual fraud. The affirmative defense would be available as long as the defendant could prove it received the transfer in good faith, Minn. Stat. § 513.48(a).  In *Finn*, that was not an issue.  860 N.W.2d at 655 n.3.

[29]And, apparently, the presumption again was argued to be irrebuttable.  *Finn*, 860 N.W.2d at 649. ("The third component of the Ponzi-scheme presumption requires the court to conclude--once again as a matter of law . . . .").

is not to be faulted for not reaching the nuance crucial to the Petters Company litigation. But the complication from its pronouncements arises nonetheless, from the two-stage deception within the core operation of a Ponzi scheme, and the diversions of money at both stages. This permeates fraud throughout the flow of funds. Fraud imbues the creation of a transferee's original right to payment from the perpetrator; and a separate, later fraud enables the payment made in facial satisfaction of that earlier-created right.

This is where the fraud exclusion to the permissible-preference construct rightly comes into play. The cumulation of fraudulent inducement pled here materially distinguishes the Trustee's avoidance litigation from the facts in *Finn*.[30] If a Ponzi-structured fraud compounded between generations of unwitting dupes is not enough to unseat an otherwise-permissible preference to an earlier lender on the grounds of inequity, it is not possible to envision a "fraud" to satisfy this long-recognized exclusion. That fraud-enabled inequity is underlined if one remembers the misdirection of the funds from the later infusion: the funds are taken entirely away from the second lender's intentions. All assurances of repayment otherwise assumed by that lender in its specific reliance on the perpetrator's factual representations are rendered a nullity.

The old-time language of *Finn*'s cited authority has special resonance here. One could quibble about what the court in *Thompson v. Schiek* meant in its reference to an "honest debt," the contractually regular payment of which could not be a fraudulent transfer, 213 N.W. at 912. But the phrase is best read in consonance with the times when the Minnesota Supreme Court originally used it--as denoting a debt incurred for legitimate purposes in the application of the credit or cash proceeds, and with pure intent not to defraud anyone--not to hoodwink the creditor in the

---

[30]One is tempted to say that the sweep of deception backward and forward in time from a subject transaction makes the point undeniable. But, *Finn* cautions us that "the focus [of MUFTA] is on individual transfers, rather than a pattern of transactions that are part of a greater 'scheme.'" *Finn*, 860 N.W.2d at 647. Describing a consequence of that phenomenon as "undeniable" would sound too much like a presumption--which of course *Finn* eschews. *Eppur si muove.*

inducement to lend or extend, not to victimize anyone else later when the debtor is to use its financial means to meet the obligation at the time of the satisfaction. A debt incurred and satisfied in the main sequence of a Ponzi scheme fails muster on every one of those considerations.

The same thought applies to the notion of a *transfer*, i.e. a *payment*, "honestly made" on an antecedent debt, as envisioned in *Skinner v. Overend*, 252 N.W. at 418-419 and *Kummet v. Thielen*, 298 N.W. at 246. A payment made with the knowing use of money misappropriated after fraud, to satisfy a debt originally contracted through a like fraud, would simply not have been considered "honestly made" in the first half of the 20th century.

This analysis dovetails with another part of *Finn*'s articulation, that "any *legally-enforceable* right to payment against [sic] the debtor is sufficient to qualify as an antecedent debt under MUFTA," *Finn*, 860 N.W.2d at 651--a payment in satisfaction of which would then qualify as value and reasonably equivalent value within the meaning of MUFTA. The outcome in *Finn* was driven by the receiver's inability to identify or prove a basis on which to invalidate as legally unenforceable the genuine deals before that court--those had been based on investors' participations in loans actually made for real transactions. *Finn*, 860 N.W.2d at 651, 655.[31] This powerfully strengthened the thrust toward the outcome in *Finn*. However, *Finn*'s analysis did not reject the presence of some sort of fraud, attached to a contractual right of payment, as a basis for invalidating the contract-structured right, so as to deny value and reasonable equivalence for all or part of a debtor's payment on it.

So: contrary to the defense's insistence here, in the case of a loan it is not enough that the dollars changed hands according to the facial tenor of the note, and a like amount plus interest just went back later. The older decisions make repeated references to debts honestly contracted in the first place and repaid with honest intent through honest means. These prominent

---

[31]The *Finn* court drew attention to the fact that Alliance Bank "performed due diligence on [its underlying] loan and ensured that the loan was properly secured." *Finn*, 860 N.W.2d at 655, n.3.

pronouncements broaden the considerations beyond the abstract flow of money technically consistent with contractual terms.   This is entirely consistent with the context in which the pronouncements were made, the application of fraudulent-transfer remedies--which lie in favor of third-party creditors that are divorced from the chicanery of a debtor-transferor, the possible complicity of a transferee, or both, but which nonetheless are harmed by such malfeasance.   The older opinions impose a qualification, fair-and-square circumstances in payment, as the prerequisite for deeming reasonably equivalent value to the satisfaction of preexisting debt.   That qualification bears right into the purpose of fraudulent-transfer remedies.

