# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re | **Jointly Administered under Case No. 08-45257** |
| Petters Company, Inc., et al., | Court File No. 08-45257 |
| Debtors. | Court File Nos.: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (KHS) |
| PC Funding, LLC; | 08-45326 (KHS) |
| Thousand Lakes, LLC; | 08-45327 (KHS) |
| SPF Funding, LLC; | 08-45328 (KHS) |
| PL Ltd., Inc.; | 08-45329 (KHS) |
| Edge One LLC; | 08-45330 (KHS) |
| MGC Finance, Inc.; | 08-45331 (KHS) |
| PAC Funding, LLC; | 08-45371 (KHS) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (KHS) |
| | Chapter 11 Cases Judge Kathleen H. Sanberg |

---

Douglas A. Kelley, in his capacity as the
Trustee of the PCI Liquidating Trust,

Plaintiff,

vs.                                                      ADV. NO. 10-04301

Opportunity Finance, LLC; Opportunity Finance
Securitization, LLC; Opportunity Finance
Securitization II, LLC; Opportunity Finance
Securitization III, LLC; International Investment
Opportunities, LLC; Sabes Family Foundation;
Sabes Minnesota Limited Partnership; Robert W.
Sabes; Janet F. Sabes; Jon R. Sabes; Steven
Sabes; Deutsche Zentralgenossenschaftbank AG;
and The Minneapolis Foundation,

Defendants.

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................ 1

PARTIES ............................................................................................................................. 3

PROCEDURAL BACKGROUND.......................................................................................... 8

JURISDICTION, VENUE, AND STANDING........................................................................ 10

NATURE OF PROCEEDING ............................................................................................... 10

FACTUAL BACKGROUND ................................................................................................. 13

    I.    THE PETTERS PONZI SCHEME.............................................................................. 13

        A.    Petters and His Associates Are Convicted and Sentenced to Prison ............................ 13

        B.    Operation of the Ponzi Scheme ................................................................................ 14

        C.    The Transfers at Issue Occurred Within the Main Churn of the Ponzi Scheme........... 22

    II.    THE SPECIFIC FRAUDULENT TRANSFERS MADE TO DEFENDANTS DURING THE COURSE OF THE PONZI SCHEME ................................................................ 27

        A.    Direct Transfers from PCI to the Investor Defendants ................................................ 28

        B.    Direct Transfers from PCI to MGLLC and Subsequent Transfers to the Investor Defendants .................................................................................................................... 31

        C.    SPF Funding Transfers .............................................................................................. 35

        D.    PC Funding Transfers ................................................................................................ 39

    III.    THE TRANSFERS ARE FRAUDULENT AS TO DIRECT AND SUBSEQUENT TRANSFEREES ..................................................................................................... 43

        A.    Each Transfer Was Made in the "Main Churn" of the Ponzi Scheme  by Insolvent Entities ......................................................................................................................... 43

        B.    Defendants Had Actual and/or Constructive Knowledge of the Fraud ....................... 46

    IV.    THE TRUSTEE HAS STANDING UNDER 11 U.S.C. § 544(B) AND THE MINNESOTA UNIFORM FRAUDULENT TRANSFER ACT TO AVOID ALL AT-ISSUE TRANSFERS ......................................................................................................... 52

        A.    The Trustee Has Identified Sufficient Predicate Creditors of PCI for Standing as to Claims Addressing Direct Transfers from PCI ..................................................................... 53

        B.    There Are Predicate Creditors of the SPEs Because the Corporate Veil Between PCI and Those SPEs Can Be Pierced................................................................................... 64

        C.    Predicate Creditors Have Direct Claims Against the SPEs .......................................... 70

CAUSES OF ACTION ......................................................................................................... 73

i

# FOURTH AMENDED COMPLAINT

Douglas A. Kelley, in his capacity as the Trustee of the PCI Liquidating Trust, as and for his Fourth Amended Complaint against defendants Opportunity Finance, LLC, Opportunity Finance Securitization, LLC, Opportunity Finance Securitization II, LLC, Opportunity Finance Securitization III, LLC, International Investment Opportunities, LLC, Sabes Family Foundation, Sabes Minnesota Limited Partnership, Robert W. Sabes, Janet F. Sabes, Jon R. Sabes, Steven Sabes, Deutsche Zentralgenossenschaftbank AG, and The Minneapolis Foundation (collectively, "Defendants"), states and alleges as follows:

## INTRODUCTION

1.      As is now widely acknowledged, Thomas Petters, together with his band of criminal colleagues, operated one of the largest Ponzi schemes the world has ever seen, causing *billions* in losses.  Petters conducted the scheme through Petters Company, Inc. and a web of special purpose entities, which Petters used to portray wholly illusory financing transactions as legitimate, thereby inducing investors to pour funds into Petters' operations with the hope and expectation of earning the promised interest on their capital outlays.

2.      Petters' scheme collapsed in September 2008 after his chief lieutenant turned state's evidence against him.  The results for investors who entrusted their money to Petters were disastrous—collectively, they lost billions of dollars, money that the Chapter 11 Trustee, and now the PCI Liquidating Trust, is attempting to recover for their benefit.  Investors have been repaid only a small fraction of their massive losses.

1

3.      While the bulk of investors suffered losses, a select group of individuals, entities,

and family partnerships associated with the Sabes family of Minneapolis profited handsomely

from their involvement in the Petters Ponzi scheme.  Over the span of approximately a decade,

the Sabeses, through their investment vehicle Opportunity Finance, LLC and other channels,

funneled nearly $2.3 billion into Petters' scheme in the guise of loans, purportedly to enable the

gray market diversion of electronic goods arranged by Petters.  In return, the Sabeses, together

with the major bank that provided much of the money they directed into the scheme, received

***more than $2.5 billion*** back from Petters.  In so doing, the Defendants in this case obtained more

than ***$228 million in false profits*** from the Petters scheme, all at the expense of other investors.

Far from being victims, the Sabes family and the other Defendants in this action were among the

greatest beneficiaries of Petters' fraud.

4.      Although the Sabeses funded legitimate transactions with specific Petters entities,

those transactions and entities are not at issue in this proceeding.  Rather, Defendants' purported

loans at issue here were unconnected to actual consumer electronics transactions.  The money

that Petters raised through these loans was used either to pay off other investors (or even other

loans from Defendants) or to fund Petters' lavish spending and unrelated pursuits.  At the other

end of the transactions, the money Defendants received when these loans were paid off was

obtained from other investors, and not from the merchandise transactions identified in the loan

documents.  As such, the transactions addressed in this proceeding—spanning a decade—were

part of the main churn of Petters' Ponzi scheme.

5.      While enjoying conscience-shocking profits paid by other investors in Petters'

Ponzi scheme, Defendants knew, or should have known, that Petters was perpetrating a fraud.

Among a lengthy list of red flags—including interest rates on loans that sometimes exceeded

100%—the Sabeses knew that the purchase orders at the core of the transactions they were purportedly funding did not match the forms used by the identified purchasers.  After years of investing with Petters, sensing that the ride was coming to an end, the Sabeses abruptly stopped investing in December 2007 and demanded immediate repayment of all outstanding notes, which accelerated to repayment of three notes per week during 2008.  From then until Petters' ultimate arrest, Defendants received more than $155 million from Petters.

6.      Through this proceeding, the Liquidating Trust seeks to avoid and recover the massive transfers to Defendants, including the payments of both principal and false profits in excess of their investments.

**PARTIES**

7.      Debtor Petters Company, Inc. ("PCI")[1] is a corporation organized under the laws of the State of Minnesota with its principal place of business in Minnesota.  PCI is, and at all times relevant herein was, wholly owned by Thomas Joseph Petters ("Petters"), an individual and citizen of the state of Minnesota.

8.      Debtor PC Funding, LLC ("PC Funding") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Minnesota.  PC Funding is, and at all times relevant herein was, wholly owned by PCI.

9.      Debtor SPF Funding, LLC ("SPF Funding"), f/k/a Petters Finance, LLC,[2] is a limited liability company organized under the laws of the State of Minnesota with its principal place of business in Minnesota.  SPF Funding is, and at all times relevant herein was, wholly owned by PCI.

---

[1] A list of defined terms is attached hereto as Exhibit V.
[2] SPF Funding was named Petters Finance, LLC until October 16, 2004.  The entity will be referred to herein as SPF Funding.

3

10.     PCI, PC Funding, and SPF Funding are collectively referred to in this Fourth Amended Complaint as the "Debtors."

11.     Defendant Opportunity Finance, LLC ("Opportunity Finance") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Minnesota.  Opportunity Finance engaged in hundreds of financial transactions with PCI, PC Funding, and SPF Funding.

12.     Defendant Opportunity Finance Securitization, LLC ("Securitization") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 South 6th Street, Suite 1200, Minneapolis, MN 55402.

13.     Defendant Opportunity Finance Securitization II, LLC ("Securitization II") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 South 6th Street, Suite 1200, Minneapolis, MN 55402.

14.     Defendant Opportunity Finance Securitization III, LLC ("Securitization III") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 200 South 6th Street, Suite 1200, Minneapolis, MN 55402.  Securitization, Securitization II, and Securitization III funded various transactions by and between Opportunity Finance and PCI, PC Funding, and SPF Funding and purportedly held security interests in the proceeds of fictitious commercial transactions, as more fully described below.

15.     International Investment Opportunities, LLC ("IIO") is a limited liability company organized under the laws of the State of Minnesota.  IIO claimed at times pertinent to this Fourth Amended Complaint to have become defendant Opportunity Finance.

16.     At various points within this Fourth Amended Complaint, Defendants

Opportunity Finance, Securitization, Securitization II, Securitization III, and IIO are referred to

collectively as the "Opportunity Finance Defendants."

17.     Defendant Sabes Family Foundation is a Minnesota-based trust located at 220

South 6th Street, Minneapolis, MN 55402, c/o Steven Sabes, Trustee.

18.     Defendant Sabes Minnesota Limited Partnership ("Sabes LP")  is a partnership

formed by members of the Sabes family on December 4, 1996 under the laws of the State of

Georgia with its principal office at 60 South 6th Street, Suite 950, Minneapolis, MN 55402.

Robert Sabes is the general partner of Sabes LP, which was registered to do business in

Minnesota as a foreign limited partnership on January 8, 1997.  Sabes LP engaged in financial

transactions with PCI for the benefit of the Sabes family.

19.     Defendant Robert W. Sabes ("Robert Sabes") is a resident of the State of Nevada

who formerly resided in the State of Minnesota.  Robert Sabes is a founder of Opportunity

Finance, the Sabes Family Foundation, and IIO.  Robert Sabes, at times through the Opportunity

Finance Defendants, engaged in financial transactions with PCI for the nominal benefit of

various trusts.  Robert Sabes formed and served as a principal of IIO, which also extensively

engaged in financial transactions with PCI and which was merged into Opportunity Finance in

2001.  Robert Sabes served as a primary decision maker on behalf of the Opportunity Finance

Defendants and other entities that he managed and controlled concerning financial transactions

undertaken with PCI, PC Funding, and SPF Funding, and various companies controlled by

Petters.  On information and belief, entities managed or controlled by Robert Sabes undertook

the financial transactions at issue in this action for the benefit of Robert Sabes, members of his

family, and trusts formed to fund the lifestyle of the Sabes family.  All actions of the Opportunity

5

Finance Defendants, and claims against them, are attributable to Robert Sabes, who is responsible at law and in equity for the actions of the Opportunity Finance Defendants.

20.     Defendant Janet F. Sabes ("Janet Sabes") is a resident of the State of Nevada who formerly resided in the State of Minnesota.  Janet Sabes also undertook financial transactions with PCI.

21.     On or about September 28, 1998, Robert Sabes, on behalf of IIO, formed Metro Gem, LLC ("MGLLC"), a Minnesota limited liability company, for the express purpose of providing funds to PCI through loan transactions similar to those in which IIO—and later Opportunity Finance—engaged separately.  IIO owned 99.9% of MGLLC.  Metro Gem, Inc., a Minnesota corporation owned entirely by Frank E. Vennes, Jr., owned the remaining 0.1%.

22.     Defendant Jon R. Sabes ("Jon Sabes") is a resident of the State of Minnesota, an attorney who graduated *cum laude* from the University of Minnesota Law School, and, at various times relevant to this Fourth Amended Complaint, served as the Chief Executive Officer and President of Opportunity Finance.  Jon Sabes operated the Opportunity Finance Defendants on a day-to-day basis, but at all times did so subject to the directives of his father, Robert Sabes.  On information and belief, entities managed or controlled by Jon Sabes undertook the financial transactions at issue in this action for the benefit of Jon Sabes, members of his family, and trusts formed to fund the lifestyle of the Sabes family.  All actions of the Opportunity Finance Defendants, and claims against them, are attributable to Jon Sabes, who is responsible at law and in equity for the actions of the Opportunity Finance Defendants.

23.     Defendant Steven Sabes is a resident of the State of Minnesota.  Steven Sabes holds a Ph.D. in organic chemistry from the University of Minnesota and formerly served as a principal of Opportunity Finance and as a trustee of the Sabes Family Foundation.  On

information and belief, entities managed or controlled by Steven Sabes undertook the financial

transactions at issue in this action for the benefit of Steven Sabes, members of his family, and

trusts formed to fund the lifestyle of the Sabes family.  All actions of the Opportunity Finance

Defendants, and claims against them, are attributable to Steven Sabes who is responsible at law

and in equity for the actions of the Opportunity Finance Defendants.

24.     Defendants Robert Sabes, Janet Sabes, Jon Sabes, Steven Sabes, and Sabes LP are

referred to at various points within this Fourth Amended Complaint as the "Sabes Family

Defendants."

25.     Defendant Deutsche Zentralgenossenschaftbank AG ("DZ Bank") is a

commercial cooperative bank organized under the laws of Germany with its principal place of

business in Frankfurt, Germany.  DZ Bank funded transactions by and between the Opportunity

Finance Defendants and PCI and PC Funding.  On information and belief, one or more of the

Opportunity Finance Defendants granted a security interest to DZ Bank in certain accounts

payable owed by PCI and PC Funding.  DZ Bank is subject to personal jurisdiction in the District

of Minnesota on the grounds that it routinely conducted business within the State and District of

Minnesota and specifically did so with respect to financial transactions by and between the

Opportunity Finance Defendants, which were managed or controlled by members of the Sabes

Family Defendants.  DZ Bank utilized a Minnesota bank in the course of business transactions

with the Opportunity Finance Defendants.  DZ Bank likewise is subject to personal jurisdiction

in the District of Minnesota on the grounds that Federal Rule of Bankruptcy Procedure 7004

provides for nationwide service of process.  This United States Bankruptcy Court therefore holds

personal jurisdiction over any defendant with minimum contacts with the United States, such as

DZ Bank.

26.    Defendant The Minneapolis Foundation is an unincorporated organization located at 800 IDS Center, 80 South 8th Street, Minneapolis, MN 55402.  Certain of the Defendants transferred and/or assigned promissory notes to The Minneapolis Foundation, which received payments from PCI and SPF Funding.

## PROCEDURAL BACKGROUND

27.    On October 3, 2008, pursuant to 18 U.S.C. § 1345, the United States District Court for the District of Minnesota (the "District Court") placed PCI, PC Funding, and SPF Funding into receivership in civil litigation commenced by the United States of America against, among others, Petters and PCI (Court File No. 08-CV-5348) (the "Receivership Action").

28.    By Order of the District Court in the Receivership Action dated October 6, 2008, as subsequently amended and restated, including on December 8, 2008, the District Court appointed Douglas A. Kelley, Esq.  ("Kelley") as equity receiver (the "Receiver") of any affiliates, subsidiaries, divisions, successors, or assigns owned 100% or controlled by Petters, including PCI, PC Funding, and SPF Funding.

29.    As the court-appointed Receiver, Kelley served as an agent of the District Court and in that capacity had exclusive custody, control, and possession of the property, assets, and estates of PCI, PC Funding, and SPF Funding.

30.    On October 11, 2008 (the "Petition Date"), PCI, at the Receiver's direction, filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in Court File No. 08-45257.

31.    On October 15, 2008, PC Funding, at the Receiver's direction, filed a petition for relief under Chapter 11 of the Bankruptcy Code in Court File No. 08-45326.  On October 15, 2008, SPF Funding, also at the Receiver's direction, filed a petition for relief under Chapter 11 of the Bankruptcy Code in Court File No. 08-45328.

8

32.     On October 22, 2008, this Court ordered the above-captioned bankruptcy cases be administratively consolidated as *In re Petters Company Inc., et al.* under case number 08-45257.

33.     On February 26, 2009, this Court approved the Office of the United States Trustee for the District of Minnesota's appointment of Kelley as Chapter 11 Trustee (the "Trustee") for all Chapter 11 debtors in this jointly administered matter, which specifically included appointing Kelley as the Chapter 11 Trustee of PCI, PC Funding, and SPF Funding.

34.     On September 30, 2010, the Trustee commenced this Adversary Proceeding against the Defendants, as well as two entities associated with West Landesbank, AG ("WestLB"). The Trustee has settled the claims against the WestLB entities.

35.     On November 22, 2013, this Court ordered that the estates of each of the Debtors be substantively consolidated.

36.     On April 15, 2016, this Court entered its Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Chapter 11 Plan of Liquidation (the "Plan"), which was dated as of April 8, 2016 (Docket No. 3305 of Case Number 08-45257) (the "Confirmation Order"). The Plan established the PCI Liquidating Trust "for the purpose of administering the Trust Assets, including prosecuting and monetizing the Trust Claims . . . and making distributions to Holders of Allowed Claims in accordance with the terms of the Plan and otherwise implementing this Plan." Plan ¶ 8.2.

37.     Pursuant to this Court's Notice of (I) Entry of Order Confirming Debtors' Second Amended Chapter 11 Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, (II) the Effective Date, (III) the Administrative Claims Bar Date, and (IV) the Professional Fee Claims Bar Date, the Plan became effective on April 22, 2016.

38.    On January 12, 2017, this Court entered a Case Management Order directing the Trustee to file its Fourth Amended Complaint no later than March 6, 2017.

## JURISDICTION, VENUE, AND STANDING

39.    This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule of Bankruptcy Procedure 1070-1.  The claims asserted herein arise under the Bankruptcy Code and are related to cases pending before this Court pursuant to the Bankruptcy Code, and have been expressly retained by the PCI Trust under the Plan and Confirmation Order.

40.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (F), (H), and (O).

41.    Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

42.    The Trustee has standing to assert the claims herein pursuant to Sections 323, 544, 547, 548, 550, and 1123 of the Bankruptcy Code, the Plan, and the Confirmation Order.

## NATURE OF PROCEEDING

43.    The Trustee brings this adversary proceeding against the Defendants pursuant to sections 105(a), 502, 506, 510, 542, 544, 547, 548(a), 550(a), and 551 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 7001 *et seq*., the Minnesota Uniform Fraudulent Transfer Act, codified at Minn. Stat. §§ 513.41-51, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states and other applicable law to set aside, avoid, and recover preferences, fraudulent conveyances, damages, and disgorgement, prevent unjust enrichment, and to impose a constructive trust, in connection with transfers of property by PCI to the Defendants, including through the artifices of PC Funding and SPF Funding.

10

44.     Defendant Opportunity Finance is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

45.     Defendant Securitization is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

46.     Defendant Securitization II is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

47.     Defendant Securitization III is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

48.     Defendant IIO is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

49.     Defendant Sabes Family Foundation is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person

11

for whose benefit such transfers were made, or an immediate or mediate transferee of any initial

transferee of such transfers.

50.     The Sabes Family Defendants are initial transferees of the fraudulent, preferential,

or other avoidable transfers alleged in this Fourth Amended Complaint, or persons for whose

benefit such transfers were made, or immediate or mediate transferees of any initial transferee of

such transfers.

51.     Defendants Robert Sabes, Janet Sabes, Jon Sabes, Steven Sabes, Sabes Family

Foundation, Sabes LP, The Minneapolis Foundation, and trusts formed, funded, organized, or

instigated at the instruction of the Sabes Family Defendants, or subject to the management or

control of the Sabes Family Defendants, are the beneficiaries of fraudulent, preferential, or other

avoidable transfers alleged in this Fourth Amended Complaint in many millions of dollars.  The

Sabes Family Defendants are responsible at law and in equity for these transactions.

52.     Defendant DZ Bank is both an initial and subsequent transferee of the fraudulent,

preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person

for whose benefit such transfers were made, or an immediate or mediate transferee of any initial

transferee of such transfers.

53.     Defendant The Minneapolis Foundation is an initial transferee of the fraudulent,

preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person

for whose benefit such transfers were made, or an immediate or mediate transferee of any initial

transferee of such transfers.

54.     At all times relevant hereto, PC Funding and SPF Funding operated as alter egos

and shell companies of PCI to the detriment of PCI's creditors.  On information and belief, the

Sabes Family Defendants managed or controlled two accounts held at U.S. Bank in the name of

12

"PC Funding" and one account held in the name of SPF Funding. All such property transferred

to the Defendants by and under the name of PC Funding or SPF Funding—other than a PC

Funding account at U.S. Bank that, on information and belief, was managed and controlled by

the Sabes Family Defendants—was property owned and controlled by PCI.

55.     The Trustee seeks to set aside such transfers, recover and preserve the property of

PC Funding and the property of SPF Funding—which at all times relevant herein was the *de

facto* property of PCI—for the benefit of defrauded individuals and organizations that are

creditors of PCI.

## FACTUAL BACKGROUND

### I.     THE PETTERS PONZI SCHEME

#### A.     Petters and His Associates Are Convicted and Sentenced to Prison

56.     On October 3, 2008, Thomas Petters was arrested by federal agents on charges

arising from the perpetration of a massive Ponzi scheme that cost its victims *billions*. Petters

and, at various times, his Associates (defined below) operated his scheme for approximately

15 years—from in or around 1993 through September 24, 2008. On that day, the FBI and other

federal agencies executed search warrants at Petters' offices.

57.     A Federal Grand Jury in the District of Minnesota indicted Petters on December

1, 2008, charging him and PCI with mail and wire fraud, conspiracy to commit mail and wire

fraud, and conspiracy to commit money laundering, and further charging Petters himself with

money laundering, all in connection with the Ponzi scheme. A Superseding Indictment handed

down on June 3, 2009 charged Petters and PCI with mail and wire fraud, conspiracy to commit

mail and wire fraud, and money laundering conspiracy, and charged Petters himself with money

laundering, again in connection with the Ponzi scheme.

58.     Petters' trial lasted approximately a month.  On December 2, 2009, after deliberating for five days, the jury found Petters guilty on all 20 counts charged in the Superseding Indictment.

59.     On April 8, 2010, Petters was sentenced to 50 years in prison—the single longest sentence in Minnesota history for a conviction of financial fraud.

60.     Besides Petters, the Ponzi scheme operated through the efforts of a few key individuals, each of whom pleaded guilty and was also sentenced to prison.  Deanna Coleman ("Coleman") pleaded guilty to one count of conspiracy to commit mail fraud and in September 2010 was sentenced to a year and a day in prison.

61.     Robert White ("White") pleaded guilty to one count of mail fraud and one count of money laundering, and in September 2010 was sentenced to five years in prison.

62.     Larry Reynolds ("Reynolds") pleaded guilty to one count of conspiracy to commit money laundering, and in September 2010 was sentenced to ten years in prison.

63.     Michael Catain ("Catain") pleaded guilty to one count of conspiracy to commit money laundering, and in September 2010 was sentenced to seven years, six months in prison.

64.     James Wehmhoff ("Wehmhoff") pleaded guilty to conspiracy to commit tax evasion, and one count of aiding and assisting in the filing of a false tax return, and in October 2010 was sentenced to three years probation, one of which would be spent in home detention.

65.     The individuals in paragraphs 60–64 are referred to herein as Petters' "Associates."

**B.      Operation of the Ponzi Scheme**

66.     Though Petters ran his Ponzi scheme through various entities and transactions throughout its 15-year operation, the basic scheme remained constant throughout.  Indeed, as

14

Coleman testified, even Petters used the term Ponzi scheme "quite a bit" to describe what he was doing.

67.     Petters, along with his Associates, induced small and individual investors, and then, beginning in approximately the year 2000, larger hedge-fund investors, to lend money to one or more entities that he owned and/or controlled.  The loans, he represented, would finance the purchase of electronics, such as televisions, that manufacturers were unable to sell through their preferred retail outlets.  The merchandise would be "diverted," meaning it would be sold to such "big box" bulk discount retailers as Costco or Sam's Club, which would then sell it at discounted prices.  The investor would have an interest in the receivable created by the sale of the merchandise to the discount retailers.  Once the sale to the discount retailers was complete, the proceeds from the sale—*i.e.* the receivable in which the investor had an interest—would fund repayment of the loan at the specified interest rate.

68.     Since 2008, however, myriad investigations and civil and criminal proceedings have confirmed that, as relevant to the entities with which Defendants here transacted with respect to transactions at issue in this Fourth Amended Complaint, the purchases and sales of electronics inventory, and the documents supposedly evidencing those sales, were fiction. Instead of distributing proceeds from the sales of consumer electronics, Petters would use funds from later investors to repay the loans made by earlier investors, while he and his Associates took commissions, salaries, bonuses, and other payments out of the flowing funds.  In other words, Petters ran a classic Ponzi scheme that encompassed effectively all of the payments and transfers made to Defendants identified in this Fourth Amended Complaint.

### 1.    The Special Purpose Entities

69.    Initially, as pleaded below in more detail, investors would provide funds directly to Petters' main operating entity, PCI.  The funds were provided in the form of loans, which were evidenced by promissory notes.

70.    Beginning in or around 2001, Petters' group established several Special Purpose Entities ("SPE").  Each SPE was dedicated to an individual large investor, and would receive the loan proceeds from that investor.  When the SPEs were first established, Defendants believed that maintaining their investments with Petters' organization in entities separate from PCI would avoid commingling their funds with funds from other investors.

71.    The SPEs are wholly owned subsidiaries of PCI, and are also debtors in the substantively consolidated bankruptcy proceedings that include PCI.

72.    SPF Funding was formed on March 14, 2001 with the name Petters Finance, LLC. In total, SPF Funding was the borrowing entity on approximately 167 promissory notes between 2001 and 2007.  During this time, the Defendants contributed approximately $234.6 million to SPF Funding, and received $287.3 million in principal and interest, for a net gain of approximately $52.7 million.  Defendants' false profits are detailed below.

73.    PC Funding was formed on December 17, 2001 as another SPE through which Opportunity Finance would provide funds to PCI.  In addition to the general rationale for forming SPEs, PC Funding was established "in conjunction with [Opportunity Finance] obtaining a credit facility" from Defendant DZ Bank.  Opportunity Finance first invested through PC Funding on January 7, 2002.  By September 30, 2008, PC Funding had been the borrowing entity on 546 promissory notes.  All but four were paid back in full by that time.  Notably, during the short span of time between February and September 2008, Defendants were paid more than $155 million on outstanding promissory notes, sometimes at a rate of paying off three notes per

16

week.  In total, Opportunity Finance invested approximately $1.95 billion through PC Funding,

and received approximately $2.04 billion in principal and interest, for a net gain of

approximately $90.49 million.

## 2.    The Credit, Loan, and Security Agreements

74.    The lending relationship between the Defendants and the SPEs was established

through the execution of a few basic agreements. Using Opportunity Finance and PC Funding as

an example, Opportunity Finance entered into a Credit Agreement (the "Credit Agreement")

with PC Funding on or about December 17, 2001.[3]  Under the Credit Agreement, Opportunity

Finance, defined as Lender, could make "Receivables Loans" to PC Funding, as Borrower, in

order to "finance the purchase price with respect to the Receivable(s) that is/are proposed to be

purchased by Borrower."[4]  The receivables proposed for purchase would, according to the Credit

Agreement, be set forth on a "loan proposal" ("Loan Proposal"), the form of which was attached

to the Credit Agreement as Exhibit A.[5]  Per the Credit Agreement, Opportunity Finance would

have one business day after receiving the Loan Proposal from PC Funding to decide whether it

would finance the accounts receivable associated with the inventory described on the Loan

Proposal.[6]

75.    The Credit Agreement further provided that each loan be evidenced by a

promissory note.  The promissory note, the form of which was attached to the Credit Agreement

as Exhibit B, set forth the loan amount, term, interest, penalty for late payment, and other terms.[7]

---

[3] A true and correct copy of the Credit Agreement is attached as Exhibit A.  These and
related exhibits are provided as materials evidencing the course of dealing and transactions
between the parties to this action.

[4] Ex. A ¶ 2.1(a)(i).

[5] *Id.*, Ex. A.

[6] *Id.*, ¶ 2.1(a)(ii).

[7] A true and correct copy of a form Promissory Note is attached as Exhibit B.

17

The promissory notes between Opportunity Finance and PC Funding were executed by PC Funding.

76.    The promissory notes were also supposedly secured by a purported Security Agreement (the "Security Agreement") between PC Funding and Opportunity Finance, also dated as of December 17, 2001.  The Security Agreement purportedly granted Opportunity Finance a security interest in PC Funding, including all of its accounts, contracts, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, money, cash or cash equivalents, and all proceeds of the foregoing.[8]

77.    As a part of its transactions with Opportunity Finance, PC Funding also entered into certain agreements with PCI.  First, PCI and PC Funding entered into a Sale Agreement (the "Sale Agreement") dated as of December 17, 2001.  The Sale Agreement sets forth the terms and conditions under which PCI sells, conveys, transfers and assigns to PC Funding all of PCI's right, title and interest in each receivable owed to PCI from the sale of goods evidenced by purchase orders.

78.    Additionally, PC Funding and PCI would execute an Assignment Schedule (the "Assignment Schedule"), as contemplated by the Sale Agreement.  Pursuant to the Assignment Schedule, PCI would assign to PC Funding its right, title, and interest in certain receivables backed by purchase orders.[9]

79.    As discussed above and herein, virtually all, if not all, of the goods and receivables were fictitious and related paperwork was fabricated, because Petters' scheme

---

[8] A true and correct copy of a form Security Agreement is attached as Exhibit C.

[9] A true and correct copy of a form Assignment Schedule is attached as Exhibit D.

operated by inducing investors into financing the purchase of non-existent electronic equipment purportedly secured by fabricated purchase orders.

80.     The paperwork that established the lending relationship between SPF Funding and the applicable Defendants was substantially similar.

### 3.     The flow of funds in the Ponzi scheme

81.     As discussed above, the first step in the scheme was to obtain funds from Defendants who, before the SPEs were formed, would transfer the funds directly to PCI, and after the SPEs were formed would transfer the funds either to PC Funding or to SPF Funding. The applicable SPE would execute the promissory note evidencing the loan.  Each SPE maintained a bank account that was used to take in and disburse cash and was controlled by the investor who corresponded to the SPE.

82.     Next, the SPE would transfer the loan amount to certain "vendors"—middleman entities that purportedly sold to PCI the inventory described on the Loan Proposal.

83.     The two main "vendor" entities during the life of the Ponzi scheme were Nationwide International Resources, Inc. ("Nationwide") and Enchanted Family Buying Company ("Enchanted") (with any other vendors, as applicable, the "Vendors").  Nationwide was owned and controlled by Reynolds, who opened a bank account in Nationwide's name to hold investor funds.  Enchanted was owned and controlled by Catain, who opened a bank account in Enchanted's name to hold investor funds.  According to Coleman, the business address for Enchanted changed over time, but the last one was Catain's "car wash address." Both Reynolds and Catain would, as directed by Petters, immediately redirect the funds they received from the SPEs to PCI.  For this bit of redirection, the Vendors exacted a commission from the funds passing through their accounts.

19

84.     In reality, the purpose of Nationwide and Enchanted was to support the fiction

that a sale transaction involving consumer electronics actually took place.  Indeed, Catain

testified that Petters asked him to establish a company so Petters could "tell people, and I would

tell them, that I secured the inventory when I actually wasn't."  The original purpose behind

Enchanted was simply a relay station "that would enable [Petters] to wire money into my

account and then I would wire it back to his account."  True to its original purpose, Enchanted

served only as a façade for moving money, and *never* engaged in purchases or sales of real

inventory:

> Q. Okay. Mr. Catain, did Enchanted Family ever do any real business with Tom
> Petters or Petters Company other than running through your bank account?
>
> A. No.
>
> Q.  It was a sham?
>
> A. Yes, it was.
>
> Q. And what you had to do to get your commission was to pretend to be Mr. Petters'
> vendor?
>
> A.  Yes.

Nationwide performed the same function—a façade that moved money through the Ponzi

scheme without participating in real transactions.

85.     The Vendors' commissions on each pretend sale gave the appearance of a

legitimate transaction and benefited the Associates that controlled those Vendors.  Petters and his

Associates further enhanced their fraud by creating fake purchase orders reflecting Nationwide's

and Enchanted's fictional sales of inventory to PCI, and additional phony paperwork reflecting

PCI's subsequent resales of that inventory to the discount retailers.[10]  The responsibilities for

creating the fraudulent paperwork were neatly divided: Coleman created the PCI purchase orders

and invoices, and White created the purchase orders purportedly provided by the discount

retailers.

86.     The retailer that purportedly purchased the inventory from PCI was supposedly

required to make its payments for the merchandise it purchased directly to the lender-controlled

SPE bank account.  But because, in fact, the transactions did not involve real retailers, Reynolds

or Catain would simply return the funds to a single bank account held at M&I Bank in the name

of PCI.  The same account would also commingle funds received from investors who did not

provide their funds through SPEs.

87.     Once the term of the promissory note had elapsed and the note matured, the next

step was for PCI to transfer funds from its account at M&I Bank to the investor-controlled

accounts at the SPEs—the accounts from which the funds had originally been transferred out to

the Vendors.

88.     The amount that PCI returned to the investor's account at the SPE was usually

greater than the original principal and accrued interest specified in the promissory note.  The

investors would then withdraw their principal and interest payments from the SPE, after which

any remaining funds were sent back to PCI as its purported fee or "profit" from the transaction.

89.     Petters and his Associates—through PCI, PC Funding, and SPF Funding—created

fictitious profits at will on each and every transaction by simply writing in the appropriate

---

[10] A true and correct copy of a fabricated purchase order of PCI is attached as Exhibit E,
and a true and correct copy of a sample fabricated purchase order of Sam's Club is attached as
Exhibit F.

quantity and price information on the two sets of purchase orders.  For example, on September

14, 2005, Opportunity Finance entered into promissory note #091405-02 with PC Funding in the

amount of $4,955,000.[11]  Opportunity Finance then took a blanket security interest in all the

assets of PC Funding.[12]  Petters and his Associates produced a fabricated purchase order showing

that PCI was purchasing 2,800 Sony televisions from Nationwide for a total cost of $5,057,500.[13]

Petters and PCI also  entered into an Assignment Schedule assigning to PC Funding PCI's

interest in the receivables due from the discount retailer that would supposedly purchase the

inventory from PCI—in this instance, Sam's Club.[14]  Petters and his Associates correspondingly

created another fabricated purchase order in the name of Sam's Club showing the purchase of

those same imaginary 2,800 Sony televisions from PCI for a total purchase price of $5,613,804.[15]

PCI ultimately paid Opportunity Finance, through its alter-ego PC Funding, $162,325 in false

profits and $4,955,000 in principal, leaving $496,478 in "profit" for PCI.[16]

### C.    The Transfers at Issue Occurred Within the Main Churn of the Ponzi Scheme

90.    During the time in which the Debtors were making the transfers that the Trustee

now seeks to avoid, PCI participated in a miniscule amount of real business, if any, and the SPEs

and Vendors engaged in none.  Consequently, Petters' sole source of funding for PCI, the SPEs,

and the Vendors, were funds obtained from investors on the basis of fraudulent

misrepresentations that those funds would be used to finance the purchase of consumer

---

[11] A true and correct copy of the Promissory Note is attached as Exhibit G.

[12] *See* Exhibit C (Security Agreement).

[13] *See* Exhibit E (PCI fabricated Purchase Order).

[14] *See* Exhibit D (Assignment Schedule).

[15] *See* Exhibit F (Sam's Club fabricated Purchase Order).

[16] *See* Exhibit H (PC Funding Note Summary) at 21, row 13.

electronics.  It also followed necessarily that funds paid out to investors over the relevant period

were acquired from other investors, and *not* from the legitimate sale of inventory.  Similarly, the

loans provided by Defendants to PCI, PC Funding, or SPF Funding, or by MGLLC to PCI, were

not used to fund legitimate business activity.  Substantial evidence and authority, gleaned from

years of investigation and litigation, points only to this conclusion.

91.     As this Court found, investors in PCI and the SPEs were repaid not with any

"earnings from legitimate transactions," but from "funds fraudulently obtained" from subsequent

investors.  Indeed, funds lent to the Debtors were "continually being depleted" due to the funds

paid out to investors, salaries and multi million-dollar bonuses for certain employees, and the

support of Petters' own "lavish lifestyle," which required Petters continually to seek additional

funds from new investors.  This Court further concluded that the Debtors could "stay afloat only

by using the new money loaned to repay" existing investors—which is the essence of a Ponzi

scheme.

92.     PricewaterhouseCoopers LLP ("PwC"), the forensic accountant for the Trustee,

determined that no more than a miniscule amount of the $82 *billion* that passed through PCI's

main bank account ($41 billion incoming and $41 billion outgoing), and thus through the Ponzi

scheme, were funds paid by the discount retailers that Petters claimed were purchasing

inventory.  Rather, the funds deposited into that account were directly attributable to Nationwide

and Enchanted (or other entities performing a similar function on a smaller scale), the various

SPEs, and certain other investors or entities.  As PwC noted, "[s]upporting documentation has

not been identified to date indicating that the funds received from any of these entities originated

from 'big-box' retailers in connection with the sale of merchandise."  PwC further noted that

"[t]he paucity of legitimate business transactions by PCI supports the conclusion that money

23

from later investors was used to fund payments to earlier investors because no other source of

payment to investors existed." Indeed, the use of investor funds to pay other investors was a

daily occurrence, as a PwC representative testified:

> Q . . . [S]o how often in your review of these records do you come across money
> coming in from investors being deposited on one day and that same day or the next
> day monies being transferred to current investors?
>
> A.  It happened all the time. I can't think of any time I looked at a day where, I
> mean of significance, where that kind of activity, that kind of behavior wasn't
> happening.

93.     Similarly, the Vendors engaged in essentially no legitimate transactions during

their lengthy participation in the Ponzi scheme. Coleman agreed that "when Mr. Reynolds or

Mr. Catain would send money back to [PCI], that those were investor dollars." Thus investors

were repaid not with sale proceeds from legitimate inventory sales, but "pretty much always . . .

from another investor or possibly from themselves." The funds flowed such that "[o]nce they

invested in [PCI] or sent the money to [Catain] or [Reynolds], Mike would turn around and send

it back to [PCI] and then I would turn around and payoff a promissory note. Sometimes it was to

the same individual or same company and other times it was to other investors." Coleman

further agreed that "Enchanted and Nationwide essentially just laundered the money and sent it

back to PCI," and further explained that she had been providing fake purchase orders to investors

"[b]asically since day one," which was around 1994. PwC concurred with this assessment,

testifying that the Vendors were "laundering funds," and agreed they were "vendor[s] . . . in

name only."

94.     Coleman further acknowledged that essentially all of the transactions stretching

back to the 1995 or 1996 timeframe—prior to Defendants' involvement with Petters' scheme—

were fraudulent. She estimated that around 98% or 99% of all transactions were phony, and thus

virtually all of the funds invested with PCI were churned through the Ponzi scheme without

touching a genuine transaction:

> Q.  Tell us, would you give us sort of a ballpark of the total amount of supposed business that PCI did, how much of it was real goods as opposed to phony deals? You don't need to include Redtag in that just PCI.

> A.  Dollar amount I couldn't. Percentage wise I'd say probably at least 99 percent of the goods were all fake.

> Q.  And these were supposed PCI transactions, right?

> A.  Right. Ninety-eight percent. I mean there was -- pretty much all of them were fake.  I mean there were some real deals, but dollar wise compared to what was real and what was fake it was pretty high.

> Q.  Do you think it would be fair that there were more real deals at the beginning of PCI than there were at the end?

> A.  [] yes.

PwC similarly confirmed that the fraud stretched back into the mid-1990s, explaining that

although the SPEs were established in 2001, "prior to that we found activity with respect to the

individual investors back into like 1996 where there seemed to be this kind of same sort of a

game being played."

95.     Robert White's testimony likewise confirmed that effectively none of the

transactions were real, and thus the payouts involved only funds provided by investors.  White

explained that at some point in late 1999 he was trying to set up a way to track the promissory

notes that PCI had executed with the various investors.  In constructing the spreadsheet, White

became confused, and asked Coleman effectively "how do you tell a good note from a bad note."

Coleman "laughed and said they are all bad," and that "[t]here isn't a good note here" since there

"isn't any merchandise to back up anything."

96.     White also acknowledged that funds owed to older investors were paid down by

funds acquired from newer investors, or even by the same investor when the note was "rolled"—

*i.e.* the investor allowed the principal to remain invested, rather than demanding it back:

Q. Mr. White, is this a true or a fake purchase order?

A. This is a purchase order that I made up as fake.

Q. And why did you do it?

A. I was asked to do this by Tom and Deanna to maintain the -- keep the flow of cash coming into the company.

Q. And was the flow of cash important?

A. Well, there were -- it was rolling notes. There were notes due like every day and if you didn't get more money in, then you couldn't pay the note. So it was this – just this hungry demon that had to be fed. You had to get new money in to pay on the old note.

Q. Where would the new money come from?

A. Quite often the same investor. Quite often he would roll the note.

Q. And who would find the investors to bring in the money to feed this demon?

A. Tom [Petters].

97.     White estimated that during his time with PCI, between 1999 and 2008, he

fabricated more than 10,000 purchase orders.

98.     Witnesses at the criminal trial confirmed that none of the discount retailers

identified on the purchase orders fabricated by White had ever done any material amount of

business with PCI.  A representative from Boscov's, one such retailer, testified that PCI had done

"no business" with Boscov's between 2001 and 2008.  Similarly, a representative from Wal-Mart

and Sam's Club testified that there were no indications of contacts between Petters or PCI and

Wal-Mart or Sam's Club reflected in the two years of records maintained by the company, nor

any indications that Petters or PCI ever attempted to collect funds purportedly owed by Sam's

Club to PCI.  Another representative of Wal-Mart and Sam's Club testified that, although PCI

had a vendor agreement with Sam's Club as of 1996, PCI stopped doing business with Sam's

Club late in 1997.  And a representative from BJ's Wholesale testified that, despite PCI's

apparent claim that BJ's purchased just over *$700 million* of merchandise from PCI, BJ's

actually appeared to have purchased approximately $100,000 worth of cameras from a different

Petters entity and *nothing* from PCI.

99.    The foregoing facts make clear that effectively all investments into the Ponzi

scheme, going back into the mid-to-late 1990s, were obtained through misrepresentation that

those funds would be used to finance genuine transactions involving real inventory, since it is

clear that virtually no real transactions took place during that timeframe.  Equally clear is that

funds paid out to investors could have been obtained only from other investors, since again there

were no other material sources of income for PCI or the SPEs.  As discussed in more detail

below, outgoing transfers during this time period between, at the latest, 1998, and September

2008, were made using funds obtained from other investors or from the same investors that

supplied those funds.

## II.    THE SPECIFIC FRAUDULENT TRANSFERS MADE TO DEFENDANTS DURING THE COURSE OF THE PONZI SCHEME

100.    From in or about 1998 to the Petition Date, the Opportunity Finance Defendants,

Sabes Family Defendants, Sabes Family Foundation, and The Minneapolis Foundation (the

"Investor Defendants") invested with the Debtors.  As pleaded above, those investments were

purported loans generally made pursuant to promissory notes, and after the formation of the

SPEs, pursuant to promissory notes and various additional agreements.

101.   In total, the Investor Defendants transferred $2,296,867,476 of principal investment to the Debtors.  The Investor Defendants, along with DZ Bank, received $2,528,699,876 in return transfers.  DZ Bank provided Opportunity Finance with a line of credit that Opportunity Finance used to finance certain of its investments in PCI and the SPEs.  ***The Investor Defendants were net winners from the Ponzi scheme of $228,047,705 in false profits***,[17] and thus are believed to have been the ***second-highest net winners*** among all of the Ponzi scheme investors.  A summary of false profits received by the Investor Defendants over the course of their investing history in the Ponzi scheme is attached as Exhibit I.  As detailed below, there were four main categories of transfers to the Defendants, each of which resulted in substantial false profits.

102.   From in or about 1998 to the Petition Date, the Investor Defendants received payouts by four different methods:

     a.     Direct transfers from PCI to the Investor Defendants;

     b.     Direct transfers from PCI to MGLLC, then transfers to the Investor Defendants;

     c.     Transfers from PCI to SPF Funding, then transfers to the Investor Defendants; and

     d.     Transfers from PCI to PC Funding, then transfers to the Investor Defendants.

**A.**     **Direct Transfers from PCI to the Investor Defendants**

103.   Virtually all, if not all, of the direct transfers from PCI to the Investor Defendants consisted of funds obtained by Petters' scheme through fraudulent means, and not from

---

[17] As detailed on Exhibit I (False Profits Summary), the total false profits pleaded is $3,784,695 less than the difference between total principal investment and total return transfers, to account for the fact that certain non-defendants received subsequent transfers from MGLLC of funds initially transferred from PCI to MGLLC.

purported sales of consumer electronics merchandise to discount retailers.  Thus virtually every, if not every, direct transfer from PCI to the Investor Defendants was made with funds supplied by other investors that were also obtained through fraudulent misrepresentations, and were therefore part of carrying out—or in the "main churn" of—the Ponzi scheme.

104.     From in or about 1999 to 2001, certain Investor Defendants transferred loan funds directly to PCI.

105.     In turn, PCI made payments directly to Investor Defendants.  As detailed below, PCI transferred funds directly to IIO, Opportunity Finance, the Sabes Family Foundation, Robert Sabes, The Minneapolis Foundation, and Sabes LP.  The typical steps involved in these PCI-Investor Defendants transactions were:

106.     *First*, an Investor Defendant would make a principal investment into PCI's bank account, in which PCI commingled most of its investors' funds.

107.     *Second*, when the term of a given promissory note was complete, and payment therefore due to an Investor Defendant, PCI would transfer back to an Investor Defendant funds corresponding either to the principal and "interest" due under the promissory note, or sometimes only the purported "interest."  If the investor elected not to receive back the invested principal, it was "rolled" to fund principal for another note.  (In certain instances, both principal and interest were used to fund new promissory notes.)  Each individual transfer from PCI to the Investor Defendants is listed on Exhibit K.  The details of each individual note, including principal investment in PCI and payment from PCI to the Investor Defendants, is listed on Exhibit J (the

"PCI Direct Note Summary").  Because funds were commingled in PCI's bank account,

investors were paid with a combination of their own money and other investors' money.[18]

108.    Between July 8, 1999 and July 12, 2001, the Investor Defendants entered into 108

promissory notes (the "PCI Direct Notes"), each of which is detailed in the PCI Direct Note

Summary.  In total, these promissory notes reflect the transfer of $48,550,475 of principal loans

to PCI, as reflected in the "Principal Investment" column of the PCI Direct Note Summary.

109.    Exhibit K reflects the corresponding transfers from PCI to the Investor

Defendants:

a.      Between September 16, 1999 and September 19, 2001, PCI transferred

$98,466,496 directly to IIO;

b.      Between May 7, 2001 and May 10, 2001, PCI transferred $11,678,458

directly to Opportunity Finance;

c.      Between February 23, 2000 and September 21, 2001, PCI transferred

$4,217,849 directly to the Sabes Family Foundation;

d.      On May 31, 2001, PCI transferred $2,410,000 directly to Robert Sabes;

e.      Between June 4, 2001 and September 11, 2001, PCI transferred

$1,231,998 directly to The Minneapolis Foundation; and

f.      On August 10, 1999, PCI transferred $1,002,000 directly to Sabes LP.

---

[18] On a few occasions, records show that non-IIO Investor Defendants made principal
investments directly into PCI, rather than transferring funds through IIO.  Occasionally, PCI
transferred funds directly to a non-IIO Investor Defendant, rather than transferring funds through
IIO.  *See* Exhibit K (showing transfers from PCI directly to IIO and non-IIO Investor
Defendants).  All direct transfers from PCI to the Investor Defendants are avoidable.

110.    In total, between August 10, 1999 and September 21, 2001, PCI transferred

$119,374,303 directly to the Investor Defendants (the "PCI Direct Transfers").  *See* Exhibit K.[19]

111.    Of this amount, $70,823,828 constituted false profits—or any amounts above the

principal loaned to PCI. *See* Exhibit I (False Profits Summary).

112.    As described above, during the time period in which the Investor Defendants were

transferring payments directly to, and receiving payments directly from, PCI, PCI was operating

a Ponzi scheme.  The scheme operated by fraudulently inducing loans from investors to Petters-

related entities—including PCI—then misappropriating those funds to make payments to prior

investors, or sometimes the same investors, as well as to pay the Associates.  As demonstrated by

the detailed allegations above, however, a miniscule portion—if any—of the funds provided by

the investors were actually used for the stated purpose of financing the purchase and resale of

consumer electronics.  Rather, virtually every single dollar paid in by investors was laundered

through the "main churn" of the Ponzi scheme, and every such transfer to the Investor

Defendants is avoidable.

**B.    Direct Transfers from PCI to MGLLC and Subsequent Transfers to the Investor Defendants**

113.    On or about September 28, 1998, Robert Sabes, through IIO, formed MGLLC for

the express purpose of providing funds to PCI through loan transactions.  MGLLC was 99.9%

owned by IIO (which, again, later became Opportunity Finance) and 0.1% owned by Metro

Gem, Inc., a corporation organized under the laws of the State of Minnesota and wholly owned

---

[19] The sum of the amounts in paragraph 109(a)-(f) is less than the total in paragraph 110 by $367,500 due to the exclusion of a $367,500 transfer from SPF Funding, LLC to the Sabes Family Foundation related to Janet Sabes' note 5355.  *See* Ex. K at 5 n.1.

by Frank E. Vennes, Jr.  IIO also held 100% of the voting interests in MGLLC.  MGLLC was

not a Petters-controlled SPE, but rather was effectively wholly owned by IIO.

114.    The direct transfers from PCI to MGLLC consisted of funds obtained by Petters'

scheme through fraudulent means, and not from purported sales of consumer electronics

merchandise to discount retailers.  Thus the transfers from PCI to MGLLC were made with funds

supplied by other investors that were obtained through fraudulent misrepresentations.  And the

direct transfers from PCI to MGLLC were therefore part of carrying out—or in the "main churn"

of—the Ponzi scheme, and are avoidable.  Similarly, subsequent transfers from MGLLC to

Defendants are also avoidable.

115.    From in or about MGLLC's formation in September 1998 through approximately

September 1, 1999, MGLLC transferred funds, in the form of loans, directly to PCI.  In turn, PCI

made payments directly to MGLLC.  The transfers from PCI to MGLLC typically took place

through the following steps:

116.    *First*, an Investor Defendant would make an investment, by means of a loan

evidenced by a promissory note, with MGLLC.

117.    *Second*, MGLLC would transfer that investment to PCI's bank account, in which

PCI commingled most, if not all, of its investors' funds.

118.    *Third*, when the term of a given promissory note was complete, and payment

therefore due to the investor, PCI would transfer back to MGLLC funds corresponding either to

the principal and "interest" due under the promissory note, or sometimes only the purported

"interest."  If the investor elected not to receive back the invested principal, it was "rolled" to

fund principal for another note.  (In certain instances, both principal and interest were used to

fund new promissory notes.)  Each individual transfer from PCI to MGLLC is listed Exhibit L.

32

119.   *Finally*, MGLLC distributed the payment from PCI to an Investor Defendant, sometimes also transferring small commissions or other amounts to other recipients.  Because funds were commingled in PCI's bank account, investors were paid with a combination of their own money and other investors' money.  The details of each associated promissory note— including the principal invested into PCI, the payment by PCI to MGLLC, and the payment from MGLLC to the Investor Defendants—is attached as Exhibit M ("PCI-MGLLC Note Summary"). The amount received from MGLLC by each Investor Defendant is set forth on Exhibit N.

120.   Between its formation in September 1998 and September 1, 1999, MGLLC entered into 107 promissory notes (the "MGLLC Notes"), each of which is detailed in the PCI-MGLLC Note Summary.  In total, these promissory notes reflect the transfer of $64,238,000 of principal loans to PCI, as indicated by the "Transfer Investment to PCI" column of the PCI-MGLLC Note Summary.

121.   Exhibit L reflects the transfers from PCI to MGLLC, which totaled $82,073,509 between MGLLC's formation in September 1998 and December 10, 1999 (the "PCI MGLLC Transfers").  Exhibit L details each of these transfers, including the dates and amounts.  The PCI-MGLLC Note Summary, under the column titled "Payment to MGLLC," likewise indicates the amount of each payment to MGLLC, as well as other details concerning the associated promissory note, including entry and maturity dates, and principal and total "interest" amounts. *See id.*

122.   MGLLC thus received $14,050,814 in false profits.  *See* Exhibit I (False Profits Summary).[20]  This entire sum is avoidable as the sum of numerous fraudulent transfers.  The vast

---

[20] As detailed on Exhibit I (False Profits Summary), Defendants received $59,223,728 of the total $75,173,513 funds transferred from MGLLC to underlying investors.  For pleading

majority of false profits were transferred from MGLLC to its 99.9% owner, IIO, and other

Investor Defendants.

123.    Exhibit N reflects the transfers from MGLLC to Investor Defendants:

a.      Between October 27, 1998 and December 9, 1999, MGLLC transferred

$34,705,679 in principal and "interest" to IIO;

b.      Between October 21, 1998 and December 9, 1999, MGLLC transferred

$21,278,567 in principal and "interest" to the Sabes Family Limited Partnership;

c.      Between January 1, 1999 and May 26, 1999, MGLLC transferred

$2,027,115 in principal and "interest" to Robert Sabes;

d.      On April 28, 1999, MGLLC transferred $1,093,886 in principal and

"interest" to Janet Sabes;

e.      Between March 12, 1999 and December 7, 1999, MGLLC transferred

$82,880 in principal and "interest" to Steven Sabes; and

f.      On November 3, 1999, MGLLC transferred $35,600 in principal and

"interest" to Jon Sabes.

124.    In total, between MGLLC's formation in September 1998 and December 9, 1999,

MGLLC transferred $59,223,728 in principal and "interest" to the Investor Defendants.

*See* Exhibit N.

125.    As described above, during the time period in which MGLLC was receiving

payments directly from PCI, and in turn transferring those payments to subsequent transferees,

including the Investor Defendants, PCI was operating a Ponzi scheme.  The scheme operated by

---

purposes, the Trustee estimates that Defendants received the same portion of total false profits as
they received of the total transfers, or just under 79%.

34

fraudulently inducing loans from investors to Petters-related entities—including PCI—then

misappropriating those funds to make payments to prior investors, or sometimes the same

investors, as well as to pay the Associates.  As demonstrated by the detailed allegations above,

however, a miniscule portion—if any—of the funds provided by the investors was actually used

for Petters' stated purpose of financing the purchase and resale of consumer electronics.  Rather,

virtually every single dollar paid in by investors was laundered through the "main churn" of the

Ponzi scheme, and every such transfer to MGLLC, and every subsequent transfer from MGLLC

to the Investor Defendants, is avoidable.

### C.      SPF Funding Transfers

126.    Each and every one of the direct transfers from SPF Funding to the Investor

Defendants consisted of funds obtained by Petters' scheme through fraudulent means, and not

from purported sales of consumer electronics merchandise to discount retailers.  Thus each and

every direct transfer from SPF Funding to the Investor Defendants was made with funds supplied

by other investors that were obtained through fraudulent misrepresentations.  Each and every

direct transfer from SPF Funding to the Investor Defendants was therefore part of carrying out—

or in the "main churn" of—the Ponzi scheme.

127.    As pleaded above, in 2001 certain Investor Defendants required that Petters form

SPEs to receive their loaned funds in order to avoid commingling the proceeds of the Investor

Defendants' loans with other investors' funds.  Thus, in or around March or April 2001, Petters

formed SPF Funding as a wholly owned subsidiary of PCI.

128.    From in or about 2001 through 2007, Opportunity Finance, the Sabes Family

Foundation, and The Minneapolis Foundation used SPF Funding as an investment vehicle for

their lending participation in Petters' scheme.  In some instances, payouts on these investments

were made directly to Securitization III and DZ Bank, and in one instance to Sabes LP.

129.    Typically, Opportunity Finance, the Sabes Family Foundation, or The Minneapolis Foundation would agree to fund a "deal" and enter into a promissory note with PCI detailing the principal and a high interest rate.  The parties would then enter into a sale agreement and assignment schedule to assign and sell the "receivable" of the "deal" from PCI to SPF Funding.  The general steps involved in these SPF Funding transactions were as follows:

130.    *First*, an Investor Defendant would make a principal investment as a loan into SPF Funding.

131.    *Second*, SPF Funding would transfer the principal investment amount, along with an equity contribution to the deal from PCI, to the bank account of one of the sham Vendors, most frequently Nationwide or Enchanted.

132.    *Third*, Nationwide or Enchanted would transfer the principal investment amount, less their "commission," to PCI.  The representation that Petters made to investors—that PCI was receiving the proceeds of PCI's sale of consumer electronics equipment—was always false.

133.    *Fourth*, when the term of a given promissory note was complete, and payment therefore due to an Investor Defendant, PCI would transfer the purported "receivable" purchased with the Investor Defendants' loan proceeds back to SPF Funding.  Each individual transfer from PCI to SPF Funding is listed on Exhibit O.  The details of each individual note, including principal investment in PCI, payment from PCI to SPF Funding, payment from SPF Funding to the Investor Defendants, and repayment from SPF Funding to PCI, is listed on Exhibit P (the "SPF Funding Note Summary").  Because funds were commingled at PCI, investors were paid with a combination of their own money and other investors' money.

134.    *Fifth*, SPF Funding would transfer the principal investment amount, plus "interest," to an Investor Defendant or DZ Bank (though a transfer to the latter was made for the

36

benefit of the Investor Defendants). Alternatively, in many cases, the Investor Defendant would "roll" the principal amount into another promissory note. Each individual transfer from SPF Funding to the Investor Defendants or DZ Bank is detailed on Exhibit Q. Additionally, the SPF Funding Note Summary, under the column "Payment to Investor," indicates the amount of each such transfer from SPF Funding to an Investor Defendant.

135. *Finally*, any amount remaining in the SPF Funding account after transferring (or rolling) the principal and "interest" would be transferred back to PCI as "profit" from the supposed transaction. Each individual payment of such "profit" from SPF Funding to PCI is listed on Exhibit R. Additionally, the SPF Funding Note Summary, under the column "Repayment to PCI," indicates the amount of each such transfer of "profit" from SPF Funding to PCI.

136. Between May 11, 2001 and May 9, 2007, Opportunity Finance, the Sabes Family Foundation, The Minneapolis Foundation, and Sabes LP entered into 167 promissory notes with SPF Funding (the "SPF Funding Notes"), each of which is detailed on the SPF Note Summary. In total, these promissory notes reflect the transfer of $234,623,000 of principal loans to SPF Funding, as reflected in the "Principal Investment" column of the SPF Funding Note Summary.

137. Exhibit Q reflects the corresponding transfers from SPF Funding to the Investor Defendants:

a. Between August 3, 2001 and March 8, 2005, SPF Funding transferred $132,382,650 in principal and "interest" to Opportunity Finance;

b. Between April 14, 2005 and June 3, 2005, SPF Funding transferred $32,232,739 in principal and "interest" to Securitization III (with the transfers to Opportunity Finance, the "SPF Funding/Opportunity Finance Transfers");

37

c.      Between January 4, 2002 and April 9, 2002, SPF Funding transferred

$78,241,766 in principal and "interest" to DZ Bank (the "SPF Funding/DZ Bank Transfers");

d.      Between August 14, 2001 and August 9, 2007, SPF Funding transferred

$29,495,341 in principal and "interest" to the Sabes Family Foundation (the "Sabes Family

Foundation Transfers");

e.      Between December 20, 2001 and July 30, 2003, SPF Funding transferred

$10,992,351 in principal and "interest" to The Minneapolis Foundation (the "SPF

Funding/Minneapolis Foundation Transfers"); and

f.      On October 8, 2002, SPF Funding transferred $4,330,000 in principal and

"interest" to Sabes LP (the "SPF Funding/Sabes LP Transfer").

138.    In total, between August 3, 2001 and August 9, 2007, SPF Funding transferred

$287,674,849 in principal and "interest" to Opportunity Finance, Securitization III, the Sabes

Family Foundation, The Minneapolis Foundation, DZ Bank, and Sabes LP (the "SPF Funding

Transfers").  *See* Exhibit Q.

139.    Of this amount, $52,684,348 constituted false profits—or any amounts above the

principal loaned to SPF Funding—obtained from SPF Funding.  *See* Exhibit I (False Profits

Summary).[21]

140.    Furthermore, as detailed on Exhibit R, between August 3, 2001 and August 8,

2007, SPF Funding transferred $69,131,621 back to PCI as PCI's "profit."

---

[21] The total transfers from SPF Funding to Defendants exceeds the sum of the total
transfers from Defendants to SPF Funding and total false profits by $367,500 due to the rolling
of principal of note 5355, under which Defendant Janet Sabes was the promisee, into Sabes
Family Foundation note SFF-C-3, which was subsequently paid from SPF Funding to the Sabes
Family Foundation.  This excess is offset by the total of false profits resulting from transfers
from SPF Funding to Defendants.

141.     Ten transfers in the collective amount of $39,486,860 were made from PCI to SPF Funding during the two years prior to the Petition Date.  *See* Exhibit O.  And 12 transfers in the collective amount of $12,469,571 were made from SPF Funding to the Sabes Family Foundation during the two years prior to the Petition Date (the "Sabes Family Foundation Two-Year Transfers").  *See* Exhibit Q.

142.     As described above, during the time period in which SPF Funding was transferring payments directly to, and receiving payments directly from, the Investor Defendants, PCI was operating a Ponzi scheme.  The scheme operated by fraudulently inducing loans from investors to Petters-related entities—including SPF Funding—then misappropriating those funds to make payments to prior investors, or sometimes the same investors, as well as to pay the Associates.  As demonstrated by the detailed allegations above, however, a miniscule portion— if any—of the funds provided by the investors were actually used for the stated purpose of financing the purchase and resale of consumer electronics.  Rather, virtually every dollar paid in by investors was laundered through the "main churn" of the Ponzi scheme, and every such transfer to the Investor Defendants is avoidable.

### D.     PC Funding Transfers

143.     Each and every one of the direct transfers from PC Funding to the Investor Defendants consisted of funds obtained by Petters' scheme through fraudulent means, and not from purported sales of consumer electronics merchandise to discount retailers.  Thus each and every direct transfer from PC Funding to the Investor Defendants was made with funds supplied by other investors that were obtained through fraudulent misrepresentations.  Each and every direct transfer from PC Funding to the Investor Defendants was therefore part of carrying out— or in the "main churn" of—the Ponzi scheme.

39

144.    As pleaded above, PC Funding was created on or about December 17, 2001 as a wholly owned subsidiary of PCI at the request of the Sabeses.  Like SPF Funding, PC Funding was established to receive certain loaned funds from the Investor Defendants in order to avoid commingling the proceeds of those loans with other investors' funds.

145.    From in or about January 2002 through December 2007, Opportunity Finance used PC Funding as an investment vehicle for lending participation in Petters' scheme by transferring funds to the SPE.  The general steps involved in transactions with PC Funding were as follows:

146.    *First*, an Investor Defendant would make a principal investment as a loan into PC Funding.

147.    *Second*, PC Funding would transfer the principal investment, along with an equity contribution to the deal from PCI, to the bank account of one of the sham Vendors, most frequently Nationwide or Enchanted.

148.    *Third*, Nationwide or Enchanted would transfer the principal amount, less their "commission," to PCI.  The representation that Petters made to investors—that PCI was receiving the proceeds of PCI's sale of consumer electronics equipment—was always false.

149.    *Fourth*, when the term of a given promissory note was complete, and payment therefore due, PCI would transfer the purported "receivable" purchased with Opportunity Finance's loan proceeds back to PC Funding.  Each individual transfer from PCI to PC Funding is listed on Exhibit S.  The details of each individual note—including principal investment into PCI, payment from PCI to PC Funding, payment from PC Funding to the Investor Defendants, and repayment from PC Funding to PCI—are listed on Exhibit H ("PC Funding Note

40

Summary"). Because investor funds were commingled at PCI, investors were paid off with a combination of their own money and other investors' money.

150.    *Fifth*, PC Funding would transfer the principal investment amount, plus "interest," to Opportunity Finance, Securitization III, or DZ Bank. Each individual transfer from PC Funding to Opportunity Finance, Securitization III, or DZ Bank is listed on Exhibit T. Additionally, the PC Funding Note Summary, under the column "Payment to Investor," indicates the amount of each such transfer from PC Funding to an Investor Defendant.

151.    *Finally*, any amount remaining in the PC Funding account after transferring the principal and "interest" would be transferred back to PCI as "profit" from the supposed transaction. Each individual payment of such profit from PC Funding to PCI is listed on Exhibit U. Additionally, the PC Funding Note Summary, under the column "Repayment to PCI," indicates the amount of each such transfer of "profit" from PC Finding to PCI.

152.    Between January 7, 2002 and December 3, 2007, Opportunity Finance entered into 546 promissory notes with PC Funding (the "PC Funding Notes"), each of which is detailed on the PC Funding Notes Summary. In total, these promissory notes reflect the transfer of $1,949,456,001 of principal loans to PC Funding, as reflected in the "Principal Investment" column of the PC Funding Notes Summary.

153.    Exhibit T reflects the transfers from PC Funding to the Investor Defendants:

a.      Between August 8, 2003 and September 12, 2008, PC Funding transferred $235,936,556 in principal and "interest" to Opportunity Finance;

b.      Between June 15, 2005 and May 12, 2008, PC Funding transferred $1,105,840,441 in principal and "interest" to Securitization III; and

c.      Between April 19, 2002 and August 4, 2003, PC Funding transferred

$698,167,716 in principal and "interest" to DZ Bank.

154.    In total, between April 19, 2002 and September 12, 2008, PC Funding transferred

$2,039,944,714 in principal and "interest" to Opportunity Finance, Securitization III, and DZ

Bank (the "PC Funding Transfers"). *See* Exhibit T. Of this amount, $90,488,713 constituted

false profits—or any amounts above the principal loaned to PC Funding. *See* Exhibit I (False

Profits Summary).

155.    Between April 19, 2002 and May 12, 2008, PC Funding transferred $204,978,946

back to PCI as PCI's "profit." *See* Exhibit U.

156.    In total, 187 transfers in the collective amount of $777,621,641 were made from

PCI to PC Funding during the two years prior to the Petition Date. *See* Exhibit S.  Of these, four

transfers in the collective amount of $9,238,419 were made within 90 days prior to the Petition

Date. *See id.*

157.    In total, 189 in the collective amount of $711,141,132 were made from PC

Funding to Opportunity Finance and Securitization III during the two years prior to the Petition

Date (the "PC Funding Two-Year Transfers"). *See* Exhibit T.  Of the PC Funding Two-Year

Transfers, four transfers in the collective amount of $9,238,419 (the "Preference Period

Transfers") were made within 90 days prior to the Petition Date (the "Preference Period"). *See

id.*

158.    As described above, during the time period in which PC Funding was transferring

payments directly to, and receiving payments directly from, the Investor Defendants, PCI was

operating a Ponzi scheme.  The scheme operated by fraudulently inducing loans from investors

to Petters-related entities—including PC Funding—then misappropriating those funds to make

42

payments to prior investors, or sometimes the same investors, as well as to pay the Associates.

As demonstrated by the detailed allegations above, however, a miniscule portion—if any—of the

funds provided by the investors were actually used for the stated purpose of financing the

purchase and resale of consumer electronics.  Rather, virtually every dollar paid in by investors

was laundered through the "main churn" of the Ponzi scheme, and every such transfer to the

Investor Defendants is avoidable.  The PC Funding Transfers were made for the benefit of

Opportunity Finance, Securitization III, and DZ Bank.

159.    The Trustee's investigation is ongoing.  During the course of this adversary

proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made

to the Defendants named in this Fourth Amended Complaint.  The Trustee intends to avoid and

recover all transfers made by PCI, SPF Funding, or PC Funding of an interest of any such entity

in property to or for the benefit of Defendants or any other transferees.  The Trustee reserves the

right to further amend this Fourth Amended Complaint to include: (i) further information

regarding any transfers described herein; (ii) additional transfers; (iii) modifications or revisions

to the names of Defendants; (iv) additional defendants; and (v) additional causes of action that

may become known to the Trustee at any time during this adversary proceeding (collectively, the

"Amendments"), through formal discovery or otherwise, and for the Amendments to relate back

to the original Complaint.

## III.    THE TRANSFERS ARE FRAUDULENT AS TO DIRECT AND SUBSEQUENT TRANSFEREES

### A.    Each Transfer Was Made in the "Main Churn" of the Ponzi Scheme by Insolvent Entities

160.    All of the transfers at issue were necessarily made in the "main churn" of the

Ponzi scheme.  In other words, all such transfers consisted of funds obtained through the

fraudulent inducement of investors, rather than through legitimate sales of merchandise.  It

follows necessarily from this lack of legitimate income that the funds used by PCI and the SPEs

to pay back the investors consisted of funds paid into the Ponzi scheme by other investors.

161.    PCI, PC Funding, and SPF Funding were the key entities through which these

transfers occurred, as discussed in detail above.  Because these entities knowingly and

intentionally used investor funds not for their purported purpose, but to pay back other investors,

they self-evidently acted with actual intent to hinder, delay, or defraud other creditors, and all

such transfers are therefore voidable as to any creditor whose claims arose before or after the

transfers were made.

162.    Furthermore, it is plain that PC Funding and SPF Funding were never solvent

entities, because their liabilities always exceeded their assets.  The funds received by PC Funding

and SPF Funding—which were acquired through fraudulent inducement—were never used to

acquire inventory, accounts receivable, or any tangible assets, but instead used to pay down their

own respective liabilities or the debt of other SPEs.  The balance payable on promissory notes

would be recorded as a bona fide liability, while non-existent accounts receivable were recorded

as assets.  Thus, the liabilities of PC Funding and SPF Funding would always exceed their assets,

and both entities were continuously insolvent.  Additionally, PC Funding and SPF Funding are

liable to all investors because PC Funding and SPF Funding were co-conspirators in the Ponzi

scheme.

163.    Notably, Coleman was asked whether, from her position at PCI, it appeared that

the SPEs could "pay their normal, every-day expenses," to which she replied "No.  Those we[re]

usually paid by PCI. . . .  [T]he money went [*sic*] and the money went out.  Any gain on the

transactions, those funds were transferred to PCI.  So they really didn't have any money left to

do anything with."  The SPEs incurred such expenses as the fees for PC Funding's independent

director and for maintaining the SPEs' corporate status, as well as accounting fees, and legal

fees, but depended upon others, including PCI and certain Defendants, for funds. The SPEs'

inability to pay basic expenses as they came due, without transferring funds from other entities,

is another indicator that PC Funding and SPF Funding were, at all times, insolvent.

164.    Similarly, PCI was insolvent at all relevant times. Petters, through PCI and the

SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those

funds would be used to finance the purchase of consumer electronics. Those funds were not

used to purchase electronics, but rather to repay fraudulent obligations incurred to other

investors. They were therefore funds that PCI never should have possessed. Any debts at all

incurred by PCI—including promissory notes issued to Defendants—thus rendered PCI

insolvent, undercapitalized, and unable to pay debts as they came due. PCI was therefore

insolvent no later than the first time it incurred any debt to an investor in the Ponzi scheme—

which was before the date of the first PCI Direct Transfer, PCI MGLLC Transfer, and any

transfer involving SPF Funding or PC Funding—and remained insolvent as of the date of each

and every subsequent transfer.

165.    To the extent that PCI received funds from entities not directly involved in the

Ponzi scheme, PCI incurred debts to those entities, and therefore such transfers did not, and

could not, render PCI solvent. To the contrary, to the extent PCI was obligated to repay those

transfers to other entities with interest, such transfers served to deepen PCI's insolvency. In all

events, because PCI transferred to the other entities more funds than it received from them,

transactions with such entities in fact served to deepen PCI's insolvency, rather than to provide

funds sufficient to pay PCI's obligations, including satisfaction of the purported loans from

investors.

45

**B.     Defendants Had Actual and/or Constructive Knowledge of the Fraud**

166.     Opportunity Finance, the Sabes Family Foundation, The Minneapolis Foundation, the Sabes Family Defendants, and the entities that provided financing to the Opportunity Finance Defendants, including DZ Bank, knew or should have known that they were benefiting from fraudulent activity, or at a minimum, failed to exercise reasonable due diligence with respect to Petters, PCI, PC Funding, and SPF Funding in connection with the Ponzi scheme.  Among other things, Opportunity Finance, the Sabes Family Foundation, and the Sabes Family Defendants were on notice of the following indicia of irregularity and fraud, but failed to make sufficient inquiry:

167.     *First*, testimony from Deanna Coleman at Petters' criminal trial shows that Opportunity Finance, Securitization, Securitization II, Securitization III, and the Sabes Family Foundation, specifically through Jon Sabes, had actual knowledge regarding the purported purchase orders Opportunity Finance and the Sabes Family Foundation were financing.  The following testimony by Coleman illustrates that Jon Sabes, a principal of Opportunity Finance and a manager of the Sabes Family Foundation, knew that Wal-Mart, doing business as Sam's Club, had been using electronic purchase orders since November 6, 2003, yet Opportunity Finance, Securitization, Securitization II, Securitization III, and the Sabes Family Foundation, acting knowingly or in reckless disregard of the fraud, accepted forged paper documents from Petters, PCI, PC Funding, and SPF Funding:

Q.  Okay.  And what was the question that he had?

A.  He was wondering why we couldn't go online to get purchase orders and go online to see when Sam's was paying us.  Most larger companies are everything online.  They no longer fax over or e-mail over purchase orders.  Everything is online.  He was just wondering why we weren't online with them. . . .

Q.  Was this of a concern to you?

46

A. It was.

Q. And why was it a concern?

A. I did not want to answer his question.  There was no reason why we weren't getting online documents instead of paper documents.

Q. Do you know -- did you ever talk to John [*sic*] Sabes or the Sabeses about why they were getting paper documents?

A. No, Tom said he would take care of it; and after I forwarded that e-mail on to Tom, I never heard back from John [*sic*] Sabes.

168.     Upon information and belief, during the course of receiving fraudulent transfers of principal and false profits from PCI and its alter-ego PC Funding, Jon Sabes also confronted White in or about the Fall of 2007 with the information that Sam's Club used only electronic purchase order documentation while PCI, PC Funding, and SPF Funding provided Opportunity Finance and the Sabes Family Foundation with paper purchase orders.  Furthermore, upon information and belief, and as known at the time by one or more agents of Opportunity Finance and the Sabes Family Foundation, the numbering format on the electronic purchase order documentation utilized by Sam's Club did not match the paper purchase order documentation PCI, PC Funding, and SPF Funding were providing to Opportunity Finance and the Sabes Family Foundation.  White directed Jon Sabes to inquire of Petters regarding the conflicting purchase order numbering and electronic format.  White did not hear from Jon Sabes, Opportunity Finance, or the Sabes Family Foundation regarding these serious and material discrepancies after directing Jon Sabes to speak with Petters.

169.     *Second*, in December 2007, Opportunity Finance abruptly ceased its business activities with Petters, PCI, and PC Funding.  On or about December 3, 2007, Opportunity Finance advanced Defendants' final loan to the SPEs or any Petters-related entity, transmitting

47

just $3,725,000 to PC Funding.  By contrast, in November 2007, Opportunity Finance received

$74,495,000 in new promissory notes from PC Funding.

170.    Upon information and belief, in or about December 2007, Opportunity Finance

demanded to be repaid at an accelerated rate.  On information and belief, this demand resulted

from a realization by the Opportunity Finance Defendants and the Sabes Family Foundation that

the Ponzi scheme no longer was able to generate adequate funds to keep current on all notes

payable.  Subsequent to a December 8, 2007 private meeting between Petters and Jon Sabes at

Petters' home, and beginning in February 2008 and ending in September 2008, Opportunity

Finance received from PC Funding cash in the amount of $155,357,376.  These transfers, all of

which occurred within two years prior to the Petition Date, are referred to herein as the "Buy Out

Transfers."  Opportunity Finance, the Sabes Family Foundation, and the Sabes Family

Defendants invested no new money with PCI and PC Funding following the private meeting at

Petters' home in December 2007, contrary to the Defendants' prior pattern and practice.

171.    *Third*, beyond these indicia of fraud regarding the Defendants' own transactions

with Petters, PCI, PC Funding, and SPF Funding, the Defendants ignored numerous other such

indicia of fraud from the general operation of Petters, PCI, PC Funding, and SPF Funding.

Among other things, IIO, Opportunity Finance, the Sabes Family Foundation, the Sabes Family

Defendants, and DZ Bank were on actual notice of the following signs of fraud and financial

irregularity, but failed to make sufficient inquiry:

a.    The Sabeses asserted that they never contacted any of the purported

discount retailers because "if we contacted the buyers . . . it would jeopardize Mr. Petters' ability

to continue doing business with those buyers."  Despite numerous red flags concerning Petters'

operation, the Sabeses failed to take the basic step of determining whether the collateral against

48

which they ultimately loaned *billions* of dollars was sound, supported the loan amounts, or even

existed.  Even after halting all investments in Petters' entities and demanding immediate

repayment of all outstanding amounts, the Sabeses still chose not to contact the identified buyers

to ascertain the state of their purported collateral.  Petters similarly refused to reveal to DZ Bank

the composition of the supply chain for the purported merchandise that investors were meant to

be funding.

       b.     The interest offered on many of the notes was abnormally high.  The range

of interest paid on notes associated with the SPEs ranged up to nearly 50%.  Indeed, between

2001 and 2007, the average annual interest rate on notes with PC Funding ranged from

approximately 14% to 30%, while the average annual interest rate on notes with SPF Funding

ranged from approximately 14% to more than 42%.  In both cases, the higher interest rates were

paid earlier on, and declined over years of investing.  In one particular transaction, Robert Sabes

negotiated to "invest" $2,300,000 in exchange for a PCI promissory note.  The note guaranteed

repayment of the principal in 6 days along with $100,000 in "profit sharing"—a 261% annual

rate of return.

       c.     Petters operated PCI, PC Funding, and SPF Funding without investor

transparency.  After Coleman proposed a reduction in interest rates to Steven Sabes in May

2004, Robert Sabes left a voicemail for Petters complaining that the reduction was inappropriate

"based on the risk involved and the lack of transparency."  In explaining, Robert Sabes

contrasted PCI's lack of transparency with the full transparency of the deals with Petters

Consumer Brands ("PCB") that the Sabeses funded.  Robert Sabes stated, "I said, you know, if

[PCI's] business were the same business as [Petters] Consumer Brands with the same face cards

and the same transparency, we'd do it at 12% I said, but it isn't.  It's totally different and doesn't

deserve that kind of rate." For PCI investments, Petters generally declined to provide investors

with audited financial statements, barred communication by investors with retailers who Petters

represented would be purchasing the fictitious electronics, prohibited investors and insurers from

viewing and inspecting the purported electronic goods they were financing, and claimed he was

unable to direct retailers to pay receivables directly to SPEs. For PCB investments, in stark

contrast, Defendants received full backup documentation and permission to inspect inventory.

        d.      The Defendants did not undertake even ordinary diligence of PCI, PC

Funding, or SPF Funding or match purchase orders, wire transfer confirmations, or other

transactional documents with the purported purchases of electronic equipment Opportunity

Finance and the Sabes Family Foundation were financing despite the fact that the Defendants

provided millions of dollars in financing to PCI, PC Funding, and SPF Funding.

        e.      The Sabeses have admitted they were aware that funds flowing into SPF

Funding and PC Funding were commingled at PCI, and were thus also aware that the funds

flowing into the two SPEs came from PCI, and not from the discount retailers supposedly

purchasing the electronics. As early as August 2001, the Sabeses knew and stated expressly that

such commingling "defeats the purpose" of a SPE, and explained that directly to Coleman.

        f.      Similarly, no later than August 2002, DZ Bank was likewise aware that

"all monies are going through the Pet[t]ers Operating Account prior to being transferred to the

PC Funding Account." In September 2002, DZ Bank noted that "Jon [Sabes] needs not only to

direct but also to cause payment directly to the PC Funding Account by the applicable Retailer,"

and as of February 2003, DZ Bank characterized this "open item" as "huge." Further, in or

around March 2003, DZ Bank employees expressly raised the possibility not only that Petters

was committing fraud, but that the Sabeses were involved in perpetrating it.

50

g.      Defendant DZ Bank, which provided financing to Opportunity Finance to fund its investments in PCI, was unable to obtain adequate assurances from Petters, PCI, and PC Funding regarding the existence of the goods which were the collateral for the business transactions, and thereafter withdrew from providing that financing.  Thereafter, Opportunity Finance, the Sabes Family Foundation, WestLB and WestLB NY nevertheless continued to invest in PCI without the capacity to obtain adequate assurances regarding the existence of the goods.

h.      WestLB and WestLB NY, which agreed to provide up to $150 million in financing to Opportunity Finance for loans to the SPEs, failed to obtain adequate assurances regarding the existence of the goods, such as inspecting the inventory supposedly financed by Opportunity Finance's loans or obtaining audited financial statements from PCI.

i.      On or about June 17, 2003, WestLB and WestLB NY sent at least three representatives from WestLB NY—Vice President Brian Stratfeld, Vice President Alberto Santos and Associate Mark Hammen—to meet with Petters and Jon Sabes in Minnesota.  Jon Sabes described the purpose of the trip to see Petters as the "preverbal [sic] smell test trip" regarding the agreement to lend up to $150 million.  Upon information and belief, the WestLB NY representatives met with Jon Sabes and Petters in Petters' corporate offices for approximately one hour, met several of Petters' company leaders, listened to Petters discuss his success, discussed books and then returned to New York without inspecting the inventory that formed the basis for the funding transfers that WestLB and WestLB NY were to finance.

j.      The Sabeses were introduced to the Petters organization through an individual named Frank Vennes, who had a criminal record and had served time in jail.  Robert

Sabes was aware of Mr. Vennes' past before the Sabeses began their long-standing investment in Petters' Ponzi scheme.

172.    Robert Sabes himself offered a potential reason for ignoring the steady drum-beat of red flags at his July 2011 deposition when he agreed that the investment in the Ponzi scheme was actually "a success" for him, and that he "got paid."

## IV.    THE TRUSTEE HAS STANDING UNDER 11 U.S.C. § 544(b) AND THE MINNESOTA UNIFORM FRAUDULENT TRANSFER ACT TO AVOID ALL AT-ISSUE TRANSFERS

173.    The Trustee has standing to avoid the transfers described in Sections II and III, pursuant to 11 U.S.C. § 544(b) and the Minnesota Uniform Fraudulent Transfer Act ("MUFTA"), on several grounds:

174.    *First*, the Trustee has standing under 11 U.S.C. § 544(b) and MUFTA to avoid direct transfers from PCI by stepping into the shoes of numerous predicate creditors with allowed, unsecured tort claims against that entity.

175.    *Second*, the Trustee has standing under 11 U.S.C. § 544(b) and MUFTA to avoid transfers from SPF Funding and PC Funding to Defendants under several veil-piercing theories, each of which is sufficient, on its own, to provide the Trustee with standing to avoid all transfers from SPF Funding and PC Funding, including (a) *insider* reverse veil-piercing (as this Court already held); (b) *outsider* reverse veil-piercing; and (c) that SPF Funding and PC Funding are mere alter egos of their parent entity, PCI.

176.    *Third*, the Trustee has standing independently under 11 U.S.C. § 544(b) and MUFTA to avoid transfers from SPF Funding and PC Funding by stepping into the shoes of

several predicate creditors with unsecured, allowed or allowable tort claims against SPF Funding

and PC Funding.[22]

### A. The Trustee Has Identified Sufficient Predicate Creditors of PCI for Standing as to Claims Addressing Direct Transfers from PCI

#### 1. Facts establishing the claims of predicate creditors of PCI

177.     The Trustee can stand in the shoes of numerous predicate creditors that have

allowed, unsecured claims against the PCI estate (several of which filed Proofs of Claim not only

in the estate of PCI, but also in the estates of SPF Funding and PC Funding):[23]

#### (a)     Lancelot

178.     Lancelot, which includes Lancelot Investors Fund, L.P., Lancelot Investors Fund

II, L.P., Lancelot Investors Fund, Ltd., and related entities as described in the Second Amended

Plan of Reorganization ("Lancelot"), filed proofs of claim in the bankruptcies of the Debtors for

a total claim of more than $1.5 billion, and have a combined, allowed, unsecured claim against

the substantively consolidated Debtors' estates, including PCI, of at least $764 million.

179.     The Proofs of Claim assert "civil conspiracy" against each Debtor, and plead that

"[o]n October 3, 2008, Petters was arrested and charged in a criminal complaint with mail and

wire fraud, money laundering and obstruction of justice," and that upon information and belief,

"much of the inventory that served as the collateral for the loans . . . never existed," and that

---

[22] The allegations in this section are included to plead the Trustee's standing under
11 U.S.C. § 544(b) and MUFTA.  The Trustee need not establish the existence of predicate
creditors to have standing pursuant to 11 U.S.C. § 548 to avoid the transfers at issue here.

[23] In addition to the investor creditors described here, PCI had a number of trade
creditors, including Leonard McHugh d/b/a Alliance Courier; AT&T Mobility, LLC; Federal
Express Corporation d/b/a Fed Ex Express; Associated Courier Inc. d/b/a Street Fleet; T-Mobile
US, Inc.; and Verizon Wireless.  Several of these claims were undisputed by PCI.  The services
provided by these trade creditors had no connection to the fraudulent activities of the Debtors,
and these trade creditors did not have knowledge of the Petters fraud and Ponzi scheme until,
at the earliest, September 24, 2008, when the federal investigation of PCI became public.

"much of the receivables that served as collateral for those loans was never generated or owed by any account debtor." Rather, the Debtors "planned and carried out a scheme to defraud, among others, the Lancelot / Colossus Funds by inducing them to provide certain of the Debtors with commercial loans . . . based on an extensive and long running pattern of knowingly false and fraudulent statements."

180.    Upon information and belief, the sources of which include a complaint filed by Lancelot against Petters, PCI, and others on October 7, 2008, Lancelot made numerous loans to a SPE called Thousand Lakes, LLC, which was wholly owned and controlled by Petters. The loans were evidenced by promissory notes executed by Thousand Lakes in favor of Lancelot, and were guaranteed by Petters and PCI. Between 2002 and 2008, Lancelot invested more than $1 billion with Petters, which was laundered through the Ponzi scheme.

181.    Upon information and belief, based upon sources including the complaint noted above, Petters directed Coleman, White, and other PCI employees to provide falsified documents concerning the purported transactions to Lancelot (and other investors). As described above, these included Loan Proposals that falsely specified the inventory for which PCI and/or the SPEs purported to seek financing, falsified invoices, purchase orders, and bills of sale supposedly showing that Nationwide or Enchanted had purchased inventory for resale, and then phony purchase orders and invoices purporting to show the resale of that equipment to such retailers as BJ's, Sam's Club, and Costco. These false documents included, but were by no means limited to:

- Invoice number 45399, dated March 12, 2008, submitted to Lancelot on or around May 1, 2008, which purported to show that BJ's had ordered 2,340 Hitachi televisions from Thousand Lakes for a sale price of $5,164,236.

54

- Invoice number 45388, dated March 13, 2008, submitted to Lancelot in or around April 2008, which purported to show that BJ's had ordered a quantity of Infocus projectors from Thousand Lakes for a sale price of $4,074,862.

- Invoice number 45431, dated March 24, 2008, submitted to Lancelot on or around May 7, 2008, which purported to show that BJ's had ordered a quantity of digital cameras from Thousand Lakes for a sale price of $2,706,637.

182.   Each of the foregoing invoices was false and misleading when prepared and presented, because, as detailed above, Petters sold virtually no inventory to any retailers—and none during the time period in which these documents were created—but instead laundered the incoming funds to pay back prior investors or, in some cases, the same investor.  Furthermore, as detailed above, this same practice of misrepresenting the intended use of the funds, and of providing false paperwork, occurred in all but a handful of transactions carried out by PCI and any of its SPEs, and thus it is fair to infer that the same or similar misrepresentations were made by the same Debtors, or their agents, throughout the relevant time period.

**(b)   Palm Beach**

183.   The Palm Beach funds, consisting of Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. (together, "Palm Beach"), filed proofs of claim in the bankruptcies of the various Petters entities, including PCI, SPF Funding, and PC Funding, for a combined total of just under $1.09 billion.  The Proofs of Claim assert that Petters' scheme gives rise to claims for fraud, fraudulent inducement, and civil conspiracy.  Palm Beach has a combined, allowed, unsecured claim against the substantively consolidated Debtors' estates, including PCI, of at least $651 million.

184.   Upon information and belief, the sources of which include the complaint filed by Barry E. Mukamal as Liquidating Trustee of the Palm Beach Finance Partners Liquidating Trust and Palm Beach Finance II Liquidating Trust against Nationwide International Resources, Inc.,

et al., 11-02857-PGH (Bankr. S.D. Fla.), Petters induced Palm Beach to lend funds to Petters'

organization through a long campaign of misrepresentations that funds loaned by Palm Beach

would finance the purchase of consumer electronics, as opposed to being laundered through a

Ponzi scheme.

185.    In early 2002, the principals of Palm Beach's general partner, David Harrold and

Bruce Prevost, met Frank Vennes, a Petters agent who helped to raise funds supposedly to

finance the purchase and sale of consumer electronics through Petters' organization.  Both

Vennes, and then Petters, represented to Palm Beach, Prevost, and Harrold that the funds they

were soliciting would be used to facilitate "purchase order financing" transactions—as described

in detail in Section I.  In particular, Vennes and/or Petters represented that Petters would

facilitate the purchase of surplus consumer electronics from manufacturers, and deliver that

merchandise to "big box" discount retailers, such as Sam's Club or BJs.  Petters representations

were false when made.

186.    During the time that Palm Beach loaned funds to Petters, Petters would supply

such false documentation as purchase orders from the discount retailers, bills of sale from

Nationwide and Enchanted and/or other sham Vendors, and other documents purporting to

assign a security interest in the merchandise to Palm Beach.  This documentation was false

because the merchandise described in the documents did not exist.

### (c)    Acorn

187.    Acorn Capital Group, LLC ("Acorn") has an allowed, unsecured claim against the

substantively consolidated Debtors' estates, including PCI, of approximately $141 million.

188.    Between 2002 and the Petition Date, Acorn entered into multiple note transactions

with PCI and PAC Funding.  Asset Based Resource Group, LLC ("ABRG"), as successor

servicer to Acorn, filed proofs of claim against the PCI and PAC Funding bankruptcy estates,

and holds an allowed, unsecured claim against the PCI and PAC Funding bankruptcy estates in the amount of $141,290,116.  On or about December 2, 2011, ABRG transferred its claims by assignment to Greenpond South, LLC.

### (d)    Ark Discovery

189.    Ark Discovery II LP ("Ark Discovery") filed proofs of claim against the PCI bankruptcy estate in the amounts of $104,609,465 and $107,207,101, respectively, as well as a claim against the Edge One bankruptcy estate in the amount of $107,207,101.  Ark Discovery has an allowed, unsecured claim against the substantively consolidated Debtors' estates, including PCI, of $107,207,101.

190.    Ark Discovery and Edge One are parties to a Master Loan Agreement dated July 7, 2007 (together with the Security Agreement and any related notes, documents, certificates, instruments, agreements and guaranty by PCI, and all amendments, replacements, extensions or restatements of any of the foregoing, the "Ark Discovery Loan Documents").  Pursuant to the Ark Discovery Loan Documents, between October 1, 2007 and September 3, 2008, Ark Discovery engaged in 29 separate note transactions in an aggregate principal amount of $159,010,000.  Beginning on March 11, 2008 and continuing through the Petition Date, PCI repaid six of the Ark Discovery notes in the aggregate amount of $36,302,900, leaving Ark Discovery with a loss of $122,707,100.  Ark Discovery also entered into Loan Purchase Agreements with Ark Royal Capital, LLC, whereby Ark Royal Capital paid $21,500,000 to Ark Discovery for a participation interest in four notes in an aggregate principal amount of $27,500,000.

191.    Ark Discovery was formed and registered as a limited partnership in the state of Delaware under the name A to Z Investors, Fund, L.P. on May 29, 2007, changed its name to Edge One Capital, L.P. on or about September 17, 2007, and then to Ark Discovery II, L.P. on or

about February 7, 2008.  Ark Discovery could not have discovered the fraud of Petters' Ponzi

scheme prior to being formed and registered on May 29, 2007, which date is within six years of

the Petition Date.

192.   Ark Discovery became concerned about payment delays in the summer of 2008

and was told by Deanna Coleman that payment delays were due to economic conditions.  Ark

Discovery also became aware of a lawsuit against Petters in 2008, but was assured by Petters that

everything was fine.  These statements were false or incomplete when made.

193.   Ark Discovery was not (i) complicit in the fraud at the PCI Debtors or elsewhere

in the Petters operations at the time of its initial loan to the PCI Debtors; (ii) aware of any of the

de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at

the time of its initial loan to the PCI Debtors; or (iii) aware of anything extrinsic at the time of its

initial loan that would cause a reasonable person or creditor to suspect that the PCI Debtors were

engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

### (e)    Interlachen

194.   Interlachen Harriet Investments Limited ("Interlachen") filed a proof of claim

against the PCI bankruptcy estate in the amount of its initial principal investment of

$60,000,000, as well as against each of the PCI Debtors' bankruptcy estates in the same amount.

Interlachen has an allowed, unsecured claim against the substantively consolidated Debtors'

estates, including PCI, of $60 million.

195.   PCI and Interlachen are parties to an Amended and Restated promissory note

dated as of April 18, 2008 in the principal amount of $60,000,000 (the "Interlachen Note")

(together with a Note Purchase Agreement, Security Agreement and any related documents,

certificates, instruments and agreements and all amendments, replacements, extensions or

restatements of any of the foregoing, the "Interlachen Loan Documents").  Pursuant to the

58

Interlachen Loan Documents, Interlachen advanced a total of $60 million to PCI between April 18 and April 22, 2008. The Interlachen Note had a maturity date of October 18, 2008.

196. Interlachen was formed and registered as an exempt company under the laws of the Cayman Islands on February 1, 2008.

197. Upon information and belief—the sources of which include Interlachen's September 30, 2008 complaint against, *inter alia*, PGW, PCI, and Nationwide—like numerous other entities, Interlachen was induced to lend funds to Petters' entities by false and fraudulent misrepresentations made by, or on behalf of, Petters and his entities.

198. To begin, the Interlachen Loan Documents themselves made clear that the funds sought from Interlachen and lent to PCI would be used to fund the purchase of electronic equipment that would then be resold at a profit. As described above, however, the evidence is clear that virtually *none* of any investors' funds, necessarily including Interlachen's, was *ever* used to purchase electronic equipment. Instead, it was used to repay earlier investors. Petters and/or his representatives therefore made specific misrepresentations to Interlachen concerning the use of Interlachen's funds.

199. PGW, PCI, Petters, and/or their representatives or agents made additional, specific misrepresentations concerning the purposes for which Interlachen's funds would be used. For instance, prior to Interlachen's April 18, 2008 investment, CalibraX Fund LP, which was operating on behalf of PGW and PCI, sent to Interlachen's Head of Special Investments a term sheet for Interlachen's upcoming investment stating that the televisions Interlachen's funds would finance—which did not exist—were worth $116 million, and they would be sold to top-five retailers. Similarly, and prior to April 18, 2008, Petters himself informed Interlachen's Head of Special Investments that Petters was planning to sell the televisions to certain top-five

59

retailers.  During this pre-investment time period, Coleman informed Interlachen's partners by telephone that Petters had completed numerous deals like the one proposed for Interlachen, and that Petters was negotiating to pre-sell the (non-existent) inventory.

200.    Petters and his representatives and affiliates also presented falsified paperwork to Interlachen's partners.  Prior to April 18, 2008, PGW's chief legal officer sent to Interlachen's partners via e-mail a purported purchase order and invoice relating to the merchandise for which Interlachen's loan was supposedly earmarked.  This paperwork, generated by Reynolds on behalf of Nationwide, was necessarily fake, since, as discussed above, Nationwide did not actually sell merchandise to PCI, but existed solely to persuade investors that Petters was engaged in genuine transactions.  PGW's chief legal officer also provided to Interlachen's partners prior to April 18, 2008 a document titled "Evidence of Property Insurance," which purportedly showed the insurance coverage applicable to the merchandise.  Because there was no merchandise, this paperwork was necessarily phony.  And PGW's chief legal officer also provided Interlachen's partners with an invoice, itemized to show the merchandise allegedly purchased with Interlachen's funds.  This, too, was fake.

201.    The misrepresentations did not end with the transmission of funds from Interlachen to Petters' entities.  In conversations on June 11, July 2, July 18, July 30, August 14, August 20, and August 21, Reynolds and Coleman informed Interlachen's managing agent about the progress in shipping and selling the non-existent inventory, including that this supposed merchandise had sold for a total of $95 million to three retailers.

202.    Each of these representations was false and misleading because, as the evidence discussed above demonstrates, Petters' entities did not, and never intended to, use the funds supplied by investors to finance merchandise, but only to maintain the Ponzi scheme by paying

funds to earlier investors (along with commissions for Nationwide and Enchanted and "profit" for PCI).

203.    Interlachen became aware of a lawsuit against Petters and PCI in August 2008 for non-payment, and on September 24, 2008 learned that multiple federal agencies executed search warrants at Petters' headquarters.  Unsurprisingly, after the search warrants were executed, Interlachen's inquiries about the status of its investments went unanswered.

204.    Interlachen never received any payments on its promissory note, which remained due and owing in full as of the Petition Date.  Based on the above facts, Interlachen had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public.

205.    Interlachen was not (i) complicit in the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial loan to the PCI Debtors; (ii) aware of any of the de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial loan to the PCI Debtors; or (iii) aware of anything extrinsic at the time of its initial loan that would cause a reasonable person to suspect that the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

**(f)    Theodore Deikel**

206.    PCI, Petters, and Theodore Deikel ("Deikel") are parties to a promissory note dated June 3, 2008 (the "Deikel Note") under which Deikel advanced a total of $10 million to PCI.  The Deikel Note matured August 2, 2008.  On or about September 23, 2008, PGW made a transfer to Deikel in the amount of $2,600,000 in partial payment of the Deikel Note.

207.    Deikel filed a proof of claim against the PCI bankruptcy estate in the amount of $10,000,000, made a settlement payment of $2,100,000 to PGW, and holds an allowed,

unsecured claim against the consolidated PCI Debtors' bankruptcy estate in the amount of $6,122,543.

208.     Upon information and belief, the source of which is Mr. Deikel's testimony at Petters' criminal trial, during a conversation among Petters, another Petters-affiliated individual, and Deikel in May 2008, Petters told Deikel that Deikel had the "opportunity" to help finance the purchase of certain electronics inventory.  Specifically, in the same conversation, Petters and/or his associate told Deikel that Petters was putting together financing for a $60 million transaction in which electronics originally bound for Circuit City would be sold instead to one or more discount retailers because Circuit City was no longer willing or able to pay.  Petters represented that he was going to contribute $30 million to the transaction himself, but that Deikel could provide up to $12.5 million.  In reliance upon these misrepresentations, Deikel loaned $10 million to Petters.

### 2. The predicate creditors of PCI have claims arising in conversion and fraud, among other causes of action, against PCI

209.     Petters and PCI committed, at least, the tortious acts of conversion and fraud as against the predicate creditors.

210.     Under Minnesota law, conversion is willful interference with personal property, without legal justification, that deprives a person of use or possession.  To prove conversion, a plaintiff need only show that (i) plaintiff owned the property taken; (ii) the property was taken by the defendant and converted; and (iii) that the property had value.  As discussed above, each predicate creditor, beginning no later than 2002, invested valuable funds, that it owned or that it obtained from and owed to third parties, with Petters, either through PCI or one of the SPEs.  In virtually all, if not all cases, these funds were misappropriated and converted for use by Petters, his Associates, and the Debtors in several ways, as identified by this Court:

211.    *First*, investor funds were diverted into the main churn of the Ponzi scheme, rather than toward the funding of the inventory or merchandise described in the Loan Approval (which merchandise did not exist).[24]

212.    *Second*, the Ponzi scheme channeled funds from purported Vendors Nationwide and Enchanted to PCI, even though "[n]o SPE's relationship with its lender allowed diversion of funds away from the SPE-vendor-lender nexus."[25]

213.    *Third*, once at PCI, the funds were commingled in PCI's main bank account with all other funds received from the two Vendors, and a portion of those commingled funds were used to supply the "interest" paid on the original transfer from a SPE.[26]

214.    *Finally*, the last step of the money-laundering scheme was to pay a "profit" to PCI after transferring interest, or principal and interest, to an investor upon the expiration of the term of a given promissory note.  Since the Ponzi scheme never actually took in funds from the sale of merchandise, the "profit" was necessarily "funded by stolen money" and thus "a final misappropriation of commingled funds."[27]

215.    As to fraud, Minnesota law requires a plaintiff to plead and prove five elements: (1) false representation of material fact; (2) made with knowledge of the falsity or made as though it were within defendant's knowledge where defendant did not know whether it was true or false; (3) with the intent to induce plaintiff to act in reliance; (4) that the representation did induce such act in reliance; and (5) the plaintiff suffered monetary damage.

---

[24] *See In re Petters Co., Inc.*, 506 B.R. 784, 803 (Bankr. Minn. 2013).

[25] *Id.* at 803.

[26] *See id.*

[27] *Id.*

216.     As noted above, each predicate creditor, beginning no later than 2002, began

investing valuable funds that it owned with Petters, either through PCI or one of the SPEs set up

for large individual creditors.  Each and every predicate creditor was induced to lend funds by

misrepresentations that those funds would be used to purchase consumer electronics, which

Petters and his Associates knew to be false.  Instead, the funds supplied by investors, including

the predicate creditors, were channeled into the "main churn" of the Ponzi scheme and used to

pay prior investors, or to pay back investors with their own funds.  Petters and his Associates

made additional misrepresentations by preparing false paperwork for the purported transactions

financed by the loans made by the predicate creditors.

217.     On information and belief, the sources of which include complaints filed by

predicate creditors discussed above, as well as extensive testimony and fact materials concerning

the operation of the Ponzi scheme, the predicate creditors relied upon these misrepresentations

when they invested funds, and were harmed because their funds actually went into a Ponzi

scheme from which they have been unable to recover their investments.

218.     It is effectively undisputed that the Ponzi scheme operated through particular

misrepresentations concerning its investment activities and overall purpose, and there is no

reason to believe that the scheme operated differently for any of the predicate creditors.

**B.      There Are Predicate Creditors of the SPEs Because the Corporate Veil
        Between PCI and Those SPEs Can Be Pierced**

**1.      PCI, SPF Funding, and PC Funding should be treated as a single
        entity**

219.     The Trustee's allegations concerning PCI's control and utilization of SPF Funding

and PC Funding in order to advance Petters' Ponzi scheme have already been deemed sufficient

to pierce the corporate veil between PCI and the SPEs.

220.    Additionally, in deciding to substantively consolidate the Debtors' estates, this Court found, based on certain facts detailed below, that "SPF [Funding]'s structure is significantly interrelated with PCI and other PCI-related entities, *and it cannot be considered structurally or operationally separate*."[28]  PwC further confirmed this fact, testifying that "the SPE's and PCI . . . were effectively one."

221.    The SPEs were, in fact, inseparable alter egos of PCI.  PC Funding and SPF Funding were created and utilized by PCI as SPEs through which to funnel funds into and out of the main churn of the Ponzi scheme.

222.    As to SPF Funding, Petters was the sole "governor," as well as president, CEO, and CFO, and Jon Sabes agreed that Petters was "the person who would make business decisions" for SPF Funding.  In addition, SPF Funding has never had an independent director, which "left SPF [Funding] without any check against PCI's influence over SPF [Funding]'s actual usage or operations."[29]  And SPF Funding depended upon PCI in order to stay in business. SPF Funding operated from the same office facility and address as PCI, and the contact people the Sabeses reached at SPF Funding—Petters, Coleman, or White—were "the same three people" who acted as contacts for PCI.  And neither SPF Funding nor PC Funding had any of their own employees, or even their own telephone lines or e-mail addresses.

223.    Notably, upon creating SPF Funding in 2001, PCI's counsel refused to provide a non-consolidation opinion.  Indeed, SPF Funding, according to PCI's attorneys, was "not structured . . . with non-consolidation in mind."[30]

---

[28] *In re Petters Co., Inc.*, 506 B.R. at 807 (emphasis added).

[29] *Id.*

[30] *Id.*

224.    As to PC Funding, Petters was likewise its only "governor," as well as its

president, CEO, and CFO.  Jon Sabes agreed that Petters "basically would sign all the important

documents for PC Funding," and testified that he had never seen letterhead for PC Funding itself.

And though PC Funding actually had an independent director, it was a "Rent-a-Director" that

acted "in name only."  PC Funding also depended upon PCI, to the point that an audit for the

years 2002 and 2003 indicated that such dependence "caused serious doubt about PCF's ability

to continue as a going concern."[31]  PC Funding also operated from the same office facility and

address as PCI, and the contact people for PC Funding were also Petters, Coleman, and White.

225.    Petters also indiscriminately commingled funds intended for PC Funding or SPF

Funding with those intended for PCI, using such funds for subsequent distribution to other

investors in other SPEs.  Petters and his Associates caused monies received from PC Funding

and SPF Funding by Nationwide and Enchanted to be rerouted and transferred directly to PCI

accounts for the operations of PCI, repayment of investors, payment of false profits, and for

Petters' personal use.

226.    Critically, though SPF Funding was the final stage of the flow of funds before a

transfer was made to Opportunity Finance, as this Court has found, "[i]n practice, every single

note from [SPF Funding] to Opportunity Finance was paid by funds that flowed through PCI's

[Bank] account, which means that every single dollar was commingled."[32]  This Court likewise

found that "every single note from [PC Funding] to Opportunity Finance was paid by funds that

flowed through PCI's M & I account," and therefore, just like the funds that flowed through SPF

Funding, "every single dollar received by Opportunity Finance on [PC Funding's] account was

---

[31] *In re Petters Co., Inc.*, 506 B.R. at 810.
[32] *Id.* at 808.

commingled at some point in time."[33]  The Sabeses conceded that they were aware that funds

flowing into SPF Funding and PC Funding were commingled at PCI, and were therefore also

aware that funds flowing into the two SPEs came from PCI, and not from the purported discount

retailers—which defeated the SPEs' express purpose of separating the Sabeses' funds from those

of other investors.

227.    PCI maintained a number of bank accounts, including a bank account at M&I

Bank.  From 2001 to 2008, PCI transferred funds from its M&I Bank account to the SPEs—

including PC Funding and SPF Funding—in the amount of approximately $32 billion dollars.

PCI also received approximately $7.3 billion dollars from its SPEs.  PCI's M&I Bank account

also received approximately $12.7 billion from Enchanted (owned by Catain, who pleaded guilty

to conspiracy to commit money laundering) and approximately $12.4 billion from Nationwide

(owned by Reynolds, who pleaded guilty to conspiracy to commit money laundering)—funds

that Nationwide and Enchanted had originally received from the SPEs.  The Sabes Family

Defendants also controlled an account at U.S. Bank in the name of PC Funding that received

proceeds of the Ponzi scheme.  This flow of funds illustrates that funds were routed through and

around PC Funding and SPF Funding to give the appearance of legitimate business activity and

that PC Funding and SPF Funding, among other entities, were used as artifices to perpetrate a

massive financial fraud.

228.    Indeed, PC Funding and SPF Funding were never independently or sufficiently

capitalized because PC Funding and SPF Funding conducted no legitimate business operations,

and all funds provided to, or paid on behalf of, PC Funding and SPF Funding were for the sole

purpose of furthering the Ponzi scheme and were ultimately forwarded to PCI for distribution.

---

[33] *In re Petters Co., Inc.*, 506 B.R. at 811.

As PwC testified, "there was little, if any, capitalization in the SPE's," which PwC determined through its forensic review of corporate records.  The amount of funds provided to PC Funding and to SPF Funding to fund the fraudulent investment activities confirms that PC Funding and SPF Funding were never capitalized to operate apart from, or independent of, PCI, and that PC Funding and SPF Funding, in fact, had no existence separate and apart from PCI and the Ponzi scheme, as was well known to Petters and his Associates.

229.   Petters conflated the multiple entities that he used to operate the Ponzi scheme by, among other things, transferring funds interchangeably among the entities, ultimately for the benefit of PCI and to generate the payment of false profits pursuant to the promissory notes to perpetrate and further the Ponzi scheme.

230.   Injustice, fundamental unfairness, and a violation of an established public policy against fraud would occur if PCI, PC Funding, and SPF Funding were allowed to maintain their abuses of the corporate form to promote and perpetrate a fraud on creditors and investors of PCI.

231.   SPF Funding, PC Funding, and PCI should be treated as one entity, for all purposes stated herein and with respect to all causes of action pleaded herein, particularly since funds provided to Petters and PCI were not used for their intended purpose, but were funneled through SPF Funding and PC Funding, among other entities, to further the operation of the massive and fraudulent Ponzi scheme, including by repaying principal and false profits to the Defendants, WestLB, and WestLB NY.

### 2.   The corporate veil between PCI and the SPEs can be pierced on several bases

232.   *Insider Reverse Veil Piercing*.  The Trustee has standing pursuant to 11 U.S.C. § 544(b) and MUFTA under an *insider* reverse veil piercing theory.  The SPEs are merely alter egos of PCI that were used to further Petters' fraudulent Ponzi scheme, and any purported

68

corporate separateness should therefore be disregarded on equitable grounds.  Under these

circumstances, an insider of PCI—or somebody making a claim through that insider—can pierce

the corporate veil to use the entity's claims against third parties.[34]

233.     The Trustee stands in the position of an insider of PCI, and can pierce the

corporate veil between PCI and its wholly owned subsidiary SPEs, including SPF Funding and

PC Funding, in order to recover fraudulent transfers made by the Debtors on behalf of creditors.

The Trustee therefore has standing not only to avoid transfers made by PCI, but to avoid

transfers made from SPF Funding and PC Funding, because for purposes of Section 544(b) and

MUFTA, those entities are not separate from PCI.

234.     ***Outsider Reverse Veil Piercing***.  The SPEs are merely alter egos of PCI that were

used to further Petters' fraudulent Ponzi scheme, and any purported corporate separateness

should therefore be disregarded on equitable grounds.  Under these circumstances, an *outsider*—

generally a creditor—of PCI can seek to recover losses incurred in the Ponzi scheme against PCI,

or if the assets of PCI are inadequate, as against the SPEs.  The "assets" of the SPEs would be

their claims for fraudulent transfers made from SPF Funding and PC Funding to Opportunity

Finance and the other Investor Defendants.

235.     There are numerous predicate creditors with unsecured, allowed or allowable

claims against PCI for which the Trustee may seek recovery.  The Trustee thus also stands in the

position of an *outsider* of PCI, and can pierce the corporate veil between PCI and its wholly

owned SPEs, including SPF Funding and PC Funding, to recover losses on behalf of those

predicate creditors.  The Trustee therefore has standing to avoid not only transfers made from

---

[34] *See* Dkt. # 217 at 10.

PCI, but also transfers made from SPF Funding and PC Funding, because for purposes of Section 544(b) and MUFTA, those entities are not separate from PCI.

236.    *Alter Ego*.  The Trustee also has standing pursuant to 11 U.S.C. § 544(b) and MUFTA under an *alter ego* veil piercing theory.  PCI and the SPEs functioned as a single economic entity that disregarded corporate formalities, commingled funds, and otherwise used the SPEs as mere instrumentalities of PCI.  Furthermore, PCI utilized the SPEs *solely* as instruments to perpetuate the Ponzi scheme, and otherwise to carry out fraud, such that it would be inequitable to observe the purported corporate separateness between PCI and the SPEs if it would prevent recovery by or on behalf of creditors.

237.    There are numerous predicate creditors with unsecured, allowed or allowable claims against PCI for which the Trustee may seek recovery.  Standing in the position of these predicate creditors, the Trustee can pierce the corporate veil between PCI and its wholly owned SPEs, including SPF Funding and PC Funding.  The Trustee therefore has standing to avoid not only transfers made from PCI, but also transfers made from SPF Funding and PC Funding, because for purposes of Section 544(b) and MUFTA, those entities are not separate from PCI.

### C.    Predicate Creditors Have Direct Claims Against the SPEs

238.    The predicate creditors of PCI identified above also have unsecured claims against SPF Funding and PC Funding for aiding and abetting, and conspiring to commit, conversion and fraud.

239.    Under Minnesota law, there are three elements to a claim for aiding and abetting a tort:  (1) the primary tortfeasor commits a tort that injures a plaintiff; (2) the defendant knows that the primary tortfeasor's conduct is a breach of duty; and (3) the defendant substantially assists or encourages the primary tortfeasor in perpetrating the breach.

70

240.    As described above, PCI acted as a primary tortfeasor through fraudulent

misrepresentations and conversion of the predicate creditors' funds.  These acts caused injury to

the predicate creditors because they paid funds to PCI that have not been returned.

241.    SPF Funding and PC Funding were controlled and dominated by Petters, through

PCI, and therefore SPF Funding and PC Funding knew that Petters and PCI were obtaining the

predicate creditors' funds through fraudulent misrepresentations, and then converting those funds

as they flowed through the main churn of the Ponzi scheme.

242.    SPF Funding and PC Funding also substantially assisted in, and encouraged the

commission of, these underlying torts, through their participation in the Ponzi scheme and the

channeling of the predicate creditors' funds into and through the Ponzi scheme.  PC Funding and

SPF Funding aided and abetted the misrepresentations and misappropriations by Petters, PCI,

and other Debtors by playing their pre-determined role in the money laundering that formed the

main churn of the Ponzi scheme—including by receiving loan proceeds and channeling them to,

and from, the Vendors.

243.    SPF Funding and PC Funding also conspired to commit the torts of conversion

and fraud against the predicate creditors.  There are five elements to a civil conspiracy claim

under Minnesota law: (1) two or more persons; (2) an object of the conspiracy; (3) a meeting of

the minds on that object or a course of action; (4) one or more unlawful overt acts; and (5)

damages that proximately result from the conspiracy.'"

244.    PCI, SPF Funding, PC Funding, as well as Petters, Coleman, White, Reynolds,

Catain, Nationwide, and Enchanted all acted in concert, knowingly and intentionally, to

accomplish the objective of advancing and perpetrating the Ponzi scheme against the predicate

creditors and numerous others.

71

245.     With this objective collectively in mind, SPF Funding and PC Funding, along with the other Debtors, committed numerous tortious acts—including fraud and conversion—in order to obtain funds from the predicate creditors.

246.     The predicate creditors were thus directly harmed by the underlying tortious acts that PCI, SPF Funding, PC Funding, and others conspired to commit through the substantial losses of funds paid to Petters' entities.

247.     Each of the listed predicate creditors therefore has a claim against SPF Funding and PC Funding for aiding and abetting, and conspiring to commit, fraud and conversion.

*     *     *

248.     The Receiver, and subsequently the Trustee, acted diligently to discover facts constituting the fraud alleged in this Fourth Amended Complaint.  Petters, or Petters and his Associates, fraudulently and intentionally concealed the ongoing fraud in an effort to hinder and delay authorities and other current and prospective investors and other creditors of PCI, SPF Funding, and PC Funding from discovering the fraud.

249.     Any temporal limitations—statutory or otherwise—on the Trustee's ability to bring the causes of action set forth below are tolled by, among other things, Petters' breach of fiduciary duty in failing to disclose the fraud, the actions of Petters, or Petters and his Associates, in fraudulently and intentionally concealing the fraud, and/or the adverse domination of PCI and other debtor entities by Petters, or Petters and his Associates, until the latest date a predicate creditor above discovered facts constituting the nature of the fraudulent activity of Petters' Ponzi scheme or until the appointment of the Receiver.

## CAUSES OF ACTION

## COUNT I – FRAUDULENTLY INCURRED OBLIGATIONS

## [Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A)]

### Against the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, and The Minneapolis Foundation

250.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

251.    The Credit Agreements, Security Agreements, PCI Direct Notes, MGLLC Notes, SPF Funding Notes, PC Funding Notes, and any other promissory notes from any of the Debtors to one or more of the Defendants or MGLLC (collectively, the "Fraudulent Obligations") are obligations that were incurred by PCI, PC Funding, and SPF Funding with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the Fraudulent Obligations.

252.    Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the

73

same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's

own funds, and not from the proceeds of any sales of consumer electronics.

253.    The Fraudulent Obligations were made to or for the benefit of the Opportunity

Finance Defendants, Sabes Family Foundation, DZ Bank, and The Minneapolis Foundation in

furtherance of a fraudulent investment scheme.

254.    In this manner, the Ponzi scheme was conducted through the successive

misdirection of investors' cash infusions toward the payment of earlier investments.  All the

funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and

laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi

scheme.

255.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 548(a)(1)(A): (a) avoiding the Fraudulent Obligations free and clear from

any claimed interest of the Opportunity Finance Defendants, Sabes Family Foundation, DZ

Bank, and The Minneapolis Foundation; and (b) directing that the Fraudulent Obligations be set

aside.

## COUNT II – FRAUDULENTLY INCURRED OBLIGATIONS

**[Actual Fraud - 11 U.S.C. §§ 544(a) and 544(b) and Minn. Stat. §§ 513.44(a)(1) and 513.47
or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, and
The Minneapolis Foundation**

256.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

257.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

258.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases; and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

259.    The Fraudulent Obligations are avoidable under applicable non-bankruptcy law

by a creditor holding an unsecured claim.

260.    The Fraudulent Obligations were made to or for the benefit of the Opportunity

Finance Defendants, Sabes Family Foundation, DZ Bank, and The Minneapolis Foundation in

furtherance of a fraudulent investment scheme.

261.    The Fraudulent Obligations were incurred with actual intent to hinder, delay, or

defraud creditors to which the Debtors were or became indebted on or after the date of the

Fraudulent Obligations.  Petters, through PCI and the SPEs, obtained funds from investors on the

basis of fraudulent misrepresentations that those funds would be used to finance the purchase of

consumer electronics.  Those funds were not used to purchase electronics, but rather to repay

fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's

main bank account during the Ponzi scheme, PwC found that only a miniscule amount could

have related to legitimate purchases or sales of consumer electronics, and the Associates,

including those who operated the purported Vendors, stated that the Vendors engaged in

essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not

every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained

through intentional, fraudulent misrepresentation, and every or nearly every investor was paid

with funds obtained from other investors—who themselves had previously been induced by the

same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's

own funds, and not from the proceeds of any sales of consumer electronics.

262.    In this manner, the Ponzi scheme was conducted through the successive

misdirection of investors' cash infusions toward the payment of earlier investments.  All the

funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and

laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi

scheme.

263.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a) and 544(b) and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states: (a) avoiding the Fraudulent Obligations free and clear from

any claimed interest of the Opportunity Finance Defendants, Sabes Family Foundation, DZ

Bank, and The Minneapolis Foundation; and (b) directing that the Fraudulent Obligations be set

aside.

## COUNT III – ACTUAL FRAUDULENT TRANSFERS

### [Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551]

**Against the Opportunity Finance Defendants and DZ Bank for avoidance and recovery of the PC Funding Two-Year Transfers**

264.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

265.    The PC Funding Two-Year Transfers, which specifically include but are not limited to the Buy Out Transfers that Opportunity Finance received following its abrupt cessation of investment activity in December 2007, were made with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the Fraudulent Transfers.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.

266.     In this manner, the Ponzi scheme was conducted through the successive

misdirection of investors' cash infusions toward the payment of earlier investments.  All the

funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and

laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi

scheme.

267.     The PC Funding Two-Year Transfers were made to or for the benefit of the

Opportunity Finance Defendants and DZ Bank, in furtherance of a fraudulent investment

scheme.

268.     To the extent that the Opportunity Finance Defendants and DZ Bank are not

initial transferees of the PC Funding Two-Year Transfers, they are immediate or mediate

transferees of the initial transferees of the PC Funding Two-Year Transfers, and cannot satisfy

their burden that they took the PC Funding Two-Year Transfers for value and in good faith and

without knowledge of the voidability of the PC Funding Two-Year Transfers.  The numerous red

flags and/or indications of Defendants' actual or constructive knowledge of the scheme include

but are not limited to the facts set forth in Section III.B.

269.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 548(a)(1)(A), 550(a), and 551: (a) avoiding and preserving the PC Funding

Two-Year Transfers free and clear from any claimed interest of the Opportunity Finance

Defendants and/or DZ Bank; (b) directing that the PC Funding Two-Year Transfers be set aside;

(c) recovering such PC Funding Two-Year Transfers in an amount not less than $711,141,132

from the Opportunity Finance Defendants and DZ Bank, for the benefit of the estates of PCI and

PC Funding; (d) alternatively, recovering false profits in an amount not less than $90,488,713;

(e) alternatively, recovering the Buy Out Transfers from the Opportunity Finance Defendants in

an amount not less than $155,357,376; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants and DZ Bank.

## COUNT IV – CONSTRUCTIVE FRAUDULENT TRANSFERS

### [Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551]

**Against the Opportunity Finance Defendants and DZ Bank for avoidance and recovery of the PC Funding Two-Year Transfers**

270.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

271.     At all times material hereto, PC Funding: (a) was insolvent on the dates the PC Funding Two-Year Transfers were made or became insolvent as a result of the PC Funding Two-Year Transfers; and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with the Debtors after the PC Funding Two-Year Transfers were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the PC Funding Two-Year Transfers, intended to incur, or believed it would incur, debts that would be beyond its ability to pay as the debts matured.

272.     Virtually all, if not all, of the funds that passed through PC Funding were funds originally obtained through fraud, and thus PC Funding operated solely with funds it should never have possessed.  Any debts at all incurred by PC Funding—including promissory notes issued to Defendants—therefore rendered PC Funding insolvent, undercapitalized, and unable to pay debts as they came due.  PC Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first PC Funding Two-Year Transfer, and remained insolvent as of the date of each and every subsequent PC Funding Two-Year Transfer.

273.    Furthermore, none of the SPEs, including PC Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including PC Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

274.    PC Funding received less than reasonably equivalent value in exchange for the PC Funding Two-Year Transfers.  Each PC Funding Two-Year Transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an investor was made for less than reasonably equivalent value, because any such payment was the

80

consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase the identified goods, but rather to repay other investors.

275.     To the extent that the Opportunity Finance Defendants and DZ Bank are not initial transferees of the PC Funding Two-Year Transfers, they are immediate or mediate transferees of the initial transferees of the PC Funding Two-Year Transfers, and cannot satisfy their burden that they took the PC Funding Two-Year Transfers for value and in good faith and without knowledge of the voidability of the PC Funding Two-Year Transfers.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme, include but are not limited to the facts set forth in Section III.B.

276.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a) and 551: (a) avoiding and preserving the PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity Finance Defendants and DZ Bank; (b) directing that the PC Funding Two-Year Transfers be set aside; (c) recovering such PC Funding Two-Year Transfers in an amount not less than $711,141,132 from the Opportunity Finance Defendants and DZ Bank, for the benefit of the estate of PC Funding; (d) alternatively, recovering false profits in an amount not less than $90,488,713; (e) alternatively, recovering the Buy Out Transfers from the Opportunity Finance Defendants in an amount not less than $155,357,376; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants and DZ Bank.

## COUNT V – ACTUAL FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat.
§§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendants, for avoidance and recovery, as initial transferees of the
PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the
PCI MGLLC Transfers and PCI SPE Transfers**

277.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

278.    At all times material hereto, there was and is at least one or more creditors, as specifically identified in Section IV, who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to assert the claims herein because he may avoid any transfer of property of a debtor or any obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor that extended credit to the debtor at the time of the Petition Date, whether or not such creditor exists.

279.    At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

280.    The PCI Direct Transfers, PCI MGLLC Transfers, PC Funding Transfers, and all

transfers from PCI to SPF Funding and PC Funding[35] (the "PCI SPE Transfers") are avoidable

under applicable non-bankruptcy law by a creditor holding an unsecured claim.

281.    The PCI Direct Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and the PC

Funding Transfers were made with actual intent to hinder, delay, or defraud a creditor to which

the Debtors were or became indebted on or after the date of the PC Funding Transfers.  Petters,

through PCI and the SPEs, obtained funds from investors on the basis of fraudulent

misrepresentations that those funds would be used to finance the purchase of consumer

electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent

obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank

account during the Ponzi scheme, PwC found that only a miniscule amount could have related to

legitimate purchases or sales of consumer electronics, and the Associates, including those who

operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate

transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into

the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional,

fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained

from other investors—who themselves had previously been induced by the same intentional,

fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and

not from the proceeds of any sales of consumer electronics.

282.    In this manner, the Ponzi scheme was conducted through the successive

misdirection of investors' cash infusions toward the payment of earlier investments.  All the

funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and

---

[35] PCI and the SPEs have stipulated that transfers from PCI to the SPEs are avoidable.

laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi scheme.

283.    The PCI Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and PC Funding Transfers were made to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

284.    To the extent that the Defendants are not initial transferees of the PCI Direct Transfers or the PC Funding Transfers, they are immediate or mediate transferees of the initial transferees of the PCI Direct Transfers or the PC Funding Transfers (including, for instance, DZ Bank, whose loans to the Opportunity Finance Defendants were paid back using funds the Opportunity Finance Defendants received from the SPEs).  Defendants are also direct transferees of MGLLC, and thus subsequent transferees of any funds transferred in the PCI MGLLC Transfers.  And Defendants are direct transferees of PC Funding and SPF Funding, and thus subsequent transferees of any funds transferred in the PCI SPE Transfers.

285.    Defendants cannot satisfy their burden to show that they took any such subsequent transfers for value or in good faith.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme include but are not limited to the facts set forth in Section III.B.

286.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a) and 551 and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC

Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to

Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to

Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI,

subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729;

(f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an

amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from

PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively,

recovering false profits received by Defendants (1) of not less than $70,823,828 as direct

transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of

PC Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI

MGLLC Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE

Transfers; (i) alternatively, recovering the Buy Out Transfers in an amount not less than

$155,357,376 from the Opportunity Finance Defendants; and (j) recovering prejudgment and

post-judgment interest, attorneys' fees, and costs from Defendants.

## COUNT VI – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat.
§§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendants, for avoidance and recovery, as initial transferees of the
PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the
PCI MGLLC Transfers and PCI SPE Transfers**

287.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

288.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

85

allowable only under Bankruptcy Code § 502(e). Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

289.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

290.    The PCI Direct Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and PC

Funding Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an

unsecured claim.

291.    At all times material hereto, PCI and PC Funding: (a) were insolvent on the dates

the transfers at issue were made or became insolvent as a result of the transfers; and/or (b) were

engaged in businesses or transactions, or were about to engage in businesses or transactions, for

which the property remaining with the Debtors after the transfers were effectuated constituted

unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for

PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or

86

(c) at the time of the transfers intended to incur, or believed that they would incur, debts that

would be beyond their ability to pay as the debts matured.

292.    Petters, through PCI and the SPEs, obtained funds from investors on the basis of

fraudulent misrepresentations that those funds would be used to finance the purchase of

consumer electronics.  Those funds were not used to purchase electronics, but rather to repay

fraudulent obligations incurred to other investors.  They were therefore funds that PCI never

should have possessed.  Any debts at all incurred by PCI—including promissory notes issued to

Defendants—thus rendered PCI insolvent, undercapitalized, and unable to pay debts as they

came due.  PCI was therefore insolvent no later than the first time it incurred any debt to an

investor in the Ponzi scheme—before the date of the first PCI Direct Transfer and first PCI

MGLLC Transfer—and remained insolvent as of the date of each and every subsequent PCI

Direct Transfer or PCI MGLLC Transfer.

293.    To the extent that PCI received funds from Petters-related entities that were not

part of the main churn of the Ponzi scheme ("Additional Petters Entities"), PCI incurred debts to

those Additional Petters Entities, and therefore such transfers did not, and could not, render PCI

solvent.  To the contrary, to the extent PCI was obligated to repay those transfers to the

Additional Petters Entities with interest, such transfers served to deepen PCI's insolvency.  In all

events, because PCI transferred to the Additional Petters Entities more funds than it received

from them, transactions with the Additional Petters Entities in fact served to deepen PCI's

insolvency, rather than to provide funds sufficient to pay PCI's obligations, including satisfaction

of the purported loans from investors.

294.    Virtually all, if not all, of the funds that passed through PC Funding were likewise

obtained through fraud, and thus PC Funding also operated solely with funds it should never

have possessed.  Any debts at all incurred by PC Funding—including promissory notes issued to

Defendants—therefore rendered PC Funding insolvent, undercapitalized, and unable to pay debts

as they came due.  PC Funding was insolvent no later than the first time it incurred any debt,

which was before the date of the first PC Funding Transfer, and remained insolvent as of the date

of each and every subsequent PC Funding Transfer.

295.    Furthermore, none of the SPEs, including PC Funding, was able to pay even basic

expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI

and certain Defendants, for funds.  The SPEs, including PC Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

296.    PCI and PC Funding received less than reasonably equivalent value in exchange

for each and every PCI Direct Transfer, PCI MGLLC Transfer, PCI SPE Transfer, and PC

Funding Transfer.  Each such transfer consisted of misappropriated funds obtained not through

legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and

the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those

funds would be used to finance the purchase of consumer electronics.  Those funds were not

used to purchase electronics, but rather to repay fraudulent obligations incurred to other

investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi

scheme, PwC found that only a miniscule amount could have related to legitimate purchases or

sales of consumer electronics, and the Associates, including those who operated the purported

Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the

Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going

back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation,

88

and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an investor was made for less than reasonably equivalent value, because any such payment was the consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase the identified goods, but rather to repay other investors.

297.    The PCI Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and the PC Funding Transfers were made to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

298.    To the extent that the Defendants are not initial transferees of PCI Direct Transfers or the PC Funding Transfers, they are immediate or mediate transferees of the initial transferees of the PCI Direct Transfers or the PC Funding Transfers (including, for instance, DZ Bank, whose loans to the Opportunity Finance Defendants were paid back using funds the Opportunity Finance Defendants received from the SPEs).  Defendants are also direct transferees of MGLLC, and thus subsequent transferees of any funds transferred in the PCI MGLLC Transfers.  And Defendants are direct transferees of PC Funding and SPF Funding, and thus subsequent transferees of the PCI SPE Transfers.

299.    Defendants cannot satisfy their burden to show that they took any such subsequent transfers for value or in good faith.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme include but are not limited to the facts set forth in Section III.B.

89

300.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a) and 551 and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from Defendants.

## COUNT VII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat.
§§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendants, for avoidance and recovery, as initial transferees of the
PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the
PCI MGLLC Transfers and PCI SPE Transfers**

301.    The Trustee realleges and incorporates by reference the preceding paragraphs of
the Fourth Amended Complaint as if fully set forth herein.

302.    At all times material hereto, there was and is at least one or more creditors, as
specifically identified in Section IV, who held and who hold unsecured claims against the
Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not
allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to
assert the claims herein because he may avoid any transfer of property of a debtor or any
obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor
that extended credit to the debtor at the time of the Petition Date, whether or not such creditor
exists.

303.    At all times material hereto, there was and is at least one or more creditors who
held and who hold allowed and allowable claims, as identified in Section IV; (a) whose claims
against the Defendants did not arise, exist or accrue at any time until within the six years before
the first date on which a bankruptcy petition was filed by any debtor in the above-captioned
bankruptcy cases; and (b) who neither had actual knowledge nor discovered facts constituting
deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six
years before the first date on which a bankruptcy petition was filed by any Debtor in the above-
captioned bankruptcy cases.

91

304.    The PCI Direct Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and PC

Funding Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an

unsecured claim.

305.    At all times material hereto, PCI and PC Funding: (a) were insolvent on the dates

the transfers at issue were made or became insolvent as a result of the transfers; and/or (b) were

engaged in businesses or transactions, or were about to engage in businesses or transactions, for

which the property remaining with the Debtors after the transfers were effectuated constituted

unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for

PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or

(c) at the time of the transfers intended to incur, or believed that they would incur, debts that

would be beyond their ability to pay as the debts matured.

306.    Petters, through PCI and the SPEs, obtained funds from investors on the basis of

fraudulent misrepresentations that those funds would be used to finance the purchase of

consumer electronics.  Those funds were not used to purchase electronics, but rather to repay

fraudulent obligations incurred to other investors.  They were therefore funds that PCI never

should have possessed.  Any debts at all incurred by PCI—including promissory notes issued to

Defendants—thus rendered PCI insolvent, undercapitalized, and unable to pay debts as they

came due.  PCI was therefore insolvent no later than the first time it incurred any debt to an

investor in the Ponzi scheme—which was before the date of the first PCI Direct Transfer and

first PCI MGLLC Transfer—and remained insolvent as of the date of each and every subsequent

PCI Direct Transfer or PCI MGLLC Transfer.

307.    To the extent that PCI received funds from Additional Petters Entities, PCI

incurred debts to those Additional Petters Entities, and therefore such transfers did not, and could

92

not, render PCI solvent.  To the contrary, to the extent PCI was obligated to repay those transfers

to the Additional Petters Entities with interest, such transfers served to deepen PCI's

insolvency.  In all events, because PCI transferred to the Additional Petters Entities more funds

than it received from them, transactions with the Additional Petters Entities in fact served to

deepen PCI's insolvency, rather than to provide funds sufficient to pay PCI's obligations,

including satisfaction of the purported loans from investors.

308.     Virtually all, if not all, of the funds that passed through PC Funding were likewise

obtained through fraud, and thus PC Funding also operated solely with funds it should never

have possessed.  Any debts at all incurred by PC Funding—including promissory notes issued to

Defendants—therefore rendered PC Funding insolvent, undercapitalized, and unable to pay debts

as they came due.  PC Funding was insolvent no later than the first time it incurred any debt,

which was before the date of the first PC Funding Transfer, and remained insolvent as of the date

of each and every subsequent PC Funding Transfer.

309.     Furthermore, none of the SPEs, including PC Funding, was able to pay even basic

expenses—such as legal fees or corporate filing fees—and depended for funds upon others

including PCI and certain Defendants.  The SPEs, including PC Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

310.     PCI and PC Funding received less than reasonably equivalent value in exchange

for each and every PCI Direct Transfer, PCI MGLLC Transfer, PCI SPE Transfer, and PC

Funding Transfer.  Each such transfer consisted of misappropriated funds obtained not through

legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and

the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those

funds would be used to finance the purchase of consumer electronics. Those funds were not

used to purchase electronics, but rather to repay fraudulent obligations incurred to other

investors. Of the $82 *billion* that passed through PCI's main bank account during the Ponzi

scheme, PwC found that only a miniscule amount could have related to legitimate purchases or

sales of consumer electronics, and the Associates, including those who operated the purported

Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the

Ponzi scheme. Thus, virtually every, if not every, "investment" into the Ponzi scheme, going

back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation,

and every or nearly every investor was paid with funds obtained from other investors—who

themselves had previously been induced by the same intentional, fraudulent misrepresentations

to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any

sales of consumer electronics. Each payment to an investor was made for less than reasonably

equivalent value, because any such payment was the consummation of the two-stage use of

fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase

the identified goods, but rather to repay other investors.

311.   The PCI Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and PC Funding

Transfers were made to or for the benefit of the Defendants in furtherance of a fraudulent

investment scheme.

312.   To the extent that the Defendants are not initial transferees of the PCI Direct

Transfers or the PC Funding Transfers, they are immediate or mediate transferees of the initial

transferees of the PCI Direct Transfers or the PC Funding Transfers (including, for instance, DZ

Bank, whose loans to the Opportunity Finance Defendants were paid back using funds the

Opportunity Finance Defendants received from the SPEs). Defendants are also direct transferees

of MGLLC, and thus subsequent transferees of any funds transferred in the PCI MGLLC

Transfers.  And Defendants are direct transferees of PC Funding and SPF Funding, and thus

subsequent transferees of the PCI SPE Transfers.

313.    Defendants cannot satisfy their burden to show that they took any such

subsequent transfers for value or in good faith.  The numerous red flags and/or indications of

Defendants' actual or constructive knowledge of the scheme include but are not limited to the

facts set forth in Section III.B.

314.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a) and 551 and Minn. Stat. §§ 513.44(a)(2)(ii) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the PCI Direct

Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any

claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC

Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to

Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to

Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI,

subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729;

(f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an

amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from

PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively,

recovering false profits received by Defendants (1) of not less than $70,823,828 as direct

transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of PC

Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI MGLLC

Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE Transfers;

(i) alternatively, recovering the Buy Out Transfers in an amount not less than $155,357,376 from

the Opportunity Finance Defendants; and (j) recovering prejudgment and post-judgment interest,

attorneys' fees, and costs from Defendants.

## COUNT VIII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a) and 551, and Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendants, for avoidance and recovery, as initial transferees of the PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the PCI MGLLC Transfers and PCI SPE Transfers**

315.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

316.    At all times material hereto, there was and is at least one or more creditors, as specifically identified in Section IV, who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

317.    At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV; (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases; and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

318.    The PCI Direct Transfers, PCI MGLLC Transfers, PC Funding Transfers, and PCI SPE Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

319.    At all times material hereto, PCI and PC Funding: (a) were insolvent on the dates the transfers at issue were made or became insolvent as a result of the transfers; and/or (b) were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the transfers were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the transfers intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

320.    Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  They were therefore funds that PCI never should have possessed.  Any debts at all incurred by PCI—including promissory notes issued to Defendants—thus rendered PCI insolvent, undercapitalized, and unable to pay debts as they came due.  PCI was therefore insolvent no later than the first time it incurred any debt to an investor in the Ponzi scheme—which was before the date of the first PCI Direct Transfer and first PCI MGLLC Transfer—and remained insolvent as of the date of each and every subsequent PCI Direct Transfer or PCI MGLLC Transfer.

321.    To the extent that PCI received funds from Additional Petters Entities, PCI incurred debts to those Additional Petters Entities, and therefore such transfers did not, and could

97

not, render PCI solvent.  To the contrary, to the extent PCI was obligated to repay those transfers

to the Additional Petters Entities with interest, such transfers served to deepen PCI's

insolvency.  In all events, because PCI transferred to the Additional Petters Entities more funds

than it received from them, transactions with the Additional Petters Entities in fact served to

deepen PCI's insolvency, rather than to provide funds sufficient to pay PCI's obligations,

including satisfaction of the purported loans from investors.

322.    Virtually all, if not all, of the funds that passed through PC Funding were likewise

obtained through fraud, and thus PC Funding also operated solely with funds it should never

have possessed.  Any debts at all incurred by PC Funding—including promissory notes issued to

Defendants—therefore rendered PC Funding insolvent, undercapitalized, and unable to pay debts

as they came due.  PC Funding was insolvent no later than the first time it incurred any debt,

which was before the date of the first PC Funding Transfer, and remained insolvent as of the date

of each and every subsequent PC Funding Transfer.

323.    Furthermore, none of the SPEs, including PC Funding, was able to pay even basic

expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI

and certain Defendants, for funds.  The SPEs, including PC Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

324.    PCI and PC Funding received less than reasonably equivalent value in exchange

for each and every PCI Direct Transfer, PCI MGLLC Transfer, PCI SPE Transfer, and PC

Funding Transfer.  Each such transfer consisted of misappropriated funds obtained not through

legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and

the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those

98

funds would be used to finance the purchase of consumer electronics.  Those funds were not

used to purchase electronics, but rather to repay fraudulent obligations incurred to other

investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi

scheme, PwC found that only a miniscule amount could have related to legitimate purchases or

sales of consumer electronics, and the Associates, including those who operated the purported

Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the

Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going

back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation,

and every or nearly every investor was paid with funds obtained from other investors—who

themselves had previously been induced by the same intentional, fraudulent misrepresentations

to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any

sales of consumer electronics.  Each payment to an investor was made for less than reasonably

equivalent value, because any such payment was the consummation of the two-stage use of

fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase

the identified goods, but rather to repay other investors.

325.    The PCI Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and PC Funding

Transfers were made to or for the benefit of the Defendants in furtherance of a fraudulent

investment scheme.

326.    To the extent that the Defendants are not initial transferees of the PCI Direct

Transfers or the PC Funding Transfers, they are immediate or mediate transferees of the initial

transferees of the PCI Direct Transfers or the PC Funding Transfers (including, for instance, DZ

Bank, whose loans to the Opportunity Finance Defendants were paid back using funds the

Opportunity Finance Defendants received from the SPEs).  Defendants are also direct transferees

of MGLLC, and thus subsequent transferees of any funds transferred in the PCI MGLLC

Transfers.  And Defendants are direct transferees of PC Funding and SPF Funding, and thus

subsequent transferees of the PCI SPE Transfers.

327.    Defendants cannot satisfy their burden to show that they took any such

subsequent transfers for value or in good faith.  The numerous red flags and/or indications of

Defendants' actual or constructive knowledge of the scheme include but are not limited to the

facts set forth in Section III.B.

328.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b), 550(a), and 551 and Minn. Stat. §§ 513.45(a) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states: (a) avoiding and preserving the PCI Direct Transfers, PCI

MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest of the

Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the PC

Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an amount

not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an amount not

less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from MGLLC to

Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI, subsequent

transfers from SPF Funding to Defendants in an amount not less than $287,674,849;

(g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an

amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by

Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of

not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than

$14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than

$143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the

Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance

Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and

costs from Defendants.

## COUNT IX – PREFERENTIAL TRANSFERS

### [11 U.S.C. §§ 547, 550, and 551]

**Against the Opportunity Finance Defendants for avoidance and recovery of
Preference Period Transfers**

329.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

330.    At the time of each of the Preference Period Transfers, to the extent their

promissory notes were enforceable, the Opportunity Finance Defendants were "creditors" of PC

Funding within the meaning of Section 101(1) of the Bankruptcy Code.

331.    Each of the Preference Period Transfers constitutes a transfer of an interest of PC

Funding in property within the meaning of Section 101(54) of the Bankruptcy Code.

332.    Each of the Preference Period Transfers was to or for the benefit of the

Opportunity Finance Defendants.

333.    To the extent the Opportunity Finance Defendants' promissory notes were

enforceable, each of the Preference Period Transfers was made for or on account of an

antecedent debt owed by PC Funding before such transfer was made.

334.    Virtually all, if not all, of the funds that were obtained through fraud, and thus PC

Funding also operated solely with funds it should never have possessed.  Any debts at all

incurred by PC Funding—including promissory notes issued to Defendants—therefore rendered

PC Funding insolvent, undercapitalized, and unable to pay debts as they came due.  PC Funding

was insolvent no later than the first time it incurred any debt, which was before the date of the first Preference Period Transfer, and remained insolvent as of the date of each and every subsequent Preference Period Transfer.

335.    Furthermore, none of the SPEs, including PC Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including PC Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

336.    Each of the Preference Period Transfers was made during the Preference Period under section 547(b)(4) of the Bankruptcy Code.

337.    Each of the Preference Period Transfers enabled the Opportunity Finance Defendants to receive more than the Opportunity Finance Defendants would receive if (i) this case were a case under Chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the Opportunity Finance Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

338.    Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to Section 547(b) of the Bankruptcy Code and recoverable from the Opportunity Finance Defendants pursuant to Section 550(a).

339.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers free and clear from any claimed interest of the Opportunity Finance Defendants; (b) directing that the Preference Period Transfers be set aside; (c) recovering the Preference Period Transfers in an amount not less than $9,238,419 from the Opportunity Finance

102

Defendants for the benefit of the bankruptcy estate of PC Funding; and (d) recovering

prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance

Defendants.

### COUNT X – ACTUAL FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§
513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants for avoidance and recovery of the
SPF Funding/Opportunity Finance Transfers and against DZ Bank for avoidance and
recovery of the SPF Funding/DZ Bank Transfers**

340.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

341.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

342.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

343.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

344.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were made with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme. Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.

104

345.     In this manner, the Ponzi scheme was conducted through the successive
misdirection of investors' cash infusions toward the payment of earlier investments.  All the
funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and
laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi
scheme.

346.     The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank
Transfers were made to or for the benefit of the Opportunity Finance Defendants and DZ Bank in
furtherance of a fraudulent investment scheme.

347.     To the extent that the Opportunity Finance Defendants and DZ Bank are not
initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank
Transfers, they are immediate or mediate transferees of the initial transferees of the SPF
Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, and cannot satisfy
their burden that they took the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ
Bank Transfers for value or in good faith.  The numerous red flags and/or indications of
Defendants' actual or constructive knowledge of the scheme, include but are not limited to the
facts set forth in Section III.B.

348.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to
Bankruptcy Code §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47,
and if the Court should determine that this action is governed by the laws of other states, the
fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF Funding/
Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear from any
claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that the SPF
Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set aside;

(c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less than

$164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy estate

SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not less than

$78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding;

(e) alternatively, recovering false profits in an amount not less than $12,234,156; and

(f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the

Opportunity Finance Defendants.

## COUNT XI – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat.
§§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants for avoidance and recovery of the
SPF Funding/Opportunity Finance Transfers and against DZ Bank for avoidance and
recovery of the SPF Funding/DZ Bank Transfers**

349.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

350.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

351.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

106

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

352.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured

claim.

353.    At all times material hereto, SPF Funding was: (a) insolvent on the dates the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were made or

became insolvent as a result of those transfers; and/or (b) engaged in businesses or transactions,

or was about to engage in businesses or transactions, for which the property remaining with SPF

Funding after the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers were effectuated constituted unreasonably small capital—in fact, records reflect as

little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any

capital contribution for PC Funding; and/or (c) at the time of the SPF Funding/Opportunity

Finance Transfers and SPF Funding/DZ Bank Transfers, intended to incur, or believed that it

would incur, debts that would be beyond its ability to pay as the debts matured.

354.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

any debt—which was before the date of the first SPF Funding/Opportunity Finance Transfer and

first SPF Funding/DZ Bank Transfer—and remained insolvent as of the date of each and every

subsequent SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.

355.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even

basic expenses—such as legal fees or corporate filing fees—but depended upon others, including

PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

356.    SPF Funding received less than reasonably equivalent value in exchange for each

and every SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.

Each such transfer consisted of misappropriated funds obtained not through legitimate

transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs,

obtained funds from investors on the basis of fraudulent misrepresentations that those funds

would be used to finance the purchase of consumer electronics.  Those funds were not used to

purchase electronics, but rather to repay fraudulent obligations incurred to other investors.

Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC

found that only a miniscule amount could have related to legitimate purchases or sales of

consumer electronics, and the Associates, including those who operated the purported Vendors,

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

108

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer

electronics. Each payment to an investor was made for less than reasonably equivalent value,

because any such payment was the consummation of the two-stage use of fraudulent inducement

and fraudulent misappropriation of funds from investors, not to purchase the identified goods,

but rather to repay other investors.

357.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers were made to or for the benefit of the Opportunity Finance Defendants and DZ Bank in

furtherance of a fraudulent investment scheme.

358.    To the extent that the Opportunity Finance Defendants and DZ Bank are not

initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers, they are immediate or mediate transferees of the initial transferees of the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, and cannot satisfy

their burden that they took the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ

Bank Transfers for value or in good faith. The numerous red flags and/or indications of

Defendants' actual or constructive knowledge of the scheme, include but are not limited to the

facts set forth in Section III.B.

359.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear

from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that

the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set

aside; (c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less

than $164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy

estate of SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not

less than $78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding;

(e) alternatively, recovering false profits in an amount not less than $12,234,156; and

(f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the

Opportunity Finance Defendants.

## COUNT XII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat.
§§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants for avoidance and recovery of the
SPF Funding/Opportunity Finance Transfers and against DZ Bank for avoidance and
recovery of the SPF Funding/DZ Bank Transfers**

360.     The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

361.     At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

110

362.     At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

363.     The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

364.     At all times material hereto, SPF Funding was: (a) insolvent on the dates the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were made or became insolvent as a result of those transfers; and/or (b) engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with SPF Funding after the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

365.     Virtually all, if not all, of the funds that passed through SPF Funding were funds originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

any debt—which was before the date of the first SPF Funding/Opportunity Finance Transfer and

first SPF Funding/DZ Bank Transfer—and remained insolvent as of the date of each and every

subsequent SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.

366.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even

basic expenses—such as legal fees or corporate filing fees—but depended upon others, including

PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

367.    SPF Funding received less than reasonably equivalent value in exchange for each

and every SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.

Each such transfer consisted of misappropriated funds obtained not through legitimate

transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs,

obtained funds from investors on the basis of fraudulent misrepresentations that those funds

would be used to finance the purchase of consumer electronics.  Those funds were not used to

purchase electronics, but rather to repay fraudulent obligations incurred to other investors.

Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC

found that only a miniscule amount could have related to legitimate purchases or sales of

consumer electronics, and the Associates, including those who operated the purported Vendors,

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer

electronics.  Each payment to an investor was made for less than reasonably equivalent value,

because any such payment was the consummation of the two-stage use of fraudulent inducement

and fraudulent misappropriation of funds from investors, not to purchase the identified goods,

but rather to repay other investors.

368.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers were made to or for the benefit of the Opportunity Finance Defendants and DZ Bank in

furtherance of a fraudulent investment scheme.

369.    To the extent that the Opportunity Finance Defendants and DZ Bank are not

initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers, they are immediate or mediate transferees of the initial transferees of the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, and cannot satisfy

their burden that they took the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ

Bank Transfers for value or in good faith.  The numerous red flags and/or indications of

Defendants' actual or constructive knowledge of the scheme, include but are not limited to the

facts set forth in Section III.B.

370.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear

from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that

the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set

aside; (c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less

than $164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy

estate of SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not

less than $78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding;

(e) alternatively, recovering false profits in an amount not less than $12,234,156; and

(f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the

Opportunity Finance Defendants.

## COUNT XIII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a) and 551, and Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants for avoidance and recovery of the SPF Funding/Opportunity Finance Transfers and against DZ Bank for avoidance and recovery of the SPF Funding/DZ Bank Transfers**

371.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

372.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).

373.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

374.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured

claim.

375.    At all times material hereto, SPF Funding was: (a) insolvent on the dates the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were made or

became insolvent as a result of those transfers; and/or (b) engaged in businesses or transactions,

or was about to engage in businesses or transactions, for which the property remaining with SPF

Funding after the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers were effectuated constituted unreasonably small capital—in fact, records reflect as

little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any

capital contribution for PC Funding; and/or (c) at the time of the SPF Funding/Opportunity

Finance Transfers and SPF Funding/DZ Bank Transfers, intended to incur, or believed that it

would incur, debts that would be beyond its ability to pay as the debts matured.

376.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

any debt—which was before the date of the first SPF Funding/Opportunity Finance Transfer and first SPF Funding/DZ Bank Transfer—and remained insolvent as of the date of each and every subsequent SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.

377.   Furthermore, none of the SPEs, including SPF Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

378.   SPF Funding received less than reasonably equivalent value in exchange for each and every SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer. Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors. Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds

116

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an investor was made for less than reasonably equivalent value, because any such payment was the consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase the identified goods, but rather to repay other investors.

379.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were made to or for the benefit of the Opportunity Finance Defendants and DZ Bank in furtherance of a fraudulent investment scheme.

380.    To the extent that the Opportunity Finance Defendants and DZ Bank are not initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, they are immediate or mediate transferees of the initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, and cannot satisfy their burden that they took the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers for value or in good faith.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme, include but are not limited to the facts set forth in Section III.B.

381.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set aside;

(c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less than

$164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy estate

of SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not less than

$78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding;

(e) alternatively, recovering false profits in an amount not less than $12,234,156; and

(f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the

Opportunity Finance Defendants.

### COUNT XIV– ACTUAL FRAUDULENT TRANSFERS

### [Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551]

**Against Defendant Sabes Family Foundation for avoidance and recovery of the
Sabes Family Foundation Two-Year Transfers**

382.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

383.    The Sabes Family Foundation Two-Year Transfers from SPF Funding were made

with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became

indebted on or after the date of the Fraudulent Transfers.  Petters, through PCI and the SPEs,

obtained funds from investors on the basis of fraudulent misrepresentations that those funds

would be used to finance the purchase of consumer electronics.  Those funds were not used to

purchase electronics, but rather to repay fraudulent obligations incurred to other investors.

Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC

found that only a miniscule amount could have related to legitimate purchases or sales of

consumer electronics, and the Associates, including those who operated the purported Vendors,

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, every "investment" into the Ponzi scheme, going back to the mid-to-late 1990s,

was obtained through intentional, fraudulent misrepresentation, and every investor was paid with

funds obtained from other investors—who themselves had previously been induced by the same

intentional, fraudulent misrepresentations to provide funds to PCI—and not from the proceeds of

any sales of consumer electronics.

384.    In this manner, the Ponzi scheme was conducted through the successive

misdirection of investors' cash infusions toward the payment of earlier investments.  All the

funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and

laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi

scheme.

385.    The Sabes Family Foundation Two-Year Transfers were made to or for the

benefit of the Sabes Family Foundation in furtherance of a fraudulent investment scheme.

386.    To the extent that the Sabes Family Foundation is not an initial transferee of the

Sabes Family Foundation Two-Year Transfers, it is an immediate or mediate transferee of the

initial transferees of the Sabes Family Foundation Two-Year Transfers, and cannot satisfy its

burden that it took the Sabes Family Foundation Two-Year Transfers for value and in good faith

and without knowledge of the voidability of the Sabes Family Foundation Two-Year Transfers.

The numerous red flags and/or indications of Defendants' actual or constructive knowledge of

the scheme, include but are not limited to the facts set forth in Section III.B.

387.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 548(a)(1)(A), 550(a), and 551: (a) avoiding and preserving the Sabes

Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes

Family Foundation; (b) directing that the Sabes Family Foundation Two-Year Transfers be set

aside; (c) recovering such Sabes Family Foundation Two-Year Transfers in an amount not less

119

than $12,469,571 from the Sabes Family Foundation for the benefit of the estate of SPF Funding;

(d) alternatively, recovering false profits in an amount not less than $12,469,571; and (e)

recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes

Family Foundation.

## COUNT XV – CONSTRUCTIVE FRAUDULENT TRANSFERS

## [Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551]

### Against Defendant Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Two-Year Transfers

388.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

389.    At all times material hereto, SPF Funding was: (a) insolvent on the dates the

Sabes Family Foundation Two-Year Transfers were made or became insolvent as a result of the

Sabes Family Foundation Two-Year Transfers; and/or (b) engaged in businesses or transactions,

or was about to engage in businesses or transactions, for which the property remaining with SPF

Funding after the Sabes Family Foundation Two-Year Transfers were effectuated constituted

unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for

PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or

(c) at the time of the Sabes Family Foundation Two-Year Transfers, intended to incur, or

believed it would incur, debts that would be beyond its ability to pay as the debts matured.

390.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

120

any debt, which was before the date of the first Sabes Family Foundation Two-Year Transfer, and remained insolvent as of the date of each and every subsequent Sabes Family Foundation Two-Year Transfer.

391.   Furthermore, none of the SPEs, including SPF Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital, and/or unable to pay their debts as they came due.

392.   SPF Funding received less than reasonably equivalent value in exchange for each and every Sabes Family Foundation Two-Year Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's

own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an

investor was made for less than reasonably equivalent value, because any such payment was the

consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of

funds from investors, not to purchase the identified goods, but rather to repay other investors.

393.    To the extent that the Sabes Family Foundation is not an initial transferee of the

Sabes Family Foundation Two-Year Transfers, it is an immediate or mediate transferee of the

initial transferees of the Sabes Family Foundation Two-Year Transfers, and cannot satisfy its

burden that it took the Sabes Family Foundation Two-Year Transfers for value and in good faith

and without knowledge of the voidability of the Sabes Family Foundation Two-Year Transfers.

The numerous red flags and/or indications of Defendants' actual or constructive knowledge of

the scheme, include but are not limited to the facts set forth in Section III.B.

394.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 548(a)(1)(B), 550(a), and 551: (a) avoiding and preserving the Sabes

Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes

Family Foundation; (b) directing that the Sabes Family Foundation Two-Year Transfers be set

aside; (c) recovering such Sabes Family Foundation Two-Year Transfers in the amount of

$12,469,571 from the Sabes Family Foundation for the benefit of the estate of SPF Funding;

(d) alternatively, recovering false profits in the amount of $12,469,571; and (e) recovering

prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family

Foundation.

## COUNT XVI – ACTUAL FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers**

395.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

396.    At all times material hereto, there was and is at least one or more creditors, as specifically identified in Section IV, who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to assert the claims herein because he may avoid any transfer of property of a debtor or any obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor that extended credit to the debtor at the time of the Petition Date, whether or not such creditor exists.

397.    At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

398.    The Sabes Family Foundation Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

123

399.    The Sabes Family Foundation Transfers were made with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the Sabes Family Foundation Transfers.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.

400.    In this manner, the Ponzi scheme was conducted through the successive misdirection of investors' cash infusions toward the payment of earlier investments.  All the funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi scheme.

401.    The Sabes Family Foundation Transfers were made to or for the benefit of the Sabes Family Foundation in furtherance of a fraudulent investment scheme.

402.    To the extent that the Sabes Family Foundation is not an initial transferee of the

Sabes Family Foundation Transfers, it is an immediate or mediate transferee of the initial

transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took

the Sabes Family Foundation Transfers for value or in good faith.  The numerous red flags

and/or indications of Defendants' actual or constructive knowledge of the scheme, include but

are not limited to the facts set forth in Section III.B.

403.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the Sabes Family

Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation;

(b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes

Family Foundation Transfers in an amount not less than $29,495,341 from the Sabes Family

Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering

false profits in an amount not less than $29,495,341; and (e) recovering prejudgment and post-

judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

### COUNT XVII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat.
§§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant Sabes Family Foundation for avoidance and recovery of the
Sabes Family Foundation Transfers**

404.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

405.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

406.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

407.    The Sabes Family Foundation Transfers are avoidable under applicable non-

bankruptcy law by a creditor holding an unsecured claim.

408.    At all times material hereto, SPF Funding: (a) was insolvent on the dates the

Sabes Family Foundation Transfers were made or became insolvent as a result of the Sabes

Family Foundation Transfers; and/or (b) was engaged in businesses or transactions, or was about

to engage in businesses or transactions, for which the property remaining with the Debtors after

the Sabes Family Foundation Transfers were effectuated constituted unreasonably small

capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF

Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of

126

the Sabes Family Foundation Transfers, intended to incur, or believed that it would incur, debts

that would be beyond its ability to pay as the debts matured.

409.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

any debt, which was before the date of the first Sabes Family Foundation Transfer, and remained

insolvent as of the date of each and every subsequent Sabes Family Foundation Transfer.

410.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even

basic expenses—such as legal fees or corporate filing fees—but depended upon others, including

PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

411.    SPF Funding received less than reasonably equivalent value in exchange for each

and every Sabes Family Foundation Transfer.  Each such transfer consisted of misappropriated

funds obtained not through legitimate transactions, but through fraudulent inducement of

investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of

fraudulent misrepresentations that those funds would be used to finance the purchase of

consumer electronics.  Those funds were not used to purchase electronics, but rather to repay

fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's

main bank account during the Ponzi scheme, PwC found that only a miniscule amount could

have related to legitimate purchases or sales of consumer electronics, and the Associates,

including those who operated the purported Vendors, stated that the Vendors engaged in

essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not

every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained

through intentional, fraudulent misrepresentation, and every or nearly every investor was paid

with funds obtained from other investors—who themselves had previously been induced by the

same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's

own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an

investor was made for less than reasonably equivalent value, because any such payment was the

consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of

funds from investors, not to purchase the identified goods, but rather to repay other investors.

412.    The Sabes Family Foundation Transfers were made to or for the benefit of the

Sabes Family Foundation in furtherance of a fraudulent investment scheme.

413.    To the extent that the Sabes Family Foundation is not an initial transferee of the

Sabes Family Foundation Transfers, it is an immediate or mediate transferee of the initial

transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took

the Sabes Family Foundation Transfers for value or in good faith.  The numerous red flags

and/or indications of Defendants' actual or constructive knowledge of the scheme, include but

are not limited to the facts set forth in Section III.B.

414.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the Sabes Family

Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation;

(b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes

Family Foundation Transfers in the amount of at least $29,495,341 from the Sabes Family

Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering

false profits in the amount of at least $29,495,341; and (e) recovering prejudgment and post-

judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

## COUNT XVIII – CONSTRUCTIVE FRAUDULENT TRANSFERS

### [Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]

### Against Defendant Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers

415.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

416.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

417.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

129

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

418.    The Sabes Family Foundation Transfers are avoidable under applicable non-

bankruptcy law by a creditor holding an unsecured claim.

419.    At all times material hereto, SPF Funding: (a) was insolvent on the dates the

Sabes Family Foundation Transfers were made or became insolvent as a result of the Sabes

Family Foundation Transfers; and/or (b) was engaged in businesses or transactions, or was about

to engage in businesses or transactions, for which the property remaining with the Debtors after

the Sabes Family Foundation Transfers were effectuated constituted unreasonably small

capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF

Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of

the Sabes Family Foundation Transfers, intended to incur, or believed that it would incur, debts

that would be beyond its ability to pay as the debts matured.

420.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

any debt, which was before the date of the first Sabes Family Foundation Transfer, and remained

insolvent as of the date of each and every subsequent Sabes Family Foundation Transfer.

421.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even

basic expenses—such as legal fees or corporate filing fees—but depended upon others, including

PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

422.    SPF Funding received less than reasonably equivalent value in exchange for each

and every Sabes Family Foundation Transfer.  Each such transfer consisted of misappropriated

funds obtained not through legitimate transactions, but through fraudulent inducement of

investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of

fraudulent misrepresentations that those funds would be used to finance the purchase of

consumer electronics.  Those funds were not used to purchase electronics, but rather to repay

fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's

main bank account during the Ponzi scheme, PwC found that only a miniscule amount could

have related to legitimate purchases or sales of consumer electronics, and the Associates,

including those who operated the purported Vendors, stated that the Vendors engaged in

essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not

every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained

through intentional, fraudulent misrepresentation, and every or nearly every investor was paid

with funds obtained from other investors—who themselves had previously been induced by the

same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's

own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an

investor was made for less than reasonably equivalent value, because any such payment was the

consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of

funds from investors, not to purchase the identified goods, but rather to repay other investors.

131

423.    The Sabes Family Foundation Transfers were made to or for the benefit of the Sabes Family Foundation in furtherance of a fraudulent investment scheme.

424.    To the extent that the Sabes Family Foundation is not an initial transferee of the Sabes Family Foundation Transfers, it is an immediate or mediate transferee of the initial transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took the Sabes Family Foundation Transfers for value or in good faith.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme, include but are not limited to the facts set forth in Section III.B.

425.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes Family Foundation Transfers in the amount of at least $29,495,341 from the Sabes Family Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering false profits in the amount of at least $29,495,341; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

## COUNT XIX – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a) and 551, and Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers**

426.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

427.    At all times material hereto, there was and is at least one or more creditors, as specifically identified in Section IV, who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

428.    At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

429.    The Sabes Family Foundation Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

430.    At all times material hereto, SPF Funding: (a) was insolvent on the dates the Sabes Family Foundation Transfers were made or became insolvent as a result of the Sabes Family Foundation Transfers; and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with the Debtors after the Sabes Family Foundation Transfers were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the Sabes Family Foundation Transfers, intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

133

431.    Virtually all, if not all, of the funds that passed through SPF Funding were funds originally obtained through fraud, and thus SPF Funding operated solely with funds it should never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first Sabes Family Foundation Transfer, and remained insolvent as of the date of each and every subsequent Sabes Family Foundation Transfer.

432.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

433.    SPF Funding received less than reasonably equivalent value in exchange for each and every Sabes Family Foundation Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not

134

every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained

through intentional, fraudulent misrepresentation, and every or nearly every investor was paid

with funds obtained from other investors—who themselves had previously been induced by the

same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's

own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an

investor was made for less than reasonably equivalent value, because any such payment was the

consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of

funds from investors, not to purchase the identified goods, but rather to repay other investors.

434.    The Sabes Family Foundation Transfers were made to or for the benefit of the

Sabes Family Foundation in furtherance of a fraudulent investment scheme.

435.    To the extent that the Sabes Family Foundation is not an initial transferee of the

Sabes Family Foundation Transfers, it is an immediate or mediate transferee of the initial

transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took

the Sabes Family Foundation Transfers for value or in good faith.  The numerous red flags

and/or indications of Defendants' actual or constructive knowledge of the scheme, include but

are not limited to the facts set forth in Section III.B.

436.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states: (a) avoiding and preserving the Sabes Family Foundation

Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing

that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes Family

Foundation Transfers in the amount of at least $29,495,341 from the Sabes Family Foundation

135

for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering false profits

in the amount of at least $29,495,341; and (e) recovering prejudgment and post-judgment

interest, attorneys' fees, and costs from the Sabes Family Foundation.

### COUNT XX – ACTUAL FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§
513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant The Minneapolis Foundation for avoidance and recovery of the
SPF Funding/Minneapolis Foundation Transfers and against Defendant Sabes LP for
avoidance and recovery of the SPF Funding/Sabes LP Transfer**

437.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

438.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

439.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

440.     The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

441.     The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were made with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme. Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.

137

442.    In this manner, the Ponzi scheme was conducted through the successive misdirection of investors' cash infusions toward the payment of earlier investments.  All the funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi scheme.

443.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were made to or for the benefit of The Minneapolis Foundation and Sabes LP in furtherance of a fraudulent investment scheme.

444.    To the extent that The Minneapolis Foundation and Sabes LP are not initial transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, they are immediate or mediate transferees of the initial transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, and cannot satisfy their burden that they took the SPF Funding/ Minneapolis Foundation Transfers or SPF Funding/Sabes LP for value or in good faith.

445.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP Transfer free and clear from any claimed interest of Sabes LP; (c) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $10,992,351 from The

138

Minneapolis Foundation for the benefit of the bankruptcy estate of SPF Funding; (f) recovering

the SPF Funding/Sabes LP Transfer in the amount of at least $4,330,000 from Sabes LP for the

benefit of the bankruptcy estate of SPF Funding; (g) alternatively, recovering false profits in the

amount of at least $10,992,351 from The Minneapolis Foundation and at least $330,000 from

Sabes LP; and (h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs

from The Minneapolis Foundation.

## COUNT XXI – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat.
§§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant The Minneapolis Foundation for avoidance and recovery of the
SPF Funding/Minneapolis Foundation Transfers and against Defendant Sabes LP for
avoidance and recovery of the SPF Funding/Sabes LP Transfer**

446.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

447.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

448.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

449.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP

Transfer are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured

claim.

450.    At all times material hereto, SPF Funding: (a) was insolvent on the dates the SPF

Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were made or

became insolvent as a result of the SPF Funding/Minneapolis Foundation Transfers and/or SPF

Funding/Sabes LP Transfer; and/or (b) was engaged in businesses or transactions, or was about

to engage in businesses or transactions, for which the property remaining with SPF Funding after

the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were

effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of

initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution

for PC Funding; and/or (c) at the time of the SPF Funding/Minneapolis Foundation Transfers and

SPF Funding/Sabes LP Transfer intended to incur, or believed that it would incur, debts that

would be beyond its ability to pay as the debts matured.

451.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

any debt, which was before the date of the first SPF Funding/Minneapolis Foundation Transfer

and the SPF Funding/Sabes LP Transfer, and remained insolvent as of the date of each and every

subsequent SPF Funding/Minneapolis Foundation Transfer.

452.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even

basic expenses—such as legal fees or corporate filing fees—but depended upon others, including

PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

453.    SPF Funding received less than reasonably equivalent value in exchange for each

and every SPF Funding/Minneapolis Foundation Transfer and the SPF Funding/Sabes LP

Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate

transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs,

obtained funds from investors on the basis of fraudulent misrepresentations that those funds

would be used to finance the purchase of consumer electronics.  Those funds were not used to

purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of

the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC

found that only a miniscule amount could have related to legitimate purchases or sales of

consumer electronics, and the Associates, including those who operated the purported Vendors,

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

141

previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics. Each payment to an investor was made for less than reasonably equivalent value, because any such payment was the consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase the identified goods, but rather to repay other investors.

454. The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were made to or for the benefit of The Minneapolis Foundation and Sabes LP in furtherance of a fraudulent investment scheme.

455. To the extent that The Minneapolis Foundation and Sabes LP are not initial transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, they are immediate or mediate transferees of the initial transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, and cannot satisfy their burden that they took the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer for value or in good faith.

456. As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP Transfer free and clear from any claimed interest of the Sabes LP; (c) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF

142

Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis

Foundation Transfers in the amount of at least $10,992,351 from The Minneapolis Foundation

for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes

LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy

estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least

$10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and

(h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The

Minneapolis Foundation.

## COUNT XXII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat.
§§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant The Minneapolis Foundation for avoidance and recovery of the
SPF Funding/Minneapolis Foundation Transfers and against Defendant Sabes LP for
avoidance and recovery of the SPF Funding/Sabes LP Transfer**

457.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

458.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

143

459.    At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

460.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

461.    At all times material hereto, SPF Funding: (a) was insolvent on the dates the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were made or became insolvent as a result of the SPF Funding/Minneapolis Foundation Transfers and/or SPF Funding/Sabes LP Transfer; and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with SPF Funding after the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

462.    Virtually all, if not all, of the funds that passed through SPF Funding were funds originally obtained through fraud, and thus SPF Funding operated solely with funds it should never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first SPF Funding/Minneapolis Foundation Transfer and the SPF Funding/Sabes LP Transfer, and remained insolvent as of the date of each and every subsequent SPF Funding/Minneapolis Foundation Transfer.

463.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

464.    SPF Funding received less than reasonably equivalent value in exchange for each and every SPF Funding/Minneapolis Foundation Transfer and the SPF Funding/Sabes LP Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors,

145

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer

electronics.  Each payment to an investor was made for less than reasonably equivalent value,

because any such payment was the consummation of the two-stage use of fraudulent inducement

and fraudulent misappropriation of funds from investors, not to purchase the identified goods,

but rather to repay other investors.

465.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP

Transfer were made to or for the benefit of The Minneapolis Foundation and Sabes LP in

furtherance of a fraudulent investment scheme.

466.    To the extent that The Minneapolis Foundation and Sabes LP are not initial

transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP

Transfer, they are immediate or mediate transferees of the initial transferees of the SPF

Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, and cannot

satisfy their burden that they took the SPF Funding/ Minneapolis Foundation Transfers or SPF

Funding/Sabes LP Transfer for value or in good faith.

467.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF

146

Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The

Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP Transfer free

and clear from any claimed interest of the Sabes LP; (c) directing that the SPF

Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF

Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis

Foundation Transfers in the amount of at least $10,992,351 from The Minneapolis Foundation

for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes

LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy

estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least

$10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and

(h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The

Minneapolis Foundation.

### COUNT XXIII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a) and 551, and Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant The Minneapolis Foundation for avoidance and recovery of the SPF Funding/Minneapolis Foundation Transfers and against Defendant Sabes LP for avoidance and recovery of the SPF Funding/Sabes LP Transfer**

468.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

469.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).

147

470.    At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

471.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

472.    At all times material hereto, SPF Funding: (a) was insolvent on the dates the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were made or became insolvent as a result of the SPF Funding/Minneapolis Foundation Transfers and/or SPF Funding/Sabes LP Transfer; and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with SPF Funding after the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

473.    Virtually all, if not all, of the funds that passed through SPF Funding were funds originally obtained through fraud, and thus SPF Funding operated solely with funds it should never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first SPF Funding/Minneapolis Foundation Transfer and the SPF Funding/Sabes LP Transfer, and remained insolvent as of the date of each and every subsequent SPF Funding/Minneapolis Foundation Transfer.

474.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

475.    SPF Funding received less than reasonably equivalent value in exchange for each and every SPF Funding/Minneapolis Foundation Transfer and the SPF Funding/Sabes LP Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors. Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors,

149

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer

electronics.  Each payment to an investor was made for less than reasonably equivalent value,

because any such payment was the consummation of the two-stage use of fraudulent inducement

and fraudulent misappropriation of funds from investors, not to purchase the identified goods,

but rather to repay other investors.

476.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP

Transfer were made to or for the benefit of The Minneapolis Foundation and Sabes LP in

furtherance of a fraudulent investment scheme.

477.    To the extent that The Minneapolis Foundation and Sabes LP are not initial

transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP

Transfer, they are immediate or mediate transferees of the initial transferees of the SPF

Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, and cannot

satisfy their burden that they took the SPF Funding/ Minneapolis Foundation Transfers or SPF

Funding/Sabes LP Transfer for value or in good faith.

478.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states: (a) avoiding and preserving the SPF Funding/Minneapolis

Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation;

(b) avoiding and preserving the SPF Funding/Sabes LP Transfer free and clear from any claimed

interest of Sabes LP; (c) directing that the SPF Funding/Minneapolis Foundation Transfers be set

aside; (d) directing that the SPF Funding/Sabes LP Transfer be set aside; (e) recovering such SPF

Funding/Minneapolis Foundation Transfers in the amount of at least $10,992,351 from The

Minneapolis Foundation for the benefit of the bankruptcy estate of SPF Funding; (f) recovering

the SPF Funding/Sabes LP Transfer in the amount of at least $4,330,000 from Sabes LP for the

benefit of the bankruptcy estate of SPF Funding; (g) alternatively, recovering false profits in the

amount of at least $10,992,351 from The Minneapolis Foundation and at least $330,000 from

Sabes LP; and (h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs

from The Minneapolis Foundation.

## COUNT XXIV – LIEN AVOIDANCE

### [11 U.S.C. § 506(d)]

### Against Defendants

479.    This Court dismissed this cause of action in its Order dated December 1, 2016.

The Trustee includes this cause of action solely to preserve any issues and reserve its rights in

the event of an appeal.

## COUNT XXV – UNJUST ENRICHMENT/EQUITABLE DISGORGEMENT

### Against Defendants

480.    This Court dismissed this cause of action in its Order dated December 1, 2016.

The Trustee includes this cause of action solely to preserve any issues and reserve its rights in

the event of an appeal.

**WHEREFORE**, the Trustee respectfully requests this Court enter judgment in favor of

Plaintiffs and against the Defendants as follows:

A.      That as a matter of law and equity, at all times relevant PC Funding was an alter

ego of Debtor PCI, the very purpose of which was to defraud and hinder the detection of the

Ponzi scheme by the creditors of PCI, and that as a result the Trustee is entitled to, and has

standing to, reverse-pierce PC Funding; that PCI and PC Funding be treated as one entity for all

intents and purposes hereto, and that the assets of PC Funding be therefore made available to the

creditors of PCI and the Trustee of PCI for all purposes;

B.      That as a matter of law and equity, at all times relevant SPF Funding was an alter

ego of Debtor PCI, the very purpose of which was to defraud and hinder the detection of the

Ponzi scheme by the creditors of PCI, and that as a result the Trustee is entitled to, and has

standing to, reverse-pierce SPF Funding; that PCI and SPF Funding be treated as one entity for

all intents and purposes hereto, and that the assets of SPF Funding be therefore made available to

the creditors of PCI and the Trustee of PCI for all purposes;

C.      On Count 1 – Fraudulently Incurred Obligations (Actual Fraud), pursuant to 11

U.S.C. §§ 548(a)(1)(A) as against the Opportunity Finance Defendants, Sabes Family

Foundation, DZ Bank, and The Minneapolis Foundation: (a) avoiding the Fraudulent Obligations

free and clear from any claimed interest of the Opportunity Finance Defendants; Sabes Family

Foundation, DZ Bank, and The Minneapolis Foundation; and (b) directing that the Fraudulent

Obligations be set aside.

D.      On Count 2 – Fraudulently Incurred Obligations (Actual Fraud), pursuant to 11

U.S.C. §§ 544(a) and 544(b), and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court

should determine that this action is governed by the laws of other states, the fraudulent transfer

laws of such other states as against the Opportunity Finance Defendants, Sabes Family

Foundation, DZ Bank, and The Minneapolis Foundation:  (a) avoiding the Fraudulent

Obligations free and clear from any claimed interest of the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, and The Minneapolis Foundation; and (b) directing that the Fraudulent Obligations be set aside.

E.       On Count 3 – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 as against the Opportunity Finance Defendants and DZ Bank for avoidance and recovery of the PC Funding Two-Year Transfers: (a) avoiding and preserving the PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity Finance Defendants and/or DZ Bank; (b) directing that the PC Funding Two-Year Transfers be set aside; (c) recovering such PC Funding Two-Year Transfers in the amount of $711,141,132 from the Opportunity Finance Defendants and DZ Bank, for the benefit of the estate of PC Funding; (d) alternatively, recovering false profits in the amount of $90,488,713; (e) alternatively, recovering the Buy Out Transfers from the Opportunity Finance Defendants in the amount of $155,357,376; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants and DZ Bank.

F.       On Count 4 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551 as against the Opportunity Finance Defendants and DZ Bank for avoidance and recovery of the PC Funding Two-Year Transfers: (a) avoiding and preserving the PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity Finance Defendants and DZ Bank; (b) directing that the PC Funding Two-Year Transfers be set aside; (c) recovering such PC Funding Two-Year Transfers in the amount of $711,141,132 from the Opportunity Finance Defendants and DZ Bank, for the benefit of the estate of PC Funding; (d) alternatively, recovering false profits in the amount of $90,488,713; (e) alternatively, recovering the Buy Out Transfers from the Opportunity Finance Defendants in the amount of

$155,357,376; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants and DZ Bank.

G.      On Count 5 – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 544(a), 544(b), 550, and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendants for avoidance and recovery, as initial transferees of the PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the PCI MGLLC Transfers and PCI SPE Transfers: (a) avoiding and preserving the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance

Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from Defendants.

H.      On Count 6 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(a), 544(b), 550, and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendants for avoidance and recovery, as initial transferees of the PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the PCI MGLLC Transfers and PCI SPE Transfers: (a) avoiding and preserving the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance

Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from Defendants.

I.      On Count 7 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(a), 544(b), 550, and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendants for avoidance and recovery, as initial transferees of the PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the PCI MGLLC Transfers and PCI SPE Transfers: (a) avoiding and preserving the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance

Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from Defendants.

J.    On Count 8 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendants for avoidance and recovery, as initial transferees of the PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the PCI MGLLC Transfers and PCI SPE Transfers: (a) avoiding and preserving the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance

Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from Defendants.

K.      On Count 9 – Preferential Transfers, pursuant to 11 U.S.C. §§ 547, 550, and 551 as against the Opportunity Finance Defendants for avoidance and recovery of Preference Period Transfers: (a) avoiding and preserving the Preference Period Transfers free and clear from any claimed interest of the Opportunity Finance Defendants; (b) directing that the Preference Period Transfers be set aside; (c) recovering the Preference Period Transfers in the amount of $9,238,419 from the Opportunity Finance Defendants, for the benefit of the bankruptcy estate of PC Funding; and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants;

L.      On Count 10 – Fraudulent Transfers (Actual Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants for avoidance and recovery of the SPF Funding/Opportunity Finance Transfers and the SPF Funding/DZ Bank Transfers: (a) avoiding and preserving the SPF Funding/ Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set aside; (c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less than $164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy estate SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not less than $78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding; (e) alternatively, recovering false profits in an

158

amount not less than $12,234,156; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

M.      On Count 11 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants for avoidance and recovery of the SPF Funding/Opportunity Finance Transfers and the SPF Funding/DZ Bank Transfers: (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set aside; (c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less than $164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy estate of SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not less than $78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding; (e) alternatively, recovering false profits in an amount not less than $12,234,156; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

N.      On Count 12 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants for avoidance and recovery of the SPF Funding/Opportunity Finance Transfers and the SPF Funding/DZ Bank Transfers: (a) avoiding and preserving the SPF Funding/Opportunity Finance

Transfers and SPF Funding/DZ Bank Transfers free and clear from any claimed interest of the

Opportunity Finance Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity

Finance Transfers and SPF Funding/DZ Bank Transfers be set aside; (c) recovering such SPF

Funding/Opportunity Finance Transfers in an amount not less than $164,615,390 from the

Opportunity Finance Defendants for the benefit of the bankruptcy estate of SPF Funding;

(d) recovering such SPF Funding/DZ Bank Transfers in an amount not less than $78,241,766

from DZ Bank for the benefit of the bankruptcy estate of SPF Funding; (e) alternatively,

recovering false profits in an amount not less than $12,234,156; and (f) recovering prejudgment

and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

   O.  On Count 13 – Fraudulent Transfers (Constructive Fraud), pursuant to

Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states as against the Opportunity Finance Defendants for avoidance

and recovery of the SPF Funding/Opportunity Finance Transfers and the SPF Funding/DZ Bank

Transfers: (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers and SPF

Funding/DZ Bank Transfers free and clear from any claimed interest of the Opportunity Finance

Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity Finance Transfers and

SPF Funding/DZ Bank Transfers be set aside; (c) recovering such SPF Funding/Opportunity

Finance Transfers in an amount not less than $164,615,390 from the Opportunity Finance

Defendants for the benefit of the bankruptcy estate of SPF Funding; (d) recovering such SPF

Funding/DZ Bank Transfers in an amount not less than $78,241,766 from DZ Bank for the

benefit of the bankruptcy estate of SPF Funding; (e) alternatively, recovering false profits in an

amount not less than $12,234,156; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

  P.  On Count 14 – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 as against Defendant Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Two-Year Transfers: (a) avoiding and preserving the Sabes Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Two-Year Transfers be set aside; (c) recovering such Sabes Family Foundation Two-Year Transfers in an amount not less than $12,469,571 from the Sabes Family Foundation for the benefit of the estate of SPF Funding; (d) alternatively, recovering false profits in an amount not less than $12,469,571; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

  Q.  On Count 15 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 as against Defendant Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Two-Year Transfers: (a) avoiding and preserving the Sabes Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Two-Year Transfers be set aside; (c) recovering such Sabes Family Foundation Two-Year Transfers in an amount not less than $12,469,571 from the Sabes Family Foundation for the benefit of the estate of SPF Funding; (d) alternatively, recovering false profits in an amount not less than $12,469,571; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

R.      On Count 16 – Fraudulent Transfers (Actual Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes Family Foundation Transfers in an amount not less than $29,495,341 from the Sabes Family Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering false profits in an amount not less than $29,495,341; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

S.      On Count 17 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes Family Foundation Transfers in an amount not less than $29,495,341 from the Sabes Family Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering false profits in an amount not less than $29,495,341; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

162

T.      On Count 18 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes Family Foundation Transfers in an amount not less than $29,495,341 from the Sabes Family Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering false profits in an amount not less than $29,495,341; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

U.      On Count 19 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes Family Foundation Transfers in an amount not less than $29,495,341 from the Sabes Family Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering false profits in an amount not less than $29,495,341; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

163

V.      On Count 20 – Fraudulent Transfers (Actual Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendants The Minneapolis Foundation and Sabes LP for avoidance and recovery of the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer: (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP Transfer free and clear from any claimed interest of Sabes LP; (c) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $10,992,351 from The Minneapolis Foundation for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least $10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and (h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation.

W.      On Count 21 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendants The Minneapolis Foundation and Sabes LP for avoidance and recovery of the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer: (a) avoiding and preserving the SPF

164

Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The

Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP Transfer free

and clear from any claimed interest of the Sabes LP; (c) directing that the SPF

Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF

Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis

Foundation Transfers in the amount of at least $10,992,351 from The Minneapolis Foundation

for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes

LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy

estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least

$10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and

(h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The

Minneapolis Foundation.

   X.  On Count 22 – Fraudulent Transfers (Constructive Fraud), pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states as against Defendant The Minneapolis

Foundation and Sabes LP for avoidance and recovery of the SPF Funding/Minneapolis

Foundation Transfers: (a) avoiding and preserving the SPF Funding/Minneapolis Foundation

Transfers free and clear from any claimed interest of The Minneapolis Foundation; (b) avoiding

and preserving the SPF Funding/Sabes LP Transfer free and clear from any claimed interest of

the Sabes LP; (c) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside;

(d) directing that the SPF Funding/Sabes LP Transfer be set aside; (e) recovering such SPF

Funding/Minneapolis Foundation Transfers in the amount of at least $10,992,351 from The

Minneapolis Foundation for the benefit of the bankruptcy estate of SPF Funding; (f) recovering

the SPF Funding/Sabes LP Transfer in the amount of at least $4,330,000 from Sabes LP for the

benefit of the bankruptcy estate of SPF Funding; (g) alternatively, recovering false profits in the

amount of at least $10,992,351 from The Minneapolis Foundation and at least $330,000 from

Sabes LP; and (h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs

from The Minneapolis Foundation.

Y.      On Count 23 – Fraudulent Transfers (Constructive Fraud), pursuant to

Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states as against Defendant The Minneapolis Foundation for

avoidance and recovery of the SPF Funding/Minneapolis Foundation Transfers: (a) avoiding and

preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed

interest of The Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP

Transfer free and clear from any claimed interest of Sabes LP; (c) directing that the SPF

Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF

Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis

Foundation Transfers in the amount of at least $10,992,351 from The Minneapolis Foundation

for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes

LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy

estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least

$10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and

(h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The

Minneapolis Foundation.

Z.      On Count 24 – Lien Avoidance:  This Court dismissed this cause of action in its

Order dated December 1, 2016.  The Trustee includes this cause of action solely to preserve any

issues and reserve its rights in the event of an appeal.

AA.      On Count 25 - Unjust Enrichment/Equitable Disgorgement:  This Court dismissed

this cause of action in its Order dated December 1, 2016.  The Trustee includes this cause of

action solely to preserve any issues and reserve its rights in the event of an appeal;

BB.      On all Claims for Relief, establishment of a constructive trust over the proceeds of

the transfers in favor of the Trustee for the benefit of the estates of PCI, PC Funding, and SPF

Funding;

CC.      On all Claims for Relief, assignment of any defendant's income tax refunds from

the United States, state, and local governments paid on fictitious profits during the course of the

Ponzi scheme;

DD.      Awarding the Trustee all applicable interest (including prejudgment and post-

judgment interest), attorneys' fees, costs, and disbursements in this action; and

EE.      Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.

 DATED: March 6, 2017                     **LINDQUIST & VENNUM LLP**


                                         By:   /s/ James A. Lodoen
                                               James A. Lodoen (0173605)
                                               Michael Olafson (0156693)
                                               Adam C. Ballinger (0389058)
                                               4200 IDS Center
                                               80 South Eighth Street
                                               Minneapolis, MN 55402-2274
                                               (612) 371-3211
                                               (612) 371-3207 (facsimile)
                                               www.lindquist.com

167

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

Robert S. Loigman (*pro hac vice*)
Benjamin I. Finestone (*pro hac vice*)
Jacob J. Waldman (*pro hac vice*)
Victor Noskov (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
www.quinnemanuel.com

**ATTORNEYS FOR
DOUGLAS A. KELLEY
CHAPTER 11 TRUSTEE OF PETTERS
COMPANY, INC., PC FUNDING, LLC,
AND SPF FUNDING, LLC**

# EXHIBIT  A

## CREDIT AGREEMENT

THIS CREDIT AGREEMENT is entered into as of December 17, 2001, by PC FUNDING, LLC, a Delaware limited liability company ("Borrower"), and OPPORTUNITY FINANCE, LLC, a Delaware limited liability company ("Lender").

1.    **DEFINITIONS AND CERTAIN RULES OF CONSTRUCTION**

1.1    **Definitions.**  For all purposes of this Agreement, capitalized terms used in this Agreement shall have (unless otherwise provided elsewhere in this Agreement) the following respective meanings when used herein:

"**Affiliate**" shall mean, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, 5% or more of the equity interests having ordinary voting power in the election of directors (or Persons having similar functions) of such Persons, (b) each Person that controls, is controlled by or is under common control with such Person, (c) each of such Person's officers, directors, joint venturers and partners, and (d) in the case of Borrower, the immediate family members, spouses and lineal descendants of individuals who are Affiliates of Borrower.  For the purposes of this definition "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise; provided, that Lender is not an Affiliate of Borrower for any purpose.

"**Assigned Receivable**" has the meaning set forth in the Sale Agreement.

"**Buyer**" shall mean a purchaser of inventory pursuant to a Buyer Purchase Order.

"**Buyer Purchase Order**" shall mean, with respect to any Receivables Sale financed by Lender under this Agreement, a purchase order or other similar agreement between Originator and a Buyer pursuant to which such Buyer agrees to purchase Inventory from Originator.  Each Buyer Purchase Order shall be in form and substance satisfactory to Lender.  For avoidance of doubt, Buyer Purchase Order does not include any Buyer purchase order or similar agreement issued to Originator which is not related to any Receivable assigned to Borrower pursuant to the Sale Agreement.

"**Change of Control Date**" shall mean the date upon which Thomas J. Petters ceases to own and control directly or indirectly 100% of the outstanding capital stock or equity of both Borrower and Originator.

"**Code**" shall mean the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of Minnesota.

"**Collateral**" shall have the meaning assigned to it in the Security Agreement.

"**Event of Default**" shall have the meaning assigned to it in Section 7.1.

OF/SFF 002926
OF00008935

"**Facility Termination Date**" shall mean the earlier of (i) March 31, 2006 and (ii) the date this Agreement is terminated under Section 7.2(a)(i) or Section 7.3.

"**Fixed Yield**" shall mean the "fixed yield dollar amount" as specified to be paid to Lender as established in the Promissory Note for each Fixed Yield Loan.

"**Fixed Yield Loan**" shall mean a Receivables Loan with respect to which the parties have selected the Fixed Yield option under Section 2.1(a)(i)(C) and have an agreed upon Fixed Yield pursuant to the related Promissory Note.

"**Interest Loan**" shall mean a Receivables Loan with respect to which the parties have selected the interest option under Section 2.1(a)(i)(C) and have agreed upon an interest rate pursuant to the related Promissory Note.

"**Inventory**" shall mean with respect to any Receivables Sale, all inventory or goods purchased by Originator pursuant to an Originator Purchase Order, the sale, or contract for sale, of which by Originator to a Buyer gives rise to the related Receivables.

"**Loan Documents**" shall mean this Agreement, the Promissory Notes, the Security Agreement, and all other agreements, instruments, documents, agreements, and certificates delivered to Lender in connection with this Agreement or the transactions contemplated hereby, and all amendments, restatements, renewals, supplements and modifications of the foregoing.

"**Material Adverse Effect**" shall mean a material adverse effect, including by reason of an effect on Originator, Thomas J. Petters or any other Affiliate of Borrower, on (a) the business, assets, operations, prospects or financial or other condition of Borrower or Originator; (b) the inability of Originator to conduct any purchase or sales of inventory in accordance with the applicable Originator Purchase Order and Buyer Purchase Order; (c) the inability of Borrower to pay any of the Receivables Loans or any of the other obligations in accordance with the terms of this Agreement; (d) the Collateral or Lender's liens on the Collateral or the priority of such liens; or (e) Lender's rights and remedies under this Agreement and the other Loan Documents.

"**Maximum Loan Amount**" shall mean the amount equal to $500,000,000.00.

"**Originator**" shall mean Petters Company, Inc., a Minnesota corporation.

"**Originator Purchase Order**" shall mean, with respect to any Receivables Sale financed by Lender under this Agreement, a purchase order or other similar agreement between Originator and a Seller pursuant to which Originator agrees to purchase from such Seller the goods or inventory to be sold by Originator pursuant to a Buyer Purchase Order. Each Originator Purchase Order shall be in form and substance satisfactory to Lender. For avoidance of doubt, Originator Purchase Order does not include any Originator purchase order which has not been assigned pursuant to the Sale Agreement.

"**Person**" shall mean any individual, partnership, joint venture, trust, unincorporated organization, corporation, or government.

"**Promissory Note**" shall have the meaning assigned to it in Section 2.1(b).

42121 17712091/CreditAg

OF/SFF 002927
OF00008936

"**Receivable**" has the meaning set forth in the Sale Agreement.

"**Receivables Loan**" shall mean a loan made pursuant to section 2.1 with respect to a Receivables Sale financed by Lender, and all accrued fees, interest and other obligations payable by Borrower to Lender with respect thereto.

"**Receivables Sale**" shall mean a sale of Receivables by Originator to Borrower pursuant to the Sale Agreement.

"**Restricted Payment**" shall mean, with respect to any Person, (a) the declaration or payment of any dividend; (b) any payment on account of the purchase, redemption or other retirement of such Person's stock or any warrants, options or other rights with respect to such stock; (c) any payment of management fees by such Person to any stockholder of such Person or their Affiliates other than reasonable advances or payments made in the ordinary course of business on account of salary and routine business expenses; and (d) payments on indebtedness permitted under Section 6.4 of this Agreement.

"**Sale Agreement**" shall mean the Sale Agreement of even date herewith between Borrower and Originator.

"**Security Agreement**" shall mean the Security Agreement of even date herewith between Borrower and Lender.

"**Seller**" shall mean a seller of Inventory to Originator.

"**Servicing Agreement**" shall mean the Servicing Agreement of even date herewith between Borrower and Originator.

2.    AMOUNT AND TERMS OF CREDIT

2.1    **Advances.**  Subject to the terms and conditions hereof, Lender may, *in its discretion*, from time to time until the Facility Termination Date, make Receivables Loans to or for the benefit of Borrower as provided for in this Section 2.1. Each Receivables Loan shall be evidenced by a Promissory Note as defined in Section 2.1(b). The aggregate amount of Receivables Loans outstanding shall not exceed at any time the Maximum Loan Amount.

(a)    **Receivables Loan Proposals.**

(i)    If Borrower proposes to enter into any Receivables Sale, Borrower may propose that Lender agree to make a Receivables Loan to finance the purchase price with respect to the Receivable(s) that is/are proposed to be purchased by Borrower. The loan proposal shall be in substantially the form of Exhibit A attached hereto and shall specify the (A) details of the Receivables Sale, (B) amount of the proposed Receivables Loan, (C) if the financing is to be on a Fixed Yield basis, the amount of the Fixed Yield with respect to that Receivables Sale or, if the financing is to be on an interest bearing basis, the interest rate applicable to the financing, (D) terms of the assignment, if required, of the Receivables Sale, and (E) the casualty and credit insurance maintained with respect to the sale of goods giving rise to Receivable(s). Borrower shall also provide such other information as Lender shall reasonably require in its sole discretion.

OF/SFF 002928
OF00008937

(ii)    Within one business day after Lender's receipt of a loan proposal, Lender will notify Borrower either in writing, by telephone or by e-mail if (A) Lender is willing to make a Receivables Loan with respect to the proposed Receivables Sale on the terms proposed by Borrower, (B) Lender is not willing to make a Receivables Loan with respect to such Receivables Sale, or (C) Lender would be willing to make a Receivables Loan with respect to the proposed Receivables Sale, but only with such modifications as specified in such notice. Lender shall have sole discretion to decide whether or not to agree to any loan proposal or to propose a loan for the proposed Receivables Sale on different terms, and Borrower shall have the right to accept or reject any such different terms.

(b)    **Promissory Notes.**  On the date of each Receivables Loan, Borrower shall execute and deliver to Lender a note in the original principal amount of that Receivables Loan, substantially in the form of Exhibit B hereto (each a "Promissory Note" and collectively the "Promissory Notes). Each Promissory Note shall represent the obligation of Borrower to pay the amount of the related Receivables Loan, which shall include the interest or Fixed Yield thereon as prescribed in Section 2.4.  Unless otherwise agreed with respect to a particular Receivables Loan and set forth in the related Promissory Note, the due date of each Promissory Note shall be on the earlier of (i) the 120th day after the date thereof (unless otherwise specified in the Promissory Note), or (ii) the day upon which Borrower receives available funds from the payment from the Buyer on the Receivables financed by the proceeds of such Promissory Note. The Promissory Notes may be prepaid in whole or in part at any time, as provided therein.

(c)    **Reliance on Notices.**  Lender shall be entitled to rely upon any notice of Receivables Loan, any loan proposal and any similar notice believed by Lender to be signed by any authorized representatives of Borrower.  Lender may assume that each person executing and delivering such a notice was duly authorized to do so, unless the responsible individual acting thereon for Lender has actual knowledge to the contrary.

2.2    Use of Proceeds; Payments from Buyers.

(a)    **Use of Proceeds.**  Borrower must use the proceeds of each Receivables Loan solely for the purpose of paying the purchase price with respect to the associated Receivables Sale, as and when Borrower is required to pay such amounts in accordance with the terms of the Sale Agreement. No loan proceeds shall be disbursed by Borrower until Lender has authorized (in a writing, by e-mail or by telephone) the disbursement and all conditions precedent to the disbursement established by Lender have been satisfied.  Such purchase price shall be disbursed by Borrower directly for the account of the Originator to the Seller under the applicable Originator Purchase Order and must not be paid to any other Person.

(b)    **Payments from Buyers.**  Borrower and Originator shall direct Buyers to make payments, whether by check or by wire transfer, with respect to all Assigned Receivables directly to Borrower for deposit into such account or accounts of Borrower as may be mutually agreed by Borrower and Lender.  In the event any such payment other than a wire transfer is received by Borrower or Originator from a Buyer with respect to an Assigned Receivable, such payment shall deposited only in such account or accounts of Borrower as may be mutually agreed to by Borrower and Lender.  In the event any Buyer proposes to pay by wire transfer, the wire transfer instructions shall direct the payment to such account or accounts of Borrower as

OF/SFF 002929
OF00008938

may be mutually agreed by Borrower and Lender. In the event that any payment in the form of a wire transfer is received by Originator or Borrower from such a Buyer, Originator, or Borrower, as the case may be, shall, by the next business day, wire transfer such payment to such account or accounts of Borrower. If a payment is deposited into an account with respect to which Lender's approvals are required to disburse funds, Lender agrees to grant its approval within one business day after such deposit to disbursements from such account in the following priority:

     (i)   to Lender, or such party or parties as Lender may direct, in an amount owed to Lender with respect to the Receivables Loan made and the Promissory Note issued in connection with such a Buyer Purchaser Order;

     (ii)   provided that no Event of Default then exists, to Servicer (as defined in the Servicer Agreement by and between the Originator and Borrower), in an amount owed to the Servicer pursuant to the Servicing Agreement;

     (iii)   except as provided in (iv), and provided that no Event of Default then exists, to Borrower, or such party or parties as Borrower may direct, for the balance of such payment; and

     (iv)   if a case or proceeding shall have been commenced against a Buyer (a) under Title 11 of the United States Code or any other applicable federal, state or foreign bankruptcy or other similar law; (b) requesting the appointment of a custodian, receiver or trustee (or similar official) of a Buyer of any substantial part of its assets; or (c) requesting the winding-up or liquidation of the affairs of a Buyer, and such case or proceeding shall remain undismissed or unstayed for sixty (60) days or such court shall enter a decree or order granting the relief sought in such case or proceeding, then Lender may apply the balance of such payment to the payment of the then outstanding Promissory Notes due Lender for the purchase of any Receivable(s) related to such Buyer until such Promissory Notes are paid in full.

     (c)   Borrower acknowledges that each Promissory Note shall be due and payable on the due date set forth in such Promissory Note, which shall be the earlier of (i) the 120th day after the date thereof (unless otherwise specified in the Promissory Note), or (ii) the day upon which Borrower receives available funds from payment from the Buyer on the account of the Receivables Sale financed by such Promissory Note. Each such Promissory Note shall be due on such due date, whether or not Borrower shall have received payment from the Buyer under the Buyer Purchase Order related to such Promissory Note. It shall not be an Event of Default under this Agreement or the Loan Documents if a Buyer does not pay an underlying Assigned Receivable when due, provided the related Promissory Note is paid on or before its due date (it being acknowledged that Borrower has until the Promissory Note due date to receive payment from such Buyer or to otherwise pay the Promissory Note from other sources.

     **2.3**   **Maturity of Receivables Loans.** Unless sooner paid, all obligations with respect to each Receivables Loan shall be due and payable in full on the date specified in Promissory Note executed with respect to such Receivables Loan.

OF/SFF 002930
OF00008939

**2.4    Fixed Yield and Interest; Late Payments.**  At the time Borrower pays each Receivables Loan, Borrower shall also pay the Fixed Yield or interest with respect to such Receivables Loan as provided in the related Promissory Note. In the event that Borrower fails to pay when due any payment under a Promissory Note, interest shall accrue on the past due payment from the due date until such payment is made (a) at the stated interest rate on an Interest Loan, and (b) at the rate of twenty percent (20%) per annum from and after the due date of such payment on a Fixed Yield loan. Notwithstanding anything to the contrary set forth in this Section 2.4, if a court of competent jurisdiction determines in a final order that the Fixed Yield or interest payable hereunder exceeds the highest rate of interest permissible under applicable law, then for so long as the maximum lawful rate would be so exceeded, the Fixed Yield or interest payable hereunder shall be equal to the maximum interest amount allowed under applicable law.

**2.5    Loan Account; Etc.**  Lender shall maintain a loan account on its books to record with respect to each Receivables Loan: (a) all Receivables Loans, (b) all payments made by Borrower or otherwise received by Lender, and (c) all other debits and credits as provided in this Agreement with respect to each Receivables Loan or any other obligation. All entries in Lender's loan account shall be made in accordance with Lender's customary accounting practices as in effect from time to time and a copy of which will be provided to Originator or Borrower upon request. Lender further agrees that, with respect to any disposition of goods in connection with any Receivables Sale pursuant to a Buyer Purchase Order, Lender shall, upon payment to it of all amounts due in connection with the related Receivables Loan, release its lien on such assets in order to permit Originator to effect such disposition, and shall execute and deliver to Borrower appropriate UCC-3 statements as reasonably requested by Borrower.

**2.6    Indemnity.**  Borrower shall, within ten (10) days of written demand therefore, indemnify and hold harmless each of Lender and its Affiliates, and each of such person's respective officers, directors, employees, attorneys, agents, representatives, successors, and assigns (each, an "**Indemnified Person**"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) which may be instituted or asserted against or incurred, without limitation, by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all environmental liabilities, or any breaches by Borrower or any of its representations, warranties or covenants contained in this Agreement, and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "**Indemnified Liabilities**") except to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF

OF/SFF 002931
OF00008940

CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER. NEITHER TERMINATION NOR COMPLETION OF THIS AGREEMENT SHALL AFFECT THESE INDEMNIFICATION PROVISIONS WHICH SHALL THEN REMAIN OPERATIVE AND IN FULL FORCE AND EFFECT.

2.7     **Access.**  Borrower and Originator shall, during normal business hours, from time to time as frequently as Lender reasonably determines to be appropriate: (a) provide Lender and any of its officers, employees and agents complete and timely access to, and prompt and full cooperation from, its properties, facilities, computers, computer records, advisors and employees (including officers) of Borrower, Originator and to the Collateral to the extent related to the Assigned Receivables; and (b) permit Lender, and any of its officers, employees and agents, to inspect, audit and make extracts from Borrower's and Originator's books and records related to the Assigned Receivables. Borrower and Originator shall provide, at no cost to Lender, an employee or consultant to assure that Lender can access and retrieve all information in Borrower's computers and computer records related to the Assigned Receivables.

2.8     **Originator Power of Attorney.**  With respect to any check received by Originator from a Buyer in payment of an Assigned Receivable, Originator hereby grants Lender an irrevocable power of attorney to endorse any such check constituting proceeds of an Assigned Receivable with an endorsement from Originator to Borrower (if necessary) and with the restrictive endorsement *"For deposit only – PC Funding, LLC"* in order that Lender may deposit such check in the account or accounts referenced in Section 2.2(b).

2.9     **Taxes.**  Any and all payments by Borrower hereunder or under the Promissory Notes shall be made free and clear of and without deduction for any and all present or future taxes. Borrower shall indemnify and pay Lender for the full amount of taxes (other than taxes on Lender's income) paid by Lender with respect to the transactions under this Agreement.

3.     **CONDITIONS PRECEDENT**

Lender may require as a condition to any Receivables Loan that Borrower provide documentation and information acceptable to Lender. In addition, upon execution of this Agreement, Borrower shall provide to Lender an opinion letter of Borrower's counsel in form and substance reasonably satisfactory to Lender.

4.     **REPRESENTATIONS AND WARRANTIES**

To induce Lender to make the Receivables Loans, Borrower makes the following representations and warranties to Lender, each and all of which shall survive the execution and delivery of this Agreement.

4.1     **Corporate Existence; Compliance with Law.**  Borrower (a) is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware; (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification; (c) has the requisite corporate power and authority and the legal right to own, pledge, mortgage

OF/SFF 002932
OF00008941

or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now, heretofore and proposed to be conducted; (d) has all licenses, permits, consents or approvals from or by, and has made all filings with, and has given all notices to, all governmental authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (e) is in compliance with its certificate of formation and limited liability company agreement; and (f) is in compliance with all applicable provisions of law, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

4.2     **Executive Offices; FEIN.**  The current location of Borrower's and Originator's chief executive office and principal place of business is 7585 Equitable Drive, Eden Prairie, Minnesota 55344, and neither Borrower nor Originator has had any other chief executive office or principal place of business.  Borrower's federal employer identification number is 41-2022687

4.3     **Corporate Power, Authorization, Enforceable Obligations.**  The execution, delivery and performance by Borrower of the Loan Documents to which it is a party and the creation of all liens provided for therein: (a) are within Borrower's limited liability company power; (b) have been duly authorized by all necessary or proper limited liability company action; (c) do not contravene any provision of Borrower's certificate of formation and limited liability company agreement; (d) do not violate any law or regulation, or any order or decree of any court or governmental authority; (e) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which Borrower is a party or by which Borrower or any of its property is bound; (f) do not result in the creation or imposition of any lien upon any of the property of Borrower other than those in favor of Lender pursuant to the Loan Documents; and (g) do not require the consent or approval of any governmental authority or any other Person. Each Loan Document constitutes a legal, valid and binding obligation of Borrower enforceable against it in accordance with its terms.

4.4     **Material Adverse Effect.**  No event has occurred, which alone or together with other events, could reasonably be expected to have a Material Adverse Effect.

4.5     **Ownership of Property; Liens.**  Borrower owns no material property other than the Assigned Receivables and related rights purchased or granted pursuant to the Sale Agreement. Borrower has good and marketable title to such assets, and none of such assets is subject to any liens not held by Lender or an Affiliate of Lender.

4.6     **Taxes.**  All tax returns, reports and statements, including information returns, required by any governmental authority to be filed by Borrower have been filed with the appropriate governmental authority and all taxes have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof (or any such fine, penalty, interest, late charge or loss has been paid).

5.     **AFFIRMATIVE COVENANTS**

To induce Lender to make the Receivables Loans, Borrower agrees that from and after the date hereof and until the Facility Termination Date:

332: 173129/01/CreditAg

OF00008942

**5.1     Maintenance of Existence and Conduct of Business.**  Borrower shall: (a) do or cause to be done all things necessary to preserve and keep in full force and effect Borrower's limited liability company existence, and its rights and franchises necessary to the proper conduct of its business; (b) continue to conduct Borrower's business solely for the purpose of conducting Receivables Sales financed by Lender or an Affiliate of Lender; (c) at all times maintain, preserve and protect all of Borrower's assets and properties used or useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear); (d) transact business only in Borrower's legal name; and (e) conduct Borrower's operations in a manner that complies with all of the terms and covenants in this Agreement and other Loan Documents.

**5.2     Books and Records.**  Borrower shall keep adequate books and records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with generally accepted accounting principles consistently applied. Borrower shall deliver to Lender financial statements, reports, notices and other information regarding Borrower, Originator and Receivables Sales financed by Lender as Lender shall request in its discretion from time to time.  Borrower shall promptly report to Lender the occurrence of any event that could reasonably expect to have a Material Adverse Effect, including any litigation, judgments or liens.

**5.3     Insurance.**  Borrower shall maintain, at its sole cost and expense, policies of casualty and liability insurance as are typically maintained by similar companies engaged in similar businesses, naming Lender as a loss payee and additional insured.  In addition, Borrower shall maintain credit insurance, on an equal cost-shared basis with Lender unless otherwise agreed, with respect to any Receivables Loan to the extent and on the terms specified in the related loan proposal as accepted by Lender.  In addition, Borrower with respect to such credit insurance, will take all appropriate steps to preserve and pursue all claims under such policies. In the event Borrower fails to maintain such insurance, Lender may, in its discretion, procure such insurance and charge the Borrower for the cost thereof (subject to such equal cost-sharing with respect to credit insurance).

**5.4     Compliance with Laws.**  Borrower shall comply with all federal, state, local, and foreign laws and regulations applicable to them, except to the extent that the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.5     Further Assurances.**  Borrower agrees that it shall and shall request any Seller and any Buyer to, at Borrower's expense and upon request of Lender, duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out the provisions and purposes of this Agreement or any other Loan Document; provided however, that Lender agrees to file a financing statement substantially in the form attached hereto as Exhibit C.  Without limiting the foregoing, Borrower shall take all actions necessary such that the liens granted to Lender pursuant to the Loan Documents will at all times be fully perfected first priority liens in and to the Collateral described therein.

OF/SFF 002934
OF00008943

**5.6  No Liens.**  Borrower shall cause the Originator to warrant to Borrower that, upon payment to a Seller using the proceeds of a Receivables Loan which, taken together with any contribution from the Originator, shall be used to pay a portion of the purchase price of the related Receivables Sale, the Originator shall be the owner of Inventory subject to the related Originator Purchase Order, free and clear of any adverse claims, liens and encumbrances other than those in favor of Borrower or Lender.

**5.7  Operational Limitations.**  For at least one year and one day after the date that all Loans shall have been paid in full, Borrower shall comply with the following:

(a)  Borrower shall own no assets, and will not engage in any business, other than the assets and transactions specifically contemplated by this Agreement.

(b)  Borrower shall not incur any indebtedness or obligation, secured or unsecured, direct or indirect, absolute or contingent (including any guaranty of any such obligation), other than in connection with Receivables Sales financed by Lender or an Affiliate of Lender and as otherwise permitted under this Agreement.

(c)  Borrower shall not make any loans or advances to any third party and shall not acquire obligations (other than pursuant to the Servicing Agreement and the Sale Agreement) or securities of any of its Affiliates.

(d)  Borrower shall pay Borrower's debts and liabilities only from Borrower's assets.

(e)  Borrower shall do all things necessary to observe organizational formalities and preserve Borrower's existence and will not amend, modify or otherwise change its certificate of formation or limited liability company agreement, or suffer the same to be amended, modified or otherwise changed, without the prior written consent of Lender.

(f)  Borrower shall maintain all of Borrower's books, records, financial statements and bank accounts separate from those of the Originator or any of its other Affiliates.

(g)  Borrower shall be, and at all times will, hold itself out to the public as a legal entity separate and distinct from any other entity (including Originator and any other Affiliate of Borrower) and shall correct any known misunderstanding regarding Borrower's status as a separate entity, shall conduct its business in the name of Borrower, and shall not identify itself or any of its Affiliates as a division or part of the other and shall maintain and utilize separate invoices and checks.

(h)  Borrower shall maintain adequate capital, as determined in Borrower's reasonable discretion, for the normal obligations reasonably foreseeable in a business of Borrower's size and character and in light of Borrower's contemplated business operations.

(i)  Borrower shall not engage in or suffer any dissolution, winding-up, liquidation, consolidation or merger in whole or in part.

OF/SFF 002935
OF00008944

(j)     Borrower shall not commingle Borrower's funds or other assets with those of Originator or any other Affiliate of Borrower or any other person or entity.

(k)     Borrower shall maintain Borrower's assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify Borrower's individual assets from those of Originator or any other Affiliate or any other person or entity.

(l)     Borrower shall not hold itself out to be responsible for the debts or obligations of any other person or entity (other than as contemplated by the Servicing Agreement and the Sale Agreement).

(m)     Borrower shall maintain an independent director as set forth in its limited liability company agreement.

(n)     Borrower shall maintain, at its sole cost and expense, policies of casualty and property insurance with respect to the Inventory which is subject to each Originator Purchase Order which shall (i) provide for coverage in an amount which shall be equal to the price for which the related Seller has agreed to sell such Inventory under the related Seller Purchase Order, (ii) be continuously in effect during the period from the date the Lender shall advance the proceeds of the related Receivables Loan to the Borrower through and including the date that the related Buyer shall irrevocably accept delivery of such Inventory and agree to be responsible for the purchase price therefor; (iii) name the Lender and its successors and assigns as loss payee parties thereunder; and (iv) otherwise be in form and substance acceptable to the Lender and shall be from one or more insurance companies acceptable to the Lender.

## 6.     NEGATIVE COVENANTS

To induce Lender to make the Receivables Loans, Borrower agrees that, without the prior written consent of Lender, from and after the date hereof until one year and one day after the Facility Termination Date:

**6.1     Mergers, Subsidiaries, Etc.**  Borrower shall not directly or indirectly, by operation of law or otherwise, (a) form or acquire any subsidiary, or (b) merge with, consolidate with, acquire all or substantially all of the assets or capital stock of, or otherwise combine with or acquire, any Person; provided however, that the acquisition of any assets by Borrower pursuant to the Sale Agreement shall not be a violation of this covenant.

**6.2     Purchase Orders.**  Borrower shall not amend, modify, supplement, or assent to noncompliance with any material term, provision or condition of any Buyer Purchase Order, or permit Originator to do so.

**6.3     Investments; Loans and Advances.**  Borrower shall not make or permit to exist any investment in, or make, accrue or permit to exist loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise.

**6.4     Indebtedness.**  Borrower shall not create, incur, assume or permit to exist any indebtedness or liabilities, except: (a) obligations owing to Lender or to Other Lenders as described in Section 8.11; (b) contingent liabilities arising out of endorsements of checks and

OF/SFF 002936

OF00008945

other negotiable instruments for deposit or collection in the ordinary course of business: and (c) indebtedness or liabilities under the Servicing Agreement.

6.5    **Affiliate Transactions.**  Borrower shall not enter into or be a party to any transaction with any Affiliate other than payments to Affiliates permitted by Section 6.9 and as otherwise contemplated by this Agreement (including, without limitation, the Sale Agreement and the Servicing Agreement).

6.6    **Capital Structure and Business.**  Borrower shall not make any changes to its capital structure which results in Thomas J. Petters, directly or indirectly, owning less than 100% of the equity and financial interest of Borrower, or to its business objectives or purposes, or make any material change in its operations.

6.7    **Guaranteed Indebtedness.**  Borrower shall not create, incur, assume or permit to exist any obligation to guaranty any indebtedness or other obligation of any other Person in any manner except by endorsement of instruments or items of payment for deposit to the general account of Borrower.

6.8    **Liens.**  Borrower shall not create, incur, assume or permit to exist any lien on or with respect to the any of its properties or assets (whether now owned or hereafter acquired) except (i) liens in favor of Lender pursuant to the Loan Documents and liens in favor of Other Lenders, and (ii) liens for taxes not yet due.

6.9    **Restricted Payments.**  Borrower shall not make any Restricted Payment, provided that so long as no Event of Default has occurred and is continuing, Borrower may, with respect to the proceeds of any Receivables financed by Lender, after re-paying in full that portion of the obligations to Lender that relate to such Receivables, pay the remainder of the proceeds of that Receivable to Originator as distributions with respect to the equity of Borrower.

6.10    Change of Corporate Name or Location.  Borrower shall not (a) change its name or jurisdiction of organization, or (b) change its chief executive office, principal place of business, other business offices, warehouses or other locations, or the location of its records concerning any Collateral, in any case without at least 30 days' prior written notice to Lender and after completing or taking any reasonable action requested by Lender in connection therewith.

## 7.    EVENTS OF DEFAULT: RIGHTS AND REMEDIES; TERM

7.1    **Events of Default.**  The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)    Borrower (i) fails to make any required payment on any Receivables Loan or any of the other obligations under the Promissory Notes when due and payable, unless such due date has been extended in writing by Lender, and such failure remains unremedied for one (1) business day; or (ii) fails to pay or reimburse Lender for any expense reimbursable under any Loan Document within ten (10) days following Lender's demand for such reimbursement or payment of expenses.

OF/SFF 002937
OF00008946

(b)    Borrower or Originator shall fail or neglect to perform, keep or observe any other provision of any Loan Documents (other than any provision embodied in or covered by any other clause of this Section) and the same shall remain unremedied for a period ending on the first to occur of five (5) business days after Borrower or Originator shall receive written notice of any such failure from Lender or five (5) business days after Borrower or Originator shall become aware thereof; provided however, that if Originator or Borrower fails to transmit funds as required in Section 2.2(b), such five-day grace period shall not apply and there shall be no grace period.

(c)    Any representation or warranty in any Loan Document or in any written statement, report, financial statement or certificate made or delivered to Lender by Borrower is untrue or incorrect in any material respect as of the date when made or deemed made.

(d)    Any assets of Borrower or Originator shall be attached, seized or levied upon, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of Borrower.

(e)    A case or proceeding shall have been commenced against Borrower or Originator (i) under Title 11 of the United States Code or any other applicable federal, state or foreign bankruptcy or other similar law; (ii) requesting the appointment of a custodian, receiver or trustee (or similar official) of Borrower or Originator or of any substantial part of its assets; or (iii) requesting the winding-up or liquidation of the affairs of Borrower or Originator, and such case or proceeding shall remain undismissed or unstayed for sixty (60) days or such court shall enter a decree or order granting the relief sought in such case or proceeding.

(f)    Borrower or Originator (i) shall file a petition seeking relief under Title 11 of the United States Code, or any other applicable federal, state or foreign bankruptcy or other similar law; (ii) shall fail to contest in a timely and appropriate manner or shall consent to the institution of proceedings thereunder or to the filing of any such petition or to the appointment of or taking possession by a custodian, receiver or trustee (or similar official) of Borrower or Originator or of any substantial part of its assets; (iii) shall make an assignment for the benefit of creditors; or (iv) shall take any action in furtherance of any of the foregoing; or (v) shall admit in writing its inability to, or shall be generally unable to, pay its debts as such debts become due.

(g)    A final judgment or judgments for the payment of money shall be rendered against Borrower and the same shall not, within thirty (30) days after the entry thereof, have been discharged or execution thereof stayed or bonded pending appeal, or shall not have been discharged prior to the expiration of any such stay.

(h)    A Change of Control Date shall have occurred.

(i)    Any other event shall have occurred that has a Material Adverse Effect.

7.2    **Remedies.**

(a)    If any Event of Default shall have occurred and be continuing, Lender may, without notice, (i) suspend or terminate this facility with respect to further Receivables Loans, and, upon written notice, terminate this Agreement (in which case the Facility

OF/SFF 002938
OF00008947

Termination Date shall be the termination date set forth in such notice); (ii) declare all or any portion of the Promissory Notes due; and (iii) exercise any rights and remedies provided to Lender under the Loan Documents and/or at law or equity, including all remedies provided under the Code; provided, that upon the occurrence of an Event of Default specified in Sections 7.1 (d),(e) or (f), all of the obligations shall become immediately due and payable automatically without declaration, notice or demand by any Person. Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies which Lender may have under any other agreement, including the other Loan Documents, by operation of law or otherwise. Recourse to any Collateral shall not be required. Borrower hereby irrevocably appoints Lender and its successors and assigns as Borrower's attorney-in-fact, coupled with an interest, to take all actions and perform all obligations required of Borrower under this Agreement after the occurrence and during the continuance of an Event of Default.

(b)    If any Event of Default shall have occurred and be continuing and if Lender determines that Originator is unwilling or unable to complete any inventory sale as required under any Originator Purchase Order or Buyer Purchase Order, then Lender or its successors and assigns may assume control of, and conduct and complete, such inventory sale pursuant to the terms of such Originator Purchase Order or Buyer Purchase Order, as the case may be.

7.3    **Term**.  The financing arrangements contemplated hereby shall be in effect until the Facility Termination Date.  In addition to Lender's rights under Section 7.2(a)(i), either Borrower or Lender may also terminate this Agreement on thirty (30) days prior written notice, and the Facility Termination Date shall be the thirtieth day after such notice (unless otherwise agreed by Borrower and Lender); provided that such termination shall not affect: (a) Borrower's obligations to make any payments due and owing to Lender pursuant to this Agreement; and (b) the indemnification provisions under Section 2.6, all of which shall remain operative and in full force and effect.  Upon payment in full in cash and performance of all of Borrower's obligations to Lender (other than indemnification obligations hereunder), Lender shall deliver to Borrower and Originator termination statements, release of Collateral and guaranties and other documents necessary or appropriate to evidence termination of the liens and guaranties securing payment of the amounts owed to Lender hereunder.

8.    **MISCELLANEOUS**

8.1    **Complete Agreement; Modification of Agreement**.  The Loan Documents constitute the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in Section 8.2 below.  Any prior agreement, whether written or oral, between Borrower and Lender or any of their respective affiliates, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement.

8.2    **Amendments**.  No amendment, modification, or termination of any provision of any Loan Document, or any consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and Borrower.

OF/SFF 002939

OF00008948

**8.3    Fees and Expenses.**  Borrower shall reimburse Lender for all fees, filing fees, costs and expenses, including the fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(a)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrower or any other Person as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection therewith or herewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to Lender by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any workout or restructuring of the Receivables Loans during the pendency of one or more Events of Default;

(b)    any attempt to enforce any remedies of Lender against Borrower or any other Person that may be obligated to Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any workout or restructuring of the Receivables Loans during the pendency of one or more Events of Default; and

(c)    efforts to perfect, verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

including all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in any way or respect arising in connection with or relating to any of the events or actions described in this Section, all of which shall be payable, on demand, by Borrower to Lender. If Borrower shall fail to pay any of such items upon demand, interest under Section 2.4 shall apply to such items until payment in full.

**8.4    No Waiver.**  Lender's failure, at any time or times, to require strict performance by Borrower of any provision of this Agreement and any of the other Loan Documents shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith.  Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type.  None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the other Loan Documents and no default or Event of Default by Borrower shall be deemed to have been suspended or waived by Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of Lender and directed to Borrower specifying such suspension or waiver.

**8.5    Successors and Assigns.**  This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of Borrower, Lender and their respective successors and assigns (including a debtor-in-possession on behalf of Borrower or Originator).  Borrower may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written

OF/SFF 002940
OF00008949

consent of Lender. Any such purported assignment, transfer, hypothecation or other conveyance by Borrower without the prior express written consent of Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of Borrower and Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

**8.6    GOVERNING LAW. THE LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MINNESOTA WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. BORROWER HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN HENNEPIN COUNTY, MINNESOTA SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED, LENDER MAY BRING SUIT OR TAKE OTHER ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.**

**8.7    Notices.** Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered (a) upon the earlier of actual receipt and three business days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by email, telecopy or other similar facsimile transmission (with such email, telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section); (c) one business day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to:

If to Borrower:

> PC Funding, LLC
> 7585 Equitable Drive
> Eden Prairie, MN 55344
> Attn: Thomas J. Petters
> Fax: 952-975-2295
> email: Tom.Petters@redtagbiz.com

If to Lender:

OF/SFF 002941
OF00008950

Opportunity Finance, LLC
60 South Sixth Street
Minneapolis, MN 55402
Attn: Jon R. Sabes
Fax: 612-339-8922
email: sabesjon@qwest.net

or to such other address or person (or facsimile number) as may be substituted by notice given as herein provided.

**8.8    Counterparts.**  This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.

**8.9    WAIVER OF JURY TRIAL.   THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN LENDER AND BORROWER ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.**

**8.10    No Joint Venture.**  Nothing contained herein shall be deemed or construed to create a partnership or joint venture between Borrower and Lender or Originator and Lender.

**8.11    Other Lenders.**  The parties contemplate that from time to time Borrower may enter into financing agreements with Affiliates of Lender ("**Other Lenders**").  Lender may act as an agent for Other Lenders and Lender may appoint one or more Other Lenders or other Affiliates of Lender to act as agent for Lender for such purposes under this Agreement as Lender shall designate in a written notice to Borrower.  Borrower may not grant any Other Lender a lien on any Receivables Sale (or related asset) with respect to which Lender has made a Receivables Loan unless Lender consents to such grant in writing.  Any default or event of default under any financing agreement with any Other Lender shall constitute an Event of Default under this Agreement.

**8.12    Confidentiality.**  Lender agrees to use reasonable efforts (equivalent to the efforts Lender applies to maintain as confidential its own confidential information) to maintain as confidential all information provided by Borrower or Originator to Lender and designated as confidential; provided however, that Lender, may disclose such information to (i) any entity providing financing to Lender or any assignee of Lender (a "**Funding Source**"); (ii) any credit-enhancement provider of (a) Lender, (b) any assignee of Lender, or (c) any Funding Source (a "**Credit Enhancement Provider**"); or (iii) any rating agency; provided further that Lender or any such other party or person may disclose such information to Persons employed or engaged by Lender, such Funding Source, such Credit Enhancement Provider, or such rating agency in evaluating, approving, structuring or administering the Receivables Loans and the financing facility provided hereunder; provided however, that any such party or person to whom such information will be provided agrees to maintain such information as confidential as set forth

17

OF/SFF 002942
OF00008951

above, and provided that Lender or any such party or person may disclose such information (a) as required or requested by any governmental authority or reasonably believed by Lender, any Funding Source, any Credit Enhancement Provider, or any rating agency to be compelled by any court decree, subpoena or legal or administrative order or process; (b) as, in the opinion of counsel to Lender, any Funding Source, any Credit Enhancement Provider, or any rating agency required by law; (c) in connection with the exercise of any right or remedy under the Loan Document or in connection with any litigation to which Lender, any Funding Source, any Credit Enhancement Provider or rating agency is a party; or (d) which ceases to be confidential through no fault of Lender, any Funding Source, any Credit Enhancement Provider or any rating agency.

    **8.13   Consent to Sale or Transfer.**   Borrower and Originator hereby consent, and agree to be bound by, any sale, transfer, assignment or pledge of any or all right, title and interest of Lender in, to or under the Receivables, Loans, Collateral, Loan Documents and any or all related rights, privileges and entitlements therein, and hereby further consents to the Lender's transfer, assignment, and pledge of any or all of its rights as a third-party beneficiary under the Sale Agreement.   Borrower and Originator further consent to, and agree to be bound by, any subsequent sales, transfers, assignments or pledges of any or all of the foregoing by any transferee, assignee or pledge of Lender.

    IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

PC FUNDING, LLC

By: _____
  Thomas J. Petters
  President


OPPORTUNITY FINANCE, LLC

By: _____
  Jon R. Sabes
  Chief Manager and President

OF/SFF 002943
OF00008952

## ACKNOWLEDGMENT AND AGREEMENT

The undersigned hereby consents to the foregoing Credit Agreement and agrees to be bound by, perform those obligations imposed on it by, and be responsible for the representations and warranties by it in, the Credit Agreement.

PETTERS COMPANY, INC.
a Minnesota corporation

By: _____

Thomas J. Petters
President

451325/8                              19.                    ...21.17/112001/CreditAg

OF/SFF 002944

OF00008953

## EXHIBIT A

### FORM OF RECEIVABLES LOAN PROPOSAL

Reference is made to that certain Credit Agreement dated as of December __, 2001 by and between the undersigned ("Borrower") and Opportunity Finance, LLC ("Lender") (the "Credit Agreement"). Capitalized terms used herein without definition are so used as defined in the Credit Agreement.

The undersigned, being the _____ of Borrower, hereby certifies that the information provided herein is true and correct in all material respects.

1.  **GENERAL INFORMATION REGARDING SELLER AND INVENTORY (AND COPIES OF ASSOCIATED BUYER PURCHASE ORDERS AND ORIGINATOR PURCHASE ORDERS)**

    (a)   Name of Seller   _____

    (b)   Originator Purchase Order No. (if available)   _____

    (c)   Purchase Price on Bill of Sale or Buyer Purchase Order   $_____

    (d)   Buyer Purchase Order No. (if available)   _____

    (e)   Inventory Description:

    _____

    _____

2.  **AMOUNT REQUESTED FOR LOAN**   $_____

3.  **INTEREST**

    (a)   Monthly Interest Rate   _____%

    or

    (b)   Fixed Yield   $_____

4.  **DESCRIPTION OF INSURANCE**

    _____

    _____

PC FUNDING, LLC

By:_____
Name:_____
Title:_____
Dated:_____

Accepted:

OPPORTUNITY FINANCE, LLC

By:_____
Name:_____
Its:_____
Dated:_____

i

OF00008954

# EXHIBIT  B

EXHIBIT B

PROMISSORY NOTE

$_____                                    Minneapolis, Minnesota
                                                    _____, 2001

    FOR VALUE RECEIVED, the undersigned, PC FUNDING, L.L.C., a Delaware corporation ("**Borrower**"), hereby promises to pay to the order of OPPORTUNITY FINANCE, LLC ("**Lender**"), or its assigns, on the earlier of (i) the 120th day after the date hereof; or (ii) the day upon which Borrower receives available funds from payment from the Buyer on the Receivables Sale financed by the proceeds of this Promissory Note pursuant to the Credit Agreement (as defined below), at its main office in Minneapolis, Minnesota, or at such other place as Lender may designate from time to time in writing, in lawful money of the United States of America and in immediately available funds, the principal amount of _____ DOLLARS ($_____).

    All capitalized terms, unless otherwise defined herein, shall have the meanings assigned to them in the Credit Agreement of dated as of December 17, 2001 (as the same may be subsequently amended, restated or otherwise modified, the "Credit Agreement") by and between Borrower and Lender.  The terms, covenants, and conditions of the Credit Agreement and all other instruments evidencing or securing the indebtedness hereunder, including the Loan Documents, are made a part of this Promissory Note and are deemed incorporated herein in full. This Promissory Note is issued pursuant to the Credit Agreement, is one of the Promissory Notes referred to therein, and is entitled to the benefit and security of the Loan Documents provided for therein, to which reference is hereby made for a statement of all of the terms and conditions under which the Receivables Loan evidenced hereby have been made and are to be repaid.  The date and amount of each Receivables Loan made by Lender to Borrower and each payment made on account of the principal thereof, shall be recorded by Lender on its books; provided that the failure of Lender to make any such recordation shall not affect the obligations of Borrower to make a payment when due of any amount owing under the Credit Agreement or this Promissory Note with respect to the Receivables Loans made by Lender to Borrower.

    Borrower shall pay [interest at the rate of ____% for each 30-day period (pro rated for partial periods) from the date hereof until paid in full] [a Fixed Yield of $_____] on this Promissory Note, payable on the date that principal is payable.

    Borrower may prepay the principal of this Promissory Note in whole or in part at any time at Borrower's option without premium or penalty, provided that any prepayment shall be applied first to [accrued interest on the amount prepaid through the date of payment] [the Fixed Yield], and then to the principal amount hereof.

    If any payment on this Promissory Note becomes due and payable on a day other than a business day, the maturity thereof shall be extended to the next succeeding business day.

    Upon the occurrence and during the continuance of any Event of Default, this Promissory Note may, as provided in the Credit Agreement, without demand, notice or legal process of any kind, be declared, and upon such declaration immediately shall become, or upon certain

461325/8                                    1

circumstances set forth in the Credit Agreement may become without declaration, due and payable.

In the event that Borrower fails to pay when due any payment under this Promissory Note, interest shall accrue on the past due payment from the due date until such payment at the interest rate stated above, or in the event no such interest rate is stated above, then at the rate of twenty percent (20%) per annum.

Wherever possible each provision of this Promissory Note shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Promissory Note shall be prohibited or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Promissory Note.

Time is of the essence of this Promissory Note. To the fullest extent permitted by applicable law, Borrower waives: (a) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all Loan Documents, notes, commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard; (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, any Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies; and (c) the benefit of all valuation, appraisal and exemption laws.

BORROWER WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER THIS PROMISSORY NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, WHETHER ARISING IN CONTRACT OR TORT OR OTHERWISE.

THIS PROMISSORY NOTE SHALL BE GOVERNED BY, AND INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MINNESOTA WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

PC FUNDING, LLC
a Delaware limited liability company

By:_____

Name:_____

Title:_____

# EXHIBIT C

## SECURITY AGREEMENT
### (Borrower)

This SECURITY AGREEMENT (this "**Security Agreement**"), dated as of December 17, 2001, between PC Funding, LLC, a Delaware limited liability company ("**Grantor**"), and OPPORTUNITY FINANCE, LLC, a Delaware limited liability company ("**Lender**").

WHEREAS, pursuant to that certain Credit Agreement dated as of the date hereof by and between Grantor and Lender (the "**Credit Agreement**"), Lender has agreed to provide to Grantor the financing facility described therein;

WHEREAS, in order to induce Lender to enter into the Credit Agreement and the other Loan Documents and to provide the financing facility as provided for in the Credit Agreement, Grantor has agreed to grant and herein does grant to Lender and Lender's successors or assigns a continuing Lien on the Collateral (hereinafter defined) to secure the payment in full of the Obligations (hereinafter defined);

WHEREAS, the Grantor acquired, or in the future will acquire, some or all of the Collateral from Petters Company, Inc. (the "**Seller**") pursuant to a Sale Agreement (the "**Sale Agreement**") dated as of the date hereof between the Grantor and the Seller;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **DEFINED TERMS.** All capitalized terms used but not otherwise defined herein have the meanings given to them in the Credit Agreement. All other undefined terms contained in this Security Agreement, unless the context indicates otherwise, have the meanings provided for by Article 9 of the Uniform Commercial Code in effect in Minnesota as of the date hereof and as amended hereafter from time to time ("**Code**") to the extent the same are used or defined therein. The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation."

"Account Debtor" shall mean a Buyer, as defined in the Credit Agreement.

"**Accounts**" shall mean all "accounts," as such term is defined in the Code, now owned or hereafter acquired by Grantor and, in any event, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to Grantor, whether arising out of goods sold or services rendered or from any other transaction (including any such obligations which may be characterized as an account or contract right under the Code), (b) all of Grantor's rights in, to and under all purchase orders, including all Buyer Purchase Orders, or receipts now owned or hereafter acquired by it for goods or services, (c) all of Grantor's rights to any goods represented by or relating to any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all monies due or to become due to Grantor, under all purchase orders and contracts for the sale of goods or the performance of services or both by such Grantor or in connection with any other transaction (whether or not yet earned by performance on the part of Grantor or any other person) now or hereafter in existence, including the right to receive the proceeds of said purchase orders and contracts, and (e) all collateral security and guarantees of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"**Books and Records**" the term "Books and Records" shall mean all of Grantor's books and records including, but not limited to, records indicating, summarizing, or evidencing the Collateral (hereinafter defined), the Obligations, and/or Grantor's property, business operations, or financial condition; and computer runs, invoices, tapes, processing software, processing contracts (such as

42019174                                    1                          42421 17/112001/SecAgt

OF/SFF 002970
OF00008979

contracts for computer time and services) and any computer prepared information, tapes or data of every kind and description, whether in the possession of Grantor or in the possession of third parties.

"**Chattel Paper**" shall mean any "chattel paper," as such term is defined in the Code, now owned or hereafter acquired by Grantor, wherever located.

"**Contracts**" shall mean the Sale Agreement, each "Contract" as defined in the Sale Agreement and all other contracts, now owned or hereafter acquired by Grantor, in any event, including all Buyer Purchase Orders, Originator Purchase Orders, contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which Grantor may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account, together with any and all extensions, modifications, amendments and renewals of such contracts, undertakings and agreements and all rights of Grantor to receive moneys due or to become due thereunder or pursuant thereto and to amend, modify, terminate or exercise rights under such contracts, undertakings and agreements.

"**Copyrights**" shall mean all of the following now owned or hereafter acquired by Grantor: (a) all copyrights and general intangibles of like nature (whether registered or unregistered), now owned or existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States of America, any state or territory thereof, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

"**Documents**" shall mean any "documents," as such term is defined in the Code, now owned or hereafter acquired by Grantor, wherever located.

"**Equipment**" shall mean all "equipment," as such term is defined in the Code, now owned or hereafter acquired by Grantor, wherever located and, in any event, including all Grantor's machinery and equipment, including processing equipment, conveyors, machine tools, data processing and computer equipment with software and peripheral equipment and all engineering, processing and manufacturing equipment, office machinery, furniture, materials, handling equipment, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, rolling stock and other equipment of every kind and nature, trade fixtures and fixtures not forming a part of real property, all whether now owned or hereafter acquired, and wherever situated, together with all additions and accessions thereto, replacements therefor, all parts therefor, all substitutes for any of the foregoing, fuel therefor, and all manuals, drawings, instructions, warranties and rights with respect thereto, and all products and proceeds thereof and condemnation awards and insurance proceeds with respect thereto.

"**Fixtures**" shall mean any "fixtures" as such term is defined in the Code, now owned or hereafter acquired by Grantor.

"**General Intangibles**" shall mean any "general intangibles," as such term is defined in the Code, now owned or hereafter acquired by Grantor, and, in any event, including all right, title and interest which Grantor may now or hereafter have in or under any Buyer Purchase Order not constituting an Account, any Contract, all customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in intellectual Property, Books and Records, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill as associated with any Trademark or trademark license), payment intangibles, all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit, checking and other bank accounts, rights to receive tax refunds and other payments, rights of

OF/SFF 002971
OF00008980

indemnification, all books and records, correspondence, credit files, invoices and other papers, including all tapes, cards, computer runs, any and all security interests granted to Grantor under the Sale Agreement and other papers and documents in the possession or under the control of Grantor or any computer bureau or service company from time to time acting for Grantor.

"**Goods**" shall mean any "goods," as such term is defined in the Code, now owned or hereafter acquired by Grantor, wherever located.

"**Instruments**" shall mean any "instrument," as such term is defined in the Code, now owned or hereafter acquired by Grantor, wherever located, and, in any event, including all certificated securities, all certificates of deposit, and all notes and other, without limitation, evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"**Inventory**" shall mean any "inventory," as such term is defined in the Code, now or hereafter owned or acquired by Grantor, wherever located, and in any event including inventory, merchandise, goods and other personal property which are held by or on behalf of Grantor for sale or lease, or that have been returned to or repossessed by or on behalf of Grantor (in each case whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of Grantor or is held by Grantor or by others for the account of Grantor) or are furnished or are to be furnished under a contract of service, or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in Grantor's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including other supplies.

"**Intellectual Property**" shall mean any and all Licenses, Patents, Copyrights, Trademarks, trade secrets and customer lists.

"**Investment Property**" shall have meaning ascribed thereto in the Code and shall include (i) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares; (ii) all securities entitlements of Grantor, including the rights of Grantor to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account; (iii) all securities accounts held by Grantor; (iv) all commodity contracts held by Grantor; and (v) all commodity accounts held by Grantor, and all goods in which Grantor now or at any time hereafter has any interest or right of any kind, and all goods that have been returned to or repossessed by or on behalf of Grantor, in each case whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of Grantor or is held by Grantor or by others for the account of Grantor, and in each case whether now owned or existing or hereafter acquired or arising.

"**License**" shall mean any copyright license, patent license, trademark license or other license of rights or interests now held or hereafter acquired by Grantor.

"**Obligations**" shall mean the full and complete performance of all terms and conditions and payment of all debts, liabilities and obligations arising under the Credit Agreement and any instrument or document referenced in the Credit Agreement.

"**Patents**" shall mean all of the following in which Grantor now holds or hereafter acquires any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State or Territory thereof, or any other country, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"**Proceeds**" shall mean "proceeds," as such term is defined in the Code and, in any event, shall include (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Grantor

OF/SFF 002972
OF00008981

from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any Person acting under color of governmental authority), (c) any claim of Grantor against third parties (i) for past, present or future infringement of any Patent or patent license, or (ii) for past, present or future infringement or dilution of any Copyright, copyright license, Trademark or trademark license, or for injury to the goodwill associated with any Trademark or trademark license, (d) any recoveries by Grantor against third parties with respect to any litigation or dispute concerning any of the Collateral, and (e) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral, upon disposition or otherwise.

"**Termination Date**" means the "Facility Termination Date" as defined in the Credit Agreement.

"**Trademarks**" shall mean all of the following now owned or hereafter acquired by any Grantor: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), now owned or existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

2. **GRANT OF LIEN.**

(a) To secure the prompt and complete payment, performance and observance of all of the Obligations, Grantor hereby grants, assigns, conveys, mortgages, pledges, hypothecates and transfers to Lender a Lien upon all of its property and assets, including without limitation all of its right, title and interest in, to and under the following property, whether now owned by or owing to, or hereafter acquired by or arising in favor of Grantor (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from or to, Grantor, and regardless of where located (all of which being hereinafter collectively referred to as the "**Collateral**"):

    (i)    all Accounts;

    (ii)    all Books and Records;

    (iii)    all Chattel Paper;

    (iv)    all Contracts;

    (v)    all Documents;

    (vi)    all Equipment;

    (vii)    all Fixtures;

    (viii)    all General Intangibles;

    (ix)    all Goods;

    (x)    all Instruments;

    (xi)    all Inventory;

OF/SFF 002973
OF00008982

    (xii)    all Investment Property;

    (xiii)    all money, cash or cash equivalents of Grantor;

    (xiv)    to the extent not otherwise included, all Proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing; and

    (xv)    to the extent not covered or not specifically excluded by clauses (i) through (xiv) above, all of Grantor's other personal property, whether now owned or hereafter acquired.

(b)   In addition, to secure the prompt and complete payment, performance and observance of the Obligations and in order to induce Lender as aforesaid, Grantor hereby grants to Lender a right of set-off against the property of Grantor held by Lender, consisting of property described above in Section 2(a) now or hereafter in the possession or custody of or in transit to Lender, for any purpose, including safekeeping, collection or pledge, for the account of Grantor, or as to which Grantor may have any right or power.

(c)   Security for Secured Obligations.  This Agreement and the Collateral secure the full and prompt payment, at any time and from time to time as and when due (whether at the stated maturity, by acceleration or otherwise), of all liabilities and obligations of Grantor, whether now existing or hereafter incurred, created or arising and whether direct or indirect, absolute or contingent, due or to become due, and whether under, arising out of or in connection with the Credit Agreement, this Agreement or any of the other Loan Documents to which it is or hereafter becomes a party, including, without limitation, all principal of and interest on the Receivables Loans, all fees, expenses, indemnities and other amounts payable by Grantor under the Credit Agreement or any other Loan Document (including interest accruing after the filing of a petition or commencement of a case by or with respect to the Grantor seeking relief under any applicable federal and state laws pertaining to bankruptcy, reorganization, arrangement, moratorium, readjustment of debts, dissolution, liquidation or other debtor relief, specifically including, without limitation, the Bankruptcy Code and any fraudulent transfer and fraudulent conveyance laws, whether or not the claim for such interest is allowed in such proceeding).

3.   **LENDER'S RIGHTS; LIMITATIONS ON LENDER'S OBLIGATIONS**

(a)   It is expressly agreed by Grantor that, anything herein to the contrary notwithstanding, Grantor shall remain liable under each of its Contracts and each of its Licenses to observe and perform all the conditions and obligations to be observed and performed by it thereunder.  Lender shall not have any obligation or liability under any Contract or License by reason of or arising out of this Security Agreement or the granting herein of a Lien thereon or the receipt by Lender of any payment relating to any Contract or License pursuant hereto.  Lender shall not be required or obligated in any manner to perform or fulfill any of the obligations Grantor under or pursuant to any Contract or License, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contract or License, or to present or file any claims, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)   Lender may at any time after an Event of Default shall have occurred and be continuing, without prior notice to Grantor, notify Account Debtors, parties to the Contracts and obligors in respect of Instruments and Chattel Paper, that the Accounts and the right, title and interest of Grantor in and under such Contracts, Instruments and Chattel Paper have been assigned to Lender and that payments shall be made directly to Lender.  Upon the request of Lender, Grantor shall so notify Account Debtors, parties to Contracts and obligors in respect of Instruments and Chattel Paper.  Prior to the occurrence of an Event of Default, neither Lender nor

5

OF/SFF 002974
OF00008983

any of its successors, assigns, participants, creditors nor any of their employees, officers or agents shall contact any Account Debtor, party to any Contract or obligor in respect of Instruments or Chattel Paper with respect to any rights under this Agreement, including the foregoing, without the prior consent of Grantor.

(c)   Lender may at any time in Lender's own name or in the name of Grantor communicate with Account Debtors, parties to Contracts, obligors in respect of Instruments and obligors in respect of Chattel Paper to verify with such Persons, to Lender's satisfaction, the existence, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper. If an Event of Default shall have occurred and be continuing, Grantor, at its own expense, shall cause the independent certified public accountants then engaged by Grantor to prepare and deliver to Lender at any time and from time to time promptly upon Lender's request, the following reports with respect to Grantor: (i) a reconciliation of all Accounts; (ii) an aging of all Accounts; (iii) trial balances; and (iv) a test verification of such Accounts as Lender may request. Grantor, at its own expense, shall deliver to Lender the results of each physical verification if any, which Grantor may in its discretion have made, or caused any other Person to have made on its behalf, of all or any portion of its Inventory.

(d)   Subject to Section 5.5 of the Credit Agreement, the Lender is hereby authorized to file, from time to time, UCC Financing Statements in such jurisdictions as necessary or appropriate, in the discretion of Lender, to perfect the securities interests of the Lender granted hereunder.

4.      REPRESENTATIONS AND WARRANTIES.  Grantor represents and warrants that:

(a)   Grantor is the sole owner of each item of the Collateral upon which it purports to grant a Lien hereunder, and has good and marketable title thereto free and clear of any and all Liens other than encumbrances permitted under the Credit Agreement.

(b)   No effective security agreement, financing statement, equivalent security or Lien instrument or continuation statement covering all or any part of the Collateral is on file or of record in any public office, except such as may have been filed (i) by Grantor in favor of Lender pursuant to this Security Agreement or the other Loan Documents, and (ii) in connection with any other encumbrances permitted under the Credit Agreement.

(c)   This Security Agreement is effective to create a valid and continuing Lien on, and upon the filing of the appropriate financing statements, a perfected Lien in favor of Lender on, the Collateral with respect to which a Lien may be perfected by filing pursuant to the Code.  Such Lien is prior to all other Liens, except encumbrances permitted under the Credit Agreement that would be prior to Liens in favor of Lender as a matter of law, and is enforceable as such as against any and all creditors of and purchasers from Grantor (other than purchasers of Inventory in the ordinary course of business).  All action by Grantor necessary or desirable to protect and perfect such Lien on each item of the Collateral has been duly taken.

(d)   The Lien of Lender on the Collateral is prior to all other Liens, and is enforceable as such against any and all creditors of and purchasers from Grantor.

(e)   Grantor's state of formation is Delaware and Grantor's chief executive office, principal place of business, corporate offices and the location of all of its books and records concerning the Collateral is the Grantor's address stated in the Credit Agreement.

(f)   With respect to the Accounts: (i) they represent bona fide sales of Inventory or rendering of services to Account Debtors in the ordinary course of Grantor's or Seller's business and are not evidenced by a judgment, Instrument or Chattel Paper; (ii) there are no setoffs, claims or disputes existing or asserted with respect thereto except as arise in the ordinary course

420191.5                                          6                        42421.17311200L/SecAgt

OF/SFF 002975
OF00008984

of business and which are not expected to result in a Material Adverse Effect, and Grantor has not made any agreement with any Account Debtor for any extension of time for the payment thereof beyond the due date of the related Promissory Note, any compromise or settlement for less than the full amount thereof, any release of any Account Debtor from liability therefor, or any deduction therefrom except a discount or allowance allowed by Grantor or Seller in the ordinary course of its business and disclosed to Lender; (iii) to Grantor's knowledge, there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or could reasonably be expected to reduce the amount payable thereunder as shown on Grantor's books and records and any invoices or statements delivered to Lender with respect thereto; (iv) Grantor has not received any notice of proceedings or actions which are threatened or pending against any Account Debtor which might result in any adverse change in such Account Debtor's financial condition; and (v) Grantor has no knowledge that any Account Debtor is unable generally to pay its debts as they become due.  Further with respect to the Accounts (x) the amounts shown on such records and all invoices and statements that may be delivered to Lender with respect thereto are actually and absolutely owing to Grantor as indicated thereon and are not in any way contingent; (y) no payments have been or shall be made thereon; and (z) to Grantor's knowledge, all Account Debtors have the capacity to contract.

(g)  With respect to any Inventory, except as otherwise disclosed by Grantor to Lender in writing; (i) such Inventory is in transit, located at a Seller's location or a Buyer's location, or located at one of Grantor's locations disclosed to Lender in writing; (ii) no Inventory is now, or shall at any time or times hereafter be stored at any other location without Lender's prior consent, and if Lender gives such consent, Grantor will concurrently therewith obtain, to the extent required by the Credit Agreement, bailee, landlord and mortgagee agreements; (iii) Grantor has good, indefeasible and merchantable title to such Inventory and such Inventory is not subject to any Lien or security interest or document whatsoever except for the Lien granted to Lender and except for encumbrances permitted under the Credit Agreement; (iv) such Inventory is of good and merchantable quality, free from any defects; (v) such Inventory is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreements with any third parties which would require any consent to any third party upon sale or disposition of that Inventory or the payment of any monies to any party as a precondition of such sale or other disposition; (vi) the completion of manufacture, sale or other disposition of such inventory by Lender following an Event of Default shall not require consent of any Person and shall not constitute a breach or default under any contract or agreement to which Grantor is a party or to which such property is subject; and (vi) there are no documents of title incident to any Inventory.

(h) Grantor shall diligently enforce its rights under the Sale Agreement, but if Grantor fails to do so, Grantor authorizes and empowers Lender to enforce such rights on behalf and in the name of Grantor.

5.     COVENANTS.  Grantor covenants and agrees with Lender that from and after the date of this Security Agreement and until the Termination Date:

(a) **Further Assurances; Pledge of Instruments**.  At any time and from time to time, upon the written request of Lender and at the sole expense of Grantor, Grantor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as Lender may deem desirable to obtain the full benefits of this Security Agreement and of the rights and powers herein granted, including (i) using its best efforts to secure all consents and approvals necessary or appropriate for the assignment to or for the benefit of Lender of any License or Contract held by Grantor or in which Grantor has any rights not heretofore assigned, (ii) filing any financing or continuation statements under the Code with respect to the Liens granted hereunder or under any other Loan Document; (iii) transferring Collateral to Lender's possession if such Collateral consists of Documents, Chattel Paper, Instruments or if a Lien on such Collateral can be perfected only by possession, or if requested by Lender, and (iv) obtaining, or using its best efforts to obtain, waivers of Liens, any exist, from landlords and mortgagees in accordance with the Credit Agreement.  Grantor also hereby

42019175                                    7.                        42421 17/112h01 Sec Agt

OF/SFF 002976
OF00008985

authorizes Lender to file any such financing, continuation statements and amendments thereto against Grantor. If any amount payable under or in connection with any of the Collateral is or shall become evidenced by any Instrument, such Instrument, other than checks and notes received in the ordinary course of business, shall be duly endorsed in a manner satisfactory to Lender immediately upon Grantor's receipt thereof.

(b)  **Maintenance of Records.**  Grantor shall keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, including a record of any and all payments received and any and all credits granted with respect to the Collateral and all other dealings with the Collateral.  Grantor shall mark its Books and Records pertaining to the Collateral to evidence this Security Agreement and the Liens granted hereby and shall furnish such Books and Records to Lender from time to time at Lender's request.

(c)  **Indemnification.**  In any suit, proceeding or action brought by Lender relating to any Account, Chattel Paper, Contract, Document, General Intangible or Instrument for any sum owing thereunder or to enforce any provision of any Account, Chattel Paper, Contract, Document, General Intangible or Instrument, Grantor will save, indemnify and keep Lender harmless from and against all expense (including reasonable attorneys' fees and expenses), loss or damage suffered by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the obligor thereunder, arising out of a breach by Grantor of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to, or in favor of, such obligor or its successors from Grantor, except in the case of Lender, to the extent such expense, loss, or damage is attributable solely to the gross negligence or willful misconduct of Lender as finally determined by a court of competent jurisdiction.  All such obligations of Grantor shall be and remain enforceable against and only against Grantor and shall not be enforceable against Lender.

(d)  **Compliance with Terms of Accounts, etc.**  In all material respects, Grantor will perform and comply with all obligations in respect of its Accounts, Chattel Paper, Contracts and Licenses and all other agreements to which it is a party or by which it is bound relating to the Collateral and shall endeavor to collect its Accounts and all amounts owing to it thereunder in the ordinary course of its business consistent with past practices, and in connection therewith, upon the occurrence and continuance of an Event of Default, shall, at the request of the Lender, take such action as the Lender may deem necessary or advisable (within applicable laws) to enforce such collection.

(e)  **Limitation on Liens on Collateral.**  Grantor will not create, permit or suffer to exist, and will defend the Collateral against, and take such other action as is necessary to remove, any Lien on the Collateral except encumbrances permitted under the Credit Agreement, and will defend the right, title and interest of Lender in and to any of Grantor's rights under the Collateral against the claims and demands of all Persons whomsoever.

(f)  **Inventory.**  Grantor will, in accordance with sound business practices, maintain, to the fullest extent practicable, all Inventory held by it or on its behalf in good saleable or useable condition.  Grantor agrees that it shall not permit any Inventory to be in the possession of any bailee, warehouseman, agent or processor at any time unless such bailee, warehouseman, agent or processor shall have been notified of the security interest created by this Agreement and such Grantor shall have obtained, at such Grantor's sole cost and expense, a written agreement by such person to hold such Inventory subject to the security interest created by this Agreement and the instructions of the Lender and to waive and release any Lien (whether arising by operation of law or otherwise) such person may have with respect to such Inventory, such agreement to be in form and substance reasonably satisfactory to the Lender.

(g)  **Limitations on Disposition.**  Grantor will not sell, lease, transfer or otherwise dispose of any of the Collateral, or attempt or contract to do so except as permitted by the Credit Agreement.

420181 5                                           8                        42421 17/112601/SecAgt

OF/SFF 002977
OF00008986

(h)  **Further Identification of Collateral.**  Grantor will, if so requested by Lender, furnish to Lender, as often as Lender requests, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Lender may reasonably request, all in such detail as Lender may specify.

(i)  **Notices.**  Grantor will advise Lender promptly, in reasonable detail, (i) of any Lien or claim made or asserted against any of the Collateral; (ii) of the occurrence of any other event which would have a material adverse effect on the aggregate value of the Collateral or on the Liens created hereunder or under any other Loan Document; and (iii) of any change of name of Grantor or change of location of Grantor's principal office.

(j)  Grantor hereby irrevocably makes, constitutes and appoints the Lender at all times after the occurrence and during the continuance of an Event of Default, its true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing its name on any check, draft, instrument or other item or payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect to such policies of insurance.  Grantor will deliver to the Lender, promptly as rendered, true copies of all material claims and reports made in any reporting forms to insurance companies.  Not less than 30 days prior to the expiration date of the insurance policies required to be maintained by Grantor hereunder, Grantor will deliver to the Lender one or more certificates of insurance evidencing renewal of the insurance coverage required hereunder plus such other evidence of payment of premiums therefor as the Lender may request.  Upon the reasonable request of the Lender from time to time, each Lender will deliver to the Lender evidence that the insurance required to be maintained pursuant to this Section is in effect.

REMEDIES; RIGHTS UPON DEFAULT.

(a)  In addition to all other rights and remedies granted to it under this Security Agreement, the Credit Agreement, the other Loan Documents and under any other instrument or agreement securing, evidencing or relating to any of the Obligations, if any Event of Default shall have occurred and be continuing, Lender may exercise all rights and remedies of a secured party under the Code.  Without limiting the generality of the foregoing, Grantor expressly agrees that in any such event Lender, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon Grantor or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the Code and other applicable law) may forthwith enter upon the premises of Grantor where any Collateral is located through self-help, without judicial process, without first obtaining a final judgment or giving Grantor or any other Person notice and opportunity for a hearing on Lender's claim or action, and may collect, receive, assemble, process, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at a public or private sale or sales, at any exchange at such prices as it may deem acceptable, for cash or on credit or for future delivery without assumption of any credit risk.  Lender shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption Grantor hereby releases.  Such sales may be adjourned and continued from time to time with or without notice.  Lender shall have the right to conduct such sales on Grantor's premises or elsewhere and shall have the right to use Grantor's premises without charge for such time or times as Lender deems necessary or advisable.

If any Event of Default shall have occurred and be continuing, Lender may take possession of, receive, endorse, assign and deliver, in its own name or in the name of any Grantor, all checks, notes, drafts and other instruments relating to any Collateral, including receiving, opening and properly disposing of all mail addressed to any Grantor concerning

OF/SFF 002978
OF00008987

Accounts and other Collateral and to notify the appropriate postal authority to change the mailing or delivery address of such mail; to verify with account debtors or other contract parties the validity, amount or any other matter relating to any Accounts or other Collateral, in its own name or in the name of any Grantor, to accelerate any indebtedness or other obligation constituting Collateral that may be accelerated in accordance with its terms; to take or bring all actions and suits deemed necessary or appropriate to effect collections and to enforce payment of any Accounts or other Collateral; to settle, compromise or release in whole or in part any amounts owing on Accounts or other Collateral and to extent the time of payment of any and all Accounts or other amounts owing under any Collateral and to make allowances and adjustments with respect thereto, all in the same manner and to the same extent as any Grantor might have done and to notify any or all depository institutions with which any Deposit Accounts are maintained to remit and transfer all monies, securities and other property on deposit in such Deposit Accounts or deposited or received for deposit thereafter to the Lender, for deposit in a Collateral Account or such other accounts as may be designated by the Lender, for application to the Obligations as provided herein.

Grantor further agrees, at Lender's request, to assemble the Collateral and make it available to Lender at places which Lender shall select, whether at Grantor's premises or elsewhere. Until Lender is able to effect a sale, lease, or other disposition of Collateral, Lender shall have the right to hold or use Collateral, or any part thereof to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by Lender. Lender shall have no obligation to Grantor to maintain or preserve the rights of Grantor as against third parties with respect to Collateral while Collateral is in the possession of Lender. Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of Lender's remedies with respect to such appointment without prior notice or hearing as to such appointment. Lender shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale to the Obligations as provided in the Credit Agreement, and only after so paying over such net proceeds, and after the payment by Lender of any other amount required by any provision of law, need Lender account for the surplus, if any, to Grantor. To the maximum extent permitted by applicable law, Grantor waives all claims, damages, and demands against Lender arising out of the repossession, retention or sale of the Collateral except such as arise solely out of the gross negligence or willful misconduct of Lender as finally determined by a court of competent jurisdiction. Grantor agrees that ten (10) days prior notice by Lender of the time and place of any public sale or of the time after which a private sale may take place is reasonable notification of such matters. Grantor shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Obligations, including any attorneys, fees and other expenses incurred by Lender to collect such deficiency.

(b) Except as otherwise specifically provided herein, Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Security Agreement or any Collateral.

(c) Upon an Event of Default, Lender may exercise the power of attorney incorporated in this Security Agreement as Exhibit A.

6.     GRANT OF LICENSE TO USE INTELLECTUAL PROPERTY.   For the purpose of enabling Lender to exercise rights and remedies hereunder, Grantor hereby grants to Lender an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Grantor) to use, license or sublicense any Intellectual Property now owned or hereafter acquired by Grantor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

7.     LIMITATION ON LENDER'S DUTY IN RESPECT OF COLLATERAL.   Lender shall use reasonable care with respect to the Collateral in its possession or under its control Lender shall not have

OF/SFF 002979
OF00008988

any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of Lender, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

9.    **REINSTATEMENT.** This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Grantor for liquidation or reorganization, should Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of Grantor's assets and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

10.    **NOTICES.** Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give and serve upon any other party any communication with respect to this Security Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be given in the manner, and deemed received, as provided for in the Credit Agreement.

11.    **SEVERABILITY.** Whenever possible, each provision of this Security Agreement shall be interpreted in a manner as to be effective and valid under applicable law, but if any provision of this Security Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Security Agreement. This Security Agreement is to be read, construed and applied together with the Credit Agreement and the other Loan Documents which, taken together, set forth the complete understanding and agreement of Lender and Grantor with respect to the matters referred to herein and therein.

12.    **NO WAIVER, CUMULATIVE REMEDIES.** Lender shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder, and no waiver shall be valid unless in writing, signed by Lender and then only to the extent therein set forth. A waiver by Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Lender would otherwise have had on any future occasion. No failure to exercise nor any delay in exercising on the part of Lender, any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or future exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law. None of the terms or provisions of this Security Agreement may be waived, altered, modified or amended except by an instrument in writing, duly executed by Lender and Grantor.

13.    **LIMITATION BY LAW.** All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Security Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not reader this Security Agreement invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law.

14.    **SUCCESSORS AND ASSIGNS.** This Security Agreement and all obligations of Grantor hereunder shall be binding upon the successors and assigns of Grantor (including any debtor-in-possession on behalf of Grantor) and shall, together with the rights and remedies of Lender hereunder, inure to the benefit of Lender, all future holders of any instrument evidencing any of the Obligations and

OF/SFF 002980
OF00008989

their respective successors and assigns. No sales of participations, other sales assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner affect the Lien granted to Lender hereunder. Grantor may not assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Security Agreement.

15.     COUNTERPARTS. This Security Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one and the same agreement.

16.     GOVERNING LAW. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS SECURITY AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MINNESOTA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. GRANTOR HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN HENNEPIN COUNTY, MINNESOTA, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN GRANTOR AND LENDER PERTAINING TO THIS SECURITY AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, PROVIDED, THAT NOTHING IN THIS SECURITY AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE ANY AGREEMENT OR ANY COURT ORDER IN FAVOR OF LENDER. GRANTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND GRANTOR HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. GRANTOR HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO GRANTOR AT THE ADDRESS SET FORTH IN THE CREDIT AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF ACTUAL RECEIPT THEREOF OR THREE DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

17.     WAIVER OF JURY TRIAL. THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN LENDER AND GRANTOR ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED IN CONNECTION WITH, THIS SECURITY AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO.

18.     Advice of Counsel. Each of the parties represents to each other party hereto that it has discussed this Security Agreement and, specifically, the provisions of Section 16 and Section 17, with its counsel.

OF/SFF 002981
OF00008990

IN WITNESS WHEREOF, each of the parties hereto has caused this Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**GRANTOR:**

PC FUNDING, LLC., a Delaware limited liability company

By _____
Thomas J. Petters
President

**LENDER:**

OPPORTUNITY FINANCE, LLC, a Delaware limited liability company

By _____
Jon R. Sabes
Its Chief Manager and President

420191/5                    13                    42421 17/112001/SecAgt

OF/SFF 002982
OF00008991

## EXHIBIT A

### POWER OF ATTORNEY

This Power of Attorney is granted by PC Funding, LLC, a Delaware limited liability company ("Grantor") to Opportunity Finance, LLC, a Delaware limited liability company and its successors or assigns ("Attorney"), as Lender, under a Credit Agreement and a Security Agreement, both dated as of December ___, 2001, and other related documents (the "Loan Documents"). No person to whom this Power of Attorney is presented, as authority for Attorney to take any action or actions contemplated hereby, shall be required to inquire into or seek confirmation from Grantor as to the authority of Attorney to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Attorney unconditionally the authority to take and perform the actions contemplated herein, and Grantor irrevocably waives any right to commence any suit or action, in any law or equity, against any person or entity which acts in reliance upon or acknowledges the authority granted under this Power of Attorney. The power of attorney granted hereby is coupled with an interest, and may be revoked or canceled by Grantor without Attorney's written consent.

Grantor hereby irrevocably constitutes and appoints Attorney (an all offices, employees or agents designated by Attorney), with full power of substitution, as Grantor's true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Grantor and in the name of Grantor or in its own name, from time to time in Attorney's discretion, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Loan Documents and, without limiting the generality of the foregoing, Grantor hereby grants to Attorney the power and right, on behalf of Grantor, without notice to or assent by Grantor, and at any time after the occurrence and during the continuance of an Event of Default, to do the following:  (a) change the mailing address of Grantor, open a post office box on behalf of Grantor, open mail for Grantor, and ask, demand, collect, give acquittances and receipts for, take possession of, endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignment, verifications, and notices in connection with any property of Grantor; (b) effect any repairs to any asset of Grantor, or continue or obtain any insurance and pay all or any part of the premiums therefor and costs thereof, and make, settle and adjust all claims under such policies of insurance, and make all determinations and decisions with respect to such policies; (c) pay or discharge any taxes, liens, security interest, or other encumbrances levied or placed on or threatened against Grantor or its property; (d) defend any suit, action or proceeding brought against Grantor if Grantor does not defend such suit, action or proceeding or if Attorney believes that Grantor is not pursuing such defense in a manner that will maximize the recovery to Attorney, and settle, compromise or adjust any suit, action, or proceeding described above and, in connection therewith, give such discharges or releases as Attorney may deem appropriate; (e) file or prosecute any claims, jurisdiction on or before any arbitrator, or take any other action collecting any and all such moneys due to Grantor whenever payable and to enforce any other right in respect of Grantor's property; (f) cause the certified public accountants then engaged from time to time by Grantor or other accountants retained by Attorney, promptly upon Attorney's request, to issue the following reports:  (1) a reconciliation of all accounts, (2) an aging of all accounts, (3) trial balances, (4) test verifications of such accounts as Attorney may request, and (5) the results of any inquiry in its own name to any party to any Contract with regard to the assignment of the right, title and interest of such Grantor in and under the Contracts and other matters relating thereto; and (g) execute, in connection with any Contract or any sale provided for in any Loan Document, any endorsements, assignment or other instruments of conveyance or transfer with respect to the Collateral and to otherwise direct the completion and performance of such Contract and such sale or resale, all as though Attorney were the absolute owner of the property of Grantor for all purposes, and to do, at Attorney's option and Grantor's expense, at any time or from time to time, all acts and other things that Attorney reasonably deems necessary to perfect, preserve, or realize thereon, all as fully and effectively as Grantor might do.  Grantor hereby ratifies, to the extent permitted by law, all that said Attorney shall lawfully do or cause to be done by virtue hereof.

OF/SFF 002983
OF00008992

# EXHIBIT  D

**Assignment Schedule**

This Assignment Schedule is made by Petters Company, Inc. ("Seller") and PC Funding, LLC ("Purchaser") pursuant to the Sale Agreement between them dated as of December 17, 2001 (as the same may be amended, supplemented or otherwise modified, the "Sale Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Sale Agreement. This Assignment Schedule is in addition to, and is not in substitution for, all previous Assignment Schedules given under the Assignment Agreement.

The following Receivable(s) is/are assigned by Seller to Purchaser and constitute(s) an Assigned Receivable(s) under the Sale Agreement:

Seller Name:              Petters Company, Inc.
Seller Purchase Order No:  41149

Obligor Name:             Sam's Club
Obligor Purchase Order No: 9209657285

Deal #                    091405-02

PETTERS COMPANY, INC.

By:
Its:      President
Dated: September 14, 2005

PC FUNDING, LLC

By:
Its:      President
Dated: September 14, 2005

PCI-SW-039-001541

# EXHIBIT  E

# PETTERS COMPANY, INC.

4400 BAKER ROAD, SUITE 200, MINNETONKA, MN 55343
PHONE 952-934-9918  FAX 952-975-2295

*Selling to Sims*

## PURCHASE ORDER

TO:        NATIONWIDE INT'L RESOURCES          SHIP TO: WILL ADVISE
           2346 WESTWOOD BLVD.
           LOS ANGELES, CA 90064

| ORDERED BY: | TOM PETTERS | PURCHASE ORDER NUMBER: | 41149 |
|---|---|---|---|
| DATE: | 9-6-05 | SHIP VIA: | BEST WAY |
| PAYMENT TERMS: | WIRE | F.O.B. POINT | CA |

| ITEM NO. | DESCRIPTION | UNIT | QTY. | UNIT COST | TOTAL AMOUNT |
|---|---|---|---|---|---|
| KDF50WE655 | SONY GRAND WEGA 50" LCD HDTV | | 2,800 | $1,806.25 | $5,057,500.00 |

|  |  |
|---|---|
| SUBTOTAL | $5,057,500.00 |
| Shipping charges | |
| Handling charges | |
| Insurance | |
| Tax rate ____ % Tax | $0.00 |
| TOTAL DUE | $5,057,500.00 |

Your receipt and acceptance of this purchase price for the inventory which is the subject of this purchase order shall be
deemed acknowledgment of the following: (i) all such inventory is being held by you solely for our account and subject
to our instructions, with due care; (ii) you have no further rights in such inventory and will defend title to such inventory
on our behalf as well as our successors and assigns; and (iii) all such inventory shall be specifically excluded from any
and all liens and security interest in favor of your creditors.

PCI-SW-039-001542

# EXHIBIT  F

PURCHASE ORDER

SAM'S CLUB
ATT: ACCOUNTS PAYABLE
608 SW 8TH STREET
BENTONVILLE, AR 72712-6297

INVOICE TO
AND MAIL TO

PURCHASE ORDER NUMBER   9209657285

ORDER TYPE | REBUY   REGULAR

PH#: 501-273-4000  TWX: 910-720-7982
TLX: 53-6223  ANSBK: WALMAR TF BTVN

63

NET 60                    LOS ANGELES, CA                    EVENT BLANKET PO

CALL 5012734300    COL ON                          FACTORY

SHIP TO:
        AS DIRECTED

VENDOR : 728163131
PETTERS COMPANY, INC.
ATTN: TOM PETTERS
4400 BAKER ROAD
MINNETONKA, MN 55343

09/13/05
10/10/05
10/21/05

BUYER JHILLIAMS/NLD

| CASES ORD-ERED | CASE INNER | VENDOR STOCK NO / OUR ITEM NUMBER | DESCRIPTION | SIZE COLOR | TOT-LBS CUBE-FT | COST PER CASE | EXTENDED COST AFTER DISCOUNTS | LIN KRP |
|---|---|---|---|---|---|---|---|---|
| UNITS 2,800 | KDF50WE655 | | SONY GRAND WEGA 50" LCD HDTV | | | $2,004.93 | $5,613,804.00 | |

** NO BACK ORDERS PLEASE **

PCI-SW-039-001543

# EXHIBIT  G

Note # 091405-02

PROMISSORY NOTE

$ 4.955.000

Minneapolis, Minnesota
September 14, 2005

FOR VALUE RECEIVED, the undersigned, PC FUNDING, L.L.C., a Delaware corporation ("Borrower"), hereby promises to pay to the order of OPPORTUNITY FINANCE, LLC ("Lender"), or its assigns, on the earlier of (i) the 120th day after the date hereof; or (ii) the day upon which Borrower receives available funds from payment from the Buyer on the Receivables Sale financed by the proceeds of this Promissory Note pursuant to the Credit Agreement (as defined below), at its main office in Minneapolis, Minnesota, or at such other place as Lender may designate from time to time in writing, in lawful money of the United States of America and in immediately available funds, the principal amount of FOUR MILLION NINE HUNDRED FIFTY FIVE THOUSAND DOLLARS ($4,955,000).

All capitalized terms, unless otherwise defined herein, shall have the meanings assigned to them in the Credit Agreement of dated as of December 17, 2001 (as the same may be subsequently amended, restated or otherwise modified, the "Credit Agreement") by and between Borrower and Lender. The terms, covenants, and conditions of the Credit Agreement and all other instruments evidencing or securing the indebtedness hereunder, including the Loan Documents, are made a part of this Promissory Note and are deemed incorporated herein in full. This Promissory Note is issued pursuant to the Credit Agreement, is one of the Promissory Notes referred to therein, and is entitled to the benefit and security of the Loan Documents provided for therein, to which reference is hereby made for a statement of all of the terms and conditions under which the Receivables Loan evidenced hereby have been made and are to be repaid. The date and amount of each Receivables Loan made by Lender to Borrower and each payment made on account of the principal thereof, shall be recorded by Lender on its books; provided that the failure of Lender to make any such recordation shall not affect the obligations of Borrower to make a payment when due of any amount owing under the Credit Agreement or this Promissory Note with respect to the Receivables Loans made by Lender to Borrower.

Borrower shall pay interest at the rate of 1.17% for each 30-day period pro rated for partial periods from the date hereof until paid in full on this Promissory Note, payable on the date that principal is payable.

Borrower may prepay the principal of this Promissory Note in whole or in part at any time at Borrower's option without premium or penalty, provided that any prepayment shall be applied first to accrued interest on the amount prepaid through the date of payment, and then to the principal amount hereof.

If any payment on this Promissory Note becomes due and payable on a day other than a business day, the maturity thereof shall be extended to the next succeeding business day.

Upon the occurrence and during the continuance of any Event of Default, this Promissory Note may, as provided in the Credit Agreement, without demand, notice or legal process of any kind, be declared, and upon such declaration immediately shall become, or upon certain circumstances set forth in the Credit Agreement may become without declaration, due and payable.

461325/8                                    1

In the event that Borrower fails to pay when due any payment under this Promissory Note, interest shall accrue on the past due payment from the due date until such payment at the interest rate stated above, or in the event no such interest rate is stated above, then at the rate of twenty percent (20%) per annum.

Wherever possible each provision of this Promissory Note shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Promissory Note shall be prohibited or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Promissory Note.

Time is of the essence of this Promissory Note. To the fullest extent permitted by applicable law, Borrower waives: (a) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all Loan Documents, notes, commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard; (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, any Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies; and (c) the benefit of all valuation, appraisal and exemption laws.

BORROWER WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER THIS PROMISSORY NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, WHETHER ARISING IN CONTRACT OR TORT OR OTHERWISE.

THIS PROMISSORY NOTE SHALL BE GOVERNED BY, AND INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MINNESOTA WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

PC FUNDING, LLC
a Delaware limited liability company

By: _____

Name: Thomas Petters

Title: President

461325/8

2

PCI-SW-039-001540

# EXHIBIT  H

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 010702-01 | 1/7/2002 | 5/7/2002 | 2.50% | $4,000,000.00 | $4,000,000.00 | ($455,490.85) | $4,455,490.85 | ($5,168,350.39) | $828,350.39 | ($4,340,000.00) | ($4,340,000.00) | $340,000.00 | $0.00 | $4,000,000.00 | $0.00 |
| 011502-01 | 1/15/2002 | 5/15/2002 | 2.50% | $2,400,000.00 | $2,400,000.00 | ($118,455.00) | $2,518,455.00 | ($2,920,028.95) | $318,028.95 | ($2,602,000.00) | ($2,602,000.00) | $202,000.00 | $0.00 | $2,400,000.00 | $0.00 |
| 011502-02 | 1/15/2002 | 5/15/2002 | 2.50% | $3,000,000.00 | $3,000,000.00 | ($131,840.00) | $3,131,840.00 | ($3,632,934.40) | $390,434.40 | ($3,242,500.00) | ($3,242,500.00) | $242,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| 011502-03 | 1/15/2002 | 5/15/2002 | 2.50% | $4,800,000.00 | $4,800,000.00 | ($200,337.25) | $5,000,337.25 | ($5,800,379.55) | $584,379.55 | ($5,216,000.00) | ($5,216,000.00) | $416,000.00 | $0.00 | $4,800,000.00 | $0.00 |
| 012202-01 | 1/22/2002 | 5/22/2002 | 2.50% | $2,500,000.00 | $2,500,000.00 | ($94,540.60) | $2,594,540.60 | ($3,081,687.48) | $379,604.15 | ($2,702,083.33) | ($2,702,083.33) | $202,083.33 | $0.00 | $2,500,000.00 | $0.00 |
| 012202-02 | 1/22/2002 | 5/22/2002 | 2.50% | $3,600,000.00 | $3,600,000.00 | ($159,027.00) | $3,759,027.00 | ($4,360,471.32) | $457,471.32 | ($3,903,000.00) | ($3,903,000.00) | $303,000.00 | $0.00 | $3,600,000.00 | $0.00 |
| 012502-01 | 1/25/2002 | 5/25/2002 | 2.50% | $2,400,000.00 | $2,400,000.00 | ($49,207.45) | $2,449,207.45 | ($2,816,486.21) | $212,486.21 | ($2,604,000.00) | ($2,604,000.00) | $204,000.00 | $0.00 | $2,400,000.00 | $0.00 |
| 012502-02 | 1/25/2002 | 5/25/2002 | 2.50% | $2,000,000.00 | $2,000,000.00 | ($111,532.75) | $2,111,532.75 | ($2,428,028.40) | $264,695.07 | ($2,163,333.33) | ($2,163,333.33) | $163,333.33 | $0.00 | $2,000,000.00 | $0.00 |
| 012502-03 | 1/25/2002 | 5/25/2002 | 2.50% | $2,200,000.00 | $2,200,000.00 | ($55,287.50) | $2,255,287.50 | ($2,593,566.65) | $217,566.65 | ($2,376,000.00) | ($2,376,000.00) | $176,000.00 | $0.00 | $2,200,000.00 | $0.00 |
| 020402-01 | 2/4/2002 | 6/4/2002 | 2.50% | $4,300,000.00 | $4,300,000.00 | ($121,665.60) | $4,421,665.60 | ($5,084,915.44) | $448,082.11 | ($4,636,833.33) | ($4,636,833.33) | $336,833.33 | $0.00 | $4,300,000.00 | $0.00 |
| 020402-02 | 2/4/2002 | 6/4/2002 | 2.50% | $3,100,000.00 | $3,100,000.00 | ($128,860.00) | $3,228,860.00 | ($3,713,189.00) | $375,522.33 | ($3,337,666.67) | ($3,337,666.67) | $237,666.67 | $0.00 | $3,100,000.00 | $0.00 |
| 020402-03 | 2/4/2002 | 6/4/2002 | 2.50% | $1,700,000.00 | $1,700,000.00 | ($63,195.84) | $1,763,195.84 | ($2,027,633.84) | $205,800.51 | ($1,821,833.33) | ($1,821,833.33) | $121,833.33 | $0.00 | $1,700,000.00 | $0.00 |
| 020402-04 | 2/4/2002 | 6/4/2002 | 2.50% | $1,400,000.00 | $1,400,000.00 | ($51,600.00) | $1,451,600.00 | ($1,669,340.00) | $159,673.33 | ($1,509,666.67) | ($1,509,666.67) | $109,666.67 | $0.00 | $1,400,000.00 | $0.00 |
| 021102-01 | 2/11/2002 | 6/11/2002 | 2.50% | $1,500,000.00 | $1,500,000.00 | ($67,772.25) | $1,567,772.25 | ($1,802,910.85) | $186,660.85 | ($1,616,250.00) | ($1,616,250.00) | $116,250.00 | $0.00 | $1,500,000.00 | $0.00 |
| 021102-02 | 2/11/2002 | 6/11/2002 | 2.50% | $2,400,000.00 | $2,400,000.00 | ($112,000.00) | $2,512,000.00 | ($2,888,800.00) | $292,800.00 | ($2,596,000.00) | ($2,596,000.00) | $196,000.00 | $0.00 | $2,400,000.00 | $0.00 |
| 021102-03 | 2/11/2002 | 6/11/2002 | 2.50% | $2,600,000.00 | $2,600,000.00 | ($131,273.75) | $2,731,273.75 | ($3,140,958.20) | $328,624.87 | ($2,812,333.33) | ($2,812,333.33) | $212,333.33 | $0.00 | $2,600,000.00 | $0.00 |
| 021102-04 | 2/11/2002 | 6/11/2002 | 2.50% | $3,800,000.00 | $3,800,000.00 | ($160,067.75) | $3,960,067.75 | ($4,554,064.00) | $453,230.67 | ($4,100,833.33) | ($4,100,833.33) | $300,833.33 | $0.00 | $3,800,000.00 | $0.00 |
| 021102-05 | 2/11/2002 | 6/11/2002 | 2.50% | $3,300,000.00 | $3,300,000.00 | ($167,357.95) | $3,467,357.95 | ($3,987,436.90) | $428,936.90 | ($3,558,500.00) | ($3,558,500.00) | $258,500.00 | $0.00 | $3,300,000.00 | $0.00 |
| 021102-06 | 2/11/2002 | 6/11/2002 | 2.50% | $1,300,000.00 | $1,300,000.00 | ($55,387.25) | $1,355,387.25 | ($1,558,693.30) | $155,776.63 | ($1,402,916.67) | ($1,402,916.67) | $102,916.67 | $0.00 | $1,300,000.00 | $0.00 |
| 022202-01 | 2/22/2002 | 6/22/2002 | 2.50% | $3,400,000.00 | $3,400,000.00 | ($138,869.75) | $3,538,896.75 | ($4,069,686.80) | $414,686.80 | ($3,655,000.00) | ($3,655,000.00) | $255,000.00 | $0.00 | $3,400,000.00 | $0.00 |

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 022202-02 | 2/22/2002 | 6/22/2002 | 2.50% | $3,700,000.00 | $3,700,000.00 | ($154,418.00) | $3,854,418.00 | ($4,431,916.00) | $454,416.00 | ($3,977,500.00) | ($3,977,500.00) | $277,500.00 | $0.00 | $3,700,000.00 | $0.00 |
| 022202-03 | 2/22/2002 | 6/22/2002 | 2.50% | $3,000,000.00 | $3,000,000.00 | ($138,421.75) | $3,138,421.75 | ($3,609,173.35) | $381,673.35 | ($3,227,500.00) | ($3,227,500.00) | $227,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| 022202-04 | 2/22/2002 | 6/22/2002 | 2.50% | $2,200,000.00 | $2,200,000.00 | ($103,579.71) | $2,303,579.71 | ($2,639,431.36) | $265,264.69 | ($2,374,166.67) | ($2,374,166.67) | $174,166.67 | $0.00 | $2,200,000.00 | $0.00 |
| 022202-05 | 2/22/2002 | 6/22/2002 | 2.50% | $1,700,000.00 | $1,700,000.00 | ($134,113.09) | $1,834,113.09 | ($2,136,610.69) | $302,027.36 | ($1,834,583.33) | ($1,834,583.33) | $134,583.33 | $0.00 | $1,700,000.00 | $0.00 |
| 022802-01 | 2/28/2002 | 6/28/2002 | 2.50% | $3,000,000.00 | $3,000,000.00 | ($126,339.75) | $3,126,339.75 | ($3,595,283.25) | $372,783.25 | ($3,222,500.00) | ($3,222,500.00) | $222,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| 022802-02 | 2/28/2002 | 6/28/2002 | 2.50% | $2,500,000.00 | $2,500,000.00 | ($109,062.50) | $2,609,062.50 | ($3,000,413.35) | $308,746.68 | ($2,691,666.67) | ($2,691,666.67) | $191,666.67 | $0.00 | $2,500,000.00 | $0.00 |
| 022802-03 | 2/28/2002 | 6/28/2002 | 2.50% | $3,000,000.00 | $3,000,000.00 | ($112,926.50) | $3,112,926.50 | ($3,579,838.65) | $339,838.65 | ($3,240,000.00) | ($3,240,000.00) | $240,000.00 | $0.00 | $3,000,000.00 | $0.00 |
| 030602-01 | 3/6/2002 | 7/4/2002 | 2.50% | $2,300,000.00 | $2,300,000.00 | ($120,927.50) | $2,420,927.50 | ($2,784,053.75) | $300,053.75 | ($2,484,000.00) | ($2,484,000.00) | $184,000.00 | $0.00 | $2,300,000.00 | $0.00 |
| 030602-02 | 3/6/2002 | 7/4/2002 | 2.50% | $1,750,000.00 | $1,750,000.00 | ($87,337.75) | $1,837,337.75 | ($2,112,914.25) | $230,205.92 | ($1,882,708.33) | ($1,882,708.33) | $132,708.33 | $0.00 | $1,750,000.00 | $0.00 |
| 030802-01 | 3/8/2002 | 7/6/2002 | 2.50% | $2,000,000.00 | $2,000,000.00 | ($100,821.85) | $2,100,821.85 | ($2,415,870.20) | $259,203.53 | ($2,156,666.67) | ($2,156,666.67) | $156,666.67 | $0.00 | $2,000,000.00 | $0.00 |
| 030802-02 | 3/8/2002 | 7/6/2002 | 2.50% | $3,600,000.00 | $3,600,000.00 | ($202,467.50) | $3,802,467.50 | ($4,372,804.95) | $466,804.95 | ($3,906,000.00) | ($3,906,000.00) | $306,000.00 | $0.00 | $3,600,000.00 | $0.00 |
| 030802-03 | 3/8/2002 | 7/6/2002 | 2.50% | $3,000,000.00 | $3,000,000.00 | ($242,085.25) | $3,242,085.25 | ($3,728,372.53) | $448,372.53 | ($3,280,000.00) | ($3,280,000.00) | $280,000.00 | $0.00 | $3,000,000.00 | $0.00 |
| 031302-01 | 3/13/2002 | 7/11/2002 | 2.50% | $4,000,000.00 | $4,000,000.00 | ($210,353.50) | $4,210,353.50 | ($4,841,886.30) | $511,886.30 | ($4,330,000.00) | ($4,330,000.00) | $330,000.00 | $0.00 | $4,000,000.00 | $0.00 |
| 031302-02 | 3/13/2002 | 7/11/2002 | 2.50% | $3,500,000.00 | $3,500,000.00 | ($105,198.00) | $3,605,198.00 | ($4,145,975.45) | $333,892.12 | ($3,812,083.33) | ($3,812,083.33) | $312,083.33 | $0.00 | $3,500,000.00 | $0.00 |
| 031302-03 | 3/13/2002 | 7/11/2002 | 2.50% | $2,600,000.00 | $2,600,000.00 | ($112,827.50) | $2,712,827.50 | ($3,119,749.50) | $320,416.17 | ($2,799,333.33) | ($2,799,333.33) | $199,333.33 | $0.00 | $2,600,000.00 | $0.00 |
| 031302-04 | 3/13/2002 | 7/11/2002 | 2.50% | $1,700,000.00 | $1,700,000.00 | ($112,750.00) | $1,812,750.00 | ($2,084,662.50) | $247,245.83 | ($1,837,416.67) | ($1,837,416.67) | $137,416.67 | $0.00 | $1,700,000.00 | $0.00 |
| 031802-01 | 3/18/2002 | 7/16/2002 | 2.50% | $3,500,000.00 | $3,500,000.00 | ($129,900.00) | $3,629,900.00 | ($4,174,378.00) | $368,128.00 | ($3,806,250.00) | ($3,806,250.00) | $306,250.00 | $0.00 | $3,500,000.00 | $0.00 |
| 032602-01 | 3/26/2002 | 7/24/2002 | 2.50% | $3,100,000.00 | $3,100,000.00 | ($109,900.00) | $3,209,900.00 | ($3,691,385.00) | $335,635.00 | ($3,355,750.00) | ($3,355,750.00) | $255,750.00 | $0.00 | $3,100,000.00 | $0.00 |
| 032602-02 | 3/26/2002 | 7/24/2002 | 2.50% | $3,600,000.00 | $3,600,000.00 | ($76,125.00) | $3,676,125.00 | ($4,227,543.75) | $309,543.75 | ($3,918,000.00) | ($3,918,000.00) | $318,000.00 | $0.00 | $3,600,000.00 | $0.00 |
| 032602-03 | 3/26/2002 | 7/24/2002 | 2.50% | $3,300,000.00 | $3,300,000.00 | ($124,429.25) | $3,424,429.25 | ($3,938,081.90) | $352,081.90 | ($3,586,000.00) | ($3,586,000.00) | $286,000.00 | $0.00 | $3,300,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 040102-01 | 4/1/2002 | 7/30/2002 | 2.50% | $3,500,000.00 | $3,500,000.00 | ($123,894.25) | $3,623,894.25 | ($4,167,476.35) | $372,893.02 | ($3,794,583.33) | ($3,794,583.33) | $294,583.33 | $0.00 | $3,500,000.00 | $0.00 |
| 040102-02 | 4/1/2002 | 7/30/2002 | 2.50% | $3,400,000.00 | $3,400,000.00 | ($106,584.50) | $3,506,584.50 | ($4,032,551.29) | $349,217.96 | ($3,683,333.33) | ($3,683,333.33) | $283,333.33 | $0.00 | $3,400,000.00 | $0.00 |
| 040102-03 | 4/1/2002 | 7/30/2002 | 2.50% | $3,900,000.00 | $3,900,000.00 | ($106,856.85) | $4,006,856.85 | ($4,607,851.30) | $379,601.30 | ($4,228,250.00) | ($4,228,250.00) | $328,250.00 | $0.00 | $3,900,000.00 | $0.00 |
| 040102-04 | 4/1/2002 | 7/30/2002 | 2.50% | $2,000,000.00 | $2,000,000.00 | ($1,151,157.00) | $3,151,157.00 | ($3,623,816.30) | $1,457,149.63 | ($2,166,666.67) | ($2,166,666.67) | $166,666.67 | $0.00 | $2,000,000.00 | $0.00 |
| 041102-01 | 4/11/2002 | 8/9/2002 | 2.50% | $1,700,000.00 | $1,700,000.00 | ($89,565.25) | $1,789,565.25 | ($2,057,906.65) | $209,156.65 | ($1,848,750.00) | ($1,848,750.00) | $148,750.00 | $0.00 | $1,700,000.00 | $0.00 |
| 041102-02 | 4/11/2002 | 8/9/2002 | 2.50% | $2,800,000.00 | $2,800,000.00 | ($163,329.05) | $2,963,329.05 | ($3,427,815.44) | $380,482.11 | ($3,047,333.33) | ($3,047,333.33) | $247,333.33 | $0.00 | $2,800,000.00 | $0.00 |
| 041102-03 | 4/11/2002 | 8/9/2002 | 2.50% | $3,600,000.00 | $3,600,000.00 | ($132,379.40) | $3,732,379.40 | ($4,292,190.21) | $380,190.21 | ($3,912,000.00) | ($3,912,000.00) | $312,000.00 | $0.00 | $3,600,000.00 | $0.00 |
| 042602-01 | 4/26/2002 | 8/24/2002 | 2.50% | $4,600,000.00 | $4,600,000.00 | ($170,339.65) | $4,770,339.65 | ($5,485,851.78) | $514,018.45 | ($4,971,833.33) | ($4,971,833.33) | $371,833.33 | $0.00 | $4,600,000.00 | $0.00 |
| 042602-02 | 4/26/2002 | 8/24/2002 | 2.50% | $1,400,000.00 | $1,400,000.00 | ($105,322.75) | $1,505,322.75 | ($1,731,108.80) | $224,942.13 | ($1,506,166.67) | ($1,506,166.67) | $106,166.67 | $0.00 | $1,400,000.00 | $0.00 |
| 042602-03 | 4/26/2002 | 8/24/2002 | 2.50% | $2,800,000.00 | $2,800,000.00 | ($145,799.10) | $2,945,799.10 | ($3,407,710.00) | $372,043.33 | ($3,035,666.67) | ($3,035,666.67) | $235,666.67 | $0.00 | $2,800,000.00 | $0.00 |
| 050302-01 | 5/3/2002 | 8/31/2002 | 2.50% | $4,300,000.00 | $4,300,000.00 | ($144,471.50) | $4,444,471.50 | ($5,111,122.95) | $438,456.28 | ($4,672,666.67) | ($4,672,666.67) | $372,666.67 | $0.00 | $4,300,000.00 | $0.00 |
| 050302-03 | 5/3/2002 | 8/31/2002 | 2.50% | $1,700,000.00 | $1,700,000.00 | ($86,500.00) | $1,786,500.00 | ($2,054,475.00) | $215,641.67 | ($1,838,833.33) | ($1,838,833.33) | $138,833.33 | $0.00 | $1,700,000.00 | $0.00 |
| 050302-02 | 5/9/2002 | 9/7/2002 | 2.50% | $3,900,000.00 | $3,900,000.00 | ($172,186.25) | $4,072,186.25 | ($4,683,003.00) | $497,003.00 | ($4,186,000.00) | ($4,186,000.00) | $286,000.00 | $0.00 | $3,900,000.00 | $0.00 |
| 050302-04 | 5/9/2002 | 9/7/2002 | 2.50% | $2,300,000.00 | $2,300,000.00 | ($252,545.50) | $2,552,545.50 | ($2,935,412.60) | $447,579.27 | ($2,487,833.33) | ($2,487,833.33) | $187,833.33 | $0.00 | $2,300,000.00 | $0.00 |
| 050902-01 | 5/9/2002 | 9/6/2002 | 2.50% | $1,200,000.00 | $1,200,000.00 | ($32,968.75) | $1,232,968.75 | ($1,417,880.45) | $141,880.45 | ($1,276,000.00) | ($1,276,000.00) | $76,000.00 | $0.00 | $1,200,000.00 | $0.00 |
| 050902-02 | 5/9/2002 | 9/6/2002 | 2.50% | $3,100,000.00 | $3,100,000.00 | ($159,126.50) | $3,259,126.50 | ($3,747,968.10) | $397,384.77 | ($3,350,583.33) | ($3,350,583.33) | $250,583.33 | $0.00 | $3,100,000.00 | $0.00 |
| 050902-03 | 5/9/2002 | 9/6/2002 | 2.50% | $2,500,000.00 | $2,500,000.00 | ($142,500.16) | $2,642,500.16 | ($3,036,557.21) | $324,057.21 | ($2,712,500.00) | ($2,712,500.00) | $212,500.00 | $0.00 | $2,500,000.00 | $0.00 |
| 050902-04 | 5/9/2002 | 9/6/2002 | 2.50% | $3,100,000.00 | $3,100,000.00 | ($100,448.95) | $3,200,448.95 | ($3,680,484.58) | $324,734.58 | ($3,355,750.00) | ($3,355,750.00) | $255,750.00 | $0.00 | $3,100,000.00 | $0.00 |
| 052102-01 | 5/21/2002 | 9/18/2002 | 2.50% | $2,200,000.00 | $2,200,000.00 | ($141,091.10) | $2,341,091.10 | ($2,692,219.44) | $312,552.77 | ($2,379,666.67) | ($2,379,666.67) | $179,666.67 | $0.00 | $2,200,000.00 | $0.00 |
| 052102-02 | 5/21/2002 | 9/18/2002 | 2.50% | $2,100,000.00 | $2,100,000.00 | ($78,850.00) | $2,178,850.00 | ($2,505,677.50) | $242,927.50 | ($2,262,750.00) | ($2,262,750.00) | $162,750.00 | $0.00 | $2,100,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 052102-03 | 5/21/2002 | 9/18/2002 | 2.50% | $4,800,000.00 | $4,800,000.00 | ($107,172.50) | $4,907,172.50 | ($5,643,240.00) | $439,240.00 | ($5,204,000.00) | ($5,204,000.00) | $404,000.00 | $0.00 | $4,800,000.00 | $0.00 |
| 052102-04 | 5/21/2002 | 9/18/2002 | 2.50% | $1,400,000.00 | $1,400,000.00 | ($104,671.96) | $1,504,671.95 | ($1,730,223.80) | $220,557.13 | ($1,509,666.67) | ($1,509,666.67) | $109,666.67 | $0.00 | $1,400,000.00 | $0.00 |
| 052102-05 | 5/21/2002 | 9/18/2002 | 2.50% | $2,300,000.00 | $2,300,000.00 | ($127,176.75) | $2,427,176.75 | ($2,791,246.20) | $297,662.87 | ($2,493,583.33) | ($2,493,583.33) | $193,583.33 | $0.00 | $2,300,000.00 | $0.00 |
| 052102-06 | 5/21/2002 | 9/18/2002 | 2.50% | $2,100,000.00 | $2,100,000.00 | ($88,133.75) | $2,188,133.75 | ($2,516,341.70) | $251,841.70 | ($2,264,500.00) | ($2,264,500.00) | $164,500.00 | $0.00 | $2,100,000.00 | $0.00 |
| 053002-01 | 5/30/2002 | 9/27/2002 | 2.50% | $4,800,000.00 | $4,800,000.00 | ($179,381.75) | $4,979,381.75 | ($5,726,273.18) | $534,273.18 | ($5,192,000.00) | ($5,192,000.00) | $392,000.00 | $0.00 | $4,800,000.00 | $0.00 |
| 053002-02 | 5/30/2002 | 9/27/2002 | 2.50% | $3,300,000.00 | $3,300,000.00 | ($122,828.75) | $3,422,828.75 | ($3,936,236.50) | $330,986.50 | ($3,605,250.00) | ($3,605,250.00) | $305,250.00 | $0.00 | $3,300,000.00 | $0.00 |
| 053002-03 | 5/30/2002 | 9/27/2002 | 2.50% | $4,600,000.00 | $4,600,000.00 | ($141,036.50) | $4,741,036.50 | ($5,452,150.34) | $449,650.34 | ($5,002,500.00) | ($5,002,500.00) | $402,500.00 | $0.00 | $4,600,000.00 | $0.00 |
| 053002-04 | 5/30/2002 | 9/27/2002 | 2.50% | $3,800,000.00 | $3,800,000.00 | ($141,237.20) | $3,941,237.20 | ($4,532,412.36) | $396,745.69 | ($4,135,666.67) | ($4,135,666.67) | $335,666.67 | $0.00 | $3,800,000.00 | $0.00 |
| 060602-01 | 6/6/2002 | 10/4/2002 | 2.50% | $4,000,000.00 | $4,000,000.00 | ($104,593.25) | $4,104,593.25 | ($4,720,275.65) | $366,942.32 | ($4,353,333.33) | ($4,353,333.33) | $353,333.33 | $0.00 | $4,000,000.00 | $0.00 |
| 060602-02 | 6/6/2002 | 10/4/2002 | 2.50% | $3,700,000.00 | $3,700,000.00 | ($118,673.00) | $3,818,673.00 | ($4,391,447.14) | $370,780.47 | ($4,020,666.67) | ($4,020,666.67) | $320,666.67 | $0.00 | $3,700,000.00 | $0.00 |
| 060602-03 | 6/6/2002 | 10/4/2002 | 2.50% | $2,200,000.00 | $2,200,000.00 | ($103,378.75) | $2,303,378.75 | ($2,648,869.00) | $269,202.33 | ($2,379,666.67) | ($2,379,666.67) | $179,666.67 | $0.00 | $2,200,000.00 | $0.00 |
| 060602-04 | 6/6/2002 | 10/4/2002 | 2.50% | $4,400,000.00 | $4,400,000.00 | ($189,297.00) | $4,589,297.00 | ($5,094,101.16) | $309,101.16 | ($4,785,000.00) | ($4,785,000.00) | $385,000.00 | $0.00 | $4,400,000.00 | $0.00 |
| 061702-01 | 6/17/2002 | 10/15/2002 | 2.50% | $3,500,000.00 | $3,500,000.00 | ($118,461.25) | $3,618,461.25 | ($4,161,213.60) | $346,213.60 | ($3,815,000.00) | ($3,815,000.00) | $315,000.00 | $0.00 | $3,500,000.00 | $0.00 |
| 061702-02 | 6/17/2002 | 10/15/2002 | 2.50% | $2,700,000.00 | $2,700,000.00 | ($137,042.35) | $2,837,042.35 | ($3,262,574.40) | $326,324.40 | ($2,936,250.00) | ($2,936,250.00) | $236,250.00 | $0.00 | $2,700,000.00 | $0.00 |
| 061702-03 | 6/17/2002 | 10/15/2002 | 2.50% | $2,400,000.00 | $2,400,000.00 | ($104,611.30) | $2,504,611.30 | ($2,880,280.33) | $266,280.33 | ($2,614,000.00) | ($2,614,000.00) | $214,000.00 | $0.00 | $2,400,000.00 | $0.00 |
| 061702-04 | 6/17/2002 | 10/15/2002 | 2.50% | $4,200,000.00 | $4,200,000.00 | ($182,403.65) | $4,382,403.65 | ($5,039,745.76) | $472,245.76 | ($4,567,500.00) | ($4,567,500.00) | $367,500.00 | $0.00 | $4,200,000.00 | $0.00 |
| 062602-01 | 6/26/2002 | 10/24/2002 | 2.50% | $2,200,000.00 | $2,200,000.00 | ($205,899.75) | $2,405,899.75 | ($2,766,769.15) | $383,435.82 | ($2,383,333.33) | ($2,383,333.33) | $183,333.33 | $0.00 | $2,200,000.00 | $0.00 |
| 062602-02 | 6/26/2002 | 10/24/2002 | 2.50% | $4,400,000.00 | $4,400,000.00 | ($196,896.50) | $4,596,896.50 | ($5,286,416.65) | $508,749.98 | ($4,777,666.67) | ($4,777,666.67) | $377,666.67 | $0.00 | $4,400,000.00 | $0.00 |
| 062602-03 | 6/26/2002 | 10/24/2002 | 2.50% | $3,700,000.00 | $3,700,000.00 | ($265,755.00) | $3,965,755.00 | ($4,560,595.94) | $555,345.94 | ($4,005,250.00) | ($4,005,250.00) | $305,250.00 | $0.00 | $3,700,000.00 | $0.00 |
| 070202-01 | 7/2/2002 | 10/30/2002 | 2.50% | $5,100,000.00 | $5,100,000.00 | ($127,057.50) | $5,227,057.50 | ($6,011,092.70) | $511,592.70 | ($5,499,500.00) | ($5,499,500.00) | $399,500.00 | $0.00 | $5,100,000.00 | $0.00 |

EXHIBIT H

PC Funding Notes - Summary of Notes Payable by Note

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 071102-01 | 7/11/2002 | 11/8/2002 | 2.50% | $4,200,000.00 | $4,200,000.00 | ($100,625.00) | $4,300,625.00 | ($4,945,718.75) | $430,718.75 | ($4,515,000.00) | ($4,515,000.00) | $315,000.00 | $0.00 | $4,200,000.00 | $0.00 |
| 071102-02 | 7/11/2002 | 11/8/2002 | 2.50% | $1,750,000.00 | $1,750,000.00 | ($78,875.00) | $1,828,875.00 | ($2,103,206.25) | $210,289.58 | ($1,892,916.67) | ($1,892,916.67) | $142,916.67 | $0.00 | $1,750,000.00 | $0.00 |
| 071102-03 | 7/11/2002 | 11/8/2002 | 2.50% | $4,850,000.00 | $4,850,000.00 | ($128,966.25) | $4,978,966.25 | ($5,725,792.50) | $479,709.17 | ($5,246,083.33) | ($5,246,083.33) | $396,083.33 | $0.00 | $4,850,000.00 | $0.00 |
| 071702-01 | 7/17/2002 | 11/14/2002 | 2.50% | $4,800,000.00 | $4,800,000.00 | ($130,363.60) | $4,930,363.60 | ($5,669,894.21) | $481,894.21 | ($5,188,000.00) | ($5,188,000.00) | $388,000.00 | $0.00 | $4,800,000.00 | $0.00 |
| 071702-02 | 7/17/2002 | 11/14/2002 | 2.50% | $3,200,000.00 | $3,200,000.00 | ($110,692.25) | $3,310,692.25 | ($3,807,269.05) | $308,602.38 | ($3,498,666.67) | ($3,498,666.67) | $298,666.67 | $0.00 | $3,200,000.00 | $0.00 |
| 071702-03 | 7/17/2002 | 11/14/2002 | 2.50% | $3,400,000.00 | $3,400,000.00 | ($133,873.75) | $3,533,873.75 | ($4,063,921.50) | $369,254.83 | ($3,694,666.67) | ($3,694,666.67) | $294,666.67 | $0.00 | $3,400,000.00 | $0.00 |
| 072502-01 | 7/25/2002 | 11/22/2002 | 2.50% | $3,000,000.00 | $3,000,000.00 | ($242,084.00) | $3,242,084.00 | ($3,728,389.60) | $468,389.60 | ($3,260,000.00) | ($3,260,000.00) | $260,000.00 | $0.00 | $3,000,000.00 | $0.00 |
| 072502-02 | 7/25/2002 | 11/22/2002 | 2.50% | $3,900,000.00 | $3,900,000.00 | ($311,333.50) | $4,211,333.50 | ($4,842,992.05) | $604,992.05 | ($4,238,000.00) | ($4,238,000.00) | $338,000.00 | $0.00 | $3,900,000.00 | $0.00 |
| 080102-01 | 8/1/2002 | 11/29/2002 | 2.50% | $2,250,000.00 | $2,250,000.00 | ($87,925.00) | $2,337,925.00 | ($2,688,607.00) | $241,732.00 | ($2,446,875.00) | ($2,446,875.00) | $196,875.00 | $0.00 | $2,250,000.00 | $0.00 |
| 080102-02 | 8/1/2002 | 11/29/2002 | 2.50% | $3,600,000.00 | $3,600,000.00 | ($96,862.50) | $3,696,862.50 | ($4,251,388.90) | $321,388.90 | ($3,930,000.00) | ($3,930,000.00) | $330,000.00 | $0.00 | $3,600,000.00 | $0.00 |
| 080102-03 | 8/1/2002 | 11/29/2002 | 2.50% | $2,100,000.00 | $2,100,000.00 | ($77,486.25) | $2,177,486.25 | ($2,504,100.45) | $230,850.45 | ($2,273,250.00) | ($2,273,250.00) | $173,250.00 | $0.00 | $2,100,000.00 | $0.00 |
| 080502-01 | 8/5/2002 | 12/3/2002 | 2.50% | $3,100,000.00 | $3,100,000.00 | ($100,526.50) | $3,200,526.50 | ($3,680,589.69) | $317,089.69 | ($3,363,500.00) | ($3,363,500.00) | $263,500.00 | $0.00 | $3,100,000.00 | $0.00 |
| 080702-01 | 8/7/2002 | 12/5/2002 | 2.50% | $2,600,000.00 | $2,600,000.00 | ($87,742.50) | $2,687,742.50 | ($3,090,894.30) | $252,560.97 | ($2,838,333.33) | ($2,838,333.33) | $238,333.33 | $0.00 | $2,600,000.00 | $0.00 |
| 080702-02 | 8/7/2002 | 12/5/2002 | 2.50% | $2,800,000.00 | $2,800,000.00 | ($78,307.50) | $2,878,307.50 | ($3,309,972.60) | $229,972.60 | ($3,080,000.00) | ($3,080,000.00) | $280,000.00 | $0.00 | $2,800,000.00 | $0.00 |
| 081402-01 | 8/14/2002 | 12/12/2002 | 2.50% | $2,900,000.00 | $2,900,000.00 | ($112,010.00) | $3,012,010.00 | ($3,463,808.25) | $290,724.92 | ($3,173,083.33) | ($3,173,083.33) | $273,083.33 | $0.00 | $2,900,000.00 | $0.00 |
| 081402-02 | 8/14/2002 | 12/12/2002 | 2.50% | $2,300,000.00 | $2,300,000.00 | ($110,996.50) | $2,410,996.50 | ($2,773,776.00) | $272,526.00 | ($2,501,250.00) | ($2,501,250.00) | $201,250.00 | $0.00 | $2,300,000.00 | $0.00 |
| 081402-03 | 8/14/2002 | 12/12/2002 | 2.50% | $2,100,000.00 | $2,100,000.00 | ($1,008,162.50) | $3,108,162.50 | ($3,574,371.15) | $1,281,871.15 | ($2,292,500.00) | ($2,292,500.00) | $192,500.00 | $0.00 | $2,100,000.00 | $0.00 |
| 082102-01 | 8/21/2002 | 12/19/2002 | 2.50% | $5,500,000.00 | $5,500,000.00 | ($163,376.25) | $5,663,376.25 | ($6,512,864.40) | $527,031.07 | ($5,985,833.33) | ($5,985,833.33) | $485,833.33 | $0.00 | $5,500,000.00 | $0.00 |
| 082202-01 | 8/22/2002 | 12/20/2002 | 2.50% | $3,900,000.00 | $3,900,000.00 | ($87,967.50) | $3,987,967.50 | ($4,586,154.45) | $322,154.45 | ($4,264,000.00) | ($4,264,000.00) | $364,000.00 | $0.00 | $3,900,000.00 | $0.00 |
| 082802-01 | 8/28/2002 | 12/26/2002 | 2.50% | $3,200,000.00 | $3,200,000.00 | ($109,899.50) | $3,309,899.50 | ($3,806,371.75) | $323,705.08 | ($3,482,666.67) | ($3,482,666.67) | $282,666.67 | $0.00 | $3,200,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 082802-02 | 8/28/2002 | 12/26/2002 | 2.50% | $3,600,000.00 | $3,600,000.00 | ($75,021.00) | $3,675,021.00 | ($4,226,245.85) | $296,245.85 | ($3,930,000.00) | ($3,930,000.00) | $330,000.00 | $0.00 | $3,600,000.00 | $0.00 |
| 082802-03 | 8/28/2002 | 12/26/2002 | 2.50% | $4,400,000.00 | $4,400,000.00 | ($100,610.00) | $4,500,610.00 | ($5,175,687.35) | $387,020.68 | ($4,788,666.67) | ($4,788,666.67) | $388,666.67 | $0.00 | $4,400,000.00 | $0.00 |
| 090502-01 | 9/5/2002 | 1/3/2003 | 2.50% | $2,800,000.00 | $2,800,000.00 | ($74,352.50) | $2,874,352.50 | ($3,305,490.80) | $274,490.80 | ($3,031,000.00) | ($3,031,000.00) | $231,000.00 | $0.00 | $2,800,000.00 | $0.00 |
| 090502-02 | 9/5/2002 | 1/3/2003 | 2.50% | $5,200,000.00 | $5,200,000.00 | ($122,951.00) | $5,322,951.00 | ($6,121,373.34) | $466,373.34 | ($5,655,000.00) | ($5,655,000.00) | $455,000.00 | $0.00 | $5,200,000.00 | $0.00 |
| 090502-03 | 9/9/2002 | 1/7/2003 | 2.50% | $1,900,000.00 | $1,900,000.00 | ($87,784.25) | $1,987,784.25 | ($2,285,923.11) | $230,756.44 | ($2,055,166.67) | ($2,055,166.67) | $155,166.67 | $0.00 | $1,900,000.00 | $0.00 |
| 090902-01 | 9/9/2002 | 1/7/2003 | 2.50% | $4,300,000.00 | $4,300,000.00 | ($137,500.00) | $4,437,500.00 | ($5,103,125.00) | $437,625.00 | ($4,665,500.00) | ($4,665,500.00) | $365,500.00 | $0.00 | $4,300,000.00 | $0.00 |
| 091802-01 | 9/18/2002 | 1/16/2003 | 2.50% | $1,950,000.00 | $1,950,000.00 | ($68,746.00) | $2,018,746.00 | ($2,250,848.57) | $149,723.57 | ($2,101,125.00) | ($2,101,125.00) | $151,125.00 | $0.00 | $1,950,000.00 | $0.00 |
| 091802-02 | 9/18/2002 | 1/16/2003 | 2.50% | $4,800,000.00 | $4,800,000.00 | ($103,794.50) | $4,903,794.50 | ($5,639,359.60) | $467,359.60 | ($5,172,000.00) | ($5,172,000.00) | $372,000.00 | $0.00 | $4,800,000.00 | $0.00 |
| 091802-03 | 9/18/2002 | 1/16/2003 | 2.50% | $1,950,000.00 | $1,950,000.00 | ($67,753.70) | $2,017,753.70 | ($2,320,400.22) | $220,900.22 | ($2,099,500.00) | ($2,099,500.00) | $149,500.00 | $0.00 | $1,950,000.00 | $0.00 |
| 092502-01 | 9/25/2002 | 1/23/2003 | 2.50% | $2,150,000.00 | $2,150,000.00 | ($71,620.70) | $2,221,620.70 | ($2,554,830.45) | $225,663.78 | ($2,329,166.67) | ($2,329,166.67) | $179,166.67 | $0.00 | $2,150,000.00 | $0.00 |
| 092502-02 | 9/25/2002 | 1/23/2003 | 2.50% | $2,550,000.00 | $2,550,000.00 | ($95,850.00) | $2,645,850.00 | ($3,042,727.50) | $297,227.50 | ($2,745,500.00) | ($2,745,500.00) | $195,500.00 | $0.00 | $2,550,000.00 | $0.00 |
| 092502-03 | 9/25/2002 | 1/23/2003 | 2.50% | $2,100,000.00 | $2,100,000.00 | ($65,066.25) | $2,165,066.25 | ($2,489,817.00) | $209,567.00 | ($2,280,250.00) | ($2,280,250.00) | $180,250.00 | $0.00 | $2,100,000.00 | $0.00 |
| 092502-04 | 9/25/2002 | 1/23/2003 | 2.50% | $4,850,000.00 | $4,850,000.00 | ($103,233.75) | $4,953,233.75 | ($5,696,202.40) | $474,369.07 | ($5,221,833.33) | ($5,221,833.33) | $371,833.33 | $0.00 | $4,850,000.00 | $0.00 |
| 092502-05 | 9/25/2002 | 1/23/2003 | 2.50% | $3,950,000.00 | $3,950,000.00 | ($124,338.50) | $4,074,338.50 | ($4,685,464.95) | $396,423.28 | ($4,289,041.67) | ($4,289,041.67) | $339,041.67 | $0.00 | $3,950,000.00 | $0.00 |
| 100202-01 | 10/2/2002 | 1/30/2003 | 2.50% | $4,050,000.00 | $4,050,000.00 | ($86,294.70) | $4,136,294.70 | ($4,756,738.91) | $345,613.91 | ($4,411,125.00) | ($4,411,125.00) | $361,125.00 | $0.00 | $4,050,000.00 | $0.00 |
| 100202-02 | 10/2/2002 | 1/30/2003 | 2.50% | $2,400,000.00 | $2,400,000.00 | ($143,030.00) | $2,543,030.00 | ($2,924,474.00) | $302,474.00 | ($2,622,000.00) | ($2,622,000.00) | $222,000.00 | $0.00 | $2,400,000.00 | $0.00 |
| 100202-03 | 10/2/2002 | 1/30/2003 | 2.50% | $3,250,000.00 | $3,250,000.00 | ($108,903.75) | $3,358,903.75 | ($3,761,972.20) | $222,180.53 | ($3,539,791.67) | ($3,539,791.67) | $289,791.67 | $0.00 | $3,250,000.00 | $0.00 |
| 100202-04 | 10/2/2002 | 1/30/2003 | 2.50% | $2,900,000.00 | $2,900,000.00 | ($109,813.00) | $3,009,813.00 | ($3,461,258.60) | $302,675.27 | ($3,158,583.33) | ($3,158,583.33) | $258,583.33 | $0.00 | $2,900,000.00 | $0.00 |
| 101002-01 | 10/10/2002 | 2/7/2003 | 2.50% | $5,850,000.00 | $5,850,000.00 | ($123,006.00) | $5,973,006.00 | ($6,839,083.59) | $443,083.59 | ($6,396,000.00) | ($6,396,000.00) | $546,000.00 | $0.00 | $5,850,000.00 | $0.00 |
| 101002-02 | 10/10/2002 | 2/7/2003 | 2.50% | $3,800,000.00 | $3,800,000.00 | ($105,791.25) | $3,905,791.25 | ($4,491,611.35) | $333,778.02 | ($4,157,833.33) | ($4,157,833.33) | $357,833.33 | $0.00 | $3,800,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101002-03 | 10/10/2002 | 2/7/2003 | 2.50% | $1,500,000.00 | $1,500,000.00 | ($78,836.00) | $1,578,836.00 | ($1,799,856.20) | $163,606.20 | ($1,636,250.00) | ($1,636,250.00) | $136,250.00 | $0.00 | $1,500,000.00 | $0.00 |
| 101002-04 | 10/10/2002 | 2/7/2003 | 2.50% | $2,150,000.00 | $2,150,000.00 | ($73,922.50) | $2,223,922.50 | ($2,546,356.00) | $193,897.67 | ($2,352,458.33) | ($2,352,458.33) | $202,458.33 | $0.00 | $2,150,000.00 | $0.00 |
| 101602-01 | 10/16/2002 | 2/13/2003 | 2.50% | $3,900,000.00 | $3,900,000.00 | ($90,110.00) | $3,990,110.00 | ($4,568,619.96) | $311,119.96 | ($4,257,500.00) | ($4,257,500.00) | $357,500.00 | $0.00 | $3,900,000.00 | $0.00 |
| 101602-02 | 10/16/2002 | 2/13/2003 | 2.50% | $4,700,000.00 | $4,700,000.00 | ($107,048.50) | $4,807,048.50 | ($5,504,051.40) | $361,468.07 | ($5,142,583.33) | ($5,142,583.33) | $442,583.33 | $0.00 | $4,700,000.00 | $0.00 |
| 101602-03 | 10/16/2002 | 2/13/2003 | 2.50% | $5,350,000.00 | $5,350,000.00 | ($136,345.00) | $5,486,345.00 | ($6,281,846.62) | $432,513.29 | ($5,849,333.33) | ($5,849,333.33) | $499,333.33 | $0.00 | $5,350,000.00 | $0.00 |
| 102302-01 | 10/23/2002 | 2/20/2003 | 2.50% | $4,900,000.00 | $4,900,000.00 | ($346,708.70) | $5,246,708.75 | ($6,007,459.75) | $674,626.42 | ($5,332,833.33) | ($5,332,833.33) | $432,833.33 | $0.00 | $4,900,000.00 | $0.00 |
| 102302-02 | 10/23/2002 | 2/20/2003 | 2.50% | $4,800,000.00 | $4,800,000.00 | ($347,497.75) | $5,147,497.75 | ($5,739,433.85) | $495,433.85 | ($5,244,000.00) | ($5,244,000.00) | $444,000.00 | $0.00 | $4,800,000.00 | $0.00 |
| 102302-03 | 10/23/2002 | 2/20/2003 | 2.50% | $2,050,000.00 | $2,050,000.00 | ($82,276.50) | $2,132,276.50 | ($2,430,785.25) | $199,701.92 | ($2,231,083.33) | ($2,231,083.33) | $181,083.33 | $0.00 | $2,050,000.00 | $0.00 |
| 111202-01 | 11/12/2002 | 3/12/2003 | 2.50% | $1,450,000.00 | $1,450,000.00 | ($38,322.50) | $1,488,322.50 | ($1,696,685.15) | $133,101.82 | ($1,563,583.33) | ($1,563,583.33) | $113,583.33 | $0.00 | $1,450,000.00 | $0.00 |
| 111202-02 | 11/12/2002 | 3/12/2003 | 2.50% | $2,650,000.00 | $2,650,000.00 | ($95,114.00) | $2,745,114.00 | ($3,143,099.85) | $272,266.52 | ($2,870,833.33) | ($2,870,833.33) | $220,833.33 | $0.00 | $2,650,000.00 | $0.00 |
| 111202-03 | 11/12/2002 | 3/12/2003 | 2.50% | $3,400,000.00 | $3,400,000.00 | ($96,924.75) | $3,496,924.75 | ($4,003,923.34) | $323,423.34 | ($3,680,500.00) | ($3,680,500.00) | $280,500.00 | $0.00 | $3,400,000.00 | $0.00 |
| 111202-04 | 11/12/2002 | 3/12/2003 | 2.50% | $5,200,000.00 | $5,200,000.00 | ($142,150.00) | $5,342,150.00 | ($6,116,743.60) | $509,410.27 | ($5,607,333.33) | ($5,607,333.33) | $407,333.33 | $0.00 | $5,200,000.00 | $0.00 |
| 111202-05 | 11/12/2002 | 3/12/2003 | 2.50% | $2,600,000.00 | $2,600,000.00 | ($72,873.75) | $2,672,873.75 | ($3,047,068.75) | $230,402.08 | ($2,816,666.67) | ($2,816,666.67) | $216,666.67 | $0.00 | $2,600,000.00 | $0.00 |
| 112102-01 | 11/21/2002 | 3/21/2003 | 2.50% | $3,800,000.00 | $3,800,000.00 | ($87,558.55) | $3,887,558.55 | ($4,451,234.31) | $347,234.31 | ($4,104,000.00) | ($4,104,000.00) | $304,000.00 | $0.00 | $3,800,000.00 | $0.00 |
| 112102-02 | 11/21/2002 | 3/21/2003 | 2.50% | $2,850,000.00 | $2,850,000.00 | ($73,762.50) | $2,923,762.50 | ($3,347,703.00) | $283,953.00 | ($3,063,750.00) | ($3,063,750.00) | $213,750.00 | $0.00 | $2,850,000.00 | $0.00 |
| 120402-01 | 12/4/2002 | 4/3/2003 | 2.50% | $1,750,000.00 | $1,750,000.00 | ($83,097.50) | $1,833,097.50 | ($2,106,956.25) | $244,664.58 | ($1,862,291.67) | ($1,862,291.67) | $112,291.67 | $0.00 | $1,750,000.00 | $0.00 |
| 120402-02 | 12/4/2002 | 4/3/2003 | 2.50% | $4,150,000.00 | $4,150,000.00 | ($89,220.00) | $4,239,220.00 | ($4,853,876.55) | $382,251.55 | ($4,471,625.00) | ($4,471,625.00) | $321,625.00 | $0.00 | $4,150,000.00 | $0.00 |
| 121102-01 | 12/11/2002 | 4/10/2003 | 2.50% | $3,000,000.00 | $3,000,000.00 | ($310,342.50) | $3,310,342.50 | ($3,790,339.95) | $580,339.95 | ($3,210,000.00) | ($3,210,000.00) | $210,000.00 | $0.00 | $3,000,000.00 | $0.00 |
| 121102-02 | 12/11/2002 | 4/10/2003 | 2.50% | $3,200,000.00 | $3,200,000.00 | ($496,814.75) | $3,696,814.75 | ($4,232,809.45) | $787,476.12 | ($3,445,333.33) | ($3,445,333.33) | $245,333.33 | $0.00 | $3,200,000.00 | $0.00 |
| 121102-03 | 12/11/2002 | 4/10/2003 | 2.50% | $4,200,000.00 | $4,200,000.00 | ($465,421.00) | $4,665,421.00 | ($5,341,879.35) | $823,379.35 | ($4,518,500.00) | ($4,518,500.00) | $318,500.00 | $0.00 | $4,200,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 121102-04 | 12/11/2002 | 3/31/2003 | 2.50% | $2,600,000.00 | $2,600,000.00 | ($129,577.00) | $2,729,577.00 | ($3,111,701.30) | $312,367.97 | ($2,799,333.33) | ($2,799,333.33) | $199,333.33 | $0.00 | $2,600,000.00 | $0.00 |
| 121702-01 | 12/17/2002 | 4/16/2003 | 2.50% | $4,750,000.00 | $4,750,000.00 | ($112,985.00) | $4,862,985.00 | ($5,568,107.60) | $422,274.27 | ($5,145,833.33) | ($5,145,833.33) | $395,833.33 | $0.00 | $4,750,000.00 | $0.00 |
| 121702-02 | 12/17/2002 | 4/16/2003 | 2.50% | $3,500,000.00 | $3,500,000.00 | ($111,344.75) | $3,611,344.75 | ($4,134,940.55) | $433,690.55 | ($3,701,250.00) | ($3,701,250.00) | $201,250.00 | $0.00 | $3,500,000.00 | $0.00 |
| 121902-01 | 12/19/2002 | 4/18/2003 | 2.50% | $3,950,000.00 | $3,950,000.00 | ($99,964.25) | $4,049,964.25 | ($4,616,947.45) | $347,655.78 | ($4,269,291.67) | ($4,269,291.67) | $319,291.67 | $0.00 | $3,950,000.00 | $0.00 |
| 121902-03 | 12/19/2002 | 4/18/2003 | 2.50% | $3,850,000.00 | $3,850,000.00 | ($104,796.50) | $3,954,796.50 | ($4,508,434.65) | $421,017.98 | ($4,087,416.67) | ($4,087,416.67) | $237,416.67 | $0.00 | $3,850,000.00 | $0.00 |
| 121902-02 | 12/23/2002 | 4/22/2003 | 2.50% | $4,600,000.00 | $4,600,000.00 | ($140,777.00) | $4,740,777.00 | ($5,404,478.05) | $444,144.72 | ($4,960,333.33) | ($4,960,333.33) | $360,333.33 | $0.00 | $4,600,000.00 | $0.00 |
| 122302-01 | 12/23/2002 | 4/22/2003 | 2.50% | $2,150,000.00 | $2,150,000.00 | ($62,343.75) | $2,212,343.75 | ($2,522,056.90) | $203,640.23 | ($2,318,416.67) | ($2,318,416.67) | $168,416.67 | $0.00 | $2,150,000.00 | $0.00 |
| 122402-01 | 12/24/2002 | 4/23/2003 | 2.50% | $4,050,000.00 | $4,050,000.00 | ($99,621.25) | $4,149,621.25 | ($4,751,238.40) | $373,863.40 | ($4,377,375.00) | ($4,377,375.00) | $327,375.00 | $0.00 | $4,050,000.00 | $0.00 |
| 122402-02 | 12/24/2002 | 4/23/2003 | 2.50% | $3,600,000.00 | $3,600,000.00 | ($115,556.25) | $3,715,556.25 | ($4,254,278.95) | $375,278.95 | ($3,879,000.00) | ($3,879,000.00) | $279,000.00 | $0.00 | $3,600,000.00 | $0.00 |
| 122402-03 | 12/24/2002 | 4/23/2003 | 2.50% | $2,650,000.00 | $2,650,000.00 | ($88,707.00) | $2,738,707.00 | ($3,122,094.05) | $268,927.38 | ($2,853,166.67) | ($2,853,166.67) | $203,166.67 | $0.00 | $2,650,000.00 | $0.00 |
| 123002-01 | 12/30/2002 | 4/29/2003 | 2.50% | $2,300,000.00 | $2,300,000.00 | ($83,370.00) | $2,383,370.00 | ($2,728,900.45) | $254,483.78 | ($2,474,416.67) | ($2,474,416.67) | $174,416.67 | $0.00 | $2,300,000.00 | $0.00 |
| 123002-02 | 12/30/2002 | 4/29/2003 | 2.50% | $4,500,000.00 | $4,500,000.00 | ($125,433.25) | $4,625,433.25 | ($5,296,073.80) | $544,823.80 | ($4,751,250.00) | ($4,751,250.00) | $251,250.00 | $0.00 | $4,500,000.00 | $0.00 |
| 123002-03 | 12/30/2002 | 4/29/2003 | 2.50% | $3,950,000.00 | $3,950,000.00 | ($105,586.25) | $4,055,586.25 | ($4,643,635.45) | $394,093.78 | ($4,249,541.67) | ($4,249,541.67) | $299,541.67 | $0.00 | $3,950,000.00 | $0.00 |
| 010803-01 | 1/8/2003 | 5/8/2003 | 2.50% | $3,550,000.00 | $3,550,000.00 | ($111,355.50) | $3,661,355.50 | ($4,173,933.37) | $348,808.37 | ($3,825,125.00) | ($3,825,125.00) | $275,125.00 | $0.00 | $3,550,000.00 | $0.00 |
| 010803-02 | 1/8/2003 | 5/8/2003 | 2.50% | $4,000,000.00 | $4,000,000.00 | ($536,590.00) | $4,536,590.00 | ($5,194,387.50) | $897,720.83 | ($4,296,666.67) | ($4,296,666.67) | $296,666.67 | $0.00 | $4,000,000.00 | $0.00 |
| 010803-03 | 1/8/2003 | 5/8/2003 | 2.50% | $3,150,000.00 | $3,150,000.00 | ($497,400.00) | $3,647,400.00 | ($4,176,270.90) | $784,770.90 | ($3,391,500.00) | ($3,391,500.00) | $241,500.00 | $0.00 | $3,150,000.00 | $0.00 |
| 012303-01 | 1/23/2003 | 5/23/2003 | 2.50% | $1,600,000.00 | $1,600,000.00 | ($44,591.75) | $1,644,591.75 | ($1,874,770.85) | $156,104.18 | ($1,718,666.67) | ($1,718,666.67) | $118,666.67 | $0.00 | $1,600,000.00 | $0.00 |
| 012303-02 | 1/23/2003 | 5/23/2003 | 2.50% | $5,000,000.00 | $5,000,000.00 | ($511,547.25) | $5,511,547.25 | ($6,310,698.00) | $964,864.67 | ($5,345,833.33) | ($5,345,833.33) | $345,833.33 | $0.00 | $5,000,000.00 | $0.00 |
| 012303-03 | 1/23/2003 | 5/23/2003 | 2.50% | $2,100,000.00 | $2,100,000.00 | ($116,715.25) | $2,216,715.25 | ($2,538,137.30) | $284,137.30 | ($2,254,000.00) | ($2,254,000.00) | $154,000.00 | $0.00 | $2,100,000.00 | $0.00 |
| 012303-04 | 1/23/2003 | 5/23/2003 | 2.50% | $2,050,000.00 | $2,050,000.00 | ($43,596.50) | $2,093,596.50 | ($2,386,638.85) | $203,388.85 | ($2,183,250.00) | ($2,183,250.00) | $133,250.00 | $0.00 | $2,050,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

<u>Closed Notes</u>

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 012303-05 | 1/23/2003 | 5/23/2003 | 2.50% | $3,500,000.00 | $3,500,000.00 | ($142,587.50) | $3,642,587.50 | ($4,170,754.20) | $414,087.53 | ($3,756,666.67) | ($3,756,666.67) | $256,666.67 | $0.00 | $3,500,000.00 | $0.00 |
| 020503-01 | 2/5/2003 | 6/5/2003 | 2.50% | $3,850,000.00 | $3,850,000.00 | ($93,587.50) | $3,943,587.50 | ($4,495,689.75) | $360,148.08 | ($4,135,541.67) | ($4,135,541.67) | $285,541.67 | $0.00 | $3,850,000.00 | $0.00 |
| 020503-02 | 2/5/2003 | 6/5/2003 | 2.50% | $3,150,000.00 | $3,150,000.00 | ($113,549.75) | $3,263,549.75 | ($3,736,659.80) | $353,034.80 | ($3,383,625.00) | ($3,383,625.00) | $233,625.00 | $0.00 | $3,150,000.00 | $0.00 |
| 020503-03 | 2/5/2003 | 6/5/2003 | 2.50% | $4,750,000.00 | $4,750,000.00 | ($110,775.00) | $4,860,775.00 | ($5,565,550.50) | $475,133.83 | ($5,090,416.67) | ($5,090,416.67) | $340,416.67 | $0.00 | $4,750,000.00 | $0.00 |
| 020503-04 | 2/5/2003 | 6/5/2003 | 2.50% | $2,250,000.00 | $2,250,000.00 | ($50,685.00) | $2,300,685.00 | ($2,622,780.00) | $230,280.00 | ($2,392,500.00) | ($2,392,500.00) | $142,500.00 | $0.00 | $2,250,000.00 | $0.00 |
| 020503-05 | 2/5/2003 | 6/5/2003 | 2.50% | $2,850,000.00 | $2,850,000.00 | ($75,000.00) | $2,925,000.00 | ($3,349,125.00) | $285,375.00 | ($3,063,750.00) | ($3,063,750.00) | $213,750.00 | $0.00 | $2,850,000.00 | $0.00 |
| 021103-01 | 2/11/2003 | 6/11/2003 | 2.50% | $5,200,000.00 | $5,200,000.00 | ($114,777.25) | $5,314,777.25 | ($6,085,391.70) | $512,725.03 | ($5,572,666.67) | ($5,572,666.67) | $372,666.67 | $0.00 | $5,200,000.00 | $0.00 |
| 021103-02 | 2/11/2003 | 6/11/2003 | 2.50% | $4,050,000.00 | $4,050,000.00 | ($84,310.25) | $4,134,310.25 | ($4,733,728.35) | $393,478.35 | ($4,340,250.00) | ($4,340,250.00) | $290,250.00 | $0.00 | $4,050,000.00 | $0.00 |
| 021103-03 | 2/11/2003 | 6/11/2003 | 2.50% | $3,050,000.00 | $3,050,000.00 | ($69,287.50) | $3,119,287.50 | ($3,555,975.00) | $284,850.00 | ($3,271,125.00) | ($3,271,125.00) | $221,125.00 | $0.00 | $3,050,000.00 | $0.00 |
| 021103-04 | 2/11/2003 | 6/11/2003 | 2.50% | $2,200,000.00 | $2,200,000.00 | ($56,548.70) | $2,256,548.70 | ($2,583,665.09) | $224,165.09 | ($2,359,500.00) | ($2,359,500.00) | $159,500.00 | $0.00 | $2,200,000.00 | $0.00 |
| 021903-01 | 2/19/2003 | 6/19/2003 | 1.50% | $4,150,000.00 | $4,150,000.00 | ($104,325.70) | $4,254,325.70 | ($4,871,171.05) | $530,271.05 | ($4,340,900.00) | ($4,340,900.00) | $190,900.00 | $0.00 | $4,150,000.00 | $0.00 |
| 021903-02 | 2/19/2003 | 6/19/2003 | 1.50% | $2,600,000.00 | $2,600,000.00 | ($94,086.75) | $2,694,086.75 | ($3,152,040.50) | $442,840.50 | ($2,709,200.00) | ($2,709,200.00) | $109,200.00 | $0.00 | $2,600,000.00 | $0.00 |
| 021903-03 | 2/19/2003 | 6/19/2003 | 2.50% | $2,750,000.00 | $2,750,000.00 | ($91,562.50) | $2,841,562.50 | ($3,239,371.10) | $299,162.77 | ($2,940,208.33) | ($2,940,208.33) | $190,208.33 | $0.00 | $2,750,000.00 | $0.00 |
| 021903-04 | 2/19/2003 | 6/19/2003 | 2.50% | $4,200,000.00 | $4,200,000.00 | ($99,058.00) | $4,299,058.00 | ($5,029,865.60) | $514,865.60 | ($4,515,000.00) | ($4,515,000.00) | $315,000.00 | $0.00 | $4,200,000.00 | $0.00 |
| 022403-01 | 2/24/2003 | 6/24/2003 | 2.50% | $3,550,000.00 | $3,550,000.00 | ($85,751.50) | $3,635,751.50 | ($4,162,923.20) | $355,548.20 | ($3,807,375.00) | ($3,807,375.00) | $257,375.00 | $0.00 | $3,550,000.00 | $0.00 |
| 022403-02 | 2/24/2003 | 6/24/2003 | 1.50% | $2,050,000.00 | $2,050,000.00 | ($47,904.50) | $2,097,904.50 | ($2,402,074.95) | $262,899.95 | ($2,139,175.00) | ($2,139,175.00) | $89,175.00 | $0.00 | $2,050,000.00 | $0.00 |
| 022703-01 | 2/27/2003 | 6/27/2003 | 1.50% | $3,000,000.00 | $3,000,000.00 | ($63,838.50) | $3,063,838.50 | ($3,508,055.60) | $380,555.60 | ($3,127,500.00) | ($3,127,500.00) | $127,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| 022703-02 | 2/27/2003 | 6/27/2003 | 2.50% | $1,950,000.00 | $1,950,000.00 | ($63,893.75) | $2,013,893.75 | ($2,295,826.75) | $202,826.75 | ($2,093,000.00) | ($2,093,000.00) | $143,000.00 | $0.00 | $1,950,000.00 | $0.00 |
| 022703-03 | 2/27/2003 | 6/27/2003 | 2.50% | $4,100,000.00 | $4,100,000.00 | ($125,915.00) | $4,225,915.00 | ($4,838,653.85) | $434,570.52 | ($4,404,083.33) | ($4,404,083.33) | $304,083.33 | $0.00 | $4,100,000.00 | $0.00 |
| 022703-04 | 2/27/2003 | 6/27/2003 | 2.50% | $2,800,000.00 | $2,800,000.00 | ($92,000.00) | $2,892,000.00 | ($3,296,880.00) | $284,546.67 | ($3,012,333.33) | ($3,012,333.33) | $212,333.33 | $0.00 | $2,800,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 031103-01 | 3/11/2003 | 7/9/2003 | 2.50% | $2,000,000.00 | $2,000,000.00 | ($52,117.75) | $2,052,117.75 | ($2,298,335.35) | $153,335.35 | ($2,145,000.00) | ($2,145,000.00) | $145,000.00 | $0.00 | $2,000,000.00 | $0.00 |
| 031103-02 | 3/11/2003 | 7/9/2003 | 2.50% | $2,900,000.00 | $2,900,000.00 | ($153,046.00) | $3,053,046.00 | ($3,480,445.00) | $360,528.33 | ($3,119,916.67) | ($3,119,916.67) | $219,916.67 | $0.00 | $2,900,000.00 | $0.00 |
| 031103-03 | 3/11/2003 | 7/9/2003 | 2.50% | $2,950,000.00 | $2,950,000.00 | ($72,260.75) | $3,022,260.75 | ($3,460,405.40) | $296,530.40 | ($3,163,875.00) | ($3,163,875.00) | $213,875.00 | $0.00 | $2,950,000.00 | $0.00 |
| 031103-04 | 3/11/2003 | 7/9/2003 | 2.50% | $4,700,000.00 | $4,700,000.00 | ($96,772.50) | $4,796,772.50 | ($5,492,260.90) | $431,927.57 | ($5,060,333.33) | ($5,060,333.33) | $360,333.33 | $0.00 | $4,700,000.00 | $0.00 |
| 031103-05 | 3/11/2003 | 7/9/2003 | 2.50% | $1,450,000.00 | $1,450,000.00 | ($63,345.00) | $1,513,345.00 | ($1,725,201.65) | $165,243.32 | ($1,559,958.33) | ($1,559,958.33) | $109,958.33 | $0.00 | $1,450,000.00 | $0.00 |
| 032003-01 | 3/20/2003 | 7/18/2003 | 2.50% | $4,150,000.00 | $4,150,000.00 | ($105,200.00) | $4,255,200.00 | ($4,872,197.00) | $410,947.00 | ($4,461,250.00) | ($4,461,250.00) | $311,250.00 | $0.00 | $4,150,000.00 | $0.00 |
| 032003-02 | 3/20/2003 | 7/18/2003 | 2.50% | $3,050,000.00 | $3,050,000.00 | ($87,781.25) | $3,137,781.25 | ($3,592,742.25) | $313,992.25 | ($3,278,750.00) | ($3,278,750.00) | $228,750.00 | $0.00 | $3,050,000.00 | $0.00 |
| 032503-01 | 3/25/2003 | 7/23/2003 | 2.50% | $1,400,000.00 | $1,400,000.00 | ($59,844.00) | $1,459,844.00 | ($1,664,193.40) | $158,026.73 | ($1,506,166.67) | ($1,506,166.67) | $106,166.67 | $0.00 | $1,400,000.00 | $0.00 |
| 032503-02 | 3/25/2003 | 7/23/2003 | 2.50% | $1,600,000.00 | $1,600,000.00 | ($73,250.00) | $1,673,250.00 | ($1,907,505.00) | $191,505.00 | ($1,716,000.00) | ($1,716,000.00) | $116,000.00 | $0.00 | $1,600,000.00 | $0.00 |
| 032503-03 | 3/25/2003 | 7/23/2003 | 2.50% | $2,800,000.00 | $2,800,000.00 | ($138,318.25) | $2,938,318.25 | ($3,364,361.75) | $363,695.08 | ($3,000,666.67) | ($3,000,666.67) | $200,666.67 | $0.00 | $2,800,000.00 | $0.00 |
| 040103-01 | 4/1/2003 | 7/30/2003 | 1.50% | $3,350,000.00 | $3,350,000.00 | ($87,023.50) | $3,437,023.50 | ($3,935,371.50) | $422,896.50 | ($3,512,475.00) | ($3,512,475.00) | $162,475.00 | $0.00 | $3,350,000.00 | $0.00 |
| 040103-02 | 4/1/2003 | 7/30/2003 | 1.50% | $3,150,000.00 | $3,150,000.00 | ($98,742.50) | $3,248,742.50 | ($3,719,790.90) | $415,440.90 | ($3,304,350.00) | ($3,304,350.00) | $154,350.00 | $0.00 | $3,150,000.00 | $0.00 |
| 040103-03 | 4/1/2003 | 7/30/2003 | 1.50% | $2,100,000.00 | $2,100,000.00 | ($66,525.00) | $2,166,525.00 | ($2,469,838.50) | $279,538.50 | ($2,190,300.00) | ($2,190,300.00) | $90,300.00 | $0.00 | $2,100,000.00 | $0.00 |
| 040803-01 | 4/8/2003 | 8/6/2003 | 2.50% | $1,800,000.00 | $1,800,000.00 | ($75,802.00) | $1,875,802.00 | ($2,138,397.55) | $201,897.55 | ($1,936,500.00) | ($1,936,500.00) | $136,500.00 | $0.00 | $1,800,000.00 | $0.00 |
| 040803-02 | 4/8/2003 | 8/6/2003 | 1.50% | $4,925,000.00 | $4,925,000.00 | ($124,186.75) | $5,049,186.75 | ($5,781,299.65) | $610,049.65 | ($5,171,250.00) | ($5,171,250.00) | $246,250.00 | $0.00 | $4,925,000.00 | $0.00 |
| 040803-03 | 4/8/2003 | 8/6/2003 | 2.50% | $3,675,000.00 | $3,675,000.00 | ($95,380.00) | $3,770,380.00 | ($4,317,085.10) | $354,210.10 | ($3,962,875.00) | ($3,962,875.00) | $287,875.00 | $0.00 | $3,675,000.00 | $0.00 |
| 040803-04 | 4/8/2003 | 8/6/2003 | 1.50% | $1,500,000.00 | $1,500,000.00 | ($47,740.00) | $1,547,740.00 | ($1,764,423.60) | $194,673.60 | ($1,569,750.00) | ($1,569,750.00) | $69,750.00 | $0.00 | $1,500,000.00 | $0.00 |
| 040903-01 | 4/9/2003 | 8/7/2003 | 1.50% | $4,450,000.00 | $4,450,000.00 | ($127,428.75) | $4,577,428.75 | ($5,241,134.70) | $570,859.70 | ($4,670,275.00) | ($4,670,275.00) | $220,275.00 | $0.00 | $4,450,000.00 | $0.00 |
| 040903-02 | 4/9/2003 | 8/7/2003 | 2.50% | $3,600,000.00 | $3,600,000.00 | ($103,214.75) | $3,703,214.75 | ($4,240,142.13) | $349,142.13 | ($3,891,000.00) | ($3,891,000.00) | $291,000.00 | $0.00 | $3,600,000.00 | $0.00 |
| 041703-01 | 4/17/2003 | 8/15/2003 | 2.50% | $2,200,000.00 | $2,200,000.00 | ($73,566.50) | $2,273,568.50 | ($2,591,854.35) | $228,687.68 | ($2,363,166.67) | ($2,363,166.67) | $163,166.67 | $0.00 | $2,200,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 041703-02 | 4/17/2003 | 8/15/2003 | 2.50% | $3,250,000.00 | $3,250,000.00 | ($95,830.00) | $3,345,830.00 | ($3,814,246.20) | $315,079.53 | ($3,499,166.67) | ($3,499,166.67) | $249,166.67 | $0.00 | $3,250,000.00 | $0.00 |
| 041703-03 | 4/17/2003 | 8/15/2003 | 1.50% | $4,050,000.00 | $4,050,000.00 | ($120,825.00) | $4,170,825.00 | ($4,775,591.25) | $531,191.25 | ($4,244,400.00) | ($4,244,400.00) | $194,400.00 | $0.00 | $4,050,000.00 | $0.00 |
| 050103-01 | 5/1/2003 | 8/29/2003 | 2.50% | $2,950,000.00 | $2,950,000.00 | ($59,150.00) | $3,009,150.00 | ($3,445,472.70) | $269,306.03 | ($3,176,166.67) | ($3,176,166.67) | $226,166.67 | $0.00 | $2,950,000.00 | $0.00 |
| 050103-02 | 5/1/2003 | 8/29/2003 | 1.50% | $4,850,000.00 | $4,850,000.00 | ($106,795.50) | $4,956,795.50 | ($5,799,438.32) | $726,338.32 | ($5,073,100.00) | ($5,073,100.00) | $223,100.00 | $0.00 | $4,850,000.00 | $0.00 |
| 050703-01 | 5/7/2003 | 9/4/2003 | 1.50% | $3,200,000.00 | $3,200,000.00 | ($73,100.00) | $3,273,100.00 | ($3,747,699.50) | $394,099.50 | ($3,353,600.00) | ($3,353,600.00) | $153,600.00 | $0.00 | $3,200,000.00 | $0.00 |
| 050703-02 | 5/7/2003 | 9/4/2003 | 2.50% | $4,350,000.00 | $4,350,000.00 | ($94,168.75) | $4,444,168.75 | ($5,088,571.25) | $401,446.25 | ($4,687,125.00) | ($4,687,125.00) | $337,125.00 | $0.00 | $4,350,000.00 | $0.00 |
| 050703-03 | 5/7/2003 | 9/4/2003 | 2.50% | $3,500,000.00 | $3,500,000.00 | ($110,200.00) | $3,610,200.00 | ($4,115,620.00) | $344,370.00 | ($3,771,250.00) | ($3,771,250.00) | $271,250.00 | $0.00 | $3,500,000.00 | $0.00 |
| 050703-04 | 5/7/2003 | 9/4/2003 | 1.50% | $4,500,000.00 | $4,500,000.00 | ($106,550.00) | $4,606,550.00 | ($5,274,473.45) | $565,223.45 | ($4,709,250.00) | ($4,709,250.00) | $209,250.00 | $0.00 | $4,500,000.00 | $0.00 |
| 051403-01 | 5/14/2003 | 9/11/2003 | 2.50% | $1,200,000.00 | $1,200,000.00 | ($119,018.00) | $1,319,018.00 | ($1,510,247.95) | $220,247.95 | ($1,290,000.00) | ($1,290,000.00) | $90,000.00 | $0.00 | $1,200,000.00 | $0.00 |
| 063003-01 | 6/30/2003 | 10/28/2003 | 1.75% | $3,800,000.00 | $3,800,000.00 | ($125,431.25) | $3,925,431.25 | ($4,416,096.50) | $421,029.83 | ($3,995,066.67) | ($3,995,066.67) | $195,066.67 | $0.00 | $3,800,000.00 | $0.00 |
| 063003-02 | 6/30/2003 | 10/28/2003 | 1.75% | $4,200,000.00 | $4,200,000.00 | ($182,158.75) | $4,382,158.75 | ($4,929,908.65) | $504,508.65 | ($4,425,400.00) | ($4,425,400.00) | $225,400.00 | $0.00 | $4,200,000.00 | $0.00 |
| 071703-01 | 7/17/2003 | 11/14/2003 | 1.75% | $3,950,000.00 | $3,950,000.00 | ($99,755.75) | $4,049,755.75 | ($4,535,699.80) | $376,020.63 | ($4,159,679.17) | ($4,159,679.17) | $209,679.17 | $0.00 | $3,950,000.00 | $0.00 |
| 071703-02 | 7/17/2003 | 11/14/2003 | 1.75% | $3,150,000.00 | $3,150,000.00 | ($69,351.50) | $3,219,351.50 | ($3,605,662.25) | $288,449.75 | ($3,317,212.50) | ($3,317,212.50) | $167,212.50 | $0.00 | $3,150,000.00 | $0.00 |
| 072203-01 | 7/22/2003 | 11/19/2003 | 1.75% | $3,900,000.00 | $3,900,000.00 | ($186,396.75) | $4,086,396.75 | ($4,576,746.90) | $465,171.90 | ($4,111,575.00) | ($4,111,575.00) | $211,575.00 | $0.00 | $3,900,000.00 | $0.00 |
| 072203-02 | 7/22/2003 | 11/19/2003 | 1.75% | $2,900,000.00 | $2,900,000.00 | ($103,722.50) | $3,003,722.50 | ($3,364,169.20) | $308,535.87 | ($3,055,633.33) | ($3,055,633.33) | $155,633.33 | $0.00 | $2,900,000.00 | $0.00 |
| 082103-01 | 8/21/2003 | 12/19/2003 | 1.75% | $3,700,000.00 | $3,700,000.00 | ($89,550.00) | $3,789,550.00 | ($4,244,296.00) | $362,996.00 | ($3,881,300.00) | ($3,881,300.00) | $181,300.00 | $0.00 | $3,700,000.00 | $0.00 |
| 082103-02 | 8/21/2003 | 12/19/2003 | 1.75% | $3,350,000.00 | $3,350,000.00 | ($73,210.00) | $3,423,210.00 | ($3,833,970.00) | $317,865.83 | ($3,516,104.17) | ($3,516,104.17) | $166,104.17 | $0.00 | $3,350,000.00 | $0.00 |
| 082103-03 | 8/21/2003 | 12/19/2003 | 1.75% | $2,200,000.00 | $2,200,000.00 | ($49,538.00) | $2,249,538.00 | ($2,519,466.00) | $206,532.67 | ($2,312,933.33) | ($2,312,933.33) | $112,933.33 | $0.00 | $2,200,000.00 | $0.00 |
| 082603-03 | 8/26/2003 | 12/24/2003 | 1.75% | $2,800,000.00 | $2,800,000.00 | ($129,064.25) | $2,929,064.25 | ($3,280,518.25) | $322,084.92 | ($2,958,433.33) | ($2,958,433.33) | $158,433.33 | $0.00 | $2,800,000.00 | $0.00 |
| 082803-04 | 8/28/2003 | 12/26/2003 | 1.75% | $3,800,000.00 | $3,800,000.00 | ($131,500.00) | $3,931,500.00 | ($4,324,650.00) | $307,416.67 | ($4,017,233.33) | ($4,017,233.33) | $217,233.33 | $0.00 | $3,800,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 082803-05 | 8/28/2003 | 12/26/2003 | 1.75% | $2,300,000.00 | $2,300,000.00 | ($119,642.00) | $2,419,642.00 | ($2,709,950.00) | $282,491.67 | ($2,427,458.33) | ($2,427,458.33) | $127,458.33 | $0.00 | $2,300,000.00 | $0.00 |
| 100703-01 | 10/7/2003 | 2/4/2004 | 1.75% | $3,850,000.00 | $3,850,000.00 | ($89,235.25) | $3,939,235.25 | ($4,411,850.25) | $370,954.42 | ($4,040,895.83) | ($4,040,895.83) | $190,895.83 | $0.00 | $3,850,000.00 | $0.00 |
| 100703-02 | 10/7/2003 | 2/4/2004 | 1.75% | $2,750,000.00 | $2,750,000.00 | ($73,785.00) | $2,823,785.00 | ($3,162,629.00) | $279,483.17 | ($2,883,145.83) | ($2,883,145.83) | $133,145.83 | $0.00 | $2,750,000.00 | $0.00 |
| 102103-01 | 10/21/2003 | 2/18/2004 | 1.75% | $4,600,000.00 | $4,600,000.00 | ($139,293.75) | $4,739,293.75 | ($5,236,894.10) | $390,027.43 | ($4,846,866.67) | ($4,846,866.67) | $246,866.67 | $0.00 | $4,600,000.00 | $0.00 |
| 102103-02 | 10/21/2003 | 2/18/2004 | 1.75% | $4,250,000.00 | $4,250,000.00 | ($89,855.75) | $4,339,855.75 | ($4,860,568.75) | $380,006.25 | ($4,480,562.50) | ($4,480,562.50) | $230,562.50 | $0.00 | $4,250,000.00 | $0.00 |
| 102703-01 | 10/27/2003 | 2/24/2004 | 1.75% | $1,950,000.00 | $1,950,000.00 | ($61,055.00) | $2,011,055.00 | ($2,252,254.45) | $202,154.45 | ($2,050,100.00) | ($2,050,100.00) | $100,100.00 | $0.00 | $1,950,000.00 | $0.00 |
| 102703-02 | 10/27/2003 | 2/24/2004 | 1.75% | $3,550,000.00 | $3,550,000.00 | ($102,884.50) | $3,652,884.50 | ($4,091,225.75) | $350,709.08 | ($3,740,516.67) | ($3,740,516.67) | $190,516.67 | $0.00 | $3,550,000.00 | $0.00 |
| 110403-01 | 11/4/2003 | 3/3/2004 | 1.75% | $4,300,000.00 | $4,300,000.00 | ($108,487.50) | $4,408,487.50 | ($4,937,506.00) | $406,739.33 | ($4,530,766.67) | ($4,530,766.67) | $230,766.67 | $0.00 | $4,300,000.00 | $0.00 |
| 110403-02 | 11/4/2003 | 3/3/2004 | 1.75% | $4,550,000.00 | $4,550,000.00 | ($115,695.25) | $4,665,695.25 | ($5,225,574.05) | $434,044.88 | ($4,791,529.17) | ($4,791,529.17) | $241,529.17 | $0.00 | $4,550,000.00 | $0.00 |
| 112003-02 | 11/20/2003 | 3/19/2004 | 1.75% | $2,200,000.00 | $2,200,000.00 | ($59,718.00) | $2,259,718.00 | ($2,530,782.35) | $221,699.02 | ($2,309,083.33) | ($2,309,083.33) | $109,083.33 | $0.00 | $2,200,000.00 | $0.00 |
| 112003-03 | 11/20/2003 | 3/19/2004 | 1.75% | $4,350,000.00 | $4,350,000.00 | ($105,341.00) | $4,455,341.00 | ($4,989,797.65) | $426,647.65 | ($4,563,150.00) | ($4,563,150.00) | $213,150.00 | $0.00 | $4,350,000.00 | $0.00 |
| 112003-04 | 11/20/2003 | 3/19/2004 | 1.75% | $3,650,000.00 | $3,650,000.00 | ($75,773.50) | $3,725,773.50 | ($4,172,809.80) | $333,313.97 | ($3,839,495.83) | ($3,839,495.83) | $189,495.83 | $0.00 | $3,650,000.00 | $0.00 |
| 120803-01 | 12/8/2003 | 4/6/2004 | 1.75% | $3,500,000.00 | $3,500,000.00 | ($110,625.00) | $3,610,625.00 | ($4,043,900.00) | $368,316.67 | ($3,675,583.33) | ($3,675,583.33) | $175,583.33 | $0.00 | $3,500,000.00 | $0.00 |
| 120803-02 | 12/8/2003 | 4/6/2004 | 1.75% | $4,500,000.00 | $4,500,000.00 | ($108,462.00) | $4,608,462.00 | ($5,161,347.50) | $438,222.50 | ($4,723,125.00) | ($4,723,125.00) | $223,125.00 | $0.00 | $4,500,000.00 | $0.00 |
| 012004-01 | 1/20/2004 | 5/19/2004 | 1.75% | $3,950,000.00 | $3,950,000.00 | ($94,800.00) | $4,044,800.00 | ($4,530,176.00) | $384,321.83 | ($4,145,854.17) | ($4,145,854.17) | $195,854.17 | $0.00 | $3,950,000.00 | $0.00 |
| 012004-02 | 1/20/2004 | 5/19/2004 | 1.75% | $4,150,000.00 | $4,150,000.00 | ($80,000.00) | $4,230,000.00 | ($4,737,541.25) | $379,349.58 | ($4,358,191.67) | ($4,358,191.67) | $208,191.67 | $0.00 | $4,150,000.00 | $0.00 |
| 012204-02 | 1/22/2004 | 5/21/2004 | 1.75% | $4,100,000.00 | $4,100,000.00 | ($105,148.75) | $4,205,148.75 | ($4,709,698.35) | $399,231.68 | ($4,310,466.67) | ($4,310,466.67) | $210,466.67 | $0.00 | $4,100,000.00 | $0.00 |
| 012204-03 | 1/22/2004 | 5/21/2004 | 1.75% | $2,400,000.00 | $2,400,000.00 | ($147,548.75) | $2,547,548.75 | ($2,853,200.70) | $330,000.70 | ($2,523,200.00) | ($2,523,200.00) | $123,200.00 | $0.00 | $2,400,000.00 | $0.00 |
| 012204-04 | 1/22/2004 | 5/21/2004 | 1.75% | $3,500,000.00 | $3,500,000.00 | ($136,125.50) | $3,636,125.50 | ($4,072,411.75) | $400,911.75 | ($3,671,500.00) | ($3,671,500.00) | $171,500.00 | $0.00 | $3,500,000.00 | $0.00 |
| 012804-01 | 1/28/2004 | 5/27/2004 | 1.75% | $3,850,000.00 | $3,850,000.00 | ($87,181.25) | $3,937,181.25 | ($4,409,643.00) | $357,518.00 | ($4,052,125.00) | ($4,052,125.00) | $202,125.00 | $0.00 | $3,850,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 012804-02 | 1/28/2004 | 5/27/2004 | 1.75% | $4,650,000.00 | $4,650,000.00 | ($129,503.75) | $4,779,503.75 | ($5,353,044.20) | $472,481.70 | ($4,880,562.50) | ($4,880,562.50) | $230,562.50 | $0.00 | $4,650,000.00 | $0.00 |
| 020904-01 | 2/9/2004 | 6/8/2004 | 1.75% | $2,650,000.00 | $2,650,000.00 | ($79,560.00) | $2,729,560.00 | ($3,056,977.15) | $264,760.48 | ($2,792,216.67) | ($2,792,216.67) | $142,216.67 | $0.00 | $2,650,000.00 | $0.00 |
| 020904-02 | 2/9/2004 | 6/8/2004 | 1.75% | $3,400,000.00 | $3,400,000.00 | ($87,863.75) | $3,487,863.75 | ($3,906,407.40) | $335,840.73 | ($3,570,566.67) | ($3,570,566.67) | $170,566.67 | $0.00 | $3,400,000.00 | $0.00 |
| 021004-01 | 2/10/2004 | 6/9/2004 | 1.75% | $3,700,000.00 | $3,700,000.00 | ($256,637.50) | $3,956,637.50 | ($4,431,434.00) | $532,867.33 | ($3,898,566.67) | ($3,898,566.67) | $198,566.67 | $0.00 | $3,700,000.00 | $0.00 |
| 021704-01 | 2/17/2004 | 6/16/2004 | 1.75% | $2,250,000.00 | $2,250,000.00 | ($66,817.50) | $2,316,817.50 | ($2,594,803.50) | $230,616.00 | ($2,364,187.50) | ($2,364,187.50) | $114,187.50 | $0.00 | $2,250,000.00 | $0.00 |
| 021704-02 | 2/17/2004 | 6/16/2004 | 1.75% | $4,150,000.00 | $4,150,000.00 | ($132,943.25) | $4,282,943.25 | ($4,796,803.47) | $438,611.80 | ($4,358,191.67) | ($4,358,191.67) | $208,191.67 | $0.00 | $4,150,000.00 | $0.00 |
| 021704-03 | 2/17/2004 | 6/16/2004 | 1.75% | $2,450,000.00 | $2,450,000.00 | ($76,125.00) | $2,526,125.00 | ($2,829,225.00) | $254,887.50 | ($2,574,337.50) | ($2,574,337.50) | $124,337.50 | $0.00 | $2,450,000.00 | $0.00 |
| 030404-02 | 3/4/2004 | 7/2/2004 | 1.75% | $3,900,000.00 | $3,900,000.00 | ($107,831.25) | $4,007,831.25 | ($4,488,771.00) | $384,021.00 | ($4,104,750.00) | ($4,104,750.00) | $204,750.00 | $0.00 | $3,900,000.00 | $0.00 |
| 031604-01 | 3/16/2004 | 7/14/2004 | 1.75% | $5,800,000.00 | $5,800,000.00 | ($150,297.50) | $5,950,297.50 | ($6,664,231.90) | $556,348.57 | ($6,107,883.33) | ($6,107,883.33) | $307,883.33 | $0.00 | $5,800,000.00 | $0.00 |
| 041604-01 | 4/16/2004 | 8/14/2004 | 1.75% | $3,350,000.00 | $3,350,000.00 | ($91,792.00) | $3,441,792.00 | ($3,854,797.60) | $332,830.93 | ($3,521,966.67) | ($3,521,966.67) | $171,966.67 | $0.00 | $3,350,000.00 | $0.00 |
| 041604-02 | 4/16/2004 | 8/14/2004 | 1.75% | $4,450,000.00 | $4,450,000.00 | ($129,282.50) | $4,579,282.50 | ($5,128,796.40) | $450,363.07 | ($4,678,433.33) | ($4,678,433.33) | $228,433.33 | $0.00 | $4,450,000.00 | $0.00 |
| 041604-03 | 4/16/2004 | 8/14/2004 | 1.75% | $4,650,000.00 | $4,650,000.00 | ($120,945.00) | $4,770,945.00 | ($5,343,445.50) | $457,458.00 | ($4,885,987.50) | ($4,885,987.50) | $235,987.50 | $0.00 | $4,650,000.00 | $0.00 |
| 042004-01 | 4/20/2004 | 8/18/2004 | 1.75% | $4,300,000.00 | $4,300,000.00 | ($95,940.00) | $4,395,940.00 | ($4,923,452.80) | $410,244.47 | ($4,513,208.33) | ($4,513,208.33) | $213,208.33 | $0.00 | $4,300,000.00 | $0.00 |
| 042704-01 | 4/27/2004 | 8/25/2004 | 1.75% | $4,150,000.00 | $4,150,000.00 | ($120,527.50) | $4,270,527.50 | ($4,782,990.80) | $424,799.13 | ($4,358,191.67) | ($4,358,191.67) | $208,191.67 | $0.00 | $4,150,000.00 | $0.00 |
| 042804-01 | 4/28/2004 | 8/25/2004 | 1.75% | $4,050,000.00 | $4,050,000.00 | ($103,500.00) | $4,153,500.00 | ($4,651,920.00) | $389,295.00 | ($4,262,625.00) | ($4,262,625.00) | $212,625.00 | $0.00 | $4,050,000.00 | $0.00 |
| 061504-01 | 6/15/2004 | 10/13/2004 | 1.17% | $3,550,000.00 | $3,550,000.00 | ($101,393.75) | $3,651,393.75 | ($4,053,020.15) | $383,953.15 | ($3,669,067.00) | ($3,669,067.00) | $119,067.00 | $0.00 | $3,550,000.00 | $0.00 |
| 061504-02 | 6/15/2004 | 10/13/2004 | 1.17% | $4,750,000.00 | $4,750,000.00 | ($91,013.50) | $4,841,013.50 | ($5,373,465.50) | $491,938.00 | ($4,881,527.50) | ($4,881,527.50) | $131,527.50 | $0.00 | $4,750,000.00 | $0.00 |
| 061604-02 | 6/16/2004 | 10/14/2004 | 1.17% | $3,850,000.00 | $3,850,000.00 | ($92,888.75) | $3,942,888.75 | ($4,376,578.80) | $388,440.80 | ($3,988,138.00) | ($3,988,138.00) | $138,138.00 | $0.00 | $3,850,000.00 | $0.00 |
| 062104-02 | 6/21/2004 | 10/19/2004 | 1.17% | $4,550,000.00 | $4,550,000.00 | ($95,863.00) | $4,645,863.00 | ($5,156,901.90) | $443,647.90 | ($4,713,254.00) | ($4,713,254.00) | $163,254.00 | $0.00 | $4,550,000.00 | $0.00 |
| 062104-03 | 6/21/2004 | 10/19/2004 | 1.17% | $5,350,000.00 | $5,350,000.00 | ($123,000.00) | $5,473,000.00 | ($6,075,020.00) | $543,494.50 | ($5,531,525.50) | ($5,531,525.50) | $181,525.50 | $0.00 | $5,350,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 062904-02 | 6/29/2004 | 10/27/2004 | 1.17% | $4,600,000.00 | $4,600,000.00 | ($111,827.25) | $4,711,827.25 | ($5,230,091.45) | $465,043.45 | ($4,765,048.00) | ($4,765,048.00) | $165,048.00 | $0.00 | $4,600,000.00 | $0.00 |
| 071304-02 | 7/13/2004 | 11/10/2004 | 1.17% | $4,600,000.00 | $4,600,000.00 | ($132,375.00) | $4,732,375.00 | ($5,252,936.25) | $500,446.25 | ($4,752,490.00) | ($4,752,490.00) | $152,490.00 | $0.00 | $4,600,000.00 | $0.00 |
| 032105-01 | 3/21/2005 | 7/19/2005 | 1.17% | $3,675,000.00 | $3,675,000.00 | ($82,000.00) | $3,757,000.00 | ($4,170,270.00) | $372,010.50 | ($3,798,259.50) | ($3,798,259.50) | $123,259.50 | $0.00 | $3,675,000.00 | $0.00 |
| 032105-02 | 3/21/2005 | 7/19/2005 | 1.17% | $2,100,000.00 | $2,100,000.00 | ($67,500.00) | $2,167,500.00 | ($2,405,910.00) | $235,476.00 | ($2,170,434.00) | ($2,170,434.00) | $70,434.00 | $0.00 | $2,100,000.00 | $0.00 |
| 032205-01 | 3/22/2005 | 7/20/2005 | 1.17% | $4,100,000.00 | $4,100,000.00 | ($102,664.75) | $4,202,664.75 | ($4,664,916.10) | $421,006.10 | ($4,243,910.00) | ($4,243,910.00) | $143,910.00 | $0.00 | $4,100,000.00 | $0.00 |
| 041405-01 | 4/14/2005 | 8/12/2005 | 1.17% | $4,700,000.00 | $4,700,000.00 | ($140,750.00) | $4,840,750.00 | ($5,373,232.50) | $510,095.50 | ($4,863,137.00) | ($4,863,137.00) | $163,137.00 | $0.00 | $4,700,000.00 | $0.00 |
| 041405-02 | 4/14/2005 | 8/12/2005 | 1.17% | $3,000,000.00 | $3,000,000.00 | ($71,758.00) | $3,071,758.00 | ($3,409,555.10) | $304,255.10 | ($3,105,300.00) | ($3,105,300.00) | $105,300.00 | $0.00 | $3,000,000.00 | $0.00 |
| 041405-03 | 4/14/2005 | 8/12/2005 | 1.17% | $3,500,000.00 | $3,500,000.00 | ($80,045.75) | $3,580,045.75 | ($3,973,790.70) | $350,940.70 | ($3,622,850.00) | ($3,622,850.00) | $122,850.00 | $0.00 | $3,500,000.00 | $0.00 |
| 042005-01 | 4/20/2005 | 8/18/2005 | 1.17% | $4,575,000.00 | $4,575,000.00 | ($106,800.00) | $4,681,800.00 | ($5,196,780.00) | $450,492.00 | ($4,746,288.00) | ($4,746,288.00) | $171,288.00 | $0.00 | $4,575,000.00 | $0.00 |
| 051005-01 | 5/10/2005 | 9/7/2005 | 1.17% | $5,150,000.00 | $5,150,000.00 | ($149,537.50) | $5,299,537.50 | ($5,882,474.40) | $557,734.90 | ($5,324,739.50) | ($5,324,739.50) | $174,739.50 | $0.00 | $5,150,000.00 | $0.00 |
| 051005-02 | 5/10/2005 | 9/7/2005 | 1.17% | $4,950,000.00 | $4,950,000.00 | ($112,156.50) | $5,062,156.50 | ($5,618,988.00) | $493,312.50 | ($5,125,675.50) | ($5,125,675.50) | $175,675.50 | $0.00 | $4,950,000.00 | $0.00 |
| 053105-01 | 5/31/2005 | 9/28/2005 | 1.17% | $3,300,000.00 | $3,300,000.00 | ($90,550.00) | $3,390,550.00 | ($3,763,482.00) | $346,365.00 | ($3,417,117.00) | ($3,417,117.00) | $117,117.00 | $0.00 | $3,300,000.00 | $0.00 |
| 053105-02 | 5/31/2005 | 9/28/2005 | 1.17% | $4,675,000.00 | $4,675,000.00 | ($111,562.50) | $4,786,562.50 | ($5,313,064.50) | $472,148.75 | ($4,840,915.75) | ($4,840,915.75) | $165,915.75 | $0.00 | $4,675,000.00 | $0.00 |
| 060705-01 | 6/6/2005 | 10/4/2005 | 1.17% | $3,375,000.00 | $3,375,000.00 | ($93,000.00) | $3,468,000.00 | ($3,849,480.00) | $353,385.00 | ($3,496,095.00) | ($3,496,095.00) | $121,095.00 | $0.00 | $3,375,000.00 | $0.00 |
| 060805-01 | 6/8/2005 | 10/6/2005 | 1.17% | $4,055,000.00 | $4,055,000.00 | ($84,925.00) | $4,139,925.00 | ($4,595,307.20) | $393,232.35 | ($4,202,074.85) | ($4,202,074.85) | $147,074.85 | $0.00 | $4,055,000.00 | $0.00 |
| 061605-01 | 6/16/2005 | 10/13/2005 | 1.17% | $4,200,000.00 | $4,200,000.00 | ($135,000.00) | $4,335,000.00 | ($4,811,850.00) | $464,430.00 | ($4,347,420.00) | ($4,347,420.00) | $147,420.00 | $0.00 | $4,200,000.00 | $0.00 |
| 061605-02 | 6/17/2005 | 10/15/2005 | 1.17% | $3,950,000.00 | $3,950,000.00 | ($103,225.00) | $4,053,225.00 | ($4,499,055.00) | $413,491.00 | ($4,085,564.00) | ($4,085,564.00) | $135,564.00 | $0.00 | $3,950,000.00 | $0.00 |
| 062105-01 | 6/21/2005 | 10/19/2005 | 1.17% | $4,070,000.00 | $4,070,000.00 | ($84,375.00) | $4,154,375.00 | ($4,611,350.50) | $396,906.20 | ($4,214,444.30) | ($4,214,444.30) | $144,444.30 | $0.00 | $4,070,000.00 | $0.00 |
| 071305-01 | 7/13/2005 | 11/10/2005 | 1.17% | $5,280,000.00 | $5,280,000.00 | ($111,240.00) | $5,391,240.00 | ($5,984,259.00) | $543,641.40 | ($5,440,617.60) | ($5,440,617.60) | $160,617.60 | $0.00 | $5,280,000.00 | $0.00 |
| 071905-01 | 7/19/2005 | 11/16/2005 | 1.17% | $2,550,000.00 | $2,550,000.00 | ($55,280.00) | $2,605,280.00 | ($2,891,838.00) | $257,305.50 | ($2,634,532.50) | ($2,634,532.50) | $84,532.50 | $0.00 | $2,550,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 071905-02 | 7/19/2005 | 11/16/2005 | 1.17% | $5,125,000.00 | $5,125,000.00 | ($106,983.75) | $5,231,983.75 | ($5,807,453.85) | $512,560.10 | ($5,294,893.75) | ($5,294,893.75) | $169,893.75 | $0.00 | $5,125,000.00 | $0.00 |
| 071905-03 | 7/19/2005 | 11/16/2005 | 1.17% | $3,016,000.00 | $3,016,000.00 | ($61,508.00) | $3,077,508.00 | ($3,415,989.90) | $297,657.02 | ($3,118,332.88) | ($3,118,332.88) | $102,332.88 | $0.00 | $3,016,000.00 | $0.00 |
| 072705-01 | 7/27/2005 | 11/24/2005 | 1.17% | $5,025,000.00 | $5,025,000.00 | ($104,750.00) | $5,129,750.00 | ($5,693,984.00) | $492,606.50 | ($5,201,377.50) | ($5,201,377.50) | $176,377.50 | $0.00 | $5,025,000.00 | $0.00 |
| 081105-01 | 8/11/2005 | 12/9/2005 | 1.17% | $3,785,000.00 | $3,785,000.00 | ($79,542.50) | $3,864,542.50 | ($4,289,619.50) | $370,289.90 | ($3,919,329.60) | ($3,919,329.65) | $134,329.65 | $0.00 | $3,785,000.00 | $0.00 |
| 081105-02 | 8/11/2005 | 12/9/2005 | 1.17% | $3,775,000.00 | $3,775,000.00 | ($77,675.00) | $3,852,675.00 | ($4,276,395.00) | $361,531.25 | ($3,914,863.75) | ($3,914,863.75) | $139,863.75 | $0.00 | $3,775,000.00 | $0.00 |
| 081105-03 | 8/11/2005 | 12/9/2005 | 1.17% | $2,675,000.00 | $2,675,000.00 | ($55,875.00) | $2,730,875.00 | ($3,031,245.00) | $254,006.50 | ($2,777,238.50) | ($2,777,238.50) | $102,238.50 | $0.00 | $2,675,000.00 | $0.00 |
| 083105-01 | 8/31/2005 | 12/29/2005 | 1.17% | $4,090,000.00 | $4,090,000.00 | ($91,468.75) | $4,181,468.75 | ($4,641,412.95) | $407,853.95 | ($4,233,559.00) | ($4,233,559.00) | $143,559.00 | $0.00 | $4,090,000.00 | $0.00 |
| 090105-01 | 9/1/2005 | 12/30/2005 | 1.17% | $4,600,000.00 | $4,600,000.00 | ($119,000.00) | $4,719,000.00 | ($5,238,090.00) | $478,424.00 | ($4,759,666.00) | ($4,759,666.00) | $159,666.00 | $0.00 | $4,600,000.00 | $0.00 |
| 090105-02 | 9/1/2005 | 12/30/2005 | 1.17% | $4,240,000.00 | $4,240,000.00 | ($95,000.00) | $4,335,000.00 | ($4,811,850.00) | $424,679.60 | ($4,387,170.40) | ($4,387,170.40) | $147,170.40 | $0.00 | $4,240,000.00 | $0.00 |
| 090805-01 | 9/8/2005 | 1/6/2006 | 1.17% | $2,947,000.00 | $2,947,000.00 | ($60,490.00) | $3,007,490.00 | ($3,338,261.65) | $295,867.26 | ($3,042,394.39) | ($3,042,394.39) | $95,394.39 | $0.00 | $2,947,000.00 | $0.00 |
| 091405-01 | 9/14/2005 | 1/12/2006 | 1.17% | $3,340,000.00 | $3,340,000.00 | ($70,000.00) | $3,410,000.00 | ($3,785,080.00) | $333,056.40 | ($3,452,023.60) | ($3,452,023.60) | $112,023.60 | $0.00 | $3,340,000.00 | $0.00 |
| 091405-02 | 9/14/2005 | 1/12/2006 | 1.17% | $4,955,000.00 | $4,955,000.00 | ($102,500.00) | $5,057,500.00 | ($5,613,804.00) | $496,478.20 | ($5,117,325.80) | ($5,117,325.80) | $162,325.80 | $0.00 | $4,955,000.00 | $0.00 |
| 092005-01 | 9/20/2005 | 1/18/2006 | 1.17% | $4,650,000.00 | $4,650,000.00 | ($96,825.00) | $4,746,825.00 | ($5,268,957.50) | $462,996.50 | ($4,805,961.00) | ($4,805,961.00) | $155,961.00 | $0.00 | $4,650,000.00 | $0.00 |
| 092005-02 | 9/20/2005 | 1/18/2006 | 1.17% | $3,720,000.00 | $3,720,000.00 | ($77,550.00) | $3,797,550.00 | ($4,215,258.75) | $370,489.95 | ($3,844,768.80) | ($3,844,768.80) | $124,768.80 | $0.00 | $3,720,000.00 | $0.00 |
| 092005-03 | 9/20/2005 | 1/18/2006 | 1.17% | $4,100,000.00 | $4,100,000.00 | ($90,400.00) | $4,190,400.00 | ($4,651,320.00) | $412,207.00 | ($4,239,113.00) | ($4,239,113.00) | $139,113.00 | $0.00 | $4,100,000.00 | $0.00 |
| 092705-01 | 9/27/2005 | 1/25/2006 | 1.17% | $4,898,000.00 | $4,898,000.00 | ($100,367.50) | $4,998,367.50 | ($5,548,156.00) | $483,966.86 | ($5,064,189.14) | ($5,064,189.14) | $166,189.14 | $0.00 | $4,898,000.00 | $0.00 |
| 100405-01 | 10/4/2005 | 2/1/2006 | 1.17% | $4,550,000.00 | $4,550,000.00 | ($95,675.00) | $4,645,675.00 | ($5,156,699.25) | $452,317.75 | ($4,704,381.50) | ($4,704,381.50) | $154,381.50 | $0.00 | $4,550,000.00 | $0.00 |
| 101705-01 | 10/17/2005 | 2/14/2006 | 1.17% | $5,000,000.00 | $5,000,000.00 | ($118,750.00) | $5,118,750.00 | ($5,681,790.00) | $512,140.00 | ($5,169,650.00) | ($5,169,650.00) | $169,650.00 | $0.00 | $5,000,000.00 | $0.00 |
| 101905-01 | 10/19/2005 | 2/16/2006 | 1.17% | $5,175,000.00 | $5,175,000.00 | ($109,543.75) | $5,284,543.75 | ($5,865,797.95) | $507,137.20 | ($5,358,660.75) | ($5,358,660.75) | $183,660.75 | $0.00 | $5,175,000.00 | $0.00 |
| 102505-01 | 10/25/2005 | 2/22/2006 | 1.17% | $4,250,000.00 | $4,250,000.00 | ($95,756.25) | $4,345,756.25 | ($4,823,788.75) | $422,956.25 | ($4,400,832.50) | ($4,400,832.50) | $150,832.50 | $0.00 | $4,250,000.00 | $0.00 |

**EXHIBIT H**

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 102505-02 | 10/25/2005 | 2/22/2006 | 1.17% | $4,350,000.00 | $4,350,000.00 | ($89,350.00) | $4,439,350.00 | ($4,927,650.00) | $423,268.50 | ($4,504,381.50) | ($4,504,381.50) | $154,381.50 | $0.00 | $4,350,000.00 | $0.00 |
| 110105-01 | 11/1/2005 | 3/1/2006 | 1.17% | $3,975,000.00 | $3,975,000.00 | ($101,796.00) | $4,076,796.00 | ($4,525,200.80) | $418,429.55 | ($4,106,771.25) | ($4,106,771.25) | $131,771.25 | $0.00 | $3,975,000.00 | $0.00 |
| 111405-01 | 11/14/2005 | 3/14/2006 | 1.17% | $3,625,000.00 | $3,625,000.00 | ($97,320.00) | $3,722,320.00 | ($4,131,775.20) | $385,192.70 | ($3,746,582.50) | ($3,746,582.50) | $121,582.50 | $0.00 | $3,625,000.00 | $0.00 |
| 112105-01 | 11/21/2005 | 3/21/2006 | 1.17% | $2,845,000.00 | $2,845,000.00 | ($59,582.50) | $2,904,582.50 | ($3,224,050.50) | $281,410.10 | ($2,942,640.40) | ($2,942,640.40) | $97,640.40 | $0.00 | $2,845,000.00 | $0.00 |
| 112105-02 | 11/21/2005 | 3/21/2006 | 1.17% | $4,325,000.00 | $4,325,000.00 | ($96,700.00) | $4,421,700.00 | ($4,908,060.00) | $427,879.00 | ($4,480,181.00) | ($4,480,181.00) | $155,181.00 | $0.00 | $4,325,000.00 | $0.00 |
| 113005-01 | 11/30/2005 | 3/30/2006 | 1.17% | $4,650,000.00 | $4,650,000.00 | ($118,500.00) | $4,768,500.00 | ($5,293,020.00) | $479,805.00 | ($4,813,215.00) | ($4,813,215.00) | $163,215.00 | $0.00 | $4,650,000.00 | $0.00 |
| 113005-02 | 11/30/2005 | 3/30/2006 | 1.17% | $3,950,000.00 | $3,950,000.00 | ($90,559.50) | $4,040,559.50 | ($4,484,958.90) | $397,854.40 | ($4,087,104.50) | ($4,087,104.50) | $137,104.50 | $0.00 | $3,950,000.00 | $0.00 |
| 120105-01 | 12/1/2005 | 3/31/2006 | 1.17% | $2,200,000.00 | $2,200,000.00 | ($68,650.00) | $2,268,650.00 | ($2,518,201.50) | $245,271.50 | ($2,272,930.00) | ($2,272,930.00) | $72,930.00 | $0.00 | $2,200,000.00 | $0.00 |
| 120805-01 | 12/8/2005 | 4/7/2006 | 1.17% | $4,240,000.00 | $4,240,000.00 | ($89,581.25) | $4,329,581.25 | ($4,805,808.75) | $425,252.75 | ($4,380,556.00) | ($4,380,556.00) | $140,556.00 | $0.00 | $4,240,000.00 | $0.00 |
| 121405-01 | 12/14/2005 | 4/13/2006 | 1.17% | $5,100,000.00 | $5,100,000.00 | ($123,655.00) | $5,223,655.00 | ($5,798,257.05) | $531,181.05 | ($5,267,076.00) | ($5,267,076.00) | $167,076.00 | $0.00 | $5,100,000.00 | $0.00 |
| 121405-02 | 12/14/2005 | 4/13/2006 | 1.17% | $5,025,000.00 | $5,025,000.00 | ($122,700.00) | $5,147,700.00 | ($5,713,920.00) | $526,260.75 | ($5,187,659.25) | ($5,187,659.25) | $162,659.25 | $0.00 | $5,025,000.00 | $0.00 |
| 122005-01 | 12/20/2005 | 4/19/2006 | 1.17% | $4,035,000.00 | $4,035,000.00 | ($83,250.00) | $4,118,250.00 | ($4,571,250.00) | $402,489.75 | ($4,168,760.25) | ($4,168,760.25) | $133,760.25 | $0.00 | $4,035,000.00 | $0.00 |
| 122005-02 | 12/20/2005 | 4/19/2006 | 1.17% | $4,475,000.00 | $4,475,000.00 | ($98,001.25) | $4,573,001.25 | ($5,034,865.75) | $409,774.25 | ($4,625,091.50) | ($4,625,091.50) | $150,091.50 | $0.00 | $4,475,000.00 | $0.00 |
| 122005-03 | 12/20/2005 | 4/19/2006 | 1.17% | $3,450,000.00 | $3,450,000.00 | ($75,400.00) | $3,525,400.00 | ($3,913,120.00) | $346,061.50 | ($3,567,058.50) | ($3,567,058.50) | $117,058.50 | $0.00 | $3,450,000.00 | $0.00 |
| 123005-01 | 12/30/2005 | 4/29/2006 | 1.17% | $4,395,000.00 | $4,395,000.00 | ($90,000.00) | $4,485,000.00 | ($4,937,985.00) | $404,146.95 | ($4,533,838.05) | ($4,533,838.05) | $138,838.05 | $0.00 | $4,395,000.00 | $0.00 |
| 010306-01 | 1/3/2006 | 5/3/2006 | 1.17% | $4,185,000.00 | $4,185,000.00 | ($86,712.50) | $4,271,712.50 | ($4,741,591.25) | $416,226.35 | ($4,325,364.90) | ($4,325,364.90) | $140,364.90 | $0.00 | $4,185,000.00 | $0.00 |
| 011106-01 | 1/11/2006 | 5/11/2006 | 1.17% | $5,150,000.00 | $5,150,000.00 | ($106,187.50) | $5,256,187.50 | ($5,834,356.00) | $501,582.50 | ($5,332,773.50) | ($5,332,773.50) | $182,773.50 | $0.00 | $5,150,000.00 | $0.00 |
| 011806-01 | 1/18/2006 | 5/18/2006 | 1.17% | $4,350,000.00 | $4,350,000.00 | ($100,600.00) | $4,450,600.00 | ($4,940,166.00) | $444,267.00 | ($4,495,899.00) | ($4,495,899.00) | $145,899.00 | $0.00 | $4,350,000.00 | $0.00 |
| 011906-01 | 1/19/2006 | 5/19/2006 | 1.17% | $2,400,000.00 | $2,400,000.00 | ($67,337.50) | $2,467,337.50 | ($2,738,727.55) | $260,103.55 | ($2,478,624.00) | ($2,478,624.00) | $78,624.00 | $0.00 | $2,400,000.00 | $0.00 |
| 012606-01 | 1/26/2006 | 5/26/2006 | 1.17% | $4,400,000.00 | $4,400,000.00 | ($105,988.75) | $4,505,988.75 | ($5,001,646.25) | $457,502.25 | ($4,544,144.00) | ($4,544,144.00) | $144,144.00 | $0.00 | $4,400,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 012606-02 | 1/26/2006 | 5/26/2006 | 1.17% | $3,800,000.00 | $3,800,000.00 | ($101,500.00) | $3,901,500.00 | ($4,330,650.00) | $404,680.00 | ($3,925,970.00) | ($3,925,970.00) | $125,970.00 | $0.00 | $3,800,000.00 | $0.00 |
| 013106-01 | 1/31/2006 | 5/31/2006 | 1.17% | $4,650,000.00 | $4,650,000.00 | ($119,127.50) | $4,769,127.50 | ($5,293,697.25) | $487,736.25 | ($4,805,961.00) | ($4,805,961.00) | $155,961.00 | $0.00 | $4,650,000.00 | $0.00 |
| 021506-01 | 2/15/2006 | 6/15/2006 | 1.17% | $3,725,000.00 | $3,725,000.00 | ($82,575.00) | $3,807,575.00 | ($4,226,385.00) | $388,070.50 | ($3,838,314.50) | ($3,838,314.50) | $113,314.50 | $0.00 | $3,725,000.00 | $0.00 |
| 022106-01 | 2/21/2006 | 6/21/2006 | 1.17% | $3,875,000.00 | $3,875,000.00 | ($86,136.25) | $3,961,136.25 | ($4,396,793.65) | $402,404.90 | ($3,994,388.75) | ($3,994,388.75) | $119,388.75 | $0.00 | $3,875,000.00 | $0.00 |
| 022206-01 | 2/22/2006 | 6/22/2006 | 1.17% | $4,075,000.00 | $4,075,000.00 | ($84,100.00) | $4,159,100.00 | ($4,616,582.00) | $411,263.50 | ($4,205,318.50) | ($4,205,318.50) | $130,318.50 | $0.00 | $4,075,000.00 | $0.00 |
| 022806-01 | 2/28/2006 | 6/28/2006 | 1.17% | $4,650,000.00 | $4,650,000.00 | ($118,500.00) | $4,768,500.00 | ($5,293,020.00) | $499,753.50 | ($4,793,266.50) | ($4,793,266.50) | $143,266.50 | $0.00 | $4,650,000.00 | $0.00 |
| 022806-02 | 2/28/2006 | 6/28/2006 | 1.17% | $3,300,000.00 | $3,300,000.00 | ($81,300.00) | $3,381,300.00 | ($3,753,240.00) | $342,558.00 | ($3,410,682.00) | ($3,410,682.00) | $110,682.00 | $0.00 | $3,300,000.00 | $0.00 |
| 030606-01 | 3/6/2006 | 7/4/2006 | 1.17% | $2,650,000.00 | $2,650,000.00 | ($64,375.00) | $2,714,375.00 | ($3,012,931.30) | $268,882.80 | ($2,744,048.50) | ($2,744,048.50) | $94,048.50 | $0.00 | $2,650,000.00 | $0.00 |
| 030606-02 | 3/6/2006 | 7/4/2006 | 1.17% | $3,975,000.00 | $3,975,000.00 | ($99,900.00) | $4,074,900.00 | ($4,523,139.00) | $413,267.25 | ($4,109,871.75) | ($4,109,871.75) | $134,871.75 | $0.00 | $3,975,000.00 | $0.00 |
| 030806-01 | 3/8/2006 | 7/6/2006 | 1.17% | $4,225,000.00 | $4,225,000.00 | ($110,000.00) | $4,335,000.00 | ($4,811,850.00) | $435,257.00 | ($4,376,593.00) | ($4,376,593.00) | $151,593.00 | $0.00 | $4,225,000.00 | $0.00 |
| 031406-01 | 3/14/2006 | 7/12/2006 | 1.17% | $3,700,000.00 | $3,700,001.00 | ($92,025.75) | $3,792,026.75 | ($4,209,096.80) | $379,226.80 | ($3,829,870.00) | ($3,829,870.00) | $129,870.00 | $0.00 | $3,700,000.00 | $1.00 |
| 031606-01 | 3/16/2006 | 7/14/2006 | 1.17% | $3,600,000.00 | $3,600,000.00 | ($84,750.00) | $3,684,750.00 | ($4,090,050.00) | $365,094.00 | ($3,724,956.00) | ($3,724,956.00) | $124,956.00 | $0.00 | $3,600,000.00 | $0.00 |
| 032006-01 | 3/20/2006 | 7/18/2006 | 1.17% | $4,175,000.00 | $4,175,000.00 | ($102,200.00) | $4,277,200.00 | ($4,747,640.00) | $430,982.25 | ($4,316,657.75) | ($4,316,657.75) | $141,657.75 | $0.00 | $4,175,000.00 | $0.00 |
| 032006-02 | 3/20/2006 | 7/18/2006 | 1.17% | $4,200,000.00 | $4,200,000.00 | ($94,448.00) | $4,294,448.00 | ($4,766,786.40) | $422,642.40 | ($4,344,144.00) | ($4,344,144.00) | $144,144.00 | $0.00 | $4,200,000.00 | $0.00 |
| 032206-01 | 3/22/2006 | 7/20/2006 | 1.17% | $4,325,000.00 | $4,325,000.00 | ($95,255.00) | $4,420,255.00 | ($4,906,475.00) | $431,354.25 | ($4,475,120.75) | ($4,475,120.75) | $150,120.75 | $0.00 | $4,325,000.00 | $0.00 |
| 032206-02 | 3/22/2006 | 7/20/2006 | 1.17% | $3,900,000.00 | $3,900,000.00 | ($88,160.00) | $3,988,160.00 | ($4,426,848.00) | $344,328.00 | ($4,082,520.00) | ($4,082,520.00) | $136,890.00 | $0.00 | $3,945,630.00 | ($45,630.00) |
| 040506-01 | 4/5/2006 | 8/3/2006 | 1.17% | $4,450,000.00 | $4,450,000.00 | ($264,200.00) | $4,714,200.00 | ($5,232,720.00) | $623,054.00 | ($4,609,666.00) | ($4,609,666.00) | $159,666.00 | $0.00 | $4,450,000.00 | $0.00 |
| 041806-01 | 4/18/2006 | 8/16/2006 | 1.17% | $4,725,000.00 | $4,725,000.00 | ($101,300.00) | $4,826,300.00 | ($5,357,193.00) | $473,716.50 | ($4,883,476.50) | ($4,883,476.50) | $158,476.50 | $0.00 | $4,725,000.00 | $0.00 |
| 041806-02 | 4/18/2006 | 8/16/2006 | 1.17% | $3,625,000.00 | $3,625,000.00 | ($99,038.25) | $3,724,038.25 | ($4,133,637.45) | $385,641.20 | ($3,747,996.25) | ($3,747,996.25) | $122,996.25 | $0.00 | $3,625,000.00 | $0.00 |
| 042406-01 | 4/24/2006 | 8/22/2006 | 1.17% | $2,800,000.00 | $2,800,000.00 | ($61,100.00) | $2,861,100.00 | ($3,175,801.00) | $281,889.00 | ($2,893,912.00) | ($2,893,912.00) | $93,912.00 | $0.00 | $2,800,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 042506-01 | 4/25/2006 | 8/23/2006 | 1.17% | $4,225,000.00 | $4,225,000.00 | ($110,000.00) | $4,335,000.00 | ($4,811,850.00) | $490,772.50 | ($4,321,077.50) | ($4,321,077.50) | $141,706.50 | $0.00 | $4,179,371.00 | $45,629.00 |
| 042506-02 | 4/25/2006 | 8/23/2006 | 1.17% | $3,375,000.00 | $3,375,000.00 | ($89,387.50) | $3,464,387.50 | ($3,814,285.50) | $324,771.75 | ($3,489,513.75) | ($3,489,513.75) | $114,513.75 | $0.00 | $3,375,000.00 | $0.00 |
| 050206-01 | 5/2/2006 | 8/30/2006 | 1.17% | $3,650,000.00 | $3,650,000.00 | ($299,023.00) | $3,949,023.00 | ($4,383,309.10) | $603,770.60 | ($3,779,538.50) | ($3,779,538.50) | $129,538.50 | $0.00 | $3,650,000.00 | $0.00 |
| 050806-01 | 5/8/2006 | 9/5/2006 | 1.17% | $3,900,000.00 | $3,900,000.00 | ($533,840.00) | $4,433,840.00 | ($4,921,532.00) | $889,205.00 | ($4,032,327.00) | ($4,032,327.00) | $132,327.00 | $0.00 | $3,900,000.00 | $0.00 |
| 051606-01 | 5/16/2006 | 9/13/2006 | 1.17% | $4,900,000.00 | $4,900,000.00 | ($106,820.00) | $5,006,820.00 | ($5,557,566.00) | $493,220.00 | ($5,064,346.00) | ($5,064,346.00) | $164,346.00 | $0.00 | $4,900,000.00 | $0.00 |
| 052306-01 | 5/23/2006 | 9/20/2006 | 1.17% | $4,225,000.00 | $4,225,000.00 | ($110,000.00) | $4,335,000.00 | ($4,811,850.00) | $435,257.00 | ($4,376,593.00) | ($4,376,593.00) | $151,593.00 | $0.00 | $4,225,000.00 | $0.00 |
| 052406-01 | 5/24/2006 | 9/21/2006 | 1.17% | $4,650,000.00 | $4,650,000.00 | ($118,500.00) | $4,768,500.00 | ($5,293,020.00) | $481,618.50 | ($4,811,401.50) | ($4,811,401.50) | $161,401.50 | $0.00 | $4,650,000.00 | $0.00 |
| 060706-01 | 6/7/2006 | 10/5/2006 | 1.17% | $3,550,000.00 | $3,550,000.00 | ($91,200.00) | $3,641,200.00 | ($4,041,640.00) | $364,266.00 | ($3,677,374.00) | ($3,677,374.00) | $127,374.00 | $0.00 | $3,550,000.00 | $0.00 |
| 060706-02 | 6/7/2006 | 10/5/2006 | 1.17% | $1,900,000.00 | $1,900,000.00 | ($39,157.00) | $1,939,157.00 | ($2,152,416.20) | $184,244.20 | ($1,968,172.00) | ($1,968,172.00) | $68,172.00 | $0.00 | $1,900,000.00 | $0.00 |
| 061306-01 | 6/13/2006 | 10/11/2006 | 1.17% | $4,150,000.00 | $4,150,000.00 | ($101,912.50) | $4,251,912.50 | ($4,719,609.50) | $420,707.50 | ($4,298,902.00) | ($4,298,902.00) | $148,902.00 | $0.00 | $4,150,000.00 | $0.00 |
| 061406-01 | 6/14/2006 | 10/12/2006 | 1.17% | $4,425,000.00 | $4,425,000.00 | ($104,980.00) | $4,529,980.00 | ($5,028,274.00) | $444,505.00 | ($4,583,769.00) | ($4,583,769.00) | $158,769.00 | $0.00 | $4,425,000.00 | $0.00 |
| 061606-01 | 6/16/2006 | 10/14/2006 | 1.17% | $4,875,000.00 | $4,875,000.00 | ($118,317.50) | $4,993,317.50 | ($5,542,580.00) | $496,467.50 | ($5,046,112.50) | ($5,046,112.50) | $171,112.50 | $0.00 | $4,875,000.00 | $0.00 |
| 062006-01 | 6/20/2006 | 10/18/2006 | 1.17% | $4,375,000.00 | $4,375,000.00 | ($111,650.00) | $4,486,650.00 | ($4,980,180.00) | $451,617.50 | ($4,528,562.50) | ($4,528,562.50) | $153,562.50 | $0.00 | $4,375,000.00 | $0.00 |
| 062006-02 | 6/20/2006 | 10/18/2006 | 1.17% | $4,450,000.00 | $4,450,000.00 | ($101,750.00) | $4,551,750.00 | ($5,052,425.00) | $444,494.50 | ($4,607,930.50) | ($4,607,930.50) | $157,930.50 | $0.00 | $4,450,000.00 | $0.00 |
| 062606-01 | 6/26/2006 | 10/24/2006 | 1.17% | $2,450,000.00 | $2,450,000.00 | ($59,022.50) | $2,509,022.50 | ($2,784,939.00) | $251,810.50 | ($2,533,128.50) | ($2,533,128.50) | $83,128.50 | $0.00 | $2,450,000.00 | $0.00 |
| 062606-02 | 6/26/2006 | 10/24/2006 | 1.17% | $4,850,000.00 | $4,850,000.00 | ($135,100.00) | $4,985,100.00 | ($5,533,440.00) | $516,988.00 | ($5,016,452.00) | ($5,016,452.00) | $166,452.00 | $0.00 | $4,850,000.00 | $0.00 |
| 070606-01 | 7/6/2006 | 11/3/2006 | 1.17% | $4,500,000.00 | $4,500,000.00 | ($105,937.50) | $4,605,937.50 | ($5,112,580.00) | $465,160.00 | ($4,647,420.00) | ($4,647,420.00) | $147,420.00 | $0.00 | $4,500,000.00 | $0.00 |
| 071106-01 | 7/11/2006 | 11/8/2006 | 1.17% | $3,275,000.00 | $3,275,000.00 | ($91,600.00) | $3,366,600.00 | ($3,736,880.00) | $352,036.50 | ($3,384,843.50) | ($3,384,843.50) | $109,843.50 | $0.00 | $3,275,000.00 | $0.00 |
| 071106-02 | 7/11/2006 | 11/8/2006 | 1.17% | $4,175,000.00 | $4,175,000.00 | ($105,812.50) | $4,280,812.50 | ($4,751,692.00) | $439,919.00 | ($4,311,773.00) | ($4,311,773.00) | $136,773.00 | $0.00 | $4,175,000.00 | $0.00 |
| 071706-01 | 7/17/2006 | 11/14/2006 | 1.17% | $5,100,000.00 | $5,100,000.00 | ($123,675.00) | $5,223,675.00 | ($5,798,279.25) | $527,225.25 | ($5,271,054.00) | ($5,271,054.00) | $171,054.00 | $0.00 | $5,100,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 071706-02 | 7/17/2006 | 11/14/2006 | 1.17% | $3,375,000.00 | $3,375,000.00 | ($76,743.75) | $3,451,743.75 | ($3,831,408.00) | $336,629.25 | ($3,494,778.75) | ($3,494,778.75) | $119,778.75 | $0.00 | $3,375,000.00 | $0.00 |
| 072006-01 | 7/20/2006 | 11/17/2006 | 1.17% | $4,475,000.00 | $4,475,000.00 | ($100,231.25) | $4,575,231.25 | ($5,078,478.75) | $444,661.00 | ($4,633,817.75) | ($4,633,817.75) | $158,817.75 | $0.00 | $4,475,000.00 | $0.00 |
| 072006-02 | 7/20/2006 | 11/17/2006 | 1.17% | $2,675,000.00 | $2,675,000.00 | ($65,803.75) | $2,740,803.75 | ($3,042,260.55) | $272,324.80 | ($2,769,935.75) | ($2,769,935.75) | $94,935.75 | $0.00 | $2,675,000.00 | $0.00 |
| 072406-01 | 7/24/2006 | 11/21/2006 | 1.17% | $5,025,000.00 | $5,025,000.00 | ($121,006.25) | $5,146,006.25 | ($5,712,052.50) | $500,876.25 | ($5,211,176.25) | ($5,211,176.25) | $186,176.25 | $0.00 | $5,025,000.00 | $0.00 |
| 080806-01 | 8/8/2006 | 12/6/2006 | 1.17% | $3,275,000.00 | $3,275,000.00 | ($88,150.00) | $3,363,150.00 | ($3,733,065.00) | $340,558.00 | ($3,392,507.00) | ($3,392,507.00) | $117,507.00 | $0.00 | $3,275,000.00 | $0.00 |
| 080806-02 | 8/8/2006 | 12/6/2006 | 1.17% | $4,375,000.00 | $4,375,000.00 | ($111,725.00) | $4,486,725.00 | ($4,980,264.75) | $449,996.00 | ($4,530,268.75) | ($4,530,268.75) | $155,268.75 | $0.00 | $4,375,000.00 | $0.00 |
| 081506-01 | 8/15/2006 | 12/13/2006 | 1.17% | $2,725,000.00 | $2,725,000.00 | ($77,800.00) | $2,802,800.00 | ($3,111,040.00) | $289,329.75 | ($2,821,710.25) | ($2,821,710.25) | $96,710.25 | $0.00 | $2,725,000.00 | $0.00 |
| 082306-01 | 8/23/2006 | 12/21/2006 | 1.17% | $4,600,000.00 | $4,600,000.00 | ($108,597.50) | $4,708,597.50 | ($5,226,482.00) | $463,228.00 | ($4,763,254.00) | ($4,763,254.00) | $163,254.00 | $0.00 | $4,600,000.00 | $0.00 |
| 082306-02 | 8/23/2006 | 12/21/2006 | 1.17% | $4,550,000.00 | $4,550,000.00 | ($99,287.50) | $4,649,287.50 | ($5,160,691.25) | $449,211.75 | ($4,711,479.50) | ($4,711,479.50) | $161,479.50 | $0.00 | $4,550,000.00 | $0.00 |
| 082306-03 | 8/23/2006 | 12/21/2006 | 1.17% | $3,425,000.00 | $3,425,000.00 | ($88,534.50) | $3,513,534.50 | ($3,899,988.60) | $356,106.85 | ($3,543,881.75) | ($3,543,881.75) | $118,881.75 | $0.00 | $3,425,000.00 | $0.00 |
| 091206-01 | 9/12/2006 | 1/10/2007 | 1.17% | $5,075,000.00 | $5,075,000.00 | ($127,000.00) | $5,202,000.00 | ($5,774,208.00) | $527,013.25 | ($5,247,194.75) | ($5,247,194.75) | $172,194.75 | $0.00 | $5,075,000.00 | $0.00 |
| 091406-01 | 9/14/2006 | 1/12/2007 | 1.17% | $2,450,000.00 | $2,450,000.00 | ($67,003.75) | $2,517,003.75 | ($2,793,856.65) | $264,550.15 | ($2,529,306.50) | ($2,529,306.50) | $79,306.50 | $0.00 | $2,450,000.00 | $0.00 |
| 091506-01 | 9/15/2006 | 1/13/2007 | 1.17% | $4,550,000.00 | $4,550,000.00 | ($107,017.50) | $4,657,017.50 | ($5,169,285.00) | $461,354.50 | ($4,707,930.50) | ($4,707,930.50) | $157,930.50 | $0.00 | $4,550,000.00 | $0.00 |
| 092006-01 | 9/20/2006 | 1/18/2007 | 1.17% | $3,700,000.00 | $3,700,000.00 | ($91,133.75) | $3,791,133.75 | ($4,208,140.05) | $376,827.05 | ($3,831,313.00) | ($3,831,313.00) | $131,313.00 | $0.00 | $3,700,000.00 | $0.00 |
| 092006-02 | 9/20/2006 | 1/18/2007 | 1.17% | $4,725,000.00 | $4,725,000.00 | ($121,750.75) | $4,846,750.75 | ($5,379,859.30) | $489,011.80 | ($4,890,847.50) | ($4,890,847.50) | $165,847.50 | $0.00 | $4,725,000.00 | $0.00 |
| 092006-03 | 9/20/2006 | 1/18/2007 | 1.17% | $2,725,000.00 | $2,725,000.00 | ($56,625.00) | $2,781,625.00 | ($3,087,584.50) | $266,937.00 | ($2,820,647.50) | ($2,820,647.50) | $95,647.50 | $0.00 | $2,725,000.00 | $0.00 |
| 092206-01 | 9/22/2006 | 1/20/2007 | 1.17% | $4,525,000.00 | $4,525,000.00 | ($99,000.00) | $4,624,000.00 | ($5,132,640.00) | $448,812.50 | ($4,683,827.50) | ($4,683,827.50) | $158,827.50 | $0.00 | $4,525,000.00 | $0.00 |
| 092206-02 | 9/22/2006 | 1/20/2007 | 1.17% | $3,950,000.00 | $3,950,000.00 | ($89,040.00) | $4,039,040.00 | ($4,483,296.00) | $396,191.50 | ($4,087,104.50) | ($4,087,104.50) | $137,104.50 | $0.00 | $3,950,000.00 | $0.00 |
| 092706-01 | 9/27/2006 | 1/25/2007 | 1.17% | $2,275,000.00 | $2,275,000.00 | ($65,900.00) | $2,340,900.00 | ($2,598,372.00) | $247,068.50 | ($2,351,303.50) | ($2,351,303.50) | $76,303.50 | $0.00 | $2,275,000.00 | $0.00 |
| 100306-01 | 10/3/2006 | 1/31/2007 | 1.17% | $3,525,000.00 | $3,525,000.00 | ($87,500.00) | $3,612,500.00 | ($4,009,875.00) | $366,646.50 | ($3,643,228.50) | ($3,643,228.50) | $118,228.50 | $0.00 | $3,525,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 100406-01 | 10/4/2006 | 2/1/2007 | 1.17% | $4,475,000.00 | $4,475,000.00 | ($109,262.50) | $4,584,262.50 | ($5,088,513.75) | $465,167.50 | ($4,623,346.25) | ($4,623,346.25) | $148,346.25 | $0.00 | $4,475,000.00 | $0.00 |
| 101206-01 | 10/12/2006 | 2/9/2007 | 1.17% | $4,475,000.00 | $4,475,000.00 | ($96,165.00) | $4,571,165.00 | ($5,073,958.00) | $443,630.75 | ($4,630,327.25) | ($4,630,327.25) | $155,327.25 | $0.00 | $4,475,000.00 | $0.00 |
| 101806-01 | 10/18/2006 | 2/15/2007 | 1.17% | $3,700,000.00 | $3,700,000.00 | ($93,125.00) | $3,793,125.00 | ($4,210,360.00) | $379,047.00 | ($3,831,313.00) | ($3,831,313.00) | $131,313.00 | $0.00 | $3,700,000.00 | $0.00 |
| 101806-02 | 10/18/2006 | 2/15/2007 | 1.17% | $4,525,000.00 | $4,525,000.00 | ($99,000.00) | $4,624,000.00 | ($5,132,640.00) | $448,812.50 | ($4,683,827.50) | ($4,683,827.50) | $158,827.50 | $0.00 | $4,525,000.00 | $0.00 |
| 101806-03 | 10/18/2006 | 2/15/2007 | 1.17% | $3,000,000.00 | $3,000,000.00 | ($77,850.00) | $3,077,850.00 | ($3,416,413.50) | $311,113.50 | ($3,105,300.00) | ($3,105,300.00) | $105,300.00 | $0.00 | $3,000,000.00 | $0.00 |
| 102406-01 | 10/24/2006 | 2/21/2007 | 1.17% | $3,250,000.00 | $3,250,000.00 | ($87,573.25) | $3,337,573.25 | ($3,704,686.75) | $344,414.25 | ($3,360,272.50) | ($3,360,272.50) | $110,272.50 | $0.00 | $3,250,000.00 | $0.00 |
| 102406-02 | 10/24/2006 | 2/21/2007 | 1.17% | $4,600,000.00 | $4,600,000.00 | ($114,250.00) | $4,714,250.00 | ($5,232,800.00) | $471,340.00 | ($4,761,460.00) | ($4,761,460.00) | $161,460.00 | $0.00 | $4,600,000.00 | $0.00 |
| 103106-01 | 10/31/2006 | 2/28/2007 | 1.17% | $3,775,000.00 | $3,775,000.00 | ($102,278.25) | $3,877,278.25 | ($4,303,720.15) | $403,578.90 | ($3,900,141.25) | ($3,900,141.25) | $125,141.25 | $0.00 | $3,775,000.00 | $0.00 |
| 110806-01 | 11/8/2006 | 3/8/2007 | 1.17% | $4,500,000.00 | $4,500,000.00 | ($249,126.00) | $4,749,126.00 | ($5,271,470.40) | $613,520.40 | ($4,657,950.00) | ($4,657,950.00) | $157,950.00 | $0.00 | $4,500,000.00 | $0.00 |
| 110806-02 | 11/8/2006 | 3/8/2007 | 1.17% | $4,200,000.00 | $4,200,000.00 | ($218,800.00) | $4,418,800.00 | ($4,904,840.00) | $557,420.00 | ($4,347,420.00) | ($4,347,420.00) | $147,420.00 | $0.00 | $4,200,000.00 | $0.00 |
| 110806-03 | 11/8/2006 | 3/8/2007 | 1.17% | $3,700,000.00 | $3,700,000.00 | ($266,340.00) | $3,966,340.00 | ($4,402,621.00) | $571,308.00 | ($3,831,313.00) | ($3,831,313.00) | $131,313.00 | $0.00 | $3,700,000.00 | $0.00 |
| 110906-01 | 11/9/2006 | 3/9/2007 | 1.17% | $4,300,000.00 | $4,300,000.00 | ($186,650.00) | $4,486,650.00 | ($4,980,180.00) | $529,250.00 | ($4,450,930.00) | ($4,450,930.00) | $150,930.00 | $0.00 | $4,300,000.00 | $0.00 |
| 111506-01 | 11/15/2006 | 3/15/2007 | 1.17% | $4,200,000.00 | $4,200,000.00 | ($135,000.00) | $4,335,000.00 | ($4,811,840.00) | $462,782.00 | ($4,349,058.00) | ($4,349,058.00) | $149,058.00 | $0.00 | $4,200,000.00 | $0.00 |
| 112106-01 | 11/21/2006 | 3/21/2007 | 1.17% | $3,575,000.00 | $3,575,000.00 | ($268,700.00) | $3,843,700.00 | ($4,266,488.00) | $572,976.75 | ($3,693,511.25) | ($3,693,511.25) | $118,511.25 | $0.00 | $3,575,000.00 | $0.00 |
| 112706-01 | 11/27/2006 | 3/27/2007 | 1.17% | $3,225,000.00 | $3,225,000.00 | ($67,686.75) | $3,292,686.75 | ($3,654,847.20) | $314,134.20 | ($3,340,713.00) | ($3,340,713.00) | $115,713.00 | $0.00 | $3,225,000.00 | $0.00 |
| 112706-02 | 11/27/2006 | 3/27/2007 | 1.17% | $4,550,000.00 | $4,550,000.00 | ($93,575.50) | $4,643,575.50 | ($5,154,308.40) | $451,701.40 | ($4,702,607.00) | ($4,702,607.00) | $152,607.00 | $0.00 | $4,550,000.00 | $0.00 |
| 112906-01 | 11/29/2006 | 3/29/2007 | 1.17% | $2,700,000.00 | $2,700,000.00 | ($73,805.75) | $2,773,805.75 | ($3,078,845.60) | $284,075.60 | ($2,794,770.00) | ($2,794,770.00) | $94,770.00 | $0.00 | $2,700,000.00 | $0.00 |
| 112906-02 | 11/29/2006 | 3/29/2007 | 1.17% | $2,250,000.00 | $2,250,000.00 | ($62,000.00) | $2,312,000.00 | ($2,566,320.00) | $235,590.00 | ($2,330,730.00) | ($2,330,730.00) | $80,730.00 | $0.00 | $2,250,000.00 | $0.00 |
| 112906-03 | 11/29/2006 | 3/29/2007 | 1.17% | $4,100,000.00 | $4,100,000.00 | ($88,939.00) | $4,188,939.00 | ($4,649,699.70) | $412,185.70 | ($4,237,514.00) | ($4,237,514.00) | $137,514.00 | $0.00 | $4,100,000.00 | $0.00 |
| 112906-04 | 11/29/2006 | 3/29/2007 | 1.17% | $4,550,000.00 | $4,550,000.00 | ($102,900.00) | $4,652,900.00 | ($5,164,719.00) | $265,885.67 | ($4,713,254.00) | ($4,713,254.00) | $163,254.00 | $0.00 | $4,550,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 120606-01 | 12/6/2006 | 4/5/2007 | 1.17% | $2,400,000.00 | $2,400,000.00 | ($191,246.25) | $2,591,246.25 | ($2,876,253.45) | $392,013.45 | ($2,484,240.00) | ($2,484,240.00) | $84,240.00 | $0.00 | $2,400,000.00 | $0.00 |
| 120606-02 | 12/6/2006 | 4/5/2007 | 1.17% | $4,700,000.00 | $4,700,000.00 | ($241,900.00) | $4,941,900.00 | ($5,485,490.00) | $618,687.00 | ($4,866,803.00) | ($4,866,803.00) | $166,803.00 | $0.00 | $4,700,000.00 | $0.00 |
| 121206-01 | 12/12/2006 | 4/11/2007 | 1.17% | $4,050,000.00 | $4,050,000.00 | ($97,150.00) | $4,147,150.00 | ($4,603,316.00) | $409,581.50 | ($4,193,734.50) | ($4,193,734.50) | $143,734.50 | $0.00 | $4,050,000.00 | $0.00 |
| 121206-02 | 12/12/2006 | 4/11/2007 | 1.17% | $3,100,000.00 | $3,100,000.00 | ($71,052.50) | $3,171,052.50 | ($3,519,852.60) | $314,669.60 | ($3,205,183.00) | ($3,205,183.00) | $105,183.00 | $0.00 | $3,100,000.00 | $0.00 |
| 121806-01 | 12/18/2006 | 4/17/2007 | 1.17% | $3,425,000.00 | $3,425,000.00 | ($82,472.50) | $3,507,472.25 | ($3,893,247.80) | $352,037.55 | ($3,541,210.25) | ($3,541,210.25) | $116,210.25 | $0.00 | $3,425,000.00 | $0.00 |
| 122006-01 | 12/20/2006 | 4/19/2007 | 1.17% | $4,000,000.00 | $4,000,000.00 | ($161,600.00) | $4,161,600.00 | ($4,619,376.00) | $478,976.00 | ($4,140,400.00) | ($4,140,400.00) | $140,400.00 | $0.00 | $4,000,000.00 | $0.00 |
| 122006-02 | 12/20/2006 | 4/19/2007 | 1.17% | $3,000,000.00 | $3,000,000.00 | ($99,330.00) | $3,099,330.00 | ($3,440,229.00) | $339,609.00 | ($3,100,620.00) | ($3,100,620.00) | $100,620.00 | $0.00 | $3,000,000.00 | $0.00 |
| 122106-01 | 12/21/2006 | 4/20/2007 | 1.17% | $3,175,000.00 | $3,175,000.00 | ($66,135.00) | $3,241,135.00 | ($3,597,659.85) | $309,979.10 | ($3,287,680.75) | ($3,287,680.75) | $112,680.75 | $0.00 | $3,175,000.00 | $0.00 |
| 122106-02 | 12/21/2006 | 4/20/2007 | 1.17% | $3,325,000.00 | $3,325,000.00 | ($74,066.00) | $3,399,066.00 | ($3,772,935.60) | $329,931.35 | ($3,443,004.25) | ($3,443,004.25) | $118,004.25 | $0.00 | $3,325,000.00 | $0.00 |
| 122806-01 | 12/28/2006 | 4/27/2007 | 1.17% | $3,300,000.00 | $3,300,000.00 | ($104,781.25) | $3,404,781.25 | ($3,779,280.00) | $361,617.00 | ($3,417,663.00) | ($3,417,663.00) | $117,663.00 | $0.00 | $3,300,000.00 | $0.00 |
| 122906-01 | 12/29/2006 | 4/28/2007 | 1.17% | $4,300,000.00 | $4,300,000.00 | ($95,319.50) | $4,395,319.50 | ($4,878,789.30) | $429,536.30 | ($4,449,253.00) | ($4,449,253.00) | $149,253.00 | $0.00 | $4,300,000.00 | $0.00 |
| 122906-02 | 12/29/2006 | 4/28/2007 | 1.17% | $3,690,000.00 | $3,690,000.00 | ($81,450.00) | $3,771,450.00 | ($4,186,309.50) | $366,790.50 | ($3,819,519.00) | ($3,819,519.00) | $129,519.00 | $0.00 | $3,690,000.00 | $0.00 |
| 010307-01 | 1/3/2007 | 5/3/2007 | 1.17% | $4,300,000.00 | $4,300,000.00 | ($92,800.00) | $4,392,800.00 | ($4,875,970.00) | $433,425.00 | ($4,442,545.00) | ($4,442,545.00) | $142,545.00 | $0.00 | $4,300,000.00 | $0.00 |
| 010307-02 | 1/3/2007 | 5/3/2007 | 1.17% | $2,600,000.00 | $2,600,000.00 | ($78,675.00) | $2,678,675.00 | ($2,973,248.00) | $286,044.00 | ($2,687,204.00) | ($2,687,204.00) | $87,204.00 | $0.00 | $2,600,000.00 | $0.00 |
| 011007-01 | 1/10/2007 | 5/10/2007 | 1.17% | $4,075,000.00 | $4,075,000.00 | ($100,150.00) | $4,175,150.00 | ($4,634,416.50) | $422,741.00 | ($4,211,675.50) | ($4,211,675.50) | $136,675.50 | $0.00 | $4,075,000.00 | $0.00 |
| 011207-01 | 1/12/2007 | 5/12/2007 | 1.17% | $5,000,000.00 | $5,000,000.00 | ($146,000.00) | $5,146,000.00 | ($5,712,050.00) | $542,400.00 | ($5,169,650.00) | ($5,169,650.00) | $169,650.00 | $0.00 | $5,000,000.00 | $0.00 |
| 011707-01 | 1/17/2007 | 5/17/2007 | 1.17% | $4,700,000.00 | $4,700,000.00 | ($120,881.25) | $4,820,881.25 | ($5,351,148.75) | $495,343.75 | ($4,855,805.00) | ($4,855,805.00) | $155,805.00 | $0.00 | $4,700,000.00 | $0.00 |
| 012207-01 | 1/22/2007 | 5/22/2007 | 1.17% | $3,725,000.00 | $3,725,000.00 | ($84,381.25) | $3,809,381.25 | ($4,228,404.40) | $377,015.15 | ($3,851,389.25) | ($3,851,389.25) | $126,389.25 | $0.00 | $3,725,000.00 | $0.00 |
| 012207-02 | 1/22/2007 | 5/22/2007 | 1.17% | $2,375,000.00 | $2,375,000.00 | ($73,191.25) | $2,448,191.25 | ($2,717,464.05) | $263,732.80 | ($2,453,731.25) | ($2,453,731.25) | $78,731.25 | $0.00 | $2,375,000.00 | $0.00 |
| 012207-03 | 1/22/2007 | 5/22/2007 | 1.17% | $3,175,000.00 | $3,175,000.00 | ($69,820.00) | $3,244,820.00 | ($3,601,678.00) | $311,520.75 | ($3,290,157.25) | ($3,290,157.25) | $115,157.25 | $0.00 | $3,175,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 013007-01 | 1/30/2007 | 5/30/2007 | 1.17% | $4,700,000.00 | $4,700,000.00 | ($104,625.00) | $4,804,625.00 | ($5,333,133.75) | $466,330.75 | ($4,866,803.00) | ($4,866,803.00) | $166,803.00 | $0.00 | $4,700,000.00 | $0.00 |
| 020207-01 | 2/2/2007 | 6/2/2007 | 1.17% | $4,575,000.00 | $4,575,000.00 | ($97,768.75) | $4,672,768.75 | ($5,186,744.70) | $452,946.45 | ($4,733,798.25) | ($4,733,798.25) | $158,798.25 | $0.00 | $4,575,000.00 | $0.00 |
| 020707-01 | 2/7/2007 | 6/7/2007 | 1.17% | $3,275,000.00 | $3,275,000.00 | ($81,915.00) | $3,356,915.00 | ($3,726,134.75) | $341,291.25 | ($3,384,843.50) | ($3,384,843.50) | $109,843.50 | $0.00 | $3,275,000.00 | $0.00 |
| 020807-01 | 2/8/2007 | 6/8/2007 | 1.17% | $4,700,000.00 | $4,700,000.00 | ($111,850.00) | $4,811,850.00 | ($5,341,135.00) | $477,998.00 | ($4,863,137.00) | ($4,863,137.00) | $163,137.00 | $0.00 | $4,700,000.00 | $0.00 |
| 021307-01 | 2/13/2007 | 6/13/2007 | 1.17% | $4,400,000.00 | $4,400,000.00 | ($585,250.00) | $4,985,250.00 | ($5,533,616.00) | $987,756.00 | ($4,545,860.00) | ($4,545,860.00) | $145,860.00 | $0.00 | $4,400,000.00 | $0.00 |
| 022007-01 | 2/20/2007 | 6/20/2007 | 1.17% | $4,050,000.00 | $4,050,000.00 | ($95,287.50) | $4,145,287.50 | ($4,601,250.00) | $418,572.00 | ($4,182,678.00) | ($4,182,678.00) | $132,678.00 | $0.00 | $4,050,000.00 | $0.00 |
| 022307-01 | 2/23/2007 | 6/23/2007 | 1.17% | $3,175,000.00 | $3,175,000.00 | ($74,400.00) | $3,249,400.00 | ($3,606,785.00) | $329,010.25 | ($3,277,774.75) | ($3,277,774.75) | $102,774.75 | $0.00 | $3,175,000.00 | $0.00 |
| 022707-01 | 2/27/2007 | 6/27/2007 | 1.17% | $4,950,000.00 | $4,950,000.00 | ($125,201.25) | $5,075,201.25 | ($5,633,446.65) | $529,006.65 | ($5,104,440.00) | ($5,104,440.00) | $154,440.00 | $0.00 | $4,950,000.00 | $0.00 |
| 022807-01 | 2/28/2007 | 6/28/2007 | 1.17% | $4,725,000.00 | $4,725,000.00 | ($115,027.50) | $4,840,027.50 | ($5,372,413.20) | $503,678.70 | ($4,868,734.50) | ($4,868,734.50) | $143,734.50 | $0.00 | $4,725,000.00 | $0.00 |
| 022807-02 | 2/28/2007 | 6/28/2007 | 1.17% | $3,800,000.00 | $3,800,000.00 | ($88,495.00) | $3,888,495.00 | ($4,316,169.00) | $402,055.00 | ($3,914,114.00) | ($3,914,114.00) | $114,114.00 | $0.00 | $3,800,000.00 | $0.00 |
| 030207-01 | 3/2/2007 | 6/30/2007 | 1.17% | $4,075,000.00 | $4,075,000.00 | ($92,460.00) | $4,167,460.00 | ($4,625,816.00) | $422,086.75 | ($4,203,729.25) | ($4,203,729.25) | $128,729.25 | $0.00 | $4,075,000.00 | $0.00 |
| 031207-01 | 3/12/2007 | 7/10/2007 | 1.17% | $4,450,000.00 | $4,450,000.00 | ($101,750.00) | $4,551,750.00 | ($5,052,442.50) | $465,338.00 | ($4,587,104.50) | ($4,587,104.50) | $137,104.50 | $0.00 | $4,450,000.00 | $0.00 |
| 031207-02 | 3/12/2007 | 7/10/2007 | 1.17% | $3,075,000.00 | $3,075,000.00 | ($67,693.75) | $3,142,693.75 | ($3,488,373.75) | $309,039.00 | ($3,179,334.75) | ($3,179,334.75) | $104,334.75 | $0.00 | $3,075,000.00 | $0.00 |
| 031307-01 | 3/13/2007 | 7/11/2007 | 1.17% | $3,025,000.00 | $3,025,000.00 | ($74,525.00) | $3,099,525.00 | ($3,440,463.00) | $315,184.25 | ($3,125,278.75) | ($3,125,278.75) | $100,278.75 | $0.00 | $3,025,000.00 | $0.00 |
| 031507-01 | 3/15/2007 | 7/13/2007 | 1.17% | $3,900,000.00 | $3,900,000.00 | ($96,021.00) | $3,996,021.00 | ($4,435,568.85) | $401,720.85 | ($4,033,848.00) | ($4,033,848.00) | $133,848.00 | $0.00 | $3,900,000.00 | $0.00 |
| 032207-01 | 3/22/2007 | 7/20/2007 | 1.17% | $3,575,000.00 | $3,575,000.00 | ($75,235.00) | $3,650,235.00 | ($4,051,714.00) | $348,443.00 | ($3,703,271.00) | ($3,703,271.00) | $128,271.00 | $0.00 | $3,575,000.00 | $0.00 |
| 032207-02 | 3/22/2007 | 7/20/2007 | 1.17% | $3,600,000.00 | $3,600,000.00 | ($86,556.25) | $3,686,556.25 | ($4,092,048.00) | $365,688.00 | ($3,726,360.00) | ($3,726,360.00) | $126,360.00 | $0.00 | $3,600,000.00 | $0.00 |
| 032207-03 | 3/22/2007 | 7/20/2007 | 1.17% | $2,775,000.00 | $2,775,000.00 | ($78,875.00) | $2,853,875.00 | ($3,167,781.50) | $294,296.75 | ($2,873,484.75) | ($2,873,484.75) | $98,484.75 | $0.00 | $2,775,000.00 | $0.00 |
| 032907-01 | 3/29/2007 | 7/27/2007 | 1.17% | $2,925,000.00 | $2,925,000.00 | ($71,470.00) | $2,996,470.00 | ($3,326,058.00) | $298,390.50 | ($3,027,667.50) | ($3,027,667.50) | $102,667.50 | $0.00 | $2,925,000.00 | $0.00 |
| 032907-02 | 3/29/2007 | 7/27/2007 | 1.17% | $4,650,000.00 | $4,650,000.00 | ($118,500.00) | $4,768,500.00 | ($5,293,024.00) | $477,995.50 | ($4,815,028.50) | ($4,815,028.50) | $165,028.50 | $0.00 | $4,650,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

<u>Closed Notes</u>

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 033007-01 | 3/30/2007 | 7/28/2007 | 1.17% | $2,860,000.00 | $2,860,000.00 | ($59,150.00) | $2,919,150.00 | ($3,240,198.00) | $278,696.60 | ($2,961,501.40) | ($2,961,501.40) | $101,501.40 | $0.00 | $2,860,000.00 | $0.00 |
| 033007-02 | 3/30/2007 | 7/28/2007 | 1.17% | $3,340,000.00 | $3,340,000.00 | ($75,880.00) | $3,415,880.00 | ($3,791,612.80) | $333,076.20 | ($3,458,536.60) | ($3,458,536.60) | $118,536.60 | $0.00 | $3,340,000.00 | $0.00 |
| 040407-01 | 4/4/2007 | 8/2/2007 | 1.17% | $2,975,000.00 | $2,975,000.00 | ($64,918.75) | $3,039,918.75 | ($3,374,300.25) | $296,038.00 | ($3,078,262.25) | ($3,078,262.25) | $103,262.25 | $0.00 | $2,975,000.00 | $0.00 |
| 040407-02 | 4/4/2007 | 8/2/2007 | 1.17% | $4,550,000.00 | $4,550,000.00 | ($117,350.00) | $4,667,350.00 | ($5,180,730.00) | $471,025.00 | ($4,709,705.00) | ($4,709,705.00) | $159,705.00 | $0.00 | $4,550,000.00 | $0.00 |
| 040507-01 | 4/5/2007 | 8/3/2007 | 1.17% | $2,475,000.00 | $2,475,000.00 | ($61,367.50) | $2,536,367.50 | ($2,815,364.15) | $252,526.40 | ($2,562,837.75) | ($2,562,837.75) | $87,837.75 | $0.00 | $2,475,000.00 | $0.00 |
| 040507-02 | 4/5/2007 | 8/3/2007 | 1.17% | $4,525,000.00 | $4,525,000.00 | ($108,812.50) | $4,633,812.50 | ($5,143,513.00) | $461,450.25 | ($4,682,062.75) | ($4,682,062.75) | $157,062.75 | $0.00 | $4,525,000.00 | $0.00 |
| 041207-01 | 4/12/2007 | 8/10/2007 | 1.17% | $4,800,000.00 | $4,800,000.00 | ($113,000.00) | $4,913,000.00 | ($5,453,400.00) | $484,920.00 | ($4,968,480.00) | ($4,968,480.00) | $168,480.00 | $0.00 | $4,800,000.00 | $0.00 |
| 041207-02 | 4/12/2007 | 8/10/2007 | 1.17% | $2,400,000.00 | $2,400,000.00 | ($56,200.00) | $2,456,200.00 | ($2,726,320.00) | $243,016.00 | ($2,483,304.00) | ($2,483,304.00) | $83,304.00 | $0.00 | $2,400,000.00 | $0.00 |
| 041807-01 | 4/18/2007 | 8/16/2007 | 1.17% | $2,350,000.00 | $2,350,000.00 | ($68,840.00) | $2,418,840.00 | ($2,684,880.00) | $256,061.00 | ($2,428,819.00) | ($2,428,819.00) | $78,819.00 | $0.00 | $2,350,000.00 | $0.00 |
| 043007-01 | 5/1/2007 | 8/29/2007 | 1.17% | $3,850,000.00 | $3,850,000.00 | ($89,431.25) | $3,939,431.25 | ($4,372,759.60) | $386,123.10 | ($3,986,636.50) | ($3,986,636.50) | $136,636.50 | $0.00 | $3,850,000.00 | $0.00 |
| 043007-02 | 5/1/2007 | 8/29/2007 | 1.17% | $4,450,000.00 | $4,450,000.00 | ($114,755.00) | $4,564,755.00 | ($5,066,841.00) | $455,439.50 | ($4,611,401.50) | ($4,611,401.50) | $161,401.50 | $0.00 | $4,450,000.00 | $0.00 |
| 043007-03 | 5/1/2007 | 8/29/2007 | 1.17% | $3,750,000.00 | $3,750,000.00 | ($99,480.00) | $3,849,480.00 | ($4,272,903.45) | $386,890.95 | ($3,886,012.50) | ($3,886,012.50) | $136,012.50 | $0.00 | $3,750,000.00 | $0.00 |
| 043007-04 | 5/1/2007 | 8/29/2007 | 1.17% | $3,525,000.00 | $3,525,000.00 | ($78,425.00) | $3,603,425.00 | ($3,999,800.00) | $349,697.75 | ($3,650,102.25) | ($3,650,102.25) | $125,102.25 | $0.00 | $3,525,000.00 | $0.00 |
| 050307-01 | 5/3/2007 | 8/31/2007 | 1.17% | $4,775,000.00 | $4,775,000.00 | ($101,875.00) | $4,876,875.00 | ($5,413,311.00) | $468,846.25 | ($4,944,464.75) | ($4,944,464.75) | $169,464.75 | $0.00 | $4,775,000.00 | $0.00 |
| 050907-01 | 5/9/2007 | 9/6/2007 | 1.17% | $3,575,000.00 | $3,575,000.00 | ($86,630.00) | $3,661,630.00 | ($4,064,391.20) | $355,543.20 | ($3,708,848.00) | ($3,708,848.00) | $133,848.00 | $0.00 | $3,575,000.00 | $0.00 |
| 051407-01 | 5/14/2007 | 9/11/2007 | 1.17% | $3,800,000.00 | $3,800,000.00 | ($96,535.00) | $3,896,535.00 | ($4,325,139.75) | $388,795.75 | ($3,936,344.00) | ($3,936,344.00) | $136,344.00 | $0.00 | $3,800,000.00 | $0.00 |
| 051407-02 | 5/14/2007 | 9/11/2007 | 1.17% | $2,600,000.00 | $2,600,000.00 | ($76,765.00) | $2,676,765.00 | ($2,971,176.00) | $277,888.00 | ($2,693,288.00) | ($2,693,288.00) | $93,288.00 | $0.00 | $2,600,000.00 | $0.00 |
| 052107-01 | 5/21/2007 | 9/18/2007 | 1.17% | $2,525,000.00 | $2,525,000.00 | ($76,000.00) | $2,601,000.00 | ($2,887,080.00) | $272,467.75 | ($2,614,612.25) | ($2,614,612.25) | $89,612.25 | $0.00 | $2,525,000.00 | $0.00 |
| 052307-01 | 5/23/2007 | 9/20/2007 | 1.17% | $2,825,000.00 | $2,825,000.00 | ($63,916.25) | $2,888,916.25 | ($3,206,687.95) | $281,428.70 | ($2,925,259.25) | ($2,925,259.25) | $100,259.25 | $0.00 | $2,825,000.00 | $0.00 |
| 052307-02 | 5/23/2007 | 9/20/2007 | 1.17% | $4,250,000.00 | $4,250,000.00 | ($112,093.75) | $4,362,093.75 | ($4,841,902.50) | $441,070.00 | ($4,400,832.50) | ($4,400,832.50) | $150,832.50 | $0.00 | $4,250,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 052307-03 | 5/23/2007 | 9/20/2007 | 1.17% | $2,575,000.00 | $2,575,000.00 | ($62,125.00) | $2,637,125.00 | ($2,927,190.50) | $261,808.00 | ($2,665,382.50) | ($2,665,382.50) | $90,382.50 | $0.00 | $2,575,000.00 | $0.00 |
| 052307-04 | 5/23/2007 | 9/20/2007 | 1.17% | $3,775,000.00 | $3,775,000.00 | ($93,987.50) | $3,868,987.50 | ($4,294,577.00) | $382,657.75 | ($3,911,919.25) | ($3,911,919.25) | $136,919.25 | $0.00 | $3,775,000.00 | $0.00 |
| 052307-05 | 5/23/2007 | 9/20/2007 | 1.17% | $4,650,000.00 | $4,650,000.00 | ($103,787.50) | $4,753,787.50 | ($5,276,694.50) | $458,039.00 | ($4,818,655.50) | ($4,818,655.50) | $168,655.50 | $0.00 | $4,650,000.00 | $0.00 |
| 061407-01 | 6/14/2007 | 10/12/2007 | 1.17% | $3,625,000.00 | $3,625,000.00 | ($85,580.00) | $3,710,580.00 | ($4,118,743.80) | $363,678.80 | ($3,755,065.00) | ($3,755,065.00) | $130,065.00 | $0.00 | $3,625,000.00 | $0.00 |
| 061407-02 | 6/14/2007 | 10/12/2007 | 1.17% | $4,450,000.00 | $4,450,000.00 | ($101,750.00) | $4,551,750.00 | ($5,052,425.00) | $435,817.00 | ($4,616,608.00) | ($4,616,608.00) | $166,608.00 | $0.00 | $4,450,000.00 | $0.00 |
| 061407-03 | 6/14/2007 | 10/12/2007 | 1.17% | $2,400,000.00 | $2,400,000.00 | ($56,400.00) | $2,456,400.00 | ($2,726,600.00) | $241,424.00 | ($2,485,176.00) | ($2,485,176.00) | $85,176.00 | $0.00 | $2,400,000.00 | $0.00 |
| 062507-01 | 6/25/2007 | 10/23/2007 | 1.17% | $4,600,000.00 | $4,600,000.00 | ($96,250.00) | $4,696,250.00 | ($5,212,818.00) | $445,976.00 | ($4,766,842.00) | ($4,766,842.00) | $166,842.00 | $0.00 | $4,600,000.00 | $0.00 |
| 062707-01 | 6/27/2007 | 10/25/2007 | 1.17% | $4,950,000.00 | $4,950,000.00 | ($115,447.50) | $5,065,447.50 | ($5,622,637.50) | $481,518.00 | ($5,141,119.50) | ($5,141,119.50) | $191,119.50 | $0.00 | $4,950,000.00 | $0.00 |
| 062707-02 | 6/27/2007 | 10/25/2007 | 1.17% | $4,200,000.00 | $4,200,000.00 | ($103,932.50) | $4,303,932.50 | ($4,777,353.00) | $425,019.00 | ($4,352,334.00) | ($4,352,334.00) | $152,334.00 | $0.00 | $4,200,000.00 | $0.00 |
| 062807-01 | 6/28/2007 | 10/26/2007 | 1.17% | $3,550,000.00 | $3,550,000.00 | ($96,818.75) | $3,646,818.75 | ($4,047,960.40) | $370,586.40 | ($3,677,374.00) | ($3,677,374.00) | $127,374.00 | $0.00 | $3,550,000.00 | $0.00 |
| 071107-01 | 7/11/2007 | 11/8/2007 | 1.17% | $2,400,000.00 | $2,400,000.00 | ($70,760.00) | $2,470,760.00 | ($2,742,498.00) | $258,258.00 | ($2,484,240.00) | ($2,484,240.00) | $84,240.00 | $0.00 | $2,400,000.00 | $0.00 |
| 071107-02 | 7/11/2007 | 11/8/2007 | 1.17% | $4,200,000.00 | $4,200,000.00 | ($98,875.00) | $4,298,875.00 | ($4,771,725.00) | $422,667.00 | ($4,349,058.00) | ($4,349,058.00) | $149,058.00 | $0.00 | $4,200,000.00 | $0.00 |
| 071107-03 | 7/11/2007 | 11/8/2007 | 1.17% | $2,675,000.00 | $2,675,000.00 | ($70,400.00) | $2,745,400.00 | ($3,047,360.00) | $272,208.00 | ($2,775,152.00) | ($2,775,152.00) | $100,152.00 | $0.00 | $2,675,000.00 | $0.00 |
| 071107-04 | 7/11/2007 | 11/8/2007 | 1.17% | $4,550,000.00 | $4,550,000.00 | ($99,205.00) | $4,649,205.00 | ($5,160,606.00) | $445,577.50 | ($4,715,028.50) | ($4,715,028.50) | $165,028.50 | $0.00 | $4,550,000.00 | $0.00 |
| 071307-01 | 7/13/2007 | 11/10/2007 | 1.17% | $4,525,000.00 | $4,525,000.00 | ($107,960.00) | $4,632,960.00 | ($5,142,568.50) | $449,917.25 | ($4,692,651.25) | ($4,692,651.25) | $167,651.25 | $0.00 | $4,525,000.00 | $0.00 |
| 071707-01 | 7/17/2007 | 11/14/2007 | 1.17% | $4,825,000.00 | $4,825,000.00 | ($116,900.00) | $4,941,900.00 | ($5,485,509.00) | $487,388.00 | ($4,998,121.00) | ($4,998,121.00) | $173,121.00 | $0.00 | $4,825,000.00 | $0.00 |
| 071807-01 | 7/18/2007 | 11/15/2007 | 1.17% | $3,650,000.00 | $3,650,000.00 | ($93,043.00) | $3,743,043.00 | ($4,154,766.00) | $373,804.00 | ($3,780,962.00) | ($3,780,962.00) | $130,962.00 | $0.00 | $3,650,000.00 | $0.00 |
| 072607-01 | 7/26/2007 | 11/23/2007 | 1.17% | $4,825,000.00 | $4,825,000.00 | ($109,675.00) | $4,934,675.00 | ($5,477,489.25) | $481,250.00 | ($4,996,239.25) | ($4,996,239.25) | $171,239.25 | $0.00 | $4,825,000.00 | $0.00 |
| 072707-01 | 7/27/2007 | 11/24/2007 | 1.17% | $4,550,000.00 | $4,550,000.00 | ($117,200.00) | $4,667,200.00 | ($5,180,560.00) | $461,982.50 | ($4,718,577.50) | ($4,718,577.50) | $168,577.50 | $0.00 | $4,550,000.00 | $0.00 |
| 072707-02 | 7/27/2007 | 11/24/2007 | 1.17% | $3,900,000.00 | $3,900,000.00 | ($88,200.00) | $3,988,200.00 | ($4,426,892.80) | $383,918.80 | ($4,042,974.00) | ($4,042,974.00) | $142,974.00 | $0.00 | $3,900,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

Closed Notes

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 072707-03 | 7/27/2007 | 11/24/2007 | 1.17% | $5,000,000.00 | $5,000,000.00 | ($120,718.75) | $5,120,718.75 | ($5,683,991.25) | $500,691.25 | ($5,183,300.00) | ($5,183,300.00) | $183,300.00 | $0.00 | $5,000,000.00 | $0.00 |
| 080207-01 | 8/2/2007 | 11/30/2007 | 1.17% | $4,275,000.00 | $4,275,000.00 | ($91,212.50) | $4,366,212.50 | ($4,846,450.50) | $418,063.50 | ($4,428,387.00) | ($4,428,387.00) | $153,387.00 | $0.00 | $4,275,000.00 | $0.00 |
| 080207-02 | 8/2/2007 | 11/30/2007 | 1.17% | $2,025,000.00 | $2,025,000.00 | ($65,130.00) | $2,090,130.00 | ($2,319,974.00) | $223,896.50 | ($2,096,077.50) | ($2,096,077.50) | $71,077.50 | $0.00 | $2,025,000.00 | $0.00 |
| 080307-01 | 8/3/2007 | 12/1/2007 | 1.17% | $4,175,000.00 | $4,175,000.00 | ($105,812.50) | $4,280,812.50 | ($4,751,692.00) | $422,008.25 | ($4,329,683.75) | ($4,329,683.75) | $154,683.75 | $0.00 | $4,175,000.00 | $0.00 |
| 080307-02 | 8/3/2007 | 12/1/2007 | 1.17% | $3,950,000.00 | $3,950,000.00 | ($103,225.00) | $4,053,225.00 | ($4,499,070.40) | $402,722.90 | ($4,096,347.50) | ($4,096,347.50) | $146,347.50 | $0.00 | $3,950,000.00 | $0.00 |
| 080307-03 | 8/3/2007 | 12/1/2007 | 1.17% | $4,750,000.00 | $4,750,000.00 | ($117,747.50) | $4,867,747.50 | ($5,403,167.00) | $484,589.50 | ($4,918,577.50) | ($4,918,577.50) | $168,577.50 | $0.00 | $4,750,000.00 | $0.00 |
| 080307-04 | 8/3/2007 | 12/1/2007 | 1.17% | $3,000,000.00 | $3,000,000.00 | ($67,735.00) | $3,067,735.00 | ($3,405,176.20) | $295,196.20 | ($3,109,980.00) | ($3,109,980.00) | $109,980.00 | $0.00 | $3,000,000.00 | $0.00 |
| 080907-01 | 8/9/2007 | 12/7/2007 | 1.17% | $4,250,000.00 | $4,250,000.00 | ($96,330.00) | $4,346,330.00 | ($4,824,396.50) | $421,906.50 | ($4,402,490.00) | ($4,402,490.00) | $152,490.00 | $0.00 | $4,250,000.00 | $0.00 |
| 080907-02 | 8/9/2007 | 12/7/2007 | 1.17% | $3,375,000.00 | $3,375,000.00 | ($93,000.00) | $3,468,000.00 | ($3,849,472.00) | $353,377.00 | ($3,496,095.00) | ($3,496,095.00) | $121,095.00 | $0.00 | $3,375,000.00 | $0.00 |
| 081407-01 | 8/14/2007 | 12/12/2007 | 1.17% | $3,075,000.00 | $3,075,000.00 | ($64,065.00) | $3,139,065.00 | ($3,484,295.00) | $298,964.00 | ($3,185,331.00) | ($3,185,331.00) | $110,331.00 | $0.00 | $3,075,000.00 | $0.00 |
| 081407-02 | 8/14/2007 | 12/12/2007 | 1.17% | $3,225,000.00 | $3,225,000.00 | ($69,600.00) | $3,294,600.00 | ($3,657,006.00) | $313,777.50 | ($3,343,228.50) | ($3,343,228.50) | $118,228.50 | $0.00 | $3,225,000.00 | $0.00 |
| 081407-03 | 8/14/2007 | 12/12/2007 | 1.17% | $4,600,000.00 | $4,600,000.00 | ($95,696.25) | $4,695,696.25 | ($5,212,174.70) | $438,156.70 | ($4,774,018.00) | ($4,774,018.00) | $174,018.00 | $0.00 | $4,600,000.00 | $0.00 |
| 081407-04 | 8/14/2007 | 12/12/2007 | 1.17% | $2,200,000.00 | $2,200,000.00 | ($50,069.75) | $2,250,069.75 | ($2,497,496.80) | $137,996.80 | ($2,274,646.00) | ($2,274,646.00) | $74,646.00 | $0.00 | $2,200,000.00 | $0.00 |
| 081407-05 | 8/14/2007 | 12/12/2007 | 1.17% | $3,200,000.00 | $3,200,000.00 | ($72,925.00) | $3,272,925.00 | ($3,632,946.75) | $187,613.42 | ($3,314,816.00) | ($3,314,816.00) | $114,816.00 | $0.00 | $3,200,000.00 | $0.00 |
| 081607-01 | 8/16/2007 | 12/14/2007 | 1.17% | $2,600,000.00 | $2,600,000.00 | ($59,606.25) | $2,659,606.25 | ($2,952,130.00) | $260,870.00 | ($2,691,260.00) | ($2,691,260.00) | $91,260.00 | $0.00 | $2,600,000.00 | $0.00 |
| 081607-02 | 8/16/2007 | 12/14/2007 | 1.17% | $2,925,000.00 | $2,925,000.00 | ($66,150.00) | $2,991,150.00 | ($3,320,176.50) | $286,805.25 | ($3,033,371.25) | ($3,033,371.25) | $108,371.25 | $0.00 | $2,925,000.00 | $0.00 |
| 082307-01 | 8/23/2007 | 12/21/2007 | 1.17% | $4,625,000.00 | $4,625,000.00 | ($105,447.50) | $4,730,447.50 | ($5,250,779.75) | $459,834.75 | ($4,790,945.00) | ($4,790,945.00) | $165,945.00 | $0.00 | $4,625,000.00 | $0.00 |
| 082307-02 | 8/23/2007 | 12/21/2007 | 1.17% | $2,725,000.00 | $2,725,000.00 | ($56,625.00) | $2,781,625.00 | ($3,087,595.00) | $264,822.00 | ($2,822,773.00) | ($2,822,773.00) | $97,773.00 | $0.00 | $2,725,000.00 | $0.00 |
| 082307-03 | 8/23/2007 | 12/21/2007 | 1.17% | $4,450,000.00 | $4,450,000.00 | ($94,340.00) | $4,544,340.00 | ($5,044,210.00) | $429,337.50 | ($4,614,872.50) | ($4,614,872.50) | $164,872.50 | $0.00 | $4,450,000.00 | $0.00 |
| 082307-04 | 8/23/2007 | 12/21/2007 | 1.17% | $2,725,000.00 | $2,725,000.00 | ($74,687.50) | $2,799,687.50 | ($3,107,633.75) | $281,672.00 | ($2,825,961.75) | ($2,825,961.25) | $100,961.25 | $0.00 | $2,725,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 082907-01 | 8/29/2007 | 12/27/2007 | 1.17% | $2,500,000.00 | $2,500,000.00 | ($58,902.50) | $2,558,902.50 | ($2,840,376.00) | $249,701.00 | ($2,590,675.00) | ($2,590,675.00) | $90,675.00 | $0.00 | $2,500,000.00 | $0.00 |
| 082907-02 | 8/29/2007 | 12/27/2007 | 1.17% | $2,300,000.00 | $2,300,000.00 | ($47,315.00) | $2,347,315.00 | ($2,605,434.00) | $224,704.00 | ($2,380,730.00) | ($2,380,730.00) | $80,730.00 | $0.00 | $2,300,000.00 | $0.00 |
| 082907-03 | 8/29/2007 | 12/27/2007 | 1.17% | $2,350,000.00 | $2,350,000.00 | ($61,994.00) | $2,411,994.00 | ($2,677,283.15) | $242,965.15 | ($2,434,318.00) | ($2,434,318.00) | $84,318.00 | $0.00 | $2,350,000.00 | $0.00 |
| 092807-01 | 9/28/2007 | 1/26/2008 | 1.17% | $3,400,000.00 | $3,400,000.00 | ($86,690.00) | $3,486,690.00 | ($3,870,224.00) | $290,326.22 | ($3,579,897.78) | ($3,579,897.78) | $179,897.78 | $0.00 | $3,400,000.00 | $0.00 |
| 092807-02 | 9/28/2007 | 1/26/2008 | 1.17% | $4,600,000.00 | $4,600,000.00 | ($110,275.00) | $4,710,275.00 | ($5,228,381.00) | $361,989.89 | ($4,866,391.11) | ($4,866,391.11) | $266,391.11 | $0.00 | $4,600,000.00 | $0.00 |
| 092807-03 | 9/28/2007 | 1/26/2008 | 1.17% | $3,400,000.00 | $3,400,000.00 | ($76,935.00) | $3,476,935.00 | ($3,859,394.00) | $288,940.67 | ($3,570,453.33) | ($3,570,453.33) | $170,453.33 | $0.00 | $3,400,000.00 | $0.00 |
| 100407-01 | 10/4/2007 | 2/1/2008 | 1.17% | $4,025,000.00 | $4,025,000.00 | ($93,250.00) | $4,118,250.00 | ($4,571,250.00) | $310,921.67 | ($4,260,328.33) | ($4,260,328.33) | $235,328.33 | $0.00 | $4,025,000.00 | $0.00 |
| 100407-02 | 10/4/2007 | 2/1/2008 | 1.17% | $3,550,000.00 | $3,550,000.00 | ($89,593.75) | $3,639,593.75 | ($4,039,920.00) | $284,335.56 | ($3,755,584.44) | ($3,755,584.44) | $205,584.44 | $0.00 | $3,550,000.00 | $0.00 |
| 100407-03 | 10/4/2007 | 2/1/2008 | 1.17% | $2,950,000.00 | $2,950,000.00 | ($70,550.00) | $3,020,550.00 | ($3,352,791.00) | $254,897.67 | ($3,097,893.33) | ($3,097,893.33) | $147,893.33 | $0.00 | $2,950,000.00 | $0.00 |
| 100407-04 | 10/4/2007 | 2/1/2008 | 1.17% | $3,750,000.00 | $3,750,000.00 | ($93,700.00) | $3,843,700.00 | ($4,266,488.00) | $297,238.00 | ($3,969,250.00) | ($3,969,250.00) | $219,250.00 | $0.00 | $3,750,000.00 | $0.00 |
| 100507-01 | 10/5/2007 | 2/2/2008 | 1.17% | $4,625,000.00 | $4,625,000.00 | ($105,568.75) | $4,730,568.75 | ($5,250,925.25) | $342,669.69 | ($4,908,255.56) | ($4,908,255.56) | $283,255.56 | $0.00 | $4,625,000.00 | $0.00 |
| 100907-01 | 10/9/2007 | 2/6/2008 | 1.17% | $4,725,000.00 | $4,725,000.00 | ($101,895.00) | $4,826,895.00 | ($5,357,830.50) | $351,325.50 | ($5,006,505.00) | ($5,006,505.00) | $281,505.00 | $0.00 | $4,725,000.00 | $0.00 |
| 101107-01 | 10/11/2007 | 2/8/2008 | 1.17% | $4,200,000.00 | $4,200,000.00 | ($107,906.25) | $4,307,906.25 | ($4,781,766.00) | $336,206.00 | ($4,445,560.00) | ($4,445,560.00) | $245,560.00 | $0.00 | $4,200,000.00 | $0.00 |
| 101107-02 | 10/11/2007 | 2/8/2008 | 1.17% | $4,100,000.00 | $4,100,000.00 | ($108,432.25) | $4,208,432.25 | ($4,671,357.60) | $315,699.82 | ($4,355,657.78) | ($4,355,657.78) | $255,657.78 | $0.00 | $4,100,000.00 | $0.00 |
| 101607-01 | 10/16/2007 | 2/13/2008 | 1.17% | $3,175,000.00 | $3,175,000.00 | ($76,160.00) | $3,251,160.00 | ($3,608,784.00) | $244,624.56 | ($3,364,159.44) | ($3,364,159.44) | $189,159.44 | $0.00 | $3,175,000.00 | $0.00 |
| 101607-02 | 10/16/2007 | 2/13/2008 | 1.17% | $3,750,000.00 | $3,750,000.00 | ($93,700.00) | $3,843,700.00 | ($4,266,488.00) | $278,488.00 | ($3,988,000.00) | ($3,988,000.00) | $238,000.00 | $0.00 | $3,750,000.00 | $0.00 |
| 101607-03 | 10/16/2007 | 2/13/2008 | 1.17% | $2,825,000.00 | $2,825,000.00 | ($65,000.00) | $2,890,000.00 | ($3,207,880.00) | $214,572.78 | ($2,993,307.22) | ($2,993,307.22) | $168,307.22 | $0.00 | $2,825,000.00 | $0.00 |
| 101707-01 | 10/17/2007 | 2/14/2008 | 1.17% | $4,525,000.00 | $4,525,000.00 | ($108,031.25) | $4,633,031.25 | ($5,142,656.25) | $335,497.36 | ($4,807,158.89) | ($4,807,158.89) | $282,158.89 | $0.00 | $4,525,000.00 | $0.00 |
| 101807-01 | 10/18/2007 | 2/15/2008 | 1.17% | $2,650,000.00 | $2,650,000.00 | ($77,798.75) | $2,727,798.75 | ($3,027,840.00) | $212,597.78 | ($2,815,242.22) | ($2,815,242.22) | $165,242.22 | $0.00 | $2,650,000.00 | $0.00 |
| 101907-01 | 10/19/2007 | 2/16/2008 | 1.17% | $4,875,000.00 | $4,875,000.00 | ($101,218.75) | $4,976,218.75 | ($5,523,593.75) | $331,068.75 | ($5,192,525.00) | ($5,192,525.00) | $317,525.00 | $0.00 | $4,875,000.00 | $0.00 |

EXHIBIT H

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 102607-01 | 10/26/2007 | 2/23/2008 | 1.17% | $3,875,000.00 | $3,875,000.00 | ($104,530.00) | $3,979,530.00 | ($4,417,263.00) | $294,176.89 | ($4,123,086.11) | ($4,123,086.11) | $248,086.11 | $0.00 | $3,875,000.00 | $0.00 |
| 103007-01 | 10/30/2007 | 2/27/2008 | 1.17% | $3,800,000.00 | $3,800,000.00 | ($94,275.00) | $3,894,275.00 | ($4,322,633.00) | $283,570.78 | ($4,039,062.22) | ($4,039,062.22) | $239,062.22 | $0.00 | $3,800,000.00 | $0.00 |
| 103007-02 | 10/30/2007 | 2/27/2008 | 1.17% | $2,500,000.00 | $2,500,000.00 | ($57,545.00) | $2,557,545.00 | ($2,838,870.75) | $189,926.31 | ($2,648,944.44) | ($2,648,944.44) | $148,944.44 | $0.00 | $2,500,000.00 | $0.00 |
| 103007-03 | 10/30/2007 | 2/27/2008 | 1.17% | $2,625,000.00 | $2,625,000.00 | ($53,800.00) | $2,678,800.00 | ($2,973,440.00) | $194,965.00 | ($2,778,475.00) | ($2,778,475.00) | $153,475.00 | $0.00 | $2,625,000.00 | $0.00 |
| 103107-01 | 10/31/2007 | 2/28/2008 | 1.17% | $2,900,000.00 | $2,900,000.00 | ($80,312.50) | $2,980,312.50 | ($3,308,137.50) | $227,306.39 | ($3,080,831.11) | ($3,080,831.11) | $180,831.11 | $0.00 | $2,900,000.00 | $0.00 |
| 110107-01 | 11/1/2007 | 2/29/2008 | 1.17% | $3,520,000.00 | $3,520,000.00 | ($72,631.25) | $3,592,631.25 | ($3,987,792.00) | $236,567.11 | ($3,751,224.89) | ($3,751,224.89) | $231,224.89 | $0.00 | $3,520,000.00 | $0.00 |
| 110207-01 | 11/2/2007 | 3/1/2008 | 1.17% | $3,225,000.00 | $3,225,000.00 | ($90,913.75) | $3,315,913.75 | ($3,680,623.20) | $243,776.53 | ($3,436,846.67) | ($3,436,846.67) | $211,846.67 | $0.00 | $3,225,000.00 | $0.00 |
| 110507-01 | 11/5/2007 | 3/4/2008 | 1.17% | $4,125,000.00 | $4,125,000.00 | ($101,625.00) | $4,226,625.00 | ($4,691,505.00) | $306,996.67 | ($4,384,508.33) | ($4,384,508.33) | $259,508.33 | $0.00 | $4,125,000.00 | $0.00 |
| 110507-02 | 11/5/2007 | 3/4/2008 | 1.17% | $4,650,000.00 | $4,650,000.00 | ($106,482.50) | $4,756,482.50 | ($5,279,659.00) | $321,622.33 | ($4,958,036.67) | ($4,958,036.67) | $308,036.67 | $0.00 | $4,650,000.00 | $0.00 |
| 110507-03 | 11/5/2007 | 3/4/2008 | 1.17% | $3,575,000.00 | $3,575,000.00 | ($97,192.75) | $3,672,192.75 | ($4,076,101.95) | $258,319.73 | ($3,817,782.22) | ($3,817,782.22) | $242,782.22 | $0.00 | $3,575,000.00 | $0.00 |
| 110707-01 | 11/7/2007 | 3/6/2008 | 1.17% | $4,200,000.00 | $4,200,000.00 | ($91,650.00) | $4,291,650.00 | ($4,763,726.00) | $283,166.00 | ($4,480,560.00) | ($4,480,560.00) | $280,560.00 | $0.00 | $4,200,000.00 | $0.00 |
| 110707-02 | 11/7/2007 | 3/6/2008 | 1.17% | $3,925,000.00 | $3,925,000.00 | ($98,963.75) | $4,023,963.75 | ($4,524,076.22) | $321,622.33 | ($4,202,453.89) | ($4,202,453.89) | $277,453.89 | $0.00 | $3,925,000.00 | $0.00 |
| 111307-01 | 11/13/2007 | 3/12/2008 | 1.17% | $4,450,000.00 | $4,450,000.00 | ($94,525.00) | $4,544,525.00 | ($5,044,395.00) | $294,662.78 | ($4,749,732.22) | ($4,749,732.22) | $299,732.22 | $0.00 | $4,450,000.00 | $0.00 |
| 111307-02 | 11/13/2007 | 3/12/2008 | 1.17% | $3,375,000.00 | $3,375,000.00 | ($75,780.50) | $3,450,780.50 | ($3,830,321.90) | $227,996.00 | ($3,602,325.90) | ($3,602,325.00) | $227,325.00 | $0.00 | $3,375,000.00 | $0.00 |
| 111607-01 | 11/16/2007 | 3/15/2008 | 1.17% | $3,575,000.00 | $3,575,000.00 | ($88,075.00) | $3,663,075.00 | ($4,065,984.00) | $242,243.44 | ($3,823,740.56) | ($3,823,740.56) | $248,740.56 | $0.00 | $3,575,000.00 | $0.00 |
| 111607-02 | 11/16/2007 | 3/15/2008 | 1.17% | $3,075,000.00 | $3,075,000.00 | ($78,285.00) | $3,153,285.00 | ($3,500,134.50) | $211,182.83 | ($3,288,951.67) | ($3,288,951.67) | $213,951.67 | $0.00 | $3,075,000.00 | $0.00 |
| 112007-01 | 11/20/2007 | 3/19/2008 | 1.17% | $2,475,000.00 | $2,475,000.00 | ($64,540.00) | $2,539,540.00 | ($2,796,002.00) | $157,047.00 | ($2,638,955.00) | ($2,638,955.00) | $163,955.00 | $0.00 | $2,475,000.00 | $0.00 |
| 112007-03 | 11/20/2007 | 3/19/2008 | 1.17% | $3,225,000.00 | $3,225,000.00 | ($69,912.50) | $3,294,912.50 | ($3,657,333.55) | $193,611.88 | ($3,463,721.67) | ($3,463,721.67) | $238,721.67 | $0.00 | $3,225,000.00 | $0.00 |
| 112807-02 | 11/28/2007 | 3/27/2008 | 1.17% | $2,500,000.00 | $2,500,000.00 | ($68,487.50) | $2,568,487.50 | ($2,850,991.50) | $174,269.28 | ($2,676,722.22) | ($2,676,722.22) | $176,722.22 | $0.00 | $2,500,000.00 | $0.00 |
| 112807-03 | 11/28/2007 | 3/27/2008 | 1.17% | $3,525,000.00 | $3,525,000.00 | ($91,112.50) | $3,616,112.50 | ($4,013,856.00) | $239,677.67 | ($3,774,178.33) | ($3,774,178.33) | $249,178.33 | $0.00 | $3,525,000.00 | $0.00 |

**EXHIBIT H**

**PC Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 113007-01 | 11/30/2007 | 3/29/2008 | 1.17% | $3,200,000.00 | $3,200,000.00 | ($87,375.00) | $3,287,375.00 | ($3,648,960.00) | $226,311.11 | ($3,422,648.89) | ($3,422,648.89) | $222,648.89 | $0.00 | $3,200,000.00 | $0.00 |
| Count 541 | | Closed Notes Total | | $1,927,856,000.00 | $1,927,856,001.00 | ($61,616,550.06) | $1,989,472,580.05 | ($2,235,685,243.14) | $204,577,995.65 | ($2,030,706,296.83) | ($2,030,706,295.48) | $102,850,294.48 | $0.00 | $1,927,856,001.00 | $0.00 |

**Open Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Accrued Interest | Principal Paid | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 111607-03 | 11/16/2007 | 3/15/2008 | 1.17% | $4,175,000.00 | $4,175,000.00 | ($123,875.00) | $4,298,875.00 | ($332,868.06) | $0.00 | ($332,868.06) | ($332,868.06) | $332,868.06 | $200,014.39 | $0.00 | $4,375,014.39 |
| 112007-02 | 11/20/2007 | 3/19/2008 | 1.17% | $4,775,000.00 | $4,775,000.00 | ($104,830.00) | $4,879,830.00 | ($369,749.84) | $0.00 | ($369,749.84) | ($369,749.84) | $369,749.84 | $228,606.72 | $0.00 | $5,003,606.72 |
| 112707-01 | 11/27/2007 | 3/26/2008 | 1.17% | $4,400,000.00 | $4,400,000.00 | ($101,175.00) | $4,501,175.00 | ($323,045.35) | $0.00 | ($323,045.35) | ($323,045.35) | $323,045.35 | $210,407.81 | $0.00 | $4,610,407.81 |
| 112807-01 | 11/28/2007 | 3/27/2008 | 1.17% | $4,525,000.00 | $4,525,000.00 | ($99,000.00) | $4,624,000.00 | ($329,627.28) | $0.00 | ($329,627.28) | ($329,627.28) | $329,627.28 | $216,349.24 | $0.00 | $4,741,349.24 |
| 120307-01 | 12/3/2007 | 4/1/2008 | 1.17% | $3,725,000.00 | $3,725,000.00 | ($93,412.50) | $3,818,412.50 | ($2,810,367.76) | $0.00 | ($2,810,367.76) | ($2,810,367.76) | $434,997.54 | $2,204.69 | $2,375,370.22 | $1,351,834.47 |
| | | Adjustment | | $0.00 | $0.00 | $0.00 | $0.00 | ($72,760.71) | $0.00 | ($72,760.71) | ($72,760.71) | $72,760.71 | $0.00 | $0.00 | ($72,760.71) |
| Count 5 | | Open Notes Total | | $21,600,000.00 | $21,600,000.00 | ($522,292.50) | $22,122,292.50 | ($4,238,419.00) | $0.00 | ($4,238,419.00) | ($4,238,419.00) | $1,863,048.78 | $857,582.85 | $2,375,370.22 | $20,009,451.92 |
| Count 546 | | Total | | $1,949,456,000.00 | $1,949,456,001.00 | ($62,138,842.56) | $2,011,594,872.55 | ($2,239,923,662.14) | $204,577,995.65 | ($2,034,944,715.83) | ($2,034,944,714.48) | $104,713,343.26 | $857,582.85 | $1,930,231,371.22 | $20,009,451.92 |

# EXHIBIT  I

**EXHIBIT I**
**Summary of False Profits**

Table 1 - False Profits by Transferor

| | Cash In | Cash Out | | | | |
|---|---|---|---|---|---|---|
| Type | A<br>Principal Investment | B<br>Payment to SPE | C<br>Repayment to PCI | D = B + C<br>Net Payment to SPE | E<br>Payment to Defendants / MGLLC | F = A + E<br>Defendants' False (Profits) |
| Transfers from PCI Directly to Defendants | $ 48,550,475.00 | N/A | N/A | N/A | $ (119,374,303.91) | $ (70,823,828.91) |
| Transfers from PCI through MGLLC to Defendants | 64,238,000.00 | N/A | N/A | N/A | (82,073,509.07) | $ (14,050,814.05) [1] |
| Transfers from SPF Funding to Defendants | 234,623,000.00 | (635,251,582.47) | 69,131,621.47 | (566,119,961.00) | (287,307,348.72) [2] | $ (52,684,348.72) |
| Transfers from PC Funding to Defendants | 1,949,456,001.00 | (2,244,923,662.14) | 204,978,946.31 | (2,039,944,715.83) | (2,039,944,714.48) | $ (90,488,713.48) |
| Total | $ 2,296,867,476.00 | $ (2,880,175,244.61) | $ 274,110,567.78 | $ (2,606,064,676.83) | $ (2,528,699,876.18) | $ (228,047,705.16) |

[1] Based on an analysis of documentation produced by Opportunity Finance, LLC, Defendants received $59,223,728.64 of the total $75,173,513.44 (i.e., approximately 78.78%) that was subsequently transferred from MGLLC to underlying investors. For purposes of estimating the portion of MGLLC false profits attributable to Defendants, the False Profits amount shown reflects 78.78% of the MGLLC false profits amount (i.e., ($82,073,509.07 - $64,238,000.00 = $17,835,509.07) * 78.78% = $14,050,814.05).  Refer to Exhibit N, Transfers from Metro Gem, LLC to Defendants.

[2] Includes certain transfers paid from a PC Funding, LLC bank account.  Refer to footnote 1 on Exhibit Q, Transfers from SPF Funding, LLC to Defendants.

**EXHIBIT I**
**Summary of False Profits**

**Table 2 - False Profits by Recipient**

| Defendant | Cash In | Cash Out | C = A + B |
|---|---|---|---|
| | **A**<br>**Principal Investment** | **B**<br>**Payment to Defendants / MGLLC** | **Defendants'**<br>**False (Profits) / Losses** |
| **Transfers from PCI Directly to Defendants** | | | |
| International Investment Opportunities, LLC | $ 43,750,475.00 | $ (98,466,496.93) | $ (54,716,021.93) |
| Opportunity Finance LLC | - | (11,678,458.24) | $ (11,678,458.24) |
| Sabes Family Foundation | - | (4,217,849.42) | $ (4,217,849.42) |
| Minneapolis Foundation | - | (1,231,998.90) | $ (1,231,998.90) |
| Robert Sabes | 2,300,000.00 | (2,410,000.00) | $ (110,000.00) |
| Sabes Minnesota Limited Partnership | 2,500,000.00 | (1,002,000.00) | $ 1,498,000.00 |
| **Subtotal** | $ 48,550,475.00 | $ (119,006,803.49) | $ (70,823,828.91) [1] |
| **Transfers from PCI through MGLLC to Defendants** | | | |
| All Transfers | 64,238,000.00 | (82,073,509.07) | $ (14,050,814.05) [2] |
| **Subtotal** | $ 64,238,000.00 | $ (82,073,509.07) | $ (14,050,814.05) |
| **Transfers from SPF Funding to Defendants** | | | |
| Sabes Family Foundation | - | (29,495,341.68) | $ (29,495,341.68) |
| Opportunity Finance entities and DZ Bank AG as their Agent | 230,623,000.00 | (242,857,156.36) [3] | $ (12,234,156.36) |
| Minneapolis Foundation | - | (10,992,351.10) | $ (10,992,351.10) |
| Sabes Minnesota Limited Partnership | 4,000,000.00 | (4,330,000.00) | $ (330,000.00) |
| **Subtotal** | $ 234,623,000.00 | $ (287,674,849.14) | $ (52,684,348.72) [1] |
| **Transfers from PC Funding to Defendants** | | | |
| Opportunity Finance entities and DZ Bank AG as their Agent | 1,949,456,001.00 | (2,039,944,714.48) | $ (90,488,713.48) |
| **Subtotal** | $ 1,949,456,001.00 | $ (2,039,944,714.48) | $ (90,488,713.48) |
| **Total** | $ 2,296,867,476.00 | $ (2,528,699,876.18) | $ (228,047,705.16) |

[1] False (Profits) / Losses is defined as the difference between "Principal Investment" and "Payment to Defendants / MGLLC." The excess sum of False (Profits) resulting from Transfers from PCI Directly to Defendants equals $367,500.42. This excess amount relates to Janet Sabes note 5355, which rolled into Sabes Family Foundation note SFF-C-3 and subsequently was paid from SPF Funding, LLC to Sabes Family Foundation. The excess amount is offset in the sum of False (Profits) resulting from Transfers from SPF Funding to Defendants.

[2] Based on an analysis of documentation produced by Opportunity Finance, LLC, Defendants received $59,223,728.64 of the total $75,173,513.44 (i.e., approximately 78.78%) that was subsequently transferred from MGLLC to underlying investors. For purposes of estimating the portion of MGLLC false profits attributable to Defendants, the False Profits amount shown reflects 78.78% of the MGLLC false profits amount (i.e., ($82,073,509.07 - $64,238,000.00 = $17,835,509.07) * 78.78% = $14,050,814.05). Refer to Exhibit N, Transfers from Metro Gem, LLC to Defendants.

[3] Includes certain transfers paid from a PC Funding, LLC bank account. Refer to footnote 1 on Exhibit Q, Transfers from SPF Funding, LLC to Defendants.

# EXHIBIT  J

**EXHIBIT J**
**PCI Direct Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to Defendants | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3400 | 7/8/1999 | 9/29/1999 | 3.74% | $2,500,000.00 | $2,500,000.00 | $0.00 | N/A | ($2,758,475.00) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 3412 | 7/26/1999 | 8/25/1999 | 18.95% | $1,500,000.00 | $1,500,000.00 | $0.00 | N/A | ($1,784,237.00) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 3413 | 7/26/1999 | 8/25/1999 | 17.14% | $2,800,000.00 | $2,800,000.00 | $0.00 | N/A | $0.00 | $479,916.50 | $2,800,000.00 | 4121, 4122 | $0.00 |
| 3414 | 7/26/1999 | 8/25/1999 | 16.85% | $1,300,475.00 | $1,300,475.00 | $0.00 | N/A | $0.00 | $219,111.50 | $1,300,475.00 | 4121, 4122 | $0.00 |
| NO NOTE | 7/28/1999 | 8/10/1999 | 0.46% | $1,000,000.00 | $1,000,000.00 | $0.00 | N/A | ($1,002,000.00) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 4121 | 9/30/1999 | 11/15/1999 | 9.75% | $999,503.00 | $0.00 | $999,503.00 | 3413, 3414 | ($149,407.00) | $0.00 | $999,503.00 | 4210-5, 4212-5 | $0.00 |
| 4122 | 9/30/1999 | 11/15/1999 | 9.81% | $3,800,000.00 | $0.00 | $3,800,000.00 | 3413, 3414 | ($571,875.00) | $0.00 | $3,800,000.00 | 4210-5, 4212-5 | $0.00 |
| 4120-5 | 10/1/1999 | 1/5/2000 | 3.50% | $2,650,000.00 | $0.00 | $2,650,000.00 | 3027-6 (MGLLC), 3230-6 (MGLLC) | ($296,800.32) | $0.00 | $2,650,000.00 | 4220-5 | $0.00 |
| 4130-5 | 10/12/1999 | 1/12/2000 | 3.50% | $3,500,000.00 | $0.00 | $3,500,000.00 | 2962-6 (MGLLC) | ($375,666.36) | $0.00 | $3,500,000.00 | 4245-5 | $0.00 |
| 4149-5 | 10/12/1999 | 1/18/2000 | 3.50% | $2,500,000.00 | $500,000.00 | $2,000,000.00 | 3240-6 (MGLLC) | ($285,833.66) | $0.00 | $2,500,000.00 | 5010-5 | $0.00 |
| 4150-5 | 10/12/1999 | 1/18/2000 | 3.50% | $2,500,000.00 | $500,000.00 | $2,000,000.00 | 3235-6 (MGLLC) | ($285,833.66) | $0.00 | $2,500,000.00 | 5015-5 | $0.00 |
| 4152-5 | 10/19/1999 | 1/24/2000 | 3.50% | $2,500,000.00 | $2,500,000.00 | $0.00 | N/A | ($282,916.99) | $0.00 | $2,500,000.00 | 5120 | $0.00 |
| 4165-5 | 10/26/1999 | 1/31/2000 | 3.50% | $3,500,000.00 | $3,500,000.00 | $0.00 | N/A | ($396,083.01) | $0.00 | $3,500,000.00 | 5132-5 | $0.00 |
| 4170-5 | 10/29/1999 | 1/31/2000 | 3.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | 3271-5 (MGLLC) | ($372,866.98) | $0.00 | $3,400,000.00 | 5134-5 | $0.00 |
| 4173 | 11/4/1999 | 2/2/2000 | 3.50% | $4,000,000.00 | $400,000.00 | $3,600,000.00 | 3283-5 (MGLLC) | ($420,000.00) | $0.00 | $4,000,000.00 | 5140-5 | $0.00 |
| 4175 | 11/4/1999 | 2/2/2000 | 3.50% | $2,000,000.00 | $0.00 | $2,000,000.00 | 3286-5 (MGLLC) | ($210,000.00) | $0.00 | $2,000,000.00 | 5142-5 | $0.00 |
| 4180 | 11/20/1999 | 11/20/2001 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 3305-8 (MGLLC) | ($2,233,000.00) | $0.00 | $3,000,000.00 | SFF-A-7, MPLS-A-3 | $0.00 |
| 4188-5 | 11/20/1999 | 2/22/2000 | 3.50% | $2,600,000.00 | $500,000.00 | $2,100,000.00 | 3305-8 (MGLLC) | ($285,133.02) | $0.00 | $2,600,000.00 | 5163-5 | $0.00 |
| 4190-5 | 11/20/1999 | 2/22/2000 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 3295-8 (MGLLC) | ($329,000.00) | $0.00 | $3,000,000.00 | 5160-5 | $0.00 |
| 4210-5 | 12/6/1999 | 1/25/2000 | 9.46% | $1,950,000.00 | $0.00 | $1,950,000.00 | 4121, 4122 | ($307,305.00) | $0.00 | $1,950,000.00 | 5125-5-5 | $0.00 |
| 4212-5 | 12/6/1999 | 1/26/2000 | 9.94% | $2,849,503.00 | $0.00 | $2,849,503.00 | 4121, 4122 | ($481,334.50) | $0.00 | $2,849,503.00 | 5130-5--1 | $0.00 |

EXHIBIT J

**PCI Direct Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to Defendants | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4215-5 | 12/8/1999 | 3/12/2000 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 3308-1 (MGLLC) | ($332,500.00) | $0.00 | $3,000,000.00 | 5172-5 | $0.00 |
| 4218-5 | 12/10/1999 | 3/12/2000 | 3.50% | $4,600,000.00 | $0.00 | $4,600,000.00 | 3319-1 (MGLLC) | ($499,100.31) | $0.00 | $4,600,000.00 | 5170-5 | $0.00 |
| 5005 | 12/28/1999 | 3/8/2000 | 9.23% | $3,000,000.00 | $3,000,000.00 | $0.00 | N/A | ($655,682.50) | $0.00 | $3,000,000.00 | 5167-1 | $0.00 |
| 4220-5 | 1/6/2000 | 4/3/2000 | 3.50% | $2,650,000.00 | $0.00 | $2,650,000.00 | 4120-5 | ($272,066.96) | $0.00 | $2,650,000.00 | 5182-5 | $0.00 |
| 4245-5 | 1/13/2000 | 4/17/2000 | 3.50% | $3,500,000.00 | $0.00 | $3,500,000.00 | 4130-5 | ($3,887,916.35) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5010-5 | 1/19/2000 | 4/19/2000 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 4149-5 | ($265,416.66) | $0.00 | $2,500,000.00 | 5188-5 | $0.00 |
| 5015-5 | 1/19/2000 | 4/19/2000 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 4150-5 | ($265,416.66) | $0.00 | $2,500,000.00 | 5186-5 | $0.00 |
| 5120 | 1/25/2000 | 4/24/2000 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 4152-5 | ($262,500.00) | $0.00 | $2,500,000.00 | 5197-5 | $0.00 |
| 5125-5-5 | 1/26/2000 | 4/28/2000 | 5.12% | $1,950,000.00 | $0.00 | $1,950,000.00 | 4210-5 | ($309,448.75) | $0.00 | $1,950,000.00 | 5205-5 | $0.00 |
| 5130-5--1 | 1/27/2000 | 4/24/2000 | 5.19% | $2,849,503.00 | $0.00 | $2,849,503.00 | 4212-5 | ($433,905.00) | $0.00 | $2,849,503.00 | 5200 | $0.00 |
| 5132-5 | 2/1/2000 | 4/24/2000 | 3.50% | $3,500,000.00 | $0.00 | $3,500,000.00 | 4165-5 | ($338,196.39) | $0.00 | $3,500,000.00 | 5195-5 | $0.00 |
| 5134-5 | 2/1/2000 | 5/5/2000 | 3.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | 4170-5 | ($372,866.90) | $0.00 | $3,400,000.00 | 5210-5 | $0.00 |
| 5140-5 | 2/3/2000 | 5/5/2000 | 3.50% | $4,000,000.00 | $0.00 | $4,000,000.00 | 4173 | ($429,333.64) | $0.00 | $4,000,000.00 | 5214-5 | $0.00 |
| 5142-5 | 2/3/2000 | 5/5/2000 | 3.50% | $2,000,000.00 | $0.00 | $2,000,000.00 | 4175 | ($214,666.36) | $0.00 | $2,000,000.00 | 5212-5 | $0.00 |
| 5160-5 | 2/23/2000 | 5/25/2000 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 4190-5 | ($322,000.00) | $0.00 | $3,000,000.00 | 5230-7 | $0.00 |
| 5163-5 | 2/23/2000 | 5/25/2000 | 3.46% | $2,600,000.00 | $0.00 | $2,600,000.00 | 4188-5 | ($279,066.36) | $0.00 | $2,600,000.00 | 5228-5 | $0.00 |
| 5165-5 | 2/24/2000 | 5/23/2000 | 5.69% | $3,500,000.00 | $3,500,000.00 | $0.00 | N/A | ($591,296.65) | $0.00 | $3,500,000.00 | 5235-5 | $0.00 |
| 5167-1 | 3/9/2000 | 3/20/2000 | 11.64% | $6,000,000.00 | $3,000,000.00 | $3,000,000.00 | 5005 | ($2,255,996.00) | $0.00 | $4,000,000.00 | 5180 | $0.00 |
| 5170-5 | 3/13/2000 | 6/12/2000 | 3.50% | $4,600,000.00 | $0.00 | $4,600,000.00 | 4218-5 | ($488,366.67) | $0.00 | $4,600,000.00 | 5241-5 | $0.00 |
| 5172-5 | 3/13/2000 | 6/12/2000 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 4215-5 | ($318,500.00) | $0.00 | $3,000,000.00 | 5240-5 | $0.00 |
| 5180 | 3/21/2000 | 6/19/2000 | 5.43% | $4,000,000.00 | $0.00 | $4,000,000.00 | 5167-1 | ($652,037.10) | $0.00 | $4,000,000.00 | 5245-5 | $0.00 |

**EXHIBIT J**
**PCI Direct Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to Defendants | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5182-5 | 4/4/2000 | 6/30/2000 | 3.50% | $2,650,000.00 | $0.00 | $2,650,000.00 | 4220-5 | ($268,975.29) | $0.00 | $2,650,000.00 | 5250 | $0.00 |
| 5186-5 | 4/20/2000 | 7/18/2000 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 5015-5 | ($259,583.33) | $0.00 | $2,500,000.00 | 5263-5 | $0.00 |
| 5188-5 | 4/20/2000 | 7/17/2000 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 5010-5 | ($256,666.96) | $0.00 | $2,500,000.00 | 5260-5 | $0.00 |
| 5190-5 | 4/20/2000 | 7/17/2000 | 3.50% | $3,000,000.00 | $3,000,000.00 | $0.00 | N/A | ($308,000.00) | $0.00 | $3,000,000.00 | 5255-5 | $0.00 |
| 5195-5 | 4/25/2000 | 7/25/2000 | 3.50% | $3,500,000.00 | $0.00 | $3,500,000.00 | 5132-5 | ($371,583.33) | $0.00 | $3,500,000.00 | 5270-5 | $0.00 |
| 5197-5 | 4/25/2000 | 7/20/2000 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 5120 | ($250,833.62) | $0.00 | $2,500,000.00 | 5265-5 | $0.00 |
| 5200 | 4/25/2000 | 8/16/2000 | 3.84% | $2,849,503.00 | $0.00 | $2,849,503.00 | 5130-5--1 | ($412,280.59) | $0.00 | $2,849,503.00 | 5287-5 | $0.00 |
| 5205-5 | 4/29/2000 | 8/24/2000 | 4.54% | $1,950,000.00 | $0.00 | $1,950,000.00 | 5125-5-5 | ($345,324.27) | $0.00 | $1,950,000.00 | 5294-5 | $0.00 |
| 5210-5 | 5/6/2000 | 8/16/2000 | 3.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | 5134-5 | ($404,600.34) | $0.00 | $3,400,000.00 | 5285-5 | $0.00 |
| 5212-5 | 5/6/2000 | 8/10/2000 | 3.50% | $2,000,000.00 | $0.00 | $2,000,000.00 | 5142-5 | ($223,999.68) | $0.00 | $2,000,000.00 | 5273-5 | $0.00 |
| 5214-5 | 5/6/2000 | 8/24/2000 | 3.50% | $4,000,000.00 | $0.00 | $4,000,000.00 | 5140-5 | ($513,333.33) | $0.00 | $4,000,000.00 | 5290-5 | $0.00 |
| 5220-5 | 5/17/2000 | 8/10/2000 | 6.63% | $3,750,000.00 | $3,750,000.00 | $0.00 | N/A | ($703,932.52) | $0.00 | $3,750,000.00 | 5280-5 | $0.00 |
| 5235-5 | 5/24/2000 | 8/29/2000 | 5.17% | $3,500,000.00 | $0.00 | $3,500,000.00 | 5165-5 | ($584,650.00) | $0.00 | $3,500,000.00 | 5297-5 | $0.00 |
| 5228-5 | 5/26/2000 | 8/28/2000 | 3.50% | $2,600,000.00 | $0.00 | $2,600,000.00 | 5163-5 | ($285,133.02) | $0.00 | $2,600,000.00 | 5302-5 | $0.00 |
| 5230-7 | 5/26/2000 | 8/28/2000 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 5160-5 | ($329,000.00) | $0.00 | $3,000,000.00 | 5300-5 | $0.00 |
| 5240-5 | 6/13/2000 | 9/13/2000 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 5172-5 | ($322,000.00) | $0.00 | $3,000,000.00 | 5310-5 | $0.00 |
| 5241-5 | 6/13/2000 | 9/18/2000 | 3.50% | $4,600,000.00 | $0.00 | $4,600,000.00 | 5170-5 | ($520,566.99) | $0.00 | $4,600,000.00 | 5315-5 | $0.00 |
| 5245-5 | 6/20/2000 | 9/28/2000 | 4.31% | $4,000,000.00 | $0.00 | $4,000,000.00 | 5180 | ($575,135.00) | $0.00 | $4,000,000.00 | 5325-5 | $0.00 |
| 5250 | 7/1/2000 | 9/28/2000 | 3.54% | $2,650,000.00 | $0.00 | $2,650,000.00 | 5182-5 | ($275,158.33) | $0.00 | $2,650,000.00 | 5320-5 | $0.00 |
| 5255-5 | 7/18/2000 | 10/10/2000 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 5190-5 | ($294,000.00) | $0.00 | $3,000,000.00 | 5335-5 | $0.00 |
| 5260-5 | 7/18/2000 | 10/10/2000 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 5188-5 | ($245,000.28) | $0.00 | $2,500,000.00 | 5330-5 | $0.00 |

**EXHIBIT J**
**PCI Direct Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to Defendants | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5263-5 | 7/19/2000 | 10/24/2000 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 5186-5 | ($282,916.99) | $0.00 | $2,500,000.00 | 5348-5 | $0.00 |
| 5265-5 | 7/21/2000 | 10/30/2000 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 5197-5 | ($294,583.67) | $0.00 | $2,500,000.00 | 5355 | $0.00 |
| 5270-5 | 7/26/2000 | 10/31/2000 | 3.50% | $3,500,000.00 | $0.00 | $3,500,000.00 | 5195-5 | ($396,083.01) | $0.00 | $3,500,000.00 | 5360-5 | $0.00 |
| 5273-5 | 8/11/2000 | 11/15/2000 | 3.50% | $2,000,000.00 | $0.00 | $2,000,000.00 | 5212-5 | ($223,999.68) | $0.00 | $2,000,000.00 | 5375-5 | $0.00 |
| 5280-5 | 8/11/2000 | 11/21/2000 | 5.26% | $3,750,000.00 | $0.00 | $3,750,000.00 | 5220-5 | ($670,186.41) | $0.00 | $3,750,000.00 | 5380-5 | $0.00 |
| 5285-5 | 8/17/2000 | 8/17/2002 | 3.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | 5210-5 | ($1,515,265.55) | $0.00 | $3,400,000.00 | SFF-B-4, 1000401-01 (SPF) | $0.00 |
| 5287-5 | 8/17/2000 | 11/29/2000 | 4.05% | $2,849,503.00 | $0.00 | $2,849,503.00 | 5200 | ($400,183.78) | $0.00 | $2,849,503.00 | 5385-5 | $0.00 |
| 5290-5 | 8/25/2000 | 12/14/2000 | 3.50% | $4,000,000.00 | $0.00 | $4,000,000.00 | 5214-5 | ($517,926.00) | $0.00 | $4,000,000.00 | 5400-5 | $0.00 |
| 5294-5 | 8/25/2000 | 12/8/2000 | 4.78% | $1,950,000.00 | $0.00 | $1,950,000.00 | 5205-5 | ($326,184.88) | $0.00 | $1,950,000.00 | 5395-5 | $0.00 |
| 5295-5 | 8/29/2000 | 1/10/2001 | 3.76% | $3,500,000.00 | $3,500,000.00 | $0.00 | N/A | ($587,298.65) | $0.00 | $3,500,000.00 | 5420-5 | $0.00 |
| 5300-5 | 8/29/2000 | 12/14/2000 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 5230-7 | ($374,500.00) | $0.00 | $3,000,000.00 | 5405 | $0.00 |
| 5302-5 | 8/29/2000 | 12/20/2000 | 3.50% | $2,600,000.00 | $0.00 | $2,600,000.00 | 5228-5 | ($342,766.29) | $0.00 | $2,600,000.00 | 5410-5 | $0.00 |
| 5297-5 | 8/30/2000 | 1/5/2001 | 3.21% | $3,500,000.00 | $0.00 | $3,500,000.00 | 5235-5 | ($479,675.00) | $0.00 | $3,500,000.00 | 5415-5 | $0.00 |
| 5310-5 | 9/14/2000 | 1/19/2001 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 5240-5 | ($444,500.00) | $0.00 | $3,000,000.00 | 5425-5 | $0.00 |
| 5315-5 | 9/19/2000 | 1/23/2001 | 3.50% | $4,600,000.00 | $0.00 | $4,600,000.00 | 5241-5 | ($676,199.16) | $0.00 | $4,600,000.00 | 5440-5 | $0.00 |
| 5320-5 | 9/29/2000 | 1/23/2001 | 3.50% | $2,650,000.00 | $0.00 | $2,650,000.00 | 5250 | ($358,632.76) | $0.00 | $2,650,000.00 | 5435-5-5 | $0.00 |
| 5325-5 | 9/29/2000 | 2/2/2001 | 3.67% | $4,000,000.00 | $0.00 | $4,000,000.00 | 5245-5 | ($615,737.50) | $0.00 | $4,000,000.00 | 5450 | $0.00 |
| 5330-5 | 10/11/2000 | 3/23/2001 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 5260-5 | $0.00 | $475,417.21 | $2,500,000.00 | 5470-5 | $0.00 |
| 5335-5 | 10/11/2000 | 3/23/2001 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 5255-5 | $0.00 | $570,500.00 | $3,000,000.00 | 5470-5 | $0.00 |
| 5340 | 10/18/2000 | 5/9/2001 | 3.05% | $2,000,000.00 | $2,000,000.00 | $0.00 | N/A | ($2,413,030.70) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5342-5 | 10/18/2000 | 3/23/2001 | 3.92% | $1,600,000.00 | $1,600,000.00 | $0.00 | N/A | $0.00 | $326,433.27 | $1,600,000.00 | 5470-5 | $0.00 |

**EXHIBIT J**
**PCI Direct Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to Defendants | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5344-5 | 10/18/2000 | 5/9/2001 | 3.00% | $1,400,000.00 | $1,400,000.00 | $0.00 | N/A | ($1,684,173.85) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5348-5 | 10/25/2000 | 5/7/2001 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 5263-5 | ($3,065,832.04) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5355 | 10/31/2000 | 10/31/2002 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | 5265-5 | ($837,084.29) | $0.00 | $2,500,000.00 | SFF-C-3 | $0.00 |
| 5360-5 | 11/1/2000 | 5/7/2001 | 3.50% | $3,500,000.00 | $0.00 | $3,500,000.00 | 5270-5 | ($4,263,582.71) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5370-5 | 11/13/2000 | 5/3/2001 | 5.37% | $1,500,000.00 | $1,500,000.00 | $0.00 | N/A | ($1,959,377.38) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5375-5 | 11/16/2000 | 5/2/2001 | 3.50% | $2,000,000.00 | $0.00 | $2,000,000.00 | 5273-5 | ($2,389,666.11) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5380-5 | 11/22/2000 | 7/12/2001 | 3.86% | $3,750,000.00 | $0.00 | $3,750,000.00 | 5280-5 | ($4,868,264.64) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5385-5 | 11/30/2000 | 5/11/2001 | 3.18% | $2,849,503.00 | $0.00 | $2,849,503.00 | 5287-5 | ($3,338,223.00) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5390-5-1 | 12/6/2000 | 5/16/2001 | 3.69% | $1,000,000.00 | $1,000,000.00 | $0.00 | N/A | ($1,197,856.57) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5395-5 | 12/9/2000 | 5/17/2001 | 3.26% | $1,950,000.00 | $0.00 | $1,950,000.00 | 5294-5 | ($2,287,260.00) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5400-5 | 12/15/2000 | 12/15/2002 | 3.50% | $4,000,000.00 | $0.00 | $4,000,000.00 | 5290-5 | ($1,231,998.90) | $0.00 | $4,000,000.00 | SFF-A-7, MPLS-A-3 | $0.00 |
| 5405 | 12/15/2000 | 3/15/2001 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 5300-5 | ($3,577,500.00) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5410-5 | 12/21/2000 | 5/23/2001 | 3.50% | $2,600,000.00 | $0.00 | $2,600,000.00 | 5302-5 | ($3,064,099.49) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5415-5 | 1/6/2001 | 6/19/2001 | 2.88% | $3,500,000.00 | $0.00 | $3,500,000.00 | 5297-5 | ($4,050,462.50) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5420-5 | 1/11/2001 | 6/22/2001 | 2.96% | $3,500,000.00 | $0.00 | $3,500,000.00 | 5295-5 | ($4,059,350.00) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5425-5 | 1/20/2001 | 7/2/2001 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | 5310-5 | ($1,570,500.00) | $0.00 | $2,000,000.00 | IIO-5475 | $0.00 |
| 5430-5 | 1/22/2001 | 6/19/2001 | 6.06% | $1,000,000.00 | $1,000,000.00 | $0.00 | N/A | ($1,299,114.49) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5460 | 1/22/2001 | 6/22/2001 | N/A | $1,000,000.00 | $1,000,000.00 | $0.00 | N/A | $0.00 | $0.00 | $1,000,000.00 | 5470-5 | $0.00 |
| 5435-5-5 | 1/24/2001 | 7/24/2001 | 3.50% | $2,650,000.00 | $0.00 | $2,650,000.00 | 5320-5 | ($3,209,592.27) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5440-5 | 1/24/2001 | 4/24/2001 | 3.50% | $4,600,000.00 | $0.00 | $4,600,000.00 | 5315-5 | ($5,425,033.97) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| 5450 | 2/3/2001 | 8/9/2001 | 2.55% | $4,000,000.00 | $0.00 | $4,000,000.00 | 5325-5 | ($4,635,088.18) | $0.00 | $0.00 | PAID IN FULL | $0.00 |

**EXHIBIT J**

**PCI Direct Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to Defendants | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5470-5 | 3/24/2001 | 7/31/2001 | 5.47% | $9,472,350.48 | $0.00 | $9,472,350.48 | 5330-5, 5335-5, 5342-5, 5460 | ($11,699,576.45) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| RS-5475 | 5/23/2001 | 5/29/2001 | 21.74% | $2,300,000.00 | $2,300,000.00 | $0.00 | N/A | ($2,410,000.00) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| IIO-5475 | 7/12/2001 | 9/12/2001 | 7.43% | $2,000,000.00 | $0.00 | $2,000,000.00 | 5425-5 | ($2,307,193.40) | $0.00 | $0.00 | PAID IN FULL | $0.00 |
| *Count 108* | | *Closed Notes Total* | | *$317,919,843.48* | *$48,550,475.00* | *$269,369,368.48* | | *($119,374,303.91)* | *$2,071,378.48* | *$245,347,990.00* | | *$0.00* |

# EXHIBIT  K

**EXHIBIT K**
**Transfers from PCI to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| ***90 Day Transfers*** | | | |
| No Transfers Identified | | | |
| ***Two Year Transfers*** | | | |
| No Transfers Identified | | | |
| ***Additional Transfers*** | | | |
| 9/21/2001 | SABES FAMILY FOUNDATION | $495,833.33 | |
| 9/19/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $2,307,193.40 | |
| 9/11/2001 | MINNEAPOLIS FOUNDATION | $462,000.00 | |
| 9/11/2001 | SABES FAMILY FOUNDATION | $385,000.00 | |
| 8/16/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $4,635,088.18 | |
| 8/10/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $5,425,033.97 | |
| 8/1/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $3,209,592.27 | |
| 7/31/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $11,699,576.45 | |
| 7/23/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $200,000.00 | |
| 7/20/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $4,668,264.64 | |
| 7/12/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,570,500.00 | |
| 7/2/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $4,059,350.00 | |
| 6/27/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $4,050,462.50 | |
| 6/27/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,299,114.49 | |
| 6/6/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $3,577,500.00 | |
| 6/4/2001 | MINNEAPOLIS FOUNDATION | $769,998.90 | |
| 6/1/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $3,064,099.49 | |
| 6/1/2001 | SABES FAMILY FOUNDATION | $588,000.00 | |
| 5/31/2001 | ROBERT SABES | $2,410,000.00 | |
| 5/25/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $2,287,260.00 | |
| 5/25/2001 | SABES FAMILY FOUNDATION | $662,432.22 | |
| 5/23/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,197,856.57 | |
| 5/21/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $3,338,223.00 | |
| 5/15/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $2,413,030.70 | |
| 5/15/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,604,173.85 | |
| 5/15/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $80,000.00 | |

**EXHIBIT K**
**Transfers from PCI to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|---|---|---|---|
| 5/10/2001 | OPPORTUNITY FINANCE LLC | $4,263,582.71 | |
| 5/10/2001 | OPPORTUNITY FINANCE LLC | $3,065,832.04 | |
| 5/8/2001 | OPPORTUNITY FINANCE LLC | $1,959,377.38 | |
| 5/7/2001 | OPPORTUNITY FINANCE LLC | $2,389,666.11 | |
| 5/7/2001 | OPPORTUNITY FINANCE LLC | $2,389,666.11 | |
| 5/7/2001 | PCI | -$2,389,666.11 | |
| 4/13/2001 | SABES FAMILY FOUNDATION | $469,583.87 | |
| 2/22/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $615,737.50 | |
| 2/2/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $676,199.16 | |
| 2/2/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $358,632.76 | |
| 1/29/2001 | PCI | -$358,632.56 | |
| 1/29/2001 | PCI | -$676,199.16 | |
| 1/26/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $676,199.16 | |
| 1/26/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $358,632.56 | |
| 1/25/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $444,500.00 | |
| 1/16/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $587,298.65 | |
| 1/11/2001 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $479,675.00 | |
| 12/26/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $517,926.00 | |
| 12/26/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $374,500.00 | |
| 12/26/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $342,766.29 | |
| 12/19/2000 | PCI | -$374,500.00 | |
| 12/19/2000 | PCI | -$517,926.00 | |
| 12/18/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $517,926.00 | |
| 12/18/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $374,500.00 | |
| 12/12/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $326,184.88 | |
| 12/7/2000 | SABES FAMILY FOUNDATION | $315,000.00 | |
| 12/6/2000 | SABES FAMILY FOUNDATION | $357,000.00 | |
| 12/1/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $400,183.78 | |
| 11/24/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $670,186.41 | |
| 11/20/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $223,999.68 | |
| 11/2/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $396,083.01 | |

**EXHIBIT K**
**Transfers from PCI to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 11/2/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $294,583.67 | |
| 10/26/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $282,916.99 | |
| 10/13/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $294,000.00 | |
| 10/13/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $245,000.28 | |
| 10/4/2000 | PCI | -$3,091.67 | |
| 10/2/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $575,135.00 | |
| 10/2/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $278,250.00 | |
| 9/22/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $520,566.99 | |
| 9/18/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $322,000.00 | |
| 8/31/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $584,650.00 | |
| 8/30/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $329,000.00 | |
| 8/30/2000 | SABES FAMILY FOUNDATION | $315,000.00 | |
| 8/30/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $285,133.02 | |
| 8/28/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $513,333.33 | |
| 8/28/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $345,324.27 | |
| 8/18/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $412,280.59 | |
| 8/18/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $404,600.34 | |
| 8/14/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $703,932.52 | |
| 8/14/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $223,999.68 | |
| 7/27/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $371,583.33 | |
| 7/24/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $250,833.62 | |
| 7/20/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $259,583.33 | |
| 7/19/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $308,000.00 | |
| 7/19/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $256,666.96 | |
| 7/3/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $268,975.29 | |
| 6/21/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $652,037.10 | |
| 6/14/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $488,366.67 | |
| 6/14/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $318,500.00 | |
| 5/30/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $322,000.00 | |
| 5/30/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $279,066.36 | |
| 5/26/2000 | SABES FAMILY FOUNDATION | $315,000.00 | |

**EXHIBIT K**
**Transfers from PCI to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|---|---|---|---|
| 5/25/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $591,296.65 | |
| 5/9/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $429,333.64 | |
| 5/9/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $372,866.90 | |
| 5/9/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $214,666.36 | |
| 5/2/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $309,448.75 | |
| 4/26/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $433,905.00 | |
| 4/26/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $338,196.39 | |
| 4/26/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $262,500.00 | |
| 4/21/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $265,416.66 | |
| 4/21/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $265,416.66 | |
| 4/19/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $3,887,916.35 | |
| 4/5/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $272,066.96 | |
| 3/22/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $2,255,996.00 | |
| 3/14/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $499,100.31 | |
| 3/14/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $332,500.00 | |
| 3/13/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $655,682.50 | |
| 2/24/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $329,000.00 | |
| 2/24/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $285,133.02 | |
| 2/23/2000 | SABES FAMILY FOUNDATION | $315,000.00 | |
| 2/4/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $420,000.00 | |
| 2/4/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $210,000.00 | |
| 2/2/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $396,083.01 | |
| 2/2/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $372,866.98 | |
| 1/28/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $481,334.50 | |
| 1/27/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $307,305.00 | |
| 1/26/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $282,916.99 | |
| 1/20/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $285,833.66 | |
| 1/20/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $285,833.66 | |
| 1/14/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $367,500.00 | |
| 1/14/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $8,166.36 | |
| 1/7/2000 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $296,800.32 | |

**EXHIBIT K**
**Transfers from PCI to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 12/6/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $571,875.00 | |
| 12/6/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $149,407.00 | |
| 9/29/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $2,758,475.00 | |
| 9/16/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,784,237.00 | |
| 8/10/1999 | SABES MINNESOTA LIMITED PARTNERSHIP | $1,002,000.00 | $     119,006,803.49 |

| | | |
|---|---|---|
| *Subtotal - Transfers to International Investment Opportunities LLC* | *$98,466,496.93* | |
| *Subtotal - Transfers to Opportunity Finance LLC* | *$11,678,458.24* | |
| *Subtotal - Transfers to Sabes Family Foundation* | *$4,217,849.42* | |
| *Subtotal - Transfers to Robert Sabes* | *$2,410,000.00* | |
| *Subtotal - Transfers to Minneapolis Foundation* | *$1,231,998.90* | |
| *Subtotal - Transfers to Sabes Family Limited Partnership* | *$1,002,000.00* | |
| **Total Transfers** | **$119,006,803.49** [1] | |

[1] Amount differs from total Payment from PCI to Defendants stated in Exhibit J, PCI Direct Notes - Summary of Notes Payable by Note by $367,500.42 (i.e. $119,006,803.49 - $119,374,303.91 = -$367,500.42).  This variance is due to the exclusion of a $367,500.42 transfer from SPF Funding, LLC to Sabes Family Foundation related to Janet Sabes note 5355.

# EXHIBIT L

**EXHIBIT L**

**Transfers from PCI to Metro Gem, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| *90 Day Transfers* | | |
| No Transfers Identified | | |
| *Two Year Transfers* | | |
| No Transfers Identified | | |
| *Additional Transfers* | | |
| 12/10/1999 | $689,800.00 | |
| 12/10/1999 | $500,000.00 | |
| 12/7/1999 | $444,000.00 | |
| 11/23/1999 | $608,200.00 | |
| 11/23/1999 | $374,000.00 | |
| 11/11/1999 | $500.00 | |
| 11/3/1999 | $640,800.00 | |
| 11/3/1999 | $356,000.00 | |
| 10/29/1999 | $5,576.00 | |
| 10/28/1999 | $613,224.00 | |
| 10/11/1999 | $380,000.00 | |
| 10/11/1999 | $352,000.00 | |
| 10/7/1999 | $644,000.00 | |
| 9/30/1999 | $280,000.00 | |
| 9/30/1999 | $168,000.00 | |
| 8/31/1999 | $765,000.00 | |
| 8/25/1999 | $540,000.00 | |
| 8/19/1999 | $928,200.00 | |
| 8/16/1999 | $440,000.00 | |
| 8/6/1999 | $2,000,000.00 | |
| 8/6/1999 | $1,388,799.69 | |
| 8/6/1999 | $218,666.53 | |
| 7/27/1999 | $516,800.00 | |
| 7/14/1999 | $1,571,200.00 | |
| 7/7/1999 | $474,000.00 | |
| 7/6/1999 | $483,000.00 | |
| 7/6/1999 | $257,400.00 | |
| 7/2/1999 | $26,400.00 | |
| 6/30/1999 | $2,200,000.00 | |
| 6/30/1999 | $330,000.00 | |
| 6/25/1999 | $134,400.00 | |
| 6/25/1999 | $89,600.00 | |
| 6/11/1999 | $995,400.00 | |
| 5/25/1999 | $3,766,400.00 | |

**EXHIBIT L**

**Transfers from PCI to Metro Gem, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 5/21/1999 | $16,800.00 | |
| 5/19/1999 | $3,620,400.00 | |
| 5/12/1999 | $4,592,000.00 | |
| 5/3/1999 | $639,600.00 | |
| 4/28/1999 | $3,932,093.88 | |
| 4/28/1999 | $2,917,163.52 | |
| 4/26/1999 | $3,899,000.00 | |
| 4/20/1999 | $1,210,000.00 | |
| 4/15/1999 | $5,200,480.20 | |
| 4/15/1999 | $2,112,800.00 | |
| 4/8/1999 | $436,000.00 | |
| 4/2/1999 | $1,253,500.00 | |
| 3/25/1999 | $1,090,000.00 | |
| 3/23/1999 | $3,447,542.00 | |
| 3/23/1999 | $2,121,820.00 | |
| 3/22/1999 | $1,635,000.00 | |
| 3/13/1999 | $2,561,064.00 | |
| 3/13/1999 | $2,240,000.00 | |
| 3/13/1999 | $1,526,000.00 | |
| 3/12/1999 | $2,180,000.00 | |
| 3/11/1999 | $603,587.50 | |
| 3/1/1999 | $1,090,000.00 | |
| 2/26/1999 | $360,000.00 | |
| 2/26/1999 | $315,000.00 | |
| 2/26/1999 | $99,000.00 | |
| 2/25/1999 | $1,123,600.00 | |
| 2/25/1999 | $555,376.80 | |
| 2/15/1999 | $312,000.00 | |
| 2/15/1999 | $171,000.00 | |
| 2/15/1999 | $103,500.00 | |
| 2/14/1999 | $135,000.00 | |
| 2/11/1999 | $156,567.60 | |
| 2/11/1999 | $73,651.80 | |
| 2/5/1999 | $90,000.00 | |
| 2/4/1999 | $135,000.00 | |
| 1/27/1999 | $1,404,465.00 | |
| 1/26/1999 | $403,931.25 | |
| 1/26/1999 | $337,464.00 | |
| 1/26/1999 | $280,035.00 | |
| 1/26/1999 | $172,350.00 | |

**EXHIBIT L**

**Transfers from PCI to Metro Gem, LLC**

| Date | Amount | Subtotal |
|---|---|---|
| 1/25/1999 | $180,000.00 | |
| 1/25/1999 | $49,837.50 | |
| 1/25/1999 | $47,910.00 | |
| 1/7/1999 | $416,000.00 | |
| 1/7/1999 | $315,000.00 | |
| 1/7/1999 | $240,000.00 | |
| 1/7/1999 | $99,000.00 | |
| 1/7/1999 | $73,651.80 | |
| 1/1/1999 | $103,500.00 | |
| 12/19/1998 | $61,080.00 | |
| 12/11/1998 | $551,875.00 | |
| 12/3/1998 | $96,416.00 | |
| 11/27/1998 | $528,000.00 | |
| 11/20/1998 | $178,200.00 | |
| 11/13/1998 | $138,000.00 | |
| 11/12/1998 | $157,500.00 | |
| 11/10/1998 | $288,000.00 | |
| 11/10/1998 | $254,760.00 | |
| 10/27/1998 | $421,800.00 | |
| 10/27/1998 | $13,250.00 | |
| 10/26/1998 | $69,920.00 | |
| 10/21/1998 | $55,650.00 | $82,073,509.07 |
| **Transfers** | **$82,073,509.07** | |

# EXHIBIT M

EXHIBIT M
PCI-MGLLC Notes - Summary of Notes Payable by Note

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment into MGLLC | Transfer Investment to PCI | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to MGLLC | Interest Paid to Investor from MGLLC | Principal Paid to Investor from MGLLC | Total Payment to Investor from MGLLC | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2044 | 9/28/1998 | 11/12/1998 | 6.00% | $1,750,000.00 | $1,750,000.00 | $1,750,000.00 | $0.00 | N/A | ($157,500.00) | $157,500.00 | $0.00 | $157,500.00 | $0.00 | $1,750,000.00 | 2092 | $0.00 |
| 2045 | 9/28/1998 | 11/27/1998 | 6.00% | $4,400,000.00 | $0.00 | $0.00 | $4,400,000.00 | 2010 (MGI), 1695 (MGI) | ($528,000.00) | $528,000.00 | $0.00 | $528,000.00 | $0.00 | $4,400,000.00 | 2105, 2106 | $0.00 |
| 2050 | 9/30/1998 | 10/21/1998 | 6.00% | $1,325,000.00 | $325,000.00 | $325,000.00 | $1,000,000.00 | 1580 (MGI), 1579 (MGI) | ($55,650.00) | $55,650.00 | $0.00 | $55,650.00 | $0.00 | $1,325,000.00 | 2073 | $0.00 |
| 2055_19981011 | 10/11/1998 | 11/10/1998 | 6.00% | $4,246,000.00 | $472,000.00 | $472,000.00 | $3,774,000.00 | 1697 (MGI) | ($254,760.00) | $254,760.00 | $0.00 | $254,760.00 | $0.00 | $4,246,000.00 | 2091 | $0.00 |
| 2061 | 10/16/1998 | 10/27/1998 | 6.01% | $4,033,000.00 | $0.00 | $0.00 | $4,033,000.00 | 2004 (MGI) | ($421,800.00) | $88,800.00 | $333,000.00 | $421,800.00 | $0.00 | $3,700,000.00 | 2076, 2077 | $0.00 |
| 2062 | 10/17/1998 | 11/16/1998 | 5.66% | $1,219,000.00 | $0.00 | $0.00 | $1,219,000.00 | 2003 (MGI) | ($138,000.00) | $69,000.00 | $69,000.00 | $138,000.00 | $0.00 | $1,150,000.00 | 2097 | $0.00 |
| 2069-1 | 10/20/1998 | 12/3/1998 | 6.14% | $822,400.00 | $0.00 | $0.00 | $822,400.00 | 2055_19981006 (MGI) | ($96,416.00) | $74,016.00 | $22,400.00 | $96,416.00 | $0.00 | $800,000.00 | 2107 (MGI) | $0.00 |
| 2070-1 | 10/20/1998 | 12/19/1998 | 6.00% | $2,084,000.00 | $0.00 | $0.00 | $2,084,000.00 | 2051 (MGI) | ($61,080.00) | $61,080.00 | $0.00 | $61,080.00 | $189,000.00 | $2,084,000.00 | 2515 (MGI) | $0.00 |
| 2073 | 10/22/1998 | 10/29/1998 | 10.05% | $1,325,000.00 | $0.00 | $0.00 | $1,325,000.00 | 2050 | ($13,250.00) | $13,250.00 | $0.00 | $13,250.00 | $0.00 | $1,325,000.00 | 2079, 2080 | $0.00 |
| 2072 | 10/25/1998 | 10/30/1998 | 33.03% | $828,400.00 | $0.00 | $0.00 | $828,400.00 | 2015 (MGI) | ($69,920.00) | $1,520.00 | $68,400.00 | $69,920.00 | $0.00 | $760,000.00 | 2079, 2080 | $0.00 |
| 2075 | 10/27/1998 | 11/10/1998 | 5.90% | $2,616,000.00 | $0.00 | $0.00 | $2,616,000.00 | 2016 (MGI) | ($288,000.00) | $72,000.00 | $216,000.00 | $288,000.00 | $0.00 | $2,400,000.00 | 2090 | $0.00 |
| 2076 | 10/27/1998 | 12/11/1998 | 6.00% | $3,440,000.00 | $0.00 | $0.00 | $3,440,000.00 | 2061 (MGI) | $0.00 | $0.00 | $0.00 | $0.00 | $309,600.00 | $3,440,000.00 | 2410 | $0.00 |
| 2077 | 10/27/1998 | 12/11/1998 | 6.00% | $1,197,000.00 | $937,000.00 | $937,000.00 | $260,000.00 | 2061 (MGI) | $0.00 | $0.00 | $0.00 | $0.00 | $107,730.00 | $1,197,000.00 | 2095_19981212 | $0.00 |
| 2079 | 10/27/1998 | 12/11/1998 | 8.00% | $4,500,000.00 | $2,263,000.00 | $2,263,000.00 | $2,237,000.00 | 2072, 2018 (MGI), 2073 | ($551,875.00) | $540,000.00 | $11,875.00 | $551,875.00 | $0.00 | $4,488,125.00 | 2470 | $0.00 |
| 2080 | 10/30/1998 | 12/14/1998 | 6.00% | $3,598,000.00 | $0.00 | $0.00 | $3,598,000.00 | 2072, 2018 (MGI), 2073 | $0.00 | $0.00 | $0.00 | $0.00 | $323,820.00 | $3,598,000.00 | 2400, 2420, 2440, 2450, 2490, 2500 | $0.00 |
| 2078 | 10/31/1998 | 11/20/1998 | 5.78% | $1,471,500.00 | $0.00 | $0.00 | $1,471,500.00 | 2025 (MGI) | ($178,200.00) | $56,700.00 | $121,500.60 | $178,200.60 | $0.00 | $1,350,000.00 | 2100 | $0.00 |
| 2085 | 11/8/1998 | 12/23/1998 | 6.00% | $1,650,000.00 | $0.00 | $0.00 | $1,650,000.00 | 2024 (MGI), 2025 (MGI) | $0.00 | $0.00 | $0.00 | $0.00 | $148,500.00 | $1,650,000.00 | 2516, 2517 | $0.00 |
| 2094 | 11/10/1998 | 12/10/1998 | 6.00% | $541,000.00 | $541,000.00 | $541,000.00 | $0.00 | N/A | $0.00 | $0.00 | $0.00 | $0.00 | $32,460.00 | $541,000.00 | 2400, 2420, 2440, 2450, 2490, 2500 | $0.00 |
| 2090 | 11/11/1998 | 12/11/1998 | 6.00% | $3,100,000.00 | $700,000.00 | $700,000.00 | $2,400,000.00 | 2075 | $0.00 | $0.00 | $0.00 | $0.00 | $186,000.00 | $3,100,000.00 | 2400, 2420, 2440, 2450, 2490, 2500 | $0.00 |
| 2091 | 11/11/1998 | 12/26/1998 | 6.00% | $4,246,000.00 | $0.00 | $0.00 | $4,246,000.00 | 2055 | $0.00 | $0.00 | $0.00 | $0.00 | $382,140.00 | $4,246,000.00 | 2518 | $0.00 |
| 2095_19981112 | 11/12/1998 | 1/11/1999 | 6.00% | $2,000,000.00 | $2,000,000.00 | $2,000,000.00 | $0.00 | N/A | ($240,000.00) | $240,000.00 | $0.00 | $240,000.00 | $0.00 | $2,000,000.00 | 2530 | $0.00 |

**EXHIBIT M**
**PCI-MGLLC Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment into MGLLC | Transfer Investment to PCI | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to MGLLC | Interest Paid to Investor from MGLLC | Principal Paid to Investor from MGLLC | Total Payment to Investor from MGLLC | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2092 | 11/13/1998 | 12/13/1998 | 6.00% | $2,750,000.00 | $1,000,000.00 | $1,000,000.00 | $1,750,000.00 | 2044 | $0.00 | $0.00 | $0.00 | $0.00 | $165,000.00 | $2,750,000.00 | 2400, 2420, 2440, 2450, 2490, 2500 | $0.00 |
| 2097 | 11/17/1998 | 1/1/1999 | 6.00% | $1,150,000.00 | $0.00 | $0.00 | $1,150,000.00 | 2062 | ($103,500.00) | $103,500.00 | $0.00 | $103,500.00 | $0.00 | $1,150,000.00 | 2520_19990102 | $0.00 |
| 2100 | 11/20/1998 | 1/4/1999 | 6.00% | $4,000,000.00 | $2,650,000.00 | $2,650,000.00 | $1,350,000.00 | 2078 | $0.00 | $0.00 | $0.00 | $0.00 | $360,000.00 | $4,000,000.00 | 2526 | $0.00 |
| 2105 | 11/28/1998 | 1/12/1999 | 6.00% | $1,100,000.00 | $200,000.00 | $200,000.00 | $900,000.00 | 2045 | ($99,000.00) | $99,000.00 | $0.00 | $99,000.00 | $0.00 | $1,100,000.00 | 2534_19990113 | $0.00 |
| 2106 | 11/28/1998 | 1/12/1999 | 6.00% | $3,500,000.00 | $0.00 | $0.00 | $3,500,000.00 | 2045 | ($315,000.00) | $315,000.00 | $0.00 | $315,000.00 | $0.00 | $3,500,000.00 | 2533 | $0.00 |
| 2400 | 12/11/1998 | 1/25/1999 | 6.00% | $553,750.00 | $0.00 | $0.00 | $553,750.00 | 2080, 2094, 2090, 2092 | ($49,837.50) | $49,837.50 | $0.00 | $49,837.50 | $0.00 | $553,750.00 | 2546 | $0.00 |
| 2510 | 12/11/1998 | 1/25/1999 | 6.00% | $2,000,000.00 | $2,000,000.00 | $2,000,000.00 | $0.00 | N/A | ($180,000.00) | $180,000.00 | $0.00 | $180,000.00 | $0.00 | $2,000,000.00 | 2547 | $0.00 |
| 2095_19981212 | 12/12/1998 | 2/10/1999 | 6.00% | $1,304,730.00 | $0.00 | $0.00 | $1,304,730.00 | 2077 | ($156,567.60) | $156,567.00 | $0.00 | $156,567.00 | $0.00 | $1,304,730.00 | 2566 | $0.00 |
| 2410 | 12/12/1998 | 1/26/1999 | 6.00% | $3,749,600.00 | $0.00 | $0.00 | $3,749,600.00 | 2076 | ($337,464.00) | $337,464.00 | $0.00 | $337,464.00 | $0.00 | $3,749,600.00 | 2553, 2554 | $0.00 |
| 2420 | 12/12/1998 | 1/26/1999 | 6.00% | $3,111,500.00 | $0.00 | $0.00 | $3,111,500.00 | 2080, 2094, 2090, 2092 | ($280,035.00) | $280,035.00 | $0.00 | $280,035.00 | $0.00 | $3,111,500.00 | 2549 | $0.00 |
| 2440 | 12/12/1998 | 1/26/1999 | 6.00% | $1,915,000.00 | $0.00 | $0.00 | $1,915,000.00 | 2080, 2094, 2090, 2092 | ($172,350.00) | $172,350.00 | $0.00 | $172,350.00 | $0.00 | $1,915,000.00 | 2550 | $0.00 |
| 2450 | 12/12/1998 | 1/11/1999 | 6.00% | $1,227,530.00 | $0.00 | $0.00 | $1,227,530.00 | 2080, 2094, 2090, 2092 | ($73,651.80) | $73,651.80 | $0.00 | $73,652.40 | $0.00 | $1,227,530.00 | 2531 | $0.00 |
| 2470 | 12/12/1998 | 1/26/1999 | 6.00% | $4,488,125.00 | $0.00 | $0.00 | $4,488,125.00 | 2079 | ($403,931.25) | $403,931.25 | $0.00 | $403,931.25 | $0.00 | $4,488,125.00 | 2552 | $0.00 |
| 2490 | 12/15/1998 | 2/13/1999 | 6.00% | $2,600,000.00 | $0.00 | $0.00 | $2,600,000.00 | 2080, 2094, 2090, 2092 | ($312,000.00) | $312,000.00 | $0.00 | $312,000.40 | $0.00 | $2,600,000.00 | 2568 | $0.00 |
| 2500 | 12/15/1998 | 1/29/1999 | 6.00% | $1,288,500.00 | $0.00 | $0.00 | $1,288,500.00 | 2080, 2094, 2090, 2092 | ($1,404,465.00) | $115,965.00 | $1,288,500.00 | $1,404,465.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2520_19981221 | 12/21/1998 | 2/4/1999 | 6.00% | $1,500,000.00 | $1,500,000.00 | $1,500,000.00 | $0.00 | N/A | ($135,000.00) | $135,000.00 | $0.00 | $135,000.00 | $0.00 | $1,500,000.00 | 2560 | $0.00 |
| 2516 | 12/24/1998 | 2/7/1999 | 6.00% | $1,000,000.00 | $0.00 | $0.00 | $1,000,000.00 | 2085 | ($90,000.00) | $90,000.00 | $0.00 | $90,000.00 | $0.00 | $1,000,000.00 | 2561 | $0.00 |
| 2517 | 12/24/1998 | 1/23/1999 | 6.00% | $798,500.00 | $0.00 | $0.00 | $798,500.00 | 2085 | ($47,910.00) | $47,910.00 | $798,500.00 | $846,410.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2518 | 12/27/1998 | 2/25/1999 | 6.00% | $4,628,140.00 | $0.00 | $0.00 | $4,628,140.00 | 2091 | ($1,678,976.80) | $555,376.80 | $1,123,600.20 | $1,678,977.00 | $0.00 | $3,504,540.00 | 2584 | $0.00 |
| 2522 | 12/31/1998 | 2/14/1999 | 6.00% | $1,500,000.00 | $1,500,000.00 | $1,500,000.00 | $0.00 | N/A | ($135,000.00) | $135,000.00 | $0.00 | $135,000.00 | $0.00 | $1,500,000.00 | 2568 | $0.00 |
| 2520_19990102 | 1/2/1999 | 2/16/1999 | 6.00% | $1,150,000.00 | $0.00 | $0.00 | $1,150,000.00 | 2097 | ($103,500.00) | $103,500.00 | $0.00 | $103,500.00 | $0.00 | $1,150,000.00 | 2576 | $0.00 |

**EXHIBIT M**
**PCI-MGLLC Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment into MGLLC | Transfer Investment to PCI | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to MGLLC | Interest Paid to Investor from MGLLC | Principal Paid to Investor from MGLLC | Total Payment to Investor from MGLLC | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2534_19990104 | 1/4/1999 | 2/18/1999 | 6.00% | $1,900,000.00 | $1,100,000.00 | $1,100,000.00 | $800,000.00 | 2107 (MGI) | ($171,000.00) | $171,000.00 | $0.00 | $171,000.00 | $0.00 | $1,900,000.00 | 2575 | $0.00 |
| 2526 | 1/5/1999 | 1/11/1999 | 6.42% | $4,360,000.00 | $0.00 | $0.00 | $4,360,000.00 | 2100 | ($416,000.00) | $56,000.00 | $360,000.00 | $416,000.00 | $0.00 | $4,000,000.00 | 2532 | $0.00 |
| 2530 | 1/12/1999 | 3/13/1999 | 6.00% | $2,000,000.00 | $0.00 | $0.00 | $2,000,000.00 | 2095_19981112 | ($2,240,000.00) | $240,000.00 | $2,000,000.00 | $2,240,000.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2531 | 1/12/1999 | 2/11/1999 | 6.00% | $1,227,530.00 | $0.00 | $0.00 | $1,227,530.00 | 2450 | ($73,651.80) | $73,651.80 | $0.00 | $73,651.80 | $0.00 | $1,227,530.00 | 2566 | $0.00 |
| 2532 | 1/12/1999 | 2/26/1999 | 6.00% | $4,000,000.00 | $0.00 | $0.00 | $4,000,000.00 | 2526 | ($360,000.00) | $360,000.00 | $0.00 | $360,000.00 | $0.00 | $4,000,000.00 | 2585-1-1 | $0.00 |
| 2533 | 1/13/1999 | 2/27/1999 | 6.00% | $3,500,000.00 | $0.00 | $0.00 | $3,500,000.00 | 2106 | ($315,000.00) | $315,000.00 | $0.00 | $315,000.00 | $0.00 | $3,500,000.00 | 2588 | $0.00 |
| 2534_19990113 | 1/13/1999 | 2/27/1999 | 6.00% | $1,100,000.00 | $0.00 | $0.00 | $1,100,000.00 | 2105 | ($99,000.00) | $99,000.00 | $0.00 | $99,000.00 | $0.00 | $1,100,000.00 | 2587 | $0.00 |
| 250 | 1/15/1999 | 3/1/1999 | 6.00% | $1,000,000.00 | $1,000,000.00 | $1,000,000.00 | $0.00 | N/A | ($1,090,000.00) | $90,000.00 | $1,000,000.00 | $1,090,000.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2546 | 1/26/1999 | 3/12/1999 | 6.00% | $553,750.00 | $0.00 | $0.00 | $553,750.00 | 2400 | ($603,587.50) | $49,837.50 | $553,750.50 | $603,588.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2547 | 1/26/1999 | 3/12/1999 | 6.00% | $2,000,000.00 | $0.00 | $0.00 | $2,000,000.00 | 2510 | ($2,180,000.00) | $180,000.00 | $2,000,000.00 | $2,180,000.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2549 | 1/27/1999 | 3/13/1999 | 6.00% | $3,111,500.00 | $0.00 | $0.00 | $3,111,500.00 | 2420 | $0.00 | $280,035.00 | $3,111,500.00 | $3,391,535.00 | $280,035.00 | $3,111,500.00 | 2700 | $0.00 |
| 2550 | 1/27/1999 | 3/13/1999 | 6.00% | $1,915,000.00 | $0.00 | $0.00 | $1,915,000.00 | 2440 | $0.00 | $115,750.00 | $0.00 | $115,750.00 | $172,350.00 | $1,915,000.00 | 2701 | $0.00 |
| 2552 | 1/27/1999 | 3/28/1999 | 6.00% | $4,488,125.00 | $0.00 | $0.00 | $4,488,125.00 | 2470 | $0.00 | $0.00 | $0.00 | $0.00 | $538,575.00 | $4,488,125.00 | 2720 | $0.00 |
| 2553 | 1/27/1999 | 3/13/1999 | 6.00% | $1,400,000.00 | $0.00 | $0.00 | $1,400,000.00 | 2410 | ($1,526,000.00) | $126,000.00 | $1,400,000.00 | $1,526,000.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2554 | 1/27/1999 | 3/13/1999 | 6.00% | $2,349,600.00 | $0.00 | $0.00 | $2,349,600.00 | 2410 | ($2,561,064.00) | $211,464.00 | $2,349,600.00 | $2,561,064.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2560 | 2/5/1999 | 3/22/1999 | 6.00% | $1,500,000.00 | $0.00 | $0.00 | $1,500,000.00 | 2520_19981221 | ($1,635,000.00) | $135,000.00 | $1,500,000.00 | $1,635,000.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2561 | 2/8/1999 | 3/25/1999 | 6.00% | $1,000,000.00 | $0.00 | $0.00 | $1,000,000.00 | 2516 | ($1,090,000.00) | $90,000.00 | $1,000,000.00 | $1,090,000.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2566 | 2/11/1999 | 3/28/1999 | 6.00% | $2,532,260.00 | $0.00 | $0.00 | $2,532,260.00 | 2095_19981212, 2531 | $0.00 | $0.00 | $0.00 | $0.00 | $227,903.40 | $2,532,260.00 | 2721-1 | $0.00 |
| 2568 | 2/14/1999 | 3/31/1999 | 6.00% | $4,100,000.00 | $0.00 | $0.00 | $4,100,000.00 | 2490, 2522 | $0.00 | $0.00 | $0.00 | $0.00 | $369,000.00 | $4,100,000.00 | 2722 | $0.00 |
| 2576 | 2/17/1999 | 4/2/1999 | 6.14% | $1,150,000.00 | $0.00 | $0.00 | $1,150,000.00 | 2520 | ($1,253,500.00) | $103,500.00 | $1,150,000.00 | $1,253,500.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2575 | 2/19/1999 | 4/5/1999 | 6.00% | $1,900,000.00 | $0.00 | $0.00 | $1,900,000.00 | 2534_19990104 | $0.00 | $0.00 | $0.00 | $0.00 | $171,000.00 | $1,900,000.00 | 2723 | $0.00 |

EXHIBIT M
PCI-MGLLC Notes - Summary of Notes Payable by Note

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment into MGLLC | Transfer Investment to PCI | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to MGLLC | Interest Paid to Investor from MGLLC | Principal Paid to Investor from MGLLC | Total Payment to Investor from MGLLC | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2580 | 2/22/1999 | 4/8/1999 | 6.00% | $400,000.00 | $400,000.00 | $400,000.00 | $0.00 | N/A | ($436,000.00) | $36,000.00 | $400,000.00 | $436,000.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2584 | 2/26/1999 | 4/12/1999 | 6.00% | $3,504,540.00 | $0.00 | $0.00 | $3,504,540.00 | 2518 | $0.00 | $0.00 | $0.00 | $0.00 | $315,408.60 | $3,504,540.00 | 2736-1 | $0.00 |
| 2585-1-1 | 2/27/1999 | 5/12/1999 | 6.00% | $4,000,000.00 | $0.00 | $0.00 | $4,000,000.00 | 2532 | ($4,592,000.00) | $592,000.00 | $599,999.66 | $1,191,999.66 | $0.00 | $0.00 | N/A | $0.00 |
| 2587 | 2/28/1999 | 4/14/1999 | 6.00% | $1,100,000.00 | $0.00 | $0.00 | $1,100,000.00 | 2534 | $0.00 | $0.00 | $0.00 | $0.00 | $99,000.00 | $1,100,000.00 | 2738 | $0.00 |
| 2588 | 2/28/1999 | 4/14/1999 | 6.00% | $3,500,000.00 | $0.00 | $0.00 | $3,500,000.00 | 2533 | $0.00 | $0.00 | $0.00 | $0.00 | $315,000.00 | $3,500,000.00 | 2739-1 | $0.00 |
| 2700 | 3/14/1999 | 3/22/1999 | 6.19% | $3,391,535.00 | $0.00 | $0.00 | $3,391,535.00 | 2549 | ($3,447,542.00) | $56,007.00 | $0.00 | $56,007.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2701 | 3/14/1999 | 3/22/1999 | 6.19% | $2,087,350.00 | $0.00 | $0.00 | $2,087,350.00 | 2550 | ($2,121,820.00) | $34,470.00 | $1,971,600.00 | $2,006,070.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2715-1 | 3/24/1999 | 5/24/1999 | 7.61% | $3,150,000.00 | $3,150,000.00 | $3,150,000.00 | $0.00 | N/A | ($3,637,200.00) | $487,200.00 | $3,150,000.00 | $3,637,200.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2720 | 3/29/1999 | 4/13/1999 | 5.71% | $5,026,700.00 | $0.00 | $0.00 | $5,026,700.00 | 2552 | $0.00 | $0.00 | $0.00 | $0.00 | $143,620.00 | $5,026,700.00 | 2737 | $0.00 |
| 2721-1 | 3/29/1999 | 4/28/1999 | 5.69% | $2,760,163.40 | $0.00 | $0.00 | $2,760,163.40 | 2566 | ($2,917,163.52) | $157,000.12 | $2,760,162.88 | $2,917,163.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2722 | 4/1/1999 | 4/20/1999 | 5.68% | $4,469,000.00 | $0.00 | $0.00 | $4,469,000.00 | 2568 | ($639,600.00) | $270,600.00 | $369,000.00 | $639,600.00 | $0.00 | $4,100,000.00 | 2900-1 | $0.00 |
| 2724-1 | 4/2/1999 | 5/25/1999 | 8.00% | $3,300,000.00 | $3,300,000.00 | $3,300,000.00 | $0.00 | N/A | ($3,766,400.00) | $466,400.00 | $300,001.00 | $766,401.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2723 | 4/6/1999 | 4/16/1999 | 6.73% | $2,071,000.00 | $0.00 | $0.00 | $2,071,000.00 | 2575 | ($2,112,800.00) | $41,800.00 | $2,071,001.00 | $2,112,801.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2736-1 | 4/13/1999 | 4/28/1999 | 5.87% | $3,819,948.60 | $0.00 | $0.00 | $3,819,948.60 | 2584 | ($3,932,093.88) | $112,145.28 | $3,519,948.60 | $3,632,093.88 | $0.00 | $0.00 | N/A | $0.00 |
| 2737 | 4/14/1999 | 4/16/1999 | 8.75% | $5,170,320.00 | $0.00 | $0.00 | $5,170,320.00 | 2720 | ($5,200,480.20) | $30,160.20 | $5,170,319.53 | $5,200,479.73 | $0.00 | $0.00 | N/A | $0.00 |
| 2738 | 4/15/1999 | 4/19/1999 | 6.88% | $1,199,000.00 | $0.00 | $0.00 | $1,199,000.00 | 2587 | ($1,210,000.00) | $11,000.00 | $1,199,000.00 | $1,210,000.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2739-1 | 4/15/1999 | 4/26/1999 | 6.01% | $3,815,000.00 | $0.00 | $0.00 | $3,815,000.00 | 2588 | ($3,899,000.00) | $84,000.00 | $3,615,000.00 | $3,699,000.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2760-1 | 4/16/1999 | 6/30/1999 | 6.31% | $2,200,000.00 | $2,200,000.00 | $2,200,000.00 | $0.00 | N/A | ($2,556,400.00) | $356,400.00 | $2,200,000.00 | $2,556,400.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2780-1 | 4/19/1999 | 7/7/1999 | 6.00% | $3,000,000.00 | $3,000,000.00 | $3,000,000.00 | $0.00 | N/A | ($474,000.00) | $474,000.00 | $0.00 | $474,000.00 | $0.00 | $3,000,000.00 | 3230-6, 3235-6 | $0.00 |
| 2781-1 | 4/19/1999 | 6/11/1999 | 6.00% | $900,000.00 | $900,000.00 | $900,000.00 | $0.00 | N/A | ($995,400.00) | $95,400.00 | $900,000.00 | $995,400.00 | $0.00 | $0.00 | N/A | $0.00 |
| 2782-1 | 4/19/1999 | 7/6/1999 | 6.00% | $1,650,000.00 | $1,650,000.00 | $1,650,000.00 | $0.00 | N/A | ($257,400.00) | $257,400.00 | $0.00 | $257,400.00 | $0.00 | $1,650,000.00 | 3027-6 | $0.00 |

**EXHIBIT M**
**PCI-MGLLC Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment into MGLLC | Transfer Investment to PCI | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to MGLLC | Interest Paid to Investor from MGLLC | Principal Paid to Investor from MGLLC | Total Payment to Investor from MGLLC | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2850-1 | 4/28/1999 | 7/6/1999 | 6.00% | $3,500,000.00 | $3,500,000.00 | $3,500,000.00 | $0.00 | N/A | ($483,000.00) | $483,000.00 | $0.00 | $483,000.00 | $0.00 | $3,500,000.00 | 2962-6 | $0.00 |
| 2855-1 | 4/29/1999 | 7/14/1999 | 6.00% | $3,100,000.00 | $3,100,000.00 | $3,100,000.00 | $0.00 | N/A | ($1,571,200.00) | $471,200.00 | $1,100,000.00 | $1,571,200.00 | $0.00 | $2,000,000.00 | 3240-6 | $0.00 |
| 2856-1 | 4/29/1999 | 6/24/1999 | 6.00% | $800,000.00 | $800,000.00 | $800,000.00 | $0.00 | N/A | ($89,600.00) | $89,600.00 | $0.00 | $89,601.00 | $0.00 | $800,000.00 | 3008-1 | $0.00 |
| 2857-1 | 4/29/1999 | 6/24/1999 | 6.00% | $1,200,000.00 | $1,200,000.00 | $1,200,000.00 | $0.00 | N/A | ($134,400.00) | $134,400.00 | $0.00 | $134,400.00 | $0.00 | $1,200,000.00 | 3008-1 | $0.00 |
| 2900-1 | 5/4/1999 | 8/5/1999 | 8.00% | $5,600,000.00 | $1,500,000.00 | $1,500,000.00 | $4,100,000.00 | 2722 | ($3,388,799.69) | $1,388,799.69 | $2,000,000.00 | $3,388,799.69 | $0.00 | $3,600,000.00 | 3283-5 | $0.00 |
| 2920-1 | 5/13/1999 | 7/28/1999 | 6.00% | $3,400,000.00 | $0.00 | $3,400,000.00 | $0.00 | N/A | ($516,800.00) | $516,800.00 | $0.00 | $516,800.00 | $0.00 | $3,400,000.00 | 3271-5 | $0.00 |
| 2930-1 | 5/20/1999 | 8/19/1999 | 6.00% | $5,100,000.00 | $5,100,000.00 | $5,100,000.00 | $0.00 | N/A | ($928,200.00) | $928,200.00 | $0.00 | $928,200.00 | $0.00 | $5,100,000.00 | 3305-8 | $0.00 |
| 2956-1 | 5/26/1999 | 8/24/1999 | 6.00% | $3,000,000.00 | $3,000,000.00 | $3,000,000.00 | $0.00 | N/A | ($540,000.00) | $540,000.00 | $0.00 | $540,000.00 | $0.00 | $3,000,000.00 | 3308-1 | $0.00 |
| 2962-5 | 6/2/1999 | 8/31/1999 | 5.00% | $5,100,000.00 | $5,100,000.00 | $5,100,000.00 | $0.00 | N/A | ($765,000.00) | $765,000.00 | $0.00 | $765,000.00 | $0.00 | $5,100,000.00 | 3319-1 | $0.00 |
| 3000 | 6/22/1999 | 7/22/1999 | 8.00% | $3,000,000.00 | $3,000,000.00 | $3,000,000.00 | $0.00 | N/A | ($440,000.00) | $440,000.00 | $0.00 | $440,000.00 | $0.00 | $3,000,000.00 | 3295-8 | $0.00 |
| 3008-1 | 6/25/1999 | 8/5/1999 | 8.00% | $2,000,000.00 | $0.00 | $0.00 | $2,000,000.00 | 2856-1, 2857-1 | ($218,666.53) | $218,666.53 | $0.00 | $218,666.53 | $0.00 | $2,000,000.00 | 3286-5 | $0.00 |
| 2962-6 | 7/7/1999 | 10/7/1999 | 6.00% | $3,500,000.00 | $0.00 | $0.00 | $3,500,000.00 | 2850-1 | ($644,000.00) | $644,000.00 | $0.00 | $644,001.00 | $0.00 | $3,500,000.00 | 4130-5 (IIO) | $0.00 |
| 3027-6 | 7/7/1999 | 9/30/1999 | 6.00% | $1,650,000.00 | $0.00 | $0.00 | $1,650,000.00 | 2782-1 | ($280,500.00) | $280,500.00 | $0.00 | $280,500.00 | $0.00 | $1,650,000.00 | 4120-5 (IIO) | $0.00 |
| 3230-6 | 7/8/1999 | 9/30/1999 | 6.00% | $1,000,000.00 | $0.00 | $0.00 | $1,000,000.00 | 2780-1 | ($168,000.00) | $168,000.00 | $0.00 | $168,000.00 | $0.00 | $1,000,000.00 | 4120-5 (IIO) | $0.00 |
| 3235-6 | 7/8/1999 | 10/11/1999 | 6.00% | $2,000,000.00 | $0.00 | $0.00 | $2,000,000.00 | 2780-1 | ($380,000.00) | $380,000.00 | $0.00 | $380,000.00 | $0.00 | $2,000,000.00 | 4150-5 (IIO) | $0.00 |
| 3240-6 | 7/15/1999 | 10/11/1999 | 6.00% | $2,000,000.00 | $0.00 | $0.00 | $2,000,000.00 | 2855-1 | ($352,000.00) | $352,000.00 | $0.00 | $352,000.00 | $0.00 | $2,000,000.00 | 4149-5 (IIO) | $0.00 |
| 3271-5 | 7/29/1999 | 10/27/1999 | 6.00% | $3,400,000.00 | $0.00 | $0.00 | $3,400,000.00 | 2920-1 | ($618,800.00) | $618,800.00 | $0.00 | $618,800.00 | $0.00 | $3,400,000.00 | 4170-5 (IIO) | $0.00 |
| 3283-5 | 8/6/1999 | 11/4/1999 | 6.07% | $3,600,000.00 | $0.00 | $0.00 | $3,600,000.00 | 2900-1 | ($640,800.00) | $640,800.00 | $0.00 | $640,800.00 | $0.00 | $3,600,000.00 | 4173 (IIO) | $0.00 |
| 3286-5 | 8/6/1999 | 11/4/1999 | 6.07% | $2,000,000.00 | $0.00 | $0.00 | $2,000,000.00 | 3008-1 | ($356,000.00) | $356,000.00 | $0.00 | $356,000.00 | $0.00 | $2,000,000.00 | 4175 (IIO) | $0.00 |
| 3295-8 | 8/17/1999 | 11/19/1999 | 3.98% | $3,000,000.00 | $0.00 | $0.00 | $3,000,000.00 | 3000 | ($374,000.00) | $374,000.00 | $0.00 | $374,000.00 | $0.00 | $3,000,000.00 | 4190-5 (IIO) | $0.00 |
| 3305-8 | 8/20/1999 | 11/19/1999 | 3.76% | $5,100,000.00 | $0.00 | $0.00 | $5,100,000.00 | 2930-1 | ($608,200.00) | $608,200.00 | $0.00 | $608,200.00 | $0.00 | $5,100,000.00 | 4180 (IIO), 4188-5 (IIO) | $0.00 |

EXHIBIT M
PCI-MGLLC Notes - Summary of Notes Payable by Note

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment into MGLLC | Transfer Investment to PCI | Rolled Principal Investment within PCI | Rolled from Note | Payment from PCI to MGLLC | Interest Paid to Investor from MGLLC | Principal Paid to Investor from MGLLC | Total Payment to Investor from MGLLC | Interest Rolled within PCI | Principal Rolled within PCI | Rolled to Note | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3308-1 | 8/25/1999 | 12/7/1999 | 4.27% | $3,000,000.00 | $0.00 | $0.00 | $3,000,000.00 | 2956-1 | ($444,000.00) | $444,000.00 | $0.00 | $444,000.00 | $0.00 | $3,000,000.00 | 4215-5 (IIO) | $0.00 |
| 3319-1 | 9/1/1999 | 12/9/1999 | 4.10% | $5,100,000.00 | $0.00 | $0.00 | $5,100,000.00 | 2962-5 | ($1,189,800.00) | $689,800.00 | $500,000.00 | $1,189,800.00 | $0.00 | $4,600,000.00 | 4218-5 (IIO) | $0.00 |
| *Count 107* | | *Closed Notes Total* | | *$274,459,997.00* | *$57,838,000.00* | *$64,238,000.00* | *$210,221,997.00* | | *($82,073,509.07)* | *$23,668,351.47* | *$52,303,658.97* | *$75,972,013.44* | *$4,836,142.00* | *$214,860,555.00* | | *$0.00* |

# EXHIBIT N

**EXHIBIT N**

**Transfers from Metro Gem, LLC to Defendants**

| Date | Payee | Amount | Subtotal |
|------|-------|--------|----------|
| *90 Day Transfers* | | | |
| No Transfers Identified | | | |
| *Two Year Transfers* | | | |
| No Transfers Identified | | | |
| *Additional Transfers* | | | |
| 12/9/1999 | SABES FAMILY LIMITED PARTNERSHIP | $500,000.00 | |
| 12/9/1999 | SABES FAMILY LIMITED PARTNERSHIP | $343,796.08 | |
| 12/9/1999 | METRO GEM, INC. | $146,600.00 | |
| 12/9/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $139,403.92 | |
| 12/9/1999 | SCHECHTER DOKKEN KANTER | $60,000.00 | |
| 12/8/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $139,093.33 | |
| 12/8/1999 | ARROW CAPITAL ASSOCIATES | $48,533.33 | |
| 12/7/1999 | METRO GEM, INC. | $118,000.00 | |
| 12/7/1999 | ERROL CARLSTROM | $60,133.34 | |
| 12/7/1999 | LAWRENCE MCGOUGH | $32,600.00 | |
| 12/7/1999 | STEVE SABES | $22,820.00 | |
| 12/7/1999 | ROSS SABES | $22,820.00 | |
| 11/23/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $383,667.92 | |
| 11/23/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $281,000.00 | |
| 11/23/1999 | METRO GEM, INC. | $149,400.00 | |
| 11/23/1999 | SABES FAMILY LIMITED PARTNERSHIP | $75,132.08 | |
| 11/22/1999 | METRO GEM, INC. | $93,000.00 | |
| 11/3/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $237,333.33 | |
| 11/3/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $230,199.09 | |
| 11/3/1999 | METRO GEM, INC. | $213,600.00 | |
| 11/3/1999 | SABES FAMILY LIMITED PARTNERSHIP | $161,400.91 | |
| 11/3/1999 | METRO GEM, INC. | $118,666.67 | |
| 11/3/1999 | JON SABES | $35,600.00 | |
| 10/29/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $412,533.33 | |
| 10/28/1999 | METRO GEM, INC. | $206,266.67 | |
| 10/12/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $253,333.33 | |
| 10/12/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $234,666.67 | |

**EXHIBIT N**

**Transfers from Metro Gem, LLC to Defendants**

| Date | Payee | Amount | Subtotal |
|------|-------|--------|----------|
| 10/11/1999 | METRO GEM, INC. | $126,666.67 | |
| 10/11/1999 | METRO GEM, INC. | $117,333.33 | |
| 10/8/1999 | METRO GEM, INC. | $214,667.00 | |
| 10/8/1999 | SABES FAMILY LIMITED PARTNERSHIP | $138,000.00 | |
| 10/8/1999 | SABES FAMILY LIMITED PARTNERSHIP | $76,667.00 | |
| 10/8/1999 | AERO INC. | $46,000.00 | |
| 10/6/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $168,667.00 | |
| 10/1/1999 | METRO GEM, INC. | $93,500.00 | |
| 10/1/1999 | METRO GEM, INC. | $56,000.00 | |
| 9/29/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $124,667.00 | |
| 9/29/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $112,000.00 | |
| 9/29/1999 | SABES FAMILY LIMITED PARTNERSHIP | $62,333.00 | |
| 9/2/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $245,333.00 | |
| 9/1/1999 | SABES FAMILY LIMITED PARTNERSHIP | $366,667.00 | |
| 9/1/1999 | METRO GEM, INC. | $153,000.00 | |
| 8/24/1999 | METRO GEM, INC. | $180,000.00 | |
| 8/24/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $153,600.00 | |
| 8/24/1999 | ERROL CARLSTROM | $78,000.00 | |
| 8/24/1999 | ARROW CAPITAL ASSOCIATES | $42,000.00 | |
| 8/24/1999 | LAWRENCE MCGOUGH | $36,000.00 | |
| 8/24/1999 | ROSS SABES | $25,200.00 | |
| 8/24/1999 | STEVE SABES | $25,200.00 | |
| 8/19/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $471,066.00 | |
| 8/19/1999 | METRO GEM, INC. | $309,400.00 | |
| 8/19/1999 | SABES FAMILY LIMITED PARTNERSHIP | $147,734.00 | |
| 8/18/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $315,000.00 | |
| 8/18/1999 | SABES FAMILY LIMITED PARTNERSHIP | $40,000.00 | |
| 8/18/1999 | OTHER- METRO GEM, LLC- OVERHEAD | $30,000.00 | |
| 8/16/1999 | METRO GEM, INC. | $55,000.00 | |
| 8/5/1999 | SABES FAMILY LIMITED PARTNERSHIP | $2,000,000.00 | |
| 8/5/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $451,344.81 | |
| 8/5/1999 | SABES FAMILY LIMITED PARTNERSHIP | $416,654.88 | |

**EXHIBIT N**

**Transfers from Metro Gem, LLC to Defendants**

| Date | Payee | Amount | Subtotal |
|------|-------|--------|----------|
| 8/5/1999 | METRO GEM, INC. | $347,200.00 | |
| 8/5/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $191,333.20 | |
| 8/5/1999 | ERROL CARLSTROM | $173,600.00 | |
| 8/5/1999 | METRO GEM, INC. | $27,333.33 | |
| 7/28/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $344,533.00 | |
| 7/28/1999 | METRO GEM, INC. | $172,267.00 | |
| 7/15/1999 | SABES FAMILY LIMITED PARTNERSHIP | $1,100,000.00 | |
| 7/15/1999 | METRO GEM, INC. | $157,067.00 | |
| 7/13/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $314,133.00 | |
| 7/7/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $316,000.00 | |
| 7/7/1999 | METRO GEM, INC. | $158,000.00 | |
| 7/6/1999 | SABES FAMILY LIMITED PARTNERSHIP | $2,437,600.00 | |
| 7/6/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $322,000.00 | |
| 7/6/1999 | SABES FAMILY LIMITED PARTNERSHIP | $171,600.00 | |
| 7/6/1999 | METRO GEM, INC. | $161,000.00 | |
| 7/6/1999 | METRO GEM, INC. | $85,800.00 | |
| 7/6/1999 | METRO GEM, INC. | $6,000.00 | |
| 7/5/1999 | METRO GEM, INC. | $8,800.00 | |
| 6/28/1999 | METRO GEM, INC. | $104,000.00 | |
| 6/24/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $89,600.00 | |
| 6/24/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $59,734.00 | |
| 6/24/1999 | METRO GEM, INC. | $44,800.00 | |
| 6/24/1999 | METRO GEM, INC. | $29,867.00 | |
| 6/11/1999 | SABES FAMILY LIMITED PARTNERSHIP | $900,000.00 | |
| 6/11/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $63,600.00 | |
| 6/11/1999 | METRO GEM, INC. | $31,800.00 | |
| 5/26/1999 | ROBERT SABES | $531,547.00 | |
| 5/26/1999 | ERROL CARLSTROM | $31,267.00 | |
| 5/26/1999 | LAWRENCE MCGOUGH | $26,800.00 | |
| 5/26/1999 | ROSS SABES | $22,260.00 | |
| 5/26/1999 | STEVE SABES | $22,260.00 | |
| 5/26/1999 | ARROW CAPITAL ASSOCIATES | $11,933.66 | |

**EXHIBIT N**

**Transfers from Metro Gem, LLC to Defendants**

| Date | Payee | Amount | Subtotal |
|------|-------|--------|----------|
| 5/26/1999 | ARROW CAPITAL ASSOCIATES | $3,733.34 | |
| 5/25/1999 | METRO GEM, INC. | $116,600.00 | |
| 5/21/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $3,515,400.00 | |
| 5/20/1999 | METRO GEM, INC. | $4,200.00 | |
| 5/19/1999 | METRO GEM, INC. | $117,600.00 | |
| 5/12/1999 | METRO GEM, INC. | $600,000.00 | |
| 5/12/1999 | METRO GEM, INC. | $256,533.00 | |
| 5/12/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $207,693.33 | |
| 5/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $127,213.33 | |
| 5/12/1999 | OTHER | $560.00 | |
| 5/4/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $232,948.00 | |
| 5/4/1999 | METRO GEM, INC. | $213,200.00 | |
| 5/4/1999 | SABES FAMILY LIMITED PARTNERSHIP | $193,452.00 | |
| 4/28/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $2,013,875.20 | |
| 4/28/1999 | ROBERT SABES | $1,426,568.00 | |
| 4/28/1999 | METRO GEM, INC. | $1,146,000.00 | |
| 4/28/1999 | JANET SABES | $1,093,886.00 | |
| 4/28/1999 | METRO GEM, INC. | $447,818.00 | |
| 4/28/1999 | SABES FAMILY LIMITED PARTNERSHIP | $160,576.00 | |
| 4/28/1999 | METRO GEM, INC. | $138,223.00 | |
| 4/28/1999 | METRO GEM, INC. | $97,910.00 | |
| 4/28/1999 | ERROL CARLSTROM | $24,400.68 | |
| 4/27/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $3,550,800.00 | |
| 4/26/1999 | METRO GEM, INC. | $133,000.00 | |
| 4/26/1999 | LAWRENCE MCGOUGH | $15,200.00 | |
| 4/20/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $960,000.00 | |
| 4/20/1999 | METRO GEM, INC. | $250,000.00 | |
| 4/16/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $3,774,795.00 | |
| 4/16/1999 | METRO GEM, INC. | $1,253,067.00 | |
| 4/16/1999 | SABES FAMILY LIMITED PARTNERSHIP | $1,000,000.00 | |
| 4/16/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $859,734.00 | |
| 4/16/1999 | METRO GEM, INC. | $237,451.73 | |

**EXHIBIT N**

**Transfers from Metro Gem, LLC to Defendants**

| Date | Payee | Amount | Subtotal |
|------|-------|-------:|---------:|
| 4/16/1999 | SABES FAMILY LIMITED PARTNERSHIP | $188,233.00 | |
| 4/8/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $300,000.00 | |
| 4/8/1999 | METRO GEM, INC. | $100,000.00 | |
| 4/8/1999 | METRO GEM, INC. | $18,000.00 | |
| 4/8/1999 | ARROW CAPITAL ASSOCIATES | $9,000.00 | |
| 4/8/1999 | ERROL CARLSTROM | $4,500.00 | |
| 4/8/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $4,500.00 | |
| 4/2/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,150,000.00 | |
| 4/2/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $69,000.00 | |
| 4/2/1999 | METRO GEM, INC. | $34,500.00 | |
| 3/30/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,060,000.00 | |
| 3/26/1999 | METRO GEM, INC. | $30,000.00 | |
| 3/23/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,993,920.00 | |
| 3/23/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,066,000.00 | |
| 3/22/1999 | SABES FAMILY LIMITED PARTNERSHIP | $400,000.00 | |
| 3/22/1999 | METRO GEM, INC. | $100,000.00 | |
| 3/22/1999 | METRO GEM, INC. | $51,000.00 | |
| 3/22/1999 | SABES FAMILY LIMITED PARTNERSHIP | $37,338.00 | |
| 3/22/1999 | METRO GEM, INC. | $18,669.00 | |
| 3/22/1999 | METRO GEM, INC. | $12,150.00 | |
| 3/22/1999 | ERROL CARLSTROM | $6,000.00 | |
| 3/13/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,480,000.00 | |
| 3/13/1999 | METRO GEM, INC. | $160,000.00 | |
| 3/13/1999 | METRO GEM, INC. | $93,345.00 | |
| 3/13/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $4,000.00 | |
| 3/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $3,100,000.00 | |
| 3/12/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,378,000.00 | |
| 3/12/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $1,186,400.00 | |
| 3/12/1999 | METRO GEM, INC. | $1,000,000.00 | |
| 3/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $1,000,000.00 | |
| 3/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $1,000,000.00 | |
| 3/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $700,000.00 | |

**EXHIBIT N**

**Transfers from Metro Gem, LLC to Defendants**

| Date | Payee | Amount | Subtotal |
|------|-------|--------|----------|
| 3/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $186,690.00 | |
| 3/12/1999 | METRO GEM, INC. | $103,200.00 | |
| 3/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $80,000.00 | |
| 3/12/1999 | METRO GEM, INC. | $76,680.00 | |
| 3/12/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $71,184.00 | |
| 3/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $63,600.00 | |
| 3/12/1999 | METRO GEM, INC. | $60,750.00 | |
| 3/12/1999 | METRO GEM, INC. | $60,000.00 | |
| 3/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $60,000.00 | |
| 3/12/1999 | METRO GEM, INC. | $55,000.00 | |
| 3/12/1999 | METRO GEM, INC. | $42,000.00 | |
| 3/12/1999 | METRO GEM, INC. | $17,262.00 | |
| 3/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $16,800.00 | |
| 3/12/1999 | STEVE SABES | $12,600.00 | |
| 3/12/1999 | ROSS SABES | $12,600.00 | |
| 3/12/1999 | SABES FAMILY LIMITED PARTNERSHIP | $11,500.00 | |
| 3/12/1999 | METRO GEM, INC. | $10,820.00 | |
| 3/1/1999 | OTHER- METRO GEM, LLC- EXCESS | $435,000.00 | |
| 3/1/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $290,000.00 | |
| 3/1/1999 | SABES FAMILY LIMITED PARTNERSHIP | $275,000.00 | |
| 3/1/1999 | METRO GEM, INC. | $30,000.00 | |
| 3/1/1999 | OTHER- METRO GEM, LLC- EXCESS | $26,100.00 | |
| 3/1/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $17,400.00 | |
| 3/1/1999 | SABES FAMILY LIMITED PARTNERSHIP | $16,500.00 | |
| 2/28/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $575,506.00 | |
| 2/28/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $54,000.00 | |
| 2/28/1999 | METRO GEM, INC. | $45,000.00 | |
| 2/27/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $198,000.00 | |
| 2/27/1999 | METRO GEM, INC. | $105,000.00 | |
| 2/26/1999 | METRO GEM, INC. | $156,000.00 | |
| 2/26/1999 | SABES FAMILY LIMITED PARTNERSHIP | $147,000.00 | |
| 2/26/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $57,000.00 | |

**EXHIBIT N**

**Transfers from Metro Gem, LLC to Defendants**

| Date | Payee | Amount | Subtotal |
|------|-------|--------|----------|
| 2/26/1999 | LAWRENCE MCGOUGH | $12,000.00 | |
| 2/25/1999 | SABES FAMILY LIMITED PARTNERSHIP | $1,123,600.00 | |
| 2/25/1999 | METRO GEM, INC. | $292,497.00 | |
| 2/25/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $149,248.00 | |
| 2/25/1999 | SABES FAMILY LIMITED PARTNERSHIP | $89,888.00 | |
| 2/25/1999 | ERROL CARLSTROM | $23,744.00 | |
| 2/19/1999 | METRO GEM, INC. | $123,000.00 | |
| 2/16/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $69,000.00 | |
| 2/16/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $48,000.00 | |
| 2/16/1999 | METRO GEM, INC. | $34,500.00 | |
| 2/15/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $59,190.40 | |
| 2/14/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $90,000.00 | |
| 2/14/1999 | METRO GEM, INC. | $45,000.00 | |
| 2/13/1999 | SABES FAMILY LIMITED PARTNERSHIP | $148,810.00 | |
| 2/13/1999 | METRO GEM, INC. | $104,000.00 | |
| 2/11/1999 | SABES FAMILY LIMITED PARTNERSHIP | $5,832.80 | |
| 2/10/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $101,506.00 | |
| 2/10/1999 | METRO GEM, INC. | $55,061.00 | |
| 2/10/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $40,788.00 | |
| 2/10/1999 | METRO GEM, INC. | $27,031.00 | |
| 2/7/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $60,000.00 | |
| 2/5/1999 | METRO GEM, INC. | $30,000.00 | |
| 2/5/1999 | ARROW CAPITAL ASSOCIATES | $12,000.00 | |
| 2/4/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $72,000.00 | |
| 2/4/1999 | METRO GEM, INC. | $51,000.00 | |
| 2/4/1999 | ERROL CARLSTROM | $6,000.00 | |
| 2/4/1999 | OTHER | $6,000.00 | |
| 1/29/1999 | SABES FAMILY LIMITED PARTNERSHIP | $1,180,560.00 | |
| 1/29/1999 | METRO GEM, INC. | $107,940.00 | |
| 1/29/1999 | SABES FAMILY LIMITED PARTNERSHIP | $70,834.00 | |
| 1/29/1999 | METRO GEM, INC. | $45,131.00 | |
| 1/26/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $204,787.50 | |

**EXHIBIT N**

**Transfers from Metro Gem, LLC to Defendants**

| Date | Payee | Amount | Subtotal |
|------|-------|--------|----------|
| 1/26/1999 | SABES FAMILY LIMITED PARTNERSHIP | $186,690.00 | |
| 1/26/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $155,184.00 | |
| 1/26/1999 | METRO GEM, INC. | $134,643.75 | |
| 1/26/1999 | METRO GEM, INC. | $118,680.00 | |
| 1/26/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $111,600.00 | |
| 1/26/1999 | METRO GEM, INC. | $93,345.00 | |
| 1/26/1999 | SABES FAMILY LIMITED PARTNERSHIP | $64,500.00 | |
| 1/26/1999 | SABES FAMILY LIMITED PARTNERSHIP | $63,600.00 | |
| 1/26/1999 | METRO GEM, INC. | $60,750.00 | |
| 1/25/1999 | METRO GEM, INC. | $60,000.00 | |
| 1/25/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $48,000.00 | |
| 1/25/1999 | SABES FAMILY LIMITED PARTNERSHIP | $42,000.00 | |
| 1/25/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $32,575.80 | |
| 1/25/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $30,000.00 | |
| 1/25/1999 | METRO GEM, INC. | $17,261.70 | |
| 1/24/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $2,400.00 | |
| 1/23/1999 | METRO GEM, INC. | $45,510.00 | |
| 1/12/1999 | METRO GEM, INC. | $105,000.00 | |
| 1/12/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $54,000.00 | |
| 1/12/1999 | METRO GEM, INC. | $33,000.00 | |
| 1/11/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $198,000.00 | |
| 1/11/1999 | METRO GEM, INC. | $180,267.00 | |
| 1/11/1999 | SABES FAMILY LIMITED PARTNERSHIP | $169,866.00 | |
| 1/11/1999 | METRO GEM, INC. | $160,000.00 | |
| 1/11/1999 | SABES FAMILY LIMITED PARTNERSHIP | $80,000.00 | |
| 1/11/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $65,867.00 | |
| 1/11/1999 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $40,788.40 | |
| 1/11/1999 | METRO GEM, INC. | $27,031.00 | |
| 1/11/1999 | METRO GEM, INC. | $12,000.00 | |
| 1/11/1999 | LAWRENCE MCGOUGH | $12,000.00 | |
| 1/11/1999 | SABES FAMILY LIMITED PARTNERSHIP | $5,833.00 | |
| 1/1/1999 | ROBERT SABES | $69,000.00 | |

**EXHIBIT N**

**Transfers from Metro Gem, LLC to Defendants**

| Date | Payee | Amount | Subtotal |
|------|-------|--------|----------|
| 1/1/1999 | METRO GEM, INC. | $34,500.00 | |
| 12/19/1998 | METRO GEM, INC. | $61,080.00 | |
| 12/11/1998 | METRO GEM, INC. | $325,000.00 | |
| 12/11/1998 | METRO GEM, INC. | $226,875.00 | |
| 12/3/1998 | METRO GEM, INC. | $96,416.00 | |
| 11/28/1998 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $336,000.00 | |
| 11/27/1998 | METRO GEM, INC. | $176,000.00 | |
| 11/27/1998 | LAWRENCE MCGOUGH | $16,000.00 | |
| 11/20/1998 | METRO GEM, INC. | $95,866.60 | |
| 11/20/1998 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $82,334.00 | |
| 11/16/1998 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $92,000.00 | |
| 11/16/1998 | METRO GEM, INC. | $46,000.00 | |
| 11/12/1998 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $105,000.00 | |
| 11/12/1998 | METRO GEM, INC. | $52,500.00 | |
| 11/10/1998 | SABES FAMILY LIMITED PARTNERSHIP | $192,000.00 | |
| 11/10/1998 | METRO GEM, INC. | $130,760.00 | |
| 11/10/1998 | METRO GEM, INC. | $96,000.00 | |
| 11/10/1998 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $81,600.00 | |
| 11/10/1998 | SABES FAMILY LIMITED PARTNERSHIP | $42,400.00 | |
| 10/30/1998 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $46,613.33 | |
| 10/30/1998 | METRO GEM, INC. | $23,306.67 | |
| 10/27/1998 | INTERNATIONAL INVESTMENT OPPORTUNITIES LLC | $205,200.00 | |
| 10/27/1998 | METRO GEM, INC. | $140,600.00 | |
| 10/27/1998 | SABES FAMILY LIMITED PARTNERSHIP | $76,000.00 | |
| 10/27/1998 | SABES FAMILY LIMITED PARTNERSHIP | $6,666.67 | |
| 10/27/1998 | METRO GEM, INC. | $6,583.33 | |
| 10/21/1998 | SABES FAMILY LIMITED PARTNERSHIP | $28,000.00 | |
| 10/21/1998 | METRO GEM, INC. | $27,650.00 | $75,173,513.44 |

| | | |
|---|---|---|
| *Subtotal - International Investment Opportunities LLC* | *$34,705,679.89* | |
| *Subtotal - Sabes Family Limited Partnership* | *$21,278,567.75* | |
| *Subtotal - Robert Sabes* | *$2,027,115.00* | |
| *Subtotal - Janet Sabes* | *$1,093,886.00* | |

**EXHIBIT N**

**Transfers from Metro Gem, LLC to Defendants**

| | |
|---|---:|
| Subtotal - Steve Sabes | *$82,880.00* |
| Subtotal - Jon Sabes | *$35,600.00* |
| **Subtotal - Transfers to Defendants** | **$59,223,728.64** |
| | |
| Subtotal - Transfers to Metro Gem, Inc. | *$14,577,799.45* |
| Subtotal - Transfers to Other - Metro Gem, LLC - Excess | *$461,100.00* |
| Subtotal - Transfers to Errol Carlstrom | *$407,645.02* |
| Subtotal - Transfers to Lawrence McGough | *$150,600.00* |
| Subtotal - Transfers to Arrow Capital Associates | *$127,200.33* |
| Subtotal - Transfers to Ross Sabes | *$82,880.00* |
| Subtotal - Transfers to Schechter Dokken Kanter | *$60,000.00* |
| Subtotal - Transfers to Aero Inc. | *$46,000.00* |
| Subtotal - Transfers to Other - Metro Gem, LLC - Overhead | *$30,000.00* |
| Subtotal - Transfers to Other | *$6,560.00* |
| **Subtotal - Transfers to Non-Defendants** | **$15,949,784.80** |
| | |
| **Total Transfers** | **$75,173,513.44** [1,2] |

[1] Amount differs from Total Payment to Investor from MGLLC stated in Exhibit M, PCI-MGLLC Notes - Summary of Notes Payable by Note by $798,500.00 (i.e. $75,972,013.44 - $75,173,513.44 = $798,500.00).  This variance is due to a $798,500.00 principal payment related to Note 2517 that was paid from PCI to Metro Gem, Inc. ("MGI") rather than MGLLC.

[2] Amount differs from total Payment from PCI to MGLLC stated in Exhibit M, PCI-MGLLC Notes - Summary of Notes Payable by Note and in Exhibit L by $6,899,995.63 (i.e., $82,073,509.07 - $75,173,513.44 = $6,899,995.63).  This variance is due to (1) $6,899,999.34 of principal related to Note Numbers 2585-1-1, 2724-1, 2736-1, and 2739-1 that was paid to MGLLC and subsequently reinvested as principal on new notes with PCI, and (2) a total of $3.71 in overpayments from MGLLC to investors ($6,899,999.34 - $3.71 = $6,899,995.63).

# EXHIBIT O

**EXHIBIT O**

**Transfers from PCI to SPF Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| **90 Day Transfers** | | |
| No Transfers Identified | | |
| **Two Year Transfers** | | |
| 8/8/2007 | $2,925,126.00 | |
| 5/7/2007 | $4,029,494.40 | |
| 5/4/2007 | $4,811,840.00 | |
| 4/4/2007 | $3,961,728.00 | |
| 1/31/2007 | $3,161,912.65 | |
| 1/29/2007 | $3,087,595.00 | |
| 1/26/2007 | $4,065,984.00 | |
| 1/8/2007 | $3,870,447.75 | |
| 10/31/2006 | $5,312,264.00 | |
| 10/31/2006 | $4,260,468.75 | **$39,486,860.55** |
| **Additional Transfers** | | |
| 8/17/2006 | $3,695,296.00 | |
| 7/20/2006 | $4,114,125.00 | |
| 6/12/2006 | $3,394,043.30 | |
| 5/5/2006 | $5,389,272.00 | |
| 4/11/2006 | $5,790,713.25 | |
| 2/23/2006 | $3,713,005.85 | |
| 2/15/2006 | $5,485,500.00 | |
| 12/30/2005 | $4,532,528.00 | |
| 11/29/2005 | $4,057,988.00 | |
| 11/10/2005 | $5,261,400.00 | |
| 8/25/2005 | $4,546,855.00 | |
| 8/18/2005 | $3,485,743.95 | |
| 6/7/2005 | $5,397,261.00 | |
| 6/3/2005 | $2,514,281.10 | |
| 6/2/2005 | $5,569,704.80 | |
| 5/20/2005 | $4,638,623.40 | |
| 5/19/2005 | $5,349,156.00 | |
| 5/17/2005 | $3,488,591.25 | |
| 5/6/2005 | $3,452,377.50 | |
| 5/3/2005 | $4,986,095.80 | |
| 4/19/2005 | $4,661,470.00 | |
| 4/14/2005 | $4,390,804.00 | |
| 4/12/2005 | $3,822,975.10 | |
| 3/9/2005 | $3,919,647.50 | |
| 3/8/2005 | $5,846,385.60 | |

**EXHIBIT O**

**Transfers from PCI to SPF Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 2/23/2005 | $5,367,841.20 | |
| 2/22/2005 | $4,072,019.60 | |
| 1/24/2005 | $4,241,925.35 | |
| 1/21/2005 | $4,754,645.00 | |
| 1/13/2005 | $3,791,732.35 | |
| 1/12/2005 | $3,338,465.40 | |
| 12/15/2004 | $4,383,009.50 | |
| 12/9/2004 | $4,483,023.20 | |
| 10/22/2004 | $3,922,344.05 | |
| 10/15/2004 | $3,760,556.00 | |
| 10/14/2004 | $4,978,198.20 | |
| 10/13/2004 | $5,119,875.70 | |
| 9/23/2004 | $3,995,030.00 | |
| 9/22/2004 | $5,473,470.70 | |
| 8/27/2004 | $3,723,939.60 | |
| 7/30/2004 | $4,005,540.00 | |
| 6/11/2004 | $5,187,735.00 | |
| 6/3/2004 | $3,696,982.30 | |
| 5/11/2004 | $3,513,559.20 | |
| 4/28/2004 | $4,163,590.20 | |
| 3/10/2004 | $5,258,435.00 | |
| 3/2/2004 | $4,620,544.75 | |
| 2/9/2004 | $3,729,945.80 | |
| 1/22/2004 | $4,041,674.00 | |
| 12/5/2003 | $2,989,256.50 | |
| 12/2/2003 | $2,176,215.25 | |
| 11/21/2003 | $4,404,108.60 | |
| 10/30/2003 | $3,655,176.00 | |
| 10/9/2003 | $4,067,323.60 | |
| 8/20/2003 | $4,635,053.50 | |
| 8/7/2003 | $4,362,990.25 | |
| 8/1/2003 | $3,553,872.30 | |
| 6/26/2003 | $4,071,822.35 | |
| 6/13/2003 | $4,031,367.60 | |
| 6/5/2003 | $4,901,620.75 | |
| 5/13/2003 | $3,060,262.15 | |
| 5/7/2003 | $3,310,759.50 | |
| 5/1/2003 | $3,883,462.30 | |
| 5/1/2003 | $3,442,594.45 | |
| 3/14/2003 | $4,309,111.20 | |

**EXHIBIT O**

**Transfers from PCI to SPF Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 2/24/2003 | $4,348,935.65 | |
| 2/21/2003 | $4,720,915.75 | |
| 2/14/2003 | $3,540,783.80 | |
| 2/7/2003 | $3,528,119.70 | |
| 1/24/2003 | $3,547,219.02 | |
| 1/23/2003 | $4,019,319.90 | |
| 12/9/2002 | $4,330,497.40 | |
| 11/14/2002 | $3,418,706.85 | |
| 11/7/2002 | $5,677,306.14 | |
| 10/30/2002 | $2,984,598.95 | |
| 10/21/2002 | $3,250,307.80 | |
| 10/7/2002 | $4,806,456.46 | |
| 9/26/2002 | $3,683,445.13 | |
| 9/26/2002 | $3,654,745.20 | |
| 8/23/2002 | $4,053,271.50 | |
| 7/24/2002 | $3,695,987.55 | |
| 7/15/2002 | $4,955,199.40 | |
| 7/11/2002 | $3,811,200.98 | |
| 7/2/2002 | $3,116,430.45 | |
| 6/10/2002 | $3,712,348.10 | |
| 6/10/2002 | $3,451,492.35 | |
| 5/1/2002 | $4,242,259.10 | |
| 4/15/2002 | $3,766,375.00 | |
| 4/8/2002 | $3,684,785.15 | |
| 4/4/2002 | $4,844,571.05 | |
| 4/2/2002 | $3,778,408.55 | |
| 3/29/2002 | $3,098,446.25 | |
| 3/25/2002 | $3,675,443.00 | |
| 3/25/2002 | $3,044,213.31 | |
| 3/22/2002 | $3,463,934.00 | |
| 3/22/2002 | $3,438,217.00 | |
| 3/21/2002 | $3,255,071.05 | |
| 3/21/2002 | $1,183,463.58 | |
| 3/8/2002 | $3,629,658.18 | |
| 3/8/2002 | $1,417,678.20 | |
| 3/7/2002 | $4,558,000.28 | |
| 3/6/2002 | $4,211,513.99 | |
| 3/6/2002 | $3,615,324.15 | |
| 3/4/2002 | $3,638,035.24 | |
| 3/1/2002 | $3,482,693.85 | |

**EXHIBIT O**

**Transfers from PCI to SPF Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 3/1/2002 | $2,109,652.36 | |
| 2/26/2002 | $4,320,800.12 | |
| 2/25/2002 | $4,383,835.80 | |
| 2/25/2002 | $3,799,448.13 | |
| 2/22/2002 | $1,762,641.99 | |
| 2/13/2002 | $1,771,073.21 | |
| 2/13/2002 | $1,637,093.67 | |
| 2/5/2002 | $4,996,555.00 | |
| 2/5/2002 | $2,534,093.33 | |
| 1/30/2002 | $2,586,434.60 | |
| 1/29/2002 | $3,147,052.88 | |
| 1/23/2002 | $3,115,200.20 | |
| 1/23/2002 | $2,721,128.37 | |
| 1/16/2002 | $3,047,063.15 | |
| 1/10/2002 | $3,598,835.60 | |
| 1/10/2002 | $1,200,939.50 | |
| 1/3/2002 | $4,688,542.05 | |
| 1/3/2002 | $3,414,621.44 | |
| 12/20/2001 | $4,744,838.76 | |
| 12/19/2001 | $3,730,410.10 | |
| 12/18/2001 | $3,179,361.70 | |
| 12/5/2001 | $1,937,881.50 | |
| 12/5/2001 | $1,535,515.28 | |
| 11/29/2001 | $6,228,840.15 | |
| 11/29/2001 | $3,130,122.47 | |
| 11/20/2001 | $4,696,917.25 | |
| 11/16/2001 | $4,921,067.40 | |
| 11/16/2001 | $3,295,761.80 | |
| 11/14/2001 | $3,175,830.45 | |
| 11/13/2001 | $3,281,918.24 | |
| 11/8/2001 | $3,592,281.50 | |
| 11/8/2001 | $1,789,323.50 | |
| 11/2/2001 | $2,829,414.18 | |
| 11/1/2001 | $3,076,063.56 | |
| 11/1/2001 | $2,578,857.40 | |
| 10/30/2001 | $7,052,687.92 | |
| 10/24/2001 | $3,179,107.62 | |
| 10/24/2001 | $1,524,741.15 | |
| 10/18/2001 | $2,619,692.50 | |
| 10/4/2001 | $5,932,936.37 | |

**EXHIBIT O**

**Transfers from PCI to SPF Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 10/1/2001 | $1,462,757.10 | |
| 9/21/2001 | $4,221,979.69 | |
| 9/20/2001 | $2,845,274.48 | |
| 9/14/2001 | $4,949,653.23 | |
| 9/4/2001 | $4,005,185.95 | |
| 9/4/2001 | $3,547,032.11 | |
| 8/23/2001 | $3,892,540.82 | |
| 8/21/2001 | $2,686,644.21 | |
| 8/20/2001 | $2,668,461.04 | |
| 8/14/2001 | $2,867,500.42 [1] | |
| 8/13/2001 | $1,533,705.00 | |
| 8/9/2001 | $4,471,815.66 | |
| 8/2/2001 | $2,292,789.62 | $598,632,222.34 |
| **Transfers** | **$638,119,082.89** | |

[1] Transfer is a repayment of principal plus interest on Note 5355 between PCI and Janet Sabes.  Interest in the amount of $367,500.42 was subsequently paid from SPF Funding, LLC to Sabes Family Foundation and the $2,500,000.00 principal amount was rolled to a new note (i.e., Note SFF-C-3).

# EXHIBIT P

EXHIBIT P

**SPF Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Principal Paid | Principal Rolled | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Opportunity Finance* | | | | | | | | | | | | | | | | |
| 051101-01 | 5/11/2001 | 9/8/2001 | 3.50% | $1,900,000.00 | $1,900,000.00 | $0.00 | ($26,699.01) | $1,926,699.01 | ($2,292,789.62) | $208,806.01 | ($2,083,983.61) | ($2,083,983.61) | $183,983.61 | $1,900,000.00 | $0.00 | $0.00 |
| 051101-02 | 5/11/2001 | 9/8/2001 | 3.50% | $3,700,000.00 | $3,700,000.00 | $0.00 | ($57,806.40) | $3,757,806.40 | ($4,471,815.66) | $383,315.66 | ($4,088,500.00) | ($4,088,500.00) | $388,500.00 | $3,700,000.00 | $0.00 | $0.00 |
| 051601-01 | 5/16/2001 | 8/23/2001 | 3.50% | $3,400,000.00 | $3,400,000.00 | $0.00 | ($23,058.46) | $3,423,058.46 | ($3,892,540.82) | $99,840.49 | ($3,792,700.33) | ($3,792,700.33) | $392,700.33 | $3,400,000.00 | $0.00 | $0.00 |
| 060501-01 | 6/5/2001 | 10/3/2001 | 3.50% | $2,300,000.00 | $2,300,000.00 | $0.00 | ($2,837.89) | $2,302,837.89 | ($2,686,644.21) | $180,027.80 | ($2,506,616.41) | ($2,506,616.41) | $206,616.41 | $2,300,000.00 | $0.00 | $0.00 |
| 060501-02 | 6/5/2001 | 10/3/2001 | 3.50% | $2,273,000.00 | $2,273,000.00 | $0.00 | ($1,256.57) | $2,274,256.57 | ($2,668,461.04) | $193,921.96 | ($2,474,539.08) | ($2,474,539.08) | $201,539.08 | $2,273,000.00 | $0.00 | $0.00 |
| 060501-03 | 6/5/2001 | 10/3/2001 | 3.50% | $1,300,000.00 | $1,300,000.00 | $0.00 | ($4,082.50) | $1,304,082.50 | ($1,533,705.00) | $129,054.77 | ($1,404,650.23) | ($1,404,650.23) | $104,650.23 | $1,300,000.00 | $0.00 | $0.00 |
| 060501-04 | 6/5/2001 | 8/27/2001 | 3.50% | $4,200,000.00 | $4,200,000.00 | $0.00 | ($12,470.84) | $4,212,470.84 | ($4,949,653.23) | $259,653.23 | ($4,690,000.00) | ($4,690,000.00) | $490,000.00 | $4,200,000.00 | $0.00 | $0.00 |
| 060601-01 | 6/6/2001 | 10/4/2001 | 3.50% | $2,400,000.00 | $2,400,000.00 | $0.00 | ($21,510.19) | $2,421,510.19 | ($2,845,274.48) | $148,474.48 | ($2,696,800.00) | ($2,696,800.00) | $296,800.00 | $2,400,000.00 | $0.00 | $0.00 |
| 060701-01 | 6/7/2001 | 10/5/2001 | 3.50% | $3,000,000.00 | $3,000,000.00 | $0.00 | ($401,639.90) | $3,401,639.90 | ($4,005,185.95) | $693,685.95 | ($3,311,500.00) | ($3,311,500.00) | $311,500.00 | $3,000,000.00 | $0.00 | $0.00 |
| 062001-01 | 6/20/2001 | 10/18/2001 | 3.50% | $3,000,000.00 | $3,000,000.00 | $0.00 | ($57,816.17) | $3,057,816.17 | ($3,547,032.11) | $281,032.11 | ($3,266,000.00) | ($3,266,000.00) | $266,000.00 | $3,000,000.00 | $0.00 | $0.00 |
| 062801-01 | 6/28/2001 | 10/26/2001 | 3.50% | $3,600,000.00 | $3,600,000.00 | $0.00 | ($39,642.90) | $3,639,642.90 | ($4,221,979.69) | $264,979.69 | ($3,957,000.00) | ($3,957,000.00) | $357,000.00 | $3,600,000.00 | $0.00 | $0.00 |
| 062801-02 | 6/28/2001 | 10/26/2001 | 3.50% | $1,200,000.00 | $1,200,000.00 | $0.00 | ($60,997.50) | $1,260,997.50 | ($1,462,757.10) | $129,757.10 | ($1,333,000.00) | ($1,333,000.00) | $133,000.00 | $1,200,000.00 | $0.00 | $0.00 |
| 070301-01 | 7/3/2001 | 10/31/2001 | 3.50% | $5,000,000.00 | $5,000,000.00 | $0.00 | ($70,863.20) | $5,070,863.20 | ($5,932,936.37) | $390,436.68 | ($5,542,499.69) | ($5,542,499.69) | $542,499.69 | $5,000,000.00 | $0.00 | $0.00 |
| 071601-01 | 7/17/2001 | 11/14/2001 | 3.50% | $1,300,000.00 | $1,300,000.00 | $0.00 | ($1,742.05) | $1,301,742.05 | ($1,524,741.15) | $74,590.82 | ($1,450,150.33) | ($1,450,150.33) | $150,150.33 | $1,300,000.00 | $0.00 | $0.00 |
| 072301-01 | 7/23/2001 | 10/29/2001 | 3.50% | $3,000,000.00 | $3,000,000.00 | $0.00 | ($71,873.75) | $3,071,873.75 | ($3,592,281.50) | $214,281.50 | ($3,378,000.00) | ($378,000.00) | $378,000.00 | $0.00 | $3,000,000.00 | $0.00 |
| 072301-02 | 7/23/2001 | 11/20/2001 | 3.50% | $2,100,000.00 | $2,100,000.00 | $0.00 | ($178,185.35) | $2,278,185.35 | ($2,619,692.50) | $306,542.50 | ($2,313,150.00) | ($2,313,150.00) | $213,150.00 | $2,100,000.00 | $0.00 | $0.00 |
| 080101-01 | 8/1/2001 | 11/29/2001 | 3.50% | $6,000,000.00 | $6,000,000.00 | $0.00 | ($25,471.00) | $6,025,471.00 | ($7,052,687.92) | $422,687.92 | ($6,630,000.00) | ($6,630,000.00) | $630,000.00 | $6,000,000.00 | $0.00 | $0.00 |
| 080601-01 | 8/6/2001 | 12/4/2001 | 3.50% | $2,800,000.00 | $2,800,000.00 | $0.00 | ($5,066.55) | $2,805,066.55 | ($3,281,918.24) | $158,517.91 | ($3,123,400.33) | ($323,400.33) | $323,400.33 | $0.00 | $2,800,000.00 | $0.00 |
| 080701-01 | 8/7/2001 | 12/5/2001 | 3.50% | $4,200,000.00 | $4,200,000.00 | $0.00 | ($6,972.50) | $4,206,972.50 | ($4,921,067.40) | $226,167.40 | ($4,694,900.00) | ($4,694,900.00) | $494,900.00 | $4,200,000.00 | $0.00 | $0.00 |
| 080801-01 | 8/8/2001 | 12/6/2001 | 3.50% | $1,500,000.00 | $1,500,000.00 | $0.00 | ($29,387.15) | $1,529,387.15 | ($1,789,323.50) | $128,323.50 | ($1,661,000.00) | ($1,661,000.00) | $161,000.00 | $1,500,000.00 | $0.00 | $0.00 |
| 081001-01 | 8/10/2001 | 12/8/2001 | 3.50% | $2,400,000.00 | $2,400,000.00 | $0.00 | ($18,376.45) | $2,418,376.45 | ($2,829,414.18) | $194,214.18 | ($2,635,200.00) | ($2,635,200.00) | $235,200.00 | $2,400,000.00 | $0.00 | $0.00 |
| 081001-02 | 8/10/2001 | 12/8/2001 | 3.50% | $2,700,000.00 | $2,700,000.00 | $0.00 | ($18,278.50) | $2,718,278.50 | ($3,175,830.45) | $173,430.45 | ($3,002,400.00) | ($3,002,400.00) | $302,400.00 | $2,700,000.00 | $0.00 | $0.00 |

EXHIBIT P
**SPF Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Principal Paid | Principal Rolled | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 081301-01 | 8/13/2001 | 12/11/2001 | 3.50% | $2,600,000.00 | $2,600,000.00 | $0.00 | ($29,129.05) | $2,629,129.05 | ($3,076,063.56) | $233,397.16 | ($2,842,666.40) | ($2,842,666.40) | $242,666.40 | $2,600,000.00 | $0.00 | $0.00 |
| 081401-01 | 8/14/2001 | 12/12/2001 | 3.50% | $2,800,000.00 | $2,800,000.00 | $0.00 | ($20,371.25) | $2,820,371.25 | ($3,295,761.80) | $188,694.82 | ($3,107,066.98) | ($3,107,066.98) | $307,066.98 | $2,800,000.00 | $0.00 | $0.00 |
| 081501-01 | 8/15/2001 | 12/13/2001 | 3.50% | $5,200,000.00 | $5,200,000.00 | $0.00 | ($123,994.00) | $5,323,994.00 | ($6,228,840.15) | $385,773.13 | ($5,843,067.02) | ($5,843,067.02) | $643,067.02 | $5,200,000.00 | $0.00 | $0.00 |
| 082101-01 | 8/21/2001 | 12/19/2001 | 3.50% | $2,700,000.00 | $2,700,000.00 | $0.00 | ($17,335.70) | $2,717,335.70 | ($3,179,107.62) | $277,507.62 | ($2,901,600.00) | ($2,901,600.00) | $201,600.00 | $2,700,000.00 | $0.00 | $0.00 |
| 082201-01 | 8/22/2001 | 12/20/2001 | 3.50% | $1,600,000.00 | $1,600,000.00 | $0.00 | ($14,901.25) | $1,614,901.25 | ($1,937,881.50) | $141,881.15 | ($1,796,000.35) | ($1,796,000.35) | $196,000.35 | $1,600,000.00 | $0.00 | $0.00 |
| 082201-02 | 8/22/2001 | 12/20/2001 | 3.50% | $2,900,000.00 | $2,900,000.00 | $0.00 | ($20,655.93) | $2,920,655.53 | ($3,414,621.44) | $61,255.22 | ($3,353,366.22) | ($453,366.22) | $453,366.22 | $0.00 | $2,900,000.00 | $0.00 |
| 082701-01 | 8/27/2001 | 12/25/2001 | 3.50% | $4,000,000.00 | $4,000,000.00 | $0.00 | ($14,475.00) | $4,014,475.00 | ($4,696,917.25) | $300,250.30 | ($4,396,666.95) | ($4,396,666.95) | $396,666.95 | $4,000,000.00 | $0.00 | $0.00 |
| 082701-02 | 8/27/2001 | 12/25/2001 | 3.50% | $2,000,000.00 | $2,000,000.00 | $0.00 | ($204,167.00) | $2,204,167.00 | ($2,578,857.40) | $424,857.62 | ($2,153,999.78) | ($2,153,999.78) | $153,999.78 | $2,000,000.00 | $0.00 | $0.00 |
| 090501-01 | 9/5/2001 | 1/3/2002 | 3.50% | $2,700,000.00 | $2,700,000.00 | $0.00 | ($23,396.55) | $2,723,396.55 | ($3,179,361.70) | $151,761.70 | ($3,027,600.00) | ($3,027,600.00) | $327,600.00 | $2,700,000.00 | $0.00 | $0.00 |
| 091701-01 | 9/17/2001 | 1/15/2002 | 3.50% | $4,000,000.00 | $4,000,000.00 | $0.00 | ($7,304.25) | $4,007,304.25 | ($4,688,542.05) | $184,542.05 | ($4,504,000.00) | ($4,504,000.00) | $504,000.00 | $4,000,000.00 | $0.00 | $0.00 |
| 091701-02 | 9/17/2001 | 1/15/2002 | 3.50% | $1,300,000.00 | $1,300,000.00 | $0.00 | ($12,427.70) | $1,312,427.70 | ($1,535,515.28) | $115,699.14 | ($1,419,816.14) | ($1,419,816.14) | $119,816.14 | $1,300,000.00 | $0.00 | $0.00 |
| 092001-01 | 9/20/2001 | 1/18/2002 | 3.50% | $2,100,000.00 | $2,100,000.00 | $0.00 | ($510,606.80) | $2,610,606.80 | ($3,047,063.15) | $657,963.15 | ($2,389,100.00) | ($2,389,100.00) | $289,100.00 | $2,100,000.00 | $0.00 | $0.00 |
| 092401-01 | 9/24/2001 | 1/22/2002 | 3.50% | $1,000,000.00 | $1,000,000.00 | $0.00 | ($31,730.00) | $1,031,730.00 | ($1,200,939.50) | $74,939.14 | ($1,126,000.36) | ($1,126,000.36) | $126,000.36 | $1,000,000.00 | $0.00 | $0.00 |
| 092401-02 | 9/24/2001 | 1/22/2002 | 3.50% | $2,300,000.00 | $2,300,000.00 | $0.00 | ($45,806.45) | $2,345,806.45 | ($2,721,128.37) | $96,445.44 | ($2,624,682.93) | ($2,624,682.93) | $324,682.93 | $2,300,000.00 | $0.00 | $0.00 |
| 092601-01 | 9/26/2001 | 1/24/2002 | 3.50% | $2,700,000.00 | $2,700,000.00 | $0.00 | ($13,082.50) | $2,713,082.50 | ($3,147,052.88) | $53,302.88 | ($3,093,750.00) | ($3,093,750.00) | $393,750.00 | $2,700,000.00 | $0.00 | $0.00 |
| 092601-02 | 9/26/2001 | 1/24/2002 | 3.50% | $2,200,000.00 | $2,200,000.00 | $0.00 | ($29,685.00) | $2,229,685.00 | ($2,586,434.60) | $63,034.00 | ($2,523,400.60) | ($2,523,400.00) | $323,400.00 | $2,200,000.00 | $0.00 | $0.00 |
| 100401-01 | 10/4/2001 | 2/1/2002 | 3.50% | $1,900,000.00 | $1,900,000.00 | $400,000.00 | ($385,541.25) | $2,685,541.25 | ($3,115,200.20) | $517,350.57 | ($2,597,849.63) | ($2,197,849.63) | $297,849.63 | $1,900,000.00 | $400,000.00 | $0.00 |
| 101101-01 | 10/11/2001 | 2/8/2002 | 3.00% | $2,500,000.00 | $2,500,000.00 | $0.00 | ($2,028,120.00) | $4,528,120.00 | ($4,996,555.00) | $2,204,055.00 | ($2,792,500.00) | ($2,792,500.00) | $292,500.00 | $2,500,000.00 | $0.00 | $0.00 |
| 101501-01 | 10/15/2001 | 2/12/2002 | 3.50% | $3,000,000.00 | $3,000,000.00 | $0.00 | ($303,884.75) | $3,303,184.75 | ($3,799,448.13) | $333,948.13 | ($3,465,500.00) | ($3,465,500.00) | $465,500.00 | $3,000,000.00 | $0.00 | $0.00 |
| 102201-01 | 10/22/2001 | 2/19/2002 | 3.50% | $2,200,000.00 | $2,200,000.00 | $0.00 | ($3,602.54) | $2,203,602.54 | ($2,534,093.33) | $62,026.31 | ($2,472,067.02) | ($2,472,067.02) | $272,067.02 | $2,200,000.00 | $0.00 | $0.00 |
| 102501-01 | 10/25/2001 | 2/22/2002 | 3.50% | $3,700,000.00 | $3,700,000.00 | $0.00 | ($75,822.20) | $3,775,822.20 | ($4,383,835.80) | $152,885.80 | ($4,230,950.00) | ($4,230,950.00) | $530,950.00 | $3,700,000.00 | $0.00 | $0.00 |
| 103101-01 | 10/31/2001 | 2/28/2002 | 3.50% | $1,400,000.00 | $1,400,000.00 | $0.00 | ($11,303.15) | $1,411,303.15 | ($1,637,093.67) | $65,593.67 | ($1,571,500.00) | ($1,571,500.00) | $171,500.00 | $1,400,000.00 | $0.00 | $0.00 |

EXHIBIT P

**SPF Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Principal Paid | Principal Rolled | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 103101-02 | 10/31/2001 | 2/28/2002 | 3.50% | $1,500,000.00 | $1,500,000.00 | $0.00 | ($26,799.52) | $1,526,799.52 | ($1,771,073.21) | $87,323.21 | ($1,683,750.00) | ($1,683,750.00) | $183,750.00 | $1,500,000.00 | $0.00 | $0.00 |
| 103101-03 | 10/31/2001 | 2/28/2002 | 3.50% | $3,700,000.00 | $3,700,000.00 | $0.00 | ($24,849.76) | $3,724,849.76 | ($4,320,800.12) | $111,433.45 | ($4,209,366.67) | ($4,209,366.67) | $509,366.67 | $3,700,000.00 | $0.00 | $0.00 |
| 110501-01 | 11/5/2001 | 3/5/2002 | 3.50% | $1,400,000.00 | $1,400,000.00 | $0.00 | ($119,522.05) | $1,519,522.05 | ($1,762,641.99) | $184,608.66 | ($1,578,033.33) | ($1,578,033.33) | $178,033.33 | $1,400,000.00 | $0.00 | $0.00 |
| 110501-02 | 11/5/2001 | 3/5/2002 | 3.50% | $3,000,000.00 | $3,000,000.00 | $0.00 | ($116,658.75) | $3,116,658.75 | ($3,615,324.15) | $191,824.15 | ($3,423,500.00) | ($3,423,500.00) | $423,500.00 | $3,000,000.00 | $0.00 | $0.00 |
| 110901-01 | 11/9/2001 | 3/9/2002 | 3.50% | $1,700,000.00 | $1,700,000.00 | $0.00 | ($118,719.70) | $1,818,719.90 | ($2,109,652.36) | $187,519.40 | ($1,922,132.96) | ($1,922,132.96) | $222,132.96 | $1,700,000.00 | $0.00 | $0.00 |
| 111301-01 | 11/13/2001 | 3/13/2002 | 3.50% | $3,500,000.00 | $3,500,000.00 | $0.00 | ($130,626.40) | $3,630,626.40 | ($4,211,513.99) | $250,097.32 | ($3,961,416.67) | ($3,961,416.67) | $461,416.67 | $3,500,000.00 | $0.00 | $0.00 |
| 111501-01 | 11/15/2001 | 3/15/2002 | 3.50% | $3,000,000.00 | $3,000,000.00 | $0.00 | ($129,030.90) | $3,129,030.90 | ($3,629,658.18) | $234,158.18 | ($3,395,500.00) | ($3,395,500.00) | $395,500.00 | $3,000,000.00 | $0.00 | $0.00 |
| 111901-01 | 11/19/2001 | 3/19/2002 | 3.50% | $3,800,000.00 | $3,800,000.00 | $0.00 | ($129,328.35) | $3,929,328.35 | ($4,558,000.28) | $279,200.28 | ($4,278,800.00) | ($4,278,800.00) | $478,800.00 | $3,800,000.00 | $0.00 | $0.00 |
| 112001-01 | 11/20/2001 | 3/20/2002 | 3.50% | $1,200,000.00 | $1,200,000.00 | $0.00 | ($22,174.96) | $1,222,174.96 | ($1,417,678.20) | $66,478.20 | ($1,351,200.00) | ($1,351,200.00) | $151,200.00 | $1,200,000.00 | $0.00 | $0.00 |
| 112101-01 | 11/21/2001 | 3/21/2002 | 3.50% | $2,700,000.00 | $2,700,000.00 | $0.00 | ($106,141.85) | $2,806,141.85 | ($3,255,071.05) | $177,071.05 | ($3,078,000.00) | ($3,078,000.00) | $378,000.00 | $2,700,000.00 | $0.00 | $0.00 |
| 112601-01 | 11/26/2001 | 3/26/2002 | 3.50% | $900,000.00 | $900,000.00 | $0.00 | ($124,151.18) | $1,024,151.18 | ($1,183,463.58) | $162,713.58 | ($1,020,750.00) | ($1,020,750.00) | $120,750.00 | $900,000.00 | $0.00 | $0.00 |
| 112601-02 | 11/26/2001 | 3/26/2002 | 3.50% | $2,800,000.00 | $2,800,000.00 | $0.00 | ($186,150.00) | $2,986,150.00 | ($3,463,934.00) | $285,000.67 | ($3,178,933.33) | ($3,178,933.33) | $378,933.33 | $2,800,000.00 | $0.00 | $0.00 |
| 113001-01 | 11/30/2001 | 3/30/2002 | 3.50% | $2,700,000.00 | $2,700,000.00 | $0.00 | ($180,426.45) | $2,880,426.45 | ($3,438,217.00) | $385,417.00 | ($3,052,800.00) | ($3,052,800.00) | $352,800.00 | $2,700,000.00 | $0.00 | $0.00 |
| 113001-02 | 11/30/2001 | 3/30/2002 | 3.50% | $2,900,000.00 | $2,900,000.00 | $0.00 | ($224,126.55) | $3,124,126.55 | ($3,675,443.00) | $386,359.67 | ($3,289,083.33) | ($3,289,083.33) | $389,083.33 | $2,900,000.00 | $0.00 | $0.00 |
| 120601-01 | 12/6/2001 | 4/5/2002 | 3.50% | $2,400,000.00 | $2,400,000.00 | $0.00 | ($271,082.50) | $2,671,082.50 | ($3,098,446.25) | $382,046.25 | ($2,716,400.00) | ($2,716,400.00) | $316,400.00 | $2,400,000.00 | $0.00 | $0.00 |
| 121801-01 | 12/18/2001 | 4/17/2002 | 3.50% | $2,800,000.00 | $2,800,000.00 | $0.00 | ($404,161.00) | $3,204,161.00 | ($3,684,785.15) | $522,185.15 | ($3,162,600.00) | ($3,162,600.00) | $362,600.00 | $2,800,000.00 | $0.00 | $0.00 |
| 40902 | 4/9/2002 | 7/8/2002 | 3.50% | $4,000,000.00 | $0.00 | $4,000,000.00 | ($308,876.25) | $4,308,876.25 | ($4,955,199.40) | $502,532.73 | ($4,452,666.67) | ($452,666.67) | $452,666.67 | $0.00 | $4,000,000.00 | $0.00 |
| 071904-02 | 7/19/2004 | 11/16/2004 | 1.17% | $4,400,000.00 | $4,400,000.00 | $0.00 | ($84,918.75) | $4,484,918.75 | ($4,978,198.20) | $428,906.20 | ($4,549,292.00) | ($4,549,292.00) | $149,292.00 | $4,400,000.00 | $0.00 | $0.00 |
| 071904-03 | 7/19/2004 | 11/16/2004 | 1.17% | $3,300,000.00 | $3,300,000.00 | $0.00 | ($87,890.00) | $3,387,890.00 | ($3,760,556.00) | $347,300.00 | ($3,413,256.00) | ($3,413,256.00) | $113,256.00 | $3,300,000.00 | $0.00 | $0.00 |
| 071904-04 | 7/19/2004 | 11/16/2004 | 1.17% | $4,500,000.00 | $4,500,000.00 | $0.00 | ($112,540.25) | $4,612,540.25 | ($5,119,875.70) | $468,945.70 | ($4,650,930.00) | ($4,650,930.00) | $150,930.00 | $4,500,000.00 | $0.00 | $0.00 |
| 080404-01 | 8/4/2004 | 12/2/2004 | 1.17% | $3,450,000.00 | $3,450,000.00 | $0.00 | ($83,674.75) | $3,533,674.75 | ($3,922,344.05) | $366,049.55 | ($3,556,294.50) | ($3,556,294.50) | $106,294.50 | $3,450,000.00 | $0.00 | $0.00 |
| 092004-01 | 9/20/2004 | 1/18/2005 | 1.17% | $3,900,000.00 | $3,900,000.00 | $0.00 | ($138,808.50) | $4,038,808.50 | ($4,483,023.20) | $461,343.20 | ($4,021,680.00) | ($4,021,680.00) | $121,680.00 | $3,900,000.00 | $0.00 | $0.00 |

EXHIBIT P

**SPF Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Principal Paid | Principal Rolled | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101304-01 | 10/13/2004 | 2/10/2005 | 1.17% | $3,350,000.00 | $3,350,000.00 | $0.00 | ($66,007.25) | $3,416,007.25 | ($3,791,732.35) | $321,534.35 | ($3,470,198.00) | ($3,470,198.00) | $120,198.00 | $3,350,000.00 | $0.00 | $0.00 |
| 102504-01 | 10/25/2004 | 2/22/2005 | 1.17% | $4,150,000.00 | $4,150,000.00 | $0.00 | ($133,468.75) | $4,283,468.75 | ($4,754,645.00) | $462,217.00 | ($4,292,428.00) | ($4,292,428.00) | $142,428.00 | $4,150,000.00 | $0.00 | $0.00 |
| 102504-02 | 10/25/2004 | 2/22/2005 | 1.17% | $3,700,000.00 | $3,700,000.00 | $0.00 | ($121,591.50) | $3,821,591.50 | ($4,241,925.35) | $410,612.35 | ($3,831,313.00) | ($3,831,313.00) | $131,313.00 | $3,700,000.00 | $0.00 | $0.00 |
| 111604-05 | 11/16/2004 | 3/16/2005 | 1.17% | $3,500,000.00 | $3,500,000.00 | $0.00 | ($168,493.75) | $3,668,493.75 | ($4,072,019.60) | $438,249.60 | ($3,633,770.00) | ($3,633,770.00) | $133,770.00 | $3,500,000.00 | $0.00 | $0.00 |
| 121304-03 | 12/13/2004 | 4/12/2005 | 1.17% | $5,100,000.00 | $5,100,000.00 | $0.00 | ($167,025.00) | $5,267,025.00 | ($5,846,385.60) | $577,320.60 | ($5,269,065.00) | ($5,269,065.00) | $169,065.00 | $5,100,000.00 | $0.00 | $0.00 |
| 011405-04 | 1/14/2005 | 5/14/2005 | 1.17% | $3,850,000.00 | $3,850,000.00 | $0.00 | ($105,687.50) | $3,955,687.50 | ($4,390,804.00) | $405,669.00 | ($3,985,135.00) | ($3,985,135.00) | $135,135.00 | $3,850,000.00 | $0.00 | $0.00 |
| 012405-07 | 1/24/2005 | 5/24/2005 | 1.17% | $4,100,000.00 | $4,100,000.00 | $0.00 | ($99,531.25) | $4,199,531.25 | ($4,661,470.00) | $425,555.00 | ($4,235,915.00) | ($4,235,915.00) | $135,915.00 | $4,100,000.00 | $0.00 | $0.00 |
| 020805-01 | 2/8/2005 | 6/8/2005 | 1.17% | $4,400,000.00 | $4,400,000.00 | $0.00 | ($91,990.00) | $4,491,990.00 | ($4,986,095.80) | $441,951.80 | ($4,544,144.00) | ($4,544,144.00) | $144,144.00 | $4,400,000.00 | $0.00 | $0.00 |
| 020805-02 | 2/8/2005 | 6/8/2005 | 1.17% | $3,000,000.00 | $3,000,000.00 | $0.00 | ($110,250.00) | $3,110,250.00 | ($3,452,377.50) | $350,587.50 | ($3,101,790.00) | ($3,101,790.00) | $101,790.00 | $3,000,000.00 | $0.00 | $0.00 |
| 022405-02 | 2/24/2005 | 6/24/2005 | 1.17% | $4,050,000.00 | $4,050,000.00 | $0.00 | ($128,940.00) | $4,178,940.00 | ($4,638,623.40) | $454,365.90 | ($4,184,257.50) | ($4,184,257.50) | $134,257.50 | $4,050,000.00 | $0.00 | $0.00 |
| 022405-03 | 2/24/2005 | 6/24/2005 | 1.17% | $4,700,000.00 | $4,700,000.00 | $0.00 | ($119,075.00) | $4,819,075.00 | ($5,349,156.00) | $495,184.00 | ($4,853,972.00) | ($4,853,972.00) | $153,972.00 | $4,700,000.00 | $0.00 | $0.00 |
| 030805-01 | 3/8/2005 | 7/6/2005 | 1.17% | $2,200,000.00 | $2,200,000.00 | $0.00 | ($65,125.00) | $2,265,125.50 | ($2,514,281.10) | $239,635.10 | ($2,274,646.00) | ($2,274,646.00) | $74,646.00 | $2,200,000.00 | $0.00 | $0.00 |
| 031405-01 | 3/14/2005 | 7/12/2005 | 1.17% | $4,900,000.00 | $4,900,000.00 | $0.00 | ($117,762.50) | $5,017,762.50 | ($5,569,704.80) | $516,824.80 | ($5,052,880.00) | ($5,052,880.00) | $152,880.00 | $4,900,000.00 | $0.00 | $0.00 |
| *Count 79* | | *Opportunity Finance Closed Notes Subtotal* | | *$234,623,000.00* | *$230,623,000.00* | *$4,400,000.00* | *($9,688,983.07)* | *$244,711,283.37* | *($280,962,166.06)* | *$24,017,126.71* | *($256,945,039.35)* | *($243,845,038.75)* | *$21,922,038.75* | *$221,923,000.00* | *$13,100,000.00* | *$0.00* |
| | | | | | | | | | | | | | | | | |
| ***Sabes Family Foundation*** | | | | | | | | | | | | | | | | |
| SFF-C-3 | 8/13/2001 | 11/29/2002 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | ($175,383.00) | $2,675,383.00 | ($3,130,122.47) | $318,038.78 | ($2,812,083.69) | ($312,083.69) | $312,083.69 | $0.00 | $2,500,000.00 | $0.00 |
| SFF-A-7 | 9/10/2001 | 12/10/2001 | 3.50% | $3,188,397.50 | $0.00 | $3,188,397.50 | $0.00 | $3,188,397.50 | ($3,730,410.10) | $170,032.60 | ($3,560,377.50) | ($371,980.00) | $371,980.00 | $0.00 | $3,188,397.50 | $0.00 |
| SFF-B-4 | 9/26/2001 | 12/20/2001 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($80,016.99) | $3,080,016.99 | ($3,598,835.60) | $227,835.60 | ($3,371,000.00) | ($371,000.00) | $371,000.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-E-2 | 11/9/2001 | 12/20/2001 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($136,239.60) | $3,136,239.60 | ($3,638,035.24) | $235,535.24 | ($3,402,500.00) | ($402,500.00) | $402,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-F-2 | 11/15/2001 | 2/14/2002 | 3.50% | $2,800,000.00 | $0.00 | $2,800,000.00 | ($202,330.25) | $3,002,330.25 | ($3,482,693.85) | $336,426.83 | ($3,146,267.02) | ($346,267.02) | $346,267.02 | $0.00 | $2,800,000.00 | $0.00 |
| SFF-C-4 | 12/3/2001 | 3/28/2002 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | ($124,326.60) | $2,624,326.60 | ($3,044,213.31) | $217,546.64 | ($2,826,666.67) | ($326,666.67) | $326,666.67 | $0.00 | $2,500,000.00 | $0.00 |
| SFF-A-8 | 12/20/2001 | 3/20/2002 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($257,248.75) | $3,257,248.75 | ($3,778,408.55) | $417,908.55 | ($3,360,500.00) | ($360,500.00) | $360,500.00 | $0.00 | $3,000,000.00 | $0.00 |

EXHIBIT P

**SPF Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Principal Paid | Principal Rolled | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SFF-B-5 | 1/23/2002 | 4/23/2002 | 3.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($288,930.00) | $3,688,930.00 | ($4,242,259.10) | $457,493.08 | ($3,784,766.02) | ($384,766.02) | $384,766.02 | $0.00 | $3,400,000.00 | $0.00 |
| SFF-F-3 | 3/4/2002 | 6/2/2002 | 3.50% | $2,800,000.00 | $0.00 | $2,800,000.00 | ($201,372.80) | $3,001,372.80 | ($3,451,492.35) | $347,692.35 | ($3,103,800.00) | ($303,800.00) | $303,800.00 | $0.00 | $2,800,000.00 | $0.00 |
| SFF-E-3 | 3/5/2002 | 6/10/2002 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($228,144.50) | $3,228,144.50 | ($3,712,348.10) | $372,848.10 | ($3,339,500.00) | ($339,500.00) | $339,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-C-5 | 3/26/2002 | 6/24/2002 | 3.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | ($210,043.65) | $2,710,043.65 | ($3,116,430.45) | $330,597.12 | ($2,785,833.33) | ($285,833.33) | $285,833.33 | $0.00 | $2,500,000.00 | $0.00 |
| SFF-A-9 | 4/3/2002 | 7/2/2002 | 3.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($314,131.55) | $3,314,131.55 | ($3,811,200.98) | $464,700.98 | ($3,346,500.00) | ($346,500.00) | $346,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-B-6 | 5/16/2002 | 8/14/2002 | 2.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($124,593.75) | $3,524,593.75 | ($4,053,271.50) | $372,771.50 | ($3,680,500.00) | ($280,500.00) | $280,500.00 | $0.00 | $3,400,000.00 | $0.00 |
| SFF-F-4 | 6/11/2002 | 9/26/2002 | 2.50% | $2,800,000.00 | $0.00 | $2,800,000.00 | ($378,045.00) | $3,178,045.00 | ($3,654,745.20) | $605,078.53 | ($3,049,666.67) | ($249,666.67) | $249,666.67 | $0.00 | $2,800,000.00 | $0.00 |
| SFF-E-4 | 6/13/2002 | 9/26/2002 | 2.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($203,021.25) | $3,203,021.25 | ($3,683,445.13) | $420,945.13 | ($3,262,500.00) | ($262,500.00) | $262,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-C-6 | 7/9/2002 | 10/7/2002 | 2.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | ($326,362.00) | $2,826,362.00 | ($3,250,307.80) | $533,641.43 | ($2,716,666.37) | ($216,666.67) | $216,666.67 | $0.00 | $2,500,000.00 | $0.00 |
| SFF-A-10 | 7/25/2002 | 10/23/2002 | 2.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | ($95,308.00) | $2,595,308.00 | ($2,984,598.95) | $282,515.52 | ($2,702,083.43) | ($202,083.33) | $202,083.33 | $0.00 | $2,500,000.00 | $0.00 |
| SFF-B-7 | 8/26/2002 | 11/24/2002 | 2.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($365,662.75) | $3,765,662.75 | ($4,330,497.40) | $632,997.40 | ($3,697,500.00) | ($297,500.00) | $297,500.00 | $0.00 | $3,400,000.00 | $0.00 |
| SFF-E-5 | 10/3/2002 | 1/1/2003 | 2.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($495,070.00) | $3,495,070.00 | ($4,019,319.90) | $739,319.90 | ($3,280,000.00) | ($280,000.00) | $280,000.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-F-5 | 10/7/2002 | 1/5/2003 | 2.50% | $2,800,000.00 | $0.00 | $2,800,000.00 | ($284,550.65) | $3,084,550.65 | ($3,547,219.02) | $492,885.69 | ($3,054,333.33) | ($254,333.33) | $254,333.33 | $0.00 | $2,800,000.00 | $0.00 |
| SFF-C-7 | 10/23/2002 | 1/21/2003 | 2.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | ($581,376.00) | $3,081,376.00 | ($3,528,119.70) | $805,203.03 | ($2,722,916.67) | ($222,916.67) | $222,916.67 | $0.00 | $2,500,000.00 | $0.00 |
| SFF-A-11 | 11/4/2002 | 2/2/2003 | 2.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | ($592,403.00) | $3,092,403.00 | ($3,540,783.80) | $828,283.80 | ($2,712,500.00) | ($212,500.00) | $212,500.00 | $0.00 | $2,500,000.00 | $0.00 |
| SFF-B-8 | 12/11/2002 | 3/11/2003 | 2.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($363,425.00) | $3,763,425.00 | ($4,309,111.20) | $645,611.20 | ($3,663,500.00) | ($263,500.00) | $263,500.00 | $0.00 | $3,400,000.00 | $0.00 |
| SFF-E-6 | 1/28/2003 | 5/1/2003 | 2.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($391,752.75) | $3,391,752.75 | ($3,883,462.30) | $650,962.30 | ($3,232,500.00) | ($232,500.00) | $232,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-F-6 | 1/28/2003 | 5/1/2003 | 2.50% | $2,800,000.00 | $0.00 | $2,800,000.00 | ($206,676.75) | $3,006,676.75 | ($3,442,594.45) | $425,594.45 | ($3,017,000.00) | ($217,000.00) | $217,000.00 | $0.00 | $2,800,000.00 | $0.00 |
| SFF-C-8 | 2/11/2003 | 5/7/2003 | 2.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | ($404,175.00) | $2,904,175.00 | ($3,310,759.50) | $633,676.17 | ($2,677,083.33) | ($177,083.33) | $177,083.33 | $0.00 | $2,500,000.00 | $0.00 |
| SFF-A-12 | 2/19/2003 | 5/13/2003 | 1.50% | $2,500,000.00 | $0.00 | $2,500,000.00 | ($115,627.75) | $2,615,627.75 | ($3,060,262.15) | $456,512.15 | ($2,603,750.00) | ($103,750.00) | $103,750.00 | $0.00 | $2,500,000.00 | $0.00 |
| SFF-B-9 | 3/24/2003 | 6/26/2003 | 1.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($171,821.25) | $3,571,821.25 | ($4,071,822.35) | $512,022.35 | ($3,559,800.00) | ($159,800.00) | $159,800.00 | $0.00 | $3,400,000.00 | $0.00 |
| SFF-E-7 | 5/6/2003 | 8/1/2003 | 1.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($117,446.25) | $3,117,446.25 | ($3,553,872.30) | $423,372.30 | ($3,130,500.00) | ($130,500.00) | $130,500.00 | $0.00 | $3,000,000.00 | $0.00 |

EXHIBIT P

**SPF Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Principal Paid | Principal Rolled | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SFF-F-7 | 5/13/2003 | 8/7/2003 | 1.50% | $3,800,000.00 | $0.00 | $3,800,000.00 | ($27,208.75) | $3,827,208.75 | ($4,362,990.25) | $399,590.25 | ($3,963,400.00) | ($163,400.00) | $163,400.00 | $0.00 | $3,800,000.00 | $0.00 |
| SFF-C-9 | 5/14/2003 | 8/20/2003 | 1.50% | $4,000,000.00 | $0.00 | $4,000,000.00 | ($48,100.00) | $4,048,100.00 | ($4,635,053.50) | $439,053.50 | ($4,196,000.00) | ($196,000.00) | $196,000.00 | $0.00 | $4,000,000.00 | $0.00 |
| SFF-B-10 | 7/9/2003 | 10/9/2003 | 1.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($231,584.25) | $3,631,584.25 | ($4,067,323.60) | $510,923.60 | ($3,556,400.00) | ($156,400.00) | $156,400.00 | $0.00 | $3,400,000.00 | $0.00 |
| SFF-E-8 | 8/4/2003 | 10/30/2003 | 1.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($263,550.00) | $3,263,550.00 | ($3,655,176.00) | $524,676.00 | ($3,130,500.00) | ($130,500.00) | $130,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-A-14 | 8/26/2003 | 11/21/2003 | 1.50% | $3,800,000.00 | $0.00 | $3,800,000.00 | ($132,311.25) | $3,932,311.25 | ($4,404,108.60) | $438,808.60 | ($3,965,300.00) | ($165,300.00) | $165,300.00 | $0.00 | $3,800,000.00 | $0.00 |
| SFF-F-8 | 8/28/2003 | 12/2/2003 | 1.50% | $1,900,000.00 | $0.00 | $1,900,000.00 | ($43,082.50) | $1,943,082.50 | ($2,176,215.25) | $185,015.25 | ($1,991,200.00) | ($91,200.00) | $91,200.00 | $0.00 | $1,900,000.00 | $0.00 |
| SFF-C-10 | 9/2/2003 | 12/5/2003 | 1.50% | $2,600,000.00 | $0.00 | $2,600,000.00 | ($68,992.50) | $2,668,992.50 | ($2,989,256.50) | $267,056.50 | ($2,722,200.00) | ($122,200.00) | $122,200.00 | $0.00 | $2,600,000.00 | $0.00 |
| SFF-B-11 | 10/22/2003 | 1/20/2004 | 1.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($208,637.50) | $3,608,637.50 | ($4,041,674.00) | $485,274.00 | ($3,556,400.00) | ($156,400.00) | $156,400.00 | $0.00 | $3,400,000.00 | $0.00 |
| SFF-E-9 | 11/4/2003 | 2/2/2004 | 1.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($330,308.75) | $3,330,308.75 | ($3,729,945.80) | $584,445.80 | ($3,145,500.00) | ($145,500.00) | $145,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-A-15/SFF-F-9 | 12/1/2003 | 2/29/2004 | 1.50% | $3,800,000.00 | $0.00 | $3,800,000.00 | ($325,577.75) | $4,125,577.75 | ($4,620,544.75) | $645,744.75 | ($3,974,800.00) | ($174,800.00) | $174,800.00 | $0.00 | $3,800,000.00 | $0.00 |
| SFF-C-11/SFF-F-9 | 12/15/2003 | 3/14/2004 | 1.50% | $4,500,000.00 | $0.00 | $4,500,000.00 | ($195,031.25) | $4,695,031.25 | ($5,258,435.00) | $564,935.00 | ($4,693,500.00) | ($193,500.00) | $193,500.00 | $0.00 | $4,500,000.00 | $0.00 |
| SFF-B-12 | 1/28/2004 | 4/27/2004 | 1.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($317,491.25) | $3,717,491.25 | ($4,163,590.20) | $608,890.20 | ($3,554,700.00) | ($154,700.00) | $154,700.00 | $0.00 | $3,400,000.00 | $0.00 |
| SFF-E-10 | 2/10/2004 | 5/10/2004 | 1.50% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($137,112.00) | $3,137,112.00 | ($3,513,559.20) | $377,059.20 | ($3,136,500.00) | ($136,500.00) | $136,500.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-E-10 | 3/10/2004 | 6/8/2004 | 1.50% | $3,200,000.00 | $0.00 | $3,200,000.00 | ($100,978.00) | $3,300,978.00 | ($3,696,982.30) | $360,982.30 | ($3,336,000.00) | ($136,000.00) | $136,000.00 | $0.00 | $3,200,000.00 | $0.00 |
| SFF-C-12/SFF-F-10 | 3/16/2004 | 6/14/2004 | 1.50% | $4,500,000.00 | $0.00 | $4,500,000.00 | ($131,925.00) | $4,631,925.00 | ($5,187,735.00) | $491,985.00 | ($4,695,750.00) | ($195,750.00) | $195,750.00 | $0.00 | $4,500,000.00 | $0.00 |
| SFF-B-13 | 5/3/2004 | 8/1/2004 | 1.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($176,375.00) | $3,576,375.00 | ($4,005,540.00) | $455,940.00 | ($3,549,600.00) | ($3,549,600.00) | $149,600.00 | $3,400,000.00 | $0.00 | $0.00 |
| SFF-E-11/F-11 | 6/15/2004 | 9/13/2004 | 1.17% | $3,300,000.00 | $0.00 | $3,300,000.00 | ($54,965.00) | $3,354,965.00 | ($3,723,939.60) | $329,988.60 | ($3,393,951.00) | ($93,951.00) | $93,951.00 | $0.00 | $3,300,000.00 | $0.00 |
| SFF-A-17/F-11 | 6/29/2004 | 9/27/2004 | 1.17% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($199,137.50) | $3,599,137.50 | ($3,995,030.00) | $480,994.00 | ($3,514,036.00) | ($114,036.00) | $114,036.00 | $0.00 | $3,400,000.00 | $0.00 |
| SFF-C-13/F-11 | 6/29/2004 | 9/27/2004 | 1.17% | $4,600,000.00 | $0.00 | $4,600,000.00 | ($331,062.50) | $4,931,062.50 | ($5,473,470.70) | $720,980.70 | ($4,752,490.00) | ($152,490.00) | $152,490.00 | $0.00 | $4,600,000.00 | $0.00 |
| SFF-E-12/SFF-F-12 | 9/20/2004 | 12/19/2004 | 1.17% | $3,300,000.00 | $0.00 | $3,300,000.00 | ($648,663.00) | $3,948,663.00 | ($4,383,009.50) | $982,389.50 | ($3,400,620.00) | ($100,620.00) | $100,620.00 | $0.00 | $3,300,000.00 | $0.00 |
| SFF-F-12 | 10/13/2004 | 1/11/2005 | 1.17% | $2,800,000.00 | $0.00 | $2,800,000.00 | ($207,660.00) | $3,007,660.00 | ($3,338,465.40) | $439,093.40 | ($2,899,372.00) | ($99,372.00) | $99,372.00 | $0.00 | $2,800,000.00 | $0.00 |
| SFF | 11/16/2004 | 2/14/2005 | 1.17% | $4,700,000.00 | $0.00 | $4,700,000.00 | ($175,430.00) | $4,875,430.00 | ($5,367,841.20) | $486,374.20 | ($4,881,467.00) | ($181,467.00) | $181,467.00 | $0.00 | $4,700,000.00 | $0.00 |

EXHIBIT P

**SPF Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Principal Paid | Principal Rolled | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SFF-E-13/C-15 | 12/16/2004 | 3/16/2005 | 1.17% | $3,500,000.00 | $0.00 | $3,500,000.00 | ($31,218.75) | $3,531,218.75 | ($3,919,647.50) | $306,352.50 | ($3,613,295.00) | ($113,295.00) | $113,295.00 | $0.00 | $3,500,000.00 | $0.00 |
| SFF-F-13/C-15 | 1/13/2005 | 4/13/2005 | 1.17% | $3,100,000.00 | $0.00 | $3,100,000.00 | ($344,157.50) | $3,444,157.50 | ($3,822,975.10) | $615,374.10 | ($3,207,601.00) | ($107,601.00) | $107,601.00 | $0.00 | $3,100,000.00 | $0.00 |
| SFF-A-19 | 2/25/2005 | 5/26/2005 | 1.17% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($142,875.00) | $3,142,875.00 | ($3,488,591.25) | $393,821.25 | ($3,094,770.00) | ($94,770.00) | $94,770.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-E-14/C-16 | 3/14/2005 | 6/12/2005 | 1.17% | $4,800,000.00 | $0.00 | $4,800,000.00 | ($102,162.50) | $4,902,162.50 | ($5,397,261.00) | $438,141.00 | ($4,959,120.00) | ($159,120.00) | $159,120.00 | $0.00 | $4,800,000.00 | $0.00 |
| SFF-A-20 | 5/23/2005 | 8/18/2005 | 1.17% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($140,367.50) | $3,140,367.50 | ($3,485,743.95) | $383,953.95 | ($3,101,790.00) | ($101,790.00) | $101,790.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-F-14/C-16 | 5/31/2005 | 8/29/2005 | 1.17% | $3,500,000.00 | $0.00 | $3,500,000.00 | ($612,500.00) | $4,112,500.00 | ($4,546,855.00) | $929,485.00 | ($3,617,370.00) | ($117,390.00) | $117,390.00 | $0.00 | $3,500,000.00 | $0.00 |
| SFF-E-15/C-17 | 8/11/2005 | 11/10/2005 | 1.17% | $4,700,000.00 | $0.00 | $4,700,000.00 | ($40,000.00) | $4,740,000.00 | ($5,261,400.00) | $394,597.00 | ($4,866,803.00) | ($167,073.00) | $167,073.00 | $0.00 | $4,700,000.00 | $0.00 |
| SFF-A-21/C-17 | 8/24/2005 | 11/22/2005 | 1.17% | $3,100,000.00 | $0.00 | $3,100,000.00 | ($555,850.00) | $3,655,850.00 | ($4,057,988.00) | $840,715.00 | ($3,217,273.00) | ($117,273.00) | $117,273.00 | $0.00 | $3,100,000.00 | $0.00 |
| SFF-F-15/C-18 | 10/4/2005 | 1/2/2006 | 1.17% | $3,500,000.00 | $0.00 | $3,500,000.00 | ($583,380.00) | $4,083,380.00 | ($4,532,528.00) | $913,773.00 | ($3,618,755.00) | ($118,755.00) | $118,755.00 | $0.00 | $3,500,000.00 | $0.00 |
| SFF-E-16/C-19 | 11/14/2005 | 2/12/2006 | 1.17% | $4,700,000.00 | $0.00 | $4,700,000.00 | ($241,900.00) | $4,941,900.00 | ($5,485,500.00) | $615,031.00 | ($4,870,469.00) | ($170,469.00) | $170,469.00 | $0.00 | $4,700,000.00 | $0.00 |
| SFF-A-22/C-20 | 11/30/2005 | 2/28/2006 | 1.17% | $3,100,000.00 | $0.00 | $3,100,000.00 | ($245,118.50) | $3,345,118.50 | ($3,713,005.85) | $510,240.85 | ($3,202,765.00) | ($102,765.00) | $102,765.00 | $0.00 | $3,100,000.00 | $0.00 |
| SFF-F-16/C-20 | 1/10/2006 | 4/10/2006 | 1.17% | $3,500,000.00 | $0.00 | $3,500,000.00 | ($1,716,871.00) | $5,216,871.00 | ($5,790,713.25) | $2,166,498.25 | ($3,624,215.00) | ($124,215.00) | $124,215.00 | $0.00 | $3,500,000.00 | $0.00 |
| SFF-E-17/C-21 | 2/16/2006 | 5/17/2006 | 1.17% | $4,700,000.00 | $0.00 | $4,700,000.00 | ($155,200.00) | $4,855,200.00 | ($5,389,272.00) | $546,298.00 | ($4,842,974.00) | ($142,974.00) | $142,974.00 | $0.00 | $4,700,000.00 | $0.00 |
| SFF-A-23 | 3/14/2006 | 6/12/2006 | 1.17% | $3,000,000.00 | $0.00 | $3,000,000.00 | ($57,712.50) | $3,057,712.50 | ($3,394,043.30) | $288,743.30 | ($3,105,300.00) | ($105,300.00) | $105,300.00 | $0.00 | $3,000,000.00 | $0.00 |
| SFF-F-17/C-22 | 4/24/2006 | 7/23/2006 | 1.17% | $3,600,000.00 | $0.00 | $3,600,000.00 | ($106,425.00) | $3,706,425.00 | ($4,114,125.00) | $391,977.00 | ($3,722,148.00) | ($122,148.00) | $122,148.00 | $0.00 | $3,600,000.00 | $0.00 |
| SFF-E-18/C-22 | 5/24/2006 | 8/22/2006 | 1.17% | $3,200,000.00 | $0.00 | $3,200,000.00 | ($129,120.00) | $3,329,120.00 | ($3,695,296.00) | $389,216.00 | ($3,306,080.00) | ($106,080.00) | $106,080.00 | $0.00 | $3,200,000.00 | $0.00 |
| SFF-A-24/C-23 | 7/24/2006 | 10/22/2006 | 1.17% | $4,700,000.00 | $0.00 | $4,700,000.00 | ($85,840.00) | $4,785,840.00 | ($5,312,264.00) | $430,797.00 | ($4,881,467.00) | ($181,467.00) | $181,467.00 | $0.00 | $4,700,000.00 | $0.00 |
| SFF-F-18/C-24 | 7/26/2006 | 10/24/2006 | 1.17% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($438,281.25) | $3,838,281.25 | ($4,260,468.75) | $731,846.75 | ($3,528,622.00) | ($128,622.00) | $128,622.00 | $0.00 | $3,400,000.00 | $0.00 |
| SFF-E-19/C-24 | 10/10/2006 | 1/8/2007 | 1.17% | $3,200,000.00 | $0.00 | $3,200,000.00 | ($286,892.50) | $3,486,892.50 | ($3,870,447.75) | $556,879.75 | ($3,313,568.00) | ($113,568.00) | $113,568.00 | $0.00 | $3,200,000.00 | $0.00 |
| SFF-A-24/C-25 | 11/1/2006 | 1/30/2007 | 1.17% | $3,200,000.00 | $0.00 | $3,200,000.00 | ($463,075.00) | $3,663,075.00 | ($4,065,984.00) | $758,656.00 | ($3,307,328.00) | ($107,328.00) | $107,328.00 | $0.00 | $3,200,000.00 | $0.00 |
| SFF-F-19 | 11/1/2006 | 1/30/2007 | 1.17% | $2,400,000.00 | $0.00 | $2,400,000.00 | ($381,625.00) | $2,781,625.00 | ($3,087,595.00) | $604,291.00 | ($2,483,304.00) | ($83,304.00) | $83,304.00 | $0.00 | $2,400,000.00 | $0.00 |
| SFF-C-25/F-19 | 11/2/2006 | 1/31/2007 | 1.17% | $2,500,000.00 | $0.00 | $2,500,000.00 | ($348,614.75) | $2,848,614.75 | ($3,161,912.65) | $574,162.65 | ($2,587,750.00) | ($87,750.00) | $87,750.00 | $0.00 | $2,500,000.00 | $0.00 |

EXHIBIT P

**SPF Funding Notes - Summary of Notes Payable by Note**

**Closed Notes**

| Note Number | Start Date | Maturity Date | Monthly Interest Rate | Note Amount | Principal Investment | Rolled Principal Investment | PCI Cost Amount | Cost Paid to Vendors | Payment to SPE | Repayment to PCI | Net Payment to SPE | Payment to Defendants | Interest Paid | Principal Paid | Principal Rolled | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SFF-E-20/C-25 | 1/9/2007 | 4/9/2007 | 1.17% | $3,200,000.00 | $0.00 | $3,200,000.00 | ($369,150.00) | $3,569,150.00 | ($3,961,728.00) | $655,648.00 | ($3,306,080.00) | ($106,080.00) | $106,080.00 | $0.00 | $3,200,000.00 | $0.00 |
| SFF-A-26/C-26 | 2/7/2007 | 5/8/2007 | 1.17% | $3,600,000.00 | $0.00 | $3,600,000.00 | ($30,201.25) | $3,630,201.25 | ($4,029,494.40) | $304,538.40 | ($3,724,956.00) | ($124,956.00) | $124,956.00 | $0.00 | $3,600,000.00 | $0.00 |
| SFF-F-20/C-26 | 2/7/2007 | 5/8/2007 | 1.17% | $4,300,000.00 | $0.00 | $4,300,000.00 | ($35,000.00) | $4,335,000.00 | ($4,811,840.00) | $367,618.00 | ($4,444,222.00) | ($144,222.00) | $144,222.00 | $0.00 | $4,300,000.00 | $0.00 |
| SFF-F-21 | 5/9/2007 | 8/7/2007 | 1.17% | $2,600,000.00 | $0.00 | $2,600,000.00 | ($35,300.00) | $2,635,300.00 | ($2,925,126.00) | $232,852.00 | ($2,692,274.00) | ($2,692,274.00) | $92,274.00 | $2,600,000.00 | $0.00 | $0.00 |
| *Count 77* | | *Sabes Family Foundation Closed Notes Subtotal* | | *$251,588,397.50* | *$0.00* | *$251,588,397.50* | *($19,469,506.59)* | *$271,057,904.09* | *($305,332,334.85)* | *$39,479,755.82* | *($265,852,579.03)* | *($20,264,471.73)* | *$14,264,471.73* | *$6,000,000.00* | *$245,588,397.50* | *$0.00* |
| **Minneapolis Foundation** | | | | | | | | | | | | | | | | |
| MPLS-A-3 | 9/12/2001 | 12/10/2001 | 3.50% | $3,811,602.50 | $0.00 | $3,811,602.50 | ($243,848.75) | $4,055,451.25 | ($4,744,838.76) | $492,996.13 | ($4,251,842.63) | ($440,240.13) | $440,240.13 | $0.00 | $3,811,602.50 | $0.00 |
| MPLS-A-4 | 12/20/2001 | 3/20/2002 | 3.50% | $4,000,000.00 | $0.00 | $4,000,000.00 | ($176,356.00) | $4,176,365.00 | ($4,844,571.05) | $354,571.05 | ($4,490,000.00) | ($490,000.00) | $490,000.00 | $0.00 | $4,000,000.00 | $0.00 |
| MPLS-B-2 | 1/3/2002 | 4/3/2002 | 3.50% | $2,900,000.00 | $0.00 | $2,900,000.00 | ($346,875.00) | $3,246,875.00 | ($3,766,375.00) | $531,425.00 | ($3,234,950.00) | ($334,950.00) | $334,950.00 | $0.00 | $2,900,000.00 | $0.00 |
| MPLS-B-3 | 4/16/2002 | 7/15/2002 | 3.50% | $2,900,000.00 | $0.00 | $2,900,000.00 | ($313,950.95) | $3,213,950.95 | ($3,695,987.55) | $461,037.55 | ($3,234,950.00) | ($334,950.00) | $334,950.00 | $0.00 | $2,900,000.00 | $0.00 |
| MPLS-A-6 | 7/25/2002 | 10/23/2002 | 2.50% | $4,500,000.00 | $0.00 | $4,500,000.00 | ($436,796.10) | $4,936,796.10 | ($5,677,306.14) | $783,556.14 | ($4,893,750.00) | ($393,750.00) | $393,750.00 | $0.00 | $4,500,000.00 | $0.00 |
| MPLS-B-4 | 8/5/2002 | 11/23/2002 | 2.50% | $2,900,000.00 | $0.00 | $2,900,000.00 | ($72,803.75) | $2,972,803.75 | ($3,418,706.85) | $274,623.52 | ($3,144,083.33) | ($244,083.33) | $244,083.33 | $0.00 | $2,900,000.00 | $0.00 |
| MPLS-A-7 | 11/18/2002 | 2/16/2003 | 2.50% | $4,000,000.00 | $0.00 | $4,000,000.00 | ($123,075.00) | $4,123,075.00 | ($4,720,915.75) | $404,249.09 | ($4,316,666.66) | ($316,666.66) | $316,666.66 | $0.00 | $4,000,000.00 | $0.00 |
| MPLS-B-5 | 11/20/2002 | 2/18/2003 | 2.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($398,206.25) | $3,798,206.25 | ($4,348,935.65) | $676,935.65 | ($3,672,000.00) | ($272,000.00) | $272,000.00 | $0.00 | $3,400,000.00 | $0.00 |
| MPLS-A-8 | 2/27/2003 | 6/5/2003 | 1.50% | $4,000,000.00 | $0.00 | $4,000,000.00 | ($280,250.00) | $4,280,250.00 | ($4,901,620.75) | $705,620.75 | ($4,196,000.00) | ($4,196,000.00) | $196,000.00 | $4,000,000.00 | $0.00 | $0.00 |
| MPLS-B-6 | 3/11/2003 | 6/13/2003 | 1.50% | $3,400,000.00 | $0.00 | $3,400,000.00 | ($120,861.00) | $3,520,861.00 | ($4,031,367.60) | $473,267.60 | ($3,558,100.00) | ($3,058,100.00) | $158,100.00 | $2,900,000.00 | $500,000.00 | $0.00 |
| *Count 10* | | *Minneapolis Foundation Closed Notes Subtotal* | | *$35,811,602.50* | *$0.00* | *$35,811,602.50* | *($2,513,022.80)* | *$38,324,634.30* | *($44,150,625.10)* | *$5,158,282.48* | *($38,992,342.62)* | *($10,080,740.12)* | *$3,180,740.12* | *$6,900,000.00* | *$28,911,602.50* | *$0.00* |
| **Sabes Minnesota Limited Partnership** | | | | | | | | | | | | | | | | |
| PF-062702-01 | 6/27/2002 | 9/27/2002 | 3.50% | $4,000,000.00 | $4,000,000.00 | $0.00 | ($179,538.50) | $4,179,538.50 | ($4,806,456.46) | $476,456.46 | ($4,330,000.00) | ($4,330,000.00) | $330,000.00 | $4,000,000.00 | $0.00 | $0.00 |
| *Count 1* | | *Sabes Minnesota Limited Partnership Closed Notes Subtotal* | | *$4,000,000.00* | *$4,000,000.00* | *$0.00* | *($179,538.50)* | *$4,179,538.50* | *($4,806,456.46)* | *$476,456.46* | *($4,330,000.00)* | *($4,330,000.00)* | *$330,000.00* | *$4,000,000.00* | *$0.00* | *$0.00* |
| ***Count 167*** | | **Closed Notes Total** | | **$526,023,000.00** | **$234,623,000.00** | **$291,800,000.00** | **($31,851,050.96)** | **$558,273,360.26** | **($635,251,582.47)** | **$69,131,621.47** | **($566,119,961.00)** | **($278,520,250.60)** | **$39,697,250.60** | **$238,823,000.00** | **$287,600,000.00** | **$0.00** |

# EXHIBIT Q

**EXHIBIT Q**

**Transfers from SPF Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|---|---|---|---|
| **90 Day Transfers** | | | |
| No Transfers Identified | | | |
| **Two Year Transfers** | | | |
| 8/9/2007 | SABES FAMILY FOUNDATION | $2,600,000.00 | |
| 8/8/2007 | SABES FAMILY FOUNDATION | $92,274.00 | |
| 6/22/2007 | SABES FAMILY FOUNDATION | $8,700,000.00 | |
| 5/7/2007 | SABES FAMILY FOUNDATION | $144,222.00 | |
| 5/7/2007 | SABES FAMILY FOUNDATION | $124,956.00 | |
| 4/4/2007 | SABES FAMILY FOUNDATION | $106,080.00 | |
| 1/31/2007 | SABES FAMILY FOUNDATION | $87,750.00 | |
| 1/29/2007 | SABES FAMILY FOUNDATION | $83,304.00 | |
| 1/26/2007 | SABES FAMILY FOUNDATION | $107,328.00 | |
| 1/9/2007 | SABES FAMILY FOUNDATION | $113,568.00 | |
| 10/31/2006 | SABES FAMILY FOUNDATION | $181,467.00 | |
| 10/31/2006 | SABES FAMILY FOUNDATION | $128,622.00 | $12,469,571.00 |
| **Additional Transfers** | | | |
| 8/17/2006 | SABES FAMILY FOUNDATION | $106,080.00 | |
| 7/20/2006 | SABES FAMILY FOUNDATION | $122,148.00 | |
| 6/12/2006 | SABES FAMILY FOUNDATION | $105,300.00 | |
| 5/5/2006 | SABES FAMILY FOUNDATION | $142,974.00 | |
| 4/11/2006 | SABES FAMILY FOUNDATION | $124,215.00 | |
| 2/23/2006 | SABES FAMILY FOUNDATION | $102,765.00 | |
| 2/15/2006 | SABES FAMILY FOUNDATION | $170,469.00 | |
| 1/3/2006 | SABES FAMILY FOUNDATION | $118,755.00 | |
| 11/29/2005 | SABES FAMILY FOUNDATION | $117,273.00 | |
| 11/10/2005 | SABES FAMILY FOUNDATION | $167,073.00 | |
| 8/25/2005 | SABES FAMILY FOUNDATION | $117,390.00 | |
| 8/18/2005 | SABES FAMILY FOUNDATION | $101,790.00 | |
| 6/7/2005 | SABES FAMILY FOUNDATION | $159,120.00 | |
| 6/3/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,274,646.00 [1] | |
| 6/2/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,052,880.00 [1] | |
| 5/20/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,184,257.50 [1] | |
| 5/19/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,853,972.00 [1] | |
| 5/17/2005 | SABES FAMILY FOUNDATION | $94,770.00 | |

**EXHIBIT Q**
**Transfers from SPF Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|---|---|---|---|
| 5/9/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,101,790.00 [1] | |
| 5/3/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,544,144.00 [1] | |
| 4/19/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,235,915.00 [1] | |
| 4/14/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,985,135.00 [1] | |
| 4/12/2005 | SABES FAMILY FOUNDATION | $107,601.00 | |
| 3/9/2005 | SABES FAMILY FOUNDATION | $113,295.00 | |
| 3/8/2005 | OPPORTUNITY FINANCE LLC | $5,269,065.00 | |
| 2/23/2005 | SABES FAMILY FOUNDATION | $181,467.00 | |
| 2/22/2005 | OPPORTUNITY FINANCE LLC | $3,633,770.00 | |
| 1/24/2005 | OPPORTUNITY FINANCE LLC | $3,831,313.00 | |
| 1/21/2005 | OPPORTUNITY FINANCE LLC | $4,292,428.00 | |
| 1/13/2005 | OPPORTUNITY FINANCE LLC | $3,440,148.50 | |
| 1/13/2005 | SABES FAMILY FOUNDATION | $30,049.50 | |
| 1/12/2005 | SABES FAMILY FOUNDATION | $99,372.00 | |
| 12/15/2004 | SABES FAMILY FOUNDATION | $100,620.00 | |
| 12/9/2004 | OPPORTUNITY FINANCE LLC | $4,021,680.00 | |
| 10/22/2004 | OPPORTUNITY FINANCE LLC | $3,556,294.50 | |
| 10/15/2004 | OPPORTUNITY FINANCE LLC | $3,413,256.00 | |
| 10/14/2004 | OPPORTUNITY FINANCE LLC | $4,650,930.00 | |
| 10/14/2004 | OPPORTUNITY FINANCE LLC | $4,549,292.00 | |
| 9/23/2004 | SABES FAMILY FOUNDATION | $152,490.00 | |
| 9/23/2004 | SABES FAMILY FOUNDATION | $114,036.00 | |
| 8/27/2004 | SABES FAMILY FOUNDATION | $93,951.00 | |
| 8/4/2004 | SABES FAMILY FOUNDATION | $3,400,000.00 | |
| 8/2/2004 | SABES FAMILY FOUNDATION | $149,600.00 | |
| 6/11/2004 | SABES FAMILY FOUNDATION | $195,750.00 | |
| 6/3/2004 | SABES FAMILY FOUNDATION | $136,000.00 | |
| 5/12/2004 | SABES FAMILY FOUNDATION | $136,500.00 | |
| 4/28/2004 | SABES FAMILY FOUNDATION | $154,700.00 | |
| 3/10/2004 | SABES FAMILY FOUNDATION | $193,500.00 | |
| 3/2/2004 | SABES FAMILY FOUNDATION | $174,800.00 | |
| 2/9/2004 | SABES FAMILY FOUNDATION | $145,500.00 | |
| 1/23/2004 | SABES FAMILY FOUNDATION | $156,400.00 | |
| 12/8/2003 | SABES FAMILY FOUNDATION | $122,200.00 | |

**EXHIBIT Q**
**Transfers from SPF Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 12/3/2003 | SABES FAMILY FOUNDATION | $91,200.00 | |
| 11/24/2003 | SABES FAMILY FOUNDATION | $165,300.00 | |
| 10/31/2003 | SABES FAMILY FOUNDATION | $130,500.00 | |
| 10/9/2003 | SABES FAMILY FOUNDATION | $156,400.00 | |
| 8/20/2003 | SABES FAMILY FOUNDATION | $196,000.00 | |
| 8/8/2003 | SABES FAMILY FOUNDATION | $163,400.00 | |
| 8/1/2003 | SABES FAMILY FOUNDATION | $130,500.00 | |
| 7/30/2003 | MINNEAPOLIS FOUNDATION | $87,098.12 | |
| 6/26/2003 | SABES FAMILY FOUNDATION | $159,800.00 | |
| 6/17/2003 | MINNEAPOLIS FOUNDATION | $3,034,850.00 | |
| 6/17/2003 | SABES FAMILY FOUNDATION | $23,250.00 | |
| 6/6/2003 | MINNEAPOLIS FOUNDATION | $4,196,000.00 | |
| 5/13/2003 | SABES FAMILY FOUNDATION | $103,750.00 | |
| 5/7/2003 | SABES FAMILY FOUNDATION | $177,083.33 | |
| 5/2/2003 | SABES FAMILY FOUNDATION | $232,500.00 | |
| 5/2/2003 | SABES FAMILY FOUNDATION | $217,000.00 | |
| 3/17/2003 | SABES FAMILY FOUNDATION | $263,500.00 | |
| 2/25/2003 | MINNEAPOLIS FOUNDATION | $232,000.00 | |
| 2/25/2003 | SABES FAMILY FOUNDATION | $40,000.00 | |
| 2/21/2003 | MINNEAPOLIS FOUNDATION | $316,666.66 | |
| 2/14/2003 | SABES FAMILY FOUNDATION | $212,500.00 | |
| 2/7/2003 | SABES FAMILY FOUNDATION | $222,916.67 | |
| 1/27/2003 | SABES FAMILY FOUNDATION | $254,333.33 | |
| 1/23/2003 | SABES FAMILY FOUNDATION | $280,000.00 | |
| 12/10/2002 | SABES FAMILY FOUNDATION | $297,500.00 | |
| 11/15/2002 | MINNEAPOLIS FOUNDATION | $244,083.33 | |
| 11/12/2002 | MINNEAPOLIS FOUNDATION | $350,000.00 | |
| 11/12/2002 | SABES FAMILY FOUNDATION | $43,750.00 | |
| 10/31/2002 | SABES FAMILY FOUNDATION | $202,083.33 | |
| 10/21/2002 | SABES FAMILY FOUNDATION | $216,666.67 | |
| 10/8/2002 | SABES MINNESOTA LIMITED PARTNERSHIP | $4,330,000.00 | |
| 9/27/2002 | SABES FAMILY FOUNDATION | $262,500.00 | |
| 9/27/2002 | SABES FAMILY FOUNDATION | $249,666.67 | |
| 8/23/2002 | SABES FAMILY FOUNDATION | $280,500.00 | |

**EXHIBIT Q**
**Transfers from SPF Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 7/24/2002 | MINNEAPOLIS FOUNDATION | $334,950.00 | |
| 7/16/2002 | MINNEAPOLIS FOUNDATION | $452,666.67 | |
| 7/12/2002 | SABES FAMILY FOUNDATION | $346,500.00 | |
| 7/3/2002 | SABES FAMILY FOUNDATION | $285,833.33 | |
| 6/11/2002 | SABES FAMILY FOUNDATION | $339,500.00 | |
| 6/10/2002 | SABES FAMILY FOUNDATION | $303,800.00 | |
| 5/2/2002 | SABES FAMILY FOUNDATION | $384,766.02 | |
| 4/16/2002 | MINNEAPOLIS FOUNDATION | $334,950.00 | |
| 4/9/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,162,600.00 [1] | |
| 4/5/2002 | MINNEAPOLIS FOUNDATION | $490,000.00 | |
| 4/3/2002 | SABES FAMILY FOUNDATION | $360,500.00 | |
| 3/29/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,716,400.00 [1] | |
| 3/26/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,289,083.33 [1] | |
| 3/25/2002 | SABES FAMILY FOUNDATION | $326,666.67 | |
| 3/22/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,178,933.33 [1] | |
| 3/22/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,078,000.00 [1] | |
| 3/22/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,052,800.00 [1] | |
| 3/21/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,020,750.00 [1] | |
| 3/11/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,395,500.00 [1] | |
| 3/11/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,351,200.00 [1] | |
| 3/7/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,278,800.00 [1] | |
| 3/7/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,961,416.67 [1] | |
| 3/6/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,423,500.00 [1] | |
| 3/4/2002 | SABES FAMILY FOUNDATION | $402,500.00 | |
| 3/1/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,922,132.96 [1] | |
| 3/1/2002 | SABES FAMILY FOUNDATION | $346,267.02 | |
| 2/27/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,209,366.67 [1] | |
| 2/26/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,230,950.00 [1] | |
| 2/26/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,465,500.00 [1] | |
| 2/25/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,578,033.33 [1] | |
| 2/14/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,683,750.00 [1] | |
| 2/14/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,571,500.00 [1] | |
| 2/6/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,472,067.02 [1] | |
| 2/5/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,792,500.00 [1] | |

**EXHIBIT Q**

**Transfers from SPF Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 1/31/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,523,400.00 [1] | |
| 1/30/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,093,750.00 [1] | |
| 1/24/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,624,682.93 [1] | |
| 1/24/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,146,049.63 [1] | |
| 1/24/2002 | SABES FAMILY FOUNDATION | $51,800.00 | |
| 1/17/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,389,100.00 [1] | |
| 1/11/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,126,000.36 [1] | |
| 1/11/2002 | SABES FAMILY FOUNDATION | $371,000.00 | |
| 1/4/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,504,000.00 [1] | |
| 1/3/2002 | MINNEAPOLIS FOUNDATION | $453,366.22 | |
| 12/20/2001 | MINNEAPOLIS FOUNDATION | $371,980.00 | |
| 12/20/2001 | SABES FAMILY FOUNDATION | $346,500.03 | |
| 12/20/2001 | MINNEAPOLIS FOUNDATION | $93,740.10 | |
| 12/18/2001 | OPPORTUNITY FINANCE LLC | $3,027,600.00 | |
| 12/5/2001 | OPPORTUNITY FINANCE LLC | $1,796,000.35 | |
| 12/5/2001 | OPPORTUNITY FINANCE LLC | $1,419,816.14 | |
| 11/29/2001 | OPPORTUNITY FINANCE LLC | $5,843,067.02 | |
| 11/29/2001 | SABES FAMILY FOUNDATION | $312,083.69 | |
| 11/21/2001 | OPPORTUNITY FINANCE LLC | $4,396,666.95 | |
| 11/19/2001 | OPPORTUNITY FINANCE LLC | $4,694,900.00 | |
| 11/19/2001 | OPPORTUNITY FINANCE LLC | $3,107,066.98 | |
| 11/15/2001 | OPPORTUNITY FINANCE LLC | $3,002,400.00 | |
| 11/14/2001 | OPPORTUNITY FINANCE LLC | $323,400.33 | |
| 11/9/2001 | OPPORTUNITY FINANCE LLC | $1,661,000.00 | |
| 11/9/2001 | OPPORTUNITY FINANCE LLC | $378,000.00 | |
| 11/5/2001 | OPPORTUNITY FINANCE LLC | $2,635,200.00 | |
| 11/1/2001 | OPPORTUNITY FINANCE LLC | $2,842,666.40 | |
| 11/1/2001 | OPPORTUNITY FINANCE LLC | $2,153,999.78 | |
| 10/30/2001 | OPPORTUNITY FINANCE LLC | $6,630,000.00 | |
| 10/24/2001 | OPPORTUNITY FINANCE LLC | $2,901,600.00 | |
| 10/24/2001 | OPPORTUNITY FINANCE LLC | $1,450,150.33 | |
| 10/18/2001 | OPPORTUNITY FINANCE LLC | $2,313,150.00 | |
| 10/5/2001 | OPPORTUNITY FINANCE LLC | $5,542,499.69 | |
| 10/1/2001 | OPPORTUNITY FINANCE LLC | $1,333,000.00 | |

**EXHIBIT Q**

**Transfers from SPF Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 9/24/2001 | OPPORTUNITY FINANCE LLC | $3,957,000.00 | |
| 9/21/2001 | OPPORTUNITY FINANCE LLC | $2,696,800.00 | |
| 9/14/2001 | OPPORTUNITY FINANCE LLC | $4,690,000.00 | |
| 9/4/2001 | OPPORTUNITY FINANCE LLC | $3,311,500.00 | |
| 9/4/2001 | OPPORTUNITY FINANCE LLC | $3,266,000.00 | |
| 8/24/2001 | OPPORTUNITY FINANCE LLC | $3,792,700.33 | |
| 8/21/2001 | OPPORTUNITY FINANCE LLC | $2,506,616.41 | |
| 8/21/2001 | OPPORTUNITY FINANCE LLC | $2,474,539.08 | |
| 8/14/2001 | SABES FAMILY FOUNDATION | $367,500.42 | |
| 8/13/2001 | OPPORTUNITY FINANCE LLC | $1,404,650.23 | |
| 8/10/2001 | OPPORTUNITY FINANCE LLC | $4,088,500.00 | |
| 8/3/2001 | OPPORTUNITY FINANCE LLC | $2,083,983.61 | $275,205,278.14 |

| | | | |
|------|-------------------|--------|----------|
| | *Subtotal - Transfers to Opportunity Finance LLC* | *$132,382,650.63* | |
| | *Subtotal - Transfers to Opportunity Finance Securitization III, LLC* | *$32,232,739.50* | |
| | *Subtotal - Transfers to DZ Bank AG, As Collateral Agent for Certain Secured Parties* | *$78,241,766.23* | |
| | *Subtotal - Transfers to Sabes Minnesota Limited Partnership* | *$4,330,000.00* | |
| | *Subtotal - Transfers to Sabes Family Foundation* | *$29,495,341.68* | |
| | *Subtotal - Transfers to Minneapolis Foundation* | *$10,992,351.10* | |
| | **Total Transfers** | **$287,674,849.14** [2, 3] | |

[1] Transfer was paid from a PC Funding, LLC bank account; however, the Borrower on the note was SPF Funding, LLC / Petters Finance, LLC.

[2] Amount differs from total Payment to Defendants stated in Exhibit P, SPF Funding Notes - Summary of Notes Payable by Note by $9,154,598.54 (i.e. $287,674,849.14 - $278,520,250.60 = $9,154,598.54). This variance is due to (1) the inclusion of $8,700,000.00 and $87,098.12 in additional transfers from SPF Funding, LLC to the Defendants, not tied to particular notes, and (2) the inclusion of a $367,500.42 transfer from SPF Funding, LLC to Sabes Family Foundation related to Janet Sabes note 5355 ($8,700,000.00 + $87,098.12 + $367,500.42 = $9,154,598.54).

[3] Amount differs from net transfers from PCI to SPF Funding, LLC (i.e., $638,119,082.89 paid to SPF Funding, LLC (see Exhibit O) less $69,131,621.47 repaid to PCI (see Exhibit R) = $568,987,461.42) by $281,312,612.28. This variance is due to (1) $290,100,000.00 of principal that was rolled to new SPF Funding, LLC notes, (2) the total $8,787,098.12 in additional transfers from SPF Funding, LLC to the Defendants, not tied to particular notes, and (3) a total of $289.60 in overpayments from SPF Funding, LLC to Defendants ($290,100,000.00 - $8,787,098.12 - $289.60 = $281,312,612.28).

# EXHIBIT R

**EXHIBIT R**

**Repayments from SPF Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| *90 Day Transfers* | | |
| No Transfers Identified | | |
| *Two Year Transfers* | | |
| 8/8/2007 | $232,852.00 | |
| 5/7/2007 | $367,618.00 | |
| 5/7/2007 | $304,538.40 | |
| 4/4/2007 | $655,648.00 | |
| 1/31/2007 | $574,162.65 | |
| 1/29/2007 | $604,291.00 | |
| 1/26/2007 | $758,656.00 | |
| 1/9/2007 | $556,879.75 | |
| 10/31/2006 | $731,846.75 | |
| 10/31/2006 | $430,797.00 | **$5,217,289.55** |
| *Additional Transfers* | | |
| 8/17/2006 | $389,216.00 | |
| 7/20/2006 | $391,977.00 | |
| 6/12/2006 | $288,743.30 | |
| 5/5/2006 | $546,298.00 | |
| 4/11/2006 | $2,166,498.25 | |
| 2/24/2006 | $510,240.85 | |
| 2/15/2006 | $615,031.00 | |
| 1/3/2006 | $913,773.00 | |
| 11/29/2005 | $840,715.00 | |
| 11/10/2005 | $394,597.00 | |
| 8/25/2005 | $929,485.00 | |
| 8/18/2005 | $383,953.95 | |
| 6/7/2005 | $438,141.00 | |
| 6/3/2005 | $239,635.10 | |
| 6/2/2005 | $516,824.80 | |
| 5/20/2005 | $454,365.90 | |
| 5/19/2005 | $495,184.00 | |
| 5/17/2005 | $393,821.25 | |
| 5/9/2005 | $350,587.50 | |
| 5/3/2005 | $441,951.80 | |
| 4/19/2005 | $425,555.00 | |
| 4/14/2005 | $405,669.00 | |
| 4/12/2005 | $615,374.10 | |
| 3/9/2005 | $306,352.50 | |
| 3/8/2005 | $577,320.60 | |

**EXHIBIT R**

**Repayments from SPF Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 2/23/2005 | $486,374.20 | |
| 2/22/2005 | $438,249.60 | |
| 1/24/2005 | $410,612.35 | |
| 1/21/2005 | $462,217.00 | |
| 1/13/2005 | $321,534.35 | |
| 1/12/2005 | $439,093.40 | |
| 12/15/2004 | $982,389.50 | |
| 12/9/2004 | $461,343.20 | |
| 10/22/2004 | $366,049.55 | |
| 10/15/2004 | $347,300.00 | |
| 10/14/2004 | $468,945.70 | |
| 10/14/2004 | $428,906.20 | |
| 9/23/2004 | $720,980.70 | |
| 9/23/2004 | $480,994.00 | |
| 8/27/2004 | $329,988.60 | |
| 8/2/2004 | $455,940.00 | |
| 6/11/2004 | $491,985.00 | |
| 6/3/2004 | $360,982.30 | |
| 5/12/2004 | $377,059.20 | |
| 4/28/2004 | $608,890.20 | |
| 3/10/2004 | $564,935.00 | |
| 3/2/2004 | $645,744.75 | |
| 2/9/2004 | $584,445.80 | |
| 1/23/2004 | $485,274.00 | |
| 12/8/2003 | $267,056.50 | |
| 12/3/2003 | $185,015.25 | |
| 11/24/2003 | $438,808.60 | |
| 10/31/2003 | $524,676.00 | |
| 10/9/2003 | $510,923.60 | |
| 8/20/2003 | $439,053.50 | |
| 8/8/2003 | $399,590.25 | |
| 8/1/2003 | $423,372.30 | |
| 6/26/2003 | $512,022.35 | |
| 6/13/2003 | $473,267.60 | |
| 6/6/2003 | $705,620.75 | |
| 5/13/2003 | $456,512.15 | |
| 5/7/2003 | $633,676.17 | |
| 5/2/2003 | $650,962.30 | |
| 5/2/2003 | $425,594.45 | |
| 3/17/2003 | $645,611.20 | |

## EXHIBIT R

### Repayments from SPF Funding, LLC to PCI

| Date | Amount | Subtotal |
|------|--------|----------|
| 2/25/2003 | $676,935.65 | |
| 2/21/2003 | $404,249.09 | |
| 2/14/2003 | $828,283.80 | |
| 2/7/2003 | $805,203.03 | |
| 1/27/2003 | $492,885.69 | |
| 1/23/2003 | $739,319.90 | |
| 12/10/2002 | $632,997.40 | |
| 11/15/2002 | $274,623.52 | |
| 11/12/2002 | $783,556.14 | |
| 10/31/2002 | $282,515.52 | |
| 10/21/2002 | $533,641.43 | |
| 10/8/2002 | $476,456.46 | |
| 9/27/2002 | $605,078.53 | |
| 9/27/2002 | $420,945.13 | |
| 8/23/2002 | $372,771.50 | |
| 7/24/2002 | $461,037.55 | |
| 7/16/2002 | $502,532.73 | |
| 7/12/2002 | $464,700.98 | |
| 7/3/2002 | $330,597.12 | |
| 6/11/2002 | $372,848.10 | |
| 6/10/2002 | $347,692.35 | |
| 5/2/2002 | $457,493.08 | |
| 4/16/2002 | $531,425.00 | |
| 4/9/2002 | $522,185.15 | |
| 4/5/2002 | $354,571.05 | |
| 4/3/2002 | $417,908.55 | |
| 3/29/2002 | $382,046.25 | |
| 3/26/2002 | $386,359.67 | |
| 3/25/2002 | $217,546.64 | |
| 3/22/2002 | $385,417.00 | |
| 3/22/2002 | $285,000.67 | |
| 3/22/2002 | $177,071.05 | |
| 3/21/2002 | $162,713.58 | |
| 3/11/2002 | $234,158.18 | |
| 3/11/2002 | $66,478.20 | |
| 3/7/2002 | $279,200.28 | |
| 3/7/2002 | $250,097.32 | |
| 3/6/2002 | $191,824.15 | |
| 3/5/2002 | $235,535.24 | |
| 3/1/2002 | $336,426.83 | |

## EXHIBIT R

### Repayments from SPF Funding, LLC to PCI

| Date | Amount | Subtotal |
|------|--------|----------|
| 3/1/2002 | $187,519.40 | |
| 2/27/2002 | $111,433.45 | |
| 2/26/2002 | $333,948.13 | |
| 2/26/2002 | $152,885.80 | |
| 2/25/2002 | $184,608.66 | |
| 2/14/2002 | $87,323.21 | |
| 2/14/2002 | $65,593.67 | |
| 2/6/2002 | $62,026.31 | |
| 2/5/2002 | $2,204,055.00 | |
| 1/31/2002 | $63,034.00 | |
| 1/30/2002 | $53,302.88 | |
| 1/24/2002 | $517,350.57 | |
| 1/24/2002 | $96,445.44 | |
| 1/17/2002 | $657,963.15 | |
| 1/11/2002 | $227,835.60 | |
| 1/11/2002 | $74,939.14 | |
| 1/4/2002 | $184,542.05 | |
| 1/3/2002 | $61,255.22 | |
| 12/20/2001 | $492,996.13 | |
| 12/20/2001 | $170,032.60 | |
| 12/18/2001 | $151,761.70 | |
| 12/5/2001 | $141,881.15 | |
| 12/5/2001 | $115,699.14 | |
| 11/29/2001 | $385,773.13 | |
| 11/29/2001 | $318,038.78 | |
| 11/21/2001 | $300,250.30 | |
| 11/19/2001 | $226,167.40 | |
| 11/19/2001 | $188,694.82 | |
| 11/15/2001 | $173,430.45 | |
| 11/14/2001 | $158,517.91 | |
| 11/9/2001 | $214,281.50 | |
| 11/9/2001 | $128,323.50 | |
| 11/5/2001 | $194,214.18 | |
| 11/1/2001 | $424,857.62 | |
| 11/1/2001 | $233,397.16 | |
| 10/30/2001 | $422,687.92 | |
| 10/25/2001 | $74,590.82 | |
| 10/24/2001 | $277,507.62 | |
| 10/18/2001 | $306,542.50 | |
| 10/5/2001 | $390,436.68 | |

**EXHIBIT R**

**Repayments from SPF Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 10/1/2001 | $129,757.10 | |
| 9/24/2001 | $264,979.69 | |
| 9/21/2001 | $148,474.48 | |
| 9/14/2001 | $259,653.23 | |
| 9/4/2001 | $693,685.95 | |
| 9/4/2001 | $281,032.11 | |
| 8/24/2001 | $99,840.49 | |
| 8/21/2001 | $193,921.96 | |
| 8/21/2001 | $180,027.80 | |
| 8/13/2001 | $129,054.77 | |
| 8/9/2001 | $383,315.66 | |
| 8/3/2001 | $208,806.01 | **$63,914,331.92** |
| **Transfers** | **$69,131,621.47** | |

# EXHIBIT S

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|---|---|---|
| ***90 Day Transfers*** | | |
| 9/12/2008 | $2,000,000.00 | |
| 9/5/2008 | $2,000,000.00 | |
| 8/5/2008 | $1,000,000.00 | |
| 8/1/2008 | $4,238,419.00 | **$9,238,419.00** |
| ***Two Year Transfers*** | | |
| 5/9/2008 | $4,013,856.00 | |
| 5/9/2008 | $3,648,960.00 | |
| 5/9/2008 | $2,850,991.50 | |
| 5/7/2008 | $3,657,333.55 | |
| 4/25/2008 | $4,065,984.00 | |
| 4/25/2008 | $3,500,134.50 | |
| 4/23/2008 | $2,796,002.00 | |
| 4/22/2008 | $57,522.87 | |
| 4/18/2008 | $5,044,395.00 | |
| 4/18/2008 | $4,466,553.35 | |
| 4/18/2008 | $3,830,321.90 | |
| 4/11/2008 | $4,763,726.00 | |
| 4/11/2008 | $4,076,101.95 | |
| 4/8/2008 | $5,279,659.00 | |
| 4/4/2008 | $3,680,623.20 | |
| 4/3/2008 | $3,987,792.00 | |
| 4/2/2008 | $4,691,505.00 | |
| 3/27/2008 | $4,322,633.00 | |
| 3/27/2008 | $3,308,137.50 | |
| 3/25/2008 | $4,417,263.00 | |
| 3/21/2008 | $2,838,870.75 | |
| 3/20/2008 | $5,523,593.75 | |
| 3/19/2008 | $2,973,440.00 | |
| 3/14/2008 | $4,266,488.00 | |
| 3/14/2008 | $3,027,840.00 | |
| 3/13/2008 | $5,142,656.25 | |
| 3/7/2008 | $4,671,357.60 | |
| 3/7/2008 | $3,608,784.00 | |
| 3/7/2008 | $3,207,880.00 | |
| 2/29/2008 | $5,357,830.50 | |
| 2/29/2008 | $4,781,766.00 | |
| 2/28/2008 | $5,250,925.25 | |
| 2/22/2008 | $4,571,250.00 | |
| 2/22/2008 | $4,266,488.00 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 2/21/2008 | $4,039,920.00 | |
| 2/15/2008 | $5,228,381.00 | |
| 2/7/2008 | $3,352,791.00 | |
| 2/6/2008 | $3,870,224.00 | |
| 2/1/2008 | $3,859,394.00 | |
| 11/30/2007 | $2,840,376.00 | |
| 11/29/2007 | $2,677,283.15 | |
| 11/27/2007 | $2,605,434.00 | |
| 11/26/2007 | $5,044,210.00 | |
| 11/26/2007 | $3,107,633.75 | |
| 11/23/2007 | $5,250,779.75 | |
| 11/23/2007 | $3,087,595.00 | |
| 11/19/2007 | $5,212,174.70 | |
| 11/19/2007 | $3,320,176.50 | |
| 11/16/2007 | $3,657,006.00 | |
| 11/14/2007 | $3,632,946.75 | |
| 11/14/2007 | $3,484,295.00 | |
| 11/14/2007 | $2,952,130.00 | |
| 11/9/2007 | $4,824,396.50 | |
| 11/9/2007 | $3,849,472.00 | |
| 11/9/2007 | $2,497,496.80 | |
| 11/6/2007 | $4,751,692.00 | |
| 11/6/2007 | $4,499,070.40 | |
| 11/5/2007 | $3,405,176.20 | |
| 11/2/2007 | $5,403,167.00 | |
| 11/2/2007 | $4,846,450.50 | |
| 10/31/2007 | $2,319,974.00 | |
| 10/30/2007 | $5,180,560.00 | |
| 10/29/2007 | $5,683,991.25 | |
| 10/29/2007 | $4,426,892.80 | |
| 10/25/2007 | $5,477,489.25 | |
| 10/18/2007 | $4,154,766.00 | |
| 10/17/2007 | $5,485,509.00 | |
| 10/16/2007 | $5,142,568.50 | |
| 10/15/2007 | $3,047,360.00 | |
| 10/12/2007 | $5,160,606.00 | |
| 10/10/2007 | $4,771,725.00 | |
| 10/9/2007 | $2,742,498.00 | |
| 10/4/2007 | $5,622,637.50 | |
| 9/28/2007 | $4,777,353.00 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 9/28/2007 | $4,047,960.40 | |
| 9/26/2007 | $5,212,818.00 | |
| 9/18/2007 | $5,052,425.00 | |
| 9/14/2007 | $4,118,743.80 | |
| 9/13/2007 | $2,726,600.00 | |
| 8/24/2007 | $5,276,694.50 | |
| 8/24/2007 | $4,294,577.00 | |
| 8/22/2007 | $4,841,902.50 | |
| 8/22/2007 | $3,206,687.95 | |
| 8/21/2007 | $2,927,190.50 | |
| 8/20/2007 | $2,887,080.00 | |
| 8/14/2007 | $4,325,139.75 | |
| 8/14/2007 | $2,971,176.00 | |
| 8/13/2007 | $4,064,391.20 | |
| 8/2/2007 | $5,413,311.00 | |
| 8/2/2007 | $5,066,841.00 | |
| 8/2/2007 | $4,272,903.45 | |
| 7/31/2007 | $4,372,759.60 | |
| 7/31/2007 | $3,999,800.00 | |
| 7/13/2007 | $2,684,880.00 | |
| 7/11/2007 | $5,453,400.00 | |
| 7/10/2007 | $2,726,320.00 | |
| 7/5/2007 | $2,815,364.15 | |
| 7/3/2007 | $5,180,730.00 | |
| 7/3/2007 | $5,143,513.00 | |
| 7/2/2007 | $3,374,300.25 | |
| 6/29/2007 | $3,791,612.80 | |
| 6/29/2007 | $3,240,198.00 | |
| 6/28/2007 | $5,293,024.00 | |
| 6/27/2007 | $3,326,058.00 | |
| 6/22/2007 | $4,051,714.00 | |
| 6/21/2007 | $3,167,781.50 | |
| 6/20/2007 | $4,092,048.00 | |
| 6/11/2007 | $4,435,568.85 | |
| 6/7/2007 | $3,488,373.75 | |
| 6/6/2007 | $3,440,463.00 | |
| 5/30/2007 | $5,052,442.50 | |
| 5/22/2007 | $4,625,816.00 | |
| 5/18/2007 | $5,633,446.65 | |
| 5/17/2007 | $5,372,413.20 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 5/17/2007 | $3,606,785.00 | |
| 5/16/2007 | $4,316,169.00 | |
| 5/15/2007 | $4,601,250.00 | |
| 5/9/2007 | $5,533,616.00 | |
| 5/8/2007 | $5,341,135.00 | |
| 5/4/2007 | $3,726,134.75 | |
| 5/2/2007 | $5,186,744.70 | |
| 5/1/2007 | $5,333,133.75 | |
| 4/25/2007 | $3,601,678.00 | |
| 4/19/2007 | $4,228,404.40 | |
| 4/17/2007 | $2,717,464.05 | |
| 4/12/2007 | $5,351,148.75 | |
| 4/9/2007 | $5,712,050.00 | |
| 4/6/2007 | $4,634,416.50 | |
| 3/30/2007 | $2,973,248.00 | |
| 3/29/2007 | $4,875,970.00 | |
| 3/29/2007 | $4,186,309.50 | |
| 3/28/2007 | $4,878,789.30 | |
| 3/27/2007 | $3,779,280.00 | |
| 3/22/2007 | $3,772,935.60 | |
| 3/22/2007 | $3,597,659.85 | |
| 3/20/2007 | $4,619,376.00 | |
| 3/16/2007 | $3,440,229.00 | |
| 3/15/2007 | $3,893,247.80 | |
| 3/13/2007 | $4,603,316.00 | |
| 3/9/2007 | $3,519,852.60 | |
| 3/7/2007 | $5,485,490.00 | |
| 3/6/2007 | $2,876,253.45 | |
| 3/1/2007 | $5,164,719.00 | |
| 3/1/2007 | $2,566,320.00 | |
| 2/27/2007 | $3,654,847.20 | |
| 2/27/2007 | $3,078,845.60 | |
| 2/23/2007 | $4,649,699.70 | |
| 2/21/2007 | $5,154,308.40 | |
| 2/14/2007 | $4,811,840.00 | |
| 2/14/2007 | $4,266,488.00 | |
| 2/7/2007 | $4,980,180.00 | |
| 2/7/2007 | $4,402,621.00 | |
| 2/6/2007 | $5,271,470.40 | |
| 2/6/2007 | $4,904,840.00 | |

**EXHIBIT S**
**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 1/24/2007 | $4,303,720.15 | |
| 1/22/2007 | $5,232,800.00 | |
| 1/19/2007 | $3,704,686.75 | |
| 1/17/2007 | $4,210,360.00 | |
| 1/16/2007 | $5,132,640.00 | |
| 1/16/2007 | $3,416,413.50 | |
| 1/9/2007 | $5,073,958.00 | |
| 12/28/2006 | $5,088,513.75 | |
| 12/28/2006 | $4,009,875.00 | |
| 12/22/2006 | $2,598,372.00 | |
| 12/21/2006 | $5,132,640.00 | |
| 12/20/2006 | $4,483,296.00 | |
| 12/20/2006 | $4,208,140.05 | |
| 12/19/2006 | $5,379,859.30 | |
| 12/19/2006 | $3,087,584.50 | |
| 12/13/2006 | $5,169,285.00 | |
| 12/8/2006 | $5,774,208.00 | |
| 12/6/2006 | $2,793,856.65 | |
| 11/22/2006 | $5,226,482.00 | |
| 11/22/2006 | $5,160,691.25 | |
| 11/20/2006 | $3,899,988.60 | |
| 11/14/2006 | $3,111,040.00 | |
| 11/8/2006 | $3,733,065.00 | |
| 11/7/2006 | $4,980,264.75 | |
| 10/27/2006 | $5,712,052.50 | |
| 10/19/2006 | $5,078,478.75 | |
| 10/19/2006 | $3,042,260.55 | |
| 10/16/2006 | $3,831,408.00 | |
| 10/11/2006 | $5,798,279.25 | **$768,383,222.62** |

*Additional Transfers*

| | | |
|------|--------|----------|
| 10/5/2006 | $3,736,880.00 | |
| 10/3/2006 | $4,280,812.50 | |
| 10/3/2006 | $470,879.50 | |
| 9/28/2006 | $5,112,580.00 | |
| 9/22/2006 | $5,533,440.00 | |
| 9/21/2006 | $2,784,939.00 | |
| 9/19/2006 | $5,052,425.00 | |
| 9/18/2006 | $4,980,180.00 | |
| 9/14/2006 | $5,542,580.00 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|---|---|---|
| 9/14/2006 | $5,028,274.00 | |
| 9/13/2006 | $4,719,609.50 | |
| 9/7/2006 | $4,041,640.00 | |
| 9/7/2006 | $2,152,416.20 | |
| 8/23/2006 | $4,811,850.00 | |
| 8/21/2006 | $5,293,020.00 | |
| 8/10/2006 | $5,557,566.00 | |
| 8/3/2006 | $4,921,532.00 | |
| 8/1/2006 | $4,383,309.10 | |
| 7/21/2006 | $3,814,285.50 | |
| 7/20/2006 | $4,811,850.00 | |
| 7/19/2006 | $3,175,801.00 | |
| 7/14/2006 | $4,133,637.45 | |
| 7/13/2006 | $5,357,193.00 | |
| 7/6/2006 | $5,232,720.00 | |
| 6/20/2006 | $4,426,848.00 | |
| 6/19/2006 | $4,906,475.00 | |
| 6/16/2006 | $4,766,786.40 | |
| 6/15/2006 | $4,747,640.00 | |
| 6/13/2006 | $4,090,050.00 | |
| 6/12/2006 | $4,209,096.80 | |
| 6/8/2006 | $4,811,850.00 | |
| 6/5/2006 | $3,012,931.30 | |
| 6/1/2006 | $4,523,139.00 | |
| 5/25/2006 | $3,753,240.00 | |
| 5/18/2006 | $5,293,020.00 | |
| 5/15/2006 | $4,616,582.00 | |
| 5/11/2006 | $4,396,793.65 | |
| 5/4/2006 | $4,226,385.00 | |
| 4/27/2006 | $5,293,697.25 | |
| 4/21/2006 | $4,330,650.00 | |
| 4/20/2006 | $5,001,646.25 | |
| 4/14/2006 | $4,940,166.00 | |
| 4/13/2006 | $2,738,727.55 | |
| 4/12/2006 | $5,834,356.00 | |
| 3/30/2006 | $4,741,591.25 | |
| 3/21/2006 | $4,937,985.00 | |
| 3/17/2006 | $3,913,120.00 | |
| 3/16/2006 | $5,034,865.75 | |
| 3/15/2006 | $4,571,250.00 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|---|---|---|
| 3/8/2006 | $5,798,257.05 | |
| 3/7/2006 | $5,713,920.00 | |
| 3/3/2006 | $4,805,808.75 | |
| 2/28/2006 | $5,293,020.00 | |
| 2/27/2006 | $4,484,958.90 | |
| 2/24/2006 | $2,518,201.50 | |
| 2/21/2006 | $4,908,060.00 | |
| 2/17/2006 | $3,224,050.50 | |
| 2/8/2006 | $4,131,775.20 | |
| 1/25/2006 | $4,525,200.80 | |
| 1/24/2006 | $4,927,650.00 | |
| 1/24/2006 | $4,823,788.75 | |
| 1/18/2006 | $5,865,797.95 | |
| 1/12/2006 | $5,681,790.00 | |
| 12/30/2005 | $5,156,699.25 | |
| 12/23/2005 | $5,548,156.00 | |
| 12/16/2005 | $4,651,320.00 | |
| 12/15/2005 | $5,268,957.50 | |
| 12/15/2005 | $4,215,258.75 | |
| 12/9/2005 | $3,785,080.00 | |
| 12/7/2005 | $5,613,804.00 | |
| 11/30/2005 | $4,811,850.00 | |
| 11/30/2005 | $3,338,261.65 | |
| 11/29/2005 | $5,238,090.00 | |
| 11/29/2005 | $4,641,412.95 | |
| 11/17/2005 | $3,031,245.00 | |
| 11/14/2005 | $4,276,395.00 | |
| 11/10/2005 | $4,289,619.50 | |
| 10/25/2005 | $5,693,984.00 | |
| 10/14/2005 | $3,415,989.90 | |
| 10/12/2005 | $5,807,453.85 | |
| 10/12/2005 | $2,891,838.00 | |
| 9/29/2005 | $5,984,259.00 | |
| 9/20/2005 | $4,611,350.50 | |
| 9/14/2005 | $4,811,850.00 | |
| 9/13/2005 | $4,499,055.00 | |
| 9/9/2005 | $4,595,307.20 | |
| 9/7/2005 | $3,849,480.00 | |
| 8/30/2005 | $5,313,064.50 | |
| 8/30/2005 | $3,763,482.00 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|---|---|---|
| 8/9/2005 | $5,618,988.00 | |
| 8/5/2005 | $5,882,474.40 | |
| 7/25/2005 | $5,196,780.00 | |
| 7/13/2005 | $3,973,790.70 | |
| 7/13/2005 | $3,409,555.10 | |
| 7/12/2005 | $5,373,232.50 | |
| 6/20/2005 | $4,664,916.10 | |
| 6/15/2005 | $4,170,270.00 | |
| 6/15/2005 | $2,405,910.00 | |
| 10/6/2004 | $5,252,936.25 | |
| 9/29/2004 | $5,230,091.45 | |
| 9/21/2004 | $5,156,901.90 | |
| 9/16/2004 | $6,075,020.00 | |
| 9/16/2004 | $4,376,578.80 | |
| 9/9/2004 | $4,053,020.15 | |
| 8/25/2004 | $5,373,465.50 | |
| 7/27/2004 | $4,651,920.00 | |
| 7/22/2004 | $4,782,990.80 | |
| 7/14/2004 | $4,923,452.80 | |
| 7/13/2004 | $5,128,796.40 | |
| 7/13/2004 | $3,854,797.60 | |
| 7/12/2004 | $5,343,445.50 | |
| 6/15/2004 | $6,664,231.90 | |
| 6/2/2004 | $4,488,771.00 | |
| 5/14/2004 | $2,829,225.00 | |
| 5/14/2004 | $2,594,803.50 | |
| 5/13/2004 | $4,796,803.47 | |
| 5/12/2004 | $4,431,434.00 | |
| 5/11/2004 | $3,056,977.15 | |
| 5/5/2004 | $3,906,407.40 | |
| 4/27/2004 | $4,409,643.00 | |
| 4/22/2004 | $5,353,044.20 | |
| 4/19/2004 | $4,709,698.35 | |
| 4/19/2004 | $2,853,200.70 | |
| 4/15/2004 | $4,737,541.25 | |
| 4/15/2004 | $4,072,411.75 | |
| 4/14/2004 | $4,530,176.00 | |
| 3/3/2004 | $4,043,900.00 | |
| 3/2/2004 | $5,161,347.50 | |
| 2/17/2004 | $4,172,809.80 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|---|---|---|
| 2/13/2004 | $2,530,782.35 | |
| 2/12/2004 | $4,989,797.65 | |
| 2/4/2004 | $4,937,506.00 | |
| 2/3/2004 | $5,225,574.05 | |
| 1/27/2004 | $4,091,225.75 | |
| 1/23/2004 | $2,252,254.45 | |
| 1/22/2004 | $4,860,568.75 | |
| 1/21/2004 | $5,236,894.10 | |
| 12/31/2003 | $4,411,850.25 | |
| 12/29/2003 | $3,162,629.00 | |
| 12/4/2003 | $4,324,650.00 | |
| 12/1/2003 | $3,280,518.25 | |
| 12/1/2003 | $2,709,950.00 | |
| 11/17/2003 | $2,519,466.00 | |
| 11/14/2003 | $3,833,970.00 | |
| 11/13/2003 | $4,244,296.00 | |
| 10/23/2003 | $4,576,746.90 | |
| 10/22/2003 | $3,364,169.20 | |
| 10/16/2003 | $4,535,699.80 | |
| 10/16/2003 | $3,605,662.25 | |
| 9/30/2003 | $4,929,908.65 | |
| 9/26/2003 | $4,416,096.50 | |
| 8/12/2003 | $1,510,247.95 | |
| 8/11/2003 | $3,747,699.50 | |
| 8/8/2003 | $5,274,473.45 | |
| 8/8/2003 | $5,088,571.25 | |
| 8/8/2003 | $4,115,620.00 | |
| 8/1/2003 | $5,799,438.32 | |
| 8/1/2003 | $3,445,472.70 | |
| 7/22/2003 | $4,775,591.25 | |
| 7/18/2003 | $3,814,246.20 | |
| 7/17/2003 | $5,781,299.65 | |
| 7/17/2003 | $5,241,134.70 | |
| 7/15/2003 | $4,240,142.13 | |
| 7/15/2003 | $2,591,854.35 | |
| 7/11/2003 | $4,317,085.10 | |
| 7/10/2003 | $1,764,423.60 | |
| 7/8/2003 | $3,719,790.90 | |
| 7/8/2003 | $2,138,397.55 | |
| 7/7/2003 | $3,935,371.50 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 6/26/2003 | $2,469,838.50 | |
| 6/24/2003 | $1,664,193.40 | |
| 6/20/2003 | $1,907,505.00 | |
| 6/19/2003 | $3,364,361.75 | |
| 6/18/2003 | $4,872,197.00 | |
| 6/18/2003 | $3,592,742.25 | |
| 6/11/2003 | $5,492,260.90 | |
| 6/10/2003 | $3,480,445.00 | |
| 6/10/2003 | $1,725,201.65 | |
| 6/6/2003 | $3,460,405.40 | |
| 6/6/2003 | $2,298,335.35 | |
| 5/29/2003 | $3,296,880.00 | |
| 5/27/2003 | $4,838,653.85 | |
| 5/27/2003 | $2,295,826.75 | |
| 5/23/2003 | $3,508,055.60 | |
| 5/22/2003 | $4,871,171.05 | |
| 5/22/2003 | $4,162,923.20 | |
| 5/22/2003 | $2,402,074.95 | |
| 5/20/2003 | $5,029,865.60 | |
| 5/14/2003 | $3,152,040.50 | |
| 5/13/2003 | $3,239,371.10 | |
| 5/9/2003 | $3,555,975.00 | |
| 5/9/2003 | $2,583,665.09 | |
| 5/8/2003 | $6,085,391.70 | |
| 5/8/2003 | $4,733,728.35 | |
| 5/6/2003 | $3,349,125.00 | |
| 5/5/2003 | $4,495,689.75 | |
| 5/5/2003 | $3,736,659.80 | |
| 5/2/2003 | $5,565,550.50 | |
| 4/22/2003 | $2,622,780.00 | |
| 4/22/2003 | $1,874,770.85 | |
| 4/21/2003 | $4,170,754.20 | |
| 4/21/2003 | $2,538,137.30 | |
| 4/16/2003 | $6,310,698.00 | |
| 4/11/2003 | $4,173,933.37 | |
| 4/11/2003 | $2,386,638.85 | |
| 4/10/2003 | $4,176,270.90 | |
| 4/7/2003 | $5,194,387.50 | |
| 3/31/2003 | $4,751,238.40 | |
| 3/31/2003 | $4,643,635.45 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 3/31/2003 | $2,728,900.45 | |
| 3/28/2003 | $2,522,056.90 | |
| 3/27/2003 | $5,568,107.60 | |
| 3/27/2003 | $5,404,478.05 | |
| 3/27/2003 | $4,254,278.95 | |
| 3/26/2003 | $4,616,947.45 | |
| 3/26/2003 | $3,122,094.05 | |
| 3/13/2003 | $4,232,809.45 | |
| 3/13/2003 | $3,111,701.30 | |
| 3/12/2003 | $5,341,879.35 | |
| 3/7/2003 | $5,296,073.80 | |
| 3/7/2003 | $4,853,876.55 | |
| 3/5/2003 | $3,790,339.95 | |
| 3/3/2003 | $4,508,434.65 | |
| 2/25/2003 | $4,451,234.31 | |
| 2/24/2003 | $4,134,940.55 | |
| 2/20/2003 | $3,143,099.85 | |
| 2/20/2003 | $3,047,068.75 | |
| 2/19/2003 | $4,003,923.34 | |
| 2/19/2003 | $3,347,703.00 | |
| 2/19/2003 | $2,106,956.25 | |
| 2/14/2003 | $6,116,743.60 | |
| 2/14/2003 | $1,696,685.15 | |
| 2/11/2003 | $5,739,433.85 | |
| 2/6/2003 | $6,007,459.75 | |
| 2/6/2003 | $5,504,051.40 | |
| 2/6/2003 | $2,430,785.25 | |
| 2/5/2003 | $6,281,846.62 | |
| 2/3/2003 | $4,568,619.96 | |
| 1/31/2003 | $4,491,611.35 | |
| 1/31/2003 | $2,546,356.00 | |
| 1/30/2003 | $6,839,083.59 | |
| 1/27/2003 | $1,799,856.20 | |
| 1/21/2003 | $2,924,474.00 | |
| 1/17/2003 | $4,756,738.91 | |
| 1/17/2003 | $3,761,972.20 | |
| 1/17/2003 | $3,461,258.60 | |
| 1/6/2003 | $4,685,464.95 | |
| 1/6/2003 | $2,489,817.00 | |
| 1/3/2003 | $2,554,830.45 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 12/26/2002 | $5,696,202.40 | |
| 12/26/2002 | $3,042,727.50 | |
| 12/20/2002 | $5,639,359.60 | |
| 12/20/2002 | $5,103,125.00 | |
| 12/20/2002 | $2,250,848.57 | |
| 12/19/2002 | $6,121,373.34 | |
| 12/19/2002 | $2,320,400.22 | |
| 12/16/2002 | $4,226,245.85 | |
| 12/16/2002 | $2,285,923.11 | |
| 12/13/2002 | $3,305,490.80 | |
| 12/12/2002 | $5,175,687.35 | |
| 12/12/2002 | $4,586,154.45 | |
| 12/12/2002 | $3,806,371.75 | |
| 12/5/2002 | $6,512,864.40 | |
| 12/5/2002 | $3,463,808.25 | |
| 12/5/2002 | $3,309,972.60 | |
| 12/2/2002 | $3,574,371.15 | |
| 11/27/2002 | $2,773,776.00 | |
| 11/25/2002 | $3,090,894.30 | |
| 11/19/2002 | $4,251,388.90 | |
| 11/15/2002 | $3,680,589.69 | |
| 11/14/2002 | $2,688,607.00 | |
| 11/8/2002 | $2,504,100.45 | |
| 11/6/2002 | $4,842,992.05 | |
| 11/6/2002 | $3,807,269.05 | |
| 11/6/2002 | $3,728,389.60 | |
| 10/29/2002 | $4,063,921.50 | |
| 10/22/2002 | $5,669,894.21 | |
| 10/17/2002 | $5,725,792.50 | |
| 10/17/2002 | $2,103,206.25 | |
| 10/9/2002 | $4,945,718.75 | |
| 10/7/2002 | $5,286,416.65 | |
| 10/4/2002 | $6,011,092.70 | |
| 10/4/2002 | $2,766,769.15 | |
| 10/3/2002 | $4,560,595.94 | |
| 10/3/2002 | $4,161,213.60 | |
| 10/2/2002 | $2,880,280.33 | |
| 9/30/2002 | $5,039,745.76 | |
| 9/30/2002 | $3,262,574.40 | |
| 9/20/2002 | $4,720,275.65 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 9/19/2002 | $5,094,101.16 | |
| 9/18/2002 | $4,391,447.14 | |
| 9/18/2002 | $3,936,236.50 | |
| 9/13/2002 | $4,532,412.36 | |
| 9/12/2002 | $5,452,150.34 | |
| 9/12/2002 | $2,648,869.00 | |
| 9/5/2002 | $5,726,273.18 | |
| 8/30/2002 | $5,643,240.00 | |
| 8/30/2002 | $2,791,246.20 | |
| 8/27/2002 | $2,692,219.44 | |
| 8/23/2002 | $2,516,341.70 | |
| 8/23/2002 | $1,730,223.80 | |
| 8/22/2002 | $2,505,677.50 | |
| 8/19/2002 | $3,036,557.21 | |
| 8/16/2002 | $3,680,484.58 | |
| 8/15/2002 | $5,111,122.95 | |
| 8/15/2002 | $2,935,412.60 | |
| 8/14/2002 | $3,747,968.10 | |
| 8/9/2002 | $2,054,475.00 | |
| 8/5/2002 | $4,683,003.00 | |
| 8/5/2002 | $3,407,710.00 | |
| 8/2/2002 | $20,000.00 | |
| 8/1/2002 | $5,485,851.78 | |
| 7/26/2002 | $3,407,815.44 | |
| 7/26/2002 | $1,731,108.80 | |
| 7/25/2002 | $2,057,906.65 | |
| 7/24/2002 | $4,292,190.21 | |
| 7/24/2002 | $1,417,880.45 | |
| 7/12/2002 | $4,167,476.35 | |
| 7/11/2002 | $4,607,851.30 | |
| 7/10/2002 | $4,227,543.75 | |
| 7/10/2002 | $4,032,551.29 | |
| 7/10/2002 | $3,623,816.30 | |
| 7/8/2002 | $3,938,081.90 | |
| 7/3/2002 | $3,691,385.00 | |
| 7/1/2002 | $4,174,378.00 | |
| 6/28/2002 | $4,145,975.45 | |
| 6/28/2002 | $3,728,372.53 | |
| 6/20/2002 | $4,841,886.30 | |
| 6/18/2002 | $4,372,804.95 | |

**EXHIBIT S**

**Transfers from PCI to PC Funding, LLC**

| Date | Amount | Subtotal |
|------|--------|----------|
| 6/18/2002 | $2,084,662.50 | |
| 6/13/2002 | $3,119,749.50 | |
| 6/10/2002 | $2,784,053.75 | |
| 6/10/2002 | $2,415,870.20 | |
| 6/5/2002 | $2,112,914.25 | |
| 6/4/2002 | $3,579,838.65 | |
| 5/31/2002 | $3,000,413.35 | |
| 5/28/2002 | $3,595,283.25 | |
| 5/28/2002 | $2,639,431.36 | |
| 5/28/2002 | $2,136,610.69 | |
| 5/24/2002 | $3,609,173.35 | |
| 5/23/2002 | $4,431,916.00 | |
| 5/23/2002 | $4,069,686.80 | |
| 5/20/2002 | $3,140,958.20 | |
| 5/20/2002 | $2,888,800.00 | |
| 5/17/2002 | $4,554,064.00 | |
| 5/17/2002 | $1,558,693.30 | |
| 5/16/2002 | $3,987,436.90 | |
| 5/15/2002 | $1,802,910.85 | |
| 5/9/2002 | $5,084,915.44 | |
| 5/9/2002 | $1,669,340.00 | |
| 5/7/2002 | $3,713,189.00 | |
| 5/7/2002 | $2,816,486.21 | |
| 5/3/2002 | $4,360,471.32 | |
| 5/3/2002 | $2,428,028.40 | |
| 5/1/2002 | $2,593,566.65 | |
| 5/1/2002 | $2,027,633.84 | |
| 4/29/2002 | $5,800,379.55 | |
| 4/29/2002 | $3,081,687.48 | |
| 4/26/2002 | $2,920,028.95 | |
| 4/19/2002 | $5,168,350.39 | |
| 4/19/2002 | $3,632,934.40 | **$1,467,302,020.52** |
| **Transfers** | **$2,244,923,662.14** | |

# EXHIBIT T

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| *90 Day Transfers* | | | |
| 9/12/2008 | OPPORTUNITY FINANCE LLC | $2,000,000.00 | |
| 9/5/2008 | OPPORTUNITY FINANCE LLC | $2,000,000.00 | |
| 8/6/2008 | OPPORTUNITY FINANCE LLC | $1,000,000.00 | |
| 8/1/2008 | OPPORTUNITY FINANCE LLC | $4,238,419.00 | $9,238,419.00 |
| *Two Year Transfers* | | | |
| 5/12/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,774,178.33 | |
| 5/12/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,422,648.89 | |
| 5/12/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,676,722.22 | |
| 5/7/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,463,721.67 | |
| 4/25/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,823,740.56 | |
| 4/25/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,288,951.67 | |
| 4/23/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,638,955.00 | |
| 4/21/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,958,036.67 | |
| 4/21/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,749,732.22 | |
| 4/21/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,602,325.00 | |
| 4/21/2008 | PC FUNDING, LLC | ($755,582.78) | |
| 4/11/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,480,560.00 | |
| 4/11/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,817,782.22 | |
| 4/8/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,958,036.67 | |
| 4/4/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,436,846.67 | |
| 4/3/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,751,224.89 | |
| 4/2/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,384,508.33 | |
| 3/27/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,039,062.22 | |
| 3/27/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,080,831.11 | |
| 3/25/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,123,086.11 | |
| 3/21/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,648,944.44 | |
| 3/20/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,192,525.00 | |
| 3/19/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,778,475.00 | |
| 3/14/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,988,000.00 | |
| 3/14/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,815,242.22 | |
| 3/13/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,807,158.89 | |
| 3/7/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,355,657.78 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 3/7/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,364,159.44 | |
| 3/7/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,993,307.22 | |
| 2/29/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,006,505.00 | |
| 2/29/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,445,560.00 | |
| 2/28/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,908,255.56 | |
| 2/22/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,260,328.33 | |
| 2/22/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,969,250.00 | |
| 2/21/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,755,584.44 | |
| 2/19/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,866,391.11 | |
| 2/7/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,097,893.33 | |
| 2/6/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,579,897.78 | |
| 2/4/2008 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,570,453.33 | |
| 11/30/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,590,675.00 | |
| 11/29/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,434,318.00 | |
| 11/27/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,380,730.00 | |
| 11/26/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,614,872.50 | |
| 11/26/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,825,961.25 | |
| 11/23/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,790,945.00 | |
| 11/23/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,822,773.00 | |
| 11/19/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,774,018.00 | |
| 11/19/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,033,371.25 | |
| 11/16/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,343,228.50 | |
| 11/15/2007 | PC FUNDING, LLC | ($215,371.33) | |
| 11/14/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,445,333.33 | |
| 11/14/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,185,331.00 | |
| 11/14/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,691,260.00 | |
| 11/9/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,402,490.00 | |
| 11/9/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,496,095.00 | |
| 11/9/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,359,500.00 | |
| 11/6/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,329,683.75 | |
| 11/6/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,096,347.50 | |
| 11/5/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,109,980.00 | |
| 11/2/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,918,577.50 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 11/2/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,428,387.00 | |
| 10/31/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,096,077.50 | |
| 10/30/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,718,577.50 | |
| 10/29/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,183,300.00 | |
| 10/29/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,042,974.00 | |
| 10/25/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,996,239.25 | |
| 10/18/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,780,962.00 | |
| 10/17/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,998,121.00 | |
| 10/16/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,692,651.25 | |
| 10/15/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,775,152.00 | |
| 10/12/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,715,028.50 | |
| 10/10/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,349,058.00 | |
| 10/9/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,484,240.00 | |
| 10/4/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,141,119.50 | |
| 9/28/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,352,334.00 | |
| 9/28/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,677,374.00 | |
| 9/26/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,766,842.00 | |
| 9/18/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,616,608.00 | |
| 9/14/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,755,065.00 | |
| 9/13/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,485,176.00 | |
| 8/24/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,818,655.50 | |
| 8/24/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,911,919.25 | |
| 8/22/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,400,832.50 | |
| 8/22/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,925,259.25 | |
| 8/21/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,665,382.50 | |
| 8/20/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,614,612.25 | |
| 8/14/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,936,344.00 | |
| 8/14/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,693,288.00 | |
| 8/13/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,708,848.00 | |
| 8/2/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,944,464.75 | |
| 8/2/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,611,401.50 | |
| 8/2/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,886,012.50 | |
| 7/31/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,986,636.50 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 7/31/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,650,102.25 | |
| 7/13/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,428,819.00 | |
| 7/11/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,968,480.00 | |
| 7/10/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,483,304.00 | |
| 7/5/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,562,837.75 | |
| 7/3/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,709,705.00 | |
| 7/3/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,682,062.75 | |
| 7/2/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,078,262.25 | |
| 6/29/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,458,536.60 | |
| 6/29/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,961,501.40 | |
| 6/28/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,815,028.50 | |
| 6/27/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,027,667.50 | |
| 6/22/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,703,271.00 | |
| 6/21/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,873,484.75 | |
| 6/20/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,726,360.00 | |
| 6/11/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,033,848.00 | |
| 6/7/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,179,334.75 | |
| 6/6/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,125,278.75 | |
| 5/30/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,587,104.50 | |
| 5/22/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,203,729.25 | |
| 5/18/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,104,440.00 | |
| 5/17/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,868,734.50 | |
| 5/17/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,277,774.75 | |
| 5/16/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,914,114.00 | |
| 5/15/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,182,678.00 | |
| 5/9/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,545,860.00 | |
| 5/8/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,863,137.00 | |
| 5/7/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,384,843.50 | |
| 5/2/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,733,798.25 | |
| 5/1/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,866,803.00 | |
| 4/25/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,290,157.25 | |
| 4/19/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,851,389.25 | |
| 4/17/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,453,731.25 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 4/12/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,855,805.00 | |
| 4/9/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,169,650.00 | |
| 4/6/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,211,675.50 | |
| 4/2/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,687,204.00 | |
| 3/29/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,442,545.00 | |
| 3/29/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,819,519.00 | |
| 3/28/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,449,253.00 | |
| 3/27/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,417,663.00 | |
| 3/22/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,443,004.25 | |
| 3/22/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,287,680.75 | |
| 3/20/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,140,400.00 | |
| 3/16/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,100,620.00 | |
| 3/15/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,541,210.25 | |
| 3/14/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,193,734.50 | |
| 3/9/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,205,183.00 | |
| 3/7/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,866,803.00 | |
| 3/6/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,484,240.00 | |
| 3/2/2007 | PC FUNDING, LLC | ($185,579.33) | |
| 3/1/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,898,833.33 | |
| 3/1/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,330,730.00 | |
| 2/27/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,340,713.00 | |
| 2/27/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,794,770.00 | |
| 2/23/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,237,514.00 | |
| 2/21/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,702,607.00 | |
| 2/14/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,349,058.00 | |
| 2/14/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,693,511.25 | |
| 2/8/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,450,930.00 | |
| 2/8/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,831,313.00 | |
| 2/6/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,657,950.00 | |
| 2/6/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,347,420.00 | |
| 1/24/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,900,141.25 | |
| 1/22/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,761,460.00 | |
| 1/19/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,360,272.50 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|---|---|---|---|
| 1/17/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,831,313.00 | |
| 1/16/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,683,827.50 | |
| 1/16/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,105,300.00 | |
| 1/9/2007 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,630,327.25 | |
| 12/28/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,623,346.25 | |
| 12/28/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,643,228.50 | |
| 12/22/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,351,303.50 | |
| 12/21/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,683,827.50 | |
| 12/20/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,087,104.50 | |
| 12/20/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,831,313.00 | |
| 12/19/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,890,847.50 | |
| 12/19/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,820,647.50 | |
| 12/13/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,707,930.50 | |
| 12/8/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,247,194.75 | |
| 12/6/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,529,306.50 | |
| 11/22/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,763,254.00 | |
| 11/22/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,711,479.50 | |
| 11/20/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,543,881.75 | |
| 11/14/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,821,710.25 | |
| 11/8/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,392,507.00 | |
| 11/7/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,530,268.75 | |
| 10/27/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,211,176.25 | |
| 10/19/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,633,817.75 | |
| 10/19/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,769,935.75 | |
| 10/16/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,494,778.75 | |
| 10/11/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,271,054.00 | $701,902,713.29 |
| *Additional Transfers* | | | |
| 10/5/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,384,843.50 | |
| 10/3/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,311,773.00 | |
| 9/28/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,647,420.00 | |
| 9/22/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,016,452.00 | |
| 9/21/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,533,128.50 | |
| 9/19/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,607,930.50 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 9/18/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,528,562.50 | |
| 9/14/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,046,112.50 | |
| 9/14/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,583,769.00 | |
| 9/13/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,298,902.00 | |
| 9/7/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,677,374.00 | |
| 9/7/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $1,968,172.00 | |
| 8/23/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,376,593.00 | |
| 8/21/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,811,401.50 | |
| 8/10/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,064,346.00 | |
| 8/3/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,032,327.00 | |
| 8/1/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,779,538.50 | |
| 7/21/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,489,513.75 | |
| 7/20/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,321,077.50 | |
| 7/19/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,893,912.00 | |
| 7/14/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,747,996.25 | |
| 7/13/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,883,476.50 | |
| 7/6/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,609,666.00 | |
| 6/20/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,082,520.00 | |
| 6/19/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,475,120.75 | |
| 6/16/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,344,144.00 | |
| 6/15/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,316,657.75 | |
| 6/13/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,724,956.00 | |
| 6/12/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,829,870.00 | |
| 6/8/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,376,593.00 | |
| 6/5/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,744,048.50 | |
| 6/1/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,109,871.75 | |
| 5/25/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,410,682.00 | |
| 5/18/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,793,266.50 | |
| 5/15/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,205,318.50 | |
| 5/11/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,994,388.75 | |
| 5/4/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,838,314.50 | |
| 4/27/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,805,961.00 | |
| 4/21/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,925,970.00 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 4/20/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,544,144.00 | |
| 4/14/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,495,899.00 | |
| 4/13/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,478,624.00 | |
| 4/12/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,332,773.50 | |
| 3/30/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,325,364.90 | |
| 3/21/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,533,838.05 | |
| 3/17/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,567,058.50 | |
| 3/16/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,625,091.50 | |
| 3/15/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,168,760.25 | |
| 3/8/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,267,076.00 | |
| 3/7/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,187,659.25 | |
| 3/3/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,380,556.00 | |
| 2/28/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,813,215.00 | |
| 2/27/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,087,104.50 | |
| 2/24/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,272,930.00 | |
| 2/21/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,480,181.00 | |
| 2/17/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,942,640.40 | |
| 2/8/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,746,582.50 | |
| 1/25/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,106,771.25 | |
| 1/24/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,504,381.50 | |
| 1/24/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,400,832.50 | |
| 1/18/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,358,660.75 | |
| 1/12/2006 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,169,650.00 | |
| 12/30/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,704,381.50 | |
| 12/23/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,064,189.14 | |
| 12/16/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,239,113.00 | |
| 12/15/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,805,961.00 | |
| 12/15/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,844,768.80 | |
| 12/12/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,452,023.60 | |
| 12/7/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,117,325.80 | |
| 11/30/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,387,170.40 | |
| 11/30/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,042,394.39 | |
| 11/29/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,759,666.00 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 11/29/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,233,559.00 | |
| 11/17/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,777,238.50 | |
| 11/14/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,914,863.75 | |
| 11/10/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,919,329.65 | |
| 10/25/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,201,377.50 | |
| 10/14/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,118,332.88 | |
| 10/12/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,294,893.75 | |
| 10/12/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,634,532.50 | |
| 9/29/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,440,617.60 | |
| 9/20/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,214,444.30 | |
| 9/14/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,347,420.00 | |
| 9/13/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,085,564.00 | |
| 9/9/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,202,074.85 | |
| 9/7/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,496,095.00 | |
| 8/30/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,840,915.75 | |
| 8/30/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,417,117.00 | |
| 8/9/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,125,675.50 | |
| 8/5/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $5,324,739.50 | |
| 7/25/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,746,288.00 | |
| 7/13/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,863,137.00 | |
| 7/13/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,622,850.00 | |
| 7/13/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,105,300.00 | |
| 6/20/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $4,243,910.00 | |
| 6/15/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $3,798,259.50 | |
| 6/15/2005 | OPPORTUNITY FINANCE SECURITIZATION III, LLC | $2,170,434.00 | |
| 10/6/2004 | OPPORTUNITY FINANCE LLC | $4,752,490.00 | |
| 9/29/2004 | OPPORTUNITY FINANCE LLC | $4,765,048.00 | |
| 9/21/2004 | OPPORTUNITY FINANCE LLC | $4,713,254.00 | |
| 9/17/2004 | OPPORTUNITY FINANCE LLC | $5,531,525.50 | |
| 9/17/2004 | OPPORTUNITY FINANCE LLC | $3,988,138.00 | |
| 9/10/2004 | OPPORTUNITY FINANCE LLC | $3,669,067.00 | |
| 8/25/2004 | OPPORTUNITY FINANCE LLC | $4,881,527.50 | |
| 7/27/2004 | OPPORTUNITY FINANCE LLC | $4,262,625.00 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 7/22/2004 | OPPORTUNITY FINANCE LLC | $4,358,191.67 | |
| 7/14/2004 | OPPORTUNITY FINANCE LLC | $4,513,208.33 | |
| 7/14/2004 | OPPORTUNITY FINANCE LLC | $3,521,966.67 | |
| 7/13/2004 | OPPORTUNITY FINANCE LLC | $4,678,433.33 | |
| 7/12/2004 | OPPORTUNITY FINANCE LLC | $4,885,987.50 | |
| 6/15/2004 | OPPORTUNITY FINANCE LLC | $6,107,883.33 | |
| 6/2/2004 | OPPORTUNITY FINANCE LLC | $4,104,750.00 | |
| 5/14/2004 | OPPORTUNITY FINANCE LLC | $2,574,337.50 | |
| 5/14/2004 | OPPORTUNITY FINANCE LLC | $2,364,187.50 | |
| 5/13/2004 | OPPORTUNITY FINANCE LLC | $4,358,191.67 | |
| 5/12/2004 | OPPORTUNITY FINANCE LLC | $3,898,566.67 | |
| 5/11/2004 | OPPORTUNITY FINANCE LLC | $2,792,216.67 | |
| 5/5/2004 | OPPORTUNITY FINANCE LLC | $3,570,566.67 | |
| 4/28/2004 | OPPORTUNITY FINANCE LLC | $4,052,125.00 | |
| 4/22/2004 | OPPORTUNITY FINANCE LLC | $4,880,562.50 | |
| 4/19/2004 | OPPORTUNITY FINANCE LLC | $4,310,466.67 | |
| 4/19/2004 | OPPORTUNITY FINANCE LLC | $2,523,200.00 | |
| 4/15/2004 | OPPORTUNITY FINANCE LLC | $4,358,191.67 | |
| 4/15/2004 | OPPORTUNITY FINANCE LLC | $3,671,500.00 | |
| 4/14/2004 | OPPORTUNITY FINANCE LLC | $4,145,854.17 | |
| 3/3/2004 | OPPORTUNITY FINANCE LLC | $3,675,583.33 | |
| 3/2/2004 | OPPORTUNITY FINANCE LLC | $4,723,125.00 | |
| 2/17/2004 | OPPORTUNITY FINANCE LLC | $3,839,495.83 | |
| 2/13/2004 | OPPORTUNITY FINANCE LLC | $2,309,083.33 | |
| 2/12/2004 | OPPORTUNITY FINANCE LLC | $4,563,150.00 | |
| 2/4/2004 | OPPORTUNITY FINANCE LLC | $4,530,766.67 | |
| 2/3/2004 | OPPORTUNITY FINANCE LLC | $4,791,529.17 | |
| 1/27/2004 | OPPORTUNITY FINANCE LLC | $3,740,516.67 | |
| 1/23/2004 | OPPORTUNITY FINANCE LLC | $2,050,100.00 | |
| 1/22/2004 | OPPORTUNITY FINANCE LLC | $4,846,866.67 | |
| 1/22/2004 | OPPORTUNITY FINANCE LLC | $4,480,562.50 | |
| 12/31/2003 | OPPORTUNITY FINANCE LLC | $4,040,895.83 | |
| 12/30/2003 | OPPORTUNITY FINANCE LLC | $2,883,145.83 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 12/5/2003 | OPPORTUNITY FINANCE LLC | $4,017,233.33 | |
| 12/1/2003 | OPPORTUNITY FINANCE LLC | $2,958,433.33 | |
| 12/1/2003 | OPPORTUNITY FINANCE LLC | $2,427,458.33 | |
| 11/17/2003 | OPPORTUNITY FINANCE LLC | $2,312,933.33 | |
| 11/14/2003 | OPPORTUNITY FINANCE LLC | $3,516,104.17 | |
| 11/13/2003 | OPPORTUNITY FINANCE LLC | $3,881,300.00 | |
| 10/23/2003 | OPPORTUNITY FINANCE LLC | $4,111,575.00 | |
| 10/23/2003 | OPPORTUNITY FINANCE LLC | $3,055,633.33 | |
| 10/17/2003 | OPPORTUNITY FINANCE LLC | $4,159,679.17 | |
| 10/17/2003 | OPPORTUNITY FINANCE LLC | $3,317,212.50 | |
| 9/30/2003 | OPPORTUNITY FINANCE LLC | $4,425,400.00 | |
| 9/29/2003 | OPPORTUNITY FINANCE LLC | $3,995,066.67 | |
| 8/12/2003 | OPPORTUNITY FINANCE LLC | $1,290,000.00 | |
| 8/11/2003 | OPPORTUNITY FINANCE LLC | $4,709,250.00 | |
| 8/11/2003 | OPPORTUNITY FINANCE LLC | $3,771,250.00 | |
| 8/11/2003 | OPPORTUNITY FINANCE LLC | $3,353,600.00 | |
| 8/8/2003 | OPPORTUNITY FINANCE LLC | $4,687,125.00 | |
| 8/4/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,073,100.00 | |
| 8/4/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,176,166.67 | |
| 7/22/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,244,400.00 | |
| 7/18/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $6,254,166.67 | |
| 7/18/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,499,166.67 | |
| 7/17/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,171,250.00 | |
| 7/17/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,670,275.00 | |
| 7/11/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,962,875.00 | |
| 7/11/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,569,750.00 | |
| 7/8/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,304,350.00 | |
| 7/8/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,936,500.00 | |
| 7/7/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,512,475.00 | |
| 6/26/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,190,300.00 | |
| 6/24/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,506,166.67 | |
| 6/20/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,716,000.00 | |
| 6/19/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,278,750.00 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 6/19/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,000,666.67 | |
| 6/18/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,461,250.00 | |
| 6/11/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,060,333.33 | |
| 6/11/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,119,916.67 | |
| 6/11/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,559,958.33 | |
| 6/6/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,163,875.00 | |
| 6/6/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,145,000.00 | |
| 5/30/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,012,333.33 | |
| 5/28/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,093,000.00 | |
| 5/27/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,404,083.33 | |
| 5/23/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,127,500.00 | |
| 5/22/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,340,900.00 | |
| 5/22/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,807,375.00 | |
| 5/22/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,139,175.00 | |
| 5/20/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,515,000.00 | |
| 5/15/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,709,200.00 | |
| 5/13/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,940,208.33 | |
| 5/9/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,271,125.00 | |
| 5/9/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,359,500.00 | |
| 5/8/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,572,666.67 | |
| 5/8/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,340,250.00 | |
| 5/7/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,063,750.00 | |
| 5/6/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,135,541.67 | |
| 5/6/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,383,625.00 | |
| 5/2/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,090,416.67 | |
| 4/23/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,392,500.00 | |
| 4/23/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,718,666.67 | |
| 4/22/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,756,666.67 | |
| 4/22/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,254,000.00 | |
| 4/17/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,345,833.33 | |
| 4/11/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,825,125.00 | |
| 4/11/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,183,250.00 | |
| 4/10/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,391,500.00 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|---|---|---|---|
| 4/8/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,296,666.67 | |
| 3/31/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,377,375.00 | |
| 3/31/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,249,541.67 | |
| 3/31/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,474,416.67 | |
| 3/28/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,960,333.33 | |
| 3/28/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,879,000.00 | |
| 3/28/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,318,416.67 | |
| 3/27/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,145,833.33 | |
| 3/27/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,269,291.67 | |
| 3/26/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,853,166.67 | |
| 3/13/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,445,333.33 | |
| 3/13/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,799,333.33 | |
| 3/12/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,518,500.00 | |
| 3/7/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,751,250.00 | |
| 3/7/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,471,625.00 | |
| 3/6/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,210,000.00 | |
| 3/3/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,087,416.67 | |
| 2/25/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,104,000.00 | |
| 2/25/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,701,250.00 | |
| 2/21/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,816,666.67 | |
| 2/20/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,870,833.33 | |
| 2/20/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,862,291.67 | |
| 2/19/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,680,500.00 | |
| 2/19/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,063,750.00 | |
| 2/18/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,607,333.33 | |
| 2/14/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,563,583.33 | |
| 2/12/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,244,000.00 | |
| 2/6/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,332,833.33 | |
| 2/6/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,142,583.33 | |
| 2/6/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,231,083.33 | |
| 2/5/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,849,333.33 | |
| 2/4/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,257,500.00 | |
| 2/3/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,352,458.33 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 1/31/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $6,396,000.00 | |
| 1/31/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,157,833.33 | |
| 1/27/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,636,250.00 | |
| 1/22/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,622,000.00 | |
| 1/17/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,411,125.00 | |
| 1/17/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,539,791.67 | |
| 1/17/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,158,583.33 | |
| 1/7/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,280,250.00 | |
| 1/6/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,289,041.67 | |
| 1/6/2003 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,329,166.67 | |
| 12/26/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,221,833.33 | |
| 12/26/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,745,500.00 | |
| 12/23/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,172,000.00 | |
| 12/20/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,665,500.00 | |
| 12/20/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,101,125.00 | |
| 12/19/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,655,000.00 | |
| 12/19/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,099,500.00 | |
| 12/17/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,930,000.00 | |
| 12/17/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,055,166.67 | |
| 12/16/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,031,000.00 | |
| 12/13/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,788,666.67 | |
| 12/12/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,264,000.00 | |
| 12/12/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,482,666.67 | |
| 12/6/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,985,833.33 | |
| 12/6/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,173,083.33 | |
| 12/5/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,080,000.00 | |
| 12/2/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,292,500.00 | |
| 11/27/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,501,250.00 | |
| 11/25/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,838,333.33 | |
| 11/19/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,930,000.00 | |
| 11/18/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,363,500.00 | |
| 11/15/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,446,875.00 | |
| 11/12/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,273,250.00 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 11/7/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,238,000.00 | |
| 11/7/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,498,666.67 | |
| 11/7/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,260,000.00 | |
| 10/30/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,694,666.67 | |
| 10/22/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,188,000.00 | |
| 10/18/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,246,083.33 | |
| 10/18/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,892,916.67 | |
| 10/10/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,515,000.00 | |
| 10/8/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,777,666.67 | |
| 10/7/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,499,500.00 | |
| 10/7/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,383,333.33 | |
| 10/4/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,005,250.00 | |
| 10/4/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,815,000.00 | |
| 10/2/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,614,000.00 | |
| 10/1/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,567,500.00 | |
| 10/1/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,936,250.00 | |
| 9/20/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,785,000.00 | |
| 9/20/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,353,333.33 | |
| 9/19/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,020,666.67 | |
| 9/19/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,605,250.00 | |
| 9/16/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,135,666.67 | |
| 9/13/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,379,666.67 | |
| 9/12/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,002,500.00 | |
| 9/6/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,192,000.00 | |
| 8/30/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,204,000.00 | |
| 8/30/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,493,583.33 | |
| 8/28/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,379,666.67 | |
| 8/26/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,264,500.00 | |
| 8/26/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,509,666.67 | |
| 8/23/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,262,750.00 | |
| 8/20/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,712,500.00 | |
| 8/19/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,355,750.00 | |
| 8/16/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,672,666.67 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 8/16/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,350,583.33 | |
| 8/16/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,487,833.33 | |
| 8/9/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,838,833.33 | |
| 8/6/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,186,000.00 | |
| 8/6/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,035,666.67 | |
| 8/1/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,971,833.33 | |
| 7/29/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,047,333.33 | |
| 7/29/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,506,166.67 | |
| 7/25/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,912,000.00 | |
| 7/25/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,848,750.00 | |
| 7/25/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,276,000.00 | |
| 7/12/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,228,250.00 | |
| 7/12/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,794,583.33 | |
| 7/11/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,683,333.33 | |
| 7/11/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,166,666.67 | |
| 7/10/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,918,000.00 | |
| 7/9/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,586,000.00 | |
| 7/8/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,355,750.00 | |
| 7/1/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,806,250.00 | |
| 6/28/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,812,083.33 | |
| 6/28/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,280,000.00 | |
| 6/20/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,330,000.00 | |
| 6/19/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,906,000.00 | |
| 6/19/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,837,416.67 | |
| 6/14/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,799,333.33 | |
| 6/11/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,156,666.67 | |
| 6/10/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,484,000.00 | |
| 6/6/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,882,708.33 | |
| 6/4/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,240,000.00 | |
| 6/3/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,691,666.67 | |
| 5/29/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,222,500.00 | |
| 5/29/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,374,166.67 | |
| 5/29/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,834,583.33 | |

**EXHIBIT T**

**Transfers from PC Funding, LLC to Defendants**

| Date | Defendant (Payee) | Amount | Subtotal |
|------|-------------------|--------|----------|
| 5/24/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,227,500.00 | |
| 5/23/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,977,500.00 | |
| 5/23/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,655,000.00 | |
| 5/21/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,812,333.33 | |
| 5/21/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,596,000.00 | |
| 5/20/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,100,833.33 | |
| 5/17/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,558,500.00 | |
| 5/17/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,402,916.67 | |
| 5/16/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,616,250.00 | |
| 5/10/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,636,833.33 | |
| 5/10/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,509,666.67 | |
| 5/8/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,337,666.67 | |
| 5/8/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,604,000.00 | |
| 5/3/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,903,000.00 | |
| 5/3/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,163,333.33 | |
| 5/2/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,376,000.00 | |
| 5/1/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $1,821,833.33 | |
| 4/30/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,702,083.33 | |
| 4/29/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $5,216,000.00 | |
| 4/29/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $2,602,000.00 | |
| 4/22/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $3,242,500.00 | |
| 4/19/2002 | DZ BANK AG, AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES | $4,340,000.00 | $1,328,803,582.19 |

| | | |
|---|---|---|
| *Subtotal - Transfers to Opportunity Finance LLC* | *$235,936,556.51* | |
| *Subtotal - Transfers to Opportunity Finance Securitization III, LLC* | *$1,105,840,441.30* | |
| *Subtotal - Transfers to DZ Bank AG, As Collateral Agent for Certain Secured Parties* | *$698,167,716.67* | |
| **Total Transfers** | **$2,039,944,714.48** [1, 2] | |

[1] Amount differs from total Payment to Defendants stated in Exhibit H, PC Funding Notes - Summary of Notes Payable by Note by $5,000,000.00 (i.e. $2,039,944,714.48 - $2,034,944,714.48 = $5,000,000.00).  This variance is due to the inclusion of $5,000,000.00 in additional transfers from PC Funding, LLC to the Defendants, not tied to particular notes.

[2] Amount differs from net transfers from PCI to PC Funding, LLC (i.e., $2,244,923,662.14 paid to PC Funding, LLC (see Exhibit S) less $204,978,946.31 repaid to PCI (see Exhibit U) = $2,039,944,715.83) by $1.35 due to a total of $1.35 in overpayments from PCI to PC Funding, LLC, not subsequently transferred to the Defendants.

# EXHIBIT U

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| **90 Day Transfers** | | |
| No Transfers Identified | | |
| **Two Year Transfers** | | |
| 5/12/2008 | $239,677.67 | |
| 5/12/2008 | $226,311.11 | |
| 5/12/2008 | $174,269.28 | |
| 5/7/2008 | $193,611.88 | |
| 4/25/2008 | $242,243.44 | |
| 4/25/2008 | $211,182.83 | |
| 4/23/2008 | $157,047.00 | |
| 4/21/2008 | $321,622.33 | |
| 4/21/2008 | $294,662.78 | |
| 4/21/2008 | $227,996.00 | |
| 4/11/2008 | $283,166.00 | |
| 4/11/2008 | $258,319.73 | |
| 4/8/2008 | $321,622.33 | |
| 4/4/2008 | $243,776.53 | |
| 4/3/2008 | $236,567.11 | |
| 4/2/2008 | $306,996.67 | |
| 3/27/2008 | $283,570.78 | |
| 3/27/2008 | $227,306.39 | |
| 3/25/2008 | $294,176.89 | |
| 3/21/2008 | $189,926.31 | |
| 3/20/2008 | $331,068.75 | |
| 3/19/2008 | $194,965.00 | |
| 3/14/2008 | $278,488.00 | |
| 3/14/2008 | $212,597.78 | |
| 3/13/2008 | $335,497.36 | |
| 3/7/2008 | $315,699.82 | |
| 3/7/2008 | $244,624.56 | |
| 3/7/2008 | $214,572.78 | |
| 2/29/2008 | $351,325.50 | |
| 2/29/2008 | $336,206.00 | |
| 2/28/2008 | $342,669.69 | |
| 2/22/2008 | $310,921.67 | |
| 2/22/2008 | $297,238.00 | |
| 2/21/2008 | $284,335.56 | |
| 2/19/2008 | $361,989.89 | |
| 2/7/2008 | $254,897.67 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 2/6/2008 | $290,326.22 | |
| 2/4/2008 | $288,940.67 | |
| 11/30/2007 | $249,701.00 | |
| 11/29/2007 | $242,965.15 | |
| 11/27/2007 | $224,704.00 | |
| 11/26/2007 | $429,337.50 | |
| 11/26/2007 | $281,672.00 | |
| 11/23/2007 | $459,834.75 | |
| 11/23/2007 | $264,822.00 | |
| 11/19/2007 | $438,156.70 | |
| 11/19/2007 | $286,805.25 | |
| 11/16/2007 | $313,777.50 | |
| 11/15/2007 | $215,371.33 | |
| 11/14/2007 | $298,964.00 | |
| 11/14/2007 | $260,870.00 | |
| 11/14/2007 | $187,613.42 | |
| 11/9/2007 | $421,906.50 | |
| 11/9/2007 | $353,377.00 | |
| 11/9/2007 | $137,996.80 | |
| 11/6/2007 | $422,008.25 | |
| 11/6/2007 | $402,722.90 | |
| 11/5/2007 | $295,196.20 | |
| 11/2/2007 | $484,589.50 | |
| 11/2/2007 | $418,063.50 | |
| 10/31/2007 | $223,896.50 | |
| 10/30/2007 | $461,982.50 | |
| 10/29/2007 | $500,691.25 | |
| 10/29/2007 | $383,918.80 | |
| 10/25/2007 | $481,250.00 | |
| 10/18/2007 | $373,804.00 | |
| 10/17/2007 | $487,388.00 | |
| 10/16/2007 | $449,917.25 | |
| 10/15/2007 | $272,208.00 | |
| 10/12/2007 | $445,577.50 | |
| 10/10/2007 | $422,667.00 | |
| 10/9/2007 | $258,258.00 | |
| 10/4/2007 | $481,518.00 | |
| 9/28/2007 | $425,019.00 | |
| 9/28/2007 | $370,586.40 | |
| 9/26/2007 | $445,976.00 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 9/18/2007 | $435,817.00 | |
| 9/14/2007 | $363,678.80 | |
| 9/13/2007 | $241,424.00 | |
| 8/24/2007 | $458,039.00 | |
| 8/24/2007 | $382,637.75 | |
| 8/24/2007 | $20.00 | |
| 8/22/2007 | $441,070.00 | |
| 8/22/2007 | $281,428.70 | |
| 8/21/2007 | $261,808.00 | |
| 8/20/2007 | $272,467.75 | |
| 8/14/2007 | $388,795.75 | |
| 8/14/2007 | $277,888.00 | |
| 8/13/2007 | $355,543.20 | |
| 8/2/2007 | $468,846.25 | |
| 8/2/2007 | $455,439.50 | |
| 8/2/2007 | $386,890.95 | |
| 7/31/2007 | $386,123.10 | |
| 7/31/2007 | $349,697.75 | |
| 7/13/2007 | $256,061.00 | |
| 7/11/2007 | $484,920.00 | |
| 7/10/2007 | $243,016.00 | |
| 7/5/2007 | $252,526.40 | |
| 7/3/2007 | $471,025.00 | |
| 7/3/2007 | $461,450.25 | |
| 7/2/2007 | $296,038.00 | |
| 6/29/2007 | $333,076.20 | |
| 6/29/2007 | $278,696.60 | |
| 6/28/2007 | $477,995.50 | |
| 6/27/2007 | $298,390.50 | |
| 6/22/2007 | $348,443.00 | |
| 6/21/2007 | $294,296.75 | |
| 6/20/2007 | $365,688.00 | |
| 6/11/2007 | $401,720.85 | |
| 6/7/2007 | $309,039.00 | |
| 6/6/2007 | $315,184.25 | |
| 5/30/2007 | $465,338.00 | |
| 5/22/2007 | $422,086.75 | |
| 5/18/2007 | $529,006.65 | |
| 5/17/2007 | $503,678.70 | |
| 5/17/2007 | $329,010.25 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 5/16/2007 | $402,055.00 | |
| 5/15/2007 | $418,572.00 | |
| 5/9/2007 | $987,756.00 | |
| 5/8/2007 | $477,998.00 | |
| 5/7/2007 | $341,291.25 | |
| 5/2/2007 | $452,946.45 | |
| 5/1/2007 | $466,330.75 | |
| 4/25/2007 | $311,520.75 | |
| 4/19/2007 | $377,015.15 | |
| 4/17/2007 | $263,732.80 | |
| 4/12/2007 | $495,343.75 | |
| 4/9/2007 | $542,400.00 | |
| 4/6/2007 | $422,741.00 | |
| 4/2/2007 | $286,044.00 | |
| 3/29/2007 | $433,425.00 | |
| 3/29/2007 | $366,790.50 | |
| 3/28/2007 | $429,536.30 | |
| 3/27/2007 | $361,617.00 | |
| 3/22/2007 | $329,931.35 | |
| 3/22/2007 | $309,979.10 | |
| 3/20/2007 | $478,976.00 | |
| 3/16/2007 | $339,609.00 | |
| 3/15/2007 | $352,037.55 | |
| 3/14/2007 | $409,581.50 | |
| 3/9/2007 | $314,669.60 | |
| 3/7/2007 | $618,687.00 | |
| 3/6/2007 | $392,013.45 | |
| 3/2/2007 | $185,579.33 | |
| 3/1/2007 | $265,885.67 | |
| 3/1/2007 | $235,590.00 | |
| 2/27/2007 | $314,134.20 | |
| 2/27/2007 | $284,075.60 | |
| 2/23/2007 | $412,185.70 | |
| 2/21/2007 | $451,701.40 | |
| 2/14/2007 | $572,976.75 | |
| 2/14/2007 | $462,782.00 | |
| 2/8/2007 | $571,308.00 | |
| 2/8/2007 | $529,250.00 | |
| 2/6/2007 | $613,520.40 | |
| 2/6/2007 | $557,420.00 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|---|---|---|
| 1/24/2007 | $403,578.90 | |
| 1/22/2007 | $471,340.00 | |
| 1/19/2007 | $344,414.25 | |
| 1/17/2007 | $379,047.00 | |
| 1/16/2007 | $448,812.50 | |
| 1/16/2007 | $311,113.50 | |
| 1/9/2007 | $443,630.75 | |
| 12/28/2006 | $465,167.50 | |
| 12/28/2006 | $366,646.50 | |
| 12/22/2006 | $247,068.50 | |
| 12/21/2006 | $448,812.50 | |
| 12/20/2006 | $396,191.50 | |
| 12/20/2006 | $376,827.05 | |
| 12/19/2006 | $489,011.80 | |
| 12/19/2006 | $266,937.00 | |
| 12/13/2006 | $461,354.50 | |
| 12/8/2006 | $527,013.25 | |
| 12/6/2006 | $264,550.15 | |
| 11/22/2006 | $463,228.00 | |
| 11/22/2006 | $449,211.75 | |
| 11/20/2006 | $356,106.85 | |
| 11/14/2006 | $289,329.75 | |
| 11/8/2006 | $340,558.00 | |
| 11/7/2006 | $449,996.00 | |
| 10/27/2006 | $500,876.25 | |
| 10/19/2006 | $444,661.00 | |
| 10/19/2006 | $272,324.80 | |
| 10/16/2006 | $336,629.25 | |
| 10/11/2006 | $527,225.25 | **$66,480,507.93** |
| *Additional Transfers* | | |
| 10/5/2006 | $352,036.50 | |
| 10/3/2006 | $439,919.00 | |
| 9/28/2006 | $465,160.00 | |
| 9/22/2006 | $516,988.00 | |
| 9/21/2006 | $251,810.50 | |
| 9/19/2006 | $444,494.50 | |
| 9/18/2006 | $451,617.50 | |
| 9/14/2006 | $496,467.50 | |
| 9/14/2006 | $444,505.00 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|---|---|---|
| 9/13/2006 | $420,707.50 | |
| 9/7/2006 | $364,266.00 | |
| 9/7/2006 | $184,244.20 | |
| 8/23/2006 | $435,257.00 | |
| 8/21/2006 | $481,618.50 | |
| 8/10/2006 | $493,220.00 | |
| 8/3/2006 | $889,205.00 | |
| 8/1/2006 | $603,770.60 | |
| 7/21/2006 | $324,771.75 | |
| 7/20/2006 | $490,772.50 | |
| 7/19/2006 | $281,889.00 | |
| 7/14/2006 | $385,641.20 | |
| 7/13/2006 | $473,716.50 | |
| 7/6/2006 | $623,054.00 | |
| 6/20/2006 | $344,328.00 | |
| 6/19/2006 | $431,354.25 | |
| 6/16/2006 | $422,642.40 | |
| 6/15/2006 | $430,982.25 | |
| 6/13/2006 | $365,094.00 | |
| 6/12/2006 | $379,226.80 | |
| 6/8/2006 | $435,257.00 | |
| 6/5/2006 | $268,882.80 | |
| 6/1/2006 | $413,267.25 | |
| 5/25/2006 | $342,558.00 | |
| 5/18/2006 | $499,753.50 | |
| 5/15/2006 | $411,263.50 | |
| 5/11/2006 | $402,404.90 | |
| 5/4/2006 | $388,070.50 | |
| 4/27/2006 | $487,736.25 | |
| 4/21/2006 | $404,680.00 | |
| 4/20/2006 | $457,502.25 | |
| 4/14/2006 | $444,267.00 | |
| 4/13/2006 | $260,103.55 | |
| 4/12/2006 | $501,582.50 | |
| 3/30/2006 | $416,226.35 | |
| 3/21/2006 | $404,146.95 | |
| 3/17/2006 | $346,061.50 | |
| 3/16/2006 | $409,774.25 | |
| 3/15/2006 | $402,489.75 | |
| 3/8/2006 | $531,181.05 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 3/7/2006 | $526,260.75 | |
| 3/3/2006 | $425,252.75 | |
| 2/28/2006 | $479,805.00 | |
| 2/27/2006 | $397,854.40 | |
| 2/24/2006 | $245,271.50 | |
| 2/21/2006 | $427,879.00 | |
| 2/17/2006 | $281,410.10 | |
| 2/8/2006 | $385,192.70 | |
| 1/25/2006 | $418,429.55 | |
| 1/24/2006 | $423,268.50 | |
| 1/24/2006 | $422,956.25 | |
| 1/18/2006 | $507,137.20 | |
| 1/12/2006 | $512,140.00 | |
| 12/30/2005 | $452,317.75 | |
| 12/23/2005 | $483,966.86 | |
| 12/16/2005 | $412,207.00 | |
| 12/15/2005 | $462,996.50 | |
| 12/15/2005 | $370,489.95 | |
| 12/12/2005 | $333,056.40 | |
| 12/7/2005 | $496,478.20 | |
| 11/30/2005 | $424,679.60 | |
| 11/30/2005 | $295,867.26 | |
| 11/29/2005 | $478,424.00 | |
| 11/29/2005 | $407,853.95 | |
| 11/17/2005 | $254,006.50 | |
| 11/14/2005 | $361,531.25 | |
| 11/10/2005 | $370,289.90 | |
| 10/25/2005 | $492,606.50 | |
| 10/14/2005 | $297,657.02 | |
| 10/12/2005 | $512,560.10 | |
| 10/12/2005 | $257,305.50 | |
| 9/29/2005 | $543,641.40 | |
| 9/20/2005 | $396,906.20 | |
| 9/14/2005 | $464,430.00 | |
| 9/13/2005 | $413,491.00 | |
| 9/9/2005 | $393,232.35 | |
| 9/7/2005 | $353,385.00 | |
| 8/30/2005 | $472,148.75 | |
| 8/30/2005 | $346,365.00 | |
| 8/9/2005 | $493,312.50 | |

## EXHIBIT U
### Repayments from PC Funding, LLC to PCI

| Date | Amount | Subtotal |
|---|---|---|
| 8/5/2005 | $557,734.90 | |
| 7/25/2005 | $450,492.00 | |
| 7/13/2005 | $510,095.50 | |
| 7/13/2005 | $350,940.70 | |
| 7/13/2005 | $304,255.10 | |
| 6/20/2005 | $421,006.10 | |
| 6/15/2005 | $372,010.50 | |
| 6/15/2005 | $235,476.00 | |
| 10/6/2004 | $500,446.25 | |
| 9/29/2004 | $465,043.45 | |
| 9/21/2004 | $443,647.90 | |
| 9/17/2004 | $543,494.50 | |
| 9/17/2004 | $388,440.80 | |
| 9/10/2004 | $383,953.15 | |
| 8/25/2004 | $491,938.00 | |
| 7/27/2004 | $389,295.00 | |
| 7/22/2004 | $424,799.13 | |
| 7/14/2004 | $410,244.47 | |
| 7/14/2004 | $332,830.93 | |
| 7/13/2004 | $450,363.07 | |
| 7/12/2004 | $457,458.00 | |
| 6/15/2004 | $556,348.57 | |
| 6/2/2004 | $384,021.00 | |
| 5/14/2004 | $254,887.50 | |
| 5/14/2004 | $230,616.00 | |
| 5/13/2004 | $438,611.80 | |
| 5/12/2004 | $532,867.33 | |
| 5/11/2004 | $264,760.48 | |
| 5/5/2004 | $335,840.73 | |
| 4/28/2004 | $357,518.00 | |
| 4/22/2004 | $472,481.70 | |
| 4/19/2004 | $399,231.68 | |
| 4/19/2004 | $330,000.70 | |
| 4/15/2004 | $400,911.75 | |
| 4/15/2004 | $379,349.58 | |
| 4/14/2004 | $384,321.83 | |
| 3/3/2004 | $368,316.67 | |
| 3/2/2004 | $438,222.50 | |
| 2/17/2004 | $333,313.97 | |
| 2/13/2004 | $221,699.02 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 2/12/2004 | $426,647.65 | |
| 2/4/2004 | $406,739.33 | |
| 2/3/2004 | $434,044.88 | |
| 1/27/2004 | $350,709.08 | |
| 1/23/2004 | $202,154.45 | |
| 1/22/2004 | $390,027.43 | |
| 1/22/2004 | $380,006.25 | |
| 12/31/2003 | $370,954.42 | |
| 12/30/2003 | $279,483.17 | |
| 12/5/2003 | $307,416.67 | |
| 12/1/2003 | $322,084.92 | |
| 12/1/2003 | $282,491.67 | |
| 11/17/2003 | $206,532.67 | |
| 11/14/2003 | $317,865.83 | |
| 11/13/2003 | $362,996.00 | |
| 10/23/2003 | $465,171.90 | |
| 10/23/2003 | $308,535.87 | |
| 10/17/2003 | $376,020.63 | |
| 10/17/2003 | $288,449.75 | |
| 9/30/2003 | $504,508.65 | |
| 9/29/2003 | $421,029.83 | |
| 8/12/2003 | $220,247.95 | |
| 8/11/2003 | $565,223.45 | |
| 8/11/2003 | $394,099.50 | |
| 8/11/2003 | $344,370.00 | |
| 8/8/2003 | $401,446.25 | |
| 8/4/2003 | $726,338.32 | |
| 8/4/2003 | $269,306.03 | |
| 7/22/2003 | $531,191.25 | |
| 7/18/2003 | $315,079.53 | |
| 7/17/2003 | $610,049.65 | |
| 7/17/2003 | $570,859.70 | |
| 7/16/2003 | $349,142.13 | |
| 7/16/2003 | $228,687.68 | |
| 7/11/2003 | $354,210.10 | |
| 7/11/2003 | $194,673.60 | |
| 7/8/2003 | $415,440.90 | |
| 7/8/2003 | $201,897.55 | |
| 7/7/2003 | $422,896.50 | |
| 6/26/2003 | $279,538.50 | |

## EXHIBIT U
### Repayments from PC Funding, LLC to PCI

| Date | Amount | Subtotal |
|------|--------|----------|
| 6/24/2003 | $158,026.73 | |
| 6/20/2003 | $191,505.00 | |
| 6/19/2003 | $363,695.08 | |
| 6/19/2003 | $313,992.25 | |
| 6/18/2003 | $410,947.00 | |
| 6/11/2003 | $431,927.57 | |
| 6/11/2003 | $360,528.33 | |
| 6/11/2003 | $165,243.32 | |
| 6/6/2003 | $296,530.40 | |
| 6/6/2003 | $153,335.35 | |
| 5/30/2003 | $284,546.67 | |
| 5/28/2003 | $202,826.75 | |
| 5/27/2003 | $434,570.52 | |
| 5/23/2003 | $380,555.60 | |
| 5/22/2003 | $530,271.05 | |
| 5/22/2003 | $355,548.20 | |
| 5/22/2003 | $262,899.95 | |
| 5/20/2003 | $514,865.60 | |
| 5/15/2003 | $442,840.50 | |
| 5/13/2003 | $299,162.77 | |
| 5/9/2003 | $284,850.00 | |
| 5/9/2003 | $224,165.09 | |
| 5/8/2003 | $512,725.03 | |
| 5/8/2003 | $393,478.35 | |
| 5/7/2003 | $285,375.00 | |
| 5/6/2003 | $360,148.08 | |
| 5/6/2003 | $353,034.80 | |
| 5/2/2003 | $475,133.83 | |
| 4/23/2003 | $230,280.00 | |
| 4/23/2003 | $156,104.18 | |
| 4/22/2003 | $414,087.53 | |
| 4/22/2003 | $284,137.30 | |
| 4/17/2003 | $964,864.67 | |
| 4/11/2003 | $348,808.37 | |
| 4/11/2003 | $203,388.85 | |
| 4/10/2003 | $784,770.90 | |
| 4/8/2003 | $897,720.83 | |
| 3/31/2003 | $394,093.78 | |
| 3/31/2003 | $373,863.40 | |
| 3/31/2003 | $254,483.78 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 3/28/2003 | $444,144.72 | |
| 3/28/2003 | $375,278.95 | |
| 3/28/2003 | $203,640.23 | |
| 3/27/2003 | $422,274.27 | |
| 3/27/2003 | $347,655.78 | |
| 3/26/2003 | $268,927.38 | |
| 3/13/2003 | $787,476.12 | |
| 3/13/2003 | $312,367.97 | |
| 3/12/2003 | $823,379.35 | |
| 3/7/2003 | $544,823.80 | |
| 3/7/2003 | $382,251.55 | |
| 3/6/2003 | $580,339.95 | |
| 3/3/2003 | $421,017.98 | |
| 2/25/2003 | $433,690.55 | |
| 2/25/2003 | $347,234.31 | |
| 2/21/2003 | $230,402.08 | |
| 2/20/2003 | $272,266.52 | |
| 2/20/2003 | $244,664.58 | |
| 2/19/2003 | $323,423.34 | |
| 2/19/2003 | $283,953.00 | |
| 2/18/2003 | $509,410.27 | |
| 2/14/2003 | $133,101.82 | |
| 2/12/2003 | $495,433.85 | |
| 2/6/2003 | $674,626.42 | |
| 2/6/2003 | $361,468.07 | |
| 2/6/2003 | $199,701.92 | |
| 2/5/2003 | $432,513.29 | |
| 2/4/2003 | $311,119.96 | |
| 2/3/2003 | $193,897.67 | |
| 1/31/2003 | $443,083.59 | |
| 1/31/2003 | $333,778.02 | |
| 1/27/2003 | $163,606.20 | |
| 1/22/2003 | $302,474.00 | |
| 1/17/2003 | $345,613.91 | |
| 1/17/2003 | $302,675.27 | |
| 1/17/2003 | $222,180.53 | |
| 1/7/2003 | $209,567.00 | |
| 1/6/2003 | $396,423.28 | |
| 1/6/2003 | $225,663.78 | |
| 12/26/2002 | $474,369.07 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 12/26/2002 | $297,227.50 | |
| 12/23/2002 | $467,359.60 | |
| 12/20/2002 | $437,625.00 | |
| 12/20/2002 | $149,723.57 | |
| 12/19/2002 | $466,373.34 | |
| 12/19/2002 | $220,900.22 | |
| 12/17/2002 | $296,245.85 | |
| 12/17/2002 | $230,756.44 | |
| 12/16/2002 | $274,490.80 | |
| 12/13/2002 | $387,020.68 | |
| 12/12/2002 | $323,705.08 | |
| 12/12/2002 | $322,154.45 | |
| 12/6/2002 | $527,031.07 | |
| 12/6/2002 | $290,724.92 | |
| 12/5/2002 | $229,972.60 | |
| 12/2/2002 | $1,281,871.15 | |
| 11/27/2002 | $272,526.00 | |
| 11/25/2002 | $252,560.97 | |
| 11/19/2002 | $321,388.90 | |
| 11/18/2002 | $317,089.69 | |
| 11/15/2002 | $241,732.00 | |
| 11/12/2002 | $230,850.45 | |
| 11/7/2002 | $604,992.05 | |
| 11/7/2002 | $468,389.60 | |
| 11/7/2002 | $308,602.38 | |
| 10/30/2002 | $369,254.83 | |
| 10/22/2002 | $481,894.21 | |
| 10/18/2002 | $479,709.17 | |
| 10/18/2002 | $210,289.58 | |
| 10/10/2002 | $430,718.75 | |
| 10/8/2002 | $508,749.98 | |
| 10/7/2002 | $511,592.70 | |
| 10/7/2002 | $383,435.82 | |
| 10/4/2002 | $555,345.94 | |
| 10/4/2002 | $346,213.60 | |
| 10/2/2002 | $266,280.33 | |
| 10/1/2002 | $472,245.76 | |
| 10/1/2002 | $326,324.40 | |
| 9/20/2002 | $366,942.32 | |
| 9/20/2002 | $309,101.16 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 9/19/2002 | $370,780.47 | |
| 9/19/2002 | $330,986.50 | |
| 9/16/2002 | $396,745.69 | |
| 9/13/2002 | $269,202.33 | |
| 9/12/2002 | $449,650.34 | |
| 9/6/2002 | $534,273.18 | |
| 8/30/2002 | $439,240.00 | |
| 8/30/2002 | $297,662.87 | |
| 8/28/2002 | $312,552.77 | |
| 8/26/2002 | $251,841.70 | |
| 8/26/2002 | $220,557.13 | |
| 8/23/2002 | $242,927.50 | |
| 8/20/2002 | $324,057.21 | |
| 8/19/2002 | $324,734.58 | |
| 8/16/2002 | $447,579.27 | |
| 8/16/2002 | $438,456.28 | |
| 8/16/2002 | $397,384.77 | |
| 8/9/2002 | $215,641.67 | |
| 8/6/2002 | $497,003.00 | |
| 8/6/2002 | $372,043.33 | |
| 8/1/2002 | $514,018.45 | |
| 7/29/2002 | $380,482.11 | |
| 7/29/2002 | $224,942.13 | |
| 7/25/2002 | $380,190.21 | |
| 7/25/2002 | $209,156.65 | |
| 7/25/2002 | $141,880.45 | |
| 7/12/2002 | $379,601.30 | |
| 7/12/2002 | $372,893.02 | |
| 7/11/2002 | $1,457,149.63 | |
| 7/11/2002 | $349,217.96 | |
| 7/10/2002 | $309,543.75 | |
| 7/9/2002 | $352,081.90 | |
| 7/8/2002 | $335,635.00 | |
| 7/1/2002 | $368,128.00 | |
| 6/28/2002 | $448,372.53 | |
| 6/28/2002 | $333,892.12 | |
| 6/20/2002 | $511,886.30 | |
| 6/19/2002 | $466,804.95 | |
| 6/19/2002 | $247,245.83 | |
| 6/14/2002 | $320,416.17 | |

**EXHIBIT U**

**Repayments from PC Funding, LLC to PCI**

| Date | Amount | Subtotal |
|------|--------|----------|
| 6/11/2002 | $259,203.53 | |
| 6/10/2002 | $300,053.75 | |
| 6/6/2002 | $230,205.92 | |
| 6/4/2002 | $339,838.65 | |
| 6/3/2002 | $308,746.68 | |
| 5/29/2002 | $372,783.25 | |
| 5/29/2002 | $302,027.36 | |
| 5/29/2002 | $265,264.69 | |
| 5/24/2002 | $454,416.00 | |
| 5/24/2002 | $381,673.35 | |
| 5/23/2002 | $414,686.80 | |
| 5/21/2002 | $328,624.87 | |
| 5/21/2002 | $292,800.00 | |
| 5/20/2002 | $453,230.67 | |
| 5/17/2002 | $428,936.90 | |
| 5/17/2002 | $155,776.63 | |
| 5/16/2002 | $186,660.85 | |
| 5/10/2002 | $448,082.11 | |
| 5/10/2002 | $159,673.33 | |
| 5/8/2002 | $375,522.33 | |
| 5/8/2002 | $212,486.21 | |
| 5/3/2002 | $457,471.32 | |
| 5/3/2002 | $264,695.07 | |
| 5/2/2002 | $217,566.65 | |
| 5/1/2002 | $205,800.51 | |
| 4/30/2002 | $379,604.15 | |
| 4/29/2002 | $584,379.55 | |
| 4/29/2002 | $318,028.95 | |
| 4/22/2002 | $390,434.40 | |
| 4/19/2002 | $828,350.39 | **$138,498,438.38** |
| **Transfers** | **$204,978,946.31** | |

# EXHIBIT V

**EXHIBIT V**
**Terms Defined in the Fourth Amended Complaint**

| | |
|---|---|
| **ABRG** | Asset Based Resource Group, LLC, as successor servicer to Acorn |
| **Acorn** | Acorn Capital Group, LLC |
| **Additional Petters Entities** | Petters-related entities that were not part of the main churn of the Ponzi scheme |
| **Amendments** | Potential future amendments to include (i) further information regarding any transfers described herein; (ii) additional transfers; (iii) modifications or revisions to the names of Defendants; (iv) additional defendants; and (v) additional causes of action that may become known to the Trustee at any time during this adversary proceeding, through formal discovery or otherwise, which will relate back to the original Complaint |
| **Ark Discovery** | Ark Discovery II LP |
| **Ark Discovery Loan Documents** | Master Loan Agreement, Security Agreement and any related notes, documents, certificates, instruments, agreements and guaranty by PCI, and all amendments, replacements, extensions or restatements of any of the foregoing underlying note transactions entered into by Ark Discovery with PCI and Edge One |
| **Assignment Schedule** | PC Funding and PCI would execute an Assignment Schedule, as contemplated by the Sale Agreement.  Pursuant to the Assignment Schedule, PCI would assign to PC Funding its right, title, and interest in certain receivables backed by purchase orders. |
| **Associates** | Deanna Coleman, Robert White, Larry Reynolds, Michael Catain, and James Wehmhoff |
| **Bankruptcy Code** | Title 11 of the United States Code |
| **Catain** | Michael Catain |
| **Coleman** | Deanna Coleman |

1

| | |
|---|---|
| **Confirmation Order** | Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Chapter 11 Plan of Liquidation Dated April 8, 2016 (Docket No. 3305 of Case Number 08-45257) |
| **Credit Agreement** | Credit Agreement between Opportunity Finance and PC Funding on or about December 17, 2001 |
| **Debtors** | PCI, PC Funding, and SPF Funding |
| **Defendants** | Opportunity Finance, LLC, Opportunity Finance Securitization, LLC, Opportunity Finance Securitization II, LLC, Opportunity Finance Securitization III, LLC, International Investment Opportunities, LLC, Sabes Family Foundation, Sabes Minnesota Limited Partnership, Robert W. Sabes, Janet F. Sabes, Jon R. Sabes, Steven Sabes, Deutsche Zentralgenossenschaftbank AG, and The Minneapolis Foundation |
| **Deikel** | Theodore Deikel |
| **Deikel Note** | Promissory Note dated June 3, 2008 under which Deikel advanced a total of $10 million to PCI |
| **District Court** | United States District Court of the District of Minnesota |
| **DZ Bank** | Deutsche Zentralgenossenschaftbank AG |
| **Enchanted** | Enchanted Family Buying Company |
| **Fraudulent Obligations** | Credit Agreements, Security Agreements, PCI Direct Notes, MGLLC Notes, SPF Funding Notes, PC Funding Notes, and any other promissory notes from any of the Debtors to one or more of the Defendants or MGLLC |
| **IIO** | International Investment Opportunities, LLC |
| **Interlachen** | Interlachen Harriet Investments Limited |
| **Interlachen Note** | An Amended and Restated Promissory Note between PCI and Interlachen, dated as of April 18, 2008 in the principal amount of $60,000,000 |

| | |
|---|---|
| **Investor Defendants** | Opportunity Finance, Securitization, Securitization II, Securitization III, IIO, Sabes Family Defendants, Sabes LP, Sabes Family Foundation, and Minneapolis Foundation |
| **Janet Sabes** | Janet F. Sabes |
| **Jon Sabes** | Jon R. Sabes |
| **Kelley** | Douglas A. Kelley, Esq. |
| **Lancelot** | Lancelot Investors Fund, L.P., Lancelot Investors Fund II, L.P., Lancelot Investors Fund, Ltd., and related entities |
| **Loan Proposal** | Loan proposal setting forth the receivables proposed for purchase, as provided for in the Credit Agreement |
| **MGLLC** | Metro Gem, LLC |
| **MGLLC Note Summary** | Exhibit M, a schedule with details of each MGLLC Promissory Note, including the principal invested into PCI, the payment by PCI to MGLLC, and the payment from MGLLC to the Investor Defendants |
| **MGLLC Notes** | 107 promissory notes entered into by MGLLC between September 1998 and September 1, 1999 |
| **MUFTA** | Minnesota Uniform Fraudulent Transfer Act, Minn. Stat. §§ 513.41–51 |
| **Nationwide** | Nationwide International Resources, Inc. |
| **Opportunity Finance Defendants** | Opportunity Finance, Securitization, Securitization II, Securitization III, and IIO |
| **Opportunity Finance** | Opportunity Finance, LLC |
| **Palm Beach** | The Palm Beach funds, consisting of Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. |
| **PC Funding** | PC Funding, LLC |
| **PC Funding Note Summary** | Exhibit H, a schedule with details of each PC Funding note, including principal investment into PCI, payment from PCI to PC Funding, payment from PC Funding to the Investor Defendants, and repayment from PC Funding to PCI |

| | |
|---|---|
| **PC Funding Notes** | 546 promissory notes entered into by Opportunity Finance with PC Funding between January 7, 2002 and December 3, 2007 |
| **PC Funding Transfers** | Transfers of $2,039,944,714 from PC Funding to Opportunity Finance, Securitization III, and DZ Bank between April 19, 2002 and September 12, 2008 |
| **PC Funding Two-Year Transfers** | 189 transfers in the collective amount of $711,141,132 from PC Funding to Opportunity Finance and Securitization III during the two years prior to the Petition Date |
| **PCB** | Petters Consumer Brands |
| **PCI** | Petters Company, Inc. |
| **PCI Direct Note Summary** | Exhibit J, a schedule with details of each PCI Direct Note, including principal investment in PCI and payment from PCI to Investor Defendants |
| **PCI Direct Notes** | 108 promissory notes entered into by Investor Defendants between July 8, 1999 and July 12, 2001 |
| **PCI Direct Transfers** | Transfers of $119,374,303 from PCI directly to Investor Defendants between August 10, 1999 and September 21, 2001 |
| **PCI MGLLC Transfers** | Transfers of $82,073,509 from PCI to MGLLC between September 1998 and December 10, 1999 |
| **PCI SPE Transfers** | All transfers from PCI to SPF Funding and PC Funding |
| **Petition Date** | October 11, 2008 |
| **Petters** | Thomas Joseph Petters |
| **Plan** | Chapter 11 Plan of Liquidation |
| **Preference Period Transfers** | Four transfers in the collective amount of $9,238,419 from PC Funding to Opportunity Finance during the 90 days prior to the Petition Date |
| **Preference Period** | The 90 days prior to the Petition Date |
| **PwC** | PricewaterhouseCoopers LLP |

4

| | |
|---|---|
| **Receiver** | Douglas A. Kelley, Esq. as equity receiver of any affiliates, subsidiaries, divisions, successors, or assigns owned 100% or controlled by Petters, including PCI, PC Funding, and SPF Funding |
| **Receivership Action** | Court File No. 08-CV-5348 |
| **Reynolds** | Larry Reynolds |
| **Robert Sabes** | Robert W. Sabes |
| **Sabes Family Defendants** | Robert Sabes, Janet Sabes, Jon Sabes, Steven Sabes, and Sabes LP |
| **Sabes Family Foundation Transfers** | Transfers of $29,495,341 from SPF Funding to the Sabes Family Foundation between August 14, 2001 and August 9, 2007 |
| **Sabes Family Foundation Two-Year Transfers** | 12 transfers in the collective amount of $12,469,571 from SPF Funding to the Sabes Family Foundation during the two years prior to the Petition Date |
| **Sabes LP** | Sabes Minnesota Limited Partnership |
| **Sale Agreement** | Sale Agreement between PCI and PC Funding, setting forth the terms and conditions under which PCI sells, conveys, transfers and assigns to PC Funding all of PCI's right, title and interest in each receivable owed to PCI from the sale of goods evidenced by purchase orders |
| **Securitization** | Opportunity Finance Securitization, LLC |
| **Securitization II** | Opportunity Finance Securitization II, LLC |
| **Securitization III** | Opportunity Finance Securitization III, LLC |
| **Security Agreement** | Security Agreement between PC Funding and Opportunity Finance securing promissory notes, dated as of December 17, 2001 |
| **SPE** | Special Purpose Entity |
| **SPF Funding** | SPF Funding, LLC f/k/a Petters Finance, LLC |
| **SPF Funding Note Summary** | Exhibit P, a schedule with details of each SPF Funding note, including principal investment in PCI, payment from PCI to SPF Funding, payment from SPF Funding to the Investor Defendants, and repayment from SPF Funding to PCI |

| | |
|---|---|
| **SPF Funding Notes** | 167 promissory notes entered into by Opportunity Finance, the Sabes Family Foundation, the Minneapolis Foundation, and Sabes LP with SPF Funding between May 11, 2001 and May 9, 2007 |
| **SPF Funding Transfers** | Transfers of $287,674,849 from SPF Funding to Opportunity Finance, Securitization III, the Sabes Family Foundation, the Minneapolis Foundation, DZ Bank, and Sabes LP between August 3, 2001 and August 9, 2007 |
| **SPF Funding/DZ Bank Transfers** | Transfers of $78,241,766 from SPF Funding to DZ Bank between January 4, 2002 and April 9, 2002 |
| **SPF Funding/Minneapolis Foundation Transfers** | Transfers of $10,992,351 from SPF Funding to the Minneapolis Foundation between December 20, 2001 and July 30, 2003 |
| **SPF Funding/Opportunity Finance Transfers** | Transfers of $132,382,650 from SPF Funding to Opportunity Finance between August 3, 2001 and March 8, 2005 and transfers of $32,232,739 from SPF Funding to Securitization III between April 14, 2005 and June 3, 2005 |
| **SPF Funding/Sabes LP Transfer** | Transfer of $4,330,000 from SPF Funding to Sabes LP on October 8, 2002 |
| **Trustee** | Douglas A. Kelley, Esq., in his capacity as the Trustee of the PCI Liquidating Trust |
| **Vendors** | Nationwide International Resources, Inc., Enchanted Family Buying Company, and any other vendors |
| **Wehmhoff** | James Wehmhoff |
| **WestLB** | West Landesbank, AG |
| **White** | Robert White |