# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re | **Jointly Administered under Case No. 08-45257** |
| Petters Company, Inc., et al., | |
| Debtors. | Court File No. 08-45257 |
| | Court File Nos.: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (KHS) |
| PC Funding, LLC; | 08-45326 (KHS) |
| Thousand Lakes, LLC; | 08-45327 (KHS) |
| SPF Funding, LLC; | 08-45328 (KHS) |
| PL Ltd., Inc.; | 08-45329 (KHS) |
| Edge One LLC; | 08-45330 (KHS) |
| MGC Finance, Inc.; | 08-45331 (KHS) |
| PAC Funding, LLC; | 08-45371 (KHS) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (KHS) |
| | Chapter 11 Cases |
| | Judge Kathleen H. Sanberg |

Douglas A. Kelley, in his capacity as the court-appointed Chapter 11 Trustee of Debtors Petters Company, Inc.; PC Funding, LLC; and SPF Funding, LLC,

Plaintiff,

vs.                                                                 ADV. NO. 10-04301

Opportunity Finance, LLC, <u>et al.,</u> ,

Defendants.

## DEFENDANT DZ BANK'S NOTICE OF MOTION AND MOTION FOR <u>SUMMARY JUDGMENT</u>

To:    Plaintiff Douglas A. Kelly (the "Trustee") in his capacity as the Trustee of the PCI Liquidation Trust and his attorneys, Quinn Emanuel Urquhart & Sullivan, LLP; and all other partied entitled to notice by and through their attorneys:

1.      PLEASE TAKE NOTICE THAT the Court will hold a hearing on this Motion on **Wednesday, April 8, 2020 at 1:30 PM**, or as soon thereafter as the parties may be heard, before Kathleen H. Sanberg, United States Bankruptcy Judge, in Courtroom 8 West of the United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota

2.      Pursuant to the Court's December 12, 2019 order (Dkt. No. 316), any response to this Motion must be electronically filed on or before **5:00 PM on Friday, February 7, 2020**. **UNLESS A RESPONSE OPPOSING THIS MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

3.      This Motion arises under Federal Rule of Bankruptcy Procedure 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1.

4.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Federal Rule of Bankruptcy Procedure 1005, and Local Rule 1070-1. The bankruptcy cases jointly administered under No. 08-45257 are now pending in this Court.

5.      Defendant DZ Bank AG, Deutsche Zentral Genossenschaftsbank, Frankfurt am Main ("DZ Bank") respectfully moves the Court for an Order granting summary judgment in DZ Bank's favor in the following ways:

> a.  Holding that, in connection with all of the Trustee's claims as against DZ Bank,  DZ Bank was not a transferee for any of the principal and interest that Opportunity Finance Securitization ("OFS") paid to Autobahn Funding Company LLC ("Autobahn") because DZ Bank, as the Agent and Collateral Agent for the Autobahn-OFS loan facility, acted only as a "mere conduit" of Autobahn's funds and did not exercise dominion and control over the "Collateral Agent Collection Account" (defined in DZ Bank's

2

Memorandum of Law in Support of DZ Bank's Motion for Summary Judgment) for DZ Bank's own benefit.

b.  Dismissing the Trustee's constructive fraudulent transfer claims as against DZ Bank in Counts VI, VII, VIII, XI, XII, and XIII of the Trustee's Fourth Amended Complaint (Dkt. No. 233) because every transfer that DZ Bank received from the Collateral Agent Collection Account was for reasonably equivalent value.

c.  Dismissing all of the Trustee's claims as against DZ Bank because the Trustee has no standing to assert claims under Section 544 of the Bankruptcy Code because the Trustee cannot establish that there is a predicate creditor on whose behalf the Trustee could assert any claims for constructive or actual fraudulent transfers.

6.      This Motion is based upon all the files, records, and proceedings in this action and the underlying main proceeding, as well as upon the accompanying Memorandum of Law in Support of DZ Bank's Motion for Summary Judgment and the Declaration of Michael A. Rosow dated December 20, 2019 (and the exhibits thereto) being submitted herewith.

7.      In bringing this Motion, DZ Bank does not waive and hereby expressly reserves its right to a jury trial in this matter.

WHEREFORE, DZ Bank respectfully requests that the Court enter an Order awarding DZ Bank summary judgment, and granting such other and further relief as the Court deems just and proper.

3

Dated: December 20, 2019

Respectfully submitted,

WINTHROP & WEINSTINE

By: *s/Michael A. Rosow*
Michael A. Rosow, #317998

Capella Tower | Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
Phone: (612) 604-6734
Facsimile: (612) 604-6834
mrosow@winthrop.com

-and-

PEPPER HAMILTON LLP
H. Peter Haveles, Jr.
37th Floor
620 Eighth Avenue
New York, NY 10018-1405
Phone: (212) 808-2700
Facsimile: (212) 286-9806

*Attorneys for Defendant DZ Bank AG, Deutsche*
*Zentral Genossenschaftsbank, Frankfurt am Main*

18441680v2

4

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re

Petters Company, Inc., et al.,

                Debtors.

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.;
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

Jointly Administered under
Case No. 08-45257

Court File No. 08-45257

Court File Nos.:

08-45258 (KHS)
08-45326 (KHS)
08-45327 (KHS)
08-45328 (KHS)
08-45329 (KHS)
08-45330 (KHS)
08-45331 (KHS)
08-45371 (KHS)
08-45392 (KHS)

Chapter 11 Cases
Judge Kathleen H. Sanberg

Douglas A. Kelley, in his capacity as the
Trustee of the PCI Liquidating Trust,

                Plaintiff,

vs.

Opportunity Finance, LLC, et al.,

                Defendants.

ADV. NO. 10-04301

## DEFENDANT DZ BANK AG, DEUTSCHE ZENTRAL GENOSSENSCHAFTSBANK, FRANKFURT AM MAIN'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## PRELIMINARY STATEMENT

Defendant DZ Bank AG, Deutsche Zentral Genossenschaftsbank, Frankfurt am Main ("DZ Bank") submits this memorandum of law in support of its motion for summary judgment with respect to the claims asserted by plaintiff Douglas A. Kelley, in his capacity as the Trustee of the PCI Liquidating Trust (the "Trustee").

The Trustee asserts claims for constructive and actual fraudulent transfers against DZ Bank.  It is the <u>sine qua non</u> of such a claim that the claim must be asserted against a transferee. As a matter of law, however, DZ Bank is not a transferee with respect to any of the transfers at issue in the Trustee's claims except with respect to the modest amount of fees that DZ Bank received (and that transfer was for reasonably equivalent value).  The actual transferee, which the Trustee inexplicably failed to sue, is Autobahn Funding Company LLC ("Autobahn").

It is well established in the Eighth Circuit that, if a party does not have dominion and control over funds for its own use and benefit, it cannot be a transferee.  That rule has been strictly enforced in this Circuit.  The undisputed evidence establishes that DZ Bank acted as the agent and collateral agent of Autobahn, and that all funds received from PC Funding in the collection account were not within DZ Bank's dominion and control for its own use and benefit. Accordingly, as a matter of law DZ Bank cannot be a transferee, and the Trustee cannot assert any claims against DZ Bank for the repayment of principal and interest to Autobahn.

The Trustee's claims suffer from another fatal defect.  In order for the Trustee to assert his claims, there must be predicate creditors. None of the Trustee's predicate creditors are creditors of PC Funding, and the Trustee cannot as matter of law establish that any of those five creditors may assert claims against PC Funding for a tort or reverse veil piercing.

Accordingly, as requested in DZ Bank's Motion, and for the reasons set forth below, DZ Bank's motion for summary judgment should be granted in its entirety.

## STATEMENT OF UNDISPUTED FACTS

### A.      The Parties

On October 11, 2008, Petters Company, Inc. ("PCI") filed a petition for relief under Chapter 11 of the Bankruptcy Code. Ex. 1 ¶ 30. On October 15, 2008, PC Funding, LLC ("PC Funding") filed a petition for relief under Chapter 11. Id. ¶ 31. PC Funding was a wholly-owned special purpose entity of PCI. Id. ¶ 1.

DZ Bank is a commercial bank organized under the laws of Germany. Id. ¶ 25. DZ Bank serves as the Administrator for Autobahn, which is a financing conduit. Ex. 2 at 1.

Former Defendant Opportunity Finance had its principal place of business in Minnesota. Ex. 1 ¶ 11. Opportunity Finance, through its special purpose entity, made loans to PC Funding to finance the purported purchase and sale of merchandise pursuant to a Credit Agreement. Ex. 6. Opportunity Finance's loans to PC Funding were partially funded by funds that Opportunity Finance borrowed from Autobahn. See this Memo at 5-7, infra.

### B.      The Opportunity Finance Loans

#### 1.      Autobahn and ABCP Loans

Asset-backed commercial paper ("ABCP") conduits such as Autobahn are used by bankers and financial institutions to finance receivables-backed loans for corporate borrowers. See Ex. 31 at 11;[1] see also Ex. 57 at 150:7-22. While conduits may be sponsored and/or administered by commercial banks, the conduit is a separate legal entity and is not owned by the sponsor banks. Ex. 31 at 25, Figure 1; see also Ex. 57 at 144:15-145:4. Conduits raise money from outside

---

[1] The Trustee's expert witness Daniel Ladd reviewed and relied on the Moody's report, and he testified that the report is "generally consistent his understanding of the business." Ex. 57 at 196:18-198:1.

investors by issuing commercial paper, and they use the commercial paper proceeds to make loans
to borrowers identified and approved by the sponsor/administrator.  Ex. 31 at 15.

      Autobahn is a typical conduit.  It is a special purpose, bankruptcy-remote Delaware
limited liability company.  Ex. 7 at 204:21-205:12; Ex. 4 at 1.  Autobahn's primary purpose is to
facilitate the issuance of commercial paper, the proceeds of which are used to acquire asset
interests, which can be loans, pools of accounts, financial assets and securities.  Id. at 203:15-
205:1; Ex. 4 at 1.  A conduit is a "special purpose vehicle with no employees."  Ex. 31 at 29.  "All
of the activities associated with the administration of the conduit are handled by one or more firms
that are contractually obligated to perform certain tasks."  Id.  Conduit "Service and Support
Providers" may include the conduit's administrator, manager, issuing and paying agent,
depositary, placement agent, collateral agent, custodian, liquidity agent, liquidity bank, credit
enhancement provider, and hedging agent.  Id.

      Autobahn is managed by Lord Securities Corporation ("Lord Securities") pursuant
to a September 17, 1999 Management Agreement.  See Ex. 3.  Sections 3 and 4 of the Management
Agreement set out the services that Lord Securities provided.  Id. at 2-4.  Lord Securities was
responsible for designating Autobahn's officers and directors, managing meetings of the board of
directors, maintaining Autobahn's books and records, overseeing financial audits and the filing of
reports, financial statements and tax returns.  Id.  Section 5 required at least two "Responsible
Officers" be appointed by Lord Securities to review and approve all asset financing transactions
that DZ Bank proposed to Autobahn.  Id. at 4.  Autobahn paid Lord Securities a fixed annual fee
and variable quarterly fees for these management services.  Id. at 4-5.

      At the time that Autobahn entered into the Opportunity Finance credit facility,
Autobahn's commercial paper placement agents were Morgan Stanley & Co., Inc. and Merrill

Lynch Money Markets, Inc.  Ex. 2 at 1, 4.  U.S. Bank Trust National Association ("U.S. Bank")

acted as Autobahn's "issuing and paying agent and depositary" with respect to the commercial

paper notes.  Id.  Among other things, U.S. Bank was responsible for repaying mature commercial

paper.  See id. at 24-25; see also Ex. 31 at 32.

       DZ Bank acted as Autobahn's administrator pursuant to a September 17, 1999

Administration Agreement.  See Ex. 2.  Section 2.01 authorized DZ Bank to act as Autobahn's

agent and to administer Autobahn's operations in four areas: (i) the acquisition of investments; (ii)

the sale of commercial paper notes, (iii) the implementation of liquidity agreements; and (iv)

"related operations and activities of the Company."  Id. at 17.  Article 3 specified the "Services

and Duties of the Administrator," including loan origination, credit analysis, due diligence, credit

approvals and loan administration.  Id. at 17-27; see Ex. 57 at 201:16:-202:25.

       Autobahn was audited by Deloitte (2000-01) and Ernst & Young (2002-04).  See

Exs. 27, 33, 42, 45.  Autobahn was also evaluated by the ratings agencies Moody's and Fitch which

both rated Autobahn with their highest credit rating categories of "Prime-1" and "F-1",

respectively.  Exs. 4, 14, 30, 41, Ex. 57 at 201:22-15; 203:2-14.

## 2.      The Opportunity Finance – PC Funding Credit Agreement

       On December 17, 2001, Opportunity Finance and PC Funding entered into a Credit

Agreement.  Ex. 6.  The Credit Agreement provided that Opportunity Finance would make loans

to PC Funding (the "Opportunity Finance Loans") for "Receivable Sales" relating to the purported

purchase and sale of goods by PCI.  Id. at 3-4.  Opportunity Finance received promissory notes in

the amounts of the loaned funds.  Id. at 4.  The promissory notes were to be repaid either on the

earlier of 120 days after they were made or "the day upon which [PC Funding] received payment

from the Buyer[s] on the Receivables" financed by the Opportunity Finance Loan.  Id. at 5.

The Credit Agreement provided that PC Funding would direct Buyers to make payment on the receivables to PC Funding "for deposit into such account or accounts of [PC Funding] as may mutually be agreed by [PC Funding] and [Opportunity Finance]." Id. at 4.  PC Funding, Opportunity Finance, Opportunity Finance Securitization ("OFS") (a special purpose vehicle owned by Opportunity Finance)[2] and U.S. Bank entered into an "Account Control Agreement." Ex. 5.  Under the Account Control Agreement, PC Funding agreed to deposit the payments on receivables in a trust account in its name at U.S. Bank (the "PC Funding Collection Account"). Id. at 1.  The Account Control Agreement granted OFS complete control over the PC Funding Collection Account. Id. at 1-2.  Section 2 provided that U.S. Bank "will comply with all instructions originated by [OFS] directing disposition of the funds in the [PC Funding Collection Account] without any further consent by [PC Funding] nor [Opportunity Finance]." Id. at 1. Section 4(a) provided that neither PC Funding nor Opportunity Finance "will permit any person or entity except [OFS] to have control over the [PC Funding Collection Account]" Id. at 2.  Section 4(c) provided that U.S. Bank "shall not permit any withdrawal or transfer from the [PC Funding Collection Account] except in favor of [OFS] or an entity designated by [OFS]." Id.

### 3.      The Receivables Loan and Security Agreement

Opportunity Finance obtained partial funding for its loans to PC Funding from Autobahn pursuant to the Receivables and Loan Security Agreement ("RLSA"), dated December 28, 2001, among Opportunity Finance, DZ Bank, Autobahn, OFS, U.S. Bank and Royal and Sun Alliance ("Royal"). See Ex. 10 at 1.  The RLSA established and governed a $100 million credit facility that Autobahn (as the Lender) provided to OFS (the "Opportunity Finance Facility"). Id.

---

[2] OFS purchased all of Opportunity Finance's rights with respect to the Receivables in a separate "Purchase and Contribution Agreement". Ex. 9.

Pursuant to Section 2.01(b), OFS was to use the loans solely to fund or refinance 80 percent of Opportunity Finance Loans. Id. at 36.

     Each party to the RLSA had a distinct and separate role. Autobahn was the "Lender", and OFS was the "Borrower." Id. at 1, 6, 36. DZ Bank was Autobahn's "Agent" and "Collateral Agent." Id. at 1-2, 7. Opportunity Finance was the "Servicer" responsible for servicing and administering the receivables pledged by PC Funding. Id. at 1, 32. Royal was the "Facility Insurer", as it issued a $50 million "first loss" insurance policy. Id. at 1, 17; Ex. 4. Together, Autobahn, DZ Bank and Royal were the "Secured Parties."[3] Ex. 10 at 32. Finally, U.S. Bank acted as the "Custodian", responsible for maintaining a certain bank accounts and performing other duties pursuant to the Custodial Agreement. Id. at 1, 10.

     The RLSA established the "Collateral Agent Collection Account". Id. at 7-8. The Collateral Agent Collection Account is defined as:

> The special trust account (account number 33398730) at the Custodian in the name of and under the sole dominion and control of the Collateral Agent [DZ Bank] for the benefit of the Secured Parties; provided, that the funds deposited in such account (including any assets and interest thereon) from time to time shall constitute the property and assets of [OFS] and [OFS] shall be solely liable for any taxes payable with respect to the Collection Account.

Id. at 7-8. The formal name of the account was "DZ Bank as Collateral Agent for Certain Secured Parties Under the [RLSA] With Opportunity Finance LLC Collection." See, e.g., Ex. 19. As stated above, OFS owned the account and the funds deposited in the account, and had merely granted a lien on the account under the RSLA. Ex. 10 at 7-6; Ex. 8 at 1.

---

[3] Each party was a secured party only to the extent of the payments to which they were entitled under the waterfall. Ex. 10 at 45.

For every Opportunity Finance Loan, OFS pledged and assigned its rights to the underlying receivables to DZ Bank "on behalf of the Secured Parties." Ex. 10 at 45. In accordance with the terms of the agreement, when the PC Funding Collection Account received funds, OFS swept those funds into the Collateral Agent Collection Account. Id. at 50.

Once funds reached the Collateral Agent Collection Account, Section 2.05 of the RLSA dictated the priority for the repaying Autobahn and paying fees owed to the other RLSA parties. Id. at 40-41. The funds in the Collateral Agent Collection Account were either (a) rolled over by OFS in order to fund new Opportunity Finance Loans in accordance with Section 2.05(f) or (b) remitted to the parties monthly strictly in accordance with the express provisions in the RLSA's waterfall. Id. at 40-42. The waterfall in Section 2.05(c) provided that the funds were to be distributed in the following "amounts and priority":

1. U.S. Bank for its backup servicer's fees;

2. Equitably proportioned fees to (a) U.S. Bank for its custodian fees; (b) U.S. Bank for its "backup servicer and standby fees"; and (c) Royal for insurance premiums;

3. Autobahn and DZ Bank for fees, yield and margin;

4. DZ Bank for the account of Autobahn for the "borrowing base" deficiency, if any;

5. DZ Bank for the account of Autobahn for the aggregate obligations of OFS;

6. Opportunity Finance for its fees and any advances;

7. In the event of an early amortization, DZ Bank for the account of Autobahn in an amount the lesser of (a) the remaining funds in the Collateral Agent Collection Account or (b) the outstanding principal on all loans;

8. Royal for any accrued liability on the loans; and finally;

9.   OFS as to all remaining amounts.

Id. at 40-41.  As the owner of the Collateral Agent Collection Account, OFS – the "Borrower" –

retained all amounts in the account after all the other parties had been paid.  Id. at 41.

This "waterfall" payment structure was mandatory, and DZ Bank had no discretion

regarding to whom payments were made and the amount of those payments.  Id. at 39; see Ex. 58.

at 244:2-23.  Section 2.05 of the RLSA provided that "[n]o funds shall be transferred from the

Collateral Agent Collection Account except in accordance with this Section 2.05."  Ex. 10 at 39.

The Trustee's expert conceded that he was "not aware of any departure from the waterfall

provisions of the RLSA."  See Ex. 58 at 269:13-19.

### 4.      The Flow of Funds for the Opportunity Finance Facility

Under the Credit Agreement, PC Funding could request a loan from Opportunity

Finance.  Ex. 6 at 3-4.  Pursuant to Section 2.02 of the RLSA, OFS could draw down on the

Opportunity Finance Facility in order to fund up to 80 percent of any such loan by issuing a "Notice

of Borrowing" to DZ Bank in its capacity as Agent and Collateral Agent.  See Ex. 10 at 37.  OFS

provided DZ Bank and U.S. Bank with the paperwork required to support each particular loan

request.  Exs. 26, 28, 29.  Pursuant to the Custodial Agreement, U.S. Bank reviewed and certified

that the OFS request was supported by the requisite paperwork.  Ex. 10 at 37.  Upon receipt of the

advice from U.S. Bank, DZ Bank sent Lord Securities a request to Autobahn to sell commercial

paper pursuant to a separate Asset Purchase Agreement among DZ Bank, Autobahn and Financial

Institutions.  Exs. 7, 11, 16-18, 21, 23-25.  Autobahn then made a loan to OFS by depositing the

proceeds of the sale into the account that OFS directed in its Notice of Borrowing.  See Ex. 15.

When funds were received in the PC Funding Collection Account, Opportunity

Finance directed that the amounts that PC Funding owed OFS be transferred to the Collateral

Agent Collection Account.  See, e.g., Ex. 14.  Once a month, based on the funds in the Collateral

Agent Collection Account, Opportunity Finance (in its capacity as Servicer) prepared instructions

to use the funds to either (i) reinvest in new loans; or (ii) to disburse the funds strictly in accordance

with the waterfall provisions in Section 2.05(c) of the RLSA.  See Exs. 37, 40.  In either instance,

DZ Bank reviewed and approved these instructions in its capacity as the Collateral Agent to ensure

compliance with the terms of the RLSA – DZ Bank had no authority to disapprove any instructions

that complied with the RLSA provisions.  U.S. Bank disbursed funds from the Collateral Agent

Collection Account to the parties in accordance with the instructions and the waterfall.  See Exs.

51, 52.

When OFS directed repayments of principal to Autobahn, funds were transferred

from the Collateral Agent Collection Account to the Autobahn Account at U.S. Bank.  Exs. 34,

36.  U.S. Bank then transferred those funds in the Autobahn Account to the commercial paper

holders.  See Exs. 35, 38, 40.

**5.      The Autobahn Loans**

From January 2002 through May 2003, Autobahn lent OFS a total of $99,300,000,

which OFS used to fund the Opportunity Finance Loans to PC Funding.  See Exs. 53, 48, 49.  To

fund those loans, Autobahn issued commercial paper.  Ex. 58 at 304:20-305:2; Exs. 11, 16-18, 21,

23-25.  DZ Bank never provided any funding for those loans.  Ex. 58 at 305:9-22.

By mid-2002, Opportunity Finance had drawn almost all of the $100 million credit

facility.  See Ex. 53; Ex. 58 at 304:15-305:3, 322:23-324.  Thereafter, as permitted under Section

2.05(f) of the RLSA, when PC Funding made requests to Opportunity Finance and Opportunity

Finance thereafter made requests for loans, OFS was entitled to use the funds that were in the

Collateral Agent Collection Account, i.e., in effect, to recycle those funds for additional loans.  Ex.

58 at 289:8-290:7.  Notwithstanding that fact, at no time did Autobahn ever advance more than

$99,300,000 to Opportunity Finance or OFS.  See Ex. 53; Ex. 58 at 304:15-305:3; 322:23-324:16.

OFS repaid Autobahn $99,300,000 in principal plus $2,391,408 for interest, for a total of $101,691,408. Ex. 58 at 335:14-23; Ex. 50. U.S. Bank transferred those funds directly to the Autobahn account at U.S. Bank. Id. at 335:14-336:8. The $101,691,408 paid to the Autobahn account were never transferred to DZ Bank, either before or after the transfer to Autobahn. Id. at 336:8-15.

DZ Bank received $3,234,266 in fees (or "margin") and $126,153 in non-use fees from the Collateral Agent Collection Account, for a total of $3,360,419. Id. at 334:23-335:13; Ex. 51.

## C.    The Trustee's Purported Predicate Creditors

The Trustee claims to have standing because he "can stand in the shoes of numerous predicate creditors that have allowed, unsecured claims against the PCI estate…." Ex. 1 ¶ 177. The Trustee specifically alleges that he stands in the shoes of Acorn Capital Group, LLC ("Acorn"), Ark Discovery II ("Ark Discovery"), Theodore Deikel, Interlachen Harriet Investments Limited ("Interlachen") and "Lancelot" (which consists of a series of related investment funds) (collectively, the "Predicate Creditors").[4] See id. ¶¶ 178-82, 187-202. It is undisputed that these alleged Predicate Creditors are not creditors of PC Funding. Kelley v. Opportunity Finance (In re Petters Co.), 550 B.R. 438, 446 (Bankr. D. Minn. 2016).

1.    Acorn no longer exists, and there is no former employee of Acorn who is competent to testify as to Acorn's alleged claims against PC Funding. Ex. 46 at 6-7. In response to DZ Bank's Interrogatories, the Trustee identified Deanna Coleman as the sole individual with knowledge of the bases of the Trustee's claim that Acorn was a Predicate Creditor. Id. However,

---

[4] The Complaint alleges that Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. are also predicate creditors. However, the Trustee subsequently withdrew his reliance on them.

the only testimony related to Acorn that Ms. Coleman offered at her deposition was that Acorn was among a "primary group of investors" that loaned money to PCI and that Acorn was provided with certain false information. Ex. 55 at 127:2-129:2, 142:10-143:5, 161:5-20, 398:16-399:3. The Trustee also relies on a spreadsheet of Acorn's unpaid notes. Ex. 46 at 7. The Trustee, however, has not identified any facts supporting its claim that Acorn was a predicate creditor. Id. at 7.

      2.      Ark Discovery is in liquidation. Ex. 47 ¶ 3. Frances Gecker, the Chapter 7 trustee of Ark Discovery, has no personal knowledge regarding (i) Ark Discovery's operations; (ii) "Ark's lending to or transactions with PCI, [Ark Discovery affiliates] or any PCI affiliate"; (iii) "Opportunity Finance's or DZ Bank's lending activities or transactions with PCI, [Ark Discovery affiliates] or any PCI affiliate"; or (iv) "Ark's due diligence, investigation, inspection, monitoring, auditing or review of its activities related to Ark's lending to PCI, [Ark Discovery affiliates], or any PCI affiliate." Id. ¶¶ 6, 9-11. Further, there is no one in her employ or under her control who has such personal knowledge. Id.

      3.      Theodore Deikel ("Deikel") made a loan to PCI in 2008 for which he was not repaid. Ex. 56 at 122:4-123:25. Deikel performed no due diligence in advance of the 2008 loan. Id. at 120:12-121:23. Deikel did not ask to review any financial statements from Petters, PCI or any other Petters entity, and he did not review other documentation related to the loan. Id. Deikel made the loan solely on the basis of the unrelated success that he had with Petters in connection with the 2002 acquisition of Fingerhut. Id.

      4.      Interlachen loaned $60 million to PCI in April 2008. Ex. 54 at 19:9-10. At his deposition, Lance Breiland (an Interlachen partner) did not recall knowing about PC Funding prior to August 2008 – four months after the $60 million loan. Id. at 186:3-24. Interlachen never reviewed any financial information related to any of PCI's SPEs, including PC Funding. Id. at

187:25-186:7.   Prior to August 2008, Interlachen did not know that Opportunity Finance had entered into any agreements with PCI or any of its subsidiaries or that DZ Bank played any role in any Opportunity Finance transaction.  Id. at 188:12-24.   Interlachen's due diligence consisted solely of internet research on the value of the collateral allegedly being pledged as security for the loan (i.e., T.Vs) and obtaining online photos of warehouses where the collateral was allegedly stored.  Id. at 101:15-23; 119:18-121:6.   Interlachen otherwise relied on Petters' reputation and supposed success in the market.  Id. at 221:11-222:9.

5.      Lancelot is also in liquidation.  Ex. 59 at 15:24-18:23, 87:2-23.   Lancelot had no business dealings with PC Funding.  Id. at 54:53-55:19.  The only Petters SPE with which Lancelot transacted was Thousand Lakes.  Id. at 57:2-7.   Lancelot's former CEO Greg Bell was convicted in connection with Lancelot's involvement with PCI and the Petters Ponzi scheme.  Ex. 45.  Mr. Bell "engineered approximately 86 'round-trip' banking transactions that gave investors and potential investors the false impression that PCI was paying its promissory notes in a timely manner."  Ex. 45 at 4-5.  Mr. Bell caused money to be wired from a Lancelot-controlled account to a PCI account.  Id. at 5; Ex. 59 at 43:2-5.  Mr. Bell plead guilty to engaging in wire fraud in violation of 18 U.S.C. § 1343.  Ex. 45 at 1.

**D.      DZ Bank's Motion for Judgment on the Pleadings**

On May 23, 2014, the Trustee filed his Second Amended Complaint, in which he alleged that DZ Bank lent money in exchange for promissory notes issued by PC Funding and received transfers originating from PC Funding when those notes were repaid.  Kelley v.

Opportunity Finance, LLC (In re Petters Co.), 562 B.R. 391, 394, 397 (Bankr. D. Minn. 2016).  In

May 2015, DZ Bank answered and filed a Motion for Judgment on the Pleadings.[5]  Dkt. 121, 122.

In December 2016, the Court granted in part and denied in part DZ Bank's Motion.

Kelley, 562 B.R. at 394.  The Court acknowledged that it was required to accept all of the Trustee's

factual allegations as true and draw all reasonable inferences in the Trustee's favor.  Id. at 396.

The Court granted DZ Bank's motion on a single issue.  Specifically, the Court held that, as a

matter of law, any transfers that DZ Bank received from Opportunity Finance were taken for

reasonably equivalent value.  Id. at 402.

The Court otherwise denied DZ Bank's motion.  The Court declined to consider the

RLSA and other loan documents because, among other things, it concluded that the documents

were improperly offered for the purpose of contradicting certain allegations in the Complaint.  Id.

at 398.  The Court also held that factual disputes precluded any determination of whether DZ Bank

was an initial or subsequent transferee.  Id. at 397.  The Court stated that "discovery will reveal

evidence of how DZ Bank actually received the transfers to resolve the issue of whether DZ Bank

was an initial or subsequent transferee, or neither."  Id.

## ARGUMENT

### I.      As a Matter of Law, DZ Bank Is Not a Transferee Because It Was a Mere Conduit

As a matter of law, DZ Bank was not a transferee for the $101,691,408 in principal

and interest that OFS paid to Autobahn.  DZ Bank, as the Agent and Collateral Agent for the

Autobahn-OFS loan facility, acted only as a "mere conduit" of Autobahn's funds.

---

[5] While DZ Bank's motion was pending, the Court granted the Trustee leave to amend his complaint in
response to the Minnesota Supreme Court's decision in Finn v. Alliance Bank.   DZ Bank elected to proceed with its
motion even after the Third Amended Complaint was filed.  Kelley, 562 B.R. at 395.

The Trustee seeks to recover from DZ Bank all of the principal and interest paid to Autobahn as actual and constructive fraudulent transfers under the Minnesota Uniform Fraudulent Transfer Act ("MUFTA") in accordance with Section 544 of the Bankruptcy Code. Under the Code, the Trustee may recover voidable transfers made to "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). Under MUFTA, the Trustee may recover voidable transfers made to "the first transferee of the asset or the person for whose benefit the transfer was made." Minn. Stat. § 513.48.

> **A.   In Order to Be a Transferee, the Party Receiving the Funds Must Exercise "Dominion and Control" for Its Own Benefit**

An "initial transferee" is not defined in the Code. Courts nationwide have developed a definition by exclusion, holding that a transferee who acts as a "mere conduit" is not an initial transferee. The Eighth Circuit has unambiguously held that an entity is a "mere conduit" if it does not exercise "dominion and control" for its own benefit over the allegedly fraudulently transferred funds. Luker v. Reeves (In re Reeves), 63 F.3d 670, 676 (8th Cir. 1995); Sarachek v. Luana Savings Bank (In re Agriprocessors, Inc.), 859 F.3d 599, 605-06 (8th Cir. 2017) (an entity has "dominion" only when it is free to use the funds for any purpose).

The Eighth Circuit adopted the reasoning of the Seventh Circuit's seminal decision in Bonded Financial Services, Inc. v. European American Bank, 838 F.2d 890 (7th Cir. 1988). In Bonded, the Seventh Circuit affirmed the grant of summary judgment that the bank was a mere conduit that did not exercise dominion over the transferred funds. Id. at 893. Judge Easterbrook wrote: "Although the Bankruptcy Code does not define 'transferee', and there is no legislative history on the point, we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." Id.

In <u>Reeves</u> the Eighth Circuit adopted the "dominion and control" standard.  The trustee sought to recover note proceeds that had been transferred by debtor's attorney to a corporate bank account fraudulently opened by the debtor and concealed from creditors.  65 F.3d at 675-76.  Holding that the lower court did not apply the proper "dominion and control standard," the Eighth Circuit reversed and remanded.  <u>Id.</u> at 676.

The Eighth Circuit elaborated on this rule in <u>In re Agriprocessors</u>, holding that dominion is "legal title to [funds] and the ability to use them as [the party] sees fit" and that control is "real control of the funds in question."  859 F.3d at 605 (citing (<u>Universal Service Administration Co. v. Post-Confirmation Committee (In re Incomnet, Inc.)</u>, 463 F.3d 1064, 1071 (9th Cir. 2006)).  The court held that Luana Savings Bank ("Luana"), which permitted a party to transfer funds from one account to another to settle overdraft fees, was liable as an initial transferee of the overdraft-covering deposits under Section 550.  <u>Id.</u> at 605-06

> When Luana allowed a true-overdraft-causing provisional settlement to become final, Luana irrevocably paid a third party the amount of the true overdraft.  Luana was not a 'conduit' between Agriprocessors and the third party: Luana itself paid the third party.  In exchange for Luana paying the overdraft, Agriprocessors owed Luana a debt.  Therefore, when Agriprocessors made deposits covering true overdrafts, Agriprocessors made payment on debt to Luana.  Luana had full control over the true-overdraft-covering deposits and could use the funds for any purpose.

<u>Id.</u>

The "dominion and control" standard has been applied consistently in the Eighth Circuit.  <u>See</u>, <u>e.g.</u>, <u>Leonard v. First Commercial Mortgage Co. (In re Circuit Alliance, Inc.)</u>, 228 B.R. 225 (Bankr. D. Minn. 1998).  In that decision, Judge Kishel emphasized that "[i]t is not the simple possession of funds, coupled with a one-time act of directing them on to a further transferee, that makes out the 'dominion and control' of <u>Bonded Financial Services</u>.  Rather, it is an unfettered legal right to use the funds for the possessor's own purposes and benefits."  <u>Id.</u> at 232.  Judge

-15-

Kishel noted that "[g]enerally, 'mere conduits' hold transferred funds via escrow, trust, or deposit, and do so only in the status of commercial or professional intermediaries for the parties that actually hold or receive a legal right, title, or interest." Id. at 233.

Judge Kishel evaluated the transferee status of three parties: (i) the debtor's agent; (ii) the attorney who received funds from the agent deposited those funds in her trust account and was directed by the debtor to issue checks from that account to defendant mortgage lender; and (iii) the mortgage lender. Judge Kishel granted summary judgment against the mortgage lender. Id. at 235. However, Judge Kishel held that the attorney was a mere conduit and that the debtor was not liable because he never had legal title. Id. at 233. Judge Kishel held that the attorney "was acting solely as an intermediary, without a legal interest in the funds and certainly without authority to direct them to her own use." Id. at 233. He also emphasized the importance of actual control to the mere conduit defense analysis:

> Of course, [the attorney] could have exercised her signatory authority over her client trust account to make personal use of the funds, but it would be absurd to vest her with 'transferee' status from that unadorned circumstance. Had she exercised that "raw power," In re Baker & Getty Fin'l Serv., Inc., 974 F.2d at 722, it would have been a conversion of her client's property, in violation of her legal and ethical duties. It would not have given her any enforceable right, title or interest in the funds. In re Coutee, 984 F.2d at 141, n. 4.

Id. at 233 n.13.

A number of courts are in accord with the Seventh and Eighth Circuits. See, e.g., Nordberg, Bonded, Richardson v. United States, IRS (In re Anton Noll, Inc.), 277 B.R. 875, 880 (B.A.P. 1st Cir. 2002); Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52, 57-58 (2d Cir. 1997) ("The Seventh Circuit's logic has been widely adopted. We join these other circuits in adopting the 'mere conduit' test for determining who is an initial transferee under § 550(a)(1).") (internal citations

omitted); In re Coutee, 984 F.2d 138, 141 (5th Cir. 1993); Universal Service, 463 F.3d at 1071;

Malloy v. Citizens Bank (In re First Security Mortgage Co.), 33 F.3d 42, 44 (10th Cir. 1994).

Moreover, many of these courts have held that summary judgment is proper when a defendant is a mere conduit. For example, in Malloy, the Tenth Circuit granted summary judgment for the bank, even though the bank received funds to be placed in attorney's trust account, because the bank was "obligated to make the funds available to [the attorney] upon demand, and, therefore, it acted only as a financial intermediary." 33 F.3d at 44.

### B.    As the Collateral Agent, DZ Bank Did Not Exercise Dominion and Control for its Own Benefit

It is undisputed that DZ Bank's role under the RLSA was that of an Agent and Collateral Agent. DZ Bank never had the right to treat the funds in their Collateral Agent Collection Account as its own or to do with those funds as it wished.

When an entity is required to hold funds for a particular purpose, it is acting as a mere conduit. In Miller v. T.C. Sheet Metal (In re Curran), 1995 Bankr. LEXIS 1713, at *14-15 (Bankr. D. Minn. Nov. 29, 1995), Judge Dreher granted judgment in favor of the defendant benefits administrator with respect to transfers made to the administrator for the debtor's employees' pension funds. The Court observed that "an entity does not have the requisite dominion or control over the funds transferred unless it is, in essence, 'free to invest the whole [amount] in lottery tickets or uranium stocks.'" Id. at *8 (quoting Bonded, 838 F.3d at 894). The Court held that, "[a]lthough the Defendant obtained possession of the funds transferred, it received no benefit whatsoever from the transfer and had no legal right to use the funds that came into its possession for its own purposes." Id. at *14.

In Iannacone v. IRS (In re Bauer), 318 B.R. 697, 703-04 (Bankr. D. Minn. 2005), Judge O'Brien held that the IRS, and not the manager of debtor's retirement account, was the

initial transferee of funds that the debtor withdrew from his retirement account. Judge O'Brien emphasized that the manager did not exercise dominion and control when it "managed [the debtor's] IRA funds as a fiduciary, in trust for the benefit of [the debtor], under terms surely set forth in a typical IRA agreement between [the debtor] and [the manager]." Id. The Court stated that there was "little dispute" that, once the IRS received the funds, it asserted dominion and control over them. Id. at 704. In holding the manager was a conduit, Judge O'Brien followed "prevalent and consistent" Eighth Circuit precedent that, "[w]hen an avoidable transfer is made through a mere innocent conduit that receives no beneficial interest from the transfer, the clear weight of authority embraces the essential conclusions reached in Bonded Financial and Nordberg and holds that such a conduit is not an 'initial transferee' for purposes of recovery under § 550(a)(1)." Id. at 702-03; accord Pankey v. Pankey (In re Pankey), 2015 Bankr., LEXIS 1122, at *5-6 (Bankr. N.D. Iowa Apr. 6, 2015) (the defendant law firm was a mere conduit when the firm was obligated to transfer the settlement funds to pay for the debtor's medical debt, and the firm "did not have the ability to retain or control the funds.")

　　　　The RLSA explicitly imposed limits and restrictions on DZ Bank with respect to all the funds transferred to the Collateral Agent Collection Account. DZ Bank had "dominion and control" over the account solely for the benefit of the Secured Parties. See this Memo at 6-8, supra. Section 2.05 explicitly set forth to whom and for what obligations funds could be transferred. To the extent that the waterfall did not authorize the transfer of funds for payments to specific parties, all remaining funds were to be remitted to OFS – DZ Bank had no right to use the remaining funds for any other purpose. DZ Bank had no discretion with respect to the use or disposition of any funds in the Collateral Agent Collection Account. Indeed, the Trustee's expert Theodore Martens conceded that the RLSA granted DZ Bank no right to use the funds as DZ Bank's own and that

DZ Bank approved the transfer of funds specifically in accordance with Section 2.05's terms, without any variation. See this Memo at 8-9, supra.

Without the "legal title to [the funds] and the ability to use them as the party sees fit" and the "real control of the funds," DZ Bank did not exercise the requisite dominion and control over the funds in the Collateral Agent Collateral Account. See In re Agriprocessors, 859 F. 3d at 605 (citing Universal Service, 463 F.3d at 1071); accord Bonded, 838 F.2d at 893 ("the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes.")  Like the attorney in Leonard, the benefits administrator in Miller, the IRA manager in Iannocone and the law firm in Pankey, DZ Bank was bound by the explicit terms of the RLSA to act as the Agent and Collateral Agent.  DZ Bank was not allowed to withdraw funds and use them for its own benefit.  DZ Bank was obligated to disburse the funds precisely in accordance with the contractual priority set forth in the "waterfall" provision of Section 2.05(c) of the RLSA. Ex. 58 at 242:19-243:9.

The fact that DZ Bank had comprehensive decision making authority in its role as the administrator of the Autobahn loans to Opportunity Finance does not mean that DZ Bank was not a conduit with respect to the Collateral Agent Collection Account.  A decision from the bankruptcy court in Kansas is instructive.  In Northern Capital v. Stockton National Bank (In re Brooke Corp), 458 B.R. 579 (Bankr. D. Kan. 2011), on a motion for partial summary judgment, the court determined whether the trustee was entitled to recover $487,974 in payments to the account maintained by the defendant originating lender of a loan syndicate.  Pursuant to the purchase agreements that defendant entered with eight other banks, the other banks, as participating lenders, retained "legal and equitable" ownership of the shares that they purchased, and the defendant "retain[ed] the duties of holding the Loan documentation and of administering

the loan," entitling it to an administrative fee. Id. This fee was separate and apart from the funds

that the bank received for its share of the loan "which was not sold to third parties." Id. at 588.

The defendant bank received payment on the loan that "will be held for the benefit of Seller and

Purchaser until the payments are actually paid to and received by Purchaser." Id. Relying on

Bonded and In re Coutee, the court held that the bank as the administrator of the loan syndicate

had an "unequivocal legal duty to distribute funds" in accordance with the participation agreements

and that, because defendant "complied with that duty, [defendant] could not, without breach of the

Agreement and its legal obligation to the Purchasers, use the funds for its own purposes." Id. at

587.   The court also rejected the trustee's contention that the bank retained discretion over the

funds to "make additional advances for taxes, insurance premiums, and other items deemed

necessary by [the bank] to collect, enforce, or protect the Loan and any Property securing the

Loan," holding that

> This discretion does not equate to control under the Bonded conduit test.
> [The bank's] discretion is related to the administration of the Loan, not the
> distribution of Loan payments, which is the focus of the dominion test. [The
> bank] had no discretion regarding the distributions; they were governed by
> specific terms of the Agreements stating the duty to make distributions, the
> time distributions were to be made, and imposing a penalty if payments
> were not timely.  The provision regarding advances is likewise irrelevant to
> whether [the bank] had dominion and control of the funds distributed to the
> Participants.  The Participants' argument that [the bank] had dominion and
> control of the Loan payments because it had administrative discretion
> ignores the mandatory, specific terms of the Agreements under which the
> bank acted when making the distributions to the Participants.

Id. at 587.  The court thus granted summary judgment in favor of the bank.  Id. at 591.

The loan syndicate administrator's duty is virtually identical to the duty of an ABCP

administrator.  ABCP programs rose in popularity because they "not only reduced the capital tied

up by the bank's lending to the corporate client; [they] also enabled the client to obtain cheaper

financing.  The banks, meanwhile, collected a stable fee income for sponsoring and administering

the conduits (called because assets go in one end and [commercial paper] comes out the other)." <u>As easy as ABCP</u>, The Banker, February 1, 2002. ABCP conduits receive ratings from Moody's and Fitch which generally are an "assessment of the credit quality of the [commercial paper] issued to the commercial paper investors." Ex. 57 at 200:22-201:13. The administrator "has true responsibility for the conduit's strategic and day-to-day operations. Ex. 31 at 25. The administrator "negotiates support arrangements, structures and oversees the transactions funded by the conduit and manages the funding through the issuance and repayment of ABCP." <u>Id.</u> The manager of the conduit – here, Lord Securities – "is responsible for the corporate affairs of the conduit as a legal entity." Ex. 31 at 31; <u>see</u> <u>also</u> Ex. 57 at 144:15-145:7 (the conduits that issued commercial paper to UBS clients were "not owned" by UBS). In its role as administrator, DZ Bank identified borrowers and executed funding agreements, administered securitization transactions and other investments and maintained liquidity and credit support for commercial paper notes. Ex. 2 at 17-27. Like the defendant in <u>Northern Capital</u>, DZ Bank performed this work in exchange for a fee. <u>Id.</u> at 30.

Courts recognize that administrators can exercise operational control, but still be a mere conduit. As articulated by the Kansas bankruptcy court, discretion related to the administration of a loan is not the same as discretion over use of loan payments under the <u>Bonded</u> test. <u>Northern Capital</u>, 458 B.R. at 587. For example, in <u>Christy</u>, the Second Circuit affirmed the grant of summary judgment and held that an insurance broker who advised a going-bankrupt law firm was a mere conduit. 130 F.3d at 59. The court held that, even though the relationship with the debtor "transcended that of a mere courier," "once the decision had been made—however it was made—to [alter debtor's insurance policies]," the broker's "role in the transfers of funds was that of a mere conduit." 130 F.3d at 59. The court held that "a commercial entity that, in the

ordinary course of its business, acts as a mere conduit for funds and performs that role consistent

with its contractual undertaking in respect of the challenged transaction, is not an initial transferee

within the meaning of § 550(a)(1)." Id.

Despite all its other responsibilities, DZ Bank was a mere conduit for the transfers

to Autobahn's bank.   Accordingly, as a matter of law, DZ Bank cannot be liable for the

$101,691,408 in principal and interest paid to Autobahn.

## II.      The Trustee's Constructive Fraudulent Transfer Claims Fail Because Reasonably Equivalent Value Was Exchanged.

The Trustee's only remaining claim against DZ Bank is for the $3.36 million of

transfers that were actually made to DZ Bank.  As a matter of law, DZ Bank provided reasonably

equivalent value for the transfers.

To assert a claim for constructive fraudulent transfer, the Trustee must prove that

the transfers were made without receipt of reasonably equivalent value at a time where the debtor

was insolvent or unable to pay its debts as they became due.  Minn. Stat. § 513.44(a)(2).  MUFTA

provides that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or

obligation, property is transferred or an antecedent debt is secured or satisfied."  Minn. Stat. §

513.43(a).  The Minnesota Supreme Court held that "any legally enforceable right to payment

against the debtor is sufficient to qualify as an antecedent debt under MUFTA." Finn v. Alliance

Bank, 860 N.W.2d 638, 651 (Minn. 2015).

All of the $3.36 million of transfers that DZ Bank received were to satisfy

antecedent debt.  DZ Bank had a legally enforceable right to be paid under the RLSA.  DZ Bank

provided services on behalf of Autobahn for the benefit of Opportunity Finance and OFS in

exchange for OFS's agreement to pay DZ Bank's fees.  See Kelley, 562 B.R. at 402.

Thus, as a matter of law, the $3.36 million that DZ Bank received was for reasonably equivalent value.

### III.    As a Matter of Law, the Trustee Has No Standing to Assert Claims Under Section 544 of the Bankruptcy Code

The Trustee is not a creditor of PC Funding, and thus does not have standing to bring a fraudulent transfer claim against DZ Bank.  Rather, the Trustee "must derive his avoidance power from a predicate creditor that is legally cognizable as a creditor under non-bankruptcy law." Kelley, 550 B.R. at 445.  The Trustee must "prove that the debtor for whose estate he sues, in fact had a creditor of the sort identified in the statute, one with a right to payment from the debtor, in order for the trustee to invoke the same state-law avoidance remedies that such a creditor could have used on the date of the bankruptcy filing and in the absence of the bankruptcy filing."  Id. at 443.  Stated differently, as Judge Kishel explained: "[A] right of avoidance for a bankruptcy estate under §544(b) must be anchored to the debtor's pre-bankruptcy past—based on actual pre-petition facts in which that debtor features as a participant, linked directly to the pre-petition right of a creditor of that debtor."  Id. at 444.

The Trustee has asserted three theories as to how he can bring claims against PC Funding, one of which has already been rejected by this Court.  The three theories are: (1) the substantive consolidation allows the Trustee to bring claims against PC Funding; (2) PCI and PC Funding were alter egos; and (3) the Predicate Creditors have tort claims against PC Funding.

In May 2016, the Court ruled that the substantive consolidation had no effect on the Trustee's standing.  Id. at 447.  ("Thus, despite the nominal, structural relatedness of PCI, PC Funding, and SPF Funding as parent and subsidiaries, creditors with claims allowable originally against the separate bankruptcy estate of PCI would not function in that status, as predicate creditors on which the Trustee could assert standing to avoid PC Funding or SPF Funding's

transfers of their own property.")   Furthermore, as noted by Judge Kishel, there is no dispute that "neither SPF Funding nor PC Funding had any consensual, contractual creditors when bankruptcy petitions were filed for them, and thus had no predicate creditor for § 544(b)." Id. at 446. Accordingly, in order to bring a claim against PC Funding, the Trustee must prove a Predicate Creditor can establish that PCI and PC Funding were alter egos or that a Predicate Creditor can establish tort claims against PC Funding.

   A.   **The Trustee Cannot Establish that an Injustice or Fundamental Unfairness Would Result if the Veil Between PC Funding and PCI Is Not Pierced**

        Pursuant to this Court's December 2016 opinion, insider reverse veil piercing is the appropriate theory of veil piercing to apply to this case. Kelley v. Opportunity Finance, LLC (In re Petters), 561 B.R. 738, 750 (Bankr. D. Minn. 2016).   Under an insider reverse veil piercing theory, an insider, or someone claiming through him, attempts to pierce the corporate veil such that the corporate shareholder and the corporate entity are considered one and the same. Id.

        To pierce the corporate veil under Minnesota law, a predicate creditor must be able to prove that: (1) a number of factors exist to hold one corporation liable for the wrongdoing of another; and (2) a finding of injustice or fundamental unfairness. Urban v. American Legion Post 184, 2005 Min. App. LEXIS 433, at *19 (Minn. Ct. App. April 26, 2005).   The burden of proof on the two-pronged test belongs to the party seeking to have the veil pierced, and the burden has been termed a difficult one to meet. In re Intelefilm Corp., 301 B.R. 327, 331 (Bankr. D. Minn. 2003).

        Thus, the Trustee must be able to prove that, if the corporate veil between PCI and PC Funding is not pierced, there will be an injustice or fundamental unfairness to the Predicate Creditors.   This inquiry is focused solely on veil piercing as it affects the Predicate Creditors – the question is not whether on a broader level, there was injustice or fundamental unfairness (for example, as to the existence of the Ponzi scheme as a whole).   Rather, the question is the narrow

one of whether declining to pierce the corporate veil between PCI and PC Funding will result in an injustice or fundamental unfairness to the Predicate Creditors.  The kind of unjust conduct must be a "wrong beyond a creditor's inability to collect."  Id. at 332.  The prong is satisfied when:

> []the common sense rules of adverse possession would be undermined; former partners would be permitted to skirt the legal rules concerning monetary obligations; a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful.

Id. (quoting Sea-Land Services, Inc. v. Pepper Source, 941 F.2d 519, 522-23 (7th Cir. 1991)); see also Halsne v. Health, No. 12-cv-2409 (SRN/JJG), 2014 U.S. Dist. LEXIS 37363, at *25 (D. Minn. Mar. 21, 2014).

In In re Intelefilm, Judge Kishel held that a creditor had not identified a theory of fact that was material to the second essential element of his legal theory to affix liability in the debtor for its subsidiary's debt. 301 B.R. at 335.  The creditor labeled a few specific circumstances as badges of "fundamental unfairness", including that the debtor acted by nefariously loaning to the subsidiary rather than purchasing further equity in exchange for its cash infusions.  Id. at 334-35.  The court held that there was no unfairness discernible from the chosen form of the debtor's infusions into the subsidiary.  Id. at 335.  As a matter of law, the corporate veil of the subsidiary could not be pierced in favor of the creditor.  Id.

Here, as a matter of law, the Trustee cannot establish injustice or fundamental unfairness.  The recognition of PC Funding's corporate separateness does not create any injustice or unfairness in this case, because: (i) there is no evidence that any of the Predicate Creditors had any transactions with PC Funding; (ii) there is no evidence that any of the proceeds from the loans underlying the Predicate Creditors' loans to PCI were transferred to PC Funding; and (iii) there is

no evidence that PC Funding assisted PCI in defrauding the alleged Predicate Creditors. For example, the Predicate Creditors did not rely on PC Funding's financial statements or operations when deciding to loan money to PCI. See e.g. Ex. 56 at 120:12-121:23. Thus, there can be no injustice as against Acorn, Ark Discovery, Deikel, Interlachen, or Lancelot that would go unavenged should the separate corporate forms of PCI and PC Funding be respected.

Further, the undisputed conduct of Deikel, Interlachen and Lancelot preclude the equities from favoring piercing the corporate veil. Deikel testified that he did not conduct any diligence on any Petters entity in advance of his 2008 loan to PCI, and simply made the loan on the basis of the unrelated success that he had with Petters in connection with the 2002 acquisition of Fingerhut. Ex. 56 at 29:1-8; 30:6-12; 120:12-121:23. The same is true for Interlachen. See Ex. 54 at 101:15-23; 119:18-121:6; 221:11-222:9.

Separately, Lancelot has unclean hands. Its principal Greg Bell was participant in PCI's fraudulent conduct, pleading guilty for making sham "round-trip" banking transactions orchestrated to make PCI appear solvent to investors. Ex. 45. A party that acts inequitably is barred from obtaining equitable relief. All Finish Concrete, Inc. v. Erickson, 899 N.W.2d 557, 565-66 (Minn. App. 2017) (citing Fred O. Watson Co. v. U.S. Life Insurance Co., 258 N.W.2d 776, 778 (Minn. 1977)). Because Lancelot was an active and knowing participant in PCI's fraudulent conduct, it may not assert a veil piercing claim with respect to PC Funding.

For these reasons, no injustice or fundamental unfairness can result from respecting the separate corporate form of PC Funding.

## B.    As A Matter of Law, None of the Predicate Creditors Can Maintain Tort Claims Against PC Funding

Judge Kishel ruled in May 2016 that "[t]he law still requires the trustee's standing to be anchored in the actual history of the transferor-debtor, and substantive consolidation does

not and could not remake that history." <u>Kelley</u>, 550 B.R. at 455. In other words, a Predicate

Creditor must be able to assert tort claims directly against PC Funding.

        The Trustee cannot establish that there are claims for fraud, conversion, conspiracy

or aiding and abetting. For the fraud claim, there is no evidence that any of the predicate creditors

can meet all five prongs of a fraud claim. As to the conversion claims, the Trustee cannot prove

that any of the Predicate Creditors held a property interest in PC Funding, and intangible money

cannot form a basis for a conversion claim. Both conspiracy and aiding and abetting are secondary

claims that require an underlying tort claim, which cannot be established. In addition, the

conspiracy claim fails because there can be no conspiracy between a subsidiary and a parent.

     **1.**      **Fraud**

        To establish a claim for fraud under Minnesota law, the Trustee must prove: (1) a

false representation of a past or existing material fact susceptible of knowledge; (2) made with

knowledge of the falsity of the representation or made without knowing whether it was true or

false; (3) with the intention to induce action in reliance thereon; (4) the representation proximately

caused action in reliance thereon; and (5) pecuniary damages as a result of the reliance. <u>Meecorp

Capital Markets, LLC v. Oliver</u>, 776 F.3d 557, 562 (8th Cir. 2015).

        First, there is no evidence that PC Funding made a false representation to any

Predicate Creditor. For example, Deikel testified that he did not conduct any diligence on any

Petters entity in advance of his 2001 or 2008 loans to PCI, and simply made the loan on the basis

of the unrelated success that he had with Petters in connection with the 2002 acquisition of

Fingerhut. Ex. 56 at 29:1-8; 30:6-12; 120:12-121:23. The same is true for Interlachen. <u>See</u> Ex.

54 at 101:15-23; 119:18-121:6; 221:11-222:9. Lancelot had no business dealings with PC

Funding, Ex. 59 at 54-55, and Lancelot's principal was participant in PCI's fraudulent conduct.

Ex. 45. As to Acorn and Ark Discovery, there is no evidence at all. <u>See</u> this Memo at 11, <u>supra.</u>

Second, the Trustee cannot establish reliance. "[T]o survive a motion for summary judgment, the nonmoving party must come forward with some facts supporting a conclusion of reasonable reliance." Hoyt Properties, Inc. v. Production Resource Group, LLC., 736 N.W.2d 313, 321 (Minn. 2007). The Trustee must prove that each Predicate Creditor did not know the statement at issue was untrue and that the misrepresentation was not obvious. Id. When evaluating reliance, courts consider "the context of the aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue." Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 369 (Minn. 2009).

There is no evidence that Acorn, Ark Discovery, Deikel or Interlachen had dealings with PC Funding or that any of them reasonably relied upon a misrepresentation by PC Funding. Lancelot could not have relied because it participated in the fraud.

### 2.    Conversion

To assert a claim for conversion, the Trustee must be able to prove: (1) that a Predicate Creditor holds a property interest; and (2) that PC Funding deprived the Predicate Creditor of that interest. Staffing Specifix, Inc. v. TempWorks Management Services, 896 N.W.2d 115, 125 (Minn. Ct. App. 2017), aff'd, 913 N.W.2d 687 (Minn. 2018).

The Trustee's conversion claim fails for two reasons. First, money in intangible form does not constitute property for a conversion claim. In TCI Business Capital, Inc. v. Five Star American Die Casting, LLC, 890 N.W.2d 423, 428-30 (Minn. Ct. App. 2017), the Minnesota Court of Appeals held that a conversion claim is viable only with respect to money in tangible form, such as a particular stack of bills that is kept separate from other money. Accord World Business Lenders, LLC v. Palen, 2017 U.S. Dist. LEXIS 91403, at *18-20 (D. Minn., June 13, 2017). Second, there is no evidence that any of the Predicate Creditors held a property interest in

PC Funding.  As held by Judge Kishel, there is no dispute that none of the Predicate Creditors had any transactions with PC Funding directly.  In re Petters, 550 B.R.at 446.

### 3.     Conspiracy

The Trustee's conspiracy claim fails as a matter of law for two reasons.

First, a wholly owned subsidiary cannot conspire with its parent organization.  In Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984), the Supreme Court held that a parent and subsidiary cannot engage in conspiracy because "[a] parent and its wholly owned subsidiary have a complete unity of interest.  Their objectives are common, no disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one."  In I-Systems Inc. v. Software, Inc., 20045 U.S. Dist. LEXIS 6001, at *54-55 (D. Minn., Mar. 29, 2004), the court applied Copperweld to a civil conspiracy claim.  The court held that, because Software and Quantum were wholly owned subsidiaries of CHOP, a conspiracy claim could not exist as a matter of law.  Id. at *55.  PC Funding is wholly owned by PCI.  Ex. 1 ¶ 1.  Therefore, as a matter of law, no Predicate Creditor can assert a conspiracy claim.

The Trustee's conspiracy claims also fail for a second, independent reason -- conspiracy is a secondary liability claim that must be supported by an underlying tort.  D.A.B. v. Brown, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997); Carlson v. A.L.S. Enterprises., Inc., 2008 U.S. Dist. LEXIS 3981, at *15 (D. Minn. Jan. 18, 2008).  Because no Predicate Creditor has a valid underlying tort claim, the claim for conspiracy fails as a matter of law.

### 4.     Aiding and Abetting

Aiding and abetting is also a secondary liability claim, and requires the following elements: (1) the primary tort-feasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty, and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement

of the breach.  <u>Richard P. Anderson, LLC v. United States Bank National Association</u>, 2013 Minn.

Dist. LEXIS 41, at *11-12 (D. Minn., Jan. 10, 2013).

There is no evidence that PC Funding substantially assisted or encouraged PCI or

Petters to commit fraud or conversion against any Predicate Creditor.  The Trustee has not

proffered no evidence that any of the Predicate Creditors' funds were directed to PC Funding, and

there is no evidence that they dealt with or gave any consideration to PC Funding and its

involvement with Petters' Ponzi scheme.

Dated: December 20, 2019                    Respectfully submitted,

                                            WINTHROP & WEINSTINE


                                            By: *s/Michael A. Rosow*
                                            Michael A. Rosow, #317998

                                            Capella Tower | Suite 3500
                                            225 South Sixth Street
                                            Minneapolis, MN 55402-4629
                                            Phone: (612) 604-6734
                                            Facsimile: (612) 604-6834
                                            mrosow@winthrop.com

                                                        -and-

                                            PEPPER HAMILTON LLP
                                            H. Peter Haveles, Jr.
                                            37th Floor
                                            620 Eighth Avenue
                                            New York, NY 10018-1405
                                            Phone: (212) 808-2700
                                            Facsimile: (212) 286-9806

                                            *Attorneys for Defendant DZ Bank AG, Deutsche*
                                            *Zentral Genossenschaftsbank, Frankfurt am Main*


18454884v1

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re

    Petters Company, Inc., et al.,

            Debtors.

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.;
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

Jointly Administered under
Case No. 08-45257

Court File No. 08-45257

Court File Nos.:

08-45258 (KHS)
08-45326 (KHS)
08-45327 (KHS)
08-45328 (KHS)
08-45329 (KHS)
08-45330 (KHS)
08-45331 (KHS)
08-45371 (KHS)
08-45392 (KHS)

Chapter 11 Cases
Judge Kathleen H. Sanberg

Douglas A. Kelley, in his capacity as the court-
appointed Chapter 11 Trustee of Debtors
Petters Company, Inc.; PC Funding, LLC; and
SPF Funding, LLC,

            Plaintiff,

vs.

Opportunity Finance, LLC, et al.,

            Defendants.

ADV. NO. 10-04301

## DECLARATION OF MICHAEL A. ROSOW IN SUPPORT OF DEFENDANT DZ BANK AG, DEUTSCHE ZENTRAL GENOSSENSCHAFTSBANK, FRANKFURT AM MAIN'S MOTION FOR SUMMARY JUDGMENT

I, Michael A. Rosow, state and declare as follows:

1.      I am admitted to practice before this Court and am a member of Winthrop & Weinstine, co-counsel for defendant DZ Bank AG Deutsche Zentral Genossenschaftsbank, Frankfurt am Main ("DZ Bank").  I make this Declaration in support of DZ Bank's Motion for Summary Judgment in order to authenticate the exhibits annexed hereto.

2.      Attached as <u>Exhibit 1</u> is a true and correct copy of the Fourth Amended Complaint (excluding exhibits) filed by plaintiff Douglas A. Kelley, Trustee against Defendant on March 6, 2017.

3.      Attached as <u>Exhibit 2</u> is a true and correct copy of the Administration Agreement between Autobahn Funding Company LLC and DG Bank Deutsche Genossenschaftsbank AG dated September 17, 1999.

4.      Attached as <u>Exhibit 3</u> is a true and correct copy of the Management Agreement between Autobahn Funding Company LLC and Lord Securities Corporation dated September 17, 1999.

5.      Attached as <u>Exhibit 4</u> is a true and correct copy of a Fitch IBCA report regarding Autobahn Funding Co., LLC dated October 21, 1999.

6.      Attached as <u>Exhibit 5</u> is a true and correct copy of the Account Control Agreement among Opportunity Finance, LLC, Opportunity Finance Securitization LLC, PC Funding, LLC and U.S. Bank National Association dated December 17, 2001.

7.      Attached as <u>Exhibit 6</u> is a true and correct copy of the Credit Agreement between PC Funding, LLC and Opportunity Finance, LLC dated December 17, 2001.

8.      Attached as <u>Exhibit 7</u> is a true and correct copy of the Asset Purchase Agreement among Autobahn Funding Company LLC, DZ Bank AG Deutsche Zentral

Genossenschaftsbank, Frankfurt am Main and the Financial Institutions From Time to Time Hereto as Purchasers dated December 28, 2001.

9.      Attached as <u>Exhibit 8</u> is a true and correct copy of the Collection Account Securities Account Agreement among DZ Bank AG Deutsche Zentral Genossenschaftsbank, Frankfurt am Main, Opportunity Finance Securitization, LLC, Opportunity Finance, LLC and U.S. Bank National Association dated December 28, 2001.

10.      Attached as <u>Exhibit 9</u> is a true and correct copy of the Purchase and Contribution Agreement between Opportunity Finance, LLC and Opportunity Finance Securitization, LLC dated December 28, 2001.

11.      Attached as <u>Exhibit 10</u> is a true and correct copy of the Receivables Loan and Security Agreement among Opportunity Finance Securitization, LLC, Opportunity Finance, LLC, Autobahn Funding Company LLC, DZ Bank AG Deutsche Zentral Genossenschaftsbank, Frankfurt am Main, Royal Indemnity Company and U.S. Bank National Association dated December 28, 2001.

12.      Attached as <u>Exhibit 11</u> is a true and correct copy of the Royal Indemnity Company Credit Risk Insurance Policy to Opportunity Finance Securitization, LLC for the benefit of  DZ Bank AG Deutsche Zentral Genossenschaftsbank, Frankfurt am Main, as Agent dated December 28, 2001.

13.      Attached as <u>Exhibit 12</u> is a true and correct copy of Commercial Paper Instructions from DZ Bank to Lord Securities on behalf of Opportunity Finance Securitization LLC for December 31, 2001.

14.      Attached as <u>Exhibit 13</u> is a true and correct copy of Moody's ABCP Market Review, Autobahn Funding Company LLC, Prime-1 Rating, Fourth Quarter 2001.

15.     Attached as <u>Exhibit 14</u> is a true and correct copy of a Closing Wire Transfer Request from Opportunity Finance, LLC to DZ Bank for January 11, 2002.

16.     Attached as <u>Exhibit 15</u> is a true and correct copy of Notice of Borrowing from Opportunity Finance Securitization, LLC to DZ Bank and US. Bank National Association for January 15, 2002.

17.     Attached as <u>Exhibit 16</u> is a true and correct copy of Autobahn Commercial Paper Instructions from DZ Bank to Lord Securities on behalf of Opportunity Finance Securitization LLC for January 15, 2002.

18.     Attached as <u>Exhibit 17</u> is a true and correct copy of Autobahn Commercial Paper Instructions from DZ Bank to Lord Securities on behalf of Opportunity Finance Securitization LLC for January 22, 2002.

19.     Attached as <u>Exhibit 18</u> is a true and correct copy of Autobahn Commercial Paper Instructions from DZ Bank to Lord Securities on behalf of Opportunity Finance Securitization LLC for January 25, 2002.

20.     Attached as <u>Exhibit 19</u> is a true and correct copy of the Collateral Agent Collection Account statement from U.S. Bank National Association ("U.S. Bank") dated January 31, 2002.

21.     Attached as <u>Exhibit 20</u> is a true and correct copy of  the article "As easy as ABCP" published by The Banker dated February 1, 2002.

22.     Attached as <u>Exhibit 21</u> is a true and correct copy of Autobahn Commercial Paper Instructions from DZ Bank to Lord Securities on behalf of Opportunity Finance Securitization LLC for February 11, 2002.

23.     Attached as <u>Exhibit 22</u> is a true and correct copy of Autobahn Commercial

Paper Remittance Report from Opportunity Finance Securitization LLC for March 1, 2002.

24.    Attached as <u>Exhibit 23</u> is a true and correct copy of Autobahn Commercial Paper Instructions from DZ Bank to Lord Securities on behalf of Opportunity Finance Securitization LLC for March 8, 2002.

25.    Attached as <u>Exhibit 24</u> is a true and correct copy of Autobahn Commercial Paper Instructions from DZ Bank to Lord Securities on behalf of Opportunity Finance Securitization LLC for March 18, 2002.

26.    Attached as <u>Exhibit 25</u> is a true and correct copy of Autobahn Commercial Paper Instructions from DZ Bank to Lord Securities on behalf of Opportunity Finance Securitization LLC for April 1, 2002.

27.    Attached as <u>Exhibit 26</u> is a true and correct copy of the Deal Checklist for Opportunity Finance, LLC Deal #042602-02 dated April 26, 2002.

28.    Attached as <u>Exhibit 27</u> is a true and correct copy of the Independent Auditor's Report by Deloitte and Touche of Autobahn Funding Company LLC's financial statements for the years 2000 and 2001 dated June 30, 2002.

29.    Attached as <u>Exhibit 28</u> is a true and correct copy of the Deal Checklist for Opportunity Finance, LLC Deal #091802-03 dated September 18, 2002.

30.    Attached as <u>Exhibit 29</u> is a true and correct copy of the Deal Checklist for Opportunity Finance, LLC Deal #091802-01 dated September 18, 2002.

31.    Attached as <u>Exhibit 30</u> is a true and correct copy of Moody's ABCP Market Review, Autobahn Funding Company LLC, Prime-1 Rating, Fourth Quarter 2002.

32.    Attached as <u>Exhibit 31</u> is a true and correct copy of a Special Report of Moody's Investor Service, "The Fundamentals of Asset Backed Commercial Paper" dated

February 3, 2003, and used as Ladd Deposition Exhibit 8.

33.    Attached as <u>Exhibit 32</u> is a true and correct copy of Fitch Ratings, Asset-Backed Special Report: "Asset-Backed Commercial Paper: 2003 Review and 2004 Outlook" (March 23, 2004).

34.    Attached as <u>Exhibit 33</u> is a true and correct copy of the Independent Auditor's Report by Ernst & Young of Autobahn Funding Company LLC's financial statements for the year 2002 dated April 29, 2003.

35.    Attached as <u>Exhibit 34</u> is a true and correct copy of the Commercial Paper Remittance Report from Opportunity Finance Securitization LLC for May 15, 2003.

36.    Attached as <u>Exhibit 35</u> is a true and correct copy of Autobahn Account statement from U.S. Bank dated May 31, 2003.

37.    Attached as <u>Exhibit 36</u> is a true and correct copy of the Commercial Paper Remittance Report from Opportunity Finance Securitization LLC for June 9, 2003.

38.    Attached as <u>Exhibit 37</u> is a true and correct copy of the Opportunity Finance Securitization LLC May 2003 Monthly Remittance Report dated June 10, 2003.

39.    Attached as <u>Exhibit 38</u> is a true and correct copy of Autobahn Account statement from U.S. Bank dated June 30, 2003.

40.    Attached as <u>Exhibit 39</u> is a true and correct copy of Autobahn Account statement from U.S. Bank dated July 31, 2003.

41.    Attached as <u>Exhibit 40</u> is a true and correct copy of the Opportunity Finance Securitization LLC July 2003 Monthly Remittance Report dated August 10, 2003.

42.    Attached as <u>Exhibit 41</u> is a true and correct copy of Moody's ABCP Market Review, Autobahn Funding Company LLC, Prime-1 Rating, December 13, 2003.

43.     Attached as <u>Exhibit 42</u> is a true and correct copy of the Independent Auditor's Report by Ernst & Young of Autobahn Funding Company LLC's financial statements for the years 2002 and 2003 dated March 11, 2004.

44.     Attached as <u>Exhibit 43</u> is a true and correct copy of the Fitch IBCA, Asset-Backed New Issue, dated September 17, 2004, Autobahn Funding Company.

45.     Attached as <u>Exhibit 44</u> is a true and correct copy of the Independent Auditor's Report by Ernst & Young of Autobahn Funding Company LLC's financial statements for the years 2003 and 2004 dated April 13, 2005.

46.     Attached as <u>Exhibit 45</u> is a true and correct copy of the Plea Agreement in the criminal case <u>United States v. Gregory Malcom Bell</u> entered December 7, 2009.

47.     Attached as <u>Exhibit 46</u> is a true and correct copy of the Trustee's Amended Interrogatory Responses in this matter dated December 21, 2018.

48.     Attached as <u>Exhibit 47</u> is a true and correct copy of the Affidavit of Frances Gecker of Ark Discovery II, LP dated January 17, 2019.

49.     Attached as <u>Exhibit 48</u> is a true and correct copy of Exhibit H of the Expert Report of Theodore F. Martens dated April 26, 2019.

50.     Attached as <u>Exhibit 49</u> is a true and correct copy of Exhibit I of the Expert Report of Theodore F. Martens dated April 26, 2019.

51.     Attached as <u>Exhibit 50</u> is a true and correct copy of Exhibit Q of the Expert Report of Theodore F. Martens dated April 26, 2019.

52.     Attached as <u>Exhibit 51</u> is a true and correct copy of Exhibit R of the Expert Report of Theodore F. Martens dated April 26, 2019.

53.     Attached as <u>Exhibit 52</u> is a true and correct copy of Exhibit T of the Expert

Report of Theodore F. Martens dated April 26, 2019.

54.     Attached as <u>Exhibit 53</u> is a true and correct copy of Exhibit A of the Expert Report of W. Barefoot Bankhead dated July 5, 2019.

55.     Attached as <u>Exhibit 54</u> are true and correct copies of excerpts from the deposition transcript of Lance Breiland, dated February 27, 2019.

56.     Attached as <u>Exhibit 55</u> are true and correct copies of excerpts from the deposition transcript of Deanna Coleman, dated November 15, 2018.

57.     Attached as <u>Exhibit 56</u> are true and correct copies of excerpts from the deposition transcript of Theodore Deikel, dated December 28, 2018.

58.     Attached as <u>Exhibit 57</u> are true and correct copies of excerpts from the deposition transcript of Daniel Ladd, dated October 15, 2019.

59.     Attached as <u>Exhibit 58</u> are true and correct copies of excerpts from the deposition transcript of Theodore Martens, dated September 10, 2019.

60.     Attached as <u>Exhibit 59</u> are true and correct copies of excerpts from the deposition transcript of Ronald Peterson, dated February 7, 2019.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 20, 2019


_____
*s/ Michael A. Rosow*
MICHAEL A. ROSOW


18454908v1

# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re | **Jointly Administered under<br>Case No. 08-45257** |
| Petters Company, Inc., et al., | Court File No. 08-45257 |
| Debtors. | Court File Nos.: |
| (includes:<br>Petters Group Worldwide, LLC;<br>PC Funding, LLC;<br>Thousand Lakes, LLC;<br>SPF Funding, LLC;<br>PL Ltd., Inc.;<br>Edge One LLC;<br>MGC Finance, Inc.;<br>PAC Funding, LLC;<br>Palm Beach Finance Holdings, Inc.) | 08-45258 (KHS)<br>08-45326 (KHS)<br>08-45327 (KHS)<br>08-45328 (KHS)<br>08-45329 (KHS)<br>08-45330 (KHS)<br>08-45331 (KHS)<br>08-45371 (KHS)<br>08-45392 (KHS) |
| | Chapter 11 Cases<br>Judge Kathleen H. Sanberg |

---

Douglas A. Kelley, in his capacity as the
Trustee of the PCI Liquidating Trust,

       Plaintiff,

vs.                                                                    ADV. NO. 10-04301

Opportunity Finance, LLC; Opportunity Finance
Securitization, LLC; Opportunity Finance
Securitization II, LLC; Opportunity Finance
Securitization III, LLC; International Investment
Opportunities, LLC; Sabes Family Foundation;
Sabes Minnesota Limited Partnership; Robert W.
Sabes; Janet F. Sabes; Jon R. Sabes; Steven
Sabes; Deutsche Zentralgenossenschaftbank AG;
and The Minneapolis Foundation,

       Defendants.

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................ 1

PARTIES ............................................................................................................. 3

PROCEDURAL BACKGROUND......................................................................... 8

JURISDICTION, VENUE, AND STANDING....................................................... 10

NATURE OF PROCEEDING ............................................................................. 10

FACTUAL BACKGROUND ............................................................................... 13

   I.    THE PETTERS PONZI SCHEME................................................................ 13

      A.   Petters and His Associates Are Convicted and Sentenced to Prison ........................... 13

      B.   Operation of the Ponzi Scheme ................................................................... 14

      C.   The Transfers at Issue Occurred Within the Main Churn of the Ponzi Scheme.......... 22

   II.   THE SPECIFIC FRAUDULENT TRANSFERS MADE TO DEFENDANTS DURING THE COURSE OF THE PONZI SCHEME ........................................................ 27

      A.   Direct Transfers from PCI to the Investor Defendants ................................................. 28

      B.   Direct Transfers from PCI to MGLLC and Subsequent Transfers to the Investor Defendants ........................................................................... 31

      C.   SPF Funding Transfers ................................................................... 35

      D.   PC Funding Transfers ................................................................... 39

   III.   THE TRANSFERS ARE FRAUDULENT AS TO DIRECT AND SUBSEQUENT TRANSFEREES ........................................................................... 43

      A.   Each Transfer Was Made in the "Main Churn" of the Ponzi Scheme  by Insolvent Entities ........................................................................... 43

      B.   Defendants Had Actual and/or Constructive Knowledge of the Fraud ....................... 46

   IV.   THE TRUSTEE HAS STANDING UNDER 11 U.S.C. § 544(B) AND THE MINNESOTA UNIFORM FRAUDULENT TRANSFER ACT TO AVOID ALL AT-ISSUE TRANSFERS........................................................................... 52

      A.   The Trustee Has Identified Sufficient Predicate Creditors of PCI for Standing as to Claims Addressing Direct Transfers from PCI ................................................... 53

      B.   There Are Predicate Creditors of the SPEs Because the Corporate Veil Between PCI and Those SPEs Can Be Pierced........................................................ 64

      C.   Predicate Creditors Have Direct Claims Against the SPEs ......................................... 70

CAUSES OF ACTION ...................................................................................... 73

# FOURTH AMENDED COMPLAINT

Douglas A. Kelley, in his capacity as the Trustee of the PCI Liquidating Trust, as and for his Fourth Amended Complaint against defendants Opportunity Finance, LLC, Opportunity Finance Securitization, LLC, Opportunity Finance Securitization II, LLC, Opportunity Finance Securitization III, LLC, International Investment Opportunities, LLC, Sabes Family Foundation, Sabes Minnesota Limited Partnership, Robert W. Sabes, Janet F. Sabes, Jon R. Sabes, Steven Sabes, Deutsche Zentralgenossenschaftbank AG, and The Minneapolis Foundation (collectively, "Defendants"), states and alleges as follows:

## INTRODUCTION

1.      As is now widely acknowledged, Thomas Petters, together with his band of criminal colleagues, operated one of the largest Ponzi schemes the world has ever seen, causing *billions* in losses.  Petters conducted the scheme through Petters Company, Inc. and a web of special purpose entities, which Petters used to portray wholly illusory financing transactions as legitimate, thereby inducing investors to pour funds into Petters' operations with the hope and expectation of earning the promised interest on their capital outlays.

2.      Petters' scheme collapsed in September 2008 after his chief lieutenant turned state's evidence against him.  The results for investors who entrusted their money to Petters were disastrous—collectively, they lost billions of dollars, money that the Chapter 11 Trustee, and now the PCI Liquidating Trust, is attempting to recover for their benefit.  Investors have been repaid only a small fraction of their massive losses.

1

3.      While the bulk of investors suffered losses, a select group of individuals, entities,

and family partnerships associated with the Sabes family of Minneapolis profited handsomely

from their involvement in the Petters Ponzi scheme.  Over the span of approximately a decade,

the Sabeses, through their investment vehicle Opportunity Finance, LLC and other channels,

funneled nearly $2.3 billion into Petters' scheme in the guise of loans, purportedly to enable the

gray market diversion of electronic goods arranged by Petters.  In return, the Sabeses, together

with the major bank that provided much of the money they directed into the scheme, received

***more than $2.5 billion*** back from Petters.  In so doing, the Defendants in this case obtained more

than ***$228 million in false profits*** from the Petters scheme, all at the expense of other investors.

Far from being victims, the Sabes family and the other Defendants in this action were among the

greatest beneficiaries of Petters' fraud.

4.      Although the Sabeses funded legitimate transactions with specific Petters entities,

those transactions and entities are not at issue in this proceeding.  Rather, Defendants' purported

loans at issue here were unconnected to actual consumer electronics transactions.  The money

that Petters raised through these loans was used either to pay off other investors (or even other

loans from Defendants) or to fund Petters' lavish spending and unrelated pursuits.  At the other

end of the transactions, the money Defendants received when these loans were paid off was

obtained from other investors, and not from the merchandise transactions identified in the loan

documents.  As such, the transactions addressed in this proceeding—spanning a decade—were

part of the main churn of Petters' Ponzi scheme.

5.      While enjoying conscience-shocking profits paid by other investors in Petters'

Ponzi scheme, Defendants knew, or should have known, that Petters was perpetrating a fraud.

Among a lengthy list of red flags—including interest rates on loans that sometimes exceeded

100%—the Sabeses knew that the purchase orders at the core of the transactions they were
purportedly funding did not match the forms used by the identified purchasers.  After years of
investing with Petters, sensing that the ride was coming to an end, the Sabeses abruptly stopped
investing in December 2007 and demanded immediate repayment of all outstanding notes, which
accelerated to repayment of three notes per week during 2008.  From then until Petters' ultimate
arrest, Defendants received more than $155 million from Petters.

6.     Through this proceeding, the Liquidating Trust seeks to avoid and recover the
massive transfers to Defendants, including the payments of both principal and false profits in
excess of their investments.

## PARTIES

7.     Debtor Petters Company, Inc. ("PCI")[1] is a corporation organized under the laws
of the State of Minnesota with its principal place of business in Minnesota.  PCI is, and at all
times relevant herein was, wholly owned by Thomas Joseph Petters ("Petters"), an individual
and citizen of the state of Minnesota.

8.     Debtor PC Funding, LLC ("PC Funding") is a limited liability company organized
under the laws of the State of Delaware with its principal place of business in Minnesota.  PC
Funding is, and at all times relevant herein was, wholly owned by PCI.

9.     Debtor SPF Funding, LLC ("SPF Funding"), f/k/a Petters Finance, LLC,[2] is a
limited liability company organized under the laws of the State of Minnesota with its principal
place of business in Minnesota.  SPF Funding is, and at all times relevant herein was, wholly
owned by PCI.

---

[1] A list of defined terms is attached hereto as Exhibit V.
[2] SPF Funding was named Petters Finance, LLC until October 16, 2004.  The entity will
be referred to herein as SPF Funding.

10.     PCI, PC Funding, and SPF Funding are collectively referred to in this Fourth
Amended Complaint as the "Debtors."

11.     Defendant Opportunity Finance, LLC ("Opportunity Finance") is a limited
liability company organized under the laws of the State of Delaware with its principal place of
business in Minnesota.  Opportunity Finance engaged in hundreds of financial transactions with
PCI, PC Funding, and SPF Funding.

12.     Defendant Opportunity Finance Securitization, LLC ("Securitization") is a limited
liability company organized under the laws of the State of Delaware with its principal place of
business at 220 South 6th Street, Suite 1200, Minneapolis, MN 55402.

13.     Defendant Opportunity Finance Securitization II, LLC ("Securitization II") is a
limited liability company organized under the laws of the State of Delaware with its principal
place of business at 220 South 6th Street, Suite 1200, Minneapolis, MN 55402.

14.     Defendant Opportunity Finance Securitization III, LLC ("Securitization III") is a
limited liability company organized under the laws of the State of Delaware with its principal
place of business at 200 South 6th Street, Suite 1200, Minneapolis, MN 55402.  Securitization,
Securitization II, and Securitization III funded various transactions by and between Opportunity
Finance and PCI, PC Funding, and SPF Funding and purportedly held security interests in the
proceeds of fictitious commercial transactions, as more fully described below.

15.     International Investment Opportunities, LLC ("IIO") is a limited liability
company organized under the laws of the State of Minnesota.  IIO claimed at times pertinent to
this Fourth Amended Complaint to have become defendant Opportunity Finance.

16.     At various points within this Fourth Amended Complaint, Defendants

Opportunity Finance, Securitization, Securitization II, Securitization III, and IIO are referred to

collectively as the "Opportunity Finance Defendants."

17.     Defendant Sabes Family Foundation is a Minnesota-based trust located at 220

South 6th Street, Minneapolis, MN 55402, c/o Steven Sabes, Trustee.

18.     Defendant Sabes Minnesota Limited Partnership ("Sabes LP")  is a partnership

formed by members of the Sabes family on December 4, 1996 under the laws of the State of

Georgia with its principal office at 60 South 6th Street, Suite 950, Minneapolis, MN 55402.

Robert Sabes is the general partner of Sabes LP, which was registered to do business in

Minnesota as a foreign limited partnership on January 8, 1997.  Sabes LP engaged in financial

transactions with PCI for the benefit of the Sabes family.

19.     Defendant Robert W. Sabes ("Robert Sabes") is a resident of the State of Nevada

who formerly resided in the State of Minnesota.  Robert Sabes is a founder of Opportunity

Finance, the Sabes Family Foundation, and IIO.  Robert Sabes, at times through the Opportunity

Finance Defendants, engaged in financial transactions with PCI for the nominal benefit of

various trusts.  Robert Sabes formed and served as a principal of IIO, which also extensively

engaged in financial transactions with PCI and which was merged into Opportunity Finance in

2001.  Robert Sabes served as a primary decision maker on behalf of the Opportunity Finance

Defendants and other entities that he managed and controlled concerning financial transactions

undertaken with PCI, PC Funding, and SPF Funding, and various companies controlled by

Petters.  On information and belief, entities managed or controlled by Robert Sabes undertook

the financial transactions at issue in this action for the benefit of Robert Sabes, members of his

family, and trusts formed to fund the lifestyle of the Sabes family.  All actions of the Opportunity

5

Finance Defendants, and claims against them, are attributable to Robert Sabes, who is responsible at law and in equity for the actions of the Opportunity Finance Defendants.

20.     Defendant Janet F. Sabes ("Janet Sabes") is a resident of the State of Nevada who formerly resided in the State of Minnesota.  Janet Sabes also undertook financial transactions with PCI.

21.     On or about September 28, 1998, Robert Sabes, on behalf of IIO, formed Metro Gem, LLC ("MGLLC"), a Minnesota limited liability company, for the express purpose of providing funds to PCI through loan transactions similar to those in which IIO—and later Opportunity Finance—engaged separately.  IIO owned 99.9% of MGLLC.  Metro Gem, Inc., a Minnesota corporation owned entirely by Frank E. Vennes, Jr., owned the remaining 0.1%.

22.     Defendant Jon R. Sabes ("Jon Sabes") is a resident of the State of Minnesota, an attorney who graduated *cum laude* from the University of Minnesota Law School, and, at various times relevant to this Fourth Amended Complaint, served as the Chief Executive Officer and President of Opportunity Finance.  Jon Sabes operated the Opportunity Finance Defendants on a day-to-day basis, but at all times did so subject to the directives of his father, Robert Sabes.  On information and belief, entities managed or controlled by Jon Sabes undertook the financial transactions at issue in this action for the benefit of Jon Sabes, members of his family, and trusts formed to fund the lifestyle of the Sabes family.  All actions of the Opportunity Finance Defendants, and claims against them, are attributable to Jon Sabes, who is responsible at law and in equity for the actions of the Opportunity Finance Defendants.

23.     Defendant Steven Sabes is a resident of the State of Minnesota.  Steven Sabes holds a Ph.D. in organic chemistry from the University of Minnesota and formerly served as a principal of Opportunity Finance and as a trustee of the Sabes Family Foundation.  On

6

information and belief, entities managed or controlled by Steven Sabes undertook the financial

transactions at issue in this action for the benefit of Steven Sabes, members of his family, and

trusts formed to fund the lifestyle of the Sabes family.  All actions of the Opportunity Finance

Defendants, and claims against them, are attributable to Steven Sabes who is responsible at law

and in equity for the actions of the Opportunity Finance Defendants.

24.     Defendants Robert Sabes, Janet Sabes, Jon Sabes, Steven Sabes, and Sabes LP are

referred to at various points within this Fourth Amended Complaint as the "Sabes Family

Defendants."

25.     Defendant Deutsche Zentralgenossenschaftbank AG ("DZ Bank") is a

commercial cooperative bank organized under the laws of Germany with its principal place of

business in Frankfurt, Germany.  DZ Bank funded transactions by and between the Opportunity

Finance Defendants and PCI and PC Funding.  On information and belief, one or more of the

Opportunity Finance Defendants granted a security interest to DZ Bank in certain accounts

payable owed by PCI and PC Funding.  DZ Bank is subject to personal jurisdiction in the District

of Minnesota on the grounds that it routinely conducted business within the State and District of

Minnesota and specifically did so with respect to financial transactions by and between the

Opportunity Finance Defendants, which were managed or controlled by members of the Sabes

Family Defendants.  DZ Bank utilized a Minnesota bank in the course of business transactions

with the Opportunity Finance Defendants.  DZ Bank likewise is subject to personal jurisdiction

in the District of Minnesota on the grounds that Federal Rule of Bankruptcy Procedure 7004

provides for nationwide service of process.  This United States Bankruptcy Court therefore holds

personal jurisdiction over any defendant with minimum contacts with the United States, such as

DZ Bank.

26.     Defendant The Minneapolis Foundation is an unincorporated organization located
at 800 IDS Center, 80 South 8th Street, Minneapolis, MN 55402.  Certain of the Defendants
transferred and/or assigned promissory notes to The Minneapolis Foundation, which received
payments from PCI and SPF Funding.

## PROCEDURAL BACKGROUND

27.     On October 3, 2008, pursuant to 18 U.S.C. § 1345, the United States District
Court for the District of Minnesota (the "District Court") placed PCI, PC Funding, and SPF
Funding into receivership in civil litigation commenced by the United States of America against,
among others, Petters and PCI (Court File No. 08-CV-5348) (the "Receivership Action").

28.     By Order of the District Court in the Receivership Action dated October 6, 2008,
as subsequently amended and restated, including on December 8, 2008, the District Court
appointed Douglas A. Kelley, Esq.  ("Kelley") as equity receiver (the "Receiver") of any
affiliates, subsidiaries, divisions, successors, or assigns owned 100% or controlled by Petters,
including PCI, PC Funding, and SPF Funding.

29.     As the court-appointed Receiver, Kelley served as an agent of the District Court
and in that capacity had exclusive custody, control, and possession of the property, assets, and
estates of PCI, PC Funding, and SPF Funding.

30.     On October 11, 2008 (the "Petition Date"), PCI, at the Receiver's direction, filed
a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy
Code") in Court File No. 08-45257.

31.     On October 15, 2008, PC Funding, at the Receiver's direction, filed a petition for
relief under Chapter 11 of the Bankruptcy Code in Court File No. 08-45326.  On October 15,
2008, SPF Funding, also at the Receiver's direction, filed a petition for relief under Chapter 11
of the Bankruptcy Code in Court File No. 08-45328.

8

32.     On October 22, 2008, this Court ordered the above-captioned bankruptcy cases be administratively consolidated as *In re Petters Company Inc., et al.* under case number 08-45257.

33.     On February 26, 2009, this Court approved the Office of the United States Trustee for the District of Minnesota's appointment of Kelley as Chapter 11 Trustee (the "Trustee") for all Chapter 11 debtors in this jointly administered matter, which specifically included appointing Kelley as the Chapter 11 Trustee of PCI, PC Funding, and SPF Funding.

34.     On September 30, 2010, the Trustee commenced this Adversary Proceeding against the Defendants, as well as two entities associated with West Landesbank, AG ("WestLB").  The Trustee has settled the claims against the WestLB entities.

35.     On November 22, 2013, this Court ordered that the estates of each of the Debtors be substantively consolidated.

36.     On April 15, 2016, this Court entered its Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Chapter 11 Plan of Liquidation (the "Plan"), which was dated as of April 8, 2016 (Docket No. 3305 of Case Number 08-45257) (the "Confirmation Order").  The Plan established the PCI Liquidating Trust "for the purpose of administering the Trust Assets, including prosecuting and monetizing the Trust Claims . . . and making distributions to Holders of Allowed Claims in accordance with the terms of the Plan and otherwise implementing this Plan."  Plan ¶ 8.2.

37.     Pursuant to this Court's Notice of (I) Entry of Order Confirming Debtors' Second Amended Chapter 11 Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, (II) the Effective Date, (III) the Administrative Claims Bar Date, and (IV) the Professional Fee Claims Bar Date, the Plan became effective on April 22, 2016.

9

38.     On January 12, 2017, this Court entered a Case Management Order directing the

Trustee to file its Fourth Amended Complaint no later than March 6, 2017.

## JURISDICTION, VENUE, AND STANDING

39.     This Court has subject matter jurisdiction over this adversary proceeding pursuant

to 28 U.S.C. §§ 157 and 1334, and Local Rule of Bankruptcy Procedure 1070-1.  The claims

asserted herein arise under the Bankruptcy Code and are related to cases pending before this

Court pursuant to the Bankruptcy Code, and have been expressly retained by the PCI Trust under

the Plan and Confirmation Order.

40.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§§ 157(b)(2)(A), (B), (C), (E), (F), (H), and (O).

41.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

42.     The Trustee has standing to assert the claims herein pursuant to Sections 323,

544, 547, 548, 550, and 1123 of the Bankruptcy Code, the Plan, and the Confirmation Order.

## NATURE OF PROCEEDING

43.     The Trustee brings this adversary proceeding against the Defendants pursuant to

sections 105(a), 502, 506, 510, 542, 544, 547, 548(a), 550(a), and 551 of the Bankruptcy Code,

Federal Rule of Bankruptcy Procedure 7001 *et seq*., the Minnesota Uniform Fraudulent Transfer

Act, codified at Minn. Stat. §§ 513.41-51, and if the Court should determine that this action is

governed by the laws of other states, the fraudulent transfer laws of such other states and other

applicable law to set aside, avoid, and recover preferences, fraudulent conveyances, damages,

and disgorgement, prevent unjust enrichment, and to impose a constructive trust, in connection

with transfers of property by PCI to the Defendants, including through the artifices of PC

Funding and SPF Funding.

10

44.     Defendant Opportunity Finance is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

45.     Defendant Securitization is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

46.     Defendant Securitization II is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

47.     Defendant Securitization III is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

48.     Defendant IIO is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

49.     Defendant Sabes Family Foundation is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person

11

for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

50.     The Sabes Family Defendants are initial transferees of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or persons for whose benefit such transfers were made, or immediate or mediate transferees of any initial transferee of such transfers.

51.     Defendants Robert Sabes, Janet Sabes, Jon Sabes, Steven Sabes, Sabes Family Foundation, Sabes LP, The Minneapolis Foundation, and trusts formed, funded, organized, or instigated at the instruction of the Sabes Family Defendants, or subject to the management or control of the Sabes Family Defendants, are the beneficiaries of fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint in many millions of dollars.  The Sabes Family Defendants are responsible at law and in equity for these transactions.

52.     Defendant DZ Bank is both an initial and subsequent transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

53.     Defendant The Minneapolis Foundation is an initial transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Fourth Amended Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

54.     At all times relevant hereto, PC Funding and SPF Funding operated as alter egos and shell companies of PCI to the detriment of PCI's creditors.  On information and belief, the Sabes Family Defendants managed or controlled two accounts held at U.S. Bank in the name of

"PC Funding" and one account held in the name of SPF Funding.  All such property transferred

to the Defendants by and under the name of PC Funding or SPF Funding—other than a PC

Funding account at U.S. Bank that, on information and belief, was managed and controlled by

the Sabes Family Defendants—was property owned and controlled by PCI.

55.     The Trustee seeks to set aside such transfers, recover and preserve the property of

PC Funding and the property of SPF Funding—which at all times relevant herein was the *de*

*facto* property of PCI—for the benefit of defrauded individuals and organizations that are

creditors of PCI.

## FACTUAL BACKGROUND

## I.     THE PETTERS PONZI SCHEME

### A.     Petters and His Associates Are Convicted and Sentenced to Prison

56.     On October 3, 2008, Thomas Petters was arrested by federal agents on charges

arising from the perpetration of a massive Ponzi scheme that cost its victims *billions*.  Petters

and, at various times, his Associates (defined below) operated his scheme for approximately

15 years—from in or around 1993 through September 24, 2008.  On that day, the FBI and other

federal agencies executed search warrants at Petters' offices.

57.     A Federal Grand Jury in the District of Minnesota indicted Petters on December

1, 2008, charging him and PCI with mail and wire fraud, conspiracy to commit mail and wire

fraud, and conspiracy to commit money laundering, and further charging Petters himself with

money laundering, all in connection with the Ponzi scheme.  A Superseding Indictment handed

down on June 3, 2009 charged Petters and PCI with mail and wire fraud, conspiracy to commit

mail and wire fraud, and money laundering conspiracy, and charged Petters himself with money

laundering, again in connection with the Ponzi scheme.

13

58.     Petters' trial lasted approximately a month.  On December 2, 2009, after deliberating for five days, the jury found Petters guilty on all 20 counts charged in the Superseding Indictment.

59.     On April 8, 2010, Petters was sentenced to 50 years in prison—the single longest sentence in Minnesota history for a conviction of financial fraud.

60.     Besides Petters, the Ponzi scheme operated through the efforts of a few key individuals, each of whom pleaded guilty and was also sentenced to prison.  Deanna Coleman ("Coleman") pleaded guilty to one count of conspiracy to commit mail fraud and in September 2010 was sentenced to a year and a day in prison.

61.     Robert White ("White") pleaded guilty to one count of mail fraud and one count of money laundering, and in September 2010 was sentenced to five years in prison.

62.     Larry Reynolds ("Reynolds") pleaded guilty to one count of conspiracy to commit money laundering, and in September 2010 was sentenced to ten years in prison.

63.     Michael Catain ("Catain") pleaded guilty to one count of conspiracy to commit money laundering, and in September 2010 was sentenced to seven years, six months in prison.

64.     James Wehmhoff ("Wehmhoff") pleaded guilty to conspiracy to commit tax evasion, and one count of aiding and assisting in the filing of a false tax return, and in October 2010 was sentenced to three years probation, one of which would be spent in home detention.

65.     The individuals in paragraphs 60–64 are referred to herein as Petters' "Associates."

**B.     Operation of the Ponzi Scheme**

66.     Though Petters ran his Ponzi scheme through various entities and transactions throughout its 15-year operation, the basic scheme remained constant throughout.  Indeed, as

14

Coleman testified, even Petters used the term Ponzi scheme "quite a bit" to describe what he was

doing.

67.     Petters, along with his Associates, induced small and individual investors, and

then, beginning in approximately the year 2000, larger hedge-fund investors, to lend money to

one or more entities that he owned and/or controlled.  The loans, he represented, would finance

the purchase of electronics, such as televisions, that manufacturers were unable to sell through

their preferred retail outlets.  The merchandise would be "diverted," meaning it would be sold to

such "big box" bulk discount retailers as Costco or Sam's Club, which would then sell it at

discounted prices.  The investor would have an interest in the receivable created by the sale of

the merchandise to the discount retailers.  Once the sale to the discount retailers was complete,

the proceeds from the sale—*i.e.* the receivable in which the investor had an interest—would fund

repayment of the loan at the specified interest rate.

68.     Since 2008, however, myriad investigations and civil and criminal proceedings

have confirmed that, as relevant to the entities with which Defendants here transacted with

respect to transactions at issue in this Fourth Amended Complaint, the purchases and sales of

electronics inventory, and the documents supposedly evidencing those sales, were fiction.

Instead of distributing proceeds from the sales of consumer electronics, Petters would use funds

from later investors to repay the loans made by earlier investors, while he and his Associates

took commissions, salaries, bonuses, and other payments out of the flowing funds.  In other

words, Petters ran a classic Ponzi scheme that encompassed effectively all of the payments and

transfers made to Defendants identified in this Fourth Amended Complaint.

15

### 1.    The Special Purpose Entities

69.    Initially, as pleaded below in more detail, investors would provide funds directly to Petters' main operating entity, PCI.  The funds were provided in the form of loans, which were evidenced by promissory notes.

70.    Beginning in or around 2001, Petters' group established several Special Purpose Entities ("SPE").  Each SPE was dedicated to an individual large investor, and would receive the loan proceeds from that investor.  When the SPEs were first established, Defendants believed that maintaining their investments with Petters' organization in entities separate from PCI would avoid commingling their funds with funds from other investors.

71.    The SPEs are wholly owned subsidiaries of PCI, and are also debtors in the substantively consolidated bankruptcy proceedings that include PCI.

72.    SPF Funding was formed on March 14, 2001 with the name Petters Finance, LLC. In total, SPF Funding was the borrowing entity on approximately 167 promissory notes between 2001 and 2007.  During this time, the Defendants contributed approximately $234.6 million to SPF Funding, and received $287.3 million in principal and interest, for a net gain of approximately $52.7 million.  Defendants' false profits are detailed below.

73.    PC Funding was formed on December 17, 2001 as another SPE through which Opportunity Finance would provide funds to PCI.  In addition to the general rationale for forming SPEs, PC Funding was established "in conjunction with [Opportunity Finance] obtaining a credit facility" from Defendant DZ Bank.  Opportunity Finance first invested through PC Funding on January 7, 2002.  By September 30, 2008, PC Funding had been the borrowing entity on 546 promissory notes.  All but four were paid back in full by that time.  Notably, during the short span of time between February and September 2008, Defendants were paid more than $155 million on outstanding promissory notes, sometimes at a rate of paying off three notes per

16

week.  In total, Opportunity Finance invested approximately $1.95 billion through PC Funding,

and received approximately $2.04 billion in principal and interest, for a net gain of

approximately $90.49 million.

### 2.     The Credit, Loan, and Security Agreements

74.     The lending relationship between the Defendants and the SPEs was established

through the execution of a few basic agreements. Using Opportunity Finance and PC Funding as

an example, Opportunity Finance entered into a Credit Agreement (the "Credit Agreement")

with PC Funding on or about December 17, 2001.[3]  Under the Credit Agreement, Opportunity

Finance, defined as Lender, could make "Receivables Loans" to PC Funding, as Borrower, in

order to "finance the purchase price with respect to the Receivable(s) that is/are proposed to be

purchased by Borrower."[4]  The receivables proposed for purchase would, according to the Credit

Agreement, be set forth on a "loan proposal" ("Loan Proposal"), the form of which was attached

to the Credit Agreement as Exhibit A.[5]  Per the Credit Agreement, Opportunity Finance would

have one business day after receiving the Loan Proposal from PC Funding to decide whether it

would finance the accounts receivable associated with the inventory described on the Loan

Proposal.[6]

75.     The Credit Agreement further provided that each loan be evidenced by a

promissory note.  The promissory note, the form of which was attached to the Credit Agreement

as Exhibit B, set forth the loan amount, term, interest, penalty for late payment, and other terms.[7]

---

[3] A true and correct copy of the Credit Agreement is attached as Exhibit A.  These and
related exhibits are provided as materials evidencing the course of dealing and transactions
between the parties to this action.

[4] Ex. A ¶ 2.1(a)(i).

[5] *Id.*, Ex. A.

[6] *Id.*, ¶ 2.1(a)(ii).

[7] A true and correct copy of a form Promissory Note is attached as Exhibit B.

The promissory notes between Opportunity Finance and PC Funding were executed by PC Funding.

76.     The promissory notes were also supposedly secured by a purported Security Agreement (the "Security Agreement") between PC Funding and Opportunity Finance, also dated as of December 17, 2001.  The Security Agreement purportedly granted Opportunity Finance a security interest in PC Funding, including all of its accounts, contracts, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, money, cash or cash equivalents, and all proceeds of the foregoing.[8]

77.     As a part of its transactions with Opportunity Finance, PC Funding also entered into certain agreements with PCI.  First, PCI and PC Funding entered into a Sale Agreement (the "Sale Agreement") dated as of December 17, 2001.  The Sale Agreement sets forth the terms and conditions under which PCI sells, conveys, transfers and assigns to PC Funding all of PCI's right, title and interest in each receivable owed to PCI from the sale of goods evidenced by purchase orders.

78.     Additionally, PC Funding and PCI would execute an Assignment Schedule (the "Assignment Schedule"), as contemplated by the Sale Agreement.  Pursuant to the Assignment Schedule, PCI would assign to PC Funding its right, title, and interest in certain receivables backed by purchase orders.[9]

79.     As discussed above and herein, virtually all, if not all, of the goods and receivables were fictitious and related paperwork was fabricated, because Petters' scheme

---

[8] A true and correct copy of a form Security Agreement is attached as Exhibit C.

[9] A true and correct copy of a form Assignment Schedule is attached as Exhibit D.

operated by inducing investors into financing the purchase of non-existent electronic equipment

purportedly secured by fabricated purchase orders.

80.     The paperwork that established the lending relationship between SPF Funding and

the applicable Defendants was substantially similar.

### 3.    The flow of funds in the Ponzi scheme

81.     As discussed above, the first step in the scheme was to obtain funds from

Defendants who, before the SPEs were formed, would transfer the funds directly to PCI, and

after the SPEs were formed would transfer the funds either to PC Funding or to SPF Funding.

The applicable SPE would execute the promissory note evidencing the loan.  Each SPE

maintained a bank account that was used to take in and disburse cash and was controlled by the

investor who corresponded to the SPE.

82.     Next, the SPE would transfer the loan amount to certain "vendors"—middleman

entities that purportedly sold to PCI the inventory described on the Loan Proposal.

83.     The two main "vendor" entities during the life of the Ponzi scheme were

Nationwide International Resources, Inc. ("Nationwide") and Enchanted Family Buying

Company ("Enchanted") (with any other vendors, as applicable, the "Vendors").  Nationwide

was owned and controlled by Reynolds, who opened a bank account in Nationwide's name to

hold investor funds.  Enchanted was owned and controlled by Catain, who opened a bank

account in Enchanted's name to hold investor funds.  According to Coleman, the business

address for Enchanted changed over time, but the last one was Catain's "car wash address."

Both Reynolds and Catain would, as directed by Petters, immediately redirect the funds they

received from the SPEs to PCI.  For this bit of redirection, the Vendors exacted a commission

from the funds passing through their accounts.

19

84.     In reality, the purpose of Nationwide and Enchanted was to support the fiction
that a sale transaction involving consumer electronics actually took place.  Indeed, Catain
testified that Petters asked him to establish a company so Petters could "tell people, and I would
tell them, that I secured the inventory when I actually wasn't."  The original purpose behind
Enchanted was simply a relay station "that would enable [Petters] to wire money into my
account and then I would wire it back to his account."  True to its original purpose, Enchanted
served only as a façade for moving money, and *never* engaged in purchases or sales of real
inventory:

> Q. Okay. Mr. Catain, did Enchanted Family ever do any real business with Tom
> Petters or Petters Company other than running through your bank account?
>
> A. No.
>
> Q.  It was a sham?
>
> A. Yes, it was.
>
> Q.  And what you had to do to get your commission was to pretend to be Mr. Petters'
> vendor?
>
> A.  Yes.

Nationwide performed the same function—a façade that moved money through the Ponzi
scheme without participating in real transactions.

85.     The Vendors' commissions on each pretend sale gave the appearance of a
legitimate transaction and benefited the Associates that controlled those Vendors.  Petters and his
Associates further enhanced their fraud by creating fake purchase orders reflecting Nationwide's
and Enchanted's fictional sales of inventory to PCI, and additional phony paperwork reflecting

PCI's subsequent resales of that inventory to the discount retailers.[10]  The responsibilities for creating the fraudulent paperwork were neatly divided: Coleman created the PCI purchase orders and invoices, and White created the purchase orders purportedly provided by the discount retailers.

86.     The retailer that purportedly purchased the inventory from PCI was supposedly required to make its payments for the merchandise it purchased directly to the lender-controlled SPE bank account.  But because, in fact, the transactions did not involve real retailers, Reynolds or Catain would simply return the funds to a single bank account held at M&I Bank in the name of PCI.  The same account would also commingle funds received from investors who did not provide their funds through SPEs.

87.     Once the term of the promissory note had elapsed and the note matured, the next step was for PCI to transfer funds from its account at M&I Bank to the investor-controlled accounts at the SPEs—the accounts from which the funds had originally been transferred out to the Vendors.

88.     The amount that PCI returned to the investor's account at the SPE was usually greater than the original principal and accrued interest specified in the promissory note.  The investors would then withdraw their principal and interest payments from the SPE, after which any remaining funds were sent back to PCI as its purported fee or "profit" from the transaction.

89.     Petters and his Associates—through PCI, PC Funding, and SPF Funding—created fictitious profits at will on each and every transaction by simply writing in the appropriate

---

[10] A true and correct copy of a fabricated purchase order of PCI is attached as Exhibit E, and a true and correct copy of a sample fabricated purchase order of Sam's Club is attached as Exhibit F.

quantity and price information on the two sets of purchase orders.  For example, on September 14, 2005, Opportunity Finance entered into promissory note #091405-02 with PC Funding in the amount of $4,955,000.[11]  Opportunity Finance then took a blanket security interest in all the assets of PC Funding.[12]  Petters and his Associates produced a fabricated purchase order showing that PCI was purchasing 2,800 Sony televisions from Nationwide for a total cost of $5,057,500.[13]  Petters and PCI also  entered into an Assignment Schedule assigning to PC Funding PCI's interest in the receivables due from the discount retailer that would supposedly purchase the inventory from PCI—in this instance, Sam's Club.[14]  Petters and his Associates correspondingly created another fabricated purchase order in the name of Sam's Club showing the purchase of those same imaginary 2,800 Sony televisions from PCI for a total purchase price of $5,613,804.[15]  PCI ultimately paid Opportunity Finance, through its alter-ego PC Funding, $162,325 in false profits and $4,955,000 in principal, leaving $496,478 in "profit" for PCI.[16]

### C.   The Transfers at Issue Occurred Within the Main Churn of the Ponzi Scheme

90.     During the time in which the Debtors were making the transfers that the Trustee now seeks to avoid, PCI participated in a miniscule amount of real business, if any, and the SPEs and Vendors engaged in none.  Consequently, Petters' sole source of funding for PCI, the SPEs, and the Vendors, were funds obtained from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer

---

[11] A true and correct copy of the Promissory Note is attached as Exhibit G.

[12] *See* Exhibit C (Security Agreement).

[13] *See* Exhibit E (PCI fabricated Purchase Order).

[14] *See* Exhibit D (Assignment Schedule).

[15] *See* Exhibit F (Sam's Club fabricated Purchase Order).

[16] *See* Exhibit H (PC Funding Note Summary) at 21, row 13.

electronics.  It also followed necessarily that funds paid out to investors over the relevant period

were acquired from other investors, and *not* from the legitimate sale of inventory.  Similarly, the

loans provided by Defendants to PCI, PC Funding, or SPF Funding, or by MGLLC to PCI, were

not used to fund legitimate business activity.  Substantial evidence and authority, gleaned from

years of investigation and litigation, points only to this conclusion.

91.    As this Court found, investors in PCI and the SPEs were repaid not with any

"earnings from legitimate transactions," but from "funds fraudulently obtained" from subsequent

investors.  Indeed, funds lent to the Debtors were "continually being depleted" due to the funds

paid out to investors, salaries and multi million-dollar bonuses for certain employees, and the

support of Petters' own "lavish lifestyle," which required Petters continually to seek additional

funds from new investors.  This Court further concluded that the Debtors could "stay afloat only

by using the new money loaned to repay" existing investors—which is the essence of a Ponzi

scheme.

92.    PricewaterhouseCoopers LLP ("PwC"), the forensic accountant for the Trustee,

determined that no more than a miniscule amount of the $82 *billion* that passed through PCI's

main bank account ($41 billion incoming and $41 billion outgoing), and thus through the Ponzi

scheme, were funds paid by the discount retailers that Petters claimed were purchasing

inventory.  Rather, the funds deposited into that account were directly attributable to Nationwide

and Enchanted (or other entities performing a similar function on a smaller scale), the various

SPEs, and certain other investors or entities.  As PwC noted, "[s]upporting documentation has

not been identified to date indicating that the funds received from any of these entities originated

from 'big-box' retailers in connection with the sale of merchandise."  PwC further noted that

"[t]he paucity of legitimate business transactions by PCI supports the conclusion that money

from later investors was used to fund payments to earlier investors because no other source of

payment to investors existed." Indeed, the use of investor funds to pay other investors was a

daily occurrence, as a PwC representative testified:

> Q . . . [S]o how often in your review of these records do you come across money
> coming in from investors being deposited on one day and that same day or the next
> day monies being transferred to current investors?

> A.  It happened all the time. I can't think of any time I looked at a day where, I
> mean of significance, where that kind of activity, that kind of behavior wasn't
> happening.

93.     Similarly, the Vendors engaged in essentially no legitimate transactions during

their lengthy participation in the Ponzi scheme. Coleman agreed that "when Mr. Reynolds or

Mr. Catain would send money back to [PCI], that those were investor dollars." Thus investors

were repaid not with sale proceeds from legitimate inventory sales, but "pretty much always . . .

from another investor or possibly from themselves." The funds flowed such that "[o]nce they

invested in [PCI] or sent the money to [Catain] or [Reynolds], Mike would turn around and send

it back to [PCI] and then I would turn around and payoff a promissory note. Sometimes it was to

the same individual or same company and other times it was to other investors." Coleman

further agreed that "Enchanted and Nationwide essentially just laundered the money and sent it

back to PCI," and further explained that she had been providing fake purchase orders to investors

"[b]asically since day one," which was around 1994. PwC concurred with this assessment,

testifying that the Vendors were "laundering funds," and agreed they were "vendor[s] . . . in

name only."

94.     Coleman further acknowledged that essentially all of the transactions stretching

back to the 1995 or 1996 timeframe—prior to Defendants' involvement with Petters' scheme—

were fraudulent. She estimated that around 98% or 99% of all transactions were phony, and thus

virtually all of the funds invested with PCI were churned through the Ponzi scheme without

touching a genuine transaction:

> Q.  Tell us, would you give us sort of a ballpark of the total amount of supposed
> business that PCI did, how much of it was real goods as opposed to phony deals?
> You don't need to include Redtag in that just PCI.
>
> A.  Dollar amount I couldn't. Percentage wise I'd say probably at least 99 percent
> of the goods were all fake.
>
> Q.  And these were supposed PCI transactions, right?
>
> A.  Right. Ninety-eight percent. I mean there was -- pretty much all of them were
> fake.  I mean there were some real deals, but dollar wise compared to what was real
> and what was fake it was pretty high.
>
> Q.  Do you think it would be fair that there were more real deals at the beginning
> of PCI than there were at the end?
>
> A.  [] yes.

PwC similarly confirmed that the fraud stretched back into the mid-1990s, explaining that

although the SPEs were established in 2001, "prior to that we found activity with respect to the

individual investors back into like 1996 where there seemed to be this kind of same sort of a

game being played."

> 95.     Robert White's testimony likewise confirmed that effectively none of the

transactions were real, and thus the payouts involved only funds provided by investors.  White

explained that at some point in late 1999 he was trying to set up a way to track the promissory

notes that PCI had executed with the various investors.  In constructing the spreadsheet, White

became confused, and asked Coleman effectively "how do you tell a good note from a bad note."

Coleman "laughed and said they are all bad," and that "[t]here isn't a good note here" since there

"isn't any merchandise to back up anything."

96.     White also acknowledged that funds owed to older investors were paid down by

funds acquired from newer investors, or even by the same investor when the note was "rolled"—

*i.e.* the investor allowed the principal to remain invested, rather than demanding it back:

Q. Mr. White, is this a true or a fake purchase order?

A. This is a purchase order that I made up as fake.

Q. And why did you do it?

A. I was asked to do this by Tom and Deanna to maintain the -- keep the flow of
cash coming into the company.

Q. And was the flow of cash important?

A. Well, there were -- it was rolling notes. There were notes due like every day and
if you didn't get more money in, then you couldn't pay the note. So it was this –
just this hungry demon that had to be fed. You had to get new money in to pay on
the old note.

Q. Where would the new money come from?

A. Quite often the same investor. Quite often he would roll the note.

Q. And who would find the investors to bring in the money to feed this demon?

A. Tom [Petters].

97.     White estimated that during his time with PCI, between 1999 and 2008, he

fabricated more than 10,000 purchase orders.

98.     Witnesses at the criminal trial confirmed that none of the discount retailers

identified on the purchase orders fabricated by White had ever done any material amount of

business with PCI.  A representative from Boscov's, one such retailer, testified that PCI had done

"no business" with Boscov's between 2001 and 2008.  Similarly, a representative from Wal-Mart

and Sam's Club testified that there were no indications of contacts between Petters or PCI and

Wal-Mart or Sam's Club reflected in the two years of records maintained by the company, nor

26

any indications that Petters or PCI ever attempted to collect funds purportedly owed by Sam's

Club to PCI.  Another representative of Wal-Mart and Sam's Club testified that, although PCI

had a vendor agreement with Sam's Club as of 1996, PCI stopped doing business with Sam's

Club late in 1997.  And a representative from BJ's Wholesale testified that, despite PCI's

apparent claim that BJ's purchased just over *$700 million* of merchandise from PCI, BJ's

actually appeared to have purchased approximately $100,000 worth of cameras from a different

Petters entity and *nothing* from PCI.

99.    The foregoing facts make clear that effectively all investments into the Ponzi

scheme, going back into the mid-to-late 1990s, were obtained through misrepresentation that

those funds would be used to finance genuine transactions involving real inventory, since it is

clear that virtually no real transactions took place during that timeframe.  Equally clear is that

funds paid out to investors could have been obtained only from other investors, since again there

were no other material sources of income for PCI or the SPEs.  As discussed in more detail

below, outgoing transfers during this time period between, at the latest, 1998, and September

2008, were made using funds obtained from other investors or from the same investors that

supplied those funds.

## II.    THE SPECIFIC FRAUDULENT TRANSFERS MADE TO DEFENDANTS DURING THE COURSE OF THE PONZI SCHEME

100.    From in or about 1998 to the Petition Date, the Opportunity Finance Defendants,

Sabes Family Defendants, Sabes Family Foundation, and The Minneapolis Foundation (the

"Investor Defendants") invested with the Debtors.  As pleaded above, those investments were

purported loans generally made pursuant to promissory notes, and after the formation of the

SPEs, pursuant to promissory notes and various additional agreements.

101.     In total, the Investor Defendants transferred $2,296,867,476 of principal

investment to the Debtors.  The Investor Defendants, along with DZ Bank, received

$2,528,699,876 in return transfers.  DZ Bank provided Opportunity Finance with a line of credit

that Opportunity Finance used to finance certain of its investments in PCI and the SPEs.  ***The

Investor Defendants were net winners from the Ponzi scheme of $228,047,705 in false

profits***,[17] and thus are believed to have been the ***second-highest net winners*** among all of the

Ponzi scheme investors.  A summary of false profits received by the Investor Defendants over

the course of their investing history in the Ponzi scheme is attached as Exhibit I.  As detailed

below, there were four main categories of transfers to the Defendants, each of which resulted in

substantial false profits.

102.     From in or about 1998 to the Petition Date, the Investor Defendants received

payouts by four different methods:

     a.    Direct transfers from PCI to the Investor Defendants;

     b.    Direct transfers from PCI to MGLLC, then transfers to the Investor
         Defendants;

     c.    Transfers from PCI to SPF Funding, then transfers to the Investor
         Defendants; and

     d.    Transfers from PCI to PC Funding, then transfers to the Investor
         Defendants.

**A.     Direct Transfers from PCI to the Investor Defendants**

103.     Virtually all, if not all, of the direct transfers from PCI to the Investor Defendants

consisted of funds obtained by Petters' scheme through fraudulent means, and not from

---

[17] As detailed on Exhibit I (False Profits Summary), the total false profits pleaded is
$3,784,695 less than the difference between total principal investment and total return transfers,
to account for the fact that certain non-defendants received subsequent transfers from MGLLC of
funds initially transferred from PCI to MGLLC.

purported sales of consumer electronics merchandise to discount retailers.  Thus virtually every, if not every, direct transfer from PCI to the Investor Defendants was made with funds supplied by other investors that were also obtained through fraudulent misrepresentations, and were therefore part of carrying out—or in the "main churn" of—the Ponzi scheme.

104.    From in or about 1999 to 2001, certain Investor Defendants transferred loan funds directly to PCI.

105.    In turn, PCI made payments directly to Investor Defendants.  As detailed below, PCI transferred funds directly to IIO, Opportunity Finance, the Sabes Family Foundation, Robert Sabes, The Minneapolis Foundation, and Sabes LP.  The typical steps involved in these PCI-Investor Defendants transactions were:

106.    *First*, an Investor Defendant would make a principal investment into PCI's bank account, in which PCI commingled most of its investors' funds.

107.    *Second*, when the term of a given promissory note was complete, and payment therefore due to an Investor Defendant, PCI would transfer back to an Investor Defendant funds corresponding either to the principal and "interest" due under the promissory note, or sometimes only the purported "interest."  If the investor elected not to receive back the invested principal, it was "rolled" to fund principal for another note.  (In certain instances, both principal and interest were used to fund new promissory notes.)  Each individual transfer from PCI to the Investor Defendants is listed on Exhibit K.  The details of each individual note, including principal investment in PCI and payment from PCI to the Investor Defendants, is listed on Exhibit J (the

29

"PCI Direct Note Summary"). Because funds were commingled in PCI's bank account, investors were paid with a combination of their own money and other investors' money.[18]

108. Between July 8, 1999 and July 12, 2001, the Investor Defendants entered into 108 promissory notes (the "PCI Direct Notes"), each of which is detailed in the PCI Direct Note Summary. In total, these promissory notes reflect the transfer of $48,550,475 of principal loans to PCI, as reflected in the "Principal Investment" column of the PCI Direct Note Summary.

109. Exhibit K reflects the corresponding transfers from PCI to the Investor Defendants:

     a.     Between September 16, 1999 and September 19, 2001, PCI transferred $98,466,496 directly to IIO;

     b.     Between May 7, 2001 and May 10, 2001, PCI transferred $11,678,458 directly to Opportunity Finance;

     c.     Between February 23, 2000 and September 21, 2001, PCI transferred $4,217,849 directly to the Sabes Family Foundation;

     d.     On May 31, 2001, PCI transferred $2,410,000 directly to Robert Sabes;

     e.     Between June 4, 2001 and September 11, 2001, PCI transferred $1,231,998 directly to The Minneapolis Foundation; and

     f.     On August 10, 1999, PCI transferred $1,002,000 directly to Sabes LP.

---

[18] On a few occasions, records show that non-IIO Investor Defendants made principal investments directly into PCI, rather than transferring funds through IIO. Occasionally, PCI transferred funds directly to a non-IIO Investor Defendant, rather than transferring funds through IIO. *See* Exhibit K (showing transfers from PCI directly to IIO and non-IIO Investor Defendants). All direct transfers from PCI to the Investor Defendants are avoidable.

30

110.    In total, between August 10, 1999 and September 21, 2001, PCI transferred $119,374,303 directly to the Investor Defendants (the "PCI Direct Transfers"). *See* Exhibit K.[19]

111.    Of this amount, $70,823,828 constituted false profits—or any amounts above the principal loaned to PCI. *See* Exhibit I (False Profits Summary).

112.    As described above, during the time period in which the Investor Defendants were transferring payments directly to, and receiving payments directly from, PCI, PCI was operating a Ponzi scheme.  The scheme operated by fraudulently inducing loans from investors to Petters-related entities—including PCI—then misappropriating those funds to make payments to prior investors, or sometimes the same investors, as well as to pay the Associates.  As demonstrated by the detailed allegations above, however, a miniscule portion—if any—of the funds provided by the investors were actually used for the stated purpose of financing the purchase and resale of consumer electronics.  Rather, virtually every single dollar paid in by investors was laundered through the "main churn" of the Ponzi scheme, and every such transfer to the Investor Defendants is avoidable.

**B.**    **Direct Transfers from PCI to MGLLC and Subsequent Transfers to the Investor Defendants**

113.    On or about September 28, 1998, Robert Sabes, through IIO, formed MGLLC for the express purpose of providing funds to PCI through loan transactions.  MGLLC was 99.9% owned by IIO (which, again, later became Opportunity Finance) and 0.1% owned by Metro Gem, Inc., a corporation organized under the laws of the State of Minnesota and wholly owned

---

[19] The sum of the amounts in paragraph 109(a)-(f) is less than the total in paragraph 110 by $367,500 due to the exclusion of a $367,500 transfer from SPF Funding, LLC to the Sabes Family Foundation related to Janet Sabes' note 5355.  *See* Ex. K at 5 n.1.

by Frank E. Vennes, Jr.  IIO also held 100% of the voting interests in MGLLC.  MGLLC was

not a Petters-controlled SPE, but rather was effectively wholly owned by IIO.

114.    The direct transfers from PCI to MGLLC consisted of funds obtained by Petters'

scheme through fraudulent means, and not from purported sales of consumer electronics

merchandise to discount retailers.  Thus the transfers from PCI to MGLLC were made with funds

supplied by other investors that were obtained through fraudulent misrepresentations.  And the

direct transfers from PCI to MGLLC were therefore part of carrying out—or in the "main churn"

of—the Ponzi scheme, and are avoidable.  Similarly, subsequent transfers from MGLLC to

Defendants are also avoidable.

115.    From in or about MGLLC's formation in September 1998 through approximately

September 1, 1999, MGLLC transferred funds, in the form of loans, directly to PCI.  In turn, PCI

made payments directly to MGLLC.  The transfers from PCI to MGLLC typically took place

through the following steps:

116.    *First*, an Investor Defendant would make an investment, by means of a loan

evidenced by a promissory note, with MGLLC.

117.    *Second*, MGLLC would transfer that investment to PCI's bank account, in which

PCI commingled most, if not all, of its investors' funds.

118.    *Third*, when the term of a given promissory note was complete, and payment

therefore due to the investor, PCI would transfer back to MGLLC funds corresponding either to

the principal and "interest" due under the promissory note, or sometimes only the purported

"interest."  If the investor elected not to receive back the invested principal, it was "rolled" to

fund principal for another note.  (In certain instances, both principal and interest were used to

fund new promissory notes.)  Each individual transfer from PCI to MGLLC is listed Exhibit L.

119.    *Finally*, MGLLC distributed the payment from PCI to an Investor Defendant, sometimes also transferring small commissions or other amounts to other recipients.  Because funds were commingled in PCI's bank account, investors were paid with a combination of their own money and other investors' money.  The details of each associated promissory note— including the principal invested into PCI, the payment by PCI to MGLLC, and the payment from MGLLC to the Investor Defendants—is attached as Exhibit M ("PCI-MGLLC Note Summary"). The amount received from MGLLC by each Investor Defendant is set forth on Exhibit N.

120.    Between its formation in September 1998 and September 1, 1999, MGLLC entered into 107 promissory notes (the "MGLLC Notes"), each of which is detailed in the PCI-MGLLC Note Summary.  In total, these promissory notes reflect the transfer of $64,238,000 of principal loans to PCI, as indicated by the "Transfer Investment to PCI" column of the PCI-MGLLC Note Summary.

121.    Exhibit L reflects the transfers from PCI to MGLLC, which totaled $82,073,509 between MGLLC's formation in September 1998 and December 10, 1999 (the "PCI MGLLC Transfers").  Exhibit L details each of these transfers, including the dates and amounts.  The PCI-MGLLC Note Summary, under the column titled "Payment to MGLLC," likewise indicates the amount of each payment to MGLLC, as well as other details concerning the associated promissory note, including entry and maturity dates, and principal and total "interest" amounts. *See id.*

122.    MGLLC thus received $14,050,814 in false profits.  *See* Exhibit I (False Profits Summary).[20]  This entire sum is avoidable as the sum of numerous fraudulent transfers.  The vast

---

[20] As detailed on Exhibit I (False Profits Summary), Defendants received $59,223,728 of the total $75,173,513 funds transferred from MGLLC to underlying investors.  For pleading

majority of false profits were transferred from MGLLC to its 99.9% owner, IIO, and other

Investor Defendants.

123.    Exhibit N reflects the transfers from MGLLC to Investor Defendants:

a.    Between October 27, 1998 and December 9, 1999, MGLLC transferred

$34,705,679 in principal and "interest" to IIO;

b.    Between October 21, 1998 and December 9, 1999, MGLLC transferred

$21,278,567 in principal and "interest" to the Sabes Family Limited Partnership;

c.    Between January 1, 1999 and May 26, 1999, MGLLC transferred

$2,027,115 in principal and "interest" to Robert Sabes;

d.    On April 28, 1999, MGLLC transferred $1,093,886 in principal and

"interest" to Janet Sabes;

e.    Between March 12, 1999 and December 7, 1999, MGLLC transferred

$82,880 in principal and "interest" to Steven Sabes; and

f.    On November 3, 1999, MGLLC transferred $35,600 in principal and

"interest" to Jon Sabes.

124.    In total, between MGLLC's formation in September 1998 and December 9, 1999,

MGLLC transferred $59,223,728 in principal and "interest" to the Investor Defendants.

*See* Exhibit N.

125.    As described above, during the time period in which MGLLC was receiving

payments directly from PCI, and in turn transferring those payments to subsequent transferees,

including the Investor Defendants, PCI was operating a Ponzi scheme.  The scheme operated by

---

purposes, the Trustee estimates that Defendants received the same portion of total false profits as
they received of the total transfers, or just under 79%.

fraudulently inducing loans from investors to Petters-related entities—including PCI—then misappropriating those funds to make payments to prior investors, or sometimes the same investors, as well as to pay the Associates.  As demonstrated by the detailed allegations above, however, a miniscule portion—if any—of the funds provided by the investors was actually used for Petters' stated purpose of financing the purchase and resale of consumer electronics.  Rather, virtually every single dollar paid in by investors was laundered through the "main churn" of the Ponzi scheme, and every such transfer to MGLLC, and every subsequent transfer from MGLLC to the Investor Defendants, is avoidable.

### C.    SPF Funding Transfers

126.    Each and every one of the direct transfers from SPF Funding to the Investor Defendants consisted of funds obtained by Petters' scheme through fraudulent means, and not from purported sales of consumer electronics merchandise to discount retailers.  Thus each and every direct transfer from SPF Funding to the Investor Defendants was made with funds supplied by other investors that were obtained through fraudulent misrepresentations.  Each and every direct transfer from SPF Funding to the Investor Defendants was therefore part of carrying out— or in the "main churn" of—the Ponzi scheme.

127.    As pleaded above, in 2001 certain Investor Defendants required that Petters form SPEs to receive their loaned funds in order to avoid commingling the proceeds of the Investor Defendants' loans with other investors' funds.  Thus, in or around March or April 2001, Petters formed SPF Funding as a wholly owned subsidiary of PCI.

128.    From in or about 2001 through 2007, Opportunity Finance, the Sabes Family Foundation, and The Minneapolis Foundation used SPF Funding as an investment vehicle for their lending participation in Petters' scheme.  In some instances, payouts on these investments were made directly to Securitization III and DZ Bank, and in one instance to Sabes LP.

35

129.     Typically, Opportunity Finance, the Sabes Family Foundation, or The

Minneapolis Foundation would agree to fund a "deal" and enter into a promissory note with PCI

detailing the principal and a high interest rate.  The parties would then enter into a sale

agreement and assignment schedule to assign and sell the "receivable" of the "deal" from PCI to

SPF Funding.  The general steps involved in these SPF Funding transactions were as follows:

130.     *First*, an Investor Defendant would make a principal investment as a loan into

SPF Funding.

131.     *Second*, SPF Funding would transfer the principal investment amount, along with

an equity contribution to the deal from PCI, to the bank account of one of the sham Vendors,

most frequently Nationwide or Enchanted.

132.     *Third*, Nationwide or Enchanted would transfer the principal investment amount,

less their "commission," to PCI.  The representation that Petters made to investors—that PCI was

receiving the proceeds of PCI's sale of consumer electronics equipment—was always false.

133.     *Fourth*, when the term of a given promissory note was complete, and payment

therefore due to an Investor Defendant, PCI would transfer the purported "receivable" purchased

with the Investor Defendants' loan proceeds back to SPF Funding.  Each individual transfer from

PCI to SPF Funding is listed on Exhibit O.  The details of each individual note, including

principal investment in PCI, payment from PCI to SPF Funding, payment from SPF Funding to

the Investor Defendants, and repayment from SPF Funding to PCI, is listed on Exhibit P (the

"SPF Funding Note Summary").  Because funds were commingled at PCI, investors were paid

with a combination of their own money and other investors' money.

134.     *Fifth*, SPF Funding would transfer the principal investment amount, plus

"interest," to an Investor Defendant or DZ Bank (though a transfer to the latter was made for the

benefit of the Investor Defendants).  Alternatively, in many cases, the Investor Defendant would

"roll" the principal amount into another promissory note.  Each individual transfer from SPF

Funding to the Investor Defendants or DZ Bank is detailed on Exhibit Q.  Additionally, the SPF

Funding Note Summary, under the column "Payment to Investor," indicates the amount of each

such transfer from SPF Funding to an Investor Defendant.

135.    *Finally*, any amount remaining in the SPF Funding account after transferring (or

rolling) the principal and "interest" would be transferred back to PCI as "profit" from the

supposed transaction.  Each individual payment of such "profit" from SPF Funding to PCI is

listed on Exhibit R.  Additionally, the SPF Funding Note Summary, under the column

"Repayment to PCI," indicates the amount of each such transfer of "profit" from SPF Funding to

PCI.

136.    Between May 11, 2001 and May 9, 2007, Opportunity Finance, the Sabes Family

Foundation, The Minneapolis Foundation, and Sabes LP entered into 167 promissory notes with

SPF Funding (the "SPF Funding Notes"), each of which is detailed on the SPF Note Summary.

In total, these promissory notes reflect the transfer of $234,623,000 of principal loans to SPF

Funding, as reflected in the "Principal Investment" column of the SPF Funding Note Summary.

137.    Exhibit Q reflects the corresponding transfers from SPF Funding to the Investor

Defendants:

a.    Between August 3, 2001 and March 8, 2005, SPF Funding transferred

$132,382,650 in principal and "interest" to Opportunity Finance;

b.    Between April 14, 2005 and June 3, 2005, SPF Funding transferred

$32,232,739 in principal and "interest" to Securitization III (with the transfers to Opportunity

Finance, the "SPF Funding/Opportunity Finance Transfers");

37

   c.  Between January 4, 2002 and April 9, 2002, SPF Funding transferred

$78,241,766 in principal and "interest" to DZ Bank (the "SPF Funding/DZ Bank Transfers");

   d.  Between August 14, 2001 and August 9, 2007, SPF Funding transferred

$29,495,341 in principal and "interest" to the Sabes Family Foundation (the "Sabes Family

Foundation Transfers");

   e.  Between December 20, 2001 and July 30, 2003, SPF Funding transferred

$10,992,351 in principal and "interest" to The Minneapolis Foundation (the "SPF

Funding/Minneapolis Foundation Transfers"); and

   f.  On October 8, 2002, SPF Funding transferred $4,330,000 in principal and

"interest" to Sabes LP (the "SPF Funding/Sabes LP Transfer").

  138.  In total, between August 3, 2001 and August 9, 2007, SPF Funding transferred

$287,674,849 in principal and "interest" to Opportunity Finance, Securitization III, the Sabes

Family Foundation, The Minneapolis Foundation, DZ Bank, and Sabes LP (the "SPF Funding

Transfers").  *See* Exhibit Q.

  139.  Of this amount, $52,684,348 constituted false profits—or any amounts above the

principal loaned to SPF Funding—obtained from SPF Funding.  *See* Exhibit I (False Profits

Summary).[21]

  140.  Furthermore, as detailed on Exhibit R, between August 3, 2001 and August 8,

2007, SPF Funding transferred $69,131,621 back to PCI as PCI's "profit."

---

[21] The total transfers from SPF Funding to Defendants exceeds the sum of the total
transfers from Defendants to SPF Funding and total false profits by $367,500 due to the rolling
of principal of note 5355, under which Defendant Janet Sabes was the promisee, into Sabes
Family Foundation note SFF-C-3, which was subsequently paid from SPF Funding to the Sabes
Family Foundation.  This excess is offset by the total of false profits resulting from transfers
from SPF Funding to Defendants.

141.    Ten transfers in the collective amount of $39,486,860 were made from PCI to SPF Funding during the two years prior to the Petition Date.  *See* Exhibit O.  And 12 transfers in the collective amount of $12,469,571 were made from SPF Funding to the Sabes Family Foundation during the two years prior to the Petition Date (the "Sabes Family Foundation Two-Year Transfers").  *See* Exhibit Q.

142.    As described above, during the time period in which SPF Funding was transferring payments directly to, and receiving payments directly from, the Investor Defendants, PCI was operating a Ponzi scheme.  The scheme operated by fraudulently inducing loans from investors to Petters-related entities—including SPF Funding—then misappropriating those funds to make payments to prior investors, or sometimes the same investors, as well as to pay the Associates.  As demonstrated by the detailed allegations above, however, a miniscule portion—if any—of the funds provided by the investors were actually used for the stated purpose of financing the purchase and resale of consumer electronics.  Rather, virtually every dollar paid in by investors was laundered through the "main churn" of the Ponzi scheme, and every such transfer to the Investor Defendants is avoidable.

D.    **PC Funding Transfers**

143.    Each and every one of the direct transfers from PC Funding to the Investor Defendants consisted of funds obtained by Petters' scheme through fraudulent means, and not from purported sales of consumer electronics merchandise to discount retailers.  Thus each and every direct transfer from PC Funding to the Investor Defendants was made with funds supplied by other investors that were obtained through fraudulent misrepresentations.  Each and every direct transfer from PC Funding to the Investor Defendants was therefore part of carrying out—or in the "main churn" of—the Ponzi scheme.

39

144.     As pleaded above, PC Funding was created on or about December 17, 2001 as a wholly owned subsidiary of  PCI at the request of the Sabeses.  Like SPF Funding, PC Funding was established to receive certain loaned funds from the Investor Defendants in order to avoid commingling the proceeds of those loans with other investors' funds.

145.     From in or about January 2002 through December 2007, Opportunity Finance used PC Funding as an investment vehicle for lending participation in Petters' scheme by transferring funds to the SPE.  The general steps involved in transactions with PC Funding were as follows:

146.     *First*, an Investor Defendant would make a principal investment as a loan into PC Funding.

147.     *Second*, PC Funding would transfer the principal investment, along with an equity contribution to the deal from PCI, to the bank account of one of the sham Vendors, most frequently Nationwide or Enchanted.

148.     *Third*, Nationwide or Enchanted would transfer the principal amount, less their "commission," to PCI.  The representation that Petters made to investors—that PCI was receiving the proceeds of PCI's sale of consumer electronics equipment—was always false.

149.     *Fourth*, when the term of a given promissory note was complete, and payment therefore due, PCI would transfer the purported "receivable" purchased with Opportunity Finance's loan proceeds back to PC Funding.  Each individual transfer from PCI to PC Funding is listed on Exhibit S.  The details of each individual note—including principal investment into PCI, payment from PCI to PC Funding, payment from PC Funding to the Investor Defendants, and repayment from PC Funding to PCI—are listed on Exhibit H ("PC Funding Note

Summary"). Because investor funds were commingled at PCI, investors were paid off with a combination of their own money and other investors' money.

150.     *Fifth*, PC Funding would transfer the principal investment amount, plus "interest," to Opportunity Finance, Securitization III, or DZ Bank. Each individual transfer from PC Funding to Opportunity Finance, Securitization III, or DZ Bank is listed on Exhibit T. Additionally, the PC Funding Note Summary, under the column "Payment to Investor," indicates the amount of each such transfer from PC Funding to an Investor Defendant.

151.     *Finally*, any amount remaining in the PC Funding account after transferring the principal and "interest" would be transferred back to PCI as "profit" from the supposed transaction. Each individual payment of such profit from PC Funding to PCI is listed on Exhibit U. Additionally, the PC Funding Note Summary, under the column "Repayment to PCI," indicates the amount of each such transfer of "profit" from PC Finding to PCI.

152.     Between January 7, 2002 and December 3, 2007, Opportunity Finance entered into 546 promissory notes with PC Funding (the "PC Funding Notes"), each of which is detailed on the PC Funding Notes Summary. In total, these promissory notes reflect the transfer of $1,949,456,001 of principal loans to PC Funding, as reflected in the "Principal Investment" column of the PC Funding Notes Summary.

153.     Exhibit T reflects the transfers from PC Funding to the Investor Defendants:

a.     Between August 8, 2003 and September 12, 2008, PC Funding transferred $235,936,556 in principal and "interest" to Opportunity Finance;

b.     Between June 15, 2005 and May 12, 2008, PC Funding transferred $1,105,840,441 in principal and "interest" to Securitization III; and

41

c.      Between April 19, 2002 and August 4, 2003, PC Funding transferred $698,167,716 in principal and "interest" to DZ Bank.

154.      In total, between April 19, 2002 and September 12, 2008, PC Funding transferred $2,039,944,714 in principal and "interest" to Opportunity Finance, Securitization III, and DZ Bank (the "PC Funding Transfers"). *See* Exhibit T. Of this amount, $90,488,713 constituted false profits—or any amounts above the principal loaned to PC Funding. *See* Exhibit I (False Profits Summary).

155.      Between April 19, 2002 and May 12, 2008, PC Funding transferred $204,978,946 back to PCI as PCI's "profit." *See* Exhibit U.

156.      In total, 187 transfers in the collective amount of $777,621,641 were made from PCI to PC Funding during the two years prior to the Petition Date. *See* Exhibit S. Of these, four transfers in the collective amount of $9,238,419 were made within 90 days prior to the Petition Date. *See id.*

157.      In total, 189 in the collective amount of $711,141,132 were made from PC Funding to Opportunity Finance and Securitization III during the two years prior to the Petition Date (the "PC Funding Two-Year Transfers"). *See* Exhibit T. Of the PC Funding Two-Year Transfers, four transfers in the collective amount of $9,238,419 (the "Preference Period Transfers") were made within 90 days prior to the Petition Date (the "Preference Period"). *See id.*

158.      As described above, during the time period in which PC Funding was transferring payments directly to, and receiving payments directly from, the Investor Defendants, PCI was operating a Ponzi scheme. The scheme operated by fraudulently inducing loans from investors to Petters-related entities—including PC Funding—then misappropriating those funds to make

payments to prior investors, or sometimes the same investors, as well as to pay the Associates.

As demonstrated by the detailed allegations above, however, a miniscule portion—if any—of the

funds provided by the investors were actually used for the stated purpose of financing the

purchase and resale of consumer electronics.  Rather, virtually every dollar paid in by investors

was laundered through the "main churn" of the Ponzi scheme, and every such transfer to the

Investor Defendants is avoidable.  The PC Funding Transfers were made for the benefit of

Opportunity Finance, Securitization III, and DZ Bank.

159.    The Trustee's investigation is ongoing.  During the course of this adversary

proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made

to the Defendants named in this Fourth Amended Complaint.  The Trustee intends to avoid and

recover all transfers made by PCI, SPF Funding, or PC Funding of an interest of any such entity

in property to or for the benefit of Defendants or any other transferees.  The Trustee reserves the

right to further amend this Fourth Amended Complaint to include: (i) further information

regarding any transfers described herein; (ii) additional transfers; (iii) modifications or revisions

to the names of Defendants; (iv) additional defendants; and (v) additional causes of action that

may become known to the Trustee at any time during this adversary proceeding (collectively, the

"Amendments"), through formal discovery or otherwise, and for the Amendments to relate back

to the original Complaint.

## III.    THE TRANSFERS ARE FRAUDULENT AS TO DIRECT AND SUBSEQUENT TRANSFEREES

### A.    Each Transfer Was Made in the "Main Churn" of the Ponzi Scheme by Insolvent Entities

160.    All of the transfers at issue were necessarily made in the "main churn" of the

Ponzi scheme.  In other words, all such transfers consisted of funds obtained through the

fraudulent inducement of investors, rather than through legitimate sales of merchandise.  It

43

follows necessarily from this lack of legitimate income that the funds used by PCI and the SPEs

to pay back the investors consisted of funds paid into the Ponzi scheme by other investors.

161.    PCI, PC Funding, and SPF Funding were the key entities through which these

transfers occurred, as discussed in detail above.  Because these entities knowingly and

intentionally used investor funds not for their purported purpose, but to pay back other investors,

they self-evidently acted with actual intent to hinder, delay, or defraud other creditors, and all

such transfers are therefore voidable as to any creditor whose claims arose before or after the

transfers were made.

162.    Furthermore, it is plain that PC Funding and SPF Funding were never solvent

entities, because their liabilities always exceeded their assets.  The funds received by PC Funding

and SPF Funding—which were acquired through fraudulent inducement—were never used to

acquire inventory, accounts receivable, or any tangible assets, but instead used to pay down their

own respective liabilities or the debt of other SPEs.  The balance payable on promissory notes

would be recorded as a bona fide liability, while non-existent accounts receivable were recorded

as assets.  Thus, the liabilities of PC Funding and SPF Funding would always exceed their assets,

and both entities were continuously insolvent.  Additionally, PC Funding and SPF Funding are

liable to all investors because PC Funding and SPF Funding were co-conspirators in the Ponzi

scheme.

163.    Notably, Coleman was asked whether, from her position at PCI, it appeared that

the SPEs could "pay their normal, every-day expenses," to which she replied "No.  Those we[re]

usually paid by PCI. . . .  [T]he money went [*sic*] and the money went out.  Any gain on the

transactions, those funds were transferred to PCI.  So they really didn't have any money left to

do anything with."  The SPEs incurred such expenses as the fees for PC Funding's independent

44

director and for maintaining the SPEs' corporate status, as well as accounting fees, and legal

fees, but depended upon others, including PCI and certain Defendants, for funds. The SPEs'

inability to pay basic expenses as they came due, without transferring funds from other entities,

is another indicator that PC Funding and SPF Funding were, at all times, insolvent.

164.    Similarly, PCI was insolvent at all relevant times. Petters, through PCI and the

SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those

funds would be used to finance the purchase of consumer electronics. Those funds were not

used to purchase electronics, but rather to repay fraudulent obligations incurred to other

investors. They were therefore funds that PCI never should have possessed. Any debts at all

incurred by PCI—including promissory notes issued to Defendants—thus rendered PCI

insolvent, undercapitalized, and unable to pay debts as they came due. PCI was therefore

insolvent no later than the first time it incurred any debt to an investor in the Ponzi scheme—

which was before the date of the first PCI Direct Transfer, PCI MGLLC Transfer, and any

transfer involving SPF Funding or PC Funding—and remained insolvent as of the date of each

and every subsequent transfer.

165.    To the extent that PCI received funds from entities not directly involved in the

Ponzi scheme, PCI incurred debts to those entities, and therefore such transfers did not, and

could not, render PCI solvent. To the contrary, to the extent PCI was obligated to repay those

transfers to other entities with interest, such transfers served to deepen PCI's insolvency. In all

events, because PCI transferred to the other entities more funds than it received from them,

transactions with such entities in fact served to deepen PCI's insolvency, rather than to provide

funds sufficient to pay PCI's obligations, including satisfaction of the purported loans from

investors.

## B.     Defendants Had Actual and/or Constructive Knowledge of the Fraud

166.     Opportunity Finance, the Sabes Family Foundation, The Minneapolis Foundation, the Sabes Family Defendants, and the entities that provided financing to the Opportunity Finance Defendants, including DZ Bank, knew or should have known that they were benefiting from fraudulent activity, or at a minimum, failed to exercise reasonable due diligence with respect to Petters, PCI, PC Funding, and SPF Funding in connection with the Ponzi scheme.  Among other things, Opportunity Finance, the Sabes Family Foundation, and the Sabes Family Defendants were on notice of the following indicia of irregularity and fraud, but failed to make sufficient inquiry:

167.     *First*, testimony from Deanna Coleman at Petters' criminal trial shows that Opportunity Finance, Securitization, Securitization II, Securitization III, and the Sabes Family Foundation, specifically through Jon Sabes, had actual knowledge regarding the purported purchase orders Opportunity Finance and the Sabes Family Foundation were financing.  The following testimony by Coleman illustrates that Jon Sabes, a principal of Opportunity Finance and a manager of the Sabes Family Foundation, knew that Wal-Mart, doing business as Sam's Club, had been using electronic purchase orders since November 6, 2003, yet Opportunity Finance, Securitization, Securitization II, Securitization III, and the Sabes Family Foundation, acting knowingly or in reckless disregard of the fraud, accepted forged paper documents from Petters, PCI, PC Funding, and SPF Funding:

Q.  Okay.  And what was the question that he had?

A.  He was wondering why we couldn't go online to get purchase orders and go online to see when Sam's was paying us.  Most larger companies are everything online.  They no longer fax over or e-mail over purchase orders.  Everything is online.  He was just wondering why we weren't online with them. . . .

Q.  Was this of a concern to you?

46

A.  It was.

Q.  And why was it a concern?

A.  I did not want to answer his question.  There was no reason why we weren't getting online documents instead of paper documents.

Q.  Do you know -- did you ever talk to John [*sic*] Sabes or the Sabeses about why they were getting paper documents?

A.  No, Tom said he would take care of it; and after I forwarded that e-mail on to Tom, I never heard back from John [*sic*] Sabes.

168.    Upon information and belief, during the course of receiving fraudulent transfers of principal and false profits from PCI and its alter-ego PC Funding, Jon Sabes also confronted White in or about the Fall of 2007 with the information that Sam's Club used only electronic purchase order documentation while PCI, PC Funding, and SPF Funding provided Opportunity Finance and the Sabes Family Foundation with paper purchase orders.  Furthermore, upon information and belief, and as known at the time by one or more agents of Opportunity Finance and the Sabes Family Foundation, the numbering format on the electronic purchase order documentation utilized by Sam's Club did not match the paper purchase order documentation PCI, PC Funding, and SPF Funding were providing to Opportunity Finance and the Sabes Family Foundation.  White directed Jon Sabes to inquire of Petters regarding the conflicting purchase order numbering and electronic format.  White did not hear from Jon Sabes, Opportunity Finance, or the Sabes Family Foundation regarding these serious and material discrepancies after directing Jon Sabes to speak with Petters.

169.    *Second*, in December 2007, Opportunity Finance abruptly ceased its business activities with Petters, PCI, and PC Funding.  On or about December 3, 2007, Opportunity Finance advanced Defendants' final loan to the SPEs or any Petters-related entity, transmitting

47

just $3,725,000 to PC Funding.  By contrast, in November 2007, Opportunity Finance received

$74,495,000 in new promissory notes from PC Funding.

170.     Upon information and belief, in or about December 2007, Opportunity Finance

demanded to be repaid at an accelerated rate.  On information and belief, this demand resulted

from a realization by the Opportunity Finance Defendants and the Sabes Family Foundation that

the Ponzi scheme no longer was able to generate adequate funds to keep current on all notes

payable.  Subsequent to a December 8, 2007 private meeting between Petters and Jon Sabes at

Petters' home, and beginning in February 2008 and ending in September 2008, Opportunity

Finance received from PC Funding cash in the amount of $155,357,376.  These transfers, all of

which occurred within two years prior to the Petition Date, are referred to herein as the "Buy Out

Transfers."  Opportunity Finance, the Sabes Family Foundation, and the Sabes Family

Defendants invested no new money with PCI and PC Funding following the private meeting at

Petters' home in December 2007, contrary to the Defendants' prior pattern and practice.

171.     *Third*, beyond these indicia of fraud regarding the Defendants' own transactions

with Petters, PCI, PC Funding, and SPF Funding, the Defendants ignored numerous other such

indicia of fraud from the general operation of Petters, PCI, PC Funding, and SPF Funding.

Among other things, IIO, Opportunity Finance, the Sabes Family Foundation, the Sabes Family

Defendants, and DZ Bank were on actual notice of the following signs of fraud and financial

irregularity, but failed to make sufficient inquiry:

a.     The Sabeses asserted that they never contacted any of the purported

discount retailers because "if we contacted the buyers . . . it would jeopardize Mr. Petters' ability

to continue doing business with those buyers."  Despite numerous red flags concerning Petters'

operation, the Sabeses failed to take the basic step of determining whether the collateral against

48

which they ultimately loaned *billions* of dollars was sound, supported the loan amounts, or even

existed.  Even after halting all investments in Petters' entities and demanding immediate

repayment of all outstanding amounts, the Sabeses still chose not to contact the identified buyers

to ascertain the state of their purported collateral.  Petters similarly refused to reveal to DZ Bank

the composition of the supply chain for the purported merchandise that investors were meant to

be funding.

        b.      The interest offered on many of the notes was abnormally high.  The range

of interest paid on notes associated with the SPEs ranged up to nearly 50%.  Indeed, between

2001 and 2007, the average annual interest rate on notes with PC Funding ranged from

approximately 14% to 30%, while the average annual interest rate on notes with SPF Funding

ranged from approximately 14% to more than 42%.  In both cases, the higher interest rates were

paid earlier on, and declined over years of investing.  In one particular transaction, Robert Sabes

negotiated to "invest" $2,300,000 in exchange for a PCI promissory note.  The note guaranteed

repayment of the principal in 6 days along with $100,000 in "profit sharing"—a 261% annual

rate of return.

        c.      Petters operated PCI, PC Funding, and SPF Funding without investor

transparency.  After Coleman proposed a reduction in interest rates to Steven Sabes in May

2004, Robert Sabes left a voicemail for Petters complaining that the reduction was inappropriate

"based on the risk involved and the lack of transparency."  In explaining, Robert Sabes

contrasted PCI's lack of transparency with the full transparency of the deals with Petters

Consumer Brands ("PCB") that the Sabeses funded.  Robert Sabes stated, "I said, you know, if

[PCI's] business were the same business as [Petters] Consumer Brands with the same face cards

and the same transparency, we'd do it at 12% I said, but it isn't.  It's totally different and doesn't

deserve that kind of rate." For PCI investments, Petters generally declined to provide investors

with audited financial statements, barred communication by investors with retailers who Petters

represented would be purchasing the fictitious electronics, prohibited investors and insurers from

viewing and inspecting the purported electronic goods they were financing, and claimed he was

unable to direct retailers to pay receivables directly to SPEs. For PCB investments, in stark

contrast, Defendants received full backup documentation and permission to inspect inventory.

        d.      The Defendants did not undertake even ordinary diligence of PCI, PC

Funding, or SPF Funding or match purchase orders, wire transfer confirmations, or other

transactional documents with the purported purchases of electronic equipment Opportunity

Finance and the Sabes Family Foundation were financing despite the fact that the Defendants

provided millions of dollars in financing to PCI, PC Funding, and SPF Funding.

        e.      The Sabeses have admitted they were aware that funds flowing into SPF

Funding and PC Funding were commingled at PCI, and were thus also aware that the funds

flowing into the two SPEs came from PCI, and not from the discount retailers supposedly

purchasing the electronics. As early as August 2001, the Sabeses knew and stated expressly that

such commingling "defeats the purpose" of a SPE, and explained that directly to Coleman.

        f.      Similarly, no later than August 2002, DZ Bank was likewise aware that

"all monies are going through the Pet[t]ers Operating Account prior to being transferred to the

PC Funding Account." In September 2002, DZ Bank noted that "Jon [Sabes] needs not only to

direct but also to cause payment directly to the PC Funding Account by the applicable Retailer,"

and as of February 2003, DZ Bank characterized this "open item" as "huge." Further, in or

around March 2003, DZ Bank employees expressly raised the possibility not only that Petters

was committing fraud, but that the Sabeses were involved in perpetrating it.

g.      Defendant DZ Bank, which provided financing to Opportunity Finance to fund its investments in PCI, was unable to obtain adequate assurances from Petters, PCI, and PC Funding regarding the existence of the goods which were the collateral for the business transactions, and thereafter withdrew from providing that financing.  Thereafter, Opportunity Finance, the Sabes Family Foundation, WestLB and WestLB NY nevertheless continued to invest in PCI without the capacity to obtain adequate assurances regarding the existence of the goods.

h.      WestLB and WestLB NY, which agreed to provide up to $150 million in financing to Opportunity Finance for loans to the SPEs, failed to obtain adequate assurances regarding the existence of the goods, such as inspecting the inventory supposedly financed by Opportunity Finance's loans or obtaining audited financial statements from PCI.

i.      On or about June 17, 2003, WestLB and WestLB NY sent at least three representatives from WestLB NY—Vice President Brian Stratfeld, Vice President Alberto Santos and Associate Mark Hammen—to meet with Petters and Jon Sabes in Minnesota.  Jon Sabes described the purpose of the trip to see Petters as the "preverbal [sic] smell test trip" regarding the agreement to lend up to $150 million.  Upon information and belief, the WestLB NY representatives met with Jon Sabes and Petters in Petters' corporate offices for approximately one hour, met several of Petters' company leaders, listened to Petters discuss his success, discussed books and then returned to New York without inspecting the inventory that formed the basis for the funding transfers that WestLB and WestLB NY were to finance.

j.      The Sabeses were introduced to the Petters organization through an individual named Frank Vennes, who had a criminal record and had served time in jail.  Robert

51

Sabes was aware of Mr. Vennes' past before the Sabeses began their long-standing investment in
Petters' Ponzi scheme.

172.    Robert Sabes himself offered a potential reason for ignoring the steady drum-beat
of red flags at his July 2011 deposition when he agreed that the investment in the Ponzi scheme
was actually "a success" for him, and that he "got paid."

**IV.    THE TRUSTEE HAS STANDING UNDER 11 U.S.C. § 544(b) AND THE
MINNESOTA UNIFORM FRAUDULENT TRANSFER ACT TO AVOID ALL
AT-ISSUE TRANSFERS**

173.    The Trustee has standing to avoid the transfers described in Sections II and III,
pursuant to 11 U.S.C. § 544(b) and the Minnesota Uniform Fraudulent Transfer Act
("MUFTA"), on several grounds:

174.    *First*, the Trustee has standing under 11 U.S.C. § 544(b) and MUFTA to avoid
direct transfers from PCI by stepping into the shoes of numerous predicate creditors with
allowed, unsecured tort claims against that entity.

175.    *Second*, the Trustee has standing under 11 U.S.C. § 544(b) and MUFTA to avoid
transfers from SPF Funding and PC Funding to Defendants under several veil-piercing theories,
each of which is sufficient, on its own, to provide the Trustee with standing to avoid all transfers
from SPF Funding and PC Funding, including (a) *insider* reverse veil-piercing (as this Court
already held); (b) *outsider* reverse veil-piercing; and (c) that SPF Funding and PC Funding are
mere alter egos of their parent entity, PCI.

176.    *Third*, the Trustee has standing independently under 11 U.S.C. § 544(b) and
MUFTA to avoid transfers from SPF Funding and PC Funding by stepping into the shoes of

52

several predicate creditors with unsecured, allowed or allowable tort claims against SPF Funding and PC Funding.[22]

### A. The Trustee Has Identified Sufficient Predicate Creditors of PCI for Standing as to Claims Addressing Direct Transfers from PCI

#### 1. Facts establishing the claims of predicate creditors of PCI

177.    The Trustee can stand in the shoes of numerous predicate creditors that have allowed, unsecured claims against the PCI estate (several of which filed Proofs of Claim not only in the estate of PCI, but also in the estates of SPF Funding and PC Funding):[23]

#### (a)    Lancelot

178.    Lancelot, which includes Lancelot Investors Fund, L.P., Lancelot Investors Fund II, L.P., Lancelot Investors Fund, Ltd., and related entities as described in the Second Amended Plan of Reorganization ("Lancelot"), filed proofs of claim in the bankruptcies of the Debtors for a total claim of more than $1.5 billion, and have a combined, allowed, unsecured claim against the substantively consolidated Debtors' estates, including PCI, of at least $764 million.

179.    The Proofs of Claim assert "civil conspiracy" against each Debtor, and plead that "[o]n October 3, 2008, Petters was arrested and charged in a criminal complaint with mail and wire fraud, money laundering and obstruction of justice," and that upon information and belief, "much of the inventory that served as the collateral for the loans . . . never existed," and that

---

[22] The allegations in this section are included to plead the Trustee's standing under 11 U.S.C. § 544(b) and MUFTA. The Trustee need not establish the existence of predicate creditors to have standing pursuant to 11 U.S.C. § 548 to avoid the transfers at issue here.

[23] In addition to the investor creditors described here, PCI had a number of trade creditors, including Leonard McHugh d/b/a Alliance Courier; AT&T Mobility, LLC; Federal Express Corporation d/b/a Fed Ex Express; Associated Courier Inc. d/b/a Street Fleet; T-Mobile US, Inc.; and Verizon Wireless. Several of these claims were undisputed by PCI. The services provided by these trade creditors had no connection to the fraudulent activities of the Debtors, and these trade creditors did not have knowledge of the Petters fraud and Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI became public.

"much of the receivables that served as collateral for those loans was never generated or owed by any account debtor." Rather, the Debtors "planned and carried out a scheme to defraud, among others, the Lancelot / Colossus Funds by inducing them to provide certain of the Debtors with commercial loans . . . based on an extensive and long running pattern of knowingly false and fraudulent statements."

180.    Upon information and belief, the sources of which include a complaint filed by Lancelot against Petters, PCI, and others on October 7, 2008, Lancelot made numerous loans to a SPE called Thousand Lakes, LLC, which was wholly owned and controlled by Petters. The loans were evidenced by promissory notes executed by Thousand Lakes in favor of Lancelot, and were guaranteed by Petters and PCI. Between 2002 and 2008, Lancelot invested more than $1 billion with Petters, which was laundered through the Ponzi scheme.

181.    Upon information and belief, based upon sources including the complaint noted above, Petters directed Coleman, White, and other PCI employees to provide falsified documents concerning the purported transactions to Lancelot (and other investors). As described above, these included Loan Proposals that falsely specified the inventory for which PCI and/or the SPEs purported to seek financing, falsified invoices, purchase orders, and bills of sale supposedly showing that Nationwide or Enchanted had purchased inventory for resale, and then phony purchase orders and invoices purporting to show the resale of that equipment to such retailers as BJ's, Sam's Club, and Costco. These false documents included, but were by no means limited to:

- Invoice number 45399, dated March 12, 2008, submitted to Lancelot on or around May 1, 2008, which purported to show that BJ's had ordered 2,340 Hitachi televisions from Thousand Lakes for a sale price of $5,164,236.

- Invoice number 45388, dated March 13, 2008, submitted to Lancelot in or around April 2008, which purported to show that BJ's had ordered a quantity of Infocus projectors from Thousand Lakes for a sale price of $4,074,862.

- Invoice number 45431, dated March 24, 2008, submitted to Lancelot on or around May 7, 2008, which purported to show that BJ's had ordered a quantity of digital cameras from Thousand Lakes for a sale price of $2,706,637.

182.    Each of the foregoing invoices was false and misleading when prepared and presented, because, as detailed above, Petters sold virtually no inventory to any retailers—and none during the time period in which these documents were created—but instead laundered the incoming funds to pay back prior investors or, in some cases, the same investor.  Furthermore, as detailed above, this same practice of misrepresenting the intended use of the funds, and of providing false paperwork, occurred in all but a handful of transactions carried out by PCI and any of its SPEs, and thus it is fair to infer that the same or similar misrepresentations were made by the same Debtors, or their agents, throughout the relevant time period.

### (b)    Palm Beach

183.    The Palm Beach funds, consisting of Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. (together, "Palm Beach"), filed proofs of claim in the bankruptcies of the various Petters entities, including PCI, SPF Funding, and PC Funding, for a combined total of just under $1.09 billion.  The Proofs of Claim assert that Petters' scheme gives rise to claims for fraud, fraudulent inducement, and civil conspiracy.  Palm Beach has a combined, allowed, unsecured claim against the substantively consolidated Debtors' estates, including PCI, of at least $651 million.

184.    Upon information and belief, the sources of which include the complaint filed by Barry E. Mukamal as Liquidating Trustee of the Palm Beach Finance Partners Liquidating Trust and Palm Beach Finance II Liquidating Trust against Nationwide International Resources, Inc.,

et al., 11-02857-PGH (Bankr. S.D. Fla.), Petters induced Palm Beach to lend funds to Petters'

organization through a long campaign of misrepresentations that funds loaned by Palm Beach

would finance the purchase of consumer electronics, as opposed to being laundered through a

Ponzi scheme.

185.    In early 2002, the principals of Palm Beach's general partner, David Harrold and

Bruce Prevost, met Frank Vennes, a Petters agent who helped to raise funds supposedly to

finance the purchase and sale of consumer electronics through Petters' organization.  Both

Vennes, and then Petters, represented to Palm Beach, Prevost, and Harrold that the funds they

were soliciting would be used to facilitate "purchase order financing" transactions—as described

in detail in Section I.  In particular, Vennes and/or Petters represented that Petters would

facilitate the purchase of surplus consumer electronics from manufacturers, and deliver that

merchandise to "big box" discount retailers, such as Sam's Club or BJs.  Petters representations

were false when made.

186.    During the time that Palm Beach loaned funds to Petters, Petters would supply

such false documentation as purchase orders from the discount retailers, bills of sale from

Nationwide and Enchanted and/or other sham Vendors, and other documents purporting to

assign a security interest in the merchandise to Palm Beach.  This documentation was false

because the merchandise described in the documents did not exist.

### (c)    Acorn

187.    Acorn Capital Group, LLC ("Acorn") has an allowed, unsecured claim against the

substantively consolidated Debtors' estates, including PCI, of approximately $141 million.

188.    Between 2002 and the Petition Date, Acorn entered into multiple note transactions

with PCI and PAC Funding.  Asset Based Resource Group, LLC ("ABRG"), as successor

servicer to Acorn, filed proofs of claim against the PCI and PAC Funding bankruptcy estates,

and holds an allowed, unsecured claim against the PCI and PAC Funding bankruptcy estates in

the amount of $141,290,116.  On or about December 2, 2011, ABRG transferred its claims by

assignment to Greenpond South, LLC.

### (d)    Ark Discovery

189.    Ark Discovery II LP ("Ark Discovery") filed proofs of claim against the PCI

bankruptcy estate in the amounts of $104,609,465 and $107,207,101, respectively, as well as a

claim against the Edge One bankruptcy estate in the amount of $107,207,101.  Ark Discovery

has an allowed, unsecured claim against the substantively consolidated Debtors' estates,

including PCI, of $107,207,101.

190.    Ark Discovery and Edge One are parties to a Master Loan Agreement dated July

7, 2007 (together with the Security Agreement and any related notes, documents, certificates,

instruments, agreements and guaranty by PCI, and all amendments, replacements, extensions or

restatements of any of the foregoing, the "Ark Discovery Loan Documents").  Pursuant to the

Ark Discovery Loan Documents, between October 1, 2007 and September 3, 2008, Ark

Discovery engaged in 29 separate note transactions in an aggregate principal amount of

$159,010,000.  Beginning on March 11, 2008 and continuing through the Petition Date, PCI

repaid six of the Ark Discovery notes in the aggregate amount of $36,302,900, leaving Ark

Discovery with a loss of $122,707,100.  Ark Discovery also entered into Loan Purchase

Agreements with Ark Royal Capital, LLC, whereby Ark Royal Capital paid $21,500,000 to Ark

Discovery for a participation interest in four notes in an aggregate principal amount of

$27,500,000.

191.    Ark Discovery was formed and registered as a limited partnership in the state of

Delaware under the name A to Z Investors, Fund, L.P. on May 29, 2007, changed its name to

Edge One Capital, L.P. on or about September 17, 2007, and then to Ark Discovery II, L.P. on or

about February 7, 2008.  Ark Discovery could not have discovered the fraud of Petters' Ponzi scheme prior to being formed and registered on May 29, 2007, which date is within six years of the Petition Date.

192.    Ark Discovery became concerned about payment delays in the summer of 2008 and was told by Deanna Coleman that payment delays were due to economic conditions.  Ark Discovery also became aware of a lawsuit against Petters in 2008, but was assured by Petters that everything was fine.  These statements were false or incomplete when made.

193.    Ark Discovery was not (i) complicit in the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial loan to the PCI Debtors; (ii) aware of any of the de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial loan to the PCI Debtors; or (iii) aware of anything extrinsic at the time of its initial loan that would cause a reasonable person or creditor to suspect that the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

### (e)    Interlachen

194.    Interlachen Harriet Investments Limited ("Interlachen") filed a proof of claim against the PCI bankruptcy estate in the amount of its initial principal investment of $60,000,000, as well as against each of the PCI Debtors' bankruptcy estates in the same amount.  Interlachen has an allowed, unsecured claim against the substantively consolidated Debtors' estates, including PCI, of $60 million.

195.    PCI and Interlachen are parties to an Amended and Restated promissory note dated as of April 18, 2008 in the principal amount of $60,000,000 (the "Interlachen Note") (together with a Note Purchase Agreement, Security Agreement and any related documents, certificates, instruments and agreements and all amendments, replacements, extensions or restatements of any of the foregoing, the "Interlachen Loan Documents").  Pursuant to the

58

Interlachen Loan Documents, Interlachen advanced a total of $60 million to PCI between April 18 and April 22, 2008.  The Interlachen Note had a maturity date of October 18, 2008.

196.     Interlachen was formed and registered as an exempt company under the laws of the Cayman Islands on February 1, 2008.

197.     Upon information and belief—the sources of which include Interlachen's September 30, 2008 complaint against, *inter alia*, PGW, PCI, and Nationwide—like numerous other entities, Interlachen was induced to lend funds to Petters' entities by false and fraudulent misrepresentations made by, or on behalf of, Petters and his entities.

198.     To begin, the Interlachen Loan Documents themselves made clear that the funds sought from Interlachen and lent to PCI would be used to fund the purchase of electronic equipment that would then be resold at a profit.  As described above, however, the evidence is clear that virtually *none* of any investors' funds, necessarily including Interlachen's, was *ever* used to purchase electronic equipment.  Instead, it was used to repay earlier investors.  Petters and/or his representatives therefore made specific misrepresentations to Interlachen concerning the use of Interlachen's funds.

199.     PGW, PCI, Petters, and/or their representatives or agents made additional, specific misrepresentations concerning the purposes for which Interlachen's funds would be used.  For instance, prior to Interlachen's April 18, 2008 investment, CalibraX Fund LP, which was operating on behalf of PGW and PCI, sent to Interlachen's Head of Special Investments a term sheet for Interlachen's upcoming investment stating that the televisions Interlachen's funds would finance—which did not exist—were worth $116 million, and they would be sold to top-five retailers.  Similarly, and prior to April 18, 2008, Petters himself informed Interlachen's Head of Special Investments that Petters was planning to sell the televisions to certain top-five

59

retailers.  During this pre-investment time period, Coleman informed Interlachen's partners by
telephone that Petters had completed numerous deals like the one proposed for Interlachen, and
that Petters was negotiating to pre-sell the (non-existent) inventory.

200.    Petters and his representatives and affiliates also presented falsified paperwork to
Interlachen's partners.  Prior to April 18, 2008, PGW's chief legal officer sent to Interlachen's
partners via e-mail a purported purchase order and invoice relating to the merchandise for which
Interlachen's loan was supposedly earmarked.  This paperwork, generated by Reynolds on behalf
of Nationwide, was necessarily fake, since, as discussed above, Nationwide did not actually sell
merchandise to PCI, but existed solely to persuade investors that Petters was engaged in genuine
transactions.  PGW's chief legal officer also provided to Interlachen's partners prior to April 18,
2008 a document titled "Evidence of Property Insurance," which purportedly showed the
insurance coverage applicable to the merchandise.  Because there was no merchandise, this
paperwork was necessarily phony.  And PGW's chief legal officer also provided Interlachen's
partners with an invoice, itemized to show the merchandise allegedly purchased with
Interlachen's funds.  This, too, was fake.

201.    The misrepresentations did not end with the transmission of funds from
Interlachen to Petters' entities.  In conversations on June 11, July 2, July 18, July 30, August 14,
August 20, and August 21, Reynolds and Coleman informed Interlachen's managing agent about
the progress in shipping and selling the non-existent inventory, including that this supposed
merchandise had sold for a total of $95 million to three retailers.

202.    Each of these representations was false and misleading because, as the evidence
discussed above demonstrates, Petters' entities did not, and never intended to, use the funds
supplied by investors to finance merchandise, but only to maintain the Ponzi scheme by paying

60

funds to earlier investors (along with commissions for Nationwide and Enchanted and "profit" for PCI).

203.    Interlachen became aware of a lawsuit against Petters and PCI in August 2008 for non-payment, and on September 24, 2008 learned that multiple federal agencies executed search warrants at Petters' headquarters.  Unsurprisingly, after the search warrants were executed, Interlachen's inquiries about the status of its investments went unanswered.

204.    Interlachen never received any payments on its promissory note, which remained due and owing in full as of the Petition Date.  Based on the above facts, Interlachen had neither actual knowledge nor deemed notice of Petters' fraud and the Ponzi scheme until, at the earliest, September 24, 2008, when the federal investigation of PCI and PGW became public.

205.    Interlachen was not (i) complicit in the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial loan to the PCI Debtors; (ii) aware of any of the de facto circumstances of the fraud at the PCI Debtors or elsewhere in the Petters operations at the time of its initial loan to the PCI Debtors; or (iii) aware of anything extrinsic at the time of its initial loan that would cause a reasonable person to suspect that the PCI Debtors were engaged in wrongful conduct that would implicate the use of fraudulent transfer remedies.

### (f)    Theodore Deikel

206.    PCI, Petters, and Theodore Deikel ("Deikel") are parties to a promissory note dated June 3, 2008 (the "Deikel Note") under which Deikel advanced a total of $10 million to PCI.  The Deikel Note matured August 2, 2008.  On or about September 23, 2008, PGW made a transfer to Deikel in the amount of $2,600,000 in partial payment of the Deikel Note.

207.    Deikel filed a proof of claim against the PCI bankruptcy estate in the amount of $10,000,000, made a settlement payment of $2,100,000 to PGW, and holds an allowed,

unsecured claim against the consolidated PCI Debtors' bankruptcy estate in the amount of

$6,122,543.

208.     Upon information and belief, the source of which is Mr. Deikel's testimony at

Petters' criminal trial, during a conversation among Petters, another Petters-affiliated individual,

and Deikel in May 2008, Petters told Deikel that Deikel had the "opportunity" to help finance the

purchase of certain electronics inventory.  Specifically, in the same conversation, Petters and/or

his associate told Deikel that Petters was putting together financing for a $60 million transaction

in which electronics originally bound for Circuit City would be sold instead to one or more

discount retailers because Circuit City was no longer willing or able to pay.  Petters represented

that he was going to contribute $30 million to the transaction himself, but that Deikel could

provide up to $12.5 million.  In reliance upon these misrepresentations, Deikel loaned $10

million to Petters.

> **2.     The predicate creditors of PCI have claims arising in conversion and fraud, among other causes of action, against PCI**

209.     Petters and PCI committed, at least, the tortious acts of conversion and fraud as

against the predicate creditors.

210.     Under Minnesota law, conversion is willful interference with personal property,

without legal justification, that deprives a person of use or possession.  To prove conversion, a

plaintiff need only show that (i) plaintiff owned the property taken; (ii) the property was taken by

the defendant and converted; and (iii) that the property had value.  As discussed above, each

predicate creditor, beginning no later than 2002, invested valuable funds, that it owned or that it

obtained from and owed to third parties, with Petters, either through PCI or one of the SPEs.  In

virtually all, if not all cases, these funds were misappropriated and converted for use by Petters,

his Associates, and the Debtors in several ways, as identified by this Court:

211.    *First*, investor funds were diverted into the main churn of the Ponzi scheme, rather than toward the funding of the inventory or merchandise described in the Loan Approval (which merchandise did not exist).[24]

212.    *Second*, the Ponzi scheme channeled funds from purported Vendors Nationwide and Enchanted to PCI, even though "[n]o SPE's relationship with its lender allowed diversion of funds away from the SPE-vendor-lender nexus."[25]

213.    *Third*, once at PCI, the funds were commingled in PCI's main bank account with all other funds received from the two Vendors, and a portion of those commingled funds were used to supply the "interest" paid on the original transfer from a SPE.[26]

214.    *Finally*, the last step of the money-laundering scheme was to pay a "profit" to PCI after transferring interest, or principal and interest, to an investor upon the expiration of the term of a given promissory note.  Since the Ponzi scheme never actually took in funds from the sale of merchandise, the "profit" was necessarily "funded by stolen money" and thus "a final misappropriation of commingled funds."[27]

215.    As to fraud, Minnesota law requires a plaintiff to plead and prove five elements: (1) false representation of material fact; (2) made with knowledge of the falsity or made as though it were within defendant's knowledge where defendant did not know whether it was true or false; (3) with the intent to induce plaintiff to act in reliance; (4) that the representation did induce such act in reliance; and (5) the plaintiff suffered monetary damage.

---

[24] *See In re Petters Co., Inc.*, 506 B.R. 784, 803 (Bankr. Minn. 2013).
[25] *Id.* at 803.
[26] *See id.*
[27] *Id.*

216.     As noted above, each predicate creditor, beginning no later than 2002, began

investing valuable funds that it owned with Petters, either through PCI or one of the SPEs set up

for large individual creditors.  Each and every predicate creditor was induced to lend funds by

misrepresentations that those funds would be used to purchase consumer electronics, which

Petters and his Associates knew to be false.  Instead, the funds supplied by investors, including

the predicate creditors, were channeled into the "main churn" of the Ponzi scheme and used to

pay prior investors, or to pay back investors with their own funds.  Petters and his Associates

made additional misrepresentations by preparing false paperwork for the purported transactions

financed by the loans made by the predicate creditors.

217.     On information and belief, the sources of which include complaints filed by

predicate creditors discussed above, as well as extensive testimony and fact materials concerning

the operation of the Ponzi scheme, the predicate creditors relied upon these misrepresentations

when they invested funds, and were harmed because their funds actually went into a Ponzi

scheme from which they have been unable to recover their investments.

218.     It is effectively undisputed that the Ponzi scheme operated through particular

misrepresentations concerning its investment activities and overall purpose, and there is no

reason to believe that the scheme operated differently for any of the predicate creditors.

**B.      There Are Predicate Creditors of the SPEs Because the Corporate Veil
          Between PCI and Those SPEs Can Be Pierced**

**1.      PCI, SPF Funding, and PC Funding should be treated as a single
          entity**

219.     The Trustee's allegations concerning PCI's control and utilization of SPF Funding

and PC Funding in order to advance Petters' Ponzi scheme have already been deemed sufficient

to pierce the corporate veil between PCI and the SPEs.

220.    Additionally, in deciding to substantively consolidate the Debtors' estates, this
Court found, based on certain facts detailed below, that "SPF [Funding]'s structure is
significantly interrelated with PCI and other PCI-related entities, *and it cannot be considered
structurally or operationally separate*."[28]  PwC further confirmed this fact, testifying that "the
SPE's and PCI . . . were effectively one."

221.    The SPEs were, in fact, inseparable alter egos of PCI.  PC Funding and SPF
Funding were created and utilized by PCI as SPEs through which to funnel funds into and out of
the main churn of the Ponzi scheme.

222.    As to SPF Funding, Petters was the sole "governor," as well as president, CEO,
and CFO, and Jon Sabes agreed that Petters was "the person who would make business
decisions" for SPF Funding.  In addition, SPF Funding has never had an independent director,
which "left SPF [Funding] without any check against PCI's influence over SPF [Funding]'s
actual usage or operations."[29]  And SPF Funding depended upon PCI in order to stay in business.
SPF Funding operated from the same office facility and address as PCI, and the contact people
the Sabeses reached at SPF Funding—Petters, Coleman, or White—were "the same three
people" who acted as contacts for PCI.  And neither SPF Funding nor PC Funding had any of
their own employees, or even their own telephone lines or e-mail addresses.

223.    Notably, upon creating SPF Funding in 2001, PCI's counsel refused to provide a
non-consolidation opinion.  Indeed, SPF Funding, according to PCI's attorneys, was "not
structured . . . with non-consolidation in mind."[30]

---

[28] *In re Petters Co., Inc.*, 506 B.R. at 807 (emphasis added).
[29] *Id.*
[30] *Id.*

65

224.   As to PC Funding, Petters was likewise its only "governor," as well as its
president, CEO, and CFO.  Jon Sabes agreed that Petters "basically would sign all the important
documents for PC Funding," and testified that he had never seen letterhead for PC Funding itself.
And though PC Funding actually had an independent director, it was a "Rent-a-Director" that
acted "in name only."  PC Funding also depended upon PCI, to the point that an audit for the
years 2002 and 2003 indicated that such dependence "caused serious doubt about PCF's ability
to continue as a going concern."[31]  PC Funding also operated from the same office facility and
address as PCI, and the contact people for PC Funding were also Petters, Coleman, and White.

225.   Petters also indiscriminately commingled funds intended for PC Funding or SPF
Funding with those intended for PCI, using such funds for subsequent distribution to other
investors in other SPEs.  Petters and his Associates caused monies received from PC Funding
and SPF Funding by Nationwide and Enchanted to be rerouted and transferred directly to PCI
accounts for the operations of PCI, repayment of investors, payment of false profits, and for
Petters' personal use.

226.   Critically, though SPF Funding was the final stage of the flow of funds before a
transfer was made to Opportunity Finance, as this Court has found, "[i]n practice, every single
note from [SPF Funding] to Opportunity Finance was paid by funds that flowed through PCI's
[Bank] account, which means that every single dollar was commingled."[32]  This Court likewise
found that "every single note from [PC Funding] to Opportunity Finance was paid by funds that
flowed through PCI's M & I account," and therefore, just like the funds that flowed through SPF
Funding, "every single dollar received by Opportunity Finance on [PC Funding's] account was

---

[31] *In re Petters Co., Inc.*, 506 B.R. at 810.
[32] *Id.* at 808.

66

commingled at some point in time."[33]  The Sabeses conceded that they were aware that funds

flowing into SPF Funding and PC Funding were commingled at PCI, and were therefore also

aware that funds flowing into the two SPEs came from PCI, and not from the purported discount

retailers—which defeated the SPEs' express purpose of separating the Sabeses' funds from those

of other investors.

227.   PCI maintained a number of bank accounts, including a bank account at M&I

Bank.  From 2001 to 2008, PCI transferred funds from its M&I Bank account to the SPEs—

including PC Funding and SPF Funding—in the amount of approximately $32 billion dollars.

PCI also received approximately $7.3 billion dollars from its SPEs.  PCI's M&I Bank account

also received approximately $12.7 billion from Enchanted (owned by Catain, who pleaded guilty

to conspiracy to commit money laundering) and approximately $12.4 billion from Nationwide

(owned by Reynolds, who pleaded guilty to conspiracy to commit money laundering)—funds

that Nationwide and Enchanted had originally received from the SPEs.  The Sabes Family

Defendants also controlled an account at U.S. Bank in the name of PC Funding that received

proceeds of the Ponzi scheme.  This flow of funds illustrates that funds were routed through and

around PC Funding and SPF Funding to give the appearance of legitimate business activity and

that PC Funding and SPF Funding, among other entities, were used as artifices to perpetrate a

massive financial fraud.

228.   Indeed, PC Funding and SPF Funding were never independently or sufficiently

capitalized because PC Funding and SPF Funding conducted no legitimate business operations,

and all funds provided to, or paid on behalf of, PC Funding and SPF Funding were for the sole

purpose of furthering the Ponzi scheme and were ultimately forwarded to PCI for distribution.

---

[33] *In re Petters Co., Inc.*, 506 B.R. at 811.

As PwC testified, "there was little, if any, capitalization in the SPE's," which PwC determined through its forensic review of corporate records.  The amount of funds provided to PC Funding and to SPF Funding to fund the fraudulent investment activities confirms that PC Funding and SPF Funding were never capitalized to operate apart from, or independent of, PCI, and that PC Funding and SPF Funding, in fact, had no existence separate and apart from PCI and the Ponzi scheme, as was well known to Petters and his Associates.

229.    Petters conflated the multiple entities that he used to operate the Ponzi scheme by, among other things, transferring funds interchangeably among the entities, ultimately for the benefit of PCI and to generate the payment of false profits pursuant to the promissory notes to perpetrate and further the Ponzi scheme.

230.    Injustice, fundamental unfairness, and a violation of an established public policy against fraud would occur if PCI, PC Funding, and SPF Funding were allowed to maintain their abuses of the corporate form to promote and perpetrate a fraud on creditors and investors of PCI.

231.    SPF Funding, PC Funding, and PCI should be treated as one entity, for all purposes stated herein and with respect to all causes of action pleaded herein, particularly since funds provided to Petters and PCI were not used for their intended purpose, but were funneled through SPF Funding and PC Funding, among other entities, to further the operation of the massive and fraudulent Ponzi scheme, including by repaying principal and false profits to the Defendants, WestLB, and WestLB NY.

### 2.    The corporate veil between PCI and the SPEs can be pierced on several bases

232.    *Insider Reverse Veil Piercing*.  The Trustee has standing pursuant to 11 U.S.C. § 544(b) and MUFTA under an *insider* reverse veil piercing theory.  The SPEs are merely alter egos of PCI that were used to further Petters' fraudulent Ponzi scheme, and any purported

68

corporate separateness should therefore be disregarded on equitable grounds. Under these circumstances, an insider of PCI—or somebody making a claim through that insider—can pierce the corporate veil to use the entity's claims against third parties.[34]

233.    The Trustee stands in the position of an insider of PCI, and can pierce the corporate veil between PCI and its wholly owned subsidiary SPEs, including SPF Funding and PC Funding, in order to recover fraudulent transfers made by the Debtors on behalf of creditors. The Trustee therefore has standing not only to avoid transfers made by PCI, but to avoid transfers made from SPF Funding and PC Funding, because for purposes of Section 544(b) and MUFTA, those entities are not separate from PCI.

234.    ***Outsider Reverse Veil Piercing***. The SPEs are merely alter egos of PCI that were used to further Petters' fraudulent Ponzi scheme, and any purported corporate separateness should therefore be disregarded on equitable grounds. Under these circumstances, an *outsider*— generally a creditor—of PCI can seek to recover losses incurred in the Ponzi scheme against PCI, or if the assets of PCI are inadequate, as against the SPEs. The "assets" of the SPEs would be their claims for fraudulent transfers made from SPF Funding and PC Funding to Opportunity Finance and the other Investor Defendants.

235.    There are numerous predicate creditors with unsecured, allowed or allowable claims against PCI for which the Trustee may seek recovery. The Trustee thus also stands in the position of an *outsider* of PCI, and can pierce the corporate veil between PCI and its wholly owned SPEs, including SPF Funding and PC Funding, to recover losses on behalf of those predicate creditors. The Trustee therefore has standing to avoid not only transfers made from

---

[34] *See* Dkt. # 217 at 10.

PCI, but also transfers made from SPF Funding and PC Funding, because for purposes of Section 544(b) and MUFTA, those entities are not separate from PCI.

236.   ***Alter Ego***.  The Trustee also has standing pursuant to 11 U.S.C. § 544(b) and MUFTA under an *alter ego* veil piercing theory.  PCI and the SPEs functioned as a single economic entity that disregarded corporate formalities, commingled funds, and otherwise used the SPEs as mere instrumentalities of PCI.  Furthermore, PCI utilized the SPEs *solely* as instruments to perpetuate the Ponzi scheme, and otherwise to carry out fraud, such that it would be inequitable to observe the purported corporate separateness between PCI and the SPEs if it would prevent recovery by or on behalf of creditors.

237.   There are numerous predicate creditors with unsecured, allowed or allowable claims against PCI for which the Trustee may seek recovery.  Standing in the position of these predicate creditors, the Trustee can pierce the corporate veil between PCI and its wholly owned SPEs, including SPF Funding and PC Funding.  The Trustee therefore has standing to avoid not only transfers made from PCI, but also transfers made from SPF Funding and PC Funding, because for purposes of Section 544(b) and MUFTA, those entities are not separate from PCI.

## C.   Predicate Creditors Have Direct Claims Against the SPEs

238.   The predicate creditors of PCI identified above also have unsecured claims against SPF Funding and PC Funding for aiding and abetting, and conspiring to commit, conversion and fraud.

239.   Under Minnesota law, there are three elements to a claim for aiding and abetting a tort:  (1) the primary tortfeasor commits a tort that injures a plaintiff; (2) the defendant knows that the primary tortfeasor's conduct is a breach of duty; and (3) the defendant substantially assists or encourages the primary tortfeasor in perpetrating the breach.

70

240.    As described above, PCI acted as a primary tortfeasor through fraudulent

misrepresentations and conversion of the predicate creditors' funds.  These acts caused injury to

the predicate creditors because they paid funds to PCI that have not been returned.

241.    SPF Funding and PC Funding were controlled and dominated by Petters, through

PCI, and therefore SPF Funding and PC Funding knew that Petters and PCI were obtaining the

predicate creditors' funds through fraudulent misrepresentations, and then converting those funds

as they flowed through the main churn of the Ponzi scheme.

242.    SPF Funding and PC Funding also substantially assisted in, and encouraged the

commission of, these underlying torts, through their participation in the Ponzi scheme and the

channeling of the predicate creditors' funds into and through the Ponzi scheme.  PC Funding and

SPF Funding aided and abetted the misrepresentations and misappropriations by Petters, PCI,

and other Debtors by playing their pre-determined role in the money laundering that formed the

main churn of the Ponzi scheme—including by receiving loan proceeds and channeling them to,

and from, the Vendors.

243.    SPF Funding and PC Funding also conspired to commit the torts of conversion

and fraud against the predicate creditors.  There are five elements to a civil conspiracy claim

under Minnesota law: (1) two or more persons; (2) an object of the conspiracy; (3) a meeting of

the minds on that object or a course of action; (4) one or more unlawful overt acts; and (5)

damages that proximately result from the conspiracy.'"

244.    PCI, SPF Funding, PC Funding, as well as Petters, Coleman, White, Reynolds,

Catain, Nationwide, and Enchanted all acted in concert, knowingly and intentionally, to

accomplish the objective of advancing and perpetrating the Ponzi scheme against the predicate

creditors and numerous others.

245.     With this objective collectively in mind, SPF Funding and PC Funding, along with the other Debtors, committed numerous tortious acts—including fraud and conversion—in order to obtain funds from the predicate creditors.

246.     The predicate creditors were thus directly harmed by the underlying tortious acts that PCI, SPF Funding, PC Funding, and others conspired to commit through the substantial losses of funds paid to Petters' entities.

247.     Each of the listed predicate creditors therefore has a claim against SPF Funding and PC Funding for aiding and abetting, and conspiring to commit, fraud and conversion.

*   *   *

248.     The Receiver, and subsequently the Trustee, acted diligently to discover facts constituting the fraud alleged in this Fourth Amended Complaint.  Petters, or Petters and his Associates, fraudulently and intentionally concealed the ongoing fraud in an effort to hinder and delay authorities and other current and prospective investors and other creditors of PCI, SPF Funding, and PC Funding from discovering the fraud.

249.     Any temporal limitations—statutory or otherwise—on the Trustee's ability to bring the causes of action set forth below are tolled by, among other things, Petters' breach of fiduciary duty in failing to disclose the fraud, the actions of Petters, or Petters and his Associates, in fraudulently and intentionally concealing the fraud, and/or the adverse domination of PCI and other debtor entities by Petters, or Petters and his Associates, until the latest date a predicate creditor above discovered facts constituting the nature of the fraudulent activity of Petters' Ponzi scheme or until the appointment of the Receiver.

# CAUSES OF ACTION

## COUNT I – FRAUDULENTLY INCURRED OBLIGATIONS

### [Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A)]

**Against the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, and
The Minneapolis Foundation**

250.    The Trustee realleges and incorporates by reference the preceding paragraphs of
the Fourth Amended Complaint as if fully set forth herein.

251.    The Credit Agreements, Security Agreements, PCI Direct Notes, MGLLC Notes,
SPF Funding Notes, PC Funding Notes, and any other promissory notes from any of the Debtors
to one or more of the Defendants or MGLLC (collectively, the "Fraudulent Obligations") are
obligations that were incurred by PCI, PC Funding, and SPF Funding with actual intent to
hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the
date of the Fraudulent Obligations.

252.    Petters, through PCI and the SPEs, obtained funds from investors on the basis of
fraudulent misrepresentations that those funds would be used to finance the purchase of
consumer electronics.  Those funds were not used to purchase electronics, but rather to repay
fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's
main bank account during the Ponzi scheme, PwC found that only a miniscule amount could
have related to legitimate purchases or sales of consumer electronics, and the Associates,
including those who operated the purported Vendors, stated that the Vendors engaged in
essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not
every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained
through intentional, fraudulent misrepresentation, and every or nearly every investor was paid
with funds obtained from other investors—who themselves had previously been induced by the

73

same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's

own funds, and not from the proceeds of any sales of consumer electronics.

253.    The Fraudulent Obligations were made to or for the benefit of the Opportunity

Finance Defendants, Sabes Family Foundation, DZ Bank, and The Minneapolis Foundation in

furtherance of a fraudulent investment scheme.

254.    In this manner, the Ponzi scheme was conducted through the successive

misdirection of investors' cash infusions toward the payment of earlier investments.  All the

funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and

laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi

scheme.

255.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 548(a)(1)(A): (a) avoiding the Fraudulent Obligations free and clear from

any claimed interest of the Opportunity Finance Defendants, Sabes Family Foundation, DZ

Bank, and The Minneapolis Foundation; and (b) directing that the Fraudulent Obligations be set

aside.

## COUNT II – FRAUDULENTLY INCURRED OBLIGATIONS

**[Actual Fraud - 11 U.S.C. §§ 544(a) and 544(b) and Minn. Stat. §§ 513.44(a)(1) and 513.47
or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, and
The Minneapolis Foundation**

256.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

257.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

258.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases; and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

259.    The Fraudulent Obligations are avoidable under applicable non-bankruptcy law

by a creditor holding an unsecured claim.

260.    The Fraudulent Obligations were made to or for the benefit of the Opportunity

Finance Defendants, Sabes Family Foundation, DZ Bank, and The Minneapolis Foundation in

furtherance of a fraudulent investment scheme.

261.    The Fraudulent Obligations were incurred with actual intent to hinder, delay, or

defraud creditors to which the Debtors were or became indebted on or after the date of the

Fraudulent Obligations.  Petters, through PCI and the SPEs, obtained funds from investors on the

basis of fraudulent misrepresentations that those funds would be used to finance the purchase of

consumer electronics.  Those funds were not used to purchase electronics, but rather to repay

75

fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.

262.    In this manner, the Ponzi scheme was conducted through the successive misdirection of investors' cash infusions toward the payment of earlier investments.  All the funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi scheme.

263.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(a) and 544(b) and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding the Fraudulent Obligations free and clear from any claimed interest of the Opportunity Finance Defendants, Sabes Family Foundation, DZ Bank, and The Minneapolis Foundation; and (b) directing that the Fraudulent Obligations be set aside.

## COUNT III – ACTUAL FRAUDULENT TRANSFERS

## [Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551]

### Against the Opportunity Finance Defendants and DZ Bank for avoidance and recovery of the PC Funding Two-Year Transfers

264.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

265.    The PC Funding Two-Year Transfers, which specifically include but are not limited to the Buy Out Transfers that Opportunity Finance received following its abrupt cessation of investment activity in December 2007, were made with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the Fraudulent Transfers.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.

266.    In this manner, the Ponzi scheme was conducted through the successive misdirection of investors' cash infusions toward the payment of earlier investments.  All the funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi scheme.

267.    The PC Funding Two-Year Transfers were made to or for the benefit of the Opportunity Finance Defendants and DZ Bank, in furtherance of a fraudulent investment scheme.

268.    To the extent that the Opportunity Finance Defendants and DZ Bank are not initial transferees of the PC Funding Two-Year Transfers, they are immediate or mediate transferees of the initial transferees of the PC Funding Two-Year Transfers, and cannot satisfy their burden that they took the PC Funding Two-Year Transfers for value and in good faith and without knowledge of the voidability of the PC Funding Two-Year Transfers.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme include but are not limited to the facts set forth in Section III.B.

269.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(A), 550(a), and 551: (a) avoiding and preserving the PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity Finance Defendants and/or DZ Bank; (b) directing that the PC Funding Two-Year Transfers be set aside; (c) recovering such PC Funding Two-Year Transfers in an amount not less than $711,141,132 from the Opportunity Finance Defendants and DZ Bank, for the benefit of the estates of PCI and PC Funding; (d) alternatively, recovering false profits in an amount not less than $90,488,713; (e) alternatively, recovering the Buy Out Transfers from the Opportunity Finance Defendants in

78

an amount not less than $155,357,376; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants and DZ Bank.

## COUNT IV – CONSTRUCTIVE FRAUDULENT TRANSFERS

## [Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551]

### Against the Opportunity Finance Defendants and DZ Bank for avoidance and recovery of the PC Funding Two-Year Transfers

270.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

271.    At all times material hereto, PC Funding: (a) was insolvent on the dates the PC Funding Two-Year Transfers were made or became insolvent as a result of the PC Funding Two-Year Transfers; and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with the Debtors after the PC Funding Two-Year Transfers were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the PC Funding Two-Year Transfers, intended to incur, or believed it would incur, debts that would be beyond its ability to pay as the debts matured.

272.    Virtually all, if not all, of the funds that passed through PC Funding were funds originally obtained through fraud, and thus PC Funding operated solely with funds it should never have possessed.  Any debts at all incurred by PC Funding—including promissory notes issued to Defendants—therefore rendered PC Funding insolvent, undercapitalized, and unable to pay debts as they came due.  PC Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first PC Funding Two-Year Transfer, and remained insolvent as of the date of each and every subsequent PC Funding Two-Year Transfer.

273.    Furthermore, none of the SPEs, including PC Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including PC Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

274.    PC Funding received less than reasonably equivalent value in exchange for the PC Funding Two-Year Transfers.  Each PC Funding Two-Year Transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an investor was made for less than reasonably equivalent value, because any such payment was the

80

consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase the identified goods, but rather to repay other investors.

275.    To the extent that the Opportunity Finance Defendants and DZ Bank are not initial transferees of the PC Funding Two-Year Transfers, they are immediate or mediate transferees of the initial transferees of the PC Funding Two-Year Transfers, and cannot satisfy their burden that they took the PC Funding Two-Year Transfers for value and in good faith and without knowledge of the voidability of the PC Funding Two-Year Transfers.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme, include but are not limited to the facts set forth in Section III.B.

276.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a) and 551: (a) avoiding and preserving the PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity Finance Defendants and DZ Bank; (b) directing that the PC Funding Two-Year Transfers be set aside; (c) recovering such PC Funding Two-Year Transfers in an amount not less than $711,141,132 from the Opportunity Finance Defendants and DZ Bank, for the benefit of the estate of PC Funding; (d) alternatively, recovering false profits in an amount not less than $90,488,713; (e) alternatively, recovering the Buy Out Transfers from the Opportunity Finance Defendants in an amount not less than $155,357,376; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants and DZ Bank.

## COUNT V – ACTUAL FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat.
§§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendants, for avoidance and recovery, as initial transferees of the
PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the
PCI MGLLC Transfers and PCI SPE Transfers**

277.    The Trustee realleges and incorporates by reference the preceding paragraphs of
the Fourth Amended Complaint as if fully set forth herein.

278.    At all times material hereto, there was and is at least one or more creditors, as
specifically identified in Section IV, who held and who hold unsecured claims against the
Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not
allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to
assert the claims herein because he may avoid any transfer of property of a debtor or any
obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor
that extended credit to the debtor at the time of the Petition Date, whether or not such creditor
exists.

279.    At all times material hereto, there was and is at least one or more creditors who
held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims
against the Defendants did not arise, exist or accrue at any time until within the six years before
the first date on which a bankruptcy petition was filed by any debtor in the above-captioned
bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting
deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six
years before the first date on which a bankruptcy petition was filed by any Debtor in the above-
captioned bankruptcy cases.

82

280.     The PCI Direct Transfers, PCI MGLLC Transfers, PC Funding Transfers, and all

transfers from PCI to SPF Funding and PC Funding[35] (the "PCI SPE Transfers") are avoidable

under applicable non-bankruptcy law by a creditor holding an unsecured claim.

281.     The PCI Direct Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and the PC

Funding Transfers were made with actual intent to hinder, delay, or defraud a creditor to which

the Debtors were or became indebted on or after the date of the PC Funding Transfers.  Petters,

through PCI and the SPEs, obtained funds from investors on the basis of fraudulent

misrepresentations that those funds would be used to finance the purchase of consumer

electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent

obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank

account during the Ponzi scheme, PwC found that only a miniscule amount could have related to

legitimate purchases or sales of consumer electronics, and the Associates, including those who

operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate

transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into

the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional,

fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained

from other investors—who themselves had previously been induced by the same intentional,

fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and

not from the proceeds of any sales of consumer electronics.

282.     In this manner, the Ponzi scheme was conducted through the successive

misdirection of investors' cash infusions toward the payment of earlier investments.  All the

funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and

---

[35] PCI and the SPEs have stipulated that transfers from PCI to the SPEs are avoidable.

laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi scheme.

283.    The PCI Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and PC Funding Transfers were made to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

284.    To the extent that the Defendants are not initial transferees of the PCI Direct Transfers or the PC Funding Transfers, they are immediate or mediate transferees of the initial transferees of the PCI Direct Transfers or the PC Funding Transfers (including, for instance, DZ Bank, whose loans to the Opportunity Finance Defendants were paid back using funds the Opportunity Finance Defendants received from the SPEs).  Defendants are also direct transferees of MGLLC, and thus subsequent transferees of any funds transferred in the PCI MGLLC Transfers.  And Defendants are direct transferees of PC Funding and SPF Funding, and thus subsequent transferees of any funds transferred in the PCI SPE Transfers.

285.    Defendants cannot satisfy their burden to show that they took any such subsequent transfers for value or in good faith.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme include but are not limited to the facts set forth in Section III.B.

286.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a) and 551 and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC

Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to

Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to

Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI,

subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729;

(f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an

amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from

PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively,

recovering false profits received by Defendants (1) of not less than $70,823,828 as direct

transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of

PC Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI

MGLLC Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE

Transfers; (i) alternatively, recovering the Buy Out Transfers in an amount not less than

$155,357,376 from the Opportunity Finance Defendants; and (j) recovering prejudgment and

post-judgment interest, attorneys' fees, and costs from Defendants.

### COUNT VI – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat.
§§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendants, for avoidance and recovery, as initial transferees of the
PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the
PCI MGLLC Transfers and PCI SPE Transfers**

287.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

288.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

85

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

289.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

290.    The PCI Direct Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and PC

Funding Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an

unsecured claim.

291.    At all times material hereto, PCI and PC Funding: (a) were insolvent on the dates

the transfers at issue were made or became insolvent as a result of the transfers; and/or (b) were

engaged in businesses or transactions, or were about to engage in businesses or transactions, for

which the property remaining with the Debtors after the transfers were effectuated constituted

unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for

PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or

(c) at the time of the transfers intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

292.    Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  They were therefore funds that PCI never should have possessed.  Any debts at all incurred by PCI—including promissory notes issued to Defendants—thus rendered PCI insolvent, undercapitalized, and unable to pay debts as they came due.  PCI was therefore insolvent no later than the first time it incurred any debt to an investor in the Ponzi scheme—before the date of the first PCI Direct Transfer and first PCI MGLLC Transfer—and remained insolvent as of the date of each and every subsequent PCI Direct Transfer or PCI MGLLC Transfer.

293.    To the extent that PCI received funds from Petters-related entities that were not part of the main churn of the Ponzi scheme ("Additional Petters Entities"), PCI incurred debts to those Additional Petters Entities, and therefore such transfers did not, and could not, render PCI solvent.  To the contrary, to the extent PCI was obligated to repay those transfers to the Additional Petters Entities with interest, such transfers served to deepen PCI's insolvency.  In all events, because PCI transferred to the Additional Petters Entities more funds than it received from them, transactions with the Additional Petters Entities in fact served to deepen PCI's insolvency, rather than to provide funds sufficient to pay PCI's obligations, including satisfaction of the purported loans from investors.

294.    Virtually all, if not all, of the funds that passed through PC Funding were likewise obtained through fraud, and thus PC Funding also operated solely with funds it should never

have possessed.  Any debts at all incurred by PC Funding—including promissory notes issued to Defendants—therefore rendered PC Funding insolvent, undercapitalized, and unable to pay debts as they came due.  PC Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first PC Funding Transfer, and remained insolvent as of the date of each and every subsequent PC Funding Transfer.

295.    Furthermore, none of the SPEs, including PC Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including PC Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

296.    PCI and PC Funding received less than reasonably equivalent value in exchange for each and every PCI Direct Transfer, PCI MGLLC Transfer, PCI SPE Transfer, and PC Funding Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation,

88

and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an investor was made for less than reasonably equivalent value, because any such payment was the consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase the identified goods, but rather to repay other investors.

297.    The PCI Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and the PC Funding Transfers were made to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

298.    To the extent that the Defendants are not initial transferees of PCI Direct Transfers or the PC Funding Transfers, they are immediate or mediate transferees of the initial transferees of the PCI Direct Transfers or the PC Funding Transfers (including, for instance, DZ Bank, whose loans to the Opportunity Finance Defendants were paid back using funds the Opportunity Finance Defendants received from the SPEs).  Defendants are also direct transferees of MGLLC, and thus subsequent transferees of any funds transferred in the PCI MGLLC Transfers.  And Defendants are direct transferees of PC Funding and SPF Funding, and thus subsequent transferees of the PCI SPE Transfers.

299.    Defendants cannot satisfy their burden to show that they took any such subsequent transfers for value or in good faith.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme include but are not limited to the facts set forth in Section III.B.

89

300.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a) and 551 and Minn. Stat. §§ 513.44(a)(2)(i) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the PCI Direct

Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any

claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC

Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to

Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to

Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI,

subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729;

(f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an

amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from

PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively,

recovering false profits received by Defendants (1) of not less than $70,823,828 as direct

transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of PC

Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI MGLLC

Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE Transfers;

(i) alternatively, recovering the Buy Out Transfers in an amount not less than $155,357,376 from

the Opportunity Finance Defendants; and (j) recovering prejudgment and post-judgment interest,

attorneys' fees, and costs from Defendants.

## COUNT VII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat.
§§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendants, for avoidance and recovery, as initial transferees of the
PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the
PCI MGLLC Transfers and PCI SPE Transfers**

301.    The Trustee realleges and incorporates by reference the preceding paragraphs of
the Fourth Amended Complaint as if fully set forth herein.

302.    At all times material hereto, there was and is at least one or more creditors, as
specifically identified in Section IV, who held and who hold unsecured claims against the
Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not
allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to
assert the claims herein because he may avoid any transfer of property of a debtor or any
obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor
that extended credit to the debtor at the time of the Petition Date, whether or not such creditor
exists.

303.    At all times material hereto, there was and is at least one or more creditors who
held and who hold allowed and allowable claims, as identified in Section IV; (a) whose claims
against the Defendants did not arise, exist or accrue at any time until within the six years before
the first date on which a bankruptcy petition was filed by any debtor in the above-captioned
bankruptcy cases; and (b) who neither had actual knowledge nor discovered facts constituting
deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six
years before the first date on which a bankruptcy petition was filed by any Debtor in the above-
captioned bankruptcy cases.

91

304.    The PCI Direct Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and PC

Funding Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an

unsecured claim.

305.    At all times material hereto, PCI and PC Funding: (a) were insolvent on the dates

the transfers at issue were made or became insolvent as a result of the transfers; and/or (b) were

engaged in businesses or transactions, or were about to engage in businesses or transactions, for

which the property remaining with the Debtors after the transfers were effectuated constituted

unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for

PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or

(c) at the time of the transfers intended to incur, or believed that they would incur, debts that

would be beyond their ability to pay as the debts matured.

306.    Petters, through PCI and the SPEs, obtained funds from investors on the basis of

fraudulent misrepresentations that those funds would be used to finance the purchase of

consumer electronics.  Those funds were not used to purchase electronics, but rather to repay

fraudulent obligations incurred to other investors.  They were therefore funds that PCI never

should have possessed.  Any debts at all incurred by PCI—including promissory notes issued to

Defendants—thus rendered PCI insolvent, undercapitalized, and unable to pay debts as they

came due.  PCI was therefore insolvent no later than the first time it incurred any debt to an

investor in the Ponzi scheme—which was before the date of the first PCI Direct Transfer and

first PCI MGLLC Transfer—and remained insolvent as of the date of each and every subsequent

PCI Direct Transfer or PCI MGLLC Transfer.

307.    To the extent that PCI received funds from Additional Petters Entities, PCI

incurred debts to those Additional Petters Entities, and therefore such transfers did not, and could

92

not, render PCI solvent.  To the contrary, to the extent PCI was obligated to repay those transfers to the Additional Petters Entities with interest, such transfers served to deepen PCI's insolvency.  In all events, because PCI transferred to the Additional Petters Entities more funds than it received from them, transactions with the Additional Petters Entities in fact served to deepen PCI's insolvency, rather than to provide funds sufficient to pay PCI's obligations, including satisfaction of the purported loans from investors.

308.    Virtually all, if not all, of the funds that passed through PC Funding were likewise obtained through fraud, and thus PC Funding also operated solely with funds it should never have possessed.  Any debts at all incurred by PC Funding—including promissory notes issued to Defendants—therefore rendered PC Funding insolvent, undercapitalized, and unable to pay debts as they came due.  PC Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first PC Funding Transfer, and remained insolvent as of the date of each and every subsequent PC Funding Transfer.

309.    Furthermore, none of the SPEs, including PC Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—and depended for funds upon others including PCI and certain Defendants.  The SPEs, including PC Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

310.    PCI and PC Funding received less than reasonably equivalent value in exchange for each and every PCI Direct Transfer, PCI MGLLC Transfer, PCI SPE Transfer, and PC Funding Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those

funds would be used to finance the purchase of consumer electronics.  Those funds were not

used to purchase electronics, but rather to repay fraudulent obligations incurred to other

investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi

scheme, PwC found that only a miniscule amount could have related to legitimate purchases or

sales of consumer electronics, and the Associates, including those who operated the purported

Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the

Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going

back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation,

and every or nearly every investor was paid with funds obtained from other investors—who

themselves had previously been induced by the same intentional, fraudulent misrepresentations

to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any

sales of consumer electronics.  Each payment to an investor was made for less than reasonably

equivalent value, because any such payment was the consummation of the two-stage use of

fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase

the identified goods, but rather to repay other investors.

311.    The PCI Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and PC Funding

Transfers were made to or for the benefit of the Defendants in furtherance of a fraudulent

investment scheme.

312.    To the extent that the Defendants are not initial transferees of the PCI Direct

Transfers or the PC Funding Transfers, they are immediate or mediate transferees of the initial

transferees of the PCI Direct Transfers or the PC Funding Transfers (including, for instance, DZ

Bank, whose loans to the Opportunity Finance Defendants were paid back using funds the

Opportunity Finance Defendants received from the SPEs).  Defendants are also direct transferees

94

of MGLLC, and thus subsequent transferees of any funds transferred in the PCI MGLLC

Transfers.  And Defendants are direct transferees of PC Funding and SPF Funding, and thus

subsequent transferees of the PCI SPE Transfers.

313.   Defendants cannot satisfy their burden to show that they took any such

subsequent transfers for value or in good faith.  The numerous red flags and/or indications of

Defendants' actual or constructive knowledge of the scheme include but are not limited to the

facts set forth in Section III.B.

314.   As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a) and 551 and Minn. Stat. §§ 513.44(a)(2)(ii) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the PCI Direct

Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any

claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC

Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to

Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to

Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI,

subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729;

(f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an

amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from

PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively,

recovering false profits received by Defendants (1) of not less than $70,823,828 as direct

transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of PC

Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI MGLLC

95

Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE Transfers;

(i) alternatively, recovering the Buy Out Transfers in an amount not less than $155,357,376 from

the Opportunity Finance Defendants; and (j) recovering prejudgment and post-judgment interest,

attorneys' fees, and costs from Defendants.

## COUNT VIII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a) and 551, and Minn. Stat. §§ 513.45(a)
and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendants, for avoidance and recovery, as initial transferees of the
PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the
PCI MGLLC Transfers and PCI SPE Transfers**

315.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

316.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).

317.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV; (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases; and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

96

318.    The PCI Direct Transfers, PCI MGLLC Transfers, PC Funding Transfers, and PCI SPE Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

319.    At all times material hereto, PCI and PC Funding: (a) were insolvent on the dates the transfers at issue were made or became insolvent as a result of the transfers; and/or (b) were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the transfers were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the transfers intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

320.    Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  They were therefore funds that PCI never should have possessed.  Any debts at all incurred by PCI—including promissory notes issued to Defendants—thus rendered PCI insolvent, undercapitalized, and unable to pay debts as they came due.  PCI was therefore insolvent no later than the first time it incurred any debt to an investor in the Ponzi scheme—which was before the date of the first PCI Direct Transfer and first PCI MGLLC Transfer—and remained insolvent as of the date of each and every subsequent PCI Direct Transfer or PCI MGLLC Transfer.

321.    To the extent that PCI received funds from Additional Petters Entities, PCI incurred debts to those Additional Petters Entities, and therefore such transfers did not, and could

97

not, render PCI solvent. To the contrary, to the extent PCI was obligated to repay those transfers to the Additional Petters Entities with interest, such transfers served to deepen PCI's insolvency. In all events, because PCI transferred to the Additional Petters Entities more funds than it received from them, transactions with the Additional Petters Entities in fact served to deepen PCI's insolvency, rather than to provide funds sufficient to pay PCI's obligations, including satisfaction of the purported loans from investors.

322.    Virtually all, if not all, of the funds that passed through PC Funding were likewise obtained through fraud, and thus PC Funding also operated solely with funds it should never have possessed. Any debts at all incurred by PC Funding—including promissory notes issued to Defendants—therefore rendered PC Funding insolvent, undercapitalized, and unable to pay debts as they came due. PC Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first PC Funding Transfer, and remained insolvent as of the date of each and every subsequent PC Funding Transfer.

323.    Furthermore, none of the SPEs, including PC Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds. The SPEs, including PC Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

324.    PCI and PC Funding received less than reasonably equivalent value in exchange for each and every PCI Direct Transfer, PCI MGLLC Transfer, PCI SPE Transfer, and PC Funding Transfer. Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors. Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those

98

funds would be used to finance the purchase of consumer electronics.  Those funds were not

used to purchase electronics, but rather to repay fraudulent obligations incurred to other

investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi

scheme, PwC found that only a miniscule amount could have related to legitimate purchases or

sales of consumer electronics, and the Associates, including those who operated the purported

Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the

Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going

back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation,

and every or nearly every investor was paid with funds obtained from other investors—who

themselves had previously been induced by the same intentional, fraudulent misrepresentations

to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any

sales of consumer electronics.  Each payment to an investor was made for less than reasonably

equivalent value, because any such payment was the consummation of the two-stage use of

fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase

the identified goods, but rather to repay other investors.

325.    The PCI Transfers, PCI MGLLC Transfers, PCI SPE Transfers, and PC Funding

Transfers were made to or for the benefit of the Defendants in furtherance of a fraudulent

investment scheme.

326.    To the extent that the Defendants are not initial transferees of the PCI Direct

Transfers or the PC Funding Transfers, they are immediate or mediate transferees of the initial

transferees of the PCI Direct Transfers or the PC Funding Transfers (including, for instance, DZ

Bank, whose loans to the Opportunity Finance Defendants were paid back using funds the

Opportunity Finance Defendants received from the SPEs).  Defendants are also direct transferees

99

of MGLLC, and thus subsequent transferees of any funds transferred in the PCI MGLLC

Transfers.  And Defendants are direct transferees of PC Funding and SPF Funding, and thus

subsequent transferees of the PCI SPE Transfers.

327.    Defendants cannot satisfy their burden to show that they took any such

subsequent transfers for value or in good faith.  The numerous red flags and/or indications of

Defendants' actual or constructive knowledge of the scheme include but are not limited to the

facts set forth in Section III.B.

328.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b), 550(a), and 551 and Minn. Stat. §§ 513.45(a) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states: (a) avoiding and preserving the PCI Direct Transfers, PCI

MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest of the

Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the PC

Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an amount

not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an amount not

less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from MGLLC to

Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI, subsequent

transfers from SPF Funding to Defendants in an amount not less than $287,674,849;

(g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an

amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by

Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of

not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than

$14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than

100

$143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the

Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance

Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and

costs from Defendants.

<div align="center">

**COUNT IX – PREFERENTIAL TRANSFERS**

**[11 U.S.C. §§ 547, 550, and 551]**

**Against the Opportunity Finance Defendants for avoidance and recovery of
Preference Period Transfers**

</div>

329.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

330.    At the time of each of the Preference Period Transfers, to the extent their

promissory notes were enforceable, the Opportunity Finance Defendants were "creditors" of PC

Funding within the meaning of Section 101(1) of the Bankruptcy Code.

331.    Each of the Preference Period Transfers constitutes a transfer of an interest of PC

Funding in property within the meaning of Section 101(54) of the Bankruptcy Code.

332.    Each of the Preference Period Transfers was to or for the benefit of the

Opportunity Finance Defendants.

333.    To the extent the Opportunity Finance Defendants' promissory notes were

enforceable, each of the Preference Period Transfers was made for or on account of an

antecedent debt owed by PC Funding before such transfer was made.

334.    Virtually all, if not all, of the funds that were obtained through fraud, and thus PC

Funding also operated solely with funds it should never have possessed.  Any debts at all

incurred by PC Funding—including promissory notes issued to Defendants—therefore rendered

PC Funding insolvent, undercapitalized, and unable to pay debts as they came due.  PC Funding

<div align="center">101</div>

was insolvent no later than the first time it incurred any debt, which was before the date of the

first Preference Period Transfer, and remained insolvent as of the date of each and every

subsequent Preference Period Transfer.

335.    Furthermore, none of the SPEs, including PC Funding, was able to pay even basic

expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI

and certain Defendants, for funds.  The SPEs, including PC Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

336.    Each of the Preference Period Transfers was made during the Preference Period

under section 547(b)(4) of the Bankruptcy Code.

337.    Each of the Preference Period Transfers enabled the Opportunity Finance

Defendants to receive more than the Opportunity Finance Defendants would receive if (i) this

case were a case under Chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made;

and (iii) the Opportunity Finance Defendants received payment of such debt to the extent

provided by the provisions of the Bankruptcy Code.

338.    Each of the Preference Period Transfers constitutes a preferential transfer

avoidable by the Trustee pursuant to Section 547(b) of the Bankruptcy Code and recoverable

from the Opportunity Finance Defendants pursuant to Section 550(a).

339.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to

sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the

Preference Period Transfers free and clear from any claimed interest of the Opportunity Finance

Defendants; (b) directing that the Preference Period Transfers be set aside; (c) recovering the

Preference Period Transfers in an amount not less than $9,238,419 from the Opportunity Finance

Defendants for the benefit of the bankruptcy estate of PC Funding; and (d) recovering

prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance

Defendants.

## COUNT X – ACTUAL FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§
513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants for avoidance and recovery of the
SPF Funding/Opportunity Finance Transfers and against DZ Bank for avoidance and
recovery of the SPF Funding/DZ Bank Transfers**

340.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

341.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

342.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

103

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

343.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured

claim.

344.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers were made with actual intent to hinder, delay, or defraud a creditor to which the

Debtors were or became indebted on or after the date of the SPF Funding/Opportunity Finance

Transfers and SPF Funding/DZ Bank Transfers.  Petters, through PCI and the SPEs, obtained

funds from investors on the basis of fraudulent misrepresentations that those funds would be

used to finance the purchase of consumer electronics.  Those funds were not used to purchase

electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82

*billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that

only a miniscule amount could have related to legitimate purchases or sales of consumer

electronics, and the Associates, including those who operated the purported Vendors, stated that

the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.

Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-

late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly

every investor was paid with funds obtained from other investors—who themselves had

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer

electronics.

345.     In this manner, the Ponzi scheme was conducted through the successive misdirection of investors' cash infusions toward the payment of earlier investments.  All the funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi scheme.

346.     The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were made to or for the benefit of the Opportunity Finance Defendants and DZ Bank in furtherance of a fraudulent investment scheme.

347.     To the extent that the Opportunity Finance Defendants and DZ Bank are not initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, they are immediate or mediate transferees of the initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, and cannot satisfy their burden that they took the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers for value or in good faith.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme, include but are not limited to the facts set forth in Section III.B.

348.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF Funding/ Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set aside;

(c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less than

$164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy estate

SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not less than

$78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding;

(e) alternatively, recovering false profits in an amount not less than $12,234,156; and

(f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the

Opportunity Finance Defendants.

### COUNT XI – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat.
§§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants for avoidance and recovery of the
SPF Funding/Opportunity Finance Transfers and against DZ Bank for avoidance and
recovery of the SPF Funding/DZ Bank Transfers**

349.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

350.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

351.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

106

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

352.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured

claim.

353.    At all times material hereto, SPF Funding was: (a) insolvent on the dates the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were made or

became insolvent as a result of those transfers; and/or (b) engaged in businesses or transactions,

or was about to engage in businesses or transactions, for which the property remaining with SPF

Funding after the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers were effectuated constituted unreasonably small capital—in fact, records reflect as

little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any

capital contribution for PC Funding; and/or (c) at the time of the SPF Funding/Opportunity

Finance Transfers and SPF Funding/DZ Bank Transfers, intended to incur, or believed that it

would incur, debts that would be beyond its ability to pay as the debts matured.

354.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

any debt—which was before the date of the first SPF Funding/Opportunity Finance Transfer and

first SPF Funding/DZ Bank Transfer—and remained insolvent as of the date of each and every

subsequent SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.

355.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even

basic expenses—such as legal fees or corporate filing fees—but depended upon others, including

PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

356.    SPF Funding received less than reasonably equivalent value in exchange for each

and every SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.

Each such transfer consisted of misappropriated funds obtained not through legitimate

transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs,

obtained funds from investors on the basis of fraudulent misrepresentations that those funds

would be used to finance the purchase of consumer electronics.  Those funds were not used to

purchase electronics, but rather to repay fraudulent obligations incurred to other investors.

Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC

found that only a miniscule amount could have related to legitimate purchases or sales of

consumer electronics, and the Associates, including those who operated the purported Vendors,

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

108

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer

electronics.  Each payment to an investor was made for less than reasonably equivalent value,

because any such payment was the consummation of the two-stage use of fraudulent inducement

and fraudulent misappropriation of funds from investors, not to purchase the identified goods,

but rather to repay other investors.

357.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers were made to or for the benefit of the Opportunity Finance Defendants and DZ Bank in

furtherance of a fraudulent investment scheme.

358.    To the extent that the Opportunity Finance Defendants and DZ Bank are not

initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers, they are immediate or mediate transferees of the initial transferees of the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, and cannot satisfy

their burden that they took the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ

Bank Transfers for value or in good faith.  The numerous red flags and/or indications of

Defendants' actual or constructive knowledge of the scheme, include but are not limited to the

facts set forth in Section III.B.

359.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear

from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that

109

the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set

aside; (c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less

than $164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy

estate of SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not

less than $78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding;

(e) alternatively, recovering false profits in an amount not less than $12,234,156; and

(f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the

Opportunity Finance Defendants.

## COUNT XII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat.
§§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants for avoidance and recovery of the
SPF Funding/Opportunity Finance Transfers and against DZ Bank for avoidance and
recovery of the SPF Funding/DZ Bank Transfers**

360.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

361.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

110

362.    At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

363.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

364.    At all times material hereto, SPF Funding was: (a) insolvent on the dates the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were made or became insolvent as a result of those transfers; and/or (b) engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with SPF Funding after the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

365.    Virtually all, if not all, of the funds that passed through SPF Funding were funds originally obtained through fraud, and thus SPF Funding operated solely with funds it should

111

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred any debt—which was before the date of the first SPF Funding/Opportunity Finance Transfer and first SPF Funding/DZ Bank Transfer—and remained insolvent as of the date of each and every subsequent SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.

366.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

367.    SPF Funding received less than reasonably equivalent value in exchange for each and every SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

112

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer

electronics.  Each payment to an investor was made for less than reasonably equivalent value,

because any such payment was the consummation of the two-stage use of fraudulent inducement

and fraudulent misappropriation of funds from investors, not to purchase the identified goods,

but rather to repay other investors.

368.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers were made to or for the benefit of the Opportunity Finance Defendants and DZ Bank in

furtherance of a fraudulent investment scheme.

369.    To the extent that the Opportunity Finance Defendants and DZ Bank are not

initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers, they are immediate or mediate transferees of the initial transferees of the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, and cannot satisfy

their burden that they took the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ

Bank Transfers for value or in good faith.  The numerous red flags and/or indications of

Defendants' actual or constructive knowledge of the scheme, include but are not limited to the

facts set forth in Section III.B.

370.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF

113

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear

from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that

the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set

aside; (c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less

than $164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy

estate of SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not

less than $78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding;

(e) alternatively, recovering false profits in an amount not less than $12,234,156; and

(f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the

Opportunity Finance Defendants.

## COUNT XIII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a) and 551, and Minn. Stat. §§ 513.45(a)
and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against the Opportunity Finance Defendants for avoidance and recovery of the
SPF Funding/Opportunity Finance Transfers and against DZ Bank for avoidance and
recovery of the SPF Funding/DZ Bank Transfers**

371.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

372.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).

373.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

114

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

374.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured

claim.

375.    At all times material hereto, SPF Funding was: (a) insolvent on the dates the SPF

Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were made or

became insolvent as a result of those transfers; and/or (b) engaged in businesses or transactions,

or was about to engage in businesses or transactions, for which the property remaining with SPF

Funding after the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank

Transfers were effectuated constituted unreasonably small capital—in fact, records reflect as

little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any

capital contribution for PC Funding; and/or (c) at the time of the SPF Funding/Opportunity

Finance Transfers and SPF Funding/DZ Bank Transfers, intended to incur, or believed that it

would incur, debts that would be beyond its ability to pay as the debts matured.

376.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

115

any debt—which was before the date of the first SPF Funding/Opportunity Finance Transfer and

first SPF Funding/DZ Bank Transfer—and remained insolvent as of the date of each and every

subsequent SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.

377.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even

basic expenses—such as legal fees or corporate filing fees—but depended upon others, including

PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

378.    SPF Funding received less than reasonably equivalent value in exchange for each

and every SPF Funding/Opportunity Finance Transfer and SPF Funding/DZ Bank Transfer.

Each such transfer consisted of misappropriated funds obtained not through legitimate

transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs,

obtained funds from investors on the basis of fraudulent misrepresentations that those funds

would be used to finance the purchase of consumer electronics.  Those funds were not used to

purchase electronics, but rather to repay fraudulent obligations incurred to other investors.

Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC

found that only a miniscule amount could have related to legitimate purchases or sales of

consumer electronics, and the Associates, including those who operated the purported Vendors,

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

116

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics. Each payment to an investor was made for less than reasonably equivalent value, because any such payment was the consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase the identified goods, but rather to repay other investors.

379.    The SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers were made to or for the benefit of the Opportunity Finance Defendants and DZ Bank in furtherance of a fraudulent investment scheme.

380.    To the extent that the Opportunity Finance Defendants and DZ Bank are not initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, they are immediate or mediate transferees of the initial transferees of the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers, and cannot satisfy their burden that they took the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers for value or in good faith. The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme, include but are not limited to the facts set forth in Section III.B.

381.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set aside;

117

(c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less than

$164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy estate

of SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not less than

$78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding;

(e) alternatively, recovering false profits in an amount not less than $12,234,156; and

(f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the

Opportunity Finance Defendants.

## COUNT XIV– ACTUAL FRAUDULENT TRANSFERS

### [Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551]

**Against Defendant Sabes Family Foundation for avoidance and recovery of the
Sabes Family Foundation Two-Year Transfers**

382.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

383.    The Sabes Family Foundation Two-Year Transfers from SPF Funding were made

with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became

indebted on or after the date of the Fraudulent Transfers.  Petters, through PCI and the SPEs,

obtained funds from investors on the basis of fraudulent misrepresentations that those funds

would be used to finance the purchase of consumer electronics.  Those funds were not used to

purchase electronics, but rather to repay fraudulent obligations incurred to other investors.

Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC

found that only a miniscule amount could have related to legitimate purchases or sales of

consumer electronics, and the Associates, including those who operated the purported Vendors,

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, every "investment" into the Ponzi scheme, going back to the mid-to-late 1990s,

118

was obtained through intentional, fraudulent misrepresentation, and every investor was paid with

funds obtained from other investors—who themselves had previously been induced by the same

intentional, fraudulent misrepresentations to provide funds to PCI—and not from the proceeds of

any sales of consumer electronics.

384.    In this manner, the Ponzi scheme was conducted through the successive

misdirection of investors' cash infusions toward the payment of earlier investments.  All the

funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and

laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi

scheme.

385.    The Sabes Family Foundation Two-Year Transfers were made to or for the

benefit of the Sabes Family Foundation in furtherance of a fraudulent investment scheme.

386.    To the extent that the Sabes Family Foundation is not an initial transferee of the

Sabes Family Foundation Two-Year Transfers, it is an immediate or mediate transferee of the

initial transferees of the Sabes Family Foundation Two-Year Transfers, and cannot satisfy its

burden that it took the Sabes Family Foundation Two-Year Transfers for value and in good faith

and without knowledge of the voidability of the Sabes Family Foundation Two-Year Transfers.

The numerous red flags and/or indications of Defendants' actual or constructive knowledge of

the scheme, include but are not limited to the facts set forth in Section III.B.

387.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 548(a)(1)(A), 550(a), and 551: (a) avoiding and preserving the Sabes

Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes

Family Foundation; (b) directing that the Sabes Family Foundation Two-Year Transfers be set

aside; (c) recovering such Sabes Family Foundation Two-Year Transfers in an amount not less

119

than $12,469,571 from the Sabes Family Foundation for the benefit of the estate of SPF Funding;

(d) alternatively, recovering false profits in an amount not less than $12,469,571; and (e)

recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes

Family Foundation.

## COUNT XV – CONSTRUCTIVE FRAUDULENT TRANSFERS

### [Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551]

**Against Defendant Sabes Family Foundation for avoidance and recovery of the
Sabes Family Foundation Two-Year Transfers**

388.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

389.    At all times material hereto, SPF Funding was: (a) insolvent on the dates the

Sabes Family Foundation Two-Year Transfers were made or became insolvent as a result of the

Sabes Family Foundation Two-Year Transfers; and/or (b) engaged in businesses or transactions,

or was about to engage in businesses or transactions, for which the property remaining with SPF

Funding after the Sabes Family Foundation Two-Year Transfers were effectuated constituted

unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for

PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or

(c) at the time of the Sabes Family Foundation Two-Year Transfers, intended to incur, or

believed it would incur, debts that would be beyond its ability to pay as the debts matured.

390.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

120

any debt, which was before the date of the first Sabes Family Foundation Two-Year Transfer, and remained insolvent as of the date of each and every subsequent Sabes Family Foundation Two-Year Transfer.

391.     Furthermore, none of the SPEs, including SPF Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital, and/or unable to pay their debts as they came due.

392.     SPF Funding received less than reasonably equivalent value in exchange for each and every Sabes Family Foundation Two-Year Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's

121

own funds, and not from the proceeds of any sales of consumer electronics. Each payment to an
investor was made for less than reasonably equivalent value, because any such payment was the
consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of
funds from investors, not to purchase the identified goods, but rather to repay other investors.

393.    To the extent that the Sabes Family Foundation is not an initial transferee of the
Sabes Family Foundation Two-Year Transfers, it is an immediate or mediate transferee of the
initial transferees of the Sabes Family Foundation Two-Year Transfers, and cannot satisfy its
burden that it took the Sabes Family Foundation Two-Year Transfers for value and in good faith
and without knowledge of the voidability of the Sabes Family Foundation Two-Year Transfers.
The numerous red flags and/or indications of Defendants' actual or constructive knowledge of
the scheme, include but are not limited to the facts set forth in Section III.B.

394.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to
Bankruptcy Code §§ 548(a)(1)(B), 550(a), and 551: (a) avoiding and preserving the Sabes
Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes
Family Foundation; (b) directing that the Sabes Family Foundation Two-Year Transfers be set
aside; (c) recovering such Sabes Family Foundation Two-Year Transfers in the amount of
$12,469,571 from the Sabes Family Foundation for the benefit of the estate of SPF Funding;
(d) alternatively, recovering false profits in the amount of $12,469,571; and (e) recovering
prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family
Foundation.

## COUNT XVI – ACTUAL FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers**

395.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

396.    At all times material hereto, there was and is at least one or more creditors, as specifically identified in Section IV, who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to assert the claims herein because he may avoid any transfer of property of a debtor or any obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor that extended credit to the debtor at the time of the Petition Date, whether or not such creditor exists.

397.    At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

398.    The Sabes Family Foundation Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

123

399.    The Sabes Family Foundation Transfers were made with actual intent to hinder,
delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of
the Sabes Family Foundation Transfers.  Petters, through PCI and the SPEs, obtained funds from
investors on the basis of fraudulent misrepresentations that those funds would be used to finance
the purchase of consumer electronics.  Those funds were not used to purchase electronics, but
rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed
through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule
amount could have related to legitimate purchases or sales of consumer electronics, and the
Associates, including those who operated the purported Vendors, stated that the Vendors
engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually
every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was
obtained through intentional, fraudulent misrepresentation, and every or nearly every investor
was paid with funds obtained from other investors—who themselves had previously been
induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from
the investor's own funds, and not from the proceeds of any sales of consumer electronics.

400.    In this manner, the Ponzi scheme was conducted through the successive
misdirection of investors' cash infusions toward the payment of earlier investments.  All the
funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and
laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi
scheme.

401.    The Sabes Family Foundation Transfers were made to or for the benefit of the
Sabes Family Foundation in furtherance of a fraudulent investment scheme.

124

402.    To the extent that the Sabes Family Foundation is not an initial transferee of the

Sabes Family Foundation Transfers, it is an immediate or mediate transferee of the initial

transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took

the Sabes Family Foundation Transfers for value or in good faith.  The numerous red flags

and/or indications of Defendants' actual or constructive knowledge of the scheme, include but

are not limited to the facts set forth in Section III.B.

403.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the Sabes Family

Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation;

(b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes

Family Foundation Transfers in an amount not less than $29,495,341 from the Sabes Family

Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering

false profits in an amount not less than $29,495,341; and (e) recovering prejudgment and post-

judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

## COUNT XVII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat.
§§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

### Against Defendant Sabes Family Foundation for avoidance and recovery of the
### Sabes Family Foundation Transfers

404.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

405.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

406.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

407.    The Sabes Family Foundation Transfers are avoidable under applicable non-

bankruptcy law by a creditor holding an unsecured claim.

408.    At all times material hereto, SPF Funding: (a) was insolvent on the dates the

Sabes Family Foundation Transfers were made or became insolvent as a result of the Sabes

Family Foundation Transfers; and/or (b) was engaged in businesses or transactions, or was about

to engage in businesses or transactions, for which the property remaining with the Debtors after

the Sabes Family Foundation Transfers were effectuated constituted unreasonably small

capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF

Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of

126

the Sabes Family Foundation Transfers, intended to incur, or believed that it would incur, debts

that would be beyond its ability to pay as the debts matured.

409.     Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

any debt, which was before the date of the first Sabes Family Foundation Transfer, and remained

insolvent as of the date of each and every subsequent Sabes Family Foundation Transfer.

410.     Furthermore, none of the SPEs, including SPF Funding, was able to pay even

basic expenses—such as legal fees or corporate filing fees—but depended upon others, including

PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

411.     SPF Funding received less than reasonably equivalent value in exchange for each

and every Sabes Family Foundation Transfer.  Each such transfer consisted of misappropriated

funds obtained not through legitimate transactions, but through fraudulent inducement of

investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of

fraudulent misrepresentations that those funds would be used to finance the purchase of

consumer electronics.  Those funds were not used to purchase electronics, but rather to repay

fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's

main bank account during the Ponzi scheme, PwC found that only a miniscule amount could

have related to legitimate purchases or sales of consumer electronics, and the Associates,

including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme. Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics. Each payment to an investor was made for less than reasonably equivalent value, because any such payment was the consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase the identified goods, but rather to repay other investors.

412.    The Sabes Family Foundation Transfers were made to or for the benefit of the Sabes Family Foundation in furtherance of a fraudulent investment scheme.

413.    To the extent that the Sabes Family Foundation is not an initial transferee of the Sabes Family Foundation Transfers, it is an immediate or mediate transferee of the initial transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took the Sabes Family Foundation Transfers for value or in good faith. The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme, include but are not limited to the facts set forth in Section III.B.

414.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation;

(b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes

Family Foundation Transfers in the amount of at least $29,495,341 from the Sabes Family

Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering

false profits in the amount of at least $29,495,341; and (e) recovering prejudgment and post-

judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

### COUNT XVIII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat.
§§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant Sabes Family Foundation for avoidance and recovery of the
Sabes Family Foundation Transfers**

415.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

416.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

417.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

129

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

418.    The Sabes Family Foundation Transfers are avoidable under applicable non-

bankruptcy law by a creditor holding an unsecured claim.

419.    At all times material hereto, SPF Funding: (a) was insolvent on the dates the

Sabes Family Foundation Transfers were made or became insolvent as a result of the Sabes

Family Foundation Transfers; and/or (b) was engaged in businesses or transactions, or was about

to engage in businesses or transactions, for which the property remaining with the Debtors after

the Sabes Family Foundation Transfers were effectuated constituted unreasonably small

capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF

Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of

the Sabes Family Foundation Transfers, intended to incur, or believed that it would incur, debts

that would be beyond its ability to pay as the debts matured.

420.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

any debt, which was before the date of the first Sabes Family Foundation Transfer, and remained

insolvent as of the date of each and every subsequent Sabes Family Foundation Transfer.

421.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even

basic expenses—such as legal fees or corporate filing fees—but depended upon others, including

130

PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

422.    SPF Funding received less than reasonably equivalent value in exchange for each and every Sabes Family Foundation Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly every investor was paid with funds obtained from other investors—who themselves had previously been induced by the same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an investor was made for less than reasonably equivalent value, because any such payment was the consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of funds from investors, not to purchase the identified goods, but rather to repay other investors.

131

423.    The Sabes Family Foundation Transfers were made to or for the benefit of the Sabes Family Foundation in furtherance of a fraudulent investment scheme.

424.    To the extent that the Sabes Family Foundation is not an initial transferee of the Sabes Family Foundation Transfers, it is an immediate or mediate transferee of the initial transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took the Sabes Family Foundation Transfers for value or in good faith.  The numerous red flags and/or indications of Defendants' actual or constructive knowledge of the scheme, include but are not limited to the facts set forth in Section III.B.

425.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes Family Foundation Transfers in the amount of at least $29,495,341 from the Sabes Family Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering false profits in the amount of at least $29,495,341; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

## COUNT XIX – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a) and 551, and Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]**

### Against Defendant Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers

426.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

132

427. At all times material hereto, there was and is at least one or more creditors, as specifically identified in Section IV, who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

428. At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

429. The Sabes Family Foundation Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

430. At all times material hereto, SPF Funding: (a) was insolvent on the dates the Sabes Family Foundation Transfers were made or became insolvent as a result of the Sabes Family Foundation Transfers; and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with the Debtors after the Sabes Family Foundation Transfers were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the Sabes Family Foundation Transfers, intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

431.    Virtually all, if not all, of the funds that passed through SPF Funding were funds originally obtained through fraud, and thus SPF Funding operated solely with funds it should never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first Sabes Family Foundation Transfer, and remained insolvent as of the date of each and every subsequent Sabes Family Foundation Transfer.

432.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

433.    SPF Funding received less than reasonably equivalent value in exchange for each and every Sabes Family Foundation Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors, stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.  Thus, virtually every, if not

every, "investment" into the Ponzi scheme, going back to the mid-to-late 1990s, was obtained

through intentional, fraudulent misrepresentation, and every or nearly every investor was paid

with funds obtained from other investors—who themselves had previously been induced by the

same intentional, fraudulent misrepresentations to provide funds to PCI—or from the investor's

own funds, and not from the proceeds of any sales of consumer electronics.  Each payment to an

investor was made for less than reasonably equivalent value, because any such payment was the

consummation of the two-stage use of fraudulent inducement and fraudulent misappropriation of

funds from investors, not to purchase the identified goods, but rather to repay other investors.

434.    The Sabes Family Foundation Transfers were made to or for the benefit of the

Sabes Family Foundation in furtherance of a fraudulent investment scheme.

435.    To the extent that the Sabes Family Foundation is not an initial transferee of the

Sabes Family Foundation Transfers, it is an immediate or mediate transferee of the initial

transferees of the Sabes Family Foundation Transfers, and cannot satisfy its burden that it took

the Sabes Family Foundation Transfers for value or in good faith.  The numerous red flags

and/or indications of Defendants' actual or constructive knowledge of the scheme, include but

are not limited to the facts set forth in Section III.B.

436.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states: (a) avoiding and preserving the Sabes Family Foundation

Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing

that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes Family

Foundation Transfers in the amount of at least $29,495,341 from the Sabes Family Foundation

for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering false profits

in the amount of at least $29,495,341; and (e) recovering prejudgment and post-judgment

interest, attorneys' fees, and costs from the Sabes Family Foundation.

## COUNT XX – ACTUAL FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§
513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant The Minneapolis Foundation for avoidance and recovery of the
SPF Funding/Minneapolis Foundation Transfers and against Defendant Sabes LP for
avoidance and recovery of the SPF Funding/Sabes LP Transfer**

437.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

438.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

439.    At all times material hereto, there was and is at least one or more creditors who

held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims

against the Defendants did not arise, exist or accrue at any time until within the six years before

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-
captioned bankruptcy cases.

440.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP
Transfer are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured
claim.

441.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP
Transfer were made with actual intent to hinder, delay, or defraud a creditor to which the Debtors
were or became indebted on or after the date of the SPF Funding/Minneapolis Foundation
Transfers or SPF Funding/Sabes LP Transfer.  Petters, through PCI and the SPEs, obtained funds
from investors on the basis of fraudulent misrepresentations that those funds would be used to
finance the purchase of consumer electronics.  Those funds were not used to purchase
electronics, but rather to repay fraudulent obligations incurred to other investors.  Of the $82
*billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that
only a miniscule amount could have related to legitimate purchases or sales of consumer
electronics, and the Associates, including those who operated the purported Vendors, stated that
the Vendors engaged in essentially no legitimate transactions throughout the Ponzi scheme.
Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to the mid-to-
late 1990s, was obtained through intentional, fraudulent misrepresentation, and every or nearly
every investor was paid with funds obtained from other investors—who themselves had
previously been induced by the same intentional, fraudulent misrepresentations to provide funds
to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer
electronics.

442.     In this manner, the Ponzi scheme was conducted through the successive misdirection of investors' cash infusions toward the payment of earlier investments.  All the funds loaned to PCI and the SPEs, and all the funds paid back to investors, were infused into and laundered through the main churn of the Ponzi scheme's operation, which perpetuated the Ponzi scheme.

443.     The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were made to or for the benefit of The Minneapolis Foundation and Sabes LP in furtherance of a fraudulent investment scheme.

444.     To the extent that The Minneapolis Foundation and Sabes LP are not initial transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, they are immediate or mediate transferees of the initial transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, and cannot satisfy their burden that they took the SPF Funding/ Minneapolis Foundation Transfers or SPF Funding/Sabes LP for value or in good faith.

445.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP Transfer free and clear from any claimed interest of Sabes LP; (c) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $10,992,351 from The

Minneapolis Foundation for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least $10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and (h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation.

## COUNT XXI – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant The Minneapolis Foundation for avoidance and recovery of the SPF Funding/Minneapolis Foundation Transfers and against Defendant Sabes LP for avoidance and recovery of the SPF Funding/Sabes LP Transfer**

446.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Fourth Amended Complaint as if fully set forth herein.

447.    At all times material hereto, there was and is at least one or more creditors, as specifically identified in Section IV, who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to assert the claims herein because he may avoid any transfer of property of a debtor or any obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor that extended credit to the debtor at the time of the Petition Date, whether or not such creditor exists.

448.    At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before

139

the first date on which a bankruptcy petition was filed by any debtor in the above-captioned

bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting

deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six

years before the first date on which a bankruptcy petition was filed by any Debtor in the above-

captioned bankruptcy cases.

449.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP

Transfer are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured

claim.

450.    At all times material hereto, SPF Funding: (a) was insolvent on the dates the SPF

Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were made or

became insolvent as a result of the SPF Funding/Minneapolis Foundation Transfers and/or SPF

Funding/Sabes LP Transfer; and/or (b) was engaged in businesses or transactions, or was about

to engage in businesses or transactions, for which the property remaining with SPF Funding after

the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were

effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of

initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution

for PC Funding; and/or (c) at the time of the SPF Funding/Minneapolis Foundation Transfers and

SPF Funding/Sabes LP Transfer intended to incur, or believed that it would incur, debts that

would be beyond its ability to pay as the debts matured.

451.    Virtually all, if not all, of the funds that passed through SPF Funding were funds

originally obtained through fraud, and thus SPF Funding operated solely with funds it should

never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes

issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable

140

to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred

any debt, which was before the date of the first SPF Funding/Minneapolis Foundation Transfer

and the SPF Funding/Sabes LP Transfer, and remained insolvent as of the date of each and every

subsequent SPF Funding/Minneapolis Foundation Transfer.

452.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even

basic expenses—such as legal fees or corporate filing fees—but depended upon others, including

PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always

insolvent, operating with unreasonably small capital and/or unable to pay their debts as they

came due.

453.    SPF Funding received less than reasonably equivalent value in exchange for each

and every SPF Funding/Minneapolis Foundation Transfer and the SPF Funding/Sabes LP

Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate

transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs,

obtained funds from investors on the basis of fraudulent misrepresentations that those funds

would be used to finance the purchase of consumer electronics.  Those funds were not used to

purchase electronics, but rather to repay fraudulent obligations incurred to other investors.  Of

the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC

found that only a miniscule amount could have related to legitimate purchases or sales of

consumer electronics, and the Associates, including those who operated the purported Vendors,

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

141

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer

electronics. Each payment to an investor was made for less than reasonably equivalent value,

because any such payment was the consummation of the two-stage use of fraudulent inducement

and fraudulent misappropriation of funds from investors, not to purchase the identified goods,

but rather to repay other investors.

454. The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP

Transfer were made to or for the benefit of The Minneapolis Foundation and Sabes LP in

furtherance of a fraudulent investment scheme.

455. To the extent that The Minneapolis Foundation and Sabes LP are not initial

transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP

Transfer, they are immediate or mediate transferees of the initial transferees of the SPF

Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, and cannot

satisfy their burden that they took the SPF Funding/Minneapolis Foundation Transfers or SPF

Funding/Sabes LP Transfer for value or in good faith.

456. As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF

Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The

Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP Transfer free

and clear from any claimed interest of the Sabes LP; (c) directing that the SPF

Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF

142

Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis

Foundation Transfers in the amount of at least $10,992,351 from The Minneapolis Foundation

for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes

LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy

estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least

$10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and

(h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The

Minneapolis Foundation.

## COUNT XXII – CONSTRUCTIVE FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(a), 544(b), 550(a) and 551, and Minn. Stat.
§§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against Defendant The Minneapolis Foundation for avoidance and recovery of the
SPF Funding/Minneapolis Foundation Transfers and against Defendant Sabes LP for
avoidance and recovery of the SPF Funding/Sabes LP Transfer**

457.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

458.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).  Alternatively, the Trustee has standing to

assert the claims herein because he may avoid any transfer of property of a debtor or any

obligation incurred by a debtor that is voidable by a judicial lien or unsatisfied execution creditor

that extended credit to the debtor at the time of the Petition Date, whether or not such creditor

exists.

143

459.    At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

460.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

461.    At all times material hereto, SPF Funding: (a) was insolvent on the dates the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were made or became insolvent as a result of the SPF Funding/Minneapolis Foundation Transfers and/or SPF Funding/Sabes LP Transfer; and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with SPF Funding after the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

144

462.    Virtually all, if not all, of the funds that passed through SPF Funding were funds originally obtained through fraud, and thus SPF Funding operated solely with funds it should never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first SPF Funding/Minneapolis Foundation Transfer and the SPF Funding/Sabes LP Transfer, and remained insolvent as of the date of each and every subsequent SPF Funding/Minneapolis Foundation Transfer.

463.    Furthermore, none of the SPEs, including SPF Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

464.    SPF Funding received less than reasonably equivalent value in exchange for each and every SPF Funding/Minneapolis Foundation Transfer and the SPF Funding/Sabes LP Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors. Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors,

145

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer

electronics.  Each payment to an investor was made for less than reasonably equivalent value,

because any such payment was the consummation of the two-stage use of fraudulent inducement

and fraudulent misappropriation of funds from investors, not to purchase the identified goods,

but rather to repay other investors.

465.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP

Transfer were made to or for the benefit of The Minneapolis Foundation and Sabes LP in

furtherance of a fraudulent investment scheme.

466.    To the extent that The Minneapolis Foundation and Sabes LP are not initial

transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP

Transfer, they are immediate or mediate transferees of the initial transferees of the SPF

Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, and cannot

satisfy their burden that they took the SPF Funding/ Minneapolis Foundation Transfers or SPF

Funding/Sabes LP Transfer for value or in good faith.

467.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states: (a) avoiding and preserving the SPF

146

Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The

Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP Transfer free

and clear from any claimed interest of the Sabes LP; (c) directing that the SPF

Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF

Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis

Foundation Transfers in the amount of at least $10,992,351 from The Minneapolis Foundation

for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes

LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy

estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least

$10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and

(h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The

Minneapolis Foundation.

## COUNT XXIII – CONSTRUCTIVE FRAUDULENT TRANSFERS

### [Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a) and 551, and Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]

### Against Defendant The Minneapolis Foundation for avoidance and recovery of the SPF Funding/Minneapolis Foundation Transfers and against Defendant Sabes LP for avoidance and recovery of the SPF Funding/Sabes LP Transfer

468.    The Trustee realleges and incorporates by reference the preceding paragraphs of

the Fourth Amended Complaint as if fully set forth herein.

469.    At all times material hereto, there was and is at least one or more creditors, as

specifically identified in Section IV, who held and who hold unsecured claims against the

Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not

allowable only under Bankruptcy Code § 502(e).

147

470.     At all times material hereto, there was and is at least one or more creditors who held and who hold allowed and allowable claims, as identified in Section IV, (a) whose claims against the Defendants did not arise, exist or accrue at any time until within the six years before the first date on which a bankruptcy petition was filed by any debtor in the above-captioned bankruptcy cases, and (b) who neither had actual knowledge nor discovered facts constituting deemed notice of the nature of Petters' fraud and the Ponzi scheme at any time until within six years before the first date on which a bankruptcy petition was filed by any Debtor in the above-captioned bankruptcy cases.

471.     The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim.

472.     At all times material hereto, SPF Funding: (a) was insolvent on the dates the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were made or became insolvent as a result of the SPF Funding/Minneapolis Foundation Transfers and/or SPF Funding/Sabes LP Transfer; and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with SPF Funding after the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer were effectuated constituted unreasonably small capital—in fact, records reflect as little as $5,000 of initial capitalization for PCI, $500 for SPF Funding, and no evidence of any capital contribution for PC Funding; and/or (c) at the time of the SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP Transfer intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

148

473.     Virtually all, if not all, of the funds that passed through SPF Funding were funds originally obtained through fraud, and thus SPF Funding operated solely with funds it should never have possessed.  Any debts at all incurred by SPF Funding—including promissory notes issued to Defendants—therefore rendered SPF Funding insolvent, undercapitalized, and unable to pay debts as they came due.  SPF Funding was insolvent no later than the first time it incurred any debt, which was before the date of the first SPF Funding/Minneapolis Foundation Transfer and the SPF Funding/Sabes LP Transfer, and remained insolvent as of the date of each and every subsequent SPF Funding/Minneapolis Foundation Transfer.

474.     Furthermore, none of the SPEs, including SPF Funding, was able to pay even basic expenses—such as legal fees or corporate filing fees—but depended upon others, including PCI and certain Defendants, for funds.  The SPEs, including SPF Funding, were therefore always insolvent, operating with unreasonably small capital and/or unable to pay their debts as they came due.

475.     SPF Funding received less than reasonably equivalent value in exchange for each and every SPF Funding/Minneapolis Foundation Transfer and the SPF Funding/Sabes LP Transfer.  Each such transfer consisted of misappropriated funds obtained not through legitimate transactions, but through fraudulent inducement of investors.  Petters, through PCI and the SPEs, obtained funds from investors on the basis of fraudulent misrepresentations that those funds would be used to finance the purchase of consumer electronics.  Those funds were not used to purchase electronics, but rather to repay fraudulent obligations incurred to other investors. Of the $82 *billion* that passed through PCI's main bank account during the Ponzi scheme, PwC found that only a miniscule amount could have related to legitimate purchases or sales of consumer electronics, and the Associates, including those who operated the purported Vendors,

stated that the Vendors engaged in essentially no legitimate transactions throughout the Ponzi

scheme.  Thus, virtually every, if not every, "investment" into the Ponzi scheme, going back to

the mid-to-late 1990s, was obtained through intentional, fraudulent misrepresentation, and every

or nearly every investor was paid with funds obtained from other investors—who themselves had

previously been induced by the same intentional, fraudulent misrepresentations to provide funds

to PCI—or from the investor's own funds, and not from the proceeds of any sales of consumer

electronics.  Each payment to an investor was made for less than reasonably equivalent value,

because any such payment was the consummation of the two-stage use of fraudulent inducement

and fraudulent misappropriation of funds from investors, not to purchase the identified goods,

but rather to repay other investors.

476.    The SPF Funding/Minneapolis Foundation Transfers and SPF Funding/Sabes LP

Transfer were made to or for the benefit of The Minneapolis Foundation and Sabes LP in

furtherance of a fraudulent investment scheme.

477.    To the extent that The Minneapolis Foundation and Sabes LP are not initial

transferees of the SPF Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP

Transfer, they are immediate or mediate transferees of the initial transferees of the SPF

Funding/Minneapolis Foundation Transfers or SPF Funding/Sabes LP Transfer, and cannot

satisfy their burden that they took the SPF Funding/ Minneapolis Foundation Transfers or SPF

Funding/Sabes LP Transfer for value or in good faith.

478.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states: (a) avoiding and preserving the SPF Funding/Minneapolis

Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation;

(b) avoiding and preserving the SPF Funding/Sabes LP Transfer free and clear from any claimed

interest of Sabes LP; (c) directing that the SPF Funding/Minneapolis Foundation Transfers be set

aside; (d) directing that the SPF Funding/Sabes LP Transfer be set aside; (e) recovering such SPF

Funding/Minneapolis Foundation Transfers in the amount of at least $10,992,351 from The

Minneapolis Foundation for the benefit of the bankruptcy estate of SPF Funding; (f) recovering

the SPF Funding/Sabes LP Transfer in the amount of at least $4,330,000 from Sabes LP for the

benefit of the bankruptcy estate of SPF Funding; (g) alternatively, recovering false profits in the

amount of at least $10,992,351 from The Minneapolis Foundation and at least $330,000 from

Sabes LP; and (h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs

from The Minneapolis Foundation.

## COUNT XXIV – LIEN AVOIDANCE

### [11 U.S.C. § 506(d)]

### Against Defendants

479.    This Court dismissed this cause of action in its Order dated December 1, 2016.

The Trustee includes this cause of action solely to preserve any issues and reserve its rights in

the event of an appeal.

## COUNT XXV – UNJUST ENRICHMENT/EQUITABLE DISGORGEMENT

### Against Defendants

480.    This Court dismissed this cause of action in its Order dated December 1, 2016.

The Trustee includes this cause of action solely to preserve any issues and reserve its rights in

the event of an appeal.

**WHEREFORE**, the Trustee respectfully requests this Court enter judgment in favor of

Plaintiffs and against the Defendants as follows:

A.      That as a matter of law and equity, at all times relevant PC Funding was an alter

ego of Debtor PCI, the very purpose of which was to defraud and hinder the detection of the

Ponzi scheme by the creditors of PCI, and that as a result the Trustee is entitled to, and has

standing to, reverse-pierce PC Funding; that PCI and PC Funding be treated as one entity for all

intents and purposes hereto, and that the assets of PC Funding be therefore made available to the

creditors of PCI and the Trustee of PCI for all purposes;

B.      That as a matter of law and equity, at all times relevant SPF Funding was an alter

ego of Debtor PCI, the very purpose of which was to defraud and hinder the detection of the

Ponzi scheme by the creditors of PCI, and that as a result the Trustee is entitled to, and has

standing to, reverse-pierce SPF Funding; that PCI and SPF Funding be treated as one entity for

all intents and purposes hereto, and that the assets of SPF Funding be therefore made available to

the creditors of PCI and the Trustee of PCI for all purposes;

C.      On Count 1 – Fraudulently Incurred Obligations (Actual Fraud), pursuant to 11

U.S.C. §§ 548(a)(1)(A) as against the Opportunity Finance Defendants, Sabes Family

Foundation, DZ Bank, and The Minneapolis Foundation: (a) avoiding the Fraudulent Obligations

free and clear from any claimed interest of the Opportunity Finance Defendants; Sabes Family

Foundation, DZ Bank, and The Minneapolis Foundation; and (b) directing that the Fraudulent

Obligations be set aside.

D.      On Count 2 – Fraudulently Incurred Obligations (Actual Fraud), pursuant to 11

U.S.C. §§ 544(a) and 544(b), and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court

should determine that this action is governed by the laws of other states, the fraudulent transfer

laws of such other states as against the Opportunity Finance Defendants, Sabes Family

Foundation, DZ Bank, and The Minneapolis Foundation:  (a) avoiding the Fraudulent

152

Obligations free and clear from any claimed interest of the Opportunity Finance Defendants,

Sabes Family Foundation, DZ Bank, and The Minneapolis Foundation; and (b) directing that the

Fraudulent Obligations be set aside.

      E.      On Count 3 – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§

548(a)(1)(A), 550, and 551 as against the Opportunity Finance Defendants and DZ Bank for

avoidance and recovery of the PC Funding Two-Year Transfers: (a) avoiding and preserving the

PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity

Finance Defendants and/or DZ Bank; (b) directing that the PC Funding Two-Year Transfers be

set aside; (c) recovering such PC Funding Two-Year Transfers in the amount of $711,141,132

from the Opportunity Finance Defendants and DZ Bank, for the benefit of the estate of PC

Funding; (d) alternatively, recovering false profits in the amount of $90,488,713;

(e) alternatively, recovering the Buy Out Transfers from the Opportunity Finance Defendants in

the amount of $155,357,376; and (f) recovering prejudgment and post-judgment interest,

attorneys' fees, and costs from the Opportunity Finance Defendants and DZ Bank.

      F.      On Count 4 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C.

§§ 548(a)(1)(B), 550(a), and 551 as against the Opportunity Finance Defendants and DZ Bank

for avoidance and recovery of the PC Funding Two-Year Transfers: (a) avoiding and preserving

the PC Funding Two-Year Transfers free and clear from any claimed interest of the Opportunity

Finance Defendants and DZ Bank; (b) directing that the PC Funding Two-Year Transfers be set

aside; (c) recovering such PC Funding Two-Year Transfers in the amount of $711,141,132 from

the Opportunity Finance Defendants and DZ Bank, for the benefit of the estate of PC Funding;

(d) alternatively, recovering false profits in the amount of $90,488,713; (e) alternatively,

recovering the Buy Out Transfers from the Opportunity Finance Defendants in the amount of

$155,357,376; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants and DZ Bank.

      G.      On Count 5 – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 544(a), 544(b), 550, and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendants for avoidance and recovery, as initial transferees of the PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the PCI MGLLC Transfers and PCI SPE Transfers: (a) avoiding and preserving the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an amount not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an amount not less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from MGLLC to Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI, subsequent transfers from SPF Funding to Defendants in an amount not less than $287,674,849; (g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than $14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than $143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance

154

Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and
costs from Defendants.

      H.      On Count 6 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C.
§§ 544(a), 544(b), 550, and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court
should determine that this action is governed by the laws of other states, the fraudulent transfer
laws of such other states as against Defendants for avoidance and recovery, as initial transferees
of the PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the PCI
MGLLC Transfers and PCI SPE Transfers: (a) avoiding and preserving the PCI Direct Transfers,
PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest
of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the
PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an
amount not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an
amount not less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from
MGLLC to Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI,
subsequent transfers from SPF Funding to Defendants in an amount not less than $287,674,849;
(g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an
amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by
Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of
not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than
$14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than
$143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the
Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance

Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and

costs from Defendants.

I.       On Count 7 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C.

§§ 544(a), 544(b), 550, and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court

should determine that this action is governed by the laws of other states, the fraudulent transfer

laws of such other states as against Defendants for avoidance and recovery, as initial transferees

of the PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the PCI

MGLLC Transfers and PCI SPE Transfers: (a) avoiding and preserving the PCI Direct Transfers,

PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest

of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the

PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an

amount not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an

amount not less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from

MGLLC to Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI,

subsequent transfers from SPF Funding to Defendants in an amount not less than $287,674,849;

(g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an

amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by

Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of

not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than

$14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than

$143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the

Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance

156

Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and

costs from Defendants.

      J.      On Count 8 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C.

§§ 544(b), 550, and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should

determine that this action is governed by the laws of other states, the fraudulent transfer laws of

such other states as against Defendants for avoidance and recovery, as initial transferees of the

PCI Direct Transfers and PC Funding Transfers, and as subsequent transferees of the PCI

MGLLC Transfers and PCI SPE Transfers: (a) avoiding and preserving the PCI Direct Transfers,

PCI MGLLC Transfers, and the PC Funding Transfers free and clear from any claimed interest

of the Defendants; (b) directing that the PCI Direct Transfers, PCI MGLLC Transfers, and the

PC Funding Transfers be set aside; (c) recovering PCI Direct Transfers to Defendants in an

amount not less than $119,006,803; (d) recovering PC Funding Transfers to Defendants in an

amount not less than $2,039,944,714; (e) recovering, on behalf of PCI, subsequent transfers from

MGLLC to Defendants in an amount not less than $59,223,729; (f) recovering, on behalf of PCI,

subsequent transfers from SPF Funding to Defendants in an amount not less than $287,674,849;

(g) recovering, on behalf of PCI, subsequent transfers from PC Funding to Defendants in an

amount not less than $2,039,944,714; (h) alternatively, recovering false profits received by

Defendants (1) of not less than $70,823,828 as direct transferees of PCI Direct Transfers, (2) of

not less than $90,488,713 as direct transferees of PC Funding Transfers, (3) of not less than

$14,050,814 as subsequent transferees of PCI MGLLC Transfers, and (4) of not less than

$143,173,061 as subsequent transferees of PCI SPE Transfers; (i) alternatively, recovering the

Buy Out Transfers in an amount not less than $155,357,376 from the Opportunity Finance

Defendants; and (j) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from Defendants.

K.      On Count 9 – Preferential Transfers, pursuant to 11 U.S.C. §§ 547, 550, and 551 as against the Opportunity Finance Defendants for avoidance and recovery of Preference Period Transfers: (a) avoiding and preserving the Preference Period Transfers free and clear from any claimed interest of the Opportunity Finance Defendants; (b) directing that the Preference Period Transfers be set aside; (c) recovering the Preference Period Transfers in the amount of $9,238,419 from the Opportunity Finance Defendants, for the benefit of the bankruptcy estate of PC Funding; and (d) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants;

L.      On Count 10 – Fraudulent Transfers (Actual Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants for avoidance and recovery of the SPF Funding/Opportunity Finance Transfers and the SPF Funding/DZ Bank Transfers: (a) avoiding and preserving the SPF Funding/ Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set aside; (c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less than $164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy estate SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not less than $78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding; (e) alternatively, recovering false profits in an

158

amount not less than $12,234,156; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

M.      On Count 11 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants for avoidance and recovery of the SPF Funding/Opportunity Finance Transfers and the SPF Funding/DZ Bank Transfers: (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers free and clear from any claimed interest of the Opportunity Finance Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity Finance Transfers and SPF Funding/DZ Bank Transfers be set aside; (c) recovering such SPF Funding/Opportunity Finance Transfers in an amount not less than $164,615,390 from the Opportunity Finance Defendants for the benefit of the bankruptcy estate of SPF Funding; (d) recovering such SPF Funding/DZ Bank Transfers in an amount not less than $78,241,766 from DZ Bank for the benefit of the bankruptcy estate of SPF Funding; (e) alternatively, recovering false profits in an amount not less than $12,234,156; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

N.      On Count 12 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Opportunity Finance Defendants for avoidance and recovery of the SPF Funding/Opportunity Finance Transfers and the SPF Funding/DZ Bank Transfers: (a) avoiding and preserving the SPF Funding/Opportunity Finance

Transfers and SPF Funding/DZ Bank Transfers free and clear from any claimed interest of the

Opportunity Finance Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity

Finance Transfers and SPF Funding/DZ Bank Transfers be set aside; (c) recovering such SPF

Funding/Opportunity Finance Transfers in an amount not less than $164,615,390 from the

Opportunity Finance Defendants for the benefit of the bankruptcy estate of SPF Funding;

(d) recovering such SPF Funding/DZ Bank Transfers in an amount not less than $78,241,766

from DZ Bank for the benefit of the bankruptcy estate of SPF Funding; (e) alternatively,

recovering false profits in an amount not less than $12,234,156; and (f) recovering prejudgment

and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

      O.      On Count 13 – Fraudulent Transfers (Constructive Fraud), pursuant to

Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states as against the Opportunity Finance Defendants for avoidance

and recovery of the SPF Funding/Opportunity Finance Transfers and the SPF Funding/DZ Bank

Transfers: (a) avoiding and preserving the SPF Funding/Opportunity Finance Transfers and SPF

Funding/DZ Bank Transfers free and clear from any claimed interest of the Opportunity Finance

Defendants or DZ Bank; (b) directing that the SPF Funding/Opportunity Finance Transfers and

SPF Funding/DZ Bank Transfers be set aside; (c) recovering such SPF Funding/Opportunity

Finance Transfers in an amount not less than $164,615,390 from the Opportunity Finance

Defendants for the benefit of the bankruptcy estate of SPF Funding; (d) recovering such SPF

Funding/DZ Bank Transfers in an amount not less than $78,241,766 from DZ Bank for the

benefit of the bankruptcy estate of SPF Funding; (e) alternatively, recovering false profits in an

amount not less than $12,234,156; and (f) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Opportunity Finance Defendants.

P.      On Count 14 – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 as against Defendant Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Two-Year Transfers: (a) avoiding and preserving the Sabes Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Two-Year Transfers be set aside; (c) recovering such Sabes Family Foundation Two-Year Transfers in an amount not less than $12,469,571 from the Sabes Family Foundation for the benefit of the estate of SPF Funding; (d) alternatively, recovering false profits in an amount not less than $12,469,571; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

Q.      On Count 15 – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 as against Defendant Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Two-Year Transfers: (a) avoiding and preserving the Sabes Family Foundation Two-Year Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Two-Year Transfers be set aside; (c) recovering such Sabes Family Foundation Two-Year Transfers in an amount not less than $12,469,571 from the Sabes Family Foundation for the benefit of the estate of SPF Funding; (d) alternatively, recovering false profits in an amount not less than $12,469,571; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

R.     On Count 16 – Fraudulent Transfers (Actual Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes Family Foundation Transfers in an amount not less than $29,495,341 from the Sabes Family Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering false profits in an amount not less than $29,495,341; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

S.     On Count 17 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against the Sabes Family Foundation for avoidance and recovery of the Sabes Family Foundation Transfers: (a) avoiding and preserving the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes Family Foundation; (b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering such Sabes Family Foundation Transfers in an amount not less than $29,495,341 from the Sabes Family Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively, recovering false profits in an amount not less than $29,495,341; and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

162

T.      On Count 18 – Fraudulent Transfers (Constructive Fraud), pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states as against the Sabes Family Foundation for

avoidance and recovery of the Sabes Family Foundation Transfers: (a) avoiding and preserving

the Sabes Family Foundation Transfers free and clear from any claimed interest of the Sabes

Family Foundation; (b) directing that the Sabes Family Foundation Transfers be set aside; (c)

recovering such Sabes Family Foundation Transfers in an amount not less than $29,495,341

from the Sabes Family Foundation for the benefit of the bankruptcy estate of SPF Funding; (d)

alternatively, recovering false profits in an amount not less than $29,495,341; and (e) recovering

prejudgment and post-judgment interest, attorneys' fees, and costs from the Sabes Family

Foundation.

U.      On Count 19 – Fraudulent Transfers (Constructive Fraud), pursuant to

Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the

Court should determine that this action is governed by the laws of other states, the fraudulent

transfer laws of such other states as against the Sabes Family Foundation for avoidance and

recovery of the Sabes Family Foundation Transfers: (a) avoiding and preserving the Sabes

Family Foundation Transfers free and clear from any claimed interest of the Sabes Family

Foundation; (b) directing that the Sabes Family Foundation Transfers be set aside; (c) recovering

such Sabes Family Foundation Transfers in an amount not less than $29,495,341 from the Sabes

Family Foundation for the benefit of the bankruptcy estate of SPF Funding; (d) alternatively,

recovering false profits in an amount not less than $29,495,341; and (e) recovering prejudgment

and post-judgment interest, attorneys' fees, and costs from the Sabes Family Foundation.

163

V.     On Count 20 – Fraudulent Transfers (Actual Fraud), pursuant to Bankruptcy Code
§§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court
should determine that this action is governed by the laws of other states, the fraudulent transfer
laws of such other states as against Defendants The Minneapolis Foundation and Sabes LP for
avoidance and recovery of the SPF Funding/Minneapolis Foundation Transfers and SPF
Funding/Sabes LP Transfer: (a) avoiding and preserving the SPF Funding/Minneapolis
Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation;
(b) avoiding and preserving the SPF Funding/Sabes LP Transfer free and clear from any claimed
interest of Sabes LP; (c) directing that the SPF Funding/Minneapolis Foundation Transfers be set
aside; (d) directing that the SPF Funding/Sabes LP Transfer be set aside; (e) recovering such SPF
Funding/Minneapolis Foundation Transfers in the amount of at least $10,992,351 from The
Minneapolis Foundation for the benefit of the bankruptcy estate of SPF Funding; (f) recovering
the SPF Funding/Sabes LP Transfer in the amount of at least $4,330,000 from Sabes LP for the
benefit of the bankruptcy estate of SPF Funding; (g) alternatively, recovering false profits in the
amount of at least $10,992,351 from The Minneapolis Foundation and at least $330,000 from
Sabes LP; and (h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs
from The Minneapolis Foundation.

W.     On Count 21 – Fraudulent Transfers (Constructive Fraud), pursuant to
Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(i) and
513.47, and if the Court should determine that this action is governed by the laws of other states,
the fraudulent transfer laws of such other states as against Defendants The Minneapolis
Foundation and Sabes LP for avoidance and recovery of the SPF Funding/Minneapolis
Foundation Transfers and SPF Funding/Sabes LP Transfer: (a) avoiding and preserving the SPF

164

Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The

Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP Transfer free

and clear from any claimed interest of the Sabes LP; (c) directing that the SPF

Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF

Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis

Foundation Transfers in the amount of at least $10,992,351 from The Minneapolis Foundation

for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes

LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy

estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least

$10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and

(h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The

Minneapolis Foundation.

     X.      On Count 22 – Fraudulent Transfers (Constructive Fraud), pursuant to

Bankruptcy Code §§ 544(a), 544(b), 550(a), and 551, and Minn. Stat. §§ 513.44(a)(2)(ii) and

513.47, and if the Court should determine that this action is governed by the laws of other states,

the fraudulent transfer laws of such other states as against Defendant The Minneapolis

Foundation and Sabes LP for avoidance and recovery of the SPF Funding/Minneapolis

Foundation Transfers: (a) avoiding and preserving the SPF Funding/Minneapolis Foundation

Transfers free and clear from any claimed interest of The Minneapolis Foundation; (b) avoiding

and preserving the SPF Funding/Sabes LP Transfer free and clear from any claimed interest of

the Sabes LP; (c) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside;

(d) directing that the SPF Funding/Sabes LP Transfer be set aside; (e) recovering such SPF

Funding/Minneapolis Foundation Transfers in the amount of at least $10,992,351 from The

Minneapolis Foundation for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least $10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and (h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation.

Y.      On Count 23 – Fraudulent Transfers (Constructive Fraud), pursuant to Bankruptcy Code §§ 544(b), 550(a), and 551, and Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against Defendant The Minneapolis Foundation for avoidance and recovery of the SPF Funding/Minneapolis Foundation Transfers: (a) avoiding and preserving the SPF Funding/Minneapolis Foundation Transfers free and clear from any claimed interest of The Minneapolis Foundation; (b) avoiding and preserving the SPF Funding/Sabes LP Transfer free and clear from any claimed interest of Sabes LP; (c) directing that the SPF Funding/Minneapolis Foundation Transfers be set aside; (d) directing that the SPF Funding/Sabes LP Transfer be set aside; (e) recovering such SPF Funding/Minneapolis Foundation Transfers in the amount of at least $10,992,351 from The Minneapolis Foundation for the benefit of the bankruptcy estate of SPF Funding; (f) recovering the SPF Funding/Sabes LP Transfer in the amount of at least $4,330,000 from Sabes LP for the benefit of the bankruptcy estate of SPF Funding; (g) alternatively, recovering false profits in the amount of at least $10,992,351 from The Minneapolis Foundation and at least $330,000 from Sabes LP; and (h) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from The Minneapolis Foundation.

Z.      On Count 24 – Lien Avoidance:  This Court dismissed this cause of action in its Order dated December 1, 2016.  The Trustee includes this cause of action solely to preserve any issues and reserve its rights in the event of an appeal.

AA.     On Count 25 - Unjust Enrichment/Equitable Disgorgement:  This Court dismissed this cause of action in its Order dated December 1, 2016.  The Trustee includes this cause of action solely to preserve any issues and reserve its rights in the event of an appeal;

BB.     On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of the estates of PCI, PC Funding, and SPF Funding;

CC.     On all Claims for Relief, assignment of any defendant's income tax refunds from the United States, state, and local governments paid on fictitious profits during the course of the Ponzi scheme;

DD.     Awarding the Trustee all applicable interest (including prejudgment and post-judgment interest), attorneys' fees, costs, and disbursements in this action; and

EE.     Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

DATED: March 6, 2017                      **LINDQUIST & VENNUM LLP**


                                    By:   /s/ James A. Lodoen
                                          James A. Lodoen (0173605)
                                          Michael Olafson (0156693)
                                          Adam C. Ballinger (0389058)
                                          4200 IDS Center
                                          80 South Eighth Street
                                          Minneapolis, MN 55402-2274
                                          (612) 371-3211
                                          (612) 371-3207 (facsimile)
                                          www.lindquist.com

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

Robert S. Loigman (*pro hac vice*)
Benjamin I. Finestone (*pro hac vice*)
Jacob J. Waldman (*pro hac vice*)
Victor Noskov (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
www.quinnemanuel.com

**ATTORNEYS FOR
DOUGLAS A. KELLEY
CHAPTER 11 TRUSTEE OF PETTERS
COMPANY, INC., PC FUNDING, LLC,
AND SPF FUNDING, LLC**

168

# EXHIBIT 2

[Execution Version]

ADMINISTRATION AGREEMENT

Dated as of September 17, 1999

between

AUTOBAHN FUNDING COMPANY LLC

as the Company

and

DG BANK DEUTSCHE GENOSSENSCHAFTSBANK AG

as the Administrator

Confidential

DZB074493

TABLE OF CONTENTS

SECTION                                                          Page

ARTICLE I

    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.01. Certain Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.02. Accounting Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    1.03. Computation of Time Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE II

    APPOINTMENT OF THE ADMINISTRATOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    2.01. Appointment and Authority of the Administrator . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE III

    SERVICES AND DUTIES OF THE ADMINISTRATOR . . . . . . . . . . . . . . . . . . . . . . . 15
    3.01. Identification of Sellers and Execution of Funding Agreements . . . . . . . . . . . . . 15
    3.02. Administration of Securitization Transactions and Other Permitted Investments . 15
    3.03. Maintenance of Liquidity and Credit Support for Commercial Paper Notes . . . . . 18
    3.04. Issuance of Commercial Paper Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    3.05. Usage of the Liquidity Agreements and Supplemental Enhancement Agreements 20
    3.06. Other Duties of the Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    3.07. Termination Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE IV

    OTHER PROVISIONS RELATING TO THE POWERS AND DUTIES AND
    COMPENSATION OF THE ADMINISTRATOR . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    4.01. Standard of Care; Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    4.02. Direction by the Company; Conformity with Law and Covenants . . . . . . . . . . . 26
    4.03. Attorney-in-Fact; Limitations on Authority of the Administrator as Attorney-in-
          Fact; Authority with Respect to Bank Accounts; Nature of Services . . . . . . . . 26
    4.04. Company's Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    4.05. Compensation of the Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ARTICLE V

    REPRESENTATIONS AND COVENANTS OF THE COMPANY . . . . . . . . . . . . . . 28
    5.01. Representations of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    5.02. Covenants of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE VI

TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
     6.01. Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARTICLE VII

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
7.01. No Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
7.02. Effectiveness; Benefits of Agreement . . . . . . . . . . . . . . . . . . . . . . . 32
7.03. Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.04. Notices, Etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.05. Recourse Against Certain Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.06. GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF
      OBJECTION TO VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
7.07. WAIVER OF JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
7.08. Headings, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
7.09. Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
7.10. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

EXHIBITS

Exhibit A-1        Form of Liquidity Loan Agreement
Exhibit A-2        Form of Liquidity Purchase Agreement
Exhibit B          Form of Security Agreement
Exhibit C          Form of Management Agreement
Exhibit D          Form of Funding Agreement
Exhibit E          Form of Commercial Paper Depositary Agreement
Exhibit F          Form of Commercial Paper Placement Agreement
Exhibit G          Form of Swing-Line Credit Agreement
Exhibit H          Form of Program Report

Confidential

DZB074495

THIS ADMINISTRATION AGREEMENT (this "Agreement") is dated as of September 17, 1999, between:

(1)     AUTOBAHN FUNDING COMPANY LLC, a Delaware limited liability company (the "Company"); and

(2)     DG BANK DEUTSCHE GENOSSENSCHAFTSBANK AG ("DG"), as administrator hereunder (the "Administrator").

WHEREAS, the Company intends from time to time to enter into Funding Agreements with various parties, under which the Company may purchase or otherwise acquire or make loans secured by, or otherwise finance, interests in, or in pools of, accounts, general intangibles, chattel paper, instruments, certificated and uncertificated securities, inventory, investment property or other financial assets, including without limitation, publicly or privately issued securities secured by or representing interests in any of the foregoing (collectively, the "Underlying Assets") in accordance with Autobahn's investment policies and guidelines (such Underlying Assets, including ownership interests and security interests therein, are referred to herein as "Asset Interests");

WHEREAS, in order to fund its acquisition of Asset Interests, the Company, among other things, intends from time to time to issue and sell Commercial Paper Notes, the issuance and sale of which, in each case, will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to the exemption from such registration requirements set forth in Section 4(2) thereof;

WHEREAS, U.S. Bank Trust National Association, a national banking association, has agreed, pursuant to the terms of the Commercial Paper Depositary Agreement, to act as issuing and paying agent and depositary (the "Issuing and Paying Agent") on behalf of the Company with respect to the Commercial Paper Notes;

WHEREAS, pursuant to the Commercial Paper Placement Agreements, Merrill Lynch Money Markets Inc. ("Merrill") and J.P. Morgan Securities Inc. ("J.P. Morgan") have agreed, and certain other Persons, from time to time hereafter, may agree to act as commercial paper placement agents for the Company with respect to the Commercial Paper Notes;

WHEREAS, to support payment of the Commercial Paper Notes, and to provide an alternate means of funding the Company's acquisition and maintenance of Asset Interests, the Company will enter into certain Liquidity Agreements with one or more Liquidity Providers in connection with the Funding Agreements;

WHEREAS, the Company and DG will enter into the Swing-Line Credit Agreement pursuant to which DG may, in its sole discretion, agree to make unsecured loans, advances or other extensions of credit to the Company from time to time upon the Company's request therefor, the proceeds of which may be used by the Company for any purpose, including, without limitation, for the acquisition and/or maintenance of Asset Interests;

DZB074496

WHEREAS, the Company has requested Lord Securities Corporation, a Delaware corporation (the "Manager"), and the Manager has agreed, to perform certain management functions for the Company, subject to the terms and conditions set forth in the Management Agreement; and

WHEREAS, the Company and the Administrator desire to set forth the terms and conditions under which the Administrator will hereafter conduct and administer certain other business operations of the Company;

IT IS AGREED as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01.  Certain Defined Terms.  (a)  When used herein, the terms "Adjusted Eurodollar Rate", "Alternative Rate", "Asset Report", "Capital", "Collection Agent", "Collections", "Coverage Shortfall", "Event of Termination", "Obligor", "Purchase Limit", "Purchase Period", "Termination Date" and "Yield" will have the meanings given to such terms in the applicable Funding Agreement; provided, however, that if under any Funding Agreement a different term is used in place of any of the foregoing quoted terms (or any other term defined in such Funding Agreement and used as so defined in any Program Document), the Administrator shall so notify the Company and each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator, on or before the date that the Administrator enters into or otherwise becomes a party to such Funding Agreement (or as soon thereafter as possible) on behalf of the Company, and such foregoing quoted term when used herein in reference to such Funding Agreement shall have the meaning given in such Funding Agreement to the corresponding different term identified in such notice from the Administrator to the Company.

(b)  When used herein, the terms "Asset Balance", "Liquidity Commitments", and "Scheduled Liquidity Commitment Termination Date" will have the meanings given to such terms in the applicable Liquidity Loan Agreement. When used herein, the terms "Purchase Commitments", "Purchase Price" and "Scheduled Purchase Commitment Termination Date" will have the meanings given to such terms in the applicable Liquidity Purchase Agreement.  If under any Liquidity Loan Agreement or Liquidity Purchase Agreement, as the case may be, a different term is used in place of any of the foregoing quoted terms applicable to such Liquidity Agreement (or any other term defined in such Liquidity Agreement and used as so defined in any Program Document), the Administrator shall so notify the Company and each of the rating agencies rating the Commercial Paper Notes, on or before the date that the Administrator enters into or otherwise becomes a party to such Liquidity Agreement (or as soon thereafter as possible) on behalf of the Company, and such foregoing quoted term when used herein in reference to such Liquidity Agreement shall have the meaning given in such Liquidity Agreement to the corresponding different term identified in such notice from the Administrator to the Company.

−2−

DZB074497

(c) In addition to the foregoing, the following terms shall have the following meanings (such meanings to be equally applicable to the singular and plural forms of the terms defined):

"AFC Account" means an account (or a sub-account thereof) established and maintained by the Administrator on behalf of the Company, at an Eligible Commercial Bank for the purpose of receiving funds remitted to the Company, including, without limitation, funds in respect of a Funding Agreement.

"Affiliate" means when used with respect to a Person, any other Person controlling, controlled by, or under common control with, such Person; provided, however, that neither DG nor any of its subsidiaries or Affiliates shall be deemed to be an "Affiliate" of the Company.

"Asset Backed Security" means any security or other financial instrument secured by or representing interests in specified accounts, general intangibles, chattel paper, instruments, investment property and/or other financial assets or in specified pools of any of the foregoing.

"Asset Interest" has the meaning specified in the Preliminary Statements hereto.

"Available Liquidity Commitment Amount" means on any date of determination, with respect to any Funding Agreement to which the Company is a party on such day, an amount determined pursuant to clause (1) or (2) below, as applicable:

(1) the lesser of

(a) the unused Liquidity Commitments on such day under the Liquidity Loan Agreement relating to such Funding Agreement; and

(b) the excess of the Asset Balance on such day under the Liquidity Loan Agreement relating to such Funding Agreement over the aggregate principal balance of the Liquidity Loans outstanding on such day under such Liquidity Loan Agreement;

or

(2) the lesser of

(a) the unused Purchase Commitments on such day under the Liquidity Purchase Agreement relating to such Funding Agreement; and

(b) the maximum Purchase Price payable on such day in consideration of the sale under such Liquidity Purchase Agreement of all Asset Interests then held by the Company pursuant to such Funding Agreement.

-3-

Confidential

"Business Day" means a day of the year (other than a Saturday or Sunday) on which (a) banks are not required or authorized to close in New York City, and (b) if the term "Business Day" is used in connection with the Adjusted Eurodollar Rate, dealings in dollar deposits are carried on in the London interbank Eurodollar market.

"Collateral Agent" means, with respect to any Security Agreement, the Person from time to time acting as agent for the secured parties thereunder.

"Commercial Paper Depositary Agreement" means the Commercial Paper Depositary Agreement executed between the Company and the Issuing and Paying Agent, substantially in the form of Exhibit E hereto, as the same may be amended, supplemented, or otherwise modified from time to time.

"Commercial Paper Note" means any short-term promissory note of the Company, having an original maturity not to exceed 270 days, whether in certificated or in book-entry form.

"Commercial Paper Placement Agreements" means the Commercial Paper Placement Agreements executed between the Company and each of Merrill and J.P. Morgan and such other Commercial Paper Placement Agreements as may be separately executed between the Company and certain other Persons that may act from time to time as commercial paper placement agents, in each case, substantially in the form of Exhibit F hereto, as the same may be amended, supplemented or otherwise modified from time to time.

"Deal Agent" means the Person acting as agent or trustee (or in a similar capacity) for the holders of the Asset Interests under each of the Funding Agreements, or, with respect to any such Funding Agreement, any successor thereto appointed in accordance with the terms of such Funding Agreement.

"Disclosure Documents" shall mean the Private Placement Memoranda and any documents incorporated by reference therein.

"Dollar" shall mean freely transferable lawful money of the United States.

"Eligible Commercial Bank" means (a) any commercial bank satisfactory to the Administrator and having (i) combined capital and surplus of at least $250,000,000 and (ii) a short-term debt rating of at least P-1 from Moody's and F1 from Fitch IBCA (if rated by Fitch IBCA), or (b) such other commercial bank satisfactory to the Administrator and in respect of which each of Moody's and Fitch IBCA shall have delivered prior written confirmation to the Administrator that the maintenance of the AFC Accounts with such commercial bank will not result in the reduction or withdrawal of the respective ratings of the Commercial Paper Notes.

-4-

DZB074499

"<u>Face Amount</u>" means, when used with reference to Commercial Paper Notes, the face amount stated therein in the case of any Commercial Paper Note issued on a discount basis, and the principal amount stated therein plus the amount of all interest scheduled to accrue on such Commercial Paper Note through its stated maturity date in the case of any Commercial Paper Note issued on an interest bearing basis.

"<u>First Loss Protection</u>" means, with respect to any Funding Agreement, any loans, lines of credit, letters of credit, financial guaranties, surety bonds, insurance policies, cash collateral accounts or other forms of credit enhancement or a combination thereof available to support the payment of Capital under such Funding Agreement, allocated or relating solely to such Funding Agreement.

"<u>Fitch IBCA</u>" means Fitch IBCA, Inc., and any successor thereto. With respect to any notice required to be given hereunder to Fitch IBCA, such notice requirement shall be deemed satisfied by notice to: Fitch IBCA, Inc., One State Street Plaza, New York, New York 10004.

"<u>Funding Agreement</u>" means any agreement or group of agreements pursuant to which Asset Interests with respect to a particular Seller are created, governed, issued and/or acquired by the Company, including, without limitation, any purchase agreement, loan agreement, credit agreement, indenture, pooling and servicing agreement, note purchase agreement, certificate purchase agreement, assignment agreement, assignment and assumption agreement, bill of sale, deed, trust agreement or any similar agreement, together with any supplement or other agreement ancillary to any of the foregoing, in each case, in form and substance and among such parties as shall be approved by the Administrator, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Funding Agreement Requirements</u>" means, with respect to the execution by the Company of a Funding Agreement, or in the event that the Company acquires an Asset Interest governed by a Funding Agreement to which the Company is not a party, at the time the Company acquires such Asset Interest, the following:

(a) the acquisition of any Asset Interest pursuant to such Funding Agreement would not cause the Company to become subject to registration as an "investment company" within the meaning of the Investment Company Act or the Commercial Paper Notes issued with respect thereto to become subject to registration under the Securities Act;

(b) the acquisition of any Asset Interest pursuant to such Funding Agreement would not cause, or result in the occurrence of, an "Event of Termination" or any event of default (however denominated) under any other Funding Agreement;

-5-

DZB074500

(c) in the case of a Funding Agreement to be entered into in connection with Asset Interests which purport to be secured by a security interest in, or constitute an ownership interest in, other Underlying Assets, the Administrator shall have obtained an opinion, in form and substance satisfactory to the Administrator, rendered by counsel acceptable to the Administrator, substantially to the effect that the Company has, or upon such acquisition will have, a valid ownership interest or security interest in the Underlying Assets, as the case may be, that are the subject of such Asset Interests, and such Funding Agreement, or other ancillary agreement, shall contain a covenant of the Seller or such other Person as the Administrator may deem acceptable thereunder, requiring such Person to execute and deliver or file such financing statements, continuation statements, notices and other documents, and take all such further action, as may be necessary from time to time to maintain the validity and perfection of such ownership or security interest; provided that the requirements of this clause (c) shall be deemed satisfied upon the Administrator's determination that an opinion of counsel has been rendered in connection with the original issuance of such Asset Interests to the effect that the trustee or agent acting for the benefit of the holders of such Asset Interests or class or series of similar interests has, or upon acquisition of the Underlying Assets by the issuer of such Asset Interest, will have, a valid ownership interest or security interest in such Underlying Assets, as the case may be, that are the subject of such Asset Interest;

(d) such Funding Agreement, to the extent that the Company is a party thereto, shall contain an agreement by each of the parties thereto (other than the Company) not to institute against, or join any other person or entity in instituting against, the Company any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law for one year and one day after the latest maturing Commercial Paper Note issued by the Company is repaid in full;

(e) such Funding Agreement, to the extent that the Company is a party thereto, shall contain an agreement by the Seller to indemnify and hold the Company and the Company Indemnified Parties (as such term is defined in Section 4.01(b)) harmless against any and all losses, claims, damages, causes of action, suits, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) or judgments of whatever kind and nature, imposed upon, incurred by or asserted against the Company or the Company Indemnified Parties arising out of or based upon the inaccuracy of any information delivered to the Company for inclusion in a Program Report.

(f) unless the Asset Interest is a Highly-Rated Asset Interest, (i) such Funding Agreement (in the event such Funding Agreement (A) is a Funding Agreement to which the Company is a party and (B) is entered into in connection with Asset Interests which purport to be secured by, or constitute an ownership interest in, other Underlying Assets) shall contain a provision obligating the Seller

–6–

DZB074501

or such other Person deemed appropriate by the Administrator thereunder to provide to the Company or the Administrator (directly or indirectly) such statistical information as the Company or the Administrator shall determine to be appropriate concerning the performance of the Underlying Assets which are the subject of such Funding Agreement and (ii) the related Liquidity Agreement or Security Agreement shall contain a provision requiring the Company to notify, or to cause the Deal Agent to notify, the Collateral Agent under the related Security Agreement of the occurrence of any Event of Termination or the Termination Date under such Funding Agreement, in each case, as soon as practicable after the Company or the Deal Agent (as the case may be) receives notice of the same;

(g) the Company shall be advised in writing by each rating agency rating the Commercial Paper Notes at the request of the Company and/or the Administrator, that the effectiveness of such Funding Agreement will not result in the reduction or withdrawal of the rating of the Commercial Paper Notes; provided, however, that (i) no such written advice shall be required from the aforementioned rating agencies prior to the execution of such Funding Agreement, if such agency or agencies previously advised the Company in writing (a copy of which shall be promptly delivered to each commercial paper placement agent with respect to the Commercial Paper Notes) that such written advice may be obtained subsequent to the execution of such Funding Agreement and (ii) in connection with any Highly-Rated Asset Interest, no such advice of a rating agency shall be required;

(h) the Administrator shall have analyzed the Asset Interests or the relevant offering materials relating, as the case may be, to such Funding Agreement as well as the general structure of the arrangement to be evidenced by such Funding Agreement, and such analysis shall have included a review of the characteristics, credit quality and expected performance of the Asset Interests and any Underlying Assets; the Administrator shall have consulted with, and shall have supplied sufficiently detailed information regarding the foregoing to, the appropriate officers of the Company; and if the Funding Agreement is executed on behalf of the Company by the Administrator, such execution of shall have been approved by the Company, which approval shall be conclusively evidenced by a certificate from the Chairman of the Board, the President or any Vice-President of the Company upon which certificate the Administrator shall be entitled to rely;

(i) if the Funding Agreement contemplates a commitment by the Company to make acquisitions of Asset Interests from the Seller thereunder, either (A) the Scheduled Liquidity Commitment Termination Date under the related Liquidity Loan Agreement or the Scheduled Purchase Commitment Termination Date under the related Liquidity Purchase Agreement, as the case may be, shall be no earlier than the Termination Date under the Funding Agreement or (B) such Funding Agreement shall provide for the automatic occurrence of the Termination Date

–7–

DZB074502

thereunder upon the termination of the commitment under the applicable Liquidity Agreement;

(j) the Administrator shall have delivered to each of Moody's and Fitch IBCA a notice of the "Stop Events," with respect to such Funding Agreement (if any); and

(k) the Administrator shall have established on behalf of the Company, an AFC Account for the purpose of receiving funds remitted to the Company in respect of such Funding Agreement.

(l)  in the case of a Funding Agreement to be entered into in connection with Asset Interests which are Highly-Rated Asset Interests, the related Liquidity Agreement shall provide that

(i) the "Asset Balance" set forth in the related Liquidity Agreement shall be an amount equal to all Capital of the Company outstanding under the related Funding Agreement at such time plus unpaid Yield on that portion of such Capital funded or maintained through the issuance of Transaction Commercial Paper Notes (as such term is defined in the related Liquidity Agreement) (including both Yield which has accrued and Yield to be accrued through the next occurring maturity dates of such Transaction Commercial Paper Notes), and

(ii) the obligation of the Liquidity Providers party to the related Liquidity Agreement to make Funding Advances (as such term is defined in the related Liquidity Agreement) thereunder shall be subject only to the conditions precedent that (A) (1) if such Highly-Rated Asset Interests are Asset Backed Securities described in clause (iii)(A) of the definition of Highly-Rated Asset Interests, the long-term debt rating of such Asset Backed Securities shall not have been reduced below Caa1 by Moody's or CCC+ by Fitch IBCA (if rated by Fitch IBCA), and (2) if such Highly-Rated Asset Interests are Asset Backed Securities described in clause (iii)(B)(1) of the definition of Highly-Rated Asset Interests, the long-term debt, financial strength or claims-paying rating of the provider of the First Loss Protection for such Asset Backed Securities shall not have been reduced below Caa1 by Moody's or CCC+ by Fitch IBCA (if rated by Fitch IBCA) and (B) no proceeding shall have been instituted by or against the Company seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but

–8–

Confidential

not instituted by it), which proceeding shall have remained undismissed or unstayed for a period of 60 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for it, or for any substantial part of its property) shall have occurred, and

(iii)  solely in the event that the related Liquidity Agreement is a Liquidity Purchase Agreement, such Asset Interests shall be freely transferable to the Liquidity Purchasers.

(m)  if the Funding Agreement contemplates a commitment by the Company to make acquisitions from the Seller thereunder of Highly-Rated Asset Interests constituting variable funding notes or certificates, including increases in the principal amount thereof, the commitment of the Liquidity Providers party to the related Liquidity Agreement to make loans or advances thereunder shall include the commitment to make loans or advances to fund the Company's acquisition of such increases in the principal amount of such variable funding notes or certificates, provided that such commitment shall be subject to the terms and conditions applicable to the making of loans or advances generally under the related Liquidity Agreement.

"GAAP" means, at any particular time with respect to the Company, generally accepted accounting principles as in effect at such time in the United States of America, consistently applied.

"Hedge Contract" means an interest rate swap agreement, interest rate cap, floor or collar agreement or any other similar agreement, however denominated, entered into by the Company in connection with its rights or obligations under any Commercial Paper Notes, Asset Interests or Other Permitted Investments, the terms of which, in the case of a "Hedge Contract" entered into by the Company in connection with its rights or obligations under any Highly-Rated Asset Interests, provide that (i) the hedge counterparty shall not to institute against, or join any other person or entity in instituting against, the Company any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law for one year and one day after the latest maturing Commercial Paper Note issued by the Company is repaid in full, (ii) all costs, fees, expenses and indemnities payable by the Company to the hedge counterparty thereunder shall be payable solely from funds available to the Company in respect of the transaction relating to its acquisition of such underlying Highly-Rated Asset Interests, (iii) no recourse under any obligation, covenant or agreement of the Company contained therein shall be had against any incorporator, stockholder, member, manager, affiliate, officer, employee or director of the Company, the Manager or the Administrator, as such, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute or otherwise, (iv) the hedge counterparty shall have the right to terminate such Hedge Contract solely in the event of the bankruptcy of the Company or a

–9–

Confidential

payment default on the underlying Highly-Rated Asset Interests, (v) the hedge counterparty shall be prohibited from off-setting any amounts against its payment obligations thereunder, (vi) there shall be no grace periods on required payment dates thereunder, and (v) such Hedge Contract shall be transferable under the same terms and conditions applicable to the underlying Highly-Rated Asset.

"Highly-Rated Asset Interest" means a Dollar denominated Asset Backed Security (i) the terms of which provide for (A) a promise to pay interest thereon at a fixed or floating rate of interest, and (B) a promise to repay the principal thereof in full by a stated final maturity date, (ii) which was acquired for a purchase price of par or lower and (iii) which either (A) has a long term debt rating of at least Aa2 from Moody's and AA- from Fitch IBCA (if rated by Fitch IBCA) (provided that such ratings reflects the probability of (x) timely payment of interest and (y) either timely payment of principal or ultimate payment of principal by a stated final maturity date), or (B) benefits at all times from First Loss Protection in an amount equal to 100% of the Capital thereof, and the provider of such First loss Protection either (1) has long-term debt, financial strength or claims-paying ratings of at least Aa2 from Moody's and AA- from Fitch IBCA (if rated by Fitch IBCA) or (2) is a United States government agency which is backed at all times by the full faith and credit of the United States government; provided, however, that in the event that such long-term debt rating of such Asset Backed Security or the long-term debt, financial strength or claims-paying rating of the provider of such First Loss Protection, as applicable, shall be reduced below Aa2 by Moody's or AA- by Fitch IBCA (if rated by Fitch IBCA) (each such event being a "Downgrade Event"), the Company shall, to the extent such Asset Backed Security is funded through the issuance of Commercial Paper Notes, maintain Commercial Paper Notes having a remaining maturity of 45 days or less, in an aggregate Face Amount equal to or greater than the sum of (A) the amount of the Company's initial investment in the Asset Backed Security subject to such Downgrade Event minus all payments received in respect of principal thereon following such initial investment, plus (B) all interest to be accrued through the next occurring maturity dates of any then outstanding Commercial Paper Notes issued in order to fund or maintain the Company's investment in such Asset Backed Security subject to such Downgrade Event (such sum referred to herein as the "Highly Rated Asset Interest Amount"), and provided, further that in the event that such long-term debt rating of such Asset Backed Security or the long-term debt, financial strength or claims-paying rating of the provider of such First Loss Protection, as applicable, shall be reduced below Aa2 from Moody's or AA- from Fitch IBCA (if rated by Fitch IBCA), such Asset Backed Security shall no longer be considered a "Highly-Rated Asset Interest" and the Company shall cease to issue Commercial Paper Notes to fund or maintain its investment in such Asset Backed Security if, within 30 days after the date of such reduction or withdrawal, (1) the Company or the Administrator shall have failed to receive from each of the rating agencies then rating the Commercial Paper Notes at the request of the Company and/or the Administrator written confirmation that such reduction or withdrawal will not result in the reduction or withdrawal of the respective ratings of the Commercial Paper Notes, and (2) the Company shall have failed to sell its interest in such Asset Backed Security subject to a Downgrade Event for the Highly Rated Asset Interest Amount.

-10-

Confidential

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Issuing and Paying Agent" has the meaning specified in the Preliminary Statements hereto.

"Liquidity Agent" means, with respect to any Liquidity Agreement, (a) the financial institution from time to time acting as agent for the Liquidity Providers thereunder, which financial institution (or the Person guaranteeing the obligations of such financial institution under the relevant Liquidity Agreement), as of the date such financial institution became party to such Liquidity Agreement, has a short-term debt rating of at least P-1 from Moody's and F1 from Fitch IBCA (if rated by Fitch IBCA), or (b) such other Person satisfactory to the Company and the relevant Liquidity Providers, and with respect to which, each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator has confirmed in writing that the appointment of such Person as Liquidity Agent will not result in the reduction or withdrawal of the respective ratings of the Commercial Paper Notes.

"Liquidity Agreement" means, with respect to any Funding Agreement, a Liquidity Loan Agreement or a Liquidity Purchase Agreement, or a Supplemental Enhancement Agreement.

"Liquidity Loan" means, with respect to any Liquidity Loan Agreement, a "Borrowing" or an "Advance" under and as defined in such Liquidity Loan Agreement.

"Liquidity Loan Agreement" means, with respect to any Funding Agreement, a liquidity agreement executed by and among the Company, the Liquidity Providers party thereto and the Liquidity Agent thereunder specifically with respect to such Funding Agreement, which liquidity agreement shall be substantially in the form of Exhibit A-1 hereto with such changes in form or substance as may be approved by the Administrator, or in such other form as may be approved by the Administrator, in each case, as the same may be amended, supplemented, or otherwise modified from time to time.

"Liquidity Loan Obligations" means the outstanding amounts owing by the Company pursuant to the terms of the Liquidity Loan Agreements.

"Liquidity Provider" means (a) any one of the financial institutions having a commitment to make Liquidity Loans to the Company under any Liquidity Loan Agreement or Liquidity Purchases under any Liquidity Purchase Agreement, which financial institution, (i) as of the date such financial institution became party to such Liquidity Agreement, has a short-term debt rating of at least P-1 from Moody's and F1 from Fitch IBCA (if rated by Fitch IBCA), or (ii)(x) whose obligations, as of the date such financial institution became party to such Liquidity Agreement, are guaranteed by a Person whose short- term debt rating is at least P-1 from Moody's, and F1 by Fitch IBCA (if rated

-11-

DZB074506

by Fitch IBCA) and (y) of whose guarantee obligations the Company has provided not less than 5 days prior written notice and a copy of such guarantee to Moody's and Fitch IBCA; or (b) such other Person satisfactory to the Company and the relevant Liquidity Agent, and with respect to which, (i) each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator has confirmed in writing that the commitment of such Person to make Liquidity Loans under any Liquidity Loan Agreement or Liquidity Purchases under any Liquidity Purchase Agreement, as the case may be, will not result in the reduction or withdrawal of the respective ratings of the Commercial Paper Notes; and (ii) each of the commercial paper placement agents for the Commercial Paper Notes shall have received prompt notice in writing of the inclusion of such other Person as a "Liquidity Provider" hereunder.

"Liquidity Purchase" means, with respect to any Liquidity Purchase Agreement, a "Purchase" under and as defined in such Liquidity Purchase Agreement.

"Liquidity Purchase Agreement" means, with respect to any Funding Agreement, an asset purchase agreement executed by and among the Company, the Liquidity Providers party thereto and the Liquidity Agent thereunder specifically with respect to such Funding Agreement, which asset purchase agreement shall be substantially in the form of Exhibit A-2 hereto with such changes in form or substance as may be approved by the Administrator, or in such other form as may be approved by the Administrator, in each case, as the same may be amended, supplemented, or otherwise modified from time to time.

"Management Agreement" means the Management Agreement, executed between the Company and the Manager, substantially in the form of Exhibit C hereto, as the same may be amended, supplemented or otherwise modified from time to time.

"Manager" has the meaning specified in the Preliminary Statements hereto.

"Moody's" means Moody's Investors Service, Inc., and any successor thereto. With respect to any notice required to be given hereunder to Moody's, such notice requirement shall be deemed satisfied by notice to: Moody's Investors Service, Inc., Corporate Department, Asset Backed Commercial Paper Monitoring, 99 Church Street, New York, New York 10007.

"Net Worth Calculation Date" means, with respect to any calendar month, the 15th day of the immediately succeeding calendar month.

"Other Permitted Investments" means any one or more of the following types of investments:

      (a)    marketable obligations of the United States of America, the full and timely payment of which are backed by the full faith and credit of the United States

-12-

Confidential

of America and which have a maturity of not more than 270 days from the date of acquisition;

(b)     marketable obligations, the full and timely payment of which are directly and fully guaranteed by the full faith and credit of the United States of America and which have a maturity of not more than 270 days from the date of acquisition;

(c)     bankers' acceptances and certificates of deposit and other interest-bearing obligations (in each case having a maturity of not more than 270 days from the date of acquisition) denominated in dollars and issued by any bank with capital, surplus and undivided profits aggregating at least $100,000,000, the short-term securities of which are rated at least P-1 by Moody's and F1 by Fitch IBCA (if rated by Fitch IBCA);

(d)     repurchase obligations with a term of not more than ten days for underlying securities of the types described in clauses (a), (b) and (c) above entered into with any bank of the type described in clause (c) above;

(e)     commercial paper having a rating of at least P-1 from Moody's and F1 from Fitch IBCA (if rated by Fitch IBCA); and

(f)    demand deposits, time deposits or certificates of deposit (having original maturities of no more than 365 days) of depository institutions or trust companies incorporated under the laws of the United States of America or any state thereof (or domestic branches of any foreign bank) and subject to supervision and examination by federal or state banking or depository institution authorities; provided that at the time such investment, or the commitment to make such investment, is entered into, the short-term debt of such depository institution or trust company shall have a rating of at least P-1 from Moody's and F1 from Fitch IBCA (if rated by Fitch IBCA).

"Person" means an individual, bank, financial institution, partnership, limited liability company, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, government or any agency or political subdivision thereof or any other entity.

"Primary Asset Proceeds" means, on any day, all amounts held by the Company (exclusive of amounts held by the Company in respect of Asset Interests sold to any Liquidity Provider under a Liquidity Purchase Agreement) on such day constituting (a) Collections of Asset Interests under any Funding Agreement, (b) to the extent not constituting Collections, payments of Yield in respect of any Asset Interests, (c) proceeds of Commercial Paper Notes, (d) proceeds of Liquidity Loans, (e) proceeds of Liquidity Purchases, (f) proceeds of Supplemental Enhancement Draws, (g) proceeds from the sale, assignment or other disposition of Asset Interests by the Company, (h) proceeds of

-13-

DZB074508

Swing-Line Advances made to the Company for the purpose of financing its acquisition and/or maintenance of Asset Interests, and (i) proceeds of Hedge Contracts.

"Private Placement Memorandum" means, with respect to the Commercial Paper Notes, each private placement memorandum prepared by or on behalf of the Company in connection with the issuance of the Commercial Paper Notes, as the same may be replaced, amended or supplemented from time to time.

"Program Default" means (i) the Company shall have failed to repay any Commercial Paper Note when due and payable, (ii) any proceeding shall be instituted by or against the Company seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), any such proceeding shall remain undismissed or unstayed for a period of 60 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for it, or for any substantial part of its property) shall occur, or (iii) a Program Deficiency shall have occurred and continued for 5 consecutive days.

"Program Deficiency" means, as of any date of determination, that (x) the aggregate Face Amount of all outstanding Commercial Paper Notes on such day, exceeds (y) the aggregate of the Available Liquidity Commitment Amount for all Funding Agreements on such day.

"Program Documents" means this Agreement, the Commercial Paper Depositary Agreement, the Commercial Paper Placement Agreements, the Funding Agreements, the Liquidity Agreements, the Supplemental Enhancement Agreements, if any, the Security Agreements, the Management Agreement, the Swing-Line Credit Agreement, and any Hedge Contracts.

"Program Report" means the monthly portfolio summary substantially in the form of Exhibit H hereto, to be prepared by the Administrator based upon the information provided to the Administrator by the Sellers.

"Program Termination Events" means any of the following:

(a)  any notice is received by the Company from the Administrator or by the Administrator from the Company, in either case, pursuant to Section 6.01(a)(i), and a new Administrator does not assume the responsibilities of the Administrator within 60 days following the date of such notice;

-14-

DZB074509

(b)     any notice is received by the Administrator from the Company pursuant to Section 6.01(a)(ii) in respect of any material adverse regulatory, accounting or tax consequences to the Company; and

(c) the net worth of the Company as of the end of any calendar month, based upon the Administrator's determination thereof as of the Net Worth Calculation Date for such month, shall be zero or negative and shall have continued zero or negative for the next 5 succeeding Business Days after such Net Worth Calculation Date.

"Securities Act" has the meaning specified in the Preliminary Statements hereto.

"Security Agreement" means with respect to any Funding Agreement with respect to which a Liquidity Loan Agreement is executed, a Security Agreement specifically relating to such Funding Agreement to be executed by the Company and the relevant Collateral Agent thereunder, which Security Agreement shall be substantially in the form of Exhibit B hereto with such changes in form or substance as may be approved by the Administrator, or in such other form as may be approved by the Administrator, in each case, as the same may be amended, supplemented, or otherwise modified from time to time.

"Seller" means, in respect of any Funding Agreement, any one or more of the following Persons as determined by the Administrator as the context may require (i) the Person that originated, acquired or owned the Underlying Assets underlying the related Asset Interest (if any) prior to the creation of such Asset Interest, (ii) if different from the Person described in clause (i) hereof, the owner of any such Underlying Assets at the time of creation of such Asset Interest, (iii) the Person issuing and/or liable under such Asset Interest, and/or (iv) any trustee or other agent acting for the benefit of the holders of such Asset Interest.

"Stop Event" means an event which is designated as a "Stop Event" by the Administrator in writing at the time of the execution of each Funding Agreement.  Such events will be determined by the Administrator and may include, without limitation, non-compliance with coverage test requirements under the applicable Funding Agreement.

"Supplemental Enhancement Agreement" means any one of the enhancement agreements with respect to any Funding Agreement executed between the Company and the enhancement provider thereunder, in form or substance as may be approved by the Administrator, as the same may be amended, supplemented or otherwise modified from time to time.

"Supplemental Enhancement Draws" means with respect to any Supplemental Enhancement Agreement, any funds advanced to or for the account of the Company.

-15-

DZB074510

"<u>Supplemental Enhancement Obligations</u>" means all obligations of the Company to the Supplemental Enhancement Provider under any Supplemental Enhancement Agreement, if any, including, without limitation, (i) the obligation to reimburse any Supplemental Enhancement Provider for any Supplemental Enhancement Draw, (ii) the obligation to pay interest on the unreimbursed amount of any Supplemental Enhancement Draw and (iii) all obligations in respect of fees, costs, expenses and indemnities.

"<u>Supplemental Enhancement Provider</u>" means any one of the Persons having a commitment to advance funds to or for the account of the Company under any Supplemental Enhancement Agreement.

"<u>Swing-Line Advance</u>" means any loan or advance made to the Company by DG pursuant to the Swing-Line Credit Agreement.

"<u>Swing-Line Credit Agreement</u>" means that certain Swing-Line Credit Agreement between the Company and DG, pursuant to which DG may, in its sole discretion, elect to make unsecured loans, advances or other extensions of credit to the Company from time to time upon the Company's request therefor, which agreement shall be substantially in the form of <u>Exhibit G</u> attached hereto, with such changes in form or substance as may be approved by the Administrator (as the same may be amended, supplemented or otherwise modified from time to time).

"<u>Transaction Support Requirements</u>" means, with respect to a Funding Agreement, the following:

(i) the existence of a Liquidity Agreement with respect to such Funding Agreement under which the sum of the used and unused Liquidity Commitments or Purchase Commitments, as the case may be, shall be no less than 102% of the aggregate dollar amount of the Purchase Limit under such Funding Agreement, and

(ii) if the Administrator shall determine that the execution of a Supplemental Enhancement Agreement with respect to such Funding Agreement is necessary based upon the structure of the transaction evidenced by such Funding Agreement and the assets acquired thereunder, then the Company shall have entered into a Supplemental Enhancement Agreement providing for Supplemental Enhancement Draws to the Company in an amount determined by the Administrator.

"<u>Underlying Assets</u>" has the meaning specified in the Preliminary Statements hereto.

SECTION 1.02.  <u>Accounting Terms</u>.  As used herein, unless otherwise specifically defined in this Agreement and unless the context requires a different meaning, all accounting terms shall be construed in accordance with GAAP.

-16-

Confidential

SECTION 1.03.  Computation of Time Periods.  Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."

# ARTICLE II

## APPOINTMENT OF THE ADMINISTRATOR

SECTION 2.01.  Appointment and Authority of the Administrator.  The Company hereby appoints the Administrator as its agent to administer, on the Company's behalf, all of the operations of the Company in connection with or relating to (a) the acquisition and administration of Asset Interests, and other investments that may from time to time be made by the Company, (b) the issuance, sale and payment of the Commercial Paper Notes, (c) the implementation and administration of the Liquidity Agreements, the Supplemental Enhancement Agreements  and the other Program Documents, as applicable and (d) related operations and activities of the Company. The Administrator hereby accepts such appointment.  The provisions of this Section 2.01 are solely for the benefit of the Administrator and the Company and no Seller shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties under this Agreement, the Administrator shall act solely as agent of the Company and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Seller or any party other than the Company.

# ARTICLE III

## SERVICES AND DUTIES OF THE ADMINISTRATOR

SECTION 3.01.  Identification of Sellers and Execution of Funding Agreements. (a)  The Administrator's duties on behalf of the Company in connection with the Company's acquisition of Asset Interests that may from time to time be made by the Company shall include, without limitation, the following:

(i)  the Administrator shall identify on behalf of the Company, parties potentially interested in selling or assigning Asset Interests, or transferring or granting security interests in Asset Interests, to the Company; and

(ii)  the Administrator shall make offers on behalf of and for the account of the Company to such parties identified in paragraph (a)(i) above to enter into Funding Agreements and negotiate and execute such Funding Agreements on behalf of the Company with respect to the acquisition of such Asset Interests for or on behalf of the Company, subject in each case to the Company's approval.

-17-

Confidential

DZB074512

The Administrator shall not arrange for the Company to enter into or become bound by any Funding Agreement, and the Company shall not enter into, or become bound by any Funding Agreement, if (a) any Program Termination Event has occurred and is continuing or would result therefrom, or (b) any of the Funding Agreement Requirements or the Transaction Support Requirements are not satisfied with respect to such Funding Agreement.

SECTION 3.02.  Administration of Securitization Transactions and Other Permitted Investments.  The Administrator's duties on behalf of the Company in connection with the Company's administration of Asset Interests and other investments that may from time to time be made by the Company shall include, without limitation, the following:

(a)   depositing all funds remitted to the Company, including, without limitation, all Primary Asset Proceeds, into one or more AFC Accounts or, to the extent required pursuant to any related Security Agreement, into the Collateral Account (as defined in such Security Agreement), and applying such funds in the AFC Accounts or any such Collateral Account to the payment of the obligations owing by the Company from time to time or as the Administrator shall otherwise direct; provided, however, that, subject to the provisions of any Liquidity Agreement, Security Agreement or Hedge Contract governing the application and/or allocation of Primary Asset Proceeds relating to a Funding Agreement, the Administrator shall apply funds in the AFC Account in respect of such Funding Agreement or any of the Collateral Accounts constituting Primary Asset Proceeds in respect of such Funding Agreement, (i) first, to the payment of matured Commercial Paper Notes allocated by the Administrator from time to time to fund the acquisition or maintenance of Asset Interests relating to such Funding Agreement and to settle related Hedge Contracts; provided that following the occurrence of a Program Default, all Primary Asset Proceeds received on such day shall be remitted on any day, subject to the limitations arising under any Liquidity Agreement, Security Agreement or Hedge Contract, to the Issuing and Paying Agent to be applied to the repayment of all outstanding Commercial Paper Notes ratably in accordance with the terms of the Commercial Paper Depositary Agreement; (ii) second, subject to Section 2.5 of the Swing-Line Agreement, to the payment of principal of, and accrued and unpaid interest on, any outstanding Swing-Line Advance; (iii) third, to the purchase of additional Asset Interests related to such Funding Agreement; (iv) fourth, to the payment of any outstanding Liquidity Loan Obligations or fees, costs, expenses and other amounts under any Liquidity Purchase Agreement, in each case, which are currently due and payable under (and in accordance with the terms of) any such Liquidity Loan Agreement or Liquidity Purchase Agreement (as the case may be) related to such Funding Agreement and, in the Administrator's discretion, to the payment of any principal or interest amounts, any other amounts for which reserves have been established under the related Funding Agreement not to exceed such reserves, any other amounts permitted by Section 5.02 below, in each case, that are outstanding under any Liquidity Loan Agreement; (v) fifth, (X) to the payment of interest, fees, costs, expenses and other amounts which are currently due and payable under any Supplemental Enhancement Agreement related to such Funding Agreement which fees, costs, expenses and other amounts are allocable to such Funding Agreement, and (Y) to the payment of other Supplemental Enhancement

-18-

Confidential

Obligations not included in (X) of this clause (v), if, either (I) all Commercial Paper Notes allocated to such Funding Agreement have been paid in full or (II) the payment of such other Supplemental Enhancement Obligations results in the reinstatement of the amount available to be drawn under such Supplemental Enhancement Agreement (but only to the extent so reinstated); (vi) sixth, to the payment of such other amounts (including any costs, expenses and indemnities arising under the agreements described in the immediately succeeding clause (vii), but excluding any fees payable under such agreements) as may be owing by the Company from time to time in such order as the Administrator shall deem appropriate, but not to exceed in the aggregate $100,000 per year for each Funding Agreement pursuant to which the Company has acquired Asset Interests or such greater amount with respect to any Funding Agreement; provided that each of the rating agencies rating the Commercial Paper Notes has confirmed in writing that the payment of such greater amount will not result in the reduction or withdrawal of the respective ratings of the Commercial Paper Notes; and (vii) seventh, to the payment of all fees owing to the Manager and the Administrator for their performance of services under and pursuant to the Management Agreement and this Agreement, respectively;

(b)  to the extent that the Company shall from time to time have funds which are not then required for the payment of maturing Commercial Paper Notes, the acquisition or maintenance of Asset Interests, the payment of Liquidity Loan Obligations, the payment of Supplemental Enhancement or the payment of any other obligations of the Company, applying such funds on behalf and for the account of the Company to the acquisition of Other Permitted Investments; provided, however, that (i) in no event shall the Administrator so apply funds of the Company if such application will cause the Company to become subject to registration as an "investment company" under the Investment Company Act and (ii) recognizing the obligation of the Company to pay the Commercial Paper Notes as they mature and to ensure the availability of such funds for such repayment obligation, the Administrator shall acquire such Other Permitted Investments in such amounts and maturities as it deems appropriate in consideration of the amounts and maturities of the outstanding Commercial Paper Notes;

(c)  from time to time upon the request by the Company, or as otherwise deemed advisable by the Administrator, arranging for Hedge Contracts to be entered into by the Company in connection with any Asset Interests or Other Permitted Investments; provided, however, that at the time that any such Hedge Contract is entered into by the Company, the short-term debt of each counterparty thereto shall have a rating of at least P-1 by Moody's and F1 by Fitch IBCA (if rated by Fitch IBCA);

(d)  monitoring and enforcing on behalf of the Company compliance with the terms of Funding Agreements by the Sellers thereunder, and Hedge Contracts by the counterparties thereunder;

(e)  recording, accounting for and enforcing payment of amounts distributable or payable to the Company in connection with each Asset Interest or Other Permitted Investment acquired or held on behalf and for the account of the Company and each

-19-

Hedge Contract entered into in connection therewith, and arranging for payments on Asset Interests to be collected from the Obligors in respect thereof and under Hedge Contracts from the Obligors thereunder on behalf of and for the account of the Company;

(f) on the request of the Company, arranging for the sale or other divestment of any Asset Interest in accordance with this Agreement and the other Program Documents or for the termination, cancellation, offsetting or assignment of any Hedge Contract;

(g) holding, maintaining and preserving records with respect to acquisitions of, or investments in, sales or divestitures of, and distributions and payments in connection with, Asset Interests, and Other Permitted Investments and with respect to any related Hedge Contracts; and

(h) taking such other steps as may be necessary or appropriate to enable the Company to perform its duties or exercise its rights under or in connection with any Funding Agreement, any Other Permitted Investments or any Hedge Contract.

SECTION 3.03.  Maintenance of Liquidity and Credit Support for Commercial Paper Notes.  The Administrator's duties on behalf and for the account of the Company in connection with the Liquidity Agreements and the Supplemental Enhancement Agreements, shall consist of the following:

(a) making requests for Liquidity Loans under the Liquidity Loan Agreements, Liquidity Purchases under the Liquidity Purchase Agreements and Supplemental Enhancement Draws under any Supplemental Enhancement Agreements;

(b) arranging for the payment of amounts distributable or payable under the Liquidity Agreements and any Supplemental Enhancement Agreements;

(c) holding, maintaining and preserving records with respect to Supplemental Enhancement Draws under any Supplemental Enhancement Agreements and Liquidity Loans under the Liquidity Loan Agreements, Liquidity Purchases under the Liquidity Purchase Agreements;

(d) giving notices and preparing reports required by the Liquidity Agreements and any Supplemental Enhancement Agreements, based on information made available to the Administrator in the performance of its duties hereunder;

(e) giving notice to each rating agency rating the Commercial Paper Notes (at the request of the Company and/or the Administrator) of any assignment by a Liquidity Provider under a Liquidity Agreement or a Supplemental Enhancement Provider under a Supplemental Enhancement Agreement of all or any part of its commitment to lend or otherwise advance (or in the case of a Liquidity Purchase Agreement, to purchase) thereunder, together with delivery of appropriate officer's certificates or enforceability opinions, as necessary to such rating agencies, and, prior to any such assignment by any

–20–

DZB074515

Liquidity Provider to any other prospective Liquidity Provider whose commercial paper or short-term deposits have a rating of less than P-1 from Moody's or F1 from Fitch IBCA (if rated by Fitch IBCA), acquiring written confirmation from each such rating agency that such assignment to such prospective Liquidity Provider will not result in any reduction or withdrawal of the respective rating of the Commercial Paper Notes by such rating agency;

    (f) ensuring that at all times during the term of this Agreement the aggregate number of different Persons in the capacities of Liquidity Providers, and to the extent that the Company is obligated to repay Supplemental Enhancement Draws therefrom, Supplemental Enhancement Providers (including any Person having a participation interest in the rights of any such Liquidity Provider or Supplemental Enhancement Provider), shall not exceed eighty (80); and

    (g)    taking such other steps as may be necessary or appropriate to enable the Company to perform its duties and exercise its rights under the Liquidity Agreements and any Supplemental Enhancement Agreements.

    SECTION 3.04. <u>Issuance of Commercial Paper Notes</u>. The Administrator's duties on behalf of the Company in connection with the Company's issuance, sale and payment of the Commercial Paper Notes shall include, without limitation, the following:

    (a) advising one or more of the commercial paper placement agents for the Company with respect to the Commercial Paper Notes from time to time of the funding requirements of the Company, determining on behalf of the Company, in consultation with one or more of such commercial paper placement agents in connection with each issuance of Commercial Paper Notes the principal (or face) amount, interest rate (or rate of discount), issuance date and maturity date of such Commercial Paper Notes and advising such commercial paper placement agents from time to time of the desire of the Company to sell Commercial Paper Notes;

    (b) giving instructions on behalf of the Company to the Issuing and Paying Agent, to issue and deliver, from time to time, Commercial Paper Notes in connection with the acquisition or maintenance of Asset Interests under Funding Agreements; <u>provided, however</u>, that in no event will the Administrator give instructions to the Issuing and Paying Agent to issue Commercial Paper Notes with respect to the acquisition or maintenance of Asset Interests (I) under any Funding Agreement, if:

    (i) after giving effect to such issuance and the use of the proceeds thereof, the aggregate of the Available Liquidity Commitment Amount for all Funding Agreements would be less than the aggregate Face Amount of all outstanding Commercial Paper Notes;

    (ii) the maturity date of any such Commercial Paper Note is not a Business Day or is later than the earliest of:

–21–

DZB074516

(A) the 270th day from and including the date of issuance of such Commercial Paper Note, and

(B) the fifteenth day preceding the Scheduled Liquidity Commitment Termination Date or Scheduled Purchase Commitment Termination Date, as applicable, under the related Liquidity Agreement;

(iii) either (A) the Administrator shall have received the notice from the Company referred to in clause (i) or clause (ii) of Section 6.01(a), (B) the date of issuance of such Commercial Paper Notes would occur after the effective date of an order issued by a regulatory, tax or accounting body ordering that the activities of the Company contemplated hereby be terminated (an "Order Effective Date") or (C) the maturity date of any such Commercial Paper Note is scheduled to occur after any Order Effective Date of which the Administrator has actual knowledge at the time of issuance of such Commercial Paper Note;

(iv) such Commercial Paper Notes would be required to be registered under the Securities Act;

(v) the net worth of the Company as of the end of the most recently ended calendar month, based upon the Administrator's determination thereof as of the Net Worth Calculation Date for such month was less than $25,000, and shall have continued less than $25,000 for the next 5 succeeding Business Days after such Net Worth Calculation Date;

(vi) after giving effect to such issuance, the aggregate outstanding Face Amount of all Commercial Paper Notes is greater than $2,000,000,000;

(vii) a Program Default shall have occurred (provided, that for the purposes of this clause (vii), a Program Default shall be deemed to have occurred upon the occurrence of any Program Deficiency); or

(viii) the Commercial Paper Depositary Agreement shall not then be in full force and effect;

or (II) under a certain Funding Agreement, if:

(i) after giving effect to such issuance and the use of proceeds thereof, the Transaction Support Requirements shall not have been satisfied with respect to such Funding Agreement; or

(ii) a Stop Event shall have occurred under such Funding Agreement; or

(iii) (a) such Funding Agreement is entered into in connection with Asset Interests which are Highly-Rated Asset Interests, and (b) after giving effect to any

-22-

applicable Hedge Contracts (1) the yield to be paid to the Company on its investment in the Highly-Rated Asset Interests under such Funding Agreement is less than the sum of (A) the Yield to be paid by the Company on the Commercial Paper Notes issued to fund or maintain its investment in such Highly-Rated Asset Interests plus (B) all carrying costs, fees and expenses payable by or on behalf of the Company with respect to the Commercial Paper Notes issued to fund or maintain its investment in such Highly-Rated Asset Interests or (2) the Available Liquidity Commitment under the Liquidity Agreement relating to such Funding Agreement is less than the Face Amount of the Commercial Paper Notes issued to fund or maintain the Company's investment in such Highly-Rated Asset Interests up to the next date upon which yield is due to be paid on such Highly-Rated Asset Interests.

(c)  applying, on behalf and for the account of the Company, the proceeds of the sale of Commercial Paper Notes as set forth in the Program Documents;

(d)  holding, maintaining and preserving books and records with respect to the Company's issuance, sale and repayment of Commercial Paper Notes and with respect to the Company's acquisition of Asset Interests and Other Permitted Investments; and

(e)  taking such other actions on behalf of the Company as may be necessary or appropriate to carry out the activities contemplated by clauses (a) through (d) above.

SECTION 3.05.  Usage of the Liquidity Agreements and Supplemental Enhancement Agreements.  The Administrator shall perform the following duties in connection with usage of the applicable Liquidity Agreement and the applicable Supplemental Enhancement Agreement, if any, for the payment of maturing Commercial Paper Notes issued in connection with a Funding Agreement and for the funding of the Company's acquisition of related Asset Interests:

(a)  not later than 1:00 P.M., New York City time, on the stated maturity date of any outstanding Commercial Paper Notes, the Administrator shall:

(i)  determine the aggregate Face Amount of such maturing Commercial Paper Notes,

(ii)  determine the amount of cash in the related AFC Account(s) and available for payment of such maturing Commercial Paper Notes and the amount of cash which is expected to be received on such maturity date as proceeds of sales of new Commercial Paper Notes related to the same Asset Interests as the maturing Commercial Paper Notes,

(iii)  calculate the expected deficiency, if any, between the amounts described in clause (i) and the amounts described in clause (ii) with respect to such maturing Commercial Paper Notes, and

-23-

DZB074518

(iv)  give notice to the Company if the expected deficiency determined pursuant to clause (iii) above is greater than zero;

(b)  subject to Section 3.04(b), on the stated maturity date referred to in subsection (a) above, the Administrator shall instruct the Issuing and Paying Agent and one or more of the commercial paper placement agents for the Company with respect to the Commercial Paper Notes to proceed with the issuance and sale on such maturity date of the new Commercial Paper Notes referred to in clause (a)(ii) above and cause the amount referred to in such clause (a)(ii), to the extent necessary to pay maturing Commercial Paper Notes, to be applied to the payment of such maturing Commercial Paper Notes;

(c)  if at any time (i) the Administrator determines that the Company will not have funds available from the sale of new Commercial Paper Notes or otherwise (other than from the proceeds of a Liquidity Loan or a Liquidity Purchase) in an amount sufficient to pay maturing Commercial Paper Notes, (ii) pursuant to a Funding Agreement, the Seller thereunder shall have requested, and the relevant Deal Agent and/or the Administrator shall have agreed, that the Yield with respect to any Asset Interest thereunder for the next succeeding Purchase Period shall be calculated at the Alternative Rate, or (iii) the Company shall notify the Administrator that the Company prefers (A) to fund any Asset Interest, or portion thereof, by drawing under a Liquidity Agreement, or (B) to fund the payment of maturing Commercial Paper Notes with respect to any Asset Interest, or portion thereof, by drawing under a Liquidity Agreement or a Supplemental Enhancement Agreement, if any, rather than by selling Commercial Paper Notes or otherwise, then the Administrator shall, on behalf and for the account of the Company, first, at the time and in the manner required by any Liquidity Agreement to the extent available thereunder, request the Liquidity Providers to make a Liquidity Loan or Liquidity Purchase under any such Liquidity Agreement, such Liquidity Loan or Liquidity Purchase, as the case may be, to be requested pursuant to the requirements set forth in such Liquidity Agreement, and second, at the time and in the manner required by any Supplement Enhancement Agreement to the extent available thereunder, request the Supplemental Enhancement Providers to make a Supplemental Enhancement Draw under any such Supplemental Enhancement Agreement, such Supplemental Enhancement Draw to be requested pursuant to the requirements set forth in such Supplemental Enhancement Agreement;

(d)  apply the proceeds of any Liquidity Loan or Liquidity Purchase, as the case may be, under a Liquidity Agreement or any Supplemental Enhancement Draw under a Supplemental Enhancement Agreement in the manner required by the terms of this Agreement and of such Liquidity Agreement, Supplemental Enhancement Agreement and Commercial Paper Depositary Agreement, respectively;

(e)  if at any time the Administrator determines that a Program Deficiency has occurred, the Administrator shall (i) on behalf and for the account of the Company, as soon as allowed and in the manner required by each Liquidity Agreement, request each Liquidity Provider to make a Liquidity Loan or Liquidity Purchase under their respective Liquidity Agreements in an aggregate amount equal to the Available Liquidity

-24-

DZB074519

Commitment Amount thereunder, and (ii) pursuant to <u>Section 3.02(a)</u>, cause the proceeds of such Liquidity Advances and Liquidity Purchases to be remitted to the Issuing and Paying Agent to be applied to the repayment of all outstanding Commercial Paper Notes ratably in accordance with the terms of the Commercial Paper Depositary Agreement;

(f) allocate and re-allocate Commercial Paper Notes among Funding Agreements as may be necessary or appropriate in the determination of the Administrator; and

(g) take such other actions on behalf of the Company as may be necessary or appropriate, in the determination of the Administrator, to carry out the activities contemplated by the immediately preceding <u>clauses (a)-(g)</u>.

SECTION 3.06.  <u>Other Duties of the Administrator</u>.

(a)  The Administrator shall provide the Company with quarterly reports of the outstanding Capital under each Funding Agreement and the outstanding Commercial Paper Notes. At the request of the Company's management committee or its officers, the Administrator shall provide the Company with additional information, including such information as may be necessary to enable the Company to determine whether the Administrator is in compliance with its obligations hereunder.  The Administrator shall notify each commercial paper placement agent with respect to the Commercial Paper Notes (i) of each amendment to and written waiver of any provision of this Agreement and the other Program Documents as required to be provided by the Company pursuant to the terms hereof and of the applicable Commercial Paper Placement Agreements (in each case in such manner and at such times as may be required by the terms hereof or of such Commercial Paper Placement Agreement) and (ii) of the termination of this Agreement in accordance with the terms of <u>Section 6.01</u> by delivery to each commercial paper placement agent for the Company with respect to the Commercial Paper Notes of a copy of such written notice of termination.

(b)  The Administrator shall also apply for ratings of the Commercial Paper Notes (if determined to be necessary by the Company and/or the Administrator) from at least two nationally recognized rating agencies to be selected by the Administrator, select one or more depositary agents and one or more commercial paper placement agents for the Company with respect to the Commercial Paper Notes, and establish and maintain bank accounts for the Company and arrange for the retention of legal counsel and accounting firms for the Company.

(c)    The Administrator shall arrange for the execution by the Company of the Swing-Line Credit Agreement, and the Administrator shall make draws thereunder for the benefit of the Company in such amounts as the Administrator may determine; <u>provided, however,</u> that the maximum principal obligations of the Company under the Swing-Line Credit Agreement may not exceed $500,000 at any time outstanding.

(d)  In the event that the Administrator is unable to perform any of its duties under this Agreement or any other agreement relating to the Company, the Administrator shall promptly so notify the Company as provided in <u>Section 6.01(a)</u>.

–25–

Confidential

(e)  The Administrator shall make all calculations and determinations (which calculations and determinations shall be conclusive and binding absent manifest error) and give all notices or other information required of it or the Company under any agreement relating to the operations of the Company to which it or the Company is a party.

(f)  The Administrator shall maintain proper books of account and complete records of all transactions undertaken or performed by it and shall, upon request, render statements or copies thereof to the Company and shall cooperate in all audits of the Company; provided, however, that the Administrator shall not be responsible for preparing the tax returns of the Company, but shall nevertheless cooperate in providing information necessary for the preparation thereof.

(g)  The Administrator shall as soon as practicable, but in no event later than 15 Business Days following the end of each calendar month, deliver a Program Report to the Company, each rating agency rating the Commercial Paper Notes at the request of the Company and/or the Administrator, and each commercial paper placement agent for the Company with respect to the Commercial Paper Notes.

(h)  In performing its duties and services hereunder, the Administrator will not take, or permit any Person acting on its behalf to take, any action (including, without limitation, any action to amend or waive any provision of this Agreement or any of the other Program Documents) that would materially adversely affect the interests of the holders of the Commercial Paper Notes, as measured immediately prior to the taking of such action.

(i)  The Administrator shall execute such agreements, instruments and other documents as may be necessary or appropriate to the performance of its duties hereunder.

(j)  The Administrator shall promptly notify each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator of the appointment of any successor Collateral Agent under any Security Agreement or any commercial paper placement agents under the Commercial Paper Placement Agreements.

(k)  The Administrator shall promptly provide written notice to the Company, each Collateral Agent under any Security Agreement, each Liquidity Agent under any Liquidity Loan Agreement, the Issuing and Paying Agent, each commercial paper placement agent with respect to the Commercial Paper Notes and each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator of the occurrence of any Program Termination Event or Program Default (provided, that for the purposes of this provision, a Program Default shall be deemed to have occurred upon the occurrence of any Program Deficiency).

(l)  The Administrator shall, on behalf of the Company and subject to the review and approval of the Company, (i) prepare a Private Placement Memorandum in connection with the sale of the Commercial Paper Notes pursuant to the applicable Commercial Paper Placement Agreement and in that regard the Administrator will ensure that such Private Placement

-26-

Confidential

Memorandum does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading, and (ii) update from time to time such Private Placement Memorandum to ensure that such Private Placement Memorandum does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(m)  Subject to the limitations of Sections 3.02(a) and (b), the Administrator shall arrange for the timely payment of costs, fees, expenses, taxes and other amounts owed by the Company from time to time from the Company's available funds, and in furtherance of the foregoing, the Administrator shall negotiate Funding Agreement terms pursuant to Section 3.01 such that the Company has or is likely to have available funds to pay such amounts when due.

(n)  The Administrator shall promptly provide written notice to each commercial paper placement agent with respect to the Commercial Paper Notes in the event that, notwithstanding the occurrence of a Stop Event with respect to a particular Funding Agreement, the Company expects to issue additional Commercial Paper Notes in order to fund or maintain Asset Interests acquired in connection with such Funding Agreement.

SECTION 3.07.  Termination Procedures.  Upon the occurrence of any Program Termination Event or any Program Default, the Administrator shall take or direct such other Person as may be authorized to do so under each Funding Agreement to take, such action as may be necessary under such Funding Agreement to cause the earliest practical date permitted under such Funding Agreement to be the Termination Date thereunder, whereupon the Company will cease to make further acquisitions of Asset Interests thereunder or to permit the Collection Agent thereunder to reinvest Collections in Eligible Assets on behalf of the Company.

## ARTICLE IV

## OTHER PROVISIONS RELATING TO THE POWERS AND DUTIES AND COMPENSATION OF THE ADMINISTRATOR

SECTION 4.01.  Standard of Care: Indemnification.

(a)  In performing its responsibilities and duties hereunder, the Administrator shall diligently perform such responsibilities and duties in conformity with the Company's underlying obligations with respect thereto and shall exercise the standard of care of a prudent person in connection with the administration of assets or investments similar to the Asset Interests and, in no event with less care than it would exercise in taking actions for its own account, but it shall not be responsible to the Company (other than for the Administrator's own actions) (i) for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of any of the Program Documents, the Asset Interests, or any other documents in connection with the Program Documents, or (ii) for any representations, warranties, recitals, statements, instruments, reports, certificates of any Person other than the Administrator.  Notwithstanding any provision to

–27–

DZB074522

the contrary elsewhere in this Agreement, the Administrator shall not have any duties or responsibilities, except those expressly set forth herein, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against the Administrator.  Neither the Administrator nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement if such action or omission is consistent with that of a prudent person under the circumstances.  The Administrator shall be entitled to rely on any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys, accountants, experts and other professional advisors selected by it.

(b)  The Administrator hereby agrees to indemnify and hold the Company and its managers, members, officers and affiliates (the "Company Indemnified Parties") harmless against any and all losses, claims, damages, causes of action, suits, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) or judgments of whatever kind and nature, imposed upon, incurred by or asserted against the Company or the Company Indemnified Parties arising out of or based upon (i) any untrue statement or alleged untrue statement of a material fact contained in the Disclosure Documents or the Program Report or the omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, except to the extent such untrue statement of material fact included therein or such material fact omitted therefrom is based on and in conformity with information that has been provided to the Company (A) in the case of the Disclosure Documents, by a commercial paper placement agent for the Company with respect to the Commercial Paper Notes in writing expressly for use therein or (B) in the case of the Program Report, by or on behalf of a Seller, (ii) the breach by the Administrator of a representation or warranty made by it hereunder or (iii) a default by the Administrator in the performance of its obligations and duties hereunder (including its obligations to assist the Company in the preparation of Program Reports and Disclosure Documents).

(c)  Notwithstanding anything herein to the contrary, the Company and the Administrator hereby acknowledge that each commercial paper placement agent for the Company with respect to the Commercial Paper Notes is a third party beneficiary of Section 4.01(b) and is entitled to the benefits of the indemnity from the Administrator contained therein and to bring any action to enforce such indemnification directly against the Administrator in respect of any claim, loss or expense which such commercial paper placement agents may incur which result from a breach by the Administrator as described in Sections 4.01(b), and in the case of any such claim for indemnification by such commercial paper placement agent, the Administrator shall pay the amount of such indemnity directly to such commercial paper placement agent as if such commercial paper placement agent were named as a "Company Indemnified Party" herein.  In this regard and for the purposes of Section 4.01(b), (i) the last sentence of Section 2.01 shall not restrict the Company's or any such commercial paper placement agent's rights to enforce the indemnity contained in Sections 4.01(b) and (ii) Section 4.04 shall be deemed to commence with the words "Subject to Section 4.01(c)".

-28-

Confidential

DZB074523

SECTION 4.02.  <u>Direction by the Company; Conformity with Law and Covenants</u>. Notwithstanding anything herein to the contrary, the Administrator shall perform its duties hereunder subject to the direction of the Company and in a manner consistent with the Company's certificate of formation and operating agreement and with any applicable resolutions of the management committee of the Company in effect from time to time. Neither the Manager nor the Company shall be responsible for supervising the activities of the Administrator and neither the Manager nor the Company shall incur any liability for actions taken by, or omissions of, the Administrator, other than at the direction of the Manager or the Company, respectively.  The Administrator will not, in performing its obligations hereunder, (a) take any action that would cause the Company to be in violation of (i) any law, rule or regulation applicable to it, (ii) any provision of the certificate of formation or operating agreement of the Company or (iii) any of the covenants set forth in <u>Section 5.02</u> of this Agreement,  (b) take any action that would cause the Company to become subject to registration as an "investment company" under the Investment Company Act, (c) knowingly cause the Company to violate any of the Company's agreements, or (d) knowingly cause the Company to incur any obligation or to become bound by any agreement which, in the reasonable judgment of the Administrator, the Company would not reasonably be able to satisfy or perform.

SECTION 4.03.  <u>Attorney-in-Fact; Limitations on Authority of the Administrator as Attorney-in-Fact; Authority with Respect to Bank Accounts; Nature of Services</u>.  (a)  Subject to <u>subsection (b)</u> of this <u>Section 4.03</u>, the Company hereby irrevocably appoints the Administrator as the Company's attorney-in-fact, with full authority in the place and stead of the Company and in the name of the Company or otherwise, from time to time in the Administrator's discretion, but subject to the direction of the Company, to take such actions on behalf of the Company as may be necessary or advisable for purposes of the administration and management of the operations of the Company, including, without limitation, the execution and delivery of Funding Agreements and the other Program Documents, and the right to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due in connection therewith and to receive, endorse, and collect any drafts or other instruments, documents and chattel paper in connection therewith, and to file any claims or take any action or institute any proceedings which may be necessary or desirable for the collection thereof or to enforce compliance with the terms and conditions of any of such documents, instruments and agreements.

(b)  Anything in <u>subsection (a)</u> of this <u>Section 4.03</u> or elsewhere in this Agreement to the contrary notwithstanding, the Administrator is not hereby authorized to execute on behalf of or as attorney-in-fact for the Company, this Agreement, the Management Agreement, any income or franchise tax return of the Company, or any amendment, modification or waiver to or under any of the foregoing.

(c)  The Company authorizes the Administrator to transfer and deposit funds of the Company to and in such bank accounts as may be established in the name of the Company and to cause the expenses of the Company to be paid from such deposited funds.

(d)  The Administrator shall be permitted to perform its services hereunder through any of its officers or the officers of any of its Affiliates or through any agents selected by it.  The

–29–

Confidential

DZB074524

Administrator shall not be liable for the negligence or misconduct of any agents selected by it with reasonable care. The services of the Administrator to the Company under this Agreement are not to be deemed exclusive, and the Administrator shall be free to render similar services to others.

SECTION 4.04.  Company's Liabilities.  The Administrator shall not be liable for any expenses of the Company, including, but not limited to, the fees of any depositary, depositary agent, issuing and paying agent, commercial paper placement agent, or other agent or placement agent for the sale or payment of the Commercial Paper Notes, any loss or expense of the Company, any salaries, expenses or other compensation of the Company's officers and managers, any loss, claim, damage or expense arising from the misappropriation or fraudulent use of the Company's funds by any of the Company's officers or managers, and any taxes assessed against, or applicable to, the Company.

SECTION 4.05.  Compensation of the Administrator.  In consideration of, and as compensation for, all services to be rendered by the Administrator as described in this Agreement, the Company will pay to the Administrator a fee specified in the letter agreements executed from time to time between the Administrator and the Company.  As additional compensation for the services it provides in connection with the origination and administration of Asset Interests, the Administrator shall, if so agreed to with the Seller, be entitled to (a) an arrangement fee, payable by each Seller (or an Affiliate of such Seller) under a Funding Agreement, in an amount to be agreed on between it and such Seller and/or (b) an administration fee, payable by each Seller (or an Affiliate of such Seller) under each Funding Agreement in an amount, or calculated in a manner to be agreed on between the Administrator and such Seller; provided, however, that any and all fees, costs and expenses owing by the Company to the Administrator hereunder shall be payable out of funds then available to the Company and which are not otherwise required (i) to repay Commercial Paper Notes which are then due and payable or (ii) to be paid to the Liquidity Providers pursuant to the terms of the Liquidity Agreements.

ARTICLE V

REPRESENTATIONS AND COVENANTS OF THE COMPANY

SECTION 5.01.  Representations of the Company.  The Company represents and warrants to the Administrator that:

(a)  The execution, delivery and performance by the Company of this Agreement and the other Program Documents to which it is a party (i) are within the Company's powers, (ii) have been duly authorized by all necessary action, and (iii) do not contravene (A) the Company's certificate of formation or operating agreement or (B) any law or any contractual restriction binding on or affecting the Company.

(b)  No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by the Company of this Agreement.

–30–

Confidential

(c)  This Agreement is the legal, valid and binding obligation of the Company enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, and other similar laws affecting the rights of creditors generally and subject to the availability of equitable remedies (whether considered in a proceeding in equity or at law).

(d)  The Company is not required to be registered under the Investment Company Act.

SECTION 5.02.  Covenants of the Company.  The Company agrees as follows:

(a)  The Company will not issue or sell any Commercial Paper Notes or incur any other indebtedness, except in accordance with the Program Documents.

(b)  The Company will not enter into any Funding Agreement or Supplemental Enhancement Agreement, or make any other purchases, loans or investments (other than the acquisition of Other Permitted Investments as permitted under this Agreement) or enter into any Hedge Contracts or similar transactions without prior notice thereof to the Administrator and prior written confirmation to the Company from each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator, that the Company's entering into such agreement, contract or transaction will not result in the reduction or withdrawal of the respective ratings of the Commercial Paper Notes; provided that in connection with any Highly-Rated Asset Interest, the Company shall not be required to obtain such rating agency confirmation.

(c)  The Company will not sell or otherwise dispose of any portion of any Asset Interest, except (i) to the Seller under and pursuant to the terms of the related Funding Agreement with such Seller, or to such other Person as may be designated by such Seller, (ii) pursuant to any Security Agreement, (iii) pursuant to any Liquidity Purchase Agreement and (iv) as may otherwise be acceptable to the Administrator following confirmation from each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator that such sale or other disposition would not cause the reduction or withdrawal of the rating of the Commercial Paper Notes.

(d)  Except upon dissolution of the Company, the Company will not declare or pay any dividends, or make any distributions upon any of the common stock of the Company (other than dividends and distributions payable only in shares of its common stock), if the effect of such declaration, payment or distribution would be to reduce the paid-in capital and paid-in surplus of the Company determined in accordance with GAAP.

(e)  The Company will not engage in any business other than that contemplated by the Program Documents and any other business and activities incidental thereto.

(f)  The Company will not become a party to any Program Document or other material agreement nor agree to indemnify any Person against any liabilities which may be

-31-

DZB074526

imposed on, incurred by or assessed against such Person, unless each Person party thereto (other
than the Company) agrees that it shall not institute against, or join any other Person in instituting
against, the Company any bankruptcy, reorganization, arrangement, insolvency or liquidation
proceeding, or other proceeding under any federal or state bankruptcy or similar law, for at least
one year and one day after the last maturing Commercial Paper Note issued by the Company is
paid in full (which agreement not to institute any such proceeding shall survive the termination of
such document, material agreement or indemnity); provided, however, that the foregoing shall not
prohibit any indemnification by operation or requirement of law or regulation.

(g)  The Company will not (i) agree to any amendment, waiver or other
modification of or to any provision of this Agreement, the Management Agreement, the Swing-
Line Credit Agreement or the Commercial Paper Depositary Agreement (collectively, the
"Primary Program Documents") to which it is a party or agree to terminate any such Primary
Program Document prior to the scheduled date therefor as set forth therein, to the extent that
such amendment, waiver, modification or termination (as described in this clause (i)) materially
adversely affects the holders of the Commercial Paper Notes or causes the Private Placement
Memorandum to contain an untrue statement of a material fact or omit to state any material fact
necessary to make the statements made therein, in light of the circumstances under which they
were made, not misleading, and (ii) take any of the following actions without the prior written
consent of the Administrator and prior written confirmation from each of the rating agencies that
rate the Commercial Paper Notes at the request of the Company and/or the Administrator that the
rating of the Commercial Paper Notes would not, as a result thereof, be reduced or withdrawn:
(A) amend or modify the certificate of formation or operating agreement of the Company;
(B) merge, consolidate, liquidate, dissolve, reclassify its securities, recapitalize or engage in any
other similar transaction; (C) authorize or issue any capital stock or other securities (other than
Commercial Paper Notes and the capital stock issued by the Company to Broad Street Contract
Services, Inc.); or (D) take any action that would cause the Company to violate the terms of any
Program Document.

(h)  Subject to Section 5.02(g) immediately above, the Company will not so long
as this Agreement is in effect, agree to any amendment, waiver or modification of or to any
provision of any of the Program Documents to which it is a party or agree to terminate any
Program Document (other than any Funding Agreement) at any time prior to the scheduled date
therefor as set forth therein, in either case, without prior written notice thereof to the
Administrator and to each of the rating agencies rating the Commercial Paper Notes at the request
of the Company and/or the Administrator.

(i)  The Company will not consent to any assignment by any Liquidity Provider
of such Liquidity Provider's commitment or any portion thereof to make loans to or purchases
from the Company under any Liquidity Agreement to any other prospective Liquidity Provider
whose commercial paper or short-term debt has a rating of less than P-1 from Moody's or F1
from Fitch IBCA (if rated by Fitch IBCA), without prior written confirmation from each of the
rating agencies rating the Commercial Paper Notes that the rating of the Commercial Paper Notes
will not, as a result of such assignment, be reduced or withdrawn; and the Administrator shall
promptly provide written notice to each of the commercial paper placement agents with respect to

-32-

Confidential

DZB074527

the Commercial Paper Notes of any such assignment. In addition, the Company will not assign any of its rights or obligations under any Liquidity Agreement or under any Funding Agreement (other than pursuant to the terms of the applicable Liquidity Purchase Agreement, if any, or as permitted pursuant to Section 5.02(c)) without prior written confirmation from each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator that the rating of the Commercial Paper Notes will not, as a result of such assignment, be reduced or withdrawn.

(j)     The Company will not pay or prepay any Liquidity Loan Obligations which do not constitute principal or interest or any other amounts for which reserves have been established under the related Funding Agreement, except (A) from amounts paid to the Company by the Seller under the related Funding Agreement for the purpose of enabling the Company to satisfy such Liquidity Loan Obligations or (B) following the Termination Date under such Funding Agreement from (X) Collections of those Asset Interests that were not eligible (as such term is used for calculating any Coverage Shortfall) on such Termination Date or (Y) Collections after all Commercial Paper Notes allocable to such Funding Agreement have been paid in full.

(k)  As soon as practicable, and in any event within three (3) Business Days of receiving written notice thereof, the Company will give each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator and each commercial paper placement agent with respect to the Commercial Paper Notes notice of the occurrence of any Stop Event under any Funding Agreement that continues beyond the applicable grace period, if any.

(l)  The Company will arrange for the preparation of audited annual financial statements of the Company by independent certified public accountants, prepared in accordance with GAAP, consistently applied, and, promptly after the Company's receipt thereof, the Company will deliver a copy of such audited financial statements to each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator.

(m)  Promptly after receiving written notice thereof, the Company will give each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator notice that any Liquidity Provider has been placed on "credit watch" by Moody's or Fitch IBCA, and of the occurrence of any reduction or withdrawal by Moody's or Fitch IBCA of the short-term debt rating of any Liquidity Provider.

(o)     The Company shall, promptly following the receipt thereof, deliver to each rating agency rating the Commercial Paper Notes at the request of the Company and/or the Administrator a copy of the Asset Report provided to the Company by the Seller pursuant to the terms of each Funding Agreement.

(p)   . The Company shall promptly notify each of the Placement Agents in the event it enters into any Liquidity Agreement with a Liquidity Provider other than DG.

-33-

(q)     Solely with respect to Asset Interests which are Highly-Rated Asset Interests, the Company shall monitor, or cause to be monitored on its behalf, no less frequently than monthly, (i) if such Highly-Rated Asset Interests are Asset Backed Securities described in clause (iii)(A) of the definition of Highly-Rated Asset Interests, the long-term debt rating of such Asset Backed Securities, and (ii) if such Highly-Rated Asset Interests are Asset Backed Securities described in clause (iii)(B)(1) of the definition of Highly-Rated Asset Interests, the long-term debt, financial strength or claims-paying rating of the provider of the First Loss Protection for such Asset Backed Securities.

(r)     The Company shall, promptly upon becoming aware of a Downgrade Event, (i) request from each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator confirmation that such Downgrade Event will not result in the reduction or withdrawal of the respective ratings of the Commercial Paper Notes and (ii) notify each commercial paper placement agent with respect to the Commercial Paper Notes of such Downgrade Event.

## ARTICLE VI

## TERMINATION

SECTION 6.01.  Termination.  (a)  This Agreement (other than Sections 4.04, 7.01 and 7.05) shall terminate:

(i)  If the Administrator shall receive a notice of cancellation from the Company or the Company shall receive a notice of cancellation from the Administrator, in which case this Agreement shall terminate on the earlier of (A) the later to occur of (x) the appointment by the Company of, and the assumption of responsibilities by, a successor Administrator and (y) in the case of receipt of notice of cancellation by the Administrator from the Company, the 360th day after the receipt of such notice by the Administrator; and (B) the later to occur of (x) the fifteenth day after the maturity date of the latest maturing Commercial Paper Note outstanding on the date of receipt of such notice of cancellation (or, if such fifteenth day is not a Business Day, the next succeeding Business Day) and (y) the date of final liquidation (by sale, reduction of Capital to zero, or otherwise) of all Asset Interests owned by the Company under all of the Funding Agreements occurring after the Termination Date under the last outstanding Funding Agreement.

(ii)  If at any time the Company shall notify the Administrator or the Administrator shall notify the Company that the continuation of the activities of the Company contemplated hereby may reasonably be expected to cause the Company, DG, the Administrator, or any of their respective Affiliates to suffer materially adverse regulatory, accounting or tax consequences, in which case this Agreement shall terminate at the close of business of the Administrator on the later of (A) the fifteenth day after the maturity date of the latest maturing Commercial Paper Note outstanding on the date of receipt of such

-34-

Confidential

notice (or, if such fifteenth day is not a Business Day, the next succeeding Business Day) and (B) the date of final liquidation (by sale, reduction of Capital to zero, or otherwise) of all Asset Interests owned by the Company under all of the Funding Agreements occurring after the Termination Date under the last outstanding Funding Agreement.

(b)  Upon the occurrence of such termination, the Administrator shall, promptly upon the request of the Company, deliver to the Company all of the books and records in the possession of the Administrator relating to the subject matter of this Agreement.  The Company agrees that it will not appoint a successor Administrator until either the Administrator or the Company receives from each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator written confirmation that the rating of the Commercial Paper Notes would not be reduced or withdrawn as a result of the appointment of the proposed successor Administrator.

## ARTICLE VII

## MISCELLANEOUS

SECTION 7.01.  No Proceedings.  The Administrator hereby agrees that it shall not institute against, or join any other Person in instituting against, the Company any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law, for one year and one day after the latest maturing Commercial Paper Note issued by the Company is paid in full.  The provisions of this Section 7.01 shall survive the termination of this Agreement.

SECTION 7.02.  Effectiveness; Benefits of Agreement.  This Agreement shall become effective upon its execution and delivery by the Company and the Administrator and the execution and delivery by the Company and the Manager of the Management Agreement, and thereafter this Agreement shall be binding on the Company and the Administrator and their respective successors and assigns; provided, however, that, except as permitted pursuant to Section 4.03(c), no party may assign its rights or delegate its obligations under this Agreement without (i) the prior written consent of the other party and (ii) written confirmation from each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator that the rating of the Commercial Paper Notes will not, as a result of such assignment or delegation, be reduced or withdrawn.  Except as provided in Sections 4.01(b) and (c), nothing expressed or implied herein is intended or shall be construed to confer upon or to give to any Person, other than the parties hereto and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or of any term, covenant or condition hereof, and all the terms, covenants, conditions, promises and agreements contained herein shall be for the sole and exclusive benefit of the parties hereto and their respective successors and assigns.

SECTION 7.03.  Amendments.  The provisions of this Agreement may be supplemented, modified or amended by written instrument signed on behalf of the Company and

–35–

DZB074530

the Administrator by their duly authorized officers; provided, however, that no amendment, modification or supplement of or to Sections 3.04, 3.05, 4.02 or 5.02, and no material amendment, modification or supplement of or to any other provision of this Agreement shall be deemed effective prior to the receipt by the Administrator and/or the Company from each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator of written confirmation that the rating of the Commercial Paper Notes would not, as a result of such amendment, modification or supplement, be reduced or withdrawn. The Administrator shall provide written notice of all amendments, modifications or supplements to Sections 3.01, 3.02, 3.03 and 3.06 to each of the rating agencies rating the Commercial Paper Notes at the request of the Company or the Administrator not less than ten (10) days prior to the effectiveness thereof. The Administrator shall send copies of all amendments, modifications or supplements to this Agreement to (i) each of the rating agencies rating the Commercial Paper Notes at the request of the Company and/or the Administrator, prior to the execution thereof by all parties thereto and (ii) each of the commercial paper placement agents for the Company with respect to the Commercial Paper Notes, as soon as possible after the effective date thereof.

SECTION 7.04.  Notices, Etc.  All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including telex communication and communication by facsimile copy) and mailed, telexed, transmitted or delivered, as to each party hereto, at its address set forth under its name on the signature pages hereof or at such other address as shall be designated by such party in a written notice to the other parties hereto.  All such notices and communications shall be effective, upon receipt, or in the case of (a) notice by mail, three days after being deposited in the United States mails, first class postage prepaid, (b) notice by overnight courier, one Business Day after being deposited with a national overnight courier service, (c) notice by telex, when telexed against receipt of answerback or (d) notice by facsimile copy, when transmitted against mechanical confirmation of successful transmission, except that notices and communications pursuant to Section 6.01 shall not be effective until received by the Administrator or the Company, as the case may be.

SECTION 7.05.  Recourse Against Certain Parties.  No recourse under or with respect to any obligation, covenant or agreement of the Company as contained in this Agreement or any of the other Program Documents or any other agreement, instrument or document to which the Company is a party shall be had against any incorporator, stockholder, Affiliate, officer, employee or manager of the Company, the Manager or the Administrator, as such, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute or otherwise; it being expressly agreed and understood that the agreements of the Company and the Administrator contained in this Agreement and all other agreements, instruments and documents entered into pursuant hereto or in connection herewith are, in each case, solely company obligations of the Company and the Administrator, respectively, and that no personal liability whatsoever shall attach to or be incurred by the incorporators, stockholders, Affiliates, officers, employees or managers of the Company, the Manager or the Administrator, as such, or any of them, under or by reason of any of the respective obligations, covenants or agreements of the Company or the Administrator contained in this Agreement or any of the other Program Documents or any other such agreements, instruments or documents, or implied therefrom, and that any and all personal liability of every such incorporator, stockholder, Affiliate, officer,

–36–

employee or manager of the Company, the Manager or the Administrator for breaches by the Company, the Manager or the Administrator of any such respective obligation, covenant or agreement, which liability may arise either at common law or at equity, by statute or constitution, or otherwise, is hereby expressly waived as a condition of and in consideration for the execution of this Agreement; provided, however, that nothing herein contained shall absolve the Administrator of any obligations undertaken by it under this Agreement in its capacity as Administrator.  The provisions of this Section 7.05 shall survive the termination of this Agreement.

SECTION 7.06.  GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF OBJECTION TO VENUE.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK. THE COMPANY AND THE ADMINISTRATOR EACH HEREBY AGREES TO THE JURISDICTION OF ANY FEDERAL COURT LOCATED WITHIN THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER IN ANY OF THE AFOREMENTIONED COURTS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

SECTION 7.07.  WAIVER OF JURY TRIAL.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY AND THE ADMINISTRATOR EACH WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE BETWEEN THE PARTIES HERETO ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  INSTEAD, ANY SUCH DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

SECTION 7.08.  Headings, Etc.  The table of contents and Article and Section headings of this Agreement are inserted in this Agreement for convenience of reference only and are not to be considered part of this Agreement for any other purpose.

SECTION 7.09.  Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts, each of which shall be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

SECTION 7.10.  Confidentiality.  The Administrator (a) hereby acknowledges that in the performance of its duties hereunder and under the other Program Documents it may from time to time receive or otherwise obtain non-public or confidential information relating to particular Sellers under the Funding Agreements and (b) hereby agrees not to disclose any such information to any Person in violation of any applicable restrictions regarding the disclosure thereof contained in any such Funding Agreement or any related instrument, document or agreement between any such Seller and the Company.

-37-

IN WITNESS WHEREOF, the Company and the Administrator have caused this Agreement to be executed as of the day and year first above written.

COMPANY:                    AUTOBAHN FUNDING COMPANY LLC


                            By: _____
                            Name:
                            Title:        RICHARD L. TAIANO
                                          VICE PRESIDENT


                            AUTOBAHN FUNDING COMPANY LLC
                            c/o DG BANK DEUTSCHE
                            GENOSSENSCHAFTSBANK AG
                            609 5th Avenue
                            New York, NY 10017
                            Attention: Asset Securitization Group
                            Facsimile No.: (212) 745-1651
                            Confirmation No.: (212) 745-1656

                            c/o LORD SECURITIES CORPORATION
                            2 Wall Street, 19th Floor
                            New York, New York  10005
                            Attention: Richard L. Taiano
                            Facsimile No.:  (212) 346-9012
                            Confirmation No.:  (212) 346-8006


ADMINISTRATOR:              DG BANK DEUTSCHE GENOSSENSCHAFTSBANK AG


                            By: _____
                            Name:
                            Title:


                            DG BANK DEUTSCHE
                            GENOSSENSCHAFTSBANK AG
                            609 5th Avenue
                            New York, NY 10017
                            Attention: Asset Securitization Group
                            Facsimile No.: (212) 745-1651
                            Confirmation No.: (212) 745-1656

Confidential

IN WITNESS WHEREOF, the Company and the Administrator have caused this Agreement to be executed as of the day and year first above written.

COMPANY:                    AUTOBAHN FUNDING COMPANY LLC


By:_____
  Name:
  Title:

          AUTOBAHN FUNDING COMPANY LLC
          c/o  DG BANK DEUTSCHE
          GENOSSENSCHAFTSBANK AG
          609 5th Avenue
          New York, NY 10017
          Attention: Asset Securitization Group
          Facsimile No.: (212) 745-1651
          Confirmation No.: (212) 745-1656

          c/o LORD SECURITIES CORPORATION
          2 Wall Street, 19th Floor
          New York, New York  10005
          Attention: Richard L. Taiano
          Facsimile No.:  (212) 346-9012
          Confirmation No.:  (212) 346-8006


ADMINISTRATOR:             DG BANK DEUTSCHE GENOSSENSCHAFTSBANK AG


By:_____
  Name: David Dobbins          Jennifer Wikoff
  Title: General Manager         Vice President

          DG BANK DEUTSCHE
          GENOSSENSCHAFTSBANK AG
          609 5th Avenue
          New York, NY 10017
          Attention: Asset Securitization Group
          Facsimile No.: (212) 745-1651
          Confirmation No.: (212) 745-1656

[Administration Agreement]

Confidential

# EXHIBIT 3

Execution Version

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT ("Management Agreement") is made as of September 17, 1999 by and between AUTOBAHN FUNDING COMPANY LLC, a limited liability company organized under the laws of the State of Delaware (the "Company"), and LORD SECURITIES CORPORATION, a corporation organized under the laws of the State of Delaware ("Lord").

## PRELIMINARY STATEMENTS

WHEREAS, the Company advises Lord, and Lord hereby acknowledges, that the Company and DG BANK Deutsche Genossenschaftsbank AG, in its capacity as administrator (in such capacity, the "Administrator"), have entered into a certain Administration Agreement of even date herewith (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Administration Agreement"), pursuant to which the Company has appointed the Administrator as its agent to perform various duties on behalf of the Company, including, without limitation, administering all of the operations of the Company in connection with or relating to (i) the acquisition and administration of "Asset Interests" and other investments that may from time to time be made by the Company, (ii) the issuance, sale and payment of "Commercial Paper Notes", (iii) the implementation and administration of the "Liquidity Agreements", any "Supplemental Enhancement Agreements", and the other "Program Documents", as applicable, and (iv) the related operations and activities of the Company (as such quoted terms are defined in the Administration Agreement);

WHEREAS, the Company and Lord desire to set forth the terms and conditions under which Lord will hereafter provide management assistance to the Company and perform various other services for the Company;

NOW, THEREFORE, the parties hereto, intending to be legally bound and in consideration of the premises and the mutual covenants herein contained, agree as follows:

SECTION 1.  DEFINED TERMS.  Unless otherwise defined herein, all capitalized terms shall have the meanings assigned thereto in the Administration Agreement.

SECTION 2.  APPOINTMENT AND AUTHORITY OF MANAGING AGENT. The Company hereby appoints Lord to supervise and manage, on the Company's behalf, the operations of the Company in connection with or relating to the Program Documents (excluding those operations which are to be supervised and managed by the Administrator pursuant to the Administration Agreement) and to perform certain other administrative and corporate

management services on behalf of the Company that are specified below. Lord, acting in such capacity, is hereinafter referred to as the "Managing Agent."

SECTION 3. ADMINISTRATIVE SERVICES. The Management Agent hereby agrees to provide the following specific services to the Company:

(a)      provide assistance to the Company in the preparation and maintenance of general accounting records of the Company and in the preparation for certification of such periodic financial statements as may be necessary or appropriate; provided, that the Management Agent so agrees to perform such services so long as, and on the condition that, the Administrator and/or the Company provides the Management Agent all of the information necessary for such purposes as contemplated in the Administration Agreement;

(b)      provide office space and such reasonable ancillary services as may be necessary or appropriate to carry out the Management Agent's obligations under this Agreement, including, without limitation, telephone, telecopy, duplicating and word processing, clerical and bookkeeping services;

(c)      provide assistance to the Company in the preparation of such income, franchise or other tax returns of the Company as shall be required to be filed by applicable law, and cause (i) such tax returns to be filed in a timely manner and (ii) the Company to pay, solely from the assets of the Company, any taxes required to be paid by it under any applicable laws; provided, however, that the Administrator and the Management Agent shall consult with each other as to whether the Company is required to file any such returns or pay any such taxes in any States other than New York and Delaware; and provided, further, that the Management Agent so agrees to perform such services so long as, and on the condition that, the Administrator and/or the Company provides the Management Agent all of the necessary information and documents for such purposes as contemplated in the Administration Agreement;

(d)      retain, on behalf of and for the benefit of the Company, an accounting firm to audit the Company's annual financial statements, and assist in the conduct of such audit and in the preparation of tax returns pursuant to clause (c) above;

(e)      provide such company bookkeeping and maintenance requirements as are necessary to maintain the existence of the Company as a limited liability company in good standing under the laws of the States of Delaware and New York; provided that the payment of all filing fees, maintenance fees and franchise or other taxes of the Company shall be the sole obligation of the Company;

(f)      prepare reports relating to the Commercial Paper Notes, including, without limitation, (i) a report summarizing the outstanding Commercial Paper Notes by placement agent and program, substantially in the form attached hereto as Exhibit A, (ii) a report comparing the average rates and tenor of the outstanding Commercial Paper Notes by

2

placement agent, substantially in the form attached hereto as Exhibit B, (iii) a report summarizing the weighted average rate and tenor of the outstanding Commercial Paper Notes by program and in the aggregate, substantially in the form attached hereto as Exhibit C, (iv) a report detailing the average outstanding Commercial Paper Notes by program and in the aggregate, substantially in the form attached hereto as Exhibit D, (v) a report comparing the Commercial Paper Rate (as defined in the Facility Documents) to Libor for all Commercial Paper Notes, substantially in the form attached hereto as Exhibit E, and (vi) such other reports relating to the Commercial Paper Notes as the Company or the Administrator may request;

    (g)    hold, maintain and preserve executed copies of this Management Agreement, the Program Documents and all other documents executed by the Company and delivered to the Management Agent from time to time; and

    (h)    such other specific services as the Company, the Management Agent and the Administrator may agree in writing from time to time.

    Except to the extent expressly set forth in this Agreement or undertaken by the Management Agent pursuant to clause (iii) of <u>Section 4</u> below, the Management Agent shall have no responsibility for performing any functions or duties, or exercising any rights under or in connection with the Liquidity Agreements, any Supplemental Enhancement Agreements or any other Program Documents or any successor or other related agreement, instrument, officer's certificate or any other document entered into or executed and delivered by the Company or any officer thereof.

    SECTION 4.  <u>COMPANY MANAGEMENT SERVICES</u>.  The Management Agent agrees to provide the following specific company management services to the Company:

    (a)    designating individuals who are directors, officers or employees of the Management Agent, and who are available to, and, in view of the skills, experience and responsibilities of such Persons qualified to serve, from time to time, as "<u>Managers</u>" (as defined in the Limited Liability Company Operating Agreement dated as of August __, 1998 (the "<u>Operating Agreement</u>") between the Company and BSCS XVI, Inc.), officers, employees, agents or attorneys-in-fact of the Company;

    (b)    arranging for meetings from time to time, as appropriate, of the Management Committee (as defined in the Operating Agreement) of the Company, for the purpose of supervising, directing and controlling the business of the Company;

    (c)  in conjunction with the Administrator and based on information and recommendations provided by the Administrator and/or the Company, providing advice to the Company regarding (i) the financing of the Company's operations, including the sale of Commercial Paper Notes and (ii) the entry into particular transactions by the Company; and

3

(d) such other services as the Company, the Management Agent and the Administrator may from time to time agree in writing.

SECTION 5.  TRANSACTION EVALUATION.  (a) At least two Responsible Officers (as hereinafter defined) shall review and evaluate all information submitted to the Responsible Officers by the Administrator relating to any receivable or other financial asset transaction proposed for the Company by the Administrator pursuant to the Administration Agreement.  Within a reasonable time following the submission of such information and recommendations by the Administrator, a Responsible Officer shall notify the Management Agent and the Administrator, in writing (upon which notice the Management Agent and the Administrator shall be entitled to rely), as to whether, based solely upon the information and recommendations provided by the Administrator, the Responsible Officers reviewing such information and recommendations have determined that the entry by the Company into such transaction would be consistent with reasonable business judgment.  The Responsible Officers shall have the right to request additional information from the Administrator should they deem the information initially submitted to them insufficient for purposes of making a reasonable business judgment.  As used in this Section 5, a "Responsible Officer" shall mean any of the President, any Vice President or the Treasurer of the Company.

(b)  The obligations of the Company under this Section 5 are solely the obligations of the Company and no recourse shall be had against any incorporator, stockholder, affiliate, officer, member, manager, partner, employee or director of the Company or the Management Agent or any incorporator, stockholder, affiliate, officer, member, manager, partner, employee or director of the Management Agent (including, without limitation, the Responsible Officers).  The agreements of this Section 5(b) shall survive the termination of this Agreement.

SECTION 6.  COMPENSATION.  The Company agrees to pay the Management Agent the following fees, in consideration of the Management Agent's services described herein:

(a)  an initial annual fee of $35,000 (the "Initial Management Fee"), payable on the date hereof;

(b)  an ongoing annual fee of $15,000 (together with the Initial Management Fee, collectively, the "Annual Management Fee"), payable beginning on the first anniversary date hereof and continuing on each anniversary date thereafter; and

(c)  a quarterly fee (the "Quarterly Management Fee") equal to (i) if the face amount of the Commercial Paper Notes outstanding at any time during such quarter was between $1 and $500,000,000, the sum of $3,750 (the "Base Fee") or (ii) if the face amount of the Commercial Paper Notes outstanding at any time during such quarter was greater than $500,000,000, the Base Fee plus a pro rata portion of the Base Fee calculated upon the average face amount of the Commercial Paper Notes outstanding in excess of $500,000,000, payable on the last Business Day of each calendar quarter, commencing on September 30, 1999. By way of example with regard to the Quarterly Management Fee: (a) if the amount of Commercial Paper Notes outstanding is $2,000,000,000, the

4

Quarterly Management Fee shall be $15,000 (i.e., $3,750 x 4); and (b) if the amount of the Commercial Paper Notes outstanding is $1,200,000,000, the Quarterly Management Fee shall be $9,000 (i.e., $3750 x 2) plus $1,500 (i.e., 40% of $3,750).

Upon the termination of this Agreement for any reason, the Management Agent agrees to promptly (and, in any event, within 3 Business Days after the Company's demand therefor) refund to the Company, such unearned portion, if any, of the Annual Management Fee for such year (pro rated for the number of days during such year after the effective date of termination) so paid in advance by the Company to the Management Agent; provided, however, that the Management Agent shall be permitted to deduct from any such refund the amount of any costs and expenses of the type described in the immediately following sentence which are then owing by the Company to the Management Agent. The Company shall pay or reimburse the Management Agent for reasonable costs and expenses incurred by the Management Agent in connection with its performance of this Agreement, including the fees and expenses of any independent accountants, attorneys or rating agencies engaged to perform professional services for the Company; provided, however, that the Management Agent shall not incur any costs and expenses (which are not in the ordinary course of the Management Agent's duties hereunder) that it expects to be reimbursed by the Company without the prior approval thereof by the Administrator; and provided, further, that any and all fees (including, without limitation, the Annual Management Fee and the Quarterly Management Fee), costs and expenses owing by the Company to the Management Agent hereunder shall only be payable out of funds then available to the Company and which are not otherwise required (x) to repay Commercial Paper Notes which are then due and payable or (y) to be paid to the Liquidity Providers pursuant to the terms of the Liquidity Agreements, the Supplemental Enhancement Providers pursuant to the terms of the Supplemental Enhancement Agreements or the counterparties under the Hedge Contracts. No director, officer or employee of the Management Agent shall be entitled to any compensation therefor from the Company or the Administrator.

SECTION 7. TERM. Unless earlier terminated as described in the succeeding sentence, this Agreement shall terminate upon termination of the Administration Agreement. In addition, either the Management Agent or the Company may terminate this Agreement at any time upon at least thirty days' written notice to the other and the Administrator.

SECTION 8. MANAGER'S LIABILITY; INDEMNITY. (a) The Management Agent and its incorporators, shareholders, directors, officers and employees who serve as managers, members, officers and employees of the Company assume no liability for anything other than to render or stand ready to render the services provided for herein, and neither the Management Agent nor any of its incorporators, shareholders, directors, officers, employees, or subsidiaries, or Persons controlling, controlled by or under common control or affiliated with the Management Agent shall be responsible for any action of the Company or the Administrator under any Program Document or any other agreement, instrument or document to which the Company or the Administrator is a party or otherwise. In addition, except as set forth in Section 8(b) below, neither the Management Agent, nor any affiliate, incorporator, shareholder, director, officer or employee of the Management Agent who serves as a manager, member, officer or employee of the Company, shall be liable for, or shall have any obligation with respect to, any of

5

the liabilities, whether direct or indirect, absolute or contingent, of the Company in connection with any of the Program Documents. All services to be performed by the Management Agent under this Agreement may be furnished by an officer or employee of the Management Agent or any other Person designated by it. The Company recognizes that the accuracy and completeness of the records maintained and the information supplied by the Management Agent hereunder is dependent upon the accuracy and completeness of the information obtained by the Management Agent from the parties to the Program Documents and other sources, and the Management Agent shall not be responsible for any inaccuracy in the information so obtained or for any inaccuracy in the records maintained by the Management Agent hereunder which may result therefrom. Neither the Management Agent nor the Company shall be responsible for supervising the activities of the Administrator and neither the Management Agent nor the Company shall incur any liability for actions taken by, or omissions of, the Administrator, other than at the direction of the Management Agent or the Company, respectively.

(b)     The Company shall pay and shall protect, indemnify and save harmless the directors, officers, employees and agents and the managers, members and officers of the Company who are directors, officers or employees of the Management Agent (each of the foregoing an "Indemnified Person") from and against any and all losses, liabilities (including liabilities for penalties), actions, suits, judgments, demands, damages, costs and expenses (including, without limitation, reasonable fees and expenses of counsel) of any nature (including, without limitation, under any federal, state or foreign securities laws, rules or regulations) arising from or relating to the transactions contemplated hereby or by any of the agreements, instruments or documents referred to in the Program Documents, whether now existing or hereinafter arising (all of the foregoing being collectively referred to as "Indemnified Amounts"), provided, however, that the Company shall have no obligation to indemnify any Indemnified Person hereunder in respect of Indemnified Amounts to the extent resulting solely from the gross negligence of wilful misconduct on the part of such Indemnified Person, and provided, further, that each Indemnified Person shall be fully protected under this indemnity for any such action taken or omitted at the direction, request or recommendation of the Administrator or any of its officers, directors, employees or agents. If any actions, suit or proceedings arising from any of the foregoing is brought against any Indemnified Person, the Company will resist and defend such action, suit or proceeding or cause the same to be resisted and defended by its counsel (which counsel shall be reasonably satisfactory to the affected indemnified Person or Persons) and shall pay all costs of defense as incurred unless it is finally determined by a court of competent jurisdiction that such Indemnified Person is not entitled to indemnification hereunder.

(c)     The Management Agent hereby agrees that if it or any of its officers, employees, directors or agents shall fail to observe or perform Section 3(a) or Section 3(c) of this Agreement and as a result of such failure the Company incurs (whether as a result of any action so taken or omitted to be taken in violation of the terms hereof) any costs, expenses, actions, suits, judgments, demands, damages, losses or liabilities (including, without limitation, reasonable attorneys' fees and expenses) (collectively, the "Indemnified Expenses"), then the Management Agent shall indemnify and hold harmless the Company for such Indemnified Expenses; provided, however, that the Management Agent shall only be liable for any such Indemnified Expense to the extent arising in connection with, or as a result of, its or its officers', employees', directors' or

6

agents' gross negligence or willful misconduct.  The indemnities set forth in this <u>Section 8(b)</u> shall survive the termination of this Agreement.

SECTION 9.  <u>NOTICES</u>.  All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including telex communication and communication by facsimile copy) and mailed, telexed, transmitted or delivered, as to each party hereto, at its address set forth under its name on the signature pages hereof or at such other address as shall be designated by such party in a written notice to the other party hereto.  All such notices and communications shall be effective, upon receipt, or in the case of (i) notice by mail, three days after being deposited in United States mails, first class postage prepaid, (ii) notice by telex, when telexed against receipt of answerback, (iii) notice by overnight courier, one Business Day after being deposited with a national overnight courier service, or (iv) notice by facsimile, when transmitted against mechanical confirmation of successful transmission.  Each of the Management Agent and the Company agrees that it will send a copy to the Administrator of (1) any notice delivered hereunder to the Company or the Management Agent, respectively, concurrently with its delivery of such notice to such Person, and (2) any amendment, waiver, alteration, modification, or supplement hereto, or any assignment by either party hereto of any of their rights or obligations hereunder, in each case, promptly after the execution thereof by all of the parties thereto.  Any notices or other items to be given or delivered to the Administrator in accordance with this Agreement shall be given or delivered in the manner described above to DG BANK Deutsche Genossenschaftsbank AG, 609 5th Avenue, 9th Floor, New York, New York 10017, Attention:  Asset Securitization Group, Facsimile No.: (212) 745-1651, Telephone No.: (212) 745-1656.

SECTION 10.  <u>NO RESTRICTIONS</u>.  Nothing in this Agreement shall limit or restrict the right of the Management Agent, any Person affiliated with the Management Agent or any director, officer, partner or employee of the Management Agent or of any of its subsidiaries or affiliates to engage in any other business or devote time and attention in part to the management or other aspects of any other business, whether of a similar or dissimilar nature, nor to limit or restrict the right of the Management Agent, any Person affiliated with the Management Agent or any director, officer, partner or employee of the Management Agent or of any of its subsidiaries or affiliates to engage in any other business or to render services of any kind to any other corporation, firm, individual, association, partnership, trust, or legal entity.

SECTION 11.  <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

SECTION 12.  <u>ENTIRE AGREEMENT</u>.  This Agreement constitutes the entire agreement between the parties hereto with respect to the matters covered hereby and supersedes all prior agreements between the parties.

SECTION 13.  <u>SUCCESSORS AND COUNTERPARTS</u>.  The terms of this Agreement shall not be waived, altered, modified, amended or supplemented in any manner whatsoever except by written instruments signed by both parties hereto.  This Agreement shall be

7

binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that this Agreement may not be assigned by any party except with the prior written consent of all of the parties hereto.  This Agreement may be executed in several counterparts, each of which shall be deemed an original hereof.

SECTION 14.  CAPTIONS.  The captions in this Agreement are for the convenience of reference only and shall not govern the interpretation of any of the provisions hereof.

SECTION 15.  NO PETITION.  The Management Agent hereby agrees that it shall not institute against, or join any other Person in instituting against, the Company or any subsidiary of the Company any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law, for the period commencing on the date hereof and ending one year and one day after the date upon which all of the Commercial Paper Notes issued by the Company shall have been repaid in full. The Management Agent further agrees that, following the request of the Company therefor, it shall cause each of its directors, officers or employees who are from time to time the managers, officers or employees of the Company, to execute and deliver agreements pursuant to which such directors, officers and employees agree not to institute against, or join any other Person in instituting against, the Company or any subsidiary of the Company any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law prior to the date set forth in the immediately preceding sentence.  The agreements of the Management Agent contained in this Section shall survive the termination of this Agreement.

SECTION 16.  CONFIDENTIALITY.  The Management Agent hereby (i) acknowledges that any information provided by the Company or the Administrator pursuant to or in connection with this Agreement or any of the other instruments, documents or agreements executed and/or delivered in connection with this Agreement or which is otherwise obtained by the Company or any of its officers, employees, agents, directors, or advisers in connection with the structuring, negotiating, execution and/or performance of the transactions contemplated hereby or thereby is, in each case, confidential and (ii) agrees not to disclose to any Person any such information, without the prior written authorization of the Company, except that the Management Agent may disclose any of such information (a) to such of its officers, directors, employees or advisors who have a need to know such information in light of the Management Agent's responsibilities under this Agreement; provided that such officers, directors, agents, advisors and/or employees are advised of the confidentiality of such information, (b) to such other Persons authorized by the Administrator to receive such information, (c) as specifically required to be disclosed (or reasonably believed by the Management Agent's counsel to be required to be disclosed) by any applicable law or order of any judicial or administrative proceeding (and all reasonable applications for confidential treatment are unavailable), and (d) which is or becomes public information (other than as a result of the violation of the provision of this Section 16 by the Management Agent or any of its officers, directors, employees, agents or advisers).

8

SECTION 17.  <u>RESTRICTION ON PAYMENTS</u>.  Notwithstanding anything contained herein to the contrary, it is hereby expressly agreed by the parties hereto that all costs, fees, expenses and indemnities payable by the Company hereunder shall only be payable out of funds available to the Company to the extent that (i) the making of such payment would not render the Company insolvent and (ii) the Company has funds available to make such payment which are not required to pay (A) Commercial Paper Notes which are then due and payable or (B) the Liquidity Providers pursuant to the terms of the Liquidity Agreements.

DG BANK Deutsche Genossenschaftsbank AG, in its capacity as Administrator, hereby acknowledges its receipt of a fully-executed copy of this Management Agreement as of the 17th day of September, 1999.

DG BANK DEUTSCHE GENOSSENSCHAFTSBANK AG,
as Administrator

By: _____

Name: _Jennifer Wikoff_

Title: _Vice President_

[Management Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

AUTOBAHN FUNDING COMPANY LLC

By: _____
Name:    RICHARD L. TAIANO
Title:    VICE PRESIDENT


AUTOBAHN FUNDING COMPANY LLC
c/o  DG BANK Deutsche Genossenschaftsbank AG
609 5th Avenue, 9th Floor
New York, New York 10017
Attention:  Asset Securitization Group
Facsimile No.:  (212) 745-1651
Confirmation No.: (212) 745-1656


c/o Lord Securities Corporation
2 Wall Street, 17th Floor
New York, New York  10005
Attention:  Richard L. Taiano
Facsimile No.: (212) 346-9012
Confirmation No.: (212) 346-9006


LORD SECURITIES CORPORATION

By: _____
Name:    RICHARD L. TAIANO
Title:    VICE PRESIDENT


Lord Securities Corporation
2 Wall Street, 17th Floor
New York, New York  10005
Attention:  Frank B. Bilotta
Facsimile No.: (212) 346-9012
Confirmation No.: (212) 346-9008


[Management Agreement]

# EXHIBIT 4

 FITCH IBCA
The International Rating Agency

# Structured Finance

Asset-Backed
New Issue

# Autobahn Funding Co. L.L.C.

**Rating**
$2,000,000,000 4(2) Commercial Paper
Program .................................... F1

**Analysts**
Michael T. Nguyen
1 212 908-0602
mnguyen@fitchibca.com

David C. DeMilt
1 212 908-0676
ddemilt@fitchibca.com

Darryl J. Osojnak, Esq.
1 212 908-0722
dosojnak@fitchibca.com

**Administrator Contacts**
Deutsche Genossenschaftsbank AG
Kenneth W. Brandt
Senior Vice President
1 212 745-1655
kenneth_brandt@dgbank.de

Jennifer Wikoff
Vice President
1 212 745-1661
jennifer_wikoff@dgbank.de

**Commercial Paper Dealers**
J.P. Morgan Securities Inc.
Merrill Lynch Money Markets Inc.

**Program Establishment Date**
Sept. 22, 1999

## ■ Summary

Deutsche Genossenschaftsbank AG's (DG Bank) $2.0 billion 4(2) commercial paper vehicle, Autobahn Funding Co. L.L.C. (Autobahn), is rated 'F1' by Fitch IBCA. The rating is based on the structure of Autobahn's asset purchases, the required reserves dedicated to each asset pool, the 102% liquidity support provided, a sound legal structure, and DG Bank's strong administrative capabilities. Autobahn is a special purpose, bankruptcy-remote Delaware limited liability company established to acquire asset interests, which can be loans, pools of accounts, financial assets, and securities. Autobahn issues CP with maturities of up to 270 days to fund asset purchases and financings backed by receivables. Autobahn intends to maintain a diversified portfolio by obligor and industry. DG Bank is rated 'AA-/F1+' by Fitch IBCA.

Credit enhancement and liquidity support provide protection from losses and ensure timely payment of the notes. There is no fungible layer of programwide credit support. Instead, each pool is protected against losses by deal-specific loss reserves. Although there is no minimum required loss reserve, loss reserves are tailored to reflect each transaction's unique characteristics and are sized to cover a multiple of historical losses that is commensurate with Autobahn's 'F1' rating.

Due to the unique structure of Autobahn's asset purchases and because the program does not benefit from programwide credit enhancement, Fitch IBCA will review and approve each transaction prior to its inclusion into Autobahn.

Autobahn maintains backstop liquidity support to supplement the inherent liquidity of the asset pools. Committed liquidity coverage will be maintained at a minimum of 102% of the maximum purchase limit permitted under the applicable purchase agreement. The 102% liquidity coverage is made up of deal-specific liquidity and/or enhancement agreements.

DG Bank, which acts as administrator for Autobahn, evaluates and structures all asset purchases and monitors asset performance to ensure compliance with the credit and investment policy. DG Bank's capable staff provides in-depth credit expertise, solid structuring capabilities, and experience in identifying and minimizing asset deterioration.

## ■ Issuer

Autobahn is a special purpose, bankruptcy-remote Delaware limited liability company. Its primary purpose is to issue CP, the proceeds of which are used to acquire asset interests, which can be loans, pools of accounts, financial assets, and securities. Autobahn will issue CP with maturities of up to 270 days.

**October 21, 1999**

**Kelley_DZ_00092191**



Δ π EXHIBIT 4
Deponent _Ladd_
Date 6/15/19 Rptr. LK
WWW.DEPOBOOKPRODUCTS.COM



**Structured Finance**

**Structural Overview**

**Originator/Seller**

**Bankruptcy-Remote, Special Purpose Corporation**

**Autobahn Funding Co. L.L.C.**

**Commercial Paper Dealers**
- J.P. Morgan Securities, Inc.
- Merrill Lynch Money Markets, Inc.

**CP Investors**

**Administrator**
*DG Bank*
- Structures asset purchases in accordance with Autobahn's credit and investment policy
- Negotiates the terms and conditions of each funding agreement
- Arranges deal-specific liquidity and credit enhancement agreements
- Responsible for hedging any interest rate or currency risk associated with the purchased assets
- Authorizes the issuance of CP

**Manager**
*Lord Securities Corp.*
- Designates directors and officers of Autobahn
- Maintains the program's principal corporate books and recorded to maintain Autobahn's corporate existence
- Retains an accounting firm to audit Autobahn's annual financial statements
- Prepares and files reports, financial statements, and tax returns

**Issuing and Paying Agent and Collateral Agent**
*U.S. Bank Trust, N.A.*
- Coordinates the issuance and repayment of CP
- Draws on liquidity support in the event of a shortfall
- Maintains the collateral account related to the sale and repayment of CP

**Deal-Specific Credit Support**
- Sized to cover a multiple of historical losses
- May be provided by overcollateralization, letter of credit or surety bond, and subordinated note issuance, among other items

**Liquidity Support**
- 100% deal-specific coverage provided by a syndicate of 'F1' or higher rated financial institutions in the form of a liquidity loan or liquidity asset purchase agreement
- $500,000 fungible support in the form of a swing-line facility provided by DG Bank
- Drawn in the even of a CP market disruption or to fund short-term mismatches in cash flows

DG Bank – Deutsche Genossenschaftsbank AG.

Autobahn Funding Co. L.L.C.

2

**Kelley_DZ_00092192**



Structured Finance



As a bankruptcy-remote entity, Autobahn cannot incur any indebtedness other than CP, liquidity and credit enhancement obligations, and other incidental amounts permitted under the program's organizational documents. All principal parties, including the liquidity bank, CP dealers, and the issuing and paying agent, have agreed not to file bankruptcy petitions against Autobahn until one year and one day after all CP is paid in full, mitigating bankruptcy concerns.

### ■ Asset Quality

Autobahn will acquire assets or make loans secured by interests in pools of receivables and other financial assets, including asset-backed securities. Each asset purchased by Autobahn must meet eligibility requirements as stipulated by its credit and investment policy guidelines, which focus on asset quality and concentration, obligor diversity and exposure, and transaction structure. DG Bank, acting in its role as administrator, concentrates on four primary risk areas, including collateral, legal, operational, and fraud risk to ensure that each asset purchased adheres to Autobahn's credit and investment policy.

Although Autobahn's credit and investment policy does not require a minimum loss reserve percentage for any pool, it does set forth underwriting criteria, which require that each purchased receivables pool be originated by a high-quality company and that each transaction includes substantial loss protection and structural elements to maintain the overall quality of the conduit's entire asset portfolio.

### ■ Sellers

Autobahn may purchase receivables from investment-grade and unrated or non-investment-grade sellers. Autobahn will only purchase receivables from sellers that possess high-quality underlying business and servicing capabilities, to minimize the credit and performance risk of such seller. DG Bank evaluates performance history to determine appropriate levels and forms of credit enhancement for each transaction,

sets transaction triggers and termination events, and conducts an on-site due diligence on every seller. This due diligence includes a review of the seller's business plan, management, and servicing capabilities. For transactions where DG Bank requires a hot backup servicer, a due diligence will also be performed on the backup servicer semiannually. In addition to requiring monthly performance reports, DG Bank visits most sellers quarterly and performs a due diligence review at least annually for each seller. All sellers of asset interests to Autobahn must certify in writing that they are Year 2000 (Y2K) compliant.

The acquisition of asset interests from a seller will be governed by a funding agreement. Fitch IBCA will review every transaction to ensure that it meets the conduit's investment criteria and has been structured to a level commensurate with the conduit's rating prior to closing. Autobahn's asset purchases are structured to a level commensurate with an 'F1' rating. This level of structuring is accomplished through the proper combination of credit enhancement, asset eligibility criteria, obligor concentration limits, and deal-specific termination events. Fitch IBCA then monitors the transactions monthly as part of its ongoing surveillance. However, highly rated assets do not necessitate a Fitch IBCA review or confirmation. Highly rated assets include securities rated at least 'AA–' from Fitch IBCA or one those backed by the full faith and credit of the U.S. government.

For most transactions, Autobahn will use a two-tier legal structure, utilizing a bankruptcy-remote special purpose corporation (SPC) to transfer purchased receivables interests or financial assets to Autobahn, thus mitigating seller bankruptcy concerns. However, for certain investment-grade sellers only, the two-tier legal structure may not be used. Under a two-tier structure, the seller sells the assets to a bankruptcy-remote SPC, which then sells the assets to Autobahn pursuant to a purchase agreement. This procedure insulates the asset interest from claims or an automatic stay subsequent to a seller bankruptcy.

**Kelley_DZ_00092193**

 FITCH IBCA
The International Rating Agency

Structured Finance

### ■ Credit Support

Autobahn does not benefit from programwide credit enhancement; instead, deal-specific required reserves provide loss protection for each transaction. Each reserve is designed to cover a significant level of losses that could be incurred by the pool in the event of its liquidation. The amount of loss protection is determined by providing a multiple of the actual loss history of the related underlying asset or coverage for certain obligor concentrations. The credit enhancement may be fixed or dynamic, increasing with the deterioration of the underlying asset pool. Each transaction is structured to include performance triggers to alert the administrator if the portfolio performs below a certain threshold.

Loss reserves may take the form of overcollateralization, third-party letter of credit or surety bond, cash collateral account, recourse to the seller, subordinated note issuance, or other forms of acceptable loss protection approved by Fitch IBCA. DG Bank, as administrator, is responsible for structuring and monitoring each asset purchase to achieve an 'F1' rating (credit quality commensurate with an 'A' rating) on each underlying transaction.

Generally, loss reserves are sized as follows:

- For installment receivables pools, the loss reserve will be a minimum of a fixed percentage that is a multiple (typically three times) of the pool's recent loss experience (over a period of typically no less than one year) times the investment in such receivables pool.
- For retail pools (e.g. pools with large numbers of obligors that individually are in relatively small amounts), the loss reserve, at a minimum, will be a multiple (typically three times) of the pool's historical and/or recent loss-to-liquidation experience (over a period typically no less than one year), depending on fluctuations in pool performance, times the investment in such receivables pool.
- For commercial and wholesale trade receivables pools (e.g. pools having some obligor concentrations), the loss reserve, at a minimum, will be a multiple of the obligor limit for a pool times the investment in such receivables pool.

If needed, Autobahn has the option, but not the obligation, to enter into supplemental credit enhancement facilities.

### ■ Liquidity Support

Autobahn maintains backstop liquidity support to supplement the inherent liquidity of the receivables pools. The liquidity facilities are available to ensure timely payments of rated debt and are not intended to provide loss coverage on the assets. Committed liquidity coverage will be maintained at a minimum of 102% of the maximum purchase limit permitted under the applicable purchase agreement. The 102% liquidity coverage is made up of deal-specific liquidity and/or enhancement agreements. Deal-specific liquidity support can come in the form of a liquidity asset purchase agreement or liquidity loan agreement. The liquidity agreements will not fund against defaulted assets. If maturing notes are not rolled over and there are cash flow delays interrupting availability of funds for repayment of the notes, the liquidity facilities will be drawn on. Initially, DG Bank will provide the liquidity facilities; however, it may syndicate portions of the liquidity commitment to 'F1' or better rated banks or financial institutions.

The liquidity provider's commitment is irrevocable; however, liquidity providers will not be required to fund if:

- Autobahn is the subject of bankruptcy or insolvency proceedings, which is unlikely due to its bankruptcy-remote structure.
- The face amount of all outstanding CP notes shall have exceeded the aggregate available liquidity commitment amount for all funding agreements.

### Swing-Line Facility

Another source of liquidity support is a $500,000 fungible programwide swing-line facility provided by DG Bank. The swing line facility can be used to give Autobahn additional liquidity during minor CP market interruptions or to fund short-term mismatches in cash flows.

It is important to mention that, at least initially, the support providers under the liquidity agreement and the swing-line facility are rated 'F1+'. Thus, investors are benefiting from liquidity support counterparties rated 'F1+', or one notch higher than that necessary for Autobahn's current 'F1' rating.

### ■ Program Wind-Down Events

DG Bank, as administrator, has the right to direct Autobahn to cease issuance of CP upon the occurrence of certain wind-down events, which include, but are not limited to, the following:

- Autobahn shall fail to pay any CP note or any loan, including interest, when due and payable.
- A bankruptcy event shall be commenced against Autobahn, which remains unstayed and in effect for a period of 60 consecutive days.
- Autobahn shall commence voluntary bankruptcy proceedings.
- The face amount of all outstanding CP notes shall have exceeded the aggregate available liquidity

**Kelley_DZ_00092194**

 **FITCH IBCA**
The International Rating Agency

# Structured Finance

commitment amount for all funding agreements and continued for five consecutive days.

- The aggregate outstanding face amount of all CP notes is greater than $2 billion.
- The company shall be required to register as an investment company.
- The CP depository agreement shall not then be in full force and effect.

## ■ Administrator

DG Bank's professionals have previous conduit and securitization experience and have structured and completed transactions exceeding 18 billion in various asset classes.

As administrator for Autobahn, DG Bank's duties include, but are not limited to:

- Structuring receivables purchases in accordance with Autobahn's credit and investment policy.
- Assisting Autobahn in identifying prospective transactions.
- Negotiating the terms and conditions of each funding agreement on behalf of Autobahn with respect to the acquisition of asset interests.
- Arranging for hedge contracts to be entered into by Autobahn.
- Monitoring performance of the purchased assets.
- Negotiating liquidity facility agreements and any credit enhancement agreements.
- Authorizing the issuance of CP.

## ■ Manager

As manager, Lord Securities Corp., is responsible for providing certain financial, accounting, and other services for the company. Specifically, Lord's duties include the following:

- Designating directors, officers, or employees of the manager to serve as officers and directors of Autobahn.
- Arranging for meetings of Autobahn's board of directors.
- Maintaining the program's principal corporate books and records to maintain Autobahn's corporate existence in good standing.
- Retaining an accounting firm to audit Autobahn's annual financial statements.
- Representing Autobahn in its day-to-day operations.
- Preparing and filing reports, financial statements, and tax returns.

## ■ Disaster Recovery

DG Bank has a comprehensive Y2K readiness program to inventory, test, and certify all critical applications and

systems. The renovation, replacement, and testing of all mission critical systems, including those used to book assets, manage liabilities, and review transaction and portfolio information by DG Bank, in various capacities for Autobahn, were substantially completed in accordance with dates specified by the Federal Financial Institutions Examination Council. With respect to Autobahn, it is important to note that all parties to the program documents have confirmed their Y2K compliance. Additionally, DG Bank will obtain statements from each seller of asset interests to Autobahn certifying Y2K compliance prior to the closing of each transaction.

DG Bank has developed and successfully tested its own Y2K contingency plan in the event of a systems failure or other material business disruption created by the start of 2000. The plan is designed to accommodate a disruption of up to two weeks after the start of the new year, but could reasonably be relied upon for an even longer period, if necessary. Local network shared drives, used principally for the storage of account data and other information, as well as for external e-mail services, are backed up nightly and stored at an off-site facility in Carlstadt, NJ. In the event of a business disruption, this information can be communicated to members for home usage. Given the extensive Y2K readiness testing on all critical systems, DG Bank's exposure to Y2K disruptions is remote. Notwithstanding, DG Bank is prepared for a disruptive event based on the plan.

## ■ Pool Composition

Due to the recent launching of the program, Autobahn's portfolio has no significant performance history. As of Sept. 30, 1999, Autobahn has authorized one $200 million transaction. The pool benefits from credit enhancement inherent in the transaction, which is commensurate with the 'F1' rating of the conduit. DG Bank serves as the liquidity provider. As the conduit grows, Autobahn is committed to monitoring a well diversified asset portfolio in terms of transaction size and asset class.

DG Bank also has several other transactions held on balance sheet that will be funded through Autobahn. The conduit projects total commitments by year end to be in the $1 billion range, with various underlying asset types.

*Fitch IBCA's asset-backed CP surveillance is available on Fitch IBCA's web site at www.fitchibca.com and on Bloomberg by typing "FIT" and hitting GO.*

Autobahn Funding Co. L.L.C.

**Kelley_DZ_00092195**

 **FITCH IBCA**
The International Rating Agency

# Structured Finance

Copyright © 1999 by Fitch IBCA, Inc. One State Street Plaza, NY, NY 10004.
Telephone: New York, 1-800-753-4824, (212) 908-0500, Fax (212) 480-4435; Chicago, IL, 1-800-483-4824, (312) 214-3434, Fax (312) 214-3110;
London, 011-44 207 417-4222; Fax 011-44 207 417-4242; San Francisco, CA, 1-800-953-4824, (415) 732-5770, Fax (415) 732-5610.
John Forde, Publisher. Madeline O'Connell, Director. Subscriber Services; Nicholas T. Tresauwald, Senior Managing Editor. Diane Lupi, Managing Editor; Paula M. Sirard, Production
Manager; Jennifer Hickey, Andrew Simpson, Sandra Wagman, Igor Zasłavsky, Editors; Martin G. Gutman, Senior Publishing Specialist; Harvey Aronson, Publishing Specialist; Colin Grubb,
Robert Rzadkowski, Julie Taub, Publishing Assistants. Printed by American Direct Mail Co, Inc. NY, NY 10014. Reproduction in whole or in part prohibited except by permission.
Fitch IBCA ratings are based on information obtained from issuers, other obligors, underwriters, their experts, and other sources Fitch IBCA believes, to be reliable. Fitch IBCA does not audit or
verify the truth or accuracy of such information. Ratings may be changed, suspended, or withdrawn as a result of changes in, or the unavailability of, information or for other reasons. Ratings are
not a recommendation to buy, sell, or hold any security. Ratings do not comment on the adequacy of market price, the suitability of any security for a particular investor, or the tax-exempt nature
or taxability of payments made in respect to any security. Fitch IBCA receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating securities. Such fees generally
vary from $1,000 to $750,000 per issue. In certain cases, Fitch IBCA will rate all or a number of issues issued by a particular issuer, or insured or guaranteed by a particular insurer or guarantor, for a
single annual fee. Such fees are expected to vary from $10,000 to $1,500,000. The assignment, publication, or dissemination of a rating by Fitch IBCA shall not constitute a consent by Fitch IBCA to use
its name as an expert in connection with any registration statement filed under the federal securities laws. Due to the relative efficiency of electronic publishing and distribution, Fitch IBCA Research
may be available to customers, subscribers up to three days earlier than print subscribers.

Autobahn Funding Co. L.L.C.

6

Kelley_DZ_00092196

# EXHIBIT 5

## ACCOUNT CONTROL AGREEMENT

December 17, 2001

This Account Control Agreement is among Opportunity Finance, LLC (the "Creditor"), Opportunity Finance Securitization LLC (the "Assignee"), PC Funding, LLC (the "Customer"), and U.S. Bank National Association (the "Custodian").

### Background:

The Customer and the Creditor have entered into a Credit Agreement dated as of December 17, 2001 under which the Creditor may provide the Customer with a facility to finance the purchase of certain assets. To secure the prompt and complete payment, performance and observance of all of the Customer's obligations under the Credit Agreement, the Customer has granted the Creditor a security interest in such assets and hereby grants the Creditor a security interest in the Account (as defined below) and all funds on deposit therein from time to time and agrees to deposit the proceeds from the sale of those assets into the Account. The Creditor and the Assignee shall enter into a Purchase and Contribution Agreement under which the Creditor shall assign to the Assignee, among other things, the Creditor's security interest in the Account and all funds on deposit therein from time to time. The parties are entering into this Agreement to perfect the Assignee's security interest in the Account and all funds on deposit therein from time to time.

### Agreement:

1.     The Account. The Custodian represents and warrants to Assignee that: (a) the Custodian maintains trust account number <sup>Redacted - Confidential</sup>(the "Account") for Customer, (b) the Custodian does not know of any claim to or interest in the Account or the funds on deposit therein from time to time, except for claims and interests of the parties to this Agreement and (c) the Custodian has not entered into any other agreement pursuant to which it agreed to comply with any instructions originated by any party other than the Assignee directing disposition of the funds in the Account without any further consent by the Customer or any similar agreement. The Account shall not be interest bearing and shall not contain investment property. The Custodian acknowledges receipt of notice of the Assignee's security interest in the Account. The parties hereto acknowledge and agree that an agreement will be entered into hereafter among the Custodian, the Creditor, the Assignee and certain other parties which agreement shall set forth the terms for the establishment and operation of the Account.

2.     Control by Assignee. The Custodian will comply with all instructions originated by the Assignee directing disposition of the funds in the Account without any further consent by the Customer or the Creditor. The Custodian will comply with all orders, notices, requests, entitlement orders and other instructions of the Assignee relating to the Account and/or the funds on deposit therein from time to time, including but not limited to orders, notices, requests and other instructions to withdraw or transfer funds on deposit in the Account.

3.     Limitation of Customer's Rights in Account. Without the Assignee's written consent the Custodian will not comply with any order, notice, request or other instruction from

DZB006271

the Customer or any other person or entity except the Assignee relating to the Account or any funds on deposit in the Account, and the Custodian will not pay or transfer any funds on deposit in the Account to the Customer or any other person or entity except for entities designated by the Assignee.

4.      Agreements Regarding Account.

a)      Neither the Customer nor the Custodian will permit any person or entity except the Assignee to have control over the Account, and neither the Customer nor the Custodian will enter into any agreement that gives any person or entity except the Assignee control over the Account.

b)      The Custodian has not issued, and will not issue, any instrument, security, or certificate evidencing, giving rights in or otherwise with respect to the Account, and the Custodian will not give to the Customer or any other person or entity any instrument, security, or certificate evidencing, giving rights in or otherwise with respect to the Account.

c)      The Custodian shall not permit any withdrawal or transfer from the Account, except in favor of the Assignee or an entity designated by the Assignee.

d)      The Custodian agrees that all of the Custodian's existing and future security interests, liens, claims, rights of setoff and recoupment, and other right, title and interest in the Account are fully subordinate to the Assignee's security interest in the Account. The Custodian will not assert or enforce any of the Custodian's existing or future security interests, liens, claims, rights of setoff or recoupment, or other right, title or interest in the Account. Notwithstanding the foregoing, the Custodian may charge the Account for the Custodian's standard account fees for the Account and the Custodian will retain its prior lien on the Account to secure payment for investment property purchased for and deposited in the Account.

e)      The Custodian is a national banking association. The State of Minnesota is the Custodian's jurisdiction for purposes of Article 9 of the Uniform Commercial Code.

f)      At the Assignee's request, the Custodian will send to the Assignee a copy of the Custodian's statements regarding the Account and any other information about the Account, and the Customer hereby authorizes the Custodian to do so.

5.      Custodian's Responsibility.  This Agreement does not create any obligation of the Custodian except for those expressly set forth in this Agreement. In particular, the Custodian need not investigate whether the Assignee is entitled under the Assignee's agreements with the Customer to exercise control over the Account or any funds on deposit in the Account. The Custodian may rely on notices and communications it believes given by the appropriate party. The Custodian will not be liable to the Customer for complying with a notice originated by the Assignee, even if the Customer notifies the Custodian that Assignee is not legally entitled to issue the notice, unless the Custodian takes the action after it is served with legal process

DZB006272

enjoining it from doing so, issued by a court of competent jurisdiction, and had a reasonable opportunity to act on the legal process before taking the action.

      6.    <u>Termination; Survival</u>.  The Assignee may terminate this Agreement by notice to the Custodian, the Customer and, in each case, any assignee thereof.  The Custodian may terminate this Agreement on 60 days' notice to the Assignee the Customer and, in each case, any assignee thereof.  If the Assignee and any assignee thereof notifies the Custodian that the Assignee's security interest in the Account has terminated, this Agreement will immediately terminate.  The provisions of Section 5 hereof will survive termination of this Agreement.

      7.    <u>Miscellaneous</u>.  Custodian and Customer may not change the law governing the Account without Assignee's express written consent.  This Agreement is the entire agreement of the parties concerning its subject matter.  No amendment or waiver of this Agreement will be effective unless in writing and signed by each of the parties hereto and any assignee thereof.  To the extent a provision of this Agreement is unenforceable, this Agreement will be construed as if the unenforceable provision were omitted.  The parties hereto acknowledge and agree that any assignee of the Assignee may exercise any of Assignee's rights under this Agreement.  A notice or other communication to a party under this Agreement shall be in writing and shall be sent to the party's address set forth below or to such other address as the party may notify the other parties.

**CUSTOMER**

PC Funding, LLC

By _____

   Its _____

Address for Notices

7585 Equitable Drive
Eden Prairie, Minnesota 55344

**CUSTODIAN**

U.S. Bank National Association

By _____

   Its _____

Address for Notices

180 East Fifth Street
St. Paul , Minnesota 55101

**CREDITOR**

Opportunity Finance, LLC

By _____

   Its _____

Address for Notices:

60 South Sixth Street
Suite 2540
Minneapolis, MN  55402

**ASSIGNEE**

Opportunity Finance Securitization LLC

By _____

   Its _____

Address for Notices

60 South Sixth Street
Suite 2540
Minneapolis, MN  55402

DZB006273

enjoining it from doing so, issued by a court of competent jurisdiction, and had a reasonable opportunity to act on the legal process before taking the action.

6.    <u>Termination; Survival</u>.  The Assignee may terminate this Agreement by notice to the Custodian, the Customer and the Agent (as defined below).  The Custodian may terminate this Agreement on 60 days' notice to the Assignee the Customer and the Agent.  If the Assignee and the Agent notifies the Custodian that the Assignee's security interest in the Account has terminated, this Agreement will immediately terminate.  The provisions of Section 5 hereof will survive termination of this Agreement.

7.    <u>Miscellaneous</u>.  Custodian and Customer may not change the law governing the Account without Assignee's express written consent.  This Agreement is the entire agreement of the parties concerning its subject matter.  No amendment or waiver of this Agreement will be effective unless in writing and signed by each of the parties hereto and the Agent.  To the extent a provision of this Agreement is unenforceable, this Agreement will be construed as if the unenforceable provision were omitted.  The parties hereto acknowledge and agree that DZ BANK AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main (the "<u>Agent</u>") as assignee of the Assignee may exercise any of  Assignee's rights under this Agreement.  A notice or other communication to a party under this Agreement shall be in writing and shall be sent to the party's address set forth below or to such other address as the party may notify the other parties.

**CUSTOMER**

PC Funding, LLC

By _____
    Its _____

Address for Notices:

7585 Equitable Drive
Eden Prairie, Minnesota 55344

**CUSTODIAN**

U.S. Bank National Association

By _~~Carol Tagle~~_____
    Its _____

Address for Notices:

180 East Fifth Street
St. Paul , Minnesota 55101

**CREDITOR**

Opportunity Finance, LLC

By _____
    Its _____

Address for Notices:

60 South Sixth Street
Suite 2540
Minneapolis, MN  55402

**ASSIGNEE**

Opportunity Finance Securitization LLC

By _____
    Its _____

Address for Notices:

60 South Sixth Street
Suite 2540
Minneapolis, MN  55402

30391961.doc                                3

DZB006274

# EXHIBIT 6

## CREDIT AGREEMENT

THIS CREDIT AGREEMENT is entered into as of December 17, 2001, by PC FUNDING, LLC, a Delaware limited liability company ("Borrower"), and OPPORTUNITY FINANCE, LLC, a Delaware limited liability company ("Lender").

## 1.  DEFINITIONS AND CERTAIN RULES OF CONSTRUCTION

1.1  **Definitions.**  For all purposes of this Agreement, capitalized terms used in this Agreement shall have (unless otherwise provided elsewhere in this Agreement) the following respective meanings when used herein:

"**Affiliate**" shall mean, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, 5% or more of the equity interests having ordinary voting power in the election of directors (or Persons having similar functions) of such Persons, (b) each Person that controls, is controlled by or is under common control with such Person, (c) each of such Person's officers, directors, joint venturers and partners, and (d) in the case of Borrower, the immediate family members, spouses and lineal descendants of individuals who are Affiliates of Borrower. For the purposes of this definition "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise; provided, that Lender is not an Affiliate of Borrower for any purpose.

"**Assigned Receivable**" has the meaning set forth in the Sale Agreement.

"**Buyer**" shall mean a purchaser of inventory pursuant to a Buyer Purchase Order.

"**Buyer Purchase Order**" shall mean, with respect to any Receivables Sale financed by Lender under this Agreement, a purchase order or other similar agreement between Originator and a Buyer pursuant to which such Buyer agrees to purchase Inventory from Originator. Each Buyer Purchase Order shall be in form and substance satisfactory to Lender. For avoidance of doubt, Buyer Purchase Order does not include any Buyer purchase order or similar agreement issued to Originator which is not related to any Receivable assigned to Borrower pursuant to the Sale Agreement.

"**Change of Control Date**" shall mean the date upon which Thomas J. Petters ceases to own and control directly or indirectly 100% of the outstanding capital stock or equity of both Borrower and Originator.

"**Code**" shall mean the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of Minnesota.

"**Collateral**" shall have the meaning assigned to it in the Security Agreement.

"**Event of Default**" shall have the meaning assigned to it in Section 7.1.

DZB004335

"**Facility Termination Date**" shall mean the earlier of (i) March 31, 2006 and (ii) the date this Agreement is terminated under Section 7.2(a)(i) or Section 7.3.

"**Fixed Yield**" shall mean the "fixed yield dollar amount" as specified to be paid to Lender as established in the Promissory Note for each Fixed Yield Loan.

"**Fixed Yield Loan**" shall mean a Receivables Loan with respect to which the parties have selected the Fixed Yield option under Section 2.1(a)(i)(C) and have an agreed upon Fixed Yield pursuant to the related Promissory Note.

"**Interest Loan**" shall mean a Receivables Loan with respect to which the parties have selected the interest option under Section 2.1(a)(i)(C) and have agreed upon an interest rate pursuant to the related Promissory Note.

"**Inventory**" shall mean with respect to any Receivables Sale, all inventory or goods purchased by Originator pursuant to an Originator Purchase Order, the sale, or contract for sale, of which by Originator to a Buyer gives rise to the related Receivables.

"**Loan Documents**" shall mean this Agreement, the Promissory Notes, the Security Agreement, and all other agreements, instruments, documents, agreements, and certificates delivered to Lender in connection with this Agreement or the transactions contemplated hereby, and all amendments, restatements, renewals, supplements and modifications of the foregoing.

"**Material Adverse Effect**" shall mean a material adverse effect, including by reason of an effect on Originator, Thomas J. Petters or any other Affiliate of Borrower, on (a) the business, assets, operations, prospects or financial or other condition of Borrower or Originator; (b) the inability of Originator to conduct any purchase or sales of inventory in accordance with the applicable Originator Purchase Order and Buyer Purchase Order; (c) the inability of Borrower to pay any of the Receivables Loans or any of the other obligations in accordance with the terms of this Agreement; (d) the Collateral or Lender's liens on the Collateral or the priority of such liens; or (e) Lender's rights and remedies under this Agreement and the other Loan Documents.

"**Maximum Loan Amount**" shall mean the amount equal to $500,000,000.00.

"**Originator**" shall mean Petters Company, Inc., a Minnesota corporation.

"**Originator Purchase Order**" shall mean, with respect to any Receivables Sale financed by Lender under this Agreement, a purchase order or other similar agreement between Originator and a Seller pursuant to which Originator agrees to purchase from such Seller the goods or inventory to be sold by Originator pursuant to a Buyer Purchase Order. Each Originator Purchase Order shall be in form and substance satisfactory to Lender. For avoidance of doubt, Originator Purchase Order does not include any Originator purchase order which has not been assigned pursuant to the Sale Agreement.

"**Person**" shall mean any individual, partnership, joint venture, trust, unincorporated organization, corporation, or government.

"**Promissory Note**" shall have the meaning assigned to it in Section 2.1(b).

DZB004336

"Receivable" has the meaning set forth in the Sale Agreement.

"Receivables Loan" shall mean a loan made pursuant to section 2.1 with respect to a Receivables Sale financed by Lender, and all accrued fees, interest and other obligations payable by Borrower to Lender with respect thereto.

"Receivables Sale" shall mean a sale of Receivables by Originator to Borrower pursuant to the Sale Agreement.

"Restricted Payment" shall mean, with respect to any Person, (a) the declaration or payment of any dividend; (b) any payment on account of the purchase, redemption or other retirement of such Person's stock or any warrants, options or other rights with respect to such stock; (c) any payment of management fees by such Person to any stockholder of such Person or their Affiliates other than reasonable advances or payments made in the ordinary course of business on account of salary and routine business expenses; and (d) payments on indebtedness permitted under Section 6.4 of this Agreement.

"Sale Agreement" shall mean the Sale Agreement of even date herewith between Borrower and Originator.

"Security Agreement" shall mean the Security Agreement of even date herewith between Borrower and Lender.

"Seller" shall mean a seller of Inventory to Originator.

"Servicing Agreement" shall mean the Servicing Agreement of even date herewith between Borrower and Originator.

2.    AMOUNT AND TERMS OF CREDIT

2.1    **Advances.**    Subject to the terms and conditions hereof, Lender may, *in its discretion*, from time to time until the Facility Termination Date, make Receivables Loans to or for the benefit of Borrower as provided for in this Section 2.1. Each Receivables Loan shall be evidenced by a Promissory Note as defined in Section 2.1(b). The aggregate amount of Receivables Loans outstanding shall not exceed at any time the Maximum Loan Amount.

(a)    **Receivables Loan Proposals.**

(i)    If Borrower proposes to enter into any Receivables Sale, Borrower may propose that Lender agree to make a Receivables Loan to finance the purchase price with respect to the Receivable(s) that is/are proposed to be purchased by Borrower. The loan proposal shall be in substantially the form of Exhibit A attached hereto and shall specify the (A) details of the Receivables Sale, (B) amount of the proposed Receivables Loan, (C) if the financing is to be on a Fixed Yield basis, the amount of the Fixed Yield with respect to that Receivables Sale or, if the financing is to be on an interest bearing basis, the interest rate applicable to the financing, (D) terms of the assignment, if required, of the Receivables Sale, and (E) the casualty and credit insurance maintained with respect to the sale of goods giving rise to Receivable(s). Borrower shall also provide such other information as Lender shall reasonably require in its sole discretion.

(ii)     Within one business day after Lender's receipt of a loan proposal. Lender will notify Borrower either in writing. by telephone or by e-mail if (A) Lender is willing to make a Receivables Loan with respect to the proposed Receivables Sale on the terms proposed by Borrower, (B) Lender is not willing to make a Receivables Loan with respect to such Receivables Sale, or (C) Lender would be willing to make a Receivables Loan with respect to the proposed Receivables Sale, but only with such modifications as specified in such notice. Lender shall have sole discretion to decide whether or not to agree to any loan proposal or to propose a loan for the proposed Receivables Sale on different terms. and Borrower shall have the right to accept or reject any such different terms.

(b)     **Promissory Notes.**  On the date of each Receivables Loan, Borrower shall execute and deliver to Lender a note in the original principal amount of that Receivables Loan. substantially in the form of Exhibit B hereto (each a "Promissory Note" and collectively the "Promissory Notes). Each Promissory Note shall represent the obligation of Borrower to pay the amount of the related Receivables Loan, which shall include the interest or Fixed Yield thereon as prescribed in Section 2.4.  Unless otherwise agreed with respect to a particular Receivables Loan and set forth in the related Promissory Note. the due date of each Promissory Note shall be on the earlier of (i) the 120th day after the date thereof (unless otherwise specified in the Promissory Note). or (ii) the day upon which Borrower receives available funds from the payment from the Buyer on the Receivables financed by the proceeds of such Promissory Note. The Promissory Notes may be prepaid in whole or in part at any time. as provided therein.

(c)     **Reliance on Notices.**  Lender shall be entitled to rely upon any notice of Receivables Loan, any loan proposal and any similar notice believed by Lender to be signed by any authorized representatives of Borrower. Lender may assume that each person executing and delivering such a notice was duly authorized to do so. unless the responsible individual acting thereon for Lender has actual knowledge to the contrary.

2.2     Use of Proceeds; Payments from Buyers.

(a)     **Use of Proceeds.**  Borrower must use the proceeds of each Receivables Loan solely for the purpose of paying the purchase price with respect to the associated Receivables Sale, as and when Borrower is required to pay such amounts in accordance with the terms of the Sale Agreement. No loan proceeds shall be disbursed by Borrower until Lender has authorized (in a writing, by e-mail or by telephone) the disbursement and all conditions precedent to the disbursement established by Lender have been satisfied.  Such purchase price shall be disbursed by Borrower directly for the account of the Originator to the Seller under the applicable Originator Purchase Order and must not be paid to any other Person.

(b)     **Payments from Buyers.**  Borrower and Originator shall direct Buyers to make payments. whether by check or by wire transfer. with respect to all Assigned Receivables directly to Borrower for deposit into such account or accounts of Borrower as may be mutually agreed by Borrower and Lender.  In the event any such payment other than a wire transfer is received by Borrower or Originator from a Buyer with respect to an Assigned Receivable, such payment shall deposited only in such account or accounts of Borrower as may be mutually agreed to by Borrower and Lender. In the event any Buyer proposes to pay by wire transfer, the wire transfer instructions shall direct the payment to such account or accounts of Borrower as

DZB004338

may be mutually agreed by Borrower and Lender. In the event that any payment in the form of a wire transfer is received by Originator or Borrower from such a Buyer, Originator, or Borrower, as the case may be, shall, by the next business day, wire transfer such payment to such account or accounts of Borrower. If a payment is deposited into an account with respect to which Lender's approvals are required to disburse funds, Lender agrees to grant its approval within one business day after such deposit to disbursements from such account in the following priority:

     (i)    to Lender, or such party or parties as Lender may direct, in an amount owed to Lender with respect to the Receivables Loan made and the Promissory Note issued in connection with such a Buyer Purchaser Order;

     (ii)    provided that no Event of Default then exists, to Servicer (as defined in the Servicer Agreement by and between the Originator and Borrower), in an amount owed to the Servicer pursuant to the Servicing Agreement;

     (iii)    except as provided in (iv), and provided that no Event of Default then exists, to Borrower, or such party or parties as Borrower may direct, for the balance of such payment; and

     (iv)    if a case or proceeding shall have been commenced against a Buyer (a) under Title 11 of the United States Code or any other applicable federal, state or foreign bankruptcy or other similar law; (b) requesting the appointment of a custodian, receiver or trustee (or similar official) of a Buyer of any substantial part of its assets; or (c) requesting the winding-up or liquidation of the affairs of such a Buyer, and such case or proceeding shall remain undismissed or unstayed for sixty (60) days or such court shall enter a decree or order granting the relief sought in such case or proceeding, then Lender may apply the balance of such payment to the payment of the then outstanding Promissory Notes due Lender for the purchase of any Receivable(s) related to such Buyer until such Promissory Notes are paid in full.

     (c)    Borrower acknowledges that each Promissory Note shall be due and payable on the due date set forth in such Promissory Note, which shall be the earlier of (i) the 120th day after the date thereof (unless otherwise specified in the Promissory Note), or (ii) the day upon which Borrower receives available funds from payment from the Buyer on the account of the Receivables Sale financed by such Promissory Note. Each such Promissory Note shall be due on such due date, whether or not Borrower shall have received payment from the Buyer under the Buyer Purchase Order related to such Promissory Note. It shall not be an Event of Default under this Agreement or the Loan Documents if a Buyer does not pay an underlying Assigned Receivable when due, provided the related Promissory Note is paid on or before its due date (it being acknowledged that Borrower has until the Promissory Note due date to receive payment from such Buyer or to otherwise pay the Promissory Note from other sources.

     **2.3**    **Maturity of Receivables Loans.** Unless sooner paid, all obligations with respect to each Receivables Loan shall be due and payable in full on the date specified in Promissory Note executed with respect to such Receivables Loan.

DZB004339

**2.4    Fixed Yield and Interest; Late Payments.** At the time Borrower pays each Receivables Loan, Borrower shall also pay the Fixed Yield or interest with respect to such Receivables Loan as provided in the related Promissory Note. In the event that Borrower fails to pay when due any payment under a Promissory Note, interest shall accrue on the past due payment from the due date until such payment is made (a) at the stated interest rate on an Interest Loan, and (b) at the rate of twenty percent (20%) per annum from and after the due date of such payment on a Fixed Yield loan. Notwithstanding anything to the contrary set forth in this Section 2.4, if a court of competent jurisdiction determines in a final order that the Fixed Yield or interest payable hereunder exceeds the highest rate of interest permissible under applicable law, then for so long as the maximum lawful rate would be so exceeded, the Fixed Yield or interest payable hereunder shall be equal to the maximum interest amount allowed under applicable law.

**2.5    Loan Account; Etc.** Lender shall maintain a loan account on its books to record with respect to each Receivables Loan: (a) all Receivables Loans, (b) all payments made by Borrower or otherwise received by Lender, and (c) all other debits and credits as provided in this Agreement with respect to each Receivables Loan or any other obligation. All entries in Lender's loan account shall be made in accordance with Lender's customary accounting practices as in effect from time to time and a copy of which will be provided to Originator or Borrower upon request. Lender further agrees that, with respect to any disposition of goods in connection with any Receivables Sale pursuant to a Buyer Purchase Order, Lender shall, upon payment to it of all amounts due in connection with the related Receivables Loan, release its lien on such assets in order to permit Originator to effect such disposition, and shall execute and deliver to Borrower appropriate UCC-3 statements as reasonably requested by Borrower.

**2.6    Indemnity.** Borrower shall, within ten (10) days of written demand therefore, indemnify and hold harmless each of Lender and its Affiliates, and each of such person's respective officers, directors, employees, attorneys, agents, representatives, successors, and assigns (each, an "**Indemnified Person**"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) which may be instituted or asserted against or incurred, without limitation, by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all environmental liabilities, or any breaches by Borrower or any of its representations, warranties or covenants contained in this Agreement, and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities") except to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF

DZB004340

CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER. NEITHER TERMINATION NOR COMPLETION OF THIS AGREEMENT SHALL AFFECT THESE INDEMNIFICATION PROVISIONS WHICH SHALL THEN REMAIN OPERATIVE AND IN FULL FORCE AND EFFECT.

2.7    **Access.**  Borrower and Originator shall, during normal business hours, from time to time as frequently as Lender reasonably determines to be appropriate: (a) provide Lender and any of its officers, employees and agents complete and timely access to, and prompt and full cooperation from, its properties, facilities, computers, computer records, advisors and employees (including officers) of Borrower, Originator and to the Collateral to the extent related to the Assigned Receivables; and (b) permit Lender, and any of its officers, employees and agents, to inspect, audit and make extracts from Borrower's and Originator's books and records related to the Assigned Receivables.  Borrower and Originator shall provide, at no cost to Lender, an employee or consultant to assure that Lender can access and retrieve all information in Borrower's computers and computer records related to the Assigned Receivables.

2.8    **Originator Power of Attorney.**  With respect to any check received by Originator from a Buyer in payment of an Assigned Receivable, Originator hereby grants Lender an irrevocable power of attorney to endorse any such check constituting proceeds of an Assigned Receivable with an endorsement from Originator to Borrower (if necessary) and with the restrictive endorsement "*For deposit only – PC Funding, LLC*" in order that Lender may deposit such check in the account or accounts referenced in Section 2.2(b).

2.9    **Taxes.**  Any and all payments by Borrower hereunder or under the Promissory Notes shall be made free and clear of and without deduction for any and all present or future taxes.  Borrower shall indemnify and pay Lender for the full amount of taxes (other than taxes on Lender's income) paid by Lender with respect to the transactions under this Agreement.

3.    **CONDITIONS PRECEDENT**

Lender may require as a condition to any Receivables Loan that Borrower provide documentation and information acceptable to Lender.  In addition, upon execution of this Agreement, Borrower shall provide to Lender an opinion letter of Borrower's counsel in form and substance reasonably satisfactory to Lender.

4.    **REPRESENTATIONS AND WARRANTIES**

To induce Lender to make the Receivables Loans, Borrower makes the following representations and warranties to Lender, each and all of which shall survive the execution and delivery of this Agreement.

4.1    **Corporate Existence; Compliance with Law.**  Borrower (a) is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware; (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification; (c) has the requisite corporate power and authority and the legal right to own, pledge, mortgage

DZB004341

or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now, heretofore and proposed to be conducted; (d) has all licenses, permits, consents or approvals from or by, and has made all filings with, and has given all notices to, all governmental authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (e) is in compliance with its certificate of formation and limited liability company agreement; and (f) is in compliance with all applicable provisions of law, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**4.2    Executive Offices; FEIN.**  The current location of Borrower's and Originator's chief executive office and principal place of business is 7585 Equitable Drive, Eden Prairie, Minnesota 55344, and neither Borrower nor Originator has had any other chief executive office or principal place of business.  Borrower's federal employer identification number is 41-2022687

**4.3    Corporate Power, Authorization, Enforceable Obligations.**  The execution, delivery and performance by Borrower of the Loan Documents to which it is a party and the creation of all liens provided for therein: (a) are within Borrower's limited liability company power; (b) have been duly authorized by all necessary or proper limited liability company action; (c) do not contravene any provision of Borrower's certificate of formation and limited liability company agreement; (d) do not violate any law or regulation, or any order or decree of any court or governmental authority; (e) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which Borrower is a party or by which Borrower or any of its property is bound; (f) do not result in the creation or imposition of any lien upon any of the property of Borrower other than those in favor of Lender pursuant to the Loan Documents; and (g) do not require the consent or approval of any governmental authority or any other Person.  Each Loan Document constitutes a legal, valid and binding obligation of Borrower enforceable against it in accordance with its terms.

**4.4    Material Adverse Effect.**  No event has occurred, which alone or together with other events, could reasonably be expected to have a Material Adverse Effect.

**4.5    Ownership of Property; Liens.**  Borrower owns no material property other than the Assigned Receivables and related rights purchased or granted pursuant to the Sale Agreement.  Borrower has good and marketable title to such assets, and none of such assets is subject to any liens not held by Lender or an Affiliate of Lender.

**4.6    Taxes.**  All tax returns, reports and statements, including information returns, required by any governmental authority to be filed by Borrower have been filed with the appropriate governmental authority and all taxes have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof (or any such fine, penalty, interest, late charge or loss has been paid).

**5.    AFFIRMATIVE COVENANTS**

To induce Lender to make the Receivables Loans, Borrower agrees that from and after the date hereof and until the Facility Termination Date.

**5.1     Maintenance of Existence and Conduct of Business.** Borrower shall: (a) do or cause to be done all things necessary to preserve and keep in full force and effect Borrower's limited liability company existence, and its rights and franchises necessary to the proper conduct of its business; (b) continue to conduct Borrower's business solely for the purpose of conducting Receivables Sales financed by Lender or an Affiliate of Lender; (c) at all times maintain. preserve and protect all of Borrower's assets and properties used or useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear); (d) transact business only in Borrower's legal name: and (e) conduct Borrower's operations in a manner that complies with all of the terms and covenants in this Agreement and other Loan Documents.

**5.2     Books and Records.** Borrower shall keep adequate books and records with respect to its business activities in which proper entries, reflecting all financial transactions. are made in accordance with generally accepted accounting principles consistently applied. Borrower shall deliver to Lender financial statements, reports, notices and other information regarding Borrower. Originator and Receivables Sales financed by Lender as Lender shall request in its discretion from time to time. Borrower shall promptly report to Lender the occurrence of any event that could reasonably expect to have a Material Adverse Effect, including any litigation, judgments or liens.

**5.3     Insurance.** Borrower shall maintain. at its sole cost and expense. policies of casualty and liability insurance as are typically maintained by similar companies engaged in similar businesses, naming Lender as a loss payee and additional insured. In addition. Borrower shall maintain credit insurance, on an equal cost-shared basis with Lender unless otherwise agreed. with respect to any Receivables Loan to the extent and on the terms specified in the related loan proposal as accepted by Lender.  In addition. Borrower with respect to such credit insurance, will take all appropriate steps to preserve and pursue all claims under such policies. In the event Borrower fails to maintain such insurance. Lender may. in its discretion. procure such insurance and charge the Borrower for the cost thereof (subject to such equal cost-sharing with respect to credit insurance).

**5.4     Compliance with Laws.** Borrower shall comply with all federal. state. local. and foreign laws and regulations applicable to them. except to the extent that the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.5     Further Assurances.** Borrower agrees that it shall and shall request any Seller and any Buyer to, at Borrower's expense and upon request of Lender. duly execute and deliver, or cause to be duly execu·· ·' and delivered. to Lender such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out the provisions and purposes of this Agreement or any other Loan Document; provided however, that Lender agrees to file a financing statement substantially in the form attached hereto as Exhibit C.  Without limiting the foregoing. Borrower shall take all actions necessary such that the liens granted to Lender pursuant to the Loan Documents will at all times be fully perfected first priority liens in and to the Collateral described therein.

DZB004343

5.6     **No Liens.** Borrower shall cause the Originator to warrant to Borrower that, upon payment to a Seller using the proceeds of a Receivables Loan which, taken together with any contribution from the Originator, shall be used to pay a portion of the purchase price of the related Receivables Sale, the Originator shall be the owner of Inventory subject to the related Originator Purchase Order, free and clear of any adverse claims, liens and encumbrances other than those in favor of Borrower or Lender.

5.7     **Operational Limitations.** For at least one year and one day after the date that all Loans shall have been paid in full, Borrower shall comply with the following:

(a)     Borrower shall own no assets, and will not engage in any business, other than the assets and transactions specifically contemplated by this Agreement.

(b)     Borrower shall not incur any indebtedness or obligation, secured or unsecured, direct or indirect, absolute or contingent (including any guaranty of any such obligation), other than in connection with Receivables Sales financed by Lender or an Affiliate of Lender and as otherwise permitted under this Agreement.

(c)     Borrower shall not make any loans or advances to any third party and shall not acquire obligations (other than pursuant to the Servicing Agreement and the Sale Agreement) or securities of any of its Affiliates.

(d)     Borrower shall pay Borrower's debts and liabilities only from Borrower's assets.

(e)     Borrower shall do all things necessary to observe organizational formalities and preserve Borrower's existence and will not amend, modify or otherwise change its certificate of formation or limited liability company agreement, or suffer the same to be amended, modified or otherwise changed, without the prior written consent of Lender.

(f)     Borrower shall maintain all of Borrower's books, records, financial statements and bank accounts separate from those of the Originator or any of its other Affiliates.

(g)     Borrower shall be, and at all times will, hold itself out to the public as a legal entity separate and distinct from any other entity (including Originator and any other Affiliate of Borrower) and shall correct any known misunderstanding regarding Borrower's status as a separate entity, shall conduct its business in the name of Borrower, and shall not identify itself or any of its Affiliates as a division or part of the other and shall maintain and utilize separate invoices and checks.

(h)     Borrower shall maintain adequate capital, as determined in Borrower's reasonable discretion, for the normal obligations reasonably foreseeable in a business of Borrower's size and character and in light of Borrower's contemplated business operations.

(i)     Borrower shall not engage in or suffer any dissolution, winding-up, liquidation, consolidation or merger in whole or in part.

DZB004344

(j)     Borrower shall not commingle Borrower's funds or other assets with those of Originator or any other Affiliate of Borrower or any other person or entity.

(k)     Borrower shall maintain Borrower's assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify Borrower's individual assets from those of Originator or any other Affiliate or any other person or entity.

(l)     Borrower shall not hold itself out to be responsible for the debts or obligations of any other person or entity (other than as contemplated by the Servicing Agreement and the Sale Agreement).

(m)     Borrower shall maintain an independent director as set forth in its limited liability company agreement.

(n)     Borrower shall maintain, at its sole cost and expense, policies of casualty and property insurance with respect to the Inventory which is subject to each Originator Purchase Order which shall (i) provide for coverage in an amount which shall be equal to the price for which the related Seller has agreed to sell such Inventory under the related Seller Purchase Order, (ii) be continuously in effect during the period from the date the Lender shall advance the proceeds of the related Receivables Loan to the Borrower through and including the date that the related Buyer shall irrevocably accept delivery of such Inventory and agree to be responsible for the purchase price therefor; (iii) name the Lender and its successors and assigns as loss payee parties thereunder; and (iv) otherwise be in form and substance acceptable to the Lender and shall be from one or more insurance companies acceptable to the Lender.

## 6.     NEGATIVE COVENANTS

To induce Lender to make the Receivables Loans, Borrower agrees that, without the prior written consent of Lender, from and after the date hereof until one year and one day after the Facility Termination Date:

**6.1     Mergers; Subsidiaries, Etc.**   Borrower shall not directly or indirectly, by operation of law or otherwise, (a) form or acquire any subsidiary, or (b) merge with, consolidate with, acquire all or substantially all of the assets or capital stock of, or otherwise combine with or acquire, any Person; provided however, that the acquisition of any assets by Borrower pursuant to the Sale Agreement shall not be a violation of this covenant.

**6.2     Purchase Orders.**   Borrower shall not amend, modify, supplement, or assent to noncompliance with any material term, provision or condition of any Buyer Purchase Order, or permit Originator to do so.

**6.3     Investments; Loans and Advances.**   Borrower shall not make or permit to exist any investment in, or make, accrue or permit to exist loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise.

**6.4     Indebtedness.**   Borrower shall not create, incur, assume or permit to exist any indebtedness or liabilities, except, (a) obligations owing to Lender or to Other Lenders as described in Section 8.11; (b) contingent liabilities arising out of endorsements of checks and

DZB004345

other negotiable instruments for deposit or collection in the ordinary course of business: and (c) indebtedness or liabilities under the Servicing Agreement.

**6.5    Affiliate Transactions.**  Borrower shall not enter into or be a party to any transaction with any Affiliate other than payments to Affiliates permitted by Section 6.9 and as otherwise contemplated by this Agreement (including, without limitation, the Sale Agreement and the Servicing Agreement).

**6.6    Capital Structure and Business.**  Borrower shall not make any changes to its capital structure which results in Thomas J. Petters, directly or indirectly, owning less than 100% of the equity and financial interest of Borrower, or to its business objectives or purposes, or make any material change in its operations.

**6.7    Guaranteed Indebtedness.**  Borrower shall not create, incur, assume or permit to exist any obligation to guaranty any indebtedness or other obligation of any other Person in any manner except by endorsement of instruments or items of payment for deposit to the general account of Borrower.

**6.8    Liens.**  Borrower shall not create, incur, assume or permit to exist any lien on or with respect to the any of its properties or assets (whether now owned or hereafter acquired) except (i) liens in favor of Lender pursuant to the Loan Documents and liens in favor of Other Lenders, and (ii) liens for taxes not yet due.

**6.9    Restricted Payments.**  Borrower shall not make any Restricted Payment, provided that so long as no Event of Default has occurred and is continuing, Borrower may, with respect to the proceeds of any Receivables financed by Lender, after re-paying in full that portion of the obligations to Lender that relate to such Receivables, pay the remainder of the proceeds of that Receivable to Originator as distributions with respect to the equity of Borrower.

6.10    Change of Corporate Name or Location.  Borrower shall not (a) change its name or jurisdiction of organization, or (b) change its chief executive office, principal place of business, other business offices, warehouses or other locations, or the location of its records concerning any Collateral, in any case without at least 30 days' prior written notice to Lender and after completing or taking any reasonable action requested by Lender in connection therewith.

## 7.    EVENTS OF DEFAULT: RIGHTS AND REMEDIES; TERM

**7.1    Events of Default.**  The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)    Borrower (i) fails to make any required payment on any Receivables Loan or any of the other obligations under the Promissory Notes when due and payable, unless such due date has been extended in writing by Lender, and such failure remains unremedied for one (1) business day; or (ii) fails to pay or reimburse Lender for any expense reimbursable under any Loan Document within ten (10) days following Lender's demand for such reimbursement or payment of expenses.

DZB004346

(b)     Borrower or Originator shall fail or neglect to perform, keep or observe any other provision of any Loan Documents (other than any provision embodied in or covered by any other clause of this Section) and the same shall remain unremedied for a period ending on the first to occur of five (5) business days after Borrower or Originator shall receive written notice of any such failure from Lender or five (5) business days after Borrower or Originator shall become aware thereof; provided however, that if Originator or Borrower fails to transmit funds as required in Section 2.2(b), such five-day grace period shall not apply and there shall be no grace period.

(c)     Any representation or warranty in any Loan Document or in any written statement, report, financial statement or certificate made or delivered to Lender by Borrower is untrue or incorrect in any material respect as of the date when made or deemed made.

(d)     Any assets of Borrower or Originator shall be attached, seized or levied upon, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of Borrower.

(e)     A case or proceeding shall have been commenced against Borrower or Originator (i) under Title 11 of the United States Code or any other applicable federal, state or foreign bankruptcy or other similar law; (ii) requesting the appointment of a custodian, receiver or trustee (or similar official) of Borrower or Originator or of any substantial part of its assets; or (iii) requesting the winding-up or liquidation of the affairs of Borrower or Originator, and such case or proceeding shall remain undismissed or unstayed for sixty (60) days or such court shall enter a decree or order granting the relief sought in such case or proceeding.

(f)     Borrower or Originator (i) shall file a petition seeking relief under Title 11 of the United States Code, or any other applicable federal, state or foreign bankruptcy or other similar law; (ii) shall fail to contest in a timely and appropriate manner or shall consent to the institution of proceedings thereunder or to the filing of any such petition or to the appointment of or taking possession by a custodian, receiver or trustee (or similar official) of Borrower or Originator or of any substantial part of its assets; (iii) shall make an assignment for the benefit of creditors; or (iv) shall take any action in furtherance of any of the foregoing; or (v) shall admit in writing its inability to, or shall be generally unable to, pay its debts as such debts become due.

(g)     A final judgment or judgments for the payment of money shall be rendered against Borrower and the same shall not, within thirty (30) days after the entry thereof, have been discharged or execution thereof stayed or bonded pending appeal, or shall not have been discharged prior to the expiration of any such stay.

(h)     A Change of Control Date shall have occurred

(i)     Any other event shall have occurred that has a Material Adverse Effect.

7.2    Remedies.

(a)     If any Event of Default shall have occurred and be continuing, Lender may, without notice, (i) suspend or terminate this facility with respect to further Receivables Loans, and, upon written notice, terminate this Agreement (in which case the Facility

15

DZB004347

Termination Date shall be the termination date set forth in such notice); (ii) declare all or any portion of the Promissory Notes due; and (iii) exercise any rights and remedies provided to Lender under the Loan Documents and/or at law or equity, including all remedies provided under the Code; provided, that upon the occurrence of an Event of Default specified in Sections 7.1 (d),(e) or (f), all of the obligations shall become immediately due and payable automatically without declaration, notice or demand by any Person. Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies which Lender may have under any other agreement, including the other Loan Documents, by operation of law or otherwise. Recourse to any Collateral shall not be required. Borrower hereby irrevocably appoints Lender and its successors and assigns as Borrower's attorney-in-fact, coupled with an interest, to take all actions and perform all obligations required of Borrower under this Agreement after the occurrence and during the continuance of an Event of Default.

(b) If any Event of Default shall have occurred and be continuing and if Lender determines that Originator is unwilling or unable to complete any inventory sale as required under any Originator Purchase Order or Buyer Purchase Order, then Lender or its successors and assigns may assume control of, and conduct and complete, such inventory sale pursuant to the terms of such Originator Purchase Order or Buyer Purchase Order, as the case may be.

7.3  **Term.**  The financing arrangements contemplated hereby shall be in effect until the Facility Termination Date. In addition to Lender's rights under Section 7.2(a)(i), either Borrower or Lender may also terminate this Agreement on thirty (30) days prior written notice, and the Facility Termination Date shall be the thirtieth day after such notice (unless otherwise agreed by Borrower and Lender); provided that such termination shall not affect: (a) Borrower's obligations to make any payments due and owing to Lender pursuant to this Agreement; and (b) the indemnification provisions under Section 2.6, all of which shall remain operative and in full force and effect. Upon payment in full in cash and performance of all of Borrower's obligations to Lender (other than indemnification obligations hereunder), Lender shall deliver to Borrower and Originator termination statements, release of Collateral and guaranties and other documents necessary or appropriate to evidence termination of the liens and guaranties securing payment of the amounts owed to Lender hereunder.

8.  **MISCELLANEOUS**

8.1  **Complete Agreement; Modification of Agreement.**  The Loan Documents constitute the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in Section 8.2 below. Any prior agreement, whether written or oral, between Borrower and Lender or any of their respective affiliates, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement.

8.2  **Amendments.**  No amendment, modification, or termination of any provision of any Loan Document, or any consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and Borrower.

8.3     **Fees and Expenses.**  Borrower shall reimburse Lender for all fees, filing fees, costs and expenses, including the fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(a)     any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrower or any other Person as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection therewith or herewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to Lender by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any workout or restructuring of the Receivables Loans during the pendency of one or more Events of Default;

(b)     any attempt to enforce any remedies of Lender against Borrower or any other Person that may be obligated to Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any workout or restructuring of the Receivables Loans during the pendency of one or more Events of Default; and

(c)     efforts to perfect, verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

including all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in any way or respect arising in connection with or relating to any of the events or actions described in this Section, all of which shall be payable, on demand, by Borrower to Lender.  If Borrower shall fail to pay any of such items upon demand, interest under Section 2.4 shall apply to such items until payment in full.

8.4     **No Waiver.**  Lender's failure, at any time or times, to require strict performance by Borrower of any provision of this Agreement and any of the other Loan Documents shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith.  Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type.  None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the other Loan Documents and no default or Event of Default by Borrower shall be deemed to have been suspended or waived by Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of Lender and directed to Borrower specifying such suspension or waiver.

8.5     **Successors and Assigns.**  This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of Borrower, Lender and their respective successors and assigns (including a debtor-in-possession on behalf of Borrower or Originator).  Borrower may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written

DZB004349

consent of Lender. Any such purported assignment, transfer, hypothecation or other conveyance by Borrower without the prior express written consent of Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of Borrower and Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

**8.6   GOVERNING LAW. THE LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MINNESOTA WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. BORROWER HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN HENNEPIN COUNTY, MINNESOTA SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED, LENDER MAY BRING SUIT OR TAKE OTHER ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.**

8.7   Notices. Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered (a) upon the earlier of actual receipt and three business days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by email, telecopy or other similar facsimile transmission (with such email, telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section); (c) one business day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to:

If to Borrower:

PC Funding, LLC
7585 Equitable Drive
Eden Prairie, MN 55344
Attn: Thomas J. Petters
Fax: 952-975-2295
email: Tom.Petters@redtagbiz.com

If to Lender:

DZB004350

Opportunity Finance, LLC
60 South Sixth Street
Minneapolis, MN 55402
Attn: Jon R. Sabes
Fax: 612-339-8922
email: sabesjon@qwest.net

or to such other address or person (or facsimile number) as may be substituted by notice given as
herein provided.

**8.8    Counterparts.**  This Agreement may be executed in any number of separate
counterparts, each of which shall collectively and separately constitute one agreement.

**8.9    WAIVER OF JURY TRIAL.  THE PARTIES HERETO WAIVE ALL
RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT
TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR
OTHERWISE, BETWEEN LENDER AND BORROWER ARISING OUT OF,
CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP
ESTABLISHED AMONG THEM IN CONNECTION WITH, THIS AGREEMENT OR
ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED
THERETO.**

**8.10    No Joint Venture.**  Nothing contained herein shall be deemed or construed to
create a partnership or joint venture between Borrower and Lender or Originator and Lender.

**8.11    Other Lenders.**  The parties contemplate that from time to time Borrower may
enter into financing agreements with Affiliates of Lender ("**Other Lenders**").  Lender may act
as an agent for Other Lenders and Lender may appoint one or more Other Lenders or other
Affiliates of Lender to act as agent for Lender for such purposes under this Agreement as Lender
shall designate in a written notice to Borrower.  Borrower may not grant any Other Lender a lien
on any Receivables Sale (or related asset) with respect to which Lender has made a Receivables
Loan unless Lender consents to such grant in writing.  Any default or event of default under any
financing agreement with any Other Lender shall constitute an Event of Default under this
Agreement.

**8.12    Confidentiality.**  Lender agrees to use reasonable efforts (equivalent to the efforts
Lender applies to maintain as confidential its own confidential information) to maintain as
confidential all information provided by Borrower or Originator to Lender and designated as
confidential; provided however, that Lender, may disclose such information to (i) any entity
providing financing to Lender or any assignee of Lender (a "**Funding Source**"); (ii) any credit-
enhancement provider of (a) Lender, (b) any assignee of Lender, or (c) any Funding Source (a
"**Credit Enhancement Provider**"); or (iii) any rating agency; provided further that Lender or
any such other party or person may disclose such information to Persons employed or engaged
by Lender, such Funding Source, such Credit Enhancement Provider, or such rating agency in
evaluating, approving, structuring or administering the Receivables Loans and the financing
facility provided hereunder; provided however, that any such party or person to whom such
information will be provided agrees to maintain such information as confidential as set forth

DZB004351

above, and provided that Lender or any such party or person may disclose such information (a) as required or requested by any governmental authority or reasonably believed by Lender, any Funding Source, any Credit Enhancement Provider, or any rating agency to be compelled by any court decree, subpoena or legal or administrative order or process; (b) as, in the opinion of counsel to Lender, any Funding Source, any Credit Enhancement Provider, or any rating agency required by law; (c) in connection with the exercise of any right or remedy under the Loan Document or in connection with any litigation to which Lender, any Funding Source, any Credit Enhancement Provider or rating agency is a party; or (d) which ceases to be confidential through no fault of Lender, any Funding Source, any Credit Enhancement Provider or any rating agency.

     **8.13  Consent to Sale or Transfer.**  Borrower and Originator hereby consent, and agree to be bound by, any sale, transfer, assignment or pledge of any or all right, title and interest of Lender in, to or under the Receivables, Loans, Collateral, Loan Documents and any or all related rights, privileges and entitlements therein, and hereby further consents to the Lender's transfer, assignment, and pledge of any or all of its rights as a third-party beneficiary under the Sale Agreement.  Borrower and Originator further consent to, and agree to be bound by, any subsequent sales, transfers, assignments or pledges of any or all of the foregoing by any transferee, assignee or pledge of Lender.

     IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

PC FUNDING, LLC

By:_____
    Thomas J. Peters
    President


OPPORTUNITY FINANCE, LLC

By:_____
    Jon R. Sabes
    Chief Manager and President

DZB004352

## ACKNOWLEDGMENT AND AGREEMENT

The undersigned hereby consents to the foregoing Credit Agreement and agrees to be bound by, perform those obligations imposed on it by, and be responsible for the representations and warranties by it in, the Credit Agreement.

PETTERS COMPANY, INC.
a Minnesota corporation

By: _____
Thomas J. Petters
President

DZB004353

## EXHIBIT A

### FORM OF RECEIVABLES LOAN PROPOSAL

Reference is made to that certain Credit Agreement dated as of December __, 2001 by and between the undersigned ("Borrower") and Opportunity Finance, LLC ("Lender") (the "Credit Agreement"). Capitalized terms used herein without definition are so used as defined in the Credit Agreement

The undersigned, being the _____ of Borrower, hereby certifies that the information provided herein is true and correct in all material respects.

1.  **GENERAL INFORMATION REGARDING SELLER AND INVENTORY (AND COPIES OF ASSOCIATED BUYER PURCHASE ORDERS AND ORIGINATOR PURCHASE ORDERS)**

    (a)   Name of Seller _____

    (b)   Originator Purchase Order No. (if available) _____

    (c)   Purchase Price on Bill of Sale or Buyer Purchase Order   $ _____

    (d)   Buyer Purchase Order No. (if available) _____

    (e)   Inventory Description:

    _____

    _____

2.  **AMOUNT REQUESTED FOR LOAN**   $ _____

3.  **INTEREST**

    (a)   Monthly Interest Rate   _____ %

              or

    (b)   Fixed Yield   $ _____

4.  **DESCRIPTION OF INSURANCE**

    _____

    _____

PC FUNDING, LLC

By: _____
Name: _____
Title: _____
Dated: _____

Accepted.

OPPORTUNITY FINANCE, LLC

By: _____
Name: _____
Its: _____
Dated: _____

i

DZB004354

# EXHIBIT 7

ASSET PURCHASE AGREEMENT

Dated as of December 28, 2001

Among

AUTOBAHN FUNDING COMPANY LLC

as the Company

and

THE FINANCIAL INSTITUTIONS
FROM TIME TO TIME PARTY HERETO AS PURCHASERS

as the Purchasers

and

DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, FRANKFURT AM
MAIN

as the Agent

*This Asset Purchase Agreement has been entered into in connection with the Receivables Loan and Security Agreement dated as of December 28, 2001 among Opportunity Finance Securitization, LLC, as Borrower, Opportunity Finance, LLC, as Servicer, Royal Indemnity Company, U.S. Bank National Association, the Lender named therein and DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main, as Agent on behalf of the Lender therein.*

Doc. #30393215_V6.WPD

DZB041507

[Asset Purchase Agreement - Opportunity Finance)]

TABLE OF CONTENTS

PAGE

ARTICLE I    DEFINITIONS AND ACCOUNTING TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    SECTION 1.01.    Funding Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    SECTION 1.02.    Certain Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    SECTION 1.03.    Computation of Time Periods . . . . . . . . . . . . . . . . . . . . . . . 7
    SECTION 1.04.    Accounting Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    SECTION 1.05.    Other Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE II    PURCHASE COMMITMENTS AND THE FUNDING OF PURCHASES . . . . 8
    SECTION 2.01.    The Purchasers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    SECTION 2.02.    The Purchase Commitment . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    SECTION 2.03.    Making the Purchases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    SECTION 2.04.    Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    SECTION 2.05.    Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    SECTION 2.06.    Certain Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    SECTION 2.07.    Register . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    SECTION 2.08.    Downgraded Bank Advances; Downgraded Bank Accounts . . . . 12
    SECTION 2.09.    Change in Borrowing Limit; Change in Maximum
                Purchase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    SECTION 2.10.    Extension of the Scheduled Purchase Commitment
                Termination Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE III  CONDITIONS PRECEDENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    SECTION 3.01.    Conditions Precedent to the Effectiveness of Purchase
                Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    SECTION 3.02.    Conditions Precedent to Purchase, Downgraded Bank
                Advance and Funding Commitment Account . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE IV  DISTRIBUTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    SECTION 4.01.    Distributions of Payments . . . . . . . . . . . . . . . . . . . . . . . . . 16
    SECTION 4.02.    Returned Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    SECTION 4.03.    Excess Recoveries of Principal and Yield . . . . . . . . . . . . . . . . 16
    SECTION 4.04.    Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE V   REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . . . . . . . . . 17
    SECTION 5.01.    Representations and Warranties of the Company . . . . . . . . . . . 17
    SECTION 5.02.    Representations and Warranties of each Purchaser . . . . . . . . . . . 18

DZB041508

[Asset Purchase Agreement - Opportunity Finance)]

PAGE

ARTICLE VI  COVENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
SECTION 6.01.    Affirmative Covenants of the Company . . . . . . . . . . . . . . . . . . 19
SECTION 6.02.    Negative Covenants of the Company . . . . . . . . . . . . . . . . . . . . 20
SECTION 6.03.    Amendment of the Funding Agreement, Etc . . . . . . . . . . . . . . . 20
SECTION 6.04.    Purchaser Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
SECTION 6.05.    Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE VII        AGENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
SECTION 7.01.    Authorization and Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
SECTION 7.02.    Agents' Reliance, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
SECTION 7.03.    DZ Bank AG Deutsche Zentral-Genossenschaftsbank,
                 Frankfurt AM Main and Affiliates . . . . . . . . . . . . . . . . . . . . . . . 24
SECTION 7.04.    Purchaser Credit Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
SECTION 7.05.    Company's Reliance, Etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
SECTION 7.06.    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
SECTION 7.07.    Successor Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ARTICLE VIII        MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
SECTION 8.01.    Amendments, Etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
SECTION 8.02.    Notices, Etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
SECTION 8.03.    No Waiver; Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
SECTION 8.04.    Costs, Expenses and Indemnification . . . . . . . . . . . . . . . . . . . . 28
SECTION 8.05.    Binding Effect; Termination . . . . . . . . . . . . . . . . . . . . . . . . . . 28
SECTION 8.06.    Assignments and Participation . . . . . . . . . . . . . . . . . . . . . . . . . . 29
SECTION 8.07.    No Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 8.08.    GOVERNING LAW; CONSENT TO JURISDICTION;
                 WAIVER OF OBJECTION TO VENUE . . . . . . . . . . . . . . . . . . . . 32
SECTION 8.09.    WAIVER OF JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
SECTION 8.10.    Execution in Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
SECTION 8.11.    Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
SECTION 8.12.    Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
SECTION 8.13.    Recourse Against Certain Parties . . . . . . . . . . . . . . . . . . . . . . . . 33
SECTION 8.14.    Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

DZB041509

[Asset Purchase Agreement - Opportunity Finance)]

SCHEDULES:

SCHEDULE I          List of Conditions Precedent Documents

EXHIBITS:

EXHIBIT A   Form of Assignment and Acceptance
EXHIBIT B   Form of Certificate Evidencing Purchase

DZB041510

THIS Asset Purchase Agreement (this "Agreement") is made as of December 28, 2001 among:

(1)     AUTOBAHN FUNDING COMPANY LLC, a Delaware limited liability company (the "Company");

(2)     THE FINANCIAL INSTITUTIONS from time to time parties hereto as purchasers (each, a "Purchaser" and collectively, the "Purchasers"); and

(3)     DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, FRANKFURT AM MAIN ("DZ Bank") in its capacity as agent for the Purchasers hereunder (in such capacity, the "Agent").

PRELIMINARY STATEMENTS

The Company has entered into the Receivables Loan and Security Agreement dated as of December 28, 2001 (as amended, restated, supplemented and/or otherwise modified from time to time in accordance with the provisions thereof, the "Funding Agreement"), among Opportunity Finance Securitization, LLC (the "Borrower"), Opportunity Finance, LLC, the Company, DZ Bank, as Agent and Collateral Agent (the "Deal Agent"), Royal Indemnity Company and U.S. Bank National Association pursuant to which the Company may from time to time make Loans (as defined in the Funding Agreement) to the Borrower secured by Pledged Assets (as defined in the Funding Agreement). The Company may from time to time wish to sell undivided interests in all of its right, title and interest in, to, and under such Loans, together with the Pledged Assets securing such Loans (each a "Percentage Interest" and collectively, the "Percentage Interests") to the Purchasers. Pursuant to the terms and subject to the conditions of this Agreement, the Purchasers agree to purchase such Percentage Interests at the request of the Company (or the Administrator acting on its behalf).

The Company may fund its Loans under the Funding Agreement through the issuance of Commercial Paper Notes, through the borrowing of loans or the obtaining of other extensions of credit from financial institutions. In addition, the Company may fund its Loans under the Funding Agreement, and refinance maturing Commercial Paper Notes, through the selling of Percentage Interests to the Purchasers.

IT IS AGREED as follows:

[Asset Purchase Agreement - Opportunity Finance)]

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Funding Agreement.  As used herein, unless otherwise defined herein, capitalized terms defined in the Funding Agreement shall have the respective meanings set forth therein.

SECTION 1.02.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to the singular and plural forms of the terms defined):

"Administration Agreement" means that certain Administration Agreement, dated as of September 17, 1999 executed by and between the Company and DZ Bank, as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"Administrator" means DZ Bank in its capacity as Administrator under the Administration Agreement, and any successor thereto in such capacity.

"Agent" has the meaning specified in the preamble of this Agreement.

"Aggregate Commitment" means, at any time, the sum of the Purchase Commitments then in effect.

"Agreement Collection Date" has the meaning specified in Section 6.01.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Purchaser and an Eligible Assignee, and accepted by the Agent, in substantially the form of Exhibit A.

"Bankruptcy Event" means any proceeding instituted by or against the Company seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), any such proceeding shall remain undismissed or unstayed for a period of 60 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur.

"Borrower" has the meaning set forth in the Preliminary Statements.

DZB041512

"Business Day" means a day of the year other than a Saturday or Sunday on which (a) banks are required to be open in New York City, and on which the Depository Trust Company conducts business and (b) if the term "Business Day" is used in connection with the Adjusted Eurodollar Rate, dealings are carried on generally in the London interbank Eurodollar market.

"Commercial Paper Depositary Agreement" means the Commercial Paper Depositary Agreement dated as of September 17, 1999 between the Company and the Issuing and Paying Agent, as the same may be amended, supplemented, or otherwise modified from time to time.

"Commercial Paper Note" means any promissory note of the Company having an original maturity not to exceed 270 days.

"Commitment Account" has the meaning specified in Section 2.10(b).

"Company" has the meaning specified in the preamble of this Agreement.

"Company's Share" means, at any time, a fraction (a) the numerator of which is the aggregate outstanding principal balance of Loans advanced by the Company under the Funding Agreement at such time and (b) the denominator of which is the aggregate outstanding principal balance of Loans advanced by all Lenders under the Funding Agreement at such time.

"Deal Agent" has the meaning specified in the Preliminary Statements of this Agreement.

"DZ Bank" has the meaning specified in the preamble of this Agreement.

"Dollars" and the sign "$" each mean lawful money of the United States of America.

"Downgrade Event" has the meaning specified in Section 2.08(a).

"Downgraded Bank Account" has the meaning specified in Section 2.08(a).

"Downgraded Bank Advance" means an advance made by a Purchaser which is remitted to a Downgraded Bank Account pursuant to Section 2.08, the outstanding principal amount of which at any time is equal to the amount of such initial advance minus the aggregate amount of all monies released to such Purchaser pursuant to Section 2.08 (other than any such amounts released in respect of Investment Earnings) plus the aggregate amount of all monies deposited into such Downgraded Bank Account pursuant to the first sentence of Section 2.08(b).

"Effective Date" means the first date hereunder on which the condition specified in Section 3.01 shall have been satisfied with respect to a Purchaser.

DZB041513

"Eligible Account Bank" means (a) any commercial bank satisfactory to the Administrator and having (i) combined capital and surplus of at least $250,000,000, (ii) a short-term debt rating of at least P-1 from Moody's and F1 from Fitch (if rated by Fitch), and (iii) in a manner acceptable to the Agent and the Company, expressly waived all contractual and equitable rights of set-off and combination of accounts it may have with respect to the relevant Downgraded Bank Account or Commitment Account, or (b) such other commercial bank satisfactory to the Administrator and in respect of which each of the rating agencies rating the Commercial Paper Notes at the request of the Company and the Administrator shall have delivered prior written confirmation to the Administrator that the maintenance of the Downgraded Bank Account or Commitment Account with such commercial bank will not result in the reduction or withdrawal of the respective ratings of the Commercial Paper Notes.

"Eligible Assignee" means (a) a Person approved by the Company (i) whose short-term rating is at least P-1 from Moody's and F1 by Fitch, if rated by Fitch, or (ii)(x) whose obligations under this Agreement are guaranteed by a Person whose short-term debt rating is at least P-1 from Moody's, and F1 by Fitch, if rated by Fitch and (y) of whose guarantee obligations the Company has provided not less than 5 days prior written notice and a copy of such guarantee to Moody's and Fitch, or (b) such other Person satisfactory to the Company and the Agent, and in respect of which each of the rating agencies then rating the Commercial Paper Notes at the request of the Company and the Administrator has confirmed in writing that the assignment to such Person of all or a portion of a Purchaser's rights and obligations under this Agreement will not result in the reduction or withdrawal of the respective ratings of the Commercial Paper Notes.

"Face Amount" means in relation to any Commercial Paper Note (a) if issued on a discount basis, the face amount stated therein and (b) if issued on an interest-bearing basis, the principal amount stated therein plus the amount of all interest scheduled to accrue thereon through its stated maturity date.

"Facility Documents" means this Agreement, the Funding Agreement, the other Transaction Documents and all other notes, security agreements, instruments, documents and other agreements (including, without limitation, UCC financing statements) heretofore, now or hereafter executed and/or delivered by or on behalf of the Company in connection with any of the foregoing, in each case, as the same may be amended, supplemented or otherwise modified from time to time.

"Federal Funds Rate" means, for any day, a fluctuating interest rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the immediately preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day for such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

[Asset Purchase Agreement - Opportunity Finance)]

"Fitch" means Fitch, Inc., and any successor thereto.

"Funding Agreement" has the meaning set forth in the Preliminary Statements.

"GAAP" means, at any particular time with respect to the Company, U.S. generally accepted accounting principles as in effect at such time, consistently applied.

"Indemnified Liabilities" has the meaning specified in Section 7.06.

"Indemnified Party" has the meaning specified in Section 8.04.

"Investment Earnings" means, with respect to any Downgraded Bank Account, the interest and/or other net investment income arising with respect to any funds (and investments made therewith) on deposit, for the benefit of the Company, in such Downgraded Bank Account net of investment expenses and fees and of losses on such investments.

"Issuing and Paying Agent" means U.S. Bank Trust National Association, a national banking association, as depositary and issuing and paying agent for the Company, and any successor thereto acting in such capacity under the Commercial Paper Depositary Agreement.

"Lien" means, with respect to any asset, (a) any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset or (b) the interest of a vendor or lessor under any conditional sale agreement, financing lease or other title retention agreement relating to such asset.

"Majority Purchasers" means, at any time, Purchasers owning Percentage Interests that, in the aggregate, constitute at least 66⅔% of the aggregate Percentage Interests owned by all Purchasers hereunder, or, if no purchases of Percentage Interests have been made at such time hereunder, Purchasers having at least 66⅔% of the Percentages then applicable to all Purchasers hereunder.

"Maximum Purchase" means, with respect to each Purchaser, the maximum amount which such Purchaser is obligated to pay hereunder on account of the Purchase Price of Percentage Interests, as set forth in its signature page to this Agreement, or in the Assignment and Acceptance pursuant to which it became a Purchaser hereunder (as the case may be), as such amount may be modified in connection with any subsequent Assignment and Acceptance pursuant to Section 8.06(a), or in connection with a change in the Borrowing Limit pursuant to Section 2.09(a) or (b), or in connection with a termination or reduction of such Purchaser's Purchase Commitment pursuant to Section 2.09(c).

"Moody's" means Moody's Investors Service, Inc., and any successor thereto.

DZB041515

[Asset Purchase Agreement - Opportunity Finance)]

"Net Purchase Price Balance" means, with respect to any Percentage Interest owned by a Purchaser, the original Purchase Price paid by such Purchaser for such Percentage Interest minus the sum of (a) the aggregate amount of all payments from Collections received by such Purchaser for application to the principal amount of Loans related to such Percentage Interest, (b) the aggregate amount of all payments from Collections received by such Purchaser for application to Yield on the principal amount of Loans related to such Percentage Interest to the extent that such Yield was applied to the payment of interest accrued on Commercial Paper which was included in the Purchase Price of such Percentage Interest and (c) the aggregate amount of any other reductions to the outstanding principal balance of Loans relating to such Percentage Interest in accordance with the terms of the Funding Agreement (as such Net Purchase Price Balance may otherwise be reduced from time to time pursuant to the terms of this Agreement).

"Other Agreements" has the meaning specified in Section 7.01.

"Percentage" means, with respect to each Purchaser, the undivided percentage interest in the Percentage Interests to be sold to the Purchasers hereunder that such Purchaser has agreed to purchase as set forth on its signature page to this Agreement or in the Assignment and Acceptance pursuant to which it became a Purchaser, as such percentage may be modified in connection with any subsequent Assignment and Acceptance pursuant to Section 8.06(a) or reallocation pursuant to Section 2.09.

"Percentage Interest" has the meaning set forth in the Preliminary Statements.

"Permitted Investments" has the meaning specified in the definition for the term "Permitted Investments" in the Funding Agreement without giving effect to the last sentence of such definition.

"Person" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"Placement Agent" means, at any time, any Person who has agreed to act as a placement agent for the Commercial Paper Notes pursuant to a commercial paper placement agreement which is in effect at such time.

"Purchase Commitment" means, with respect to a Purchaser, such Purchaser's commitment to make purchases of Percentage Interests from the Company under Article II of this Agreement, and "Purchase Commitments" means, collectively, the aggregate amount of the Purchase Commitments of all of the Purchasers.

"Purchase Commitment Effective Date" means, with respect to each Purchaser, the "Purchase Commitment Effective Date" identified on the signature page hereto executed by such Purchaser, or in the event that such Purchaser is a party to an Assignment and Acceptance, the

DZB041516

"Purchase Commitment Effective Date" identified on the earliest such Assignment and Acceptance entered into by such Purchaser.

"Purchase Commitment Termination Date" means, with respect to each Purchaser, the earlier to occur of (a) the Scheduled Purchase Commitment Termination Date for such Purchaser, and (b) the date of the termination in whole of the Purchase Commitments pursuant to Section 2.09.

"Purchase Price" means, with respect to each Purchaser, its Percentage of an amount equal to (i) the Loans Outstanding under the Funding Agreement at such time identified to the Purchasers for sale, plus (ii) all interest accrued and to accrue upon Commercial Paper Notes issued by the Company as a source of funding for the funding and/or maintenance by the Company of such Loans.

"Purchaser" has the meaning specified in the preamble of this Agreement.

"Register" has the meaning specified in Section 2.07.

"Related Person" has the meaning specified in Section 7.02(a).

"Scheduled Purchase Commitment Termination Date" means, with respect to each Purchaser, the "Scheduled Purchase Commitment Termination Date" identified on the signature page hereto executed by such Purchaser, or in the event that such Purchaser is a party to an Assignment and Acceptance, the "Scheduled Purchase Commitment Termination Date" identified on the latest such Assignment and Acceptance entered into by such Purchaser.

"Successor Agent" has the meaning specified in Section 7.07.

"Transaction Commercial Paper Notes" means the Commercial Paper Notes issued by the Company as a source of funding for the Loans advanced and/or maintained by the Company under the Funding Agreement.

"United States" and "U.S." each mean United States of America.

"Withholding Tax" has the meaning set forth in Section 8.14.

SECTION 1.03.   Computation of Time Periods.   In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding". Periods of days referred to in this Agreement shall be counted in calendar days unless Business Days are expressly prescribed and references in this Agreement to months and years shall be to calendar months and calendar years unless otherwise specified.

DZB041517

[Asset Purchase Agreement - Opportunity Finance)]

SECTION 1.04.   Accounting Terms.  All accounting terms not specifically defined otherwise herein shall have the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed, unless specifically provided otherwise herein, in accordance with GAAP.

SECTION 1.05.   Other Terms.  Any references herein to Exhibits, Schedules, Sections or Articles are references to Exhibits, Schedules, Sections or Articles of this Agreement, unless otherwise specified.

## ARTICLE II

## PURCHASE COMMITMENTS AND THE FUNDING OF PURCHASES

SECTION 2.01.   The Purchasers.  A Person shall become a party hereto as a Purchaser (i) by executing and delivering to the Agent a counterpart of its signature page to this Agreement or (ii) pursuant to the terms of an Assignment and Acceptance entered into in accordance with the terms and conditions of Section 8.06 hereof.  Upon acceptance and recording of such executed signature page or such Assignment and Acceptance by the Agent in the Register and subject to such Purchaser's being an Eligible Assignee, a Purchaser shall become a party to this Agreement from and after the effective date set forth on such signature page or Assignment and Acceptance, as the case may be.  Purchasers may become parties hereto at different times and from time to time in accordance with the foregoing procedure.  The signature page of a Purchaser, or its relevant Assignment and Acceptance (as the case may be) shall set forth the applicable Percentage, Maximum Purchase, Purchase Commitment Effective Date and Scheduled Purchase Commitment Termination Date for such Purchaser.

SECTION 2.02.   The Purchase Commitment.  (a) Each Purchaser severally agrees, on the terms and conditions hereinafter set forth, from time to time during the period from such Purchaser's Purchase Commitment Effective Date to and including the earliest to occur of the dates described in clauses (i) and (ii) of Section 2.02(b) below with respect to such Purchaser, upon notice from the Agent to each such Purchaser, to purchase from the Company, without recourse to the Company, in accordance with its respective Percentage, the Percentage Interests that the Company (or the Administrator acting on its behalf) offers to such Purchaser for sale.

(b)   Each Purchaser's Purchase Commitment shall be irrevocable and, subject to the limitations provided in Section 2.04 and Article III, unconditional, from such Purchaser's Purchase Commitment Effective Date, to and including the earlier to occur of (i) such Purchaser's Purchase Commitment Termination Date and (ii) the date on which the Agent notifies the Purchaser that the Funding Agreement has been terminated and all principal of Loans and Yield accrued thereon have been paid in full.

Doc 930393215_V6.WPD          8

DZB041518

[Asset Purchase Agreement - Opportunity Finance)]

(c)     Notwithstanding that any Purchaser may have purchased Percentage Interests hereunder for an aggregate Purchase Price equal to such Purchaser's Maximum Purchase, if and to the extent that such Purchaser shall thereafter have received payments of principal or Yield made by the Borrower for application to the Percentage Interests owned by such Purchaser, such Purchaser shall, subject to the limitations provided in Section 2.04, Article III, and the other terms and provisions of this Agreement be obligated to purchase additional Percentage Interests to and including the earlier to occur of the dates described in clauses (i) and (ii) of Section 2.02(b) above with respect to such Purchaser in an amount equal at any time to the excess of its Maximum Purchase over its aggregate Net Purchase Price Balance at such time.

SECTION 2.03.    Making the Purchases.  (a)  The Company (or the Administrator acting on its behalf) shall provide telephonic notice to the Agent of any proposed sale of Percentage Interests hereunder to the Purchasers by no later than 1:15 P.M. (New York City time) on the date of such proposed sale.  Upon receipt of such telephonic notice, the Agent shall then give to each applicable Purchaser prompt (and in any event by not later than 1:30 P.M. (New York City time)) notice thereof by telephone, facsimile or telex.  By 2:30 P.M. (New York City time) on the date of such proposed sale, the Company (or the Administrator acting on its behalf) shall deliver to the Agent a written notice of such proposed sale by facsimile, telex or otherwise.

(b)     Each written notice of a proposed sale of Percentage Interests to be delivered by the Company (or the Administrator acting on its behalf) to the Agent pursuant to this Section 2.03 shall specify (i) the date of such proposed sale, and (ii) the Purchase Price applicable to each Purchaser, and the calculation of such Purchase Price and the resulting percentage of the Percentage Interest applicable to such Purchaser.  Any such notice of proposed sale (including any telephonic notice) given by the Company (or the Administrator acting on its behalf) pursuant to this Section 2.03 shall be irrevocable and binding on the Company.

(c)     Each Purchaser shall, before 3:00 P.M. (New York City time) on the date of a proposed purchase of Percentage Interests hereunder, make available to the Agent by wire transfer of immediately available funds to such account as may be designated by the Agent from time to time, the Purchase Price to be paid by such Purchaser with respect to such purchase.  The Agent shall promptly notify the Company in the event that any Purchaser either fails to make such funds available to the Agent before such time or notifies the Agent that it will not make such funds available to the Agent before such time.  Subject to (x) the Agent's receipt of such Purchase Price and (y) the terms and conditions set forth in Section 2.04 and Article III, the Agent will no later than 3:30 P.M. (New York City time) (i) to the extent that the proceeds of such purchase are to be used to pay Commercial Paper Notes, make such funds available to the Issuing and Paying Agent, and (ii) in any other case, make such funds available to the Company or as the Company may otherwise direct.

(d)     The failure of any Purchaser to make the purchase required to be made by it of Percentage Interests hereunder shall not relieve any other Purchaser of its obligation hereunder to make its purchase of a Percentage Interest on such date.  Subject to the terms and conditions of

DZB041519

this Agreement, in the event any Purchaser fails to satisfy its obligation to purchase any Percentage Interest as required hereunder, upon receipt of notice of such failure from the Agent, subject to the limitations provided in Section 2.04 and Article III, the non-defaulting Purchasers shall promptly purchase the defaulting Purchaser's Percentage Interest on a pro rata basis in proportion to their relative Percentages (determined without regard to the Percentage of the defaulting Purchaser).

(e)   Unless the Agent shall have received notice from a Purchaser, prior to 3:00 P.M. (New York City time) on the date of any proposed sale of Percentage Interests hereunder, that the Purchaser will not make available to the Agent the amount of that Purchaser's Purchase Price for the Percentage Interests being sold, the Agent may assume that each Purchaser has made the required amount available to the Agent on the purchase date and the Agent may (but shall not be so required), in reliance upon such assumption, make available to the Issuing and Paying Agent or the Company on such date a corresponding amount. If and to the extent any Purchaser shall not have made its full Purchase Price available to the Agent, and the Agent in such circumstances has made available to the Issuing and Paying Agent or the Company the corresponding amount, that Purchaser shall on the next Business Day following the date of such sale make such amount available to the Agent, together with interest at the Federal Funds Rate for each day during the period during which such amount remains unpaid to the Agent. A certificate of the Agent submitted to any Purchaser with respect to amounts owing under this subsection (e) shall be conclusive, absent manifest error. If such amount is so made available, such payment to the Agent shall constitute such Purchaser's purchase on the date of sale for all purposes of this Agreement. If such amount is not made available to the Agent on the next Business Day following the date of such purchase, the Agent shall notify the Company of such failure to purchase and, upon demand by the Agent, the Company shall pay such amount to the Agent for the Agent's account, together with interest thereon for each day elapsed since the date of such purchase at a rate per annum equal to the Federal Funds Rate; provided, however, that the Company shall not be obligated to pay such amount to the Agent, except to the extent that the Company shall have received aggregate payments of Purchase Price, at least equal to such amount, from non-defaulting Purchasers pursuant to the terms of the last sentence of subsection (d) above.

(f)   The Percentage Interests sold to the Purchasers at any one time pursuant to this Article II, constitute an undivided percentage participation interest in all or a portion of the Company's right, title and interest in, to and under, the Funding Agreement (but excluding any obligation of the Company to make Loans to the Borrower), and all or a corresponding portion of the Company's rights in, to and under the Loans and the Pledged Assets securing such Loans. Upon receipt of payment by the Company of the Purchase Price relating to any purchase of Percentage Interests made by Purchasers hereunder, the Purchasers making such payment (and in the case of a purchase payment made by the Agent under subsection (e) above, the Agent) shall own an undivided interest in such Percentage Interests corresponding to the amount of Purchase Price so funded by such Purchaser (or Agent, as the case may be). Each Percentage Interest purchased by a Purchaser (or Agent, as the case may be) shall include the right to receive (x) a

[Asset Purchase Agreement - Opportunity Finance)]

proportionate share of the principal and Yield payments made to the Company by the Borrower
under the Funding Agreement and (y) certain related payments, as more fully described in
Article IV. Notwithstanding anything to the contrary herein, the purchase of a Percentage Interest
hereunder shall vest in a Purchaser no rights to exercise rights and remedies against the Pledged
Assets or the Borrower or any of its respective agents, all such rights and remedies being
exercisable solely by the Deal Agent in accordance with the provisions of the Funding
Agreement.

(g)     Within 10 Business Days after each purchase pursuant to this Article II, the Agent
shall deliver to each Purchaser (and in the case of a payment made by the Agent under subsection
(e) above, the Company shall deliver to the Agent) a certificate as to each Purchaser's (or
Agent's) undivided ownership interest in the Percentage Interest(s) so purchased, in substantially
the form of Exhibit B.

(h)     Within 10 days after the first purchase of a Percentage Interest under this
Agreement, the Agent shall arrange for the filing of Uniform Commercial Code financing
statements, in form and substance satisfactory to the Agent, in all jurisdictions that the Agent
may deem necessary or desirable in order to perfect the interests of the Purchasers contemplated
by this Agreement. Upon request, the Agent shall furnish to any Purchaser copies of such
financing statements (at such Purchaser's sole expense).

SECTION 2.04.   Limitations. Notwithstanding anything in the foregoing or elsewhere
to the contrary, a Purchaser shall not be obligated to make a purchase of a Percentage Interest:

(a)     to the extent that, after giving effect to such purchase and the application of all
amounts which are received by such Purchaser on or prior to the date of such purchase in respect
of all Percentage Interests previously purchased by such Purchaser under this Agreement, the
aggregate Net Purchase Price Balance of all Percentage Interests purchased by such Purchaser
under this Agreement would exceed such Purchaser's Maximum Purchase; or

(b)     if, on the date of such purchase, any of the conditions precedent to a purchase of
Percentage Interests set forth in Article III is not satisfied.

SECTION 2.05.   Use of Proceeds. The Company covenants and agrees that:

(a)     the proceeds of payments of Purchase Price shall only be used (i) to repay
maturing Commercial Paper Notes or (ii) to repay principal of, and to pay accrued and unpaid
interest on, any discretionary unsecured loans made to the Company (the proceeds of which were
used by the Company for the purposes described in the immediately preceding clause (i)), in each
case as the same are required or permitted to be paid in accordance with the documentation
relating thereto or (iii) to fund Loans made by the Company to the Borrower pursuant to the
Funding Agreement; and

DZB041521

[Asset Purchase Agreement - Opportunity Finance)]

(b)      the proceeds of the Downgraded Bank Advances shall only be used to fund the Downgraded Bank Accounts.

SECTION 2.06.   Certain Fees.  The Company agrees to pay to the Agent for the account of each Purchaser certain fees in the amounts and on the dates set forth in a fee letter executed between the Company and the Agent; provided that each such payment shall only be made to the extent that all Fees which are due and payable by the Borrower in connection with the Funding Agreement have been paid.

SECTION 2.07.   Register.  The Agent will maintain at its address set forth on the signature page hereof, a copy of this Agreement and all counterpart signature pages hereto, each Assignment and Acceptance delivered to and accepted by it, each notice of revision to the allocation of each Purchaser's Maximum Purchase and Percentage, and a register (the "Register") for the recordation of the names and addresses of the Purchasers, their Maximum Purchases, Percentages, Percentage Interests, Purchase Commitment Effective Dates, Scheduled Purchase Commitment Termination Dates, the Purchase Price of each Percentage Interest owned by each Purchaser, the aggregate outstanding principal amount of Loans allocable to the Percentage Interests owned by each Purchaser from time to time and the Net Purchase Price Balance relating thereto.  The entries in the Register shall be conclusive and binding for all purposes absent manifest error, and the Agent, the Company, the Administrator and the Purchasers may treat each Person whose name is recorded in the Register as a Purchaser hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Company, the Administrator, any Placement Agent or any Purchaser at any reasonable time and from time to time upon reasonable prior notice.

SECTION 2.08.   Downgraded Bank Advances; Downgraded Bank Accounts.  (a)  In the event that any Purchaser (or, if such Purchaser is an Eligible Assignee referred to in clause (a)(ii) of the definition of Eligible Assignee, the Person guarantying the obligations of such Purchaser under this Agreement) ceases to have a short-term debt rating of at least P-1 from Moody's and F1 from Fitch (if rated by Fitch) (any such event being a "Downgrade Event"), and such Purchaser is not replaced pursuant to Section 8.06 hereof within thirty days of such Downgrade Event, then the Company (or the Administrator acting on its behalf) may, by delivery of a notice to such effect to the Agent, require such Purchaser to make a Downgraded Bank Advance in an amount equal to the excess of such Purchaser's Maximum Purchase over the then outstanding Net Purchase Price Balance of such Purchaser.  Upon receipt of the proceeds of such Downgraded Bank Advance, the Agent shall deposit such funds into a trust account (each, a "Downgraded Bank Account"), in the name of the Company and referencing the name of such Purchaser, maintained at an Eligible Account Bank chosen by the Company.  The Company hereby grants to the Agent full power and authority, on behalf of the Company, to withdraw funds from each Downgraded Bank Account at the time of, and in connection with, the funding of any purchase of Percentage Interests required hereunder, and to deposit funds received to the related Downgraded Bank Account, all in accordance with the terms of and for the purposes set forth in this Agreement.  The deposit of monies in such Downgraded Bank Account by any

Doc 730393215_V6.WPD                                              12

DZB041522

[Asset Purchase Agreement - Opportunity Finance)]

Purchaser shall not constitute a purchase of a Percentage Interest (and such Purchaser shall not be entitled to interest on such monies except as provided below in subsection (c)) unless and until (and then only to the extent that) such monies are used to purchase Percentage Interests pursuant to the first sentence of clause (b) below).

(b)     From and after the establishment of a Downgraded Bank Account with respect to any Purchaser, and until the earliest of (i) the assignment by such Purchaser of all of its rights pursuant to Section 8.06 hereof, (ii) such Purchaser obtaining a short-term debt rating of at least P-1 from Moody's and F1 from Fitch (if rated by Fitch) and (iii) such Purchaser's Scheduled Purchase Commitment Termination Date, all purchases of Percentage Interests to be made by such Purchaser pursuant to its Purchase Commitment hereunder shall be made by withdrawing funds from such Downgraded Bank Account, and all payments received in respect of the principal of Loans relating to the Percentage Interests purchased by such Purchaser hereunder (whether or not originally funded from such Purchaser's Downgraded Bank Account) shall be made by depositing the related funds into such Downgraded Bank Account. Upon the earliest of (i) the assignment by such Purchaser of all of its rights pursuant to Section 8.06 hereof, (ii) such Purchaser obtaining a short-term debt rating of at least P-1 from Moody's and F1 from Fitch (if rated by Fitch), and (iii) such Purchaser's Scheduled Purchase Commitment Termination Date, all funds then held in such Downgraded Bank Account (after giving effect to any purchases of Percentage Interests to be made hereunder on such date) shall be paid by the Agent to such Purchaser, and thereafter all payments received in respect of the principal of Loans relating to the Percentage Interests purchased by such Purchaser hereunder (whether or not originally funded from such Purchaser's Downgraded Bank Account) shall be paid directly to such Purchaser in accordance with the terms of this Agreement.

(c)     Proceeds in a Downgraded Bank Account shall be invested, at the written direction of the applicable Purchaser to the Company and the Administrator, only in investments which constitute Permitted Investments. The Investment Earnings with respect to a Downgraded Bank Account shall accrue as the Purchaser and the applicable Eligible Account Bank shall agree. The Agent shall direct each such Eligible Account Bank to pay all such Investment Earnings directly to the Purchaser for its own account.

(d)     Notwithstanding anything herein to the contrary, neither the Agent nor the Company shall have any liability for any loss arising from any investment or reinvestment made by it with respect to a Downgraded Bank Account in accordance with, and pursuant to, the provisions hereof.

SECTION 2.09.   Change in Borrowing Limit; Change in Maximum Purchase.  (a) If the Funding Agreement shall be amended to increase the Borrowing Limit, then (i) the Agent shall promptly notify each Purchaser of such amendment, and (ii) on the effective date of such amendment, each Purchaser's Percentage shall be proportionately reduced and the amount of each Purchaser's Maximum Purchase shall remain the same; provided, however, that each Purchaser may elect to maintain its Percentage under its Purchase Commitment by executing and

DZB041523

delivering, within ten days after receipt of notice of such amendment, a new signature page to this Agreement reaffirming its Percentage and indicating the amount of its new Maximum Purchase.; provided, further, that the Borrowing Limit shall not be increased to an amount in excess of the quotient of aggregate Maximum Purchase amounts of the Purchase Commitments hereunder (after giving effect to any increases thereof with respect to such change in the Borrowing Limit) divided by 102%.

(b)     If the Funding Agreement shall be amended to reduce the Borrowing Limit, each Purchaser's Percentage under its Purchase Commitment shall remain the same and each Purchaser's Maximum Purchase shall be proportionately reduced.

(c)     The Company shall have the right, upon at least one Business Day's prior written notice to the Agent, to terminate in whole or ratably reduce in part the unused portion of the respective Purchase Commitments of the Purchasers hereunder by (i) reducing each Purchaser's Maximum Purchase ratably, and (ii) maintaining each Purchaser's Percentage constant under its Purchase Commitment; provided, however, that each partial reduction of Purchase Commitments shall be in the aggregate amount of $1,000,000, or an integral multiple of $250,000 in excess of that amount.

(d)     Notwithstanding anything in this Section 2.09 or elsewhere to the contrary, the Company shall in no event reduce the aggregate Maximum Purchase amounts of the Purchase Commitments hereunder to an amount less than the greater of (i) an amount equal to the product of 102% and the Borrowing Limit then in effect under the Funding Agreement, and (ii) the sum of the aggregate Face Amount of all outstanding Transaction Commercial Paper Notes at such time plus the aggregate Net Purchase Price Balance for all Purchasers hereunder at such time.

SECTION 2.10.   Extension of the Scheduled Purchase Commitment Termination Date. (a)  No more than 90 days and no less than 30 days before the Scheduled Purchase Commitment Termination Date then in effect with respect to a Purchaser, the Company may (by delivery of a written notice), request the Agent (each such request being irrevocable) to request that such Purchaser extends such Scheduled Purchase Commitment Termination Date for an additional period of 364 days or less selected by the Company. If the Company shall make such a request, the Agent shall promptly notify the relevant Purchaser of such request and shall, on or before the 20th day prior to the Scheduled Purchase Commitment Termination Date then in effect for such Purchaser, notify the Company in writing whether or not such Purchaser consents to such request; provided, however, that in the event that such Purchaser does not provide the Agent with written notice of its agreement to such requested extension of the Scheduled Purchase Commitment Termination Date on or before the 20th day prior to the relevant Scheduled Purchase Commitment Termination Date then in effect, such Purchaser shall be deemed to have rejected such requested extension of the Scheduled Purchase Commitment Termination Date then in effect.

[Asset Purchase Agreement - Opportunity Finance)]

(b)      If at any time as of the 20th Business Day immediately preceding the then current Scheduled Purchase Commitment Termination Date for any Purchaser, such Purchaser shall not have agreed in writing to extend its Scheduled Purchase Commitment Termination Date for an additional 364 days beyond the then current Scheduled Purchase Commitment Termination Date, then on or before 3:00 P.M. (New York City time) on such 20th Business Day, such Purchaser shall fund a segregated account which shall be established and maintained by the Agent with respect to such Purchaser (a "Commitment Account") pursuant to this Section 2.10(b). Such Commitment Account shall be established and maintained in the name of the Company (and referencing the applicable Purchaser) with an Eligible Account Bank designated by the Company and moneys in such Commitment Account shall, pending use, be invested in Permitted Investments with maturities of no longer than three Business Days.  Moneys in a Commitment Account with respect to any Purchaser shall be the functional equivalent of its available Purchase Commitment (to the same extent as if the Scheduled Purchase Commitment Termination Date had not occurred with respect to such Purchaser) and if the Company (or the Administrator acting on its behalf) offers to such Purchaser for sale any Percentage Interests pursuant to Section 2.02 hereof, moneys in such Commitment Account shall be used to pay the Purchase Price with respect to the purchase of such Percentage Interests.  The deposit of monies in such Commitment Account by any Purchaser shall not constitute a purchase of a Percentage Interest (and such Purchaser shall not be entitled to Yield or any other interest on such monies except to the extent of any earnings on Permitted Investments made with funds in the Commitment Account) unless and until (and then only to the extent that) such monies are used to purchase Percentage Interests. Any earnings on Permitted Investments (after deducting any losses) which the Agent has received shall be released to such Purchaser on the last Business Day of each month.  Unless required to be released by the last sentence of this Section 2.10(b) any principal payments received by the Agent in respect of Loans under the Funding Agreement that would otherwise be distributed to such Purchaser pursuant to Article IV shall be deposited instead into the Commitment Account for such Purchaser.  Moneys in a Commitment Account with respect to any Purchaser shall be remitted to such Purchaser on the day on which such Purchaser has effectively assigned all of its rights and obligations hereunder pursuant to Section 8.06.  If, at any time, the amount of funds in the Commitment Account relating to any Purchaser exceeds such Purchaser's then-unutilized Maximum Purchase (determined as if the Scheduled Purchase Commitment Termination Date for such Purchaser had not occurred), the amount of such excess shall be remitted to such Purchaser promptly upon demand.

## ARTICLE III

## CONDITIONS PRECEDENT

SECTION 3.01.   Conditions Precedent to the Effectiveness of Purchase Commitments. The Purchase Commitment of each Purchaser shall become effective upon the receipt by the Agent of (i) a signature page to this Agreement or to an Assignment and Acceptance (as the case may be) duly executed by such Purchaser, and (ii) each of the instruments, documents and

DZB041525

agreements specified on Schedule I hereto, provided that the condition precedent set forth in this clause (ii) shall conclusively be deemed to have been satisfied upon the unconditional execution of a signature page to this Agreement or to an Assignment and Acceptance (as the case may be) by such Purchaser.

SECTION 3.02.    Conditions Precedent to Purchase, Downgraded Bank Advance and Funding Commitment Account. The obligation of each Purchaser to make a purchase hereunder on the occasion of each offer by the Company (or the Administrator on its behalf) of Percentage Interests for sale to the Purchasers under Article II shall be subject to the condition precedent that on the date of such purchase,  no Bankruptcy Event has occurred and is continuing.  The obligation of a Purchaser to make a Downgraded Bank Advance to the Downgraded Bank Account shall be subject to the conditions precedent that on the date of such advance no Bankruptcy Event has occurred and is continuing and that a Downgrade Event shall have occurred with respect to the applicable Purchaser.  The obligation of a Purchaser to fund a Commitment Account pursuant to Section 2.10(b) shall be subject to the condition precedent that on the date such funding would be required under Section 2.10(b), no Bankruptcy Event has occurred and is continuing.

## ARTICLE IV

## DISTRIBUTIONS

SECTION 4.01.    Distributions of Payments.  Whenever any payment in respect of the principal of or Yield on the Loans is remitted to the Deal Agent or the Company, if any Purchaser has any Net Purchase Price Balance outstanding, or any Yield accrued with respect to the principal amount of Loans included in such Net Purchase Price Balance remains unpaid, the Company (or the Deal Agent acting on its behalf) shall promptly pay, or cause to be paid, to the Agent an amount equal to the sum of (i) the product of (A) the amount of such payment in respect of such principal times (B) the portion of the outstanding principal amount of Loans related to Percentage Interests sold to the Purchasers hereunder at such time, expressed as a percentage of the total outstanding principal amount of Loans under the Funding Agreement at such time, plus (ii) the product of (A) the amount of such payment in respect of Yield times (B) the percentage described in clause (i)(B) above, and the Agent shall promptly pay, or cause to be paid, out of such funds received by it, to each Purchaser, in United States dollars, its ratable share of such amount, which share shall be determined on the basis of the Net Purchase Price Balance of each such Purchaser; provided, however, that each Purchaser shall be entitled to distributions of amounts relating to Yield to the extent (X) accrued from and after the date such Purchaser purchased the relevant Percentage Interest or (Y) included in the Purchase Price of such Percentage Interest and representing interest accrued or to accrue on Commercial Paper.

SECTION 4.02.    Returned Payments.  If, after the Agent has paid a Purchaser its ratable share of any amounts remitted to the Agent pursuant to Section 4.01, all or any portion of such

DZB041526

[Asset Purchase Agreement - Opportunity Finance)]

amount must be returned for any reason (including the occurrence of any proceeding of the type described in definition of the term "Bankruptcy Event"), such Purchaser shall promptly repay to the Agent the portion of the amount the Agent paid to such Purchaser which is required to be returned, together with such Purchaser's ratable share of any related interest and penalties required to be paid by the Agent in connection with such repayment.

SECTION 4.03.   Excess Recoveries of Principal and Yield.   Each Purchaser acknowledges and agrees that, following the reduction to zero of such Purchaser's Net Purchase Price Balance and the receipt by such Purchaser of all Yield accrued with respect to the principal amount of Loans included in such Net Purchase Price Balance (excluding any repayment referred to in Section 4.02), any remaining amounts of principal or Yield paid in connection with the Loans related to Percentage Interests purchased hereunder to which such Purchaser would otherwise be entitled by reason of the Percentage Interests held by it hereunder shall be paid to the Company for its own account.

SECTION 4.04.   Additional Payments.   Each Purchaser shall also be entitled to the following payments or deposits, if any, made by or on behalf of the Borrower under the Funding Agreement, to the extent related to the Percentage Interests purchased by such Purchaser: increased capital costs, yield protection, withholding taxes and other taxes, increased costs, reserves or taxes relating to the Adjusted Eurodollar Rate or the Base Rate, indemnities, and costs and expenses of enforcement. However, the Purchasers shall not be entitled to any of the fees set forth or referred to in Section 2.11 of the Funding Agreement except as agreed in any separate fee letters among the Agent, on behalf of the Purchasers, and the Company.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

SECTION 5.01.   Representations and Warranties of the Company.   The Company represents and warrants as follows on the date of this Agreement and, with respect to each Purchaser, on the Purchase Commitment Effective Date with respect to such Purchaser, in each case, with reference to the facts and circumstances then existing:

(a)   Organization of the Company.   The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has the limited liability company power and authority to own its assets and to conduct its business as it is now being conducted or as it is proposed to be conducted. The Company is duly qualified to do business and is in good standing as a foreign limited liability company in the State of New York.

(b)   Authorization.   The execution, delivery and performance by the Company of this Agreement and the other Facility Documents to which it is party are within the limited liability

DZB041527

[Asset Purchase Agreement - Opportunity Finance)]

company power and authority of the Company and have been duly authorized by all necessary limited liability company action, and this Agreement has been duly executed by the Company.

(c)    Validity.  This Agreement and the other Facility Documents to which the Company is party constitute the legal, valid and binding obligations of the Company enforceable against the Company in accordance with their respective terms, except as the enforceability hereof or thereof may be limited by bankruptcy, insolvency, or other similar laws affecting creditors' rights generally.

(d)    Consents.  All consents, licenses, authorizations, approvals, exemptions of or registrations or filings with any commission, board, agency, court or other governmental authority necessary in connection with the valid execution, delivery and performance by the Company of this Agreement and the other Facility Documents to which it is party have been obtained or effected.

(e)    No Conflict.  The execution and delivery by the Company of this Agreement and the other Facility Documents to which it is party do not, and the performance by it of this Agreement and such other Facility Documents will not, (i) violate any provision of the certificate of formation or operating agreement of the Company or any law, rule, regulation, order, writ, judgment, decree, determination or award applicable to it, (ii) result in a breach of or constitute a default under any indenture, lease, loan or other agreement or any instrument to which the Company is a party or by which it or its assets may be bound or affected, or (iii) result in, or require the creation or imposition of, any Lien upon or with respect to any of the assets now owned or hereafter acquired by the Company, except to the extent that the sale of Percentage Interests hereunder may be construed to constitute the creation or imposition of any such Lien.

(f)    Investment Company Act; Securities Act.  The Company is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the making of the purchases hereunder and the use of the proceeds thereof by the Company will not violate any provision of said Act, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder. The issuance and sale of the Commercial Paper Notes are exempt from the registration requirements of the Securities Act of 1933, as amended.

SECTION 5.02.    Representations and Warranties of each Purchaser.  Each Purchaser represents and warrants as follows as of the Purchase Commitment Effective Date with respect to its Purchase Commitment hereunder, in each case, with reference to the facts and circumstances then existing:

(a)    Eligibility and Organization of the Purchaser.  Such Purchaser is an Eligible Assignee, and duly incorporated or organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization.

DZB041528

[Asset Purchase Agreement - Opportunity Finance)]

(b)     Authorization. The execution, delivery and performance by such Purchaser of this Agreement are within the corporate power and corporate authority of such Purchaser and have been duly authorized by all necessary corporate action, and this Agreement has been duly executed by such Purchaser.

(c)     Validity. This Agreement constitutes the legal, valid and binding obligation of such Purchaser enforceable against such Purchaser in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, or other similar laws affecting creditors' rights generally.

(d)     Consents. All consents, licenses, authorizations, approvals, exemptions of or registrations or filings with any commission, board, agency, court or other governmental authority necessary in connection with the valid execution, delivery and performance by such Purchaser of this Agreement have been obtained or effected.

(e)     No Conflict. The execution and delivery by such Purchaser of this Agreement do not, and the performance by it of this Agreement will not, (i) violate any provision of the certificate of incorporation or by-laws (or other organizational documents) of such Purchaser or any law, rule, regulation (including, without limitation, any such law, rule or regulation regarding borrower lending limits), order, writ, judgment, decree, determination or award applicable to it or (ii) result in a breach of or constitute a default under any indenture, lease, loan or other agreement or any instrument to which such Purchaser is a party or by which it or its assets may be bound or affected.

## ARTICLE VI

## COVENANTS

SECTION 6.01.   Affirmative Covenants of the Company. Until the first date on which (i) all Purchase Commitments hereunder shall have terminated, (ii) the Net Purchase Price Balance of each Purchaser shall have been reduced to zero, and (iii) each such Purchaser shall have received (x) all Yield accrued in respect of such Net Purchase Price Balance, and (y) payment in full of all other amounts owed to such Purchaser hereunder (excluding any repayment referred to in Section 4.02) (such date being referred to herein as the "Agreement Collection Date"), the Company shall:

(a)     Reporting Requirements. Furnish to the Agent and each Purchaser:

(i)     Quarterly Statements. As soon as available and in any event within 120 days after the end of each of the first three quarters of each fiscal year of the Company, the balance sheet of the Company and the related statements of income, member's equity and cash

DZB041529

[Asset Purchase Agreement - Opportunity Finance)]

flows, each for the period commencing at the end of the preceding fiscal year and ending with the end of such fiscal quarter, prepared in accordance with GAAP consistently applied;

        (ii)    Annual Statements. As soon as available and in any event within 120 days after the end of each fiscal year of the Company, the balance sheets of the Company and the related statements of income, member's equity and cash flows for the fiscal year then ended, each prepared in accordance with GAAP consistently applied and reported on by the Company's independent public accountants;

        (iii)    Reports Under the Funding Agreement. As soon as practicable following receipt by the Company or the Administrator from the Borrower under the Funding Agreement, a copy of each report, list or statement (including any periodic report or settlement statement) relating to the Loans and the Pledged Assets; provided, however, that the foregoing items (other than the Monthly Remittance Report) shall be made available to a Purchaser only if requested by such Purchaser;

        (iv)    Litigation. As soon as possible and in any event not later than five Business Days after notice to the Company of the commencement thereof, notice of any action, suit or proceeding against the Company which could, if adversely determined, have a material adverse effect on the business, financial condition or results of operations of the Company or on the ability of the Company to perform any of its obligations under this Agreement or the other Facility Documents;

        (v)    Bankruptcy Event. Immediately after the Company knows of the occurrence of any Bankruptcy Event or any event or condition which with the giving of notice or lapse of time, or both, would constitute a Bankruptcy Event, a certificate of the Administrator specifying the nature of such event or condition and the action which the Company has taken and/or proposes to take with respect thereto; and

        (vi)    Additional Information. Such other information respecting the condition or operations, financial or otherwise, of the Company as any Purchaser through the Agent may from time to time reasonably request.

        (b)    Preservation of Existence. Do or cause to be done all things necessary on its part to preserve and keep in full force and effect its limited liability company existence.

        (c)    Visitation Rights. Subject to the terms of the Funding Agreement, at any reasonable time and from time to time, permit the Agent or any of the Purchasers, or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, the Company, to the extent that such records and books of account of the Company relate to the Funding Agreement and the transactions contemplated thereby.

DZB041530

[Asset Purchase Agreement - Opportunity Finance)]

SECTION 6.02. Negative Covenants of the Company. Until the Agreement Collection Date, the Company shall not:

(a) Transaction Commercial Paper Notes. (i) Permit to be outstanding at any time any Transaction Commercial Paper Note having a maturity date which is not a Business Day or is later than the earlier of (A) the 270th day from and including the date of issuance of such Commercial Paper Note, and (B) the fifteenth day preceding the latest Scheduled Purchase Commitment Termination Date of any Purchaser in effect at such time.

(b) Negative Pledge. Except as contemplated pursuant to this Agreement, (i) sell, assign (by operation of law or otherwise) or otherwise dispose of its rights in, to and under the Loans and the Pledged Assets securing such Loans, or (ii) create or suffer to exist any Lien upon or with respect to any of its rights in, to and under the Loans and the Pledged Assets securing such Loans, to secure indebtedness of any Person.

(c) Offering Materials. Include any material relating to the Agent or specifically relating to and naming any Purchaser in an offering circular, private placement memorandum or other document used in the offering or sale of Commercial Paper Notes unless such material is approved in writing by the Agent or such Purchaser, as the case may be, prior to its inclusion in such offering circular, private placement memorandum or other document.

SECTION 6.03. Amendment of the Funding Agreement, Etc. The Company (or the Administrator acting on its behalf) shall retain the exclusive right, in its sole discretion (subject to the next sentence) to exercise any rights and remedies available under the Funding Agreement, or pursuant to applicable law, including the right to cast its vote to approve any amendment, modification or waiver of the Funding Agreement or any instrument or document delivered in connection therewith. Notwithstanding the foregoing, the Company agrees that it shall not without the prior written consent of:

(a) the Majority Purchasers, amend the Funding Agreement to increase the Borrowing Limit; and

(b) each of the Purchasers,

(i) amend the definitions of "Eligible Receivable," "Defaulted Receivable", "Delinquent Receivable", "Minimum Overcollateralization Amount" or "Overconcentration Amount" contained in the Funding Agreement; or

(ii) amend, modify or waive any provision of the Funding Agreement in any way which would

(A) reduce the amount of principal or Yield that is payable on account of any Percentage Interests or delay any scheduled date for payment thereof, or

DZB041531

[Asset Purchase Agreement - Opportunity Finance)]

(B)      impair any rights expressly granted to an assignee or participant under the Funding Agreement, or

(C)      reduce fees payable by the Borrower to the Deal Agent or the Company which relate to payments to Purchasers or delay the dates on which such fees are payable, or

(D)      modify any provisions relating to the Minimum Overcollateralization Amount; or

(iii)      amend or waive the Event of Default relating to the bankruptcy of the Borrower.

SECTION 6.04.   Purchaser Information.  Each Purchaser acknowledges that, in connection with the sale of the Commercial Paper Notes, certain documents containing information relating to the Purchasers may be prepared and distributed to purchasers or prospective purchasers of the Commercial Paper Notes. To provide the basis for the preparation of such documents and to assist the Placement Agents in their credit review procedures, each Purchaser hereby agrees to provide to the Company and the Agent the following documents, promptly upon request therefor by the Company (or the Administrator acting on its behalf): (i) such Purchaser's quarterly and fiscal-year-end financial statements for its last three years, and (ii) such Purchaser's publicly available quarterly and fiscal-year-end financial statements for any fiscal year ending during the term of this Agreement. In addition, each Purchaser agrees to provide to the Company and the Agent any other information that the Company (or the Administrator acting on its behalf) or the Agent reasonably requests for the purpose of the ongoing review of the Company and such Purchaser.

SECTION 6.05.   Confidentiality.  Each Purchaser understands that each of the Facility Documents is a confidential document and such Purchaser agrees that it will not disclose any Facility Document to any other Person except (a) with the Company's prior written consent, (b) to such Purchaser's legal counsel or auditors if such counsel or auditors agree to hold it confidential, (c) to any regulatory authority having jurisdiction over such Purchaser or (d) as required by law or any court of law in connection with any litigation. Notwithstanding the foregoing, any Purchaser may, in connection with any assignment or proposed assignment or any participation or proposed participation pursuant to Section 8.06 hereof, disclose to any assignee, participant or proposed assignee or participant the Facility Documents or any information relating to the Borrower furnished to such Purchaser by or on behalf of the Borrower or by the Agent or the Company (or the Administrator acting on its behalf); provided that, prior to any such disclosure, the assignee, participant or proposed assignee or participant agrees to preserve the confidentiality of any confidential information (including the Facility Documents) relating to the Borrower or the Facility Documents received by it from any of the foregoing entities. The agreements in this Section 6.05 shall survive termination of the Agreement and payment of all obligations hereunder.

DZB041532

[Asset Purchase Agreement - Opportunity Finance)]

## ARTICLE VII

### AGENCY

SECTION 7.01.   Authorization and Action.  Each Purchaser hereby appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Facility Documents to which the Agent is a party (each such other Facility Document is referred to herein as an "Other Agreement"), as are delegated to such agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto. As to any matters not expressly provided for by this Agreement or any Other Agreement, the Agent shall be fully justified in failing or refusing to take any action under this Agreement or any Other Agreement unless it shall first receive such advice or concurrence of the Majority Purchasers as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Purchasers against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or the Other Agreements in accordance with a request or consent of the Majority Purchasers and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Purchasers; provided, however, that in no event shall the Agent be required to take any action which exposes it to personal liability or which is contrary to this Agreement, any Other Agreement or applicable law.  Notwithstanding any provision to the contrary contained elsewhere in this Agreement, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Agent have or be deemed to have any fiduciary relationship with any Purchaser, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any Other Agreement or otherwise exist against the Agent.  The Agent may execute any of its duties under this Agreement or any Other Agreement by or through agents, employees or attorneys-in-fact and shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects with reasonable care.

SECTION 7.02.   Agents' Reliance, Etc.  (a)  None of the Agent, the Administrator or any of their respective Affiliates or any of the officers, directors, employees, agents or attorneys-in-fact of the Agent, the Administrator or any of their respective Affiliates (each, a "Related Person") shall be (x) liable for any action taken or omitted to be taken by a Related Person under or in connection with this Agreement or any Other Agreement, except for the gross negligence or willful misconduct of such Related Person, or (y) responsible in any manner to any of the Purchasers for any recital, statement, representation or warranty made by the Company or any Affiliate of the Company, or any officer thereof, contained in this Agreement or in any Other Agreement, or in any certificate, report, statement or other document referred to or provided for in, or received by a Related Person under or in connection with, this Agreement or any Other Agreement, or for the value of or title to any Loans or Pledged Assets, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any Other Agreement, or for any failure of the Borrower, the Company or any other party to any Facility Document to perform its obligations hereunder or thereunder.

DZB041533

[Asset Purchase Agreement - Opportunity Finance)]

    (b)    Without limiting the generality of the foregoing paragraph, each Related Person: (i) may treat the Purchaser that purchased any Percentage Interest hereunder as the holder of such Percentage Interest and the corresponding Purchase Commitment until such Related Person receives and accepts an Assignment and Acceptance entered into by such Purchaser, as assignor, and an Eligible Assignee, as assignee, as provided in Section 8.06; (ii) may consult with legal counsel (including counsel for the Company), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) makes no warranty or representation to any Purchaser and shall not be responsible to any Purchaser for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement or any other Facility Document; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or any other Facility Document on the part of the Company or to inspect the property (including the books and records) of the Company; (v) shall not be responsible to any Purchaser for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, the other Facility Documents, or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall incur no liability under or in respect of this Agreement or any Other Agreement by acting upon, and shall be entitled to rely, and shall be fully protected in relying, upon, any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex, cable or telephone message, statement or other document or conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons. The Agent shall not be deemed to have knowledge or notice of the occurrence of an Event of Default or an Early Amortization Event under the Funding Agreement, unless the Agent shall have received written notice from a Purchaser or the Company referring to this Agreement, describing such Event of Default or Early Amortization Event and stating that such notice is a "notice of an Event of Default" or "notice of an Early Amortization Event."

    SECTION 7.03.    DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main. With respect to its Purchase Commitment, the purchases of Percentage Interests made by it, and any Percentage Interests owned by it, if any, DZ Bank and any of its Affiliates shall have the same rights and powers as any other Purchaser and may exercise the same as though it were not the Agent, the Administrator or the Deal Agent or acting in any other capacity under any Facility Document, and the term "Purchaser" or "Purchasers" shall, unless otherwise expressly indicated, include DZ Bank in its individual capacity as a Purchaser hereunder. DZ Bank and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, act as placement agent for securities of, and generally engage in any kind of business with the Company or any of its respective subsidiaries and any Person who may do business with or own securities of the Company or any such subsidiary, all as if DZ Bank or any of its Affiliates were not the Agent or the Deal Agent or acting in any other capacity under any Facility Document, and without any duty to account therefor to the Purchasers.

DZB041534

[Asset Purchase Agreement - Opportunity Finance)]

SECTION 7.04.    Purchaser Credit Decision. Each Purchaser acknowledges that none of the Related Persons has made any representation or warranty to it, and that no act by the Agent hereinafter taken, including any review of the affairs of the Company, shall be deemed to constitute any representation or warranty by any Related Person to any Purchaser. Each Purchaser acknowledges that (a) it has, independently and without reliance upon the Agent, any Affiliate of the Agent, any other Related Person or any other Purchaser and based on such financial statements and such other documents and information as it has deemed appropriate (the receipt of which it hereby acknowledges), made its own credit analysis and decision to enter into this Agreement and the other Facility Documents to which it is a party, and (b) the commitments being entered into by such Purchaser have been approved through its regular approval process and it is duly authorized to execute and deliver this Agreement as a result of such approval. Each Purchaser also acknowledges that it will, independently and without reliance upon the Agent, any other Related Person or any other Purchaser and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and such other Facility Documents. Each Purchaser acknowledges that entering into this Agreement, and funding any required purchases and/or advances hereunder, complies with all legal lending limits applicable to such Purchaser. Each Purchaser acknowledges that, to the best knowledge, information and belief of its officers, there is no regulatory or legal impediment to its entering into this Agreement. Pursuant to the terms of Section 6.01(a), the Company (or the Administrator acting on its behalf) shall furnish to the Agent and/or the Purchasers, from time to time, copies of certain financial or other documents that the Company receives from time to time in connection with the Funding Agreement, but none of the Related Persons assumes any responsibility for the authenticity, validity, accuracy or completeness thereof.

SECTION 7.05.    Company's Reliance, Etc. None of the Agent, the Administrator or the Company shall be liable to any Purchaser in connection with (x) the administration of the Funding Agreement or (y) this Agreement or any purchases hereunder (except in the case of the Company, pursuant to the Company's representations in Article V, and its covenants and other obligations specifically set forth herein), in either case except for its own gross negligence or willful misconduct. Without limiting the foregoing, the Agent, the Administrator and the Company:

(i)    may consult with legal counsel, independent public accountants or other experts and shall not be liable for any action taken or omitted to be taken in good faith in accordance with the advice of such counsel, accountants or other experts;

(ii)    shall not be responsible for the performance or observance by the Borrower of any of the terms, covenants or conditions of the Funding Agreement or any instrument or document furnished pursuant thereto;

Doc. #30393215_V6.WPD                    25

DZB041535

[Asset Purchase Agreement - Opportunity Finance)]

(iii)    shall incur no liability by acting upon any notice, consent, certificate or other instrument or writing, or any other communication believed to be genuine and signed, sent or made by the proper Person or Persons; and

(iv)    shall not be deemed to be acting as any Purchaser's trustee or otherwise in a fiduciary capacity hereunder or under or in connection with the Funding Agreement.

SECTION 7.06.   Indemnification. Whether or not the transactions contemplated hereby shall be consummated, the Purchasers shall indemnify upon demand the Related Persons, ratably in accordance with the respective Percentages of the Purchasers, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, charges, expenses and disbursements (including reasonable counsel's fees) of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the Funding Agreement, or any document contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby, and with respect to any investigation, litigation or proceeding (including any insolvency proceeding or appellate proceeding) related to this Agreement, the purchases of Percentage Interests or the use of the proceeds thereof, whether or not any Related Person is a party thereto (all of the foregoing, collectively, the "Indemnified Liabilities"); provided, however, that no Purchaser shall be liable for the payment to the Related Persons of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct. Without limitation of the foregoing, each Purchaser shall reimburse the Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including reasonable counsel's fees) incurred by the Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, the Funding Agreement, or any document contemplated by or referred to herein to the extent that the Agent is not reimbursed for such expenses by or on behalf of the Company. The agreements in this Section 7.06 shall survive the Agreement Collection Date and the termination of this Agreement.

SECTION 7.07.   Successor Agents. The Agent may resign at any time by giving written notice thereof to the Purchasers, the Company and each of the rating agencies then rating the Commercial Paper Notes at the request of the Company and the Administrator, and may be removed at any time with cause by the Majority Purchasers upon written notice thereof to the Agent (which shall thereupon notify each of the rating agencies rating the Commercial Paper Notes at the request of the Company and the Administrator) and the Company. Such resignation or removal shall only become effective as set forth below. The Majority Purchasers shall have the right to appoint a successor Agent (each such successor being hereinafter referred to as, a "Successor Agent"), provided that the Company shall have the right to approve such Successor Agent, which approval shall not be unreasonably withheld. If no Successor Agent has been so appointed by the Majority Purchasers and approved by the Company, and shall have accepted such appointment, within 30 days after the departing Agent's giving of notice of resignation or the Majority Purchasers' removal of the departing Agent, then the departing Agent

DZB041536

[Asset Purchase Agreement - Opportunity Finance)]

may, on behalf of the Purchasers, appoint a Successor Agent, which Successor Agent shall be either a commercial bank having a combined capital and surplus of at least $250,000,000 or an Affiliate of such an institution. Upon the acceptance of any appointment as Agent hereunder by a Successor Agent, such Successor Agent shall thereupon succeed to and become vested with all of the rights, powers, privileges and duties of the departing Agent, and the departing Agent shall be discharged from its duties and obligations under this Agreement and the Other Agreements; provided that the appointment of such Successor Agent shall not become effective until the Company shall have received written confirmation from each of the rating agencies then rating the Commercial Paper Notes at the request of the Company and the Administrator that the rating of the Commercial Paper Notes would not, as a result of such appointment, be reduced or withdrawn. Notwithstanding anything contained to the contrary herein, until such time as such Successor Agent shall have accepted such appointment, and such appointment shall have become effective as aforesaid, the departing Agent shall not be discharged from any of its duties and obligations as the Agent under this Agreement or any of the Other Agreements. After any departing Agent's resignation or removal hereunder as such agent, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was such agent under this Agreement and the Other Agreements.


## ARTICLE VIII

## MISCELLANEOUS

SECTION 8.01.    Amendments, Etc.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Company therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Purchasers and the Company, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall, unless in writing and signed by all of the Purchasers and the Company, do any of the following:

    (a)    waive any of the conditions to purchases hereunder specified in Section 3.02,

    (b)    modify any of the provisions of Section 2.04,

    (c)    modify any of the provisions of Section 2.05,

    (d)    modify the formula for the calculation of the Purchase Price set forth in Section 1.02, or

    (e)    change the definition of "Majority Purchasers", any of the provisions of Section 6.03, or any of the provisions of this Section 8.01;

DZB041537

[Asset Purchase Agreement - Opportunity Finance)]

provided further that no amendment shall, unless in writing and signed by a Purchaser and the Company, do any of the following:

(1)     increase the Maximum Purchase of such Purchaser;

(2)     reduce any of the distributions otherwise payable to such Purchaser in respect of principal or Yield pursuant to Section 4.01, any amount payable to such Purchaser pursuant to Section 4.04, or any fees or other amounts otherwise payable hereunder or under any related fee letter to such Purchaser; or

(3)     postpone the Scheduled Purchase Commitment Termination Date for such Purchaser, or otherwise postpone the Purchase Commitment Termination Date for such Purchaser;

provided further that no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Purchasers required above to take such action, affect the rights or duties of the Agent under this Agreement; and provided, further, that no material amendment, modification or supplement of or to this Agreement shall be deemed effective prior to the receipt by the Administrator and/or the Company from each of the rating agencies then rating the Commercial Paper Notes at the request of the Company and the Administrator of written confirmation that the rating of the Commercial Paper Notes would not, as a result of such amendment, modification or supplement, be reduced or withdrawn. The Company shall send, or shall cause the Administrator to send copies of all amendments, modifications or supplements to this Agreement to each of the rating agencies then rating the Commercial Paper Notes at the request of the Company and the Administrator prior to the execution thereof by all parties thereto.

SECTION 8.02.   Notices, Etc. All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including telex communication and communication by facsimile copy) and mailed, telexed, transmitted or delivered, as to each party hereto, at its address set forth under its name on the signature pages hereof or specified in such party's Assignment and Acceptance or at such other address as shall be designated by such party in a written notice to the other parties hereto. All such notices and communications shall be effective, upon receipt, or in the case of (i) notice by mail, five days after being deposited in the United States mails, first class postage prepaid, (ii) notice by overnight courier, one Business Day after being deposited with a national overnight courier service, (iii) notice by telex, when telexed against receipt of answerback or (iv) notice by facsimile copy, when transmitted against mechanical confirmation of successful transmission, except that notices and communications to the Agent pursuant to Article II or Article VII shall not be effective until received by the Agent.

SECTION 8.03.   No Waiver; Remedies. No failure on the part of any Purchaser or the Agent to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further

DZB041538

[Asset Purchase Agreement - Opportunity Finance)]

exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 8.04.   Costs, Expenses and Indemnification.   The Company agrees, subject to the terms of Section 8.13(b), to pay all costs and expenses of the Agent in connection with the preparation, execution, delivery, modification and amendment of this Agreement, the other Facility Documents and the other documents to be delivered hereunder and thereunder, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Agent with respect thereto and with respect to advising the Agent as to its rights and responsibilities under this Agreement and such other Facility Documents. The Company further agrees, subject to the terms of Section 8.13(b), to pay all costs and expenses, if any (including, without limitation, reasonable counsel fees and expenses), of the Agent in connection with the enforcement of this Agreement, the other Facility Documents and the other documents to be delivered hereunder and thereunder, including, without limitation, reasonable counsel fees and expenses in connection with the enforcement of rights under this Section 8.04. The Company further agrees, subject to the terms of Section 8.13(b), to indemnify the Agent and each of its Affiliates, control persons, officers, directors, employees and agents (each an "Indemnified Party"), from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel) for which any of them may become liable or which may be incurred by or asserted against any of them in connection with the investigation of, preparation for or defense of any pending or threatened claim or any action or proceeding arising out of, related to or in connection with the transactions described herein whether or not any Indemnified Party or the Company is a party thereto, including, without limitation, any transaction in which any proceeds of any payments of Purchase Price hereunder are or are proposed to be applied; provided, however, that the Company shall not be liable for any portion of such claims, damages, losses, liabilities or expenses resulting from an Indemnified Party's gross negligence or willful misconduct.

SECTION 8.05.   Binding Effect; Termination.   This Agreement shall become effective upon the first Effective Date for a Purchaser to occur hereunder, and shall thereafter be binding upon and inure to the benefit of each of the Company, the Agent and the Purchasers and each of their respective successors and assigns, except that the Company shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Purchasers. This Agreement shall terminate on the Agreement Collection Date.

SECTION 8.06.   Assignments and Participation.   (a) Each Purchaser may upon at least 10 days notice to the Company and the Agent, assign to one or more banks or other entities all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Purchase Commitment and the Percentage Interests owned by it); provided, however, that (i) each such assignment shall be of a constant, and not a varying, percentage of all of the assigning Purchaser's rights and obligations under this Agreement, its Percentage, its Maximum Purchase and the Percentage Interests owned by it, (ii) the amount of the Purchase Commitment of the assigning Purchaser being assigned pursuant to each such assignment

DZB041539

(determined on the basis of its Maximum Purchase and as of the date of the Assignment and Acceptance evidencing such assignment) shall in no event be less than the lesser of (A) $5,000,000, or an integral multiple of $1,000,000 in excess of such amount and (B) the full amount of the assigning Purchaser's Purchase Commitment, (iii) each such assignment shall be to an Eligible Assignee, (iv) the parties to each such assignment shall execute and deliver to the Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with a processing and recordation fee of $2,000 or such lesser amount as shall be approved by the Agent, (v) the parties to each such assignment shall have agreed to reimburse the Agent and the Company for all fees, costs and expenses (including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for each of the Agent and the Company) incurred by the Agent and the Company, respectively, in connection with such assignment, (vi) at least five days prior to the effective date specified in the applicable Assignment and Acceptance, the information and financial statements, if any, regarding the assignee described in Section 6.04 and requested to be delivered by the Administrator shall have been so delivered; and provided further that the Agent shall have received written confirmation from the Administrator that upon the effective date of such assignment the provisions of Section 3.03(f) of the Administration Agreement shall be satisfied. Upon such execution, delivery, acceptance and recording by the Agent, from and after the later of the Purchase Commitment Effective Date specified in such Assignment and Acceptance and the date of acceptance of such Assignment and Acceptance by the Agent, (1) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Purchaser hereunder and (2) the Purchaser assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Purchaser's Purchase Commitment and all of its other rights and obligations under this Agreement, such Purchaser shall cease to be a party hereto); provided that such assignment shall not become effective until the Company shall have received all consents required under the Funding Agreement and written confirmation from each of the Rating Agencies then rating the Commercial Paper Notes at the request of the Company and the Administrator that the rating of the Commercial Paper Notes would not, as a result of such assignment, be reduced or withdrawn.

(b)    By executing and delivering an Assignment and Acceptance, the Purchaser assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Purchaser makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or any of the other Facility Documents, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any of the other Facility Documents or any other instrument or document furnished pursuant hereto or thereto; (ii) such assigning Purchaser makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Company or the performance or observance by the

DZB041540

[Asset Purchase Agreement - Opportunity Finance)]

Company of any of its respective obligations under this Agreement, any of the other Facility Documents or any other instrument or document furnished pursuant hereto or thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of such financial statements, other Facility Documents and other documents, instruments, agreements, and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Agent, such assigning Purchaser or any other Purchaser and based on such documents, instruments, agreements, and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement or any of the other Facility Documents; (v) such assigning Purchaser and such assignee confirm that such assignee is an Eligible Assignee; (vi) such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Facility Documents as are delegated to such agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement or any of the other Facility Documents are required to be performed by it as a Purchaser.

(c)     Subject to the satisfaction of the requirements of <u>Section 8.06(a)</u>, upon its receipt of an Assignment and Acceptance executed by an assigning Purchaser and an assignee, the Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of <u>Exhibit A</u> hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Company. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Company, the Agent and the Purchasers may treat each Person whose name is recorded in the Register as a Purchaser hereunder for all purposes of this Agreement.

(d)     Each Purchaser may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Purchase Commitment, Maximum Purchase, Percentage, and the Percentage Interests owned by it); <u>provided, however</u>, that (i) such Purchaser's obligations under this Agreement (including, without limitation, its Purchase Commitment to the Company hereunder, Maximum Purchase and Percentage) shall remain unchanged, (ii) such Purchaser shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Company, the Agent and the other Purchasers shall continue to deal solely and directly with such Purchaser in connection with such Purchaser's rights and obligations under this Agreement and (iv) such Purchaser shall give prior written notice to the Agent of the identity of such participant, and provided further that the Agent shall have received written confirmation from the Administrator that upon the effective date of such participation the provisions of Section 3.03(f) of the Administration Agreement shall be satisfied. Notwithstanding anything herein to the contrary, each participant shall have the rights of a Purchaser (including any right to receive payment) under Section 4.04; <u>provided, however</u>, that no participant shall be entitled to receive payment under such Section in excess of the amount that would have been payable under

DZB041541

such Section by the Company to the Purchaser granting its participation had such participation not been granted, and no Purchaser granting a participation shall be entitled to receive payment under such Section in an amount which exceeds the sum of (i) the amount to which such Purchaser is entitled under such Section with respect to payments to be made to it which are not subject to any participation, plus (ii) the aggregate amount to which its participants are entitled under such Section with respect to the amounts of their respective participations.  With respect to any participation described in this Section 8.06(d), the participant's rights as set forth in the agreement between such participant and the applicable Purchaser to agree to or to restrict such Purchaser's ability to agree to any modification, waiver or release of any of the terms of this Agreement or any other Facility Document or to exercise or refrain from exercising any powers or rights which such Purchaser may have under or in respect of any Facility Document shall be limited to the right to consent to any of the matters set forth in clauses (a) through (e) and clauses (1) through (3) in the first sentence of Section 8.01 of this Agreement.

(e)    In the event a Purchaser ceases to qualify as an Eligible Assignee, the Company shall have the right, in any such case, notwithstanding any provision to the contrary herein, to terminate the right and obligation of such Purchaser to purchase Percentage Interests hereunder. Such termination shall be effective upon the delivery of written notice to such effect delivered by the Company to the Agent and such Purchaser, subject to the next following sentence.  Effective upon such termination, (A) such Purchaser shall cease to have any rights or obligations with respect to future purchases of Percentage Interests under this Agreement but shall continue to have the rights and obligations of a Purchaser (including, without limitation, rights to payments described in Section 4.04 hereof) with respect to any Percentage Interests purchased by it pursuant to the terms of this Agreement prior to such termination and shall continue to be bound by the provisions of Section 6.05 and Section 8.07, and (B) either (x) the Agent shall arrange for all of such Purchaser's rights and obligations hereunder to be assigned to an Eligible Assignee pursuant to Section 8.06(a) hereof or (y) if such an assignment cannot be arranged on or before such date, the Percentage and the Maximum Purchase corresponding to such Purchaser's Purchase Commitment hereunder shall be reduced to zero; provided that, after giving effect to any such reduction  the aggregate amount of the Maximum Purchases of all Purchasers hereunder shall equal or exceed the greater of (i) an amount equal to the product of 102% and the Borrowing Limit then in effect, and (ii) the sum of the aggregate Face Amount of all outstanding Transaction Commercial Paper Notes at such time plus the aggregate Net Purchase Price Balance for all Purchasers hereunder at such time.  In the event of the replacement of a Purchaser in accordance with the foregoing sentence, such Purchaser agrees (i) to assign all of its rights and obligations hereunder to an Eligible Assignee selected by the Company upon payment to such Purchaser of the amount of such Purchaser's Net Purchase Price Balance outstanding at such time, together with any accrued and unpaid Yield thereon, all accrued and unpaid fees owing to such Purchaser hereunder and under any fee letter entered into in connection with Section 2.06 and all other amounts owing to such Purchaser hereunder and (ii) to execute and deliver an Assignment and Acceptance and such other documents evidencing such assignment as shall be necessary or reasonably requested by the Company or the Agent. In the event that any Purchaser ceases to qualify as an Eligible Assignee, such affected Purchaser agrees (1) to give the Agent

DZB041542

[Asset Purchase Agreement - Opportunity Finance)]

and the Company prompt written notice thereof and (2) subject to the following proviso, to reimburse the Agent, the Company and the relevant assignee for all fees, costs and expenses (including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for each of the Agent, the Company and such assignee) incurred by the Agent, the Company and such assignee, respectively, in connection with any assignment made pursuant to this Section 8.06(e) by such affected Purchaser; provided, however, that such affected Purchaser's liability for such costs, fees and expenses shall be limited to the amount of any up-front fees paid to such affected Purchaser, if any, at the time that it became a party to this Agreement.

(f)     Notwithstanding the foregoing provisions of this Section 8.06, any Purchaser may at any time pledge or assign all or a portion of such Purchaser's rights under this Agreement and any of the other Facility Documents to a Federal Reserve bank in accordance with applicable law; provided, however, that no such pledge or assignment shall release such Purchaser from such Purchaser's obligations hereunder (other than compliance with Section 8.06(a) or Section 8.06(b)) or under any other Facility Document.

SECTION 8.07.   No Proceedings.  The Agent and each Purchaser hereby agrees (which agreement shall, pursuant to the terms of this Agreement, be binding upon its successors, assigns, and participants) that it shall not institute against, or join any other Person in instituting against, the Company any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law, for one year and a day after the latest maturing commercial paper note (whether or not issued to fund or maintain Loans under the Funding Agreement) issued by the Company is paid.  The provisions of this Section 8.07 shall survive the termination of this Agreement.

SECTION 8.08.   GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF OBJECTION TO VENUE.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK. THE COMPANY, THE AGENT AND THE PURCHASERS EACH HEREBY AGREES TO THE JURISDICTION OF ANY FEDERAL COURT LOCATED WITHIN THE STATE OF NEW YORK.  EACH OF THE PARTIES HERETO HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER IN ANY OF THE AFOREMENTIONED COURTS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

SECTION 8.09.   WAIVER OF JURY TRIAL.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY, THE AGENT AND THE PURCHASERS EACH WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE BETWEEN THE PARTIES HERETO ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

DZB041543

[Asset Purchase Agreement - Opportunity Finance)]

INSTEAD, ANY SUCH DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A
BENCH TRIAL WITHOUT A JURY.

SECTION 8.10.   Execution in Counterparts.  This Agreement may be executed in any
number of counterparts and by different parties hereto in separate counterparts, each of which
when so executed shall be deemed to be an original and all of which taken together shall
constitute one and the same agreement.

SECTION 8.11.   Headings.  The headings contained in this Agreement are for
convenience of reference only and shall not affect the construction or interpretation of any
provision of this Agreement.

SECTION 8.12.   Severability.  If any provision of this Agreement shall be prohibited or
invalid under applicable law, it shall be ineffective only to such extent, without invalidating the
remainder of this Agreement.

SECTION 8.13.   Recourse Against Certain Parties; Source of Funds.  (a)  No recourse
under or with respect to any obligation, covenant or agreement (including, without limitation,
any obligation or agreement to pay fees or any other amount) of the Company contained in this
Agreement or any other agreement, instrument or document entered into by it pursuant hereto or
in connection herewith shall be had against the Administrator or against any incorporator,
affiliate, stockholder, officer, member, manager, partner, employee or director of the Company
or of the Administrator, as such, by the enforcement of any assessment, by any legal or equitable
proceeding, by virtue of any statute or otherwise; it being expressly agreed and understood that
the agreements of the Company contained in this Agreement and all of the other agreements,
instruments and documents entered into by it pursuant hereto or in connection herewith are, in
each case, solely the obligations of the Company, and that no personal liability whatsoever shall
attach to or be incurred by the Administrator or any incorporator, stockholder, affiliate, officer,
member, manager, partner, employee or director of the Company or of the Administrator, as
such, or any of them, under or by reason of any of the obligations, covenants or agreements of
the Company contained in this Agreement or in any other such instrument, document or
agreement, or which are implied therefrom, and that any and all personal liability of the
Administrator and every such incorporator, stockholder, affiliate, officer, member, manager,
partner, employee or director of the Company or of the Administrator for breaches by the
Company of any such obligations, covenants or agreements, which liability may arise either at
common law or at equity, by statute or constitution, or otherwise, is hereby expressly waived as a
condition of and in consideration for the execution of this Agreement. The provisions of this
Section 8.13 shall survive the termination of this Agreement.

(b)   Notwithstanding any other provision to the contrary contained in this Agreement,
the Company's obligations hereunder, including, without limitation, its obligations to make
distributions to Purchaser in respect of principal or Yield pursuant to Section 4.01, to pay fees
pursuant to Section 2.06 and/or to make any payments pursuant to Section 8.04, shall be payable

DZB041544

[Asset Purchase Agreement - Opportunity Finance)]

by the Company solely from (and no recourse shall be had against the Company for the payment of any of the foregoing except from) (a) funds paid to the Company for such purpose by or on behalf of the Borrower, (b) excess cash flow from the Company's operations which is not required to pay when due the principal of or interest on Commercial Paper Notes or (c) proceeds from the sale by the Company of Percentage Interests hereunder. Any amount which the Company does not pay pursuant to the operation of the preceding sentence shall not constitute a claim as defined in Section 101(5) of the Bankruptcy Code against the Company for any such insufficiency unless and until the Company does have excess cash flow or excess funds.

SECTION 8.14. Taxes. Any taxes due and payable on any payments to be made to any Purchaser hereunder shall be such Purchaser's sole responsibility. Each Purchaser warrants that it is not subject to any taxes, charges, levies or withholdings with respect to payments under this Agreement that are imposed by means of withholding by any applicable taxing authority ("Withholding Tax"). Each Purchaser agrees to provide the Agent, from time to time upon the Agent's request, completed and signed copies of any documents that may be required by an applicable taxing authority to certify such Purchaser's exemption from Withholding Tax with respect to payments to be made to such Purchaser under this Agreement; and each Purchaser agrees to hold the Agent harmless from any Withholding Tax imposed due to such Purchaser's failure to establish that it is not subject to Withholding Tax.

DZB041545

[Asset Purchase Agreement - Opportunity Finance)]

Signature Page

}

with respect to

Autobahn Funding Company LLC

Opportunity Finance Securitization, LLC

Asset Purchase Agreement

Dated as of December 2ꢀ, 2001

| | |
|---|---|
| Percentage: | 100% |
| Maximum Purchase: | $102,000,000 |
| Effective Purchase Commitment Date: | December 2ꢀ, 2001 |
| Scheduled Purchase Commitment Termination Date: | December 2ꢀ, 2002 |

DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, FRANFURT AM MAIN,
as Agent and as Purchaser

By: _____

Title:

By: _____

Title:

DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main
609 Fifth Avenue, Suite 911
New York, NY  10017
Attention: Vincent Salerno
Facsimile No.:  212-745-1651
Telephone No.:  212-745-1659

DZB041546

DEC-27-01   12:59PM   FROM-DZ BANK - ASG                    212 745 1651          T-265   P 006/008   F-574

(Asset Purchase Agreement - Opportunity Finance))

Signature Page

with respect to

Autobahn Funding Company LLC

Opportunity Finance Securitization, LLC

Asset Purchase Agreement

Dated as of December 28, 2001

| | |
|---|---|
| Percentage: | 100% |
| Maximum Purchase: | $102,000,000 |
| Effective Purchase Commitment Date: | December 28, 2001 |
| Scheduled Purchase Commitment Termination Date: | December 27 2002 |

DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, FRANFURT AM
MAIN,
as Agent and as Purchaser

By: _____
Title:

By: _____
Title:    VP

DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main
609 Fifth Avenue, Suite 911
New York, NY 10017
Attention: Vincent Salerno
Facsimile No.: 212-745-1651
Telephone No.: 212-745-1659

Doc. #30393215.WPD                        36

DZB041547

AUTOBAHN FUNDING COMPANY LLC

By:   DZ Bank AG Deutsche Zentral-Genossenschaftsbank,
Frankfurt AM Main, as its attorney-in-fact

By:
Title:

By:
Title:   VP

Autobahn Funding Company LLC
% DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main
609 Fifth Avenue, Suite 911
New York, NY 10017
Facsimile No.: 212-745-1651
Telephone No.: 212-745-1659

DZB041548

[Asset Purchase Agreement - Opportunity Finance)]

AUTOBAHN FUNDING COMPANY LLC

By:     DZ Bank AG Deutsche Zentral-Genossenschaftsbank,
        Frankfurt AM Main, as its attorney-in-fact

By:     _____
Title:

By:     _____
Title:

Autobahn Funding Company LLC
% DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main
609 Fifth Avenue, Suite 911
New York, NY  10017
Facsimile No.: 212-745-1651
Telephone No.: 212-745-1659

DZB041549

[Asset Purchase Agreement - Opportunity Finance)]

## SCHEDULE I

## LIST OF CONDITIONS PRECEDENT DOCUMENTS

1.      A copy of this Agreement duly executed by the Company, the Purchasers and the Agent.

2.      A certificate of the Secretary or Assistant Secretary of the Company dated the date of this Agreement, certifying (i) the names and true signatures of certain officers of the Company, (ii) that the copy of the certificate of formation of the Company attached thereto is a complete and correct copy and that such certificate of formation has not been amended, modified or supplemented and is in full force and effect, (iii) that the copy of the operating agreement of the Company attached thereto is a complete and correct copy and that such operating agreement has not been amended, modified or supplemented and is in full force and effect, and (iv) that the copy attached thereto of certain resolutions of the Company's management committee is a true and complete copy thereof and that such resolutions have not been amended, modified or otherwise supplemented and are in full force and effect as of the date of such certificate.

3.      A fully executed copy of the Funding Agreement.

4.      A fully executed copy of the fee letter contemplated by Section 2.06.

5.      Confirmation to the Administrator by each of Moody's and Fitch that the Commercial Paper Notes shall continue to have short-term ratings of P-1 and F1, respectively.

DZB041550

[Asset Purchase Agreement - Opportunity Finance)]

## EXHIBIT A

## FORM OF ASSIGNMENT AND ACCEPTANCE

Attached.

DZB041551

## ASSIGNMENT AND ACCEPTANCE

Dated _____, __ 20__

Reference is made to the Asset Purchase Agreement dated as of December__, 2001 (the "Asset Purchase Agreement") among AUTOBAHN FUNDING COMPANY LLC, a Delaware limited liability company (the "Company"), the Purchasers (as defined in the Asset Purchase Agreement), and DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main, as the Agent for the Purchasers (the "Agent"). Terms defined in the Asset Purchase Agreement are used herein with the same meaning.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:

1.      The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to all of the Assignor's rights and obligations under the Asset Purchase Agreement as of the date hereof which represents the percentage interest specified in Section 1 of Schedule 1 of all outstanding rights and obligations of the Assignor under the Asset Purchase Agreement, including, without limitation, such interest in the Assignor's Purchase Commitment, Maximum Purchase, Percentage and Net Purchase Price Balance, and the Percentage Interests purchased by the Assignor. After giving effect to such sale and assignment, the Assignee's and the Assignor's respective Maximum Purchase, Percentage and Net Purchase Price Balance sold or retained (as the case may be) and accrued interest allocable to the relevant Percentage Interests sold or retained (as the case may be) will be as set forth in Section 2 of Schedule 1.

2.      The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Asset Purchase Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Asset Purchase Agreement or any other instrument or document furnished pursuant thereto; and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Company or the performance or observance by the Company of any of their respective obligations under the Asset Purchase Agreement or any of the other Facility Documents or other instrument or document furnished pursuant thereto.

3.      The Assignee (i) confirms that it has received a copy of the Asset Purchase Agreement, together with copies of such financial statements, other Facility Documents and such other documents, instruments, agreements, and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Agent, the Assignor or any other Purchaser and based on such documents, instruments, agreements, and information as it shall deem

Exh. A-2

appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Asset Purchase Agreement or any of the other Facility Documents; (iii) confirms that it is an Eligible Assignee; (iv) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Asset Purchase Agreement and the other Facility Documents as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto; and (v) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Asset Purchase Agreement or any of the other Facility Documents are required to be performed by it as a Purchaser.

4.     Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, it will be delivered to the Agent for acceptance and recording by the Agent. The effective date of this Assignment and Acceptance (the "Transfer Date") shall be the date of acceptance thereof by the Agent, unless a later date is specified in Section 3 of Schedule 1. The Transfer Date shall serve as the Assignee's Purchase Commitment Effective Date under the Asset Purchase Agreement. The Assignee's Scheduled Purchase Commitment Termination Date is specified in Section 4 of Schedule 1.

5.     Upon such acceptance and recording by the Agent, as of the Transfer Date, (i) the Assignee shall be a party to the Asset Purchase Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Purchaser thereunder and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Asset Purchase Agreement.

6.     Upon such acceptance and recording by the Agent, from and after the Transfer Date, the Agent shall make all payments and deposits under the Asset Purchase Agreement in respect of the interest assigned hereby (including, without limitation, all payments and deposits in respect of outstanding principal of Loans related to the Percentage Interests assigned hereunder and accrued Yield thereon and fees with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Asset Purchase Agreement for periods prior to the Transfer Date directly between themselves.

7.     This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written, such execution being made on Schedule 1 hereto.

[Asset Purchase Agreement - Opportunity Finance)]

## Schedule 1

to

## Assignment and Acceptance

Dated _____, ____ 20__

Section 1.

percentage of Assignor's
rights and obligations
being purchased :          _____%

Section 2.

The following information shall be calculated after giving effect to the transactions contemplated
by the attached Assignment and Acceptance:

a)      Assignor's Percentage: $_____

b)      Assignee's Percentage: $_____

c)      Assignor's Maximum Purchase: $_____

d)      Assignee's Maximum Purchase: $_____

e)      Assignor's Net Purchase Price Balance: $_____

f)      Assignee's Net Purchase Price Balance: $_____

g)      Assignor's accrued Yield allocable
        to the Percentage Interests retained: $_____

h)      Assignee's accrued Yield allocable
        to the Percentage Interests sold: $_____

DZB041554

[Asset Purchase Agreement - Opportunity Finance)]

<u>Section 3</u>.

Transfer Date: _____ ___, 20__

<u>Section 4</u>.

Scheduled Purchase Commitment
Termination Date:                       _____, 20__

[NAME OF ASSIGNOR]

By:_____
Title:

[NAME OF ASSIGNEE]

By:_____
Title:

<u>Address for notices</u>

[Address]

Accepted this ____ day
of _____, 20__

DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, FRANKFURT AM
MAIN, as Agent

By:_____
Title:

By:_____
Title:

DZB041555

[Asset Purchase Agreement - Opportunity Finance)]

## EXHIBIT B

### FORM OF CERTIFICATE EVIDENCING PURCHASE

**[Date of Purchase]**

(Name and Address of Purchaser)

Re:   Opportunity Finance Securitization, LLC (the "Borrower").

Ladies and Gentlemen:

The undersigned hereby confirms that on the date hereof you have purchased for your account and risk, under the terms and conditions of the Asset Asset Purchase Agreement dated as of December___,2001 (as amended, supplemented or otherwise modified and in effect from time to time, the "Asset Purchase Agreement") among you, the undersigned and certain other parties, an undivided interest (your "Percentage Interest") to the extent of ____ % in, to and under the Loans (and the Pledged Assets securing such Loans) outstanding as of the date hereof advanced by Autobahn Funding Company LLC to the Borrower pursuant to the Funding Agreement. Capitalized terms which are used but not defined herein have the meanings attributed to them in the Asset Purchase Agreement.

Annex 1 hereto provides additional information with respect to the Percentage Interest you have purchased.

We acknowledge receipt from you of the sum of $_____ in payment of the Purchase Price for your Percentage Interest.

Very truly yours,

DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK FRANKFURT, AM MAIN,
as Agent

By: _____
Name:
Title:

By: _____
Name:
Title:

Doc 430393215_V6.WPD                    Exh. B-1

DZB041556

Annex 1 to Certificate Evidencing Purchase

Information Regarding Percentage Interests


Original Principal of
Percentage Interests as of          Accrued Yield of Percentage
Date of Purchase                    Interests as of Date of Purchase

DZB041557

# EXHIBIT 8

[Execution Copy]

## COLLECTION ACCOUNT SECURITIES ACCOUNT AGREEMENT

THIS COLLECTION ACCOUNT SECURITIES ACCOUNT AGREEMENT (this "Agreement") dated as of December 28, 2001, by and among DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main, in its capacity as "Collateral Agent" under the RLSA (as defined below) (the "Collateral Agent"), Opportunity Finance Securitization, LLC, a Delaware limited liability company (the "Borrower"), Opportunity Finance, LLC, a Delaware limited liability company (the "Servicer"), and U.S. Bank National Association, as "Custodian" under the RLSA and the Custodial Agreement (as each such term is defined below) and as securities intermediary (the "Securities Intermediary").

WITNESSETH THAT

WHEREAS, the Custodian, the Collateral Agent, the Borrower and the Servicer are parties to that certain Custodial Agreement dated as of December 28, 2001 (the "Custodial Agreement");

WHEREAS, the Collateral Agent, the Borrower, the Servicer, the Secured Parties named therein and U.S. Bank National Association, as Backup Servicer and Custodian, are parties to a certain Receivables Loan and Security Agreement dated as of December 28, 2001 (the "RLSA");

WHEREAS, the Borrower and Opportunity Finance, LLC have entered into a certain Purchase and Contribution Agreement, dated as of December 28, 2001 (the "Purchase and Contribution Agreement");

WHEREAS, pursuant to the terms of the RLSA, it is required that there be established and maintained a Collection Account (the "Account") into which funds are to be transmitted upon the occurrence of certain specified events;

WHEREAS, the Collateral Agent and the Borrower have requested that the Securities Intermediary establish the Account in the name of the Collateral Agent;

WHEREAS, pursuant to Section 2.10 of the RLSA, the Borrower has granted a security interest to the Collateral Agent, on behalf of the Secured Parties, in all of the Borrower's right, title and interest in and to the Account, all funds held in the Account and all income from the investment of funds in the Account and all proceeds of the foregoing;

WHEREAS, the Collateral Agent and the Borrower have requested that the Securities Intermediary establish an account, in the name of the Collateral Agent (for the benefit of the Secured Parties), to serve as the Collection Account; and

DZB006258

WHEREAS, the Collateral Agent and the Borrower desire that the Account be established and maintained with, or that dominion and control over such Account be maintained by, the Securities Intermediary in accordance with the terms of this Agreement;

NOW, THEREFORE, for valuable consideration, the receipt whereof by the parties hereto is hereby acknowledged, each of the Collateral Agent, the Borrower, the Servicer and the Securities Intermediary hereby agrees as follows:

1.    <u>Definitions</u>.

(a)    The terms "securities intermediary," "financial asset," "securities account," "entitlement holder," "entitlement order" and "security entitlement" shall each have the meaning given to such terms under the provisions of Article 8 of the Minnesota Uniform Commercial Code (the "UCC").

(b)    Unless and except to the extent otherwise expressly defined herein, capitalized terms appearing herein shall have the same meanings as are assigned thereto under the RLSA.

2.    <u>Permitted Investments</u>.  The parties hereto hereby each agree that, notwithstanding any other provision of the RLSA or any other agreement executed in connection with the RLSA (including, without limitation, the Custodial Agreement), funds in the Account, shall be invested and reinvested only in Permitted Investments (as such term is defined in the RLSA) by the Securities Intermediary at the written direction (which may include, subject to the provisions hereof, general standing instructions) of the Servicer (except that if the Collateral Agent shall notify the Securities Intermediary in writing that any Event of Default (as defined in the RLSA) shall have occurred and be continuing, such funds shall be invested and reinvested solely at the written direction of the Collateral Agent) or its designee received by the Securities Intermediary by 1:00 p.m., Minneapolis, Minnesota time, on the business day prior to the date on which such investment shall be made.  If no written direction with respect to all or any portion of the funds in the Account is received by the Securities Intermediary, the Securities Intermediary shall invest such funds in the First American Prime Obligations Fund ("First Prime"), so long as First Prime is a Permitted Investment at the time of such investment, or such other Permitted Investments as the Securities Intermediary may select, provided that the Securities Intermediary shall not be liable for any loss or absence of income resulting from such investments.

3.    <u>Securities Intermediary's Representations, Warranties and Covenants</u>.  The Securities Intermediary represents and warrants that it is as of the date hereof, and it agrees that for so long as it maintains the Account and acts as Securities Intermediary pursuant to this Agreement it shall be, a securities intermediary.  In furtherance of the foregoing, the Securities Intermediary hereby:

(a)    represents and warrants to the other parties hereto that it is a national banking association, validly existing and in good standing under the laws of the United

DZB006259

States, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity hereunder and with respect to the Account;

(b)     agrees that the Account shall be an account to which financial assets may be credited, and the Securities Intermediary undertakes to treat the Collateral Agent as entitled to exercise rights that comprise (and entitled to the benefits of) such financial assets, and entitled to exercise the ordinary rights of an entitlement holder in the fashion contemplated by the UCC;

(c)     represents and warrants to the other parties hereto that it has not granted, and covenants that so long as it acts as Securities Intermediary it shall not grant control (within the meaning of § 8-106 of the UCC) over, nor any security interest in, the Account or any Permitted Investments to any Person other than the Collateral Agent and represents that it does not know of any claim to, or interest in, the Account or in any financial asset credited thereto, except for claims and interest of the Collateral Agent and of the Borrower in the Account;

(d)     covenants that in its capacity as Securities Intermediary hereunder and with respect to the Account, it shall not take any action inconsistent with, and represents and covenants that it is not and so long as this Agreement remains in effect will not become party to any agreement the terms of which are inconsistent with, the provisions of this Agreement;

(e)     agrees that each item of property (whether investment property, financial assets, securities, instruments or cash) in the Account and all funds in the Account invested in Permitted Investments shall be treated as financial assets;

(f)     agrees that no Account or any Permitted Investment held in the Account shall be subject to any security interest, lien or right of setoff in favor of the Securities Intermediary and that it will promptly notify the Collateral Agent and the Borrower if any person asserts any claim, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against any Account or any financial asset carried therein;

(g)     agrees that all securities or other property underlying any financial assets credited to any Account shall be registered in the name of the Securities Intermediary, endorsed to the Securities Intermediary or in blank or credited to another securities account or accounts maintained in the name of the Securities Intermediary, and in no case will any financial asset credited to any Account be registered in the name of the Borrower, payable to the order of the Borrower or specially endorsed to the Borrower, except to the extent the foregoing have been specially endorsed to the Securities Intermediary or in blank; and

DZB006260

(h)     agrees that all property delivered to the Securities Intermediary pursuant to the RLSA will be promptly credited to the Account.

4.     <u>Securities Intermediary to Maintain Account</u>. The Securities Intermediary agrees to maintain the Account until it resigns or is removed pursuant to paragraph 7 hereof. The Securities Intermediary shall maintain appropriate books and records in respect of the Account in accordance with its usual procedures and subject to the terms of this Agreement.

5.     <u>Control</u>. The parties hereto hereby each agree that, with respect to the Account and each financial asset credited thereto, the Securities Intermediary shall treat the Collateral Agent, on behalf of the Secured Parties, as the entitlement holder with respect to the securities entitlements thereto and will comply with entitlement orders and any other instructions directing disposition of funds in the Account originated by the Collateral Agent, on behalf of the Secured Parties, without further consent of the Borrower or Servicer. Notwithstanding the foregoing, the Collateral Agent has delegated to the Servicer the right to make entitlement orders, and the Securities Intermediary shall comply with entitlement orders originated by the Servicer until the Securities Intermediary receives written notice from the Collateral Agent (a copy of which shall be sent to the Servicer by the Collateral Agent) that (a) a Servicer Default, an Early Amortization Event or an Event of Default has occurred and (b) the Securities Intermediary is to cease taking entitlement orders originated by the Servicer and commence taking entitlement orders from the Collateral Agent or a designee thereof until notice otherwise from the Collateral Agent. Unless and until otherwise instructed by the Collateral Agent, the Securities Intermediary will accept and execute instructions from the Servicer without any inquiry into the authority of the Servicer to give such instructions, including instructions to sell and purchase financial assets for the Account.

6.     <u>Securities Intermediary's Jurisdiction</u>. Each of the parties hereto hereby agrees that this Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota, and that the Securities Intermediary's jurisdiction, for purposes of § 8-110(e) of the UCC as it pertains to this Agreement, the Account and the security entitlements relating to the financial assets credited thereto, shall be the State of Minnesota.

7.     <u>Removal or Resignation; Termination</u>. The Securities Intermediary may (solely in its capacity as Securities Intermediary) resign at any time by giving written notice thereof to the Collateral Agent and the Borrower not less than 90 days prior to the effective date of such resignation; <u>provided</u>, that no such resignation shall be effective until a successor securities intermediary has been appointed by the Collateral Agent and has accepted such appointment and assumed the obligations and duties of the Securities Intermediary under this Agreement. If the Collateral Agent fails to appoint a successor securities intermediary which accepts such appointment within thirty (30) days of the Collateral Agent receiving notice of the Securities Intermediary's resignation, the Securities Intermediary may petition a court of competent jurisdiction to appoint a successor Securities Intermediary. This Agreement will terminate upon (A) written notice from the Collateral Agent that the RLSA has been terminated and (B) payment in full of all fees due and owing from the Collateral Agent to the Securities Intermediary.

DZB006261

8.    <u>No Implied or Increased Duties</u>.  Nothing herein shall imply or impose upon the Securities Intermediary any duties, obligations, responsibilities or liabilities, other than those duties and responsibilities expressly agreed to herein and those as may be imposed upon a securities intermediary under the UCC (or other applicable law); and in that regard, the Securities Intermediary shall be entitled to all of the protections and benefits afforded to or available to a securities intermediary under the UCC (and other applicable law).  Without limiting the generality of the foregoing, nothing herein shall impose or imply on the part of the Securities Intermediary any duties of a fiduciary nature, or any of the duties, responsibilities or liabilities of the Collateral Agent under the RLSA.

9.    <u>Rights, Duties, etc.; No Implied Covenants; Investigation</u>.

(a)    <u>Rights, Duties, etc</u>.  The acceptance by the Securities Intermediary of its duties hereunder is subject to the following terms and conditions which the parties to this Agreement hereby agree shall govern and control with respect to the Securities Intermediary's rights, duties, liabilities and immunities hereunder:

(1)    The Securities Intermediary shall be protected in acting or refraining from acting upon any written notice, certificate, instruction, request or other paper or document, as to the due execution thereof and the validity and effectiveness of the provisions thereof and as to the truth of any information therein contained, which the Securities Intermediary in good faith believes to be genuine;

(2)    The Securities Intermediary may consult with and obtain advice from counsel of its own choice in the event of any dispute or question as to the construction of any provision hereof or otherwise in connection with its duties hereunder, and any action taken or omitted by the Securities Intermediary in reasonable reliance upon such opinion shall be full justification and protection to it;

(3)    The Securities Intermediary shall not be liable for any error of judgment or for any act done or step taken or omitted except in the case of its gross negligence, willful misconduct or bad faith;

(4)    The Securities Intermediary shall have no duties hereunder except those which are expressly set forth herein and in any modification or amendment hereof; <u>provided</u>, <u>however</u>, that no such modification or amendment hereof shall affect its duties unless it shall have given its prior written consent thereto;

(5)    The Securities Intermediary may engage or be interested in any financial or other transactions with any party hereto and may act on, or as depositary, trustee or Collateral Agent for, any committee or body of holders of

DZB006262

obligations of such Persons as freely as if it were not the Securities Intermediary hereunder; and

(6) The Securities Intermediary shall not be obligated to take any action which in its reasonable judgment would cause it to incur any expense or liability not otherwise contemplated hereunder unless it has been furnished with an indemnity with respect thereto which is reasonably satisfactory to the Securities Intermediary.

(b) <u>No Implied Covenants</u>. No implied covenants or obligations on the part of the Securities Intermediary shall be incorporated into this Agreement. If in one or more instances the Securities Intermediary takes any action or assumes any responsibility not specifically delegated to it hereunder, neither the taking of such action nor the assumption of such responsibility shall be deemed to be an express or implied undertaking on the part of the Securities Intermediary that it will take the same or similar action or assume the same or similar responsibility in any other instance.

(c) <u>Investigation</u>. The Securities Intermediary shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the Borrower, Servicer or Collateral Agent; <u>provided</u>, <u>however</u>, that if the payment within a reasonable time to the Securities Intermediary of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Securities Intermediary, not reasonably assured to the Securities Intermediary pursuant to the terms of this Agreement, the Securities Intermediary may require reasonable indemnity from the Borrower against such expense or liability as a condition to taking any such action. The reasonable expense of every such examination shall be paid by the Borrower or, if paid by the Securities Intermediary, the reasonable expenses thereof which are documented in reasonable detail shall be repaid by the Borrower upon demand from the Borrower's own funds.

10. <u>Indemnification</u>. The Borrower shall indemnify and hold the Securities Intermediary and its directors, officers, employees and agents harmless against any loss, liability or expense (including the costs and expenses of defending against any claim of liability) arising out of or in connection with this Agreement or any action or inaction of the Securities Intermediary or any such person hereunder, except such loss, liability or expense of any such person which shall result from its own gross negligence, bad faith or willful misconduct. The obligation of the Borrower under this section shall survive the termination of this Agreement.

11. <u>Fees and Expenses</u>. In connection with its services hereunder, the Securities Intermediary shall be entitled to charge (and the Borrower hereby agrees to pay) such fees and reasonable charges as set forth in the "Schedule of Fees for Service as Collateral Agent and Paying Agent," dated November 14, 2001, attached hereto as <u>Schedule I</u>.

DZB006263

12. <u>Amendments; Waivers</u>. Except as otherwise expressly provided herein, no amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed (i) in the case of an amendment, by all the parties hereto and the Facility Insurer, or (ii) in the case of a waiver, by the party against which it applies; and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.

13. <u>Severability</u>. If any provision of this Agreement is declared invalid by any court of competent jurisdiction, such invalidity shall not affect any other provision hereof, and the remaining terms of this Agreement shall be enforced to the fullest extent permitted by law.

14. <u>Entire Agreement</u>. This Agreement sets forth the entire agreement between the parties with respect to the matters set forth herein and supersedes any prior communications or understandings regarding such matters.

15. <u>Headings</u>. As used herein, headings are for convenience only and are not intended to affect the interpretation of this Agreement.

16. <u>Other Dealings</u>. Nothing herein shall restrict, or prevent the parties herein from entering into, other business transactions or relationships with any of the other parties hereto.

17. <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of, and be binding upon, the successors and permitted assigns of each of the parties hereto. None of the rights, duties or obligations of any of the parties hereunder may be assigned without the express written consent of the other parties.

18. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

19. <u>No Bankruptcy Petition</u>. The Securities Intermediary hereby agrees it shall not institute against, nor join any other person in instituting against, the Borrower any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under U.S. federal or state or other bankruptcy or similar laws until at least one year and one day or, if longer, the applicable preference period then in effect, after the payment in full of all Obligations; <u>provided</u>, <u>however</u>, that nothing herein shall preclude or stop the Securities Intermediary (A) from taking any action prior to the expiration of the applicable preference period in (x) any case or proceeding voluntarily filed or commenced by the Borrower or (y) any involuntary insolvency proceeding filed or commenced against the Borrower by a Person other than the Securities Intermediary or (B) from commencing against the Borrower or any properties of the Borrower any legal action which is not a bankruptcy, reorganization, arrangement,

DZB006264

insolvency, moratorium or liquidation proceeding. This provision shall survive termination of this Agreement for any reason whatsoever.

20.   Agreement Among the Parties. This Agreement is among the Securities Intermediary, the Collateral Agent, the Servicer and the Borrower solely and shall give no rights to any other party other than the Secured Parties.

21.   Notices. Any notice, request or other communication required or permitted to be given under this Agreement shall be in writing and deemed to have been properly given when delivered in person, or when sent by telecopy or other electronic means and electronic confirmation of error free receipt is received or two days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address set forth below:

|  |  |
|---|---|
| If to the Borrower: | Opportunity Finance Securitization, LLC<br>60 South Sixth Street, Suite 2540 (B)<br>Minneapolis, Minnesota 55402<br>Attn: Jon Sabes<br>Telecopier No.: (612)339-8922<br>Telephone No.: (612)339-8921 |
| If to the Servicer: | Opportunity Finance, LLC<br>60 South Sixth Street, Suite 2540<br>Minneapolis, Minnesota 55402<br>Attn: Jon Sabes<br>Telecopier No.: (612)339-8922<br>Telephone No.: (612)339-8921 |
| If to the Collateral Agent: | DZ Bank AG Deutsche Zentral-<br>Genossenschaftsbank, Frankfurt am Main<br>609 Fifth Avenue<br>New York, New York 10017<br>Attn: Patrick Preece<br>Telecopier No.: (212) 745-1651<br>Telephone No.: (212) 745-1658 |
| If to the Securities Intermediary: | U.S. Bank National Association<br>180 East Fifth Street<br>St. Paul, Minnesota 55101<br>Attn: Eve Kaplan<br>Telecopier No.: (651)244-0089<br>Telephone No.: (651)244-0727 |

DZB006265

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

OPPORTUNITY FINANCE
SECURITIZATION, LLC

By: _____
Name: ~~~~~
Title: ~~~~~

OPPORTUNITY FINANCE, LLC

By: _____
Name: ~~~~~
Title: ~~~~~

U.S. BANK NATIONAL ASSOCIATION,
as Securities Intermediary

By: _____
    Name:
    Title:

DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK,
FRANKFURT AM MAIN, as Collateral
Agent

By: _____
    Name: ~~~~~
    Title: V P

By: _____
    Name:
    Title:

Doc #30394215

DZB006266

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

OPPORTUNITY FINANCE
SECURITIZATION, LLC

By: _____
     Name:
     Title:

OPPORTUNITY FINANCE, LLC

By: _____
     Name:
     Title:

U.S. BANK NATIONAL ASSOCIATION,
as Securities Intermediary

By: _____
     Name:
     Title:

DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK,
FRANKFURT AM MAIN, as Collateral
Agent

By: _____
     Name:
     Title:

By: _____
     Name: Richard J. Wisnewski
     Title: VP

Doc #30394215

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

OPPORTUNITY FINANCE
SECURITIZATION, LLC


By: _____
        Name:
        Title:

OPPORTUNITY FINANCE, LLC


By: _____
        Name:
        Title:

U.S. BANK NATIONAL ASSOCIATION,
as Securities Intermediary


By: _____
        Name:    EVE D. KAPLAN
        Title:    Vice President

DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK,
FRANKFURT AM MAIN, as Collateral
Agent


By: _____
        Name:
        Title:

By: _____
        Name:
        Title:

Doc #30394215

U.S. BANK NATIONAL ASSOCIATION, as
Custodian

By: _____

Name:   EVE D. KAPLAN

Title:   Vice President

DZB006269

# EXHIBIT 9

[Execution Copy]

## PURCHASE AND CONTRIBUTION AGREEMENT

THIS PURCHASE AND CONTRIBUTION AGREEMENT, dated as of December 28, 2001 (this "Agreement"), between Opportunity Finance, LLC, a Delaware limited liability company ("Opportunity"), and Opportunity Finance Securitization, LLC, a Delaware limited liability company (the "Purchaser").

## W I T N E S S E T H:

WHEREAS, the Purchaser has agreed to purchase from Opportunity from time to time, and Opportunity has agreed to Sell (as hereinafter defined) to the Purchaser from time to time, certain Receivables and the Related Security and Other Conveyed Property (in each case, as hereinafter defined) related thereto on the terms set forth herein.

WHEREAS, Opportunity may also wish from time to time to Contribute (as hereinafter defined) certain Receivables, Related Security and Other Conveyed Property to the capital of the Purchaser on the terms set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual agreements hereinafter contained, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Purchaser and Opportunity, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.1    General.  The specific terms defined in this Article include the plural as well as the singular.  Words herein importing a gender include the other gender. References herein to "writing" include printing, typing, lithography, and other means of reproducing words in visible form.  References to agreements and other contractual instruments include all subsequent amendments thereto or changes therein entered into in accordance with their respective terms and not prohibited by this Agreement or the RLSA (as hereinafter defined).  References herein to Persons include their successors and assigns permitted hereunder or under the RLSA.  The terms "include" or "including" mean "include without limitation" or "including without limitation".  The words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and Article, Section, Schedule and Exhibit references, unless otherwise specified, refer to Articles and Sections of and Schedules and Exhibits to this Agreement.  Capitalized terms used herein but not defined herein shall have the respective meanings assigned to such terms in the RLSA.

DZB006137

SECTION 1.2    Specific Terms.  Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the following meanings:

"Agreement" means this Purchase and Contribution Agreement and all amendments hereof and supplements hereto made in accordance with the terms hereof.

"Assignment" means an Assignment executed by Opportunity, substantially in the form of Exhibit A attached hereto.

"Convey" means to Sell and/or Contribute Receivables, Related Security and Other Conveyed Property hereunder.

"Conveyance" means, collectively, a Sale and/or Contribution of Receivables, Related Security, and Other Conveyed Property by Opportunity to the Purchaser.

"Conveyance Date" has the meaning specified in Section 2.1(f).

"Contribute" and "Contribution" have the meanings specified in Section 2.1(a).

"Cut-Off Date" means with respect to any Receivable that is Conveyed hereunder, the date such Receivable is Conveyed hereunder.

"Existing Opportunity Loan Schedules of Representations" means the Schedules of Representations and Warranties attached hereto as Schedule C and Schedule D.

"Lender" means any present or future "Lender" named under the RLSA.

"New Opportunity Loan Schedules of Representations" means the Schedules of Representations and Warranties attached hereto as Schedule A and Schedule B.

"Opportunity Purchase Event" means the occurrence of a breach of any of Opportunity's representations and warranties under Section 4.1(a).

"Other Conveyed Property" means, with respect to any Receivable, all of Opportunity's right, title and interest in, to and under (but none of Opportunity's obligations, if any, under) (i) all monies at any time received or receivable with respect to such Receivable after the applicable Cut-Off Date, (ii) the security interest in the Opportunity Loan Collateral securing such Receivable (which was granted by the related Opportunity Loan Borrower to Opportunity under the related Contract) and any and all of Opportunity's other interests in the Opportunity Loan Collateral related to such Receivable, (iii) any and all agreements, documents, certificates and instruments evidencing Opportunity's security interest or other interest in and to the Opportunity Loan Collateral securing such Receivable or otherwise related to such Receivable, (iv) any Eligible Credit Insurance, Subject Inventory Insurance Policy and any similar insurance

DZB006138

policies and, in each case, any proceeds from any such policy relating to such Receivable or the related Subject Inventory, including rebates of premiums, (vii) the related Contract, the related Opportunity Loan Promissory Note and all other items required to be contained in the related Receivable File, any and all other documents or electronic records that Opportunity keeps on file in accordance with its customary procedures relating to such Receivable, the related Opportunity Loan Collateral or the related Opportunity Loan Borrower, (viii) all property (including the right to receive future liquidation proceeds) that secures such Receivable and that has been acquired by or on behalf of the Opportunity pursuant to the liquidation of such property or such Receivable, and (x) all present and future rights, claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds and investments of any kind and nature in respect of any of the foregoing.

"PCA Defaulted Receivable" means any Receivable which is not paid within ninety (90) or more days after the due date set forth in the Contract related thereto.

"PCA Purchase Price" means, with respect to any Receivable and the Related Security and Other Conveyed Property related thereto Conveyed hereunder pursuant to a Sale, an amount equal to the Outstanding Principal Balance of such Receivable.

"Purchaser" has the meaning specified in the Preamble.

"Reassignment Amount" means, as of any date with respect to any Receivable and the Related Security and Other Conveyed Property related thereto Conveyed hereunder, an amount equal to the Outstanding Principal Balance of such Receivable as of such date .

"Receivable" means the right to receive all payments from an Opportunity Loan Borrower with respect to an Opportunity Loan advanced to such Opportunity Loan Borrower including, without limitation, any rights to payments with respect to (i) any proceeds arising in respect of any Opportunity Loan Collateral, (ii) any Subject Inventory Insurance Proceeds, Eligible Credit Insurance proceeds, other credit insurance proceeds or any other insurance proceeds paid in respect of any Opportunity Loan Collateral or Subject Inventory Collateral, in each case, related to such Opportunity Loan.

"Request Notice" means a notice, which shall include a computer print-out, tape or other form acceptable to the Purchaser sufficient to enable the Purchaser to identify all Receivables to be Sold or Contributed by Opportunity to the Purchaser on a Conveyance Date.

"Request Notice Date" has the meaning specified in Section 2.1(b).

"RLSA" means the Receivables Loan and Security Agreement, dated as of the date hereof, by and among the Purchaser, Opportunity, as Servicer, DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main, as Agent and as Collateral Agent, the Lenders

DZB006139

named therein and U.S. Bank Trust National Association, as Backup Servicer, the Custodian and Trustee, as amended and/or restated from time to time pursuant to the terms thereof.

"Sale" and "Sell" have the meanings specified in Section 2.1(a).

"Schedule of Receivables" means the schedule of all Receivables Sold and/or Contributed pursuant to this Agreement which is attached hereto as Schedule F, as amended or supplemented from time to time pursuant to the terms hereof.

"Schedule of Representations" means the Existing Opportunity Loan Schedules of Representations and the New Opportunity Loan Schedules of Representations.

"Transfer Taxes" means any tax, fee or governmental charge payable by the Purchaser, Opportunity or any other Person to any federal, state or local government arising from or otherwise related to the Conveyance of any Receivable, the related Opportunity Loan Collateral and/or any other related Other Conveyed Property from Opportunity to the Purchaser under this Agreement (excluding taxes measured by net income).

SECTION 1.3    Certain References. All references to the Adjusted Balance of a Receivable as of a Conveyance Date shall refer to the close of business on such day.

## ARTICLE II

### CONVEYANCE OF THE RECEIVABLES
### AND THE OTHER CONVEYED PROPERTY

SECTION 2.1    Conveyance of the Receivables and the Other Conveyed Property.

(a)    Subject to the terms and conditions of this Agreement, on and after the date of this Agreement (but not after the occurrence of the Early Amortization Commencement Date under the RLSA), Opportunity hereby agrees to (i) sell, transfer, assign, and otherwise convey (collectively, "Sell" and any such sale, transfer, assignment, and/or other conveyance, a "Sale"), from time to time, to the Purchaser, without recourse (except to the extent specifically provided herein), and the Purchaser hereby agrees to purchase, all right, title and interest of Opportunity in and to certain Receivables originated or otherwise acquired by Opportunity and the Related Security and Other Conveyed Property related thereto, (ii) contribute to the capital of, and transfer, assign, and otherwise convey to (collectively, "Contribute" and any such contribution to capital, transfer, assignment, and/or other conveyance, a "Contribution"), from time to time, the Purchaser, without recourse (except to the extent specifically provided herein), and the Purchaser hereby agrees to acquire, all right, title and interest of Opportunity in and to certain Receivables, Related Security and Other Conveyed Property, and (iii) transfer, or cause the deposit, into the Collection Account of all amounts received by Opportunity on account of

DZB006140

any Receivables, Related Security and Other Conveyed Property Conveyed hereunder on and after the Cut-Off Date related to such Receivables, Related Security and Other Conveyed Property, in each case, within one Business Day of the receipt thereof. Opportunity hereby acknowledges that each sale, contribution and conveyance to the Purchaser hereunder is absolute and irrevocable, without reservation or retention of any interest whatsoever by Opportunity.

(b)    The Sales of Receivables, Related Security and Other Conveyed Property by Opportunity to the Purchaser and the Contributions of Receivables, Related Security and Other Conveyed Property by Opportunity to the capital of the Purchaser pursuant to this Agreement are intended to be absolute assignments (free and clear of any Liens) of all of Opportunity's right, title and interest in, to and under such Receivables, Related Security and Other Conveyed Property for all purposes and, except to the extent specifically provided herein, without recourse.

(c)    [Intentionally omitted.]

(d)    It is the intention of Opportunity and the Purchaser that the Receivables, Related Security and Other Conveyed Property Sold by Opportunity to the Purchaser and the Receivables, Related Security and Other Conveyed Property Contributed by Opportunity to the capital of the Purchaser pursuant to this Agreement shall not be part of Opportunity's estate in the event of the filing of a bankruptcy petition by or against Opportunity under any bankruptcy or similar law.

(e)    In the event that the Sales of Receivables, Related Security and Other Conveyed Property by Opportunity to the Purchaser and/or the Contributions of Receivables, Related Security and Other Conveyed Property by Opportunity to the capital of the Purchaser pursuant to this Agreement are deemed to be a secured financing (or are otherwise determined not to be absolute assignments of all of Opportunity's right, title and interest in, to and under (or transfers of all of Opportunity's equitable interest in, to and under) the Receivables, Related Security and Other Conveyed Property Sold or Contributed, or purportedly Sold or Contributed hereunder, then (i) Opportunity shall be deemed hereunder to have granted to the Purchaser, and Opportunity does hereby grant to the Purchaser, a security interest in all of Opportunity's right, title and interest in, to and under such Receivables, Related Security and Other Conveyed Property, whether now owned or hereafter acquired and (ii) this Agreement shall constitute a security agreement under applicable law.

(f)    Opportunity may on any Business Day (each a "Conveyance Date") deliver to the Purchaser a Request Notice identifying the Receivables, Related Security and Other Conveyed Property to be Sold by Opportunity to the Purchaser and/or the Receivables, Related Security and Other Conveyed Property to be Contributed by Opportunity to the capital of the Purchaser on such Conveyance Date. Each delivery of a Request Notice shall be accompanied by an updated Schedule of Receivables, which schedule shall be attached hereto as Schedule C and made a part hereof. Each schedule so delivered shall supersede any prior schedules so delivered.

DZB006141

(g)    The price paid for Receivables, the Related Security and Other Conveyed Property related thereto which are Sold hereunder shall be the PCA Purchase Price with respect thereto. Such PCA Purchase Price shall be paid first, to the extent that the Purchaser has cash available therefor, by means of an immediate cash payment to Opportunity (or any designee thereof) by wire transfer on the applicable Conveyance Date to an account designated by Opportunity on or before such Conveyance Date and second, to the extent that any portion of the PCA Purchase Price remains unpaid, an amount of cash equal to such unpaid portion of the PCA Purchase Price shall be deemed to have been Contributed by Opportunity to the capital of the Purchaser on the applicable Conveyance Date (and, by proper accounting entries being entered upon the accounts and records of Opportunity and the Purchaser, the amount Contributed by Opportunity to the capital of the Purchaser shall be treated as having paid such unpaid portion of the PCA Purchase Price).

(h)    On and after each Conveyance Date hereunder, the Purchaser shall own the Receivables, Related Security and Other Conveyed Property Sold or Contributed by Opportunity to the Purchaser on such Conveyance Date and Opportunity shall not take any action inconsistent with such ownership and shall not claim any ownership interest in such Receivables, Related Security and/or Other Conveyed Property.

(i)    Until the occurrence of a Servicer Default and the replacement of Opportunity as Servicer pursuant to the terms of the RLSA, Opportunity, as Servicer, shall conduct the servicing, administration and collection of the Receivables Conveyed hereunder and shall take, or cause to be taken, all such actions as may be necessary or advisable to service, administer and collect such Conveyed Receivables, from time to time, all in accordance with the terms of the RLSA. In accordance with the Custodial Agreement, certain documents relating to Receivables Conveyed hereunder shall be delivered to and held in trust by the Custodian for the benefit of the Purchaser and its assignees, and the Purchaser hereby instructs Opportunity to so deliver such documents to the Custodian. Such delivery to the Custodian of such documents and the possession thereof by the Custodian is at the will of the Purchaser and its assignees and in a custodial capacity for their benefit only.

(j)    On each Conveyance Date, Opportunity shall deliver to the Custodian on behalf of the Purchaser and any assignee thereof each item contained in the Receivable Files of, and any other chattel paper (as defined in the UCC) representing or evidencing, any of the Receivables, the Related Security and the Other Conveyed Property related thereto being Conveyed on such Conveyance Date.

## ARTICLE III

## CONDITIONS OF CONVEYANCE

DZB006142

SECTION 3.1     Conditions Precedent to the Initial Conveyance.  The initial Conveyance hereunder is subject to the condition precedent that the Purchaser shall have received on or before the date of the initial Conveyance under this Agreement, in form and substance satisfactory to the Purchaser:

(i)     an Assignment executed by Opportunity and setting forth the Receivables to be Conveyed on the date of the initial Conveyance under this Agreement;

(ii)    a copy of resolutions duly adopted by the members of Opportunity approving this Agreement, the Assignments and the other documents to be delivered by it hereunder and the transactions and matters contemplated hereby and thereby, certified by Opportunity's Secretary or Assistant Secretary;

(iii)   the certificate of formation as amended, of Opportunity, certified by the Secretary of State of Delaware as of a date not earlier than 10 days prior to the date hereof;

(iv)    a good standing certificate for Opportunity issued by the Secretary of State of Delaware, dated as of a date not earlier than 10 days prior to the date hereof;

(v)     a copy of Opportunity's operating agreement as amended, certified by its Chief Manager;

(vi)    a certificate of the Chief Manager of Opportunity certifying the names and true signatures of the officers authorized on its behalf to sign this Agreement, the Assignments, and the other documents to be delivered by it hereunder (on which certificate the Purchaser may conclusively rely until such time as the Purchaser shall receive from Opportunity a revised certificate meeting the requirements of this subsection (vi)) and certifying that all representations and warranties made by Opportunity in this Agreement are true and correct in all material respects;

(vii)   copies of proper financing statements (on Form UCC-1) accurately describing the Conveyed Receivables, the Related Security and the Other Conveyed Property related thereto and naming Opportunity as the "Debtor/Seller" and the Purchaser as "Secured Party/Purchaser", or other similar instruments or documents, in form and substance sufficient for filing under the UCC or any comparable law of any and all jurisdictions as may be necessary or, in the opinion of the Purchaser or any assignee thereof, desirable to perfect the Purchaser's ownership interest in all Conveyed Receivables and the Related Security and the Other Conveyed Property related thereto;

(viii)  copies of properly executed termination statements or statements of release (on Form UCC-3) or other similar instruments or documents, if any, in form and substance satisfactory for filing under the UCC or any comparable law of any and all jurisdictions as may be necessary or, in the opinion of the Purchaser and its assigns,

DZB006143

desirable to release all security interests and similar rights of any Person in the Conveyed Receivables and the Related Security and Other Conveyed Property related thereto previously granted by Opportunity;

(ix)    certified copies of requests for information or copies (on Form UCC-11) (or a similar search report certified by a party acceptable to the Purchaser and any assignee thereof), dated a date reasonably near and prior to the date of such initial Conveyance, listing all effective financing statements and other similar instruments and documents which name Opportunity (under its present name, any previous name or any trade name) as debtor and which are filed in the jurisdictions in which filings are to be made pursuant to subsections (vii) and (viii) above, together with copies of such financing statements, none of which, except those filed pursuant to subsections (vii) and (viii), above, shall cover any Conveyed Receivables or Related Security or Other Conveyed Property related thereto;

(x)    any necessary third party consents to the closing of the transactions contemplated hereby, in the form and substance satisfactory to the Purchaser; and

(xi)    one or more favorable opinions of Moss & Barnett, A Professional Association and Mayer, Brown & Platt, counsel to Opportunity, with respect to such matters as the Purchaser or any assignee thereof may reasonably request.

SECTION 3.2    Conditions Precedent to All Conveyances. The Conveyance to take place on the initial Conveyance Date and each Conveyance to take place on a subsequent Conveyance Date hereunder shall be subject to the further conditions precedent that:

(a)    The following statements shall be true:

(i)    the representations and warranties of Opportunity contained in Section 4.1 shall be correct on and as of such Conveyance Date in all material respects, before and after giving effect to the Conveyance to take place on such Conveyance Date and to the application of proceeds therefrom, as though made on and as of such date; and

(ii)    Opportunity is in compliance in all material respects with each of its covenants and other agreements set forth herein.

(b)    The Purchaser shall have received an Assignment, dated the date of such Conveyance Date, executed by Opportunity, listing each Receivable being Conveyed on such Conveyance Date.

(c)    Opportunity shall have delivered to the Custodian on behalf of the Purchaser and any assignee thereof each item required to be contained in the Receivable Files of, and any other chattel paper (as defined in the UCC) representing or evidencing, any of the

8

DZB006144

Receivables (or Related Security or Other Conveyed Property related thereto) being Conveyed on such Conveyance Date.

        (d)     Opportunity shall have taken such other action, including delivery of approvals, consents, opinions, documents and instruments to the Purchaser, as the Purchaser or any assignee thereof may reasonably request.

        (e)     Opportunity shall have taken all steps necessary under all applicable law in order to Convey to the Purchaser the Receivable being Conveyed on such Conveyance Date and the Related Security and the Other Conveyed Property related thereto and, upon the Conveyance of such Receivable and the Related Security and the Other Conveyed Property related thereto from Opportunity to the Purchaser pursuant to the terms hereof, the Purchaser will have acquired good and marketable title to, and a valid and perfected ownership interest in, the Conveyed Receivables being Conveyed on such Conveyance Date and the Related Security and Other Conveyed Property related thereto, free and clear of any Adverse Claim or restrictions on transferability.

        (f)     There shall have been no material adverse change in the condition (financial or otherwise), business, or results of operations of Opportunity since the preceding Conveyance Date.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

        SECTION 4.1     Representations and Warranties of Opportunity.  Opportunity makes the following representations and warranties, on which the Purchaser relies in acquiring the Receivables and the Related Security and the Other Conveyed Property related thereto Conveyed hereunder.  Such representations are made as of the execution and delivery of this Agreement, as of each Conveyance Date, but shall survive the Conveyance hereunder of the Receivables, the Related Security and the Other Conveyed Property Conveyed on such Conveyance Date.

        (a)     Schedule of Representations.  All of the representations and warranties set forth on the Existing Opportunity Loan Schedules of Representations are true and correct with respect to all of the Receivables which have been Conveyed on the initial Conveyance Date and are referred to in the Assignment (or any annex or schedule thereto) delivered by Opportunity to the Purchaser as of the date hereof.  All of the representations and warranties set forth on the New Opportunity Loan Schedules of Representations are true and correct with respect to all Receivables which have been Conveyed after the initial Conveyance Date and are referred to in any Assignment (or any annex or schedule thereto) delivered by Opportunity to the Purchaser as of the date of such Assignment.

DZB006145

   (b) <u>Organization and Good Standing</u>. Opportunity has been duly organized and is validly existing as a limited liability company in good standing under the laws of the jurisdiction of its formation, with power and authority to own its properties and to conduct its business as such properties are currently owned and such business is currently conducted, and had at all relevant times and now has power, authority and legal right to acquire and own the Receivables and the Related Security and the Other Conveyed Property related thereto Conveyed hereunder and to Convey such Receivables and the Related Security and the Other Conveyed Property related thereto to the Purchaser and to enter into and perform its obligations under this Agreement.

   (c) <u>Due Qualification</u>. Opportunity is duly qualified to do business as a foreign limited liability company in good standing, and has obtained all necessary licenses and approvals, in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification, licenses and/or approvals.

   (d) <u>Power and Authority</u>. Opportunity has the power and authority to execute and deliver this Agreement, the RLSA and the other Transaction Documents to which it is a party and to carry out its terms and their terms, respectively; Opportunity has full power and authority to Convey the Receivables and the Related Security and Other Conveyed Property ·related thereto to be Conveyed to the Purchaser·hereunder·and has duly authorized such Conveyance to the Purchaser by all necessary corporate action and the execution, delivery and performance of this Agreement, the RLSA and the Transaction Documents to which it is a party have been duly authorized by Opportunity by all necessary corporate action.

   (e) <u>Valid Conveyance; Binding Obligations</u>. This Agreement, the RLSA, each Assignment and the Transaction Documents to which Opportunity is party have been and, in the case of each Assignment delivered after the date hereof, will be duly executed and delivered by Opportunity, and this Agreement shall effect valid Conveyances of Receivables and the Related Security and the Other Conveyed Property related thereto, enforceable against Opportunity and creditors of and purchasers from Opportunity, and this Agreement, the RLSA and such Transaction Documents shall constitute legal, valid and binding obligations of Opportunity enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, conservatorship, receivership, liquidation or other similar laws affecting the enforcement of creditors' rights generally and general principles of equity.

   (f) <u>No Violation</u>. The consummation of the transactions contemplated by this Agreement, the RLSA and the Transaction Documents, and the fulfillment of the terms of this Agreement, the RLSA and the Transaction Documents to which it is a party, shall not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the certificate of formation or operating agreement of Opportunity, or any material indenture, agreement, mortgage, deed of trust or other instrument to which Opportunity is a party or by which it is bound or any of its properties are subject, or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any

DZB006146

such indenture, agreement, mortgage, deed of trust or other instrument, other than liens created under this Agreement or the RLSA, or violate any law, order, rule or regulation applicable to Opportunity of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over Opportunity or any of its properties, or in any way affect Opportunity's ability to perform its obligations under this Agreement.

(g)    No Proceedings.  There are no proceedings or investigations pending or, to the best of Opportunity's knowledge, threatened against Opportunity before any court, regulatory body, administrative agency or other tribunal or governmental instrumentality having jurisdiction over Opportunity or its properties (i) asserting the invalidity of this Agreement or any of the Transaction Documents, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or any of the Transaction Documents, (iii) seeking any determination or ruling that could have an adverse effect (other than an inconsequential adverse effect) on the performance by Opportunity of its obligations under, or the validity or enforceability of, this Agreement or any of the Transaction Documents, (iv) that would reasonably be likely to have an adverse effect (other than an inconsequential adverse effect) on the federal or state income tax attributes of, or seek to impose any excise, franchise, transfer or similar tax upon, the transfer and acquisition of the Receivables and the Related Security and the Other Conveyed Property related thereto Conveyed hereunder or (v) that would reasonably be likely to have an adverse effect on the Receivables and the Related Security and Other Conveyed Property related thereto Conveyed to the Purchaser hereunder.

(h)    No Consents.  Opportunity is not required to obtain the consent of any other party or any consent, license, approval or authorization, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement except those which may have been obtained.

(i)    Approvals.  All approvals, authorizations, orders or other actions of any person, corporation or other organization, or of any court, governmental agency or body or official, required in connection with the execution and delivery by Opportunity of this Agreement and the consummation of the transactions contemplated hereby (including the Conveyance of Receivables and the Related Security and the Other Conveyed Property related thereto to the Purchaser) have been or will be taken or obtained on or prior to the date hereof or the applicable Conveyance Date.

(j)    Chief Executive Office.  The chief executive office of Opportunity and the office where Opportunity keeps its records regarding the Receivables is at 60 South Sixth Street, Suite 2540, Minneapolis, Minnesota 55402.  Opportunity has not been known by any name other than Opportunity Finance, LLC and is not known by any trade names other than those listed on Schedule E hereto.

(k)    Solvency.  Opportunity is solvent and will not become insolvent after giving effect to the transactions contemplated by this Agreement and the other Transaction

DZB006147

Documents. Opportunity, after giving effect to the transactions contemplated by this Agreement and the other Transaction Documents, will have an adequate amount of capital to conduct its business in the foreseeable future.

(l)    Accounting Treatment. For accounting purposes, Opportunity will treat the transactions effected by this Agreement and the RLSA as sales of assets to, or contributions of assets to the capital of, the Purchaser in accordance with GAAP. Opportunity's financial records shall reflect that the assets Conveyed hereunder have been Conveyed to the Purchaser, are no longer owned by Opportunity and are not intended to be available to the creditors of Opportunity.

(m)    Compliance With Laws. Opportunity has complied and will comply in all material respects with all applicable laws, rules, regulations, judgments, agreements, decrees and orders with respect to its business and properties.

(n)    Taxes. Opportunity has filed on a timely basis all tax returns (including, without limitation, foreign, federal, state, local and otherwise) required to be filed, is not liable for taxes payable by any other Person and has paid or made adequate provisions for the payment of all taxes, assessments and other governmental charges due from Opportunity other than those being disputed in good faith and in respect of which it has made proper reserves on its books. No tax lien or similar adverse claim has been filed, and no claim is being asserted, with respect to any such tax, assessment or other governmental charge. Any taxes, fees and other governmental charges payable by Opportunity in connection with the execution and delivery of this Agreement and the other Transaction Documents and the transactions contemplated hereby or thereby have been paid.

(o)    Request Notices. Each Request Notice is accurate in all material respects.

(p)    Assignments. Each Assignment is accurate in all material respects.

(q)    No Liens, Etc. The Receivables and the Related Security and Other Conveyed Property related thereto to be Conveyed to the Purchaser hereunder are owned by Opportunity free and clear of any Adverse Claim or restrictions on transferability and Opportunity has the full right, corporate power and lawful authority to Convey the same and interests therein and, upon Conveyance thereof hereunder, the Purchaser will have acquired good and marketable title to and a valid and perfected ownership interest in such Receivables and the Related Security and Other Conveyed Property related thereto, free and clear of any Adverse Claim or restrictions on transferability. No effective financing statement or other instrument similar in effect covering all or any part of any Receivables or the Related Security and Other Conveyed Property related thereto Conveyed hereunder is on file in any recording office, except such as may have been filed in favor of the Collateral Agent as "Secured Party" or "Assignee", in each case, for the benefit of the Secured Parties or except as shall be released upon the Conveyance of such Receivables and Related Security and Other Conveyed Property to the Purchaser.

Doc# 30385857.WPD                                        12

DZB006148

(r)     [intentionally omitted.]

(s)     Information True and Correct.  All information heretofore or hereafter furnished by or on behalf of Opportunity to the Purchaser or any assignee thereof in connection with this Agreement or any transaction contemplated hereby is and will be true and complete in all material respects as of the date furnished or provided and does not and will not omit to state a material fact necessary to make the statements contained therein not misleading.

(t)     ERISA Compliance.  Opportunity is in compliance with ERISA and the Internal Revenue Code of 1986 with respect to any "employee benefit plans" (within the meaning of Section 3(1) of ERISA) it maintains or contributes to (the "Plans").  There are no liens outstanding against any such Plan or against Opportunity with respect to any such Plan and Opportunity has not incurred and does not expect to incur any liabilities (except for premium payments arising in the ordinary course of business) to the Pension Benefit Guaranty Corporation (or any successor thereto) in connection with such Plans.  Opportunity does not contribute to any "multiemployer pension plan," as defined in Section 4001 of ERISA.

(u)     No Material Adverse Effect; No Default.  (i) Opportunity is not a party to any indenture, loan or credit agreement or any lease or other agreement or instrument or subject to any charter or corporate restriction that would reasonably be likely to have, and no provision of applicable law or governmental regulation would reasonably be likely to have, a material adverse effect on the condition (financial or otherwise), business, operations, results of operations or properties of Opportunity, or would reasonably be likely to have such an effect on the ability of Opportunity to carry out its obligations under this Agreement and the other Transaction Documents to which Opportunity is a party and (ii) Opportunity is not in default under or with respect to any contract, agreement, lease or other instrument to which Opportunity is a party and which is material to Opportunity's condition (financial or otherwise), business, operations or properties, and Opportunity has not delivered or received any notice of default thereunder.

(v)     Financial or Other Condition.  There has been no material adverse change in the condition (financial or otherwise), business, operations, results of operations, or properties of Opportunity since December 31, 2000.

(w)     Investment Company Status.  Opportunity is not an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.  The consummation of the transactions contemplated by this Agreement and the other Transaction Documents by Opportunity will not violate any provision of such Act or any rule, regulation or order issued by the Securities and Exchange Commission thereunder.

(x)     No Shared Obligations.  There is not now, nor will there be at any time in the future, any agreement or understanding between Opportunity and the Purchaser (other than as

DZB006149

expressly set forth herein or in the other Transaction Documents) providing for the allocation or sharing of obligations to make payments or otherwise in respect of any taxes, fees, assessments or other governmental charges.

(y)     Representation and Warranties True and Correct. Each of the representations and warranties of Opportunity contained in this Agreement and the other Transaction Documents to which it is a party is true and correct in all respects as of the date made or deemed made and Opportunity hereby makes each such representation and warranty to, and for the benefit of, the Purchaser as if the same were set forth in full herein.

(z)     Intent of Opportunity. Opportunity has not Conveyed any interest in any Receivable or the Related Security or the Other Conveyed Property related thereto to the Purchaser with any intent to hinder, delay or defraud any of Opportunity's creditors.

(aa)    Consideration. Opportunity has received fair consideration and reasonably equivalent value in exchange for the Conveyance of the Receivables and the Related Security and the Other Conveyed Property related thereto Conveyed hereunder.

(bb)    Compliance with Limited Liability Company Documents. All actions required under the limited liability company agreement of Opportunity in connection with the Conveyance of the Receivables, and the Related Security and the Other Conveyed Property related thereto to the Purchaser have been taken in full compliance with such document.

SECTION 4.2   Representations and Warranties of the Purchaser. The Purchaser makes the following representations and warranties, on which Opportunity relies in Conveying Receivables and the Related Security and the Other Conveyed Property related thereto to the Purchaser hereunder. Such representations are made as of the execution and delivery of this Agreement, but shall survive the Conveyance of Receivables and the Related Security and the Other Conveyed Property related thereto Conveyed hereunder and the grant of a security interest in such Receivables and the Related Security and the Other Conveyed Property related thereto by the Purchaser under the RLSA.

(a)     Organization and Good Standing. The Purchaser has been duly organized and is validly existing and in good standing as a limited liability company under the laws of the State of Delaware, with the power and authority to own its properties and to conduct its business as such properties are currently owned and such business is currently conducted, and had at all relevant times, and has, full power, authority and legal right to acquire and own the Receivables and the Related Security and the Other Conveyed Property related thereto Conveyed hereunder.

(b)     Due Qualification. The Purchaser is duly qualified to do business as a foreign limited liability company in good standing, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification, licenses and/or approvals.

DZB006150

(c)     Power and Authority.  The Purchaser has the power, authority and legal right to execute and deliver this Agreement and to carry out the terms hereof and to acquire the Receivables and the Related Security and the Other Conveyed Property related thereto Conveyed hereunder; and the execution, delivery and performance of this Agreement and all of the documents required pursuant hereto have been duly authorized by the Purchaser by all necessary action.

(d)     No Consent Required.  The Purchaser is not required to obtain the consent of any other Person, or any consent, license, approval or authorization or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery or performance of this Agreement, the RLSA and the Transaction Documents to which it is a party, except for such as have been obtained, effected or made.

(e)     Binding Obligation.  This Agreement constitutes a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject, as to enforceability, to applicable bankruptcy, insolvency, reorganization, conservatorship, receivership, liquidation or other similar laws affecting the enforcement of creditors' rights generally and general principles of equity.

(f)     No Violation.  The execution, delivery and performance by the Purchaser of this Agreement, the consummation of the transactions contemplated by this Agreement, the RLSA and the Transaction Documents to which it is a party and the fulfillment of the terms of this Agreement, the RLSA and the Transaction Documents to which it is a party do not and will not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the organizational documents of the Purchaser, or conflict with or breach any of the terms or provisions of, or constitute (with or without notice or lapse of time) a default under, any indenture, agreement, mortgage, deed of trust or other instrument to which the Purchaser is a party or by which the Purchaser is bound or to which any of its properties are subject, or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement, mortgage, deed of trust or other instrument (other than liens created hereunder or under the RLSA), or violate any law or any order, rule or regulation, applicable to the Purchaser or its properties, of any federal or state regulatory body, any court, administrative agency, or other governmental instrumentality having jurisdiction over the Purchaser or any of its properties.

(g)     No Proceedings.  There are no proceedings or investigations pending, or, to the best of the Purchaser's knowledge, threatened against the Purchaser before any court, regulatory body, administrative agency, or other tribunal or governmental instrumentality having jurisdiction over the Purchaser or its properties: (i) asserting the invalidity of this Agreement, the RLSA or any of the Transaction Documents, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, the RLSA or any of the Transaction Documents, (iii) seeking any determination or ruling that could have an adverse effect (other than an inconsequential adverse effect) on the performance by the Purchaser of its obligations under, or the validity or enforceability of, this Agreement, the RLSA or any of the Transaction

DZB006151

Documents, (iv) that may have an adverse effect (other than an inconsequential adverse effect) on the federal or state income tax attributes of, or seek to impose any excise, franchise, transfer or similar tax upon, the transfer and acquisition of the Receivables and the Related Security and the Other Conveyed Property related thereto Conveyed hereunder or (v) that could have an adverse effect on the Receivables and Other Conveyed Property related thereto Conveyed to the Purchaser hereunder.

(h)   Consideration.  The Purchaser has given fair consideration and reasonably equivalent value in exchange for the Conveyance of the Receivables and the Other Conveyed Property related thereto Conveyed hereunder.

In the event of any breach of a representation and warranty made by the Purchaser hereunder, Opportunity covenants and agrees that Opportunity will not take any action to pursue any remedy that it may have hereunder, in law, in equity or otherwise, until a year and a day have passed since all obligations of the Purchaser under the RLSA and any other Transaction Document have been paid in full.  Opportunity and the Purchaser agree that damages will not be an adequate remedy for a breach of this covenant and that this covenant may be specifically enforced by the Purchaser or any assignee thereof.

SECTION 4.3   Indemnification.

(a)   Opportunity shall defend, indemnify and hold harmless the Purchaser and any assignee thereof (each an "Indemnified Person") from and against any and all costs, expenses, losses, damages, claims, and liabilities, suffered or sustained by any Indemnified Person arising out of or resulting from any breach of Opportunity's representations, warranties and/or covenants contained herein, except for any such amounts (A) resulting from any gross negligence, bad faith or willful misconduct of such Indemnified Person or (B) to the extent that providing such indemnity would constitute recourse for losses due to the uncollectibility of any Receivable due to the insolvency, bankruptcy, or financial inability to pay of the Related Opportunity Loan Borrower arising or occurring at any time after the date of its Conveyance hereunder (the "Excluded Amounts").

(b)   [Intentionally omitted.]

(c)   Opportunity will defend and indemnify and hold harmless each Indemnified Person against any and all costs, expenses, losses, damages, claims and liabilities, other than Excluded Amounts, arising out of or resulting from any action taken by Opportunity, other than in accordance with this Agreement or the RLSA, in respect of any portion of the Receivables or the Related Security and the Other Conveyed Property related thereto which are Conveyed hereunder.

(d)   Opportunity agrees to pay, and shall defend, indemnify and hold harmless each Indemnified Party from and against, any taxes (other than taxes based upon the income of an Indemnified Party and taxes that would constitute Excluded Amounts) that may at any time be

DZB006152

asserted against any Indemnified Party by reason of the purchase, contribution or ownership of the Receivables, the Related Security or Other Conveyed Property, including, without limitation, any sales, gross receipts, general corporation, tangible or intangible personal property, privilege, or license taxes and costs and expenses in defending against the same, arising by reason of the acts to be performed by Opportunity under this Agreement and imposed against such Person. Without limiting the foregoing, in the event that the Purchaser, the Custodian, the Backup Servicer, the Trustee, the Collateral Agent, the Facility Insurer, the Lender or the Agent receives actual notice of any Transfer Taxes arising out of the Conveyance of any Receivable, the Related Security with respect thereto, the related Opportunity Loan Collateral and/or any other related Other Conveyed Property from Opportunity to the Purchaser under this Agreement, on written demand by such party, or upon Opportunity otherwise being given notice thereof, Opportunity shall pay, and otherwise indemnify and hold the Purchaser, the Custodian, the Backup Servicer, the Trustee, the Collateral Agent, the Facility Insurer, the Lender and the Agent harmless, on an after-tax basis, from and against any and all such Transfer Taxes (it being understood that the Purchaser, the Custodian, the Backup Servicer, the Trustee, the Collateral Agent, the Facility Insurer, the Lender and the Agent shall have no contractual obligation to pay such Transfer Taxes).

    (e)    Opportunity shall defend, indemnify, and hold harmless each Indemnified Party from and against any and all costs, expenses, losses, claims, damages, and liabilities, other than Excluded Amounts, to the extent that such cost, expense, loss, claim, damage, or liability arose out of, or was imposed upon such Indemnified Party through the negligence, willful misfeasance, or bad faith of Opportunity in the performance of its duties under this Agreement or by reason of reckless disregard of Opportunity's obligations and duties under this Agreement.

    (f)    Opportunity shall indemnify, defend and hold harmless each Indemnified Party from and against any loss, liability or expense, other than Excluded Amounts, imposed upon, or incurred by, any such Indemnified Party as a result of the failure of any Receivable or the Related Security or the Other Conveyed Property related thereto which are Conveyed hereunder, to comply with all requirements of applicable law as of its Conveyance Date.

    (g)    Opportunity shall indemnify, defend and hold harmless each Indemnified Party from and against any loss, liability or expense, other than Excluded Amounts, imposed upon, or incurred by, any such Indemnified Party as a result of the failure by Opportunity to comply with all requirements of Section 6.1 hereof.

    Indemnification under this Section 4.3 shall include reasonable fees and expenses of counsel and expenses of litigation. The indemnity obligations hereunder shall be in addition to any obligation that Opportunity may otherwise have under applicable law or any other Transaction Document.

DZB006153

## ARTICLE V

## COVENANTS OF OPPORTUNITY

SECTION 5.1      Protection of Title of the Purchaser.

(a)      On or prior to the date hereof, Opportunity shall have filed or caused to be filed UCC-1 financing statements (each in a form proper for filing in the applicable jurisdiction) naming Opportunity as seller or debtor, naming the Purchaser as purchaser or secured party, naming the Collateral Agent, for the benefit of the Secured Parties, as assignee and describing the Receivables, Related Security and the Other Conveyed Property being Conveyed by it to the Purchaser as collateral, with the office of the Secretary of State of the State of Delaware and in such other locations as the Purchaser or the Agent shall have required, without limiting the foregoing, Opportunity hereby authorizes the Purchaser and/or any assignee thereof to prepare and file any such UCC-1 financing statements. From time to time thereafter, Opportunity shall authorize, execute (if applicable) and file such financing statements and cause to be executed (if applicable) and filed such continuation statements, all in such manner and in such places as may be required by law (or deemed desirable by the Purchaser or any assignee thereof) to fully perfect, preserve, maintain and protect the interest of the Purchaser under this Agreement, and the security interest of the Collateral Agent for the benefit of the Secured Parties under the RLSA, in the Receivables, Related Security and the Other Conveyed Property related thereto which are Conveyed hereunder, as the case may be, and in the proceeds thereof. Opportunity shall deliver (or cause to be delivered) to the Purchaser, the Custodian, the Backup Servicer, the Trustee, the Collateral Agent, the Facility Insurer, the Lender and the Agent file-stamped copies of, or filing receipts for, any document filed as provided above, as soon as available following such filing. In the event that Opportunity fails to perform its obligations under this subsection, the Purchaser or the Collateral Agent may perform such obligations, at the expense of Opportunity, and Opportunity hereby grants to the Purchaser and the Collateral Agent an irrevocable power of attorney to take any and all steps in order to perform such obligations in Opportunity's or in its own name, as applicable, and on behalf of Opportunity, as are necessary or desirable, in the determination of the Purchaser or Collateral Agent or any assignee thereof.

(b)      On or prior to each Conveyance Date hereunder, Opportunity shall take all steps necessary under all applicable law in order to transfer and assign to the Purchaser the Receivables and the Related Security and the Other Conveyed Property related thereto being Conveyed on such Conveyance Date to the Purchaser so that, upon the Conveyance of such Receivable and the Other Conveyed Property related thereto from Opportunity to the Purchaser pursuant to the terms hereof on such Conveyance Date, the Purchaser will have acquired good and marketable title to and a valid and perfected ownership interest in such Receivables and Other Conveyed Property related thereto, free and clear of any Adverse Claim or restrictions on transferability (other than Permitted Liens). On or prior to each Conveyance Date hereunder, Opportunity shall take all steps required under applicable law to allow the Purchaser to assign its

DZB006154

perfected, first priority security interest in the Opportunity Loan Collateral to the Collateral Agent for the benefit of the Secured Parties.

(c)     With respect to each Receivable Conveyed hereunder, Opportunity shall, prior to or on the Conveyance Date of such Receivable, (i) take or cause to be taken all steps necessary under all applicable law in order to cause a valid, subsisting and enforceable perfected, first priority security interest to exist in Opportunity's favor in the Opportunity Loan Collateral securing such Receivable, (ii) have assigned the perfected, first priority security interest in the Opportunity Loan Collateral referred to in clause (i) above to the Purchaser by means of a Conveyance hereunder and (iii) take or cause to be taken all steps necessary under all applicable law in order to allow the Purchaser to assign the perfected, first priority security interest in the Opportunity Loan Collateral referred to in clause (i) above to the Collateral Agent, for the benefit of the Secured Parties, pursuant to Section 2.10 of the RLSA;

(d)     [Intentionally omitted.]

(e)     [Intentionally omitted.]

(f)     Opportunity shall not change its name, identity, jurisdiction of formation, or corporate structure in any manner that would or could make any financing statement or continuation statement filed by Opportunity (or by the Purchaser on behalf of Opportunity) in accordance with paragraph (a) above seriously misleading within the meaning of § 9-507 of the UCC (or any similar provision of the UCC), unless Opportunity shall have given the Purchaser, the Custodian, the Backup Servicer, the Trustee, the Collateral Agent, the Facility Insurer, the Lender and the Agent at least 30 days prior written notice thereof, and shall promptly file appropriate amendments to all previously filed financing statements and continuation statements.

(g)     Opportunity shall give the Purchaser, the Custodian, the Backup Servicer, the Trustee, the Collateral Agent, the Facility Insurer, the Lender and the Agent at least 30 days prior written notice of any relocation of its jurisdiction of formation if, as a result of such relocation, the applicable provisions of the UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new financing statement. Opportunity shall at all times maintain its jurisdiction of formation, each office from which it services Receivables and its principal executive office within the United States of America.

(h)     Opportunity shall maintain its computer systems so that, from and after the time of Conveyance under this Agreement of Receivables (and the Related Security and the Other Conveyed Property related thereto) to the Purchaser and the grant of a security interest in such Receivables (and the Related Security and the Other Conveyed Property related thereto) by the Purchaser to the Agent for the benefit of the Lender, Opportunity's master computer records (including archives) that shall refer to such a Receivable (and the Related Security and the Other Conveyed Property related thereto) indicate clearly that such Receivable (and the Related Security and the Other Conveyed Property related thereto) has been Conveyed to the Purchaser hereunder and Pledged by the Purchaser under the RLSA. Indication of the Collateral Agent's

DZB006155

security interest for the benefit of the Secured Parties in a Receivable (and the Related Security and the Other Conveyed Property related thereto) Conveyed hereunder shall be deleted from or modified on Opportunity's computer systems when, and only when, such Conveyed Receivable shall be (i) paid off by the related Opportunity Loan Borrower, (ii) liquidated by the Servicer, (iii) purchased by Opportunity in accordance with Section 6.1 or 6.2 hereof or (v) released by the Agent pursuant to Section 2.20 of the RLSA.

(i)     If, subject to the provisions of the RLSA, at any time Opportunity shall propose to sell, grant a security interest in, or otherwise transfer any interest in any loan receivables to any prospective purchaser, lender or other transferee, Opportunity shall give to such prospective purchaser, lender, or other transferee computer tapes, records, or print-outs (including any restored from archives) that, if they shall refer in any manner whatsoever to any Receivable (and/or the Related Security and the Other Conveyed Property related thereto) Conveyed hereunder, shall indicate clearly that such Receivable (and the Related Security and the Other Conveyed Property related thereto) has been so Conveyed to the Purchaser and is subject to a security interest in favor of the Collateral Agent for the benefit of the Secured Parties.

SECTION 5.2     Other Liens or Interests.  Except for the Conveyances hereunder, Opportunity will not sell, pledge, assign, transfer or otherwise convey to any other Person, or grant, create, incur, assume or suffer to exist any Adverse Claim on the Receivables or the Related Security and the Other Related Property related thereto Conveyed hereunder or any interest therein, and Opportunity shall defend the right, title, and interest of the Purchaser and the Collateral Agent for the benefit of the Secured Parties in and to such Receivables and the Related Security and the Other Conveyed Property related thereto against all Adverse Claims of third parties claiming through or under Opportunity.

SECTION 5.3     Costs and Expenses.  Opportunity shall pay all reasonable, documented costs and disbursements in connection with the performance of its obligations hereunder and the Transaction Documents to which it is a party.

SECTION 5.4     Financial Covenants.

(a)     Opportunity shall at all times have and maintain a Tangible Net Worth in an amount which shall not be less than an amount equal to $12,000,000.

## ARTICLE VI

## PURCHASES BY OPPORTUNITY

SECTION 6.1     Purchase of Receivables Upon Breach of Warranty.  In the event of the occurrence of an Opportunity Purchase Event, Opportunity shall, unless such Opportunity Purchase Event shall have been cured in all respects, purchase from the Purchaser

DZB006156

each Receivable Conveyed hereunder which is effected by or related to such Opportunity
Purchase Event from the Purchaser within 30 days of the discovery by or notice (from any
Person) to Opportunity of such Opportunity Purchase Event, and Opportunity shall pay to the
Purchaser (by means of a transfer to the Collection Account) the Outstanding Principal Balance
of such Receivable as of the date of the purchase thereof from the Purchaser. Notwithstanding
any other provision of this Agreement or the RLSA to the contrary, the obligation of Opportunity
under this Section shall not terminate upon a termination of Opportunity as Servicer under the
RLSA and shall be performed in accordance with the terms hereof notwithstanding the failure of
the Servicer or the Purchaser to perform any of their respective obligations with respect to such
Receivable under the RLSA. It is understood and agreed that the obligation of Opportunity to
cure an Opportunity Purchase Event or purchase the Receivables Conveyed hereunder which are
effected by or related to such Opportunity Purchase Event shall (i) constitute the sole remedy
against Opportunity with respect to such Opportunity Purchase Event available to the Purchaser,
the Agent or the Lender or any assignee of any of the foregoing (except for indemnities, if
applicable, provided for under Section 4.3 hereof or under the RLSA) and (ii) is not intended to,
and shall not, constitute a guaranty of the collectibility or payment of any Receivable which is
not collected, not paid or uncollectible on account of the insolvency, bankruptcy, or financial
inability to pay of the related Opportunity Loan Borrower.

SECTION 6.2   Reassignment of Purchased Receivables.  Upon deposit in the
Collection Account of the price paid to the Purchaser for any Receivable purchased by
Opportunity under Section 6.1, the Purchaser shall (and shall request the Collateral Agent to)
take such steps as may be reasonably requested by Opportunity in order to assign to Opportunity
all of the Purchaser's and the Collateral Agent's right, title and interest in and to such Receivable
and all security and documents and all Related Security and Other Conveyed Property Conveyed
to the Purchaser directly relating thereto, without recourse, representation or warranty of any
kind, except as to the absence of liens, charges or encumbrances created by or arising solely as a
result of actions of the Purchaser or the Agent. Such assignment shall be a sale and assignment
outright, and not for security. If, following the reassignment of a Receivable, in any enforcement
suit or legal proceeding, it is held that Opportunity may not enforce any such Receivable on the
ground that it shall not be a party in interest or a holder entitled to enforce such Receivable, the
Purchaser shall, at the expense of Opportunity, take such steps as Opportunity, deems reasonably
necessary to enforce such Receivable, including bringing suit in the Purchaser's name.

SECTION 6.3   Limited Repurchase Obligations.

(a)   Purchaser shall have the right to require Opportunity to accept
reassignment of any Receivable that becomes a PCA Defaulted Receivable on the date specified
in the notice given by the Purchaser pursuant to the next sentence (the "Reassignment Date");
provided, however, that in connection with any such reassignment, the Reassignment Amount
payable by Opportunity shall be limited to the Limited Recourse Balance (as defined below) as
of the close of business of the immediately-preceding calendar month. Purchaser shall give
Opportunity prior written notice requiring Opportunity to accept reassignment of any PCA
Defaulted Receivable, which notice shall identify such PCA Defaulted Receivable in reasonable

DZB006157

detail.  On any Reassignment Date with respect to a PCA Defaulted Receivable, Opportunity shall pay the Purchaser, in immediately available funds by deposit into the Collection Account the Reassignment Amount with respect to such PCA Defaulted Receivable.  Upon the payment of such Reassignment Amount, Purchaser shall be deemed to have assigned, transferred and conveyed to Opportunity, all of Purchaser's right title and interest in such PCA Defaulted Receivable, without recourse, representation or warranty (except that Purchaser shall be deemed to have represented and warranted that such PCA Defaulted Receivable is free and clear of all Adverse Claims created by or through Purchaser); provided, however, that if such Reassignment Amount shall be greater than the Limited Recourse Balance (as defined below) applied in satisfaction thereof (the amount by which such Reassignment Amount shall exceed such Limited Recourse Balance is herein referred to as the "Excess Amount"), then the Purchaser shall have a retained interest (the "Retained Interest") in such PCA Defaulted Receivable which shall be superior to the interest of Opportunity therein and all Collections received in respect of such PCA Defaulted Receivable shall be first applied in respect of such Retained Interest until such Excess Amount is paid in full.  Any such Retained Interest shall not be deemed an Adverse Claim for purposes of the immediately preceding sentence.

(b)      Opportunity shall establish on its books a special record-keeping account (the "Limited Recourse Account"), and shall calculate the balance in such account (the "Limited Recourse Balance") as of the close of business each calendar month in the manner set forth in this Section 6.3.  The Limited Recourse Balance (as calculated prior to taking into account any Reassignment Amount to be paid) as of the close of each calendar month shall be equal to the sum of (a) the Limited Recourse Balance as of the end of the calendar month immediately preceding such calendar month, plus (b) 2% times the aggregate outstanding balance of all Receivables that became Conveyed Receivables during such calendar month, minus (c) 2% times the aggregate original balance of all Conveyed Receivables that were paid in full during such calendar month (whether from payments from or on behalf of the Opportunity Loan Borrower thereof, or amounts paid from Opportunity pursuant to Section 6.1 or otherwise).  Any Reassignment Amount actually paid by Opportunity to Purchaser pursuant to this Section 6.3 shall be subtracted from the Limited Recourse Balance at such time the Reassignment Amount is actually paid by Opportunity to Purchaser. As of the date of this Agreement the Limited Recourse Balance is $0.00.

SECTION 6.4     Waivers.  No failure or delay on the part of the Purchaser or any assignee thereof, in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other or future exercise thereof or the exercise of any other power, right or remedy.

DZB006158

## ARTICLE VII

## MISCELLANEOUS

SECTION 7.1    Liability of Opportunity.  Opportunity shall be liable in accordance herewith only to the extent of the obligations in this Agreement specifically undertaken by Opportunity and with respect to its representations and warranties hereunder.

SECTION 7.2    Merger or Consolidation of Opportunity or the Purchaser.  Any corporation or other entity (i) into which Opportunity or the Purchaser may be merged or consolidated, (ii) resulting from any merger or consolidation to which Opportunity or the Purchaser is a party or (iii) succeeding to the business of Opportunity or the Purchaser, provided that in any of the foregoing cases such corporation or other entity shall execute an agreement of assumption to perform every obligation of Opportunity or the Purchaser, as the case may be, under this Agreement and, whether or not such assumption agreement is executed, shall be the successor to Opportunity or the Purchaser, as the case may be, hereunder (without relieving Opportunity or the Purchaser of its responsibilities hereunder, if it survives such merger or consolidation) without the execution or filing of any document or any further act by any of the parties to this Agreement.  Opportunity or the Purchaser shall prior to the effective date thereof inform the other party, the Custodian, the Backup Servicer, the Trustee, the Collateral Agent, the Facility Insurer, the Lender and the Agent of such merger, consolidation or purchase and assumption.  Notwithstanding the foregoing, as a condition to the consummation of the transactions referred to in clauses (i), (ii) and (iii) above, (x) immediately after giving effect to such transaction, no representation or warranty made pursuant to Sections 4.1 and 4.2 or covenant made pursuant to Section 4.3, shall have been breached in any respect (for purposes hereof, such representations and warranties, other than those contained in Section 4.1(a), shall speak as of the date of the consummation of such transaction), (y) Opportunity or the Purchaser, as applicable, shall have delivered to the Agent an Officer's Certificate and an Opinion of Counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section 7.2 and that all conditions precedent, if any, provided for in this Agreement relating to such transaction have been complied with, and (z) Opportunity or the Purchaser, as applicable, shall have delivered to the Agent an Opinion of Counsel, stating, in the opinion of such counsel, either (Λ) all financing statements and continuation statements and amendments thereto have been executed and filed that are necessary to preserve and protect the security interest of the Collateral Agent for the benefit of the Secured Parties in the Conveyed Receivables and the Other Conveyed Property related thereto and reciting the details of the filings or (B) no such action shall be necessary to preserve and protect such interest.

SECTION 7.3    Limitation on Liability of Opportunity and Others.
Opportunity and any manager, employee or agent of Opportunity may rely in good faith on the advice of counsel respecting any matters arising under this Agreement.  Opportunity shall not be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its obligations under this Agreement, the RLSA or the Transaction Documents to which it is a party.

DZB006159

SECTION 7.4    Amendment. This Agreement may be amended by Opportunity and the Purchaser only with the prior written consent of the Agent and the Facility Insurer.

SECTION 7.5    Notices. All demands, notices and communications to Opportunity or the Purchaser hereunder shall be in writing, personally delivered, or sent by telecopier (subsequently confirmed in writing), reputable overnight courier or mailed by certified mail, return receipt requested, and shall be deemed to have been given upon receipt (a) in the case of Opportunity at the following address:  60 South Sixth Street, Suite 2540, Minneapolis, Minnesota 55402, Attention:  Jon Sabes, Facsimile No.:  612-339-8922 or such other address as shall be designated by Opportunity in a written notice delivered to the Purchaser and (b) in the case of the Purchaser at the following address:  60 South Sixth Street, Suite 2540 (B), Minneapolis, Minnesota 55402, Attention:  Jon Sabes, Facsimile No.:  612-339-8922 or such other address as shall be designated by a party in a written notice delivered to the other party.

SECTION 7.6    Merger and Integration. Except as specifically stated otherwise herein, this Agreement, each Assignment, the RLSA and the Transaction Documents set forth the entire understanding of the parties relating to the subject matter hereof, and all prior understandings, written or oral, are superseded by this Agreement, the RLSA and the Transaction Documents. This Agreement may not be modified, amended, waived or supplemented except as provided herein.

SECTION 7.7    Severability of Provisions. If any one or more of the covenants, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, provisions or terms shall be deemed severable from the remaining covenants, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

SECTION 7.8    Costs, Expenses and Taxes.

(a)    In addition to the rights of indemnification granted to the Purchaser pursuant to Section 4.3, Opportunity agrees to pay on demand all costs and expenses in connection with the preparation, execution and delivery of this Agreement and the other documents and agreements to be delivered hereunder, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Purchaser with respect thereto and with respect to advising the Purchaser as to its rights and remedies under this Agreement, and Opportunity agrees to pay all costs and expenses, if any of the Purchaser and any assignee thereof (including reasonable counsel fees and expenses), in connection with the enforcement of this Agreement and the other documents to be delivered hereunder excluding, however, any costs of enforcement or collection of Receivables purchased by the Purchaser hereunder.

(b)    In addition, Opportunity agrees to pay any and all stamp and other taxes and fees payable in connection with the execution, delivery, filing and recording of this Agreement or the other documents or agreements to be delivered hereunder, and Opportunity

DZB006160

agrees to save the Purchaser and its assigns and transferees harmless from and against any liabilities with respect to or resulting from any delay in paying or omission to pay such taxes and fees.

SECTION 7.9 Governing Law. THIS AGREEMENT SHALL, IN ACCORDANCE WITH SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF THAT WOULD CALL FOR THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

SECTION 7.10 Counterparts. For the purpose of facilitating the execution of this Agreement and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and all of which counterparts shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 7.11 Nonpetition Covenant. Until one year and one day after the latest maturing commercial paper issued by the Lender in connection with the funding of Loans under the RLSA shall be paid in full, neither Opportunity nor the Purchaser shall petition or otherwise invoke the process of any court or government authority for the purpose of commencing or sustaining a case against such Lender (and, in the case of Opportunity, against the Purchaser) under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of such Lender (or the Purchaser) or any substantial part of its property, or ordering the winding up or liquidation of the affairs of such Lender (or the Purchaser).

SECTION 7.12 Binding Effect; Assignability.

(a) This Agreement shall be binding upon and inure to the benefit of Opportunity, the Purchaser and their respective successors and assigns; provided, however, that Opportunity may not assign its rights or obligations hereunder or any interest herein without the prior written consent of the Purchaser and any assignee thereof. The Purchaser may assign all of its rights hereunder to an assignee, and such assignee shall have all rights of the Purchaser under this Agreement (as if such assignee were the Purchaser hereunder).

(b) This Agreement shall create and constitute the continuing obligation of the parties hereto in accordance with its terms, and shall remain in full force and effect until such time, after the Collection Date, when all of the Receivables Conveyed hereunder are collected in full; provided, however, that rights and remedies with respect to any breach of any representation and warranty made by Opportunity pursuant to Article IV hereof and the provisions of Article V and Section 7.11 shall be continuing and shall survive any termination of this Agreement.

DZB006161

SECTION 7.13   Third Party Beneficiary. Each of the parties hereto hereby acknowledges that the Purchaser intends to assign all of its rights under this Agreement to the Collateral Agent for the benefit of the Secured Parties and Opportunity hereby consents to such assignment. The Collateral Agent, the Agent, the Lender and the Facility Insurer shall be third party beneficiaries of, and shall be entitled to enforce the Purchaser's rights and remedies under, this Agreement to the same extent as if they were parties hereto.

SECTION 7.14   Term. This Agreement shall commence as of the date of execution and delivery hereof and shall continue in full force and effect until the later of (a) the payment in full with respect to each Receivable Conveyed hereunder and (b) the Collection Date under the RLSA.

[Remainder of page intentionally left blank.]

DZB006162

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

OPPORTUNITY FINANCE, LLC

By: _____

Name: TON SHAES

Title: CEO

OPPORTUNITY FINANCE
SECURITIZATION, LLC

By: _____

Name: TON SHAES

Title: President

[Signature Page to Purchase and Contribution Agreement]

EXHIBIT A

## FORM OF ASSIGNMENT

ASSIGNMENT, dated as of _____, 20__ between Opportunity Finance, LLC ("Opportunity") and Opportunity Finance Securitization, LLC (the "Purchaser").

1.     We refer to the Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") dated as of December 28, 2001 between Opportunity and the Purchaser. All provisions of the Purchase and Contribution Agreement are incorporated herein by reference. All capitalized terms used herein and not defined herein shall have the meanings set forth in the Purchase and Contribution Agreement.

2.     Opportunity does hereby Convey, to the Purchaser, without recourse (except to the extent specifically provided in the Purchase and Contribution Agreement), and the Purchaser hereby acquires, all right, title and interest of Opportunity in, to and under the Receivables identified as such on Annex A hereto and the Related Security and the Other Conveyed Property related thereto (including, without limitation, all right, title and interest of Opportunity in and to the Opportunity Loan Collateral related to each such Receivable) pursuant to the Purchase and Contribution Agreement.

3.     In accordance with Section 4.1(a) of the Purchase and Contribution Agreement, all of the representations and warranties set forth on the Schedule of Representations are true and correct with respect to all of the Receivables identified in Annex A hereto as of the date of this Assignment.

4.     Opportunity does hereby remake the representations and warranties set forth in Section 4.1 of the Purchase and Contribution Agreement with full force and effect as if the same were fully set forth herein.

IN WITNESS WHEREOF, the parties have caused this Assignment to be executed by their respective officers thereunto duly authorized, as of the date first above written.

OPPORTUNITY FINANCE, LLC

By:_____

    Name:

    Title:

OPPORTUNITY FINANCE
SECURITIZATION, LLC

By:_____

    Name:

    Title:

DZB006165

SCHEDULE A

<u>REPRESENTATIONS AND WARRANTIES OF OPPORTUNITY WITH RESPECT TO
RECEIVABLES REFERRED TO IN ANY ASSIGNMENT</u>

The following representations and warranties are made by Opportunity, as of the date of
any Assignment by Opportunity, with respect to each Receivable (other than with respect to
Receivables related to Existing Opportunity Loans) which is referred to in any such Assignment
(or any schedule thereto).

**Opportunity Loan/Opportunity Loan Borrower**

1.      Such Receivable and the related Opportunity Loan Promissory Note and
Contract represents the genuine, legal, valid, binding and full recourse payment obligation of the
Opportunity Loan Borrower thereunder, and such Opportunity Loan Promissory Note and
Contract are enforceable by Opportunity in accordance with its terms and the Opportunity Loan
Borrower, with respect to such Opportunity Loan Promissory Note and Contract (and any
guarantor of the Opportunity Loan Borrower's obligations thereunder), had full legal capacity to
execute and deliver such Contract and any other documents related thereto.

2.      The Opportunity Loan Promissory Note related to such Receivable constitutes a
"Promissory Note" within the meaning of the UCC, and there exists only one original copy of
such Opportunity Loan Promissory Note.

3.      All requirements of applicable federal, state and local laws, and regulations
thereunder, in respect of such Receivable and the related Opportunity Loan Documents, the
execution, delivery and performance thereof, and the granting of a security interest in the
Opportunity Loan Collateral to Opportunity pursuant thereto, have been complied with in all
respects.

4.      The Coupon Rate with respect to such Receivable at the time it is Conveyed
hereunder is equal to or greater than 15%.

5.      The Credit Agreement which evidences the financing arrangement between
Opportunity and the Opportunity Loan Borrower related to such Receivable is in substantially
the form attached to the RLSA as <u>Exhibit F-2</u>, the Opportunity Loan Promissory Note related to
such Receivable is in substantially the form attached to the RLSA as <u>Exhibit G-2</u> and the
Opportunity Loan Security Agreement which grants a security interest in the Existing
Opportunity Loan Collateral related to such Receivable to Opportunity is in substantially the
form attached to the RLSA as <u>Exhibit H-2</u>.

6.      The Contract related to such Receivable contains enforceability provisions (i)
permitting the acceleration of the payments thereunder if the Opportunity Loan Borrower is in

DZB006166

default under such Contract and (ii) sufficient to enable the Purchaser to repossess or foreclose upon the Opportunity Loan Collateral related thereto.

7.    Such Receivable represents the genuine, legal, valid, binding and full recourse payment obligation of the Opportunity Loan Borrower thereunder, and the Contract related to such Receivable is enforceable by Opportunity and its successors and assigns, in accordance with its terms.

8.    The Opportunity Loan Collateral related to such Receivable is not subject to any tax lien or any other Adverse Claim (other than Permitted Liens).

9.    The Opportunity Loan Collateral related to such Receivable has not been repossessed from the related Approved Distributor or any other Person or otherwise foreclosed upon.

10.    Neither the operation of law nor any of the terms of any Contract related to such Receivable nor the exercise by Opportunity, the Purchaser or the Opportunity Loan Borrower of any right under any Contract related to such Receivable will render such Contract unenforceable in whole or in part nor subject to any right of rescission, setoff, claim, counterclaim or defense, and no such right of rescission, set-off, claim, counterclaim or defense exists as of the date of such Conveyance.

11.    The Opportunity Loan Promissory Note related thereto has an original or extended term of not more than 150 days.

12.    The Opportunity Loan Security Agreement related to such Receivable grants a valid and enforceable security interest to Opportunity in the Opportunity Loan Collateral related to such Receivable.

13.    The Opportunity Loan Borrower with respect to such Receivable is an Approved Distributor SPV.

14.    With respect to such Receivable the amount of the Opportunity Loan provided to an Opportunity Loan Borrower in respect thereof does not exceed 98% of the Purchase Price of the Subject Inventory related thereto, the full amount of the difference between such Opportunity Loan and the Purchase Price of such Subject Inventory has been advanced or contributed to the Opportunity Loan Borrower as a contribution of capital or pursuant to a New Opportunity Loan Subordinate Note, and the full amount of such Purchaser Price has been (or, immediately upon funding of the Loan with respect to such Receivable will be) paid to the related Manufacturer.

15.    The Opportunity Loan Borrower and any guarantor with respect to such Receivable received a completely legible, completely filled-in copy of the related Contract and

Sch. A-2

DZB006167

each other document that such Opportunity Loan Borrower or such Person executing a Guaranty was required to sign in connection with the Opportunity Loans.

16.     The Opportunity Loan Borrower with respect to such Receivable (and any guarantor of the Approved Retailer's obligations thereunder), had full legal capacity to execute and deliver the related Opportunity Loan Promissory Note and each other Opportunity Loan Document related to such Receivable and any other documents related thereto.

17.     The Opportunity Loan Borrower obligated to make payments under such Receivable has been directed by Opportunity to remit by wire transfer all amounts payable with respect to such Receivable directly into the Collection Account.

18.     Neither the Opportunity Loan Borrower nor the Approved Distributor with respect to such Receivable is a partner, member or affiliate of Opportunity or the Purchaser.

19.     The Opportunity Loan Borrower with respect to such Receivable has a billing address in the United States and the Opportunity Loan Collateral, which is the subject of each such Receivable, is located in the United States.

20.     Such Receivable is not the subject of any litigation, or subject to any right of rescission, setoff, counterclaim or defense on the part of the Opportunity Loan Borrower thereunder.

21.     With respect to such Receivable there has been no default, breach, violation or event permitting acceleration under the terms of any such Contract related to such Receivable, and no condition exists or event has occurred and is continuing that with notice, the lapse of time or both would constitute a default, breach, violation or event permitting acceleration under the terms of any such Contract related to such Receivable, and there has been no waiver of any of the foregoing.

22.     With respect to such Receivable all of the proceeds of the Opportunity Loan related thereto shall have been paid, by Opportunity on behalf of the Opportunity Loan Borrower and its related Approved Distributor, to the Manufacturer of the Subject Inventory as partial payment of the Purchase Price of such Subject Inventory pursuant to a Manufacturer Sale Order.

23.     With respect to the Contract related to such Receivable, no advances have been made by Opportunity under such Contract other than for Receivables, Related Security and Other Conveyed Property which have been Conveyed to the Purchaser under this Agreement.

24.     The Contract related to such Receivable is in full force and effect in accordance with its terms and Opportunity has not suspended or reduced any payments or obligations due or to become due thereunder by reason of a default by any other party to such Contract related to such Receivable; there are no proceedings pending or, to the best of Opportunity's knowledge, threatened asserting insolvency of such Opportunity Loan Borrower; there are no proceedings

DZB006168

pending or, to the best of Opportunity's knowledge, threatened wherein such Opportunity Loan
Borrower, any other obligated party or any governmental agency has alleged that such Contract
related to such Receivable is illegal or unenforceable.

## Opportunity

26.    Opportunity has duly fulfilled all obligations on its part to be fulfilled under or
in connection with the origination, acquisition and assignment of each such Receivable and the
related Opportunity Loan Collateral, including, without limitation, giving any notices or consents
necessary to effect the Conveyance of such Receivable, Related Security and Other Conveyed
Property to the Purchaser, and has done nothing to impair the rights of the Purchaser in such
Receivable, Related Security and Other Conveyed Property and the related Opportunity Loan
Documents or payments with respect thereto.

26.    Opportunity had full legal capacity to execute and deliver the Opportunity Loan
Documents related to such Receivable and any other documents related thereto.

27.    Opportunity shall have received from the Approved Distributor and the
Opportunity Loan Borrower all reports (including, without limitation, each financial statement
delivered to Opportunity) required to be delivered to Opportunity pursuant to the Contract related
to such Receivable and all such reports shall have been delivered to the Purchaser.

28.    Such Receivable, at the time of origination and at all times prior to the date of
its Conveyance hereunder, conformed to all requirements of the Credit and Collection Policy
applicable to such Receivable and, in any case, such Receivable is not and has not been, prior to
the date of its Conveyance, required to be written off pursuant to the Credit and Collection
Policy.

29.    No such Receivable is assumable by another Person in a manner which would
release the Opportunity Loan Borrower thereof from such Opportunity Loan Borrower's
obligations to Opportunity or the Purchaser.

30.    Such Receivable (i) was originated by Opportunity in the ordinary course of
Opportunity's business and is consistent with similar transactions in the customary trade finance
business and Opportunity has all necessary licenses and permits to originate such Receivable
under Applicable Laws (ii) was Conveyed by Opportunity to the Purchaser under this
Agreement, and (iii) contains customary and enforceable provisions, such that the rights and
remedies of the Purchaser (and any assignee thereof) are adequate for realization against the
Opportunity Loan Collateral related thereto.

31.    Such Receivable was originated by Opportunity (i) in a manner consistent with
its standard underwriting procedures and (ii) without any fraud or material misrepresentation on
the part of the related Opportunity Loan Borrower or Opportunity.

Doc# 30385857.WPD                              Sch. A-4

DZB006169

32.     Opportunity has no systematic selection procedures with respect to the selection of Receivables to be Conveyed hereunder and no such selection procedures have been utilized in selecting any such Receivable from all other similar Receivables originated or purchased by Opportunity.

33.     The origination and collection practices used by the Servicer with respect to such Receivable have been in all respects legal, proper, prudent and customary in the inventory financing business.

## Loan Purchase Agreement

34.     Opportunity had good and marketable title to such Receivable at the time such Receivable, Related Security and Other Conveyed Property was Conveyed to the Purchaser pursuant to this Agreement.

35.     Such Receivable, Related Security and Other Conveyed Property was Conveyed by Opportunity to the Purchaser without any fraud or material misrepresentation on the part of Opportunity.

36.     The transfer, assignment and conveyance of the Receivable, Related Security and Other Conveyed Property from Opportunity to the Purchaser of such Receivable and the grant of the security interest in such Receivable, Related Security and Other Conveyed Property related thereto does not violate the terms or provisions of any agreement to which Opportunity is a party or by which it is bound.

37.     No such Receivable was originated in, or is subject to the laws of, any jurisdiction the laws of which would make unlawful, void or voidable the Conveyance of such Receivable, Related Security and Other Conveyed Property under this Agreement and Opportunity has not entered into any agreement with any Opportunity Loan Borrower that prohibits, restricts or conditions the Conveyance of such Receivable, Related Security and Other Conveyed Property.

38.     No such Receivable has been sold, transferred, assigned or pledged by Opportunity to any Person other than the Purchaser. Opportunity has not taken any action to convey any right to any Person that would result in such Person having a right to payments due under any such Receivable or to impair the rights of the Purchaser in such Receivable, Related Security and Other Conveyed Property or any proceeds thereof.

39.     Such Receivable was payable to Opportunity immediately prior to its Conveyance under this Agreement and has not been endorsed by Opportunity to any other Person other than the Purchaser.

DZB006170

**Receivables**

40.     Such Receivable and the related Opportunity Loan Promissory Note, (i) is not contractually past due at the time of its Conveyance hereunder and (ii) is in full force and effect and no provision thereof has been waived, amended, altered or modified in any respect since its origination except in conformity with the Credit and Collection Policy.

41.     Such Receivable was originated in the United States and is denominated in United States Dollars.

42.     Such Receivable is secured by an Eligible Retailer Receivable.

43.     The Receivable File with respect to such Receivable is complete and accurate in all respects.

44.     With respect to such Receivable there exists a Receivable File and such Receivable File contains a complete and accurate copy (or if required hereunder, an originally executed copy) of each item listed in the definition of Receivable File with respect to such Receivable and such Receivable File is in the possession of the Custodian.

45.     Such Receivable constitutes an "Account" within the meaning of the UCC.

46.     The information pertaining to such Receivable set forth in the New Opportunity Loan Schedules of Representations (and any schedule thereto) is true and correct in all respects.

47.     Such Receivable is secured by a perfected first priority security interest in the Opportunity Loan Collateral and each Retailer Receivable included in such Opportunity Loan Collateral is an Eligible Retailer Receivable.

48.     No such Receivable has been repaid, prepaid, satisfied, subordinated or rescinded, and the Opportunity Loan Collateral securing such Receivable has not been released from the Lien of the Collateral Agent, for the benefit of the Secured Parties, in whole or in part.

49.     With respect to such Receivable the Approved Retailer related thereto is not the obligor of more than one Delinquent Receivable.

50.     The Subject Inventory related to such Receivable is not a vehicle or other type of merchandise which requires titling in the name of a secured party in order to perfect a secured party's interest therein.

51.     The Opportunity Loan Documents related to such Receivable have not been amended, rewritten or modified from the original terms thereof except to correct clerical errors or to extend the term thereof in conformity with the Credit and Collection Policy.

DZB006171

52.    With respect to such Receivable, none of Opportunity, the Opportunity Loan Borrower, the Approved Retailer or the Manufacturer is an affiliate of any other such party.

## Security Interest

53.    With respect to such Receivable (i) the related Opportunity Loan Borrower has taken all steps necessary under all applicable law (including the filing of a UCC financing statement) in order to cause a valid, subsisting and enforceable perfected, first priority security interest to exist in Opportunity's favor in the Opportunity Loan Collateral securing such Opportunity Loan, and (ii) Opportunity shall have assigned the perfected, first priority security interest in the Opportunity Loan Collateral referred to in clause (i) above to the Purchaser pursuant to this Agreement and (iii) Opportunity shall have taken all actions necessary to allow the Purchaser to assign the perfected, first priority security interest in the Opportunity Loan Collateral referred to in clause (i) above to the Collateral Agent, for the benefit of the Secured Parties, pursuant to Section 2.10 of the RLSA.

54.    [Reserved.].

55.    With respect to such Receivable, by the Conveyance Date on which such Receivable is Conveyed hereunder and on each relevant date thereafter, Opportunity will have caused its master computer records relating to such Receivable to be clearly and unambiguously marked to show that such Receivable has been sold or contributed under this Agreement.

56.    No Opportunity Loan Collateral with respect to such Receivable has been released from the Lien of Opportunity prior to the Conveyance hereunder.

DZB006172

DZB006173

SCHEDULE B

## REPRESENTATIONS AND WARRANTIES OF OPPORTUNITY WITH RESPECT TO RETAILER RECEIVABLES RELATED TO RECEIVABLES REFERRED TO IN ANY ASSIGNMENT

The following representations and warranties are made by Opportunity with respect to each Retailer Receivable related to a Receivable (other than with respect to Retailer Receivables which are related to Existing Opportunity Loans) which is referred to in any such Assignment (or any schedule thereto).

**Manufacturer Sale Order; Subject Inventory**

1.      An Approved Distributor and a Manufacturer have fully executed and delivered a Manufacturer Sale Order, in substantially the form of one of the contracts attached to the RLSA as Exhibit L-2, with respect to the Subject Inventory related to such Retailer Receivable.

2.      The Manufacturer selling the Subject Inventory with respect to such Retailer Receivable received a completely legible, completely filled-in copy of the Manufacturer Sale Order and each other document that such Manufacturer was required to sign in connection with the purchase of the related Subject Inventory.

3.      Immediately prior to the payment of the Purchase Price pursuant to the Manufacturer Sale Order with respect to the Subject Inventory related to such Retailer Receivable the related Manufacturer had good and marketable title to such Subject Inventory and immediately upon payment of such Purchase Price the Approved Distributor has good and marketable title to such Subject Inventory free and clear of all Liens, security interests, charges, encumbrance and other rights of claims (other than Permitted Liens).

4.      The Subject Inventory related to such Retailer Receivable is located in the United States.

5.      During the period beginning at the time the Purchase Price is paid to the Manufacturer of the Subject Inventory until the Subject Inventory is accepted by the related Approved Retailer, the Subject Inventory related to such Retailer Receivable shall be covered by a Subject Inventory Insurance Policy from an insurance company acceptable to the Agent and the Facility Insurer and on terms and in an amount acceptable to the Agent and the Facility Insurer and all premiums thereof for such period have been prepaid in full.

6.      The purchase of the Subject Inventory related to such Retailer Receivable by the Approved Distributor does not violate the terms or provisions of any agreement or any law to which the Approved Distributor is a party or by which it is bound.

DZB006174

7.      If delivered to the related Approved Retailer, the Subject Inventory related to such Retailer Receivable was delivered to such Approved Retailer in good repair, without defects and is in proper working order and such Approved Retailer has accepted the related Subject Inventory and after reasonable opportunity to inspect and test such Subject Inventory, has not notified the Approved Distributor or the Opportunity Loan Borrower of any defects therein.

8.      If delivered to the related Approved Retailer, the Subject Inventory related to such Retailer Receivable was delivered in accordance with the related Retailer Purchase Order and the related Approved Distributor (and, if applicable, the related Opportunity Loan Borrower) has fully performed its obligations under such Retailer Purchase Order.

9.      Every manufacturer warranty with respect to the Subject Inventory related to such Retailer Receivable, both express and implied, is in full force and effect.

10.     If delivered to the related Approved Retailer, the Subject Inventory related to such Retailer Receivable was delivered to the related Approved Retailer within seventy-five (75) calendar days of the payment of the related Purchase Price to the related Manufacturer.  If the Subject Inventory has not been delivered to the related Approved Retailer, no more than seventy-five (75) calendar days have passed since the date of payment of the related Purchase Price to the related Manufacturer.

**Approved Retailer; Retailer Purchase Order**

11.     The Retailer with respect to such Retailer Receivable was an Approved Retailer at the time the Receivable related to the Opportunity Loan secured by such Retailer Receivable was Conveyed hereunder and no Bankruptcy Event has occurred and is continuing with respect to such Retailer.

12.     Such Retailer Receivable arises under a fully executed Retailer Purchase Order between an Approved Retailer and an Approved Distributor substantially in the form of one of the purchase orders attached to the RLSA as Exhibit K.

13.     The Approved Retailer and any Person executing a Guaranty with respect to such Retailer Receivable received a completely legible, completely filled-in copy of such Retailer Purchase Order and each other document that such Approved Retailer or such Person executing a Guaranty was required to sign in connection with the purchase of the related Subject Inventory.

14.     The Retailer Purchase Order related to such Retailer Receivable is in full force and effect in accordance with its terms and neither the Approved Distributor nor the Approved Retailer has or will have suspended or reduced payments or obligations due or to become due thereunder by reason of default by any other party to such Retailer Purchase Order.

DZB006175

15.      With respect to such Retailer Receivable the Approved Retailer party to the related Retailer Purchase Order has a billing address in the United States.

16.      Such Retailer Receivable was originated in the United States and is denominated in United States dollars.

17.      Such Retailer Receivable and the related Retailer Purchase Order represents the genuine, legal, valid, binding and full recourse payment obligation of the Approved Retailer thereunder, and such Retailer Purchase Order is enforceable by the Approved Distributor and its successors and assigns, in accordance with its terms.

18.      The Approved Retailer obligated to make payments in respect of such Retailer Receivable has been directed by the related Approved Distributor and Opportunity Loan Borrower to remit by wire transfer all amounts payable with respect to such Retailer Receivable directly into the Opportunity Collection Account.

19.      The Approved Retailer with respect to such Retailer Receivable (and any Person executing a Guaranty in connection therewith), had full legal capacity to execute and deliver the related Retailer Purchase Order and each other Inventory Financing Document related to such Retailer Receivable and any other documents related thereto.

20.      Each such Retailer Receivable and the related Retailer Purchase Order, at the time of origination and at all times prior to the Conveyance of the related Receivable hereunder, conformed to all requirements of the credit and collection policy of such Approved Distributor and, in any case, no such Retailer Receivable and such related Retailer Purchase Order is not and has not been, prior to the date of the Conveyance of the related Receivable hereunder, is required to be written off pursuant to the credit and collection policy of such Approved Distributor.

**Approved Distributor; Retailer Receivable**

21.      The Approved Distributor which originated the Retailer Purchase Order related to such Retailer Receivable was an Approved Distributor at the time the Receivable related to the Opportunity Loan secured by such Retailer Receivable and no Bankruptcy Event has occurred and is continuing with respect to such Approved Distributor.

22.      The Approved Distributor with respect to such Retailer Receivable received fully executed copies of each of the Inventory Financing Document related to such Retailer Receivable and all other documents executed in connection therewith.

23.      Such Retailer Receivable and the related Retailer Purchase Order was originated by an Approved Distributor in the ordinary course such Approved Distributor's business and such Approved Distributor had all necessary licenses and permits to originate the Retailer Receivable and the related Retailer Purchase Order under all Applicable Laws.

DZB006176

24.      Such Retailer Receivable arose out of a Consummated Retail Financing Transaction.

25.      Such Retailer Receivable and the related Retailer Purchase Order was originated by the Approved Distributor without any fraud or material misrepresentation on the part of the such Approved Distributor or the related Approved Retailer.

26.      Such Retailer Receivable, the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) and Subject Inventory Security Interest are not subject to laws which would make unlawful, void or voidable the sale, transfer, pledge and/or assignment of Retailer Receivable, the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) and Subject Inventory Security Interest under the Approved Distributor Sale Agreement.

27.      The payment obligation under such Retailer Receivable is not assignable to any Person in a manner which would release the Approved Retailer thereof from such Approved Retailer's payment obligations thereunder.

28.      No systematic selection procedures adverse to the Opportunity Loan Borrower, Opportunity or the Purchaser have been utilized in selecting such Retailer Receivables (related to Receivables to be Conveyed hereunder) from all similar receivables originated by the related Approved Distributor.

29.      Such Retailer Receivable is not a Defaulted Retailer Receivable or a Delinquent Retailer Receivable.

30.      Such Retailer Receivable is in an amount that exceeds the aggregate amount of all payments to be made with respect to the Opportunity Loan related thereto.

31.      The Inventory Financing Documents related to such Retailer Receivable have not been amended, rewritten or modified from their original terms thereof except to correct clerical errors.

**Approved Distributor Sale Agreement**

32.      Such Retailer Receivable, the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) were sold to an Opportunity Loan Borrower pursuant to an Approved Distributor Sale Agreement substantially in the form attached to the RLSA as  Exhibit J-2.

33.      The Opportunity Loan Borrower which purchased such Retailer Receivable pursuant to the related Approved Distributor Sale Agreement is an Approved Distributor SPV.

DZB006177

34.    The Opportunity Loan Borrower which purchased such Retailer Receivable pursuant to the related Approved Distributor Sale Agreement has all necessary licenses and permits to own such Retailer Receivable, the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) and to enter into and perform its obligations under the Approved Distributor Sale Agreement related to such Retailer Receivable.

35.    The purchase of such Retailer Receivable, the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) by the Opportunity Loan Borrower and the grant of the Subject Inventory Security Interest, in each case, pursuant to the Approved Distributor Sale Agreement does not violate the terms or provisions of any agreement or any law to which the Opportunity Loan Borrower is a party or by which it is bound.

36.    The sale of such Retailer Receivable, and the related Retailer Purchase Order and other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) and the granting of the Subject Inventory Security Interest pursuant to an Approved Distributor Sale Agreement by the Approved Distributor does not violate the terms or provisions of any agreement or law to which the Approved Distributor is a party or by which it is bound.

37.    Such Retailer Receivable and the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) were sold by the Approved Distributor to the related Opportunity Loan Borrower without any fraud or material misrepresentation on the part of such Approved Distributor or such Opportunity Loan Borrower.

38.    The purchase of such Retailer Receivable and the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) by the Opportunity Loan Borrower constitutes a "true-sale" and the related Opportunity Loan Borrower (and the Agent and the Purchaser) shall have received an Opinion of Counsel to such effect.

39.    The Approved Distributor had good and marketable title to such Retailer Receivable, the Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) at the time the Retailer Receivable, the Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) related to such Retailer Receivable was sold to an Opportunity Loan Borrower pursuant to an Approved Distributor Sale Agreement.

40.    The Approved Distributor had good and marketable title to the Subject Inventory related to such Retailer Receivable at the time such Subject Inventory was granted as collateral security to an Opportunity Loan Borrower pursuant to an Approved Distributor Sale Agreement.

DZB006178

41.    The purchase of such Retailer Receivable, the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) by an Opportunity Loan Borrower pursuant to an Approved Distributor Sale Agreement does not violate the terms or provisions of any agreement or laws to which the Opportunity Loan Borrower is a party or by which it is bound.

42.    The Approved Distributor Sale Agreement related to such Retailer Receivable contains customary and enforceable provisions, such that the rights and remedies of the Opportunity Loan Borrower (and any assignee thereof) are adequate for realization of the Subject Inventory Security Interest granted therein.

43.    With respect to such Retailer Receivable, the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) and the Subject Inventory and the Subject Inventory Security Interest, the Approved Distributor has not entered into any agreement that prohibits, restricts or conditions the sale, transfer, pledge and/or assignment of such Retailer Receivable, the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) or the Subject Inventory or the Subject Inventory Security Interest.

44.    · Such Retailer Receivable, the related Retailer Purchase Order and the other "Related Rights" (as defined in the related Approved Distributor Sale Agreement) and Subject Inventory Security Interest are neither subject to any litigation, nor subject to any right of rescission, setoff, counterclaim or defense on the part of the Approved Retailer thereunder or any other Person.

45.    Such Retailer Receivable and the related Retailer Purchase Order were not contractually past due at the time of sale pursuant to the related Approved Distributor Sale Agreement.

46.    No term or provision of such Retailer Receivable or the related Retailer Purchase Order has been waived, amended, altered or modified in any respect since its origination (other in accordance with the Credit and Collection Policy).

47.    With respect to such Retailer Receivable, the related Retailer Purchase Order has payment terms of 90 days or less and does not permit any extension of such payment terms.

48.    With respect to such Retailer Receivable, there has been no default, breach or other violation of the terms of the Retailer Receivable or any other related Inventory Financing Document, and no condition exists or event has occurred and is continuing that with notice, lapse of time or both would constitute a default, breach, or other violation under the terms of such Inventory Financing Documents and there has been no waiver of any of the foregoing.

49.    With respect to such Retailer Receivable, none of the Approved Distributor, the Approved Retailer or the Manufacturer is an affiliate of any other such party.

DZB006179

**Capital Contribution or Approved Distributor Subordinated Loan**

50.    The Approved Distributor originating such Retailer Receivable shall have (i) made, in connection with such Retailer Receivable, a cash capital contribution to the related Opportunity Loan Borrower in an amount that is not less than 2% of the Purchase Price paid to the related Manufacturer for the purchase of the Subject Inventory related to such Retailer Receivable or (ii) advanced, in connection with such Retailer Receivable, an Approved Distributor Subordinated Loan to the related Opportunity Loan Borrower in a principal amount that is not less than 2% of the Purchase Price paid or to be paid to the related Manufacturer for the purchase of the Subject Inventory related to such Retailer Receivable.

51.    The Approved Distributor Subordinated Loan, if any, related to such Retailer Receivable is evidenced by a New Opportunity Loan Subordinated Note and such New Opportunity Loan Subordinated Note is the subject of a New Opportunity Loan Subordination Agreement.

**Opportunity Loan Borrower**

52.    The Opportunity Loan Borrower has not taken any action to convey any right to any Person that would result in such Person having a right to payments due under any such Retailer Receivable or impair the rights of the Opportunity Loan Borrower in such Retailer Receivable or any proceeds thereof.

**Security Interests**

53.    The Approved Distributor Sale Agreement related to such Retailer Receivable grants a valid and enforceable security interest to the Opportunity Loan Borrower in the Subject Inventory Collateral related to such Retailer Receivable.

54.    With respect to such Retailer Receivable (i) the related Approved Distributor has taken (or caused to be taken) all steps necessary under all applicable law (including the filing of the Approved Distributor Financing Statement with respect to such Subject Inventory Collateral) in order to cause a valid, subsisting and enforceable perfected, first priority security interest to exist in the Opportunity Loan Borrower's favor in the Subject Inventory Collateral securing each such Approved Distributor Sale Agreement, and (ii) such Opportunity Loan Borrower shall have assigned such perfected, first priority security interest in the Subject Inventory Collateral referred to in clause (i) to Opportunity pursuant to the Opportunity Loan Documents.

55.    With respect to such Retailer Receivable, no later than the date on which the Purchase Price is paid to the Manufacturer of the related Subject Inventory, the Approved Distributor and the Opportunity Loan Borrower will have caused their respective master computer records relating to such Retailer Receivable to be clearly and unambiguously marked

DZB006180

to show that such Retailer Receivable has been sold to such Opportunity Loan Borrower and subsequently Conveyed to the Purchaser under this Agreement.

56.    No Subject Inventory Collateral with respect to such Retailer Receivable has been released from the Lien of the Opportunity Loan Borrower.

Sch. B-8

DZB006181

SCHEDULE C

REPRESENTATIONS AND WARRANTIES
WITH RESPECT TO ELIGIBLE RECEIVABLES
RELATED TO EXISTING OPPORTUNITY LOANS

The following representations and warrantics are made by Opportunity, with respect to each Retailer Receivable related to a Receivable (with respect to Existing Opportunity Loans) which is referred to in any such Assignment (or any schedule thereto) dated the date of this Agreement.

**<u>Opportunity Loan/Opportunity Loan Borrower</u>**

1.      Such Receivable and the related Opportunity Loan Promissory Note and Contract represents the genuine, legal, valid, binding and full recourse payment obligation of the Opportunity Loan Borrower thereunder, and such Opportunity Loan Promissory Note and Contract is enforceable by the Purchaser, as assignee of Opportunity, in accordance with its terms and the Opportunity Loan Borrower, with respect to such Opportunity Loan Promissory Note and Contract (and any guarantor of the Opportunity Loan Borrower's obligations thereunder), had full legal capacity to execute and deliver such Contract and any other documents related thereto.

2.      The Opportunity Loan Promissory Note related to such Receivable constitutes a "Promissory Note" within the meaning of the UCC, and there exists only one original copy of such Opportunity Loan Promissory Note.

3.      All requirements of applicable federal, state and local laws, and regulations thereunder, in respect of such Receivable and the related Opportunity Loan Documents, the execution, delivery and performance thereof, and the granting of a security interest in the Opportunity Loan Collateral to Opportunity pursuant thereto, have been complied with in all respects.

4.      The Coupon Rate with respect to such Receivable at the time it is Conveyed hereunder is equal to or greater than 15%.

5.      The Credit Agreement which evidences the financing arrangement between Opportunity and the Opportunity Loan Borrower related to such Receivable is in substantially the form attached to the RLSA as <u>Exhibit F-1</u>, the Opportunity Loan Promissory Note related to such Receivable is in substantially the form attached to the RLSA as <u>Exhibit G-1</u> and the Opportunity Loan Security Agreement which grants a security interest in the Opportunity Loan Collateral related to such Receivable to Opportunity is in substantially the form attached to the RLSA as <u>Exhibit H-1</u>.

DZB006182

6.     The Contract related to such Receivable contains enforceability provisions (i) permitting the acceleration of the payments thereunder if the Opportunity Loan Borrower is in default under such Contract and (ii) sufficient to enable the Purchaser to repossess or foreclose upon the Opportunity Loan Collateral related thereto.

7.     Such Receivable represents the genuine, legal, valid, binding and full recourse payment obligation of the Opportunity Loan Borrower thereunder, and the Contract related to such Receivable is enforceable by Opportunity and its successors and assigns, in accordance with its terms.

8.     The Opportunity Loan Collateral related to such Receivable is not subject to any tax lien or any other Adverse Claim (other than Permitted Liens).

9.     The Opportunity Loan Collateral related to such Receivable has not been repossessed from the related the related Approved Distributor or any other Person or otherwise foreclosed upon.

10.     Neither the operation of law nor any of the terms of any such Contract related to such Receivable nor the exercise by Opportunity, the Purchaser or the Opportunity Loan Borrower of any right under any Contract related to such Receivable will render such Contract unenforceable in whole or in part nor subject to any right of rescission, setoff, claim, counterclaim or defense, and no such right of rescission, set-off, claim, counterclaim or defense as of the date of such Conveyance.

11.     The Opportunity Loan Promissory Note related thereto has an original or extended term of not more than 150 days.

12.     The Opportunity Loan Security Agreement related to such Receivable grants a valid and enforceable security interest to Opportunity in the Opportunity Loan Collateral related to such Receivable.

13.     The Opportunity Loan Borrower with respect to such Receivable is Existing Petters LLC.

14.     The Opportunity Loan Borrower and any guarantor with respect to such Receivable received a completely legible, completely filled-in copy of such Contract and each other document that such Opportunity Loan Borrower or such Person executing a Guaranty was required to sign in connection with the Opportunity Loans.

15.     The Opportunity Loan Borrower with respect to such Receivable (and any guarantor of the Approved Retailer's obligations thereunder), had full legal capacity to execute and deliver the related Opportunity Loan Promissory Note and each other Opportunity Loan Document related to such Receivable and any other documents related thereto.

Sch. C-2

DZB006183

16.     The Opportunity Loan Borrower obligated to make payments under such Receivable has been directed by Opportunity to remit by wire transfer all amounts payable with respect to such Receivable directly into the Collection Account.

17.     The Opportunity Loan Borrower with respect to such Receivable is not a partner, member or affiliate of Opportunity or the Purchaser.

18.     The Opportunity Loan Borrower with respect to such Receivable has a billing address in the United States and the Opportunity Loan Collateral, which is the subject of each such Receivable, is located in the United States.

19.     Such Receivable is not the subject of any litigation, or subject to any right of rescission, setoff, counterclaim or defense on the part of the Opportunity Loan Borrower thereunder.

20.     With respect to such Receivable there has been no default, breach, violation or event permitting acceleration under the terms of any such Contract related to such Receivable, and no condition exists or event has occurred and is continuing that with notice, the lapse of time or both would constitute a default, breach, violation or event permitting acceleration under the terms of any such Contract related to such Receivable, and there has been no waiver of any of the foregoing.

21.     With respect to such Receivable all of the proceeds of the Opportunity Loan related thereto shall have been paid, by Opportunity on behalf of the Opportunity Loan Borrower and its related Approved Distributor, to the Manufacturer of the Subject Inventory as partial payment of the Purchase Price of such Subject Inventory pursuant to a Manufacturer Sale Order.

22.     With respect to the Contract related to such Receivable, no advances have been made by Opportunity under such Contract other than for Receivables, Related Security and Other Conveyed Property which have been Conveyed to the Purchaser under this Agreement.

23.     The Contract related to such Receivable is in full force and effect in accordance with its terms and neither the Purchaser nor the Opportunity has or will have suspended or reduced any payments or obligations due or to become due thereunder by reason of a default by any other party to such Contract related to such Receivable; there are no proceedings pending or, to the best of the Opportunity's knowledge, threatened asserting insolvency of such Opportunity Loan Borrower; there are no proceedings pending or, to the best of the Opportunity's knowledge, threatened wherein such Opportunity Loan Borrower, any other obligated party or any governmental agency has alleged that such Contract related to such Receivable is illegal or unenforceable.

DZB006184

**Opportunity**

24.      Opportunity has duly fulfilled all obligations on its part to be fulfilled under or in connection with the origination, acquisition and assignment of each such Receivable and the related Opportunity Loan Collateral, including, without limitation, giving any notices or consents necessary to effect the Conveyance of such Receivable, Related Security and Other Conveyed Property to the Purchaser, and have done nothing to impair the rights of the Purchaser or the Agent in such Receivable, Related Security and Other Conveyed Property or payments with respect thereto.

25.      Opportunity had full legal capacity to execute and deliver the Opportunity Loan Documents related to such Receivable and any other documents related thereto.

26.      Such Receivable, at the time of origination and at all times prior to its Conveyance hereunder, conformed to all requirements of the Credit and Collection Policy applicable to such Receivable and, in any case, such Receivable is not and has not been at any time prior to its Conveyance , required to be written off pursuant to the Credit and Collection Policy.

27.      No such Receivable is assumable by another Person in a manner which would release the Opportunity Loan Borrower thereof from such Opportunity Loan Borrower's obligations to Opportunity or the Purchaser.

28.      Such Receivable (i) was originated by Opportunity in the ordinary course of Opportunity's business and is consistent with similar transactions in the customary trade finance business and Opportunity has all necessary licenses and permits to originate such Receivable under Applicable Laws and (ii) contains customary and enforceable provisions, such that the rights and remedies of the Purchaser (and any assignee thereof) are adequate for realization against the Opportunity Loan Collateral related thereto.

29.      Such Receivable was originated by Opportunity (i) in a manner consistent with its standard underwriting procedures and (ii) without any fraud or material misrepresentation on the part of the related Opportunity Loan Borrower or Opportunity.

30.      Opportunity has no systematic selection procedures with respect to the selection of Receivables to be Conveyed hereunder and no such selection procedures have been utilized in selecting any such Receivable from all other similar Receivables originated or purchased by Opportunity.

31.      The origination and collection practices used by Opportunity with respect to such Receivable have been in all respects legal, proper, prudent and customary in the inventory financing business.

DZB006185

**Loan Purchase Agreement**

32.    Opportunity had good and marketable title to such Receivable at the time such Receivable, Related Security and Other Conveyed Property was Conveyed to the Purchaser pursuant to this Agreement.

33.    Such Receivable, Related Security and Other Conveyed Property was Conveyed by Opportunity to the Purchaser without any fraud or material misrepresentation on the part of Opportunity.

34.    The transfer, assignment and conveyance of such Receivable, Related Security and Other Conveyed Property from Opportunity to the Purchaser of such Receivable, Related Security and Other Conveyed Property and the grant of the security interest in such Receivable related thereto does not violate the terms or provisions of any agreement to which Opportunity is a party or by which it is bound.

35.    No such Receivable was originated in, or is subject to the laws of, any jurisdiction the laws of which would make unlawful, void or voidable the sale, transfer, pledge and/or assignment of such Receivable, Related Security and Other Conveyed Property under this Agreement and Opportunity has not entered into any agreement with any Opportunity Loan Borrower that prohibits, restricts or conditions the sale, transfer, pledge and/or assignment of such Receivable, Related Security and Other Conveyed Property.

36.    No such Receivable has been sold, transferred, assigned or pledged by Opportunity to any Person other than the Purchaser. Opportunity has not taken any action to convey any right to any Person that would result in such Person having a right to payments due under any such Receivable or to impair the rights of the Purchaser in such Receivable, Related Security and Other Conveyed Property or any proceeds thereof.

37.    Such Receivable was payable to Opportunity immediately prior to its Conveyance under this Agreement and has not been endorsed by Opportunity to any other Person other than the Purchaser.

**Receivables**

38.    Such Receivable and the related Opportunity Loan Promissory Note, (i) is not contractually past due at the time of its Pledge hereunder and (ii) is in full force and effect and no provision thereof has been waived, amended, altered or modified in any respect since its origination except in conformity with the Credit and Collection Policy.

39.    Such Receivable was originated in the United States and is denominated in United States Dollars.

DZB006186

40.     With respect to such Receivable there exists a Receivable File and such Receivable File contains a complete and accurate copy (or if required hereunder, an originally executed copy) of each item listed in the definition of Receivable File with respect to such Receivable and such Receivable File is in the possession of the Custodian.

41.     Opportunity has delivered to the Purchaser the sole original counterpart of the Opportunity Loan Promissory Note related to such Receivable and the executed Allonge related thereto.

42.     Such Receivable is secured by an Eligible Retailer Receivable.

43.     Such Receivable constitutes an "Account" within the meaning of the UCC.

44.     No such Receivable is a Defaulted Receivable.

45.     The information pertaining to such Receivable set forth in the Schedules of Representations is true and correct in all respects.

46.     Such Receivable is secured by a perfected first priority security interest in the Opportunity Loan Collateral and each Retailer Receivable included in such Opportunity Loan Collateral is an Eligible Retailer Receivable.

47.     No such Receivable has been repaid, prepaid, satisfied, subordinated or rescinded, and the Opportunity Loan Collateral securing such Receivable has not been released from the Lien of the Collateral Agent, for the benefit of the Secured Parties, in whole or in part.

48.     With respect to such Receivable the Approved Retailer related thereto is not the obligor of more than one Delinquent Receivable.

49.     The Subject Inventory related to such Receivable is not a vehicle or other type of merchandise which requires titling in the name of a secured party in order to perfect a secured party's interest therein.

50.     The Opportunity Loan Documents related to such Receivable have not been amended, rewritten or modified from the original terms thereof except to correct clerical errors or to extend the term of an Opportunity Loan Promissory Note in conformity with the Credit and Collection Policy.

51.     With respect to such Receivable, none of Opportunity, the Opportunity Loan Borrower, the Approved Retailer or the Manufacturer is an affiliate of any other such party.

**Guarantees**

52.     Such Receivable is guaranteed by Petters pursuant to the Petters Company Guaranty and by Thomas J. Petters pursuant to the Petters Personal Guaranty and the guarantor

Doc# 30385857.WPD                              Sch. C-6

DZB006187

under each Guaranty related to such Receivable has full legal capacity to execute and deliver such Guaranty and all other documents related thereto.

53.     Each Guaranty related to such Receivable is in full force and effect in accordance with its terms.

54.     Each Guaranty related to such Receivable represents the genuine, legal, valid, binding, unconditional, absolute and continuing obligation of the guarantor thereunder, and such Guaranty is enforceable by the Agent and its successors and assigns, in accordance with its terms.

## Security Interest

55.     With respect to such Receivable (i) the related Opportunity Loan Borrower has taken all steps necessary under all applicable law (including the filing of a UCC financing statement) in order to cause a valid, subsisting and enforceable perfected, first priority security interest to exist in Opportunity's favor in the Opportunity Loan Collateral securing such Opportunity Loan, and (ii) Opportunity shall have assigned the perfected, first priority security interest in the Opportunity Loan Collateral referred to in clause (i) above to the Purchaser pursuant to this Agreement and (iii) Opportunity shall have taken all actions necessary to allow the Purchaser to assign the perfected, first priority security interest in the Opportunity Loan Collateral referred to in clause (i) above to the Collateral Agent, for the benefit of the Secured Parties, pursuant to Section 2.10 of the RLSA.

56.     [Reserved].

57.     With respect to such Receivable, by the Conveyance Date on which such Receivable is Conveyed hereunder and on each relevant date thereafter, Opportunity will have caused its master computer records relating to such Receivable to be clearly and unambiguously marked to show that such Receivable has been Conveyed under this Agreement.

58.     No Opportunity Loan Collateral with respect to such Receivable has been released from the Lien of Opportunity prior to the Conveyance of such Receivable hereunder.

DZB006188

SCHEDULE D

**REPRESENTATIONS AND WARRANTIES
WITH RESPECT TO ELIGIBLE RETAILER RECEIVABLES
RELATED TO THE EXISTING OPPORTUNITY LOANS**

The following representations and warranties are made by Opportunity with respect to each Retailer Receivable related to any Receivable (with respect to the Existing Opportunity Loans) which is referred to in the Assignment (or any Schedule thereto) dated as of the date of this Agreement.

**Manufacturer Sale Order; Subject Inventory**

1.      An Approved Distributor and a Manufacturer have fully executed and delivered a Manufacturer Sale Order, in substantially the form of one of the contracts attached to the RLSA as Exhibit L-1 with respect to the Subject Inventory related to such Retailer Receivable.

2.      The Manufacturer selling the Subject Inventory with respect to such Retailer Receivable received a completely legible, completely filled-in copy of the Manufacturer Sale Order and each other document that such Manufacturer was required to sign in connection with the purchase of the related Subject Inventory.

3.      Immediately prior to the payment of the Purchase Price pursuant to the Manufacturer Sale Order with respect to the Subject Inventory related to such Retailer Receivable the related Manufacturer had good and marketable title to such Subject Inventory and immediately upon payment of such Purchase Price the Approved Distributor has good and marketable title to such Subject Inventory free and clear of all Liens, security interests, charges, encumbrance and other rights of claims (other than Permitted Liens).

4.      The Subject Inventory related to such Retailer Receivable is located in the United States.

5.      During the period beginning at the time the Purchase Price is paid to the Manufacturer of the Subject Inventory until the Subject Inventory is accepted by the related Approved Retailer, the Subject Inventory related to such Retailer Receivable shall be covered by a Subject Inventory Insurance Policy from an insurance company acceptable to the Agent and the Facility Insurer and on terms and in an amount acceptable to the Agent and the Facility Insurer and all premiums thereof for such period have been prepaid in full.

6.      The purchase of the Subject Inventory related to such Retailer Receivable by the Approved Distributor does not violate the terms or provisions of any agreement or any law to which the Approved Distributor is a party or by which it is bound.

Doc# 30385857.WPD                          Sch. D-1

DZB006189

7.     If delivered to the related Approved Retailer, the Subject Inventory related to such Retailer Receivable was delivered to such Approved Retailer in good repair, without defects and is in proper working order and such Approved Retailer has accepted the related Subject Inventory and after reasonable opportunity to inspect and test such Subject Inventory, has not notified the Approved Distributor or the Opportunity Loan Borrower of any defects therein.

8.     If delivered to the related Approved Retailer, the Subject Inventory related to such Retailer Receivable was delivered in accordance with the related Retailer Purchase Order and the related Approved Distributor (and, if applicable, the related Opportunity Loan Borrower) has fully performed its obligations under such Retailer Purchase Order.

9.     Every manufacturer warranty with respect to the Subject Inventory related to such Retailer Receivable, both express and implied, is in full force and effect.

10.    If delivered to the related Approved Retailer, the Subject Inventory related to such Retailer Receivable was delivered to the related Approved Retailer within seventy-five (75) calendar days of the payment of the related Purchase Price to the related Manufacturer. If the Subject Inventory has not been delivered to the related Approved Retailer, no more than seventy-five (75) days have passed since the date of payment of the related Purchase Price to the related Manufacturer.

**Approved Retailer; Retailer Purchase Order**

11.    The Retailer with respect to such Retailer Receivable was an Approved Retailer at the time the Opportunity Loan was advanced in respect of such Retailer Receivable and no Bankruptcy Event has occurred and be continuing with respect to such Retailer.

12.    Such Retailer Receivable arises under a fully executed Retailer Purchase Order between an Approved Retailer and an Approved Distributor substantially in the form of one of the purchase orders attached to the RLSA as Exhibit K.

13.    The Approved Retailer and any Person executing a Guaranty with respect to such Retailer Receivable received a completely legible, completely filled-in copy of such Retailer Purchase Order and each other document that such Approved Retailer or such Person executing a Guaranty was required to sign in connection with the purchase of the related Subject Inventory.

14.    The Retailer Purchase Order related to such Retailer Receivable is in full force and effect in accordance with its terms and neither the Approved Distributor nor the Approved Retailer has or will have suspended or reduced payments or obligations due or to become due thereunder by reason of default by any other party to such Retailer Purchase Order.

15.    With respect to such Retailer Receivable the Approved Retailer party to the related Retailer Purchase Order has a billing address in the United States.

DZB006190

16.     Such Retailer Receivable was originated in the United States and is denominated in United States dollars.

17.     Such Retailer Receivable and the related Retailer Purchase Order represents the genuine, legal, valid, binding and full recourse payment obligation of the Approved Retailer thereunder, and such Retailer Purchase Order is enforceable by the Approved Distributor and its successors and assigns, in accordance with its terms.

18.     The Approved Retailer obligated to make payments in respect of such Retailer Receivable has been directed by the related Approved Distributor and Opportunity Loan Borrower to remit by wire transfer all amounts payable with respect to such Retailer Receivable directly into the Opportunity Collection Account so specified.

19.     The Approved Retailer with respect to such Retailer Receivable (and any Person executing a Guaranty in connection therewith), had full legal capacity to execute and deliver the related Retailer Purchase Order and each other Inventory Financing Document related to such Retailer Receivable and any other documents related thereto.

20.     Each such Retailer Receivable and the related Retailer Purchase Order, at the time of origination and at all times prior to the Conveyance of the related Receivable hereunder, conforms to all requirements of the credit and collection policy of such Approved Distributor and, in any case, no such Retailer Receivable and such related Retailer Purchase Order has not been, prior to the date of the Conveyance of the related Receivable, required to be written off pursuant to the credit and collection policy of such Approved Distributor.

**Approved Distributor; Retailer Receivable**

21.     No Bankruptcy Event has occurred and be continuing with respect to the Approved Distributor related to Such Retailer Receivable.

22.     The Approved Distributor with respect to such Retailer Receivable received fully executed copies of each Inventory Financing Document related to such Retailer Receivable and all other documents executed in connection therewith.

23.     Such Retailer Receivable and the related Retailer Purchase Order was originated by an Approved Distributor in the ordinary course such Approved Distributor's business and such Approved Distributor had all necessary licenses and permits to originate the Retailer Receivable and the related Retailer Purchase Order under all Applicable Laws.

24.     Such Retailer Receivable arose out of a Consummated Retail Financing Transaction.

DZB006191

25.     Such Retailer Receivable and the related Retailer Purchase Order was originated by the Approved Distributor without any fraud or material misrepresentation on the part of the such Approved Distributor or the related Approved Retailer.

26.     Such Retailer Receivable, the related Retailer Purchase Order, Subject Inventory and any other related rights sold pursuant to the related Existing Opportunity Loan Assignment Agreement are not subject to laws which would make unlawful, void or voidable the sale, transfer, pledge and/or assignment of Retailer Receivable, the related Retailer Purchase Order, the Subject Inventory and any other related rights sold pursuant to the related Existing Opportunity Loan Assignment Agreement.

27.     The payment obligation under such Retailer Receivable is not assignable to any Person in a manner which would release the Approved Retailer thereof from such Approved Retailer's payment obligations thereunder.

28.     No systematic selection procedures adverse to the Opportunity Loan Borrower, Opportunity or the Purchaser have been utilized in selecting such Retailer Receivables (related to the Receivables to be Conveyed hereunder) from all similar receivables originated by the related Approved Distributor.

29.     Such Retailer Receivable is not a Defaulted Retailer Receivable or a Delinquent Retailer Receivable.

30.     Such Retailer Receivable is in an amount that exceeds the aggregate amount of all payments to be made with respect to the Opportunity Loan related thereto.

31.     The Inventory Financing Documents related to such Retailer Receivable have not been amended, rewritten or modified from their original terms thereof except to correct clerical errors.

## Guarantees

32.     The guarantor under each Guaranty related to such Receivable has full legal capacity to execute and deliver such Guaranty and all other documents related thereto.

33.     Each Guaranty related to such Receivable is in full force and effect in accordance with its terms.

34.     Each Guaranty related to such Receivable represents the genuine, legal, valid, binding, unconditional, absolute and continuing obligation of the guarantor thereunder, and such Guaranty is enforceable by the Agent and its successors and assigns, in accordance with its terms.

DZB006192

**Existing Opportunity Loan Assignment Agreement**

35.     Such Retailer Receivable, the related Retailer Purchase Order, the Subject Inventory and any other related rights were sold pursuant to the related Existing Opportunity Loan Assignment Agreement substantially in the form attached to the RLSA as Exhibit J-1.

36.     The Opportunity Loan Borrower which purchased such Retailer Receivable pursuant to the related Approved Distributor Sale Agreement is Petters Finance, LLC, a Minnesota limited liability company.

37.     The Opportunity Loan Borrower which purchased such Retailer Receivable, the related Subject Inventory and other related rights pursuant to the related Existing Opportunity Loan Assignment Agreement has all necessary licenses and permits to own such Retailer Receivable, the related Subject Inventory and related rights.

38.     The purchase of such Retailer Receivable, the related Retailer Purchase Order, the Subject Inventory and the related rights by the Opportunity Loan Borrower, in each case, pursuant to the Existing Opportunity Loan Assignment Agreement does not violate the terms or provisions of any agreement or any law to which the Opportunity Loan Borrower is a party or by which it is bound.

39.     The sale of such Retailer Receivable, and the related Retailer Purchase Order, the Subject Inventory and any other related rights and the related Subject Inventory Security Interest pursuant to an Existing Opportunity Loan Assignment Agreement by the Approved Distributor does not violate the terms or provisions of any agreement or law to which the Approved Distributor is a party or by which it is bound.

40.     Such Retailer Receivable, the related Retailer Purchase Order, the related Subject Inventory and related rights were sold by the Approved Distributor to the related Opportunity Loan Borrower without any fraud or material misrepresentation on the part of such Approved Distributor or such Opportunity Loan Borrower.

41.     The Approved Distributor had good and marketable title to such Retailer Receivable, the Retailer Purchase Order, the Subject Inventory and the related rights at the time they were sold to an Opportunity Loan Borrower pursuant to an Approved Distributor Assignment Agreement.

42.     The purchase of such Retailer Receivable, the related Retailer Purchase Order, the Subject Inventory and the related rights by an Opportunity Loan Borrower pursuant to an Existing Opportunity Loan Assignment Agreement does not violate the terms or provisions of any agreement or laws to which the Opportunity Loan Borrower is a party or by which it is bound.

DZB006193

43.     The Existing Opportunity Loan Assignment Agreement related to such Retailer Receivable contains customary and enforceable provisions, such that the rights and remedies of the Opportunity Loan Borrower (and any assignee thereof) are adequate for realization of the interests in the Retailer Receivable, Subject Inventory and any other related rights granted therein.

44.     With respect to such Retailer Receivable, the related Retailer Purchase Order, the Subject Inventory and the Subject Inventory Security Interest, the Approved Distributor has not entered into any agreement that prohibits, restricts or conditions the sale, transfer, pledge and/or assignment of such Retailer Receivable, the related Retailer Purchase Order, the Subject Inventory or the related rights.

45.     Such Retailer Receivable, the related Retailer Purchase Order, the Subject Inventory, the related rights and Subject Inventory Security Interest are neither subject to any litigation, nor subject to any right of rescission, setoff, counterclaim or defense on the part of the Approved Retailer thereunder or any other Person.

46.     Such Retailer Receivable and the related Retailer Purchase Order were not contractually past due at the time of sale pursuant to the related Approved Distributor Sale Agreement.

47.     No term or provision of such Retailer Receivable or the related Retailer Purchase Order has been waived, amended, altered or modified in any respect since its origination (other in accordance with the Credit and Collection Policy).

48.     With respect to such Retailer Receivable, the related Retailer Purchase Order has payment terms of 90 days or less and does not permit any extension of such payment terms.

49.     With respect to such Retailer Receivable, there has been no default, breach or other violation of the terms of the Retailer Receivable or any other related Inventory Financing Document, and no condition exists or event has occurred and is continuing that with notice, lapse of time or both would constitute a default, breach, or other violation under the terms of such Inventory Financing Documents and there has been no waiver of any of the foregoing.

50.     With respect to such Retailer Receivable, none of the Approved Distributor, the Approved Retailer or the Manufacturer is an affiliate of any other such party.

## Approved Distributor Subordinated Loan

51.     The Approved Distributor originating such Retailer Receivable advanced an Approved Distributor Subordinated Loan under an Existing Opportunity Loan Subordinated Note to the related Opportunity Loan Borrower in a principal amount that, together with all other outstanding Approved Distributor Subordinated Loans advanced by such Approved Distributor to such Opportunity Loan Borrower under such Existing Opportunity Loan Subordinated Note, is

Doc# 30385857.WPD                              Sch. D-6

DZB006194

not less than 2% of the Purchase Prices paid to the related Manufacturers for the purchase of the Subject Inventory related to all outstanding Existing Opportunity Loans.

52.     The Approved Distributor Subordinated Loan related to such Retailer Receivable is evidenced by an Existing Opportunity Loan Subordinated Note, substantially in the form attached to the RLSA as Exhibit P and such Existing Opportunity Loan Subordinated Note is the subject of an Existing Opportunity Loan Subordination Agreement substantially in the form attached to the RLSA as Exhibit Q.

**Opportunity Loan Borrower**

53.     The Opportunity Loan Borrower has not taken any action to convey any right to any Person that would result in such Person having a right to payments due under any such Retailer Receivable or impair the rights of the Opportunity Loan Borrower in such Retailer Receivable or any proceeds thereof.

**Security Interests**

54.     The Existing Opportunity Loan Assignment Agreement related to such Retailer Receivable grants a valid and enforceable security interest to the Opportunity Loan Borrower in the Subject Inventory Collateral related to such Retailer Receivable.

55.     With respect to such Retailer Receivable (i) the related Approved Distributor has taken (or caused to be taken) all steps necessary under all applicable law (including the filing of the Approved Distributor Financing Statement with respect to such Subject Inventory Collateral) in order to cause a valid, subsisting and enforceable perfected, first priority security interest to exist in the Opportunity Loan Borrower's favor in the Subject Inventory Collateral securing each such Existing Opportunity Loan Assignment Agreement, and (ii) such Opportunity Loan Borrower shall have assigned such perfected, first priority security interest in the Subject Inventory Collateral referred to in clause (i) to Opportunity pursuant to the Opportunity Loan Documents.

56.     With respect to such Retailer Receivable, no later than the date on which the Purchase Price is paid to the Manufacturer of the related Subject Inventory, the Approved Distributor and the Opportunity Loan Borrower will have caused their respective master computer records relating to such Retailer Receivable to be clearly and unambiguously marked to show that such Retailer Receivable has been sold to such Opportunity Loan Borrower and subsequently pledged to the Opportunity Loan Borrower under the Opportunity Loan Documents.

57.     No Subject Inventory Collateral with respect to such Retailer Receivable has been released from the Lien of the Opportunity Loan Borrower.

DZB006195

SCHEDULE E

## PRIOR NAMES AND TRADE NAMES OF OPPORTUNITY

Prior Names:

International Investment Opportunities, LLC, a Minnesota limited liability company, was merged with and into Opportunity Finance, LLC, a Delaware limited liability company, on May 9, 2001.

Opportunity Finance, LLC has not assumed or operated under any other names.

Trade Names:

None.

Doc# 30385857.WPD

Sch. E-1

DZB006196

SCHEDULE F

## SCHEDULE OF RECEIVABLES

[See attached.]

DZB006197

DEC-28-2001   11:41      U.S. BANK

651 244 0089   P.02/02

Oppertunity Finance LLC
Opportunity Finance Securitization LLC
Schedule XG to NLSA (DRAFT 12/26/01)

| Deal No. | Orig. Or Note | Prom. Note Principal | Issuance Date | Maturity Date | Filing Date | UCC File No. | Sticker Price | Approved Label | Seller PO No. | Seller & Buyer Price | Akamid Buyer | Buyer PO No. | Inventory Description | Shipping Date | Claimant Status Inventory Collateral | Trade Rec Collateral |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 323 | 0917/01-01 | $ 4,900,000 | 9/17/01 | 1/16/02 | 9/19/01 | 200159092147 | $ 4,081,204 | Nationwide | 36022 | $ 4,688,542 | 3AMS | 82003536AM | RCN TV's | 11/09/01 | $ 4,688,542 | $ 4,688,542 |
| 325 | 0921/01-02 | 1,000,000 | 9/21/01 | 1/22/02 | 9/24/01 | 2001167134S | 1,031,730 | Nationwide | 36041 | 1,201,046 | BOSCOV | 82003A35514 | Cal Club | 10/25/01 | 1,296.90 | 1,296.90 |
| 326 | 112401-02 | 2,300,000 | 9/24/01 | 1/22/02 | 9/25/01 | 20011817603 | 2,343,089 | Nationwide | 35453 | 2,721,128 | 8/5 | 84941 | Camcorders | 11/30/01 | 2,271,029 | 2,271,029 |
| 327 | 012502-01 | 2,700,000 | 9/25/01 | 1/24/02 | 9/27/01 | 20011825029 | 2,313,098 | Lechon | 35463 | 1,147,120 | 8J/5 | 8354411XXX | Casio TV's | 11/14/01 | 2,141,053 | 2,141,053 |
| 328 | 092601-02 | 2,250,000 | 9/28/01 | 1/24/02 | 9/28/00 | 20011700710 | 2,229,005 | Nationwide | 35463 | 2,286,101 | 3AMS | 820010026 | JBL Audio | 11/14/01 | 2,500,104 | 2,500,104 |
| 329 | 100401-01 | 1,960,000 | 10/4/01 | 2/6/02 | 10/03/01 | 20011771126 | 2,055,541 | Nationwide | 36677 | 3,115,200 | 3AMS | 820045926 | Sharp CDDVD | 11/01/01 | 3,115,200 | 3,115,200 |
| 330 | 101901-01 | 7,500,000 | 10/11/01 | 2/8/02 | 10/17/01 | 20011888425 | 4,715,120 | Nationwide | 35691 | 4,905,344 | 3AMS | 820083276 | Sony TV | 11/02/01 | 4,905,553 | 4,905,553 |
| 331 | 101501-01 | 3,000,000 | 10/15/01 | 2/13/02 | 10/17/01 | 20011888408 | 3,340,848 | Nationwide | 35695 | 3,726,448 | 3AMS | 820080374M | Sony DVD | 11/27/01 | 3,792,448 | 3,792,448 |
| 332 | 102201-01 | 3,200,000 | 10/22/01 | 2/14/02 | 12/31/01 | 20012413023 | 3,270,003 | Mackenzie | 35319 | 2,524,080 | 8J/5 | 3834PE13XXX | Suomi | 12/16/01 | 2,524,633 | 2,524,633 |
| 333 | 102501-01 | 3,700,000 | 10/25/01 | 2/22/02 | 10/25/01 | 20011951541 | 3,771,822 | Mackenzie | 35732 | 4,281,000 | 3AMS | 820003948 | Vizio EQ | 11/26/01 | 4,383,830 | 4,383,830 |
| 334 | 102601-01 | 1,420,000 | 10/26/01 | 2/28/02 | 11/5/01 | 20012049180 | 1,411,320 | Mackenzie | 35340 | 1,237,091 | 8J/5 | CDDVD | 12/03/01 | 1,237,104 | 1,237,104 |
| 335 | 11310-02 | 1,500,000 | 10/24/01 | 2/28/02 | 11/06/01 | 20012098160 | 1,576,051 | Mackenzie | 35242 | 1,731,073 | 8J/5 | 8OA1613XXX | Mult TV | 11/09/01 | 1,731,020 | 1,731,020 |
| 336 | 013101-03 | 3,700,000 | 10/31/01 | 2/6/02 | 11/06/01 | 20012090621 | 3,724,830 | Nationwide | 30415 | 4,303,500 | 3AMS | 820069024 | Mult TV | 12/7/01 | 4,390,040 | 4,300,040 |
| 337 | 002031-01 | 2,120,000 | 9/20/01 | 1/11/02 | 9/21/01 | 20011862163 | 2,610,082 | Nationwide | 36438 | 3,047,083 | BOSCOV | B1401 | Speakers | 09/30/01 | 3,847,852 | 3,847,852 |
| 338 | 10034-01 | 1,406,000 | 1/4/01 | 3/27/02 | 11/13/01 | 2907214042 | 1,510,022 | Nationwide | 35740 | 1,742,042 | REX | 2190J | PanelsFabricators | 11/30/01 | 1,742,542 | 1,742,542 |
| 339 | 118301-02 | 3,000,000 | 1/4/01 | 3/20/02 | 11/13/01 | 2907214061 | 3,110,650 | Nationwide | 35361 | 3,018,324 | 8J/5 | SUI150TXX | Hiachi TV | 12/11/01 | 3,815,324 | 3,815,324 |
| 340 | 115301-01 | 1,750,080 | 11/6/01 | 3/6/02 | 11/16/01 | 2907208667 | 1,018,720 | PanGroup | 35363 | 2,106,632 | 8J/4 | SUI150TXX | Microwave | 12/12/01 | 2,100,632 | 2,100,632 |
| 341 | 115301-03 | 3,000,000 | 11/13/01 | 3/15/02 | 11/13/01 | 2907088991 | 3,030,824 | Nationwide | 35712 | 4,211,514 | REX | 24743 | Sony DVD | 12/19/01 | 4,211,514 | 4,211,514 |
| 342 | 115301-01 | 3,200,000 | 11/16/01 | 3/9/02 | 11/20/01 | 2907293088 | 3,170,521 | PanGroup | 35370 | 3,826,000 | 3AMS | 820004072 | Video Cards | 12/19/01 | 3,826,819 | 3,826,819 |
| 343 | 119901-01 | 3,300,100 | 11/19/01 | 3/7/02 | 11/21/01 | 20012214206 | 3,292,031 | Mackenzie | 35419 | 4,508,100 | 3AMS | 820054072H | Sony Theater | 12/19/01 | 4,543,500 | 4,543,500 |
| 344 | 112031-01 | 1,200,000 | 11/26/01 | 3/26/02 | 11/27/01 | 2907221325 | 1,722,175 | Nationwide | 35195 | 1,412,578 | 3AMS | 820040215 | Heaters | 12/20/01 | . | . |
| 345 | 121301-01 | 2,700,000 | 11/30/01 | 3/22/02 | 11/29/01 | 2907286122 | 3,505,142 | Nationwide | 35769 | 3,236,571 | 3AMS | A23040331 | Sony CD | na | 1,412,578 | 1,412,578 |
| 246 | 112401-01 | 903,000 | 11/23/01 | 3/8/02 | 11/20/01 | 2907202401 | 1,324,151 | Universal | 35611 | 1,182,444 | 3AMS | E26640352 | Toni | na | 2,448,142 | 2,448,142 |
| 247 | 112831-02 | 2,800,000 | 11/26/01 | 3/26/02 | 11/28/01 | 20011280104 | 3,294,680 | Nationwide | 35612 | 3,453,834 | 3AMS | 820340354 | Toshiba HDTV | na | 1,824,151 | 1,824,151 |
| 248 | 113001-01 | 2,700,000 | 11/30/01 | 3/20/02 | 12/3/01 | 20011305362 | 3,280,428 | Nationwide | 35645 | 3,438,217 | BOSCOV | B5231 | Hiachi TV | na | 2,900,150 | 2,900,150 |
| 249 | 112031-02 | 2,200,000 | 11/25/01 | 3/5/02 | 12/3/01 | 20011280411 | 3,174,721 | Nationwide | 35425 | 3,816,043 | BOSCOV | 8S6201213XX | Sony Shelf Syst | na | 2,982,429 | 2,982,429 |
| 250 | 120501-01 | 2,700,000 | 12/5/01 | 4/4/02 | 12/7/01 | 20012420091 | 3,311,017 | Nationwide | 35453 | 3,266,449 | 3AMS | 82604041Z | Green Receivers | na | 3,134,127 | 3,134,127 |
| 251 | 121801-01 | 2,900,000 | 12/18/01 | 4/17/02 | 12/19/01 | 20012534794 | 3,226,181 | Universal | 35347 | 3,064,783 | 8J/5 | SUI150780XX | Philips TVs | na | 2,811,563 | . |
| | | | | | | | | | | | | | | | 3,134,161 | . |
| Total | | $ 66,000,000 | | | | | $75,100,460 | | | $ 87,653,054 | | | | | $ 18,604,210 | $ 63,253,778 |

DZB006198

# EXHIBIT 10

[Execution Copy]

U.S. $100,000,000

RECEIVABLES LOAN AND SECURITY AGREEMENT

Dated as of December 28, 2001

Among

OPPORTUNITY FINANCE SECURITIZATION, LLC,

as the Borrower

and

OPPORTUNITY FINANCE, LLC,

as the Servicer

and

AUTOBAHN FUNDING COMPANY LLC,

as a Lender

and

DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK
FRANKFURT AM MAIN,

as Agent and as Collateral Agent

and

ROYAL INDEMNITY COMPANY,

as Facility Insurer

and

U.S. BANK NATIONAL ASSOCIATION,

as the Custodian and the Backup Servicer

Doc #30365937.WPD

DZB004104

## TABLE OF CONTENTS

Page

I.    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      SECTION 1.01    Certain Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      SECTION 1.02    Other Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      SECTION 1.03    Computation of Time Periods . . . . . . . . . . . . . . . . . . . . 34

II.    THE RECEIVABLES FACILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      SECTION 2.01    Borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      SECTION 2.02    The Initial Borrowing and Subsequent Borrowings . . . . 35
      SECTION 2.03    Facility Maturity Date . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
      SECTION 2.04    Selection of Fixed Periods . . . . . . . . . . . . . . . . . . . . . . . 36
      SECTION 2.05    Remittance Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . 37
            (a) Yield and Liquidation Fees . . . . . . . . . . . . . . . . . . . . . . . . . . 37
            (b) Fixed Period Loan Principal Repayment . . . . . . . . . . . . . . . . . 38
            (c) Remittance Date Transfers from Collection Account . . . . . . . . 38
            (d) Borrower Deficiency Payments . . . . . . . . . . . . . . . . . . . . . . . 39
            (e) Instructions to the Custodian . . . . . . . . . . . . . . . . . . . . . . . . . 39
      SECTION 2.06    Payments and Computations, Etc. . . . . . . . . . . . . . . . . . 40
      SECTION 2.07    Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      SECTION 2.08    Increased Costs; Capital Adequacy . . . . . . . . . . . . . . . . 41
      SECTION 2.09    Collateral Assignment of Agreements . . . . . . . . . . . . . . 42
      SECTION 2.10    Grant of a Security Interest . . . . . . . . . . . . . . . . . . . . . . 42
      SECTION 2.11    The Collateral Agent and the Pledged Assets . . . . . . . . . 43
      SECTION 2.12    Limitations on Duties of Collateral Agent . . . . . . . . . . . 44
      SECTION 2.13    Exculpatory Provisions . . . . . . . . . . . . . . . . . . . . . . . . . 44
      SECTION 2.14    Reliance by Collateral Agent . . . . . . . . . . . . . . . . . . . . . 45
      SECTION 2.15    Agent's and Collateral Agent's Reliance, Etc. . . . . . . . . 46
      SECTION 2.16    Delegation of Duties by Agent and the Collateral
                              Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      SECTION 2.17    Successor Agent and Collateral Agent . . . . . . . . . . . . . . 46
      SECTION 2.18    Evidence of Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
      SECTION 2.19    Survival of Representations and Warranties;
                              Repayment Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . 47
      SECTION 2.20    Release of Pledged Receivables . . . . . . . . . . . . . . . . . . . 47
      SECTION 2.21    Treatment of Amounts Paid by the Borrower . . . . . . . . . 48
      SECTION 2.22    Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
      SECTION 2.23    Underlying Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
      SECTION 2.24    Establishment of Accounts . . . . . . . . . . . . . . . . . . . . . . . 48

III.    CONDITIONS OF LOANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
      SECTION 3.01    Conditions Precedent to Initial Borrowing . . . . . . . . . . 49
      SECTION 3.02    Conditions Precedent to All Borrowings . . . . . . . . . . . . 49

DZB004105

Page

SECTION 3.03     Advances Do Not Constitute a Waiver .............. 54

IV.   REPRESENTATIONS AND WARRANTIES ................................ 54
      SECTION 4.01     Representations and Warranties of the Borrower and
                       the Servicer ................................... 54

V.    GENERAL COVENANTS OF THE BORROWER AND THE SERVICER ........ 59
      SECTION 5.01     General Covenants .............................. 59

VI.   ADMINISTRATION AND SERVICING; CERTAIN COVENANTS ............ 62
      SECTION 6.01     Appointment and Designation of the Servicer ......... 62
      SECTION 6.02     Collection of Receivable Payments; Modification
                       and Amendment of Receivables ................... 64
      SECTION 6.03     Realization Upon Receivables ..................... 64
      SECTION 6.04     Insurance ..................................... 65
      SECTION 6.05     Maintenance of Security Interests in Opportunity
                       Loan Collateral and Subject Inventory Loan
                       Collateral .................................... 65
      SECTION 6.06     Pledged Receivable Receipts ..................... 66
      SECTION 6.07     Unidentified Payments; Lender's Right of
                       Presumption .................................. 66
      SECTION 6.08     No Rights of Withdrawal ........................ 66
      SECTION 6.09     Permitted Investments .......................... 66
      SECTION 6.10     Servicing Compensation ........................ 67
      SECTION 6.11     Reports to the Agent; Account Statements;
                       Servicing Information .......................... 67
      SECTION 6.12     Statements as to Compliance; Financial Statements .... 68
      SECTION 6.13     Access to Certain Documentation; Opportunity
                       Loan Borrowers ............................... 72
      SECTION 6.14     Backup Servicer ............................... 73
      SECTION 6.15     Additional Remedies of Agent Upon Event of
                       Default ...................................... 76
      SECTION 6.16     Waiver of Defaults ............................. 76
      SECTION 6.17     Maintenance of Certain Insurance .................. 77
      SECTION 6.18     Segregation of Collections ....................... 77
      SECTION 6.19     UCC Matters; Protection and Perfection of Pledged
                       Assets ....................................... 77
      SECTION 6.20     Servicer Advances ............................. 78
      SECTION 6.21     Certain Rights of the Agent, the Lender and the
                       Facility Insurer ............................... 78
      SECTION 6.22     Repurchase of Receivables Upon Breach of
                       Covenant or Representation and Warranty by
                       Servicer ..................................... 79

DZB004106

Page

SECTION 6.23   Compliance with Applicable Law .................. 79

VII.   EVENTS OF DEFAULT ................................................. 80
       SECTION 7.01   Events of Default ............................. 80
       SECTION 7.02   Additional Remedies ........................... 82

VIII.  INDEMNIFICATION ................................................... 83
       SECTION 8.01   Indemnities by the Borrower ..................... 83
       SECTION 8.02   Indemnities by the Servicer ..................... 85
       SECTION 8.03   Indemnification of Collateral Agent .............. 86

IX.    MISCELLANEOUS ..................................................... 87
       SECTION 9.01   Amendments and Waivers ......................... 87
       SECTION 9.02   Notices, Etc. .................................. 87
       SECTION 9.03   No Waiver; Remedies ............................ 87
       SECTION 9.04   Binding Effect; Assignability; Multiple Lenders ....... 87
       SECTION 9.05   Term of This Agreement ......................... 88
       SECTION 9.06   Governing Law; Jury Waiver ..................... 89
       SECTION 9.07   Costs, Expenses and Taxes ...................... 89
       SECTION 9.08   No Proceedings ................................ 90
       SECTION 9.09   Recourse Against Certain Parties ................. 90
       SECTION 9.10   Execution in Counterparts; Severability; Integration ... 91
       SECTION 9.11   Tax Characterization ........................... 91
       SECTION 9.12   Exclusivity ................................... 91
       SECTION 9.13   Consent of the Facility Insurer .................. 93

DZB004107

## LIST OF SCHEDULES AND EXHIBITS

SCHEDULES

| | |
|---|---|
| SCHEDULE I | Condition Precedent Documents |
| SCHEDULE I | Credit and Collection Policy |
| SCHEDULE I I | Prior Names, Tradenames, Fictitious Names and "Doing Business As" Names |
| SCHEDULE IV | Litigation |
| SCHEDULE V | Debt Rating of Approved Retailer |
| SCHEDULE VI | Special Concentration Approved Retailer/Special Concentration Limits |
| SCHEDULE VII | Representations and Warranties With Respect to Eligible Receivables Related to the New Opportunity Loans |
| SCHEDULE VIII | Representations and Warranties With Respect to Eligible Retailer Receivables Related to the New Opportunity Loans |
| SCHEDULE IX | Eligibility Requirements with Respect to Approved Distributor SPV |
| SCHEDULE X | Approved Distributor Minimum Tangible Net Worth |
| SCHEDULE XI | Existing Opportunity Loans |
| SCHEDULE XII | Representations and Warranties with Respect to Eligible Receivables Related to the Existing Opportunity Loans |
| SCHEDULE XIII | Representations and Warranties with Respect to Eligible Retailer Receivables Related to the Existing Opportunity Loans |

EXHIBITS

| | |
|---|---|
| EXHIBIT A | Form of Borrowing Base Certificate |
| EXHIBIT B | Form of Commercial Paper Remittance Report |
| EXHIBIT C | Form of Monthly Remittance Report |
| EXHIBIT D | [Reserved.] |
| EXHIBIT E-1 | [Reserved.] |
| EXHIBIT E-2 | [Reserved.] |
| EXHIBIT F-1 | Form of Existing Opportunity Loan Credit Agreement |
| EXHIBIT F-2 | Form of New Credit Agreement |
| EXHIBIT G-1 | Form of Existing Opportunity Loan Promissory Note |
| EXHIBIT G-2 | Form of New Opportunity Loan Promissory Note |
| EXHIBIT H-1 | Form of Existing Opportunity Loan Security Agreement |
| EXHIBIT H-2 | Form of New Opportunity Loan Security Agreement |
| EXHIBIT I | Form of Allonge |
| EXHIBIT J-1 | Form of Existing Opportunity Loan Assignment Agreement |
| EXHIBIT J-2 | Form of Approved Distributor Sale Agreement |
| EXHIBIT K | Form of Retailer Purchase Order |
| EXHIBIT L | Form of Manufacturer Sale Order |
| EXHIBIT M | Custodian's Fee |
| EXHIBIT N | Form of Backup Servicer Certification Letter |
| EXHIBIT O | Form of Approved Distributor SPV Collection Account Control Agreement |
| EXHIBIT P | Form of Existing Opportunity Loan Subordinated Note |

DZB004108

| EXHIBIT Q | Form of Existing Opportunity Loan Subordination Agreement |
| EXHIBIT R | Form of Petters Company Guaranty |
| EXHIBIT S | Form of Petters Personal Guaranty |
| EXHIBIT T-1 | Form of Existing Approved Distributor Financing Statement |
| EXHIBIT T-2 | Form of New Approved Distributor Financing Statement |
| EXHIBIT U-1 | Form of Existing Approved Distributor Financing Statement |
| EXHIBIT U-2 | Form of New Approved Distributor Financing Statement |

DZB004109

THIS RECEIVABLES LOAN AND SECURITY AGREEMENT is made as of December 28, 2001, among:

(1)  OPPORTUNITY FINANCE SECURITIZATION, LLC, a Delaware limited liability company (the "Borrower");

(2)  OPPORTUNITY FINANCE, LLC, a Delaware limited liability company ("Opportunity"), as the Servicer (as defined herein);

(3)  AUTOBAHN FUNDING COMPANY LLC ("Autobahn"), as a Lender (as defined herein);

(4)  DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK FRANKFURT AM MAIN ("DZ Bank"), as agent for the Lender (the "Agent") and as Collateral Agent (the "Collateral Agent");

(5)  U.S. BANK NATIONAL ASSOCIATION, as the Custodian and the Backup Servicer (as such terms are defined herein); and

(6)  ROYAL INDEMNITY COMPANY, a Delaware capital stock insurance company ("Royal") as Facility Insurer (as defined herein); and

IT IS AGREED as follows:


I.    DEFINITIONS

SECTION 1.01    Certain Defined Terms.  (a)  Certain capitalized terms used throughout this Agreement are defined above or in this Section 1.01.

b)    As used in this Agreement and its exhibits, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Accountants' Report" has the meaning assigned to that term in Section 6.12(b).

"Accrued Liability" means any amount and any other obligations and liability (other than Premiums) owed by the Borrower to the Facility Insurer of any claims paid by the Facility Insurer to the Borrower pursuant to the Facility Insurance Policy, including interest thereon and all other amounts (other than the Premiums) due and owing to the Facility Insurer as specified in the Facility Insurance Policy and other Transaction Documents.

"Adjusted Eurodollar Rate" means with respect to any Fixed Period for any Loan allocated to such Fixed Period, an interest rate per annum equal to the sum of (i) the Applicable Margin plus (ii) the Eurodollar Rate for such Fixed Period.

Doc #30365937.WPD

DZB004110

"Adverse Claim" means a lien, security interest, charge, encumbrance or other right or claim of any Person other than, with respect to (i) the Pledged Assets, any lien, security interest, charge, encumbrance or other right or claim in favor of the Lender (or the Collateral Agent on behalf of the Secured Parties), (ii) the Opportunity Loan Collateral, any lien, security interest, charge, encumbrance or other right or claim in favor of the Lender (or the Collateral Agent on behalf of the Secured Parties), the Borrower or Opportunity or (iii) the Subject Inventory Collateral any lien, security interest, charge, encumbrance or other right or claim in favor of the Lender (or the Collateral Agent on behalf of the Secured Parties), the Borrower, Opportunity or the Approved Distributor SPV related thereto.

"Affected Party" has the meaning assigned to that term in Section 2.08.

"Affiliate" when used with respect to a Person means any other Person controlling, controlled by or under common control with such Person. For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person. directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" has the meaning assigned to that term in the preamble hereto.

"Agreement" means this Receivables Loan and Security Agreement, as the same may be amended, restated, supplemented and/or otherwise modified from time to time hereafter.

"Allonge" means an allonge in the form attached hereto as Exhibit I whereby an Opportunity Loan Promissory Note is assigned from Opportunity to the Borrower and subsequently from the Borrower to the Collateral Agent.

"Applicable Jurisdiction" means. with respect to any Opportunity Loan (i) the state, the laws of which govern the terms of the related Opportunity Loan Documents and (ii) the state of incorporation or formation of the Opportunity Loan Borrower thereunder.

"Applicable Laws" means, with respect to an Opportunity Loan any and all foreign, federal, state. and local statutes. ordinances. rules. regulations. court orders and decrees, administrative orders and decrees. and other legal requirements of any and every conceivable type to which Opportunity. the Borrower. such Opportunity Loan. or any portion thereof. or all or any portion of the Pledged Assets or any Opportunity Loan Collateral is or becomes subject to from time to time.

"Applicable Margin" has the meaning ascribed to such term in the Fee Letter.

"Approved Distributor" means a retail finance company which (i) complies in all respects with the Credit and Collection Policy. (ii) has been approved in writing, by the Agent, the Lender and the Facility Insurer. in their sole discretion. as an "Approved Distributor", and

DZB004111

such approval has not been revoked by the Agent, the Lender and the Facility Insurer pursuant to Section 6.21, ( ii) with respect to which the Agent, the Lender and the Facility Insurer have been provided with on or before the approval referenced in clause (ii) above) copies of the Approved Distributor Credit and Collection Policy which were true and correct as of the date of the approval referenced in clause (ii) above and there have been no material changes thereto since the approval referenced in clause (ii) above without the written approval of the Agent, the Lender and the Facility Insurer and (iv) has established and maintains an Approved Distributor SPV. The parties hereto agree that as of the Closing Date Petters is an Approved Distributor (provided, that Petters' status as such is at all times subject to Section 6.21 hereof).

"Approved Distributor Credit and Collection Policy" means the credit and collection policy of an Approved Distributor.

"Approved Distributor Financing Statement" means a UCC financing statement filed by an Opportunity Loan Borrower against an Approved Distributor in the form attached hereto as Exhibit T-1, for Existing Opportunity Loans, and Exhibit T-2, for New Opportunity Loans originated after the Closing Date.

"Approved Distributor Sale Agreement" means a sale agreement between an Approved Distributor and an Approved Distributor SPV, substantially in the form attached hereto as Exhibit J-2 (or such other form as agreed to in writing by the Agent and the Facility Insurer) pursuant to which the Approved Distributor party thereto sells, among other things, its right, title and interest to the Retailer Receivable subject thereof, and the related Retailer Purchase Order and grants a security interest in the Subject Inventory related thereto, to the Approved Distributor SPV party thereto.

"Approved Distributor SPV" means a wholly-owned, special purpose, bankruptcy remote subsidiary of an Approved Distributor, (i) which has been approved in writing, by the Agent, the Lender and the Facility Insurer, in their sole discretion, as an "Approved Distributor SPV", and such approval has not been revoked by the Agent, the Lender and the Facility Insurer pursuant to Section 6.21 and (ii) satisfies all of the criteria set forth on Schedule IX. The parties hereto agree that, as of the Closing Date, Existing Petters LLC is an Approved Distributor SPV only with respect to the Existing Opportunity Loans listed on Schedule XI.

"Approved Distributor SPV Collection Account" means a trust account (account number 333987.0 at the Custodian) established in the name of PC Funding, LLC to receive Collections of Retailer Receivables and in which the Borrower has been granted a perfected security interest which has been assigned to the Collateral Agent for the benefit of the Secured Parties (and any other account approved by the Agent and the Facility Insurer that is established in the name of an Approved Distributor SPV to receive Collections of Retailer Receivables and in which the Borrower has been granted a perfected security interest which has been assigned to the Collateral Agent for the benefit of the Secured Parties).

Doc #30365937 WPD                    3

DZB004112

"Approved Distributor SPV Collection Account Control Agreement" means an agreement, in substantially the form attached hereto as Exhibit O (or otherwise in form and substance acceptable to the Collateral Agent and the Lender and the Facility Insurer) pursuant to which the Borrower is granted a perfected security interest in and to the Approved Distributor SPV Collection Account subject thereof.

"Approved Distributor SPV Financing Statement" means a UCC financing statement with respect to the perfection of Opportunity's security interest in Opportunity Loan Collateral, filed by Opportunity against an Approved Distributor SPV and assigned, sequentially to the Borrower and the Collateral Agent and which is in the form attached hereto as Exhibit U-1, for Existing Opportunity Loans, and Exhibit U-2, for New Opportunity Loans.

"Approved Distributor Subordinated Loan" means a loan advanced under, and evidenced by, a New Opportunity Loan Subordinated Note or an Existing Opportunity Loan Subordinated Note.

"Approved Distributor Transaction Documents" means the Manufacturer Sale Order, Retailer Purchase Order, Approved Distributor Transfer Agreement, each Approved Distributor Financing Statement, the Approved SPV Distributor Financing Statement, the Approved Distributor Subordinated Note (if applicable), the Approved Distributor Subordination Agreement (if applicable) and all other agreements, certificates, instruments, or other documents related thereto.

"Approved Distributor Transfer Agreement" means the Existing Opportunity Loan Assignment Agreement and the Approved Distributor Sale Agreement.

"Approved Facility Insurer" means an insurance company which is rated "A2" or better by Moody's and "A" or better by S&P and, if rated by Fitch, "A" or better by Fitch and which is acceptable to the Agent.

"Approved Retailer" means a Retailer which (i) complies in all respects with the Credit and Collection Policy and the Approved Distributor Credit and Collection Policy and (ii) has been approved, in writing, by the Agent, the Lender and the Facility Insurer and such approval has not been revoked by the Agent, the Lender or the Facility Insurer pursuant to Section 6.21. The parties hereto agree that as of the Closing Date each of Sam's Club, BJ's, Boscov's, Costco, Fleming Companies Inc. and Rex Stores Corporation is an Approved Retailer (provided, that each of their status as such is at all times subject to Section 6.21 hereof).

"Assigned Documents" has the meaning assigned to that term in Section 2.09.

"Assignment and Acceptance" has the meaning assigned to that term in Section 9.04.

"Autobahn" has the meaning assigned to that term in the preamble hereto.

DZB004113

"Backup Servicer" means US Bank or any substitute Backup Servicer appointed by the Agent pursuant to Section 6.14.

"Backup Servicer Standby Fee" means, for any Remittance Period or portion thereof, an amount payable out of Collections on the Pledged Receivables and amounts applied to the payment of, or treated as payments on, the Pledged Receivables, equal to the greater of (i) the applicable Backup Servicer Standby Fee Rate multiplied by the Net Eligible Receivables Balance as of the first day of such Remittance Period or (ii) $1,000.

"Backup Servicer Standby Fee Rate" means the per annum rate of 0.02%; provided, that during the period when the Backup Servicer is acting as the Servicer the Backup Servicer Standby Fee Rate shall equal 0%.

"Backup Servicer's Fee" means, for any Remittance Period or portion thereof after the occurrence of a Servicer Default and the appointment of the Backup Servicer as Servicer hereunder, an amount, payable out of Collections on the Pledged Receivables and amounts applied to the payment of, or treated as payments on, the Pledged Receivables, equal to the applicable Backup Servicing Fee Rate multiplied by the Net Eligible Receivables Balance as of the first day of such Remittance Period.

"Backup Servicing Fee Rate" means the per annum rate of 0.50%.

"Bankruptcy Code" means Title 11, United States Code, 11 U.S.C. §§ 101 et seq., as amended.

"Bankruptcy Event" shall be deemed to have occurred with respect to a Person if either:

    (a)    a case or other proceeding shall be commenced, without the application or consent of such Person, in any court, seeking the liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of such Person, the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestration or the like for such Person or all or substantially all of its assets, or any similar action with respect to such Person under any law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, and such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of 60 consecutive days or an order for relief in respect of such Person shall be entered in an involuntary case under the federal bankruptcy laws or other similar laws now or hereafter in effect or

    (b)    such Person shall commence a voluntary case or other proceeding under any applicable bankruptcy, insolvency, reorganization, debt arrangement, dissolution or other similar law now or hereafter in effect, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestration (or

DZB004114

other similar official) for such Person or for any substantial part of its property, or shall make any general assignment for the benefit of creditors, or shall fail to, or admit in writing its inability to, pay its debts generally as they become due, or, if a corporation or similar entity, its board of directors shall vote to implement any of the foregoing.

"Base Rate" means, on any date, a fluctuating rate of interest per annum equal to the rate of interest publicly announced by DZ Bank as its prime commercial lending rate (or, if DZ Bank does not announce such a rate, DZ Bank's "base" or other rate determined by the Lender to be the equivalent rate announced by such bank), except that, if DZ Bank shall, for any period, cease to announce publicly its prime commercial lending (or equivalent) rate, the Agent shall, during such period, determine the Base Rate based upon the prime commercial lending (or equivalent) rate or rates announced publicly by one or more other banks reasonably acceptable to the Borrower. The prime commercial lending (or equivalent) rates used in computing the Base Rate are not intended to be the lowest rates of interest charged by DZ Bank in connection with extensions of credit to debtors.  The Base Rate shall change as and when DZ Bank's prime commercial lending (or equivalent) rates change.

"BJ's" means BJ's Wholesale Club, Inc.

"Borrower" has the meaning assigned to that term in the preamble hereto.

"Borrower Operating Account" means the special trust account (account number 33398721 at the Custodian) in the name of the Borrower.

"Borrowing" means a borrowing of Loans under this Agreement.

"Borrowing Base Certificate" means a report, in substantially the form of Exhibit A, prepared by the Servicer for the benefit of Lender pursuant to Section 6.11(c).

"Borrowing Base Deficiency" means, at any time that the Capital Limit shall be less than the Facility Amount, an amount equal to the amount of such deficiency.

"Borrowing Base Surplus" means, at any time that the Capital Limit shall be in excess of the Facility Amount, an amount equal to the amount of such excess.

"Borrowing Base Surplus Withdrawal" means a withdrawal from the Collection Account made pursuant to Section 2.05(e).

"Borrowing Date" means, with respect to any Borrowing, the date on which such Borrowing is funded (which date, other than in the case of the initial Borrowing, shall be a "Subsequent Borrowing Date").

DZB004115

"Borrowing Limit" means initially $100,000,000; provided, that at all times, on or after the Early Amortization Commencement Date, the Borrowing Limit shall mean the aggregate outstanding Loans.

"Boscov's" means Boscov's Department Store, LLC.

"Business Day" means a day of the year other than a Saturday or a Sunday or any other day on which banks are not authorized or required to close in New York City or the State of Minnesota; provided, that, if any determination of a Business Day shall relate to a Loan bearing interest at the Adjusted Eurodollar Rate, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Limit" means, at any time, an amount equal to:

$$NEB + CA$$

where:       NEB       =       the Net Eligible Receivables Balance at such time; and

CA       =       the amount of Collections on deposit in the Collection Account at such time to be applied in accordance with Section 2.05 on the next Remittance Date.

"Change of Control" means that at any time (i) Opportunity shall own less than 100% of all equity interests and voting interests of the Borrower; (ii) Jon R. Sabes or Steve F. Sabes or their mother, father, brother, sister, children, and lineal descendants thereof and/or grantor trusts in which any of the foregoing are the beneficiaries thereof fail to collectively own 51% of Opportunity; or (iii) Jon R. Sabes or Steve F. Sabes fail to constitute more than 50% of the board of managers or managing members, as the case may be, of Opportunity and a successor acceptable to the Agent, the Lender and the Facility Insurer is not appointed within thirty (30) days of such failure.

"Closing Date" means December 28, 2001.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral Agent" means DZ Bank in its role as "Collateral Agent" under this Agreement, or its successors and assigns in such capacity.

"Collateral Receipt" has the meaning assigned to that term in the Custodial Agreement.

"Collection Account" means the special trust account (account number 33398730 at the Custodian) in the name of and under the sole dominion and control of the Collateral Agent for the benefit of the Secured Parties; provided, that the funds deposited in such account

DZB004116

(including any interest and earnings thereon) from time to time shall constitute the property and assets of the Borrower and the Borrower shall be solely liable for any taxes payable with respect to the Collection Account.

"Collection Account Agreement" means that certain "Collection Account Securities Account Agreement" dated as of the date hereof among the Collateral Agent, the Borrower, the Servicer, the Custodian and U.S. Bank National Association, as securities intermediary, as such agreement may from time to time be amended, supplemented or otherwise modified in accordance with the terms thereof.

"Collection Date" means the date on which the aggregate outstanding principal amount of the Loans have been repaid in full and all Yield and Fees and all other Obligations have been paid in full and the Lender shall have no further obligation to make any additional Loans.

"Collections" means, without duplication, with respect to any Pledged Receivable all cash receipts and proceeds in respect of such Pledged Receivable, including, without limitation, all payments of any principal, interest, fees, delinquent payments recovered by the Servicer, prepaid principal, Liquidation Proceeds or any other proceeds from any disposition of any Pledged Assets related to such Pledged Receivable, late fees, redemption fees, other penalty fees and charges, Servicer Advances, any payments under any insurance policies (including, without limitation, the Facility Insurance Policy, any Subject Inventory Insurance Policy, any Eligible Credit Insurance policy or any other credit insurance policy related to a Retailer Receivable) related to such Pledged Receivable or the related Subject Inventory, all cash proceeds of Related Security with respect to such Receivable or other amounts received by the Borrower or the Servicer with respect to the Contract, all cash proceeds received pursuant to any Guaranty, all cash proceeds of any other Pledged Assets with respect to such Pledged Receivable, any other payments made to the Borrower or Opportunity with respect to the related Contract, any other payments made by a Retailer in respect of any Subject Inventory or otherwise in respect of a Retailer Purchaser Order, and any interest earned on amounts on deposit in the Collection Account, any income from the investment in Permitted Investments of amounts deposited into the Collection Account.

"Commercial Paper Remittance Report" means a report, in substantially the form of Exhibit B, furnished by the Servicer to the Agent for the Lender pursuant to Section 6.11(d).

"Commitment Percentage" has the meaning assigned to that term in Section 9.04(b).

"Competitor" means Foothill Capital Corporation, General Electric Capital Corporation, General Motors Acceptance Corporation, and Fleet Capital Corporation; provided, that if any such entity ceases to conduct business involving the financing of transactions of the type contemplated under this Agreement such entity shall cease to be a "Competitor".

DZB004117

"Computer Tape or Listing" means the computer tape or listing (whether in electronic form or otherwise) generated by the Servicer on behalf of the Borrower which provides information relating to the Receivables included in the Net Eligible Receivables Balance.

"Consummated Retail Financing Transaction" means, a transaction, among an Approved Distributor, an Approved Retailer and the Manufacturer of the Subject Inventory related to such transaction, whereby such Manufacturer has sold (or is legally obligated to sell) such Subject Inventory to such Approved Distributor pursuant to a fully executed Manufacturer Sale Order and such Approved Retailer has purchased (or is legally obligated to purchase) such Subject Inventory from such Approved Distributor pursuant to a fully executed Retailer Purchase Order, and includes the performance of each party thereto of its respective obligations thereunder.

"Contract" means a Credit Agreement, together with the Opportunity Loan Security Agreement, and each Opportunity Loan Promissory Note issued in connection therewith and all schedules, supplements, riders and amendments thereto and each other document and instrument related thereto.

"Costco" means Costco Wholesale Corp.

"Coupon Rate" means, with respect to any Receivable, the annual percentage rate of interest or the annual percentage rate of interest equivalent to the "Fixed Yield" (as defined in the related Contract)(calculated assuming payment of such Fixed Yield on the scheduled maturity date of such Receivable), in each case selected for such Receivable pursuant to such related Contract.

"CP Disruption Event" means, at any time, the inability of the Issuer to raise (whether as a result of a prohibition or any other event or circumstance whatsoever) funds through the issuance of commercial paper notes in the United States commercial paper market, including, without limitation, by virtue of (i) any disruption in the commercial paper market, (ii) insufficient availability under the liquidity or enhancement facility entered into by the Issuer with respect to this Agreement or (iii) a downgrade of the rating of one or more financial institutions extending credit to or for the account of the Issuer or having a commitment to extend credit to the Lender under a liquidity or enhancement facility which relates to this Agreement to a level lower than that required by the Rating Agencies.

"CP Rate" means with respect to any Fixed Period for all Loans allocated to such Fixed Period, the sum of (i) the per annum rate equivalent to the per annum rate (or if more than one rate, the weighted average of the rates) at which commercial paper notes of the Issuer having a term equal to such Fixed Period and to be issued to fund, in whole or in part, the applicable Loans (and, at the election of the Issuer, other loans by the Issuer) by the Issuer may be sold by any placement agent or commercial paper dealer selected by the Issuer, as agreed between each such agent or dealer and the Issuer and notified by the Issuer to the Agent and the Servicer;

DZB004118

provided, however, if the rate (or rates) as agreed between any such agent or dealer and the Issuer with respect to any Fixed Period for the applicable Loans is a discount rate (or rates), the CP Rate for such Fixed Period shall be the rate (or if more than one rate, the weighted average of the rates) resulting from converting such discount rate (or rates) to an interest-bearing equivalent rate per annum; provided, further, however, that such rate (or rates) shall reflect and give effect to borrowings to fund small or odd dollar amounts that are not easily accommodated in the commercial paper market to the extent that such amounts are allocated, in whole or in part, to such Loans, plus (ii) the Applicable Margin.  Notwithstanding any other provision hereof, if any Event of Default shall have occurred, the CP Rate shall be increased to the Default Funding Rate, effective as of the date of the occurrence of such Event of Default and shall remain at the Default Funding Rate so long as such Event of Default shall remain uncured.

"CP Rollover Fixed Period" means any Fixed Period other than any Fixed Period (i) applicable to the Loan arising as a result of the Borrowing on the initial Borrowing Date, which shall have been requested in the Notice of Borrowing delivered in connection with such Borrowing, (ii) applicable to any new Loan arising as a result of a Borrowing on a Subsequent Borrowing Date which shall have been requested in the Notice of Borrowing delivered in connection with such Borrowing or (iii) applicable to any Loan accruing Yield at the Non-CP Rate.

"Credit Agreement" means an Existing Opportunity Loan Credit Agreement or a New Opportunity Loan Credit Agreement.

"Credit and Collection Policy" means the credit and collection policy of Opportunity together with all exhibits thereto as annexed hereto as Schedule II, as such policies may hereafter be amended, modified or supplemented from time to time in compliance with this Agreement.

"Custodial Agreement" means that certain Custodial Agreement, dated as of the date hereof, among the Borrower, the Servicer, the Collateral Agent and the Custodian, together with all instruments, documents and agreements executed in connection therewith, as such Custodial Agreement may from time to time be amended, restated, supplemented and/or otherwise modified in accordance with the terms thereof.

"Custodian" means U.S. Bank National Association or any substitute Custodian appointed by the Agent (with the consent of the Facility Insurer) pursuant to the Custodial Agreement.

"Custodian's Fee" means, for any Remittance Period, an amount, payable out of Collections on the Pledged Receivables and amounts applied to the payment of, or treated as payments on, the Pledged Receivables, equal to the aggregate fees listed in Exhibit M hereto which relate to such Remittance Period.

DZB004119

"Custodian's Supplemental Fee" means the fee payable to the Custodian pursuant to the Collection Account Agreement.

"Debt" of any Person means (i) indebtedness of such Person for borrowed money, (ii) obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) obligations of such Person to pay the deferred purchase price of property or services, (iv) obligations of such Person as lessee under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases, (v) obligations secured by an Adverse Claim upon property or assets owned by such Person, even though such Person has not assumed or become liable for the payment of such obligations and (vi) obligations of such Person under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (v) above.

"Debt Rating" for any Person, shall mean the rating by Moody's or Fitch of such Person's long-term public senior unsecured non-credit-enhanced debt.

"Default Funding Rate" means an interest rate per annum equal to two percent (2%) plus the Base Rate.

"Default Percentage" means, as of any date of determination, the fraction, expressed as a percentage, (i) the numerator of which is an amount equal to the difference of (A) the aggregate Outstanding Principal Balance of all Retailer Receivables that have become Defaulted Retailer Receivables during the most recently ended Remittance Period minus (B) the aggregate amount of collections received by Opportunity in respect of Defaulted Retailer Receivables during the most recently ended Remittance Period, and (ii) the denominator of which is the aggregate Outstanding Principal Balance of all Eligible Retailer Receivables as of the first day of the Remittance Period in effect on such date of determination.

"Defaulted Receivable" means any Receivable which is not paid in full, when due, in accordance with the Contract related thereto.

"Defaulted Retailer Receivable" means, as of any time of determination, any Retailer Receivable:

        (i)     with respect to which any amount payable under the Retailer Purchase Order related to such Retailer Receivable remains unpaid for ninety (90) or more days after the due date therefor set forth in such Retailer Purchase Order;

        (ii)    which has been or should be written off as a result of the occurrence of a Bankruptcy Event with respect to the Retailer obligated to pay such Retailer Receivable;

DZB004120

    (iii) which has been or should otherwise be deemed uncollectible by the Servicer in accordance with the Credit and Collection Policy or by the related Approved Distributor in accordance with the Approved Distributor Credit and Collection Policy;

    (iv) with respect to which the terms or conditions thereof or of the Retailer Purchase Order related thereto have been modified in any manner after the date of purchase of such Retailer Receivable by the Opportunity Loan Borrower pursuant to the Approved Distributor Transfer Agreement related thereto (unless the Agent, the Lender and the Facility Insurer have approved such change in writing); or

    (v) with respect to which the Subject Inventory related to such Eligible Receivable has been repossessed.

    "Delinquent Retailer" means, at any time, any Retailer which is the obligor of one or more Delinquent Retailer Receivables.

    "Delinquent Retailer Excluded Amount" means, with respect to any a Delinquent Retailer at any time of determination, (i) 50% of the sum of the Outstanding Principal Balances of all Eligible Receivables which are secured by Retailer Receivables owed by such Delinquent Retailer, if such Delinquent Retailer is the obligor of one, but not more than one, Delinquent Retailer Receivable at such time or (ii) 100% of the sum of the Outstanding Principal Balances of all Eligible Receivables which are secured by Retailer Receivables owed by such Delinquent Retailer, if such Delinquent Retailer is the obligor of two or more Delinquent Retailer Receivables at such time.

    "Delinquent Retailer Receivable" means, as of any time of determination, any Retailer Receivable with respect to which any amount payable under the Retailer Purchase Order related to such Retailer Receivable remains unpaid for sixty (60) or more days after the due date therefor set forth in such Retailer Purchase Order.

    "Diluted Receivable" means that portion (and only that portion) of any Retailer Receivable which is either (a) reduced or canceled as a result of (i) any defective, rejected or returned Subject Inventory related to such Retailer Receivable or any failure by the Approved Distributor or Approved Distributor SPV (as the case may be) related to such Retailer Receivable to deliver any Subject Inventory related to such Receivable or otherwise to perform under the underlying Retailer Purchase Order, (ii) any change in the terms of or cancellation of, a Retailer Purchase Order or any cash discount, discount for quick payment or other adjustment which reduces the amount payable by the Retailer on the related Retailer Receivable (except any such change or cancellation resulting from or relating to the financial inability to pay or insolvency of the Retailer related to such Retailer Receivable), (iii) any change in the terms of or cancellation of, the related Retailer Purchase Order or any adjustment which reduces the amount payable by the Retailer thereunder, or (iv) any set-off by the related Retailer in respect of any claim by such Retailer (whether such claim arises out of the same or a related transaction or an unrelated transaction), or (b) a Retailer Receivable which is subject to any specific dispute, offset,

DZB004121

counterclaim or defense whatsoever (except the discharge in bankruptcy of the related Retailer); provided that Diluted Receivables are calculated assuming that all chargebacks are resolved in the Retailer's favor.

"Dilution Percentage" means, as of any date of determination, the fraction, expressed as a percentage, (i) the numerator of which is an amount equal to the aggregate amount of Retailer Receivables which became Diluted Receivables during the most recently ended Remittance Period, and (ii) the denominator of which is an amount equal to the Outstanding Principal Balance of Eligible Retailer Receivables as of the first day of the Remittance Period in effect on such date of determination.

"DZ Bank" has the meaning assigned to that term in the preamble hereto.

"Early Amortization Commencement Date" means the earlier of (i) the date of the declaration or automatic occurrence of the Early Amortization Commencement Date pursuant to Section 7.01 or (ii) at the option of the Lender or the Facility Insurer, in each case, in its sole discretion, upon written notice to the Borrower, the occurrence of an Early Amortization Event.

"Early Amortization Event" means the occurrence of any of the following events:

(i)      a regulatory, tax or accounting body has ordered that the activities of the Lender or any Affiliate of the Lender contemplated hereby be terminated or, as a result of any other event or circumstance, the activities of the Lender contemplated hereby may reasonably be expected to cause the Lender, the Person, if any, then acting as the administrator or the manager for the Lender, or any of their respective Affiliates to suffer materially adverse regulatory, accounting or tax consequences;

(ii)     the Facility Maturity Date shall have occurred;

(iii)    an Event of Default has occurred and is continuing

(iv)     the three-month rolling average Default Percentage shall at any time exceed 5.00%;

(v)      the three-month rolling average Dilution Percentage shall at any time exceed 5.00%;

(vi)     the Facility Insurer shall fail to be an Approved Facility Insurer and such failure remains unremedied for thirty (30) days; or

(vii)    the Facility Insurer shall default under any other insurance policy or agreement similar to the Facility Insurance Policy.

DZB004122

"Eligible Credit Insurance" means any credit or other insurance, in amounts and on terms acceptable to the Agent, the Lender and the Facility Insurer, for losses resulting from the non-payment of a Retailer Receivable or the occurrence of a Bankruptcy Event with respect to the related Retailer of such Retailer Receivable, naming the related Approved Distributor SPV as the insured party and naming Opportunity, the Borrower and their respective successors and assigns as additional insured parties and loss payees, and is provided by an insurance company acceptable to, the Agent, the Lender and the Facility Insurer in their sole discretion, and under which all premiums have been paid and no defaults have occurred.

"Eligible Credit Insurance Amount" means with respect to any Retailer Receivable, the amount of Eligible Credit Insurance in effect with respect to such Retailer Receivable.

"Eligible Receivable" means, as of any date, (i) each Receivable related to a New Opportunity Loan with respect to which each Representation and Warranty set forth on Schedule VII hereto is true and correct and (ii) each Receivable related to an Existing Opportunity Loan with respect to which each Representation and Warranty set forth on Schedule XII hereto is true and correct.

"Eligible Retailer Receivable" means, as of any date, (i) each Retailer Receivable related to a New Opportunity Loan with respect to which each Representation and Warranty set forth on Schedule VIII hereto is true and correct and (ii) each Retailer Receivable related to an Existing Opportunity Loan with respect to which each Representation and Warranty set forth on Schedule XIII hereto is true and correct.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurodollar Disruption Event" means any of the following: (i) a determination by the Lender that it would be contrary to law or to the directive of any central bank or other governmental authority (whether or not having the force of law) to obtain United States dollars in the London interbank market to make, fund or maintain any Loan, (ii) a determination by the Lender that the rate at which deposits of United States dollars are being offered in the London interbank market does not accurately reflect the cost to the Lender of making, funding or maintaining any Loan or (iii) the inability of the Lender to obtain United States dollars in the London interbank market to make, fund or maintain any Loan.

"Eurodollar Rate" means with respect to any Fixed Period for any Loan allocated to such Fixed Period, an interest rate per annum equal to the average of the interest rates per annum (rounded upwards, if necessary, to the nearest 1/16 of 1%) reported during such Fixed Period on Telerate Access Service Page 3750 (British Bankers Association Settlement Rate) as the London Interbank Offered Rate for United States dollar deposits having a term of thirty (30) days and in a principal amount of $1,000,000 or more (or, if such page shall cease to be publicly available or, if the information contained on such page, in the Lender's sole judgment, shall

DZB004123

cease to accurately reflect such London Interbank Offered Rate, such rate as reported by any publicly available recognized source of similar market data selected by the Lender that, in the Lender's reasonable judgment, accurately reflects such London Interbank Offered Rate).

"Event of Default" has the meaning assigned to that term in Section 7.01.

"Excess Extended Term Receivables Amount" means, the amount by which the Outstanding Principal Balance of all Eligible Receivables which are Extended Term Receivables exceeds 25% of the Outstanding Principal Balance of all Eligible Receivables.

"Excess Maximum Individual Loan Amount" means, the sum for all Eligible Receivables, of the amounts by which the Outstanding Principal Balance of any such Eligible Receivable exceeds $6,000,000; provided, that for purposes of calculating such amount any Eligible Receivables with respect to any two or more Consummated Retail Financing Transactions that have been deemed by the Agent or the Lender to be but one and the same Consummated Retail Financing Transaction pursuant to the proviso contained in the definition of Maximum Individual Loan Amount, the Outstanding Principal Balance of all such Eligible Receivables shall be aggregated.

"Existing Opportunity Loan" means an advance, each evidenced by an Existing Opportunity Loan Promissory Note, identified on Schedule XI hereto made by Opportunity to an Opportunity Loan Borrower prior to the date hereof.

"Existing Opportunity Loan Assignment Agreement" means an assignment agreement between an Approved Distributor and an Opportunity Loan Borrower, substantially in the form attached hereto as Exhibit J-1 pursuant to which the Approved Distributor party has sold, among other things, its right, title and interest to the Retailer Receivable subject thereof, the related Retailer Purchase Order and the Subject Inventory related thereto to and Opportunity Loan Borrower has been granted a security interest in the collateral related thereto.

"Existing Opportunity Loan Collateral" means any and all collateral granted to Opportunity to secure the payment by an Opportunity Loan Borrower of all principal, interest and other amounts owed to Opportunity by such Opportunity Loan Borrower in connection with an Existing Opportunity Loan, including, without limitation, the Retailer Receivable and the other "Collateral" (as such term is defined in the Existing Opportunity Loan Security Agreement) related to such Receivable, the related Subject Inventory Collateral and all other collateral granted by each Opportunity Loan Borrower in connection with such Existing Opportunity Loan.

"Existing Opportunity Loan Credit Agreement" means, a credit agreement, in substantially the form attached hereto as Exhibit F-1 (or such other form as has been agreed to in writing by the Agent, the Lender and the Facility Insurer), pursuant to which Opportunity advanced an Existing Opportunity Loan.

DZB004124

"Existing Opportunity Loan Documents" means, with respect to each Existing Opportunity Loan, the related Existing Opportunity Loan Credit Agreement, Existing Opportunity Loan Promissory Note, Existing Opportunity Loan Security Agreement, Existing Opportunity Loan Subordinated Note, Existing Opportunity Loan Subordination Agreement, all related Inventory Financing Documents, each Guaranty and all other agreements, certificates, instruments, or other documents related thereto.

"Existing Opportunity Loan Promissory Note" means a promissory note, substantially in the form attached hereto of Exhibit G-1 relating to an Existing Opportunity Loan Credit Agreement, which is executed by an Opportunity Loan Borrower in favor of Opportunity and evidences an Existing Opportunity Loan advanced pursuant to such Existing Opportunity Loan Credit Agreement.

"Existing Opportunity Loan Security Agreement" means a security agreement between Opportunity and an Opportunity Loan Borrower substantially in the form attached hereto as Exhibit H-1 whereby such Opportunity Loan Borrower grants Opportunity a security interest in all of such Opportunity Loan Borrower's assets to secure such Opportunity Loan Borrower's obligations in respect of each Existing Opportunity Loan advanced to such Opportunity Loan Borrower, and all schedules, supplements, riders and amendments thereto and each other document and instrument related thereto.

"Existing Opportunity Loan Subordinated Note" means a note substantially in the form of Exhibit P attached hereto (or such other form as agreed to in writing by the Agent and the Facility Insurer) evidencing the indebtedness of an Opportunity Loan Borrower to an Approved Distributor with respect to funds advanced by such Approved Distributor to such Opportunity Loan Borrower to partially fund the Purchase Price of the related Subject Inventory.

"Existing Opportunity Loan Subordination Agreement" means a subordination agreement between an Opportunity Loan Borrower and an Approved Distributor substantially in the form attached hereto as Exhibit Q (or such other form as agreed to in writing by the Agent and the Facility Insurer) which evidences the subordination of all indebtedness and obligations with respect to Subordinated Indebtedness in right and time of payment to the Opportunity Loan Indebtedness.

"Existing Petters LLC" means Petters Finance, LLC, a Minnesota limited liability company.

"Extended Term Receivables" means a Receivable which, pursuant to the related Opportunity Loan Promissory Note (or pursuant to an extension granted by the Servicer), is due more than 120 days but less than 151 days after the date an Opportunity Loan is advanced in respect thereof.

"Facility Amount" means at any time, the sum of (i) the face amount of outstanding commercial paper notes (net of the amount of all interest scheduled to accrue thereon

DZB004125

through their respective stated maturity if such commercial paper notes are issued on a discount basis) of the Lender issued to fund Loans hereunder, plus (ii) the aggregate Loans Outstanding hereunder bear ng interest at the Non-CP Rate, plus (iii) accrued Yield and Fees with respect to the amounts described in the foregoing clauses (i) and (ii).

"Facility Insurance Agreement" means the Insurance Agreement among the Borrower, Opportunity and the Facility Insurer, dated as of the date hereof, pursuant to which the Facility Insurance Policy has been issued, as such Insurance Agreement may be amended, supplemented, modified, extended or replaced from time to time, with the consent of the Agent and the Lender and which Insurance Agreement shall at all times be satisfactory, in form and substance, in all respects, to the Agent and the Lender, in their sole and absolute discretion.

"Facility Insurance Policy" means Credit Risk Insurance Policy (Policy Number RST 147541) issued by the Facility Insurer pursuant to the Facility Insurance Agreement, as such Credit Risk Insurance Policy may be amended, supplemented, modified, extended or replaced from time to time, with the consent of the Agent and the Lender and which Credit Risk Insurance Policy shall at all times be satisfactory, in form and substance, to the Agent and the Lender, in their sole and absolute discretion (or another insurance policy, in an insured amount not less than $50,000,000, in form and substance satisfactory to the Agent and the Lender).

"Facility Insurer" means Royal or any successor insurance company which has underwritten the Facility Insurance Policy.

"Facility Insurer Default Type I" means the occurrence of (i) the Facility Insurance Policy failing to be in full force and effect, or (ii) a Bankruptcy Event of the Facility Insurer.

"Facility Insurer Default Type II" means the occurrence of a default of the Facility Insurer, including, without limitation, any payment default, under the Facility Insurance Policy as determined by the Agent in its sole and absolute discretion, that is not cured within 10 days of such occurrence.

"Facility Maturity Date" means the fifth anniversary of the date of this Agreement.

"Fee Letter" has the meaning assigned to that term in Section 2.07(a).

"Fees" has the meaning assigned to that term in Section 2.07(a).

"Fitch" means Fitch IBCA, Inc. (or its successors in interest).

"Fixed Period" means for any outstanding Loans, (i) if Yield in respect of all or any part thereof is computed by reference to the CP Rate, a period of up to and including sixty

DZB004126

(60) days as determined pursuant to Section 2.04, or (ii) if Yield in respect of all or any part thereof is computed by reference to the Non-CP Rate, the applicable Remittance Period.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States.

"Government Entity" means the United States, any State, any political subdivision of a State and any agency or instrumentality of the United States or any State or political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guaranty" means each of the Petters Company Guaranty, the Petters Personal Guaranty and any other guaranty executed by any Person in respect of the obligations of an Approved Distributor, Opportunity Loan Borrower, Opportunity or the Borrower arising under or in connection with the Transaction Documents.

"Indemnified Amounts" has the meaning assigned to that term in Section 8.01.

"Independent Accountants" has the meaning assigned to that term in Section 6.12(b).

"Individual Receivable File" means, with respect to each Opportunity Loan, a file containing each of the following items with respect to each Receivable related thereto:

(i)      the original, executed copy of the Opportunity Loan Promissory Note and the Allonge attached thereto related to such Receivable;

(ii)      a copy of the Retailer Purchase Order and the Manufacturer Sale Order related to such Receivable;

(iii)      a filed stamped copy of the Approved Distributor Financing Statement related to such Receivable filed against the related Approved Distributor in connection with such Opportunity Loan, together with evidence of any additional filings required to assign such Approved Distributor Financing Statement from the applicable Opportunity Loan Borrower to Opportunity, from Opportunity to the Borrower and from the Borrower to the Collateral Agent;

(iv)      true and complete copies of all other agreements, documents and instruments evidencing, securing or guarantying or otherwise related to, or required by applicable law with respect to such Receivable; and

(v)      the original copy of the Opening Wire Transfer Request, if any, related to such Receivable, executed by the Servicer (and, after the funding of the Loan hereunder related to such Receivable, executed by the Servicer, the Custodian and the Agent).

DZB004127

"Initial Opportunity Loan Advance" means, as to a particular Contract, the first advance of a Loan by Lender hereunder secured by the Opportunity Loan Collateral related to such Contract.

"Inventory Financing Documents" means, with respect to each Consummated Retail Financing Transaction, the applicable Manufacturer Sale Order, Retailer Purchase Order, Approved Distributor Transfer Agreement, Approved Distributor Financing Statement, the Existing Opportunity Loan Subordinated Note (if applicable), the Existing Opportunity Loan Subordination Agreement (if applicable), the Petters Company Guaranty (if applicable) and the Petters Personal Guaranty (if applicable) and all other agreements, certificates, instruments, or other documents related thereto.

"Inventory Stage Eligible Receivable" means an Eligible Receivable related to an Opportunity Loan the proceeds of which have been used by the applicable Opportunity Loan Borrower to purchase Subject Inventory from a Manufacturer but such Subject Inventory has not yet been delivered to and accepted by the related Approved Retailer.

"Issuer" means, collectively, Autobahn and any presently existing or future Person administered by DZ Bank whose principal business consists of issuing commercial paper or other securities to fund its acquisition and maintenance of receivables, accounts, instruments, chattel paper, general intangibles and other similar assets.

"Lender" means, collectively, Autobahn and/or any other Person (including, without limitation, any present or future Affiliate of DZ Bank) that agrees, pursuant to the pertinent Assignment and Acceptance, to make Loans secured by Pledged Assets pursuant to Article II of this Agreement.

"Level I Approved Retailer" means an Approved Retailer (other than a Special Concentration Approved Retailer) whose Debt Rating corresponds to Level I as set forth on Schedule V hereto.

"Level II Approved Retailer" means an Approved Retailer (other than a Special Concentration Approved Retailer) whose Debt Rating corresponds to Level II as set forth on Schedule V hereto.

"Level III Approved Retailer" means an Approved Retailer (other than a Special Concentration Approved Retailer) whose Debt Rating corresponds to Level III as set forth on Schedule V hereto.

"Level IV Approved Retailer" means an Approved Retailer (other than a Special Concentration Approved Retailer) whose Debt Rating corresponds to Level IV as set forth on Schedule V hereto.

DZB004128

"Lien" means any mortgage, security interest, or other interest in property securing an obligation owed to, or valid claim by, a Person other than the owner of such property, whether such interest arises in equity or is based on common law, statute, or contract.

"Liquidation Fee" means, for Loans allocated to any Fixed Period during which such Loans are repaid (in whole or in part) prior to the end of such Fixed Period, the amount, if any, by which (i) Yield (calculated without taking into account any Liquidation Fee) which would have accrued on the amount of the payment of such Loans during such Fixed Period (as so computed) if such payment had not been made, as the case may be, exceeds (ii) the sum of (A) Yield actually received by the Lender in respect of such Loans for such Fixed Period plus, if applicable, (B) the income, if any, received by the Lender from the Lender's investing the proceeds of such payments on such Loans.

"Liquidation Proceeds" means with respect to a Receivable with respect to which the related Subject Inventory has been foreclosed upon by the Servicer, all amounts realized with respect to such Receivable net of reasonable expenses of the Servicer incurred in connection with the collection, repossession and disposition of the related Subject Inventory; provided, however, that the Liquidation Proceeds with respect to any Receivable shall in no event be less than zero.

"Liquidity/Credit Enhancement Facility" means an Enhancement Agreement, to be entered into on the date hereof among the Issuer, the financial institutions party thereto and the Agent, and/or a Liquidity Agreement, to be entered into on the date hereof among the Issuer, the financial institutions party thereto and the Agent and/or a letter of credit or similar instrument or agreement by the financial institution party thereto in favor of the Issuer, together with any related agreements, in each case, to be entered into on the date hereof.

"Loan" has the meaning set forth in Section 2.01(a).

"Loan Purchase Agreement" means that certain Purchase and Contribution Agreement, dated as of the date hereof, by and between the Borrower, as purchaser, and Opportunity, as seller, whereby, among other terms and conditions, Opportunity sells or contributes all now existing and hereafter arising Opportunity Loans to the Borrower, together with all instruments, documents and agreements executed in connection therewith, as the same may from time to time be amended, restated, supplemented and/or otherwise modified in accordance with the terms hereof.

"Loans Outstanding" means the sum of the principal amounts loaned to the Borrower for the initial and any subsequent borrowings pursuant to Sections 2.01 and 2.02, reduced from time to time by Collections received and distributed on account of such Loans outstanding pursuant to Section 2.05; provided, however, that such Loans outstanding shall not be reduced by any distribution of any portion of Collections if at any time such distribution is rescinded or must be returned for any reason.

DZB004129

"Manufacturer" means a manufacturer or wholesale liquidator of Subject Inventory.

"Manufacturer Sale Order" means (i) with respect to the Receivables related to Existing Opportunity Loans, a purchase order, substantially in the form attached hereto as Exhibit L-1, between the Manufacturer of Subject Inventory and an Approved Distributor, pursuant to which the Approved Distributor agrees to purchase the Subject Inventory related thereto and (ii) with respect to the Receivables related to New Opportunity Loans, a purchase order, substantially in the form attached hereto as Exhibit L-2, between the Manufacturer of Subject Inventory and an Approved Distributor, pursuant to which the Approved Distributor agrees to purchase the Subject Inventory related thereto and which contains language acceptable to the Agent and the Facility Insurer whereby the Manufacturer agrees to, upon payment of the Purchase Price for the Subject Inventory, subordinate any of its or its creditors' rights to the rights of the Approved Distributor (and its successors and assigns) in the related Subject Inventory and provide other protections to such Approved Distributor's (and its successors and assigns) rights in such Subject Inventory.

"Master Receivables File" means, with respect to any Contract related to an Opportunity Loan and the related Receivable, a file containing each of the following items with respect to such Receivable:

> (i)      the original, executed copy of the related Credit Agreement related to such Receivable;

> (ii)     a copy of the Opportunity Loan Security Agreement related to such Receivable;

> (iii)    a copy of each Guaranty (if applicable) related to such Receivable;

> (iv)     a copy of the Approved Distributor Transfer Agreement related to such Receivable;

> (v)      a copy of the Existing Opportunity Loan Subordination Agreement (if applicable) related to such Receivable;

> (vi)     a copy of the Existing Opportunity Loan Subordinated Note (if applicable) with respect to such Receivable;

> (vii)    the Subject Inventory Insurance Certificate with respect to the Subject Inventory related to such Receivable;

> (viii)   a copy of the Approved Distributor SPV Financing Statement filed against the related Approved Distributor SPV together with evidence of filing (including,

DZB004130

within 30 days of the execution of the related Contract, a file-stamped copy of such Approved Distributor SPV Financing Statement); and

(ix)    true and complete copies of all other agreements, documents and instruments evidencing, securing or guarantying or otherwise related to, or required by applicable law with respect to such Opportunity Loan.

"Material Adverse Effect" means a material adverse effect on (i) the ability of the Borrower or Opportunity (in its capacity as Servicer or otherwise) to conduct its business, (ii) the ability of the Borrower or Opportunity (in its capacity as Servicer or otherwise) to perform its obligations under this Agreement or any other Transaction Document to which it is a party, (iii) the validity or enforceability of this Agreement or any other Transaction Document to which the Borrower or Opportunity (in its capacity as Servicer or otherwise), as applicable, is a party, (iv) the rights and remedies of the Lender, the Agent, the Collateral Agent, or the Facility Insurer under this Agreement or any of the Transaction Documents or (v) the validity, enforceability or collectibility of all or any portion (other than an inconsequential portion) of the Pledged Receivables.

"Maximum Individual Loan Amount" means $4,800,000, which is the maximum amount of any Loan to be advanced to the Borrower in connection with any Consummated Retail Financing Transaction, provided, that the Agent, in its reasonable discretion, may determine that two or more purportedly separate Consummated Retail Financing Transactions constitute one in the same Consummated Retail Financing Transaction and therefore the Maximum Individual Loan Amount for such separate Consummated Retail Financing Transactions shall collectively be $4,800,000.

"Monthly Remittance Report" means a report, in substantially the form of Exhibit C, furnished by the Servicer to the Agent, the Lender, the Custodian and the Facility Insurer pursuant to Section 6.11(b).

"Moody's" means Moody's Investors Service, Inc. (or its successors in interest).

"Net Eligible Receivables Balance" means, at any time, (A) 80% multiplied by (B) an amount equal to (X) the Outstanding Principal Balance of all Eligible Receivables, minus (Y) the sum of (i) the Excess Extended Term Receivables Amount, plus (ii) the aggregate Delinquent Retailer Excluded Amounts for all Delinquent Retailers, plus (iii) the Excess Maximum Individual Loan Amount, plus (iv) the Overconcentration Amount; provided, that any amount that would otherwise be included in more than one of such Excess Extended Term Receivables Amount, Delinquent Retailer Excluded Amounts, Excess Maximum Individual Loan Amount or Overconcentration Amount shall instead be included only in the one of the foregoing which would lead to the smallest Net Eligible Receivables Balance.

"New Credit Agreement" means, a credit agreement, in substantially the form attached hereto as Exhibit F (or such other form as is agreed to in writing by the Agent, the

22

DZB004131

Lender and the Facility Insurer), pursuant to which Opportunity advances an Opportunity Loan, from time to time.

"New Opportunity Loan" means an advance, each evidenced by a New Opportunity Loan Promissory Note, made after the date hereof by Opportunity to an Approved Distributor SPV pursuant to a Contract.

"New Opportunity Loan Collateral" means any and all collateral granted to Opportunity to secure the payment by an Opportunity Loan Borrower of all principal, interest, and other amounts owed to Opportunity by such Opportunity Loan Borrower in connection with an Opportunity Loan, including, without limitation, with respect to each Receivable, the Retailer Receivable and the other "Collateral" (as such term is defined in the related Opportunity Loan Security Agreement) related to such Receivable, the Approved Distributor SPV Collection Account, the related Subject Inventory Collateral and all other collateral granted by each Opportunity Loan Borrower to Opportunity in connection with such Opportunity Loan.

"New Opportunity Loan Documents" means, with respect to each Opportunity Loan, the related Contract, New Opportunity Loan Promissory Note, New Opportunity Loan Security Agreement, the Approved Distributor SPV Collection Account Control Agreement, all related Inventory Financing Documents, and all other agreements, certificates, instruments, or other documents related thereto.

"New Opportunity Loan Promissory Note" means a promissory note, substantially in the form of Exhibit G-2 hereto, which is executed by an Opportunity Loan Borrower in favor of Opportunity and evidences an Opportunity Loan advanced pursuant to such Contract.

"New Opportunity Loan Security Agreement" means a security agreement between Opportunity and an Opportunity Loan Borrower substantially in the form attached hereto as Exhibit H-2 whereby such Opportunity Loan Borrower grants Opportunity a security interest in all of such Opportunity Loan Borrower's assets to secure such Opportunity Loan Borrower's obligations in respect of each Opportunity Loan advanced to such Opportunity Loan Borrower, and all schedules, supplements, riders and amendments thereto and each other document and instrument related thereto.

"New Opportunity Loan Subordinated Note" means a note substantially in a form agreed to in writing by the Agent and the Facility Insurer evidencing the indebtedness of an Opportunity Loan Borrower to an Approved Distributor with respect to funds advanced by such Approved Distributor to such Opportunity Loan Borrower to partially fund the Purchase Price of the related Subject Inventory.

"New Opportunity Loan Subordination Agreement" means a subordination agreement between an Opportunity Loan Borrower and an Approved Distributor substantially in a form agreed to in writing by the Agent and the Facility Insurer which evidences the

DZB004132

subordination of all indebtedness and obligations with respect to Subordinated Indebtedness in right and time of payment to the Opportunity Loan Indebtedness.

"Non-CP Rate" means with respect to any Fixed Period for any Loan allocated to such Fixed Period, an interest rate per annum equal to the Adjusted Eurodollar Rate; provided, however, that if the Lender shall have notified the Agent that a Eurodollar Disruption Event has occurred, the Non-CP Rate shall be equal to the Base Rate until the Lender shall have notified the Agent that such Eurodollar Disruption Event has ceased, at which time the Non-CP Rate shall again be equal to the Adjusted Eurodollar Rate). Notwithstanding any other provision hereof, if any Event of Default shall have occurred, the Non-CP Rate shall be increased to the Default Funding Rate, effective as of the date of the occurrence of such Event of Default and shall remain at the Default Funding Rate so long as such Event of Default shall remain uncured.

"Non-Use Fee" has the meaning ascribed thereto in the Fee Letter.

"Non-Use Fee Rate" has the meaning ascribed thereto in the Fee Letter.

"Notice of Borrowing" has the meaning assigned to that term in Section 2.02(b) hereof.

"Notice of Pledge" has the meaning assigned to that term in the Custodial Agreement.

"Obligations" means all present and future indebtedness and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due) of the Borrower to the Lender, the Agent, the Collateral Agent or the Facility Insurer arising under this Agreement and the other Transaction Documents and shall include, without limitation, all Fees (including, without limitation, any unpaid portion of the Structuring Fee) all liability for principal of and interest on the Loans, indemnifications and other amounts due or to become due under this Agreement and such other documents, including, without limitation, interest, fees and other obligations that accrue after the commencement of an insolvency proceeding (in each case whether or not allowed as a claim in such insolvency proceeding).

"Officer's Certificate" means a certificate signed by the chief manager, president, the secretary, the chief financial officer or any vice president of any Person.

"Opening Wire Transfer Request" has the meaning ascribed to such term in the Custodial Agreement.

"Opening Wire Transfer Request (Self Funding)" has the meaning ascribed to such term in the Custodial Agreement.

DZB004133

"Opinion of Counsel" means a written opinion of independent counsel acceptable to the Agent and the Facility Insurer in their reasonable discretion, which opinion, if such opinion or a copy thereof is required by the provisions of this Agreement, the Loan Purchase Agreement, or an Opportunity Loan Document to be delivered to the Borrower or the Agent, is reasonably acceptable in form and substance to the Agent and the Facility Insurer.

"Opportunity" has the meaning ascribed to such term in the preamble of this Agreement.

"Opportunity Loan" means an Existing Opportunity Loan and a New Opportunity Loan.

"Opportunity Loan Borrower" means (i) with respect to each New Opportunity Loan, the Approved Distributor SPV which is the "Borrower" as defined in the Contract related thereto and (ii) with respect to each Existing Opportunity Loan, Existing Petters LLC.

"Opportunity Loan Collateral" means the Existing Opportunity Loan Collateral and the New Opportunity Loan Collateral.

"Opportunity Loan Documents" means the Existing Opportunity Loan Documents and the New Opportunity Loan Documents.

"Opportunity Loan Indebtedness" means all indebtedness, liabilities and other obligations of an Opportunity Loan Borrower to Opportunity arising under a Contract, the Opportunity Loan Documents or otherwise, which is related to a Consummated Retail Financing Transaction and any other documents, instruments or agreements executed by the Opportunity Loan Borrower with or in favor of Opportunity in connection therewith, as each may be amended, supplemented, extended, renewed, modified or restated, whether for principal, premium, interest, fees, expenses, indemnities or otherwise.

"Opportunity Loan Promissory Note" means an Existing Opportunity Loan Promissory Note or a New Opportunity Loan Promissory Note, as applicable.

"Opportunity Loan Security Agreement" means the Existing Opportunity Security Agreement and the New Opportunity Loan Security Agreement.

"Opportunity Loan Security Interest" means the security interest in the Opportunity Loan Collateral granted by an Opportunity Loan Borrower to Opportunity pursuant to an Opportunity Loan Security Agreement.

"Outstanding Principal Balance" means, as of any date, (i) with respect to a Receivable, the aggregate amount of credit actually extended to the Opportunity Loan Borrower minus that portion of all amounts paid by such Opportunity Loan Borrower with respect to such Opportunity Loan on or prior to such date which were allocable to principal in accordance with

DZB004134

the terms of such Contract, or (ii) with respect to a Retailer Receivable, the amount of such Retailer Receivable which was initially due under the Retailer Purchaser Order which remains unpaid as of such date.

"Overconcentration Amount" means, at any time, without duplication, the sum of:

(a)     the amount by which the sum of the Outstanding Principal Balances of all Eligible Receivables which are secured by Eligible Retailer Receivables related to any one Level IV Approved Retailer at such time exceeds 5% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time;

(b)     the amount by which the sum of the Outstanding Principal Balances of all Eligible Receivables which are secured by Eligible Retailer Receivables related to any one Level III Approved Retailer at such time exceeds 10% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time;

(c)     the amount by which the sum of the Outstanding Principal Balances of all Eligible Receivables which are secured by Eligible Retailer Receivables related to any one Level II Approved Retailer at such time exceeds 20% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time;

(d)     the amount by which the sum of the Outstanding Principal Balances of all Eligible Receivables which are secured by Eligible Retailer Receivables related to any one Level I Approved Retailer at such time exceeds 25% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time;

(e)     the sum of the amounts by which the sum of the Outstanding Principal Balances of all Eligible Receivables which are secured by Eligible Retailer Receivables related to any one Special Concentration Approved Retailer at such time exceeds the Special Concentration Limit related to such Special Concentration Approved Retailer at such time multiplied by the sum of the Outstanding Principal Balances of all Eligible Receivables at such time:

(f)     the amount by which the sum of the Outstanding Principal Balances of all Eligible Receivables which are secured by Eligible Retailer Receivables where the related Approved Retailer is a Government Entity exceeds 2.00% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time:

(g)     the aggregate amount by which the sum of the Outstanding Principal Balances of all Eligible Receivables which are secured by Eligible Retailer Receivables related to Approved Retailers (other than Special Concentration Approved Retailers) whose Debt Rating is below A3/A- exceeds 20% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time;

DZB004135

(h)    the amount equal to the greater of (I) zero or (II) an amount equal to (i) the Outstanding Principal Balances of all Eligible Receivables at such time <u>multiplied by</u> (ii)(A) 111% <u>minus</u> (B) a fraction, expressed as a percentage, having a numerator equal to the aggregate principal amount of all outstanding Eligible Retailer Receivables securing Eligible Receivables at such time and having a denominator equal to the Outstanding Principal Balances of all Eligible Receivables at such time;

(i)    if, at such time, a Subject Inventory Insurance Policy is in full force and effect and a Supplemental Inventory Insurance Policy is in full force and effect, the amount by which the sum of the Outstanding Principal Balances of all Inventory Stage Eligible Receivables at such time exceeds 65% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time;

(j)    if, at such time, no Subject Inventory Insurance Policy is in full force and effect but a Supplemental Inventory Insurance Policy is in full force and effect, the amount by which the sum of the Outstanding Principal Balances of all Inventory Stage Eligible Receivables at such time exceeds 50% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time;

(k)    if, at such time, a Subject Inventory Insurance Policy is in full force and effect but no Supplemental Inventory Insurance Policy is in full force and effect, the amount by which the sum of the Outstanding Principal Balances of all Inventory Stage Eligible Receivables at such time exceeds 30% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time;

(l)    if, at such time, neither a Subject Inventory Insurance Policy nor a Supplemental Inventory Insurance Policy is in full force and effect, the amount by which the sum of the Outstanding Principal Balances of all Inventory Stage Eligible Receivables at such time exceeds 0% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time; and

m)    the amount by which the sum of the Outstanding Principal Balances of all Eligible Receivables related to Opportunity Loan Promissory Notes which had original terms of not more than 120 days which were extended to be not more than 150 days at such time exceeds 15% of the sum of the Outstanding Principal Balances of all Eligible Receivables at such time;

<u>provided</u>, however, that the percentages set forth in clauses (a) through (d) above are subject to modification with respect to any Level IV Approved Retailer, Level III Approved Retailer, Level II Approved Retailer or Level I Approved Retailer, in the sole discretion of the Lender (with the consent of the Facility Insurer) in connection with the provision of Eligible Credit Insurance with respect to the Eligible Retailer Receivables of such Level IV Approved Retailer, Level III Approved Retailer, Level II Approved Retailer or Level I Approved Retailer (such modification to be subject to such terms, conditions limitations and requirements as shall be imposed by the

DZB004136

Lender and/or the Facility Insurer and in effect only for so long as the Lender and the Facility Insurer, in their reasonable discretion, have not deemed it to be desirable to terminate or change such modification) and provided, further, that any amount that would otherwise be included in more than one of clauses (a) through (m) above shall instead be included only in the one such clause which would lead to the calculation of the largest Overconcentration Amount.

"Permitted Investments" means any one or more of the following:

        (i)     direct obligations of, or obligations fully guaranteed as to principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States; and

        (ii)     repurchase obligations (the collateral for which is held by a third party) with respect to any security described in clause (i) above, provided that the long-term unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by Moody's and S&P in one of their two highest long-term rating categories and if rated by Fitch, in one of its two highest long-term rating categories;

        (iii)    certificates of deposit, time deposits, demand deposits and bankers' acceptances of any bank or trust company incorporated under the laws of the United States or any State thereof or the District of Columbia, provided that the short-term commercial paper of such bank or trust company (or, in the case of the principal depository institution in a depository institution holding company, the long-term unsecured debt obligations of the depository institution holding company) at the date of acquisition thereof has been rated by Moody's and S&P in their highest short-term rating category, and if rated by Fitch, in its highest short-term rating category;

        (iv)    commercial paper (having original maturities of not more than 270 days) of any corporation incorporated under the laws of the United States or any State thereof or the District of Columbia, having a rating, on the date of acquisition thereof, of no less than A-1 by Moody's, P-1 by S&P and F-1 if rated by Fitch; and

        (v)     money market mutual funds registered under the Investment Company Act of 1940, as amended, having a rating, at the time of such investment, of no less than Aaa by Moody's, AAA by S&P and AAA if rated by Fitch;

provided, that no such instrument shall be a Permitted Investment if such instrument evidences the right to receive either (a) interest only payments with respect to the obligations underlying such instrument or (b) both principal and interest payments derived from obligations underlying such instrument where the principal and interest payments with respect to such instrument provide a yield to maturity exceeding 120% of the yield to maturity at par of such underlying obligation. Each Permitted Investment may be purchased by the Custodian or through an Affiliate of the Custodian.

DZB004137

"Permitted Liens" means Liens created under this Agreement, and, provided that the Collateral Agent for the benefit of the Secured Parties shall have a first priority perfected security interest in the Opportunity Loan Collateral and the Subject Inventory Collateral, Liens created under the Opportunity Loan Security Agreement and the Approved Distributor Transfer Agreement.

"Person" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture, government (or any agency or political subdivision thereof) or other entity.

"Petters" means Petters Company, Inc., a Minnesota corporation.

"Petters Company Guaranty" means the Petters Company Guaranty, substantially in the form attached hereto as Exhibit R, executed by Petters in favor of Opportunity and which has been assigned to the Collateral Agent for the benefit of the Secured Parties.

"Petters Personal Guaranty" means the Petters Personal Guaranty, substantially in the form attached hereto as Exhibit S, executed by Thomas J. Petters in favor of Opportunity and which has been assigned to the Collateral Agent for the benefit of the Secured Parties.

"Pledge" means the pledge of any Receivable pursuant to Article II.

"Pledged Assets" has the meaning assigned to that term in Section 2.10.

"Pledged Receivables" has the meaning assigned to that term in Section 2.10(a).

"Premium" means the premium payable by the Borrower to the Facility Insurer in respect of the Facility Insurance Policy in the amount set forth in the Facility Insurance Policy as in effect on the date hereof without giving effect to any amendment or modification thereof.

"Pre-payment Fee" means a fee, in an amount equal to the net present value as of the date of determination (calculated using a discount rate equal to the sum of (i) the average of the Yield Rates with respect to the Fixed Periods for each Loan outstanding as of such date of determination, (ii) the Non-Use Fee Rate, (iii) the Servicing Fee Rate, (iv) the Backup Servicer Standby Fee Rate, (v) the Custodian's Fee with respect to the Remittance Period immediately preceding the Remittance Period in which such date of determination occurs (expressed as a percentage of the Net Eligible Receivables Balance as of the first day of such immediately preceding Remittance Period), (vi) the Custodian's Supplemental Fee allocable to the Remittance Period immediately preceding the Remittance Period in which such date of determination occurs (expressed as a percentage of the Net Eligible Receivables Balance as of the first day of such immediately preceding Remittance Period) and (vii) so long as no Facility Insurer Default Type I or Facility Insurer Default Type II shall have occurred and be continuing, 0.40%) of the fee that would accrue at a rate equal to the Non-Use Fee Rate on the entire initial Borrowing Limit hereunder (as the same may be increased pursuant to any amendment hereto or amendment and

DZB004138

restatement hereof) from the effective date of the termination of this Agreement through and including the Facility Maturity Date.

"Program Deficiency" means, at any time, the Facility Amount exceeds the lesser of (x) the Borrowing Limit at such time and (y) the Capital Limit at such time.

"Purchase Price" with respect to any Subject Inventory, the amount set forth as the full purchase price for such Subject Inventory in the applicable Manufacturer Sale Order.

"Rating Agencies" mean Moody's and Fitch, if and so long as they have rated and are continuing to rate commercial paper notes of the Lender at any time that the Lender is an Issuer, or such other nationally recognized statistical rating organizations as may be designated by the Agent.

"Receivable" means the right to receive all payments from an Opportunity Loan Borrower with respect to an Opportunity Loan advance to such Opportunity Loan Borrower including, without limitation, any right to the payment with respect to (i) any proceeds arising in respect of any Opportunity Loan Collateral or any Subject Inventory Collateral related to such Opportunity Loan and (ii) any Subject Inventory Insurance Proceeds, Eligible Credit Insurance proceeds, other credit insurance proceed and any other insurance proceeds paid in respect of any Pledged Assets, Opportunity Loan Collateral or Subject Inventory Collateral, in each case, related to such Opportunity Loan.

"Receivables File" means a file consisting of each of the following items with respect to each Opportunity Loan:

(i)     the Master Receivables File; and

(ii)    the Individual Receivable File.

"Receivables Schedule" has the meaning assigned to that term in the Custodial Agreement.

"Records" means all documents, books, records and other information (including, without limitation, computer programs, tapes, disks, punch cards, data processing software and related property and rights) maintained with respect to Receivables and the related Opportunity Loan Borrowers which the Borrower has itself generated, in which the Borrower has acquired an interest pursuant to the applicable Loan Purchase Agreement or in which the Borrower has otherwise obtained an interest.

"Related Security" means with respect to any Receivable:

(i)     any and all security interests or liens and property subject thereto (including, without limitation, the related Subject Inventory Security Interest and

DZB004139

Opportunity Loan Security Interest) from time to time purporting to secure payment of such Receivable;

       (ii)    the Guarantees, and all other guarantees, indemnities, warranties, letters of credit, insurance policies and proceeds and premium refunds thereof and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable, including, without limitation, Subject Inventory Insurance Proceeds and any proceeds paid in respect of Eligible Credit Insurance or any other credit insurance policy related to a Retailer Receivable; and

       (iii)    all proceeds of the foregoing.

"Release Price" means with respect to a Pledged Receivable to be released hereunder, an amount equal to the Outstanding Principal Balance of such Pledged Receivable plus all accrued but unpaid interest and fees thereon.

"Remittance Date" means the tenth day of each month or, if such date is not a Business Day, the next succeeding Business Day; provided, that the final Remittance Date shall occur on the Collection Date.

"Remittance Period" means, (i) as to the initial Remittance Date, the period beginning on the date of this Agreement and ending on the last day of the calendar month in which such date shall occur (or such other dates as the Agent and the Borrower may agree) and (ii) as to any subsequent Remittance Date, the period beginning on the first day of the most recently ended calendar month and ending on the last day of the most recently ended calendar month; provided, that the final Remittance Period shall begin on the first day of the most recently ended calendar month and shall end on the Collection Date.

"Retailer" means a retailer which is a party to a Retailer Purchaser Order.

"Retailer Purchase Order" means a purchase order substantially in the form of one of the purchase orders attached hereto as Exhibit K pursuant to which an Approved Retailer purchases Subject Inventory from an Approved Distributor.

"Retailer Receivable" means the rights to all payments from a Retailer under a Retailer Purchase Order, including, without limitation, any right to the payment with respect to any Eligible Credit Insurance Proceeds, or any other insurance proceeds paid in respect thereof.

"Royal" has the meaning set forth in the Preamble hereto.

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc. (or its successors in interest).

DZB004140

"Secured Parties" means the Agent, the Lender, the Facility Insurer and their successors and assigns.

"Servicer" means at any time the Person then authorized, pursuant to Section 6.01, to service, administer and collect Pledged Receivables.

"Servicer Advance" has the meaning assigned to such term in Section 6.20.

"Servicer Default" means the occurrence of any of the following events:

(i)     the failure of the Servicer to deliver any payments, collections or proceeds which it is obligated to deliver under the terms hereof or of any other Transaction Document at the times it is obligated to make such deliveries under the terms hereof or of any other Transaction Document;

(ii)    the inability or failure of the Servicer to satisfy any of its reporting, certification, notification or documentation requirements under the terms hereof or of any other Transaction Document or the failure of the Servicer to observe or perform any other covenant under the terms hereof or of any other Transaction Document;

(iii)   any representation, warranty or statement of the Servicer made herein or in any other Transaction Document shall prove to be incorrect in any material respect; provided, however, that if any such event is cured by the repurchase of Receivables pursuant to Section 6.22 hereof, such event shall cease to constitute a Servicer Default;

(iv)    the occurrence of an Early Amortization Event described in clause (iii) or (iv) of the definition of Early Amortization Events;

(v)     the Servicer has at any time a Tangible Net Worth in an amount which shall be less than an amount equal to $12,000,000; or

(vi)    the occurrence of any Bankruptcy Event in respect of the Servicer.

"Servicing Fee" means, for any Remittance Period, an amount, payable out of Collections on the Pledged Receivables and amounts applied to the payment of, or treated as payments on, the Pledged Receivables, equal to (i) the Servicing Fee Rate multiplied by (ii) the Net Eligible Receivables Balance as of the first day of such Remittance Period.

"Servicing Fee Rate" means with respect to the Pledged Receivables, the per annum rate of 0.50%.

"Servicing Officer" means any officer of the Servicer involved in, or responsible for, the administration and servicing of the Pledged Receivables, whose name appears on a list of

DZB004141

servicing officers furnished to the Agent by the Servicer, as such list may from time to time be amended.

"Special Concentration Approved Retailer" means each Approved Retailer appearing on Schedule VI hereto, and any other Approved Retailer designated by the Agent, the Lender and the Facility Insurer, from time to time, in their sole discretion, as a "Special Concentration Approved Retailer"; provided, that if any Special Concentration Approved Retailer ceases to be an Approved Retailer it shall immediately cease to be a Special Concentration Approved Retailer.

"Special Concentration Limit" means, with respect to any Special Concentration Approved Retailer, the percentage appearing opposite such Special Concentration Approved Retailer's name on Schedule VI, provided, that the Agent (with the consent of the Facility Insurer if such Special Concentration Limit is to be increased or eliminated) in its sole discretion, may adjust or eliminate such Special Concentration Limit at any time.

"State" means one of the fifty states of the United States or the District of Columbia.

"Structuring Fee" has the meaning ascribed thereto in the Fee Letter.

"Subject Inventory" means the new retail consumer merchandise which is purchased by an Approved Distributor pursuant to a Manufacturer Sale Order and sold by such Approved Distributor pursuant to a Retailer Purchase Order.

"Subject Inventory Collateral" means the Subject Inventory, any Eligible Credit Insurance (or any other credit insurance policy) related thereto, all purchase orders, contracts or other agreements for the purchase by the Approved Distributor of the Subject Inventory and all proceeds of the foregoing granted as collateral security by an Approved Distributor to an Opportunity Loan Borrower pursuant to an Approved Distributor Transfer Agreement for such Approved Distributor's obligations thereunder.

"Subject Inventory Insurance Certificate" means, with respect to any Subject Inventory, the insurance certificate related to the Subject Inventory Insurance Policy with respect to such Subject Inventory (which insurance certificate shall list Opportunity, the Borrower and their respective successors and assigns as additional insured parties and loss payees).

"Subject Inventory Insurance Policy" means, with respect to any Subject Inventory, any insurance policy (i) maintained by or on behalf of the related Opportunity Loan Borrower, (ii) naming the Borrower as loss payee, (iii) that covers any damage to or any loss of such Subject Inventory and provides general liability coverage with respect to such Subject Inventory and (iv) approved by the Agent and the Facility Insurer in their reasonable discretion.

DZB004142

"Subject Inventory Insurance Proceeds" means, with respect to any Subject Inventory, any amount paid under a Subject Inventory Insurance Policy issued with respect to such Subject Inventory.

"Subject Inventory Security Interest" means with respect to any Subject Inventory Collateral, the security interest in such Subject Inventory Collateral granted by an Approved Distributor to the related Opportunity Loan Borrower.

"Subordinated Indebtedness" means all indebtedness, liabilities and other obligations of an Opportunity Loan Borrower to an Approved Distributor arising under an Existing Opportunity Loan Subordinated Note or otherwise, which is related to a Consummated Retail Financing Transaction, and any documents, instruments or agreements executed by the Opportunity Loan Borrower with or in favor of the Approved Distributor in connection therewith, as each may be amended, supplemented, extended, renewed, modified or restated, whether for principal, premium, interest, fees, expenses, indemnities or otherwise.

"Subsequent Borrowing" means a Borrowing which occurs on a Subsequent Borrowing Date.

"Subsequent Borrowing Date" has the meaning ascribed to such term in the definition of "Borrowing Date".

"Supplemental Inventory Insurance Policy" means any insurance policy (i) maintained by the Borrower, (ii) naming the Collateral Agent as loss payee, (iii) that covers any damage to, or any loss of, Subject Inventory and provides general liability coverage with respect to such Subject Inventory, in each case, under terms and conditions satisfactory to the Agent and the Facility Insurer in their reasonable discretion, including that such coverage is provided in the amount of $10,000,000 per occurrence with no aggregate limitation on such payments, (iv) issued by an insurance company satisfactory to the Agent and the Facility Insurer in their sole discretion, (v) that is in full force and effect, (vi) under which there have been no payment defaults by the insurer and (vii) that is otherwise, at all times, satisfactory to the Agent and the Facility Insurer in their reasonable discretion.

"Tangible Net Worth" means with respect to any Person, the amount calculated in accordance with GAAP as (i) the consolidated net worth of such Person and its consolidated subsidiaries, plus (ii) to the extent not otherwise included in such consolidated net worth, unsecured subordinated Debt of such Person and its consolidated subsidiaries the terms and conditions of which are reasonably satisfactory to the Agent and the Facility Insurer, minus (iii) the consolidated intangibles of such Person and its consolidated subsidiaries, including, without limitation, goodwill, trademarks, tradenames, copyrights, patents, patent allocations, licenses and rights in any of the foregoing and other items treated as intangibles in accordance with GAAP.

DZB004143

"Transaction Documents" means this Agreement, the Loan Purchase Agreement, the Collection Account Agreement, each Approved Distributor SPV Collection Account Control Agreement, the Fee Letter, the Custodial Agreement, the Facility Insurance Policy, the Facility Insurance Agreement, the Opportunity Loan Documents and the Inventory Financing Documents and each document and instrument related to any of the foregoing.

"Transition Costs" means any documented expenses and allocated cost of personnel reasonably incurred by the Backup Servicer in connection with a transfer of servicing from the Servicer to the Backup Servicer as the successor Servicer in an amount not to exceed $10,000.

"UCC" means the Uniform Commercial Code as from time to time in effect in the specified jurisdiction.

"United States" means the United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"Unmatured Event of Default" means any event that, if it continues uncured, will, with lapse of time or notice or lapse of time and notice, constitute an Event of Default.

"Yield" means with respect to any Fixed Period for any Loan allocated to such Fixed Period, the product of:

$$YR \times L \times \frac{ED}{360}$$

where:   $YR$   $=$   the Yield Rate for such Fixed Period;

$L$   $=$   the principal amount of Loans Outstanding allocated to such Fixed Period; and

$ED$   $=$   the actual number of days elapsed during such Fixed Period;

provided, however, that (i) no provision of this Agreement shall require the payment or permit the collection of Yield in excess of the maximum permitted by applicable law and (ii) Yield shall not be considered paid by any distribution if at any time such distribution is required to be rescinded by the Lender to the Borrower or any other Person for any reason including, without limitation, such distribution becoming void or otherwise avoidable under any statutory provision or common law or equitable action, including, without limitation, any provision of the Bankruptcy Code.

"Yield Rate" means with respect to any Fixed Period for any Loan allocated to such Fixed Period:

DZB004144

(i)     to the extent the Lender will be funding the applicable Loan on the first day of such Fixed Period through the issuance of commercial paper, a rate equal to the CP Rate for such Fixed Period; and

(ii)     to the extent the Lender will not be funding the applicable Loan through the issuance of commercial paper, (x) a rate equal to the Non-CP Rate for such Fixed Period or (y) such other rate as the Agent and the Borrower shall agree to in writing with the consent of the Facility Insurer.

SECTION 1.02   Other Terms.   All accounting terms not specifically defined herein shall be construed in accordance with GAAP.  All terms used in Article 9 of the UCC in the State of New York, and not specifically defined herein, are used herein as defined in such Article 9.

SECTION 1.03   Computation of Time Periods.   Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."

II.   THE RECEIVABLES FACILITY

SECTION 2.01   Borrowings.   (a)  On the terms and conditions hereinafter set forth, the Lender shall make loans ("Loans") to the Borrower secured by Pledged Assets from time to time during the period from the date hereof until the earlier of the Early Amortization Commencement Date or the Facility Maturity Date.  The proceeds of each Loan shall be used by the Borrower as set forth in Section 2.01(b) below.  Under no circumstances shall the Borrower request, or the Lender make, any Loan if, (a) the principal amount of such Loan is less than $1,000,000 or greater than the Maximum Individual Loan Amount, (b) the principal amount of such Loan is greater than an amount equal to 80% of the Opportunity Loan related thereto, (c) after giving effect to the Borrowing of such Loan, (i) an Early Amortization Event or an event that but for notice or lapse of time or both would constitute an Early Amortization Event has occurred and is continuing or (ii) a Program Deficiency would occur or (d) the Lender has previously advanced a Loan in respect of the Opportunity Loan related thereto.  Under no circumstances shall the Borrower request, or the Lender make any Loan if, after giving effect to the Borrowing of such Loan, the aggregate face amount of all commercial paper issued by the Lender to fund Loans hereunder exceeds the amount which is available to be drawn under the Liquidity/Credit Enhancement Facility.

(b)     The proceeds of each Loan shall be used solely to fund or refinance the advance of a portion of the Opportunity Loan related thereto.

SECTION 2.02   The Initial Borrowing and Subsequent Borrowings.   (a)  Until the occurrence of the earlier of the Early Amortization Commencement Date and the Facility

DZB004145

Maturity Date, the Lender will make Loans on any Business Day at the request of the Borrower, subject to and in accordance with the terms and conditions of Sections 2.01 and 2.02 and subject to the provisions of Article III hereof.

(b)    (i)  The initial Borrowing and each Subsequent Borrowing shall be made on at least two Business Days' irrevocable written notice from the Borrower to the Agent, with a copy to the Custodian, (any such written notice, a "Notice of Borrowing"), provided that such Notice of Borrowing is received by the Agent no later than 1:00 P.M. (New York City time) on the Business Day of receipt. Any Notice of Borrowing received after 1:00 P.M. (New York City time) shall be deemed received prior to 1:00 P.M. (New York City time) on the following Business Day. Each such Notice of Borrowing shall specify (A) the aggregate amount of such Borrowing, (B) the date of such Borrowing, (C) the requested Fixed Period(s) for such Borrowing and the allocations of Loans to each such requested Fixed Period, (D) the Eligible Receivables to be Pledged in connection with such Borrowing (and upon such Borrowing, such Receivables shall be Pledged Receivables hereunder) and (E) the account into which the Lender is requested to wire transfer the amount of the requested Borrowing. The Agent shall notify the Borrower whether the duration of the Fixed Period(s) described in such Notice of Borrowing is acceptable or, if not acceptable, the Agent shall advise the Borrower of such Fixed Period(s) as may be acceptable. On the date of each Borrowing, the Lender shall, upon satisfaction of the applicable conditions set forth in Article III, make available to the Borrower on the applicable Borrowing Date, no later than 4:00 P.M. (New York City time) in same day funds, the amount of such Borrowing (net of amounts payable to or for the benefit of the Lender) by payment into the account which the Borrower has designated in writing.

(ii)   The Notice of Borrowing for each Borrowing delivered to the Agent pursuant to this Section 2.02(b) shall be accompanied by a copy of the Notice of Pledge (and the Receivables Schedule attached thereto) which was sent to the Custodian pursuant to the terms of the Custodial Agreement in connection with the pledge of Eligible Receivables to be made in connection therewith.

(c)    Unless otherwise provided in this Agreement, the Loans shall bear interest at the Yield Rate.

(d)    Subject to the terms, conditions, provisions and limitations set forth herein, the Borrower may borrow, repay or prepay Loans, on and after the date hereof and prior to the earlier to occur of the Facility Maturity Date and the Early Amortization Commencement Date.

(e)    Determinations by the Lender of the existence of any CP Disruption Event, or of the effect of any CP Disruption Event on its making or maintaining Loans at the CP Eurodollar Rate, shall be conclusive absent manifest error.

DZB004146

(f)    Determinations by the Lender of the existence of any Eurodollar Disruption Event, or of the effect of any Eurodollar Disruption Event on its making or maintaining Loans at the Adjusted Eurodollar Rate, shall be conclusive absent manifest error.

SECTION 2.03    Facility Maturity Date. Any Loans outstanding on the Facility Maturity Date shall mature on such date. Notwithstanding any other provision hereof, on the Facility Maturity Date, the outstanding principal of all outstanding Loans, if any, and all Yield and all Fees accrued thereon and all other Obligations shall be immediately due and payable (and the Borrower shall pay all such amounts immediately).

SECTION 2.04    Selection of Fixed Periods. (a) At all times until the earlier to occur of the Early Amortization Commencement Date and the Facility Maturity Date, the Borrower shall, subject to the Agent's and the Lender's approval and the limitations described below, request Fixed Periods (none of which shall have a duration in excess of 60 days) and allocations of a portion of the outstanding Loans to each selected Fixed Period, so that all such outstanding Loans are at all times allocated to one or more Fixed Periods. Subject to Section 2.04(c), the Yield Rate to apply to all Loans outstanding shall be the CP Rate. The requested initial Fixed Period applicable to any new Loan arising as a result of a Borrowing shall be requested in the Notice of Borrowing which shall be delivered in connection with the applicable Subsequent Borrowing. Subject to the next sentence of this Section 2.04, each CP Rollover Fixed Period shall commence on the last day of the immediately preceding Fixed Period, and the duration of such CP Rollover Fixed Period shall be such as the Borrower shall request in a Commercial Paper Remittance Report and the Agent shall approve; provided; that such Commercial Paper Remittance Report was received by the Agent not later than 12:30 P.M. (New York City time) on a day at least one Business Day prior to such last day, except that if the Agent shall not have received such report before 12:30 P.M. on such day or the Agent and the Borrower shall not have so mutually agreed before 2:00 P.M. (New York City time) on such day, such CP Rollover Fixed Period shall be one day and the applicable Yield Rate shall be the CP Rate; provided that, notwithstanding any other provision hereof, upon the occurrence of any Early Amortization Event, the applicable Yield Rate for all Fixed Periods in effect at the time of such occurrence, and for all Fixed Periods that come into effect thereafter (but prior to the occurrence of any Event of Default) shall be calculated using the Non-CP Rate; and provided further that, notwithstanding the foregoing, upon the occurrence and during the continuance of any Event of Default, the Lender may cease issuing commercial paper notes to fund and maintain Loans hereunder and the applicable Yield Rate for all Fixed Periods in effect at the time of such occurrence shall convert to, and for all Fixed Periods that come into effect during the continuance of any Event of Default shall be, the Default Funding Rate. Any Fixed Period requested hereunder must end on a day which is a Business Day and if, notwithstanding the foregoing, any Fixed Period selected would otherwise end on a day which is not a Business Day, such Fixed Period shall be extended to the next succeeding Business Day. Any Fixed Period which commences before the Early Amortization Commencement Date and would otherwise end on a date occurring after the Early Amortization Commencement Date shall end on the Early Amortization Commencement Date. On and after the Early Amortization Commencement Date, the Agent shall have the right to allocate outstanding Loans, if any, to Fixed Periods of such

DZB004147

duration as shall be selected by the Agent. The Lender shall, on the first day of each Fixed Period with respect to Loans which accrue Yield at the CP Rate, notify the Agent of the Yield Rate for such loans.

(b)      References herein to Loans which accrue Yield at the Non-CP Rate being allocated to a Fixed Period shall mean all such Loans that are outstanding during such Fixed Period or a portion thereof.

(c)      So long as no Event of Default or Early Amortization Event or event or circumstance which, with the giving of notice or the passage of time, or both, would constitute an Event of Default or Early Amortization Event shall have occurred and be continuing, each of the Lender and the Agent shall make reasonable efforts to allow Loans to accrue Yield at the CP Rate; provided that neither the Lender nor the Agent shall have any obligation to allow Loans to accrue Yield at the CP Rate upon the occurrence of a CP Disruption Event.

SECTION 2.05    Remittance Procedures. The Servicer, as agent for the Agent, the Lender and the Facility Insurer, shall, with the written consent of the Agent, instruct the Custodian, and the Agent may instruct the Custodian, to apply funds on deposit in the Collection Account as described in this Section 2.05. No funds shall be transferred from the Collection Account except in accordance with this Section 2.05. Notwithstanding any other provision of this Section 2.05, no funds shall be transferred from the Collection Account without the written consent of the Agent.

(a)      Yield and Liquidation Fees. On each Business Day (including any Remittance Date), the Servicer shall, with the written consent of the Agent, and the Agent may, direct the Custodian to set aside in the Collection Account for transfer at the further direction of the Lender or the Agent or any other duly authorized agent of the Lender (whether on such day or on a subsequent day) collected funds in an amount equal to Yield accrued through such day on the Loans and the Non-Use Fees accrued through such day, in each case, not so previously set aside and the amount of any unpaid Liquidation Fees owed to the Lender on such day. On the last day of each Fixed Period, the Agent shall notify the Servicer of, and direct the Custodian to pay, such collected funds set aside in respect of Yield pursuant to this Section 2.05(a) to the Lender (or the designee of the Lender) in respect of payment of accrued Yield for such Fixed Period; provided, however, that (i) in the case of any Loan accruing Yield at the CP Rate, the portion of such Yield attributable to the Applicable Margin, and (ii) in the case of any Loan accruing Yield at the Non-CP Rate, all such Yield, shall remain set aside in the Collection Account until the next Remittance Date and, at which time, shall be disbursed pursuant to Section 2.05(c). Any funds set aside in respect of accrued Non-Use Fees pursuant to this Section 2.05(a) shall remain set aside in the Collection Account until the next Remittance Date, at which time such funds shall be disbursed pursuant to Section 2.05(c). On any Business Day on which an amount is set aside in respect of Liquidation Fees pursuant to this Section 2.05(a), the Agent shall direct the Custodian to pay such funds to the Lender in payment of such Liquidation Fees.

DZB004148

(b)      Fixed Period Loan Principal Repayment. The Servicer shall, with the written consent of the Agent, and the Agent may, on the last day of each Fixed Period that is not a Remittance Date, direct the Custodian to transfer collected funds held by the Custodian in the Collection Account on such day, to pay the Agent for the account of the Lender in payment of the outstanding principal amount of all Loans allocated to such Fixed Period, an amount equal to the lesser of (i) the amount of such collected funds held in the Collection Account minus an amount equal to the accrued and unpaid Yield, Fees and Premium as of such day and all other amounts that will need to be withdrawn from the Collection Account on the next Remittance Date pursuant to Section 2.05(c) to the extent such amounts can be allocated to that portion of the corresponding Remittance Period that has elapsed as of such day or (ii) the aggregate outstanding principal amount of Loans allocated to such Fixed Period or, if the Early Amortization Commencement Date shall not have occurred, if lower, an amount equal to the excess, if any, of the aggregate outstanding principal amount of Loans immediately prior to such distribution over the Capital Limit (after giving effect to any Borrowing made on such date and any distributions of amounts on deposit in the Collection Account made on such date).

(c)      Remittance Date Transfers from Collection Account. The Servicer shall, with the written consent of the Agent, and the Agent may, on each Remittance Date, direct the Custodian to transfer collected funds held by the Custodian in the Collection Account (in excess of the aggregate amounts (except amounts described in sub-paragraph (iii) below) set aside and/or paid on such Remittance Date pursuant to Section 2.05(a)), in the following amounts and priority:

(i)      at any time after the occurrence of a Servicer Default and the appointment of the Backup Servicer as the Servicer hereunder, to the Backup Servicer in an amount equal to the Backup Servicer's Fees which are accrued and unpaid as of the last day of the preceding month plus any Transition Costs not previously reimbursed to the Backup Servicer as of the last day of the preceding month;

(ii)      equally and ratably (A) to the Custodian in an amount equal to the Custodian's Fees which are accrued and unpaid as of the last day of the preceding month (and expenses of the Custodian which are reimbursable under the terms of the Custodial Agreement and are unpaid as of the last day of the preceding month); (B) to the Custodian in an amount equal to the Custodian's Supplemental Fees which are accrued and unpaid as of the last day of the preceding month (and expenses of the Custodian which are reimbursable under the terms of the Collection Account Agreement and are unpaid as of the last day of the preceding month), (C) to the Backup Servicer in an amount equal to the Backup Servicer Standby Fees which are accrued and unpaid as of the last day of the preceding month; and (D) to the Facility Insurer in respect of Premiums which are then due and payable (provided that, upon the occurrence and during the continuance of a Facility Insurer Default Type I or a Facility Insurer Default Type II, the amount otherwise payable to the Facility Insurer in respect of such Premiums shall be paid to Agent for the benefit of the Lender as partial payment of Applicable Margin due);

DZB004149

(iii)    to the Agent for the account of the Lender in an amount equal to (and for the pro rata payment of) (A) the Fees which are due and payable on such Remittance Date pursuant to the terms of the Fee Letter, (B) any Yield (not paid in accordance with clause (ii) above) on any Loan accruing Yield at the CP Rate which is attributable to the Applicable Margin and which is accrued and unpaid as of the last day of the preceding month and (C) any Yield on any Loan accruing Yield at the Non-CP Rate which is accrued and unpaid as of the last day of the preceding month;

(iv)    to the Agent for the account of the Lender in an amount equal to the Borrowing Base Deficiency (if any) as of such Remittance Date;

(v)    to the Agent for the account of the Lender in an amount equal to the aggregate amount of all other obligations of the Borrower then due to the Lender, the Agent or any Affected Party hereunder (other than those specified in clauses (iv) above and (vii) below);

(vi)    so long as no Program Deficiency would result from payment thereof to the Servicer (if the Servicer is Opportunity or any Affiliate thereof) in an amount equal to the Servicing Fee which is accrued and unpaid as the last day of the preceding month plus any Servicer Advances not previously reimbursed to the Servicer;

(vii)    on or after the occurrence of the Early Amortization Commencement Date, to the Agent for the account of the Lender for the repayment of Loans outstanding in an amount equal to the lesser of (i) all remaining funds in the Collection Account and (ii) an amount necessary to repay the outstanding principal amount of all Loans in full;

(viii)    to the Facility Insurer an amount equal to the Accrued Liability on the Loans then due and payable; and

(ix)    to the Borrower, any remaining amounts.

Upon its receipt of funds pursuant to clauses (iii), (iv), (v) and (vii), the Agent shall apply such funds as directed by the Lender or as otherwise provided in this Agreement.

(d)    Borrower Deficiency Payments. Notwithstanding anything to the contrary contained in this Section 2.05 or in any other provision in this Agreement, if, on any day prior to the Collection Date a Program Deficiency shall occur, then the Borrower shall remit to the Agent, prior to any Borrowing and in any event no later than the close of business of the Agent on such day (or if such day is not a Business Day, no later than the close of business of the Agent on the next succeeding Business Day), a payment (to be applied by the Agent to repay Loans selected by the Agent, in its sole discretion) in such amount as may be necessary to eliminate such Program Deficiency.

DZB004150

(e)    Borrowing Base Surplus Withdrawals. Notwithstanding anything to the contrary contained in this Section 2.05 or in any other provision in this Agreement, if, on any Business Day (provided that such day shall be prior to the Early Amortization Commencement Date), a Borrowing Base Surplus exists, the Borrower may, with the written consent of the Agent, request that the Custodian withdraws from the Collection Account and deposits into (x) the Borrower Operating Account for use at the discretion of the Borrower or (y) an account designated by the Borrower and the Agent for the purpose of repaying Loans allocated to a Fixed Period ending on such Business Day, an amount not greater than the smallest of (i) the principal amount of Loans allocated to such Fixed Period (in the case of Clause (y) above), (ii) the Borrowing Base Surplus as of such day (prior to giving effect to such withdrawal) and (iii) an amount equal to (x) the amount on deposit in the Collection Account minus (y) an amount equal the accrued and unpaid Yield, Fees and Premium as of such day.

(f)    Reinvestment and Loan Repayment Withdrawals. Notwithstanding anything to the contrary contained in this Section 2.05 or in any other provision in this Agreement, if, on any Business Day (provided that such day shall be prior to the Early Amortization Commencement Date) the Borrower may, with the written consent of the Agent, request that the Custodian withdraws from the Collection Account and deposits into (A) an Approved Distributor SPV Collection Account (for further transfer to an Approved Manufacturer pursuant to the terms of the Custodial Agreement) or (B) an account designated by the Borrower and the Agent for the purpose of repaying Loans allocated to a Fixed Period ending on such Business Day, an amount not in excess of (x) the amount on deposit in the Collection Account minus (y) an amount equal to the accrued and unpaid Yield, Fees and Premium as of such day; provided, that (I)(i) the entire amount of such withdrawal shall be used by the Borrower to purchase one or more Eligible Receivables pursuant to the Loan Purchase Agreement, (ii) such Eligible Receivables shall be Pledged hereunder on the day of such withdrawal and (iii) after giving effect to such withdrawal and the Pledge of such Eligible Receivables, no Borrowing Base Deficiency shall exist or (II) the entire amount of such withdrawal shall be used by the Borrower to repay Loans allocated to a Fixed Period ending on such Business Day.

(g)    Withdrawals for Certain Premium Payments. If the Servicer and/or the Borrower shall fail to make any premium or other payment due to an insurer providing any (i) Eligible Credit Insurance policy or any other credit insurance policy related to a Retailer Receivable, (ii) Subject Inventory Insurance Policy or (iii) Supplemental Inventory Insurance Policy, the Collateral Agent, with the consent of the Facility Insurer, may (but has no obligation to) withdraw amounts from the Collection Account on any Business Day in order to make such payment to such insurer.

(h)    Instructions to the Custodian. All instructions and directions given to the Custodian by the Servicer or the Agent pursuant to this Section 2.05 shall be in writing (including instructions and directions transmitted to the Custodian by telecopy) and such written instructions and directions shall be delivered with a written certification that such instructions and directions are in compliance with the provisions of this Section 2.05. A copy of all instructions and directions given to the Custodian by the Servicer pursuant to this Section 2.05,

DZB004151

shall be immediately transmitted by the Servicer to the Agent and the Facility Insurer by telecopy. A copy of all instructions and directions given to the Custodian by the Agent pursuant to this <u>Section 2.05</u>, shall be immediately transmitted by the Agent to the Servicer, the Borrower and the Facility Insurer by telecopy.

SECTION 2.06    <u>Payments and Computations, Etc.</u> (a) All amounts to be paid or deposited by the Borrower or the Servicer hereunder shall be paid or deposited in accordance with the terms hereof no later than 1:00 P.M. (New York City time) on the day when due in lawful money of the United States in immediately available funds to the Collection Account or such other account as is designated by the Lender. The Borrower shall, to the extent permitted by law, pay to the Agent interest on all amounts not paid or deposited when due hereunder (whether owing by the Borrower or the Servicer) at the Non-CP Rate plus 2.00%, payable on demand; <u>provided</u>, <u>however</u>, that such interest rate shall not at any time exceed the maximum rate permitted by applicable law.  Such interest shall be for the account of, and distributed by the Agent to, the Lender.  Any Obligation hereunder shall not be reduced by any distribution of any portion of Collections if at any time such distribution is rescinded or returned by the Lender to the Borrower or any other Person for any reason.  All computations of interest and all computations of Yield, Liquidation Fee and other fees hereunder (including, without limitation, the Fees, the Backup Servicer's Fee, the Backup Servicer Standby Fee and the Servicing Fee) shall be made on the basis of a year of 360 days for the actual number of days (including the first but excluding the last day) elapsed.

(b)    Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of Yield, interest or any fee payable hereunder, as the case may be.

(c)    If any Borrowing requested by the Borrower and approved by the Lender and the Agent pursuant to <u>Section 2.02</u> or any selection of any Fixed Period requested by the Borrower and approved by the Agent pursuant to <u>Section 2.04</u> is not for any reason whatsoever, except as a result of the gross negligence or wilful misconduct of the Lender and/or the Agent, made or effectuated, as the case may be, on the date specified therefor, the Borrower shall indemnify the Lender against any loss, cost or expense incurred by the Lender (other than any such loss, cost or expense solely due to the gross negligence or willful misconduct of the Lender or the Agent), including, without limitation, any loss (including cost of funds and out-of-pocket expenses), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender to fund Loans or maintain Loans during such Fixed Period.

SECTION 2.07    <u>Fees</u>. (a) The Borrower shall pay the Lender (either directly or through the Agent) certain fees (the "<u>Fees</u>") in the amounts and on the dates set forth in a fee letter (the "<u>Fee Letter</u>"), dated the date hereof, among Opportunity, the Borrower, the Agent, and the Lender as in effect on the date hereof and as such fee letter may be amended by the parties thereto with the consent of the Facility Insurer.

DZB004152

(b)      All of the Fees payable pursuant to this <u>Section 2.07</u> shall be payable solely from amounts available for application pursuant to, and subject to the priority of payment set forth in, <u>Section 2.05</u>.

SECTION 2.08    <u>Increased Costs; Capital Adequacy</u>.  (a) If, due to either (i) the introduction of or any change (including, without limitation, any change by way of imposition or increase of reserve requirements) in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other governmental authority (whether or not having the force of law), there shall be any increase in the cost to the Agent, the Lender, or any Affiliate, successor or assign thereof (each of which shall be an "<u>Affected Party</u>") of agreeing to make or making, funding or maintaining any Loan, as the case may be, the Borrower shall, from time to time, upon written demand by such Affected Party (with a copy to the Agent), pay (from Collections pursuant to, and subject to the priority of payment set forth in, <u>Section 2.05(c)</u>) to such Affected Party (as a third party beneficiary, in the case of an Affected Party that is not also the Lender hereunder), additional amounts sufficient to compensate such Affected Party for such increased costs.

(b)      If either (i) the introduction of or any change in or in the interpretation of any law, guideline, rule or regulation, directive or request or (ii) the compliance by any Affected Party with any law, guideline, rule, regulation, directive or request from any central bank or other governmental authority or agency (whether or not having the force of law), including, without limitation, compliance by an Affected Party with any request or directive regarding capital adequacy, has or would have the effect of reducing the rate of return on the capital of any Affected Party as a consequence of its obligations hereunder or arising in connection herewith to a level below that which any such Affected Party could have achieved but for such introduction, change or compliance (taking into consideration the policies of such Affected Party with respect to capital adequacy) by an amount deemed by such Affected Party to be material, then from time to time, within ten days after demand by such Affected Party (which demand shall be accompanied by a statement setting forth the basis of such demand), the Borrower shall pay (from Collections pursuant to, and subject to the priority of payment set forth in, <u>Section 2.05(c)</u>) such Affected Party such additional amounts as will compensate such Affected Party for such reduction.

(c)      In determining any amount provided for in this <u>Section 2.08</u>, the Affected Party may use any reasonable averaging and attribution methods.  Any Affected Party making a claim under this <u>Section 2.08</u> shall submit to the Borrower a certificate setting forth in reasonable detail the computations of such additional or increased costs, which certificate shall be conclusive absent demonstrable error.

(d)      If, as a result of any event or circumstance similar to those described in <u>Section 2.08(a)</u> or <u>2.08(b)</u>, any Affected Party (that is an Issuer) is required to compensate a bank or other financial institution providing liquidity support, credit enhancement or other similar support to such Affected Party in connection with this Agreement, then, upon demand by such

DZB004153

Affected Party the Borrower shall pay to such Affected Party such additional amount or amounts as may be necessary to reimburse such Affected Party for any amounts paid by it.

SECTION 2.09    Collateral Assignment of Agreements. The Borrower hereby collaterally assigns to the Collateral Agent, for the benefit of the Secured Parties, all of the Borrower's right, title and interest in, to and under the Loan Purchase Agreement and all Contracts and other Opportunity Loan Documents and all Inventory Financing Documents and all other agreements, documents and instruments comprising Pledged Assets, Opportunity Loan Collateral or Subject Inventory Collateral or all other agreements, documents and instruments evidencing, securing or guarantying any Pledged Receivable and all other agreements, documents and instruments related to any of the foregoing (the "Assigned Documents"). The Borrower confirms and agrees that the Collateral Agent (or any designee thereof) shall have, following an Event of Default or an Early Amortization Event, the sole right to enforce the Borrower's rights and remedies under each Assigned Document, but without any obligation on the part of the Agent, the Collateral Agent, the Lender and the Facility Insurer or any of their respective Affiliates to perform any of the obligations of the Borrower under any such Assigned Document. In addition, each of the Servicer and the Borrower confirms and agrees that the Servicer or the Borrower will send to the Collateral Agent, with a copy to the Agent and the Facility Insurer, a notice of (i) any breach of any representation, warranty, agreement or covenant under any such Assigned Document or (ii) any event or occurrence that, upon notice to Opportunity, or upon the passage of time or both, would constitute such a breach. The Borrower further confirms and agrees that such assignment to the Collateral Agent shall terminate upon the Collection Date.

SECTION 2.10    Grant of a Security Interest. (i)  To secure the prompt and complete payment when due of the Obligations and the performance by the Borrower of all of the covenants and obligations to be performed by it pursuant to this Agreement, the Borrower hereby collaterally assigns and pledges to the Collateral Agent, on behalf of the Secured Parties (and their successors and assigns) and grants to the Collateral Agent, on behalf of the Secured Parties (and their successors and assigns), a security interest in all of the Borrower's right, title and interest in, to and under all of its assets, including without limitation all of the following property and interests in property (collectively, the "Pledged Assets"), whether tangible or intangible and whether now owned or existing or hereafter arising or acquired and wheresoever located:

(a)        all Receivables purchased or contributed by (or purportedly purchased or contributed by) the Borrower under the Loan Purchase Agreement (collectively, the "Pledged Receivables"), together with all collateral (including without limitation, all Subject Inventory Collateral and all Opportunity Loan Collateral) and all Related Security related to the Pledged Receivables, all Collections and other monies due and to become due to the Borrower in respect of any Pledged Receivable and any security therefor received on or after the date such Pledged Receivables were purchased by (or purportedly purchased by) the Borrower;

DZB004154

(b)      the Assigned Documents, including in each case, without limitation, all monies due and to become due to the Borrower under or in connection therewith, and all legal opinions delivered or rendered in connection with any item included in clause (a) above or this clause (b) or any transaction related to any of the foregoing;

(c)      (i) the Collection Account and all other bank and similar accounts relating to the collection of Pledged Receivables (whether now existing or hereafter established) and all funds held therein or in such other accounts, and all investments in and all income from the investment of such funds in the Collection Account, and such other accounts and (ii) the Borrower's security interest in the Approved Distributor SPV Collection Account and all funds held therein;

(d)      the Records relating to any Pledged Receivables;

(e)      all UCC financing statements filed by the Borrower against Opportunity under or in connection with the Loan Purchase Agreement;

(f)      all Liquidation Proceeds relating to any Pledged Receivables;

(g)      all proceeds of the foregoing property described in clauses (a) through (f) above, including interest, dividends. cash. instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for or on account of the sale or other disposition of any or all of the then existing Pledged Receivables.

(ii)      It is agreed by the Facility Insurer that as between the Facility Insurer, on the one hand, and the Agent and the Lender, on the other hand,  (a) the Facility Insurer's right, title and interest in, to and under. the Pledged Assets is subordinate in all respects to the Agent's and the Lender's right, title and interest in. to and under. the Pledged Assets and (b) no proceeds from the sale or other disposal of any Pledged Assets shall be applied to pay any amounts due to the Facility Insurer under any Transaction Document or otherwise unless and until all amounts due to the Lender and the Agent under any Transaction Document have been indefeasibly paid in full.

SECTION 2.11   The Collateral Agent and the Pledged Assets.   The Secured Parties hereby authorize and the Collateral Agent hereby agrees that it shall execute and deliver each UCC financing statement and the other Transaction Documents relating to the Pledged Assets requiring execution and delivery by it and shall accept delivery from the Borrower of those Transaction Documents relating to the Pledged Assets which do not require the Collateral Agent's execution; provided, however, that the Collateral Agent shall not be required to execute any such Transaction Document relating to the Collateral Agent. or adversely affecting the Collateral Agent unless the provisions thereof imposing such obligation or liability or adversely affecting the Collateral Agent are. in each case. in form and substance satisfactory to the Collateral Agent.   The Collateral Agent shall take any action with respect to the Pledged Assets,

DZB004155

this Agreement and the other Transaction Documents relating to the Pledged Assets requested in a written notice signed by each of the Secured Parties, including, without limitation, releasing portions of the Pledged Assets from the security interests imposed pursuant to this Agreement and the other Transaction Documents relating to the Pledged Assets; provided, however, that the Collateral Agent shall not be obligated to take any such action which is in conflict with any provisions of law, of this Agreement, or of the other Transaction Documents or with respect to which the Collateral Agent has not received adequate security or indemnity, determined in the sole discretion of the Collateral Agent. The Collateral Agent shall not be under any obligation to take any action which is discretionary under the provisions hereof or under any other Transaction Document relating to the Pledged Assets unless so directed to do so in a written notice signed by each of the Secured Parties. The Collateral Agent shall not have any duty to any of the Secured Parties as to any Pledged Assets in their possession or control or in the possession or control of any agent or nominee of such Secured Party or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

SECTION 2.12   Limitations on Duties of Collateral Agent. The Collateral Agent shall be obligated to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Collateral Agent. The Collateral Agent shall exercise the rights and powers vested in it by this Agreement or by any other Transaction Document, and the Collateral Agent shall not be liable with respect to any action taken or omitted to be taken by it in accordance with the direction of the Secured Parties in accordance with the terms of this Agreement.

SECTION 2.13   Exculpatory Provisions, Indemnification. (a) The Collateral Agent shall not be responsible in any manner whatsoever for the correctness of any recitals, statements, representations or warranties contained herein or in the other Transaction Documents, except for those made by or required to be verified by the Collateral Agent. The Collateral Agent makes no representations as to the value or condition of the Pledged Assets or any part thereof, or as to the title of the Borrower thereto or as to the security afforded by the Transaction Documents or this Agreement. The Collateral Agent shall not be responsible for insuring the Pledged Assets or for the payment of taxes, charges, assessments or liens upon the Pledged Assets or for the maintenance of the Pledged Assets.

(b)   The Collateral Agent shall not be liable for any acts, omissions, errors or judgment or mistakes of fact or law made, taken or omitted to be made or taken by it in accordance with this Agreement or any other Transaction Document (including, without limitation, acts, omissions, errors or mistakes with respect to the Pledged Assets), except for those arising out of or in connection with the Collateral Agent's gross negligence or willful misconduct.

(c)   Without limiting any other rights which the Collateral Agent or any of its respective Affiliates may have hereunder or under applicable law, to the extent not previously paid by the Borrower or the Servicer pursuant to Article VIII hereof (but without any obligation of the Collateral Agent to have made any demand for indemnification thereunder) (i) the Facility Insurer agrees to indemnify the Collateral Agent (in such capacity) from and against all damages,

DZB004156

losses, claims, liabilities. and related costs and expenses, including reasonable attorneys' fees awarded or incurred by the Collateral Agent (in such capacity) which have resulted from any action taken or omitted to be taken by the Collateral Agent  (in such capacity) solely in accordance with the directions of the Facility Insurer and (ii) the Facility Insurer and the Lender agree to indemnify, on an equal basis, the Collateral Agent from and against all of the damages, losses, claims, liabilities, and related costs and expenses, including reasonable attorneys' fees awarded or incurred by the Collateral Agent  (in such capacity) which have resulted from any action taken or omitted to be taken by the Collateral Agent (in such capacity) other than those specified in clause (i) above, excluding, in each case, any such amounts to the extent resulting from gross negligence or willful misconduct on part of the Collateral Agent.  Upon payment of any such amounts by the Facility Insurer and/or the Lender,  the Facility Insurer and/or the Lender, as applicable, shall be subrogated to any claim that the Collateral Agent may have against the Borrower or the Servicer with respect thereto.

SECTION 2.14   Reliance by Collateral Agent. (a)  Whenever in the administration of the Pledged Assets under this Agreement the Collateral Agent shall deem it necessary or desirable that a matter be proved or established with respect to any or all of the Secured Parties in connection with the taking, suffering or omission of any action hereunder by the Collateral Agent, such matter (unless other evidence in respect thereof is specifically prescribed under this Agreement) may be deemed to be conclusively provided or established by an Officer's Certificate of any or each Secured Party. as applicable, in each case, delivered to the Collateral Agent. and such Officer's Certificate shall be full warranty to the Collateral Agent for any action taken, suffered or omitted in reliance thereon.  Without in any way limiting the foregoing, all certificates. notices or directions required to be delivered by any of the Secured Parties to the Collateral Agent pursuant to the terms hereof shall in all cases be signed by a duly authorized officer of such Person.

(b)   The Collateral Agent may consult with counsel. accountants and other experts, and any opinion or advice of any such counsel. any such accountant. and any such other expert shall be full and complete authorization and protection in respect of any action taken or suffered by the Collateral Agent hereunder in accordance therewith.  The Collateral Agent shall have the right at any time to seek instructions concerning the administration of the Pledged Assets from any court of competent jurisdiction.

(c)   The Collateral Agent may rely, and shall be fully protected in acting, upon any resolution. statement, certificate. instrument. opinion. report. notice. request. consent. order, bond or other paper or document which it has no reasonable reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or. in the case of cables, telecopies and telexes. to have been sent by the proper party or parties.  In the absence of its gross negligence or willful misconduct. the Collateral Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Collateral Agent and conforming to the requirements of this Agreement or any other Transaction Document.

DZB004157

d)     If the Collateral Agent has been requested or directed to take action pursuant to any provision of this Agreement, the Collateral Agent shall not be under any obligation to exercise any of the rights or powers vested in the Collateral Agent by this Agreement or any Transaction Document unless the Collateral Agent shall have been provided adequate security and indemnity against the costs, expenses and liabilities which may be incurred by it in compliance with such request or direction, including such reasonable advances as may be requested by the Collateral Agent.

SECTION 2.15     Agent's and Collateral Agent's Reliance, Etc.  Neither the Agent nor the Collateral Agent nor any of their directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them as Agent or as Collateral Agent, as applicable, under or in connection with this Agreement or any other agreement executed pursuant hereto, except for its or their own gross negligence or willful malfeasance or misfeasance. Without limiting the foregoing, each of the Agent and the Collateral Agent: (i) may consult with legal counsel (including counsel for the Borrower, the Servicer, the Backup Servicer, the Custodian and the Facility Insurer), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (ii) makes no warranty or representation to the Lender or the Facility Insurer and shall not be responsible to the Lender or the Facility Insurer for any statements, warranties or representations made in or in connection with this Agreement or in connection with any of the other agreements executed pursuant hereto; (iii) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement on the part of the Borrower or the Servicer or to inspect the property (including the books and records) of the Borrower or the Servicer; (iv) shall not be responsible to the Lender or the Facility Insurer for the due execution, liability, validity, enforceability, genuineness or sufficiency of value of this Agreement or any other agreement, instrument or document furnished pursuant hereto; and (v) shall incur no liability under or in respect of this Agreement or any other agreement executed pursuant hereto, by acting upon any notice, consent, certificate or other instrument or writing (which may be by telex or facsimile) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 2.16     Delegation of Duties by Agent and the Collateral Agent.  The Agent and the Collateral Agent may each execute any of its duties under this Agreement by or through agents or attorneys-in-fact approved by the Secured Parties and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Neither the Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

SECTION 2.17     Successor Agent and Collateral Agent.  The Agent and the Collateral Agent may, upon thirty (30) days' notice to the Borrower, the Servicer, the Lender, the Facility Insurer and each other party hereto, resign as Agent and/or Collateral Agent. If DZ Bank shall resign as Agent or Collateral Agent under this Agreement, then the Lender (with the consent of the Facility Insurer) during such thirty-day period shall appoint a successor Agent and/or Collateral Agent, whereupon such successor Agent and/or Collateral Agent shall succeed

DZB004158

to the rights, powers and duties of the Agent and/or Collateral Agent and references herein to the Agent and/or Collateral Agent shall mean such successor agent, effective upon its appointment; and such former Agent's and/or Collateral Agent's rights, powers and duties in such capacity shall be terminated, without any other or further act or deed on the part of such former Agent and/or Collateral Agent or any of the parties to this Agreement. After any retiring Agent's or Collateral Agent's resignation hereunder as such agent, the provisions of Article VIII, this Article II and Section 9.07 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent and/or Collateral Agent under this Agreement.

SECTION 2.18   Evidence of Debt.  The Lender shall maintain an account or accounts evidencing the indebtedness of the Borrower to the Lender resulting from each Loan owing to the Lender from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.  The entries made in such account(s) of the Lender shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.19   Survival of Representations and Warranties; Repayment Obligations.  (a)  It is understood and agreed that the representations and warranties set forth in Section 4.01 are made on the date of this Agreement, at the time of the initial Borrowing, and on each Subsequent Borrowing Date and Remittance Date thereafter.  If, as a result of the breach of any of the representations and warranties in Section 4.01 or for any other reason there exists or would exist a Program Deficiency, the Borrower shall promptly (and, in any case, within one Business Day) prepay to the Agent, for the account of the Lender, the portion of the Loans as is necessary to cure such Program Deficiency.  The Borrower shall promptly reimburse the Agent and the Lender for any reasonable out-of-pocket expenses incurred by the Agent and the Lender, respectively, in respect of any such prepayment including, without limitation, Liquidation Fees.

SECTION 2.20   Release of Pledged Receivables.  (a)  In connection with the consummation of any payment in full by the related Opportunity Loan Borrower or liquidation by the Servicer of any Receivable, or any required repurchase by Opportunity of Pledged Receivables pursuant to the Loan Purchase Agreement, the Borrower shall be entitled to obtain the release of any Pledged Receivable subject to any such transaction, pay off, liquidation or repurchase at any time after the date hereof by depositing into the Collection Account the Release Price therefor on any Remittance Date and upon such deposit the Collateral Agent shall execute and deliver, within a reasonable period of time and at the sole expense of the Borrower, such documents as the Borrower determines in its reasonable discretion to be necessary to effect such release; provided, that the foregoing release shall only be available if, after giving effect thereto and the application of the proceeds thereof in accordance with the terms hereof, there shall not be a Program Deficiency or Early Amortization Event.

(b)      The Borrower shall notify the Agent of any Release Price to be paid pursuant to this Section 2.20 on the Business Day on which such Release Price shall be paid specifying the Pledged Receivables to be released and the Release Price.

DZB004159

SECTION 2.21   Treatment of Amounts Paid by the Borrower.  Amounts paid by the Borrower pursuant to Section 2.20 on account of Pledged Receivables shall be treated as payments on Pledged Receivables hereunder.

SECTION 2.22   Termination. (a)  The Borrower shall not terminate this Agreement or any other Transaction Document or reduce the Borrowing Limit, in each instance, prior to the Facility Maturity Date without the Agent's and the Facility Insurer's prior written consent, which consent may be withheld in the Agent's and the Facility Insurer's sole discretion; provided, that the Borrower may, as a result of the inability of Opportunity to originate Opportunity Loans, terminate this Agreement upon (i) 30 Business Days prior written notice to the Agent, the Lender and the Facility Insurer, (ii) the reduction of the amount of Loans Outstanding to zero ($0), (iii) the payment by the Borrower of all other amounts owed to the Agent, the Collateral Agent, the Lender and the Facility Insurer hereunder, including without limitation, the payment of the Pre-payment Fee to the Agent and (iv) receipt by the Borrower of a written statement from the Lender to the effect that the Lender does not wish to modify this Agreement, or enter into another agreement, in order to provide financing to Opportunity or the Borrower under terms and conditions different than the terms and conditions hereof.

b)   Notwithstanding anything contained in Section (a) above, the Borrower may, if DZ Bank ceases to be the Agent under this Agreement, terminate this Agreement upon (i) 30 Business Days' prior written notice to the Agent, the Lender and the Facility Insurer, (ii) the reduction of the amount of Loans Outstanding to zero ($0) and (iii) the payment by the Borrower of all other amounts owed to the Agent, the Collateral Agent, the Lender and the Facility Insurer hereunder (other than any Pre-payment Fee).

SECTION 2.23   Underlying Payments.  With respect to each Opportunity Loan, the Servicer shall direct or otherwise cause the related Opportunity Loan Borrower and the related Approved Distributor to direct or otherwise cause the Retailer of the Retailer Receivable related thereto to pay the related Opportunity Loan Borrower by wire transfer or check into the applicable Approved Distributor SPV Collection Account all amounts payable by such Retailer in respect of such Retailer Receivable or otherwise in connection with the Retailer Purchase Order related to such Opportunity Loan.  Opportunity and the Borrower shall direct each Opportunity Loan Borrower and its related Approved Distributor to remit all funds payable in respect of all Opportunity Loans to the Collection Account.  Neither the Servicer nor the Borrower shall (or allow the related Approved Distributor SPV or Approved Distributor to) change any payment directions referred to in this paragraph without the prior written consent of the Agent and the Facility Insurer.

SECTION 2.24   Establishment of Accounts.  On or before the Closing Date, the Custodian shall establish the Collection Account, the Approved Distributor SPV Collection Account and the Borrower Operating Account.

DZB004160

III.    CONDITIONS OF LOANS

        SECTION 3.01    Conditions Precedent to Initial Borrowing.  The initial
Borrowing hereunder is subject to the conditions precedent that:

        (a)    all acts and conditions (including, without limitation, the obtaining of any
necessary regulatory approvals and the making of any required filings, recordings or
registrations) required to be done and performed and to have happened prior to the
execution, delivery and performance of this Agreement and all related documents and to
constitute the same legal, valid and binding obligations, enforceable in accordance with
their respective terms, shall have been done and performed and shall have happened in
due and strict compliance with all applicable laws; and

        (b)    the Agent shall have received on or before the date of such Borrowing the
items listed in Schedule I, each in form and substance satisfactory to the Agent, the
Lender and the Facility Insurer.

        SECTION 3.02    Conditions Precedent to All Borrowings.  Except as otherwise
expressly provided below, each Borrowing (including the initial Borrowing) by the Borrower
from the Lender shall be subject to the further conditions precedent that:

        (a)    With respect to any such Borrowing (other than the initial Borrowing), on
or prior to the date of such Borrowing, the Servicer shall have delivered to the Agent,
with a copy to the Facility Insurer, in form and substance satisfactory to the Agent, the
most recent Monthly Remittance Report required by the terms of Section 6.11(b);

        (b)    With respect to such Borrowing, at least one Business Day prior to the
date of such Borrowing, the Servicer shall have delivered to the Agent, with a copy to the
Facility Insurer, in form and substance satisfactory to the Agent, a certificate signed by an
officer of the Borrower having responsibility for financial matters of the Borrower which
shall demonstrate that, after giving effect to such Borrowing requested by the Borrower
no Program Deficiency shall exist;

        (c)    On the Borrowing Date of such Borrowing, the following statements shall
be true, and the Borrower by accepting the amount of such Borrowing shall be deemed to
have certified that:

        (i)    the representations and warranties contained in Section 4.01 are
true and correct in all material respects, before and after giving effect to the Borrowing to
take place on such Borrowing Date and to the application of proceeds therefrom, on and
as of such day as though made on and as of such date;

DZB004161

(ii)      no event has occurred and is continuing, or would result from such Borrowing, which constitutes an Early Amortization Event hereunder, or an event that but for notice or lapse of time or both would constitute an Early Amortization Event;

(iii)      on and as of such day, after giving effect to such Borrowing no Program Deficiency shall exist;

(iv)      (A) the Borrower has delivered to the Agent a timely copy of a Notice of Borrowing and the Notice of Pledge (together with the attached Receivables Schedule) pursuant to <u>Section 2.02</u>, each appropriately completed and executed by the Borrower, (B) (1) the Borrower has delivered or caused to have been delivered to the Custodian the Notice of Pledge (together with the attached Receivables Schedule) related to the Receivables being Pledged hereunder on such Borrowing Date and the Receivable File with respect to the Pledged Receivables being Pledged hereunder on or before such Borrowing Date and each such Receivables File shall be complete and accurate in all respects and (2) the Opportunity Loan Note and the Allonge related thereto and each other Assigned Document, to the extent applicable to the Receivables being Pledged hereunder on such Borrowing Date have been duly endorsed and duly assigned by Opportunity to the Borrower and duly endorsed and duly assigned by the Borrower to the Collateral Agent for the benefit of the Secured Parties and (C) the Custodian has delivered to the Agent by 5:00 P.M. (New York City time) one Business Day Prior to such Borrowing Date, (x) an executed Collateral Receipt from the Custodian confirming that, inter alia, the Receivables Files with respect to the Pledged Receivables being Pledged hereunder on such Borrowing Date have been received by the Custodian and conform with the Receivables Schedule referred to in clause (A) above and (y) a fully executed Opening Wire Transfer Request or Opening Wire Transfer Request (Self Funding) with respect to the Pledged Receivables being Pledged hereunder on such Borrowing Date;

(v)      all terms and conditions of the applicable Loan Purchase Agreement required to be satisfied in connection with the transfer and sale of each Receivable being Pledged hereunder on such Borrowing Date, including, without limitation, the perfection of the Borrower's interests therein shall have been satisfied in full, and all filings (including, without limitation, UCC filings) required to be made by any Person and all actions required to be taken or performed by any Person in any jurisdiction to give the Collateral Agent, for the benefit of the Secured Parties, a first priority perfected security interest in such Receivables and the proceeds thereof shall have been made, taken or performed;

(vi)      the Borrower shall have taken all steps necessary under all applicable law in order to cause a valid, subsisting and enforceable first priority security interest to exist in its favor in the Opportunity Loan Collateral (including, without limitation, the Subject Inventory Collateral) related to each Receivable (and the proceeds thereof) being Pledged hereunder on such Borrowing Date and immediately prior to the

DZB004162

Pledge of such Receivable by the Borrower to the Collateral Agent (for the benefit of the Secured Parties), there shall have existed in favor of the Borrower as secured party, a valid, subsisting and enforceable first priority perfected lien in the Opportunity Loan Collateral (including, without limitation, the Subject Inventory Collateral) related to such Receivable (and the proceeds thereof), and such security interest is and shall be prior to all other liens (other than Permitted Liens) upon and security interests in the Opportunity Loan Collateral (and the proceeds thereof) that now exist or may hereafter arise or be created;

(vii)     the Borrower shall have taken all steps necessary under all applicable law in order to cause to exist in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid, subsisting and enforceable first priority perfected lien in (A) the Borrower's perfected security interest in the Opportunity Loan Collateral (including, without limitation, the Subject Inventory Collateral) and all other Pledged Assets related to each Receivable (and the proceeds thereof) being Pledged hereunder on such Borrowing Date and (B) the Pledged Receivables and any other Pledged Assets related to each Receivable (and the proceeds thereof) being Pledged hereunder on such Borrowing Date, and upon the Pledge of such Receivable by the Borrower to the Collateral Agent (for the benefit of the Secured Parties), there shall exist in favor of the Collateral Agent (for the benefit of the Secured Parties) as secured party, a valid, subsisting and enforceable first priority perfected security interest in the Borrower's perfected security interest in the Opportunity Loan Collateral (including, without limitation, the Subject Inventory Collateral) and all other Pledged Assets related to each Receivable (and the proceeds thereof) being Pledged hereunder on such Borrowing Date, and such security interest is and shall be prior to all other liens upon and security interests therein that now exist or may hereafter arise or be created (other than Permitted Liens); and

(viii)     the Facility Insurance Policy shall be in full force and effect.

(d)     [Intentionally omitted]:

(e)     No law or regulation shall prohibit, and no order, judgment or decree of any federal, state or local court or governmental body, agency or instrumentality shall prohibit or enjoin, the making of such Loans by the Lender in accordance with the provisions hereof or the execution or performance of the Opportunity Loan or the Consummated Retail Financing Transaction by any party thereto;

(f)     As to each Opportunity Loan in respect of which the requested Loan is sought, the following statements shall be true:

(i)     There is no event of default or event which with the giving of notice or the passage of time, or both, would constitute an event of default under the related Contract; and

DZB004163

(ii)    The Borrower has received no notice of any asserted or threatened defense  offset, counterclaim, discount, or allowance in respect of any Pledged Receivables or any related Retailer Receivables being Pledged hereunder with respect to the related Opportunity Loan on such Borrowing Date; and

(iii)    The Borrower has received such additional items as the Agent shall reasonably require, including, without limitation, an aging report and delinquency reports of any Pledged Receivables and all related Retailer Receivables; and

(iv)    There is a Subject Inventory Insurance Policy in full force and effect related to the Subject Inventory related to any Pledged Receivables being Pledged hereunder with respect to the related Opportunity Loan on such Borrowing Date and each Subject Inventory Insurance Policy and Eligible Credit Insurance policy, and any other insurance policy related to any Pledged Receivables (or any related Retailer Receivables or Subject Inventory) being Pledged hereunder on such Borrowing Date (i) is in full force and effect and the most current insurance premium for such policy has been fully paid, (ii) has not expired and will not expire until after the maturity of the related Opportunity Loan (or, in the case of a Subject Inventory Insurance Policy, will not expire prior to the time that the related Subject Inventory shall have been delivered to the related Approved Retailer) and (iii) has a certificate of insurance, an insurance policy or other written evidence from the insurer that such policy is in full force and effect which has been delivered to the Agent; and

(v)    Borrower has received the financial statements required by the Opportunity Loan Documents to be delivered to Borrower, or otherwise required by Borrower, for the Opportunity Loan Borrower.

(g)    On the date of each Borrowing that is an Initial Opportunity Loan Advance, the following conditions shall have been satisfied:

(i)    <u>Applicable Underlying Documents</u>.  In the case of an Initial Opportunity Loan Advance, the related Opportunity Loan Borrower has executed and delivered to the Borrower the related Opportunity Loan Documents.

(ii)    <u>Opinions of Applicable Underlying Borrower's Counsel</u>.  The Borrower has received from counsel for the Opportunity Loan Borrower of the Opportunity Loan related to such Initial Opportunity Loan Advance, licensed in the Applicable Jurisdiction and reasonably acceptable to the Borrower, the Agent and the Facility Insurer, legal opinions in substantially the applicable form attached hereto as <u>Exhibit D</u> (it being agreed that legal opinions substantially in such form are acceptable to the Agent) or otherwise in form and substance reasonably satisfactory to the Borrower, the Agent and the Facility Insurer, dated as of the date of closing of the related Opportunity Loan, covering such items as may be reasonably required by the Borrower,

DZB004164

the Facility Insurer and the Agent, including, without limitation, that the Opportunity Loan Documents are valid, binding, and enforceable in accordance with their terms and that they do not violate any applicable usury or other Applicable Laws. The Borrower shall use cause each such legal opinion to also be addressed to its successors and assigns and expressly state that it may be relied upon by such successors and assigns.

(iii) <u>Opportunity Loan Borrower's Background Documents</u>. The Opportunity Loan Borrower has delivered to the Servicer and the Servicer has approved each of the following:

(A) <u>Opportunity Loan Borrower's Organizational Documents</u>. Copies of the Opportunity Loan Borrower's organizational documents, including but not limited to its articles of incorporation, bylaws, partnership agreement, limited liability company agreement and other relevant documents, as applicable, together with any amendments thereto, certified to be true and complete by the Opportunity Loan Borrower's secretary or other authorized representative.

(B) <u>Good Standing Certificates</u>. Good standing certificates with respect to such Opportunity Loan Borrower, dated within 10 days of such Initial Opportunity Loan Advance issued by the appropriate secretaries of state for the Opportunity Loan Borrower.

(C) <u>Resolutions</u>. Certified resolutions of the Opportunity Loan Borrower's boards of directors or managing members, as applicable, or such other evidence of authority as is appropriate for the Opportunity Loan Borrower's form of business organization, authorizing the execution of all Opportunity Loan Documents and the performance of all obligations of the Opportunity Loan Borrower thereunder.

(iv) <u>Evidence of Subject Inventory Insurance Policy</u>. The Borrower has received certified copies of all insurance policies and endorsements thereto or other evidence of insurance satisfactory to Borrower and Lender, in the reasonable discretion of each, relating to the Subject Inventory and such insurance policies and endorsements thereto shall conform with the Credit and Collection Policy in all material respects and customary practice in the industry in the Applicable Jurisdiction. In addition, Borrower has received written evidence that the Opportunity Loan Borrower has obtained and is maintaining or has caused the related Approved Distributor to obtain and maintain all policies of insurance required by and in accordance with the terms of the Credit and Collection Policy and hereof and which are customary in the industry in the Applicable Jurisdiction, including but not limited to copies of the most current paid insurance premium invoices for such policies.

DZB004165

(v)     Litigation.  Borrower has received evidence satisfactory to Borrower and Lender that there exists no pending bankruptcy, foreclosure, or other material litigation or judgments outstanding against the Opportunity Loan Borrower.  The term "other material litigation" as used herein shall not include matters in which (i) an Opportunity Loan Borrower is a plaintiff and no counterclaim is pending; or (ii) Borrower and Agent (with the consent of the Facility Insurer) determine, in their reasonable discretion, that such litigation is immaterial due to settlement, insurance coverage, frivolity, or amount or nature of claim.  Borrower shall have obtained an independent search, at Borrower's or the Opportunity Loan Borrower's expense, confirming that no such bankruptcy, foreclosure action, or other material litigation or judgment exists.

(vi)     Code/Other Searches.  Borrower has obtained such searches of the applicable public records as it deems necessary under all Applicable Laws to verify that it has a first and prior perfected lien and security interest covering all of the Opportunity Loan Collateral.

(vii)     Taxes and Assessments.  Borrower has received evidence satisfactory to it that all taxes and assessments owed by or for which the Opportunity Loan Borrower is responsible for collection have been paid except for such taxes as are being disputed in good faith and with respect to which adequate reserves have been established.

(viii)     Financial Statements.  Borrower has received the financial statements required by the Opportunity Loan Documents to be delivered to Borrower, or otherwise required by Borrower, for the Opportunity Loan Borrower, all in form and substance satisfactory to Borrower and Lender in their reasonable discretion.

(h)     Approved Distributor Tangible Net Worth. The Approved Distributor with respect to such Borrowing has a Tangible Net Worth of at least the amount set forth opposite its name on Schedule X hereto.

(i)     Miscellaneous. Such other matters as Lender shall reasonably require.

True copies or, to the extent required hereby, originals of all of the above-referenced documents, instruments, forms, opinions, and other materials shall be delivered to the Servicer, either prior to or contemporaneously with Borrower's execution and delivery to the Lender of the Notice of Borrowing with respect to a proposed Loan secured by the Receivables related thereto. The delivery by the Borrower of any Notice of Borrowing shall be deemed to be the Borrower's and the Servicer's written representation and acknowledgment of receipt and approval of each item referred to in the previous sentence which are related to the Receivables being Pledged to secure the Loan being requested pursuant to such Notice of Borrowing.

DZB004166

SECTION 3.03    Advances Do Not Constitute a Waiver. No advance of a Loan hereunder shall constitute a waiver of any condition to the Lender's obligation to make such an advance unless such waiver is in writing and executed by the Lender.

IV.    REPRESENTATIONS AND WARRANTIES

SECTION 4.01    Representations and Warranties of the Borrower and the Servicer. Each of the Servicer and the Borrower hereby represents and warrants to the Agent, the Lender and the Facility Insurer, as of the date hereof, on each Borrowing Date, on each Remittance Date and on the first day of each CP Rollover Fixed Period, as follows:

(a)    Each Pledged Receivable designated as an Eligible Receivable on any Borrowing Base Certificate, Monthly Remittance Report or Commercial Paper Remittance Report is an Eligible Receivable.

(b)    The Borrower is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has the power and all licenses necessary to own its assets and to transact the business in which it is presently engaged, and is duly qualified and in good standing under the laws of each jurisdiction where its ownership of the Pledged Receivables requires such qualification except where failure to obtain such licenses or to be so qualified would not cause a Material Adverse Effect.

(c)    The Servicer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has the power and all licenses necessary to own its assets and to transact the business in which it is presently engaged (which includes servicing Receivables on behalf of third parties and itself), and is duly qualified and in good standing under the laws of each jurisdiction where its servicing of the Pledged Receivables requires such qualification except where failure to obtain such licenses or to be so qualified would not cause a Material Adverse Effect.

(d)    Each of the Servicer and the Borrower has the power, authority and legal right to make, deliver and perform this Agreement and each of the Transaction Documents to which it is a party and all of the transactions contemplated hereby and thereby, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and each of the Transaction Documents to which it is a party, and, in the case of the Borrower, to grant to the Collateral Agent, for the benefit of the Secured Parties, a first priority perfected security interest in the Pledged Assets on the terms and conditions of this Agreement. This Agreement and each of the Transaction Documents to which the Servicer or the Borrower is a party constitutes the legal, valid and binding obligation of the Servicer and the Borrower, as applicable, enforceable against them in accordance with their respective terms except as the enforceability hereof and thereof may be limited by bankruptcy, insolvency, moratorium, reorganization and other similar

DZB004167

laws of general application affecting creditors' rights generally and by general principles of equity (whether such enforceability is considered in a proceeding in equity or at law). No consent of any other party and no consent, license, approval or authorization of, or registration or declaration with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by the Borrower or the Servicer of this Agreement or any Transaction Document to which it is a party, or the validity or enforceability of this Agreement or any such Transaction Document or the Pledged Receivables.

e)    The execution, delivery and performance of this Agreement, the other Transaction Documents and all other agreements and instruments executed and delivered or to be executed and delivered pursuant hereto or thereto will not (i) create any Adverse Claim on the Pledged Assets other than as contemplated herein or (ii) violate any provision of any existing law or regulation or any order or decree of any court, regulatory body or administrative agency or the certificate of formation or the limited liability company agreement of the Servicer or the Borrower or any mortgage, indenture, contract or other agreement to which the Servicer or the Borrower is a party or by which the Service or the Borrower or any property or assets of the Servicer or the Borrower may be bound, other than, in the case of the Servicer, any such mortgage, indenture, contract or other agreement the violation of which would not reasonably be expected to have a Material Adverse Effect.

f)    Except as set forth on Schedule IV hereto, no litigation or administrative proceeding of or before any court, tribunal or governmental body is presently pending or, to the knowledge of the Servicer and the Borrower, threatened against the Servicer or the Borrower or any properties of the Servicer or the Borrower or with respect to this Agreement (x) which, if adversely determined, could reasonably be expected to have a Material Adverse Effect or (y) which purports to affect the legality, validity or enforceability of this Agreement, any Transaction Document to which the Borrower or Servicer is a party, or any of the other applicable documents forming part of the Pledged Assets.

g)    Except as permitted under Section 9.12, Opportunity has not advanced any loans to any Person other than the Opportunity Loans, there are no loans other than Opportunity Loans advanced under any one Contract and all Opportunity Loans and the related Opportunity Loan Collateral have been transferred to the Borrower pursuant to the Loan Purchase Agreement.

h)    The grant of the security interest in the Pledged Assets by the Borrower to the Collateral Agent for the benefit of the Secured Parties pursuant to this Agreement is in the ordinary course of business for the Borrower and is not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction. No such Pledged Assets have been sold, transferred, assigned or pledged by the Borrower to any

DZB004168

Person other than the Collateral Agent, for the benefit of the Secured Parties, pursuant to the terms of this Agreement.

(i)      The Borrower has no Debt or other indebtedness, other than Debt incurred under (or contemplated by) the terms of this Agreement and the Loan Purchase Agreement.

(j)      The Borrower has been formed solely for the purpose of engaging in transactions of the types contemplated by this Agreement and the Loan Purchase Agreement.

(k)      No injunction, writ, restraining order or other order of any nature adversely affects the Servicer's or the Borrower's performance of their respective obligations under this Agreement or any Transaction Document to which the Servicer or the Borrower is a party.

(l)      Each of the Servicer and the Borrower has filed (on a consolidated basis or otherwise) on a timely basis all federal, state and other material tax returns required to be filed, is not liable for taxes payable by any other Person and has paid or made adequate provisions for the payment of all taxes, assessments and other governmental charges due from the Servicer or the Borrower, as applicable. No tax lien or similar adverse claim has been filed, and, to the best of the Servicer's and the Borrower's knowledge, no claim is being asserted, with respect to any such tax, assessment or other governmental charge. Any taxes, fees and other governmental charges payable by the Servicer or the Borrower, as applicable in connection with the execution and delivery of this Agreement and the other Transaction Documents and the transactions contemplated hereby or thereby have been paid, if due, or shall have been paid prior to delinquency.

(m)      The chief executive office of the Servicer (and the location of the Servicer's records regarding the Pledged Receivables) is located at 60 South Sixth Street, Suite 2540, Minneapolis, Minnesota 55402. The chief executive office of the Borrower (and the location of the Borrower's records regarding the Pledged Receivables) is located at 60 South Sixth Street, Suite 2540 (B), Minneapolis, Minnesota 55402.

(n)      Each of the Servicer's and the Borrower's legal names is as set forth in this Agreement; each of the Servicer and the Borrower has not changed its jurisdiction of formation other than as disclosed on Schedule III hereto (as such schedule may be updated from time to by the Agent upon receipt of a notice delivered to the Agent and the Facility Insurer pursuant to Section 6.19 and compliance with all terms and conditions of Section 6.19), each of the Servicer and the Borrower has not changed its name since its formation, each of the Servicer and the Borrower does not have tradenames, fictitious names, assumed names or "doing business as" names other than as disclosed on Schedule III hereto (as such schedule may be updated from time to by the Agent upon

DZB004169

receipt of a notice delivered to the Agent and the Facility Insurer pursuant to <u>Section 6.19</u> and compliance with all terms and conditions of <u>Section 6.19</u>).

o)     Each of the Servicer and the Borrower is solvent and will not become insolvent after giving effect to the transactions contemplated hereby; each of the Servicer and the Borrower is paying its debts as they become due; and each of the Servicer and the Borrower, after giving effect to the transactions contemplated hereby, will have adequate capital to conduct its business.

p)     The Borrower has no subsidiaries.

q)     The Borrower has given fair consideration and reasonably equivalent value in exchange for the sale of the Pledged Receivables by Opportunity under the Loan Purchase Agreement.

r)     No Monthly Remittance Report, Borrowing Base Certificate or Commercial Paper Remittance Report (each if prepared by the Borrower or the Servicer, or to the extent that information contained therein is supplied by the Borrower or the Servicer), information, exhibit, financial statement, document, book, record or report furnished or to be furnished by the Borrower or the Servicer to the Agent, the Lender or the Facility Insurer in connection with this Agreement is or will be inaccurate in any material respect as of the date it is or shall be dated or (except as otherwise disclosed in writing to the Agent, the Lender or the Facility Insurer, as the case may be, at such time) as of the date so furnished, and no such document contains or will contain any material misstatement of fact or omits or shall omit to state a material fact or any fact necessary to make the statements contained therein not misleading.

s)     No proceeds of any Loans will be used by the Borrower to acquire any security in any transaction which is subject to Section 13 or 14 of the Securities Exchange Act of 1934, as amended.

t)     There are no agreements in effect adversely affecting the rights of the Borrower to make, or cause to be made, the grant of the security interest in the Pledged Assets contemplated by <u>Section 2.10</u>.

u)     The Borrower is not an "investment company" or an "affiliated person" of or "promoter" or "principal underwriter" for an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended, nor is the Borrower otherwise subject to regulation thereunder.

v)     No Event of Default or Unmatured Event of Default has occurred and is continuing.

DZB004170

(w)     Each of the Pledged Receivables was underwritten and is being serviced in conformance with the Servicer's and the Borrower's standard underwriting, credit, collection, operating and reporting procedures and systems (including, without limitation, the Credit and Collection Policy).

(x)     Each of the Servicer and the Borrower is in compliance in all material respects with ERISA and has not incurred and does not expect to incur any material liabilities (except for premium payments arising in the ordinary course of business) to the Pension Benefit Guaranty Corporation (or any successor thereto) under ERISA.

(y)     There is not now, nor will there be at any time in the future, any agreement or understanding between the Servicer and the Borrower (other than as expressly set forth herein) providing for the allocation or sharing of obligations to make payments or otherwise in respect of any taxes, fees, assessments or other governmental charges.

(z)     (i) All filings (including, without limitation, UCC filings) required to be made by any Person and all other actions required to be taken or performed by any Person in any jurisdiction to give the Collateral Agent for the benefit of the Secured Parties a first priority perfected lien on all Pledged Assets, including without limitation all Opportunity Loan Collateral and Subject Inventory Collateral related thereto and the proceeds thereof have been made, taken or performed; (ii) All filings (including, without limitation, UCC filings) required to be made by any Person and all other actions required to be taken or performed by any Person in any jurisdiction to transfer to the Borrower a first priority perfected lien on all Opportunity Loan Collateral and all other collateral security for all Opportunity Loans and the proceeds thereof have been made, taken or performed; (iii) all filings (including, without limitation, UCC filings) required to be made by any Person and all other actions required to be taken or performed by any Person in any jurisdiction to give the applicable Opportunity Loan Borrower a first priority perfected lien on all Subject Inventory Collateral and the proceeds thereof have been made, taken or performed; and (iv) all filings (including, without limitation, UCC filings) required to be made by any Person and all other actions required to be taken or performed by any Person in any jurisdiction to assign to Opportunity from the applicable Opportunity Loan Borrower a first priority perfected lien on all Subject Inventory Collateral and the proceeds thereof have been made, taken or performed.

(aa)    No Opportunity Loan Borrower, Approved Distributor or Approved Retailer is an Affiliate of the Servicer or the Borrower.

DZB004171

## V.   GENERAL COVENANTS OF THE BORROWER AND THE SERVICER

SECTION 5.01   General Covenants. (a) The Borrower will observe all limited liability company procedures required by its certificate of formation and limited liability company agreement and the laws of its jurisdiction of formation. The Borrower will maintain its limited liability company existence in good standing under the laws of its jurisdiction of formation and will promptly obtain and thereafter maintain qualifications to do business as a foreign limited liability company in any other state in which it does business and in which it is required to so qualify in accordance with applicable law.

(b)   The Borrower will at all times ensure that (i) its members act independently and in its interests and in the interest of its creditors, (ii) it shall at all times maintain at least one independent member (x) who is not currently and has not been during the five years preceding the date of this Agreement an officer, director or employee of the Borrower or an Affiliate thereof and (y) who is not a holder of any equity interest of the Borrower or an Affiliate thereof, (iii) its assets are not commingled with those of Opportunity or any other Affiliate of the Borrower, (iv) its members authorize all of its limited liability company actions, (v) it maintains separate and accurate records and books of account and such books and records are kept separate from those of Opportunity and any other Affiliate of the Borrower, and (vi) it maintains minutes of the meetings and other proceedings of the members. Where necessary, the Borrower will obtain proper authorization from its members for limited liability action.

(c)   The Borrower will pay its operating expenses and liabilities from its own assets; provided, however, that the Borrower's organizational expenses and the expenses incurred in connection with the negotiation and execution of this Agreement and the other Transaction Documents may be paid by Opportunity.

(d)   Furthermore, the Borrower will not hold itself out, or permit itself to be held out, as having agreed to pay or as being liable for the debts of Opportunity or any Affiliate of Opportunity and the Borrower will not engage in business transactions with Opportunity or any Affiliate of Opportunity, except on an arm's-length basis. The Borrower will not hold Opportunity or any Affiliate of Opportunity out to third parties as other than an entity with assets and liabilities distinct from the Borrower. The Borrower will cause any financial statements consolidated with those of Opportunity or any Affiliate of Opportunity to state that the Borrower is a separate legal entity with its own separate creditors who, in any liquidation of the Borrower, will be entitled to be satisfied out of the Borrower's assets prior to any value in the Borrower becoming available to the Borrower's equity holders. The Borrower will not act in any other manner that could foreseeably mislead others with respect to the Borrower's separate identity.

DZB004172

(e)    In its capacity as Servicer, Opportunity will, to the extent necessary, maintain separate records on behalf of and for the benefit of the Agent, the Lender and the Facility Insurer, will act in accordance with instructions and directions, delivered in accordance with the terms hereof, from the Borrower, the Agent, the Lender and/or the Facility Insurer in connection with its servicing of the Pledged Receivables hereunder, and will ensure that, at all times when it is dealing with or in connection with the Pledged Receivables in its capacity as Servicer, it holds itself out as Servicer, and not in any other capacity.

(f)    The Servicer shall, to the extent required by applicable law, disclose all material transactions associated with this transaction in appropriate regulatory filings and public announcements. The annual financial statements of Opportunity (including any consolidated financial statements) shall disclose the effects of the transactions contemplated by the Loan Purchase Agreement as a sale of Receivables and related security and the annual financial statements of the Borrower shall disclose the effects of the transactions contemplated by this Agreement as a loan to the extent required by and in accordance with GAAP.

(g)    The Borrower shall take all other actions necessary to maintain the accuracy of the factual assumptions set forth in the legal opinion of Mayer, Brown & Platt, LLP, special counsel to Opportunity and the Borrower, issued in connection with the Loan Purchase Agreement and relating to the issues of substantive consolidation and true sale or contribution of the Pledged Receivables.

(h)    Except as otherwise provided herein or in any other Transaction Document, neither the Borrower nor the Servicer shall (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim (other than Permitted Liens) upon or with respect to, any Pledged Receivable, any Collections related thereto or any other Pledged Assets related thereto, or upon or with respect to any account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof or (ii) create or suffer to exist any Adverse Claim (other than Permitted Liens) upon or with respect to any of the Borrower's assets.

(i)    The Borrower will not merge or consolidate with, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions), all or substantially all of its assets (whether now owned or hereafter acquired), or acquire all or substantially all of the assets or capital stock or other ownership interest of any Person.

(j)    The Borrower will not account for or treat (whether in financial statements or otherwise) the transactions contemplated by the Loan Purchase Agreement in any manner other than the sale or contribution of Receivables by Opportunity, as the case may be, to the Borrower.

(k)    The Borrower will not amend, modify, waive or terminate any terms or conditions of the Loan Purchase Agreement (including, without limitation, any eligibility criteria

DZB004173

thereunder) without the written consent of the Agent and the Facility Insurer, and shall perform its obligations thereunder.

(l)    The Borrower will not amend, modify or otherwise make any change to its certificate of formation or limited liability company agreement without the prior written consent of the Agent and the Facility Insurer.

(m)    Neither the Borrower nor the Servicer will make or allow to be made any amendment to the Credit and Collection Policy without the prior written consent of the Agent and the Facility Insurer which such consent shall not be unreasonably withheld; provided that, without the prior written consent of the Agent and the Facility Insurer, the Borrower or the Servicer may make or allow to be made any inconsequential amendment to any of the foregoing policy or guidelines.

(n)    If the Borrower or the Servicer receive any Collections, the Borrower or the Servicer, as applicable, will remit such Collections to the Collection Account within one (1) Business Day of the Borrower's or the Servicer's receipt thereof.

(o)    The Borrower shall deliver or cause to be delivered to the Custodian on or before each Borrowing Date the Receivable File with respect to the Pledged Receivables being Pledged hereunder on such Borrowing Date.

(p)    Each of the Servicer and the Borrower shall, at their expense, cooperate and take all actions reasonably requested by the Agent in connection with obtaining a shadow rating with respect to the financing facility provided for hereunder, including, without limitation providing to each of the Rating Agencies all information requested by such Rating Agencies.

(q)    The Servicer shall at all times maintain a Tangible Net Worth in an amount which shall not be less than $12,000,000.

(r)    Each of the Servicer and the Borrower shall take all actions necessary (including, without limitation, making payment of premiums payable) in order for payments to be made by the applicable insurer under, and pursuant to the terms of, (i) each Eligible Credit Insurance policy or any other credit insurance policy related to a Retailer Receivable in the event of the non-payment of such Retailer Receivable (including, without limitation, all actions necessary in order to maintain in full force and effect each such Eligible Credit Insurance policy or other credit insurance policy), (ii) each Subject Inventory Insurance Policy and (iii) each Supplemental Inventory Insurance Policy and (iv) the Facility Insurance Policy.

## VI.    ADMINISTRATION AND SERVICING; CERTAIN COVENANTS

SECTION 6.01    Appointment and Designation of the Servicer. (a) The Borrower, the Lender, the Facility Insurer, the Collateral Agent and the Agent hereby appoint the

DZB004174

Person designated by the Collateral Agent from time to time (with the approval of the Lender and the Facility Insurer) pursuant to this Section 6.01 (the "Servicer"), as their agent to service, administer and collect the Pledged Receivables and otherwise to enforce their respective rights and interests in and under the Pledged Receivables and the other Pledged Assets. The Servicer shall collect such Pledged Receivables under the conditions referred to above by means of the collection procedures as set forth in the Credit and Collection Policy, to the extent consistent with the provisions of this Article VI. The Servicer's authorization under this Agreement shall terminate on the Collection Date. Opportunity is hereby designated as, and hereby agrees to perform the duties and obligations of, the Servicer pursuant to the terms hereof at all times until the earliest of (i) the Collateral Agent's (with the consent of the Facility Insurer) designation of a new Servicer upon the occurrence and during the continuance of any Servicer Default, (ii) the delivery by the Collateral Agent and the Facility Insurer of their prior written consent to the appointment by the Borrower of a new Servicer or (iii) the Collection Date. Upon the occurrence and during the continuance of any Servicer Default, the Agent may at any time (with the approval of the Lender and the Facility Insurer) designate as Servicer any Person to succeed Opportunity or any successor Servicer, on the condition in each case that any such Person so designated shall agree to perform the duties and obligations of the Servicer pursuant to the terms hereof. Each of the Borrower and Opportunity hereby grants to any successor Servicer an irrevocable power of attorney and license to take any and all steps in the Borrower's, Opportunity's or the Servicer's name, as applicable, and on behalf of the Borrower or Opportunity, necessary or desirable, in the determination of such successor Servicer, to service, administer or collect any and all Pledged Receivables.

(b)     The Servicer is hereby authorized to act for the Borrower, the Agent and the Collateral Agent and in such capacity shall manage, service, administer and make collections on the Pledged Receivables, and perform the other actions required by the Servicer under this Agreement for the benefit of the Agent, the Collateral Agent, the Lender and the Facility Insurer. The Servicer agrees that its servicing of the Pledged Receivables shall be carried out in accordance with customary and usual procedures of institutions which service comparable receivables and, to the extent more exacting, the degree of skill and attention that the Servicer exercises from time to time with respect to all comparable receivables that it services for itself or others in accordance with the Credit and Collection Policy and, to the extent more exacting, the requirements of this Article VI. The Servicer's duties shall include, without limitation, collection and posting of all payments, responding to inquiries of Opportunity Loan Borrowers on the Pledged Receivables, investigating delinquencies, sending payment statements or payment books to Opportunity Loan Borrowers, reporting any required tax information to Opportunity Loan Borrowers, policing the collateral, complying with the terms of the Collection Account Agreement, accounting for collections, furnishing monthly and annual statements to the Agent, with a copy to the Facility Insurer, with respect to distributions and performing the other duties specified herein.

(c)     To the extent consistent with the standards, policies and procedures otherwise required hereby, the Servicer shall have full power and authority, acting alone, to do any and all things in connection with such managing, servicing, administration and collection

DZB004175

that it may deem necessary or desirable. The Servicer is authorized to release Liens on Opportunity Loan Collateral in order to collect insurance and condemnation proceeds with respect thereto and to liquidate such Opportunity Loan Collateral in accordance with its customary standards, policies and procedures; provided, however, that notwithstanding the foregoing, the Servicer shall not, (i) except pursuant to an order from a court of competent jurisdiction, release an Opportunity Loan Borrower from payment of any unpaid amount under any Pledged Receivable or (ii) waive the right to collect the unpaid balance of any Pledged Receivable from such Opportunity Loan Borrower, except that, subject to Section 6.02(a), the Servicer may forego collection efforts if the amount which the Servicer, in its reasonable judgment, expects to realize in connection with such collection efforts is determined by the Servicer in its reasonable judgment to be less than the reasonably expected costs of pursuing such collection efforts, and if the Servicer would forego such collection efforts in accordance with its customary procedures. The Servicer is hereby authorized to commence, in its own name or in the name of the Borrower, the Agent, the Collateral Agent, the Lender or the Facility Insurer (provided that if the Servicer is acting in the name of the Borrower, the Agent, the Collateral Agent, the Lender or the Facility Insurer, the Servicer shall have obtained the Borrower's, the Agent's, the Collateral Agent's, the Lender's, and the Facility Insurer's consent, as the case may be, which consent shall not be unreasonably withheld), a legal proceeding to enforce a Pledged Receivable or to commence or participate in any other legal proceeding (including, without limitation, a bankruptcy proceeding) relating to or involving a Pledged Receivable, an Opportunity Loan Borrower or any Pledged Assets. If the Servicer commences or participates in such a legal proceeding in its own name, the Borrower, the Agent, the Collateral Agent, the Lender or the Facility Insurer, as the case may be, shall thereupon be deemed to have automatically assigned such Pledged Receivable to the Servicer solely for purposes of commencing or participating in any such proceeding as a party or claimant, and the Servicer is authorized and empowered by the Borrower, the Agent, the Collateral Agent, the Lender or the Facility Insurer, as the case may be, to execute and deliver in the Servicer's name any notices, demands, claims, complaints, responses, affidavits or other documents or instruments in connection with any such proceeding. The Borrower, the Agent, the Collateral Agent, the Lender or the Facility Insurer, as the case may be, shall furnish the Servicer with any powers of attorney and other documents which the Servicer may reasonably request in writing and which the Servicer deems necessary or appropriate and take any other steps which the Servicer may deem necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

(J)    The Servicer shall not resign from the obligations and duties hereby imposed on it hereunder except upon determination that (i) the performance of its duties hereunder is no longer permissible under applicable law and (ii) there is no reasonable action which can be taken to make the performance of its duties hereunder permissible under applicable law. Any such determination permitting the resignation of the Servicer pursuant to clause (i) of the previous sentence hereof shall be evidenced by an Opinion of Counsel to such effect delivered to the Agent and the Facility Insurer. Unless otherwise required by applicable law, no such resignation shall be effective until a successor Servicer designated by the Agent, the Lender

DZB004176

and the Facility Insurer shall have assumed the responsibilities and obligations of the Servicer hereunder.

SECTION 6.02   Collection of Receivable Payments; Modification and Amendment of Receivables. (a) Consistent with the standards, policies and procedures required by this Agreement, the Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Pledged Receivables as and when the same shall become due, and shall follow such collection procedures as it follows with respect to all comparable receivables that it services for itself or others (or that it formerly serviced for itself or others) and otherwise act with respect to the Pledged Receivables in such manner as will, in the reasonable judgment of the Servicer, maximize the amount to be received by the Borrower and the Lender with respect thereto.

(b)   The Servicer may extend the term of an Opportunity Loan Promissory Note related to a Pledged Receivable in conformity with the Credit and Collection Policy, but the Servicer may not permit any other modifications or amendments to a Pledged Receivable.

(c)   The Servicer shall remit all payments by or on behalf of the Opportunity Loan Borrowers received directly by the Servicer to the Collection Account, without deposit into any intervening account as soon as practicable, but in no event later than one (1) Business Day after receipt thereof.

SECTION 6.03   Realization Upon Receivables. Consistent with the standards, policies and procedures required by this Agreement, the Servicer shall use its best efforts to foreclose upon (or otherwise comparably convert the ownership of) and liquidate any Pledged Assets, Opportunity Loan Collateral or Subject Inventory Collateral securing a Pledged Receivable (to the extent it has the right to do so under the related Transaction Documents, Opportunity Loan Documents or the Inventory Financing Documents) with respect to which the Servicer has determined that payments thereunder have ceased and are not likely to be resumed, as soon as is practicable after default on such Pledged Receivable but in no event later than thirty (30) days after such determination or an earlier date that would be customary under the circumstances involved and, in any case, in a manner as will, in the reasonable judgment of the Servicer, maximize the amount to be received by the Borrower and the Lender with respect thereto. The Servicer is authorized to follow such customary practices and procedures as it shall deem necessary or advisable, consistent with the standard of care required by Section 6.01, which practices and procedures may include reasonable efforts to realize upon any recourse to any Retailer, selling the related Subject Inventory or other Pledged Assets at public or private sale, and other actions by the Servicer in order to realize upon such Pledged Receivable. All Liquidation Proceeds shall be remitted directly by the Servicer to the Collection Account without deposit into any intervening account as soon as practicable, but in no event later than one (1) Business Day after receipt thereof. The Servicer shall pay on behalf of the Borrower any personal property taxes assessed on foreclosed Subject Inventory, and the Servicer shall be entitled to reimbursement of any such tax as a Servicer Advance.

DZB004177

SECTION 6.04    Insurance. (a) Without limiting the effect of any other provision hereof, the Servicer shall monitor the status of and maintain in full force and effect the Facility Insurance Policy, any Eligible Credit Insurance Policy, the Subject Inventory Insurance Policies and any Supplemental Inventory Insurance Policy. If the Servicer shall determine that an Opportunity Loan Borrower has failed to obtain or maintain (or cause to be maintained) a Subject Inventory Insurance Policy covering any related Subject Inventory, the Servicer shall enforce all rights under the related Opportunity Loan Documents to ensure that such Opportunity Loan Borrower obtains such Subject Inventory Insurance Policy or shall obtain such Subject Inventory Insurance Policy as required hereunder.

b)    The Servicer may and, upon the request of the Agent or the Facility Insurer, shall sue to enforce or collect upon any Eligible Credit Insurance Policy, the Subject Inventory Insurance Policies and any Supplemental Inventory Insurance Policy, in its own name, if possible, or as agent of the Borrower, the Agent, the Lender and the Facility Insurer. If the Servicer elects to commence a legal proceeding to enforce any Eligible Credit Insurance Policy, a Subject Inventory Insurance Policy or any Supplemental Inventory Insurance Policy, the act of commencement shall be deemed to be an automatic assignment of the rights of the Borrower, the Agent, the Lender and the Facility Insurer under such Eligible Credit Insurance Policy, Subject Inventory Insurance Policy or Supplemental Inventory Insurance Policy to the Servicer for purposes of collection only. If, however, in any enforcement suit or legal proceeding it is held that the Servicer may not enforce any Eligible Credit Insurance Policy, any Subject Inventory Insurance Policy or any Supplemental Inventory Insurance Policy on the grounds that it is not a real party in interest or a holder entitled to enforce the Eligible Credit Insurance Policy, Subject Inventory Insurance Policy or Supplemental Inventory Insurance Policy, the Borrower shall take such steps as the Servicer deems necessary to enforce such Eligible Credit Insurance Policy, Subject Inventory Insurance Policy or, if any, the Supplemental Inventory Insurance Policy, including bringing suit in its name.

SECTION 6.05    Maintenance of Security Interests in Opportunity Loan Collateral and Subject Inventory Loan Collateral. If the Borrower has failed to, the Servicer shall take all steps necessary under all applicable law in order to cause a valid, subsisting and enforceable first priority security interest to exist in the Borrower's favor in the Subject Inventory Loan Collateral and all other the Opportunity Loan Collateral related to each Receivable (and the proceeds thereof) being Pledged hereunder on any Borrowing Date and immediately prior to the Pledge of such Receivable by the Borrower to the Collateral Agent (for the benefit of the Secured Parties), there shall have existed in favor of the Borrower as secured party, a valid, subsisting and enforceable first priority perfected lien in such Subject Inventory Loan Collateral and all other such Opportunity Loan Collateral related to such Receivable (and the proceeds thereof), and such security interest is and shall be prior to all other liens upon and security interests in such Subject Inventory Loan Collateral and all other such Opportunity Loan Collateral (and the proceeds thereof) that now exist or may hereafter arise or be created, except with regard to Permitted Liens.

DZB004178

SECTION 6.06   Pledged Receivable Receipts. The Servicer shall promptly make a deposit or cause the Borrower or any of its Affiliates to make a deposit into the Collection Account in an amount equal to the Collections received or made by or on behalf of it, the Borrower or any such Affiliate, as the case may be, within one (1) Business Day of receiving any such Collections.

SECTION 6.07   Unidentified Payments; Lender's Right of Presumption. The Borrower agrees and consents that the Servicer and/or the Agent may apply any payment it receives (or any such payment the Servicer deposits into the Collection Account) from an Opportunity Loan Borrower to any Loan secured by a Pledged Receivable if the Servicer and/or the Agent is unable in good faith to determine whether such payment from an Opportunity Loan Borrower relates to such Pledged Receivable.

SECTION 6.08   No Rights of Withdrawal. Until the Collection Date, the Borrower shall have no rights of direction or withdrawal with respect to amounts held in the Collection Account, except as provided for herein.

SECTION 6.09   Permitted Investments. The Borrower shall, pursuant to written instruction, direct the Custodian (and if the Borrower fails to do so, the Agent may, pursuant to written instruction, direct the Custodian) to invest, or cause the investment of, funds on deposit in the Collection Account, in Permitted Investments, from the date of this Agreement until the Collection Date. Absent any such written instruction, the Custodian shall invest, or cause the investment of, such funds in the First American Prime Obligations Fund ("First Prime"), so long as First Prime is a Permitted Investment at the time of such investment, or in Permitted Investments described in clause (v) of the definition thereof. A Permitted Investment acquired with funds deposited in the Collection Account shall mature not later than the Business Day immediately preceding the last day of the next ending Fixed Period, and shall not be sold or disposed of prior to its maturity. All such Permitted Investments shall be registered in the name of the Collateral Agent (in its capacity as such) or its nominee for the benefit of the Secured Parties. All income and gain realized from any such investment as well as any interest earned on deposits in the Collection Account shall be distributed in accordance with the provisions of Section 2.05 hereof. The Servicer shall deposit in the Collection Account (with respect to investments made hereunder of funds held therein), an amount equal to the amount of any actual loss incurred in respect of any such investment immediately upon realization of such loss. Neither the Custodian nor the Agent shall be liable for the amount of any loss incurred in respect of any investment, or lack of investment, of funds held in the Collection Account.

SECTION 6.10   Servicing Compensation. As compensation for its activities hereunder, the Servicer shall be entitled to be paid the Servicing Fee from the Collection Account as provided in Section 2.05(c). The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement therefor, except any Servicer Advances made by the Servicer pursuant hereto; provided, that the Backup Servicer, if serving as the Servicer, shall not be required to pay any expenses in connection with curing or otherwise remedying mistakes made by the predecessor Servicer or the

DZB004179

costs of attorneys engaged in connection with the enforcement and/or collection of any Receivables to the extent that such attorneys and the related enforcement and/or collection action have been consented to in writing by the Agent and the Facility Insurer. The Servicing Fee may not be transferred in whole or in part except in connection with the transfer of all the Servicer's responsibilities and obligations under this Agreement.

        SECTION 6.11   Reports to the Agent; Account Statements; Servicing Information. (a) The Borrower will deliver to the Agent and the Facility Insurer (i) on the Early Amortization Commencement Date, a report identifying the Pledged Receivables (and any information with respect thereto requested by the Agent) on the day immediately preceding the Early Amortization Commencement Date and (ii) upon the Agent's or the Facility Insurer's reasonable request and upon reasonable notice, on any other Business Day, a report identifying the Pledged Receivables (and any information with respect thereto reasonably requested by the Agent or the Facility Insurer) on such day.

        (b)   On the fifth day of each calendar month or, if such day is not a Business Day, the immediately preceding Business Day, the Servicer shall prepare and deliver or have delivered to the Agent for the Lender and the Facility Insurer, (i) a Monthly Remittance Report and any other information reasonably requested by the Agent (or the Facility Insurer) relating to all Pledged Receivables (including if requested, a Computer Tape or Listing), all information in the Monthly Remittance Report (including, without limitation, the calculation of Default Percentage, Dilution Percentage and the three-month rolling averages for the most recently ended Remittance Periods) and all other such information to be accurate as of the last day of the immediately preceding Remittance Period and (ii) in an electronic format mutually acceptable to the Servicer and the Agent, all information reasonably requested by the Agent (or the Facility Insurer) relating to all Pledged Receivables. If any Monthly Remittance Report indicates the existence of a Borrowing Base Deficiency, the Borrower shall on the date of delivery of such Monthly Remittance Report prepay to the Agent, for the account of the Lender, a portion of the Loans as is necessary to cure such Borrowing Base Deficiency (or otherwise cure such Borrowing Base Deficiency).

        (c)   By no later than 1:00 P.M. (New York City time) on the Business Day immediately preceding a Borrowing or a Borrowing Base Surplus Withdrawal, the Servicer shall prepare and deliver to the Agent for the Lender and the Facility Insurer a Borrowing Base Certificate containing information accurate as of the date of delivery of such Borrowing Base Certificate. If any Borrowing Base Certificate indicates the existence of a Borrowing Base Deficiency, the Borrower shall on the date of delivery of such Borrowing Base Certificate prepay to the Agent, for the account of the Lender, a portion of the Loans as is necessary to cure such Borrowing Base Deficiency (or otherwise cure such Borrowing Base Deficiency).

        (d)   On the Business Day immediately preceding the last day of each Fixed Period, the Servicer shall prepare and deliver or have delivered to the Agent for the Lender and the Facility Insurer, a Commercial Paper Remittance Report containing information accurate as of the date of delivery of such Commercial Paper Remittance Report.

DZB004180

(e)     On the fifth day of each calendar month, or if such day is not a Business Day, the immediately preceding Business Day, the Servicer shall prepare and deliver or have delivered to the Backup Servicer (i) a Monthly Remittance Report in respect of the immediately preceding Remittance Period and (ii) a computer tape or a diskette or any other electronic transmission in a format acceptable to the Backup Servicer containing the information with respect to the Pledged Receivables during such Remittance Period which was necessary for preparation of such Monthly Remittance Report.

(f)     On the first day of each calendar week, or if such day is not a Business Day, the next Business Day, the Servicer shall deliver a computer tape or a diskette or any other electronic transmission in a format acceptable to the Backup Servicer containing the information with respect to the Pledged Receivables during the calendar week ending on the preceding Saturday which will be necessary for preparation of the next Monthly Remittance Report to be delivered pursuant to Section 6.11(b).

(g)     The Borrower shall deliver to the Agent and the Facility Insurer all reports it receives pursuant to the Loan Purchase Agreement within five (5) Business Day of the receipt thereof.

(h)     The Servicer and the Borrower shall deliver to the Agent and the Facility Insurer prompt notice (in writing) of any cancellation or termination of, or any default under, any (i) Eligible Credit Insurance policy or similar policy, (ii) Subject Inventory Insurance Policy and (iii) Supplemental Inventory Insurance Policy.

SECTION 6.12   Statements as to Compliance; Financial Statements. (a)  The Servicer shall deliver to the Agent, the Facility Insurer, the Borrower, the Custodian and the Lender on or before January 15 of each year, beginning with January 15, 2003, an Officers Certificate stating that (x) a review of the activities of the Servicer during the preceding calendar year and of its performance under this Agreement has been made under such officer's supervision, and (y) to the best of such officers' knowledge, based on such review, the Servicer has fulfilled all of its obligations under this Agreement throughout such calendar year (or portion thereof, as the case may be) or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof and the action being taken to cure such default.

(b)     The Servicer shall, at its expense (or, if the Backup Servicer is acting as the Servicer hereunder, at the expense of the Borrower, to be paid from Collections subject to the priority of payment set forth in Section 2.05 hereof; provided, that the Agent or the Facility Insurer has requested the delivery of an Accountant's Report), cause a firm of independent certified public accountants reasonably acceptable to the Agent, the Custodian and the Facility Insurer (the "Independent Accountants"), who may also render other services to the Servicer or to the Borrower to deliver to the Borrower, the Facility Insurer and the Agent, on or before March 31 of each year, beginning on March 31, 2003, with respect to the twelve (12) months

DZB004181

ended the immediately preceding December 31, a statement (the "<u>Accountants' Report</u>")
addressed to the Board of Directors of the Servicer, to the Facility Insurer and to the Agent, to
the effect that such firm has examined such Borrowing Base Certificates, Monthly Remittance
Reports and Commercial Paper Remittance Reports prepared by the Servicer during the
twelve (12) months ended the immediately preceding December 31 as it deemed necessary in
order to issue the Accountant's Report and issued its report thereon and that such examination
was made in accordance with generally accepted auditing standards, and accordingly included
such tests of the accounting records and such other auditing procedures as such firm considered
necessary in the circumstances. The Accountants' Report shall further state that (i) a review in
accordance with agreed upon procedures was made; (ii) except as disclosed in the Accountant's
Report, no exceptions or errors in the Borrowing Base Certificates, Monthly Remittance Reports
and Commercial Paper Remittance Reports examined were found except for (A) such exceptions
as the Independent Accountants believe to be immaterial and (B) such other exceptions as shall
be set forth in the Accountants' Report. The Accountants' Report shall also indicate that the firm
is independent of the Borrower and the Servicer within the meaning of the Code of Professional
Ethics of the American Institute of Certified Public Accountants.

        (c)     As soon as available and no later than forty-five (45) days after the end of
each calendar quarter in each fiscal year of Opportunity, the Servicer (if Opportunity or an
Affiliate thereof) shall deliver to the Lender, the Facility Insurer, the Custodian and the Agent
copies of:

        (i)     a consolidated and consolidating balance sheet of Opportunity and
its consolidated subsidiaries (including the Borrower) as of the end of such calendar
quarter setting forth in comparative form the corresponding figures for the most recent
year-end for which an audited balance sheet has been prepared, which such balance sheet
shall be prepared and presented in accordance with, and provide all necessary disclosure
required by, GAAP and shall be accompanied by a certificate signed by the financial vice
president, treasurer, chief financial officer or controller of Opportunity stating that such
balance sheet presents fairly the financial condition of the companies being reported upon
and has been prepared in accordance with GAAP consistently applied; and

        (ii)     consolidated and consolidating statements of income, stockholders'
equity and cash flow of Opportunity and its consolidated subsidiaries (including the
Borrower) for such calendar quarter, in each case and for the portion of the fiscal year
ending with such calendar quarter setting forth in comparative form the corresponding
figures for the comparable period one year prior thereto (subject to normal year-end
adjustments), which such statements shall be prepared and presented in accordance with,
and provide all necessary disclosure required by, GAAP and shall be accompanied by a
certificate signed by the financial vice president, treasurer, chief financial officer or
controller of Opportunity, stating that such financial statements present fairly the
financial condition and results of operations of the companies being reported upon and
have been prepared in accordance with GAAP consistently applied.

DZB004182

(d)     As soon as available and no later than one-hundred and twenty (120) days after the end of each fiscal year of Opportunity, the Servicer (if Opportunity or an Affiliate thereof) shall deliver to the Lender, the Facility Insurer, the Custodian and the Agent copies of:

(i)     a consolidated and consolidating balance sheet of Opportunity and its consolidated subsidiaries (including the Borrower), all as of the end of the fiscal year, setting forth in comparative form the figures for the previous fiscal year and accompanied by an opinion of the Independent Accountants stating that such balance sheet presents fairly the financial condition of the companies being reported upon and has been prepared in accordance with GAAP consistently applied (except for changes in application in which such accountants concur); and

(ii)     consolidated and consolidating statements of income, stockholders' equity and cash flow of Opportunity and its consolidated subsidiaries (including the Borrower), for such fiscal year; in each case setting forth in comparative form the figures for the previous fiscal year and accompanied by an opinion of the Independent Accountants stating that such financial statements present fairly the financial condition of the companies being reported upon and have been prepared in accordance with GAAP consistently applied (except for changes in application in which such accountants concur).

(e)     As soon as available and no later than one-hundred and twenty (120) days after the end of each fiscal year of the Borrower, the Borrower shall deliver to the Lender, the Facility Insurer and the Agent copies of:

(i)     a balance sheet of the Borrower, as of the end of the fiscal year, setting forth in comparative form the figures for the previous fiscal year (if applicable) and accompanied by an opinion of the Independent Accountants stating that such balance sheet presents fairly the financial condition of the Borrower and has been prepared in accordance with GAAP consistently applied (except for changes in application in which such accountants concur); and

(ii)     statements of income, stockholders' equity and cash flow of the Borrower for such fiscal year; setting forth in comparative form the figures for the previous fiscal year and accompanied by an opinion of the Independent Accountants stating that such financial statements present fairly the financial condition of the Borrower and have been prepared in accordance with GAAP consistently applied (except for changes in application in which such accountants concur).

(f)     As soon as available and no later than thirty (30) days after the end of each fiscal month of the Borrower, the Borrower shall deliver to the Lender, the Facility Insurer and the Agent copies of:

DZB004183

(i)      a balance sheet of the Borrower, as of the end of such fiscal month, which such balance sheet shall be prepared and presented in accordance with, and provide all necessary disclosure required by, GAAP and shall be accompanied by a certificate signed by the financial vice president, treasurer, chief financial officer or controller of Opportunity, stating that such financial statements present fairly the financial condition and results of operations of the companies being reported upon and have been prepared in accordance with GAAP consistently applied); and

(ii)      statements of income, stockholders' equity and cash flow of the Borrower for such fiscal month, which such statements shall be prepared and presented in accordance with, and provide all necessary disclosure required by, GAAP and shall be accompanied by a certificate signed by the financial vice president, treasurer, chief financial officer or controller of Opportunity, stating that such financial statements present fairly the financial condition and results of operations of the companies being reported upon and have been prepared in accordance with GAAP consistently applied).

g)      (i)      As soon as available, and not later than one-hundred and twenty (120) days after the end of each fiscal year of each Approved Distributor and Approved Distributor SPV, the Servicer (if Opportunity or an Affiliate thereof) shall deliver to the Lender, the Facility Insurer and the Agent copies of the audited financial statements of each such Approved Distributor and Approved Distributor SPV, which financial statements shall (i) be in form reasonably acceptable to the Agent, the Lender and the Facility Insurer and audited by independent accountants reasonably acceptable to the Agent, the Lender and the Facility Insurer and (ii) include a statement of income of each such Approved Distributor and Approved Distributor SPV during such fiscal year; provided; that solely with respect to Petters (but not its related Approved Distributor SPV) such financial statements shall not be audited but shall be prepared and presented in accordance with, and shall provide all necessary disclosure required by, GAAP and shall be accompanied by a certificate signed by the financial vice president, treasurer, chief financial officer or controller of Petters stating that such financial statements present fairly the financial condition of the companies being reported upon and have been prepared in accordance with GAAP consistently applied.

(ii)      As soon as available and no later than forty-five (45) days after the end of each calendar quarter in each fiscal year of each Approved Distributor and Approved Distributor SPV, the Servicer (if Opportunity or an Affiliate thereof) shall deliver to the Lender, the Facility Insurer and the Agent copies of the unaudited financial statements of each such Approved Distributor and Approved Distributor SPV, which such financial statements shall be prepared and presented in accordance with, and provide all necessary disclosure required by, GAAP and shall be accompanied by a certificate signed by the financial vice president, treasurer, chief financial officer or controller of each such Approved Distributor and Approved Distributor SPV stating that such balance sheet presents fairly the financial condition of the companies being reported upon and has been prepared in accordance with GAAP consistently applied; and which financial statements shall (i) be in form reasonably acceptable to the Agent, the Facility Insurer

DZB004184

and the Lender and (ii) include a statement of income of each such Approved Distributor and Approved Distributor SPV during such calendar quarter.

(iii)    As soon as available and no later than thirty (30) days after the end of each calendar month of each Approved Distributor and Approved Distributor SPV, the Servicer (if Opportunity or an Affiliate thereof) shall deliver to the Lender, the Facility Insurer and the Agent copies of the unaudited financial statements of each such Approved Distributor and Approved Distributor SPV, which such financial statements shall be prepared and presented in accordance with, and provide all necessary disclosure required by, GAAP and shall be accompanied by a certificate signed by the financial vice president, treasurer, chief financial officer or controller of each such Approved Distributor and Approved Distributor SPV stating that such balance sheet presents fairly the financial condition of the companies being reported upon and has been prepared in accordance with GAAP consistently applied; and which financial statements shall (i) be in form reasonably acceptable to the Agent, the Facility Insurer and the Lender and (ii) include a statement of income of each Approved Distributor and Approved Distributor SPV during such calendar month.

SECTION 6.13    Access to Certain Documentation; Opportunity Loan Borrowers. (a)  Each of the Lender, the Agent and the Facility Insurer (and their respective agents or professional advisors) shall at the expense of the Borrower, have the right under this Agreement, four (4) times during each calendar year, upon reasonable prior notice to the Servicer, to examine and audit, during business hours or at such other times as might be reasonable under applicable circumstances, any and all of the books, records, or other information of the Servicer or the Borrower, or held by another for the Servicer or the Borrower or on its behalf, concerning this Agreement; provided, that the Borrower shall not be responsible for (x) the expenses of the Agent and the Lender to the extent that such expenses exceed $7,500 in the aggregate in any calendar year or (y) the expenses of the Facility Insurer to the extent that such expenses exceed $2,500 in the aggregate in any calendar year. Each of the Lender, the Agent and the Facility Insurer (and their respective agents or professional advisors) shall at the expense of the Borrower and as frequently as the Lender, the Agent or the Facility Insurer may desire, have the right under this Agreement after the occurrence and during the continuance of an Event of Default, upon reasonable prior notice to the Servicer, to examine and audit, during business hours or at such other times as might be reasonable under applicable circumstances, any and all of the books, records, or other information of the Servicer or the Borrower, or held by another for the Servicer or the Borrower or on its behalf, concerning this Agreement. The Lender, the Agent and the Facility Insurer (and their respective agents and professional advisors) shall treat as confidential any information obtained during such examination which is not already publicly known or available; provided, however, that the Lender, the Agent and the Facility Insurer may disclose such information (i) to such of its officers, directors, employees, agents and representatives as need to know such information in connection with the transaction contemplated hereunder; (ii) to the Rating Agencies; (iii) to the extent required by applicable laws and regulations or by any subpoena or similar legal process, or if requested by any governmental regulatory body having authority over it; (iv) to the extent such confidential information becomes publicly available other than as a result of a breach of this agreement; (v)

DZB004185

that was already in the Agent's, the Lender's or the Facility Insurer's possession prior to the date hereof; and (vi) to the extent the Borrower shall have consented to such a disclosure in writing; provided, that to the extent that the Lender, the Agent or the Facility Insurer is requested pursuant to any subpoena or similar legal process to disclose such information, the Lender, the Agent or the Facility Insurer, as applicable, shall provide the Borrower and the Servicer with reasonably prompt notice of such request unless, the Lender, the Agent or the Facility Insurer believes that it is prohibited from doing so by applicable law or court order.

(b)   The Lender, the Agent and the Facility Insurer (and their respective agents or professional advisors) shall, at their own expense (and, after the occurrence and during the continuance of an Event of Default, at the expense of the Borrower), have the right under this Agreement to, not more frequently than twice each calendar year (but as frequently as the Lender, the Agent or the Facility Insurer may desire after the occurrence and during the continuance of an Event of Default), contact any or all Opportunity Loan Borrowers with respect to any Receivables which are Pledged hereunder in order to procure such information related to any or all such Opportunity Loan Borrowers, the related Contracts, and the Receivables as the Lender, the Agent or the Facility Insurer deems reasonable under the circumstances; provided, that so long as no Event of Default has occurred and is continuing, the Lender, the Agent and the Facility Insurer shall (i) provide the Servicer with five business days' prior written notice of such contact, indicating the purpose of such contact and any specific information sought from such Opportunity Loan Borrowers by such contact and (ii) make such contact with such Opportunity Loan Borrowers only in the presence of the Servicer or its authorized representative (unless such requirement is waived by the Servicer or the Servicer does not make itself or an authorized representative available to accompany the Lender, the Agent and the Facility Insurer in connection with such contact by the fifth Business Day after notice of such Person's desire to make such contact is delivered to the Servicer). The Servicer and the Borrower hereby agree to cooperate with the Lender, the Agent and the Facility Insurer (and their respective agents or professional advisors) in connection with any attempt thereby to contact any such Opportunity Loan Borrower and shall provide to the Lender, the Agent and the Facility Insurer such information as is needed in order to facilitate such contact. The Lender, Agent and Facility Insurer (and their respective agents and professional advisors) shall treat as confidential any information obtained during any such contact with any such Opportunity Loan Borrower which is not already publicly known or available; provided, however, that the Lender, the Agent and the Facility Insurer may disclose such information (i) to such of its officers, directors, employees, agents and representatives as need to know such information in connection with the transaction contemplated hereunder; (ii) to the Rating Agencies; (iii) to the extent required by applicable laws and regulations or by any subpoena or similar legal process, or if requested by any governmental regulatory body having authority over it; (iv) to the extent such information becomes publicly available other than as a result of a breach of this agreement; (v) that was already in the Agent's, the Lender's or the Facility Insurer's possession prior to the date hereof; and (vi) to the extent the Borrower shall have consented to such a disclosure in writing.

SECTION 6.14   Backup Servicer. If a Servicer Default shall occur and is continuing, then the Collateral Agent may (and at the direction of the Facility Insurer, shall), by

DZB004186

notice to the Servicer, the Borrower and the Backup Servicer, terminate all of the rights and obligations of the Servicer under this Agreement. Upon the delivery to the Servicer of such notice, all authority and power of the Servicer under this Agreement, whether with respect to the Pledged Assets or otherwise, shall pass to and be vested in the Backup Servicer pursuant to and under this Section, and, without limitation, the Backup Servicer is hereby authorized and empowered to execute and deliver, on behalf of the Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination or to perform the duties of the Servicer under this Agreement. The Servicer agrees to cooperate with the Collateral Agent and the Backup Servicer in effecting the termination of the Servicer's responsibilities and rights hereunder, including, without limitation, notification to the Opportunity Loan Borrowers of the assignment of the servicing function, providing the Backup Servicer with all records, in electronic or other form, reasonably requested by it to enable the Backup Servicer to assume the servicing functions hereunder and the transfer to the Backup Servicer for administration by it all cash amounts which at the time should be or should have been deposited by the Servicer in the Collection Account or thereafter be received by the Servicer with respect to the Pledged Receivables. Neither the Agent, the Collateral Agent nor the Backup Servicer shall be deemed to have breached any obligation hereunder as a result of a failure to make or delay in making any distribution as and when required hereunder caused by the failure of the Servicer to remit any amounts received by it or to deliver any documents held by it with respect to the Pledged Assets.

The Backup Servicer's Fees and Transition Costs shall be paid out of Collections as set forth in Section 2.05(c) on and after the date, if any, that the Backup Servicer assumes the responsibilities of the Servicer pursuant to this Section.

Any obligations of Opportunity hereunder other than in its capacity as Servicer shall continue in effect notwithstanding Opportunity's termination as Servicer.

On and after the time the Servicer receives a notice of termination pursuant to this Section 6.14, the Backup Servicer shall be (and the Backup Servicer hereby agrees to be) the successor in all respects to the Servicer in its capacity as Servicer under this Agreement and the transactions set forth or provided for herein and shall have all the rights and powers and be subject thereafter to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions hereof: provided, however, that any failure to perform such duties or responsibilities caused by the Servicer's failure to provide information required by this Section 6.14 shall not be considered a default by the Backup Servicer hereunder. The Backup Servicer shall have (i) no liability with respect to any obligation which was required to be performed by the terminated Servicer prior to the date that the Backup Servicer becomes the successor to the Servicer or any claim of a third party based on any alleged action or inaction of the terminated Servicer, (ii) no obligation to perform any repurchase or advancing obligations, if any, of the Servicer, (iii) no obligation to pay any taxes required to be paid by the Servicer (provided that the Backup Servicer shall pay any income taxes for which it is liable), (iv) no obligation to pay any of the fees and expenses of any other party to the transactions contemplated hereby, and (v) no liability or obligation with respect to any Servicer indemnification obligations

DZB004187

of any prior Servicer, including the original Servicer. The indemnification obligations of the Backup Servicer, upon becoming a successor Servicer, are expressly limited to those arising on account of its negligence or wilfull misconduct. In addition, the Backup Servicer shall have no liability relating to the representations and warranties of the Servicer contained in Article IV. Notwithstanding the above, the Collateral Agent may, if the Backup Servicer shall be unwilling to so act, or shall, if the Backup Servicer is unable to so act, or if the Lender or the Facility Insurer so requests in writing to the Collateral Agent, appoint any established servicing institution acceptable to the Agent, the Collateral Agent and the Facility Insurer, as the successor to the Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Servicer hereunder. Pending appointment of a successor to the Servicer hereunder, and after the Collateral Agent notifies the Servicer to discontinue performing servicing functions under this Agreement, the Backup Servicer (or the Agent if there is no Backup Servicer) shall act in such capacity as hereinabove provided. In connection with such appointment and assumption, the Collateral Agent may make such arrangements for the compensation of such successor out of payments on Pledged Receivables as it and such successor shall agree; provided, however, that, except as provided herein, no such compensation shall be in excess of that permitted the Servicer hereunder, unless otherwise agreed to by the Lender. The Borrower, the Collateral Agent and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession.

Prior to each Remittance Date, the Backup Servicer shall compare the information on the computer tape or diskette (or other means of electronic transmission acceptable to the Backup Servicer) most recently delivered to the Backup Servicer by the Servicer pursuant to Section 6.11(e) to the Monthly Remittance Report most recently delivered to the Backup Servicer by the Servicer pursuant to Section 6.11(e) and shall:

(a)    confirm that such Monthly Remittance Report is complete on its face;

(b)    [Reserved];

(c)    verify the mathematical accuracy of the following fields on such Monthly Remittance Report: (i) "Net Eligible Receivables Balance", (ii) "Default Percentage", (iii) "Dilution Percentage" and (iii) the three-month rolling average Default Percentage and Dilution Percentage for the three most recently ended Remittance Periods;.

(d)    deliver to the Collateral Agent and the Facility Insurer a certification letter with respect to the above substantially in the form of Exhibit N hereto on or before such Remittance Date.

In the event of any discrepancy between the information set forth in subparagraphs (b) or (c) above as calculated by the Servicer from that determined or calculated by the Backup Servicer, the Backup Servicer shall promptly report such discrepancy to the Servicer, the Collateral Agent and the Facility Insurer. In the event of a discrepancy as described in the preceding sentence, the Servicer and the Backup Servicer shall attempt to reconcile such

DZB004188

discrepancies prior to the related Remittance Date, but in the absence of a reconciliation, distributions on the related Remittance Date shall be made consistent with the information calculated by the Servicer, the Servicer and the Backup Servicer shall attempt to reconcile such discrepancies prior to the next Remittance Date, and the Servicer shall promptly report to the Collateral Agent and the Facility Insurer regarding the progress, if any, which shall have been made in reconciling such discrepancies. If the Backup Servicer and the Servicer are unable to reconcile such discrepancies with respect to such Monthly Remittance Report by the next Remittance Date that falls in April, July, October or January, the Servicer shall cause independent accountants acceptable to the Collateral Agent and the Facility Insurer, at the Servicer's expense, to examine such Monthly Remittance Report and attempt to reconcile such discrepancies at the earliest possible date (and the Servicer shall promptly provide the Collateral Agent and the Facility Insurer with a report regarding such events). The effect, if any, of such reconciliation shall be reflected in the Monthly Remittance Report for the next succeeding Remittance Date.

The Backup Servicer may not resign except upon sixty (60) day's prior written notice to the Collateral Agent, the Facility Insurer, the Servicer and the Borrower. In addition, the Backup Servicer may be removed by the Collateral Agent or the Lender (with the consent of the Facility Insurer) with or without cause at any time upon thirty (30) day's prior written notice to the Backup Servicer, the Servicer and the Borrower. In the event of any such resignation or removal, the Backup Servicer may be replaced by a new Backup Servicer selected by the Collateral Agent (with the consent of the Facility Insurer) upon notice to the Servicer and the Borrower.

SECTION 6.15    Additional Remedies of Agent Upon Event of Default. During the continuance of any Event of Default, the Agent and/or the Collateral Agent, in addition to the rights specified in Section 7.01, shall have the right, in its own name and as agent for the Lender and the Facility Insurer, to take all actions now or hereafter existing at law, in equity or by statute to enforce its rights and remedies and to protect the interests, and enforce the rights and remedies, of the Lender and the Facility Insurer (including the institution and prosecution of all judicial, administrative and other proceedings and the filings of proofs of claim and debt in connection therewith). Except as otherwise expressly provided in this Agreement, no remedy provided for by this Agreement shall be exclusive of any other remedy, and each and every remedy shall be cumulative and in addition to any other remedy, and no delay or omission to exercise any right or remedy shall impair any such right or remedy or shall be deemed to be a waiver of any Event of Default.

SECTION 6.16    Waiver of Defaults. Upon consent of the Lender and the Facility Insurer, the Agent may waive any default by the Servicer in the performance of its obligations hereunder and its consequences. Upon any such waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall be effective unless it shall be in writing and signed by the Agent on the Lender's and the Facility Insurer's behalf and no

DZB004189

such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

SECTION 6.17   Maintenance of Certain Insurance. During the term of its service as Servicer, the Servicer shall maintain in force an "errors and omissions" and an employee fidelity insurance policy, in each case, (i) in an amount not less than $1,000,000, (ii) in a form reasonably acceptable to the Lender, the Agent and the Facility Insurer and, in any case, that would cover any loss of Collections by the Servicer hereunder caused by employee dishonesty, (iii) with an insurance company reasonably acceptable to the Lender, the Agent and the Facility Insurer and (iv) naming the Collateral Agent as loss payee. Unless otherwise directed by the Agent, the Lender and/or the Facility Insurer, the Servicer shall prepare and present, on behalf of itself, the Agent, the Lender and the Facility Insurer, claims under any such policy in a timely fashion in accordance with the terms of such policy, and upon the filing of any claim on any policy described in this Section, the Servicer shall promptly notify the Agent and the Facility Insurer of such claim and deposit the proceeds of any such claim into the Collection Account.

SECTION 6.18   Segregation of Collections. The Servicer shall not commingle funds constituting Collections with any other funds of the Servicer.

SECTION 6.19   UCC Matters; Protection and Perfection of Pledged Assets. The Borrower will not change the jurisdiction of its formation or make any change to its corporate name or use any tradenames, fictitious names, assumed names, "doing business as" names or other names (other than those listed on Schedule III hereto, as such schedule may be revised from time to time to reflect name changes and name usage permitted under the terms of this Section 6.19 after compliance with all terms and conditions of this Section 6.19 related thereto) unless prior to the effective date of any such change in the jurisdiction of its formation or name change or use, the Borrower notifies the Agent and the Collateral Agent of such change in writing and delivers to the Collateral Agent such financing statements as the Collateral Agent may reasonably request to reflect such name change or use, together with such other documents and instruments as the Collateral Agent may reasonably request in connection therewith. The Borrower will not change the location of its chief executive office or the location of its records regarding the Pledged Receivables unless prior to the effective date of any such change of location, the Borrower notifies the Collateral Agent of such change of location in writing and delivers to the Collateral Agent such executed financing statements as the Collateral Agent may reasonably request to reflect such change of location, together with such Opinions of Counsel, documents and instruments as the Collateral Agent may reasonably request in connection therewith. The Borrower agrees that from time to time, at its expense, it will promptly execute and deliver all further instruments and documents, and take all further action that the Collateral Agent may reasonably request in order to perfect, protect or more fully evidence the Lender's interest in the Pledged Assets acquired hereunder, or to enable the Collateral Agent to exercise or enforce any of their respective rights hereunder. Without limiting the generality of the foregoing, the Borrower will upon the request of the Collateral Agent: (i) execute and file such financing or continuation statements, or amendments thereto or assignments thereof, and such other

DZB004190

instruments or notices, as may be necessary or appropriate or as the Collateral Agent may request, and (ii) mark its master data processing records evidencing such Pledged Receivables with a legend acceptable to the Collateral Agent, evidencing that the Lender has acquired an interest therein as provided in this Agreement.  The Borrower hereby authorizes the Collateral Agent to file one or more financing or continuation statements, and amendments thereto and assignments thereof, relative to all or any of the Pledged Receivables and the Related Security related thereto and the proceeds of the foregoing now existing or hereafter arising without the signature of the Borrower where permitted by law.  Subject to applicable law, a carbon, photographic or other reproduction of this Agreement or any financing statement covering the Pledged Receivables, or any part thereof shall be sufficient as a financing statement.  The Borrower shall, upon the request of the Collateral Agent at any time after the occurrence of an Event of Default and at the Borrower's expense, notify the Opportunity Loan Borrowers obligated to pay any Pledged Receivables, or any of them, of the security interest of the Secured Parties in the Pledged Assets.  If the Borrower fails to perform any of its agreements or obligations under this Section 6.19, the Collateral Agent may (but shall not be required to) itself perform, or cause performance of, such agreement or obligation, and the expenses of the Collateral Agent incurred in connection therewith shall be payable by the Borrower upon the Collateral Agent's demand therefor.  For purposes of enabling the Collateral Agent to exercise its rights described in the preceding sentence and elsewhere in this Article VI, the Borrower, the Lender and the Facility Insurer hereby authorize each of the Collateral Agent and its successors and assigns to take any and all steps in the Borrower's name and on behalf of the Borrower, the Lender and the Facility Insurer necessary or desirable, in the determination of the Collateral Agent, to collect all amounts due under any and all Pledged Receivables, including, without limitation, endorsing the Borrower's name on checks and other instruments representing Collections and enforcing such Pledged Receivables and other Contracts and, if any, the related Guarantees.

SECTION 6.20    Servicer Advances.  The Servicer may, in its sole discretion, make an advance in respect of any payment due on a Pledged Receivable to the extent such payment has not been received by the Servicer as of its due date and the Servicer reasonably expects such payment will be ultimately recoverable (a "Servicer Advance").  The Servicer shall deposit into the Collection Account in immediately available funds the aggregate of all Servicer Advances to be made during a Remittance Period on or prior to the Business Day immediately preceding the related Remittance Date.  The Servicer shall be entitled to reimbursement for such Servicer Advances from monies in the Collection Account as provided in Section 2.05(c) hereof.

SECTION 6.21    Certain Rights of the Agent, the Lender and the Facility Insurer.  (a) In the event that (i) any Approved Retailer reports negative net income for any fiscal year of such Approved Retailer, (ii) any Approved Retailer reports negative net income for any two consecutive calendar quarters of such Approved Retailer, (iii) any Approved Retailer shall have suffered (in the reasonable determination of the Agent, the Lender or the Facility Insurer) any material adverse change to its financial condition or operations (it being agreed by the parties hereto that, among other things, any decrease of an Approved Retailer's "financial stress class" or "credit score" under a Dunn & Bradstreet report with respect to such Approved Retailer shall

DZB004191

constitute evidence that such Approved Retailer has suffered such a material adverse change), or (iv) any Approved Retailer has become a Delinquent Retailer, each of the Agent, the Lender and the Facility Insurer, may determine that such Approved Retailer shall no longer be an Approved Retailer and upon the delivery of notice to the Borrower of such determination, such Approved Retailer shall no longer be an Approved Retailer.

(b)    In the event that (i) any Approved Distributor reports negative net income during any fiscal quarter of such Approved Distributor, as set forth on a financial statement delivered by the Servicer pursuant to Section 6.12(g)(i) hereof, (ii) any Approved Distributor fails, at any time, to maintain the minimum Tangible Net Worth set forth opposite such Approved Distributor on Schedule X hereto, (iii) the Servicer fails to deliver, when due the financial statements described in Section 6.12(g)(i) and (ii) hereof, or (iv) any Approved Distributor shall have suffered (in the determination of the Agent, the Lender or the Facility Insurer) any material adverse change to its financial condition or operations, each of the Agent, the Lender and the Facility Insurer, may determine that such Approved Distributor shall no longer be an Approved Distributor and upon the delivery of notice to the Borrower of such determination, such Approved Distributor shall no longer be an Approved Distributor.

(c)    The Servicer hereby agrees that it shall deliver to the Agent and the Facility Insurer on a quarterly basis, an updated Dunn & Bradstreet report (in form and substance satisfactory to the Agent and the Facility Insurer) with respect to Boscov's and any other Approved Retailer, the stock of which is not publicly traded.

SECTION 6.22    Repurchase of Receivables Upon Breach of Covenant or Representation and Warranty by Servicer. (a) The Borrower or the Servicer, as the case may be, shall inform the other parties to this Agreement promptly, in writing, upon the discovery of any breach of the Servicer's representations, warranties and/or covenants pursuant to Section 6.05 or Article V; provided, however, that the failure to provide any such notice shall not diminish, in any manner whatsoever, any obligation of the Servicer hereunder to repurchase any Pledged Receivable. Unless such breach shall have been cured by the last day of the first full calendar month following the discovery by or notice to the Servicer of such breach, the Servicer shall have an obligation, and the Borrower shall and the Agent may, enforce such obligation of the Servicer, to repurchase any Pledged Receivable materially and adversely affected by such breach. The Borrower shall notify the Agent and the Facility Insurer promptly, in writing, of any failure by the Servicer to so repurchase any such Pledged Receivable. In consideration of the repurchase of such Pledged Receivable, the Servicer shall remit funds in an amount equal to the Release Price for such Pledged Receivable to the Collection Account on the date of such repurchase.

(b)    In addition to the foregoing and notwithstanding whether any Pledged Receivable shall have been repurchased by the Servicer pursuant to Section 6.22(a), the Servicer hereby indemnifies the Borrower, the Agent, the Lender and the Facility Insurer against all costs, expenses, losses, damages, claims and liabilities, including reasonable fees and expenses of counsel, which may be asserted against or incurred by any of them in connection with any of the

DZB004192

events or facts giving rise to a breach of the Servicer's representations, warranties, agreements and/or covenants set forth in Article V or Article VI.

SECTION 6.23   Compliance with Applicable Law.  The Servicer and the Borrower shall at all times comply in all material respects with all requirements of applicable federal, state and local laws, and regulations thereunder (including, without limitation but only if and to the extent applicable, usury laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Federal Reserve Board's Regulations "B" and "Z", the Soldiers' and Sailors' Civil Relief Act of 1940 and state adaptations of the National Consumer Act and of the Uniform Consumer Credit Code, and all other credit laws and equal credit opportunity and disclosure laws and any regulations promulgated thereunder) in the conduct of its business.

## VII.   EVENTS OF DEFAULT

SECTION 7.01   Events of Default.  If any of the following events ("Events of Default") shall occur:

(a)     a Program Deficiency shall occur and shall remain unremedied for two Business Days; or

(b)     the occurrence of any Bankruptcy Event with respect to the Borrower, the Servicer or Opportunity; or

(c)     any representation or warranty made or deemed to be made by the Borrower, Opportunity or the Servicer (or any of their respective officers) under or in connection with this Agreement, any remittance report or other information or report delivered pursuant hereto or any other Transaction Document shall prove to have been false or incorrect in any material respect when made (including, without limitation, any representation or warranty made or deemed to be made by Opportunity (or any of its officers or agents) under or in connection with the Loan Purchase Agreement); provided, however, that if any breach described above is cured by the repurchase of Receivables pursuant to Article VI of the Loan Purchase Agreement or by a repayment pursuant to Section 2.12 or a repurchase pursuant to Section 6.22 hereof, such breach shall cease to constitute an Event of Default; or

(d)     (i) the Borrower or Opportunity shall fail to perform or observe any term, covenant or agreement hereunder or under any other Transaction Document (other than as set forth in clause (ii) of this subparagraph (d)) in any material respect and such failure remains unremedied for thirty (30) days or (ii) either the Servicer (if Opportunity) or the Borrower shall fail to make any payment or deposit to be made by it hereunder or under the Fee Letter when due; or

DZB004193

(e)     the Borrower, Opportunity or any other Affiliate of Opportunity shall fail to pay any principal of or premium or interest on any Debt in an amount in excess of $50,000, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue beyond the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other default under any agreement or instrument relating to any Debt or any other event, shall occur and shall continue beyond the applicable grace period, if any, specified in such agreement or instrument if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Debt; or any such Debt shall be declared to be due and payable or required to be prepaid (other than by a regularly scheduled required prepayment) prior to the stated maturity thereof; or

f)     (i) the Lender shall at any time fail to have a valid, perfected, first priority security interest in any of the Pledged Assets or (ii) any purchase by the Borrower of a Receivable the Loan Purchase Agreement shall, for any reason, cease to create in favor of the Borrower a perfected ownership interest in such Receivable; provided, however, that if an event described in the foregoing clause (i) or (ii) is cured by the repurchase of Receivables pursuant to Article VI of the applicable Loan Purchase Agreement or by a repayment pursuant to Section 2.12 or a repurchase pursuant to Section 6.22 hereof, such event shall cease to constitute an Event of Default; or

(g)     the Borrower or Opportunity shall have suffered any material adverse change to its financial condition or operations which would adversely affect the collectibility of the Pledged Receivables or the Borrower's or Opportunity's ability to conduct its business; or

(h)     Opportunity or the Borrower can no longer conduct business for any reason; or

(i)     the Loan Purchase Agreement shall cease to be in full force and effect; or

(j)     the occurrence of a Servicer Default (if the Servicer is Opportunity or an Affiliate thereof); or

(k)     the Borrower has at any time a Tangible Net Worth in an amount which shall be less than an amount equal to $12,000,000; or

(l)     a Change of Control shall occur; or

(m)     (i) the Facility Insurer is required to make any payment pursuant to the Facility Insurance Policy or (ii) the occurrence of a Facility Insurer Default Type I or a Facility Insurer Default Type II.

DZB004194

then the Agent may (and at the request of the Facility Insurer shall), by notice to the Borrower, declare the Early Amortization Commencement Date to have occurred; provided, that, in the case of any event described in 7.01(b) above, the Early Amortization Commencement Date shall be deemed to have occurred automatically upon the occurrence of such event.  Upon any such declaration or automatic occurrence, (i) the Borrower shall cease purchasing Receivables from Opportunity under the Loan Purchase Agreement, (ii) the Lender may cease issuing commercial paper notes to fund or maintain the Loans hereunder, (iii) the Liquidity/Credit Enhancement Facility may be drawn upon by the Lender from time to time thereafter in order to retire the maturing commercial paper notes issued to fund or maintain the Loans hereunder (and the Loans hereunder maintained by the amounts so drawn under the Liquidity/Credit Enhancement Facility shall bear interest at the Default Funding Rate), (iv) at the option of the Lender in its sole discretion, the Lender may declare the Loans made to the Borrower hereunder and all Yield and all Fees accrued on such Loans and any other Obligations to be immediately due and payable (and the Borrower shall pay such Loans and all such amounts and Obligations immediately); and (v) the Collateral Agent may (with the consent of the Facility Insurer) direct the Opportunity Loan Borrowers to make all payments under the Pledged Receivables directly to the Backup Servicer, the Agent, the Lender or any lockbox or account established by any of such parties.  In addition, upon any such declaration or upon any such automatic occurrence, the Collateral Agent shall have, in addition to all other rights and remedies under this Agreement or otherwise, all other rights and remedies provided under the UCC of the applicable jurisdiction and other applicable laws, which rights shall be cumulative.  Notwithstanding any other provision hereof, if any Event of Default shall have occurred, the Non-CP Rate and the CP Rate shall be increased to the Default Funding Rate, effective as of the date of the occurrence of such Event of Default and shall remain at the Default Funding Rate.

SECTION 7.02   Additional Remedies.  (a) If, upon the Lender's declaration that the Loans made to the Borrower hereunder are immediately due and payable pursuant to Section 7.01 or on the Facility Maturity Date, the aggregate outstanding principal amount of the Loans, all accrued Fees and Yield and any other Obligations are not immediately paid in full, then the Collateral Agent, in addition to all other rights specified hereunder, shall have the right, to immediately sell, subject to the prior consent of the Agent and the Facility Insurer, in a commercially reasonable manner and otherwise in accordance with applicable law, in a recognized market (if one exists) at such price or prices as the Collateral Agent with the prior consent of the Facility Insurer may reasonably deem satisfactory, any or all Pledged Assets and apply the proceeds thereof to the Obligations.

(b)     The parties recognize that it may not be possible to sell all of the Pledged Assets on a particular Business Day, or in a transaction with the same purchaser, or in the same manner because the market for such Pledged Assets may not be liquid.  Accordingly, the Collateral Agent may elect, in its sole discretion, the time and manner of liquidating any Pledged Assets and nothing contained herein shall obligate the Collateral Agent to liquidate any Pledged Assets on the date the Lender declares the Loans made to the Borrower hereunder to be immediately due and payable pursuant to Section 7.01 or to liquidate all Pledged Assets in the

DZB004195

same manner or on the same Business Day; provided any such sale shall be subject to the prior written consent of the Agent and the Facility Insurer.

(c)     Any amounts received from any sale or liquidation of the Pledged Assets pursuant to this Section 7.02 in excess of the Obligations will be returned to the Borrower, its successors or assigns, or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may otherwise direct.

(d)     The Collateral Agent shall have, in addition to all the rights and remedies provided herein and provided by applicable federal, state, foreign, and local laws (including, without limitation, the rights and remedies of a secured party under the Uniform Commercial Code of any applicable state, to the extent that the Uniform Commercial Code is applicable, and the right to offset any mutual debt and claim), all rights and remedies available to the lenders in law, in equity, or under any other agreement between the Lender or the Facility Insurer and the Borrower.

(e)     Except as otherwise expressly provided in this Agreement, no remedy provided for by this Agreement shall be exclusive of any other remedy, and each and every remedy shall be cumulative and in addition to any other remedy, and no delay or omission to exercise any right or remedy shall impair any such right or remedy or shall be deemed to be a waiver of any Early Amortization Event or Event of Default.

VIII.   INDEMNIFICATION

SECTION 8.01   Indemnities by the Borrower.  Without limiting any other rights which the Agent, the Collateral Agent, the Lender, the Backup Servicer, the Custodian, the Facility Insurer or any of their respective Affiliates may have hereunder or under applicable law, the Borrower hereby agrees to indemnify the Agent, the Lender, the Backup Servicer, the Custodian, the Facility Insurer and each of their respective Affiliates (each an "Indemnified Party" for purposes of this Article VIII) from and against any and all damages, losses, claims, liabilities and related costs and expenses, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively referred to as "Indemnified Amounts") awarded against or incurred by any of them arising out of or as a result of this Agreement or in respect of any Pledged Assets, excluding, however, Indemnified Amounts to the extent resulting from gross negligence or willful misconduct on the part of the Agent, the Lender, the Backup Servicer, the Custodian, the Facility Insurer or such Affiliate.  Without limiting the foregoing, the Borrower shall indemnify each Indemnified Party for Indemnified Amounts relating to or resulting from:

(a)     any Pledged Receivable treated as or represented by the Borrower to be an Eligible Receivable which is not an Eligible Receivable;

(b)     reliance on any representation or warranty made or deemed made by the Borrower, the Servicer (if Opportunity or one of its Affiliates) or any of their respective

DZB004196

officers under or in connection with this Agreement, which shall have been false or incorrect in any material respect when made or deemed made or delivered;

(c)     the failure by the Borrower or the Servicer (if Opportunity or one of its Affiliates) to comply with any term, provision or covenant contained in this Agreement or any agreement executed in connection with this Agreement, or with any applicable law, rule or regulation with respect to any Pledged Assets, or the nonconformity of any Pledged Assets with any such applicable law, rule or regulation;

(d)     the failure to vest and maintain vested in the Collateral Agent, for the benefit of the Secured Parties, or to transfer to the Collateral Agent, for the benefit of the Secured Parties, a first priority perfected security interest in the Receivables which are, or are purported to be, Pledged Receivables, together with all Collections, Related Security and other Pledged Assets related thereto (including, without limitation, any and all Subject Inventory and Opportunity Loan Collateral with respect to such Receivables), free and clear of any Adverse Claim (other than Permitted Liens) whether existing at the time of the related Borrowing or at any time thereafter;

(e)     the failure to maintain, as of the close of business on each Business Day prior to the Collection Date, a Facility Amount which is less than or equal to the lesser of (x) the Borrowing Limit on such Business Day, or (y) the Capital Limit on such Business Day (provided, that in determining the Capital Limit for purposes of this Section 8.01(v), all information used in such determination must be accurate as of the date of such determination);

(f)     the failure to file, or any delay in filing, financing statements (including without limitation the Approved Distributor Financing Statements) or other similar instruments or documents under the UCC of any applicable jurisdiction or other applicable laws with respect to any Receivables which are, or are purported to be, Pledged Receivables or the other Pledged Assets related thereto, whether at the time of any Borrowing or at any subsequent time;

(g)     any dispute, claim, offset or defense (other than the discharge in bankruptcy of an Opportunity Loan Borrower) to the payment of any Receivable which is, or is purported to be, a Pledged Receivable (including, without limitation, a defense based on such Receivable (or the Contract evidencing such Receivable) not being a legal, valid and binding obligation of such Opportunity Loan Borrower enforceable against it in accordance with its terms);

(h)     any failure of the Borrower or the Servicer (if Opportunity or one of its Affiliates) to perform its duties or obligations in accordance with the provisions of this Agreement;

DZB004197

(i)      the failure to pay prior to delinquency any taxes payable in connection with the Pledged Receivables or the Pledged Assets related thereto;

(j)      any repayment by the Agent or the Lender of any amount previously distributed in payment of Loans or payment of Yield or Fees or any other amount due hereunder, in each case which amount the Agent or the Lender believes in good faith is required to be repaid;

(k)      the commingling of Collections of Pledged Receivables at any time with other funds;

(l)      any investigation, litigation or proceeding related to this Agreement or the use of proceeds of Loans or the Pledged Assets;

(m)      any failure by the Borrower to give reasonably equivalent value to Opportunity in consideration for the transfer by Opportunity to the Borrower of any Receivable or any attempt by any Person to void or otherwise avoid any such transfer under any statutory provision or common law or equitable action, including, without limitation, any provision of the Bankruptcy Code; or

(n)      any failure of the Borrower, the Servicer or any of their respective agents or representatives (including, without limitation, agents, representatives and employees of the Servicer acting pursuant to authority granted under Section 6.01 hereof) to remit to the Servicer or the Agent, Collections of Pledged Receivables remitted to the Borrower, the Servicer or any such agent or representative.

Any amounts subject to the indemnification provisions of this Section 8.01 shall be paid by the Borrower to the Agent within five (5) Business Days following the Agent's written demand therefor.

SECTION 8.02    Indemnities by the Servicer. Without limiting any other rights which the Agent, the Collateral Agent, the Lender, the Facility Insurer or any of their respective Affiliates may have hereunder or under applicable law, the Servicer (if Opportunity or one of its Affiliates) hereby agrees to indemnify each Indemnified Party from and against any and all Indemnified Amounts awarded against or incurred by any of them arising out of or as a result of the Servicer's performance of or failure to perform its obligations under this Agreement excluding, however, Indemnified Amounts to the extent resulting from gross negligence or willful misconduct on the part of the Agent, the Collateral Agent, the Lender, the Facility Insurer or such Affiliate. Without limiting the foregoing, the Servicer (if Opportunity or one of its Affiliates) shall indemnify each Indemnified Party for Indemnified Amounts relating to or resulting from:

(a)      any Pledged Receivable treated as or represented by the Servicer to be an Eligible Receivable which is not an Eligible Receivable; or

DZB004198

(b)     reliance on any representation or warranty made or deemed made by the Servicer (if Opportunity or one of its Affiliates) or any of their respective officers under or in connection with this Agreement, which shall have been false or incorrect in any material respect when made or deemed made or delivered; or

(c)     the failure by the Servicer (if Opportunity or one of its Affiliates) to comply with any term, provision or covenant obtained in this Agreement or any agreement executed in connection with this Agreement, or with any applicable law, rule or regulation with respect to any Pledged Assets, or the nonconformity of any Pledged Assets with any such applicable law, rule or regulation; or

(d)     the failure to vest and maintain vested in the Collateral Agent, for the benefit of the Secured Parties, or to transfer to the Collateral Agent, for the benefit of the Secured Parties, a first priority perfected security interest in the Receivables which are, or are purported to be, Pledged Receivables, together with all Collections, Related Security and other Pledged Assets related thereto (including, without limitation, any and all (including, without limitation, any and all Subject Inventory and Opportunity Loan Collateral with respect to such Receivables), free and clear of any Adverse Claim (other than Permitted Liens) whether existing at the time of the related Borrowing or at any time thereafter; or

(e)     the commingling by the Servicer of Collections of Pledged Receivables at any time with other funds; or

(f)     any failure of the Servicer or any of its respective agents or representatives (including, without limitation, agents, representatives and employees of the Servicer acting pursuant to authority granted under Section 6.01 hereof) to remit to the Servicer or the Agent, Collections of Pledged Receivables remitted to the Borrower, the Servicer or any such agent or representative.

Any amounts subject to the indemnification provisions of this Section 8.02 shall be paid by the Servicer to the Agent within five (5) Business Days following the Agent's written demand therefor.

Each applicable Indemnified Party shall deliver to the indemnifying party under Section 8.01 and/or Section 8.02 within a reasonable time after such Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by such Indemnified Party relating to the claim giving rise to the Indemnified Amounts. Each such Indemnified Party will cooperate with the Borrower and the Servicer in connection with any claim giving rise to the Indemnified Amounts to minimize the liability of such indemnifying parties, provided that nothing contained herein shall obligate any such Indemnified Party to take any action which, in the opinion of such Indemnified Party, is unlawful or otherwise disadvantageous to such Indemnified Party.

Doc. #30365937.WPD                                        90

IX.    MISCELLANEOUS

SECTION 9.01    Amendments and Waivers. (a) Except as provided in Section 9.01(b). no amendment or modification of any provision of this Agreement shall be effective without the written agreement of the Borrower, the Servicer, the Agent (with the consent of the Facility Insurer) and the Lender and no termination or, except as set forth in Section 9.12 hereof, waiver of any provision of this Agreement or consent to any departure therefrom by the Borrower or the Servicer shall be effective without the written concurrence of the Agent (with the consent of the Facility Insurer) and the Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)    In addition to the consents required by Section 9.01(a) the written consent of each Lender in the event that there is more than one Lender) shall be required for any amendment, modification or waiver (i) reducing any outstanding Loans, or the Yield thereon, (ii) postponing any date for any payment of any Loan, or the Yield thereon, or (iii) modifying the provisions of this Section 9.01, or (iv) increasing the Capital Limit or the Borrowing Limit.

SECTION 9.02    Notices, Etc. All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including telex communication and communication by facsimile copy) and mailed, telexed, transmitted or delivered, as to each party hereto, at its address set forth under its name on the signature pages hereof or specified in such party's Assignment and Acceptance or at such other address as shall be designated by such party in a written notice to the other parties hereto. All such notices and communications shall be effective, upon receipt, or in the case of (i) notice by mail, five days after being deposited in the United States mails, first class postage prepaid, (ii) notice by telex, when telexed against receipt of answerback, or (iii) notice by facsimile copy, when verbal communication of receipt is obtained, except that notices and communications pursuant to Article II shall not be effective until received.

SECTION 9.03    No Waiver; Remedies. Except as set forth in Section 9.12 hereof, no failure on the part of the Facility Insurer, the Agent, the Collateral Agent or the Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04    Binding Effect; Assignability; Multiple Lenders. (a) This Agreement shall be binding upon and inure to the benefit of the Borrower, the Servicer, the Facility Insurer, the Agent, the Collateral Agent, the Lender, the Backup Servicer and the Custodian, and their respective successors and permitted assigns. This Agreement and the Lender's rights and obligations hereunder and interest herein shall be assignable in whole or in part (including by way of the sale of participation interests therein) by the Lender and its successors and assigns provided, that no such assignment shall be to a Competitor of Opportunity

Doc #30365937.WPD                                91

DZB004200

without the prior consent of Opportunity (such consent not to be unreasonably withheld or delayed). None of the Borrower, the Servicer or the Backup Servicer may assign any of its rights and obligations hereunder or any interest herein without the prior written consent of the Facility Insurer, the Lender and the Agent. The parties to each assignment or participation made pursuant to this Section 9.04 shall execute and deliver to the Agent for its acceptance and recording in its books and records, an assignment and acceptance agreement (an "Assignment and Acceptance") or a participation agreement or other transfer instrument reasonably satisfactory in form and substance to the Agent and the Borrower. Each such assignment or participation shall be effective as of the date specified in the applicable Assignment and Acceptance or other agreement or instrument only after the execution, delivery, acceptance and recording as described in the preceding sentence. The Agent shall notify the Borrower and the Facility Insurer of any assignment or participation thereof made pursuant to this Section 9.04. The Lender may, in connection with any assignment or participation or any proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower and the Pledged Assets furnished to the Lender by or on behalf of the Borrower or the Servicer; provided, however that the Lender shall obtain an agreement from such assignee or participant or proposed assignee or participant that they shall treat as confidential (under terms mutually satisfactory to the Agent and such assignee or participant or proposed assignee or participant) any information obtained which is not already publicly known or available.

(b)     Whenever the term "Lender" is used herein, it shall mean Autobahn and/or any other Person which shall have executed an Assignment and Acceptance; provided, however, that each such party shall have a pro rata share of the rights and obligations of the Lender hereunder in such percentage amount (the "Commitment Percentage") as shall be obtained by dividing such party's commitment to fund Loans hereunder by the total commitment of all parties to fund Loans hereunder. Any right at any time of the Lender to enforce any remedy, or instruct the Agent to take (or refrain from taking) any action hereunder, shall be exercised by the Agent only upon direction by such parties that hold a majority of the Commitment Percentages at such time.

(c)     Any bank or other financial institution (including, without limitation, DZ Bank) providing liquidity support, credit enhancement or other similar support under the Liquidity/Credit Enhancement Facility may assign, in whole or in part, its rights and obligations thereunder without the consent of the Borrower or the Servicer: provided, that no such assignment shall be to a Competitor of Opportunity.

SECTION 9.05     Term of This Agreement. This Agreement including, without limitation, the Borrower's obligation to observe its covenants set forth in Articles V and VI, and the Servicer's obligation to observe its covenants set forth in Articles V and VI, shall remain in full force and effect until the Collection Date; provided, however, that the rights and remedies with respect to any breach of any representation and warranty made or deemed made by the Borrower or Servicer pursuant to Articles III and IV and the indemnification and payment

DZB004201

provisions of Article VIII and Article IX and the provisions of Section 9.08 and Section 9.09 shall be continuing and shall survive any termination of this Agreement.

SECTION 9.06    Governing Law; Jury Waiver. THIS AGREEMENT SHALL, IN ACCORDANCE WITH SECTION 5-1401 OF THE GENERAL OBLIGA- TIONS LAW OF THE STATE OF NEW YORK, BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF THAT WOULD CALL FOR THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION, EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF THE INTERESTS OF THE LENDER IN THE PLEDGED RECEIVABLES, OR REMEDIES HEREUNDER, IN RESPECT THEREOF, ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING DIRECTLY OR INDIRECTLY OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREUNDER.

SECTION 9.07    Costs, Expenses and Taxes. (a) In addition to the rights of indemnification granted to the Backup Servicer, the Custodian, the Agent, the Collateral Agent, the Lender, the Facility Insurer and their respective Affiliates under Article VIII hereof, the Borrower agrees to pay on demand all reasonable costs and expenses of the Backup Servicer, the Custodian, the Agent, the Collateral Agent, the Lender and the Facility Insurer incurred in connection with the preparation, execution, delivery, administration of, or any waiver or consent issued or amendment prepared in connection with, this Agreement, the other Transaction Documents and the other documents to be delivered hereunder or in connection herewith or therewith or incurred in connection with any amendment, waiver or modification of this Agreement, any other Transaction Document, and any other documents to be delivered hereunder or thereunder or in connection herewith or therewith that is necessary or requested by any of the Borrower, the Servicer, the Lender or a Rating Agency or made necessary or appropriate as a result of the actions of any regulatory, tax or accounting body affecting the Lender and its Affiliates, or which is related to an Event of Default including, without limitation, the reasonable fees and reasonable out-of-pocket expenses of counsel for the Backup Servicer, the Custodian, the Agent, the Collateral Agent, the Lender and the Facility Insurer with respect thereto and with respect to advising the Backup Servicer, the Custodian, the Facility Insurer, the Agent, the Collateral Agent and the Lender as to their respective rights and remedies under this Agreement and the other documents to be delivered hereunder or in connection herewith, and all costs and expenses, if any (including reasonable counsel fees and expenses), incurred by the Backup Servicer, the Custodian, the Agent, the Collateral Agent, the Lender or the Facility Insurer in connection with the enforcement of this Agreement and the other Transaction Documents.

(b)    The Borrower shall pay on demand any and all stamp, sales, excise and other taxes and fees payable or determined to be payable in connection with the execution, delivery, filing and recording of this Agreement, the other documents to be delivered hereunder

DZB004202

or any agreement or other document providing liquidity support, credit enhancement or other similar support to the Lender which is specific to this Agreement or the funding or maintenance of Loans hereunder.

        (c)    The Custodian shall pay all expenses it incurs in connection with its services in connection with this Agreement and any other agreements executed in connection herewith and the transactions contemplated hereby or thereby; provided, that the Custodian shall be entitled to reimbursement for such expenses to the extent provided under the Custodial Agreement.

        (d)    The Borrower shall pay on demand all other costs, expenses and taxes (excluding franchise and income taxes) incurred by any Issuer or incurred by any general or limited partner, or member or shareholder of such Issuer on behalf of such Issuer related to this Agreement ("Other Costs"), including, without limitation, the portion of the cost of rating such Issuer's commercial paper by independent financial rating agencies which is allocable to commercial paper issued to fund Loans hereunder, the cost of obtaining a shadow rating from the Rating Agencies with respect to the financing facility provided for under this Agreement and the other Transaction Documents, the taxes (excluding franchise and income taxes) resulting from such Issuer's operations which are allocable to the provision of Loans hereunder, and the reasonable fees and out-of-pocket expenses of counsel for the Issuer with respect to (i) advising the Issuer as to its rights and remedies under this Agreement and the other documents to be delivered hereunder or in connection herewith, (ii) the enforcement of this Agreement and the other documents to be delivered hereunder or in connection herewith and (iii) advising the Issuer as to the issuance of the Issuer's commercial paper notes to fund Loans hereunder and action in connection with such issuance.

        SECTION 9.08    No Proceedings.  Each of the Borrower, the Agent, the Collateral Agent, the Servicer, the Lender and the Facility Insurer hereby agrees that it will not institute against, or join any other Person in instituting against, any Issuer any proceedings of the type referred to in the definition of Bankruptcy Event so long as any commercial paper issued by such Issuer shall be outstanding or there shall not have elapsed one year and one day since the last day on which any such commercial paper shall have been outstanding.  The Servicer hereby agrees that it will not institute against, or join any other Person in instituting against, the Borrower any proceedings of the type referred to in the definition of Bankruptcy Event (a) prior to the Collection Date and (b) so long as any commercial paper issued by a Lender which is an Issuer shall be outstanding or there shall not have elapsed one year and one day since the last day on which any such commercial paper shall have been outstanding.

        SECTION 9.09    Recourse Against Certain Parties.  No recourse under or with respect to any obligation, covenant or agreement (including, without limitation, the payment of any fees or any other obligations) of the Lender, the Agent, the Collateral Agent or the Facility Insurer as contained in this Agreement or any other agreement, instrument or document entered into by the Lender, the Agent, the Collateral Agent or the Facility Insurer pursuant hereto or in connection herewith shall be had against any administrator of the Lender, the Agent, the

           94

DZB004203

Collateral Agent or the Facility Insurer or any incorporator, affiliate, stockholder, officer, employee or director of the Lender, the Agent, the Collateral Agent or the Facility Insurer or of any such administrator, as such, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute or otherwise; it being expressly agreed and understood that the agreements of each party hereto contained in this Agreement and all of the other agreements, instruments and documents entered into by the Lender, the Agent, the Collateral Agent or the Facility Insurer pursuant hereto or in connection herewith are, in each case, solely the corporate obligations of such party (and nothing in this Section 9.09 shall be construed to diminish in any way such corporate obligations of such party), and that no personal liability whatsoever shall attach to or be incurred by any administrator of the Lender, the Agent, the Collateral Agent or the Facility Insurer or any incorporator, stockholder, affiliate, officer, employee or director of the Lender, the Agent, the Collateral Agent or the Facility Insurer or of any such administrator, as such, or any of them, under or by reason of any of the obligations, covenants or agreements of the Lender, the Agent, the Collateral Agent or the Facility Insurer contained in this Agreement or in any other such instruments, documents or agreements, or which are implied therefrom, and that any and all personal liability of every such administrator of the Lender, the Agent, the Collateral Agent or the Facility Insurer and each incorporator, stockholder, affiliate, officer, employee or director of the Lender, the Agent or the Facility Insurer or of any such administrator, or any of them, for breaches by the Lender, the Agent, the Collateral Agent or the Facility Insurer of any such obligations, covenants or agreements, which liability may arise either at common law or at equity, by statute or constitution, or otherwise, is hereby expressly waived as a condition of and in consideration for the execution of this Agreement. The provisions of this Section 9.09 shall survive the termination of this Agreement.

SECTION 9.10   Execution in Counterparts; Severability; Integration.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.   Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.   In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.   This Agreement contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than the Fee Letter.

SECTION 9.11   Tax Characterization.   Notwithstanding any provision of this Agreement, the parties hereto intend for the transactions effected hereunder to constitute a financing transaction for federal taxation purposes.

SECTION 9.12   Exclusivity.   The Borrower and Opportunity hereby agree that unless they have obtained the written consent of the Lender (which may be granted or refused in

DZB004204

the Lender's sole discretion) to do otherwise, from the date hereof through and including the Facility Maturity Date, they will not, and will cause their Affiliates not to, assign, transfer, pledge, convey, sell or otherwise dispose of or finance any Receivable (or any similar right to payment from any Person related to the advancing of loans secured by receivables originated in connection with the trade finance business) originated or otherwise acquired by the Borrower, Opportunity or any Affiliate thereof, except pursuant to the terms and provisions of this Agreement and the other Transaction Documents. The Borrower and Opportunity hereby agree that, from the date hereof through and including the Facility Maturity Date, they will, and will cause their Affiliates to, make reasonable commercial efforts to originate each of their Receivables (or any similar right to payment from any Person related to the advancing of loans secured by receivables originated in connection with the trade finance business) in such a manner that it will qualify as an Eligible Receivable hereunder.

Notwithstanding the foregoing paragraph, Opportunity may, after providing Agent and the Facility Insurer at least 10 days prior written notice (each such notice, a "First Look Notice"), advance loans to Persons (each, a "Subject Borrower") other than Opportunity Loan Borrowers pursuant to documents and agreements other than the Transaction Documents unless (within 10 days of delivery to the Agent of such First Look Notice) the Agent shall have delivered to Opportunity a written notice stating that the Lender and the Facility Insurer have approved such Subject Borrower as an Approved Distributor or Approved Distributor SPV at such time.

The first time that the aggregate outstanding amount of loans advanced by Opportunity (and any Affiliate thereof) to any Subject Borrower shall exceed $15,000,000, Opportunity shall promptly deliver a written notice (each such notice, a "Second Look Notice") to the Agent and the Facility Insurer providing notice of such occurrence and, unless the Agent shall have delivered to Opportunity a written notice (within 10 days of delivery to the Agent of such Second Look Notice) stating that the Lender and the Facility Insurer have approved such Subject Borrower as an Approved Distributor or Approved Distributor SPV at such time, Opportunity may continue to advance loans to such Subject Borrower.

If, in connection with the delivery to the Agent and the Facility Insurer of any First Look Notice, the Agent and the Facility Insurer approve the Subject Borrower described therein as a potential Approved Distributor or Approved Distributor SPV, Opportunity and the Borrower shall take all commercially reasonable actions necessary to cause such Subject Borrower to qualify as an Approved Distributor or Approved Distributor SPV, as applicable, and to cause all amounts advanced directly or indirectly to such Subject Borrower to qualify as Eligible Receivables. If, in connection with the delivery to the Agent and the Facility Insurer of any Second Look Notice, the Agent approves the Subject Borrower described therein as a potential Approved Distributor or Approved Distributor SPV, Opportunity and the Borrower shall take all commercially reasonable actions necessary to cause (within forty-five (45) days of such approval) such Subject Borrower to qualify as an Approved Distributor or Approved Distributor SPV, as applicable, and to cause all future amounts advanced directly or indirectly to such Subject Borrower to qualify as Eligible Receivables. If, in connection with the delivery to the Agent and the Facility Insurer of any First Look Notice or Second Look Notice, the Agent and the Facility Insurer approve the Subject

DZB004205

Borrower described therein as a potential Approved Distributor, and Opportunity's and the Borrower's commercially reasonable actions have failed to cause such Subject Borrower to qualify as an Approved Distributor or Approved Distributor SPV, as applicable, and/or to cause all future amounts advanced to such Subject Borrower to qualify as Eligible Receivables, the Lender shall still have the right, but not the obligation, to provide financing with respect to such Subject Borrower on terms and conditions agreed to among the Agent, the Lender, the Facility Insurer, Opportunity and the Borrower. In any case, the Borrower shall not allow Opportunity or its Affiliates to have, in the aggregate, more than $45,000,000 of outstanding loans advanced to all Subject Borrowers at any time.

Opportunity shall promptly comply with all of the Agent's and the Facility Insurer's reasonable requests for information related to any Person named in a First Look Notice or Second Look Notice.

SECTION 9.13    Consent of the Facility Insurer.

(a)      The Facility Insurer acknowledges and agrees that with respect to each provision under this Agreement where its approval or consent is required (other than any such approval or consent with respect to (i) the declaration of the occurrence of the Early Amortization Commencement Date or an Event of Default, (ii) termination or designation of a successor Servicer, the Backup Servicer, Collateral Agent or the Custodian or (iii) any remedies available to the Agent, the Lender or the Facility Insurer hereunder), such approval shall not be unreasonably withheld or delayed.

(b)      The Facility Insurer acknowledges and agrees that after the occurrence and during the continuation of a Facility Insurer Default Type I, the Facility Insurer's agreement, permission, vote, acknowledgment or other consent shall not be required for the Agent or the Lender, as the case may be, to take any action permitted to be taken under, pursuant to or in connection with this Agreement and the Facility Insurer shall have no right to take any action permitted by it to be taken, or instruct or direct the taking of any action under, pursuant to or in connection with this Agreement without the prior written consent of the Agent and the Lender.

(c)      The Facility Insurer acknowledges and agrees that after the occurrence and during the continuation of a Facility Insurer Default Type II and the occurrence of the Early Amortization Commencement Date, the Facility Insurer's agreement, permission vote, acknowledgment or other consent shall not be required for the Agent or the Lender, as the case may be, to take any action permitted to be taken under, pursuant to or in connection with this Agreement and the Facility Insurer shall have no right to take any action permitted by it to be taken, or instruct or direct the taking of any action under, pursuant to, or in connection with this Agreement without the prior consent of the Agent and the Lender. Notwithstanding the foregoing, the Facility Insurer shall not lose any voting, acknowledgment or consent rights with respect to any action permitted to be taken under, pursuant to or in connection with this Agreement which would have the effect of (i) increasing the Capital Limit or Borrowing Limit, (ii) postponing any date for any payment of any Loan, or Yield thereon, (iii) increasing the Yield

DZB004206

or fees or other amounts payable to any party by the Borrower or (iv) amending or modifying Section 9.01 or Section 9.13 hereof.

**[Signature pages to follow.]**

DZB004207

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

THE BORROWER:                          OPPORTUNITY FINANCE SECURITIZATION, LLC

                                       By: _____
                                       Title: _____

                                       60 South Sixth Street, Suite 2540 (B)
                                       Minneapolis, Minnesota 55402
                                       Attention: Jon Sabes
                                       Facsimile No.: 612-339-8922
                                       Confirmation No.: 612-339-8921


THE SERVICER:                          OPPORTUNITY FINANCE, LLC

                                       By: _____
                                       Title: _____

                                       60 South Sixth Street, Suite 2540
                                       Minneapolis, Minnesota 55402
                                       Attention: Jon Sabes
                                       Facsimile No.: 612-339-8922
                                       Confirmation No.: 612-339-8921

Doc #30365937

DZB004208

AS THE AGENT AND AS
THE COLLATERAL AGENT:

DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK,
FRANKFURT AM MAIN

By: _____
Title: *VP*

By: _____
Title:

609 Fifth Avenue
New York, New York  10017
Attention:  Patrick Preece
Facsimile No.: (212) 745-1651
Confirmation No.: (212) 745-1665

THE LENDER:

AUTOBAHN FUNDING COMPANY LLC

By:   DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK,
FRANKFURT AM MAIN,
its attorney-in-fact

By: _____
Title: *VP*

By: _____
Title:

609 Fifth Avenue
New York, New York  10017
Attention:  Patrick Preece
Facsimile No.: (212) 745-1651
Confirmation No.: (212) 745-1665

Doc ±30365937

DZB004209

AS THE AGENT AND AS
THE COLLATERAL AGENT:            DZ BANK AG DEUTSCHE ZENTRAL-
                                 GENOSSENSCHAFTSBANK,
                                 FRANKFURT AM MAIN


                                 By: _____
                                      Title:

                                 By: _____
                                      Title:  VP

                                 609 Fifth Avenue
                                 New York, New York 10017
                                 Attention: Patrick Preece
                                 Facsimile No.: (212) 745-1651
                                 Confirmation No.: (212) 745-1665


THE LENDER:                      AUTOBAHN FUNDING COMPANY LLC

                                 By:   DZ BANK AG DEUTSCHE ZENTRAL-
                                       GENOSSENSCHAFTSBANK,
                                       FRANKFURT AM MAIN,
                                       its attorney-in-fact


                                 By: _____
                                      Title:

                                 By: _____
                                      Title:  VP

                                 609 Fifth Avenue
                                 New York, New York 10017
                                 Attention: Patrick Preece
                                 Facsimile No.: (212) 745-1651
                                 Confirmation No.: (212) 745-1665


Doc. #30365937

DZB004210

THE CUSTODIAN AND THE
BACKUP SERVICER:

U.S. BANK NATIONAL ASSOCIATION, not in
its individual capacity but solely as the Custodian
and the Backup Servicer

By: _____

Title:          Vice President

180 East Fifth Street
St. Paul, Minnesota 55101
Attention: Structured Finance/Opportunity Finance
Facsimile No.: 651-244-1797
Confirmation No.: 651-244-1171

THE FACILITY INSURER:

ROYAL INDEMNITY COMPANY

By: _____

Title: _____

11111 Carmel Commons Boulevard
Charlotte, North Carolina 28226
Attention: David Schneider
Facsimile No.: 704-543-3566
Confirmation No.: 704-543-3349

Doc #3091

DZB004211

THE CUSTODIAN, THE
BACKUP SERVICER
AND THE TRUSTEE:

U.S. BANK NATIONAL ASSOCIATION, not in
its individual capacity but solely as the Custodian,
the Backup Servicer and the Trustee

By: _____
    Title:

180 East Fifth Street
St. Paul, Minnesota 55101
Attention: Structured Finance/Opportunity Finance
Facsimile No.: 651-244-1797
Confirmation No.: 651-244-1171

THE FACILITY INSURER:

ROYAL INDEMNITY COMPANY

By: _William J Hibberd_____
    Title: Authorized Representative

11111 Carmel Commons Boulevard
Charlotte, North Carolina 28226
Attention: David Schneider
Facsimile No.: 704-543-3566
Confirmation No.: 704-543-3349

Doc #30365917

THE CUSTODIAN AND THE
BACKUP SERVICER:

U.S. BANK NATIONAL ASSOCIATION, not in
its individual capacity but solely as the Custodian
and the Backup Servicer

By: _____
    Title:

180 East Fifth Street
St. Paul, Minnesota 55101
Attention: Structured Finance/Opportunity Finance
Facsimile No.: 651-244-1797
Confirmation No.: 651-244-1171

THE FACILITY INSURER:

ROYAL INDEMNITY COMPANY

By: _William J. Hobbel_____
    Title: AUTHORIZED Representative

11111 Carmel Commons Boulevard
Charlotte, North Carolina 28226
Attention: David Schneider
Facsimile No.: 704-543-3566
Confirmation No.: 704-543-3349

Doc. #30365937

DZB004213

# EXHIBIT 11

**ROYAL INDEMNITY COMPANY**

(A Delaware Capital Stock Insurance Company)
P.O. Box 472488
Charlotte, North Carolina 28247-2488

Policy Number RST 147541
**CREDIT RISK INSURANCE POLICY**

**DECLARATIONS**

| | | | |
|---|---|---|---|
| Item 1. | Insured: | Opportunity Finance Securitization, LLC | |
| | Address: | 60 South Sixth Street, Suite 2540 (B)<br>Minneapolis, MN 55402 | |
| | Beneficiary: | DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main, as Agent | |
| | Address: | 609 Fifth Avenue<br>New York, NY 10017 | |
| Item 2. | Policy Period: | Policy Inception Date: | December 28, 2001 |
| | | Policy Expiration Date: | The earlier of (a) the date, following the Termination Date, on which the aggregate Outstanding Principal Balances of all Covered Loans, together with Yield thereon accrued in accordance with the RLSA, has been indefeasibly paid in full to the Beneficiary and (b) the date on which the Limit of Liability has been indefeasibly paid by the Insurer. |
| | | | (in each case at 12:01 A.M. at the address of the Insured stated herein). |
| Item 3: | Limit of Liability: | $50,000,000 aggregate principal amount of Covered Loans, together with Yield thereon accrued in accordance with the RLSA. | |
| Item 4: | Premium: | As provided in Article IV, Section A. | |
| Item 5: | Exclusions: | None. | |

Countersigned by:
Royal Indemnity Company

*William J. Hibberd*
Name:  William J. Hibberd
Title:  Authorized Representative

30394889

DZB006243

## CREDIT RISK INSURANCE POLICY

In consideration of the payment of the Premium and in accordance with this Policy, the Declarations, and any endorsement(s) hereto from time to time, which together shall constitute the Credit Risk Insurance Policy (the "Policy"), Royal Indemnity Company (the "Insurer") agrees as follows:

I.    INSURING AGREEMENT

Subject to the Limit of Liability, the Insurer hereby irrevocably and unconditionally agrees to pay on behalf of the Insured to the Beneficiary, as Agent, for the benefit of the Lender, from the Insurer's own funds, the amount of each Loss during the Policy Period up to the Limit of Liability. The amount payable by the Insurer will be paid in accordance with Article III, Payment; Notice and Proof of Loss and Recoveries after Payment.

II.   DEFINITIONS

Capitalized terms used herein (and in the Declarations) and not otherwise defined herein shall have the meanings assigned to them in the Receivables Loan and Security Agreement dated as of December 28, 2001 (as amended from time to time with the written consent of the Insurer, the "RLSA") among the Insured, as Borrower, Opportunity Finance, LLC, as the Servicer, Autobahn Funding Company, LLC, as a Lender, the Beneficiary, as the Agent and Collateral Agent, and U.S. Bank National Association, as the Custodian and Backup Servicer.

A.    "Agent" shall mean DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main, as Agent, for the benefit of the Lender, under the RLSA, and any permitted successor thereto.

B.    "Beneficiary" shall mean the entity listed as the Beneficiary in Item 1 of the Declarations, its successors and permitted assigns.

C.    "Claim" shall mean a written Claim by or on behalf of the Beneficiary submitted to the Insurer for payment of a Loss pursuant to delivery of a Notice.

D.    "Covered Loans" shall mean all Loans made pursuant to the RLSA prior to the Termination Date.

E.    "Covered Payments" shall mean, as of any Remittance Date: (i) a payment of principal on the Covered Loans in an amount equal to the excess, if any, of (A) the aggregate outstanding principal balances of the Covered Loans, minus (B) the Net Receivables Balance; plus (ii) payment of Yield then due pursuant to the RLSA.

F.    "Exposure" shall mean, with respect to each Remittance Period, an amount equal to the average daily amount of the aggregate outstanding principal balances of the Covered Loans during such Remittance Period.

G.    "Insured" shall mean the entity listed as the Insured in Item 1 of the Declarations, its successors and permitted assigns.

DZB006244

H.     "Insurer" shall mean Royal Indemnity Company, its successors and permitted assigns.

I.     "Late Payment Rate" shall mean the rate publicly announced by Citibank, N.A. at its principal office in New York, New York as its prime rate (any change in such prime rate to be effective on the date such change is announced by Citibank, N.A.) plus 3%, computed on the basis of a year of 365 days, calculating the actual number of days elapsed.  In no event shall the Late Payment Rate exceed the maximum rate permissible under any applicable law limiting interest rates.

J.     "Limit of Liability" shall mean the amount specified in Item 3 of the Declarations, subject to reinstatement as provided in Article V, and shall be the maximum payment obligation of the Insurer under this Policy for all Losses for the entire Policy Period, exclusive of interest on late payments required to be paid pursuant to Article III, Section A hereof.

K.     "Loss" shall mean, (a) as of any Remittance Date, the excess, if any, of (i) the Covered Payments with respect to such Remittance Date over (ii) the amount of funds in the Collection Account available to pay, and to be applied to, such Covered Payments on such Remittance Date pursuant to, and subject to the priority of payments set forth in, Section 2.05(a) of the RLSA (determined after giving effect to all transfers made on such date to the Collection Account), and (b) as of the date of an applicable final, nonappealable order described in the definition of "Preference Amount", the related Preference Amount.

L.     "Net Receivables Balance" shall mean the aggregate Outstanding Principal Balance of all Pledged Receivables funded prior to the Termination Date (other than Defaulted Receivables).

M.     "Notice" shall mean the Notice of Claim to be provided by the Beneficiary to the Insurer directing payment of a Claim as described in Article III, Section B.

N.     "Policy Expiration Date" shall be as set forth in Item 2 of the Declarations.

O.     "Policy Inception Date" shall be as set forth in Item 2 of the Declarations.

P.     "Policy Period" shall mean the period from the Policy Inception Date to the Policy Expiration Date.

Q.     "Preference Amount" shall mean any amount previously paid to the Beneficiary pursuant to the RLSA in respect of any Covered Payment, which amount is determined, by a final, nonappealable order of a court having competent jurisdiction, to be a voidable preference recoverable from the Beneficiary under the Bankruptcy Code.

R.     "Termination Date" shall mean the earlier of (a) an Early Amortization Commencement Date and (b) the Facility Maturity Date.

DZB006245

III.    PAYMENT; NOTICE AND PROOF OF LOSS AND RECOVERIES AFTER PAYMENT

    A.    PAYMENT

        1.    Payments of any Loss under this Policy shall be due and payable by the Insurer no later than 12:00 p.m. New York, New York time on the fifth (5th) Business Day following receipt of the related Notice in accordance with Section B of this Article III and shall be paid to the Beneficiary by wire transfer of immediately available funds to the account designated by the Agent in such Notice. In the event that any proper Claim for Loss hereunder is not paid within such five (5) Business Day period, the Insurer agrees to pay interest thereon at the Late Payment Rate from the date such payment was due hereunder to the date such payment is made.

        2.    The Insurer shall at any time, and from time to time, with respect to a Remittance Date, have the option to deliver amounts to the Agent for deposit into the Collection Account for any of the following purposes: (a) to provide funds in respect of the payment of fees or expenses of any provider of services to the Insured with respect to the immediately preceding Remittance Period; (b) to provide funds to the extent that without such amount a draw would be required to be made on this Policy; or (c) after the Termination Date, to pay the aggregate remaining Limit of Liability, to be applied solely to the outstanding principal balance of the Covered Loans and accrued and unpaid Yield thereon. Any payments pursuant to clauses (a) and (b) above which are applied against items other than the Covered Payments shall not reduce the Insurer's obligations hereunder with respect to such Covered Payments and shall not reduce the Limit of Liability.

    B.    NOTICE

The Notice shall be in the form attached hereto, setting forth the amount of the Loss to be paid by the Insurer. The Notice shall be sent by certified mail, return receipt requested, hand delivery, facsimile transmission or overnight courier, addressed to 11111 Carmel Commons Boulevard, Charlotte, North Carolina 28226, Attention: Tony McKenzie, fax number (704) 543-3566, or his representative. The Notice will be deemed to have been received on the date of the execution of receipt for certified mail, on the date of delivery if by hand delivery or facsimile transmission or the next Business Day if sent by overnight courier.

    C.    PROOF OF LOSS AND RECOVERIES AFTER PAYMENT

        1.    After payment of a Loss or any amount paid pursuant to Section III.A.2 hereof, the Insurer shall be entitled to reimbursement from the Insured for the full amount of such payment plus interest thereon from the date paid until the date of reimbursement at the Late Payment Rate, and shall be subrogated to the extent of such payments to the rights of the Beneficiary with respect to the Insured and the Receivables; provided, that, except for the right to payment out of the Collection Account and the rights as a Secured Party, all as provided in (and subject to the limitations set forth in) the RLSA, the Insurer shall not enforce or seek to enforce any such rights until all Obligations under the RLSA payable to the Beneficiary, Collateral Agent and the Lender have been indefeasibly paid in full.

DZB006246

2.    No failure to comply with the provisions of this Article III shall in any way impair, delay or limit the right of the Beneficiary to make a Claim for or receive payment of any Loss under this Policy.

IV.    GENERAL CONDITIONS

A.    PAYMENT OF PREMIUM

1.    A premium shall be payable in an amount equal to (a) on the initial Remittance Date, a fraction the numerator of which equals the number of days elapsed during the initial Remittance Period and the denominator of which is 360, or (b) on each Remittance Date thereafter, one-twelfth (1/12), of four-tenths of one percent (0.40%), in each case multiplied by the Exposure for the corresponding Remittance Period; provided, that upon the occurrence and during the continuance of a Facility Insurer Default Type I or Facility Insurer Default Type II, the amount otherwise payable to the Insurer in respect of such premium shall be payable to the Agent as provided in the RLSA. In the event that any amount of premium is not paid when due hereunder, additional premium shall be due thereon from the date when due to the date of payment in full at the Late Payment Rate.

2.    No failure to comply with the provisions of this Article IV, Section A shall in any way impair, delay or limit the right of the Beneficiary to make a Claim for or receive payment of any Loss under this Policy.

B.    TERMINATION

This Policy and all of the Insurer's obligations hereunder will terminate automatically on the Policy Expiration Date.

V.    LIMIT OF LIABILITY

The Limit of Liability stated in Item 3 of the Declarations and in this Article V, Limit of Liability, is the absolute limit of the Insurer's liability for all payments under this Policy (exclusive of interest on late payments as provided in Article III, Section A). Each payment made by the Insurer hereunder (exclusive of interest on late payments as provided in Article III, Section A) shall reduce the Limit of Liability by an amount equal to such payment; provided, however, that the Limit of Liability shall be reinstated to the extent of reimbursements received by the Insurer as provided for in the RLSA.

VI.    CANCELLATION

THIS POLICY IS IRREVOCABLE AND MAY NOT BE CANCELED BY EITHER THE INSURED OR THE INSURER FOR ANY REASON, INCLUDING WITHOUT LIMITATION ANY NON-PAYMENT OF PREMIUM.

VII.    ASSIGNMENT

This Policy and any rights and obligations hereunder (i) may not be assigned by the Insured without the prior written consent of the Insurer and Beneficiary, (ii) may not be assigned by the

DZB006247

Insurer without the prior written consent of the Beneficiary and (iii) may not be assigned by the Beneficiary without the prior written consent of the Insurer.

VIII.    <u>CHANGES</u>

Notice to any representative of the Insurer or knowledge possessed by any representative or by any person shall not effect a waiver or change in any part of this Policy; nor shall the terms of this Policy be waived, changed, modified or amended, or any endorsement(s) attached hereto, unless agreed to in writing by an authorized representative of the Insurer and the Insured and consented to in writing by the Beneficiary in its sole discretion.

IX.    <u>CHOICE OF LAW</u>

The construction, validity and performance of this Policy shall be governed by the internal laws of Delaware. This Policy shall be deemed to be executed and delivered in the State of Delaware and all parties hereto acknowledge and agree that it is so executed and delivered. In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Policy, the parties hereto agree that the United States District Court for the District of Delaware shall have the sole and exclusive jurisdiction over any such proceeding. If such court lacks federal subject matter jurisdiction, the parties agree that the appropriate court in the State of Delaware shall have sole and exclusive jurisdiction. Any of these courts shall be proper venue for any such lawsuit or judicial proceeding and the parties hereto waive any objection to such venue. The parties hereto consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts.

X.    <u>RIGHT TO RECEIVE PAYMENT SUBJECT ONLY TO LIMIT OF LIABILITY</u>

**NOTWITHSTANDING ANY OTHER PROVISION OF THIS POLICY TO THE CONTRARY, THE RIGHT OF THE BENEFICIARY TO RECEIVE PAYMENT FOR LOSSES UNDER THIS POLICY SHALL BE ABSOLUTE, CONTINUING, IRREVOCABLE AND UNCONDITIONAL, IRRESPECTIVE, WITHOUT LIMITATION, OF (A) ANY FRAUD WITH RESPECT TO THE RECEIVABLES OR THE INSURED, (B) THE GENUINENESS, VALIDITY OR ENFORCEABILITY OF ANY TRANSACTION DOCUMENT OR RECEIVABLES OR (C) ANY OTHER RIGHTS OR DEFENSES THAT MAY BE AVAILABLE TO THE INSURER TO AVOID PAYMENT OF ITS OBLIGATIONS UNDER THIS POLICY (ALL OF WHICH RIGHTS AND DEFENSES ARE HEREBY EXPRESSLY WAIVED BY THE INSURER), AND NO FAILURE ON THE PART OF THE INSURED, THE SERVICER, OR THE BENEFICIARY TO OBSERVE OR PERFORM ANY COVENANT OR CONDITION CONTAINED IN THIS POLICY OR ANY TRANSACTION DOCUMENT SHALL ENTITLE THE INSURER TO ANY RIGHT OF SET-OFF, COUNTERCLAIM OR DEFENSE AGAINST THE BENEFICIARY (ALL OF WHICH RIGHTS AND DEFENSES ARE HEREBY EXPRESSLY WAIVED BY THE INSURER) OR OTHERWISE RELIEVE THE INSURER OF ANY LIABILITY TO MAKE ANY PAYMENT FOR LOSSES TO THE BENEFICIARY UNDER THIS POLICY, SUBJECT ONLY TO THE LIMIT OF LIABILITY.**

DZB006248

**THE INSURER HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS POLICY, THE TRANSACTION DOCUMENTS OR ANY TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND FOR ANY COUNTERCLAIM THEREIN.**

Notwithstanding the foregoing, nothing herein shall constitute a waiver or release of any claims or rights which the Insurer may have against the Insured or Servicer pursuant to the RLSA, any Transaction Document, the Insurance Agreement or Article III, Section C.1 hereof, provided that no such claims or rights shall constitute or be asserted as a defense, counterclaim or set-off with respect to, or otherwise as a basis for impairing, limiting, withholding or delaying, the payment to the Agent, on behalf of the Beneficiary, of any Claim hereunder.

DZB006249

## FORM OF

## <u>NOTICE OF CLAIM</u>

To:    Royal Indemnity Company
       11111 Carmel Commons Boulevard
       Charlotte, North Carolina 28226
       Attention: Tony McKenzie
       Fax Number: (704) 543-3566

       Re:    Credit Risk Insurance Policy, Policy Number RST 147541

       The undersigned, being a duly appointed officer of the Beneficiary hereby provides this Notice of Claim pursuant to the above referenced Policy, and in connection therewith certifies the information set forth herein.  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Policy.  A person who files a claim with the intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

       1.    The Termination Date has occurred (or, by virtue of the submission of this Notice of Claim, will occur).

       2.    As of the Remittance Date on _____ __, 200_,
             there is a Loss in the amount of:   $_____

       3.    The full amount of such Loss should be wired to:

                    Bank Name:       _____
                    ABA #:           _____
                    Account Name:    _____
                    Reference:       _____

       IN WITNESS WHEREOF, the undersigned has executed this Notice of Claim as of the date indicated below.

                    DZ BANK AG DEUTSCHE ZENTRAL-
                    GENOSSENSCHAFTSBANK, FRANKFURT AM
                    MAIN, as Agent

                    By:_____
                       Name:
                       Title:

                    Date: _____ __, 200_

30394889.DOC                         8

DZB006250

**ROYAL INDEMNITY COMPANY**
**P.O. Box 472488**
**Charlotte, North Carolina 28247-2488**

**OFFICER'S CLOSING CERTIFICATE**

The undersigned officer of Royal Indemnity Company ("Royal") hereby certifies on behalf of Royal, after due inquiry, that as of the date hereof, the Credit Risk Insurance Policy Number 147541 issued by Royal naming Opportunity Finance Securitization, LLC as the insured and DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main, as Agent, as the beneficiary is in full force and effect.

[Remainder of page intentionally left blank]

30394892

DZB006251

IN WITNESS WHEREOF, the undersigned, on behalf of Royal Indemnity Company, signed this Officer's Certificate as of the 28th day of December, 2001.

ROYAL INDEMNITY COMPANY

By: _William J. Hibberd_

William J. Hibberd
Authorized Representative

30394888                          3

DZB006252

# EXHIBIT 12

**URGENT – AUTOBAHN CP INSTRUCTIONS**     **DZ BANK**

| | |
|---|---|
| **TO:** | Andy Yan / Sue Ciaramella<br>Lord Securities<br>(F) 346-9012 |
| **FROM:** | Stacey Rolsing<br>Asset Securitization |
| **DATE:** | Friday, December 28, 2001 |
| **RE:** | **Commercial Paper Instructions** |

| | |
|---|---|
| *Customer:* | Opportunity Finance Securitization LLC |
| *Trade Date:* | **12/31/01** |
| *Amount of CP Maturing:* | **$0.00** |
| *Amount of CP Requested:* | **$50,600,000.00** |
| *CP BASIS:* | **NET PROCEEDS** |
| *Tenor of CP:* | **60 days,** to mature **3/1/02** |
| *Interest on Maturing CP:* | N/A |

For the initial funding, a Sources and Uses spreadsheet will be sent to Rosalyn at US Bank.

Regards,

Asset Securitization Group

# EXHIBIT 13

# Autobahn Funding Company LLC



**Closing Date:**
September 22, 1999

## Analysts:

Karen Cook
Associate Analyst
(212) 553-1439
*Karen.Cook@moodys.com*

Stephany Bushweller
Analyst
(212) 553-4929
*Stephany.Bushweller
@moodys.com*

## Contacts:

Sam Pilcer
Managing Director
(212) 553-7418
*Sam.Pilcer@moodys.com*

Michael Kanef
Managing Director
(212) 553-1964
*Michael.Kanef@moodys.com*

Vernessa Poole
Investor Liaison
(212) 553-4796
*Vernessa.Poole@moodys.com*

## Structure Summary

| | |
|---|---|
| Rating: | **Prime-1** |
| Securities: | Asset-backed commercial paper (ABCP) |
| Program Type: | Partially supported, multi seller |
| Authorized Amount: | $2.596 billion (as of December 31, 2001) |
| Administrative & Hedging Agent: | DZ Bank AG Deutsche Zentral-Genossenschaftsbank (**A2/ Prime-1/ C-**) |
| Assets: | Trade and term receivables, debt securities |
| Collateral Agent: | U.S. Bank Trust National Association (**Aa3/ Prime-1/ B**)[1] |
| Depositary: | U.S. Bank Trust National Association (**Aa3/ Prime-1/ B**) |
| Placement Agents: | J.P. Morgan |
| | Merrill Lynch |
| Securities Act Exemption: | Section 4(2) |
| Owner: | BSCS XVI Inc. |
| Manager: | Lord Securities Corporation |

### Program Credit Enhancement

None

### Liquidity

| | |
|---|---|
| Type 1: | Asset pool-specific liquidity loan and purchase agreements |
| Support Percentage: | Face amount of outstanding ABCP |
| Provider: | DZ Bank and other **Prime-1**-rated financial institutions |
| Funding Basis: | Amount of nondefaulted receivables |
| Out to Funding: | Bankruptcy of Autobahn |
| Dilution Coverage: | Yes |
| Type 2: | Swing-line credit agreement |
| Support Amount: | $500,000 |
| Provider: | DZ Bank AG Deutsche Zentral-Genossenschaftsbank |
| Funding Basis: | Amount of nondefaulted receivables |
| Out to Funding: | Loans are provided at DZ's sole and absolute discretion |

### Program Wind Down Events

Any of the following events would prevent Autobahn Funding Company LLC from issuing ABCP:

- Bankruptcy of Autobahn Funding Company LLC
- Net worth of Autobahn less than $25,000
- Aggregate face amount of CP exceeds the aggregate available liquidity commitments

Administrator's Other
ABCP Programs:              None

1  Ratings are based on its parent, U.S. Bank National Association.

## CURRENT HIGHLIGHTS

- As of December 31, 2001, Autobahn Funding Company had $1.703 billion of ABCP outstanding. Autobahn had 21 asset pools with a total program commitment of $2.596 billion.
- During the fourth quarter of 2001, Autobahn funded three new transactions totaling $239.2 million. The asset classes represented by these deals are timber receivables, project finance loans and inventory trade loans.

BM-000245

## PROGRAM OVERVIEW

Autobahn Funding Company LLC (Autobahn) is a special-purpose limited liability company organized under Delaware law. It is owned by BSCS XVI Inc., a special-purpose corporation organized under Delaware law and owned by Broad Street Contract Services, Inc., a Delaware corporation, which is in turn owned by a third party not affiliated with DZ Bank AG Deutsche Zentral-Genossenschaftsbank (DZ Bank).

Autobahn is a partially supported, multiseller asset-backed commercial paper (ABCP) program that purchases trade and term receivables and other asset-backed securities. Autobahn is the first ABCP program sponsored by DZ Bank. Autobahn's initial capital contribution is $25,000.

### Investors Do Not Benefit From Program-Level Credit Enhancement

Unlike many partially supported, multiseller programs, Autobahn will not have the benefit of program-level credit enhancement. Consequently, all losses experienced on an asset pool must be absorbed by the pool-specific credit enhancement (first loss protection); otherwise, ABCP investors will suffer a loss.

Moody's will review each asset purchase before it is made to assess its effect on Autobahn's **Prime-1** rating. Because Autobahn's ABCP investors do not benefit from program-level credit enhancement, each asset pool in Autobahn's portfolio will necessarily be credit enhanced to a high investment grade level to support the program's **Prime-1** rating. Any significant deterioration in the credit quality of any asset pool in Autobahn's portfolio is likely to have a negative impact on Autobahn's **Prime-1** rating.

### Purchases Of Highly-Rated Assets

Autobahn may also purchase, on a post-review basis, assets rated **Aa2** or higher – assets commonly referred to as "highly rated assets." Because Moody's will not be looking at these transactions prior to their inclusion in the conduit, Autobahn's purchase of highly rated assets is subject to strict conditions.

For example, to be considered a highly rated asset, a security must be rated **Aa2** or higher, and any rate mismatches between the security and the ABCP issued to fund it must be addressed through a swap agreement or other similar mechanism as determined by DZ Bank. As with other asset pools, a loss on a highly rated asset could result in a loss to ABCP investors.

### First-Loss Protection Provides Liquidity Support

A second unique feature of Autobahn's ABCP program, as compared with other partially supported multi-seller programs, is that the pool-specific credit enhancement will provide liquidity support. Therefore, liquidity support for Autobahn ABCP will be provided by a combination of liquidity loan or liquidity asset purchase agreements provided by **Prime-1** banks and pool-specific credit enhancement, if necessary.

In all transactions, the sum of the liquidity agreements and the pool-specific credit enhancement will equal the maximum amount of ABCP that can be issued with respect to each specific transaction. Typically, liquidity support alone is sized in an amount equal to outstanding ABCP.

The pool-specific credit enhancement will typically be in the form of a loan agreement provided by a **Prime-1**-rated bank and will fund up to a certain dollar amount, without regard to a borrowing base test. Some of the deals, however, use other forms of credit enhancement such as overcollateralization and surety bonds. The liquidity agreements are typically subject to a borrowing base test, which means that funds will be available up to the amount of the nondefaulted assets. Additionally, many of Autobahn's deals have a trigger that causes the transaction to be immediately "put" to the liquidity banks upon the occurrence of certain performance-related events or deterioration of the asset pool.

Even though reliance on credit enhancement to provide liquidity support is unique, this structure results in no additional risks to ABCP investors.

### DZ Bank Is Program Administrator

DZ Bank's New York Branch is Autobahn's administrator. Although this is DZ Bank's first conduit, the personnel handling the administrative responsibilities have significant prior experience in administrating other ABCP conduits. Moody's was favorably impressed by the underwriting and administrative functions of DZ Bank.

### ABCP Investors Are Secured Creditors

Autobahn ABCP investors have a security interest in all of Autobahn's assets. In the unlikely event Autobahn were to become bankrupt, ABCP investors would have a *pari passu* interest with the program liquidity providers in the proceeds of Autobahn's assets. In Moody's opinion, a security interest in the assets is a very strong feature of the program. The security interest would likely reduce the severity of loss to investors in the event of an Autobahn bankruptcy.

However, the security interest does not add any significant benefit from a short-term rating perspective. Moody's **Prime-1** rating addresses not only the probability of repayment in full, but timely repayment of ABCP. The addition of a security interest does not materially enhance investors' probability of being repaid on time.

## RATING OPINION

Autobahn's **Prime-1** rating is based on:

- The credit quality of the program's assets
- Liquidity support provided by **Prime-1**-rated banks
- Certain structural protections, including the bankruptcy-remote nature of Autobahn

Because of the significant role played by DZ Bank as principal liquidity and credit enhancement provider, the **Prime-1** rating assigned to Autobahn is closely correlated with DZ Bank's **Prime-1** rating.

BM-000246

A

*Table 1*

**Autobahn Portfolio**

As of December 31, 2001

| Pool No. | Seller Industry | Seller Rating | Asset Type | Purchase Limit ($ million) | Inception Date |
|---|---|---|---|---|---|
| 1 | Insurance | A2 | Insurance Premium Loans | 170 | 10/22/99 |
| 2 | Consumer Finance | A2 | Prime Auto Loans | 13 | 10/22/99 |
| 3 | Consumer Finance | NR | Prime Auto Loans | 85 | 01/18/00 |
| 4 | Travel/Leisure | NR | Timeshare Loan Receivables | 150 | 01/31/00 |
| 5 | Corporate Bonds | Aaa/Aa3 | Collateralized Bond Obligation | 100 | 03/28/00 |
| 6 | Retail Banking | NR | ATM Cash Receivables | 20 | 03/17/00 |
| 7 | Banking | Aa2 | Senior Secured Bank Debt (CLO) | 142 | 04/13/00 |
| 8 | Insurance | NR | Senior Life Insurance Settlements | 200 | 04/25/00 |
| 9 | Insurance | NR | Insurance Premium Loans | 100 | 05/26/00 |
| 10 | Leasing | NR | Equipment Leases | 75 | 06/30/00 |
| 11 | Medical Practice | A1 | Equipment Loans | 125 | 08/16/00 |
| 12 | Travel/Leisure | NR | Timeshare Loan Receivables | 100 | 10/30/00 |
| 13 | Financial Services | A1 | Small Business Loans/Factored Receivables | 200 | 12/15/00 |
| 14 | Financial Services | NR | Equipment Leases | 200 | 12/29/00 |
| 15 | Insurance | NR | Structured Settlements | 100 | 3/23/01 |
| 16 | Leasing | NR | Equipment Leases | 60 | 3/30/01 |
| 17 | Financial Services | NR | Lottery Receivables | 150 | 7/31/01 |
| 18 | Financial Services | NR | Diversified Receivables Portfolio | 368 | 8/22/01 |
| 19 | Agriculture | Aaa | Timber Receivables | 95 | 9/1/01 |
| 20 | Energy | Baa3 | Project Finance Loan | 44 | 12/20/01 |
| 21 | Retail- Wholesale | NR | Wholesale Inventory Trade Loans | 100 | 12/28/01 |
|  |  |  | Total | 2,596 |  |

*Source: Autobahn Monthly Report*

## ASSET OVERVIEW

### Portfolio Investment Criteria

Autobahn may invest in assets such as trade and term receivables, which are commonly found in other partially supported, multiseller programs. According to the program administrator, preferred asset classes include consumer finance receivables (interest bearing, short and long term), trade receivables, insurance premium loans, and finance leases. Investments in these assets may take the form of an interest in an undivided pool of assets or a certificate backed by an identified asset pool.

Autobahn may also invest in highly rated assets – that is, securities rated **Aa2** or above by Moody's. These assets can be purchased by Autobahn without notification to Moody's, but they must be fully supported by liquidity agreements. Generally, these securities take the form of collateralized loan obligations (CLOs) or collateralized bond obligations (CBOs).

### Current Portfolio

As Autobahn's portfolio increases in size, its diversification by asset class has improved. Compared to January 2000, when auto loans comprised 60% of the portfolio, the current portfolio contains a much broader exposure of asset interests. Corporate loans CLOs/ CBOs, equipment leases, structured settlements and small business loans each accounts for 12 to 13% of the portfolio. Moody's does not rate about 54% of the transactions (by purchase commitment); however, these transactions have the benefit of full liquidity support from **Prime-1-**

rated DZ Bank. *Table 1* summarizes Autobahn's asset portfolio as of December 31, 2001. *Chart 1* presents Autobahn's portfolio by asset type.



*Chart 1*

**Autobahn Portfolio By Asset Type**

Purchase Limits as of December 31, 2001
(Total: $2.596 billion)

*Source: Autobahn Funding Company LLC*

BM-000247

Because Autobahn ABCP investors do not benefit from program-level credit enhancement, Moody's requires that each transaction be of very high credit quality (equivalent to **Aa2**) on a stand-alone basis. In order to meet this requirement and facilitate the funding of transactions through the conduit, Autobahn typically fully supports new transactions with **Prime-1**-rated liquidity and then proposes a partially supported structure to Moody's for confirmation of the **Prime-1** rating. As of December 31, 2001, fifteen of the twenty-one deals in the Autobahn portfolio were fully supported by liquidity banks that assumed all the credit risk of the assets.

Six of the twenty-one deals, which represent approximately 27% of Autobahn's authorized amount (as of December 31, 2001), are partially supported by liquidity. Of the six, two of the partially supported deals are a dental equipment loan facility and a small business loan facility, both of which are rated **A1** by Moody's and are enhanced to a level consistent with **Prime-1**. The other deals are two insurance premium deals, a prime auto loan transaction and a timber receivable transaction. One of the insurance premium deals and the prime auto deal were both rated **A2** on a stand-alone basis by Moody's. The timber receivable deal was rated **Aaa** based on an insurance policy provided by a **Aaa**-rated surety bond provider that fully supports this transaction. Deal-specific credit enhancement for these deals take the form of: overcollateralization, an insurance policy provided by a **Aaa**-rated surety bond provider and/or an immediate "put" to the liquidity banks upon the deterioration of the receivables. The partial liquidity support combined with deal-specific credit enhancement supports the **Prime-1** rating of Autobahn.

From a statistical standpoint, the probability of default (even among assets rated **Aa2**) becomes greater as the number of assets increases. Consequently, at some point, the probability of default on a large portfolio of **Aa2**-rated assets is not consistent with **Prime-1**, and will need to be addressed should circumstances warrant it.

### Hedging

Autobahn may also be exposed to interest rate risk due to the assets it holds in its portfolio. To mitigate these risks, DZ Bank (as Autobahn's hedging agent) is required to arrange appropriate hedges for each Autobahn asset, if necessary. Autobahn may enter into hedging arrangements only with **Prime-1**-rated counterparties.

## CREDIT ENHANCEMENT

Pool-specific credit enhancement is typically in the form of a loan agreement provided by a **Prime-1**-rated bank and funds up to a certain dollar amount, without regard to a borrowing base test. As noted above in the Program Overview section, unlike many partially supported, multiseller programs, Autobahn does not have the benefit of program-level credit enhancement. Losses experienced

on any asset pool must be absorbed by the pool's first-loss protection; otherwise, ABCP investors will suffer a loss.

The six partially supported deals incorporate various forms of deal-specific credit enhancement to maintain Autobahn's **Prime-1** rating. Each deal-specific credit enhancement takes the form of one or a combination of the following: an insurance policy provided by **Aaa**-rated surety bond provider, letter of credit, overcollateralization and excess spread.

## LIQUIDITY

Liquidity support is provided by a combination of liquidity loan or liquidity asset purchase agreements furnished by **Prime-1** banks. Unless the transaction is fully supported, liquidity funding is subject to a borrowing base test. The liquidity loan or liquidity asset purchase agreements are not available upon the voluntary or involuntary bankruptcy of Autobahn. Because Autobahn is bankruptcy-remote, this risk is consistent with the program's **Prime-1** rating.

## PROGRAM WIND DOWN EVENTS

Autobahn has incorporated program wind down events that provide protection to ABCP investors by facilitating the orderly exit of the program from the ABCP market if certain adverse events occur.

The following wind down events would prevent Autobahn from issuing ABCP:

- Autobahn becomes bankrupt
- Net worth of Autobahn is less than $25,000
- Aggregate available liquidity commitments are less than the aggregate face amount of outstanding ABCP
- Aggregate face amount of all outstanding ABCP is greater than $4 billion
- Occurrence of a termination event, as defined in a pool-specific funding agreement

## PROGRAM ADMINISTRATOR

DZ Bank acts as administrator for Autobahn. This is DZ Bank's first ABCP program; however, the personnel handling the responsibilities of Autobahn all have significant prior experience in administrating other ABCP conduits. DZ Bank's current long- and short-term ratings are **A2** and **Prime-1**, respectively; its financial strength rating is **C-**.

*Contacts:* Ms. Jennifer Wikoff, Vice President
DZ Bank AG
New York Branch, (212) 745-1661

Mr. Kenneth Bradt, Senior Vice President
DZ Bank AG
New York Branch, (212) 745-1655

BM-000248

# EXHIBIT 14

# <u>FAX</u>

**To:**     **Stacey Rolsing – DZ Bank**
         **212-745-1651**

**From:**   **Steven F. Sabes**
         **612-339-8922**

Date:     Jan. 10, 2002

Re:      Deal 092401-01 - Paid

Pages:   4 (including this cover sheet)

From the desk of...

Steven F. Sabes
Opportunity Finance, LLC
60 S 6th St #2540
Minneapolis, MN 55402
612-339-8921 ext. 15
Fax: 612-339-8922

DZB006654

---

## CLOSING WIRE TRANSFER REQUEST

| | | |
|---|---|---|
| To: | Stacey Rolsing | DZ BANK<br>212-745-1651   FAX |
| From: | Steven Sabes | OPPORTUNITY FINANCE, LLC<br>612-339-8922   FAX |
| Cc: | Deanna Munson | PC FUNDING, LLC<br>952-975-2295   FAX |
| Date: | January 11, 2002 | |
| Re: | *Wire Authorization* | |

---

Reference is made to the Credit Agreement dated December 17, 2001 (the "Credit Agreement") by and between PC Funding, LLC ("Underlying Borrower") and Opportunity Finance, LLC ("Lender"). In connection with the Credit Agreement, Underlying Borrower, has requested and Opportunity Finance Securitization, LLC, as assignee of the Lender, hereby approves and requests, the following wire transfer according to the terms set forth below.

U.S. Bank National Association is hereby instructed to include in the wire transfer requested hereunder the following text: "If this wire is received in error, funds may only be returned to the sending bank (contact: Toby Robilard)".

<div align="center">

Loan Control No.    092401-01

### WIRE TRANSFER INFORMATION
</div>

| | | |
|---|---|---|
| Sender: | US Bank – Minneapolis, MN | |
| | Acct. Name:   PC Funding, LLC | |
| | Acct. No.:   Redacted - Confidential | |

| | | |
|---|---|---|
| Recipient: | (1) | US Bank – Minneapolis, MN |
| | | Acct. Name:   DZ Bank AG Deutsche Zentral-Genossenschaftsbank, as Collateral Agent for Certain Secured Parties |
| | | Acct. No.:   Redacted - Confidential |
| | | **Amount:**      **$1,126,000.36** ✓ |
| | | |
| | (2) | M&I Bank – Milwaukee, WI |
| | | Acct. Name:   Petters Company, Inc. |
| | | Acct. No.:   Redacted - Confidential |
| | | ABA No.:   075000051 |
| | | **Amount:**      **$74,939.14** ✓ |

*Handwritten note:*

Vinny –

This is Opportunity Finances Closing Wire Transfer Request Info.

Toby from US Bank should be faxing you a signed copy in the a.m.

Thank you so much for your help on this! – Stacy

**OPPORTUNITY FINANCE SECURITIZATION, LLC**

By: _____
Its: _____

Wire_PC_Funding_Close_092401-01

## CUSTODIAN CONFIRMATION

U.S. Bank National Association, as Custodian, has complied with the requirements of the first sentence of Section 8(f) of the Custodial Agreement (the "Agreement") dated as of December 28, 2001 among Opportunity Finance Securitization, LLC, Opportunity Finance, LLC, DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main, as the Collateral Agent and U.S. Bank National Association, as the Custodian, with respect to this Opening Wire Transfer Request.

U.S. BANK NATIONAL ASSOCIATION, as Custodian

By: _____
Its: _____

Acknowledged and Approved:
DZ Bank AG Deutsche Zentral - Genossenschaftsbank,
Frankfurt am Main, as the Collateral Agent

_____
By:
Name:
Title:
Date:

DZB006656

004

1/10/02 3:07 PM

**Opportunity Finance Securitiztion, LLC**

**Deal Payment Approval**

| NOTE # | 092401-01 ✓ | | Deal Goods: | Golf Clubs |
|---|---|---|---|---|
| | | | Nationwide | 1,031,730.00 |
| | | | Sam's Club | 1,200,939.50 |
| Principal Amount | 1,000,000.00 ✓ | | gross | 169,209.50 |
| Payment Amount | 126,000.36 | | payment | 126,000.36 |
| | | | net | 43,209.14 |
| **TOTAL NOTE:** | **1,126,000.36** | | | |
| Issued | 24-Sep-01 ✓ | | | |
| Maturity | 10-Jan-02 | | | |
| Number of Days | 108 | | | |
| Interest Rate | 3.50% | | | |

| | | |
|---|---|---|
| Total to OF SPV Collection Account: | 1,126,000.36 | |
| Total to Petters Account: | 74,939.14 | |
| | 1,200,939.50 | ✓ |

Approved by: _____

Steven F. Sabes
Opportunity Finance, LLC

1/10/02
Date

DZB006657

# EXHIBIT 15

# NOTICE OF BORROWING

DZ Bank AG Deutsche Zentral-Genossenschaftsbank,
Frankfurt am Main, as Collateral Agent
Attn: Asset-Backed Finance Group/Stacey Rosling/Vincent Salerno
609 Fifth Avenue
New York, New York  10017

U.S. Bank National Association
180 East Fifth Street
Attn: Eve Kaplan/Jeffrey Tupper/Toby Robilard
St. Paul, Minnesota 55101

Re:    Receivables Loan And Security Agreement (the "Agreement") dated as of
December 28, 2001, among Opportunity Finance Securitization, LLC, as the
Borrower, Opportunity Finance, LLC, Autobahn Funding Company, LLC, DZ
Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main, as the
Collateral Agent and U.S. Bank National Association, as the Custodian, and
Royal Indemnity Company

Ladies and Gentlemen:

In accordance with Section 2.02(b) of the Agreement, enclosed please find the
written Notice of Borrowing from the Borrower to the Agent, with a copy to the
Custodian, for the Pledged Receivable(s) described below:

| | |
|---|---|
| 1. Aggregate Amount Borrowing | $3,900,000.00 |
| 2. Date of Borrowing | January 15, 2001 |
| 3. Requested Fixed Period(s) | 59 days |
| 4. Eligible Receivables Pledged with Borrowing | Schedule A |
| 5. Notice of Pledged | Attached |

6. Account into which the Lender is requested to wire requested Borrowing

| | |
|---|---|
| Bank Name: | U.S. Bank National Association |
| For Further Credit: | U.S. Bank Trust N. A. |
| ABA #: | 091000022 |
| Account Number: | Redacted - Confidential |
| OBI #: | 47300425 |
| Re: | Redacted - Confidential PC Funding Acct. |
| | Attn: Toby Robillard 41171 |

**The Notice of Borrowing is being delivered to the Agent pursuant to this Section 2.02(b)** with a copy of the Notice of Pledge (and the Receivables Schedule attached thereto) which was sent to the Custodian pursuant to the terms of the Custodial Agreement in connection with the pledge of Eligible Receivables to be made in connection therewith.

> Opportunity Finance Securitization, LLC
> 60 South Sixth Street, Suite 2540 (B)
> Minneapolis, Minnesota 55402
> Attention: Jon Sabes/Steve Sabes
> Telecopier No.: (612)339-8922
> Telephone No.: (612)339-8921
>
> Receivable Number:  011502-01,02,03

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Agreement.

> OPPORTUNITY FINANCE
> SECURITIZATION, LLC, as
> Borrower
>
> By: _____
> Name:  Steven F. Sabes
> Title:  Secretary

Date: _January 14_, 2002

DZB006705

DZB006706

004

061233198922

01/14/02    14:46

Opportunity Finance LLC
Opportunity Finance Securitization LLC
Schedule A

Cut-Off Date    1/1/2002
Servicing Date    1/16/2002

| Obligation No. | CF No. | Promissory Note Principal | Issuance Date | Maturity Date | Filing Date | File No. | Seller Price | Approved Seller | Seller PO No. | Item No. | Inventory Description | Qty | Unit Cost | Total Amount | Buyer Price | Approved Buyer | Buyer PO No. | Item No. | Inventory Description | Qty | Unit Cost | Total Amount | Shipping Date | Inventory Collateral | Trade Rec Collateral |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2-453 | 011502-01 | $ 3,400,000 | 1/15/2002 | 6/15/2002 | 1/15/2002 | 20022715225 | 2,518,458.20 | Nationwide | 35600 | DVX00478 | Panac DVDCO | 2,050 | 165 | 467,530 | 2,920,678.85 | SAMS | 60025403X | DVX0RF95 | Panac DVDCO | 2,650 | 191 | 594,600 | n/a | $ 2,929,280 | $ | - |
| | | | | | | | | | | KDT036038 | Panac Phone | 1,025 | 250 | 256,250 | | | | KDT092053 | Panac Phone | 1,025 | 290 | 297,350 | | | | |
| | | | | | | | | | | CT27C11 | Panac 27" TV | 3,315 | 238 | 787,870 | | | | CT27D11 | Panac 27" TV | 3,315 | 278 | 314,045 | | | | |
| | | | | | | | | | | CT32C6 | Panac 32" TV | 2,650 | 348 | 595,350 | | | | CT32C9 | Panac 32" TV | 2,650 | 401 | 1,144,506 | | | | |
| | | | | | | | | | | | | | | 2,516,454 | | | | | | | | 2,929,039 | | | | |
| 2-454 | 011502-02 | $ 3,000,000 | 1/15/2002 | 5/15/2002 | 1/16/2002 | 20022719543 | 3,131,540.00 | Nationwide | 35608 | KV32F610 | Sony 32" Wega TV | 890 | 785 | 731,400 | 3,632,534.48 | SAMS | 60028403X | KV32F610 | Sony 32" Wega TV | 820 | 922 | 849,424 | n/a | $ 3,632,534 | $ | - |
| | | | | | | | | | | KV36F513 | Sony 36" Flat TV | 1,350 | 938 | 1,173,200 | | | | KV36F613 | Sony 36" Flat TV | 1,350 | 1,068 | 1,399,400 | | | | |
| | | | | | | | | | | KV36HS36 | Sony 32" Hi-Scan TV | 895 | 1,272 | 1,277,540 | | | | KV32HS36 | Sony 32" Hi-Scan TV | 895 | 1,642 | 1,484,410 | | | | |
| | | | | | | | | | | | | | | 3,131,540 | | | | | | | | 3,632,834 | | | | |
| 2-456 | 011502-03 | $ 4,5400,000 | 1/15/2002 | 5/15/2002 | 1/15/2002 | 20022714W | 5,600,337.25 | Nationwide | 35604 | PVC2021 | Panac TV/VCR | 2,460 | 160 | 513,600 | 5,600,378.56 | SAMS | 60029403X | PVC2021 | Panac TV/VCR | 3,400 | 209 | 708,620 | n/a | $ 5,600,280 | $ | - |
| | | | | | | | | | | CT27C6 | Panac 27" TV | 2,915 | 209 | 615,860 | | | | CT27C6 | Panac 27" TV | 2,045 | 341 | 718,570 | | | | |
| | | | | | | | | | | CT32C6 | Panac 32" TV | 2,915 | 348 | 1,869,827 | | | | CT32C6 | Panac 32" TV | 2,915 | 482 | 1,178,480 | | | | |
| | | | | | | | | | | CT262C21 | Panac 36" Flat TV | 2,650 | 1,056 | 2,396,750 | | | | CT36HS34 | Panac 36" Flat TV | 2,650 | 1,750 | 3,306,430 | | | | |
| | | | | | | | | | | | | | | 5,600,337 | | | | | | | | 5,600,360 | | | | |
| Totals | | $10,2000,000 | | | | | 18,250,433.20 | | | | | | | $ 12,353,565 | | | | | | | | $ 12,353,353 | | $ | - |

# EXHIBIT 16

## URGENT – AUTOBAHN CP INSTRUCTIONS

**ᴥᴥ DZ BANK**

**TO:** Andy Yan / Sue Ciaramella
Lord Securities
(F) 346-9012

**FROM:** Vincent Salerno (for Stacey Rolsing)
Asset Securitization

**DATE:** Monday, January 14, 2002

**RE:** **Commercial Paper Instructions**

| | |
|---|---|
| *Customer:* | Opportunity Finance Securitization, LLC |
| *Trade Date:* | **1/15/01** |
| *Amount of CP Maturing:* | $0.00 |
| *Amount of CP Requested:* | **$3,900,000.00** |
| *CP BASIS:* | **NET PROCEEDS** |
| *Tenor of CP:* | **59 days,** to mature on **3/15/02.** |
| *Interest on Maturing CP:* | N/A |

Please send **Net Proceeds** of **$3,900,000.00** to the following wire instructions on behalf of the Customer and retain any **excess Proceeds** on deposit until such time as they are needed to retire maturing CP:

> ABA # 091-000-022
> U.S. Bank National Association
> for further credit to U.S. Bank Trust N.A.
> Acct# Redacted - Confidential
> OBI #47300425
> Re: Redacted - Confidential PC Funding Acct Collection Account
> Attn: Toby Robillard 41171

Should you have any questions, please contact me at (212) 745-1659.

Asset Securitization Group

MEMORY TRANSMISSION REPORT

```
                              PAGE      : 001
                              TIME      : JAN-14-02  05:17PM
                              TEL NUMBER1: 212 745 1651
                              NAME      : DZ BANK - ASG
```

| | | |
|---|---|---|
| FILE NUMBER | : | 958 |
| DATE | : | JAN-14 05:16PM |
| TO | : | 93469012 |
| DOCUMENT PAGES | : | 001 |
| START TIME | : | JAN-14 05:16PM |
| END TIME | : | JAN-14 05:17PM |
| SENT PAGES | : | 001 |
| STATUS | : | OK |

FILE NUMBER : 958 *** SUCCESSFUL TX NOTICE ***

---

**URGENT — AUTOBAHN CP INSTRUCTIONS**     **DZ BANK**

| | |
|---|---|
| **TO:** | Andy Yan / Sue Claramella<br>Lord Securities<br>(F) 346-9012 |
| **FROM:** | Vincent Salerno (for Stacey Rolsing)<br>Asset Securitization |
| **DATE:** | Monday, January 14, 2002 |
| **RE:** | **Commercial Paper Instructions** |

| | |
|---|---|
| *Customer:* | **Opportunity Finance Securitization, LLC** |
| *Trade Date:* | **1/15/01** |
| *Amount of CP Maturing:* | **$0.00** |
| *Amount of CP Requested:* | **$3,900,000.00** |
| *CP BASIS:* | **NET PROCEEDS** |
| *Tenor of CP:* | **59 days,** to mature on **3/15/02.** |
| *Interest on Maturing CP:* | **N/A** |

Please send **Net Proceeds** of **$3,900,000.00** to the following wire instructions on behalf of the Customer and retain any **excess Proceeds** on deposit until such time as they are needed to retire maturing CP:

ABA # 091-000-022
U.S. Bank National Association
for further credit to U.S. Bank Trust N.A.
Acct# Redacted - Confidential
OBI #47300425
Re: Redacted - Confidential PC Funding Acct Collection Account
Attn: Toby Robillard 41171

Should you have any questions, please contact me at (212) 745-1659.

---

Asset Securitization Group

# EXHIBIT 17

**URGENT – AUTOBAHN CP INSTRUCTIONS**         **DZ BANK**

**TO:**     Andy Yan / Sue Ciaramella
            Lord Securities
            (F) 346-9012

**FROM:**   Stacey Rolsing
            Asset Securitization

**DATE:**   Friday, January 18, 2002

**RE:**     **Commercial Paper Instructions**

---

*Customer:*                    Opportunity Finance Securitization LLC

*Trade Date:*                  **1/22/02**

*Amount of CP Maturing:*       **$0.00**

*Amount of CP Requested:*      **$2,900,000.00**

*CP BASIS:*                    **NET PROCEEDS**

*Tenor of CP:*                 **59 days,** to mature **3/22/02**

*Interest on Maturing CP:*     N/A

Please send **Net Proceeds** of **$2,900,000.00** to the following wire instructions on
behalf of the Customer and retain any **Excess Proceeds** on deposit until such time as
they are needed to retire maturing CP:

>           ABA: 091-000-022
>           U.S. Bank National Association
>           For further credit to U.S. Bank Trust N.A.
>           A/C #: Redacted - Confidential
>           OBI #: 47300425
>           Re: Redacted - Confidential PC Funding Acct Collection Account
>           Attn:  Toby Robillard 41171

Should you have any questions, please contact me at (212) 745-1669.

Regards,

*SR*

---

Asset Securitization Group

MEMORY TRANSMISSION REPORT

```
PAGE       : 001
TIME       : JAN-18-02  04:16PM
TEL NUMBER1: 212 745 1651
NAME       : DZ BANK - ASG
```

| FILE NUMBER | : | 087 |
|---|---|---|
| DATE | : | JAN-18 04:15PM |
| TO | : | ☎93469012 |
| DOCUMENT PAGES | : | 001 |
| START TIME | : | JAN-18 04:15PM |
| END TIME | : | JAN-18 04:16PM |
| SENT PAGES | : | 001 |
| STATUS | : | OK |

FILE NUMBER    : 087        *** SUCCESSFUL TX NOTICE ***

---

**URGENT — AUTOBAHN CP INSTRUCTIONS**          **DZ BANK**

| TO: | Andy Yan / Sue Ciaramella<br>Lord Securities<br>(F) 346-9012 |
|---|---|
| **FROM:** | Stacey Rolsing<br>Asset Securitization |
| **DATE:** | Friday, January 18, 2002 |
| **RE:** | **Commercial Paper Instructions** |

| | |
|---|---|
| *Customer:* | **Opportunity Finance Securitization LLC** |
| *Trade Date:* | **1/22/02** |
| *Amount of CP Maturing:* | **$0.00** |
| *Amount of CP Requested:* | **$2,900,000.00** |
| *CP BASIS:* | **NET PROCEEDS** |
| *Tenor of CP:* | **59 days,** to mature **3/22/02** |
| *Interest on Maturing CP:* | **N/A** |

Please send **Net Proceeds** of **$2,900,000.00** to the following wire Instructions on behalf of the Customer and retain any **Excess Proceeds** on deposit until such time as they are needed to retire maturing CP:

> ABA: 091-000-022
> U.S. Bank National Association
> For further credit to U.S. Bank Trust N.A.
> A/C #: Redacted - Confidential
> OBI #: 47300425
> Re: Redacted - Confidential PC Funding Acct Collection Account
> Attn: Toby Robillard 41171

Should you have any questions, please contact me at (212) 745-1669.

Regards,

*SR*

---

Asset Securitization Group

# EXHIBIT 18

## URGENT – AUTOBAHN CP INSTRUCTIONS  **DZ BANK**

**TO:**     Andy Yan / Sue Ciaramella
Lord Securities
(F) 346-9012

**FROM:**   Stacey Rolsing
Asset Securitization

**DATE:**   Thursday, January 24, 2002

**RE:**     **Commercial Paper Instructions**

---

*Customer:*                     Opportunity Finance Securitization LLC

*Trade Date:*                   **1/25/02**

*Amount of CP Maturing:*        **$0.00**

*Amount of CP Requested:*       **$2,500,000.00**

*CP BASIS:*                     **NET PROCEEDS**

*Tenor of CP:*                  **60 days,** to mature **3/26/02**

*Interest on Maturing CP:*      N/A

Please send **Net Proceeds** of **$2,500,000.00** to the following wire instructions on behalf of the Customer and retain any **Excess Proceeds** on deposit until such time as they are needed to retire maturing CP:

> ABA: 091-000-022
> U.S. Bank National Association
> For further credit to U.S. Bank Trust N.A.
> A/C #: Redacted - Confidential
> OBI #: 47300425
> Re: Redacted - Confidential PC Funding Acct Collection Account
> Attn:  Toby Robillard 41171

Should you have any questions, please contact me at (212) 745-1669.

Regards,

*SR*

---

Asset Securitization Group

DZB006811

MEMORY TRANSMISSION REPORT

```
                                        PAGE    : 001
                                        TIME    : JAN-24-02  05:28PM
                                        TEL NUMBER1: 212 745 1651
                                        NAME    : DZ BANK - ASG
```

| | | |
|---|---|---|
| FILE NUMBER | : | 191 |
| DATE | : | JAN-24 05:26PM |
| TO | : | ☎93469012 |
| DOCUMENT PAGES | : | 001 |
| START TIME | : | JAN-24 05:28PM |
| END TIME | : | JAN-24 05:28PM |
| SENT PAGES | : | 001 |
| STATUS | : | OK |

FILE NUMBER    : 191            *** SUCCESSFUL TX NOTICE ***

---

**URGENT — AUTOBAHN CP INSTRUCTIONS**          **DZ BANK**

**TO:** Andy Yan / Sue Ciaramella
Lord Securities
(F) 346-9012

**FROM:** Stacey Roising
Asset Securitization

**DATE:** Thursday, January 24, 2002

**RE:** Commercial Paper Instructions

| | |
|---|---|
| *Customer:* | Opportunity Finance Securitization LLC |
| *Trade Date:* | 1/25/02 |
| *Amount of CP Maturing:* | $0.00 |
| *Amount of CP Requested:* | $2,500,000.00 |
| *CP BASIS:* | NET PROCEEDS |
| *Tenor of CP:* | 60 days, to mature 3/26/02 |
| *Interest on Maturing CP:* | N/A |

Please send **Net Proceeds** of **$2,500,000.00** to the following wire instructions on behalf of the Customer and retain any **Excess Proceeds** on deposit until such time as they are needed to retire maturing CP:

ABA: 091-000-022
U.S. Bank National Association
For further credit to U.S. Bank Trust N.A.
A/C #: Redacted - Confidential
OBI #: 47300425
Re: Redacted - Confidential PC Funding Acct Collection Account
Attn: Toby Robillard 41171

Should you have any questions, please contact me at (212) 745-1669.

Regards,

Asset Securitization Group

# EXHIBIT 19



**Corporate Trust Services**

01/31/02

DZ BANK AS COLLATERAL AGENT FOR
CERTAIN SECURED PARTIES UNDER THE
REC LN & SEC AGMT WITH OPPORTUNITY
FINANCE LLC COLLECTION

ACCOUNT: Redacted - Confidential

CLOSE OF BUSINESS
JANUARY 31, 2002

20-CORPSNOOMNI

ADMINISTRATOR: EVE D KAPLAN

COPIES:    1

DZ BANK AG DEUTSCHE ZENTRAL
-GENOSSENSCHAFTSBANK
ATTN VINCENT SALERNO
609 FIFTH AVE 7TH FLOOR
NEW YORK NY 10017

DZB009730


**Corporate Trust Services**

DZ BANK AS COLLATERAL AGENT FOR
CERTAIN SECURED PARTIES UNDER THE
REC LN & SEC AGMT WITH OPPORTUNITY
FINANCE LLC COLLECTION

ACCOUNT: Redacted - Confidentia     PAGE     1

FOR THE PERIOD
01/01/02 - 01/31/02

STATEMENT OF TRANSACTIONS

| DATE | TYPE OF ENTRY | FACE AMOUNT OR NUMBER OF SHARES | DESCRIPTION | INCOME TRANSACTIONS | PRINCIPAL TRANSACTIONS |
|------|---------------|--------------------------------|-------------|---------------------|------------------------|
| 2002 | | | OPENING BALANCE    JANUARY 02, 2002 | 0.00 | 0.00 |
| 01-04 | TSFR | | FUNDS RECEIVED FROM ACCOUNT Redacted - Confidentia REPRESENTS FUNDS RECEIVED IN CONNECTION WITH PETTERS COMPANY PAYOFF TLR476 | | 4,504,000.00 |
| | BUY | 4,504,000 | FIRST AMERICAN PRIME OBLIG FD CL D CORP TR | | 4,504,000.00- |
| 01-08 | PMT | | U.S. BANK NATIONAL ASSOCIATION, WI REF: FUNDS WIRED TO OPPORTUNITY FINANCE IN CONNECTION WITH 1/8/02 SELF FUNDING TLR476 | | 4,000,000.00- |
| | SELL | 4,000,000 | FIRST AMERICAN PRIME OBLIG FD CL D CORP TR | | 4,000,000.00 |
| 01-11 | TSFR | | FUNDS RECEIVED FROM ACCOUNT Redacted - Confidentia REPRESENTS FUNDS RECEIVED IN CONNECTION WITH PETTERS COMPANY PAYOFF TLR476 | | 1,126,000.56 |
| | TSFR | | FUNDS RECEIVED FROM ACCOUNT Redacted - Confidentia REPRESENTS FUNDS RECEIVED IN CONNECTION WITH PETTERS COMPANY PAYOFF 1/11/02 TLR476 | | 74,939.14 |
| | PMT | | MARSHALL AND ILSLEY BK OF MILWAUKE REF: FUNDS WIRED TO PETTERS COMPANY INC IN CONNECTION WITH 1/11/02 PAYOFF TLR476 | | 74,939.14- |
| | BUY | 1,126,000 | FIRST AMERICAN PRIME OBLIG FD CL D CORP TR | | 1,126,000.00- |

# USbank.
## Corporate Trust Services

| | | |
|---|---|---|
| DZ BANK AS COLLATERAL AGENT FOR CERTAIN SECURED PARTIES UNDER THE REC LN & SEC AGMT WITH OPPORTUNITY FINANCE LLC COLLECTION | ACCOUNT: Redacted - Confidential<br>FOR THE PERIOD<br>01/01/02 - 01/31/02 | PAGE    2 |

STATEMENT OF TRANSACTIONS

| DATE | TYPE OF ENTRY | FACE AMOUNT OR NUMBER OF SHARES | DESCRIPTION | INCOME TRANSACTIONS | PRINCIPAL TRANSACTIONS |
|---|---|---|---|---|---|
| 01-15 | TSFR | | TRANSFER TO ACCOUNT Redacted - Confident IN CONNECTION WITH 1/15/02 FUNDING BETWEEN PETTERS COMPANY INC AND NATIONWIDE INC TLR476 | | 1,500,000.00- |
| | SELL | 1,500,000 | FIRST AMERICAN PRIME OBLIG FD CL D CORP TR | | 1,500,000.00 |
| 01-17 | TSFR | | FUNDS RECEIVED FROM ACCOUNT Redacted - Confidential IN CONNECTION WITH PETTERS COMPANY INC PAYOFF TLR476 | | 2,389,100.00 |
| | PMT | | MARSHALL AND ILSLEY BK OF MILWAUKE REF: FUNDS WIRED TO PETTERS COMPANY INC IN CONNECTION WITH 1/11/02 PAYOFF TLR476 TO CANCEL ENTRY OF 01/11/2002 | | 74,939.14 |
| | TSFR | | FUNDS RECEIVED FROM ACCOUNT Redacted - Confidential REPRESENTS FUNDS RECEIVED IN CONNECTION WITH PETTERS COMPANY PAYOFF 1/11/02 TLR476 TO CANCEL ENTRY OF 01/11/2002 | | 74,939.14- |
| | BUY | 2,389,100 | FIRST AMERICAN PRIME OBLIG FD CL D CORP TR | | 2,389,100.00- |
| 01-22 | TSFR | | TRANSFER TO ACCOUNT Redacted - Confidentia IN CONNECTION WITH 1/22/02 FUNDING BETWEEN PETTERS COMPANY INC AND NATIONWIDE INC TLR476 | | 2,300,000.00- |
| | SELL | 2,300,000 | FIRST AMERICAN PRIME OBLIG FD CL D CORP TR | | 2,300,000.00 |


**Corporate Trust Services**

| | | | DZ BANK AS COLLATERAL AGENT FOR<br>CERTAIN SECURED PARTIES UNDER THE<br>REC LN & SEC AGMT WITH OPPORTUNITY<br>FINANCE LLC COLLECTION | ACCOUNT: Redacted - Confident | PAGE   3 |
|---|---|---|---|---|---|
| | | | | FOR THE PERIOD<br>01/01/02 - 01/31/02 | |

STATEMENT OF TRANSACTIONS

| DATE | TYPE OF ENTRY | FACE AMOUNT OR NUMBER OF SHARES | DESCRIPTION | INCOME TRANSACTIONS | PRINCIPAL TRANSACTIONS |
|---|---|---|---|---|---|
| 01-24 | TSFR | | FUNDS RECEIVED FROM ACCOUNT<br>Redacted - Confidentia IN CONNECTION WITH<br>PETTERS COMPANY INC PAYOFF<br>TLR476 | | 2,624,682.93 |
| | TSFR | | FUNDS RECEIVED FROM ACCOUNT<br>Redacted - Confidentia IN CONNECTION WITH<br>PETTERS COMPANY INC PAYOFF<br>TLR476 | | 2,146,049.63 |
| | BUY | 4,770,732 | FIRST AMERICAN PRIME OBLIG FD<br>CL D CORP TR | | 4,770,732.00- |
| 01-25 | TSFR | | TRANSFER TO ACCOUNT Redacted - Confident<br>IN CONNECTION WITH 1/25/02<br>FUNDING<br>TLR476 | | 4,100,000.00- |
| | PMT | | U.S. BANK NATIONAL ASSOCIATION, WI<br>REF: FUNDS WIRED TO OPPORTUNITY<br>FINANCE IN CONNECTION WITH<br>1/25/02 FUNDING<br>TLR476 | | 600,000.00- |
| | SELL | 4,700,000 | FIRST AMERICAN PRIME OBLIG FD<br>CL D CORP TR | | 4,700,000.00 |
| 01-30 | TSFR | | FUNDS RECEIVED FROM ACCOUNT<br>Redacted - Confidentia IN CONNECTION WITH<br>PETTERS COMPANY INC PAYOFF<br>TLR476 | | 3,093,750.00 |
| | BUY | 3,093,750 | FIRST AMERICAN PRIME OBLIG FD<br>CL D CORP TR | | 3,093,750.00- |
| 01-31 | TSFR | | FUNDS RECEIVED FROM ACCOUNT<br>Redacted - Confidentia IN CONNECTION WITH<br>PETTERS COMPANY INC PAYOFF<br>TLR476 | | 2,523,400.00 |
| | BUY | 2,523,400 | FIRST AMERICAN PRIME OBLIG FD<br>CL D CORP TR | | 2,523,400.00- |

**USbank.**
Corporate Trust Services

DZ BANK AS COLLATERAL AGENT FOR
CERTAIN SECURED PARTIES UNDER THE
REC LN & SEC AGMT WITH OPPORTUNITY
FINANCE LLC COLLECTION

ACCOUNT: Redacted - Confidential    PAGE    4

FOR THE PERIOD
01/01/02 - 01/31/02

STATEMENT OF TRANSACTIONS

| DATE | TYPE OF ENTRY | FACE AMOUNT OR NUMBER OF SHARES | DESCRIPTION | INCOME TRANSACTIONS | PRINCIPAL TRANSACTIONS |
|------|---------------|----------------------------------|-------------|---------------------|------------------------|
| | | | BALANCE | 0.00 | 0.92 |
| | | | COMBINED INCOME/PRINCIPAL BALANCE | | 0.92 |

DZB009734



**Corporate Trust Services**

| | |
|---|---|
| DZ BANK AS COLLATERAL AGENT FOR | ACCOUNT: Redacted - Confidential   PAGE   5 |
| CERTAIN SECURED PARTIES UNDER THE | |
| REC LN & SEC AGMT WITH OPPORTUNITY | CLOSE OF BUSINESS |
| FINANCE LLC COLLECTION | JANUARY 31, 2002 |

01/31/02
SETTLEMENT                    STATEMENT OF INVESTMENTS

| UNITS | DESCRIPTION | UNIT COST | TOTAL COST | MARKET PRICE | TOTAL MARKET VALUE | % OF SECUR TYPE | EST. ANNUAL INCOME | YIELD |
|---|---|---|---|---|---|---|---|---|
| | | | CASH EQUIVALENTS | | | | | |
| 5,906,982 | FIRST AMERICAN PRIME OBLIG FD CL D CORP TR | 100.00 | 5,906,982.00 | COST | 5,906,982.00 | 100.00 | 92,355 | 1.6 |
| *TOTAL SECURITIES 5,906,982 | | | 5,906,982.00 | | 5,906,982.00 | 100.00 | 92,355 | |
| CASH BALANCE | | | .92 | | .92 | .00 | | |
| * TOTAL ASSETS | | | 5,906,982.92 | | 5,906,982.92 | 100.00 | | |

PUBLICLY TRADED ASSETS ARE VALUED IN ACCORDANCE WITH MARKET QUOTATIONS OR VALUATION METHODS FROM SERVICES
BELIEVED BY US TO BE RELIABLE.  ASSETS WHICH ARE NOT PUBLICLY TRADED MAY REFLECT VALUES FROM OTHER EXTERNAL
SOURCES OR SPECIAL VALUATIONS PREPARED BY US.  ASSETS FOR WHICH A CURRENT VALUE IS NOT AVAILABLE MAY BE
REFLECTED AS NOT VALUED, N/A, OR AT A NOMINAL VALUE OF $1.00.  VALUES SHOWN DO NOT NECESSARILY REFLECT PRICES
AT WHICH ASSETS COULD HAVE BEEN BOUGHT OR SOLD.  VALUES ARE UPDATED BASED ON INTERNAL POLICY AND MAY BE
UPDATED LESS FREQUENTLY THAN STATEMENT GENERATION.

DZB009735

# EXHIBIT 20

MARKETS / CAPITAL MKTS

# As easy as ABCP

**The Banker editor** | 2/01/2002 12:00 am

**The asset-backed commercial paper (ABCP) market, which started modestly as a way for banks to move assets off their balance sheet, using special purpose vehicles known as conduits, is today among the most innovative and complex financial sectors, often supporting entirely synthetic transactions. But its very success is arousing concern among some close observers. The market's role in shifting risk, often to exploit anomalies in the regulatory treatment of the banks' capital, looks distinctly uncertain when the rules change in three years time under current proposals.**

For now, the deals keep pumping out. According to the US Federal Reserve Board, the ABCP market has grown at a compound average annual rate of more than 40% in the US since 1994, to reach $710bn (in outstanding issuance) by the beginning of November (some late big deals will push the figure to a lot higher by the end of 2001). Asset-backed issues now account for more than half of the $1440bn US commercial paper market. Lehman Brothers, one of the leading dealers in the market, says some 56 of the world's largest 100 commercial banks have now set up ABCP conduits, taking the total of such vehicles to around 300 (some banks have several conduits).

**European ABCP**

In Europe too, the ABCP market is expanding smartly, although from a very low base. Some market participants predict the pace will accelerate further as the euro helps create a pan-European investor base and securitisation becomes generally better understood. At the moment, however, it is somewhat unclear what constitutes the European market, as many deals are generated by banks in Europe, but funded in the US market. Of the roughly $140bn of ABCP deals generated in Europe, around 85% have been sold to US investors, which is a measure of the depth and liquidity of the market in that country.

Another big boost to the market came last month in a classic deal from Dutch bank ABN Amro, which launched a a12.5bn synthetic securitisation of assets from its own loan book. The complex deal involved buying credit default swaps, financed chiefly through the bank's Amstel conduit. It was the biggest ever such European deal, with over a12bn of highly-rated asset backed bonds refinanced by commercial paper and the lower rated asset backed bonds sold into the euro bonds market.

There are several factors behind this rapid expansion. But not least is what Lehman coyly refers to as the "heightened focus of European and US banks on risk-based capital". Lehman promotes ABCP programmes as a tool to help the banks improve "balance sheet and capital management", and achieve more "efficient lending".

A rather blunter explanation comes from one of the first participants in the market, who is no longer involved. "The asset-backed CP market provides two kinds of arbitrage," he explains. "Firstly, there is a tenor arbitrage, as long-dated assets are financed by short-dated paper. It is cheaper to borrow money for 90 days and keep rolling it over, than to borrow for five years. Secondly, there is regulatory arbitrage. Assets on the bank balance sheet incur a capital charge of 100% if the tenor is over a year, irrespective of whether they are triple-A or sub-investment grade.

"If the top-quality assets are taken off the balance sheet and held by a conduit, which finances them through the CP market, the capital charge is eliminated," says the former market participant. "This is what has really allowed the market to grow."

**Lateral benefits**

There are other benefits, too. Initially, the so-called multi-seller conduits - with names such as Kittyhawk, Tulip and Great Lakes - were set up by banks to purchase, from their corporate clients, streams of good-quality trade receivables that could be funded in the CP market. This not only reduced the capital tied up by the bank's lending to the corporate client; it also enabled the client to obtain cheaper financing. The banks, meanwhile, collected a stable fee income for sponsoring and administering the conduits (called because assets go in one end, and CP comes out the other).

As a market for the highest-quality borrowers, with maturities ranging from one day up to 270 days, CPs have advantages over other markets. To begin with, as a private market, CPs offer the corporate client "simpler execution. There are no roadshows and no prospectuses," says Steve Gandy, head of asset securitisation at Bank of America, in London.

There is also no disclosure of the client's name, so it does not lose its scarcity value in the capital markets. "The ABCP market now generally trades well below Libor [London interbank offered rate], because it is recognised as a very safe liquid product," says Mr Gandy. This is why it is so attractive to blue-chip borrowers or, at least, the borrowers with good quality receivables that form the collateral for the ABCP.

**Market growth**

But since Citibank created the first multi-seller conduit - now known as Ciesco - in 1983, the market has sprouted in many directions. The range of assets that are now purchased through conduits has grown markedly, becoming ever more exotic, while banks are creating vehicles to house their own investments, as well as the conduits for their clients. Trade receivables now account for just 24% of all assets in these vehicles, according to Goldman Sachs (the rating agency Fitch reckons the figure is even lower, at 13%). Other assets now regularly purchased through conduits include credit card payments, car loans, equipment leases and mortgages. At

the more exotic end, even anticipated settlements from tobacco lawsuits have been used as collateral, as well as England Premier League football club receipts.

More significantly, debt securities are increasingly purchased by the conduits, often in the form of collateralised bond obligations or collateralised loan obligations. Fitch calculates that such securities now account for some 25% of conduit assets. In some cases, securities are simply added to the mix of assets in the multi-seller conduit.

In others, separate vehicles are created exclusively for a bank's securities portfolio. Known as securities arbitrage vehicles, they offer banks the same kind of off-balance sheet benefits in relation to regulatory capital, as the general type of conduit. Some banks have taken this process a step further and established securities investment vehicles (SIVs), which are structured rather differently and have many of the characteristics of an investment fund. In addition, some of the larger banks are now actively marketing the off-balance sheet advantages of their conduits (particularly the arbitrage variety) to the smaller, second-tier banks that do not have the expertise or the business volumes to create conduits of their own. This mostly involves the second-tier banks putting their business through an existing conduit.

### Third-party conduits

But a few banks, and specialist institutions such as Chicago-based Liberty Hampshire, will create and administer a conduit for other banks that want to offer conduit services to clients, but do not have the expertise, or want the bother, of arranging it themselves. Loosely termed "renting a conduit", such activities - whether using another bank's conduit, or outsourcing the running of it - are increasingly becoming another key facet of the ABCP market.Dresdner Bank, for example, launched a "product" in July, which involves renting space in its conduits to regional European banks that "want the regulatory capital and funding benefits of originating pools of assets into a conduit, rather than through its own balance sheet", explains London-based Forbes Elworthy, who is heading the marketing effort for the product. Banks that are too small to create a conduit of their own, may want the economies of scale from renting space in an existing conduit. "You do not get efficient funding in the conduit market with issuance of less than $1bn, and it is also hard to amortise the fixed costs of setting up the conduit. So it may not pay a bank with a $200m pool of securities," he says. These securities - the main asset involved, here, is debt securities - might instead go through Beethoven, a Dresdner conduit that is a combined multi-seller and securities arbitrage type. Dresdner, which has more than $20bn in its four main conduits of this type, as well as its SIV called K2, has received three mandates since July from banks choosing to take advantage of the new "product" says Mr Elworthy.

### ABCP failings

Despite all the evident success of the ABCP market, there are some uncertainties on the horizon. In part, these relate to the new Basel Capital Accord, which will regulate - from 2005 - how much capital the banks in the leading industrial countries must set aside to cover exposures, such as credit risks. Unlike the present Basel Accord, which is a blunt, one-size-fits-all instrument, the new accord will be more closely related to specific degrees of risk. The proposed changes will reduce some of the present benefits of the conduit.

The reason that conduits command the highest credit ratings from the rating agencies is, first, because they are substantially over-collateralised (relative to the amount of CP issued); second, they enjoy additional credit enhancement, such as a letter of credit; and third, they are fully backed by a liquidity facility. This facility is not supposed to be insurance against a borrower's default, but a guarantee that investors will get paid in the event that the CP market is severely disrupted, and paper cannot be rolled over when it falls due. (This applies much less to SIVs, which use different mechanisms to maintain liquidity.)

As regulators have been persuaded, until now, the liquidity facility is what the banks claim it to be; it bears no regulatory capital charge. It is, however, a grey area that banks are often reluctant to talk about.

In many circumstances, the liquidity facility "becomes a direct credit substitute", says a former ABCP market participant. "The banks will always deny this because to admit it would undo the very favourable regulatory treatment that they have obtained for [conduits] in the past 10 years," he adds. Tony Lowes, head of Citibank's conduit business in London says: "Any time you have an extension of funds, you have credit exposure, whether you call it liquidity or credit enhancement. However, it is very rare for these facilities to be drawn down and losses have been extremely small."

**Changing the rules**

The regulators are aiming to change the rules. Under initial proposals for the new Basel Accord, liquidity facilities would have faced a 20%, regulatory capital charge after 2005. More recent drafts of the new rules have dropped the 20% figure, and it remains to be seen what capital charge will eventually be specified, although it is likely to be lower than proposed.

Even so, some regulatory charge on liquidity facilities will raise the cost of operating conduits and reduce some of their attractions, says New York-based Ira Powell, head of asset-backed CP origination for Goldman Sachs, one of the top three CP dealing houses, along with Lehman Brothers and Merrill Lynch. In addition, it looks likely that loans to top-rated companies, or investment in their debt issues, will incur little or no regulatory capital charge after 2005 (against the current undiscriminating 100% charge), under the new Basel Accord. This will reduce the incentive to remove such assets from bank balance sheets."These two factors will both work in the same direction, and imply a lower requirement for conduits. They will make some marginal deals uneconomical," says Mr Powell. "This will not, though, eliminate all the incentive for doing these deals."

Some banks do set aside economic capital against their liquidity exposures. But economic capital is a measure of how the banks themselves perceive the risks involved in particular business lines and is, inevitably, much less than regulators seem likely to require. In the case of top-notch conduit assets, the economic capital assigned is only a tiny percentage of the contingent liquidity liability, and nothing like the 20% initially proposed under Basle II. If a capital charge on liquidity eliminates some marginal conduit deals, this may not be a bad thing, according to Bank of America's Steve Gandy. "A capital charge on a contingent liability will apply a little more sanity to this market because many European banks do not even assign economic capital against their liquidity exposures. They price their transactions very thinly. This provides crazy competition," he says.

## Hitting the ceiling

Meanwhile, the sheer scale of the liquidity now needed after several years of rapid ABCP market growth is also becoming a problem for some banks. Some have "effectively been capped out", says a market observer, suggesting that they have reached a ceiling, set either by external or internal regulators, for such activities. In earlier days, the banks that created conduits were able to syndicate out part of the liquidity facility to other banks. But now that most of the large commercial banks have their own conduits, they are reluctant to use their balance sheet supporting rivals in this way.

"Some banks are undoubtedly running up against [liquidity facility] limits", says Goldman Sachs' Mr Powell. "But many of these [limits] are being set by internal treasury people, rather than national regulators," he adds. Mike Nawas, European head of asset securitisation at ABN Amro, one of the three biggest conduit sponsors and arrangers - along with Citibank and Bank One - concedes that supporting conduits with liquidity facilities is increasingly becoming a constraint, leading to higher pricing for conduit securistisation transactions. Liquidity is not for free," he says. But ABN Amro, which had $43bn in outstanding ABCP in its conduits at end-March 2001, is not being obliged by external regulators to slow down, he says. "It is something we assess for ourselves in relation to our overall balance sheet management." Adds John Bottorff, head of North American securitisation at Dresdner Bank, in New York: "Liquidity capacity is a scarce resource. You have to decide what is the most efficient use of economic capital. Do you want to use it all up supporting conduits or divide it between various businesses? Of course we are finding this a constraint. Everybody is."

## CRA scrutiny

Although the ABCP market is viewed as deep and liquid, the speed of growth is prompting the credit rating agencies to watch it more closely. The contingent bank liquidity commitments may not match the total $700bn of issuance outstanding (the SIVs, for example, do not require as much bank liquidity as other conduits), but it could amount to 90% of the outstanding paper. Certainly, it has got to the point where one rating agency has its bank analysts and structuring specialists working more closely together in assessing the market. At the same time, the constraints imposed by the high liquidity support required for conduits - and the associated capital charges expected from 2005 - is prompting banks and CP dealing houses to search for new technologies to reduce or eliminate these impediments. "The large banks cannot provide liquidity in infinite amounts. They need to find new ways to continue to grow their business without increasing the liquidity they provide," says Jim Peterson, head of European origination for ABCP at Lehman Brothers in London.

## Liquidity initiatives

One approach came from Citibank a year ago when it restructured its Eureka multi-seller conduit for European corporate receivables. Citibank, which has nine multi-seller conduits, funded by some $58bn of ABCP issuance, managed to create a structure comprising receivables with such inherently high liquidity that it no longer needed 100% support from a separate bank liquidity facilities. The liquidity cover has been reduced to around 70%, with the endorsement of the rating agencies.

Lehman is also working on structures to reduce greatly the amount of the liquidity facility needed. Last December, it was helping to create a conduit for a UK bank that required no facility at all, and would be entirely synthetic. Several other, similar conduits are said to be in preparation. Pressure for ever greater capital efficiency and the anticipation of Basel II rules are today spurring big changes in the ABCP market. Whatever risk framework is finally produced by the Basel regulators, the market looks set to try to stay ahead of them.

## More stories from this section

Are the bond markets ripe for a shake-up?

Verallia pulls off clear success with long-desired IPO

Mizuho International CEO aims to build long-term trust

Caixa opens Spanish market for SDG bonds

Rabobank's record AT1 sets new benchmark

SocGen makes SDG history with Enel

The Banker and its journalism are subject to a self-regulation regime under the FT Editorial Code of Practice.
© 2019 **The Banker** | A service from the Financial Times Ltd.

# EXHIBIT 21

## URGENT – AUTOBAHN CP INSTRUCTIONS        **Ⴧ DZ BANK**

**TO:**       Andy Yan / Sue Ciaramella
             Lord Securities
             (F) 346-9012

**FROM:**     Stacey Rolsing
             Asset Securitization

**DATE:**     Friday, February 08, 2002

**RE:**       **Commercial Paper Instructions**

---

*Customer:*                    **Opportunity Finance Securitization LLC**

*Trade Date:*                  **2/11/02**

*Amount of CP Maturing:*       **$0.00**

*Amount of CP Requested:*      **$1,000,000.00**

*CP BASIS:*                    **NET PROCEEDS**

*Tenor of CP:*                 **59 days,** to mature **4/11/02**

*Interest on Maturing CP:*     N/A

Please send **Net Proceeds** of **$1,000,000.00** to the following wire instructions on
behalf of the Customer and retain any **Excess Proceeds** on deposit until such time as
they are needed to retire maturing CP:

> ABA: 091-000-022
> U.S. Bank National Association
> For further credit to U.S. Bank Trust N.A.
> A/C #: Redacted - Confidential
> OBI #: 47300425
> Re: Redacted - Confidential PC Funding Acct Collection Account
> Attn: Toby Robillard 41171

Should you have any questions, please contact me at (212) 745-1669.


Regards,

*Stacey*

---

Asset Securitization Group

DZB006936

# MEMORY TRANSMISSION REPORT

```
PAGE       : 001
TIME       : FEB-08-02  05:48PM
TEL NUMBER1: 212 745 1651
NAME       : DZ BANK - ASG
```

| | | |
|---|---|---|
| FILE NUMBER | : | 564 |
| DATE | : | FEB-08 05:47PM |
| TO | : | ☎93469012 |
| DOCUMENT PAGES | : | 001 |
| START TIME | : | FEB-08 05:47PM |
| END TIME | : | FEB-08 05:48PM |
| SENT PAGES | : | 001 |
| STATUS | : | OK |

FILE NUMBER   : 564          *** SUCCESSFUL TX NOTICE ***

---

## URGENT — AUTOBAHN CP INSTRUCTIONS        ⊡⊡ DZ BANK

**TO:**    Andy Yan / Sue Claramella
           Lord Securities
           (F) 346-9012
**FROM:**  Stacey Roising
           Asset Securitization
**DATE:**  Friday, February 08, 2002
**RE:**    Commercial Paper Instructions

| | |
|---|---|
| Customer: | Opportunity Finance Securitization LLC |
| Trade Date: | 2/11/02 |
| Amount of CP Maturing: | $0.00 |
| Amount of CP Requested: | $1,000,000.00 |
| CP BASIS: | NET PROCEEDS |
| Tenor of CP: | 59 days, to mature 4/11/02 |
| Interest on Maturing CP: | N/A |

Please send **Net Proceeds** of **$1,000,000.00** to the following wire instructions on behalf of the Customer and retain any **Excess Proceeds** on deposit until such time as they are needed to retire maturing CP:

        ABA: 091-000-022
        U.S. Bank National Association
        For further credit to U.S. Bank Trust N.A.
        A/C #: Redacted - Confidential
        OBI #: 47300425
        Re: Redacted - Confidential PC Funding Acct Collection Account
        Attn:  Toby Robillard 41171

Should you have any questions, please contact me at (212) 745-1669.

Regards,
Stacey

---

Asset Securitization Group

# EXHIBIT 22

**Opportunity Finance Securitization LLC**
Commercial Paper Remittance Report

| | FIXED PERIOD ENDING: | 1-Mar-02 |
|---|---|---|
| | REPORT DATE: | 1-Mar-02 |

**A.  COMMERCIAL PAPER MATURITIES**

| | Issuance Date | Fixed Period (days) | Face Value |
|---|---|---|---|
| Tranche #1 | 12/31/2001 | 60.00 | 50,766,000.00 |
| Tranche #2 | xx/xx/xx | - | - |
| Tranche #3 | xx/xx/xx | - | - |

TOTAL FACE VALUE OF CP MATURING        **50,766,000.00**

**B.  CP ROLLOVER**

| | Net Proceeds | Fixed Period (days - not to exceed 60) | Maturity Date |
|---|---|---|---|
| Tranche #1 | 50,601,010.50 | 3.00 | 3/4/2002 |
| Tranche #2 | - | - | 3/1/2002 |
| Tranche #3 | - | - | 3/1/2002 |

TOTAL NET PROCEEDS OF CP REQUESTED ON ROLLOVER DATE        **50,601,010.50**

**C.  SUMMARY**

| | | |
|---|---|---|
| Face Value of CP Maturing on Fixed Period end-date | 50,766,000.00 | (a) |
| Net Proceeds of CP Requested | 50,601,010.50 | (b) |
| Amount to be paid by Borrower directly to US BANK (Principal and Yield) | 164,989.50 | (a - b) |
| Outstanding Principal Balance of Loans - post CP Rollover | 74,800,000.00 | (c) |
| Borrowing Limit | 100,000,000 | (d) |
| Is (c) greater than (d) ? (if "YES", then Loans must be paid down pursuant to RLSA) | OK | |

The undersigned hereby represents and warrants that this report is a true and accurate accounting as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001 among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent and as Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated from time to time. This Commercial Paper Remittance Report is being delivered pursuant to Section 2.04 of the RLSA.

BY:    OPPORTUNITY FINANCE, LLC  (AS SERVICER)

Name: _Scott Baker_

Title: _Secretary_

Remittance Instructions for Lender:
US BANK
ABA# 091-000-022
A/C # Redacted- Confidential
ATTN: ROSALYN CALLENDER
REF:  Autobahn Funding (Opportunity Finance)

DZB013801

Left margin: DZ Bank  ⇢⇢⇢  612339822  10:06  03/01/02  002

03/01/02   10:05   ☎6123398922                               DZ Bank                   ☑001

# **FAX**

| | | | |
|---|---|---|---|
| **To:** | **Stacey Rolsing** | **DZ Bank** | **212-745-1651** |
| **From:** | **Steven F. Sabes** | **Opportunity Finance** | **612-339-8922** |
| Date: | 3/1/02 | | |
| Re: | CP Rollover Report - Overnight | | |
| Pages: | **2** (including this cover sheet) | | |

It printed out in Landscape format.  This was the original setting, let me know if you prefer
Portrait format.

Steve

From the desk of...

Steven F. Sabes
Opportunity Finance, LLC
60 S 6th St #2540
Minneapolis, MN 55402
612-339-8921 ext. 15
Fax: 612-339-8922

DZB013802

# MEMORY TRANSMISSION REPORT

```
                                    PAGE      : 001
                                    TIME      : MAR-01-02  10:18AM
                                    TEL NUMBER1: 212 745 1651
                                    NAME      : DZ BANK - ASG
```

| | | |
|---|---|---|
| FILE NUMBER | : | 043 |
| DATE | : | MAR-01 10:17AM |
| TO | : | ☎93469012 |
| DOCUMENT PAGES | : | 001 |
| START TIME | : | MAR-01 10:17AM |
| END TIME | : | MAR-01 10:18AM |
| SENT PAGES | : | 001 |
| STATUS | : | OK |

FILE NUMBER   : 043          *** SUCCESSFUL TX NOTICE ***

---

**URGENT — AUTOBAHN CP INSTRUCTIONS**        **DZ BANK**

**TO:**   Andy Yan / Sue Ciaramella
          Lord Securities
          (F) 346-9012
**FROM:** Stacey Rolsing
          Asset Securitization
**DATE:** Friday, March 01, 2002
**RE:**   **Commercial Paper Instructions**      *Revised*

| | |
|---|---|
| *Customer:* | Opportunity Finance Securitization LLC |
| *Trade Date:* | 2/22/02 |
| *Amount of CP Maturing:* | $50,766,000.00 |
| *Amount of CP Requested:* | $50,601,010.50 |
| *CP BASIS:* | NET PROCEEDS |
| *Tenor of CP:* | 3 days, to mature 3/4/02 |
| *Interest on Maturing CP:* | To be paid by OF to US Bank |

Please send **$0.00** to the following wire instructions:

        ABA: 091-000-022
        U.S. Bank National Association
        For further credit to U.S. Bank Trust N.A.
        A/C #: Redacted - Confidential
        OBI #: 47300425
        Re: Redacted - Confidential PC Funding Acct Collection Account
        Attn:  Toby Robillard 41171

Please retain any **Excess Proceeds** on deposit until such time as they are needed to
retire maturing CP.
Should you have any questions, please contact me at (212) 745-1669.

Regards,

Stacey

Asset Securitization Group

DZB013803

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Stacey Rosling | Steve Sabes |

| COMPANY: | DATE: |
|---|---|
| DZ Bank | 3/1/02 |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
|---|---|
| (212) 745-1651 | 1 |

| PHONE NUMBER: | SENDER'S PHONE NUMBER: |
|---|---|
| (212) 745-1659 | (612) 339-8921 |

| RE: | SENDER'S FAX NUMBER: |
|---|---|
| Transfer of Funds — Opportunity Finance Securitization LLC | (612) 339-8922 |

☑ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

Pursuant to the Section 2.05 (f) of the Receivables Loan & Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Agent and Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank, N.A. as Custodian and Backup Servicer, please make the following funds transfer on **Friday, March 1, 2002.**

FROM:

| | |
|---|---|
| Account #: | Redacted - Confidential |
| Account Name: | DZ Bank AG Deutsche Zentral-Genossenschaftsbank, as Collateral Agent for Certain Secured Parties — Collection Account |
| **Amount:** | **$164,989.50** |

TO:

| | |
|---|---|
| Account #: | Redacted- Confidential |
| Account Name: | US Bank |
| Attn: | Rosalyn Callender |
| Ref: | Autobahn Funding (Opportunity Finance) |

Should you have any questions or require further information, please do not hesitate to contact me. Regards,

By:

Opportunity Finance Securitization, LLC

Acknowledged and Approved by:

DZ Bank AG Deutsche Zentral-Genossenschaftsbank, as Collateral Agent

## Fax Coversheet

**DZ BANK**

**Attention:** **Toby Robillard**
Assistant Vice President
US Bank

DZ BANK AG
New York Branch
609 Fifth Avenue
New York, NY   10017-1021

Telephone  (212) 745 1400
Telefax    (212) 745 1550
SWIFT – Code GENOUS 33
Email:    new.york@dzbank.de

Telephone:   (651) 244-1171
Telefax:    **(651) 244-1797**

Pages:(incl. cover) 3

**From:**
**Stacey L. Rolsing**
Assistant Treasuer
Asset Securitization
Direct Tel   (212) 745-1669
Direct Fax  **(212) 745-1651**
stacey.rolsing@dzbank.de

**Reference: Transfer Request**

Friday, March 01, 2002

DZB013805

# MEMORY TRANSMISSION REPORT

|  |  |
|---|---|
| PAGE | : 001 |
| TIME | : MAR-01-02 02:21PM |
| TEL NUMBER1: 212 745 1651 |  |
| NAME | : DZ BANK - ASG |

| FILE NUMBER | : | 061 |
|---|---|---|
| DATE | : | MAR-01 02:20PM |
| TO | : ☎916512441797 | |
| DOCUMENT PAGES | : | 002 |
| START TIME | : | MAR-01 02:20PM |
| END TIME | : | MAR-01 02:21PM |
| SENT PAGES | : | 002 |
| STATUS | : | OK |

FILE NUMBER : 061          *** SUCCESSFUL TX NOTICE ***

---

**Fax Coversheet**                           **DZ BANK**

**Attention:** **Toby Robillard**
                **Assistant Vice President**
                **US Bank**

**Telephone:** **(651) 244-1171**
**Telefax:** **(651) 244-1797**
**Pages:**(incl. cover) 3

**Reference: Transfer Request**

DZ BANK AG
New York Branch
609 Fifth Avenue
New York, NY   10017-1021

Telephone (212) 745 1400
Telefax    (212) 745 1550
SWIFT - Code GENOUS 33
Email:    new.york@dzbank.de

**From:**
**Stacey L. Rolsing**
**Assistant Treasurer**
**Asset Securitization**
Direct Tel  (212) 745-1669
Direct Fax  (212) 745-1651
stacey.rolsing@dzbank.de

Friday, March 01, 2002

DZB013806

**URGENT – AUTOBAHN CP INSTRUCTIONS**    **DZ BANK**

**TO:**   Andy Yan / Sue Ciaramella
Lord Securities
(F) 346-9012

**FROM:**   Stacey Rolsing
Asset Securitization

**DATE:**   Friday, March 01, 2002

**RE:**   **Commercial Paper Instructions**   *✱ Revised ✱*

| | |
|---|---|
| *Customer:* | Opportunity Finance Securitization LLC |
| *Trade Date:* | **2/22/02** |
| *Amount of CP Maturing:* | **$50,766,000.00** |
| *Amount of CP Requested:* | **$50,601,010.50** |
| *CP BASIS:* | **NET PROCEEDS** |
| *Tenor of CP:* | **3 days,** to mature **3/4/02** |
| *Interest on Maturing CP:* | To be paid by OF to US Bank |

Please send **$0.00** to the following wire instructions:

ABA: 091-000-022
U.S. Bank National Association
For further credit to U.S. Bank Trust N.A.
A/C #: Redacted - Confidential
OBI #: 47300425
Re: Redacted - Confidential PC Funding Acct Collection Account
Attn: Toby Robillard 41171

Please retain any **Excess Proceeds** on deposit until such time as they are needed to
retire maturing CP.
Should you have any questions, please contact me at (212) 745-1669.

Regards,

*Stacey*

Asset Securitization Group

# EXHIBIT 23

**URGENT – AUTOBAHN CP INSTRUCTIONS**   **DZ BANK**

**TO:**   Andy Yan / Sue Ciaramella – Lord Securities
(F) 346-9012

**FROM:**   Stacey Rolsing – Asset Securitization

**DATE:**   Thursday, March 07, 2002

**RE:**   **Commercial Paper Instructions**

| | |
|---|---|
| *Customer:* | Opportunity Finance Securitization LLC |
| *Trade Date:* | **3/8/02** |
| *Amount of CP Maturing:* | **$0.00** |
| *Amount of CP Requested:* | **$5,400,000.00** |
| *CP BASIS:* | **NET PROCEEDS** |
| *Tenor of CP:* | **56 days,** to mature **5/3/02** |
| *Interest on Maturing CP:* | To be paid by OF to US Bank |

Please send **$3,200,000.00** to the following wire instructions:

> ABA: 091-000-022
> U.S. Bank National Association
> For further credit to U.S. Bank Trust N.A.
> A/C #: Redacted - Confidential
> OBI #: 47300425
> Re: Redacted - Confidential PC Funding Acct Collection Account
> Attn:  Toby Robillard 41171

Please send **$2,200,000.00** to the following wire instructions:

> ABA: 091-000-022
> A/C #: Redacted - Confidential
> A/C Name: Opportunity Finance LLC

Please retain any **Excess Proceeds** on deposit until such time as they are needed to retire maturing CP.

Should you have any questions, please contact me at (212) 745-1669.

Asset Securitization Group

Thanks!
Stacey

# EXHIBIT 24

## URGENT – AUTOBAHN CP INSTRUCTIONS     **DZ BANK**

**TO:**    Andy Yan / Sue Ciaramella – Lord Securities
(F) 346-9012

**FROM:**   Stacey Rolsing – Asset Securitization

**DATE:**   Friday, March 15, 2002

**RE:**    **Commercial Paper Instructions**

---

*Customer:*              Opportunity Finance Securitization LLC

*Trade Date:*            **3/18/02**

*Amount of CP Maturing:*      **0.00**

*Amount of CP Requested:*     **$1,900,000.00**

*CP BASIS:*              **NET PROCEEDS**

*Tenor of CP:*            **46 days,** to mature **5/3/02**

*Interest on Maturing CP:*     To be paid by OF to US Bank

Please send **$1,900,000.00** to the following wire instructions:

> ABA: 091-000-022
> U.S. Bank National Association
> For further credit to U.S. Bank Trust N.A.
> A/C #: Redacted - Confidential
> OBI #: 47300425
> Re: Redacted - Confidential PC Funding Acct Collection Account
> Attn:  Toby Robillard 41171

Please send **$0.00** to the following wire instructions:

> ABA: 091-000-022
> A/C #: Redacted - Confidential
> A/C Name: Opportunity Finance LLC

Please retain any **Excess Proceeds** on deposit until such time as they are needed to retire maturing CP.

Should you have any questions, please contact me at (212) 745-1669.

---

Asset Securitization Group

*Thank you!*
*Stacey*

# EXHIBIT 25

**URGENT – AUTOBAHN CP INSTRUCTIONS**      **DZ BANK**

| | |
|---|---|
| **TO:** | Andy Yan / Sue Ciaramella – Lord Securities<br>(F) 346-9012 |
| **FROM:** | Stacey Rolsing – Asset Securitization |
| **DATE:** | Friday, March 29, 2002 |
| **RE:** | **Commercial Paper Instructions** |

| | |
|---|---|
| *Customer:* | Opportunity Finance Securitization LLC |
| *Trade Date:* | **4/01/02** |
| *Amount of CP Maturing:* | **$0.00** |
| *Amount of CP Requested:* | **$9,900,000.00** |
| *CP BASIS:* | **NET PROCEEDS** |
| *Tenor of CP:* | **60 days,** to mature **5/31/02** |
| *Interest on Maturing CP:* | To be paid by OF to US Bank |

Please send **$9,400,000.00** to the following wire instructions:

> ABA: 091-000-022
> U.S. Bank National Association
> For further credit to U.S. Bank Trust N.A.
> A/C #: Redacted - Confidential
> OBI #: 47300425
> Re: Redacted - Confidential PC Funding Acct Collection Account
> Attn: Toby Robillard 41171

Please send **$500,000.00** to the following wire instructions:

> ABA: 091-000-022
> A/C #: Redacted - Confidential
> A/C Name: Opportunity Finance LLC

Please retain any **Excess Proceeds** on deposit until such time as they are needed to retire maturing CP.

Should you have any questions, please contact me at (212) 745-1669.

Asset Securitization Group      *Thanks!*
*Stacey*

# EXHIBIT 26

## Deal Checklist

**Deal #** *042602-02*      **Deal Amount $** *1,400,000*

| | O.F. | US Bank |
|---|---|---|
| UCC1 Prep - email date to Washington County | *4/25/02* | |
| | | |
| Courier Originals to US Bank Trust | **O.F.** | **US Bank** |
| 1 Original/Package Day (copies of for each deal file): | | |
| Collateral Receipt | ✓ | ✓ |
| Schedule A | ✓ | ✓ |
| Confirmation & Notice of Pledge | ✓ | ✓ |
| 1 Original/Deal (put in individual manila folders): | | |
| Promissory Note | ✓ | ✓ |
| Assignment – Client to PC Funding | ✓ | ✓ |
| Allonge | ✓ | ✓ |
| Assignment – OF to OF Sec. | ✓ | ✓ |
| P.O. Buyer | ✓ | ✓ |
| P.O. Seller | ✓ | ✓ |
| UCC1 Filing Acknowledgement<br>* 1 Filing    2 Amendments | ✓ | ✓ |
| UCC1 Financing Statement<br>* 1 Statement   2 Amendments | ✓ | ✓ |
| | | |
| US Bank Approval of Deal Documents ("No Exceptions" fax) | | ✓ |
| | | |
| Fax to Stacey @ DZ Bank: | | **DZ Bank** |
| Funding Worksheet | *TOBY* ✓ | ✓ |
| Borrowing Base Certificate | *REPORT FILE* ✓ | ✓ |
| Funds Transfer (Collection Account Transfer Form) | | ✓ |
| Notice of Borrowing (Only if CP involved transaction) | | ✓ |
| | | |
| Fax to Toby @ US Bank: | | **US Bank** |
| Open Wire – Approval Sheet | | ✓ |
| Closing Wire – Approval Sheet (also to Stacey @ DZ) | **DZ Bank** | |
| | | |
| QuickBooks Accounting Entries: | **Open/New** | **Closed/Paid** |
| Deal Transaction/Detail in PC Funding Books | ✓ | ✓ |
| Note Transaction/Detail in OF_SPV Books | ✓ | ✓ |
| NIM Distributions - OF Parent Books | | |
| | | |
| Portfolio Current Entries: | **Portfolio Current** | |
| New Deal Information | ✓ | |
| Transfer from Inventory to Receivable | ✓ | |
| Closed/Paid Off | ✓ | |
| | | |
| Fund Transfer Notification (buyer pays for goods) | ✓ | |
| | | |
| | | |
| Opportunity Finance, LLC | **Initials** *MG* | **Date** *4/26/02* |

**Confidential Information - Provided Pursuant to Non-Disclosure Agreement -**
**Disclosure to Third Parties Prohibited**

OFLOANF4_0000524

**Funding Worksheet**
4/25/02 11:18 AM

| NOTE # | 042602-01 | 042602-02 | 042602-03 | | |
|---|---|---|---|---|---|
| "Open" or "Close" | open | open | open | Close | TOTAL |
| Principal Amount | $ 4,600,000.00 | 1,400,000.00 | 2,800,000.00 | | 8,800,000.00 |
| Issue Date | 26-Apr-02 | 26-Apr-02 | 26-Apr-02 | | |
| Maturity Date | 24-Aug-02 | 24-Aug-02 | 24-Aug-02 | | |
| Number of Days | 120 | 120 | 120 | | |
| Interest Rate (30 days) | 2.50% | 2.50% | 2.50% | | |
| Interest Due at Maturity | $ 460,000.00 | $ 140,000.00 | $ 280,000.00 | | |
| | | | | | |
| Seller Purchase Order | Par Group | Nationwide | Enchanted | | |
| Purchase Order Amount | $ 4,770,339.65 | 1,505,322.75 | 2,945,799.10 | | |
| Buyer Purchase Order | Sam's | Sam's | Sam's | | |
| Purchase Order/Retailer Payment Amount | $ 5,485,651.78 | 1,731,108.80 | 3,407,710.00 | | |
| | | | | | |
| Opening Wire Transfer Request - Summary: | | | | | |
| Opportunity Finance | 4,600,000.00 | 1,400,000.00 | 2,800,000.00 | - | 8,800,000.00 |
| Petters Company | 170,339.65 | 105,322.75 | 145,799.10 | - | 421,461.50 |
| Total Opening Wire Amount | 4,770,339.65 | 1,505,322.75 | 2,945,799.10 | - | 9,221,461.50 |
| | | | | | |
| Closing Wire Transfer Request: | | | | | |
| OpFin Securitizaton Acc 333-987-30: | - | - | - | - | - |
| Petters Company Acc 195-9018: | - | - | - | - | - |
| Total Closing Wire Amount | - | - | - | - | - |

**Opportunity Finance: Sources and Uses of Funds**

| Sources | Account | |
|---|---|---|
| Opportunity Finance | Redacted - Confidential | |
| OpFin Securitization | | - |
| OpFin Securitization Collection | | 7,400,000.00 |
| DZ CP Sale Proceeds | | 2,100,000.00 |
| *Total Sources of Funds* | | 9,500,000.00 |

| Uses | | |
|---|---|---|
| Amounts to PC Funding | | |
| Source: Opportunity Finance | | - |
| Source: OpFin Securitization | | - |
| Source: OpFin Securitization Collection | | 7,400,000.00 |
| Source: DZ CP Sale Proceeds | | 1,400,000.00 |
| *Total to PC Funding:* | OK | 8,800,000.00 |
| | | |
| Amounts to OpFin Securitization | | |
| Source: OpFin Securitization Collection | | - |
| Source: DZ CP Sale Proceeds | | 700,000.00 |
| *Total to OpFin Securitization:* | | 700,000.00 |
| | | |
| *Total Uses of Funds* | OK | 9,500,000.00 |

Prepared and Approved by:

Opportunity Finance Securitization, LLC

By: Steven F. Sauls
Its: Secretary

**Confidential Information - Provided Pursuant to Non-Disclosure Agreement -
Disclosure to Third Parties Prohibited**

Confidential                                                                                   Kelley_Micro_0032148

# EXHIBIT 27

# *Autobahn Funding Company LLC*

**Independent Auditors' Report**

**Financial Statements**
Years Ended December 31, 2001 and 2000

# AUTOBAHN FUNDING COMPANY LLC

## TABLE OF CONTENTS

|  | Page |
|---|---|
| INDEPENDENT AUDITORS' REPORT | 1 |
| FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2001 AND 2000 | |
| Balance Sheets | 2 |
| Statements of Operations | 3 |
| Statements of Changes in Member's Capital | 4 |
| Statements of Cash Flows | 5 |
| Notes to Financial Statements | 6-8 |

Deloitte & Touche LLP
Two World Financial Center
New York, New York 10281-1414

Tel: (212) 436-2000
Fax: (212) 436-5000
www.us.deloitte.com

**Deloitte & Touche**

## INDEPENDENT AUDITORS' REPORT

To the Management of
Autobahn Funding Company LLC:

We have audited the accompanying balance sheets of Autobahn Funding Company LLC (the "Company") as of December 31, 2001 and 2000, and the related statements of operations, changes in member's capital and of cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2001 and 2000, and the results of its operations, its changes in member's capital and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

*Deloitte & Touche LLP*

June 30, 2002

Deloitte
Touche
Tohmatsu

# AUTOBAHN FUNDING COMPANY LLC

**BALANCE SHEETS**
**DECEMBER 31, 2001 AND 2000**

|  | **2001** | **2000** |
|---|---|---|
| **ASSETS** | | |
| CASH AND CASH EQUIVALENTS | $ 83,910 | $ 30,304 |
| INVESTMENTS IN, AND LOANS COLLATERALIZED BY, POOLED RECEIVABLES (Note 3) | 1,767,569,202 | 1,122,949,594 |
| INTEREST RECEIVABLE | 3,640,327 | 6,513,256 |
| PROGRAM FEES RECEIVABLE | 1,829,523 | 1,471,030 |
| TOTAL ASSETS | $ 1,773,122,962 | $ 1,130,964,184 |
| **LIABILITIES AND MEMBER'S CAPITAL** | | |
| LIABILITIES: | | |
| Notes payable (net of unamortized discount of $2,268,707 and $3,990,118 in 2001 and 2000, respectively) (Note 6) | $ 1,771,187,293 | $ 1,129,466,882 |
| Accounts payable and accrued expenses | 1,910,669 | 1,472,302 |
| Total liabilities | 1,773,097,962 | 1,130,939,184 |
| MEMBER'S CAPITAL | 25,000 | 25,000 |
| TOTAL LIABILITIES AND MEMBER'S CAPITAL | $ 1,773,122,962 | $ 1,130,964,184 |

See notes to financial statements.

# AUTOBAHN FUNDING COMPANY LLC

**STATEMENTS OF OPERATIONS**
**YEARS ENDED DECEMBER 31, 2001 AND 2000**

|  | 2001 | 2000 |
|---|---|---|
| REVENUES: | | |
| Interest | $53,600,926 | $46,806,050 |
| Program fees | 17,462,476 | 9,588,973 |
| Total revenues | 71,063,402 | 56,395,023 |
| EXPENSES: | | |
| Interest | 53,243,633 | 46,805,023 |
| Facility fees | 17,819,769 | 9,588,973 |
| Other | - | 1,027 |
| Total expenses | 71,063,402 | 56,395,023 |
| NET INCOME | $            - | $            - |

See notes to financial statements.

# AUTOBAHN FUNDING COMPANY LLC

## STATEMENTS OF CHANGES IN MEMBER'S CAPITAL
## YEARS ENDED DECEMBER 31, 2001 AND 2000

|  | Sole Member | Retained Earnings | Total |
|---|---|---|---|
| MEMBER'S CAPITAL, DECEMBER 31, 1999 | $ 25,000 | $    - | $ 25,000 |
| Net income | - | - | - |
| MEMBER'S CAPITAL, DECEMBER 31, 2000 | 25,000 | - | 25,000 |
| Net income | - | - | - |
| MEMBER'S CAPITAL, DECEMBER 31, 2001 | $ 25,000 | $    - | $ 25,000 |

See notes to financial statements.

# AUTOBAHN FUNDING COMPANY LLC

## STATEMENTS OF CASH FLOWS
## YEARS ENDED DECEMBER 31, 2001 AND 2000

|  | 2001 | 2000 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: |  |  |
| Net income | $ - | $ - |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: |  |  |
| Non-cash charges included in net income: |  |  |
| Amortization of discount on notes | 53,017,883 | 46,805,023 |
| Changes in assets and liabilities: |  |  |
| Decrease (increase) in interest receivable | 2,872,929 | (5,929,117) |
| Increase in program fees receivable | (358,493) | (1,471,030) |
| Increase in accounts payable and accrued expenses | 438,367 | 1,472,057 |
| Net cash provided by operating activities | 55,970,686 | 40,876,933 |
| CASH FLOWS FROM INVESTING ACTIVITIES - |  |  |
| Net payments for loans and pooled receivables | (644,619,608) | (976,010,636) |
| CASH FLOWS FROM FINANCING ACTIVITIES: |  |  |
| Proceeds from issuance of notes | 42,551,929,528 | 27,912,506,334 |
| Payments in connection with maturities of notes | (41,963,227,000) | (26,977,369,000) |
| Proceeds from liquidity facility borrowings | 492,154,251 | - |
| Repayments of liquidity facility borrowings | (492,154,251) | - |
| Net cash provided by financing activities | 588,702,528 | 935,137,334 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 53,606 | 3,631 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR | 30,304 | 26,673 |
| CASH AND CASH EQUIVALENTS, END OF YEAR | $ 83,910 | $ 30,304 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION: |  |  |
| Cash paid during the year for interest | $ 56,195,676 | $ 40,875,906 |

See notes to financial statements.

# AUTOBAHN FUNDING COMPANY LLC

**NOTES TO FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2001 AND 2000**

## 1.   ORGANIZATION

Autobahn Funding Company LLC (the "Company"), a special purpose, bankruptcy-remote Delaware limited liability company, was formed on August 17, 1999.  The Company is a wholly-owned subsidiary of BSCS XVI Inc., a special purpose corporation owned by Broad Street Contract Services, Inc. ("Broad Street").

The primary purpose of the Company is to issue commercial paper notes ("CP") with maturities of up to 270 days.  The proceeds from such CP will be used to acquire asset interests, which can be loans, pools of accounts, financial assets and securities, to make payment of amounts outstanding under the Liquidity Facilities or Swing Line Credit Agreement and to make repayment of matured CP.  The Company has engaged U.S. Bank Trust National Association as a depositary and issuing and paying agent.

The Company has engaged DZ BANK Deutsche Zentral-Genossenschaftsbank, formerly DG BANK Deutsche Genossenschaftsbank, ("DZ" or the "Administrator") as its administrator pursuant to the Administration Agreement dated September 17, 1999 between the Company and DZ.  The Administrator identifies and structures pools of Underlying Assets, as defined, that will back Asset Interests, as defined, and is responsible for monitoring and conducting periodic reviews of the Company's portfolio of Asset Interests.  DZ is also responsible for administering the Liquidity Facilities, Supplemental Credit Enhancement, if any, and the Swing Line Credit Agreement, as well as the issuance, sale and payment of CP.

Lord Securities Corporation ("Lord" or the "Manager") has agreed to act as a manager for the Company pursuant to the Management Agreement dated September 17, 1999 (the "Management Agreement") between the Company and Lord.  Lord is responsible for providing certain financial, accounting and other services for the Company; for such services, Lord receives a fee directly from the Administrator. The Manager is an affiliated entity of Broad Street.

## 2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The fiscal year-end of the Company is December 31.  The Company maintains its accounting records on the accrual basis of accounting and its financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America.

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. However, actual results could differ from those estimates.

For purposes of the statements of cash flows, the Company defines cash equivalents as short-term, highly liquid securities with original maturities of 90 days or less.

Interest income earned on purchased receivables and secured loans is calculated at the Company's commercial paper funding rate or LIBOR rate and is charged to Sellers (as defined in Note 3) based on

average daily outstanding receivable balances.  Program fee rates vary by receivable pool and the fees charged to Sellers are based on average daily outstanding receivable balances.

Liquidity fee rates vary by receivable pool and the fees are charged to the Company based on average daily outstanding liquidity commitments made by syndicate of liquidity banks to the Company. Liquidity fees paid to these liquidity providers are accrued over the lives of the liquidity commitments.

The discount on CP is amortized, on a straight-line basis, which approximates constant yield to maturity, and has been reflected as interest expense on the statements of operations.

No provision for income taxes is included in the accompanying financial statements since the sole member is responsible for such taxes based on the member's share of the Company's net income.

## 3. INVESTMENTS IN, AND LOANS COLLATERALIZED BY, POOLED RECEIVABLES

The Company:  (i) purchases or otherwise acquires or makes loans secured by, or otherwise finances interests in, or in pools of, accounts, general intangibles, chattel paper, instruments, certified and uncertified securities, inventory, investment property or other financial assets, including, without limitation, publicly or privately issued securities secured by or representing interests in any of the foregoing (collectively, the "Underlying Assets") pursuant to funding agreements (such Underlying Assets, including ownership interests and security interests therein, collectively, the "Asset Interests") in accordance with the Company's investment policies and guidelines, (ii) sells Asset Interests, (iii) funds its acquisitions of Asset Interests through the issuance of CP and (iv) enters into liquidity and credit enhancement facilities in connection with the acquisition of Asset Interests.  The Company acquires Asset Interests originated by various companies referred to the Company from time to time as sellers of, issuers of or borrowers (collectively, the "Sellers") in respect of Underlying Assets.  The Company provides the financing in Asset Interests primarily through the issuance of CP.

## 4. LIQUIDITY AND CREDIT ENHANCEMENT SUPPORT

Autobahn does not benefit from program-wide credit enhancement; instead, deal-specific required reserves provide loss protection for each transaction.  Each reserve is designed to cover a significant level of losses that could be incurred by the pool in the event of its liquidation.  The amount of loss protection is determined by providing a multiple of the actual loss history of the related underlying asset or coverage for certain obligor concentrations.  The credit enhancement may be fixed or dynamic, increasing with the deterioration of the underlying asset pool.  Each transaction is structured to include performance triggers to alert the administrator if the portfolio performs below a certain threshold.  Loss reserves may take the form of overcollateralization, third-party letter of credit or surety bond, cash collateral account, recourse to the seller, subordinated note issuance, or other forms of acceptable loss protection.

Autobahn maintains backstop liquidity support to supplement the inherent liquidity of the receivables pools.  The liquidity facilities are available to ensure timely payments of rated debt and are not intended to provide loss coverage on the assets.  Committed liquidity coverage is maintained at a minimum of 102% of the maximum purchase limit permitted under the applicable purchase agreement.  The 102% liquidity coverage is made up of deal-specific liquidity and/or enhancement agreements.  Deal-specific liquidity support can come in the form of a liquidity asset purchase agreement or liquidity loan agreement.  The liquidity agreements will not fund against defaulted assets.  If maturing CP is not rolled over and there are cash flow delays interrupting availability of funds for repayment of the CP, the liquidity facilities will be drawn upon.

During the year ended December 31, 2001, due to the closure of the commercial paper market after the September 11th tragedy, the Company drew against certain of the deal-specific liquidity and/or enhancement agreements to pay for maturing commercial paper notes. The average amount drawn during the week following the September 11th tragedy was approximately $35,007,900 and the daily weighted average interest rate was 6.46%. For the year ended December 31, 2001, the Company incurred interest expense of approximately $224,990 related to such borrowings. No amounts were outstanding against any of the deal-specific liquidity and/or enhancement agreements as of December 31, 2001. No amounts were drawn against any of the deal-specific liquidity and/or enhancement agreements during the year ended December 31, 2000.

## 5.   SWING LINE CREDIT AGREEMENT

In order to provide additional flexibility to the Company in meeting its liquidity needs, DZ and the Company have entered into a Swing Line Credit Agreement. Pursuant to such Agreement, DZ may make advances to the Company, not to exceed $500,000 outstanding at any time, to enable it to pay, among other things, maturing CP. Such agreement terminates at an earlier of (a) expiration of all liquidity commitments or (b) an insolvency of the Company. Borrowings under the Swing Line Credit Agreement bear interest equal to the greater of the DZ base rate or the Federal Funds Rate plus 50 basis points. No amounts were drawn against the Swing Line Credit Agreement during 2001 and 2000.

## 6.   NOTES PAYABLE

At December 31, 2001 and 2000, the Company had various commercial paper notes outstanding, as follows:

|  | 2001 | 2000 |
|---|---|---|
| Total face value | $1,773,456,000 | $1,133,457,000 |
| Interest due at maturity | $5,829,920 | $10,503,374 |
| Interest payable at December 31 | $3,561,213 | $6,513,256 |
| Range of face values (in $000's) | $400 - $184,071 | $1,500 - $72,269 |
| Maturity dates | 1/2/02 - 6/17/02 | 1/2/01 - 3/26/01 |
| Rates | 1.92% - 2.65% | 6.43% - 7.05% |

At maturity, the CP was rolled over and replaced with other CP with varying maturities and similar face values and yields.

## 7.   FAIR VALUE OF FINANCIAL INSTRUMENTS AND CONCENTRATION OF RISK

The Company's cash and cash equivalents, investments in, and loans collateralized by, pooled receivables, interest receivable, program fees receivable, notes payable and accounts payable and accrued expenses are carried at amounts that approximate their fair values at December 31, 2001 and 2000, in accordance with SFAS No. 107, *Disclosures About Fair Value of Financial Instruments.*

Financial instruments, which potentially subject the Company to concentrations of credit risk, consist principally of cash and cash equivalents, investments in, and loans collateralized by, pooled receivables and other related receivables. The Company deposits its cash in financial institutions and purchases investments of pooled receivables from sellers. Such investments are supported by various liquidity and credit facilities provided by various sellers and financial institutions. The Company holds cash to meet pending CP maturities and to purchase investments.

* * * * * *

# EXHIBIT 28

| Deal Checklist | | |
|---|---|---|
| Deal # *09/802-03* | Deal Amount $ *1,950,000* | |
| UCCI Prep - email date to Washington County | *9/17/02* | |
| Email Toby 1 day prior to funding | | |
| Courier Originals to US Bank Trust | O.F. | US Bank |
| 1 Original/Package Day (copies of for each deal file): | | |
| **Collateral Receipt** | X | X |
| **Schedule A** | X | X |
| **Confirmation & Notice of Pledge** | X | X |
| 1 Original/Deal (put in individual manila folders): | | |
| **Promissory Note** | X | X |
| **Assignment – Client to PC Funding** | X | X |
| **Allonge** | X | X |
| **Assignment – OF to OF Sec.** | X | X |
| **P.O. Buyer** | X | X |
| **P.O. Seller** | X | X |
| **UCCI Filing Acknowledgement**  * 1 Filing    2 Amendments | X | X |
| **UCCI Financing Statement**  * 1 Statement  2 Amendments | X | X |
| | | |
| **US Bank Approval of Deal Documents ("No Exceptions" fax)** | | X |
| | | |
| Fax to Stacey @ DZ Bank: | | DZ Bank |
| **Open/Close Worksheet** | Toby | X |
| **Borrowing Base Certificate w/ScheduleA** | Remit Folder Copy | X |
| **Collection Account Transfer Form** | | X |
| **Notice of Borrowing (Only if CP involved transaction)** | | N/A |
| | | |
| Fax to Toby @ US Bank: | | US Bank |
| **Open Wire – Approval Sheet** | | X |
| **Closing Wire – Approval Sheet (also to Stacey @ DZ)** | DZ Bank  X | X |
| | | |
| QuickBooks Accounting Entries: | Open/New | Closed/Paid |
| **Deal Transaction/Detail in PC Funding Books** | X | |
| **Note Transaction/Detail in OF_SPV Books** | X | |
| Database Entries: | | |
| **Loan_Data table** | X | X |
| **OrderDetail table** | X | |
| | | |
| Portfolio Current Entries: | Portfolio Current | |
| **New Deal Information** | X | |
| **Transfer from Inventory to Receivable** | X | |
| **Closed/Paid Off** | | |
| | | |
| **Fund Transfer Notification (buyer pays for goods)** | X | |
| Opportunity Finance, LLC | Initials  MB | Date  9/18/02 |

Confidential Information - Provided Pursuant to Non-Disclosure Agreement -
Disclosure to Third Parties Prohibited

OFLOANF5_0000003

**Funding Worksheet**
9/17/02 3:34 PM

| NOTE # | 091802-01 | 091802-02 | 091802-03 | | |
|---|---|---|---|---|---|
| "Open" or "Close" | Open | Open | Open | Close | TOTAL |
| Principal Amount | $ 1,950,000.00 | $ 4,800,000.00 | $ 1,950,000.00 | $ - | 8,700,000.00 |
| Issue Date | 18-Sep-02 | 18-Sep-02 | 18-Sep-02 | 0-Jan-00 | |
| Maturity Date | 16-Jan-03 | 16-Jan-03 | 16-Jan-03 | 29-Apr-00 | |
| Number of Days | 120 | 120 | 120 | 120 | |
| Interest Rate (30 days) | 2.50% | 2.50% | 2.50% | 2.50% | |
| Interest Due at Maturity | $ 195,000.00 | $ 480,000.00 | $ 195,000.00 | $ - | |
| Seller Purchase Order | Enchanted | Enchanted | After 2nd Millennium | Nationwide | |
| Purchase Order Amount | $ 2,018,746.00 | $ 4,903,794.50 | $ 2,017,753.70 | $ - | 8,940,294.20 |
| Buyer Purchase Order | Sam's Club | Sam's Club | Boscov's | Sam's Club | |
| Purchase Order/Retailer Payment Amount | $ 2,250,848.57 | $ 5,639,359.60 | $ 2,320,400.22 | $ - | 10,210,608.39 |
| Opening Wire Transfer Request - Summary: | | | | | |
| Opportunity Finance | 1,950,000.00 | 4,800,000.00 | 1,950,000.00 | - | 8,700,000.00 |
| Petters Company | 68,746.00 | 103,794.50 | 67,753.70 | - | 240,294.20 |
| Total Opening Wire Amount | 2,018,746.00 | 4,903,794.50 | 2,017,753.70 | - | 8,940,294.20 |
| Closing Wire Transfer Request: | | | | | |
| OpFin Securitizaton Acc 333-987-30: | - | - | - | - | - |
| Petters Company Acc 195-9018: | - | - | - | - | - |
| Total Closing Wire Amount | - | - | - | - | - |

**Opportunity Finance: Sources and Uses of Funds**

| Sources | Account | |
|---|---|---|
| | Redacted - Confidential | |
| Opportunity Finance | | - |
| OpFin Securitization | | - |
| OpFin Securitization Collection | | 8,700,000.00 |
| DZ CP Sale Proceeds | | - |
| *Total Sources of Funds* | | 8,700,000.00 |

| Uses | | |
|---|---|---|
| Amounts to PC Funding | | |
| Source: Opportunity Finance | | - |
| Source: OpFin Securitization | | - |
| Source: OpFin Securitization Collection | | 8,700,000.00 |
| Source: DZ CP Sale Proceeds | | - |
| *Total to PC Funding:* | OK | 8,700,000.00 |
| Amounts to OpFin Securitization | | |
| Source: OpFin Securitization Collection | | - |
| Source: DZ CP Sale Proceeds | | - |
| *Total to OpFin Securitization:* | | - |
| **Total Uses of Funds** | OK | 8,700,000.00 |

Prepared and Approved by:

Opportunity Finance Securitization, LLC

By: Steven F. Sabes
Its: Secretary

**Confidential Information - Provided Pursuant to Non-Disclosure Agreement -
Disclosure to Third Parties Prohibited**

OFLOANF5_0000004

Confidential

Kelley_Micro_0034609

# EXHIBIT 29

## Deal Checklist

| Deal # _09/802-01_ | Deal Amount $ | |
|---|---|---|

| | | |
|---|---|---|
| UCC1 Prep  - email date to Washington County | 9/11/02 | |
| Email Toby 1 day prior to funding | | |
| Courier Originals to US Bank Trust | O.F. | US Bank |
| 1 Original/Package Day (copies of for each deal file): | | |
| Collateral Receipt | X | X |
| Schedule A | X | X |
| Confirmation & Notice of Pledge | X | X |
| 1 Original/Deal (put in individual manila folders): | | |
| Promissory Note | X | X |
| Assignment – Client to PC Funding | X | X |
| Allonge | X | X |
| Assignment – OF to OF Sec. | X | X |
| P.O. Buyer | X | X |
| P.O. Seller | X | X |
| UCC1 Filing Acknowledgement<br>  * 1 Filing     2 Amendments | X | X |
| UCC1 Financing Statement<br>  * 1 Statement  2 Amendments | X | X |
| | | |
| US Bank Approval of Deal Documents ("No Exceptions" fax) | | X |
| | | |
| Fax to Stacey @ DZ Bank: | | DZ Bank |
| Open/Close Worksheet | Toby | X |
| Borrowing Base Certificate w/ScheduleA | Remit Folder Copy | X |
| Collection Account Transfer Form | | X |
| Notice of Borrowing (Only if CP involved transaction) | | N/A |
| | | |
| Fax to Toby @ US Bank: | | US Bank |
| Open Wire – Approval Sheet | | X |
| Closing Wire – Approval Sheet (also to Stacey @ DZ) | DZ Bank | X |
| | | |
| QuickBooks Accounting Entries: | Open/New | Closed/Paid |
| Deal Transaction/Detail in PC Funding Books | X | X |
| Note Transaction/Detail in OF_SPV Books | X | X |
| Database Entries: | | |
| Loan_Data table | X | X |
| OrderDetail table | X | X |
| | | |
| Portfolio Current Entries: | Portfolio Current | |
| New Deal Information | X | |
| Transfer from Inventory to Receivable | X | |
| Closed/Paid Off | X | |
| | | |
| Fund Transfer Notification (buyer pays for goods) | X | |
| Opportunity Finance, LLC | Initials<br>M6 | Date<br>9/18/02 |

Confidential Information - Provided Pursuant to Non-Disclosure Agreement -
Disclosure to Third Parties Prohibited

OFLOANF5_0000096

**Funding Worksheet**
9/17/02 3:34 PM

| NOTE # | 091802-01 | 091802-02 | 091802-03 | | |
|---|---|---|---|---|---|
| "Open" or "Close" | Open | Open | Open | Close | TOTAL |
| Principal Amount | $ 1,950,000.00 | $ 4,800,000.00 | $ 1,950,000.00 | $ - | 8,700,000.00 |
| Issue Date | 18-Sep-02 | 18-Sep-02 | 18-Sep-02 | 0-Jan-00 | |
| Maturity Date | 16-Jan-03 | 16-Jan-03 | 16-Jan-03 | 29-Apr-00 | |
| Number of Days | 120 | 120 | 120 | 120 | |
| Interest Rate (30 days) | 2.50% | 2.50% | 2.50% | 2.50% | |
| Interest Due at Maturity | $ 195,000.00 | $ 480,000.00 | $ 195,000.00 | $ - | |
| Seller Purchase Order | Enchanted | Enchanted | After 2nd Millennium | Nationwide | |
| Purchase Order Amount | $ 2,018,746.00 | $ 4,903,794.50 | $ 2,017,753.70 | $ - | 8,940,294.20 |
| Buyer Purchase Order | Sam's Club | Sam's Club | Boscov's | Sam's Club | |
| Purchase Order/Retailer Payment Amount | $ 2,250,848.57 | $ 5,639,359.60 | $ 2,320,400.22 | $ - | 10,210,608.39 |
| Opening Wire Transfer Request - Summary: | | | | | |
| Opportunity Finance | 1,950,000.00 | 4,800,000.00 | 1,950,000.00 | | 8,700,000.00 |
| Petters Company | 68,746.00 | 103,794.50 | 67,753.70 | - | 240,294.20 |
| Total Opening Wire Amount | 2,018,746.00 | 4,903,794.50 | 2,017,753.70 | - | 8,940,294.20 |
| Closing Wire Transfer Request: | | | | | |
| OpFin Securitization Acc 333-987-30: | - | - | - | - | - |
| Petters Company Acc 195-9018: | - | - | - | - | - |
| Total Closing Wire Amount | - | - | - | - | - |

**Opportunity Finance: Sources and Uses of Funds**

| Sources | Account | |
|---|---|---|
| Opportunity Finance | Redacted - Confidential | - |
| OpFin Securitization | | - |
| OpFin Securitization Collection | | 8,700,000.00 |
| DZ CP Sale Proceeds | | - |
| *Total Sources of Funds* | | 8,700,000.00 |

| Uses | | |
|---|---|---|
| Amounts to PC Funding | | |
| Source: Opportunity Finance | | - |
| Source: OpFin Securitization | | - |
| Source: OpFin Securitization Collection | | 8,700,000.00 |
| Source: DZ CP Sale Proceeds | | - |
| *Total to PC Funding:* | OK | 8,700,000.00 |
| Amounts to OpFin Securitization | | |
| Source: OpFin Securitization Collection | | - |
| Source: DZ CP Sale Proceeds | | - |
| *Total to OpFin Securitization:* | | - |
| *Total Uses of Funds* | OK | 8,700,000.00 |

Prepared and Approved by:

Opportunity Finance Securitization, LLC

By: Steven F. Sabes
Its: Secretary

**Confidential Information - Provided Pursuant to Non-Disclosure Agreement -**
**Disclosure to Third Parties Prohibited**

Confidential

Kelley_Micro_0034702

# EXHIBIT 30

# Autobahn Funding Company LLC

A

**Closing Date:**
September 22, 1999

**Analysts:**

Karen Cook
Analyst
(212) 553-4439
Karen.Cook@moodys.com

Wanda Lee
Senior Associate
(212) 553-3804
Wanda.Lee@moodys.com

**Contacts:**

Sam Pilcer
Managing Director
(212) 553-7418
Sam.Pilcer@moodys.com

Michael Kanef
Managing Director
(212) 553-1964
Michael.Kanef@moodys.com

Marie Erickson
Investor Liaison
(212) 553-4796
Marie.Erickson@moodys.com

## Structure Summary

| | |
|---|---|
| Rating: | **Prime-1** |
| Securities: | Asset-backed commercial paper (ABCP) |
| Program Type: | Partially supported, multiseller |
| Authorized Amount: | $2.41 billion (as of November 30, 2002) |
| Administrative & Hedging Agent: | DZ Bank AG Deutsche Zentral-Genossenschaftsbank (A2/ Prime-1/ D) |
| Assets: | Trade and term receivables, debt securities |
| Collateral Agent: | U.S. Bank Trust National Association (Aa2/ Prime-1/ B+)[1] |
| Depositary: | U.S. Bank Trust National Association |
| Placement Agents: | J.P. Morgan |
| | Merrill Lynch |
| Securities Act Exemption: | Section 4(2) |
| Owner: | BSCS XVI Inc. |
| Manager: | Lord Securities Corporation |

## Program Credit Enhancement
None

## Liquidity

| | |
|---|---|
| Type 1: | Asset pool-specific liquidity loan and purchase agreements |
| Support Percentage: | Face amount of outstanding ABCP |
| Provider: | DZ Bank and other Prime-1-rated financial institutions |
| Funding Basis: | Amount of nondefaulted receivables |
| Out to Funding: | Bankruptcy of Autobahn |
| Dilution Coverage: | Yes |
| Type 2: | Swing-line credit agreement |
| Support Amount: | $500,000 |
| Provider: | DZ Bank AG Deutsche Zentral-Genossenschaftsbank |
| Funding Basis: | Amount of nondefaulted receivables |
| Out to Funding: | Loans are provided at DZ's sole and absolute discretion |

## Program Wind Down Events

Any of the following events would prevent Autobahn Funding Company LLC from issuing ABCP:

- Bankruptcy of Autobahn Funding Company LLC
- Net worth of Autobahn less than $25,000
- Aggregate face amount of ABCP exceeds the aggregate available liquidity commitments

Administrator's Other
    ABCP Programs:    None

1 Ratings are based on its parent, U.S. Bank National Association.

## CURRENT HIGHLIGHTS

- As of November 30, 2002, Autobahn Funding Company had $1.72 billion of ABCP outstanding. Autobahn had 21 asset pools with a total program commitment of $2.41 billion.
- Since August 2002, Autobahn has not funded any new transactions.

BM-000249

## PROGRAM OVERVIEW

Autobahn Funding Company LLC (Autobahn) is a special-purpose limited liability company organized under Delaware law. It is owned by BSCS XVI Inc., a special-purpose corporation organized under Delaware law and owned by Broad Street Contract Services, Inc., a Delaware corporation, which is in turn owned by a third party not affiliated with DZ Bank AG Deutsche Zentral-Genossenschaftsbank (DZ Bank).

Autobahn is a partially supported, multiseller asset-backed commercial paper (ABCP) program that purchases trade and term receivables and other asset-backed securities. Autobahn is the first ABCP program sponsored by DZ Bank. Autobahn's initial capital contribution is $25,000.

### Investors Do Not Benefit From Program-Level Credit Enhancement

Unlike many partially supported, multiseller programs, Autobahn will not have the benefit of program-level credit enhancement. Consequently, all losses experienced on an asset pool must be absorbed by the pool-specific credit enhancement (first loss protection); otherwise, ABCP investors will suffer a loss.

Moody's reviews each asset purchase before it is made to assess its effect on Autobahn's Prime-1 rating. Because Autobahn's ABCP investors do not benefit from program-level credit enhancement, each asset pool in Autobahn's portfolio is credit enhanced to a high investment grade level to support the program's Prime-1 rating. Any significant deterioration in the credit quality of any asset pool in Autobahn's portfolio is likely to have a negative impact on Autobahn's Prime-1 rating.

### Purchases Of Highly-Rated Assets

Autobahn may also purchase, on a post-review basis, assets rated Aa2 or higher – assets commonly referred to as "highly rated assets." Because Moody's will not be looking at these transactions prior to their inclusion in the conduit, Autobahn's purchase of highly rated assets is subject to strict conditions.

For example, to be considered a highly rated asset, a security must be rated Aa2 or higher, and any rate mismatches between the security and the ABCP issued to fund it must be addressed through a swap agreement or other similar mechanism as determined by DZ Bank. As with other asset pools, a loss on a highly rated asset could result in a loss to ABCP investors. As of November 30, 2002, Autobahn had investments in two highly rated securities (both rated Aa2) with a total outstanding principal balance of $219.3 million.

### First-Loss Protection Provides Liquidity Support

A second unique feature of Autobahn's ABCP program, as compared with other partially supported multi-seller programs, is that the pool-specific credit enhancement will provide liquidity support. Therefore, liquidity support for Autobahn ABCP will be provided by a combination of liquidity loan or liquidity asset purchase agreements provided by Prime-1 banks and pool-specific credit enhancement, if necessary.

In all transactions, the sum of the liquidity agreements and the pool-specific credit enhancement will equal the maximum amount of ABCP that can be issued with respect to each specific transaction. Typically, liquidity support alone is sized in an amount equal to outstanding ABCP.

The pool-specific credit enhancement will typically be in the form of a loan agreement provided by a Prime-1-rated bank and will fund up to a certain dollar amount, without regard to a borrowing base test. Some of the deals, however, use other forms of credit enhancement such as overcollateralization and surety bonds. The liquidity agreements are typically subject to a borrowing base test, which means that funds will be available up to the amount of the nondefaulted assets. Additionally, many of Autobahn's deals have a trigger that causes the transaction to be immediately "put" to the liquidity banks upon the occurrence of certain performance-related events or deterioration of the asset pool.

Even though reliance on credit enhancement to provide liquidity support is unique, this structure results in no additional risks to ABCP investors.

### DZ Bank Is Program Administrator

DZ Bank's New York Branch is Autobahn's administrator. Although this is DZ Bank's first conduit, the personnel handling the administrative responsibilities have significant prior experience in administrating other ABCP conduits. Moody's has been favorably impressed by the underwriting and administrative functions of DZ Bank.

### ABCP Investors Are Secured Creditors

Autobahn ABCP investors have a security interest in all of Autobahn's assets. In the unlikely event Autobahn were to become bankrupt, ABCP investors would have a *pari passu* interest with the program liquidity providers in the proceeds of Autobahn's assets. In Moody's opinion, a security interest in the assets is a very strong feature of the program. The security interest would likely reduce the severity of loss to investors in the event of an Autobahn bankruptcy.

However, the security interest does not add any significant benefit from a short-term rating perspective. Moody's Prime-1 rating addresses not only the probability of repayment in full, but timely repayment of ABCP. The addition of a security interest does not materially enhance investors' probability of being repaid on time.

## RATING OPINION

Autobahn's Prime-1 rating is based on:

- The credit quality of the program's assets
- Liquidity support provided by Prime-1-rated banks
- Certain structural protections, including the bankruptcy-remote nature of Autobahn

Because of the significant role played by DZ Bank as principal liquidity and credit enhancement provider, the Prime-1 rating assigned to Autobahn is closely correlated with DZ Bank's Prime-1 rating.

BM-000250

*Table 1*

## Autobahn Portfolio
### As of November 30, 2002

| Pool No. | Seller Industry | Rating | Asset Type | Purchase Limit ($ million) | Inception Date |
|---|---|---|---|---|---|
| 1 | Insurance | Aaa | Insurance Premium Loans | 200 | 10/22/99 |
| 2 | Consumer Finance | Aa2 | Senior Secured Bank Debt | 77 | 1/18/00 |
| 3 | Travel/Leisure | Ba1 | Timeshare Loan Receivables | 150 | 1/31/00 |
| 4 | Corporate Bonds | Aa3/Baa3 | Collateralized Bond Obligation | 97 | 3/28/00 |
| 5 | Retail Banking | NR | ATM Cash Receivables | 30 | 3/17/00 |
| 6 | Banking | Aa2 | Senior Secured Bank Debt (CLO) | 142 | 4/13/00 |
| 7 | Insurance | NR | Senior Life Insurance Settlements | 200 | 4/25/00 |
| 8 | Insurance | NR | Insurance Premium Loans | 135 | 5/26/00 |
| 9 | Leasing | NR | Equipment Leases | 75 | 6/30/00 |
| 10 | Medical Practice | A1 | Equipment Loans | 125 | 6/16/00 |
| 11 | Travel/Leisure | NR | Timeshare Loan Receivables | 100 | 10/30/00 |
| 12 | Financial Services | A1 | Small Business Loans/Factored Receivables | 200 | 12/15/00 |
| 13 | Insurance | NR | Structured Settlements | 100 | 3/23/01 |
| 14 | Leasing | NR | Equipment Leases | 60 | 3/30/01 |
| 15 | Financial Services | NR | Lottery Receivables | 150 | 7/31/01 |
| 16 | Financial Services | NR | Diversified Receivables Portfolio | 218 | 6/22/01 |
| 17 | Agriculture | Aaa | Timber Receivables | 95 | 9/1/01 |
| 18 | Energy | Baa3 | Project Finance Loan | 44 | 12/20/01 |
| 19 | Retail- Wholesale | NR | Wholesale Inventory Trade Loans | 100 | 12/28/01 |
| 20 | Energy | NR | Project Finance Loan | 35 | 3/1/02 |
| 21 | Insurance | NR | Insurance Premium Loans | 75 | 6/28/02 |
| | | | **Total** | **2,408** | |

*Source: Autobahn Monthly Report*

## ASSET OVERVIEW

### Portfolio Investment Criteria

Autobahn may invest in assets such as trade and term receivables, which are commonly found in other partially supported, multiseller programs. According to the program administrator, preferred asset classes include consumer finance receivables (interest bearing, short and long term), trade receivables, insurance premium loans, and finance leases. Investments in these assets may take the form of an interest in an undivided pool of assets or a certificate backed by an identified asset pool.

Autobahn may also invest in highly rated assets – that is, securities rated Aa2 or above by Moody's. These securities may be purchased by Autobahn without notification to Moody's and generally take the form of collateralized loan obligations (CLOs) or collateralized bond obligations (CBOs). The securities are fully supported by liquidity agreements; however, liquidity banks are not required to fund under a liquidity commitment for a particular security if the security is downgraded below Caa1. Therefore, DZ Bank must notify Moody's of any downgrade of a security below Aa2. If such event occurs, DZ Bank, as administrator, must propose a solution to the rating agencies which will isolate ABCP investors from any potential losses as a result of the downgraded security.

### Current Portfolio

As Autobahn's portfolio increases in size, its diversification by asset class has improved. Autobahn's current portfolio contains a fairly broad exposure of asset inter-

ests. Moody's does not rate 48% of the transactions (by purchase commitment) (*see Chart 1*); however, all except one of these transactions have the benefit of full liquidity support from Prime-1-rated DZ Bank. *Table 1* summarizes Autobahn's asset portfolio as of November 30, 2002. *Chart 2* presents Autobahn's portfolio by asset type. CLOs/CBOs and factored receivables/small business loans each account for over 13% of the portfolio.



*Chart 1*
**Autobahn Portfolio By Moody's Long-Term Rating**
As of November 30, 2002
(Total: $2.41 billion)

A1 13%
A2 11%
Not Rated 48%
Aa2 9%
Aa3 4%
Aaa 4%
Ba1 6%
Baa2 3%
B1 2%

*Source: Autobahn Monthly Reports*

BM-000251

Autobahn's sellers represent a variety of industries, including insurance, commercial finance and construction, which collectively comprise 78% of Autobahn's portfolio. *Chart 3* shows the breakdown of industries represented by Autobahn's seller pools.



Chart 2
**Autobahn Portfolio By Asset Type**
Purchase Limit as of November 30, 2002
(Total: $2.41 billion)

*Source: Autobahn Monthly Reports*



Chart 3
**Autobahn Portfolio By Seller Industry**
As of November 30, 2002
(Total: $2.41 billion)

*Source: Autobahn Monthly Reports*

Because Autobahn ABCP investors do not benefit from program-level credit enhancement, Moody's requires that each transaction be of very high credit quality (equivalent to Aa2) on a stand-alone basis. In order to meet this requirement and facilitate the funding of transactions through the conduit, Autobahn typically fully supports new transactions with Prime-1-rated liquidity and then proposes a partially supported structure to Moody's for confirmation of the Prime-1 rating. As of November 30, 2002, seventeen of the twenty-one deals in the Autobahn portfolio were fully supported by liquidity banks that assumed all the credit risk of the assets.

Four of the twenty-one deals, which represent approximately 23% of Autobahn's authorized amount (as of November 30, 2002), are partially supported by liquidity. Of the four, two are investments in Aa2-rated CLO transactions, one of the partially supported deals is a small business loan facility, which is rated A1 by Moody's and enhanced to a level consistent with Prime-1 and the other is an insurance premium deal which has an immediate "put" to the liquidity banks if certain deal-specific trigger events occur. Credit enhancement for these deals takes the form of either overcollateralization or an immediate "put" to the liquidity banks upon the deterioration of the receivables pool. The partial liquidity support combined with deal-specific credit enhancement supports the Prime-1 rating of Autobahn.

From a statistical standpoint, the probability of default (even among assets rated Aa2) becomes greater as the number of assets increases. Consequently, at some point, the probability of default on a large portfolio of Aa2-rated assets is not consistent with Prime-1, and will need to be addressed should circumstances warrant it.

### Hedging

Autobahn may also be exposed to interest rate risk due to the assets it holds in its portfolio. To mitigate these risks, DZ Bank (as Autobahn's hedging agent) is required to arrange appropriate hedges for each Autobahn asset, if necessary. Autobahn may enter into hedging arrangements only with Prime-1-rated counterparties.

## CREDIT ENHANCEMENT

Pool-specific credit enhancement is typically in the form of a loan agreement provided by a Prime-1-rated bank and funds up to a certain dollar amount, without regard to a borrowing base test. As noted above in the Program Overview section, unlike many partially supported, multi-seller programs, Autobahn does not have the benefit of program-level credit enhancement. Losses experienced on any asset pool must be absorbed by the pool's first-loss protection; otherwise, ABCP investors will suffer a loss.

The four partially supported deals incorporate various forms of deal-specific credit enhancement to maintain Autobahn's Prime-1-rating. Each deal-specific credit enhancement takes the form of one or a combination of the following: letter of credit, overcollateralization and excess spread.

## LIQUIDITY

Liquidity support is provided by a combination of liquidity loan or liquidity asset purchase agreements furnished by Prime-1 banks. Currently, 100% of the liquidity support for Autobahn is provided by DZ Bank. Unless the

BM-000252

transaction is fully supported, liquidity funding is subject to a borrowing base test. The liquidity loan or liquidity asset purchase agreements are not available upon the voluntary or involuntary bankruptcy of Autobahn. Because Autobahn is bankruptcy-remote, this risk is consistent with the program's Prime-1 rating.

## PROGRAM WIND DOWN EVENTS

Autobahn has incorporated program wind down events that provide protection to ABCP investors by facilitating the orderly exit of the program from the ABCP market if certain adverse events occur.

The following wind down events would prevent Autobahn from issuing ABCP:

- Autobahn becomes bankrupt
- Net worth of Autobahn is less than $25,000
- Aggregate available liquidity commitments are less than the aggregate face amount of outstanding ABCP

- Aggregate face amount of all outstanding ABCP is greater than $4 billion
- Occurrence of a termination event, as defined in a pool-specific funding agreement

## PROGRAM ADMINISTRATOR

DZ Bank acts as administrator for Autobahn. This is DZ Bank's first ABCP program; however, the personnel handling the responsibilities of Autobahn all have significant prior experience in administrating other ABCP conduits. DZ Bank's current long- and short-term ratings are A2 and Prime-1, respectively; its financial strength rating is D.

*Contacts:* Ms. Jennifer Wikoff, Vice President
DZ Bank AG
New York Branch, (212) 745-1661

Mr. Kenneth Bradt, Senior Vice President
DZ Bank AG
New York Branch, (212) 745-1655

BM-000253

© Copyright 2003. Moody's Investors Service, Inc. and/or its licensors including Moody's Assurance Company, Inc. (together, "MOODY'S"). All rights reserved. ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMIT-TED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind and MOODY'S, in particular, makes no representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability or fitness for any particular purpose of any such information. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, com-pilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The credit ratings, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any secu-rities. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER. Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling. Pursuant to Section 17(b) of the Securities Act of 1933, MOODY'S hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MOODY'S have, prior to assignment of any rating, agreed to pay to MOODY'S for appraisal and rating services rendered by it fees ranging from $1,500 to $1,500,000. PRINTED IN U.S.A.

BM-000254

# EXHIBIT 31

## STRUCTURED FINANCE                     Special Report

# The Fundamentals of Asset-Backed Commercial Paper

**AUTHORS:**

Swasi Bate
Assistant Vice President
(212) 553-4163
Swasi.Bate@moodys.com

Stephany Bushweller
Assistant Vice President
(212) 553-4929
Stephany.Bushweller@moodys.com

Everett Rutan
Senior Vice President
(212) 553-4808
Everett.Rutan@moodys.com

**CONTACTS:**

**New York**
Sam Pilcer
Managing Director
(212) 553-7418
Sam.Pilcer@moodys.com

Michael Kanef
Managing Director
(212) 553-1964
Michael.Kanef@moodys.com

**London**
Jean Dornhofer
Senior Vice President
(44-20) 7772-5355
Jean.Dornhofer@moodys.com

**Paris**
Annick Poulain
Senior Vice President
(33-1) 53-30-10-31
Annick.Poulain@moodys.com

**Sydney**
Patrick Eng
Senior Vice President
(612) 9270-8104
Patrick.Eng@moodys.com

**Managed Funds Group**
Douglas Rivkin
Vice President
Senior Credit Officer
(212) 553-7712
Douglas.Rivkin@moodys.com

**Investor Relations**
Marie Erickson
Investor Relations
(212) 553- 4796
Marie.Erickson@moodys.com

**WEBSITE:**
www.moodys.com

**CONTENTS**

- Overview
- Note to the Reader
- Table of Contents
- Executive Summary
- The Fundamentals of ABCP
- Appendix, Bibliography, Glossary and Index

**OVERVIEW**

This report provides the reader with a comprehensive introduction to asset-backed commercial paper (ABCP) programs. It focuses on the basic ABCP structures, the risks and mitigants found in these structures, and typical assets purchased or financed by these structures. It is a significant update to and revision of the 1993 Moody's article entitled "ABCP: Understanding the Risks." We have extended the contents of that article with information about new developments in ABCP programs driven both by market factors and regulatory pressures. We have also added a discussion of the ABCP investor base. An initial Executive Summary provides a concise overview of the article and may be read separately from the rest of the paper.

Moody's publishes information on each rated ABCP conduit on a quarterly basis as well as articles of interest to market participants in _Moody's Global Asset Backed Commercial Paper Market Review_. All publications may also be found on the www.moodys.com website.



**Moody's Investors Service**

**February 3, 2003**

Kelley_DZ_00092005

Doc ID# SF19491

© Copyright 2003. Moody's Investors Service, Inc. and/or its licensors including Moody's Assurance Company Inc. (together "MOODY'S"). All rights reserved. ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TR ANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained byMOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind and MOODY'S, in particular, makes no representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability or fitness for any particular purpose of any such information. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information.The credit ratings, if any, constituting part of the information contained herein are and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER. Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling. Pursuant to Section 17(b) of the Securities Act of 1933 MOODY'S hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MOODY'S have, prior to assignment of any rating, agreed to pay to MOODY'S for appraisal and rating services rendered by it fees ranging from $1,500 to $1,500,000          PRINTED IN U.S.A.

Kelley_DZ_00092006

## TABLE OF CONTENTS

Overview..........................................................................................................................1
Note to the Reader.............................................................................................................2
Executive Summary.............................................................................................................5
   Growth of the ABCP Market................................................................................................5
   The Meaning of a Prime-1 Rating..........................................................................................5
   Categorizing Risk in ABCP Programs......................................................................................5
   Fully and Partially-supported ABCP Programs.............................................................................6
   Liquidity Support in ABCP Programs.......................................................................................6
   Types of ABCP Programs....................................................................................................7
   Moody's Rating Process....................................................................................................9
   ABCP Investors...........................................................................................................10
   For More Information.....................................................................................................10
The Fundamentals of ABCP......................................................................................................11
   What is an ABCP Program?.................................................................................................11
      Basic Structure.......................................................................................................11
      Liquidity and Credit Enhancement......................................................................................11
      Security Law Considerations...........................................................................................11
   Why ABCP Programs Developed..............................................................................................15
      ABCP Is a Low-Cost, Off-Balance Sheet Funding Source..................................................................15
      ABCP Provides an Alternative Funding Source...........................................................................15
      ABCP Accommodates Variable Funding Needs..............................................................................15
   Types of ABCP Programs...................................................................................................17
      Fully-supported versus Partially-supported Programs...................................................................17
      Fully-supported Programs..............................................................................................17
      Partially-supported ABCP Programs.....................................................................................19
      Transaction Support in Partially-supported Programs...................................................................19
      Rating Analysis for Partially-supported ABCP Programs.................................................................19
      Fully-supported Deals in Partially-supported Conduits.................................................................20
      Conduits Classified by Program Type...................................................................................20
   Conduit Structure and Support Providers..................................................................................25
      Overview..............................................................................................................25
      The Conduit Special Purpose Vehicle...................................................................................27
      Who's Who in an ABCP Program: Service and Support Providers...........................................................29
   General Risks and Mitigants..............................................................................................36
      Structural Risk.......................................................................................................36
      Credit Risk...........................................................................................................38
      Liquidity Risk........................................................................................................41
      Operational Risk......................................................................................................44
      Interest Rate Risk....................................................................................................45
      Foreign Exchange Risk.................................................................................................46
   ABCP Issuance and Program Termination....................................................................................47
      ABCP Issuance Tests...................................................................................................47
      Program Termination Events............................................................................................47
   Post-Review versus Prior-Review Conduits.................................................................................48
      Prior-Review Conduits.................................................................................................48
      Post-Review Conduits..................................................................................................48
   Monitoring Conduit and Asset Performance.................................................................................50
      Monitoring Transaction Performance....................................................................................50

Kelley_DZ_00092007

Moody's Publications on Conduit Activity ............................................................................................50
Conduit Liabilities: ABCP, Floating Rate CP, SLNs, ECNs and MTNs ...............................................52
    Ordinary ABCP......................................................................................................................52
    Interest Bearing ABCP ..........................................................................................................52
    Floating Rate ABCP...............................................................................................................52
    Extendible Commercial Paper ...............................................................................................53
    Medium-Term Notes..............................................................................................................54
    Serialized ABCP....................................................................................................................54
Investors—Who Are They and Why Do They Buy ABCP? ..................................................................56
    Traditional Investors .............................................................................................................56
    What's the Appeal of ABCP?.................................................................................................56
    Money Fund Liquidity Requirements for ABCP Holdings ......................................................58
    Investors Comfortable, Yet Still Concerned ..........................................................................58
    Conclusion.............................................................................................................................59
*Appendix: Asset Purchase Structures* ...........................................................................................*61*
    Trade Receivable Funding by Conduits.................................................................................61
        Two-Step Sale Structure ...................................................................................................61
        Liquidity Backup Facility....................................................................................................61
        Incremental Program Credit Enhancement.......................................................................63
        Analyzing the Credit Risk of Trade Receivables................................................................63
        Risk Mitigants in Trade Receivable Transactions..............................................................64
    Securities Purchases by Conduits.........................................................................................65
*Glossary of Terms*...........................................................................................................................*69*
*Bibliography of Moody's Special Comments*..................................................................................*81*
*Index*.................................................................................................................................................*85*

Kelley_DZ_00092008

## EXECUTIVE SUMMARY

Asset-backed commercial paper (ABCP) is a form of senior secured, short-term borrowing, in contrast to corporate commercial paper, which is senior unsecured short-term corporate debt. Asset-backed commercial paper programs offer low-cost financing to companies that could not otherwise directly borrow in the commercial paper markets .

## GROWTH OF THE ABCP MARKET

ABCP programs first appeared in the mid-1980s. Initially, ABCP conduits were primarily sponsored by major commercial banks as a means of providing trade receivable financing to their corporate customers. Over the past decade ABCP programs have grown to serve a wide variety of needs such as: asset-based financing for companies that cannot access the term market, warehousing assets prior to term securities issuance, investing in rated securities for arbitrage profit, providing leverage to mutual funds, and off-balance sheet funding of selected assets. In general, any asset class that has been funded in the term market has been funded in a conduit, and there are a wide variety of assets that are unique to the conduit market (See Sidebar: Growth of the ABCP Market).

ABCP programs issue commercial paper as their primary liability. However, some have diversified their funding sources to include other types of debt. Some ABCP programs issue extendible commercial paper, medium-term notes (MTNs), and, in some cases, subordinated debt to provide credit enhancement. Moody's expects this diversification to continue as the market grows in size and sophistication.

## THE MEANING OF A PRIME-1 RATING

Moody's short-term ratings are based solely on the risk of default, which is the failure to make full and timely payment. Failure to repay in full, even by a small amount, is considered a default. A delay in repayment, even by a few days, is considered a default. For a corporation, a **Prime-1** short-term rating may be consistent with a long-term debt rating from Aaa to A2, and, for some financial firms, A3.[1]

Moody's long-term ratings are based on expected loss, and include a consideration of the recoveries likely to be received by investors in the event of a default, as well as on the likelihood of default itself. A few ABCP programs that issue MTNs have long-term ratings—typically Aaa. However, the majority of ABCP programs carry only a **Prime-1** short-term rating. There are a few ABCP programs with **Prime-2** short-term ratings, but these are not a significant factor in the ABCP market.

ABCP programs may purchase or fund assets that carry Moody's short- or long-term ratings. However, many of the assets included in ABCP conduit portfolios do not carry explicit Moody's ratings. Moody's **Prime-1** rating on an ABCP program refers only to the commercial paper notes issued by the ABCP program, not to any of the individual transactions funded by the program. In assigning or confirming the rating of an ABCP program, Moody's reviews the credit quality of each transaction in the context of the program as a whole. A transaction funded by an ABCP program does not have an implicit **Prime-1** rating or an implicit term rating: it is unrated unless explicitly rated by Moody's.[2]

## CATEGORIZING RISK IN ABCP PROGRAMS

For the investor, ABCP is a high-quality security typically backed by diversified assets. The **Prime-1** rating of an ABCP program expresses Moody's opinion of the probability that investors will receive full and timely repayment. The **Prime-1** rating is based primarily on an assessment of four risks associated with ABCP programs: structural, credit, liquidity and operational.

*Structural risk* is the danger that an ABCP program becomes entangled in a bankruptcy or similar proceeding. An ABCP program is essentially a limited purpose specialty finance company structured to minimize the risk of insolvency. A special purpose trust or corporation (SPC) is set up by a legal owner under the direction of a sponsor (typically a major commercial bank). The SPC, for accounting and regulatory reasons, is generally not owned by the sponsoring bank. The SPC has no employees, and its purposes are limited

---

1   See Sidebar 1: *Moody's Short Term Rating Definitions* on page 12, and Sidebar 2: *Short-Term Ratings, Long-Term Ratings and ABCP* on page 14 for more details about Moody's rating categories.
2   See Sidebar 4: *What Does an ABCP Conduit Prime-1 Rating Cover?* on page 18 for a discussion of this issue.

**Kelley_DZ_00092009**



to acquiring and funding assets. All counterparties that deal with the SPC agree to non-petition and other language designed to limit the risk of bankruptcy.

*Credit risk* is the likelihood that the assets financed through the program will suffer credit-related losses The rating of a partially-supported ABCP program depends on the performance of the program's assets. It also depends on the amount of credit support and credit strength of the counterparties providing credit, liquidity, hedging or other forms of support. The rating of a fully-supported ABCP program is directly linked to the credit strength of the guarantor.

*Liquidity risk* arises from the timing mismatch between cash flow from the assets held by ABCP programs and funds needed to make payments on maturing ABCP. ABCP programs typically have liquidity backup facilities equal to the amount of ABCP outstanding. These facilities are usually provided by **Prime-1**-rated banks, primarily through liquidity back-up loan or purchase commitments, but also through letters of credit, cash collateral accounts, swaps or similar facilities. The cost of liquidity facilities has been rising over time in recognition of the associated credit risk and increased regulatory scrutiny of banks' contingent liabilities. The increased cost of bank liquidity has led conduit managers to seek ways of reducing the amount of bank liquidity required to maintain a **Prime-1** rating. Non-bank liquidity providers, extendible ABCP, and cash collections from assets and asset sales are just some of the techniques that have been used to reduce the reliance on bank liquidity lines.

*Operational risk* arises from the need to properly manage the conduit's assets and liabilities on a day-to-day basis, from facilitating the purchase of assets to issuing and repaying ABCP. Operational risk is related largely to the administrator responsible for running the program, most often a **Prime-1**-rated commercial bank. Typically the sponsor of the conduit is also the administrator, and may also act as the liquidity agent, lead liquidity bank, credit enhancement provider and hedge counterparty. The assets sold to or financed by the conduit are often originated by companies that are clients of the sponsoring bank under other lending facilities.

## FULLY AND PARTIALLY-SUPPORTED ABCP PROGRAMS

ABCP programs can be either fully-supported or partially-supported. A program is fully-supported when ABCP investors are insulated from asset performance deterioration and rely on a third party to ensure timely repayment of ABCP. Typically a single external support facility provides 100% coverage against credit risk and liquidity risk. The support facility absorbs any losses on the assets and provides cash to cover any timing differences with respect to repayment. Moody's analysis of a fully-supported program is based on the financial strength of the support provider, rather than on the quality of the assets. If the rating of the support provider is lowered, the rating of the ABCP program will most likely be lowered.

The rating of partially-supported programs depends on a joint analysis of the quality of the assets and the credit strength of the support facilities. The underlying asset is generally structured with some form of first-loss credit enhancement—usually overcollateralization—similar to a term asset-backed transaction. In fact, many assets in conduits come from the same master trusts as existing term deals and are identically structured. In the conduit, the asset further benefits from a liquidity facility that often absorbs some forms of credit risk and a program-wide credit enhancement facility that is increased by an amount equal to 5% to 10% of each transaction.

## LIQUIDITY SUPPORT IN ABCP PROGRAMS

ABCP programs are often used to fund long-term assets, such as auto loans or corporate loans. Even when funding short-term assets such as trade receivables, ABCP programs still face the inherent timing mismatch between cash received on the assets and cash needed to repay maturing ABCP. Most maturing ABCP is repaid with the proceeds of newly issued ABCP, a process called "rolling." However, to protect investors in case of a market interruption, ABCP programs typically have liquidity backup lines equal to the face amount of ABCP outstanding. These are usually provided by commercial banks in the form of a loan or purchase agreement. However, some liquidity backup facilities have been provided by non-bank, highly-rated counterparties that are able to provide funds on a same-day basis. Alternative liquidity sources have

**Kelley_DZ_00092010**

included letters of credit, derivative contracts, and funding commitments from non-bank financial firms, or, rarely, other highly-rated corporations. Liquidity commitments are usually specific to particular transactions in a conduit, though some programs have liquidity facilities that cover a particular group of assets or are available program-wide.

## Partial Liquidity

Over the past few years, regulatory scrutiny and increased capital requirements have raised the cost of bank liquidity lines, while bank mergers have contributed to decreased availability. ABCP program sponsors have looked for ways to reduce the amount of liquidity support and still maintain a Prime-1 rating. Some programs have added the ability to issue longer-term liabilities such as medium term notes. Others have developed "partial liquidity" programs, where backup liquidity is less than 100% of outstanding ABCP.

The gap between maturing ABCP and the size of the liquidity facility may be bridged in a number of ways. First, some assets, such as credit card and trade receivables, have intrinsically high cash flows. Liquidity may be sized to cover the gaps between the ABCP maturity schedule and the expected timing of cash collections from the receivables. Second, some assets, such as highly-rated securities and residential mortgages are highly liquid and can be sold at a price close to par on short notice. The market value risk may be covered by credit enhancement or by a market value swap.

Some programs issue extendible ABCP. Extendible ABCP gives the issuer the option to extend the scheduled maturity of the ABCP for an additional period — usually 90 days — as long as certain conditions are met. Extendible ABCP gives the issuer additional time to marshal the cash flow from portfolio assets or to sell assets in order to repay ABCP at its final maturity date. This structural feature is often associated with fast paying or liquid assets such as credit card receivables, trade receivables, or marketable securities.

Finally, a program may manage its assets and liabilities to minimize the mismatch between cash inflows from its assets and cash outflows to repay maturing ABCP. In this way a program sponsor can minimize the size of the required liquidity facility. This is commonly done with structured investment vehicles, a form of securities arbitrage ABCP program discussed below.

## TYPES OF ABCP PROGRAMS

There are five principal types of ABCP program:
- General purpose multiseller
- Credit arbitrage
- Structured investment vehicle (SIV)
- Single-seller
- Loan-backed

Hybrid programs, which combine the features of two or more of these programs, constitute a sixth type. Hybrid programs typically include multiseller, credit arbitrage, and loan-backed features. Information on the number of programs and the ABCP outstanding in each category may be found in Sidebar 5: The *ABCP Market Today*, on page 22.

At present, the largest and most visible ABCP programs are *partially-supported bank-sponsored multiseller programs*. These programs generally provide working capital financing to the sponsoring bank's corporate clients. The conduit provides financing by purchasing or advancing against receivables generated by corporate clients. However, these programs also fulfill a variety of other financing needs: securities purchases, asset warehousing prior to term transaction execution, unsecured corporate loans with some form of guarantee, and so on. Most assets have first-loss credit enhancement provided by overcollateralization, though others will have reserve accounts, insurance or partial guarantees. Some transactions may be fully-supported. Most transactions have a liquidity facility sized at the maximum purchase commitment plus some additional amount to cover interest on ABCP. These programs also tend to have program-wide credit enhancement in a "second-loss" position, equal to approximately 5% to 10% of the purchase commitment.

Kelley_DZ_00092011

*Credit arbitrage programs* are bank-sponsored programs that invest in securities rated Aa3 or higher. The programs are similar to a cash flow CDO, but funded with short-term liabilities instead of term debt. They generally have no credit enhancement because the securities are highly-rated and the program administrator must sell the securities or provide credit enhancement if the assets are downgraded. The liquidity facility is sized at the face amount of ABCP outstanding and purchases assets at book value, implicitly protecting investors from market value risk. These programs exist largely because the initial BIS regulatory capital regulations for commercial banks do not distinguish between highly-rated and lower-rated securities. By funding off-balance sheet, banks obtain regulatory capital relief. The program also serves to diversify the bank's sources of financing.



Figure 1

*Structured investment vehicles* (SIVs), another form of securities arbitrage program, are almost as old as multiseller programs. SIVs issue **Prime-1**-rated ABCP, but also issue **Aaa**-rated MTNs typically provide one-half to two-thirds of the SIV's funding. The proceeds are invested in highly-rated securities with an average credit quality of **Aa** or higher. Investors are protected by significant credit enhancement, typically 6% to 10% in the form of subordinated capital notes. A partial liquidity facility supports timely repayment, and is sized based on an analysis of cash inflows and outflows over a one-year time horizon. SIVs operate on a market-value basis. They are similar to market-value CDOs in that they must maintain a dynamic over-collateralization ratio determined by an analysis of the potential price volatility in the portfolio. SIVs are monitored on a daily basis, and must meet strict liquidity, capitalization, leverage and concentration guidelines.

*Single-seller programs* are generally set up to fund the assets originated by a single corporation. There are a number of reasons that a company might choose to establish its own ABCP program instead of participating in a multiseller conduit. Some companies desire more control over the management of ABCP issuance. Others may find cost advantages or more advantageous accounting or tax treatment. In evaluating these programs, Moody's reviews the business reasons for the program as well as the various credit risks enumerated above. A single-seller program should have a sound business purpose and committed support at a high level in the sponsoring corporation. Moody's also reviews the program with the corporate analyst responsible for the firm's rating.

Kelley_DZ_00092012

*Loan-backed programs* were a more significant part of the market in the early and mid-1990s than they are today. They are bank-sponsored programs and fund direct loans to the bank's corporate customers. These loans are generally closely managed by the bank, and have a variety of covenants designed to reduce credit risk. Historically, the credit performance of these short-term loans has been quite good, even though most of the borrowers are unrated or rated non-investment grade. However, given the typical borrower profile, these programs are heavily enhanced in order to receive a **Prime-1** rating. Several sponsoring banks have closed their programs in the past year due to regulatory and accounting changes, and Moody's expects these programs to largely disappear.

## MOODY'S RATING PROCESS

Conduits are usually rated in two steps. First, Moody's assigns a rating to the conduit structure. Then, Moody's confirms the conduit's rating as transactions are added to the conduit's portfolio. This process reflects the fact that conduits are revolving structures with a changing portfolio of funding commitments as new deals are added and old deals pay down.

### Initial Program Rating Assignment

The initial rating assignment focuses on the conduit sponsor and the business purpose of the program, on the legal structure of the program, on the documentation that specifies the duties of the various support parties, on the type of assets to be funded, on the support facilities needed to maintain the desired rating, and on the capability of the program administrator. The financial strength of the sponsor and the sponsor's commitment to the capital markets are important qualitative considerations. The sponsor is typically also the program administrator. Because of the administrator's central role in overseeing the proper functioning of the program, Moody's generally conducts an operations review at the administrator's offices to see first hand how the program will be managed. Moody's concerns include origination and underwriting of assets, procedures for issuing and repaying ABCP, procedures for ensuring compliance with the program documents, and staffing and information systems to support all of these.

### Confirming Conduit Purchases

Once the conduit rating is assigned, the administrator identifies and structures transactions to be funded. Moody's typically reviews each transaction in the context of the portfolio of assets funded by the conduit to determine whether the addition is consistent with the conduit's rating. The administrator provides Moody's with its underwriting and credit approval analysis to facilitate this process. The rating analysis of any transaction is very similar to that conducted for a term asset-backed security, and Moody's ABCP analysts often work closely with Moody's term and corporate analysts in this process. As noted above, conduit funding usually means the transaction will benefit from a liquidity facility, program credit enhancement, and supervision by the administrator. Moody's rating analysis incorporates these additional investor protections, if present.

### Post-Review Programs

Some conduits are permitted to acquire assets on a "post-review" basis, often subject to specific limits by asset type, transaction size and structural protections. This means the administrator may add a new deal within these limits without Moody's prior review. This is common for programs investing exclusively in rated securities. It is less common for programs funding term and trade receivable transactions. Post-review programs are subject to an ongoing credit monitoring process.

### Monitoring ABCP Programs

Moody's rating process is not limited to reviewing new programs and transactions. Moody's receives performance information on each conduit typically on a monthly basis and sometimes more frequently. Moody's monitors transaction and conduit performance as presented in these reports, and maintains regular contact with the administrator to discuss any noteworthy items. Generally a conduit administrator informs Moody's proactively of any anticipated problems, and, if necessary, proposes a remedy to protect investors and maintain the program's rating. Moody's and the administrator meet periodically to review conduit performance and discuss planned changes and additions.

Kelley_DZ_00092013

## ABCP INVESTORS

ABCP is a high quality short-term investment secured by an interest in a diversified pool of assets. Most ABCP programs are rated **Prime-1**. ABCP is generally issued at a discount at a rate close to the London inter-bank offer rate (LIBOR). Money market funds are major purchasers of ABCP. ABCP has become more attractive to these funds in recent years due to its high quality and increased availability[3].

## FOR MORE INFORMATION

Moody's currently rates nearly all ABCP programs in the market. Moody's publishes individual reports on the programs that it rates that are updated quarterly. Moody's also publishes special reports that explore credit issues affecting the ABCP market. Investors are invited to call Moody's analysts with any questions concerning ABCP, and to visit Moody's website, www.moodys.com, for further information.

---

[3]    See Investors—Who Are They and Why Do They Buy ABCP? on page 56 for more details on money market funds and ABCP.

**Kelley_DZ_00092014**

# THE FUNDAMENTALS OF ABCP

The remainder of the special comment revisits the topics in the *Executive Summary* in greater depth. The focus of the presentation is the *general-purpose multiseller ABCP program*. There is some discussion of other types of ABCP programs, but these are better covered in other special comments referenced in the annotated Bibliography.

An *Appendix* presents the issues involved in structuring particular assets for funding by an ABCP conduit. Trade receivables and securities purchased are discussed in some details. The Bibliography contains references to Moody's special comments that discuss other asset types.

## WHAT IS AN ABCP PROGRAM?

Commercial paper is a senior unsecured obligation generally issued by a corporation to provide working capital funding. In the 1980's, parallel with the development of the term asset-backed market, commercial banks developed a commercial paper product issued by a special purpose entity and secured in repayment by defined pools of assets. The initial assets were trade and term receivables, and the purpose was to provide working capital funding to the firm selling the receivables. Though still under $50 billion outstanding as late as 1992, by 2002 the ABCP market has grown to over $700 billion and now exceeds the amount of corporate CP outstanding. ABCP is used to finance almost every type of asset that has been successfully securitized.

### Basic Structure

An ABCP program, also called conduit, is a special purpose vehicle (SPV) established to fund a portfolio of assets through the issuance of commercial paper. An Administrator[4] is responsible for the overall activities of the conduit: recommending assets, arranging for purchase, issuing and repaying ABCP as needed, monitoring and servicing the assets and so forth. The structure and key players in a typical conduit are discussed below on page 25, Conduit Structure and Support Providers.

Each transaction funded by the conduit is structured similarly to a term securitization: an originator or Seller of the assets sells them to a special purpose vehicle in a true sale. In some cases conduits fund the purchase of rated securities rather than receivables. The purchasing SPV is funded by a loan from the ABCP conduit. The amount of funding depends on the amount of "good"—non-defaulted, non-delinquent—assets available, usually financed at a haircut or percentage of face value to provide credit enhancement. Like a term transaction, the conduit transaction will have certain performance triggers to cause early amortization or otherwise limit investors' exposure to deteriorating assets. Transaction structures are discussed in the Appendix: Asset Purchase Structures on page 61.

### Liquidity and Credit Enhancement

The conduit funds the loans it has made by issuing ABCP. Typically, the conduit applies the proceeds of new ABCP issuance to repay maturing ABCP, a process called "rolling" ABCP. This permits the conduit to fund even long-term assets on a continuing basis. To ensure repayment in the event new ABCP cannot be issued, and to guarantee funding to the Seller, each transaction usually has a backup liquidity facility sufficient to cover the Face Amount—principal plus interest to maturity—of ABCP issued to fund the transaction. The liquidity facility may also absorb a variety of risks. The liquidity facility often absorbs risks associated with the bankruptcy of the seller, but not those associated with the obligors on the individual receivables. This means liquidity is generally available in an amount equal to that of non-defaulted assets. Liquidity is discussed below in Liquidity Risk on page 41

In addition to these protections at the transaction level, the ABCP conduit has certain program-level facilities: credit enhancement, hedging arrangements, and possibly a swing-line of credit for unforeseen expenses. These facilities are available as needed to see that ABCP is repaid on time and in full, regardless of which, if any, transaction may be causing a problem. Credit enhancement is discussed in Credit Risk on page 38, while hedging arrangements are covered in Interest Rate Risk and Foreign Exchange Risk starting on page 45.

### Security Law Considerations

In the United States, two major laws govern the issuance of securities and the companies that issue them: the Securities Act of 1933 and the Investment Company Act of 1940. These acts govern registration, disclosure and reporting requirements, among other things.

---

4    Capitalized terms may be found in the Glossary of Terms on page 69.

**Kelley_DZ_00092015**

## Moody's Short Term Rating Definitions

**Moody's Short-Term Debt Ratings**

Moody's short-term ratings are opinions of the ability of issuers to repay punctually senior debt obligations. These obligations have an original maturity not exceeding one year, unless explicitly noted.

Moody's employs the following three designations, all judged to be investment grade, to indicate the relative repayment ability of rated issuers:

**Prime-1**

Issuers rated Prime-1 (or supporting institutions) have a superior ability for repayment of senior short-term debt obligations. Prime-1 repayment ability will often be evidenced by many of the following characteristics:

- Leading market positions in well-established industries.
- High rates of return on funds employed.
- Conservative capitalization structure with moderate reliance on debt and ample asset protection.
- Broad margins in earnings coverage of fixed financial charges and high internal cash generation.
- Well-established access to a range of financial markets and assured sources of alternate liquidity.

**Prime-2**

Issuers rated Prime-2 (or supporting institutions) have a strong ability for repayment of senior short-term debt obligations. This will normally be evidenced by many of the characteristics cited above but to a lesser degree. Earnings trends and coverage ratios, while sound, may be more subject to variation. Capitalization characteristics, while still appropriate, may be more affected by external conditions. Ample alternate liquidity is maintained.

**Prime-3**

Issuers rated Prime-3 (or supporting institutions) have an acceptable ability for repayment of senior short-term obligations. The effect of industry characteristics and market compositions may be more pronounced. Variability in earnings and profitability may result in changes in the level of debt protection measurements and may require relatively high financial leverage. Adequate alternate liquidity is maintained.

**Not Prime**

Issuers rated Not Prime do not fall within any of the Prime rating categories.

THE FUNDAMENTALS OF ABCP

Kelley_DZ_00092016

ABCP programs are structured to avoid the registration requirements of these acts, both the requirement to register the conduit itself under the Investment Company Act and to register the commercial paper notes under the Securities Act. Registration is expensive and time consuming, and limits the flexibility of the program. In order to qualify for an exemption under either of these laws, the conduit must meet certain restrictions set down in the laws or in rules put forward by the Securities and Exchange Commission (SEC) by its authority under the law.

The most important restriction has to do with limiting the sale of commercial paper to investors with certain qualifications, "qualified purchasers" as defined in Section 3(c)(7) of the Investment Company Act and "Qualified Institutional Buyers" or QIBs as defined by Rule 144a under the Securities Act.[5] Investors who qualify under these rules tend to be more sophisticated than individual investors. They are typically corporations, institutions, investment funds or wealthy individuals with substantial capital or funds to invest.

Money market funds comprise the largest single class of investors in ABCP.[6] These funds are governed by the Investment Company Act of 1940. ABCP programs will structure themselves and limit the assets funded so that the commercial paper qualifies for purchase by money market funds under Rule 2a-7. This rule has implications for disclosure by conduits. ABCP programs typically do not disclose the names of the Sellers of the assets funded by the program. Under Rule 2a-7 a conduit must disclose any asset that comprises 10% or more of the total investments made by the conduit. Typically ABCP programs will diversify their assets so they are not affected by this requirement.

Finally, the Employee Retirement Income Security Act of 1974 (ERISA) places restrictions on investments purchased by "employee benefit plans" as defined in the act. In order to avoid these burdens, ABCP programs typically require that the commercial paper notes not be sold to employee benefit plans.

---

5    Rule 144a covers U.S.-based investors. Non-U.S. investors are governed by Regulation S.
6    See Investors—Who Are They and Why Do They Buy ABCP? on page 56 for more information on money market fund investment in ABCP.

What is an ABCP Program?                                          *Moody's Investors Service • 13*

Kelley_DZ_00092017



Kelley_DZ_00092018

## WHY ABCP PROGRAMS DEVELOPED[7]

The emergence of ABCP programs is attributable to a combination of competitive and regulatory factors affecting the banking industry. ABCP allows commercial banks to offer their corporate customers low-cost, off balance sheet funding. ABCP provides corporations with an alternative to direct debt issuance and term ABS. Finally, ABCP provides distinct advantages with respect to variable funding needs.

### ABCP Is a Low-Cost, Off-Balance Sheet Funding Source

As banks competed to provide low-cost financing to commercial and industrial customers, funding through ABCP programs became popular. Banking clients without a **Prime-1** rating found the ABCP programs particularly attractive. Few companies rated below **Prime-1** are able to access the corporate CP market reliably and at favorable rates. A company that becomes a Seller in an ABCP program can finance its receivables at rates comparable to prevailing rates for **Prime-1**-rated unsecured commercial paper. Companies that cannot issue their own commercial paper at comparable rates often find that a bank-sponsored ABCP program provides the lowest cost working capital financing.

ABCP programs also offer advantages to their bank sponsors. The programs are typically structured and accounted for by the banks as an off-balance sheet activity. If the bank were to provide a direct corporate loan, even one secured by the same assets, it would appear on the bank's balance sheet as an asset and the bank would be obligated to maintain regulatory capital for it. An ABCP program permits the Sponsor (i.e., the commercial bank) to offer receivable financing services to its customers without using the Sponsor's balance sheet or holding incremental regulatory capital.

### ABCP Provides an Alternative Funding Source

Even a Seller that can issue its own commercial paper at attractive rates may be drawn to bank-sponsored ABCP programs as an alternative source of financing. Typically, Sellers to ABCP conduits remain anonymous to investors. The Administrator reports asset type, industry, funding amount, credit enhancement levels, performance data and so on for each deal, but not the name of the Seller. Investors are protected by a secured interest in a diversified portfolio of assets and also by the additional protections—liquidity, program credit enhancement, pro-active management by the Administrator—provided by the ABCP program structure. ABCP investors are not directly exposed to the credit risk of the Seller. This means that conduit funding is not likely to be subject to the event risk that might be associated with corporate CP.

Also, a Seller may be able to achieve off-balance sheet accounting treatment for receivables financed through a bank-sponsored ABCP program. Although most Sellers are not subject to the same regulatory accounting constraints as are sponsoring banks, off-balance sheet accounting may be desirable for other reasons.

### ABCP Accommodates Variable Funding Needs

Finally, ABCP funding is short-term, and the amount of funding can be quickly increased or reduced depending on need. A company in a highly seasonal business may prefer ABCP financing because its borrowings can be matched to its seasonal needs. A company in a growing business may prefer ABCP because it is relatively easy and cost-effective to increase the facility size, rather than issuing additional term ABS.

Frequent issuers of term asset-backed securities also actively use ABCP programs as warehousing facilities. Assets can be financed in a conduit prior to term execution. The funding amount increases during the accumulation phase, and then is quickly reduced when the assets are packaged into a term asset-backed security.[8] These warehouse facilities are very common for auto loans, auto leases, residential mortgages and other mortgage-related assets.

---

[7]   For a more detailed discussion of many of these issues, see Moody's Special Report, *Pros, Cons and Considerations in Introducing an ABCP Conduit*, October 2002.
[8]   See *Moody's Approach to ABCP and Mortgage Financing Taking a New Look at an Old Favorite Rating Perspectives from the U.S., Europe and Australia*, Moody's Special Report, April 2001

Kelley_DZ_00092019

*Sidebar 3*
### Growth of the U.S. ABCP Market

The ABCP market started in the 1980s, but only became a significant source of funding in the 1990s. At the end of 2001, after a decade of double-digit annual growth rates, the outstanding amount of Prime-1 asset-backed commercial paper exceeded that of corporate commercial paper for the first time. Th Prime-1 corporate CP issuance actually peaked in November 2000, and has fallen by almost one-third since then, as issuers have lost their Prime-1 ratings and withdrawn from the direct issue market. Many of those "fallen angels" have turned to asset-backed financing, many using ABCP conduits.

The graph shows the amount of ABCP and corporate CP from 1995 to the present, based on data from the Federal Reserve. Also included is the size of the U.S.$ prime money funds. These funds are the largest single class of investors in ABCP, and their growth clearly parallels the growth of ABCP volume.

The table below shows the number of new conduits by conduit type, and the total number of ABCP conduits, annually from 1999 through 2002. This table is based on all conduits rated by Moody's and includes both U.S.-based and non-U.S.-based ABCP programs. (For more information on ABCP program types see Types of ABCP Programs on page 17).



*Figure S-3-1*
**ABCP Outstandings vs Unsecured Corporate CP**
Dec 1995 - Dec 2002 ($ Billions)

*Sources: Federal Reserve Board, iMoneyNet, Inc.*

*Figure S-3-2*
**New ABCP Programs by Type**

| Type | 1998 | % | 1999 | % | 2000 | % | 2001 | % | 2002 | % |
|------|------|---|------|---|------|---|------|---|------|---|
| Hybrid* | 0 | 0 | 1 | 2 | 4 | 8 | 4 | 13 | 4 | 31% |
| Loan-Backed | 1 | 2 | 2 | 3 | 3 | 6 | - | - | - | - |
| Multiseller | 26 | 51 | 25 | 41 | 16 | 33 | 10 | 31 | 9 | 69% |
| Other | 5 | 10 | - | - | - | - | - | - | - | - |
| Securities Arbitrage | 10 | 20 | 20 | 33 | 16 | 33 | 6 | 19 | 11 | 85% |
| Single-Seller | 9 | 18 | 13 | 21 | 9 | 19 | 12 | 38 | 7 | 54% |
| Total | 51 | 100% | 61 | 100% | 48 | 100% | 32 | 100% | 31 | 100% |
| Total Conduits | 269 | | 323 | | 339 | | 358 | | 363 | |

* A hybrid ABCP program combines the capabilities of 2 or more classifications of conduits. Usually it combines features of securities arbitrage facilities with multiseller and/or loan-backed programs.

**Kelley_DZ_00092020**

## TYPES OF ABCP PROGRAMS[9]

Moody's classifies ABCP programs in two ways. The first is by the type of credit support. ABCP programs may be fully-supported, in which case repayment depends primarily on the credit strength of a third party, or partially-supported, in which case repayment depends to a greater degree on asset quality.

The second way that Moody's categorizes ABCP programs is by program type. The major program types are multiseller, securities arbitrage—comprising credit arbitrage and structured investment vehicles—single seller and loan-backed. A sixth type, hybrid programs, combines the features of two or more program types. Hybrid programs most commonly combine the capabilities of multiseller, credit arbitrage and loan-backed programs. (See Sidebar 5, "The ABCP Market Today" on page 22 for the number of programs and the amount outstanding for each of these types.)

### Fully-supported versus Partially-supported Programs

The concepts of *credit risk* and *liquidity risk* are fundamental to an understanding of ABCP programs. Credit risk addresses the likelihood that the receivables will suffer losses and ultimately not be fully collectible. Liquidity risk is the danger that collections on receivables will not be received in time to provide funds for the payment of maturing ABCP. *Moody's analysis of an ABCP program encompasses the credit risk, the liquidity risk, and other factors discussed below.*

Typically, maturing ABCP is repaid by issuing new ABCP in an amount sufficient to make the needed payments. This is called "rolling" ABCP. If it is assumed that ABCP can always be "rolled over," then there is no liquidity risk. However, an assumption that ABCP can always be rolled over is not consistent with a **Prime-1** rating in light of the many factors that might trigger a disruption in the commercial paper markets in general or in the markets for ABCP in particular. An analysis of liquidity risk must start with the assumption that new ABCP cannot be issued to provide funds for the repayment of maturing ABCP.

Most ABCP programs benefit from a variety of support facilities. Each transaction is likely to have some form of first-loss credit enhancement such as overcollateralization. Timely repayment of ABCP and funding of the assets is ensured by liquidity facilities equal to the purchase commitment and greater than or equal to the amount of ABCP issued. The conduit may also have swing-line loan facilities available to cover unforeseen expenses or other cash shortfalls on a temporary basis.

The distinction between fully and partially-supported programs has to do with the primary source of credit protection provided to investors, or equivalently, the primary source of credit risk borne by ABCP investors. In fully-supported ABCP programs, investors are primarily exposed to the risk of a third party that guarantees repayment of the assets, and not to the risk of the assets themselves. In a partially-supported ABCP program, investors are primarily exposed to the risk of the assets themselves, though they may benefit in part from a variety of forms of third-party support.

### Fully-supported Programs

The earliest ABCP programs included a support facility that *directly* and *fully* ensured the full and timely payment of maturing ABCP. In such programs, which still exist today, the support facility typically consists of a letter of credit issued by a highly-rated bank (the Support Provider), which, in effect, directly guarantees the ABCP. Holders of ABCP issued under such an arrangement have the right to seek payment directly from the Support Provider if the issuer fails to fully retire ABCP at its maturity.

The Support Provider in such a program bears the risk that collections on the receivables in which the issuer has acquired an interest will ultimately be insufficient to fully reimburse the Support Provider for payments made to holders of the ABCP. That risk is referred to as the *credit risk* of the receivables. The Support Provider in such a program also bears the risk that collections on the receivables, although ultimately received, will not be received quickly enough to provide funds to retire maturing ABCP on its scheduled maturity date. That risk is referred to as *liquidity risk*.

The fact that the Support Provider bears both the credit risk and the liquidity risk insulates holders of the ABCP from both risks. The rating of such a program is, in most circumstances, the same as the short-term rating of the Support Provider. Moody's rating of a fully-supported ABCP program is based primarily on an analysis of the credit strength and liquidity of the Support Provider. The rating process does not typically include an analysis of the assets funded by the conduit.

[9]   See Sidebar 5: *The ABCP Market Today* on page 22 for information on the number and size of the programs rated by Moody's.

Kelley_DZ_00092021

**Kelley_DZ_00092022**

## Partially-supported ABCP Programs

The rise of bank risk-based capital standards around the world in 1988 imposed significant costs on Support Providers in fully-supported ABCP programs. Risk-based capital standards required Support Providers to hold regulatory capital for the entire face amount of ABCP outstanding under certain ABCP programs because the support facility has been viewed as a "direct credit substitute" and not merely as a loan commitment. The increased costs associated with providing direct credit substitutes motivated banks to find a more cost effective way to structure ABCP programs. The result was the creation of partially-supported ABCP programs, which were eligible for more advantageous treatment under the risk-based capital standards, and could continue to offer funding at attractive rates to Sellers.

*The primary distinguishing feature of a partially-supported ABCP program is that investors bear a portion of the credit risk.* The support facilities are not intended to fully insulate investors from the credit risk associated with the receivables. Investors must rely, to some degree, on the performance of the receivables in which the conduit has acquired an interest. However, if a partially-supported ABCP program has been assigned a rating of **Prime-1**, the magnitude of the credit risk borne by investors must be extremely small to be consistent with that rating.

## Transaction Support in Partially-supported  Programs

In a partially-supported ABCP program, there are generally a number of supporting facilities. Each transaction funded will typically have some form of first-loss credit protection. This is usually provided by overcollateralization, but might be in the form of a third-party guarantee or letter of credit. The second, which primarily addresses liquidity risk, is called the *liquidity facility*. The common practice today is to have a separate liquidity facility for each transaction in the conduit, but some programs have a program-wide liquidity facility that is available for all or for a subset of deals. Liquidity is typically available only to the extent that there are non-defaulted ("good") receivables available as collateral, though some liquidity facilities absorb a variety of risks associated with the assets or the Seller.

Finally, partially-supported programs have a secondary credit enhancement facility, often referred to as the *program-wide credit enhancement facility*. The credit enhancement facility is intended to cover any losses on the receivables in excess of the deal-specific enhancement. Program-wide credit enhancement is usually sized as the greater of a fixed dollar minimum amount and a percentage (*e.g.*, 8% or 10%) of the total amount of funding commitments made by the conduit.[100] In many programs, the credit enhancement facility may be drawn whenever there are insufficient funds available to repay maturing ABCP, in which case it may be used by the Issuer to obtain funds necessary for liquidity purposes as well as to cover credit risk.

## Rating Analysis for Partially-supported ABCP Programs

Moody's analysis of a partially-supported ABCP program is much more demanding than the analysis of a fully-supported program. The credit enhancement—both the transaction-specific first-loss enhancement and the program-wide facility—provides investors with only partial protection against losses on the underlying receivables. Therefore, Moody's considers and analyzes:

- The credit quality of the receivables relative to the available credit enhancement, both within the transaction and at the program level
- The quality of the Seller of receivables with respect to underwriting, servicing, and the ability to meet its support commitments
- The structure of the transaction, especially with respect to securing the conduit's interest in the receivables and terminating the transaction if performance deteriorates
- The support provided by the liquidity facility, if any, beyond pure timing mismatch between payments due on ABCP and cash received from the receivables

The analysis of each transaction in a partially-supported ABCP program is very similar to that of a term ABS transaction with the same type of collateral, and Moody's ABCP analysts work closely with their colleagues in term ABS as well as the corporate analysts in rating these transactions.

---

10 In some cases, program-wide credit enhancement may be specified as a percentage of the total ABCP outstanding, which will be less than the total funding commitments if not all facilities are fully drawn.

Kelley_DZ_00092023

## Fully-supported Deals in Partially-supported Conduits

Often a partially-supported ABCP conduit funds one or more fully-supported transactions, though the majority of the transactions are only partially-supported. There are a number of means commonly employed to provide full credit support to a transaction. These transaction may benefit from a surety bond or "wrap," or be protected by a letter of credit equal to the size of the funding commitment. Some transactions are protected through a liquidity facility that funds for the amount of ABCP outstanding for the transaction without regard to the level of defaulted collateral. For the fully-supported transactions, though not for the entire conduit, investors are exposed to the risk of the highly rated support provider, not the credit quality of the underlying assets. Moody's rating analysis of these transactions is directed at the credit strength of the support facility and not that of the assets.

Conduit Sponsors structure transactions to be fully-supported for several reasons. Sometimes a conduit sponsor wishes to close a transaction quickly. Since the credit analysis of a fully-supported transaction is focused on a structural review rather than an asset review, a fully-supported transaction can typically be reviewed and closed more quickly than a partially-supported one. A fully-supported transaction can subsequently be restructured as partially-supported at a later date. Sometimes transactions are fully-supported because the credit quality of the deal is not consistent with the rating of the conduit, and full support is the only way that conduit funding is possible. A similar situation may arise if the Sponsor wishes to offer the Seller an advance rate that is higher than would be consistent with the conduit's rating. By insulating the conduit from the credit risk associated with the assets financed, the Sponsor gains flexibility in negotiating the terms of the transaction with the Seller.

## Conduits Classified by Program Type

ABCP conduits are classified by the purpose of the program and the type of assets funded. The major program types are multiseller, securities arbitrage, single-seller, and loan-backed. Within securities arbitrage there are two major categories, credit arbitrage and structured investment vehicles (SIVs). Finally, hybrid programs combine the features of two or more of these types, most commonly multiseller, credit arbitrage and loan-backed. Note that the classification by full or partial support cuts across all of these program types, in that within each there are instances of both fully and partially-supported programs.

### Multiseller ABCP Conduits

More than half of the outstanding ABCP in the market is issued by traditional partially-supported multiseller ABCP conduits.[11] These conduits are typically sponsored by a commercial bank for the purpose of providing low cost, off-balance sheet working capital financing to its clients. Each multiseller conduit typically provides financing to a wide variety of industries, companies and asset types, offering ABCP investors a well-diversified pool of supporting assets. Each transaction funded by the conduit usually has some form of first-loss protection and benefits from a separate liquidity facility[12]. The liquidity facility typically funds only for non-defaulted assets, so that investors are exposed to the risk of asset performance. However, as noted above, some transactions may be fully-supported by a surety bond, letter of credit, liquidity facility, or other form of guarantee.

Each transaction in a multiseller program is usually structured similar to a term securitization or a secured loan and is collateralized by a pool of assets. In many cases a conduit actually purchases a rated term asset-backed security or an unrated series issued by a master trust that is structured identically to publicly rated series issued by that master trust. The conduit makes advances against the asset at less than par, thus creating a level of overcollateralization that serves as pool-specific credit enhancement. Alternatively, pool-specific credit enhancement may be provided by a cash reserve, letter of credit, credit insurance or partial guarantee, in each case in a form and of a credit quality consistent with the rating of the conduit.

Most partially-supported multiseller conduits also have credit enhancement at the conduit level. This program-wide credit enhancement is typically sized at the greater of a minimum fixed amount and a percentage of the funding commitments. It may be drawn up to its full amount for any asset funded by the conduit, providing an additional degree of protection to investors by effectively cross-collateralizing the asset portfolio.

### Single-Seller ABCP Conduits

Unlike multiseller conduits, single-seller ABCP conduits provide financing for assets originated by only one com-

---

11  Fully-supported multiseller conduits support the same variety of assets, but Moody's rating analysis is directed at the support provider, and not the credit quality of the assets.

12  Some multiseller conduits employ a program-wide liquidity facility provided by the sponsoring bank.

---

THE FUNDAMENTALS OF ABCP

Kelley_DZ_00092024

pany, or related to one company's business operations. Such conduits represent a smaller percentage of the ABCP market than multiseller programs.

The company whose assets will be financed usually sponsors single-seller conduits. If the company is highly rated, then the sponsoring company may provide both liquidity and credit enhancement to the conduit. In this case the investors are exposed entirely to the risk of the sponsoring company. Single-seller programs may also be fully-supported by some form of third-party guarantee, either alone or in combination with a liquidity facility. In this case investors are exposed to the credit risk of those support providers.

If the company's credit quality is not high enough to support the transaction on its own, or if the company wants to achieve off-balance sheet treatment and does not guarantee the program, then the rating will depend on the credit quality of the assets and the support facilities. Typically the assets are credit-enhanced using overcollat-eralization, either alone or in combination with some other form of support such as a letter of credit from a highly rated bank. A liquidity facility from a syndicate of **Prime-1**-rated banks is available to fund for non-defaulted assets and to bridge any timing differences between the assets, funding requirements and ABCP maturities.

### Securities Arbitrage ABCP Conduits [13]

Securities arbitrage conduits are established to invest in various fixed income securities such as government and agency securities, asset-backed securities, mortgage-backed securities, corporate bonds, and bank loans. These conduits use the proceeds of low-cost ABCP to fund the purchase of higher yielding, longer-term marketable securities. The resulting spread is passed on to the sponsoring institution.

Securities arbitrage conduits typically have a credit and investment policy that describes the type of securities that may be purchased, the required ratings, and other parameters such as concentration limits, diversification requirements, interest and exchange rate risk sensitivity and so forth. These guidelines are designed to accom-modate the business purpose of the sponsoring organization and also Moody's requirements with respect to maintaining the desired rating on the program. The guidelines may also specify the type, size and credit quality of various support facilities consistent with the program rating.

Some securities arbitrage programs are fully-supported; in which case the rating analysis focuses on the credit quality of the guarantor. But most securities arbitrage conduits can be further classified by whether they expose investors to the credit risk or to the market value risk of the underlying securities. Securities arbitrage programs that primarily expose investors to the credit risk of the underlying securities are similar to cash flow CDOs. Credit arbitrage programs are the largest class of this type of program. Securities arbitrage programs that expose investors to the market value risk—recognizing that credit risk is an important factor in price volatil-ity—are similar to market value CDOs. Structured Investment Vehicles (SIVs) are the largest class of this type of program. Both credit arbitrage programs and SIVs typically invest in highly rated securities.

### Credit Arbitrage ABCP Conduits [14]

Credit arbitrage conduits offer banks a method of establishing a securities portfolio with the advantages of off-balance sheet accounting treatment and reduced regulatory capital charges. The securities are generally rated at least Aa2 when purchased. The program liquidity facility is available to fund for the face amount of ABCP issued unless a security is defaulted or rated in the Caa category. This structure protects investors against any changes in the market value of security up until the security defaults.

Credit arbitrage programs typically operate with no program-wide credit enhancement. Instead they rely on the high credit quality of the securities purchased along with a requirement to add credit enhancement or sell a security after it has been downgraded below the Aa level. The required amount of credit enhancement is sized dynamically based on the ratings of the securities in the conduit's portfolio. If after a downgrade the required credit enhancement increases, ABCP cannot be issued unless the available credit enhancement equals or exceeds the required amount. If ABCP cannot be issued, the liquidity facility will be drawn upon to purchase the downgraded security at par. The proceeds will then be used to repay maturing ABCP, thus removing any increased risk to investors. Some programs require the downgraded security be sold at par value to the liquid-ity provider after a short period, but prior to any CP maturity, if credit enhancement hasn't been increased.

---

13  See Moody's Special Report, *Comparing and Contrasting Credit Arbitrage ABCP Programs and Structured Investment Vehicles*, January 2002.
14  See Moody's Special Report, *Moody's Approach to Evaluating Credit Arbitrage ABCP Programs*, August 2002.

Types of ABCP Programs

**Kelley_DZ_00092025**

THE FUNDAMENTALS OF ABCP

Kelley_DZ_00092026

The combination of a dynamic credit enhancement requirement and a liquidity support facility narrows investors' credit exposure considerably. Effectively, investors are only exposed to the risk of a precipitous decline in a security's rating, from Aa or higher to Caa or default, in a relatively short period. The probability of such a precipitous decline for a security rated Aa2 or higher is very low and consistent with the conduit's Prime-1 rating. If the program holds securities rated below Aa then credit enhancement is necessary in order to bring the portfolio to a level of credit quality consistent with a Prime-1 rating.

## Structured Investment Vehicles [15]

Market value ABCP conduits are generally established by investment managers in order to secure a stable source of financing for a securities portfolio. Because these programs rely on third-party support providers, they are structured to minimize the use of credit enhancement and liquidity facilities. The primary risk to investors is that the market value of the securities purchased falls below the amount needed to repay the debt issued by the conduit.

Structured Investment Vehicles or SIVs are the most prevalent type of market value ABCP program. SIVs issue Aaa-rated medium-term notes and Prime-1-rated ABCP to fund their investment portfolio. The issuance of MTNs reduces the amount of liquidity support required to ensure timely repayment. SIVs have strictly enforced operating guidelines with respect to asset types, ratings, concentration limits and diversification.

SIVs also require substantial analytic resources on the part of the program administrator. Potential portfolio volatility with respect to interest rate and exchange rate movements must be analyzed daily and maintained within tight limits. Required credit enhancement, provided by subordinated capital notes, is determined by modeling the potential market value risk over the time horizon that would be required to liquidate the portfolio and repay all outstanding ABCP and MTNs. Liquidity is provided both by the securities themselves as well as by a liquidity facility sized to be a fraction of outstanding ABCP. The required amount of liquidity is determined by analyzing the difference in cash received from the assets and payments due on maturing liabilities over a one-year horizon. All of these tests—sensitivity, credit enhancement, liquidity—are run daily, and any violation must be corrected in a relatively short period of time. Failure to correct a violation leads to a variety of limitations on the SIVs operations. Initially no new assets may be purchased. If a cure is not effected after a certain period, then no further CP and MTNs may be issued. Ultimately the portfolio is liquidated and the outstanding debt is defeased in order to prevent further deterioration and to insure that investors are repaid.

## Loan-Backed ABCP Conduits [16]

Loan-Backed ABCP conduits were established to fund portfolios of bank loans made to corporate customers, and are similar to CLOs. Credit enhancement is based on the number and size of the loans funded, and the credit quality of the obligors. Liquidity in loan-backed conduits is provided by the loans themselves, as they are maturity-matched to the ABCP issued to fund them. Investors are exposed to the risk that the obligor does not repay the loan in a timely fashion, due either to bankruptcy, default or late payment.

As the loan-backed ABCP programs evolved, they have tended to finance mostly companies with low investment grade or non-investment grade ratings, and unrated companies. Since required credit enhancement is a function of the borrowers' ratings, the required credit enhancement levels are quite high. With the increase in costs associated with ABCP support facilities, these programs have become expensive to maintain. In addition, loan backed programs are vulnerable to pending changes in FASB accounting regulations regarding consolidation of certain ABCP conduit exposures with sponsoring banks' balance sheets. [17]

As a result of the higher costs and adverse accounting changes, these programs have declined in importance. Banks with loan-backed programs have been winding them down, and new ones are not being created to replace them.

## Hybrid ABCP Conduits

Hybrid ABCP conduits are those that feature characteristics of more than one type of ABCP program. They are typically combine features of partially-supported multiseller and securities arbitrage ABCP conduits, although a few programs also incorporate a loan-backed component as well.

---

[15]   See Moody's Special Reports, *An Introduction to Structured Investment Vehicles*, January 2002, and *Structured Investment Vehicles   Recent Developments*, January 2003.
[16]   See Moody's Special Report, *Rating Commercial Paper Programs Backed by Maturity-Matched Loans*, September 1999.
[17]   See Moody's Special Reports, *ABCP 2002 Year in Review: Maturity and a Pause in the U.S., Youth and Rapid Growth in Europe*, January 2003., and *The FASB Consolidation Proposal: The End of ABCP as We Know It?* October 2002.

Kelley_DZ_00092027

One of the reasons for the appearance of hybrid programs is that investors prefer to purchase ABCP issued by conduits that issue paper on a regular basis and that maintain a minimum of $1 to $2 billion outstanding at any given time. The challenge faced by smaller bank sponsors or new ABCP programs is that building a portfolio of receivables is a time-consuming process. Marketing, structuring and funding a receivable-backed transaction can involve months of lead time. Smaller sponsors may not be in a position to assemble a multi-billion dollar receivable portfolio at all. By combining the properties of a multiseller conduit with those of a securities arbitrage program, a sponsor can grow the conduit's portfolio more quickly.

While a hybrid program offers greater efficiency in terms of issuance, it does suffer from the disadvantage of agglomeration. Many investors prefer single-purpose conduits. They are easier to understand and they allow investors to easily choose a particular type of conduit exposure. However, a number of conduit sponsors find that the advantages of a hybrid program outweigh the disadvantages in terms of market acceptance.

**Kelley_DZ_00092028**

## CONDUIT STRUCTURE AND SUPPORT PROVIDERS

### Overview

A typical ABCP program contains a number of components: the conduit special purpose vehicle itself, a variety of support providers playing well-defined roles in the conduit operations, and the transactions funded by the program. *Figure 1* illustrates some of these relationships.



In the center of the diagram is the conduit special purpose vehicle (SPV) itself. The SPV is typically limited in purpose, is minimally-capitalized and has no employees. The SPV is owned by the "Conduit Owner", which is usually a service company formed for the purpose of owning and providing management and officers for SPVs.

The owner's role is actually minimal. The Administrator, usually also the Sponsor of the program, has true responsibility for the conduit's strategic and day-to-day operation. In most cases the Administrator is a commercial bank, though in some cases other experienced parties act as Administrator or share the role with a third party. The Administrator negotiates support arrangements, structures and oversees the transactions funded by the conduit and manages the funding through the issuance and repayment of ABCP.

The various Sellers—originators of the funded assets—are shown at the top. The structure of these transactions is discussed in detail in the Appendix: Asset Purchase Structures on page 61. Typically these transactions are structured in a manner similar to a term ABS transaction. The Seller transfers assets in a true sale to a purchasing SPV. The SPV funds its purchases with a loan from the ABCP conduit. The Seller is usually the servicer of the assets. The Administrator monitors asset performance, and often has the right to name a replacement servicer if the Seller defaults in its obligations as servicer.

Many, but not all conduits grant a security interest in the conduit's assets to ABCP investors. If this is the case, the ABCP program structure includes a Collateral Agent or a Custodian to hold assets in trust for the benefit of the investors.

A multiseller conduit often has program-wide credit enhancement and usually has deal-specific liquidity backup lines, as noted in the diagram to the left and right of center. The liquidity backup serves to bridge timing mismatches between the repayment of maturing ABCP and either cash payments from the transactions or the proceeds of newly issued ABCP. Liquidity draws are typically available to the extent the conduit has good—non-defaulted—assets to sell to liquidity providers or to post as collateral for a liquidity loan. The program credit enhancement serves as a final backstop. Typically program credit enhancement is available to cover any ABCP repayment shortfalls after all other sources of funds (including liquidity draws) have been exhausted. A conduit may also have a Hedge Counterparty (not shown) if interest rate or currency mismatches are material.

Kelley_DZ_00092029

### Sidebar 6
## The European ABCP Market

The European ABCP market continued to grow rapidly in 2002, increasing to $178 billion outstanding issued by 58 conduits at year-end from $135 billion at the start of the year. In addition, fifteen structured investment vehicles (SIVs) rated and monitored by Moody's London office had $41.5 billion of ABCP and $49.6 billion of MTNs outstanding. Figure S-6 shows the growth of ABCP in Europe for the past five years. Moody's expects the European ABCP market to continue to grow.



Figure S-6
Growth of European ABCP Market

European programs issue in a number of currencies. In fact, some 69% of issuance is U.S.$ CP. Approximately 21% is Euro CP[2], and the remaining 10% are Billets de Tésorerie (BTs, see Sidebar 8 on page 32 "Billets de Tésorerie—the French CP").

The Euro CP market has been growing rapidly—by 77% last year alone—due in part to sellers' preferences for match funding assets and liabilities in the same currency. Many U.S.-based ABCP conduits are adding the ability to issue Euro CP in order to allow for access to more than one market.

There are many similarities between U.S. and European ABCP programs. European conduits are typically created by a sponsor to fund receivables generated by their clients. Historically European conduits initially funded themselves in the U.S.$ CP market to benefit from that market depth and low funding costs. Increasingly, however, European conduits are electing to issue in both the U.S. and European market, or exclusively issue in the European market.

Each country has a preferred way of organizing a conduit as a special purpose vehicle, much as Delaware-based entities are preferred in the U.S.. The Jersey Channel Islands and other offshore English-law jurisdictions are commonly seen in the U.S. for tax purposes. The SPV is established as a limited purpose corporation owned by a charitable trust. All assets are required to be held outside of the jurisdiction, and all investors must be non-residents.

Overall, European conduits demonstrate more differences than similarities to their U.S. counterparts. The legal, tax, and accounting requirements of the seller's country, and lack of historical precedent often dictate that most structures are tailored to adapt to the specific circumstances. In response to some of these restrictions, many European conduits use a distinct issuer/purchaser structure, whereby the issuer does not directly hold assets. Historically, the European market has adapted some of the structural innovations first debuted in the U.S. However, the widespread use of synthetics recently seen in the European market suggests that the European market will foster innovations as well.

European conduit transactions have been structured more cleanly than in the U.S.. Borrowing bases in liquidity facilities are less likely to fully support the repayment of ABCP, or absorb risks such as dilution, which is commonly seen in the U.S. There tends to be less program credit enhancement than in the U.S., set at a lower percentage of funding commitments and with lower or no floor amount. Post review has currently only been granted in limited incidences.

Moody's provides detailed reporting on the European ABCP market. There is a monthly European ABCP Market Summary which presents information on the size of the market, the largest sponsors and portfolio composition. Moody's Performance Overviews, also published monthly, provides detailed information on a conduit basis, including asset purchases and terminations, support providers and performance. The European ABCP Market at a Glance: Moody's ABCP Market Snapshot summarizes the main structural features of each conduit. In January of each year there a year-in-review piece summarizing important trends and prospects for the coming year. Finally, like all Moody's rated ABCP programs, each European conduit is covered in detail in "Moody's Global Asset-Backed Commercial Paper Market Review" published quarterly.

1  See Moody's Special Comment, 2002 Review and 2003 Outlook: A Rising Star-The Uninterrupted Growth of the European ABCP Market, January 2003.
2  Euro CP is issued from Europe. It may be denominated in many other currencies besides Euros, and may be issued to investors & continents within, or outside of, Europe.

Kelley_DZ_00092030

The actual issuance and repayment of ABCP is handled by an Issuing and Paying Agent (IPA) also called a Depositary. The IPA issues ABCP, in the form of formal notes or electronically, to investors. The IPA also makes payments to investors when the ABCP matures. The IPA usually has the right to request funds directly from the liquidity banks or from the credit enhancement providers if funds from the issuance of new ABCP or cash collections from the assets are insufficient.

One or more Placement Agents (not shown) broker the sale of ABCP. Placement Agents are typically investment banks that specialize in the sale of ABCP for a commission. The Placement Agents consult with the Administrator on the amount, maturity and interest rate of ABCP to be issued. The Placement Agents coordinate with the IPA in seeing that funds are received from investors in return for the ABCP delivered.

## The Conduit Special Purpose Vehicle

The heart of an ABCP program is a minimally capitalized special purpose vehicle that is limited in its activities to purchasing assets and funding those purchases through the issuance of ABCP. In the United States, the SPV often takes the form of a limited purpose company, established and organized under the laws of Delaware. However, an SPV may be organized as a cooperative corporation, a trust, a limited liability corporation or partnership, or a limited partnership.

In Europe, the typical conduit is organized as a limited purpose corporation under Jersey, Channel Island law, with charitable trust as owner. Similar structures are possible in other English law jurisdictions such as Bermuda, the Bahamas or the Cayman Islands. In France, the SPV may be organized as a Socété Anonyme.

In its rating process, Moody's reviews the corporate structure of the conduit SPV in order to determine that it is organized to promote "bankruptcy remoteness." A bankruptcy-remote entity is not immune to the risk of bankruptcy, but is structured so as to render the risk of bankruptcy highly unlikely. The risks that bankruptcy presents to ABCP investors are discussed in Structural Risk on page 36.

There are several components that are necessary in order to minimize the potential for an SPV bankruptcy. First, the legal structure should isolate the SPV from any entity likely to enter bankruptcy. The owner of the conduit should itself be unlikely to enter bankruptcy and the SPV should be unlikely to be consolidated into the owner's bankruptcy should it occur. Jurisdictions that are commonly used to domicile securitization vehicles typically have one or more structures, like those mentioned above, which achieve this goal.

Second, the structure should make it unlikely that the SPV itself will enter into bankruptcy voluntarily, except in the gravest circumstances. This goal is generally achieved by requiring the SPV to have independent directors or owners, and by requiring that these independent directors consent to any voluntary bankruptcy filing. In some cases the SPV's constituent documents may prohibit it from declaring voluntary bankruptcy, or strictly limit the circumstances in which it may occur.

Third, the SPV should not have any employees, and the SPV's purpose should be limited to issuing commercial paper and using the proceeds to purchase or make loans against assets. Only those activities related to and necessary for that purpose should be permitted. This reduces the chance of insolvency from a liability unrelated to the conduits stated activities.

Fourth, all parties engaged to provide services to the conduit should do so in agreements structured to limit the risk of a claim by those parties. Typically, service providers agree not to petition the conduit into bankruptcy until all the ABCP has been repaid. In addition, they agree to abide by the priority of payments set out in the conduit's documents. Providers agree that they have no claim in a bankruptcy proceeding so long as all funds are distributed as agreed. The formation documents of conduit corporations typically restrict the ability of the conduit to enter into any other types of contractual relationships.

Finally, Moody's asks to receive notice of all amendments to the program documents. Moody's may revise its rating opinion of the conduit in accordance with the materiality of the amendment and its effect on the bankruptcy remoteness of the conduit. Conduit corporation documents typically restrict the ability of a conduit to enter into any contractual arrangement without notification to the rating agencies and require a confirmation of the rating for any material changes to the structure.

## Using Corporations and LLCs as Conduit Structures

In the United States, ABCP sponsors have established conduits using the corporate form. Recently, however, the vast majority of conduits have been organized as limited liability companies (LLCs). Both entities are formed and their elements of corporate governance are established under the statutory provisions of state law, most often Delaware law.

Kelley_DZ_00092031

Corporations have a long and venerable history as SPVs in the structured market.[18] Their unique role as a perpetually existing entity and the judicial precedent that demonstrates strong protections against violation of corporate separateness from parent companies have made them ideally suited as bankruptcy-remote vehicles. Management is through a board of directors, with ownership interests held by shareholders.

LLCs are hybrid structures, sharing attributes of both corporations and partnerships. They offer limited liability to equity holders and generally pass through income without entity-level taxation to their equity holders. They provide significant flexibility from a tax and business perspective. As a consequence, nearly all new ABCP conduits are organized as LLCs. Equity ownership of LLCs consists of "membership" interests held by one or more natural persons or legal entities. For tax and accounting reasons, ABCP conduits and other SPVs organized as LLCs typically have a single member. However, as hybrid entities akin to partnerships, LLCs are subject to dissolution, which raises special concerns involving bankruptcy-remoteness, that are discussed in a later section.

---

18   See Moody's Special Report, *Handle with Care: Single Member LLCs in Structured Transactions*, March 1999.

Kelley_DZ_00092032

## Who's Who in an ABCP Program: Service and Support Providers

An ABCP program is a special purpose vehicle with no employees. All of the activities associated with the administration of the conduit are handled by one or more firms that are contractually obligated to perform certain tasks. As part of its rating process, Moody's reviews the conduit's documentation to determine that parties with the requisite expertise and resources undertake the conduit's administrative functions. The conduit's documentation must precisely specify the duties and responsibilities of each service provider. In addition, Moody's meets with major service providers and administrators in order to understand their resources, capabilities and commitment.

*Table 1* lists the main parties involved in an ABCP conduit, the name of the agreement that documents their role, and a brief description of that role.

| | Table 1 Conduit Service and Support Providers | |
|---|---|---|
| Name | Agreement Name | Responsibilities |
| Administrator | Administration Agreement | Overall responsibility for the management and operation of the conduit |
| Manager | Management Agreement | Management of SPV, provision of corporate officers, preparation of tax and regulatory filings based on information from the Administrator |
| Issuing and Paying Agent | Issuing and Paying Agent Agreement | Issuance and repayment of commercial paper. |
| Depositary | Depositary Agreement | Issuance and repayment of commercial paper in European programs. |
| Placement Agent | Placement Agency Agreement | Sale of commercial paper to investors |
| Collateral Agent | Security Agreement | Usually a trust department. Holds the security interest in all assets of the conduit for the benefit of the investors |
| Custodian | Custody Agreement | Usually the custody department of a commercial bank. Maintains physical, and more recently electronic, control of conduit assets. |
| Liquidity Agent | Liquidity Agreement, or Liquidity Asset Purchase Agreement, or Liquidity Loan Agreement. | Management of bank syndicate that provides backup liquidity lines to the conduit with respect to a single deal or for the entire program. Receives requests for funds from the conduit and passes them on to the liquidity banks, and returns funds from those banks to the conduit. |
| Liquidity Bank | Same as Liquidity Agent | Provision of a liquidity backup line to the conduit. |
| Credit enhancement provider | Credit Agreement, or Credit and Reimbursement Agreement, or various other | Provision of a credit enhancement facility. Often an irrevocable letter of credit provided by a commercial bank that may be drawn by the conduit at any time to repay ABCP. |
| Hedging Agent | Hedging Agreement | Arrangement of hedging agreements covering interest rate and foreign exchange rate risk for the conduit. |

Kelley_DZ_00092033



## Administrator

The Administrator has the most important role in an ABCP program because it takes overall responsibility for the proper functioning of the program. Moody's considers the role of the administrator and the agreements governing the administrator's activities to be the heart of an ABCP program.[19] Beyond the details specified in the documents, Moody's expects the Administrator to be committed to the smooth operation of the conduit and to be willing to take the necessary steps to see that the other parties perform as expected.

The administrator's main functions consist of:

- Identifying, reviewing, structuring, and recommending assets for purchase or funding by the conduit
- Arranging for liquidity, credit support, and hedging for assets funded by the conduit
- Presenting new transactions to Moody's for review and rating confirmation prior to funding
- Arranging to have ABCP issued in the appropriate amounts, maturities and discount rates consistent with the business purpose and program documents
- Arranging for the prompt repayment of maturing ABCP, either from the issuance of new ABCP, cash from the assets or by timely draws on liquidity, credit enhancement, or other support facilities
- Arranging for the prompt payment of all conduit expenses from funds available as provided for in the program's priority of payments
- Enforcing the terms of all asset funding agreements especially with respect to timely receipt or payment of funds due
- Monitoring the performance of the asset pools in the conduit's portfolio, relative to transaction borrowing bases, and performance triggers and other relevant collateral information
- Provide information on the status of the program and its funding commitments to investors, Moody's and the support providers as appropriate

19  See Moody's Special Report, *Moody's Approach to Reviewing Administrators The Importance of Being Earnest*, March 2001

---

**Kelley_DZ_00092034**

- Monitoring required program credit enhancement level and amount of liquidity supporting ABCP issued and outstanding
- Monitoring contacts, ratings, and expiration dates of all credit and liquidity support facilities, and arrange for renewal or replacement as needed
- Monitoring ratings, payment dates, and other relevant information on securities held (for securities arbitrage programs)
- Daily mark-to-market of all securities in the portfolio (for market value securities arbitrage programs)
- Ensuring that all tax and regulatory filings and payments are made in a timely fashion
- Directing the activities of support providers by giving instructions or notice as necessary

In some programs these functions are divided among several parties. In others, the Administrator may take on additional duties such as arranging hedging agreements to deal with exchange rate risk. In some programs the Administrator may be called the Trustee or another title altogether. In all programs, there should be one party with overall responsibility for conduit administration.

### Third-Party Administrators

The ABCP market has seen a growing use of third-party administrators—someone other than the sponsor of the ABCP program—running the day-to-day operations. These third-party administrators are often banks that have had years of experience managing their own ABCP programs. In other cases, the third-party Administrator is a management company that has been involved providing corporate services to ABCP programs and has expanded their activities to include the role of administrator.

Third-party administrators pose several concerns from a credit perspective. Third-party administrators may have less experience than traditional administrators may in managing an ABCP conduit. An unrated administrator may not have the financial resources to indemnify the conduit for losses stemming from its own negligence. Finally, third-party administrators typically do not have a financial stake in the conduit, either as a strategic part of their business, or as a provider of liquidity and credit enhancement. In evaluating a third-party administrator, Moody's focuses particularly on the administrator's experience and resources. In addition, the administration agreement is carefully analyzed to ensure that the administrator's duties and fees are clearly enumerated.

There are several reasons that an ABCP conduit sponsor might choose to use a third-party administrator. Some of the newer or smaller bank conduit sponsors do not have the experience or resources to run the day-to-day operations of a conduit. The bank may also have an expensive overhead structure that leads to a material cost for the incremental hires needed to run an ABCP program. Relying on an experienced administrator rather than establishing their own conduit management operations can result in lower costs. Typically, however, the sponsor retains all credit and administrative functions with regard to the assets, such as underwriting and credit approval for new sellers, as well as monitoring the performance of asset pools. The sponsor is generally required to indemnify the conduit for errors of the third-party administrator, especially if material administrative functions have been delegated, such as ABCP issuance, repayment, and hedging. If the program sponsor is a non-financial institution, lacking in experience, credit ratings, and financial resources to remedy any errors, the appointment of an experienced, rated third party to provide some amount of administrative services and to indemnify for performance would be considered a positive factor in Moody's rating analysis.

### Owner/ Manager

The legal owner of the conduit is typically a third party independent of the sponsor. In the U.S. it is usually a shell company controlled by a service provider that also acts as Manager of the conduit. The most common third-party owners of U.S. ABCP conduits are Global Securitization Services LLC, Amacar Holdings, and Lord Securities. In English law jurisdictions a charitable trust often holds ownership of the conduit, and this trust is established and managed by a law firm that provides similar services as a Manager. In both cases these firms provide corporate officers and board members for the conduit.

The Manager is responsible for the corporate affairs of the conduit as a legal entity, not the operations with respect to commercial paper or assets. These duties typically include providing a board of directors, providing a legal address, maintaining corporate bookkeeping records, preparing tax returns and filing required regulatory statements. Although a third party not affiliated with the Sponsor often owns the conduit, the Sponsor actually controls the activities of the conduit by acting as the Administrator. A Management Agreement governs the relationship between the Administrator and Manager, while the corporate formation documents limit the actions of the Owner.

Kelley_DZ_00092035

### Issuing and Paying Agent or Depositary

The Issuing and Paying Agent (IPA), sometimes called the Depositary, is responsible for issuing ABCP, either electronically or in certificate form, and repaying maturing ABCP. This role is documented in an Issuing and Paying Agency Agreement, sometimes called a Depositary Agreement. While the IPA may be part of the same bank as the Administrative Agent, a separate trustee group within the bank usually performs the IPA function. This role is more frequently performed by a third-party institution.

Almost all ABCP issued today is held in electronic book entry form and is cleared through one of the electronic clearing systems, either The Depository Trust Company (DTC) in the U.S. or Euroclear and Clearstream in Europe. ABCP is issued to investors upon instruction from the Placement Agent. ABCP is repaid at maturity when presented to the IPA for repayment with the holder of record at maturity based on payment instructions. The IPA typically has working arrangements with one or more of the electronic clearing systems so that it can administer these activities through those systems. The duties of the IPA are similar to those of a trustee.

The actual cash movement between the conduit and the ABCP investors generally takes place via a "Commercial Paper Account," which both receives the proceeds of newly issued ABCP and is used to repay maturing ABCP. Most ABCP is repaid from the proceeds of newly issued ABCP, a process called "rolling" ABCP. The IPA typically holds the Commercial Paper Account in trust for the benefit of the CP investors. As funds are received or paid at different times during the business day, the IPA may at its discretion advance funds on behalf of the conduit on an intraday basis, something known as a "daylight advance." The IPA will usually advance funds if it is certain that by the end of the day all cash inflows and outflows will match up.

In order to provide for timely repayment, the IPA is required to determine if the CP account has sufficient funds to repay maturing ABCP each day, either from the proceeds of new ABCP or amounts deposited by the Administrator. If not, the IPA gives notice to the Administrator and requests that additional funds be provided. In many programs the IPA has the obligation and right to draw on the liquidity and credit enhancement facilities directly, rather than through the Administrator, if it needs funds for timely repayment.

### Placement Agents and Dealers

The CP Placement Agent serves as an ABCP dealer and provides the conduit access to investors, under the terms of a Placement Agency Agreement. A Dealer is usually an investment bank, or the investment banking arm of a larger financial corporation. Most Dealers maintain a trading desk that makes a market in the conduit's ABCP, and a marketing group that presents the conduit to prospective investors. An ABCP conduit typically uses two or three placement agents including an affiliate of the Sponsor, if the Sponsor has placement capabilities, in order to ensure that funding will be done on competitive terms.

---

**Kelley_DZ_00092036**

The Placement Agent works closely with the Administrator and the IPA to facilitate the sale of ABCP. The Administrator determines the amount of ABCP required for funding new assets or repaying maturing ABCP. Either the Administrator or the IPA relays that information to the Placement Agent on a daily basis. The Placement Agent then informs the Administrator of the likely discount rate for ABCP issued at different maturities. The two then decide how much ABCP to issue at each maturity, based on cost, expected cash flow from the conduit's assets, and the currently outstanding ABCP. When the ABCP is sold, the Placement Agent informs the IPA of the amounts, maturities and the purchasers.

The Placement Agent also screens investors to be sure that they are qualified and eligible to invest in the conduit's ABCP. Almost all ABCP programs are structured to qualify as exempt from registration under the Investment Company Act of 1940 and are also structured so that the commercial paper notes issued qualify as exempt under the Securities Act of 1933. In order to preserve this status, ABCP can only be sold to "qualified purchasers" as defined by the Investment Company Act and "Qualified Institutional Buyers" or QIBs under Rule 144a[20] of the Securities Act of 1933. The Placement Agent typically requires new customers to provide certain information in order to confirm this status. The Placement Agent also evaluates a client's counterparty risk as a purchaser of ABCP.

## Collateral Agent or Security Agent

ABCP investors often hold or benefit from a security interest in the assets of the ABCP program. In order to maintain that security interest, the conduit must have and maintain a perfected first priority lien, since the assets secure the financing provided. In partially-supported programs there is some degree of reliance on these assets to repay maturing ABCP. The Collateral Agent must ensure that inappropriate parties do not share a security interest or gain a priority interest in assets that are pledged to investors. In some programs, the loss of a first priority security interest could jeopardize repayment of ABCP.

The Collateral Agent, sometimes called the Security Agent or the Trustee, receives a security interest from the conduit in all of the conduit's assets, all rights and interests under all of the program documents, and all other accounts and investments. The Collateral Agent holds this security interest for the benefit and repayment of the investors, support providers and service providers. The Collateral Agent's role is documented by a Collateral Agency Agreement or a Security Agreement, sometimes called a Security and Intercreditor Agreement. That agreement broadly lists the assets and interests covered and the procedures to be followed for holding them and maintaining the necessary security interest.

The Collateral Agent, based on information provided by the Administrator, performs or verifies that the Administrator has performed, the tasks necessary to maintain a perfected first priority security interest in the purchased assets. The Collateral Agent typically has the authority to direct the Administrator to take any steps it deems necessary to maintain that interest. The Collateral Agent also exercises certain of the conduit's rights and interests in the assets on behalf of the secured parties. As assets are acquired, sold or transferred, the Collateral Agent takes possession of the assets or arranges proper transfer and holds the proceeds of sale in accounts held in trust for the conduit. Normally this will be done according to instructions received from the Administrator. However, during an ABCP program liquidation event, the Collateral or Security Agent may also have the right or obligation to take control over the assets on behalf of investors and arrange for their orderly sale, repaying investors and other creditors from the proceeds.

### Not All Programs Are Secured

Not all ABCP programs grant a security interest in assets to ABCP investors. In many cases the ABCP investors are unsecured, relying on repayment from liquidity banks and credit enhancement providers. Those providers, in turn receive a security interest in the specific asset pools that they are supporting. This means that ABCP investors would be unsecured creditors in the unlikely event that the conduit enters bankruptcy. Structural provisions in ABCP program documents are intended to make them bankruptcy remote to a **Prime-1** level of certainty.

Moody's does not view the presence of a security interest as critical to maintaining the **Prime-1** rating of most ABCP programs. The **Prime-1** rating is an opinion as to the likelihood of full and timely repayment of ABCP. Since most ABCP programs make little if any attempt to match asset collections with CP maturities, the timely repayment of ABCP relies ultimately on a draw under the liquidity facility. Moody's identifies the presence or lack of a security interest for investors in its program research reports published in Moody's Global ABCP Market Review.

20   Rule 144A pertains to U S.-based investors.  Non-U.S. investors must qualify under Regulation S.  See Security Law Considerations on page 11.

---

Kelley_DZ_00092037

## Custodian

A Custodian maintains actual possession of certain assets, or the documentation representing certain types of assets. In some cases the Custodian and the Collateral agent are the same, governed by a single agreement. In others they are separate parties. Typically a conduit that invests in securities has a Custodian in addition to the Collateral Agent to hold the securities for the benefit of the secured parties, in a Securities Account. The Custodian Agreement details the procedures for handling of securities so as to maintain a perfected first priority security interest in them.

## Liquidity Agent

The liquidity facility is typically provided by one or more commercial banks on a transaction-by-transaction basis through a Liquidity Loan Agreement, or a Liquidity Asset Purchase Agreement. In some cases the liquidity facility covers multiple transactions or the entire conduit, and is governed by a Global Liquidity Loan Agreement or Global Liquidity Asset Purchase Agreement. In every case there is a Liquidity Agent who is responsible for managing the syndicate of banks providing the facility.

If the conduit needs funds to repay maturing ABCP or to fund an asset purchase, the Administrator or IPA sends a funding request to the Liquidity Agent. The Liquidity Agent verifies that the conditions precedent to drawing on the facility are met and then notifies the syndicate members of the amount they will be required to provide. In particular, the Liquidity Agent verifies the amount of liquidity funding available relative to the assets purchase price using the "Purchase Price" or "Borrowing Base" formula stated in the liquidity agreement. Liquidity banks typically remit funds to the Liquidity Agent who then passes them on to the conduit. In reverse, the conduit remits facility fees, interest and principal payments to the Liquidity Agent who then pays the liquidity banks in proportion to their commitment or to their advanced amount, as specified in the liquidity agreement.

Along with acting as the Administrator, the bank Sponsor often acts as the Liquidity Agent for most of the liquidity facilities associated with its conduit. Sponsors of single-seller programs (who are not typically banks) appoint a Liquidity Agent who then syndicates the facility to a group of banks.

### Liquidity Banks

The Liquidity Banks typically sign the liquidity agreement on a page or schedule indicating the dollar amount of their commitment. Generally the Liquidity Agent is also a Liquidity Bank. A Liquidity Bank should understand the precise notice and timing requirements, and limited conditionality for a draw on the liquidity facility. It is expected that a Liquidity Bank will fund upon proper notice by the Liquidity Agent, with that notice serving as a representation that all of the conditions necessary for a draw have been fulfilled, and that none of the"outs" to funding are present. The same-day payment requirement does not leave time for independent verification by the Liquidity Bank.

A Liquidity Bank also represents that it has independently evaluated the risk associated with the transaction and its commitment under the terms of the liquidity agreement. It may accept terms that permit its commitment to be drawn and placed in escrow if it does not renew the commitment in a timely fashion or if its credit rating is lowered or withdrawn. The Liquidity Bank may also agree to"non pro rata draw" provisions, permitting its commitment to be drawn to cover the failure to pay by another liquidity bank.

For bank-sponsored conduits, the sponsoring commercial bank typically provides the bulk of the liquidity for every transaction. Liquidity facility syndicates—multiple banks providing liquidity for a single deal in a single conduit—used to be fairly common. However, with bank mergers and higher liquidity pricing, often the sponsoring bank is both the Liquidity Agent and the sole Liquidity Bank. Liquidity facility syndicates in multiseller conduits have been largely replaced by"club" deals, a syndication of the deal itself with multiple conduits funding a portion of the deal, and each conduit sponsor providing liquidity for its share of the deal.

A Liquidity Bank is typically required to have a rating equivalent to that of the ABCP issued by the conduit. Most Liquidity Banks therefore have Prime-1 ratings. Moody's considers the rating of parties providing liquidity or credit support to the conduit to be very important.[21] The Liquidity Agreement will often provide a mechanism to provide for the downgrade of a Liquidity Bank, either by replacement or by having the downgraded Liquidity Bank put up cash to collateralize its funding commitment.

## Credit Enhancement Providers

Credit enhancement may be provided in a number of ways. Deal-specific enhancement—the first-loss position—and overcollateralization are discussed in the Appendix: Asset Purchase Structures on page 61. At the

21   See Moody's Special Report, *Downgraded Support Providers in ABCP Programs: Grace Periods Don't Exist*, September 1998.

---

Kelley_DZ_00092038

conduit level, the most common form of program-wide credit enhancement is an irrevocable letter of credit (LOC) from the sponsoring bank under the terms of a Credit and Reimbursement Agreement. Because an LOC may be drawn on a same-day basis, an LOC may provide liquidity in addition to credit support.

Program credit enhancement can also be provided by almost any type of arrangement where the amount available is not dependent on the credit status of the assets funded by the conduit. In addition to using LOCs from highly rated banks, program credit enhancement has also been provided in the form of a cash collateral account and a surety bond from a monoline insurance company. A liquidity facility may also provide credit support if the amount of available funding depends only on the amount of ABCP maturing and the facility commitment amount, and not on the default status of the assets.

As with Liquidity Banks, the rating of a credit enhancement provider must typically be consistent with the rating of the ABCP notes. Most program wide credit enhancement is provided by Prime-1-rated entities, or by entities with high term ratings fronted by a liquidity facility provided by Prime-1-rated entities.

**Hedging Agent**

Conduits typically use hedging arrangements or swaps to cover two types of risk. These are the basis risk associated with ABCP funding costs and asset yields, and the conversion risk when ABCP is issued in one currency and assets are denominated in another.[22] Typical hedge arrangements include interest rate swaps (from fixed to floating) and currency spot-forward contracts (from non-U.S. dollars to U.S. dollars). The hedge counterparty is almost always the sponsoring bank of an ABCP conduit.

First, as assets are acquired, each asset purchase may include the hedge necessary to address currency or interest rate risk specific to that transaction. Moody's reviews the details of the hedging arrangements as part of the rating confirmation process.

Second, a Hedging Agent may take responsibility for seeing that the conduit enters into hedging arrangements that, in its judgement, are appropriate. Moody's does not review the specific hedges the Hedging Agent structures for the conduit, but instead relies on the rating of and an indemnity from the Hedging Agent. The indemnity says, in fairly broad language, that if the hedging arrangements are incorrect or insufficient, and as a result the conduit faces a shortage of funds to repay maturing ABCP or to pay conduit expenses, then the Hedging Counterparty will provide funds on a same-day basis to make up the shortfall. Documented in a Hedging Agency Agreement, this arrangement gives the conduit the greatest degree of flexibility in managing interest rate and currency risk. For a bank-sponsored conduit, the Hedging Agent is often the Administrator. In many cases the duties of the Hedging Agent may be specified in the Administration Agreement and there may be no separate Hedging Agent or Agreement.

The hedge counterparty utilized upon the direction and determination of the Hedging Agent or Administrator may be a third party. Hedge counterparties must have a rating consistent with the rating assigned to the conduit. The hedge counterparty must also be a firm that commonly engages in swap transactions. The Hedging Agent is typically not liable for the default of a hedging counterparty that meets these eligibility criteria.

Over the past couple of years, there has been an increased use of swaps as a form of program liquidity or credit enhancement. Total return swaps can be tailored to absorb a wide range of risks. If the swap counterparty has a Prime-1 rating, and if payments are made whenever ABCP comes due, then the swap may also serve as a source of liquidity. Credit default swaps or market value swaps are utilized to either mitigate credit risk or cover any price differential of assets sold for less than their purchase price. Credit default swaps are a common form of credit enhancement. Market value swaps have become common for warehouse transactions, as price fluctuations may cause financial assets purchased by the conduit to be worth less than their purchase price by the time they are sold into a term securitization.

---

22   See *The Use of Swaps and Derivatives in ABCP Programs: Efficient Ways to Transfer Risk,* Moody's Special Report, reprinted from the Second Quarter Asset-Backed Commercial Paper Market Review.

---

**Kelley_DZ_00092039**

## GENERAL RISKS AND MITIGANTS

In reviewing ABCP programs, Moody's looks at four broad categories of risk: structural, credit, liquidity and operational. Structural risk arises from the organizational form and contractual arrangements of the program and takes the form of the potential insolvency or bankruptcy of the program. Structural risk is mitigated largely by proper legal documentation, particularly restrictions on permitted activities and agreements with third parties. Credit risk arises from the assets funded by the conduit and the support providers and appears as a failure to repay investors. It is mitigated by providing credit enhancement that is appropriate to the asset quality of the portfolio and by structuring amortization triggers. Liquidity risk arises from the inherent mismatch in cash payments received from the conduit's assets and cash payments required to be made to repay maturing ABCP and cover conduit expenses. It is mitigated by analyzing all of the conduit's sources of cash and all of the conduits required payments and sizing liquidity backup facilities to cover the difference. Finally, operational risk arises from the inherent complexity of a large financial program with multiple assets, support providers and investors. It is mitigated by having well qualified committed service providers with the staff, expertise and systems to perform at the highest levels and the financial strength to indemnify investors for any errors.

ABCP conduits issue high levels of debt with virtually no equity. Yet these conduits generally carry the highest short-term rating of Moody's and other rating agencies. These ratings are only achievable when each of the categories of risk present in an ABCP conduit is accounted for and mitigated with a high degree of certainty.

### Structural Risk

ABCP conduits are structured as bankruptcy remote special purpose vehicles. In order for investors to be secured in the assets for repayment, there should be little risk that the conduit or the assets will be consolidated into the bankruptcy of a third party. Investors are faced with two types of bankruptcy risk in ABCP conduits. First, that the conduit, itself, becomes bankrupt, and second, that a seller whose assets are funded by the conduit files for bankruptcy. These risks cannot be eliminated, but they can be significantly reduced. A properly structured conduit is highly unlikely to be subject to bankruptcy.[23]

#### Conduit Bankruptcy

A conduit could be bankrupt because it does not have sufficient assets to pay all claims against it, or because it is illiquid and has a shortage of cash relative to payments due.

In either case, the bankruptcy court is likely to impose an automatic stay that would temporarily prevent the conduit from making any payments to creditors. The automatic stay gives the court time to determine the validity of and priority of claims against the bankrupt's estate. Even if the assets are sufficient to repay ABCP investors, they are unlikely to be repaid on time.

Bankruptcy may release many support parties from their commitments to the conduit. Generally, one cannot be compelled to lend money to a bankrupt entity. If a conduit is bankrupt, then liquidity facilities may be unavailable to provide timely repayment as ABCP matures. Other agreements with support and service providers may also be conditional on the conduit's solvency.

#### *Limiting the Risk of Conduit Bankruptcy*

A conduit can enter bankruptcy voluntarily or involuntarily. A voluntary bankruptcy is one in which the conduit files a bankruptcy petition on its own behalf. An involuntary bankruptcy filing is one in which a third party has filed a petition against the conduit. In order to reduce the probability of these events, the conduit must be set up in a way that prevents it from entering bankruptcy voluntarily, and makes it unlikely that a third party will have sufficient grounds to file.

The first step in achieving bankruptcy remoteness is to establish the conduit as a special purpose vehicle (SPV) with a third party as the majority shareholder. The conduit must meet the legal standards required to maintain its existence as a distinct entity: for example, separate records, books, stationary, and offices. The Administrator and the Manager are generally charged with operating the conduit in a way that will not jeopardize its status as an independent entity.

---

23   See Moody's Special Reports, *Handle with Care: Single Member LLCs in Structured Transactions*, March 1999, and *Bulletproof Structures Revisited: Bankruptcies and a Market Hangover Test Securitization*, August 2002, for a more detailed discussion of bankruptcy issues and asset-backed finance.

Kelley_DZ_00092040

The third party that owns the conduit is itself an entity that is unlikely to enter bankruptcy, and the ownership relationship structured so the conduit is unlikely to be consolidated with the owner if the owner did become bankrupt. Generally Moody's reviews a "non-consolidation opinion" from a law firm providing a reasoned argument to this effect with respect to the applicable laws. The conduit is almost never a subsidiary of the sponsor, so that it is unlikely to be consolidated with the sponsor's bankruptcy, should it occur. This is not a critical issue to investors when the sponsor is a highly-rated commercial bank. Most bank sponsors provide support to the conduit through liquidity facilities or credit enhancement. The credit quality of the conduit is closely related to that of the sponsoring bank, and a downgrade of the bank would likely lead to a downgrade of the ABCP issued by the conduit.

The precise legal form of the SPV depends on the jurisdiction. The SPV's bylaws usually require that 100% of the SPV's board of directors vote in favor in order to file a voluntary bankruptcy petition. The bylaws further require that at least one member of the board be independent of any party with an economic interest in the conduit. This limits the possibility that the SPV's board may feel pressure from the sponsoring bank, or any other interested party. In some jurisdictions, the bylaws may not permit a voluntary bankruptcy petition under any circumstances.

### Reducing the Risk of Third-Party Bankruptcy Filings

The second step in achieving bankruptcy remote status is to reduce the likelihood that others will petition the conduit into bankruptcy. A conduit's bylaws and other documents limit its activities to issuing commercial paper and funding certain kinds of assets, and anything necessary to support those activities. Moody's generally asks for notice of any changes to the conduit documents, and prior review of any material changes.

A conduit enters into a number of service and support agreements with various third parties. A conduit also enters into a variety of loan and asset purchase agreements as it funds assets. To protect ABCP investors from

---

General Risks and Mitigants

Kelley_DZ_00092041

the risk that a third party forces an involuntary bankruptcy, each party should agree to certain terms that reduce the likelihood that the relationship will end with a bankruptcy petition. Moody's reviews a conduit's agreements with third parties in order to assess whether appropriate provisions are in place.

First, each party should agree to respect the priority of payments that is set out in the conduit's documents. As long as available funds are distributed as agreed, failure to receive payment should not constitute a claim in a bankruptcy petition. This is referred to as "excess funds" language: amounts owed to third parties are due and payable only to the extent the conduit has funds in excess of those required to repay maturing ABCP. (ABCP repayment ranks at or near the top in payment priority.) Second, each party should agree that it will have no recourse for repayment beyond the funds and assets of the conduit. And finally, each party should agree that it will not file a bankruptcy petition against the conduit for some period, usually at least one year and one day, following the maturity of the final outstanding ABCP. The period should be chosen to prevent funds paid to investors from being "clawed back" as a consequence of any bankruptcy claim.

## Seller Bankruptcy

Seller bankruptcy may affect the conduit in four ways. First, the bankruptcy of the seller may have an effect on the credit quality of the assets owned or funded by the conduit. Second, collections on the receivables due from the bankrupt seller may be subject to an "automatic stay" by the court and may not be remitted to the conduit in a timely fashion. Third, payments owed by the seller to the conduit may also be stayed or may not be paid at all. For example, the seller may be liable to the conduit for the repurchase of ineligible receivables, reimbursement for billing adjustments for returns and volume discounts, and credits to obligors, such as cooperative advertising. Fourth, monies already transferred to the conduit by the seller may be considered "preferential transfers" and can potentially be "clawed back" by a bankruptcy court. The bankruptcy trustee would hold clawed back amounts until the court determines where the monies rightfully belong.

### *Limiting the Impact of Seller Bankruptcy*

A conduit cannot prevent a Seller bankruptcy. However, given the prevalence of non-investment-grade-rated Sellers, the risk of a Seller bankruptcy is a real concern. Generally, the risks associated with seller bankruptcy—other than the credit quality of the assets—are assumed by the liquidity facility supporting the transaction. Most liquidity facilities are structured to fund against a defined borrowing base or include a funding formula that determines the amount that may be drawn by the conduit against the assets of a given transaction. Typically, that borrowing base includes all non-defaulted assets and all funds due from the seller that have not been received by the conduit. This means that the liquidity banks may not deduct from the borrowing base amounts that have been stayed, clawed back, or are owed by the seller to cover receivable dilution. The reasoning is that a properly structured transaction will eventually receive payment for these items, but not in time to repay maturing ABCP. Therefore the liquidity banks, if they have done their due diligence, are taking timing and not credit risk with respect to these items. However, liquidity facilities typically do not fund for defaulted assets, so ABCP investors bear the credit risk associated with the collateral.

## Term versus Conduit Transaction Structures

One major difference between a term transaction and a conduit transaction is that a term transaction typically does not have a liquidity facility to take seller risk. Both a term transaction and a conduit transaction typically have a dilution reserve sized to cover payments due from the seller.[2,4] A term transaction may have more stringent cash handling procedures to limit the risk that funds will be trapped in a seller bankruptcy, though conduit transactions are generally careful to limit this risk also. Finally, a term transaction often requires a reserve fund or letter of credit to bridge any expected delay in receiving funds during the resolution of a seller bankruptcy. This reserve will be sized to cover interest and any other payments due investors, plus servicing and trustee fees.

## Credit Risk

Credit risk arises primarily from the assets funded by the conduit, and secondarily from the quality of the support and service providers. This section focuses on the likelihood that the assets supporting the repayment of ABCP perform so poorly that losses to those assets could affect repayment of ABCP.

---

24   Moody's generally expects ABCP investors to benefit from the dilution reserve in the liquidity funding formula, even though liquidity banks take dilution risk. Bankruptcy may result in a decline in servicing quality, and dilution may not be recognized in a timely fashion. Until dilution is recognized, it may appear as a defaulted asset. See Appendix: Asset Purchase Structures on page 61 for more details.

Kelley_DZ_00092042

## First-Loss Protection

ABCP investors typically benefit from two layers of credit protection. First, each transaction funded by the conduit has a level of first-loss protection associated solely with that transaction. This first-loss protection typically takes the form of overcollateralization, but may be a reserve fund, credit insurance, letter of credit, third-party guarantee or provided by the liquidity facility.

## Program-Level Credit Enhancement

Most conduits provide second-loss protection through a program-level credit enhancement facility. This program-level enhancement is usually sized as the greater of a minimum dollar amount and a percentage of the conduit's aggregate funding commitments. Older programs tend to set this percentage at 10% or higher. As credit enhancement has become more expensive and conduits have sought to reduce costs, this percentage has declined, and newer programs tend to use 8% or even 5%. The calculation of program credit enhancement may exclude "highly-rated" assets. Highly-rated assets are generally defined as those with explicit ratings of **Aa2** or higher, or assets that are fully-supported by the liquidity facility or by a guarantee from a similarly rated party. In most cases, these excluded assets still benefit from the program credit enhancement facility; in some cases they do not.

The amount of program credit enhancement is an important consideration in Moody's rating analysis. All other things being equal, a conduit with a lower percentage of program-level credit enhancement must structure individual transactions to a higher credit level. In every case the overall credit strength must be consistent with the rating assigned, usually **Prime-1**. However, some conduits may be deliberately over-enhanced. Conduits typically do not disclose the identity of the sellers or obligors underlying the transactions funded, and most conduit assets do not carry explicit term ratings from Moody's. ABCP investors may take comfort in seeing a substantial amount of program-level credit enhancement as second-loss protection. Conduit sponsors may maintain high levels of credit enhancement in order to obtain greater investor acceptance and lower funding costs.

## Forms of Credit Enhancement

The most common forms of credit enhancement are overcollateralization, subordination, seller recourse, excess spread, structured liquidity, cash reserve account, letter of credit, third-party guarantee, and total return swap. Each form of credit enhancement comes with its own set of risks. These may be related to asset performance, credit risk of the provider, funding formula and availability in the event of bankruptcy. Overcollateralization, subordination, seller recourse, excess spread, structured liquidity and third-party guarantees are often seen at the transaction level providing first loss protection. Subordination, cash reserve accounts, letters of credit and third-party guarantees typically provide program-level credit enhancement

### Overcollateralization

Conduits obtain credit enhancement against potential losses in many transactions by advancing less than the full value of the pool of assets that are pledged to repay maturing ABCP. The portion of the asset pool that exceeds the advances outstanding is the overcollateralization. For example, a conduit might advance $80 against $100 in assets. The percentage funded is called the advance rate, which in this case is 80%. The extra $20 constitutes overcollateralization. The 20% overcollateralization is sometimes referred to as the "haircut". The unfunded percentage is generally represented by a "seller interest" that is subordinate to the interest in the receivables held by the conduit. The seller will receive cash flow allocable to the seller interest to the extent that these funds are not required to repay ABCP.

The amount of overcollateralization is determined by examining the various factors that may cause an asset to default based on a review of the past performance of the specific and similar asset pools. For trade receivable transactions the advance rate follows a dynamic formula based on recent performance, subject to a minimum level. For other asset types, such as auto loans or mortgages, the advance rate may be fixed.

### Subordination

Subordination is similar to overcollateralization, except that another investor may hold the subordinated tranche of a transaction. Conduits often fund tranches of public term securitizations or private transactions with identical structures. The holder of a senior or mezzanine tranche benefits from the cash flows allocable to the more subordinated tranches. As with overcollateralization, if losses on the assets exceed the available subordination, conduit investors may experience losses.

---

General Risks and Mitigants

**Kelley_DZ_00092043**

**Seller Recourse**
In some transactions ABCP investors benefit from recourse to the seller of the assets. That is, to the extent there are losses on those assets, the seller agrees to pay for those losses. This protection is in addition to any recourse to the seller for ineligible receivables or other dilutive items. The value of the recourse is a function of the credit quality of the seller. If the seller is rated Prime-1 or an equivalent long-term rating, full reliance can be placed on this form of enhancement. However, there may be a high degree of correlation between asset performance and seller credit quality—a factor that Moody's rating analysis takes into consideration. For lower-rated sellers, recourse to the seller is not a negative factor, but it may not provide significant benefit. Seller recourse may also threaten the "true sale" of the assets and the ability of the seller to treat the financing as an off-balance sheet activity. For this reason, recourse to the seller for items other than ineligible receivables and dilution is not common.

**Excess Spread**
Some assets such as credit card receivables and other consumer loans carry a rate of interest significantly in excess of the CP funding costs and asset servicing costs. Some of this excess spread may be "monetized," if the conduit purchases the assets for more than their par value. Excess spread that is pledged to the transaction is available to cover some or all of the realized losses on the assets, usually on a "use it or lose it" basis. This means that to the extent interest payments exceed funding costs and servicing fees, the remaining excess can be applied as credit enhancement to cover charge-offs taken on the assets during the applicable collection period. If excess spread remains after covering charge-offs, it is released to the seller. Therefore, any excess spread not used in the current period is "lost" and cannot be applied against future losses. Transactions with excess spread are often structured with a "trapping" mechanism that requires a reserve account to be funded if excess spread declines below a certain level. This "spread account" is combined with an early amortization trigger that forces the transaction to cease purchasing new assets and wind down if excess spread falls even lower or becomes negative. (Negative spread occurs when expenses and losses exceed available spread.) Moody's rating analysis includes an evaluation of the benefit derived from excess spread based on asset performance and the effectiveness of the spread trapping mechanism. Like overcollateralization, the availability of excess spread is linked to the level of delinquencies and defaults in the asset pool.

**Structured Liquidity [25]**
Liquidity facilities may be structured to absorb a variety of risks in addition to market disruption and cash flow timing differences. As previously noted, liquidity facilities typically absorb many forms of seller recourse risk, such as removal of ineligible receivables, cash collected but not remitted and other dilutive items. Liquidity facilities are sometimes structured to absorb other credit risks as well. A liquidity facility designed to bear all credit risk by paying the face amount of commercial paper regardless of the credit quality of the assets is said to be a "fully supporting" liquidity facility. A liquidity facility may also be designed to purchase or refinance a transaction if certain performance triggers are hit. Depending on the trigger levels chosen and the time span over which liquidity purchases the assets, credit risk may be shared between ABCP investors and liquidity banks. Some liquidity facilities are structured with somewhat convoluted funding formulas and triggers that nevertheless result in virtually full credit support from ABCP investor's point of view.

The credit strength of structured liquidity facilities, like all liquidity facilities, is a function of the credit quality of the provider. Liquidity providers must have a rating consistent with the rating of the ABCP program. Moody's also carefully reviews the funding formula and the conditions precedent to funding in order to determine the amount and likely availability of funds. Finally, liquidity funding is typically not available if the conduit is bankrupt, as noted in the discussion of Structural Risk.

**Cash Reserve Account**
Some transactions have a cash reserve account that is either funded at closing or that funds over time by retaining excess spread. In relatively rare cases cash reserves have also been used as program-level credit enhancement or liquidity. The funds are usually kept in a trust account for the benefit of investors. The trustee is permitted to invest the funds, in high quality assets that mature before the next maturing ABCP. A cash reserve account can generally be drawn on a same-day basis, and is unaffected by the credit quality of third parties or the conduit.

---

25    See *Understanding Structured Liquidity Facilities in Asset-Backed Commercial Paper Programs*, Moody's Special Report, reprinted from the Asset-Backed Commercial Paper Market Review, First Quarter 1997

Kelley_DZ_00092044

### Letter of Credit

Program-level credit enhancement is most commonly provided in the form of an irrevocable direct pay letter of credit (LOC) from the sponsoring commercial bank as credit enhancement provider. LOCs are also used to enhance specific transactions. LOCs can be drawn on a same-day basis and typically have no conditions precedent to making a draw. The availability of funds under the LOC is not affected by the credit quality of the assets or of the conduit. However, the credit quality of the LOC is directly tied to the credit strength of the bank providing the LOC.

### Third-Party Guarantee

Some transactions benefit from an insurance policy or guarantee whereby a highly rated counterparty agrees to pay losses, either in full or up to a specified limit. Aaa-rated monoline insurers are the most prevalent providers of guarantees in the ABCP market. The monoline financial guarantors' primary business is insuring financial transactions for a fee or premium. However Moody's has also reviewed guarantees from multiline insurers or from other highly rated parties. Trade receivable transactions sometimes include credit insurance that covers defaults by obligors. Credit insurance is more common in European deals than in U.S. transactions.

The value of a guarantee depends first on the credit quality of the guarantor, second, on the conditions and limits to funding that may affect availability, and finally on the willingness of the guarantor to pay. For example, monoline financial guarantors have a track record of making investors whole promptly according to the original payment terms. In contrast, the business model for multiline and credit insurers is to review and possibly challenge claims prior to payment.

Although the insurance policy may cover credit losses, it usually will not pay claims in time to repay maturing ABCP. Most transactions require a liquidity facility to "front" for the payment under the surety bond, insurance contract, credit insurance or other type of guarantee. The liquidity facility provides the conduit with funds until the guarantor reimburses the conduit for credit losses.

### Total Return Swap [26]

In the past few years, securities portfolios have become a more significant component of ABCP conduits assets. With the growth of securities portfolios has come an increased use of derivatives to hedge various risks. Swaps typically exchange defined cash flows on certain specified payment dates. A swap may bear all risks in a transaction, i.e. interest rate, foreign exchange, liquidity and credit. Under a total return swap, the swap counterparty makes all payments of interest and principal required to repay ABCP and conduit expenses in return for receiving all payments from the underlying security. In some cases, if the swap counterparty has a **Prime-1** rating and the swap is written to require payment whenever the conduit needs funds, a total return swap may serve as a source of liquidity.

The credit quality of the swap counterparty is the primary concern in analyzing total return swaps. Moody's also carefully reviews the terms of the swap—typically based on standard ISDA (International Swap Dealers Association) documentation—to determine the payment amounts, payment dates and conditions to funding, if any. Total return swaps are most commonly seen enhancing single securities or a pool of securities. There are some conduits that are fully-supported with respect to credit and liquidity through a total return swap.

## Liquidity Risk

Moody's short-term ratings address the likelihood that an investor will be repaid in full and on time. ABCP is a continuously offered product. Large programs are in the market every day issuing new ABCP and paying off maturing ABCP. Sometimes the pattern of ABCP issuance and maturity are closely matched to cash flows from the assets, but this is not necessarily the funding strategy of many ABCP conduits. In a typical ABCP program, maturing paper is repaid with the proceeds of newly issued paper so as to maintain uninterrupted funding of the conduit's portfolio. Liquidity risk arises from the imperfect matching of cash flows and the uncertainty of new issuance. Even though the conduit's assets are performing well, there may not be enough cash generated in a timely manner to repay maturing ABCP if new paper cannot be issued.

The ABCP market has been liquid throughout its history, in that no **Prime-1**-rated conduit has ever been unable to issue ABCP at some reasonable rate of interest. However, Moody's credit analysis of ABCP conduits does not assume that ABCP can always be "rolled". Most ABCP conduits require backup sources of liquidity.

---

[26]  See Moody's Special Reports, *Understanding the Risks in Credit Default Swaps*, March 2001, and *The Use of Swaps and Derivatives in ABCP Programs: Efficient Ways to Transfer Risk*, reprinted from the Second Quarter 2000 Asset-Backed Commercial Paper Market Review, for a discussion of Moody's concerns with respect to the language in swap agreements.

Kelley_DZ_00092045

**Bank Liquidity Backup Facilities**
Most ABCP conduits have bank liquidity backup facilities sized to cover the face value—interest and principal
at maturity—of all ABCP outstanding. These facilities are usually provided on a deal-by-deal basis, though they
may cover a pool of assets or the entire conduit. Some conduits have liquidity at both the transaction and the
conduit level.

A traditional bank liquidity facility is provided by a syndicate of Prime-1-rated banks and is available to repay
maturing ABCP to the extent that the assets supporting the ABCP are performing. Although some liquidity facil-
ities assume the credit risk of the assets (see Credit Risk section above) most liquidity facilities fund according
to a borrowing base that is adjusted for defaulted assets in a pool. The facility typically has a term of 364 days
in order to qualify for zero risk capital weight under the first Basle Accord on bank regulatory capital.

*Bank Syndication Risk*
When a liquidity facility is provided by a large group of banks, a degree of operational risk may arise. In order to
pay maturing ABCP the liquidity facility must fund on a same day-basis. The Liquidity Agent may have only a
few hours to notify the liquidity banks and receive the funds. When many banks must be contacted in order for
funding to occur, the probability of an error increases. The liquidity providers may be willing and able to fund, but
if the funding notice is delivered to the wrong contact, or the payment instructions are incorrect, there may be a
delay in marshalling all the funds required to repay maturing ABCP. In two instances known to Moody's, ABCP
repayment was delayed for one day on a small amount of ABCP as a result of this sort of operational problem[27].[7]

Large syndicated liquidity facilities are less commonly used by ABCP conduits than in the past. When a few
large multiseller conduits dominated the market, large transactions were often funded by one conduit and a
number of banks would agree to participate in the liquidity facility. Today, most major banks have their own
conduits and liquidity is more expensive. Now, large transactions are usually syndicated among several con-
duits, a practice known as a "club deal." Each conduit funds a portion of the transaction and the conduit spon-
sor provides a liquidity facility for that portion.

Syndicated liquidity facilities are most often employed in single-seller conduits that are not sponsored by com-
mercial banks. In reviewing these programs, Moody's scrutinizes the procedures for making liquidity draws,
especially where the credit quality of the sponsor or the assets may be uncertain.

**How Much Liquidity Is Enough?** [28]
A bank liquidity facility is typically sized at 102% of the transaction limit. The transaction limit corresponds to the
maximum principal component of ABCP that may be issued. The additional 2% in liquidity commitments is
meant to cover the interest component of the ABCP. In a low interest rate environment, 2% is enough liquidity to
cover long-dated ABCP. In high-interest-rate environments it may only cover ABCP with very short maturities.
Most conduits cannot issue ABCP unless there is sufficient available liquidity to cover the face amount at matu-
rity. Moody's rating analysis is relies on this coverage test, not on the precise size of the liquidity facility. The siz-
ing of liquidity facilities affects the conduit's funding flexibility and conduit sponsors should carefully consider this
when setting up the program.

**Alternate Sources of Liquidity** [29]
Bank backup liquidity facilities have become scarcer and more expensive over the past few years for a number
of reasons. First, bank mergers have reduced the number of liquidity providers. Second, events associated
with Long Term Capital Management and Russia in 1998, and the weakened economy in 2000-01 led banks to
increase liquidity pricing in line with the perception of increased risk. Finally, the Base III Accords will likely result
in regulatory capital assessed against liquidity backup lines provided by banks.[30]

Increased cost and reduced availability have prompted many sponsors to look for alternatives to bank backup
facilities. These have included non-bank liquidity providers, reliance on cash flow from assets, maturity-
matched funding, extendible notes, and medium-term notes (MTNs). Several of these methods may be used in
combination, along with traditional liquidity backup lines, in order to achieve a cost-efficient liquidity plan.

---

27   See Moody's Special Report, *Often Confused Concepts: Related Commercial Paper and the 10 Bank Rule,* November 1995.
28   See Moody's Special Report, *Why Liquidity Facilities in ABCP Programs Equal 102%,* reprinted from the First Quarter 1999 Global Asset-Backed
     Commercial Paper Market Review.
29   See Moody's Special Report, *Alternative Liquidity Comes of Age: A Decade of Development,* reprinted from the Second Quarter 2001 Global
     Asset-Backed Commercial Paper Market Review.
30   See Moody's Special Report, *Entering a New Regulatory Environment. Proposed Revisions to the 1988 Basel Accord May Raise Costs and
     Squeeze Availability of ABCP Liquidity,* April 2001.

Kelley_DZ_00092046

**Non-Bank Liquidity Providers**

In most jurisdictions, each bank has access to a central bank that is able to ensure that bank's own liquidity. In the United States, for example, the Federal Reserve acts as a lender of last resort to banks that need additional liquidity to meet their funding obligations. Banks' ready access to funds makes them ideal providers of liquidity backup lines. However, many other firms have both a **Prime-1** rating and the cash or near-cash resources to be acceptable liquidity providers, even if they do not have access to a central bank. Non-bank financial firms and insurance companies generally have high cash flow, highly liquid assets, and a business model that requires careful liquidity management. Derivatives products companies with **Prime-1** ratings may provide liquidity by a properly constructed swap agreement. Some non-financial corporations may also have significant liquid resources.

In reviewing a non-bank liquidity provider, Moody's looks to the firm's short-term rating, its business model and practices, its relationship to the program or the parties involved, and its likely willingness to pay. Moody's will also consult with the corporate rating analyst for the firm involved. In some cases, entering into an agreement to provide liquidity backup facilities may have a negative effect on the firm's short-term rating.

**Relying on Assets for Liquidity**

Conduit assets may provide funds in two ways. Some, like trade receivables and credit card receivables, may have very high repayment rates. Others, like whole loan mortgages and rated securities, may have liquid secondary markets, either through direct sale or securitization. Some conduits rely on collections or asset sales for part or all of their liquidity needs. However, reliance on asset collections or asset sales as a source of liquidity is subject to a variety of risks and complications that Moody's must consider in its evaluation of a conduit's sources of liquidity.

First, the liquidity of an asset is often a function of its credit quality. A decline in credit quality may result in slower payment rates or difficulty in selling the asset. A security with a lower rating may be worth significantly less than its book value, or may not have a ready market.

Second, a security may be subject to uncertainty as to the timing of its cash flow. Interest and schedule principal payments may be relatively certain, but prepayments may not be. Trade receivables have a payment due date, but tend to receive a significant percentage of payments late as companies manage their cash flow by choosing when and which suppliers to pay. Most traded securities require more than one day to settle; same-day settlement can be arranged but at higher costs, which results in lower sale proceeds. Buyers may take advantage of a forced sale by offering to pay less. Conduits may arrange for purchase commitments, or committed security repurchase ("repo") facilities. Moody's evaluates committed purchase or repurchase arrangements based on their terms and the credit quality of the counterparty.

Finally, relying on the cash flow of the conduit's asset portfolio, while technically feasible, can lead to negative side effects. Revolving transactions such as credit card and trade receivable facilities entail the continuous purchase of new receivables as old receivables are paid off. In order to use asset collections to pay down ABCP, the conduit must cease purchasing new receivables. The seller is then forced to replace the conduit with another funding source. A large, highly rated company with multiple funding sources would not be negatively affected, but a smaller or thinly capitalized firm could be forced into a liquidity crisis if the conduit ceased funding its receivables. At worst, a seller could file for bankruptcy, which could negatively impact the ability to collect repayments on the assets.

**Maturity Matched Funding** [31]

Short-term assets with fixed maturities can theoretically be financed with ABCP issued to mature on the same day or a day later. If the credit quality of the assets is consistent with a **Prime-1** rating, no backup liquidity may be needed. Alternatively, credit enhancement may be sized to cover the risk of default or late payment. The assets that fit this profile are short-term corporate loans or rated, short-term securities. Loan-backed programs finance short-term corporate loans on a maturity matched basis (see Types of ABCP Programs on page 17), but are less prevalent in the market than they once were. However, some conduits finance purchases of commercial paper, for example, with maturity-matched issuance of ABCP.

---

[31]  See Moody's Special Report, *Rating Commercial Paper Programs Backed by Maturity-Matched Loans*, September 1999.

---

General Risks and Mitigants

**Kelley_DZ_00092047**

**Extendible Notes** [32]

A more recent development in the ABCP market is the use of extendible notes to mitigate liquidity risk. If ABCP cannot be re-issued, the conduit has the right to extend the scheduled maturity of outstanding ABCP to a later final maturity date. The issuer's option to extend is embedded in the security so investors' consent is not required in order to extend. Investors are compensated by receiving a higher interest rate, usually a positive spread to LIBOR, during the extension period. The extension period benefits the conduit by providing additional time to remarket its ABCP, and, failing that, to obtain cash from the assets by repayment or sale. In effect, the investor is providing liquidity to the conduit.

Extendible ABCP is common in two types of programs. It has been used in several single-seller programs that finance credit card receivables. The credit card receivables have relatively high and reliable payment rates. Moody's has evaluated the likelihood of repayment during the extension period and believes that receivable collections combined with a small bank liquidity facility provide liquidity consistent with the **Prime-1** rating. Mortgage warehouse conduits that finance newly issued mortgages prior to term securitization have also issued Extendible ABCP. Term mortgage-backed securities are issued very frequently. Since securitization is in effect a sale of the whole loan mortgages to new investors, these programs generally have a market value swap or other form of credit enhancement to cover the risk that the sale price may be less than the purchase prices. Both the credit card programs and the mortgage warehouse programs have credit enhancement sized to cover any credit risk on the funded portfolios.

**Medium-Term Notes and Liquidity**

Some conduits issue Aaa-rated Medium-Term Notes (MTNs) in addition to Prime-1-rated ABCP. MTNs are usually issued at a floating rate of interest at original maturities of six months or longer, often more than one year. By extending the maturity of the conduit's liabilities, MTNs can be used in conjunction with other measures to reduce the need for backup liquidity.

**Combined Liquidity Management Strategies**

In assigning short-term ratings to corporations, Moody's considers all sources of funds, all liabilities, and the company's strategy, experience and competence in managing its liquidity. As a result, not all corporate CP programs have full bank liquidity backup facilities.

ABCP programs are special purpose vehicles with limited resources. Unlike operating companies, they typically have only nominal capital and no additional sources of funds if problems arise. Moody's analysis of liquidity for ABCP programs reflects this difference. However, there is no reason that an ABCP conduit might not combine all of the methods listed above in a liquidity management strategy in order to reduce the required amount of bank liquidity, much as a corporation does.

Most conduits have a range of assets, from high to medium credit quality, from high to low cash flow, and from high to low marketability. Most conduits issue only fixed-rate ABCP with a fixed maturity—"plain vanilla" ABCP. But there are conduits that can issue a mix of conventional ABCP, extendible ABCP and MTNs. The securities arbitrage programs known as structured investment vehicles have long relied on both ABCP and MTN funding combined with a model of liquidity sources and uses to reduce their reliance on bank liquidity lines. A number of multiseller and other conduits use a similar combined approach to liquidity management. Moody's has reviewed the liquidity management strategies of these programs and determined that they provide for the repayment of ABCP to a **Prime-1** standard.

## Operational Risk

Management of an ABCP conduit is a complex task. Among other things, conduit administrators manage the issuance and repayment of ABCP, the purchase, monitoring and collection of assets, and the coordination among all of the parties mentioned above (*Who's Who in an ABCP Program: Service and Support Providers* on page 29). Each asset may have a liquidity facility, a Liquidity Agent and one or more Liquidity Banks involved in the timing and amount of liquidity draws. The conduit may also have a global liquidity facility, program credit enhancement, and a swingline loan facility. The Depositary and Placement Agents must coordinate the sale, issuance and repayment of ABCP. Hedging services may be needed to deal with interest rate or currency mismatch. It is critical to the successful operation of a conduit that parties with administrative and decision-making responsibilities are well prepared and able to manage conduit operations. Operational risk consists of the possibility that procedures outlined in the conduit's documentation are not properly followed.

32  See Moody's Special Report, *Extendible Commercial Notes Extend Asset Allocation Choices for Money Market Funds*, August 2000, for a discussion of extendible CP in both the corporate and asset-backed markets.

Kelley_DZ_00092048

**Mitigating Operational Risk**

Operational risk can be reduced in a number of ways. First, Moody's reviews the capability and commitment of the sponsor and support providers, especially the Administrator, when the initial rating is assigned. Most conduit sponsors assume several formal roles in the conduit operation, and provide some credit enhancement and liquidity. In its rating process, Moody's considers the degree to which the financial and reputational interests of the sponsor are aligned with those of the conduit.

Most conduit service and support providers have a proven track record in the market. They are typically large commercial banks. The conduit's operations are not dissimilar to a bank's credit, loan monitoring and funding areas. A conduit may be managed to the same standards as the sponsor's existing activities in these areas, often by the same people. In assessing a sponsor who is new to the market, Moody's undertakes an "operational review," in which Moody's analysts visit the company and review its infrastructure and staffing to determine whether the company's operational capacity is appropriate for the type of ABCP conduit that is contemplated. Some conduit sponsors who are small or new to the market engage an experienced third party to provide some or all of the needed services either directly or as a backup.

Second, Moody's monitors conduit activities over time. Conduits are usually active vehicles, and Moody's has regular interaction with sponsors and other parties when reviewing new transactions or program amendments. Moody's receives surveillance reports on asset performance and CP issuance at least monthly. Administrators are required to notify Moody's immediately if rating downgrades of sellers, servicers, support providers or rated assets held by the conduit occur or if certain performance triggers are hit. Moody's also conducts regular face-to-face reviews with program sponsors, during which conduit performance, future plans and industry issues will be discussed. Moody's also follows business activity in general and ratings actions in particular, and contacts program sponsors as events warrant.

**Indemnification**

Any entity involved in providing service or support to the conduit should be willing to provide a performance indemnity to the conduit covering any negligence or misconduct on its part. In particular, Moody's looks for a broad performance indemnity from the Administrator as the single party taking responsibility for the overall smooth operation of the program. To the extent a conduit and its ABCP investors are exposed to any loss as a result of the negligence of a particular entity, that entity will reimburse the conduit and/or investors for that loss.

## Interest Rate Risk

Most ABCP is issued at a fixed rate of interest and for a short duration. The rate at which ABCP is issued fluctuates over time based on market conditions and investor appetite. ABCP rates tend to closely track the comparable LIBOR rate, but the two are not contractually linked.[33] The financial assets held by conduits carry a variety of interest rates including fixed rates, LIBOR-based rates and rates based on the conduit's own cost of funds. A conduit's exposure to interest rate risk consists of the risk that the rate of interest received by the conduit on its assets will be insufficient to cover the conduit's cost of funds and operating expenses.

**Mitigating Interest Rate Risk**

Most conduit assets are structured to pay a fee or rate equal to the conduit's funding costs plus fees and expenses. Assets that carry a fixed rate, or are pegged to a floating index are usually hedged with a swap or other agreement with a **Prime-1**-rated counterparty. Although hedges come in many forms—and some are structured to mitigate more than just interest rate risk—the most basic form is a simple exchange of interest payments. The conduit agrees to pay the hedge counterparty all interest generated by the asset, and the hedge counterparty agrees to pay a rate that covers interest on ABCP and conduit expenses.

Certain types of assets do not pay any interest at all. The most common example is a trade receivable. A trade receivable is a form of short-term financing in which a company selling a good or service allows its customers to delay payment for goods or services received. In a trade receivable transaction, a reserve is created to provide for interest by advancing less than the face value of the asset, that is, by purchasing the receivable at a discount. Other than factoring in the interest cost, sizing the discount requires an analysis of the terms of sale, obligor payment rate, and default rate of the assets.

---

[33] If a conduit issues floating rate ABCP where the interest rate is reset at regular intervals, the index used is typically thecorresponding LIBO rate. For a discussion of floating rate ABCP see Moody's Special Report, *Floating Rate ABCP: Issues and Answers*, December 1999.

---

**Kelley_DZ_00092049**

## Foreign Exchange Risk

Some ABCP conduits purchase assets denominated in one currency and issue ABCP denominated in another currency. With the introduction of the Euro, many conduits may issue both U.S.$ and Euro-denominated ABCP in order to have maximum funding flexibility and access to the lowest funding costs. At any point in time, ABCP, asset payments, liquidity and credit enhancement may be denominated in one or more currencies that will have to be exchanged at reliable rates to provide for repayment of ABCP and transaction funding[3],[4]

Foreign exchange risk is typically hedged via an agreement with a Prime-1-rated counterparty. Currency risk can be hedged with matching spot and forward contracts, or with more sophisticated foreign exchange rate swap agreements. Moody's reviews the credit quality of the counterparty and the terms of the hedging agreements with respect to timing, payment amounts and funding conditions.

A more recent development is to enter into a Hedging Agreement with a highly rated Hedging Agent. The Hedging Agent agrees to recommend hedging arrangements appropriate to the conduit's risk exposure with highly rated counterparties. If these arrangements prove insufficient for any reason other than the default of the counterparty or the underlying conduit asset, the Hedging Agent indemnifies the conduit by providing same-day funds to cover any shortfall. In this type of agreement, ABCP investors assume the credit risk of the counterparties and the assets, while the Hedging Agent assumes the risk of properly hedging the program. This type of agreement usually covers both foreign exchange and interest rate risk.

---

34   See "Asset-Backed Commercial Paper Programs in Europe: Implications of Currency Risk", *Special Report*, November 1995.

**Kelley_DZ_00092050**

## ABCP ISSUANCE AND PROGRAM TERMINATION

ABCP conduits have certain program-level protections in addition to program-wide credit enhancement. These protections set the conditions precedent to issuing ABCP, and under extreme circumstances may require the conduit to be wound down. The purpose of these features is to insure that there is sufficient support to protect ABCP investors at the time ABCP is issued by the conduit.

### ABCP Issuance Tests

Several conditions should be met before ABCP is issued. First the conduit should be solvent. Most administration agreements have a net worth test requiring that the minimal net worth contributed to establish the special purpose vehicle not be impaired. This test may ignore mark-to-market calculations for conduits that are run on a cash flow basis or changes in market value of certain derivative contracts[35]. Second, the principal value of the non-defaulted assets funded should equal or exceed the principal amount of ABCP outstanding, as ABCP principal must ultimately repaid by the principal value of non-defaulted assets. Third, the program should not be running at a loss. The earnings on the assets funded should equal or exceed interest on ABCP and program expenses. Fourth, available liquidity should equal or exceed the face amount—principal plus interest at maturity—of ABCP outstanding. Available liquidity is determined by the funding formula in each liquidity agreement, and may be less than the liquidity facility commitment if the funding commitment is not fully drawn or if there are defaulted assets. Fifth, many programs require that the full amount of required program credit enhancement be available, or a material portion of it in order for the conduit to issue new ABCP.

### Program Termination Events

If it becomes clear that the conduit is not performing as expected, then the best protection for ABCP investors may be for the program to cease issuing ABCP permanently and wind down. Clearly, if any of the issuance tests mentioned in the previous paragraph are not met for more than a short period, the conduit will begin to wind down naturally. Most conduits specify that if these issuance conditions are not met for some continuous number of days then the cease issuance is permanent. The inability to meet net worth, asset coverage, expense coverage or liquidity coverage tests may indicate a loss to investors or inability to pay on a timely basis.

Many ABCP programs have program-level credit enhancement providing second-loss protection to investors. If a significant amount of this enhancement is drawn to cover losses on funded assets, it may also be an indication of problems with the program. Most conduits with program-level credit enhancement are required to permanently cease issuing ABCP if more than a given percentage of that credit enhancement is drawn for longer than a fixed period of time, for example, more than 10% for more than 5 days. Other common program termination triggers include a downgrade of the program's rating, and when the bankruptcy remoteness of the SPV is compromised.

If a program termination is signaled, the Administrator is required to notify Moody's. Typically, the conduit is prohibited from acquiring assets or additional interests in existing transactions within its portfolio, and from issuing new ABCP. The issuer is required to apply collections on existing assets toward paying out maturing ABCP, and to the extent that such collections are not sufficient, to use liquidity facilities and any pool-specific credit enhancement facility to do so. If these amounts are insufficient then any remaining program credit enhancement may be drawn to pay investors. Note that some programs, particularly structured investment vehicles, may have more complicated wind down procedures reviewed by Moody's as part of the rating assignment.

---

[35]  See Moody's Special Report, *FASB 133's Impact on Nominally Capitalized ABCP Conduits: Should Investors Be Concerned?*, January 2002.

Kelley_DZ_00092051

## POST-REVIEW VERSUS PRIOR-REVIEW CONDUITS

ABCP conduits are dynamic structures. Moody's initially assigns a rating to the structural shell, consisting of a special purpose corporation and a collection of support parties bound by a set of legal documents. When Moody's first assigns a **Prime-1** rating to a conduit, it typically has no ABCP outstanding, and funds no assets. Over time assets are structured and recommended by the Administrator, and purchased or funded by the conduit using the proceeds of newly issued ABCP. Eventually the conduit may have a substantial portfolio of funded transactions and billions of dollars worth of ABCP outstanding. Even then the program will change over time, as some asset pools pay down, some mature and are not renewed, and new deals are added to take their place.

### Prior-Review Conduits

Most multiseller conduits operate on a "prior review" basis. Prior-review ABCP conduits are required to submit each new transaction to rating agency scrutiny and receive written confirmation of the Prime-1 rating prior to funding. Moody's reviews each transaction on its on merits, in conjunction with the other assets in the conduit's portfolio and the program-level support. Prior review is one way that Moody's can be sure that a new transaction is consistent with the credit quality of the already outstanding ABCP.

### Post-Review Conduits [36]

Prior review is not the only way to ensure that a conduit maintains its credit quality. Some conduits operate on a post-review basis. Post-review status means that the conduit may enter into and fund new transactions that conform to the conduit's credit and investment policy without Moody's prior review. Moody's is notified after the transaction is completed, and reviews the credit quality of the ABCP program as part of its ongoing credit monitoring and surveillance process.

Most single-seller, securities arbitrage, and fully-supported ABCP conduits are post-review programs. These types of conduits tend to be highly structured to limit the type and manner of assets funded, limiting risk to investors. Fully-supported programs expose investors only to the risk of the guarantor, so the credit quality of the assets does not affect the credit quality of the program. Single-seller programs fund the assets related to one firm's activities, so the initial rating analysis of the program will continue to apply so long as the underlying business is sound. Securities arbitrage programs must act quickly in order to purchase assets when they are available on favorable terms. The securities they are permitted to purchase are subject to strict, clearly specified investment and credit enhancement guidelines.

Some partially-supported multiseller ABCP conduits also enjoy post-review status. These conduits have experienced administrators, and the ABCP conduit is an important banking product, offered to the sponsor's better clients. These administrators have a history of transactions that Moody's can evaluate for consistent and conservative underwriting as part of the process of evaluating post-review status. In addition the conduit's asset purchases are subject to a detailed credit and investment policy, with high standards of credit quality and strict divestiture requirements for pools that no longer meet those criteria. In addition to these factors each of the post-review programs has a high level of program credit enhancement, usually with a materially higher floor than is typical for prior-review programs.

The Administrator's operational capability is one of the most important considerations when Moody's considers post-review status for an ABCP conduit. The Administrator of a post-review program must have a well-staffed underwriting group for conduit transactions. It must be experienced, committed to the ABCP market, and have a conservative credit culture with respect to transaction selection and structuring.

### Limited or Partial Post-Review Programs

A number of conduits have partial post-review status. Hybrid conduits—those combining the features of two or more types of program—generally operate on a post-review basis for securities purchases and funding maturity-matched loans. Credit arbitrage and loan-backed programs are subject to strict rules regarding asset quality, credit enhancement, liquidity support and funding, and are post-review on a stand alone basis. Permitting hybrids to operate these portions of their program on a post-review status is consistent with the ABCP market as a whole. The multiseller portion of these programs typically remains prior review.

---

36   See Moody's Special Report, *Achieving Post Review Status for Partially-supported ABCP Programs*, published in the Third Quarter 1997 Asset-Backed Commercial Paper Market Review.

---

Kelley_DZ_00092052

Some multiseller conduits have limited post-review status. Transactions funding certain asset types, where the transaction does not exceed a given size limit and is structured with particular features may be funded without Moody's prior review. Transactions that do not fall within these guidelines remain subject to review by Moody's prior to funding.

Moody's has also implemented a process of limited prior review with some program sponsors termed "Execution Light." In these cases, Moody's reviews a set of document templates and agrees to certain transaction criteria with the program sponsor. The sponsor presents a specific transaction to Moody's as a detailed term sheet with supporting information. If Moody's review of this material confirms that it falls within the agreed framework, then the transaction can be funded by the conduit without a full review.

As with full post-review programs, Moody's monitors the credit quality of these limited or partial post-review programs as part of its ongoing monitoring and surveillance activities.

Kelley_DZ_00092053

## MONITORING CONDUIT AND ASSET PERFORMANCE

Moody's ratings on ABCP conduits are public, monitored ratings. Moody's monitors the asset performance and overall structure of each ABCP conduit to insure that the risk borne by ABCP investors remains consistent over time with the **Prime-1** rating assigned to the ABCP. Conduits resemble operating companies in many ways. They have dynamic portfolios that change composition, and may grow or decline over time. A conduit's operating documents require transaction and portfolio monitoring, regular reporting, and rating agency notification of key events. Generally, the conduit's administrator is responsible for these activities.

There are a number of components to the monitoring process. First, Moody's maintains a relationship with the conduit's sponsor. Even before the conduit is created, Moody's works with potential sponsors to discuss the business purpose of the program and identify and resolve potential concerns. Moody's performs an operations review of each new conduit sponsor and/or administrator. In this review, Moody's seeks to determine that the administrator has the appropriate infrastructure and personnel to effectively manage conduit operations according to the program documents.

Once a conduit has been established, Moody's reviews each transaction prior to its inclusion in the conduit's portfolio if the conduit is operating on a "prior review" basis. No amendments can be made to a conduit's operating documents unless Moody's confirms that the program's rating will not be affected by the proposed change. Moody's analysts interact with conduit sponsors on a regular basis to discuss the conduit's performance, future activity and industry trends.

### Monitoring Transaction Performance

The performance of individual transactions in a conduit's portfolio is monitored on several levels. The servicer of the assets is required to monitor receivable performance and report on it at least monthly to the conduit's administrator. Most deals also require that the servicer report any financial or operational problems that it may have, outside of the receivables' performance. The administrator is responsible for ensuring that the servicer's reports are received as required. The administrator also conducts regular due diligence on the servicer's operations. In some cases the administrator may have the right to act as backup servicer under the transaction documents. Should there be a problem with a particular transaction, the administrator notifies Moody's and works with the servicer to rectify the problem.

Each month the administrator is required to prepare a report for investors, dealers and rating agencies. This report will summarize the status of each transaction funded by the conduit. It will typically include key asset performance statistics vis-à-vis the related triggers, such as delinquencies, defaults, excess spread and so forth, depending on the type of asset funded. It also includes information about support facilities, ratings of the support providers, the amount of ABCP outstanding and the size of the program-level credit enhancement.

Moody's reviews each monthly report to determine that the transactions and program are in compliance with the documentation. Moody's also reviews asset performance to determine whether performance is in line with expectations at the time that the transaction closed. Loss levels are compared to indices published by Moody's for various asset classes to assess relative performance. Moody's also compares the current loss levels to current credit enhancement, both at the transaction and conduit levels. Moody's monitors the ratings of the liquidity and credit support providers and of large obligors. Moody's also tracks market conditions and industry trends that impact the securitization market. The credit opinions expressed by the ABCP rating team incorporate the views of Moody's corporate analysts and term ABS analysts.[37]

### Moody's Publications on Conduit Activity

Moody's publishes information on conduit performance quarterly in Moody's Global Asset-Backed Commercial Paper Market Review. These reports outline the structural features and business objectives of each conduit, and report on various portfolio characteristics. The reports can also be found on the Moodys.com website. The quarterly publication also includes special reports on topics relevant to the ABCP market and a review of the past quarter's market trends. In January of each year Moody's publishes a variety of annual review pieces covering ABCP markets around the world.

---

[37]  See Moody's Special Report, *ABCP's Song of the Sirens: Reporting Monthly Performance Data May Lure Investors onto the Rocks* February 1999, discusses some of the issues with respect to conduit surveillance reports.

Kelley_DZ_00092054

Moody's publishes ABCP market and conduit statistical information monthly in the *ABCP Snapshot* publication. More detailed information appears in an Excel spreadsheet-based publication, *ABCP Query*.

The ABCP group also publishes press releases documenting significant rating actions such as the assignment of new ratings and confirmations of existing ratings in light of a significant credit event. Moody's rating actions that relate to lesser events, such as conduit additions and amendments, are summarized in a weekly press release. These can be found on various news services and on Moody's web site.

Finally, Moody's conducts a number of educational seminars for investors, issuers and other industry participants. "The ABC's of ABCP" aimed at those new to the market has become a popular annual event. "The PhD's of ABCP" presents advanced topics and is expected to be as successful as its introductory counterpart. These seminars have been held in New York, London and other major cities in the U.S. and around the world.

Please see the Bibliography of Moody's Special Comments on page Bibliography of Moody's Special Comments for a detailed list of Moody's ABCP monitoring publications.

Kelley_DZ_00092055

## CONDUIT LIABILITIES: ABCP, FLOATING RATE CP, SLNS, ECNS AND MTNS

Most ABCP conduits issue fixed rate commercial paper at a discount and pay off of the face value on a single stated maturity date. However, some programs issue a variation on this "plain vanilla" CP, and others issue a variety of term notes. The only difference between commercial paper and asset-backed commercial paper is that the former is a senior unsecured obligation of a corporation, while the latter is issued by a special purpose vehicle and is secured by and repaid from pools of assets. Corporate issuers have pioneered many of the variations on ABCP described below.

### Ordinary ABCP

Traditionally, commercial paper is a security with an original term to maturity of no longer than 270 days for U.S. CP and 364 days for Euro CP, though in some jurisdictions the maximum term is as short as 180 days and as long as 390. Most commercial paper is issued at a discount to face value, with a fixed rate of interest expressed on a 365-day basis. The only payment is that of the face value at maturity. The issuer has no right to prepay nor does the investor have a right to put the paper back to the issuer prior to its maturity date.[38]

### Interest Bearing ABCP

Sometimes CP is issued in interest bearing form, though this is usually just a cosmetic difference. All interest and principal is repaid at maturity, and no intermediate interest payments are made during the life of the note.

If an ABCP conduit were to issue commercial paper with periodic interest payments prior to maturity, then the program documentation would have to reflect that option. In addition to being sure that the liquidity facility is sized to cover the intermediate interest payments, the liquidity banks must agree to be drawn if needed to cover these payments. In addition, the Administrator or other appropriate party must be required to draw liquidity to cover the interest payments if cash is not available from other sources.

### Floating Rate ABCP [39]

The term of most ABCP issued is much less than the permitted maximum, typically under 90 days and often under 30. One reason is investor demand. Money market funds are often looking for a short maturity investment. The other is that depending on the interest rate environment, either investors or issuers are reluctant to hold or issue, respectively, fixed rate notes with longer maturities.

One solution has been for conduits to issue floating rate ABCP. The more expensive[40] conduits issue paper at 5 to 10 basis points below LIBOR, the cheaper programs at 5 to 10 basis points over LIBOR. Floating rate ABCP, issued at a spread to one-month LIBOR with the rate reset every 30 days, may be issued at long maturities at similar spreads. Both issuer and investor may be reasonably certain that the interest rate will be close to that of newly issued shorter term paper.

Almost all ABCP conduits have an issuance test that requires that available liquidity exceed the outstanding face amount—principal plus interest due at maturity—of ABCP. For floating rate ABCP the interest portion obviously cannot be calculated at time of issuance, hence this test cannot be satisfied because one of the terms cannot be known. Also, as interest rates change during the life of the outstanding floating rate paper, rising rates may cause the program to violate the interest rate coverage test. Conduits that wish to issue floating rate ABCP must find a way to deal with the problem of maintaining adequate liquidity coverage and then amend their issuance test correspondingly.

Some programs have a liquidity facility sized to cover the fixed principal amount of their purchase commitments but an unspecified and unlimited amount of interest. Other programs have a liquidity facility sized to cover the fixed principal amount of the purchase commitments, but use an interest rate swap or equivalent hedging arrangement to cover the interest portion. In some cases the conduit works with Moody's to arrive at a liquidity coverage formula that covers extreme interest rate movements to a degree consistent with a Prime-1 rating.

The final concern is that the conduit not operate at a loss. The funding costs must be covered by the assets or the risk otherwise transferred to a suitably rated third party.

---

38  See Moody's Special Report, *Introduction to Asset-Backed Commercial Paper Structures*, reprinted from the Fourth Quarter 1997 Asset-Backed Commercial Paper Market Review.
39  See Moody's Special Report, *Floating Rate ABCP: Issues and Answers*, December 1999.
40  "more expensive" in that investors pay a higher price, or equivalently, receive a lower rate of interest. ABCP with a lower discount or interest rate clearly provides lower cost funding to the issuer.

Kelley_DZ_00092056

## Extendible Commercial Paper

As backup liquidity facilities have become more expensive, corporate and asset-backed issuers have looked for ways to reduce the amount of backup liquidity required to support their commercial paper programs. Longer maturity CP locks investor funding in and eases the liquidity burden in much the same way, though not as effectively, as term debt or equity. A related innovation is to issue extendible ABCP. Extendible ABCP appears under several names depending on the sponsor: extendible commercial notes (ECNs), secured liquidity notes (SLNs) and MITTENs[41].

Much like commercial paper, extendible commercial paper is initially issued as a discount security at a fixed rate of interest for an initial maturity. The primary difference is that at the scheduled maturity, the issuer may choose not to repay extendible commercial paper and extend its maturity for an additional fixed period. If extended, the extendible CP switches to a variable rate security, usually with a LIBOR-based rate that resents monthly.[42] The spread or "go-to" rate is significantly above the normal ABCP spread of 5 to 10 basis points below LIBOR, typically on the order of 25 basis points above LIBOR. In addition, once extended, the extendible ABCP often has a call feature permitting prepayment by the issuer as funds are available.

Extendible commercial paper may be problematic for money market fund investors, or other investors who need to closely manage the maturities of their investment portfolios. The extendible feature creates uncertainty about the principal payment date of the CP notes. Should extendible ABCP be classified based on its scheduled maturity date or by its potential extended maturity date? To date, no extendible ABCP has ever actually been extended, though some corporate extendible CP has been extended.

### Extendible Commercial Notes

The first ABCP programs to issue extendible ABCP, (ECNs) were programs funding credit card receivables. These include Citibank's DAKOTA CP Notes Program, MBNA's Emerald Notes Program and Discover Card's Newcastle Certificates Program. The ECNs issued by these programs have an initial scheduled maturity of 90 days and a maximum extension period of 300 days, for a maximum final maturity (original plus the extension period) of 390 days. This tenor limitation qualifies the notes as an eligible investment for money market funds under Rule 2a-7 to the Investment Company Act of 1940.

Typically, the ECNs are issued at a discount with an initial maximum term of not more than 90 days. Typically, the conduit pays maturing notes by issuing more notes. If, however, new notes cannot be issued, the maturing notes will automatically become extended. The effects of extension are that the ECNs will have a legal final maturity of 390 days from issuance, with a bullet payment of principal on the 390th day and monthly interest payments. Investors receive stepped-up pricing as compensation for waiting 300 days for repayment of the ECNs. During this extension period the conduit begins liquidating the assets that collateralize the ECNs in order to pay investors by the 390th day.

Conduits that finance assets with rapid and reliable payment rates, such as credit card receivables, are ideally suited for the issuance of ECNs. Typically the ECNs may be prepaid in part or in full upon 5 days' notice from the conduit, as funds become available. These programs have a small partial liquidity facility that may be used to avoid immediate extension, and they may also attempt to reissue the CP and prevent full amortization of the asset pools.

### Secured Liquidity Notes

Extendible ABCP has also been issued under the name Secured Liquidity Notes or SLNs. They have most commonly been used for single-seller residential mortgage warehouse conduits such as Harwood Street Funding and Principal Residential Mortgage Capital Resources. The typical tenor for initial SLN issuance is no more than 65 days. As with conventional ABCP, maturing SLNs will be repaid either through collections from the asset interests or from the issuance of new SLNs. If new notes cannot be issued, the maturing SLN can be extended for a period up to 300 days so that the notes will mature no later than 365 days from issuance. Again the term qualifies under Rule 2a-7.

Residential mortgages are unlikely to amortize fully during the extension period, even at the most extreme prepayment rates. Whole loan mortgages are, however, highly liquid, and may be sold directly to third parties or securitized. In fact, term securitization is the intended "take out" for a mortgage warehouse program. In addition to the credit risk of default, the sale of assets may expose investors to market value risk. These mortgage

41  Name given to extendible issuances of GMAC's mortgage warehousing ABCP program – Mortgage Interest Networking Trust (MINT).
42  See Moody's Special Report, *Extendible Commercial Notes Extend Asset Allocation Choices for Money Market Funds*, August 2000.

Kelley_DZ_00092057

warehouse SLN programs typically include a highly rated swap counterparty to provide coverage of the market value risk and to guarantee purchase of the collateral by the final maturity date.

## Medium-Term Notes

Medium-term notes (MTNs) have maturities ranging from 180 days to 30 years, with a dollar-weighted average of about five years. MTNs are not a form of commercial paper and receive long-term, not short-term ratings. Those issued by ABCP programs have typically received Aaa ratings. Unless they mature in under a year, MTNs typically do not qualify as money market fund investments under Rule 2a-7. MTNs are typically floating rate, issued at a spread to monthly or quarterly LIBOR, and make regular interest payments while they are outstanding. By locking in long-term funding, MTNs are a powerful tool for managing liquidity needs.

An additional appeal of MTNs lies in the ability to issue them when there are favorable market opportunities. The terms may be arranged to take advantage of the status of the market and to meet particular funding requirements. Maturity, interest rate, currency, and other terms of MTN issuance allow programs to expand their funding mix. Many MTN structures are extremely complex, and can result in unusual credit and market risks for investors that Moody's identifies and analyzes when assigning a rating.

ABCP programs that issue MTNs are typically of the highest asset quality and have a reasonable level of cross-collateralized program credit enhancement to support the securities issued. SIVs, described above, are securities arbitrage programs that issue both ABCP and MTNs. In order to reduce the amount of required liquidity they tend to do more of their funding with MTNs than with ABCP, often a 2:1 mix. There are also a number of multiseller programs that are able to issue MTNs, such as Citibank's Eureka and CXC programs, though their use of MTNs is not as extensive as that of the SIVs.

MTNs issued by multiseller programs entail complicated analysis emphasizing strong asset quality, cash flow from assets, and a reasonable level of cross-collateralized program credit enhancement. An alternative, though a somewhat unwieldy one, is to "ring-fence" specific assets within a conduit and dedicate those assets to deal-specific MTNs or other liabilities issued by multiseller programs. This would entail re-documenting ABCP programs to isolate specific pools of collateral and associate them with specific liabilities. This would also entail intercreditor issues among the conduits' separate debt issuances. Conduits with a certain asset profile may benefit by splitting into separate entities housing asset pools that would be dedicated to specific MTNs, or serialized debt issuance. The disadvantage of this approach is that it weakens one of the historic strengths of traditional ABCP conduits: large, diversified portfolios financed by a single class of investor.

## Serialized ABCP [43]

In most conduits, all of the outstanding liabilities are equally and ratably secured by all of the assets. There are conduits (such as Perry Funding, and Prime Asset Vehicle (No. 2) Ltd.) that issue serialized commercial paper. In a serialized program, a single special purpose company issues different series of ABCP. A specific, identifiable asset portfolio, with its own credit enhancement and liquidity support backs each series. The liquidity and credit support facilities for one asset pool are not available to repay commercial paper issued in respect of another asset pool. Because there is no cross-collateralization, each series and asset pool must be structured to a **Prime-1** rating on its own.

Serialized ABCP may be a cost efficient way for issuers to reach a wider range of investors. However, merely offering different series of ABCP backed by different assets and supported by separate credit and liquidity support does not necessarily insulate investors from the risks of other series issued as part of the same program. Each series is fundamentally linked with every other series because the same special purpose vehicle issues them all. If there is a default in one series, the unpaid investors could force the company into bankruptcy.[44] While all investors typically agree not to file a bankruptcy petition until a year and a day after all series have been repaid, it is possible that a bankruptcy court judge could permit a filing to stand. Most of the other creditors of an ABCP conduit are insiders such as the administrator or the liquidity providers and a bankruptcy court judge is more likely to uphold the waiver of a right to file for insiders than for investors.

---

43  See Moody's Special Report, *Serialized ABCP: The Hidden Dangers*, reprinted from the First Quarter 1998 Global Asset-Backed Commercial Paper Market Review.
44  The unpaid investor has very strong economic incentive to force a bankruptcy especially when he is a unsecured investor. By laving all other investors at the same playing field, a bankruptcy could increase an investor's prospects for recovery by having access to a large pool of assets.

Kelley_DZ_00092058

In its ratings of the rare programs that issue serialized ABCP, Moody's typically holds all serialized issuers to the same stringent **Prime-1** rating standards. Downgraded counterparties of any of the serialized issuers could cause a downgrade of all the serialized issuers. Moody's is clear in its publications as to this risk and the counterparties involved.

Kelley_DZ_00092059

## INVESTORS—WHO ARE THEY AND WHY DO THEY BUY ABCP?[45]

### Traditional Investors
From the early days of ABCP issuance, the regular investors in ABCP have been securities lending groups and prime money market funds. Corporate treasurers, STIFs (short-term investment funds, essentially money market funds established for institutional investors), common funds, and public and private treasury managers have also become investors as they have become more familiar with ABCP.



Figure 2
ABCP Outstandings vs Unsecured Corporate CP
Dec 1995 - Dec 2002 ($ Billions)

Sources: Federal Reserve Board, IMoneyNet, Inc.

At about 50% of outstanding ABCP, Prime Money Funds Represent the Largest Investor Segment

### What's the Appeal of ABCP?
ABCP programs are designed to satisfy the investment requirements of short-term investors in the money market securities market. As with unsecured CP, ABCP programs are set up as SEC 3(a)3 or 4(2) public programs, or 144(a) eligible private placements. ABCP programs are careful to limit asset concentration so as to avoid disclosure and remain in compliance with 2a-7 rules. Additionally, the ABCP market has become very competitive to other money market instruments in terms of its high quality credit profile, exemption from SEC registration and focus on bankruptcy remoteness.

#### High-Quality Alternative to Unsecured CP
ABCP's popularity among short-term investors reflects the wariness of issuer-specific event risk— a credit risk by-product of unsecured CP. In the late 1990s and early 2000s, many portfolio managers were exposed to unsecured investment-grade securities that transitioned into non-investment grade securities within a short period of time. In a few instances, Prime-1-rated corporate CP actually defaulted.

In response to the volatile corporate credit environment, some portfolio managers expressed a greater interest in highly-rated secured ABCP. With their structural protections and portfolios of financial assets, ABCP conduits were less prone to event risk than some corporate borrowers. No ABCP program rated Prime-1 has ever defaulted on its outstanding paper.

#### Diversification
ABCP programs offer portfolio managers a large asset class not completely correlated with corporate CP, bankers' acceptances, government securities and other short-term investments. Concentration risk and the basic supply of available money market securities are key for short-term investors due to their investment diversification restrictions and guidelines.

---

45   This section is based on Moody's Special Report, *U.S. Money Market Funds Hungry for Asset-Backed Commercial Paper*, April 20, 2001. See also the companion report, *U.S. Money Market Funds Carry a Big "Buy-Side" Stick with ABCP*, July 2002.

Kelley_DZ_00092060

## Yield Enhancement

ABCP programs have been offering money funds and institutional investors very competitive yields since they first appeared in the early 1980s. ABCP spreads over traditional CP continue to be a prime motivator for investors. In a study conducted by Moody's using reported yields from Bloomberg, ABCP spreads over CP have averaged 6.27 bps for the one-year period from February 2001 through February 2002.



Figure 3
30-Day ABCP Spreads over CP / 30-Day ABCP Yields
August 13, 1997 - October 11, 2002

Bloomberg: A-1+/P-1 ABCP and AA non-financial CP

It is not clear if this yield advantage will persist. Given the event risk seen in corporate CP in the 2001-2002 period, and given the greater understanding of ABCP among short-term investors, spreads may well narrow. As a result of a variety of economic and credit factors, the amount of corporate CP outstanding has declined by one-third from its peak, and the amount of ABCP outstanding exceeds the amount of corporate CP outstanding by about 10%. Already some of the best Prime-1 ABCP programs trade through some of the weaker **Prime-1** corporate CP issuers.

## Investor Acceptance and Comfort with ABCP

The mid-1990s brought ABCP into the mainstream of money market instruments as more institutional investors began to significantly increase their holdings. However, market cycles and risk events continued to concern some investors, and occasionally ABCP yield has jumped significantly above its average spread to traditional unsecured CP (see *Figure 3*). One reason is lack of understanding on the part of investors. Corporate CP is relatively easy to understand and explain: it is a senior unsecured obligation of a single corporation. ABCP is a senior obligation issued by an unfamiliar special purpose corporation and secured by a portfolio of assets originated by anonymous sellers.

A new trend began with the new millenium. Investors took note of the relative credit stability in asset-backed securities in general and ABCP in particular. Many investors made the effort to educate themselves and their credit committees about the risks and mitigants in ABCP programs and have them added to their lists of approved assets. For these and other reasons, the average ABCP spread to corporate CP has been more stable and the spikes seen in the 1990's have not recurred. This may be an indication that short-term investors have reached a new comfort level with this asset class.

## Choice of Maturity

ABCP is typically issued with a maturity between 30 and 90 days. Although overnight and over 90-day maturities are available, they are utilized to a much lesser extent. These shorter maturities make ABCP well suited for managing portfolio liquidity using 'laddered' maturities. A laddered portfolio has equal amounts of ABCP at a series of maturities spaced into the future.

---

Investors—Who Are They and Why Do They Buy ABCP?

Kelley_DZ_00092061

## Money Fund Liquidity Requirements for ABCP Holdings

ABCP secondary market liquidity is very important for money market portfolio managers. Despite a money fund's typical buy-and-hold investment strategies, funds do hold most securities as "liquid" as interpreted by regulatory requirements. A security held by a money market fund is liquid if the fund can sell it in seven days or less at a price approximately equal to the amortized value of the security. This means each ABCP holding must have a "good price"[46] on it when the portfolio is marked-to-market for constant NAV tolerances.

Bear in mind, as with the liquidity of any security, an investment's liquidity is often a factor of the investor's business relationships with the dealers. Dealers often make a secondary market in ABCP as a concession to a large investor. A dealer is also more likely to make a secondary market in the ABCP for a larger ABCP program with a strong sponsor, as the dealer is likely to be able to resell the repurchased securities quickly. Hence the growth of the ABCP market improves the secondary market liquidity of the product and makes it more acceptable to money market fund managers.

### The Illiquid Basket

Under the Investment Company Act 1940, a money market fund may invest up to 10% of its assets in illiquid securities or securities that are not readily marketable. Some smaller ABCP programs may be considered illiquid under money fund regulatory guidelines. In addition, the status of extendible ABCP may not be clear. Most money funds buy little or no illiquid ABCP.

## Investors Comfortable, Yet Still Concerned

ABCP's historical credit and structural performance has been exceptional with no defaults on **Prime-1**-rated ABCP, and no downgrades as a result of the credit quality of the underlying assets. This record has given great comfort to short-term investors, especially when contrasted with the recent credit volatility of corporate CP. However, some investors feel the ABCP market has not been exposed to the full extent of market cycles or risks that would test the integrity of all the various assets and structures employed by ABCP conduits.

---

46   A "good price" refers to a quoted price that a dealer will stand behind.  Regulatory requirements, in part, define liquid securities as those for which a fund has received independent price quotes from two dealers, or one quoted price if there is only one dealer for an ABCP program.

**Kelley_DZ_00092062**

## CONCLUSION

ABCP programs provide a valuable and flexible alternative for companies seeking short-term financing. Most ABCP programs are bank-sponsored multiseller entities. The form of these programs can either be fully or partially-supported. To a certain extent the form predetermines the type of risks and the kind of analysis that Moody's performs.

Moody's analysis of an ABCP program encompasses the credit risk, liquidity risk, structural risk, operational risk and other factors. Credit risk is the risk that losses will occur on the assets purchased by the program. Liquidity risk is the risk that collections on the assets will not be received quickly enough to provide funds needed to repay maturing ABCP (assuming that new ABCP cannot be issued to provide funds for that purpose). Structural risk refers to risks associated with the legal structure of the program. Operational risk arises from the complexity of an ABCP program and the need to follow documented procedures correctly. All these risks while distinct, are in fact interrelated. All these risks have to be adequately addressed in order for an issuer of ABCP to receive a **Prime-1** rating.

Moody's review of a program is different when it is fully or partially-supported. A fully-supported ABCP program uses a single external support facility to provide 100% coverage against credit risk and liquidity risk. There are three forms of support facility used -- a letter of credit or an irrevocable revolving commitment or a total return swap. In all cases, the amounts provided under the support facility are intended to fully protect investors from any credit and liquidity risks of the program's assets. Any credit losses on the assets are absorbed by the support facility, as well as ensuring timely repayment of ABCP if collections on the assets are not received quickly enough. The main risk to investors in such a program is that the rating of the support provider may be lowered, in which case the rating of the issuer of the ABCP might also be lowered. Moody's analysis of a fully-supported program is not based on the program's assets but primarily on the financial strength of the support provider, the obligations of the support provider are listed in the program documents and its legal structure.

On the other hand, a partially-supported ABCP program has two supporting facilities intended to address a specific type of risk. As the facilities only provide partial coverage against credit losses on the assets in the program, Moody's analysis of a partially-supported program focuses on the assets. The goal is to determine that the probability of losses on the assets exceeding the coverage of the credit enhancement facility is so remote as to be consistent with the rating assigned to the issuer. Because the credit enhancement facility provides only partial coverage, a separate liquidity facility is used to address liquidity risk. In most cases, the size of the liquidity facility are typically 100% or more of the amount of ABCP issued and the credit enhancement facility about 5% to 10% of the facility limit or the amount of ABCP outstanding with a flooramount.

The rating of a partially-supported ABCP program depends on multiple factors, including (1) the performance of the program's assets, (2) the rating(s) of the provider(s) of the credit enhancement facility, (3) the rating(s) of the provider(s) of the liquidity facility, and (4) the expertise of the program's administrator. The largest and most visible ABCP programs are partially-supported, bank-sponsored, multi-seller programs.

The ABCP market has grown and evolved in the last decade. In response to the growing scarcity of inexpensive available liquidity and the changing regulatory environment, new types of ABCP programs and the variety of instruments used to fund such programs have grown. Fortunately, investors' increased understanding of and comfort in investing in these instruments have grown as well. It also helps that there have been increased concerns with the credit risk of unsecured CP (i.e., corporate CP).

A **Prime-1** rating on a ABCP issuer conveys Moody's opinion that it is highly probable that investors will receive full and timely payment on the ABCP. Moody's plans to continue its present practice of rating nearly all ABCP issuers and of publishing special reports when appropriate. To reiterate, investors are invited to contact Moody's with any questions concerning ABCP.

**Kelley_DZ_00092063**

*Page intentionally left blank.*

Kelley_DZ_00092064

# APPENDIX: ASSET PURCHASE STRUCTURES

Conduits fund a wide variety of transactions, but most of them employ structures that are very similar to term asset-backed securitizations. If an asset type has been securitized, it can most likely be found in some conduit's portfolio. *Sidebar 9* shows the asset mix for the largest multiseller programs. In many cases, conduits directly purchase rated ABS and other securities.

Trade receivable financing is much more prevalent in the conduit market than it is in the term ABS market. Given the importance of trade receivables to the ABCP market, this asset type is discussed in detail here. The structuring details and credit considerations described for trade receivables also apply to many other asset types. For the details of other asset classes, please refer to the Moody's special comments for specific asset types.

## TRADE RECEIVABLE FUNDING BY CONDUITS [47]

One of the most common asset class purchases made by a conduit is trade receivables. Trade receivables are short-term corporate obligations resulting from the purchase of goods or services in the ordinary course of business. The Seller of the goods and services, also called the Originator of the receivables, is typically a customer of the bank that sponsors the conduit.  The Seller "sells" the receivables—the bills owed by its customers—at a discount to face value in order to obtain working capital financing. The discount provides overcollateralization as a reserve for funding costs, servicing, credit losses and dilutive items.[48]

Most facilities are revolving in nature. Therefore, as receivables are paid down and new receivables are generated, the new receivables are sold to the transaction at a discount. If insufficient new receivables are generated, then funds are transferred to the conduit to repay maturing ABCP. If additional new receivables are generated, more ABCP may be issued—up to the facility limit—to purchase them. The amount of financing available to the seller fluctuates based on the available receivables and the facility limit. Depending on the deal, settlement may take place on a daily, weekly or monthly basis.

Trade receivables, with their varying balances and short –terms are ideally suited to financing with commercial paper. In fact, commercial paper is the traditional source of working capital financing for Prime-1-rated companies. By financing their trade receivables in an ABCP conduit, companies who cannot access the corporate commercial paper market are able to access the ABCP market at lower all-in rates than the available alternatives, such as a secured bank line.

### Two-Step Sale Structure

The first tier of the transaction is the sale of receivables from the seller to a special purpose vehicle (SPV)[49] established to specifically purchase these receivables. The governing document is a receivable sale agreement between the Seller and the SPV.[50] The conduit then agrees to purchase the same pool of receivables from the SPV, or to fund that SPV's purchase by making a loan secured by the purchased receivables. This is generally documented through a Receivables Purchase Agreement between the conduit and the SPV.

Such a structure is known as a "two-step sale". The transaction is structured this way for two reasons. The first is to achieve off-balance sheet treatment for the seller. The more important reason is to obtain "true sale" status to reduce the risk that the assets would be consolidated with the Seller's estate should the Seller enter bankruptcy proceedings. A first priority perfected security interest is also obtained for the benefit of the conduit and the liquidity banks. The liquidity facility typically absorbs the risk of seller bankruptcy. But true sale status protects the liquidity banks and provides an extra layer of protection to ABCP investors.

### Liquidity Backup Facility

The conduit's asset purchase is supported by a liquidity facility sized to the conduit's purchase commitment with an additional amount to cover interest on ABCP. In almost all cases, the conduit is not a committed purchaser of the assets.  The liquidity banks in the backup facility are committed to purchase the assets should the conduit choose not to fund or be unable to fund, for example if CP cannot be issued.  This arrangement is documented in a liquidity agreement.

[47]  The material in this section draws heavily from Moody's Special Report, *Moody's Approach to Rating Trade Receivables Backed Transactions*, July 2002.
[48]  Dilution, or dilutive items, are non-credit-related reductions in the receivable amounts, for example for volume rebates. In trade receivables transactions, there is typically recourse to the Seller for reimbursement of dilutive items.
[49]  The SPV in this case is generally a bankruptcy remote subsidiary of the originator of the receivables.
[50]  Also referred to as a "first tier agreement."

Kelley_DZ_00092065

## Assets Financed by ABCP Programs

[illegible]

### 20 Largest Partially Supported Multiseller Programs

[illegible]

### Asset Types in ABCP Multiseller Programs

[illegible]

The liquidity support is typically sized at 102% or 103% of the facility limit. The extra 2 to 3% is intended to cover interest on the CP. [51] Generally the conduit cannot issue ABCP unless available liquidity equals or exceeds the face amount—principal plus interest at maturity—of outstanding ABCP. The amount of liquidity available is determined by a funding formula that typically limits liquidity funding to"good," i.e. non-defaulted, assets.

## Incremental Program Credit Enhancement
Program-wide credit enhancement is typically increased by a percentage of each conduit asset purchase.[52] This level of enhancement is in addition to the pool-specific or transaction-specific credit enhancement. Both types of credit enhancements are established to cover defaulted receivables. The pool-specific enhancement is used to cover defaulted receivables in a specific deal, while the program-wide credit enhancement is available to cover losses across most, if not all assets in the conduit's portfolio. Program credit enhancement effectively provides cross-collateralization across all of the assets in the conduit portfolio. The administrator draws on the program-wide credit enhancement to repay maturing ABCP if no other funds are available, including funds from the liquidity facility.

If the purchased receivables are denominated in a different currency than that of the ABCP issued to fund them, a currency hedge is arranged to minimize exchange risks to ABCP investors.

## Analyzing the Credit Risk of Trade Receivables
The conduit funds trade receivables at a discount to face value. That discount must cover losses due to obligor default, dilution, servicing and program costs, and, because trade receivables are non-interest bearing, interest on ABCP. In addition, the receivables are further refined through eligibility criteria designed to screen out less desirable receivables. Generally delinquent and defaulted receivables are excluded from purchase. Some receivables with a government or a foreign obligor may also be limited or excluded. In order to reduce concentration risk, the amount funded from any one obligor may also be limited. Moody's analysis of the trade receivables focuses on whether the proposed discount rate, eligibility criteria and termination triggers provide sufficient investor protection.

### Industry-Specific Risks
The performance characteristics of trade receivables vary greatly from one industry to another. Trade receivables originated by a clothing manufacturer selling to retail stores have different patterns of delinquency, default and dilution than do those originated by an equipment manufacturer selling to industrial firms. Moody's first step in analyzing a trade receivable deal is to understand the business model of the seller and the standard terms of trade in that industry. Moody's structured finance analyst probes the Seller for information on its trade practices and consults with Moody's fundamental analysts for information on industry-wide practices.[53]

### Asset Performance Analysis
Moody's reviews the historical performance of assets to understand trends and to determine whether the pool-specific credit enhancement is sufficient to cover potential losses in the transaction. Delinquency, default and payment rates are the primary indicators of asset performance. Moody's also studies the amount of dilutions (which are commonly related to product returns or billing disputes), and the originator's chargeoff practices, which can distort the receivables' performance data. Typically three years of monthly performance data are needed in order to get a good measure of asset quality. Moody's will analyzes the performance data and compare its with other, similar transactions.

### Obligor Quality and Concentration [54]
Investor repayment depends greatly on the quality of the obligors. Moody's is concerned with obligors' size, credit quality and willingness to pay. Obligor concentrations in the receivable pool are a concern, since a default by a large obligor would affect a significant portion of the pool. Generally, strong trade receivable deals have a well-diversified pool of obligors with no significant concentrations.

---

51  See Moody's Special Report, *Why Liquidity Facilities in ABCP Programs Equal 102%*, reprinted from the 1st Quarter 1999 Asset-Backed Commercial Paper Market Review.
52  For most conduits, the exemption to this requirement is when the asset is rated at least Aa2 or higher, is fully-supported bya Prime-1 rated financial institution or is covered under a policy provided by a Aaa-rated monoline or surety provider.
53  For example, see Moody's Special Report, *A Guide to Collateral Quality Risks in Securitized Trade Receivable Transactions: Focus on the Contract-Related and Dealer-Network Risks*, April 1995.
54  See Moody's Special Report, *Bigger Isn't Better: The Risk of Obligor Concentrations in Trade ReceivablesTransactions*, September 1998.

Appendix: Asset Purchase Structures

Kelley_DZ_00092067

More often than not, trade receivable transactions set obligor limits based on their ratings. The higher the obligor's rating, the larger the obligor concentration limit. However, even highly rated obligors pose significant risks in a trade receivable transaction. A highly rated obligor is unlikely to default due to bankruptcy, but its receivables may be subject to slow pay risk and dilution risk.

Trade receivables have a due date, but it is not uncommon in many industries for obligors to delay payment past the stated due date for a variety of reasons. Some retailers, for example are notoriously slow payers on receivables due to their suppliers. A company's rating, which indicates their willingness and ability to make payments on corporate debt, does not speak to a company's payment behavior on accounts payable. In some industries, trade receivable obligors have the market power to manage their cash flows at the expense of their suppliers by delaying payment on receivables. Slow payment reduces the cash flow to the transaction and may increase the risk of default.   In a trade receivable transaction, liquidity banks typically fund against"non-defaulted" receivables. Receivables that are still unpaid after a specified time period are considered defaulted under the liquidity agreement and the banks will not fund against them. This then becomes a risk to ABCP investors.

### Dilution Risks Vary by Industry in Trade Receivables Transactions [55]

The sources of dilution risk vary greatly from industry to industry. Dilution comes about when the amount payable on a receivable is reduced for a non-credit-related reason, that is any reason other than default by the obligor. Product returns are an obvious source of dilution, but many other, less obvious sources of dilution exist. Sellers may grant volume discounts or advertising credits. These forms of dilution are more likely to be made available to large customers. Large customers may also have more leverage with respect to payment terms and returns. A large obligor may choose to take credits when it feels they have been earned and not necessarily when the Seller grants them. This may lead to late payments or disputed items that, as they age, are eventually considered "defaulted" under the liquidity agreement, resulting in a loss or reduction in liquidity funding.

Another significant source of dilution to trade receivables is the risk that obligors offset amounts they owe against receivables or liabilities of the Seller. Offset risk is most likely to materialize when the Sale's credit quality deteriorates.  Concerned obligors may begin to offset amounts they owe against unearned receivables or warranty damages owed to them. The evaluation of the potential for offset is necessarily a qualitative analysis, since these amounts would generally not be evident in historical receivable performance.

### Servicer Quality

In almost all trade receivable transactions, the Servicer of the asset pool is the Seller of the assets. The Servicer is responsible for credit underwriting of the obligors, origination, collection and performance monitoring. In most U.S. trade receivables transactions payments are made through a lock box unless the Servicer is an investment grade firm. While the Servicer typically can direct the cash received in the lock box while the deal is performing, the Trustee can take control in certain defined circumstances where the transaction performance is at risk, particularly if the Servicer's credit rating is lowered. In cases where lock boxes are not used, the Servicer is typically required to transfer payments to an account owned by the securitization on a regular basis, more frequently the lower the credit rating of the Servicer.

The Servicer handles any receivable disputes or payment delays through its ultimate settlement or write-off. Moody's reviews the Servicer's credit and collection policy, operations and results of any third-party audits done of the Servicer's operations. In some cases, a transaction may have a backup servicer to collect on the receivables if the primary servicer enters bankruptcy or fails to perform.   In some cases a deterioration in servicer credit quality could be material to the performance of the receivable pool. This is usually due to selling practices and contingent obligations that the seller may have relative to its obligor base. Moody's considers these factors in its analysis of receivable pools in conduits.

## Risk Mitigants in Trade Receivable Transactions
* The primary investor protections in trade receivable transactions are:
* Pool-specific credit enhancement provided through overcollateralization and funded by purchasing the receivables at a discount
* Eligibility criteria that limit the type of obligations s purchased
* Performance triggers that force the transaction to amortize early and protect investors from future deterioration

[55]  See Moody's Special Report, *Trade Receivables Update:  Concentrating on Dilution—Focus on Capital Goods and Consumer Products Receivables*, January 1997

---

APPENDIX: ASSET PURCHASE STRUCTURES

Kelley_DZ_00092068

**Pool-Specific Credit Enhancement**
Pool-specific credit enhancement in a trade receivable transaction is set to cover the risk of loss and dilution, servicing costs and funding costs. Each transaction has a minimum level of pool-specific credit enhancement that is typically express as a percentage of eligible receivables. The minimum credit enhancement level may also be defined to cover the three or four largest obligors in the pool in order to reduce concentration risk. A dynamic formula tied to asset delinquency, default, and dilution, servicing fees and funding costs results in credit enhancement that fluctuates above the minimum level according to receivable performance. Reserve levels for trade receivable deals tend to be in the range of 10% to 25%, which means that the discounted purchase price or advance rate for receivables is in the range of 75% to 90%.

**Reducing the Risk of Large Obligor Concentrations**
There are a number of ways to mitigate the risk of large obligor concentrations. The most common is to limit the amount of funds advanced against any single obligor. Second, many transactions have "cross-aging" of delinquent or defaulted receivables, such that if a percentage of an obligor's receivables are delinquent or defaulted, then all of that obligor's receivables become ineligible for funding. Finally, credit enhancement may be sized to cover a certain number of obligors at minimum.

**Asset Performance Triggers**
Most transactions have asset performance triggers based on delinquency, default, dilution and payment rates. Almost every trade receivable transaction has a trigger related to the overcollateralization levels. If the amount of receivables eligible for liquidity funding (sometimes referred to as "good" receivables) is insufficient to cover the ABCP the conduit has issued to fund the transaction plus all of the required reserves, the transaction is said to be "out of formula". This is also referred to as "failing the Asset Interest test". The formula is generally expressed as the face amount of ABCP outstanding plus Required Reserves / Eligible Receivables. If this ratio is greater than 100% and remains uncured for more than one to five days, it is generally an automatic termination event.

**Other Triggers**
ABCP trade receivable financing is usually just one part of an overall financing strategy for an industrial corporation. Conduit receivable deals normally have triggers that require amortization upon any material default on other indebtedness of the Seller, particularly bank lines or public debt. There are frequently financial covenants in conduit receivable purchase agreements that mirror those in other bank lines. If the Seller or any material subsidiary files for bankruptcy protection it is always a termination event in a receivable securitization.

Any trigger may cause a "cease purchase" which means that no new receivables are purchased from the seller and the transaction amortizes as the existing receivables are paid down. Alternatively, a trigger may cause a "cease issuance" which means that no further ABCP may be issued to fund the transaction. Some triggers result in both a cease purchase and a cease issuance. If receivables pay quickly ABCP will be repaid from cash receipts; otherwise liquidity will be drawn to repay ABCP. A trigger may cause an immediate "put" to liquidity providers, which means that the liquidity facility is drawn immediately to purchase the conduit's interest in the transaction and the funds are held in a trust account to repay ABCP as it matures. These triggers may be mandatory, or they may be "waivable." Generally Moody's receives notification when a trigger is hit in order to discuss transaction performance and remedies with the conduit sponsor.

## SECURITIES PURCHASES BY CONDUITS
ABCP programs also purchase rated asset-backed securities, a practice that has become increasingly common in the last five years. The fact that a security is already rated makes a security purchase simpler to effect in some ways than a transaction structured solely for the conduit market. On the other hand, term structures lack short-term ratings and liquidity facilities. In addition, many ABS are pass-through securities and their ratings reflect the likelihood of ultimate payment, but not the timing of payment. In order to make sure that these issues are adequately addressed, Moody's reviews the terms and funding arrangements of securities purchases prior to their implementation.

"Highly rated" securities (typically **Aa2** and higher) backed by a liquidity facility that funds for non-defaulted assets are typically consistent with a **Prime-1** rating. Lower rated securities may need additional enhancement. Credit enhancement may take any of the forms discussed under Forms of Credit Enhancement on page Forms of Credit Enhancement. The most common methods of enhancement are surety bonds, letters of credit,

**Kelley_DZ_00092069**

and increased program-wide credit enhancement. Often, lower rated securities are enhanced through the liquidity facility, either by a more generous funding formula or by limiting the time investors are exposed to loss.

For example, credit card "C" pieces are often funded in conduits with a 30-day restriction on ABCP maturity, and a cease issuance if the underlying credit card master trust goes into early amortization. Investors are exposed to a 60-day window of risk exposure: one month to receive a performance report indicating amortization and a second month for outstanding ABCP to mature and be repaid by cash from the asset or draws on the liquidity facility. The enhancement supporting the C piece plus program credit enhancement may cover this 60-day risk of loss to a very high degree of certainty, consistent with **Prime-1**.[56]

Some ABCP programs, credit arbitrage programs and structured investment vehicles in particular, only purchase highly rated securities[57]. These programs are generally post-review, in that purchases can be made without Moody's prior review. The rating, enhancement and structural protections that are required by these programs are very detailed. Moody's reviews the program's credit and investment policy and the enhancement and structural features to determine that they are consistent with a **Prime-1** rating.

---

56   See Moody's Special Report, *Understanding Structured Liquidity Facilities in Asset-Backed Commercial Paper Programs*, April 1997.
57   See Moody's Special Reports, *Moody's Approach to Evaluating Credit Arbitrage ABCP Programs*, August 2002, and *An Introduction to Structured Investment Vehicles*, January 2002.

APPENDIX: ASSET PURCHASE STRUCTURES

Kelley_DZ_00092070



Appendix: Asset Purchase Structures

*Moody's Investors Service • 67*

Kelley_DZ_00092071

*Page intentionally left blank.*

Appendix: Asset Purchase Structures                    *Moody's Investors Service • 68*

Kelley_DZ_00092072

## GLOSSARY OF TERMS

**ABCP:** Asset-backed commercial paper.

**ABS:** Asset-backed securities.

**Administrator:** Entity that administers the ABCP program by monitoring receivables, compiling monthly reports, and ensuring that the issuer is in compliance with the program documents and with the credit and investment policy (if there is one). The administrator may be the party who draws under the credit and/or liquidity enhancement if needed. The administrator is often the program sponsor, although programs with multiple sponsors may have a single administrator.

**Advance Rate:** in an asset-backed transaction, the purchase price paid for new assets, usually less than par, to provide credit enhancement and yield. For example, if the transaction pays 80% of the par value of new assets, the advance rate is 80% and the haircut is 20%. See also, Haircut.

**Asset Interest Test:** a typical conduit feature, it specifies that the principal amount of ABCP issued by a conduit cannot exceed the amount of the assets available to support repayment of the ABCP. See also, Liquidity Coverage Test, Issuance Test.

**Asset Purchase Agreement:** Agreement to purchase a specified pool of receivables (provided that performance has not deteriorated beyond specified trigger levels). Asset purchase agreements provide liquidity for ABCP programs and permit the issuer to sell the receivables to the asset purchase provider at any time for any reason. Asset purchase agreements are especially useful with term receivable pools because those pools do not have inherent liquidity as do trade receivable pools.

**Authorized Amount:** Maximum authorized amount of an ABCP program. Actual program outstandings could be significantly less than the authorized amount. ABCP may be issued up to the authorized amount only if sufficient receivables, credit enhancement and liquidity support are available.

**Automatic Stay:** A feature of bankruptcy law in the U.S. and many other jurisdiction, that requires all funds of a bankrupt to be frozen pending court or trustee determination as to their fair and proper disposition. The "stay" is automatic in that it does not require any court action to be effective.

**Backup Liquidity Facility:** a liquidity facility that provides support for a commercial paper program. In some cases it may guarantee funding to a seller if an ABCP program cannot provide such funding.

**Bank Syndication Risk:** see Liquidity Syndication Risk.

**Bankruptcy Remoteness:** structural features of a special purpose vehicle that make it unlikely, though not impossible, that it will become bankrupt either voluntarily or involuntarily, or that it will be consolidated into the bankruptcy estate of a third party.

**Basle Accord:** an international agreement setting common standards for bank regulatory capital requirements. Basle I in 1988 established the blanket 8% standard, and exempted liquidity facilities of less than one-year duration. Basle II, currently under negotiation, will likely establish a risk-based capital requirement standard, and include some requirement for short-term commitments.

**Borrowing Base:** A calculation for determining how much a liquidity bank will fund. Typically, the borrowing base includes non-defaulted receivables and cash a seller has received but has not yet remitted to the conduit. It may include dilution but frequently does not.

**CP:** Commercial paper.

**Cash Collateral Account:** also known as a CCA, a support facility under which a cash or highly liquid securities are maintained in an account for the benefit of a securitization. A CCA may provide liquidity, credit enhancement or both.

**Cease Purchase Event:** in a revolving transaction, a situation that requires the special purchase vehicle to stop purchasing new assets, and retain cash as existing assets pay down. A Cease Purchase Event may be mandatory or waivable, and may be permanent or curable.

Kelley_DZ_00092073

**Clearstream:** Clearstream Banking, s.a., a firm which provides book-entry security ownership and automated settlement services for European transactions, similar to the Depository Trust Corporation (DTC) in the U.S. and Euroclear in Europe.

**Club Deal:** See Syndicated Transaction.

**Collateral Agent:** a support provider in a structured finance transaction responsible for

**Commercial Paper:** or CP, a form of short-term senior unsecured corporate or asset-backed obligation, typically issued at a fixed discount, though sometimes on an interest bearing or floating rate basis. CP maturity is typically less than 270 days in the U.S. and 180 days in Europe, though in some cases may be as long as 390 days.

**Collateral Agent:** in a structured transaction, holds the security interest in all assets of the conduit for the benefit of the investors. Usually the trust department of a commercial bank.

**Concentration Limit:** in a structured transaction, a restriction on the amount of funding that may be provided against the receivables of any one obligor. Typically these limits will vary by the rating of the obligor, and may include exceptions for special obligors. See Special Obligor.

**Concentration Risk:** in a structured transaction, the concern that default by an obligor or obligors that make up a significant proportion of the receivables may jeopardize eventual repayment to investors.

**Counterparty Risk:** the risk of default or non-performance by the other party in a contractual arrangement, most typically a support provider in a liquidity, credit enhancement or swap facility.

**Credit and Investment Policy:** or C&I, for an ABCP conduit, a statement of the type and quality of assets the conduit may fund, including concentration restrictions. Typically the C&I will also specify the type of liquidity, credit enhancement, hedging and other structural features required for any asset funding or purchase.

**Credit Arbitrage:** a type of ABCP conduit that primarily funds highly-rated securities, and in which investors are only exposed to the risk of default, or credit risk, of those securities, and not the risk of market value or price change.

**Credit Default Swap:** a form of credit protection in which one party agrees to compensate the either in the event of a default by a specified entity or security—the reference entity or reference credit—for a fee.

**Credit Enhancement:** Used to cover credit losses, and often dilution, and may include external and/or internal support. It may be seller specific or program-wide.

**Credit Insurance:** an insurance policy, typically in a trade receivables transaction, that provides support payments to cover defaults by obligors. Typically subject to certain eligibility criteria and an overall payment limit.

**Credit Support:** see Credit Enhancement.

**Cross-aging:** an eligibility criteria in a trade receivables transaction that excludes the funding of all receivables from a given obligor if a certain portion of those receivables are delinquent. Cross-aging provides investor protection by removing obligors that begin to show deteriorating payment behavior before they actually default.

**Custodian:** in a structured transaction, maintains physical, and more recently electronic, control of assets. Usually the custody department of a commercial bank.

**Daylight Advance:** in an ABCP program, the provision of funds by an agent, such as the Liquidity Agent, Administrator, or IPA, in anticipation of the receipt of funds from other parties to the program, where those funds are due under the terms of the program documents. Daylight advances are typically not mandatory, but are commonly provided in practice for highly-rated counterparties or where the provider has reason to believe funds will be delivered by the end of the day.

**Dealer:** see Placement Agent.

Kelley_DZ_00092074

**Depositary**: see Issuing and Paying Agent.

**Depositary Trust Corporation**: a firm which provides book-entry security ownership and automated settlement services for U.S. transactions, similar to the Euroclear and Clearstream in Europe.

**Dilution**: the reduction in the value of a receivable for reasons that are not credit related, such as default. Dilution is caused by events such as disputes, returns of sold goods, offsets, credits, rebates, and warranty claims that dilute the value of outstanding receivables. For example, if receivables totaling $1 million are created when goods are sold, and $50,000 of those goods are subsequently returned, the receivables have suffered 5% dilution.

**DTC**: see Depositary Trust Corporation.

**ECNs**: Extendible Commercial Notes. See Extendible Commercial Paper.

**Eligibility Criteria**: see Eligible Receivable.

**Eligible Receivable**: Receivable that meets the issuer's eligibility criteria for purchases. Eligibility criteria typically include extensive provisions in addition to a receivable being a non-defaulted receivable.

**Euroclear**: Euroclear Bank, S.A/N.V., a firm which provides book-entry security ownership and automated settlement services for European transactions, similar to the Depository Trust Corporation (DTC) in the U.S. and Clearstream in Europe.

**Excess Funds**: in an ABCP program, funds that are not needed to repay maturing ABCP, and which therefor may be used to pay expenses or other amounts due without harming ABCP investors. ABCP programs typically have restrictions that permit certain expenses and other items to be paid only with excess funds.

**Execution Light**: a form of limited prior rating review for ABCP transactions that may be agreed between Moody's and a conduit sponsor. See also Post Review Status and Limited Post Review.

**Expected Loss**: the reduction in the return to investors based on an evaluation of the likelihood of default and the recovery in the event of default. Moody's method for determining the rating on long-term securities. See Probability of Default.

**Extendible Commercial Paper**: commercial paper issued with an initial scheduled maturity, but which may, at the option of the seller, be extended on the schedule maturity for some fixed period to a final maturity, usually at a higher rate of interest. Also called Extendible Commercial Notes or ECNs, and Secured Liquidity Notes or SLNs.

**External Credit Support**: Credit support supplied by a party other than a seller. May take the form of a cash collateral account, guarantee, letter of credit, or surety bond. May be provided at the program and/or seller level.

**Face Amount**: The principal amount of ABCP plus all interest due at maturity. For ABCP issued at a discount, this is literally the "face amount" on the note issued. For ABCP issued on a interest-bearing basis, it is the principal amount on the note issued, plus all interest that will accrue to maturity. Essentially, the Face Amount is how much is due to be paid to an investor at maturity.

**FASB**: the Financial Accounting Standards Board, the primary accounting regulatory body in the U.S..

**First Loss Enhancement**: in a structured transaction, credit enhancement that is the first to be drawn or written down to cover losses on the assets. Typically provided by overcollateralization.

**First Priority Security Interest**: a security interest that legally comes ahead of all others, often evidenced by the existence of a First Priority Lien. See Security Interest.

**Floating Rate ABCP**: ABCP that pays an interest rate that is periodically reset during the time the ABCP is outstanding prior to maturity, and specified by a spread to an interest rate index such as one-month LIBOR.

**Floor**: A minimum dollar amount below which the program-level credit enhancement cannot decline (unless it is reduced by credit losses).

Kelley_DZ_00092075

**Freeze:** The program-level credit enhancement may "freeze" if a specified trigger event occurs. Effectively, a freeze in the credit enhancement means that a floor is established at the dollar amount of credit enhancement available at the time the related trigger event occurs. For example, the credit enhancement may freeze if it is reduced 20% by losses.

**Fully-supported:** indicates that the credit quality of a transaction or ABCP conduit depends solely on the rating of a support provider and not on the quality of the underlying assets. See Partially-supported.

**Funding Cost:** the all-in cost to the conduit of providing funds to a transaction. The Funding Cost will include the interest that must be paid on ABCP, and also the fees paid to liquidity and credit enhancement providers and a share of the operational expenses of the conduit.

**Funding Formula:** see Liquidity Funding Formula.

**GLAPA:** Global Liquidity Asset Purchase Agreement. See Global Liquidity Agreement.

**Global Liquidity Agreement:** a liquidity agreement that provides a backup liquidity facility for multiple transactions in a conduit, as opposed to a deal-specific liquidity agreement. Can be in the form of a loan agreement or a purchase agreement.

**Global Liquidity Asset Purchase Agreement:** Also referred to as a GLAPA. See Global Liquidity Agreement.

**Guarantor:** in a structured transaction, a third party, usually highly rated, that takes on the credit risk of an asset pool or of another party to the transaction. A monoline insurance company or a commercial bank is the most common guarantors seen in ABCP conduits.

**Haircut:** in an asset-backed transaction, the difference between par and the purchase price paid for new assets, usually to provide credit enhancement and yield. For example, if the transaction pays 80% of the par value of new assets, the advance rate is 80% and the haircut is 20%. See also, Advance Rate.

**Hedge:** a financial arrangement, usually executed through a swap agreement, to alter and typically reduce the risk of a transaction. For example, an interest rate hedge will often trade a floating rate liability for a fixed rate liability, or liability in one currency for a liability in another currency.

**Hedge Counterparty:** the entity taking the other side of a hedging agreement or swap. For ABCP conduit transactions, a Hedge Counterparty is considered a support provider and is typically highly rated.

**Hedging Agent:** in a conduit, the party responsible for managing interest rate and currency risk, among other. The Hedging Agent usually has wide latitude as to how it recommends the conduit  manage these risks, and provides a performance indemnity should the arrangements prove insufficient.

**Hybrid ABCP Conduit:** an ABCP conduit that incorporates the structural features of two or more conduit types. Most Hybrid Conduits have Multiseller and Credit Arbitrage characteristics, and some include Loan-Backed.

**Indemnification:** a promise to make payments to cover losses in the event of an error or failure to perform properly. In an ABCP conduit, the Administrator typically agrees to indemnify the conduit for failure to perform its duties correctly.

**Internal Credit Support:** Credit support supplied by the seller, usually in the form of overcollateralization or seller recourse. Typically provided at the seller level.

**International Swap Dealers Association:** an industry organization that sets the standards and provides the templates for over-the-counter swap agreements.

**Investment Company Act of 1940:** one of the two main laws governing the securities industry, among other things it sets registration and disclosure requirements for investment companies, affecting both ABCP programs and their primary investor, money market mutual funds. See also Securities Act of 1933.

**IPA:** See Issuing and Paying Agent

Kelley_DZ_00092076

**ISDA:** see International Swap Dealers Association.

**Issuance Test:** in an ABCP conduit, a condition that must be satisfied prior to issuing ABCP. Typical issuance tests are non-bankruptcy of the conduit, positive tangible net worth, sufficient performing assets to support the principal amount of ABCP outstanding, and sufficient liquidity coverage to support the face amount of ABCP outstanding.

**Issuer:** Party that issues ABCP. The issuer is typically a bankruptcy-remote, special-purpose vehicle or trust.

**Issuing and Paying Agent :** also IPA, the party that handles the mechanics of delivering ABCP notes to investors in return for payment, and redeeming them at maturity. In European transaction typically called the **Depositary**. The IPA typically has a working relationship with the electronic clearinghouses such as DTC in the U.S. and Euroclear or Clearstream in Europe.

**LAPA:** see Liquidity Asset Purchase Agreement.

**Legal Final Maturity:** last day on which investors may be paid under the terms of a structured transaction in order to avoid default. Typically later than the Scheduled Maturity.

**Legal Owner:** the party that owns the equity of an ABCP conduit. This will vary by the corporate form of the conduit and the jurisdiction. In the U.S. it is typically a subsidiary of a specialized management company; in European transactions it is often a charitable trust.

**Legal Structure:** the corporate form of the ABCP conduit, as determined by its foundation documents. This will vary by jurisdiction.

**Letter of Credit:** a document issued by a commercial bank that guarantees payment up to a specified amount. In an ABCP program, typically used as a form of credit enhancement.

**LIBOR:** London Interbank Offer Rate, a commonly used reference interest rate set by commercial banks in London.

**Limited Post Review:** the ability of an ABCP conduit to enter into certain classes of transactions, typically limited by type, industry, size and rating, without prior review by Moody's. Also called Execution Light.

**Limited Purpose Investment Corporation:** or LIPIC. See Structured Investment Vehicle.

**LIPIC:** a Limited Purpose Investment Corporation. See Structured Investment Vehicle.

**Liquidations:** Collections on receivables, usually during a specified period of time, such as one month or one year.

**Liquidity Agent:** in a liquidity facility, the party responsible the operation of the facility under the terms of a Liquidity Agreement. The Liquidity Agent accepts notice of a request to draw and forwards it on to each Liquidity Bank, receives payment from the Liquidity Banks and forwards it on to the conduit, and receives interest and principal payments from the conduit and forwards them to the Liquidity Banks.

**Liquidity Bank:** a commercial bank that agrees to provide funding up to a specified amount under the terms of a Liquidity Agreement.

**Liquidity Agreement:** in an ABCP program, the document among the conduit, the Liquidity Agent and the Liquidity Banks that establishes the liquidity facility. Liquidity Agreements may be in the form of a loan agreement or a purchase agreement.

**Liquidity Asset Purchase Agreement:** a form of liquidity agreement, under which the liquidity banks agree to purchase assets, sometimes referred to as a LAPA.

**Liquidity Facility:** Covers liquidity or timing risk, which arises, for example, because ABCP is maturing but sufficient collections have not yet been received to pay maturing ABCP. Sometimes called a Liquidity Backup Facility.

**Liquidity Funding Formula:** in a liquidity agreement, the section that specifies how much funding the liquidity syndicate is required to provide. In a partially-supported transaction, the funding formula will

Kelley_DZ_00092077

typically be limited to the value of non-defaulted assets plus any amounts due from the seller of the receivables.

**Liquidity Risk:** the potential for loss to investors from the failure to make timely payment on a security. Liquidity Risk typically arises in an asset-backed transaction from a timing mismatch between the payments due on the assets and those promised to investors.

**LLC:** limited liability corporation, a U.S. form of corporate organization.

**Loan-Backed Conduit:** an ABCP conduit whose primary purpose is to provide short-term corporate loans, typically on a maturity-matched basis.

**LOC:** see Letter of Credit.

**Lock Box:** a payment system under which an obligor sends his payments to an account controlled by a third party, typically a commercial bank, rather than to the seller. Lock Boxes are the typical method for payments in securitized transactions in the U.S., and are less common in other jurisdictions.

**Losses:** Credit losses due to an obligor's failure to pay what is owed on a receivable. Losses are often deemed to occur when receivables remain unpaid for a specified period of time past their due date, even though the seller may not choose to write them off. For example, a receivable may be deemed to have defaulted, and thus to have incurred a loss, if it is not paid 90 days following its due date.

**Losses/Liquidations:** The ratio of losses on receivables to collections on those receivables during a specified time period, such as a month or a year. This ratio is calculated somewhat differently by different issuers, so comparisons may be misleading. However, it does give a good indication of one program's performance over time.

**Losses/Outstandings:** The ratio of losses on receivables over a period of time, such as a month or a year, to outstanding receivables, preferably those outstanding at the beginning of the time period. This ratio is calculated somewhat differently by different issuers, so comparisons may be misleading.

**Management Agreement:** in an asset-backed transaction, an agreement with a support provider that covers the corporate existence of the special purpose vehicle, providing for officers, office arrangements such as phone, fax and mailing address, and filing of accounting and tax reports.

**Manager:** the third-party service provider under the Management Agreement, in the case of an ABCP conduit typically a firm that specializes in providing these services to special purpose vehicles.

**Mark-to-Market:** the process of pricing the assets of an asset-backed transaction, particularly for Market Value Conduits.

**Market Value Conduits:** ABCP conduits in which investors are subject to the risk of changes in the price of the assets funded by the conduit. The largest category of Market Value Conduits is the Structured Investment Vehicles or SIVs.

**Maturity Matched Funding:** the process of issuing ABCP with maturities that are identical to that of the assets being funded, so that cash flow from the assets repays ABCP as it becomes due. Typical of Loan-Backed programs.

**Medium Term Notes:** or MTNs, interest-bearing securities with an original maturity of one to ten years. Issued by some ABCP programs to reduce the required amount of liquidity by delaying repayment to investors to a point after the maturity of the program assets. MTNs receive long-term ratings based on an evaluation of expected loss.

**Money Market Fund:** a mutual fund that invests in high-quality short-term assets with the intention of providing a rate of interest with no risk to capital. Money Market Funds are the single largest class of investors in ABCP.

**Monoline Insurance Company:** in finance, an insurance company whose sole business is to provide a guaranty or surety bond to protect investors from loss, usually to the full value of the investment. Most Monoline Insurance Companies carry a Aaa rating from Moody's. See also Guarantor.

**Multiline Insurance Company:** an insurance company involved in more than one type or "line" of insurance, such as life, property/casualty, financial, etc. See Monoline Insurance Company.

Kelley_DZ_00092078

**Multiseller Conduit:** an ABCP program structured to fund assets originated by a variety of sellers, typically all clients of the sponsoring commercial bank.

**Non-Consolidation Opinion:** a reasoned legal opinion as to the likelihood that a bankruptcy remote special purpose vehicle, such as an ABCP conduit, would be included in the bankruptcy estate of a third party under the bankruptcy laws of the relevant jurisdictions. See Bankruptcy Remoteness.

**Non-Defaulted Receivables:** Receivables that either have not defaulted or been deemed to have defaulted *(see Losses)*. Liquidity agreements sometimes provide that a liquidity bank will only fund against non-defaulted receivables.

**Non-Petition Agreement:** a clause in an agreement in which one party agrees not to file a bankruptcy opinion against another for some specified period of time. Most parties agree not to file a bankruptcy petition against an ABCP conduit until at least a year and a day after the last ABCP is repaid in order to reduce the risk that money paid to ABCP investors will be considered a preferential payment in bankruptcy and subject to clawback. See Bankruptcy Remoteness.

**Non-Pro-Rata Draw :** a feature of syndicated liquidity facilities in which liquidity providers agree to provide funds to cover the failure of any bank in the syndicate to advance funds when requested. Normally banks are only required to provide their pro rata share of the amount requested, based on their share of the total commitment. Even with this feature, no bank is required to advance funds in excess of its stated liquidity commitment.

**Obligor:** Party who owes payment on a receivable to a seller.

**Operational Risk:** the possibility that investors will suffer a loss because a party to the transaction will fail to perform its duties according to the documents or at the necessary level of competence.

**Operations Review :** also called an "Op Review," Moody's process for visiting a program sponsor or support provider in order to review staffing, expertise, systems, support and other aspects of the party's role in a structured finance transaction.

**Originator:** the party that generates the assets being securitized, for example the firm selling product in a trade receivables transaction, or the bank offering credit card accounts, or the firm making mortgage loans. The Originator is usually initial Seller of the assets.

**Out of Formula:** in a receivables transaction, the situation in which the available amount of non-defaulted and eligible receivables is not sufficient to cover the principal amount of debt outstanding plus the required overcollateralization and reserves. When a transaction is "Out of Formula" it generally means that investors have less credit protection than they are required to have under the transaction documents.

**Outstandings:** May refer to outstanding ABCP or outstanding receivables. Outstanding ABCP is ABCP that is issued and not yet paid. Outstanding receivables are those that have been created and that are not yet paid.

**Overcollateralization:** A form of internal credit support that arises when an issuer purchases receivables from a seller at a discount. For example, a seller may pay $100 for $110 of receivables, generating overcollateralization of 10%. See Advance Rate and Haircut.

**Partial Post Review:** see Limited Post Review.

**Partially-supported:** a asset-backed transaction or ABCP program where investors depend on the credit quality of the assets for repayment. See Fully-supported.

**Placement Agent :** in an ABCP program, the party, typically the trading arm of an investment bank, that markets ABCP to investors.

**Pool:** Refers to a pool of receivables.

**Pool Purchase Agreement:** See Asset Purchase Agreement.

**Post Review Status:** for an ABCP conduit, the ability to enter into new transactions without prior review of the transaction by Moody 's. See also Limited Post Review and Prior Review.

Kelley_DZ_00092079

**Preferential Transfer:** a payment made outside of the normal course or priority of business. Under bankruptcy law, there is a presumption that payments made near to the event of bankruptcy are preferential and subject to review by the bankruptcy court.

**Prior Review:** for an ABCP program, the requirement that Moody's review new transactions before they are funded by the conduit. See also Post Review and Limited Post Review.

**Priority of Payments:** also called the Waterfall, language in a transaction that specifies the order in which parties to the transaction are to be paid from the cash available.

**Program:** Asset-backed commercial paper program. The program includes all the receivable pools from all the sellers who have sold receivables to the issuer.

**Program-Level Credit Support:** Credit support available to cover losses incurred by any pool of assets in the program.

**Program-Level Liquidity Support:** Liquidity support available to any and all asset pools in the program. See also Global Liquidity Agreement.

**Program-Wide Credit Enhancement:** see Program-Level Credit Support.

**Purchase Agreement:** in an asset-backed transaction, typically the agreement defining the terms of sale of assets between an Originator or Seller and a special purpose entity.

**Purchase Price:** in an asset-backed transaction the price paid for an asset, typically less than the par value of the asset. See Advance Rate, Haircut and Overcollateralization.

**Qualified Institutional Buyer:** or QIB, defined by Rule 144a under the Securities Act of 1933, it designates larger, more sophisticated investor. ABCP programs must restrict sales of commercial paper to QIBs to avoid registration requirements under the Securities Act.

**QIB:** see Qualified Institutional Buyer.

**Receivable:** Amount a seller is due to receive from an obligor as payment for goods, services, or other items under the terms of a contract.

**Receivable Pool:** A pool of receivables sold by a seller to an issuer. A single seller may sell more than one pool of receivables to an issuer, especially if it has heterogeneous product lines that are sold under different terms.

**Related CP:** A negative structural feature found in some ABCP programs that requires the issuer to track the use of the proceeds of each tranche of ABCP to a particular receivable pool and to limit which liquidity banks can be drawn upon when the related ABCP matures. The presence of a related ABCP structural feature in an ABCP program increases the probability that there will be delays in payment if unexpected operational or administrative problems arise in the liquidity funding process. Sometimes called Serialized ABCP.

**Repo:** See Repurchase Agreement.

**Repurchase Agreement:** a short-term funding arrangement, under which a borrower sells securities with a commitment to repurchase them at a fixed price at a certain point in the future. Sometimes used to provide liquidity in an ABCP conduit. Also called a Repo Agreement.

**Rolling:** the process of issuing new ABCP to repay maturing ABCP. Most ABCP is issued to repay maturing ABCP in order to maintain funding to the Seller, rather than requiring repayment or relying on the Liquidity Facility.

**Rule 144a:** under the Securities and Exchange Act of 1933, defines Qualified Institutional Buyer or QIB, among other things.

**Rule 2a-7:** under the Investment Company Act of 1940, governs investments by money market mutual funds.

**Scheduled Maturity:** the anticipated Termination Date of a transaction. Typically earlier than the Legal Final Maturity.

Kelley_DZ_00092080

**Section 3(c)(7):** of the Investment Company Act of 1940, provides for exemption from the company registration requirements. ABCP programs often observe the requirements of this section in order to avoid registration under the Act.

**Section 4(2):** of the Securities Act of 1933, provides for exemption from the security registration requirements. ABCP programs often observe the requirements of this section in order to avoid having to register the commercial paper notes under the Act.

**Secured Liquidity Notes:** or SLNs. See Extendible Commercial Paper.

**Securities Act of 1933:** one of the two main laws governing the securities industry, among other things it sets registration and disclosure requirements for publicly issued securities. It also created the Securities and Exchange Commission. See also Investment Company Act of 1940.

**Security Agreement:** a document that establishes a security interest for investors. Typically present in ABCP conduits in which investors have a direct security interest in the funded assets.

**Security and Intercreditor Agreement :** see Security Agreement.

**Security Interest:** a legal right to the financial benefits of an asset such as interest and principal cash flow.

**Seller:** Party that sells receivables to an issuer.

**Seller-Level Credit Support:** Credit support provided to cover losses incurred by a particular pool of assets, and only by that pool. It does not cover losses incurred by other pools in a program. Typically it is in the form of overcollateralization or seller recourse, but may also include a seller-specific LOC, guaranty, or surety bond. It is usually the first form of credit enhancement to be tapped if losses arise.

**Seller Recourse:** Recourse a seller gives to an issuer to cover losses, dilution, or other offsets on that seller's receivables. The seller agrees to cover shortfalls up to the specified recourse percentage. The value of seller recourse is linked to the seller's credit quality. For that reason, seller recourse is often limited to sellers whose rating is at least as high as the rating assigned to an issuer's ABCP program.

**Seller Reserves:** Internal credit support.

**Seller-Specific Liquidity Support:** Liquidity support for a single seller or for a specified sub-group of the sellers in the program. Unlike program-level liquidity support, it provides liquidity only for the specified seller(s).

**Serialized ABCP:** see Related ABCP.

**Service Provider:** in an ABCP conduit, a third party that provides administrative, operational, credit, liquidity or some other form of service or support to the program.

**Servicer:** in an asset-backed transaction, the party responsible for overseeing the payment collection process. The initial servicer is typically the Seller or Originator of the assets, or a related firm.

**Servicer Risk:** the possibility of loss due to inefficient, careless or improper collection procedures by the Servicer.

**Single Seller Program:** an ABCP conduit established to fund the assets originated by one Seller, or one Seller and its subsidiaries and related entities.

**SIV:** Structured Investment Vehicle.

**SLNs:** Secured Liquidity Notes. See Extendible Commercial Paper.

**Special Purpose Corporation:** or SPC. See Special Purpose Entity.

**Special Purpose Entity:** a limited purpose corporate or trust entity typically used  for securitization. The exact legal form will depend on the jurisdiction in which the entity is created and the business purpose. Also called an SPE, Special Purpose Corporation or SPC, or Special Purpose Vehicle or SPV. The terms are used interchangeably.

**Special Purpose Vehicle:** or SPV. See Special Purpose Entity.

**Kelley_DZ_00092081**

**Sponsor:** Entity that has set up the ABCP program. The sponsor approves the sellers and receivable pools to be included in the program. The sponsor often serves as administrator.

**SPC:** or Special Purpose Corporation. See Special Purpose Entity.

**SPE:** see Special Purpose Entity.

**SPV:** or Special Purpose Vehicle. See Special Purpose Entity.

**Structured Investment Vehicle:** or SIV, a market value, securities arbitrage program that typically purchases highly-rated securities funded by ABCP and MTNs, under strict investment and operational guidelines. Also called a Limited Purpose Investment Corporation or LIPIC.

**Support Provider:** see Service Provider.

**Surety Bond:** a guaranty issued by a monoline financial insurer. See Monoline Insurance Company.

**Swap:** a financial agreement under which two parties agree to exchange defined payment streams. Typically a swap is used to hedge interest rate, exchange rate, market value or some other form of risk, and is based on a Master ISDA Agreement. See ISDA, Hedging.

**Syndicated Liquidity:** in ABCP transactions, a liquidity facility provided by a group of Liquidity Banks on a pro rata basis relative to their commitment amounts.

**Syndicated Transaction:** an asset-backed transaction financed by a group of ABCP conduits on a pro rata basis relative to their commitment amounts. Also called a Club Deal.

**Ten Bank Rule:** A structural mechanism in an ABCP program that mitigates against the possibility that delays in payments of ABCP will occur due to operational or administrative problems. Pursuant to the 10 Bank Rule, once the number of banks equals or exceeds 10, the liquidity documentation in an ABCP program should provide for non-pro rata draw. This means that funds may be requested from any liquidity bank (up to the amount of the particular bank 's commitment) to cover the failure of another bank to advance funds in a timely manner.

**Term ABS Transaction:** an asset-backed securitization funded by issuing long-term debt,  typically with a long-term rating.

**Term Receivables:** receivables that have a term longer than one year. Term receivables may have consumer or corporate obligors.

**Termination Event:** a transaction feature that provides for the orderly wind down of a transaction. Termination Events are typically triggered by events that signal credit deterioration and increased risk to investors, and cause the transaction to end prior to its Scheduled Maturity. See also Trigger Event.

**Third party:** in an ABCP program, all parties other than the conduit and the ABCP investors. Typically Support or Service providers.

**Trade Receivables:** Receivables that arise between business entities and that are due and payable in less than one year. Trade receivables often have a turnover period of 30-60 days.

**Trapping Mechanism:** a transaction structural feature that retains cash within the transaction accounts rather than passing it on to a third party. Many transactions require cash be retained if credit deterioration occurs.

**Trigger Event:** a defined event, usually credit related, in a transaction that signals a material change in operation, for example early wind down, replacement of the Servicer, cease issuance of ABCP or immediate funding by the Liquidity Facility. See also Termination Event.

**True Sale:** a legal term indicating that an asset has been sold for adequate compensation in accordance with the pertinent laws and regulation so that it will not be overturned or reversed by a court judgement, in particular as a result of bankruptcy of the seller.

**Turnover:** Describes how often receivables "turn over" during the year. For example, if receivables are usually paid in 30 days, they turn over 12 times a year, or it takes 30 days for receivables to turn  over.

Kelley_DZ_00092082

**Two-Step Sale**: the most common form of asset securitization structure, in which a Seller sells assets to a Special Purpose Entity in a True Sale and that entity is then funded by a loan from another Special Purpose Entity that issues debt to investors.

**Unsecured ABCP Program**: an ABCP program in which the ABCP investors do not have a direct security interest in the assets.

**Warehouse Transaction**: a particular type of ABCP conduit transaction that finances assets for a period of time until the amount of assets accumulated and market conditions permit the assets to be efficiently securitized in the term ABS market.

**Waterfall**: see Priority of Payments.

**Wind Down Events**: Trigger Events that cause an issuer to cease purchasing receivables or to cease issuing ABCP. For example, if a seller reaches a wind-down event, the issuer ceases to purchase receivables from that seller. If there is a program wind-down event, the issuer ceases to issue ABCP.

**Wrap**: a full guarantee of repayment, usually by a highly rated party. See Surety Bond.

Kelley_DZ_00092083

*Page intentionally left blank.*

**Kelley_DZ_00092084**

# BIBLIOGRAPHY OF MOODY'S SPECIAL COMMENTS

For convenience, we have grouped the special comments by subject matter.

## Introduction to ABCP and ABCP Program Types

"Introduction to Asset-Backed Commercial Paper Structures", Special Report, January 1998

"Pros, Cons and Considerations in Introducing an ABCP Conduit," Special Report, October 2002

"Asset-Backed Commercial Paper: Understanding the Risks," Special Report, April 1997.
(Note: this article is the predecessor to "The Fundamentals of ABCP.")

"Moody's Approach to Evaluating Credit Arbitrage ABCP Programs," Special Report, August 2002.

"An Introduction to Structured Investment Vehicles," Special Report, January 2002

"Structured Investment Vehicles—Recent Developments," Special Report, January 2003

"Comparing and Contrasting Credit Arbitrage ABCP Programs and Structured Investment Vehicles", Special Report, January 2002

"LOC-Backed CP Programs: Structure is Key," Special Report, August 2000.

"Rating Commercial Paper Programs Backed by Maturity-Matched Loans," Special Report, September 1999.

"On Being A Prudent Investor: Understanding the Nuts and Bolts of Australian ABCP Structures," Special Report, August 1998.

## ABCP Investors

"U.S. Money Market Funds Carry a Big 'Buy-Side' Stick with ABCP," Special Report, July 2002.

"U.S. Money Market Funds Hungry for Asset-Backed Commercial Paper", Special Report, April 20, 2001.

"Extendible Commercial Notes Extend Asset Allocation Choices for Money Market Funds", Special Comment, August 2000.

## Market and Regulatory Issues

"September 11: ABCP Demonstrates Resiliency in the Face of Operational Meltdown," Special Report, December 2001.

"ABCP Program Credit Enhancement: Ratings May Reduce Capital Requirements," Special Report, May 2002.

"Entering A New Regulatory Environment: Proposed Revisions to the 1988 Basel Accord May Raise Costs and Squeeze Availability of ABCP Liquidity", Special Report, April 2001

"FASB 133's Impact on Nominally Capitalized ABCP Conduits: Should Investors Be Concerned?" Special Report, January 2002

"Revised Article 9: The Benefits Are Many, But Diligence Is Warranted," Special Report, May 2002

Kelley_DZ_00092085

"The FASB Consolidation Proposal: The End Of ABCP As We Know It?" Special Report, October 2002.

**Conduit Structural Details**

"Achieving Post Review Status for Partially-supported ABCP Programs", *Special Report,* October 1997.

"Asset-Backed Commercial Paper Programs In Europe: Implications of Currency Risk", *Special Report*, November 1995.

"The Use of Swaps and Derivatives in ABCP Programs: Efficient Ways to Transfer Risk", *Special Report*, reprinted from the Second Quarter 2000 Asset-Backed Commercial Paper Market Review.

"Floating Rate ABCP: Issues and Answers," Special Report, December 1999.

"Serialized ABCP: The Hidden Dangers", *Special Report*, reprinted from the First Quarter 1998 Asset-Backed Commercial Paper Market Review.

"Often Confused Concepts: 'Related Commercial Paper' and 'The 10 Bank Rule,'" Special Report, November 1995.

"Handle with Care: Single Member LLCs in Structured Transactions", *Special Report*, March 1999.

"True Sale Assailed: Implications of In re LTV Steel for Structured Transactions", Special Report, April 2001

"Bulletproof Structures Revisited: Bankruptcies and a Market Hangover Test Securitizations' Mettle", Special Report, August 2002.

**Liquidity**

"Alternative Liquidity Comes of Age: A Decade of Development", *Special Report*, reprinted from the Second Quarter Asset-Backed Commercial Paper Market Review 2001

"Alternatives for Structuring Liquidity for Asset-Backed Commercial Paper Programs: Conduit Issuer Ratings and Pure Liquidity Support," Special Comment, February 2002

"Entering A New Regulatory Environment: Proposed Revisions to the 1988 Basel Accord May Raise Costs and Squeeze Availability of ABCP Liquidity", *Special Report*, April 2001

"Understanding Structured Liquidity Facilities in Asset-Backed Commercial Paper Programs", *Special Report*, reprinted from the Asset-Backed Commercial Paper Market Review, First Quarter 1997

"Why Liquidity Facilities in ABCP Programs Equal 102%", Moody's Structured Finance, *Special Report*, reprinted from the 1st Quarter 1999 Asset-Backed Commercial Paper Market Review.

"Revolving Commitment Vehicle: A New Form of Alternative Liquidity", Special Report, June 1998.

"Moody's Approach to Jointly Supported Prime-1 Liquidity Facilities," Special Comment, August 1999.

"The Importance of Liquidity Support in Asset-Backed Commercial Paper," Special Comment, March 1994.

**Trade Receivables**

"Moody's Approach to Rating Trade Receivables Backed Transactions," *Special Report*, July 2002.

**Kelley_DZ_00092086**

"Bigger Isn't Better: The Risk of Obligor Concentrations in Trade Receivables Transactions", *Special Report*, September 1998.

"A Guide to Collateral Quality Risks in Securitized Trade Receivable Transactions: Focus on the Contract Related and Dealer-Network Risks," *Special Report*, April 1995

"Trade Receivables Update: Concentrating on Dilution – Focus on Capital Goods and Consumer Products Receivables," *Special Report*, January 1997,

## Other Asset Types

"Moody's Approach to ABCP and Mortgage Financing: Taking a New Look at an Old Favorite Rating Perspectives from the U.S., Europe and Australia", *Special Report*, April 2001

"Asset-Backed Commercial Paper Supported by Rental Cars: Critical Components of Moody's Analysis," Special Report, November 1995

## Monitoring and Surveillance Practices

"Moody's Approach to Reviewing Administrators The Importance of Being Earnest", *Special Report*, March 2001

"ABCP's Song of the Sirens: Reporting of Monthly Performance Data May Lure Investors onto the Rocks", Special Report, February 1999.

## Ratings and Volatility

"The Impact of the Asian Crisis on the ABCP Market," Special Report, April 1998.

"ABCP Programs and Securities Downgrades: Safely Weathering the Storm",   Special Report, October 2002.

"Forever **Prime-1**? Downgrade Risk in Asset-Backed Commercial Paper Programs," Special Report, December 1994.

"The Meaning of **Prime-1**: A Case Study of Bravo Trust Series 1997-1 Class A,"Special Report, December 1999.

"Downgraded Support Providers in ABCP Programs: Grace Periods Don't Exist," Special Report, September 1998.

"When Good Deals Go Bad: Recent Ratings Volatility and ABCP Securities Arbitrage Programs", Special Report, May 2001

"Bank Financial Strength Ratings are Important for ABCP Investors," Special Comment, November 1995.

"Climbing Back Up the Ladder of Credit Quality," Special Comment, October 1997.

"ABCP Conduits Sponsored by Japanese Banks: As the Banks' Ratings Go, So Go the Conduits' Ratings," Special Comment, March 1996

## Annual and Quarterly Market Overview

Moody's publishes annual market reviews in January.

Kelley_DZ_00092087

"ABCP 2001 Review and 2002 Outlook: ABCP Fights Back," January 2002.

"ABCP 2002 Year in Review: Maturity and a Pause in the U.S., Youth and Rapid Growth in Europe," January 2003

"2001 Review and 2002 Outlook - European ABCP Market: Predicted to Grow Up and Slim Down", January 2002.

"2002 Review and 2003 Outlook: A Rising Star—The Uninterrupted Growth of the European ABCP Market," January 2003.

Quarter market overviews appear as the lead article in *Moody's Global Asset-Backed Commercial Paper Market Review*.

"ABCP Market Overview: First Quarter 2002 – Down but not Out," June 2002

"ABCP Market Overview: Second Quarter 2002 - Some Chill From the Draft - Will FASB Close the Window?" September 2002

"ABCP Market Overview: Third Quarter 2002 - Walking In Place, Face to the Wind," December 2002.

### Moody's ABCP Market Reports

"Moody's Global Asset-Backed Commercial Paper Market Review," published quarterly, includes the quarterly market overview, detailed market statistics and a report in detail for each conduit rated by Moody's.

"Moody's ABCP Program Index," updated quarterly, is an Excel worksheet containing the summary information for each conduit that appears in the program indices in "Moody's Global Asset-Backed Commercial Paper Market Review."

"Moody's ABCP Rating Actions," is a weekly press release summarizing Moody's rating actions with respect to ABCP programs worldwide.

### Moody's detailed reporting on the U.S. ABCP market

"U.S. ABCP Market At A Glance: U.S. ABCP Multi-Seller Market Snapshot," monthly, provides statistical summary information on assets held by U.S. multiseller programs.

"U.S. ABCP Market At A Glance: U.S. ABCP Credit Arbitrage Snapshot," monthly, provides statistical summary information on assets held by U.S. credit arbitrage programs.

"U.S. ABCP Query," updated monthly, is an Excel worksheet-based product that includes detailed asset and support provider data for the majority of U.S. ABCP conduits.

### Moody's detailed reporting on the European ABCP market

"European ABCP Market Summary," updated monthly, reports on ABCP outstanding by conduit and sponsor.

"Moody's European ABCP Market Performance Overviews," updated monthly, report on conduit asset funding, purchases and termination.

"European ABCP Market at a Glance: Moody's ABCP Market Snapshot," updated quarterly, summarizes the main structural features of each conduit.

Kelley_DZ_00092088

# INDEX

## A

ABCP
  appeal of 4, 56
  Euro-denominated 46
Administration Agreement 29, 35
Administrative Functions of Conduits 29, 31
Administrator 6, 8, 9, 11, 15, 18, 23, 25, 27, 29, 30, 31, 32, 33, 34, 35, 36, 45, 47, 48, 50, 52, 54, 59, 63, 69, 70, 72, 78
  functions of 29, 30, 31
  Third-Party 31
  Unrated 31
Amendments 27, 45, 50, 51
Amortization 11, 36, 40, 53, 65, 66
  early 11, 40, 66
  triggers 36, 40
Asset Interest Test 69
Asset Performance 3, 6, 20, 25, 39, 40, 45, 50, 63, 65
  Triggers 65
Asset Performance Analysis 63
Asset Purchase Agreement 29, 34, 69, 73, 75
Asset Purchase Structures 4, 11, 25, 34, 38, 61
Asset Purchases 4, 18, 26, 29, 34, 35, 37, 48, 61, 63, 69, 73, 75
Asset Quality 17, 36, 48, 54, 63
Asset Types 9, 11, 15, 20, 23, 37, 39, 49, 61, 62, 67, 83
Asset Yield 35
Asset-Backed Securities 15, 19, 21, 25, 50, 57, 61, 62, 65, 69, 78, 79
Assets 62
Automatic Stay 36, 38, 69

## B

Backup Liquidity Facilities 6, 11, 36, 42, 43, 44, 53, 61, 69, 72, 73
Bank Loans 21, 23
Bank Syndication Risk 42, 69
Bankruptcy 5, 11, 23, 27, 33, 36, 37, 38, 39, 43, 47, 54, 56, 61, 64, 65, 69, 75, 76, 78
  court 36, 38, 54, 76
  involuntary 36, 38
  seller 38, 61
  voluntary 27, 36, 37
Bankruptcy Petition 36, 37, 38, 54, 75
Bankruptcy Remoteness 27, 36, 47, 56, 69, 75
Basis Points 52, 53
Basis Risk 35
Basle Accord 42, 69
Basle II Accords 42
Borrowing Base 26, 30, 34, 38, 42, 69

## C

Capital Notes 8, 23
Cash Collateral Account 6, 35, 69, 71
Cash Flow 6, 7, 8, 21, 33, 39, 40, 41, 42, 43, 44, 47, 54, 64, 74, 77
  timing 40
Cash Movement 32
Cash Receipts 65
Cash Reserve 20, 39, 40
Cease Issuance 47, 65, 66, 78
Cease Purchase 65, 69
Chargeoff 63
Charitable Trust 26, 27, 31, 73
Clawback 75
Collateral Agency Agreement 33
Collateral Agent 25, 29, 33, 34, 70
Collateralized Loan Obligations 23
Collection 40, 44, 48, 64, 77
Commercial Bank 5, 6, 8, 11, 15, 20, 25, 29, 34, 37, 41, 42, 45, 70, 72, 73, 74, 75
Commercial Banks 5, 6, 8, 11, 15, 20, 25, 29, 34, 37, 41, 42, 45, 70, 72, 73, 74, 75
Commercial Paper 5, 6, 11, 13, 15, 16, 17, 18, 19, 21, 22, 23, 26, 27, 29, 31, 32, 33, 35, 37, 40, 41, 42, 43, 44, 45, 46, 48, 50, 52, 53, 54, 56, 57, 58, 59, 61, 63, 66, 67, 69, 70, 71, 76, 77, 81, 82, 83
Commercial Paper Account 32
Concentration Limits 21, 23, 64, 70
Concentration Risk 56, 63, 65, 70
Conduit Owner 25
Conduit Performance 9, 45, 50
Conversion Risk 35
Corporate Bonds 21
Corporate Commercial Paper 5, 11, 15, 16, 44, 56, 57, 58, 59, 61
Corporate Issuers 52
Counterparty Risk 33, 70
Credit Agreement 29
Credit And Investment Policy 18, 21, 48, 66, 69, 70
Credit And Reimbursement Agreement 29, 35
Credit Arbitrage 7, 8, 17, 20, 21, 48, 66, 67, 70, 72, 81, 84
Credit Enhancement 3, 4, 5, 6, 7, 8, 9, 11, 15, 17, 18, 19, 20, 21, 23, 25, 26, 27, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 43, 44, 45, 46, 47, 48, 50, 54, 59, 63, 64, 65, 66, 69, 70, 71, 72, 73, 76, 77, 81
  Dynamic 23
  first-loss 6, 7, 17
  Pool-specific 20, 47, 63, 64, 65
  Program-level 39, 40, 41, 47, 50, 71, 72
  Provider 6, 27, 29, 33, 34, 35, 41, 72
Credit Insurance 20, 39, 41, 70
Credit Quality 5, 8, 14, 18, 19, 20, 21, 23, 37, 38, 40,

Kelley_DZ_00092089

41, 42, 43, 44, 46, 48, 49, 58, 63, 64, 67, 72, 75, 77, 83

Credit Ratings 31

Credit Risk 3, 4, 6, 8, 9, 15, 17, 19, 20, 21, 35, 36, 38, 39, 40, 42, 44, 46, 53, 56, 59, 63, 70, 72

Cross-aging 70

Currency Hedge 63

Custodian 25, 29, 34, 70

Custody Agreement 29

**D**

Daylight Advance 32, 70

Dealers 32, 41, 50, 58, 70, 72, 73

Default 5, 14, 23, 35, 37, 39, 41, 43, 45, 46, 53, 54, 63, 64, 65, 70, 71, 73

Defaulted Receivables 63, 65

Defaults 21, 25, 40, 41, 50, 58, 70

Delinquency 63, 65

Depositary Agreement 29, 32

Dilution 26, 37, 38, 40, 61, 63, 64, 65, 69, 70, 71, 77, 83

Dilution Risk 37, 38, 64

Discount 10, 30, 33, 45, 52, 53, 61, 63, 64, 70, 71, 75
    to Face Value 52, 61, 63

Discount Rate 30, 33, 63

Diversification 5, 21, 23, 56

Divestiture Requirements 48

Downgrade 21, 34, 37, 47, 55, 83

**E**

Eligibility Criteria 35, 63, 64, 70, 71

Euro CP 26, 52

Event Risk 15, 56, 57

Excess Funds 38, 71

Excess Spread 39, 40, 50

Exchange Rate Movements 23

Extendible ABCP 6, 7, 44, 53, 58

Extendible Commercial Notes 4, 44, 52, 53, 71, 81

Extendible Commercial Paper 4, 5, 44, 53, 71, 77

Extension Period 44, 53

**F**

Face Amount 6, 8, 11, 19, 21, 40, 42, 47, 52, 63, 65, 71, 73

Face Value 11, 42, 45, 52, 61, 63

FASB 22, 23, 47, 71, 81, 82, 84

Federal Reserve 16, 43

First Priority Lien 33, 71

First Priority Security Interest 33, 34, 71

Floating Rate ABCP 4, 45, 52, 71, 82

Floating rate ABCP 4, 44, 45, 52, 54, 70, 71, 72, 82

Floating Rate CP 4, 52

Foreign Exchange Risk 3, 46

Fully-Supported Conduits 3, 6, 7, 17, 19, 20, 21, 37, 39, 41, 48, 59, 63, 72, 75

Funding Formula 38, 39, 40, 47, 63, 66, 72, 73

**G**

Global Liquidity Agreement 72, 76

Global Liquidity Asset Purchase Agreement 34, 72

Guarantors 6, 21, 41, 48, 72, 74

**H**

Hedge 6, 11, 18, 29, 30, 31, 35, 44, 46, 52, 70, 72, 78

Hedge Arrangements 35

Hedge Counterparties 6, 25, 35, 45, 72

Hedging Agency Agreement 35

Hedging Agents 29, 35, 46, 72

Hedging Agreement 29, 31, 46, 72

Hybrid conduits 7, 17, 20, 23, 24, 28, 48, 72

**I**

Illiquid 36, 58

Indemnification 45, 72

Industry-Specific Risks 63

Ineligible Receivables 38, 40

Interest 1, 3, 4, 7, 10, 11, 15, 17, 19, 21, 23, 25, 27, 29, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 52, 53, 54, 56, 61, 63, 65, 69, 70, 71, 72, 73, 74, 77, 78, 79

Interest Rates 3, 23, 25, 27, 29, 35, 41, 42, 44, 45, 46, 52, 54, 71, 72, 73, 78
    risks 3, 35, 45, 46
    swaps 35

Interest-bearing ABCP 4, 52

International Swap Dealers Association 41, 72, 73

Investment Company Act of 1940 11, 13, 33, 53, 72, 76, 77

Investment Policy 18, 21, 48, 66, 69, 70

IPA 27, 32, 33, 34, 70, 72, 73

ISDA 41, 73, 78

Issuance Tests 3, 47, 52, 69, 73

Issuing and Paying Agency Agreement 32

Issuing And Paying Agent 27, 29, 32, 33, 34, 70, 71, 72, 73

Issuing And Paying Agent Agreement 29

**L**

Letter Of Credit 17, 19, 20, 21, 29, 35, 38, 39, 41, 59, 71, 73, 74

Letter of Credit 35, 41, 74, 77

LIBOR 10, 44, 52, 53, 54, 71, 73

Lien 33, 71

Liquidation Event 33

Liquidity 3, 4, 5, 6, 7, 8, 9, 11, 12, 15, 17, 18, 19, 20, 21, 23, 25, 26, 27, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 50, 52, 53, 54, 57, 58, 59, 61, 63, 64, 65, 66, 67, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 81, 82
    Syndication of 21, 29, 34, 42, 69, 73, 75

Kelley_DZ_00092090

Liquidity Agent 6, 29, 34, 42, 44, 70, 73
Liquidity Agreement 29, 34, 47, 61, 64, 72, 73, 75, 76
Liquidity Asset Purchase Agreement 29, 34, 72, 73
Liquidity Backup Facility 4, 6, 25, 29, 36, 42, 43, 44, 61, 73
Liquidity Banks 6, 27, 29, 33, 34, 35, 38, 40, 42, 44, 52, 61, 64, 69, 73, 75, 76, 78
Liquidity Coverage 47, 52, 67, 69, 73
Liquidity Draw 25, 42, 44
Liquidity Facility 6, 7, 8, 9, 11, 17, 18, 19, 20, 21, 23, 26, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 44, 47, 52, 53, 59, 61, 63, 65, 66, 69, 72, 73, 75, 76, 78, 82
Liquidity Funding 34, 38, 40, 63, 64, 65, 72, 73, 76
Liquidity Loan Agreement 29, 34
Liquidity Providers 6, 21, 25, 40, 42, 43, 54, 65, 75
Liquidity Risks 3, 6, 17, 19, 36, 41, 44, 59, 74
Loan-Backed Conduits 7, 9, 17, 20, 23, 43, 48, 72, 74

**M**

Management Agreement 29, 31, 74
Management Company 31, 73
Manager 29, 31, 36, 74
Market Value Swaps 35
Mark-To-Market 31, 47, 74
Maturing ABCP 6, 7, 11, 17, 19, 21, 25, 30, 32, 33, 34, 35, 36, 38, 39, 40, 41, 42, 47, 59, 61, 63, 71, 73, 76
Maturity 7, 11, 12, 14, 17, 21, 23, 27, 32, 33, 38, 40, 41, 42, 43, 44, 47, 52, 53, 54, 57, 63, 66, 70, 71, 73, 74, 76, 78, 84
Maturity-Matched Funding 42
Medium-Term Notes 4, 5, 8, 23, 26, 42, 44, 52, 54, 67, 74, 78
Money Funds 4, 16, 56, 57, 58
Money Market 10, 13, 32, 44, 52, 53, 54, 56, 57, 58, 72, 74, 76, 81
Money Market Funds 10, 13, 32, 44, 52, 53, 56, 74, 81
Money Market Securities 56
Monoline Insurers 35, 41, 63, 72, 74, 78
Mortgage-Backed Securities 21, 37, 44
Multiline Insurers 41, 74
Multiseller conduits 7, 8, 17, 20, 23, 24, 25, 34, 42, 44, 48, 49, 54, 59, 61, 62, 67, 72, 75, 84

**N**

Non-Defaulted Assets 11, 19, 20, 21, 25, 38, 47, 63, 64, 65, 69, 71, 74, 75
Non-defaulted Assets 11, 19, 20, 21, 25, 38, 47, 63, 64, 65, 69, 71, 74, 75

**O**

Obligors 11, 23, 38, 39, 41, 45, 50, 63, 64, 65, 70, 74, 75, 76, 78, 83
    Concentration 63, 64, 65, 83
    Default 63

Foreign 63
Operating Documents 50
Operating Guidelines 23
Operational Review 45
Operational Risk 3, 6, 36, 42, 44, 45, 59, 75
Operations Review 9, 50, 75
Origination 9, 64
Originator 11, 61, 63, 75, 76, 77
Out of Formula 65
Overcollateralization 6, 7, 8, 17, 19, 20, 21, 34, 39, 40, 61, 64, 65, 71, 72, 75, 76, 77
    Levels 65
Owner 5, 25, 27, 31, 37, 73
    Legal 5, 31, 73
Owner/Manager 31

**P**

Par Value 21, 40, 69, 72, 76
Partial Guarantee 7, 20
Partially-Supported Conduits 3, 6, 7, 17, 19, 20, 23, 33, 37, 48, 59, 62, 72, 73, 75, 82
Payment 5, 17, 23, 30, 31, 32, 34, 38, 41, 42, 43, 44, 45, 46, 52, 53, 59, 63, 64, 65, 70, 73, 74, 75, 76, 77, 78
    Priority of 27, 30, 38
    Rate 43, 44, 45, 53, 63, 65
Performance Monitoring 64
Placement Agency Agreement 29, 32
Placement Agent 27, 29, 32, 33, 44, 70, 75
Post-Review 3, 9, 18, 48, 49, 66
    Limited 49
    Partial 48, 49
Prepayment 52, 53
Prior-Review 3, 9, 18, 37, 48, 49, 50, 66, 73, 75, 76
Program Liquidation Event 33
Program Termination 3, 22, 47
Program-wide Credit Enhancement 6, 7, 19, 20, 21, 25, 35, 47, 63, 66, 76
Purchase Agreements 37, 65, 69
Purchase Price 34, 35, 44, 65, 69, 72, 76
Put 65

**R**

Rating Confirmation Process 35
Receivables
    Non-defaulted 69, 75
Registration 11, 13, 33, 56, 72, 76, 77
Repayment 5, 6, 8, 11, 12, 17, 23, 25, 26, 27, 29, 30, 31, 32, 33, 36, 38, 42, 43, 44, 46, 53, 59, 63, 69, 70, 74, 75, 76, 79
Reporting 1, 2, 9, 11, 15, 21, 23, 26, 28, 30, 33, 34, 35, 36, 40, 41, 42, 43, 44, 45, 46, 47, 48, 50, 52, 53, 54, 56, 61, 63, 64, 66, 69, 74
Risk
    Timing 73

Kelley_DZ_00092091

Rolling ABCP 6, 11, 17, 32, 76

**S**

Sale of ABCP 27, 33
Same-Day Payment 34
Second-Loss Protection 39, 47
Section 4(2) 77
Secured Liquidity Notes 4, 52, 53, 54, 71, 77
Securities 67
Securities Act of 1933 11, 33, 72, 76, 77
Securities Arbitrage Conduits 7, 8, 17, 20, 21, 23, 24, 31, 44, 48, 54, 78
Security Agreement 29, 33, 77
Security Interests 25, 29, 33, 34, 61, 70, 71, 77, 79
Seller Quality 40
Seller Recourse 39, 40, 72, 77
Serialized ABCP 4, 37, 54, 55, 76, 77, 82
Service Providers 27, 29, 31, 33, 36, 38, 74, 77, 78
Servicer of Assets 25, 37, 45, 50, 64, 77, 78
    Quality 64
Servicing 11, 19, 38, 40, 61, 63, 65
Shareholders 28, 36
Single-Seller ABCP Conduits 8, 20, 21, 34, 37, 42, 44, 48, 53
Single-Seller Conduits 7, 8, 20, 21, 34, 37, 42, 44, 48, 53
Slow Pay Risk 64
Special Purpose Vehicles 3, 5, 11, 25, 26, 27, 28, 29, 36, 37, 44, 47, 48, 52, 54, 57, 61, 69, 74, 75, 77, 78
Sponsor 5, 6, 7, 9, 15, 18, 20, 21, 24, 25, 26, 27, 31, 32, 34, 37, 39, 42, 45, 48, 49, 50, 53, 58, 61, 62, 65, 69, 71, 75, 78, 84
Structural Risks 3, 5, 27, 36, 40, 59
Structure of ABCP conduits 3, 9, 15, 19, 25, 27, 50, 75
Structured Investment Vehicles 7, 8, 17, 20, 21, 22, 23, 26, 44, 47, 66, 67, 73, 74, 77, 78, 81
Structured Liquidity 37, 39, 40, 66, 82
Subordinated Capital Notes 8, 23
Subordination 39
Support Facilities 6, 9, 17, 18, 19, 20, 21, 23, 30, 31, 50, 54, 59, 69

Support Providers 3, 6, 11, 17, 19, 20, 21, 23, 25, 26, 29, 30, 31, 33, 34, 36, 44, 45, 50, 59, 70, 72, 74, 75, 78, 83, 84
Surety Bonds 20, 35, 41, 65, 71, 74, 77, 78, 79
Swap
    credit default 35, 41, 70
Swaps 6, 7, 35, 39, 41, 43, 44, 45, 46, 52, 54, 59, 70, 72, 73, 78, 82
    interest rate 35, 52
    Market value 7, 35, 44

**T**

Tenor 53
Termination Triggers 47, 63
Third-Party Audits 64
Third-Party Guarantee 19, 21, 39, 41
Timing 6, 7, 14, 19, 21, 25, 34, 38, 40, 43, 44, 46, 65, 73, 74
Total Return Swap 35, 39, 41, 59
Trade Receivables 4, 6, 7, 11, 43, 61, 63, 64, 70, 75, 78, 82, 83
Transaction Support 3, 19
Triggers
    Performance 11, 30, 40, 45, 64, 65
    Program Termination 47
True Sale 11, 25, 40, 61, 78, 79, 82
Trustee 31, 32, 33, 38, 40, 64, 69
Trustee Group 32
Two-Step Sale 4, 61, 79
Types of ABCP programs 2, 3, 7, 11, 16, 17, 20, 43, 59
Types Of Conduits 48

**V**

Volatility 8, 21, 23, 58, 83

**W**

Warehouse Transactions 15, 35, 44, 53, 79
Wind-Down 40, 47, 78, 79

**Y**

Yield Enhancement 57

Doc ID# SF19491

© Copyright 2003. Moody's Investors Service, Inc. and/or its licensors including Moody's Assurance Company Inc. (together "MOODY'S") All rights reserved. ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TR ANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind and MOODY'S, in particular, makes no representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability or fitness for any particular purpose of any such information. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation lost profits) even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The credit ratings, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER. Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling. Pursuant to Section 17(b) of the Securities Act of 1933. MOODY'S hereby discloses that most issuers of debt securities (including corporate and municipal bonds. debentures, notes and commercial paper) and preferred stock rated by MOODY'S have, prior to assignment of any rating, agreed to pay to MOODY'S for appraisal and rating services rendered by it fees ranging from $1,500 to $1,500,000       PRINTED IN U.S.A.

Kelley_DZ_00092092

# EXHIBIT 32

# FitchRatings

## Structured Finance

Asset-Backed
Special Report

# Asset-Backed Commercial Paper: 2003 Review and 2004 Outlook

## Analysts

**ABCP Group**
Deborah Seife
1 212 908-0604
deborah.seife@fitchratings.com

Darryl J. Osojnak, Esq.
1 212 908-0602
darryl.osojnak@fitchratings.com

Aoto Kenmochi, CFA
1 212 908-0867
aoto.kenmochi@fitchratings.com

Sarah Repucci
1 212 908-0726
sarah.repucci@fitchratings.com

Ileana Sayago-Fermaint
1 212 908-0752
ileana.fermaint@fitchratings.com

■ **Summary**

As of Dec. 31, 2003, asset-backed commercial paper (ABCP) outstandings were down 4.95%, or $35.5 billion, to $717.3 billion from the near record high of $752.8 billion recorded as of Dec. 31, 2002. When compared with the record level of ABCP outstandings set at Dec. 31, 2001 of $765.8 billion, outstandings have declined 6.76% *(see chart, page 2)*. Despite the decline in outstandings during the past year, ABCP, as a percentage of the overall U.S. commercial paper (USCP) market had risen to one of the highest historical levels recorded, as ABCP constituted 55.66% of the total USCP market, reflecting a continued flight to quality by investors *(see chart, page 4)*.

The U.S. ABCP market weathered many challenges during 2003, the most prominent of which were general weakness of the overall U.S. economy, a slower than hoped for recovery, and an ever changing regulatory and accounting landscape. These factors contributed to the decline in outstandings in 2003, which went against the historical trend of rebounding during the final month of the year, which, in fact, dipped slightly during the typically strong month of December. Mitigating some of the negative factors working against the market in 2003 was the introduction of various structural innovations and new program structures in the form of collateralized debt obligations (CDOs) that issue short-term notes, mortgage warehouse programs, and the use of extendable and callable liabilities for both of these program types.

**Influences and Trends in 2003**
- Launch of new single seller/mortgage warehouse programs.
- New structures, such as CDO vehicles entering the market.
- Number of large corporate accounting scandals (i.e. Enron, Worldcom, Tyco, and Parmalat).
- Tightening spreads on ABCP, thus diverting short-term funds to other higher yielding investments.
- Troubled exposures in some conduit holdings (i.e. DVI, AMS, and Parmalat), which ultimately were removed through liquidity or fully credit-enhanced.
- International and domestic banking woes, particularly in the German banking sector.
- 62% growth in the European ABCP market (U.S. $88.1 billion at Dec. 31, 2003 versus U.S. $54.4 billion at Dec. 31, 2002).

■ **FIN 46**

Financial Interpretation No. 46 (FIN 46) diverted sponsoring banks' attention away from originating and prospecting for new transactions as such entities needed to understand how FIN 46 would impact them

**March 23, 2004**

BM-000001

# FitchRatings

# Structured Finance



**Monthly U.S. ABCP Outstanding**

ABCP – Asset-backed commercial paper.

and what, if any, solutions were available. In addition, sponsors were reluctant to enter into new multiyear asset purchase agreements without fully understanding the ambiguous message sent by the Financial Accounting Standards Board (FASB) with regard to FIN 46.

Additionally, FIN 46 led to the termination and organized wind-down of a number of ABCP programs as certain sponsors concluded that the continued use of their programs was no longer viable. Moreover, a number of programs were terminated as a result of consolidation into a "sister" or similar program sponsored by the same entity in an effort to reduce costs and the number of programs for which solutions were needed. During 2003, 18 ABCP programs rated by Fitch Ratings terminated for FIN 46-related reasons, scheduled program termination, consolidation into other programs, or a change in the sponsor's business strategy.

Despite the complexity and challenges presented by FIN 46, many sponsors appear to be comfortable with the solutions available to them and have taken steps to absorb the costs associated with such solutions or simply passed them along to sellers.

### FIN 46 Solutions

Currently, conduit sponsors have several options available to them in addressing FIN 46. The most widely utilized option is selling an expected first-loss piece to a third party. Pursuant to FIN 46, the amount sold must be large enough so that the investment at risk is greater than the conduit's variable expected loss (VEL) as calculated pursuant to Appendix A of FIN 46. The amount of VEL represents the weighted average of potential deviation from expected cash flows from the asset portfolio and, when sold, is considered a sufficient means of dispersing collateral risk. If the conduit's auditors sign off on the sizing



**Monthly USCP Outstanding**

USCP – U.S. commercial paper.

Asset-Backed Commercial Paper: 2003 Review and 2004 Outlook

2

BM-000002

# FitchRatings

# Structured Finance



**ABCP 2003 Weekly Outstandings**

ABCP — Asset-backed commercial paper.

methodology and the amount of the first-loss piece, the conduit may retain off balance sheet treatment. However, during 2003, only a few of the major auditing firms were able to sign off on the sizing of the loss piece and interpretation of the VEL.

The second solution, utilized by Bank of America's 'F1+' vehicle, Yorktown Capital, LLC, uses the "silo" concept, which creates distinct and separate asset interests (silos) within a trust matched to distinct liabilities. Each respective seller is the holder of the variable interest in the corresponding silo. Under this structure, each seller is required to consolidate its respective assets onto its balance sheet, thereby allowing the conduit to retain off balance sheet treatment, subject to the accountant's interpretation of FIN 46.

The final option would be to consolidate the conduit assets onto the sponsor's balance sheet. On April 4, 2004, the U.S. federal banking regulators are expected to provide regulatory capital relief to consolidated conduit assets to banks affected by FIN 46. As a result, sponsors that consolidate their conduits will benefit from the capital relief on these assets, but such relief would not apply to the bank's leverage capital ratios, with regard to those same assets.

## Slow Economic Recovery
FIN 46 was not solely to blame for the difficulties experienced in the market during the year. ABCP outstandings were also negatively impacted by the slow pace of economic recovery following the stock market bubble burst in 2000 and the following recessionary period. The lagging economy resulted in a reduced need for working capital and fewer

securitizable assets as many existing conduit facilities went unutilized or only partially utilized.

## New Structures
One of the more notable structural developments during 2003 was the use of extendable or callable notes. These liabilities have been used in various ways and most recently have been issued for the sole purpose of buying the most senior CDO tranches, in the case of stand-alone ABCP vehicles, or as the senior most liability in a CDO's capital structure.

During 2003, Fitch assigned ratings to 10 CDO/single seller structures with a combined issuance limit of more than $8.0 billion *(for a listing of these and other programs rated by Fitch during 2003, see New Ratings Assigned During 2003 table, page 5)*. These structures, in addition to other extendable or callable note structures, allow for the issuance of notes almost identical to ABCP, the main difference being the notes do not carry the typical 100% third-party liquidity support found in traditional ABCP. Instead, these notes are supported by a put agreement provided by a highly rated counterparty, which, subject to certain provisions, is required to take out the extendable notes at their scheduled maturity date should the notes be extended due to a failed remarketing.

In the case of callable notes, the swap will take out the notes at their scheduled maturity date should the issuer be unable to call the notes at the scheduled call dates after issuance, up until such scheduled maturity date. Scheduled maturity dates are typically one year from issuance and may be callable on a monthly, quarterly, or semi-annual basis up until the scheduled

BM-000003

# FitchRatings                          Structured Finance



**ABCP as a Percentage of Overall USCP**

ABCP — Asset-backed commercial paper. USCP — U.S. commercial paper.

maturity date, or extended six months after issuance to the scheduled maturity date.

In all, approximately 25 programs currently in existence fall under the extendable or callable program type with outstandings of close to $70.0 billion. The extendable/callable market grew close to 40% during 2003.

These structures, which are still gaining market acceptance, accomplish several things: they reduce the need for traditional liquidity and they provide a more economic way to fund senior CDO tranches in this low interest rate environment.

Fitch anticipates seeing more of these extendable and callable structures during 2004 (several are currently in the pipeline) as they continue to gain market acceptance, reduce the reliance on third-party liquidity, and may offer more attractive spreads.

### ■ 2004 Outlook
Despite projected volatility during the year, Fitch expects to see outstandings climb back closer to the $735.0 billion level by the end of 2004 as the economy continues to improve, as solutions to the accounting challenge presented by FIN 46 are implemented, and as new ABCP structures and programs are introduced to the market. However, further uncertainty presented by FIN 46R, a revision to FIN 46 may inhibit the sponsor's ability to turn their full attention back to growing their business and negatively impact potential growth of the market in 2004. Not surprisingly, outstandings during January

and February 2004 continued to slide, albeit with a slight uptick in early January to $720.4 billion and in February to $707.8 billion; however, the first few weeks of March have shown signs of a rebound as levels climbed to $715.4 billion. The current levels haven't been seen since late 2001, prior to the record high of $765.8 billion set at Dec. 31, 2001.

### FIN 46R
Introduced late in December 2003, FIN 46R does several things: it delays the FIN 46 effective date, adds clarity to the definition of a variable interest, and reduces the likelihood that decision makers and/or certain guarantors will be considered primary beneficiaries. The effective date of FIN 46 has been delayed until the end of the first reporting period ending after March 15, 2004. However, public companies must apply either FIN 46 or FIN 46R to special purpose entities (SPEs) by the end of the first reporting period after Dec. 15, 2003. The definition of variable interest has been slightly clarified so that only the holder of a variable interest can ever be a variable interest entity's (VIE) primary beneficiary. However, determining what constitutes a variable interest will remain difficult and is still open to interpretation. And finally, FIN 46R puts decision makers and/or certain guarantors' fees on par with other variable interests. FIN 46 treated these fees as types of variable interests in a VIE, which gave a strong impression that such decision maker or guarantor should consolidate. As a result, the likelihood is reduced that CDO asset managers will be required to consolidate.

---

Asset-Backed Commercial Paper: 2003 Review and 2004 Outlook

BM-000004

# FitchRatings                                    Structured Finance

## Economic Recovery

Barring any lapses in homeland security, the economy is expected to continue to improve during 2004. Productivity is projected to increase through advances in technology. Spending in both the business and consumer segments will continue to grow. Given the low cost of borrowing and the rise in operating profitability, capital spending is expected to increase over the lows observed in the past few years. Inflation is projected to remain low, which will keep interest rates low, while boosting the housing and financial markets. All of these factors are expected to help spur the economic recovery, which in turn will produce securitization assets and revenue streams. As the economy grows, the ABCP market will continue to provide a source of low cost, short-term funding as well as an opportunity to move assets off-balance sheet. In addition, as the number of assets that can be securitized grows, ABCP programs will continue to

play a key role in acting as an incubator for new asset types, allowing more seasoning to occur prior to securitization in the term ABS market. In addition, economic growth will surely lead to a higher utilization rate of existing conduit facilities.

### ■ Surveillance

In light of recent accounting scandals, troubled assets, and the market's continued push for greater transparency, a greater emphasis is being placed on surveilling conduit portfolios. In response to the market's need for more detailed and timely monitoring information, Fitch will soon launch its new ABCP monitoring and surveillance system, ABCP Surveillance Metrics Analytics Research and Tools (ABCP S.M.A.R.T.), which provides users with an easy-to-use tool for surveillance and allows for the creation of customized reports.

## New Ratings Assigned During 2003

| Date | Program | Rating | Program Limit ($) | Type | Sponsor |
|------|---------|--------|-------------------|------|---------|
| 1/3/03 | Cedar Springs Capital Company, LLC | 'F1' | N.A. | Multiseller | The Liberty Hampshire Company, LLC |
| 2/3/03 | Saint Germain Holdings Ltd. | 'F1' | 5.0 Bil. | Market value, securities backed | CDC IXIS Capital Markets North America |
| 2/25/03 | Blue Heron V Ltd. | 'F1+' | 910.0 Mil. | Single seller/CDO | WestLB, AG, New York Branch |
| 3/28/03 | House of Europe Funding I Ltd. | 'F1+' | EUR915.0 Mil. | Single seller/CDO | Westdeutsche Hypothekenbank Dortmund |
| 5/21/03 | INdwa Investments Limited | 'F1+' | 15.0 Bil. | Hybrid (multiseller, securities backed) | FirstRand Bank, Limited |
| 5/21/03 | Blue Heron VII Ltd | 'F1+' | 1.14 Bil. | Single seller/CDO | WestLB, AG, New York Branch |
| 5/23/03 | Yorktown Capital LLC | 'F1+' | 18.0 Bil. | Multiseller | Bank of America, N.A. |
| 5/27/03 | Concord Minuteman Capital Co., LLC – Series B | 'F1' | 10.0 Bil. | Multiseller | The Liberty Hampshire Company, LLC |
| 5/30/03 | Blue Heron VII Ltd. | 'F1+' | 1.14 Bil. | Single seller/CDO | WestLB, AG, New York Branch |
| 6/26/03 | CCN (Independence IV) LLC | 'F1+' | 240.0 Mil. | Single seller/CDO | Declaration Management & Research LLC |
| 7/14/03 | Grenadier Funding Limited/Grenadier Funding Corp. | 'F1+' | 1.32 Bil. | Single seller/CDO | ACA Management L.L.C. |
| 7/25/03 | CCN (Bluegrass I) LLC | 'F1+' | 250.0 Mil. | Single seller/CDO | INVESCO Institutional N.A. |
| 8/21/03 | Yum! Capital LLC | 'F1' | 110.0 Mil. | Single seller | Tricon Global Restaurants Inc. |
| 10/2/03 | Belmont Funding LLC | 'F1' | 10.0 Bil. | Multiseller | Hudson Castle Group, Inc. |
| 10/28/03 | Salome Funding Limited | 'F1' | EUR5.0 Bil. | Multiseller/securities backed | Bayerische Hypo- und Vereinsbank AG |
| 11/14/03 | Bennington Stark Capital Company LLC | 'F1' | N.A. | Multiseller | The Liberty Hampshire Company, LLC |
| 12/1/03 | Coral Capital Ltd. | 'F1' | EUR10.0 Bil. | Hybrid | DZ Bank |
| 12/11/03 | Lakeside Funding LLC | 'F1+' | 624.0 Mil. | Single seller/CDO | Vanderbilt Capital Advisors LLC |
| 12/12/03 | Commodore II Ltd. and Commodore CDO II, Corp. | 'F1+' | 186.0 Mil. | Single seller/CDO | Fischer Francis Trees & Watts, Inc. |
| 12/12/03 | Blue Bell Funding Ltd. and Blue Bell Funding Corp. | 'F1+' | 1.11 Bil. | Single seller/CDO | GMAC Institutional Advisors LLC |
| 12/31/03 | Alpine Securitization Corp. | 'F1+' | N.A. | Multiseller | Credit Suisse First Boston Corp. |

CDO – Collateralized debt obligation. N.A. – Not available.

BM-000005

# FitchRatings

# Structured Finance

## Rating Affirmations Issued During 2003

| Date | Program | Rating | Asset Type/Amendment | Program Sponsor |
|------|---------|--------|----------------------|-----------------|
| 4/1/03 | Asset Securitization Cooperative Corp. | 'F1+' | Following staff departures | Canadian Imperial Bank of Commerce |
| 4/1/03 | Special Purpose Accounts Receivable Corp. | 'F1' | Following staff departures | Canadian Imperial Bank of Commerce |
| 4/17/03 | Brahms Funding Corp. | 'F1' | Collateralization of swap obligations | Dresdner Bank AG |
| 4/23/03 | Silver Tower Funding Ltd./Silver Tower US Funding LLC | 'F1' | Addition of backstop liquidity support | Dresdner Bank AG |
| 10/30/03 | Enterprise Funding Corporation | 'F1+' | Bank of America/FleetBoston merger | Bank of America Corporation |
| 10/30/03 | Independence Funding LLC | 'F1+' | Bank of America/FleetBoston merger | Bank of America Corporation |
| 10/30/03 | Kitty Hawk Funding Corporation | 'F1+' | Bank of America/FleetBoston merger | Bank of America Corporation |
| 10/30/03 | Receivables Capital Company LLC | 'F1+' | Bank of America/FleetBoston merger | Bank of America Corporation |
| 10/30/03 | Quincy Capital Corporation | 'F1+' | Bank of America/FleetBoston merger | Bank of America Corporation |
| 10/30/03 | Yorktown Capital LLC | 'F1+' | Bank of America/FleetBoston merger | Bank of America Corporation |
| 10/30/03 | Perry Funding Corporation | 'F1+' | Bank of America/FleetBoston merger | Bank of America Corporation |
| 10/30/03 | Perry III Funding Corporation | 'F1+' | Bank of America/FleetBoston merger | Bank of America Corporation |
| 10/30/03 | Perry Global Funding Limited – Series A | 'F1+' | Bank of America/FleetBoston merger | Bank of America Corporation |
| 10/30/03 | Perry Global Funding Limited – Series B | 'F1' | Bank of America/FleetBoston merger | Bank of America Corporation |
| 11/17/03 | Loch Ness Limited | 'F1' | Transfer of assets to sister program | Royal Bank of Scotland |
| 12/16/03 | Silver Tower Funding Ltd./Silver Tower US Funding LLC | 'F1' | Upgrade of Dresdner Bank AG | Dresdner Bank AG |

Note: Affirmations are rating actions when Fitch Ratings, on its own action, not on the request of someone outside Fitch, affirms a rating.

## Rating Downgrades and Upgrades During 2003

| Date | Program | Current Rating | Former Rating | Program Size ($ Bil.) | Type | Sponsor |
|------|---------|----------------|---------------|------------------------|------|---------|
| **Downgrades** | | | | | | |
| 9/3/03 | Amedis Commercial Finance Limited | 'F1' | 'F1+' | EUR1.0 | Securities backed | BRED Banque Populaire |
| **Upgrades** | | | | | | |
| 5/30/03 | Trainer Wortham First Republic CBO I, Ltd. | 'F1+' | 'F1' | 375 | Market value mortgage CBO | Trainer, Wortham & Co., Inc. |

CBO – Collateralized bond obligation.

## Rating Withdrawals During 2003

| Date | Program | Former Rating | Program Size ($) | Type | Program Sponsor |
|------|---------|---------------|-------------------|------|-----------------|
| 1/14/03 | Sunflowers Funding Corporation | 'F1+' | 3.0 Bil. | Single seller | ABN AMRO Bank N.V. |
| 4/15/03 | Fulbock Funding Limited | 'F1+' | 10.0 Bil. | Credit default swap | Abbey National Financial Products |
| 4/29/03 | VistaOne Metafolio LLC | 'F1' | 5.0 Bil. | Multiseller | Hudson Castle Group, Inc. |
| 5/12/03 | MPF Limited, LLC | 'F1' | 1.5 Bil. | Market value mortgage CBO | Alliance Capital Management, L.P. |
| 5/20/03 | Breeds Hill Capital Corp. | 'F1' | 10.0 Bil. | Multiseller | The Liberty Hampshire Co., LLC |
| 6/17/03 | Broadway Capital Corporation | 'F1' | 4.0 Bil. | Loan backed | The Bank of Tokyo-Mitsubishi Ltd. |
| 6/24/03 | Phebus Finance SA | 'F1' | EUR224.0 Mil. | Multiseller | Credit Commercial de France |
| 6/25/03 | Conduit Asset Backed Securities Co. Ltd | 'F1+' | 4.0 Bil. | Securities-backed | Dexia Bank |
| 7/11/03 | Westways Funding II, Ltd. | 'F1' | 750.0 Mil. | Market value mortgage CBO | TCW Funds Management, Inc. |
| 7/11/03 | Westways Funding III, Ltd. | 'F1' | 675.0 Mil. | Market value mortgage CBO | TCW Funds Management, Inc. |
| 7/17/03 | Nuveen Funding LLC | 'F1+' | 155.0 Mil. | Loan backed | Nuveen Senior Loan Asset Management |
| 7/25/03 | Black Forest Funding Corporation | 'F1' | 6.0 Bil. | Multiseller | Bayerische Hypo- und Vereinsbank AG, NY |
| 8/22/03 | Star Marketers Acceptance Corp. | 'F1' | 200.0 Mil. | Single seller | Texaco Inc., Shell Oil Co., and Saudi Aramco |
| 8/29/03 | Astro Capital Corp. | 'F2' | 5.0 Bil. | Multiseller | Mizuho Corporate Bank, Ltd. |
| 9/12/03 | Prometix Limited | 'F1' | EUR242.0 Mil. | Multiseller | Titrisation et Finance Internationales |
| 9/28/03 | Moriarity Limited | 'F1+' | 10.0 Bil. | Securities backed | Abbey National Treasury Services plc |
| 10/31/03 | Stellar Funding Group, Inc. | 'F1+' | 6.0 Bil. | Loan backed | U.S. Bank, N.A. |
| 11/7/03 | Brahms Funding Corp. | 'F1' | 5.0 Bil. | Extendable | Dresdner Bank AG, New York Branch |
| 11/14/03 | Hudson-American Realty Protection LLC | 'F1' | 2.0 Bil. | Credit default swap | Bayerische Hypo- und Vereinsbank AG |
| 12/16/03 | Bavaria Finance Funding I LLC | 'F1' | 4.0 Bil. | Securities backed | Bayerische Hypo- und Vereinsbank AG |

CBO – Collateralized bond obligation.

Asset-Backed Commercial Paper: 2003 Review and 2004 Outlook

BM-000006

# FitchRatings

# Structured Finance

## Confirmations Issued During 2003 by Sponsor

| Program Sponsor | Program | Rating | Date | Trans-action Size ($ Bil.) | Asset Type/Amendment |
|---|---|---|---|---|---|
| ABN AMRO Bank N.V. | Orchid Funding Corp. | 'F1' | 4/17/03 | 57.9 | Credit card |
| Aeltus Investment Management, Inc. | Aeltus CBO V, Ltd. | 'F1+' | 9/2/03 | N.A. | Portfolio review |
| Alliance Capital Management, L.P. | MPF Two, Ltd. | 'F1' | 9/5/03 | N.A. | Portfolio review |
| Bank of America, N.A. | Receivables Capital Company LLC | 'F1+' | 10/8/03 | N.A. | Program amendment |
| Bank One, N.A. | Falcon Asset Securitization Corporation | 'F1+' | 10/15/03 | N.A. | Program amendment |
| Bank One, N.A. | Jupiter Securitization Corporation | 'F1+' | 10/15/03 | N.A. | Program amendment |
| Bank One, N.A. | Preferred Receivables Funding Corporation | 'F1+' | 10/15/03 | N.A. | Program amendment |
| Bank One, NA | Ivory Funding Corporation | 'F1' | 12/1/03 | N.A. | Program amendment |
| Bankgesellschaft Berlin AG | Check Point Charlie | 'F1+' | 9/17/03 | N.A. | Operational review |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Finance I LLC | 'F1' | 4/4/03 | N.A. | Liquidity amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria TRR Corporation | 'F1+' | 3/7/03 | N.A. | Program amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 1/30/03 | N.A. | Liquidity amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 3/7/03 | N.A. | Liquidity syndication |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 4/21/03 | N.A. | Liquidity amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 6/11/03 | N.A. | Program amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 6/26/03 | N.A. | Liquidity amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 7/31/03 | N.A. | Program amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 7/31/03 | N.A. | Transaction amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 8/20/03 | N.A. | Program amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 9/26/03 | N.A. | Transaction amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 10/3/03 | N.A. | Transaction amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 10/8/03 | N.A. | Transaction amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 10/15/03 | N.A. | Transaction amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 10/16/03 | N.A. | Transaction amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 11/6/03 | N.A. | Transaction amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Bavaria Universal Funding Corporation | 'F1' | 11/6/03 | N.A. | Transaction amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Black Forest Funding Corporation | 'F1' | 1/27/03 | 8 | Aircraft and aircraft lease |
| Bayerische Hypo- und Vereinsbank AG, NY | Black Forest Funding Corporation | 'F1' | 1/30/03 | N.A | Liquidity amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Black Forest Funding Corporation | 'F1' | 2/20/03 | N.A | Liquidity amendment |
| Bayerische Hypo- und Vereinsbank AG, NY | Black Forest Funding Corporation | 'F1' | 4/14/03 | 74.5 | Credit card |
| Bayerische Hypo- und Vereinsbank AG, NY | Black Forest Funding Corporation | 'F1' | 4/30/03 | 50 | Commercial mortgage loan |
| Bayerische Hypo- und Vereinsbank AG, NY | Black Forest Funding Corporation | 'F1' | 5/27/03 | N.A. | Liquidity amendment |
| Bayerische Landesbank, NY Branch | Giro Balanced Funding Corporation | 'F1' | 3/24/03 | N.A. | Transaction amendment |
| Bayerische Landesbank, NY Branch | Giro Balanced Funding Corporation | 'F1' | 4/11/03 | 111.55 | Synthetic lease |
| Bayerische Landesbank, NY Branch | Giro Balanced Funding Corporation | 'F1' | 6/18/03 | 400 | Asset/backed securities |
| Bayerische Landesbank, NY Branch | Giro Balanced Funding Corporation | 'F1' | 6/30/03 | N.A. | Transaction amendment |
| Bayerische Landesbank, NY Branch | Giro Balanced Funding Corporation | 'F1' | 8/25/03 | N.A | Transaction amendment |
| Bayerische Landesbank, NY Branch | Giro Balanced Funding Corporation | 'F1' | 9/8/03 | 300 | Asset/backed securities |
| Bayerische Landesbank, NY Branch | Giro Balanced Funding Corporation | 'F1' | 11/18/03 | 250 | Credit cards |
| Bayerische Landesbank, NY Branch | Giro Balanced Funding Corporation | 'F1' | 12/11/03 | 237.5 | Auto loans |
| Bayerische Landesbank, NY Branch | Giro Balanced Funding Corporation | 'F1' | 12/15/03 | 1,000.00 | Asset/backed securities |
| Bayerische Landesbank, NY Branch | Giro Multi/Funding Corporation | 'F1+' | 10/23/03 | N.A. | Transaction amendment |
| Bayerische Landesbank, NY Branch | Giro Multi/Funding Corporation | 'F1+' | 12/10/03 | N.A. | Transaction amendment |
| Bayerische Landesbank, NY Branch | Giro Multi/Funding Corporation | 'F1+' | 12/11/03 | 237.5 | Auto loans |
| Bayerische Landesbank Girozentrale, Paris | Indigo Funding Ltd. | 'F1' | 9/29/03 | N.A. | Operational review |
| BNP Paribas | Thesee Ltd. | 'F1' | 6/24/03 | EUR250.00 | Credit/linked notes |
| BNP Paribas | Thesee Ltd. | 'F1' | 9/29/03 | EUR268.30 | Shopping credit receivables |
| BNP Paribas | Thesee Ltd. | 'F1' | 10/7/03 | EUR300.00 | Credit cards |
| BRED Banque Populaire | Amedis Commercial Finance Limited | 'F1+' | 4/17/03 | N.A. | Program amendment |
| Canadian Imperial Bank of Commerce | Asset Securitization Cooperative Corp. | 'F1+' | 1/28/03 | N.A. | Program amendment |
| Canadian Imperial Bank of Commerce | Asset Securitization Cooperative Corp. | 'F1+' | 9/12/03 | N.A. | Program amendment |
| Canadian Imperial Bank of Commerce | Asset Securitization Capital Company, LLC | 'F1+' | 12/17/03 | N.A. | Program amendment |
| Canadian Imperial Bank of Commerce | Special Purpose Accounts Receivable Cooperative Corp. | 'F1' | 10/3/03 | N.A. | Program amendment |
| Canadian Imperial Bank of Commerce | SPARC, LLC | 'F1+' | 12/17/03 | N.A. | Program amendment |
| CDC Financial Products | Eiffel Funding, LLC | 'F1' | 1/9/03 | 150 | Auto loans |
| CDC Financial Products | Eiffel Funding, LLC | 'F1' | 1/29/03 | 28 | Construction loan |
| CDC Financial Products | Eiffel Funding, LLC | 'F1' | 1/31/03 | N.A. | Transaction amendment |
| CDC Financial Products | Eiffel Funding, LLC | 'F1' | 2/13/03 | N.A. | Transaction amendment |
| CDC Financial Products | Eiffel Funding, LLC | 'F1' | 2/25/03 | N.A. | Transaction amendment |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 4/22/03 | 180 | Investment subscriptions |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 4/28/03 | N.A. | Transaction amendment |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 4/30/03 | 100 | Trade receivables |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 5/13/03 | N.A. | Program amendments |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 6/11/03 | 180 | Investment subscriptions |

BM-000007

# FitchRatings

# Structured Finance

## Confirmations Issued During 2003 by Sponsor (continued)

| Program Sponsor | Program | Rating | Date | Trans-action Size ($ Bil.) | Asset Type/Amendment |
|---|---|---|---|---|---|
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 6/13/03 | 150 | Loan warehouse facility |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 6/13/03 | 150 | Loan warehouse facility |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 6/30/03 | N.A. | Transaction amendment |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 7/10/03 | 60 | Cash flow CLO |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 7/11/03 | N.A. | Transaction amendment |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 7/18/03 | 150 | Loan warehouse facility |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 7/18/03 | 100 | Loan warehouse facility |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 7/30/03 | 50 | Loan warehouse facility |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 8/7/03 | N.A. | Transaction amendment |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 8/12/03 | 100 | Franchise loans |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 8/13/03 | 250 | Fixed/rate funding agreement |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 8/18/03 | 150 | Residential mortgages |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 8/28/03 | 100 | Loan warehouse facility |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 9/5/03 | 100 | Revolving loan facility |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 11/7/03 | N.A. | Program amendment |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 11/7/03 | N.A. | Transaction amendment |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 11/12/03 | EUR 250.00 | Revolving loan facility |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 11/13/03 | 150 | Collateralized debt obligation |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 11/17/03 | N.A. | Transaction amendment |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 11/17/03 | 25 | Credit cards |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 11/18/03 | 500 | Auto loans |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 11/20/03 | 140 | CLO |
| CDC Financial Products | Eiffel Funding LLC | 'F1' | 11/20/03 | 160 | CLO |
| CDC Financial Products | Eiffel Funding, LLC | 'F1' | 11/25/03 | 50 | Revolving loan facility |
| CDC Financial Products | Eiffel Funding, LLC | 'F1' | 12/18/03 | N.A. | Transaction amendment |
| CDC Financial Products | Eiffel Funding, LLC | 'F1' | 12/19/03 | N.A. | Program amendment |
| CDC Financial Products | Eiffel Funding, LLC | 'F1' | 12/22/03 | 175 | Collateralized debt obligation |
| CDC Financial Products | Eiffel Funding, LLC | 'F1' | 12/22/03 | 349.7 | Consumer loans |
| Cendant Mortgage Corp. | Bishop's Gate Residential Mortgage Trust | 'F1/AAA' | 5/16/03 | N.A. | Program amendment |
| Cendant Mortgage Corp | Bishop's Gate Residential Mortgage Trust | 'F1/AAA' | 9/10/03 | N.A. | Program amendment |
| Cendant Mortgage Corp | Bishop's Gate Residential Mortgage Trust | 'AAA/F1+' | 12/2/03 | N.A. | Program and liquidity amendment |
| Centex Home Equity Corporation | Harwood Street Funding II, LLC | 'F1+' | 2/24/03 | N.A. | Program amendment |
| Centex Home Equity Corporation | Harwood Street Funding II, LLC | 'F1+' | 2/28/03 | N.A. | Program amendment |
| Citibank, N.A. | Eureka Securitzation Plc/Eureka Securitzation Inc. | 'F1+/AAA' | 8/27/03 | N.A | Operational review |
| Citicorp North America, Inc. | APRECO, LLC | 'F1+' | 6/30/03 | N.A. | Program amendment |
| Citicorp North America, Inc. | CAFCO, LLC | 'F1+' | 7/10/03 | N.A. | Program amendment |
| Citicorp North America, Inc. | Ciesco, LLC | 'F1+/AAA' | 6/30/03 | N.A. | Program amendment |
| Citicorp North America, Inc. | CRC Funding, LLC | 'F1+' | 6/30/03 | N.A. | Program amendment |
| Citicorp North America, Inc. | CXC, LLC | 'F1+/AAA' | 10/27/03 | N.A. | Support review following complaint |
| Citigroup Global Markets Inc. | Cobblestone Funding LLC | 'F1' | 1/23/03 | 300 | Credit card |
| Citigroup Global Markets Inc. | Cobblestone Funding LLC | 'F1' | 11/17/03 | N.A. | Transaction amendment |
| Citigroup Global Markets Inc. | Cobblestone Funding LLC | 'F1' | 11/17/03 | 99.3 | Credit cards |
| Citigroup Global Markets Inc. | Cobblestone Funding LLC | 'F1' | 12/19/03 | 300 | Consumer loans |
| Colonial Advisory Services, Inc. | Newbury Funding CBO I, Ltd. | 'F1' | 9/2/03 | N.A. | Portfolio review |
| Commerzbank Aktiengesellschaft | Four Winds Funding Corp. | 'F2' | 5/27/03 | N.A. | Program amendment |
| Compass Bank | Sunbelt Funding Corp. | 'F1' | 11/5/03 | N.A. | Program amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 3/14/03 | N.A. | Program amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 3/24/03 | N.A. | Transaction amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 4/2/03 | N.A. | Transaction amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 4/18/03 | N.A. | Transaction amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 4/24/03 | 130 | Trade receivables |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 4/29/03 | 250 | Auto loans |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 5/23/03 | 100 | Residential mortgage |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 6/16/03 | N.A. | Transaction amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 6/25/03 | N.A. | Transaction amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 7/10/03 | 200 | Trade receivables |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 7/25/03 | N.A. | Transaction amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 8/18/03 | N.A. | Transaction amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 8/25/03 | N.A. | Transaction amendment |

BM-000008

# FitchRatings                        Structured Finance

## Confirmations Issued During 2003 by Sponsor (continued)

| Program Sponsor | Program | Rating | Date | Trans-action Size ($ Bil.) | Asset Type/Amendment |
|---|---|---|---|---|---|
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 9/26/03 | 175 | Trade/consumer receivables |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 9/30/03 | N.A. | Transaction amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 11/20/03 | N.A. | Transaction amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 11/26/03 | N.A. | Program amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 12/12/03 | 100 | Trade receivables |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 12/12/03 | N.A. | Transaction amendment |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 12/15/03 | 175 | Trade receivables |
| Credit Lyonnais | Atlantic Asset Securitization Corp. | 'F1' | 12/15/03 | 100 | Timeshare loans |
| Credit Lyonnais | La Fayette Asset Securitization Corp. | 'F1' | 3/24/03 | N.A. | Transaction amendment |
| Credit Lyonnais | La Fayette Asset Securitization Corp. | 'F1' | 4/29/03 | 250 | Auto loans |
| Credit Lyonnais | La Fayette Asset Securitization Corp. | 'F1' | 6/16/03 | N.A. | Transaction amendment |
| Credit Lyonnais | La Fayette Asset Securitization Corp. | 'F1' | 7/17/03 | N.A. | Transaction amendment |
| Credit Lyonnais | La Fayette Asset Securitization Corp. | 'F1' | 8/8/03 | 200 | Residential mortgage warehouse |
| Credit Lyonnais | La Fayette Asset Securitization Corp. | 'F1' | 8/18/03 | N.A. | Transaction amendment |
| Credit Lyonnais | La Fayette Asset Securitization Corp. | 'F1' | 9/10/03 | N.A. | Transaction amendment |
| Delaware Group Dividend and Income Fund, Inc. | Delaware Group Dividend and Income Fund, Inc. | 'F1' | 6/23/03 | N.A. | Program amendment |
| Deutsche Bank AG | Aspen Funding Corp. | 'F1+' | 8/18/03 | N.A. | Program amendment |
| Deutsche Bank AG | Aspen Funding Corp. | 'F1+' | 9/12/03 | N.A. | Program amendment |
| Deutsche Bank AG | Aspen Funding Corp. | 'F1+' | 10/3/03 | N.A. | Program amendment |
| Deutsche Bank AG | Bills Securitisation Ltd | 'F1+' | 12/10/03 | N.A. | Operational/sponsor review |
| Deutsche Bank AG | Newport Funding Corp. | 'F1+' | 6/26/03 | N.A. | Program amendment |
| Deutsche Bank AG | Newport Funding Corp. | 'F1+' | 7/15/03 | N.A. | Program amendment |
| Deutsche Bank AG | Newport Funding Corp. | 'F1+' | 9/12/03 | N.A. | Program amendment |
| Deutsche Bank AG | Newport Funding Corp. | 'F1+' | 10/2/03 | N.A. | Program amendment |
| Dollar Thrifty Automotive Group | Dollar Thrifty Funding Corp. | 'F1' | 2/24/03 | N.A. | Program amendment |
| Dresdner Bank AG | Brahms Funding Corp. | 'F1' | 5/28/03 | N.A. | Transaction amendment |
| Dresdner Bank AG | Brahms Funding Corp | 'F1' | 7/14/03 | N.A. | Transaction amendment |
| Duff & Phelps Investment Management | DNP Select Income Fund Inc. | 'F1+/AAA' | 2/12/03 | N.A. | Program amendment |
| Duff & Phelps Investment Management Co. | DNP Select Income Fund Inc | 'F1+/AAA' | 6/26/03 | N.A. | Program amendment |
| DZ Bank AG | Autobahn Funding Co. LLC | 'F1' | 2/11/03 | 75 | Home remodeling loans |
| DZ Bank AG | Autobahn Funding Co. LLC | 'F1' | 2/27/03 | 100 | Rental car leases |
| DZ Bank AG | Autobahn Funding Co. LLC | 'F1' | 5/30/03 | 75 | Equipment loan and lease |
| DZ Bank AG | Autobahn Funding Co. LLC | 'F1' | 9/11/03 | N.A | Transaction amendment |
| DZ Bank AG | Autobahn Funding Co. LLC | 'F1' | 12/31/03 | N.A | Transaction amendment |
| Educational Finance Group, Inc. | EFG Funding, LLC | 'F1' | 7/30/03 | N.A. | Waiver request |
| Erste Bank | High Peak Funding LLC | 'F1' | 9/26/03 | N.A. | Program amendment |
| Exxon Mobil Corporation | Tiger Peg Funding Inc. | 'F1' | 1/28/03 | N.A. | Replace liquidity and credit enhancement provider |
| Federated Investment Counseling | Eagle I CBO, Ltd | 'F1' | 9/2/03 | N.A. | Portfolio review |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 1/17/03 | 50 | Credit card |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 2/19/03 | N.A. | Transaction amendment |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 3/31/03 | 130 | Film property and rights |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 4/8/03 | 90 | Trade receivables |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 7/10/03 | 250 | Trade receivables |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 7/11/03 | 100 | Insurance premium finance |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 7/17/03 | N.A. | Transaction amendment |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 7/24/03 | N.A. | Transaction amendment |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 8/12/03 | N.A. | Transaction amendment |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 9/26/03 | 100 | Film property and rights |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 11/7/03 | 152 | Sports revenue backed |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 12/12/03 | N.A. | Transaction amendment |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 12/16/03 | N.A. | Transaction amendment |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 12/24/03 | 200 | Fixed income securities |
| FleetBoston Financial Corp. | EagleFunding Capital Corporation | 'F1' | 12/31/03 | 50 | Trade receivables |
| Fortis Bank S.A./N.V. | Scaldis Capital Limited | 'F1+' | 4/1/03 | N.A. | Operational review |
| Fortis Bank S.A./N.V. | Scaldis Capital Limited | 'F1+' | 5/27/03 | N.A. | Program amendment |
| Gordian Knot Ltd. | Sigma Finance Corp. | 'F1+/AAA' | 3/28/03 | N.A. | Program amendment |
| Hilton Hotel Corp. | Hilton Managers Acceptance Corp. | 'F1' | 6/24/03 | N.A. | Program/liquidity amendments |
| Hudson Castle Group Inc. | AriesOne Metafolio Corporation | 'F1' | 7/25/03 | N.A. | Liquidity amendment |

BM-000009

# FitchRatings

# Structured Finance

## Confirmations Issued During 2003 by Sponsor (continued)

| Program Sponsor | Program | Rating | Date | Transaction Size ($ Bil.) | Asset Type/Amendment |
|---|---|---|---|---|---|
| Hudson Castle Group, Inc. | Belmont Funding LLC | 'F1' | 12/15/03 | N.A. | Program amendment |
| Hudson Castle Group, Inc. | Belmont Funding LLC | 'F1' | 12/17/03 | 700 | Collateralized debt obligation |
| Independence Fixed Income Assoc. | Declaration Funding I, Ltd. | 'F1' | 9/2/03 | N.A. | Portfolio review |
| ING Baring (U.S.) Capital Markets LLC | Holland Limited Securitization, Inc. | 'F1' | 4/28/03 | N.A. | Transaction amendment |
| ING Baring (U.S.) Capital Markets LLC | Holland Limited Securitization, Inc. | 'F1' | 5/22/03 | N.A. | Transaction amendment |
| ING Baring (U.S.) Capital Markets LLC | Holland Limited Securitization, Inc. | 'F1' | 6/24/03 | N.A. | Transaction amendment |
| ING Baring (U.S.) Capital Markets LLC | Holland Limited Securitization, Inc. | 'F1' | 6/30/03 | N.A. | Transaction amendment |
| ING Baring (U.S.) Capital Markets LLC | Holland Limited Securitization, Inc. | 'F1' | 12/15/03 | N.A. | Transaction amendment |
| JP Morgan Chase Bank | Asset Portfolio Funding Corp. | 'F1' | 4/14/03 | N.A. | Program amendment |
| JP Morgan Chase Bank | Asset Portfolio Funding Corp. | 'F1' | 4/30/03 | N.A. | Program amendment |
| JP Morgan Chase Bank | Asset Portfolio Funding Corp. | 'F1' | 4/30/03 | N.A. | Program amendment |
| JPMorgan Chase Bank | Bunge Asset Funding Corp. | 'F1' | 7/3/03 | N.A. | Program amendment |
| JPMorgan Chase Bank | Delaware Funding Company, LLC | 'F1' | 12/18/03 | N.A. | Program amendment |
| JPMorgan Chase Bank | MOAT Funding LLC | 'F1' | 3/3/03 | N.A. | Program amendment |
| JPMorgan Chase Bank | MOAT Funding LLC | 'F1' | 11/19/03 | N.A. | Liquidity amendment |
| KBC Bank N.V. | Rosy Blue International S.A. | 'F1+' | 9/25/03 | N.A. | Operational review |
| KBC Bank N.V. | Rosy Blue International S.A. | 'F1+' | 12/19/03 | N.A. | Program amendment |
| MBNA America Bank, N.A. | MBNA Credit Card Master Note Trust Class A (2001 Emerald) | F1-' | 8/14/03 | N.A. | Program amendment |
| Mellon Bank | Three Rivers Funding Corporation | 'F1' | 7/3/03 | N.A. | Program amendment |
| Mizuho Corporate Bank, Ltd. | Astro Capital Corporation | 'F2' | 3/3/03 | N.A. | Program amendment |
| Mizuho Corporate Bank, Ltd. | Astro Capital Corporation | 'F2' | 5/28/03 | N.A. | Program amendment |
| Natexis Banques Populaires | Elixir Funding Limited | 'F1' | 10/2/03 | EUR 60.00 | Senior units |
| Rabobank International, London Branch | Atlantis One Funding Corp. | 'F1+' | 1/22/03 | N.A. | Operational/sponsor review |
| Rabobank International, London Branch | Atlantis Two Funding Corp. | 'F2' | 1/22/03 | N.A. | Operational/sponsor review |
| Rabobank International, New York Branch | Mermaid Funding Corp. | 'F2' | 9/26/03 | 150 | Credit linked deposit |
| Rabobank International, NY Branch | Neptune Funding Corp. | 'F1' | 6/30/03 | N.A. | Transaction amendment |
| Rabobank International, New York Branch | Neptune Funding Corp. | 'F1' | 10/28/03 | 147 | Credit/linked deposit |
| Rabobank International, NY Branch | Nieuw Amsterdam Receivables Corp. | 'F1' | 2/11/03 | 175 | Film rights |
| Rabobank International, NY Branch | Nieuw Amsterdam Receivables Corp. | 'F1' | 3/4/03 | 135 | Trade receivables |
| Rabobank International, NY Branch | Nieuw Amsterdam Receivables Corp. | 'F1' | 3/7/03 | N.A. | Transaction amendment |
| Rabobank International, NY Branch | Nieuw Amsterdam Receivables Corp. | 'F1' | 4/4/03 | N.A. | Transaction amendment |
| Rabobank International, NY Branch | Nieuw Amsterdam Receivables Corp. | 'F1' | 4/29/03 | N.A. | Transaction amendment |
| Rabobank International, NY Branch | Nieuw Amsterdam Receivables Corp. | 'F1' | 6/27/03 | N.A. | Program amendment |
| Rabobank International, NY Branch | Nieuw Amsterdam Receivables Corp. | 'F1' | 10/23/03 | 100 | Rail car lease |
| Rabobank International, NY Branch | Nieuw Amsterdam Receivables Corp. | 'F1' | 11/20/03 | 100 | Trade receivables |
| Rabobank International, NY Branch | Nieuw Amsterdam Receivables Corp. | 'F1' | 11/20/03 | 50 | CLO |
| Rabobank International, NY Branch | Nieuw Amsterdam Receivables Corp. | 'F1' | 11/20/03 | 150 | CLO |
| Royal Bank of Canada | Old Line Funding Corporation | 'F1+' | 4/8/03 | N.A. | Program amendment |
| Société Générale | Asset One Securitization, LLC | 'F1' | 2/6/03 | 47.88 | Credit card |
| Société Générale | Asset One Securitization, LLC | 'F1' | 2/26/03 | 200 | Trade receivables |
| Société Générale | Asset One Securitization, LLC | 'F1' | 2/27/03 | 200 | Trade receivables |
| Société Générale | Asset One Securitization, LLC | 'F1' | 3/7/03 | N.A. | Transaction amendment |
| Société Générale | Asset One Securitization, LLC | 'F1' | 3/28/03 | 19.43 | Credit cards |
| Société Générale | Asset One Securitization, LLC | 'F1' | 7/14/03 | N.A. | Transaction amendment |
| Société Générale | Asset One Securitization, LLC | 'F1' | 7/29/03 | 25 | Credit cards |
| Société Générale | Asset One Securitization, LLC | 'F1' | 10/23/03 | N.A. | Transaction amendment |
| Société Générale | Asset One Securitization, LLC | 'F1' | 12/17/03 | 25.6 | Credit cards |
| Sumitomo Mitsui Banking Corporation Group | Manhattan Asset Funding Co. | 'F1' | 2/4/03 | N.A. | Liquidity amendment |
| TCW Asset Management Co. | Eminont Funding I, Ltd. | 'F1' | 9/2/03 | N.A. | Portfolio review |
| The Bank of Tokyo-Mitsubishi, Ltd. | Albion Capital Corp. | 'F1' | 8/27/03 | N.A. | Operational review |
| The Bank of Tokyo-Mitsubishi, Ltd. | Apex Funding Corp. | 'F1' | 3/6/03 | N.A. | Program amendment |
| The Liberty Hampshire Company, LLC | Cedar Springs Capital Company, LLC | 'F1' | 10/8/03 | N.A. | Program amendment |
| The Liberty Hampshire Company, LLC | Cedar Springs Capital Company, LLC | 'F1' | 12/10/03 | N.A. | Program amendment |
| The Liberty Hampshire Company, LLC | Concord Minuteman Capital Company, LLC – Series A | 'F1' | 5/27/03 | N.A. | Program amendment |
| The Liberty Hampshire Company, LLC | Concord Minuteman Capital Company, LLC | 'F1' | 8/19/03 | N.A. | Liquidity amendment |
| The Liberty Hampshire Company, LLC | Concord Minuteman Capital Company, LLC | 'F1' | 12/10/03 | N.A. | Program amendment |
| The Liberty Hampshire Company, LLC | Crown Point Capital Company, LLC | 'F1' | 12/10/03 | N.A. | Program amendment |
| The Liberty Hampshire Company, LLC | Lexington Parker Capital Company, LLC | 'F1' | 4/7/03 | N.A. | Program amendment |
| The Liberty Hampshire Company, LLC | Lexington Parker Capital Company, LLC | 'F1' | 12/10/03 | N.A. | Program amendment |
| Titrisation et Finance Internationales | Prometix Limited | 'F1' | 3/7/03 | N.A. | Operational review |

Asset-Backed Commercial Paper: 2003 Review and 2004 Outlook

BM-000010

# FitchRatings

# Structured Finance

## Confirmations Issued During 2003 by Sponsor (continued)

| Program Sponsor | Program | Rating | Date | Trans-action Size ($ Bil.) | Asset Type/Amendment |
|---|---|---|---|---|---|
| Trainer, Wortham & Co., Inc. | Trainer Wortham First Republic CBO I, Ltd. | 'F1+' | 9/2/03 | N.A. | Portfolio review |
| Tricon Restaurants Inc. | Tricon Capital Corp. | 'F1' | 8/6/03 | N.A. | Program amendment |
| U.S. Bank, N.A. | Galaxy Funding, Inc. | 'F1+' | 3/31/03 | N.A. | Program amendment |
| U.S. Bank, N.A. | Stellar Funding Group, Inc. | 'F1+' | 3/31/03 | N.A. | Program amendment |

CLO – Collateralized loan obligation. N.A. – Not available. Note: Confirmations are rating actions occurring when Fitch Ratings is presented with a change or addition.

Copyright © 2004 by Fitch, Inc., Fitch Ratings Ltd. and its subsidiaries. One State Street Plaza, NY, NY 10004
Telephone: 1-800-753-4824, (212) 908-0500. Fax: (212) 480-4435. Reproduction or retransmission in whole or in part is prohibited except by permission. All rights reserved. All of the information contained herein is based on information obtained from issuers, other obligors, underwriters, and other sources which Fitch believes to be reliable. Fitch does not audit or verify the truth or accuracy of any such information. As a result, the information in this report is provided "as is" without any representation or warranty of any kind. A Fitch rating is an opinion as to the creditworthiness of a security. The rating does not address the risk of loss due to risks other than credit risk, unless such risk is specifically mentioned. Fitch is not engaged in the offer or sale of any security. A report providing a Fitch rating is neither a prospectus nor a substitute for the information assembled, verified and presented to investors by the issuer and its agents in connection with the sale of the securities. Ratings may be changed, suspended, or withdrawn at anytime for any reason in the sole discretion of Fitch. Fitch does not provide investment advice of any sort. Ratings are not a recommendation to buy, sell, or hold any security. Ratings do not comment on the adequacy of market price, the suitability of any security for a particular investor, or the tax-exempt nature or taxability of payments made in respect to any security. Fitch receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating securities. Such fees generally vary from US$1,000 to US$750,000 (or the applicable currency equivalent) per issue. In certain cases, Fitch will rate all or a number of issues issued by a particular issuer, or insured or guaranteed by a particular insurer or guarantor, for a single annual fee. Such fees are expected to vary from US$10,000 to US$1,500,000 (or the applicable currency equivalent). The assignment, publication, or dissemination of a rating by Fitch shall not constitute a consent by Fitch to use its name as an expert in connection with any registration statement filed under the United States securities laws, the Financial Services and Markets Act of 2000 of Great Britain, or the securities laws of any particular jurisdiction. Due to the relative efficiency of electronic publishing and distribution, Fitch research may be available to electronic subscribers up to three days earlier than to print subscribers.

BM-000011

# EXHIBIT 33

Financial Statements

Autobahn Funding Company LLC

Year ended December 31, 2002
with Report of Independent Auditors

# Autobahn Funding Company LLC

## Financial Statements

December 31, 2002

## Contents

Report of Independent Auditors ..................................................................................... 1

Statement of Financial Condition ................................................................................. 2
Statement of Operations ............................................................................................... 3
Statement of Cash Flows .............................................................................................. 4
Notes to Financial Statements ....................................................................................... 5

**≣‖ ERNST & YOUNG**

■ Ernst & Young LLP        ■ Phone: (212) 773-3000
5 Times Square            www.ey.com
New York, New York 10036-6530

## Report of Independent Auditors

To the Management of
Autobahn Funding Company LLC

We have audited the accompanying statement of financial condition of Autobahn
Funding Company LLC (the "Company") as of December 31, 2002, and the related
statements of operations and cash flows for the year then ended. These financial
statements are the responsibility of the Company's management. Our responsibility is to
express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the
United States of America. Those standards require that we plan and perform the audit to
obtain reasonable assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting the
amounts and disclosures in the financial statements. An audit also includes assessing the
accounting principles used and significant estimates made by management, as well as
evaluating the overall financial statement presentation. We believe that our audit provides
a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material
respects, the financial position of Autobahn Funding Company LLC at December 31,
2002, and the results of its operations and its cash flows for the year then ended, in
conformity with accounting principles generally accepted in the United States of
America.

*Ernst & Young LLP*

April 29, 2003

# Autobahn Funding Company LLC

## Statement of Financial Condition

### December 31, 2002

**Assets**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 72,646 |
| Investments in, and loans collateralized | | |
| by, pooled receivables | | 1,657,233,341 |
| Interest receivable | | 1,412,954 |
| Program fees receivable | | 2,395,227 |
| Total assets | | $ 1,661,114,168 |

**Liabilities and member's capital**

Liabilities:

| | |
|---|---:|
| Notes payable (net of unamortized discount of $751,695) | $ 1,658,656,305 |
| Facility fees payable | 2,430,760 |
| Accounts payable and accrued expenses | 2,103 |
| Total liabilities | 1,661,089,168 |

Member's capital:

| | |
|---|---:|
| Contributed Capital | 25,000 |
| Retained earnings | - |
| Total member's capital | 25,000 |
| Total liabilities and member's capital | $ 1,661,114,168 |

*See notes to financial statements.*

# Autobahn Funding Company LLC

## Statement of Operations

Year ended December 31, 2002

| | |
|---|---:|
| **Revenues** | |
| Interest income | $ 33,309,635 |
| Program fees | 26,592,075 |
| Total revenues | 59,901,710 |
| | |
| **Expenses** | |
| Interest expense | 32,730,841 |
| Facility fees | 27,170,799 |
| Other | 70 |
| Total expenses | 59,901,710 |
| **Net income** | $          — |

*See notes to financial statements.*

3

# Autobahn Funding Company LLC

## Statement of Cash Flows

### Year Ended December 31, 2002

| | | |
|---|---:|---:|
| Cash flows from operating activities: | | |
| Net income | $ | – |
| Adjustments to reconcile net income to net cash | | |
| provided by operating activities: | | |
| Decrease in interest payable | | (2,183,792) |
| Decrease in interest receivable | | 2,227,373 |
| Increase in program fees receivable | | (565,704) |
| Increase in facility fee payable | | 601,237 |
| Decrease in accounts payable and accrued expenses | | (79,043) |
| Net cash provided by operating activities | | 71 |
| | | |
| Cash flows from investing activities: | | |
| Net payments for investments in, and loans collateralized by, pooled receivables | | 110,335,861 |
| Net cash provided by investing activities | | 110,335,861 |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from issuance of notes | | 64,867,072,171 |
| Payments in connection with maturities of notes | | (64,977,419,367) |
| Net cash used in financing activities | | (110,347,196) |
| | | |
| Net decrease in cash and cash equivalents | | (11,264) |
| Cash and cash equivalents, beginning of year | | 83,910 |
| Cash and cash equivalents, end of year | $ | 72,646 |
| | | |
| **Supplemental disclosure of cash flow information** | | |
| Cash paid during the year for interest | $ | 34,914,633 |

*See notes to financial statements.*

4

Autobahn Funding Company LLC

Notes to Financial Statements

December 31, 2002

## 1. Organization and Services Agreement

### Organization

Autobahn Funding Company LLC (the "Company"), a special purpose, bankruptcy-remote Delaware limited liability company, was formed on August 17, 1999. The Company is a wholly-owned subsidiary of BSCS XVI Inc., a special purpose corporation owned by Broad Street Contract Services, Inc. ("Broad Street").

The primary purpose of the Company is to issue commercial paper notes ("CP") with maturities of up to 270 days. The proceeds from such CP is used to acquire interests in assets, which can be loans, pools of accounts, financial assets and securities, or to make payment of amounts outstanding under the Liquidity Facilities or Swing Line Credit Agreement and to repay matured CP. The Company has engaged U.S. Bank Trust N.A. as a depositary and issuing and paying agent.

The Company has engaged DZ BANK Deutsche Zentral-Genossenschaftsbank, formerly DG BANK Deutsche Genossenschaftsbank, ("DZ" or the "Administrator") as its administrator pursuant to the Administration Agreement dated September 17, 1999 between the Company and DZ. The Administrator identifies and structures pools of Underlying Assets, as defined, that will back Asset Interests, as defined, and is responsible for monitoring and conducting periodic reviews of the Company's portfolio of Asset Interests. DZ is also responsible for administering the Liquidity Facilities, Supplemental Credit Enhancement, if any, and the Swing Line Credit Agreement, as well as the issuance, sale and payment of CP.

### Services Agreement

Lord Securities Corporation ("Lord" or the "Manager") has agreed to act as a manager for the Company pursuant to the Management Agreement dated September 17, 1999 (the "Management Agreement") between the Company and Lord. Lord is responsible for providing certain financial, accounting and other services for the Company; for such services, Lord receives a fee directly from the Administrator. The Manager is an affiliated entity of Broad Street.

5

# Autobahn Funding Company LLC

## Notes to Financial Statements (continued)

### 2. Summary of Significant Accounting Policies

The accounting policies of the Company conform to accounting principles generally accepted in the United States of America. The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the statement of financial condition date, and the reported amounts of revenues and expenses during the reporting period. However, actual results could differ from management's estimates.

Cash and cash equivalents consists of cash at banks.

The discount on CP is amortized on a straight-line basis, which approximates constant yield to maturity, and has been reflected as interest expense on the statement of operations.

Interest income earned on notes receivable and secured loans is calculated at the Company's commercial paper funding rate or LIBOR rate and is charged to Sellers (as defined in Note 3) based on average daily outstanding receivable balances.

Program fee rates vary by receivable pool and the fees charged to Sellers are based on average daily outstanding receivable balances.

Liquidity facility fee rates vary by receivable pool and the fees are charged to the Company based on average daily outstanding liquidity commitments made by a syndicate of liquidity banks to the Company. Liquidity fees paid to these liquidity providers are accrued over the lives of the liquidity commitments.

The Company is considered a partnership for U.S. federal income tax purposes. As a result, the Company is not a taxable entity.

## Autobahn Funding Company LLC

## Notes to Financial Statements (continued)

### 3. Investments In, and Loans Collateralized By, Pooled Receivables

The Company: (i) purchases or otherwise acquires or makes loans secured by, or otherwise finances interests in, or in pools of, accounts, general intangibles, chattel paper, instruments, certified and uncertified securities, inventory, investment property or other financial assets, including, without limitation, publicly or privately issued securities secured by or representing interests in any of the foregoing (collectively, the "Underlying Assets") pursuant to funding agreements (such Underlying Assets, including ownership interests and security interests therein, collectively, the "Asset Interests") in accordance with the Company's investment policies and guidelines, (ii) sells Asset Interests, (iii) funds its acquisitions of Asset Interests through the issuance of CP and (iv) enters into liquidity and credit enhancement facilities in connection with the issuance of CP. The Company acquires Asset Interests originated by various companies referred to the Company from time to time as sellers of, issuers of or borrowers (collectively, the "Sellers") in respect of Underlying Assets. The Company provides the financing in Asset Interests primarily through the issuance of CP.

At December 31, 2002 the investments in, and loans collateralized by, pooled receivables is comprised of variable rate secured loans receivable of $1,259,283,451 and variable rate secured notes of $397,949,890.

### 4. Liquidity and Credit Enhancement Support

The Company does not benefit from program-wide credit enhancement; instead, deal-specific required reserves provide loss protection for each transaction. Each reserve is designed to cover a significant level of losses that could be incurred by the pool in the event of its liquidation. The amount of loss protection is determined by providing a multiple of the actual loss history of the related underlying asset or coverage for certain obligor concentrations. The credit enhancement may be fixed or dynamic, increasing with the deterioration of the underlying asset pool. Each transaction is structured to include performance triggers to alert the administrator if the portfolio performs below a certain threshold. Loss reserves may take the form of overcollateralization, third-party letter of credit or surety bond, cash collateral account, recourse to the seller, subordinated note issuance, or other forms of acceptable loss protection.

# Autobahn Funding Company LLC

## Notes to Financial Statements (continued)

### 4. Liquidity and Credit Enhancement Support (continued)

The Company maintains backstop liquidity support to supplement the inherent liquidity of the receivables pools. The liquidity facilities are available to ensure timely payments of rated CP and are not intended to provide loss coverage on the assets. Committed liquidity coverage is typically maintained at a minimum of 100%-102% of the maximum purchase limit permitted under the applicable purchase agreement. The 100%-102% liquidity coverage is made up of deal-specific liquidity and/or enhancement agreements. Deal-specific liquidity support can come in the form of a liquidity asset purchase agreement or liquidity loan agreement. The liquidity agreements will not fund against defaulted assets except in cases where the liquidity provider also provides credit enhancement. If maturing CP is not rolled over and there are cash flow delays interrupting availability of funds for repayment of the CP, the liquidity facilities will be drawn upon.

As of December 31, 2002, no amounts were outstanding against any of the deal-specific liquidity and/or enhancement agreements. No amounts were drawn against any of the deal-specific liquidity and/or enhancement agreements during the year ended December 31, 2002.

### 5. Swing Line Credit Agreement

In order to provide additional flexibility to the Company in meeting its liquidity needs, DZ and the Company have entered into a Swing Line Credit Agreement. Pursuant to such Agreement, DZ may make advances to the Company, not to exceed $500,000 outstanding at any time, to enable it to pay, among other things, maturing CP. Such agreement terminates at an earlier of (a) expiration of all liquidity commitments or (b) an insolvency of the Company. Borrowings under the Swing Line Credit Agreement bear interest equal to the greater of the DZ base rate or the Federal Funds Rate plus 50 basis points. No amounts were drawn against the Swing Line Credit Agreement during 2002.

Autobahn Funding Company LLC

Notes to Financial Statements (continued)

**6. Notes Payable**

At December 31, 2002, the Company had commercial paper notes outstanding, as follows:

| | |
|---|---|
| Total face value | $1,659,408,000 |
| Interest due at maturity | 2,129,116 |
| Interest payable at December 31 | 1,377,421 |
| Range of face values (in $000's) | $309 –$71,339 |
| Maturity dates | 1/2/03 – 2/14/03 |
| Rates | 1.32% - 1.90% |
| Weighted-Average rate during the year | 1.80% |
| Weighted-Average rate (year-end) | 1.61% |
| Maximum month-end outstanding | 1,831,962,000 |
| Average month-end outstanding | 1,713,612,500 |

At maturity, the CP is rolled over and replaced with other CP with varying maturities, face values and yields.

**7. Fair Value of Financial Instruments and Concentration of Risk**

SFAS No. 107, "Disclosures about Fair Value of Financial Instruments," requires disclosure of fair value information about financial instruments, whether or not recognized in the statement of financial condition, for which it is practicable to estimate that value. In cases where quoted market prices or known sales prices are not available, fair values are based on estimates using present value or other valuation techniques.

Those techniques are significantly affected by the assumptions used, including the discount rate and estimates of future cash flows. In that regard, the derived fair value estimates cannot be substantiated by comparison to independent markets and, in many cases, could not be realized in immediate settlement of the instrument. SFAS No. 107 excludes certain financial instruments and all non-financial instruments from its disclosure requirements. Accordingly, the aggregate fair value amounts as presented do not represent the underlying value of the Company.

## Autobahn Funding Company LLC

## Notes to Financial Statements (continued)

### 7. Fair Value of Financial Instruments and Concentration of Risk (continued)

The following methods and assumptions were used by the Company in estimating the fair value of each class of financial instruments:

*Cash and cash equivalents*—The carrying amount of cash and cash equivalents approximates its fair value.

*Investments in, and loans collateralized by, pooled receivables*—The carrying amount of investments in, and loans collateralized by, pooled receivables approximates its fair value.

*Interest receivable*—The carrying amount of interest receivable approximates its fair value.

*Program fees receivable*—The carrying amount of program fees receivable approximates its fair value.

*Notes payable*—The carrying amount of notes payable approximates its fair value due to the short-term nature of these instruments.

*Facility fees payable*—The carrying amount of facility fees payable approximates its fair value.

# EXHIBIT 34

MAY-15-2003  10:18        OPPORTUNITY FINANCE                612 339 8922      P.02/02

## Opportunity Finance Securitization LLC
### Commercial Paper Remittance Report

| | FIXED PERIOD ENDING: | 16-May-03 |
| --- | --- | --- |
| | REPORT DATE: | 15-May-03 |

**A. COMMERCIAL PAPER MATURITIES**

| | Issuance Date | Fixed Period (days) | Face Value | Proceeds |
| --- | --- | --- | --- | --- |
| Tranche #1 | 3/18/2003 | 59.00 | 16,570,000.00 | 16,533,057.31 |
| Tranche #2 | 3/18/2003 | 59.00 | 16,570,000.00 | 16,533,882.00 |
| Tranche #3 | 3/18/2003 | 59.00 | 16,571,000.00 | 16,533,521.92 |
| **TOTAL FACE VALUE OF CP MATURING** | | | 49,711,000.00 | 49,600,471.23 |

**B. CP ROLLOVER**

| | Net Proceeds | Fixed Period (days - not to exceed 60) | Maturity Date |
| --- | --- | --- | --- |
| Tranche #1 | 13,900,000.00 | 60.00 | 7/15/2003 |
| Tranche #2 | | | 5/16/2003 |
| Tranche #3 | | | 5/16/2003 |
| **TOTAL NET PROCEEDS OF CP REQUESTED ON ROLLOVER DATE** | | | 13,900,000.00 |

**C. SUMMARY**

| | | |
| --- | --- | --- |
| Face Value of CP Maturing on Fixed Period end-date | 49,711,000.00 | (a) |
| Net Proceeds of CP Maturing on Fixed Period end-date | 49,600,471.23 | (b) |
| Net Proceeds of CP Requested | 13,900,000.00 | (c) |
| Amount to be sent from the Collection Acct. (at US Bank) to paydown maturing CP | 35,700,000.00 | (d) |
| Amount to be paid by Borrower directly to US BANK (Principal and Yield) | 35,810,528.77 | (a - b + d) |
| Outstanding Principal Balance of Loans - post CP Rollover | 63,600,000.00 | (e) |
| Borrowing Limit | 100,000,000 | (f) |
| Is (c) greater than (d) ? (If "YES", then Loans must be paid down pursuant to RLSA) | OK | |

The undersigned hereby represents and warrants that this report is a true and accurate accounting as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001, among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent and Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated from time to time.

BY:    OPPORTUNITY FINANCE, LLC  (AS SERVICER)

Name:    _____
Title:    Secretary

### WIRE TRANSFER REQUEST

Pursuant to the Section 2.05 ( f ) of the Receivables Loan & Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Agent and Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank, N.A. as Custodian and Backup Servicer, please make the following wire funds transfer:

| | |
| --- | --- |
| Date of Transfer: | 16 - May - 03 |
| Transfer From Account: | Redacted - Confidential |
| Account Name: | DZ Bank AG Deutsche Zentral-Genossenschaftsbank as Collateral Agent for Certain Secured Parties Collection Account |
| Transfer Amount: | $35,810,528.77    35,810,528.77 |
| Transfer To Account: | US BANK ABA# 091-000-022 A/C # Redacted-Confidential ATTN: ROSALYN CALLENDER REF: Autobahn Funding (Opportunity Finance) |

BY:    OPPORTUNITY FINANCE SECURITIZATION, LLC

Name:    _____
Title:    Secretary

BY:    DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTBANK

Name:    Stacey Robeing
Title:    AT

DZB013684

# OPPORTUNITY FINANCE, LLC

60 SOUTH SIXTH STREET
SUITE 2540
MINNEAPOLIS, MN 55402
612.339.8994
FACSIMILE 612.339-8922

## FACSIMILE COVER PAGE

**TO:** <u>Stacey Rolsing – DZ Bank</u>

**FAX NUMBER:** 212-745-1651

**PHONE:** 212-745-1669

**FROM:** Steven Sabes

**DATE:** May 15, 2003

**PAGES:** <u>2</u>   (including cover)

**RE:** CP Remittance Report – 051603 Revised

---

*Balance in Collection Acct. as of 5/15/03 :*

*$ 38,825,093.74*

♦♦♦♦

The following information has been prepared by Opportunity Finance LLC ("OF") solely for the intended recipient first named above. In accepting the following information and any other material received from OF, the recipient agrees to keep confidential all information contained herein, and that unless prior written consent has been obtained from OF, the recipient will not disclose to any person or company information that has been made herein available. Parties who have received this information in error should contact Steven Sabes at OF at 612.339.8994 ext 15.

DZB013685

# DZ BANK

**Asset Securitization Group
609 Fifth Avenue
New York, NY 10017
Fax Number 212-745-1651**

## Fax

**TO:** Dawn Gilson /Toby Robillard

**COMPANY:** US Bank

**FAX # :**

**# OF PAGES:**

**Re:**

| | | |
|---|---|---|
| ❑ | Kenneth Bradt | 212-745-1655 |
| ❑ | Fran Farragher | 212-745-1667 |
| ❑ | Christian Haesslein | 212-745-1668 |
| ❑ | Howard O'Brien | 212-745-1672 |
| ❑ | Daniel Marino | 212-745-1664 |
| ❑ | Christine Ogden | 212-745-1656 |
| ❑ | Mark Parsa | 212-745-1666 |
| ❑ | Patrick Preece | 212-745-1665 |
| ☒ | Stacey Rolsing | 212-745-1669 |
| ❑ | Dominick Ruggiero | 212-745-1657 |
| ❑ | Vincent Salerno | 212-745-1659 |
| ❑ | Jennifer Wikoff | 212-745-1661 |
| ❑ | Richard Wisniewski | 212-745-1662 |
| ❑ | Teresa Zariczny | 212-745-1663 |

DZB013686

MAY-14-2003  09:35   OPPORTUNITY FINANCE                        612 339 8922   P.02/02

Opportunity Finance Securitization LLC
Commercial Paper Remittance Report

| | FIXED PERIOD ENDING | 16-May-03 |
| | REPORT DATE | 14-MAY-03 |

**A. COMMERCIAL PAPER MATURITIES**

| | Issuance Date | Fixed Period (Days) | Face Value | Proceeds |
|---|---|---|---|---|
| Tranche #1 | 3/18/2003 | 59.00 | 16,670,000.00 | 16,553,067.31 |
| Tranche #2 | 3/18/2003 | 59.00 | 16,570,000.00 | 16,533,660.09 |
| Tranche #3 | 3/18/2003 | 59.00 | 16,071,000.00 | 16,553,524.53 |
| TOTAL FACE VALUE OF CP MATURING | | | 49,711,000.00 | 49,640,251.93 |

**B. CP ROLLOVER**

| | Net Proceeds | Fixed Period (days - not to exceed 60) | MATURITY DATE |
|---|---|---|---|
| Tranche #1 | 18,600,000.00 | 60.00 | 7/13/2003 |
| Tranche #2 | | | 5/16/2003 |
| Tranche #3 | | | 5/16/2003 |

TOTAL NET PROCEEDS OF CP REQUESTED ON ROLLOVER DATE            18,600,000.00

**C. SUMMARY**

| | | |
|---|---|---|
| Face Value of CP Maturing on Fixed Period end-date | 49,711,000.00 | (a) |
| Net Proceeds of CP Maturing on Fixed Period end-date | 49,640,251.93 | (b) |
| Net Proceeds of CP Requested | 18,600,000.00 | (c) |
| Amount to be sent from the Collection Acct. (at US Bank) to paydown maturing CP | 31,000,000.00 | (d) |
| Amount to be sold by Borrower directly to US BANK (Principal and Yield) | 3,311,000.07 | (a + b + c) |
| Outstanding Principal Balance of Loans - post CP Rollover | 60,000,000.00 | (f) |
| Borrowing Limit | 100,000,000.00 | (g) |
| Is (e) greater than 7 (if "YES", then Loans must be paid down pursuant to RLSA) | | NO |

The undersigned hereby represents and warrants that this report is a true and accurate accounting as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001 among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent and as Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated from time to time.

BY:    OPPORTUNITY FINANCE LLC (AS SERVICER)

Name: _____
Title: Secretary

**WIRE TRANSFER REQUEST**

Pursuant to the Section 2.05 (f) of the Receivables Loan & Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Agent and Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank, N.A. as Custodian and Backup Servicer, please make the following wire funds transfer.

| Date of Transfer: | 12-May-03 |

Transfer From Account:     Redacted - Confidential

Account Name:     DZ Bank AG Deutsche Zentral-Genossenschaftsbank
as Collateral Agent for Certain Secured Parties
Collection Account

Transfer Amount:     $ 33,311,10,528.77

Transfer To Account:     US BANK
ABA# 091-000-022
A/C # _____
ATTN: ROSALYN CALLENDER
REF: Autobahn Funding (Opportunity Finance)

BY:   OPPORTUNITY FINANCE SECURITIZATION, LLC

Name: _____
Title: Secretary

BY:   DZ BANK AG DEUTSCHE ZENTRAL-GENOSENSCHAFTBANK

Name: Stacey Robbins
Title: AT

TOTAL P.02

DZB013687

Draft

**Opportunity Finance Securitization LLC**
Commercial Paper Remittance Report

|  | FIXED PERIOD ENDING: | 16-May-03 |
|---|---|---|
|  | REPORT DATE: | 14-May-03 |

**A.   COMMERCIAL PAPER MATURITIES**

| | Issuance Date | Fixed Period (days) | Face Value | Proceeds |
|---|---|---|---|---|
| Tranche #1 | 3/18/2003 | 59.00 | 16,570,000.00 | 16,533,067.31 |
| Tranche #2 | 3/18/2003 | 59.00 | 16,570,000.00 | 16,533,882.00 |
| Tranche #3 | 3/18/2003 | 59.00 | 16,571,000.00 | 16,533,521.92 |
| **TOTAL FACE VALUE OF CP MATURING** | | | 49,711,000.00 | 49,600,471.23 |

**B.   CP ROLLOVER**

| | Net Proceeds | Fixed Period (days - not to exceed 60) | Maturity Date |
|---|---|---|---|
| Tranche #1 | 16,600,000.00 | 60.00 | 7/15/2003 |
| Tranche #2 | - | - | 5/16/2003 |
| Tranche #3 | - | - | 5/16/2003 |
| **TOTAL NET PROCEEDS OF CP REQUESTED ON ROLLOVER DATE** | | | 16,600,000.00 |

**C.   SUMMARY**

| | | |
|---|---|---|
| Face Value of CP Maturing on Fixed Period end-date | 49,711,000.00 | (a) |
| Net Proceeds of CP Maturing on Fixed Period end-date | 49,600,471.23 | (b) |
| Net Proceeds of CP Requested | 16,600,000.00 | (c) |
| Amount to be sent from the Collection Acct. (at US Bank) to paydown maturing CP | 33,000,000.00 | (d) |
| Amount to be paid by Borrower directly to US BANK (Principal and Yield) | 33,110,528.77 | (a - b + c) |
| Outstanding Principal Balance of Loans - post CP Rollover | 66,300,000.00 | (e) |
| Borrowing Limit | 100,000,000 | (f) |
| Is (c) greater than (d) ? (if "YES", then Loans must be paid down pursuant to RLSA) | OK | |

The undersigned hereby represents and warrants that this report is a true and accurate accounting as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001 among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent as Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated from time to time.  This Commercial Paper

BY:     OPPORTUNITY FINANCE, LLC  (AS SERVICER)

Name: _____
Title:

**WIRE TRANSFER REQUEST**

Pursuant to the Section 2.05 (f ) of the Receivables Loan & Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Agent and Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank, N.A. as Custodian and Backup Servicer, please make the following wire funds transfer:

| | |
|---|---|
| **Date of Transfer:** | 16-May-03 |
| **Transfer From Account:** | Redacted - Confidential |
| **Account Name:** | DZ Bank AG Deutsche Zentral-Genossenschaftsbank as Collateral Agent for Certain Secured Parties Collection Account |
| **Transfer Amount:** | $ 33,110,528.77 |
| **Transfer To Account:** | US BANK ABA# 091-000-022 A/C # Redacted - Confidential ATTN: ROSALYN CALLENDER REF: Autobahn Funding (Opportunity Finance) |

BY:     OPPORTUNITY FINANCE SECURITIZATION, LLC

Name: _____
Title:

BY:     DZ BANK AG DEUTSCHE ZENTRAL-GENOSSCHAFTBANK

Name: _____
Title:

# DZ BANK

**Asset Securitization Group**
**609 Fifth Avenue**
**New York, NY 10017**
**Fax Number 212-745-1651**

## Fax

**TO:** Toby Robillard / Dawn Gilson

**COMPANY:** US Bank

**FAX #:** (651) 244-1797

**# OF PAGES:** 3

**Re:** Opportunity Finance — 5/16/03 CP Roll

Toby / Dawn –
The signed copy is
hard to read, so I
printed it up
and faxed a cleaner
Copy as well.
Let me know if you
have any questions.
Thanks!
Stacey

| | | |
|---|---|---|
| ❑ | Kenneth Bradt | 212-745-1655 |
| ❑ | Fran Farragher | 212-745-1667 |
| ❑ | Christian Haesslein | 212-745-1668 |
| ❑ | Howard O'Brien | 212-745-1672 |
| ❑ | Daniel Marino | 212-745-1664 |
| ❑ | Christine Ogden | 212-745-1656 |
| ❑ | Mark Parsa | 212-745-1666 |
| ❑ | Patrick Preece | 212-745-1665 |
| ☒ | Stacey Rolsing | 212-745-1669 |
| ❑ | Dominick Ruggiero | 212-745-1657 |
| ❑ | Vincent Salerno | 212-745-1659 |
| ❑ | Jennifer Wikoff | 212-745-1661 |
| ❑ | Richard Wisniewski | 212-745-1662 |
| ❑ | Teresa Zariczny | 212-745-1663 |

DZB013689

MAY-14-2003  09:35   OPPORTUNITY FINANCE                    612 339 8922   P.01/02

# OPPORTUNITY FINANCE, LLC

60 SOUTH SIXTH STREET
SUITE 2540
MINNEAPOLIS, MN 55402
612.339.8994
FACSIMILE 612.339-8922

## FACSIMILE COVER PAGE

**TO:**            Stacey Rolsing – DZ Bank

**FAX NUMBER:**    212-745-1651

**PHONE:**         212-745-1669

**FROM:**          Steven Sabes

**DATE:**          May 14, 2003

**PAGES:**         2    (including cover)

**RE:**            CP Remittance Report - 051603

---

The following information has been prepared by Opportunity Finance LLC ("OF") solely for the intended recipient first named above. In accepting the following information and any other material received from OF, the recipient agrees to keep confidential all information contained herein, and that unless prior written consent has been obtained from OF, the recipient will not disclose to any person or company information that has been made herein available. Parties who have received this information in error should contact Steven Sabes at OF at 612.339.8994 ext 15.

DZB013690

# MEMORY TRANSMISSION REPORT

```
                              PAGE    : 001
                              TIME    : MAY-14-03  10:24AM
                              TEL NUMBER1: 212 745 1651
                              NAME    : DZ BANK - ASG
```

| | | |
|---|---|---|
| FILE NUMBER | : | 520 |
| DATE | : | MAY-14 10:21AM |
| TO | : | ☎916512441797 |
| DOCUMENT PAGES | : | 003 |
| START TIME | : | MAY-14 10:21AM |
| END TIME | : | MAY-14 10:24AM |
| SENT PAGES | : | 003 |
| STATUS | : | OK |

FILE NUMBER    : 520          \*\*\* SUCCESSFUL TX NOTICE \*\*\*

# DZ BANK

**Asset Securitization Group**
**609 Fifth Avenue**
**New York, NY 10017**
**Fax Number 212-745-1651**

## Fax

TO: Toby Robillard / Dawn Gilson

COMPANY: US Bank

FAX #: (651) 244-1797

# OF PAGES: 3

Re: Opportunity Finance — 5/16/03 CP Roll

Toby / Dawn —
The signed copy is
hard to read, so I
printed it up
and faxed a cleaner
copy as well.
Let me know if you
have any questions.
    Thanks!
    Stacey

| | | |
|---|---|---|
| ☐ | Kenneth Bradt | 212-745-1655 |
| ☐ | Fran Farragher | 212-745-1667 |
| ☐ | Christian Haeeslein | 212-745-1668 |
| ☐ | Howard O'Brien | 212-745-1672 |
| ☐ | Daniel Marino | 212-745-1664 |
| ☐ | Christine Ogden | 212-745-1656 |
| ☐ | Mark Parsa | 212-745-1666 |
| ☐ | Patrick Preece | 212-745-1685 |
| ☒ | Stacey Rolsing | 212-745-1669 |
| ☐ | Dominick Ruggiero | 212-745-1657 |
| ☐ | Vincent Salerno | 212-745-1659 |
| ☐ | Jennifer Wikoff | 212-745-1661 |
| ☐ | Richard Wieniewski | 212-745-1662 |
| ☐ | Teresa Zariczny | 212-745-1663 |

DZB013691

Fax Coversheet             **DZ BANK**

| | |
|---|---|
| **Attention:** **Andy Yan/ Sue Ciaramella**<br>Lord Securities Corporation<br><br>Telephone: (212) 346-9864 / 9010<br>**Telefax:** **(212) 346-9012**<br><br>Pages:(incl. cover) 1<br><br>Date: May 14, 2003<br><br>Re: **Commercial Paper Instructions** | DZ BANK AG        Telephone (212) 745 1400<br>New York Branch     Telefax (212) 745 1550<br>609 Fifth Avenue      SWIFT – Code GENOUS 33<br>New York, NY 10017 -1021   Email new.york@dzbank.de<br><br>**Stacey Rolsing**<br>Assistant Treasurer<br>**From:** Asset Securitization Group<br>         (212) 745 1669<br>         (212) 745 1651<br>stacey.rolsing@dzbank.de<br>Direct Tel<br>Direct Fax |

| ***Customer*** | **Opportunity Finance Securitization LLC** |
|---|---|
| Trade Date: | 5/16/03 |
| Amount of CP Maturing: | $49,711,000.00 |
| Amount of CP Requested: | $16,600,000.00 |
| Tenor of CP: | 60 days, to mature on 7/15/03 |
| CP BASIS: | Net Proceeds |
| Interest on Maturing CP: | $33,110,528.77 to be paid by OF to US Bank |

Please send **$0.00** to the following wire instructions:

ABA: 091-000-022
U.S. Bank National Association
For further credit to U.S. Bank Trust N.A.
A/C #: Redacted - Confidential
OBI #: 47300425
Re: Redacted - Confidential PC Funding LLC
Attn: Toby Robillard 41171

Please send **$0.00** to the following wire instructions:

A/C #: Redacted - Confidential
A/C Name: Opportunity Finance Securitization LLC

Please take **$471.23** (as needed) from deposit from US Bank to repay maturing CP.
Please retain any **Excess Proceeds** on deposit until such time as they are needed to
retire maturing CP.

Should you have any questions, please contact me at (212) 745-1669.

The content of this fax is
exclusively intended for the
recipients indicated in the fax. If
you are not one of the intended
recipients and have received
this fax, we kindly ask you to
inform us of the mistake by
returning the fax. You can find
more information on fax
communication and further
details on DZ BANK AG in our
homepage
http://www.dzbank.de in the
sections "Disclaimer" and
"Impressum".

Der Inhalt dieses Fax ist
ausschließlich für den/die im
Fax bezeichneten Empfänger
bestimmt. Wir bitten Sie, sofern
Sie nicht dem Empfängerkreis
angehören, uns durch die
Rücksendung dieses Fax von
dessen irrtümlichen Versand an
Sie in Kenntnis zu setzen.
Weitere Informationen zur
Faxkommunikation und nähere
Angaben zur DZ BANK AG
finden Sie auf unserer
Homepage
http://www.dzbank.de in den
Rubriken "Disclaimer" und
"Impressum".

DZB013692

## MEMORY TRANSMISSION REPORT

```
PAGE      : 001
TIME      : MAY-14-03  10:10AM
TEL NUMBER1: 212 745 1651
NAME      : DZ BANK - ASG
```

| | | |
|---|---|---|
| FILE NUMBER | : | 517 |
| DATE | : | MAY-14 10:09AM |
| TO | : | 912123469012 |
| DOCUMENT PAGES | : | 001 |
| START TIME | : | MAY-14 10:09AM |
| END TIME | : | MAY-14 10:10AM |
| SENT PAGES | : | 001 |
| STATUS | : | OK |

FILE NUMBER  : 517          *** SUCCESSFUL TX NOTICE ***

---

**Fax Coversheet**                    **DZ BANK**

**Attention:  Andy Yan/ Sue Ciaramella**
Lord Securities Corporation

Telephone:  (212) 346-9864 / 9010
Telefax:    (212) 346-9012

Pages: (incl. cover) 1

Date: May 14, 2003

Re: **Commercial Paper Instructions**

DZ BANK AG
New York Branch
609 Fifth Avenue
New York, NY  10017-1021

Telephone (212) 745 1400
Telex      (212) 745 1060
SWIFT - Code GENOUS 33
Email:    new.york@dzbank.de

**Stacey Roising**
Assistant Treasurer
Asset Securitization Group
            (212) 745 1669
            (212) 745 1651
stacey.roising@dzbank.de
Direct Fax

| Customer | Opportunity Finance Securitization LLC |
|---|---|
| Trade Date: | 5/16/03 |
| Amount of CP Maturing: | $49,711,000.00 |
| Amount of CP Requested: | $16,600,000.00 |
| Tenor of CP: | 60 days, to mature on 7/15/03 |
| CP BASIS: | Net Proceeds |
| Interest on Maturing CP: | $33,110,528.77 to be paid by OF to US Bank |

Please send $0.00 to the following wire instructions:

ABA: 091-000-022
U.S. Bank National Association
For further credit to U.S. Bank Trust N.A.
A/C #: Redacted - Confidential
OBI #: 47300425
Re: Redacted - Confidential PC Funding LLC
Attn: Toby Robillard 41171

Please send $0.00 to the following wire instructions:

A/C #: Redacted - Confidential
A/C Name: Opportunity Finance Securitization LLC

Please take **$471.23** (as needed) from deposit from US Bank to repay maturing CP. Please retain any **Excess Proceeds** on deposit until such time as they are needed to retire maturing CP.

Should you have any questions, please contact me at (212) 745-1669.

The content of this fax is exclusively intended for the recipients indicated in the fax. If you are not one of the intended recipients and have received this fax, we kindly ask you to inform us of the mistake by returning the fax. You can find more information on fax communication and further details on DZ BANK AG in our homepage http://www.dzbank.de in the sections "Disclaimer" and "Impressum".

Der Inhalt dieses Fax ist ausschließlich für diejenige im Fax bezeichneten Empfänger bestimmt. Wir bitten Sie, sofern Sie nicht dem Empfängerkreis angehören, uns durch die Rücksendung dieses Fax von dessen irrtümlichen Versand zu Sie in Kenntnis zu setzen. Weitere Informationen zur Faxkommunikation und nähere Angaben zur DZ BANK AG finden Sie auf unserer Homepage http://www.dzbank.de in den Rubriken "Disclaimer" und "Impressum".

DZB013693



Return to Account Summary Page
(This is a printable page only. Click on the Return link to continue your current transaction.)

14-May-2003 10:11 AM ET

## ACCOUNT SUMMARY
### DZ/OF COLLECTION ACCOUNT  Redacted - Confidential

**Investments**

| Asset Type | Current Value | % of Assets |
|---|---|---|
| Cash & Equivalents | $36,115,893.74 | 100.0% |
| **Total Current Value** | **$36,115,893.74** | 100.0% |

The Current Values for the account are determined nightly. The values are based on the prices of assets at the close of the stock market each day. For assets that are priced on a weekly, monthly or sporadic interval, the current value reflects the value as of that assets pricing. The information is presented "As is" and "As Available" without expressed or implied warranties. We expressly disclaim any liability for errors and omissions to this information.

Return to Account Summary Page (This is a text only printable page. Click on the Return link to continue your current transaction.)

DZB013694

# EXHIBIT 35

**U.S. bank**
*Five Star Service Guaranteed*

ENCLOSED ARE YOUR STATEMENTS
COVERING THE PERIOD
APRIL 30, 2003 - MAY 31, 2003
AUTOBAHN OPPORTUNITY
ACCOUNT NO. Redacted - Confidential

IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT
IGNAZIO TAMBURELLO

DZ BANK
ATTN  STACEY ROLSING
609 FIFTH AVE   FLOOR 7
NEW YORK NY  10017-1021

DZB013307

# USbank

*Five Star Service Guaranteed*

AUTOBAHN OPPORTUNITY

PAGE   1

ACCOUNT NO:   Redacted - Confidential

TRANSACTIONS FROM APRIL 30, 2003 TO MAY 31, 2003

| DATE | DESCRIPTION | CASH | INVESTMENTS |
|------|-------------|------|-------------|
| | BALANCE AT BEGINNING OF PERIOD | 1,282.78 | 0.00 |
| 05/16/03 | PAID TO AUTOBAHN OPPORTUNITY<br>MISCELLANEOUS DISBURSEMENT<br>ADDTIONAL FUNDS NEEDED TO COVER MATURING C/P | 50.43- | |
| 05/16/03 | PAID TO AUTOBAHN FDG (OPPORTUNITY FIN)<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO COVER SHORTFALL ON MATURING C/P | 35,810,528.77- | |
| 05/16/03 | PAID TO AUTOBAHN FDG (OPPORTUNITY FIN)<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO PAY MATURING C/P | 13,900,420.80- | |
| 05/16/03 | MISCELLANEOUS RECEIPT<br>FUNDS REC'D FROM THE COMPANY | 35,810,528.77 | |
| 05/16/03 | MISCELLANEOUS RECEIPT<br>FUNDS REC'D FROM THE DEALER | 13,900,420.80 | |
| | BALANCE AT END OF PERIOD | 1,232.35 | 0.00 |

DZB013308



PAGE    2

**AUTOBAHN OPPORTUNITY**

ACCOUNT NO:  Redacted - Confidential
5/30/03

**LIST OF ASSETS**

| SHARES/ FACE VALUE | SECURITY DESCRIPTION | COST BASIS | ESTIMATED MARKET VALUE | YIELD TO MATURITY ON MKT |
|---|---|---|---|---|
| | TOTAL ACCOUNT VALUE | 0.00 | 0.00 | |
| | | ================ | ================ | |

DZB013309

# EXHIBIT 36

Attn: Dawn Gilson

Opportunity Finance Securitization LLC
Commercial Paper Remittance Report

| | FIXED PERIOD ENDING: | 10-Jun-03 |
| | REPORT DATE: | 9-Jun-03 |

A. COMMERCIAL PAPER MATURITIES

| | ISSUANCE DATE | PRIME PERIOD (days) | FACE VALUE | Proceeds |
|---|---|---|---|---|
| Tranche #1 | 4/11/2003 | 60.00 | 16,406,000.00 | 16,366,067.47 |
| Tranche #2 | 4/11/2003 | 60.00 | 16,604,000.00 | 16,526,641.00 |
| Tranche #3 | 4/11/2003 | 60.00 | 16,604,000.00 | 16,456,187.51 |
| **TOTAL FACE VALUE OF CP MATURING** | | | **49,614,000.00** | **49,700,911.50** |

B. CP ROLLOVER

| | Net Proceeds | Fixed Period (days - not to exceed 60) | Maturity Date |
|---|---|---|---|
| Tranche #1 | 13,650,000.00 | 14.00 | 6/24/2003 |
| Tranche #2 | 13,000,000.00 | 78.00 | 7/9/2003 |
| Tranche #3 | | | 0/10/2003 |

TOTAL NET PROCEEDS OF CP REQUESTED ON ROLLOVER DATE        26,500,000.00

C. SUMMARY

| Face Value of CP Maturing on Fixed Period end-date | | 49,614,000.00 | (a) |
| Net Proceeds of CP Maturing on Fixed Period end-date | | 49,700,911.50 | (b) |
| Net Proceeds of CP Requested | | 26,500,000.00 | (c) |
| Amount to be sent from the Collection Acct. (in US Bank) to paydown maturing CP | | 23,700,000.00 | (d) |
| Amount to be paid by Borrower directly to US BANK (Principal and Yield) | | 23,813,188.50 | (a - b + d) |
| Outstanding Principal Balance of Loans - post CP Rollover | | 30,000,000.00 | (e) |
| Borrowing Limit | | 100,000,000.00 | (f) |
| Is (c) greater than (d) ? (If "YES", then Loans must be paid down pursuant to RLSA) | | OK |

The undersigned hereby represents and warrants that this report is a true and accurate accounting as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001 among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent and as Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated from time to time.

BY: OPPORTUNITY FINANCE, LLC (AS SERVICER)

Name:
Title: Secretary

WIRE TRANSFER REQUEST

Pursuant to the Section 2.05 (F) of the Receivables Loan & Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Service, Autobahn Funding Company LLC., as Lender, DZ Bank as Agent and Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank, N.A. as Custodian and Backup Servicer, please make the following wire funds transfer:

Date of Transfer:        10-Jun-03

Transfer From Account:        Redacted - Confidential

Account Name:        DZ Bank AG Deutsche Zentral Genossenschaftsbank
as Collateral Agent for Certain Secured Parties
Collection Account

Transfer Amount:        $23,813,188.50    23,813,188.50

Transfer To Account:        US BANK
ABA# 091 000-022
A/C #: Redacted Confidential 1
AT IN: ROSALYN CALLENDER
REF: Autobahn Funding (Opportunity Finance)

BY: OPPORTUNITY FINANCE SECURITIZATION, LLC
Name:
Title: Secretary

BY: DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFT BANK
Name: Stacey Robeing
Title: AT

TOTAL P.02

DZB013672

## MEMORY TRANSMISSION REPORT

```
                                   PAGE      : 001
                                   TIME      : JUN-09-03  04:58PM
                                   TEL NUMBER1: 212 745 1651
                                   NAME      : DZ BANK - ASG
```

| FILE NUMBER | : | 020 |
|---|---|---|
| DATE | : | JUN-09 04:56PM |
| TO | : | ☎916512441797 |
| DOCUMENT PAGES | : | 001 |
| START TIME | : | JUN-09 04:56PM |
| END TIME | : | JUN-09 04:58PM |
| SENT PAGES | : | 001 |
| STATUS | : | OK |

FILE NUMBER    : 020              *** SUCCESSFUL TX NOTICE ***

JUN-09-2003  15:52      OPPORTUNITY FINANCE          612 339 8922    P.02/02



TOTAL P.02

DZB013673

# Fax Coversheet     🔳 DZ BANK

| | |
|---|---|
| **Attention:** **Andy Yan/ Sue Ciaramella**<br>Lord Securities Corporation | |

DZ BANK AG        Telephone (212) 745 1400
New York Branch     Telefax    (212) 745 1550
609 Fifth Avenue      SWIFT – Code GENOUS 33
New York, NY 10017-1021   Email:    new.york@dzbank.de

**Telephone:** (212) 346-9864 / 9010
**Telefax:** (212) 346-9012

**Stacey Rolsing**
Assistant Treasurer
**From:**
Asset Securitization Group
(212) 745 1669
(212) 745 1651
stacey.rolsing@dzbank.de

Pages:(incl. cover) 1

Date: June 9, 2003

Direct Tel

Direct Fax

Re: **Commercial Paper Instructions**

| *Customer* | **Opportunity Finance Securitization LLC** |
|---|---|
| Trade Date: | 6/10/03 |
| Amount of CP Maturing: | $49,814,000.00 |
| Amount of CP Requested: | (1) $13,000,000.00<br>(2) $13,000,000.00 |
| Tenor of CP: | (1)    14 days, to mature 6/24/03<br>(2)    28 days, to mature 7/8/03 |
| CP BASIS: | Net Proceeds |
| Interest on Maturing CP: | $23,813,188.50 to be paid by OF to US Bank |

Please send **$0.00** to the following wire instructions:

ABA: 091-000-022
U.S. Bank National Association
For further credit to U.S. Bank Trust N.A.
A/C #: Redacted - Confidential
OBI #: 47300425
Re: 333-987-20 PC Funding LLC
Attn: Toby Robillard 41171

Please send **$0.00** to the following wire instructions:

A/C #: Redacted - Confidential
A/C Name: Opportunity Finance Securitization LLC

Please take **$811.50** (as needed) from deposit from US Bank to repay maturing CP.
Please retain any **Excess Proceeds** on deposit until such time as they are needed to
retire maturing CP.

Should you have any questions, please contact me at (212) 745-1669.

*Stacey*

The content of this fax is
exclusively intended for the
recipients indicated in the fax. If
you are not one of the intended
recipients and have received
this fax, we kindly ask you to
inform us of the mistake by
returning the fax. You can find
more information on fax
communication and further
details on DZ BANK AG in our
homepage
http://www.dzbank.de in the
sections "Disclaimer" and
"Impressum".

Der Inhalt dieses Fax ist
ausschließlich für den/die im
Fax bezeichneten Empfänger
bestimmt. Wir bitten Sie, sofern
Sie nicht dem Empfängerkreis
angehören, uns durch die
Rücksendung dieses Fax von
dessen irrtümlichen Versand an
Sie in Kenntnis zu setzen.
Weitere Informationen zur
Faxkommunikation und nähere
Angaben zur DZ BANK AG
finden Sie auf unserer
Homepage
http://www.dzbank.de in den
Rubriken "Disclaimer" und
"Impressum".

DZB013674

`MEMORY TRANSMISSION REPORT

```
                                      PAGE      : 001
                                      TIME      : JUN-09-03  04:45PM
                                      TEL NUMBER1: 212 745 1651
                                      NAME      : DZ BANK - ASG
```

| | | |
|---|---|---|
| FILE NUMBER | : | 018 |
| DATE | : | JUN-09 04:45PM |
| TO | : | 912123469012 |
| DOCUMENT PAGES | : | 001 |
| START TIME | : | JUN-09 04:45PM |
| END TIME | : | JUN-09 04:45PM |
| SENT PAGES | : | 001 |
| STATUS | : | OK |

FILE NUMBER    : 018          *** SUCCESSFUL TX NOTICE ***

---

**Fax Coversheet**                          **ᴅᴢ DZ BANK**

| | |
|---|---|
| **Attention:  Andy Yan/ Sue Ciaramella**<br>Lord Securities Corporation | |
| | DZ BANK AG<br>New York Branch<br>609 Fifth Avenue<br>New York, NY  10017-1021 |
| **Telephone:  (212) 346-9864 / 9010**<br>**Telefax:    (212) 346-9012** | |
| **Pages:**(incl. cover) 1 | |
| **Date: June 9, 2003** | |
| **Re: Commercial Paper Instructions** | |

Telephone: (212) 745 1400
Telefax   (212) 745 1580
SWIFT – Code GENODU 33
Email:    new.york@dzbank.de

**Stacey Roising**
Assistant Treasurer
ABS Securitization Group
(212) 745 1669
(212) 745 1651
stacey.roising@dzbank.de
Direct Fax

| Customer | Opportunity Finance Securitization LLC |
|---|---|
| Trade Date: | 6/10/03 |
| Amount of CP Maturing: | $49,814,000.00 |
| Amount of CP Requested: | (1) $13,000,000.00<br>(2) $13,000,000.00 |
| Tenor of CP: | (1)   14 days, to mature 6/24/03<br>(2)   28 days, to mature 7/8/03 |
| CP BASIS: | Net Proceeds |
| Interest on Maturing CP: | $23,813,188.50 to be paid by OF to US Bank |

Please send **$0.00** to the following wire instructions:

ABA: 091-000-022
U.S. Bank National Association
For further credit to U.S. Bank Trust N.A.
A/C #: Redacted - Confidential
OBI #: 47300425
Re: Redacted - Confidential PC Funding LLC
Attn: Toby Robillard 41171

Please send **$0.00** to the following wire instructions:

A/C #: Redacted - Confidential
A/C Name: Opportunity Finance Securitization LLC

Please take **$811.50** (as needed) from deposit from US Bank to repay maturing CP.
Please retain any **Excess Proceeds** on deposit until such time as they are needed to
retire maturing CP.

Should you have any questions, please contact me at (212) 745-1669.

*Stacey*

The content of this fax is
exclusively intended for the
recipients indicated in this fax. If
you are not one of the intended
recipients and have received
this fax, we kindly ask you to
inform us of the mistake by
returning the fax. You can find
more information on fax
communication and further
details on DZ BANK AG in our
homepage
http://www.dzbank.de in the
sections "Disclaimer" and
"Impressum".

Der Inhalt dieses Fax ist
ausschließlich für die/die im
Fax bezeichneten Empfänger
bestimmt. Wir bitten Sie, sofern
Sie nicht dem Empfängerkreis
angehören, uns durch die
Rücksendung dieses Fax von
diesem irrtümlichen Versand an
Sie in Kenntnis zu setzen.
Weitere Informationen zur
Faxkommunikation und nähere
Angaben zur DZ BANK AG
finden Sie auf unserer
Homepage
http://www.dzbank.de in den
Rubriken "Disclaimer" und
"Impressum".

DZB013675

# OPPORTUNITY FINANCE, LLC

60 SOUTH SIXTH STREET
SUITE 2340
MINNEAPOLIS, MN 55402
612.339.8994
FACSIMILE 612.338 8922

## FACSIMILE COVER PAGE

**TO:**            <u>Stacey Rolsing – DZ Bank</u>

**FAX NUMBER:**    212-745-1651

**PHONE:**          212-745-1669

**FROM:**          Steven Sabes

**DATE:**          June 9, 2003

**PAGES:**          <u>2</u>    (including cover)

**RE:**            CP Remittance Report - 061003

••••
The following information has been prepared by Opportunity Finance LLC ("OF") solely for the intended recipient first named above. In accepting the following information and any other material received from OF, the recipient agrees to keep confidential all information contained herein, and that unless prior written consent has been obtained from OF, the recipient will not disclose to any person or company information that has been made herein available. Parties who have received this information in error should contact Steven Sabes at OF at 012.339.8994 ext 15.

DZB013676

**Opportunity Finance Securitization LLC**
Commercial Paper Remittance Report

|  | FIXED PERIOD ENDING: | 10-Jun-03 |
|---|---|---|
|  | REPORT DATE: | 9-Jun-03 |

**A. COMMERCIAL PAPER MATURITIES**

| | Issuance Date | Fixed Period (days) | Face Value | Proceeds |
|---|---|---|---|---|
| Tranche #1 | 4/11/2003 | 60.00 | 16,606,000.00 | 16,568,082.97 |
| Tranche #2 | 4/11/2003 | 60.00 | 16,604,000.00 | 16,566,641.00 |
| Tranche #3 | 4/11/2003 | 60.00 | 16,604,000.00 | 16,566,087.53 |
| **TOTAL FACE VALUE OF CP MATURING** | | | **49,814,000.00** | **49,700,811.50** |

**B. CP ROLLOVER**

| | Net Proceeds | Fixed Period (days - not to exceed 60) | Maturity Date |
|---|---|---|---|
| Tranche #1 | 13,000,000.00 | 14.00 | 6/24/2003 |
| Tranche #2 | 13,000,000.00 | 28.00 | 7/8/2003 |
| Tranche #3 | - | - | 6/10/2003 |
| **TOTAL NET PROCEEDS OF CP REQUESTED ON ROLLOVER DATE** | | | **26,000,000.00** |

**C. SUMMARY**

| | | |
|---|---|---|
| Face Value of CP Maturing on Fixed Period end-date | 49,814,000.00 | (a) |
| Net Proceeds of CP Maturing on Fixed Period end-date | 49,700,811.50 | (b) |
| Net Proceeds of CP Requested | 26,000,000.00 | (c) |
| Amount to be paid by Borrower directly to US BANK (Principal and Yield) | 113,188.50 | (a - b) |
| Outstanding Principal Balance of Loans - post CP Rollover | 39,900,000.00 | (d) |
| Borrowing Limit | 100,000,000 | (e) |
| Is (c) greater than (d) ? (if "YES", then Loans must be paid down pursuant to RLSA) | OK | |

The undersigned hereby represents and warrants that this report is a true and accurate accounting as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001 among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent and as Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated from time to time. This

BY:    OPPORTUNITY FINANCE, LLC (AS SERVICER)

Name: _____
Title:

**WIRE TRANSFER REQUEST**

Pursuant to the Section 2.05 (f ) of the Receivables Loan & Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Agent and Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank, N.A. as Custodian and Backup Servicer, please make the following wire funds transfer:

| | |
|---|---|
| **Date of Transfer:** | 10-Jun-03 |
| **Transfer From Account:** | Redacted - Confidential |
| **Account Name:** | DZ Bank AG Deutsche Zentral-Genossenschaftsbank as Collateral Agent for Certain Secured Parties Collection Account |
| **Transfer Amount:** | $ 113,188.50 |
| **Transfer To Account:** | US BANK ABA# 091-000-022 A/C #[ Redacted - Confidential ] ATTN: ROSALYN CALLENDER REF: Autobahn Funding (Opportunity Finance) |

BY:    OPPORTUNITY FINANCE SECURITIZATION, LLC

Name: _____
Title:

BY:    DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTBANK

Name: _____
Title:

|  | FIXED PERIOD ENDING: | 15-Jun-03 |
|---|---|---|
|  | REPORT DATE: | 9-Jun-03 |

**A.  COMMERCIAL PAPER MATURITIES**

| | Issuance Date | Fixed Period (days) | Face Value | Proceeds |
|---|---|---|---|---|
| Tranche #1 | 4/11/2003 | 60.00 | 16,636,000.00 | 16,568,082.07 |
| Tranche #2 | 4/11/2003 | 60.00 | 18,604,000.00 | 18,359,041.00 |
| Tranche #3 | 4/11/2003 | 60.00 | 16,624,000.00 | 16,566,057.53 |
| **TOTAL FACE VALUE OF CP MATURING** | | | **49,614,000.00** | **49,706,611.30** |

**B.  CP ROLLOVER**

| | Net Proceeds | Fixed Period (days – not to exceed 90) | Maturity Date |
|---|---|---|---|
| Tranche #1 | 12,000,000.00 | 14.00 | 6/24/2003 |
| Tranche #2 | 19,019,170.00 | 24.00 | 7/9/2003 |
| Tranche #3 | | | 6/19/2003 |
| **TOTAL NET PROCEEDS OF CP REQUESTED ON ROLLOVER DATE** | | | **24,000,000.00** |

**C.  SUMMARY**

| | | |
|---|---|---|
| Face Value of CP Maturing on Fixed Period end-date | 49,614,000.00 | (a) |
| Net Proceeds of CP Maturing on Fixed Period end-date | 49,706,611.30 | (b) |
| Net Proceeds of CP Requested | 24,000,000.00 | (c) |
| Amount to be paid by borrower directly to US BANK (Principal and Yield) | 113,180.41 | (a – b) |
| Outstanding Principal Balance of Loans - post CP Rollover | 39,000,000.00 | (d) |
| Borrowing Limit | 100,000,000 | (e) |
| Is (c) greater than (d) 7 (If "YES", then Loans must be paid down pursuant to RLSA) | | NO |

The undersigned hereby represents and warrants that this report is a true and accurate accounting as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001 among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent and as Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated

HY:   OPPORTUNITY FINANCE, LLC (AS SERVICER)

Name:
Title:   Secretary

**WIRE TRANSFER REQUEST**

Pursuant to the Section 2.05 (F) of the Receivables Loan & Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Agent and Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank, N.A. as Custodian and Backup Servicer, please make the following wire funds transfer:

| | |
|---|---|
| **Date of Transfer:** | 10-Jun-03 |
| **Transfer From Account:** | Redacted - Confidential |
| **Account Name:** | DZ Bank AG Deutsche Zentral-Genossenschaftsbank as Collateral Agent for Certain Secured Parties Collection Account |
| **Transfer Amount:** | $ 113,180.50 |
| **Transfer To Account:** | US BANK ABA# 091-000-022 A/C # Redacted - Confidential ATTN: ROSALYN CALLENDER REF: Autobahn Funding (Opportunity Finance) |

BY:   OPPORTUNITY FINANCE SECURITIZATION, LLC          BY:   DZ BANK AG DEUTSCHE ZENTRAL GENOSSENSCHAFTBANK

Name:                                                  Name:
Title:   Secretary                                     Title:

TOTAL P.02

DZB013678

# EXHIBIT 37

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| | | |
|---|---|---|
| Remittance Period: May | Borrowing Limit: | 100,000,000 |
| Remittance Date: 10-Jun-03 | | |

**I. Eligible Receivables**

| | | |
|---|---|---|
| A | Aggregate Outstanding Principal Balance ("OPB") of Pledged Receivables - beginning of Remittance Period | 125,300,000.00 ✓Apr-03 |
| B | plus Receivables Pledged during Remittance Period (see Schedule II, Item B | 7,800,000.00 ✓ 1 BBase 5/1/03 |
| C | minus Collections allocable to principal (scheduled amortization, voluntary prepayments, servicer advances) | (60,250,000.00) |
| D. | (+/-) Other Principal adjustments [Servicer to provide detail] | - |
| E. | **OPB of Pledged Receivables - end of Remittance Period** | 72,850,000.00 |
| F. | minus OPB of Pledged Receivables that are Defaulted Receivables (see Item L. below) | - |
| G. | minus OPB of Pledged Receivables that are Ineligible Receivables - end of Remittance Period | - |
| H. | **OPB of Eligible Receivables Pledged to Lender - end of Remittance Period** | 72,850,000.00 ✓ |

**Defaulted Receivable Summary:**

| | | |
|---|---|---|
| I | OPB of Pledged Receivables that were Defaulted Receivables - beginning of Remittance Period | - |
| J. | plus OPB of Receivables that became Defaulted during the Remittance Period | - |
| K. | minus OPB of Defaulted Receivables repurchased or released in accordance with RLSA guideline | - |
| L. | **Balance of Defaulted Receivables - end of current Remittance Period** | - |

**II. Net Eligible Receivables Balance** (to be calculated w/o duplication of Concentration deductions)

| | | |
|---|---|---|
| A. | OPB of Eligible Receivables (Item I H. above) | 72,850,000.00 |
| B. | minus: Overconcentration Amount (see Schedule III) | (10,132,500.00) |
| C. | minus: Excess Extended Term Receivable Amount (see Schedule III) | - |
| D. | minus: Aggregate Delinquent Retailer Excluded Amount (see Schedule III) | - |
| E | minus: Excess Maximum Individual Loan Amount (see Schedule III) | - |
| F. | Sub-total | 62,717,500.00 |
| G | Multiplied by: | 80.0% |
| H. | **Net Eligible Receivables Balance - end of current Remittance Period** | 50,174,000.00 ✓ |

**III. Collection Account Activity**

| | | |
|---|---|---|
| A | Collection Account Balance - beginning of current Remittance Period: | 26,053,513.25 ✓ |
| B. | plus Collections on Pledged Receivables | |
| | Principal collections | 60,250,000.00 ✓ |
| | Interest & Fee Collections | 4,055,650.00 ✓ |
| | Collections on Defaulted Receivables | - |
| | Pre-payment proceeds on Pledged Receivables | - |
| | Liquidation Proceeds | - |
| | Payments under any insurance policies | - |
| | Investment proceeds from amounts on deposit in the Collection Account | 14,299.17 |
| | Other transfers into the Collection Account (OF Investment) | 3,000,000.00 Amount to cure 5/12 BBase deficit |
| C. | minus Disbursements from the Collection Account in accordance with Section 2.05 of the RLSA | |
| | Amounts paid with respect to the Loans (Principal / Yield) | (35,810,528.77) |
| | Remittance Date transfers in accordance with Section 2.05(c) of the RLSA | (266,392.24) |
| | Release of Borrowing Base surplus to the Borrower | (19,050,000.00) |
| | Reinvestment withdrawals in accordance with Section 2.05 (f) of the RLSA | (7,800,000.00) |
| | Other transfers from the Collection Account | - |
| D. | **Collection Account Balance - end of current Remittance Period** | 30,446,541.41 |

**IV. Capital Limit**

| | | |
|---|---|---|
| A. | Net Eligible Receivables Balance (II. H. above) | 50,174,000.00 |
| B. | plus amounts on deposit in the Collection Account (III. D above | 30,446,541.41 |
| C | Capital Limit - end of current Remittance Period | 80,620,541.41 |
| D. | minus Remittance Date Transfers in accordance with Section 2.05 of the RLSA (see Item VII. M.) | (241,263.47) |
| E. | **Capital Limit - Post Remittance Date Transfers** | 80,379,277.94 ✓ |

**V. Program Deficiency Test**

| | | |
|---|---|---|
| A | Facility Amount - end of current Remittance Period (see Schedule II) | 63,703,450.85 |
| B | Capital Limit - Post Remittance Date Transfers (Item IV. E above) | 80,379,277.94 |
| C | Borrowing Limit | 100,000,000.00 |
| D. | **Program Deficiency** [excess, if any, of V. A. over the lesser of V. B. and V. C.] | - ✓ |
| E | Face Value of CP Notes issued to fund Loans to the Borrower - end of Remittance Period (see Schedule II) | 63,746,000.00 |
| F | Amount available to be drawn under Liquidity/Enhancement Facility | 102,000,000.00 |
| G. | **Face Value of CP exceeds amount available to be drawn under Liquidity/Credit Enhancement Facility ?** | No ✓ |

| | | |
|---|---|---|
| **VI.** | **Borrowing Base Surplus** [Excess of V. B. over V. A.] | (16,675,827.09) |

**VII. Remittance Date Transfers pursuant to Section 2.05(c) of the RLSA**

| | | |
|---|---|---|
| A. | Post-Servicing transfer, to the Backup Servicer, the Backup Servicer's Fees (plus Transition Costs not already reimbursed) | - |
| B. | To the Custodian, accrued and unpaid Custodian's Fees (plus reimbursable expenses) | 2,000.00 (see Schedule I) |
| C. | To the Trustee, accrued and unpaid Trustee Fees (plus reimbursable expenses) | 317.20 (see Schedule I) |
| D | To the Backup Servicer, accrued and unpaid Backup Servicer Standby Fees | 1,522.13 (see Schedule I) |
| E | To the Facility Insurer, accrued and unpaid Premiums (prior to a Type I or Type II Default) | 27,856.67 (see Schedule I) |
| F | To the Agent for the Lender's account, Fees, Applicable Margin and Yield on Non-CP Rate Loans | 170,245.69 (see Schedule I) |
| G | To the Agent for the Lender's account, the Borrowing Base Deficiency as of the Remittance Date | - |
| H. | To the Agent for the Lender's account, all other obligations of the Borrower to the Lender, Agent or any Affected Party | - |
| I. | To the Servicer (if Opportunity or an Affiliate), so long as no Program Deficiency would result, the Servicing Fee | 39,321.78 (see Schedule I) |
| J. | After the occurrence of the EACD, to the Agent for the Lender's account, any amounts required to pay the Loans in full | - |

DZB013273

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| Remittance Period: | May | Borrowing Limit: | 100,000,000 |
|---|---|---|---|
| Remittance Date: | 10-Jun-03 | | |

K. To the Facility Insurer, an amount equal to the Accrued Liability on the Loans then due and payable -
L. To the Borrower, any remaining amounts -
N. Other Fees payable for the current Remittance Period to US Bank - Closing Fees - see Sched / H.) -
M. **Total Remittance Date Transfers** 241,253.47 ✓

**VIII. Early Amortization Events**

Pledged Receivables Aging:

| Days Outstanding | Outstanding Principal Balance | % of Total | Count | % of Total |
|---|---|---|---|---|
| 0 - 30 days | 7,800,000.00 | 10.71% | 2.00 | 8.33% |
| 31 - 60 days | 38,050,000.00 | 52.23% | 12.00 | 50.00% |
| 61 - 90 days | 27,000,000.00 | 37.06% | 10.00 | 41.67% |
| 91 - 120 days | - | 0.00% | - | 0.00% |
| 121 - 150 days | - | 0.00% | - | 0.00% |
| 150+ days | - | 0.00% | - | 0.00% |
| **Totals** | **72,850,000.00** | **100.00%** | **24.00** | **100.00%** |

Retailer Receivables Aging:

| Days Outstanding | Outstanding Principal Balance | % of Total | Count | % of Total |
|---|---|---|---|---|
| 0 - 30 days | 38,599,547.03 | 50.98% | - | 0.00% |
| 30 - 60 days | 36,322,075.45 | 47.39% | - | 0.00% |
| 61 - 90 days | 1,725,201.65 | 2.25% | - | 0.00% |
| 90+ days | - | 0.00% | - | 0.00% |
| **Totals** | **76,646,824.13** | **100.00%** | **-** | **0.00%** |

**Default Percentage**

A Aggregate OPB of all Retailer Receivables that became Defaulted Retailer Receivables - current Remittance Period -
B Aggregate amount of Collections on Defaulted Retailer Receivables - current Remittance Period -
C Aggregate OPB of all Eligible Retailer Receivables as of the first day of the current Remittance Period -
D. Default Percentage - current Remittance Period 0.00%
E Default Percentage - prior Remittance Period 0.00%
F. Default Percentage - second prior Remittance Period 0.00%
G Three month-rolling average Default Percentage 0.00%
H Limit 5.00%
I. **Early Amortization Event ?** No

**Dilution Percentage**

J. Aggregate amount of Retailer Receivables that became Diluted Receivables - current Remittance Period -
K. OPB of all Eligible Retailer Receivables as of the first day of the current Remittance Period -
L. Dilution Percentage - current Remittance Period 0.00%
M. Dilution Percentage - prior Remittance Period 0.00%
N. Dilution Percentage - second prior Remittance Period 0.00%
O. Three month-rolling average Dilution Percentage 0.00%
P. Limit 5.00%
Q. **Early Amortization Event ?** No ✓

R. Facility Insurer Rating - Royal Indemnity Company
   Moody's BAA2 ✓
   S&P BBB+ ✓
   Fitch (if rated by Fitch) BBB+ ✓

S. Is the Facility Insurer an Approved Facility Insurer ? Yes ✓
   *(Must be rated 'A2' or higher by Moody's / 'A' or higher by S&P and 'A' or higher by Fitch (if rated by Fitch))*

T. Other Early Amortization Event has occurred ? (Servicer to provide detail) No ✓

**IX. Events of Default**

A. **Program Deficiency has occurred ?** [see Item V. D. above] No

B Borrower Tangible Net Worth (to be calculated in accordance with GAAP). 4/30/2003
C Consolidated net worth of Borrower (including subordinated debt acceptable to Agent and Facility Insurer) 58,317,636.31
D Consolidated intangibles of Borrower (inc goodwill, trademarks, copyrights, etc) 1,828,083.98
E Tangible Net Worth 56,489,552.33 ✓
F Minimum 12,000,000 ✓
G. **Event of Default ?** No ✓

H. Change in Control has occurred ? No ✓

I Either (i) the Facility Insurer has made a payment under the Facility Insurance Policy or (ii) a Facility Insurer Default
  Type I or Type II has occurred ? No ✓

J. Other Event of Default has occurred ? (Servicer to provide detail) No ✓

**X. Servicer Default**

A. Servicer Tangible Net Worth (to be calculated in accordance with GAAP) 4/30/03
B. Consolidated net worth of Servicer (including subordinated debt acceptable to Agent and Facility Insurer) 58,519,673.89
C. Consolidated intangibles of Servicer (inc goodwill, trademarks, copyrights, etc) 1,828,083.98
D. Tangible Net Worth 56,691,589.91 ✓

DZB013274

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| | |
|---|---|
| Remittance Period:   May | Borrowing Limit:   100,000,000 |
| Remittance Date:   10-Jun-03 | |

| | | |
|---|---|---|
| E. | Minimum | 12,000,000 |
| F. | Servicer Default ? | No |
| G. | Event of Default has occurred ? | No |
| H. | Three month rolling average Default Percentage exceeds 5.0% ? | No |
| I. | Other Servicer Default has occurred ?  (Servicer to provide detail) | No |

XI.   Exclusivity

| | | Loans Outstanding |
|---|---|---|
| A | Subject Borrowers (other than an Opportunity Loan Borrower) | |
| | Subject Borrower #1 | - |
| | Subject Borrower #2 | - |
| B | Aggregate Loans outstanding to all Subject Borrowers | - |
| C. | Maximum | 45,000,000.00 |
| D. | Exclusivity breached ? | No |

The undersigned hereby represents and warrants that this report is a true and accurate accounting of the Pledged Receivables as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001 among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent and as Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated from time to time.

BY:        Opportunity Finance, LLC as Servicer

Name:      _____

Title:      Secretary        _____

| ATTACHMENTS: | EXHIBIT I | FEE CALCULATIONS |
|---|---|---|
| | EXHIBIT II | FACILITY AMOUNT CALCULATION / COMMERCIAL PAPER ACTIVITY |
| | EXHIBIT III | CONCENTRATION ANALYSIS |
| | EXHIBIT IV | APPROVED DISTRIBUTOR / RETAILER STATUS |

DZB013275

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule I*
*Fee Calculations*

**A.  Applicable Margin**

| | | |
|---|---|---|
| Average Outstanding Principal Balance of Loans Outstanding to Borrower | 80,874,193.55 | |
| Applicable Margin | 2.35% | |
| Number of days during Remittance Period | 31 | |
| Yield Attributable to Applicable Margin: | | 163,657.92 |

**B.  Non-Use Fees** (not applicable after the occurrence of the Early Amortization Commencement Date)

| | | |
|---|---|---|
| Borrowing Limit (or average Borrowing Limit if applicable) | 100,000,000.00 | |
| Average unused position | 19,125,806.45 | |
| Non-Use Fee Rate | 0.40% | |
| Number of days during Remittance Period | 31 | |
| Non-Use Fees: | | 6,587.78 |

| | |
|---|---|
| **Total Yield (Applicable Margin only) & Fees due Lender on Remittance Date** | 170,245.69 |

**C.  Premium**

| | | |
|---|---|---|
| Average Outstanding Principal Balance of Covered Loans | 80,874,193.55 | |
| Premium Rate | 0.40% | |
| Number of days during Remittance Period | 31 | |
| **Premium Due Facility Insurer:** | | 27,856.67 |

**D.  Servicing Fee**

| | | |
|---|---|---|
| Net Eligible Receivables Balance - first day of current Remittance Period | 91,328,000.00 | |
| Servicing Fee Rate | 0.50% | |
| Number of days during Remittance Period | 31 | |
| **Servicing Fee:** | | 39,321.78 |

**E.  Backup Servicer Standby Fee**

| | | |
|---|---|---|
| Net Eligible Receivables Balance - first day of current Remittance Period | 91,328,000.00 | |
| Backup Servicer Standby Fee Rate | 0.02% | |
| Number of days during Remittance Period (30 day period fixed per US Bank) | 30 | |
| **Backup Servicer Standby Fee (subject to $1,000 floor):** | | 1,522.13 |

**F.  Custodian's Supplemental Fee** (pursuant to Collection Account Agreement)    317.20

**G.  Custodian's Fees** ($2,000 per month pursuant to Custodial Agreement)    2,000.00

**H.  Other Fees** payable for the current Remittance Period (Servicer to provide detail)

| | |
|---|---|
| **TOTAL APPLICABLE MARGIN & FEES PAYABLE - CURRENT REMITTANCE PERIOD** | 241,263.47 |

DZB013276

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule II*
*Facility Amount Calculation & Commercial Paper Activity*

A.  **FACILITY AMOUNT**  [not including Yield attributable to Applicable Margin and Non-Use Fees]

| | |
|---|---:|
| Face value of Commercial Paper Outstanding - end of Remittance Period | 63,746,000.00 |
| minus   Discount scheduled to accrue thereon through stated maturity | (42,549.15) |
| plus:  Aggregate Loans Outstanding bearing interest at the Non-CP Rate | - |
| plus  accrued Yield and Fees with respect to Loans bearing interest at the Non-CP Rate | - |
| **Facility Amount - end of Remittance Period** | **63,703,450.85** |

B.

| Date | OPB of Receivables Pledged ($) | OPB of Eligible Retailer Receivables | Coverage | COMMERCIAL PAPER (NOT FACE VALUE) | | | |
|---|---|---|---|---|---|---|---|
| | | | | Beginning | (+) Issuances | (-) Maturities | Ending |
| 5/1/2003 | 133,100,000.00 | 156,794,382.94 | 117.80% | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/2/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/3/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/4/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/5/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/6/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/7/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/8/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/9/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/10/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/11/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/12/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/13/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/14/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/15/2003 | - | - | | 99,300,000.00 | - | - | 99,300,000.00 |
| 5/16/2003 | - | - | | 99,300,000.00 | 13,900,000.00 | 49,600,000.00 | 63,600,000.00 |
| 5/17/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/18/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/19/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/20/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/21/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/22/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/23/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/24/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/25/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/26/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/27/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/28/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/29/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/30/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| 5/31/2003 | - | - | | 63,600,000.00 | - | - | 63,600,000.00 |
| **Total** | 133,100,000.00 | 156,794,382.94 | | | 13,900,000.00 | 49,600,000.00 | |
| **Average** | | | | | | | 80,874,193.55 |

DZB013277

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

**Overconcentration Amounts**

| Approved Retailer Limits | | | | |
|---|---|---|---|---|
| Level IV | < Baa3/BBB- or NR | 5 00% |
| Level III | < A2/A but <= Baa3/BBB- | 10 00% |
| Level II | < Aa2/AA but <= A2/A | 20.00% |
| Level I | >= Aa2/AA | 25 00% |

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | Type | Limit | Excess |
|---|---|---|---|---|---|---|---|
| | | 0 00% | | 0.00% | Level IV | 5 0% | - |
| Rex Stores Corporation | 6,450,000 00 | 8.85% | 7,623,657 15 | 8 88% | Level IV | 5 0% | 2,807,500 00 |
| **Totals** | **6,450,000.00** | **8.85%** | **7,623,657.15** | **8.88%** | | | **2,807,500.00** |

*(handwritten: 72.850)*          *(handwritten: 85,891,735.15)*

**Special Concentration Approved Retailers**

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | Limit | Excess |
|---|---|---|---|---|---|---|
| BJ's Wholesale Club | 12,150,000 00 | 16.68% | 14,343,871 55 | 16.70% | 22 5% | - |
| Costco | 0 00% | 0.00% | - | 0.00% | 25.0% | - |
| Sam's Club | 43,750,000.00 | 60.05% | 51,507,669 20 | 59 97% | 50.0% | 7,325,000 00 |
| Boscov's | 10,500,000 00 | 14.41% | 12,416,537 25 | 14 46% | 15.0% | - |
| **Totals** | **66,400,000.00** | **91.15%** | **78,268,078.00** | **91.12%** | | **7,325,000.00** |

**Eligible Receivables secured by Retailer Receivables to Government Entities**

| | |
|---|---|
| Eligible Receivables relating to Approved Retailers which are Government Entities | - |
| Outstanding Principal Balance of all Eligible Receivables | 72,850,000.00 ✓ |
| Percentage | 0 00% |
| Maximum % | 2.00% |
| Overconcentration | - |

**Eligible Receivables secured by Retailer Receivables from Approved Retailers with a Debt Rating below A3/A-**
*Excludes Special Concentration Approved Retailers*

| | |
|---|---|
| Eligible Receivables relating to Approved Retailers with a Debt Rating of below A3/A- | 6,450,000 00 ✓ *Rex* |
| Outstanding Principal Balance of all Eligible Receivables | 72,850,000 00 ✓ |
| Percentage | 8.85% |
| Maximum % | 20 00% |
| Overconcentration | - |

**Minimum Opportunity Loan Coverage Overconcentration**

| | |
|---|---|
| Aggregate principal amount of all outstanding Eligible Retailer Receivables | 85,891,735.15 ✓ |
| Outstanding Principal Balance of all Eligible Receivables | 72,850,000 00 ✓ |
| Percentage | *(handwritten: 117.90)* |
| Minimum % | 111.11% |
| Overconcentration | ✓ |

**Maximum Inventory Stage Eligible Receivables**

| | |
|---|---|
| Subject Inventory Insurance Policy in full force and effect ? | Yes |
| Supplemental Inventory Insurance Policy in full force and effect ? | Yes |
| Outstanding Principal Balance of all Inventory Stage Eligible Receivables | 7,800,000.00 ✓ |
| Outstanding Principal Balance of all Eligible Receivables | 72,850,000 00 |
| Percentage | 10 71% ✓ |
| Maximum % | 65 00% |
| Overconcentration | - ✓ |

**Maximum Eligible Receivables Extended by Servicer**

| | |
|---|---|
| Outstanding Principal Balance of all Eligible Receivables w/ original terms of 120 days extended to 150 days | - ✓ |
| Outstanding Principal Balance of all Eligible Receivables | 72,850,000.00 |

DZB013278

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

| | |
|---|---|
| Percentage | - |
| Maximum % | 15 00% |
| Overconcentration | - |

| | |
|---|---|
| **TOTAL OVERCONCENTRATION AMOUNT (must be without duplication)** | 10,132,500.00 |

**Excess Extended Term Receivable Amount**  (due more than 120 days but less than 151 days after date of Opportunity Loan)

| | |
|---|---|
| Outstanding Principal Balance of all Eligible Receivables which are Extended Term Receivables | - |
| Outstanding Principal Balance of all Eligible Receivables | 72,850,000.00 |
| Percentage | 0.00% |
| Maximum % | 25.00% |
| Overconcentration | - |

Schedule III - Page 2 of 3

DZB013279

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

**Delinquent Retailer Excluded Amount**

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | # of Delinquent Retailer Rec. | Excluded Amount |
|---|---|---|---|---|---|---|
| Fleming | - | 0.00% | - | 0.00% | 0 | - |
| Rex Stores Corporation | 6,450,000.00 | 8.85% | 7,623,657.15 | 8.88% | 0 | - |
| BJ's Wholesale Club | 12,150,000.00 | 16.68% | 14,343,871.55 | 16.70% | 0 | - |
| Costco | - | 0.00% | - | 0.00% | 0 | - |
| Sam's Club | 43,750,000.00 | 60.05% | 51,507,669.20 | 59.97% | 0 | - |
| Boscov's | 10,500,000.00 | 14.41% | 12,416,537.25 | 14.46% | 0 | - |
| **Totals** | **72,850,000.00** | **100.00%** | **85,891,735.15** | **100.00%** | | **-** |

**Excess Maximum Individual Loan Amount**

| Eligible Receivable | Approved Retailer | Outstanding Principal Balance | Limit | Excess |
|---|---|---|---|---|
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| **Totals** | | **-** | | **-** |

Schedule III - Page 3 of 3

DZB013280

# OPPORTUNITY FINANCE SECURITIZATION LLC

*Monthly Remittance Report - Schedule IV*
*Approved Distributor(s) & Approved Retailer(s) Status*

| Approved Distributor(s) | Net Income Most recent FQE *(cannot be negative)* | Tangible Net Worth | Minimum TNW | Financials Delivered as per 6.12(g)(i) and (ii) ? | Delinquent Retailer ? | MAC has occurred ? | Approved ? |
|---|---|---|---|---|---|---|---|
| Peters Company, Inc. | 6,136,553 | 78,138,456 | 30,000,000.00 | Yes | No | No | Yes |

| Approved Retailer(s) | Net Income Most recent FYE *(cannot be negative)* | Most recent FQE | Prior FQE *(cannot be negative for two consecutive quarters)* | Delinquent Retailer ? | MAC has occurred ? | Approved ? |
|---|---|---|---|---|---|---|
| Sam's Club (Wal-Mart) (4/10K) | $ 8,039,000,000 | $ 2,529,000,000 | $ 1,820,000,000 | No | No | Yes |
| BJ's Wholesale, Inc. (3/30K) | $ 130,866,000 | $ 56,352,000 | $ 23,423,000 | No | No | Yes |
| Boscov's Department Stores, Inc. * | NA | NA | NA | No | No | Yes |
| Costco Wholesale Corp. (3/31,10Q) | $ 699,983,000 | $ 182,065,000 | $ 247,401,000 | No | No | Yes |
| Fleming Companies, Inc. | $ - | $ - | $ - | No | Yes | No |
| Rex Stores Corporation (3/10K) | $ 22,932,000 | $ 8,460,000 | $ 4,274,000 | No | No | Yes |

**\* Private Approved Retailer - Dunn & Bradstreet Results:**

| | Financial Stress Class | | Credit Score | |
|---|---|---|---|---|
| | Current Quarter End | Prior Quarter End | Current Quarter End | Prior Quarter End |
| Boscov's Department Stores, Inc. | 1  3/31/2003 | 1 | 3  3/31/2003 | 4 |

OK

DZB013281

# EXHIBIT 38

**ENCLOSED ARE YOUR STATEMENTS**
**COVERING THE PERIOD**
**MAY 31, 2003 - JUNE 30, 2003**
**AUTOBAHN OPPORTUNITY**
**ACCOUNT NO.** Redacted - Confidential

**IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT**
**IGNAZIO TAMBURELLO**

**DZ BANK**
**ATTN   STACEY ROLSING**
**609 FIFTH AVE    FLOOR 7**
**NEW YORK NY   10017-1021**

DZB013264

**usbank**
*Five Star Service Guaranteed*

**AUTOBAHN OPPORTUNITY**

ACCOUNT NO:  Redacted - Confidential

TRANSACTIONS FROM MAY 31, 2003 TO JUNE 30, 2003

| DATE | DESCRIPTION | CASH | INVESTMENTS |
|------|-------------|------|-------------|
| | BALANCE AT BEGINNING OF PERIOD | 1,232.35 | 0.00 |
| 06/10/03 | MISCELLANEOUS RECEIPT<br>EXCESS PROCEEDS RECEIVED FROM THE DEALER | 352.97 | |
| 06/10/03 | PAID TO AUTOBAHN FDG (OPPORTUNITY FIN)<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO PAY MATURING CP | 26,000,811.50- | |
| 06/10/03 | PAID TO AUTOBAHN FDG (OPPORTUNITY FIN)<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO COVER SHORTFALL ON MATURING CP | 23,813,188.50- | |
| 06/10/03 | MISCELLANEOUS RECEIPT<br>FUNDS RECD FROM THE DEALER | 26,000,811.50 | |
| 06/10/03 | MISCELLANEOUS RECEIPT<br>FUNDS RECD FROM THE COMPANY | 23,813,188.50 | |
| 06/24/03 | PAID TO AUTOBAHN FDG (OPPORTUNITY FIN)<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO COVER SHORTFALL ON MATURING CP | 8,006,676.93- | |
| 06/24/03 | PAID TO AUTOBAHN FDG (OPPORTUNITY FIN)<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO PAY MATURING CP | 5,000,313.07- | |
| 06/24/03 | MISCELLANEOUS RECEIPT<br>FUNDS RECD FROM THE COMPANY | 8,006,676.93 | |
| 06/24/03 | MISCELLANEOUS RECEIPT<br>FUNDS RECD FROM THE DEALER | 5,000,313.07 | |
| 06/24/03 | MISCELLANEOUS RECEIPT<br>EXCESS PROCEEDS RECEIVED FROM THE DEALER | 200.24 | |
| | BALANCE AT END OF PERIOD | 1,785.56 | 0.00 |

**US bank.**
*Five Star Service Guaranteed* (★★)

**PAGE   2**

**AUTOBAHN OPPORTUNITY**

**ACCOUNT NO:** Redacted - Confidential
**6/30/03**

**LIST OF ASSETS**

| SHARES/<br>FACE VALUE | SECURITY DESCRIPTION | COST BASIS | ESTIMATED<br>MARKET VALUE | YIELD TO<br>MATURITY<br>ON MKT |
|---|---|---|---|---|
| | TOTAL ACCOUNT VALUE | 0.00 | 0.00 | |

# EXHIBIT 39



ENCLOSED ARE YOUR STATEMENTS
COVERING THE PERIOD
JUNE 30, 2003 - JULY 31, 2003
AUTOBAHN OPPORTUNITY
ACCOUNT NO.  Redacted - Confidential

IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT
IGNAZIO TAMBURELLO

DZ BANK
ATTN  STACEY ROLSING
609 FIFTH AVE   FLOOR 7
NEW YORK NY  10017-1021



PAGE   1

AUTOBAHN OPPORTUNITY

ACCOUNT NO: Redacted - Confidential

TRANSACTIONS FROM JUNE 30, 2003 TO JULY 31, 2003

| DATE | DESCRIPTION | CASH | INVESTMENTS |
|------|-------------|------|-------------|
| | BALANCE AT BEGINNING OF PERIOD | 1,785.56 | 0.00 |
| 07/08/03 | PAID TO AUTOBAHN OPPORTUNITY<br>MISCELLANEOUS DISBURSEMENT<br>ADDITIONAL FUNDS NEEDED TO COVER MATURING C/P | 198.25- | |
| 07/08/03 | PAID TO AUTOBAHN FDG (OPPORTUNITY FIN)<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO COVER SHORTFALL ON MATURING CP | 8,013,158.60- | |
| 07/08/03 | PAID TO AUTOBAHN (OPPOR FIN)<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO PAY MATURING CP | 5,000,643.15- | |
| 07/08/03 | MISCELLANEOUS RECEIPT<br>FUNDS RECD FROM COMPANY | 8,013,158.60 | |
| 07/08/03 | MISCELLANEOUS RECEIPT<br>FUNDS RECD FROM DEALER | 5,000,643.15 | |
| 07/⬛/03 | PAID TO AUTOBAHN FDG (OPPORTUNITY FIN)<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO COVER SHORTFALL ON MATURING CP | 7,431,579.20- | |
| 07/15/03 | PAID TO AUTOBAHN FDG (OPPORTUNITY FINANCE)<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO PAY MATURING CP | 6,500,420.80- | |
| 07/15/03 | MISCELLANEOUS RECEIPT<br>FUNDS RECD FROM THE COMPANY | 7,431,579.20 | |
| 07/15/03 | MISCELLANEOUS RECEIPT<br>FUNDS RECD FROM THE DEALER | 6,500,420.80 | |
| 07/15/03 | MISCELLANEOUS RECEIPT<br>EXCESS PROCEEDS RECEIVED FROM THE DEALER | 215.43 | |
| 07/22/03 | PAID TO AUTOBAHN<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO PAY MATURING COMM PAPER | 5,004,476.69- | |
| 07/22/03 | MISCELLANEOUS RECEIPT<br>FUNDS RECEIVED FROM THE DEALER | 5,004,476.69 | |
| 07/22/03 | PAID TO AUTOBAHN FUNDING OPPORTUNITY<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO COVER SHORTFALL ON MATURING COMM PAPER | 523.31- | |
| 07/29/03 | PAID TO AUTOBAHN OPPORTUNITY<br>MISCELLANEOUS DISBURSEMENT<br>ADDITIONAL FUNDS NEEDED TO COVER MATURING C/P | 643.15- | |



AUTOBAHN OPPORTUNITY

ACCOUNT NO: Redacted - Confidential

TRANSACTIONS FROM JUNE 30, 2003 TO JULY 31, 2003

| DATE | DESCRIPTION | CASH | INVESTMENTS |
|------|-------------|------|-------------|
| 07/29/03 | PAID TO AUTOBAHN<br>MISCELLANEOUS DISBURSEMENT<br>FUNDS TO COVER SHORTFALL | 5,003,356.85- | |
| 07/29/03 | MISCELLANEOUS RECEIPT<br>FUNDS RECEIVED FROM THE COMPANY | 5,003,356.85 | |
| | BALANCE AT END OF PERIOD | 636.28 | 0.00 |

**us bank**
*Five Star Service Guaranteed* ⭐

AUTOBAHN OPPORTUNITY

PAGE   3

Redacted - Confidential
ACCOUNT NO:
7/31/03

LIST OF ASSETS

| SHARES/<br>FACE VALUE | SECURITY DESCRIPTION | COST BASIS | ESTIMATED<br>MARKET VALUE | YIELD TO<br>MATURITY<br>ON MKT |
|---|---|---|---|---|
| | TOTAL ACCOUNT VALUE | 0.00 | 0.00 | |

# EXHIBIT 40

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| | | | | Borrowing Limit: | 100,000,000 |
|---|---|---|---|---|---|
| Remittance Period: | Jul | | | | |
| Remittance Date: | 10-Aug-03 | | | | |

**I.  Eligible Receivables**

| | | | |
|---|---|---|---|
| A. | Aggregate Outstanding Principal Balance ("OPB") of Pledged Receivables - beginning of Remittance Period | 43,750,000.00 | |
| B. | plus:  Receivables Pledged during Remittance Period (see Schedule II, Item B. | - | |
| C. | minus:  Collections allocable to principal (scheduled amortization, voluntary prepayments, servicer advances | (35,950,000.00) | |
| D. | (+/-) Other Principal adjustments (Servicer to provide detail) | - | |
| E. | **OPB of Pledged Receivables - end of Remittance Period** | 7,800,000.00 | |
| F. | minus:  OPB of Pledged Receivables that are Defaulted Receivables  (see Item L. below | - | |
| G. | minus:  OPB of Ineligible Receivables - end of Remittance Period | - | |
| H. | **OPB of Eligible Receivables Pledged to Lender - end of Remittance Period** | | 7,800,000.00 |

**Defaulted Receivable Summary:**

| | | | |
|---|---|---|---|
| I. | OPB of Pledged Receivables that were Defaulted Receivables - beginning of Remittance Period | - | |
| J. | plus:  OPB of Receivables that became Defaulted during the Remittance Period | - | |
| K. | minus:  OPB of Defaulted Receivables repurchased or released in accordance with RLSA guideline | - | |
| L. | **Balance of Defaulted Receivables - end of current Remittance Period** | - | |

**II.  Net Eligible Receivables Balance**  (to be calculated w/o duplication of Concentration deductions)

| | | | |
|---|---|---|---|
| A | OPB of Eligible Receivables (Item I. H. above) | 7,800,000.00 | |
| B. | minus:  Overconcentration Amount  (see Schedule III) | (2,145,000.00) | |
| C. | minus:  Excess Extended Term Receivable Amount (see Schedule III) | - | |
| D. | minus:  Aggregate Delinquent Retailer Excluded Amount (see Schedule III | - | |
| E. | minus:  Excess Maximum Individual Loan Amount (see Schedule III | - | |
| F. | Sub-total | 5,655,000.00 | |
| G. | Multiplied by: | 70.0% | |
| H. | **Net Eligible Receivables Balance - end of current Remittance Period** | | 3,958,500.00 |

**III.  Collection Account Activity**

| | | | |
|---|---|---|---|
| A. | Collection Account Balance - beginning of current Remittance Period | 14,600,636.27 | |
| B | plus:  Collections on Pledged Receivables | | |
| | Principal collections | 35,950,000.00 | |
| | Interest & Fee Collections | 2,175,208.33 | |
| | Collections on Defaulted Receivables | | |
| | Pre-payment proceeds on Pledged Receivables | | |
| | Liquidation Proceeds | | |
| | Payments under any insurance policies | 10,933.71 | |
| | Investment proceeds from amounts on deposit in the Collection Account | | |
| | Other transfers into the Collection Account (OF Investment) | | |
| C | minus:  Disbursements from the Collection Account in accordance with Section 2.05 of the RLSA | | |
| | Amounts paid with respect to the Loans (Principal / Yield) | (25,452,571.34) | |
| | Remittance Date transfers in accordance with Section 2.05(c) of the RLSA | (182,985.05) | |
| | Release of Borrowing Base surplus to the Borrower | (21,248,152.97) | |
| | Reinvestment withdrawals in accordance with Section 2.05 (f) of the RLSA | - | |
| | Other transfers from the Collection Account | (8,435.32) | |
| D. | **Collection Account Balance - end of current Remittance Period** | | 5,863,633.63 |

**IV.  Capital Limit**

| | | | |
|---|---|---|---|
| A | Net Eligible Receivables Balance (II. H. above) | 3,958,500.00 | |
| B | plus  amounts on deposit in the Collection Account (III. D. above) | 5,863,633.63 | |
| C. | **Capital Limit - end of current Remittance Period** | 9,822,133.63 | |
| D. | minus:  Remittance Date Transfers in accordance with Section 2.05 of the RLSA  (see Item VII. M. | (91,634.83) | |
| E. | **Capital Limit - Post Remittance Date Transfers** | | 9,730,498.80 |

**V.  Program Deficiency Test**

| | | | |
|---|---|---|---|
| A. | Facility Amount - end of current Remittance Period  (see Schedule II) | 6,503,961.01 | |
| B. | Capital Limit - Post Remittance Date Transfers (Item IV. E. above) | 9,730,498.80 | |
| C. | Borrowing Limit | 100,000,000.00 | |
| D. | **Program Deficiency** [excess, if any, of V. A. over the lesser of V. B. and V. C.] | - | |
| E. | Face Value of CP Notes issued to fund Loans to the Borrower - end of Remittance Period  (see Schedule II) | 6,505,000.00 | |
| F. | Amount available to be drawn under Liquidity/Enhancement Facility | 102,000,000.00 | |
| G. | **Face Value of CP exceeds amount available to be drawn under Liquidity/Credit Enhancement Facility ?** | | No |

**VI.  Borrowing Base Surplus** [Excess of V. B. over V. A ] | | | 3,226,537.79 |

**VII.  Remittance Date Transfers pursuant to Section 2.05(c) of the RLSA**

| | | | |
|---|---|---|---|
| A | Post-Servicing transfer, to the Backup Servicer, the Backup Servicer's Fees (plus Transition Costs not already reimbursed) | - | |
| B. | To the Custodian, accrued and unpaid Custodian's Fees (plus reimburseable expenses) | 2,000.00 | *(see Schedule I)* |
| C | To the Trustee, accrued and unpaid Trustee Fees (plus reimburseable expenses) | 189.80 | *(see Schedule I)* |
| D. | To the Backup Servicer, accrued and unpaid Backup Servicer Standby Fees | 1,000.00 | *(see Schedule I)* |
| E. | To the Facility Insurer, accrued and unpaid Premiums (prior to a Type I or Type II default) | 10,101.67 | *(see Schedule I)* |
| F. | To the Agent for the Lender's account, Fees, Applicable Margin and Yield on Non-CP Rate Loans | 67,274.88 | *(see Schedule I)* |
| G. | To the Agent for the Lender's account, the Borrowing Base Deficiency as of the Remittance Date | - | |
| H. | To the Agent for the Lender's account, all other obligations of the Borrower to the Lender, Agent or any Affected Party | - | |
| I. | To the Servicer (if Opportunity or an Affiliate), so long as no Program Deficiency would result, the Servicing Fee | 11,068.51 | *(see Schedule I)* |
| J. | After the occurrence of the EACD, to the Agent for the Lender's account, any amounts required to pay the Loans in full | - | |

Page 1 of 3

DZB013174

## OPPORTUNITY FINANCE SECURITIZATION LLC
*Monthly Remittance Report*

| Remittance Period: | Jul | Borrowing Limit: | 100,000,000 |
| Remittance Date: | 10-Aug-03 | | |

K. To the Facility Insurer, an amount equal to the Accrued Liability on the Loans then due and payable — -
L. To the Borrower, any remaining amounts — -
N. Other Fees payable for the current Remittance Period (to US Bank - Closing Fees - see Sched.I H.) — -
M. **Total Remittance Data Transfers** — **91,634.83**

**VIII. Early Amortization Events**

**Pledged Receivables Aging:**

| Days Outstanding | Outstanding Principal Balance | % of Total | Count | % of Total |
|---|---|---|---|---|
| 0 - 30 days | - | 0.00% | - | 0.00% |
| 31 - 60 days | - | 0.00% | - | 0.00% |
| 61 - 90 days | - | 0.00% | - | 0.00% |
| 91 - 120 days | 7,800,000.00 | 100.00% | 2.00 | 100.00% |
| 121 - 150 days | - | 0.00% | - | 0.00% |
| 150+ days | - | 0.00% | - | 0.00% |
| **Totals** | **7,800,000.00** | **100.00%** | **2.00** | **100.00%** |

**Retailer Receivables Aging:**

| Days Outstanding | Outstanding Principal Balance | % of Total | Count | % of Total |
|---|---|---|---|---|
| 0 - 30 days | - | 0.00% | - | 0.00% |
| 30 - 60 days | - | 0.00% | - | 0.00% |
| 61 - 90 days | 9,244,911.02 | 100.00% | 2.00 | 100.00% |
| 90+ days | - | 0.00% | - | 0.00% |
| **Totals** | **9,244,911.02** | **100.00%** | **2.00** | **100.00%** |

**Default Percentage**

| | | |
|---|---|---|
| A. | Aggregate OPB of all Retailer Receivables that became Defaulted Retailer Receivables - current Remittance Period | - |
| B. | Aggregate amount of Collections on Defaulted Retailer Receivables - current Remittance Period | - |
| C. | Aggregate OPB of all Eligible Retailer Receivables as of the first day of the current Remittance Period | - |
| D. | Default Percentage - current Remittance Period | 0.00% |
| E. | Default Percentage - prior Remittance Period | 0.00% |
| F. | Default Percentage - second prior Remittance Period | 0.00% |
| G. | Three month-rolling average Default Percentage | 0.00% |
| H. | Limit | 5.00% |
| I. | Early Amortization Event ? | No |

**Dilution Percentage**

| | | |
|---|---|---|
| J. | Aggregate amount of Retailer Receivables that became Diluted Receivables - current Remittance Period | - |
| K. | OPB of all Eligible Retailer Receivables as of the first day of the current Remittance Period | - |
| L. | Dilution Percentage - current Remittance Period | 0.00% |
| M. | Dilution Percentage - prior Remittance Period | 0.00% |
| N. | Dilution Percentage - second prior Remittance Period | 0.00% |
| O. | Three month-rolling average Dilution Percentage | 0.00% |
| P. | Limit | 5.00% |
| Q. | Early Amortization Event ? | No |

R. Facility Insurer Rating - Royal Indemnity Company

| Moody's | BAA2 |
| S&P | BBB+ |
| Fitch (if rated by Fitch) | BBB+ |

S. Is the Facility Insurer an Approved Facility Insurer ? — Yes
*(Must be rated 'A2' or higher by Moody's / 'A' or higher by S&P and 'A' or higher by Fitch (if rated by Fitch))*

T. Other Early Amortization Event has occurred ? (Servicer to provide detail) — No

**IX. Events of Default**

A. Program Deficiency has occurred ? [see item V. D. above] — No

B. Borrower Tangible Net Worth *(to be calculated in accordance with GAAP):*    6/30/2003
C. Consolidated net worth of Borrower (including subordinated debt acceptable to Agent and Facility Insurer) — 26,178,804.51
D. Consolidated intangibles of Borrower (inc. goodwill, trademarks, copyrights, etc) — 2,172,908.33
E. Tangible Net Worth — 24,005,896.18
F. Minimum — 12,000,000
G. Event of Default ? — No

H. Change in Control has occurred ? — No

I. Either (i) the Facility Insurer has made a payment under the Facility Insurance Policy or (ii) a Facility Insurer Default Type I or Type II has occurred ? — No

J. Other Event of Default has occurred ? (Servicer to provide detail) — No

**X. Servicer Default**

A. Servicer Tangible Net Worth *(to be calculated in accordance with GAAP).*    6/30/03
B. Consolidated net worth of Servicer (including subordinated debt acceptable to Agent and Facility Insurer) — 55,797,459.75
C. Consolidated intangibles of Servicer (inc. goodwill, trademarks, copyrights, etc) — 
D. Tangible Net Worth — 55,797,459.75

DZB013175

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| Remittance Period: | Jul | | Borrowing Limit: | 100,000,000 |
|---|---|---|---|---|
| Remittance Date: | 10-Aug-03 | | | |

| | | | |
|---|---|---|---|
| E. | Minimum | | 12,000,000 |
| F. | Servicer Default ? | | No |
| G. | Event of Default has occurred ? | | No |
| H. | Three month rolling average Default Percentage exceeds 5.0% ? | | No |
| I. | Other Servicer Default has occurred ?  (Servicer to provide detail) | | No |

**XI. Exclusivity**

| | | Loans Outstanding |
|---|---|---|
| A | Subject Borrowers (other than an Opportunity Loan Borrower) | |
| | Subject Borrower #1 | - |
| | Subject Borrower #2 | - |
| B. | Aggregate Loans outstanding to all Subject Borrowers | - |
| C. | Maximum | 45,000,000.00 |
| D. | Exclusivity breached ? | No |

The undersigned hereby represents and warrants that this report is a true and accurate accounting of the Pledged Receivables as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001 among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent and as Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated from time to time.

BY.  Opportunity Finance, LLC as Servicer

Name:  _____

Title  Chief Executive Officer  _____

ATTACHMENTS:
| | |
|---|---|
| EXHIBIT I | FEE CALCULATIONS |
| EXHIBIT II | FACILITY AMOUNT CALCULATION / COMMERCIAL PAPER ACTIVITY |
| EXHIBIT III | CONCENTRATION ANALYSIS |
| EXHIBIT IV | APPROVED DISTRIBUTOR / RETAILER STATUS |

DZB013176

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule I*
*Fee Calculations*

**A.   Applicable Margin**

| | | |
|---|---:|---:|
| Average Outstanding Principal Balance of Loans Outstanding to Borrower | 19,551,612.90 | |
| Applicable Margin | 2.35% | |
| Number of days during Remittance Period | 31 | |
| | Yield Attributable to Applicable Margin: | 39,564.86 |

**B.   Non-Use Fees** (not applicable after the occurrence of the Early Amortization Commencement Date)

| | | |
|---|---:|---:|
| Borrowing Limit (or average Borrowing Limit if applicable) | 100,000,000.00 | |
| Average unused position | 80,448,387.10 | |
| Non-Use Fee Rate | 0.40% | |
| Number of days during Remittance Period | 31 | |
| | Non-Use Fees: | 27,710.00 |

| | |
|---|---:|
| **Total Yield (Applicable Margin only) & Fees due Lender on Remittance Date** | **67,274.86** |

**C.   Premium**

| | | |
|---|---:|---:|
| Average Outstanding Principal Balance of Covered Loans | 19,551,612.90 | |
| Premium Rate | 0.60% | |
| Number of days during Remittance Period | 31 | |
| | | 10,101.67 |

**D.   Servicing Fee**

| | | |
|---|---:|---:|
| Net Eligible Receivables Balance - first day of current Remittance Period | 25,707,500.00 | |
| Servicing Fee Rate | 0.50% | |
| Number of days during Remittance Period | 31 | |
| | Servicing Fee: | 11,068.51 |

**E.   Backup Servicer Standby Fee**

| | | |
|---|---:|---:|
| Net Eligible Receivables Balance - first day of current Remittance Period | 25,707,500.00 | |
| Backup Servicer Standby Fee Rate | 0.02% | |
| Number of days during Remittance Period (30 day period fixed per US Bank) | 30 | |
| | Backup Servicer Standby Fee (subject to $1,000 floor): | 1,000.00 |

**F.   Custodian's Supplemental Fee** (pursuant to Collection Account Agreement)      189.80

**G.   Custodian's Fees** ($2,000 per month pursuant to Custodial Agreement)      2,000.00

**H.   Other Fees** payable for the current Remittance Period (Servicer to provide detail)

| | |
|---|---:|
| **TOTAL APPLICABLE MARGIN & FEES PAYABLE - CURRENT REMITTANCE PERIOD** | **91,634.83** |

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule II*
*Facility Amount Calculation & Commercial Paper Activity*

**A. FACILITY AMOUNT [not including Yield attributable to Applicable Margin and Non-Use Fees]**

| | |
|---|---:|
| Face value of Commercial Paper Outstanding - end of Remittance Period | 6,505,000.00 |
| minus:  Discount scheduled to accrue thereon through stated maturity | (1,038.99) |
| plus:  Aggregate Loans Outstanding bearing interest at the Non-CP Rate | - |
| plus:  accrued Yield and Fees with respect to Loans bearing interest at the Non-CP Rate | |
| **Facility Amount - end of Remittance Period** | **6,503,961.01** |

**B.**

| Date | OPB of Receivables Pledged ($) | OPB of Eligible Retailer Receivables | Coverage | COMMERCIAL PAPER (NOT FACE VALUE) | | | |
|---|---|---|---|---|---|---|---|
| | | | | Beginning | (+) Issuances | (-) Maturities | Ending |
| 7/1/2003 | 43,750,000.00 | 51,564,248.95 | 117.86% | 31,900,000.00 | - | - | 31,900,000.00 |
| 7/2/2003 | - | - | | 31,900,000.00 | - | - | 31,900,000.00 |
| 7/3/2003 | - | - | | 31,900,000.00 | - | - | 31,900,000.00 |
| 7/4/2003 | - | - | | 31,900,000.00 | - | - | 31,900,000.00 |
| 7/5/2003 | - | - | | 31,900,000.00 | - | - | 31,900,000.00 |
| 7/6/2003 | - | - | | 31,900,000.00 | - | - | 31,900,000.00 |
| 7/7/2003 | - | - | | 31,900,000.00 | - | - | 31,900,000.00 |
| 7/8/2003 | - | - | | 31,900,000.00 | 5,000,000.00 | 13,000,000.00 | 23,900,000.00 |
| 7/9/2003 | - | - | | 23,900,000.00 | - | - | 23,900,000.00 |
| 7/10/2003 | - | - | | 23,900,000.00 | - | - | 23,900,000.00 |
| 7/11/2003 | - | - | | 23,900,000.00 | - | - | 23,900,000.00 |
| 7/12/2003 | - | - | | 23,900,000.00 | - | - | 23,900,000.00 |
| 7/13/2003 | - | - | | 23,900,000.00 | - | - | 23,900,000.00 |
| 7/14/2003 | - | - | | 23,900,000.00 | - | - | 23,900,000.00 |
| 7/15/2003 | - | - | | 23,900,000.00 | 6,500,000.00 | 13,900,000.00 | 16,500,000.00 |
| 7/16/2003 | - | - | | 16,500,000.00 | - | - | 16,500,000.00 |
| 7/17/2003 | - | - | | 16,500,000.00 | - | - | 16,500,000.00 |
| 7/18/2003 | - | - | | 16,500,000.00 | - | - | 16,500,000.00 |
| 7/19/2003 | - | - | | 16,500,000.00 | - | - | 16,500,000.00 |
| 7/20/2003 | - | - | | 16,500,000.00 | - | - | 16,500,000.00 |
| 7/21/2003 | - | - | | 16,500,000.00 | - | - | 16,500,000.00 |
| 7/22/2003 | - | - | | 16,500,000.00 | - | 5,000,000.00 | 11,500,000.00 |
| 7/23/2003 | - | - | | 11,500,000.00 | - | - | 11,500,000.00 |
| 7/24/2003 | - | - | | 11,500,000.00 | - | - | 11,500,000.00 |
| 7/25/2003 | - | - | | 11,500,000.00 | - | - | 11,500,000.00 |
| 7/26/2003 | - | - | | 11,500,000.00 | - | - | 11,500,000.00 |
| 7/27/2003 | - | - | | 11,500,000.00 | - | - | 11,500,000.00 |
| 7/28/2003 | - | - | | 11,500,000.00 | - | - | 11,500,000.00 |
| 7/29/2003 | - | - | | 11,500,000.00 | - | 5,000,000.00 | 6,500,000.00 |
| 7/30/2003 | - | - | | 6,500,000.00 | - | - | 6,500,000.00 |
| 7/31/2003 | - | - | | 6,500,000.00 | - | - | 6,500,000.00 |
| **Total** | 43,750,000.00 | 51,564,248.95 | | | 11,500,000.00 | 36,900,000.00 | |
| **Average** | | | | | | | 19,551,612.90 |

DZB013178

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

## Overconcentration Amounts

| | | | | |
|---|---|---|---|---|
| Approved Retailer Limits: | Level IV | < Baa3/BBB- or NR | 5 00% |
| | Level III | < A2/A but <= Baa3/BBB- | 10 00% |
| | Level II | < Aa2/AA but <= A2/A | 20 00% |
| | Level I | >= Aa2/AA | 25.00% |

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | Type | Limit | Excess |
|---|---|---|---|---|---|---|---|
| | - | 0.00% | - | 0.00% | Level IV | 5.0% | |
| Rex Stores Corporation | - | 0.00% | - | 0.00% | Level IV | 5.0% | - |
| **Totals** | **-** | **0.00%** | **-** | **0.00%** | | | **-** |

## Special Concentration Approved Retailers

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | Limit | Excess |
|---|---|---|---|---|---|---|
| BJ's Wholesale Club | 2,950,000.00 | 37 82% | 3,445,472.70 | 37 27% | 22 5% | 1,195,000 00 |
| Costco | - | 0.00% | - | 0.00% | 25 0% | - |
| Sam's Club | 4,850,000.00 | 62.18% | 5,799,438.32 | 62.73% | 50 0% | 950,000.00 |
| Boscov's | - | 0.00% | - | 0 00% | 15 0% | - |
| **Totals** | **7,800,000.00** | **100.00%** | **9,244,911.02** | **100.00%** | | **2,145,000.00** |

## Eligible Receivables secured by Retailer Receivables to Government Entities

| | |
|---|---|
| Eligible Receivables relating to Approved Retailers which are Government Entities | - |
| Outstanding Principal Balance of all Eligible Receivables | 7,800,000 00 |
| Percentage | 0 00% |
| Maximum % | 2 00% |
| Overconcentration | - |

## Eligible Receivables secured by Retailer Receivables from Approved Retailers with a Debt Rating below A3/A-

*Excludes Special Concentration Approved Retailers*

| | |
|---|---|
| Eligible Receivables relating to Approved Retailers with a Debt Rating of below A3/A- | - |
| Outstanding Principal Balance of all Eligible Receivables | 7,800,000.00 |
| Percentage | 0.00% |
| Maximum % | 20.00% |
| Overconcentration | - |

## Minimum Opportunity Loan Coverage Overconcentration

| | |
|---|---|
| Aggregate principal amount of all outstanding Eligible Retailer Receivables | 9,244,911.02 |
| Outstanding Principal Balance of all Eligible Receivables | 7,800,000 00 |
| Percentage | 118 52% |
| Minimum % | 111 11% |
| Overconcentration | - |

## Maximum Inventory Stage Eligible Receivables

| | |
|---|---|
| Subject Inventory Insurance Policy in full force and effect ? | Yes |
| Supplemental Inventory Insurance Policy in full force and effect ? | Yes |
| Outstanding Principal Balance of all Inventory Stage Eligible Receivables | - |
| Outstanding Principal Balance of all Eligible Receivables | 7,800,000 00 |
| Percentage | 0 00% |
| Maximum % | 65 00% |
| Overconcentration | - |

## Maximum Eligible Receivables Extended by Servicer

| | |
|---|---|
| Outstanding Principal Balance of all Eligible Receivables w/ original terms of 120 days extended to 150 days | - |
| Outstanding Principal Balance of all Eligible Receivables | 7,800,000.00 |

*OK*

DZB013179

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

| | |
|---|---:|
| Percentage | - |
| Maximum % | 15.00% |
| Overconcentration | - |

| | |
|---|---:|
| **TOTAL OVERCONCENTRATION AMOUNT (must be without duplication)** | **2,145,000.00** |

**Excess Extended Term Receivable Amount** (due more than 120 days but less than 151 days after date of Opportunity Loan)

| | |
|---|---:|
| Outstanding Principal Balance of all Eligible Receivables which are Extended Term Receivables | - |
| Outstanding Principal Balance of all Eligible Receivables | 7,800,000.00 |
| Percentage | 0.00% |
| Maximum % | 25.00% |
| Overconcentration | - |

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

**Delinquent Retailer Excluded Amount**

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | # of Delinquent Retailer Rec. | Excluded Amount |
|---|---|---|---|---|---|---|
| Fleming | - | 0.00% | - | 0.00% | 0 | - |
| Rex Stores Corporation | - | 0.00% | - | 0.00% | 0 | - |
| BJ's Wholesale Club | 2,950,000.00 | 37.82% | 3,445,472.70 | 37.27% | 0 | - |
| Costco | - | 0.00% | - | 0.00% | 0 | - |
| Sam's Club | 4,850,000.00 | 62.18% | 5,799,438.32 | 62.73% | 0 | - |
| Boscov's | - | 0.00% | - | 0.00% | 0 | - |
| **Totals** | **7,800,000.00** | **100.00%** | **9,244,911.02** | **100.00%** | | **-** |

**Excess Maximum Individual Loan Amount**

| Eligible Receivable | Approved Retailer | Outstanding Principal Balance | Limit | Excess |
|---|---|---|---|---|
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| **Totals** | | **-** | | **-** |

DZB013181

# OPPORTUNITY FINANCE SECURITIZATION LLC
*Monthly Remittance Report - Schedule IV*
*Approved Distributor(s) & Approved Retailer(s) Status*

| Approved Distributor(s) | Net Income Most recent FQE *(cannot be negative)* | Tangible Net Worth | Minimum TNW | Financials Delivered as per 6.12(g)(i) and (ii)? | MAC has occurred? | Approved? |
|---|---|---|---|---|---|---|
| Peters Company, Inc. | 6,136,555 | 80,089,002 | 30,000,000.00 | Yes | No | Yes |

| Approved Retailer(s) | Net Income Most recent FYE *(cannot be negative)* | Net Income Most recent FQE | Prior FQE *(cannot be negative for two consecutive quarters)* | Delinquent Retailer? | MAC has occurred? | Approved? |
|---|---|---|---|---|---|---|
| Sam's Club (Wal-Mart) (6/9q) | $ 8,039,000,000 | $ 1,861,000,000 | $ 2,529,000,000 | No | No | Yes |
| BJ's Wholesale, Inc. (6/20q) | $ 130,866,000 | $ 11,267,000 | $ 56,352,000 | No | No | Yes |
| Boscov's Department Stores, Inc. | NA | NA | NA | No | No | Yes |
| Costco Wholesale Corp. (6/20Q) | $ 699,983,000 | $ 153,780,000 | $ 182,065,000 | No | No | Yes |
| Fleming Companies, Inc. | $ - | $ - | $ - | No | Yes | No |
| Rex Stores Corporation (6/10q) | $ 22,932,000 | $ 3,138,000 | $ 8,460,000 | No | No | Yes |

**Private Approved Retailer Dunn & Bradstreet Results:**

| | Financial Stress Class | | Credit Score | |
|---|---|---|---|---|
| | Current Quarter End | Prior Quarter End | Current Quarter End | Prior Quarter End |
| | 3/31/2003 | | 3/31/2003 | |
| Boscov's Department Stores, Inc. | 1 | 1 | 3 | 4 |

*Ok*

DZB013182

# EXHIBIT 41

# Autobahn Funding Company LLC

**Closing Date:**
September 22, 1999

**Analysts:**

Karen Cook
Analyst
(212) 553-1439
*Karen.Cook@moodys.com*

Wanda Lee
Senior Associate
(212) 553-3804
*Wanda.Lee@moodys.com*

**Contacts:**

Claire Robinson
Managing Director
(212) 553-1436
*Claire.Robinson@moodys.com*

Michael Kanef
Managing Director
(212) 553-1964
*Michael.Kanef@moodys.com*

Marie Erickson
Investor Liaison
(212) 553-4796
*Marie.Erickson@moodys.com*

## Structure Summary

| | |
|---|---|
| Rating: | **Prime-1** |
| Securities: | Asset-backed commercial paper (ABCP) |
| Program Type: | Partially supported, multiseller |
| Authorized Amount: | $2.24 billion (as of September 30, 2003) |
| Administrative & Hedging Agent: | DZ Bank AG Deutsche Zentral-Genossenschaftsbank (**A2/Prime-1/D**) |
| Assets: | Trade and term receivables, debt securities |
| Collateral Agent: | U.S. Bank Trust National Association (**Aa2/Prime-1/B+**)[1] |
| Depositary: | U.S. Bank Trust National Association |
| Placement Agents: | J.P. Morgan |
| | Merrill Lynch |
| Securities Act Exemption: | Section 4(2) |
| Owner: | BSCS XVI Inc. |
| Manager: | Lord Securities Corporation |

## Program Credit Enhancement
None

## Liquidity

| | |
|---|---|
| Type 1: | Asset pool-specific liquidity loan and purchase agreements |
| Support Percentage: | Face amount of outstanding ABCP |
| Provider: | DZ Bank and other **Prime-1**-rated financial institutions |
| Funding Basis: | Amount of nondefaulted receivables |
| Out to Funding: | Bankruptcy of Autobahn |
| Dilution Coverage: | Yes |
| Type 2: | Swing-line credit agreement |
| Support Amount: | $500,000 |
| Provider: | DZ Bank AG Deutsche Zentral-Genossenschaftsbank |
| Funding Basis: | Amount of nondefaulted receivables |
| Out to Funding: | Loans are provided at DZ's sole and absolute discretion |

## Program Wind Down Events
Any of the following events would prevent Autobahn Funding Company LLC from issuing ABCP:

- Bankruptcy of Autobahn Funding Company LLC
- Net worth of Autobahn less than $25,000
- Aggregate face amount of ABCP exceeds the aggregate available liquidity commitments

Administrator's Other
ABCP Programs:                    None

---

1    Ratings are based on its parent, U.S. Bank National Association.



***Moody's Investors Service***

**December 13, 2003**

BM-000235

## CURRENT HIGHLIGHTS

- As of September 30, 2003, Autobahn Funding Company had $1.6 billion of ABCP outstanding. The conduit owned 22 asset pools with a total program commitment of $2.24 billion.
- Since May 31, 2003, Autobahn has not added or removed any transactions from its portfolio.

## PROGRAM OVERVIEW

Autobahn Funding Company LLC (Autobahn) is a special-purpose limited liability company organized under Delaware law. It is owned by BSCS XVI Inc., a special-purpose corporation organized under Delaware law and owned by Broad Street Contract Services, Inc., a Delaware corporation, which is in turn owned by a third party not affiliated with DZ Bank AG Deutsche Zentral-Genossenschaftsbank (DZ Bank).

Autobahn is a partially supported, multiseller asset-backed commercial paper (ABCP) program that purchases trade and term receivables and other asset-backed securities. Autobahn is the first ABCP program sponsored by DZ Bank. Autobahn's initial capital contribution is $25,000.

### Investors Do Not Benefit From Program-Level Credit Enhancement

Unlike many partially supported, multiseller programs, Autobahn will not have the benefit of program-level credit enhancement. Consequently, all losses experienced on an asset pool must be absorbed by the pool-specific credit enhancement (first loss protection); otherwise, ABCP investors will suffer a loss.

Moody's reviews each asset purchase before it is made to assess its effect on Autobahn's **Prime-1** rating. Because Autobahn's ABCP investors do not benefit from program-level credit enhancement, each asset pool in Autobahn's portfolio is credit enhanced to a high investment grade level to support the program's **Prime-1** rating. Any significant deterioration in the credit quality of any asset pool in Autobahn's portfolio is likely to have a negative impact on Autobahn's **Prime-1** rating.

### Purchases Of Highly Rated Assets

Autobahn may also purchase, on a post-review basis, assets rated **Aa2** or higher – assets commonly referred to as highly rated assets. Because Moody's will not be looking at these transactions prior to their inclusion in the conduit, Autobahn's purchase of highly rated assets is subject to strict conditions.

For example, to be considered a highly rated asset, a security must be rated **Aa2** or higher, and any rate mismatches between the security and the ABCP issued to fund it must be addressed through a swap agreement or other similar mechanism as determined by DZ Bank. As with other asset pools, a loss on a highly rated asset could result in a loss to ABCP investors. As of September 30, 2003, Autobahn had investments in two highly rated securities (both rated **Aa2**) with a total outstanding principal balance of $218.04 million.

### First-Loss Protection Provides Liquidity Support

A second unique feature of Autobahn's ABCP program, as compared with other partially supported multi-seller programs, is that the pool-specific credit enhancement will provide liquidity support. Therefore, liquidity support for Autobahn ABCP will be provided by a combination of liquidity loan or liquidity asset purchase agreements provided by **Prime-1** banks and pool-specific credit enhancement, if necessary.

In all transactions, the sum of the liquidity agreements and the pool-specific credit enhancement will equal the maximum amount of ABCP that can be issued with respect to each specific transaction. Typically, liquidity support alone is sized in an amount equal to outstanding ABCP.

The pool-specific credit enhancement will typically be in the form of a loan agreement provided by a **Prime-1**-rated bank and will fund up to a certain dollar amount, without regard to a borrowing base test. Some of the deals, however, use other forms of credit enhancement such as overcollateralization and surety bonds. The liquidity agreements are typically subject to a borrowing base test, which means that funds will be available up to the amount of the nondefaulted assets. Additionally, many of Autobahn's deals have a trigger that causes the transaction to be immediately put to the liquidity banks upon the occurrence of certain performance-related events or deterioration of the asset pool.

Even though reliance on credit enhancement to provide liquidity support is unique, this structure results in no additional risks to ABCP investors.

### DZ Bank Is Program Administrator

DZ Bank's New York Branch is Autobahn's administrator. Although this is DZ Bank's first conduit, the personnel handling the administrative responsibilities have significant prior experience in administering other ABCP conduits. Moody's has been favorably impressed by the underwriting and administrative functions of DZ Bank.

### ABCP Investors Are Secured Creditors

Autobahn ABCP investors have a security interest in all of Autobahn's assets. In the unlikely event Autobahn were to become bankrupt, ABCP investors would have a *pari passu* interest with the program liquidity providers in the proceeds of Autobahn's assets. In Moody's opinion, a security interest in the assets is a very strong feature of the program. The security interest would likely reduce the severity of loss to investors in the event of an Autobahn bankruptcy.

BM-000236

However, the security interest does not add any significant benefit from a short-term rating perspective. Moody's **Prime-1** rating addresses not only the probability of repayment in full, but timely repayment of ABCP. The addition of a security interest does not materially enhance investors' probability of being repaid on time.

## RATING OPINION

Autobahn's **Prime-1** rating is based on:

- The credit quality of the program's assets
- Liquidity support provided by **Prime-1**-rated banks
- Certain structural protections, including the bankruptcy-remote nature of Autobahn

Because of the significant role played by DZ Bank as principal liquidity and credit enhancement provider, the **Prime-1** rating assigned to Autobahn is closely correlated with DZ Bank's **Prime-1** rating.

*Table 1*

### Autobahn Portfolio
As of September 30, 2003

| Pool No. | Seller Industry | Rating | Asset Type | Purchase Limit ($million) | Inception Date |
|---|---|---|---|---|---|
| 1 | Insurance | A2 | Insurance Premium Loans | 170.00 | 10/22/1999 |
| 2 | Consumer Finance | Aa2 | Senior Secured Bank Debt | 76.04 | 1/18/2000 |
| 3 | Travel/Leisure | Ba1 | Timeshare Loan Receivables | 150.00 | 1/31/2000 |
| 4 | Corporate Bonds | Aa3/Baa3 | Collateralized Bond Obligation | 89.99 | 3/28/2000 |
| 5 | Retail Banking | NR | ATM Cash Receivables | 50.00 | 3/17/2000 |
| 6 | Banking | Aa2 | Senior Secured Bank Debt (CLO) | 142.00 | 4/13/2000 |
| 7 | Insurance | NR | Senior Life Insurance Settlements | 200.00 | 4/25/2000 |
| 8 | Insurance | NR | Insurance Premium Loans | 135.00 | 5/26/2000 |
| 9 | Leasing | NR | Equipment Leases | 75.00 | 6/30/2000 |
| 10 | Travel/Leisure | NR | Timeshare Loan Receivables | 100.00 | 10/30/2000 |
| 11 | Financial Services | A1 | Small Business Loans/Factored Receivables | 200.00 | 12/15/2000 |
| 12 | Insurance | NR | Structured Settlements | 100.00 | 3/23/2001 |
| 13 | Leasing | A2 | Equipment Leases | 60.00 | 3/30/2001 |
| 14 | Financial Services | A2 | Lottery Receivables | 150.00 | 7/31/2001 |
| 15 | Financial Services | NR | Diversified Receivables Portfolio | 57.4 | 8/22/2001 |
| 16 | Agriculture | Aaa | Timber Receivables | 95.00 | 9/1/2001 |
| 17 | Retail- Wholesale | NR | Wholesale Inventory Trade Loans | 100.00 | 12/28/2001 |
| 18 | Energy | NR | Project Finance Loan | 35.46 | 3/1/2002 |
| 19 | Retail Banking | NR | ATM Cash Receivables | 0.00 | 12/18/2002 |
| 20 | Financial Services | NR | Home Remodeling Loans | 75.00 | 2/11/2003 |
| 21 | Financial Services | NR | Rental Vehicle Loans | 100.00 | 2/28/2003 |
| 22 | Leasing | NR | Equipment Leases | 75.00 | 5/30/2003 |
| | | | Total | $2,236 | |

*Source: Autobahn Monthly Report*

## ASSET OVERVIEW

### Portfolio Investment Criteria

Autobahn may invest in assets such as trade and term receivables, which are commonly found in other partially supported, multiseller programs. According to the program administrator, preferred asset classes include consumer finance receivables (interest bearing, short and long term), trade receivables, insurance premium loans, and finance leases. Investments in these assets may take the form of an interest in an undivided pool of assets or a certificate backed by an identified asset pool.

Autobahn may also invest in highly rated assets — that is, securities rated **Aa2** or above by Moody's. These securities may be purchased by Autobahn without notification to Moody's and generally take the form of collateralized loan obligations (CLOs) or collateralized bond obligations (CBOs). The securities are fully supported by liquidity agreements; however, liquidity banks are not required to fund under a liquidity commitment for a particular security if the security is downgraded below **Caa1**. Therefore, DZ Bank must notify Moody's of any downgrade of a security below **Aa2**. If such event occurs, DZ Bank, as administrator, must propose a solution to the rating agencies which will isolate ABCP investors from any potential losses as a result of the downgraded security.

### Current Portfolio

As Autobahn's portfolio increases in size, its diversification by asset class has improved. Autobahn's current portfolio contains a fairly broad exposure of

BM-000237

asset interests. Moody's does not rate 46% of the transactions (by purchase commitment) (see Chart 1); however, all except one of these transactions have the benefit of full liquidity support from **Prime-1**-rated DZ Bank. Table 1 summarizes Autobahn's asset portfolio as of September 30, 2003. Chart 2 presents Autobahn's portfolio by asset type. CLOs/CBOs comprise the largest asset type in Autobahn, at 13.8% of total commitments. Insurance premium loans and timeshare loans are the next two largest commitments, accounting for 13.6% and 11.2%, respectively, of the portfolio.



Chart 1
**Autobahn Portfolio By Moody's Long-Term Rating**
As of September 30, 2003
(Total: $2.24 billion)

Source: Autobahn Monthly Reports

Because Autobahn ABCP investors do not benefit from program-level credit enhancement, Moody's requires that each transaction be of very high credit quality (equivalent to **Aa2**) on a stand-alone basis. In order to meet this requirement and facilitate the funding of transactions through the conduit, Autobahn typically fully supports new transactions with **Prime-1**-rated liquidity and then proposes a partially supported structure to Moody's for confirmation of the **Prime-1** rating. As of September 30, 2003, eighteen of the twenty-two deals in the Autobahn portfolio are fully supported by liquidity commitments that assumed all the credit risk of the assets.

Four of the twenty-two deals, which represent approximately 24.7% of Autobahn's authorized amount (as of September 30, 2003), are partially supported by liquidity. Of the four, two are investments in **Aa2**-rated CLO transactions, one of the partially supported deals is a small business loan facility, which is rated **A1** by Moody's and enhanced to a level consistent with **Prime-1** and the other is an insurance premium deal which has an immediate put to the liquidity banks if certain deal-specific trigger events occur. Credit enhance-

ment for these deals takes the form of either over-collateralization or an immediate put to the liquidity banks upon the deterioration of the receivables pool. The partial liquidity support combined with deal-specific credit enhancement supports the **Prime-1** rating of Autobahn.



Chart 2
**Autobahn Portfolio By Asset Type**
Purchase Limit as of September 30, 2003
(Total: $2.24 billion)

Source: Autobahn Monthly Reports

From a statistical standpoint, the probability of default (even among assets rated **Aa2**) becomes greater as the number of assets increases. Consequently, at some point, the probability of default on a large portfolio of **Aa2**-rated assets is not consistent with **Prime-1**, and will need to be addressed should circumstances warrant it.

### Hedging

Autobahn may also be exposed to interest rate risk due to the assets it holds in its portfolio. To mitigate these risks, DZ Bank (as Autobahn's hedging agent) is required to arrange appropriate hedges for each Autobahn asset, if necessary. Autobahn may enter into hedging arrangements only with **Prime-1**-rated counterparties.

## CREDIT ENHANCEMENT

Pool-specific credit enhancement is typically in the form of a loan agreement provided by a **Prime-1**-rated bank and funds up to a certain dollar amount, without regard to a borrowing base test. As noted above in the Program Overview section, unlike many partially supported, multiseller programs, Autobahn does not have the benefit of program-level credit enhancement. Losses experienced on any asset pool must be absorbed by the pool's first-loss protection; otherwise, ABCP investors will suffer a loss.

BM-000238

The four partially supported deals incorporate various forms of deal-specific credit enhancement to maintain Autobahn's **Prime-1**-rating. Each deal-specific credit enhancement takes the form of one or a combination of the following: letter of credit, overcollateralization and excess spread.

## LIQUIDITY

Liquidity support is provided by a combination of liquidity loan or liquidity asset purchase agreements furnished by **Prime-1** banks. Currently, 96.96% of the liquidity support for Autobahn is provided by DZ Bank. Key Bank (**A1/Prime-1/B-**), Bank Hapoalim (**A2/Prime-1/C**) and RZB Bank (**A1/Prime-1/C+**) provide $35 million (1.52%), $20 million (0.87%) and $15 million (0.65%) respectively of the remaining liquidity. Unless the transaction is fully supported, liquidity funding is subject to a borrowing base test. The liquidity loan or liquidity asset purchase agreements are not available upon the voluntary or involuntary bankruptcy of Autobahn. Because Autobahn is bankruptcy-remote, this risk is consistent with the program's **Prime-1** rating.

## PROGRAM WIND DOWN EVENTS

Autobahn has incorporated program wind down events that provide protection to ABCP investors by facilitating the orderly exit of the program from the ABCP market if certain adverse events occur.

The following wind down events would prevent Autobahn from issuing ABCP:

- Autobahn becomes bankrupt
- Net worth of Autobahn is less than $25,000
- Aggregate available liquidity commitments are less than the aggregate face amount of outstanding ABCP
- Aggregate face amount of all outstanding ABCP is greater than $4 billion
- Occurrence of a termination event, as defined in a pool-specific funding agreement

## PROGRAM ADMINISTRATOR

DZ Bank acts as administrator for Autobahn. This is DZ Bank's first ABCP program; however, the personnel handling the responsibilities of Autobahn all have significant prior experience in administrating other ABCP conduits. DZ Bank's current long- and short-term ratings are **A2** and **Prime-1**, respectively; its financial strength rating is **D**.

Contacts:  Ms. Jennifer Wikoff, Vice President
DZ Bank AG
New York Branch, (212) 745-1661

Mr. Kenneth Bradt, Senior Vice President
DZ Bank AG
New York Branch, (212) 745-1655

BM-000239

Doc ID# SFSF29874

© Copyright 2003, Moody's Investors Service, Inc. and/or its licensors including Moody's Assurance Company, Inc. (together, "MOODY'S"). All rights reserved. ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind and MOODY'S, in particular, makes no representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability or fitness for any particular purpose of any such information. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The credit ratings, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER. Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling. MOODY'S hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MOODY'S have, prior to assignment of any rating, agreed to pay to MOODY'S for appraisal and rating services rendered by it fees ranging from $1,500 to $1,800,000.                    PRINTED IN U.S.A.

BM-000240

# EXHIBIT 42

FINANCIAL STATEMENTS

Autobahn Funding Company LLC

Years ended December 31, 2003 and 2002
with Report of Independent Auditors

# Autobahn Funding Company LLC

## Financial Statements

December 31, 2003

## Contents

Report of Independent Auditors ................................................................................ 1

Statements of Financial Condition ........................................................................... 2
Statements of Operations ......................................................................................... 3
Statements of Changes in Member's Capital ......................................................... 4
Statements of Cash Flows......................................................................................... 5
Notes to Financial Statements ................................................................................. 6

**≡ℓ ERNST & YOUNG**

■ Ernst & Young LLP
5 Times Square
New York, New York 10036-6530

■ Phone: (212) 773-3000
www.ey.com

## Report of Independent Auditors

To the Management of
Autobahn Funding Company LLC

We have audited the accompanying statements of financial condition of Autobahn Funding Company LLC (the "Company") as of December 31, 2003 and 2002, and the related statements of operations, changes in member's capital and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Autobahn Funding Company LLC at December 31, 2003 and 2002, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

*Ernst & Young LLP*

March 11, 2004

## Autobahn Funding Company LLC

### Statements of Financial Condition

|  | December 31 | |
|---|---|---|
|  | **2003** | 2002 |
| **Assets** | | |
| Cash and cash equivalents | $ **71,166** | $ 72,646 |
| Investments in, and loans collateralized by, pooled receivables | **1,424,407,862** | 1,657,233,341 |
| Interest receivable | **1,086,212** | 1,412,954 |
| Program fees receivable | **2,527,724** | 2,395,227 |
| Total assets | $ **1,428,092,964** | $ 1,661,114,168 |
| | | |
| **Liabilities and member's capital** | | |
| Liabilities: | | |
| Notes payable (net of unamortized discount of $754,390 and $751,695 in 2003 and 2002, respectively) | $ **1,425,508,611** | $ 1,658,656,305 |
| Facility fees payable | **2,557,216** | 2,430,760 |
| Accounts payable and accrued expenses | **2,137** | 2,103 |
| Total liabilities | **1,428,067,964** | 1,661,089,168 |
| | | |
| Member's capital: | | |
| Contributed capital | **25,000** | 25,000 |
| Retained earnings | **–** | – |
| Total member's capital | **25,000** | 25,000 |
| Total liabilities and member's capital | $ **1,428,092,964** | $ 1,661,114,168 |

*See notes to financial statements.*

## Autobahn Funding Company LLC

## Statements of Operations

|  | Years ended December 31 | |
|  | 2003 | 2002 |
|---|---|---|
| **Revenues** | | |
| Interest income | $  21,714,192 | $  33,309,635 |
| Program fees | 29,194,339 | 26,592,075 |
| Total revenues | 50,908,531 | 59,901,710 |
| | | |
| **Expenses** | | |
| Interest expense | 21,497,734 | 32,730,841 |
| Facility fees | 29,410,762 | 27,170,799 |
| Administration fees | 35 | 70 |
| Total expenses | 50,908,531 | 59,901,710 |
| Net income | $        – | $        – |

*See notes to financial statements.*

3

## Autobahn Funding Company LLC

## Statements of Changes in Member's Capital

| | Member's Capital | Retained Earnings | Total |
|---|---|---|---|
| Balance at January 1, 2002 | $25,000 | $ – | $25,000 |
| Net income | – | – | – |
| Balance at December 31, 2002 | $25,000 | $ – | $25,000 |
| **Net income** | **–** | **–** | **–** |
| **Balance at December 31, 2003** | **$25,000** | **$ –** | **$25,000** |

*See notes to financial statements.*

4

# Autobahn Funding Company LLC

## Statements of Cash Flows

|  | Years ended December 31 | |
|---|---|---|
|  | 2003 | 2002 |
| **Cash flows from operating activities** |  |  |
| Net income | $ – | $ – |
| Adjustments to reconcile net income to net cash provided by operating activities: |  |  |
| Amortization of discount on notes | **21,497,734** | 32,730,841 |
| Changes in assets and liabilities: |  |  |
| (Increase) in program fees receivable | **(132,497)** | (565,704) |
| Decrease in interest receivable | **326,742** | 2,227,373 |
| Increase in facility fees payable | **126,456** | 601,237 |
| Increase (decrease) in accounts payable and accrued expenses | **34** | (79,043) |
| Net cash provided by operating activities | **21,818,469** | 34,914,704 |
|  |  |  |
| **Cash flows from investing activities:** |  |  |
| Proceeds from maturities of investments in, and loans collateralized by, pooled receivables | **74,231,010,566** | 64,977,419,368 |
| Payments for investments in, and loans collateralized by, pooled receivables | **(73,998,185,087)** | (64,867,083,507) |
| Net cash provided by investing activities | **232,825,479** | 110,335,861 |
|  |  |  |
| **Cash flows from financing activities:** |  |  |
| Proceeds from issuance of notes | **73,998,183,572** | 64,867,072,171 |
| Payments in connection with maturities of notes | **(74,252,829,000)** | (65,012,334,000) |
| Net cash used in financing activities | **(254,645,428)** | (145,261,829) |
|  |  |  |
| Net decrease in cash and cash equivalents | **(1,480)** | (11,264) |
| Cash and cash equivalents, beginning of year | **72,646** | 83,910 |
| Cash and cash equivalents, end of year | $ **71,166** | $ 72,646 |
|  |  |  |
| **Supplemental disclosure of cash flow information** |  |  |
| Cash paid during the year for interest | $ **21,818,437** | $ 34,914,633 |

*See notes to financial statements.*

5

# Autobahn Funding Company LLC

## Notes to Financial Statements

### December 31, 2003

## 1. Organization and Services Agreement

### Organization

Autobahn Funding Company LLC (the "Company"), a special purpose, bankruptcy-remote Delaware limited liability company, was formed on August 17, 1999. The Company is a wholly-owned subsidiary of BSCS XVI Inc., a special purpose corporation owned by Broad Street Contract Services, Inc. ("Broad Street").

The primary purpose of the Company is to issue commercial paper notes ("CP") with maturities of up to 270 days. The proceeds from such CP is used to acquire interests in assets, which can be loans, pools of accounts, financial assets and securities, or to make payment of amounts outstanding under the Liquidity Facilities or Swing Line Credit Agreement and to repay matured CP. The Company has engaged U.S. Bank Trust N.A. as a depositary, issuing and paying agent.

The Company has engaged DZ BANK AG Deutsche Zentral-Genossenschaftsbank, formerly DG BANK Deutsche Genossenschaftsbank, ("DZ" or the "Administrator") as its administrator pursuant to the Administration Agreement dated September 17, 1999 between the Company and DZ. The Administrator identifies and structures pools of Underlying Assets, as defined in Note 3, that will back Asset Interests, as defined in Note 3, and is responsible for monitoring and conducting periodic reviews of the Company's portfolio of Asset Interests. DZ is also responsible for administering the Liquidity Facilities, Supplemental Credit Enhancement, if any, and the Swing Line Credit Agreement, as well as the issuance, sale and payment of CP.

### Services Agreement

Lord Securities Corporation ("Lord" or the "Manager") has agreed to act as a manager for the Company pursuant to the Management Agreement dated September 17, 1999 (the "Management Agreement") between the Company and Lord. Lord is responsible for providing certain financial, accounting and other services for the Company; for such services, Lord receives a fee directly from the Administrator. The Manager is an affiliated entity of Broad Street.

6

Autobahn Funding Company LLC

Notes to Financial Statements (continued)

## 2. Summary of Significant Accounting Policies

The accounting policies of the Company conform to accounting principles generally accepted in the United States of America. The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the statement of financial condition date, and the reported amounts of revenues and expenses during the reporting period. However, actual results could differ from management's estimates.

Cash and cash equivalents consists of cash at banks.

The discount on CP is amortized on a straight-line basis, which approximates constant yield to maturity, and has been reflected as interest expense on the statements of operations.

Interest income earned on notes receivable and secured loans is calculated at the Company's commercial paper funding rate or LIBOR rate and is charged to Sellers (as defined in Note 3) based on average daily outstanding receivable balances.

Program fee rates vary by receivable pool and the fees charged to Sellers are based on average daily outstanding receivable balances.

Liquidity facility fee ("facility fee") rates vary by receivable pool and the fees are charged to the Company based on average daily outstanding liquidity commitments made by a syndicate of liquidity banks to the Company. Liquidity fees paid to these liquidity providers are accrued over the lives of the liquidity commitments.

The Company is considered a partnership for U.S. federal income tax purposes. As a result, the Company is not a taxable entity.

Autobahn Funding Company LLC

Notes to Financial Statements (continued)

**3. Investments In, and Loans Collateralized By, Pooled Receivables**

The Company: (i) purchases or otherwise acquires or makes loans secured by, or otherwise finances interests in, or in pools of, accounts, general intangibles, chattel paper, instruments, certified and uncertified securities, inventory, investment property or other financial assets, including, without limitation, publicly or privately issued securities secured by or representing interests in any of the foregoing (collectively, the "Underlying Assets") pursuant to funding agreements (such Underlying Assets, including ownership interests and security interests therein, collectively are referred to as "Asset Interests") in accordance with the Company's investment policies and guidelines, (ii) sells Asset Interests, (iii) funds its acquisitions of Asset Interests through the issuance of CP and (iv) enters into liquidity and credit enhancement facilities in connection with the issuance of CP. The Company acquires Asset Interests originated by various companies referred to the Company from time to time as sellers of, issuers of or borrowers (collectively, the "Sellers") in respect of Underlying Assets. The Company provides the financing for Asset Interests primarily through the issuance of CP.

At December 31, 2003 and 2002, the investments in, and loans collateralized by, pooled receivables is comprised of variable rate secured loans receivable of $1,035,849,818 and $1,259,283,451 and variable rate secured notes of $388,558,044 and $397,949,890, respectively.

**4. Liquidity and Credit Enhancement Support**

The Company does not benefit from program-wide credit enhancement; instead, deal-specific required reserves provide loss protection for each transaction. Each reserve is designed to cover a significant level of losses that could be incurred by the pool in the event of its liquidation. The amount of loss protection is determined by providing a multiple of the actual loss history of the related underlying asset or coverage for certain obligor concentrations. The credit enhancement may be fixed or dynamic, increasing with the deterioration of the underlying asset pool. Each transaction is structured to include performance triggers to alert the administrator if the portfolio performs below a certain threshold. Loss reserves may take the form of over collateralization, third-party letter of credit or surety bond, cash collateral account, recourse to the seller, subordinated note issuance, or other forms of acceptable loss protection.

# Autobahn Funding Company LLC

## Notes to Financial Statements (continued)

### 4. Liquidity and Credit Enhancement Support (continued)

The Company maintains backstop liquidity support to supplement the inherent liquidity of the receivables pools. The liquidity facilities are available to ensure timely payments of rated CP and are not intended to provide loss coverage on the assets. Committed liquidity coverage is typically maintained at a minimum of 100% - 102% of the maximum purchase limit permitted under the applicable purchase agreement. The 100% - 102% liquidity coverage is made up of deal-specific liquidity and/or enhancement agreements. Deal-specific liquidity support can come in the form of a liquidity asset purchase agreement or liquidity loan agreement. The liquidity agreements will not fund against defaulted assets except in cases where the liquidity provider also provides credit enhancement. If maturing CP is not rolled over and there are cash flow delays interrupting availability of funds for repayment of the CP, the liquidity facilities will be drawn upon.

As of December 31, 2003 and 2002, no amounts were outstanding against any of the deal-specific liquidity and/or enhancement agreements. No amounts were drawn against any of the deal-specific liquidity and/or enhancement agreements during the years ended December 31, 2003 and 2002.

### 5. Swing Line Credit Agreement

In order to provide additional flexibility to the Company in meeting its liquidity needs, DZ and the Company have entered into a Swing Line Credit Agreement. Pursuant to such Agreement, DZ may make advances to the Company, not to exceed $500,000 outstanding at any time, to enable it to pay, among other things, maturing CP. Such agreement terminates at an earlier of (a) expiration of all liquidity commitments or (b) an insolvency of the Company. Borrowings under the Swing Line Credit Agreement bear interest equal to the greater of the DZ base rate or the Federal Funds Rate plus 50 basis points. No amounts were drawn against the Swing Line Credit Agreement during 2003 and 2002.

# Autobahn Funding Company LLC

## Notes to Financial Statements (continued)

### 6. Notes Payable

At December 31, 2003 and 2002, and for the years then ended, information on commercial paper notes is as follows:

|  | 2003 | 2002 |
|---|---|---|
| At year end: |  |  |
| Total face value | **$1,426,263,000** | $1,659,408,000 |
| Interest due at maturity | **$1,811,111** | $2,129,116 |
| Interest payable | **$1,056,720** | $1,377,421 |
| Range of face values (in $000's) | **$343 – $60,736** | $309 – $71,339 |
| Maturity dates | **1/2/04 – 3/25/04** | 1/2/03 – 2/14/03 |
| Rates | **1.03 % – 1.21 %** | 1.32 % – 1.90 % |
| Weighted-Average rate | **1.18 %** | 1.61 % |
|  |  |  |
| Weighted-Average rate during the year | **1.26 %** | 1.80 % |
| Maximum month-end outstanding | **$1,836,505,000** | $1,831,962,000 |
| Average month-end outstanding | **$1,668,639,000** | $1,713,612,500 |

At maturity, the CP is rolled over and replaced with other CP with varying maturities, face values and yields.

### 7. Fair Value of Financial Instruments and Concentration of Risk

SFAS No. 107, "Disclosures about Fair Value of Financial Instruments," requires disclosure of fair value information about financial instruments, whether or not recognized in the statements of financial condition, for which it is practicable to estimate that value. In cases where quoted market prices or known sales prices are not available, fair values are based on estimates using present value or other valuation techniques.

Those techniques are significantly affected by the assumptions used, including the discount rate and estimates of future cash flows. In that regard, the derived fair value estimates cannot be substantiated by comparison to independent markets and, in many cases, could not be realized in immediate settlement of the instrument. SFAS No.107 excludes certain financial instruments and all non-financial instruments from its disclosure requirements. Accordingly, the aggregate fair value amounts as presented do not represent the underlying value of the Company.

Autobahn Funding Company LLC

Notes to Financial Statements (continued)

**7. Fair Value of Financial Instruments and Concentration of Risk (continued)**

The following methods and assumptions were used by the Company in estimating the fair value of each class of financial instruments:

*Cash and cash equivalents*–The carrying amount of cash and cash equivalents approximates its fair value.

*Investments in, and loans collateralized by, pooled receivables*–The carrying amount of investments in, and loans collateralized by, pooled receivables approximate its fair value due to the floating rate nature of the investments and the stable credit standing of the investments.

*Interest receivable*–The carrying amount of interest receivable approximates its fair value.

*Program fees receivable*–The carrying amount of program fees receivable approximates its fair value.

*Notes payable*–The carrying amount of notes payable approximates its fair value due to the short-term nature of these instruments.

*Facility fees payable*–The carrying amount of facility fees payable approximates its fair value.

# EXHIBIT 43

# FitchRatings

# Structured Finance

Asset-Backed
Credit Analysis

# Autobahn Funding Co. L.L.C.

## Rating

$4,000,000,000 4(2) Commercial
  Paper Program ....................................... F1

## Analysts

Robert J. Cammilleri
1 212 908-0244
robert.cammilleri@fitchratings.com

Darryl J. Osojnak, Esq.
1 212 908-0722
darryl.osojnak@fitchratings.com

Michael J. FitzSimons
1 212 908-0565
michael.fitzsimons@fitchratings.com

## Administrator Contacts

DZ Bank AG Deutsche
  Zentral Genossenschaftbank
Richard Wisniewski
Senior Vice President
1 212 745-1662
richard_wisniewski@dzbank.de

Jennifer Wikoff
Vice President
1 212 745-1661
jennifer_wikoff@dzbank.de

## Commercial Paper Dealers

J.P. Morgan Securities, Inc.
Merrill Lynch Money Markets, Inc.
Bank of America Securities, LLC

## Program Establishment Date

Sept. 22, 1999

## ■ Summary

DZ Bank AG Deutsche Zentral Genossenschaftbank's (DZ Bank) $4.0 billion 4(2) commercial paper (CP) program, Autobahn Funding Co. L.L.C. (Autobahn), is rated 'F1' by Fitch Ratings. The rating is based on the structure of Autobahn's asset purchases, required reserves dedicated to each asset pool, the 102% liquidity support provided, a sound legal structure, and DZ Bank's strong administrative capabilities. Autobahn is a special purpose, bankruptcy-remote Delaware limited liability company established to acquire asset interests, which can be loans, pools of accounts, financial assets, and securities. Autobahn issues CP with maturities of up to 270 days to fund asset purchases and financings backed by receivables. Autobahn intends to maintain a diversified portfolio by obligor and industry. DZ Bank is rated 'A/F1' by Fitch.

Credit enhancement and liquidity support provide protection from losses and ensure timely payment of the CP notes. There is no fungible layer of programwide credit support; instead, each pool is protected against losses by deal-specific loss reserves. Although there is no minimum required loss reserve, loss reserves are tailored to reflect each transaction's unique characteristics and are sized to cover a multiple of historical losses that is commensurate with Autobahn's 'F1' rating.

Due to the unique structure of Autobahn's asset purchases and because the program does not benefit from programwide credit enhancement, Fitch reviews each transaction prior to its inclusion in Autobahn.

Autobahn maintains backstop liquidity support to supplement the inherent liquidity of the asset pools. Committed liquidity coverage is maintained at a minimum of 102% of the maximum purchase limit permitted under the applicable purchase agreement. The 102% liquidity coverage is made up of deal-specific liquidity and/or enhancement agreements.

DZ Bank, as administrator for Autobahn, evaluates and structures all asset purchases and monitors asset performance to ensure compliance with the credit and investment policy. DZ Bank's capable staff provides in-depth credit expertise, solid structuring capabilities, and experience in identifying and minimizing asset deterioration.

## ■ Issuer

Autobahn is a special purpose, bankruptcy-remote Delaware limited liability company. Its primary purpose is to issue CP, the proceeds of which are used to acquire asset interests, which can be loans, pools of accounts, financial assets, and securities. Autobahn will issue CP with maturities of up to 270 days.

**September 17, 2004**

# FitchRatings

# Structured Finance



## Structural Overview

**Originator/Seller**

**Deal-Specific Credit Support**
- Sized to cover a multiple of historical losses
- May be provided by overcollateralization, letter of credit or surety bond, and subordinated note issuance, among other items

**Bankruptcy-remote, special purpose corporation**

**Administrator**
*DZ Bank*
- Structures asset purchases in accordance with Autobahn's credit and investment policy
- Negotiates the terms and conditions of each funding agreement
- Arranges deal-specific liquidity and credit enhancement agreements
- Responsible for hedging any interest rate or currency risk associated with the purchased assets
- Authorizes the issuance of commercial paper

**Autobahn Funding Co. L.L.C.**

**Liquidity Support**
- 102% deal-specific coverage provided by a syndicate of 'F1' or higher rated financial institutions in the form of a liquidity loan or liquidity asset purchase agreement
- $500,000 fungible support in the form of a swing-line facility provided by DZ Bank
- Drawn on in the event of a commercial paper market disruption or to fund short-term mismatches in cash flows

**Manager**
*Lord Securities Corp.*
- Designates directors and officers of Autobahn
- Maintains the program's principal corporate books and records to keep Autobahn's corporate existence in good standing
- Retains an accounting firm to audit Autobahn's annual financial statements
- Prepares and files reports, financial statements, and tax returns

**Commercial Paper Dealers**
*J.P. Morgan Securities, Inc.
Merrill Lynch Money Markets, Inc.
Bank of America Securities, LLC*

**Issuing and Paying Agent and Collateral Agent**
*U.S. Bank Trust, N.A.*
- Coordinates the issuance and repayment of commercial paper
- Draws on liquidity support in the event of a shortfall
- Maintains the collateral account related to the sale and repayment of commercial paper

**Commercial Paper Investors**

DZ Bank – DZ Bank AG Deutsche Zentral Genossenschaftbank. Autobahn – Autobahn Funding Co. L.L.C.

---

As a bankruptcy-remote entity, Autobahn cannot incur any indebtedness other than CP, liquidity and credit enhancement obligations, and other incidental amounts permitted under the program's organizational documents. All principal parties, including the liquidity bank, CP dealers, and the issuing and paying agent, have agreed not to file bankruptcy petitions against Autobahn until one year and one day after all CP is paid in full, mitigating bankruptcy concerns.

### ■ Asset Quality

Autobahn acquires assets or makes loans secured by interests in pools of receivables and other financial assets, including asset-backed securities. Each asset purchased by Autobahn must meet eligibility requirements as stipulated by its credit and investment policy guidelines, which focus on asset quality and concentration, obligor diversity and exposure, and transaction structure. DZ Bank, acting as administrator, ensures that each asset purchased adheres to Autobahn's credit and investment policy by concentrating on four primary risk areas — collateral, legal, operational, and fraud risk.

Although Autobahn's credit and investment policy does not require a minimum loss reserve percentage for any pool, it specifies underwriting criteria, which require that each purchased receivables pool be

---

# FitchRatings                                   Structured Finance



**Two-Tier Legal Structure**

originated by a high-quality company and that each transaction include substantial loss protection and structural elements that maintain the overall quality of the conduit's asset portfolio.

## ■ Sellers

Autobahn may purchase receivables from investment-grade and unrated or non-investment-grade sellers. Autobahn only purchases receivables from sellers that possess high-quality underlying business and servicing capabilities, to minimize the credit and performance risk of such seller. DZ Bank evaluates performance history to determine appropriate levels and forms of credit enhancement for each transaction, sets transaction triggers and termination events, and conducts on-site due diligence for every seller; this due diligence includes a review of the seller's business plan, management, and servicing capabilities. For transactions where DZ Bank requires a backup servicer, semiannual due diligence will also be performed on the backup servicer. In addition to requiring monthly performance reports, DZ Bank visits most sellers quarterly and performs a due diligence review at least annually for each seller.

The acquisition of asset interests from a seller is governed by a funding agreement. Fitch reviews every transaction to ensure that it meets the conduit's investment criteria and has been structured to a level commensurate with the conduit's rating prior to closing. Autobahn's asset purchases are structured to a level commensurate with an 'F1' rating. This level of structuring is accomplished through the proper combination of credit enhancement, asset eligibility criteria, obligor concentration limits, and deal-specific termination events. Fitch then monitors the transactions monthly as part of its ongoing surveillance. However, highly rated assets do not necessitate a Fitch review or confirmation. Highly rated assets include securities rated at least 'AA–' by Fitch or other assets backed by the full faith and credit of the U.S. government.

For most transactions, Autobahn uses a two-tier legal structure, utilizing a bankruptcy-remote, special purpose corporation (SPC) to transfer purchased receivables interests or financial assets to Autobahn, thus mitigating seller bankruptcy concerns. However, for certain investment-grade sellers only, the two-tier legal structure may not be used. Under a two-tier structure, the seller sells the assets to a bankruptcy-remote SPC, which then sells the assets to Autobahn pursuant to a purchase agreement. This procedure insulates the asset interest from claims or an automatic stay subsequent to a seller bankruptcy.

## ■ Credit Support

Autobahn does not benefit from programwide credit enhancement; instead, deal-specific required reserves provide loss protection for each transaction. Each reserve is designed to cover a significant level of the losses that could be incurred by the pool in the event of its liquidation. The amount of loss protection is determined by providing a multiple of the actual loss history of the related underlying asset or coverage for certain obligor concentrations. The credit enhancement may be fixed or dynamic, increasing with the deterioration of the underlying asset pool. Each transaction is structured to include performance triggers that alert the administrator if the portfolio performs below a certain threshold.

Loss reserves may take the form of overcollateralization, a third-party letter of credit or surety bond, a cash collateral account, recourse to the seller, subordinated note issuance, or other forms of acceptable loss protection. DZ Bank, as administrator, is responsible for structuring and monitoring each asset purchase to achieve an 'F1' rating (credit quality commensurate with an 'A' rating) on each underlying transaction.

Generally, loss reserves are sized as follows:
- For installment receivables pools, the loss reserve will be a minimum of a fixed percentage that is a multiple (typically three times) of the pool's recent loss experience (over a period of

**FitchRatings**                    Structured Finance

typically no less than one year) times the
investment in such receivables pool.
- For retail pools (e.g. pools with large numbers of
  obligors that are in relatively small amounts
  individually), the loss reserve, at a minimum,
  will be a multiple (typically three times) of the
  pool's historical and/or recent loss-to-liquidation
  experience (over a period typically no less than
  one year), depending on fluctuations in pool
  performance, times the investment in such
  receivables pool.
- For commercial and wholesale trade receivables
  pools (e.g. pools having some obligor
  concentrations), the loss reserve, at a minimum,
  will be a multiple of the obligor limit for a pool
  times the investment in such receivables pool.

If needed, Autobahn has the option, but not the
obligation, to enter into supplemental credit
enhancement facilities.

■ **Liquidity Support**

Autobahn maintains backstop liquidity support to
supplement the inherent liquidity of the receivables
pools. The liquidity facilities are available to ensure
timely payments of rated debt and are not intended to
provide loss coverage on the assets. Committed
liquidity coverage is maintained at a minimum of
102% of the maximum purchase limit permitted
under the applicable purchase agreement. The 102%
liquidity coverage is made up of deal-specific
liquidity and/or enhancement agreements. Deal-
specific liquidity support can come in the form of a
liquidity asset purchase agreement or liquidity loan
agreement. If new CP is not issued and there are cash
flow delays interrupting availability of funds for the
payment of maturing CP, the liquidity facilities will
be drawn on. DZ Bank provides liquidity to the
majority of facilities in the program; however, it
syndicates portions of the liquidity commitment to
'F1' or better rated banks or financial institutions.

The liquidity provider's commitment is irrevocable;
however, liquidity providers will not be required to
fund if:
- Autobahn is the subject of bankruptcy or
  insolvency proceedings, which is unlikely due to
  its bankruptcy-remote structure.
- The face amount of all outstanding CP notes
  exceeds the aggregate available liquidity
  commitment amount for all funding agreements.

**Swing-Line Facility**

Another source of liquidity support is an
uncommitted $500,000 fungible programwide swing-
line facility provided by DZ Bank. The swing-line
facility can be used to give Autobahn additional
liquidity during minor CP market interruptions or to
fund short-term mismatches in cash flows.

■ **Program Wind-Down Events**

As administrator, DZ Bank has the right to direct
Autobahn to cease issuance of CP upon the
occurrence of certain wind-down events, which
include, but are not limited to, the following:
- Autobahn fails to pay any CP note or any loan,
  including interest, when due and payable.
- A bankruptcy event commences against Autobahn,
  which remains unstayed and in effect for a period
  of 60 consecutive days.
- Autobahn commences voluntary bankruptcy
  proceedings.
- The face amount of all outstanding CP notes
  exceeds the aggregate available liquidity
  commitment amount for all funding agreements,
  continuing for five consecutive days.
- The aggregate outstanding face amount of all CP
  notes is greater than $4 billion.
- The company is required to register as an
  investment company.

■ **Administrator**

DZ Bank's professionals have previous conduit and
securitization experience and have structured and
completed transactions exceeding $18 billion in
various asset classes.

As administrator for Autobahn, DZ Bank's duties
include, but are not limited to:
- Structuring receivables purchases in accordance
  with Autobahn's credit and investment policy.
- Assisting Autobahn in identifying prospective
  transactions.
- Negotiating the terms and conditions of each
  funding agreement on behalf of Autobahn related to
  the acquisition of asset interests.
- Arranging for hedge contracts to be entered into
  by Autobahn.
- Monitoring performance of the purchased assets.
- Negotiating liquidity facility agreements and any
  credit enhancement agreements.
- Authorizing the issuance of CP.

# FitchRatings

# Structured Finance

## ■ Manager

As manager, Lord Securities Corp. (Lord) is responsible for providing certain financial, accounting, and other services for the company. Specifically, Lord's duties include the following:

- Designating directors, officers, or employees of the manager to serve as officers and directors of Autobahn.
- Arranging for meetings of Autobahn's board of directors.
- Maintaining the program's principal corporate books and records to maintain Autobahn's corporate existence in good standing.
- Retaining an accounting firm to audit Autobahn's annual financial statements.
- Representing Autobahn in its day-to-day operations.

- Preparing and filing reports, financial statements, and tax returns.

## ■ Pool Composition

As of Feb. 29, 2004, Autobahn had authorized 18 transactions. The pool benefits from credit enhancement inherent in each transaction, which is commensurate with the 'F1' rating of the conduit. DZ Bank serves as the liquidity provider. As the conduit grows, Autobahn is committed to monitoring a well-diversified asset portfolio in terms of transaction size and asset class.

*For detailed portfolio information on Autobahn, see Fitch's asset-backed CP S.M.A.R.T. performance analytics system at www.fitchratings.com or call Fitch's product and services group at 1 800 908-0800.*

Copyright © 2004 by Fitch, Inc., Fitch Ratings Ltd. and its subsidiaries. One State Street Plaza, NY, NY 10004.
Telephone: 1-800-753-4824, (212) 908-0500. Fax: (212) 480-4435. Reproduction or retransmission in whole or in part is prohibited except by permission. All rights reserved. All of the information contained herein is based on information obtained from issuers, other obligors, underwriters, and other sources which Fitch believes to be reliable. Fitch does not audit or verify the truth or accuracy of any such information. As a result, the information in this report is provided "as is" without any representation or warranty of any kind. A Fitch rating is an opinion as to the creditworthiness of a security. The rating does not address the risk of loss due to risks other than credit risk, unless such risk is specifically mentioned. Fitch is not engaged in the offer or sale of any security. A report providing a Fitch rating is neither a prospectus nor a substitute for the information assembled, verified and presented to investors by the issuer and its agents in connection with the sale of the securities. Ratings may be changed, suspended, or withdrawn at anytime for any reason in the sole discretion of Fitch. Fitch does not provide investment advice of any sort. Ratings are not a recommendation to buy, sell, or hold any security. Ratings do not comment on the adequacy of market price, the suitability of any security for a particular investor, or the tax-exempt nature or taxability of payments made in respect to any security. Fitch receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating securities. Such fees generally vary from US$1,000 to US$750,000 (or the applicable currency equivalent) per issue. In certain cases, Fitch will rate all or a number of issues issued by a particular issuer, or insured or guaranteed by a particular insurer or guarantor, for a single annual fee. Such fees are expected to vary from US$10,000 to US$1,500,000 (or the applicable currency equivalent). The assignment, publication, or dissemination of a rating by Fitch shall not constitute a consent by Fitch to use its name as an expert in connection with any registration statement filed under the United States securities laws, the Financial Services and Markets Act of 2000 of Great Britain, or the securities laws of any particular jurisdiction. Due to the relative efficiency of electronic publishing and distribution, Fitch research may be available to electronic subscribers up to three days earlier than to print subscribers.

Autobahn Funding Co. L.L.C.

# EXHIBIT 44

Financial Statements

Autobahn Funding Company LLC

Years ended December 31, 2004 and 2003
with Report of Independent Auditors

Autobahn Funding Company LLC

Financial Statements

Years ended December 31, 2004 and 2003

## Contents

Report of Independent Auditors ............................................................................................. 1

Statements of Financial Condition......................................................................................... 2
Statements of Operations ...................................................................................................... 3
Statements of Changes in Member's Capital ........................................................................ 4
Statements of Cash Flows...................................................................................................... 5
Notes to Financial Statements............................................................................................... 6

**ΞΙΙ ERNST & YOUNG**

■ Ernst & Young LLP
5 Times Square
New York, New York 10036-6530

■ Phone: (212) 773-3000
www.ey.com

## Report of Independent Auditors

To the Management of
  Autobahn Funding Company LLC

We have audited the accompanying statements of financial condition of Autobahn Funding Company LLC (the "Company") as of December 31, 2004 and 2003, and the related statements of operations, changes in member's capital and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Autobahn Funding Company LLC at December 31, 2004 and 2003, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States.

*Ernst & Young LLP*

April 13, 2005

1

## Autobahn Funding Company LLC

## Statements of Financial Condition

| | December 31 | |
|---|---|---|
| | **2004** | **2003** |
| **Assets** | | |
| Cash and cash equivalents | $ **74,722** | $ 71,166 |
| Investments in, and loans collateralized by, pooled receivables | **1,450,366,064** | 1,424,407,862 |
| Interest receivable | **2,187,525** | 1,086,212 |
| Program fees receivable | **3,110,910** | 2,527,724 |
| Total assets | **$ 1,455,739,221** | $ 1,428,092,964 |
| | | |
| **Liabilities and member's capital** | | |
| Liabilities: | | |
| Notes payable (net of unamortized discount of $1,367,865—2004  and $754,389—2003) | **$ 1,452,601,135** | $ 1,425,508,611 |
| Facility fees payable | **3,110,910** | 2,557,216 |
| Accounts payable and accrued expenses | **2,176** | 2,137 |
| Total liabilities | **1,455,714,221** | 1,428,067,964 |
| | | |
| Member's capital: | | |
| Contributed capital | **25,000** | 25,000 |
| Retained earnings | **–** | – |
| Total member's capital | **25,000** | 25,000 |
| Total liabilities and member's capital | **$ 1,455,739,221** | $ 1,428,092,964 |

*See notes to financial statements.*

Autobahn Funding Company LLC

Statements of Operations

|  | Years ended December 31 | |
|  | **2004** | **2003** |
|---|---|---|
| **Revenues** | | |
| Interest income | **$  20,504,883** | $ 21,714,192 |
| Program fees | **34,231,157** | 29,194,339 |
| Total revenues | **54,736,040** | 50,908,531 |
| | | |
| **Expenses** | | |
| Interest expense | **20,501,914** | 21,497,734 |
| Facility fees | **34,234,087** | 29,410,762 |
| Administration fees | **39** | 35 |
| Total expenses | **54,736,040** | 50,908,531 |
| | | |
| Net income | **$           –** | $          – |

*See notes to financial statements.*

3

## Autobahn Funding Company LLC

### Statements of Changes in Member's Capital

| | Member's Capital | Retained Earnings | Total |
|---|---|---|---|
| Balance at January 1, 2003 | $25,000 | $    – | $25,000 |
| Net income | – | – | – |
| Balance at December 31, 2003 | 25,000 | – | 25,000 |
| Net income | – | – | – |
| Balance at December 31, 2004 | **$25,000** | **$    –** | **$25,000** |

*See notes to financial statements.*

4

## Autobahn Funding Company LLC

### Statements of Cash Flows

|  | Years ended December 31 | |
|  | 2004 | 2003 |
|---|---:|---:|
| **Cash flows from operating activities** | | |
| Net income | $          – | $          – |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Changes in assets and liabilities: | | |
| Decrease (increase) in interest receivable | **(1,101,313)** | 326,742 |
| Increase in program fees receivable | **(583,186)** | (132,497) |
| Increase (decrease) in interest payable | **1,130,805** | (320,701) |
| Increase in facility fees payable | **553,694** | 126,456 |
| Increase in accounts payable and accrued expenses | **39** | 34 |
| Net cash provided by operating activities | **39** | 34 |
| | | |
| **Cash flows from investing activities** | | |
| Proceeds from maturities of investments in, and loans collateralized by, pooled receivables | **72,428,253,892** | 74,231,010,566 |
| Payments for investments in, and loans collateralized by, pooled receivables | **(72,454,212,094)** | (73,998,185,087) |
| Net cash provided by (used in) investing activities | **(25,958,202)** | 232,825,479 |
| | | |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of notes | **72,454,215,611** | 73,998,183,572 |
| Payments in connection with maturities of notes | **(72,428,253,892)** | (74,231,010,565) |
| Net cash provided by (used in) financing activities | **25,961,719** | (232,826,993) |
| | | |
| Net increase (decrease) in cash and cash equivalents | **3,556** | (1,480) |
| Cash and cash equivalents, beginning of year | **71,166** | 72,646 |
| Cash and cash equivalents, end of year | $ **74,722** | $ 71,166 |
| | | |
| **Supplemental disclosure of cash flow information** | | |
| Cash paid during the year for interest | $ **19,371,109** | $ 21,818,435 |

*See notes to financial statements.*

5

Autobahn Funding Company LLC

Notes to Financial Statements

December 31, 2004

## 1. Organization and Services Agreement

### Organization

Autobahn Funding Company LLC (the "Company"), a special purpose, bankruptcy-remote Delaware limited liability company, was formed on August 17, 1999. The Company is a wholly-owned subsidiary of BSCS XVI Inc., a special purpose corporation owned by Broad Street Contract Services, Inc. ("Broad Street").

The primary purpose of the Company is to issue commercial paper notes ("CP") with maturities of up to 270 days. The proceeds from such CP is used to acquire interests in assets, which can be loans, pools of accounts, financial assets and securities, or to make payment of amounts outstanding under the Liquidity Facilities or Swing Line Credit Agreement and to repay matured CP.  The Company has engaged U.S. Bank Trust N.A. as a depositary, issuing and paying agent.

The Company has engaged DZ BANK AG Deutsche Zentral-Genossenschaftsbank, formerly DG BANK Deutsche Genossenschaftsbank AG, ("DZ" or the "Administrator") as its administrator pursuant to the Administration Agreement dated September 17, 1999 between the Company and DZ. The Administrator identifies and structures pools of Underlying Assets, as defined in Note 3, that will back Asset Interests, as defined in Note 3, and is responsible for monitoring and conducting periodic reviews of the Company's portfolio of Asset Interests. DZ is also responsible for administering the Liquidity Facilities, Supplemental Credit Enhancement, if any, and the Swing Line Credit Agreement, as well as the issuance, sale and payment of CP.

### Services Agreement

Lord Securities Corporation ("Lord" or the "Manager") has agreed to act as a manager for the Company pursuant to the Management Agreement dated September 17, 1999 (the "Management Agreement") between the Company and Lord. Lord is responsible for providing certain financial, accounting and other services for the Company; for such services, Lord receives a fee directly from the Administrator. The Manager is an affiliated entity of Broad Street.

6

Autobahn Funding Company LLC

Notes to Financial Statements (continued)

**2. Summary of Significant Accounting Policies**

The accounting policies of the Company conform to accounting principles generally accepted in the United States of America. The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the statement of financial condition date, and the reported amounts of revenues and expenses during the reporting period. However, actual results could differ from management's estimates.

Certain items in the prior period have been reclassified to conform to the current year's presentation.

Cash and cash equivalents consists of cash at banks.

The discount on CP is amortized on a straight-line basis, which approximates constant yield to maturity, and has been reflected as interest expense on the statements of operations.

Interest income earned on secured loans is calculated at the Company's commercial paper funding rate or LIBOR rate and is charged to Sellers (as defined in Note 3) based on average daily outstanding secured loan balances.

Program fee rates vary by receivable pool and the fees charged to Sellers are based on average daily outstanding secured loan balances.

Liquidity facility fee ("facility fee") rates vary by receivable pool and the fees are charged to the Company based on average daily outstanding liquidity commitments made by a syndicate of liquidity banks to the Company. Liquidity fees paid to these liquidity providers are accrued over the lives of the liquidity commitments.

The Company is considered a partnership for U.S. federal income tax purposes. As a result, the Company is not a taxable entity.

Autobahn Funding Company LLC

Notes to Financial Statements (continued)

**3. Investments In, and Loans Collateralized By, Pooled Receivables**

The Company: (i) purchases or otherwise acquires or makes loans secured by, or otherwise finances interests in, or in pools of, accounts, general intangibles, chattel paper, instruments, certificated and uncertificated securities, inventory, investment property or other financial assets, including, without limitation, publicly or privately issued securities secured by or representing interests in any of the foregoing (collectively, the "Underlying Assets") pursuant to funding agreements (such Underlying Assets, including ownership interests and security interests therein, collectively are referred to as "Asset Interests") in accordance with the Company's investment policies and guidelines, (ii) sells Asset Interests, (iii) funds its acquisitions of Asset Interests through the issuance of CP and (iv) enters into liquidity and credit enhancement facilities in connection with the issuance of CP. The Company acquires Asset Interests originated by various companies referred to the Company from time to time as sellers of, issuers of or borrowers (collectively, the "Sellers") in respect of Underlying Assets. The Company provides the financing for Asset Interests primarily through the issuance of CP.

At December 31, 2004 and 2003, the investments in, and loans collateralized by, pooled receivables is comprised of variable rate secured loans receivable of $1,087,428,022 and $1,035,849,818 and variable rate secured notes of $362,938,042 and $388,558,044, respectively.

**4. Liquidity and Credit Enhancement Support**

The Company does not benefit from program-wide credit enhancement; instead, deal-specific required reserves provide loss protection for each transaction. Each reserve is designed to cover a significant level of losses that could be incurred by the pool in the event of its liquidation. The amount of loss protection is determined by providing a multiple of the actual loss history of the related underlying asset or coverage for certain obligor concentrations. The credit enhancement may be fixed or dynamic, increasing with the deterioration of the underlying asset pool. Each transaction is structured to include performance triggers to alert the administrator if the portfolio performs below a certain threshold. Loss reserves may take the form of over collateralization, third-party letter of credit or surety bond, cash collateral account, recourse to the seller, subordinated note issuance, or other forms of acceptable loss protection.

Autobahn Funding Company LLC

Notes to Financial Statements (continued)

**4. Liquidity and Credit Enhancement Support (continued)**

The Company maintains backstop liquidity support to supplement the inherent liquidity of the receivables pools. The liquidity facilities are available to ensure timely payments of rated CP and are not intended to provide loss coverage on the assets. Committed liquidity coverage is typically maintained at a minimum of 100%—102% of the maximum purchase limit permitted under the applicable purchase agreement. The 100%—102% liquidity coverage is made up of deal-specific liquidity and/or enhancement agreements. Deal-specific liquidity support can come in the form of a liquidity asset purchase agreement or liquidity loan agreement. The liquidity agreements will not fund against defaulted assets except in cases where the liquidity provider also provides credit enhancement. If maturing CP is not rolled over and there are cash flow delays interrupting availability of funds for repayment of the CP, the liquidity facilities will be drawn upon.

As of December 31, 2004 and 2003, no amounts were outstanding against any of the deal-specific liquidity and/or enhancement agreements. No amounts were drawn against any of the deal-specific liquidity and/or enhancement agreements during the years ended December 31, 2004 and 2003.

**5. Swing Line Credit Agreement**

In order to provide additional flexibility to the Company in meeting its liquidity needs, DZ and the Company have entered into a Swing Line Credit Agreement. Pursuant to such Agreement, DZ may make advances to the Company, not to exceed $500,000 outstanding at any time, to enable it to pay, among other things, maturing CP. Such agreement terminates at the earlier of (a) expiration of all liquidity commitments or (b) an insolvency of the Company. Borrowings under the Swing Line Credit Agreement bear interest equal to the greater of the DZ base rate or the Federal Funds Rate plus 50 basis points. No amounts were drawn against the Swing Line Credit Agreement during 2004 and 2003.

Autobahn Funding Company LLC

Notes to Financial Statements (continued)

**6. Notes Payable**

At December 31, 2004 and 2003, and for the years then ended, information on commercial paper notes is as follows:

|  | 2004 | 2003 |
|---|---|---|
| At year end: | | |
| Total face value | $ 1,453,969,000 | $ 1,426,263,000 |
| Interest due at maturity | $ 3,555,390 | $ 1,811,111 |
| Interest payable | $ 2,187,525 | $ 1,056,720 |
| Range of face values (in $000's) | $ 537—$62,723 | $ 343—$60,736 |
| Maturity dates | 1/3/05—3/28/05 | 1/2/04—3/25/04 |
| Rates | 2.07 %—2.50% | 1.03 %—1.21% |
| Weighted-Average rate | 2.35% | 1.18% |
| Weighted-Average rate during the year | 1.46% | 1.26% |
| Maximum month-end outstanding | $ 1,515,853,000 | $ 1,836,505,000 |
| Average month-end outstanding | $ 1,388,227,750 | $ 1,668,639,000 |

At maturity, the CP is rolled over and replaced with other CP with varying maturities, face values and yields.

**7. Fair Value of Financial Instruments and Concentration of Risk**

SFAS No. 107, "Disclosures about Fair Value of Financial Instruments," requires disclosure of fair value information about financial instruments, whether or not recognized in the statements of financial condition, for which it is practicable to estimate that value. In cases where quoted market prices or known sales prices are not available, fair values are based on estimates using present value or other valuation techniques.

Those techniques are significantly affected by the assumptions used, including the discount rate and estimates of future cash flows. In that regard, the derived fair value estimates cannot be substantiated by comparison to independent markets and, in many cases, could not be realized in immediate settlement of the instrument. SFAS No.107 excludes certain financial instruments and all non-financial instruments from its disclosure requirements. Accordingly, the aggregate fair value amounts as presented do not represent the underlying value of the Company.

10

Autobahn Funding Company LLC

Notes to Financial Statements (continued)

**7. Fair Value of Financial Instruments and Concentration of Risk (continued)**

The following methods and assumptions were used by the Company in estimating the fair value of each class of financial instruments:

*Cash and cash equivalents:* The carrying amount of cash and cash equivalents approximates its fair value.

*Investments in, and loans collateralized by, pooled receivables:* The carrying amount of investments in, and loans collateralized by, pooled receivables approximates its fair value due to the floating rate nature of the investments and the stable credit standing of the investments.

*Interest receivable:* The carrying amount of interest receivable approximates its fair value.

*Program fees receivable:* The carrying amount of program fees receivable approximates its fair value.

*Notes payable:* The carrying amount of notes payable approximates its fair value due to the short-term nature of these instruments.

*Facility fees payable:* The carrying amount of facility fees payable approximates its fair value.

11

# EXHIBIT 45

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No.: 09-~~273~~
269

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | )   PLEA AGREEMENT |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| GREGORY MALCOLM BELL, | ) |
|  | ) |
| Defendant. | ) |

The United States of America, by and through its attorneys,
B. Todd Jones, United States Attorney for the District of
Minnesota, and Assistant United States Attorneys John Docherty and
Timothy C. Rank, and Gregory Malcolm Bell (hereinafter referred to
as the "defendant") agree to resolve this case on the terms and
conditions that follow.

1.    **Charges**.   The defendant agrees to plead guilty to the
sole count of an Information charging the defendant with one count
of wire fraud, in violation of Title 18, United States Code,
Section 1343.

2.    **Factual Basis**.

The Scheme and Artifice to Defraud

The defendant, between on or about February 26, 2008 and on or
about September 24, 2008, knowingly and intentionally created,
devised, executed, and attempted to execute a scheme and artifice
to defraud, and to obtain money and other things of value, by means
of materially false and misleading statements and representations.



Pekirson
EXHIBIT NO. 3
2|7|19
P. CAMPBELL



FILED OCT 0 7 2009
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD.
DEPUTY CLERK

United States v. Gregory Malcolm Bell                    Crim No. 09-293 $\cancel{SF}$
                                                                      $269$
                                                                      $\cancel{9}7D$

### Background on the Defendant and the Lancelot Funds

The defendant earned a Master of Business Administration
degree with a concentration in finance from the University of
Chicago's Graduate School of Business. He has worked in the hedge
fund business continuously since 1998. In approximately December
of 2001, the defendant started his own hedge fund. Shortly after
that hedge fund was founded, the defendant organized Lancelot
Investment Management (hereinafter referred to as "Lancelot
Management") which became the investment advisor to, and general
partner in, three other hedge funds which were organized as limited
partnerships: Lancelot Investors Fund, LP (hereinafter referred to
as "Lancelot I"), Lancelot Investors Fund, II, LP (hereinafter
referred to as "Lancelot II"), and Lancelot Investors Fund, Ltd.
(hereinafter referred to as "Lancelot Limited")(the three Lancelot
funds plus Lancelot Management are referred to collectively as
"Lancelot"). The defendant owned 99% of a holding company that in
turn owned Lancelot. The defendant made all significant decisions
for Lancelot, including, but not limited to, all investment
decisions, all investment allocation decisions, and all significant
operational and personnel decisions. The defendant also routinely
met with and provided information about the Lancelot Funds to both
existing and potential Lancelot investors, and he was the primary

2

United States v. Gregory Malcolm Bell                    Crim No. 09-273

point-of-contact for Lancelot investors with respect to the
operation of the Lancelot Funds.

Lancelot's investment portfolio was highly concentrated in
short term, trade finance, promissory notes issued by Petters
Company, Incorporated (hereinafter referred to as "PCI").
Allegedly, PCI used the money raised through the sale of those
notes to finance the acquisition and resale at a profit of large
quantities of consumer goods.    Three PCI executives, and two
individuals outside PCI, have pled guilty in the United States
District Court for the District of Minnesota to fraud offenses in
connection with the business activities of PCI.    At their guilty
plea hearings, those individuals admitted facts sufficient to prove
that PCI was in fact operated as a Ponzi scheme, and that the
claims that PCI was engaged in the buying and reselling of consumer
goods were false, and supported by fabricated documents.

On September 24, 2008, the PCI fraud collapsed when multiple
federal search warrants were executed on locations related to PCI.
As of September 24, 2008, Lancelot held approximately $1.5 billion
worth of PCI's notes. This was substantially all of the money that
Lancelot had.

The defendant, and others acting at his direction, both
verbally and in written materials provided to investors and
potential investors, made material misrepresentations and concealed

3

United States v. Gregory Malcolm Bell                    Crim No. 09-273

material information about the Lancelot Funds' investments with PCI
from investors and potential investors.

### The Extension of the Term of the PCI Notes

Beginning in late 2007, PCI became delinquent in paying the
notes held by Lancelot.   The delinquent payments from PCI were not
reported to Lancelot investors by Bell.   Instead, on December 18,
2007, Bell executed an agreement with Thomas Petters that extended
the repayment term of all the PCI notes held by Lancelot from 180
to 270 days.   The effects of this extension were that those notes
that had been delinquent on a 180-day maturity schedule were no
longer delinquent, and that the day on which any other note would
have to be acknowledged as delinquent was pushed back by 90 days.
Bell concealed the extension from Lancelot investors, disclosing
the note extension only if questioned specifically about it by an
investor, but he did not disclose to investors that the extension
was prompted by delinquent payment by PCI.   Bell's failure to
disclose information regarding the extension of the payment terms
of the PCI notes was material.

### Round Trips

By February 2008, even with the 90-day extension of time Bell
gave to PCI to pay the notes, PCI failed to make payments and the
PCI notes again became delinquent.   To conceal this information
from Lancelot investors, the defendant, between February 26, 2008

4

United States v. Gregory Malcolm Bell                Crim No. 09-273

and September 24, 2008, aided and abetted by officers and employees
of PCI, including Thomas Petters, and by the defendant's
subordinate employees at Lancelot, engineered approximately 86
"round-trip" banking transactions that gave investors and potential
investors the false impression that PCI was paying its promissory
notes in a timely manner.

In these transactions, money was wired from a Lancelot-
controlled account at a Chicago bank to a PCI account at a
Milwaukee bank. Shortly afterwards, the money was wired back to
the Lancelot-controlled account. The transactions were structured
to make it look like PCI was paying off an outstanding PCI
promissory note or a number of invoices contained within a
particular PCI promissory note. Bell intentionally concealed from
Lancelot investors information about these "round-trip"
transactions, thereby concealing PCI's delinquent payments from
Lancelot investors.

Lancelot had a $50 million line of credit at the Chicago bank
that was used in the round-trip transactions. Money advanced to
Lancelot on this line of credit was also used to invest in PCI
notes. The line of credit came up for renewal during the period of
time that the round-trip transactions were being conducted. By
making the same false representations to the bank that were being
made to other Lancelot investors, Lancelot was able to retain its

5

United States v. Gregory Malcolm Bell                    Crim No. 09-~~223~~
                                                            $269 \bigcap 70$
line of credit at the bank.  As of September 24, 2008, Lancelot
owed \$49 million on this line of credit.   This bank was a
"financial    institution"    within    the    meaning    of    USSG
§2B1.1(b)(14)(A).

    In  early  September,  the  defendant  was  asked  by  an
institutional investor for a note-by-note accounting of the pay off
status of a number of PCI promissory notes.  Defendant directed his
subordinates at Lancelot to create a spreadsheet he knew was going
to be provided to this investor which purported to show that a
number of the notes about which the investor was inquiring had been
paid in full; one had been partially paid; and the balance were
notes that were not yet due.   All of the notes characterized as
either fully or partially paid had been paid through round-trip
transactions, but this information was not disclosed to the
investor.

    Round-trip transactions were preceded by telephone calls or an
exchange of e-mails between Lancelot personnel in Illinois and PCI
personnel in Minnesota about the amounts of money that would be
involved in the upcoming transaction.  The defendant acknowledges
that  these  telephone  call  and  e-mails  were  interstate  wire
communications; that they were in furtherance of the scheme and
artifice  to  defraud;  and  that  by  his  role  in  devising  and

6

<u>United States v. Gregory Malcolm Bell</u>                    Crim No. 09-293
                                                                         269

implementing the round-trip transactions the defendant caused these
interstate wire communications to be made.

The misrepresentations to investors that PCI was paying its
notes when due, when in fact PCI was only paying notes when
Lancelot self-funded those payments, were made during the time the
scheme   and   artifice   to   defraud   was   in   operation.     These
misrepresentations were material.

Amount

After the "round trip" transactions commenced, on or about
February 26, 2008, until on or about September 24, 2008, Lancelot
raised over $200 million, but less than $400 million. in new
investor money from approximately 43 investors.  Lancelot was also
able to retain its $50 million line of credit at the Chicago bank
referred to above.

3.   **Waiver of Indictment**.   The defendant agrees to waive
indictment by a grand jury on these charges and to consent to the
filing of a criminal information.  The defendant further agrees to
execute a written waiver of his right to be indicted by a grand
jury on these offenses.

4.   **Waiver of Pretrial Motions**.   The defendant understands
and agrees that he has certain rights to file pre-trial motions in
this case.  As part of this plea agreement, and based upon the
concessions of the United States within this plea agreement, the

7

United States v. Gregory Malcolm Bell                Crim No. 09-2~~

defendant knowingly, willingly, and voluntarily gives up the right

to file pre-trial motions in this case.

     5.   **Statutory Penalties**.

    The parties agree that Count 1 of the Information carries

statutory penalties of:

          a.    a term of imprisonment of up to 20 years;

          b.    a criminal fine of up to the greater of
              $250,000.00 or twice the amount of gain or
              loss;

          c.    a term of supervised release of up to three
              years;

          d.    a special assessment of $100.00, which is
              payable to the Clerk of Court prior to
              sentencing; and

          e.    the costs of prosecution (as defined in 28
              U.S.C. §§ 1918(b) and 1920).

     6.    **Revocation of Supervised Release**.    The defendant

understands that, if he were to violate any condition of supervised

release, he could be sentenced to an additional term of

imprisonment of up to the length of the original supervised release

term, subject to the statutory maximums set forth in 18 U.S.C. §

3583.

     7.    **United States Sentencing Guidelines**.    The parties agree

that the facts set forth in the factual basis section of this plea

agreement are sufficient to bring the defendant's sentence as

calculated under the United States Sentencing Guidelines to the

United States v. Gregory Malcolm Bell                Crim No. 09-

statutory maximum in this case, which is 240 months. The parties acknowledge that the defendant will be sentenced in accordance with 18 U.S.C. § 3551, et seq. The parties also acknowledge that the defendant will be sentenced in accordance with federal sentencing law which includes consideration of the Sentencing Guidelines promulgated pursuant to the Sentencing Reform Act of 1984.

8.    **Discretion of the Court**. This plea agreement is binding on the parties, but it does not bind the Court. The parties understand that the Sentencing Guidelines are advisory and their application is a matter that falls solely within the Court's discretion. The Court may make its own determination regarding the applicable guideline factors and the applicable criminal history category.    The Court may also depart from the applicable guidelines.   If the Court determines that the applicable guideline calculations are different from that stated above, neither party may withdraw from this agreement, and the defendant will be sentenced pursuant to the Court's determinations.

9.    **Special Assessments**. The Guidelines require payment of a special assessment in the amount of $100.00 for each felony count of which the defendant is convicted. U.S.S.G. § 5E1.3.

10.    **Restitution**. The defendant understands and agrees that the Mandatory Victim Restitution Act, 18 U.S.C. §3663A, applies and

9

United States v. Gregory Malcolm Bell                    Crim No. 09-

that the Court is required to order the defendant to make restitution to the victims of his crime.

The defendant will fully and completely disclose to the United States Attorney's Office the existence and location of any assets in which he has any right, title, or interest.  The defendant agrees to assist the United States in identifying, locating, returning, and transferring assets for use in payment of restitution and fines ordered by the Court.  The financial statement to be provided to the United States Attorney's Office will be accurate, truthful and complete.

If requested by the United States, the defendant agrees to submit to a financial deposition and to a polygraph examination to determine whether he has truthfully disclosed the existence of all of his assets.

11.  **Forfeiture**.  The government reserves its right to proceed against any of the defendant's assets if those assets represent real or personal property involved in violations of the laws of the United States or are proceeds traceable to such property.

12.  **Waiver of Appeal**.  The defendant understands that 18 U.S.C. Section 3742 affords the defendant the right to appeal the sentence imposed in this case.  Acknowledging this right, and in exchange for the concessions made by the United States in this plea agreement, the defendant hereby waives all rights conferred by 18

10

<u>United States v. Gregory Malcolm Bell</u>                    Crim No. 09-

U.S.C. Section 3742 to appeal the length of his sentence, unless

the sentence exceeds 240 months, is the product of a violation of

the constitution of the United States, a mis-application of the

Sentencing Guidelines, or a misapplication of 18 U.S.C. §3553.  The

defendant has discussed these rights with his attorney.    The

defendant understands the rights being waived, and the defendant

waives these rights knowingly, intelligently, and voluntarily.

13.  **Venue**.  The parties agree that venue of this case is

proper in the District of Minnesota.

14.  **Binding Effect**.    The   parties   agree   that under

principles of double jeopardy a plea of guilty pursuant to this

plea agreement bars further prosecution of the defendant for the

same course of conduct.

15.  **Complete Agreement**.  This is the entire agreement and

understanding between the United States and the defendant.  There

are   no   other   agreements,   promises,   representations,   or

understandings.

Date: $Sept. 23, 2009$                    B. TODD JONES
United States Attorney

BY:

JOHN DOCHERTY
TIMOTHY C. RANK
Assistant U.S. Attorneys

11

United States v. Gregory Malcolm Bell                    Crim No. 09-

Date:

GREGORY MALCOLM BELL
Defendant

Date:

VINCENT P. SCHMELZ, III,   ESQ.
Counsel for Defendant

12

# EXHIBIT 46

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re | **Jointly Administered under**<br>**Case No. 08-45257** |
| | |
| Petters Company, Inc., et al., | Court File No. 08-45257 |
| | |
| Debtors. | Court File Nos.: |
| | |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (KHS) |
| PC Funding, LLC; | 08-45326 (KHS) |
| Thousand Lakes, LLC; | 08-45327 (KHS) |
| SPF Funding, LLC; | 08-45328 (KHS) |
| PL Ltd., Inc.; | 08-45329 (KHS) |
| Edge One LLC; | 08-45330 (KHS) |
| MGC Finance, Inc.; | 08-45331 (KHS) |
| PAC Funding, LLC; | 08-45371 (KHS) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (KHS) |
| | |
| | Chapter 11 Cases |
| | Judge Kathleen H. Sanberg |

---

| | |
|---|---|
| Douglas A. Kelley, in his capacity as the<br>Trustee of the PCI Liquidating Trust, | |
| | |
| Plaintiff, | |
| | |
| vs. | ADV. NO. 10-04301 |
| | |
| Opportunity Finance, LLC; Opportunity Finance<br>Securitization, LLC; Opportunity Finance<br>Securitization II, LLC; Opportunity Finance<br>Securitization III, LLC; International Investment<br>Opportunities, LLC; Sabes Family Foundation;<br>Sabes Minnesota Limited Partnership; Robert W.<br>Sabes; Janet F. Sabes; Jon R. Sabes; Steven<br>Sabes; Deutsche Zentralgenossenschaftbank AG;<br>and The Minneapolis Foundation, | |
| | |
| Defendants. | |

**THE TRUSTEE'S AMENDED RESPONSES AND OBJECTIONS TO
DEFENDANT DZ BANK'S FIRST SET OF INTERROGATORIES TO THE TRUSTEE**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to this proceeding by Rules 7026, 7033 and 9014 of the Federal Rules of Bankruptcy Procedure, Douglas E. Kelley, in his capacity as the Trustee of the PCI Liquidating Trust (the "Trustee"), provides the following amended responses to Defendant DZ Bank's First Set of Interrogatories to the Trustee dated October 16, 2018.

## GENERAL OBJECTIONS

The Trustee expressly incorporates the following general objections into each specific response as if set forth fully therein (all objections herein are collectively "Objections"):

1.      The Trustee objects to the Interrogatories as exceeding the maximum number permitted pursuant to Federal Rule 33(a)(1), and reserves all rights under Federal Rule 33(a)(1) and other applicable Federal Rules and caselaw.

2.      The Trustee objects to the Interrogatories to the extent they purport to expand the Trustee's discovery obligations beyond those established by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, or the applicable rules or Orders of this Court.

3.      The Trustee objects to the Interrogatories to the extent they seek, or could be interpreted to seek, information shielded from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or protection.  The Trustee's responses to the Interrogatories do not waive, and may not be construed as waiving, any applicable objection, privilege, or protection.

4.      The Trustee objects to the Interrogatories to the extent they seek information that is not, or requires review of materials that are not, in the Trustee's "possession, custody or control,"

1

*see* FRCP 34(a)(1), are equally available to DZ Bank from sources other than the Trustee, including public sources, and/or are obtainable from other sources through means that are more convenient, more efficient, more practical, less burdensome, or less expensive.

5.     The Trustee objects to the Interrogatories to the extent they are duplicative, overly broad, cumulative, vague as to the scope of what they seek or timeframe, or unduly burdensome to answer, including, without limitation, as to subject matter and where compliance with specific Interrogatories would be unreasonably difficult as well as prohibitively expensive or time-consuming.

6.     The Trustee objects to the Interrogatories, including but not limited to all Interrogatories that expressly purport to have no date limitation, to the extent they seek documents generated outside the relevant time frame for each Interrogatory.

7.     The Trustee objects to the Interrogatories to the extent they seek materials that are not relevant to any party's claim or defense or not proportional to the needs of the action.

8.     The Trustee objects to the Interrogatories to the extent they prematurely seek disclosure of expert materials or materials relevant to other stages of the litigation that have not yet commenced.

9.     The Trustee objects to the Interrogatories to the extent that answering them would require the Trustee to breach a protective order.

10.     The Trustee objects to the Interrogatories to the extent they seek sensitive or confidential information about third parties whose privacy interests are protected by federal law, Minnesota law, or the applicable law of other states, or that the Trustee has a legal or contractual obligation not to disclose.

11.     The Trustee's election to respond to an Interrogatory, notwithstanding its

2

objectionable nature, is not, and may not be construed as: (a) an acceptance of, or agreement with, any of the characterizations or purported descriptions of the factual assertions or implications, transactions, or events contained in the Interrogatory; (b) a concession or admission that the materials are relevant to this proceeding; (c) a waiver of any Objection; (d) an admission that any such information exists; (e) an agreement that requests for similar information will be treated in a similar manner; (f) an acceptance of, or agreement with, any of the defined terms to the extent the definition or meaning of any defined term is at issue in this action; or (g) waiver of the Trustee's right to object to the use of any information provided in response to these Interrogatories at any trial, evidentiary hearing, or other proceeding on grounds of privilege, relevance, materiality, authenticity, hearsay, or any other ground permitted by any applicable law or rule.

12.     It is the Trustee's position that the Trustee's initial Responses were sufficient. Nonetheless, as an accommodation to DZ Bank, the Trustee has agreed to amend its initial Responses, as set forth below.

13.     The Trustee reserves the right to amend, supplement, or alter these objections and responses at any time if it becomes necessary or appropriate to do so. The Trustee's investigation of facts and information relating to these Interrogatories is ongoing.

## OBJECTIONS TO DEFINITIONS

1.     The Trustee objects to Definition 4 as overly broad, unduly burdensome, and unworkable to the extent it purports to assert the Trustee's authority over entities or individuals over which or whom the Trustee lacks authority to obtain information.

2.     The Trustee objects to Definitions 5-6, 8, 10-12, and 16 to the extent they include entities the Trustee has not pleaded constitute predicate creditors of PCI, PC Funding, or SPF Funding.

3

## OBJECTIONS TO INSTRUCTIONS

1.     The Trustee objects to Instruction 4 to the extent it purports to impose obligations or burdens that differ from those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, or applicable rules or Orders of this Court.

2.     The Trustee objects to Instruction 5 on the grounds that it appears to apply to document requests, and is thus inapplicable.  The Trustee further objects to Instruction 5 on the grounds that the Interrogatory seeks improperly to impose upon the Trustee the responsibility and burden of revising ambiguous language in DZ Bank's interrogatories and the additional burden of responding to revised interrogatories that DZ Bank did not propound.

## SPECIFIC RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 1:

With respect to the allegations in paragraphs 178 through 182 of the Complaint, state and identify:

a.     the date on which Lancelot first became a Predicate Creditor;

b.     the documents and the individuals who have knowledge on which the Trustee may rely to prove or support the allegations set forth in paragraphs 178 through 182 of the Complaint; and

c.     any other facts supporting your contention that Lancelot is a Predicate Creditor that are not set forth in paragraphs 178 through 182 of the Complaint.

### RESPONSE TO INTERROGATORY NO. 1:

The Trustee objects to this Interrogatory as prematurely seeking the disclosure of witnesses and exhibits the Trustee might use at trial.  The Trustee further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it purports to demand that the Trustee identify every document or fact it might use within the factual record.  The Trustee further objects to this Interrogatory because it seeks to impose on the Trustee obligations to identify documents beyond the obligations imposed by the Court's September 27, 2017 Order (ECF No. 260) (the "MTC Order").

Subject to, and without waiving any general or specific Objections, the Trustee responds that Lancelot became a predicate creditor of PCI, SPF Funding, and PC Funding pursuant to 11 U.S.C. § 544(b) the date on which each of the foregoing entities committed against Lancelot the torts pleaded in the Complaint, which was the date on or about which Lancelot first transferred

4

funds to the relevant Petters-affiliated entity. The Trustee might rely upon the documents produced in connection with the MTC Order, Proofs of Claim filed by Lancelot in the above-captioned bankruptcy proceeding and in any related proceeding, the Bankruptcy Court's Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Chapter 11 Plan of Liquidation dated April 8, 2016 (the "Confirmation Order"), the Second Amended Chapter 11 Plan of Liquidation dated April 8, 2016 (the "Plan"), the PwC Interim Report dated December 15, 2010 (ECF No. 808, 08-45257) and any revised or amended versions thereof (the "Interim Report"), and expert testimony. Ron Peterson is a person with knowledge. The Trustee reserves the right to identify additional individuals, facts, or documents, including documents produced by the Trustee.

## AMENDED RESPONSE TO INTERROGATORY 1:

Subject to, and without waiving any general or specific Objections, including the Objections included in the Trustee's original Responses, the Trustee responds that, to the best of the Trustee's knowledge, the date on or about which Lancelot, or a predecessor entity, first transferred funds to a Petters-affiliated entity was November 28, 2001. Lancelot was a predicate creditor as of April 19, 2002, the date on which PC Funding transferred money to DZ Bank, because Lancelot was an existing creditor. The Trustee further responds that Deanna Coleman is an individual with knowledge. The Trustee further responds that the documents produced by the Trustee bearing Bates numbers Kelley_DZ_00000003-Kelley_DZ_00008024, Kelley_DZ_00009320-Kelley_DZ_00009818, Kelley_DZ_00009822-Kelley_DZ_00015843, Kelley_DZ_00015987-Kelley_DZ_00017312, and Kelley_DZ_00018184-Kelley_DZ_00018240 were separately produced in connection with Lancelot, pursuant to the Court's Order dated September 27, 2017 (ECF No. 260). The Trustee further responds by providing the information included on Exhibit A to these Amended Responses.

## INTERROGATORY NO. 2:

With respect to paragraphs 183 through 186 of the Complaint, state and identify:

a.      the date on which Palm Beach first became a Predicate Creditor;

b.      the documents and the individuals who have knowledge on which the Trustee may rely to prove or support the allegations set forth in paragraphs 183 through 186 of the Complaint; and

c.      any other facts supporting your contention that Palm Beach is a Predicate Creditor that are not set forth in paragraphs 183 through 186 of the Complaint.

## RESPONSE TO INTERROGATORY NO. 2:

The Trustee objects to this Interrogatory as prematurely seeking the disclosure of witnesses and exhibits the Trustee might use at trial. The Trustee further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it purports to demand that the Trustee identify every document or fact it might use within the factual record. The Trustee further objects to this Interrogatory because it seeks to impose on the Trustee obligations to identify documents beyond the obligations imposed by the MTC Order.

Subject to, and without waiving any general or specific Objections, the Trustee responds that Palm Beach became a predicate creditor of PCI, SPF Funding, and PC Funding pursuant to 11 U.S.C. § 544(b) the date on which each of the foregoing entities committed against Palm Beach the torts pleaded in the Complaint, which was the date on or about which Palm Beach first transferred funds to the relevant Petters-affiliated entity. The Trustee might rely upon the documents produced in connection with the MTC Order, Proofs of Claim filed by Palm Beach in the above-captioned bankruptcy proceeding and in any related proceeding, the Confirmation Order, the Plan, the Interim Report, and expert testimony. Barry Mukamal is a person with knowledge. The Trustee reserves the right to identify additional individuals, facts, or documents, including documents produced by the Trustee.

## AMENDED RESPONSE TO INTERROGATORY 2:

The Trustee does not intend to argue that Palm Beach is a predicate creditor, and thus the Trustee does not intend to provide further responses to this Interrogatory.

## INTERROGATORY NO. 3:

With respect to paragraphs 187 and 188 of the Complaint, state and identify:

a.      the date on which Acorn first became a Predicate Creditor;

b.      the documents and the individuals who have knowledge on which the Trustee may rely to prove or support the allegations set forth in paragraphs 187 and 188 of the Complaint; and

c.      any other facts supporting your contention that Acorn is a Predicate Creditor that are not set forth in paragraphs 187 and 188 of the Complaint.

## RESPONSE TO INTERROGATORY NO. 3:

The Trustee objects to this Interrogatory as prematurely seeking the disclosure of witnesses and exhibits the Trustee might use at trial. The Trustee further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it purports to demand that the Trustee identify every document or fact it might use within the factual record. The Trustee further objects to this Interrogatory because it seeks to impose on the Trustee obligations to identify documents beyond the obligations imposed by the MTC Order.

Subject to, and without waiving any general or specific Objections, the Trustee responds that Acorn became a predicate creditor of PCI, SPF Funding, and PC Funding pursuant to 11 U.S.C. § 544(b) the date on which each of the foregoing entities committed against Acorn the torts pleaded in the Complaint, which was the date on or about which Acorn first transferred funds to the relevant Petters-affiliated entity. The Trustee might rely upon the documents produced in connection with the MTC Order, Proofs of Claim filed by Acorn in the above-captioned bankruptcy proceeding and in any related proceeding, the Confirmation Order Approving Settlement Agreement allowing the claim of Asset Based Resource Group, LLC, as successor to Acorn Capital Group, LLC, *see* ECF 999, 08-45257, ¶ 2, the Interim Report, and expert testimony. The Trustee reserves the right to identify additional individuals, facts, or documents, including

6

documents produced by the Trustee.

## AMENDED RESPONSE TO INTERROGATORY 3:

Subject to, and without waiving any general or specific Objections, including the Objections included in the Trustee's original Responses, the Trustee responds that the date on or about which Acorn first transferred funds to, or for the benefit of, a Petters-affiliated entity, appears to have been on or about August 29, 2002.   Acorn became a predicate creditor no later than April 19, 2002, the date on which PC Funding transferred money to DZ Bank, because Acorn was a future creditor.   The Trustee further responds that Deanna Coleman is an individual with knowledge.  The Trustee further responds by providing the information included on Exhibit B to these Amended Responses.  The Trustee further responds that the Trustee intends to identify and produce separately the promissory notes referenced on Exhibit B.

## INTERROGATORY NO. 4:

With respect to paragraphs 189 through 193 of the Complaint, state and identify:

a.      the date on which Ark Discovery first became a Predicate Creditor;

b.      the documents and the individuals who have knowledge on which the Trustee may rely to prove or support the allegations set forth in paragraphs 189 through 193 of the Complaint; and

c.      any other facts supporting your contention that Ark Discovery is a Predicate Creditor that are not set forth in paragraphs 189 through 193 of the Complaint.

## RESPONSE TO INTERROGATORY NO. 4:

The Trustee objects to this Interrogatory as prematurely seeking the disclosure of witnesses and exhibits the Trustee might use at trial.  The Trustee further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it purports to demand that the Trustee identify every document or fact it might use within the factual record.  The Trustee further objects to this Interrogatory because it seeks to impose on the Trustee obligations to identify documents beyond the obligations imposed by the MTC Order.

Subject to, and without waiving any general or specific Objections, the Trustee responds that Ark Discovery became a predicate creditor of PCI, SPF Funding, and PC Funding pursuant to 11 U.S.C. § 544(b) the date on which each of the foregoing entities committed against Ark Discovery the torts pleaded in the Complaint, which was the date on or about which Ark Discovery first transferred funds to the relevant Petters-affiliated entity.  The Trustee might rely upon the documents produced in connection with the MTC Order, Proofs of Claim filed by Ark Discovery in the above-captioned bankruptcy proceeding and in any related proceeding, the Confirmation Order, the Plan, the Interim Report, and expert testimony.  The Trustee reserves the right to identify additional individuals, facts, or documents, including documents produced by the Trustee.

7

## AMENDED RESPONSE TO INTERROGATORY 4:

Subject to, and without waiving any general or specific Objections, including the Objections included in the Trustee's original Responses, the Trustee responds that, to the best of the Trustee's knowledge, the date on or about which Ark Discovery or a predecessor entity first transferred funds to a Petters-affiliated entity was October 1, 2007.  Ark Discovery became a predicate creditor no later than April 19, 2002, the date on which PC Funding transferred money to DZ Bank, because Ark Discovery was a future creditor.  The Trustee further responds that Deanna Coleman is an individual with knowledge.  The Trustee further responds that the documents produced by the Trustee bearing Bates numbers Kelley_DZ_00008025-Kelley_DZ_00009173,              Kelley_DZ_00015844-Kelley_DZ_00015986,              and Kelley_DZ_00017313-Kelley_DZ_00018183 were produced in connection with Ark Discovery, pursuant to the Court's Order dated September 27, 2017 (ECF No. 260).  The Trustee further responds by providing the information included on Exhibit C to these Amended Responses.

## INTERROGATORY NO. 5:

With respect to paragraphs 194 through 205 of the Complaint, state and identify:

a.      the date on which Interlachen first became a Predicate Creditor;

b.      the documents and the individuals who have knowledge on which the Trustee may rely to prove or support the allegations set forth in paragraphs 194 through 205 of the Complaint; and

c.      any other facts supporting your contention that Interlachen is a Predicate Creditor that are not set forth in paragraphs 194 through 205 of the Complaint.

## RESPONSE TO INTERROGATORY NO. 5:

The Trustee objects to this Interrogatory as prematurely seeking the disclosure of witnesses and exhibits the Trustee might use at trial.  The Trustee further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it purports to demand that the Trustee identify every document or fact it might use within the factual record.  The Trustee further objects to this Interrogatory because it seeks to impose on the Trustee obligations to identify documents beyond the obligations imposed by the MTC Order.

Subject to, and without waiving any general or specific Objections, the Trustee responds that Interlachen became a predicate creditor of PCI, SPF Funding, and PC Funding pursuant to 11 U.S.C. § 544(b) the date on which each of the foregoing entities committed against Interlachen the torts pleaded in the Complaint, which was the date on or about which Interlachen first transferred funds to the relevant Petters-affiliated entity.  The Trustee might rely upon the documents produced in connection with the MTC Order, Proofs of Claim filed by Interlachen in the above-captioned bankruptcy proceeding and in any related proceedings, the Confirmation Order, the Plan, the Interim Report, and expert testimony.  Lance Breiland is a person with knowledge.  The Trustee reserves the right to identify additional individuals, facts, or documents, including documents produced by the Trustee.

8

## AMENDED RESPONSE TO INTERROGATORY 5:

Subject to, and without waiving any general or specific Objections, including the Objections included in the Trustee's original Responses, the Trustee responds that, to the best of the Trustee's knowledge, the date on or about which Interlachen first transferred funds to a Petters-affiliated entity was April 18, 2008. Interlachen was a predicate creditor as of April 19, 2002, the date on which PC Funding transferred money to DZ Bank, because Interlachen was a future creditor. The Trustee further responds that Deanna Coleman is an individual with knowledge. The Trustee further responds that the documents produced by the Trustee bearing Bates numbers Kelley_DZ_00009174-Kelley_DZ_00009287, Kelley_DZ_00009290-Kelley_DZ_00009317, and Kelley_DZ_00009819-Kelley_DZ_00009821, were produced in connection with Interlachen, pursuant to the Court's Order dated September 27, 2017 (ECF No. 260). The Trustee further responds that on April 18, 2008, Interlachen transferred $50,000,000 to PCI, and that on April 22, 2008, Interlachen transferred $10,000,000 to PCI.

## INTERROGATORY NO. 6:

With respect to the allegations set forth in paragraphs 206 through 218 of the Complaint, state and identify:

a.      the date on which Deikel first became a Predicate Creditor;

b.      the documents and the individuals who have knowledge on which the Trustee may rely to prove or support the allegations set forth in paragraphs 206 through 208 of the Complaint; and

c.      any other facts supporting your contention that Deikel is a Predicate Creditor that are not set forth in paragraphs 206 through 208 of the Complaint.

## RESPONSE TO INTERROGATORY NO. 6:

The Trustee objects to this Interrogatory as prematurely seeking the disclosure of witnesses and exhibits the Trustee might use at trial. The Trustee further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it purports to demand that the Trustee identify every document or fact it might use within the factual record. The Trustee further objects to this Interrogatory because it seeks to impose on the Trustee obligations to identify documents beyond the obligations imposed by the MTC Order.

Subject to, and without waiving any general or specific Objections, the Trustee responds that Deikel became a predicate creditor of PCI, SPF Funding, and PC Funding pursuant to 11 U.S.C. § 544(b) the date on which each of the foregoing entities committed against Deikel the torts pleaded in the Complaint, which was the date on or about which Deikel first transferred funds to the relevant Petters-affiliated entity. The Trustee might rely upon the documents produced in connection with the MTC Order, Proofs of Claim filed by Deikel in the above-captioned bankruptcy proceeding and in any related proceedings, the Order Approving Settlement Agreement allowing Deikel's claim, *see* ECF No. 818, 08-45257, *see id.* ¶ 2, the Interim Report, and expert testimony. Theodore Deikel is a person with knowledge. The Trustee reserves the right to identify additional individuals, facts, or documents, including documents produced by the

9

Trustee.

## AMENDED RESPONSE TO INTERROGATORY 6:

Subject to, and without waiving any general or specific Objections, including the Objections included in the Trustee's original Responses, the Trustee responds that, to the best of the Trustee's knowledge, Deikel or an affiliated entity first transferred funds to a Petters-affiliated entity on or about November 6, 2000. Deikel became a predicate creditor no later than April 19, 2002, the date on which PC Funding transferred money to DZ Bank, because Deikel was a future creditor. The Trustee further responds that Deanna Coleman is an individual with knowledge. The Trustee further responds that the documents produced by the Trustee bearing Bates numbers Kelley_DZ_9288-Kelley_DZ_00009289 and Kelley_DZ_00009318-Kelley_DZ_00009319 were produced in connection with Deikel, pursuant to the Court's Order dated September 27, 2017 (ECF No. 260). The Trustee further responds by providing the information included on Exhibit D to these Amended Responses.

## INTERROGATORY NO. 7:

With respect to the allegations set forth in paragraphs 219 through 237 alleging that PC Funding's corporate veil can be pierced and that PCI, SPF Funding and PC Funding may be treated as a single entity, state and identify:

a. the individuals who have knowledge on which the Trustee may rely to prove or support the allegations set forth in those paragraphs.

## RESPONSE TO INTERROGATORY NO. 7:

The Trustee objects to this Interrogatory as prematurely seeking the disclosure of witnesses the Trustee might use at trial.

Subject to, and without waiving any general or specific Objections, the Trustee responds that the Trustee might rely upon the Court's prior opinions, prior testimony in connection with the Ponzi scheme, including depositions taken in the Substantive Consolidation proceeding, testimony at the Substantive Consolidation hearing, testimony at the plan confirmation hearing, testimony at Petters' criminal trial, depositions taken in this action, and expert testimony. The Trustee reserves the right to identify additional individuals.

## AMENDED RESPONSE TO INTERROGATORY 7:

Subject to, and without waiving any general or specific Objections, including the Objections included in the Trustee's original Responses, the Trustee responds that Deanna Coleman, Jon Sabes, Thomas Petters, and Thomas Hay are individuals with knowledge.

## INTERROGATORY NO. 8:

With respect to the allegations set forth in paragraphs 238 through 247 of the Complaint that each of the Predicate Creditors has a direct unsecured claim against PC Funding, state and identify:

10

a.        the facts establishing that each of the Predicate Creditors relied on the actions of PC Funding in connection with a fraud in which PC Funding participated and that the facts establishing that PCI transferred directly to PC Funding funds that PCI obtained directly from the Predicate Creditors;

b.        the individuals who have knowledge on which the Trustee may rely to prove or support the allegations in paragraphs in paragraphs 238 through 247 of the Complaint or the facts identified in the responses to subparagraphs (a) thought (d) of this Interrogatory;

c.        the documents that establish the allegations set forth in paragraphs 238 through 247 of the Complaint or the facts identified in the responses to subparagraph (a) of this Interrogatory; and

d.        any other facts supporting your contention that the Predicate Creditors have direct claims that are not set forth in paragraphs 238 through 247 of the Complaint.

## RESPONSE TO INTERROGATORY NO. 8:

The Trustee objects to this Interrogatory as prematurely seeking information the Trustee might use at trial.  The Trustee further objects to this Interrogatory as prematurely seeking expert discovery.  The Trustee further objects to this Interrogatory because neither reliance nor demonstration that funds paid by predicate creditors flowed through PC Funding are elements necessary to plead or establish liability for aiding and abetting PCI's torts.  The Trustee further objects to this Interrogatory as unduly burdensome, overly broad, contrary to the nature and purpose of Interrogatories, and wasteful of the parties' and the Court's time and resources to the extent that DZ Bank seeks information in order to challenge the existence of Petters' Ponzi scheme or of the participation in that scheme of PCI, SPF Funding, or PC Funding.  The Trustee further objects to this Interrogatory as overly broad, unduly burdensome, contrary to the nature and purpose of Interrogatories, and contrary to the MTC Order, because "the allegations in paragraphs 238 through 247" relate to the entire Ponzi scheme, and thus DZ Bank demands that the Trustee respond to this Interrogatory by listing all the documents and facts that support the Ponzi scheme (the existence of which, DZ Bank has already informed the Trustee, it does not intend to challenge).  The Trustee further objects to this Interrogatory as overly broad, unduly burdensome, contrary to the nature and purpose of Interrogatories, and contrary to the MTC Order, because it purports to demand that the Trustee identify every document or fact it might use within the factual record.  The Trustee further objects to this Interrogatory as overly broad, unduly burdensome, and contrary to the nature and purpose of Interrogatories because DZ Bank's demand for "any other facts supporting your contention that the Predicate Creditors have direct claims that are not set forth in paragraphs 238 through 247" encompasses dozens, if not hundreds, of paragraphs in the Complaint.

11

DATED: December 21, 2018

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Robert S. Loigman*

Robert S. Loigman
Benjamin Finestone
Jacob J. Waldman
51 Madison Avenue, 22nd Floor
New York, NY 10010
P: (212) 849-7000
F: (212) 849-7100
robertloigman@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
jacobwaldman@quinnemanuel.com

*Attorneys for Douglas E. Kelley in his capacity as the Trustee of the PCI Liquidating Trust*

# EXHIBIT 47

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re | **Jointly Administered under<br>Case No. 08-45257** |
| Petters Company, Inc., et al., | |
| Debtors. | Court File No. 08-45257 |
| | Court File Nos.: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (KHS) |
| PC Funding, LLC; | 08-45326 (KHS) |
| Thousand Lakes, LLC; | 08-45327 (KHS) |
| SPF Funding, LLC; | 08-45328 (KHS) |
| PL Ltd., Inc.; | 08-45329 (KHS) |
| Edge One LLC; | 08-45330 (KHS) |
| MGC Finance, Inc.; | 08-45331 (KHS) |
| PAC Funding, LLC; | 08-45371 (KHS) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (KHS) |
| | Chapter 11 Cases<br>Chief Judge Kathleen H. Sanberg |

Douglas A. Kelley, in his capacity as the
Trustee of the PCI Liquidating Trust,

                              Plaintiff,

        v.                                                    ADV. NO. 10-04301

Opportunity Finance, LLC; Opportunity
Finance Securitization, LLC; Opportunity
Finance Securitization II, LLC; Opportunity
Finance Securitization III, LLC; International
Investment Opportunities, LLC; Sabes Family
Foundation; Sabes Minnesota Limited
Partnership; Robert W. Sabes; Janet F. Sabes;
Steven Sabes; Deutsche
Zentralgenossenschaftbank AG; and The
Minneapolis Foundation,

                              Defendants.

{ARK/001/00055712.DOCX/}

## AFFIDAVIT OF FRANCES GECKER

FRANCES GECKER, being duly sworn, deposes and says:

1.      I am the Chapter 7 trustee of Ark Discovery II, LP.  I provide this affidavit in response to the subpoena dated November 21, 2018 (the "Subpoena") that DZ Bank AG ("DZ Bank") served on me.  I have personal knowledge of the facts set forth herein.

2.      As used in this affidavit, the term "Ark" refers to Ark Discovery II, LP and its predecessor and related entities, including A to Z Investors Fund L.P. and Edge One Capital, L.P.

3.      On May 22, 2009, an involuntary Chapter 7 bankruptcy petition was filed against Ark in the United States Bankruptcy Court for the Northern District of Illinois. On May 29, 2009, Ark filed an answer consenting to the entry of an order for relief, and on June 23, 2009, the Court entered a Chapter 7 order for relief. On June 24, 2009, I was appointed and now serve as Chapter 7 trustee of Ark's estate.

4.      On November 21, 2018, counsel for DZ Bank served the Subpoena on me.  A copy of the Subpoena is attached here as Exhibit 1.  I incorporate the definitions used in the Subpoena into this Affidavit.

5.      By the Subpoena, DZ Bank requested (i) testimony from me as trustee of Ark and related entities and (ii) the production of the documents in my possession or control that are responsive to the categories set forth in Exhibit A to the Subpoena.

6.      I was appointed Chapter 7 trustee of Ark's bankruptcy estate after Ark ceased to have any business dealings with PCI and its affiliates.  Consequently, I have no personal

knowledge regarding Ark's lending to or transactions with any of PCI, Edge One, LLC ("Edge One"), Ark Royal Capital, LLC ("Ark Royal") or any PCI affiliate.

7.      In response to the Subpoena, I made a good faith effort to determine whether any of the individuals in my employ or under my control has personal knowledge about Ark's lending to or transactions with any of PCI, Edge One, Ark Royal or any PCI affiliate. I have determined that no one in my employ or under my control has personal knowledge about this issue.

8.      I have no personal knowledge about the sources of funding for PCI, Edge One, Ark Royal or any PCI affiliate. Further, there is no one in my employ or under my control who has personal knowledge about this issue.

9.      I have no personal knowledge regarding Ark's operations, including with respect to the transactions and communications that Ark had with PCI Edge One, Ark Royal or any PCI affiliate. Further, there is no one in my employ or under my control who has personal knowledge about this issue.

10.      I have no personal knowledge regarding Opportunity Finance's or DZ Bank's lending activities or transactions with PCI, Edge One, Ark Royal or any PCI affiliate. Further, there is no one in my employ or under my control who has personal knowledge about this issue.

11.      I have no personal knowledge regarding Ark's due diligence, investigation, inspection, monitoring, auditing or review of its activities related to Ark's lending to PCI, Edge One, Ark Royal or any PCI affiliate. Further, there is no one in my employ or under my control who has personal knowledge about this issue.

12.      I have no personal knowledge regarding Ark's due diligence, investigation, inspection, monitoring, auditing or review policies, procedures and practices that Ark may have

employed during 2000 to 2008 in connection with lending to third parties. Further, there is no one in my employ or under my control who has personal knowledge about this issue.

13.    I have no personal knowledge regarding Ark's reasons for any decision to make loans to or engage in transactions with PCI, Edge One, Ark Royal or any PCI affiliate Further, there is no one in my employ or under my control who has personal knowledge about this issue.

14.    I have no personal knowledge regarding the facts underlying any claims that Ark has against PCI, Edge One, Ark Royal or and PCI affiliate, including PC Funding. Based on my investigation of claims that Ark had against Petters and his affiliates, I filed proofs of claims in the PCI and Edge One bankruptcy cases on the basis of documents that Ark's attorneys provided to me. Neither I nor anyone in my employ or under my control has personal knowledge about the documents supporting those claims.

15.    I have no personal knowledge regarding Petters' fraud and Ponzi scheme. Further, there is no one in my employ or under my control who has personal knowledge about this issue.

16.    Pursuant to a Notice of Abandonment filed on October 16, 2018 in the Bankruptcy Court for the Northern District of Illinois, I had all of the documents related to Ark's business operations destroyed; they were destroyed on or before November 15, 2018. I retained a digital set of documents in connection with an action that I brought on behalf of Ark's estate. I have directed that those documents be turned over to DZ Bank.

17.    On December 14, 2018, my attorney, Micah Krohn of FrankGecker, LLP

delivered to DZ Bank's counsel a DVD containing the documents that were produced to me in

connection with my administration of the Ark bankruptcy case. To the best of my knowledge and

belief, there are no other documents in my possession or control that may be responsive to the

Subpoena.

_____
FRANCES GECKER


Sworn to and subscribed before me
this _17TH_ day of January, 2019


_Carolyn A Sucic_
Notary Public

My Commission Expires: 4/19/21

> **OFFICIAL SEAL**
> **CAROLYN A SUCIC**
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES:04/19/21

# EXHIBIT 1

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

District of  Minnesota

In re Petters Company, Inc., et al.
_____
Debtor

*(Complete if issued in an adversary proceeding)*

Douglas A. Kelley, Trustee, PCI Liquidating Trust
_____
Plaintiff

v.

Opportunity Finance, LLC, et al.
_____
Defendant

Case No.  08-45257

Chapter  11

Adv. Proc. No.  10-04301

## SUBPOENA TO TESTIFY AT A DEPOSITION
## IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Frances Gecker as Trustee for Ark Discovery II, LP and related entities, FrankGecker, LLP, 325 N. LaSalle Street, Suite 625, Chicago, IL 60654
*(Name of person to whom the subpoena is directed)*

☑ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| PLACE Arnold & Porter<br>70 West Madison Street, suite 4200<br>Chicago, IL 60602 | DATE AND TIME<br>December 10, 2018 at 9:30 AM |
|---|---|

The deposition will be recorded by this method:

audio-video recording and stenographic

☑ *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See Exhibit A, attached. The applicable protective order for this case is attached as Exhibit B.

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  11/21/2018

CLERK OF COURT

OR

_____
*Signature of Clerk or Deputy Clerk*

/s/ Michael A. Rosow
_____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
DZ Bank                          , who issues or requests this subpoena, are:

Michael A. Rosow, Esq., Winthrop & Weinstine, Capella Tower Suite 3500, 225 South Sixth Street, Minneapolis, MN 55402, mrosow@winthrop.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (Page 2)

# PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the
witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (Page 3)

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# Exhibit A

## EXHIBIT A

## DEFINITIONS

For the purposes of this subpoena, the following Definitions shall apply:

1.      As used herein, use of the present tense shall also be read to include the past tense and vice versa.

2.      The term "document" or "documents" has the meaning ascribed to it in Rule 34 of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Bankruptcy Rules, as applicable, or meeting the definition of "writings and recordings" set forth in Rule 1001 of the Federal Rules of Evidence, and includes each and every form of communication and includes without limitation all written, printed, typed, recorded, or graphic matter of any kind, type, nature, or description, in whatever form (*e.g.*, final and draft versions) that is or has been in your actual or constructive possession, custody, or control, including, but not limited to, all printed and electronic copies of electronic mail, notes, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, teletypes, telexes, facsimiles, invoices, order forms, checks, drafts, statements, credit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, pamphlets, or any written or recorded materials of any other kind, however stored (whether in tangible or electronic form), recorded, produced, or reproduced, including backup tapes. The term "document" shall include not only originals, but also any copies or reproductions of all such written, printed, typed, recorded or graphic matter upon which any notations, comments, or markings of any kind have been made that do not appear on the original documents or that are

otherwise not identical to the original documents. Any document with marks such as initials, comments or notations of any kind is not deemed to be identical to one without such marks and is to be produced as a separate document.

3.    The term "including" means including without limitation.

4.    The term "you" and "your" shall mean and refer to the person or entity to whom this subpoena is addressed, or if a trustee to the entity for which you are a trustee, as well as any of your or the entity's predecessors, successors, assigns, agents, representatives, officers, directors, employees, attorneys, members, partners, parents, subsidiaries, affiliates, or other persons purported to act on your or the entity's behalf.

5.    The term "Associates" shall mean Deanna Coleman, Robert White, Larry Reynolds, Michael Catain and James Wehmhoff, collectively.

6.    The term "Complaint" shall mean the Trustee's Fourth Amended Complaint filed on March 6, 2017 (ECF No. 233 in the above-captioned action).

7.    The term "DZ Bank" shall mean defendant DZ Bank AG Deutsche Zentral Genossenschaftsbank, Frankfurt am Main.

8.    The term "merchandise" shall mean electronics goods and inventory for sale or resale, whether or not the merchandise existed or was purported to exist.

9.    The term "Opportunity Finance" shall mean Opportunity Finance, LLC, Opportunity Finance Securitization, LLC, Opportunity Finance Securitization II, LLC, and Opportunity Finance Securitization III, LLC, and any of their predecessors, successors (merged, acquired, or otherwise), parents, subsidiaries, affiliates, officers, directors, agents, employees, or any other persons acting or purporting to act on their behalf.

2

10.    The term "PCI" shall mean The Petters Company, Inc. and include Petters Company,

Inc.; Petters Group; Worldwide; PC Funding, LLC; Thousand Lakes, LLC; SPF Funding, LLC

f/k/a Petters Finance, LLC; PL Ltd., Inc. f/k/a Petters Limited, Inc.; Edge One LLC; MGC

Finance, Inc. f/k/a Petters I, Inc.; PAC Funding, LLC; Palm Beach Finance Holdings, Inc. f/k/a

Petters Capital, Inc.; Petters Warehouse, Petters Warehouse Direct, Petters Consumer Brands, or

Redtagbiz, or any of their predecessors, successors (merged, acquired, or otherwise), parents,

subsidiaries, affiliates, officers, directors, agents, employees, or any other persons acting or

purporting to act on their behalf.

11.    The term "PC Funding" shall mean PC Funding LLC.

12.    The term "Petters" shall mean Thomas Joseph Petters.

13.    Terms not defined herein shall have the meaning set forth in the Complaint.

## INSTRUCTIONS

1.    Each request for production shall be answered completely, separately, and fully.

2.    In responding to these requests for production, you shall produce all responsive

documents that are in your possession, custody, or control or in the possession, custody, or

control of your predecessors, successors, parents, subsidiaries, divisions, or affiliates, or any of

your respective directors, officers, managing agents, agents, employees, attorneys, accountants,

financial advisors, restructuring advisors or other representatives. A document shall be deemed

to be within your control if you have the right to secure the document or a copy of the document

from another person having possession or custody of the document.

3.    If you are unable to answer any request for production in full, after exercising due

diligence to secure the requested information, so state, and explain why the request for

production cannot be answered in full.

4.      These document requests are continuing in nature, and any information or documents obtained subsequent to the service of the answers and responses that would have been included in the answers and responses had they been known shall promptly be supplied by supplemental answers and responses whenever the Trustee finds, locates, acquires, creates or becomes aware of such information or document. Supplemental answers are to be served as soon as reasonably possible after receipt of such information.

5.      These document requests call for the production of all responsive documents, including drafts and other non-identical versions, whether maintained in paper form or on magnetic tape, videotape, microfilm, computer database, electronic mail, or any other means.

6.      The documents requested include all attachments and enclosures. If any portion of a document is responsive to a request, produce the entire document, including all attachments, enclosures, "post-it" – type notes, and any other matter physically attached to the document, whether by paper clip or any other manner. If documents responsive to this request are normally kept in a file or folder, also produce that file or folder with any labels attached thereto and indicate the company, division, department, and/or individual from whose files the document is being produced. If responsive documents are segregated or separated from other documents, whether by inclusion in binders, files, sub-files, or by use of dividers, tabs or any other method, produce such documents in that form.

7.      If any document is currently not available and is in the possession of another party, provide the name and address of the person or persons from whom the document may be obtained.

8.      If any document which forms a part of or the entire basis for any response to this request has been destroyed or lost, for each such document state when it was destroyed or lost, identify

4

the person who destroyed or lost the document, and the person who directed that it be destroyed. In addition, detail the reasons for the destruction, describe the nature of the document, identify the person(s) who created, sent and received the document, state the date of the document, and state in as much detail as possible the contents of the document.

9.     You should produce responsive documents as they have been kept in the usual course of business or shall organize and label them to correspond to the enumerated requests of this demand. If there are no documents responsive to any particular category, you shall so state in writing. Documents that, in their original condition, were stapled, clipped, or otherwise fastened together shall be produced in such form.

10.    If there are no documents responsive to any particular category, you shall so state in writing. Documents that, in their original condition, were stapled, clipped, or otherwise fastened together shall be produced in such form.

11.    If any requested documents are maintained in digital, electronic, and/or imaged form, production of a copy of the electronically stored information ("ESI") in digital, electronic, and/or imaged form is hereby requested, along with any information needed to access, search or sort electronic data or documents.

12.    If any requested documents are maintained in digital, electronic, and/or imaged form, production of a copy of the electronically stored information ("ESI") in digital, electronic, and/or imaged form is hereby requested, along with any information needed to access, search or sort electronic data or documents.

13.    If you have reason to believe there are responsive e-mails created during this period that have not been retained, state the name and address of the e-mail provider (*e.g.,* Microsoft,

Yahoo!, Thunderbird, GMail, Bloomberg or AOL) or program used by you during the period and what efforts you have made to retrieve the requested information.

14.     If any document or information responsive to these requests is withheld under a claim of privilege or otherwise, state the following:

      a)     the privilege or other grounds upon which you rely to protect the document from disclosure;

      b)     the date of the document;

      c)     the name, address, telephone number, title and occupation of each of the individuals who prepared, produced, or reproduced, or who were recipients of, said document;

      d)     a description of the document sufficient to identify it; and

      e)     each and every fact or basis upon which you claim any such privilege or other grounds for non-disclosure.

15.     If, in responding to these document requests, you claim any ambiguity in interpreting a request or definition or instruction applicable thereto, such claim shall not be utilized by you as a basis for refusing to respond, but you shall set forth as part of your response to such request, the language deemed to be ambiguous and the interpretation chosen to be used in responding to the request.

16.     Although some of the document requests may overlap with other requests, no document request should be read as limiting any other request.

## DOCUMENT REQUESTS

1.     Documents related to Opportunity Finance or DZ Bank and either of their lending activities related to PCI or any PCI entity.

2.     Documents related to due diligence, investigation, inspection, monitoring, auditing, or

review activities by you related to your lending or provision of funds to PCI or any PCI entity.

3.      Documents related to your due diligence, investigation, inspection, monitoring, auditing, or review policies, procedures, and practices from 2000 to 2008 for use in connection with lending or providing funding to other third parties.

4.      Documents setting forth the reasons for any decision to make loans to, make investments in, or to provide funds to PCI or any PCI entity.

5.      Documents related to your knowledge of or discovery of facts concerning (i) any claims that you have against PCI or PC Funding and (ii) Petters' fraud and Ponzi scheme.

7

Dated: November 21, 2017

WINTHROP & WEINSTINE

By: *s/Michael A. Rosow*
Michael A. Rosow, #317998

Capella Tower | Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
Phone: (612) 604-6734
Facsimile: (612) 604-6834
mrosow@winthrop.com

-and-

PEPPER HAMILTON LLP
H. Peter Haveles, Jr.
37th Floor
620 Eighth Avenue
New York, NY 10018-1405
Phone: (212) 808-2700
Facsimile: (212) 286-9806

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019
Phone: (212) 836-8000
Facsimile: (212) 836-8689

Attorneys for Defendant DZ Bank AG, Deutsche
Zentral Genossenschaftsbank, Frankfurt am Main

16337463v3

# EXHIBIT 48

# EXHIBIT H

**EXHIBIT H**
**Transfers from DZ Bank Collection Account to PC Funding [1]**

| Date | Payor | Payee | Memo | Loan / Reinvestment Withdrawal Amount | Borrowing Base Surplus Amount | Total Amount (per bank data) | Source Bates Number [2] |
|---|---|---|---|---|---|---|---|
| 1/15/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ACCOUNT 33398720 IN CONNECTION WITH 1/15/02 FUNDING BETWEEN PETTERS COMPANY INC AND NATIONWIDE INC TLR476 | $ 1,500,000.00 | $ - | $ 1,500,000.00 | DZB006698, DZB006689 |
| 1/22/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ACCOUNT 33398720 IN CONNECTION WITH 1/22/02 FUNDING BETWEEN PETTERS COMPANY INC AND NATIONWIDE INC TLR476 | 2,300,000.00 | - | 2,300,000.00 | DZB006757, DZB006729 |
| 1/25/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ACCOUNT 33398720 IN CONNECTION WITH 1/25/02 FUNDING TLR476 | 4,100,000.00 | - | 4,100,000.00 | DZB006807, DZB006776 |
| 2/4/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ACCOUNT 33398720 IN CONNECTION WITH 2/4/02 FUNDING TLR476 | 5,600,000.00 | - | 5,600,000.00 | DZB006877, DZB006843 |
| 2/11/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 5,100,000.00 | - | 5,100,000.00 | DZB006929, DZB006899 |
| 2/22/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 3,205,250.00 | - | 3,205,250.00 | DZB006979, DZB006951 |
| 2/28/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 8,500,000.00 | - | 8,500,000.00 | DZB007042, DZB007025 |
| 3/6/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 4,050,000.00 | - | 4,050,000.00 | DZB007085, DZB007071 |
| 3/8/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 5,400,000.00 | - | 5,400,000.00 | DZB007113, DZB007105 |
| 3/13/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 11,800,000.00 | - | 11,800,000.00 | DZB007174, DZB007144 |
| 3/18/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 1,600,000.00 | - | 1,600,000.00 | DZB007222, DZB007188 |
| 3/26/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 10,000,000.00 | - | 10,000,000.00 | DZB007277, DZB007259 |
| 4/1/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/01/02; FUNDING TLR476 | 3,400,000.00 | - | 3,400,000.00 | DZB007325, DZB007302 |
| 4/11/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/11/02; FUNDING TLR476 | 5,800,000.00 | - | 5,800,000.00 | DZB007358, DZB007344 |
| 4/26/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/26/02; FUNDING TLR476 | 7,400,000.00 | - | 7,400,000.00 | DZB007420, DZB007392 |
| 5/3/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/03/02; FUNDING TLR476 | 6,000,000.00 | - | 6,000,000.00 | DZB007501, DZB007474 |
| 5/9/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/09/02; FUNDING TLR476 | 9,700,000.00 | - | 9,700,000.00 | DZB007551, DZB007518 |
| 5/10/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/10/02; FUNDING TLR476 | 3,900,000.00 | - | 3,900,000.00 | DZB007551, DZB007518 |
| 5/10/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/10/02; FUNDING TLR476 | 2,500,000.00 | - | 2,500,000.00 | DZB007551, DZB007518 |
| 5/21/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/21/02; FUNDING TLR476 | 14,900,000.00 | - | 14,900,000.00 | DZB007612 |
| 5/30/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/30/02; FUNDING TLR476 | 16,500,000.00 | - | 16,500,000.00 | DZB007698, DZB007673 |
| 6/6/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 06/06/02; FUNDING TLR476 | 12,500,000.00 | - | 12,500,000.00 | DZB007746, DZB007731 |
| 6/17/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 06/17/02; FUNDING TLR476 | 12,800,000.00 | 2,800,000.00 | 15,600,000.00 | DZB007840, DZB007833, DZB007812 |
| 6/26/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 06/26/02; FUNDING TLR476 | 10,300,000.00 | - | 10,300,000.00 | DZB007902, DZB007870 |
| 7/2/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 07/02/02; FUNDING TRL476 | 5,100,000.00 | - | 5,100,000.00 | DZB007940, DZB007941 |
| 7/11/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 07/11/02; FUNDING TRL476 | 9,800,000.00 | - | 9,800,000.00 | DZB007998, DZB007990 |
| 7/17/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 07/17/02; FUNDING TRL476 | 11,400,000.00 | - | 11,400,000.00 | DZB008052, DZB008038 |
| 7/25/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 07/25/02 | 6,900,000.00 | - | 6,900,000.00 | DZB008111, DZB008085 |
| 8/1/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/01/02; FUNDING TLR476 | 7,950,000.00 | - | 7,950,000.00 | DZB008394, DZB008368 |
| 8/5/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/05/02; FUNDING TLR476 | 3,100,000.00 | - | 3,100,000.00 | DZB008427, DZB008411 |
| 8/7/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/07/02; FUNDING TLR476 | 5,400,000.00 | - | 5,400,000.00 | DZB008467, DZB008438 |
| 8/14/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/14/02; FUNDING TLR476 | 7,300,000.00 | - | 7,300,000.00 | DZB008502, DZB008478 |
| 8/21/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/21/02; FUNDING TLR476 | 5,500,000.00 | - | 5,500,000.00 | DZB008555, DZB008536 |
| 8/22/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER FROM ANOTHER TRUST IN CONNECTION WITH THE 08/22/02; FUNDING TLR476 | 3,900,000.00 | - | 3,900,000.00 | DZB008588, DZB008570 |

**EXHIBIT H**
**Transfers from DZ Bank Collection Account to PC Funding [1]**

| Date | Payor | Payee | Memo | Loan / Reinvestment Withdrawal Amount | Borrowing Base Surplus Amount | Total Amount (per bank data) | Source Bates Number [2] |
|---|---|---|---|---|---|---|---|
| 8/28/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/28/02; FUNDING TLR476 | 11,200,000.00 | - | 11,200,000.00 | DZB008655, DZB008615 |
| 9/5/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 09/05/02; FUNDING TLR476 | 8,000,000.00 | - | 8,000,000.00 | DZB010111, DZB010095 |
| 9/9/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 09/09/02; FUNDING TLR476 | 6,200,000.00 | - | 6,200,000.00 | DZB010086, DZB010069 |
| 9/18/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 09/18/02; FUNDING TLR476 | 8,700,000.00 | - | 8,700,000.00 | DZB010046, DZB010018 |
| 9/25/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 09/25/02; FUNDING TLR476 | 15,600,000.00 | - | 15,600,000.00 | DZB009966, DZB009958 |
| 10/2/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 10/02/02; FUNDING TLR476 | 12,600,000.00 | - | 12,600,000.00 | DZB009935, DZB009910 |
| 10/10/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 10/10/02; FUNDING TLR476 | 13,300,000.00 | - | 13,300,000.00 | DZB009868, DZB009845 |
| 10/16/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 10/16/02; FUNDING TLR476 | 11,750,000.00 | - | 11,750,000.00 | DZB009841, DZB009816 |
| 10/23/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 10/23/02; FUNDING TLR476 | 11,750,000.00 | - | 11,750,000.00 | DZB009772, DZB009761 |
| 11/13/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 11/12/02; FUNDING TLR476 | 15,300,000.00 | - | 15,300,000.00 | DZB010576, DZB010564 |
| 11/21/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 11/21/02; FUNDING TLR476 | 6,650,000.00 | - | 6,650,000.00 | DZB010524, DZB010509 |
| 12/4/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/04/02; FUNDING TLR476 | 5,900,000.00 | - | 5,900,000.00 | DZB010434, DZB010420 |
| 12/11/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/11/02; FUNDING TLR476 | 13,000,000.00 | - | 13,000,000.00 | DZB010383, DZB010375 |
| 12/17/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/17/02; FUNDING TLR476 | 8,250,000.00 | - | 8,250,000.00 | DZB010322, DZB010314 |
| 12/19/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/19/02; FUNDING TLR476 | 7,800,000.00 | - | 7,800,000.00 | DZB010289, DZB010273 |
| 12/23/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/23/02; FUNDING TLR476 | 6,750,000.00 | - | 6,750,000.00 | DZB010239, DZB010221 |
| 12/24/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/24/02; FUNDING TLR476 | 10,300,000.00 | - | 10,300,000.00 | DZB010204, DZB010197 |
| 12/30/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/30/02; FUNDING TLR476 | 10,750,000.00 | - | 10,750,000.00 | DZB010158, DZB010142 |
| 1/8/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 01/08/03; FUNDING TLR476 | 10,700,000.00 | - | 10,700,000.00 | DZB009080, DZB009056 |
| 1/23/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 01/23/03; FUNDING TLR476 | 13,370,625.00 | - | 13,370,625.00 | DZB008974, DZB008957 |
| 2/7/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | PAID TO OUTGOING FED WIRE; MISCELLANEOUS DISBURSEMENT; PART OF FUNDING FOR 2/5/03 DAG476 | 16,850,000.00 | - | 16,850,000.00 | DZB008889, DZB008877 |
| 2/11/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 02/11/03; FUNDING DAG476 | 14,500,000.00 | - | 14,500,000.00 | DZB008847, DZB008835 |
| 2/19/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 02/19/03; FUNDING DAG476 | 13,700,000.00 | - | 13,700,000.00 | DZB008790, DZB008773 |
| 2/24/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 02/24/03; FUNDING DAG476 | 5,600,000.00 | - | 5,600,000.00 | DZB008732, DZB008715 |
| 2/27/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 02/26/03; FUNDING DAG476 | 11,850,000.00 | - | 11,850,000.00 | DZB008700, DZB008704 |
| 3/11/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 03/11/03; FUNDING DAG476 | 14,000,000.00 | - | 14,000,000.00 | DZB012558, DZB012540 |
| 3/20/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 03/20/03; FUNDING DAG476 | 7,200,000.00 | - | 7,200,000.00 | DZB012493, DZB012474 |
| 3/25/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 03/25/03; FUNDING DAG476 | 5,800,000.00 | - | 5,800,000.00 | DZB012458, DZB012434 |
| 4/1/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/01/03; FUNDING DAG476 | 8,600,000.00 | - | 8,600,000.00 | DZB012372, DZB012355 |
| 4/8/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/08/03; FUNDING DAG476 | 11,900,000.00 | - | 11,900,000.00 | DZB012322, DZB012312 |
| 4/9/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/09/03; FUNDING DAG476 | 8,050,000.00 | - | 8,050,000.00 | DZB012301, DZB012269 |
| 4/17/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/17/03; FUNDING DAG476 | 9,500,000.00 | - | 9,500,000.00 | DZB012205, DZB012192 |
| 5/1/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/01/03; FUNDING DAG476 | 7,800,000.00 | - | 7,800,000.00 | DZB012895, DZB012867 |
| | | | **Total** | **$ 578,425,875.00** | **$ 2,800,000.00** | **$ 581,225,875.00** | |

[1] Transaction details (i.e., date, payor, payee, memo, and amount) are sourced from available bank statements for DZ Bank Collection Account Number 33398730 at US Bank and PC Funding Collection Account Number 33398720 at US Bank.

[2] Includes the Bates Number of the corresponding Borrowing Base Report, Notice of Borrowing, and/or fax including wire transfer instructions found in the DZ Bank document production.

# EXHIBIT 49

# EXHIBIT I

**EXHIBIT I**
**Transfers from DZ Bank / Autobahn to PC Funding** [1]

| Date | Payor | Payee | Memo | Loan / Reinvestment Withdrawal Amount | Borrowing Base Surplus Amount | Total Amount (per bank data) | Source Bates Number [2] |
|---|---|---|---|---|---|---|---|
| 1/15/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | ISSUANCE PROCEEDS RECEIVED FROM THE DEALER | $ 3,900,000.00 | $ - | $ 3,900,000.00 | DZB006704, DZB006689 |
| 1/22/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | ISSUANCE PROCEEDS RECEIVED FROM THE DEALER | 2,900,000.00 | - | 2,900,000.00 | DZB006743, DZB006729 |
| 1/25/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | ISSUANCE PROCEEDS RECEIVED FROM THE DEALER | 2,500,000.00 | - | 2,500,000.00 | DZB006784, DZB006776 |
| 2/4/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | ISSUANCE PROCEEDS RECEIVED FROM THE DEALER | 1,400,000.00 | - | 1,400,000.00 | DZB006862, DZB006843 |
| 2/11/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | ISSUANCE PROCEEDS RECEIVED FROM THE DEALER | 1,000,000.00 | - | 1,000,000.00 | DZB006916, DZB006899 |
| 2/22/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | ISSUANCE PROCEEDS RECEIVED FROM THE DEALER | 10,794,750.00 | - | 10,794,750.00 | DZB006977, DZB006951 |
| 3/8/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | ISSUANCE PROCEEDS RECEIVED FROM THE DEALER | 3,200,000.00 | - | 3,200,000.00 | DZB007132, DZB007105 |
| 3/18/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | ISSUANCE PROCEEDS RECEIVED FROM THE DEALER | 1,900,000.00 | - | 1,900,000.00 | DZB007231, DZB007188 |
| 4/1/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | INCOMING WIRES FROM USB NY IN CONNECTION WITH THE 04/01/02 FUNDING TLR476 | 9,900,000.00 | - | 9,900,000.00 | DZB007323, DZB007302 |
| 4/11/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | MISCELLANEOUS RECEIPT ISSUANCE PROCEEDS RECEIVED FROM THE DEALER | 4,200,000.00 | - | 4,200,000.00 | DZB007367, DZB007344 |
| 4/26/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | MISCELLANEOUS RECEIPT PROCEEDS RECEIVED FROM THE DEALER | 2,100,000.00 | - | 2,100,000.00 | DZB007405, DZB007392 |
| 7/11/2002 | DZ BANK / AUTOBAHN [3] | PC FUNDING, LLC - COLLECTION ACCOUNT | MISCELLANEOUS RECEIPT ISSUANCE PROCEEDS RECEIVED FROM THE DEALER | 1,000,000.00 | - | 1,000,000.00 | DZB008001, DZB007990 |
| | | | Total | $ 44,794,750.00 | $ - | $ 44,794,750.00 | |

[1] Transaction details (i.e., date, payee, memo, and amount) are sourced from available bank statements for PC Funding Collection Account Number 33398720 at US Bank.

[2] Includes the Bates Number of the corresponding Borrowing Base Report, Notice of Borrowing, and/or fax including wire transfer instructions found in the DZ Bank document production.

[3] Transfer is assumed to be made from a DZ Bank / Autobahn account based on the terms of the RLSA and the associated Notices of Borrowing found in the DZ Bank document production.

# EXHIBIT 50

# EXHIBIT E

EXHIBIT Q
Transfers from DZ Bank Collection Account to DZ Bank / Autobahn [1]
Commercial Paper Principal and Yield

| Date | Payor | Payee | Memo | Amount | Source Bates Number [2] |
|---|---|---|---|---|---|
| 3/1/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | REF: FUNDS WIRED TO US BANK NEW YORK FOR COMMERCIAL PAPER TLR476 | $ 164,989.50 | DZB013801 |
| 3/4/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | REF: FUNDS WIRED TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 8,034.50 | DZB013795 |
| 3/15/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | REF: FUNDS WIRED TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 11,412.17 | DZB013787 |
| 3/22/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | REF: FUNDS WIRED TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 8,724.58 | DZB013783 |
| 3/26/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | REF: FUNDS WIRED TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 7,942.00 | DZB013777 |
| 4/5/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 4,496.00 | DZB013773 |
| 4/11/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 3,126.34 | DZB013769 |
| 4/23/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 39,292.00 | DZB013763 |
| 5/3/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 205,685.11 | DZB013759 |
| 5/31/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 79,256.96 | DZB013753 |
| 6/27/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 193,570.54 | DZB013749 |
| 7/15/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 207.99 | DZB013745 |
| 7/25/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 90,540.55 | DZB013742 |
| 7/26/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 1,566.57 | DZB013739 |
| 8/22/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 214,542.35 | DZB013733 |
| 9/24/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 96,209.15 | N/A [4] |
| 10/25/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 214,367.10 | DZB013727 |
| 11/21/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 94,327.61 | DZB013722 |
| 12/19/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 234,874.49 | DZB013716 |
| 1/17/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 67,618.86 | DZB013711 |
| 2/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 129,678.45 | DZB013705 |
| 3/18/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 118,499.34 | DZB013700 |
| 4/11/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 115,116.47 | DZB013695 |
| 5/16/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 35,810,528.77 | DZB013684 |
| 6/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 23,813,188.50 | DZB013672 |
| 6/24/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 8,006,676.93 | DZB013665 |
| 7/8/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 8,013,158.60 | DZB013659 |
| 7/15/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 7,431,579.20 | DZB013654 |
| 7/22/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 5,004,476.69 | DZB013647 |
| 7/29/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 5,003,356.85 | DZB013640 |

**EXHIBIT Q**
**Transfers from DZ Bank Collection Account to DZ Bank / Autobahn [1]**
**Commercial Paper Principal and Yield**

| Date | Payor | Payee | Memo | Amount | Source Bates Number [2] |
|------|-------|-------|------|--------|------------------------|
| 8/5/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 6,504,363.77 | DZB013635 |
| | | | Total $ | 101,691,407.94 | |

[1] Transaction details (i.e., date, payor, memo, and amount) are sourced from available bank statements for DZ Bank Collection Account Number 33398730 at US Bank.

[2] Includes the Bates Number of the corresponding Commercial Paper Remittance Report found in the DZ Bank document production.

[3] Transfer is assumed to be made to a DZ Bank / Autobahn account based on wire transfer request details included on the Commercial Paper Remittance Reports found in the DZ Bank document production.

[4] A corresponding Commercial Paper Remittance Report supporting this payment could not be located in the DZ Bank document production.

# EXHIBIT 51

# EXHIBIT F

**EXHIBIT R**
**Transfers from DZ Bank Collection Account to DZ Bank / Autobahn [1]**
**Margin and Non-Use Fees**

| Date | Payor | Payee | Memo | Amount | Source Bates Number [2] |
|------|-------|-------|------|--------|------------------------|
| 2/11/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | FOR THE 02/10/02 PAYMENT DATE APPLICABLE MARGIN & NON-USE FEE TLR476 | 129,372.22 | DZB013612 |
| 3/11/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | FOR THE 03/10/02 PAYMENT DATE APPLICABLE MARGIN & NON-USE FEE TLR476 | 129,569.86 | DZB013808 |
| 4/10/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 168,506.94 | DZB052918 |
| 5/10/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 187,952.08 | DZB046208 |
| 6/10/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 199,506.53 | DZB046317 |
| 7/10/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 193,070.83 | DZB046286 |
| 8/12/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 200,644.03 | DZB046269 |
| 9/10/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 201,185.69 | DZB046223 |
| 10/10/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 194,695.83 | DZB046346 |
| 11/13/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 201,185.69 | DZB046343 |
| 12/10/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 194,695.83 | DZB046336 |
| 1/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 201,185.69 | DZB046242 |
| 2/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 201,185.69 | DZB046262 |
| 3/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 181,716.11 | DZB046252 |
| 4/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 201,185.69 | DZB046310 |
| 5/12/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 194,695.83 | DZB046215 |
| 6/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 170,245.70 | DZB046324 [4] |
| 7/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 106,691.25 | DZB046293 [5] |
| 8/11/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 67,274.86 | DZB046274 |
| 9/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; REPRESENTS APPLICABLE MARGIN & NON-USE FEE TLR476 | 35,852.78 | DZB046230 |
| | | | Total $ | 3,360,419.13 | |

[1] Transaction details (i.e., date, payor, memo, and amount) are sourced from available bank statements for DZ Bank Collection Account Number 33398730 at US Bank.

[2] Includes the Bates Number of the corresponding DZ Bank Monthly Fee Statement found in the DZ Bank document production.

[3] Transfer is assumed to be made to a DZ Bank / Autobahn account based on DZ Bank Monthly Fee Statements found in the DZ Bank document production.

[4] Amount on DZ Bank Monthly Fee Statement differs from bank transactional data by $0.01.

[5] Amount on DZ Bank Monthly Fee Statement differs from bank transactional data by $433.33.

# EXHIBIT 52

# EXHIBIT H

**EXHIBIT T**

**Other Transfers from DZ Bank Collection Account [1]**

| Date | Payor | Payee | Memo | Out Amount |
|------|-------|-------|------|-----------|
| 2/11/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRED FUNDS TO OPPORTUNITY FINANCE FOR THE 02/10/02 PAYMENT DATE MONTHLY SERVICER FEE TLR476 | $ 22,488.89 |
| 3/11/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRED FUNDS TO OPPORTUNITY FINANCE FOR THE 03/10/02 PAYMENT DATE MONTHLY SERVICER FEE TLR476 | 22,504.22 |
| 4/10/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 32,777.33 |
| 5/10/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 35,368.75 |
| 6/10/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 39,621.88 |
| 7/10/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 38,343.75 |
| 8/12/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 42,661.58 |
| 9/10/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 40,898.47 |
| 10/10/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 38,508.75 |
| 11/13/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 40,887.71 |
| 12/10/2002 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 42,299.58 |
| 1/10/2003 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 42,410.15 |
| 2/10/2003 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 43,395.69 |
| 3/10/2003 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 37,472.17 |
| 4/10/2003 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 42,949.21 |
| 4/10/2003 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476; TOTAL PAYMENT OF 44,194.38 | 1,245.17 |
| 5/12/2003 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 34,247.08 |
| 6/10/2003 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 39,321.78 |
| 7/10/2003 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 30,354.17 |
| 8/11/2003 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 1,620.17 |
| 9/10/2003 | DZ BANK - COLLECTION ACCOUNT | OPPORTUNITY FINANCE LLC | WIRE TRANSFER; REPRESENTS SERVICING FEES TLR476 | 1,704.35 |
| | | | *Subtotal - OPPORTUNITY FINANCE LLC* | $ 671,080.85 |
| 2/11/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | FOR THE 02/10/02 PAYMENT DATE MONTHLY PREMIMUM DUE TLR476 | 19,244.44 |
| 3/11/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | FOR THE 03/10/02 PAYMENT DATE MONTHLY PREMIMUM DUE TLR476 | 20,196.67 |
| 4/10/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 27,500.00 |
| 5/10/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 31,716.67 |
| 6/10/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 33,858.89 |
| 7/10/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 32,766.67 |

**EXHIBIT T**

**Other Transfers from DZ Bank Collection Account** [1]

| Date | Payor | Payee | Memo | Out Amount |
|------|-------|-------|------|-----------|
| 8/12/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 34,092.22 |
| 9/10/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 34,203.33 |
| 10/10/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 33,100.00 |
| 11/13/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 34,203.33 |
| 12/10/2002 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 33,100.00 |
| 1/10/2003 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 34,203.33 |
| 2/10/2003 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 34,203.33 |
| 3/10/2003 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 30,893.33 |
| 4/10/2003 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 34,203.33 |
| 5/12/2003 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 33,100.00 |
| 6/10/2003 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 27,856.67 |
| 6/19/2003 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 9,435.32 |
| 7/10/2003 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 22,571.67 |
| 8/11/2003 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 10,101.67 |
| 9/10/2003 | DZ BANK - COLLECTION ACCOUNT | ROYAL AND SUN ALLIANCE | WIRE TRANSFER; REPRESENTS MONTHLY PREMIUM TLR476 | 433.33 |
| | | | *Subtotal - ROYAL AND SUN ALLIANCE* $ | *570,984.20* |
| 2/20/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | US BANK FEE PAYMENT FOR INITIAL INVOICE #169320 | 19,000.00 |
| 2/26/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | US BANK FEE PAYMENT FOR 01/2002 | 1,999.99 |
| 3/27/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | US BANK FEE PAYMENT 02/2002 INVOICE #CTS00178249 | 3,999.97 |
| 5/8/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES; FEE PAYMENT FOR 03/2002 FOR INV #CTS00210581 | 3,311.07 |
| 5/29/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES COLLECTED; FEE PAYMENTS FOR APRIL 2002 | 3,414.73 |
| 7/31/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES; FEE PMT FOR 05/2002 INVOICE #CTS00305110 | 3,533.73 |
| 8/20/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES; FEE PHT FOR 6/2002 INVOICE #CTS00305531 | 3,531.16 |
| 8/28/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES COLLECTED; FEE PAYMENTS FOR JULY 2002 | 3,653.88 |
| 9/26/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES COLLECTED; FEE PAYMENTS FOR AUGUST 2002 | 3,583.15 |
| 10/29/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES COLLECTED; FEE PAYMENTS FOR SEPTEMBER 2002 | 3,540.33 |
| 11/29/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES COLLECTED; FEE PAYMENTS FOR OCTOBER 2002 | 3,582.73 |
| 12/30/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES; FEE PYMT FOR PER END 11/2002, #CTS00459158 | 3,691.96 |

**EXHIBIT T**

**Other Transfers from DZ Bank Collection Account** [1]

| Date | Payor | Payee | Memo | Out Amount |
|------|-------|-------|------|-----------|
| 1/29/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES COLLECTED; FEE PAYMENTS FOR DECEMBER 2002 | 3,641.67 |
| 6/4/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | FEE PHT FOR 02/2003 INVOICE #CTS00551091 | 3,605.51 |
| 6/26/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES COLLECTED; FEE PAYMENTS FOR MAY 2003 | 3,522.11 |
| 7/29/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES COLLECTED; FEE PAYMENTS FOR JUNE 2003 | 2,854.50 |
| 8/27/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES COLLECTED; FEE PAYMENTS FOR JULY 2003 | 2,803.53 |
| 9/26/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK N.A. | TRUST FEES COLLECTED; FEE PAYMENTS FOR AUGUST 2003 | 2,758.22 |
| | | | *Subtotal - US BANK N.A.* | *$   76,028.24* |
| 2/12/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | PAID TO FEE GL FOR DCS FEES DUE 2/10/02; ACCOUNT NUMBER 582752 | 1,076.50 |
| 3/11/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | PAID TO FEE GL FOR DCS FEES DUE 03/10/02; ACCOUNT NUMBER 582752 | 615.50 |
| 4/10/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 530.70 |
| 5/10/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 261.80 |
| 6/10/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 637.60 |
| 7/10/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 436.70 |
| 8/12/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 533.90 |
| 9/10/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 551.50 |
| 10/10/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 539.20 |
| 11/13/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 581.60 |
| 12/10/2002 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 368.90 |
| 1/10/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 628.20 |
| 2/10/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 384.50 |
| 3/10/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 598.40 |
| 4/10/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 279.40 |
| 6/10/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 317.50 [2] |
| 7/10/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 153.80 |
| 8/11/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 189.80 |
| 8/12/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; DAG476 | 317.20 |
| 9/10/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; FOR CUSTODIAN'S SUPPLEMENTAL FEE; ACCOUNT NUMBER 582752 | 623.80 |

**EXHIBIT T**
**Other Transfers from DZ Bank Collection Account** [1]

| Date | Payor | Payee | Memo | Out Amount |
|------|-------|-------|------|-----------:|
| 9/23/2003 | DZ BANK - COLLECTION ACCOUNT | US BANK DDA | ACH TRANSFER TO CHECKING ACCT; DAG476 | 321.10 |
| | | | *Subtotal - US BANK DDA* | $ 9,947.60 |
| | | | **Total** | $ 1,328,040.89 |

[1] Includes outgoing transfer activity occurring in DZ Bank Collection Account Number 33398730 at US Bank during the period 1/1/2002 to 10/7/2003 (i.e., the last Borrowing Base Surplus transfer date).  For purposes of this report, reversals (i.e., transfers of like amounts in and out of the account having zero net effect on the account balance) are excluded. Transaction details (i.e., date, payor, payee, memo, and amount) are sourced from available bank statements for DZ Bank Collection Account Number 33398730 at US Bank.

[2] Actual transfer amount per available bank data is $638.60.  On 6/13/2003, an incoming transfer in the amount of $321.10 was applied as a correction to the fee amount.  Since reversals have been excluded from this analysis (as described in footnote 1 above), the transfer amount was adjusted to account for the fee correction ($638.60 - $321.10 = $317.50).

# EXHIBIT 53

**EXPERT REPORT OF W. BAREFOOT BANKHEAD**

# Exhibit A

Summary of Autobahn Loans and Underlying

Commercial Paper Issued and Rolled

**Exhibit A: Summary of Autobahn Loans and Underlying Commercial Paper Issued and Rolled**

*Based on Notices of Borrowing, Commercial Paper Instructions, Commercial Paper Remittance Reports, and Borrowing Base Certificates. See Appendix C for a list of these documents.*

| Month | Autobahn Loan Reference Number | Issuance Date | New Commercial Paper / Reissued Commercial Paper | Total Amount Requested by Opportunity Finance Securitization ($) | New Amount Loaned by Autobahn ($) | Maturation Amount ($) | Maturation Date | Period (Days) | Current Commercial Paper Maturing on Issuance Date ($) | Commercial Paper Outstanding ($) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| December 2001 | 1 | 12/31/2001 | New Commercial Paper | 50,600,000 | 50,600,000 | 50,766,000 | 3/1/2002 | 60 | - | 50,766,000 | (1) |
| January 2002 | 2 | 1/15/2002 | New Commercial Paper | 3,900,000 | 3,900,000 | 3,912,000 | 3/15/2002 | 59 | - | 54,678,000 | (2) |
| | 3 | 1/22/2002 | New Commercial Paper | 2,900,000 | 2,900,000 | 2,909,000 | 3/22/2002 | 59 | - | 57,587,000 | |
| | 4 | 1/25/2002 | New Commercial Paper | 2,500,000 | 2,500,000 | 2,508,000 | 3/26/2002 | 60 | - | 60,095,000 | |
| February 2002 | 5 | 2/4/2002 | New Commercial Paper | 1,400,000 | 1,400,000 | 1,405,000 | 4/5/2002 | 60 | - | 61,500,000 | |
| | 6 | 2/11/2002 | New Commercial Paper | 1,000,000 | 1,000,000 | 1,004,000 | 4/11/2002 | 59 | - | 62,504,000 | |
| | 7 | 2/22/2002 | New Commercial Paper | 12,500,000 | 12,500,000 | 12,540,000 | 4/23/2002 | 60 | - | 75,044,000 | |
| March 2002 | - | 3/1/2002 | Reissued Commercial Paper | 50,601,011 | - | 50,611,000 | 3/4/2002 | 3 | (50,766,000) | 74,889,000 | (3) |
| | | 3/4/2002 | Reissued Commercial Paper | 50,602,966 | - | 50,766,000 | 5/3/2002 | 60 | (50,611,000) | 75,044,000 | (4) |
| | 8 | 3/8/2002 | New Commercial Paper | 5,400,000 | 5,400,000 | 5,417,000 | 5/3/2002 | 56 | - | 80,461,000 | (4) |
| | | 3/15/2002 | Reissued Commercial Paper | 3,900,588 | - | 3,912,000 | 5/3/2002 | 49 | (3,912,000) | 80,461,000 | (4) |
| | 9 | 3/18/2002 | New Commercial Paper | 1,900,000 | 1,900,000 | 1,905,000 | 5/3/2002 | 46 | - | 82,366,000 | (4) |
| | | 3/22/2002 | Reissued Commercial Paper | 2,900,000 | - | 2,907,000 | 5/3/2002 | 42 | (2,909,000) | 82,364,000 | (4) |
| | | 3/26/2002 | Reissued Commercial Paper | 2,500,000 | - | 2,506,000 | 5/3/2002 | 38 | (2,508,000) | 82,362,000 | (4) |
| April 2002 | 1- | 4/1/2002 | New Commercial Paper | 9,900,000 | 9,900,000 | 9,933,000 | 5/31/2002 | 60 | - | 92,295,000 | |
| | - | 4/5/2002 | Reissued Commercial Paper | 1,400,000 | - | 1,405,000 | 5/31/2002 | 56 | (1,405,000) | 92,295,000 | |
| | 11 | 4/11/2002 | New Commercial Paper and | 5,200,000 | 4,200,000 | 5,214,000 | 5/31/2002 | 50 | (1,004,000) | 96,505,000 | (5) |
| | | 4/23/2002 | Reissued Commercial Paper | 12,500,000 | - | 12,525,000 | 5/31/2002 | 38 | (12,540,000) | 96,490,000 | |
| | 12 | 4/26/2002 | New Commercial Paper | 2,100,000 | 2,100,000 | 2,104,000 | 5/31/2002 | 35 | - | 98,594,000 | (6) |
| May 2002 | - | 5/3/2002 | Reissued Commercial Paper | 67,200,000 | - | 67,394,000 | 6/27/2002 | 55 | (67,413,000) | 98,575,000 | |
| | - | 5/31/2002 | Reissued Commercial Paper | 31,100,000 | - | 31,191,000 | 7/25/2002 | 55 | (31,181,000) | 98,585,000 | (4) |
| June 2002 | - | 6/27/2002 | Reissued Commercial Paper | 67,200,000 | - | 67,414,000 | 8/26/2002 | 60 | (67,394,000) | 98,605,000 | |
| July 2002 | 13 | 7/11/2002 | New Commercial Paper | 1,000,000 | 1,000,000 | 1,001,000 | 7/15/2002 | 4 | - | 99,606,000 | (7) |
| | - | 7/15/2002 | Reissued Commercial Paper | 1,000,000 | - | 1,003,000 | 8/26/2002 | 42 | (1,001,000) | 99,608,000 | (8) |
| | - | 7/25/2002 | Reissued Commercial Paper | 31,100,000 | - | 31,103,000 | 7/26/2002 | 1 | (31,191,000) | 99,520,000 | (7) |
| | - | 7/26/2002 | Reissued Commercial Paper | 31,100,000 | - | 31,197,000 | 9/24/2002 | 60 | (31,103,000) | 99,614,000 | (9) |
| August 2002 | - | 8/26/2002 | Reissued Commercial Paper | 68,200,000 | - | 68,415,000 | 10/25/2002 | 60 | (68,417,000) | 99,612,000 | |
| September 2002 | - | 9/24/2002 | Reissued Commercial Paper | 31,100,000 | - | 31,196,000 | 11/21/2002 | 58 | (31,197,000) | 99,611,000 | (7, 10) |
| October 2002 | - | 10/25/2002 | Reissued Commercial Paper | 68,200,000 | - | 68,401,000 | 12/19/2002 | 55 | (68,415,000) | 99,597,000 | |
| November 2002 | - | 11/21/2002 | Reissued Commercial Paper | 31,100,000 | - | 31,138,000 | 12/19/2002 | 28 | (31,196,000) | 99,539,000 | (11) |
| December 2002 | - | 12/19/2002 | Reissued Commercial Paper | 49,600,000 | - | 49,669,000 | 1/17/2003 | 29 | (99,539,000) | 49,669,000 | |
| | | | | 49,700,000 | | 49,831,000 | 2/11/2003 | 54 | | 99,500,000 | |

**Exhibit A: Summary of Autobahn Loans and Underlying Commercial Paper Issued and Rolled**

*Based on Notices of Borrowing, Commercial Paper Instructions, Commercial Paper Remittance Reports, and Borrowing Base Certificates. See Appendix C for a list of these documents.*

| Month | Autobahn Loan Reference Number | Underlying Commercial Paper Details | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Issuance Date | New Commercial Paper / Reissued Commercial Paper | Total Amount Requested by Opportunity Finance Securitization ($) | New Amount Loaned by Autobahn ($) | Maturation Amount ($) | Maturation Date | Period (Days) | Current Commercial Paper Maturing on Issuance Date ($) | Commercial Paper Outstanding ($) |
| January 2003 | - | 1/17/2003 | Reissued Commercial Paper | 49,600,000 | - | 49,720,000 | 3/18/2003 | 60 | (49,669,000) | 99,551,000 |
| February 2003 | - | 2/11/2003 | Reissued Commercial Paper | 49,700,000 | - | 49,816,000 | 4/11/2003 | 59 | (49,831,000) | 99,536,000 |
| March 2003 | - | 3/18/2003 | Reissued Commercial Paper | 49,600,000 | - | 49,711,000 | 5/16/2003 | 59 | (49,720,000) | 99,527,000 **(12)** |
| April 2003 | - | 4/11/2003 | Reissued Commercial Paper | 49,700,000 | - | 49,814,000 | 6/10/2003 | 60 | (49,816,000) | 99,525,000 |
| May 2003 | - | 5/16/2003 | Reissued Commercial Paper | 13,900,000 | - | 13,932,000 | 7/15/2003 | 60 | (49,711,000) | 63,746,000 **(13)** |
| June 2003 | - | 6/10/2003 | Reissued Commercial Paper | 13,000,000 | - | 13,007,000 | 6/24/2003 | 14 | (49,814,000) | 26,939,000 |
| | | | | 13,000,000 | | 13,014,000 | 7/8/2003 | 28 | | 39,953,000 |
| | - | 6/24/2003 | Reissued Commercial Paper | 5,000,000 | - | 5,005,000 | 7/22/2003 | 28 | (13,007,000) | 31,951,000 |
| July 2003 | - | 7/8/2003 | Reissued Commercial Paper | 5,000,000 | - | 5,004,000 | 7/29/2003 | 21 | (13,014,000) | 23,941,000 |
| | - | 7/15/2003 | Reissued Commercial Paper | 6,500,000 | - | 6,505,000 | 8/5/2003 | 21 | (13,932,000) | 16,514,000 **(14)** |
| | - | 7/22/2003 | Reissued Commercial Paper | - | - | - | - | 0 | (5,005,000) | 11,509,000 |
| | - | 7/29/2003 | Reissued Commercial Paper | - | - | - | - | 0 | (5,004,000) | 6,505,000 |
| August 2003 | - | 8/5/2003 | Reissued Commercial Paper | - | - | - | - | 0 | (6,505,000) | - |
| **Total New Amount Loaned by Autobahn** | | | | | 99,300,000 | | | | | |

(1) The "Face value of Commercial Paper Outstanding as of cut-off date" is $50,600,000 per the Borrowing Base Certificate with a borrowing date of 1/7/02, but the amount is updated in the Borrowing Base Certificate with a borrowing date of 1/15/02 to $50,766,000.

(2) The issuance date is based on the Commercial Paper Remittance Report. The Notice of Borrowing and Commercial Paper Instructions state that the commercial paper is issued on 1/15/01, but per the Commercial Paper Remittance Report, the underlying commercial paper is issued on 1/15/02.

(3) The issuance date is based on the Commercial Paper Remittance Report. The Commercial Paper Instructions state that the commercial paper is to be issued on 2/22/02, but per the Commercial Paper Remittance Report, the underlying commercial paper is issued on 3/1/02.

(4) The issuance date is based on the Commercial Paper Instructions, due to differences between the maturation date and fixed period on the Commercial Paper Remittance Report.

(5) No Opportunity Loans were issued between 4/11/02 - 4/26/02 and therefore there are no Borrowing Base Certificates with the commercial paper issued on 4/23/02.

(6) The issuance date is based on the Commercial Paper Remittance Report. The Notice of Borrowing for the commercial paper issuance is dated 4/25/02, but per the Commercial Paper Remittance Reports, the underlying commercial paper is issued on 4/26/02.

(7) The cumulative Commercial Paper Outstanding does not tie to the "Face value of Commercial Paper Outstanding as of the cut-off date" in the first Borrowing Base Certificate after the commercial paper issuance. No documentation has been identified to clarify this minor inconsistency as of the date of this report.

(8) I have not identified Commercial Paper Instructions for 7/15/02. The issuance date and amount shown as currently maturing for this date is based on the Commercial Paper Remittance Report dated 7/11/02.

(9) I have not identified Commercial Paper Instructions or a Commercial Paper Remittance Report dated 9/24/02 which would include the maturation amount for the 7/26/02 commercial paper. I have based the maturation amount on the internal schedule summarizing commercial paper activity at Bates No. DZB045540 - DZB046172.

(10) I have not identified Commercial Paper Instructions or a Commercial Paper Remittance Report dated 9/24/02. The commercial paper issuance details are based on the Commercial Paper Remittance Report from 11/20/02 and the current commercial paper maturing on the issuance date is based on the face value issued on 9/24/02 from the internal schedule summarizing the commercial paper activity at Bates No. DZB045540 - DZB046172.

(11) The maturation date and period are based on the Commercial Paper Remittance Report. The commercial paper was reissued early on 12/19/02 after a 28 day period, rather than on 1/17/03 after a 57 day period as noted in the Commercial Paper Instructions.

(12) The issuance date is based on the Commercial Paper Remittance Report. The Commercial Paper Instructions state that the commercial paper is to be issued on 3/17/03, but per the Commercial Paper Remittance Report, the underlying commercial paper is issued on 3/18/03.

(13) The Commercial Paper Instructions indicate that $16,600,000 was requested, however, the Commercial Paper Remittance Report and the internal schedule summarizing the commercial paper activity at Bates No. DZB045540 - DZB046172 indicated that $13,900,000 (with a face value of $13,932,000) was actually issued.

(14) The maturation date is based on the Commercial Paper Remittance Report. The Commercial Paper Instructions state that the commercial paper is to mature on 8/8/03, but per the Commercial Paper Remittance Report, the underlying commercial paper matures on 8/5/03.

# EXHIBIT 54

Page 1

1              UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF MINNESOTA
2                    No. 08-45257
       ------------------------------------------x
3      IN RE:  PETTERS COMPANY, INC., et al.

4                    Debtors.

5      (Includes:                      Court File Nos.
       Petters Group Worldwide, LLC;    08-45258 (KHS)
6      PC Funding, LLC;                 08-45326 (KHS)
       Thousand Lakes, LLC;             08-45327 (KHS)
7      SPF Funding, LLC;                08-45328 (KHS)
       PL Ltd., Inc.;                   08-45329 (KHS)
8      Edge One LLC;                    08-45330 (KHS)
       MGC Finance, Inc.;               08-45331 (KHS)
9      PAC Funding, LLC;                08-45371 (KHS)
       Palm Beach Finance Holdings, Inc.)  08-45392 (KHS)
10
                           Chapter 11 Cases
11                         Judge Kathleen H. Sanberg
       ---------------------------------------------------
12
       Douglas A. Kelley, in his capacity
13     as the Trustee of the PCI Liquidating Trust,

14                  Plaintiff,

15          v.

16     Opportunity Finance, LLC, et al.,

17                  Defendants.

18     ---------------------------------------------------

19

20        VIDEOTAPED DEPOSITION OF LANCE BREILAND

21             Minneapolis, Minnesota

22          Wednesday, February 27, 2019

23

24     Reported by:  Amy L. Larson, RPR

25     Job No: 154994

Page 10

```
 1              BREILAND
 2  reporter is Amy Larson in association with
 3  TSG Reporting.
 4           Will counsel please introduce
 5  yourselves.
 6           MR. HAVELES:  Peter Haveles of
 7  Pepper Hamilton LLP, and Michael Rosow,
 8  Winthrop Weinstine, on behalf of defendant
 9  DZ Bank AG.
10           MR. JACKSON:  Jay Jackson of
11  Dorsey Whitney LLP on behalf of the witness
12  and Interlachen Harriet Investment Limited.
13           MR. LOIGMAN:  Robert Loigman of
14  Quinn Emanuel on behalf of the PCI Trust.
15           THE VIDEOGRAPHER:  Thank you.
16  Will the court reporter please swear in the
17  witness.
18           LANCE BREILAND,
19      a witness in the above-entitled action,
20      after having been first duly sworn, was
21      deposed and says as follows:
22
23           EXAMINATION
24  BY MR. HAVELES:
25  Q.  Good morning, Mr. Breiland.  My name is
```

Page 11

```
 1              BREILAND
 2  Petters Haveles, as I said when I introduced
 3  myself for the record.  I'm going to be
 4  taking your deposition today in accordance
 5  with a subpoena that was served on you.
 6           I know you've done this before, but
 7  I'll -- just for the sake of making sure we
 8  move smoothly, I'll repeat the basic rules.
 9           I'm going to ask questions, and it's
10  not unusual for a question every once in a
11  while not to make any sense, so tell me and
12  I'll try to re -- rephrase it so it is clear
13  to you.
14           I'm going to show you some
15  documents.  Take your time with any document
16  I give you before you answer it.
17           I will take reasonable breaks to
18  give you, more importantly, our court
19  reporter Amy, a chance to stretch.  But if
20  you'd like a break, as long as the pending
21  question is answered, I'm happy to -- to
22  accommodate you with a break at any time
23  you'd like.
24           And then, lastly, again, out of
25  consideration for our court reporter, I would
```

Page 12

```
 1              BREILAND
 2  ask that you make sure I have asked --
 3  completed asking my question before you start
 4  to speak.  And, likewise, I will try to
 5  respect the time you're taking to respond to
 6  the question before I come forward with my
 7  next question.  Okay?
 8  A.  Okay.
 9  Q.  Great.  Thank you.
10           Could you tell us your full name for
11  the record, please, sir.
12  A.  Yes.  Lance Breiland.
13  Q.  Okay.  And where do you reside, Mr. Breiland?
14  A.  In South Minneapolis.  4641 Colfax Avenue
15  South.
16  Q.  What is your current employment?
17  A.  I am a -- with DGV Solutions.  I'm the chief
18  operating officer.
19  Q.  And what is DGV Solutions?
20  A.  It's an investment manager.
21  Q.  Does it have any relationship to Interlachen?
22  A.  No.  Other than the two partners, myself and
23  Jon Havice of DGV, were partners of and are
24  partners of Interlachen Capital Group.
25  Q.  Do you still continue to be employed in any
```

Page 13

```
 1              BREILAND
 2  capacity by Interlachen?
 3  A.  I am a partner of Interlachen, and I continue
 4  to be a partner and to work in the wind-down
 5  of Interlachen Capital Group.
 6  Q.  Okay.  How much time do you spend between the
 7  two, DGV and Interlachen?
 8           MR. JACKSON:  Objection to the
 9  relevance.
10           MR. HAVELES:  I just want to get
11  some background of his experience.
12           MR. JACKSON:  Objection to the
13  relevance.
14           THE WITNESS:  Yeah, I spend on
15  each the time that's required in my judgment.
16           MR. HAVELES:  Okay.
17  BY MR. HAVELES:
18  Q.  And how long have you been with DGV?
19           MR. JACKSON:  Objection to the
20  relevance.
21           THE WITNESS:  Since early 2015, I
22  believe.
23           MR. HAVELES:  Okay.
24  BY MR. HAVELES:
25  Q.  And prior to 2015 by whom were you employed?
```

4 (Pages 10 to 13)

Page 18

BREILAND

1
2  specifically to page 6 of Exhibit A to the
3  subpoena.
4          Do you have that in front of you,
5  sir?
6  A. Yes.
7  Q. Okay. I just want to ask about one request
8  here. The first request is -- asks for
9  documents related to Opportunity Finance or
10 DZ Bank in either of their lending activities
11 related to PCI and -- or any PCI entity.
12         Did Interlachen have in its
13 possession any documents that fell within
14 that request?
15 A. I don't believe so, but we turned over any
16 documents that would have been within the
17 purview of that request and -- so to the
18 extent that you received the documents that
19 we turned over, you would have received those
20 documents.
21 Q. Okay. Thank you.
22         Did you review any documents to
23 prepare for your deposition today, sir?
24 A. I reviewed my testimony from my 2015
25 deposition in the clawback litigation

Page 19

BREILAND

1
2  involving the PCI Trust and other clawback
3  defendants.
4          I reviewed my deposition transcript
5  from my deposition in the BMO case as a
6  30(b)(6) representative of Interlachen.
7          And I -- and I reviewed very
8  cursorily the transaction documents from our
9  April 2008 transaction with PCI.
10 Q. This is the $60 million transaction?
11 A. That's correct.
12 Q. Okay. And when you say, "The transaction
13 documents," what documents do you mean by
14 that phrase?
15 A. Well, the documents I know I scanned were the
16 note purchase agreement, the deposit account
17 control agreement, and I believe the UCC
18 filing.
19 Q. In connection with the testimony that -- for
20 preparation for your testimony at this
21 deposition, did you have any meetings or
22 conversations with any lawyers who represent
23 the trustee about your deposition testimony?
24 A. Not about -- not in preparation for, but, you
25 know, about the fact of my deposition here

Page 20

BREILAND

1
2  today.
3  Q. Other than the fact of the deposition, any
4  discussions with any counsel for the Trustee?
5  A. No.
6  Q. Back at the time you gave your 2015
7  deposition, in those adversary proceedings by
8  the Trustee, did you have any discussions
9  with counsel for the Trustee about your
10 deposition testimony?
11         MR. JACKSON: Objection to the
12 form.
13         THE WITNESS: Not that I can
14 remember.
15         MR. HAVELES: Okay.
16 BY MR. HAVELES:
17 Q. And in connection with your deposition in the
18 BMO case, did you have any discussions with
19 Trustee's counsel about your deposition
20 testimony?
21         MR. JACKSON: Objection to the
22 form.
23         THE WITNESS: I can't recall.
24         MR. HAVELES: Okay.
25 BY MR. HAVELES:

Page 21

BREILAND

1
2  Q. Are you currently a member of the -- the
3  board or the committee for the litigation
4  trust that is prosecuting the claim against
5  DZ Bank?
6  A. Yes, I'm part of the committee for the
7  PCI Trust.
8  Q. Okay. The PCI Litigation Trust?
9  A. I believe it's called the PCI Liquidating
10 Trust.
11 Q. Liquidating trust. Thank you.
12         And do you -- what are your
13 responsibilities just generally as a member
14 of that committee?
15         MR. LOIGMAN: Object. I'll --
16 I'll let him answer that but --
17         MR. HAVELES: I just -- that's all
18 I want --
19         MR. LOIGMAN: -- too far down this
20 line.
21         MR. HAVELES: I just want --
22         MR. JACKSON: The judge
23 specifically said you can't get into this.
24         MR. HAVELES: No, she said I
25 couldn't get into communications, but I can

6 (Pages 18 to 21)

Page 98

BREILAND

1
2  status around that time.
3  Q. Okay. Who negotiated the transaction for
4     Interlachen? The business terms, that is,
5     not the legal terms.
6  A. The business terms were primarily negotiated
7     by Gregg Colburn, but I will say that the
8     primary business terms, as I understand it,
9     weren't really a subject of negotiation, as I
10    recall. We were given a proposal that was
11    provided by initially the -- one of the two
12    brokers, and then kind of affirmed, so to
13    speak, by the team at Petters, and those
14    ultimately were the terms on which we
15    provided the financing.
16 Q. Okay. Let me mark, so we just have them, I'm
17    not going to go through them, but I just want
18    to mark them and authenticate them for
19    purposes of the record, the three
20    transactional documents.
21       The first is going to be a
22    Note Purchase Agreement dated April 18, 2008,
23    between -- or signed by Petters Company,
24    Inc., and Thomas Petters individually, and it
25    bears the Bate numbers ICG101519 through 37.

Page 99

BREILAND

1
2       (Whereupon, Exhibit 12 was
3       marked for identification.)
4       MR. HAVELES: I'm sorry, the
5  number of the exhibit will be Exhibit 12.
6       And Exhibit 13, the Security
7  Agreement dated April 18, 2008, signed by
8  Interlachen Harriet Investments Limited as
9  administrative agent and Petters Company,
10 Inc., as borrower. And -- and let me just
11 say for the record that bears the Bate
12 numbers ICG101538 through 543. I have not
13 attached the form UCCs that were attached as
14 exhibits to the agreement to this document.
15       (Whereupon, Exhibit 13 was
16       marked for identification.)
17       MR. HAVELES: Let me mark as
18 Exhibit 14 a promissory note in the amount of
19 $60 million dated April 18, 2008, signed by
20 Petters Company, Inc., and Thomas J. Petters,
21 individually, bearing the Bate numbers
22 ICG101893.
23       (Whereupon, Exhibit 14 was
24       marked for identification.)
25 BY MR. HAVELES:

Page 100

BREILAND

1
2  Q. In terms of the loan made to the
3     Petters Company in connection with the
4     purchase of these televisions, are these the
5     three transactional documents, Mr. Breiland?
6  A. Yes, these are three transactional documents.
7     And I can't recall if there were others, but
8     these are the three primary transaction
9     documents.
10 Q. Okay. So describe for me briefly what you
11    understood the transaction to be.
12 A. We understood that Tom was going to buy
13    $60 million of TVs that we believed had a
14    value far in excess of that, and wanted to
15    procure financing from us to fund a portion
16    of that purchase price.
17 Q. And it was not for a hundred percent
18    financing, correct?
19 A. That's correct.
20 Q. How much of the purchase price under the
21    agreement between -- that Interlachen had
22    negotiated with Mr. Petters was the
23    Petters Company or Mr. Petters to pay?
24 A. We understood they would pay in the 12 to
25    $13 million range. I can't remember the

Page 101

BREILAND

1
2  exact number.
3  Q. And at the time you did this transaction,
4     what did you believe the retail value of the
5     televisions were?
6  A. I believe we thought the retail value could
7     be as high as 140 or 150 million, if I
8     recall.
9  Q. Okay.
10 A. But the -- and then the wholesale value we
11    thought we estimated in -- you know, north of
12    100 million --
13 Q. Okay.
14 A. -- if I recall.
15 Q. And what due diligence did you or the -- your
16    colleagues at Interlachen do in connection
17    with forming those understandings about the
18    wholesale and retail value of the
19    televisions?
20 A. We had done some research on where those
21    specific TVs, the model numbers, et cetera,
22    were priced in the market both at the retail
23    level and at -- and online sales level.
24 Q. Okay. There was another party involved in
25    this transaction, correct, although not a

26 (Pages 98 to 101)

Page 102

BREILAND

1
2  signatory to the agreement with Interlachen?
3  Nationwide?
4  A. Yes, Nationwide was involved in the
5  transaction. We weren't involved directly
6  with Nationwide, but Nationwide was involved,
7  yes.
8  Q. Yes. I'm talking about the television -- let
9  me withdraw that.
10       With respect to the overall
11  acquisition and sale of the televisions,
12  Nationwide was going to be a party in that
13  transaction as well, correct?
14       MR. LOIGMAN: Objection to form.
15       THE WITNESS: Okay. Nationwide --
16  yeah, Nationwide, as we understood it, was
17  the entity from which Tom and PCI were buying
18  the TVs.
19       MR. HAVELES: Okay.
20  BY MR. HAVELES:
21  Q. Now, in connection with the transaction you
22  also -- did you also enter into an agreement
23  that involved M&I, Marshal & Ilsley Bank?
24  A. We did.
25  Q. Okay. Let me mark as Exhibit 15 the

Page 103

BREILAND

1
2  Deposit Control Agreement dated as of
3  May 29, 2008, that is signed by M&I,
4  Marshal & Ilsley Bank, Petters Company, Inc.,
5  and Interlachen Harriet Investments Limited.
6       (Whereupon, Exhibit 15 was
7       marked for identification.)
8       THE WITNESS: And I'll just say
9  in -- in clarification of my previous answer,
10  these three documents you passed to me
11  previously, Exhibits 12 through 14, were the
12  three primary documents for the transaction
13  entered into on April 18th.
14       MR. HAVELES: Correct.
15       THE WITNESS: The Deposit Account
16  Control Agreement that you've handed to me as
17  Exhibit 15 was a primary document as well, it
18  just was entered into at a later date.
19       MR. HAVELES: I was going to ask
20  that, so thank you for beating me to the
21  punch. I do try to, as Mr. Loigman will tell
22  you, proceed in baby steps, so I didn't want
23  to jump to the agreement until you had it.
24       THE WITNESS: Okay.
25  BY MR. HAVELES:

Page 104

BREILAND

1
2  Q. Were you involved in the negotiation of this
3  agreement?
4  A. Yes.
5  Q. What was the purpose of the agreement?
6  A. The purpose was -- well, there were several
7  purposes. The primary purpose was to ensure
8  that Interlachen had a first priority
9  perfected security interest in the deposit
10  account into which the proceed of
11  Tom Petters' sale of the TV would -- would --
12  TVs would flow.
13  Q. Okay. And is Exhibit 15 the agreement that
14  was largely the subject of your 2017
15  deposition in the BMO case?
16       MR. JACKSON: Objection to the
17  form.
18       MR. HAVELES: I'll withdraw the
19  question.
20  BY MR. HAVELES:
21  Q. Was the Deposit Control Agreement one of the
22  subject matters of your 2017 deposition in
23  the BMO case?
24  A. Yes, it was one of the subject matters, but
25  I'll let the -- the transcript speak for

Page 105

BREILAND

1
2  itself in terms of the other subject matters.
3  Q. Yes, that's why I rephrased the question.
4       Why did Interlachen Harriet decide
5  to make this investment? And I'm not -- I'm
6  separating that from what facts you relied
7  on. What was -- let me rephrase the
8  question.
9       What was the investment purpose or
10  reason why Interlachen Harriet made this
11  investment?
12  A. Because it was a -- an investment consistent
13  with Interlachen Capital's investment
14  objectives for its group of funds that
15  Interlachen Harriet was a part.
16  Q. Okay. Let me ask you to go back to
17  Exhibit 3, which is your 2015 deposition.
18  It's going to be over on that side, on your
19  left-hand side?
20  A. (Complies.)
21  Q. Rather than asking a lot of -- I don't want
22  to ask a lot of questions that were covered
23  there, because there were actually -- you
24  were given a few opportunities to answer
25  open-ended questions rather than leading

27 (Pages 102 to 105)

Page 118

BREILAND
1
2    that point, but -- why we weren't granted the
3    ability to go to the -- the warehouses, but
4    the fact that we're asking the same question
5    again, you know --
6    Q. Post-closing.
7    A. -- post-closing leads me to believe that the
8       answer pre-closing that we got from the
9       Petters team might have been softer than a
10      firm no.
11   Q. Okay.
12   A. But I -- but I -- I can't remember.
13   Q. Do you recall receiving a firm no after this
14      e-mail exchange about warehouse visits?
15   A. I am sure -- I'm guessing we did, but I -- I
16      can't recall off the top of my head where
17      that e-mail or other written communication or
18      verbal communication -- you know, when it
19      would have happened and -- and who would have
20      delivered it.
21   Q. After the transaction closed, did Interlachen
22      ever advise PCI or Mr. Petters that it was in
23      breach of any obligations under the
24      transaction documents for not providing
25      documents from the warehouse?

Page 119

BREILAND
1
2       MR. LOIGMAN: Objection to form.
3       THE WITNESS: I don't -- no, I
4    don't think we ever did. I don't think we
5    ever thought that they were in breach for
6    that. As I recall, there was no requirement
7    that they do that contractually.
8       MR. HAVELES: Okay.
9    BY MR. HAVELES:
10   Q. Now let me mark as Exhibit 17 an e-mail dated
11      April 18, 2008, which is the date of the
12      closing, from Toby Gruszewski to
13      Gregg Colburn with two pages of photos. It
14      bears the Bate numbers ICG101614 through 17.
15          (Whereupon, Exhibit 17 was
16          marked for identification.)
17   BY MR. HAVELES:
18   Q. You testified about this in your earlier
19      deposition that it was due diligence done by
20      one of the people at Interlachen on -- via
21      the Internet.
22          Do you recall that?
23   A. I do.
24   Q. Other than Mr. Gruszewski going on the
25      Internet to pull up photos of the warehouses,

Page 120

BREILAND
1
2    was there any other due diligence done by
3    Interlachen with respect to the warehouses?
4    A. As I said, there was a request to visit the
5       warehouses pre-funding, and -- and that
6       request was denied or delayed or there was
7       some response that, you know, didn't allow us
8       to -- to do that.
9    Q. So prior to the closing, was the Internet
10      search and obtaining photos of the warehouse
11      the only due diligence about the warehouses
12      that Interlachen performed?
13   A. I'm not going to characterize it that way,
14      because I know there were conversations we
15      had with, as I mentioned, David Baer, with
16      Deanna Coleman, and potentially with
17      Larry Reynolds, I can't remember when those
18      conversations occurred, where we were --
19   Q. Okay.
20   A. -- we were asking questions about and
21      receiving answers to those questions about
22      the -- the warehouses.
23   Q. Okay. So let me focus the question.
24          Other than the Internet research
25      that Mr. Gruszewski did, did Interlachen

Page 121

BREILAND
1
2    perform any other due diligence to verify or
3    validate what you were being told by
4    Ms. Coleman, Mr. Baer, and perhaps
5    Mr. Reynolds with respect to the warehouses?
6    A. I -- I can't recall.
7    Q. Okay.
8       MR. HAVELES: Why don't we take a
9    break, because we've been going a little bit
10   more than an hour now.
11      THE VIDEOGRAPHER: And we're off
12   the record at 11:55 a.m.
13          (Whereupon, a brief recess
14          was taken.)
15      THE VIDEOGRAPHER: All right. We
16   are back on the record at 12:51 p.m.
17   BY MR. HAVELES:
18   Q. Mr. Breiland, I want to continue talking a
19      little bit about the April 2008 transaction
20      with PCI. When the transaction was proposed
21      to Interlachen, what was Interlachen told
22      about who the ultimate customers or
23      purchasers of the televisions would be?
24   A. We were told that they would be, I think the
25      words used were top five big-box retailers,

1                 BREILAND
2    but big-box retailers, in any event.
3    Q.  Did you receive any more particular
4      information about who the ultimate purchasers
5      of the televisions would be beyond that
6      big-box, top five information?
7    A.  At the -- at the time of the -- of the
8      transaction itself --
9    Q.  Yes, sir.
10   A.  -- no, we were told that Tom had a history of
11     selling to these big-box retailers and so we
12     were told some of the background about why
13     they believed it would be big-box retailers
14     that these were sold to.
15            In fact, I think we were told that
16     Tom was in negotiations potentially to
17     pre-sell the inventory, which we -- you know,
18     I interpreted, anyway, as meaning negotiating
19     a deal to sell them before he bought them.
20            But there was no, as we understood,
21     definitive commitment by a big-box retailer
22     to buy the goods prior to Tom buying them.
23   Q.  Okay.  You said that you were given some
24     background about Mr. Petters' experience with
25     big-box companies.  What was the background

1                 BREILAND
2    information provided to you --
3    A.  Well --
4    Q.  -- and your colleagues?
5    A.  Well, the background information was, you
6      know, given by Tom and Deanna and David Baer
7      in connection with this particular deal.  But
8      in addition, you know, I had been aware that
9      Tom had made his money in buying and selling
10     goods, and I had been aware of that really
11     since my time at -- at Fredrikson.
12   Q.  Okay.  All right.  Let me show you some
13     documents.  Let me start with what will be
14     Exhibit 18, which is an e-mail dated
15     April 22, 2008, from Deanna Coleman to you
16     and Gregg Colburn with an attachment that
17     bears the Bate numbers ICG103066 through 67.
18            (Whereupon, Exhibit 18 was
19            marked for identification.)
20   BY MR. HAVELES:
21   Q.  Do you recall obtaining this e-mail from
22     Ms. Coleman shortly after the transaction
23     closed?
24   A.  I believe so.
25   Q.  Okay.  Did you have an understanding as to

1                 BREILAND
2    what the attachment is, which is entitled,
3    "Bill of Sale"?
4    A.  In my mind it was the definitive document
5      that sold the inventory from Nationwide to
6      PCI.
7    Q.  Okay.  Now, in paragraph numbered 1 in the
8      bill of sale it refers to a purchase order.
9      Did you -- did Interlachen receive a copy of
10     the purchase order?
11   A.  Yes.
12   Q.  And the addresses that appear at the end of
13     that paragraph, what are those addresses of?
14   A.  I -- I believe they were the addresses of the
15     three warehouses that we were told held
16     the -- the inventory.
17   Q.  Okay.  After you received this bill of sale,
18     did you request any further information about
19     the status or disposition of the television
20     sets from anyone at the Petters organization?
21   A.  Yes.
22   Q.  What did you request?
23   A.  As I detailed pretty extensively, I believe,
24     in my 2015 deposition transcript, we had
25     several follow-up meetings and telephone

1                 BREILAND
2    conversations with the Petters folks and with
3    Larry Reynolds to check up on periodically
4    the status of the sale of the TVs.
5    Q.  Okay.  Did you request any further
6      documentation from Ms. Coleman beyond the
7      bill of sale after this time?
8    A.  Well, we definitely requested the completion
9      of the DACA, or the Deposit Account Control
10     Agreement.
11   Q.  Yes.
12   A.  And that was probably a request made to
13     David Baer as opposed to Deanna.  And I'm
14     trying to think if there would -- and then
15     there would have been associated or ancillary
16     documents to the DACA.
17   Q.  Okay.
18   A.  And there may have been other follow-up
19     documents as well.
20   Q.  And you used DACA to refer to the
21     Deposit Control Agreement with M&I, correct?
22   A.  That's correct.
23   Q.  Okay.  Let me make the question more narrow.
24            Do you recall requesting any
25     additional documents with respect to the

Page 182

BREILAND

2 because this was a really important call.
3 And -- and, ultimately, we walked away from
4 that call not being comfortable.
5          And we -- we told them that, on
6 the call, we were told by Petters
7 representatives, you know, that this debt was
8 there and we had only been told of this debt
9 via those financial statements we looked at a
10 couple of minutes ago hours earlier.  You
11 know, we were working into the late, late
12 hours of that night before.
13          And when we left to go home, when
14 Gregg and I left to go home at 3 or 4 in the
15 morning, it was only an hour or so after that
16 that they sent the PGW financials that had
17 that $175 million of debt.  And that was a
18 problem for us and we wanted an explanation
19 as to why it was there and why we were being
20 told about it for the first time at that
21 point.
22          And I remember distinctly John
23 Koneck trying to assure us that if we
24 proceeded with our financing and our
25 collateral was good, we didn't need to worry.

Page 183

BREILAND

2          And -- and I remember somebody on
3 the Petters side, and it could have been Tom
4 Petters, saying, "Are you doing the deal or
5 not?"  And Gregg Colburn said, "If you put a
6 gun to our head now, we're not going to do
7 the deal.  We'll continue working, but if
8 you're putting a gun to our head, we're not
9 going to do the deal," and that was it and we
10 didn't do the deal.
11 Q.  All right.  Let me, just so we can get the
12 chronology set, mark my last exhibit and
13 we'll pick up with that conversation.
14          Let me mark as Exhibit 43 an e-mail
15 from Gregg Colburn to AJ Discala, Tom Petters
16 and Jim Wehmhoff dated 27 August, 2008, with
17 the Bate number Kelley_Micro_0291989.
18          (Whereupon, Exhibit 43 was
19          marked for identification.)
20 BY MR. HAVELES:
21 Q.  This is an e-mail that Mr. Colburn sends on
22 the 27th talking about the $175 million in
23 debt.  Do you recall whether this e-mail was
24 sent before or after the telephone call about
25 which you just testified?

Page 184

BREILAND

2 A.  I believe this was sent before that tele --
3 Q.  Okay.
4 A.  -- telephone call.
5 Q.  So after that -- that telephone call, did
6 anything further happen with respect to the
7 August 2008 transaction or was that the --
8 let me withdraw that.
9          Was that the last communication,
10 that telephone call, with anyone at Petters
11 about the August 2008 transaction?
12 A.  It may have been, but I probably would have
13 been surprised if it were truly the last
14 call.  But at least in -- from our
15 perspective, from Interlachen's perspective,
16 the deal had died.
17 Q.  Did anyone at Interlachen propose any
18 solutions or ways to deal with the Ritchie
19 loan to anyone at the Petters organization in
20 order to facilitate a closing on this
21 transaction?
22 A.  I -- I can't recall --
23 Q.  Okay.
24 A.  -- that we did.  It's possible, but -- that
25 we brainstormed ideas, et cetera, but I can't

Page 185

BREILAND

2 recall anything specific that we proposed.
3 Q.  Do you recall whether anyone on the Petters
4 side proposed any solutions beyond the
5 assurances that Mr. Koneck gave you in that
6 call?
7 A.  I don't recall the Petters folks putting out
8 any proposals.  You know, definitely not any
9 proposals that satisfied us.
10 Q.  Okay.  I just have about five more minutes of
11 questions left, but I'll relate it to the
12 August 2008 transaction.  I'm done with
13 talking about that.
14 A.  Okay.
15 Q.  I asked you earlier, when you were at
16 Fredrikson whether you had become aware of
17 Petters Company, Inc.'s use of special
18 purpose entities in connection with financing
19 transactions.
20          Prior to the August 2008
21 transaction, did you ever become aware of the
22 Petters Company, Inc., using SPEs in
23 connection with financing transactions?
24 A.  You ask prior to August --
25 Q.  Yes.

47 (Pages 182 to 185)

Page 186

BREILAND

1
2    A.  -- 2008?
3    Q.  Let me rephrase the question.
4         So at any time before the August
5    2008 transaction discussions began, did you
6    ever -- did you or anyone at Interlachen ever
7    learn that PCI used special purpose entities
8    in connection with financing transactions for
9    PCI's business?
10   A.  I believe we learned in a very generic sense
11   that that was either being done with other
12   financiers or was a possibility for us or was
13   being proposed to us around or shortly after
14   the time of the April 2008 transaction.
15   Q.  Did you ever -- were you ever -- let me
16   withdraw it.
17        Were you ever told any information
18   by anyone that the Petters group, prior to
19   the August 2008 discussions, about a special
20   purpose entity known as PC Funding?
21   A.  I -- I can't recall.
22   Q.  Did you ever see financial statements for a
23   special purpose entity entitled PC Funding?
24   A.  Not that I recall.
25   Q.  Did you ever see any financial statements for

Page 187

BREILAND

1
2    the Petters Company, Inc., that included a
3    breakdown of the financial statements for
4    each of the SPEs that the Petters Company,
5    Inc., owned?
6    A.  Not that I recall.  And, again, that's all
7    prior to August of 2008.
8    Q.  Yes, sir.
9         I was going to ask the -- prior to
10   August 2008, did you ever see any loan
11   agreements that the Petters Company, Inc.,
12   entered with any party for financing the
13   purchase of diverted goods by the Petters
14   Company, Inc.?
15   A.  I don't think so.  I don't -- I don't know
16   that, but I don't think so.
17   Q.  Prior to August 2008, discussions with the
18   Petters organization, did you ever receive
19   any information from anyone at the Petters
20   organization about loan agreements between
21   PCI and Opportunity Finance?
22   A.  Specifically about Opportunity Finance, no,
23   not that I recall.
24   Q.  Prior to things blowing up with the raid in
25   September 2008, had you ever met any of the

Page 188

BREILAND

1
2    members of the Sabes family who were involved
3    with Opportunity Finance?
4    A.  I believe I had met Jon Sabes at some point.
5    Q.  Okay.
6    A.  But I -- but I -- I can't remember where or
7    when.
8    Q.  Did you ever have any discussions with
9    Mr. Sabes about the business activities of
10   Opportunity Finance?
11   A.  No, not that I recall.
12   Q.  Did you ever learn at any time prior to
13   the August 2008 discussions that
14   Opportunity Finance had entered into
15   agreements with the Petters Company, Inc., or
16   any other Petters organization?
17   A.  I don't think so.
18   Q.  Prior to August 2008, had you -- had you ever
19   learned from anyone at the Petters
20   organization that DZ Bank had provided
21   financing through Opportunity Finance for the
22   purchase of diverted goods by the
23   Petters Company, Inc.?
24   A.  No, I don't think so.
25        MR. LOIGMAN:  Objection to form.

Page 189

BREILAND

1
2    BY MR. HAVELES:
3    Q.  Did you ever learn at any time prior to the
4    August 2008 discussions that WestLB provided
5    financing to Opportunity Finance in
6    connection with Opportunity Finance's
7    financing of the purchase of diverted goods
8    by the Petters Company, Inc.?
9    A.  No, I don't think so.
10   Q.  Prior to you signing the Proof of Claim that
11   we looked at earlier today against
12   PC Funding --
13        MR. JACKSON:  Objection as
14   mischaracterizing the evidence.  He never
15   signed it.
16        MR. HAVELES:  Let me withdraw that
17   then.
18   BY MR. HAVELES:
19   Q.  Prior to Interlachen submitting the
20   Proof of Claim that we saw -- that we looked
21   at earlier today, had you ever seen any
22   information about PC Funding's role in the
23   Petters organization?
24   A.  I -- I can't recall specifically the timing,
25   but I expect that we had received information

48 (Pages 186 to 189)

Page 190

```
 1              BREILAND
 2   about PC Funding's role at -- by that point,
 3   by the time of claim submission.
 4   Q.  Had you received any information about the
 5      role of PC Funding in the Petters
 6      organization at any time prior to the FBI
 7      raid on Mr. Petters' offices?
 8   A.  Not that I recall.
 9   Q.  Same with respect to Opportunity Finance, did
10      you ever receive any information about
11      Opportunity Finance's involvement with
12      PC Funding and PCI prior to the raid on
13      Mr. Petters' offices in September 2008?
14   A.  Yeah, again, I don't think so.
15              MR. HAVELES:  Okay.  I think I'm
16      done, I just want to take the break to review
17      my notes, so why don't we go off the record.
18      And I think unless I discover a question or
19      two I missed, I'll pass the baton to
20      Mr. Loigman.
21              THE VIDEOGRAPHER:  And we're off
22      the record at 2:14 p.m.
23              (Whereupon, a brief recess
24              was taken.)
25              THE VIDEOGRAPHER:  All right.  We
```

Page 191

```
 1              BREILAND
 2   are back on the record at 2:25 p.m.
 3
 4              EXAMINATION
 5   BY MR. LOIGMAN:
 6   Q.  Good afternoon, Mr. Breiland.  My name is
 7      Bob Loigman.  I am counsel for the PCI
 8      Liquidation Trust or liquidating trust, and
 9      I'll just have a few questions for you this
10      afternoon.
11              Is it your understanding that the
12      money loaned by Interlachen to PCI was used
13      to pay other parties that lent money to
14      Petters?
15              MR. HAVELES:  Objection;
16      foundation.
17              THE WITNESS:  Yes, that's my
18      understanding.
19              MR. LOIGMAN:  Okay.
20   BY MR. LOIGMAN:
21   Q.  And is it your understanding that other
22      lenders to Petters could include entities
23      that lent money not directly to PCI, but also
24      to special purpose entities that were related
25      to PCI?
```

Page 192

```
 1              BREILAND
 2              MR. HAVELES:  Objection;
 3      foundation --
 4              THE WITNESS:  Yes.
 5              MR. HAVELES:  -- and leading.
 6              Mr. Breiland, when you start to hear
 7      me object, you've got to -- it's always
 8      better for our court reporter to let me
 9      finish before you start to answer.  Thank
10      you.
11              THE WITNESS:  Okay.
12   BY MR. LOIGMAN:
13   Q.  So, for example, could a lender that lent
14      money directly to PC Funding, which is one of
15      the debtors, have been repaid with money that
16      Interlachen lent to PCI?
17              MR. HAVELES:  Objection;
18      foundation, leading.
19              THE WITNESS:  Yes.
20   BY MR. LOIGMAN:
21   Q.  And is it in fact your understanding that
22      some of the money lent by Interlachen to PCI
23      was then paid by PCI over to PC Funding?
24              MR. HAVELES:  Objection;
25      foundation, calls for -- and leading.
```

Page 193

```
 1              BREILAND
 2              THE WITNESS:  Yes, that's my
 3      understanding.
 4              MR. LOIGMAN:  Okay.
 5              (Whereupon, Exhibit 44 was
 6              marked for identification.)
 7   BY MR. LOIGMAN:
 8   Q.  Let me ask you to take a look at a document
 9      that the reporter marked as Exhibit 44.  And
10      for the record, Exhibit 44 was attached as
11      Exhibit 10 to the PwC interim report that was
12      filed with the court in 2010.
13              And my first question for you is:
14      Have you ever seen this chart before?
15   A.  Yes.
16   Q.  Okay.  And let me ask you to turn to the
17      second page, which has the title at the top,
18      "April 18th, 2008, transactions."
19              Do you see that?
20   A.  I do.
21   Q.  Okay.  Is the information on this page
22      consistent with your understanding of how
23      money lent by Interlachen to PCI was actually
24      used by PCI?
25              MR. HAVELES:  Objection to
```

Page 218

BREILAND

1
2  period within that -- that chain where
3  Interlachen did not have a first priority
4  perfected security interest in the
5  collateral, and that would have been a big
6  problem.
7  BY MR. LOIGMAN:
8  Q. You mentioned that you did not have access to
9     PCI's primary account, right, to its
10    operating account?
11 A. That's -- that's correct.
12 Q. So if payments were made by PCI into the
13    special account that had been set up for
14    payment of the -- in connection with these
15    TVs, would you have been able to tell whether
16    those payments came from the retailers or
17    not?
18        MR. HAVELES:  Objection; calls for
19 speculation.
20        THE WITNESS:  Yeah, I -- I don't
21 know what it would have looked like other
22 than at M&I and with respect to this
23 particular account, other than in my
24 experience in looking at accounts for
25 businesses I've owned and run, usually there

Page 219

BREILAND

1
2  are reasonably informative tags associated
3  with incoming wire transfers and other
4  deposits that would alert the person with
5  access to the account to the nature of where
6  the amounts deposited came from.
7  BY MR. LOIGMAN:
8  Q. Earlier this afternoon, I think, you were
9     shown a number of documents that you received
10    in August of 2008, right?
11 A. That's correct.
12 Q. And those were in connection with a potential
13    additional transaction to be done in August
14    of 2008?
15 A. Yes, a proposed transaction in August of
16    2008.
17 Q. And -- and many of those documents were
18    received by Interlachen as part of your due
19    diligence process, right?
20 A. That is correct.
21 Q. Okay. Now, you didn't receive many of these
22    documents in connection with the April 2008
23    transaction that you actually did, right?
24 A. That is correct. That was a different
25    transaction that related to different assets

Page 220

BREILAND

1
2  and entities.
3  Q. And you were shown several of these documents
4     by Mr. Haveles this afternoon. Would --
5     would many of those documents have been
6     relevant to the April 2008 transaction?
7  A. Some of them might have been. Others
8     probably wouldn't have been. But the reason
9     some of them would be was that in our April
10    2008 transaction, as I stated before, we
11    viewed the obligation primarily as an
12    obligation of Tom Petters that was supported
13    by collateral of PCI that we had a first
14    priority perfected security interest in.
15        And so in a sense, all of the
16    documents we received in connection with or
17    consideration of any Tom Petters entity,
18    including in August 2008, including before
19    that in August of -- or, I'm -- I'm sorry,
20    February of 2008, fall of 2007, earlier in
21    2007 and 2006, and meetings in 2005, would be
22    relevant to some degree to Tom Petters
23    wherewithal to repay the debt he owed us.
24 Q. Okay. So the -- the receipt of the documents
25    in August of 2008, to the extent that you

Page 221

BREILAND

1
2  didn't receive those documents in April 2008,
3  did that suggest that your diligence in April
4  2008 was not sufficient?
5  A. Not at all.
6  Q. Okay. And why is that?
7  A. Because as I said, these documents received
8     in August 2008 primarily related to assets
9     and entities that were wholly separate from
10    what we were looking at in April of 2008.
11 Q. Was the April 2008 transaction a simpler
12    transaction than what was being proposed in
13    August of 2008?
14 A. It was a much more discrete transaction in
15    the sense that the collateral was much more
16    defined, easier to get our arms around and
17    easier to value.
18        And from our perspective, we had
19    believed at that point that Tom Petters had
20    made his money and had become successful by
21    virtue of his abilities in the business of
22    buying and selling consumer goods and doing
23    it for a profit.
24        And so we believed, when we were
25    considering the April 2008 transaction, that

Page 222

1            BREILAND
2    we were shown that transaction by Tom Petters
3    because he needed us and he needed a
4    financing party to help him, and he was,
5    therefore, willing to let us into what we
6    believed to -- to be one of the most
7    lucrative parts of his business, or at least
8    the bread and butter of how Tom Petters had
9    made his money.
10   Q. And in that April 2008 transaction there
11      wasn't any intellectual property element, was
12      there?
13   A. There was not.
14   Q. And there wasn't any real estate element, was
15      there?
16   A. That's correct. Or any joint venture that
17      governed the real estate or -- or litigation
18      that -- that was the subject of -- you know,
19      that the IP was the subject of.
20   Q. And those all would have been elements of the
21      transaction in August 2008?
22   A. That's correct.
23   Q. Prior to Petters' arrest and -- and the
24      collapse of PCI, did Interlachen ever receive
25      a single transfer from PCI or any related

Page 223

1            BREILAND
2    entity?
3    A. It did not.
4    Q. It lost its entire $60 million?
5            MR. HAVELES: Objection; leading.
6            THE WITNESS: Yes, that's correct.
7            MR. LOIGMAN: I have no further
8    questions.
9            MR. HAVELES: I have a few.
10           THE WITNESS: Okay.
11           MR. HAVELES: We don't need to
12   take a break.
13
14        FURTHER EXAMINATION
15   BY MR. HAVELES:
16   Q. Let me ask you to go back to Exhibit 44, the
17      exhibit that Mr. Loigman marked at the
18      inception of his examination.
19           And you had testified you had seen
20      Exhibit 44 before. Do you recall that?
21   A. Yes.
22   Q. When did you first see Exhibit 44?
23   A. I believe I saw it when or shortly after the
24      PwC interim report was first released.
25   Q. And how did you -- who -- who provided you a

Page 224

1            BREILAND
2    copy of the PwC report that was released?
3    A. Likely, counsel, but possibly I pulled it
4       from PACER myself.
5    Q. Okay. Have you -- did you make any efforts
6       to look at any of the underlying documents
7       that PwC purportedly reviewed to prepare the
8       two pages that were -- of tables that were
9       marked as Exhibit 44?
10   A. Yes, I've seen some of the underlying
11      documents.
12   Q. What underlying documents have you seen that
13      PwC used to prepare the two pages that have
14      been marked as Exhibit 44?
15   A. I've seen an Excel spreadsheet that included
16      all of the transactions in and out of the M&I
17      account.
18   Q. What -- who prepared that Excel spreadsheet
19      that you saw?
20   A. I can't remember.
21   Q. Was it prepared by PwC?
22   A. I -- I don't know.
23   Q. When did you see that spreadsheet?
24   A. I can't remember. Some -- sometime well
25      after the revelation of the fraud.

Page 225

1            BREILAND
2    Q. Okay.
3    A. Year -- years after the revelation of the
4       fraud.
5    Q. Other than the -- that Excel spreadsheet,
6       which is presumably just a more -- a bigger
7       amplification of what we see in these two
8       pages, have you seen any other documents that
9       support the entries that appear on the tables
10      on these two pages of Exhibit 44?
11   A. I -- I don't know definitively. It's
12      possible I would have seen a daily M&I
13      statement that would have contained this same
14      information in this table, but I can't say
15      that definitively.
16   Q. Do you recall producing any M&I Bank
17      statements for the PCI accounts in connection
18      with discovery either in response to this
19      subpoena or the 2015 subpoena?
20   A. I can't remember.
21   Q. Okay. Have you done anything to look at the
22      timing of the wires or the transfers out and
23      the transfers into the M&I account on
24      April 18?
25   A. I have not.

TSG Reporting - Worldwide - 877-702-9580

# EXHIBIT 55

1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF MINNESOTA
2                     No. 08-45257
    ----------------------------------------------x
3   IN RE: PETTERS COMPANY, INC., et al.
4              Debtors.
5   (Includes:                    Court File Nos.
    Petters Group Worldwide, LLC;      08-45258 (KHS)
6   PC Funding, LLC;                   08-45326 (KHS)
    Thousand Lakes, LLC;               08-45327 (KHS)
7   SPF Funding, LLC;                  08-45328 (KHS)
    PL Ltd., Inc.;                     08-45329 (KHS)
8   Edge One LLC;                      08-45330 (KHS)
    MGC Finance, Inc.;                 08-45331 (KHS)
9   PAC Funding, LLC;                  08-45371 (KHS)
    Palm Beach Finance Holdings, Inc.) 08-45392 (KHS)
10  DOUGLAS A. KELLEY, in his capacity
    as the Trustee of the PCI Liquidating Trust,
11
                   Plaintiff,
12
        v.
13
    OPPORTUNITY FINANCE, LLC; OPPORTUNITY FINANCE
14  SECURITIZATION, LLC; OPPORTUNITY FINANCE
    SECURITIZATION II, LLC; OPPORTUNITY FINANCE
15  SECURITIZATION III, LC; INTERNATIONAL INVESTMENT
    OPPORTUNITIES, LLC; SABES FAMILY FOUNDATION;
16  SABES MINNESOTA LIMITED PARTNERSHIP;
    ROBERT W. SABES; JANET F. SABES; JON R. SABES;
17  STEVEN SABES; DEUTSCHE ZENTRALGENOSSENSCHAFTBANK
    AG; AND THE MINNEAPOLIS FOUNDATION,
18
                   Defendants.
19
    ----------------------------------------------x
20
21        VIDEOTAPED DEPOSITION OF DEANNA COLEMAN
                  Minneapolis, Minnesota
22             Thursday, November 15, 2018
23
24
    Reported by:  Amy L. Larson, RPR
25  Job No. 150538

## Page 10

COLEMAN

INDEX: (Cont'd.)
EXHIBITS MARKED FOR IDENTIFICATION:        PAGE
Exhibit 70...................................353
July 2003 E-mail
Bates Kelley_Micro_0279861
Exhibit 71...................................420
September 2003 E-mail Chain
Bates Kelley_Micro_0280049 -
Kelley_Micro_0280050

Exhibit 72 - Not Introduced

Exhibit 73...................................354
October 2003 E-mail
Bates Kelley_Micro_0280160 -
Kelley_Micro_0280161
Exhibit 74 - Not Introduced
Exhibit 75 - Not Introduced
Exhibit 76...................................354
November 2003 E-mail Chain
Bates Kelley_Micro_0279833
Exhibit 77...................................357
January 2004 E-mail Chain
Bates Kelley_Micro_0279810
Exhibit 78...................................357
September 2007 E-mail Chain
Bates Kelley_Micro_0191357 -
Kelley_Micro_0191358

Exhibit 79...................................364
Excerpt of Transcript - No Bates

## Page 11

COLEMAN

THE VIDEOTAPED DEPOSITION OF DEANNA COLEMAN,
taken on this 15th day of November, 2018, at
Winthrop & Weinstine, P.A., 225 South Sixth
Street, Suite 3500, Minneapolis, Minnesota,
commencing at approximately 9:28 a.m.

P R O C E E D I N G S

THE VIDEOGRAPHER:  This is the
start of media number 1 in the videotaped
deposition of Deanna Coleman In the Matter of
In Re:  Petters Company, Inc., et al.,
Douglas A. Kelley vs. Opportunity Finance,
LLC, et al., in the United States Bankruptcy
Court, District of Minnesota, number
08-45257.
This deposition is being held at
225 South Sixth Street, Suite 3500,
Minneapolis, Minnesota, on November 15th,
2018, at approximately 9:29 a.m.
My name is Jacob Arvold from
TSG Reporting, Inc., and I am the legal video
specialist.  The court reporter is Amy Larson
in association with TSG Reporting.

## Page 12

COLEMAN

Would counsel please identify
yourselves.
MR. HAVELES:  Peter Haveles and
Matthew Chiachetti, Pepper Hamilton, LLP, on
behalf of Defendant DZ Bank AG.
THE VIDEOGRAPHER:  And --
MR. HAVELES:  They're not counsel.
THE VIDEOGRAPHER:  Okay.
MR. TSCHUMI:  Alex Tschumi,
Quinn Emanuel Urquhart & Sullivan on behalf
of the trustee, Douglas Kelly.
THE VIDEOGRAPHER:  Will the court
reporter please swear in the witness.
THE COURT REPORTER:  Would you
raise your right hand, please.
MR. LOIGMAN:  I also would like to
identify myself.  It's Robert Loigman of
Quinn Emanuel.  I'm attending by telephone on
behalf of the trustee.  And if I may just
ask, it sounds like there are people in the
room who weren't identified on the record.
Because I'm not there, could somebody just
identify who the people are in the room?
MR. HAVELES:  Sure.  I have with

## Page 13

COLEMAN

me Andrew Richmond of Cornerstone and
Kelly -- I always mispronounce your last
name, Kelly.  Kelly Waclawik of Deloitte who
are with me today.
MR. LOIGMAN:  Thank you.
MR. HAVELES:  Yup.

DEANNA COLEMAN,
a witness in the above-entitled action,
after having been first duly sworn, was
deposed and says as follows:

EXAMINATION
BY MR. HAVELES:
Q.  Good morning, Ms. Coleman.  As I introduced
myself before we started, my name is
Peter Haveles.  I'm one of the attorneys that
has been representing DZ Bank in this
adversary proceeding that was commenced by
the trustee for Petters Company and now
trustee for the PCI liquidating -- Litigation
Trust.
So I'm going to ask you a number of
questions today during your deposition.  If I

COLEMAN

1
2  MR. TSCHUMI: Objection;
3  speculation.
4        THE WITNESS: I mean, because the
5  handwriting would be clear and everything
6  else would be blurry.
7        MR. HAVELES: Okay.
8        THE WITNESS: The purchase order
9  number would be clear, the purchase order
10  date would be clear, and everything else
11  would be blurry on it.
12  BY MR. HAVELES:
13  Q. Even the items?
14  A. The items he would write in so those would be
15  clear.
16  Q. Okay. So what part would be blurry?
17  A. Like I said, the letterhead, the address.
18  Q. Okay.
19  A. I think they had small writing on the bottom
20  of it.
21  Q. Okay.
22  A. The lines in the purchase order wouldn't
23  match up anymore.
24  Q. Okay. Did you or Mr. White create false bank
25  statements?

COLEMAN

1
2  A. Yes.
3  Q. And how -- how did you create false bank
4  statements?
5  A. On the computer.
6  Q. And explain to me what you would do on
7  computer.
8  A. I would type in the information, you know,
9  the date, the incoming wire, the outgoing
10  wire, and then Bob would do the layout of it,
11  I guess you would wanted to say.
12  Q. And when you say, "Layout," because I don't
13  want to assume anything, explain what you
14  mean by that.
15  A. Just the bank statements, the layout, like, I
16  would do it on an Excel spreadsheet, I would
17  send it to Bob, and then he would do the rest
18  of the bank statement, I guess the layout of
19  the bank statement.
20  Q. Did he create the -- the false bank statement
21  on the computer?
22  A. He would do part of it and then the -- again,
23  the bank statement itself we would white it
24  out and then we would cut and paste.
25  Q. Cut and paste? Okay.

COLEMAN

1
2        Any time where he did it just all on
3  the computer without cutting and pasting?
4  A. No.
5  Q. When you created false wire transfers, how
6  did you do that?
7  A. It was done on the computer.
8  Q. Explain.
9  A. Can you ask that question again? I'm not
10  sure if I know what you mean.
11  Q. When you created false wire transfers, how
12  did you create those? And you said you did
13  it on the computer, and I said explain what
14  you mean when you said you did it on the
15  computer.
16  A. So what do you mean by false wire transfers?
17  On the bank statements or the false wire
18  transfers like the wire transfer sheet
19  itself?
20  Q. The wire transfer sheets themselves, not the
21  bank statements?
22  A. Okay. On the computer.
23  Q. And how did you use the computer to do that?
24  A. I did a draft of one on the computer and then
25  I would just change who it was coming from,

COLEMAN

1
2  the date and then the bank information.
3  Q. So for that one you had a template on your
4  computer that you used?
5  A. I did.
6  Q. Is that the -- were there any other documents
7  besides the wire transfer documents that you
8  had a template on the computer for?
9  A. Invoices.
10  Q. Okay. Anything else besides invoices and
11  bank wire statements?
12  A. And then like I said, I would have
13  National -- I had a purchase order from
14  National on my computer.
15  Q. So that wouldn't involve the cutting and
16  pasting, that one you would do on the
17  computer?
18  A. Correct.
19  Q. So that one wouldn't be blurry?
20  A. Correct.
21  Q. Did you have any other purchase orders
22  besides the one from National on your
23  computer?
24  A. No.
25  Q. Do you know if Mr. White saved any other

Page 126

COLEMAN

1
2  purchase orders on his computer?
3  A.  He didn't do any on the computer, I don't
4     think.
5  Q.  Okay.  When Petters Company bought real
6     goods, did it use monies from investors or
7     lenders to pay for those goods?
8         MR. TSCHUMI:  Objection to form.
9         THE WITNESS:  Yes.
10 BY MR. HAVELES:
11 Q.  Did it use its own money to pay for or -- the
12    purchase of any of those real goods?
13        MR. TSCHUMI:  Objection to form.
14        THE WITNESS:  Petters Company
15    didn't have any of its own money.
16        MR. HAVELES:  Okay.
17 BY MR. HAVELES:
18 Q.  Well, it had money in a bank account that
19    would sit there for awhile.  Let me rephrase
20    the question.
21        Did Petters go out and always obtain
22    new money from investors for the purchase of
23    any goods that were actually purchased by the
24    Petters Company?
25        MR. TSCHUMI:  Objection to form.

Page 127

COLEMAN

1
2         THE WITNESS:  Yes.
3         MR. HAVELES:  Okay.
4  BY MR. HAVELES:
5  Q.  And do -- what investors after 2000 did --
6     let me withdraw that.
7         In -- in the period 2000 to 2008,
8     was there a primary group of investors that
9     the Petters Company -- or lenders that the
10    Petters Company used to finance its
11    operations, be it actual or fake sales?
12        MR. TSCHUMI:  Objection to form,
13    vague.
14        THE WITNESS:  Yes.
15        MR. TSCHUMI:  Compound.
16 BY MR. HAVELES:
17 Q.  Who were they?
18 A.  Hedge funds.
19 Q.  Which hedge funds?
20 A.  Opportunity Finance, Metro Gem, and when I
21    say, "Metro Gem," I'm talking about Frank
22    Vennes so it would be Palm Beach and every --
23    Palm Beach and Jim Fry, Lancelot, Acorn
24    Capital.
25 Q.  Anyone else besides those four, or five if

Page 128

COLEMAN

1
2     you count Palm Beach as separate?
3  A.  Palm Beach, Frank -- well, Frank had three.
4  Q.  Metro Gem, Palm Beach, and what was the
5     other, when you say three?
6  A.  Oh, Jim Fry.
7  Q.  Okay.  Was Mr. Fry an independent investor or
8     did he invest through a hedge fund?
9  A.  Through hedge fund and then through Frank.
10 Q.  Okay.  And was his hedge fund Palm Beach?
11 A.  No.
12 Q.  What was his hedge fund?
13 A.  I think it was Metro Gem 2 maybe.  I mean it
14    wasn't his hedge fund, but that's what Frank
15    had it as.
16 Q.  So Frank -- and so for the record, what's his
17    last name?
18 A.  Vennes.
19 Q.  Mr. Vennes used Metro Gem, Palm Beach and
20    Metro Gem 2 for his vehicles for investment?
21 A.  To name a few, he had other ones too.
22 Q.  So there's -- what I'll call the Vennes
23    funds, that's one; there's Opportunity
24    Finance, that's two; there's Lancelot, that's
25    three; and there's Acorn, that's four.

Page 129

COLEMAN

1
2         Any other hedge funds besides those
3     four groups?
4  A.  Possibly, I just don't remember offhand.
5  Q.  Okay.  Were there any individuals who were
6     primary lenders during this period, 2000 to
7     2008?
8  A.  Yes.
9  Q.  What individuals fall in the group of being
10    one of the primary lenders?
11 A.  Dean Vlahos, Mrs. Vlahos.
12 Q.  Okay.  Anyone else besides the Vlahos family?
13 A.  There were a couple other ones, yes.
14 Q.  Do you remember their names?
15 A.  Offhand, no.
16 Q.  With Opportunity Finance, there was a --
17    recall there being a -- it being a line of
18    credit that could be drawn on?
19        MR. TSCHUMI:  Objection;
20    foundation.
21 BY MR. HAVELES:
22 Q.  Let me withdraw it.
23        Do you recall that the company,
24    Petters Company, signed an agreement for a
25    revolving line of credit with Opportunity

Page 130

COLEMAN

1
2  Finance in December 2001?
3         MR. TSCHUMI:  Objection;
4  foundation, form.
5         THE WITNESS:  Not really.  I kind
6  of remember something about it, but I
7  don't -- I guess I would have to say, no, I
8  don't remember.
9  BY MR. HAVELES:
10 Q.  Were you involved in dealing with the
11 documentation other than promissory notes
12 with respect to any of these hedge fund
13 lenders?
14 A.  Documentation referring to.
15 Q.  Do you know if there are any master
16 agreements with -- with Acorn, for instance?
17        MR. TSCHUMI:  Objection to form
18 and foundation.
19        THE WITNESS:  Yes.
20 BY MR. HAVELES:
21 Q.  Were you involved in the preparation or
22 negotiation of the master agreement with
23 Acorn?
24 A.  No.
25 Q.  What about with Lancelot?  Was there a master

Page 131

COLEMAN

1
2  agreement?
3  A.  Yes.
4         MR. TSCHUMI:  Objection to form
5  and foundation.
6  BY MR. HAVELES:
7  Q.  Were you involved with the negotiation or
8  preparation of that document?
9  A.  No.
10 Q.  What about with Opportunity Finance?  Was
11 there a master agreement?
12 A.  Yes.
13        MR. TSCHUMI:  Objection; form and
14 foundation.
15 BY MR. HAVELES:
16 Q.  Were you involved in the negotiation or
17 preparation of that agreement?
18 A.  No.
19 Q.  What about with the various Vennes entities?
20 Were there any master agreements?
21        MR. TSCHUMI:  Objection; form and
22 foundation.
23        THE WITNESS:  That one I'm not
24 sure.
25        MR. HAVELES:  Okay.  Why don't we

Page 132

COLEMAN

1
2  go off the record for just two minutes while
3  the tape is changed and then we'll keep on
4  going, okay?
5         THE VIDEOGRAPHER:  This is end of
6  media number 1 in the deposition of Deanna
7  Coleman.  We are off the record at 11:29.
8         (Whereupon, a brief recess
9          was taken.)
10        THE VIDEOGRAPHER:  This is the
11 beginning of media number 2 in the deposition
12 of Deanna Coleman.  We are back on the record
13 at 11:29.
14 BY MR. HAVELES:
15 Q.  Now, earlier when I was asking about your
16 responsibilities in the first part of our --
17 your deposition today, you indicated you had
18 responsibilities for investor relations.
19        Do you remember that?
20 A.  I do.
21 Q.  What was the nature of your responsibilities
22 when it came to investor relations with
23 respect to the hedge funds that you've just
24 identified or hedge fund groups that you've
25 identified?

Page 133

COLEMAN

1
2  A.  I would call, say, Steve Sabes up and tell
3  him I needed $5 million for a Sony
4  transaction, and then he would say yes or no
5  and then I would create the paperwork.
6  Q.  Okay.  So other than making requests for
7  advances or loans from a particular hedge
8  fund, did you have any other responsibilities
9  for investor relations with those -- those
10 entities?
11 A.  As far as what?
12 Q.  Anything to deal with their relationship with
13 the Petters Company.
14        Beyond making requests for money,
15 did you have any responsibilities for
16 managing those relationships?
17 A.  When we got money in from other investors
18 paying off the investors or rolling their
19 notes when they were due.
20 Q.  Okay.  Anything besides the tasks of asking
21 for money, paying off loans, and rolling
22 notes in terms of your responsibilities for
23 dealing with investor relationships?
24 A.  Not that I remember, no.
25 Q.  Did Mr. Petters have any responsibilities for

Page 138

COLEMAN

1
2      signed --
3    A.  Yes.
4    Q.  -- for the line of credit?
5    A.  Yes.
6    Q.  Were they meetings in which GE Capital came
7      to Petters to seek information in connection
8      with deciding whether to make a loan?
9    A.  Yes.
10   Q.  Did you make statements or -- make any
11     statements or comments about the company and
12     its operations to any of the GE Capital
13     representatives in those meetings?
14   A.  I don't remember.
15   Q.  Did you participate in meetings with any
16     other investors, be they individuals or hedge
17     funds, before they agreed to provide money to
18     the Petters Company?
19   A.  Yes.
20   Q.  And do you recall whether you spoke about the
21     company or its operations in any of those
22     meetings?
23   A.  Yes.
24   Q.  And what would you -- what did you generally
25     speak about in those meetings when making

Page 139

COLEMAN

1
2      comments to representatives from potential --
3      from potential investors?
4    A.  Answer any questions they may have and then
5      go over how it works.
6    Q.  Okay.  And when you say, "How it works," what
7      do you mean "it"?  How -- what does the "it"
8      refer to when you say, "How it works"?
9    A.  How we would call the investor up, tell them
10     what we have out there.  If it's Sony TVs,
11     the dollar amount we would need, the purchase
12     order that we would do -- or the promissory
13     note I mean that we would do, and then the
14     purchase order and the UCC filing, if we
15     filed one.
16   Q.  Do you recall being at meetings where
17     potential investors or hedge funds asked
18     about being able to look at books and records
19     of the Petters Company as part of due
20     diligence?
21        MR. TSCHUMI:  Objection to form.
22        THE WITNESS:  That, I don't know.
23   BY MR. HAVELES:
24   Q.  Do you recall being at any meetings in which
25     a potential investor, be it an individual or

Page 140

COLEMAN

1
2      hedge fund, asked to be able to inspect
3      inventory?
4    A.  No.
5    Q.  Do you recall being at any meeting with a
6      potential investor at which the potential
7      investor asked to conduct site visits?
8    A.  No.
9    Q.  Do you recall being at any meeting with a
10     potential investor where the investor asked
11     to be able to look at financial records of
12     the Petters Company?
13   A.  That one, I don't remember.
14   Q.  Do you recall being at any meeting at which a
15     potential investor asked to look at bank
16     statements?
17   A.  No.
18   Q.  Do you recall being at any potential meeting
19     at which a potential -- withdraw that.
20        Do you recall being at any meeting
21     at which a potential investor asked about
22     specific retailers with whom the Petters
23     Company purportedly did business?
24   A.  I don't know if they would necessarily ask.
25     I think we just told them.

Page 141

COLEMAN

1
2    Q.  Do you recall being at any meeting where the
3      potential investor asked for -- to see
4      documentation about the relationship between
5      the Petters Company and the retailers about
6      which Petters told them?
7        MR. TSCHUMI:  Objection to form.
8        THE WITNESS:  No.
9    BY MR. HAVELES:
10   Q.  Do you recall being at any meeting where a
11     potential investor asked about being able to
12     speak to the retailers about whom the Petters
13     Company had told them?
14   A.  No.
15        MR. TSCHUMI:  Objection to form.
16   BY MR. HAVELES:
17   Q.  Do you recall being at any meeting where you
18     described the types of documentation you
19     created for a transaction?
20   A.  Yes.
21   Q.  And when you -- do you recall what kinds of
22     information you provided to potential
23     investors about the type of documentation you
24     would provide for a loan transaction?
25   A.  I would walk through what we did.  Like I

Page 142

COLEMAN

1
2    said before, the promissory note, call the
3    investor up, then we would do the purchase
4    order to either Nationwide or to Enchanted
5    from Petters Company, Inc., and then we would
6    create the purchase order from the big-box
7    retailer to Petters Company, Inc.
8    Q. Okay. Do you -- so let me -- now -- withdraw
9    that.
10       Do you recall any potential investor
11   coming to Petters' offices and being given
12   documents to review?
13   A. Yes.
14   Q. And do you recall what documents were given
15   to potential investors when they came to the
16   Petters Company's offices to review
17   materials?
18   A. The only one that I remember coming to the
19   office to review would be Acorn Capital, and
20   they came because there was at one point in
21   time where we stopped giving them the
22   purchase orders, so then Dominic would come
23   every, I don't know, three months, every six
24   months, and he would look through the
25   promissory notes just to make sure there was

Page 143

COLEMAN

1
2    a purchase order in the folder.
3    Q. This was after the relationship was started,
4    correct?
5    A. Yes.
6    Q. So my question now was focusing on the before
7    the relationship.
8       Do you remember prior to the
9    relationship potential investors being given
10   documents to review?
11   A. No.
12   Q. Okay. Do you remember potential investors
13   being shown, prior to any agreement being
14   formed, false documents that you and
15   Mr. White had prepared?
16   A. That, I'm not sure.
17   Q. Did you ever show any potential investors
18   both actual and false documents so they could
19   see the differences that you say could be
20   detected?
21   A. No.
22        MR. TSCHUMI: Objection to form,
23   compound.
24   BY MR. HAVELES:
25   Q. Okay. So I want to just clean up a couple of

Page 144

COLEMAN

1
2    things on the false documents then we'll move
3    to a new topic.
4       Besides you and Mr. White, was
5    anyone else involved in the preparation of
6    false documents?
7    A. No.
8    Q. Who else besides you and Mr. White knew that
9    false documents were being prepared?
10        MR. TSCHUMI: Objection;
11   speculation.
12   BY MR. HAVELES:
13   Q. Let me withdraw that.
14       Do you know whether anyone else knew
15   besides you and Mr. White that false
16   documents were being prepared?
17   A. Yes.
18   Q. Who do you know?
19   A. Tom Petters.
20   Q. Anyone else besides Mr. Petters?
21   A. No.
22   Q. Did -- at any time prior to your going to the
23   government in September 2008, did anyone at
24   the Petters Company come to you and express
25   some concern or doubts about whether the

Page 145

COLEMAN

1
2    documents that you and Mr. White were
3    preparing were real?
4    A. There was some hints.
5    Q. From whom did you receive hints about
6    concerns as to whether or not any documents
7    that you and Mr. White were preparing were
8    real?
9    A. From Jim Wehmhoff.
10   Q. Anyone else besides Mr. Wehmhoff?
11   A. Mary Jeffries.
12   Q. Who is Mary Jeffries?
13   A. An employee at Petters Group.
14   Q. What did she do at Petters Group?
15   A. You know, I don't know her title, exact
16   title.
17   Q. Do you know what she did --
18   A. She helped out with Polaroid and other
19   companies trying to raise money for Polaroid.
20   Q. Did she do any work for the Petters Company
21   business activities?
22   A. No.
23   Q. So do you remember what hints Ms. -- that she
24   expressed to you?
25   A. How can Petters Company continue funding all

Page 158

COLEMAN

friends with him.

Q. Okay. And did you use it for any particular business purpose?

A. No.

Q. How did you decide whether to have -- do transactions through the M&I account as opposed to the Crown account?

A. M&I was the main account, that was pretty much what we did all the time. Every once in awhile Crown Bank would call me up and ask if we had any extra money to send over so they could have it for the end of the month.

Q. Okay. Did you prepare any periodic reports to investors and lenders?

A. I did.

Q. What kinds of -- how frequently were the reports that you prepared for investors and lenders?

A. Only when they asked for them.

Q. Okay. And if they didn't ask for them, did you have a routine practice about preparing reports?

A. No.

Q. What would -- was the nature of the reports

Page 159

COLEMAN

that you were requested to provide from investors and lenders?

A. Every once in awhile Frank Vennes would want like a shipping report, what merchandise has been shipped and what merchandise hasn't been shipped.

Q. Okay. Would you provide purchase order information to lenders on a regular basis in connection with the advances that you requested?

A. A -- the vendors -- or the investors always got a purchase -- I shouldn't say always. The hedge funds or the larger investors always got a purchase order.

Q. Did they get anything else besides purchase orders from you?

A. They got a purchase order from Petters Company to who we were buying it from.

Q. Let me withdraw that.

Did you provide any our documents besides purchase orders to lenders and hedge -- investors when you were making a request for an advance?

A. When I was making a request for an advance,

Page 160

COLEMAN

there was nothing. I would just pick up the phone and call them.

Q. Okay. And did you immediately after making the request for an advance have to provide documentation to these lenders on a regular basis?

A. Yes.

Q. What kind of documents would you provide in connection with an advance that you requested from a hedge fund lender?

A. So for Sabes or PC Funding, I would do the promissory note, and I -- I take that back. I'm not sure if we did the promissory note or if Steve did the promissory note, but I would give them the purchase order from the vendor, purchase order from -- purchase order from Petters Company to the vendor, purchase order from the retailer to Petters Company.

Q. Okay. Did you provide anything else besides purchase orders to Opportunity Finance?

A. We would provide a letter on where the wire was to go to.

Q. Okay. So wire instructions?

A. Yes.

Page 161

COLEMAN

Q. Anything else besides wire instructions and purchase orders for Opportunity Finance?

A. I don't believe so.

Q. What about the other hedge fund groups where you identified the Vennes group, Acorn and Lancelot? Did you provide any other types of documentation besides wire instructions and purchase orders to them?

A. There I -- no.

Q. Okay. What about to banks? Did you -- let me withdraw.

What about to GE Capital? Did you provide any documentation to GE Capital on a regular basis?

A. No. Just purchase orders again.

Q. Okay. And what about the banks, M&I and Crown, did you provide any documentation to them on a regular basis?

A. No.

Q. Did they require financial statements to be provided on a regular basis from the company?

MR. TSCHUMI: Objection to form.

THE WITNESS: Not that I'm aware of.

Page 162

COLEMAN

BY MR. HAVELES:

Q. Did you -- with respect to Opportunity
Finance, did you ever disclose to them that
the documents that you were sending them were
false?

A. No.

Q. Did they -- did anyone from Opportunity
Finance ever indicate to you that they had a
belief or concern that the documents that you
were providing were false before
Mr. Pettis -- Petters was arrested in
September 2008?

MR. TSCHUMI: Objection to form.

THE WITNESS: They didn't -- never
came right out and said it.

MR. HAVELES: Okay.

BY MR. HAVELES:

Q. What did they say that made you pause for a
second here?

A. Jon Sabes asked once why Costco wasn't paying
electronically because that's the only way
they pay.

Q. Okay. And other than that, you don't recall
anything else?

Page 163

COLEMAN

A. There was mistakes made that there -- I think
their attorney actually found. UCC filings
with the same purchase order numbers, wrong
dollar amounts.

Q. And did -- when they -- when they brought
those to your attention, did you tell -- tell
them anything in particular?

A. We just corrected it and moved on.

Q. Okay. All right. Anything where they
thought -- they expressed to you that they
thought they were more than just genuine
mistakes?

MR. TSCHUMI: Objection to form.

THE WITNESS: You know, towards
the end there, they just wanted to get paid,
so, you know, we would call them up and -- I
mean, they -- Tom made an agreement that he
would pay off three notes a week, and I just
had to make up what three notes were being
paid, so they knew it wasn't coming from the
investor, but yet we were writing it off as
it was coming from the investor.

BY MR. HAVELES:

Q. So two thousand --

Page 164

COLEMAN

A. Or purchase order, I mean.

Q. When you say at the end, this is referring to
2008?

A. Yes.

Q. Prior to 2008, did that situation exist with
Opportunity Finance and Mr. Sabes?

A. Well, the one with Jon Sabes about the wire,
that was prior to that, but yeah,
otherwise --

Q. I'm talking about when you -- the story you
just told about making up which notes were
being paid --

A. No.

Q. Okay. What about with respect to Lancelot?
Did Lancelot ever know that -- did you ever
tell Lancelot the documents you were
preparing were fake?

A. No.

Q. Did Lancelot ever know or any representatives
of Lancelot ever know the documents were
fake?

MR. TSCHUMI: Objection;
speculation.

THE WITNESS: I don't know that

Page 165

COLEMAN

offhand.

MR. HAVELES: Okay.

BY MR. HAVELES:

Q. What about any of the Vennes entities?
Did -- did you ever tell any -- Mr. Vennes or
any of the people involved with the Vennes
investors, Metro Gem, Palm Beach, Mr. Fry,
that the documents you were sending them were
false?

A. No.

MR. TSCHUMI: Objection to form.

BY MR. HAVELES:

Q. Did you ever know whether -- did any of them
ever express to you a belief or concern that
the documents were false?

A. Yes.

Q. Who?

A. Frank Vennes.

Q. When did he express those to you?

A. 2008.

Q. Prior to 2008, did he ever express those
concerns to you?

A. Possibly the end of 2007.

Q. Anything prior to the end of 2007?

Page 394

COLEMAN

1  inventory on PCI deals?
2  
3          MR. HAVELES:  Objection;
4  foundation.
5          THE WITNESS:  No.
6  BY MR. TSCHUMI:
7  Q.  Because they couldn't have?
8  A.  There was no inventory to inspect.
9  Q.  And if investors or their lenders went to
10  visit Nationwide's warehouse, would they have
11  covered that there was a fraud?
12  A.  Yes.
13         MR. HAVELES:  Objection;
14  foundation, speculation.
15  BY MR. TSCHUMI:
16  Q.  Why?
17  A.  A couple of the warehouses that we used had
18  absolutely nothing in them.  They were just
19  empty warehouses.  A couple of the other
20  warehouses that we used, the addresses had
21  very little merchandise.
22  Q.  And what -- and what little merchandise they
23  had wouldn't have matched the description on
24  any purchase orders, right?
25  A.  No.

Page 395

COLEMAN

1  
2  Q.  To your knowledge, did PCI tell investors and
3  their lenders that they were not allowed to
4  contact retailers?
5          MR. HAVELES:  Objection;
6  foundation.
7          THE WITNESS:  Did PCI --
8  BY MR. TSCHUMI:
9  Q.  Well, did anyone at PCI?
10         MR. HAVELES:  Objection;
11  foundation.
12         THE WITNESS:  There again, I don't
13  know if Tom told them or not.  I'm sure Tom
14  did tell them that they weren't allowed to.
15  BY MR. TSCHUMI:
16  Q.  And the only lender who contacted a retailer,
17  which was GE Capital, found out that there
18  was a fraud, correct?
19  A.  Correct.
20  Q.  To your knowledge, did anyone at PCI tell
21  investors and their lenders that retailers
22  couldn't make payments directly into the SPE
23  accounts?
24         MR. HAVELES:  Objection;
25  foundation.

Page 396

COLEMAN

1  
2          THE WITNESS:  Yes.
3  BY MR. TSCHUMI:
4  Q.  And all the funds that were purportedly deal
5  payouts to SPEs came from PCI's bank account,
6  correct?
7  A.  Yes.
8  Q.  PC Funding never received a payment directly
9  from a retailer, correct?
10  A.  Correct.
11  Q.  Do you recall being told that DZ Bank was
12  dissatisfied with retailers not paying
13  directly into PC Funding's bank account?
14         MR. HAVELES:  Objection;
15  foundation.
16         THE WITNESS:  I don't remember
17  that, no.
18  BY MR. TSCHUMI:
19  Q.  Would you mind turning to Exhibit 3.
20  A.  (Complies.)
21  Q.  And this is an e-mail sent from Jon Sabes to
22  you in connection with an audit of the
23  DZ Bank facility, correct?
24  A.  Yes.
25  Q.  And Jon Sabes tells you not to bring up that

Page 397

COLEMAN

1  
2  retailer payments are not being sent directly
3  to the PC Funding account, correct?
4  A.  Yes.
5  Q.  And was it your understanding that this would
6  have been a problem for DZ Bank?
7          MR. HAVELES:  Objection;
8  foundation, calls for speculation.
9          THE WITNESS:  I guess I wouldn't
10  have realized it was DZ Bank in general, but
11  just any hedge fund, yes.
12  BY MR. TSCHUMI:
13  Q.  And counsel for DZ Bank showed you a number
14  of memoranda and e-mails that Jon Sabes sent
15  to you regarding the M&I Bank account,
16  correct?
17  A.  Correct.
18  Q.  And PCI was never able to successfully
19  execute any of those proposals, correct?
20  A.  Correct.
21         MR. HAVELES:  Alex, I don't mean
22  to rush you and I don't want to, but do you
23  think you have a while to go because I got an
24  e-mail my flight's been canceled, and I need
25  to make a hotel reservation for tonight.  So

Page 398

COLEMAN

1
2  if you've got a while longer, I'd like to
3  take a brief recess.  If you think you're
4  going to be done soon --
5         MR. TSCHUMI:  I don't think I have
6  that much longer, but if that would make you
7  more reassured.
8         MR. HAVELES:  Well, I'll probably
9  get one.  If you're going to go for a while,
10  I would want to take a break, but if you
11  think you're done soon, I can wait 15 minutes
12  or so.
13         THE VIDEOGRAPHER:  We have 28
14  minutes to the 7 hours.
15  BY MR. TSCHUMI:
16  Q.  Did PCI give -- well, earlier you -- you said
17     that at some point you and Bob White had
18     created fraudulent bank statements for PCI's
19     general account; is that -- am I correct?
20  A.  Yes.
21  Q.  And I think you said those were given to
22     Frank Vennes?
23  A.  Yes.
24  Q.  Do you know if they were given to any other
25     investors?

Page 399

COLEMAN

1
2  A.  I believe some of them were given to Acorn
3     Capital.
4  Q.  Okay.  But you don't recall any ever being
5     shown to Opportunity Finance or DZ Bank,
6     correct?
7  A.  No.
8  Q.  PCI didn't give its investors or their
9     lenders access to PCI bank statements,
10     correct?
11  A.  No, correct.
12  Q.  And this was because M&I Bank statements
13     didn't show any of the retailer payments that
14     were purportedly occurring, correct?
15  A.  Correct.
16  Q.  And instead they showed payments directly
17     from vendors like Nationwide and Enchanted?
18  A.  Yes.
19  Q.  And those payments from -- those transfers
20     from vendors to PCI's operating account were
21     for the amount that was supposed to be for
22     buying goods minus a small commission to the
23     vendor, correct?
24         MR. HAVELES:  Objection; vague.
25         THE WITNESS:  Correct.

Page 400

COLEMAN

1
2  BY MR. TSCHUMI:
3  Q.  It was not the sale price for the purported
4     sales, correct?
5  A.  Correct.
6  Q.  Neither Opportunity Finance nor its lender,
7     DZ Bank, received M&I Bank statements for the
8     PCI operating account, correct?
9  A.  Correct.
10  Q.  If they had seen it, would they have covered
11     that there was a fraud?
12         MR. HAVELES:  Objection; calls for
13     speculation, foundation.
14         THE WITNESS:  Yes.
15  BY MR. TSCHUMI:
16  Q.  And you discussed generating false wire
17     confirmations for M&I Bank?
18  A.  Yes.
19  Q.  Investors and their lenders never received
20     those directly from M&I Bank, correct?
21  A.  Correct.
22  Q.  To your knowledge, did Opportunity Finance or
23     its lender, DZ Bank, contact M&I Bank to
24     confirm the wire transfers purportedly
25     received from retailers?

Page 401

COLEMAN

1
2  A.  No.
3  Q.  And if Opportunity Finance or their lender
4     sought to confirm the wire transfer with
5     M&I Bank, would they have discovered that
6     there was a fraud?
7         MR. HAVELES:  Objection;
8     foundation, calls for speculation.
9         THE WITNESS:  Yes.
10  BY MR. TSCHUMI:
11  Q.  Because M&I Bank, you would think, would not
12     have confirmed those transfers because they
13     weren't real?
14         MR. HAVELES:  Objection;
15     foundation, calls for speculation.
16         THE WITNESS:  There was no
17     payments from retailers, or very little.
18  BY MR. TSCHUMI:
19  Q.  And you saw some documents earlier regarding
20     requests for an account control agreement,
21     correct?
22  A.  Correct.
23  Q.  And PCI told its investors and their lenders
24     that PCI couldn't transform its M&I Bank
25     account into a custodial account, correct?

---

Page 402

COLEMAN

1
2  A.  Correct.
3  Q.  So investors had no way to see whether
4      retailers were actually making payments into
5      any PCI bank account or bank account of its
6      SPEs, correct?
7          MR. HAVELES:  Objection;
8      foundation.
9          THE WITNESS:  Correct.
10 BY MR. TSCHUMI:
11 Q.  And PCI did this because there were no such
12     wire transfers from retailers, correct?
13         MR. HAVELES:  Objection; vague.
14         THE WITNESS:  Correct.
15 BY MR. TSCHUMI:
16 Q.  I just want to clarify some testimony you
17     gave earlier, and I think you corrected it,
18     but I just want to make sure we've got it
19     right.
20         PCI was never audited, correct?
21 A.  Correct.
22 Q.  And PCI did not allow investors and their
23     lenders to audit PCI, correct?
24 A.  Correct.
25         MR. HAVELES:  Objection;

---

Page 403

COLEMAN

1
2      foundation.
3  BY MR. TSCHUMI:
4  Q.  So neither Opportunity Finance nor its lender
5      DZ Bank was allowed to audit PCI?
6          MR. HAVELES:  Objection;
7      foundation.
8          THE WITNESS:  Correct.
9  BY MR. TSCHUMI:
10 Q.  Instead they audited the SPEs like
11     PC Funding, correct?
12 A.  Correct.
13 Q.  And to your knowledge, those audits did not
14     include auditors contacting retailers,
15     correct?
16         MR. HAVELES:  Objection;
17     foundation, asked and answered.
18         THE WITNESS:  Correct.
19 BY MR. TSCHUMI:
20 Q.  Were PC Funding's auditors permitted to see
21     PCI's bank account statements?
22         MR. HAVELES:  Objection;
23     foundation.
24         THE WITNESS:  No.
25 BY MR. TSCHUMI:

---

Page 404

COLEMAN

1
2  Q.  They would have only seen PC Funding's bank
3      account statements, correct?
4          MR. HAVELES:  Objection;
5      foundation.
6          THE WITNESS:  Correct.
7  BY MR. TSCHUMI:
8  Q.  And those would have only reflected payments
9      from PCI, not payments from retailers,
10     correct?
11 A.  Correct.
12 Q.  So an audit would have contained no banking
13     evidence that money -- strike that.
14         So an audit would have contained no
15     banking evidence that a retailer payment was
16     ever made on any PC Funding deals, correct?
17 A.  Correct.
18 Q.  Would you turn to the exhibit marked 14.
19 A.  (Complies.)
20 Q.  If you turn to the second page to the -- the
21     first page of the memorandum that Jon Sabes
22     sent to Tom Petters cc'ing you, among others.
23 A.  Uh-huh.
24 Q.  It says that, "It appears from the M&I Bank
25     letter that M&I Bank is unable to provide the

---

Page 405

COLEMAN

1
2      necessary custodial management services we
3      request without changing the bank account
4      number of the Petters account, which
5      currently received all retailer payments."
6          And you testified earlier that M&I
7      gave an excuse on PCI's behalf with regard to
8      one of these proposals, correct?
9          MR. HAVELES:  Objection;
10     mischaracterizes her testimony as to this
11     document, no foundation.
12 BY MR. TSCHUMI:
13 Q.  Well, did M&I -- this document reflects that
14     M&I sent a letter stating that it was unable
15     to provide certain management services,
16     correct?
17 A.  Yes.
18 Q.  So M&I supported that specific declination by
19     PCI to incorporate Jon Sabes's proposal,
20     correct?
21         MR. HAVELES:  Objection; no
22     foundation.
23         THE WITNESS:  Yes.
24 BY MR. TSCHUMI:
25 Q.  M&I didn't provide support for any excuses

# EXHIBIT 56

```
 1                        DEIKEL
 2            UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF MINNESOTA
 3     -------------------------------------------------
       In re                    Jointly Administered
 4                              Case No. 08-45257
 5     Petters Company, Inc., et al.,
 6                    Debtors.
 7     (includes:                  Court File Nos.
       Petters Group Worldwide, LLC;    08-45258(KHS)
 8     PC Funding, LLC;                 08-45326(KHS)
       Thousand Lakes, LLC;             08-45327(KHS)
 9     SPF Funding, LLC;                08-45328(KHS)
       PL Ltd., Inc.;                   08-45329(KHS)
10     Edge One LLC;                    08-45330(KHS)
       MGC Finance, Inc.;               08-45331(KHS)
11     PAC Funding, LLC;                08-45371(KHS)
       Palm Beach Finance Holdings, Inc.  08-45392(KHS)
12
                              Chapter 11 Cases
13                       Judge Kathleen H. Sanberg
       -------------------------------------------------
14     Douglas A. Kelley, in his
       capacity as the Trustee of
15     the PCI Liquidating Trust,
16              Plaintiff,
                              ADV. NO.  10-04301
17       VS.
18     Opportunity Finance, LLC,
       Opportunity Finance
19     Securitization, LLC;
       Opportunity Finance
20     Securitization III, LLC;
       International Investment
21     Opportunities, LLC; Sabes
       Family Foundation; Sabes
22     Minnesota Limited
       Partnership; Robert W.
23     Sabes; Janet F. Sabes; Jon
       R. Sabes; Steven Sabes;
24     Deutsche
       Zentralgenossenschaftbank
25     AG; and The Minneapolis
```

## Page 2

```
 1                    DEIKEL
 2
           Defendants.
 3      _____
 4
 5
 6      VIDEOTAPED DEPOSITION OF THEODORE DEIKEL
 7              Minneapolis, Minnesota
 8              Friday, December 28, 2018
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23      Reported by:
24      BRANDI BIGALKE, RPR, RSA
25      JOB NO. 153161
```

## Page 3

```
 1                    DEIKEL
 2
 3
 4           December 28, 2018
 5
 6
 7      Videotaped Deposition of THEODORE DEIKEL,
 8   held at Winthrop & Weinstine, P.A., 225 South
 9   Sixth Street, Suite 3500, Minneapolis,
10   Minnesota before Brandi N. Bigalke, Registered
11   Professional Reporter, Realtime Systems
12   Administrator, and Notary Public in and for the
13   State of Minnesota.
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                    DEIKEL
 2   A P P E A R A N C E S :
 3
 4      ATTORNEYS FOR TRUSTEE and THEODORE DEIKEL:
 5         Jacob J. Waldman
           QUINN EMANUEL URQUHART & SULLIVAN
 6         51 Madison Avenue
           New York, New York 10010
 7
 8
        ATTORNEYS FOR DEFENDANT DZ BANK:
 9
           Matthew A. Chiachetti
10         PEPPER HAMILTON LLP
           3000 Two Logan Squarre
11         Eighteenth and Arch Streets
           Philadelphia, Pennsylvania 19103
12
           AND
13
           Michael A. Rosow
14         WINTHROP & WEINSTINE
           225 South Sixth Street
15         Suite 3500
           Minneapolis, Minnesota 55402
16
17
18
19
20   ALSO PRESENT:
21         Kyle Stolis, Legal Video Specialist
22         Ronald L. Haskvitz
23
24
25
```

## Page 5

```
 1                    DEIKEL
 2   _____INDEX PAGE_____
 3   DEIKEL        EXAMINATION BY        PAGE
 4   MR. CHIACHETTI.............................10
 5   MR. WALDMAN................................206
 6
 7   _____EXHIBITS_____
 8   DEIKEL                        PAGE
 9   EXHIBIT 1......................................13
10   Subpoena to Testify
11   EXHIBIT 2......................................34
12   Summary of PCI Notes
13   EXHIBIT 3......................................45
14   FAC Acquisition, LLC, Memorandum of Understanding
15     Meeting - September 19, 2002
16   Kelley_Micro_0216594-95
17   EXHIBIT 4......................................49
18   Agreement Regarding FDM and FAC
19   POF040201_0001-10
20   EXHIBIT 5......................................54
21   1/16/04 E-mail, Subject:  Fw: Financing Impacts
22   EXHIBIT 6......................................59
23   12/19/03 E-mail, Subject: Deikel Promissory Note
24   POF037856_0001 & 037857_0001-2
25
```

Page 10

DEIKEL

1  
2    MR. HASKVITZ:  Ron Haskvitz on
3    behalf of Theodore Deikel.
4    MR. WALDMAN:  Jacob Waldman, Quinn
5    Emanuel Urquhart & Sullivan, on behalf of
6    the Trustee and also the witness,
7    Mr. Deikel.
8    THE VIDEO OPERATOR:  Thank you.
9    Will the court reporter please swear
10   in the witness.
11       THEODORE DEIKEL
12   Called as a witness and having been first duly
13   sworn, testifies as follows:
14       EXAMINATION
15   BY MR. CHIACHETTI:
16   Q.   Good morning, Mr. Deikel.
17   A.   Good morning.
18   Q.   My name is Matthew Chiachetti.  We
19   met earlier.  I represent DZ Bank in this case.
20   Thank you for making the time to be here today.
21       Before we get started, I wanted to
22   just go over some guidelines for today to try
23   to help it run smoothly.
24       As I'm asking questions today, if
25   you don't understand my questions or can't hear

Page 11

DEIKEL

1  
2    me, please ask me to repeat myself or to
3    rephrase the question or to speak up.  I want
4    to make sure that you understand what I'm
5    asking.
6        Everything we say today is being
7    taken down by the court reporter here, so we'll
8    do our best to try not to speak over each
9    other.  I'll try to let you finish your
10   answers, and if you could try to let me finish
11   my questions before you respond, that will help
12   create a clean transcript for us.
13       Because all of the discussion today
14   is being taken down by the reporter, please try
15   to make your responses verbal.  Nods of the
16   head and uh-huhs don't come across in the
17   transcript, so if you could try to keep that in
18   mind.
19       If you need a break for any reason
20   today, just let me know.  I'll be happy to
21   accommodate that as long as we're not in the
22   middle of a question.
23       Is there any reason, any
24   circumstance that would impair your ability to
25   testify honestly and truthfully today?

Page 12

DEIKEL

1  
2    A.   No.
3    Q.   Can you please state your full name
4    for the record.
5    A.   Theodore Deikel.
6    Q.   And where do you live, Mr. Deikel?
7    A.   In California.
8    Q.   Where in California?  Your address,
9    please.
10   A.   It would be Rutherford, California.
11   Q.   Is there a street address?
12   A.   101 Rutherford Hill Road.
13   Q.   Thank you.
14       And have you ever given a deposition
15   before, testified at trial?
16   A.   Yes.
17   Q.   Were any of those instances related
18   to Petters or the Petters Ponzi scheme?
19   A.   I don't recall a deposition.
20   Q.   How about at trial?
21   A.   Yes.
22   Q.   And in what circumstance?  What was
23   the case that you gave your trial testimony?
24   A.   Against Tom Petters.
25   Q.   In his criminal trial?

Page 13

DEIKEL

1  
2    A.   Yes.
3    Q.   Was it one day of testimony?
4    A.   Yes.
5    Q.   Is that the only time that you've
6    testified in trial related to Mr. Petters or
7    his --
8    A.   Yes.
9    Q.   -- enterprise?
10       I'm going to ask you if you could
11   please take a look at this document.
12       MR. CHIACHETTI:  I'll ask the court
13   reporter to mark it as Deikel 1.
14       (Deikel Exhibit 1 was marked for
15   identification.)
16   BY MR. CHIACHETTI:
17   Q.   Mr. Deikel, have you seen this
18   document before?
19   A.   No.
20   Q.   This is a subpoena that we had
21   served on your counsel for your appearance
22   today and to produce documents.
23       Are you aware that your counsel
24   provided us with some documents --
25   A.   Yes.

Page 26

DEIKEL

1  is that what you're suggesting there?
2      A.  Yes.
3      Q.  And when you left Fingerhut, when
4  was that?
5      A.  Oh, 2004.
6      Q.  And what happened in 2004?  What was
7  your next career step?
8      A.  Minneapolis.  Let's see, I had moved
9  to California.  So primarily real estate
10 investment, startup investment.
11     Q.  Working for yourself?
12     A.  Yes.
13     Q.  Is that something that you continue
14 to do, or was there -- did you take on another
15 position after that phase of your career?
16     A.  Continue.
17     Q.  Okay.  So after you left Fingerhut
18 in 2004, you moved into real estate and startup
19 capital in California, and that's where you've
20 been?
21     A.  Correct.
22     Q.  You've mentioned that you and
23 Mr. Petters purchased or acquired the assets of
24 Fingerhut in 2002.  But even before that, I

Page 27

DEIKEL

1  presume that you met before you acquired those
2  assets.
3      When did you first meet Mr. Petters?
4      A.  About that time.  I met him as a
5  result of those discussions.  Yeah.
6      Q.  And do you remember how those
7  discussions began in terms of did you approach
8  him or did he approach you?
9      A.  I don't recall.
10     Q.  Do you remember how the two of you
11 got connected?
12     A.  No.
13     Q.  Did you have any involvement with
14 Mr. Petters or his enterprise prior to 2002?
15     A.  No.
16     MR. HASKVITZ:  Who had those loans?
17 Those two.  They were 2000, I think.
18     THE WITNESS:  Would you ask that
19 question again?
20 BY MR. CHIACHETTI:
21     Q.  Prior to 2002, had you had any
22 involvement with Mr. Petters or his enterprise?
23     A.  Yes.  I had invested -- or lent him
24 money for his enterprise, which was the
25

Page 28

DEIKEL

1  acquisition of inventories and the resale of
2  inventories.
3      Q.  And do you remember when that was?
4      A.  That would have been 2001.
5      Q.  Okay.  And do you remember how much
6  you loaned him?
7      A.  No.
8      Q.  Do you remember if it was more or
9  less than a million dollars?
10     A.  It would have been more than a
11 million.
12     Q.  Okay.  More than five?
13     A.  No.  No.
14     Q.  How did you get involved in making
15 that loan?
16     A.  Can you be more specific?
17     Q.  Sure.  How did you learn about the
18 opportunity to make that loan to Mr. Petters?
19     A.  I don't recall.
20     Q.  Do you remember receiving documents
21 related to that loan?
22     MR. WALDMAN:  Objection to form as
23 to time frame.
24 BY MR. CHIACHETTI:
25

Page 29

DEIKEL

1      Q.  Do you remember receiving documents
2  related to that loan before the time that you
3  made it?
4      A.  No.
5      Q.  Do you remember signing an agreement
6  for that loan?
7      A.  No.
8      Q.  Do you remember doing -- did you do
9  any investigation into Mr. Petters or his
10 enterprise before you made that loan?
11     A.  Yes, through my attorney.
12     Q.  And what was the nature of that
13 investigation?
14     MR. WALDMAN:  You should answer that
15 to the extent that you can do it without
16 revealing communications between you and
17 your attorney.
18     THE WITNESS:  Would you re-ask that
19 question?
20 BY MR. CHIACHETTI:
21     Q.  I'll ask a different question.
22     Do you remember reviewing documents
23 to inform your decision about your investment
24 with Mr. Petters's enterprise in 2001 or

Page 30

DEIKEL

1
2  thereabout?
3      A.   It would have been a direction to my
4  attorney to do whatever is necessary to
5  preserve the loan.
6      Q.   Okay.  Do you recall reviewing any
7  documents, financial statements about
8  Mr. Petters?
9      A.   No.
10     Q.   About any financial statements
11 related to his company?
12     A.   No.
13     Q.   So you were relying on the advice of
14 your attorney in making that investment?
15         MR. WALDMAN:  Objection to form.
16     You can answer.
17         THE WITNESS:  I relied on my
18     direction to my attorney.
19 BY MR. CHIACHETTI:
20     Q.   Okay.  How did you decide what
21 direction to give your attorney?
22         MR. WALDMAN:  Objection to form.
23     You can answer if you understand the
24     question.
25         THE WITNESS:  No, I don't.

Page 31

DEIKEL

1
2  BY MR. CHIACHETTI:
3      Q.   What was the basis for the direction
4  you gave your attorney?
5      A.   It would have been we're about to
6  lend money to somebody I don't know or don't
7  know well, do whatever is necessary to make
8  sure the loan is secure and will be paid back.
9      Q.   Do you recall having any direct
10 discussions with Mr. Petters related to that
11 loan prior to making it?
12     A.   No.
13     Q.   Do you remember what the purpose of
14 the loan was?
15     A.   Again, it was for the acquisition of
16 merchandise.
17     Q.   Do you know what kind of
18 merchandise?
19     A.   My best recollection is electronics.
20     Q.   And do you recall to which part or
21 which company within the Petters enterprise you
22 were making that loan?
23     A.   The loan was to Petters and whatever
24 act -- whatever parts of the company, I have no
25 idea.

Page 32

DEIKEL

1
2      Q.   Do you know how your money was
3  ultimately used?
4      A.   No.
5      Q.   Were you repaid that loan?
6      A.   Yes.
7      Q.   Do you remember when you were
8  repaid?
9      A.   When the money was due.
10     Q.   In relationship to when you made the
11 loan, how long after the time you made the loan
12 were you repaid approximately?  A year, five
13 years, a month; do you have any sense?
14     A.   My best recollection would be three
15 months.
16     Q.   Do you know if you received interest
17 on that loan?
18     A.   Yes.
19     Q.   Do you remember how much?
20     A.   No.
21     Q.   After that loan that you made in
22 2002 -- or excuse me, you said you made around
23 2001, did you make any other loans to
24 Mr. Petters or his enterprise?
25     A.   Yes.

Page 33

DEIKEL

1
2      Q.   When?
3      A.   2008.
4      Q.   Okay.  And how did you learn about
5  that loan?
6          MR. WALDMAN:  Objection to form.
7      You can answer if you understand.
8          THE WITNESS:  Tom had gone through a
9      couple of major acquisitions, Sun Country
10     Airlines, Polaroid, had just completed
11     loans with a couple of banks for long-term
12     financing, and it -- they were receptive to
13     outside loans at that point.
14         My understanding was there was a
15     major acquisition of an electronics
16     bankruptcy, I believe, that required a
17     large sum of money.
18 BY MR. CHIACHETTI:
19     Q.   And your loan was for the -- was
20 related to that acquisition of the bankruptcy
21 assets?
22         MR. WALDMAN:  Objection.
23         THE WITNESS:  Yes.
24         MR. WALDMAN:  Sorry.  Objection to
25     form, facts not in evidence.

Page 118

DEIKEL

2  Q.   And do you know what they actually
3  did review?
4     A.   I know the two things I mentioned.
5     Q.   Which were?  Can you repeat those,
6  please.
7     A.   That we secured the loan by whatever
8  pledges, you know, that we can get.  One was
9  stock in whatever -- one of his entities might
10 have been.  There were security filings.  I
11 know they went through that.
12        Beyond that, I left it to the
13 attorneys.
14    Q.   So thank you for the clarification.
15 Before we turned back to the 2001 loan, you
16 were talking about your relationship with Tom
17 Petters.
18        When you were business partners with
19 him in Fingerhut, did you trust him as your
20 business partner?
21    A.   Yes.
22    Q.   Did you feel like he gave you the
23 information -- gave you information that you
24 requested when you needed it?
25        MR. WALDMAN:  Objection to form.

Page 119

DEIKEL

2     THE WITNESS:  I -- yeah, I don't
3  know.
4  BY MR. CHIACHETTI:
5     Q.   Okay.  So with respect to the 2008
6  loan, how did you first learn about that
7  opportunity?
8     A.   Again, as I recall, Tom was in the
9  middle of the huge -- this is the story line
10 obviously because as it turns out it's not
11 true.  But at the time it was the potential
12 acquisition of a large liquidation, something
13 like and maybe was RadioShack.  And I think
14 they were trying to raise funds to acquire the
15 entire inventory, split up the inventories, and
16 then resell them to the likes of Walmart,
17 Sam's, can remember some of that.
18        They had large funding from, I
19 believe it was JPMorgan.  And that was the
20 opportunity that was there.
21    Q.   And how did you learn that
22 information?  Who explained that to you?
23    A.   Well, it was very public within the
24 companies, and most everybody I guess knew that
25 he was trying to acquire, you know, the

Page 120

DEIKEL

2  inventories.  And...
3     Q.   So you were -- so at this time
4  before the loan, you were in communication with
5  Tom to learn about --
6     A.   I became aware of it, sure.
7     Q.   I mean, do you remember how you
8  first became aware of it?
9     A.   No.
10    Q.   Okay.
11    A.   No.
12    Q.   Was there a formal presentation to
13 you about what the loan opportunity was?
14        Let me rephrase the question.
15        Did you have a meeting to discuss
16 the actual loan opportunity?
17    A.   There probably was, but I guess it's
18 important to understand that with the history,
19 that loan was based on more trust than anything
20 else.
21        I had a good experience with the
22 first loans.  Fingerhut worked out.  I saw
23 nothing that required me to do some kind of in
24 depth due diligence beyond what I already know.
25 And here's a man now who is employing Fritz

Page 121

DEIKEL

2  Mondale and Ted Mondale, and, you know, based
3  on a lot of trust.
4     Q.   Do you remember at some point the
5  discussion of this loan changing from mere
6  discussion to actually implementing and putting
7  the loan down on -- terms of the loan down on
8  paper?
9     A.   No.
10    Q.   Do you remember how long a time
11 between when you first learned about the loan
12 and the time that you signed -- and the time
13 that the loan was documented, what the length
14 of that time was?
15    A.   I -- I don't recall.
16    Q.   Did you ask to see any documentation
17 to give credibility to the loan?  For example,
18 any agreements with suppliers or purchase
19 orders of vendors -- from vendors who might
20 buy --
21    A.   No.
22    Q.   Any financials from Petters?
23    A.   No.
24    Q.   Do you know how -- so at some point
25 you and Tom came to an agreement on the loan,

Page 122

DEIKEL

right?

A.   Yes.

Q.   And do you know approximately when you actually made the loan and forwarded the money to him?

A.   I believe it was in June of '08.

Q.   And how much was the loan for?

A.   10 million.

Q.   And did you do that in one installment or two, or do you know how many you did it in?

A.   I think -- well, the total was ten, but I think I did it in two pieces. I'm not clear on that, but the total was the total.

Q.   And do you know how your money was ultimately used?

A.   No.

Q.   At any point did you recall -- did you consider investing more than $10 million?

A.   No.

Q.   Do you know how that $10 million was arrived at?

A.   Yes.

Q.   How?

Page 123

DEIKEL

A.   I had somehow calculated that 10 million would produce a million.

Q.   In terms of the return on your investment?

A.   The interest, yes.

Q.   Was that a negotiation you had with Tom over the --

A.   That was a negotiation I had with myself.

Q.   Well, at some point you and Tom -- you and somebody had to negotiate the terms of the loan?

A.   Yes.

Q.   Were you involved in that negotiation?

A.   Yes.

Q.   Do you know who on the other side was negotiating?

A.   I can't remember his name.

Q.   Was it Tom you were negotiating with, or?

A.   Tom grossly, broadly. But somebody specifically handled the detail, and I just can't remember his name.

Page 124

DEIKEL

MR. CHIACHETTI:  I am going to ask the court reporter to mark this as exhibit -- are we at 17?  As Exhibit 17.

(Deikel Exhibit 17 was marked for identification.)

BY MR. CHIACHETTI:

Q.   Do you know the name of AJ Discala?

A.   That's the name I couldn't come up with.

Q.   Is that the name?

MR. HASKVITZ:  What's the name?

THE WITNESS:  AJ -- I just remember the initials, not Discala.  Yes.

BY MR. CHIACHETTI:

Q.   So the document that is now marked Exhibit 17 was produced from the Trustee's database.  It's the internal number PWC013146933.

This is an e-mail from David Baer dated May 30, 2008, to Tom Petters and AJ Discala.  And Mr. Baer says, "Here is the note for Ted."  And he attaches a promissory note.

With respect to AJ Discala,

Page 125

DEIKEL

Mr. Deikel, you mentioned that he was the gentleman you negotiated with.

Do you know anything else more about him?

A.   No.

Q.   What his affiliation is with Petters?

A.   Just that he worked for Petters.

Q.   Does this attached promissory note look familiar to you?

A.   No.

Q.   The first -- the second line of the promissory note indicates an amount 12,500,000 with a date May 30, 2008.  And if you read the first paragraph, it says, "For value received, Petters Company, Inc., a Minnesota corporation, and Thomas J. Petters individually, jointly and severally, promise to pay to the order of Theodore Deikel," and it skips down to 12,500,000.

Do you have any understanding about why they would have prepared a promissory note for 12,500,000?

A.   I have no idea.

# EXHIBIT 57

Page 1

1                    DANIEL LADD

2           UNITED STATES BANKRUPTCY COURT

3              DISTRICT OF MINNESOTA

4                 NO. 08-45257

5    In Re:  Petters Company, Inc., et al.

6                   Debtors.

7    (Includes:                    Court File Nos.
     Petters Group Worldwide, LLC;     08-45258 (KHS)
8    PC Funding, LLC;                  08-45326 (KHS)
     Thousand Lakes, LLC;             08-45327 (KHS)
9    SPF Funding, LLC;                 08-45328 (KHS)
     PL Ltd., Inc.;                    08-45329 (KHS)
10   Edge One LLC;                     08-45330 (KHS)
     MGC Finance, Inc.;                08-45331 (KHS)
11   PAC Funding, LLC;                 08-45371 (KHS)
     Palm Beach Finance Holdings, Inc.)  08-45392 (KHS)
12   ---------------------------------------------------
     DOUGLAS A. KELLEY, in his capacity as the
13   Trustee of the PCI Liquidating Trust,

14          Plaintiff,

15      vs.

16   OPPORTUNITY FINANCE, LLC, et al.,

17          Defendants.
     ---------------------------------------------------
18

19      VIDEOTAPED DEPOSITION OF DANIEL LADD

20              New York, New York

21              October 15, 2019

22   Reported by:

23   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

24   JOB NO. 167179

25

Page 2

DANIEL LADD

October 15, 2019

Videotaped deposition of DANIEL
LADD, held at Pepper Hamilton, 620
Eighth Avenue, New York, New York,
before Kathy S. Klepfer, a Registered
Professional Reporter, Registered Merit
Reporter, Certified Realtime Reporter, Certified
Livenote Reporter, and Notary Public
of the State of New York.

Page 3

DANIEL LADD

A P P E A R A N C E S:

QUINN EMANUEL URQUHART & SULLIVAN
Attorneys for Plaintiffs
   51 Madison Avenue
   New York, New York  10010
BY:  ROBERT LOIGMAN, ESQ.
   JACOB WALDMAN, ESQ.

PEPPER HAMILTON
Attorneys for Defendant
   The New York Times Building
   620 Eight Avenue
   New York, New York  10018
BY:  H. PETER HAVELES, JR., ESQ.
   JESSICA ROTHENBERG, ESQ.

ALSO PRESENT:

   MATTHEW SMITH, Videographer

Page 4

DANIEL LADD

THE VIDEOGRAPHER:  This begins media
labeled number 1 of the video-recorded
deposition of Daniel Ladd in the matter of
In re:  Petters Company Incorporated, et
al., and Douglas A. Kelley v. Opportunity
Finance, LLC, et al., in the United States
Bankruptcy Court, District of Minnesota.

This deposition is being held at 620
Eighth Avenue in New York, New York, on
October 15, 2019 at approximately 9:32 a.m.

My name is Matthew Smith for TSG
Reporting, Incorporated.  I am the legal
video specialist.  The court reporter is
Kathy Klepfer, in association with TSG
Reporting.

All appearances have been noted for
the record.

Will the court reporter please swear
in the witness.

                * * *

Page 5

DANIEL LADD

DANIEL LADD, called as a
   witness, having been duly sworn by a Notary
   Public, was examined and testified as
   follows:

EXAMINATION BY
MR. HAVELES:

Q.   Good morning, Mr. Ladd.  My name is
Peter Haveles.  I'm one of the attorneys for DZ
Bank AG in this litigation.  I'll be taking your
deposition today in connection with the expert
reports that you have given.  Okay?

I will attempt to ask my questions
clearly so that you can understand and answer
them.  If you don't, let me know.  If you don't
say anything, I'm going to presume you do
understand the questions.

I will show you documents, as my pile
will indicate, during the course of the day.
You should take your time and be comfortable
with anything in the document before you answer
the question.

And I will take periodic breaks,
usually every hour, hour and a quarter or so,
but if you want to take a break at any other

Page 142

DANIEL LADD

1
2    Q.   And we spent some time talking about
3  your experience when you were global head at UBS
4  for the period 2003 through 2009 talking about
5  UBS's asset-based lending activities.
6        Is that time period, 2003 through
7  2009, the only time period for which you had any
8  involvement with the origination or
9  administration of asset-based lending?
10       MR. LOIGMAN:  Objection to form.
11   A.   I think that comprises my direct
12  experience with ABL.
13   Q.   Did you have any indirect experience,
14  other than those six years, with ABL at any of
15  your employment up through 2009?
16   A.   Could you repeat that again, please?
17   Q.   You said that the 2003 through 2009 is
18  your direct experience.  So I'm asking if you
19  had any indirect experience with asset-based
20  lending in any of your employment through 2009
21  separate and apart from your six-year oversight
22  of the ABL group?
23   A.   No.
24   Q.   Okay.  In connection with your
25  experience with asset-based lending, had you

Page 143

DANIEL LADD

1
2  ever participated in any -- or had any
3  involvement with any lending done by any of the
4  banks for which you worked that involved the
5  sale of commercial paper and use of a conduit?
6    A.   Yes, I was involved in -- could you
7  repeat the question, please?
8    Q.   Sure.
9    A.   I want to make sure I understand.
10   Q.   In connection with the asset-based
11  lending that you had experience with, did any of
12  those loans involve the sale of commercial paper
13  and use of a conduit?
14   A.   My experience with conduits was not
15  directly to my experience -- was not related
16  directly to my experience with asset-based
17  loans.
18   Q.   I know you've indicated that you were
19  involved in the sale of UBS's conduit facility.
20       Is that your only experience with
21  conduits?
22   A.   The sale was part of the experience.
23  My experience with the conduits that was the
24  conduit business of UBS began sometime after the
25  merger of Swiss Bank Corporation and UBS, and in

Page 144

DANIEL LADD

1
2  that context, I was asked as a member of the
3  business group that was responsible for the
4  management of the loan portfolio to evaluate the
5  UBS conduit business and make recommendations as
6  to how the firm should deal with that business
7  going forward.
8    Q.   Okay.  Was the conduit a separate
9  entity?
10   A.   The conduit?
11   Q.   You said evaluating UBS's conduit
12  business, so I'm asking is the conduit that you
13  were evaluating a separate entity?
14       MR. LOIGMAN:  Objection to form.
15   A.   So the context of my task at the
16  outset of my involvement with the UBS conduit
17  business was to look at the UBS conduit business
18  as a whole, and the UBS conduit business
19  revolved around financings provided to UBS
20  clients using the -- any one of the four conduit
21  entities that UBS sponsored.
22   Q.   Okay.  And so were these entities that
23  were owned by UBS or owned by third parties, the
24  four entities?
25   A.   They were managed by UBS.

Page 145

DANIEL LADD

1
2    Q.   Okay, but not owned by UBS?
3        MR. LOIGMAN:  Objection to form.
4    A.   No, they were not owned by UBS.
5    Q.   Okay.  And did those conduits sell
6  commercial paper?
7    A.   The conduits issued commercial paper.
8    Q.   Okay.  We're just using different
9  vocabulary, but I'll use "issue" going forward
10  so we avoid the confusion.
11       With respect to that work you did, was
12  it looking at it from a strategic point of view
13  or an operational point of view, your analysis
14  of the UBS conduit business?
15   A.   Could you ask the question?  Because
16  you made some observation about the distinction
17  between issuing and selling.
18   Q.   No, that was just -- I was commenting
19  to your comment.
20   A.   Okay.
21   Q.   You and I were using different words
22  for the same thing, so I was just telling you,
23  in the future, I'll use "issue" instead of
24  "sell" commercial paper to avoid confusion.  And
25  then there was a stop, and then I asked an

Page 146

DANIEL LADD

1
2  unrelated question.
3      A.   Okay.
4      Q.   And that is, with respect to the
5  conduit business that you were asked to
6  evaluate, was your evaluation at a strategic
7  level or at an operational level?
8      MR. LOIGMAN:  I just want to pause for
9  one moment to object, because I think the
10  record is a little confusing after you start
11  with the "sell" versus "issue" thing, and
12  you said you were using the term --
13  different terms for the same meaning.  I
14  don't think that's been established.  I
15  think there's a lack of foundation for that.
16      If you want to ask a question divorced
17  from that, that's probably --
18      MR. HAVELES:  This question has
19  nothing to do with that observation.
20      MR. LOIGMAN:  Maybe just ask the
21  question fresh without that background.
22      MR. HAVELES:  I was responding to Mr.
23  Ladd's comments saying, to avoid confusion,
24  I understood what he meant by "issue."  I
25  used "sell" in the way he used "issue," and

Page 147

DANIEL LADD

1
2  I just told him I was going to use "issue"
3  to avoid confusion.  That was in response to
4  his answer.  Then I stopped.
5      The question I was asking is unrelated
6  to that observation, and I'll ask the
7  question again.
8  BY MR. HAVELES:
9      Q.   In connection with the review that you
10  did of the conduit business, UBS's conduit
11  business, was it at a strategic level or an
12  operational level, your review?
13      A.   Okay.  To avoid confusion, I would
14  like to amend my answer to your previous
15  question that involved my use of the word
16  "issue."
17      Q.   Okay.
18      A.   My understanding is that the word
19  "issue" is not the same as the word "sell."
20      Q.   I understand.  That's how I used it,
21  though.  So I told you, to avoid confusion, I'm
22  going to stop using "sell" and we'll use
23  "issue."  So it went to my --
24      A.   No.
25      Q.   -- colloquial use of the word.  Okay?

Page 148

DANIEL LADD

1
2      A.   You --
3      Q.   I don't want to debate it with you.
4  I'm just going to tell you I'm going to use the
5  word "issue" to avoid confusion in the future in
6  my questions.  Okay?
7      A.   And what am I to understand when you
8  use the word "issue"?
9      Q.   That the conduit is going out there
10  and raising funds by having commercial paper
11  sold to investors.  Okay?
12      A.   How is the conduit going out there?
13      Q.   You know what?  I'm not asking
14  questions here -- or, you're answering
15  questions.  You're asked them.  If there's a
16  confusion about a question I pose to you, you
17  can tell me at the time and I'll rephrase the
18  question, but the question I have pending to you
19  doesn't go to that.  If I use the term again,
20  and if you're confused about what I ask, we can
21  have a discussion at that time, but my question
22  to you is totally unrelated to that.
23      My question is, based on the review
24  you were asked to conduct of UBS's conduit
25  business, was your review at an operational

Page 149

DANIEL LADD

1
2  level or at a strategic level?
3      A.   Both.
4      Q.   And what strategic issues did you
5  examine in that regard?
6      A.   The potential for the growth --
7  profitable growth of the conduit business, the
8  costs of maintaining the business, the costs of
9  potentially winding down the business, and the
10  strategic direction -- how that fit with the
11  strategic direction that the firm was currently
12  developing after the merger.
13      Q.   And what were the operational issues
14  that you considered?
15      A.   One of the best sources of information
16  with respect to the operational issues that
17  attended the -- that were relevant to the
18  conduit business were audit reports that
19  described the operations in great detail as well
20  as flowcharts, and I also talked to the people
21  who were responsible for the administration of
22  the conduits.  I spoke with people that was --
23  that were responsible for originating the deals
24  that would use the conduit financing.
25      Q.   Did you make any recommendations or

38 (Pages 146 to 149)

Page 150

DANIEL LADD

1
2  draw any conclusions with respect to the
3  operational elements of the UBS conduit
4  business?
5    A.  I certainly drew conclusions about the
6  operations of the conduit business.
7    Q.  Okay.  What kind of loan transactions
8  did UBS use its conduit business for?
9    A.  There were a variety of lending
10  transactions that used the conduit business.
11    Q.  Please tell me the nature of that
12  variety.
13    A.  Some of them -- they -- some of them
14  were financing of receivables generated by
15  clients of the firm, and they were looking to
16  finance -- to basically finance their -- put the
17  receivables into the conduit and finance the --
18  their -- basically to generate financing for the
19  originating firm, and others were to provide
20  financing for a specific -- specific assets,
21  financial assets that weren't necessarily
22  receivables.
23    Q.  And were you -- did you have any
24  involvement with either the origination or
25  administration of the loans that were the

Page 151

DANIEL LADD

1
2  subject of the conduit business?
3    A.  No, I was not involved in the
4  origination of those loans.
5    Q.  And were they loans that were
6  originated outside of your group?
7    A.  Yes.  Swiss Bank Corporation did not
8  have a conduit business.
9    Q.  Okay.  I'm now referring to your group
10  when you were group head for UBS in the 2001 to
11  2009 period.
12        Were the conduit's lending activity
13  outside -- done by groups outside of your group
14  when you were global head?
15        MR. LOIGMAN:  Objection to form.
16        You can answer if you understand the
17  question.
18    A.  I'm confused as to what your question
19  is directed at.
20    Q.  You told me that the conduit -- the
21  UBS conduit was used for some receivable
22  financing and for some financing of other
23  non-receivable financial assets.
24        I'm asking were those loans originated
25  and administered within your group for which you

Page 152

DANIEL LADD

1
2  were the global head during the 2001 to 2009
3  period?
4        MR. LOIGMAN:  Objection to form.
5    A.  No, and let me explain why.
6    Q.  Well, I'm not -- I don't really care
7  why.  I just want to know what group --
8        Let me do it piecemeal.  I will get to
9  that probably ultimately.
10        What group within UBS did originate
11  and administer those loans?
12    A.  Which loans?
13    Q.  The loans that you just told me were
14  part of the conduit business.  The receivables
15  loans and the financial asset loans.
16    A.  For purposes of clarification, let me
17  make clear that my involvement with the UBS
18  conduit business started sometime in the 1998-99
19  time frame.  The conduit business was sold, to
20  the best of my recollection, in September of
21  1999.
22    Q.  Okay.
23    A.  My involvement in the loan -- as
24  global head of Impaired Loan Management and Loan
25  Portfolio Risk Management, that -- my

Page 153

DANIEL LADD

1
2  involvement with that business started after the
3  conduits were sold.
4    Q.  What group originated and administered
5  the loans that were in the conduit business that
6  was ultimately sold in 1999?
7    A.  I don't know.
8    Q.  Okay.  And --
9    A.  Because that was done by -- most of
10  those loans, in fact, I think only one
11  exception, the loans that were in the conduits
12  at the time of the sale were originated prior to
13  my involvement with the conduits, with one or
14  two exceptions.
15    Q.  And what role did you play in
16  connection with the sale itself?
17    A.  In connection with the sale?
18    Q.  Yes, sir.
19    A.  I was responsible with a partner for
20  developing a sales process for putting together
21  materials that would describe the business that
22  could be used as in presenting the opportunity
23  or explaining the opportunity to potential
24  buyers, putting together lists of potential
25  buyers, and then once a potential buyer was

39 (Pages 150 to 153)

Page 194

DANIEL LADD

```
 1                DANIEL LADD
 2  conduits, you said --
 3       MR. HAVELES:  Actually, we've been
 4  going an hour and a quarter, so why don't we
 5  break because I'm starting a new topic.
 6       THE VIDEOGRAPHER:  The time is 2:23
 7  p.m.  We're off the record.
 8       (Recess.)
 9       THE VIDEOGRAPHER:  The time is 2:41
10  p.m.  We're on the record.
11  BY MR. HAVELES:
12       Q.   Let me hand to you some documents that
13  were marked while we were waiting.  The first is
14  Exhibit 8, a copy of a document entitled
15  "Structured Finance, Special Report, The
16  Fundamentals of Asset-Backed Commercial Paper"
17  by Moody's, dated February 3, 2003.  It has the
18  Bates numbers Kelley_DZ_92005 through 92; and
19  then as Exhibit 9 a document issued by Moody's.
20  It says, "Rating Action:  Moody's Assigns a
21  Prime-1 Rating to Autobahn Funding Company, LLC
22  ABCP," dated 1 October 1999, with the Bates
23  numbers Kelley_DZ_92189 through 90; as Exhibit
24  10, a document issued by Moody's entitled
25  "Rating Action:  Moody's Assigns a Prime-1
```

Page 195

DANIEL LADD

```
 2  Rating to Autobahn Funding Company, LLC ABC
 3  Program, dated 1 October 1999, with the Bates
 4  number Kelley_DZ_92001 through 4; and as Exhibit
 5  11 a document issued by Fitch IBCA entitled
 6  "Structured Finance, Asset-Backed New Issue,
 7  Autobahn Funding Co. LLC," dated October 21,
 8  1999, with the Bates numbers Kelley_DZ_92191
 9  through 96.
10       (Ladd Exhibit 8, a document entitled
11  "Structured Finance, Special Report, The
12  Fundamentals of Asset-Backed Commercial
13  Paper" by Moody's, dated February 3, 2003,
14  marked for identification, as of this date.)
15       (Ladd Exhibit 9, a document headed
16  "Rating Action:  Moody's Assigns a Prime-1
17  Rating to Autobahn Funding Company, LLC
18  ABCP," dated 1 October 1999, bearing Bates
19  Nos. Kelley_DZ_92189 through 90, marked for
20  identification, as of this date.)
21       (Ladd Exhibit 10, a document issued by
22  Moody's entitled "Rating Action:  Moody's
23  Assigns a Prime-1 Rating to Autobahn Funding
24  Company, LLC ABC Program, dated 1 October
25  1999, bearing Bates Nos. Kelley_DZ_92001
```

Page 196

DANIEL LADD

```
 1                DANIEL LADD
 2  through 92004, marked for identification, as
 3  of this date.)
 4  BY MR. HAVELES:
 5       Q.   And as Exhibit 11 a document issued by
 6  Fitch IBCA entitled structured finance
 7  asset-backed new issue, Autobahn Funding Co.
 8  LLC, dated October 21, 1999 with the Bates
 9  numbers Kelley DZ92191 through 96.
10       A.   Thanks.
11       (Ladd Exhibit 11, a document issued by
12  Fitch IBCA entitled "Structured Finance,
13  Asset-Backed New Issue, Autobahn Funding Co.
14  LLC," dated October 21, 1999, bearing Bates
15  Nos. Kelley_DZ_92191 through 92196, marked
16  for identification, as of this date.)
17  BY MR. HAVELES:
18       Q.   Are these four documents, the 8, 9, 10
19  and 11, the documents that you said you pulled
20  as a result of your research?
21       A.   Yes, as far as I can tell.
22       Q.   Now, when we were -- when you alluded
23  to Exhibit 8, the Moody's Special Report on the
24  markets, you said -- you made reference to using
25  it as the basis for your discussion about ABCP
```

Page 197

DANIEL LADD

```
 2  vehicles in your report; is that correct?
 3       MR. LOIGMAN:  Objection.
 4  Mischaracterizing testimony.
 5       A.   Yes, I don't -- I don't recall exactly
 6  the words I used in response to your question,
 7  but if I used the words "as a basis for," it was
 8  certainly -- I drafted that section of my report
 9  based on personal knowledge, and I believe it
10  was consistent with this.
11       So I was really just checking my
12  personal knowledge and recollection with
13  something that was contemporaneously written.
14       Q.   When you say "this," are you referring
15  to Exhibit 8, the Moody's report?
16       A.   I am.  I'm sorry.
17       Q.   I just have a think about vague
18  antecedents.
19       Okay.  So let's take a moment to look
20  at Exhibit 8.  Did you read it in its entirety
21  when you pulled it off the Moody's site as part
22  of your -- preparing your report in this case?
23       A.   I don't recall that I read every word
24  of it.  I certainly --
25       Q.   Okay.
```

TSG Reporting - Worldwide 877-702-9580

Page 198

DANIEL LADD

1
2    A.    I certainly reviewed it.
3    Q.    Okay.  Let me use the Bates numbers to
4  refer you to sections rather than the page
5  numbers.
6          Go to the page that has the Bates
7  number 92015, please.  And the heading is "The
8  Fundamentals of ABCP."
9    A.    Okay.
10   Q.    Did you review that section of the
11 report?
12   A.    Yes, I believe I did.
13   Q.    Was there anything in that section
14 with which you disagree based on your personal
15 experience?
16   A.    Could I take a moment to read it?
17   Q.    Sure.
18        (Document review.)
19   Q.    Was there anything with which you
20 disagree?
21   A.    I think it's generally consistent with
22 my understanding of the business.
23   Q.    Okay.  Could you turn to page 92019,
24 please.
25        You see there's that section on that

Page 199

DANIEL LADD

1
2  page that's entitled "Why ABCP Programs
3  Developed"?  Did you read that section of the
4  report when you were preparing your reports in
5  this case?
6        MR. LOIGMAN:  Peter, by "that
7  section," do you mean just that one page
8  there?
9        MR. HAVELES:  That is correct.  That's
10 the entirety of the section.
11        THE WITNESS:  So the entire page, not
12 just the initial paragraph?
13 BY MR. HAVELES:
14   Q.    Yeah, I'm just asking -- I'm just
15 asking is this something you reviewed in
16 connection with preparing your report.  That's
17 my only question.
18   A.    Yes, I believe it was.
19   Q.    Can you turn to page 92024, please.
20        You see the section -- you see section
21 entitled "Conduits Classified by Program Type"?
22   A.    Yes.
23   Q.    And you see the subsection
24 "Multi-Seller ABCP Conduits"?
25   A.    Yes.

Page 200

DANIEL LADD

1
2    Q.    Did you read that section about
3  multi-seller ABCP conduits when you were
4  preparing your report?
5    A.    I expect I did.
6    Q.    Okay.  Take a moment to read it and
7  tell me, is there anything in that section,
8  those three paragraphs, with which you disagree?
9    A.    No, I think it's generally consistent
10 with my understanding.
11   Q.    Okay.  Put that aside for a second.
12 We'll come back to it, but let's take a look at
13 the three individual reports about Autobahn.
14        Did you review each of those reports
15 when you identified them as part of your
16 research?
17   A.    Yes, I believe I did.
18   Q.    And when Moody's rated Autobahn
19 Prime-1, did you have an understanding as to
20 what that meant based on your experience?
21        Let me withdraw the question.
22        Were you familiar with ratings used
23 for conduits in the 2000s?
24   A.    Yes, generally.
25   Q.    And do you have an understanding based

Page 201

DANIEL LADD

1
2  on your experience what a Prime-1 rating means?
3    A.    Yes, I think I have a general
4  understanding.
5    Q.    And what is that?
6    A.    I'd have to look up the definition.
7    Q.    Would you have -- do you recall what
8  your understanding is presently as we sit here
9  today that?
10   A.    That that represents the rating
11 agency's assessment of the credit quality of the
12 CP issued to commercial paper investors.
13   Q.    Is Prime-1 the highest rating that
14 Moody's gives to commercial paper?
15   A.    I think it is.  I can't remember.
16   Q.    Okay.  Down at the bottom of the page
17 of Exhibit 9, the first page with the last three
18 digits 189, do you see there's a heading
19 "Program Administrator"?
20   A.    Yes.
21   Q.    It says, "DZ Bank's former name is
22 acting as administrator for Autobahn"?
23   A.    "Will be acting as administrator for
24 Autobahn."
25   Q.    "Will be acting as administrator."

Page 202

DANIEL LADD

Do you see that?
A.   Yes.
Q.   And you knew from your work with the UBS program what an administrator of a conduit program is, correct?
A.   Yes.
Q.   What is an administrator of a conduit program?
A.   I think that's described in the excerpts you asked me to read from the previous document.
Q.   I'm going to go into that, but I want to get your personal knowledge and experience based on the work you have done in the conduit area before we go to the Moody's report.
(Document review.)
A.   Okay.  Could you repeat the question?
Q.   Sure.  Based on your experience, what is your understanding of what the administrator is in the conduit program?
A.   The administrator manages the conduit in connection with the various financings that are utilized with respect -- in which the conduit is involved.

Page 203

DANIEL LADD

Q.   Okay.  Could you turn to now Exhibit 11, the Fitch's report.
Did you read the Fitch's report about Autobahn when you found it in your research?
A.   Yes, I -- I believe I did.
Q.   Are you familiar with the Fitch ratings for commercial paper?
A.   Generally, yes.
Q.   And you see that Fitch is rating Autobahn F1 in the first paragraph.
Is F1 the highest rating that Fitch gives for commercial paper?
A.   Yes, to the best of my recollection.
Q.   Okay.  If you look at the last paragraph in the section entitled "Summary," it begins "DZ Bank."
Do you see that?
Take a moment to read it to yourself.
A.   Okay.  I've read it.
Q.   Did you, when you read that paragraph in the first instance, was there anything in it with which you disagreed?
Let me withdraw that.
Focus just on the first sentence so I

Page 204

DANIEL LADD

don't ask you to adopt their opinions about DZ Bank.
Focusing on the first sentence, was there anything in the first sentence which states, "DZ Bank, which acts as administrator for Autobahn, evaluates and structures all asset purchases and monitors asset performances to ensure compliance with the credit and investment policy," is there anything in that sentence with which you disagreed?
A.   I couldn't tell you -- I can't vouch for the accuracy of that particular sentence.  In particular, they -- the "to ensure compliance," I don't -- I don't think it's necessarily possible.  When you're monitoring something, you're not ensuring compliance with a policy.
Q.   Okay.  So -- okay.
A.   I think it's injudiciously drafted.
Q.   I understand what you're saying.
Okay.  The next paragraph right under "Issuer," there's a paragraph about Autobahn.
Could you take a second to read it?
A.   Okay.  I've read it.

Page 205

DANIEL LADD

Q.   Is there anything in that paragraph about Autobahn with which you disagreed?
A.   I would have drafted the second sentence differently.
Q.   How so?
A.   It's difficult for me to -- it's -- I would say, rather than "to issue CP," I would say "to facilitate the issuance of CP," because the credit -- the conduit itself doesn't have any personnel that actually perform commercial functions.
Q.   Okay.  If you turn to the next page, there's a diagram entitled "Structural Overview."
Did you review that document -- that diagram at the time you read this report?
A.   Yes, I did.
Q.   And did you make any effort to determine whether that diagram accurately portrayed how Autobahn operated during the early 2000s during the life of the Opportunity Finance loan?
(Document review.)
A.   I'm sorry.  I was reviewing.  I have

DANIEL LADD

1
2  forgotten your question.
3       MR. HAVELES: Read the question back
4  for him, please.
5       (Record read.)
6       THE WITNESS: I read it, and at the
7  time I read it, I was not aware of any
8  material discrepancies.
9  BY MR. HAVELES:
10      Q.   And are you today aware of any
11  material discrepancies?
12      A.   No, not in the context of the level of
13  detail that it provides.
14      Q.   Okay. You see in the right-hand side
15  of the diagram there is a -- in the middle box
16  entitled, "Manager, Lord Securities Corp."?
17      A.   Yes.
18      Q.   Do you have an understanding of what
19  the manager is for a conduit based on your
20  experience?
21      A.   No, I've not -- not familiar with the
22  term "manager" in that context, and I think --
23  but that being said, I'm not disputing -- the
24  four bullet points as to what they actually do
25  are consistent with my general understanding of

DANIEL LADD

1
2  what they actually did.
3       Q.   Okay. Let's go back to Exhibit 8, the
4  Moody's report. If you could go to page 92033.
5       A.   I'm sorry --
6       Q.   The Moody's report, Exhibit 8.
7       A.   Yeah.
8       Q.   No, the big one.
9       A.   Oh, this one?
10      Q.   Yes. Page 92033, please.
11           You see there's Table 1 there,
12  "Conduit Service and Support Providers."
13           Did you review that table when you
14  reviewed the Moody's report, Exhibit 8?
15      A.   Perhaps not.
16      Q.   Okay. Are you familiar, based on your
17  experience with conduits, with the different
18  names of service and support providers
19  identified in the column in the far left
20  entitled "Name"?
21      A.   As I said before, the use of the term
22  "manager" is not -- I don't recall.
23      Q.   Okay. Other than "manager," were you
24  familiar with all the other title positions --
25  of positions set forth in this table?

DANIEL LADD

1
2       A.   "Depositary" is something I would have
3  to give more thought to or look up.
4       Q.   Okay. After that table and the
5  ensuing pages, there are discussions of each of
6  the titles -- do you -- positions.
7           Do you recall whether you read that
8  section of the report, pages that runs through
9  page 92039?
10          I just want to know if you read it.
11  That's all.
12      A.   920 -- I'm sorry.
13      Q.   It runs from -- the table on 33 all
14  the way through to 92039, did you read that
15  section?
16      A.   I can't recall.
17      Q.   Okay. All right. We're done with
18  this exhibit.
19          You reviewed the credit memos that
20  were in DZ Bank's files on the Opportunity
21  Finance loan, correct?
22      A.   Certainly some of the -- some of them,
23  yes.
24      MR. HAVELES: Let me mark as Exhibit
25  12 the credit memo dated October 17, 2001

DANIEL LADD

1
2  bearing the Bates numbers DZB1200 through
3  47.
4       (Ladd Exhibit 12, Credit Memo dated
5  October 17, 2001, bearing Bates Nos. DZB1200
6  through 47, marked for identification, as of
7  this date.)
8  BY MR. HAVELES:
9       Q.   Do you recall reviewing this credit
10  memo?
11      A.   Yes.
12      Q.   How does this memo compare to the type
13  of credit memos that you received for committee
14  approval when you were global head supervising
15  the ABL group from 2003 to 2009. In terms of
16  its general contents and materials, not in terms
17  of -- I'm not asking you for a qualitative
18  judgment, just in terms of its structure and its
19  contents.
20      MR. LOIGMAN: Object to the form.
21      A.   Structure and form, I think it's
22  generally similar to credit memos I've seen at
23  UBS and at other banks.
24      Q.   Okay. Let me mark as Exhibit 13 --
25  I'll come back to that later, but I just want to

**ERRATA SHEET**

Deposition of Daniel W. Ladd III

*Kelley v. Opportunity Finance LLC, et al.* No. 10-4301 (Bankr. D. Minn.)

October 15, 2019

| Page; Line | Change From | Change To | Reason |
|---|---|---|---|
| 7:14 | Services, LLC | Services LLC | Entity name |
| 10:20 | financing | finance | Transcription Error |
| 18:9-10 | Aramco was a summer job | Aramco, it was a summer job | Transcription Error |
| 29:16 | if there were securities | if there was security | Transcription Error |
| 88:12 | Services, LLC | Services LLC | Entity name |
| 99:5, 6, 22, 24 | 11 | Eleven | Entity name |
| 167:11 | regenerated | generated | Transcription Error |
| 168:25 | disbelief | disbelieve | Transcription Error |
| 197:17 | think | thing | Transcription Error |
| 232:16 | documents | document | Transcription Error |
| 246:12 | closing | close | Transcription Error |
| 252:12 | UBS | U.S. | Transcription Error |
| 253:13 | check | tick | Transcription Error |

Daniel W. Ladd III

October 31, 2019

# EXHIBIT 58

1           THEODORE MARTENS

2      UNITED STATES BANKRUPTCY COURT

3         DISTRICT OF MINNESOTA

4            NO. 08-45257

5   In Re:  Petters Company, Inc., et al.

6              Debtors.

7   (Includes:                      Court File Nos.

    Petters Group Worldwide, LLC;    08-45258 (KHS)

8   PC Funding, LLC;                 08-45326 (KHS)

    Thousand Lakes, LLC;             08-45327 (KHS)

9   SPF Funding, LLC;                08-45328 (KHS)

    PL Ltd., Inc.;                   08-45329 (KHS)

10  Edge One LLC;                    08-45330 (KHS)

    MGC Finance, Inc.;               08-45331 (KHS)

11  PAC Funding, LLC;                08-45371 (KHS)

    Palm Beach Finance Holdings, Inc.)   08-45392 (KHS)

12  -----------------------------------------------------

    DOUGLAS A. KELLEY, in his capacity as the

13  Trustee of the PCI Liquidating Trust,

14          Plaintiff,

15       vs.

16  OPPORTUNITY FINANCE, LLC, et al.,

17          Defendants.

    -----------------------------------------------------

18

19   VIDEOTAPED DEPOSITION OF THEODORE MARTENS

20            New York, New York

21            September 10, 2019

22  Reported by:

23  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

24  JOB NO. 167178

25

Page 6

THEODORE MARTENS

1  THEODORE MARTENS, called as a
2  witness, having been duly sworn by a Notary
3  Public, was examined and testified as
4  follows:
5  EXAMINATION BY
6  MR. HAVELES:
7      Q.   Good morning, Mr. Martens.
8      A.   Good morning.
9      Q.   My name is Peter Haveles, as I
10 introduced myself before we got started this
11 morning.  I am one of the attorneys for DZ Bank
12 in the litigation that the trustee has brought
13 against DZ and formerly against others.
14      I'm going to take your deposition
15 today.  I know you've been around this block a
16 bit, but I'll just remind you quickly.  I'm
17 going to show you a number of documents.  You
18 should take your time with the documents.  Never
19 feel you have to rush, and read whatever
20 portions of the document you want to be
21 comfortable before you answer any question.
22      I will take breaks when -- every hour,
23 hour and a quarter to give you a chance to
24 stretch, but if you would like to take a break

Page 7

THEODORE MARTENS

1  before then, just let me know, and as long as
2  the pending question is answered, I'll be happy
3  to accommodate your request.
4      I will try my best to be clear in my
5  questions, but occasionally, I am not, and if I
6  am not, please let me know and I'll try to
7  rephrase the question.
8      And lastly, as you know, we have to
9  both work hard not to speak over each other so
10 we can make our court reporter's job as easy as
11 possible in getting our questions and your
12 testimony down on the record.
13      Okay?
14      A.   Okay.
15      Q.   Great.  Could you start by telling me,
16 Mr. Martens, where you currently reside?
17      A.   116 Pine Terrace in Demarest, New
18 Jersey, D-E-M-A-R-E-S-T.
19      Q.   And what is your present employment?
20      A.   I'm a retired PwC partner.
21      Q.   Okay.  And do you maintain your own
22 business?
23      A.   Pretty much.  I can -- I'm retired on
24 paper, but I've never really retired.  I

Page 8

THEODORE MARTENS

1  continue to work.
2      Q.   So you're consultant at this juncture?
3      A.   Consultant, correct?
4      Q.   Self-employed?
5      A.   Self-employed.
6      Q.   So let me mark as Exhibits 1 and 2 the
7  two reports you have given in this case.  The
8  first is the Expert Report of Theodore F.
9  Martens dated April 25, 2019.  It will be marked
10 as Exhibit 1.
11      (Martens Exhibit 1, Expert Report of
12 Theodore F. Martens, marked for
13 identification, as of this date.)
14 BY MR. HAVELES:
15      Q.   And as Exhibit 2, the second report
16 you filed, the Expert Rebuttal Report of
17 Theodore F. Martens, dated July -- August,
18 rather, 23, 2019.
19      (Martens Exhibit 2, Expert Report of
20 Theodore F. Martens dated August 23, 2019,
21 marked for identification, as of this date.)
22 BY MR. HAVELES:
23      Q.   Is Exhibit 1 the initial report that
24 you submitted in this case regarding the claims

Page 9

THEODORE MARTENS

1  asserted by the trustee against DZ Bank?
2      A.   Yes.
3      Q.   Is that your signature that appears on
4  the last page before Exhibit Tab A on page 57?
5      A.   Yes.
6      Q.   Okay.  And is Exhibit 2 the rebuttal
7  report that you submitted in August after seeing
8  reports that were submitted by DZ Bank's expert
9  witnesses?
10      A.   Yes.
11      Q.   And is page 26 -- on page 26, just
12 before Exhibit Tab A, is that your signature?
13      A.   Yes.
14      Q.   Okay.  Great.  Let's turn to Tab A, if
15 we could, Exhibit A, which is your, in your main
16 report, Exhibit 1, and that's your CV.
17      Do you have that in front of you, sir?
18      A.   I do.
19      Q.   Okay.  I'm putting it there so you can
20 refer to it as -- assist you in answering any
21 questions, and then I'm going to walk through
22 some of the other things in more detail, but
23 first, could you tell me briefly your
24 educational background after high school?

Page 238

THEODORE MARTENS

1
2      A.   It's exercising control.  It has
3  control of the account.
4      Q.   But for whose benefit?
5      A.   Could be for its benefit as well.
6          MR. LOIGMAN:  That's argumentative.
7          MR. HAVELES:  That's not
8  argumentative.  I'm --
9          MR. LOIGMAN:  No.  No.  You're raising
10  your voice to the witness.
11         MR. HAVELES:  I'm sorry.  I won't
12  raise my voice.  That's different.
13  BY MR. HAVELES:
14     Q.   For whose benefit does a collateral
15  agent -- without reference to this agreement,
16  for whose benefit does a collateral agent
17  exercise control, in your experience as an
18  auditor and as a advisor -- member of the PwC
19  Advisory group?
20     A.   It's exer- -- it can exercise its
21  control for itself in that capacity as well as
22  for the benefit of other secured parties.
23     Q.   Okay.  And do you have any experience
24  outside of this agreement where you say that a
25  collateral agent can exercise that control for

Page 239

THEODORE MARTENS

1
2  its own benefit?
3      A.   It's functioning in that capacity,
4  yes.
5      Q.   What other experience --
6      A.   I'm saying that's -- that's what I'm
7  reading.  I reading about this --
8      Q.   I asked a separate question.  The
9  question was:  Outside of this agreement, do you
10  have any experience where, when a collateral
11  agent is charged with acting on behalf of the
12  secured parties, the collateral agent may also
13  act on its -- for its own benefit?
14         MR. LOIGMAN:  Peter, with all due
15  respect, I think you're mischaracterizing
16  his testimony.  He said, if you read exactly
17  what he said --
18         MR. HAVELES:  Now you're -- now you're
19  coaching the witness.
20         MR. LOIGMAN:  I'm just reading what
21  his answer is. I'm not -- not coaching the
22  witness.
23         MR. HAVELES:  But you don't get to do
24  that.  You can say "asked and answered,"
25  whatever, but you don't get to read back

Page 240

THEODORE MARTENS

1
2  testimony for the witness.  That's not
3  appropriate.
4          MR. LOIGMAN:  He already testified,
5  and he said "on its own behalf or for other
6  third parties."
7          MR. HAVELES:  I asked him a different
8  question.  The question was does he have any
9  experience he can point to where he's seen
10  language in the contract where the
11  collateral agent acts on behalf of the
12  secured parties that the collateral agent is
13  also entitled to act on its own behalf.
14  That's the question.  Any other experience
15  outside of this agreement.
16         MR. LOIGMAN:  Objection.
17  Mischaracterizes the testimony.
18         THE WITNESS:  I'm not sure.  I may
19  have seen it.  I'm not sure.
20  BY MR. HAVELES:
21     Q.   Can you identify any instance for me
22  today other than saying maybe?
23     A.   I'm not sure.  Not today.  Not as I
24  sit here today, no, sir.
25     Q.   And do you identify any instance in

Page 241

THEODORE MARTENS

1
2  your report, either of your two reports in this
3  case, of any instance outside of this agreement
4  where a collateral agent is allowed to act for
5  his own benefit as well?
6          MR. LOIGMAN:  Objection.
7  Mischaracterizing testimony.
8  Mischaracterizing the reports.
9      A.   Could you repeat the question, please?
10     Q.   Do you -- is there anything in your --
11  either of your two reports where you identify
12  any instance, separate and apart from this
13  agreement, where a collateral agent that is told
14  that it can act for the benefit of the secured
15  parties may also act for its own account?
16     A.   I don't recall language to that
17  effect, no, sir.
18     Q.   Okay.  Could you turn to page 39,
19  please.
20         Prior to signing your report on April
21  26, had you read in its entirety Section 2.05 of
22  the RLSA?
23     A.   Yes.
24     Q.   What is your understanding of the
25  purpose of Section 2.05?

61

Page 242

THEODORE MARTENS

1
2  A.   Section 2.05 sets forth the,
3  effectively, the remittance procedures, and it
4  has then a -- I believe this is the case here --
5  yes.  Sort of I think of it like a waterfall
6  provision in terms of how funds will be paid and
7  the priority of those payments.
8      Q.   And what's your understanding
9  generally of a waterfall, separate and apart
10 from this agreement?
11     A.   Just the -- just that; that in terms
12 of these agreements, how payments are to be
13 made, when they're to be paid, when the funds
14 will be transferred and what order of priority,
15 and typically -- and typically what you will
16 find is, to the extent that there are
17 deficiencies, how those deficiencies might be
18 cured.
19     Q.   When you read Section 2.05 in
20 connection with preparing your report, did you
21 identify any provision that allowed anyone to
22 depart from the waterfall provisions about how
23 or to whom and what amounts were to be paid to
24 the various parties identified in the waterfall?
25     A.   That would allow, for instance, in

Page 243

THEODORE MARTENS

1
2  this case, the written -- without -- with or
3  without the written consent of DZ Bank, is that
4  your question?
5      Q.   No, I'm saying is there any provisions
6  in here that allows deviation from or departure
7  from the waterfall?
8      A.   I'm not aware of any provisions to
9  that effect, sir.
10     Q.   Are you aware as to whether there is
11 any provision that gives either the servicer or
12 the agent the discretion to make payments not in
13 accordance with the terms of the waterfall?
14     A.   Each one of these items requires the
15 written consent of the agent, so to the --
16     Q.   That's not what I asked.
17     A.   Let me finish, please, sir.
18         To the extent that the agent made a
19 determination for whatever reason to withhold
20 that written consent, I mean, there's nothing
21 that would preclude the agent from doing so.
22     Q.   Well, if the agent withheld consent to
23 something someone was entitled to, that person
24 could sue for breach of contract, right?
25     A.   I assume that to be the case.

Page 244

THEODORE MARTENS

1
2      Q.   Okay.  Does the agreement authorize
3  the agent or the servicer to not make a payment
4  that's specifically required under the
5  waterfall, Section 2.05?
6      A.   That does not -- I'm sorry, that does
7  not what?
8      Q.   Does the -- anything in this agreement
9  authorize the agent or servicer to decline to
10 make a payment that is required under the terms
11 of the waterfall?
12     A.   I'm not aware of that.  Other than the
13 fact that I don't see any language in here
14 either as well that precludes the agent from
15 withholding its written consent.
16     Q.   Is there anything you have seen in
17 this agreement that authorizes the agent or
18 servicer to make a payment that is not
19 authorized under the terms of the waterfall,
20 i.e., for some other use, baseball tickets, for
21 instance?
22     A.   I don't see any provisions to that
23 effect, no.
24     Q.   Okay.  Could you turn to Section 2.10
25 on page 5, please.

Page 245

THEODORE MARTENS

1
2  Could you read that to yourself,
3  please.
4      A.   2.10?
5      Q.   Yes, please.
6      A.   Okay.
7      Q.   Are you familiar prior to your work in
8  the DZ Bank case -- prior to your work on the
9  Petters case, did you have dealings with
10 security interest as part of your job as an
11 auditor and in the Advisory practice at PwC?
12     A.   I'm familiar with the concept, yes.
13     Q.   And what's your understanding of what
14 a security interest is, separate and apart from
15 what you have acquired in connection with this
16 case or any of the Petters matters?
17     A.   The granting of an interest in let's
18 say cash, cash proceeds, that the cash in the
19 account you're granting rights to, title to,
20 whatever and so forth.  It could be other --
21 other assets as well.
22     Q.   Well, a security interest is granting
23 you a lien to protect you in the event of -- to
24 have collateral you can avail yourself of in the
25 event of a default, correct?

62

Page 246

THEODORE MARTENS

1
2    A.    Correct.  Right.
3    Q.    Okay.  And you can't exercise that
4  security interest unless there is a default as
5  defined in the terms of the Security Agreement,
6  right?
7    A.    In terms of the exercising interest
8  itself?
9    Q.    Enforcing the lien.
10    A.    Enforcing the lien.  That would be my
11  understanding, yes.
12    Q.    And if you enforce the lien and
13  liquidate the collateral, then the party who
14  holds the lien uses the collateral to satisfy
15  the loan obligations and nothing more, correct?
16    A.    Of the other party, that's correct.
17    Q.    So if I had a lien -- a lien on
18  your -- on a bank account that had $100,000 in
19  it, but my claim was only for $10,000, the lien
20  could not reach the additional $90,000, isn't
21  that your understanding?
22    A.    That would be my understanding, yes.
23    Q.    And the $10,000 has to be used to
24  satisfy the obligations under the loan
25  agreement?

Page 247

THEODORE MARTENS

1
2    A.    That's my understanding, yes.
3    Q.    Okay.  In reading Section -- did you
4  read Section 2.10 prior to signing your
5  report --
6    A.    Yes.
7    Q.    -- on April 26?
8    A.    Yes.
9    Q.    Did you have an -- did you form an
10  understanding as to, in the event that there was
11  a necessity to foreclose on the security
12  interest that was granted in Section 2.10, that
13  the proceeds from that security interest could
14  be used -- that foreclosure on the collateral
15  could be used in any manner other than what is
16  authorized in the waterfall in Section 2.05?
17        MR. LOIGMAN:  Objection to form.
18    Q.    You may answer the question.
19        MR. LOIGMAN:  If you can understand
20  it.
21        MR. HAVELES:  No coaching, please.
22    A.    I'm not sure that that -- that the --
23  to the extent that the interest that the lien
24  was exercised, that there -- that those funds
25  could be used for anything other than settling

Page 248

THEODORE MARTENS

1
2  payments, let's say, due under the waterfall, if
3  that's your question?
4    Q.    Yes.
5    A.    Is that it?
6    Q.    Yes.
7    A.    That's my understanding.
8    Q.    Okay.  And the waterfall sets forth to
9  whom and what must be paid, correct?
10    A.    With the written consent of the agent.
11    Q.    Right, but the agent has to -- the
12  consent of the agent has to be done in
13  accordance with the terms of Section 2.05,
14  right?
15    A.    Those are the remittance procedures
16  that we just discussed?
17    Q.    In the waterfall provisions, right?
18    A.    Right, and I believe -- I believe we
19  just discussed that.  That's correct, yes.
20    Q.    So, for instance, if -- upon the
21  exercise of the security interest and
22  foreclosure on the collateral, the agent
23  couldn't authorize or consent to payment of more
24  than what the servicer was entitled to under the
25  waterfall, correct?

Page 249

THEODORE MARTENS

1
2    A.    I believe that's how that would work,
3  yes.
4    Q.    Nor, if the waterfall had entitlement
5  to $10, could the agent refuse to pay the $10
6  under the waterfall if all the terms and
7  conditions of the waterfall are satisfied,
8  right?
9    A.    I believe that to be the case.
10    Q.    An agent has no discretion in
11  allocating payments -- outside of the provisions
12  of the waterfall, correct?
13    A.    I'm not sure.  It's very clear here:
14  No funds shall be transferred from the
15  collection account without the written consent
16  of the agent.
17    Q.    I understand that.  Is there any
18  language --
19        MR. LOIGMAN:  I'm sorry.  Let him
20  finish.
21    Q.    Sorry.
22    A.    My point, though, the agent is DZ
23  Bank.  They -- their -- they have to give their
24  written consent to make any payments from this
25  account.

Page 266

THEODORE MARTENS

1
2 entitlement holder with respect to the
3 securities entitlements thereto and will comply
4 with entitlement orders and any other
5 instructions directing deposition of funds in
6 the Account" -- that's the collection account --
7 "originated by the Collateral Agent, on behalf
8 of Secured Parties, without further consent of
9 the Borrower or Servicer," and then the
10 collateral agent has the right -- DZ Bank has
11 the right to delegate to the servicers rights to
12 make entitlement orders.
13        Is that your question?
14    Q.  No, that wasn't my question.
15        MR. HAVELES:  Could you read the
16 question back for him, please?
17        (Record read.)
18    A.  I'm not sure how -- I'm not sure how
19 to respond to that.
20    Q.  Okay.  Fine.  Good.  That's a good
21 answer.  Let's move on.
22        Let me ask you to go to the term
23 sheet, Exhibit 21, please.
24        Now, I'll represent to you this is one
25 of the documents that was recited in the

Page 267

THEODORE MARTENS

1
2 schedule to your report as documents that were
3 reviewed in connection with preparing your
4 report.
5        Do you have any recollection of being
6 told about the term sheet?
7    A.  Yes, I -- I did -- I testified earlier
8 I looked at the term sheet.
9    Q.  Okay.
10    A.  I don't recall spending a lot of time
11 reviewing it, but I recall seeing this document.
12    Q.  Okay.
13    A.  And I know members of my team reviewed
14 it as well.
15    Q.  Okay.  All right.  Let me move on to a
16 new topic.
17        Oh, term sheet.  You see that the
18 lender is identified on page 1 of the term sheet
19 as a multi-seller commercial paper conduit
20 sponsored and administered by DZ Bank?
21    A.  I see that, yes.
22    Q.  Do you know what a multi-seller
23 commercial paper conduit is?
24    A.  I've seen it -- I've seen Autobahn
25 referred to in that capacity.  I'm not sure the

Page 268

THEODORE MARTENS

1
2 full scope of -- of clients or other
3 relationships Autobahn has to function in that
4 capacity, though.
5    Q.  Do you know what it means to be a
6 multi-seller commercial paper conduit?  Do you
7 have an understanding of what it means, rather?
8    A.  I read the description in the
9 disclosure, the annual report, describing
10 Autobahn as well as CORAL I think was the
11 other -- conduit.  I'm not sure of the
12 details, though.
13    Q.  Did you ever, in connection when saw
14 Exhibit 21, did you ever ask your staff, your
15 team, to find out, based on research in the
16 industry, what it means to be a multi-seller
17 commercial paper conduit?
18    A.  I don't recall doing that, no, sir.
19    Q.  Now, the annual report, that's
20 something you reviewed in connection with the
21 rebuttal report that you submitted, right?
22    A.  That's correct.
23    Q.  Did you review the annual report
24 before you did the rebuttal report?
25        Let me withdraw that.

Page 269

THEODORE MARTENS

1
2        Did you review the annual report
3 before you signed the April 25 report.
4    A.  I'm not sure.
5    Q.  Okay.  Did you have any understanding
6 or did you form any understanding in connection
7 with the work you did here as to whether the
8 conduit that -- facility that was set up through
9 Autobahn departed or deviated in any way
10 different than what is done in the industry?
11    A.  I'm not aware of any deviation from
12 industry practice in that regard.
13    Q.  Okay.  Are you aware in the work that
14 you have done that there's been any departure or
15 deviation in the payment of funds from the terms
16 of the waterfall set forth in Section 2.05 of
17 the RLSA?
18    A.  I'm not aware of any departure from
19 the waterfall provisions in the RLSA.
20    Q.  Okay.  Let's quickly open up a new
21 topic, and then we'll take a short break because
22 it's almost an hour.
23        To -- when you were analyzing
24 transfers to the collection account that was
25 maintained under the RLSA, what documents did

Page 270

THEODORE MARTENS

1
2  you and your team look at to analyze the
3  transfers to the collection account.
4     A.   Bank data, by and large.
5     Q.   What bank data?
6     A.   The --
7     Q.   If you're referring to a specific
8  exhibit when you're answering a question, if you
9  could tell me which one, I would be grateful.
10    A.   The -- if I can refer you to -- these
11 are transfers from PC Funding --
12    Q.   Which exhibit?
13    A.   This is Exhibit F I'm referring to.
14 DZ Bank -- transfers from PC Funding to DZ Bank
15 collection account.
16         And if I can refer you to the last
17 page of that exhibit, you'll find there what we
18 sourced or where we sourced the information set
19 forth on this exhibit.
20    Q.   Okay.  Now, you call it the DZ Bank
21 collection account, correct?
22    A.   That's correct.
23    Q.   That's not what the account statements
24 say, right?
25    A.   The -- the account I believe is in the

Page 271

THEODORE MARTENS

1
2  name of DZ Bank.  The account name is DZ Bank
3  collection account.
4     Q.   Doesn't it say DZ Bank for the benefit
5  of the secured parties collection account?
6     A.   I'm not sure.
7     Q.   Okay.  So if it does, you all have
8  omitted that phrase from this title on the
9  exhibit, correct?
10    A.   I have a memory of it being called the
11 DZ Bank collection account.
12    Q.   I'll come back to that when I show you
13 the documents later on.
14         So, other than the bank statements for
15 PC Funding, did you look at any other documents
16 to determine what funds were transferred into
17 the collection account?
18    A.   To the extent additional funds were
19 transferred into that account --
20    Q.   I just want to know what document.
21         You can tell me if you're looking at a
22 document to refresh your recollection.
23    A.   I'm looking at Figure 1 on page 10.
24         Your question is?
25    Q.   Let me just get there.

Page 272

THEODORE MARTENS

1
2         Were there any other documents other
3  than the PC bank statements that you looked at
4  to determine what funds were transferred into
5  the collection account?  I'm only asking about
6  the documents.  That's all I want to know.
7     A.   And I'm saying I'm trying to point you
8  to the information to show there's transfers
9  that came from Opportunity Finance
10 Securitization as well as from Opportunity
11 Finance, LLC, and those transfers, the reference
12 there is to exhibits -- there's 13, Exhibit K,
13 and 14, Exhibit K, that $3 million and that $23
14 million.
15         You're asking about those transfers,
16 and then there's other transfers directly coming
17 from the other account, the DZ Bank up above,
18 slash Autobahn account, and there the exhibit is
19 Exhibit I, and so those are -- if you're asking
20 about all of the funds that have been
21 transferred into the PC -- I'm sorry, I got --
22 I'm sorry.
23         DZ Bank -- I'm talking about -- we're
24 talking about just the DZ Bank collection
25 account?

Page 273

THEODORE MARTENS

1
2     Q.   That is correct.
3     A.   You have transfers into that account
4  coming from Opportunity Finance Securitization.
5  You see the $4 million.  That is -- that -- the
6  reference to that then is Exhibit P, and then
7  you'll see there's the one transfer coming from
8  Opportunity Finance.  That's the $1.5 million up
9  above.  That's footnote number 5.  That's
10 Exhibit N.
11         And then those exhibits then would
12 have the references to the sourcing for that
13 information for those transfers.
14    Q.   So I need to look at Exhibits P and N
15 as well as to see what documents you looked at to
16 eval- -- to determine what transfers went into
17 the collection account, correct?
18    A.   Correct.
19    Q.   Okay.  What documents did you look at
20 to determine what transfers were made to the PC
21 Funding collection account that was maintained
22 under the credit agreement between Opportunity
23 Finance and PCI?
24    A.   Well, this would be the -- I mean, the
25 most -- the significant amounts are set forth on

Page 286

THEODORE MARTENS

1
2      Q.   Okay.  So did you form an
3  understanding what happens once Opportunity
4  Finance Securitization sends a notice of
5  borrowing to DZ Bank as collateral agent and
6  U.S. Bank National Association?
7      A.   Typically, the notes are attached.
8           Well, I'm sorry, I don't understand --
9      Q.   Different question.  What happens
10 next?  On -- did you form an understanding as to
11 what happens next upon Opportunity Finance
12 Securitization sending a notice of borrowing to
13 DZ Bank as collateral agent and U.S. Bank?  What
14 happens next in the process?
15     A.   There's a release of funds.
16          I mean, I'm not sure what your
17 question is.
18     Q.   Release of funds from whom or how?
19 I'm trying to get -- see if you have an
20 understanding of the process.
21     A.   Oh.  Well, let me, if I can, if I can
22 refer to my report?
23     Q.   Sure.  Tell me just where you're
24 looking at when you do that.
25     A.   The funds are released.  There's a

Page 287

THEODORE MARTENS

1  transfer.  This is actually the first note, it
2  appears, that you have given me, and if I can
3  refer you to Exhibit H, Exhibit H has the
4  transfers from the DZ Bank, the collection
5  account, to PC Funding, and in preparing this
6  exhibit, we have identified the payor, the
7  payee, and then the transfers, and then in
8  connection with funding that was dated January
9  15, 2002, and the amounts.
10          And then we have listed then the, to
11 the extent -- well, not to the extent, but we
12 then have listed all the DZ Bank reference
13 numbers and so forth that we're relying upon,
14 which are particularly these borrowing base
15 certificates, notices of borrowing, things of
16 that nature.
17     Q.   Okay.  Well, I know money ultimately
18 gets to a bank account, but my question is more
19 what's the process, what's the next step in the
20 process of getting the money to that bank
21 account?  Do you recall that?
22     A.   I'm not sure -- I'm not sure I'm
23 following what you're referring to.
24     Q.   How does the money get to the bank

Page 288

THEODORE MARTENS

1
2  account?
3      A.   There's -- there's a wire transfer
4  notice.  There's a wire transfer notification, I
5  believe, that's prepared.
6      Q.   You're sure?
7           MR. LOIGMAN:  Objection to form.
8      A.   That's what I -- that's what I recall
9  seeing wire transfer notices and requests and so
10 forth being signed off on.
11     Q.   Okay.  All right.  Let's go through
12 some other documents and see if it refreshes
13 your recollection.
14          Let me, before we get into that, I
15 want to show you a couple other documents before
16 we get into the process about how loans occur.
17          Let me show you what's next been
18 marked as Exhibit 25, which is a Collection
19 Account Transfer Request to DZ Bank from
20 Opportunity Finance.  This one is dated August
21 5, 2002.  It bears the Bates number DZB8427
22 through 36.
23          (Martens Exhibit 25, Collection
24 Account Transfer Request to DZ Bank from
25 Opportunity Finance dated August 5, 2002,

Page 289

THEODORE MARTENS

1
2  bearing Bates Nos. DZB008427 through 36,
3  marked for identification, as of this date.)
4  BY MR. HAVELES:
5      Q.   Have you seen a document like this
6  before?
7      A.   I believe I have, yes.
8      Q.   Okay.  This is asking for --
9  Opportunity Finance Securitization is seeking a
10 transfer of funds from the collection account to
11 PC Funding, correct?
12     A.   Yes; in the amount of $3.1 million.
13     Q.   And this is basically for using funds
14 in the collection account in order to extend a
15 new loan, correct?
16     A.   Yes.
17     Q.   Okay.  What you refer to as
18 reinvestment and I refer to as a rollover,
19 correct?
20     A.   I believe we're talking about the same
21 thing.
22     Q.   Yeah, and that's why I used both
23 terms.  Okay.
24          So is it your understanding that when
25 there were -- when there were funds sitting in

Page 290

THEODORE MARTENS

1
2  the collection account, that Opportunity Finance
3  Securitization was permitted to ask, subject to
4  satisfying the borrowing base requirements, to
5  have funds that were sitting there reinvested or
6  rolled over as for new loans to PC Funding?
7      A.   That's my understanding, yes.
8      Q.   Okay.  And in such instances, that did
9  not require or involve the extension or
10  application of new funds from Autobahn or the
11  commercial paper holders, correct?
12     A.   That's correct.
13     Q.   And did you look at all of the
14  documents of this type in connection with each
15  of the 246 notes that were for the period of
16  time when the agreement between -- among DZ
17  Bank, Autobahn, Opportunity Finance, Opportunity
18  Finance Securitization and others were -- was in
19  force?
20     A.   I did not review all the documents,
21  no, sir.
22     Q.   Did your team review each one of such
23  requests that were made for the reinvestment or
24  rollover of funds in the collection account for
25  new loans to PC Funding?

Page 291

THEODORE MARTENS

1
2      A.   Yes.
3      Q.   Let me show you what has been marked
4  as Exhibit 26, which is a document entitled
5  transfer of funds Opportunity Finance
6  Securitization, LLC dated July 11, 2002, bears
7  the Bates number DZB78 7998 through 8,000.
8  That's the first page.  There's several other
9  pages there too.
10         (Martens Exhibit 26, Collection
11     Account Transfer Request dated July 11,
12     2002, bearing Bates Nos. DZB007998 through
13     8000, marked for identification, as of this
14     date.)
15  BY MR. HAVELES:
16     Q.   Do you see there two requests for
17  transfer here attached to this document, the
18  collection account account transfer request and
19  a wire transfer request?
20     A.   Yes.
21     Q.   Okay.  The first one is again for
22  another rollover or reinvestment of funds that
23  are sitting in the collection account for a new
24  loan to PC Funding, correct?
25     A.   Correct.

Page 292

THEODORE MARTENS

1
2      Q.   The second one is a request by
3  Opportunity Finance Securitization that funds be
4  sent to its operating account in the amount of
5  $1.5 million, correct?
6      A.   Correct.
7      Q.   And there the operating account for
8  Opportunity Finance, that's basically the
9  borrower's own account under the -- under the
10  RLSA, correct?
11         MR. LOIGMAN:  Again, can you be clear
12     about which Opportunity Finance you're
13     referring to?
14         MR. HAVELES:  Sure.
15  BY MR. HAVELES:
16     Q.   If you're looking at the wire
17  transfer, it says Opportunity Finance
18  Securitization Operating Account.
19         Do you see that?
20     A.   I do see that, yes.
21     Q.   That is Opportunity Finance
22  Securitization's own account as the borrower
23  under the RLSA, correct?
24     A.   It appears to be the case.
25     Q.   So it is seeking consent to remit

Page 293

THEODORE MARTENS

1
2  certain funds in the collection account to it
3  under the waterfall as borrower, correct?
4      A.   Into the collection account or into
5  its operating account?
6      Q.   Into its operating account from the
7  collection account?
8      A.   From the collection account, I agree
9  with you; the 730 account, yes.
10     Q.   So these -- this is a type of request
11  for funds to be given to the borrower under the
12  waterfall, correct?
13     A.   Correct.
14     Q.   Did you and your team look at all of
15  the requests for funds to be -- for remission --
16  for transmission of funds to the borrower under
17  the waterfall?
18     A.   If I could refer you to Exhibit O.
19  Transfers from DZ Bank Collection Account to
20  Opportunity Finance Securitization.
21     Q.   Uh-huh.
22     A.   And the second entry on that page
23  there and the reference to Bates reference
24  DZB799, that's in the amount of -- you can see
25  that under the Bates numbers there, and it's in

Page 302

THEODORE MARTENS

1
2    A.   I recognize the $3.9 million and the
3    timing, although it appears to be the wrong
4    trade date.  It's off by a year.
5    Q.   A year typo, off by putting the wrong
6    date by year, but then if I look down, you see
7    the maturity date of 59 days, it does say 2002?
8    A.   Right.  I'm just pointing out the
9    trade date is in 2001.
10   Q.   And if you look at the fax cover sheet
11   that's up at the top, you got the January 14,
12   2002 date, correct?
13   A.   That's correct.
14   Q.   So there's a typo there, but
15   otherwise, this corresponds to Exhibits 23 and
16   24, correct?
17   A.   The timing would appear to be as such,
18   yes.
19   Q.   Well, it involves the same amount,
20   correct?
21   A.   It's the same amount.
22   Q.   So on the same day that the borrowing
23   base report and the notice of borrowing is
24   received from Opportunity Finance, you see DZ
25   Bank sending a request to Lord Securities for

Page 303

THEODORE MARTENS

1    Autobahn CP instructions, correct?
2    A.   Yes.
3    Q.   And it's being asked to sell 3.9 --
4    Lord Securities is being asked to sell $3.9
5    million in commercial paper and then to transfer
6    the proceeds, net any amount that may be needed,
7    to the PC Funding account -- collection account
8    at U.S. Bank, correct?
9    MR. LOIGMAN:  Objection to form.
10   A.   That's correct.
11   Q.   With respect to any new funds that
12   were advanced upon a notice of borrowing from
13   Opportunity Finance, separate from any funds
14   that may have been reinvested or rolled over
15   that we talked about in the collection account,
16   have you seen any documentation different than
17   the type of commercial paper instructions that I
18   have shown you as Exhibits 28 through 38 to
19   obtain funds to finance a loan to Opportunity
20   Finance Securitization?
21   A.   With respect to commercial paper
22   instructions?
23   Q.   Or with respect to any money that was
24   loaned to Opportunity Finance Securitization,

Page 304

THEODORE MARTENS

1    did you see any documents other than commercial
2    paper instructions to effectuate a loan to
3    Opportunity Finance Securitization?
4    MR. LOIGMAN:  Objection.  Object to
5    the form.  Mischaracterizes the document.
6    A.   I'm not sure that there are any other
7    forms with respect to new borrowings, if that's
8    your question.
9    Q.   That is correct.
10   A.   Yes, I'm not aware of -- I'm not aware
11   of any other new -- any other paper or any other
12   documents that would be involved with new
13   borrowings.
14   Q.   Okay.  Are you aware of any new
15   borrowings being made to Opportunity Finance
16   Securitization with funds other than the funds
17   that were obtained from the sale of commercial
18   paper by Lord Securities?
19   MR. LOIGMAN:  Objection to form.
20   A.   I believe the funds the -- the
21   initial -- the borrowing of 99, whatever, I
22   believe it was 99 --
23   Q.   Yes.
24   A.   -- million plus, all came from or

Page 305

THEODORE MARTENS

1    were -- was financed through the issuance of
2    commercial paper.
3    Q.   By Lord Securities?
4    A.   By Lord Securities.
5    MR. LOIGMAN:  Object to form.
6    A.   And with Autobahn as DZ Bank's
7    conduit.
8    Q.   Are you aware of DZ Bank advancing any
9    of its own monies to Opportunity Finance
10   Securitization in response to any notice of
11   borrowing?
12   A.   I'm not aware of -- I'm not aware of
13   funds -- any funds from DZ Bank being provided
14   in connection with a notice of borrowing.
15   Q.   Are you aware of DZ Bank itself
16   selling any commercial paper directly into the
17   marketplace in order to finance or fund loans to
18   Opportunity Finance Securitization?
19   A.   I'm not aware of DZ Bank selling
20   any -- any of its commercial paper in the
21   market.
22   Q.   When you and your team saw these
23   commercial paper instructions that were being
24   sent to Lord Securities asking for commercial

Page 306

THEODORE MARTENS

paper to be sold and that for funds then to be
transferred to an account in accordance with the
instructions on the various pages that I have
shown you, did you and your team do any research
to see whether Lord Securities was a broker or a
market maker that sold commercial paper into the
marketplace?
    A.   If we --
        MR. LOIGMAN:  Objection.  Objection to
form.  Mischaracterizing the document again.
    A.   If we did, I don't recall.
    Q.   After seeing these documents, did you
and your team do any research whatsoever about
Lord Securities and its role in the sale of
commercial paper?
    A.   Once again, if we did, I don't recall.
    Q.   I'm going to give you a series of
documents called commercial paper remittance
report.  It's going to be Exhibits 40 through
69, and they run from the date period 1 March
2002 through 5 August, 2003.
        I'm going to hand you Exhibit 40.
        (Martens Exhibit 40, Commercial Paper
Remittance Report bearing Bates Nos.

Page 307

THEODORE MARTENS

DZB013801 through 807, marked for
identification, as of this date.)
        MR. HAVELES:  Here's Exhibit 41.
        (Martens Exhibit 41, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013795 through 800, marked for
identification, as of this date.)
        MR. HAVELES:  This is Exhibit 42.
        (Martens Exhibit 42, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013788 through 794, marked for
identification, as of this date.)
        MR. HAVELES:  Exhibit 43.
        (Martens Exhibit 43, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013783 through 787, marked for
identification, as of this date.)
        MR. HAVELES:  Exhibit 44.
        (Martens Exhibit 44, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013777 through 780, marked for
identification, as of this date.)
        MR. HAVELES:  Exhibit 45.
        (Martens Exhibit 45, Commercial Paper

Page 308

THEODORE MARTENS

Remittance Report bearing Bates Nos.
DZB013773 through 776, marked for
identification, as of this date.)
        MR. HAVELES:  Exhibit 46.
        (Martens Exhibit 46, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013769 through 772, marked for
identification, as of this date.)
        MR. HAVELES:  And Exhibit 47.
        (Martens Exhibit 47, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013763 through 768, marked for
identification, as of this date.)
        MR. HAVELES:  Exhibit 48.
        (Martens Exhibit 48, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013759 through 762, marked for
identification, as of this date.)
        MR. HAVELES:  Exhibit 49.
        (Martens Exhibit 49, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013753 through 758, marked for
identification, as of this date.)
        MR. HAVELES:  Exhibit 60 -- 50,

Page 309

THEODORE MARTENS

rather, sorry.
        (Martens Exhibit 50, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013749 through 752, marked for
identification, as of this date.)
        MR. HAVELES:  Getting ahead of myself.
Exhibit 51.
        (Martens Exhibit 51, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013745 through 748, marked for
identification, as of this date.)
        MR. HAVELES:  Exhibit 52.
        (Martens Exhibit 52, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013742 through 47, marked for
identification, as of this date.)
        MR. HAVELES:  Exhibit 53.
        (Martens Exhibit 53, Commercial Paper
Remittance Report bearing Bates Nos.
DZB013739 through 41, marked for
identification, as of this date.)
        MR. HAVELES:  Exhibit 54.
        (Martens Exhibit 54, Commercial Paper
Remittance Report bearing Bates Nos.

Page 318

THEODORE MARTENS

1
2  due on the commercial paper would have been paid
3  to the commercial paper holders.
4    Q.   Okay.  Are you aware of any funds
5  being paid to DZ Bank other than the fee that it
6  was entitled to receive under the RLSA?
7    A.   I believe that was the compensation
8  that was paid to DZ Bank, the fees, the margin
9  and non-use fees, as I recall.
10    Q.   Which was somewhat slightly in excess
11  of $3 million, correct?
12    A.   That's correct.
13    Q.   Are you aware of anything other than
14  the margin and non-use fees being paid to DZ
15  Bank at any time prior to the termination of the
16  RLSA?
17    A.   Well, I believe there were some
18  upfront fees, some -- we have a schedule.  About
19  $525,000, I believe those were the fees that
20  were paid to DZ Bank.
21    Q.   And those fees were obligations of
22  Opportunity Finance, correct?
23    A.   I believe that's the case, yes.
24    Q.   And you saw some checks that were
25  written by Opportunity Finance, correct?

Page 319

THEODORE MARTENS

1
2    A.   I recall that, yes.
3    Q.   Okay.  Do you -- are you aware of any
4  funds that came through the PC Funding account
5  that then went to the collection account and
6  that was paid to DZ Bank other than the $3
7  million plus for the margin and the non-use
8  fees?
9    A.   The $3 million plus came from the DZ
10  Bank collection account to a DZ Bank account in
11  New York.
12    Q.   Right.  I'm just asking you were any
13  monies in excess of $3 million?
14      MR. LOIGMAN:  Can he finish his answer
15    to that question?
16      MR. HAVELES:  I'm sorry.  Okay.
17      MR. LOIGMAN:  You cut him off in the
18    middle.
19      MR. HAVELES:  I apologize.
20      THE WITNESS:  Give me a moment.
21  BY MR. HAVELES:
22    Q.   Yes, because my question is not about
23  where the money came from, but whether you are
24  aware of anything in excess of $3 plus million
25  due for the margin and the unused fee that was

Page 320

THEODORE MARTENS

1
2  paid to DZ, anything other than above that
3  amount that was paid to DZ from the collection
4  account directly?
5    A.   There was a return from Opportunity
6  Finance of $4 million, and I believe there were
7  other payments that were made for fees -- I
8  mean, there were other -- there were other
9  remittances, there were other wire transfers,
10  transfers into the DZ Bank collection account.
11    I have -- I have that set forth on
12  page 10 of my -- my first -- my initial report,
13  Figure 1.  I have exhibits for that if you want
14  to look for them.
15    Q.   Let me rephrase my question because
16  I'm not sure I'm getting through to you what I'm
17  looking for.
18    You are aware that somewhat in excess
19  of $3 million was paid to DZ Bank for funds
20  obtained from the collection account for the
21  margin fee or the margin and the unused fee,
22  correct?
23    A.   That's my understanding, yes.
24    Q.   Are you aware of any dollars over and
25  above those -- the payment of those two amounts

Page 321

THEODORE MARTENS

1
2  totaling somewhat in excess of $3 million to DZ
3  Bank from funds that emanated from the
4  collection account?
5    A.   I'm not sure, but if I can look at my
6  exhibits, I can -- I can then have --
7    Q.   Sure.
8    A.   -- I can tell what's -- how the money
9  was used.
10    Q.   Take your time, and then you can tell
11  me the answer.
12      (Document review.)
13    A.   Would you repeat the question?
14    Q.   I'll -- are you aware of anything
15  above and beyond the $3 plus million that
16  represented the margin and the unused fee,
17  unused facility fee, that was paid to DZ Bank
18  from the collection account?
19    A.   No, I'm not aware of any other -- any
20  other monies from the collection account paid to
21  DZ Bank.
22    Q.   And the other fees you talked about,
23  like that you outlined in that little schedule,
24  like the $25,000, the half million, et cetera,
25  those were paid by Opportunity Finance, correct?

Page 322

THEODORE MARTENS

1
2    A.   I believe that to be the case, yes.
3    Q.   Let me show you the statements for the
4    Autobahn bank account at U.S. Bank for the
5    period ending May 31, June 31, and July 31,
6    2003.  I would show you the one for August, but
7    that's lost and has never been part of the
8    document production.  They have been marked as
9    Exhibit 76, 77 and 78.
10       (Martens Exhibit 76, Commercial Paper
11   Remittance Report bearing Bates Nos.
12   DZB013307 through 09, marked for
13   identification, as of this date.)
14       (Martens Exhibit 77, Commercial Paper
15   Remittance Report bearing Bates Nos.
16   DZB013264 through 66, marked for
17   identification, as of this date.)
18       (Martens Exhibit 78, Commercial Paper
19   Remittance Report bearing Bates Nos.
20   DZB013204 through 07, marked for
21   identification, as of this date.)
22   BY MR. HAVELES:
23   Q.   Have you seen these bank statements
24   before?
25   A.   This is the $94,000 account at U.S.

Page 323

THEODORE MARTENS

1
2    Bank.  Yes, I have.
3    Q.   Okay.  Rather than --
4    A.   I've seen bank statements from this
5    account.  Have I seen these particulars?  I'm
6    not sure, but I have seen this.  I'm familiar
7    with the account.
8    Q.   Rather than the number, just because
9    their names aren't as well, it says up in the
10   first page, if you look at the cover sheet, it
11   says Opportunity -- Autobahn Opportunity
12   Account, and then it uses the name you just
13   referenced, correct?
14   A.   Correct.
15   Q.   Okay.  So let me ask you to turn to
16   the second page, the April 30 through May 31
17   statement.
18       Do you see that?
19   A.   I'm on the page --
20   Q.   It's page --
21   A.   Page 1, but it's --
22   Q.   Bates number 13308.
23   A.   That's the one I'm on.  I'm at that
24   one.
25   Q.   Okay.  And you see the third item, May

Page 324

THEODORE MARTENS

1
2    16, 2003?
3    A.   I do.
4    Q.   Paid to Autobahn Funding,
5    miscellaneous funds, disbursement funds to pay
6    maturing CP, and then it's for $13,900,420.80,
7    do you see that?
8    A.   I see that.
9    Q.   And do you see that on the Autobahn
10   statement it's saying that these funds are being
11   used to pay maturing CP?
12   A.   That's what it says, yes.
13   Q.   Did you have an understanding that
14   those funds are thereafter transmitted by U.S.
15   Bank to the maturing CP holders?
16   A.   That appears to be the case.
17   Q.   Okay.  And you're not aware of that
18   money, the $13.9 million, for instance, for
19   maturing CP being sent to DZ Bank, are you?
20   A.   I'm not aware of that, no, sir.
21   Q.   Okay.  And so for the next one, the
22   next statement, for the period ending June 30,
23   if you look at the second page of the document,
24   page 1 of the statement, DZB13265?
25   A.   Yes.

Page 325

THEODORE MARTENS

1
2    Q.   You see the second line item of on
3    June 10, again, funds to pay maturing CP?
4    A.   I see that.  I see that amount, yes.
5    Q.   Okay.  And are you aware as to whether
6    any of those -- are you aware -- it's your
7    understanding that those funds were then
8    transmitted by U.S. Bank to the holders of the
9    maturing CP?
10   A.   That would be my understanding.
11   Q.   Okay.  In looking at the statements,
12   the U.S. Bank statements for Autobahn
13   Opportunity, did you or your colleagues identify
14   any funds that were transmitted to that account
15   for maturing CP or for interest payments on CP
16   being transmitted to anyone other than the
17   commercial paper holders at that -- the parties
18   who held the commercial paper at that time?
19   A.   I'm not aware of any evidence that any
20   payments were made with respect to funds
21   associated with maturing CP that would not
22   otherwise have been paid to the holders of that
23   commercial paper, if that's your question.
24   Q.   Okay.  Let me show you another set of
25   bank statements.  These are Exhibits 79, 80 and

Page 330

THEODORE MARTENS

1  payments made to those parties that were
2  unauthorized or in variance with the terms of
3  the waterfall in Section 2.05 of the RLSA?
4      A.   We traced these payments.  I'm not
5  aware of -- any of those payments not being made
6  in accordance with the terms and conditions of
7  the RLSA.
8      Q.   Okay.  Does DZ Bank cause any funds to
9  be transferred to it other than the specific
10  funds authorized under the waterfall provisions
11  of Section 2.05?
12      A.   Did DZ Bank itself authorize itself to
13  have --
14      Q.   Did DZ Bank authorize or cause to be
15  transferred to it any funds other than the funds
16  specifically authorized in the waterfall of
17  Section 2.05 of the RLSA?
18      A.   I believe that DZ Bank authorized the
19  payment of funds to DZ Bank in accordance with
20  the terms and conditions and the provisions of
21  the RLSA.
22      Q.   Slightly different question.
23          Did it authorize any funds in excess
24  of what the Section 2.05 waterfall provisions

Page 331

THEODORE MARTENS

1  authorized to be paid to DZ Bank?
2      A.   I'm not aware of any excess
3  disbursements in that regard, sir.
4      Q.   Okay.  Did it operate a legitimate
5  business?
6      A.   You need to ask a more precise
7  question.
8      Q.   Well, was -- did Redtag engage in the
9  purchase and sale of goods when it operated?
10      A.   Which Redtag?
11      Q.   Redtag Bus.
12      A.   Redtag Bus. did operate a business.
13      Q.   Did Redtag Bus. participate in the
14  Ponzi scheme by taking Ponzi -- by getting --
15  doing notes to investors?
16      A.   Redtag Bus. -- Redtag Bus. had
17  individual investors who also invested in PCI in
18  the Ponzi scheme, if that's your question.
19          MR. LOIGMAN:  I'm sorry.  Please let
20  him finish his answer to the question.
21          MR. HAVELES:  I was responding to his
22  question, which was, is that my question?
23  BY MR. HAVELES:
24      Q.   No, that's not my question.

Page 332

THEODORE MARTENS

1      My question is did any notes that
2  Redtag have investors -- were they notes that
3  were secured by bogus transactions or false
4  transactions?
5      A.   I'm not aware of Redtag Bus. or
6  Redtag.com issuing notes.
7      Q.   Okay.
8      A.   To individual investors that were --
9  that were in any -- that were related to the
10  Ponzi scheme.
11      Q.   Okay.  Fingerhut, was Fingerhut a
12  legitimate business that operated in the sale of
13  goods?
14      A.   Fingerhut was a legitimate business.
15  Catalog -- catalog company.
16      Q.   Did it give notes to individual
17  investors that were based on fraudulent goods or
18  transactions?
19          MR. TSCHUMI:  Peter, can you define
20  "Fingerhut"?  We have a couple of different
21  entities.
22          MR. HAVELES:  I'm referring to all the
23  Fingerhut entities collectively.
24  BY MR. HAVELES:

Page 333

THEODORE MARTENS

1      Q.   Did any of the Fingerhut entities
2  engage in Ponzi scheme transactions with
3  investors?
4      A.   Not that I'm aware of.
5      Q.   Boombuy, did it sell goods?
6      A.   Boombuy -- Boombuy did sell goods.
7      Q.   Did Boombuy engage in any Ponzi scheme
8  transactions with any individual investors?
9      A.   Not that I'm aware of.
10      Q.   Bullet Distribution, it was a real
11  business with whom PCI did business?
12      A.   It was -- it was a real business.
13      Q.   Apex Digital, was it a real business
14  with whom PCI did business?
15      A.   Apex was a real business.
16      Q.   U.S. Redial, was it a real business
17  with whom PCI did business?
18      A.   U.S. Redial was a real business.
19      Q.   Sony Ericsson, was it a real business
20  with whom DZ Bank did business?
21      A.   Sony Ericsson was a real business,
22  yes.
23          MR. HAVELES:  Let's go off the record
24  for the moment, please.

## Page 334

THEODORE MARTENS

1
2    THE VIDEOGRAPHER:  The time is 5:50
3  p.m. and we are going off the record.
4    (Recess.)
5    THE VIDEOGRAPHER:  The time is 6 p.m.
6  and we are back on the record.
7  BY MR. HAVELES:
8    Q.   I'm going to just ask you a few
9  questions about the meaning in your report, and
10  then we're going to go to your rebuttal report,
11  okay?
12    A.   Okay.
13    Q.   Exhibit F, if you could, please -- in
14  your report, which is Exhibit 1 to your
15  deposition, Exhibit F to the report.
16    A.   I have it.
17    Q.   This is a schedule of all the
18  transfers that were made to the collection
19  account by PC Funding, correct?
20    A.   Correct.
21    Q.   And that's $776,409,483.50, right?
22    A.   That's correct.
23    Q.   Am I correct that, with respect to the
24  funds that went into the collection account from
25  PC Funding, the only funds that were thereafter

## Page 335

THEODORE MARTENS

1
2  transferred to an account that was in DZ Bank's
3  name is reflected in Exhibit R, the 3.3 --
4  $3,360,419.13 for margin and non-use fees?
5    A.   So of the -- of the $776 million that
6  was transferred from PC Funding --
7    Q.   Into the collection account.
8    A.   -- to the DZ Bank collection
9  account --
10    Q.   The only money that went from the
11  collection account to a DZ Bank account is the
12  amount shown in Exhibit R, correct?
13    A.   That's correct.
14    Q.   Okay.  Am I correct that of all the
15  money that PC Funding transferred into the
16  collection account, the only money that was
17  transferred to the Autobahn account for payment
18  of principal and interest of the commercial
19  paper is reflected in Exhibit Q, the preceding
20  exhibit, in the amount of $101,691,407.94?
21    A.   From the -- from the DZ Bank
22  collection account to the Autobahn account,
23  that's correct.
24    Q.   Okay.  Am I correct that of all the
25  funds, that $101.69 million transferred to the

## Page 336

THEODORE MARTENS

1
2  Autobahn account, none of that money was
3  transferred to DZ Bank?
4    A.   That's correct.  None of that money
5  was coming out of the DZ Bank collection account
6  being transferred.  That transfer was going to
7  the Autobahn account, if that's your question.
8    Q.   And from the Autobahn account, none of
9  that money was then transferred to DZ Bank,
10  correct?
11    A.   That's my understanding.
12    Q.   You didn't see any reflection in the
13  Autobahn bank statements of money going to DZ
14  Bank from that account, did you?
15    A.   I did not.
16    Q.   Let's go to your rebuttal report,
17  which is Exhibit 2.
18    There were three expert reports that
19  were served by the -- or filed and served by the
20  trustee:  The report of Barefoot Bankhead, the
21  report of Andrew Richmond, and the report of
22  Bruce Miller.
23    Do you recall that?
24    A.   By the trustee?
25    Q.   Yes.

## Page 337

THEODORE MARTENS

1
2  Not by the trustee.  By DZ Bank?
3    A.   I recall that by DZ Bank, yes.
4    Q.   Did you read all three reports?
5    A.   I believe I did, yes.
6    Q.   You don't address anything about the
7  Miller report in your rebuttal; is that correct?
8    A.   That's correct.
9    Q.   Okay.  With respect to the Bankhead
10  report, after you reviewed it, did you and your
11  team perform any research outside of the -- let
12  me withdraw that.
13    Let me first take you to page 4 of
14  your rebuttal report, paragraph 3.  Take a
15  moment to read that to yourself.
16    (Document review.)
17    A.   Okay.  I've read paragraph 3.
18    Q.   Other than the materials recited in
19  paragraph 3, after reading Mr. Bankhead's
20  report, did you and your staff perform any other
21  research or review any other documents?
22    A.   With respect to what?
23    Q.   After you read the Bankhead report, in
24  addition to the materials cited in paragraph 3,
25  in order to address the Bankhead report, did you

Page 338

THEODORE MARTENS

1   and your team look at any other documents or
2   perform any other research?
3       MR. LOIGMAN:  And Peter, just in
4   fairness, are you also looking at the
5   various documents listed in footnotes?
6       MR. HAVELES:  He can tell me about
7   that.  I'm just starting with paragraph 3.
8   That's up to him to tell me what they did or
9   did not look at.
10      THE WITNESS:  There's a number of --
11  of references to DZ Bank documents with
12  respect to the rebuttal points I made.
13  BY MR. HAVELES:
14      Q.  Okay.
15      A.  I mean, to the extent that's
16  additional research or searching for documents,
17  they're evidenced in the form of the footnotes.
18      Q.  Okay.
19      A.  There's a number of them here.
20      Q.  Okay.  I'm not meaning to preclude
21  you.  I -- it's not my deposition, it's yours,
22  so I have to ask you to give me testimony.
23      All right.  So, other than the
24  documents that are recited in the footnotes and

Page 339

THEODORE MARTENS

1   the documents that are recited in paragraph 3,
2   did you and your team look at any other
3   documents in connection with deciding how to
4   respond to Mr. Bankhead's report?
5       A.  I believe that, to the extent we did,
6   it's -- they're referenced in the -- in the
7   report.
8       Q.  Okay.  So you didn't look at anything
9   outside what is explicitly recited in the
10  rebuttal report in terms of responding to Mr.
11  Bankhead's opinions, correct?
12      A.  You know, I understand it's late in
13  the day, and I'm trying to help move this along,
14  but I -- I believe that to be the case.
15      Q.  Okay.  My job is just to define things
16  and put fences around things, so if there's
17  something else that's not in the report, you can
18  tell me.  If there isn't, you can just tell me
19  there's nothing else.
20      A.  And I don't believe that to be the
21  case.
22      Q.  Okay.
23      A.  Because we're -- I believe we're
24  pretty thorough when it comes to referencing

Page 340

THEODORE MARTENS

1   source material in the documents and so forth
2   that we're relying on.
3       Q.  Okay.
4       A.  That doesn't mean if I were to go
5   through this, there might be something else that
6   I'm -- that I'm thinking of that I didn't
7   reference for whatever reason.  That's all.
8       Q.  Okay.  If you could turn to page 9 of
9   your rebuttal.  In footnote 17, you give the
10  definition from Miriam Webster's Dictionary of
11  the word "delegate."
12      Do you see that?
13      A.  "Delegate," yes.
14      Q.  Did you ever bother, in connection
15  with doing your work for either the initial
16  report or your rebuttal report, to go and look
17  at the definition of Miriam Webster or any other
18  dictionary -- Oxford, American Heritage,
19  Black's -- for the word "agent"?
20      A.  I don't recall doing that, no, sir.
21      Q.  Okay.  And do you know what the
22  definition -- do you have an understanding of
23  what the definition of the word "agent" is as
24  you sit here today?

Page 341

THEODORE MARTENS

1       A.  It would depend on the circumstances,
2   but someone that's acting on behalf of others
3   comes to mind.
4       Q.  Okay.  Scattered throughout your
5   report are quotations from deposition
6   transcripts.
7       Who chose the quotations to put in
8   your rebuttal report?
9       A.  I did.
10      Q.  Okay.  So, to the extent that there's
11  only a quotation of a portion of a sentence or a
12  portion of an answer in your rebuttal report,
13  that was your decision to only use a portion of
14  the answer or the portion of a sentence?
15      MR. LOIGMAN:  Objection to form.
16      A.  To address the point or the concern
17  that I was raising, that would -- that would be
18  the case.
19      Q.  I just want to confirm.  It was your
20  decision to use --
21      A.  My decision.
22      Q.  -- excerpts rather than entire answers
23  or sentences?
24      A.  My decision.

Deposition of Theodore Martens dated September 10, 2019
Errata Sheet

| Page: Line Range | | Reason Code | Original Text | Updated Text |
|---|---|---|---|---|
| Start | End | | | |
| 22:21 | 22:21 | 2 | Insurance Company. | Insurance Company. And Mutual of New York (MONY). |
| 22:23 | 22:23 | 2 | Those are the two | Those are the three |
| 26:04 | 26:04 | 3 | Their | There |
| 33:24 | 33:24 | 3 | sparling | sparkling |
| 42:08 | 42:08 | 3 | has | have |
| 51:07 | 51:07 | 3 | Accounts | Accountants |
| 53:03 | 53:03 | 3 | Richie | Ritchie |
| 57:22 | 57:22 | 1 | BMO? | BMO Harris Bank? |
| 59:10 | 59:10 | 1 | Correct. | Correct. Promissory note transactions to fund the acquisition of inventory and subsequent sales pursuant to purchase orders. |
| 89:10 | 89:10 | 1 | Asset | Account |
| 132:08 | 132:08 | 1 | The taxation. | The Minnesota Department of Taxation. |
| 155:23 | 155:23 | 3 | 1955018 | 1959018 |
| 158:04 | 158:04 | 3 | we've | we're |
| 165:04 | 165:04 | 2 | had been invested with Tom Petters | had been invested with PCI |
| 166:05 | 166:06 | 2 | involving Petters -- Petters-related funds. | involving PCI. |
| 169:03 | 169:03 | 1 | prepared. | prepared in connection with a specific proceeding. |
| 172:04 | 172:04 | 3 | PC | PGW |
| 181:17 | 181:17 | 3 | I work | My work |
| 186:03 | 186:03 | 3 | article | articles |
| 191:15 | 191:16 | 3 | I believe that to be the case. | A.  I believe that to be the case. |
| 200:17 | 200:17 | 3 | promisor | promissory |
| 235:17 | 235:17 | 3 | control dominion | sole dominion |
| 266:05 | 266:05 | 3 | deposition | disposition |
| 276:08 | 276:08 | 3 | table | data |
| 317:15 | 317:15 | 3 | sur e | sure |
| 322:25 | 322:25 | 3 | $94,000 | 94000 |
| 331:13 | 331:13 | 3 | Bus. | Biz |
| 331:17 | 331:17 | 3 | Redtag Bus. -- Redtag Bus. | Redtag Biz -- Redtag Biz |
| 332:06 | 332:06 | 3 | Bus. | Biz |

Theodore F. Martens

October 31, 2019

# EXHIBIT 59

Page 1

1

2                 UNITED STATES BANKRUPTCY COURT

3                    DISTRICT OF MINNESOTA

4

5    _____

     In re:                          Jointly Administered
6                                     Case No. 08-45257

     PETTERS COMPANY, INC., et al.,

7

         Debtors.

8

     (includes:                        Court File Nos.
9    PETTERS GROUP WORLDWIDE, LLC        08-45258 (KHS)
     PC FUNDING, LLC                     08-45326 (KHS)
10   THOUSAND LAKES, LLC                 08-45327 (KHS)
     SPF FUNDING, LLC                    08-45328 (KHS)
11   PL LTD., INC.                       08-45329 (KHS)
     EDGE ONE, LLC                       08-45330 (KHS)
12   MGC FINANCE, INC.                   08-45331 (KHS)
     PAC FUNDING, LLC                    08-45371 (KHS)
13   PALM BEACH FINANCE HOLDINGS, INC.)  08-45392 (KHS)

14                                     Chapter 11 Cases

                                 Judge Kathleen H. Sanberg
15   _____

16   CAPTION CONTINUED ON THE NEXT PAGE

17

18

19       VIDEOTAPED DEPOSITION OF RONALD PETERSON

20                    Chicago, Illinois

21             Thursday, February 7, 2019

22

23   Reported by:

24   PAULA CAMPBELL, CSR, RDR, CRR, CRC

25   JOB NO. 154481

## Page 6

R. PETERSON

1   Hamilton, representing DZ Bank.
2
3         MR. ROSOW:  Michael Rosow from Winthrop &
4   Weinstine, also representing DZ Bank.
5         VIDEOGRAPHER:  Will the court reporter
6   please swear in the witness, and then we may
7   proceed.
8         REPORTER:  Would you please raise your
9   right hand.
10  R O N A L D   P E T E R S O N,
11  called as a witness, having been duly sworn,
12  was examined and testified as follows:
13  EXAMINATION
14  BY MR. CHIACHETTI:
15     Q.  Good morning, Mr. Peterson.
16     A.  Good morning.
17     Q.  I introduced myself earlier.  I'm Matthew
18  Chiachetti.  I represent DZ Bank in this case.  I'd
19  like to go over just a few guidelines for our
20  deposition today so that we can try to get through
21  this efficiently and properly.
22        I'm going to ask you a number of questions.
23  If at any point today you don't understand my
24  questions or you can't hear me, please ask me to
25  repeat my question, and I'll try to rephrase it

## Page 7

R. PETERSON

1
2   differently or to speak up and I'll raise my voice
3   politely so that you can hear me.
4         Everything we say today is being taken down
5   by the court reporter, so it's important that we
6   communicate verbally.  Nods of the head and uh-huhs
7   and -- are difficult for the court reporter to take
8   down.  So we can do our best to try to communicate
9   verbally that way.
10        If you could, please try allow -- please
11  try to allow me to finish my questions.  As I'm
12  speaking, I will try to allow you to finish your
13  answers before I ask my next question, again for the
14  benefit of our court reporter to keep a clean
15  record.
16        If at any point today you need to take a
17  break, please let me know.  As soon as we're done
18  with that line of questioning, I'm happy to -- to
19  take that break.  We can see how you're feeling in
20  the -- and counsel's feeling as we go, but we can
21  plan to take breaks every hour or so, and then a
22  break for lunch.  I know you have some appointment
23  that you'd like to make early this afternoon as
24  well.
25     A.  I'm 70 years old, and I may need trips to

## Page 8

R. PETERSON

1
2   the washroom.
3      Q.  That's -- that's fine.  We will make sure
4   to accommodate those.  Just let us know.
5         Is there any circumstance that impairs your
6   ability to testify truthfully today?
7      A.  No, sir.
8      Q.  Can you please state your full name for the
9   record?
10     A.  Ronald Roger Peterson.
11     Q.  And where do you currently reside?
12     A.  I reside at 171 Kimberly Lane in the city
13  of Lake Forest, Illinois.
14     Q.  And where are you currently employed?
15     A.  I am an income partner at the law firm of
16  Jenner & Block, LLP.
17     Q.  And you're a partner there?
18     A.  I said I was an income partner.
19     Q.  Yes.  We'll come back to your employment
20  history, but can you first describe your educational
21  background after high school?
22     A.  I received my bachelor's in arts degree
23  from Ripon College, Ripon, Wisconsin, in May of 1970
24  with a major in political science communications and
25  military science and tactics.

## Page 9

R. PETERSON

1
2         I then matriculated into the University of
3   Chicago, where I graduated in 1973 with a doctorate
4   in law.
5      Q.  And can you tell us about your employment
6   history after you graduated from law school?
7      A.  After I graduated from law school, I was
8   hired by a small law firm named Goldberg, Weigle,
9   W-e-i-g-l-e, Malin and Gitles, G-i-t-l-e-s, here in
10  Chicago.  I was then called to active duty in the
11  U.S. Army before I even knew the bar results, and I
12  was released, I believe, in the spring of 1974.  At
13  which point I discovered that my law firm had
14  disappeared, and I became an associate at Jenner &
15  Block on May 1st of 1974.
16     Q.  And you've been at Jenner & Block since
17  then?
18     A.  Yes.
19     Q.  Okay.  And you mentioned that you -- you're
20  an income partner at Jenner & Block.  Can you
21  describe what that means?
22     A.  I -- I get a K-1, and I receive a stipend.
23  I am in semi-retirement.
24     Q.  Okay.  And what kind of law do you
25  practice?

Page 14

R. PETERSON

1
2    Q.  Are you aware that some of the documents
3    that we did access from the KPMG database had a
4    list -- the custodian of the documents, and one of
5    the custodians listed was "Interlachen 10.13.08
6    Production."
7        Do you have an understanding of what that
8    custodian indicator might mean?
9        A.  I think you've given me a compound
10   question, but the answer is no.
11       Q.  Okay.
12       A.  To both questions.
13       Q.  Do you have a -- has Lancelot been involved
14   in any litigation with Interlachen?
15       A.  Well, if you count the Chapter 11 as
16   litigation in its own right, then the answer to your
17   question is yes.  If you're talking about a
18   contested matter or an adversary proceeding, the
19   answer to your question is no.  If you're talking
20   about a civil action, the answer is no.
21       Q.  Okay.  Thank you.
22        Have you reviewed any documents in
23   preparation for this deposition?
24       A.  I looked at one document, which was a
25   summary sheet prepared by my accountant, Mr. Tim

Page 15

R. PETERSON

1
2    Martin, showing the history of my claims against
3    Petters.
4        Q.  And did that document refresh your
5    recollection regarding anything about your testimony
6    today?
7        A.  Not really.
8        Q.  Did you review any memoranda of interviews
9    with prior Lancelot employees?
10       A.  No.
11       Q.  Other than your attorney, have you
12   discussed your deposition testimony today with
13   anybody?
14       A.  No.  Well, I change my answer.  I also
15   discussed it with my accountant, Mr. Martin.
16       Q.  And where did -- Mr. Martin is with what
17   firm?
18       A.  He is with Huron, and I don't what know the
19   other words that follow Huron is, in the Boston
20   office.
21       MR. RAIFORD:  Huron Consulting.
22       MR. CHIACHETTI:  Thank you.
23   BY MR. CHIACHETTI:
24       Q.  You are here today in your capacity as
25   Lancelot's trustee; is that correct?

Page 16

R. PETERSON

1
2        A.  Yes, although you have not defined
3    "Lancelot."
4        Q.  Well, I was just going to ask if you could
5    please identify the entities that fall under the
6    Lancelot umbrella.
7        A.  There are 19 debtors, 14 of which are what
8    we refer to in my business as special purpose
9    entities.  The five main debtors are Lancelot
10   Investment Funds Ltd., which is an off-shore fund,
11   Lancelot Investors LP, and there's no management in
12   the word, I'm thinking of the general partner, and
13   Lancelot Investor's Fund LP II, Colossus Funds LP,
14   and Colossus Funds Ltd., the latter being an
15   off-shore fund.
16       Q.  And what is the purpose for -- do you have
17   an understanding about the reason for each of those
18   five entities being created?
19       A.  I have an understanding of what my
20   investigators and what Mr. Bell told me they were,
21   yes.
22       Q.  And what is that understanding?
23       A.  Lancelot Ltd., if I just give it the short
24   name, was an off-shore entity.  It has federal tax
25   consequences.  And it primarily sought investment

Page 17

R. PETERSON

1
2    from over the -- over the water and from certain tax
3    exempt -- exempt companies in the country.
4        Lancelot LP was for domestic investors,
5    particularly hedge funds.  Lancelot LP II was for
6    the smaller investor.  Colossus Ltd., like Lancelot
7    Ltd. was a foreign Cayman's company, again
8    attracting foreign investors.  Colossus LP was for
9    the domestic side.
10       Colossuses initially were for non-Petters
11   investment and the Lancelots were for Petters
12   investments.  That did change through the course of
13   their lives.
14       Q.  What do you mean that they changed during
15   the course of their lives?
16       A.  Mr. Bell informed me that there came a
17   point in time when he decided to mix the investments
18   so that the Lancelots got some non-Petters
19   investments and the Colossuses got some Lancelot
20   investments.  I'm sorry.  I'll rephrase.  Colossus
21   got some Petter investments.
22       Q.  Okay.  So what -- can you describe now your
23   responsibility as trustee for these entities?
24       A.  My -- my responsibility as a trustee, of
25   course, is spelled out in Chapter 7 of the

Page 18

R. PETERSON

1
2 Bankruptcy Code. It is to investigate the debtors,
3 to marshal the assets, to make, when necessary,
4 criminal referrals, to understand the income,
5 expenses, debts, and liabilities of the debtor, and
6 other responsibilities specified, particularly I
7 think in 704 of the Bankruptcy Code.
8     Q. Are you familiar with an entity called RWB
9 Services, LLC?
10     A. Yes.
11     Q. What is that entity?
12     A. That was what I described to you earlier as
13 one of the SPEs. It was the administrative agent
14 that handled much of the -- the reactions with the
15 Petters groups.
16     Q. Would that have handled interactions
17 regarding both Lancelot and Colossus?
18     A. Yes. Well, I'll rephrase. I believe that
19 the two Colossuses and two of three Lancelots
20 funneled all their money in the Lancelot LP, who
21 then inter-reacted with RWB. There may have been a
22 step there that you didn't count in your question.
23     Q. Thank you for clarifying.
24     Are you the trustee now for any other
25 entities besides those that we just discussed

Page 19

R. PETERSON

1
2 related to Lancelot?
3     A. Yeah, probably a couple thousand.
4     Q. Are any of them relate -- have any of them
5 filed claims against Tom Petters or Petters Company,
6 Inc.?
7     A. No, most of them are consumer cases that
8 are assigned to me by the Department of Justice
9 every month.
10     Q. Okay. Prior to your appointment as the
11 trustee for Lancelot and the related entities, had
12 you had any involvement with those entities?
13     A. No.
14     Q. And when you became trustee for these
15 Lancelot entities, what did you do to familiarize
16 yourself with their operations?
17     A. Many things. Number one, I hired counsel.
18 Number -- several different law firms. I hired an
19 accounting firm. We went out and conducted
20 interviews of Lancelot employees up in Northbrook.
21     I spent a lot of time with Doug Kelley, who
22 was the receiver. I spent time with the FBI. I
23 spent time with an Assistant United States Attorney.
24 I received briefings from Mr. Kelley's lawyers,
25 Mr. Lodoen and Mr. Wam-- -- not Wambach. God give me

Page 20

R. PETERSON

1
2 strength. The senior partner there at -- you know
3 who I mean?
4     MR. ROSOW: Darrell Uphoff.
5     A. Thank you. Darrell Uphoff.
6     I received reports from my accountants. I
7 received reports from my lawyers. I received
8 anecdotal information from time to time from various
9 victims of the Lancelot and -- and Colossus estates.
10 And I'm sure there were other things that I did, but
11 that's what comes to mind.
12 BY MR. CHIACHETTI:
13     Q. And you mentioned that you interviewed some
14 employees of -- or former employees of Lancelot in
15 Northbrook. Is that where Lancelot was
16 headquartered? Why -- what's -- what's the
17 significance of --
18     A. You asked me a compound question.
19     Q. What's the significance --
20     A. Let me break up the answers.
21     Q. Thank you.
22     A. The headquarters was in Northbrook, and I
23 did interview employees there.
24     Q. And which employees did you interview?
25     A. When you say "you," I'm going to take that

Page 21

R. PETERSON

1
2 pronoun as an editorial "you" to mean my staff. And
3 we interviewed Mr. Bell and Mr. Katz. We may have
4 interviewed more, but that's the only two that stick
5 out in my mind right now.
6     Q. And how many members of your staff were
7 involved in the interviews?
8     A. I would say at least four different lawyers
9 and at least one accountant.
10     Q. And were you personally involved in
11 interviewing Mr. Bell?
12     A. Not in Northbrook.
13     Q. Where were -- where were you involved in
14 interviewing Mr. Bell?
15     A. I interviewed Mr. Bell while he was in
16 custody at the offices of the United States Attorney
17 for the District of Minnesota in Minneapolis.
18     Q. And what topics did you discuss with him
19 during that interview?
20     A. I think the entire history of this case.
21 It took us four days.
22     Q. And did you have records of those -- of
23 that interview?
24     A. I do not take notes. That's just my
25 training as a military intelligence officer. I

Page 38

R. PETERSON

1
2  A. That's what I did for three years after
3  being the trustee of this case.
4  Q. Okay.
5     MR. CHIACHETTI: I will ask the court
6  reporter to please mark this as Peterson 3.
7     (Peterson Exhibit 3 marked for
8  identification.)
9  BY MR. CHIACHETTI:
10  Q. Mr. Peterson, this is a document captioned
11  at the top, United States District Court, District
12  of Minnesota, and it's United States of America v.
13  Gregory Malcolm Bell, and it's captioned as a plea
14  agreement.
15     Do you recognize this document?
16  A. Yes.
17  Q. What is this document?
18  A. It's the plea agreement. You refreshed my
19  recollection.
20  Q. Could you please -- have you -- and do you
21  recall reviewing this document?
22  A. Yes.
23  Q. Do you remember when you reviewed this
24  document?
25  A. Pardon?

Page 39

R. PETERSON

1
2  Q. Do you remember when you reviewed this
3  document?
4  A. Do I remember a specific day? No.
5  Q. Approximately when you reviewed this
6  document?
7  A. I suspect the first time -- you are asking
8  me to speculate. Obviously after it was dated. I
9  can't tell you how many days after or how many weeks
10  after.
11  Q. If I -- if you could please look at Page 4
12  of this document.
13  A. Sure.
14  Q. And I'll direct your attention to the first
15  par- -- the paragraph under the caption "The
16  extension of the term of the PCI notes."
17  A. Right.
18  Q. And it says, beginning in the late --
19  excuse me, "Beginning in late 2007, PCI became
20  delinquent in paying the notes held by Lancelot.
21  The delinquent payments from PCI were not reported
22  to Lancelot investors by Bell. Instead, on
23  December 18th, 2007, Bell executed an agreement with
24  Thomas Petters that extended the repayment of all
25  the PCI notes held by Lancelot from 180 to 270

Page 40

R. PETERSON

1
2  days."
3     MR. LOIGMAN: You skipped the word "term"
4  after "repayment."
5     MR. CHIACHETTI: Thank you.
6     THE WITNESS: What did you say?
7     MR. LOIGMAN: He missed one word.
8     THE WITNESS: Oh, okay.
9  BY MR. CHIACHETTI:
10  Q. In your capacity as trustee, are you
11  familiar with these facts that are alleged here?
12  A. Yes.
13  Q. Did you investigate these facts?
14  A. Yes.
15  Q. And what did your investigation find?
16  A. That he entered into a series beginning
17  about February 28th of 2009 -- I'm sorry, 2008, a
18  series of what the government described as round
19  trip transactions.
20  Q. And what is -- do you have an understanding
21  of what a round trip transaction is?
22  A. Yes.
23  Q. And what is that?
24  A. That is where money was sent to Milwaukee
25  on day one and a similar, but not identical, amount

Page 41

R. PETERSON

1
2  of money was sent back to Northbrook on day two.
3  Q. Can you please describe what the
4  significance is of Milwaukee? You mentioned it
5  just --
6  A. That is, I believe, where Petters had a
7  bank account. Petters did banking with what is at
8  one time called the M&I Bank, which I believe was
9  then gobbled up by H -- BMO Harris. And I think he
10  was dealing, if my memory serves me correctly, with
11  the Milwaukee branch of the M&I Bank.
12  Q. And do you under- -- do you have an
13  understanding of why these round trips are
14  significant from a -- a criminal perspective?
15     MR. LOIGMAN: Objection to form.
16  BY MR. CHIACHETTI:
17  Q. You can answer, if you understand.
18  A. The U.S. Attorney took the position that
19  these transactions were synthetic and not of
20  substance.
21  Q. And can you explain -- do you have an
22  understanding of why the U.S. Attorney thought they
23  had no substance?
24  A. You're asking me to tell you what it was in
25  the mind of the U.S. Attorney, which I cannot do. I

## Page 42

R. PETERSON

1
2 can tell you that what interested me as a trustee
3 was the fact that it did not represent a real
4 economic transaction where money was invested and
5 then repaid.  It was more designed to delay the
6 inevitable.
7     Q.  If you could now look at the bottom of
8 Page 4, start -- and we'll go Page 4 onto Page 5,
9 the second -- the last sentence on Page 4 begins,
10 "To conceal this information from Lancelot
11 investors, the defendant between February 26, 2008,
12 and September 24, 2008, aided and abetted by
13 officers and employees of PCI, including Thomas
14 Petters, and by the defendants' subordinate
15 employees at Lancelot engineered approximately 86
16 round trip banking transactions that gave investors
17 and potential investors the false impression that
18 PCI was paying its promissory notes in a timely
19 manner."
20         Is that description consistent with your
21 understanding of the round trip --
22     A.  Other than I thought it started on
23 February 28th, the answer to your question is yes.
24     Q.  Did you find any evidence that these agreed
25 facts in the plea agreement were not accurate?

## Page 43

R. PETERSON

1
2     A.  I don't like the form of the question.  I
3 think I found the round trip -- or what the plea
4 agreement said to reflect accurately what I had
5 found had happened.
6     Q.  In your capacity as a trustee for Lancelot,
7 did you bring a adversary action against Greg Bell?
8     A.  I believe we did.  I don't have a
9 recollection of it, but I believe we did.
10     MR. CHIACHETTI:  Then I will ask the court
11 reporter to --
12     A.  Now where I'm getting confused is I'm also
13 Greg Bell's receiver, and I'm not -- I'm confused as
14 to whether we had an action as receiver or action as
15 trustee.
16     Q.  Can you --
17     A.  You can refresh my recollection.
18     MR. CHIACHETTI:  Well, and -- and I'm going
19 to ask the court reporter to mark this document
20 as Peterson 4.
21     (Peterson Exhibit 4 marked for
22 identification.)
23     A.  This refreshes my recollection.
24 BY MR. CHIACHETTI:
25     Q.  In what way does it refresh your

## Page 44

R. PETERSON

1
2 recollection?
3     A.  You've now told me that I filed as trustee
4 and not as receiver.
5     Q.  So this -- just for the record, this is --
6 Peterson 4 is a document titled United States
7 Bankruptcy Court for the Northern District of
8 Illinois, Eastern Division, In re: Lancelot
9 Investors Fund as debtor, Ronald R. Peterson as
10 Chapter 7 Trustee for Lancelot Investors Fund LP
11 versus Gregory Bell and other defendants.
12         Do you recall who prepared this document?
13     A.  My lawyers.
14     Q.  And if you could turn to Page 27, which is
15 the last page of that document, is that your
16 electronic signature?
17     A.  It is my facsimile, yeah.
18     Q.  Yeah, that's on your behalf; correct?
19     A.  Right.
20     Q.  Did you review the complaint prior to it
21 being filed?
22     A.  Yes, I did.
23     Q.  And did you consent to its being filed --
24     A.  Yes, I did.
25     Q.  -- on your behalf?

## Page 45

R. PETERSON

1
2         If you could, please turn to Page 3 and
3 look at Paragraph 9 of this document.  Paragraph 9
4 reads as follows, "Beginning on or about
5 February 26, 2008, after Thousand Lakes had been
6 delinquent in repaying various notes, Bell joined
7 the ponzi scheme.  Bell, through the management
8 companies including LIM, and Petters, through PCI,
9 concocted a series of round trip payments to conceal
10 Thousand Lakes' delinquencies.  On multiple
11 occasions Bell and his management companies,
12 including LIM, sent fund money directly to PCI under
13 the pretense that money was for investment in a new
14 note.  PCI then returned the money to the fund's
15 accounts, typically on the same day, to satisfy one
16 or more outstanding notes owed to the funds."
17         Did you believe that these allegations were
18 true at the time you authorized this complaint to be
19 filed?
20     A.  Yes.
21     Q.  And do you recall the basis for the facts
22 alleged in that paragraph?
23     A.  The sources that I gave you in previous
24 testimony.
25     Q.  Has your understanding changed since the

Page 50

R. PETERSON

1
2   A.  Well, we had all of Bell's e-mails in which
3   Bell's communicating with Petters, and we made a
4   conclusion, well, he had to have known, but we could
5   never prove it.
6       It's like the Hollywood movies.  There is a
7   difference between knowing and proving.
8   Q.  Earlier when we started discussing this
9   paragraph, you mentioned -- we can have the court
10  reporter go back if you need to -- I believe -- I
11  believe your comment was that Bell's actions could
12  be considered a ponzi scheme in their own right?
13  MR. RAIFORD:  Objection.  Form.
14  BY MR. CHIACHETTI:
15  Q.  Is -- is -- can you explain that comment or
16  clarify?
17  A.  I think what I said was that some people
18  could characterize the round tripping as a separate
19  ponzi scheme.
20  Q.  As I -- can we just break that down so I
21  understand your comment a little bit better?  When
22  you say that "some people could characterize the
23  round tripping," what is the round tripping that
24  you're referring to there?
25  A.  Remember my testimony, I said money would

Page 51

R. PETERSON

1
2   be sent up on day one to Milwaukee and a similar,
3   but not identical, amount would be returned on
4   Tuesday.
5   Q.  And you've -- you suggested that it was a
6   separate ponzi scheme?
7   A.  A lot of people viewed it as a separate
8   ponzi scheme.
9   Q.  Separate from --
10  A.  From Petters.
11  Q.  Okay.
12  A.  And that has created nothing but confusion
13  in my case.
14  Q.  Okay.  When you indicate that some people
15  consider it a ponzi scheme, who, in your
16  understanding, has considered it a ponzi scheme?
17  A.  Well, I think the SEC has said that to me
18  from time to time.  I probably have said it from
19  time to time.
20  Q.  If we could please look at Page 20 of
21  this -- of Exhibit 4, and look at Paragraph 104.
22  We'll be looking at 104 and 105, which read, "To
23  that end, starting in late February 2008, Bell
24  caused the funds to initiate at least 67
25  transactions where investor money was effectively

Page 52

R. PETERSON

1
2   used to satisfy Thousand Lakes' payment obligations
3   to the funds under various notes.  For each of these
4   67 transactions, the funds wired money to PCI,
5   purportedly to purchase a note from Thousand Lakes,
6   then within hours PCI wired an almost identical
7   amount of money to the funds purportedly to satisfy
8   obligations under an earlier note."
9       Did you believe those allegations to be
10  true when you authorized this complaint to be filed?
11  A.  Yes.
12  Q.  And what was your basis for those --
13  A.  Books and records that we recovered from
14  Northbrook.
15  Q.  Has your understanding of those facts in
16  104 and 105 changed since the time of this filing?
17  A.  Yes.
18  Q.  In what way?
19  A.  One, I've discovered there were 86
20  transactions, not 67.  And in some of the
21  transaction, when you say hours, was overnight to
22  the next day, which was what I previously testified
23  to.
24  Q.  And how did you discover the difference
25  between the 67 and -- I'm sorry, what was the

Page 53

R. PETERSON

1
2   number, eighty --
3   A.  Eighty-six, I believe.
4   Q.  Eighty-six.
5       How did you discover the difference between
6   the 87 and the -- excuse me, the 67 and the 86
7   transactions?
8   A.  There was a meeting at my office with an
9   Assistant U.S. Attorney and my staff.  And I wasn't
10  present at that meeting, and I can't tell you where
11  I was and why, in which they had put more flesh on
12  the bone as to what they had discovered.  We knew
13  about 67, and he said, Oh, there are really 86.
14  Q.  And did you investigate the additional 19
15  transactions?
16  A.  I'm sure we did.  I have no specific
17  recollection of what day and who did it, though.
18  MR. CHIACHETTI:  Okay.  We've been going
19  for about an hour.  Are you okay, or do you
20  want to take a break?
21  THE WITNESS:  I'm fine if you're okay.
22  MR. CHIACHETTI:  Okay.
23  THE WITNESS:  But I defer more importantly
24  to the court reporter.
25  REPORTER:  I'm fine.

Page 54

R. PETERSON

1
2     THE WITNESS:  I can precipitate a break.
3   Do you mind if I have a Coke?
4     MR. CHIACHETTI:  You certainly may.
5     REPORTER:  Watch your microphone.
6     VIDEOGRAPHER:  The time is 10:33 A.M., and
7   we are going off the video record.
8     (Recess taken from 10:33 A.M. to
9   10:42 A.M.)
10     VIDEOGRAPHER:  The time is 10:42 A.M., and
11   we're back on the video record.
12  BY MR. CHIACHETTI:
13     Q.  Mr. Peterson, are you familiar with an
14   entity called PC Funding, LLC?
15     A.  Yes.
16     Q.  And what is your -- Mr. Peterson, are you
17   familiar with an entity called PC Funding, LLC?
18     A.  Yes.
19     Q.  And what is your understanding of that
20   entity?
21     A.  They are a defendant in the matter at bar.
22     Q.  And do you know anything more about the
23   entity, other than the fact that they are a
24   defendant?
25     A.  What I know I learned from counsel, from

Page 55

R. PETERSON

1
2   the trust.
3     Q.  Okay.  And what do you know about them?
4     MR. RAIFORD:  Objection to the extent you
5   have to disclose what you've been discussing
6   with your counsel as a member of the trust.
7     A.  Yeah, we're treading on the attorney-client
8   privilege.  I do know that they are a defendant, and
9   I have read the complaint.
10  BY MR. CHIACHETTI:
11     Q.  Okay.  Do you have an understanding about
12   whether Lancelot had any dealings with PC Funding?
13     A.  Yes.
14     Q.  What is that understanding?
15     A.  My understanding is that it had no direct
16   relationship with PC Funding.
17     Q.  And what is your basis for that
18   understanding?
19     A.  The books and records of the company.
20     Q.  Do you know if you filed -- excuse me, let
21   me rephrase that question.
22     Have you filed any proofs of claim on
23   behalf of Lancelot -- let me rephrase that question.
24     Have you filed any proofs of claim against
25   Petters entities as the Lancelot trustee?

Page 56

R. PETERSON

1
2     A.  Yes.
3     Q.  And against which entities?
4     A.  I can't tell you exactly which ones.  There
5   were no shortage of Petters entities, but I know I
6   filed against quite a few of the affiliates.
7     Q.  And do you have an understanding of what
8   Lancelot's -- do you have an understanding of the
9   basis of Lancelot's claims against those entities?
10     A.  Yes.
11     Q.  And what is that basis?
12     A.  My position was that Petters, operating
13   through all of these entities, had contrived a
14   scheme to defraud the investing public, and that all
15   of these entities were in a civil conspiracy with
16   Petters to defraud.
17     Q.  And do you remember any of the entities
18   that were involved in that conspiracy, as you've
19   alleged?
20     A.  Besides Petters and I think what's called
21   PGW, Petters Worldwide, Petters Capital, your --
22   Petters Funding, Thousand Lakes, there was an entity
23   that started with Palm Beach, my understanding was
24   that for every different lender there was a separate
25   SPE created to -- to be in privity with that lender.

Page 57

R. PETERSON

1
2     Q.  Do you know if Lancelot had direct dealings
3   with each of those SPEs?
4     A.  I believe Lancelot only had direct dealings
5   with Thousand Lakes.
6     Q.  And what's your basis for that?
7     A.  The records of the company.
8     MR. CHIACHETTI:  I'm going to ask the court
9   reporter to mark three exhibits, which will be
10   Petters [sic] 5, 6, and 7.
11     (Peterson Exhibit 5 marked for
12   identification.)
13     (Peterson Exhibit 6 marked for
14   identification.)
15     (Peterson Exhibit 7 marked for
16   identification.)
17     MR. CHIACHETTI:  For the record, Petters --
18   Peterson 5 has at the -- in the forth line down
19   from the left the name of the creditor Lancelot
20   Investors Fund, LP.
21     Peterson 6 has the name of the creditor as
22   Lancelot Investors Fund II, LP.
23     And Exhibit 7 has the name of the creditor
24   as Lancelot Investors Fund, Ltd.
25     A.  Yes, I see them.

Page 58

```
1              R. PETERSON
2   BY MR. CHIACHETTI:
3       Q. Mr. Peterson, do you recognize these
4   documents?
5       A. Yes.
6       Q. What are they?
7       A. Copies of proofs of claims that I filed in
8   the Petters bankruptcy.
9       Q. And is that your signature at the bottom of
10  each of these exhibits, on the first page of each of
11  these exhibits?
12      A. Yes.
13      Q. Are you familiar with these documents?
14      A. Yes.
15      Q. Do you recall who prepared these documents?
16      A. I'm not sure what you mean by "prepared."
17  I'm sure a member of my staff, at my direction,
18  prepared them. It was my legal theory.
19      Q. And you reviewed them before --
20      A. Yes.
21      Q. -- they were filed?
22      So can you explain the difference between
23  each of -- excuse me. Let me rephrase the question.
24      Can you explain why you filed three proofs
25  of claim here?
```

Page 59

```
1              R. PETERSON
2       A. I filed one on behalf of each of the
3   Lancelot entities.
4       Q. Okay. And in -- if we can, for purposes of
5   our discussion at the moment, can we look at the
6   Exhibit 5?
7       A. Yes.
8       Q. And can you explain who this proof -- what
9   entity this proof of claim is filed against?
10      A. PC Funding.
11      Q. Okay. And if you can look at the -- do you
12  know how much this claim is for?
13      A. $268,435,399, no cents.
14      Q. Do you have an understanding of how that
15  amount was calculated?
16      A. It was calculated off the books and records
17  of the company as confirmed by account -- my
18  accountant at Huron.
19      Q. And specifically -- and do you have an
20  understanding of specifically what in the books and
21  records were evaluated to determine that number of
22  268 million?
23      A. Mr. Katz was the custodian of the note
24  files which Mister -- which Huron reviewed.
25      Q. And can you clarify who Mr. Katz is?
```

Page 60

```
1              R. PETERSON
2       A. Mr. Katz was the Chief Financial Officer of
3   the debtor.
4       Q. Okay. And do you --
5       MR. LOIGMAN: Just for clarification, you
6   used the word "debtor." There is five debtors.
7       A. And I was just thinking the same thing you
8   were. "Debtor" is plural.
9       MR. LOIGMAN: But also we have the PCI
10  debtors, we've got the --
11      A. Okay. Let's -- I'll -- let me clarify my
12  testimony for you. He was the Chief Financial
13  Officer for the three Lancelots and the two
14  Colossuses.
15      MR. CHIACHETTI: Thank you.
16      THE WITNESS: Is that better?
17      MR. LOIGMAN: Yeah, thank you.
18  BY MR. CHIACHETTI:
19      Q. And -- and, I'm sorry, we digressed a
20  little bit. Your rec- -- can you re-explain who --
21  your recollection of who prepared the calculation of
22  this $268 million?
23      A. That was done by Huron. And when I use the
24  term "Huron," I'm referring to Tim Martin and the
25  predecessor company he was with was Mesirow, but
```

Page 61

```
1              R. PETERSON
2   because of the confusion, let's just call them
3   Huron.
4       Q. For the benefit of the court reporter, are
5   you able to spell "Mesirow"?
6       MR. RAIFORD: M-e-s-i-r-o-w.
7       THE WITNESS: He is a far better speller
8   than I am.
9       MR. RAIFORD: Thank you.
10  BY MR. CHIACHETTI:
11      Q. Can you please look at -- and Huron did the
12  calculation for of the amount of claim in -- well,
13  let's look -- we'll look at -- let me do it this
14  way, can we look at Exhibit 6, please?
15      A. Yeah.
16      Q. And what is the amount that is being
17  claimed in this proof of claim?
18      A. $269,591,304.28.
19      Q. And how was that amount calculated, to your
20  knowledge?
21      A. Calculated by Huron based on the books and
22  records of the company.
23      Q. And --
24      A. And again, we're referring to the Lancelots
25  and Colossuses, not to Petters.
```

Page 82

R. PETERSON

1
2   Q.  There are many more notes on Schedule A
3   than there are on Schedule B.  Are the notes that
4   are on Schedule A and not on Schedule B notes that
5   have been repaid?
6       MR. LOIGMAN:  Objection to form.
7   A.  My -- pardon?
8       MR. LOIGMAN:  I was just objecting to the
9   form.
10  A.  Can you rephrase, please?
11  BY MR. CHIACHETTI:
12  Q.  Why are some notes included on Schedule A
13  not included on Schedule B?
14  A.  I believe some of the notes were repaid,
15  either by renewal with a new note or paid with cash.
16  Q.  Do you know if any of those repayments were
17  reclaimed by the Petters estate in the bankruptcy --
18  in its bankruptcy proceedings?
19  A.  I'm not sure what the verb "reclaim" means.
20  I'm sorry.
21  Q.  Were any -- were any of the funds that were
22  repaid to Lancelot clawed back by the Petters
23  entities that existed after the bankruptcy?
24  A.  I also -- claw back for what -- bankruptcy
25  lawyers use that term as a term of art, which I

Page 83

R. PETERSON

1
2   don't think you are using appropriately.
3   Q.  Did --
4   A.  I'm sorry.  I don't mean to --
5   Q.  No, that's --
6   A.  Please give me -- can you use a different
7   verb?
8   Q.  Was Lancelot required to return any of the
9   funds that it received from Petters at any time
10  after the -- after the raid in 2008?
11  A.  No, in my opinion.
12  Q.  What do you mean in your opinion?
13  A.  There was a controversy in the case as to
14  whether any of the money that Lancelot or Colossus
15  had received would have been a voidable transaction
16  either under Section 547 of the Bankruptcy Code, 544
17  of the Bankruptcy Code, or 548 of the Bankruptcy
18  Code.  And that was part of the negotiations that
19  took place between myself and Kelley and the other
20  creditors in order to get a consensual plan of
21  reorganization.
22  Q.  And what was the result of that
23  negotiation?
24  A.  Confirmation of a plan.
25  Q.  And how about in -- what was the result in

Page 84

R. PETERSON

1
2   respect to the money that was paid -- repaid to
3   Lancelot and was in dispute during the negotiations?
4   A.  We -- when I say "we" the -- my estates, as
5   well as the Palm Beach estates, gave a credit on
6   part of our distributions to the Lance -- now you
7   got me saying it, to the Petters estate, which
8   inured to the benefit of the other creditors.
9   Q.  Do you know the total amount of proof -- of
10  claims that were filed on behalf of Lancelot against
11  PC Funding?
12  A.  As we sit here today, without looking -- I
13  thought you gave me a proof of claim.
14  Q.  So to get the total, would I add those
15  three proofs of claim up?
16  A.  Well, you would start to get duplications.
17  I filed proof of claims against every entity I
18  could, because I saw what Jack Butler did in the
19  Kmart case, where he would have a claim disallowed
20  that was perfectly legitimate but filed against one
21  of the wrong 100 subsidiaries of Kmart, and he was
22  getting those objections sustained.
23      So I filed against everybody, number one,
24  to make sure that I covered everybody and, number
25  two, because I believed everybody was involved in a

Page 85

R. PETERSON

1
2   civil conspiracy.
3       And as part of the confirmation process,
4   all of these entities were collapsed into one, and
5   all the duplicate claims were then disallowed.
6   Q.  And are you describing the Kmart --
7   A.  Pardon?
8   Q.  Are you describing the Kmart circumstances
9   or are you --
10  A.  No, I'm describing this circumstance of
11  Petters.  I'm sorry if I was ambiguous.
12  Q.  That makes --
13  A.  Makes more sense?
14  Q.  Thank you.
15      Okay.  Do you know what Lancelot's allowed
16  claim against Petters is?
17      MR. RAIFORD:  Objection to how we are
18  defining "Lancelot" in there.
19  BY MR. CHIACHETTI:
20  Q.  Okay.  Let's talk -- we can break it out
21  into each of the entitles.
22  A.  For purposes of the plan, first and
23  foremost, all of the interest was disregarded and we
24  went by principal.  And so, the claim was allowed in
25  the principal amount of whatever it was, and I can't

Page 86

R. PETERSON

1
2  tell you the exact numbers without looking at my
3  records.
4      Q. Do you know how that amount was calculated,
5  as compared to the total amount that was claimed in
6  the proof of claims?
7      A. I don't understand your question.
8      Q. Do you -- do you have an understanding of
9  how the amount that Lancelot claimed in its proof of
10 claims was adjusted to get to the allowed amount?
11     A. My accountants, and the committee's
12 accountants, and probably Mr. Stern, sat down and
13 made those mathematical calculations.
14     Q. Were you involved in those calculations?
15     A. Only in a very supervisory way. I was not
16 hand -- I was not micromanaging that process.
17     Q. And I -- can you remind -- I'm sorry. Can
18 you remind me who Mr. Stern is?
19     A. Mr. Stern was a very competent with numbers
20 representative of Green Pond, and it was one
21 other -- Stone Hill, that's the other entity I was
22 thinking of. And he had a very sharp pencil, and
23 his responsibility with the board of trustees or the
24 creditor's committee was to supervise what the
25 accountants were doing.

Page 87

R. PETERSON

1
2      MR. CHIACHETTI: I will ask the court
3  reporter if we can please mark this as
4  Peterson 9.
5      (Peterson Exhibit 9 marked for
6  identification.)
7  BY MR. CHIACHETTI:
8      Q. Exhibit 9 is a document titled United
9  States Bankruptcy -- Bankruptcy Court, District of
10 Minnesota, In re: Petters Company, Inc., et al.,
11 Amended Chapter 11 Plan of Liquidation, and it's
12 dated February 22nd, 2016.
13     A. Yeah.
14     Q. Mr. Peterson, are you familiar with this
15 document?
16     A. Yes.
17     Q. And what is it?
18     A. It's the Amended Chapter 11 Plan for
19 Liquidation.
20     Q. And what was -- were you involved in the
21 creation of this plan?
22     A. Yes.
23     Q. In what capacity?
24     A. I was one of the people that worked on its
25 drafting and its negotiation and its mediation.

Page 88

R. PETERSON

1
2      Q. And if you could, please, turn to the page
3  of this exhibit -- at the top you'll see it has page
4  numbers 1 of 161 -- if you could please turn to
5  Page 31 of 161.
6      A. Is this the page that starts with
7  Paragraph 6.2?
8      Q. This is the page that starts with
9  Paragraph 4.6. It's --
10     MR. RAIFORD: Page 25 of the plan.
11 BY MR. CHIACHETTI:
12     Q. -- 25 of the plan at the bottom, yes.
13     A. Okay. I thought you said 32. So I got one
14 that starts with 4.6.
15     Q. There you go.
16     Could you please review Paragraph 5.2
17 that's at the bottom of that page onto Page 26, just
18 the -- I'm just going to ask some questions about
19 subparagraph A and subparagraph B, but feel free
20 to --
21     A. Yes.
22     Q. -- refamiliarize yourself as much as you
23 need.
24     A. I have reviewed them.
25     Q. If you could, please look at

Page 89

R. PETERSON

1
2  Paragraph 5.2(a). It -- it -- excuse me, that
3  paragraph describes a Lancelot payment.
4      Do you have an understanding of what the
5  Lancelot payment is?
6      A. I already told you, but I will tell you
7  again.
8      Q. Thank you.
9      A. There was a dispute as to how much of the
10 payments that Lancelot received or Colossus received
11 prior to the bankruptcy could be avoided under
12 either 544, 547, or 548 of the Code. And this was
13 the subject of contentious negotiation and mediation
14 by Ralph Mabey.
15     And what we agreed to, in order to get a
16 plan done, was that everybody -- we fixed a certain
17 amount. And that was to be credited back to the
18 estate. And that was done differently between
19 Lancelot and Palm Beach. Palm Beach actually got
20 its full dividend and then sent a check back to the
21 trust. I simply told them send me a check for the
22 net amount.
23     So I got less than what I would have been
24 entitled to, but for the fact that I was settling
25 the avoidance actions as part of this plan.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re | **Jointly Administered under**<br>**Case No. 08-45257** |
| Petters Company, Inc., et al., | Court File No. 08-45257 |
| Debtors. | Court File Nos.: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (KHS) |
| PC Funding, LLC; | 08-45326 (KHS) |
| Thousand Lakes, LLC; | 08-45327 (KHS) |
| SPF Funding, LLC; | 08-45328 (KHS) |
| PL Ltd., Inc.; | 08-45329 (KHS) |
| Edge One LLC; | 08-45330 (KHS) |
| MGC Finance, Inc.; | 08-45331 (KHS) |
| PAC Funding, LLC; | 08-45371 (KHS) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (KHS) |
| | Chapter 11 Cases<br>Judge Kathleen H. Sanberg |

| | |
|---|---|
| Douglas A. Kelley, in his capacity as the<br>Trustee of the PCI Liquidating Trust, | |
| Plaintiff, | |
| vs. | |
| Opportunity Finance, LLC; Opportunity<br>Finance Securitization, LLC; Opportunity<br>Finance Securitization II, LLC; Opportunity<br>Finance Securitization III, LLC; International<br>Investment Opportunities, LLC; Sabes Family<br>Foundation; Sabes Minnesota Limited<br>Partnership; Robert W. Sabes; Janet F. Sabes;<br>Jon R. Sabes; Steven Sabes; Deutsche<br>Zentralgenossenschaftbank AG; West<br>Landesbank AG; WestLB AG New York<br>Branch; and The Minneapolis Foundation, | ADV. NO. 10-04301 |
| Defendants. | |

# [PROPOSED] ORDER GRANTING
# DZ BANK'S MOTION FOR SUMMARY JUDGMENT

This matter came before the Court on Defendant Deutsche Zentral Genossenschaftsbank, Frankfurt am Main's ("DZ Bank") Motion for Summary Judgment, pursuant Federal Rule of Bankruptcy Procedure 7056, Federal Rule of Civil Procedure 56, and Local Rule 7056-1 ("Motion"). **IT IS HEREBY ORDERED THAT:**

1.      DZ Bank's Motion is **GRANTED**.

2.      As to all of the Trustee's claims against DZ Bank, DZ Bank was not a transferee for any of the principal and interest that Opportunity Finance Securitization paid to Autobahn Funding Company LLC.

3.      The Trustee's constructive fraudulent transfer claims against DZ Bank in Counts VI, VII, VIII, XI, XII, and XIII of the Trustee's Fourth Amended Complaint (Dkt. No. 233) are **DISMISSED WITH PREJUDICE**.

4.      The Trustee's claims against DZ Bank are **DISMISSED WITH PREJUDICE** because the Trustee has no standing to assert claims under Section 544 of the Bankruptcy Code.

5.      This action is **DISMISSED WITH PREJUDICE**.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: _____          _____

                                 KATHLEEN H. SANBERG
                                 United States Bankruptcy Judge
18442080v2