This is underlined by two different substantive approaches to that point of legal enforceability.

The first is that obligations of payment in either of the two lending or investment transactions in the sequence of a Ponzi scheme could be subject to the legal defense of unenforceability as to part or all of the obligations of the non-debtor party, for some part of the sequence up to final consummation, when all debt is paid off and both parties walk away.   The unenforceability would come about as a result of the debtor's fraud in the inducement, and this would be a matter of *law*, not equity.[32]

One can envision several scenarios where unenforceability could have been raised by a lender like the Opportunity Finance defendants at different points in the sequence of a lending transaction, on the very ground that Tom Petters had fraudulently induced them to lend.   The argument could have been asserted properly to undo executory rights or obligations under the lending relationship:

- A lender that has already advanced on a term note given by the PCI Debtors discovers that it was fraudulently induced

---

[32]It is not necessary to reach the theory of unenforceability as a matter of public policy.   That principle was a fundament of the rationale of *Scholes v. Lehmann*, but the *Finn* court found the notion quite repugnant--for reasons stated in a rather skewed fashion.   860 N.W.2d at 652-653.

and the merchandise sale on which it ostensibly lent was never contracted. The lender finds this out before the due date for the note obligor to pay in full. Fraud in the inducement could certainly justify a demand for immediate payment in full, as opposed to waiting until the due date and bearing the enhanced and unknown risk of carrying the PCI Debtors' credit through the period fixed by the original agreement and the note. Any insistence by PCI on the original terms of the deal, payment when due but not a minute before, would not be met favorably by any court.

- In a variation on that scenario, involving a pretensed schedule of several merchandise transactions and a matching series of loan advances, a mid-stream discovery of Tom Petters's fraud in the inducement would certainly justify a lender's refusal to advance further, on the ground that its commitment to lend any more was not enforceable at law due to the fraud.

- And even in a simpler scenario, a commitment to lend made on the representation of a pending merchandise transaction should not be enforceable where fraud in the inducement is revealed before the disbursement of loan proceeds. The prospective borrower could not possibly go to court for legal or injunctive relief to compel a lender to advance into a nonexistent transaction, when the reliance for the commitment to lend was on the representation of a reality.

In arguing for reasonable equivalence, the Opportunity Finance defendants insist that the note-debtors within the Petters enterprise structure were all legally bound to pay by the facial terms of their notes, and the inquiry goes no further than that. They say this point is cemented because PCI and the SPE-subsidiaries all got the money from the associated loans; and thus they were under a legally-enforceable duty of repayment.

This parses the concept of legal enforceability in a micro-focus. *Finn*'s cited authority for the issue clearly enables a court to look beyond the face of the documents and the past flow of the funds alone.

These conclusions alone are enough to confine *Finn* to the specific transactional situations before the court there, where there was no proof that the circumstances were anything other than fair and square, or even any allegation to that effect. The *Finn* court did not make rulings

31

of general applicability as to the nature of reasonably equivalent value across the entire breadth of a Ponzi scheme purveyor's business dealings.

Thus *Finn* itself does not bar the Trustee here from maintaining suit in avoidance on the grounds of constructive fraud; it cannot be said that reasonably equivalent value matched to a Debtor's transfer, as a matter of law.[33]   He must, of course, plead sufficient facts to place each transfer that he would avoid, into the two-step sequence of rolling fraud in the Petters scheme's central operation.   These must go first to the origin of the debt in question, in an act of fraudulent inducement as to the transferee.   If the funds it lent at that time went to an earlier defrauded investor, that certainly should be specified.   Then the second-stage fraud must be pleaded with specificity, in the debtor-transferor's fraudulent inducement of a new lender to obtain the funds fraudulently diverted to the payment of the transferee.   Obviously, the allegations of fact on these points must be backed up by a reconstruction through forensic accounting.

Finally, the equity-structured, federally-evolved approach previously adopted in the Second Memorandum still is viable here, on the question of whether the SPE-debtors' payment obligations are to be considered as enforceable at law now, or even as of the time of the payments through which the obligations were discharged.   As a matter of equity, that enforceability is overridden.

*Finn* looks askance at the root-source of this analysis in *Scholes v. Lehmann* and its companion federal jurisprudence.   860 N.W.2d at 652.   But however much it jibes at several of the foundational principles of the analysis, 860 N.W.2d at 652-653, *Finn* does so only in the service of one end: rejecting the Ponzi scheme presumption as to reasonably equivalent value.   860 N.W.2d at 653.   That end-use gets rid of a fact-finding shortcut; but it did so only in a case brought

---

[33]The Opportunity Finance defendants' insistence that documentary form and the initial flow of lending should compel a finding in their favor despite the lurking presence of fraud . . . sounds rather like a presumption.   And we know what *Finn* says about those, in the Ponzi-scheme context.

on facts where a finding of reasonably equivalent value would have been amply supported outside of the context of receivership or bankruptcy. It says nothing about the alternate situation in the thick of a Ponzi scheme. There, the immediate, instinctive reaction of the *Finn* court, "well of course not!," just does not happen.

*Finn* cannot be read as a categorical rejection of the analysis previously adopted in *In re Petters Co., Inc.*, 499 B.R. at 355-359. The *Finn* court had every opportunity to say the Second Memorandum erred in that substantive analysis. It never did so. Reading *Finn* to say that would be textually unsupported. Deeming it to read that way would mean that *Finn* went far beyond the appellate obligation to frame its ruling to address the specific facts before the court at that time, and none others. *Finn* therefore gives no reason to deny the continuing vitality of *Scholes v. Lehmann* and the other authority on which the Second Memorandum's ruling were based. There is still a viable theory for an equitable override that denies value to the interest component of repayment on debt owing by the perpetrator of a Ponzi scheme, incurred in transactions in the main sequential operation of the scheme, in an action for avoidance under MUFTA.

## OUTCOME

The analysis here was long, and may rightly be termed turgid. But it is offered to make sense of *Finn*'s rulings in their original form, the true reach of which was somewhat obscure from the order of analysis and the syntactical sensibility of the opinion's text. The conclusion is that *Finn* does not vitiate the Trustee's case here, for recovery of at least the ostensible interest-component that the Debtors paid to the Opportunity Finance defendants and other investor-lenders into the Petters enterprise structure that the Trustee has sued in avoidance.

That conclusion is based on several component rulings, which are reprised here in parallel form to enable ready access for the Trustee's other proceedings in litigation. As follows:

***Ruling #2***:[34]   The Trustee may not rely on a Ponzi scheme presumption of fraudulent intent on the part of the Debtors as transferors, to meet his burdens of pleading and proof.   However, he may plead and ultimately prove fraudulent intent by facts that place the transfers he would have avoided, into a chain of successive investment transactions that involved similar acts of fraudulent inducement by the Debtors, as to successive investors, and the successive misdirection of investors' cash infusions toward the payment of earlier investments rather than application to investment opportunities of the sort fraudulently represented.

***Ruling #3***:   The Trustee may not rely on a presumption that any Debtor, as transferor, was insolvent when it made any transfer that he would have avoided.   For the purposes of pleading, the Trustee may rely on a factual averment that due to its participation in an active Ponzi scheme a particular Debtor-transferor became insolvent before the date of the transfer that the Trustee would avoid, and was still insolvent as of the date of the transfer.   The issue is reserved, as to whether the Trustee must prove insolvency or financial distress within the definition of Minn. Stat. §§ 513.44(a)(2) or 513.45(a), in specific detail as of the date of a transfer that he would avoid.   That issue may be presented when the merits of any adversary proceeding are presented for decision.

***Ruling #4***:   The Trustee may not rely on a presumption that a Debtor-transferor did not receive reasonably equivalent value for the ostensible interest-component of any payment it made to the Opportunity Finance defendants or any other investor-lender into the Petters enterprise structure, on account of debt contractually owing to them.   However, upon pleading and proof that a particular transfer in payment of principal and ostensible interest was made by a Debtor to an investor-lender in consummation of the two-stage use of fraudulent inducement and

---

[34]The numbering here takes up with that started in a recent ruling on another issue presented by this adversary proceeding.   *In re Petters Co., Inc.*, ADV 10-4301 [Dkt. No. 174], ___ B.R. ___, 2016 WL 2990343 (Bankr. D. Minn. May 19, 2016).

fraudulent misappropriation through a Ponzi scheme as generally understood, the portion of the payment nominally identified as contractual interest was not transferred for reasonably equivalent value received by the Debtor-transferor under the rationale previously adopted by this court.  A like value may be recovered by the Trustee on his satisfaction of the other statutory requirements for avoidance as actually- or constructively-fraudulent transfers.

As the parties contemplated and requested, these rulings are memorialized here without concrete application to the Opportunity Finance defendants' pending motion for dismissal or DZ Bank's pending motion for judgment on the pleadings.  That application will be made later, after rulings on the balance of the multiple additional issues raised and presented by those defendants.  The rulings in this memorialization will also be used in disposition of the related issues for the Trustee's pending motions for partial summary judgment in other adversary proceedings, when they are presented for decision on their merits.  *Ave atque vale.*

*/e/ Gregory F. Kishel*

_____
GREGORY F. KISHEL
CHIEF UNITED STATES BANKRUPTCY COURT