# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re

Petters Company, Inc., et al.,

Debtors.

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.;
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

**Jointly Administered under
Case No. 08-45257**

Court File No. 08-45257

Court File Nos.:

08-45258 (KHS)
08-45326 (KHS)
08-45327 (KHS)
08-45328 (KHS)
08-45329 (KHS)
08-45330 (KHS)
08-45331 (KHS)
08-45371 (KHS)
08-45392 (KHS)

Chapter 11 Cases
Judge Kathleen H. Sanberg

Douglas A. Kelley, in his capacity as the
Trustee of the PCI Liquidating Trust,

Plaintiff,

v.

Opportunity Finance, LLC, et al.,

Defendants.

ADV. NO. 10-04301

## MEMORANDUM OF LAW ON BEHALF OF DOUGLAS A. KELLEY, IN HIS CAPACITY AS TRUSTEE OF THE PCI LIQUIDATING TRUST, IN OPPOSITION TO DZ BANK'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................... 1

COUNTERSTATEMENT OF FACTS ................................................... 3

I.    PARTIES AND RELEVANT ENTITIES ......................................... 3

    A.    DZ Bank and Autobahn Funding Company LLC .................................. 3

    B.    Debtors PCI and PC Funding ........................................................... 4

II.   THE OPERATION OF THE PONZI SCHEME ............................... 4

III.  THE OPPORTUNITY FINANCE FACILITY ................................. 5

    A.    The Facility .................................................................................. 5

    B.    DZ Bank Acted as the Lender of the Opportunity Finance Facility ..... 6

    C.    DZ Bank Appointed Itself to Act as Collateral Agent ...................... 7

IV.   THE DZ BANK COLLECTION ACCOUNT ................................... 8

V.    DZ BANK COLLECTION ACCOUNT TRANSFERS ................... 11

    A.    The Evidence Shows That None of the Funds Transferred from PC Funding to the DZ Bank Collection Account Originated From Legitimate Activity .................. 11

    B.    The Recipients of Transfers From the DZ Bank Collection Account ................. 12

        1.    Transfers to PC Funding ......................................................... 12

        2.    Other Transfers ..................................................................... 12

VI.   DZ BANK'S BAD FAITH FAILURE TO FOLLOW UP ON RED FLAGS OF FRAUD ................................................................................. 13

ARGUMENT .............................................................................. 18

I.    DZ BANK'S "MERE CONDUIT" DEFENSE IS PROCEDURALLY BARRED ......... 18

    A.    DZ Bank Has Waived Any "Mere Conduit" Affirmative Defense ...................... 18

    B.    DZ Bank Is Estopped From Arguing That It Was a "Mere Conduit" ................. 20

II.   DZ BANK WAS NOT A "MERE CONDUIT" ................................ 22

    A.    DZ Bank Cannot Be a Mere Conduit for Funds Used to Repay DZ Bank's Own Loan ............................................................................... 23

    B.    DZ Bank Cannot Be a Mere Conduit Because It Had Significant Discretion Over the Funds at Issue and Benefited From Each Fraudulent Transfer ...................... 24

        1.    The RLSA Upon Which DZ Bank Relies, Along With Other Transaction Documents, Establish That DZ Bank Controlled the DZ Bank Collection Account ................................................................. 24

        2.    Consistent with the "Sole Discretion and Control" Provided to DZ Bank in the Documents, It Exercised Actual Control Over the Funds in Its Collection Account ....................................................... 25

i

3.      DZ Bank Set Up the Transaction So the Payment Flow Would Benefit DZ
Bank ..................................................................................................... 27

4.      DZ Bank Could Not Be a "Mere Conduit" for Funds Paid to Its Own
Captive Conduit, Autobahn .................................................................. 28

C.      The "Mere Conduit" Defense Is Not Available to DZ Bank Because There Is
Substantial Evidence That DZ Bank Acted in Bad Faith ..................................... 31

III.    DZ BANK FEES ARE SUBJECT TO FRAUDULENT TRANSFER CLAIMS ........... 33

IV.     DZ BANK'S ASSERTIONS REGARDING THE LACK OF PREDICATE
CREDITORS ARE IRRELEVANT AND CONTRARY TO THE FACTUAL
RECORD .................................................................................................................. 34

A.      Predicate Creditors of PC Funding Are Not Required for the Trustee to Assert
Fraudulent Transfer Claims Against DZ Bank ..................................................... 35

1.      The Trustee Has Standing to Bring Claims Under Section 544(a) ........... 35

2.      The Trustee Can Assert Claims Against DZ Bank as a Subsequent
Transferee of PCI .................................................................................. 37

B.      There Are Predicate Creditors of PC Funding ..................................................... 37

1.      PCI Creditors Can Pierce the Corporate Veil Between PCI and PC
Funding ................................................................................................. 37

2.      Predicate Creditors Have Tort Claims Directly Against PC Funding ...... 42

CONCLUSION ................................................................................................................... 46

APPENDIX ........................................................................................................................... 1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Belford v. Cantavero (In re Bassett)*,
    221 B.R. 49 (Bankr. D. Conn. 1998) .................................................................... 36

*Bonded Fin. Servs., Inc. v. European American Bank*,
    838 F.2d 890 (7th Cir. 1988) ............................................................................. 23

*Cobb v. PayLease LLC*,
    34 F. Supp. 3d 976 (D. Minn. 2014) .................................................................... 46

*Dahhane v. Stanton*,
    2016 WL 4257536 (D. Minn. Aug. 12, 2016) ...................................................... 21

*De Castro v. Castro*,
    2018 WL 6026089 (D. Minn. Nov. 16, 2018) ...................................................... 45

*ECTG Ltd. v. O'Shaughnessy*,
    (D. Minn. Nov. 25, 2014) ................................................................................... 42

*Goscienski v. Larosa (In re Montclair Homes)*,
    200 B.R. 84 (Bankr. E.D.N.Y. 1996) .................................................................... 36

*H & R Block Enter. v. Short*,
    2006 WL 3437491 (D. Minn. Nov. 29, 2006) ...................................................... 18

*IBT Int'l, Inc. v. Northern*,
    408 F.3d 689 (11th Cir. 2005) ............................................................................. 31

*In re ATM Fin. Svcs., LLC*,
    446 B.R. 564 (M.D. Fla. 2011) ............................................................................ 27

*In re Bauer*,
    318 B.R. 697 (Bankr. D. Minn. 2005) ...................................................... 23, 27, 31

*In re Bayou Group, LLC*,
    439 B.R. 284 (S.D.N.Y. 2010) ............................................................................. 32

*In re Big Apple Volkswagen, LLC*,
    2016 WL 1069303 (S.D.N.Y. Mar. 17, 2016) ...................................................... 23

*In re Brooke Corp.*,
    458 B.R. 579 (Bankr. D. Kan. 2011) .............................................................. 26, 27

*In re Curran V. Nielsen Co.*,
  1995 WL 711268 (Bankr. D. Minn. 1995) ............................................................ 23

*In re Hurtado*,
  342 F.3d 528 (6th Cir. 2003) ............................................................................... 26

*In re Hypnotic Taxi, LLC*,
  2017 WL 4464876 (E.D.N.Y. Oct. 4, 2017)........................................................... 27

*In re Intelefilm Corp.*,
  301 B.R. 327 (Bankr. D. Minn. 2003) ....................................................... 38, 39, 40

*In re Lacina*,
  451 B.R. 485 (Bankr. D. Minn. 2011) ................................................................... 26

*In re Model Imperial, Inc.*,
  250 B.R. 776 (S.D. Fla. 2000) .............................................................................. 32

*In re Petters Co.*,
  506 B.R. 784 (Bankr. D. Minn. 2013) ..................................................... 4, 15, 38, 39

*In re Petters Co.*,
  557 B.R. 711 (Bankr. D. Minn. 2016) ................................................................... 19

*In re Petters Co.*,
  550 B.R. 438 (Bankr. D. Minn. 2016) ................................................................... 34

*In re Polaroid*,
  543 B.R. 888 (Bankr. D. Minn. 2016) ................................................................... 46

*In re Sherman*,
  67 F.3d 1348 (8th Cir. 1995) ............................................................................... 32

*In re Whaley*,
  229 B.R. 767 (Bankr. D. Minn. 1999) ................................................................... 33

*In re Whitacre Sunbelt, Inc.*,
  200 B.R. 422 (N.D. Ga. 1996) ............................................................................. 28

*Kelley v. Boosalis*,
  No. 18-cv-868 (D. Minn. Nov. 30, 2018) .............................................................. 37

*Kelley v. McDonald*,
  2018 Bankr. LEXIS 117 (Bankr. D. Minn. Jan. 17, 2018) ...................................... 31

*Kelley v. Opportunity Fin., LLC*,
  561 B.R. 738 (Bankr. D. Minn. 2016) ....................................................... 37, 38, 39

*Kleven v. Stewart (In re Myers)*,
   320 B.R. 667 (Bankr. N.D. Ind. 2005)...................................................................... 36

*Mo. Housing Dev. Comm'n v. Brice*,
   919 F.2d 1306 (8th Cir. 1990) ......................................................................... 21, 22

*Musso v. Ostashko*,
   468 F.3d 99 (2d Cir. 2006) ........................................................................................ 36

*New Hampshire v. Maine*,
   532 U.S. 742 (2001).............................................................................................. 20, 21

*Opportunity Fin., LLC v. Kelley*,
   822 F.3d 451 (8th Cir. 2016) .................................................................................... 20

*Sherman v. Winco Fireworks, Inc.*,
   532 F.3d 709 (8th Cir. 2008) .................................................................................... 19

*TCI Business Capital, Inc. v. Five Star American Die Casting, LLC*,
   890 N.W. 2d 423 (Minn. Ct. App. 2017)................................................................. 45

*United States v. Ron Pair Enterprises, Inc.*,
   489 U.S. 235 (1989)................................................................................................... 36

*Urban v. American Legion Post 184*,
   695 N.W. 2d 153 (Minn. 2005) ........................................................................... 39, 40

*World Business Lenders, LLC v. Palen*,
   2017 U.S. Dist. LEXIS 91403 (D. Minn. June 13, 2017)........................................ 45

*Zayed v. Assoc. Bank, N.A.*,
   779 F.3d 727 (8th Cir. 2015) ............................................................................... 42, 44

*Zayed v. Buysse*,
   2012 WL 12893882 (D. Minn. Sept. 27, 2012)...................................................... 32

*Zilkha Energy Co. v. Leighton*,
   920 F.2d 1520 (10th Cir. 1990) ................................................................................ 35

## **Statutes**

11 U.S.C. § 544 ............................................................................................................. 34

11 U.S.C. § 544(a)............................................................................................. 2, 34, 35, 36

11 U.S.C. § 544(a)(1)............................................................................................... 35, 36

11 U.S.C. § 544(a)(2)..................................................................................................... 35

11 U.S.C. § 544(a)(3) ................................................................................................................... 35

11 U.S.C. § 548(a)(1)(B)(i) ......................................................................................................... 33

11 U.S.C. § 550(a) ....................................................................................................................... 37

11 U.S.C. § 550(b)(1) .................................................................................................................. 33

Minn. Stat. Ann. § 513.41 ............................................................................................................ 36

Minn. Stat. Ann. § 513.44 ............................................................................................................ 34

Minn. Stat. Ann. § 513.44(a) ........................................................................................... 35, 36, 37

Minn. Stat. Ann. § 513.45 ............................................................................................................ 34

### **Rules and Regulations**

Fed. R. Civ. P. 15(a)(1)(A) .......................................................................................................... 19

Fed. R. Civ. P. 8(c) ...................................................................................................................... 18

## PRELIMINARY STATEMENT

DZ Bank's motion for summary judgment is grounded in two assertions subject to material factual dispute and, accordingly, should be denied.

First, DZ Bank asserts that it acted as a "mere conduit" for $101 million that was transferred from Debtor PC Funding into DZ Bank's Collection Account, and then subsequently released to Autobahn Funding, the captive conduit facility set up by, operated by, and that generated profits solely for, DZ Bank. DZ Bank's argument that it acted as a "mere conduit," rather than as a transferee of the $776 million that PC Funding sent to DZ Bank's Collection Account, is belied by the factual record: the governing documents expressly state that DZ Bank had "sole dominion and control" over the Collection Account; DZ Bank's own employees referred to the account as "the DZ Bank Collection Account" and "our" account; and not a single dollar could be paid out of the account without DZ Bank's approval. Moreover, DZ Bank itself set up the account in its own name so that money could flow into the account for DZ Bank's benefit—to pay its fees, reduce its exposure to liability, and acquire insurance for its protection.

DZ Bank attempts to evade the plain language of the agreements and the parties' actual conduct by arguing that Autobahn, and not DZ Bank, was the real lender and real recipient of the funds. But that contention is belied by DZ Bank's own repeated assertions *in this case* that DZ Bank was the lender, and that PC Funding paid DZ Bank to satisfy the obligations of DZ Bank's borrower (Opportunity Finance Securitization). In all events, DZ Bank ignores the fact that it dispersed hundreds of millions of dollars from the account, mostly to enable additional loans to be made to PC Funding, that never went anywhere near Autobahn. DZ Bank, plainly, was not a mere pass-through.

Moreover, this Court's decisions establish that the "mere conduit" defense—which DZ Bank waived by failing to raise as an affirmative defense in its answer—cannot be invoked if the

defendant cannot establish it acted in good faith. DZ Bank makes no mention of the good faith requirement, and for good reason: DZ Bank's employees knew that PC Funding did not receive a single dollar from legitimate retailers. Recognizing this "huge open item"—which meant that the principal guard against fraud was wholly absent—DZ Bank's employees chose to hide the fact from their own supervisors in Germany, a step that DZ Bank's own credit officer on the deal termed a "material omission."

Second, DZ Bank argues that there are no predicate creditors of PC Funding, and thus that the Trustee lacks standing to bring fraudulent transfer claims against DZ Bank. Again, the factual record is wholly at odds with DZ Bank's position: discovery has confirmed that there are several predicate creditors of PC Funding, and thus that the Trustee can assert fraudulent transfer claims against DZ Bank under Section 544(b) of the Bankruptcy Code. As an initial matter, there is no need to make this inquiry because the Trustee himself is a hypothetical creditor under Section 544(a) with standing to bring fraudulent transfer claims under state law. Moreover, there is no dispute that (i) every dollar PC Funding paid to DZ Bank first came from PCI, and (ii) PCI had plenty of creditors, and therefore the Trustee has standing to avoid transfers to DZ Bank that it received as a subsequent transferee of PCI.

Once the inquiry is made, however, the facts confirm that PC Funding had pre-bankruptcy creditors of its own, several of which are identified in the complaint. These creditors, all of which lost money through the operation of Petters' Ponzi scheme, (i) have valid tort claims against PC Funding, which substantially aided the Ponzi scheme by raising hundreds of millions of dollars that were injected into the scheme, and (ii) may pursue claims against PC Funding because it was an alter ego of PCI. The factual record demonstrates that PC Funding was wholly owned by PCI, was operated by PCI to carry out the fraud, and maintained no independence, corporate formalities,

or adequate capitalization.  Contrary to DZ Bank's assertion, it would be fundamentally unfair to treat PC Funding as if it were a separate functioning entity.

DZ Bank's 992-page submission fails to demonstrate an absence of factual disputes regarding the elements central to its assertions.  To the contrary, the extensive factual record demonstrates that DZ Bank's defenses lack merit.  The motion for summary judgment should be denied.

<div align="center">

### COUNTERSTATEMENT OF FACTS[1]

</div>

## I.  PARTIES AND RELEVANT ENTITIES

### A.  DZ Bank and Autobahn Funding Company LLC

DZ Bank is a commercial bank organized under the laws of Germany.  Mem. 2.[2]  To increase its revenues, DZ Bank established an Asset Securitization Group ("ASG") to operate as an "asset-backed lender."[3]  ASG established Autobahn Funding Company LLC ("Autobahn") as a captive lending conduit[4] and "off-balance sheet vehicle" as part of a "capital treatment strategy."[5] Autobahn had no employees, operations, or physical location separate from DZ Bank's,[6] did not

---

[1] At the January 23, 2019 Omnibus Conference, DZ Bank acknowledged it should seek summary judgment solely where facts are undisputed and that a "Rule 56.1 statement [] would facilitate a determinative motion."  No. 08-45257, Dkt. 4134 at 11:25-12:7.  DZ Bank did not provide a Rule 56.1 statement.

[2] DZ Bank's Memorandum of Law is cited herein as "Mem. __".

[3] Ex. T-1 (Deposition of Oliver d'Oelsnitz dated November 3, 2018 ("d'Oelsnitz Tr.)) at 15:21-16:15; Ex. T-2 (Deposition of Vincent Salerno dated September 26, 2018 ("Salerno Tr.)) at 32:9-16.

[4] *See* Ex. T-3 (Deposition of Francine Farragher dated Oct. 2, 2018 ("DZ Bank 30(b)(6) Tr.")) at 113:2-5 ("[W]e consider [Autobahn] ours . . . because . . . ASG set it up.").

[5] Ex. T-2 (Salerno Tr.) at 133:10-18; 134:3-4.

[6] *See, e.g.*, Ex. T-4 (Deposition of W. Barefoot Bankhead dated September 16, 2019 ("Bankhead Tr.")) at 170:18-21; 172:3-5; Ex. T-5 (Deposition of Nancy O'Connor dated October 17, 2018 ("O'Connor Tr.")) at 69:25-70:10.

<div align="center">

3

</div>

have a credit committee, and did not originate or perform diligence on loans[7]—DZ Bank

performed these functions for Autobahn.[8]  DZ Bank's employees have testified that there was no

meaningful distinction between DZ Bank and Autobahn.[9]

### B.    Debtors PCI and PC Funding

Tom Petters and his associates operated Petters Company, Inc. ("PCI"), along with its

wholly-owned, special-purpose entity ("SPE") subsidiaries, including PC Funding LLC ("PC

Funding"), as one of the largest Ponzi schemes in history.  *See In re Petters Co.*, 506 B.R. 784,

790 (Bankr. D. Minn. 2013).  Like other PCI SPEs, PC Funding was established to receive cash

infusions that funded the Ponzi scheme.[10]

## II.    THE OPERATION OF THE PONZI SCHEME

Tom Petters induced investors to lend funds to PCI and, in the case of investor and former-

Defendant Opportunity Finance LLC ("OppFin"),[11] to lend funds to PC Funding, by representing

that the funds would finance the purchase, and resale at markup, of goods consisting primarily of

electronics to Sam's Club, BJ's, Rex's, and Boscov's (the "Retailers").  *See In re Petters Co.*, 506

B.R. at 800-01.  The Retailers would then supposedly fund the receivable created by their

acceptance of the goods by submitting payment to PC Funding, which would, in turn, transfer the

---

[7] *See* Ex. T-1 (d'Oelsnitz Tr.) at 169:17-20; Ex. T-6 (Deposition of Patrick Preece dated October 18, 2018 ("Preece Tr.")) at 247:3-14.

[8] *See, e.g.*, Ex. T-5 (O'Connor Tr.) at 70:4-10 (DZ Bank credit group served as Autobahn credit group).

[9] Ex. T-7 (Testimony of Patrick Preece at Petters' Criminal Trial dated Nov. 12, 2009 ("Preece Trial Tr.")) at 1867:5-7; Ex. T-3 (DZ Bank 30(b)(6) Tr.) at 112:18-113:5; Ex. T-2 (Salerno Tr.) at 32:9-14; Ex. T-5 (O'Connor Tr.) at 69:25-70:10.

[10] Ex. T-8 (Deposition of Deanna Coleman dated Nov. 15, 2018 ("Coleman Tr.")) at 249:15-25; 308:19-309:2.

[11] OppFin and various of its affiliates were originally defendants in this action.  The Trustee settled with the OppFin defendants and the claims against them were dismissed.

principal and interest due on the loan back to OppFin or an entity chosen by OppFin, which was generally DZ Bank. The terms of each individual loan were evidenced by promissory notes. *Id.* at 802.

In reality, PCI bought no goods from suppliers and sold no goods to Retailers.[12] Instead, PC Funding routed the funds it received from OppFin to sham suppliers like Nationwide International Resources ("Nationwide") and Enchanted Family Buying Company ("Enchanted," and generally, "Vendors"), which were operated by, *inter alia*, Petters' co-conspirators Michael Catain (Nationwide) and Larry Reynolds (Enchanted). The Vendors routed the funds received from PC Funding directly to PCI[13] (less a laundering "commission").[14] PCI siphoned a profit from those funds for itself, then sent the remaining money back to investors or to their dedicated SPEs. When an Opportunity Finance promissory note came due, PCI sent funds to PC Funding; when another investor's note was due, PCI routed funds to that investor or to its SPE. Thus PCI paid its investors with other investors' funds (or sometimes the same investor's funds).[15] To be clear, these transactions did *not* involve actual suppliers of goods or goods themselves, or any Retailers who agreed to purchase any goods.[16]

## III.    THE OPPORTUNITY FINANCE FACILITY

### A.    The Facility

In 2001, OppFin sought to increase the volume of its investment with Petters by obtaining a credit facility, which was ultimately provided by DZ Bank in the revolving amount of $100

---

[12] Ex. T-8 (Coleman Tr.) at 364:20-368:16.

[13] *Id.* at 376:25-379:9.

[14] *Id.* at 247:8-248:4.

[15] *Id.* at 249:15-25; 376:25-379:9.

[16] *See id.* at 376:17-379:9.

million (the "Opportunity Finance Facility" or "Facility"), and memorialized in certain lending documents, including the Receivables Loan Security Agreement ("RLSA").[17]    Opportunity Finance established a wholly-owned subsidiary, Opportunity Finance Securitization, LLC ("OFS"), to serve as borrower under the Opportunity Finance Facility.[18]

### B.    DZ Bank Acted as the Lender of the Opportunity Finance Facility

The factual record indicates that, contrary to DZ Bank's current claims, *see* Mem. 5-6, DZ Bank acted as lender under the Opportunity Finance Facility.  DZ Bank has described itself as the lender throughout this litigation.  In connection with its partially successful Motion for Judgment on the Pleadings ("12(c) Motion"), Dkt. 122, DZ Bank stated at least a dozen times in briefing and at argument that DZ Bank was the lender to OFS.  *See* Appendix at 1 ("DZ Bank was a lender"); *id.* at 2 ("DZ Bank likewise extended a credit line to [OFS]"); *id.* at 3 ("[S]o no matter how the trustee might want to hedge his pleadings . . . DZ Bank was getting paid by PC Funding for loans that it made to -- that DZ Bank made.").  DZ Bank makes similar admissions in its Answer to the Fourth Amended Complaint ("FAC").  *See* Appendix at 4 ("DZ Bank loaned funds to" OFS); *id* ("DZ Bank made loans to" OFS); *see also* Argument § I.B, *infra* at 20-22.

The factual record supports the position DZ Bank has taken throughout the litigation—*i.e.* that it acted as the lender.  DZ Bank earned *all* the interest owed by OFS above the specified commercial paper ("CP") rate,[19] and captured a non-use fee of 0.40% on any unused portion of the

---

[17] *See* Ex. T-9 (DZB001200) at -1203; DZ Ex. 10 (RLSA).

[18] *See* Ex. T-10 (DZB019159) at -61; Ex. T-11 (DZB041876).

[19] Ex. T-6 (Preece Tr.) at 48:22-50:16 ("[DZ Bank] earned a program fee that could be akin to an – to interest. . . . [T]he commercial paper rate is, [sic] that's passed through to the commercial paper investors, and the program fee of 300 basis points is multiplied by the outstanding loan balance . . . .").

Facility.[20]  By contrast, Autobahn—which DZ Bank now claims was the lender—used money

obtained by DZ Bank to repay CP investors,[21] thus netting $0 from the Opportunity Finance

Facility.  It was also DZ Bank—and not Autobahn—that bore the full credit risk associated with

the loans extended to OppFin because DZ Bank could be required, under the Asset Purchase

Agreement ("APA"), to take over all of Autobahn's obligations in connection with the Facility at

any time.[22]  In addition, the RLSA—the central credit document for the Opportunity Finance

Facility, which DZ Bank signed on Autobahn's behalf[23]—describes Autobahn as "*a* Lender,"[24]

and defines the term "Lender" as "Autobahn and/or any other Person (*including, without*

*limitation, any present or future Affiliate of DZ Bank*) that agrees, pursuant to the pertinent

Assignment and Acceptance, to make Loans secured by Pledged Assets . . . ."[25]

### C.    DZ Bank Appointed Itself to Act as Collateral Agent

DZ Bank argues that, as Collateral Agent, it functioned as a mere administrator and "mere

conduit" for transfers from PC Funding, and cannot be liable as a transferee.  In this case, however,

DZ Bank made the choice to serve as Collateral Agent, rather than, ████████████████████

---

[20] DZ Ex. 10 (RLSA) at -4148, -4152; Ex. T-12 (DZB001353) at -54.

[21] Ex. T-13 (Expert Report of W. Barefoot Bankhead dated July 5, 2019 ("Bankhead Rpt.")) ¶¶ 41-44.

[22] DZ Ex. 7 (APA dated December 28, 2001) § 2.02(a) (DZ Bank required to "purchase from [Autobahn], without recourse to [Autobahn], in accordance with its respective Percentage, the Percentage Interests that [Autobahn] . . . offers to such Purchaser for sale."); *id* (-41547) (DZ Bank interest was 100%); *see also* Ex. T-14 (DZB057852) ████████████████████████
████████████████████████████████

[23] DZ Ex. 10 (RLSA) at -4209-10.

[24] *Id.* (Cover Page) (emphasis added).

[25] *Id.* at -4128 (emphasis added).

████████████ 26 ████████████████████████████████████████████

████████████████████████████████████████ 27

## IV.    THE DZ BANK COLLECTION ACCOUNT

PC Funding repaid the promissory notes executed with OppFin by transferring funds into the DZ Bank Collection Account.  On this motion, DZ Bank argues that "OFS owned the account and the funds deposited in the account."  Mem. 6.  The documentary evidence, as well as DZ Bank's own actions and statements, demonstrates conclusively that DZ Bank owned and had dominion and control over that account and the funds in it.  This is consistent with DZ Bank's own statements during this litigation that the Collection Account belonged to DZ Bank and was established for its benefit.  *See e.g.*, 12(c) Motion at 8-9 ("[The DZ Bank Collection Account] was opened . . . *for the benefit of DZ Bank*" and proceeds in the PC Funding account "were used in part to repay the amounts that [OFS] owed DZ Bank by making transfers into *DZ Bank's bank account at U.S. Bank*."); 10-4301, Dkt. 166, 12(c) Hearing Tr. dated November 30, 2015, at 50:4-10 ("[T]he collection account is defined as the account that is set up *for the benefit of DZ Bank*.") (emphases added).

The RLSA's definition of "Collection Account," on which DZ Bank relies, makes clear DZ Bank's control over and ownership of the account:  the Collection Account is "in the name of and under the sole dominion and control of the Collateral Agent [DZ Bank] for the benefit of the

---

[26] *See* Ex. T-15 (DZB057972) ████████████████████████████████████████ .

[27] *See* Ex. T-14 (DZB057852) ████████████████████████████████████

████████████████████████████████████████████ ; *see also* Ex. T-1 (d'Oelsnitz Tr.) at 171:20-24; Ex. T-16 (DZB041920) at -34-35 ("In conjunction with the Conduit Facility, the Company will transfer all original loan files for outstanding and newly originated loans to a *third-party financial institution* (the 'Collateral Agent') acceptable to the Lender.").

Secured Parties [DZ Bank, Autobahn, Royal]."[28]   DZ Bank's expert acknowledged that "sole"

referred exclusively to DZ Bank,[29] and that DZ Bank, as security interest holder, was the owner of

the account.[30]   DZ Bank's own employees referred to the Collection Account as the "DZ Bank

Collection Account" and "our" account.[31]   Language in the definition that funds in the Collection

Account "*from time to time* shall constitute the property and assets of [OFS]"[32] supports the

conclusion that funds on deposit are, by default, the property and assets of DZ Bank, in whose

name the account was created.[33]   Funds would constitute the property of OFS "from time to time"

so that specific burdens, like collecting any applicable taxes, could be allocated contractually to

the borrower.

The evidence also shows that DZ Bank possessed ultimate authority to control transfers

out of the DZ Bank Collection Account to fund loans to OFS.  Section 2.05 of the RLSA—which

contains the waterfall[34] upon which DZ Bank bases its "mere conduit" argument (the

"Waterfall")—expressly provides that "no funds shall be transferred from the Collection Account"

---

[28] *See* DZ Ex. 10 (RLSA) § 1.01, at -4116.

[29] Ex. T-4 (Bankhead Tr.) at 288:5-8.  Mr. Bankhead also admitted that, although his report refers to the Collection Account as the "Collateral Agent Collection Account"—rather than the "DZ Bank Collection Account"—he had never seen that term anywhere but his own report.  *See id.* at 49:24-50:3.

[30] *Id.* at 294:14-19.

[31] *See, e.g.*, Ex. T-17 (DZB043555) ("interest paid to DZ Bank Collection Account"); Ex. T-18 (DZB045346) ("amount of principal and interest sent to DZ BANK's Collection Account"); Ex. T-19 (DZB001179) at -81 ("receivables payments into the DZ BANK collection account"); DZB002686 ("[W]e have to consent to a re-direction of funds to any other account outside our Collection Account . . . .").

[32] DZ Ex. 10 (RLSA) § 1.01, at -4116 (emphasis added).

[33] *Id.*

[34] *Id.* § 2.05(c).

9

without DZ Bank's written consent.[35]   Contrary to DZ Bank's assertion that it was only OppFin that prepared transfer instructions, *see* Mem. at 8-9, there are numerous instances of instructions issued by DZ Bank.[36]   And unlike OppFin's instructions, which were subject to DZ Bank's approval, DZ Bank neither required nor received the consent of any other party when directing use of funds in its account.[37]

This course of conduct is consistent with the language of the Collection Account Securities Account Agreement ("CASAA"), the agreement between U.S. Bank (which maintained the account), DZ Bank, OppFin, and OFS that governs the DZ Bank Collection Account: under the "Control" provision, U.S. Bank must comply with any "instructions directing disposition of funds in the Account originated by the Collateral Agent, on behalf of the Secured Parties, without further consent of the Borrower or Servicer."[38]   Like the RLSA, the CASAA makes clear DZ Bank's ownership of the account.   Multiple times, the CASAA states that the Collection Account is to be established "in the name of the Collateral Agent."[39]   As to ownership of the account's contents, DZ Bank owned everything on deposit in its account.   U.S. Bank agreed that DZ Bank would

---

[35] RLSA § 2.05.  DZ Bank's assertion that it "reviewed and approved" transfer requests "in its capacity as the Collateral Agent" is contrary to the RLSA, which provides that DZ Bank approved these transfer requests as Agent of the Lender (as that term is defined in the RLSA).  *See* Mem. at 9.  In fact, the "Waterfall" provision's nine subparts *never* use the term "Collateral Agent." *See* DZ Ex. 10 (RLSA) §§ 2.05(c)(i)-(ix).

[36] *See, e.g.*, Ex. T-20 (DZB009150); T-20A (DZB009193); T-20B (DZB009237); T-20C (DZB009290).

[37] *See id.*

[38] DZ Ex. 8 (CASAA) ¶ 4.

[39] *Id.* at -58.  That OFS granted DZ Bank "a security interest . . . in all of [OFS]'s right, title and interest in and to the Account, all funds held in the Account and all income from the investment of funds in the Account and all proceeds of the foregoing" is immaterial.  *Id.*  One's grant of a blanket security interest in its "right, title and interest," if it exists, has no bearing on whether one has any such "right, title and interest."

exercise rights over all financial assets in the account, which by definition comprised each item of property (including securities and cash) in the account.[40]  For the avoidance of any doubt, the parties agreed that the CASAA "shall give no rights to any other party other than the Secured Parties," which did not include OppFin or OFS.[41]  In sum, the primary document governing the account defined DZ Bank as account owner, gave it all rights to, and benefits of, anything on deposit, and allowed it to move funds freely.

## V.     DZ BANK COLLECTION ACCOUNT TRANSFERS

### A.     The Evidence Shows That None of the Funds Transferred from PC Funding to the DZ Bank Collection Account Originated From Legitimate Activity

During the life of the Facility, PC Funding transferred $776 million into the DZ Bank Collection Account, all of which had, in turn, been transferred first from the PCI operating account.[42]  DZ Bank's expert conceded that he could not identify any evidence that the funds transferred from PCI to PC Funding, or PC Funding to DZ Bank, originated with a Retailer,[43] and further conceded that he conducted no analysis to determine whether *any* transfer into PCI originated from a legitimate source.[44]  By contrast, the Trust's expert, Theodore Martens of PricewaterhouseCoopers ("PwC"), performed a transfer-by-transfer analysis that concluded the transfers from PCI to PC Funding, and PC Funding to DZ Bank, were *not* sourced from legitimate activity.[45]

---

[40] *Id.* at -59-61.

[41] *Id.* at -65.

[42] Ex. T-8 (Coleman Tr.) at 378:17-379:9; Ex. T-21 (Expert Report of Theodore Martens dated April 26, 2019 ("Martens Rpt.") and Exs. H, Q, and U to the Report) ¶¶ 10, 35 & fig.1.

[43] Ex. T-4 (Bankhead Tr.) at 194:17-195:17.

[44] *Id.* at 272:13-20; 275:24-276:6 ("[W]e didn't do an analysis to determine if any transaction was legitimate.").

[45] Ex. T-21 (Martens Rpt.) ¶¶ 50-54.

### B.  The Recipients of Transfers From the DZ Bank Collection Account

#### 1.  Transfers to PC Funding

Of the $776 million transferred from PC Funding to DZ Bank, DZ Bank transferred more than $500 million back to PC Funding in the form of additional loans.[46]  DZ Bank had discretion over these reinvestments.  The RLSA provided that the "Borrower may, *with the written consent of [DZ Bank]*, request that the Custodian withdraws from the Collection Account and deposits into . . . an Approved Distributor SPV Collection Account (for further transfer to an Approved Manufacturer) . . . ."[47]  Moreover, no later than August 22, 2002, when it learned that OppFin and OFS were in default of Section 2.23 of the RLSA for failing to direct or cause Retailer receivable payments to be made directly to PC Funding, DZ Bank had *absolute authority* to decline to provide any further funds under the Facility.  *See also* DZ Ex. 10 (RLSA) §§ 7.01(c), (d), and (j) (additional provisions breached by the payment default).[48]

#### 2.  Other Transfers

Of the $776 million that PC Funding paid to the DZ Bank Collection Account, (i) $101,691,408 was paid to an Autobahn account (virtually all of it *after* amortization of the Opportunity Finance Facility had commenced); (ii) at least $570,984 was paid to Royal Sun Alliance ("RSA") for premiums on the $50 million first-loss policy that insured DZ Bank against, *inter alia*, losses on the Facility due to fraud; and (iii) $3,360,419 was paid to an account in the name of DZ Bank.[49]  These amounts comprise all funds paid from the DZ Bank Collection Account

---

[46] *Id.* fig.1 & Ex. T-21 (Martens Rpt. Ex. H) (showing $581 million transferred from the DZ Bank Collection Account to PC Funding).

[47] DZ Ex. 10 (RLSA) § 2.05(f) (emphasis added).

[48] Ex. T-22 (DZB000892) (letter from DZ Bank to OppFin reserving right to exercise remedies in light of failure of Retailers to make payments directly to PC Funding).

[49] Ex. T-21 (Martens Report) ¶¶ 40-42.

to the Secured Parties for whom DZ Bank purported to act as Collateral Agent.[50]  Additionally,

DZ Bank transferred from the DZ Bank Collection Account to OppFin and OFS approximately

$94 million.  OppFin, in its capacity as Servicer, requested transfers to OppFin and OFS, but DZ

Bank made final determinations of the amounts to pay to them—indeed, the $94 million that DZ

Bank transferred to OppFin and OFS was nearly $2 million less than the amount requested by

OppFin.[51]

## VI.    DZ BANK'S BAD FAITH FAILURE TO FOLLOW UP ON RED FLAGS OF FRAUD

When the Facility was first proposed, ASG vice president Mike Plunkett wrote, "Don't

waste my f**king time with that piece of s**t deal."[52]  The facts that emerged over the course of

the transaction were consistent with that reaction.  DZ Bank was aware of numerous red flags of

irregular or fraudulent activity in connection with the Opportunity Finance Facility and the

transactions it purportedly funded.  Rather than investigate and resolve these red flags, however,

DZ Bank continued to lend money into the Ponzi scheme for years, and continued to accept

payment out of the main churn of the scheme for even longer.  Through this conduct, DZ Bank

helped perpetuate a Ponzi scheme that ultimately cost investors billions of dollars in losses.

*Retailers Made No Payments to PC Funding*.  To mitigate the fraud risk that "[p]ayments

on receivables made by retailers [would be] misappropriated by either Petters or [OppFin],"[53] DZ

Bank structured the entire loan such that payments to PC Funding had to come directly from the

---

[50] *Id.* at 10, fig. 1; DZ Ex. 10 (RLSA) at -4141.

[51] Ex. T-4 (Bankhead Tr.) at 326:16-328:25.

[52] Ex. T-23 (DZB017820) (asterisks added).

[53] Ex. T-11 (DZB041876) at -77;  *see also* Ex. T-25 (DZB053896) at -901.  Notably, Patrick Preece reported that ASG head Ken Bradt was worried that Opportunity Finance was "'in' the fraud."  Ex. T-26 (DZB059538).

Retailers that purportedly were purchasing the goods.[54]  But DZ Bank discovered—no later than August 2002—that *not a single dollar* was being paid from the Retailers to PC Funding.  Instead, every dollar that PC Funding received came directly from PCI.   Jennifer Wikoff, DZ Bank's head of due diligence on the transaction, termed the payment flow a "huge open item."[55]

Because DZ Bank did not have PCI's bank account information,[56] it could not possibly know whether funds transferred from PCI to PC Funding, and then to DZ Bank, originated from Retailers or from *any* legitimate source.  While that question could be answered with one or two phone calls to the purported Retailers—since all transactions were supposedly completed with one of only four identified Retailers—DZ Bank chose not to pick up the phone or conduct any other reasonable inquiry.  And rather than alert DZ Bank management in Germany about this fundamental breach, in December 2002, DZ Bank's employees in New York *affirmatively and knowingly misrepresented* that OppFin "has performed to expectations under the Program, *with no breach of any performance or financial covenants to date*."[57]  A DZ Bank credit officer agreed that this failure to disclose the issue was a "material omission."[58]

    ***Refusing Inspection of Collateral***. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[59] Consistent with



---

[54] DZ Ex. 10 (RLSA) § 2.23; *see also* Ex. T-27 (DZB004335) (Credit Agreement) at -4338 (PC Funding and PCI required to "direct [Retailers] to make payments . . . directly to [PC Funding] . . . .").

[55] Ex. T-28 (DZB059533).

[56] Ex. T-8 (Coleman Tr.) at 400:6-9.

[57] Ex. T-19 (DZB001179) at -80 (emphasis added).

[58] Ex. T-5 (O'Connor Tr.) at 125:11-20.

[59] Ex. T-30 (DZB056085) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *see also* Ex. T-31 (DZB065695) ▮▮▮▮▮▮▮; Ex. T-14 (DZB057852) ▮▮▮▮▮▮▮▮▮

this, ASG vice president Patrick Preece testified that DZ Bank would typically "step on the goods"—*i.e.* inspect them—to "make sure that they exist."[60]

But DZ Bank was not permitted to inspect the inventory that collateralized its loans, and was told not to contact the Retailers whose receivables collateralized their loans.[61]  Rather than follow up on this red flag , DZ Bank obtained a $50 million first-loss policy that transferred the fraud risk to RSA.  As Mr. Preece testified at Petters' criminal trial, DZ Bank proceeded with the transaction due to an "insurance wrap by a company called [RSA], a large insurance company, *that would take any of that risk*."[62]  When it became necessary to replace RSA as insurer, DZ Bank sought to replace the RSA policy—which covered credit *and* fraud risk—with a policy that covered *only* fraud risk.[63]  As Judge Kishel has explained, "had DZ Bank pushed to verify the collateral much earlier and more firmly as a diligent purchase order financer would have, it would have revealed an unmistakable red flag that could not reasonably be ignored." *In re Petters Co.*, 506 B.R. at 841.

---

████████████████ ; *see also* Ex. T-32 (DZB040676) at -78 (one potential insurer noted that "[i]t would seem that it would be relatively easy to verify the [Retailer] receivables.").

[60] Ex. T-7 (Preece Trial Tr.) at 1870:1-14; *see also* Ex. T-33 (Deposition of Jennifer Wikoff dated Nov. 29, 2018 ("Wikoff Tr.")) at 38:2-15.

[61] Ex. T-7 (Preece Trial Tr.) at 1870:4-6 ("Q. Now, when you first were dealing with Petters Company, Inc., were you allowed to step on the goods? A. No, we were not."); *see also id.* 1873:13-25; T-8 (Coleman Tr.) at 393:14-394:25, 395:2-19; Ex. T-34 (PCI_S_SC_OppFin_ 0032715) at -16.

[62] Ex. T-7 (Preece Trial Tr.) at 1870:1-14 (emphasis added); *see also* Ex. T-35 (DZB057221) at -22 (DZ Bank "could not confirm our collateral in this deal and that is the reason we brought in [RSA].").

[63] DZ Bank's pursuit of a policy limited to fraud risk was highly unusual.  One potential insurer noted suspiciously, "blanket 'fraud' is not an area that is typically covered by traditional crime policies," and that "[i]t would seem that it would be relatively easy to verify the receivables." Ex. T-32 (DZB040676) at -78-79.

***Vendor Irregularities.*** DZ Bank's October 2001 credit application attached materials from PCI that listed, as PCI's suppliers, such household names as Sony, General Electric, Sharp, Maytag, and AT&T.[64] But by no later than December 28, 2001—the date it executed the RLSA— DZ Bank knew that *none* of PCI's suppliers were the major international brands PCI touted. Instead, PCI claimed to obtain goods solely from no-name aggregators that were listed in the RLSA as "approved sellers."[65] After ignoring this discrepancy for more than a year, in March 2003 DZ Bank expressly questioned "the existence of opportunity's vendors,"[66] yet the record reflects that DZ Bank's only follow-up was to review D&B reports for Nationwide and Universal Capital— *i.e.*, just two of six Vendors—which reports raised additional red flags concerning Nationwide's suspended license[67] and Universal Capital's *shared current and former addresses with PCI*.[68]

***Unexplained Interest Rates.*** OFS borrowed from DZ Bank at effective rates of 4-5%,[69] yet OppFin re-lent those funds to PC Funding at annualized interest rates of 30-42%.[70] The record nowhere indicates that DZ Bank investigated why PCI could not borrow at market interest rates,

---

[64] Ex. T-9 (DZB001200) at -35.

[65] DZ Ex. 10 (RLSA) Schedule II at -4226.

[66] Ex. T-36 (DZB059498).

[67] *Id.*

[68] *Id.*; *compare* Ex. T-37 (DZB059526) (showing Universal's then-current address as 4400 Baker Rd. and former address as 11610 Wayzata Blvd.) *with* Ex. T-38 (DZB059500) (showing PCI's then-current address as 4400 Baker Rd.) *and* Ex. T-39 (DZB000095) at -162 (showing PCI's former address as 11610 Wayzata Blvd.).

[69] OFS borrowed at 2.35% above the prevailing Commercial Paper Rate. *See* Ex. T-40 (DZB018811) (RLSA Ex. C) at -15. At all relevant times, the Commercial Paper Rate was between 1 and 2%. *See* 3-Month AA Financial Commercial Paper Rate, Fed. Bank of St. Louis, *available at* https://fred.stlouisfed.org/series/DCPF3M (last visited February 7, 2020).

[70] *See* Ex. T-41 (DZB045366) (DZ Bank tracking sheet showing *monthly* interest of 2.50% and 3.50%).

given both loans were collateralized by the same underlying transactions.[71]   Indeed, DZ Bank's

fraud insurance broker observed that "the margin on Petters' products sold to a wholesaler like

Sam's Cub [sic] would not appear to be able to support this cost of financing."[72]

*Implausible Sale Volumes*.   DZ Bank obtained an April 2003 D&B report for Retailer

Boscov's that showed companywide accounts payable of $19.7 million on February 2, 2002,[73] of

which *over 70%* ($13.9 million) would have been owing to PC Funding *alone*.[74]

*Lack of Dilution*.   As of July 2002, DZ Bank apparently accepted, without inquiry, that

$1.4 *billion* of transactions, comprised mainly of the purchase and sale of electronics equipment,

had been completed without any dilution—*i.e.*, payments by the purported retailers of less than

the full price of the purchased goods for such reasons as broken or defective merchandise.  That is

effectively impossible.[75]   Indeed, Preece testified that this volume of goods transactions *always*

---

[71]   *Cf.* Ex. T-32 (DZB040676) at -77, -79 (attributing the fact that "the financing Opportunity provides is expensive relative to other traditional sources" to a "historic business relationship," but noting that due diligence to confirm retailer payments "would have pushed Opportunity Finance into the category of a more traditional lender and their fees to Petters would not be acceptable at that point").

[72]   *Id.* at -77; *see also* Ex. T-25 (DZB053896) at -905 (DZ Bank management asking "[w]hat is the added value of Opportunity Finance?"); Ex. T-42 (DZB058241) (DZ Bank management stating "I still don't understand what Petters is all doing and where they make money.")

[73]   Ex. T-43 (DZB001051) at -63.

[74]   *Compare* T-43 (DZB001051) at -63 (showing companywide accounts payable of $19.75 million as of February 2, 2002) *with* T-44 (DZB051979) (showing $13.90 million in outstanding accounts receivable as of February 2, 2002) *and* T-46A (DZB009654) at -64 (showing $13.90 million in outstanding as of January 31, 2002).  The same D&B Report showed that Boscov's purchasing history did not match what Boscov's was purportedly purchasing from Petters. *Compare* T-43 (DZB001051) at -55-57 (showing no single Boscov credit for electronic goods above $2 million in the preceding 12 months) *with* T-44 (DZB051979) (showing 30 different purported sales of over $2 million in electronic goods to Boscov's between May 2001 and December 2002).

[75]   *See* Ex. T-45 (Deposition of Thomas J. Petters dated Dec. 11, 2018 ("Petters Tr.")) at 259:16-22 ("Q. And so if a company financed hundreds of deals with PCI, it would be implausible

involves breakage of goods.[76]

**Impossible Margins.**  DZ Bank deal spreadsheets indicated that the gross margin for more than 100 goods transactions was precisely 13%, a result that is essentially impossible across individually negotiated deals involving different sellers, purchasers, and goods ranging from electronics to clothes to golf equipment.[77]

**Tom Petters' Criminal History.**  DZ Bank knew that, in January 2003, Petters tried to seal court records of a criminal charge immediately after learning DZ Bank requested that information in a background check.[78]  The background check uncovered that criminal charge *and* another case charging Petters with four counts of felony theft and forgery.[79]

## ARGUMENT

### I.     DZ BANK'S "MERE CONDUIT" DEFENSE IS PROCEDURALLY BARRED

#### A.     DZ Bank Has Waived Any "Mere Conduit" Affirmative Defense

"[Federal Rule of Civil Procedure] 8(c) . . . requires that affirmative defenses be pleaded. In general, failure to do so constitutes a waiver of that affirmative defense."  *H & R Block Enter. v. Short*, 2006 WL 3437491, at *6 (D. Minn. Nov. 29, 2006).[80]  DZ Bank's "mere conduit" defense

---

that there would be no dilution or problems across any of those deals? A. I -- I would agree with that consensus.").

[76] Ex. T-6 (Preece Tr.) at 187:5-7.

[77] *See* Exs. T-44 and T-46 (DZB051979, DZB051973) (spreadsheets); Ex. T-47 (Deposition of Bruce Miller dated October 4, 2019 ("Miller Tr.")) at 38:18-22 (conceding that PCI represented each transaction was individually negotiated).

[78] *See* Ex. T-48 (DZB056774) ("Background check on Tom Petters in process" as of Jan. 28, 2003); T-48A (DZB000547) (two weeks later, Petters authorizes release of information); T-48B (OpFin-0000011) (background check uncovers Petters' Jan. 31, 2003 petition to seal criminal case)).

[79] *See* Ex T-48 (DZB056774); T-48B (OpFin_0000011); T-48C (DZB013618) at -19 (listing four felony charges).

[80] The examples in Rule 8(c) of affirmative defenses "is not intended to be exhaustive." 5 Wright & Miller, Fed. Prac. & Proc. § 1271 (3d ed.); *see also H & R Block*, 2006 WL 3437491 at *6 ("unclean hands" defense, which is not listed in Rule 8(c), was waived).

is an affirmative defense. *See In re Petters Co.*, 557 B.R. 711, 731 (Bankr. D. Minn. 2016) (Sanberg, J.). Yet DZ Bank failed to plead this defense in any of its answers to the Trustee's complaints. *See*, *e.g.*, Answer and Defenses of [DZ Bank] to Fourth Amended Complaint, Dkt. 241 ¶¶ 499-525 (pleading 27 other affirmative defenses). DZ Bank therefore waived its "mere conduit" defense.

Furthermore, DZ Bank may not now amend its Answer. Under Rule 16(b), DZ Bank would require leave of this Court, but would be unable to demonstrate the diligence necessary to meet the "good cause" standard necessary to obtain such relief at this stage. *See Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715-17 (8th Cir. 2008). *In Sherman*, the Eighth Circuit affirmed waiver of an affirmative defense where the defendant sought leave to amend (i) "two and a half years after the suit was filed"; (ii) almost 18 months after the amendment deadline; (iii) eight months after defendant "was actually aware of the [affirmative] defense's applicability"; (iv) a month after discovery closed; and (v) a month after raising the defense on summary judgment. *Id.* at 717. Even if DZ Bank moved to amend its Answer *today* (which it has not done), it would be (i) *a decade* after the suit was filed (and nearly three years after the Fourth Amended Complaint was filed);[81] (ii) well over two years after the amendment deadline;[82] (iii) more than a year after informing the Court that DZ Bank might raise the defense;[83] (iv) more than three months after discovery closed; and (v) nearly two months after raising the defense on summary judgment. A motion to amend would therefore be futile.

---

[81] *See* No. 10-4301, Dkt. 1 (Sept. 30, 2010); Dkt. 233 (Mar. 6, 2017).

[82] Pursuant to F.R.C.P. 15(a)(1)(A), DZ Bank's deadline to amend its Answer was 21 days after filing its Answer to the Fourth Amended Complaint, or May 26, 2017.

[83] *See* No. 08-45257, Dkt. 4134 at 11:11-22 (Jan. 23, 2019) (previewing potential "mere conduit" summary judgment motion).

**B.      DZ Bank Is Estopped From Arguing That It Was a "Mere Conduit"**

DZ Bank's "mere conduit" defense relies on establishing that Autobahn—not DZ Bank—was the lender to OFS, and that Autobahn—wholly to the exclusion of DZ Bank—was the "actual transferee" for funds paid into the DZ Bank Collection Account. *See* Mem. 1, 9.  Before this Motion, however, DZ Bank argued repeatedly, over a course of years, that *DZ Bank* was both the lender under the Facility and transferee for repayments. *See generally* Appendix.  DZ Bank is therefore estopped from claiming it was *not* the lender under the Facility or transferee for repayments.

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Opportunity Fin., LLC v. Kelley,* 822 F.3d 451, 456 (8th Cir. 2016) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001)).  The Supreme Court has adopted three, non-exhaustive, equitable factors for evaluating an estoppel claim: (i) "a party's later position must be clearly inconsistent with its earlier position"; (ii) "whether the party has succeeded in persuading a court to accept that party's earlier position"; and (iii) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51; *see also OppFin,* 822 F.3d at 456-57 (discussing *New Hampshire* factors).

DZ Bank filed its 12(c) Motion on May 13, 2015.  Dkt. 122.  This Court agreed with DZ Bank's argument that any transfers DZ Bank took from OppFin[84] were for value, finding it was "undisputed" that (i) "there was a creditor-debtor relationship between DZ Bank and [OppFin]" and (ii) "Opportunity Finance used funds from the PC Funding account to satisfy antecedent debt

---

[84] The Court did not differentiate between Opportunity Finance and its SPE, OFS.

owed to DZ Bank." Dkt. 218 at 14-15.[85]  The Court relied upon admissions in DZ Bank's Answer

to the Second Amended Complaint, Dkt. 121, for both propositions, *see* Dkt. 218 at 15, nn. 67, 68.

In obtaining this favorable result, DZ Bank's briefing and argument made no fewer than a dozen

separate statements that *DZ Bank* was the lender under the Facility.  *See, e.g.*, Appendix at 2 (*e.g.*,

"Although the Trustee is reluctant to use the word 'loan' in his complaint, the agreements are

explicit that *loans are precisely what are being tendered by [OppFin] and DZ Bank*, respectively,

and that the payments back to them were for interest and principal.") (emphasis added).

DZ Bank's about-face is a textbook case for estoppel.  DZ Bank "deliberately chang[ed]

positions according to the exigencies of the moment," *New Hampshire*, 532 U.S. at 743.  This

Court expressly relied upon DZ Bank's prior representations, *see* Dkt. 218 at 14-15.  And DZ

Bank's "unfair advantage" and the Trustee's "unfair detriment" are plain: having obtained relief

by claiming it received transfers in its capacity as a lender, DZ Bank now seeks to evade the

consequences of accepting those very same transfers by denying it did so or that it was a lender.

DZ Bank even introduces its Motion by claiming the Trustee "inexplicably" failed to sue

Autobahn.  Mem. 1.  The explanation, of course, is that DZ Bank said it was the lender and

transferee.  DZ Bank is thus estopped from contradicting its representations that (i) it accepted

transfers from PC Funding (ii) in its capacity as lender under the Facility.

DZ Bank's admissions in its Answer to the Trustee's Fourth Amended Complaint are also

"in the nature of judicial admissions binding upon the parties, unless withdrawn or amended." *Mo.*

*Housing Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990) (quotation omitted)); *see also*

*Dahhane v. Stanton*, 2016 WL 4257536, at *3 (D. Minn. Aug. 12, 2016) (admission in Answer

---

[85] Order on [DZ Bank's] Fed. R. Civ. P. 12(c) Motion for Judgment on the Pleadings, dated
December 1, 2016 ("12(c) Order").

21

"is binding . . . even when the admitting party later submits evidence contradicting its admission."). The Answer to the FAC repeatedly admits that DZ Bank was the lender to OFS. *See, e.g.*, Appendix at 4 ("DZ Bank loaned funds to [OFS]"); *id.* ("DZ Bank made loans to [OFS] in connection with the loans that Opportunity Finance made to PC Funding."); *id.* ("DZ Bank began to loan funds to [OFS] in January 2002."). These binding admissions are sufficient to award summary judgment *to the Trustee* that DZ Bank was the lender and transferee of repayments under the Facility. *See Mo. Housing*, 919 F.2d at 1315 ("[A]dmissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions."). DZ Bank is therefore estopped by its Answer from contradicting its statements that it was the lender and transferee.

## II.      DZ BANK WAS NOT A "MERE CONDUIT"

DZ Bank devotes most of its "mere conduit" argument to legal standards and little more than a paragraph to facts—consisting of a short description of a handful of RLSA provisions. Mem. 18. The full factual record, however, demonstrates that DZ Bank was no "mere conduit." Far from performing ministerial distribution of funds, DZ Bank engineered the entire transaction to give itself full control over those funds, and *every dollar* distributed according to the Waterfall benefited DZ Bank. DZ Bank did not have to appoint itself Collateral Agent and place itself directly in the cash flow—it did so to protect its lucrative lending arrangement. *See* Counterstatement of Facts § III.C, *supra* at 7-8. Furthermore, DZ Bank continued to collect revenues and transfers associated with the $100 million Facility despite multiple alarming signs of fraud, and DZ Bank's failures to investigate those "red flags" precludes the showing of good faith necessary to sustain a "mere conduit" defense.

It is important to clarify that, even if DZ Bank's "mere conduit" affirmative defense had any merit (which, for the reasons set forth here, it does not), it would apply—as DZ Bank

acknowledges—only to the $101,691,408 transferred from DZ Bank to Autobahn.  DZ Bank's

Motion does not address the other approximately $600 million in fraudulent transfers that PC

Funding made to DZ Bank, and DZ Bank therefore cannot obtain judgment dismissing the

Trustee's claims arising from those transfers.  *See* Mem. 10.

### A.    DZ Bank Cannot Be a Mere Conduit for Funds Used to Repay DZ Bank's Own Loan

DZ Bank's argument and authority make clear that a bank cannot be a mere conduit for

funds used to pay back that bank's own loan, because such funds plainly benefit the lending bank.

*See, e.g.*, *Bonded Fin. Servs., Inc. v. European American Bank*, 838 F.2d 890, 893-94 (7th Cir.

1988) ("[The bank] received nothing from Bonded that it could call its own; *the Bank was not*

*Bonded's creditor*, and [transferor] owed the Bank as much as ever.") (emphasis added); *see also*

*In re Big Apple Volkswagen, LLC*, 2016 WL 1069303, at *16 (S.D.N.Y. Mar. 17, 2016) (gathering

cases that bank is initial transferee of payment in satisfaction of debt to bank).

As discussed in Argument § I.B, *supra* at 20-22, and illustrated in the Appendix, DZ Bank

has repeatedly characterized itself—and not Autobahn—as the lender in connection with the

Opportunity Finance Facility, including in DZ Bank's 12(c) Motion, Answers to the Second and

Fourth Amended Complaints, and in oral arguments before this Court, and DZ Bank is estopped

from denying this fact.  *See id.*  To the extent transfers into the DZ Bank Collection Account

satisfied obligations under the Opportunity Finance Facility, they are transfers that benefitted DZ

Bank as the lender.  At the very least, DZ Bank's prior representations to this Court raise an issue

of material fact as to whether transfers to DZ Bank were for its benefit, which precludes summary

judgment on this defense.  *See, e.g.*, *In re Bauer*, 318 B.R. 697, 702 (Bankr. D. Minn. 2005)

(transferee is mere conduit where transfer is made through "a *mere innocent conduit* that receives

*no beneficial interest* from the transfer") (emphasis added) (quoting *In re Curran V. Nielsen Co.*,

23

1995 WL 711268, *4 (Bankr. D. Minn. 1995)).

**B.    DZ Bank Cannot Be a Mere Conduit Because It Had Significant Discretion Over the Funds at Issue and Benefited From Each Fraudulent Transfer**

**1.    The RLSA Upon Which DZ Bank Relies, Along With Other Transaction Documents, Establish That DZ Bank Controlled the DZ Bank Collection Account**

DZ Bank's current position—that the DZ Bank Collection Account belonged to OppFin, *see, e.g.*, Mem. 8—is contrary to the contemporaneous record and the testimony of DZ Bank's own expert, and should be rejected as a made-for-litigation gambit.  The RLSA *defines* the Collection Account as under the "sole dominion and control" of DZ Bank[86]—which phrasing matches precisely the language of the "mere conduit" standard used in DZ Bank's authority (and Mr. Bankhead confirmed that "sole" referred to DZ Bank[87]).  *See* Mem. 14.  The Waterfall on which DZ Bank bases much of its argument prohibits transfers from the DZ Bank Collection Account absent DZ Bank's written consent.[88]  Contrary to DZ Bank's assertion that it was only OppFin that prepared transfer instructions, *see* Mem. at 8-9, there are numerous instances of instructions issued by DZ Bank.[89]  Mr. Bankhead even conceded that, as security interest holder, DZ Bank was the owner of the account.[90]  And, tellingly, DZ Bank's employees repeatedly referred to the Collection Account as the "DZ Bank Collection Account" and "our" account.  *See* Counterstatement of Facts § IV, *supra* at 8-9, n.31.  By contrast, the record includes no instances where DZ Bank personnel refer to the DZ Bank Collection Account as belonging to OppFin.  DZ Bank plainly controlled the DZ Bank Collection Account.  DZ Bank's Motion is therefore founded

---

[86] DZ Ex. 10 (RLSA) § 1.01, at 7-8.

[87] *See* Ex. T-4 (Bankhead Tr.) at 287:22-288:8.

[88] DZ Ex. 10 (RLSA) § 2.05 at -4148.

[89] *See, e.g.*, Ex. T-20 (DZB009150); T-20A(DZB009193); T-20B (DZB009237); T-20C (DZB009290).

[90] Ex. T-4 (Bankhead Tr.) at 294:14-19.

upon a premise that is contrary to fact.

### 2.  Consistent with the "Sole Discretion and Control" Provided to DZ Bank in the Documents, It Exercised Actual Control Over the Funds in Its Collection Account

Pointing to the Waterfall (section 2.05 of the RLSA), DZ Bank argues that it must have been a mere conduit because it was not free to use money in the Collection Account "as it wished." Mem. 17.  As already explained, DZ Bank is fighting against language in the governing document expressly stating that it had "sole dominion and control" over the account—purposeful language, no doubt, given that the applicable legal standard here is the "dominion and control" test.  *See* Mem. 14.  Moreover, the facts that DZ Bank chooses *not* to cite demonstrate that it had *actual* control over the funds in the Collection Account, and that it exercised that control throughout the years that it lent money to OFS.

First, and most telling, of the $776.4 million that PC Funding transferred *into* the Collection Account, DZ Bank distributed only $200.8 million—barely more than one-quarter—pursuant to the Waterfall.  DZ Bank transferred the vast majority of the funds—more than $500 million—back to PC Funding, in the form of further extensions of credit.[91]  Lest there be any question, each decision to make a transfer to PC Funding was entirely within DZ Bank's control:  each time Opportunity Finance requested that money be sent to PC Funding, DZ Bank had to approve the transfer.[92]  Moreover, no later than August 22, 2002, DZ Bank knew that Opportunity Finance was in breach of the RLSA because payments to PC Funding were not coming from the Retailers.  *See* Counterstatement of Facts § VI, *supra* at 13-14.  At any time thereafter, DZ Bank could have

---

[91] *See* Ex. T-21 (Martens Rpt.) at 10, fig. 1.
[92] *See* DZ Ex. 10 (RLSA) § 2.05.

amortized the credit line, putting an end to any further extensions of credit.[93]  But for nearly a year, DZ Bank approved more than 100 additional transfers to PC Funding.[94]  DZ Bank was not "'merely an agent who has no legal authority to stop the principal from doing what he or she likes with the funds at issue.'"  *See In re Lacina*, 451 B.R. 485, 492 (Bankr. D. Minn. 2011) (quoting *In re Hurtado*, 342 F.3d 528, 534 (6th Cir. 2003)).  To the contrary, DZ Bank had an unfettered right to refuse to make these transfers.

Second, even with respect to the minority of payments made pursuant to the Waterfall, DZ Bank had the final say on how much to distribute, and to whom.  For example, DZ Bank made distributions that differed from OppFin's calculations by approximately $2 million.[95]  Plainly, DZ Bank had the authority to determine which payments were appropriate, and which were not.

*In re Brooke Corp.*, 458 B.R. 579 (Bankr. D. Kan. 2011), upon which DZ Bank relies, does not address similar facts.  *Brooke* held that a bank acting as administrative agent for participant banks in a loan syndicate—accepting payments solely to be distributed to the other banks—was a mere conduit when acting in that capacity, as opposed to when receiving payment on loans it extended as a bank.  *Id.* at 590-91.  In that case, the governing documents stated that each participant bank "will be considered for all purposes the legal and equitable owner" of its share of the loan.  *Id*. at 586.  And the agent bank had no discretion with respect to distribution of loan payments.  *Id.* 587.  Here, in stark contrast, (i) DZ Bank already has conceded, countless times, that it was the lending bank, and (ii) DZ Bank, as described just above, routinely exercised discretion over *disbursement* of funds in the Collection Account.  DZ Bank set up the transaction

---

[93] *See* Ex. T-22 (DZB000892) (letter from DZ Bank to OppFin reserving right to exercise remedies in light of failure of Retailers to make payments directly to PC Funding).

[94] *See* Ex. T-21 (Martens Rpt.) Ex. C.

[95] Ex. T-4 (Bankhead Tr.) at 327:14-328:5.

26

so that it would benefit from funds flowing into its Collection Account, and so that it would control

the flow of funds out of that account. Unlike the administrative agent in *Brooke*, DZ Bank did not

act as a pass-through that obtained no benefits from the vast majority of payments made by the

borrower.[96]

### 3. DZ Bank Set Up the Transaction So the Payment Flow Would Benefit DZ Bank

DZ Bank's own authorities recognize that the "mere conduit" affirmative defense seeks to

resolve the inequity of subjecting "mere stakeholders, bailees, and intermediaries to liability,

*where they had never stood to gain personally* from the funds momentarily in their possession."

*See also In re Bauer*, 318 B.R. at 702 (quotation omitted); *In re ATM Fin. Svcs., LLC*, 446 B.R.

564, 570 (M.D. Fla. 2011) ("[T]he purpose of the mere conduit or control test is to avoid unduly

harsh outcomes for unwitting recipients."). But here, DZ Bank structured the transaction so that

all funds flowed into the DZ Bank Collection Account, which benefited DZ Bank by mitigating

the risk that Petters, OppFin, or another party might misappropriate principal, interest, and fees.

An entity situated in the middle of a transaction it established to benefit itself is no mere conduit.

*See In re Hypnotic Taxi, LLC*, 2017 WL 4464876, at *10 (E.D.N.Y. Oct. 4, 2017) (holding that

the "mere conduit doctrine is inapplicable" where defendant "was on all sides of the transfer" and

"controlled every aspect of this transaction for his benefit").

---

[96] DZ Bank contends that it must have been a mere conduit because, like the defendant in Brooke, it acted as an "administrator." *See* Mem. 19-21. As the factual record makes clear, DZ Bank's status as an administrator captures only a fraction of its involvement in this transaction, which DZ Bank structured. Moreover, rather than cite the facts of the transaction at issue here, DZ Bank relies on certain third-party sources that describe generally how an ABCP conduit functions, in order to argue that the administrator of the loan syndicate in *In re Brooke* and DZ Bank are similar. These sources—which are, in any case, non-produced hearsay—are irrelevant because they do not address how DZ Bank performed its functions with respect to the Opportunity Finance Facility, and should be disregarded. *See, e.g.*, DZ Exs. 4, 20, 30, 31, 41, 43.

DZ Bank benefited in numerous other concrete ways as well.  In fact, *every dollar* transferred from the DZ Bank Collection Account pursuant to the Waterfall benefitted DZ Bank directly.  First, transfers to DZ Bank itself to pay fees and interest obviously benefited DZ Bank.  *See* Counterstatement of Facts § V.B.2, *supra* at 12-13.  Second, all transfers to Autobahn reduced DZ Bank's liability because, under the APA, DZ Bank took on 100% of the credit risk associated with the loans extended to OppFin, such that "it was a pass-through of the economics to the bank."[97]  *See id.* III.B, *supra* at 7; *In re Whitacre Sunbelt, Inc.*, 200 B.R. 422, 426 (N.D. Ga. 1996) ("[H]e did use [the money] for his own benefit—to pay off a debt that he personally guarant[e]ed.  Therefore, he cannot be protected as a mere conduit . . . .").  And, third, they were used to pay the insurance premiums on the RSA first-loss policy, which named DZ Bank as beneficiary.  *See* Counterstatement of Facts V.B.2, *supra* at 12.  DZ Bank thus benefited in multiple, substantial ways from the funds it distributed.

### 4. DZ Bank Could Not Be a "Mere Conduit" for Funds Paid to Its Own Captive Conduit, Autobahn

DZ Bank's contention that it was a conduit for the $101 million that was paid to Autobahn, *see* Mem. 13, is belied by the facts reviewed above.  In any event, even if DZ Bank had simply passed through $101 million to Autobahn (out of the $776 million that PC Funding deposited in the DZ Bank Collection Account), that would not confer "mere conduit" status on DZ Bank because, as the factual record demonstrates, Autobahn was, for all intents and purposes, part of DZ Bank.  DZ Bank could not be a conduit to itself.

DZ Bank tries to paint a picture of Autobahn as a meaningfully separate entity.  But the

---

[97] Ex. T-2 (Salerno Tr.) at 135:2-12; *see also* DZ Ex. 7 (APA) § 2.02, at 36.

facts demonstrate otherwise.  Autobahn had no employees of its own,[98] and the record offers no evidence of separate office or operations—even Autobahn's monthly bank account statements were sent to DZ Bank.[99]  One of Autobahn's nominally-independent directors from Lord Securities was the same "Rent-a-Director"[100] that PCI installed at its wholly-owned SPE, PC Funding.[101] And DZ Bank operated Autobahn solely to make money for DZ Bank—Autobahn itself did not profit from the transaction with OppFin;[102] it was a vehicle used by DZ Bank to access liquidity from commercial paper purchasers solely so DZ Bank could profit from the deal.[103]  Autobahn did not originate loans, or perform diligence on borrowers, or make credit determinations—all of that was done by DZ Bank.[104]  Witness testimony makes clear that Autobahn was nothing more than an "off-balance sheet vehicle" and a "capital treatment strategy"[105] and that there was no meaningful distinction between DZ Bank and Autobahn.[106]  The market recognized that Autobahn

---

[98] *See, e.g.*, Ex. T-4 (Bankhead Tr.) at 170:18-21 ("Q. Your understanding is that Mr. Preece doesn't work for Autobahn, right?  A. I don't recall there being any employees at Autobahn.").

[99] *See, e.g.*, DZ Exs. 35, 38 (showing statements addressed to Stacey Rolsing at DZ Bank).

[100] *See* Ex. T-49 (PCI_S_SC_OppFin_0004685) ("[D]o we have the name and contact information for the Rent-a-Director . . . ?").

[101] *See* Ex. T-50 (DZB173548) at -59 (naming Benjamin Abedine as Manager); Ex. T-51 (DZB002786) (indicating Benjamin Abedine is a Director of PC Funding); Ex. T-52 (Deposition of Thomas Hay dated Dec. 6, 2018 ("Hay Tr.")) at 272:9-23.

[102] *See* Ex. T-13 (Bankhead Rpt.) ¶¶ 41-43; *see also id.* ¶ 86 (the $101,691,407.94 was only "for distribution to the commercial paper holders").

[103] *See* Ex. T-2 (Salerno Tr.) at 133:10-134:4.  *See also* Counterstatement of Facts § III.B, *supra* at 6-7 (evidence of fees and interest-like income earned by DZ Bank).

[104] *See* Ex. T-1 (d'Oelsnitz Tr.) at 169:17-20 ("The credit process was internal at DZ Bank."); Ex. T-6 (Preece Tr.) at 247:3-14 (approval came from DZ Bank board in Germany).

[105] Ex. T-2 (Salerno Tr.) at 133:10-134:4.

[106] Ex. T-7 (Preece Trial Tr.) at 1867:5-7 (Preece was "the head of . . . the commercial paper conduit at DZ Bank"); Ex. T-3 (DZ Bank 30(b)(6) Tr.) at 112:18-113:5 ("A. ASG's multi-seller conduit, yes, because we set it up.  ASG set it up."); Ex. T-2 (Salerno Tr.) at 32:9-14 ("We lend money against portfolios of assets, not to companies themselves."); Ex. T-5 (O'Connor Tr.) at 69:25-70:10 (Autobahn had no separate employees or separate credit group).

effectively *was* DZ Bank, as reflected in DZ Bank's own documents[107] and the ratings agency reports submitted by DZ Bank on this motion.[108]

The transaction documents also reflect this reality.  DZ Bank signed the RLSA for *both* itself and Autobahn.[109]  The definition of "Lender" under the RLSA encompasses any affiliate of DZ Bank that agreed "to make Loans secured by Pledged Assets,"[110] which DZ Bank did by entering into the Asset Purchase Agreement.[111]  And DZ Bank signed that Asset Purchase Agreement—to which only Autobahn and DZ Bank are parties—for both Autobahn and DZ Bank.[112]

The bottom line is that Autobahn and DZ Bank were effectively one and the same— everyone knew and openly conceded that.  At the very least, there are significant issues of material

---

[107] For example, DZ Bank's internal credit applications provide that *DZ Bank* loaned money to Opportunity Finance *through* Autobahn.  *See, e.g.*, Ex. T-19 (DZB001179) at -80 ("DZ BANK, through [Autobahn], provided a five year $100 million" facility); *id.* at -83 ("DZ BANK, through its multi-seller conduit [Autobahn] . . . , provided a five year $100 million revolving commercial paper warehouse facility . . . ."); Ex. T-53 (DZB040825) at -25 ("DZ Bank's conduit, [Autobahn], closed a $100.0 million" facility); Ex. T-54 (DZB055810) ("The name of DZ Bank's conduit is Autobahn . . . ."); Ex. T-55 (DZB001131) at -31 ("DZ Bank's Autobahn conducts business that is, in some major respects, different from other bank's [*sic*] commercial paper conduits."); *id.* at -32 ("Our clients want to work with a large, dependable bank with strong securitization experience, with which they can do 'one stop shopping,' i.e., the entire deal. . . . As a result of the size of our clients and their portfolio of receivables, we must arrange and do entire transactions for our customers."); *id.* at -31-33 (referring to "DZ Bank's exposure," "DZ Bank's position," "DZ Bank's risk in the deal," "DZ Bank's conduit," the "weighted average risk" of "DZ Bank's ASG portfolio of transactions," "[o]ur clients," "[o]ur customers," "[o]ur deals").

[108] *See, e.g.*, DZ Ex. 4 at -91 ("[DZ Bank's] $2.0 billion 4(2) commercial paper vehicle, [Autobahn] . . . ."); DZ Ex. 13 at -46 ("Because of the significant role played by DZ Bank as principal liquidity and credit enhancement provider, the **Prime-1** rating assigned to Autobahn is closely correlated with DZ Bank's **Prime-1** rating."); DZ Ex. 30 at -50 (same); DZ Ex. 41 at -37 (same); DZ Ex. 43 at 1 ("[DZ Bank]'s . . . commercial paper (CP) program, Autobahn . . . .").

[109] *See* DZ Ex. 10 (RLSA) at -4208-09.

[110] *See id.* §1.01 at 19.

[111] *See* DZ Ex. 7 (APA) at -41547 (signature page indicating DZ Bank's 100% Percentage Interest).

[112] *See id.* at -41548.

fact as to whether DZ Bank and Autobahn are functionally separate entities.

### C.    The "Mere Conduit" Defense Is Not Available to DZ Bank Because There Is Substantial Evidence That DZ Bank Acted in Bad Faith

As this Court has observed, "parties who received the property but who did not exercise control over it would be mere conduits . . . *if they acted without bad faith and were innocent participants in the underlying fraudulent activity*." *Kelley v. McDonald*, 2018 Bankr. LEXIS 117, at *13 (Bankr. D. Minn. Jan. 17, 2018) (emphasis added) (Sanberg, J.) (citing *IBT Int'l, Inc. v. Northern*, 408 F.3d 689, 703 (11th Cir. 2005)).  In *IBT*, the Eleventh Circuit explained that the "conduit rule presumes that the facilitator of funds acts without bad faith, and is simply an innocent participant to the underlying fraud."  408 F.3d at 705; *see also In re Bauer*, 318 B.R. 697, 702. DZ Bank ignores this element of the mere conduit defense because there is no question that DZ Bank's good faith is, at least, a matter of material factual dispute.  Indeed, discovery revealed myriad examples of DZ Bank's bad faith:

- To prevent fraud, DZ Bank structured the loan transaction so that Retailers would pay PC Funding directly.  Yet, no later than August 2002 (and likely much earlier), DZ Bank knew that *none* of the payments to PC Funding came from Retailers.  ASG's due diligence chief recognized this failure as a "huge open item."[113]  *Rather than cut off the loan or contact a purported Retailer, DZ Bank employees misled their supervisors in Germany by asserting that the loan was operating as required.  See* Counterstatement of Facts § VI, *supra* at 13-14.

- PCI purported to obtain goods from such recognized suppliers as Sony, GE, Sharp, and Maytag.  Yet, from the outset, DZ Bank knew that PCI was (supposedly) buying goods from obscure, no-name Vendors.  When, a year later, DZ Bank looked at two of the six Vendors, it discovered that one was not authorized to do business, and the other shared addresses with PCI.  *Rather than investigate further, DZ Bank continued to ignore PCI's initial falsehoods and failed to follow-up on these newly-discovered red flags.  See id.*

---

[113] Ex. T-28 (DZB059533).

- DZ Bank knew, from the outset, that it was not permitted to inspect the purported collateral, ██████████████████████. *See In re Model Imperial, Inc.*, 250 B.R. 776, 799 (S.D. Fla. 2000) (rejecting good faith defense in part because defendant's "conduct was inconsistent with industry practices and in violation of its own written policies and procedures"). To compensate for this inexplicable limitation, DZ Bank obtained insurance that covered both credit- and fraud-related losses. *When the insurer was downgraded, DZ Bank sought to replace only the fraud coverage. See* Counterstatement of Facts § VI, *supra* at 14-15.

Other examples abound: DZ Bank repeatedly received reports of *zero* dilution on transactions involving *billions* of dollars of electronics merchandise; DZ Bank records reflect one hundred transactions—most consecutive—with exactly the same gross margin despite wide variations in buyer, seller, and goods (TV sets, clothes, golf equipment); and DZ Bank knew, in January 2003, that Tom Petters tried to seal records of a criminal charge immediately after learning DZ Bank had requested that very information. *See id.*; see also *id.* for additional failures to pursue red flags in connection with the Facility and underlying goods transactions.

A transferee of funds fails to act in good faith if it is on "inquiry notice" that the transfers were made with "fraudulent purpose" but fails to perform a "diligent investigation" into the relevant red flag. *See In re Bayou Group, LLC*, 439 B.R. 284, 310-14 (S.D.N.Y. 2010). To determine inquiry notice, the Eighth Circuit looks to "what [the defendant] objectively 'knew or should have known,'" rather than "actual knowledge from a subjective standpoint." *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995) (quotation omitted); *see also Zayed v. Buysse*, 2012 WL 12893882, at *22 (D. Minn. Sept. 27, 2012) ("[A] transferee is on inquiry notice when he has sufficient facts to question whether the transfer was made for a fraudulent purpose or whether the transferor was insolvent."). The factual record amply demonstrates that DZ Bank failed to act in good faith by ignoring signs of fraud and forgoing common-sense investigatory steps in favor of its lending relationship and the attendant profits. DZ Bank's failure to meet its burden of demonstrating good faith is an independent reason that its "mere conduit" defense fails.

32

### III. DZ BANK FEES ARE SUBJECT TO FRAUDULENT TRANSFER CLAIMS

DZ Bank asserts in passing that any claim against DZ Bank for the $3.36 million in fees that were paid from the DZ Bank Collection Account to a separate DZ Bank account must fail because "DZ Bank provided reasonably equivalent value for the transfers." Mem. 22. DZ Bank's assertion is fundamentally incorrect for at least two reasons.

First, payments into the DZ Bank Collection Account were made directly by PC Funding. *See* Counterstatement of Facts § V.A, *supra* at 11. Although PC Funding may have directed those payments to DZ Bank in order to reduce PC Funding's debt to OppFin, PC Funding itself did not owe any money to DZ Bank. *See id.* § III.A, *supra* at 5-6. Thus, the mere fact that DZ Bank shifted $3.36 million from its Collection Account to another account in DZ Bank's name does not immunize those funds from fraudulent transfer claims by PC Funding. *See* 11 U.S.C. § 548(a)(1)(B)(i) ("if the *debtor* . . . received less than a reasonably equivalent value in exchange") (emphasis added); *In re Whaley*, 229 B.R. 767, 775 (Bankr. D. Minn. 1999) (reasonably-equivalent value is with respect to "what the Debtor received" not to any "non-debtor third party").

Second, even if these payments were, for purposes of argument only, treated as transfers from OppFin to DZ Bank, DZ Bank would have a defense as a subsequent transferee only if it took those transfers in good faith. 11 U.S.C. § 550(b)(1); *see also* 12(c) Order at 15 ("Good faith under § 550"). There is ample evidence that DZ Bank acted in bad faith when it accepted these payments. *See* Counterstatement of Facts § VI, *supra* at 13-18. As DZ Bank has done throughout its motion, it simply ignores this good faith element in making this argument.

## IV.  DZ BANK'S ASSERTIONS REGARDING THE LACK OF PREDICATE CREDITORS ARE IRRELEVANT AND CONTRARY TO THE FACTUAL RECORD

DZ Bank seeks summary judgment on the grounds that the Trustee can raise no material issue of fact as to the existence of a "predicate creditor," *i.e.* "one with a right to payment from the debtor." Mem. 23.  Once again, DZ Bank's argument is based on facts that do not exist—discovery has confirmed that there were several predicate creditors of PC Funding ("Predicate Creditors"), including at least five that were specifically identified in the Fourth Amended Complaint.  A predicate creditor's claim need not exist at the time of the transfers, but may arise at any time up to or including the petition date.  *See* 11 U.S.C. § 544 (incorporating state law); Minnesota Uniform Fraudulent Transfer Act ("MUFTA") § 513.44 (actual or constructive fraudulent transfers voidable as to present or future creditors); *id.* § 513.45 (constructive fraudulent transfers voidable as to present creditors).  The evidence demonstrates that there were creditors of PC Funding both at the time DZ Bank received transfers from PC Funding and in the years following those transfers.[114]

Before addressing these Predicate Creditors, it should be acknowledged that the Trustee's claims against DZ Bank would survive even in the absence of such creditors.  As set forth just below, the Trustee has standing to pursue claims as a hypothetical creditor under Section 544(a) of the Code, regardless of whether there were independent predicate creditors.  Additionally, there is no dispute that the Trustee can pursue claims against DZ Bank as a subsequent transferee of PCI, as to which the existence of predicate creditors is beyond dispute.

---

[114] DZ Bank asserts incorrectly that "[i]t is undisputed that these alleged Predicate Creditors are not creditors of PC Funding."  Mem. 10.  Of course, the Trustee disputes this assertion.  And the case DZ Bank cites in support of its assertion says no such thing.  Judge Kishel wrote that, apart from OppFin, PC Funding did not have "consensual, contractual creditors."  *See In re Petters Co.*, 550 B.R. 438, 446 (Bankr. D. Minn. 2016) (Kishel, J.).  Judge Kishel did not address either tort claims or claims based upon veil piercing, and thus did not conclude that PC Funding did not have any predicate creditors.

A.   **Predicate Creditors of PC Funding Are Not Required for the Trustee to Assert Fraudulent Transfer Claims Against DZ Bank**

1.   **The Trustee Has Standing to Bring Claims Under Section 544(a)**

DZ Bank's predicate creditor argument fails as a matter of law because the Trustee has standing to bring claims under Section 544(a) and Minn. Stat. § 513.44(a) *even absent any actual predicate creditors of PC Funding*.

Section 544(a) grants to the Trustee the right to avoid any transfer of property of the debtor that is voidable by several types of creditors as of the commencement of the case "*whether or not such a creditor exists*." 11 U.S.C. § 544(a)(1), (2) (emphasis added); *see also* 11 U.S.C. § 544(a)(3) (granting trustee the right to avoid transfers by a bona fide purchaser of real property "whether or not such a purchaser exists"). In other words, the Trustee need not identify an *actual* predicate creditor from which to source avoidance powers, because the Bankruptcy Code, under Section 544(a), provides the Trustee with a *hypothetical* creditor from which the Trustee may derive standing to assert fraudulent transfer claims under state law, as of the petition date. *See Zilkha Energy Co. v. Leighton*, 920 F.2d 1520, 1523 (10th Cir. 1990) ("To understand the full import of § 544, one must first understand the power of a bankruptcy trustee to stand in the shoes of an hypothetical creditor of the debtor to effect a recovery from a third party. Simply stated, from the reservoir of equitable powers granted to the trustee to maximize the bankruptcy estate, Congress has fashioned a legal fiction. Not only is a trustee empowered to stand in the shoes of a debtor to set aside transfers to third parties, but the fiction permits the trustee also to assume the guise of a creditor with a judgment against the debtor. Under that guise, the trustee may invoke whatever remedies provided by state law to judgment lien creditors to satisfy judgments against the

35

debtor.").[115]

Looking to state law, Minn. Stat. § 513.44(a) provides that an actual or constructive

fraudulent transfer "is voidable as to a creditor, whether the creditor's claim arose before *or after*

the transfer was made." (Emphasis added.) This provision therefore allows a creditor whose claim

against the debtor arose *after* the challenged transfer, including a creditor that comes into existence

(as a creature of the Bankruptcy Code) on the petition date, to seek to avoid the antecedent transfer.

In turn, the plain language of the Bankruptcy Code allows the Trustee to do under federal law

whatever the hypothetical creditor could have done under state law.[116] *United States v. Ron Pair*

*Enter., Inc.*, 489 U.S. 235, 242 (1989) (plain meaning of the Bankruptcy Code "should be

conclusive, except in the rare cases in which the literal application [] will produce a result

demonstrably at odds with the intentions of its drafters" (internal quotation omitted)).

---

[115] This operation of Section 544(a) is well established. *See Belford v. Cantavero (In re Bassett)*, 221 B.R. 49, 52-53 (Bankr. D. Conn. 1998) ("As a hypothetical lien creditor under Section 544(a)(1), the Trustee enjoys rights under, *inter alia*, Connecticut state fraudulent transfer law . . . ."); *Kleven v. Stewart (In re Myers)*, 320 B.R. 667, 670 (Bankr. N.D. Ind. 2005) ("Exercising the rights and powers of the hypothetical lien creditor, the trustee could have challenged the transactions through § 544(a)."); *Goscienski v. Larosa (In re Montclair Homes)*, 200 B.R. 84, 94 (Bankr. E.D.N.Y. 1996) (allowing a creditor acting on behalf of the bankruptcy trustee to use the trustee's hypothetical status as a judgment lienholder to assert a fraudulent conveyance action under the NY DCL, thus gaining the benefit of the NY DCL's six-year reachback period); *see also* 5 Collier on Bankruptcy P 544.03 (16th ed. 2019) ("As the Court of Appeals for the Second Circuit has explained, section 544(a)(1) 'gives the trustee in bankruptcy the status of a hypothetical judgment lien creditor … [who] extends credit to the debtor at the time of filing [of a bankruptcy petition] and, at that moment, obtains a judicial lien on all property in which the debtor has any interest that could be reached by a creditor.' This status arises whether or not such a creditor actually exists.") (citing *Musso v. Ostashko*, 468 F.3d 99 (2d Cir. 2006)).

[116] Under Minn. Stat. § 513.41, fraudulent transfer claims, including those under Minn. Stat. § 513.44(a), may be asserted by any "Creditor" holding a "Claim", which includes "a right to payment, *whether or not the right is reduced to judgment*, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, *secured*, or unsecured." Minn. Stat. § 513.41 (emphasis added). Thus, it is clear that the three hypothetical creditors enumerated in section 544(a) of the Bankruptcy Code could have, hypothetically, asserted the fraudulent transfer claims asserted by the Trustee here.

Therefore, even assuming there were *no* actual predicate creditors of PC Funding—which, as discussed below, there were—under the plain language of the Bankruptcy Code and MUFTA, the Trustee has standing to bring any claim that could have been brought under Minn. Stat. § 513.44(a) by a creditor existing on the petition date, including the actual and constructive fraudulent transfer claims at issue here. For this reason alone, summary judgment on the predicate creditor issue should be denied.

### 2.      The Trustee Can Assert Claims Against DZ Bank as a Subsequent Transferee of PCI

There is no meaningful dispute that the Predicate Creditors have direct claims against PCI. *Cf.* Transcript of Jury Trial Vol. V at 865:17-867:13, Dkt. No. 135, *Kelley v. Boosalis*, No. 18-cv-868 (D. Minn. Nov. 30, 2018) (Nelson, J.) (bench ruling that Interlachen was a predicate creditor of PCI). Thus, even if DZ Bank could establish the absence of PC Funding creditors—which, as explained below, it cannot—the Trustee's standing to avoid transfers to PC Funding as an initial transferee of PCI, and therefore to avoid transfers to DZ Bank from PC Funding as a *subsequent transferee* of PCI, is not in dispute. *See* 11 U.S.C. § 550(a) (Trustee can recover from "any immediate or mediate transferee of such initial transferee.").

### B.      There Are Predicate Creditors of PC Funding

### 1.      PCI Creditors Can Pierce the Corporate Veil Between PCI and PC Funding

Each of the Predicate Creditors has direct tort claims against PCI. *See* Argument § IV.A.2, *supra* at 37. Because PC Funding was merely an alter ego of PCI, such that there was no real separation between the two entities, the Predicate Creditors' tort claims against PCI are tort claims against PC Funding as well.

DZ Bank accepts that a corporate veil may be pierced by satisfying the fact-intensive criteria for "insider reverse veil piercing." Mem. 24 (citing *Kelley v. Opportunity Fin., LLC*, 561

37

B.R. 738, 750 (Bankr. D. Minn. 2016)); *see also* 561 B.R. at 753 ("Whether to pierce the corporate

veil is primarily a question of fact."). *In re Intelefilm Corp.*, 301 B.R. 327 (Bankr. D. Minn. 2003)

(Kishel, J.), on which DZ Bank relies, provides that the two criteria for veil-piercing are

(i) "whether [the entities] maintained the integrity of a separate existence for the corporation," and

(ii) "whether the shareholder-owners *operated* the corporation as a constructive fraud or in an

unjust manner, in a way detrimental to the claimant." *Id.* at 331 (internal quotation marks omitted).

Each of these criteria is clearly satisfied.  As to corporate separateness, DZ Bank does not

challenge PC Funding's inadequate capitalization,[117] its insolvency at all relevant times,[118] or that

PCI siphoned funds from PC Funding by laundering them through sham Vendors that circulated

the funds back to PCI.  *See* Counterstatement of Facts § II, *supra* at 4-5.  Nor does DZ Bank

address the lack of corporate formalities between PCI and PC Funding.  Former PC Funding board

member Thomas Hay testified that PC Funding's supposed board of directors, to which he, Petters,

and a third director[119] were named, held no elections or meetings,[120] that Mr. Hay never met that

third director,[121] that PC Funding "was nonexistent, virtually," and that he was "essentially a

director in name only."[122]  Furthermore, Petters acted as PC Funding's "sole governor, President,

CEO, and CFO."  *In re Petters Co.*, 506 B.R. at 809.  Thus, it is not surprising that this Court

---

[117] *See, e.g.*, Ex. T-56 (Testimony of Theodore Martens at substantive consolidation hearing dated Dec. 12, 2011 ("Martens Hearing Tr.")) at 249:19-20 ("A. . . . [T]here was little, if any, capitalization in the SPE's.")); *see also In re Petters Co.*, 506 B.R. at 810 (PC Funding was "substantially dependent upon PCI to stay in business").

[118] Ex. T-21 (Martens Report) ¶¶ 57-59.

[119] *See* Ex. T-52 (Hay Tr.) at 272:5-23.

[120] *See id.* at 264:17-265:24.

[121] *See id.* at 272:9-23.  As noted by Judge Kishel, counsel for PCI referred to the "nominally-independent director" as a "Rent-a-Director."  *In re Petters Co.*, 506 B.R. at 809 n.35.

[122] Ex. T-52 (Hay Tr.) at 266:10-21; *see also* Ex. T-57 (Deposition of Jon Sabes dated July 7, 2011 ("Sabes Tr.")) at 88:14-90:4.

concluded that "Tom Petters and PCI controlled the way the SPEs operated, both *de facto* and *de jure*." *Id.* at 809 n.35. And this Court subsequently held that proof of the foregoing alone is sufficient to pierce the corporate veil. *See Kelley*, 561 B.R. at 753.[123]

DZ Bank likewise cannot meaningfully challenge the second criterion—that PCI operated PC Funding as a fraud, and that creditors of PCI—like the Predicate Creditors—were harmed when PCI illicitly sent their money to SPEs, like PC Funding, not to buy the represented goods, but rather simply to pay other lenders. *See* Counterstatement of Facts § II, *supra* at 4-5 (PC Funding channeled millions through the Ponzi scheme). In exactly the same fashion, creditors of the SPEs, like PC Funding, were harmed when their money flowed into PCI—rather than to the represented vendors—to pay PCI's other lenders. In *Intelefilm*, Judge Kishel found that the second criterion may be met by "false pretense or misrepresentation as to the identity of the real party-beneficiary with whom the creditor was dealing—i.e. the shareholder-owner in an individual capacity, rather than the flimsily-constituted corporation." 301 B.R. at 331-32. DZ Bank cannot dispute that Petters was the "real party-beneficiary" with whom OppFin "was dealing," because Petters continually misappropriated funds provided to PC Funding to be laundered through sham Vendors and circulated back to PCI. *See* Counterstatement of Facts § II, *supra* at 4-5; *see also Kelley*, 561 B.R. at 753 (finding conduct of Petters and PCI evidenced a lack of "true separateness between PCI and [PC Funding]").

*Urban v. American Legion Post 184*, 695 N.W. 2d 153 (Minn. 2005), which states that the second criterion simply requires proof of "injustice or fundamental unfairness," *id.* at 162, is no

---

[123] Contrary to DZ Bank's assertion, the Trustee does not claim that the Predicate Creditors' claims against PC Funding arise from substantive consolidation. Mem. 23. But the factual findings in this Court's substantive consolidation opinion demonstrate that there was no separation between PCI and PC Funding. *See In re Petters Co.*, 506 B.R. at 800-11.

more helpful to DZ Bank. *Urban* instructs that this element is satisfied "in circumstances *where the formalities of corporate existence are disregarded* by one seeking to use it," to the point that "corporate existence cannot be allowed to shield the individual from liability." *Id.* at 162 (emphasis added). Again, DZ Bank does not attempt to argue that PCI and PC Funding observed corporate separateness, nor challenge that the primary purpose of each entity was to perpetrate a fraud. And neither *Intelefilm* nor *Urban* supports DZ Bank's argument that "injustice or fundamental unfairness" requires something more than the *joint operation of a massive Ponzi scheme*. *See* Mem. 24-25.

Tellingly, in an attempt to bolster its curious assertion that PCI was not using PC Funding to achieve unjust and fundamentally unfair ends, DZ Bank invokes facts that are demonstrably false. First, DZ Bank asserts that "there is no evidence" that proceeds of the Predicate Creditors' loans were transferred to PC Funding. Mem. 25. But in several instances, there can be no question that the identified Predicate Creditors were the source of funds transferred from PCI to PC Funding. For example:

- On December 5, 2002, Acorn[124] (through RedTagBiz, Inc.) transferred approximately $8.7 million to PCI. The same day, PCI sent approximately $13.3 million to PC Funding. But because PCI's highest possible account balance that day—assuming all deposits into PCI's account on December 5, 2002 were made before any withdrawals—was approximately $17.7 million, some portion of Acorn's money necessarily funded the transfers from PCI to PC Funding.[125]

---

[124] "Acorn" is Acorn Capital Group, LLC. FAC ¶ 187. Acorn's successor servicer is Asset Based Resource Group LLC. *Id.* ¶ 188.

[125] *See* Ex. T-21 (Martens Rpt.) Ex. U at 75.

- On April 18, 2008, Interlachen[126] and Lancelot[127] (through its SPE) together transferred a total of $72.6 million to PCI.[128] Other transfers to PCI that day totaled less than $50,000.[129] The same day, PCI sent approximately $13.3 million to PC Funding.[130] Because PCI began that day with a balance of less than $900,000,[131] there can be no question that Interlachen/Lancelot's money funded the transfer from PCI to PC Funding.

Other examples of transfers from PCI to PC Funding closely following PCI's receipt of funds from Predicate Creditors include: (i) Lancelot's July 2, 2002 transfer (through another entity) of $1,025,000 to PCI, followed by PCI's transfer, that day and the next, of over $3.6 million to PC Funding;[132] and (ii) Ark Discovery's[133] October 17, 2007 transfer (through its SPE) of approximately $15 million to fraudulent Vendors Nationwide[134] and Enchanted[135] which, the same day, transferred more than $41 million to PCI,[136] which, in turn transferred $5.48 million to PC Funding.[137]

Second, DZ Bank maintains that "there is no evidence that PC Funding assisted PCI in defrauding the alleged Predicate Creditors." Mem. 25-26. Again, there is ample and unchallenged evidence that PC Funding assisted PCI in perpetrating the Ponzi scheme. Petters and PCI used PC Funding as an integral instrument of the fraud, in which capacity PC Funding accepted hundreds

---

[126] "Interlachen" is Interlachen Harriet Investments Limited. *See* FAC ¶ 194.

[127] "Lancelot" includes Lancelot Investors Fund, L.P., Lancelot Investors Fund II, L.P., Lancelot Investors Fund, Ltd., and related entities. *See id.* ¶ 187.

[128] *See* T-58 (Interim Report of PricewaterhouseCoopers) Ex. 10 at 1.

[129] *Id.*

[130] *Id.*

[131] Ex. T-59 (Kelley_DZ_00063488) (April 2008 Bank Statement for PCI account number 1959018 at M&I Bank) at -91.

[132] *See* T-21 (Martens Rpt.) Ex. U at 25.

[133] "Ark Discovery" is Ark Discovery II LP. FAC ¶ 189.

[134] *See* T-60 (Kelley_DZ_00053853) at -54.

[135] *See* T-61 (Kelley_DZ_00040184) at -84.

[136] *See* T-62 (Kelley_DZ_00068673) at -73-75; T-60 (Kelley_DZ_00053853) at -58; T-61 (Kelley_DZ_00040184) at -90.

[137] *See* T-62 (Kelley_DZ_00068673) at -79; T-63 (Kelley_DZ_00057335) at -41.

of millions in fraudulently induced transfers and provided those funds to the sham Vendors, who

laundered them and sent them back to PCI.  *See* Counterstatement of Facts § II, *supra* at 4-5.  Those

funds benefited Petters personally and perpetuated the Ponzi scheme by repaying investors with

other investors' funds.  *See id.*  At the same time, PC Funding accepted transfers from PCI—

transfers that had nothing to do with the payment of receivables by retailers—in order to pay PC

Funding's lenders.  *See id.*  It would therefore be *fundamentally unfair and unjust* to hinder

recovery against PC Funding by giving effect to a corporate separateness that the two entities

themselves purposely disregarded to advance the fraud.

### 2.   Predicate Creditors Have Tort Claims Directly Against PC Funding

In addition to their claims against PC Funding as an alter ego of PCI, the Predicate

Creditors have direct claims against PC Funding for aiding and abetting, and conspiring to commit,

fraud and conversion.  DZ Bank's legal arguments are insufficient to dismiss these claims, which

find ample support in the factual record.

Under Minnesota law, aiding and abetting a tort requires (1) a primary tort; (2) the

defendant's knowledge that the primary tortfeasor is breaching a duty; and (3) substantial

assistance in or encouragement of the breach.  *See Zayed v. Assoc. Bank, N.A.*, 779 F.3d 727, 733

(8th Cir. 2015).  Civil conspiracy under Minnesota law requires "(1) two or more persons; (2) an

object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken;

(4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of

the conspiracy." *ECTG Ltd. v. O'Shaughnessy*, 2014 WL 6684982, at *4 (D. Minn. Nov. 25, 2014)

(quotation marks omitted).

The Predicate Creditors plainly have aiding and abetting fraud claims against PC Funding.

42

First, it is clear that they have primary fraud claims against PCI.[138]  The evidence shows that each

of the Predicate Creditors was fraudulently induced to provide funds to PCI and (in some instances)

SPEs set up and operated by PCI, and was damaged as a result.  Interlachen loaned $60 million to

PCI in April 2008 on the fraudulent basis that the funds would finance goods transactions,[139] and

the loan was never repaid.[140]  Acorn Capital Group, LLC ("Acorn") was similarly "provided with

certain false information" and also holds unpaid promissory notes.  *See* Mem. 11.  Lancelot was

never told that its transaction documents were phony,[141] and DZ Bank does not dispute that

Lancelot's loans were not fully repaid.[142]  Ark Discovery loaned funds to PCI in 2007 and 2008,

and there are no facts suggesting Petters treated Ark Discovery's funds differently from any other

funds invested in the Ponzi Scheme.[143]  And Theodore Deikel testified that Petters fraudulently

---

[138] DZ Bank's argument that the Predicate Creditors did not rely on representations made by PC Funding is wholly beside the point; that is not an element of an aiding and abetting claim.

[139] *See* Ex. T-64 (Deposition of Lance Breiland dated Feb. 27, 2019 ("Breiland Tr.")) at 195:11-22 ("Q. Now, when -- when Interlachen lent $60 million to PCI in April of 2018 [*sic*], was it ever told that PCI would use the money being loaned in this way?  A. No, absolutely not.  Q. You were told that Petters was going to use the money to purchase TVs, right?  A. That's correct.").

[140] *See id.* at 222:23-223:6 ("Q. [Interlachen] lost its entire $60 million? . . . THE WITNESS: Yes, that's correct."); Ex. T-65 (Interlachen Proof of Claim); Ex. T-66 (Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Chapter 11 Plan of Liquidation Dated April 8, 2016) ("Confirmation Order") at 38 ("[T]he Interlachen Claim shall be Allowed as a Class 3 Claim in the amount of $60,000,000").

[141] *See* Ex. T-8 (Coleman Tr.) at 164:15-22 ("Q. . . . Did Lancelot ever know that -- did you ever tell Lancelot the documents you were preparing were fake?  A. No.").

[142] *See* Ex. T-67 (Lancelot Proofs of Claim); T-66 (Confirmation Order) at 37 ("Lancelot will have an Allowed Class 3 General Unsecured Claim in the amount of $764,620,000.00 . . . ."). DZ Bank argues that Lancelot CEO Greg Bell was aware of Petters' fraud, Mem. 12, but ignores that Bell's knowledge of the Ponzi scheme is in dispute. *See* Ex. T-68 (Deposition of Ron Peterson dated Feb. 7, 2019 ("Peterson Tr.")) at 46:4-16 ("A. . . . "[W]e could never establish that Bell had such knowledge.  And Bell denie[d] that he had such knowledge when I interviewed him.").

[143] *See* Ex. T-69 (Ark Discovery Proofs of Claim and supporting documents); T-66 (Confirmation Order) at 38 ("the Ark Discovery Claim will be Allowed as a Class 3 General Unsecured Claim in the aggregate amount of $107,207,101.00").

represented that Mr. Deikel's $10 million loan would finance electronics transactions, and that he suffered damages when the loan was not repaid.[144]

Second, there can be no question that PC Funding—for which Petters served as sole governor, President, CEO, and CFO—knew of PCI's fraudulent conduct. And, third, PC Funding substantially assisted the fraudulent scheme by knowingly misdirecting funds to sham Vendors, who laundered the money and sent it directly to PCI (rather than using the money to purchase grey market goods) to benefit Petters and perpetuate the Ponzi scheme. *See* Counterstatement of Facts § II, *supra* at 4-5. In fact, DZ Bank's expert Andrew Richmond opined that PC Funding created fictitious documents, and lied to outside parties, to conceal the Ponzi scheme,[145] and that Petters and his co-conspirators used the corporate structure of Petters' companies to mask the fraud.[146]

Contrary to DZ Bank's claim, it is irrelevant whether the Predicate Creditors "dealt" with PC Funding, Mem. 30; as in any aiding and abetting case, there is no requirement that PC Funding's substantial assistance include direct communications with the targets of the fraud. *See Zayed*, 779 F.3d at 733 (elements of aiding and abetting claim do not include that victim must establish direct contact with alleged tortfeasor).

With respect to conspiracy, the record also establishes that PC Funding conspired with PCI, the sham Vendors, Michael Catain, Larry Reynolds, the other SPEs, and others to operate the Ponzi scheme. Mr. Richmond opined that the Vendors were "entities operated by co-conspirators who

---

[144] *See* T-70 (Deposition of Theodore Deikel dated December 28, 2018 ("Deikel Tr.")) at 206:7-207:22. DZ Bank's assertion that Mr. Deikel loaned funds to Petters "solely on the basis of the unrelated success" of a prior transaction is disputed, at best, because it is inconsistent with Mr. Deikel's testimony that he was defrauded. *See* Mem. 11.

[145] Ex. T-71 (Report of Andrew Richmond dated July 5, 2019) ¶¶ 114-17.

[146] *Id.* ¶¶ 81-85.

were actively assisting in the execution and concealment of the fraud,"[147] and "the involvement and close coordination of these external third parties was critical to the execution and concealment of the Petters fraud scheme."[148]   Indeed, Catain and Reynolds pleaded guilty to *conspiracy* to commit money laundering in connection with their role in the Ponzi scheme.[149]   Certainly, this conduct satisfies all of the requirements for a conspiracy claim under Minnesota law.   DZ Bank's assertion that PC Funding could not conspire with its owner, PCI, *see* Mem. 29—even if true— ignores that the conspiracy involved these multiple players, within and outside of PCI.   Similarly, DZ Bank's assertion that "no Predicate Creditor has a valid underlying tort claim," *id.*, is unsupported, and belied by the evidence above that each Predicate Creditor was a victim of fraud.

For the same reasons, PC Funding aided and abetted, and conspired to commit, conversion of the Predicate Creditors' funds.   DZ Bank asserts that conversion does not apply to intangible funds,[150] citing *TCI Business Capital, Inc. v. Five Star American Die Casting, LLC*, 890 N.W. 2d 423 (Minn. Ct. App. 2017) and *World Business Lenders, LLC v. Palen*, 2017 U.S. Dist. LEXIS 91403 (D. Minn. June 13, 2017) (which bases its decision on *TCI*).[151]   DZ Bank fails to cite such relevant contrary authority as *De Castro v. Castro*, 2018 WL 6026089 (D. Minn. Nov. 16, 2018), which notes that *TCI*'s discussion was dicta and finds that *TCI*'s view is "misaligned with modern day e-commerce" and would "insulate from liability conversion perpetrated online, using credit

---

[147] *Id.* ¶ 15.

[148] *Id.* ¶ 78.

[149] *Id.* ¶¶ 76-77.

[150] DZ Bank also asserts that none of the Predicate Creditors had a property interest in PC Funding.  Mem. 28-29.  Once again, that simply is not a requirement of a claim that PC Funding aided and abetted, or conspired to commit, conversion.

[151] *World Business* identifies three reported cases from this District that apply conversion to intangible funds, but followed *TCI* because *TCI* reviewed Minnesota Supreme Court cases that address conversion.  *See* 2017 U.S. Dist. LEXIS 91403 at *19.  But none of those cases addresses conversion in the context of intangible funds.  *See id.* (gathering five cases).

cards, or any other myriad form of electronic payments." *Id.* at *6; *see also Cobb v. PayLease LLC*, 34 F. Supp. 3d 976, 988 (D. Minn. 2014) ("Cobb has adequately pled a conversion claim based upon PayLease's alleged retention of six-days' worth of interest on the $25 fee."). And in *In re Polaroid*, 543 B.R. 888 (Bankr. D. Minn. 2016) (Kishel, J.), Judge Kishel characterized the misuse of funds by a Ponzi scheme as a "permanent conversion" that "invariably occurs when a Ponzi scheme is prolonged through the rolling fraud of the classic structure." *Id.* at 909 n.34.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests an Order denying DZ Bank's motion for summary judgment in its entirety.

DATED: February 7, 2020

**BALLARD SPAHR LLP**

By:   /s/ James A. Lodoen
James A. Lodoen (0173605)
Adam C. Ballinger (0389058)
2000 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
Telephone: (612) 371-3234
Fax: (612) 371-3207
www.ballardspahr.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Robert S. Loigman (*pro hac vice*)
Benjamin I. Finestone (*pro hac vice*)
Jacob J. Waldman (*pro hac vice*)
Victor Noskov (*pro hac vice*)
Alexandre Tschumi (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
www.quinnemanuel.com

*Attorneys for Douglas A. Kelley, in his capacity as Trustee of the PCI Liquidating Trust*

46

# APPENDIX

## DZ BANK ADMISSIONS AND REPRESENTATIONS TO THE COURT

| Citation | DZ Bank Representation |
|---|---|
| **DZ Bank Motion for Judgment on the Pleadings Under Rule 12(c)** | |
| Moving Brief (Dkt. 122) Page 1 | "It is undisputed that DZ Bank was a lender and that the payments that it received constituted repayments of ordinary principal and interest on the loans that it made. Indeed, the Trustee's allegations specifically acknowledge that DZ Bank provided financing and that the transfers that DZ Bank received were repayments of that financing." |
| Moving Brief (Dkt. 122) Page 7 | "Opportunity Finance obtained financing from DZ Bank.  Opportunity Finance used the funds borrowed from DZ Bank to fund, in part, the loans to PC Funding." |
| Moving Brief (Dkt. 122) Page 7 | "Section 2.01(a) of the Receivables Loan Agreement provides that DZ Bank shall 'make loans to the Borrower secured by Pledged Assets from time to time during the period from the date hereof until the earlier of the Early Amortization Commencement Date or the Facility Maturity Date.'" |
| Moving Brief (Dkt. 122) Pages 7-8 | "Pursuant to Section 2.02(c) of the Receivables Loan Agreement, as well as the Fee Letter from DZ Bank to OF Securitization, the Yield Rate for the loan between DZ Bank and Opportunity Finance was the non-CP rate (i.e., the London Interbank Offered Rate — as reported during the Fixed Period — plus an applicable margin of 2.35 percent)." |
| Moving Brief (Dkt. 122) Page 8 | "In connection with the Receivables Agreement, Opportunity Finance formed a wholly owned, special purpose entity— OF Securitization — to serve as the borrower of funds from DZ Bank." |
| Moving Brief (Dkt. 122) Page 8 | "Pursuant to Section 2.24, a Collection Account was opened at U.S. Bank for the benefit of DZ Bank." |

| Citation | DZ Bank Representation |
|---|---|
| Moving Brief (Dkt. 122) Page 9 | "In early 2002, DZ Bank began to make loans to OF Securitization. In turn, Opportunity Finance extended loans to PC Funding in accordance with the terms of the Credit Agreement.  As Opportunity Finance received repayment of the loans by transfer into the PC Funding account, pursuant to Section 2.23 of the Receivables Loan Agreement, those repayment proceeds were used in part to repay the amounts that OF Securitization owed DZ Bank by making transfers into DZ Bank's bank account at U.S. Bank. From 2002 to 2003, DZ Bank received principal and interest repayments for its loans to OF Securitization." |
| Moving Brief (Dkt. 122) Page 9 | "Pursuant to Section 2.01 of the Receivables Loan Agreement, DZ Bank's loan matured the earlier of December 28, 2006 or when any Early Amortization Event occurred. In May 2003, Opportunity Finance triggered an informal amortization, and it ceased requesting new loan originations under the Receivables Loan Agreement." |
| Moving Brief (Dkt. 122) Page 19 | "Opportunity Finance made loans to PC Funding. DZ Bank likewise extended a credit line to OF Securitization." |
| Moving Brief (Dkt. 122) Page 20, fn. 20 | "Although the Trustee is reluctant to use the word 'loan' in his complaint, the agreements are explicit that loans are precisely what are being tendered by Opportunity Financing and DZ Bank, respectively, and that the payments back to them were for interest and principal." |
| Reply Brief (Dkt. 160) Page 4 | "The Trustee's admissions and the agreements establish that there was a direct lending relationship among DZ Bank, Opportunity Finance and PC Funding, and the transfers to DZ Bank all concerned repayment of antecedent debt due and owing DZ Bank." |
| Reply Brief (Dkt. 160) Page 23 | "Further, it is undisputed that DZ Bank was a senior lender for the loans to PC Funding.  Opportunity Finance obtained financing from DZ Bank and used the funds that it borrowed from DZ Bank to fund, in part, the loans to PC Funding. In connection with the Receivables Agreement, Opportunity Finance formed OF Securitization, a wholly owned, special purpose entity, to serve as the borrower of funds from DZ Bank. In early 2002, DZ Bank began to make loans to OF Securitization." |
| Reply Brief (Dkt. 160) Page 25 | "Further, the agreements incorporated into the Complaint and Answer establish the direct connection between DZ Bank and PC Funding based on a tripartite lending relationship." |

| Citation | DZ Bank Representation |
|---|---|
| Motion Hearing Transcript (Dkt. 166) Pages 49-50 | " . . . under Section 2.23 of the receivables loan and security agreement, which is Exhibit A to DZ's answer, Opportunity and borrower, and the borrower is Opportunity Finance Securitization, shall direct each Opportunity loan borrower, which is defined as PC Funding and its related approved distributor to remit all funds payable in respect to all Opportunity loans, i.e. the loans made to PC Funding, to the collection account, and the collection account is defined as the account that is setup for the benefit of DZ Bank." |
| Motion Hearing Transcript (Dkt. 166) Pages 49-50 | " . . . so no matter how the trustee might want to hedge his pleadings, the way things worked here is that DZ Bank was getting paid by PC Funding for loans that it made to -- that DZ Bank made. It was getting paid principal and interest." |
| **DZ Bank's Answers to the Complaints: Second Amended Complaint** | |
| Ans. to Second Amended Complaint (Dkt. 42) Paragraph 115 | Admits that "DZ Bank made loans to Opportunity Finance to provide financing for Opportunity Finance loans to PC Funding." |
| Ans. to Second Amended Complaint (Dkt. 42) Paragraph 311 | "Opportunity Finance obtained financing from DZ Bank. Opportunity Finance entered into the Receivables Loan Agreement with DZ Bank, Autobahn Funding Company LLC, U.S. Bank and Royal Indemnity Company. Opportunity Finance used the funds borrowed from DZ Bank to finance the loans that it made to PC Funding." |
| Ans. to Second Amended Complaint (Dkt. 42) Paragraph 312 | "In accordance with the Receivables Loan Agreement, Opportunity Finance formed a wholly-owned, special-purpose entity – Opportunity Finance Securitization, LLC ("OF Securitization") – to serve as the borrower of funds from DZ Bank." |
| Ans. to Second Amended Complaint (Dkt. 42) Paragraph 314 | ". . . the Yield Rate (i.e., interest rate) for the loan between DZ Bank and Opportunity Finance was the non-CP rate (i.e., the London Interbank Offered Rate – as reported during the Fixed Period – plus an applicable margin of 2.35%)." |
| Ans. to Second Amended Complaint (Dkt. 42) Paragraph 315 | "DZ Bank began to loan funds to OF Securitization in early 2002, and Opportunity Finance in turn began to extend secured loans to PC Funding in accordance with the terms of the Credit Agreement." |

| Citation | DZ Bank Representation |
|---|---|
| Ans. to Second Amended Complaint (Dkt. 42) Paragraph 315 | "In May 2003, Opportunity Finance and Opportunity Finance Securitization entered an informal amortization, and ceased requesting new loan originations under the Receivables Loan Agreement. By August 2003, all the outstanding loans by DZ Bank had been repaid." |
| **DZ Bank's Answers to the Complaints: Fourth Amended (Operative) Complaint** | |
| Ans. to Fourth Amended Complaint (Dkt. 241) Paragraph 102 | Admits that "(i) DZ Bank loaned funds to Opportunity Finance Securitization in accordance with the terms of the Receivables Loan Agreement during the period January 2002 through May 2003, (ii) Opportunity Finance loaned funds to PC Funding during that same time period in accordance with the terms of the Credit Agreement and (iii) Opportunity Finance Securitization repaid the principal and interest due on its loans." |
| Ans. to Fourth Amended Complaint (Dkt. 241) Paragraph 172 | Admits that "DZ Bank made loans to Opportunity Finance Securitization in connection with the loans that Opportunity Finance made to PC Funding." |
| Ans. to Fourth Amended Complaint (Dkt. 241) Paragraph 491 | "Opportunity Finance obtained financing from DZ Bank. Opportunity Finance entered into the Receivables Loan Agreement with DZ Bank, Autobahn Funding Company LLC, Opportunity Finance Securitization, U.S. Bank and Royal Indemnity Company. Opportunity Finance used the funds that Opportunity Finance Securitization borrowed from DZ Bank to finance, in part, the loans that it made to PC Funding." |
| Ans. to Fourth Amended Complaint (Dkt. 241) Paragraph 492 | "In accordance with the Receivables Loan Agreement and consistent with national industry practice, Opportunity Finance formed a wholly-owned, SPE – Opportunity Finance Securitization – to be the borrower of funds from DZ Bank." |
| Ans. to Fourth Amended Complaint (Dkt. 241) Paragraph 494 | ". . . the Yield Rate (i.e., interest rate) for the loan from DZ Bank to Opportunity Finance Securitization was the non-CP rate (i.e., the London Interbank Offered Rate – as reported during the applicable period – plus an applicable margin of 2.35%)." |
| Ans. to Fourth Amended Complaint (Dkt. 241) Paragraph 495 | "DZ Bank began to loan funds to Opportunity Finance Securitization in January 2002, and Opportunity Finance in turn extended secured loans to PC Funding in accordance with the terms of the Credit Agreement." |

| Citation | DZ Bank Representation |
|---|---|
| Ans. to Fourth Amended Complaint (Dkt. 241) Paragraph 498 | "In May 2003, Opportunity Finance and Opportunity Finance Securitization entered an informal amortization arrangement with respect to the loan from DZ Bank, and ceased requesting new loan originations under the Receivables Loan Agreement. By August 2003, Opportunity Finance Securitization had repaid all the outstanding loans to DZ Bank." |

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re | **Jointly Administered under** |
| | **Case No. 08-45257** |
| Petters Company, Inc., et al., | |
| Debtors. | Court File No. 08-45257 |
| | Court File Nos.: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (KHS) |
| PC Funding, LLC; | 08-45326 (KHS) |
| Thousand Lakes, LLC; | 08-45327 (KHS) |
| SPF Funding, LLC; | 08-45328 (KHS) |
| PL Ltd., Inc.; | 08-45329 (KHS) |
| Edge One LLC; | 08-45330 (KHS) |
| MGC Finance, Inc.; | 08-45331 (KHS) |
| PAC Funding, LLC; | 08-45371 (KHS) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (KHS) |
| | |
| | Chapter 11 Cases |
| | Judge Kathleen H. Sanberg |

Douglas A. Kelley, in his capacity as the
Trustee of the PCI Liquidating Trust,

<div align="center">Plaintiff,</div>

v.             ADV. NO. 10-04301

Opportunity Finance, LLC, et al.,

<div align="center">Defendants.</div>

## DECLARATION OF ROBERT S. LOIGMAN IN SUPPORT OF
## TRUSTEE DOUGLAS A. KELLEY'S OPPOSITION TO
## DZ BANK'S MOTION FOR SUMMARY JUDGMENT

I, Robert S. Loigman, state and declare as follows:

1.      I am a partner at Quinn Emanuel Urquhart & Sullivan, LLP, and am admitted *pro hac vice* to represent Plaintiff Douglas A. Kelley, in his capacity as Trustee of the PCI Liquidating Trust ("Plaintiff" or "Trustee"), in this action.  I make this Declaration in opposition to DZ Bank's Motion for Summary Judgment to put certain relevant documents before the Court.

2.      Attached as <u>Exhibit T-1</u> is a true and correct copy of excerpts from the deposition transcript of Oliver d'Oelsnitz dated December 3, 2018.

3.      Attached as <u>Exhibit T-2</u> is a true and correct copy of excerpts from the deposition transcript of Vincent Salerno dated September 26, 2018.

4.      Attached as <u>Exhibit T-3</u> is a true and correct copy of excerpts from the deposition transcript of Francine M. Farragher dated October 2, 2018.

5.      Attached as <u>Exhibit T-4</u> is a true and correct copy of excerpts from the deposition transcript of Wallace Barefoot Bankhead dated September 16, 2019.

6.      Attached as <u>Exhibit T-5</u> is a true and correct copy of excerpts from the deposition transcript of Nancy O'Connor dated October 17, 2018.

7.      Attached as <u>Exhibit T-6</u> is a true and correct copy of excerpts from the deposition transcript of Patrick Preece dated October 18, 2018.

8.      Attached as <u>Exhibit T-7</u> is a true and correct copy of excerpts from Volume XI of the transcript of the jury trial of Tom Petters, dated November 12, 2009, containing the testimony of Patrick Preece.

9.      Attached as <u>Exhibit T-8</u> is a true and correct copy of excerpts from the deposition transcript of Deanna Coleman dated November 15, 2018.

10.     Attached as <u>Exhibit T-9</u> is a true and correct copy of a Credit Application dated October 17, 2001, with the beginning Bates-stamp DZB001200.

11.     Attached as <u>Exhibit T-10</u> is a true and correct copy of a memorandum from Mayer, Brown & Platt dated December 28, 2001, with the beginning Bates-stamp DZB019159.

12.     Attached as <u>Exhibit T-11</u> is a true and correct copy of a DZ Bank Fraud Insurance Policy Memorandum, undated, with the beginning Bates-stamp DZB041876.

13.     Attached as <u>Exhibit T-12</u> is a true and correct copy of a Fee Letter dated December 28, 2001, with the beginning Bates-stamp DZB001353.

14.     Attached as <u>Exhibit T-13</u> is a true and correct copy of excerpts from the Expert Report of W. Barefoot Bankhead, dated July 5, 2019.

15.     Attached as <u>Exhibit T-14</u> is a true and correct copy of an email from Christine Ogden to Nancy O'Connor and Wolfgang Bollmann, dated August 26, 2003, with attachment, with the beginning Bates-stamp DZB057852.

16.     Attached as <u>Exhibit T-15</u> is a true and correct copy of document titled "Credit Risk Management" dated May 2002, with the beginning Bates-stamp DZB057972.

17.     Attached as <u>Exhibit T-16</u> is a true and correct copy of a memorandum titled "$100,000,000 Trade Finance Loan-Backed Commercial Paper Conduit Facility" dated September 2001, with the beginning Bates-stamp DZB041920.

18.     Attached as <u>Exhibit T-17</u> is a true and correct copy of a DZ Bank Cash Receipts Testing analysis dated August 22, 2002, with the beginning Bates-stamp DZB043555.

19.     Attached as <u>Exhibit T-18</u> is a true and correct copy of a memorandum titled "Opportunity Finance - Due Diligence Site Review" dated August 26, 2002, with the beginning Bates-stamp DZB045346.

2

20.     Attached as <u>Exhibit T-19</u> is a true and correct copy of a Credit Application dated December 12, 2002, with the beginning Bates-stamp DZB001179.

21.     Attached as <u>Exhibit T-20</u> are true and correct copies of wire instructions dated October 9, 2002, November 12, 2002, December 10, 2002, and January 10, 2003, with the beginning Bates-stamps DZB009150, DZB009193, DZB009237, and DZB009290, respectively.

22.     Attached as <u>Exhibit T-21</u> is a true and correct copy of the Expert Report of Theodore F. Martens, dated April 25, 2019, and Exhibits H and Q, and excerpts of Exhibit U, to that Report.

23.     Attached as <u>Exhibit T-22</u> is a true and correct copy of a letter from Patrick Preece to Jon Sabes dated January 8, 2003, with the beginning Bates-stamp DZB000892.

24.     Attached as <u>Exhibit T-23</u> is a true and correct copy of an email from Michael Plunkett to Patrick Preece and Richard Wisniewski dated September 28, 2001, with the beginning Bates-stamp DZB017820.

25.     <u>Exhibit T-24</u> is intentionally omitted.

26.     Attached as <u>Exhibit T-25</u> is a true and correct copy of a Credit Application dated August 26, 2003, with the beginning Bates-stamp DZB053896.

27.     Attached as <u>Exhibit T-26</u> is a true and correct copy of an email from Patrick Preece to Vincent Salerno dated March 7, 2003, and forwarded by Salerno to Jennifer Wikoff on January 14, 2004, with the beginning Bates-stamp DZB059538.

28.     Attached as <u>Exhibit T-27</u> is a true and correct copy of a Credit Agreement between PC Funding, LLC and Opportunity Finance, LLC dated December 17, 2001, with the beginning Bates-stamp DZB004335.

29.     Attached as Exhibit T-28 is a true and correct copy of an email from Jennifer Wikoff to Vincent Salerno and Howard O'Brien dated February 20, 2003, and forwarded by Salerno to Wikoff on January 14, 2004, with the beginning Bates-stamp DZB059533.

30.     Exhibit T-29 is intentionally omitted.

31.     Attached as Exhibit T-30 is a true and correct copy of excerpts of DZ Bank's North America Operations Manual for the Asset Securitization Group dated January 22, 2001, with the beginning Bates-stamp DZB056085.

32.     Attached as Exhibit T-31 is a true and correct copy of an email from Christine Ogden to Wolfgang Bollmann and Nancy O'Connor dated January 13, 2005, with attachment, with the beginning Bates-stamp DZB065695.

33.     Attached as Exhibit T-32 is a true and correct copy of a memorandum from Robert Benvenuto to Jon Sabes, Patrick Preece, and Vincent Salerno regarding "Fraud Insurance Questions" dated January 17, 2003, with the beginning Bates-stamp DZB040676.

34.     Attached as Exhibit T-33 is a true and correct copy of excerpts from the deposition transcript of Jennifer Wikoff dated November 29, 2018.

35.     Attached as Exhibit T-34 is a true and correct copy of a letter from Simon Root to Jon Sabes dated December 13, 2001, with the beginning Bates-stamp PCI_S_SC_OppFin_0032715.

36.     Attached as Exhibit T-35 is a true and correct copy of an email chain between Nancy O'Connor and Patrick Preece, dated July 10 to 11, 2003, with the beginning Bates-stamp DZB057221.

37.     Attached as Exhibit T-36 is a true and correct copy of an email from Teresa Zariczny to Jennifer Wikoff and Howard O'Brien, dated March 3, 2003, forwarded by Wikoff to

4

Vincent Salerno and Patrick Preece on March 3, 2003, and forwarded by Salerno to Wikoff on January 14, 2004, with the beginning Bates-stamp DZB059498.

38.     Attached as <u>Exhibit T-37</u> is a true and correct copy of an email from Jennifer Wikoff to Kenneth Bradt and Patrick Preece dated March 5, 2003, forwarded by Wikoff to Vincent Salerno and Teresa Zariczny on March 6, 2003, and forwarded by Salerno to Wikoff on January 14, 2004, with the beginning Bates-stamp DZB059526.

39.     Attached as <u>Exhibit T-38</u> is a true and correct copy of an email from Jennifer Wikoff to Kenneth Bradt and Patrick Preece dated March 5, 2003, forwarded by Wikoff to Vincent Salerno and Teresa Zariczny on March 6, 2003, and forwarded by Salerno to Wikoff on January 14, 2004, with the beginning Bates-stamp DZB059500.

40.     Attached as <u>Exhibit T-39</u> is a true and correct copy of excerpts of a Risk Profile Report prepared by 1stWest Financial Corporation dated March 13, 2003, with the beginning Bates-stamp DZB000095.

41.     Attached as <u>Exhibit T-40</u> is a true and correct copy of Exhibit C to the RLSA,[1] with the beginning Bates-stamp DZB018811.

42.     Attached as <u>Exhibit T-41</u> is a true and correct copy of an excerpt of a spreadsheet titled Opportunity Finance LLC Portfolio Data and dated December 31, 2002, with the Bates-stamp DZB045366.

43.     Attached as <u>Exhibit T-42</u> is a true and correct copy of an email from Wolfgang Bollmann to Nancy O'Connor dated September 11, 2003, with the beginning Bates-stamp DZB058241.

---

[1] Capitalized terms and abbreviations used herein have the same meaning as in the Trustee's Memorandum of Law in accompanying Memorandum of Law dated February 7, 2020.

44.     Attached as <u>Exhibit T-43</u> is a true and correct copy of a Dun & Bradstreet report on Boscov's Department Store, LLC dated April 7, 2003, with the beginning Bates-stamp DZB001051.

45.     Attached as <u>Exhibit T-44</u> is a true and correct copy of excerpts of a spreadsheet titled Opportunity Finance LLC Portfolio Data and dated December 31, 2002, with the Bates-stamp DZB051979.

46.     Attached as <u>Exhibit T-45</u> is a true and correct copy of excerpts from the deposition transcript of Thomas Petters dated December 11, 2018.

47.     Attached as <u>Exhibit T-46</u> are true and correct copies of (i) excerpts of a spreadsheet titled Opportunity Finance LLC Portfolio Data dated June 13, 2002, with the Bates-stamp DZB051973, and (ii) a Compliance Worksheet for the Asset Securitization Group dated January 31, 2002, with the beginning Bates-stamp DZB009654.

48.     Attached as <u>Exhibit T-47</u> is a true and correct copy of excerpts from the deposition transcript of Bruce Miller dated October 4, 2019.

49.     Attached as <u>Exhibit T-48</u> are true and correct copies of (i) an email from Patrick Preece to Kenneth Bradt, et al. dated January 28, 2003, with the beginning Bates-stamp DZB056774; (ii) a fax from Teresa Zariczny to Kelli Clayton dated February 12, 2003, with the beginning Bates-stamp DZB000547, with attachment; (iii) an email from Clayton to Zariczny dated February 19, 2003, forwarded by Zariczny to Patrick Preece, et al. on February 19, 2003, and forwarded by Vincent Salerno to Jon Sabes on February 20, 2003, with the beginning Bates-stamp OpFin-00000011; and (iv) a letter from Steven J. Meshbesher, Esq. to Patrick Preece with attachment dated February 21, 2003, with the beginning Bates-stamp DZB013618.

50.     Attached as <u>Exhibit T-49</u> is a true and correct copy of an email exchange between Jon Sabes, Heather Thayer, and Simon Root dated December 12 to 13, 2001, with the beginning Bates-stamp PCI_S_SC_OppFin_0004685.

51.     Attached as <u>Exhibit T-50</u> is a true and correct copy of Autobahn's Amended and Restated Limited Liability Company Operating Agreement dated July 10, 2008, with the beginning Bates-stamp DZB173548.

52.     Attached as <u>Exhibit T-51</u> is a true and correct copy of a Written Action in Lieu of Meeting by the Board of Governors of PC Funding dated December 17, 2001, with the beginning Bates-stamp DZB002786.

53.     Attached as <u>Exhibit T-52</u> is a true and correct copy of excerpts from the deposition transcript of Thomas Hay dated December 6, 2018.

54.     Attached as <u>Exhibit T-53</u> is a true and correct copy of an internal DZ Bank memorandum referencing "Opportunity Finance, LLC – Request for $70.0 mio Increase in Commercial Paper Program" dated April 18, 2002, with the beginning Bates-stamp DZB040825.

55.     Attached as <u>Exhibit T-54</u> is a true and correct copy of an email from Patrick Preece to Paul Joshi, et al. dated August 28, 2002, with the beginning Bates-stamp DZB055810.

56.     Attached as <u>Exhibit T-55</u> is a true and correct copy of a memorandum from Kenneth Bradt to Wolfgang Bannmann and DZ Bank's Credit Committee dated March 13, 2002, with the beginning Bates-stamp DZB001131.

57.     Attached as <u>Exhibit T-56</u> is a true and correct copy of excerpts from the transcript of the first day of the Substantive Consolidation hearing dated December 12, 2011, containing the testimony of Theodore F. Martens.

58.     Attached as <u>Exhibit T-57</u> is a true and correct copy of excerpts from the deposition transcript of Jon Sabes dated July 7, 2011.

59.     Attached as <u>Exhibit T-58</u> is a true and correct copy of Exhibit 10 to the PwC Interim Report, dated December 15, 2010.

60.     Attached as <u>Exhibit T-59</u> is a true and correct copy of an M&I Bank account statement for PCI dated April 30, 2008, with the beginning Bates-stamp Kelley_DZ_00063488.

61.     Attached as <u>Exhibit T-60</u> is a true and correct copy of a First Regional Bank account statement for Nationwide International Resources Inc. dated October 31, 2007, with the beginning Bates-stamp Kelley_DZ_00053853.

62.     Attached as <u>Exhibit T-61</u> is a true and correct copy of an Anchor Bank, N.A. account statement for Enchanted Family Buying Company dated October 19, 2007, with the beginning Bates-stamp Kelley_DZ_00040184.

63.     Attached as <u>Exhibit T-62</u> is a true and correct copy of an M&I Bank Money Transfer Statement for Petters Company Inc. dated October 17, 2007, with the beginning Bates-stamp Kelley_DZ_00068673.

64.     Attached as <u>Exhibit T-63</u> is a true and correct copy of an M&I Bank account statement for PCI dated October 31, 2007, with the beginning Bates-stamp Kelley_DZ_00057335.

65.     Attached as <u>Exhibit T-64</u> is a true and correct copy of excerpts from the deposition transcript of Lance Breiland dated February 27, 2019.

66.     Attached as <u>Exhibit T-65</u> is a true and correct copy of a Proof of Claim filed by Interlachen dated December 28, 2009.

8

67.      Attached as <u>Exhibit T-66</u> is a true and correct copy of the Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Chapter 11 Plan of Liquidation Dated April 8, 2016, No. 08-45257, Dkt. 3305.

68.      Attached as <u>Exhibit T-67</u> are true and correct copies of excerpts of Proofs of Claim filed by Lancelot Investors Fund, LP, Lancelot Investors Fund II, L.P., and Lancelot Investors Fund, Ltd. dated April 20, 2009, and a Proof of Claim filed by RWB Services LLC dated April 20, 2009.

69.      Attached as <u>Exhibit T-68</u> is a true and correct copy of excerpts from the deposition transcript of Ronald Peterson dated February 7, 2019

70.      Attached as <u>Exhibit T-69</u> are true and correct copies of Proofs of Claim filed by Ark Discovery II, LP dated December 11, 2008, October 2, 2009, and December 12, 2012.

71.      Attached as <u>Exhibit T-70</u> is a true and correct copy of excerpts from the deposition transcript of Theodore Deikel dated December 28, 2018.

72.      Attached as <u>Exhibit T-71</u> is a true and correct copy of excerpts from the Expert Report of Andrew D. Richmond, dated July 5, 2019.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: February 7, 2020

By:   <u>/s/ *Robert S. Loigman*</u>
Robert S. Loigman (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
www.quinnemanuel.com

*Attorney for Douglas A. Kelley, in his capacity as Trustee of the PCI Liquidating Trust*

# EXHIBIT T-1

Page 1

1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF MINNESOTA
2     _____
3     Petters Company, Inc., et al.,
4                     Debtors,            Court File Nos.:
      (includes:
5     Petters Group Worldwide, LLC;       08-45258(KHS)
      PC Funding, LLC;                    08-45326(KHS)
6     Thousand Lakes, LLC;                08-45327(KHS)
      SPF Funding, LLC;                   08-45328(KHS)
7     PL Ltd., Inc.;                      08-45329(KHS)
      Edge One, LLC;                      08-45330(KHS)
8     MGC Finance, Inc;                   08-45331(KHS)
      PAC Funding, LLC;                   08-45371(KHS)
9     Palm Beach Finance Holdings, Inc.)  08-45392(KHS)
      -------------------------------------------------
10

      Douglas A. Kelley, in his capacity as the
11    Trustee of the PCI Liquidating Trust,
12                    Plaintiff,
      vs.                                 ADV. NO. 10-04301
13

      Opportunity Finance, LLC, Opportunity Finance
14    Securitization, LLC; Opportunity Finance
      Securitization II, LLC; Opportunity Finance
15    Securitization III, LLC; International Investment
      Opportunities, LLC, Sabes Family Foundation;
16    Sabes Minnesota Limited Partnership; Robert W.
      Sabes; Janet F. Sabes; Jon R. Sabes; Steven
17    Sabes; Deutsche Zentrlgenossenschaftbank AG;
      and The Minneapolis Foundation,
18

                      Defendants.
19    _____
20                  VIDEOTAPED DEPOSITION OF
                         OLIVER D'OELSNITZ
21

                     London, United Kingdom
22                   Monday, December 3, 2018
23

      Reported by:
24    LEAH M. WILLERSDORF - AVR, MBIVR, QRR2*,
      International Participating Member NCRA)
25    Job No. 150588

1                    (O. D'OELSNITZ - 12/03/2018)

2    primary reason for my going -- being appointed branch

3    manager and being sent to New York was the fact that

4    the bank was not making any money, so they were

5    participating in deals that were originated by other

6    banks, they were generating an income base but their

7    costs were equal to that base, and that was an ongoing

8    problem that New York had.

9         When I came, I had a mandate to correct that

10   situation and I had ideas of how to do that, and they

11   consisted of bringing on origination teams, such as

12   ASG, originating for ourselves, earning fee income in

13   addition to the interest income and the fees that one

14   typically makes by lending, through lending, and,

15   yeah, that was my motivation.

16        Q.   So your performance when you came to

17   New York would have been gauged by, among other

18   things, whether you could increase the profitability

19   of the New York office?

20        A.   My performance would have been measured on

21   the basis of how well I ran the branch, yeah.  Oddly,

22   the Germans were not as focused on the bottom line but

23   they did have a problem when the bottom line became

24   negative.

25        Q.   You said that one of the primary drivers

1                 (O. D'OELSNITZ - 12/03/2018)

2    that are put in place were for the benefit of the

3    conduit structure, not the bank.

4    BY MR. NOSKOV:

5         Q.    And conduit was an agent of DZ Bank,

6    correct?

7              MR. HAVELES:   Objection; mischaracterizes

8    the record.

9              THE WITNESS:   Yeah, I don't know that

10   I would agree with that representation "agent."  We

11   used Autobahn.  We were arrangers of facilities, and

12   Autobahn was a facility that was created by DZ Bank

13   but it's very, very careful -- we were very careful at

14   the time to define the role that we played in

15   Autobahn.

16   BY MR. NOSKOV:

17        Q.    Was there a credit committee at Autobahn

18   that approved these transactions?

19        A.    No.  The credit process was internal at

20   DZ Bank.

21        Q.    So any credit facility that was put in

22   place was put in with the approval of the credit

23   committee at DZ Bank?

24        A.    Actually, I should be careful there

25   because there was a custodial responsible for

Page 171

1                    (O. D'OELSNITZ - 12/03/2018)

2         Q.   My question is, as part of this

3    transaction, did DZ Bank make any money?

4         A.   DZ Bank would have made money as an

5    arranger of these transactions, yes.

6         Q.   And so how would they make money as an

7    arranger in these transactions?

8         A.   Well --

9              MR. HAVELES:  Are you now asking generally

10   or as to Opportunity Finance?

11             MR. NOSKOV:  Generally.

12             MR. HAVELES:  Okay.

13             THE WITNESS:  Generally, they would

14   structure the transaction and they would make

15   arrangements that the transaction was put in place in

16   order to ensure that a client would be given access to

17   the proceeds raised by the commercial paper issued by

18   Autobahn.

19   BY MR. NOSKOV:

20        Q.   And did DZ Bank act as a collateral agent

21   under the agreements?

22        A.   I can't recall specifically, but I do not

23   believe that we were collateral agent on the ASG

24   transactions.

25             MR. NOSKOV:  Let's take a look at

# EXHIBIT T-2

```
 1

 2          UNITED STATES BANKRUPTCY COURT

 3             DISTRICT OF MINNESOTA

 4                No. 08-45257

 5   In Re:  Petters Company, Inc., et al.,

 6   Debtors.

 7   (includes:                    Court File Nos.
     Petters Group Worldwide, LLC;  08-45258 (KHS)
 8   PC Funding, LLC;               08-45326 (KHS)
     Thousand Lakes, LLC;           08-45327 (KHS)
 9   SPF Funding, LLC;              08-45328 (KHS)
     PL Ltd., Inc.;                 08-45329 (KHS)
10   Edge One LLC;                  08-45330 (KHS)
     MGC Finance, Inc.;             08-45331 (KHS)
11   PAC Funding, LLC;              08-45371 (KHS)
     Palm Beach Finance
12   Holdings, Inc.)               08-45392 (KHS)

13

14   DOUGLAS A. KELLEY, in his capacity as the
     Trustee of the PCI Liquidating Trust,
15           Plaintiff,

16       vs.

17   OPPORTUNITY FINANCE, LLC; OPPORTUNITY FINANCE
     SECURITIZATION, LLC; OPPORTUNITY FINANCE
18   SECURITIZATION II, LLC; OPPORTUNITY FINANCE
     SECURITIZATION III, LLC; INTERNATIONAL
19   INVESTMENT OPPORTUNITIES, LLC; SABES FAMILY
     FOUNDATION;  SABES MINNESOTA LIMITED
20   PARTNERSHIP; ROBERT W. SABES; JANET F. SABES;
     JON R. SABES; STEVEN SABES; DEUTSCHE
21   ZENTRALGENOSSENSCHAFTBANK AG; and the
     MINNEAPOLIS FOUNDATION,
22           Defendants.

23   ADV. NO. 10-04301

24        Deposition of VINCENT SALERNO

25   JOB NO. 148370
```

1                VINCENT SALERNO

2   BY MR. NOSKOV:

3        Q.   And sometimes those assets would be

4   unsecured obligations?

5        A.   Correct.  Or there could be part

6   assets underneath those loans.  But our loan

7   was collateralized by a portfolio of

8   receivables.

9        Q.   And why was it important for all of

10   the loans to be secured by receivables?

11        A.   That was the nature of our business.

12   We're asset-backed lenders.  We lend money

13   against portfolios of assets, not to companies

14   themselves.  So we don't take the credit risk

15   of the company, we take the credit risk of the

16   portfolio.

17        Q.   So to do that, you analyzed the

18   portfolio, correct?

19        A.   Yes.

20        Q.   And you want to understand the

21   quality of the assets, correct?

22        A.   Correct.

23        Q.   It's important for you to understand

24   the quality of the assets because if there's a

25   default on the loan obligation, you would end

1                     VINCENT SALERNO

2       can discuss that amongst --

3             A.    Okay.

4             Q.    You see DZ Bank is listed as agent

5       and as collateral agent?

6             A.    I do see that.

7             Q.    And Autobahn Funding Company is

8       listed as lender?

9             A.    That is correct.

10            Q.    What's the relationship between

11      Autobahn Funding Company and DZ Bank?

12            A.    So DZ Bank would fund its loans

13      through an off-balance sheet vehicle called the

14      commercial paper conduit.  DZ would act as

15      administrator to that conduit.  It's the

16      conduit that would actually issue short-term

17      notes to fund the loans being made to various

18      counterparties.

19            Q.    So the Autobahn Funding Company is

20      just a vehicle used by DZ Bank to -- for the

21      purposes of this particular loan?

22                  MR. HERSCHLEIN:  Object to form.

23                  THE WITNESS:  No.  Our entire

24          portfolio was funded through Autobahn

25          Funding Company.  DZ Bank would provide

1                    VINCENT SALERNO
2        certain support to the conduit in order to
3        be able to issue the notes.  It was a
4        capital treatment strategy.
5    BY MR. NOSKOV:
6        Q.    Understood.  And Autobahn Funding
7    Company did not have its own separate decision
8    makers, did it?
9        A.    DZ Bank acted as its administrator.
10   It made those decisions basically for it.  The
11   bank didn't own Autobahn Funding Company.
12       Q.    Who owned Autobahn Funding Company?
13       A.    I believe Lord Securities, a
14   third-party administrator, basically owned
15   Autobahn Funding Company.
16       Q.    And who collected the interest on the
17   loan?
18       A.    Autobahn Funding Company was the
19   lender.
20       Q.    So it collected the -- the interest
21   on the loan?
22       A.    Correct, it was payable to Autobahn
23   Funding Company as the lender.
24       Q.    And how did DZ Bank receive money
25   from the transaction?

1                          VINCENT SALERNO

2        A.   If I recall correctly, the bank would

3    get its -- its economics through the liquidity

4    facility that it provided.

5                  So every loan facility written

6    by the conduit had to have a backstop

7    commitment from a creditworthy entity.  So if

8    there was a disruption in the CP market, the

9    bank would then take it the loan onto its books

10   so CP holders could be made whole.  So

11   effectively, it was a pass-through of the

12   economics to the bank.

13       Q.   Were you involved in negotiating this

14   agreement?

15       A.   Yes.

16       Q.   Did you have counsel as part of this

17   discussion?

18       A.   Yes.

19       Q.   Who was your counsel?

20       A.   Kay Schoaler.

21       Q.   Do you recall that pursuant to this

22   agreement two accounts were created to

23   facilitate the flow of funds?

24       A.   I do recall there being separate

25   collection accounts.

# EXHIBIT T-3

```
 1                    F. FARRAGHER
 2          UNITED STATES BANKRUPTCY COURT
 3              DISTRICT OF MINNESOTA
 4                  NO. 08-45257
 5   In Re:  Petters Company, Inc., et al.
     Debtors.
 6   (Includes:                        Court File Nos.
     Petters Group Worldwide, LLC;     08-45258 (KHS)
 7   PC Funding, LLC;                  08-45326 (KHS)
     Thousand Lakes, LLC;              08-45327 (KHS)
 8   SPF Funding, LLC;                 08-45328 (KHS)
     PL Ltd., Inc.;                    08-45329 (KHS)
 9   Edge One LLC;                     08-45330 (KHS)
     MGC Finance, Inc.;                08-45331 (KHS)
10   PAC Funding, LLC;                 08-45371 (KHS)
     Palm Beach Finance
11   Holdings, Inc.)                   08-45392 (KSH)
12   DOUGLAS A. KELLEY, in his capacity as the
     Trustee of the PCI Liquidating Trust,
13            Plaintiff,
          vs.
14   OPPORTUNITY FINANCE, LLC; OPPORTUNITY FINANCE
     SECURITIZATION, LLC; OPPORTUNITY FINANCE
15   SECURITIZATION II, LLC; OPPORTUNITY FINANCE
     SECURITIZATION III, LC; INTERNATIONAL
16   INVESTMENT OPPORTUNITIES, LLC; SABES FAMILY
     FOUNDATION; SABES MINNESOTA LIMITED
17   PARTNERSHIP; ROBERT W. SABES; JANET F. SABES;
     JON R. SABES; STEVEN SABES; DEUTSCHE
18   ZENTRALGENOSSENSCHAFTBANK AG; and the
     MINNEAPOLIS FOUNDATION,
19            Defendants.
20   ADV. NO. 10-04301
21   VIDEOTAPED DEPOSITION OF FRANCINE M. FARRAGHER
22              New York, New York
23              October 2, 2018
24   Reported by:
     KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25   JOB NO. 148371
```

1                         F. FARRAGHER

2        A.    It's likely, yes.

3        Q.    Okay.  I wanted to ask you one other

4   thing.  From that first paragraph that I just

5   read that begins "ASG seeks approval," it refers

6   to a multi-seller conduit.

7        A.    Yes.

8        Q.    Can you -- can you explain what that

9   is?

10       A.    Autobahn lends to a number of

11  different sellers.  Currently, we have 27 in the

12  portfolio, so it's a multi-seller conduit.

13       Q.    And what is -- what does "seller"

14  refer to in this context?

15       A.    It would be the originator who sold

16  their receivables to an ultimate borrower that's

17  an SPV.  That's the borrower of our facility.

18       Q.    Okay.  And sorry, it refers to -- it

19  says, "ASG seeks approval to provide, through

20  its multi-seller conduit..."

21            I assume "its" there refers to ASG?

22       A.    Yes.

23       Q.    Okay.  So its -- the multi-seller

24  conduit Autobahn Funding Company, LLC is its,

25  ASG's, multi-seller conduit?

1                    F. FARRAGHER

2        A.    Well, we consider it ours, yes.

3        Q.    "Ours" meaning?

4        A.    ASG's multi-seller conduit, yes,

5    because we set it up.  ASG set it up.

6        Q.    Okay.  And this credit application was

7    ultimately approved?  The credit facility was

8    issued?

9        A.    This was signed off by New York

10   branch.  I don't have anything here indicating

11   Frankfurt.

12            MR. HAVELES:  I'll stipulate there is

13       a separate piece of paper from Frankfurt

14       approving this loan.

15            MR. WALDMAN:  Okay.

16            MR. HAVELES:  That we have produced.

17            MR. WALDMAN:  Approving this credit

18       application?

19            MR. HAVELES:  Yes.

20            MR. WALDMAN:  Okay.  That's helpful.

21   I'm not sure if we found it, but we'll look

22   again.

23            MR. HAVELES:  You can call my good

24       friend Mr. Chiachetti after the deposition.

25       We'll be happy to point you to the document.

# EXHIBIT T-4

1          WALLACE BAREFOOT BANKHEAD

2        UNITED STATES BANKRUPTCY COURT

3          DISTRICT OF MINNESOTA

4             NO. 08-45257

5      In Re:  Petters Company, Inc., et al.

6               Debtors.

7      (Includes:                    Court File Nos.

       Petters Group Worldwide, LLC;    08-45258 (KHS)

8      PC Funding, LLC;                 08-45326 (KHS)

       Thousand Lakes, LLC;             08-45327 (KHS)

9      SPF Funding, LLC;                08-45328 (KHS)

       PL Ltd., Inc.;                   08-45329 (KHS)

10     Edge One LLC;                    08-45330 (KHS)

       MGC Finance, Inc.;               08-45331 (KHS)

11     PAC Funding, LLC;                08-45371 (KHS)

       Palm Beach Finance Holdings, Inc.)   08-45392 (KHS)

12     -----------------------------------------------------

       DOUGLAS A. KELLEY, in his capacity as the

13     Trustee of the PCI Liquidating Trust,

14              Plaintiff,

15          vs.

16     OPPORTUNITY FINANCE, LLC, et al.,

17              Defendants.

       -----------------------------------------------------

18

19   VIDEOTAPED DEPOSITION OF WALLACE BAREFOOT BANKHEAD

20                New York, New York

21                September 16, 2019

22     Reported by:

23     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

24     JOB NO. 167328

25

1          WALLACE BAREFOOT BANKHEAD

2    collection account, would you understand what I

3    meant if today I referred to this account as the

4    DZ Bank collection account?

5              MR. HAVELES:  Are you asking him to

6         accept -- understanding from whatever

7         definition you use going forward?

8              MR. LOIGMAN:  Yes.

9              MR. HAVELES:  Thank you.

10             THE WITNESS:  So the question is, do I

11        understand, when you ask a question and you

12        refer to it as the "DZ Bank collateral

13        account," if that's the term, that that's

14        what I'm referring to in my report as the

15        collateral agent collection account?

16   BY MR. LOIGMAN:

17        Q.   Let me -- let me rephrase that.

18             If I use the term today "DZ Bank

19   collection account," will you understand what

20   account I am referring to?

21        A.   My understanding would be you're

22   referring to what I'm referring to as the

23   collateral agent collection account.

24        Q.   Okay.  Have you ever seen anybody,

25   other than in your report, refer to that account

Page 50

WALLACE BAREFOOT BANKHEAD

2  as the collateral agent collection account?

3      A.    I don't believe so.

4      Q.    Did anybody instruct you to refer to

5  the account as the collateral agent collection

6  account?

7      A.    I don't think there were any

8  instructions.  I don't recall what all comments

9  and edits were made on the report, but we always

10  try to distinguish between the two collection

11  accounts with something that was familiar to us.

12      Q.    Do you know who first used the term

13  "collateral agent collection account" in

14  connection with your report?

15      A.    I do not.

16      Q.    Were you the principal drafter of your

17  report?

18      A.    Some of the early sections on my

19  qualifications, background, things of that

20  nature, but I was assisted in drafting the

21  report.

22      Q.    Okay.  And in later portions of the

23  report where you discuss items specific to this

24  case, were you the principal drafter of those

25  portions of the report?

1          WALLACE BAREFOOT BANKHEAD

2          Do you see that?

3     A.    Yes.

4     Q.    Now, is it your position that DZ Bank

5 and Autobahn are completely separate from each

6 other?

7     A.    DZ Bank is the administrator of

8 Autobahn.  Autobahn is a separate entity, a

9 separate legal entity, established for the

10 purpose of raising funds.

11          I believe they raise funds only for DZ

12 Bank.  I don't know that to be for certain, but

13 that was the purpose of the establishment of

14 that conduit.  It is owned by Lord Securities,

15 is my understanding, and is a separate entity.

16 It is administered and managed by DZ Bank.

17 That's my understanding.

18     Q.    Your understanding is that Mr. Preece

19 doesn't work for Autobahn, right?

20     A.    I don't recall there being any

21 employees at Autobahn.

22     Q.    So when Mr. Preece said that he's the

23 head of the conduit, the commercial paper

24 conduit at DZ Bank, that would have to be in his

25 capacity as an employee of DZ Bank, right?

1                    WALLACE BAREFOOT BANKHEAD

2        A.    We looked through those bank

3   statements to see where the payments came from,

4   retailers or otherwise.

5        Q.    Right.  Right.  So one of the things

6   you would have observed is which of those

7   payments, if any, came from retailers, right?

8        A.    We would have observed that if it was

9   available on the wire transfer instructions or

10  denoted in the bank statement.

11       Q.    And you would also have observed

12  whether any of those incoming wires were from

13  retailers that matched those that purportedly

14  backed the opportunity loans, right?

15       A.    Assuming the same conditions I

16  mentioned in the prior answer.

17       Q.    In reviewing the M&I account

18  information, did you find evidence of a single

19  payment received into the PCI M&I account that

20  came from BJ's, Boscov's, Rex's or Sam's Club?

21       A.    We did not from a wire transfer or a

22  denotion on a bank statement.

23       Q.    Okay.  And so you didn't observe a

24  single transfer to PCI that constituted one of

25  the retailer receivables identified in

1                  WALLACE BAREFOOT BANKHEAD

2      connection with an Opportunity loan, right?

3          A.      Not from the information available

4      on -- that we looked at, which, again, was just

5      the bank statement notation and the wire

6      transfer instructions.

7          Q.      And you also did an analysis of the PC

8      Funding bank account, right?

9          A.      Yes.

10         Q.      And you also reviewed that account

11     during the relevant period?

12         A.      Yes.

13         Q.      And for that account, you didn't see

14     any evidence of any payments coming in from a

15     retailer that was associated with any of the

16     Opportunity loans, did you?

17         A.      I don't recall that we did.

18         Q.      So it would be correct to say,

19     wouldn't it, that, to the best of your

20     knowledge, not a single one of the transfers

21     from PCI to PC Funding which was made in

22     connection with the Opportunity loans was from

23     money generated by the intended retailer

24     receivables?

25         A.      I don't know that you can say that.

1                   WALLACE BAREFOOT BANKHEAD

2       A.    Yes.  From that Redtag account into

3  the M&I account.

4       Q.    So you don't know whether in fact

5  those payments were investments by Acorn in PCI,

6  do you?

7       A.    I don't know how much of it was, and I

8  haven't done the analysis if they were, how long

9  were they there, what other transactions were in

10  that account besides the transfers to PCI, what

11  other funds were in the Redtag account other

12  than from M&I.

13       Q.    So, with respect to the transfer, that

14  approximately $200 million transfer from Redtag

15  which is connected to Acorn, are you able to

16  testify whether any -- any portion of that was a

17  legitimate transfer to PCI?

18       A.    I haven't been able to do work to --

19  to testify that any transaction was legitimate.

20  Only transactions with legitimate entities.

21       Q.    When you say you haven't been able to

22  do the work, is that because you're missing some

23  documents that you would need to be able to make

24  that determination?

25       A.    That would be part of it.

1           WALLACE BAREFOOT BANKHEAD

2      Q.    And they're bank statements, right?

3      A.    Yes.

4      Q.    And you also have bank account support

5    for Redtag Biz, right?

6      A.    Also have bank account support for

7    Redtag?

8      Q.    That's what's listed at the top of the

9    page.

10     A.    That's what the -- yes, that's what

11   the description is.

12     Q.    So you did have Redtag Biz documents

13   available for you to review, right?

14     A.    I don't recall if -- it doesn't say --

15   I don't recall what bank account specifically or

16   if this is more than one bank account.  I don't

17   recall.

18     Q.    Okay.  But sitting here today, you

19   can't tell me whether the $200 million -- that

20   the transfers from Redtag in connection with

21   Acorn, whether those were legitimate transfers

22   or not, right?

23     A.    I cannot.

24     Q.    And with respect to that $200 million,

25   you did no analysis to determine whether it was

1                WALLACE BAREFOOT BANKHEAD

2    legitimate, did you?

3         MR. HAVELES:  Objection.  Asked and

4      answered.

5      A.    I mean, we didn't do an analysis to

6    determine if any transaction was legitimate.

7    That information wasn't available.  Again, it

8    was just as legitimate entities were defined, of

9    which Redtag was one.

10     Q.    By the way, do you understand that

11   there came a point in time when Fingerhut made

12   payments out of the sales of its real estate to

13   pay back amounts that it had received from --

14   from investors?  Did you understand that?

15     A.    My recollection is that,

16   post-acquisition, that there were sales of

17   certain assets, including real estate.  That's

18   all I recall.  I don't know what the proceeds

19   were used for, only reading some discussion, I

20   believe in a deposition, about the -- the monies

21   that were paid made -- the amount paid and the

22   monies that were made on sales of the assets.

23     Q.    Do you know if any of the proceeds of

24   those real estate sales were sent back to PCI?

25     A.    If they were sent to PCI?

1                    WALLACE BAREFOOT BANKHEAD

2      dominion and control was with the collateral

3      agent as -- was with DZ Bank as collateral agent

4      for the benefit of the secured parties.

5          Q.    Okay.  So does DZ Bank have sole

6      dominion and control, or do all three of those

7      parties have sole dominion and control?

8          A.    DZ Bank, as is read here.

9          Q.    Let me ask you to turn to the page

10     ending with 4148.

11         A.    I'm sorry, what page?

12         Q.    4148?

13         A.    4148.

14              MR. HAVELES:  Section 2.05 on it?

15              MR. LOIGMAN:  Yes.

16              MR. HAVELES:  Thank you.

17     BY MR. LOIGMAN:

18         Q.    So do you see where Section 2.05

19     starts in the middle of page?

20         A.    Yes.

21         Q.    And can you read the last sentence of

22     Section 2.05 in the first paragraph?

23         A.    "No funds shall be transferred from

24     the Collection Account except in accordance with

25     this Section 2.05.  Notwithstanding any other

1                WALLACE BAREFOOT BANKHEAD

2        Q.    Can you tell me what the box "Primary

3   Client Information" means?

4              MR. HAVELES:  Objection.  Foundation.

5        A.    I do not know what U.S. Bank intended

6   it to mean.

7        Q.    And also in this box it lists

8   Opportunity Finance, LLC.  It does not list

9   Opportunity Finance Securitization, right?

10       A.    Does not.

11       Q.    And Opportunity Finance, LLC was the

12  servicer on this loan, right?

13       A.    Yes.

14       Q.    And I think, as you testified, DZ Bank

15  had a perfected security interest in the

16  collection account, right?

17       A.    The -- my understanding is the owner

18  has the perfected security interest in a cash

19  account.

20       Q.    Let me ask you to turn to paragraph

21  77.

22       A.    Paragraph 77?  In my report, correct?

23       Q.    In your report.

24              Do you see in the second sentence you

25  say that, "Opportunity Finance substantively

                    WALLACE BAREFOOT BANKHEAD

1

2    for Borrowing Base Surpluses in the Monthly

3    Remittance Reports total 91,596.033," right?

4         A.    Yes.

5         Q.    And the monthly remittance reports are

6    not themselves the wire transfer requests,

7    right?

8         A.    They are not.

9         Q.    So, in this case, the wire transfer

10   requests that were sent to U.S. Bank would have

11   directed payments of about $89.67 million,

12   right?

13        A.    Yes.

14        Q.    And that differs from the $91,590,000

15   by almost $2 million, right?

16        A.    Yes.

17        Q.    Do you consider that to be an

18   immaterial difference?

19        A.    Yes.

20        Q.    So 2 percent in a lending arrangement

21   is immaterial?

22        A.    Depends.  I mean, for our purposes, we

23   didn't spend a lot of time trying to identify

24   the difference.

25        Q.    Now, the monthly remittance reports,

Page 328

WALLACE BAREFOOT BANKHEAD

1

2    those have calculations of money that may be

3    owed and fees to various parties to the RLSA,

4    right?

5         A.    Yes.

6         Q.    And those calculations you said were

7    primarily performed by Opportunity Finance; is

8    that right?

9         A.    Yes.

10        Q.    And they calculate what might be a

11   borrowing base surplus to be paid to Opportunity

12   Finance Securitization?

13        A.    Yes.

14        Q.    So the purpose of those monthly

15   remittance reports is to set forth how much

16   could be owed to each party?

17        A.    That's one of the purposes, yes.

18        Q.    And in this case, the amount that was

19   actually distributed to the parties did not

20   match the amount that was set forth in the

21   monthly remittance reports, right?

22        A.    You're talking about in this case the

23   89 million versus the 91 million?

24        Q.    Right.

25        A.    Yes, that's correct.

1                 WALLACE BAREFOOT BANKHEAD

2      Q.     And in footnote 97, you say, "As of

3  the report date, documentation has not been

4  identified to explain this difference," right?

5      A.     Yes.

6      Q.     Did you ever determine whether DZ Bank

7  had ever denied written consent for any

8  transfers that were requested with respect to

9  borrowing base surpluses?

10     A.     I don't recall.

11     Q.     Did you ever determine if DZ Bank had

12 recalculated any of the amounts requested by

13 Opportunity Finance and then paid out the

14 amounts that it had calculated?

15     A.     I don't recall.

16     Q.     You also found that U.S. Bank and

17 Royal were paid more than the remittance reports

18 indicated, right?

19     A.     Yes.

20     Q.     And you couldn't explain why that

21 happened either, right?

22     A.     Correct.

23     Q.     Did you ever determine if DZ Bank

24 recalculated the amounts that were in the

25 monthly remittance reports?

Page 330

1                     WALLACE BAREFOOT BANKHEAD

2        A.    I don't recall.

3        Q.    As the agent, did DZ Bank have the

4   authority to recalculate amounts and determine

5   what the correct amount was for the monthly

6   payments?

7        A.    DZ Bank had to approve the transfers.

8   So to the extent that they disagreed with the

9   amount, whether they recalculated or had it

10  recalculated, I don't know, but they certainly

11  would have had the ability to have it

12  recalculated by -- by disapproving it or not

13  approving it.

14       Q.    And the remittance reports constitute

15  what was Opportunity Finance's direction, in

16  your terms, to DZ Bank and the custodian how to

17  distribute the funds, right?

18       A.    Yes.

19       Q.    But you found that it was not always

20  the case that the remittance report allocations

21  were followed, right?

22            MR. HAVELES:  Objection.

23       Mischaracterizes his testimony.

24       A.    Are you talking about these

25  differences in the footnotes?

Page 331

1                  WALLACE BAREFOOT BANKHEAD

2      Q.    Yes.

3      A.    There were differences between the

4  remittance reports and the amount that we

5  identified in the bank account.

6      Q.    So would you agree that Opportunity

7  Finance did not have the last word regarding the

8  payments that would be made out of the DZ Bank

9  collection account?

10           MR. HAVELES:  Objection.

11  Argumentative.

12     A.    The last word was the RLSA, and I've

13  testified several times that DZ Bank had to

14  approve any transfer out of the account.

15           MR. HAVELES:  Close?

16           MR. LOIGMAN:  Why don't we take a

17     three-minute break, and then I'll see if I

18     have just a little bit more.

19           MR. HAVELES:  Because we have like

20     5 -- 7:10 or 7:12 now.  We're about 7:10,

21     7:12 into the deposition.

22           MR. LOIGMAN:  I don't want to take up

23     too much more of the witness's time.

24           THE VIDEOGRAPHER:  The time is 5:56

25     p.m.  We're going off the record.

# EXHIBIT T-5

Page 1

1

2             UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF MINNESOTA
3                    No. 08-45257
    ------------------------------------------------x
4   IN RE:  PETTERS COMPANY, INC., et al.
                         Debtors.
5   (Includes:                     Court File Nos.
    Petters Group Worldwide, LLC;     08-45258 (KHS)
6   PC Funding, LLC;                  08-45326 (KHS)
    Thousand Lakes, LLC;              08-45327 (KHS)
7   SPF Funding, LLC;                 08-45328 (KHS)
    PL Ltd., Inc.;                    08-45329 (KHS)
8   Edge One LLC;                     08-45330 (KHS)
    MGC Finance, Inc.;                08-45331 (KHS)
9   PAC Funding, LLC;                 08-45371 (KHS)
    Palm Beach Finance Holdings, Inc.) 08-45392 (KSH)
10  DOUGLAS A. KELLEY, in his capacity as the
    Trustee of the PCI Liquidating Trust,
11                       Plaintiff,
         v.
12  OPPORTUNITY FINANCE, LLC; OPPORTUNITY FINANCE
    SECURITIZATION, LLC; OPPORTUNITY FINANCE
13  SECURITIZATION II, LLC; OPPORTUNITY FINANCE
    SECURITIZATION III, LC; INTERNATIONAL INVESTMENT
14  OPPORTUNITIES, LLC; SABES FAMILY FOUNDATION; SABES
    MINNESOTA LIMITED PARTNERSHIP; ROBERT W. SABES;
15  JANET F. SABES; JON R. SABES; STEVEN SABES;
    DEUTSCHE ZENTRALGENOSSENSCHAFTBANK AG; AND THE
16  MINNEAPOLIS FOUNDATION,
                         Defendants.
17  ------------------------------------------------x
18      VIDEOTAPED DEPOSITION OF NANCY O'CONNOR
19                    Volume I
20        New York, New York
21        Wednesday, October 17, 2018
22
23  Reported by:
24  Amy A. Rivera, CSR, RPR, CLR
25  JOB NO. 148373

Page 69

1                    NANCY O'CONNOR

2        A.    No.

3        Q.    What was the collateral underlying DZ

4   Bank's loan in these transactions?

5             MR. HAVELES:  Objection.

6        Mischaracterizes the document.

7        Q.    I'm asking generally, what was the

8   collateral that under -- that was underlying DZ

9   Bank's loan?

10            MR. HAVELES:  Objection.

11       Mischaracterizes the document.

12            Alex, if you want me to explain it, I

13       will, but otherwise, I'm limited to just

14       objecting.

15            MR. TSCHUMI:  Sure, you can explain

16       it.

17            MR. HAVELES:  The document

18       specifically says the lender here is

19       Autobahn Funding Company, not DZ Bank.

20       Q.    What was the relationship between

21   Autobahn and DZ Bank?

22       A.    Autobahn was the commercial paper

23   issuer.  DZ Bank had an administrative agreement

24   in place to manage it.

25       Q.    Did Autobahn have separate employees

Page 70

NANCY O'CONNOR

1

2    from DZ Bank?

3        A.    Not to my -- not to my knowledge.

4        Q.    Did Autobahn have a credit group?

5        A.    Yes.

6        Q.    That being the same credit group as DZ

7    Bank?

8        A.    The business unit.

9        Q.    Of DZ Bank?

10       A.    Yes.

11       Q.    Though not reflected in this diagram,

12   do you recall whether the eventual structure of

13   the diagram -- of the transaction incorporated a

14   special purpose entity?

15       A.    I -- I don't recall.

16       Q.    Do you recall whether a special

17   purpose entity owned by PCI in the name of "PC

18   Funding" would make payments to sellers to

19   purchase goods?

20       A.    I don't recall.

21       Q.    Do you see where it's marked "8," it

22   says:  "The retailer pays on the account

23   receivable directly to the financing source,"

24   correct?

25       A.    Correct.

1                        NANCY O'CONNOR

2          Q.    As a credit officer reviewing this

3    document and having a history of reading credit

4    applications, does that represent the material

5    omission?

6               MR. HAVELES:  In what document now are

7          you asking is it a material omission?

8               Are you speaking in the abstract or

9          are you speaking about something in

10         particular?

11         Q.    Did certain DZ Bank employees' failure

12   to mention that funds were not flowing as intended

13   under the transaction structure of the deal, did

14   that constitute a material omission in the

15   December 12, 2002 credit application?

16         A.    In my personal opinion, yes.

17         Q.    And why is that?

18         A.    Because you wanted to be sure that the

19   client is adhering to the documentation as it was

20   signed by them and relied upon by the bank.

21         Q.    And why is it important to know that

22   the client is adhering to the intended structure

23   and documentation of the deal?

24         A.    Because part of what they did in the

25   asset securitization group was structure the

# EXHIBIT T-6

```
 1                    CONFIDENTIAL

 2          UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF MINNESOTA
 3                   No. 08-45257
     ---------------------------------------------x
 4   IN RE:  PETTERS COMPANY, INC., et al.
                      Debtors.
 5   (Includes:                    Court File Nos.
     Petters Group Worldwide, LLC;    08-45258 (KHS)
 6   PC Funding, LLC;                 08-45326 (KHS)
     Thousand Lakes, LLC;             08-45327 (KHS)
 7   SPF Funding, LLC;                08-45328 (KHS)
     PL Ltd., Inc.;                   08-45329 (KHS)
 8   Edge One LLC;                    08-45330 (KHS)
     MGC Finance, Inc.;               08-45331 (KHS)
 9   PAC Funding, LLC;                08-45371 (KHS)
     Palm Beach Finance Holdings, Inc.) 08-45392 (KSH)
10   DOUGLAS A. KELLEY, in his capacity as the
     Trustee of the PCI Liquidating Trust,
11                       Plaintiff,
          v.
12   OPPORTUNITY FINANCE, LLC; OPPORTUNITY FINANCE
     SECURITIZATION, LLC; OPPORTUNITY FINANCE
13   SECURITIZATION II, LLC; OPPORTUNITY FINANCE
     SECURITIZATION III, LC; INTERNATIONAL INVESTMENT
14   OPPORTUNITIES, LLC; SABES FAMILY FOUNDATION; SABES
     MINNESOTA LIMITED PARTNERSHIP; ROBERT W. SABES;
15   JANET F. SABES; JON R. SABES; STEVEN SABES;
     DEUTSCHE ZENTRALGENOSSENSCHAFTBANK AG; AND THE
16   MINNEAPOLIS FOUNDATION,
                      Defendants.
17   ---------------------------------------------x

18       VIDEOTAPED DEPOSITION OF PATRICK PREECE

19          New York, New York

20          Thursday, October 18, 2018

21

22

23

24   Reported by: Amy A. Rivera, CSR, RPR, CLR

25   Job No: 148374
```

1          PATRICK PREECE - CONFIDENTIAL

2          Q.    And were a number of those trade

3   receivables based?

4          A.    There were a couple of trade

5   receivables, I believe.

6          Q.    Okay.  Were a number of -- and if I'm

7   asking about the same thing, let me know, but

8   were -- well, let me ask it this way:  Did -- did

9   ASG also provide financing to transactions

10  involving the purchase and sale of goods?

11         A.    I believe they did.

12         Q.    Okay.  Do you remember how often that

13  kind of transaction was financed?

14         A.    I don't.

15         Q.    I want to talk a little bit just about

16  how ASG made money for DZ Bank.

17              When ASG provided financing to a

18  borrower, how did ASG or how did DZ Bank earn

19  revenue on that financing?

20         A.    Can you say it a different way?

21         Q.    Sure.

22              Let's say ASG provided, say, a

23  revolving credit line to a borrower.  Were there

24  fees that were paid to DZ Bank in connection with

25  providing that revolving credit line?

1                 PATRICK PREECE - CONFIDENTIAL

2          A.    There were.

3          Q.    Okay.  What -- what sort of -- I

4    know -- was there an up-front fee?

5          A.    It depended on the transaction.

6    Sometimes there was an up-front fee.  Sometimes it

7    was just a program fee.

8          Q.    Okay.  What's the difference between

9    those two?

10         A.    A up-front fee is paid up front, and a

11   program fee would be paid on a monthly, quarterly,

12   biannually basis, depending on how much you use

13   the -- the facility that was put in place.

14         Q.    Are there any other fees that ASG

15   would charge to the borrower that you can think

16   of?

17         A.    Amendment fees, nonuse fees.

18               I can't recall anything else.

19         Q.    Was -- did ASG earn interest from the

20   borrower on drawdowns from revolving credit lines?

21         A.    They earned a program fee that could

22   be akin to an -- to interest.

23         Q.    Okay.  And how does a program fee

24   work?

25         A.    If you're being charged commercial

1          PATRICK PREECE - CONFIDENTIAL

2    paper plus 300 basis points on a transaction,

3    whatever the commercial paper rate is, that's

4    passed through to the commercial paper investors,

5    and the program fee of 300 basis points is

6    multiplied by the outstanding loan balance, and

7    it's then adjusted for whether it's a one-month

8    period or an annual period or a one-week period,

9    and it's calculated that way, and that's the cost

10   of -- that's the cost of the -- to the customer.

11        Q.    And it varied between -- it varied

12   from transaction to transaction as to whether a

13   program fee might be charged, or were they charged

14   on all transactions?

15        A.    We charged a program fee on

16   everything.

17        Q.    Okay.  Any other revenue sources that

18   you can think of that ASG would earn in connection

19   with providing financing to a borrower?

20        A.    Not off the top of my head.

21        Q.    Where did you go when you left -- let

22   me ask it this way:  Did you -- did you leave DZ

23   Bank in connection with the fact that you had had

24   to bring arbitration against them?

25        A.    I did.

1              PATRICK PREECE - CONFIDENTIAL

2      goods are purchased as is, or was it referring to

3      the notion that goods were never broken over the

4      course of the transactions?

5           A.    I -- I couldn't tell you.  I don't

6      recall.

7           Q.    Assuming that dilution refers

8      specifically to breakage of goods, would you find

9      it unusual that across $600 million of goods

10     transactions there would never be a single

11     instance of breakage?

12              MR. HERSCHLEIN:  Object to --

13              MR. CHIACHETTI:  Objection.

14          Mischaracterizes.  Speculation.

15              MR. HERSCHLEIN:  Object to form.

16              MR. WALDMAN:  I'm talking about the

17          document.

18          A.    Based on the way this is written, it

19     is my assumption not that there wasn't any

20     breakage, but that the clients would have bought

21     it at a deep enough discount that it would have

22     been built in.  It would have been on an as-is

23     basis.

24              That would have been my assumption

25     based on reading this.

```
 1              PATRICK PREECE - CONFIDENTIAL
 2         Q.    Okay.  What's the source of your
 3    saying that that would be your assumption?
 4         A.    Because there's always some dilution.
 5    There's always -- on 600 million, there would
 6    always be at least -- there would always be at
 7    least some breakage of goods, but there would
 8    never be any dilution in the receivable.  The
 9    receivable itself would be paid in full based on
10    the contractual terms of whatever they were.
11              So that's why my assumption is it was
12    on an as-is -- purchased on an as-is basis at a
13    deep discount.
14         Q.    Do you -- on a -- do you have a sense
15    of, say, across $600 million worth of -- or let me
16    ask it this way:  Do you have a sense of what
17    percentage of goods across, say, a -- what
18    percentage of goods in a typical purchase and sale
19    transaction might be subject to dilution --
20    subject to -- sorry -- let me ask it this way:
21    Subject to the kind of breakage that you're
22    talking about?
23              MR. HERSCHLEIN:  Object to form.
24              MR. CHIACHETTI:  Objection.  Lack of
25         foundation.  Speculation.
```

1                PATRICK PREECE - CONFIDENTIAL

2          A.     I don't understand your question.

3          Q.     Let me ask it this way:  The -- the

4     paragraph indicates that the five-year facility is

5     provided by Autobahn, right?

6          A.     Correct.

7          Q.     Okay.  Before Autobahn could provide

8     that facility, Autobahn, presumably, needed

9     approval, right?

10         A.     Correct.

11         Q.     Okay.  And that approval would come

12    from DZ Bank's board -- ultimate approval would

13    come from DZ Bank's board located in Germany?

14         A.     Correct.

15         Q.     That's my question.

16                In general, do you know whether

17    Autobahn was able to extend the credit lines

18    without getting approval from DZ Bank?

19                MR. CHIACHETTI:  Objection.

20         Speculation.

21         A.     I don't know if it's ever happened.

22    That wasn't the process.

23         Q.     As far as you know, it's never

24    happened?

25         A.     As far as I know.

# EXHIBIT T-7

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                    )
      UNITED STATES OF AMERICA,       )  File No. 08 CR 364
 4                                    )           (RHK/JJK)
              Plaintiff,              )
 5                                    )
      vs.                             )  Saint Paul, Minnesota
 6                                    )  November 12, 2009
      THOMAS JOSEPH PETTERS,          )  9:00 a.m.
 7                                    )
              Defendant.              )
 8    ------------------------------------------------------------
 9
         BEFORE THE HONORABLE RICHARD H. KYLE and a Jury
10            UNITED STATES DISTRICT COURT JUDGE
                  (JURY TRIAL - VOLUME XI)
11
      APPEARANCES
12     For the Plaintiff:        UNITED STATES ATTORNEY
                                 JOHN R. MARTI, AUSA
13                               JOSEPH T. DIXON, III, AUSA
                                 TIMOTHY C. RANK, AUSA
14                               300 South Fourth Street
                                 Suite 600
15                               Minneapolis, Minnesota 55415

16     For the Defendant:        FELHABER LARSON FENLON & VOGT PA
                                 JON M. HOPEMAN, ESQ.
17                               ERIC J. RIENSCHE, ESQ.
                                 220 South Sixth Street
18                               Suite 2200
                                 Minneapolis, Minnesota
19                               55402-4504

20                               ENGH LAW OFFICE
                                 PAUL C. ENGH, ESQ.
21                               220 South Sixth Street
                                 Suite 215
22                               Minneapolis, Minnesota  55402

23

24

25
```

 1          And we'll start your testimony by asking you to

 2     give us your full name and if you would spell your last

 3     name.

 4          THE WITNESS:  Patrick Francis Preece.  P as in

 5     Patrick, R-E-E-C-E.

 6          THE COURT:  Mr. Dixon, you may proceed.

 7                    DIRECT EXAMINATION

 8     BY MR. DIXON:

 9     Q.  Good morning, Mr. Preece.

10     A.  Good morning.

11     Q.  And if you would speak into the microphone, we have a

12     court reporter over there.

13     A.  Okay.

14     Q.  Mr. Preece, where do you live?

15     A.  I live in Greenwich, Connecticut.

16     Q.  And where do you work?

17     A.  At DZ Bank.

18     Q.  And, sir, what is DZ Bank?

19     A.  DZ Bank is Deutsche Zentral-Genossenschaftsbank.

20     Q.  I think you're going to have to slow down and spell that

21     for our court reporter.

22     A.  I actually couldn't spell that for you.  I'll give you a

23     business card.  It's a German cooperative which means it's a

24     central bank for the German Cooperative Sector, which means

25     it's owned by 1230 other German banks.

1   Q.  Okay.  And they have an American subsidiary; is that

2   right?

3   A.  It is.  And that's why it goes by DZ Bank.  It's much

4   more simple.

5   Q.  And what do you do for a living?

6   A.  I am the head of the conduit, the commercial paper

7   conduit at DZ Bank.

8   Q.  How long have you worked for DZ Bank?

9   A.  Since April 1st, 2000.

10   Q.  And at some point in approximately 2001, did you begin

11   looking at a partnership opportunity investing in Petters

12   Company, Inc.?

13   A.  It was actually a financing through Opportunity Finance,

14   which was then financing Petters, Incorporated.

15   Q.  So as I understand it, DZ Bank was going to invest in

16   Opportunity Finance, which in turn invested in Petters

17   Company, Inc.?

18   A.  Yes, sir.  But you say "financing" and we were actually

19   providing financing to.  We weren't actually investing in

20   the company, but providing financing to Opportunity Finance,

21   which would in turn finance Petters.

22   Q.  And what do you mean by the distinction there?

23   A.  One is you actually make an investment in a company.

24   The other is you actually finance the assets.  One is debt

25   and one is equity.

1    Q.  And you were providing debt?

2    A.  Debt.

3    Q.  And did you at some point in late 2001 travel to Petters

4    Company, Inc., in Minnesota?

5    A.  Yes, as part of our due diligence on the transaction we

6    met with both Opportunity Finance and then went over to

7    Petters Company.

8    Q.  And who, if you recall, did you meet with at Petters

9    Company, Inc.?

10   A.  The only person I remember at this point meeting is Tom

11   Petters.

12   Q.  Were there other people there?

13   A.  I am sure there were other people there.  I don't

14   remember.  The gentleman that did most of the talking was

15   Tom Petters.

16   Q.  And what do you recall the description of the investment

17   of Opportunity Finance in Petters Company, Inc., what was

18   the business?

19   A.  Again, it was the financing of a business, not the

20   investment.  But what they were doing was -- my

21   understanding of what they were doing, is that they would

22   purchase very large volumes of goods from distributors of

23   Sony, Mont Blanc, whatever it was, and then they would,

24   because of the buying discount, be able to divert the goods

25   to a Costco, Sam's, Wal-Mart, and make a profit by doing

```
 1    that.
 2    Q.  And do you recall sort of specific recitation of
 3    retailers they had relationships with?
 4    A.  Yes.  Boscov's, BJ's, Costco.  It was the large discount
 5    warehouse entities.
 6    Q.  And so Mr. Petters was telling you he had relationships
 7    with those retailers?
 8    A.  Absolutely.
 9    Q.  And do you remember who the suppliers of these goods
10    were to Petters Company, Inc.?
11    A.  There was a company called Enchanted.  I can't remember
12    the other one.  I can't remember it.
13    Q.  Does the word NIR or Nationwide --
14    A.  Nationwide was the other one.
15    Q.  And did you -- do you do these kinds of financings often
16    in your business?
17    A.  We do not do necessarily diverted goods financings in
18    our business, but we do a multitude of different commercial
19    paper programs for different companies.
20    Q.  And when you finance the purchase and sale of goods, do
21    you typically do due diligence on the goods?
22    A.  Absolutely.
23    Q.  And what do you mean by "due diligence"?
24    A.  What we tend to do is we tend to check the purchase
25    orders.  Sometimes we actually contact the retailers.  We
```

 1    check the warehouses to make sure that the goods are there

 2    and our attorneys were able to step on the goods and make

 3    sure that they exist.

 4    Q.  Now, when you first were dealing with Petters Company,

 5    Inc., were you allowed to step on the goods?

 6    A.  No, we were not.

 7    Q.  Did you decide to go forward with the financing

 8    nevertheless?

 9    A.  What we were able to do, the transaction that was

10    presented to us had an insurance wrap by a company called

11    Royal & Son Alliance, a large insurance company, that would

12    take any of that risk.  So to me that was then their

13    position to get comfortable or not get comfortable with

14    whether they could look at the goods or not.

15    Q.  And so you decided to go forward with the financing?

16    A.  Yes.

17    Q.  I'm going to ask you if you know the name Deanna Munson?

18    A.  I've met Deanna once before, yes.

19    Q.  Do you know who she was or what she did?

20    A.  I know she was high up within Petters.  I'm not exactly

21    sure what she did.

22    Q.  And what about Bob White?  Do you know the name Bob

23    White?

24    A.  I met the Bob White once.  I'm not sure what he did

25    either.

1  Q.  Now, at some point what kind of financing did you or did

2  Opportunity Finance, with your assistance, provide Petters

3  Company, Inc.?

4  A.  What we provided Opportunity Finance with was a trade

5  receivable revolving credit facility where as long as they

6  had eligible assets, we would finance it.  What then

7  Opportunity Finance was supposed to be doing is then

8  purchasing receivables from Petters Company that were

9  receivables from the warehouse lines.  I'm sorry, the big

10  warehouse companies.

11  Q.  The retailers?

12  A.  The retailers, the Boscov's, the BJ's, people of that

13  nature.

14  Q.  How big was the credit facility you, DZ Bank, provided

15  to Opportunity Finance?

16  A.  $100 million.

17  Q.  And that went forward in 2002?

18  A.  2002, yes.

19  Q.  Now, at some point was there an issue where the

20  insurance essentially went away?

21  A.  The -- there was a trigger.  A trigger meaning it can

22  stop the transaction.  There was a trigger based on the

23  rating of Royal & Son Alliance, and the rating of Royal &

24  Son Alliance started to decrease.  And so, therefore, Royal

25  & Son Alliance called the trigger on the transaction itself.

1    Q.  And so as a result of the problem with the insurance,

2    did DZ Bank want to take different steps to protect itself

3    on its financing?

4    A.  What we had -- we had to make the decision at that point

5    on whether we were willing to do the transaction without the

6    insurance or not.  So that's what we were deciding at that

7    point.

8    Q.  If you didn't have insurance, what did you want to do?

9    A.  If I didn't have insurance, then the risk of

10   investigating whether the goods existed or not existed was

11   then our risk.  And we wanted to be able to -- then we had

12   to revisit the whole idea of whether we could search for the

13   goods and see if they existed or not.

14   Q.  Step on the goods?

15   A.  Step on the goods.

16   Q.  And so what did you do to try to be able to step on the

17   goods?

18   A.  We, again, requested from Mr. Petters the ability to go

19   to the warehouse companies, the Enchanted, the sellers, and

20   see the goods.  We asked whether we could contact the

21   retailers and verify the receivables.  These are the things

22   that we requested.

23   Q.  Did you actually have a meeting with Mr. Petters?

24   A.  I did.

25   Q.  And tell me where was that.

1   A.  That meeting was in Las Vegas during the CES, the

2   Consumer Electronics Show.

3   Q.  This is February of 2003?

4   A.  It would be 2003, yes.

5   Q.  And so describe the meeting you had with him.

6   A.  It was in his suite, and I was with John Sabes, and the

7   three of us talked about how DZ Bank could get comfortable

8   moving forward with financing this -- the Opportunity

9   Finance deal without the wrap.  And --

10  Q.  You said "wrap".  You're talking the insurance?

11  A.  I'm sorry.  The insurance.  We call it a wrap.  The

12  insurance on the transaction.

13  Q.  And so you asked to step on the goods?

14  A.  I asked Mr. Petters for access to the inventory.

15  Q.  And what was his response?

16  A.  His response was that -- can I use a direct quote?

17  There's profanity in it.

18          THE COURT:  We've heard a little of that before.

19          THE WITNESS:  All right.  He said that GE Capital

20  had fucked up his situation before by searching warehouses,

21  and that he didn't want that to happen again.  He didn't

22  want his relations to be fucked up with the retailers.

23  BY MR. DIXON:

24  Q.  And he didn't want you to step on the goods?

25  A.  He did not want that, no.

1   Q.  Did he describe to you or give you an analogy as to how

2   PCI finances worked?

3   A.  He said that he understood that, you know, the financing

4   was a little erratic that he had had; and he made the

5   example of -- he said it was like the difference in

6   infrastructure between Colorado Springs, Colorado and

7   Denver, Colorado.  He said one had time to plan everything

8   out and the infrastructure worked.  The other one just built

9   roads as they built roads.  And he said unfortunately that's

10  how his financing was.  He got investor money where he could

11  get investor money, and that it was kind of screwed up right

12  now, and that he was working very seriously to try to get

13  everything straightened out.

14  Q.  So Denver had straight roads and Colorado Springs didn't

15  have straight roads?

16  A.  To tell you the truth, I don't remember.  I have never

17  been to either city.  I don't remember which one was the

18  screwed up one and which one was the right one.  Just the

19  analogy stuck with me that one was really screwed up and

20  that's how his financing was, and one was very clean.

21  Q.  Which he did not have?

22  A.  Which he did not have.  But he promised that he was

23  going to get there, and he was going to get me to a place

24  where I could see the goods and he would get me comfortable

25  with this project.

1    Q.  And did he ever fulfill his promise to do that?

2    A.  No.

3    Q.  And so what did DZ Bank do with its financing?

4    A.  So DZ Bank -- when the wrap went away, DZ Bank went

5    away.

6                MR. DIXON:  No further questions.

7                     CROSS-EXAMINATION

8    BY MR. ENGH:

9    Q.  Good morning, Mr. Preece.

10   A.  Good morning.

11   Q.  Let me start at the beginning here.  You were asked by

12   the Sabes family -- I assume it was John?

13   A.  Yes.

14   Q.  To fund their entity, which was in turn funding

15   Mr. Petters; is that correct?

16   A.  Correct.

17   Q.  And what happened is, is that they were loaning money to

18   Petters for a higher rate than you were going to charge

19   them; is that correct?

20   A.  They were loaning money at a higher rate to Mr. Petters

21   than I was charging the Opportunity Finance Company, yes.

22   Q.  So there was what they call in your business a "spread"

23   involved; isn't that right?

24   A.  Absolutely.

25   Q.  And that's where the Sabeses were making their money,

1    provided all the deals worked out; isn't that correct?

2    A.  Absolutely.

3    Q.  What, if you remember, was your interest rate back in

4    2001 when you first started here?

5    A.  It was commercial paper plus somewhere between 250, 300

6    basis points.

7    Q.  Why don't you tell us all what a basis point is.

8    A.  I'm sorry.  A hundred basis points is 1 percent.  So it

9    would be commercial paper plus somewhere between 2 and a

10   half and 3 percent.

11   Q.  I realize it's ten years ago but do you remember what

12   commercial paper was going for in about 2001?

13   A.  Not off the top of my head, I'm sorry.

14   Q.  Can you give us an estimate?  I don't want you to guess,

15   but as best you can do it.

16   A.  It was fairly low, as I recall; 3 percent maybe.

17   Q.  Do you remember what the Sabeses were charging

18   Mr. Petters for money?

19   A.  I don't remember what the Sabeses were charging.

20   Q.  So the initial deal had security for you in the form of

21   insurance; is that right?

22   A.  Um-hum.

23              THE COURT:  Is that a yes?

24              THE WITNESS:  I'm sorry, yes.

25   BY MR. ENGH:

1    Q.  So that if something happened, at least you would be

2    covered with the value of goods being reimbursed; is that

3    right?

4    A.  Yes.

5    Q.  Which is the purpose, as we all know, of insurance;

6    right?

7    A.  Correct.

8    Q.  Were you aware that the Sabeses had a pre-existing

9    relationship with Mr. Petters and had been doing business

10   with him before then or not?

11   A.  Yes.

12   Q.  Was it John Sabes alone whom you dealt with, do you

13   remember, or was it Bob?

14   A.  Ninety-five percent of the time.  I had met all three

15   Sabeses, the father Bob, the brother Steve, and the other

16   brother John.  But primarily it was John Sabes.

17   Q.  So what happened here is that you couldn't get

18   confirmation of the goods.  You had some problems with an

19   insurance company and you backed out; is that right?

20   A.  Correct.

21   Q.  The insurance company you mentioned had a rating

22   problem?

23   A.  Correct.

24   Q.  Would that mean that there was -- well, why don't you

25   tell me what it is rather than me asking you.

1    A.  What a rating problem is?

2    Q.  What was their rating problem?

3    A.  They were, I believe, double A minus rated when we took

4    them on; and then they had quite a few problem deals that

5    they had to pay out on and they were in a free fall, so to

6    speak, where they had gone down to a plus, then a single A,

7    then A minus, and I believe it was triple B, triple B plus

8    that gave us a problem.

9    Q.  So you had a concern that they wouldn't be able to back

10   up a loss should a loss occur?

11   A.  Correct.  That's why you have rating triggers in the

12   transaction because if I count on an insurance wrap and the

13   insurance wrap is no longer viable, then I don't have it.

14   Q.  And at that point Deutsche Bank got out of the

15   transaction?

16   A.  Well, it's DZ Bank.

17   Q.  DZ Bank.  I didn't even want to try to pronounce it.

18   A.  It's different from Deutsche Bank.  But, yes, then we

19   got out of the transaction.

20   Q.  You were fully paid?

21   A.  Yes.

22   Q.  Sabeses made sure all was right with you; is that

23   correct?

24   A.  Yes.

25   Q.  Did you have another relationship with a hedge fund that

1    was run by Marlon Quan?

2    A.  Yes, we do.

3    Q.  When did that develop, if you remember?

4    A.  2007.

5    Q.  Were you aware that Marlon Quan was funding Petters

6    receivables, as well?

7    A.  Yes.

8    Q.  Did you ever disclose that you were the senior lender

9    for Marlon Quan's hedge fund?

10   A.  Disclose to who?

11   Q.  Were you required to disclose that to anyone, do you

12   remember?

13   A.  Are you talking about anybody to do with this trial?

14   Q.  Right.

15   A.  Yes, I did disclose it, I believe.

16   Q.  And to whom did you disclose it to?

17   A.  Mr. Dixon, I believe.

18   Q.  Mr. Quan ran Acorn Capital; is that right?

19   A.  Yes.

20   Q.  You -- your company, after you got out of working with

21   the Sabeses, found an attractive deal to do with Petters for

22   Polaroid, did you not?

23   A.  Correct.

24   Q.  You were interested in stepping on Polaroid goods that

25   were sold to the big-box retailers; is that right?

1   A.  Correct.

2   Q.  And who was the salesman that you talked to about this

3   Polaroid opportunity that you took on?

4   A.  Salesman.  What do you mean by "salesman"?

5   Q.  Did Petters pitch this deal to you for Polaroid or did

6   someone else from his operation?

7   A.  John Sabes was the one who came to us on the transaction

8   from Opportunity Finance.

9   Q.  So he was -- his hedge fund was funding Polaroid and,

10  again, you funded him so he could fund Polaroid?

11  A.  Technically I don't think his company is a hedge fund.

12  But, yes, his company was the one that approached us to fund

13  him to then, in turn, fund Petters.

14  Q.  So despite your concerns about insurance in the past,

15  you renewed your funding around 2004?

16  A.  Yes.  But if you also understand that, you know, the

17  fact that we were able to look at the goods on Polaroid was

18  the difference between the two transactions.

19  Q.  Right.  I was going to ask you about that.  You were

20  able to inspect the goods?

21  A.  Yes.

22  Q.  And that included DVD products?

23  A.  Yes.  Mr. Petters used a third party logistics company,

24  I believe out of California, that would be the one that

25  would take in all the goods from China.  And we were able to

 1    go out there and see warehouses full of DVDs, TVs, and

 2    actually open up some of the -- some of the boxes and see

 3    the DVD players and the TVs.

 4    Q.  And your understanding is once they got to California

 5    from China, then they were shipped to the distribution

 6    centers for the various big-box retailers?

 7    A.  If you mean the distribution centers for Sam's Club?

 8    Q.  Correct.

 9    A.  Yes.

10    Q.  And he was doing business with Best Buy at this time,

11    too, right?

12    A.  Best Buy wasn't the predominant person we were told that

13    they were doing business with.

14    Q.  And you recall that the DVDs were selling for about $200

15    a pop?

16    A.  Yes, they were.

17    Q.  You were impressed with the product?

18    A.  I was.  It was difficult to get one.  Best Buy was out

19    of them all the time.

20    Q.  Sold like hot cakes?

21    A.  Exactly.

22    Q.  You also were aware that Petters was basically the -- at

23    least in your perception -- was the salesman for the

24    company; is that right?

25    A.  Salesman for Petters?

1    Q.  Yeah, he was the sales guy.

2    A.  That was my understanding.

3    Q.  And the details were left to people like Deanna Coleman,

4    Bob White?

5    A.  See, I don't really know who the details were left to.

6    All I know is that it was -- the transaction -- to me,

7    Mr. Petters was the heart and soul.  I don't know what they

8    actually did, Deanna Munson and Bob White.

9    Q.  Well, did you have a conversation with the FBI in

10   mid-October?  October 14th, 2009, did they interview you, do

11   you recall?

12   A.  By phone.  I'm not sure of the date.

13   Q.  Well, I represent to you that it's the 14th.

14   A.  Okay.

15   Q.  There's no dispute there.  Did you tell the FBI then

16   that you found Petters to be bright and that he knew enough

17   to cut the deal?

18   A.  Oh, I thought him to be very bright.

19   Q.  And he could close the deal, right?

20   A.  I was sure that he was a good salesman, yes.

21   Q.  But the details he left to others?

22   A.  Again, I wouldn't know.

23          MR. ENGH:  Fair enough.  Thank you.  No further

24   questions.

25          MR. DIXON:  Nothing further.

# EXHIBIT T-8

Page 1

1          UNITED STATES BANKRUPTCY COURT
               DISTRICT OF MINNESOTA
2                  No. 08-45257
    ---------------------------------------------x
3   IN RE: PETTERS COMPANY, INC., et al.
4              Debtors.
5   (Includes:                    Court File Nos.
    Petters Group Worldwide, LLC;      08-45258 (KHS)
6   PC Funding, LLC;                   08-45326 (KHS)
    Thousand Lakes, LLC;               08-45327 (KHS)
7   SPF Funding, LLC;                  08-45328 (KHS)
    PL Ltd., Inc.;                     08-45329 (KHS)
8   Edge One LLC;                      08-45330 (KHS)
    MGC Finance, Inc.;                 08-45331 (KHS)
9   PAC Funding, LLC;                  08-45371 (KHS)
    Palm Beach Finance Holdings, Inc.) 08-45392 (KHS)
10  DOUGLAS A. KELLEY, in his capacity
    as the Trustee of the PCI Liquidating Trust,
11
                  Plaintiff,
12
        v.
13
    OPPORTUNITY FINANCE, LLC; OPPORTUNITY FINANCE
14  SECURITIZATION, LLC; OPPORTUNITY FINANCE
    SECURITIZATION II, LLC; OPPORTUNITY FINANCE
15  SECURITIZATION III, LC; INTERNATIONAL INVESTMENT
    OPPORTUNITIES, LLC; SABES FAMILY FOUNDATION;
16  SABES MINNESOTA LIMITED PARTNERSHIP;
    ROBERT W. SABES; JANET F. SABES; JON R. SABES;
17  STEVEN SABES; DEUTSCHE ZENTRALGENOSSENSCHAFTBANK
    AG; AND THE MINNEAPOLIS FOUNDATION,
18
                  Defendants.
19
    ---------------------------------------------x
20
21      VIDEOTAPED DEPOSITION OF DEANNA COLEMAN
               Minneapolis, Minnesota
22        Thursday, November 15, 2018
23
24
    Reported by:  Amy L. Larson, RPR
25  Job No. 150538

COLEMAN

1

2   A.   Or purchase order, I mean.

3   Q.   When you say at the end, this is referring to

4        2008?

5   A.   Yes.

6   Q.   Prior to 2008, did that situation exist with

7        Opportunity Finance and Mr. Sabes?

8   A.   Well, the one with Jon Sabes about the wire,

9        that was prior to that, but yeah,

10       otherwise --

11  Q.   I'm talking about when you -- the story you

12       just told about making up which notes were

13       being paid --

14  A.   No.

15  Q.   Okay.  What about with respect to Lancelot?

16       Did Lancelot ever know that -- did you ever

17       tell Lancelot the documents you were

18       preparing were fake?

19  A.   No.

20  Q.   Did Lancelot ever know or any representatives

21       of Lancelot ever know the documents were

22       fake?

23            MR. TSCHUMI:  Objection;

24       speculation.

25            THE WITNESS:  I don't know that

1                          COLEMAN

2    A.   Yes, it would be the -- the difference of

3         what PC Funding was not providing.

4    Q.   Okay.  And do you know what that percentage

5         was that PC Funding was providing, do you

6         recall, rather?

7    A.   I don't.

8    Q.   Okay.  And who would make the arrangements to

9         transfer funds into the PC Funding account?

10   A.   I would.

11   Q.   And typically when did you do that?

12   A.   It would have to be done before Steve would

13        wire the funds to the vendor.

14   Q.   Okay.  So then the -- Mr. Sabes or

15        Opportunity Finance have funds wired from the

16        PC Funding account to the vendors; is that

17        correct?

18   A.   Correct.

19   Q.   And then what happened?

20   A.   Then sometimes the same day or the next day

21        the vendor would wire the money back to the

22        Petters Company, Inc.

23   Q.   A hundred percent?

24   A.   Less their commission.

25   Q.   And what was the typical commission that they

Page 248

1                          COLEMAN

2      received?

3   A.  Oh, it was like half -- I don't remember

4      offhand.  If it was like a half percent.

5   Q.  Okay.  And then what was the payment terms in

6      terms of when was the money supposed to be

7      repaid to Opportunity Finance?

8   A.  It was on the promissory note, so most of

9      them were 60 days, some were 90 days.

10  Q.  And for the 60 to 90 days when Opportunity --

11     when Petters Company had the money back from

12     the vendor, what did -- what did the Petters

13     Company do with that money before it repaid

14     Opportunity Finance?

15  A.  Sometimes pay another note to PC Funding, use

16     their own money to pay off another note,

17     sometimes pay other investors.

18  Q.  And did you use it for intercorporate

19     transfers as well?

20              MR. TSCHUMI:  Objection to form.

21              THE WITNESS:  Some of it, a little

22     bit of it.

23  BY MR. HAVELES:

24  Q.  Well, did you keep track as to how much money

25     from any investor was used for intercorporate

Page 249

1                          COLEMAN

2        transfers, when you say a little bit of it?

3                    MR. TSCHUMI:  Objection to form.

4                    THE WITNESS:  Well, Sabes's dollar

5        amounts was always in the millions.

6                    MR. HAVELES:  Yes.

7                    THE WITNESS:  And when I sent

8        money to the other companies, usually it was

9        less than that, quite a business less than

10       that.  So if we did use part of the money for

11       another company, it would be very little, a

12       portion of it.  Most of it went to pay other

13       investors.

14   BY MR. HAVELES:

15   Q.  And what money would you use to send money to

16       PC Funding when the 60- to 90-day period

17       expired?

18   A.  Other investors.

19   Q.  Or the PC Funding money itself, if you held

20       on to it, because you said --

21   A.  No, we didn't hold -- not when it expired.

22       We didn't hold it for 60 to 90 days.

23   Q.  Okay.  Did you use new money from PC Funding

24       to pay old money to PC Funding?

25   A.  Yes.

```
 1                        COLEMAN

 2   Q.  Is that one of his banks?

 3   A.  Yes.

 4   Q.  Okay.  Is this the -- a typical exchange that

 5       you had with Mr. Reynolds?

 6   A.  Sometimes, yeah.

 7   Q.  When you say, "Sometimes," what would

 8       occasion you to have an e-mail exchange like

 9       this with him?

10   A.  An e-mail or verbal, just telling him what

11       he's getting in.

12   Q.  It's more than telling him what to get in,

13       correct?

14              MR. TSCHUMI:  Objection to form.

15              THE WITNESS:  And telling him what

16       he's going to be severing.  I guess, I'm

17       not --

18   BY MR. HAVELES:

19   Q.  Don't you always say what he's supposed to

20       wire back?

21   A.  Yes.

22   Q.  Okay.  So after he gets the money, you're

23       telling him what you respect -- expect to

24       receive back from him sometime in the next 24

25       hours?
```

1                            COLEMAN

2    A.   Correct.

3    Q.   Did you ever disclose to anyone at

4         Opportunity Finance that monies that went --

5         that were sent to Nationwide or Enchanted by

6         PC Funding were returned to you within 24 --

7         returned to the Petters Company within 24

8         hours?

9    A.   No.

10                  MR. TSCHUMI:  Objection to form.

11   BY MR. HAVELES:

12   Q.   Do you know if anyone at the Petters Company

13        ever advised anyone at Opportunity Finance

14        about that practice?

15                  MR. TSCHUMI:  Objection to form,

16        speculation.

17                  THE WITNESS:  I don't.

18   BY MR. HAVELES:

19   Q.   Let me ask you to look at Exhibit 34.

20        Exhibit 34 is an e-mail from Debbie Lindstrom

21        to Barry Smith dated July 8, 2002, with

22        copies to Richard Menczynski and to you.  It

23        bears the Bate numbers POF70408-001 [sic]

24        through 0002.

25                  Do you recall this e-mail exchange?

Page 364

COLEMAN

1

2      you going to mark it?  That's all I'm asking.

3                MR. TSCHUMI:  Yeah, could we

4      please mark this as Exhibit 79.

5                (Whereupon, Exhibit 79 was

6                marked for identification.)

7  BY MR. TSCHUMI:

8  Q.  And it's a little bit confusing because

9      there's pagination at the very bottom, but

10     some of the pagination is also in the middle,

11     so if you could ignore the pagination at the

12     bottom, I'll try to reference to the other

13     pages that correspond with the line numbers.

14              Would you mind turning to what is

15     page 127.

16 A.  (Complies.)

17 Q.  And the page at the bottom for that will be

18     page 11, actually.  Maybe that's the easiest

19     way.

20              And you were asked a series of

21     questions and gave a series of answers that

22     were the following:

23              "Tell us -- would you give us sort

24     of a ballpark of the total amount of supposed

25     business that PCI did, how much of it was

COLEMAN

real goods as opposed to phony deals?  You
don't need to include RedTag in that, just
PCI?"

        You respond:  "Dollar amounts I
couldn't; percentage-wise, I'd say probably
at least 99 percent of the goods were all
fake.

        "And these were supposed PCI
transactions, right?

        "Right, 98 percent.  I mean, there
was pretty much all of them were fake.  I
mean there was some real deals, but
dollar-wise compared to what was real and
what was fake, it was pretty high."

        Did you give that testimony?

A.  I did.

Q.  And was it true and correct when you gave it?

A.  Yes.

Q.  And were the real PCI deals for substantially
    smaller amounts than the fake deals?

            MR. HAVELES:  Objection; vague.

            THE WITNESS:  Yes.

BY MR. TSCHUMI:

Q.  So if 99 percent of the deals were fake, it's

COLEMAN

1

2      safe to say that much less than 1 percent of

3      PCI's purported revenue was real?

4   A.  Probably even less than that.  I mean, if you

5      look at all the purchase orders and all the

6      notes that were rolling, it was -- yeah,

7      there was, like, very little.

8   Q.  And when PCI did real transactions, it didn't

9      do them with vendors like Nationwide

10      Enchanted, After the Second Millennium,

11      Universal, correct?

12   A.  Correct.

13   Q.  Sony purchase order -- or spreadsheet that

14      bears the name Nationwide, Enchanted, After

15      the Second Millennium, or Universal would

16      have reflected fake transactions, correct?

17   A.  Yes.

18   Q.  And I believe we looked at one, which was

19      Exhibit 5, if you mind pulling that out.

20   A.  (Complies.)

21   Q.  And this is a spreadsheet sent by

22      Sandy Indahl to you and Bob White.  The

23      e-mail had subject line, "PCI Funding Audit,"

24      and it has an attached spreadsheet with a

25      list of Opportunity Finance notes.

1                         COLEMAN

2              And do you see there's a column that

3       says Purchased From?

4    A.  The writing is, like, so small.

5    Q.  Well, about two-thirds of the way --

6    A.  I know you read it to me, but I don't

7        remember what all you read off.

8    Q.  Two-thirds the way across the page, it says

9        Purchased From and then below it has in caps

10       Nationwide, Universal, Parr Group, Enchanted

11       Millennium, and I think those are all of the

12       names in the column of Purchased From.

13              I know it's small, but can you --

14       can you see that?

15   A.  Merchandise -- I'm sorry, what did you say it

16       was?

17   Q.  So -- so it only contains a list of goods

18       purportedly purchased from Nationwide,

19       Universal, Parr Group, After the Second

20       Millennium, and Enchanted?

21   A.  I don't know what page you're looking at.

22       Can you just point it out to me?

23   Q.  I'm sorry.  Just the first page of the

24       attachment.

25   A.  Okay.  And where was it?

Page 368

1                          COLEMAN

2    Q.   Two-thirds across the page there's a column

3         that says Purchased From?

4    A.   I see the merchandise -- okay, Purchased

5         From, yes, yup, I see that.

6    Q.   And then it has the list of vendors that I

7         gave previously, correct?

8    A.   Nation -- yes.

9    Q.   And as you said before, those vendors did not

10        engage in real transactions with PCI,

11        correct?

12   A.   Correct.

13   Q.   So nothing on this spreadsheet of PC Funding

14        purported deals would have been real,

15        correct?

16   A.   Correct.

17   Q.   And if you look at the e-mail to which that

18        spreadsheet was attached, there's a reference

19        to audit confirmations and it says, "Is

20        Steven Sabes the person who could sign for

21        Opportunity Finance?"  And it also says --

22        Sandy Indahl says, "I will need your

23        signature on the AR confirm and Steven's on

24        the debt confirm."

25              This doesn't reflect that the

Page 376

1                           COLEMAN

2    A.   Yes.

3    Q.   So you were knowledgeable about its deals, or

4         purported deals?

5    A.   Yes.

6    Q.   And so you would have known that PCI didn't

7         have substantial revenue?

8                   MR. HAVELES:  Objection;

9         foundation.

10                  THE WITNESS:  Correct.

11                  MR. HAVELES:  Calls for

12        speculation.

13   BY MR. TSCHUMI:

14   Q.   And you would have known that PCI had massive

15        debts?

16                  MR. HAVELES:  Objection; vague.

17                  THE WITNESS:  Yes.

18   BY MR. TSCHUMI:

19   Q.   And that those debts exceeded assets -- its

20        assets at all times you were there?

21                  MR. HAVELES:  Objection;

22        foundation.

23                  THE WITNESS:  Yes.

24   BY MR. TSCHUMI:

25   Q.   In a typical PC Funding deal, PC Funding

Page 377

COLEMAN

1

2    would transfer investor money to Nationwide

3    to pay for -- pay for purported goods to

4    start the transaction, correct?

5  A.  Yes.

6  Q.  And Nationwide would send that money back to

7    PCI's operating account as M&I Bank?

8  A.  Yes.

9  Q.  And that money would be used to pay other

10   investors or to pay out other PC Funding

11   deals that were maturing, correct?

12              MR. HAVELES:  Objection; compound.

13              THE WITNESS:  Would pay other

14   investors -- I'm not sure what you mean by

15   "PC Funding deals."

16 BY MR. TSCHUMI:

17 Q.  Well, Opportunity Finance money that

18   eventually came into PCI's general operating

19   account after hitting the vendor accounts

20   could be used to pay Opportunity Finance

21   deals, right?

22 A.  To pay their notes back, yes.  Yes.

23 Q.  And it could be used to pay other investors

24   as well?

25 A.  Correct.

1                            COLEMAN

2    Q.   And the length of these loans was 60 to 90

3         days you testified?

4    A.   Yes.

5    Q.   And over the course of that time, you would

6         have received funding for many other deals?

7                    MR. HAVELES:   Objection; vague, no

8         foundation.

9                    THE WITNESS:   From other investors

10        or for PCI, yes.

11   BY MR. TSCHUMI:

12   Q.   And you would have paid off a number of deals

13        as well?

14   A.   Yes.

15                   MR. HAVELES:   Objection; vague.

16   BY MR. TSCHUMI:

17   Q.   When PC Funding paid Opportunity Finance or

18        DZ Bank, that would have necessarily been

19        other investors money, correct?

20                   MR. HAVELES:   Objection; no

21        foundation.

22                   THE WITNESS:   Yes.

23   BY MR. TSCHUMI:

24   Q.   And it would have originated from the PCI

25        account at M&I Bank, correct?

1                          COLEMAN

2                    MR. HAVELES:  Objection; no

3        foundation.

4                    THE WITNESS:  Or whatever bank

5        account PCI had, yes.

6   BY MR. TSCHUMI:

7   Q.  It would not be from payments received from

8        retailers, correct?

9   A.  No.

10  Q.  DZ Bank's counsel asked you a number of

11       questions about what are called intercompany

12       transfers.

13                  Do you recall being asked about

14       that?

15  A.  Yes.

16  Q.  And those are transfers of PCI money to other

17       companies controlled by Tom Petters?

18  A.  Yes.

19  Q.  Would you turn to the consolidation

20       transcript page 119, and I'll try to give

21       you --

22                    MR. HAVELES:  Is that the

23       transcript 119?

24                    MR. TSCHUMI:  Yes.  Transcript

25       119, which would be --

Page 393

COLEMAN

1

2     roughly the same dollar amount as the loan or

3     a little bit higher than the loan, and then I

4     had to make sure there was enough profit in

5     there for the interest rate that we were

6     paying to come up with the purchase order

7     price from the big-box retailers.

8  Q.  And how did you make sure that the -- that

9     the spread was enough to cover that?

10 A.  I just figured out the -- the profit on it

11    and then the interest rate that we were

12    paying over the 60 days or 90 days to make

13    sure it covered it.

14 Q.  Did PCI tell its investors and their lenders

15    that they weren't allowed to inspect

16    inventory?

17 A.  I think Tom would use that excuse every once

18    in awhile, that they weren't allowed.  I

19    don't think a lot of them -- a lot of them

20    didn't ask.

21 Q.  And Tom did this because there was no

22    inventory to inspect, right?

23 A.  Correct.

24 Q.  To your knowledge, did either Opportunity

25    Finance or its lender, DZ Bank, inspect

Page 394

1                         COLEMAN

2        inventory on PCI deals?

3                    MR. HAVELES:  Objection;

4        foundation.

5                    THE WITNESS:  No.

6    BY MR. TSCHUMI:

7    Q.  Because they couldn't have?

8    A.  There was no inventory to inspect.

9    Q.  And if investors or their lenders went to

10       visit Nationwide's warehouse, would they have

11       covered that there was a fraud?

12   A.  Yes.

13                   MR. HAVELES:  Objection;

14       foundation, speculation.

15   BY MR. TSCHUMI:

16   Q.  Why?

17   A.  A couple of the warehouses that we used had

18       absolutely nothing in them.  They were just

19       empty warehouses.  A couple of the other

20       warehouses that we used, the addresses had

21       very little merchandise.

22   Q.  And what -- and what little merchandise they

23       had wouldn't have matched the description on

24       any purchase orders, right?

25   A.  No.

1                          COLEMAN

2    Q.   To your knowledge, did PCI tell investors and

3         their lenders that they were not allowed to

4         contact retailers?

5                    MR. HAVELES:   Objection;

6         foundation.

7                    THE WITNESS:   Did PCI --

8    BY MR. TSCHUMI:

9    Q.   Well, did anyone at PCI?

10                   MR. HAVELES:   Objection;

11        foundation.

12                   THE WITNESS:   There again, I don't

13        know if Tom told them or not.  I'm sure Tom

14        did tell them that they weren't allowed to.

15   BY MR. TSCHUMI:

16   Q.   And the only lender who contacted a retailer,

17        which was GE Capital, found out that there

18        was a fraud, correct?

19   A.   Correct.

20   Q.   To your knowledge, did anyone at PCI tell

21        investors and their lenders that retailers

22        couldn't make payments directly into the SPE

23        accounts?

24                   MR. HAVELES:   Objection;

25        foundation.

Page 400

1                          COLEMAN

2     BY MR. TSCHUMI:

3     Q.  It was not the sale price for the purported

4         sales, correct?

5     A.  Correct.

6     Q.  Neither Opportunity Finance nor its lender,

7         DZ Bank, received M&I Bank statements for the

8         PCI operating account, correct?

9     A.  Correct.

10    Q.  If they had seen it, would they have covered

11        that there was a fraud?

12                     MR. HAVELES:  Objection; calls for

13        speculation, foundation.

14                     THE WITNESS:  Yes.

15    BY MR. TSCHUMI:

16    Q.  And you discussed generating false wire

17        confirmations for M&I Bank?

18    A.  Yes.

19    Q.  Investors and their lenders never received

20        those directly from M&I Bank, correct?

21    A.  Correct.

22    Q.  To your knowledge, did Opportunity Finance or

23        its lender, DZ Bank, contact M&I Bank to

24        confirm the wire transfers purportedly

25        received from retailers?

# EXHIBIT T-9

**DZ BANK**

**Internal**

| | Department / Initials | Extension | Date |
|---|---|---|---|
| **New York Branch** | ASSET SECURITIZATION / PP, VS | 1665,1659 | 10.17.2001 |

Reference:

**Opportunity Finance, LLC - $102 mio Trade Finance Loan-Backed Commercial Paper Program**

For

O   Attention   D'Oelsnitz. Bollmann. Bannmann

O   Comment

X   Decision   Gesamtvorstand über Herrn Flach,

X   Information   NY: Meyers   H.O.: Ufer/IZ, Ziese/IZ, Michael Wolf F/REAU

## I.   Executive Summary

- ASG seeks approval to provide, through its multi-seller conduit Autobahn Funding Company, LLC ("Autobahn"), a $100 mio revolving senior secured credit facility (the "Facility") to Opportunity Finance, LLC ("Opportunity Finance" or the "Company"). The Company, headquartered in Minneapolis, is a Delaware Limited Liability Corporation engaged in the business of providing inventory and receivables financing to businesses ("Distributors") requiring interim financing for wholesale inventory trading transactions. Historically, electronics goods have made up 70.0% of the transactions, and appliances 10.0%

- DZ BANK will provide a $102 mio (102% of the $100 mio commitment size) 364-day backstop liquidity facility, renewable annually, to facilitate the issuance of commercial paper by Autobahn. The liquidity facility will not subject DZ BANK to BIS capital charges due to the short-term nature of its commitment (< 1 year).

- Opportunity Finance's primary customer is Petters Finance, LLC, a wholly-owned subsidiary of Petters Company, Inc. ("Petters"). Petters specializes in the bulk acquisition and disposition of wholesale goods. As of 12/31/00, Petters had approximately $36 mio in net worth and had net income of $9.2 mio for FYE 2000.

- The Company, started in 1998, has been profitable every year since 1998 – net earnings were $13.7 mio, $16.5 mio and $17.9 mio for the fiscal years ended 12/31/99, 12/31/00 and the first eight months of fiscal year 2001, respectively.

- The ultimate obligors on receivables financed by Opportunity Finance (buyers of the financed inventory) have traditionally been large discount retailers. Sam's Club, a division of Wal-Mart ("Aa2" by Moody's), and BJ's Wholesale Club (not rated, $736 mio of net worth, FY 2000 net income of $132 mio), and Costco ("A2" by Moody's, $4.6 bio net worth) have accounted for almost 80% of the portfolio.

- As of August 31, 2001, the Company's portfolio consisted of 24 loans with an outstanding principal balance of $72.2 mio secured by $86.2 mio in inventory and accounts receivable. Since its inception, the Company has originated $500 mio in loans secured by over $875 mio in inventory and accounts receivable and **has never experienced a default or dilution.**

- DZ Bank's credit enhancement in this transaction will be provided by (i) minimum 20% overcollateralization generated by an 80% advance against loans originated by Opportunity Finance and (ii) a $50 mio "first loss[1]" insurance policy from Royal & SunAlliance ("RSA"), rated A1/AA- by Moody's/Fitch. Additionally, DZ Bank will receive limited recourse from Opportunity Finance ($18 mio net worth as of 8/31/01) as well as from Petters ($36 mio net worth as of 12/31/00). **Credit enhancement is 98.0% on a fully funded basis** (see *Section IV*). These calculations **do not place any value** on the limited recourse being provided by the Company and Petters.

- For its commitment, DZ BANK will earn a structuring fee of $500,000, Facility Fees of 2.15% on the outstanding face amount of commercial paper and a non-use fee of 0.30%. Based on expected utilization, DZ BANK will earn over $1.6 mio per annum in fee income.

- It is anticipated that the lowest risk tranche of this structure will be shadow rated "A2" by Moody's.

---

[1] "First Loss" implies that, should the overcollateralization inherent in the structure prove insufficient to cover losses on the financed receivables, RSA will be required to absorb the first $50 mio of losses over and above what the program can sustain before DZ BANK would incur a dollar of loss.

DZB001200

**DZ BANK**

**Internal**

## II. Terms and Conditions

**Borrower**.................................. Opportunity Finance Funding Corporation ("OFFC" or the "Borrower"), a bankruptcy-remote subsidiary of Opportunity Finance.

**Facility** .................................... $100 mio senior secured revolving commercial paper warehouse program for which the **lowest risk tranche** is expected to be rated no lower than "A2" by Moody's.

**Term**....................................... Five years revolving.

**Credit Enhancement** ............. (a) minimum of **20.0%** overcollateralization generated through the 80.0% advance rate against Opportunity Finance's principal investment; this equates to overcollaterlization of **48.0%** on the face amount of the loans (see *Section IV*);

(b) **$50 mio, first loss insurance policy, from Royal SunAlliance ("A1" Moody's and "AA-" Fitch);**

(c) Limited recourse from Petters Company, Inc. ($36 mio net worth as of 12/31/00) and Opportunity Finance ($18 mio net worth as of 8/31/01) (these percentages have yet to be determined, however, in no event shall the limited recourse exceed 9.9% due to legal reasons).

**Back-up Servicer** ................... US BANK, N.A. (rated "Aa3" by Moody's).

**Pricing** .................................... (a) A Structuring Fee of $500,000;

(b) Facility Fees of 2.15% per annum on the outstanding face value of CP;

(c) A Non-Use Fee of 0.30%;

(d) Funded liquidity rate (during a CP disruption) of 1 MO LIBOR plus 3.15% (or the Base Rate if LIBOR is unavailable).

**Facility Exclusivity** ................ Opportunity Finance will be required to fund the origination of all trade finance loans originated by it through DZ's commercial paper program for the tenor of the Facility.

## III. Company Overview

Opportunity Finance, LLC is engaged in the business of lending money to Distributors which purchase merchandise from wholesalers for immediate re-sale to retailers (a "Wholesale Goods Transaction"). The Company, organized in 1998 and headquartered in Minneapolis, Minnesota, currently finances its loan originations through investor notes, provided primarily by the family and friends of CEO Jon Sabes (see **Exhibit I** for Senior Management Profiles). The Facility proceeds will refinance a majority of these notes, giving Opportunity Finance the ability to institute an 80% debt / 20% equity capital structure versus the more expensive 100% equity capital structure currently in place. It is important to note that any investor notes issued by the Company (which will serve as credit enhancement for Autobahn as lender) will be **subordinate to the debt outstanding under the Facility** in terms of repayment priority.

Petters Company, Inc., Opportunity Finance's primary Distributor, has been in the wholesale business since 1993. Petters finances its wholesale business through Opportunity Finance and various other financing sources that provide advance rates in excess of traditional funding sources and quick transaction specific turn-around timing. As of 12/31/00, Petters had approximately $297.0 mio in financing, $36.1 mio in net worth and had net income of $9.2 mio for FYE 2000.

The Wholesale Goods Transactions originated by Petters and financed by the Company are structured to be short-term loans (3-5 month terms) collateralized by tangible assets and accompanying receivables (typically sized at 80-85% of the underlying receivable amount). They involve only new, name brand merchandise in their original packaging and none of the inventories involve merchandise that has been damaged in any way. The Distributors are firms that specialize in the bulk acquisition and disposition of wholesale consumer product inventories.

DZB001201

**DZ BANK**

To date, the Company has successfully completed over 200 Wholesale Goods Transactions, totaling over $500 million in loan originations. **The Company has never experienced a single credit loss, nor has it experienced any losses due to dilution on the underlying inventories and accounts receivable** (refer to **Exhibit V** for the Company's loan portfolio performance). The following flow chart illustrates the process by which the Company originates new Wholesale Goods Transactions:

### Structure of Underlying Trade Transaction



1 - The Distributor, acting as a broker, sources excess inventory, typically referred to as "overstock" goods, from a seller such as RCA or Sony (the "Wholesaler") and then seeks to find a buyer looking to purchase the inventory for re-sale to consumers at the retail level (a "Retailer", i.e. Costco, Sam's Club, etc.).

2 - Once a Retailer has been found, purchase orders for both the purchase from the Wholesaler and the sale to the Retailer are contemporaneously issued. The profit margin generated by the Distributor from the difference between the cost of inventory and the price to the Retailer averages 16.0%.

3 - These purchase orders are then assigned to a financial source (like DZ Bank's customer, Opportunity Finance), who in turn lends funds to the Distributor to complete the wholesale inventory trade. A UCC1 is filed by the financing source to perfect its security interest in the inventory purchased.

4 - The mechanics of the financing to the Distributor typically requires the financing source to lend 98.0% of the cost of goods and 2.0% equity from the Distributor. The term of the financing is under 150 days and carries an annualized coupon of between 15.0% and 45.0%.

5 - The financing source will obtain its financing from Autobahn Funding Company, LLC. Autobahn will finance 80.0% of the financing source's loan, requiring the financing source to provide 20.0% equity on its loan to the Distributor. With the profit margin from the sale, the Distributor equity and the financing source equity, Autobahn has 48.0% overcollateralization (see *Section IV* for a credit enhancement calculation).

6 - Proceeds from the financing source's loan are forwarded directly to the Wholesaler for the purchase of the merchandise – **at no time do proceeds get advanced directly to the Distributor**. The Distributor then arranges for shipment of the merchandise directly to the Retailer (the Distributor **never takes possession** of the merchandise).

7 - Upon receipt of the merchandise by the Retailer, an account receivable owed to the Distributor is created and pledged to the financing source as collateral for the advance to the Distributor. The pledge of the receivable is in addition to the Distributor's obligation to repay the loan from the financing source.

8 - The Retailer pays on the account receivable directly to the financing source – the proceeds of the payment are applied against the outstanding principal and interest of the loan.

DZB001202

**▼▲ DZ BANK**

The total time elapsed in which a Wholesale Goods Transaction occurs is approximately 100 days. The loans originated by the Borrower mature at the earlier of (i) the payment of the receivable by the Retailer or (ii) 150 days from the note's origination date. The size of a Wholesale Goods Transaction typically ranges from $0.5 million to $6.0 million. For a stratification of the Company's loan portfolio, please refer to **Exhibit III**.

Financial Performance
Opportunity Finance has had strong revenue and income performance over the past three years – please refer to the following table:

| Selected Financial Data ($ mio) | FYE 1999 | FYE 2000 | 8 Mos. Ended 8/31/01 |
|---|---|---|---|
| Revenues | 14.0 | 16.7 | 18.1 |
| Income (before distributions) | 13.7 | 16.5 | 17.9 |
| Total Assets | 47.5 | 56.4 | 90.6 |

Please refer to **Exhibit II** for the Company's financial statements as of 8/31/01.

## IV. Securitization Structure

Autobahn Funding Company LLC will provide a five year, $100 mio senior secured revolving credit facility on the closing date, the proceeds of which will be used to fund Opportunity Finance's direct origination of loans to Distributors secured by inventory and accounts receivable. These loans will then be sold, on a true-sale basis, to OFFC, DZ Bank's bankruptcy-remote Borrower under the Facility. OFFC will then pledge these loans to Autobahn in order to receive commercial paper proceeds raised in the capital markets. Opportunity Finance will also pledge to OFFC both the $50 mio RSA insurance policy and a first priority perfected security interest in the underlying inventory and accounts receivable (see **Exhibit IV** for a transaction diagram).

DZ BANK will be required to provide a 364-day backstop liquidity facility sized to cover 102% of Autobahn's commitment. For this reason, ASG is requesting approval for $102 mio to cover $100 in principal advances and up to $2.0 mio in discount on commercial paper issued to fund loans under the Facility. The liquidity facility will have a term of 364 days and will be renewable annually.

The loans against which Autobahn will advance funds are subject to eligibility tests via a "borrowing base calculation" that mitigates exposure to concentrations in the underlying portfolio related to (i) individual non-rated Retailers and (ii) aggregate non-rated Retailers, among others.

The Facility will be used by the Company to (i) leverage its balance sheet more effectively, (ii) provide ongoing financing for its origination of trade finance loans and (iii) expand its Distributor lending base. To date, the Company has utilized its own un-leveraged capital to fund loan originations rather than borrowing funds from traditional sources (commercial banks, specialty finance companies etc.).

Credit Enhancement
The Company's 80.0-85.0% advance to Distributors against the value of the accompanying receivable and Autobahn's proposed 80.0% advance against the Company's principal investment yields overcollateralization under the Facility of approximately 48.0% (as measured on the outstanding loans advanced Autobahn). The following illustrates the credit enhancement using a hypothetical Wholesale Goods Transaction:

| | | |
|---|---|---|
| Sale Price to Retailer (receivable value) | $ 116.0 | (a) |
| Cost of Goods to Distributor (COG) | $ 100.0 | (b) |
| Profit Margin | 16.0% | ((a - b) / b) |
| | | |
| Opportunity Finance Advance @ 98.0% of COG | $ 98.0 | (c) = (0.98 * b) |
| | | |
| Autobahn Advance @ 80% of OF Investment | $ 78.4 | (d) = (0.80 * c) |
| | | |
| Overcollateralization *(on balance of receivable from retailer)* | $ 37.6 | (e) = (a - d) |
| | | |
| **Overcollateralization Percentage** | **48.0%** | (e / d) |

Page 4

**DZ BANK**

The above illustration does not take into account the RSA policy – after giving effect to the $50 mio first loss policy being provided by RSA, the total credit enhancement in the structure increases to 98.0% assuming full Facility utilization – please refer to the following:

**Full Utilization Scenario:**

| | |
|---|---|
| Overcollateralization | 48.0% |
| Advances under Facility | 100,000,000 |
| | |
| RSA Policy | 50,000,000 |
| Percentage | 50.0% |
| | |
| **Enhancement Percentage** | **98.0%** |

Please note that the credit enhancement percentages depicted above <u>do not factor in the limited recourse being provided by Opportunity Finance or Petters</u> (these percentages have yet to be determined, however, in no event shall the limited recourse exceed 9.9% due to legal reasons).

Based on the above analysis, ASG anticipates the lowest risk tranche of the Facility to be rated at least "A2" by Moody's Investors Service. This expectation is based on (i) the lack of any gross defaults or dilution with respect to Opportunity Finance's portfolio, (ii) the $50 mio "first loss" policy provided by 'A1'/'AA-' rated RSA, (iii) 20.0% minimum overcollateralization resulting from the 80.0% advance rate and (iv) other standard protections found in highly rated securitizations, including a bankruptcy remote Borrower, segregated cashflow accounts and a dedicated back-up servicer that can be called upon immediately to assume servicing of the portfolio if Opportunity Finance does not meet its obligations as servicer.

<u>Royal & SunAlliance Insurance Group, plc</u>
Royal & SunAlliance, created in 1996 with the merger of two of Britain's largest insurance companies, is providing a $50 mio "first loss" insurance policy to the structure, under which Autobahn shall be named as loss payee. The lawyers of both Moody's Investors Service and Fitch IBCA have reviewed the proposed policy and have concluded that the policy has no "outs" and can be viewed as equivalent to a letter of credit in the transaction.

Sun Insurance was founded in 1710, Alliance founded in 1824, and Royal founded in 1845. The combined entity, RSA, had $9.19 bio in shareholders' funds as of 12/31/00 and generated an operating profit of $691.6 mio in 2000. The Group is one of the top 10 largest multi-line insurers in the world, with over $16 billion in premium.

**V.  Transaction Risks and Mitigants**

The following is a discussion of the risks associated with this asset class. The structure incorporates protective features designed to mitigate these and all risks associated with the transaction.

<u>Asset/Credit Risk:</u> The risk that the credit quality of the financed receivables deteriorates due to dilution or default by Retailers to such a degree that the total credit enhancement (98.0% based upon the $50 mio RSA insurance policy) is not sufficient to cover losses.

In evaluating the credit protection supporting DZ BANK's exposure, ASG stressed the level of defaults that could occur before DZ Bank's credit enhancement would be exhausted. **Giving no value to recoveries, DZ Bank's structure can withstand defaults of at least 98.0% before the credit enhancement would be exhausted.** It is important to view this number in the context of Company's strong historical portfolio performance (the Company has not experienced a single default since its inception in 1998).

Additionally, the structure incorporates performance triggers that measure dilution and default on the underlying portfolio. Breach of these performance triggers (i) causes the cessation of funding under the Facility (ii) allows DZ BANK to replace the Company as servicer with US BANK and (iii) causes all cash flow from the underlying receivables to be trapped until the Facility has completely amortized.

DZB001204

**DZ BANK**                                                                    **Internal**

---

<u>Operational Risk:</u> The operational risk in this transaction is that Opportunity Finance, as servicer, fails to properly originate and service the loans in a manner consistent with its past performance.  The transaction is structured with several procedural and performance-related triggers that give DZ Bank the ability to replace Opportunity Finance with US BANK as servicer if Opportunity Finance does not perform in a satisfactory manner.

<u>Interest Rate Risk:</u> Due to the short term nature of the assets being financed, the risk resulting from the basis mismatch between the fixed-rate collateral and floating rate liabilities of the Facility is minimal.

## VI. Conclusion/Recommendation

DZ BANK was engaged by the Company due to ASG's ability to understand this asset class and develop a financing facility that will enable the Company to capitalize on its potential in the wholesale inventory trading industry.  This transaction provides DZ BANK the opportunity to earn above market risk-adjusted returns on high quality assets.

Given the risk/return profile of this transaction and the strategic importance of building our presence as an innovator in the wholesale inventory trade loan market, ASG recommends approval of this application on these or very similar terms.

Preece _____          Bollmann _____

Salerno _____          d'Oelsnitz _____

Bradt _____

Page 6

**DZ BANK**                                                                                              **Internal**

**VII. Exhibits**

| | |
|---|---|
| Exhibit I | Senior Management Profiles |
| Exhibit II | Financial Statements |
| Exhibit III | Portfolio Stratification @ 8/31/01 |
| Exhibit IV | Transaction Diagram |
| Exhibit V | Portfolio Loan Performance |
| Exhibit VI | Arthur Andersen Procedural Review - Petters Company, Inc. |

DZB001206

**DZ BANK**

# EXHIBIT I

## Senior Management Profiles

DZB001207

**DZ BANK**

Jon R. Sabes, CEO/Manager. Mr. Sabes, 35, has over twelve years experience in investment banking, business development, corporate law and consulting in a variety of industries. Mr. Sabes is responsible for the general business oversight and underwriting of the Company. Mr. Sabes is a founding partner of Jon Adams Financial Co., LLP, a law firm and business advisory firm specializing in providing small and medium size businesses with professional services related to mergers and acquisitions and corporate finance. Prior to joining Jon Adams Financial Co., Mr. Sabes served as a tax consultant with Ernst & Young LLP. In addition, Mr. Sabes' professional experience includes serving as Vice President of Business Development for Gaming Corporation of America and investment banking with Jefferies & Company, Inc. Mr. Sabes earned a Juris Doctor, Cum Laude, from the University of Minnesota and holds a BA from the University of Colorado.

Steve Sabes, Administration and Servicing Manager. Mr. Sabes, 33, has been associated with Opportunity Finance as its portfolio administrator since 1999. As portfolio administer, Mr. Sabes initiates and confirms the movement of money between investors, the Company, and its clients. In addition, Mr. Sabes tracks the status of each loan with Larry McGough, communicating with clients on a daily basis, coordinating corporate bookkeeping, and seeking to ensure portfolio payouts occur properly. Mr. Sabes performs cash management and maintains all files for the Company's portfolio. Mr. Sabes holds a Ph. D. in Organic Chemistry from the University of Minnesota and a BA from The Colorado College.

Larry McGough, Controller. Mr. McGough, 46, is charged with designing and overseeing internal accounting and computer-related systems and information reporting to senior level management. Mr. McGough oversees internal financial statement reporting systems, tax return preparation, and general back office functions related to receivable and accounts payable management. Mr. McGough provides necessary support services to members of the senior management team as needed. Mr. McGough coordinates fixed asset acquisitions and arranges for financing of related fixed assets, and for the maintenance and update of the corporate computer network as needed. Mr. McGough holds a MBA from Mankato State University and a BS from Northwest Missouri State University.

Sandy Quigley, Bookkeeper/Receptionist. Ms. Quigley is responsible for accounts payable recording, payment and reconciliation, accounts receivable recording, payment and reconciliation. Ms. Quigley assists in the preparation of financial statements through general ledger, brokerage account reconciliation. In addition, Ms. Quigley oversees the daily operations of the business office, greeting guests, handling mail, and other general administrative duties.

DZB001208

**DZ BANK**

**Internal**

# EXHIBIT II

Opportunity Finance Financial Statements as of 8/31/01

DZB001209

**DZ BANK**                                                                        **Internal**

## Opportunity Finance, LLC

### Balance Sheet (as of 8/31/01)

| | | |
|---|---|---:|
| **Assets** | | |
| | Cash | 18,570,947 |
| | Accounts Receivable | 72,200,000 |
| | Other Assets | 5,000 |
| **Total Assets** | | 90,575,947 |
| | | |
| **Liabilities** | | |
| | Investor Notes | 72,908,920 |
| **Equity** | | 17,667,027 |
| **Total Liabilities & Equity** | | 90,575,947 |

### Income Statement (for period 1/1/01-8/31/01)

| | | |
|---|---|---:|
| **Revenue** | | |
| | Interest Income | 18,069,830 |
| **Expenses** | | |
| | Direct Expenses | 209,914 |
| **Income (before distributions)** | | 17,859,916 |

**DZ BANK**

Internal

# EXHIBIT III

Portfolio Stratification as of 8/31/01

DZB001211

**DZ BANK**

**Internal**

The following are stratifications of the Company's outstanding trade finance loan portfolio as of August 31, 2001.

### Summary of Loan Portfolio:

| | |
|---|---:|
| Total Unpaid Principal Balance of Loans: | $72,200,000 |
| Number of Loans: | 24 |
| Average Outstanding Loan Balance: | $3,008,333 |
| Weighted Average Original Term to Maturity: | 120 days |
| Ratio of Unpaid Principal Balance to Cost of Goods Financed: | 98.0% |
| Ratio of Unpaid Principal Balance to Receivable from Buyer: | 83.8% |
| Weighted Average Days Outstanding | 37 days |

| Note Issuance Date | Note Principal Balance | Cost of Goods Financed | Loan as % of Cost of Goods | Receivable from Buyer | Loan as % of Rec. from Buyer | Goods Buyer | Goods Description | Days Outstanding |
|---|---|---|---|---|---|---|---|---|
| 6/5/2001 | 4,200,000 | 4,212,471 | 99.7% | 4,949,653 | 84.9% | BJ's Wholesale Club | Samsonite Luggage | 87 |
| 6/6/2001 | 2,400,000 | 2,421,510 | 99.1% | 2,845,274 | 84.4% | Sam's Club | Samsonite Luggage | 86 |
| 6/7/2001 | 3,000,000 | 3,401,640 | 88.2% | 4,005,186 | 74.9% | BJ's Wholesale Club | Panasonic TVs and VCRs | 85 |
| 6/20/2001 | 3,000,000 | 3,057,816 | 98.1% | 3,547,032 | 84.6% | BJ's Wholesale Club | Panasonic Video Equipment | 72 |
| 6/28/2001 | 3,600,000 | 3,639,643 | 98.9% | 4,221,980 | 85.3% | Sam's Club | Panasonic Video Equipment | 64 |
| 6/28/2001 | 1,200,000 | 1,260,998 | 95.2% | 1,462,757 | 82.0% | Sam's Club | Panasonic Video Equipment | 64 |
| 7/3/2001 | 5,000,000 | 5,070,863 | 98.6% | 5,932,936 | 84.3% | Sam's Club | Whirlpool Appliances | 59 |
| 7/16/2001 | 1,300,000 | 1,301,742 | 99.9% | 1,524,741 | 85.3% | Sam's Club | Men's Coats | 46 |
| 7/23/2001 | 3,000,000 | 3,071,874 | 97.7% | 3,592,282 | 83.5% | Boscov's | SONY TVs | 39 |
| 7/23/2001 | 2,100,000 | 2,278,185 | 92.2% | 2,619,693 | 80.2% | BJ's Wholesale Club | Small Appliances | 39 |
| 8/1/2001 | 6,000,000 | 6,025,471 | 99.6% | 7,052,688 | 85.1% | Sam's Club | RCA HDTV'S | 30 |
| 8/6/2001 | 2,800,000 | 2,805,066 | 99.8% | 3,281,918 | 85.3% | Boscov's | A/V Equipment | 25 |
| 8/7/2001 | 4,200,000 | 4,206,972 | 99.8% | 4,921,067 | 85.3% | Sam's Club | Cameras | 24 |
| 8/8/2001 | 1,500,000 | 1,529,387 | 98.1% | 1,789,324 | 83.8% | Boscov's | Phones | 23 |
| 8/10/2001 | 2,400,000 | 2,418,376 | 99.2% | 2,829,414 | 84.8% | Boscov's | Tents | 21 |
| 8/10/2001 | 2,700,000 | 2,718,279 | 99.3% | 3,175,830 | 85.0% | Sam's Club | Palm Pilots | 21 |
| 8/13/2001 | 2,600,000 | 2,629,129 | 98.9% | 3,076,063 | 84.5% | BJ's Wholesale Club | RCA Stereo TVs | 18 |
| 8/14/2001 | 2,800,000 | 2,820,371 | 99.3% | 3,295,761 | 85.0% | Sam's Club | HP Printeres | 17 |
| 8/15/2001 | 5,200,000 | 5,323,994 | 97.7% | 6,228,840 | 83.5% | BJ's Wholesale Club | Toshiba/Hitachi TVs | 16 |
| 8/21/2001 | 2,700,000 | 2,717,335 | 99.4% | 3,179,107 | 84.9% | Rex | Denon Digital Receivers | 10 |
| 8/22/2001 | 1,600,000 | 1,615,901 | 99.0% | 1,937,881 | 82.6% | Sam's Club | Toys | 9 |
| 8/22/2001 | 2,900,000 | 2,920,655 | 99.3% | 3,414,621 | 84.9% | Sam's Club | Furniture | 9 |
| 8/27/2001 | 4,000,000 | 4,014,475 | 99.6% | 4,696,917 | 85.2% | Sam's Club | SONY TVs | 4 |
| 8/27/2001 | 2,000,000 | 2,204,167 | 90.7% | 2,578,857 | 77.6% | Rex | RCA TVs | 4 |
| Total | 72,200,000 | 73,666,320 | 98.0% | 86,159,823 | 83.8% | | | 37 |

## By Unpaid Principal Balance:

| Range of UPB | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| $1,000,000 - $1,999,999 | 4 | 16.7% | 5,600,000 | 7.8% |
| $2,000,000 - $2,999,999 | 10 | 41.7% | 25,400,000 | 35.2% |
| $3,000,000 - $3,999,999 | 4 | 16.7% | 12,600,000 | 17.5% |
| $4,000,000 - $4,999,999 | 3 | 12.5% | 12,400,000 | 17.2% |
| $5,000,000 - $6,000,000 | 3 | 12.5% | 16,200,000 | 22.4% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

DZB001212

**DZ BANK**

**By Days Outstanding:**

| Days Outstanding | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| 1-30 Days Outstanding | 13 | 54.2% | 37,400,000 | 51.8% |
| 31-60 Days Outstanding | 5 | 20.8% | 17,400,000 | 24.1% |
| 61-90 Days Outstanding | 6 | 25.0% | 17,400,000 | 24.1% |
| 91-120 Days Outstanding | 0 | 0.0% | 0 | 0.0% |
| >90 Days Outstanding | 0 | 0.0% | 0 | 0.0% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

**By Types of Goods Financed:**

| Goods Type | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| Electronics | 16 | 66.7% | 50,300,000 | 69.7% |
| Appliances | 2 | 8.3% | 7,100,000 | 9.8% |
| Luggage | 2 | 8.3% | 6,600,000 | 9.1% |
| Furniture | 1 | 4.2% | 2,900,000 | 4.0% |
| Outdoor Goods | 1 | 4.2% | 2,400,000 | 3.3% |
| Toys | 1 | 4.2% | 1,600,000 | 2.2% |
| Clothes | 1 | 4.2% | 1,300,000 | 1.8% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

**By Ratio of Loan Amount to Cost of Goods Financed:**

| UPB % of Cost of Goods Financed | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| 88.01% - 89.00% | 1 | 4.2% | 3,000,000 | 4.2% |
| 90.01% - 91.00% | 1 | 4.2% | 2,000,000 | 2.8% |
| 92.01% - 93.00% | 1 | 4.2% | 2,100,000 | 2.9% |
| 95.01% - 96.00% | 1 | 4.2% | 1,200,000 | 1.7% |
| 97.01% - 98.00% | 2 | 8.3% | 8,200,000 | 11.4% |
| 98.01% - 99.00% | 5 | 20.8% | 15,700,000 | 21.7% |
| 99.01% - 100.00% | 13 | 54.2% | 40,000,000 | 55.4% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

**By Ratio of Loan Amount to Receivable from Retailer:**

| UPB % of Receivable from Buyer | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| 74.01% - 75.00% | 1 | 4.2% | 3,000,000 | 4.2% |
| 77.01% - 78.00% | 1 | 4.2% | 2,000,000 | 2.8% |
| 80.01% - 81.00% | 1 | 4.2% | 2,100,000 | 2.9% |
| 82.01% - 83.00% | 2 | 8.3% | 2,800,000 | 3.9% |
| 83.01% - 84.00% | 3 | 12.5% | 9,700,000 | 13.4% |
| 84.01% - 85.00% | 9 | 37.5% | 28,000,000 | 38.8% |
| 85.01% - 86.00% | 7 | 29.2% | 24,600,000 | 34.1% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

DZB001213

 **DZ BANK**

**Internal**

**Loan Portfolio by Retailer:**

| Buyer | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB | Ticker | S&P | Moody's | Fitch |
|---|---|---|---|---|---|---|---|---|
| Sam's Club | 12 | 50.0% | $37,700,000 | 52.2% | WMT | AA | Aa2 | AA |
| BJ's Wholesale Club | 6 | 25.0% | $20,100,000 | 27.8% | BJ | NR | NR | NR |
| Boscov's | 4 | 16.7% | $9,700,000 | 13.4% | Private | NR | NR | NR |
| Rex Stores Corporation | 2 | 8.3% | $4,700,000 | 6.5% | RSC | NR | NR | NR |
| Costco Wholesale Corp. | 0 | 0.0% | 0 | 0.0% | COST | A | A2 | A+ |
| Fleming Companies Inc. | 0 | 0.0% | 0 | 0.0% | FLM | BB | Ba2 | NR |
| Target Corp. | 0 | 0.0% | 0 | 0.0% | TGT | A+ | A2 | A |
| Toys R Us | 0 | 0.0% | 0 | 0.0% | TOY | BBB+ | A1 | BBB |
| Best Buy | 0 | 0.0% | 0 | 0.0% | BBY | BBB- | Baa3 | BBB |
| Home Depot | 0 | 0.0% | 0 | 0.0% | HD | AA | Aa3 | AA |
| Kmart Corp. | 0 | 0.0% | 0 | 0.0% | KM | BB+ | Baa3 | BB+ |
| Total | 24 | 100.0% | 72,200,000 | 100.0% | | | | |

DZB001214

**DZ BANK**                                                    **Internal**

# EXHIBIT IV

Transaction Diagram

DZB001215



1. The Distributor sources excess inventory from a seller such as RCA or Sony (the "Wholesaler") and then seeks to find a buyer looking to purchase the inventory for re-sale to consumers at the retail level (a "Retailer"). Once a Retailer has been found, purchase orders for both the purchase from the Wholesaler and the sale to the Retailer are contemporaneously issued.

2. These purchase orders are then assigned to Opportunity Finance, who in turn lends funds to the Distributor to complete the wholesale inventory trade.

3. Proceeds of the loan to the Distributor are forwarded directly to the Wholesaler for the purchase of the merchandise – **at no time do proceeds get advanced directly to the Distributor.**

4. The Distributor then arranges for shipment of the merchandise directly to the Retailer (the Distributor **never takes possession** of the merchandise). Upon receipt of the merchandise, an account receivable ("AR") owed to Opportunity Finance is created.

5. Opportunity Finance then sells its interest in the merchandise and accounts receivable into a bankruptcy remote Special Purpose Vehicle ("SPV") on a **true-sale basis.** This protects Autobahn Funding Company ("Autobahn") as Lender in the unlikely event of a bankruptcy on the part of Opportunity Finance.

6. The SPV then pledges receivables purchased from Opportunity Finance to Autobahn as collateral in order to draw down under the facility. Autobahn will issue commercial paper in order to fund its obligations under the loan agreement, advancing against Opportunity Finance's principal investment in the merchandise and accounts receivable.

7. Payments on the underlying accounts receivable will be made by the Retailer to a segregated Lockbox Account under the control of DZ Bank. Funds deposited into the Lockbox Account will be swept to a central Collection Account held by the Trustee for the benefit of the Lender on a daily basis. The SPV can use funds in the Collection Account to either (i) purchase additional receivables from Opportunity Finance or (ii) pay down the loan balance under the facility.

8. 364-day Liquidity will be provided to Autobahn by P-1/F1-rated financial institutions.

**DZ BANK**

**Internal**

# EXHIBIT V

Portfolio Loan Performance

DZB001217

# DZ BANK

The following is an analysis of the Company's historical loan portfolio performance.

## Portfolio Roll-Forward:

| Month | Beginning Unpaid Principal Balance | New Contracts[1] | Principal Collections | Write-Offs | Ending Unpaid Principal Balance |
|---|---|---|---|---|---|
| May-98 | - | 1,000,000 | - | - | 1,000,000 |
| Jun-98 | 1,000,000 | 1,000,000 | - | - | 2,000,000 |
| Jul-98 | 2,000,000 | 1,000,000 | (1,000,000) | - | 2,000,000 |
| Aug-98 | 2,000,000 | 1,314,000 | (2,000,000) | - | 1,314,000 |
| Sep-98 | 1,314,000 | 11,610,000 | - | - | 12,924,000 |
| Oct-98 | 12,924,000 | 12,735,000 | (12,924,000) | - | 12,735,000 |
| Nov-98 | 12,735,000 | 12,791,000 | - | - | 25,526,000 |
| Dec-98 | 25,526,000 | 24,263,199 | (14,926,000) | - | 34,863,199 |
| Jan-99 | 34,863,199 | 28,434,005 | (26,958,469) | - | 36,338,735 |
| Feb-99 | 36,338,735 | 19,032,260 | (19,632,260) | - | 35,738,735 |
| Mar-99 | 35,738,735 | 3,150,000 | (13,718,350) | - | 25,170,385 |
| Apr-99 | 25,170,385 | 19,650,000 | (25,170,385) | - | 19,650,000 |
| May-99 | 19,650,000 | 17,100,000 | (3,300,000) | - | 33,450,000 |
| Jun-99 | 33,450,000 | 10,100,000 | (10,600,000) | - | 32,950,000 |
| Jul-99 | 32,950,000 | 21,650,475 | (13,650,000) | - | 40,950,475 |
| Aug-99 | 40,950,475 | 16,700,000 | (27,400,475) | - | 30,250,000 |
| Sep-99 | 30,250,000 | 9,899,503 | (2,650,000) | - | 37,499,503 |
| Oct-99 | 37,499,503 | 20,550,000 | (10,900,000) | - | 47,149,503 |
| Nov-99 | 47,149,503 | 11,600,000 | (18,499,503) | - | 40,250,000 |
| Dec-99 | 40,250,000 | 15,399,503 | (8,100,000) | - | 47,549,503 |
| Jan-00 | 47,549,503 | 18,449,503 | (25,349,503) | - | 40,649,503 |
| Feb-00 | 40,649,503 | 22,000,000 | (14,600,000) | - | 48,049,503 |
| Mar-00 | 48,049,503 | 17,600,000 | (13,600,000) | - | 52,049,503 |
| Apr-00 | 52,049,503 | 21,449,503 | (21,949,503) | - | 51,549,503 |
| May-00 | 51,549,503 | 22,250,000 | (18,500,000) | - | 55,299,503 |
| Jun-00 | 55,299,503 | 11,600,000 | (14,250,000) | - | 52,649,503 |
| Jul-00 | 52,649,503 | 15,650,000 | (14,000,000) | - | 54,299,503 |
| Aug-00 | 54,299,503 | 27,149,503 | (27,049,503) | - | 54,399,503 |
| Sep-00 | 54,399,503 | 6,650,000 | (14,250,000) | - | 46,799,503 |
| Oct-00 | 46,799,503 | 13,000,000 | (13,000,000) | - | 46,799,503 |
| Nov-00 | 46,799,503 | 11,349,503 | (8,599,503) | - | 49,549,503 |
| Dec-00 | 49,549,503 | 8,550,000 | (11,550,000) | - | 46,549,503 |
| Jan-01 | 46,549,503 | 18,250,000 | (9,650,000) | - | 55,149,503 |
| Feb-01 | 55,149,503 | 4,000,000 | (6,000,000) | - | 53,149,503 |
| Mar-01 | 53,149,503 | 8,472,350 | (7,100,000) | - | 54,521,853 |
| Apr-01 | 54,521,853 | - | - | - | 54,521,853 |
| May-01 | 54,521,853 | 9,000,000 | (22,299,503) | - | 41,222,350 |
| Jun-01 | 41,222,350 | 23,273,000 | (4,500,000) | - | 59,995,350 |
| Jul-01 | 59,995,350 | 13,400,000 | (19,122,350) | - | 54,273,000 |
| Aug-01 | 54,273,000 | 43,400,000 | (25,473,000) | - | 72,200,000 |

(1) Aggregate principal balance of loans originated in each period.

## DZ BANK

**Internal**

**Monthly Loan Originations:**

| Month | New Contracts[1] | Month | New Contracts[1] |
|-------|-----------------|-------|-----------------|
| May-98 | 1,000,000 | Jan-00 | 18,449,503 |
| Jun-98 | 1,000,000 | Feb-00 | 22,000,000 |
| Jul-98 | 1,000,000 | Mar-00 | 17,600,000 |
| Aug-98 | 1,314,000 | Apr-00 | 21,449,503 |
| Sep-98 | 11,610,000 | May-00 | 22,250,000 |
| Oct-98 | 12,735,000 | Jun-00 | 11,600,000 |
| Nov-98 | 12,791,000 | Jul-00 | 15,650,000 |
| Dec-98 | 24,263,199 | Aug-00 | 27,149,503 |
| Jan-99 | 28,434,005 | Sep-00 | 6,650,000 |
| Feb-99 | 19,032,260 | Oct-00 | 13,000,000 |
| Mar-99 | 3,150,000 | Nov-00 | 11,349,503 |
| Apr-99 | 19,650,000 | Dec-00 | 8,550,000 |
| May-99 | 17,100,000 | Jan-01 | 18,250,000 |
| Jun-99 | 10,100,000 | Feb-01 | 4,000,000 |
| Jul-99 | 21,650,475 | Mar-01 | 8,472,350 |
| Aug-99 | 16,700,000 | Apr-01 | - |
| Sep-99 | 9,899,503 | May-01 | 9,000,000 |
| Oct-99 | 20,550,000 | Jun-01 | 23,273,000 |
| Nov-99 | 11,600,000 | Jul-01 | 13,400,000 |
| Dec-99 | 15,399,503 | Aug-01 | 43,400,000 |

(1) Aggregate principal balance of loans originated in each period.

**Portfolio Turnover:**

| | 8 Months Ended August 31, | | 12 Months Ended December 31, | | |
|---|---|---|---|---|---|
| | 2001 | 2000 | 2000 | 1999 | 1998 |
| Loans Originated[1] | $119,795,350 | $156,148,509 | $195,698,012 | $193,265,746 | $65,713,199 |
| Average Unpaid Principal Balance[2] | 55,629,177 | 51,118,253 | 49,887,003 | 35,578,903 | 11,545,275 |
| Turnover[3] | 3.23 | 4.58 | 3.92 | 5.43 | 5.69 |
| Average Days Outstanding[4] | 111.45 | 78.57 | 91.77 | 66.27 | 63.25 |

(1) Sum of the aggregate loans originated during each month of the stated period
(2) Sum of the aggregate loans outstanding at the end of each month of the stated period divided by the respective number
of months in the stated period.
(3) Annualized Loans Originated divided by Average Unpaid Principal Balance
(4) 360 days divided by Turnover

**Aging Experience:**

| | August 31, 2001 | | December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2000 | | 1999 | | 1998 | |
| | Total | % of Total | Total | % of Total | Total | % of Total | Total | % of Total |
| 1-30 Days Outstanding | $37,400,000 | 51.80% | $8,550,000 | 18.37% | $15,399,503 | 32.39% | $22,763,199 | 68.23% |
| 31-60 Days Outstanding | 17,400,000 | 24.10% | 7,849,503 | 16.86% | 11,600,000 | 24.40% | 10,600,000 | 31.77% |
| 61-90 Days Outstanding | 17,400,000 | 24.10% | 16,500,000 | 35.45% | 17,900,000 | 37.64% | 0 | 0.00% |
| 91-120 Days Outstanding | 0 | 0.00% | 6,650,000 | 14.29% | 2,650,000 | 5.57% | 0 | 0.00% |
| >120 Days Outstanding | 0 | 0.00% | 7,000,000 | 15.04% | 0 | 0.00% | 0 | 0.00% |
| Total | $72,200,000 | 100.00% | $46,549,503 | 100.00% | $47,549,503 | 100.00% | $33,363,199 | 100.00% |

NOTE    The data in the table above reflects the age of each outstanding loan as of each of the dates shown (i.e the number of days since the loan was originated)
The original term to maturity is typically 90-120 days on each of the Company's loans

 **DZ BANK**

**Internal**

**Default Experience:**

| | 8 Months Ended August 31, | | 12 Months Ended December 31, | | |
|---|---|---|---|---|---|
| | 2001 | 2000 | 2000 | 1999 | 1998 |
| Average Unpaid Principal Balance [1] | $55,629,177 | $51,118,253 | $49,887,003 | $35,578,903 | $11,545,275 |
| Gross Charge-Offs [2] | 0 | 0 | 0 | 0 | 0 |
| Average Portfolio Default Ratio [3] | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

(1) Sum of the aggregate loans outstanding at the end of each month of the stated period divided by the respective number

of months in the stated period.

(2) Sum of the aggregate gross charge-offs during the stated period.

(3) Annualized Gross Charge-Offs divided by the Average Unpaid Principal Balance for each of the periods shown.

DZB001220

**DZ BANK**

**Internal**

# EXHIBIT VI

Arther Andersen Procedural Review – Petters Company, Inc.

DZB001221

ARTHUR ANDERSEN

**Petters Company, Inc.**

Report on financial due diligence
February 2001

**CONFIDENTIAL**

DZB001222

ARTHUR ANDERSEN

arthur andersen LLP
45 South Seventh Street
Minneapolis MN 55402-1330
Tel 312 332
www.arthurandersen.com

February 19, 2001

## Introduction

This letter describes the limited consulting procedures we performed at the request of (the Client) to assist you in connection with your due diligence investigation of Petters Company, Inc. (Petters or the Company), which you are performing for purposes of a potential investment in the Company (the Transaction) in accordance with the terms of our arrangement letter of December 4, 2000.

## Procedures performed and related findings

As directed by you, our procedures were performed in the following principal areas:

• Verify that Petters has received payment from .... Corporation for all transactions completed during fiscal year 2000 (approximately 62 transactions) through December 11, 2000.

• Verify that Petters is current on its obligations to each of its creditors as of the date of the commencement of fieldwork (approximately December 11, 2000) and select a sample of the payments made by Petters to creditors for compliance with the terms of those arrangements.

• Quantify the amounts Tom Petters has taken out of the business in fiscal years 1999 and 2000.

• Roll forward the shareholder's equity activity of Petters to determine the book value of the net assets and verify the ownership percentage of Tom Petters.

• Summarize Petters' creditors and significant terms of borrowings.

The specific procedures we performed and our related findings are set forth in the applicable sections of the summary that follows this letter.

Our engagement was performed under the Statements on Standards for Consulting Services issued by the American Institute of Certified Public Accountants (AICPA).

By acceptance of this report, you acknowledge that you have determined that the procedures we performed as described in the accompanying report are all, and only, the procedures that you requested us



**CONFIDENTIAL**

DZB001223

09/25/01  10:58  FAX 214-698-1777   BAIN KRUSCHER   ☑004/027
09/21/01  10:11  ☎61~~398520   ☑004

February 19, 2001
Page 2 of 3

to perform, and that you are solely responsible for the sufficiency of those procedures for your purposes.
You also acknowledge that you have made available to us all financial records and related data that you
received from Petters that you believe are necessary for us to complete our procedures.

## Limitations

We have addressed ourselves solely to the information and procedures set forth in the accompanying
report and make no representations regarding the adequacy of the procedures, information and/or whether
any material facts have been omitted therefrom or whether the procedures would necessarily reveal all
matters of significance for your purposes. The procedures we performed were limited at your request. We
did not interview more than a small number of key personnel, analyze the Company's information
systems, perform a detailed analysis of the Company's financial statements or test or otherwise verify any
of the information provided to us.

We make no representations and express no opinion as to: (a) the sufficiency of the procedures for your
purposes; (b) questions of legal interpretation; (c) any environmental, engineering or disabilities issues;
and (d) the enforceability of third-party contracts. Had we performed additional procedures, other matters
might have come to our attention, which would have been reported to you. In particular, we did not
perform any procedures with respect to: (a) insurance or litigation matters; (b) operational evaluation,
including the capabilities, competitive sustainability or currency of technology matters; or (c) the
Company's financial projections, including the revenue estimates. We understand you have taken
responsibility for these areas.

The procedures we performed do not constitute an audit, examination or review in accordance with
standards established by the AICPA, and we have not otherwise verified the information we obtained or
presented in this report. Also, any procedures we performed with respect to Company's internal control
were substantially less in scope than an examination of internal control conducted in accordance with
Statements on Standards for Attestation Engagements issued by the AICPA. Therefore, we express no
opinion or any other form of assurance on the Company's internal control over financial reporting or on
the information presented in our report, and make no representations concerning its accuracy or
completeness.

The decision as to whether to consummate the Transaction described above lies solely with Client, and
our work and our findings shall not in any way constitute a recommendation as to whether the Client
should or should not consummate the Transaction described above, or on what terms. These procedures
should not be taken to supplant the additional inquiries and procedures that you should undertake in your
consideration of the proposed Transaction. Further, we understand that the Client is a sophisticated
investor/ lender, and it has experience in transactions of the nature described above.

This letter and the accompanying material are solely for your information and to assist you in conducting
and documenting your investigation in connection with the proposed investment in the Company and,

**CONFIDENTIAL**

DZB001224

09/25/01  10:58  FAX 2148891777  DAIN RAUSCHER  005/027
09/21/01  10:11  ☎6123  8922  005

February 19, 2001
Page 3 of 3

without our prior written consent, neither the report nor a copy of all or any portion thereof is to be used, circulated, quoted or otherwise referred to for any other purpose.

We have no responsibility to update this letter or accompanying material for events and circumstances occurring after the date of this letter.

Very truly yours,

Arthur Andersen LLP

**CONFIDENTIAL**

DZB001225

Petters Company, Inc.

Report on financial due diligence

# 1. Project scope

Verify that Petters Company, Inc. (Petters or the Company) has received payment from
Corporation (        ) for all transactions completed during Petters' fiscal year 2000 through December 11, 2000.

## Summary findings

We obtained a listing (Aging Report) of all cash receipts in fiscal year 2000 through December 11, 2000 by
Petters from its customers,                (National), an entity related to        , BOSCOV's, ESE and
E&S. This schedule listed Petters' cost of goods (cash paid to its vendors), selling price to customer (cash
received) and calculated gross margin. For each transaction, we agreed cash receipts and agreed cash payments
to Petters' bank statements. We noted certain exceptions.

We noted several instances where Petters did not make cash payments to the vendors for the goods received,
but did receive cash payments from their customers. Upon discussions with management, it was noted that in
some instances Petters' creditors prefer to make payments to Petters' vendors directly and not wire the funds to
Petters. Additionally, there are times when Petters asks its creditors to wire funds directly to their vendors
depending on Petters' cash position at the time of vendor payment.

There were also five instances in which we were unable to agree cash receipts on the Aging Report to cash
receipts on the bank statements as the bank statement's deposit balance was greater than the amount noted to
be received from customers. Per discussion with management, it was noted that this is due to Petters receiving
checks from other creditors (Investors) that were included in the daily deposit amounts. As detailed information
was not readily available, we were unable to verify that these deposit amounts included payments from        .

Additionally, for all transactions on the Aging Report for which Petters had paid its vendors, but had not received
payment from its customers, we reconciled unpaid balances to Petters' November 30, 2000 accounts receivable
totals on the balance sheet, noting agreement.

# 2. Project scope

Verify that Petters is current on its obligations to each of its creditors at the current date (approximately
December 11, 2000) and select a sample of the payments made by Petters to creditors for compliance with the
terms of those arrangements.

## Summary findings

We received a schedule of all cash principal and interest payments from January 2000 to November 2000. We
noted that total cash payments for interest expense were approximately $50.5 million and cash payments on
principle were approximately $35.5 million. We agreed each payment for principal and interest to Petters' bank
statements according to the corresponding check number or wire transfer date. No exceptions were noted over a
scope of $5,000.

We received a detail of accrued interest expense for one of Petters' significant creditors. This detail listed interest
payments made to this creditor from January 2000 to November 20, 2000. Payments for accrued interest were
either made in cash or rolled into existing principle balances. We noted that approximately $16 million in cash
interest payments were made and approximately $11 million of accrued interest was rolled into existing note
balances. We agreed each cash interest payment to cleared checks or wire transfers in Petters' bank statements.

**CONFIDENTIAL**

DZB001226

Petters Company, Inc.

Report on financial due diligence

For accrued interest amounts rolled into existing notes, we haphazardly selected three payments, obtained the creditor's file and agreed these amounts as additions to principle balances of signed notes.

We also selected two other creditors to verify cash interest payments or the addition of accrued interest to existing principal balances. We received these creditors' files and agreed interest payments on all notes outstanding during the year to a check copy (for cash payments) or as an addition to an existing principal balance (for rolled interest amounts). We noted no exceptions during these procedures.

## 3. Project scope

Quantify the amounts Tom Petters has taken out of the business in fiscal years 1999 and 2000.

### Summary findings

Through November 30, 2000, Tom Petters has taken distributions from the Company totaling $2,600,000. These distributions were taken by Tom Petters in 1999 and recorded as a note receivable by the Company. In January 2000, this amount was declared as a dividend to Tom Petters and removed from notes receivable.

Prior to fiscal year 2000, Mr. Petters received a salary from the Company. Per review of Petters' payroll records, Tom Petters received a gross salary of approximately $204,000, $167,000 and $134,000 from the Company in 1999, 1998 and 1997, respectively. Information for years prior to 1997 was not readily available and, therefore, Mr. Petter's salary information prior to that year was not verified.

In 2000, Mr. Petters received a consulting fee of approximately $12,500/month in lieu of a salary. Through November 30, 2000, Mr. Petters had collected approximately $100,000 of his consulting fees. Per Bob White, the Company's chief financial officer, Mr. Petters was paid the remaining $50,000 of the consulting fees owed in December 2000.

## 4. Project scope

Roll forward the shareholder's equity activity of the Company to determine the book value of the net assets and verify the ownership percentage of Tom Petters.

### Summary findings

Per discussions with Tom Petters and Bob White, Mr. Petters has been the sole shareholder of the Company since its inception in 1994. We performed a rollforward of shareholder's equity from 1994 through November 30, 2000. There was one unreconcilable item for approximately $68,000 for which we performed no additional analysis, as this amount was deemed to be below scope for purposes of this procedure. No other significant findings were noted as the only other equity activity was net income and dividends to Mr. Petters. Since the Company's financial statements are not audited, we cannot provide assurance that the rollforward of shareholder's equity is accurate or complete.

**CONFIDENTIAL**

DZB001227

Petters Company, Inc.

Report on financial due diligence

**CONFIDENTIAL**

## 5. Project scope

Summarize Petters' creditors and significant terms of borrowings.

## Summary findings

We received two schedules for all outstanding notes payable as of December 12, 2000 and reconciled them to Petters' November 30, 2000 balance sheet within approximately $100,000. In total, Petters had approximately 166 notes outstanding at December 12, 2000. One schedule consisted of 18 notes with principle amounts owed ranging from $500,000 to $5,900,000. For this schedule, the notes all had a maturity date of one year, paid interest at ˉ percent per month and were not secured by purchased goods. The other schedule consisted of approximately 148 notes with principle amounts ranging from $20,000 to $4,890,000, with a majority ranging from $1,000,000 to $4,000,000. These notes had maturity dates from one month to two years, with a majority having a maturity of approximately three months. Monthly interest rates varied from approximately ˉ percent to ˉ percent, with a majority of the notes accruing interest at ˉ percent to ˉ percent per month and about one-half of these creditors securing their notes by filing Uniform Commercial Code (UCC) security interests on specific merchandise.

While reconciling these schedules to the November 30, 2000 balance sheet, we noted a note payable to Tom Petters of approximately $12.9 million. Management represented that this note was the only note payable to Tom Petters.

We also noted that approximately 57 percent of the notes on the second schedule had creditors asking to receive interest payments in cash, with approximately 43 percent asking to roll their accrued interest into existing note balances.

## Additional procedures performed

- We agreed income per Petters' 1999 tax return to the 1999 financial statements, noting no exceptions.

- We agreed income per Petters accumulated earnings account on the 1999 tax return to owner's equity on the 1999 financial statements, noting no exceptions.

- We reconciled the accounts receivable balance from the Aging Report to the November 30, 2000 balance sheet, noting no exceptions.

For the month ended November 30, 2000, we reviewed the Company's calculation of "Commissions/Participation" expense. This account includes interest expense on the Company's outstanding notes and the commissions paid to Petters' brokers. We compared the interest expense calculated for the month to the Company's schedule of notes payable, noting it to be reasonable. We noted that interest expense for the month approximated ˉ percent of the Company's average outstanding note balance for the month. Management stated that commissions paid to brokers represent approximately 5 percent of revenues. For November 2000, we agreed the commissions paid to outgoing wires on the Company's bank statements, noting no exceptions, as they were approximately 5 percent of revenues.

We reviewed interest and principal payment schedules for January 2000 through November 2000 and judgmentally selected the five largest cash principal payments and the 25 largest cash interest payments for review. We compared the corresponding promissory note to each principal or interest payment selected, noting agreement of the date of the note, due date of the note, principal and interest amounts, interest rates, penalty rates, and interest amount owed per the note. We recalculated penalty interest and accrued interest based on review of due dates versus payment dates. We traced and agreed each principal or interest payment to a

DZB001228

Petters Company, Inc.

Report on financial due diligence

corresponding wire transfer or check copy, noting agreement to Petters' bank statement (date paid and amount paid) and to the terms stated in each corresponding promissory note. We noted all payments (both interest and principal) were made for the amount due per the note, including the proper amounts accrued for penalty interest and days outstanding interest. We noted two interest payments made after the due date and that penalty interest was not accrued for or paid. Upon review of the corresponding promissory notes, we noted no stated penalty rate.

## Other observations

We recommend that the Client require monthly financial statements from the Company prepared in accordance with generally accepted accounting principles (GAAP). This would allow the Client to stay current on the Company's results of operations and financial position. We further recommend requiring the Company to be audited annually, in order to provide more reliance on its financial reporting disciplines.

We noted that some investors file UCC security interests in the merchandise purchased with their funds. This appears to be a prudent way to mitigate risk and we recommend the Client secure all investments in the Company in this manner.

Since we relied on records that were not audited, we cannot assure you that our findings in all areas are accurate and complete.

**CONFIDENTIAL**

DZB001229

## Petters Note Review

| Total Dollars (Millions) | Invested Amount (Millions) | Holders | Notes |
|---|---|---|---|
| $63 | $63 | 1 | Sabes |
| $45 | $45 | 1 | MG |
| $25 | $20-$45 | 2 | IB |
| $55 | $10-$20 | 5 | Avg $11.0 mil |
| $102 | $2-$10 | 17 | Avg $6.0 mil |
| $7 | <$2 | 34 | Avg $0.2 mil |
| $297 | | 60 | Total 174 Notes |

- These are approximations based upon a review of the Petters Note detail.

- Sabes is the largest note holder with $63 million outstanding.

- MG is the second largest note holder with $45 million outstanding.

- IB is the third largest note holders with $25 million outstanding.

- There are five (5) note holders with between $10 to $20 million outstanding. An estimated average is $12 million.

- There are seventeen (17) note holders with between $2 to $10 million outstanding. An estimated average is $6 million.

- There are thirty-four (34) note holders with less than $2 million outstanding. An estimated average is $0.2 million.

- There is approximately $294 million in current outstanding notes.

- There are approximately 60 note holders total.

- There are approximately 174 notes outstanding.

**CONFIDENTIAL**

# PETTERS COMPANY, INC.





7585 EQUITABLE DRIVE    ☐    EDEN PRAIRIE, MINNESOTA 55344
(612) 934-9918 or (800) 499-1308
Fax (612) 934-7564

DZB001231

# THE MISSION

Petters Company, Inc. is dedicated to the acquisition of inventory significantly below regular line cost and sell these goods below line cost solely through the most reputable business associates with the highest of standards. From these efforts, Petters Company, Inc. shall remain a strategic vendor with key retail and wholesale accounts, enabling our customers to either become more competitive in the market or to maintain their competitive advantage. It is our belief that through this endeavor and business standard, all participants will mutually benefit.

# COMPANY SUMMARY

Petters Company, Inc. is a privately held corporation. Thomas J. Petters is the President, CEO and founder, owning 100% of the Company's stock. Petters Company, Inc. is a Minnesota Corporation, operating as an "S-Corporation" with a calendar year. Petters Company, Inc. has remained focused on the merchandise business, purchasing closeout goods for the purpose of resale.

In November of 1995, Petters Company, Inc. started "Petters Warehouse Direct, Inc." Currently this operation consists of 9 locations in three states offering brand name goods to the general public at below prevailing retail prices. Petters Warehouse Direct, Inc. enjoys the benefit of the merchandise business by having a reliable source for products.

Tom's Cyber Warehouse, Inc. (d.b.a. redtagoutlet.com) was founded in August of 1998, with the express purpose of establishing a retail presence on the Internet. The Company utilizes the experience of its management and buyers to obtain name brand merchandise at below wholesale prices and sell them to the public over the Internet.

Petters Company, Inc. purchases inventory from retailers, distributors, manufacturers and financial institutions. Inventories are purchased significantly below original wholesale cost and are pre-sold prior to taking title. Customers enjoy the benefits of having a reliable source to purchase a variety of goods at below traditional line cost.

Petters Company, Inc. corporate headquarters are located in an office/warehouse facility located at 7585 Equitable Drive, Eden Prairie, MN. 55344. This facility is shared with Petters Warehouse Direct, Inc. for general office space and warehouse. If needed, this 65,00 square foot facility will allow the Company to bring in inventory, sort and distribute to waiting customers.



DZB001232

# THE COMPANY

The principle business of Petters Company, Inc is to buy and resell consumer durable goods. Created in 1987, by Thomas J. Petters, Petters Company, Inc. has become a competitive supplier to many large regional and national retailers. By purchasing inventory at lower than original wholesale cost and passing those savings on to its customers in a consistent and reliable manner, Petters Company, Inc. has grown significantly.



| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|---|
| ■ Annual Sales | 4 | 12 | 28 | 69 | 121 | 385 |

**ANNUAL SALES GROWTH
IN MILLIONS OF DOLLARS**

The progress of Petters Company, Inc. is not only measured in terms of gross sales and profitability, but also in terms of the number of suppliers, number of customers, number of investors and the size of the transactions that Petters Company, Inc. is involved in. The diversified complement of suppliers, customers and investors provides a stable base upon which Petters Company, Inc. can continue to expand.

The corporate offices and warehouse facilities of Petters Company, Inc. are located in Eden Prairie, Minnesota, a suburb of Minneapolis. Petters Company, Inc. and its subsidiaries, provide employment for more than 250 individuals. Petters Company, Inc. management includes:

> Thomas J. Petters, President and CEO
> Deanna Munson, Vice President Operations and Investor Relations
> Tom Hay, Legal & Business Relations
> Ted Mondale, Senior VP Marketing & International Corporate Relations
> Theo Brasch, VP International Wholesale & Corporate Relations
> Robert Facente, Executive Vice President



DZB001233

# THE MARKETPLACE

The consumer goods marketplace can best be described as constantly changing and very competitive.  Retailers across the country will continue to face heavy price competition.  This environment in turn creates opportunity for Petters Company, Inc. The competition forces consolidation, reorganization and closure.  This attrition in turn creates excess inventory, which must be liquidated.  This provides Petters Company, Inc. an opportunity to purchase the inventory at a cost significantly below to original wholesale cost.  As an example, just within the last eighteen months, Petters Company, Inc. has secured the following key projects:

➢ Sun TV – Chain of electronic "Super Stores" mainly in the Ohio area with over $40 million in home electronics and major appliance inventory.

➢ Kent International, Brooklyn, N.Y. $3.1 million, multi-line, brand name electronics

➢ Steinberg's, Ohio – A multi-line distributor of name brand electronics.

➢ Montgomery Wards - Denver, Tampa & Phoenix Regions, Electronics, house wares, sporting goods, furniture and appliances.

➢ Dayton/Hudson Corporation - Closing of all electronics departments chain wide.

➢ Incredible Universe (Tandy Corporation) - Liquidation of four stores in New York, Columbus, Indianapolis and Seattle.

As manufacturers continue to focus on volume retailers, the regional players will have to consolidate and/or exit markets. In addition, continuing downward sales trends with select national retailers open up opportunities to acquire new product. The next several years indicate a trend of companies conducting either storewide or department closeouts. This will result in an increased opportunity for Petters Company, Inc.

Additionally, Petters Company, Inc. is currently in dialogue with major manufacturers regarding distribution for their product. Petters Company, Inc. can provide distribution for these products through its network of existing customers. This will provide continuity product, which will in turn enhance our position within the industry.

The market for the merchandise business is dynamic and is changing daily. The ability to focus and react in a timely manner to key opportunities will be paramount in establishing Petters Company, Inc. as a major industry leader.

**CONFIDENTIAL**

# THE SUPPLIERS

Our reputation has been the basis for developing of broad base of suppliers. These national and international suppliers include retailers, distributors, manufacturers and financial institutions. They provide the company with "upper scale" brand name merchandise, which can easily be resold to our various customers.  In fact, it has been the practice of Petters Company, Inc. to have this merchandise pre-sold prior to purchase.

Key components of our competitiveness within this industry is the ability to respond quickly to the suppliers need to move inventory, the confidentiality provided the supplier in these transactions including the final distribution of the inventory and the reputation of consistency, reliability and integrity built and maintained by the company over the years.

## Suppliers to Petters Company, Inc.:

➢ Sony

➢ General Electric Corporation

➢ Sunbeam

➢ Sharp Electronics

➢ AT&T Capital

➢ Hyundai Corporation, Seoul So. Korea

➢ Maytag Credit Corporation

➢ Daewoo Corporation

➢ Akai Electric Company

➢ American Recreation Products (Wenzel)

➢ Harley Davidson Clothing and Apparel

➢ Kowloon – Hong Kong

➢ Samsonite

Because of our reputation and abilities, Petters Company, Inc. can respond quickly to our clients request to move inventory. Key management has developed an extensive database of customers and prospect for a wide variety of goods. The result is that Petters Company, Inc. is on the front end of most transactions pursued.

A large part of the ability to react quickly is based on the quality relationships maintained with key customers. Petters Company, Inc. has the ability to get immediate decisions from customers prior to the inventory acquisition. As a result, large amounts of inventory are purchased prior to sale.



DZB001235

# THE CUSTOMERS

Petters Company, Inc. has also developed a broad stable customer base equally impressive to the supplier base. In fact, certain customers commit to purchasing annual amounts from Petters Company, Inc. and often contact Petters Company, Inc. asking for specific desired product. In response, Petters Company Inc. will search for purchases that can fulfill these requests in addition to responding to other transactions. The result is a clientele that represents diversity and stability.

## Customers of Petters Company, Inc. :

- ➢ Sam's Club / Wal-Mart
- ➢ Costco / National
- ➢ Boscov's
- ➢ Aco Hardware
- ➢ Marc's Stores
- ➢ Hudson's
- ➢ Stuckey's / Great Buy's
- ➢ United Hardware
- ➢ Value City
- ➢ Damark, Direct Marketing
- ➢ ESE Electronics
- ➢ ADAR Distributing
- ➢ Eagle Electronics
- ➢ Value Vision

Our customers have come to depend on Petters Company, Inc. to deliver on time as promised. Many of these customers consult Petters Company, Inc. on a weekly basis for making purchasing decisions.

Customers expect to be able to buy product from Petters Company, Inc. at prices that will allow them to wholesale the product. This typically means that product needs to be purchased far below standard line cost.

**CONFIDENTIAL**

DZB001236

# GROWTH OPPORTUNITIES

As the world becomes smaller, communication becomes faster and markets expand, it is important to be ahead of the game – and that is where The Petters Company is.

The combination of Petters experience in sales, expertise in bringing people together and respect in the community, puts The Petters Company in a unique position of opportunity. We have expanded our specialization to include international name-brand merchandise liquidation, acquisition and distribution.

The Petters Company has expanded into the Asian market and is taking advantage of great opportunities to purchase large quantities of merchandise at low prices directly from manufacturers from Japan, Korea and China.

The Company has developed an international wholesale and corporate development team, led by Ted Mondale. The team includes former US Vice President and Ambassador to Japan, Walter Mondale, James Southwick, from the US Embassy in Tokyo, and others with complete international business and legal experience.

A trade mission to Korea and Japan is scheduled for mid-March, and will include meetings with the Chairmen and senior executives at Samsung, NEC, Canon, Panasonic, Hyundai, Daewoo, Lucky Goldstar and SK Global. The Company has been approached by some of the same corporations, interested in The Company supplying them with merchandise from the United States.

Through our ability to act quickly and make sound business decisions, Petters has been able to establish long-term business relationships with Asian corporations that few US wholesalers have been able to develop. While other wholesalers are just starting to expand internationally, Petters has already reached agreements on flat screen monitors, color TV's, personal electronics and camping gear.

The Company's international team is also developing relationships with Brazil and Latin America for selling and distributing name-brand merchandise.

**CONFIDENTIAL**

# CREDIT POLICY

Robert Facente and Deanna Munson manage the credit department at Petters Company, Inc. Robert has over 20 years of experience in banking and Deanna has over 3 years of experience in collections and over 6 years experience in the credit department.

Petters Company, Inc requires a reference sheet with the following information from each vendor.

- Dun & Bradstreet number
- Federal ID number
- Bank reference
- At least four trade references

If the Purchase Order is under $5,000.00 Petters Company, Inc will check the bank reference and all four trade references.  If bank reference and trade references do not look good then we pull a D & B.

If the Purchase Order is over $5,000.00 Petters Company, Inc will check the bank reference, all four trade references and pull a D & B on the vendor.

If the vendor does not have good credit, Petters Company, Inc will only sell to them on a COD basis.

# COLLECTION POLICY

If Petters Company, Inc does not have payment by the due date the following takes place:

- By the due date: Sales Person calls.
- Within 10 days of the due date: Credit Department calls.
- Within 15-20 days of the due date: Credit Department calls again.
- Within 30 days of the due date: Credit Department calls the owner of the company.
- After 45 days of the due date: Send an attorney letter.
- After 60 days of the due date: Turn it over to American Credit Indemnity.


CONFIDENTIAL



Corporate Structure
Thomas Petters / Petters Companies.

**Thomas J. Petters**
Owner / Co-Owner

**Petters Warehouse Direct, Inc.**
Deep discount closeout/liquidation retailer
of name brand consumer goods.
*(60% Owned by Tom Petters)*
*(40% Owned by Petters Company, Inc.)*

**Petters Company, Inc.**
Wholesale Company that buys
& sells consumer durable goods.
*(100% Owned by Tom Petters)*

**Petters Capital, Inc.**
Wholesale Company that buys
& sells consumer durable goods.
*(100% Owned by Tom Petters)*

**Tom's Cyber Warehouse, Inc.**
d.b.a. Red Tag Outlet
www.redtagoutlet.com
*(70% Owned by Tom Petters)*

1999

CONFIDENTIAL

# KEY PERSONNEL

## THOMAS J. PETTERS

President and CEO of Petters Company, Inc., Petters Warehouse Direct, Inc. and of Tom's Cyber Warehouse, Inc. (d.b.a. redtagoutlet.com) Mr. Petters has held executive positions at Schaak Electronics and Top Brass Stores, as well as ownership in National Superstores. Mr. Petters attended and received a degree from St. Cloud State University, St. Cloud, Minnesota.

## DEANNA MUNSON

Vice President Operations and Investor Relations. Ms. Munson has been with Petters Company, Inc. for more than 7 years. Ms. Munson's experience with Petters Company included vendor management, logistics and relations. Prior to joining Petters Company Ms. Munson held positions in human resources and accounting. She has a degree in Business Education from Moorhead State University, Moorhead Minnesota.

## TED MONDALE

Senior Vice President, Marketing and International Corporate Development. Mr. Mondale joined Petters Company in February 1999. He is Chairman of the Metropolitan Council overseeing urban infrastructure including roads, transit, urban sprawl and the Minneapolis-St Paul International Airport. Mr. Mondale spent 6 years in public office as a State Senator from St Louis Park. His work in the State Senate focused on improving communities, fiscal responsibility and economic opportunities in Minnesota. Mr. Mondale was of counsel to the law firm of Halleland, Lewis, Nilan, Sipkins & Johnson. Previously Mr. Mondale worked at United Health Care as Vice President of Public Affairs.

## ROBERT FACENTE

Executive Vice President, Mr. Facente joined Petters Company in September 1998. Mr. Facente has over 20 years experience in the banking industry. Most recently Mr. Facente held the position of Vice President for Highland Banks in Bloomington Minnesota.



CONFIDENTIAL

DZB001240

## MARK BOLICK

Director of Wholesale Operations, Mr. Bolick joined Petters Company in
December of 1995. Mr. Bolick held senior management positions in sales,
marketing and production in the computer industry for over 14 years. Mr. Bolick
attended and received a Bachelors Degree in Psychology from Gustavus
Adolpitos College St Peter Minnesota.

## Theo Brasch

Vice President International Corporate Relations, Mr. Brasch joined Petters
Company in November 1998. Mr. Brasch's background is in finance. Mr. Brasch
moved to Minneapolis in May of 1997 where he took a position as Finance
Director and Deputy Campaign Manger to the Mondale for Governor Committee.
Prior to working for the Mondale Campaign Mr. Brasch was Deputy Director of
the Democratic Governor's Association in Washington D.C.



DZB001241

# The Transaction

The following outline of information has been created to narrate in a brief, yet informative, manner the "typical" transaction for an investment with the Petters Company, Inc. As a potential new investor, this outline and attached flow chart will help you understand the basic steps involved with the investment.

Investors are very important to the Petters Company, Inc. The company was founded on this simple concept of investor backed business. In fact, the original transaction for the company was performed very much in the same way as all current transactions.

The *basic* scenario for investment transactions is as follows:

Petters Company, Inc. is in the business of buying merchandise and re-selling the merchandise. The product is purchased by Petters Company, Inc. with funding provided by investors. The Investor receives compensation for their investment at a higher than market rate of return for their investment. Investments are secured through a "Promissory Note" and Security Agreement instrument, issued by the company to the investor and credit insurance policy from American Credit Indemnity Company.

The Promissory Note will indicate all of the required information for the investment. (*Such as*: term of the investment, amount of the investment, rate of return for the investment and security for the investment.) Information contained within the "Note" is based on the issues negotiated and agreed upon by the investor and the company. Upon maturity of the Note, the investor will receive the original amount invested plus the interest amount earned over the period of the Note to be distributed as directed by the investor.

**CONFIDENTIAL**

DZB001242

One of the most important factors for this company is the level of *Relationships* built within this business. This business is all about quality relationships. Petters Company Inc. lives by the quality of its relationships, and will do everything to promote the development of quality relationships. Quality in this business is better than quantity. Our outstanding relationship with our investors, retailers, buyers and employees is truly what makes the whole process work.

Having developed many quality relationships, our company is constantly presented with opportunities for transactions. This consistent, rapid, growth has created a need for additional investors. Major national retailers on a regular and more frequent basis call upon our services. Thus, demonstrating our reputation for being able to perform as promised.

For example;

1. A quality client like "Sony" will contact us to see if we are interested in purchasing 20,000 units and a purchasing price will be discussed. The intention is expressed.

2. We contact a quality client like "Wal-Mart" to see if they are interested in purchasing 20,000 "Sony Televisions" from the Petters Company at a specified price. They say "yes".

3. Quality Investors are called upon to invest in the transaction at a specified rate of return.

4. We then contact "Sony Television" to lock in the purchase, having already sold the product to "Wal-Mart", having the investors on line and already knowing what the mark up will be.

5. A Purchase Order is issued to Petters Company from "Wal-Mart" for the Sony Televisions.

**CONFIDENTIAL**

DZB001243

6. A Purchase Order is issued to "Sony Television" from Petters Company for the units purchased by "Wal-mart".

7. A Promissory Note is issued to the investor with attached Purchase Orders documenting the Transaction.

8. The Note will insure the investment by the following instruments.
   1). A Company Guarantee.
   2). An insurance policy from "American Credit Indemnity Company".

9. Product inventory is verified by the Petters Company, Inc. at "Sony Television's" origination location and then shipped directly to "Wal-Mart", very seldom having to be warehoused by the Petters Company, Inc.

10. Product is received by "Wal-Mart" and verified. Payment is made to Petters Company, Inc. At maturity of the "Note", payment is made to the investor.

This is a very simple example of a typical transaction. The key to this working is our quality relationships and ability to perform. This process has taken years to perfect, evolve and mature. A new company in this industry CAN NOT perform at this level.

By ONLY conducting business with reputable companies and investors have we been able to maintain our position in this business. Through our dedication to quality, we have progressively moved to the fore front of this business.

**CONFIDENTIAL**

DZB001244

Over the past five years we have tripled our sales each year, increased in staffing and facilities and have been experiencing more and more repeat business with major national retailers.

➤ No investor has ever lost money.

➤ We only purchase "upper scale" product.

➤ For every transaction performed approximately 10 are turned away.

➤ Merchandise is typically "pre-sold" prior to purchase.

➤ Merchandise is usually shipped direct to buyer.

➤ We will only conduct business with major retailers with quality relationships.

➤ Investors are secured with guarantees contained within the Promissory Note.

➤ "American Credit Indemnity Company" insures orders up to $6.0 Million.

➤ Goods are insured, with investor(s) having first lien across the board.

CONFIDENTIAL

09/25/0... Case 110-04304-TAF 21(9889717 Filed 02/07/20 DAIN RAUSCHER Entered 02/07/20 15:49:09 Desc Main Document Page 201 of 994 ☑026/027

01/16/01 13:23 FAX 61293 ,84 REDTAG ☑004/0

01/16/01

# PETTERS COMPANY, INC.
## Profit & Loss
### January through December 2000

|  | Jan - Dec '00 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Returns & Allowances | -118,383.09 |
| Sales - Merchandise | 1,026,440,475.22 |
| **Total Income** | 1,026,322,092.13 |
| **Cost of Goods Sold** | |
| Commissions/Participation | 131,527,646.64 |
| Freight In | 4,362,250.79 |
| Purchases - Merchandise | 878,492,315.74 |
| Warehouse Expense | 478,543.98 |
| **Total COGS** | 1,014,860,757.15 |
| **Gross Profit** | 11,461,334.98 |
| **Expense** | |
| Accounting | 13,863.86 |
| Amortization | 8,723.68 |
| Automobile Expense | 14,282.32 |
| Bank/Credit Charges | 4,864.69 |
| Business Meetings | 33,161.39 |
| Consulting | 165,397.47 |
| Contract Labor | 28,739.38 |
| Courier | 3,496.67 |
| Depreciation | 30,408.58 |
| Dues and Subscriptions | 1,695.32 |
| Insurance - General | 21,690.17 |
| Insurance - Life/Medical | 173,639.25 |
| Insurance - Product | 54,000.00 |
| Insurance - Vehicles | 6,794.59 |
| Legal | 267,708.14 |
| Miscellaneous | 8,258.38 |
| Office Expense | 7,773.77 |
| Payroll 401K | 22,882.07 |
| Payroll Flex 125 | 2,499.90 |
| Payroll Taxes - Federal | 113,850.07 |
| Payroll Taxes - FICA/MED | 35,304.12 |
| Payroll Taxes - MN | 34,496.53 |
| Postage | 2,895.29 |
| Printing | 1,178.81 |
| Promotions & Gifts | 236,666.54 |
| Rent - Building | 149,146.63 |
| Repairs & Maintenance | 1,962.30 |
| Salaries - Office | 583,332.98 |
| Telephone | 71,363.96 |
| Travel & Lodging | 117,318.05 |
| **Total Expense** | 2,216,508.91 |
| **Net Ordinary Income** | 9,245,825.07 |
| **Net Income** | 9,245,825.07 |

**CONFIDENTIAL**

DZB001246

01/16/01

CONFIDENTIAL

## PETTERS COMPANY, INC.
## Balance Sheet
### As of December 31, 2000

|  | Dec 31, '00 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Associated Bank | 65,523.62 |
| Associated Bank - CD | 2,000,000.00 |
| Highland Bank | 4,016.88 |
| National City Bank | 13,550.38 |
| Petty Cash | 158.70 |
| **Total Checking/Savings** | 2,083,249.58 |
| **Other Current Assets** | |
| Accounts Receivable - Inventory | 345,653,043.41 |
| Inter - Companies Loans | 7,472,682.77 |
| Loan to Officer | 22,151.00 |
| **Total Other Current Assets** | 353,147,877.18 |
| **Total Current Assets** | 355,231,126.76 |
| **Fixed Assets** | |
| Accumulated Amortization | -18,550.57 |
| Accumulated Depreciation | -64,812.96 |
| Equipment | 47,630.15 |
| Furniture & Fixtures | 167,670.43 |
| Leasehold Improvements | 61,067.47 |
| Security Deposit | 20,088.00 |
| **Total Fixed Assets** | 212,992.52 |
| **Other Assets** | |
| Investment - Petters Warehouse | 6,897,875.00 |
| Investment - Real Estate | 60,000.00 |
| **Total Other Assets** | 6,957,875.00 |
| **TOTAL ASSETS** | 362,401,994.28 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Accounts Payable | 49,883,613.54 |
| **Total Accounts Payable** | 49,883,613.54 |
| **Other Current Liabilities** | |
| Bank Windsor - Line of Credit | 2,000,000.00 |
| Notes Payable | 274,418,515.67 |
| **Total Other Current Liabilities** | 276,418,515.67 |
| **Total Current Liabilities** | 326,302,129.21 |
| **Total Liabilities** | 326,302,129.21 |
| **Equity** | |
| Common Stock | 5,000.00 |
| Dividend Payment | -2,600,000.00 |
| Retained Earnings Prior Years | 29,449,040.00 |
| Net Income | 9,245,825.07 |
| **Total Equity** | 36,099,865.07 |
| **TOTAL LIABILITIES & EQUITY** | 362,401,994.28 |

DZB001247

# EXHIBIT T-10

# MAYER, BROWN & PLATT

190 SOUTH LA SALLE STREET

CHICAGO, ILLINOIS 60603-3441

December 28, 2001

To the Persons Listed on Schedule I hereto

     Re:    Opportunity Finance Securitization, LLC

Ladies and Gentlemen:

We have acted as special counsel to Opportunity Finance, LLC ("Opportunity"), in connection with certain transactions (the "Transactions"), being entered into by the Agent, as contemplated by the following documents (each, unless otherwise indicated, dated as of the date hereof):

    (i)    a Purchase and Contribution Agreement (the "Purchase Agreement") between Opportunity, a Delaware limited liability company, as the Seller (in such capacity, the "Seller"), and Opportunity Finance Securitization, LLC (the "SPV"), a Delaware limited liability company; and

    (ii)    a Receivables Loan and Security Agreement (the "Receivables Agreement") among Opportunity, as Servicer (in such capacity, the "Servicer"), SPV, as Borrower (the "Borrower"), Autobahn Funding Company, LLC, as Lender (the "Lender"), DZ Bank Deutsche Zentral-Genossenschaftbank, Frankfurt am Main, as Agent and as Collateral Agent (in such capacity, the "Agent"), Royal Indemnity Company, as Facility Insurer and U.S. Bank National Association, as Custodian Trustee and Backup Servicer.

The agreements described in items (i) and (ii), above, are referred to herein as the "Agreements" or the "Transaction Documents." All capitalized terms used and not otherwise defined herein are used as defined in the Purchase Agreement and in the Receivables Agreement.

In addition to the Agreements, we have reviewed copies of the organizational documents (the "Organizational Documents") of SPV, which have been certified to us as and which we assume are true, complete and correct copies by SPV.

In connection with the Agreements, you have requested our opinion as to whether in the event the Seller became a debtor in a voluntary or involuntary case under Title 11 of the United States Code, as amended (the "Bankruptcy Code"), the court having jurisdiction over such case would:

12893465 01920041

DZB019159

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 2

(i)     hold (a) the conveyance and contribution of the Receivables, the Related Security
        and the Other Conveyed Property (each as defined in the Agreements and
        collectively herein, the "Receivables") by the Seller to SPV contemplated by the
        Purchase Agreement, to be true conveyances or instead to be secured loans and
        (b) that the Receivables and the collections thereon to be property of the Seller's
        bankruptcy estate under Section 541 of the Bankruptcy Code and, therefore,
        would compel the turnover of such Receivables and collections by SPV to the
        Seller under Section 542 of the Bankruptcy Code, and (c) determine that the
        automatic stay provisions of Section 362(a) of the Bankruptcy Code prevent
        payments on or with respect to the Receivables; or

(ii)    substantively consolidate the assets and liabilities of the Seller and SPV.

Our opinion is limited to the specific issues addressed and is further limited in all
respects, except as otherwise stated, to the facts assumed. Specifically, but without limiting the
foregoing, we express no opinion about the effect of the laws of any jurisdiction other than the
laws of the State of New York and the Bankruptcy Code, which is a federal law of the United
States of America. In rendering our opinions set forth herein, we have assumed that the laws of
the State of New York would apply to all aspects of the Transactions that are governed by state
laws in accordance with the selection of New York law as the governing law in each of the
Agreements.

## I. ASSUMPTIONS OF FACT

As to all factual matters material to the opinions set forth herein, we have, with your
permission and without any investigation or independent confirmation, relied upon and assumed
the present and continuing truth and accuracy of those factual representations made in the
Agreements or made in the certificates ("Officers' Certificates") provided to us by officers of the
Seller and SPV (and attached hereto as Exhibits A-1 and A-2), except to the extent that any such
fact or circumstance relates to the financial condition of the Seller or SPV other than on the date
of and immediately following the consummation of the Transactions. We have assumed that all
facts and circumstances described in this Part I will continue to exist, without any change in such
facts and circumstances that might be material to such opinions, except to the extent that any
such fact or circumstance relates to the financial condition of the Seller or SPV other than on the
date of and immediately following the consummation of the Transactions. Further, we have
assumed, based upon the Officers' Certificates and other representations by officers of the Seller
and SPV in the Agreements, that the issuance of SPV's membership interests to the Seller in
return for the contribution by the Seller to SPV pursuant to the Purchase Agreement, and that
any and each sale by the Seller to SPV of a Receivable and any related rights (including any

DZB019160

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 3

subsequent sale), in each instance, provide fair consideration and reasonably equivalent value to the Seller under applicable law, including applicable fraudulent conveyance law.

For the purposes of this opinion, we have assumed (i) the due authorization, execution and delivery by all parties thereto of all documents examined by us, including the Agreements, (ii) that each party to each Agreement had and has the power and authority to enter into and perform all of its obligations thereunder, and that the performance, execution and delivery of each such Agreement and the Transactions by each such party was duly authorized by all necessary company action, (iii) that none of the conveyances of assets did or will contravene or conflict with the Seller's or SPV's organizational documents, any law, regulation or rule of any governmental authority or any agreement, instrument, writ, injunction, decree or order binding on any party thereto or relating to any assets, (iv) that each Agreement was and is a legal, valid and binding obligation of each of the parties thereto, enforceable in accordance with its terms and there has been no (and there will not be any) fraud in connection with any of the Transactions and (v) that each party to such Agreements was and is duly organized, validly existing and in good standing under the laws of each party's state or jurisdiction of organization (and each other jurisdiction where the nature of such party's business so requires).

We have assumed, based upon the foregoing assumptions, and other representations, that the relevant facts regarding the Transactions and the corporate/company conduct of the Seller and SPV are and will remain (except to the extent that any such factor relates to the financial condition of the Seller or SPV other than on the date of (and immediately following) the consummation of the Transactions) as set forth in the following Subparts A and B:

A.    **Transactions Contemplated by the Agreements**

The Seller is a limited liability company formed under the laws of the State of Delaware. SPV is a limited liability company formed under the laws of the State of Delaware. SPV is a wholly-owned subsidiary of the Seller and was formed for the special purpose of purchasing Receivables from the Seller pursuant to the Purchase Agreement, entering into agreements for the servicing of such Receivables, entering into the Receivables Agreement to obtain financing for the purchase price of the Receivables and other property related thereto and conducting such other activities as SPV reasonably deems necessary or appropriate to carry out SPV's primary activities.

Upon terms and conditions set forth in the Agreements, the Seller and SPV are entering into the Purchase Agreement that provides for, among other things, the conveyance by the Seller to SPV of Receivables generated from time to time, together with the related rights and other property related thereto.

12893465 01920041

DZB019161

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 4

Prior to the commencement of the Transactions, SPV was created as a wholly owned subsidiary of the Seller. The Receivables held by SPV were sold to SPV by the Seller pursuant to the Purchase Agreement.

SPV has requested Lender, and Lender has agreed, subject to the terms and conditions contained in the Receivables Agreement, to make loans to finance the SPV's purchase of such Receivables from time to time during the term of the Receivables Agreement. According to the Receivables Agreement, no new loans are required to be made by Lender if, after giving effect to such loan, a Program Deficiency shall occur.

There is no agreement or provision in the Agreements that Seller will retain any interest as an owner of any of the Receivables. The transfer of the Receivables by Seller to SPV will be made without recourse to Seller except as described below. The Seller will make certain representations and warranties with respect to the Receivables. Additionally, SPV has the limited right to require Seller to accept the reassignment of certain Receivables buy only to the extent of the Limited Recourse Balance, if any, which should in no event exceed 2% of the aggregate original balance of the outstanding Conveyed Receivables.

The Seller and SPV intend for the transfers of Receivables under the Purchase Agreement to be true sales and/or contributions by the Seller to SPV that are absolute and irrevocable and that provide SPV with the full benefits of ownership of the Receivables. Neither the Seller nor SPV intends the transactions contemplated under the Purchase Agreement to be, or for any purpose to be characterized as, loans from SPV to the Seller. Nor is it the parties' intention that the conveyance of the Receivables be deemed a grant of a security interest in the Receivables by the Seller to SPV to secure a debt or other obligation of the Seller.

The transfers of the Receivables to SPV pursuant to the Purchase Agreement were and will continue to be booked, filed, reported and disclosed as contributions and sales for accounting[1], tax and other purposes.

SPV or the Seller (or any successor Servicer appointed in accordance with the Receivables Agreement), acting as "Servicer" on SPV's behalf, will have the sole right to service, administer, and collect the Receivables. Servicer will take, or cause to be taken, all such actions as may be necessary to collect each Receivable, with reasonable care and diligence and consistent with its current practices. Pursuant to the Agreements, the Seller (in its capacity as

---

[1] It should be noted that such accounting treatment relies, in part, on the conclusions expressed in this opinion.

12893465 01920041

**MAYER, BROWN & PLATT**

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 5

Servicer) will transfer physical possession of all documents and agreements related to the Receivables to the Custodian. The Seller will cause, and will continue to cause, the computer files relating to the Assets to be marked to evidence that such assets have been transferred to SPV. Because of the administrative burden it would otherwise impose, such books and records themselves will not be segregated by the Seller, nor will they be stamped or marked to reflect the contributions or sale, as the case may be, to SPV, but in the ordinary course of business, such books and records were not and will not be provided to creditors of the Seller except in conjunction with the marked computer files and except for the sole purpose of verifying the Seller's capacity and performance of its duties as Servicer. The Seller, or its successor, was and will continue to be paid reasonable compensation for its services as the Servicer. Such compensation was and will continue to be paid on a current basis as provided in the Receivables Agreement.

The Servicer, pursuant to the provisions of Section 2.23 of the Receivables Agreement, shall direct each Opportunity Loan Borrower and the related Approved Distributor to direct or otherwise cause the Retailer of the Retailer Receivable related to each Receivable to pay such Opportunity Loan Borrower by wire transfer into the applicable Approved Distributor Collection Account all amounts payable by such Retailer in respect of such Retailer Receivable. Opportunity and the SPV, pursuant to the provisions of Section 2.23 of the Receivables Agreement, shall direct each Opportunity Loan Borrower and its related Approved Distributor to remit all funds payable in respect of Receivables to the Collection Account.

**B.    Corporate Conduct**

The Organizational Documents of SPV state that the nature of the business or purpose to be conducted or promoted by SPV is as follows:

(a)    to purchase or otherwise acquire from time to time Receivables and to enter into any related agreements with any Affiliates or any other Person or Persons;

(b)    to purchase, acquire, own, hold, service, process, settle, collect, sell, grant a lien on, assign, pledge and otherwise deal with the Receivables, collateral securing the Receivables and any proceeds or further rights associated with any of the foregoing and to enter into any related agreements with third parties or any other Person or Persons;

(c)    to manage and service the Receivables pursuant to one or more agreements to be entered into by and among, among others, SPV and any Person or Persons acting as servicer or collection agent of the Receivables;

12893465 01920041

DZB019163

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 6

     (d)     to borrow funds and issue evidence of indebtedness in respect thereof, and to sell and assign Receivables or interests in Receivables and issue evidences of ownership or assignment in respect thereof, in each case in order to finance or facilitate the purchase of Receivables, and to secure such borrowings and indebtedness, as well as obligations incurred by SPV in connection therewith or in connection with such sales, assignments and ownership with (and pledge and grant liens on and security interests in) assets acquired from time to time by SPV and by other assets and properties which SPV owns from time to time or in which it otherwise has a right, title or interest;

     (e)     to enter into the Purchase Agreement, the Receivables Agreement and each other agreement, instrument, promissory note, certificate, Uniform Commercial Code financing statement or document contemplated by the Purchase Agreement or the Receivables Agreement, and any amendment, amendment and restatement or other modification of such Purchase Agreement, Receivables Agreement, other agreement, instrument, promissory note, certificate, Uniform Commercial Code financing statement or document;

     (f)     to carry out all of its obligations and exercise all of its rights under the agreements, instruments, promissory notes, certificates, financing statements or documents set forth in paragraph (e) above; and

     (g)     to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that, in either case, are incidental to and necessary or convenient for the accomplishment of the above-mentioned purposes.

     We assume that the formation and isolation of SPV was a necessary precondition to the execution and delivery by the Lender of the Receivables Agreement and that the Lender would not have extended the same terms and conditions set forth in the Receivables Agreement directly to the Seller.  SPV's separate existence and operations, therefore, will allow the Receivables to be financed, through the Transactions, on better terms and conditions than those that the Seller itself could obtain.  This structure will enable the Seller to lower the funding cost associated with the Receivables and thereby benefit both the Seller and its creditors.

     The location (for purposes of Article 9 of the UCC of all applicable jurisdictions) of the Seller is Delaware, and the location (for purposes of Article 9 of the UCC of all applicable jurisdictions) of SPV is Delaware.

12893465 01920041

DZB019164

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 7

SPV's organizational documents provide that it will have three directors. SPV's limited liability company agreement provides that its members will cause to be elected at least one Independent Director. An "Independent Director" shall be an individual who has never been, and shall at no time be, a stockholder, director, officer, employee or associate, or any relative of the foregoing, of any member of the Seller or any of its Affiliates (other than SPV and any other bankruptcy-remote special purpose entity formed for the sole purpose of securitizing, or facilitating the securitization of, financial assets of the Company or any of its Affiliates.

The Independent Director has been paid a fee for its activities on behalf of SPV in amounts negotiated with such Independent Director on an arm's-length basis. Whenever necessary, SPV obtains proper authorization from its directors or its member. For instance, without the affirmative consent of the Independent Director, SPV will not file or cause to be filed a petition in bankruptcy for itself. SPV observes and will continue to observe all requirements of the Limited Liability Company Act of the State of Delaware and its organizational documents.[2]

Except as indicated above with respect to the books and records relating to the Receivables, SPV's books and records are and will be maintained separately from those of the Seller. Any annual financial statements of the Seller, including any annual financial statements of the Seller which are presented on a consolidated basis and include the SPV, will contain a note to the effect that the Seller has contributed or sold Receivables to SPV, which is a separate legal entity and which then has entered into the Receivables Agreement with the Lender. Except with respect to the servicing of the Receivables (which is to be done by the Seller in its capacity as Servicer), each of SPV and the Seller conducts its business solely in its respective company name and in such a separate manner so as not to mislead others with whom they are dealing.

The Seller and SPV will disclose the Transactions publicly through the filing of UCC financing statements (the "UCC Financing Statements") in appropriate jurisdictions and, for all purposes of this opinion, we assume that the security interest of the SPV in the Receivables created as a result of the sales thereof by the Seller to the SPV will, at all times, be perfected for purposes of the UCC in all applicable jurisdictions. Neither the Seller nor SPV has concealed or will conceal from any interested party any transfers contemplated by the Agreements, although the Opportunity Loan Borrower will not be affirmatively informed in the first instance of the transfer of its obligations. Neither the Seller nor SPV has itself removed or concealed, and will

---

[2]   However, this opinion is not dependent upon the compliance with or the enforceability of the "Independent Director" provisions to which reference is made in this, and the preceding, paragraph.

12893465 01920041

DZB019165

**MAYER, BROWN & PLATT**

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 8

not itself remove or conceal, from creditors any of its assets and has not participated and will not participate in removing or concealing the assets of any other entity. The Seller and SPV are not entering into the Transactions with the intent of hindering, delaying or defrauding present or future creditors.

Each officer and director or member or director of the Seller and officer, member or director of SPV did and (we assume) will discharge his or her respective fiduciary duties and obligations in accordance with all applicable laws. The parties to the Agreements did and (we assume) will comply with the terms thereof and with the requirements of applicable law, in all respects material to the issues discussed herein.

We further assume that the Seller, SPV, the Agent, the Facility Insurer and the Lender did enter and are entering into the Agreements and consummating the Transactions in reliance on the identity of SPV as a separate legal entity, and that the SPV, the Agent and the Lender believe that the substantive consolidation of the Seller and SPV would be inequitable, harmful and prejudicial to them. particularly as to the Lender.

We assume, based on the Officers' Certificates, that Seller and SPV did and will continue to maintain SPV's separate existence and identity and did and will continue to take all steps necessary to make it apparent to third parties that SPV is an entity with assets and liabilities distinct from those of the Seller or any other subsidiary or affiliate of the Seller. In addition to the foregoing, such steps and indicia of SPV's separate identity include the following:

(a)    To the extent necessary for its limited operations, SPV does and will maintain its own mailing address, stationery, and other business forms separate from those of any other Person (including the Seller) and will conduct business in its own name except that, as a general matter, the Opportunity Loan Borrower will not be informed in the first instance that Servicer is acting on behalf of SPV;

(b)    To the extent a physical location is required, SPV will conduct its business at an office separate from the offices of the Seller (which however, may be within the premises of the Seller);

(c)    The Seller may issue consolidated financial statements that will include SPV, but such financial statements will contain a footnote to the effect that the Seller contributed or sold the Receivables to the SPV, which is a separate legal entity and which has then entered into the Receivables Agreement with the Lender. Separate financial statements will also be prepared for SPV. In addition to the aforementioned footnote to any consolidated financial statement, the Seller and

12893465 01920041

DZB019166

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 9

SPV will take certain actions to disclose publicly SPV's separate existence and the Transactions, including, without limitation, through the filing of the UCC Financing Statements. Neither the Seller nor SPV has concealed or will conceal from any interested party any transfers contemplated by the Agreements, although the Opportunity Loan Borrower will not be affirmatively informed in the first instance of the transfer of their obligations;

(d)     The Seller has caused the Independent Director to be elected, and SPV compensates the Independent Director as described above;

(e)     SPV will not have its own employees, and, as indicated, SPV's business relating to the Receivables (and other property related thereto) will be primarily conducted through the Seller as Servicer;

(f)     Except as provided in paragraph (e) above regarding the allocation of certain shared overhead items, SPV does and will pay its own operating expenses and liabilities from its own funds, except the Seller did and will pay all expenses of the SPV incurred in connection with the Transactions including SPV's organization;

(g)     Each of the Seller, on the one hand, and SPV, on the other hand, does and will maintain its assets and liabilities in such a manner that it is not costly or difficult to segregate, ascertain or otherwise identify its individual assets and liabilities from those of the other or from those of any other person or entity, including any other subsidiary or affiliate of the Seller. Except as set forth below, SPV does and will maintain its own books of account and corporate records separate from the Seller or any other subsidiary or affiliate of the Seller. SPV does not and will not commingle or pool its funds (or other assets) or liabilities with those of the Seller or any other subsidiary or affiliate of the Seller except as contemplated by and as specifically provided for in the Receivables Agreement with respect to the temporary commingling by the Servicer of Collections of the Receivables and the other property related thereto; and except with respect to the Seller's retention, in its capacity as Servicer, of the books and records pertaining to the Receivables. SPV does not and will not maintain joint bank accounts or other depository accounts to which the Seller or any other subsidiary or affiliate of the Seller (other than the Seller solely in its capacity as Servicer) has independent access;

(h)     Each of the Seller, on the one hand, and SPV, on the other hand, will observe company formalities, including with respect to its dealings with the other.

12893465 01920041

DZB019167

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 10

Specifically, no transfer of assets between the Seller, on the one hand, and SPV, on the other hand, will be made without adherence to all necessary corporate or limited liability company, as the case may be, formalities;

(i)    The Transactions, particularly between the Seller, on the one hand, and SPV, on the other hand, including the amount and payment of the servicing fee, are on terms and conditions that are consistent with those of arm's-length relationships. Neither SPV, on the one hand, nor the Seller or any other subsidiary or affiliate of the Seller on the other hand, is or will be, or holds or will hold itself out to be, responsible for the debts of the other or, except as provided in the Receivables Agreement with respect to the duties of the Servicer, the decisions or actions respecting the daily business and affairs of the other;

(j)    All distributions made by SPV to the Seller as a member of the SPV will be made in accordance with applicable law and SPV's organizational documents;

(k)    Any other transactions between the Seller, on the one hand, and SPV, on the other hand, permitted by (although not expressly provided for in the Agreements) have been and will be fair and equitable to SPV, on the one hand, and the Seller, on the other hand, have been and will be the type of transaction that would be entered into by a prudent Person in the position of SPV vis a vis the Seller, and have been and will be on terms that are at least as favorable as may be obtained from a Person who is not the Seller; and

(l)    On balance, SPV has been and will be held out to the public as a separate entity apart from the Seller.

The management of each of SPV and the Seller has analyzed the business and operations of SPV, and each is reasonably confident, and we hereby assume, that SPV, as of the date hereof: (i) is adequately capitalized to conduct its business and affairs as a going concern, considering the size and nature of its business and intended purposes; (ii) is solvent, including, without limitation, that it has not been rendered insolvent by the Transactions; and (iii) intends to and believes that it will be able to pay its debts as they come due. As a result, SPV is intended to and is reasonably expected to survive as a stand alone entity, independent of financial assistance of any Person not contemplated by the Agreements. The Seller's and SPV's respective managements do not anticipate any need for the Seller to extend advances to SPV. Although we note that the amount of SPV's capital may fluctuate from time to time, at no point is SPV expected to be rendered insolvent or left with unreasonably small capital as a result thereof.

12893465 01920041

DZB019168

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 11

We hereby assume that the Seller, as of the date of the initial borrowing under the Receivables Agreement: (i) is adequately capitalized to conduct its business and affairs as a going concern considering the size and nature of its business and intended purposes; (ii) is solvent, including, without limitation, that it has not been rendered insolvent by the Transactions; and (iii) intends to and believes that it will able to pay its debts as they come due.

There is no litigation pending or, to the best of the knowledge of the Seller or SPV, as the case may be, threatened against the Seller, or SPV, as the case may be, in which there is a reasonable possibility of an adverse decision which could result in material harm to their respective financial conditions.

The consolidation of the business operations of SPV, on one hand, with those of the Seller, on the other hand, would not result in any significant cost savings or in significantly greater efficiency of such combined business operation.

12893465 01920041

DZB019169

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 12

## II. DISCUSSION

A.    **True Conveyance**

1.    General Parameters of and Reasoning Underlying True Conveyance Analysis

The general parameters of and reasoning underlying our analysis of the "true conveyance" issue are set forth in Appendix I hereof and are incorporated herein by reference.

As set forth therein, it appears (and you have permitted us to assume) that a court would analyze the issue under either or both of two possible theories, which are (1) general state corporate and common law principles; and (2) general principles enunciated in state law "true sale" cases.

2.    Application to the Transactions

(a)    General State Corporate and Common Law Principles

In the instant case, the subjective intent of the Seller and SPV that the contribution and sale of the Receivables under the Purchase Agreement be a true contribution and sale and not a disguised loan is clear.[3]  As set forth above, the Seller hopes to realize certain financial benefits from the Transactions that are available in the marketplace only if the transfer of the subject assets to SPV is intended as a true conveyance.

If a court, however, were not inclined to limit its analysis to the subjective intent of the Seller and SPV, it would further analyze the objective indicia of such intent.  In the current situation, the expression of intent in the documents is unambiguous, viz., the Seller and SPV expressly state that they intend the transfers by the Seller to SPV to be unconditional and absolute, and that the Seller retains no interest in the Receivables after a transfer.

---

[3]    The analysis which follows in this letter does not treat contributions differently from sales, as we have concluded that the analysis would essentially involve a consideration of the same principles and factors that are likely to be operative in the sale context.  However, to the extent that the Receivables have been contributed (rather than sold) by the Seller to SPV, the absence of any payment by SPV to Borrower by reason of such contribution other than membership interests, is an additional reason why such transfer should be recognized as an absolute transfer rather than as a loan.

12893465 01920041

DZB019170

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 13

Moreover, the other objective indicia involved in the sales and contributions support a finding that the Seller intended such an absolute conveyance. Any attempt to recharacterize the contribution or sale of the Receivables as a loan between the Seller and SPV would be inconsistent with the terms of the agreements between the Seller and SPV. While it could be argued that the transfer of the Receivables by the Seller to the SPV and the distribution of the proceeds of such sale to the Seller represent a non-recourse loan to the Seller (either by Lender to SPV and then by SPV to the Seller or directly by Lender to the Seller) secured by the Receivables, such recharacterization would also be inconsistent with the stated intent and the structure of the Transactions. For example, there is no principal repayment obligation or interest payment obligation imposed on the Seller. Furthermore, insofar as such recharacterization would contend that the Lender has made a direct loan to the Seller, this would ignore the existence of SPV as a separate legal entity, which, as explained in the following "true sale" section of this opinion, a court generally will not do.

(b)    "True Sale" Decisions

As described in Appendix I hereof, judicial decisions on "true sale" issues generally take one or both of two approaches, which we have defined as the First and Second Approaches.

As described in Appendix I hereof, the First Approach gives presumptive weight to the stated intent of the parties. We would expect that a court analyzing the Transactions in accordance with the First Approach would emphasize, among other things, that (i) the parties to the Agreements have stated in the Purchase Agreement that they intend the transfers of the Receivables pursuant thereto to be true conveyances, (ii) the Transactions are premised on the sales of Receivables pursuant to the Agreements, and the Lender and other parties have required the parties to such sales of Receivables to structure them as true conveyances, (iii) the Seller and SPV have treated and will continue to treat such contributions and sales of Receivables as contributions and sales under generally accepted accounting principles, (iv) the Seller has and will continue to note in its computer files that the ownership of the Receivables has been transferred and has made appropriate UCC filings to provide public notice of the conveyances of Receivables and (v) for the reasons set forth in the balance of this Part A, the other aspects of the sales of Receivables pursuant to the Agreements are consistent with being a true conveyance. Accordingly, we believe that such a court would consider the contributions and sales of the Receivables pursuant to the Agreements to be true conveyances.

As described in Appendix I, courts applying the Second Approach purport to discern the intent of the parties based on objective considerations beyond the parties' stated intent. The following constitutes our analysis of the principal attributes of the transfers of Receivables

12893465 019200041

DZB019171

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 14

pursuant to the Agreements in terms similar to those we would expect a court taking the Second
Approach to adopt.

Most material attributes of the transfers of Receivables pursuant to the Agreements are
indicative of true conveyances under the Second Approach:

1. The Purchase Agreement expressly intends a true conveyance. Generally, the
parties' characterization of the transactions will control if supported by the facts.
See the discussion of the First Approach, supra, and footnote 8 of Appendix I, as
well as pertinent discussion in Appendix I;

2. The transfers of the Receivables to SPV pursuant to the Purchase Agreement were
and will continue to be booked, filed, reported and disclosed as contributions and
sales for accounting, tax and other purposes;

3. Except as set forth below (and only to the extent that SPV's rights can properly be
characterized as constituting such recourse), SPV has no recourse to the Seller for
uncollectibility of payments to be made pursuant to the Receivables. Section
2.1(b) of the Purchase Agreement between the Seller and SPV states, that all sales
and contribution are ". . . for all purposes, except to the extent specifically
provided herein, without recourse." Furthermore, neither the Seller nor any other
affiliate thereof has any obligation to maintain the solvency of SPV. Pursuant to
Section 6.1 of the Purchase Agreement, the Seller will be obligated to repurchase
or accept reassignment of certain Receivables and other property related thereto
through a reimbursement in cash if the interests of SPV in such Receivables and
other property related thereto are affected by a breach of certain representations
and warranties made by the Seller with respect to such Receivables as of the date
they are so transferred to the SPV. In addition, the Seller will be obligated to
indemnify (i) the SPV for breaches of representation and warranties by it, and for
certain other events under the Transactions that are, in each case, unrelated to the
ultimate creditworthiness of the Opportunity Loan Borrower and (ii) solely in its
capacity as Servicer under the Receivables Agreement, the Lender, the Agent and
their respective assigns for breaches of its duties as Servicer thereunder. Finally,
pursuant to the Purchase Agreement, the Seller will be obligated to repurchase
and accept reassignment of certain Receivables that become Defaulted
Receivables on the date specified in a notice given by the SPV to the Seller (the
"Repurchase Obligation"); provided, however, that such Repurchase Obligation
and the Reassignment Amount payable by the Seller to the SPV is limited to the
Limited Recourse Balance, if any, as of the close of business of the immediately

12893465 01920041

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 15

preceding calendar month.  We understand, and you have permitted us to assume, that in no event will the Limited Recourse Balance exceed 2% of the aggregate original balance of the outstanding Conveyed Receivables.  Such liability is expected to be de minimis.

4.  The transfers of the Receivables by the Seller to SPV are irrevocable and (except to the extent of the limited right to reassign certain Receivables) the Seller's only retained rights are those which relate to its role as Servicer and enable it to maximize collections in an efficient manner;

5.  The Receivables are, in the case of each conveyance, specific and identifiable;

6.  It would be inequitable to the Agent, the Lender and their respective successors and assigns, to recharacterize the contributions and sales of Receivables by the Seller to SPV as a loan;

7.  The Purchase Agreement contains no provision that, in the event of the bankruptcy or insolvency of the Seller, changes the terms and provisions of the Purchase Agreement or the relationship between the Seller and SPV with respect to the Receivables by means of acceleration of amounts due or otherwise; and

8.  Due to disclosures made to certain of the Seller's existing and future creditors including, without limitation, pursuant to the filing of UCC Financing Statements, and inclusion of the notes disclosing the existence of the transactions in the Seller's consolidated financial statements and the nature of investigations customarily undertaken by the Seller's creditors and prospective creditors as we understand them to be, no such creditor or prospective creditor would be expected to be reasonably misled as to the nature of the Transactions or the ownership of the Receivables.

A court, however, might find that certain attributes of the Transactions indicate that the purported contributions and sales by the Seller should be treated as a single transaction which is properly recharacterized as a loan.  Such attributes would include the following: (i) the Seller acts as the initial Servicer, (ii) SPV is a wholly-owned subsidiary of the Seller (iii) SPV's limited recourse to the Seller related to certain representations and warranties with respect to the Receivables and the Repurchase Obligation, and (iv) payments received with respect to the Receivables may be temporarily commingled with collections with respect to other receivables originated by Seller.

12893465 019200041

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 16

With the exception of factor (ii) and (iii), however, all of the factors weighing against a
true conveyance are factors designed to maximize collections in an efficient manner, to avoid
disrupting customer relationships. These factors should not be deemed to be inconsistent with a
true sale. It is true that the Seller will act as initial servicer of the Receivables, but under the
terms of Section 6.14 of the Receivables Agreement, the Agent may, upon the occurrence and
continuation of a Servicer Default, designate the Trustee as Backup Servicer to succeed the
Seller as the Servicer. This option on the part of Agent increases the likelihood that a court
would find the Transactions to involve a true sale and not a loan.

Also more specifically, with regard to the rights of the Servicer referred to in item (i) to
exercise dominion and control over the Receivables in a manner that is similar to that generally
exercised by the owner of such assets (including particularly Servicer's right to forego collection
of certain Receivables as set forth in Section 6.01(c) and to make all reasonable efforts to collect
all payments called for under the terms and provisions of the Receivables as set forth in Section
6.02 of the Receivables Agreement), we believe that the following factors, among others,
support the conclusion that these rights should not cause the Transactions to be recharacterized
as a loan: (a) the Servicer is not obligated to exercise such rights to forego collection of certain
Receivables and, in fact, pursuant to Section 6.01(c) of the Receivables Agreement, is only
permitted to forego such collection if, it does not violate the terms of Section 6.02 as discussed
in clause (b) below and in the reasonable judgment of the Servicer, the cost of collection of such
Receivable would exceed the amounts to be collected with respect to such Receivable, (b)
pursuant to Section 6.02 the Servicer shall not grant payment extensions on any Receivable or
permit any other modifications or amendments to a Receivable; (c) the provisions are not
designed to provide recourse but rather to permit the maintenance of good customer relations;
(d) all such efforts to collect Receivables will enhance the original loan and not vary from the
industry norm; (e) SPV will continue to own any Receivables resulting from such modifications;
and (f) we understand that servicers have been given comparable, or even greater, powers in
certain other rated securitizations of other financial receivables.

With respect to factor (ii), it could be argued that the contributions and sales of
Receivables to SPV are not bona fide conveyances because SPV is a wholly-owned subsidiary of
the Seller and therefore the Seller is still, as a practical matter, the owner of the Receivables, as it
is indirectly affected by whether the Receivables are realized. This argument should be rejected
by a court. In general, corporate law does not prevent a the Seller from contributing or selling an
asset to a subsidiary. Absent application of a doctrine such as fraudulent conveyances,
substantive consolidation, alter ego, instrumentality or a similar doctrine or of a specific federal
or state statute, a court normally will not disregard transactions between a the Seller and its
subsidiary, and will recognize and uphold the separate existence of the subsidiary.

12893465 01920041

DZB019174

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 17

With respect to factor (iii), it could be argued that the conveyance of the Receivables is not bona fide because the SPV retains limited recourse with respect to sales and contribution of the Receivables in the Purchase Agreement. Pursuant to the Purchase Agreement, the Seller will give certain representations and warranties in favor of SPV relating to the Receivables. However, such recourse is not intended to and does not eliminate the risk assumed by SPV that the Opportunity Loan Borrower may default on the Receivables, and thus, although it represents recourse to the Seller, it does not constitute, in our view, recourse relating to the ultimate creditworthiness of the Opportunity Loan Borrower and, as such, in our view, is not inconsistent with the true sale nature of the transactions (see supra note 4). Specifically, with respect to the repurchase obligation described in paragraph (iii) above, we understand that the relevant representations and warranties in the Agreements are customary for transactions of this type, relate to the nature of the Receivables at the time of their purchase and sale thereunder. In effect, the provisions for repurchase and indemnity are intended to ensure that SPV will receive the type of assets that it has bargained to purchase. As such, they do not transfer the risk of nonpayment on the Receivables by the Opportunity Loan Borrower from SPV to the Seller.

In addition, under the Agreements, SPV has the right to receive the Reassignment Amount with respect to the Repurchase Obligation. The Reassignment Amount is limited to the Limited Recourse Balance which in no event shall exceed 2% of the aggregate original balance of the outstanding Conveyed Receivables. With respect to the obligation of the Seller to make payments in respect of certain Defaulted Receivables as a result of the Repurchase Obligation, we understand that the Reassignment Amount actually to be paid by the Seller to the SPV will be a de minimis amount and that, based on historical collections of the Receivables, that such liability is likely to be remote.

In light of the foregoing, on balance, we do not consider those factors weighing against a true conveyance characterization to be persuasive in comparison to those which support a true conveyance characterization.

**B.    Substantive Consolidation**

    1.    General Parameters of and Reasoning Underlying Substantive Consolidation Analysis

The general parameters of and reasoning underlying our analysis of the "substantive consolidation" issues we set forth in Appendix II hereof and are incorporated herein by reference.

    2.    Application to Transactions

12893465 01920041

DZB019175

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 18

(a)    Application of Vecco's "Elements of Consolidation"

As described in Appendix II hereof, in the context of the Transactions, a court might choose to analyze the case under the "elements of consolidation" found in Vecco and similar cases. In applying the "elements of consolidation" of Vecco and its progeny (including the factors set forth in footnote 5 of Appendix II) to the instant hypothetical bankruptcy case of the Seller or SPV, a bankruptcy court should regard the following factors as weighing against substantive consolidation:

1 .    The separate financial records of the Seller and SPV, and the manner in which each otherwise maintains its assets and liabilities enable and will continue to enable their respective assets and liabilities to be readily and inexpensively ascertained;

2.    The Seller will issue consolidated financial statements that will include SPV, but such financial statement will contain a footnote to the effect that the Seller sells certain Receivables to SPV, a wholly owned subsidiary. Moreover, neither the Seller nor SPV has concealed or will conceal from any interested party any transfers contemplated by the Agreements, although the Opportunity Loan Borrower will not be affirmatively informed in the first instance of the transfers of its obligations;

3.    The consolidation of the business operations of the Seller with those of SPV will not result in any significant cost savings or in a significantly greater efficiency of such combined business operation;

4.    But for the temporary and permitted commingling of collections set forth in Section 2.05 of the Receivables Agreement, and the Seller's retention of the books and records pertaining to the transferred assets in its capacity as Servicer, there is or will be no general commingling of assets or liabilities among the Seller and SPV. Further, monetary transactions between the Seller and SPV are independently reflected in their respective financial records;

5.    SPV has been and will be held out to the public as a separate entity apart from the Seller, and all company and legal formalities of each of the Seller and SPV have been and will continue to be maintained;

6.    No transfer of assets between the Seller, on the one hand, and SPV on the other hand, has been made without adherence to all necessary company formalities;

12893465 01920041

DZB019176

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 19

7.   The Seller does not and will not guaranty any of the liabilities of SPV to any other creditor, and, except for the Repurchase Obligation, SPV does not or will not guaranty any of the liabilities of the Seller to any of its creditors.  However, Seller will give certain limited indemnities as described in Part II.A.(b)(3);

8.   At closing, each of the Seller and SPV will be solvent, will not have unreasonably small capital for its foreseeable needs, and will intend to, and will believe that it will be able to, pay its debts as they mature; and

9.   SPV does not do business solely with the Seller in that it will enter into the Receivables Agreement with the Lender who will rely on its existence as an entity, separate and distinct from the Seller.

On the other hand, the following factors may weigh in favor of the substantive consolidation of the Seller, on the one hand, and SPV, on the other hand:

A.   The Seller owns all of the membership interest of and will receive any dividends declared and paid by SPV, and the Seller and SPV have certain common directors and officers.

B.   An integration of business functions between the Seller, on the one hand, and SPV, on the other hand, will exist to the extent summarized in this paragraph. SPV will operate for the exclusive purpose of providing financing for the Seller. SPV will have no individual employees, and SPV's day-to-day business operations with respect to the Receivables will be conducted through the Seller in its capacity as Servicer pursuant to terms and conditions of the Receivables Agreement.  As part of such terms and conditions, the Seller has the right in its capacity as Servicer and, subject to the limitations set forth in Section 6.01(c) and 6.02 of the Receivables Agreement, to forego collection of certain Receivables.

C.   The books, records (other than computer records and published financial statements) and agreements of the Seller relating to the Receivables are not and will not be segregated by the Seller from other documents and agreements relating to other the Seller receivables and are not and will not be stamped or marked to evidence that the Receivables have been transferred to SPV.  There may also be a limited commingling by the Seller of collections from the Receivables and related rights with its funds as such collections are, or are deemed to be, received, and in its capacity as Servicer, of such Collections pursuant to Section 2.05 of the Receivables Agreement.

12893465 01920041

DZB019177

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 20

   D.  the Seller will issue consolidated financial statements that include SPV.

   E.  Through the representations and warranties with respect to the Receivables and
     the Repurchase Obligation described above, the Seller may effectively guaranty
     the obligations of the SPV.

   In our view, none of these factors, taken alone or together, justifies consolidation. First,
in our view, Vecco factors should not be analyzed in a vacuum, but instead should be analyzed
to determine, under the doctrine of Kheel, whether the "interrelationships of the group are
hopelessly obscured" to a point at which it is neither possible nor economically efficient to
attempt to unscramble such interrelationships. 369 F.2d at 847. Based on the foregoing, that
would not be the case in the context of the Transactions because the assets and liabilities of each
entity should always be readily and inexpensively identifiable, and the entities, on balance, will
be held out as separate entities. Case law is consistent with this conclusion. In re Snider Bros.,
18 B.R. 230 (Bankr. D. Mass. 1982), indicates, for example, that where such interrelationships
are not so hopelessly obscured, the assets and liabilities should be allocated between and among
the various entities, and creditors should be entitled and limited to their respective asset "pool"
for the payment of their claims. We believe that an appropriate consideration of the referenced
negative factors should not require a contrary conclusion.

   With respect to item A above, common ownership and control is not a sufficient basis on
its own to justify substantive consolidation. See In re Donut Queen, Ltd., 41 B.R. 706, 710
(Bankr. E.D.N.Y. 1984) (substantive consolidation denied where, notwithstanding unity of
ownership and interest, insufficient evidence of creditors' awareness of interrelatedness or
treatment as unified entity). Moreover, corporations typically have wholly owned subsidiaries or
other related entities with common officers and directors, and yet the separate identity of those
subsidiaries is normally respected.

   Although the Seller will transact business with, and solely with respect to its actions as
Servicer for SPV as described above, the weight of the case law does not find those types of
arrangements unacceptable as long as corporate formalities are honored and the assets and
liabilities of each of the Seller and SPV can be readily and inexpensively identified, as
contemplated here. Specifically, In re Snider Bros., supra, provides authority for the proposition
that some evidence of integration of the businesses of related entities and the existence of
intercorporate loans, in and of themselves, are not sufficient to justify substantive consolidation.
It should also be noted that SPV's business will not be exclusively with the Seller, in that its
assets will consist of obligations from the Opportunity Loan Borrowers and the substantial
portion of its anticipated creditors (the Lender) are not affiliated with the Seller and have relied
on its separate existence.

12893465 01920041

DZB019178

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 21

The Seller's rights and powers as Servicer as described above should not require consolidation, because those powers are circumscribed by various contractual restrictions, including the obligation that collection activity generally be exercised consistent with its current practices.

As indicated, commingling of assets is generally viewed as a negative factor, weighing in favor of substantive consolidation. However, with respect to the Seller and SPV, wholesale commingling of assets is not contemplated and is clearly not permitted by the Agreements. Instead, the contemplated commingling of cash is expressly circumscribed by such documents and is similar to cash management systems frequently employed by separate, yet affiliated entities. See In re Hillsborough Holdings Corp., 166 B.R. 461 (Bankr. M.D. Fla. 1994) (refusing to pierce corporate veil even though debtor had centralized cash management system, intercompany loans, and other indicia of centralized control). Also, the Seller's retention of the books and records pertaining to the transferred assets in its capacity as Servicer is intended to facilitate their collection. As long as this system does not lead to material confusion of the identity of assets (which is not expected to be the case),[4] we do not believe that it should not become a basis for consolidation.

With respect to item D set forth above, Vecco characterizes the presence of consolidated financial statements as a negative factor in the substantive consolidation analysis. In the instant case, the Seller will issue consolidated financial statement that include SPV. Vecco's designation of the presence of consolidated financial statements as a negative factor, in our view, reflects a concern that the use of such financial statement obscures the separate legal and business existence of the pertinent entities and is consistent with the notion that creditors, at least the ones who have reviewed such financial statements, dealt with such entities as a consolidated group. However, the Seller will consolidate its financial statements in accordance with generally accepted accounting principles ("GAAP"). GAAP did not require a corporate parent such as the Seller to prepare consolidated financial statements at the time Vecco was decided. Also, and most important, any such consolidated financial statements themselves will contain footnotes clearly disclosing the separate legal existence of SPV, thus undercutting the argument that the creditors of the Seller who received such consolidated financial statements could have reasonably dealt with such entities as a consolidated group. Moreover, the manner in which the

---

[4]   Indeed, the commingling of collections is, pursuant to Section 2.05 of the Receivables Agreement, intended to be temporary. Also, while the books and records will not be affirmatively marked or physically segregated to indicate SPV's ownership thereof, the computer records maintained by the Seller pertaining to the transferred assets clearly will reflect SPV's ownership of such assets.

12893465 01920041

DZB019179

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 22

Seller and SPV maintain their assets and liabilities otherwise facilitates their quick and inexpensive identification and the general way in which the Seller and SPV hold themselves out, including through the filing of the aforementioned UCC financing statements, otherwise facilitates the public recognition of SPV as being an entity separate and distinct from the Seller. Thus, in our opinion, the presence of consolidated financial statements, under the circumstances of the instant case, should not be dispositive in the substantive consolidation analysis.

With respect to item E above, we view the treatment by Vecco and other cases of the presence of interaffiliate guarantees as a negative factor, weighing in favor of substantive consolidation, to be premised on the notion that the widespread presence of interaffiliate guarantees is consistent with viewing such entities as a consolidated group, with the credit of each member of the group being available and necessary to support the obligations of the other members of the group. However, where the interaffiliate guarantees are limited both in number and scope, they necessarily do not invoke those considerations to the same extent. That is the case here. First, with respect to the representations and warranties made by Seller with respect to the Receivables, the bulk of such obligations do not constitute, in our view, Seller "guarantying" the obligations of another, but instead represent primary liability for the Seller's prior ownership of the Receivables and/or its actions or inactions in connection with the Transactions or as Servicer. Second, to the extent that such obligations cannot be said to relate to the Seller's primary liability as the former owner or present Servicer of the Receivables such liability relating thereto is expected to be remote and immaterial. These indemnifications are also typical in transactions of the type described herein. Third, to the extent the Repurchase Obligation results in a guaranty to SPV, it is limited to the Limited Recourse Balance, which in no event will exceed 2% of the aggregate original balance of the outstanding Conveyed Receivables and is expected to be de minimis. Moreover the presence of guarantees, even interaffiliate guarantees, is consistent with the recognition of the entities as being separate in that the guaratneed party, in asking for and receiving the guarantees, recognizes and treats the entities as being separate and distinct. See Augie/Restivo, 860 F.2d at 519. Again, that is the case here. Finally while the parties in whose favor the Indemnified Liabilities run have insisted on the extension of such indemnities, the Seller, after the consummation of the Transactions, is expected to be in a financially viable conditions (see Assumptions of Fact above). Thus, in this case, we do not believe that the presence of the representations and warranties and the Repurchase Obligation would warrant substantive consolidation.

Second, even where Vecco "elements of consolidation" are viewed as the first step in a balancing test, for the reasons set forth below in the discussion of the Augie/Restivo and Auto-Train Tests, we do not believe, based on the consideration of such factors, that a balance of the equities would favor substantive consolidation in the context of the instant hypothetical case.

12893465 01920041

DZB019180

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 23

    (b)    <u>Application of the Augie/Restivo Test to the Transactions.</u>

As noted in Appendix II hereof, a court might alternatively choose to analyze this transaction under the <u>Augie/Restivo</u> approach. Based on the facts set forth above, the two basic <u>Augie/Restivo</u> factors also weigh against substantive consolidation in the situation analyzed herein. The affairs of the Seller, on the one hand, and SPV, on the other hand, will not be so entangled that their assets and liabilities cannot be readily and inexpensively identified or that creditors should have reasonably relied on them as a consolidated group. On the contrary, the separate books and records of the Seller and SPV will enable their respective assets and liabilities to be readily and inexpensively identified, the Seller's consolidated financial statements will contain certain footnotes disclosing the transactions, the UCC Financing Statements will be publicly filed, and third parties, including particularly the Lender and the Agent will have relied on the identity of SPV as a legal entity separate and distinct from the Seller.

Furthermore, the doctrine of substantive consolidation is based on equitable principles, and the substantive consolidation of the Seller, on the one hand, and SPV, on the other hand, would be inequitable and harmful to the creditors of and third parties that have dealt with SPV. We have been advised, and have assumed with your permission, that the formation and isolation of SPV was a necessary precondition to the execution and delivery by the Lender and the Agent of the Receivables Agreement and that the Lender would not have extended the same terms and conditions set forth in the Receivables Agreement directly to the Seller. SPV's separate existence and operations, therefore, will allow the Receivables (and other property related thereto) to be financed, through the Transactions, on better terms and conditions than those that the Seller itself could obtain. This structure will enable the Seller to lower the funding cost associated with the Receivables (and other property related thereto) and thereby benefit both the Seller and its creditors. Accordingly, the Lender has (or will have) made advances to the SPV in reliance on SPV's separate legal existence from the Seller. <u>See, e.g.,</u> <u>In re Flora Mir Candy Corp.</u>, 432 F.2d 1060 (2d Cir. 1970) (substantive consolidation should not be permitted where substantive consolidation would prejudice creditors who have actually relied on the separate corporate existence of one of the debtors); <u>In re Gulfco Inv. Corp.</u>, 593 F.2d 921, 928 (10th Cir. 1979) ("[c]ourts have been reluctant to consolidate related corporations due to the possibility of creating an unfair program from the standpoint of creditors who have dealt with a corporation having a surplus . . ."); and <u>Anaconda Bldg. Materials Co. v. Newland</u>, 336 F. 2d 625 (9th Cir. 1964) (substantive consolidation denied where creditors of parent shown only to have relied on credit of parent and not also on credit of subsidiary corporation).

    (c)    <u>Application of the Auto-Train Balancing Test to the Transaction</u>

12893465 01920041

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 24


The application of the Auto-Train test, which is set forth in Appendix II hereof, to the hypothetical cases here should not warrant the imposition of substantive consolidation.  First, as indicated above, under an application of the Vecco factors, the proponent of substantive consolidation should have difficulty proving that a "substantial identity between the entities to be consolidated" exists.

Second, even if the proponent were able to establish such a "substantial identity," the third parties that required and relied on the separate legal existence of SPV in entering into the Transactions would likely be able to prove that the third parties relied on the separate legal existence of SPV.  Absent such third parties' consent (or lack of objection) to such a substantive consolidation,[5] proponents of the imposition of substantive consolidation would likely not be able to prove that the benefits of consolidation "heavily" outweigh the harm that would be caused to such parties as a result of substantive consolidation.  The present and future creditors of either the Seller or SPV should likely not be able to prove that these transactions had an inequitable effect on them (see "Assumptions of Fact" above).[6]

---

[5]   See e.g., In re Standard Brands Paint Co., 154 B.R. 563, 571-72 (Bankr. C.D. Cal. 1993).

[6]   With respect to the possible equitable considerations in favor of non-consensual creditors of the Seller and SPV whose claims arise after the transaction, we have not found any authority on point.  However, generally, the rights of creditors (including future creditors) with respect to transfers of a debtor's property primarily are protected by the fraudulent conveyance doctrine, which is codified in section 548 of the Bankruptcy Code and is incorporated in section 544(b) to the extent that such rights (as well as other specific creditor avoidance remedies) are available under applicable nonbankruptcy law.  Some courts have indicated that fraudulent conveyance concerns (and presumably other specific creditor avoidance rights) should be addressed pursuant to such specific statutes and not considered as a separate factor in the substantive consolidation analysis.  See, e.g., In re Opportunity, 54 B.R. 145, 150 (Bankr. W.D. Mo. 1984).  Cf. Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code").  Other courts have indicated that fraudulent conveyance concerns constitute a factor to be so considered, but do not indicate that such a factor would be dispositive, in and of itself, on the substantive consolidation issue.  See, e.g., Maule Industries v. Gersel, 232 F.2d 294, 297 (5th Cir. 1956), cited in Collier on Bankruptcy ¶ 1100.06, at 1100-33 n.7.  In any event, in the instant case, the Transactions should not constitute a fraudulent conveyance (see Assumptions of Fact contained above).  On the contrary, as indicated above, the Transactions are intended to
(continued...)

DZB019182

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 25

Moreover, for the reasons set forth in Appendix II hereof, we consider <u>Augie/Restivo</u> to be a better reasoned and more persuasive authority than <u>Auto-Train</u> or <u>Eastgroup Properties v. Southern Motel Ass'n</u> to the extent that either the Auto-Train test or the dicta of the latter decision suggest a more relaxed standard for the application of the substantive consolidation doctrine than the enunciated in <u>Augie/Restivo</u>. <u>See also</u> <u>Anaconda Bldg. Materials Co. v. Newland</u>, 336 F.2d 625 (9th Cir. 1964) (substantive consolidation denied where creditors of the Seller shown only to have relied on credit of the Seller and not also on credit of subsidiary corporation).

## III. OPINIONS EXPRESSED

### A.   Opinions

Based on the reasoning and subject to the assumptions, qualifications and limitations set forth in this letter, it is our opinion that:

1.   In a properly presented and decided case, (i) a court would determine that the transfer of the Receivables pursuant to the Purchase Agreement constitutes a contribution or sale of such Receivables to SPV by the Seller, as opposed to a loan; and (ii) therefore, in the event of a filing of a petition for relief by or against the Seller under the Bankruptcy Code, (A) such Receivables and collections thereon would not be property of the Seller's bankruptcy estate, under Section 541 of the Bankruptcy Code, and the bankruptcy court would not compel the turnover of such Receivables or collections thereon by SPV to the Seller under Section 542 of the Bankruptcy Code and (B) in a properly presented and decided case, the bankruptcy court would determine that payments on the Receivables not in the possession of Seller would not be subject to the automatic stay provisions of Section 362(a) of the Bankruptcy Code imposed upon the commencement of Seller's bankruptcy case;

---

[6] (...continued)

leave the Seller solvent, with sufficient capital for its foreseeable needs, and with the Seller intending to and believing that the Seller can pay its debts as they mature. Consequently, we do not believe that the equitable considerations, if any, in favor of such future creditors would heavily outweigh the equities in favor of the Lender, who will enter into the Transactions in reliance on the separate legal existence of SPV.

12893465 01920041

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 26

      2.     In a properly presented and decided case, in the event the Seller became a debtor in a voluntary or involuntary bankruptcy case under the Bankruptcy Code, a court would not substantively consolidate the assets and liabilities of SPV with those of the Seller.

**B.**    **Certain Qualifications**

We wish to note that the existing reported decisional authority is not conclusive as to the relative weight to be accorded to the factors present in the Transactions and fails to provide consistently applied general principles or guidelines with which to analyze all of the factors present in the Transactions. Instead, judicial decisions in this area are usually made on the basis of an analysis of the facts and circumstances of the particular case. Furthermore, there are facts and circumstances present in the Transactions which we believe to be relevant to our conclusion but which, because of the particular facts at issue in the reported cases, are not generally discussed in the reported cases as being material factors. We note that a court's decision regarding matters upon which we opine herein is based on the court's own analysis and interpretation of the factual evidence before the court and of applicable legal principles. Consequently, this opinion is not a prediction of what a particular court (including any appellate court) reaching the issue on the merits would hold but instead is our opinion as to the proper result to be reached by a court applying existing legal rules to the facts as properly found (and consistent with the assumptions set forth herein) after appropriate briefing and argument.[7] Moreover, the authorities we have examined contain certain cases and authorities that are arguably inconsistent with our conclusions expressed herein. These cases and authorities are, however, in our opinion, distinguishable in the context of the Transactions.

---

[7]    Consistent with the foregoing, this opinion also is not a prediction that an appellate court would necessarily reach the merits of any appeal of an adverse determination by a bankruptcy court of the matters upon which we opine herein. For example, such a bankruptcy court determination may be contained in an Order confirming a plan or reorganization or may otherwise be subject to the assertion of the doctrine of "equitable mootness"; in such an instance, if the bankruptcy court determination were not stayed pending appeal (which, even if a court were inclined to grant such a stay, would generally require the posting of a substantial bond as a condition thereof) and if the plan were substantially consummated, an appellate court might dismiss the appeal on "equitable mootness" grounds without ever reaching the merits of the appeal. We do not purport to address whether there are other ways that such an adverse determination by a bankruptcy court could evade appellate review of the merits of the determination.

12893465 01920041

DZB019184

MAYER, BROWN & PLATT

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 27

We note that legal opinions on bankruptcy law matters unavoidably have inherent limitations that generally do not exist in respect of other legal issues on which opinions to third parties are typically given. These inherent limitations exist primarily because of (1) the pervasive equity powers of bankruptcy courts; (2) the overriding goal of reorganization to which a bankruptcy court, purporting to exercise its equity powers, may subordinate other legal rights and policies (even though such a subordination would appear to be inconsistent with established legal claims and rights under applicable nonbankruptcy law and even though such equity powers arguably do not permit such a subordination); (3) the potential relevance to the exercise of judicial discretion of future-arising facts and circumstances; and (4) the nature of the bankruptcy process. The recipients of this opinion should take these limitations into account in analyzing the bankruptcy risks associated with the subject transaction.

We wish to point out that we are not expressing in this opinion letter any opinion as to perfection or priority of any ownership interest or security interest in the Receivables or any proceeds thereof or the rights of any buyer of any Receivables or proceeds thereof.

Consistent with our statement on page two (2) hereof that we express no opinion as to any matter other than the matters specifically addressed herein, in the event the Seller were to become a debtor under the Bankruptcy Code, and some party were to assert that the beneficial interest in and legal title to the Receivables were part of the Seller's estate or that the Seller had actual or constructive possession of the Receivables, we express no opinion as to how long SPV or the Lender would be denied possession of Receivables or collections of Receivables in the Seller's possession before the validity of such an assertion could be finally decided. We also express no opinion as to whether, in the event it were asserted that the beneficial interest in and legal title to the Receivables and the collections were part of the Seller's bankruptcy estate, a court would permit the Seller to use collections of Receivables in the Seller's possession without the consent of SPV or the Lender, either before deciding the issue or pending appeal after a decision adverse to SPV.

We also express no opinion as to the availability or effect of a preliminary injunction, temporary restraining order or other such temporary relief affording delay pending a determination on the merits; by such reservation, however, we do not imply that we believe that such equitable relief would ultimately be available to prevent enforcement of the transaction.

All of the foregoing analysis and its conclusions are premised upon, and limited to, the law and the structure of the proposed financing in effect as of the date of this letter. Furthermore, we note that a court's decision regarding matters upon which we opine herein would be based on the court's own analysis and interpretation of the factual evidence before the court and of applicable legal principles.

12893465 01920041

DZB019185

**MAYER, BROWN & PLATT**

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 28

   This opinion may not be relied on in any manner or for any purpose by any other person, nor any copies published, communicated or otherwise made available in whole or in part to any other person or entity without our specific prior written consent.  Without limiting the foregoing, we note that Opportunity may make available to their auditors the foregoing opinions solely as evidence in support of such auditors' evaluation of management's assertion that the transfer of the Receivables meets the isolation criterion of SFAS No. 140, so long as it is understood that (i) our opinion is not addressed to such accountants and is limited to the legal conclusions set forth herein. (ii) we do not assume or undertake any responsibility for any such accounting determinations or otherwise with respect to financial statements of Opportunity or its affiliates and (iii) in so authorizing Opportunity to make copies of such opinions available to their auditors for such purpose, we are not undertaking or assuming any duty or obligation to such auditors or establishing any lawyer-client relationship with them.

12893465 01920041

DZB019186

**MAYER, BROWN & PLATT**

To the Persons Listed on Schedule I hereto
December 28, 2001
Page 29

      This opinion should be interpreted in accordance with the Special Report by the TriBar Opinion Committee, <u>Opinions in the Bankruptcy Context:  Rating Agency, Structured Financing, and Chapter 11 Transactions</u>, 46 Business Lawyer 717 (1991).

                  Very truly yours,

                  *Mayer, Brown & Platt*

                  MAYER, BROWN & PLATT

GAP/CJO

12893465 01920041

# EXHIBIT T-11

**Opportunity Finance, LLC**
Fraud Insurance Policy Memorandum

Background

On December 28, 2001, DZ BANK, through its multi-seller conduit Autobahn Funding Company LLC ("Autobahn"), provided a five year $100 million revolving warehouse facility (the "Facility") to Opportunity Finance Securitization, LLC (the "Borrower") to finance its origination of wholesale inventory trade loan receivables.  The Borrower is a wholly owned, bankruptcy remote subsidiary of Opportunity Finance, LLC ("Opportunity"), whose business consists of providing loans to distributors to purchase excess inventories from manufacturers or liquidators and simultaneously sell these inventories to large national retailers (Sam's Club, Costco, etc.).  Currently, Opportunity provides financing to one distributor, Petters Finance LLC (the "Petters").

At closing, DZ BANK procured a $50 "first loss" financial guaranty insurance policy from Royal Indemnity Company, a subsidiary of Royal & SunAlliance Insurance Group ("Royal") which names Autobahn as loss payee and ensures coverage of up to the first $50 million of over and above what the credit support (i.e. overcollateralization) inherent in the structure can sustain. This policy was procured primarily as a protection against fraud perpetrated by either Opportunity or by Petters, as DZ BANK believes the credit risk in the transaction has been mitigated through the substantial subordination (equity) retained by the Borrower relative to its historical loss and dilution experience (*since inception, Opportunity has experienced no defaults or dilution on approximately $1 billion of loan originations*).

Risks & Mitigants

There are numerous cash management and collateral controls embedded in the current transaction structure that mitigate the risk of fraud in the underlying portfolio of trade loan receivables – please refer to the following:

| RISK | MITIGANT |
|---|---|
| • Opportunity or Petters misappropriates loan proceeds intended to be used to purchase inventory. | • Funds advanced to purchase inventory are <u>always</u> forwarded directly to the merchandise seller (an "Approved Manufacturer") on behalf of the Borrower. **Funds are <u>never</u> wired directly to the Borrower, the Servicer or an Approved Distributor (i.e. Petters).** |
| • Loan proceeds are wired to an account other than the account of the entity purporting to sell the inventory. | • US BANK, N.A., as Custodian, is required to verify**, <u>prior to any funds being advanced to an Approved Manufacturer to complete an inventory trade,</u>** that the wire instructions to which such funds are being sent are actually for the account of the Approved Manufacturer.  The Custodian maintains a list of Approved Manufacturer wire instructions and performs this check each time a new deal is funded.  To the extent that a manufacturer's payment advice is not on the approved list, the Custodian will actually contact the manufacturer prior to wiring funds to ensure that the payment advice is valid (ABA#, Account #, account name, etc.).  This process holds true for all financed receivables, whether funded through proceeds raised in the commercial paper market or through the reinvestment |

DZB041876

| | of collections on deposit in the collection account. |
|---|---|
| - Loan proceeds are wired to an Approved Manufacturer who's not expecting the funds – Opportunity or Petters then requests these funds to be returned directly to them. | - Wire instructions for funds that are dispersed to Approved Manufacturers instruct the Approved Manufacturers to send any **returned funds to the originating bank**.  This helps mitigate fraud in the case of funds sent in error, transactions cancelled after the wire is sent or outright fraudulent transactions. |
| - Opportunity, as Servicer, requests US BANK to release funds from the collection account without giving notice to Autobahn or DZ BANK. | - **The transaction documents stipulate that no movement of funds out of the Collection Account can occur without DZ BANK's prior written authorization.**  US BANK also provides DZ BANK with a Collateral Receipt prior to funding any new receivables that indicates the balance of collateral checked in and any exceptions to the required file documentation. |
| - Petters tampers or switches purchased inventories before delivery to the retailer (buyer) of the merchandise. | - Petters **does not take physical possession** of any merchandise purchased with loan proceeds.  Inventory sits in third party warehouses (typically, the warehouse of the seller) until such time as the retailer requires delivery.  Petters then arranges for shipment and, upon delivery, a receivable is created from the applicable retailer (Sam's Club, Costco, etc.). |
| - Inventory is stolen or damaged prior to delivery to the applicable retailer (buyer) of the merchandise. | - A $10 million property and casualty insurance policy is maintained and paid for by Petters and names Opportunity as a loss payee in the event inventories are damaged or stolen while warehoused or in transit.  The policy covers any single occurrence of loss up to $10 million and is issued by General Casualty Co. of Wisconsin ('A' S&P and 'A++' by A.M. Best). In addition, Opportunity has obtained $20 million of supplemental property and casualty insurance from Lloyd's to cover losses on financed inventory not covered by the above policy. |
| - Payments on receivables made by retailers are misappropriated by either Petters or Opportunity. | - Funds received from retailers on outstanding receivables are directed into a segregated trust account held by US BANK as Custodian.  These funds may only be moved pursuant to DZ BANK's written authorization as Agent. |

DZB041877

Proposal

Due to recent downgrades of Royal's financial strength rating below acceptable levels, DZ BANK seeks a replacement for Royal's policy that will insure Autobahn, as lender, against fraud perpetrated by either Opportunity or by Petters.  One possibility being considered is the procurement of a "fraud insurance policy" from a highly rated insurance carrier (potential policy size would be $15 to $30 million of coverage).  An additional proposal being considered is the establishment of a captive insurance arrangement whereby Opportunity and Petters jointly provide primary coverage against the risk of fraud in the underlying portfolio, which will be reinsured by a highly rated carrier.  In order to induce a reinsurer to enter into this arrangement, Petters and Opportunity will post $10 million into a dedicated account which will be used to cover losses resulting from fraud before the reinsurer is required to make a payment.  In this regard, the $10 million in capital will function as a deductible under the reinsurer's policy.  To the extent that no fraud occurs during the tenor of the transaction, the $10 million would be returned to Opportunity and Petters.

DZB041878

# EXHIBIT T-12

[Fee Letter]

## DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, FRANKFURT AM MAIN

December 28, 2001

Opportunity Finance Securitization, LLC
60 South Sixth Street, Suite 2540
Minneapolis, Minnesota 55402

Opportunity Finance, LLC
60 South Sixth Street, Suite 2540
Minneapolis, Minnesota 55402

Re:    Fee Letter

Ladies and Gentlemen:

        Reference is made to the Receivables Loan and Security Agreement dated as of the date hereof (as such may be amended, restated and/or otherwise modified from time to time, the "RLSA") among Opportunity Finance Securitization, LLC, as Borrower (the "Borrower"), Opportunity Finance, LLC (the "Servicer"), as Servicer, Autobahn Funding Company LLC, as Lender (the "Lender"), DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main ("DZ Bank"), as agent (the "Agent") and collateral agent, Royal Indemnity Company and U.S. Bank National Association. Terms defined in the RLSA are used in this fee letter as therein defined.

        This fee letter is the fee letter referred to in Section 2.07(a) of the RLSA and sets forth the understanding of the parties hereto with respect to certain fees that are payable by the Borrower in connection with the financing provided by the Lender pursuant to the RLSA.

        The parties hereto agree as follows:

    1.    The Borrower hereby agrees to pay to the Agent, for the benefit of the Lender, a fee (the "Structuring Fee") in the amount of $500,000.00, which such fee shall have been earned, in its entirety, as of the date hereof. The Structuring Fee shall be paid, in its entirety, on the date hereof.

    2.    (a)    During the period commencing on the date hereof and ending on the Collection Date, the Borrower shall pay the Agent, for the benefit of the Lender, a fee (the "Non-Use Fee") in respect of each Remittance Period which shall be equal to (A) the Non-Use Fee Rate multiplied by (B) an amount equal to (i) the Borrowing Limit (or, if more than one Borrowing Limit was in effect during such Remittance Period, the average Borrowing Limit) in effect during such

DZB001353

[Fee Letter]

Remittance Period minus (ii) the daily average aggregate face amount of outstanding commercial paper issued by the Lender to fund Loans under the RLSA during such Remittance Period, as determined by the Agent, multiplied by (C) a fraction, the numerator of which shall be the actual number of days in such Remittance Period and the denominator of which shall be 360 days. For purposes hereof, the "Non-Use Fee Rate" shall mean 0.40%.

(b)   The Non-Use Fee shall be payable by the Borrower in arrears with respect to each Remittance Period on the Remittance Date immediately following such Remittance Period (or, if earlier, on the Collection Date).

(c)   Notwithstanding any other provision hereof, the Non-Use Fee shall not be payable by the Borrower with respect to any Remittance Period commencing after the occurrence of an Early Amortization Commencement Date; provided, that the Early Amortization Event and/or Event of Default (or each such Early Amortization Event and/or Event of Default) related to such Early Amortization Commencement Date has not been waived by the Agent, the Lender and the Insurer.

3.   (a)   The Borrower hereby agrees to pay to the Agent, for the benefit of the Lender, upon the execution (which such execution, if any, shall be in the sole discretion of the Agent and the Lender) of any amendment to, or amendment and restatement or other modification of, the RLSA which has the effect of increasing the Borrowing Limit, a fee (the "Increase Fee") equal to 0.50% of the amount by which the Borrowing Limit is increased under such amendment, amendment and restatement or other modification.

(b)   The Increase Fee shall be paid, in its entirety, on the date of any such amendment, amendment and restatement or other modification .

4.   For all purposes under the RLSA, the term "Applicable Margin" shall mean 2.35% per annum; provided, that (i) at any time that the Facility Insurance Policy is not in full force and effect or there has occurred (and not been cured within ten days) any default by the Facility Insurer with respect to any of its payment obligations under the Facility Insurance Policy (as determined by the Agent), Applicable Margin shall mean 2.75% per annum and (ii) at any time after the occurrence of an Early Amortization Event, Applicable Margin shall mean 3.75% per annum.

5.   Unless otherwise required by applicable law, each party hereto agrees to maintain the confidentiality of this fee letter in communications with third parties and otherwise, unless the terms and provisions hereof shall become publicly available; provided, that, this fee letter may be disclosed by each party to its respective legal counsel and auditors, any rating agency and any provider of liquidity support or credit enhancement, if they agree to hold it confidential. The terms and provisions of this fee letter shall be binding upon, and shall inure to the benefit of, the successors and assigns of the parties hereof. THIS FEE LETTER SHALL, IN ACCORDANCE WITH SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT

DZB001354

[Fee Letter]

REGARD TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF THAT WOULD CALL FOR
THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

**[Remainder of page intentionally left blank.]**

DZB001355

[Fee Letter]

This fee letter may be executed in two or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this fee letter by facsimile shall be effective as delivery of a manually executed counterpart of this fee letter.

Very truly yours,

DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK, FRANKFURT AM
MAIN as Agent

By: _____
    Name: Patrick Reese
    Title: VP

By: _____
    Name:
    Title:

AUTOBAHN FUNDING COMPANY LLC,
as a Lender

By:    DZ BANK AG Deutsche Zentral-
    Genossenschaftsbank AG, Frankfurt AM
    Main as its attorney-in-fact

By: _____
    Name: Patrick Reese
    Title: VP

By: _____
    Name:
    Title:

Agreed and accepted as of
the date first above written:

OPPORTUNITY FINANCE SECURITIZATION, LLC

By: _____
    Name: Ted Sabes
    Title: President

DOC #30383381 WPD

4

DZB001356

[Fee Letter]

      This fee letter may be executed in two or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this fee letter by facsimile shall be effective as delivery of a manually executed counterpart of this fee letter.

Very truly yours,

DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK, FRANKFURT AM
MAIN as Agent

By: _____
    Name:
    Title:

By: _____
    Name: Richard S. Wisnewski
    Title: VP

AUTOBAHN FUNDING COMPANY LLC,
as a Lender

By:    DZ BANK AG Deutsche Zentral-
    Genossenschaftsbank AG, Frankfurt AM
    Main as its attorney-in-fact

By: _____
    Name:
    Title:

By: _____
    Name: Richard S. Wisnewski
    Title: VP

Agreed and accepted as of
the date first above written:

OPPORTUNITY FINANCE SECURITIZATION, LLC

By: _____
    Name:
    Title:

DOC #30383381.WPD              4

DZB001357

[Fee Letter]

OPPORTUNITY FINANCE, LLC

By: _____

Name: Ton Jebus

Title: CEO

DZB001358

# EXHIBIT T-13

**EXPERT REPORT OF W. BAREFOOT BANKHEAD**

Opportunity Loans.  See **Exhibit A** for a summary of the Autobahn Loans and underlying commercial paper issued and rolled.

40. DZ Bank did not provide any funding or loans to Opportunity Finance or Opportunity Finance Securitization during the Relevant Period.

**B.  Opportunity Finance Securitization repaid Autobahn, not DZ Bank, $99,300,000 in principal for the Autobahn Loans and paid $2,391,408 for interest on the commercial paper, for a total of $101,691,408 in payments from the Collateral Agent Collection Account to the Autobahn Account.**

41. Under the terms of the RLSA, Opportunity Finance Securitization owed interest on the Autobahn Loans.[44]  Based on my analysis, Opportunity Finance Securitization paid a portion of the interest on the Autobahn Loans from the Collateral Agent Collection Account to the Autobahn Account at U.S. Bank.[45]  It is my understanding that these payments were to pay interest due to the underlying holders of the commercial paper (the "Commercial Paper Interest").  Opportunity Finance Securitization transferred the remaining portion of the interest on the Autobahn Loans from the Collateral Agent Collection Account to a DZ Bank account.[46]  It is my understanding the transfer of that portion of the interest was in payment of the program fees due to DZ Bank as Agent and Collateral Agent.  See **Section V.C** for additional details regarding the program fees paid to DZ Bank.

---

[44] RLSA, Section 1.01, Bates No. DZB004110 - D2B004145; RLSA, Section 2.05(a), Bates No. DZB004148; RLSA, Section 2.07(a), Bates No. DZB004152; and Fee Letter, Section 4, Bates No. DZB001354.

[45] Payments were made from the Collateral Agent Collection Account through an intermediary account at U.S. Bank (account ████ 1827) prior to being sent to the Autobahn Account.  I noted that the payments from the Collateral Agent Collection Account to the intermediary account were higher than the amounts in the Autobahn Account by $3,243.  As of the report date, documentation has not been identified to explain this difference.

[46] Based on the Collateral Agent Collection Account, payments are made to DZ Bank account ████3876.  See **Section V.C** for more details regarding payments from the Collateral Agent Collection Account to DZ Bank.

42. To quantify the monies that Opportunity Finance Securitization paid Autobahn for interest during the Relevant Period, I analyzed both the Collateral Agent Collection Account and the Autobahn Account.  Throughout the Relevant Period, Opportunity Finance Securitization paid the Commercial Paper Interest to Autobahn on each commercial paper maturity date.  Beginning on May 16, 2003, Opportunity Finance Securitization also began repaying Autobahn the principal amount of the Autobahn Loans, which was then used to retire the commercial paper issued.  Opportunity Finance Securitization made its final payment to Autobahn, including principal and interest, on August 5, 2003.

43. Based on my analysis, Opportunity Finance Securitization paid a total of $101,691,408 from the Collateral Agent Collection Account to the Autobahn Account during the Relevant Period.  This amount consisted of $99,300,000 for the repayment of principal of the Autobahn Loans and $2,391,408 for Commercial Paper Interest.  Notably, Mr. Martens agrees the total amount of payments for principal and interest was $101,691,408 but incorrectly stated that payment was made to a "DZ Bank/Autobahn" account rather than to the Autobahn Account.[47]  See **Exhibit B** for details related to the commercial paper payments to the Autobahn Account.

## C.  Opportunity Finance Securitization paid $3,360,419 in fees from the Collateral Agent Collection Account to DZ Bank.

44. As discussed in **Section V.B**, Opportunity Finance Securitization paid the Commercial Paper Interest on the Autobahn Loans from the Collateral Agent Collection Account to the Autobahn Account for the benefit of the commercial paper

---

[47] The Martens Report, para. 39.

holders.  It is my understanding that the remaining interest was transferred to DZ

Bank for the payment of program fees for serving as Agent and Collateral Agent.

Based on the deposition testimony of Patrick Preece (Vice President, DZ Bank), DZ

Bank "earned a program fee that could be akin to an – to interest."  Specifically, "the

commercial paper rate is, [*sic*] that's passed through to the commercial paper

investors, and the program fee of 300 basis points is multiplied by the outstanding

loan balance" and paid on a monthly basis.[48]  Also, under the terms of the RLSA,

Opportunity Finance Securitization owed DZ Bank a non-use fee of 0.40 percent on

the portion of the $100,000,000 Facility that was not used.[49]

45. To quantify the amount of program and non-use fees paid to DZ Bank during the

Relevant Period, I analyzed both the Collateral Agent Collection Account and the

Monthly Remittance Reports.  Consistent with the RLSA and the Fee Letter,

Opportunity Finance Securitization paid $3,234,266 in program fees and $126,153 in

non-use fees to DZ Bank from the Collateral Agent Collection Account during the

Relevant Period for a total of $3,360,419.  See **Exhibit C** for details related to the fee

payments made to DZ Bank.

**D.  In order to close the RLSA, Opportunity Finance Securitization paid $525,000 in
structuring fees to DZ Bank from an Opportunity Finance checking account and not
from the Collateral Agent Collection Account.**

46. Opportunity Finance Securitization was required to pay DZ Bank certain structuring

fees to close the RLSA,[50] which based on my analysis included an upfront fee, a due

---

[48] Deposition of Patrick Preece, October 18, 2018, pg. 48:22 - 50:16.
[49] RLSA, Section 2.05(a), Bates No. DZB004148; RLSA, Section 2.07(a), Bates No. DZB004152; and Fee Letter, Section 2, Bates No. DZB001353 - DZB001354.
[50] RLSA, Section 2.07(a), Bates No. DZB004152 and Fee Letter, Section 1, Bates No. DZB001353.

amount of money transferred to DZ Bank as $150,388,858.50.  The transfers to and

from a bank account substantively controlled by Opportunity Finance should not be

misconstrued as payments to DZ Bank or Autobahn, as this amount does not in any

way reflect the amount of money actually paid to either party.

86. Based on my analysis, I determined that Opportunity Finance Securitization paid DZ

Bank $3,234,266 for program fees and $126,153 for non-use fees through the

Collateral Agent Collection Account.  Opportunity Finance Securitization paid

$101,691,408 for principal repayment and interest from the Collateral Agent

Collection Account to the Autobahn Account for distribution to the commercial paper

holders.  See **Section V.B - Section V.D** for additional details regarding the amounts

paid to DZ Bank and Autobahn.

### d)  Contradictions with Prior Reports and Testimony

87. As noted in the Martens Report, PwC was retained by the Trustee in November 2008

to perform various forensic accounting services related to this matter,[103] and Mr.

Martens was the partner assigned to oversee the services performed by PwC.  Mr.

Martens has since written numerous expert reports and testified on various occasions

as to the amounts and recipients of transfers from PCI.  Specifically, Mr. Martens

prepared a report dated December 15, 2010 in connection with a receivership and

bankruptcy proceeding (the "PwC Interim Report"),[104] which quantified the amount

of funding transferred to and from Opportunity Finance.  For illustrative purposes and

to highlight key discrepancies in Mr. Martens' treatment of the transfer of funds, I

---

[103] The Martens Report, para. 3.
[104] The PwC Interim Report, December 15, 2010, Court File No. 08-45257.

controlled by Opportunity Finance principals."[108]  However, in the Martens Report, Mr. Martens is now opining that these payments were sent to DZ Bank.

92. The contradictions within Mr. Martens' own reports demonstrate that the Martens Report, his portrayal of DZ Bank's relationship with Opportunity Finance and his ultimate conclusions are erroneous and unreliable.

## VI.  **CONCLUDING REMARKS**

93. The opinions expressed in this report are based on my work to date.  I may amend or supplement this report should additional documents or information become available to me.  Should Counsel request, I may create demonstrative exhibits from documents, data and sources referred to in this report to aid my testimony at trial.

**July 5, 2019**

W. Barefoot Bankhead

_____

W. Barefoot Bankhead

---

[108] The PwC Interim Report, December 15, 2010, Court File No. 08-45257, para. 188.

# EXHIBIT T-14

# WITHHELD PURSUANT TO PROTECTIVE ORDER

# EXHIBIT T-15

# WITHHELD PURSUANT TO PROTECTIVE ORDER

# EXHIBIT T-16

# *OPPORTUNITY FINANCE, LLC*

## OPPORTUNITY FINANCE, LLC as SELLER/SERVICER

## OPPORTUNITY FINANCE SECURITIZATION, LLC as BORROWER

## $100,000,000 TRADE FINANCE LOAN-BACKED COMMERCIAL PAPER CONDUIT FACILITY



INVESTMENT SERVICES

INVESTMENT BANKING

*MEMBER NYSE/SIPC*

**September 2001**

DZB041920

The information about Opportunity Finance, LLC ("OF" or the "Company") contained in this memorandum ("Memorandum") has been prepared by Dain Rauscher Incorporated ("DRI") solely for informational purposes and is being furnished through DRI solely for use by the recipient ("Recipient") in evaluating its interest in the financing described herein.

This Memorandum includes information on the Company's trade finance program including certain statements, estimates and projections provided by DRI based on discussions and information provided by the Company with respect to the anticipated future benefits of the program.    Such statements and estimates reflect various assumptions by the Company concerning anticipated results that may or may not prove to be correct.    DRI therefore does not make any representations or warranties as to the accuracy or completeness of this Memorandum and shall have no liability for any representations (expressed or implied) contained in, or for any omissions from, this Memorandum.    In furnishing this Memorandum, the Company and DRI reserve the right to amend or replace this Memorandum at any time.

By accepting this Memorandum, the Recipient acknowledges and agrees that: (1) the information contained herein is of a confidential nature and the Recipient will maintain and control all of such information ("Material"); (2) none of the Material will be used by the Recipient or any of its employees or representatives in any manner other than in connection with its evaluation of the financing; (3) the Recipient will make its own credit analysis and decision, independently and without reliance upon DRI and based on such documents and information as it, in its sole discretion, has deemed appropriate; (4) the Recipient will not reproduce this Memorandum, and will not distribute any portion of this Memorandum to any person other than the Recipient's employees or representatives who have a direct need to review the Material for the purpose of evaluating the financing and who are informed by the Recipient of the confidential nature of the Material; and (5) if the Recipient does not wish to pursue this financing or on the request of DRI, the Recipient will return this Memorandum to DRI.

All inquires and requests for information regarding the financing should be directed to:

**Dain Rauscher Incorporated**
**2711 North Haskell Avenue, Suite 2400**
**Dallas, Texas 75204**
**214-989-1777 (fax)**

<table>
<tr><td>**Thomas L. Gervais**</td><td>**David M. Piotrowski**</td></tr>
<tr><td>Managing Director</td><td>Vice President</td></tr>
<tr><td>214-989-1623</td><td>214-989-1622</td></tr>
<tr><td>TGervais@DainRauscher.com</td><td>DPiotrowski@DainRauscher.com</td></tr>
</table>



**Opportunity Finance, LLC**
*September 2001*                                                    *Trade Finance Loan-Backed Conduit Facility*

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ....................................................................................... 1
   Company Background .................................................................................... 1
      Table 1 – Opportunity Goods Transaction Overview ................................ 2
   The Financing ............................................................................................... 2
      Table 2 – Credit Enhancement .................................................................. 3
      Table 3 – Transaction Structure ................................................................ 3
MARKET/COMPETITIVE OVERVIEW ............................................................... 4
   Market Overview .......................................................................................... 4
   Competition .................................................................................................. 4
COMPANY OVERVIEW ........................................................................................ 7
   Overview ....................................................................................................... 7
   Clients .......................................................................................................... 7
   Financing Structure ...................................................................................... 7
      Table 4 – Lending Structure ...................................................................... 9
   Underwriting ................................................................................................. 9
   Loan Concentrations .................................................................................. 10
   Loan Documentation .................................................................................. 10
   Loan Funding ............................................................................................. 10
   Loan Portfolio Monitoring ......................................................................... 11
   Document Custody ..................................................................................... 11
   Cash Management ....................................................................................... 12
   Dilution ...................................................................................................... 12
   Default Management ................................................................................... 12
   External Audit ............................................................................................ 13
   Insurance .................................................................................................... 13
   Legal Issues ............................................................................................... 13
   Information Technology ............................................................................. 14
   Management ............................................................................................... 14
FINANCING STRUCTURE ................................................................................. 16
   Preliminary Summary of Terms .................................................................. 16
PORTFOLIO PERFORMANCE ANALYSIS ...................................................... 25
   Table 5 – Portfolio Roll Forward .............................................................. 25
   Table 6 – Monthly Loan Originations ....................................................... 26
   Table 7 – Portfolio Turnover ..................................................................... 26
   Table 8 – Aging Experience for the Portfolio ............................................ 27
   Table 9 – Default Experience for the Portfolio .......................................... 27
PORTFOLIO STRATIFICATIONS ...................................................................... 28
   Table 10 – Summary of Loan Portfolio ..................................................... 28
   Table 11 – Loan Portfolio by Unpaid Principal Balance ........................... 29
   Table 12 – Loan Portfolio by Days Outstanding ....................................... 29
   Table 13 – Loan Portfolio by Type of Goods Financed ............................. 29
   Table 14 – Loan Portfolio by Ratio of Loan Amount to Cost of Goods Financed .............. 30



DZB041922

Table 15 – Loan Portfolio by Ratio of Loan Amount to Receivable from Buyer ............... 30
Table 16 – Loan Portfolio by Buyer .................................................................................. 30

EXHIBITS

Exhibit A –    Opportunity Finance, LLC Financial Statements
Exhibit B –    Credit Agreement between Opportunity Finance, LLC and Petters Finance, LLC
Exhibit C –    Historical Transaction Detail



DZB041923

## EXECUTIVE SUMMARY

**Company Background**

Opportunity Finance, LLC, including its predecessor entities, (the "Company") is a Delaware limited liability corporation engaged in the business of providing purchase order and receivable financing to businesses ("Clients") requiring interim financing for wholesale inventory trading transactions (an "Opportunity Goods Transaction"). The Company was organized in 1998 and is headquartered in Minneapolis. The Company's chief manager is Mr. Jon R. Sabes (see "Management").

The Company's financings are structured to be short-term loans (3-5 month terms) collateralized by tangible assets and accompanying receivables (typically sized at 80-85% of the receivable amount). The inventory trades financed by the Company involve only name brand merchandise in their original packaging and none of the inventories involve merchandise that has been damaged in any way. The Clients are firms that specialize in the bulk acquisition and disposition of wholesale consumer product inventories. These bulk trades occur anywhere within the supply chain – from the manufacturers to retailers – for reasons including continuity supply, bankruptcy, packaging changes, canceled orders, production overruns, market obsolescence, and/or liquidity.

The Opportunity Goods Transactions financed by the Company generally involve the following elements: (1) the Client locates an inventory available for sale ("Seller"); (2) the Client provides Seller's inventory detail to a national retail customer ("Buyer") who approves the inventory purchase; (3) the Client receives a Buyer purchase order for the inventory and contemporaneously issues a purchase order to buy the merchandise from the Seller; (4) the Client provides the Company with the Buyer and Seller purchase orders and the Company agrees to finance the inventory trade; (5) the Client assigns the purchase orders to a wholly-owned special purpose entity ("Borrower") and the Borrower issues a note to the Company; (6) the Company advances purchase money into the Borrower and the Client funds the remainder of the purchase price via a subordinated note to the Borrower; (7) the Company (via their signatory authority on the Borrower's bank accounts) causes the Borrower to purchase the inventory directly from the Seller, and the Client arranges shipment directly to the Buyer (the Client does not ever take physical possession of the inventory); (8) payment from the receivable is paid by the Buyer directly to the Borrower and the Borrower immediately repays the Company's note and interest, with the remaining proceeds going to the Client.

To date, the Company has successfully completed over 200 Opportunity Goods Transactions, totaling over $500 million in loan originations. The Company has never experienced a single credit loss. The total time elapsed in which the Opportunity Goods Transaction occurs is approximately 100 days. The notes issued by the Borrower mature at the earlier of (i) the payment of the receivable by the Buyer; or (ii) 120 days from the note's origination date. The size of the Opportunity Goods Transactions typically ranges from $0.5 million to $6.0 million.



DZB041924

The following table illustrates the Opportunity Goods Transaction:

### Table 1 – Opportunity Goods Transaction Overview



To date, the Company has provided financing solely to Petters Finance, LLC ("Petters Finance"), a wholly owned subsidiary of Petters Company, Inc. ("Petters"), a firm specializing in the bulk acquisition and disposition of wholesale consumer product inventories. The Company has identified similar opportunities with other similar businesses and plans to begin lending to prospects upon the completion of the Conduit Facility. During 2000, Petters successfully completed over $1 billion in Opportunity Goods Transactions, of which approximately $138 million were financed by the Company. The Company currently has approximately $72.2 million in loans outstanding to Petters Finance, representing 24 Opportunity Goods Transactions. Petters has approximately $40 million in net worth and is financing Opportunity Goods Transactions with approximately 60 investors, the largest of which is the Company and the remainder of which are primarily high net worth individuals. Arthur Andersen completed a financial due diligence report in February 2001 on Petters Company, Inc., a copy of which is available upon request.

### The Financing

Opportunity Finance has formally engaged Dain Rauscher Incorporated to arrange a $100 million revolving commercial paper conduit facility (the "Conduit Facility") backed by the Company's trade finance loans (the "Receivables"). The closing date for the Conduit Facility described herein is anticipated for November 30, 2001. (See Section 4 - "Financing Structure")



DZB041925

**Opportunity Finance, LLC**
*September 2001*                                              *Trade Finance Loan-Backed Conduit Facility*

The proceeds from the Conduit Facility will be used to (i) leverage the Company's balance sheet more effectively; (ii) provide ongoing financing for the Company's origination of trade finance loans; and (iii) expand the Company's Client lending base.  To date, the Company has utilized its own un-leveraged capital to fund its loan originations rather than borrow from traditional lenders.

We are proposing an 80% advance rate against the trade finance loans originated by the Company.  Given that the Company's loans are typically structured to be 80-85% of the accompanying receivable from the Buyer, the credit enhancement to the Conduit Facility is approximately 37-45% (39.3% as of 8/31/01).  The following table displays the credit enhancement to the Conduit Facility based upon the Company's trade finance loan portfolio as of August 31, 2001:

### Table 2 – Credit Enhancement

| | |
|---|---|
| Outstanding Loan Portfolio Balance | $72,200,000 |
| Aggregate Receivable from Buyers | $86,159,823 |
| Loan Balance as % of Receivable from Buyers | 83.8% |
| | |
| Advance Rate on Conduit Facility (% of Loan Portfolio) | 80.0% |
| Advances under Conduit Facility | $57,760,000 |
| | |
| Over-collateralization (20% of Loan Portfolio) | $14,440,000 |
| Subordination (via the Client's subordinated interest in the Receivable) | $13,959,823 |
| Total Credit Enhancement - $ | $28,399,823 |
| Credit Enhancement as a % of the Loan Portfolio | 39.3% |

The following table displays the transaction structure contemplated for the Conduit Facility:

### Table 3 – Transaction Structure



DZB041926

## MARKET/COMPETITIVE OVERVIEW

**Market Overview**

The Company believes that the industry segment providing goods to the retail industry is highly fragmented and consists, in large part, of companies and individuals that lack the financial strength and systems necessary to obtain greater financial resources to supply additional merchandise to their customers.  By providing the Clients with flexible, secured, short-term loans, the Company provides a compelling opportunity for these businesses to expand their current base of operations with little additional effort.  As a result, the Company is able to charge the Clients high rates of interest and success fees because of the incremental benefit derived by these businesses with the financing provided by the Company.  Through its business model and innovative financing, the Company addresses the needs of established businesses for additional capital without negatively affecting their current operational strategy.  The Company's goal is to provide purchase money and receivable financing to their Clients in such a manner that these businesses can expand their buying power and supply additional merchandise to their current customers.

According to researchers, the market in the United States for all consumer goods totaled approximately $3.1 trillion in 2000. Researchers indicate that obsolete or excess consumer goods inventories are one of the fastest-growing segments of the wholesale consumer merchandise market in the United States.

The wholesale consumer merchandise market segment in which the Company provides financing is growing as a result of three recent industry trends:  (i) shortened product cycles; (ii) just-in-time inventory requirements; and (iii) consolidation in the retail industry.  These factors have shifted inventory risk from retailers to manufacturers and distributors, increasing the reliance by manufacturers on the intermediary businesses the Company seeks to serve.

Beyond the domestic market opportunity, the international market opportunity is estimated to be double the size of the United States.  The Company believes that it will generate sources of international transactions through the personal and professional contacts and relationships of the Company's senior management.

**Competition**

There is strong competition among various lenders seeking a secured loan portfolio and attractive financing terms.  However, the Company believes that there are few groups providing financing in the manner contemplated by the Company, or currently pursuing the strategies described herein.  Based on the experience of its principals and extensive conversations with borrowers, the Company believes that the market for providing short-term, secured purchase money and receivable financing to wholesale consumer goods trading companies is an underserved niche market, offering a substantial opportunity for the Company.  Existing lenders typically focus on loans below or well above the Company's range.  As existing institutions have



4

DZB041927

grown, their infrastructures have increased, increasing the minimum size of loans and associated inflexible structures. As a result, there are currently few lenders in the Company's target market.

Competition can be segmented according to the sources of capital. The following summarizes the primary categories of lenders in the market, and discusses significant differences between each category and the Company:

<u>Individual Lenders</u>.    Lenders in this category are generally limited to making loans in the hundreds of thousands of dollars and are limited in terms of the geographic area in which they operate. The Company will typically lend amounts ranging between $2.0 million and $7.0 million. The Company provides financing on an opportunistic basis on a national and potentially international level. The Company provides collateral and security management, structural management, and follow-on financing capabilities.

<u>Institutional Lenders/Insurance Companies</u>.    These lenders typically provide loans with maturities of more than three years, take positions subordinate to those of senior commercial lenders, base decisions on cash flow analyses, and have rigid structures that do not facilitate quick loan decisions. The Company is targeting senior secured loans with maturities of generally 180 days or less. The Company bases its loan decisions primarily on the availability of tangible asset and receivable collateral, the borrower's history of completing a significant number of wholesale inventory trade transactions, and on the probability that a pending inventory trade transaction will close. The Company has a flexible structure that enables it to make very quick loan decisions.

<u>Finance Companies</u>.    These lenders consist predominantly of asset-based lenders, such as GE Capital, Foothill Capital, Congress Financial Corporation and CIT Group. Lenders in this category provide formula based loans tied to accounts receivable, inventory, and hard assets with maturities of at least one year. Loan decisions are based on the borrower's perceived ability to service loans over time and the lender's ability to liquidate assets to recover principal and accrued interest in the event of default. As with other traditional lenders, the initial approval process can take several weeks to months, and closings can take additional weeks or months, depending on the availability of audited financial statements, asset appraisals and other materials. Draws against an approved credit facility are achieved more quickly but still may require significant delay for assessment of collateral and documentation. In contrast, the Company provides loans with shorter maturities and receives a service premium based on its ability to approve and close creditworthy loans faster with flexible loan structures as compared to traditional finance sources. Rather than being a source of competition to the Company, finance companies can provide a source of referrals and co-investment opportunities.

<u>Banks</u>.    Banks are limited in both the loan types and the situations in which they can provide credit due to federal and state regulations, as well as their charter and lending policies. Banks typically provide loans with maturities of at least one year. As is the case with finance companies, credit decisions are based upon the borrower's perceived ability to service loans over time and the lender's ability to recover principal and accrued interest in the event of default. As



5

DZB041928

with finance companies, the initial approval process can take several weeks to months, and closing can take additional weeks or months, depending on the availability of audited financial statements, asset appraisals and other materials.   Rather than being a source of competition to the Company, banks can provide a source of referrals and co-investment opportunities.

<u>Mezzanine Companies</u>.  Lenders of this type include Allied Capital, Pacific Mezzanine Investors and Churchill Capital.  These companies typically provide loans with maturities of more than three years that are subordinated to the position of senior commercial lenders.  Mezzanine companies base their lending decisions on cash flow analyses.  The initial approval process can take several weeks to months, and closing can take additional weeks or months, depending on the company's activity level, the availability of capital, the availability of audited financial statements, asset appraisals and other materials.   Again, because of the focus of the mezzanine companies, they can provide a source of referrals to the Company rather than pose a threat of competition.



DZB041929

## COMPANY OVERVIEW

**Overview**

The Receivables to be securitized in the Conduit Facility include trade finance loans originated by the Company through its normal course of business. The following is a summary of the Company's operations.

**Clients**

The Company's primary focus is to provide secured short-term loans to trading businesses ("Clients") sourcing and supplying wholesale consumer goods inventories to retailers. The Clients supply national retail chains ("Buyers") with goods such as electronics, housewares, apparel, sporting goods, hardware, seasonal goods, and, non-perishable food and health and beauty products. The Clients typically acquire name brand consumer goods inventories from manufacturers, distributors, retailers, financial institutions and other similar sources ("Sellers") at a substantial discount to their standard wholesale price (and current retail price), as a result of overproduction, cancelled sales, model changes, overstocks, and financial weakness or problems of the supplier. The Company is expanding to offer its financing product to traditional wholesalers where flexibility, timing, and incremental expansion of the wholesaler's business are key factors. Because of the nature of the underlying transactions, the Clients may experience difficulty in establishing and maintaining lending arrangements with traditional lenders, who are often unable to meet their needs for flexible and rapid execution of funding. The Company works only with established businesses that have an in-depth understanding of, and experience in, wholesale consumer goods inventory trading.

**Financing Structure**

The Company provides short-term secured loans carrying interest rates and fees (such as profit participations, facility fees, collateral fees, etc.). The loans made by the Company are generally classified as senior secured loans with first priority liens in front of other creditors and equity investors. The Company may write multiple loans with a single borrower at one time and over a period of time. The structure of a typical transaction is generally along the following lines:

Borrower:     The Client establishes a wholly-owned special purpose subsidiary ("Borrrower") for the exclusive purpose of enabling the Company to finance Opportunity Goods Transactions for the Client. Pursuant to an assignment agreement between the Client and the Borrower, the Client assigns Buyer and Seller purchase orders to the Borrower whereupon the Company provides financing pursuant to a credit agreement. As a result, the Borrower holds all rights, privileges and assets associated with the transactions financed by the Company. The Client provides certain services on behalf of the Borrower pursuant to a management agreement



DZB041930

between the Borrower and the Client. The Company does not require its Borrower to receive non-consolidation opinions from counsel for the Borrower, as the Company prefers to have a perfected secured lender status.

| | |
|---|---|
| Loan Structure: | A secured note collateralized by a priority lien on tangible assets and a receivable related to the inventory trade transaction. The credit agreement is discretionary and does not obligate the Company to provide financing to the Client/Borrower (see Exhibit B). |
| Security Agreement: | Pursuant to a security agreement, the Company holds a perfected security interest in all of the Borrower's assets. |
| Segregated Accounts: | The Company is the signatory on the Borrower's bank accounts. As a result, no outgoing financial transaction may occur in the Borrower's accounts without the approval of the Company. |
| Guaranty: | In some cases, a personal guaranty of a principal of the Client or a pledge of collateral by related parities. In the case of the lending agreement between the Company and Petters Finance, Petters and Petters' principal guarantee all of Petters Finance's obligations to the Company. |
| Loan Size: | The Company provides loans ranging typically from $0.5 million to $6.0 million. Most recently, the loans have been structured at 95-100% of the cost of the goods and 80-85% of the sales price; however, this varies on a case-by-case basis depending on a number of factors. |
| Maturity: | Loan maturity occurs upon the earlier of 120 days or the receipt of payment on the underlying receivable collateral. |
| Amortization: | Principal, interest and fees payable in full upon maturity. |
| Interest Rate: | 15% to 45% per annum. |
| Fees: | 0% to 5% commitment fees, participation fees, renewal fees, collateral fees, and prepayment fees where appropriate. |
| Covenants: | The loans generally include restrictive covenants such as structural restrictions, collateral restrictions, receivable proceeds restrictions, and other customary provisions. |



DZB041931

The following table illustrates the basic lending structure between the Company and the Client:

### Table 4 – Lending Structure

```
                           ┌──────────┐
                           │  Client  │
                           └──────────┘
                                ↕
                        $ Subordinate          ┌─────────────────────────┐
                                               │ Inventory transaction    │
                                               │ assigned, financed, and  │
                                               │ owned in SPV             │
  ┌───────────┐   $ Senior   ┌──────────────┐  └─────────────────────────┘
  │  Company  │ ←─────────→  │ SPV of Client│        Purchase Money &
  └───────────┘              │  (Borrower)  │        Receivable Financing
                             └──────────────┘
                          Seller Payments   Buyer Payments
           ┌──────────┐                        ┌──────────┐
           │ Sellers  │ ←─────────      ──────→│  Buyers  │
           └──────────┘                        └──────────┘
                  ●·················································●
                              Inventory Trade
```

## Underwriting

Due diligence is performed by the Company on every new loan and where appropriate, outside audit, appraisal and valuation firms are utilized. The due diligence process consists of a review and analysis of all available due diligence materials related to a Client, with emphasis on (i) availability of tangible assets to secure the value of the loan being made; (ii) a significant history of successful wholesale inventory trading transactions by the Client; and (iii) the experience of the Client's management team. However, the Company does not perform any notification procedures with the Buyer or Seller to verify the purchase order. The goals of the due diligence process is to make an informed underwriting decision, develop an appropriate loan structure, and design a customized loan monitoring program.

The following underwriting criteria is used in the evaluation of all transactions:

Tangible Assets. A Borrower/Client must use the loan proceeds to purchase tangible assets valued at or in excess of the amount of the loan. The Company has a priority lien on the assets and, in some cases, a pledge of collateral by related parties.

Receivable Quality. A Borrower/Client must use the loan to finance the purchase of merchandise and sell such merchandise to a customer. The customer whose receivable collateralizes the loan must be of a type and quality that the Company determines to be adequate security given the interest rate of the loan and the past performance between the parties. In certain circumstances, the Company may decide to enhance the credit quality of the borrower's receivable by purchasing credit insurance, when and if available at competitive rates (see "Insurance").



DZB041932

Management Performance History.  The Borrower/Client must be able to demonstrate to the satisfaction of the Company an ability to successfully complete the inventory trade transaction with the Company's loan proceeds.  This demonstration will be established by successful performance in similar transactions and available industry references.

Niche Market Positions.  A Borrower/Client should have strong capabilities, such as marketing/sales advantages, inventory sources, or other advantages that are not easily duplicated.

Ongoing Relationship Characteristics.  A Borrower/Client should be willing to accept additional financing from the Company pursuant to the same terms and conditions as the initial financing (as outlined in a master credit agreement – see Exhibit B) in order to achieve economies of scale and develop a long-term lending relationship with the Company.

## Loan Concentrations

The Company generally provides short-term loans ranging from $0.5 million to $6.0 million with maturities ranging from 90 to 150 days.  Moreover, the Company makes a series of loans to a single borrower; each loan backed by a specific inventory trade transaction and associated collateral.  The Company expects these "follow on" loans to increase the Company's exposure to successful situations, protect the Company's original commitments, and increase the Company's concentration to a particular borrower.  The Company continually monitors its loan concentrations as it relates to the Buyers in the underlying Opportunity Goods Transactions.

## Loan Documentation

The Company outsources legal documentation, with the exception of term sheets (which generally will be produced by the Manager).  Given the Company's focus on providing short-term loans for purchase money and receivable financing, the documentation is similar for each loan.  When deemed necessary, an outside firm is used to assist the Company in verifying and analyzing the collateral, which generally consists of wholesale-finished goods inventories and related receivables.  By leveraging the resources of outside firms to provide certain services, the Company can control expenses, limit personnel, and concentrate on its core functions – finding and closing loans.

## Loan Funding

Pursuant to the credit agreement between the Company and the Borrower, the Company funds the loan proceeds directly to the Borrower with the Client funding its participation as well.  The proceeds are then wired directly to the Seller.  As signatory on the Borrower's accounts, the Company approves the wire transfer directly to the Seller.   The credit agreement provides that the Client's financial participation in the trades financed by the Company is subordinated to any Company financing.



DZB041933

**Loan Portfolio Monitoring**

As the Company provides short-term secured loans, credit administration is viewed as extremely important. Credit administration, including loan review, loan monitoring, and continuous borrower communication is performed in-house on an ongoing basis by the Company. The Company utilizes its systems to track all outstanding loans and other equity enhancements on a continuous basis and to interface with the information with the Company's accounting system. The Company continuously monitors the loan portfolio by employing the following methods:

> *Inventory and Receivable Report.* The Company keeps in daily contact with its Clients and reviews weekly status reports on every trade financed. The Company monitors the time it takes for the inventory to be delivered, which triggers the creation of the receivable from the Buyer. Typically, the Company receives a copy of the bill of lading or other notification, verifying that the inventory has been shipped to the Buyer. In addition, verbal notice is received from the Client that the inventory has been delivered to the Buyer. The Company seeks to improve the reporting capabilities of its Clients through the use of automated delivery verification from third party shipping companies utilized, such as Yellow Freight and Consolidated Freightways.

> *Financial Reporting.* The Clients and their affiliates are required to provide unaudited financial statements on a monthly basis. Depending on the asset concentration and circumstances of the Client, management information may be required on a daily basis. The Company also requires such other supplemental information, as it deems appropriate on a case-by-case basis.

> *Credit Analysis.* Management generally analyzes all outstanding loans at least on a weekly basis and in certain situations on a daily basis. Clients' financial statements are reviewed and monitored on a continual basis. The credit analysis is used as part of the considerations in the Company's underwriting process.

> *Periodic Review of Client's Books and Records.* As part of monitoring the Company's loan portfolio, the Company's personnel make periodic on-site visits to Clients' facilities and, in some cases; the Company may place its personnel at the Client's facility for an extended period of time (rights granted to the Company in the loan documentation between the Company and the Borrower). The Company reviews each Client's performance over time and monitors potential adverse developments, as well as additional lending opportunities, to maximize returns and minimize risks for the Company.

**Document Custody**

The Company currently stores the original loan files on premises at their corporate headquarters in Minneapolis. In conjunction with the Conduit Facility, the Company will transfer all original



DZB041934

loan files for outstanding and newly originated loans to a third-party financial institution (the "Collateral Agent") acceptable to the Lender.

## Cash Management

The Buyers (national retail chains) are instructed to remit their payments via wire transfer directly to the Borrower. The Company is granted signatory authority on the Borrower's bank account in the loan documentation. Subsequent to receiving confirmation from the receiving bank of the incoming wire transfer, the Company directs payment from the Borrower's bank account to the Company for the repayment of the Company's note and interest, with the remainder being remitted to the Borrower or Client. In certain circumstances, payments are inadvertently sent directly to the Client from the Buyer; in this instance, the Client is required to immediately deposit the funds into the Borrower's bank account. The Company has never experienced any issues or material delays from their Clients directly receiving payments and the Company is continuously working with the Clients to ensure effective communication to the Buyers regarding the correct payment instructions. In the proposed Conduit Facility, the Company will, on a daily basis, remit to the Conduit Facility collection account any of the Company's note amount or interest received, with any remainder being transferred to the Borrower or Client.

## Dilution

Any dilution that occurs in the Opportunity Goods Transactions financed by the Company is fully borne by the Client (i.e. the party to which the receivable is owed) and has no effect on the note amount due to the Company. Nonetheless, to date, the Clients have not experienced any dilution on the approximately $875 million of receivables backing the loans from the Company. In Opportunity Goods Transactions, dilution is typically not experienced because the transactions are for specific identified goods and are not subject to the traditional instances of dilution (discounts, rebates, etc.). If goods are damaged during shipping, the Client's property insurance covers any losses (see "Insurance").

## Default Management

To secure repayment of loans made by the Company, all loans are cross-defaulted and secured by certain assets of the Borrower pursuant to a security instrument between the Company and the Borrower. In the event of default on the part of the Borrower for any reason, all unpaid principal, interest and other unpaid amounts, at the option of the Company, become due, and the Company is entitled to exercise all the rights to which it is entitled to as a secured party.

Events of default include the Borrower's failure to make a required payment or breach of any covenant included in a loan agreement. Such covenants may include, but not be limited to, restrictions on additional debt, minimum cash flow, minimum debt coverage, restrictions on capital expenditures, restrictions on change in ownership, rights to financial information, or maintenance of acceptable insurance on collateral.



DZB041935

If a loan default occurs and remains unremedied for any applicable cure period, the Company determines the most appropriate course of action to take under the circumstances to protect the Company's interests. Depending on the particular circumstances, the Company generally is able to pursue several courses of action, ranging from granting a waiver to the Borrower, extending the term of the entire loan or a portion thereof, or declaring all amounts due and taking steps (such as foreclosure) to secure repayment.

**External Audit**

The Company has engaged Ernst & Young on behalf of Dain Rauscher Incorporated to perform a procedural review of the historical Opportunity Goods Transactions financed by the Company. Such review was completed as of June 30, 2001 and a copy of the procedures report from Ernst & Young is available upon request. In addition, the Company has engaged Ernst & Young to audit the Company's financial statements beginning with the fiscal year ending December 31, 2001.

**Insurance**

A $10 million property and casualty insurance policy is maintained and paid for by Petters and names the Company as a loss beneficiary in the event inventories are damaged while warehoused or in transit. The policy covers any single occurrence of loss up to $10 million and is annually renewable. General Casualty Co. of Wisconsin (A rated by S&P and A++ rated by A.M. Best) is the carrier on the property insurance policy.

In addition, Petters carries and pays for a credit insurance policy covering specific Buyers in the event a receivable due from a Buyer is uncollectible. The Company is named as the loss beneficiary on the credit insurance policy. The credit insurance policy currently in place covers the following aggregate exposure levels: (i) $10 million exposure to Boscov's Department Stores, Inc. (ii) $5 million exposure to Fleming Companies, Inc., and (iii) $5 million exposure to Best Buy Co., Inc. The credit insurance policy is carried by NCM Americas, which is part of Swiss Re Group, which is AAA rated S&P and A++ rated by A.M. Best.

The Company is also named as the loss beneficiary on Petters' corporate liability insurance policies, which covers general liability up to $2 million in the aggregate ($1 million per occurrence), $2.5 million for business personal property, a $1 million blanket bodily injury coverage, and $100,000 for employee dishonesty or forgery. This policy is also carried by General Casualty Co. of Wisconsin and paid for by Petters.

**Legal Issues**

The Company is party to no legal issues that are material to the welfare of the Company.



DZB041936

## Information Technology

The Company's systems operate on a local area network with file sharing on a Compaq NT 4.0 server. The Company utilizes QuickBooks for its accounting and receivable management software. The files are backed up in a special storage sector in the server each time a user exits a program. On a weekly basis, the data on the server is backed up to a zip drive, which is stored in an offsite location.

## Management

The Company is currently managed by a team of four individuals. The Company anticipates its personnel will grow as the number of Clients/Borrowers increases. These individuals will participate in the identification and documentation of loan transactions, closing loans, and monitoring loan and borrower performance. The chief manager of the Company is Mr. Jon R. Sabes. Biographical information concerning the management team is as follows:

Jon R. Sabes, CEO/Manager. Mr. Sabes, 35, has over twelve years experience in investment banking, business development, corporate law and consulting in a variety of industries. Mr. Sabes is responsible for the general business oversight and underwriting of the Company. Mr. Sabes is a founding partner of Jon Adams Financial Co., LLP, a law firm and business advisory firm specializing in providing small and medium size businesses with professional services related to mergers and acquisitions and corporate finance. Prior to joining Jon Adams Financial Co., Mr. Sabes served as a tax consultant with Ernst & Young LLP. In addition, Mr. Sabes' professional experience includes serving as Vice President of Business Development for Gaming Corporation of America and investment banking with Jefferies & Company, Inc. Mr. Sabes earned a Juris Doctor, *Cum Laude*, from the University of Minnesota and holds a BA from the University of Colorado.

Steve Sabes, Administration and Servicing Manager. Mr. Sabes, 33, has been associated with Opportunity Finance as its portfolio administrator since 1999. As portfolio administer, Mr. Sabes initiates and confirms the movement of money between investors, the Company, and its clients. In addition, Mr. Sabes tracks the status of each loan with Larry McGough, communicating with clients on a daily basis, coordinating corporate bookkeeping, and seeking to ensure portfolio payouts occur properly. Mr. Sabes performs cash management and maintains all files for the Company's portfolio. Mr. Sabes holds a Ph. D. in Organic Chemistry from the University of Minnesota and a BA from The Colorado College.

Larry McGough, Controller. Mr. McGough, 46, is charged with designing and overseeing internal accounting and computer-related systems and information reporting to senior level management. Mr. McGough oversees internal financial statement reporting systems, tax return preparation, and general back office functions related to receivable and accounts payable management. Mr. McGough provides necessary support services to members of the senior management team as needed. Mr. McGough coordinates fixed asset acquisitions and arranges for financing of related fixed assets, and for the maintenance and update of the corporate



DZB041937

computer network as needed.  Mr. McGough holds a MBA from Mankato State University and a BS from Northwest Missouri State University.

<u>Sandy Quigley, Bookkeeper/Receptionist</u>.   Ms. Quigley is responsible for accounts payable recording, payment and reconciliation, accounts receivable recording, payment and reconciliation.  Ms. Quigley assists in the preparation of financial statements through general ledger, brokerage account reconciliation.  In addition, Ms. Quigley oversees the daily operations of the business office, greeting guests, handling mail, and other general administrative duties.



DZB041938

## FINANCING STRUCTURE

### Preliminary Summary of Terms

| | |
|---|---|
| Originator/Servicer: | Opportunity Finance, LLC |
| Borrower: | Opportunity Finance Securitization LLC, a wholly owned bankruptcy remote subsidiary of Opportunity Finance, LLC established solely for the purpose of the financing contemplated herein.  Pursuant to a Purchase and Sale Agreement, the Originator will sell Receivables (as defined herein) to the Borrower on a true sale basis.  Pursuant to a Receivables Financing Agreement, the Borrower will pledge such Receivables to the Lender and the Lender will provide the Facility (as defined herein). |
| Lender: | A multi-seller commercial paper ("CP") conduit (the "Lender") administered by [_____] (the "Agent"). |
| Facility: | The Lender will agree to lend against certain Eligible Receivables (as defined herein) owned by the Borrower in an amount not to exceed the Commitment Amount, until the earlier of (a) a Termination Event or (b) the Facility Maturity Date.  The Lender will fund the loans to the Borrower through the issuance of CP rated A-1/P-1/F-1 by Standard & Poor's, Moody's Investor's Service ("Moody's") and/or Fitch IBCA, Inc. ("Fitch"), respectively (the "Rating Agencies"). |
| Receivables: | All commercial trade finance loans originated or purchased by the Originator through its normal course of business. |
| Commitment Amount: | The initial Commitment Amount will be $100,000,000. The Lender may increase the Commitment Amount upon written request by the Borrower and approval of the Lender. |
| Anticipated Closing Date: | November 30, 2001 |
| Facility Maturity Date: | [Three (3) ]years from the closing of the transaction.  The Lender agrees to provide the Facility for a term of [3] years and the Borrower agrees not to terminate the Facility during such [3]-year term.  All Eligible Receivables originated by the Originator will be financed through this |



16

Program. The Originator shall be obligated to pay a prepayment premium, if at any time the Originator prepays the Outstanding Facility Amount with proceeds other than from a financing arranged by the Agent, in an amount equal to the Maximum Facility Amount times (i) on or prior to the first anniversary of the Closing Date, [1.50]% and (ii) anytime thereafter, [1.00]%.

**Optional Prepayment:** On any Settlement Date beginning three months before the Facility Maturity Date, the Borrower will have the right, upon not less than 30 days notice, to prepay the Facility in full without penalty.

**Amortization Period:** If the Borrower does not utilize the Optional Prepayment, beginning on the first Settlement Date after the Facility Maturity Date, a six (6) month Amortization Period will commence, unless extended by the Agent.

**Outstanding Facility Amount:** The Outstanding Facility Amount shall be an amount equal to, as of any date, the total face amount of commercial paper ("CP") outstanding plus any unpaid amounts drawn under the Liquidity Facility (which such amounts are used to reduce the amount of CP outstanding), along with accrued interest thereon.

**Liquidity Facility:** The Agent will provide a Liquidity Facility [and program-wide credit enhancement] in an amount sufficient to facilitate the issuance of commercial paper for the term of the Facility.

The cost of the Liquidity Facility [and program-wide credit enhancement] is included in the Facility Fee (as defined herein).

The Lender retains the sole right to syndicate any portion of the Liquidity Facility at its own expense.

**Fees:** The transaction fees will include the following:

1. A Due Diligence Fee of $25,000, payable upon execution of the Lender's engagement letter, which will be applied to the Lender's reasonable out-of-pocket expenses associated with the Facility.



DZB041940

      Amounts not applied to the Lender's out-of-pocket expenses will be applied to the Structuring Fee;

2.   A Structuring Fee equal to [0.50]% of the Commitment Amount, payable upon closing;

3.   A Program Fee equal to the Lender's CP Rate plus [2.50]% per annum times the average Outstanding Facility Amount, payable monthly in arrears; and

4.   A Non-Use Fee of [0.25]% per annum on the difference between the Commitment Amount and the average Outstanding Facility Amount, payable monthly in arrears.

The Program Fee and the Non-Use Fee together are referred to as the "Facility Fee". The Facility Fee includes the cost on the Liquidity Facility along with ongoing expenses of the Lender, the issuing paying agent, depositary, and commercial paper trustee. The Facility Fee does not include the back-up servicing fee (while in standby mode), collateral agent fees, rating agency fees or legal expenses associated with the transaction, which are the responsibilities of the Borrower.

**Servicing:**        The Servicer is responsible for servicing, administering and making collections on the Receivables. The Servicer will receive a monthly servicing fee (the "Servicing Fee") equal to the product of (i) 1.0% (ii) 1/12 and (iii) the average outstanding principal balance of Eligible Receivables during the preceding Settlement Period.

**Collateral Agent:**        [__]To be determined and approved by Lender.

**Collateral Agent Fee:**        The product of (i) [__]%, (ii) 1/12, and (iii) the average outstanding principal balance of Eligible Receivables during the preceding Settlement Period.

**Settlement Period:**        Any calendar month.

**Settlement Date:**        The 10th business day of the month.

**Borrowing Date:**        Any date on which a funding under the Facility occurs. The Borrower will not be limited to the frequency of fundings under the Facility. The minimum amount of any such funding will be $500,000 in denominations of



DAIN RAUSCHER

INVESTMENT SERVICES
INVESTMENT BANKING
MEMBER NYSE/SIPC

18

DZB041941

$100,000.  The Servicer will be required to submit to the Lender a Borrowing Base Report on each Borrowing Date.

| | |
|---|---|
| Borrowing Base Report: | The Servicer will be required to submit to the Lender a Borrowing Base Report on each Borrowing Date and on each Settlement Date. |

Eligible Receivables:

An Eligible Receivable is a Receivable that:

(i)     Arises in the ordinary course of business in accordance with the Originator's Credit and Collection Policy and is customary in the trade finance business;

(ii)    Was created in connection with a promissory note substantially in one of the forms set forth in Exhibit B (a "Contract");

(iii)   Arises under a Contract that permits the powers of attorney granted to the Originator, the Borrower, and the Servicer to be assigned to the Agent;

(iv)    Is in the possession of the Custodian;

(v)     The proceeds of which have been advanced;

(vi)    As to which, at the time of the sale of such Receivable by the Originator to the Borrower, the Originator has title thereto and clear of all liens and adverse claims;

(vii)   Grants the Lender a first priority perfected security interest in such Receivable;

(viii)  Is U.S. dollar denominated;

(ix)    Is not a Defaulted Receivable;

(x)     Has an original term to maturity of no more than 150 days;

(xi)    The obligor of which is not a governmental agency;

(xii)   The obligor of which is a resident of the United States; and

(xiii)  Other criteria as agreed to by the Lender and Originator.

Defaulted Receivable:

A Defaulted Receivable is a Receivable, without duplication, that:

(i)     Is more than 60 days past due; or

(ii)    Was charged off in accordance with the Credit and Collection Policy.

Excess Concentrations:

To be determined and agreed to between the Lender and Originator.



DZB041942

**Opportunity Finance, LLC**
*Trade Finance Loan-Backed Conduit Facility*

| | |
|---|---|
| Net Pool Balance: | The aggregate unpaid principal balance of all Eligible Receivables less the Excess Concentrations. |
| Advance Rate: | [80]% |
| Borrowing Base: | The product of (i) the Net Pool Balance and (ii) the Advance Rate. |
| Borrowing Base Deficiency: | The excess, if any of (i) the Outstanding Facility Amount over (ii) the Borrowing Base. |
| Borrowing Base Surplus: | The excess, if any of (i) the Borrowing Base over (ii) the Outstanding Facility Amount. |
| Collections: | All cash collections and other cash proceeds of the Receivables, including without limitation, late charges, scheduled payments, prepayments, disposal proceeds, recoveries, investment earnings, and insurance proceeds received during the Settlement Period. |
| Collection Account: | All Collections due to Borrower will be remitted to an account (the "Collection Account") in the name of the Agent for the benefit of the Lender. |
| Daily Application of Collections: | On each business day that is not a Settlement Date, amounts on deposit in the Collection Account will be used in the following order of priority: |

Daily Application of Collections (continued):

(i) To set aside in the Collection Account an amount equal to the Accrued Facility Costs (as defined herein) for transfer at the further direction of the Lender (whether on such day or on a subsequent day);

(ii) If there is a Borrowing Base Deficiency, to reduce the Outstanding Facility Amount until such Borrowing Base Deficiency is cured; and

(iii) At the option of the Borrower, (a) to finance any newly originated Eligible Receivables, (b) to reduce the Outstanding Facility Amount, or (c) to the Borrower on any Borrowing Date.

| | |
|---|---|
| Accrued Facility Costs: | Accrued Facility Costs means, on any day, the aggregate of (a) the accrued and unpaid Facility Fee, (b) the accrued and unpaid Collateral Agent Fee, (c) the accrued and unpaid |



DZB041943

Servicer Fee, and (d) all other accrued and unpaid amounts owing under the agreement.

Payments on each Settlement Date:
On each Settlement Date, including any Settlement Date during the Amortization Period, funds will be withdrawn from the Collection Account and distributed in the following order of priority:

(i)     To the Collateral Agent, the Collateral Agent Fee and any other amounts owing to the Collateral Agent;

(ii)    To the Servicer, the Servicer Fee and any other amounts owing to the Servicer;

(iii)   To the Lender, any accrued and unpaid Facility Fee;

(iv)    To the Agent, an amount equal to the Borrowing Base Deficiency (if any) as of such Settlement Date;

(v)     If any of the Outstanding Facility Amount is to be prepaid on such Settlement Date, to the Agent, any amount of such prepayment;

(vi)    To the Borrower, an amount equal to the Borrowing Base Surplus (if any) as of such Settlement Date;

(vii)   If any of the Outstanding Facility Amount is expiring on such Settlement Date, to the Agent, any amount of such expiration;

(viii)  To the Collection Account, an amount equal to the Accrued Facility Costs for application on the succeeding business day; and

(ix)    Any remaining amounts to the Borrower.

Termination Events:
Upon a Termination Event, the Lender will cease advancing funds under the Facility and the Amortization Period will commence.  Termination Events to include:

(i)     Bankruptcy or insolvency of the Originator, the Borrower, or the Servicer;

(ii)    Failure of the Borrower to transfer funds or pay principal or interest when due or within a 2-day grace period;

(iii)   The Borrower ceases to purchase Receivables under the Receivables Purchase Agreement;

(iv)    The Borrower becomes an "investment company" within the meaning of the Investment Company Act of 1940, as amended;

(v)     Failure by the Borrower or Servicer to observe or perform any other covenants or agreements and



DZB041944

**Opportunity Finance, LLC**
*Trade Finance Loan-Backed Conduit Facility*

which continues unremedied for a period of 30 days after written notice;

(vi)    Any representation or warranty made proves to have been incorrect and which continues unremedied for a period of 30 days after written notice; provided, however, that such a Termination Event shall not be deemed to occur if the Originator has repurchased the related Receivables;

(vii)    A Borrowing Base Deficiency exists for more than two consecutive business days;

(viii)    At any time, the excess of (i) the Net Pool Balance over (ii) the Outstanding Facility Amount, falls below [$10.0] million;

(ix)    The three-month rolling average Default Ratio exceeds [___]%;

(x)    At the end of any fiscal quarter, failure of the Originator to maintain at least [$____] million in tangible net worth; and

(xi)    Other Termination Events agreed to between the Lender and Originator.

The Default Ratio means, as of any Settlement Date, for any Settlement Period, a fraction, expressed as a percentage, (I) the numerator of which is the principal balance of the Defaulted Receivables during such Settlement Period and (II) the denominator of which is the average aggregate amount of Receivables during such Settlement Period.

**Representations and Warranties:**    Include the following:

(a)    Organization and good standing;
(b)    Qualification to do business;
(c)    Power and Authority to enter into agreement;
(d)    Facility documents will be binding obligations;
(e)    No violation;
(f)    No material litigation;
(g)    Payment of taxes;
(h)    No defaults existing;
(i)    Receivables conform to underwriting standards; and
(j)    Receivables are not subject to executory contract risk (i.e. rejection under bankruptcy).

**Covenants:**    Include the following:

(a)    Merger and consolidation;



DZB041945

**Opportunity Finance, LLC**
*Trade Finance Loan-Backed Conduit Facility*

(b)  Preservation of security interest;
(c)  Preservation of name;
(d)  Preservation of office;
(e)  Compliance with law;
(f)   Conveyance of assets and security interests;
(g)  Notification of breach;
(h)  Further assurances;
(i)   Indemnification;
(j)   Non-disclosure and inspection; and
(k)  Reconveyance.

**Conditions Precedent:**

Include the following:
(a)  Prior to issuing a commitment letter, satisfactory review of Originator's credit, collection, operating, and reporting procedures and systems;
(b)  Prior to issuing a commitment letter, satisfactory background checks of Originator's senior management;
(c)  Prior to issuing a commitment letter, the Lender's credit approval;
(d)  Mutually acceptable documentation encompassing the terms of the this term sheet;
(e)  Prior to closing of the Facility, payment by the Originator of all up-front expenses and fees associated with the Facility; and
(f)   Other legal opinions or conditions as deemed reasonably necessary by the Lender, or required by the Rating Agencies, including, but not limited to, true sale and non-consolidation opinions provided by the Borrower's counsel.

**Audits:**

The Originator will cause an annual audit to be performed on its consolidated financial statements, as well as those of the Borrower, by an accounting firm satisfactory to the Lender.  In addition, the Lender will perform regularly scheduled quarterly compliance reviews at Lender's expense.

**Other Restrictions:**

To include the following:
(a)  No material change in the Originator's underwriting standards without Lender's approval.

**Governing Law:**

New York State.

**Placement Agent:**

Dain Rauscher Incorporated



23

DZB041946

**Opportunity Finance, LLC**
*September 2001*                                              *Trade Finance Loan-Backed Conduit Facility*

Borrower's Counsel:                    [to be determined]

Lender's Counsel:                      [to be determined]



24

DZB041947

**Opportunity Finance, LLC**
*September 2001*                                                *Trade Finance Loan-Backed Conduit Facility*

## PORTFOLIO PERFORMANCE ANALYSIS

The following is an analysis of the Company's historical portfolio performance. A list of every Opportunity Goods Transaction financed by the Company (and matured) can be found in Exhibit C.

### Table 5 – Portfolio Roll Forward

| Month | Beginning Unpaid Principal Balance | New Contracts[1] | Principal Collections | Write-Offs | Ending Unpaid Principal Balance |
|---|---|---|---|---|---|
| May-98 | - | 1,000,000 | - | - | 1,000,000 |
| Jun-98 | 1,000,000 | 1,000,000 | - | - | 2,000,000 |
| Jul-98 | 2,000,000 | 1,000,000 | (1,000,000) | - | 2,000,000 |
| Aug-98 | 2,000,000 | 1,314,000 | (2,000,000) | - | 1,314,000 |
| Sep-98 | 1,314,000 | 11,610,000 | - | - | 12,924,000 |
| Oct-98 | 12,924,000 | 12,735,000 | (12,924,000) | - | 12,735,000 |
| Nov-98 | 12,735,000 | 12,791,000 | - | - | 25,526,000 |
| Dec-98 | 25,526,000 | 24,263,199 | (14,926,000) | - | 34,863,199 |
| Jan-99 | 34,863,199 | 28,434,005 | (26,958,469) | - | 36,338,735 |
| Feb-99 | 36,338,735 | 19,032,260 | (19,632,260) | - | 35,738,735 |
| Mar-99 | 35,738,735 | 3,150,000 | (13,718,350) | - | 25,170,385 |
| Apr-99 | 25,170,385 | 19,650,000 | (25,170,385) | - | 19,650,000 |
| May-99 | 19,650,000 | 17,100,000 | (3,300,000) | - | 33,450,000 |
| Jun-99 | 33,450,000 | 10,100,000 | (10,600,000) | - | 32,950,000 |
| Jul-99 | 32,950,000 | 21,650,475 | (13,650,000) | - | 40,950,475 |
| Aug-99 | 40,950,475 | 16,700,000 | (27,400,475) | - | 30,250,000 |
| Sep-99 | 30,250,000 | 9,899,503 | (2,650,000) | - | 37,499,503 |
| Oct-99 | 37,499,503 | 20,550,000 | (10,900,000) | - | 47,149,503 |
| Nov-99 | 47,149,503 | 11,600,000 | (18,499,503) | - | 40,250,000 |
| Dec-99 | 40,250,000 | 15,399,503 | (8,100,000) | - | 47,549,503 |
| Jan-00 | 47,549,503 | 18,449,503 | (25,349,503) | - | 40,649,503 |
| Feb-00 | 40,649,503 | 22,000,000 | (14,600,000) | - | 48,049,503 |
| Mar-00 | 48,049,503 | 17,600,000 | (13,600,000) | - | 52,049,503 |
| Apr-00 | 52,049,503 | 21,449,503 | (21,949,503) | - | 51,549,503 |
| May-00 | 51,549,503 | 22,250,000 | (18,500,000) | - | 55,299,503 |
| Jun-00 | 55,299,503 | 11,600,000 | (14,250,000) | - | 52,649,503 |
| Jul-00 | 52,649,503 | 15,650,000 | (14,000,000) | - | 54,299,503 |
| Aug-00 | 54,299,503 | 27,149,503 | (27,049,503) | - | 54,399,503 |
| Sep-00 | 54,399,503 | 6,650,000 | (14,250,000) | - | 46,799,503 |
| Oct-00 | 46,799,503 | 13,000,000 | (13,000,000) | - | 46,799,503 |
| Nov-00 | 46,799,503 | 11,349,503 | (8,599,503) | - | 49,549,503 |
| Dec-00 | 49,549,503 | 8,550,000 | (11,550,000) | - | 46,549,503 |
| Jan-01 | 46,549,503 | 18,250,000 | (9,650,000) | - | 55,149,503 |
| Feb-01 | 55,149,503 | 4,000,000 | (6,000,000) | - | 53,149,503 |
| Mar-01 | 53,149,503 | 8,472,350 | (7,100,000) | - | 54,521,853 |
| Apr-01 | 54,521,853 | - | - | - | 54,521,853 |
| May-01 | 54,521,853 | 9,000,000 | (22,299,503) | - | 41,222,350 |
| Jun-01 | 41,222,350 | 23,273,000 | (4,500,000) | - | 59,995,350 |
| Jul-01 | 59,995,350 | 13,400,000 | (19,122,350) | - | 54,273,000 |
| Aug-01 | 54,273,000 | 43,400,000 | (25,473,000) | - | 72,200,000 |

(1) Aggregate principal balance of loans originated in each period.



INVESTMENT SERVICES
INVESTMENT BANKING
MEMBER NYSE/SIPC

25

DZB041948

### Table 6 – Monthly Loan Originations

| Month | New Contracts [1] | Month | New Contracts [1] |
|---|---|---|---|
| May-98 | 1,000,000 | Jan-00 | 18,449,503 |
| Jun-98 | 1,000,000 | Feb-00 | 22,000,000 |
| Jul-98 | 1,000,000 | Mar-00 | 17,600,000 |
| Aug-98 | 1,314,000 | Apr-00 | 21,449,503 |
| Sep-98 | 11,610,000 | May-00 | 22,250,000 |
| Oct-98 | 12,735,000 | Jun-00 | 11,600,000 |
| Nov-98 | 12,791,000 | Jul-00 | 15,650,000 |
| Dec-98 | 24,263,199 | Aug-00 | 27,149,503 |
| Jan-99 | 28,434,005 | Sep-00 | 6,650,000 |
| Feb-99 | 19,032,260 | Oct-00 | 13,000,000 |
| Mar-99 | 3,150,000 | Nov-00 | 11,349,503 |
| Apr-99 | 19,650,000 | Dec-00 | 8,550,000 |
| May-99 | 17,100,000 | Jan-01 | 18,250,000 |
| Jun-99 | 10,100,000 | Feb-01 | 4,000,000 |
| Jul-99 | 21,650,475 | Mar-01 | 8,472,350 |
| Aug-99 | 16,700,000 | Apr-01 | - |
| Sep-99 | 9,899,503 | May-01 | 9,000,000 |
| Oct-99 | 20,550,000 | Jun-01 | 23,273,000 |
| Nov-99 | 11,600,000 | Jul-01 | 13,400,000 |
| Dec-99 | 15,399,503 | Aug-01 | 43,400,000 |

(1) Aggregate principal balance of loans originated in each period.

### Table 7 – Portfolio Turnover

| | 8 Months Ended August 31, | | 12 Months Ended December 31, | | |
|---|---|---|---|---|---|
| | 2001 | 2000 | 2000 | 1999 | 1998 |
| Loans Originated [1] | $119,795,350 | $156,148,509 | $195,698,012 | $193,265,746 | $65,713,199 |
| Average Unpaid Principal Balance [2] | 55,629,177 | 51,118,253 | 49,887,003 | 35,578,903 | 11,545,275 |
| Turnover [3] | 3.23 | 4.58 | 3.92 | 5.43 | 5.69 |
| Average Days Outstanding [4] | 111.45 | 78.57 | 91.77 | 66.27 | 63.25 |

(1) Sum of the aggregate loans originated during each month of the stated period

(2) Sum of the aggregate loans outstanding at the end of each month of the stated period divided by the respective number
of months in the stated period.

(3) Annualized Loans Originated divided by Average Unpaid Principal Balance

(4) 360 days divided by Turnover



DZB041949

## Table 8 – Aging Experience for the Portfolio

| | August 31, 2001 | | December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2000 | | 1999 | | 1998 | | | |
| | Total | % of Total | Total | % of Total | Total | % of Total | Total | % of Total | | |
| 1-30 Days Outstanding | $37,400,000 | 51.80% | $8,550,000 | 18.37% | $15,399,503 | 32.39% | $22,763,199 | 68.23% | | |
| 31-60 Days Outstanding | 17,400,000 | 24.10% | 7,849,503 | 16.86% | 11,600,000 | 24.40% | 10,600,000 | 31.77% | | |
| 61-90 Days Outstanding | 17,400,000 | 24.10% | 16,500,000 | 35.45% | 17,900,000 | 37.64% | 0 | 0.00% | | |
| 91-120 Days Outstanding | 0 | 0.00% | 6,650,000 | 14.29% | 2,650,000 | 5.57% | 0 | 0.00% | | |
| >120 Days Outstanding | 0 | 0.00% | 7,000,000 | 15.04% | 0 | 0.00% | 0 | 0.00% | | |
| **Total** | $72,200,000 | 100.00% | $46,549,503 | 100.00% | $47,549,503 | 100.00% | $33,363,199 | 100.00% | | |

NOTE:  The data in the table above reflects the age of each outstanding loan as of each of the dates shown (i.e. the number of days since the loan was originated)
The original term to maturity is typically 90-120 days on each of the Company's loans.

## Table 9 – Default Experience for the Portfolio

| | 8 Months Ended August 31, | | 12 Months Ended December 31, | | |
|---|---|---|---|---|---|
| | 2001 | 2000 | 2000 | 1999 | 1998 |
| Average Unpaid Principal Balance [1] | $55,629,177 | $51,118,253 | $49,887,003 | $35,578,903 | $11,545,275 |
| Gross Charge-Offs [2] | 0 | 0 | 0 | 0 | 0 |
| Average Portfolio Default Ratio [3] | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

(1) Sum of the aggregate loans outstanding at the end of each month of the stated period divided by the respective number
of months in the stated period.
(2) Sum of the aggregate gross charge-offs during the stated period.
(3) Annualized Gross Charge-Offs divided by the Average Unpaid Principal Balance for each of the periods shown.



DZB041950

Opportunity Finance, LLC
*September 2001*                    *Trade Finance Loan-Backed Conduit Facility*

## PORTFOLIO STRATIFICATIONS

The following tables are stratifications of the Company's trade finance loan portfolio ("Loan Portfolio") outstanding as of August 31, 2001.

### Table 10 – Summary of Loan Portfolio

| | |
|---|---:|
| Total Unpaid Principal Balance of Loans: | $72,200,000 |
| Number of Loans: | 24 |
| Average Outstanding Loan Balance: | $3,008,333 |
| Weighted Average Original Term to Maturity: | 120 days |
| Ratio of Unpaid Principal Balance to Cost of Goods Financed: | 98.0% |
| Ratio of Unpaid Principal Balance to Receivable from Buyer: | 83.8% |
| Weighted Average Days Outstanding | 37 days |

| Note Issuance Date | Note Principal Balance | Cost of Goods Financed | Loan as % of Cost of Goods | Receivable from Buyer | Loan as % of Rec. from Buyer | Goods Buyer | Goods Description | Days Outstanding |
|---|---|---|---|---|---|---|---|---|
| 6/5/2001 | 4,200,000 | 4,212,471 | 99.7% | 4,949,653 | 84.9% | BJ's Wholesale Club | Samsonite Luggage | 87 |
| 6/6/2001 | 2,400,000 | 2,421,510 | 99.1% | 2,845,274 | 84.4% | Sam's Club | Samsonite Luggage | 86 |
| 6/7/2001 | 3,000,000 | 3,401,640 | 88.2% | 4,005,186 | 74.9% | BJ's Wholesale Club | Panasonic TVs and VCRs | 85 |
| 6/20/2001 | 3,000,000 | 3,057,816 | 98.1% | 3,547,032 | 84.6% | BJ's Wholesale Club | Panasonic Video Equipment | 72 |
| 6/28/2001 | 3,600,000 | 3,639,643 | 98.9% | 4,221,980 | 85.3% | Sam's Club | Panasonic Video Equipment | 64 |
| 6/28/2001 | 1,200,000 | 1,260,998 | 95.2% | 1,462,757 | 82.0% | Sam's Club | Panasonic Video Equipment | 64 |
| 7/3/2001 | 5,000,000 | 5,070,863 | 98.6% | 5,932,936 | 84.3% | Sam's Club | Whirlpool Appliances | 59 |
| 7/16/2001 | 1,300,000 | 1,301,742 | 99.9% | 1,524,741 | 85.3% | Sam's Club | Men's Coats | 46 |
| 7/23/2001 | 3,000,000 | 3,071,874 | 97.7% | 3,592,282 | 83.5% | Boscov's | SONY TVs | 39 |
| 7/23/2001 | 2,100,000 | 2,278,185 | 92.2% | 2,619,693 | 80.2% | BJ's Wholesale Club | Small Appliances | 39 |
| 8/1/2001 | 6,000,000 | 6,025,471 | 99.6% | 7,052,688 | 85.1% | Sam's Club | RCA HDTV'S | 30 |
| 8/6/2001 | 2,800,000 | 2,805,066 | 99.8% | 3,281,918 | 85.3% | Boscov's | A/V Equipment | 25 |
| 8/7/2001 | 4,200,000 | 4,206,972 | 99.8% | 4,921,067 | 85.3% | Sam's Club | Cameras | 24 |
| 8/8/2001 | 1,500,000 | 1,529,387 | 98.1% | 1,789,324 | 83.8% | Boscov's | Phones | 23 |
| 8/10/2001 | 2,400,000 | 2,418,376 | 99.2% | 2,829,414 | 84.8% | Boscov's | Tents | 21 |
| 8/10/2001 | 2,700,000 | 2,718,279 | 99.3% | 3,175,830 | 85.0% | Sam's Club | Palm Pilots | 21 |
| 8/13/2001 | 2,600,000 | 2,629,129 | 98.9% | 3,076,063 | 84.5% | BJ's Wholesale Club | RCA Stereo TVs | 18 |
| 8/14/2001 | 2,800,000 | 2,820,371 | 99.3% | 3,295,761 | 85.0% | Sam's Club | HP Printeres | 17 |
| 8/15/2001 | 5,200,000 | 5,323,994 | 97.7% | 6,228,840 | 83.5% | BJ's Wholesale Club | Toshiba/Hitachi TVs | 16 |
| 8/21/2001 | 2,700,000 | 2,717,335 | 99.4% | 3,179,107 | 84.9% | Rex | Denon Digital Receivers | 10 |
| 8/22/2001 | 1,600,000 | 1,615,901 | 99.0% | 1,937,881 | 82.6% | Sam's Club | Toys | 9 |
| 8/22/2001 | 2,900,000 | 2,920,655 | 99.3% | 3,414,621 | 84.9% | Sam's Club | Furniture | 9 |
| 8/27/2001 | 4,000,000 | 4,014,475 | 99.6% | 4,696,917 | 85.2% | Sam's Club | SONY TVs | 4 |
| 8/27/2001 | 2,000,000 | 2,204,167 | 90.7% | 2,578,857 | 77.6% | Rex | RCA TVs | 4 |
| Total | 72,200,000 | 73,666,320 | 98.0% | 86,159,823 | 83.8% | | | 37 |



DZB041951

Opportunity Finance, LLC

*September 2001*                                          *Trade Finance Loan-Backed Conduit Facility*

### Table 11 – Loan Portfolio by Unpaid Principal Balance

| Range of UPB | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| $1,000,000 - $1,999,999 | 4 | 16.7% | 5,600,000 | 7.8% |
| $2,000,000 - $2,999,999 | 10 | 41.7% | 25,400,000 | 35.2% |
| $3,000,000 - $3,999,999 | 4 | 16.7% | 12,600,000 | 17.5% |
| $4,000,000 - $4,999,999 | 3 | 12.5% | 12,400,000 | 17.2% |
| $5,000,000 - $6,000,000 | 3 | 12.5% | 16,200,000 | 22.4% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

### Table 12 – Loan Portfolio by Days Outstanding

| Days Outstanding | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| 1-30 Days Outstanding | 13 | 54.2% | 37,400,000 | 51.8% |
| 31-60 Days Outstanding | 5 | 20.8% | 17,400,000 | 24.1% |
| 61-90 Days Outstanding | 6 | 25.0% | 17,400,000 | 24.1% |
| 91-120 Days Outstanding | 0 | 0.0% | 0 | 0.0% |
| >90 Days Outstanding | 0 | 0.0% | 0 | 0.0% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

### Table 13 – Loan Portfolio by Type of Goods Financed

| Goods Type | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| Electronics | 16 | 66.7% | 50,300,000 | 69.7% |
| Appliances | 2 | 8.3% | 7,100,000 | 9.8% |
| Luggage | 2 | 8.3% | 6,600,000 | 9.1% |
| Furniture | 1 | 4.2% | 2,900,000 | 4.0% |
| Outdoor Goods | 1 | 4.2% | 2,400,000 | 3.3% |
| Toys | 1 | 4.2% | 1,600,000 | 2.2% |
| Clothes | 1 | 4.2% | 1,300,000 | 1.8% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |



DZB041952

**Table 14 – Loan Portfolio by Ratio of Loan Amount to Cost of Goods Financed**

| UPB % of Cost of Goods Financed | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| 88.01% - 89.00% | 1 | 4.2% | 3,000,000 | 4.2% |
| 90.01% - 91.00% | 1 | 4.2% | 2,000,000 | 2.8% |
| 92.01% - 93.00% | 1 | 4.2% | 2,100,000 | 2.9% |
| 95.01% - 96.00% | 1 | 4.2% | 1,200,000 | 1.7% |
| 97.01% - 98.00% | 2 | 8.3% | 8,200,000 | 11.4% |
| 98.01% - 99.00% | 5 | 20.8% | 15,700,000 | 21.7% |
| 99.01% - 100.00% | 13 | 54.2% | 40,000,000 | 55.4% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

**Table 15 – Loan Portfolio by Ratio of Loan Amount to Receivable from Buyer**

| UPB % of Receivable from Buyer | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| 74.01% - 75.00% | 1 | 4.2% | 3,000,000 | 4.2% |
| 77.01% - 78.00% | 1 | 4.2% | 2,000,000 | 2.8% |
| 80.01% - 81.00% | 1 | 4.2% | 2,100,000 | 2.9% |
| 82.01% - 83.00% | 2 | 8.3% | 2,800,000 | 3.9% |
| 83.01% - 84.00% | 3 | 12.5% | 9,700,000 | 13.4% |
| 84.01% - 85.00% | 9 | 37.5% | 28,000,000 | 38.8% |
| 85.01% - 86.00% | 7 | 29.2% | 24,600,000 | 34.1% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

**Table 16 – Loan Portfolio by Buyer**

| Buyer | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB | Ticker | S&P | Moody's | Fitch |
|---|---|---|---|---|---|---|---|---|
| Sam's Club | 12 | 50.0% | $37,700,000 | 52.2% | WMT | AA | Aa2 | AA |
| BJ's Wholesale Club | 6 | 25.0% | $20,100,000 | 27.8% | BJ | NR | NR | NR |
| Boscov's | 4 | 16.7% | $9,700,000 | 13.4% | Private | NR | NR | NR |
| Rex Stores Corporation | 2 | 8.3% | $4,700,000 | 6.5% | RSC | NR | NR | NR |
| Costco Wholesale Corp. | 0 | 0.0% | 0 | 0.0% | COST | A | A2 | A+ |
| Fleming Companies Inc. | 0 | 0.0% | 0 | 0.0% | FLM | BB | Ba2 | NR |
| Target Corp. | 0 | 0.0% | 0 | 0.0% | TGT | A+ | A2 | A |
| Toys R Us | 0 | 0.0% | 0 | 0.0% | TOY | BBB+ | A1 | BBB |
| Best Buy | 0 | 0.0% | 0 | 0.0% | BBY | BBB- | Baa3 | BBB |
| Home Depot | 0 | 0.0% | 0 | 0.0% | HD | AA | Aa3 | AA |
| Kmart Corp. | 0 | 0.0% | 0 | 0.0% | KM | BB+ | Baa3 | BB+ |
| Total | 24 | 100.0% | 72,200,000 | 100.0% | | | | |



DZB041953

## EXHIBIT A - FINANCIAL STATEMENTS

## <u>EIGHT MONTHS ENDED AUGUST 31, 2001 (UNAUDITED)</u>



**Opportunity Finance, LLC**

*September 2001*                                    *Trade Finance Loan-Backed Conduit Facility*

## EXHIBIT A - FINANCIAL STATEMENTS

## <u>FISCAL YEAR ENDED DECEMBER 31, 2000 (UNAUDITED)</u>


INVESTMENT SERVICES
INVESTMENT BANKING
*MEMBER NYSE/SIPC*

DZB041955

*September 2001*                                              **Opportunity Finance, LLC**
                                              *Trade Finance Loan-Backed Conduit Facility*

## EXHIBIT A - FINANCIAL STATEMENTS

## FISCAL YEAR ENDED DECEMBER 31, 1999 (UNAUDITED)



**EXHIBIT B – CREDIT AGREEMENT BETWEEN INTERNATIONAL INVESTMENT
OPPORTUNITIES, LLC AND PETTERS FINANCE, LLC**

**NOTE:  INTERNATIONAL INVESTMENT OPPORTUNITIES, LLC IS A
PREDECESSOR COMPANY TO OPPORTUNITY FINANCE, LLC**



DZB041957

**Opportunity Finance, LLC**
*September 2001*                                                            *Trade Finance Loan-Backed Conduit Facility*

## EXHIBIT C – HISTORICAL TRANSACTION DETAIL

| | Note Issuance Date | Note Maturity Date | Note Number | Note Principal Amount | Goods Cost | Goods Sale Price | Goods Description | Days Outstanding | Loan % COGS | Loan % Sale Price |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5/22/1998 | 7/22/1998 | RWS1-MMC12A | $1,000,000 | NA | $1,360,000 | Large Inventory - Misc Pieces | 61 | NA | 74% |
| 2 | 7/23/1998 | 8/22/1998 | RWS1-MMC12A-R2 | $1,000,000 | $970,788 | $1,217,787 | Misc Electronics | 30 | 103% | 82% |
| 3 | 9/22/1998 | 10/7/1998 | RWS1-MMC12A-R3 | $1,000,000 | $1,120,000 | $1,400,000 | Shoes | 15 | 89% | 71% |
| 4 | 9/14/1998 | 10/29/1998 | SFLP-MMC-11A | $3,750,000 | $3,775,000 | $4,725,000 | King Cobra Golf Sets | 45 | 99% | 79% |
| 5 | 9/9/1998 | 10/26/1998 | IIO-MMC-11C | $760,000 | $861,770 | $1,077,213 | Hitachi TVs | 47 | 88% | 71% |
| 6 | 9/11/1998 | 10/26/1998 | SFLP-MMC-12 | $2,400,000 | $2,460,450 | $3,075,562 | Hitachi TVs | 45 | 98% | 78% |
| 7 | 6/4/1998 | 8/4/1998 | SFLP-MMC-10C | $1,000,000 | $8,589,525 | $10,300,000 | WHIRLPOOL MERCH | 61 | 12% | 10% |
| 8 | 8/30/1998 | 10/29/1998 | SFLP-MMC-10D | $1,314,000 | $1,389,015 | $1,543,350 | SONY TV | 60 | 72% | 65% |
| 9 | 9/1/1998 | 10/15/1998 | SFLP-MMC-10A | $3,700,000 | $4,203,600 | $5,199,600 | MITSUBISHI TV | 44 | 88% | 71% |
| 10 | 10/27/1998 | 12/11/1998 | LLC-8 | $1,197,000 | $1,197,000 | $1,449,000 | WELLBUILT BREAD MACHINE | 45 | 100% | 83% |
| 11 | 12/12/1998 | 2/10/1999 | LLC-8-R1 | $1,304,730 | $1,367,400 | $1,644,750 | KING COBRA GOLF SETS | 60 | 93% | 77% |
| 12 | 10/27/1998 | 12/11/1998 | LLC-9 | $3,440,000 | $3,440,558 | $4,082,006 | CHARBROIL GRILLS & SMOKERS | 45 | 100% | 84% |
| 13 | 12/12/1998 | 1/26/1999 | LLC-9-R1 | $4,087,064 | $3,841,000 | $4,509,000 | RAYBAN SUNGLASSES | 45 | 95% | 81% |
| 14 | 10/27/1998 | 12/11/1998 | LLC-10 | $4,500,000 | NA | NA | COAST TO COAST INVENTORY/ DISTRIBUTION CENTERS | 45 | NA | NA |
| 15 | 12/12/1998 | 1/26/1999 | LLC-10-R1 | $4,488,125 | NA | NA | SUN TV MERCHANDISE | 45 | NA | NA |
| 16 | 2/12/1999 | 4/16/1999 | LLC-10-R2 | $4,488,125 | $4,265,000 | $5,225,000 | DAEWOO TVS | 79 | 105% | 86% |
| 17 | 10/30/1998 | 12/14/1998 | LLC-11 | $3,598,000 | $3,600,000 | $4,392,000 | NASCAR MERCHANDISE | 45 | 100% | 82% |
| 18 | 11/8/1998 | 12/23/1998 | LLC-12 | $1,650,000 | $1,933,366 | $2,414,862 | SHERWOOD STEREO MERCHANDISE | 45 | 52% | 41% |
| 19 | 11/10/1998 | 12/10/1998 | LLC-13 | $541,000 | $541,756 | $637,360 | BLUE BIRD REPLICA RADIO | 30 | 100% | 85% |
| 20 | 12/11/1998 | 1/25/1999 | LLC-13-R1 | $553,750 | $553,750 | $664,375 | SONY TV | 45 | 98% | 82% |
| 21 | 1/26/1999 | 3/12/1999 | LLC-13-R2 | $553,750 | $745,017 | $890,470 | FISHER PRICE TOYS | 45 | 73% | 61% |
| 22 | 11/12/1998 | 1/11/1999 | LLC-14 | $2,000,000 | NA | NA | SUN TV INVENTORIES | 60 | NA | NA |
| 23 | 1/12/1999 | 3/13/1999 | LLC-14-R1 | $2,000,000 | $2,145,000 | $2,643,200 | BOSE HOME THEATER SYSTEM | 60 | 47% | 38% |
| 24 | 11/20/1998 | 1/11/1999 | LLC-15 | $4,000,000 | NA | $5,528,865 | BOSE/KLIPSCH/AIWA STEREO SYSTEMS | 52 | NA | 61% |
| 25 | 1/12/1999 | 2/26/1999 | LLC-15-R1 | $4,000,000 | $4,154,382 | $4,996,617 | PANASONIC VCRS | 45 | 82% | 68% |
| 26 | 2/27/1999 | 4/28/1999 | LLC-15-R2 | $4,000,000 | $4,520,600 | $5,418,000 | TFT COLOR MONITORS - FLAT SCREENS | 60 | 75% | 63% |
| 27 | 11/28/1998 | 1/12/1999 | LLC-16 | $3,500,000 | $3,506,477 | $4,174,480 | HOUSEHOLD APPLIANCES | 45 | 100% | 84% |
| 28 | 1/13/1999 | 2/27/1999 | LLC-16-R1 | $3,500,000 | $3,500,893 | $4,377,224 | SONY WATCHMAN/SONY TV/JVC TV | 45 | 100% | 80% |
| 29 | 2/28/1999 | 4/14/1999 | LLC-16-R2 | $3,500,000 | $3,600,816 | $4,221,966 | ZENITH TVS | 45 | 97% | 83% |
| 30 | 11/28/1998 | 1/12/1999 | LLC-17 | $1,100,000 | $2,527,500 | $3,033,000 | FITNESS BIKE | 45 | 36% | 30% |
| 31 | 1/13/1999 | 2/27/1999 | LLC-17-R1 | $1,100,000 | $1,501,005 | $1,802,391 | GE RANGES | 45 | 60% | 50% |
| 32 | 2/28/1999 | 4/19/1999 | LLC-17-R2-contd | $1,100,000 | $1,224,000 | $1,416,000 | JVC RECEIVERS | 50 | 74% | 64% |
| 33 | 12/12/1998 | 1/26/1999 | LLC-18 | $1,915,000 | $1,988,415 | $2,380,950 | SONY TVS | 45 | 94% | 78% |
| 34 | 1/27/1999 | 3/13/1999 | LLC-18-R1 | $1,915,000 | $2,461,700 | $2,927,750 | SONY DIGITAL VIDEO CAMERAS | 45 | 76% | 64% |
| 35 | 12/12/1998 | 1/11/1999 | LLC-19 | $1,227,530 | $1,279,852 | $1,541,760 | PERSONAL COMPUTERS | 30 | 91% | 76% |
| 36 | 1/12/1999 | 2/11/1999 | LLC-19-R1 | $1,227,530 | $1,335,161 | $1,602,209 | JVC MINI CD SYSTEM | 30 | 87% | 73% |
| 37 | 12/15/1998 | 2/13/1999 | LLC-20 | $2,600,000 | $2,602,745 | $3,123,791 | RCA TVS | 60 | 100% | 83% |
| 38 | 12/15/1998 | 1/29/1999 | LLC-21 | $1,288,500 | $1,288,550 | $1,546,260 | GE SPEAKER TELEPHONES | 45 | 92% | 76% |
| 39 | 12/11/1998 | 1/25/1999 | LLC-22 | $2,000,000 | NA | NA | NA | 45 | NA | NA |
| 40 | 1/26/1999 | 3/12/1999 | LLC-22-R1-contd | $2,000,000 | $2,432,625 | $2,799,225 | SHARPVISION BIGSCREEN TV | 45 | 82% | 71% |
| 41 | 1/21/1998 | 2/4/1999 | LLC-23 | $1,500,000 | $2,583,444 | $3,272,135 | ACTIVE SPORTSWEAR | 45 | 54% | 43% |
| 42 | 2/5/1999 | 3/22/1999 | LLC-23-R1 | $1,500,000 | $1,901,617 | $2,276,512 | JVS CD PLAYER | 45 | 74% | 61% |
| 43 | 12/24/1998 | 2/7/1999 | LLC-24 | $1,000,000 | $1,070,895 | $1,285,802 | EMERSON VCRS | 45 | 93% | 78% |
| 44 | 1/8/1999 | 3/25/1999 | LLC-24-R1 | $1,000,000 | $1,080,000 | $1,259,640 | FILA GOLF BAGS | 76 | 93% | 79% |
| 45 | 12/24/1998 | 1/23/1999 | LLC-25 | $798,500 | $860,208 | $1,044,756 | OFFICE FURN WORK STATIONS | 30 | 7% | 6% |



DZB041958

**Opportunity Finance, LLC**
*September 2001*                                                                 *Trade Finance Loan-Backed Conduit Facility*

## EXHIBIT C – HISTORICAL TRANSACTION DETAIL (CONTINUED)

| | Note Issuance Date | Note Maturity Date | Note Number | Note Principal Amount | Goods Cost | Goods Sale Price | Goods Description | Days Outstanding | Loan % COGS | Loan % Sale Price |
|---|---|---|---|---|---|---|---|---|---|---|
| 46 | 12/31/1998 | 2/14/1999 | LLC-26 | $1,500,000 | $3,599,300 | $4,360,802 | WHIRLPOOL RNAGE/MAYTAG DRYER | 45 | 42% | 34% |
| 47 | 1/4/1999 | 2/18/1999 | LLC-27 | $1,900,000 | $2,532,654 | $3,063,987 | JBL SPEAKERS | 45 | 32% | 26% |
| 48 | 2/19/1999 | 4/16/1999 | LLC-27-R1 | $1,900,000 | $2,089,675 | $2,430,475 | YAMAHA KEYBOARDS | 56 | 72% | 62% |
| 49 | 1/15/1999 | 3/1/1999 | LLC-28 | $1,000,000 | $2,102,940 | NA | NA | 45 | 48% | NA |
| 50 | 1/27/1999 | 3/13/1999 | LLC-29 | $1,400,000 | $1,400,150 | $1,676,900 | BOSE SPEAKERS | 45 | 100% | 83% |
| 51 | 1/27/1999 | 3/13/1999 | LLC-30 | $2,349,600 | $2,597,350 | $3,105,350 | HIATACHI STEREO/TV | 45 | 86% | 72% |
| 52 | 2/11/1999 | 4/28/1999 | LLC-31 | $2,532,260 | $2,858,124 | $3,249,749 | BOWLING INVENTORY | 76 | 85% | 75% |
| 53 | 2/14/1999 | 4/20/1999 | LLC-32 | $4,100,000 | $5,000,400 | $5,889,360 | FLAT SCREEN MONITORS | 65 | 82% | 70% |
| 54 | 2/22/1999 | 4/8/1999 | LLC-33 | $400,000 | $8,178,900 | $965,350 | RCA COUNSEL TV/STEREO | 45 | 4% | 31% |
| 55 | 3/24/1999 | 4/24/1999 | LLC-34 | $3,150,000 | $3,150,000 | $4,400,000 | LEVIS - COUNTY SEAT | 31 | 100% | 72% |
| 56 | 4/2/1999 | 5/25/1999 | LLC-35 | $3,300,000 | $3,900,000 | $4,770,000 | DAEWOO MISC INVENTORIES | 53 | 85% | 69% |
| 57 | 4/16/1999 | 6/30/1999 | LLC-36 | $2,200,000 | $4,485,500 | $5,296,400 | DAEWOO MISC INVENTORIES | 75 | 49% | 42% |
| 58 | 4/19/1999 | 6/21/1999 | LLC-37 | $900,000 | $929,500 | $1,101,100 | UNIDEN SPEAKER PHONE | 63 | 97% | 82% |
| 59 | 4/19/1999 | 7/7/1999 | LLC-38 | $3,000,000 | $3,049,260 | $3,596,020 | RCA/SONY TVS | 79 | 98% | 83% |
| 60 | 4/19/1999 | 7/6/1999 | LLC-39 | $1,650,000 | $1,665,650 | $1,998,795 | HONEYWELL ENVIRACAIRE AIR CLEANERS | 78 | 99% | 83% |
| 61 | 4/28/1999 | 6/12/1999 | LLC-40 | $3,500,000 | $3,783,135 | $4,442,808 | RCA TVS | 45 | 93% | 79% |
| 62 | 4/29/1999 | 7/14/1999 | LLC-41 | $3,100,000 | $3,127,500 | $3,690,000 | PANASONIC TVS | 76 | 99% | 84% |
| 63 | 4/29/1999 | 6/24/1999 | LLC-42 | $800,000 | $1,560,000 | $1,820,000 | BOSE HOME THEATERS | 56 | 51% | 44% |
| 64 | 4/29/1999 | 6/24/1999 | LLC-43 | $1,200,000 | $1,288,905 | $1,513,988 | SONY/PIONEER CASSWT, CD PLAYER | 56 | 93% | 79% |
| 65 | 5/4/1999 | 8/5/1999 | LLC-44 | $5,600,000 | $7,147,514 | $8,530,606 | YOUTH SPORTSWEAR | 93 | 78% | 66% |
| 66 | 5/13/1999 | 7/28/1999 | LLC-45 | $3,400,000 | $4,900,000 | $5,850,000 | LUGAGE INVENTORY | 76 | 69% | 58% |
| 67 | 5/20/1999 | 8/19/1999 | LLC-46 | $5,100,000 | $5,100,000 | $6,000,000 | LUGAGE INVENTORY | 91 | 100% | 85% |
| 68 | 5/26/1999 | 8/24/1999 | LLC-47 | $3,000,000 | $3,000,000 | $3,600,000 | CALDOR ELECTRONICS INV | 90 | 100% | 83% |
| 69 | 6/2/1999 | 8/31/1999 | LLC-48 | $5,100,000 | $5,100,000 | $6,125,000 | CALDOR ELECTRONICS INV | 90 | 100% | 83% |
| 70 | 6/22/1999 | 8/16/1999 | LLC-49 | $3,000,000 | $2,782,400 | $3,603,208 | CALLAWAY BIG BERTHA | 55 | 108% | 83% |
| 71 | 6/25/1999 | 6/25/1999 | LLC-50 | $2,000,000 | $1,429,400 | $4,852,365 | CALLAWAY BIG BERTHA | - | 140% | 41% |
| 72 | 7/8/1999 | 10/11/1999 | LLC-51 | $2,000,000 | $2,180,085 | $2,551,265 | TV/STEREO RACK SYSTEMS | 95 | 92% | 78% |
| 73 | 7/8/1999 | 9/30/1999 | LLC-52 | $1,000,000 | $1,241,200 | $1,461,600 | FUJI DIGITAL CAMERA | 84 | 81% | 68% |
| 74 | 7/7/1999 | 9/30/1999 | LLC-53 | $1,650,000 | $1,945,500 | $2,308,727 | CANON CAMCORDER | 85 | 85% | 71% |
| 75 | 7/7/1999 | 10/7/1999 | LLC-54 | $3,500,000 | $4,130,594 | $4,856,825 | SONY PORTABLE TVS | 92 | 85% | 72% |
| 76 | 7/15/1999 | 10/11/1999 | LLC-55 | $2,000,000 | $3,136,800 | $3,675,099 | BARBIE, GIJOE, HOTWHEELS | 88 | 64% | 54% |
| 77 | 7/29/1999 | 10/27/1999 | LLC-56 | $3,400,000 | $3,664,052 | $4,328,019 | NIKE SHOES | 90 | 93% | 79% |
| 78 | 8/6/1999 | 11/4/1999 | LLC-57 | $3,600,000 | $4,128,812 | $4,714,036 | SHARP DVD PLAYER | 90 | 87% | 76% |
| 79 | 8/6/1999 | 11/4/1999 | LLC-58 | $2,000,000 | $3,049,034 | $3,481,378 | SHARP DVD PLAYER | 90 | 66% | 57% |
| 80 | 8/17/1999 | 11/19/1999 | LLC-59 | $3,000,000 | $7,021,000 | $8,259,971 | PANASONIC FLAT SCREEN | 94 | 43% | 36% |
| 81 | 8/20/1999 | 11/19/1999 | LLC-60 | $5,100,000 | $5,671,710 | $6,428,275 | PANASONIC FLAT SCREEN | 91 | 90% | 79% |
| 82 | 8/25/1999 | 12/7/1999 | LLC-61 | $3,000,000 | $3,166,390 | $3,724,237 | CASIO HANDHELD TVS | 104 | 95% | 81% |
| 83 | 9/1/1999 | 12/9/1999 | LLC-62 | $5,100,000 | $5,726,711 | $6,711,948 | HITACHI TVS | 99 | 89% | 76% |
| 84 | 10/1/1999 | 1/5/1999 | IIO-LLC-63 | $2,650,000 | $5,086,755 | $5,970,805 | PANASONIC TV/VCR | 96 | 52% | 44% |
| 85 | 10/12/1999 | 1/12/2000 | IIO-LLC-64 | $3,500,000 | $4,224,125 | $4,953,715 | PANASONIC STEREO TV | 92 | 83% | 71% |
| 86 | 10/12/1999 | 1/18/2000 | IIO-LLC-65 | $2,500,000 | $2,582,640 | $3,029,838 | INFINITY SPEAKERS | 98 | 97% | 83% |
| 87 | 10/12/1999 | 1/18/2000 | IIO-LLC-66 | $2,500,000 | $2,529,370 | $2,946,365 | JVC VHS/DIGITAL CAMCORDER | 98 | 99% | 85% |
| 88 | 10/19/1999 | 1/24/2000 | IIO-LLC-67 | $2,500,000 | $2,583,648 | $3,022,029 | REEBOK SHOES | 97 | 97% | 83% |
| 89 | 10/26/1999 | 1/31/2000 | IIO-LLC-68 | $3,500,000 | $3,572,430 | $4,146,175 | PANASONIC PHONE/FAX | 97 | 98% | 84% |
| 90 | 10/26/1999 | 1/31/2000 | IIO-LLC-69 | $3,400,000 | $4,183,770 | $4,856,713 | SONY STEREO TV | 97 | 81% | 70% |



DZB041959

*September 2001*

**Opportunity Finance, LLC**
*Trade Finance Loan-Backed Conduit Facility*

## EXHIBIT C – HISTORICAL TRANSACTION DETAIL (CONTINUED)

| | Note Issuance Date | Note Maturity Date | Note Number | Note Principal Amount | Goods Cost | Goods Sale Price | Goods Description | Days Outstanding | Loan % COGS | Loan % Sale Price |
|---|---|---|---|---|---|---|---|---|---|---|
| 91 | 11/4/1999 | 2/2/2000 | IIO-LLC-70 | $4,000,000 | $4,002,896 | $4,635,097 | FRIGIDAIRE REFRIGERTOR | 90 | 100% | 86% |
| 92 | 11/4/1999 | 2/2/2000 | IIO-LLC-71 | $2,000,000 | $2,216,202 | $2,593,163 | CRAFTSMAN COMPRESSOR | 90 | 90% | 77% |
| 93 | 11/20/1999 | 2/22/2000 | IIO-LLC-72 | $3,000,000 | $3,447,500 | $4,006,875 | SONY STEREO/FLAT TV | 94 | 87% | 75% |
| 95 | 11/20/1999 | 2/22/2000 | IIO-LLC-74 | $2,600,000 | $2,674,592 | $3,127,695 | CROSS PEN | 94 | 97% | 83% |
| 96 | 12/8/1999 | 3/12/2000 | IIO-LLC-75 | $3,000,000 | $3,647,139 | $4,215,660 | KITCHENAID MIXER | 95 | 82% | 71% |
| 97 | 12/10/1999 | 3/12/2000 | IIO-LLC-76 | $4,600,000 | $6,039,260 | $7,019,240 | RCA TV | 93 | 76% | 66% |
| 98 | 1/6/2000 | 4/3/2000 | IIO-LLC-77 | $2,650,000 | $5,248,095 | $6,028,373 | WHIRLPOOL DISHWASHER/REFRIGERATON | 88 | 50% | 44% |
| 99 | 1/13/2000 | 4/17/2000 | IIO-LLC-78 | $3,500,000 | $4,005,693 | $4,675,581 | TWILL PANTS | 95 | 87% | 75% |
| 100 | 1/19/2000 | 4/19/2000 | IIO-LLC-79 | $2,500,000 | $3,355,000 | $3,960,000 | LEVI MEN'S PANTS | 91 | 75% | 63% |
| 101 | 1/19/2000 | 4/19/2000 | IIO-LLC-80 | $2,500,000 | $3,577,284 | $4,222,368 | LEVI MEN'S JEANS | 91 | 70% | 59% |
| 102 | 1/25/2000 | 4/25/2000 | IIO-LLC-81 | $2,500,000 | $3,188,660 | $3,697,122 | JVC AUDIO SYSTEM | 91 | 78% | 68% |
| 103 | 2/1/2000 | 4/24/2000 | IIO-LLC-82 | $3,500,000 | $3,815,035 | $4,416,275 | EXECUTIVE LEATHER CHAIR | 83 | 92% | 79% |
| 104 | 2/1/2000 | 5/5/2000 | IIO-LLC-83 | $3,400,000 | $3,899,890 | $4,537,225 | WEBER GAS GRILL | 94 | 87% | 75% |
| 105 | 2/3/2000 | 5/5/2000 | IIO-LLC-84 | $4,000,000 | $4,265,617 | $4,965,010 | SHARP AUDIO SYSTEM | 92 | 94% | 81% |
| 106 | 2/3/2000 | 5/5/2000 | IIO-LLC-85 | $2,000,000 | $2,306,370 | $2,709,443 | PANASONIC DVD PLAYER | 92 | 87% | 74% |
| 107 | 2/23/2000 | 5/25/2000 | IIO-LLC-86 | $3,000,000 | $3,605,925 | $4,248,166 | HITACHI STERO TV | 92 | 83% | 71% |
| 108 | 2/23/2000 | 5/25/2000 | IIO-LLC-87 | $2,600,000 | $3,110,076 | $3,737,329 | YAMAHA STEREO RECEIVER | 92 | 84% | 70% |
| 109 | 3/13/2000 | 6/12/2000 | IIO-LLC-88 | $3,000,000 | $3,672,893 | $4,231,863 | NIKE SHOES | 91 | 82% | 71% |
| 110 | 3/13/2000 | 6/12/2000 | IIO-LLC-89 | $4,600,000 | $5,150,765 | $5,948,442 | PANASONIC TV | 91 | 89% | 77% |
| 111 | 4/4/2000 | 6/30/2000 | IIO-LLC-90 | $2,650,000 | $3,187,565 | $3,740,595 | COMPAQ AERO PC, SONY PRINTER | 87 | 83% | 71% |
| 112 | 4/20/2000 | 7/17/2000 | IIO-LLC-91 | $3,000,000 | $4,433,640 | $5,110,864 | SONY DVD | 88 | 68% | 59% |
| 113 | 4/20/2000 | 7/17/2000 | IIO-LLC-92 | $2,500,000 | $2,878,402 | $3,374,702 | SHARP MICROWAVE, WHIRLPOOL ELECTRIC RANGE | 88 | 87% | 74% |
| 114 | 4/20/2000 | 7/17/2000 | IIO-LLC-93 | $2,500,000 | $3,372,416 | $3,858,953 | ZENITH TV | 88 | 74% | 65% |
| 115 | 4/25/2000 | 7/17/2000 | IIO-LLC-94 | $2,500,000 | $2,681,951 | $3,132,587 | HAMILTON CHEST | 83 | 93% | 80% |
| 116 | 4/25/2000 | 7/25/2000 | IIO-LLC-95 | $3,500,000 | $4,154,891 | $4,844,520 | NIKE MEN'S SHOE | 91 | 84% | 72% |
| 117 | 5/6/2000 | 8/16/2000 | IIO-LLC-96 | $3,400,000 | $3,634,912 | $4,272,549 | KITCHENAID REFER | 102 | 94% | 80% |
| 118 | 5/6/2000 | 8/24/2000 | IIO-LLC-97 | $4,000,000 | $4,149,600 | $4,809,668 | 3COM/PALM ORGANIZER | 110 | 96% | 83% |
| 119 | 5/6/2000 | 8/10/2000 | IIO-LLC-98 | $2,000,000 | $2,543,380 | $2,970,345 | SHARP TV | 96 | 79% | 67% |
| 120 | 5/26/2000 | 8/28/2000 | IIO-LLC-99 | $3,000,000 | $3,428,700 | $3,996,240 | SONY STEREO TV | 94 | 87% | 75% |
| 121 | 5/26/2000 | 8/28/2000 | IIO-LLC-100 | $2,600,000 | $2,707,720 | $3,151,180 | PALM ORGANIZER | 94 | 96% | 83% |
| 123 | 6/13/2000 | 9/13/2000 | IIO-LLC-101 | $3,000,000 | $3,344,587 | $3,901,415 | CALLAWAY HAWKEYE IRON/GOLF BAGS | 92 | 90% | 77% |
| 124 | 6/13/2000 | 9/18/2000 | IIO-LLC-102 | $4,600,000 | $5,117,351 | $5,833,822 | GENERAC GENERATOR/SYSTEM | 97 | 90% | 79% |
| 125 | 7/1/2000 | 9/28/2000 | IIO-LLC-103 | $2,650,000 | $3,153,605 | $3,674,454 | PANASONIC CAMERA/CAMCORDER | 89 | 84% | 72% |
| 126 | 7/18/2000 | 10/10/2000 | IIO-LLC-104 | $3,000,000 | $3,224,709 | $3,834,789 | WOMEN'S SHOES | 84 | 93% | 78% |
| 127 | 7/18/2000 | 10/10/2000 | IIO-LLC-105 | $2,500,000 | $3,081,493 | $3,575,575 | KODAK DIGITAL CAMERA | 84 | 81% | 70% |
| 128 | 7/19/2000 | 10/24/2000 | IIO-LLC-106 | $2,500,000 | $3,177,825 | $3,689,775 | WHIRLPOOL RANGE/REFRIGERATOR | 97 | 79% | 68% |
| 130 | 7/21/2000 | 10/30/2000 | IIO-LLC-107 | $2,500,000 | $3,170,413 | $3,677,686 | DENON DIGITAL RECEIVER | 101 | 79% | 68% |
| 131 | 7/26/2000 | 10/31/2000 | IIO-LLC-108 | $2,500,000 | $4,171,931 | $4,839,439 | WEED EATER'S | 97 | 60% | 52% |
| 132 | 8/11/2000 | 11/15/2000 | IIO-LLC-109 | $2,000,000 | $2,125,058 | $2,460,307 | SEIMEN DRYER/WASHER | 96 | 94% | 81% |
| 134 | 8/25/2000 | 12/14/2000 | IIO-LLC-111 | $4,000,000 | $4,322,946 | $5,014,112 | PIONEER RECEIVER | 111 | 93% | 80% |
| 135 | 8/29/2000 | 12/14/2000 | IIO-LLC-112 | $3,000,000 | $3,488,773 | $4,104,422 | BAUSCH & LOMB TELESCOPE | 107 | 86% | 73% |



DAIN RAUSCHER
INVESTMENT SERVICES
INVESTMENT BANKING
MEMBER NYSE/SIPC

DZB041960

## EXHIBIT C – HISTORICAL TRANSACTION DETAIL (CONTINUED)

| | Note Issuance Date | Note Maturity Date | Note Number | Note Principal Amount | Goods Cost | Goods Sale Price | Goods Description | Days Outstanding | Loan % COGS | Loan % Sale Price |
|---|---|---|---|---|---|---|---|---|---|---|
| 136 | 8/29/2000 | 12/20/2000 | IIO-LLC-113 | $2,600,000 | $3,020,906 | $3,501,565 | STERNS STORE SHOE | 113 | 86% | 74% |
| 139 | 9/29/2000 | 1/23/2001 | IIO-LLC-116 | $2,650,000 | $3,226,165 | $3,795,390 | HOMELITE CHAIN SAW | 116 | 82% | 70% |
| 140 | 10/11/2000 | 3/23/2001 | IIO-LLC-117 | $3,000,000 | $3,379,850 | $3,946,275 | MONGOOSE/JAANUS BICYCLE | 163 | 89% | 76% |
| 141 | 10/11/2000 | 3/23/2001 | IIO-LLC-118 | $2,500,000 | $2,665,125 | $3,116,381 | NIKE MEN'S SHOE | 163 | 94% | 80% |
| 142 | 10/25/2000 | 5/7/2001 | IIO-LLC-119 | $2,500,000 | $3,464,437 | $4,157,325 | ASSORTED APPLIANCES | 194 | 72% | 60% |
| 144 | 11/1/2000 | 5/7/2001 | IIO-LLC-121 | $3,500,000 | $4,569,939 | $5,483,927 | ASSORTED APPLIANCES | 187 | 77% | 64% |
| 145 | 11/16/2000 | 5/2/2001 | IIO-LLC-122 | $2,000,000 | $2,643,900 | $3,147,675 | SONY CAMCORDER | 167 | 76% | 64% |
| 147 | 12/15/2000 | 5/29/2001 | IIO-LLC-124 | $3,000,000 | $3,418,725 | $3,967,825 | TOSHIBA HDTV WIDESCREEN TV | 165 | 88% | 76% |
| 148 | 12/21/2000 | 5/21/2001 | IIO-LLC-125 | $2,600,000 | $3,115,175 | $3,677,624 | PANASONIC TV | 151 | 83% | 71% |
| 149 | 1/20/2001 | 7/1/2001 | IIO-LLC-126 | $3,000,000 | $3,727,838 | $4,404,885 | WEBER/COLEMAN/KIRKLAND GRILL | 162 | 80% | 68% |
| 150 | 1/24/2001 | 8/10/2001 | IIO-LLC-127 | $4,600,000 | $5,018,125 | $5,860,300 | RCA STEREO TV | 198 | 92% | 78% |
| 151 | 1/24/2001 | 7/24/2001 | IIO-LLC-128 | $2,650,000 | $3,487,670 | $4,117,130 | JVC CAMCORDER | 181 | 76% | 64% |
| 152 | 7/8/1999 | 7/22/1999 | IIO-EQ-0 | $2,500,000 | $4,998,590 | $5,515,540 | PANASONIC WIDE TV | 14 | 50% | 45% |
| 153 | 7/26/1999 | 8/25/1999 | IIO-EQ-1 | $1,300,475 | $2,196,136 | $2,634,359 | SONY CD PLAYER | 30 | 59% | 49% |
| 154 | 7/26/1999 | 8/25/1999 | IIO-EQ-2 | $2,800,000 | $5,599,980 | $6,559,813 | SONY STEREO TV | 30 | 50% | 43% |
| 155 | 7/26/1999 | 8/25/1999 | IIO-EQ-3 | $1,500,000 | $3,005,735 | $3,574,209 | JVC CAR AUDIO CD PLAYER | 30 | 50% | 42% |
| 156 | 9/30/1999 | 11/15/1999 | IIO-EQ-4 | $999,503 | $1,799,671 | $2,098,485 | SHARP STEREO TV | 46 | 56% | 48% |
| 157 | 9/30/1999 | 11/15/1999 | IIO-EQ-5 | $3,800,000 | $7,060,800 | $8,204,550 | SONY STEREO TV | 46 | 54% | 46% |
| 158 | 12/6/1999 | 1/25/2000 | IIO-EQ-6 | $1,950,000 | $3,904,215 | $4,518,825 | SONY DVD/CD PLAYER | 50 | 50% | 43% |
| 159 | 12/6/1999 | 1/26/2000 | IIO-EQ-7 | $2,849,503 | $5,625,425 | $6,588,094 | DENON DIGITAL RECEIVER | 51 | 51% | 43% |
| 160 | 12/28/1999 | 2/26/2000 | IIO-EQ-8 | $3,000,000 | $6,127,225 | $7,438,590 | SONY STEREO TV | 60 | 49% | 40% |
| 161 | 1/26/2000 | 4/25/2000 | IIO-EQ-9 | $1,950,000 | $4,078,120 | $4,697,018 | SONY RECEIVER | 90 | 48% | 42% |
| 162 | 1/27/2000 | 4/24/2000 | IIO-EQ-10 | $2,849,503 | $5,691,605 | $6,559,415 | SHARP STEREO TV | 88 | 50% | 43% |
| 163 | 2/24/2000 | 5/23/2000 | IIO-EQ-11 | $3,500,000 | $7,289,558 | $8,472,152 | NATUZZI CHAIR/SOFA | 89 | 48% | 41% |
| 164 | 3/9/2000 | 3/20/2000 | IIO-EQ-12 | $6,000,000 | $10,988,595 | $11,500,587 | CALLAWAY & BIG BERTHA IRON | 11 | 55% | 52% |
| 165 | 3/21/2000 | 6/19/2000 | IIO-EQ-13 | $4,000,000 | $7,144,340 | $8,448,414 | AMANA REFRIGERATOR | 90 | 56% | 47% |
| 166 | 4/25/2000 | 8/16/2000 | IIO-EQ-14 | $2,849,503 | $4,972,677 | $5,797,238 | PANASONIC TV | 113 | 57% | 49% |
| 167 | 4/29/2000 | 8/24/2000 | IIO-EQ-15 | $1,950,000 | $4,242,501 | $4,933,149 | SONY STEREO TV | 117 | 46% | 40% |
| 168 | 5/17/2000 | 8/10/2000 | IIO-EQ-16 | $3,750,000 | $7,551,276 | $8,959,141 | ASSORTED FURNITURE | 85 | 50% | 42% |
| 169 | 5/24/2000 | 8/29/2000 | IIO-EQ-17 | $3,500,000 | $7,029,975 | $8,199,275 | PANASONIC TV | 97 | 50% | 43% |
| 170 | 6/20/2000 | 9/28/2000 | IIO-EQ-18 | $4,000,000 | $7,659,010 | $8,809,280 | PIONEER CINEMA TV | 100 | 52% | 45% |
| 171 | 8/11/2000 | 11/21/2000 | IIO-EQ-19 | $3,750,000 | $7,372,051 | $8,712,423 | SAMSONITE LUGGAGE | 102 | 51% | 43% |
| 172 | 8/17/2000 | 11/29/2000 | IIO-EQ-20 | $2,849,503 | $5,223,135 | $6,023,503 | PIONEER/PANASONIC/AUD TV | 104 | 55% | 47% |
| 173 | 8/25/2000 | 12/8/2000 | IIO-EQ-21 | $1,950,000 | $4,116,744 | $4,769,114 | PANASONIC CORDLESS PHONE | 105 | 47% | 41% |
| 174 | 8/29/2000 | 1/10/2001 | IIO-EQ-22 | $3,500,000 | $5,285,688 | $6,460,285 | TOASTMASTER MISC. | 134 | 66% | 54% |
| 175 | 8/30/2000 | 1/5/2001 | IIO-EQ-23 | $3,500,000 | $7,206,450 | $8,165,800 | TOSHIBA PROJECTION TV | 128 | 49% | 43% |
| 176 | 9/29/2000 | 2/2/2001 | IIO-EQ-24 | $4,000,000 | $7,676,075 | $8,907,550 | HITACHI HDTV DIGITAL TV | 126 | 52% | 45% |
| 177 | 10/18/2000 | 2/15/2001 | IIO-EQ-25 | $2,000,000 | $4,008,052 | $4,834,113 | SHARP/PANASONIC MICROWAVE | 120 | 50% | 41% |
| 178 | 10/18/2000 | 3/23/2001 | IIO-EQ-26 | $1,600,000 | $3,217,072 | $3,869,939 | ROOM AIR CONDITIONER | 156 | 50% | 41% |
| 179 | 10/18/2000 | 5/15/2001 | IIO-EQ-27 | $1,400,000 | $2,775,069 | $3,343,416 | DIRT DEVIL VACUUM CLEANER | 209 | 50% | 42% |
| 180 | 11/13/2000 | 5/15/2001 | IIO-EQ-28 | $1,500,000 | $3,573,601 | $4,492,276 | MAYTAG WASHER/DRYER | 183 | 42% | 33% |



*September 2001*

## EXHIBIT C – HISTORICAL TRANSACTION DETAIL (CONTINUED)

| | Note Issuance Date | Note Maturity Date | Note Number | Note Principal Amount | Goods Cost | Goods Sale Price | Goods Description | Days Outstanding | Loan % COGS | Loan % Sale Price |
|---|---|---|---|---|---|---|---|---|---|---|
| 181 | 11/22/2000 | 7/17/2001 | IIO-EQ-29 | $1,500,000 | $6,989,154 | $9,225,683 | ASSORTED APPLIANCE | 237 | 54% | 41% |
| 182 | 11/30/2000 | 5/21/2001 | IIO-EQ-30 | $2,849,503 | $6,104,275 | $7,081,715 | RCA HIGH DEFINITION TV | 172 | 47% | 40% |
| 183 | 12/6/2000 | 5/23/2001 | IIO-EQ-31 | $1,000,000 | $4,122,012 | $4,946,414 | ASSORTED APPLIANCE | 168 | 24% | 20% |
| 184 | 12/9/2000 | 5/25/2001 | IIO-EQ-32 | $1,950,000 | $4,068,199 | $4,742,719 | POKEMON VIDEO | 167 | 48% | 41% |
| 185 | 1/6/2001 | 6/19/2001 | IIO-EQ-33 | $3,500,000 | $7,062,480 | $8,163,405 | SONY STEREO TV | 164 | 50% | 43% |
| 186 | 1/11/2001 | 7/2/2001 | IIO-EQ-34 | $3,500,000 | $6,811,800 | $7,930,500 | PANASONIC STEREO TV | 172 | 51% | 44% |
| 187 | 1/22/2001 | 6/19/2001 | IIO-EQ-35 | $1,000,000 | $4,154,368 | $5,400,678 | ASSORTED APPLIANCE | 148 | 24% | 19% |
| 188 | 2/3/2001 | 8/16/2001 | IIO-EQ-36 | $4,000,000 | $7,621,058 | $8,891,235 | ASSORTED INVENTORY | 194 | 52% | 45% |
| 189 | 3/24/2001 | 7/31/2001 | IIO-EQ-37 | $8,472,350 | $10,407,016 | $12,854,009 | ASSORTED APPLIANCE | 129 | 81% | 66% |
| 190 | 7/12/2001 | 8/16/2001 | IIO-EQ-38 | $2,000,000 | $4,092,015 | $4,706,402 | SONY TV'S | 35 | 49% | 42% |
| 191 | 5/11/2001 | 08/03/01 | OF-051101-01 | $1,900,000 | $1,923,699 | $2,292,790 | SPEAKERS | 84 | 99% | 83% |
| 192 | 5/11/2001 | 08/09/01 | OF-051101-02 | $3,700,000 | $3,757,806 | $4,471,816 | PANASONIC CORDERS | 90 | 98% | 83% |
| 193 | 5/16/2001 | 08/23/01 | OF-051601-01 | $3,400,000 | $3,423,058 | $3,892,541 | GOLF EQUIP. | 99 | 99% | 87% |
| 194 | 6/5/2001 | 08/21/01 | OF-060501-01 | $2,300,000 | $2,302,838 | $2,686,644 | HUFFY BIKES | 77 | 100% | 86% |
| 195 | 6/5/2001 | 08/21/01 | OF-060501-02 | $2,273,000 | $2,274,257 | $2,668,461 | CORNING WARE | 77 | 100% | 85% |
| 196 | 6/5/2001 | 08/13/01 | OF-060501-03 | $1,300,000 | $1,304,083 | $1,533,705 | BELL SOUTH PHONES | 69 | 100% | 85% |



DAIN RAUSCHER
INVESTMENT SERVICES
INVESTMENT BANKING
MEMBER NYSE/SIPC

DZB041962

# EXHIBIT T-17

CASH RECEIPTS TESTING 8/22/02

| DZ Bank Ctrl # | Deal No | Note No. | Issuance Date | Maturity Date | (1) | Note Amount | Note Rate | Approved Seller | (2) | Goods Sale Price (to Retailer) | (3) | (4) | Approved Buyer | Goods Description | Buyer Terms | Shipment Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 300 | 042602-02 | 4/26/2002 | 7/26/2002 | 7/29/2002 | 3 1,400,000.00 | 2.50% | Nationwide | $ 1,731,108.80 | 1,731,108.80 | $ 1,506,166.67 | Yes | SAMS | Sony Personal Organizers | 60 | 5/24/2002 |
| 2 | 297 | 041102-02 | 4/11/2002 | 7/26/2002 | 7/29/2002 | 3 2,600,000.00 | 2.50% | Nationwide | $ 3,427,815.44 | 3,407,815.44 | $ 3,047,333.33 | Yes | BJ'S | Sony Camcorder | 60 | 5/23/2002 |
| 3 | 296 | 041102-01 | 4/11/2002 | 7/25/2002 | Yes | 1,700,000.00 | 2.50% | Nationwide | $ 2,057,906.65 | 2,057,906.65 | $ 1,848,750.00 | Yes | SAMS | Panasonic Phone | 60 | 5/20/2002 |
| 4 | 298 | 041102-03 | 4/11/2002 | 7/24/2002 | 7/25/2002 | 1 3,600,000.00 | 2.50% | Universal | $ 4,292,190.21 | 4,292,190.21 | $ 3,912,000.00 | Yes | SAMS | GE TV/Air Purifier | 60 | 5/21/2002 |
| 5 | 306 | 050902-01 | 5/7/2002 | 7/24/2002 | 7/25/2002 | 1 1,200,000.00 | 2.50% | Enchanted | $ 1,417,880.45 | 1,417,880.45 | $ 1,276,000.00 | Yes | REX | GE TVs | 60 | 5/17/2002 |
| 6 | 292 | 040102-01 | 4/1/2002 | 7/11/2002 | 7/12/2002 | 1 3,500,000.00 | 2.50% | Nationwide | $ 4,167,476.35 | 4,167,476.35 | $ 3,794,583.33 | Yes | BJ'S | Bose Home Ent/DVD Panasonic | 60 | 5/10/2002 |
| 7 | 294 | 040102-03 | 4/1/2002 | 7/11/2002 | 7/12/2002 | 1 3,900,000.00 | 2.50% | Nationwide | $ 4,607,851.30 | 4,607,851.30 | $ 4,228,250.00 | Yes | SAMS | TV/DVD | 60 | 5/13/2002 |
| 8 | 290 | 032602-02 | 3/26/2002 | 7/10/2002 | Yes | 3,600,000.00 | 2.50% | Nationwide | $ 4,227,543.75 | 4,227,543.75 | $ 3,918,000.00 | Yes | SAM'S | Hitachi TV Panasonic | 60 | 5/2/2002 |
| 9 | 293 | 040102-02 | 4/1/2002 | 7/10/2002 | 7/11/2002 | 1 3,400,000.00 | 2.50% | Nationwide | $ 4,032,551.29 | 4,032,551.29 | $ 3,683,333.33 | Yes | SAM'S | Camcorder | 60 | 5/6/2002 |
| 10 | 295 | 040102-04 | 4/1/2002 | 7/10/2002 | 7/11/2002 | 1 2,000,000.00 | 2.50% | Nationwide | $ 3,623,816.30 | 3,623,816.30 | $ 2,166,666.67 | Yes | BOSCOV | RCA TV Pioneer | 60 | 5/3/2002 |
| 11 | 291 | 032602-03 | 3/26/2002 | 7/8/2002 | 7/9/2002 | 1 3,300,000.00 | 2.50% | Nationwide | $ 3,538,081.90 | 3,538,081.90 | $ 3,586,000.00 | Yes | SAMS | Receiver Bose Ent | 60 | 5/3/2002 |
| 12 | 289 | 032602-01 | 3/26/2002 | 7/3/2002 | 7/8/2002 | 5 3,100,000.00 | 2.50% | Nationwide | $ 3,691,385.00 | 3,691,385.00 | $ 3,355,750.00 | Yes | BOSCOV | System JVC | 60 | 4/30/2002 |
| 13 | 288 | 031802-01 | 3/18/2002 | 7/1/2002 | Yes | 3,500,000.00 | 2.50% | Nationwide | $ 4,174,378.00 | 4,174,378.00 | $ 3,806,250.00 | Yes | REX | Camera/Video Fitness | 60 | 4/25/2002 |
| 14 | 283 | 030802-03 | 3/8/2002 | 6/28/2002 | Yes | 3,000,000.00 | 2.50% | Universal | $ 3,728,372.53 | 3,728,372.53 | $ 3,280,000.00 | Yes | BJ'S | Equipment | 60 | 4/17/2002 |
| 15 | 285 | 031302-02 | 3/13/2002 | 6/28/2002 | Yes | 3,500,000.00 | 2.50% | Nationwide | $ 4,145,975.45 | 4,145,975.45 | $ 3,812,083.33 | Yes | SAMS | Toshiba TV | 60 | 4/19/2002 |
| 16 | 284 | 031302-01 | 3/13/2002 | 6/20/2002 | Yes | 4,000,000.00 | 2.50% | Nationwide | $ 4,841,886.30 | 4,841,886.30 | $ 4,330,000.00 | Yes | SAMS | Sony TV | 60 | 4/29/2002 |
| 17 | 282 | 030802-02 | 3/8/2002 | 6/18/2002 | 6/19/2002 | 1 3,600,000.00 | 2.50% | Nationwide | $ 4,372,804.95 | 4,372,804.95 | $ 3,906,000.00 | Yes | SAM'S | Denon Audio | 60 | 4/16/2002 |
| 18 | 287 | 031302-04 | 3/13/2002 | 6/18/2002 | 6/19/2002 | 1 1,700,000.00 | 2.50% | Nationwide | $ 2,084,662.50 | 2,084,662.50 | $ 1,837,416.67 | Yes | SAMS | Canon Printer | 60 | 4/18/2002 |
| 19 | 286 | 031302-03 | 3/13/2002 | 6/13/2002 | 6/14/2002 | 1 2,600,000.00 | 2.50% | Nationwide | $ 3,119,749.50 | 3,119,749.50 | $ 2,739,333.33 | Yes | BJ'S | Toshiba TV | 60 | 4/12/2002 |
| 20 | 279 | 030602-01 | 3/6/2002 | 6/10/2002 | Yes | 2,300,000.00 | 2.50% | Universal | $ 2,784,055.25 | 2,784,055.25 | $ 2,484,000.00 | Yes | BOSCOV | PHILLIPS TV | 60 | 4/8/2002 |
| 21 | 281 | 030802-01 | 3/8/2002 | 6/10/2002 | 6/11/2002 | 2 2,000,000.00 | 2.50% | Nationwide | $ 2,415,870.20 | 2,415,870.20 | $ 2,156,666.67 | Yes | SAMS | Bushnell | 60 | 4/8/2002 |
| 22 | 280 | 030602-02 | 3/6/2002 | 6/5/2002 | 6/6/2002 | 1 1,750,000.00 | 2.50% | Universal | $ 2,112,914.25 | 2,112,914.25 | $ 1,882,708.33 | Yes | BJ'S | Philips TV WHIRLPOOL | 60 | 4/5/2002 |
| 23 | 278 | 022802-03 | 2/28/2002 | 6/4/2002 | Yes | 3,000,000.00 | 2.50% | PAR | $ 3,579,838.65 | 3,579,838.65 | $ 3,240,000.00 | Yes | BJ'S | WASHER | 60 | 4/4/2002 |
| | | | | | | 2 63,050,000.00 | | | $ | | $ 76,825,006.22 | | | | | |

Our cash receipts review consisted of selecting all loans which had a maturity date occurring in June or July 2002.

KEY:
(1)  Maturity Date per system agrees with receipt of funds into PC Funding Collection Account?  If not, actual date of receipt per US BANK.
(2)  Funds received from Approved Retailer.
(3)  Note amount plus interest paid to DZ BANK Collection Account per US BANK statement.
(4)  Funds sent to DZ BANK Collection Account agree to Closing Wire Transfer Request?

DZB043555

### CASH DISBURSEMENT TESTING 8/22/02

Recepient Account # and ABA Verified By US Bank w/o exception

| DZ Bank's Ctrl # | Deal No. | Note No. | Note Outstanding | Traced & Agreed to Promissory Note, Original Obtained at US Bank - Custodial Receipt also on file | Issuance Date | Maturity Date | Goods Cost | Amt agrees to invoice | Amt Per Wire Transfer Request | Approved Seller | ABA | Account # | Goods Sale Price | Goods Sale Price per buyers PO | Approved Buyer | Buyer identified and PO completed before transaction consumated | Buyer correctly stated per remittance rpt | Goods Description | Description agrees to invoice | Buyers Terms | Buyers Terms per PO | Shipment Date | Open Inventory Notes | Open Inventory | Open Days Receivables Notes | Open Rec. | Open Days Rec. Performance | Open Note Days | Open Note Performance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 331 | 070232-01 | $5,100,000 | Yes | 7/2/2002 | 10/30/2002 | $5,227,058 | $5,227,058 | $5,227,058 | Nationwide | 122037769 | | $- | | BJ's | Yes | Yes | RCA TV | Yes | 60 | 60 | 10/1/900 | $5,100,000 | 29 | $- | - | - | 20 | 91 |
| 2 | 332 | 071102-01 | $4,250,000 | Yes | 7/11/2002 | 11/8/2002 | $4,300,625 | $4,300,625 | $4,300,625 | Enchanted | 71123633 | | $- | | Boscov | Yes | Yes | Mitsubishi TV | Yes | 60 | 60 | 10/1/900 | $4,250,000 | 20 | $- | - | - | 20 | 100 |
| 3 | 333 | 071102-02 | $1,750,000 | Yes | 7/11/2002 | 11/8/2002 | $1,828,875 | $1,828,875 | $1,828,875 | Enchanted | 71123633 | | $- | | Rex | Yes | Yes | Mitsubishi TV | Yes | 60 | 60 | 10/1/900 | $1,750,000 | 20 | $- | - | - | 20 | 100 |
| 4 | 334 | 071102-03 | $4,850,000 | Yes | 7/11/2002 | 11/8/2002 | $4,978,966 | $4,978,966 | $4,978,966 | Nationwide | 122401620 | | $- | | Sam's | Yes | Yes | RCA TV | Yes | 60 | 60 | 10/1/900 | $4,850,000 | 20 | $- | - | - | 20 | 100 |
| 5 | 335 | 071702-01 | $4,500,000 | Yes | 7/17/2002 | 11/14/2002 | $4,930,364 | $4,930,364 | $4,930,364 | After 2nd Millennium | 91014287 | | $- | | Sam's | Yes | Yes | Whirlpool Refrigerators | Yes | 60 | 60 | 10/1/900 | $4,500,000 | 14 | $- | - | - | 14 | 106 |
| 6 | 336 | 071702-02 | $3,200,000 | Yes | 7/17/2002 | 11/14/2002 | $3,310,692 | $3,310,692 | $3,310,692 | After 2nd Millennium | 96009650 | | $- | | Sam's | Yes (same day) | Yes | Harman Kardon DVD&Receivers Sony Camcorder, Printer, Camera | Yes | 60 | 96 | 10/1/900 | $3,200,000 | 14 | $- | - | - | 14 | 106 |
| 7 | 337 | 071702-03 | $3,400,000 | Yes | 7/17/2002 | 11/14/2002 | $3,533,874 | $3,533,874 | $3,533,874 | Nationwide | 122037769 | | $- | | BJ's | Yes | Yes | Dewalt Tool | Yes | 60 | 60 | 10/1/900 | $3,400,000 | 14 | $- | - | - | 14 | 106 |
| 8 | 338 | 072502-01 | $3,000,000 | Yes | 7/25/2002 | 11/22/2002 | $3,242,094 | $3,242,094 | $3,242,094 | After 2nd Millennium | 96009650 | | $- | | BJ's | Yes | Yes | General | Yes | 60 | 60 | 10/1/900 | $3,000,000 | 6 | $- | - | - | 6 | 114 |
| 9 | 339 | 072502-02 | $3,900,000 | Yes | 7/25/2002 | 11/22/2002 | $4,211,334 | $4,211,334 | $4,211,334 | After 2nd Millennium | 96009650 | | $- | | Sam's | Yes | Yes | Generator Whirlpool & Frigidaire Appliances | Yes | 60 | 60 | 10/1/900 | $3,900,000 | 6 | $- | - | - | 6 | 114 |
| 10 | 299 | 042602-01 | $4,600,000 | Yes | 4/26/2002 8/24/2002 | 8/24/2002 | $- | N/A | N/A | Par Group | 83110843 | | $5,485,852 | $5,485,852 | SAMS | Yes | yes) | Wilson Golf | Yes | 60 | 60 | 9/3/2002 | $- | - | $4,600,000 | 58 | (2) | 96 | 24 |
| 11 | 301 | 042602-03 | $2,900,000 | Yes | 4/26/2002 | 8/24/2002 | $- | $2,945,799 | $2,945,799 | Universal | 91014287 | | $3,407,710 | $3,407,710 | SAMS | yes | yes | Club Sets | Yes | 60 | 60 | 5/28/2002 | $- | - | $2,900,000 | 64 | 4 | 96 | 24 |
| 12 | 302 | 050302-01 | $4,300,000 | Yes | 5/3/2002 | 8/31/2002 | $- | $4,444,472 | $4,444,472 | Enchanted | 91014267 | | $5,111,123 | $5,111,123 | Sam's | yes | yes | Polk & Yamaha Home Audio, Zenith Flat TV | yes | 60 | 60 | 6/11/2002 | $- | - | $4,300,000 | 50 | (10) | 69 | 31 |
| 13 | 303 | 050302-03 | $1,700,000 | Yes | 5/3/2002 | 8/31/2002 | $- | $1,706,560 | $1,706,560 | Enchanted | 91014267 | | $2,054,475 | $2,054,475 | Boscov | yes | yes | Kitchenaid Mixers | yes | 60 | 60 | 6/6/2002 | $- | - | $1,700,000 | 55 | (5) | 89 | 31 |
| 14 | 304 | 050302-02 | $3,900,000 | Yes | 5/3/2002 | 9/6/2002 | $- | $4,072,186 | $4,072,186 | Nationwide | 122401620 | | $4,683,003 | $4,683,003 | Sam's | yes | yes | Hitachi TVs | yes | 60 | 60 | 6/5/2002 | $- | - | $3,900,000 | 56 | (4) | 83 | 37 |
| 15 | 306 | 050902-04 | $2,300,000 | Yes | 5/9/2002 | 9/6/2002 | $- | $2,552,546 | $2,552,546 | Nationwide | 122401710 | | $2,935,413 | $2,935,413 | BJ's | yes | yes | Panasonic Palmcorders Casio TV, Phillips TV, Pioneer Home Theater | yes | 60 | 60 | 5/7/2002 | $- | - | $2,300,000 | 54 | (5) | 83 | 37 |
| 16 | 307 | 050902-02 | $3,100,000 | Yes | 5/9/2002 | 9/6/2002 | $- | $3,259,137 | $3,259,137 | Enchanted | 71123633 | | $3,747,968 | $3,747,968 | Boscov | yes | yes | Assorted | yes | 60 | 60 | 6/13/2002 | $- | - | $3,100,000 | 48 | (12) | 83 | 37 |
| 17 | 308 | 050902-01 | $2,500,000 | Yes | 5/9/2002 | 9/6/2002 | $- | $2,642,500 | $2,642,500 | Enchanted | 122401710 | | $3,038,557 | $3,038,551 | Boscov | yes | yes | Snap TVs | yes | 60 | 60 | 6/14/2002 | $- | - | $2,500,000 | 47 | (13) | 83 | 37 |
| 18 | 309 | 050902-04 | $3,100,000 | Yes | 5/9/2002 | 9/6/2002 | $- | $3,260,449 | $3,259,137 | Enchanted | 71123933 | | $3,560,480 | $3,560,482 | Boscov | yes | yes | Alpine Auto | Yes | 60 | 60 | 6/15/2002 | $- | - | $3,100,000 | 43 | (17) | 83 | 37 |
| 19 | 310 | 052102-01 | $2,200,000 | Yes | 5/21/2002 | 9/18/2002 | $- | $2,341,091 | $2,341,091 | Enchanted | 71123933 | | $2,692,219 | $2,692,219 | CDs | Yes | Yes | CDs | Yes | 60 | 60 | 6/26/2002 | $- | - | $2,200,000 | 35 | (25) | 71 | 49 |
| 20 | 311 | 052102-02 | $2,100,000 | Yes | 5/21/2002 | 9/18/2002 | $- | $2,178,860 | $2,178,860 | Enchanted | 426933 | | $2,505,678 | $2,505,678 | BJ's | Yes | Yes | Mitsubishi TVs | Yes | 60 | 60 | 6/21/2002 | $- | - | $2,100,000 | 40 | (20) | 71 | 49 |
| 21 | 312 | 052102-03 | $4,600,000 | Yes | 5/21/2002 | 9/18/2002 | $- | $4,907,173 | $4,907,173 | Nationwide | 122401620 | | $5,543,240 | $5,543,250 | Sam's | Yes | Yes | RCA TVs | Yes | 60 | 60 | 6/28/2002 | $- | - | $4,600,000 | 33 | (27) | 71 | 49 |

DZB043556

| Approved Seller | ABA and Account # on file w/ US Bank |
|---|---|
| After 2nd Millennium | YES |
| Enchanted | YES |
| Nationwide | YES |
| Par Group | YES |
| Universal | YES |

DZB043557

# EXHIBIT T-18

August 26, 2002

To:     Files

From:   Jennifer Wikoff

Re:     **Opportunity Finance – Due Diligence Site Review**

A site review of Opportunity Finance, LLC, headquartered in Minneapolis, Minnesota was conducted on August 22nd and 23rd 2002.  Jennifer Wikoff and Vincent Salerno performed the review as part of the customary and on going due diligence process.

Specifically, the following areas were reviewed:

**Cash Receipts:**

DZ BANK, for all receivables that matured during the months of June and July 2002, compared the actual funds received into the PC Funding Collection Account as detailed on US BANK's account statement to the reported goods sale price to the applicable Approved Retailer.  The goods sale price was taken from the Servicer's Master File, which is sent to DZ BANK on a monthly basis.  In addition to the amount received, the (i) maturity date of the receivable as reported by the Servicer was checked against the date funds were actually received per US BANK's account statements and (ii) amount of principal and interest sent to DZ BANK's Collection Account was checked against the total amount wired to the Collection Account pursuant to the Servicer's Closing Wire Transfer Request.  *The test work revealed a lag between the Servicer's reported maturity date and the date on which US BANK indicated receipt of funds from the Approved Retailer on 15 of the 23 sampled receipts (~65%).  This lag, which ranged from 1 to 5 calendar days, was observed to be 2 calendar days on average.  Further investigation revealed that the lag was attributable to the fact that payments from Approved Retailers are being wired directly to Petter's operating account and then to the PC Funding Collection Account versus directly to the PC Funding Collection Account as required by the RLSA.  Additionally, for one sampled receipt, the total proceeds received from the Approved Retailer appeared to be overstated by $20,000.  However, this additional amount was forwarded by Petters to the PC Funding Collection Account in error and was returned per the related Closing Wire Transfer Request (see Control #1).  No other material exceptions were noted.*

**Retailer Monitoring:**

Opportunity Finance only enters into transactions with approved retailers, a listing which has been obtained.  Based on our review, their monitoring actions appear reasonable given its review of the retailers stock performance, Analyst recommendations since inception.

**Insurance:**

Obtained and reviewed the insurance coverage provided for cargo to ensure that coverage as contemplated is in effect.  Policy is being maintained and is provided by Lloyds.  Policy to lap 3/13/03.  Information should be updated on the tickler - Specifically, a notation to obtain written confirmation and a copy of the policy should be obtained to ensure that the insurance has been renewed.  I believe that the insurance laws require
that in the event of a cancellation or lapse of policy DZ Bank, whom is named as loss payee would receive notification.  During site review ensure that payments are being made as stipulated on the premium finance agreement.  It appears as though the monthly premium amount is not

DZB045346

being paid through the SPV - Opportunity Finance Securitization, LLC. Determine how this and other non-consolidation issues such as payroll, rent ect is being handled.

Liability Insurance - lapses 9/1/02 - obtain new policy information and include on the tickler. (Petters is the insured w/ Opportunity Finance LLC named as the loss payee.) - Here we would not receive notice of cancellation. Loans w/ Extended Terms - (ELIGIBILITY)

We were provided with a listing of Loans w/ extended terms since the inception of the business. 5 deals were identified, none of which were originated since the inception of our facility.

## Cash Disbursements:

For a sample of 21 files selected for review, we performed detailed testing to ensure that collateral exists prior to funding. Specifically, we verified the amount of the principal amount of the promissory note(copy - original retained at US Bank)to the information provided via our monthly download. That the goods cost agreed to the sellers invoice and the wire instructions. In addition, we reviewed documentation to ensure that the buyer and seller as reported on the remittance report were accurately stated (concentration purposes) . Furthermore, we reviewed the Buyer terms per the buyers PO to ensure that the terms per our monthly download are accurately reflected  no exceptions were noted.

We reviewed the opening wire instructions to ensure that the Bank account number and ABA number are listed on the on the approved seller list which is maintained and updated by US Bank. (In report – describe servicing risk mitigants - US Bank Process flow).

## Monthly Remittance Report

We obtained and reviewed the 7/31/02 PC funding Aging Detail and compared the aging buckets to the monthly remittance report. While the total outstanding principal balance was in agreement ($157,379,171.63) the various buckets were not. It appears as though this is attributed to the fact that the two reports are reporting different information, The remittance report is reporting days past due, while the AR aging is reporting days outstanding. It is recommended that Opportunity Finance start tracking the days outstanding.

## Eligible Receivable File Review:

For a sample of ___ receivables, we reviewed copies of the following documents. Collateral Receipt, UCC Filings, Confirmation of the Notice of Pledge, Promissory Note, Assignment, Allonge. UCC's were checked to ensure that they were filed prior to the release of monies.


Cc:    Patrick Preece
       Kenneth Bradt

DZB045347

# EXHIBIT T-19

# Credit Application

**DZ BANK**

| Place / Date New York / 12.12.02 | Name / Tel. P. Preece / 1665 V. Salerno / 1659 Customer Department: ASG | Name / Tel. N. O'Connor / 1567 Credit Department: CU | Board resp. (Customer) UEF | ☐ Pre-approval ☐ § 13 KWG ☐ § 15 KWG |
|---|---|---|---|---|
| **Credit Rating --current-:**  | | 2 | **Credit Rating --new-:** | 2 | ☐ K + B   ☐ AR |

| | | | |
|---|---|---|---|
| **Credit Rating --current-:** | 2 | **Credit Rating --new-:** | 2 |

| | | |
|---|---|---|
| **MAS-Rating ** / External Rating:** | **Major Shareholders:** | ☒ Direct Loan |
| **Borrower/ Place:** Opportunity Finance Securitization, LLC ("OFS") / Minneapolis, Minnesota - USA | Opportunity Finance, LLC (100%) | ☐ Syndicated Loan ☐ Joint Verbund Loan ☐ Yellow-List ☐ Watch-List ☐ EWB-Liste |
| **Industry:**          **Industry-Rating:** Trade Finance | **Existing EWB in TEUR:** none | ☒ Customer since:       12.28.01 Last Visit (MM/DD/JJ):   11.11.02 ** only for DZ Bank Singapore |
| **Parent Company/ Group:** Opportunity Finance, LLC (100%) | **Major Shareholders:** 100% privately owned by the friends and family of CEO Jon Sabes. | |

---

### Reason for application:

Approval to renew DZ BANK's $102 mio 364-day commercial paper backup liquidity and credit enhancement facility to support Autobahn Funding Company LLC's $100 mio 5 year (approx. 4 years remaining) revolving senior secured credit facility to OFS.  Next review date, 11/30/03.

| Type of Loan          in TEUR | Applied for | New Limit | Collateral Value as of   12.04.02 | Utilization/ Credit Equivalent as of | Other Banks Share |
|---|---|---|---|---|---|
| *USD/EURO = 1.00045* | | | | | |
| Liquidity & Credit Enhancement Facility | 101,954 | 101,954 | 101,954 | | |
| | | | | | |
| **Other existing Customer Limits:** | | | | | |
| Loans/Guarantee/Bills | | | | | |
| Securities | | | | | |
| Trading Limit | | | | | |
| FX (nominal) | | | | | |
| **Total Customer Exposure DZ BANK:** | 101,954 | 101,954 | 101,954 | | |

| Portion of Collateral value customer attributable to (in TEUR) |
|---|

| **Total Customer/Group Exposure DZ BANK** | 101,954 | 101,954 | 101,954 |
|---|---|---|---|
| **Total Customer/Group Exposure DZ BANK-Group** (for Info only) | | | |

| Country Limit inTEUR: as of : | Utilization (incl. new application) in TEUR: New application in country limit structure:     Yes   ☒ No   ☐ adjustment required | Country Rating:   A |
|---|---|---|

### Applications with Explanations:

On 12/28/01, DZ BANK, through Autobahn Funding Company LLC ("Autobahn"), provided a five year $100 million revolving commercial paper warehouse facility (the "Program") to Opportunity Finance Securitization, LLC (the "Borrower") to finance its origination of wholesale inventory trade loan receivables.  The Borrower is a wholly owned, bankruptcy remote subsidiary of Opportunity Finance, LLC ("Opportunity" or the "Company"), whose business consists of providing inventory and receivables financing to businesses requiring interim financing for wholesale inventory trading transactions.  DZ BANK currently provides a $102 mio 364-day backstop liquidity and credit enhancement facility, renewable annually, to facilitate the issuance of commercial paper under the Program.  Note that a failure to renew this commitment will require DZ BANK to fund the entire $102 mio backstop liquidity and credit enhancement facility on its balance sheet.  At closing, ASG procured a $50 mio "first loss" financial guaranty insurance policy from Royal Indemnity Company ("Royal"), a subsidiary of Royal & SunAlliance Insurance Group, which names Autobahn as loss payee.  The Royal policy provides coverage of up to the first $50 million of loss over and above what the credit support inherent in the structure can sustain.

The Company has performed to expectations under the Program, with no breach of any performance or financial covenants to date.  Since its inception, the Company has originated over $1.0 billion in loans secured by over $1.5 billion in inventory and accounts receivable and **has never experienced a default or dilution**.  For the first 9 months of 2002, the Company reported net interest margin of $22.5 mio (prior to distributions) on revenues of $28.3 mio.  Additionally, as of 9/30/02, Opportunity reported total assets and member's equity (including subordinated debt) of $156.5 mio and $56.0 mio, respectively.  Due to recent downgrades of Royals's ratings to BBB/BBB+/A- by Moody's, S&P and Fitch, respectively, Royal is no longer an "Acceptable Insurer" under the Program.  As a result, Opportunity Finance was granted a waiver to allow ASG time to contact insurance companies in search of a replacement in addition to working with Opportunity to find an alternative risk transfer mechanism to Royal's policy.  ASG expects to present a restructuring plan for the transaction to Credit Committee in 1Q03.

**Recommendation:**  Given the strong performance of the Program to date and the lack of defaults or dilution with respect to the Company's portfolio since inception (over $1.0 billion of loan originations), ASG recommends renewal of DZ BANK's liquidity commitment for an additional 364 days.

| Customer Department (Signature) | KB | OdO | | | |
|---|---|---|---|---|---|
| Credit Department (Signature) | WB | Westhoff | | | |
| Approval Level: | Board Member Market / Board Member Credit | | | Approval No.: | |
| | UEF | WK | | | |

DZB001179

**Credit Application**                                                        ⊡⊡ **DZ BANK**

| Additional information on the credit application: |
|---|

**Grundsatz weighting (%) / Weighted Margin**

| 100% (fully credit enhanced) / 2.25% per annum |
|---|

**Calculation**      Profit Contribution (DB) in TEUR      Risk Premium:                    Standard Risk Premium:

DB I:   [          ]          In TEUR:   [          ]                    [          ]

DB II:  [          ]          In %       [          ]

DB III: [          ]

**Conditions**

|  |
|---|

| Further customer details: |
|---|

**Evidenzmeldung according to § 14 KWG**

| Customer Group | Current report dated (MM/YY) | | | Last report dated (MM/YY) | | |
|---|---|---|---|---|---|---|
| | EUR Mio total | Portion DZ (%) | Number of banks | EUR Mio. total | Portion DZ (%) | Number of banks |
| | | | | | | |
| | | | | | | |

**Cross-Selling-Potential / Customer Relationship:**

ASG is currently working with Opportunity to find an alternative risk transfer mechanism to Royal's policy and expects to present a restructuring plan for the transaction to Credit Committee in 1Q03.  Additionally, due to growth in the Company's receivables portfolio, ASG intends to request approval for (i) a $50 mio increase to the existing $100 mio Program and (ii) a separate $50 mio revolving commercial paper facility that will benefit from a financial guaranty provided by a 'AA'-rated monoline guarantor.

**Latest annual report/financial statements and interim results:**

| as of : 12/31/01 annual 09/30/02 interim | Opportunity Finance, LLC Consolidated Financial Statements. |
|---|---|

**Additional information concerning the current customer exposure:**

|  |
|---|

| Information on other parties involved (e.g. exporteur, sponsor, off-taker) |
|---|

- First Loss insurance policy provided by Royal Indemnity Company, a subsidiary of Royal & SunAlliance Insurance Group (rated Baa2/BBB+/A- by Moody's, S&P & Fitch, respectively).

- Approved Retailers (buyers) of financed inventory under the Program include:

  1. Sam's Club (WalMart subsidiary, rated Aa2/AA/AA by Moody's, S&P & Fitch).
  2. Costco (rated A2/A/A+ by Moody's, S&P & Fitch).
  3. BJ's Wholesale Club (NR, $688 mio in shareholder's equity as of August 2002, net income of $59 mio for the first 6 mos. of FY 2002).
  4. Boscov's (NR, Dun & Bradtsreet Financial Stress Class of **1** out of a total of **5** (5 being the highest risk), net worth of $241.6 mio per internally generated financial statements as of February 2002).
  5. Rex Stores (NR, $158.2 mio in shareholder's equity at 7/31/02, net income of $9.6 mio for the six month period ended 7/31/02). **Limited to 5% of the underlying portfolio.**
  6. Fleming Companies Inc. (rated B2/BB+/BB- by Moody's, S&P & Fitch). **Limited to 5% of the underlying portfolio.**

<u>Votum of Creditmanagement on the extension/annual review application Opportunity Finance
Securitization, LLC dtd. 12/12/02</u>

- Renewal of the DZ BANK 364-day commercial paper back-up line to Autobahn in the amount of
  $102 million in the form of a liquidity purchase agreement and credit enhancement for the benefit of
  the financing transaction for Opportunity Finance Securitization, LLC (The $102 million is $100
  million grossed up 2% to cover commercial paper plus interest, which is the norm required in the
  market and specifically by the rating agencies.) The new annual review date will be December 15,
  2003.

- In December 2001 DZ Bank approved a $100 million 5-year facility to be provided by Autobahn to
  Opportunity Finance Securitization, LLC for the financing of wholesale distributor loans secured by
  inventory trade receivables due from approved retail counterparties. This facility continues to be
  available to the borrower, subject to existing approved waivers, for the remaining 4 years. The
  liquidity facility renewal for an additional 364 days allows ASG to fund this transaction via the CP
  market; but should the 364 day renewal not take place, DZ BANK will be required to fund the
  Autobahn commitment to Opportunity Finance Securitization, LLC, on balance sheet.

<u>Collateral:</u> The structure incorporates an additional level of collateral based upon the 80% advance
provided by Autobahn against the Opportunity loans to the distributor, which in turn cannot exceed 98% of
the cost of the product sold, or on average 88% of the final receivable amount. As the chart in the attached
memo shows, as of October 31, 2002 Autobahn advances of $99 million were made on a contracted basis
against $124 million in loan receivables (at 80%), but the full amount of the loans pledged at $145 million
results in an effective advance rate of 69%. This same $99 million versus the full amount of the underlying
retailer receivables of $173 million results in an advance against the collateral of 57%.

The first loss policy with Royal Sun Alliance was included in the original structure as a means to "transfer
risk" to address the perceived large exposure of $100 million. The recent downgrades of Royal (A1 to A3
to Baa2) were waived by the bank and Royal to avoid a termination event that would have stopped funding.
The re-financing to be submitted in the first Quarter of 2003 will provide for a restructure of the facility via
a change in the in risk transfer structure (i.e. replacement of Royal).

<u>Operating Risk:</u> At this time, Opportunity works with one distributor and we finance loans to this
distributor, which are secured by receivables from approved retailers. The inclusion of the Royal Sun
Alliance first loss policy provides additional due diligence relative to fraud risk. but was mainly put in
place as a means to "transfer risk". We recently completed our semi-annual due diligence audit and have
re-confirmed procedures related to prompt receipt of receivable payments into the DZ BANK collection
account.

<u>Credit Rating:</u> The "2" rating in on the basis of the implied "A" rating supported by the collateral values. It
is the expectation that once we restructure and increase the transaction, ASG will attempt to obtain a
Moody's or Fitch shadow rating. It is expected the agency ratings will be at a minimum investment grade
and the DZ BANK transaction rating will be adjusted to reflect that of the rating agencies.

<u>Recommendation:</u> Approval of the liquidity facility renewal for an additional 364 days is recommended to
allow ASG to continue to fund this transaction via the CP market, versus DZ BANK funding the Autobahn
commitment on balance sheet. The annual review is recommended on the basis of the support provided via
subordinated loans and equity, the pledge of the excess collateral and the performance to date of the
receivable collections.

Hans- Jörg Bannmann                                    Nancy J. O'Connor      12/12/02
Frankfurt                                              New York

DZB001181



**Patrick Preece**
12/23/2002 10:48 AM

To:     Hans-Jörg Bannmann/KR/Frankfurt/DZ BANK@DZBANK
cc:     Frank Westhoff/KR/Frankfurt/DZ BANK@DZBANK, Wolfgang Bollmann/Branch/New York/DZ
        BANK@DZBANK, Nancy O'Connor/Branch/New York/DZ BANK@DZBANK, Vincent
        Salerno/Branch/New York/DZ BANK@DZBANK, Kenneth Bradt/Branch/New York/DZ
        BANK@DZBANK
Subject: Opportunity Finance

Dear Mr. Bannmann,

I would like to clarify two points in our application for the renewal of the 364-day liquidity facility:

1.  The application before you is for an extension of the 364-day liquidity facility only, with no
    additional requests.  At a future date (expected in early 1Q03), we expect to present to
    Frankfurt a restructuring of the risk transfer mechanism and a request for additional capacity.
2.  The current risk transfer mechanism ($50 mio from Royal & SunAlliance) is a "first loss" policy.
    In the case of a deterioration of the portfolio, the following would happen:

● DZ Bank would stop funding new loan originations and the portfolio will begin amortization.
● All excess spread would be trapped as the receivables are paid off (increasing the speed of the
  amortization).
● As the portfolio is in amortization, any deficiencies in the borrowing base will be paid by Royal &
  SunAlliance (up to $50 mio).
● Royal & SunAlliance must pay within 60 days after a claim has been made.

If there are any other questions, please contact me (212/745-1665).

Regards,

Patrick

DZB001182

Internal                                                          **DZ BANK**

| From | | Date |
|------|--|------|
| Patrick Preece (1665) / Vincent Salerno (1659): DZ NA ASG | | 12.12.02 |

| To | | Contact Partner |
|----|--|------|
| Bannmann: F/KRIA | | |

| Information | Comment | Decision | |
|-------------|---------|----------|--|
| Bradt | d'Oelsnitz Bollman | Messrs. Flach and Kirsch | |

## I.   Background

On December 28, 2001, DZ BANK, through its multi-seller conduit Autobahn Funding Company LLC ("Autobahn"), provided a five year $100 million revolving commercial paper warehouse facility (the "Program") to Opportunity Finance Securitization, LLC (the "Borrower") to finance its origination of wholesale inventory trade loan receivables.   The Borrower is a wholly owned, bankruptcy remote subsidiary of Opportunity Finance, LLC ("Opportunity" or the "Company"), whose business consists of providing inventory and receivables financing to businesses ("Distributors") requiring interim financing for wholesale inventory trading transactions.   These transactions consist of purchasing excess inventories from manufacturers or liquidators and simultaneously selling these inventories to large national retailers such as Sam's Club or Costco.   It is important to note that legally binding purchase orders are obtained by the Distributor before the financing process begins, thereby locking in the corresponding profit margin on each transaction.   Historically, electronics goods have accounted for 70.0% of the Company's business, while appliances have accounted for 10.0%.   Currently, Opportunity provides financing to one Distributor, Petters Company, Inc.

DZ BANK currently provides a $102 mio 364-day backstop liquidity and credit enhancement facility, renewable annually, to facilitate the issuance of commercial paper under the Program.   Under the current structure, should DZ BANK not renew its liquidity and credit enhancement commitment, it would be forced to fund its entire $102 mio committed amount into a dedicated account for the benefit of Autobahn until such time as a replacement with the appropriate P-1/F1 short term ratings could be found.

For more detail on the Program structure, please refer to **Exhibit I** for a Transaction Diagram.

## II.   Facility Performance

The Borrower has performed to expectations under the Program, with no breach of any performance or financial covenants to date (please refer to **Exhibit II** for a Program performance summary).   Loans originated by Opportunity have been outstanding, on average, for 93 days, and average loan origination volume has been in excess of $40.0 mio per month.   As of October 31, 2002, the financed loan portfolio (which represented 100% of the receivables originated by Opportunity and subsequently sold to the Borrower under the Program) consisted of 43 loans with an outstanding principal balance of $144.6 million secured by $172.6 million in inventory and accounts receivable.   The effective advance rate against eligible receivables was 68.7% (versus the current contractual maximum of 80%) as of the same date.   The following diagram illustrates the level of overcollateralization currently in the deal:

| Overcollateralization Summary ($mio) | | |
|---|---|---|
| Sale Price to Retailer (Gross Receivable) | $ 172.6 | (a) |
| Opportunity Finance's Loans to Distributor | $ 144.6 | (b) |
| Autobahn Advance against Opportunity's Loans | $  99.3 | (c) |
| **Autobahn Advance Percentage** | **68.7%** | (c / b) |
| Overcollateralization (based upon Gross Receivable) | $  73.3 | (d) = (a - c) |
| **Overcollateralization Percentage** | **42.5%** | (d / a) |
| *(expressed as a % of the Gross Receivable to the Buyer)* | | |
| **Autobahn's Effective Advance against Gross Receivable** | **57.5%** | (c / a) |

2                                                                                      **DZ BANK**

Since its inception, Opportunity Finance LLC has originated over $1.0 billion in loans secured by over $1.5 billion in inventory and accounts receivable and **has never experienced a default or dilution**. For a stratification of the financed portfolio as of 10/31/02, please refer to **Exhibit III**.

Opportunity has also displayed strong revenue and income performance since closing of the Program. For the first 9 months of 2002, the Company reported net interest margin of $22.5 mio (prior to distributions) on revenues of $28.3 mio. Additionally, as of 9/30/02, Opportunity reported total assets and member's equity (including subordinated debt) of $156.5 mio and $56.0 mio, respectively.

Please refer to **Exhibit IV** for Opportunity's consolidated (i.e. with the Borrower SPV under DZ BANK's Program) 12/31/01 annual and 9/30/02 interim financial statements.

Royal & SunAlliance
At closing, DZ BANK procured a $50 mio "first loss" financial guaranty insurance policy from Royal Indemnity Company ("Royal"), a subsidiary of Royal & SunAlliance Insurance Group, which names Autobahn as loss payee. The policy was obtained primarily to satisfy internally mandated risk transfer requirements, as ASG was comfortable with the underlying credit profile of the transaction. The Royal policy provides coverage of up to the first $50 million of loss over and above what the credit support (i.e. overcollateralization – see above) inherent in the structure can sustain. In order for Royal to constitute an "Approved Facility Insurer" under the Program, Royal is required to maintain ratings of at least 'A2' by Moody's, 'A' by S&P and 'A' by Fitch. A failure to maintain these ratings that remains unremedied for 30 days constitutes an event of early amortization, which DZ BANK or Royal, in their sole discretion, may enforce. On 10/10/01, Royal was downgraded by Moody's from 'A1' to 'A3', and on 11/8/02, Royal was further downgraded to 'Baa2' (both S&P and Fitch have downgraded Royal as well – Royal is currently rated 'BBB+' by S&P and 'A-' by Fitch). In response to these downgrades, DZ BANK agreed to amend the provisions of the loan documentation to accommodate these lower ratings until such time as a replacement for Royal, which remains a highly rated and viable entity, could be found. After negotiations, Royal agreed to sign the necessary waiver, and its policy remains in full force and effect under the following conditions:

- Until a replacement or alternative financing structure is obtained by Opportunity, Royal will remain the Facility Insurer. On or after November 11, 2003, if Royal is still the Facility Insurer, it may call, in its sole discretion, an early amortization event under the Program.

- At any time, should Royal's ratings go below 'Baa2' by Moody's, 'BBB' by S&P or 'BBB' by Fitch, DZ BANK may, in its sole discretion, declare an early amortization event under the Program. DZ BANK, as Agent, also has the right to terminate Royal as Facility Insurer at any time so long as, at the time of such termination, Royal has satisfied all of its obligations under the Program.

- At any time, should Royal's ratings go below 'Baa3' by Moody's, 'BBB-' by S&P or 'BBB-' by Fitch, Royal may, in its sole discretion upon at least 60 days prior written notice, declare an early amortization event under the Program.

ASG is currently working with Opportunity to find an alternative risk transfer mechanism to Royal's policy and expects to present a restructuring plan for the transaction to Credit Committee in 1Q03. Additionally, due to growth in the Company's receivables portfolio, ASG intends to request approval for (i) a $50 mio increase to the existing $100 mio Program and (ii) a separate $50 mio revolving commercial paper facility that will benefit from a financial guaranty provided by a 'AA'-rated monoline guarantor.

3                                                                                          **DZ BANK**

## III.    Recommendation

Given the strong performance of the Program to date and the lack of defaults or dilution with respect to the Company's portfolio since inception (over $1.0 billion of loan originations), ASG recommends renewal of DZ BANK's liquidity commitment for an additional 364 days.   Note that a failure to renew this commitment will require DZ BANK to fund the entire $102 mio backstop liquidity and credit enhancement facility on its balance sheet in order to support the continued issuance of commercial paper under the Program.

Preece _____        Bollmann _____

Salerno _____        d'Oelsnitz _____

Bradt _____

## IV.    Exhibits

| | |
|---|---|
| Exhibit I | Transaction Diagram |
| Exhibit II | Program Performance Summary |
| Exhibit III | Portfolio Stratification @ 10/31/02 |
| Exhibit IV | 12/31/01 Annual & 9/30/02 Interim Financial Statements |

Internal                                                                                          **DZ BANK**

# EXHIBIT I

## Transaction Diagram

DZB001186

Internal

# DZ BANK



1. The Distributor sources excess inventory from a seller such as RCA or Sony (the "Wholesaler") and then seeks to find a buyer looking to purchase the inventory for re-sale to consumers at the retail level (a "Retailer"). Once a Retailer has been found, purchase orders for both the purchase from the Wholesaler and the sale to the Retailer are contemporaneously issued.

2. These purchase orders are then assigned to Opportunity Finance, who in turn lends funds to the Distributor to complete the wholesale inventory trade.

3. Proceeds of the loan to the Distributor are forwarded directly to the Wholesaler for the purchase of the merchandise – **at no time do proceeds get advanced directly to the Distributor.**

4. The Distributor then arranges for shipment of the merchandise directly to the Retailer (the Distributor **never takes possession** of the merchandise). Upon receipt of the merchandise, an account receivable ("AR") owed to Opportunity Finance is created.

5. Opportunity Finance then sells its interest in the merchandise and accounts receivable into a bankruptcy remote Special Purpose Vehicle ("SPV") on a **true-sale basis.** This protects Autobahn Funding Company ("Autobahn") as Lender in the unlikely event of a bankruptcy on the part of Opportunity Finance.

6. The SPV then pledges receivables purchased from Opportunity Finance to Autobahn as collateral in order to draw down under the facility. Autobahn will issue commercial paper in order to fund its obligations under the loan agreement, advancing against Opportunity Finance's principal investment in the merchandise and accounts receivable.

7. Payments on the underlying accounts receivable will be made by the Retailer to a segregated Lockbox Account under the control of DZ Bank. Funds deposited into the Lockbox Account will be swept to a central Collection Account held by the Trustee for the benefit of the Lender on a daily basis. The SPV can use funds in the Collection Account to either (i) purchase additional receivables from Opportunity Finance or (ii) pay down the loan balance under the facility.

8. 364-day Liquidity will be provided to Autobahn by P-1/F1-rated financial institutions.

DZB001187

Internal                                                              **DZ BANK**

# EXHIBIT II

Program Performance Summary

DZB001188

Internal                                                              **DZ BANK**

**Receivables Performance**



Note that a breach of either test above (these are three month rolling average triggers) constitutes an early amortization event under the Program. As illustrated above, the portfolio of receivables financed by Autobahn has not experienced any defaults or dilution since inception of the Program. Please refer to the following pledged receivable aging summary:

This graph illustrates the aging of the loans extended by Opportunity to Petters, which have an original term (OT) of 120 to 150 days (80% of the receivables financed must have an OT of 120 days).



Pledged Receivables Aging - Day Outstanding

Internal                                                                                          **DZ BANK**

**Financial Covenants**





Note that the Servicer tangible net worth illustrated above is on a consolidated basis with the Borrower
SPV under DZ BANK's Program and includes any subordinated debt of Opportunity.

**Borrowing Tests**



The Facility Amount (loan principal plus accrued interest and fees under the Program) may not exceed
the lesser of (i) the Capital Limit (eligible receivables plus cash) and (ii) $100 mio (the maximum Facility
Amount). As seen above, the Program has been virtually fully funded since June of 2002.

DZB001190

Internal                                                                          **DZ BANK**

# EXHIBIT III

## 10/31/02 Portfolio Stratification

DZB001191

Internal                                                                **DZ BANK**

## As of October 31, 2002:

| | |
|---|---|
| Total Unpaid Principal Balance of Loans: | $144,550,000 |
| Number of Loans: | 43 |
| Average Outstanding Loan Balance: | $3,361,628 |
| Weighted Average Original Term to Maturity: | 120 days |
| Ratio of Unpaid Principal Balance to Cost of Goods Financed: | 95.37% |
| Ratio of Unpaid Principal Balance to Receivable from Buyer: | 83.73% |
| Weighted Average Days Outstanding: | 49 days |

## By Type of Goods Financed:

| Types of Goods | Total | % of Total | Count | % of Total |
|---|---|---|---|---|
| Electronics | 123,200,000 | 85.23% | 35 | 81.40% |
| Appliances | 9,800,000 | 6.78% | 4 | 9.30% |
| Outdoor Equipment | 3,900,000 | 2.70% | 1 | 2.33% |
| Power Tools | 3,000,000 | 2.08% | 1 | 2.33% |
| Clothing | 2,550,000 | 1.76% | 1 | 2.33% |
| Exercise Equipment | 2,100,000 | 1.45% | 1 | 2.33% |
| **Total:** | **144,550,000** | **100.0%** | **43** | **100.0%** |

## By Unpaid Principal Balance:

| Principal Balance | Principal Balance | % of Total | Count | % of Total |
|---|---|---|---|---|
| $0.0 - $1.0 million | - | 0.00% | - | 0.00% |
| $1.1 - $2.0 million | 7,300,000 | 5.05% | 4 | 9.30% |
| $2.1 - $3.0 million | 39,150,000 | 27.08% | 16 | 37.21% |
| $3.1 - $4.0 million | 39,400,000 | 27.26% | 11 | 25.58% |
| $4.1 - $5.0 million | 36,800,000 | 25.46% | 8 | 18.60% |
| $5.1 - $6.0 million | 21,900,000 | 15.15% | 4 | 9.30% |
| **Total:** | **144,550,000** | **100.0%** | **43** | **100.0%** |

## By Approved Retailer (Buyer):

| Buyer | Total | % of Total | Count | % of Total |
|---|---|---|---|---|
| Sam's Club | 89,900,000 | 62.19% | 24 | 55.81% |
| BJ's Wholesale Club | 32,550,000 | 22.52% | 9 | 20.93% |
| Boscov | 15,550,000 | 10.76% | 7 | 16.28% |
| Rex | 6,550,000 | 4.53% | 3 | 6.98% |
| **Total:** | **144,550,000** | **100.0%** | **43** | **100.0%** |

## Internal                                                                                    **DZ BANK**

**By Days Outstanding:**

| Time Outstanding | Principal Balance | % of Total | Count | % of Total |
|---|---|---|---|---|
| 0-30 days | 51,600,000 | 35.70% | 14 | 32.56% |
| 31-60 days | 38,500,000 | 26.63% | 12 | 27.91% |
| 61-90 days | 36,400,000 | 25.18% | 11 | 25.58% |
| 91-120 days | 18,050,000 | 12.49% | 6 | 13.95% |
| > 120 days | - | 0.00% | - | 0.00% |
| **Total:** | **144,550,000** | **100.0%** | **43** | **100.0%** |

DZB001193

Internal                                                      **DZ BANK**

# EXHIBIT IV

### 12/31/01 Annual & 9/30/02 Interim Financial Statements

DZB001194

## Opportunity Finance, LLC

**Consolidated Income Statement**
For the period January 1, 2002 to September 30, 2002

| | | Opportunity Finance, LLC | Opportunity Finance Securitization, LLC | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Income** | | $    22,861,761 | $    28,300,780 | $(22,861,761) | $    28,300,780 |
| | Interest Expense (1) | (22,496,305) | (2,844,977) | 22,496,305 | (2,844,977) |
| | Amortization | - | (541,748) | - | (541,748) |
| | Other  Expense | (282,814) | (2,417,752) | 313,174 | (2,387,392) |
| | Total Operating Expenses | (22,779,119) | (5,804,476) | 22,809,478 | (5,774,116) |
| | Net Interest Margin | | 22,496,304 | | 22,526,664 |
| **Other Income/Expenses** | | | | | |
| | Net Allocations - Subordinate Notes (2) | - | (22,496,304) | - | (22,496,304) |
| | Other Income | 9,164 | - | - | 9,164 |
| | Total Other | 9,164 | (22,496,304) | - | (22,487,140) |
| **Net Income** | | 91,806 | (0) | (52,282) | 39,524 |

Notes:

(1)   Note:  "Interest Expense" of Opportunity Finance LLC represents the Net Allocations payable to Subordinate Note holders. This allocation is accrued and payable to subordinate note holders based upon their respective balances of the principal and accrued but unpaid Net Allocations in the family members' capital account.

(2)   Note:  "Net Allocations - Subordinate Notes" represents gross interest income earned less certain expenses related to DZ BANK's conduit facility.  This amount has been allocated to the capital account of each Subordinated Note holder.

DZB001195

## Opportunity Finance, LLC

### Consolidated Balance Sheet
September 30, 2002

| ASSETS | Opportunity Finance, LLC | Opportunity Finance Securitization, LLC | Eliminations | Consolidated |
|---|---|---|---|---|
| Cash | $ 244,829 | $ 14,409,245 | $ - | $ 14,654,073 |
| Other Receivables | - | | | - |
| Notes Receivable (1) | - | 133,250,000 | - | 133,250,000 |
| Deferred Financing Costs | - | 2,634,178 | | 2,634,178 |
| Accrued Interest Recivevable | - | 5,824,550 | - | 5,824,550 |
| Investment in Subsidiary | 55,702,696 | - | (55,702,696) | - |
| Other Assets | 152,941 | - | - | 152,941 |
| | 56,100,467 | 156,117,973 | (55,702,696) | 156,515,743 |

### LIABILITIES AND MEMBERS EQUITY

Liabilities

| | | | | |
|---|---|---|---|---|
| Revolving Note Payable | $ - | $ 99,300,000 | $ - | $ 99,300,000 |
| Subordinated Notes Payable (2) | 55,915,936 | - | - | 55,915,936 |
| Other Liabilities | 67,725 | 1,115,277 | - | 1,183,002 |
| | 55,983,661 | 100,415,277 | - | 156,398,937 |

Members' Equity

| | | | | |
|---|---|---|---|---|
| | 116,806 | 55,702,696 | (55,702,696) | 116,806 |
| | 56,100,467 | 156,117,973 | (55,702,696) | 156,515,743 |

Notes:

(1) Note:  Represents the portfolio of promissory notes which make up portfolio.

(2) Note:  Represents the principal balances and accrued, but unpaid Allocations made to Subordinate Note holders (i.e. total capital account balances of family members).  This includes $22.5 mio of net interest margin allocated to Subordinate Note holders.

DZB001196

DZB001197

**OPPORTUNITY FINANCE, LLC AND SUBSIDIARY**

**CONSOLIDATING BALANCE SHEET**
**December 31, 2001**

| ASSETS | Opportunity Finance, LLC | Opportunity Finance Securitization, LLC | Eliminations | Consolidated |
|---|---|---|---|---|
| Cash | $ 5,132,409 | $ 12,500 | $ - | $ 5,144,909 |
| Notes receivable | 1,262,500 | 69,000,000 | - | 70,262,500 |
| Deferred financing costs | - | 2,941,980 | | 2,941,980 |
| Accrued interest receivable | 12,835 | 4,785,095 | (12,500) | 4,785,430 |
| Investment in subsidiary | 26,126,065 | - | (26,126,065) | - |
| | $ 32,533,809 | $ 76,739,575 | $ (26,138,565) | $ 83,134,819 |

**LIABILITIES AND MEMBERS' EQUITY**

| | | | | |
|---|---|---|---|---|
| Liabilities | | | | |
| Revolving note payable | $ - | $ 50,600,000 | $ - | $ 50,600,000 |
| Subordinated notes payable to related parties | 27,712,500 | - | - | 27,712,500 |
| Accounts payable and accrued expenses, primarily interest | 4,796,309 | 13,510 | (12,500) | 4,797,319 |
| | 32,508,809 | 50,613,510 | (12,500) | 83,109,819 |
| Members' Equity | 25,000 | 26,126,065 | (26,126,065) | 25,000 |
| | $ 32,533,809 | $ 76,739,575 | $ (26,138,565) | $ 83,134,819 |

7

DZB001198

1:29 PM
04/18/02
Accrual Basis

# Opportunity Finance, LLC
## Profit & Loss
### January through December 2001

|  | Jan - Dec 01 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| IIO Income | 17,127,277.62 |
| Opportunity Finance Income | 8,650,073.30 |
| **Total Income** | 25,777,350.92 |
| **Gross Profit** | 25,777,350.92 |
| **Expense** | |
| Direct Expenses | 657,978.65 |
| Income Distributions | 21,541,811.08 |
| **Total Expense** | 22,199,789.73 |
| **Net Ordinary Income** | 3,577,561.19 |
| **Other Income/Expense** | |
| **Other Income** | |
| Bank Interest Income | 12,227.35 |
| **Total Other Income** | 12,227.35 |
| **Other Expense** | |
| Other Expenses | 3,589,676.24 |
| **Total Other Expense** | 3,589,676.24 |
| **Net Other Income** | -3,577,448.89 |
| **Net Income** | 112.30 |

DZB001199

# EXHIBIT T-20

# DZ BANK

ASSET SECURITIZATION GROUP

## FACSIMILE TRANSMITTAL SHEET

| TO | FROM |
|---|---|
| Toby Robillard | Stacey Rolsing |
| **COMPANY** | **DATE** |
| US Bank | Friday, January 10, 2003 |
| **FAX NUMBER** | **TOTAL NO. OF PAGES INCLUDING COVER** |
| 651-244-1797 | 1 |
| **PHONE NUMBER** | **SENDER'S PHONE NUMBER** |
| 651-244-1171 | (212) 745-1669 |
| **RE:** | **SENDER'S FAX NUMBER** |
| **Wire Instruction** | (212) 745-1651 |

☐ URGENT    ☑ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

notes/Comments:

Toby,
Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **January 10, 2003**:

FROM:
| | |
|---|---|
| Bank: | US Bank – Minneapolis, MN |
| Account #: | 33398730 |
| Account Name: | DZ Bank AG, as Collateral Agent for Certain Secured Parties |
| **Amount:** | **$201,185.69** |

TO:
| | |
|---|---|
| Bank: | Bank of New York |
| ABA#: | 021-000-018 |
| Account #: | Redacted- Confidential |
| Account Name: | DZ Bank – New York |
| Reference: | Opportunity Finance Remittance |

Should you have any questions or require further information, please do not hesitate to contact me.
Regards,

*Stacey*

## 609 FIFTH AVENUE
## NEW YORK, NY 10017

# DZ BANK

## A S S E T   S E C U R I T I Z A T I O N   G R O U P

### FACSIMILE TRANSMITTAL SHEET

| TO | FROM |
|---|---|
| Toby Robillard | Stacey Rolsing |
| **COMPANY** | **DATE** |
| US Bank | Friday, January 10, 2003 |
| **FAX NUMBER** | **TOTAL NO. OF PAGES INCLUDING COVER** |
| 651-244-1797 | 1 |
| **PHONE NUMBER** | **SENDER'S PHONE NUMBER** |
| 651-244-1171 | (212) 745-1669 |
| **RE** | **SENDER'S FAX NUMBER** |
| **Wire Instruction** | (212) 745-1651 |

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **January 10, 2003**:

> FROM:
> Bank:              US Bank – Minneapolis, MN
> Account #:         33398730
> Account Name:      DZ Bank AG, as Collateral Agent for Certain Secured Parties
> **Amount:**        **$34,203.33**
>
> TO:
> Bank:              Bank of America Dallas, Texas
> ABA#:              111-000-012
> Account #:         Redacted- Confidential
> Account Name:      Royal and Sun Alliance
> Reference:         Opportunity Finance

Should you have any questions or require further information, please do not hesitate to contact me.
Regards,

*Stacey*

## 609 FIFTH AVENUE
## NEW YORK, NY 10017

DZB009151



# DZ BANK

ASSET SECURITIZATION GROUP

## FACSIMILE TRANSMITTAL SHEET

| TO | FROM |
|---|---|
| Toby Robillard | Stacey Rolsing |

| COMPANY | DATE |
|---|---|
| US Bank | Friday, January 10, 2003 |

| FAX NUMBER | TOTAL NO OF PAGES INCLUDING COVER |
|---|---|
| 651-244-1797 | 1 |

| PHONE NUMBER | SENDER'S PHONE NUMBER |
|---|---|
| 651-244-1171 | (212) 745-1669 |

| RE. | SENDER'S FAX NUMBER |
|---|---|
| **Wire Instruction** | (212) 745-1651 |

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **January 10, 2003**:

FROM:
| | |
|---|---|
| Bank: | US Bank – Minneapolis, MN |
| Account #: | 33398730 |
| Account Name: | DZ Bank AG, as Collateral Agent for Certain Secured Parties |
| **Amount:** | **$42,410.15** |

TO:
| | |
|---|---|
| ABA#: | 091-000-022 |
| Account #: | ████-4888 |
| Account Name: | Opportunity Finance, LLC |
| Reference: | Servicing Fee |

Should you have any questions or require further information, please do not hesitate to contact me.

Regards,

*Stacey*

609 FIFTH AVENUE
NEW YORK, NY 10017

DZB009152

# MEMORY TRANSMISSION REPORT

```
PAGE       : 001
TIME       : JAN-10-03  04:02PM
TEL NUMBER1: 212 745 1651
NAME       : DZ BANK - ASG
```

| | | |
|---|---|---|
| FILE NUMBER | : | 753 |
| DATE | : | JAN-10 04:01PM |
| TO | : ☎916512441797 | |
| DOCUMENT PAGES | : | 003 |
| START TIME | : | JAN-10 04:01PM |
| END TIME | : | JAN-10 04:02PM |
| SENT PAGES | : | 003 |
| STATUS | : | OK |
| FILE NUMBER | : 753 | |

### *** SUCCESSFUL TX NOTICE ***

# DZ BANK

## ASSET SECURITIZATION GROUP

### FACSIMILE TRANSMITTAL SHEET

| TO: Toby Robillard | FROM: Stacey Rolsing |
|---|---|
| COMPANY: US Bank | DATE: Friday, January 10, 2003 |
| FAX NUMBER: 651-244-1797 | TOTAL NO. OF PAGES INCLUDING COVER: 1 |
| PHONE NUMBER: 651-244-1171 | SENDER'S PHONE NUMBER: (212) 745-1669 |
| RE: Wire Instruction | SENDER'S FAX NUMBER: (212) 745-1651 |

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

notes/Comments:

Toby,
Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent. Please make the following funds transfer on January 10, 2003:

**FROM:**
| | |
|---|---|
| Bank: | US Bank – Minneapolis, MN |
| Account #: | 33398730 |
| Account Name: | DZ Bank AG, as Collateral Agent for Certain Secured Parties |
| Amount: | **$201,185.69** |

**TO:**
| | |
|---|---|
| Bank: | Bank of New York |
| ABA#: | 021-000-018 |
| Account #: | Redacted- Confidential |
| Account Name: | DZ Bank – New York |
| Reference: | Opportunity Finance Remittance |

Should you have any questions or require further information, please do not hesitate to contact me.
Regards,

*Stacey*

### 609 FIFTH AVENUE
### NEW YORK, NY 10017

# EXHIBIT T-20A

# DZ BANK

### ASSET SECURITIZATION GROUP

---

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: **Toby Robillard** | FROM: **Stacey Rolsing** |
| COMPANY **US Bank** | DATE **Tuesday, December 10, 2002** |
| FAX NUMBER **651-244-1797** | TOTAL NO. OF PAGES INCLUDING COVER **1** |
| PHONE NUMBER **651-244-1171** | SENDER'S PHONE NUMBER **(212) 745-1669** |
| RE: **Wire Instruction** | SENDER'S FAX NUMBER. **(212) 745-1651** |

---

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

---

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **December 10, 2002**:

FROM:
| | |
|---|---|
| Bank: | US Bank – Minneapolis, MN |
| Account #: | 33398730 |
| Account Name: | DZ Bank AG, as Collateral Agent for Certain Secured Parties |
| **Amount:** | **$194,695.83** |

TO:
| | |
|---|---|
| Bank: | Bank of New York |
| ABA#: | 021-000-018 |
| Account #: | Redacted - Confidential |
| Account Name: | DZ Bank – New York |
| Reference: | Opportunity Finance Remittance |

Should you have any questions or require further information, please do not hesitate to contact me.

Regards,

*Stacey*

---

### 609 FIFTH AVENUE
### NEW YORK, NY 10017

Confidential



3A

ACE is expressly authorized to seek alternative sources of cash for the Excluded SSMs.

6A

In the event ACE and Household enter into an electronic clearing agreement satisfactory to Administrative Agent, Borrower's funds shall be distributed to the Trust Collection Account.

HOUSTON 654691v1

# DZ BANK

### ASSET SECURITIZATION GROUP

---

#### FACSIMILE TRANSMITTAL SHEET

| TO | FROM |
|---|---|
| Toby Robillard | Stacey Rolsing |

| COMPANY | DATE |
|---|---|
| US Bank | Tuesday, December 10, 2002 |

| FAX NUMBER | TOTAL NO. OF PAGES INCLUDING COVER |
|---|---|
| 651-244-1797 | 1 |

| PHONE NUMBER | SENDER'S PHONE NUMBER |
|---|---|
| 651-244-1171 | (212) 745-1669 |

| RE | SENDER'S FAX NUMBER |
|---|---|
| **Wire Instruction** | (212) 745-1651 |

---

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

---

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **December 10, 2002**:

> FROM:
> Bank:            US Bank – Minneapolis, MN
> Account #:       33398730
> Account Name:    DZ Bank AG, as Collateral Agent for Certain Secured Parties
> **Amount:**          **$33,100.00**
>
> TO:
> Bank:            Bank of America Dallas, Texas
> ABA#:            111-000-012
> Account #:       Redacted- Confidential
> Account Name:    Royal and Sun Alliance
> Reference:       Opportunity Finance

Should you have any questions or require further information, please do not hesitate to contact me.

Regards,

*Stacey*

---

### 609 FIFTH AVENUE
### NEW YORK, NY 10017

Confidential

distribution by an Approved Courier into SSMs in accordance with instructions received by such Approved Vault Bank from the Servicer (or its authorized agents), and in accordance with the terms of the Transaction Documents and the applicable Approved Vault Bank Agreement, until such time as the Collateral Agent instructs such Approved Vault Bank, or instructs the Servicer to instruct such Approved Vault Bank, to cease such distribution of funds and to distribute such funds only in accordance with further instructions from the Collateral Agent.  The initial Vault Distribution Accounts shall be as set forth on <u>Schedule I</u>.

On or before the first Borrowing Date, there shall be established, in the name of the Borrower, for the benefit of the Collateral Agent, a deposit account subject to an Approved Vault Bank Agreement (each, a "<u>Vault Collection Account</u>") at each Approved Vault Bank (i) into which the applicable Approved Vault Bank shall accept transfers of funds in respect of Collections in accordance with the terms of the Transaction Documents and the applicable Approved Vault Bank Agreement, and (ii) from which the applicable Approved Vault Bank shall distribute funds either to a specified Vault Distribution Account or to the Trust Collection Account in accordance with instructions received by such Approved Vault Bank from the Servicer, in each case until such time as the Collateral Agent instructs such Approved Vault Bank, or instructs the Servicer to instruct such Approved Vault Bank, to cease such distribution of funds and to distribute funds then on deposit in the applicable Vault Collection Account only in accordance with further instructions from the Collateral Agent.  **The initial Vault Collection Accounts shall be as set forth on Schedule I.**

Prior to adding any additional Vault Collection Accounts or Vault Distribution Accounts, Borrower shall provide an opinion of counsel with respect to perfection issues substantially in the form of the opinion issued pursuant to <u>Section 5.01(f)</u> prior to the initial Borrowing and otherwise acceptable to the Administrative Agent.  Borrower shall provide the Collateral Agent and the Administrative Agent with an updated Schedule I prior to adding any additional Vault Collection Account or Vault Distribution Account.

All such amounts in the Vault Collection Accounts, the Vault Distribution Accounts, the Trust Collection Account, the Trust Distribution Account and the Reserve Account shall be held by the Collateral Agent, each Approved Vault Bank and the Borrower, as the case may be, in such accounts as part of the Assets as herein provided, subject to withdrawal by, or at the direction of, the Collateral Agent or the Servicer, in accordance with, and for the purposes specified in the provisions of, this Agreement.  The Vault Collection Accounts, Vault Distribution Accounts, the Trust Collection Account, the Trust Distribution Account and the Reserve Account are referred to collectively herein as (the "<u>Transaction Accounts</u>").

(b)    <u>Investments</u>.  All or a portion of the amounts in the Trust Collection Account, Trust Distribution Account and the Reserve Account (together, the "<u>Trust Accounts</u>") shall be invested and reinvested by the Collateral Agent (as directed by AOE) in one or more Eligible Investments.

(c)    <u>Maturity of Investments</u>.  No investment of any amount held in the Trust Accounts shall mature later than the earlier of (i) the Business Day immediately

40070115.440070115.6 02026950                    6

Confidential

DZB009196



# DZ BANK

### ASSET SECURITIZATION GROUP

### FACSIMILE TRANSMITTAL SHEET

| TO | FROM |
|---|---|
| Toby Robillard | Stacey Rolsing |
| **COMPANY** | **DATE** |
| US Bank | Tuesday, December 10, 2002 |
| **FAX NUMBER** | **TOTAL NO. OF PAGES INCLUDING COVER** |
| 651-244-1797 | 1 |
| **PHONE NUMBER** | **SENDER'S PHONE NUMBER** |
| 651-244-1171 | (212) 745-1669 |
| **RE** | **SENDER'S FAX NUMBER** |
| **Wire Instruction** | (212) 745-1651 |

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **December 10, 2002**:

<u>FROM:</u>

| | |
|---|---|
| Bank: | US Bank – Minneapolis, MN |
| Account #: | 33398730 |
| Account Name: | DZ Bank AG, as Collateral Agent for Certain Secured Parties |
| **Amount:** | **$42,299.58** |

<u>TO:</u>

| | |
|---|---|
| ABA#: | 091-000-022 |
| Account #: | ████4888 |
| Account Name: | Opportunity Finance, LLC |
| Reference: | Servicing Fee |

Should you have any questions or require further information, please do not hesitate to contact me.

Regards,

*Stacey*

### 609 FIFTH AVENUE
### NEW YORK, NY 10017

Confidential

preceding the Settlement Date which is scheduled to occur immediately following the date of investment and (ii) one week from the date of investment.

(d)   Form of Investment.   Any investment of any funds in the Trust Accounts shall be made under the following terms and conditions:

(i)   each such investment shall be made in the name of the Collateral Agent (in its capacity as such) or in the name of a nominee of the Collateral Agent, and

(ii)   any certificate or other instrument evidencing such investment shall be delivered directly to the Collateral Agent and endorsed in the name of the Collateral Agent and the Collateral Agent shall have sole possession of such instrument.

(e)   Collateral Agent Not Liable.   The Collateral Agent shall not in any way be held liable by reason of any insufficiency in the Trust Accounts resulting from losses on investments made in accordance with the provisions of this Section 3.01 (but the Collateral Agent shall at all times remain liable for its own debt obligations, if any, constituting part of such investments).   The Collateral Agent shall not be liable for any investment made by it in accordance with this Section 3.01 on the grounds that it could have made a more favorable investment.

(f)   Reserve Account.   If on any ~~applicable~~ Business Day amounts are not available in the Trust Collection Account (A) to make all distributions set forth in Section 3.03(e)(i) through (iii), (B) to make all distributions set forth in Section 3.03(d)(ii) through (viii), as applicable, the Collateral Agent shall withdraw funds from the Reserve Account and deposit into the Trust Collection Account the lesser of (i) such shortfall and (ii) the amounts on deposit in the Reserve Account. If after making all distributions set forth in Section 3.03 on a Business Day the amount on deposit in the Reserve Account exceeds the Required Reserve Level, any such excess shall be released to the Borrower.

SECTION 3.02   Collection of Moneys.   If at any time the Borrower or the Servicer shall receive any payment on or in respect of any Asset, it shall hold such payment in trust for the benefit of the Collateral Agent and the other Secured Parties, shall segregate such payment from the other property of the Borrower or the Servicer, as the case may be, and shall, within one ~~Business~~Business day*Day* of receipt, deliver such payment in the form received to the Collateral Agent for deposit into the Trust Collection Account.

*[handwritten: Borrower]*

SECTION 3.03   Settlement.

(a)   Deposit of Collections.   The ~~Servicer~~ covenants and agrees to cause all Collections to be deposited directly into the applicable Vault Collection Account on each Business Day. ~~The Servicer shall deposit all Collections (other than amounts transferred to a Vault Distribution Account) into the Trust Collection Account within one Business~~ Day of receipt.

*[handwritten: Collection Account or the Trust]*
*[handwritten: - either]*

7

400701154002011156 02026950

DZB009198

# Fax Coversheet

# DZ BANK

**Attention:** **Toby Robillard/Dawn Gilson**
Assistant Vice President
US Bank

DZ BANK AG
New York Branch
609 Fifth Avenue
New York, NY  10017 -1021

Telephone  (212) 745  1400
Telefax      (212) 745  1550
SWIFT – Code GENOUS 33
Email:     new.york@dzbank.de

**Telephone:**  (651) 244-1171
**Telefax:**  **(651) 244-1797**

**Pages:**(incl. cover)  ~~4~~ 5

**From:**
**Stacey L. Rolsing**
Assistant Treasuer
Asset Securitization
Direct Tel    (212) 745-1669
Direct Fax   **(212) 745-1651**
stacey.rolsing@dzbank.de

**Reference: MEPCO & OPPORTUNITY**

Tuesday, December 10, 2002

Toby / Dawn –

Following are the wire transfer instructions for *TODAY*.

Thank you,

Stacey



Confidential

DZB009199

*Borrower*

(b)   Transfer of Collections.   The ~~Servicer~~ shall transfer, or cause to be transferred, all Collections from the relevant Vault Collection Accounts into the Trust Collection Account or, at the direction of the ~~Servicer~~ in accordance with Section 8.01, into specified Vault Distribution Accounts, within one Business Day of receipt thereof.

(c)   Daily Settlement Procedures.   On each Business Day during the Usage Period that is not a Settlement Date or the Usage Period Maturity Date, amounts on deposit in the Trust Collection Account (including transfers from the Reserve Account pursuant to Section 3.01(f)) will be applied by the Collateral Agent at the written direction of the ~~Servicer~~ (or, absent such direction, at the direction of the Collateral Agent) in the following order of priority:

(i)   To pay the accrued interest with respect to any Loan for which such Business Day is the last day of the applicable Interest Period for such Loan;

(ii)   To set aside in a sub-account of the Trust Collection Account an amount equal to the Accrued Facility Costs (net of amounts paid in clause (i) above) for transfer at the further direction of the Administrative Agent (whether on such day or on a subsequent day);

(iii)   To set aside in the Trust Collection Account or repay any Loans for which such Business Day is the last day of the applicable Interest Period for such Loans in an amount necessary, if any, to maintain the Advance Percentage equal to ~~or less than~~ the Maximum Advance Percentage;

(iv)   To deposit to the Reserve Account the ~~excess~~**amount** (if any) ~~of the Required Reserve Level~~**required** ~~over~~**for** the amount on deposit in the Reserve Account **to be equal to the Required Reserve Level**; and

(v)   Any remaining amounts, {at the Borrower's election}, (A) to the {Trust Distribution Account}, (B) to the reduction of the Facility Amount, ~~or~~ (C) to remain in the Trust Collection Account **or (D) to the Borrower**; provided, however, no such distribution shall be made if after making such distribution, the Advance Percentage would be greater than the Maximum Advance Percentage.

*Borrower*

(d)   Monthly Settlement Procedures.   Amounts on deposit in the Trust Collection Account (including transfers from the Reserve Account pursuant to Section 3.01(f)) will be applied in the following order of priority by the Collateral Agent at the written direction of the ~~Servicer~~ (or, absent such direction, at the direction of the Collateral Agent) on each Settlement Date prior to the Usage Period Maturity Date and prior to the occurrence of a Termination Event or the Termination Date:

(i)   To the Servicer, if the Servicer is not ACE or an affiliate of ACE, ~~in payment of~~ the accrued and unpaid Servicing Fee;

(ii)   To the Administrative Agent, for the benefit of the Lender, accrued and unpaid interest and Facility Fees with respect to any Loan for which such Settlement Date is the last day of the applicable Interest Period for such Loan;

~~40070115.4~~40070115.6 02026950                    8

Confidential                                                       DZB009200

# EXHIBIT T-20B

# ◼️◼️ DZ BANK

A S S E T   S E C U R I T I Z A T I O N   G R O U P

### FACSIMILE TRANSMITTAL SHEET

| TO | FROM |
|---|---|
| Toby Robillard | Stacey Rolsing |

| COMPANY | DATE |
|---|---|
| US Bank | Tuesday, November 12, 2002 |

| FAX NUMBER. | TOTAL NO. OF PAGES INCLUDING COVER. |
|---|---|
| 651-244-1797 | 1 |

| PHONE NUMBER | SENDER'S PHONE NUMBER |
|---|---|
| 651-244-1171 | (212) 745-1669 |

| RE | SENDER'S FAX NUMBER |
|---|---|
| **Wire Instruction** | (212) 745-1651 |

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **November 12, 2002**:

FROM:

| | |
|---|---|
| Bank: | US Bank – Minneapolis, MN |
| Account #: | 33398730 |
| Account Name: | DZ Bank AG, as Collateral Agent for Certain Secured Parties |
| **Amount:** | **$40,887.71** |

TO:

| | |
|---|---|
| ABA#: | 091-000-022 |
| Account #: | ■■■■■4888 |
| Account Name: | Opportunity Finance, LLC |
| Reference: | Servicing Fee |

Should you have any questions or require further information, please do not hesitate to contact me.

Regards,

*Stacey*

609 FIFTH AVENUE
NEW YORK, NY 10017

DZB009237



# DZ BANK

### A S S E T   S E C U R I T I Z A T I O N   G R O U P

---

### FACSIMILE TRANSMITTAL SHEET

| TO | FROM |
|---|---|
| Toby Robillard | Stacey Rolsing |

| COMPANY | DATE |
|---|---|
| US Bank | Tuesday, November 12, 2002 |

| FAX NUMBER | TOTAL NO OF PAGES INCLUDING COVER |
|---|---|
| 651-244-1797 | 1 |

| PHONE NUMBER | SENDER'S PHONE NUMBER |
|---|---|
| 651-244-1171 | (212) 745-1669 |

| RE | SENDER'S FAX NUMBER |
|---|---|
| **Wire Instruction** | (212) 745-1651 |

---

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

---

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **November 12, 2002**:

FROM:
| | |
|---|---|
| Bank: | US Bank – Minneapolis, MN |
| Account #: | 33398730 |
| Account Name: | DZ Bank AG, as Collateral Agent for Certain Secured Parties |
| **Amount:** | **$34,203.33** |

TO:
| | |
|---|---|
| Bank: | Bank of America Dallas, Texas |
| ABA#: | 111-000-012 |
| Account #: | Redacted- Confidential |
| Account Name: | Royal and Sun Alliance |
| Reference: | Opportunity Finance |

Should you have any questions or require further information, please do not hesitate to contact me.

Regards,

*Stacey*

---

### 609 FIFTH AVENUE
### NEW YORK, NY 10017

DZB009238



# DZ BANK

### A S S E T   S E C U R I T I Z A T I O N   G R O U P

---

### FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Toby Robillard | Stacey Rolsing |

| COMPANY | DATE |
|---|---|
| US Bank | Tuesday, November 12, 2002 |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER |
|---|---|
| 651-244-1797 | 1 |

| PHONE NUMBER | SENDER'S PHONE NUMBER: |
|---|---|
| 651-244-1171 | (212) 745-1669 |

| RE: | SENDER'S FAX NUMBER |
|---|---|
| **Wire Instruction** | (212) 745-1651 |

---

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

---

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **November 12, 2002**:

> FROM:
> Bank:            US Bank – Minneapolis, MN
> Account #:       33398730
> Account Name:    DZ Bank AG, as Collateral Agent for Certain Secured Parties
> **Amount:**      **$201,185.69**
>
> TO:
> Bank:            Bank of New York
> ABA#:            021-000-018
> Account #:       [Redacted- Confidential]
> Account Name:    DZ Bank – New York
> Reference:       Opportunity Finance Remittance

Should you have any questions or require further information, please do not hesitate to contact me.

Regards,

*Stacey*

---

### 609 FIFTH AVENUE
### NEW YORK, NY 10017

DZB009239



# Fax

**TO:** Shana Bloom

**COMPANY:** US Bank

**FAX #:** (651) 244-1797

**# OF PAGES:** 4

**RE:** Opportunity Finance

| | | |
|---|---|---|
| ❑ | **Kenneth Bradt** | **212-745-1655** |
| ❑ | **Fran Farragher** | **212-745-1667** |
| ❑ | **Kevin Healey** | **212-745-1663** |
| ❑ | **Daniel Marino** | **212-745-1664** |
| ❑ | **Christine Ogden** | **212-745-1656** |
| ❑ | **Mark Parsa** | **212-745-1666** |
| ❑ | **Michael Plunkett** | **212-745-1658** |
| ❑ | **Patrick Preece** | **212-745-1665** |
| ❑ | **Stacey Rolsing** | **212-745-1669** |
| ❑ | **Vincent Salerno** | **212-745-1659** |
| ❑ | **Jennifer Wikoff** | **212-745-1661** |
| ❑ | **Richard Wisniewski** | **212-745-1662** |

# EXHIBIT T-20C



# DZ BANK

### ASSET SECURITIZATION GROUP

#### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO<br>Toby Robillard | FROM<br>Stacey Rolsing |
| COMPANY.<br>US Bank | DATE<br>Wednesday, October 09, 2002 |
| FAX NUMBER.<br>651-244-1797 | TOTAL NO. OF PAGES INCLUDING COVER<br>1 |
| PHONE NUMBER<br>651-244-1171 | SENDER'S PHONE NUMBER<br>(212) 745-1669 |
| RE<br>**Wire Instruction** | SENDER'S FAX NUMBER<br>(212) 745-1651 |

☐ URGENT    ☑ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **October 10, 2002**:

FROM:

| | |
|---|---|
| Bank: | US Bank – Minneapolis, MN |
| Account #: | 33398730 |
| Account Name: | DZ Bank AG, as Collateral Agent for Certain Secured Parties |
| **Amount:** | **$194,695.83** |

TO:

| | |
|---|---|
| Bank: | Bank of New York |
| ABA#: | 021-000-018 |
| Account #: | [Redacted- Confidential] |
| Account Name: | DZ Bank – New York |
| Reference: | Opportunity Finance Remittance |

Should you have any questions or require further information, please do not hesitate to contact me.

Regards,

*Stacey*

### 609 FIFTH AVENUE
### NEW YORK, NY 10017

DZB009290



# DZ BANK

### ASSET SECURITIZATION GROUP

---

### FACSIMILE TRANSMITTAL SHEET

---

| TO | FROM |
|---|---|
| Toby Robillard | Stacey Rolsing |
| **COMPANY** | **DATE** |
| US Bank | Wednesday, October 09, 2002 |
| **FAX NUMBER** | **TOTAL NO. OF PAGES INCLUDING COVER** |
| 651-244-1797 | 1 |
| **PHONE NUMBER** | **SENDER'S PHONE NUMBER** |
| 651-244-1171 | (212) 745-1669 |
| **RE:** | **SENDER'S FAX NUMBER** |
| **Wire Instruction** | (212) 745-1651 |

---

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **October 10, 2002**:

> FROM:
> Bank:               US Bank – Minneapolis, MN
> Account #:          33398730
> Account Name:       DZ Bank AG, as Collateral Agent for Certain Secured Parties
> **Amount:**         **$33,100.00**
>
> TO:
> Bank:               Bank of America Dallas, Texas
> ABA#:               111-000-012
> Account #:          Redacted- Confidential
> Account Name:       Royal and Sun Alliance
> Reference:          Opportunity Finance

Should you have any questions or require further information, please do not hesitate to contact me.

Regards,

*Stacey*

---

### 609 FIFTH AVENUE
### NEW YORK, NY 10017

DZB009291



# DZ BANK

## ASSET SECURITIZATION GROUP

### FACSIMILE TRANSMITTAL SHEET

| TO | FROM |
|---|---|
| Toby Robillard | Stacey Rolsing |

| COMPANY | DATE |
|---|---|
| US Bank | Wednesday, October 09, 2002 |

| FAX NUMBER | TOTAL NO. OF PAGES INCLUDING COVER |
|---|---|
| 651-244-1797 | 1 |

| PHONE NUMBER | SENDER'S PHONE NUMBER |
|---|---|
| 651-244-1171 | (212) 745-1669 |

| RE | SENDER'S FAX NUMBER |
|---|---|
| **Wire Instruction** | (212) 745-1651 |

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

notes/Comments:

Toby,

Pursuant to the Section 2.05 of the Receivables Loan and Security Agreement, dated as of December 28, 2001, among Opportunity Finance Securitization LLC, as Borrower, Opportunity Finance LLC, as Servicer, Autobahn Funding Company L.L.C., as Lender, DZ Bank as Administrative and Liquidity Agent and US Bank Trust, N.A. as Collateral Agent, Please make the following funds transfer on **October 10, 2002**:

<u>FROM:</u>

| | |
|---|---|
| Bank: | US Bank – Minneapolis, MN |
| Account #: | 33398730 |
| Account Name: | DZ Bank AG, as Collateral Agent for Certain Secured Parties |
| **Amount:** | **$38,508.75** |

<u>TO:</u>

| | |
|---|---|
| ABA#: | 091-000-022 |
| Account #: | ████████-4888 |
| Account Name: | Opportunity Finance, LLC |
| Reference: | Servicing Fee |

Should you have any questions or require further information, please do not hesitate to contact me.

Regards,

*Stacey*

609 FIFTH AVENUE
NEW YORK, NY 10017

DZB009292

## Fax Coversheet

**DZ BANK**

**Attention:** **Toby Robillard**
Assistant Vice President
US Bank

| | |
|---|---|
| DZ BANK AG | Telephone (212) 745 1400 |
| New York Branch | Telefax (212) 745 1550 |
| 609 Fifth Avenue | SWIFT – Code GENOUS 33 |
| New York, NY 10017 -1021 | Email: new york@dzbank.de |

Telephone: (651) 244-1171
Telefax: **(651) 244-1797**

Pages: (incl. cover) 4

**From:**
**Stacey L. Rolsing**
Assistant Treasuer
Asset Securitization
Direct Tel (212) 745-1669
Direct Fax **(212) 745-1651**
stacey.rolsing@dzbank.de

**Reference: Monthly Remittance Transfers**

Wednesday, October 09, 2002

Toby –

Following are the wire transfer instructions for *tomorrow*.

Thank you,

Stacey

DZB009293

# MEMORY TRANSMISSION REPORT

```
                                        PAGE     : 001
                                        TIME     : OCT-09-02  11:27AM
                                        TEL NUMBER1: 212 745 1651
                                        NAME     : DZ BANK - ASG
```

FILE NUMBER          :  223

DATE                 :  OCT-09 11:25AM

TO                   :  ☎916512441797

DOCUMENT PAGES       :  004

START TIME           :  OCT-09 11:25AM

END TIME             :  OCT-09 11:27AM

SENT PAGES           :  004

STATUS               :  OK

FILE NUMBER   : 223          *** SUCCESSFUL TX NOTICE ***

---

**Fax Coversheet**                    **DZ BANK**

**Attention:**   **Toby Robillard**          DZ BANK AG          Telephone  (212) 745 1400
                 **Assistant Vice President**   New York Branch      Telefax    (212) 745 1550
                 US Bank                     609 Fifth Avenue     SWIFT – Code GENOUS 33
                                             New York, NY  10017 -1021   Email:   new.york@dzbank.de

**Telephone:**   **(651) 244-1171**
**Telefax:**     **(651) 244-1797**                          From:
                                                             **Stacey L. Rolsing**
**Pages:**(incl. cover) 4                                    Assistant Treasurer
                                                             Asset Securitisation
                                                             Direct Tel   (212) 745-1669
**Reference: Monthly Remittance Transfers**   Wednesday, October 09, 2002   Direct Fax  (212) 745-1651
                                                             stacey.rolsing@dzbank.de

Toby —

*Following are the wire transfer instructions for* ***tomorrow.***

**Thank you.**

**Stacey**

DZB009294

# EXHIBIT T-21

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re | **Jointly Administered under Case No. 08-45257** |
| Petters Company, Inc., et al., | Court File No. 08-45257 |
| Debtors. | |
| | Court File Nos.: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (KHS) |
| PC Funding, LLC; | 08-45326 (KHS) |
| Thousand Lakes, LLC; | 08-45327 (KHS) |
| SPF Funding, LLC; | 08-45328 (KHS) |
| PL Ltd., Inc.; | 08-45329 (KHS) |
| Edge One LLC; | 08-45330 (KHS) |
| MGC Finance, Inc.; | 08-45331 (KHS) |
| PAC Funding, LLC; | 08-45371 (KHS) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (KHS) |
| | Chapter 11 Cases |
| | Judge Kathleen H. Sanberg |

Douglas A. Kelley, in his capacity as the
PCI Liquidating Trustee for the PCI
Liquidating Trust,

       Plaintiff,

v.                                                                    ADV. NO. 10-04301

Opportunity Finance, LLC; Opportunity
Finance Securitization, LLC; Opportunity Finance
Securitization II, LLC; Opportunity Finance
Securitization III, LLC; International Investment
Opportunities, LLC; Sabes Family Foundation; Sabes
Minnesota Limited Partnership; Robert W. Sabes;
Janet F. Sabes; Jon R. Sabes; Steven Sabes;
Deutsche Zentralgenossenschaftsbank AG; and
The Minneapolis Foundation

       Defendants.

# EXPERT REPORT OF THEODORE F. MARTENS

# CONTENTS

I.    MY QUALIFICATIONS .......................................................................................... 4

II.   PWC ENGAGEMENT ........................................................................................... 4

III.  EXECUTIVE SUMMARY ...................................................................................... 6

   A.   Analysis of Transfers to DZ Bank............................................................... 6

   B.   Potential Sources of Funds Transferred to DZ Bank ................................. 11

   C.   Financial Condition of PCI and PC Funding at the Time of the Transfers to DZ Bank 11

IV.   DOCUMENTS CONSIDERED ........................................................................... 12

V.    THE PETTERS PONZI SCHEME ..................................................................... 14

   A.   Existence of a Ponzi Scheme ...................................................................... 14

   B.   Overview of the Petters Ponzi Scheme ....................................................... 16

   C.   Procedures Performed to Identify Entities that Received Transfers in Furtherance of the Petters Ponzi Scheme........................................................................................ 17

   D.   Procedures Performed to Calculate the Net Cash Position of PCI Investors ................ 18

VI.   PROCEDURES PERFORMED TO QUANTIFY TRANSFERS TO DZ BANK ................ 23

   A.   Notes between PC Funding/SPF Funding and Opportunity Finance ............................ 23

   B.   Note-related Transfers between PCI and PC Funding .................................................. 25

   C.   Transfers from PC Funding to DZ Bank........................................................................ 27

   D.   Loan Advances and Borrowing Base Surplus Transfers from DZ Bank ....................... 27

   E.   Other Transfers to/from the DZ Bank Collection Account............................................ 32

   F.   Other Payments to DZ Bank ......................................................................................... 34

VII.  CASH TRACING ANALYSIS .............................................................................. 34

   A.   Procedures Performed to Assess the Potential Sources of Funds Transferred from PCI to PC Funding ......................................................................................................... 34

   B.   Assessment of the Potential Sources of Funds Transferred from PCI to PC Funding... 38

**VIII.**     ANALYSIS OF PCI'S AND PC FUNDING'S FINANCIAL CONDITION AT THE

  TIME OF THE TRANSFERS TO DZ BANK ...................................................... 41

**A.**     Overview of Methodology ............................................................... 41

**B.**     Procedures Performed with Respect to PCI ..................................... 42

**C.**     Procedures Performed with Respect to PC Funding ........................ 42

**IX.**   OTHER ANALYSES PERFORMED ..................................................................... 43

**A.**     Inter-relatedness of PCI and PCI's SPEs ......................................... 43

**B.**     Prior Analyses Performed with Respect to Creditors....................... 45

**X.**   EXPERT OPINION .............................................................................................. 55

## I.  MY QUALIFICATIONS

1.      I am a retired PricewaterhouseCoopers LLP ("PwC" or "we or "our") partner working under an extension to perform client consulting services in the Forensics practice at PwC. I am the partner who was assigned responsibility for the forensic and accounting investigation performed by PwC of the matters related to Petters Company, Inc. ("PCI"), Petters Group Worldwide, LLC ("PGW"), Thomas J. Petters ("Petters"), and affiliated and related entities (collectively, the "Petters Entities") beginning in 2008.  All work in connection with this matter has been performed under my review and supervision.  I have continued to work on this assignment, along with members of the original engagement team, since retiring from PwC in 2012.

2.      I have been a Certified Public Accountant since 1981, and I also possess the American Institute of Certified Public Accountants Financial Forensics Certificate.  During the course of my professional career, I have audited many public and private companies including tobacco and food manufacturers, insurance companies, private and trust banks, securities brokerages and options dealers, and law firms.  Since 1994, I have served as a member of the faculty of The National Judicial College.  In this capacity I teach accounting, auditing, and other financial statement related topics to Federal and State Court Judges.  I have worked on many fraud investigations during my career, including fraud involving Ponzi schemes.  My curriculum vitae is attached to this report as Exhibit A.

## II.  PWC ENGAGEMENT

3.      PwC was retained by Douglas A. Kelley ("Kelley") of the law firm Kelley, Wolter & Scott, P.A., in November 2008 to assist in his former role as the court-appointed Receiver of

Petters and Petters related entities (the "Receiver").  PwC was engaged to perform various forensic

accounting and tax-related services in connection with the massive fraud and Ponzi scheme

designed and orchestrated principally by Petters and business organizations that he controlled (the

"Petters Ponzi Scheme").  In September 2010, PwC was engaged by Kelley in his former role as

the court-appointed Chapter 11 Trustee (the "Trustee") of PCI and related entities.  The services

to be provided to the Trustee were a continuation of those provided to the Receiver.  Following

the April 15, 2016 order confirming the Second Amended Chapter 11 Plan of Liquidation, PwC

was engaged by Kelley, in his role as Liquidating Trustee of the PCI Liquidating Trust (the

"Liquidating Trustee"), to continue performing forensic accounting related services and to provide

expert services and testimony in connection with ongoing adversary proceedings.  My hourly rate

is $650.

    4.    The scope of PwC's services is more thoroughly described in the PwC Interim

Report, filed with the Court on December 15, 2010 (the "Interim Report") (Case No. 08-45257,

Docket No. 808).  Among the services PwC provided the Trustee in connection with the Petters

Ponzi Scheme was to identify the individuals and entities that advanced funds to PCI and related

entities in the course of the Ponzi scheme and to determine the transfers PCI made to these and

other individuals and entities in furtherance of the Ponzi scheme.  The process PwC undertook to

identify these persons and entities and to determine the transfers made to them in furtherance of

the Ponzi scheme is discussed in the Interim Report and my Affidavit regarding (1) the Existence

of the Petters Ponzi Scheme and (2) the Identification of Persons and Entities that Received

Transfers in Furtherance of the Ponzi Scheme filed in the private investor proceedings (the

"Martens Ponzi Affidavit").[1]

5.    I also testified on behalf of the Trustee at the evidentiary hearing on the Trustee's motion for substantive consolidation of PCI and PCI's special purpose entities ("SPEs") in the Debtors' bankruptcy proceeding, Case No. 08-45257, on December 12 and 13, 2011.  In addition, I testified on behalf of the Trustee at the hearing on the Trustee's request for substantive consolidation of PCI and PGW on April 12, 2016.  At the evidentiary hearings, I offered my opinion that Petters ran a Ponzi scheme and described my assessment of the factors that Courts may consider when ordering the substantive consolidation of the Debtors.

6.    PwC's services were performed and this report was prepared solely in connection with the above-captioned proceeding.  PwC performed the services and developed the report for the use and benefit of the Liquidating Trustee and disclaims any contractual or other responsibility to others based on their access to or use of this report and the information contained herein.  Our work was limited to the procedures and analyses described herein and was based only on the information made available through April 25, 2019.  Accordingly, changes in circumstances after this date could affect the findings outlined in this report.

### III.    **EXECUTIVE SUMMARY**

####      **A.    Analysis of Transfers to DZ Bank**

7.    With respect to the above referenced adversary proceeding, I was asked to quantify and identify the source of payments made to Defendant Deutsche Zentralgenossenschaftsbank AG ("DZ Bank") in furtherance of the Petters Ponzi Scheme.  Specifically, I was tasked with

---

[1] The Martens Ponzi Affidavit was filed in connection with several Private Investor (as defined in the Interim Report) adversary proceedings.  See, for example, the adversary proceeding involving defendant Alan Charap (Adv. No. 10-04229, Docket No. 17).

identifying transfers to DZ Bank made in connection with the financial relationship existing between DZ Bank, Opportunity Finance, LLC ("Opportunity Finance"), and Opportunity Finance Securitization, LLC ("Opportunity Finance Securitization") under the Receivables Loan and Security Agreement ("RLSA") dated December 28, 2001.[2]

8.     Under the terms of the RLSA, Opportunity Finance and Opportunity Finance Securitization could borrow funds from DZ Bank to either "fund or refinance the advance of a portion of the Opportunity Loan [(as defined in the RLSA)] related thereto."[3]   Accordingly, DZ Bank provided funds that were applied toward the principal investment amounts on a number of promissory notes executed between Opportunity Finance and one of PCI's special purpose entities ("SPEs"), PC Funding, LLC ("PC Funding").   DZ Bank received direct payments from PC Funding upon the maturity of these PC Funding notes and certain notes executed between Opportunity Finance and another PCI SPE, SPF Funding, LLC ("SPF Funding").

9.     According to the RLSA and Term Sheet (as defined later in this report), the maximum facility amount was $100,000,000.00 and the minimum amount of each individual loan was $1,000,000.00.[4]   Borrowings were requested by written Notices of Borrowing[5], copies of which were identified in the DZ Bank document production.   The DZ Bank document production also contained copies of Borrowing Base Certificates (as defined in the RLSA) prepared in connection with each borrowing.   The Borrowing Base Certificates included the following information relevant to this analysis: (1) Loans Requested by Borrower, (2) Reinvestment

---

[2] Additional parties to the RLSA included Autobahn Funding Company, LLC ("Autobahn"), Royal Indemnity Company, and U.S. Bank National Association.  See DZB003396.
[3] See DZB003431, Section 2.01(b).
[4] See DZB000497 and DZB003431, Section 2.01.
[5] See DZB003432, Section 2.02(b).

Withdrawals[6], and (3) Release of Borrowing Base Surplus to the Borrower[7].  As further described

in this report, PwC relied on available bank transaction data, Notices of Borrowing, Borrowing

Base Certificates, and additional supporting documentation identified in the DZ Bank production

in order to quantify total transfers to DZ Bank.

10.     Based on the analyses described in the subsequent paragraphs, PwC determined

that PC Funding transferred $776,409,483.50 to the DZ Bank Collection Account (as defined later

in this report) on account of the DZ Bank Related Notes (as defined later in this report).   In

connection with these notes, PC Funding received a total of $626,020,625.00 directly from DZ

Bank ($44,794,750.00 from DZ Bank/Autobahn and $581,225,875.00 from the DZ Bank

Collection Account).   The net transfers from PC Funding to DZ Bank, accordingly, total

$150,388,858.50.  In connection with the RLSA, DZ Bank transferred additional loan amounts

totaling $58,505,250.00 to Opportunity Finance ($54,505,250.00 from DZ Bank/Autobahn and

$4,000,000.00 from the DZ Bank Collection Account) and additional loan amounts totaling

$879,375.00 to Opportunity Finance Securitization.  The Opportunity Finance entities, however,

transferred a net of only $20,979,375.00 to PC Funding (consisting of $26,879,375.00 transferred

from the Opportunity Finance entities to PC Funding less $5,900,000.00 transferred from PC

Funding to Opportunity Finance Securitization).  If the net transfers from the Opportunity Finance

entities to PC Funding are included with amounts that DZ Bank transferred to PC Funding, then

net transfers from PC Funding to DZ Bank total $129,409,483.50.   Of the $776,409,483.50

transferred to DZ Bank from PC Funding, $716,000,000.00 was on account of principal under the

DZ Bank Related Notes, and $60,409,483.50 was on account of interest income under the DZ

---

[6] See DZB003437, Section 2.05(f).
[7] See DZB003437, Section 2.05(e).

Bank Related Notes.  A chart summarizing the flow of funds and results of the analysis performed by PwC is included in Figure 1 below, and the transfer amounts included within Figure 1 are detailed in the subsequent paragraphs and exhibits to this Expert Report:

Figure 1:



**B.      Potential Sources of Funds Transferred to DZ Bank**

11.      In addition to quantifying transfers to DZ Bank, this report addresses the essential elements regarding the absence of a reasonably equivalent value received by PC Funding for the transfers it made to DZ Bank.  In particular, to the extent Bank Data (as defined later in this report) was available, PwC analyzed each of the transfers from PC Funding to DZ Bank to determine whether the funds paid to DZ Bank were part of the rolling churn of the Petters Ponzi Scheme or, in the alternative, might be associated with real (non-fraudulent) sales transactions.

12.      To do so, PwC analyzed the transactional activity occurring on and around the dates of the transfers to DZ Bank to determine if the transfers were sourced by real sales transactions. The approach PwC undertook to trace the potential sources of funding is outlined in the subsequent paragraphs.  Based on the documentation identified and analyzed to date, PwC concluded that there is no evidence to indicate that the source of the transfers to DZ Bank related to real PCI sales transactions.  Rather, the transfers to DZ Bank appear to have been associated with the serial churn of funds observed in connection with the Petters Ponzi Scheme.

**C.      Financial Condition of PCI and PC Funding at the Time of the Transfers to DZ Bank**

13.      Further, I was asked to assess the financial condition of PCI and PC Funding at the time that PC Funding made each transfer to DZ Bank.  A separate expert report on insolvency dated October 30, 2017 has been prepared detailing the methodology, financial statement documentation considered, and related procedures employed in support of my opinions regarding the financial condition of PCI as of each year-end (my "Insolvency Expert Report").  In summary, it is my opinion that PCI was insolvent by December 31, 1996 at the latest and never emerged

from insolvency. Therefore, PCI was insolvent throughout the duration of the transfers to DZ Bank. Although not directly related to this particular matter, I also opined that PGW was insolvent by December 31, 2002 at the latest and never emerged from insolvency.

14.     I have also assessed the financial condition of PC Funding to determine whether PC Funding was insolvent on the dates of each transfer to DZ Bank. The methodology, financial statement documentation considered, and related procedures employed in connection with this analysis are described further in this report. In summary, it is my opinion that PC Funding was insolvent by January 7, 2002 at the latest and never emerged from insolvency through December 31, 2003, the date of the last PC Funding balance sheet analyzed. Therefore, PC Funding was insolvent throughout the duration of the transfers to DZ Bank. And even ignoring corporate separateness between the above entities, considered together, they were insolvent by January 7, 2002 at the latest and never emerged from insolvency through December 31, 2003.

**IV.     DOCUMENTS CONSIDERED**

15.     To quantify and identify the source of transfers to DZ Bank, PwC leveraged the extensive inventory of available bank statements, cancelled checks, deposit slips, intra-bank account transfers (i.e., transfers between different bank accounts at the same banking institution) and/or wire transfer details (collectively defined as "Bank Data"), accounting record data, hard copy documentation, and electronically stored information that has been collected and preserved throughout the duration of the Petters proceedings. The breadth and extent of PwC's information gathering and preservation efforts is more fully discussed in the Interim Report at paragraphs 60-121. A subset of paragraphs 60-121, which have been revised to include additional information gathered by PwC subsequent to the preparation of the Interim Report, can be found in Appendix 1

of the Martens Ponzi Affidavit. PwC also considered relevant documentation produced to the Liquidating Trustee by DZ Bank in connection with this adversary proceeding (i.e., Bates ranges DZB000001 – DZB224449).

16.     In forming my opinions regarding the transfers and source of funds transferred to DZ Bank, I considered documents and information relevant to this adversary proceeding including, but not limited to, the following:

a.   Available Bank Data for accounts held by PCI, PC Funding, and DZ Bank, including: (1) PCI Account Number 1959018 at M&I Bank (the "PCI M&I Account"), (2) PC Funding Account Number 33398720 at US Bank (the "PC Funding Collection Account"), and (3) DZ Bank Account Number 33398730 at US Bank (the "DZ Bank Collection Account");

b.   The Receivables Loan and Security Agreement (previously defined as the "RLSA") dated December 28, 2001 found in the DZ Bank document production;[8]

c.   The Opportunity Finance, LLC Commercial Paper Revolving Warehouse Facility Preliminary Term Sheet ("Term Sheet") dated October 12, 2001 found in the DZ Bank document production;[9] and

d.   Borrowing Base Certificates, Notices of Borrowing, Commercial Paper Remittance Reports, and DZ Bank Monthly Fee Statements found in the DZ Bank document production.[10]

---

[8] See DZB003396 - DZB003499.
[9] See DZB000496 - DZB000511.
[10] Bates numbers of the specific documents relied upon and considered are incorporated by reference within the body of and exhibits to this Expert Report.

17.     To assess PCI's financial condition at the time of each transfer to DZ Bank, PwC considered the documentation referenced in my Insolvency Expert Report.   To assess PC Funding's financial condition at the time of each transfer to DZ Bank, PwC considered QuickBooks financial statements (i.e., balance sheets) generated as of December 31, 2001, January 7, 2002 (i.e., the date of the first PC Funding note), December 31, 2002, and December 31, 2003, which reflected PC Funding's assets (both fraudulent and non-fraudulent) and liabilities (collectively the "PC Funding Balance Sheets").

## V.     THE PETTERS PONZI SCHEME

### A.     Existence of a Ponzi Scheme

18.     A Ponzi scheme is an investment fraud in which returns to existing investors are paid with money from new investors or the same investor.   Typically, investors are enticed with promises of abnormally high or fast returns with little or no risk.   In such a scheme, the perpetrators of the fraud generally focus on obtaining new investments to make required payments to earlier stage investors and to fund their personal expenses.   Other common attributes of entities engaged in a Ponzi scheme include:   legitimate business activity generating operating losses and negative cash flows;   failure to prepare financial statements;   economically interdependent operations evidenced by significant intercompany cash transfers;   and sustained activities that are highly dependent on an increasing supply of funds.

19.     In the Interim Report and Martens Ponzi Affidavit, I opined that Petters ran a Ponzi scheme.   There were numerous indicators that Petters ran a Ponzi scheme.   These indicators are further described in the Interim Report, the Martens Ponzi Affidavit, and are summarized below:

     a.   A large portion of the money raised by and invested in PCI went directly to two

"vendors" who purported to supply the merchandise: Nationwide International Resources ("NIR") and Enchanted Family Buying Company ("Enchanted"). Neither of these entities ever actually bought or sold electronic goods in the amounts indicated on the invoices and purchase orders. Rather, the principals of NIR and Enchanted, Michael Catain ("Catain") and Larry Reynolds ("Reynolds"), respectively, deducted commissions and routed substantially all of the remaining money received back to PCI, as confirmed through bank transaction activity. Both Catain and Reynolds pled guilty to crimes in connection with their involvement in the Petters Ponzi Scheme.

b.  Investments were either sent directly to PCI or funneled to PCI through the purported vendors, such as NIR and Enchanted. The pattern of paying old investment notes with funds coming in from new notes existed throughout the time-frame during which transactional bank activity is available.

c.  PwC noted that the PCI M&I Account had substantial daily cash transactions but minimal daily balances. It was common to have tens of millions of dollars being deposited into the PCI M&I Account on any given day, and to have those funds withdrawn the same day or on the following day.

d.  Another factor evidenced in the Petters Ponzi Scheme, which is consistent with that of other Ponzi schemes, is unreasonably high rates of return promised to investors. The interest rates on the notes with respect to a particular investor were typically higher in the earlier years of the Petters Ponzi Scheme and slowly declined over time.

e.  PwC identified multiple instances in which investors rolled their investments into new notes with PCI, rather than receiving payments of principal and interest upon maturity of notes.  This enabled PCI to substantially reduce the amount of money needed to pay off existing notes and better manage its cash flow, thus enabling the furtherance of the Petters Ponzi Scheme.  Deanna Coleman ("Coleman") testified that she or Petters called investors to ask them to roll their notes.[11]  The rolling of notes continued throughout the duration of the Petters Ponzi Scheme.

**B.**     **Overview of the Petters Ponzi Scheme**

20.     PCI originally engaged in financing activities substantiated by promissory notes (both secured and unsecured) with individuals, entities, or investment funds ("Private Investors"). Although the level of promissory note documentation varied among the Private Investors, the substance of the notes was in large part the same.   Promissory notes typically contained information including the following: note number, start date, amount, borrower, holder, interest/profit sharing amount or rate, and maturity date.  The amount of documentation varied by promissory note as (1) some notes were personally guaranteed by Petters, (2) some notes were documented as secured with the underlying inventory purportedly purchased with the borrowed funds, and (3) some notes had purchase orders from PCI to the vendor (e.g., NIR or Enchanted) and from the customer (e.g., Costco) to PCI attached as additional documentation.

21.     In 2001, the PCI financing model shifted toward large, investment funds (one of which was Opportunity Finance).  Petters formed eight special purpose entities (SPEs) to serve as pass-through entities for the financing activities of these large investment funds, seven of which

---

[11] Deanna Coleman trial transcript dated November 2, 2009, at 648:4-23.

16

were structured as subsidiaries of PCI: (1) MGC Finance, Inc.; (2) PL Ltd., Inc. ("PL Ltd.");[12] (3) SPF Funding, LLC; (4) PC Funding, LLC; (5) Edge One, LLC ("Edge One"); (6) PAC Funding, LLC ("PAC Funding"); (7) Thousand Lakes, LLC ("Thousand Lakes"); and (8) Palm Beach Finance Holdings, Inc. ("Palm Beach").[13]   The SPEs were formed at various points in time and each SPE was aligned with a specific investment fund.  For example, SPF Funding and PC Funding were the SPEs aligned with Opportunity Finance.  All cash funding from and payments to Opportunity Finance (and DZ Bank) were solely processed through SPF Funding and PC Funding.

**C.**      **Procedures Performed to Identify Entities that Received Transfers in Furtherance of the Petters Ponzi Scheme**

22.      The timeline of activity for each SPE ranged between 2001 and 2008.  Investment funds financed a percentage of up to 100% of the purported inventory transaction, while PCI financed the remaining portion, if any, of the purported transaction.  A purported transaction typically included a purchase order from PCI to a vendor, and then another purchase order from a "big box" retailer to PCI.  Promissory notes detailed the financing amount, start date, maturity date, borrower (i.e., SPE), and lender/holder (i.e., investor).  Similar to some Private Investors, the SPE promissory notes were documented to be secured with the underlying electronics inventory purportedly purchased with the investor's cash funding.

23.      The purchase orders for the purported transactions often contained identical information.  As such, the electronics inventory purportedly purchased from NIR, Enchanted and

---

[12] PL Ltd., Inc. was used twice throughout the duration of the Petters Ponzi Scheme.  For the period 2001 - 2007, it was utilized for the investments of Epsilon Investment Management, LLC; during 2008, it was utilized for the investments of the Elistone Fund.

[13] Palm Beach Finance Holdings, Inc. was owned 100% by Petters.

other vendors was the same inventory purportedly sold to a retailer. Exhibit 34 of the Interim Report provides examples of two purchase orders – one from PCI to the vendor and one from the customer to PCI. A review of SPE promissory notes, Petters Entities company records ("Company Records"), and bank transaction activity indicated that potential vendors included, but were not limited to: (1) NIR; (2) Enchanted; (3) After the Second Millennium; (4) Apex Digital; (5) Universal Capital, Inc. ("Universal Capital"); (6) International Buying Service, Inc.; (7) Lectronix; (8) Nationwide Gig; (9) PAR Group/DRP; (10) Universal Assets, LLC; and (11) Chicago Buying Company.

24.     PwC performed detailed analyses for each investment fund and associated SPE in order to quantify the Net Cash Position of each investor. Net Cash Position is defined as cash in (principal amounts invested) less cash out (payments, including principal, interest, and commissions, if applicable).

**D.     Procedures Performed to Calculate the Net Cash Position of PCI Investors**

25.     The following procedures were performed for each SPE in order to analyze and report on each investor's Net Cash Position:

> a.  PwC conducted informational interviews with Petters Entities personnel to better understand the SPE process and available documents.
>
> b.  PwC analyzed notes tracking spreadsheets created and updated by PCI personnel for each SPE. Exhibit 35 of the Interim Report provides an example of a spreadsheet created and updated by PCI personnel for a SPE.
>
> c.  PwC analyzed PCI QuickBooks accounting data, specifically cash, notes payable, accrued interest, accounts receivable, sales, and cost of goods sold.

18

Though the accounting data provided useful information, PwC did not rely solely on accounting records as the information was often incomplete, inaccurate, and aggregated by account rather than by SPE.

d. PwC performed targeted searches in the Stratify Legal Discovery Service ("Stratify") database (as further described in the Interim Report) to identify promissory notes not tracked by PCI personnel. The document repository hosted by Stratify has since been transferred to and is currently hosted in the Micro Focus platform.

e. PwC analyzed investor records received from Lancelot Investment Management, LLC ("Lancelot") and Epsilon Investment Management, LLC ("Epsilon"), which tracked notes payable activity with PCI. PCI personnel provided the records that were received from these investors.

f. PwC reviewed spreadsheets created and updated by Coleman to track activity for the PCI M&I Account. Exhibit 36 of the Interim Report provides an example of a spreadsheet created and updated by Coleman.

g. PwC developed a semi-automated process to trace the notes payable information identified above to the available bank transaction data. The methodology relied on a number of factors including dates, amounts, Payors, and Payees. The results of this process were further analyzed to determine the reliability of the matched transactions. Refer to the Interim Report (paragraphs 87-100) for further details.

h. In tracing investments and payments, PwC identified Payor and Payee

19

combinations and then searched the Bank Data to identify transactions with the same Payor/Payee combinations not previously captured in another SPE analysis.  PwC conducted targeted searches within Stratify to identify the purposes of these transactions.

    i.   PwC reviewed the promissory notes to confirm the start date, maturity date, amount, and interest rate for each note identified.

26.    Exhibit 37 of the Interim Report provides a general overview of the process utilized to achieve the objectives described in the preceding paragraph.  The information contained within Company Records was traced to bank transaction activity to the extent available in order to report the volume and amounts of financing and payments for each investor.

27.    While preparing the notes payable analyses for each SPE, PwC gained an understanding of the note-related flow of funds used in connection with each SPE, as well as the specific bank accounts involved.  The flow of funds varied in level of complexity among the SPEs and oftentimes different flows were utilized for the same SPE over the years.  Although there were variations, the general flow of funds was as follows:

Figure 2:



a.  Step 1: Typically the investor sent funds to a SPE bank account (refer to

Step 1 in Figure 2 above).  Each of the SPEs had a bank account(s)

("Restricted  Account")  that  was  used  for  cash  receipts  and

disbursements.  These Restricted Accounts were most often controlled by

the investors, not Petters.  Typically, agreements[14] were executed by and among the investor (i.e., creditor), the SPE and/or PCI (i.e., customer), and the banking institution (i.e., custodian) that stipulated controls, limitations, and agreements among the parties regarding the Restricted Account.  These agreements set forth the general procedures by which deposits could be made into, and funds withdrawn from, the respective Restricted Accounts.  In general, these agreements stipulated that the investor had full control of the account and that funds deposited into the Restricted Account could only be disbursed to, at the direction of, or with the approval of, the investor or its Administrative Agent, if applicable.

b.  Step 2: Typically, funds were subsequently transferred by the investor from the Restricted Account to the vendor (most commonly NIR and Enchanted).  NIR and Enchanted received a commission as a percentage of each principal investment amount it received.

c.  Step 3: NIR and Enchanted often commingled funding for several inventory transactions and sent the aggregate amount (funding less commission) to PCI.

d.  Step 4: When the promissory note matured, PCI made payment(s) to the investor controlled Restricted Account for the sales amount (the amount purportedly paid by the "big box" retailer for the electronics

---

[14] Agreement types included Depository Account Pledge Agreement, Account Control Agreement, Deposit Pledge and Account Control Agreement, Blocked Account Agreement, Lockbox Account Agreement, and Collateral Account Agreement.

inventory).  However, the funds all came from PCI, and there was no

evidence of any payments from "big box" retailers.  As the investors

controlled the accounts, they knew that all transfers came from PCI.

e.   Step 5: The amount referenced in Step 4 was usually greater than the

principal and accrued interest due on the note, and did not originate from

the intended retailer source as contemplated by the transaction structure.  As

a result, the investor withdrew funds from the Restricted Account in the

amount of the principal and accrued interest on the note.

f.   Step 6: The difference between the amount transferred by PCI to the

Restricted Account and the amount withdrawn by the investor as repayment

of principal and interest was returned to PCI as the purported "profit"

associated with the purported transaction on which the note was based.  As

the Restricted Accounts were controlled by the investors, the transfer from

PCI to the SPE's Restricted Account was a transfer made by PCI to the

investor.

## VI.   PROCEDURES PERFORMED TO QUANTIFY TRANSFERS TO DZ BANK

28.    With respect to this DZ Bank adversary proceeding, I was asked by the Liquidating

Trustee and his counsel to quantify and identify the source of payments made to DZ Bank in

furtherance of the Petters Ponzi Scheme.  Included below are the procedures performed in order

to quantify transfers to DZ Bank.

### A.    Notes between PC Funding/SPF Funding and Opportunity Finance

29.    As described above, Petters formed eight special purpose entities (SPEs), seven of

which were owned 100% by PCI,[15] to serve as pass-through entities for the financing activities of several large investment funds. PC Funding was formed on December 17, 2001 as a SPE through which Opportunity Finance invested in PCI. Opportunity Finance's initial investment in PCI through PC Funding was on January 7, 2002 (ten days after the execution of the RLSA with DZ Bank). In total, 546 notes were executed between Opportunity Finance and PC Funding, with 542 notes paid in full and four notes open as of September 30, 2008. Annual interest rates on these notes ranged from 14% to 30%, with investment amounts ranging from $1.2 million to $5.9 million. Of the 546 PC Funding notes, 204 notes were funded (either wholly or in part) by transfers from DZ Bank. Further, upon the maturity of the 204 notes funded by DZ Bank, the payments of principal and interest were transferred directly to DZ Bank through PC Funding's bank account.

30.     Prior to the formation of PC Funding, Opportunity Finance invested in PCI through another SPE, SPF Funding. SPF Funding was formed on March 14, 2001 under the name Petters Finance, LLC[16] and served as the vehicle for investments made by or on behalf of Opportunity Finance, the Sabes Family Foundation, and the Minneapolis Foundation. In total, 167 notes were executed between the various parties and SPF Funding, until investing ceased in 2007. Opportunity Finance's initial investment in PCI through SPF Funding was on May 11, 2001, and continued through March 14, 2005. Annual interest rates on the Opportunity Finance notes were as high as 42% in 2001, and declined over time to 14%, with individual investments ranging from $900,000 to $6 million. In total, Opportunity Finance, the Sabes Family Foundation, and the Minneapolis Foundation contributed approximately $234.6 million to SPF Funding and received $287.3 million in principal and interest, for a net gain of approximately $52.7 million. Of the total

---

[15] One of the SPEs, Palm Beach Finance Holdings, Inc. was owned 100% by T. Petters.

[16] SPF Funding went by the name Petters Finance, LLC until October 6, 2004.

167 SPF Funding notes, none were funded by transfers from DZ Bank.  However, upon the

maturity of 28 SPF Funding notes coming due between January 2002 and April 2002, payments

on account of principal and interest under the SPF Funding notes were transferred directly to DZ

Bank through PC Funding's bank account.

31.     The flow of funds utilized by PC Funding and SPF Funding differed from the

general flow depicted in Figure 2 above, in that the transfer of the purported total cost of goods

(Step 2 above) included both the investment from Opportunity Finance and/or DZ Bank and a

portion of the cost contributed into the SPE account by PCI.  PwC did not detect any specific

pattern in the amount of PCI's contribution towards the total cost of the notes.  Refer to Exhibit B-

1 for an example of the flow of funds typically used by PC Funding.  Further, refer to Exhibit B-2

for a representative depiction of the flow of funds absent the fraudulent scheme employed by

Petters.

32.     For purposes of quantifying transfers made to DZ Bank in furtherance of the Petters

Ponzi Scheme, PwC's analysis focused only on transfers made in connection with the 204 PC

Funding and 28 SPF Funding notes for which payments were made to DZ Bank (the "DZ Bank

Related Notes").  A listing of the DZ Bank Related Notes containing note information such as start

date, maturity date, and interest rate, and a summary of note-related transfers is attached as Exhibit

C.

**B.     Note-related Transfers between PCI and PC Funding**

33.     In order to quantify and identify the source of transfers from PC Funding to DZ

Bank in connection with the DZ Bank Related Notes, PwC first quantified transfers made from

PCI to PC Funding upon the maturity of each note.  When the term of a given DZ Bank Related

Note was complete, and the payment of principal and interest was due, PCI would transfer the purported "sales proceeds" back to PC Funding.  Each individual transfer from PCI to PC Funding in connection with the DZ Bank Related Notes is listed in Exhibit D.  To prepare Exhibit D, PwC relied on (1) available bank transaction data for PCI's primary bank account at M&I Bank (Account Number 1959018) (previously defined as the "PCI M&I Account") and the PC Funding collection account established at US Bank (Account Number 33398720) (previously defined as the "PC Funding Collection Account") and (2) prior notes payable analyses performed with respect to PC Funding and SPF Funding notes as further described above and in the Interim Report.  Based on this analysis, it was determined that $861,012,666.84 was transferred from PCI to PC Funding in connection with the DZ Bank Related Notes.

34.     Any amounts transferred to the PC Funding account in excess of the principal and interest due to Opportunity Finance on each note would then be transferred back to PCI as PCI's "profit" from the purported transaction.  Each individual repayment of such "profit" from PC Funding to PCI in connection with the DZ Bank Related Notes is listed on Exhibit E.  To prepare Exhibit E, PwC once again relied on available bank transaction data for the PCI M&I Account and PC Funding Collection Account, as well as prior PC Funding and SPF Funding notes payable analyses.  Based on this analysis, it was determined that $84,151,383.34 was transferred from PC Funding back to PCI in connection with the DZ Bank Related Notes.

35.     In total, a net of $776,861,283.50 was transferred from PCI to PC Funding in connection with the DZ Bank Related Notes (i.e., $861,012,666.84 transfers to PC Funding less $84,151,383.34 repayments to PCI).

### C.        Transfers from PC Funding to DZ Bank

36.        Often on the same date as the transfer from PCI to PC Funding, the principal and interest due on each of the DZ Bank Related Notes was then transferred from PC Funding directly to DZ Bank.  PwC relied on available bank transaction data for the PC Funding Collection Account and the DZ Bank Collection Account established at US Bank (Account Number 33398730) to quantify transfers from PC Funding to DZ Bank.

37.        Based on this analysis, it was determined that $776,409,483.50 was transferred from the PC Funding Collection Account to the DZ Bank Collection Account in connection with the DZ Bank Related Notes.  Of this amount, $716,000,000.00 represented the return of principal on notes between Opportunity Finance and PC Funding/SPF Funding, and $60,409,483.50 represented interest income.  The individual transfers from PC Funding to DZ Bank are listed on Exhibit F.

### D.        Loan Advances and Borrowing Base Surplus Transfers from DZ Bank

38.        To quantify the total amount advanced from DZ Bank under the terms of the RLSA, and the method of transfer for each advance, the following procedures were performed:

    a.  PwC analyzed available bank transaction data for the PC Funding Collection Account and DZ Bank Collection Account to determine the source of the principal investments made to PC Funding in connection with each DZ Bank Related Note.

    b.  PwC conducted targeted searches on the DZ Bank document production to identify Borrowing Base Certificates prepared in connection with each of the DZ Bank Related Notes.  The Borrowing Base Certificates included the

27

following information relevant to this analysis, each of which represents a type of loan advance under the terms of the RLSA: (1) Loans Requested by Borrower, (2) Reinvestment Withdrawals, and (3) Release of Borrowing Base Surplus to the Borrower.  An example of a Borrowing Base Certificate is attached as <u>Exhibit G</u> and the remaining Borrowing Base Certificates identified and relied upon are incorporated by Bates reference within <u>Exhibits H, I, J, M, and O</u> as further described below.

c.   PwC also conducted targeted searches on the DZ Bank document production to identify relevant Notices of Borrowing and copies of faxes containing wire transfer instructions to quantify and further understand the purpose of certain loan advances from DZ Bank.  The specific documents identified and relied upon are incorporated by Bates reference within <u>Exhibits H, I, J, M, and O</u> as further described below.

d.   PwC compared the records identified in the DZ Bank document production to the available bank transaction data and determined that the records supported a consistent conclusion.   Based on this analysis, it was determined that principal investments were transferred to PC Funding in one of three ways:

i.   ***From DZ Bank (from the DZ Bank Collection Account) directly to the PC Funding Collection Account:*** PwC identified transfers totaling $581,225,875.00 from the DZ Bank Collection Account to the PC Funding Collection Account (see <u>Exhibit H</u>).

ii. ***From DZ Bank (from a DZ Bank/Autobahn account) directly to the PC Funding Collection Account:*** PwC identified transfers totaling $44,794,750.00 from a DZ Bank/Autobahn account to the PC Funding Collection Account (see <u>Exhibit I</u>).

iii. ***From DZ Bank (from a DZ Bank/Autobahn account) to Opportunity Finance, and subsequently from an Opportunity Finance or Opportunity Finance Securitization account to the PC Funding Collection Account:*** PwC identified transfers totaling $54,505,250.00 from a DZ Bank/Autobahn account to Opportunity Finance (see <u>Exhibit J</u>). Further, it was determined that at least $23,800,000.00 and $3,079,375.00 was subsequently transferred to the PC Funding Collection Account from Opportunity Finance and Opportunity Finance Securitization, respectively (see <u>Exhibit K</u>).

e. Based on this analysis, it was also determined that a total of $5,900,000.00 was transferred to the PC Funding Collection account that was not applied toward principal investments on any DZ Bank Related Notes. Based on an analysis of the relevant Borrowing Base Certificates, the total amount of $5,900,000.00 includes (1) $3,100,000.00 in excess funds received from either the DZ Bank Collection Account or another DZ Bank/Autobahn account that were not applied as principal investments on the PC Funding notes, and (2) a $2,800,000.00 Borrowing Base Surplus amount transferred to the PC Funding Collection Account as part of a larger $15,600,000.00

transfer dated 6/17/2002. As such, $5,900,000.00 was subsequently transferred from the PC Funding Collection Account to an Opportunity Finance Securitization account (see Exhibit L).

f.  PwC also identified additional transfers totaling $4,600,000.00 from the DZ Bank Collection Account to Opportunity Finance (see Exhibit M) and transfers totaling $1,500,000.00 from Opportunity Finance to the DZ Bank Collection Account (see Exhibit N). Based on an analysis of the relevant Borrowing Base Certificates, the total amount of $4,600,000.00 transferred to Opportunity Finance includes (1) a $4,000,000.00 transfer of a loan amount dated 1/8/2002 and (2) a $600,000.00 Borrowing Base Surplus transfer dated 1/25/2002. Based on an analysis of the relevant Borrowing Base Certificates, the total amount of $1,500,000.00 transferred to the DZ Bank Collection Account includes (1) an $879,375.00 transfer of a loan amount dated 1/24/2003 and (2) a $620,625.00 Borrowing Base Surplus transfer dated 1/23/2003, both of which appear to be related to a $1,500,000.00 transfer from the DZ Bank Collection Account to Opportunity Finance Securitization on 1/23/2003 (included in Exhibit O).

g.  PwC also identified additional transfers totaling $89,866,778.94 from the DZ Bank Collection Account to Opportunity Finance Securitization (see Exhibit O) and transfers totaling $4,000,000.00 from Opportunity Finance Securitization to the DZ Bank Collection Account (see Exhibit P). Based on an analysis of the relevant Borrowing Base Certificates, the

$89,866,778.94 transferred to Opportunity Finance Securitization consisted of $88,987,403.94 in Borrowing Base Surplus transfers and $879,375.00 in Loans Requested by the Borrower. Based on an analysis of the relevant Borrowing Base Certificates, the total amount of $4,000,000.00 transferred to the DZ Bank Collection Account includes (1) a $1,000,000.00 transfer denoted as an "Other transfer into the Collection Account (OF investment)" and (2) a $3,000,000.00 transfer, which appears to have been sent by Opportunity Finance Securitization to cure a Borrowing Base Deficit existing in the DZ Bank Collection Account.

h.  In total, PwC determined that PC Funding transferred $776,409,483.50 to the DZ Bank Collection Account on account of the DZ Bank Related Notes. In connection with these notes, PC Funding received a total of $626,020,625.00 directly from DZ Bank ($44,794,750.00 from DZ Bank/Autobahn and $581,225,875.00 from the DZ Bank Collection Account). The net transfers from PC Funding to DZ Bank, accordingly, total $150,388,858.50. In connection with the RLSA, DZ Bank transferred additional loan amounts totaling $58,505,250.00 to Opportunity Finance ($54,505,250.00 from DZ Bank/Autobahn and $4,000,000.00 from the DZ Bank Collection Account) and additional loan amounts totaling $879,375.00 to Opportunity Finance's affiliate, Opportunity Finance Securitization. The Opportunity Finance entities, however, transferred a net of only $20,979,375.00 to PC Funding (consisting of $26,879,375.00

31

transferred from the Opportunity Finance entities to PC Funding less $5,900,000.00 transferred from PC Funding to Opportunity Finance Securitization).  If the net transfers from the Opportunity Finance entities to PC Funding are included with amounts that DZ Bank transferred to PC Funding, then net transfers from PC Funding to DZ Bank total $129,409,483.50.

i.  Of the $776,409,483.50 transferred to DZ Bank from PC Funding, $716,000,000.00 was on account of principal under the DZ Bank Related Notes, and $60,409,483.50 was on account of interest income under the DZ Bank Related Notes.

**E.      Other Transfers to/from the DZ Bank Collection Account**

39.     In addition to the above-described note-related activity, the DZ Bank Collection Account was also used to make subsequent transfers to DZ Bank/Autobahn accounts for the payment of principal and interest owed on the issuance of commercial paper.  PwC analyzed the available bank transaction data for the DZ Bank Collection Account and determined that $101,691,407.94 was subsequently transferred from the DZ Bank Collection Account to a DZ Bank/Autobahn account, which consisted of the repayment of commercial paper principal ($99,300,000.00), plus applicable yield ($2,391,407.94).   PwC compared the available bank transaction data to Commercial Paper Remittance reports identified in the DZ Bank document production and determined that the DZ Bank records supported a consistent conclusion.   A summary of the commercial paper principal and yield payments is attached as Exhibit Q, and the Commercial Paper Remittance reports identified and relied upon are incorporated by Bates

reference within Exhibit Q.

40.     In accordance with the terms of the RLSA, applicable margin and non-use fees were also owed to DZ Bank on a monthly basis in connection with Opportunity Finance's borrowings. PwC analyzed the available bank transaction data for the DZ Bank Collection Account and determined that $3,360,419.13 was subsequently transferred from the DZ Bank Collection Account to DZ Bank/Autobahn as payment of the applicable margin and non-use fees.  PwC compared the available bank transaction data to DZ Bank Monthly Fee Statements identified in the DZ Bank document production and determined that the DZ Bank records supported a consistent conclusion.  A summary of the applicable margin and non-use fee payments is attached as Exhibit R, and the DZ Bank Monthly Fee Statements identified and relied upon are incorporated by Bates reference within Exhibit R.

41.     A summary of the sweep activity into and out of the DZ Bank Collection Account, supporting a net incoming sweep amount of $163,038.40, is attached as Exhibit S.

42.     A summary of subsequent transfers from the DZ Bank Collection Account to other non-DZ Bank-related payees is attached as Exhibit T.  As shown in Exhibit T, DZ Bank made subsequent transfers totaling $1,328,040.89 in connection with various fees and premiums to non-DZ-Bank-related payees, including: at least $671,080.85 to Opportunity Finance representing servicing fees; at least $570,984.20 to Royal Sun Alliance representing monthly insurance premiums; at least $76,028.24 to US Bank N.A. for trust and other fees; and at least $9,947.60 to US Bank DDA as custodian supplemental fees.  For purposes of this analysis, reversals (i.e., outgoing payments where a subsequent incoming transfer was made by the recipient to reverse the outgoing payment) were excluded.

### F.      Other Payments to DZ Bank

43.      PwC conducted targeted searches in the DZ Bank document production to identify records detailing any additional payments made to DZ Bank in connection with the RLSA or DZ Bank Related Notes and identified a preliminary Term Sheet dated October 12, 2001.[17]  The Term Sheet outlines various transaction fees payable by Opportunity Finance to DZ Bank.  In certain instances, supporting documentation in the form of checks was also identified in support of payments from Opportunity Finance to DZ Bank.  The following fee types and payments from Opportunity Finance to DZ Bank, totaling $525,000.00, were identified:

| Description | Supporting Document Bates Number | Amount |
|---|---|---|
| Upfront/Structuring Fee | DZB006661 | $450,000.00[18] |
| Commitment Fee | DZB001260 | $50,000.00 |
| Due Diligence Fee | DZB000515 | $25,000.00 |
| | Total | $525,000.00 |

## VII.   CASH TRACING ANALYSIS

### A.      Procedures Performed to Assess the Potential Sources of Funds Transferred from PCI to PC Funding

44.      This section addresses the essential elements regarding the absence of a reasonably equivalent value received by the debtor for the transfer(s) it made.  In particular, PwC analyzed each payment from PCI to PC Funding made in connection with the DZ Bank Related Notes for purposes of identifying any components of payments made on debt that were contributed in connection with real consummated underlying deals, even though their financing had been

---

[17] See DZB000496 - DZB000511.
[18] Total Upfront/Structuring Fee was $500,000.00; however, the $50,000.00 Commitment Fee was applied towards the Upfront/Structuring Fee at closing per the Term Sheet, reducing the balance to $450,000.00.

obtained through the inducement of a Ponzi scheme.  In other words, PwC analyzed the sources

of the payments from PCI to PC Funding to determine whether the funds were sourced by real PCI

sales transactions.

45.    To assess whether any of the payments from PCI to PC Funding were related to

real PCI sales transactions, bank transaction data for the PCI M&I Account was identified and

compiled to prepare cash tracing analyses for each payment to the PC Funding Collection Account.

For purposes of this report, PwC did not evaluate the uses of principal investments received from

DZ Bank/Autobahn, Opportunity Finance, or Opportunity Finance Securitization in connection

with the DZ Bank Related Notes given that all principal investment funding was transferred

directly to one or more fraudulent vendors by PC Funding.

46.    The following procedures were performed to assess each transaction:

    a.  PwC analyzed all activity within the PCI M&I Account on the date of the

       payment, including (1) the amount and volume of incoming and outgoing

       transactions and (2) the beginning and ending balance of the account.  To

       the extent a positive beginning balance existed on the date of the payment,

       PwC also assessed the prior dates(s) activity to determine the sources of

       funds which comprised the beginning balance.  In addition, if the ending

       balance of the PCI M&I Account on the date of the payment was negative,

       PwC analyzed transactions occurring on subsequent date(s) to assess the

       potential source of the replenishment of the negative ending balance.

    b.  For each payment, up to five transactional days (prior and/or subsequent to

       the transaction date) were assessed when evaluating the potential sources of

the payments from PCI to PC Funding.  To the extent the bank transaction activity occurring during the five days (i.e., total "amount in" and/or "amount out"), was insufficient to determine the potential source and/or use of funds (i.e., was less than the transaction value), additional dates would have been assessed, as required.  From our experience working on the Petters engagement for over ten years, we observed that the typical churn of the Petters Ponzi Scheme was such that cash received on one day was disbursed to other investors the same day or the day after.  Thus, to the extent a comparable transaction value was identified on the same date or the date immediately prior or subsequent to the transaction being assessed, then the analysis was limited to those select dates.

47.     The bank transaction data lacked information that would allow PwC to determine the exact timing of incoming and outgoing amounts on each day.  Accordingly, transactional activity was sorted by clear date, and/or check date, incoming transactions (descending), and outgoing transactions (descending), in that order.  To account for this limitation, account activity and associated balances were assessed on a daily basis.

48.     For purposes of preparing the cash tracing analyses described above, PwC also categorized the payors/payees appearing in the PCI M&I Account based on observations made to date with respect to each payor/payee's transaction history and relationship with PCI.  Regarding any transactions categorized as intra-entity transactions (i.e., transactions to/from one PCI account to another PCI account) and/or inter-company transactions[19] (i.e., transactions between Petters-

---

[19] SPE-related inter-company activity, identified with references in the "Related Analysis" column, was excluded from the subsequent cash tracing as the transactions in those accounts all relate to SPE note transactions.

related entities) appearing on the cash tracing analyses, an additional cash tracing analysis of the intra-entity/inter-company bank account disbursing the funds to PCI was prepared (to the extent Bank Data was available).  The same procedures used to trace the payments from PCI to PC Funding were applied to the cash tracing of the intra-entity/inter-company transactions.  PwC did not prepare an intra-entity/inter-company cash tracing analysis when one of the following applied: (1) no Bank Data was available for the relevant intra-entity/inter-company account; (2) bank statements were available, but no supporting check/wire information was available to confirm payors/payees; (3) bank statements and supporting check/wire details were available, but not in a coded and traceable format; or (4) the intra-entity/inter-company transaction amount was less than ten percent of the amount of the payment from PCI to PC Funding.  PwC also did not trace intra-entity/inter-company transactions beyond three bank accounts from the PCI M&I Account.  In these instances, targeted searches were conducted in the document repository hosted by Micro Focus to determine the potential purpose of the transfer.  The transactions researched are marked with reference to a footnote describing the results of the Micro Focus searches conducted.

49.    For transactions with a payor/payee category designated as a "Vendor," "Unknown," or "Other" where PwC was unable to determine the transaction history or relationship with PCI based on historical observations, targeted searches were conducted in Micro Focus for each transaction in an attempt to identify the originating or beneficiary party and/or potential purpose of the transfer.  The transactions researched are marked with reference to a footnote describing the results of the Micro Focus searches conducted.  PwC also identified whether the transactions appearing on the schedules were part of prior analyses performed and reported on in connection with this matter.  In these instances, no additional research was deemed necessary.

**B.**     **Assessment of the Potential Sources of Funds Transferred from PCI to PC Funding**

50.     As stated above, Opportunity Finance engaged in a total of 204 promissory notes with PC Funding and a total of 28 promissory notes with SPF Funding, whereby the payment upon maturity was made to DZ Bank (previously defined as the "DZ Bank Related Notes").  In total, 233 (i.e., 205 + 28) corresponding payments were made from PCI to PC Funding in connection with the DZ Bank Related Notes (refer to Exhibit D).  The payments from PCI to PC Funding made in connection with the DZ Bank Related Notes ended in August 2003 at which time all promissory notes were paid in full.  The 233 transfers from PCI to PC Funding were each supported by available Bank Data.  As such, cash tracing analyses were prepared following the procedures outlined above.  The results of the cash tracing analyses are attached in Exhibit U.

51.     As of the date of this report, PwC has found no support to indicate that the note-related transfers from PCI to PC Funding (and ultimately from PC Funding to DZ Bank) were related to or directly or indirectly funded by any real PCI sales transactions.  As depicted in Exhibit U, the majority of transfers into the PCI M&I Account on or around the dates of the transfers to PC Funding came from other PCI SPEs, Private Investors, or fraudulent vendors (e.g., NIR or Enchanted) as part of the serial churn of the Petters Ponzi Scheme.  Any transfers into the PCI M&I Account not from the aforementioned sources were researched and, to the extent necessary, addressed in the footnotes to the Exhibit U schedules.

52.     Following the procedures described above, PwC prepared additional intra-entity/inter-company cash tracing analyses in connection with the transfers from PCI to PC Funding.  To the extent another intra-entity transaction or an inter-company transaction appeared

in the intra-entity/inter-company tracing analyses, a subsequent tracing analysis was also prepared using the same procedures described above. The results of the intra-entity/inter-company cash tracing analyses are attached as Exhibit V. To the extent intra-entity/inter-company transfers were observed in Exhibit U for which support was unavailable to perform supplemental cash tracing analyses, PwC conducted searches in Micro Focus to determine the purpose of the transfer. The results of any research performed are detailed in the footnotes to the Exhibit V schedules.

53.     On certain of the cash tracing analyses included in Exhibits U and V, PwC noted that payments from PCI to PC Funding were potentially sourced (in part) by funds received from Bullet Distribution, Inc. ("Bullet") and National Clothing Company, Inc.,[20] entities from which transfers were identified and described in the Supplemental Transfers Affidavit of Theodore F. Martens dated June 18, 2015 (the "Supplemental Transfers Affidavit")[21] as potential PCI sales transactions. Transfers from entities/individuals affiliated with the Bullet transactions, to include James Stampfel and Bright Star, were also identified. Refer to the Supplemental Transfers Affidavit paragraphs 96 – 100 for details regarding the Bullet transactions and paragraphs 78 – 86 for details regarding the Costco transactions. Based on the analyses performed in connection with the Supplemental Transfers Affidavit and the PC Funding and SPF Funding notes, PwC found no evidence that would suggest that the transfers made from PCI to PC Funding on account of the DZ Bank Related Notes were related to the Bullet or Costco sales transactions. Further, we reviewed the DZ Bank Related Notes and noted that the only retailers purportedly purchasing merchandise from PCI were BJ's, Boscov's, Rex Stores Corporation ("Rex"), and Sam's Club. None of the DZ

---

[20] National Clothing Company, Inc. is affiliated with Costco Wholesale Corporation ("Costco").
[21] The Supplemental Transfers Affidavit was filed in connection with several Private Investor (as defined in the Interim Report) adversary proceedings. See, for example, the adversary proceeding involving defendant Alan Charap (Adv. No. 10-04229, Docket No. 24).

Bank Related Notes referenced purported deals with Bullet or Costco.

54.     Other sources of funds identified in the cash tracing analyses reflected in Exhibits U and V include the following: (1) inter-company entities, such as Redtagbiz, Inc., E&M Management, Inc., Fingerhut Direct Marketing, Inc., FAC Acquisition, LLC, Petters Group Worldwide, LLC, Petters Company, LLC, 2J Group, Inc., uBid Inc., Petters International, LLC, and Aaron Chang International, LLC; (2) related party entities, such as Onka Funding & Management, LLC; (3) vendors, such as Quetico, LLC, Wanlida Corp., and Jaysport International, Inc.; and (4) other third party entities including, but not limited to, Stayhealthy, Inc., Hampshire Hills, LLC, Ciclon/Lone Star Sourcing, Technology Resource Group, Cash N Pawn, Marvin Leeds Marketing Services, LLC, and Goyal Bros, Inc.  As per the procedures described above, and when Bank Data was available, subsequent cash tracing analyses were prepared to determine the potential sources of transfers made from inter-company entities.  Subsequent cash tracing analyses prepared with respect to transfers from Redtagbiz, Inc. reflect additional transfers to/from other third party entities not already listed above.  Although potentially real purchase and/or sales transactions may have occurred in accounts belonging to Redtagbiz, Inc. (i.e., a Petters entity that conducted real business), PwC has found no evidence to date to suggest that the transfers made from PCI to PC Funding on account of the DZ Bank Related Notes related to any real Redtagbiz, Inc. purchases or sales transactions.  Further, PwC has found no evidence to date to suggest that transfers from any of the other entities listed above directly or indirectly relate to any transfers made from PCI to PC Funding on account of the DZ Bank Related Notes and/or indicate that DZ Bank received the proceeds of any potentially real sales transactions entered into by the entities. The transfers from the entities listed above were dwarfed by transfers from PCI's SPEs, Private

Investors, and fraudulent vendors (e.g., NIR or Enchanted) and, at most, amounted to only a small percentage of the transfers made from PCI to PC Funding on account of the DZ Bank Related Notes.   Deanna Coleman testified that, on occasion, Petters entities engaged in real deals with vendors in small dollar amounts and quantities and, in doing so, secured real purchase orders from those vendors.   Coleman and Robert White later used those documents to create fictitious purchase orders in much larger dollar amounts for use in acquiring funds from investors.[22]   She further testified that "probably even less than [one percent]" of PCI's purported revenue related to real sales.[23]   Coleman's testimony is consistent with the results of the analyses described above, through which a limited number of potentially real PCI purchase/sales transactions have been identified.

## VIII.   ANALYSIS OF PCI'S AND PC FUNDING'S FINANCIAL CONDITION AT THE TIME OF THE TRANSFERS TO DZ BANK

### A.   Overview of Methodology

55.      Per Minn. Stat. §513.42, "a debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets."  PwC analyzed PCI and PC Funding's year-end balance sheets in order to assess whether each entity's liabilities exceeded its assets at the time of the transfers from PC Funding to DZ Bank.   As noted above, Minn Stat. §513.42 requires assets and liabilities to be calculated at a fair valuation when performing an insolvency analysis; however, given the short term nature of PCI's and PC Funding's assets and liabilities, and the absence of recorded and/or unrecorded intangible assets, PwC used the values of account

---

[22] Deanna Coleman deposition transcript dated November 15, 2018, page 113:10 – 115:8.
[23] Deanna Coleman deposition transcript dated November 15, 2018, page 364:17 – 366:7.

balances as presented in contemporaneously prepared financial statements and did not believe it necessary, nor appropriate, to make any fair market value adjustments.

### B.    Procedures Performed with Respect to PCI

56.    A separate expert report on insolvency dated October 30, 2017 has been prepared detailing the methodology, financial statement documentation considered, and related procedures employed in support of my opinions regarding the financial condition of PCI as of each year-end (previously defined as my "Insolvency Expert Report").  In summary, it is my opinion that PCI was insolvent by December 31, 1996 at the latest and never emerged from insolvency.  Therefore, PCI was insolvent throughout the duration of the transfers to DZ Bank.  Although not directly related to this particular matter, I also opined that PGW was insolvent by December 31, 2002 at the latest and never emerged from insolvency.

### C.    Procedures Performed with Respect to PC Funding

57.    The financial condition of PC Funding was assessed using financial statements (i.e., balance sheets) sourced from the PC Funding QuickBooks accounting file.  Using the reporting tools within QuickBooks, PC Funding Balance Sheet reports were generated as of December 31, 2001, December 31, 2002, and December 31, 2003 (i.e., the years-ended during the time period that transfers were made to DZ Bank in connection with the DZ Bank Related Notes).  PwC noted that there were no PC Funding account balances as of December 31, 2001 and, as such, generated an additional PC Funding Balance Sheet as of January 7, 2002 (i.e., the date of the first PC Funding note).

58.    PwC created insolvency assessment schedules using account balances from the PC Funding Balance Sheets identified in QuickBooks (see Exhibit W).  Given our understanding of

the nature of the Petters Ponzi Scheme and accounting for the fraudulent transactions, we recognized that the PC Funding Balance Sheets included fictitious accounts receivable balances that resulted from falsified purchases of goods, as PC Funding did not engage in actual inventory and accounts receivable financing.  Consistent with the approach taken in determining the financial condition of PCI, to derive PC Funding's true net asset/liability balance, PwC reduced total assets per the source PC Funding Balance Sheets by the amount of fictitious accounts receivable balances in determining "Adjusted Total Assets."

59.     The results of the insolvency assessment described above demonstrate that PC Funding was insolvent by January 7, 2002 at the latest and never emerged from insolvency through December 31, 2003, the date of the last PC Funding Balance Sheet analyzed.  The results are summarized in the table below, and show that PC Funding's "Total Liabilities" exceed PC Funding's "Adjusted Total Assets" at the time transfers were made to DZ Bank.

| Date Analyzed | Exhibit Reference | Adjusted Assets Less Source Liabilities |
|---|---|---|
| 12/31/2001 | N/A | $0 |
| 1/7/2002 | W-1 | $(4,454,442.02) |
| 12/31/2002 | W-2 | $(181,900,316.37) |
| 12/31/2003 | W-3 | $(43,573,500.00) |

## IX.   OTHER ANALYSES PERFORMED

### A.    Inter-relatedness of PCI and PCI's SPEs

60.     As mentioned earlier in this report, I testified at the evidentiary hearing on the Trustee's motion for substantive consolidation of PCI and PCI's SPEs in the Debtors' bankruptcy proceeding, Case No. 08-4527, on December 12 and 13, 2011.  Former Chief Bankruptcy Judge Gregory F. Kishel subsequently ordered the substantive consolidation of PCI and PCI's SPEs.

During the hearing, I offered my opinion that Petters ran a Ponzi scheme and described my assessment of the factors that Courts may consider when ordering the substantive consolidation of related entities such as PCI and PCI's SPEs.  Among the factors I discussed were (1) the commonality of ownership and control between PCI and PCI's SPEs, (2) the execution of notes and guarantees by Petters and Coleman, (3) the lack of independent governance among the entities, (4) the commingling of funds between and among PCI and PCI's SPEs and the failure to properly account for intercompany transfers, (5) the lack of adequate capitalization upon the inception of PCI and PCI's SPEs, (6) the lack of functioning directors or officers, (7) the common domination and control of PCI and PCI's SPEs by Petters, Coleman, and Robert White, and (8) the common source of cost of doing business.  In connection with the above-listed factors, I also prepared and submitted an Expert Report dated August 8, 2011 describing the procedures performed and resulting observations with respect to the inter-relatedness of PCI and PCI's SPEs (my "Sub-Con Expert Report").  As described in my Sub-Con Expert Report, it is my opinion that:

- The SPEs' "assets" were fictitious accounts receivables and inventory that resulted from fabricated purchase orders for non-existing electronic goods;

- The SPEs' "operations" were limited to the purchasing of fictitious electronic goods inventory and its fictitious subsequent sale;

- PCI and the SPEs functioned as a single economic unit by commingling funds of multiple SPEs and investors, satisfying SPE debts with payments by PCI, which resulted in paying earlier investors with funds derived from later investors that were routed through PCI;

44

- PCI and the SPEs did not engage in actual inventory and accounts receivable financing, as represented to investors;

- PCI and the SPEs' business operations produced little or no profits or earnings;

- PCI and the SPEs ultimately received funds from multiple investors;

- The SPEs do not have any assets other than nominal cash and bankruptcy avoidance claims held by the SPEs in the aggregate amount of approximately $31.2 billion; and

- It would be difficult and cost prohibitive to reconstruct the PCI and SPE accounting records from inception.

61.    Although not directly related to this particular matter, I also testified on behalf of the Trustee at the April 12, 2016 hearing on the Trustee's request for the substantive consolidation of PCI and PGW.  Former Chief Bankruptcy Judge Gregory F. Kishel subsequently ordered the substantive consolidation of PCI and PGW.

### B.    Prior Analyses Performed with Respect to Creditors

62.    The Liquidating Trustee and his counsel have also asked me to summarize prior analyses performed by PwC with respect to the following creditors identified in the Fourth Amended Complaint: (1) Lancelot Investors Fund, LP, (2) Acorn Capital Group, LLC, (3) Ark Discovery II LP, (4) Interlachen Harriet Investments Ltd., and (5) Theodore Deikel.  The procedures performed by PwC, and resulting observations, are summarized in the subsequent paragraphs.

**Lancelot Investors Fund, LP**

63.    Thousand Lakes was formed on October 2, 2002, as the SPE through which Lancelot Investment Management, LLC ("Lancelot") invested in PCI.  Greg Bell ("Bell"), founder of Lancelot, was previously a managing director at Epsilon, which was managed by Steve Stevanovich.

64.    Lancelot served as the investment manager for Granite Investors Fund, LP ("Granite"); Lancelot Investors Fund, LP; Lancelot Investors Fund II, LP; and Lancelot Investors Fund, Ltd.  Records available to PwC indicate that investment activity between Granite and PCI began on November 28, 2001.

65.    Three promissory notes were entered into between Granite and PCI prior to the execution of a Master Loan Agreement ("Thousand Lakes MLA"), dated October 11, 2002, between Thousand Lakes (as the Borrower), RWB Services, LLC ("RWB Services") (as the Administrative Agent) and Lancelot Investors Fund LP, Lancelot Investors Fund II LP, Lancelot Investors Fund Ltd. and Granite (as the Initial Lenders).  For notes executed under the Thousand Lakes MLA, Thousand Lakes was the borrower.  Assignment of notes was permitted to other individuals/entities pursuant to the terms of this agreement.  Annual interest rates on these notes ranged from 18% to 42%, with most notes bearing a rate of 18%; investments ranged from $500,000 to $37 million.  In total, 496 notes were executed between the parties, with 423 paid in full and 73 open as of September 30, 2008.

66.    In addition to reviewing the hard copy data and ESI (as defined in the Interim Report), PwC also reviewed PCI notes schedules created and maintained by Harold Katz ("Katz"), Vice President at Lancelot.  Katz periodically provided PCI personnel with his schedules to ensure

Lancelot's records agreed with PCI's records.  PwC noted the following differences between

Katz's schedules and PCI records: (1) note numbers (Lancelot and PCI each had their own

numbering systems); (2) application of payments (payment amounts were applied differently to

each note); (3) start date; and (4) maturity dates.  While the payments amounts were applied

differently to each note, the application of payments resulted in the same net payment for each

note.  As a result, the calculated interest paid was the same for Katz's schedules and Company

Records (as defined in the Interim Report).

67.     Thousand Lakes followed the general flow of funds described in Figure 2 for the

majority of its investments, with the exception of the following two time periods: (1) initial

investments from November 28, 2001 through June 28, 2002, prior to the Thousand Lakes MLA,

and (2) investments beginning on February 26, 2008 through September 17, 2008.  In both

instances, investments and payments were transferred directly to/from PCI and the investor.

Exhibits 7 and 8 of the Sub-Con Expert Report provide the flow of funds for Thousand Lakes.

68.     PwC identified six bank accounts utilized by Thousand Lakes and RWB Services

to transfer its funds.[24]  PwC did not receive all of the bank transaction activity for each of the

Thousand Lakes Accounts, as these accounts were typically controlled by the underlying

investor(s).  As a result, PwC assumed transactions from Thousand Lakes and RWB Services

accounts to purported vendors such as NIR and Enchanted were initially funded by corresponding

investments from Lancelot or related funds.  PwC confirmed funding transactions to NIR and

Enchanted through a review of the NIR and Enchanted bank accounts.  Similarly, PwC assumed

payments from PCI to Thousand Lakes or RWB Services ultimately were sent to the underlying

---

[24] The six accounts identified for this scheme were with Bank One; LaSalle Bank (two accounts); Banco Popular;
Charter One; and RBS Citizens (collectively, the "Thousand Lakes Accounts").

investor(s).[25]

69.     During the period June 2004 through July 2007, PwC identified a large volume of transactions where payments were sent and subsequently returned the same or next day. Specifically, an analysis of bank transactions in which Thousand Lakes was the Payor or Payee without an affiliated note identified 22 sets of reversals (44 transactions) where an amount transferred to PCI was returned to Thousand Lakes on the same or next day.     The incoming/outgoing amounts were approximately $94.3 million in aggregate.

70.     Beginning in February 2008, Thousand Lakes and PCI engaged in a series of roundtrip transactions, whereby approximately $1.3 billion of payments made to Thousand Lakes upon maturity of notes were reinvested shortly thereafter in notes with PCI of similar value.[26]

71.     In aggregate, Thousand Lakes' investors invested approximately $8.8 billion and were paid approximately $8.0 billion in principal and interest, resulting in a Net Cash Position of $764.6 million in cash basis losses.   Exhibit 67 of the Interim Report provides a summary of activity by year.   Further, as shown in Exhibit 68 of the Interim Report, PwC analyzed the investment and payment activity by note.

**Acorn Capital Group, LLC**

72.     Acorn Capital Group, LLC ("Acorn") began investing in Petters Entities on June 21, 2001, with investments in RedtagBiz, Inc. ("RedtagBiz").   On May 10, 2001, Acorn provided an open line of credit in the amount of $75 million to RedtagBiz, and then on March 1, 2003, the

---

[25] Similar assumptions were made with respect to investors who were determined to be net winners of the Petters Ponzi Scheme.  In the Trustee's pursuit of recoveries from the net winners, documentation has been produced by third parties supporting that the underlying investors did, in fact, transfer investments into and receive subsequent payments from the SPE bank accounts.
[26] Katz and Bell both pled guilty to crimes in connection with their involvement in these transactions.

line of credit was made available to other Petters Entities, including: PCI; Petters Group, LLC;[27] Petters Company, LLC; Petters International, LLC; Petters Consumer Brands, LLC; RedtagBiz; and such other affiliates and subsidiaries of PCI (per the credit agreement).

73.     Acorn started directly investing with PCI on August 29, 2002.  PAC Funding was formed on November 3, 2004, as the entity through which Acorn invested in PCI.  Bank accounts for PAC Funding were not opened until early December 2004, as such, notes between Acorn and PAC Funding started on February 8, 2005.  All Acorn notes prior to this time were directly with PCI.

74.     On November 1, 2004, Acorn provided an open line of credit in the amount of $200 million to PAC Funding.  Over the next several years, Acorn extended the term and increased the amount of the line of credit to $300 million through multiple amendments.  The line of credit was secured by liens on the merchandise purportedly purchased from suppliers, including NIR and Enchanted, and Petters' personal guaranty.  PAC Funding was purportedly using the loan proceeds to purchase and resell merchandise purchased from the vendors.  The notes were often assigned to Stewardship Credit Arbitrage Fund, LLC (located in the United States) or Stewardship Credit Arbitrage Fund, Ltd (located in Bermuda).  Both of these funds invested in Acorn.  In total, 169 notes were executed between Acorn and PCI (all are closed), and 539 notes were executed between Acorn and PAC Funding, one of which was open as of September 30, 2008.  Annual interest rates on these notes ranged from 11% to 18% with most notes bearing a rate of 11% or 16%, and investments ranged from approximately $1.7 million to $9.2 million.

75.     In addition to reviewing transactions from the PCI M&I Account, PwC also

---

[27] PGW was formerly known as Petters Group, LLC.

reviewed numerous bank accounts used for PCI and PAC Funding notes with Acorn.  For each of the note transactions with Acorn, the following three types of bank accounts were used.

    a.   Blocked Account:  Per the various credit agreements and notes documents between Acorn and PCI/PAC Funding, 5%, 10%, or 20% of the note amount was required to be deposited by PCI into a "blocked" account controlled by Acorn as collateral for the transaction.  After the note was paid off, the collateral was then returned to PCI/PAC Funding.

    b.   Lockbox Account: Account controlled by Acorn and was used to collect the purported "sales price" of the goods, which came from the PCI M&I Account, as well as to transfer the note amount plus interest to Acorn and PCI's "profit" for each note transaction.

    c.   Operating Account:  Account controlled by PCI/PAC Funding and used as a pass-through account to transfer initial investments, "PCI profit," and collateral to the PCI M&I Account.

76.    Refer to Exhibit 9 of the Sub-Con Expert Report for the Acorn flow of funds.  This flow of funds is different than the general flow depicted in Figure 2 above, as it involves transfers between the three different SPE accounts listed above (Blocked, Lockbox, and Operating),[28] as well as the PCI M&I Account.  In addition, unlike the other SPEs, initial investments did not flow through NIR and Enchanted bank accounts.  This flow of funds was similar for all Acorn notes with PCI and PAC Funding, with one exception.  Acorn's initial investment was usually

---

[28] The different entity name on the bank accounts used for the scheme (i.e., RedtagBiz, PCI, PAC Funding) was dependent on the date of the note.  For certain notes, a combination of different entity accounts were used.  For example, the initial collateral for Note 200 was transferred into the PCI Blocked account, but the payment to Acorn was made from the PAC Funding Lockbox account.

transferred directly to the relevant Operating Account (depending on the time period) up until mid-September 2004, and then it was transferred to the PCI M&I Account.

77.     As of late February 2008, PAC Funding was in default with Acorn, and PAC Funding requested that Acorn forbear from exercising remedies under their credit agreement and the other loan documents in respect of such default.  As such, PAC Funding (as the Borrower), Petters (as the Guarantor) and Acorn (as the Lender) entered into a forbearance agreement, dated February 29, 2008 (the "Forbearance Agreement").  Some key terms agreed upon by PAC Funding and Acorn per the Forbearance Agreement were as follows:

a.  Execution of a promissory note between Acorn and Polaroid/Polaroid Consumer Electronics, LLC ( "PCE") in the amount of $15 million;

b.  Exchange of approximately $112 million of promissory notes.  Collateral (i.e., purportedly high end electronics inventory) was used as security for the promissory notes, and PCI purportedly used the investments to purchase consumer electronics.  The collateral for the "old" promissory notes was inventory purportedly purchased by BJ's or Costco.  The collateral for the "new" notes was inventory purportedly purchased by Boscov's or Sam's Club;[29]

c.  Acorn withdrew $6,695,070 from the PAC Funding Blocked Account, which was comprised of the accrued and unpaid interest on the PAC Funding outstanding notes as of February 26, 2008; and

d.  Acorn transferred $20,061,275 from the PAC Funding Blocked Account to the PCI

---

[29] BJ's and Costco were late in paying for the purported purchases (i.e., PCI receivables), and as a result, the "old" notes were past due and then switched for "new" notes where the purchaser of the inventory was Boscov's and Sam's Club.

M&I Account, which represented the remaining PCI funds set aside as collateral for prior PAC Funding notes.

78.     Per the Fifth Amendment to the Credit Agreement dated May 12, 2008, between PAC Funding and Acorn, the principal of certain outstanding PAC Funding notes was rolled into a note totaling $15,227,246 ("Scheduled Note"), with a maturity date of July 8, 2008.  An interest rate for the Scheduled Note was not stated in the Amendment.  Interest totaling $574,629 and principal of $15,227,246 on the Scheduled Note was paid in multiple transactions from May 13, 2008 through July 8, 2008.

79.     In aggregate, Acorn invested approximately $2.5 billion and was paid approximately $2.4 billion in principal and interest, resulting in a Net Cash Position of $138.3 million in cash basis losses.  Exhibit 60 of the Interim Report provides a summary of activity by year.  Further, as shown in Exhibit 61 of the Interim Report, PwC analyzed the investment and payment activity by note.

80.     Beginning in March 2008, Acorn and PCI engaged in a series of "roundtrip" transactions, whereby approximately $83 million of payments made to Acorn upon maturity of notes were reinvested in notes with PCI of similar value.  Refer to Exhibit 62 of the Interim Report for a summary of these "roundtrip" transactions.

81.     In addition to Acorn investments in PCI, Acorn also had investments with the following entities: (1) Fingerhut Direct Marketing, Inc.; (2) Petters Company, LLC; (3) Petters Consumer Brands (PCB1); (4) Petters Consumer Brands (PCB3); (5) Redtagbiz, Inc.; (6)  Aaron Chang International, LLC; (7) Petters Aircraft Leasing, LLC; (8) Petters Aviation, LLC; (9) Elite Landings, LLC; (10) Polaroid Corporation; and (11) Polaroid Consumer Electronics, LLC.  From

2001 to 2008, Acorn invested approximately $2.8 billion in principal in these 11 entities. Please refer to Exhibit 108 of the Interim Report for a summary timeline of the investment activity. In total, Acorn's Net Cash Position for all investment activity is $156.4 million in cash basis losses (see Exhibit 109 of the Interim Report).

**Ark Discovery II, LP**

82.    Edge One, LLC (previously defined as "Edge One") was formed on May 7, 2007, as the entity through which AtoZ Investors Fund, LP ("AtoZ"); Edge One Capital, LP ("Edge One Capital"); and Ark Discovery II, LP ("Ark Discovery") invested in PCI. A Master Loan Agreement ("Edge One MLA") was entered into on July 5, 2007, among Edge One, AtoZ, and AWB Services, LLC, and was subsequently amended on February 25, 2008, for the entity name changes.

83.    Investment activity began on October 1, 2007. Throughout the investment period promissory notes specify Edge One as the "borrower" and either Edge One Capital or Ark Discovery as the "lender." In total, 29 notes were executed between the parties, with 6 paid in full and 23 open as of September 30, 2008. Interest rates on the notes were typically 16.8% on an annual basis, with several bearing a rate of 24.0%; and investment amounts ranged from $500,000 to $15 million.

84.    Edge One followed the general flow of funds described above for its investments, with a slight difference in the flow for the transfer of sales price (refer to Exhibit 15 of the Sub-Con Expert Report). Instead of the sales price being transferred from PCI to the Edge One account for the transfer of principal and interest to the underlying investor, PCI transferred the full sales price to the investors directly. PCI's profit on the deal was subsequently transferred from the

investor to PCI via the Edge One account.

85.      Edge One bank account statements were not available for this analysis as the account was controlled by the investor.  As a result, PwC assumed transactions from Edge One to purported vendors, such as NIR and Enchanted, were initially funded by corresponding investments from AtoZ, Edge One Capital, or Ark Discovery.   PwC confirmed funding transactions to NIR and Enchanted through a review of the NIR and Enchanted bank accounts. Similarly, PwC assumed transfers of profit from Edge One to PCI originated from AtoZ, Edge One Capital, or Ark Discovery.[30]

86.      In aggregate, approximately $159.0 million in investments and $36.3 million in payments of principal and interest were identified resulting in a Net Cash Position of $122.7 million in cash basis losses.  Of the $36.3 million in payments, $32.9 million was applied to principal and $3.4 million was applied to interest.  Exhibit 55 of the Interim Report provides a summary of activity by year.  Further, as shown in Exhibit 56 of the Interim Report, PwC analyzed the investment and payment activity by note.  Based on the analysis conducted, Edge One was a net loser in the amount of $122,707,100.

**Interlachen Harriet Investments, Ltd.**

87.      Interlachen Harriet Investments, Ltd. ("Interlachen") entered into one promissory note with PCI and Petters for $60 million on April 18, 2008, with an annual interest rate of 40%. Interlachen sent $50 million to the PCI M&I Account on April 18, 2008, and the remaining $10

---

[30] Similar assumptions were made with respect to investors who were determined to be net winners of the Petters Ponzi Scheme. In the Trustee's pursuit of recoveries from the net winners, documentation has been produced by third-parties supporting that the underlying investors did, in fact, transfer investments into and receive subsequent payments from the SPE bank accounts.

million on April 22, 2008. Interlachen did not receive any payments on its note. Exhibit X is a copy of this promissory note. Based on the analysis conducted, PwC determined Interlachen was a net loser in the amount of $60,000,000.

**Theodore Deikel**

88.     Theodore Deikel ("Deikel") entered into two promissory notes totaling $13 million with PCI and Petters: one in the amount of $3 million dated November 7, 2000 (with an annual interest rate of 36%), and one in the amount of $10 million dated June 3, 2008 (with an annual interest rate of 60%). Deikel received payments totaling $5,939,000.00 in connection with these two notes. Exhibit Y provides a summary of Deikel's note activity and the investment and payment activity by note. Based on the analysis conducted, PwC determined that Deikel was a net loser in the amount of $7,061,000.00. Further, as shown in Exhibit Y, PwC identified additional net transfers of $938,456.60 to Petters/Group D, LLP, an entity determined to be affiliated with Deikel; however, as of the date of this report, these transfers were not determined to have been tied to any specific PCI or Petters notes.

## X.     EXPERT OPINION

89.     Based on the results of the procedures and related findings presented above, it is my opinion that:

a. PC Funding transferred $776,409,483.50 to the DZ Bank Collection Account on account of the DZ Bank Related Notes. In connection with these notes, PC Funding received a total of $626,020,625.00 directly from DZ Bank ($44,794,750.00 from DZ Bank/Autobahn and $581,225,875.00 from the DZ Bank Collection Account). The net transfers from PC Funding to DZ Bank, accordingly, total $150,388,858.50;

b. In connection with the RLSA, DZ Bank transferred additional loan amounts totaling $58,505,250.00 to Opportunity Finance ($54,505,250.00 from DZ Bank/Autobahn and $4,000,000.00 from the DZ Bank Collection Account) and additional loan amounts totaling $879,375.00 to Opportunity Finance's affiliate, Opportunity Finance Securitization.  The Opportunity Finance entities, however, transferred a net of only $20,979,375.00 to PC Funding (consisting of $26,879,375.00 transferred from the Opportunity Finance entities to PC Funding less $5,900,000.00 transferred from PC Funding to Opportunity Finance Securitization).  If the net transfers from the Opportunity Finance entities to PC Funding are included with amounts that DZ Bank transferred to PC Funding, then net transfers from PC Funding to DZ Bank total $129,409,483.50;

c. Of the $776,409,483.50 transferred to DZ Bank from PC Funding, $716,000,000.00 was on account of principal under the DZ Bank Related Notes, and $60,409,483.50 was on account of interest income under the DZ Bank Related Notes;

d. Based on the documentation identified and analyzed to date, no evidence has been identified to indicate that the source of the transfers to DZ Bank related to real PCI sales transactions.  Rather, the transfers to DZ Bank were funded by the serial churn of funds observed in connection with the Petters Ponzi Scheme;

e. PCI was insolvent by December 31, 1996 at the latest and never emerged from insolvency and PC Funding was insolvent by January 7, 2002 at the latest and never emerged from insolvency through December 31, 2003.  Therefore, both PCI and PC Funding were insolvent throughout the duration of the transfers to DZ Bank.  To the

extent corporate separateness is disregarded, the conclusion is the same; and

f.  Our analysis confirmed the creditor status of five parties previously identified as creditors.  Each one was a net loser of the Petters Ponzi Scheme: (1) Lancelot Investors Fund, LP, (2) Acorn Capital Group, LLC, (3) Ark Discovery II, LP, (4) Interlachen Harriet Investments, Ltd., and (5) Theodore Deikel.

_____

Theodore F. Martens
April 25, 2019

# EXHIBIT H

**EXHIBIT H**
**Transfers from DZ Bank Collection Account to PC Funding[1]**

| Date | Payor | Payee | Memo | Loan / Reinvestment Withdrawal Amount | Borrowing Base Surplus Amount | Total Amount (per bank data) | Source Bates Number [2] |
|---|---|---|---|---|---|---|---|
| 1/15/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ACCOUNT 33398720 IN CONNECTION WITH 1/15/02 FUNDING BETWEEN PETTERS COMPANY INC AND NATIONWIDE INC TLR476 | $ 1,500,000.00 | $ - | $ 1,500,000.00 | DZB006698, DZB006689 |
| 1/22/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ACCOUNT 33398720 IN CONNECTION WITH 1/22/02 FUNDING BETWEEN PETTERS COMPANY INC AND NATIONWIDE INC TLR476 | 2,300,000.00 | - | 2,300,000.00 | DZB006757, DZB006729 |
| 1/25/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ACCOUNT 33398720 IN CONNECTION WITH 1/25/02 FUNDING TLR476 | 4,100,000.00 | - | 4,100,000.00 | DZB006807, DZB006776 |
| 2/4/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ACCOUNT 33398720 IN CONNECTION WITH 2/4/02 FUNDING TLR476 | 5,600,000.00 | - | 5,600,000.00 | DZB006877, DZB006843 |
| 2/11/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 5,100,000.00 | - | 5,100,000.00 | DZB006929, DZB006899 |
| 2/22/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 3,205,250.00 | - | 3,205,250.00 | DZB006979, DZB006951 |
| 2/28/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 8,500,000.00 | - | 8,500,000.00 | DZB007042, DZB007025 |
| 3/6/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 4,050,000.00 | - | 4,050,000.00 | DZB007085, DZB007071 |
| 3/8/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 5,400,000.00 | - | 5,400,000.00 | DZB007113, DZB007105 |
| 3/13/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 11,800,000.00 | - | 11,800,000.00 | DZB007174, DZB007144 |
| 3/18/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 1,600,000.00 | - | 1,600,000.00 | DZB007222, DZB007188 |
| 3/26/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFERRED TO ACCOUNT 33398720 IN CONNECTION WITH FUNDING TLR476 | 10,000,000.00 | - | 10,000,000.00 | DZB007277, DZB007259 |
| 4/1/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/01/02; FUNDING TLR476 | 3,400,000.00 | - | 3,400,000.00 | DZB007325, DZB007302 |
| 4/11/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/11/02; FUNDING TLR476 | 5,800,000.00 | - | 5,800,000.00 | DZB007358, DZB007344 |
| 4/26/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/26/02; FUNDING TLR476 | 7,400,000.00 | - | 7,400,000.00 | DZB007420, DZB007392 |
| 5/3/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/03/02; FUNDING TLR476 | 6,000,000.00 | - | 6,000,000.00 | DZB007501, DZB007474 |
| 5/9/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/09/02; FUNDING TLR476 | 9,700,000.00 | - | 9,700,000.00 | DZB007551, DZB007518 |
| 5/10/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/10/02; FUNDING TLR476 | 3,900,000.00 | - | 3,900,000.00 | DZB007551, DZB007518 |
| 5/10/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/10/02; FUNDING TLR476 | 2,500,000.00 | - | 2,500,000.00 | DZB007551, DZB007518 |
| 5/21/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/21/02; FUNDING TLR476 | 14,900,000.00 | - | 14,900,000.00 | DZB007612 |
| 5/30/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/30/02; FUNDING TLR476 | 16,500,000.00 | - | 16,500,000.00 | DZB007698, DZB007673 |
| 6/6/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 06/06/02; FUNDING TLR476 | 12,500,000.00 | - | 12,500,000.00 | DZB007746, DZB007731 |
| 6/17/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 06/17/02; FUNDING TLR476 | 12,800,000.00 | 2,800,000.00 | 15,600,000.00 | DZB007840, DZB007833, DZB007812 |
| 6/26/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 06/26/02; FUNDING TLR476 | 10,300,000.00 | - | 10,300,000.00 | DZB007902, DZB007870 |
| 7/2/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 07/02/02; FUNDING TRL476 | 5,100,000.00 | - | 5,100,000.00 | DZB007940, DZB007941 |
| 7/11/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 07/11/02; FUNDING TRL476 | 9,800,000.00 | - | 9,800,000.00 | DZB007998, DZB007990 |
| 7/17/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 07/17/02; FUNDING TRL476 | 11,400,000.00 | - | 11,400,000.00 | DZB008052, DZB008038 |
| 7/25/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 07/25/02 | 6,900,000.00 | - | 6,900,000.00 | DZB008111, DZB008085 |
| 8/1/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/01/02; FUNDING TLR476 | 7,950,000.00 | - | 7,950,000.00 | DZB008394, DZB008368 |
| 8/5/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/05/02; FUNDING TLR476 | 3,100,000.00 | - | 3,100,000.00 | DZB008427, DZB008411 |
| 8/7/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/07/02; FUNDING TLR476 | 5,400,000.00 | - | 5,400,000.00 | DZB008467, DZB008438 |
| 8/14/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/14/02; FUNDING TLR476 | 7,300,000.00 | - | 7,300,000.00 | DZB008502, DZB008478 |
| 8/21/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/21/02; FUNDING TLR476 | 5,500,000.00 | - | 5,500,000.00 | DZB008555, DZB008536 |
| 8/22/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER FROM ANOTHER TRUST IN CONNECTION WITH THE 08/22/02; FUNDING TLR476 | 3,900,000.00 | - | 3,900,000.00 | DZB008588, DZB008570 |

**EXHIBIT H**
**Transfers from DZ Bank Collection Account to PC Funding [1]**

| Date | Payor | Payee | Memo | Loan / Reinvestment Withdrawal Amount | Borrowing Base Surplus Amount | Total Amount (per bank data) | Source Bates Number [2] |
|---|---|---|---|---|---|---|---|
| 8/28/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 08/28/02; FUNDING TLR476 | 11,200,000.00 | - | 11,200,000.00 | DZB008655, DZB008615 |
| 9/5/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 09/05/02; FUNDING TLR476 | 8,000,000.00 | - | 8,000,000.00 | DZB010111, DZB010095 |
| 9/9/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 09/09/02; FUNDING TLR476 | 6,200,000.00 | - | 6,200,000.00 | DZB010086, DZB010069 |
| 9/18/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 09/18/02; FUNDING TLR476 | 8,700,000.00 | - | 8,700,000.00 | DZB010046, DZB010018 |
| 9/25/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 09/25/02; FUNDING TLR476 | 15,600,000.00 | - | 15,600,000.00 | DZB009966, DZB009958 |
| 10/2/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 10/02/02; FUNDING TLR476 | 12,600,000.00 | - | 12,600,000.00 | DZB009935, DZB009910 |
| 10/10/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 10/10/02; FUNDING TLR476 | 13,300,000.00 | - | 13,300,000.00 | DZB009868, DZB009845 |
| 10/16/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 10/16/02; FUNDING TLR476 | 11,750,000.00 | - | 11,750,000.00 | DZB009841, DZB009816 |
| 10/23/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 10/23/02; FUNDING TLR476 | 11,750,000.00 | - | 11,750,000.00 | DZB009772, DZB009761 |
| 11/13/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 11/12/02; FUNDING TLR476 | 15,300,000.00 | - | 15,300,000.00 | DZB010576, DZB010564 |
| 11/21/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 11/21/02; FUNDING TLR476 | 6,650,000.00 | - | 6,650,000.00 | DZB010524, DZB010509 |
| 12/4/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/04/02; FUNDING TLR476 | 5,900,000.00 | - | 5,900,000.00 | DZB010434, DZB010420 |
| 12/11/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/11/02; FUNDING TLR476 | 13,000,000.00 | - | 13,000,000.00 | DZB010383, DZB010375 |
| 12/17/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/17/02; FUNDING TLR476 | 8,250,000.00 | - | 8,250,000.00 | DZB010322, DZB010314 |
| 12/19/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/19/02; FUNDING TLR476 | 7,800,000.00 | - | 7,800,000.00 | DZB010289, DZB010273 |
| 12/23/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/23/02; FUNDING TLR476 | 6,750,000.00 | - | 6,750,000.00 | DZB010239, DZB010221 |
| 12/24/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/24/02; FUNDING TLR476 | 10,300,000.00 | - | 10,300,000.00 | DZB010204, DZB010197 |
| 12/30/2002 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 12/30/02; FUNDING TLR476 | 10,750,000.00 | - | 10,750,000.00 | DZB010158, DZB010142 |
| 1/8/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 01/08/03; FUNDING TLR476 | 10,700,000.00 | - | 10,700,000.00 | DZB009080, DZB009056 |
| 1/23/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 01/23/03; FUNDING TLR476 | 13,370,625.00 | - | 13,370,625.00 | DZB008974, DZB008957 |
| 2/7/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | PAID TO OUTGOING FED WIRE; MISCELLANEOUS DISBURSEMENT; PART OF FUNDING FOR 2/5/03 DAG476 | 16,850,000.00 | - | 16,850,000.00 | DZB008889, DZB008877 |
| 2/11/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 02/11/03; FUNDING DAG476 | 14,500,000.00 | - | 14,500,000.00 | DZB008847, DZB008835 |
| 2/19/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 02/19/03; FUNDING DAG476 | 13,700,000.00 | - | 13,700,000.00 | DZB008790, DZB008773 |
| 2/24/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 02/24/03; FUNDING DAG476 | 5,600,000.00 | - | 5,600,000.00 | DZB008732, DZB008715 |
| 2/27/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 02/26/03; FUNDING DAG476 | 11,850,000.00 | - | 11,850,000.00 | DZB008700, DZB008704 |
| 3/11/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 03/11/03; FUNDING DAG476 | 14,000,000.00 | - | 14,000,000.00 | DZB012558, DZB012540 |
| 3/20/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 03/20/03; FUNDING DAG476 | 7,200,000.00 | - | 7,200,000.00 | DZB012493, DZB012474 |
| 3/25/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 03/25/03; FUNDING DAG476 | 5,800,000.00 | - | 5,800,000.00 | DZB012458, DZB012434 |
| 4/1/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/01/03; FUNDING DAG476 | 8,600,000.00 | - | 8,600,000.00 | DZB012372, DZB012355 |
| 4/8/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/08/03; FUNDING DAG476 | 11,900,000.00 | - | 11,900,000.00 | DZB012322, DZB012312 |
| 4/9/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/09/03; FUNDING DAG476 | 8,050,000.00 | - | 8,050,000.00 | DZB012301, DZB012269 |
| 4/17/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 04/17/03; FUNDING DAG476 | 9,500,000.00 | - | 9,500,000.00 | DZB012205, DZB012192 |
| 5/1/2003 | DZ BANK - COLLECTION ACCOUNT | PC FUNDING, LLC - COLLECTION ACCOUNT | TRANSFER TO ANOTHER TRUST IN CONNECTION WITH THE 05/01/03; FUNDING DAG476 | 7,800,000.00 | - | 7,800,000.00 | DZB012895, DZB012867 |
| | | | **Total** | $ 578,425,875.00 | $ 2,800,000.00 | $ 581,225,875.00 | |

[1] Transaction details (i.e., date, payor, payee, memo, and amount) are sourced from available bank statements for DZ Bank Collection Account Number 33398730 at US Bank and PC Funding Collection Account Number 33398720 at US Bank.

[2] Includes the Bates Number of the corresponding Borrowing Base Report, Notice of Borrowing, and/or fax including wire transfer instructions found in the DZ Bank document production.

# EXHIBIT E

EXHIBIT Q
Transfers from DZ Bank Collection Account to DZ Bank / Autobahn [1]
Commercial Paper Principal and Yield

| Date | Payor | Payee | Memo | Amount | Source Bates Number [2] |
|------|-------|-------|------|--------|-------------------------|
| 3/1/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | REF: FUNDS WIRED TO US BANK NEW YORK FOR COMMERCIAL PAPER TLR476 | $ 164,989.50 | DZB013801 |
| 3/4/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | REF: FUNDS WIRED TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 8,034.50 | DZB013795 |
| 3/15/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | REF: FUNDS WIRED TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 11,412.17 | DZB013787 |
| 3/22/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | REF: FUNDS WIRED TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 8,724.58 | DZB013783 |
| 3/26/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | REF: FUNDS WIRED TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 7,942.00 | DZB013777 |
| 4/5/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 4,496.00 | DZB013773 |
| 4/11/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 3,126.34 | DZB013769 |
| 4/23/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 39,292.00 | DZB013763 |
| 5/3/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 205,685.11 | DZB013759 |
| 5/31/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 79,256.96 | DZB013753 |
| 6/27/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 193,570.54 | DZB013749 |
| 7/15/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 207.99 | DZB013745 |
| 7/25/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 90,540.55 | DZB013742 |
| 7/26/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 1,566.57 | DZB013739 |
| 8/22/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 214,542.35 | DZB013733 |
| 9/24/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 96,209.15 | N/A [4] |
| 10/25/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 214,367.10 | DZB013727 |
| 11/21/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 94,327.61 | DZB013722 |
| 12/19/2002 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 234,874.49 | DZB013716 |
| 1/17/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 67,618.86 | DZB013711 |
| 2/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 129,678.45 | DZB013705 |
| 3/18/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 118,499.34 | DZB013700 |
| 4/11/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 115,116.47 | DZB013695 |
| 5/16/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER TLR476 | 35,810,528.77 | DZB013684 |
| 6/10/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 23,813,188.50 | DZB013672 |
| 6/24/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 8,006,676.93 | DZB013665 |
| 7/8/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 8,013,158.60 | DZB013659 |
| 7/15/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 7,431,579.20 | DZB013654 |
| 7/22/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 5,004,476.69 | DZB013647 |
| 7/29/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 5,003,356.85 | DZB013640 |

**EXHIBIT Q**
**Transfers from DZ Bank Collection Account to DZ Bank / Autobahn [1]**
**Commercial Paper Principal and Yield**

| Date | Payor | Payee | Memo | Amount | Source Bates Number [2] |
|------|-------|-------|------|--------|------------------------|
| 8/5/2003 | DZ BANK - COLLECTION ACCOUNT | DZ BANK / AUTOBAHN [3] | WIRE TRANSFER; TO US BANK NY FOR COMMERCIAL PAPER DAG476 | 6,504,363.77 | DZB013635 |
| | | | Total $ | 101,691,407.94 | |

[1] Transaction details (i.e., date, payor, memo, and amount) are sourced from available bank statements for DZ Bank Collection Account Number 33398730 at US Bank.

[2] Includes the Bates Number of the corresponding Commercial Paper Remittance Report found in the DZ Bank document production.

[3] Transfer is assumed to be made to a DZ Bank / Autobahn account based on wire transfer request details included on the Commercial Paper Remittance Reports found in the DZ Bank document production.

[4] A corresponding Commercial Paper Remittance Report supporting this payment could not be located in the DZ Bank document production.

# EXHIBIT U

**Petters Company, Inc. (PCI)**
**PC Funding, LLC - Possible Sources and Uses of Funds**
*PCI M&I Bank (Account Number 1959018)* [1]

**PC Funding Note Number - 032602-01 - $3,691,385.00 payment dated 7/3/2002**

| Clear Date | Payor | Payor Category [2] | Payee | Payee Category [2] | In Amount | Out Amount | Balance | Related Analysis [3] |
|---|---|---|---|---|---|---|---|---|
| | | | *Beginning Balance - 7/2/2002* | | | | $ 927,352.46 | |
| 7/2/2002 | METRO GEM, INC. | PRIVATE INVESTOR, SPE-LIKE | PCI | | $ 5,500,000.00 | $ - | 6,427,352.46 | METRO GEM, INC. |
| 7/2/2002 | NATIONWIDE INTERNATIONAL RESOURCES | VENDOR (FRAUDULENT) | PCI | | 2,100,000.00 | | 8,527,352.46 | |
| 7/2/2002 | GRANITE INVESTORS FUND, LP | LENDER (SPE) | PCI | | 1,025,000.00 | - | 9,552,352.46 | THOUSAND LAKES, LLC |
| 7/2/2002 | CORPORATE TRUST CTO | SPE | PCI | | 617,125.00 | - | 10,169,477.46 | METRO GEM CAPITAL FINANCE |
| 7/2/2002 | PCI | | PETTERS FINANCE LLC | SPE | - | 3,116,430.45 | 7,053,047.01 | SPF FUNDING |
| 7/2/2002 | PCI | | PC FUNDING, LLC - COLLECTION ACCOUNT | SPE | - | 127,057.50 | 6,925,989.51 | PC FUNDING, LLC |
| 7/2/2002 | PCI | | METRO GEM, INC. | PRIVATE INVESTOR, SPE-LIKE | - | 30,058.00 | 6,895,931.51 | METRO GEM, INC. |
| 7/2/2002 | PCI | | RON MUSICH | PRIVATE INVESTOR / EMPLOYEE | - | 15,000.00 | 6,880,931.51 | RON MUSICH & ASSOCIATED ENTITIES |
| 7/3/2002 | NATIONWIDE INTERNATIONAL RESOURCES | VENDOR (FRAUDULENT) | PCI | | 6,450,057.00 | | 13,330,988.51 | |
| 7/3/2002 | PETTERS FINANCE LLC | SPE | PCI | | 330,597.12 | - | 13,661,585.63 | SPF FUNDING |
| 7/3/2002 | PCI | | REDTAGBIZ, INC. (LOCKBOX) | INTER-COMPANY (INVESTOR RELATED) | - | 4,408,029.86 | 9,253,555.77 | REDTAGBIZ, INC. (ACORN) |
| 7/3/2002 | PCI | | PC FUNDING, LLC - COLLECTION ACCOUNT | SPE | - | 3,691,385.00 | 5,562,170.77 | PC FUNDING, LLC |
| 7/3/2002 | PCI | | REDTAGBIZ, INC. (LOCKBOX) | INTER-COMPANY (INVESTOR RELATED) | - | 3,602,712.47 | 1,959,458.30 | REDTAGBIZ, INC. (ACORN) |
| 7/3/2002 | PCI | | EDGE BROOK, INC. | PRIVATE INVESTOR | - | 121,500.00 | 1,837,958.30 | EDGE BROOK, INC. |
| 7/3/2002 | PCI | | THE OZER GROUP | UNKNOWN | - | 10,000.00 | 1,827,958.30 | |
| | | | | TOTAL | $ 16,022,779.12 | $ 15,122,173.28 | | |

[1] Information is sourced from bank transactional data available as of the date of this report.

[2] Categories are based on observations made to date with respect to each payor/payee's transaction history and relationship with PCI. Categories are subject to change upon the receipt of new information and/or the performance of additional analysis subsequent to the date of this report.

[3] Information in this column identifies transactions related to prior analyses performed and reported on in connection with this matter.

**Petters Company, Inc. (PCI)**
**PC Funding, LLC - Possible Sources and Uses of Funds**
*PCI M&I Bank (Account Number 1959018)* [1]

*PC Funding Note Number - 082102-01 - $6,512,864.40 payment dated 12/5/2002*
*PC Funding Note Number - 081402-01 - $3,463,808.25 payment dated 12/5/2002*
*PC Funding Note Number - 080702-02 - $3,309,972.60 payment dated 12/5/2002*

| Clear Date | Payor | Payor Category [2] | Payee | Payee Category [3] | In Amount | Out Amount | Balance | Related Analysis [3] |
|---|---|---|---|---|---|---|---|---|
| | | | *Beginning Balance - 12/4/2002* | | | | $    115,267.69 | |
| 12/4/2002 | FAC ACQUISITION LLC | INTER-COMPANY | PCI | | $    2,100,000.00 [4,5] | $    - | 2,215,267.69 | |
| 12/4/2002 | ENCHANTED FAMILY BUYING COMPANY | VENDOR (FRAUDULENT) | PCI | | 2,088,000.00 | - | 4,303,267.69 | |
| 12/4/2002 | LANCER PARTNERS, LTD. | PRIVATE INVESTOR | PCI | | 1,000,000.00 | - | 5,303,267.69 | LANCER FINANCIAL SERVICES, LLC - COMBINED DEALS (2010), LANCER PARTNERS |
| 12/4/2002 | MICHAEL SCOTT SMITH | PRIVATE INVESTOR | PCI | | 500,000.00 | - | 5,803,267.69 | LANCER FINANCIAL SERVICES, LLC - COMBINED DEALS (2010), MICHAEL SMITH |
| 12/4/2002 | PCI | | PETTERS ACCEPTANCE METRO CAPITAL COLLATERAL ACCOUNT | SPE | - | 4,639,037.05 | 1,164,230.64 | METRO GEM CAPITAL FINANCE |
| 12/4/2002 | PCI | | PCI | INTRA-ENTITY | - | 580,000.00 | 584,230.64 | BONUS FUNDING |
| 12/4/2002 | PCI | | PC FUNDING, LLC - COLLECTION ACCOUNT | SPE | - | 172,317.50 | 411,913.14 | PC FUNDING, LLC |
| 12/5/2002 | REDTAGBIZ, INC. (OPERATING) | INTER-COMPANY (INVESTOR RELATED) | PCI | | 4,426,073.25 | - | 4,837,986.39 | PAC FUNDING, LLC |
| 12/5/2002 | REDTAGBIZ, INC. (OPERATING) | INTER-COMPANY (INVESTOR RELATED) | PCI | | 4,253,637.50 | - | 9,091,623.89 | PAC FUNDING, LLC |
| 12/5/2002 | KENNETH S CHAIJ DBA | VENDOR (FRAUDULENT) | PCI | | 4,236,900.00 | - | 13,328,523.89 | |
| 12/5/2002 | ENCHANTED FAMILY BUYING COMPANY | VENDOR (FRAUDULENT) | PCI | | 2,097,900.00 | - | 15,426,423.89 | |
| 12/5/2002 | NATIONWIDE INTERNATIONAL RESOURCES | VENDOR (FRAUDULENT) | PCI | | 1,832,090.00 | - | 17,258,513.89 | |
| 12/5/2002 | PC FUNDING, LLC - COLLECTION ACCOUNT | SPE | PCI | | 229,972.60 | - | 17,488,486.49 | PC FUNDING, LLC |
| 12/5/2002 | PETTERS ACCEPTANCE METRO CAPITAL COLLATERAL ACCOUNT | SPE | PCI | | 229,437.05 | - | 17,717,923.54 | METRO GEM CAPITAL FINANCE |
| 12/5/2002 | PCI | | PC FUNDING, LLC - COLLECTION ACCOUNT | SPE | - | 6,512,864.40 | 11,205,059.14 | PC FUNDING, LLC |
| 12/5/2002 | PCI | | PC FUNDING, LLC - COLLECTION ACCOUNT | SPE | - | 3,463,808.25 | 7,741,250.89 | PC FUNDING, LLC |
| 12/5/2002 | PCI | | METRO GEM, INC. | PRIVATE INVESTOR, SPE-LIKE | - | 3,380,733.33 | 4,360,517.56 | METRO GEM, INC. |
| 12/5/2002 | PCI | | PC FUNDING, LLC - COLLECTION ACCOUNT | SPE | - | 3,309,972.60 | 1,050,544.96 | PC FUNDING, LLC |
| 12/5/2002 | PCI | | METRO GEM, INC. | PRIVATE INVESTOR, SPE-LIKE | - | 43,680.00 | 1,006,864.96 | METRO GEM, INC. |
| | | | | **TOTAL** | **$    22,994,010.40** | **$    22,102,413.13** | | |

[1] Information is sourced from bank transactional data available as of the date of this report.

[2] Categories are based on observations made to date with respect to each payor/payee's transaction history and relationship with PCI. Categories are subject to change upon the receipt of new information and/or the performance of additional analysis subsequent to the date of this report.

[3] Information in this column identifies transactions related to prior analyses performed and reported on in connection with this matter.

[4] Transaction relates to an inter-company/intra-entity bank account for which one of the following applies: 1) no bank data was received; 2) bank statements were available, but no supporting check/wire information was available to confirm payors/payees; or 3) bank statements and supporting check/wire details were not available in a coded and traceable format. As such, an inter-company/intra-entity tracing analysis was not performed for this transaction.

[5] Targeted searches were conducted in the HPeD database using the available information for the transaction (i.e., transaction date, transaction amount, and payor/payee information, to the extent available) in an attempt to identify the originating and/or beneficiary party and/or purpose of the transfer. As of the date of this report, no support has been identified to indicate that the transfer relates to a potentially real purchase and/or sales transaction.

# EXHIBIT T-22

**DZ BANK**

January 8, 2003

Opportunity Finance Securitization, LLC
60 South Sixth Street, Suite 2540
Minneapolis, Minnesota 55402
Attention: Jon Sabes

Opportunity Finance, LLC
60 South Sixth Street, Suite 2540
Minneapolis, Minnesota 55402
Attention: Jon Sabes

Dear Jon:

DZ BANK AG
New York Branch
609 Fifth Avenue
New York, NY  10017-1021

Telephone  (212) 745 1400
Telefax     (212) 745 1550
SWIFT – Code GENOUS 33
Email      new.york@dzbank.de

Patrick Preece
Vice President
Asset Securitization
Direct Tel   212-745-1665
Direct Fax  212-745-1651
patrick.preece@dzbank.de

   Reference is made to the Receivables Loan and Security Agreement dated as of the date hereof (as amended, the "RLSA") among Opportunity Finance Securitization, LLC, as Borrower (the "Borrower"), Opportunity Finance, LLC (the "Servicer"), as Servicer, Autobahn Funding Company LLC, as Lender (the "Lender"), DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main, as agent (the "Agent") and collateral agent, Royal Indemnity Company and U.S. Bank National Association. Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the RLSA.

   As you are aware, Section 2.23 of the RLSA provides that "[w]ith respect to each Opportunity Loan, the Servicer shall direct or otherwise cause the related Opportunity Loan Borrower and the related Approved Distributor to direct or otherwise cause the Retailer of the Retailer Receivable related thereto to pay the related Opportunity Loan Borrower by wire transfer or check into the applicable Approved Distributor SPV Collection Account all amounts payable by such Retailer in respect of such Retailer Receivable or otherwise in connection with the Retailer Purchase Order related to such Opportunity Loan." As we have discussed on several occasions, Retailers have not been paying the Retailer Receivables related thereto into the Approved Distributor SPV Collection Account and, as such, the Servicer is in breach of its covenants under Section 2.23 of the RLSA. This breach (the "Breach") constitutes a Servicer Default under clause (ii) of the definition thereof and Events of Default under Sections 7.01(d) and (j) of the RLSA.

   Please be advised that (a) all rights, powers and remedies of the Agent and the Lender under the RLSA and all other Transaction Documents (collectively, the "Documents") and applicable law are hereby reserved and preserved in full with respect to the Breach (and the Servicer Default and the Events of Default which the Breach constitutes) and all other defaults under the Documents which may have occurred to date or may occur hereafter (such Breach, Servicer Default, Events of Default and other defaults being hereinafter referred to as the "Defaults") and (b) no action or inaction by the Agent or the Lender under the Documents or otherwise (i) was or is intended to be, or has operated or will operate as, a waiver of any of the Defaults or (ii) shall preclude any exercise of any right, power or remedy under any Document and/or applicable law with respect to any of the Defaults.

DZ BANK AG
Deutsche Zentral-Genossenschaftsbank,
Frankfurt am Main

Board of Managing Directors
Dr. Ulrich Brixner, Chairman
Uwe E. Flach, Deputy Chairman
Peter Dieckmann
Heinz Hilgert
Wolfgang Kirsch
Albrecht Merz
Dietrich Voigtländer
Dieter Wößner

Chairman of the Supervisory Board:
Dr. Christopher Pleister

Incorporated with limited liability in the
Federal Republic of Germany

Amtsgericht Frankfurt am Main
Commercial Register No.  HRB 45651

A Member of the German
Cooperative Financial Network

DZB000892

Please also note that our next due diligence visit will include a review of the pertinent records to ensure that signed Manufacturer Sale Orders, in the form agreed upon, are being received in connection with each new purchase of Subject Inventory.

I am looking forward to the opportunity to discuss the above matters with you when we meet in Las Vegas this week.

Very truly yours,

DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK, FRANKFURT AM
MAIN, as Agent

By: _____
Name: _POTRICK REECE_
Title: _VP_

DZB000893

# EXHIBIT T-23



Michael Plunkett
09/28/2001 04:42 PM

Sent by:  Michael Plunkett

To:      Vincent Salerno/USN-IZAS/IZ/DG BANK@DGBANK
cc:      Patrick Preece/USN-IZAS/IZ/DG BANK@DGBANK, Richard Wisniewski/USN-IZAS/IZ/DG
         BANK@DGBANK
Subject:  Re: New Business Committee Meeting - Opportunity Finance, LLC

Don't waste my fucking time with that piece of shit deal.

MP
Vincent Salerno 09/28/2001 04:40 PM



**Vincent Salerno**          09/28/2001 04:40 PM

Sent by:  Vincent Salerno

To:      Jennifer Wikoff/USN-IZAS/IZ/DG BANK@DGBANK, Richard Wisniewski/USN-IZAS/IZ/DG
         BANK@DGBANK, Kenneth Bradt/USN-IZAS/IZ/DG BANK@DGBANK, Tammy Ferone/USN-IZAS/IZ/DG
         BANK@DGBANK, Christine Ogden/USN-IZAS/IZ/DG BANK@DGBANK, Michael
         Plunkett/USN-IZAS/IZ/DG BANK@DGBANK, Daniel Marino/USN-IZAS/IZ/DG BANK@DGBANK, Patrick
         Preece/USN-IZAS/IZ/DG BANK@DGBANK, Mark Parsa/USN-IZAS/IZ/DG BANK@DGBANK, Kevin
         Healey/USN-IZAS/IZ/DG BANK@DGBANK, Francine Farragher/USN-IZAS/IZ/DG BANK@DGBANK,
         Stacey Rolsing/USN-IZAS/IZ/DG BANK@DGBANK
cc:
Subject:  New Business Committee Meeting - Opportunity Finance, LLC

All,

Please find attached the new business committee memorandum for Opportunity Finance, LLC, a proposed
$100 mio trade receivables-backed CP program.  The meeting has been scheduled for **1:30 PM on
Monday, October 1st** in the Board Room on the 13th floor.

Thanks.

VS



NewBusMemo (OpportunityFinance).c

DZB017820

# EXHIBIT T-24

# INTENTIONALLY OMITTED

# EXHIBIT T-25

18/09 '03 DO  10:19 FAX +49 69 74471072 1022 DZ BANK VS                    ☑002
SEP-09-03   12:08PM   FROM-DZ BANK H-49 69 74471072 1022      212 745 1556      T=418. P.002/028  F-823
                              2127451556

# Credit Application                                    **DZ BANK**

| Place / Date | Name / Tel. | Name / Tel. | Board resp. | | Pre-approval |  | ☐ §13 KWG |
|---|---|---|---|---|---|---|---|
| New York / 08.26.03 | P. Preate / 1666 | N. O'Conner / | (Customer) | | ☐ §13 KWG | | ☐ §15 KWG |
| | V. Salerno / 1639 | Credit Department: | CU | TD | ☐ K-B | | ☐ AR |
| Credit Rating – current: | Customer Department: ASG | | | 2 | Credit Rating – Score: | | 3 | ☒ Direct Loan |
| MAS-Rating **/ External Rating: | | Major Shareholders: | | | ☐ Syndicated Loan |
| Borrower/Place: | | | | | ☐ Joint-Ventured Loan |
| Opportunity Finance Securitization, LLC ("OFS") / | | Opportunity Finance, LLC (100%) | | | ☐ Yellow-List |
| Minneapolis, Minnesota - USA | | ("Opportunity") | | | ☐ Watch-List |
| | | | | | ☐ EWB-List |
| Industry: | Industry-Rating: | Existing EWB in TEUR: | | | ☒ Commitment | | 12.31.01 |
| Other Financing Institutions | | none | | | Last Visit (MM/DD/YY): | | 07.09.03 |
| Parent Company/Group: | | Major Shareholders: | | | * only for DZ Bank Singapore |
| Opportunity Finance, LLC (100%) | | 100% privately owned by the Sabes family. | | |

**Reason for application:**

Approval to modify and extend Autobahn's five year (approx. 3.5 years remaining) $100 mio revolving senior secured credit facility to OFS supported by a $102 mio term liquidity and credit enhancement facility provided by DZ Bank. The Autobahn facility will be reduced to $50 mio ($51 mio for DZ Bank) with a new maturity date of 2008, and Royal Indemnity's $50 mio first-loss policy will be replaced by a financial guaranty insurance policy from 'AA' rated Radian Asset Assurance. Next review date, 7/31/04. This application is submitted in conjunction with a New Facility application to OFS II, an affiliated SPV of Opportunity.

| Type of Loan | in TEUR | Applied for | New Limit | Collateral Value as of  09.26.03 | Utilization / Credit Equivalent as of 08.26.03 | Other Banks Share: |
|---|---|---|---|---|---|---|
| USD/EURO = 1.1212 | | | | | | |
| Liquidity & Credit Enhancement Facility | | (45,487) | 45,487 | 45,487 | 0 | |
| | | | | | | |
| Other existing Customer Limits: | | | | | | |
| Loans/Guaranties/Bills | | | | | | |
| Securities | | | | | | |
| Trading Limit | | | | | | |
| 1% (nominal) | | | | | | |
| Total Customer Exposure DZ BANK: | | (45,487) | 45,487 | 45,487 | 0 | |

Portion of Collateral value customer attributable to (in TEUR)

| Total Customer/Group Exposure DZ BANK | | 45,487 | 136,461 | 136,461 | 0 | |
| Total Customer/Group Exposure DZ BANK -Group (for info only) | | | | | | |

| Country Limit in TEUR: | | Utilization (last rate application) in TEUR: | | | | Country Rating: | | A |
| as of : | | New application in country limit structure: | | | Yes ☐  No ☒ | ☐ adjustment required | |

**Application with Explanations:**

The loans from Opportunity to Petters, financed by Autobahn under the Existing Facility, possess both an inventory stage and a trade receivable stage. Due to the heightened operational risks associated with holding and transporting goods during the inventory stage, ASG obtained a $50 mio first-loss insurance policy from Royal Indemnity Co. ("Royal"). Due to multiple rating downgrades over the past nine months, Royal has exited this business resulting in a wind down of our Existing Facility and zero exposure at this time. Requested modifications to the Existing Facility include: (i) reducing the 'size from $100 mio to $50 mio; (ii) replacing Royal's policy with a $50 mio policy from 'AA' rated Radian Asset Assurance, Inc. ("Radian"). The policy covers 100% of DZ Bank's portfolio with the exception of Sam's Club (division of 'AA' rated WalMart, for which only the first $10 mio of a possible $15 mio receivable exposure is covered) by Radian; and (iii) increasing the maximum advance rate from 80.0% to 91.5% of the principal balance of loans extended by Opportunity to Petters. Radian requires a 'BBB' S&P rating of the underlying transaction before giving effect to its policy. This requires sales be made to retailers rated at least 'BBB' by S&P.

**Recommendation:** Given (i) the strong performance of the collateral supporting the Existing Facility to date; (ii) the credit enhancement inherent in the facility structure; (iii) the introduction of a minimum 'BBB' rating for retailers; and (iv) the financial guaranty provided by 'AA' rated Radian, ASG recommends approval of this request.

| Customer Department (Signature) | KB | | | | | |
| Credit Department (Signature) | WB | | | | | |
| Approval Levels | | | | | | Approval No.: |
| | TD | | WK | | | |



Nancy O'Connor
09/18/2003 09:34 AM

To:       Patrick Preece/Branch/New York/DZ BANK
cc:
Subject:

---------------------- Forwarded by Wolfgang Bollmann/Branch/New York/DZ BANK on 09/18/2003 09:31 AM
--------------------------



Hans-Jörg Bannmann
09/18/2003 05:16 AM

To:       Wolfgang Bollmann/Branch/New York/DZ BANK@DZBANK
cc:       Dr. Martin Baranowski/UA/Frankfurt/DZ BANK@DZBANK
Subject:  Opportunity

Herr Bollmann,

reduction and replacement  approval  (Radian Asset Assurance) done, signatures Messres.
Duhnkrack and Kirsch , no further comment  (follows via fax)

KK - part (circulation). Westhoff´s remark: Precondition: Best Buy (or other Retailers below A -) are
limited to 25 Mio. Above 25 Credit protection has to be bought.

Kirsch: no further increase !


regards

Bannmann

DZB053897

# Credit Application

**DZ BANK**

| Place/ Date<br>New York / 08.26.03 | Name / Tel.<br>P. Preece / 1665<br>V. Salerno / 1659<br>Customer Department: | Name / Tel.<br>N. O'Connor / 13<br>Credit Department: | Board resp.<br>(Customer) | ☐ Pre-approval |  |
|---|---|---|---|---|---|
| | | | | ☐ § 13 KWG | ☐ § 15 KWG |

| | | | | | |
|---|---|---|---|---|---|
| **Credit Rating –current–:** | | 2 | **Credit Rating –new–:** | 2 | ☐ K + B    ☐ AR |
| **MAS-Rating **/ External Rating:** | | | **Major Shareholders:** | | ☒ Direct Loan |
| **Borrower/ Place:**<br>Opportunity Finance Securitization , LLC ("OFS") /<br>Minneapolis, Minnesota - USA | | | Opportunity Finance, LLC (100%)<br>("Opportunity") | | ☐ Syndicated Loan<br>☐ Joint Verbund Loan<br>☐ Yellow-List<br>☐ Watch-List<br>☐ EWB-Liste |
| **Industry:**          **Industry-Rating:**<br>Other Financing Institutions | | | **Existing EWB in TEUR:**<br>none | | ☒ Customer since:      12.31.01<br>Last Visit (MM/DD/JJ):    07.09.03<br>** only for DZ Bank Singapore |
| **Parent Company/ Group:**<br>Opportunity Finance, LLC (100%) | | | **Major Shareholders:**<br>100% privately owned by the Sabes family. | | |

**Reason for application:**

Approval to modify and extend Autobahn's five year (approx. 3.5 years remaining) $100 mio revolving senior secured credit facility to OFS supported by a $102 mio term liquidity and credit enhancement facility provided by DZ Bank. The Autobahn facility will be reduced to $50 mio ($51 mio for DZ Bank) with a new maturity date of 2008, and Royal Indemnity's $50 mio first-loss policy will be replaced by a financial guaranty insurance policy from 'AA' rated Radian Asset Assurance, Inc. Next review date, 7/31/04.   This application is submitted in conjunction with a New Facility application to OFS II, an affiliated SPV of Opportunity.

| Type of Loan          in TEUR | Applied for | New Limit | Collateral Value | Utilization/ Credit Equivalent | Other Banks Share |
|---|---|---|---|---|---|
| *USD/EURO = 1.1212* | | | as of     08.26.03 | as of     08.26.03 | |
| Liquidity & Credit Enhancement Facility | (45,487) | 45,487 | 45,487 | 0 | |
| | | | | | |
| **Other existing Customer Limits:** | | | | | |
| Loans/Guarantee/Bills | | | | | |
| Securities | | | | | |
| Trading Limit | | | | | |
| FX (nominal) | | | | | |
| **Total Customer Exposure DZ BANK:** | (45,487) | 45,487 | 45,487 | 0 | |

| **Portion of Collateral value customer attributable to (in TEUR)** | | |
|---|---|---|
| | | |

| | | | | |
|---|---|---|---|---|
| **Total Customer/Group Exposure DZ BANK** | 45,487 | 136,461 | 136,461 | 0 |
| **Total Customer/Group Exposure DZ BANK-Group** (for Info only) | | | | |

| Country Limit  inTEUR: | Utilization (incl. new application) in TEUR: | Country Rating:      A |
|---|---|---|
| as of : | New application in country limit structure:      Yes   ☒ No   ☐ adjustment required | |

**Applications with Explanations:**

The loans from Opportunity to Petters, financed by Autobahn under the Existing Facility, possess both an inventory stage and a trade receivable stage. Due to the heightened operational risks associated with holding and transporting goods during the inventory stage, ASG obtained a $50 mio first-loss insurance policy from Royal Indemnity Co. ("Royal"). Due to multiple rating downgrades over the past nine months, Royal has exited this business resulting in a wind down of our Existing Facility and zero exposure at this time. Requested modifications to the Existing Facility include: (i) reducing the size from $100 mio to $50 mio; (ii) replacing Royal's policy with a $50 mio policy from 'AA' rated Radian Asset Assurance, Inc. ("Radian"). The policy covers 100% of DZ Bank's portfolio with the exception of Sam's Club (division of 'AA' rated WalMart), for which only the first $10 mio of a possible $15 mio receivable exposure is covered by Radian; and (iii) increasing the maximum advance rate from 80.0% to 91.5% of the principal balance of loans extended by Opportunity to Petters. Radian requires a 'BBB' S&P rating of the underlying transaction **before** giving effect to its policy. This requires sales be made to retailers rated at least 'BBB' by S&P.

**Recommendation:** Given (i) the strong performance of the collateral supporting the Existing Facility to date; (ii) the credit enhancement inherent in the facility structure; (iii) the introduction of a minimum 'BBB' rating for retailers; and (iv) the financial guaranty provided by 'AA' rated Radian, ASG recommends approval of this request.

| Customer Department (Signature) | KB | OdO | | |
|---|---|---|---|---|
| Credit Department (Signature) | WB | Westhoff | | |
| Approval Level: | Board Member Market / Board Member Credit | | Approval No.: | |
| | TD | WK | | |

**Credit Application**                                                    **DZ BANK**

## Additional information on the credit application:

**Grundsatz weighting (%) / Weighted Margin**

50% (based upon term liquidity commitment) / 4.50% (based upon the 2.25% annual commercial paper fee)

| Calculation | Profit Contribution (DB) in TEUR | Risk Premium: | | Standard Risk Premium: |
|---|---|---|---|---|
| | DB I: | In TEUR: | | |
| | DB II: | In % | | |
| | DB III: | | | |

**Conditions**

## Further customer details:

**Evidenzmeldung according to § 14 KWG**

| | Current report dated (MM/YY) | | | Last report dated (MM/YY) | | |
|---|---|---|---|---|---|---|
| | EUR Mio total | Portion DZ (%) | Number of banks | EUR Mio. total | Portion DZ (%) | Number of banks |
| **Customer Group** | | | | | | |
| | | | | | | |

**Cross-Selling-Potential / Customer Relationship:**

Note that this proposal is being presented for approval subject to an agreement among DZ Bank, Radian and Opportunity Finance on a final transaction structure. It is possible that a closing for this modified facility may not occur.

**Latest annual report/financial statements and interim results:**

| as of : 12/31/02 annual 6/30/03 interim | Radian Group, Inc. (Opportunity Finance & Petters financials are attached to the Opportunity Finance Securitization II application) |
|---|---|

**Additional information concerning the current customer exposure:**

The collateral (receivables) supporting the Existing Facility has performed to expectations, with no breach of any performance or financial covenants to date. Loans originated by the Company and financed by Autobahn have been outstanding, on average, for 95 days, and average loan origination volume has been in excess of $42.0 mio per month. As of the date of this application, the exposure under the Existing Facility had been reduced to zero through the amortization of the financed assets (receivables). This amortization was a result of Royal's multiple downgrades since closing and certain issues pertaining to the facility lockbox account that were discovered during ASG's routine field audits. Specifically, retailers were making payments directly to Petters' operating account. These funds would then be transferred by Petters to the lockbox within 24 hours of receipt (transferring funds within 48 hours is the rating agency accepted standard). This issue has been addressed by transferring Petters' operating account from M&I Bank to US Bank and implementing a control agreement.

## Information on other parties involved (e.g. exporteur, sponsor, off-taker)

- Initially, approved retailers (buyers) of financed inventory under the modified facility shall include:

  1. Target ('A2' by Moody's, $9.8 bio net worth, FY 2002 net income of $1.7 bio).
  2. Costco ('A2' by Moody's, $6.0 bio net worth, FY 2002 net income of $700.0 mio).
  3. Sam's Club, a division of Wal-Mart ('Aa2' by Moody's, $39.3 bio net worth, FY 2003 net income of $8.0 bio).

  Concentration limits for individual retailers will be tiered by rating, provided that no receivable exposure to any single retailer will be allowed to exceed $10 mio (20% of the facility limit). With respect to Sam's Club, a $15 mio receivable concentration limit will exist, of which the first $10 mio will be covered by Radian's policy.

- 100% financial guaranty insurance policy will be provided by Radian Asset Assurance, Inc., rated 'AA' by both S&P and Fitch, Inc.

Votum of Creditmanagement for a revised credit application for Opportunity Finance Securitization, LLC

- Opportunity Finance LLC is a family owned specialty finance company that provides loans to distributors and currently to only one, Petters Company Inc. (Petters Inc.), a distributor that purchases excess inventory from manufacturers for sale to large discount retailers. Historically electronics have accounted for 70% of Petters sales. Petters Inc. via a new company Petters Consumer Brands (PCB) has begun to import electronic equipment under the Polaroid brand, for which it holds an exclusive license and plans to deal with additional licensed products. This credit package includes applications for two credit facilities to two wholly owned SPV subsidiaries of Opportunity Finance. The facility explained here is a modification and decrease (from $100 million to $50 million) of the existing Autobahn facility to Opportunity Finance Securitization, LLC (the SPV established for the existing Petters Inc. business). The second, explained separately, is for a new $100 million facility to a newly formed SPV, Opportunity Finance Securitization II, LLC to provide financing specifically for the new Petters Consumer Brands business, via a trade receivable securitization.

- In December 2001 DZ Bank approved a $100 million 5-year facility to be provided by Autobahn to Opportunity Finance Securitization, LLC for the financing of wholesale distributor loans secured by inventory and trade receivables due from approved retailer counterparties. The structure of this facility included a first loss insurance policy with the Royal Indemnity Co., a subsidiary of Royal & Sun Alliance Insurance Co., which at the time the deal closed was rated A1. Subsequent to the closing, the Royal was downgraded two times and the current rating is Baa2. Due to the downgrade of the Royal, and the company and DZ Bank's ongoing negotiations with a new third party insurer, Radian Asset Assurance Inc, (part of the Radian Group Inc), the current facility stopped funding new loans in May 2003 and as of today's date is paid in full.

- The credit application for Opportunity Finance Securitization, LLC is a modification to the existing facility and includes the following changes. This proposal is presented for approval, subject to an agreement among DZ BANK, Radian and Opportunity Finance on a final structure. It is possible that a closing for this modified facility may not occur.

    1. The amount of the facility will decrease from $100 million to $50 million;

    2. An extension of the December 2006 maturity date to June 2008, to provide a five year facility. The $51 million liquidity credit enhancement facility (102% of the Autobahn CP issuance) provided by DZ BANK to Autobahn will have the same maturity date of 2008.

    3. Replacement of the Royal $50 million first loss policy for the $100 million facility with a $50 million monoline insurance company guaranty from Radian Asset Assurance Inc. (S&P rating "AA") for the $50 million facility. This policy provides a full financial guaranty of all payments.

    4. The advance rate will increase from 80% of the loan amounts to 91.5% based upon the requirement that the underlying receivables will be from retailers with ratings of BBB or better and based upon the 100% insurance coverage. This increase in the loan advance rate is also supported by the performance to date of the Petters, Inc. loans and the underlying receivables.

    5. Concentration limits have been established in line with Radian's term sheet, which include 20% for any of the receivable counterparties. Excluded from this 20% limit is Sam's Club Inc. (a division of "AA" rated Wal-Mart), which will have a limit of 30% (reduced from the existing facility at 50%); resulting in a $5 mio exposure to Sam's, not covered by the Radian policy.

Radian Asset Assurance, Inc. (RAA; S&P rating AA) is a subsidiary of the Radian Group, Inc. (A2/A), which is involved in the financial guaranty, asset-backed insurance, mortgage insurance and bond re-insurance businesses. The Radian Group in the past worked closely with the "AAA" monoline insurers (MBIA, AMBAC, FSA) and provided re-insurance to their transactions. Over the past year, the company started to provide direct underwriting to clients for risks in the "AA" category and views this as its growth area. RAA, the insurance provider for our transaction, provides the direct underwriting for "AA"

DZB053900

transactions and has been supported by the parent company via capital contributions; $150 million in 2002 and $100 million in April 2003. In addition, an affiliate company, Radian Reinsurance provides a $50 million reinsurance policy for transactions. RAA works within the guidelines and criteria required by S&P to maintain its "AA" rating. This assures that the Radian Group will provide additional capital, if required, and/or the company will decrease its volume of underwriting to stay within the required ratios.

**Risks:**

Credit Risk: Lack of asset diversification; the Opportunity Finance loans are to only one distributor and the underlying receivables to repay those loans are from a limited number of approved retailers.

Mitigant: Petters Inc. has been in business for over 10 years and Opportunity Finance for over 5 years. During the 18 months that Opportunity Finance has been our client, all loans have been paid as agreed and no defaults from Petters or the receivable counterparties have occurred. The structures allow for pre-approved investment grade retailers as the receivable counterparties and will include performance triggers and ratings downgrades as a means of monitoring the receivable repayment risk. If a retailer is downgraded below BBB, they will no longer be eligible for the Radian transaction (for the trade receivable facility, the eligibility criteria is BBB- or better).The Radian policy includes pre-approved concentration limits for each of the retailers, with the Sam's Club exception, as noted above.

Credit Risk: Financial strength of our servicer, Opportunity Finance LLC and that of its client Petters Inc. related to servicing of the loans and delivery of goods to the retailers. For both facilities we will also have 2% recourse provided by each company as additional collateral to the transaction.

Mitigant: Opportunity Finance LLC is financed via the proceeds from our borrowers and via subordinated notes held by J. Sabes, the CEO, and various related parties. As of 6/30/2003, subordinated loans and equity at $55.9 mio supported SPV loans receivable of $31.9 mio and direct loans of $28.7 mio. The required sub debt and equity level of $13.44 mio is considered acceptable to support $150 mio in facilities to Opportunity Finance (via Securitization LLC and II) based upon the performance of the underlying receivables. It should be noted that during the tenor of our facility, the company maintained sub debt and equity way in excess of the required levels. Petters Company Inc. has reported net worth of $72 mio as of 12/31/2002 and balance sheet leverage of 3.4 to 1.0.

Operating Risk and Fraud: Opportunity Finance currently works with only one distributor, Petters Inc., and we will finance loans made by Opportunity Finance, directly to Petters, for the inventory/receivable transactions.

Mitigant: Under this facility, where inventory purchases are financed, the payments are made by Autobahn directly to the manufacturers and the receivable payments made to Petters are placed in a central lock box. The Radian policy is part of the structure to offset any inventory risk.

The structure put in place for the two facilities, whereby the flow of funds is directly from Autobahn to the manufactures (for the inventory loans) and directly from the retailers to bank controlled lock boxes, protects the bank against the commission of a fraud by Petters and or Opportunity Finance via the misuse of funds.

**Credit Rating:** The "2" rating is on the basis of the implied "A" rating supported by the collateral values and the structure, in addition to the "AA" Radian insurance policy.

**Recommendation:** Approval of the group exposure of $150 million to Opportunity Finance, LLC and affiliates, is recommended on the basis of the investment grade receivable counterparties, the support provided to Opportunity via the family funded subordinated loans and the structure of this facility that includes the Radian guaranty insurance policy. This $50 million insurance policy provides for full payment of all obligations under this facility.

Hans- Jörg Bannmann
UA/Frankfurt

Nancy J. O'Connor    8-29-03
Credit Underwriting-New York

DZB053901



Nancy O'Connor
09/12/2003 05:18 PM

To:     Frank Westhoff/UA/Frankfurt/DZ BANK@DZBANK
cc:     Hans-Jörg Bannmann/UA/Frankfurt/DZ BANK@DZBANK, Oliver D'Oelsnitz/Branch/New York/DZ
        BANK@DZBANK, Wolfgang Bollmann/Branch/New York/DZ BANK@DZBANK, Kenneth
        Bradt/Branch/New York/DZ BANK@DZBANK, Patrick Preece/Branch/New York/DZ
        BANK@DZBANK, Vincent Salerno/Branch/New York/DZ BANK@DZBANK
Subject:  Re: Opportunity Finance Securitisation, LLC and LLC, II

Dear Mr. Westhoff,

Attached is a memo prepared by ASG and reviewed and agreed to by Credit Underwriting New
York. The length of the memo reflects the fact that we have repeated each of your questions and
then answered them below.

In connection with your concern regarding the 50% (or $50 million) exposure to BBB- rated Best
Buy in the new $100 million receivable facility, the following summarises the conversation you and
N.J. O'Connor had on Thursday 9/11 and the conversation you and O. D'Oelsnitz had today. The
eligible receivable from Best Buy will be limited to $25 million within the $100 million facility with the
understanding that PCB/Petters will limit the exposure by increasing sales to the other approved
retailers or ASG will hedge the exposure, as required.  At this point in time, to purchase a CDS for
Best Buy for 5 years will cost between 90-100bps, which will reduce the return on this transaction.
As we will take out all Best Buy risk that exceeds $25 million, we do not consider a sell down of the
$100 million credit facility necessary at this time.  Depending upon usage and the number of retailer
obligors included in the financing, we will talk to interested participants prior to submitting any
increase in the facility.

Please contact any of us with any further information you require.  It is still our request to approve
this application "in circulation", but please advise if submission to the Tuesday Sept. 23rd Credit
Committee will be the quicker route to follow.


Regards,

Wolfgang Bollmann
Nancy J. O'Connor



opp fin-westhoff -9-12.doc




Frank Westhoff
09/10/2003 05:36 AM

To:     Wolfgang Bollmann/Branch/New York/DZ BANK@DZBANK

DZB053902

cc:     Nancy O'Connor/Branch/New York/DZ BANK@DZBANK, Hans-Jörg Bannmann/UA/Frankfurt/DZ
        BANK@DZBANK
Subject:  Opportunity Finance Securitisation II

Dear Mr. Bollmann,

thank you for submitting the credit application. Please let me make a few remarks/ask questions:

- Where is the sense of an intermediary between Petters and the lending bank? What is the
  added value of Opportunity Finance?
- What is the reason to create two separates special purpose vehicles for financing instead of
  increasing the first facility?
- You wrote that Opportunity was founded in 1998. Isn't it a short-time frame to judge over the
  historic viability?
- On page 2 of the credit application under the box 'additional information' on one hand we write
  that the loans have been outstanding on average for 95 days (this must fit to the receivable
  days) and on the other hand you wrote that the structure only allows the financing of 60 day
  receivables. How does this fit?
- I do not understand why you are reluctant to sell down parts of the increasing limits?
  Furthermore taking into respect the expected future growth to between 300 - 500 million.
  Whouldn't it be a good idea to find additional financiers in the beginning of the growth period?
- What is the reason that Opportunity has only one customer, namely Petters? Is there a
  connection between Opportunity and Petters?
- What is the reason for a maximum of 92% of the loan advance (?) made by Opportunity to
  Petters?
- Why do we distinct between the first and the second spv with respect to average outstanding
  days (60 versus 95)?
- Why do we choose several elegibility criteria (e.g. bbb for radian transactions versus bbb- in the
  new transaction)?
- I feel a bit uncomfortable with this concentration risk on Petters and on the only four final
  customers. In connection with the size of our exposure I would like to cap it below 100 million
  and to look for other banking participants in our transaction. Where do we set the level of
  subdebt and equity. Why are they below the actual numbers (13 million to 56 million)?
- What is the reason for taking only trade receivables as a collateral for financing the 100 million?
  Is there no need to finance the inventory phase?
- Do I understand it correctly that our existing facility will be reduced to 50 million guaranteed
  100% by Radian asset assurance?
- What comes first - the downpayment to the manufacture (what in fact  means that PCB has
  made purchase order) or the purchase order by the retailers?
- Why do we have a guarantee for the first facility but no one for the second one? Why do we
  have a recourse of only 2 % of  Opportunity Finance or Petters Company? In fact that means
  that they are only liable to a minimum extend for the business they pursue?
- The concentration limit of 50% seems high for my point of view, especially for a retailer at the
  non-investment-grade-borderline
- How can we prevent the retailers to pay on other accounts than our logbox-account (as far as I
  read in the past Opportunity Finance failed to properly service the loans).
- May be I have overseen it but which covenants are fixed with respect to minimum equity or
  subordinated notes provided for Opportunity Finance or PCB?
- For my point of view the selected financial data on page 6 of the application does not fit to the
  consilidated (?) statement of income (or better: it might give a wrong impression). In selected
  financial data we stated that income of roughly 30 million in the income statement at the botton
  line it is a loss? On a consolidated basis the net income is near Zero. Additionally the members
  equity is a quantity negligeable (this leads to the above mentioned question: Which minimum do
  we negotiate for subordinated notes?). What is behind the intercompany loans and the

DZB053903

subsidiary notes the balance sheet of Petters Company? In sum it is roughly 72 million which equates to the toal equity of 72 million? Referring to the P&L the net income of 21 million comes from roughly 30 million management fee provided by subsidiaries? What is the actual earning power?

- Who has to take care of the legal correctness of pledging receivables, e.g. between PCB and the Opportunity Finance, because this is aprecondition that Opportunity Finance can pledge receivables to Autobahn?
- I refer to exibit 3: How do the average outstanding days of 93 in 2002 fit to the data split in the data sheet aging experience?
- How was Opportunity able to finance its business while we have wind down the facility due to problems in the logbox-account and the rating-downgrade of the insurer?
- Why do we increase the advance rate from 80 to 91% for the existing facility?
- Do I understand it correctly that Radian (AA rated) covers our whole risk? If yes, why not taking a credit rating of 1, if no, which risk remains with us?
- What is the reason to put some time pressure on this case despite the fact that we are in negociations and in business with Opportunity since years?
- Why do we made differences beween the old facility and the new facility with respect to concentration limits? Moreover we do have higher concentration limits (50%) for the (for my point of view) weaker structure?
- Do we have a trigger which minimum rating is to be provided by Radian?
- Where is the material difference between the previous first loss insurance policy and the current financial guarantee insurance policy?
- What is the reason for that sam's club ist not guaranteed 100%?
- Why is the cross profit margin in the previous facility for Petters twice as high as for the new facility (16% versus 8%).
- In general I feel comfortable with the structure of the previous facility but i am reluctant to support the new one.

Please be so kind and answer the questions. Afterwards we can discuss by phone (Mr. Bollmann).

Kind regards

Frank Westhoff

DZB053904

Internal                                                            **ɪ̄ʒ̄ DZ BANK**

| From | | Date |
|---|---|---|
| Preece (1665) / Salerno (1659): DZ NA ASG | | 09.12.03 |
| To | | Contact Partner |
| Mr. Westhoff | | |

| Information | Comment | Decision |
|---|---|---|
| Bradt, D'Oelsnitz | | |
| Bollmann, O'Connor | | |
| Bannmann | | |

This information is being provided in response to your questions regarding the applications for
Opportunity Finance, LLC ("Opportunity") and its subsidiaries recently submitted by ASG.

**Q: Where is the sense of an intermediary between Petters and the lending bank?  What is the added value of Opportunity Finance?**
The Sabes family was one of the original financiers of Tom Petters' wholesale inventory trading business.
Mr. Petters places tremendous value on this relationship and, consequently, has shown great loyalty to
Opportunity over the years.  Due to the attractive loan terms that Opportunity extends to Petters and its
ability to provide relatively quick execution on financing transactions, Petters will continue to rely on
Opportunity as a major source of capital.   We have the direct relationship with John Sabes and
Opportunity Finance and value their role as servicer of the loans and for the due diligence they conduct.
In addition, Opportunity, via the Sabes investments, lends directly to Petters, which shows they are willing
to support the business and not just ask the bank to take the financing risks.

**Q: What is the reason to create two separates special purpose vehicles for financing instead of increasing the first facility?**
The new $100 mio facility will be collateralized solely by trade receivables generated by Petters
Consumer Brands' sale of consumer goods, while the existing $50 mio facility will continue to finance
Petters Company, Inc.'s wholesale inventory trading business (which is secured by both inventory and
accounts receivable).  Just as the collateral securing each facility will be separate and distinct, so too will
the special purposes borrowers established under each program.  Please note, however, that both SPV's
will be wholly-owned by the same originator of the financed assets, Opportunity Finance, LLC. The use of
the two SPV's also facilitates the separation of the financings, so the Radian policy can cover the
inventory and receivable transactions.

**Q: You wrote that Opportunity was founded in 1998.  Isn't it a short time frame to judge over the historic viability?**
Opportunity's five year historical experience spans across several periods of economic downturn,
including the widespread market turmoil experienced in the fourth quarter of 1998 and the current U.S.
recession.  Despite this, Opportunity has received 100% of all amounts (principal and interest) owed to it
by Petters, experiencing $0 of default or dilution to date.  It should also be noted that both the new and
existing facilities incorporate sizeable overcollateralization requirements to protect DZ Bank should
performance of the financed portfolio deteriorate over time.

**Q: On page 2 of the credit application under the box 'additional information' on one hand we write that the loans have been outstanding on average for 95 days (this must fit to the receivable days) and on the other hand you wrote that the structure only allows the financing of 60 day receivables. How does this fit?**

**Q: Why do we distinguish between the first and the second spv with respect to average outstanding days (60 versus 95)?**

DZB053905

Under the existing facility, loans made by Opportunity to Petters may be outstanding for up 120 days, to accommodate both an inventory and trade receivable stage. However, on average, these loans (which our conduit finances) have been outstanding for 95 days. Under the terms of the proposed $100 mio receivable facility, loans made by Opportunity to PCB will have a maximum tenor of 60 days, which is commensurate with the tenor of the trade receivables that ultimately secure repayment of Autobahn's advances.

**Q: I do not understand why you are reluctant to sell down parts of the increasing limits? Furthermore taking into respect the expected future growth to between 300 - 500 million. Wouldn't it be a good idea to find additional financiers in the beginning of the growth period?**
Autobahn is one of the smallest conduits of any bank, either US or international, and for a client with this level of financing needs, it is critical to our relationship with Opportunity Finance that we have the ability to hold $100 mio of this new facility. With the completion of this $100 mio facility, DZ Bank would have a right of first refusal to provide Opportunity's future facility growth and, to the extent possible, "skim" fees from other facility participants. In addition, ASG is exploring different methods of selling down (transferring risk) that don't include banking partners (selling medium term notes or use of a monoline insurer) that will allow DZ Bank to "skim" more of the fees than would be possible in a traditional pro-rata syndication. Therefore, ASG requests the ability to close the $100 mio new facility without a syndication requirement and, post-closing, methodically determine the most profitable way to grow the program in the future.

**In connection with the size of our exposure I would like to cap it below 100 million and to look for other banking participants in our transaction.**
In the aggregate, ASG seeks approval to provide Opportunity with $150 mio in financing commitments ($100 mio for the new facility and $50 for the existing facility). Of this amount, $50 million will be fully insured by 'AA' rated Radian (with the exception of Sam's Club as further described), leaving DZ Bank with net aggregate exposure of $100 mio. As this is in line with the overall cap you mention above, we do not believe there is a need for additional participants at this time.

**Q: What is the reason that Opportunity has only one customer, namely Petters? Is there a connection between Opportunity and Petters?**
Please see above for details regarding the relationship between Opportunity and Petters. While Opportunity plans on providing similar financing to other entities, it has not done so to date. This is primarily due to issues associated with financing direct competitors of Petters. Please note that inclusion of any new distributors in either the new or existing facility will require the pre-approval of DZ Bank, as Agent.

**Q: What is the reason for a maximum of 92% of the loan advance (?) made by Opportunity to Petters?**
ASG feels this advance rate is justified given (i) the reduced operational risks associated with not financing inventory stage receivables, (ii) the minimum investment grade obligor rating requirement, (iii) the short term nature of the receivables financed, and (iv) the strong performance of the loans extended by Opportunity to date (over $1.3 bio in loans with zero dilution or defaults). Please note that, pursuant to S&P's methodology for trade receivable financing programs, the effective advance rate against the principal balance of Opportunity's loans to Petters under the new facility may decrease to less than 92% depending on the actual amount of defaults and dilution experienced by the underlying portfolio of trade receivables (please refer to the illustration on page 5 of ASG's credit application for an example of this).

**Q: Why do we choose several eligibility criteria (e.g. bbb for radian transactions versus bbb- in the new transaction)?**
The minimum 'BBB' retailer rating requirement in the Radian transaction is necessary to achieve no less than a 'BBB' rating of the underlying transaction structure from S&P, which is a requirement by Radian to provide its insurance "wrap". Although Radian is not insuring the new transaction, we are comfortable with the minimum investment grade rating threshold (BBB-) on the basis of the 60 day receivable repayment terms.

DZB053906

Seite 3                                                                **DZ BANK**

**Q: I feel a bit uncomfortable with this concentration risk on Petters and on the only four final customers.**
It is important to recognize that DZ Bank is not taking the credit risk of Petters, as repayment of the facility obligations ultimately depends on the ability of the obligor (retailer) to pay for the goods it has purchased. The relatively liberal concentration limit of 50% per obligor under the new facility is mitigated by the short-term nature (60 days) of the receivables being financed. Additionally, as transaction volume increases, the obligor base is expected to grow over time, further diversifying DZ Bank's exposure.

**Q: The concentration limit of 50% seems high for my point of view, especially for a retailer at the non-investment-grade-borderline.**
This risk is mitigated by both the short-term nature of the receivables being financed and the ratings downgrade triggers embedded in the new facility structure. Should Best Buy, currently rated 'Baa3', be downgraded to below investment grade, no new Best Buy receivables would be eligible for financing and any existing receivables would amortize within 60 days.

**Q: Why do we make differences between the old facility and the new facility with respect to concentration limits? Moreover we do have higher concentration limits (50%) for the (for my point of view) weaker structure?**
The concentration limits outlined for the existing facility will primarily be a function of what Radian, as the guarantor taking substantially all of the credit risk, is willing to accept.

The more liberal concentration limits under the new facility are mitigated by (i) the short term nature of receivables being financed (maximum tenor is half that of the receivables financed under the existing facility); (ii) minimum overcollateralization of no less than 17% (15% based upon the receivable advance and 2% recourse to Opportunity. Although we have the 2% recourse to Petters, we do not include it in the calculations.), which may increase over time depending on the performance of the financed trade receivables and (iii) retailer ratings downgrade triggers which allow DZ bank to wind down exposure to a particular obligor prior to insolvency.

**Where do we set the level of subdebt and equity? Why are they below the actual numbers (13 million to 56 million)?**
Assuming full utilization of both the new and existing facilities, and taking into account the maximum advance rate against eligible receivables (i.e. loans made by Opportunity to Petters), the minimum required level of sub-debt/equity is derived as follows:

|  | New | Existing | Total |  |
|---|---|---|---|---|
| Loans Outstanding | 100,000,000 | 50,000,000 | 150,000,000 | (a) |
| Maximum Advance Rate | 92.0% | 91.5% |  | (b) |
| Minimum Required Collateral Balance | 108,695,652 | 54,644,809 | 163,340,461 | (c) = (a / b) |
| **Minimum Level of Sub-Debt/Equity** | **8,695,652** | **4,644,809** | **13,340,461** | (c - a) |

Although not required, Opportunity Finance has historically pledged all of its receivables to DZ Bank's facility due to administrative ease, creating substantial overcollateralization. If Opportunity places "ineligible" receivables into the SPV, then they also have to fund those receivables via additional sub debt, resulting in the higher reported sub debt/equity numbers

**Q: May be I have overseen it but which covenants are fixed with respect to minimum equity or subordinated notes provided for Opportunity Finance or PCB?**
Under the existing facility, minimum tangible net worth covenants currently exist with respect to DZ Bank's bankruptcy remote SPV Borrower, OFS ($12 mio), Opportunity Finance, LLC, as Servicer ( the same $12 mio) and Petters Company, Inc., as an approved distributor ($30 mio). Please note that OFS is fully consolidated in the statements of Opportunity Finance, LLC, so there is not a requirement of $24 mio on a combined basis.

DZB053907

**DZ BANK**

**Q: What is the reason for taking only trade receivables as collateral for financing the 100 million? Is there no need to finance the inventory phase?**
That is correct – Petters will be financing the "inventory stage" for these branded consumer goods using its own equity and/or proceeds from loans advanced by Opportunity.  Autobahn, however, will not advance proceeds until the goods have cleared customs, been accepted by the obligor and a legally binding receivable has been created.

**Q: Do I understand it correctly that our existing facility will be reduced to 50 million guaranteed 100% by Radian asset assurance?**
That is correct, with the exception of Sam's Club, a division of 'AA' rated Wal-Mart, for which the first $10 mio out of a possible $15 mio receivable exposure will be covered.

**Q: What comes first - the down payment to the manufacturer (what in fact means that PCB has made purchase order) or the purchase order by the retailers?**
PCB maintains a "just in time" inventory system under which goods are ordered as needed (based upon aggregate volume "pre-sale" indications from the retailer).  Once the goods have been ordered from the manufacturer and the down payment made, PCB immediately sends a purchase order to the retailer.
Regardless, under the new facility, the conduit will only fund trade receivables for which the related goods have been both paid for in full and received by the applicable obligor.  In other words, DZ Bank will not be exposed should PCB find itself unable to sell consumer goods ordered from the manufacturer.

**Q: Why do we have a guarantee for the first facility but no one for the second one?**
The guaranty under the existing facility was procured due primarily to (i) the heightened operational risks associated with holding and transporting merchandise during the inventory stage and (ii) the ability to sell inventory to entities rated below investment grade or not rated at all.  The new facility, however, will be a pure trade receivable financing program (no inventory allowed) under which the validity of receivables will be verified by DZ Bank prior to funding and all obligors must be rated at least investment grade.

**Why do we have recourse of only 2 % from Opportunity Finance or Petters Company? In fact that means that they are only liable to a minimum extend for the business they pursue?**
This recourse is **in addition to** the minimum overcollateralization requirements of the new and existing facilities, which function as "first-loss" protection for DZ Bank (15% and 23%, respectively, expressed as a percentage of the outstanding gross receivable balance). [ _____ Redacted- Privileged _____ ]

# Redacted- Privileged

**Q: How can we prevent the retailers to pay on other accounts than our lock-box account (as far as I read in the past Opportunity Finance failed to properly service the loans).**
The lock-box issues described in ASG's application were a direct result of the retailer's unwillingness to make payments on receivables to the individual financiers of those receivables.  This situation has been rectified in the existing facility and will be avoided altogether under the new facility by establishing a new lockbox for Petters Consumer Brands.  Evidence that retailers have made at least one payment into the segregated lockbox account will be required prior to the conduit's first advance.

**Q: For my point of view the selected financial data on page 6 of the application does not fit to the consolidated (?) statement of income (or better: it might give a wrong impression). In selected financial data we stated that income of roughly 30 million in the income statement at the bottom line it is a loss? On a consolidated basis the net income is near Zero. Additionally the members' equity is a quantity negligible (this leads to the above mentioned question: Which minimum do we negotiate for subordinated notes?).**
Opportunity funds its "equity" in the loans it advances to Petters (which Autobahn finances) through the issuance of subordinated notes.  The gross balance of these subordinated notes, which are of a lower repayment priority than Autobahn's advances, are included in the calculation of Opportunity's net worth.

**DZ BANK**

As a result, the $53.85 mio balance of these notes has been added to member's equity of $23,112 at 12/31/02 to yield the total capital base of $53.9 mio presented in ASG's application.

Acting essentially as a pass-through entity, Opportunity distributes the net interest margin it realizes from its operations to its subordinated note holders in the form of interest payments. Therefore, the amount of these distributions, which was $30.7 mio for fiscal year 2002, has been added back to the nominal net loss of $1,888 to obtain Opportunity's "gross" bottom line figure (prior to distributions) of $30.7 mio.

**What is behind the inter-company loans and the subsidiary notes on the balance sheet of Petters Company? In sum it is roughly 72 million which equates to the total equity of 72 million? Referring to the P&L the net income of 21 million comes from roughly 30 million management fee provided by subsidiaries? What is the actual earning power?**
The balance sheet item "Note-Subsidiary" of $31.6 mio represents Petters' interest in a special purpose corporation established to finance its wholesale inventory trading business, while "Inter-Companies Loans" of $40.1 mio represents a loan to a special purpose entity formed exclusively to acquire Fingerhut from Federated. The $30 mio in management fees from the income statement represent profits from wholesale inventory trading implemented through the special purpose entities.

**Q: Who has to take care of the legal correctness of pledging receivables, e.g. between PCB and the Opportunity Finance, because this is a precondition that Opportunity Finance can pledge receivables to Autobahn?**

# Redacted- Privileged

**Q: I refer to exhibit 3: How do the average outstanding days of 93 in 2002 fit to the data split in the data sheet aging experience?**
The 93 days you refer to represents the average number of days it took a receivable transaction (i.e. a loan to Petters) to be repaid during 2002. The aging experience in **Exhibit III** is a spot in time stratification of the portfolio of loans by days outstanding as of the date indicated.

**Q: How was Opportunity able to finance its business while we wind down the facility due to problems in the lock-box account and the rating-downgrade of the insurer?**
Opportunity has funded its business with Sabes family capital in the absence of availability under DZ Bank's facility. Please keep in mind that, prior to our facility closing in December 2001, Opportunity funded 100% of its business with equity capital supplied by the Sabes family.

**Q: Why do we increase the advance rate from 80 to 91% ("of the amount of the Opp loan to Petters") for the existing facility?**
Given the surety protection from highly rated Radian, and in light of the performance of the collateral securing the loans made by Autobahn to date, ASG is comfortable increasing the advance rate against Opportunity's loans to Petters from 80% to a maximum of 91.5%. This modification remains subject to (i) maintenance of a 'BBB' underlying transaction rating from S&P and (ii) Radian's final approval.

**Q: Do I understand it correctly that Radian (AA rated) covers our whole risk? If yes, why not taking a credit rating of 1, if no, which risk remains with us?**

The Radian policy covers 100% of DZ Bank's exposure with the exception of Sam's Club, a division of 'AA' rated Wal-Mart, for which the first $10 mio out of a possible $15 mio receivable exposure will be covered. For this reason, the new facility has been assigned a risk rating of '2'.

**Q: What is the reason to put some time pressure on this case despite the fact that we are in negotiations and in business with Opportunity since years?**
For strategic reasons, ASG seeks approval as soon as possible in order to provide the customer, Opportunity, with the additional financing capacity it needs to support Petters' consumer goods business. This will shore up future opportunities for DZ Bank to supply additional availability over time as the

Seite 6                                                                    **DZ BANK**

business grows. Additionally, obtaining approval and closing these facilities as soon as possible will allow DZ Bank to begin regenerating some of the income lost as a result of the current facility amortization.

**Q: Do we have a trigger which minimum rating is to be provided by Radian?**
It is not market standard for the larger, more highly rated monolines to grant ratings downgrade triggers. In lieu of a ratings trigger, ASG has successfully negotiated, in certain instances, cross default provisions to other insurance policies written by the same insurance company. Discussions regarding similar provisions will be had with Radian and, if possible, incorporated into the structure.

**Q: Where is the material difference between the previous first loss insurance policy and the current financial guarantee insurance policy?**
From a coverage perspective, the policies are identical in that they are written to ensure payment by the insurer regardless of the cause (i.e. fraud, default, etc.). Note that, as a percentage of the committed facility size, Radian's policy represents 100% of the proposed facility limit, whereas Royal's policy represents only 50% of the current $100 mio limit.

**Q: What is the reason for that Sam's club is not guaranteed 100%?**
Due to regulatory restrictions, Radian cannot take receivable exposure to any individual retailer in excess of 20%, or $10 mio. However, as Petters has historically done a large volume of transactions with Sam's Club, Opportunity has requested additional availability to accommodate the financing of these receivables.

**Q: Why is the Gross profit margin in the previous facility for Petters twice as high as for the new facility (16% versus 8%)?**
The existing facility provides financing for "odd-lot" transactions, where Petters purchases products at a discount to market prices and then sells them to discounters. Because of the company's ability to negotiate good purchase prices, it can sell at higher margins and the discounter still receives a good price. The lower margin in the branded import business results from the costs involved in importing the goods and the fee paid for the brand license. In addition, the lower profit margin is a result of PCB's focus on generating significant volume in order to establish market share. PCB expects the reduced margin to be offset, in part, by the larger volume of goods being sold. In contrast, Petters' inventory trading platform was a high margin, low volume business.

**Q: In general I feel comfortable with the structure of the previous facility but I am reluctant to support the new one.**
ASG <u>strongly</u> believes that the new facility should be supported because:
- The receivables have a maximum original term of 60 days.
- The obligors are required to be rated at least investment grade.
- The existence of strict downgrade triggers which allow DZ Bank to wind down exposure to obligors whose financial condition deteriorates within 60 days. <u>There has never been a retailer in history that has gone from investment grade to insolvent in less than a year, let alone 60 days.</u>
- The facility finances trade receivables only versus inventory and trade receivables in the existing deal.
- The pricing on this investment grade obligor only transaction is CP + 275 bps.
- DZ Bank will have the right to generate more fees on all future financings.

DZB053910

**Internal**                                                                    **DZ BANK**

**Opportunity Finance Securitization LLC – Request for Modification to Existing $102 mio Term Liquidity & Credit Enhancement Facility**

| From | Date |
|---|---|
| Patrick Preece (1665) / Vincent Salerno (1659): DZ NA ASG | 08.26.03 |

| To | Contact Partner |
|---|---|
| Bannmann / Westhoff | |

| Information | Attention | Decision | |
|---|---|---|---|
| H.O.: Ziese/IZ, Michael Wolf, F/REAU | d'Oelsnitz Bollman | Messrs. Duhnkrack and Kirsch | |

## I.    Background

As stated in ASG's application for the $100 mio New Facility to Opportunity Finance Securitization II, LLC, the Existing Facility provides for the financing of loans made by Opportunity Finance to Distributors. Opportunity Finance lends funds to Distributors which purchase retail goods and simultaneously obtain purchase orders for those goods from large, nationally known American retail chain stores. The loans from Opportunity Finance to Distributors possess both an 'inventory stage' (i.e. the point at which goods are purchased until they are delivered to the applicable buyer, typically 30 – 45 days) and a 'trade receivable stage' (i.e. the point at which goods are delivered to the purchaser until such time as the purchaser makes payment, typically 45 – 60 days). Due to the heightened operational risks associated with holding and transporting merchandise during the inventory stage, ASG obtained a $50.0 million first-loss[1] insurance policy from Royal Indemnity Co. ("Royal"), rated 'A1'/'AA-' by Moody's and Fitch, respectively, at closing in December of 2001. Royal has since exited this business due to multiple downgrades over the past nine months, which has resulted in a wind down of the Existing Facility exposure (zero as of the date of this application). However, in an effort to maintain this relationship, Opportunity Finance has requested certain modifications to the Existing Facility, which include the following:

- Reducing the committed size from $100 mio to $50 mio, which will reduce DZ Bank's term liquidity and credit enhancement facility to $51 mio (102% of $50 mio).

- Replacing the $50 mio first-loss insurance policy provided by 'Baa2'/'BBB+' rated Royal with a **100% financial guaranty insurance policy** from 'AA' rated Radian Asset Assurance, Inc. ("Radian"), which will unconditionally and irrevocably guaranty payment of timely interest and ultimate principal. In order to procure this policy, the modified facility will be required to maintain a minimum rating of 'BBB' by S&P <u>before</u> giving effect to the Radian policy. The one exception to the 100% guaranty is Sam's Club, for which only the first $10 mio of a possible $15 mio receivable exposure will be covered by Radian.

- Increasing the advance rate from 80% to a maximum of 91.5% against the outstanding principal balance of loans extended by Opportunity Finance to its Distributors (currently, only Petters) given Radian's financial guaranty insurance policy and the strong performance of the collateral to date. The 91.5% advance against Opportunity's loan to Petters translates into an effective advance of 77.3% against the gross balance of receivables securing this program (see chart on page 3).

- Requiring all retailers to which financed inventory is sold to be rated at least 'BBB' by S&P.

The above listed modifications will allow Opportunity Finance to continue financing Inventory Trading Transactions while improving the overall risk profile of the facility (DZ Bank's exposure will be to a minimum underlying 'BBB' transaction guaranteed by a 'AA' rated monoline insurance company). As this is the first ASG transaction on which a Radian guaranty will be employed, the modified facility will also allow DZ Bank to diversify its monoline insurance company exposure.

---

[1] "First Loss" implies that, should the overcollateralization inherent in the structure prove insufficient to cover losses on the financed receivables, Royal will be required to absorb the first $50 million of losses over and above what the program can sustain before DZ Bank would incur a dollar of loss.

**DZ BANK**

Please note that this proposal is being presented for approval subject to an agreement among DZ Bank, Radian and Opportunity Finance on a final transaction structure.  It is possible that a closing for this modified facility may not occur.

## II. Modified Terms and Conditions

**Existing Borrower** ...................Opportunity Finance Securitization LLC ("OFS" or the "Existing Borrower"), a bankruptcy-remote, wholly owned subsidiary of Opportunity Finance.

**Autobahn Program**...................$50.0 mio senior secured revolving commercial paper warehouse facility to finance loans extended by Opportunity Finance to Petters secured by both inventory and accounts receivable.

**Program Term**...........................Five (5) years revolving from the modification date of the Existing Facility.

**DZ Bank Liquidity Facility** .......A five (5) year $51.0 mio term liquidity and credit enhancement facility to support the issuance of commercial paper by Autobahn.

**Credit Enhancement** ...............(a) 100% financial guaranty insurance policy from 'AA' rated Radian, which unconditionally and irrevocably guarantees payment of timely interest and ultimate principal under the program (with the limitation on Sam's Club as noted above);

(b) overcollateralization of 22.7% based upon the effective receivable advance rate of 77.3%.  Autobahn's advances will at all times be limited to 91.5% of the principal balance of loans extended by Opportunity Finance to Petters, which on average represent 84.5% of the gross receivable balance;

(c) 2.0% recourse from Opportunity Finance ($53.9 mio in members' equity as of 12/31/02);

(d) 2.0% recourse from Petters Company, Inc. ($72.0 mio net worth as of 12/31/02).

**Back-up Servicer &
Custodian**.................................US BANK, N.A. (rated 'Aa3' by Moody's).

**Pricing** .......................................(a) Facility Fees of 2.25% per annum on the outstanding balance of loans;

(b) Non-Use Fee of 0.30%;

(c) Funded liquidity rate (during a CP disruption) of 1 MO LIBOR plus 3.25% (or the Base Rate if LIBOR is unavailable).

**Minimum Shadow Rating**.........'BBB' by S&P before giving effect to Radian's financial guaranty insurance policy.

**Facility Exclusivity** ..................Opportunity Finance is required to fund its origination of trade finance loans extended to Petters through DZ Bank's commercial paper facility for the Program Term.

**Legal Counsel**...........................Kaye Scholer LLP.

## III. Securitization Structure

Under the terms of the modified facility, Autobahn Funding Company LLC will provide a five year, $50.0 million senior secured revolving credit facility, the proceeds of which will be used to fund Opportunity Finance's direct origination of loans to Distributors secured by inventory and accounts receivable. ~~Redacted- Privileged~~

~~Redacted- Privileged~~    OFS will pledge these loans to Autobahn in order to secure commercial paper proceeds raised in the capital markets.  OFS will also pledge the Radian policy, which will unconditionally and irrevocably guaranty payment of timely interest and ultimate principal under the program (see below for more information on Radian).  Please note that, with the exception of the Radian policy, these mechanics are identical to those of the Existing Facility.

DZB053912

**DZ BANK**

To support the issuance of commercial paper by Autobahn, DZ Bank will provide a $51.0 mio (102% of $50.0 mio) term liquidity and credit enhancement facility. Of this amount, up to $50.0 mio will be available to cover principal advances and up to $1.0 mio will be available to cover discount on commercial paper issued to fund loans under the program.

Initially, obligors to which goods are sold will include Target (rated 'A2'/'A' by Moody's and Fitch), Costco ('A2' by Moody's, $6.0 bio net worth, FY 2002 net income of $700.0 mio) and Sam's Club, a division of Wal-Mart ('Aa2' by Moody's, $39.3 bio net worth, FY 2003 net income of $8.0 bio). Note that, in order to maintain the 'BBB' rating of the facility before giving effect to Radian's policy, all retailers to which financed goods are sold will be required to be (i) rated at least 'BBB' by S&P or (ii) covered by a credit default swap written by a highly rated counterparty acceptable to DZ Bank and Radian that is obtained and paid for upfront by the Borrower. Additionally, all approved retailers to which goods are sold must be pre-approved by both DZ Bank and Radian.

For a detailed transaction diagram, please refer to **Exhibit I.**

Credit Enhancement

Opportunity Finance's maximum 98% advance to Distributors against the cost of goods (inventory) sold and Autobahn's maximum 91.5% advance against Opportunity's principal investment yields minimum overcollateralization under the modified facility of 22.7% (as measured on the gross balance of retailer receivables). The following diagram illustrates the credit enhancement using a hypothetical Inventory Trading Transaction:

| | | |
|---|---|---|
| Average Sale Price to Retailer (Gross Receivable Value) | 116.0 | (a) |
| Cost of Goods to Distributor (COG) | 100.0 | (b) |
| Average Profit Margin | 16.0% | ((a - b) / b) |
| | | |
| Maximum Opportunity Finance Advance to Petters @ 98.0% of COG | 98.0 | (c) = (0.98 * b) |
| Maximum Autobahn Advance @ 91.5% of Opp Finance Investment | 89.7 | (d) = (0.915 * c) |
| Overcollateralization | 26.3 | (e) = (a - d) |
| *(on balance of Gross Receivable)* | | |
| **Minimum Overcollateralization Percentage** | **22.7%** | (e / a) |

Please note that the enhancement percentages depicted above **do not** give effect to Radian's financial guaranty insurance policy or the 2.0% recourse provided by both Opportunity Finance and Petters.

Radian Group, Inc.

Radian Group Inc. (NYSE: RDN), headquartered in Philadelphia, is a leading credit enhancement provider to the global financial and capital markets. Radian's subsidiaries provide products and services through three business lines: financial guaranty, bond reinsurance, mortgage insurance and mortgage services. Founded in 1988 and rated 'AA' by Standard & Poor's and Fitch, Inc., Radian Asset Assurance Inc. is Radian Group's "monoline" insurance company that provides financial guaranty insurance to the holders of debt obligations and asset-backed securities.

As of the end of 2002, Radian Group reported total assets of $5.4 bio, stockholders' equity of $2.8 bio, market capitalization of $4.2 bio and net income for FY 2002 of $421.7 mio. The Group's provision for losses was $243.3 mio for 2002 ($48.8 mio of which related to Radian's financial guaranty insurance business), an increase of $35.2 mio or 16.9% from $208.1 mio in 2001. Approximately $15.3 mio of this increase related to Radian's mortgage insurance business to support an increase in delinquencies and claim payments, while $19.9 mio was due to loss reserve increases in its financial guaranty business to support growth and an increase in trade credit reinsurance claims. Despite this increase in loss provisions, Radian Group and its financial guaranty subsidiaries (including Radian Asset Assurance, Inc.) remain well capitalized and highly rated.

DZB053913

Seite 4                                                                                    **DZ BANK**

For detailed financial information, please refer to **Exhibit II** for Radian Group, Inc.'s 2002 audited and 6/30/03 interim financial statements and **Exhibit III** for a Standard & Poor's research report on Radian Asset Assurance Inc.

## IV.   Conclusion/Recommendation

DZ Bank was engaged by Opportunity Finance due to its ability to understand this asset class and develop a financing facility that enabled the Company to capitalize on its potential in the wholesale inventory trading industry. This request provides DZ Bank with the opportunity to support the Company's inventory trading business while at the same time improving the overall risk profile of the facility and earning above market risk-adjusted returns on high quality assets.

Given the risk/return profile of this transaction and the strategic importance of maintaining our presence as an innovator in this market, ASG recommends approval of this application on these or very similar terms.

Preece _____                    Bollmann _____

Salerno _____                   d'Oelsnitz _____

Bradt _____

## V.   Exhibits

| | |
|---|---|
| Exhibit I | Transaction Diagram |
| Exhibit II | Financial Statements – Radian Group, Inc. |
| Exhibit III | S&P Research – Radian Asset Assurance, Inc. |

*Please refer to the credit application for Opportunity Finance Securitization II, LLC for Opportunity Finance, LLC and Petters Company, Inc. financials as well as for historical loan performance.*

DZB053914

**DZ BANK**

# EXHIBIT I

Transaction Diagram

DZB053915

**DZ BANK**



1. The Distributor sources excess inventory from a seller such as RCA or Sony (the "Wholesaler") and then seeks to find a buyer looking to purchase the inventory for re-sale to consumers at the retail level (a "Retailer"). Once a Retailer has been found, purchase orders for both the purchase from the Wholesaler and the sale to the Retailer are contemporaneously issued.
2. These purchase orders are then assigned to Opportunity Finance, who in turn lends funds to the Distributor to complete the wholesale inventory trade.
3. Proceeds of the loan to the Distributor are forwarded directly to the Wholesaler for the purchase of the merchandise – **at no time do proceeds get advanced directly to the Distributor**.
4. The Distributor then arranges for shipment of the merchandise directly to the Retailer (the Distributor **never takes possession** of the merchandise). Upon receipt of the merchandise, an account receivable owed to Opportunity Finance is created.
5. **Redacted- Privileged**
6. OFS then pledges receivables purchased from Opportunity Finance to Autobahn as collateral in order to draw down under the facility. Autobahn will issue commercial paper in order to fund its obligations under the loan agreement, advancing up to 80% of Opportunity Finance's principal investment in the merchandise and accounts receivable.
7. Payments on the underlying accounts receivable will be made by the Retailer to a segregated Lockbox Account under the control of the Lender. Funds deposited into the Lockbox Account will be swept to a central Collection Account held by the Trustee for the benefit of the Lender on a daily basis. OFS can use funds in the Collection Account to either (i) purchase additional receivables from Opportunity Finance or (ii) pay down the loan balance under the facility.
8. A term liquidity and credit enhancement facility will be provided to Autobahn by DZ Bank. Radian Asset Assurance, Inc. will provide a 100% financial guaranty insurance policy to ensure payment of timely interest and ultimate principal under the program.

DZB053916

# EXHIBIT II

Financials - Radian Group Inc.

DZ BANK

ANNUAL REPORT 2002

RADIAN

DZB053918

16

# CONSOLIDATED BALANCE SHEETS

(in thousands, except share and per-share amounts)

| | December 31 | |
| --- | --- | --- |
| | 2002 | 2001 |
| **ASSETS** | | |
| Investments | | |
| Fixed maturities held to maturity — at amortized cost (fair value $379,643 and $461,962) | $ 356,000 | $ 442,198 |
| Fixed maturities available for sale — at fair value (amortized cost $3,332,102 and $2,552,930) | 3,448,926 | 2,567,200 |
| Trading securities — at fair value (amortized cost $39,261 and $22,599) | 37,619 | 21,659 |
| Equity securities — at fair value (cost $196,766 and $116,978) | 168,517 | 120,320 |
| Short-term investments | 180,919 | 210,788 |
| Other invested assets | 8,346 | 7,310 |
| Total investments | 4,200,327 | 3,369,475 |
| Cash | 21,969 | 60,159 |
| Investment in affiliates | 259,120 | 177,465 |
| Deferred policy acquisition costs | 183,587 | 151,037 |
| Prepaid federal income taxes | 294,136 | 326,514 |
| Provisional losses recoverable | 48,561 | 47,229 |
| Other assets | 385,705 | 306,747 |
| | $5,393,405 | $4,438,626 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Unearned premiums | $ 618,050 | $ 513,932 |
| Reserve for losses and loss adjustment expenses | 624,577 | 588,663 |
| Short-term and long-term debt | 544,145 | 324,076 |
| Deferred federal income taxes | 570,279 | 432,098 |
| Accounts payable and accrued expenses | 282,919 | 233,549 |
| | 2,639,970 | 2,092,298 |
| Commitments and contingencies (Note 12) | | |
| Redeemable preferred stock, par value $.001 per share; 800,000 shares issued and outstanding in 2001 — at redemption value | — | 40,000 |
| Common stockholders' equity | | |
| Common stock, par value $.001 per share; 200,000,000 shares authorized; 95,134,279 and 94,170,300 shares issued in 2002 and 2001, respectively | 95 | 94 |
| Treasury stock: 1,581,989 and 188,092 shares in 2002 and 2001, respectively | (51,868) | (7,874) |
| Additional paid-in capital | 1,238,698 | 1,210,088 |
| Retained earnings | 1,508,138 | 1,093,580 |
| Accumulated other comprehensive income | 58,372 | 10,440 |
| | 2,753,435 | 2,306,328 |
| | $5,393,405 | $4,438,626 |

# CONSOLIDATED STATEMENTS OF INCOME

*See Notes to Consolidated Financial Statements.*

(in thousands, except per share amounts)

| | Year Ended December 31 | | |
| --- | ---: | ---: | ---: |
| | 2002 | 2001 | 2000 |
| **REVENUES:** | | | |
| Premiums written: | | | |
| Direct | $ 875,190 | $753,392 | $592,734 |
| Assumed | 147,633 | 90,917 | 80 |
| Ceded | (67,904) | (60,665) | (48,542) |
| Net premiums written | 954,919 | 783,644 | 544,272 |
| Increase in unearned premiums | (107,794) | (67,764) | (23,401) |
| Net premiums earned | 847,125 | 715,880 | 520,871 |
| Net investment income | 178,841 | 147,487 | 82,946 |
| Equity in net income of affiliates | 81,749 | 41,309 | — |
| Other income | 44,375 | 42,525 | 7,438 |
| Total revenues | 1,152,090 | 947,201 | 611,255 |
| **EXPENSES:** | | | |
| Provision for losses | 243,332 | 208,136 | 154,326 |
| Policy acquisition costs | 100,818 | 84,262 | 51,471 |
| Other operating expenses | 175,313 | 132,516 | 57,167 |
| Interest expense | 28,824 | 17,803 | — |
| Total expenses | 548,287 | 442,717 | 262,964 |
| **GAINS AND LOSSES:** | | | |
| Net gains on disposition of investments | 10,462 | 6,824 | 4,179 |
| Change in fair value of derivative instruments | (12,989) | (5,777) | — |
| Net (losses) gains | (2,527) | 1,047 | 4,179 |
| Pretax income | 601,276 | 505,531 | 352,470 |
| Provision for income taxes | 174,107 | 145,112 | 103,532 |
| Net income | 427,169 | 360,419 | 248,938 |
| Dividends to preferred stockholder | 2,475 | 3,300 | 3,300 |
| Premium paid to redeem preferred stock | 3,003 | — | — |
| Net income available to common stockholders | $ 421,691 | $357,119 | $245,638 |
| Basic net income per share | $ 4.47 | $ 3.95 | $ 3.26 |
| Diluted net income per share | $ 4.41 | $ 3.88 | $ 3.22 |
| Average number of common shares outstanding basic | 94,306 | 90,474 | 75,768 |
| Average number of common and common equivalent shares outstanding — diluted | 95,706 | 91,958 | 76,298 |

17

DZB053920

EXHIBIT INDEX

Table of Contents

2

PART I--FINANCIAL INFORMATION

ITEM 1. Financial Statements

Radian Group Inc. and Subsidiaries

CONDENSED CONSOLIDATED BALANCE SHEETS (UNAUDITED)

|  | June 30, 2003 | December 31, 2002 |
|---|---|---|
|  | (In thousands, except share and per-share amounts) | |
| **Assets** | | |
| Investments | | |
| Fixed maturities held to maturity—at amortized cost (fair value $343,666 and $379,643) | $ 320,779 | $ 356,000 |
| Fixed maturities available for sale—at fair value (amortized cost $3,786,833 and $3,332,102) | 3,979,978 | 3,448,926 |
| Trading securities—at fair value (cost $44,071 and $39,261) | 43,464 | 37,619 |
| Equity securities—at fair value (cost $205,449 and $196,766) | 205,807 | 168,517 |
| Short-term investments | 178,328 | 180,919 |
| Other invested assets | 5,662 | 8,346 |
|  | ------- | ------- |
| Total Investments | 4,734,018 | 4,200,327 |
|  | ------- | ------- |
| Cash | 35,184 | 21,969 |
| Investment in affiliates | 282,765 | 259,120 |
| Deferred policy acquisition costs | 206,613 | 183,587 |
| Prepaid federal income taxes | 310,736 | 294,136 |
| Provisional losses recoverable | 46,463 | 48,561 |

*RADIAN GROUP INC*

*Filing Date: 06/30/03*

|  | | |
|---|---:|---:|
| Accrued investment income | 53,403 | 47,762 |
| Accounts and notes receivable | 112,526 | 86,850 |
| Property and equipment, at cost (less accumulated depreciation of $27,700 and $21,703) | 61,982 | 55,580 |
| Other assets | 209,268 | 195,513 |
|  | $ 6,052,958 | $ 5,393,405 |

**Liabilities and stockholders' Equity**

|  | | |
|---|---:|---:|
| Unearned premiums | $ 562,292 | $ 618,050 |
| Reserve for losses | 653,382 | 624,577 |
| Long-term and short-term debt | 717,291 | 544,145 |
| Deferred federal income taxes | 659,252 | 570,279 |
| Accounts payable and accrued expenses | 334,737 | 282,919 |
|  | 3,026,954 | 2,639,970 |

Common stockholders' equity

|  | | |
|---|---:|---:|
| Common stock, par value $.001 per share; 200,000,000 shares authorized; 95,344,199 and 95,134,279 shares issued in 2003 and 2002, respectively | 95 | 95 |
| Treasury stock: 1,944,640 and 1,581,989 shares in 2003 and 2002, respectively | (63,892) | (51,868) |
| Additional paid-in capital | 1,244,593 | 1,238,698 |
| Retained earnings | 1,720,843 | 1,508,138 |
| Accumulated other comprehensive income | 124,365 | 58,372 |
|  | 3,026,004 | 2,753,435 |
|  | $ 6,052,958 | $ 5,393,405 |

See notes to unaudited condensed consolidated financial statements.

3

Table of Contents

Radian Group Inc. and Subsidiaries

DZB053922

RADIAN GROUP INC

Filing Date: 06/30/03

## CONDENSED CONSOLIDATED STATEMENTS OF INCOME (UNAUDITED)

(In thousands, except per-share amounts)

| | Quarter Ended June 30 | | Six Months Ended June 30 | |
| --- | --- | --- | --- | --- |
| | 2003 | 2002 | 2003 | 2002 |
| **Revenues:** | | | | |
| Premiums written: | | | | |
| Direct | $ 239,537 | $ 221,076 | $ 451,214 | $ 423,940 |
| Assumed | 52,093 | 34,092 | 111,781 | 69,494 |
| Ceded | (17,734) | (17,558) | (36,739) | (31,186) |
| Net premiums written | 273,896 | 237,610 | 526,256 | 462,248 |
| Increase in net unearned premiums | (18,884) | (26,579) | (45,115) | (42,028) |
| Premiums earned | 255,012 | 211,031 | 481,141 | 420,220 |
| Net investment income | 47,004 | 44,485 | 93,676 | 87,238 |
| Equity in net income of affiliates | 33,859 | 26,774 | 48,747 | 45,394 |
| Other income | 15,403 | 10,965 | 29,960 | 22,247 |
| Total revenues | 351,278 | 293,255 | 653,524 | 575,099 |
| **Expenses:** | | | | |
| Provision for losses | 95,540 | 57,576 | 163,298 | 115,003 |
| Policy acquisition costs | 31,368 | 25,603 | 62,385 | 49,050 |
| Other operating expenses | 56,565 | 44,500 | 101,006 | 89,245 |
| Interest expense | 9,652 | 7,239 | 18,236 | 14,393 |
| Total expenses | 193,125 | 134,918 | 344,925 | 267,691 |
| **Gains and losses:** | | | | |
| Net gains on dispositions of investments | 2,824 | 2,462 | 6,849 | 3,083 |
| Change in fair value of derivative instruments | (4,829) | (5,764) | (12,727) | (9,006) |
| Net losses | (2,005) | (3,302) | (5,878) | (5,923) |
| Pretax income | 156,148 | 155,035 | 302,721 | 301,485 |
| Provision for income taxes | 44,474 | 46,113 | 86,275 | 88,630 |
| Net income | 111,674 | 108,922 | 216,446 | 212,855 |
| Dividends to preferred stockholder | -- | 825 | -- | 1,650 |

6

*RADIAN GROUP INC*                                                                                      *Filing Date: 06/30/03*

| | | | |
|---|---|---|---|
| Net income available to common stockholders | $ 111,674 | $ 108,097 | $ 216,446 | $ 211,205 |
| Basic net income per share | $ 1.20 | $ 1.14 | $ 2.32 | $ 2.24 |
| Diluted net income per share | $ 1.18 | $ 1.12 | $ 2.29 | $ 2.20 |
| Average number of common shares outstanding--basic | 93,341 | 94,708 | 93,367 | 94,466 |
| Average number of common and common equivalent shares outstanding--diluted | 94,360 | 96,387 | 94,328 | 96,134 |

See notes to unaudited condensed consolidated financial statements.

4

Table of Contents

Radian Group Inc. and Subsidiaries

CONDENSED CONSOLIDATED STATEMENT OF CHANGES IN COMMON STOCKHOLDERS' EQUITY

(UNAUDITED)

(In thousands)

| Common Stock | Treasury Stock | Additional Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Comprehensive Income (Loss) | Foreign Currency Translation Adjustment | Unrealized Holding Gains (Losses) |
|---|---|---|---|---|---|---|---|
| Balance, January 1, 2003 | | | | | | | |
| Comprehensive income: | $ 95 | $ (51,868) | $ 1,238,698 | $ 1,508,138 | $ 233 | $ 58,139 | $ 2,753,435 |

7

DZB053924

**RADIAN GROUP INC**

Filing Date: 06/30/03

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Net income | -- | -- | 216,446 | -- | -- | -- | 216,446 |
| Unrealized foreign currency translation adjustment, net of tax of $603 | -- | -- | 1,120 | -- | -- | -- | 1,120 |
| Unrealized holding gains arising during period, net of tax of $37,329 | -- | -- |  | -- | -- | 69,325 |  |
| Less: Reclassification adjustment for net gains included in net income, net of tax of $2,397 | -- | -- |  | -- | -- | (4,452) |  |
| Net unrealized gain on investments, net of tax of $34,932 | -- | -- | 64,873 |  |  | 64,873 |  |
| Comprehensive income |  |  |  |  |  |  | 282,439 |
| Issuance of common stock under incentive plans | -- | -- | 5,895 | -- | -- | 5,895 |  |
| Treasury stock purchased, net | (12,024) | -- | -- | -- | -- | (12,024) |  |
| Dividends | -- | -- | (3,741) | -- | -- | (3,741) |  |
| Balance, June 30, 2003 | $ 95 | $ (63,892) | $ 1,244,593 | $ 1,720,843 | $ 1,353 | $ 123,012 | $ 3,026,004 |

See notes to unaudited condensed consolidated financial statements.

Table of Contents

Radian Group Inc. and Subsidiaries

8

DZB053925

# EXHIBIT III

S&P Research – Radian Asset Assurance, Inc.

DZ BANK

DZB053926

Radian Asset Assurance Inc.

Page 1 of 7

STANDARD & POORS

**Print**

CLK

# Radian Asset Assurance Inc.

Analyst:
Robert E Green, New York (1) 212-438-2013; Richard P Smith, New York (1) 212-438-2095

Publication date: 06-Jun-03, 10:34:25 EST
Reprinted from RatingsDirect

## Quick Links

Rationale

Outlook

Management and Corporate
Strategy

Business Profile

Finances

Capitalization



**RATING AA**
**HOLDING COMPANY**
Radian Group Inc.
**DOMICILE**
New York
**LICENSED**
None

## Rationale

The 'AA' financial strength and financial enhancement ratings of Radian Asset
Assurance Inc. (Radian Asset) are based on:

- A solid market position as a niche, 'AA' rated insurer in the financial
  guaranty insurance industry;
- Capital resources and capital modeling results that are consistent with a
  'AA' rating; and
- Supportive ownership that views this business as crucial with respect to
  consolidated growth and earnings goals.

Insurance volume at Radian Asset increased quite substantially in 2002, with $9.1
billion in gross par written. This level of activity was well above the $3.5 billion
written in 2001. Business plan expectations are for continued growth either
consistent with a 'AAA' bond insurers or in transactions where,
in sectors out of favor with the 'AAA' bond insurers or in transactions where,
consistent with a 'AAA' rating, incrementally more risk is assumed. Supporting this
potential growth and this incrementally higher risk, Radian Asset has added new
capital resources and has adequate capital resources, financial and operating
flexibility to maintain a margin of safety of 100%. The margin of safety expresses,
in the context of Standard & Poor's Ratings Services capital adequacy model, the
relationship of worst-case losses incurred to capital at the end of the modeling
period. A margin of safety of 100% indicates that capital is sufficient to pay all
theoretical worst-case claims incurred. If growth exceeds what is budgeted for in
the context of the capital model, Radian Asset has indicated it will add the
required capital to support these opportunities or reduce its underwritings to
remain in compliance with margin of safety requirements. Modeling output will be
regularly examined to make this determination.

Looking ahead, financial guaranty business is the key element of parent
company, Radian Group Inc.'s, growth and earnings plans. As such, and in
recognition of the importance of maintaining ratings in this industry, the parent
company has been very supportive with respect to capital planning and allocation.
Radian Asset benefited from $150 million in paid-in capital in 2002. In April of
2003, an additional $100 million was contributed. Additional capital support in the
form of a $50 million excess of loss reinsurance treaty was received from sister
company Radian Reinsurance Inc. (Radian Re). Radian Re is expected to
operate more as a captive reinsurer for Radian Asset since growth opportunities
in traditional third-party reinsurance business may be down in view of the current
weak economics in that area, combined with greater selectivity on the part of
Radian Re.

As the Radian Group shifts it strategic emphasis in financial guaranty from
reinsurance to direct writings, an important near-term challenge for management
will be the continued strengthening of controls, systems and procedures, and risk
management oversight, in anticipation of this strong growth and new asset
classes. This will be accomplished in part by Radian Re's plan to bolster

DZB053927

resources for overall risk management efforts. The risk management group increased staff in 2001 and 2002 and has further additions budgeted for 2003, particularly to broaden the group's range of expertise. This effort has also included the addition of a head of risk management for the U.K. Also, a Radian group-wide initiative referred to as enterprise risk management is intended to facilitate and maximize group-wide portfolio risk management and direct capital to its most efficient use within the group.

[↑ back to top]

## Outlook

Radian Asset is expected to continue to operate within the guidelines and criteria established for a 'AA' financial guarantor. The company has likewise committed and is expected to further strengthen its controls and risk management.

[↑ back to top]

| Table 1 Radian Asset Assurance Inc. Business Statistics (Mil. $) | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|
| Net par exposure | 15,266 | 10,044 | 8,360 | 9,974 | 7,681 |
| *Adjusted Gross Premiums Written* | | | | | |
| U.S. public finance | 64.0 | 38.2 | 31.2 | 34.2 | 21.7 |
| U.S. asset-backed and other | 125.0 | 31.3 | 12.3 | 13.1 | 14.4 |
| U.S. total | 189.0 | 69.5 | 43.5 | 47.3 | 36.1 |
| International public finance | 0 | 0 | 0.1 | 0.3 | 0.2 |
| International asset-backed and other | 45.0 | 33.0 | 23.7 | 42.9 | 16.4 |
| International total | 45.0 | 33.0 | 23.8 | 43.2 | 16.6 |
| Total adjusted gross premiums written | 234.0 | 102.5 | 67.3 | 90.5 | 52.7 |
| Net premiums written | 170.9 | 72.0 | 42.9 | 71.1 | 49.2 |
| *Gross Par Written* | | | | | |
| U.S. public finance | 2,154.0 | 1,433.0 | 1,353.9 | 1,706.0 | 2,654.1 |
| U.S. asset-backed and other | 6,391.0 | 1,632.0 | 517.0 | 729.7 | 517.4 |
| U.S. total | 8,545.0 | 3,065.0 | 1,870.9 | 2,435.7 | 3,171.5 |
| International public finance | 30.0 | 0 | 0 | 2.0 | 1.2 |
| International asset-backed and other | 516.0 | 435.0 | 198.6 | 222.3 | 108.6 |
| International total | 546.0 | 435.0 | 198.6 | 224.3 | 109.7 |
| Total gross par written | 9,091.0 | 3,500.0 | 2,069.5 | 2,650.0 | 3,281.3 |
| Net par written | 6,615.0 | 2,631.0 | 1,685.3 | 2,473.0 | 2,818.3 |

Note: Exposure does not include trade credit. *Adjusted gross premiums written include upfront and present value of installment premiums.

[↑ back to top]

## Management and Corporate Strategy

Business planning at Radian Asset is addressed in the context of holding company Radian Group's ('A' senior debt rating) strategic plan to become a consolidated full-service credit enhancement company. Shaping the parent's strategy are expectations for the convergence of financial guaranty, mortgage insurance, mortgage services, and other operational areas of the group. Mortgage insurance and Radian Asset's business activity in the securitization of mortgages and home equity loans is the most obvious example of synergistic opportunities. As Radian Group's mortgage insurance business is a solidly profitable but mature business, capital resources and strategic emphasis are being directed to the financial guarantee business, which also includes Radian Asset's sister company, Radian Re ('AA' financial strength rating).

A key element in the strategic plan is to position the company internationally in anticipation of strong future business growth. Radian Asset created a Global Structured Products Group in 2001 to better position the company for this opportunity. In addition, staffing has been on the increase in the company's U.K. branch office, where a license is expected sometime this year. Management is very positive about opportunities in the U.K. and the E.U., as capital markets continue to evolve and banks attempt to better manage existing credit risk.

The Global Structured Products Group has recently reorganized by product type in the hope of being more responsive to the market. Units within the Global Structured Products Group now are organized along the lines of traditional asset-

DZB053928

backed transactions; CDOs and related structured transactions; financial risk solutions, which include soft capital facilities; and client and portfolio management. It is the role of the client and portfolio management team to coordinate client relationships across product lines.

In the U.S. public finance market Radian Asset is a niche guarantor, insuring investment-grade credits in underserved market segments. Hospitals are the best example of a sector currently out of favor with the 'AAA' primary companies, although that is slowly changing. The senior living sector is another example. Nevertheless, Radian Asset does business in most public finance sectors, including GO, tax-backed, utilities, and private education. In these sectors Radian Asset may find opportunities either because of a transaction size or because it is a 'story' credit. Municipal utility districts in Texas are currently the only sector in which Radian Asset is comfortable wrapping non-investment grade credits.

A similar approach to business and underwriting is found in the asset-backed market. For example, a majority of structured business written in 2002 was various CDO products. In this market Radian Asset cannot compete with the 'AAA' financial guarantors in the "super senior" area of execution. Rather, it will participate in the less competitive but still highly shadow-rated senior mezzanine areas.

In the context of the Radian Group providing comprehensive credit insurance, Radian Asset is a reinsurer of trade credit and surety insurance. Unlike bond insurance, credit and surety lines are a "for loss" business, but unlike bond insurance that is relatively short-tail "duration" business. Historical loss ratios for this line at Radian Asset have ranged between 43% and 87%. Like bond insurance, the principal risk to policyholders is not cyclical downturns or recessions, but deep protracted depressions. Over 90% of 2002 losses incurred are attributable to the company's credit and surety business. Because of expectations for slower growth and some capital surplus at sister company Radian Re, the credit and surety book was transferred to that company during the first half of 2003.

Risk management for both Radian Asset and Radian Re is the responsibility of a single, consolidated group. Responsibilities of this group include credit approval, surveillance, and portfolio management. Historically, some of these functions, as well as aspects of strategic planning, have not been up to industry standards. Corrective initiatives in 2003 complement those begun in 2002 and include a continued, controlled staffing increase and a greater emphasis on policies and procedures. This is crucial as Radian Asset, and by connection Radian Re, plans a significant expansion both globally and in terms of product lines. It is planned that appropriate resources will be allocated to acquire the requisite expertise and maintain appropriate portfolio measurements and controls. This will include increasing staff, increasing training, and technological updates. Also, a Radian group-wide initiative referred to as enterprise risk management is intended to facilitate and maximize group-wide portfolio risk management and direct capital to its most efficient use within the group.

| Table 2 Radian Asset Assurance Inc. Portfolio Statistics (Mil. $) | | | | | | |
|---|---|---|---|---|---|---|
| | | --Year ended Dec. 31-- | | | | |
| | 2002 industry average % par | 2002 % of par | 2002 par | 2001 par | 2000 par | 1999 par |
| **Public Finance** | | | | | | |
| G.O. | 21.3 | 13.8 | 2,104 | 1,991 | 1,818 | 2,313 |
| Utility | 10.6 | 5.4 | 828 | 831 | 813 | 1,084 |
| Tax-backed | 7.4 | 3.3 | 504 | 417 | 396 | 302 |
| Health care | 5.3 | 18.6 | 2,838 | 2,077 | 1,655 | 1,344 |
| Transportation | 5.3 | 0.8 | 125 | 131 | 145 | 859 |
| Colleges and universities | 3.0 | 10.1 | 1,549 | 1,348 | 1,152 | 940 |
| Investor-owned utilities | 1.8 | 0.2 | 29 | 37 | 85 | 277 |
| Housing | 2.1 | 1.4 | 209 | 237 | 251 | 291 |
| Special revenue | 1.3 | 4.9 | 746 | 656 | 611 | 623 |
| Other | 4.3 | 2.9 | 443 | 515 | 523 | 0 |
| Total | 62.6 | 61.4 | 9,375 | 8,240 | 7,449 | 8,032 |

DZB053929

Radian Asset Assurance Inc.

## Business Profile

Radian Asset is a New York State domiciled financial guaranty insurance company. Its immediate parent company is Enhance Financial Services Group Inc. and its ultimate parent is the Radian Group Inc. The company had a successful year in the U.S. public finance market, where gross par written increased to $2.2 billion for the 12 months ended Dec. 31, 2002, up from $1.4 billion for the 12 months ended Dec. 31, 2001. Business written in the public finance market benefited in part from total municipal par issuance, increasing by 25% to $357.9 billion. The composition of Radian Asset's insured public finance book of business reflects its niche position in the market and resulting origination strategy. The health care sector, for example, comprises 18.6% of total exposure. The industry average is about 6%. However, Radian Asset's health care exposure is down from 20.7% as of Dec. 31, 2001. Likewise, higher education insured debt is 10.1% of exposure compared to about 2.9% for the industry average.

The company's business position has resulted in a capital charge of 29.5% on its public finance book of business. For comparison, the industry average weighted average capital charge is about 11.6%. However, 'A' rated ACA Financial Guaranty Corp. had a public finance capital charge of 67.4% as of Dec. 31, 2002. About 25% of ACA's public finance book of business is shadow-rated in the 'BB' category, while Radian Asset's public finance portfolio is generally investment grade. Capital charges are assigned to each insured transaction and are used in Standard & Poor's capital adequacy model to determine a worst-case level of losses.

Growth in the asset-backed sector was quite strong for the company, with gross insured par of $6.4 billion for the year-ended Dec. 31, 2002, up from $1.6 billion for the year-ended Dec. 31, 2001. The bulk of this production was in the CDO area. About 76% of structured net par insured was CDOs. Overall, the structured products portfolio increased from 18% to 38% as of Dec. 31, 2002. The capital charge on the asset-backed portfolio is 4.3%. For comparison, the industry average capital charge on asset-backed risk in force is about 1.8%. Radian Asset's asset-backed portfolio capital charge declined to 4.3% from 9.0% as of Dec. 31, 2001. This substantial decline was due to a management-initiated reduction in the volume insured of a very high capital charge product, combined with the strong growth in typically lower capital charge CDO business.

### Domestic Asset-Backed and Corporate Finance

+ back to top

| | | | | | |
|---|---|---|---|---|---|
| MBS | 3.8 | 1.3 | 193 | 262 | 111 | 232 |
| Home equity loan | 4.5 | 0.2 | 32 | 6 | 8 | 225 |
| Auto loan | 2.8 | 0.6 | 97 | 158 | 184 | 483 |
| Other consumer asset-backed | 1.9 | 3.1 | 466 | 413 | 90 | 67 |
| Commercial asset-backed | 5.9 | 27.0 | 4,128 | 630 | 258 | 211 |
| Bank/financial institutions | 0.5 | 0.7 | 111 | 111 | 1 | 11 |
| Other | 5.6 | 1.7 | 255 | 6 | 122 | 305 |
| Total | 25.0 | 34.6 | 5,282 | 1,574 | 774 | 1,545 |
| *International* | | | | | | |
| Public finance | 1.9 | 0.2 | 31 | 2 | 4 | 69 |
| Asset-backed | 10.3 | 3.8 | 578 | 229 | 134 | 181 |
| Other | 0.2 | 0 | 0 | 0 | 0 | 148 |
| Total | 12.4 | 4.0 | 609 | 231 | 138 | 398 |
| Total net par outstanding | 100.0 | 100.0 | 15,266 | 10,045 | 8,360 | 9,974 |

### Table 3 Radian Asset Assurance Inc. Financial Statistics (Mil. $)

| | --Year ended Dec. 31-- | | | | |
|---|---|---|---|---|---|
| *Insurance Company** | 2002 | 2001 | 2000 | 1999 | 1998 |
| Total assets | 657.4 | 381.5 | 327.6 | 296.8 | 272.6 |
| Cash + invested assets | 622.5 | 360.2 | 278.9 | 251.3 | 227.0 |

DZB053930

DZB053931

## Finances

Net income for Radian Asset for the year-ended Dec. 31, 2002, was $33.4 million, a substantial increase over Dec. 31, 2001, results of $10.6 million. Radian Asset's return on average statutory capital for the year-ended Dec. 31, 2002, was a sound 12.9%. Premiums earned were $94.1 million for the 12 months ended Dec. 31, 2002, compared with $49.0 million for the prior year. The larger book of business, as well as the growth in shorter-life asset-backed business, contributed to the increase. Also, about $33.1 million of the total premiums earned is credit and surety earned premiums. For the first time in several years Radian Asset recorded a positive underwriting profit ratio, at 18.9%. This is the ratio of premiums earned less underwriting expenses and losses divided by earned premiums. Included in the $32.1 million of losses incurred in 2002 were $28.3 million of trade credit and surety losses. This resulted in a loss ratio on credit and surety business of 85% in 2002, and a loss ratio of 6.4% for financial guaranty business.

Net investment income also increased substantially in 2002 to $27.2 million, up from $19.8 million as of Dec. 31, 2001. This is mostly due to the substantial 73% increase in invested assets, to $622.5 million as of Dec. 31, 2002. Net cash from operations of $107 million and the capital contribution of $150 million mostly accounted for the increased size of the investment portfolio. Radian Asset's investment portfolio is mostly invested in high-quality fixed-income securities. About 57% of the portfolio is rated 'AAA' with 21% in the 'AA' category, 5.3% in the 'A' category, and 12.3% in the 'BBB' category. About 4% is rated 'BB' or not rated. The primary objective of the investment manager is to maximize total return in the context of maintaining adequate liquidity and complying with regulatory and rating agency guidelines.

### Holding Company§

| | Radian Group | –Enhance Financial Services Group– | |
|---|---|---|---|
| Total assets | 5,393.0 | 4,406.0 | 1,579.0 | 1,453.9 | 1,310.0 |
| Stockholders' equity | 2753.0 | 2306.0 | 705.7 | 676.3 | 662.6 |
| Net income | 427.0 | 360.0 | (9.4) | 69.6 | 82.5 |
| Debt-to-capitalization (%) | 19.8 | 15.8 | 35.2 | 21.8 | 16.3 |
| Return on average equity (%) | 16.9 | 19.6 | -1.4 | 13.7 | 13.9 |

§Statutory accounting basis. ¶Net earned premiums - underwriting expenses and losses)/net earned premiums. §GAAP accounting basis.

| | | | | | |
|---|---|---|---|---|---|
| Unearned premiums | 233.7 | 156.9 | 133.9 | 132.2 | 102.8 |
| Statutory capital | 348.7 | 169.8 | 135.4 | 121.8 | 121.4 |
| Net premiums earned | 94.1 | 49.0 | 41.3 | 41.7 | 36.7 |
| Losses and LAE | 32.1 | 25.6 | 18.2 | 11.0 | 7.9 |
| Underwriting expense | 44.2 | 30.7 | 29.9 | 31.3 | 24.1 |
| Investment income including gains | 27.2 | 19.8 | 9.8 | 15.2 | 13.5 |
| Net income | 33.4 | 10.6 | 9.3 | 8.4 | 11.0 |
| Loss ratio (%) | 34.1 | 52.3 | 44.2 | 26.3 | 21.5 |
| Underwriting profitability ratio (%)¶ | 18.9 | (15.0) | (16.5) | (1.4) | 12.8 |

*Statutory accounting basis.

[↑ back to top]

### Table 4 Radian Asset Assurance Inc. Capital Statistics

| | –Year ended Dec. 31– | | | | |
|---|---|---|---|---|---|
| | 2002 | 2001 | 2000 | 1999 | 1998 |
| **Portfolio Risk** | | | | | |
| Public finance weighted-average capital charge (% of AADS) | 29.5 | 28.3 | 30.3 | 22.7 | 20.5 |
| Asset-backed capital charge (% of par) | 4.3 | 9.1 | 4.3 | 3.7 | 3.43 |
| Credit insurance (mil $ capital allocation) | 0 | 0 | 17.9 | 57.8 | 0 |
| Specialty line capital required (times premiums written) | 0 | 1.0 | 1.0 | 1.0 | 1.0 |
| **Financial Strength Resources (Mil $)** | | | | | |
| Statutory capital | 348.7 | 169.8 | 135.4 | 121.8 | 121.4 |
| excess of loss with Radian Re | 50.0 | 25.0 | 0 | 0 | 0 |
| Line of credit | 0.0 | 25.0 | 25.0 | 0 | 0 |

DZB053932

| | | | | | |
|---|---|---|---|---|---|
| Stop-loss treaty | 0.0 | 15.0 | 0.0 | | 0 |
| Unearned premiums | 237.7 | 156.9 | 133.9 | 132.2 | 102.8 |
| Present value of annual premiums | 151.0 | 71.8 | 24.1 | 20.2 | 9.6 |
| **Total** | 783.4 | 438.5 | 318.4 | 274.2 | 233.7 |
| *Capital adequacy* | | | | | |
| Capital remaining at end of depression test (mil. $) | 50-100 | 50-100 | 50-0.50 | 0-0.50 | 0-0.50 |
| Margin of safety | 1.0-1.1 | 1.0-1.1 | 1.0-1.1 | 1.1-1.2 | 1.2-1.3 |
| Reliance on soft capital (%) | 9.4 | 10.9 | 9.9 | 0 | 0 |

[+back to top]

## Capitalization

Radian Asset is in compliance with capital requirement for a 'AA' rated financial guarantor. The company has a margin of safety in the 1.0x to 1.1 range. The margin of safety expresses, in the context of Standard & Poor's capital adequacy model, the relationship of worst-case losses incurred to capital at the end of the modeling period. The margin of safety indicates that capital is sufficient to pay all theoretical claims incurred. Total claims-paying resources increased by 78.6% to $783.4 million, as strong gains in all claims-paying resource categories were recorded. Statutory capital about doubled to $348.7 million due to capital contributions combined with earnings. The unearned premium reserve increased by 49% to $234 million due to solid growth. And the present value of installment premiums increased more than 100% due to strong growth in the asset-backed sector. In addition, another $100 million has been paid into the company in the second quarter of 2003 as surplus. The company has also secured a $50 million excess of loss treaty with Radian Re.

With respect to losses within the capital model, the public finance capital charge has remained relatively constant compared to last year; however, modeling losses are greater in expectation of increased volume. For the asset-backed insured portfolio, the capital charge has declined substantially to 4.3% as of Dec. 31, 2002, from 9.1% a year earlier. A reduction in volume in a high capital charge product, called NIMS (net interest margin securitizations), combined with growth in lower capital charge CDO business has led to the lower weighted-average capital charge. In addition to capital modeling losses associated with the company's capital charges on municipal and structured finance insured debt, a worst-case capital charge has historically been assigned to the company's credit and surety businesses.

Liquidity at Radian Asset is consistent with expectations for 'AA' rated bond insurers. Liquidity resources, mostly consisting of U.S. government bonds, corporate bonds, and asset-backed securities and notes, total $229 million. That amount has been conservatively haircut in the context of it being offered as collateral in a reverse repurchase transaction. Against this liquidity resource, worst-case theoretical payments in each operating sector total only $116 million, resulting in a resource to theoretical use ratio of 194%.

Table 5 Radian Asset Assurance Inc. Liquidity Margin of Safety Analysis (Mil. $)

| | Haircut (%) | Amount |
|---|---|---|
| **Assets/Resources as of Dec. 31, 2002** | | |
| Cash and short-term investments | 0 | 39.7 |
| Treasury and government agency fixed-income securities | 10 | 34.1 |
| Corporate and ABS/MBS bonds | 50 | 217.4 |
| Bank lines of credit | 0 | 50.0 |
| Total | | 341.2 |
| Adjusted cash totals after haircut | | 229.1 |
| **Potential Uses (occurring in the full year 2003)** | | |
| Municipal bonds (for information only) | | 331.4 |
| Largest net total payments in 2003 associated with a municipal obligor default | | 7.8 |
| Largest net bullet maturity default (potentially includes IOUs, international, or "guaranteed" maturity bonds) | | 20.6 |
| Largest DSR draw | | 0 |

Radian Asset Assurance Inc.

| | |
|---|---|
| 90 days of payments associated with the largest servicer default | 2.8 |
| Largest financial service obligations, such as largest unscheduled draw on a municipal investment contract | 0 |
| Largest individual "single name" credit default swap or single name in a defaulted synthetic structure | 87.0 |
| Holding company debt and dividend servicing needs | 0 |
| Total usage | 118.2 |
| Net (assets - usage) | 110.9 |
| Margin of safety (%) | 194 |

↑ back to top

Regulatory Disclosures    Privacy Policy    Terms of Use    Disclaimers    Site Map    Site Feedback

Copyright (c) Standard & Poor's, a division of The McGraw-Hill Companies, Inc. All rights reserved.

DZB053933

# EXHIBIT T-26

Message

| | |
|---|---|
| **From:** | Vincent Salerno [CN=Vincent Salerno/OU=Branch/OU=New York/O=DZ BANK] |
| **Sent:** | 1/14/2004 1:32:04 PM |
| **To:** | Jennifer Wikoff [CN=Jennifer Wikoff/OU=Branch/OU=New York/O=DZ BANK@DZBANK] |
| **Subject:** | Opportunity Finance |

-------------------- Forwarded by Vincent Salerno/Branch/New York/DZ BANK on 01/14/2004 01:36 PM --------------------------



Patrick Preece
03/07/2003 08:11 AM

To:      Vincent Salerno/Branch/New York/DZ BANK@DZBANK, Stacey Rolsing/Branch/New York/DZ BANK@DZBANK
cc:
Subject:   Opportunity Finance

Vinny/Stacey,

Do we have access to Jon's bank account electronically?   What I am trying to determine is whether Jon contributes money into the SPC to fund new purchases or does he uses the capital he receives from completed transactions.   If a) he uses money he receives from completed transactions, and b) we can see that he is adding his share of the equity on each purchase from the wire information from this same account, then is seems to me we are sure that Jon does have the required amount of capital in his deals.   Ken's worry is that Jon is putting in his capital and then sence he is "in on" the fraud, he receives the money back out and Jon has no REAL equity in the deal.

I would like to discuss Opportunity Finance amongst the three of us this morning to see how we (the 3 that know the most about the deal) can end this witch hunt.

Regards,

Patrick

DZB059538

# EXHIBIT T-27

# CREDIT AGREEMENT

THIS CREDIT AGREEMENT is entered into as of December 17, 2001, by PC FUNDING, LLC, a Delaware limited liability company ("**Borrower**"), and OPPORTUNITY FINANCE, LLC, a Delaware limited liability company ("**Lender**").

## 1.   DEFINITIONS AND CERTAIN RULES OF CONSTRUCTION

**1.1   Definitions.** For all purposes of this Agreement, capitalized terms used in this Agreement shall have (unless otherwise provided elsewhere in this Agreement) the following respective meanings when used herein:

"**Affiliate**" shall mean, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, 5% or more of the equity interests having ordinary voting power in the election of directors (or Persons having similar functions) of such Persons, (b) each Person that controls, is controlled by or is under common control with such Person, (c) each of such Person's officers, directors, joint venturers and partners, and (d) in the case of Borrower, the immediate family members, spouses and lineal descendants of individuals who are Affiliates of Borrower. For the purposes of this definition "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise; provided, that Lender is not an Affiliate of Borrower for any purpose.

"**Assigned Receivable**" has the meaning set forth in the Sale Agreement.

"**Buyer**" shall mean a purchaser of inventory pursuant to a Buyer Purchase Order.

"**Buyer Purchase Order**" shall mean, with respect to any Receivables Sale financed by Lender under this Agreement, a purchase order or other similar agreement between Originator and a Buyer pursuant to which such Buyer agrees to purchase Inventory from Originator. Each Buyer Purchase Order shall be in form and substance satisfactory to Lender. For avoidance of doubt, Buyer Purchase Order does not include any Buyer purchase order or similar agreement issued to Originator which is not related to any Receivable assigned to Borrower pursuant to the Sale Agreement.

"**Change of Control Date**" shall mean the date upon which Thomas J. Petters ceases to own and control directly or indirectly 100% of the outstanding capital stock or equity of both Borrower and Originator.

"**Code**" shall mean the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of Minnesota.

"**Collateral**" shall have the meaning assigned to it in the Security Agreement.

"**Event of Default**" shall have the meaning assigned to it in Section 7.1.

DZB004335

**"Facility Termination Date"** shall mean the earlier of (i) March 31, 2006 and (ii) the date this Agreement is terminated under Section 7.2(a)(i) or Section 7.3.

**"Fixed Yield"** shall mean the "fixed yield dollar amount" as specified to be paid to Lender as established in the Promissory Note for each Fixed Yield Loan.

**"Fixed Yield Loan"** shall mean a Receivables Loan with respect to which the parties have selected the Fixed Yield option under Section 2.1(a)(i)(C) and have an agreed upon Fixed Yield pursuant to the related Promissory Note.

**"Interest Loan"** shall mean a Receivables Loan with respect to which the parties have selected the interest option under Section 2.1(a)(i)(C) and have agreed upon an interest rate pursuant to the related Promissory Note.

**"Inventory"** shall mean with respect to any Receivables Sale, all inventory or goods purchased by Originator pursuant to an Originator Purchase Order, the sale, or contract for sale, of which by Originator to a Buyer gives rise to the related Receivables.

**"Loan Documents"** shall mean this Agreement, the Promissory Notes, the Security Agreement, and all other agreements, instruments, documents, agreements, and certificates delivered to Lender in connection with this Agreement or the transactions contemplated hereby, and all amendments, restatements, renewals, supplements and modifications of the foregoing.

**"Material Adverse Effect"** shall mean a material adverse effect, including by reason of an effect on Originator, Thomas J. Petters or any other Affiliate of Borrower, on (a) the business, assets, operations, prospects or financial or other condition of Borrower or Originator; (b) the inability of Originator to conduct any purchase or sales of inventory in accordance with the applicable Originator Purchase Order and Buyer Purchase Order; (c) the inability of Borrower to pay any of the Receivables Loans or any of the other obligations in accordance with the terms of this Agreement; (d) the Collateral or Lender's liens on the Collateral or the priority of such liens; or (e) Lender's rights and remedies under this Agreement and the other Loan Documents.

**"Maximum Loan Amount"** shall mean the amount equal to $500,000,000.00.

**"Originator"** shall mean Petters Company, Inc., a Minnesota corporation.

**"Originator Purchase Order"** shall mean, with respect to any Receivables Sale financed by Lender under this Agreement, a purchase order or other similar agreement between Originator and a Seller pursuant to which Originator agrees to purchase from such Seller the goods or inventory to be sold by Originator pursuant to a Buyer Purchase Order. Each Originator Purchase Order shall be in form and substance satisfactory to Lender. For avoidance of doubt, Originator Purchase Order does not include any Originator purchase order which has not been assigned pursuant to the Sale Agreement.

**"Person"** shall mean any individual, partnership, joint venture, trust, unincorporated organization, corporation, or government.

**"Promissory Note"** shall have the meaning assigned to it in Section 2.1(b).

DZB004336

**"Receivable"** has the meaning set forth in the Sale Agreement.

**"Receivables Loan"** shall mean a loan made pursuant to section 2.1 with respect to a Receivables Sale financed by Lender, and all accrued fees, interest and other obligations payable by Borrower to Lender with respect thereto.

**"Receivables Sale"** shall mean a sale of Receivables by Originator to Borrower pursuant to the Sale Agreement.

**"Restricted Payment"** shall mean, with respect to any Person, (a) the declaration or payment of any dividend; (b) any payment on account of the purchase, redemption or other retirement of such Person's stock or any warrants, options or other rights with respect to such stock; (c) any payment of management fees by such Person to any stockholder of such Person or their Affiliates other than reasonable advances or payments made in the ordinary course of business on account of salary and routine business expenses; and (d) payments on indebtedness permitted under Section 6.4 of this Agreement.

**"Sale Agreement"** shall mean the Sale Agreement of even date herewith between Borrower and Originator.

**"Security Agreement"** shall mean the Security Agreement of even date herewith between Borrower and Lender.

**"Seller"** shall mean a seller of Inventory to Originator.

**"Servicing Agreement"** shall mean the Servicing Agreement of even date herewith between Borrower and Originator.

2.    AMOUNT AND TERMS OF CREDIT

**2.1    Advances.**  Subject to the terms and conditions hereof, Lender may, *in its discretion*, from time to time until the Facility Termination Date, make Receivables Loans to or for the benefit of Borrower as provided for in this Section 2.1. Each Receivables Loan shall be evidenced by a Promissory Note as defined in Section 2.1(b). The aggregate amount of Receivables Loans outstanding shall not exceed at any time the Maximum Loan Amount.

(a)    **Receivables Loan Proposals.**

(i)    If Borrower proposes to enter into any Receivables Sale, Borrower may propose that Lender agree to make a Receivables Loan to finance the purchase price with respect to the Receivable(s) that is/are proposed to be purchased by Borrower. The loan proposal shall be in substantially the form of Exhibit A attached hereto and shall specify the (A) details of the Receivables Sale, (B) amount of the proposed Receivables Loan, (C) if the financing is to be on a Fixed Yield basis, the amount of the Fixed Yield with respect to that Receivables Sale or, if the financing is to be on an interest bearing basis, the interest rate applicable to the financing, (D) terms of the assignment, if required, of the Receivables Sale, and (E) the casualty and credit insurance maintained with respect to the sale of goods giving rise to Receivable(s). Borrower shall also provide such other information as Lender shall reasonably require in its sole discretion.

DZB004337

(ii)     Within one business day after Lender's receipt of a loan proposal, Lender will notify Borrower either in writing, by telephone or by e-mail if (A) Lender is willing to make a Receivables Loan with respect to the proposed Receivables Sale on the terms proposed by Borrower, (B) Lender is not willing to make a Receivables Loan with respect to such Receivables Sale, or (C) Lender would be willing to make a Receivables Loan with respect to the proposed Receivables Sale, but only with such modifications as specified in such notice. Lender shall have sole discretion to decide whether or not to agree to any loan proposal or to propose a loan for the proposed Receivables Sale on different terms, and Borrower shall have the right to accept or reject any such different terms.

(b)     **Promissory Notes**. On the date of each Receivables Loan, Borrower shall execute and deliver to Lender a note in the original principal amount of that Receivables Loan, substantially in the form of Exhibit B hereto (each a "Promissory Note" and collectively the "Promissory Notes). Each Promissory Note shall represent the obligation of Borrower to pay the amount of the related Receivables Loan, which shall include the interest or Fixed Yield thereon as prescribed in Section 2.4.  Unless otherwise agreed with respect to a particular Receivables Loan and set forth in the related Promissory Note, the due date of each Promissory Note shall be on the earlier of (i) the 120th day after the date thereof (unless otherwise specified in the Promissory Note), or (ii) the day upon which Borrower receives available funds from the payment from the Buyer on the Receivables financed by the proceeds of such Promissory Note. The Promissory Notes may be prepaid in whole or in part at any time, as provided therein.

(c)     **Reliance on Notices**. Lender shall be entitled to rely upon any notice of Receivables Loan, any loan proposal and any similar notice believed by Lender to be signed by any authorized representatives of Borrower.  Lender may assume that each person executing and delivering such a notice was duly authorized to do so, unless the responsible individual acting thereon for Lender has actual knowledge to the contrary.

2.2     Use of Proceeds; Payments from Buyers.

(a)     **Use of Proceeds**. Borrower must use the proceeds of each Receivables Loan solely for the purpose of paying the purchase price with respect to the associated Receivables Sale, as and when Borrower is required to pay such amounts in accordance with the terms of the Sale Agreement. No loan proceeds shall be disbursed by Borrower until Lender has authorized (in a writing, by e-mail or by telephone) the disbursement and all conditions precedent to the disbursement established by Lender have been satisfied.  Such purchase price shall be disbursed by Borrower directly for the account of the Originator to the Seller under the applicable Originator Purchase Order and must not be paid to any other Person.

(b)     **Payments from Buyers**. Borrower and Originator shall direct Buyers to make payments, whether by check or by wire transfer, with respect to all Assigned Receivables directly to Borrower for deposit into such account or accounts of Borrower as may be mutually agreed by Borrower and Lender.  In the event any such payment other than a wire transfer is received by Borrower or Originator from a Buyer with respect to an Assigned Receivable, such payment shall deposited only in such account or accounts of Borrower as may be mutually agreed to by Borrower and Lender.  In the event any Buyer proposes to pay by wire transfer, the wire transfer instructions shall direct the payment to such account or accounts of Borrower as

may be mutually agreed by Borrower and Lender. In the event that any payment in the form of a wire transfer is received by Originator or Borrower from such a Buyer, Originator, or Borrower, as the case may be, shall, by the next business day, wire transfer such payment to such account or accounts of Borrower. If a payment is deposited into an account with respect to which Lender's approvals are required to disburse funds, Lender agrees to grant its approval within one business day after such deposit to disbursements from such account in the following priority:

(i)     to Lender, or such party or parties as Lender may direct, in an amount owed to Lender with respect to the Receivables Loan made and the Promissory Note issued in connection with such a Buyer Purchaser Order;

(ii)     provided that no Event of Default then exists, to Servicer (as defined in the Servicer Agreement by and between the Originator and Borrower), in an amount owed to the Servicer pursuant to the Servicing Agreement;

(iii)     except as provided in (iv), and provided that no Event of Default then exists, to Borrower, or such party or parties as Borrower may direct, for the balance of such payment; and

(iv)     if a case or proceeding shall have been commenced against a Buyer (a) under Title 11 of the United States Code or any other applicable federal, state or foreign bankruptcy or other similar law; (b) requesting the appointment of a custodian, receiver or trustee (or similar official) of a Buyer of any substantial part of its assets; or (c) requesting the winding-up or liquidation of the affairs of a Buyer, and such case or proceeding shall remain undismissed or unstayed for sixty (60) days or such court shall enter a decree or order granting the relief sought in such case or proceeding, then Lender may apply the balance of such payment to the payment of the then outstanding Promissory Notes due Lender for the purchase of any Receivable(s) related to such Buyer until such Promissory Notes are paid in full.

(c)     Borrower acknowledges that each Promissory Note shall be due and payable on the due date set forth in such Promissory Note, which shall be the earlier of (i) the 120th day after the date thereof (unless otherwise specified in the Promissory Note), or (ii) the day upon which Borrower receives available funds from payment from the Buyer on the account of the Receivables Sale financed by such Promissory Note. Each such Promissory Note shall be due on such due date, whether or not Borrower shall have received payment from the Buyer under the Buyer Purchase Order related to such Promissory Note. It shall not be an Event of Default under this Agreement or the Loan Documents if a Buyer does not pay an underlying Assigned Receivable when due, provided the related Promissory Note is paid on or before its due date (it being acknowledged that Borrower has until the Promissory Note due date to receive payment from such Buyer or to otherwise pay the Promissory Note from other sources.

**2.3     Maturity of Receivables Loans.** Unless sooner paid, all obligations with respect to each Receivables Loan shall be due and payable in full on the date specified in Promissory Note executed with respect to such Receivables Loan.

DZB004339

**2.4    Fixed Yield and Interest; Late Payments.**  At the time Borrower pays each Receivables Loan, Borrower shall also pay the Fixed Yield or interest with respect to such Receivables Loan as provided in the related Promissory Note.  In the event that Borrower fails to pay when due any payment under a Promissory Note, interest shall accrue on the past due payment from the due date until such payment is made (a) at the stated interest rate on an Interest Loan, and (b) at the rate of twenty percent (20%) per annum from and after the due date of such payment on a Fixed Yield loan.  Notwithstanding anything to the contrary set forth in this Section 2.4, if a court of competent jurisdiction determines in a final order that the Fixed Yield or interest payable hereunder exceeds the highest rate of interest permissible under applicable law, then for so long as the maximum lawful rate would be so exceeded, the Fixed Yield or interest payable hereunder shall be equal to the maximum interest amount allowed under applicable law.

**2.5    Loan Account; Etc.**  Lender shall maintain a loan account on its books to record with respect to each Receivables Loan: (a) all Receivables Loans, (b) all payments made by Borrower or otherwise received by Lender, and (c) all other debits and credits as provided in this Agreement with respect to each Receivables Loan or any other obligation.  All entries in Lender's loan account shall be made in accordance with Lender's customary accounting practices as in effect from time to time and a copy of which will be provided to Originator or Borrower upon request.  Lender further agrees that, with respect to any disposition of goods in connection with any Receivables Sale pursuant to a Buyer Purchase Order, Lender shall, upon payment to it of all amounts due in connection with the related Receivables Loan, release its lien on such assets in order to permit Originator to effect such disposition, and shall execute and deliver to Borrower appropriate UCC-3 statements as reasonably requested by Borrower.

**2.6    Indemnity.**  Borrower shall, within ten (10) days of written demand therefore, indemnify and hold harmless each of Lender and its Affiliates, and each of such person's respective officers, directors, employees, attorneys, agents, representatives, successors, and assigns (each, an "**Indemnified Person**"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) which may be instituted or asserted against or incurred, without limitation, by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all environmental liabilities, or any breaches by Borrower or any of its representations, warranties or covenants contained in this Agreement, and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities") except to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction.  NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF

CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER. NEITHER TERMINATION NOR COMPLETION OF THIS AGREEMENT SHALL AFFECT THESE INDEMNIFICATION PROVISIONS WHICH SHALL THEN REMAIN OPERATIVE AND IN FULL FORCE AND EFFECT.

**2.7 Access.** Borrower and Originator shall, during normal business hours, from time to time as frequently as Lender reasonably determines to be appropriate: (a) provide Lender and any of its officers, employees and agents complete and timely access to, and prompt and full cooperation from, its properties, facilities, computers, computer records, advisors and employees (including officers) of Borrower, Originator and to the Collateral to the extent related to the Assigned Receivables; and (b) permit Lender, and any of its officers, employees and agents, to inspect, audit and make extracts from Borrower's and Originator's books and records related to the Assigned Receivables. Borrower and Originator shall provide, at no cost to Lender, an employee or consultant to assure that Lender can access and retrieve all information in Borrower's computers and computer records related to the Assigned Receivables.

**2.8 Originator Power of Attorney.** With respect to any check received by Originator from a Buyer in payment of an Assigned Receivable, Originator hereby grants Lender an irrevocable power of attorney to endorse any such check constituting proceeds of an Assigned Receivable with an endorsement from Originator to Borrower (if necessary) and with the restrictive endorsement "*For deposit only – PC Funding, LLC*" in order that Lender may deposit such check in the account or accounts referenced in Section 2.2(b).

**2.9 Taxes.** Any and all payments by Borrower hereunder or under the Promissory Notes shall be made free and clear of and without deduction for any and all present or future taxes. Borrower shall indemnify and pay Lender for the full amount of taxes (other than taxes on Lender's income) paid by Lender with respect to the transactions under this Agreement.

## 3. CONDITIONS PRECEDENT

Lender may require as a condition to any Receivables Loan that Borrower provide documentation and information acceptable to Lender. In addition, upon execution of this Agreement, Borrower shall provide to Lender an opinion letter of Borrower's counsel in form and substance reasonably satisfactory to Lender.

## 4. REPRESENTATIONS AND WARRANTIES

To induce Lender to make the Receivables Loans, Borrower makes the following representations and warranties to Lender, each and all of which shall survive the execution and delivery of this Agreement.

**4.1 Corporate Existence; Compliance with Law.** Borrower (a) is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware; (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification; (c) has the requisite corporate power and authority and the legal right to own, pledge, mortgage

or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now, heretofore and proposed to be conducted; (d) has all licenses, permits, consents or approvals from or by, and has made all filings with, and has given all notices to, all governmental authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (e) is in compliance with its certificate of formation and limited liability company agreement; and (f) is in compliance with all applicable provisions of law, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**4.2    Executive Offices; FEIN.**  The current location of Borrower's and Originator's chief executive office and principal place of business is 7585 Equitable Drive, Eden Prairie, Minnesota 55344, and neither Borrower nor Originator has had any other chief executive office or principal place of business.  Borrower's federal employer identification number is 41-2022687

**4.3    Corporate Power, Authorization, Enforceable Obligations.**  The execution, delivery and performance by Borrower of the Loan Documents to which it is a party and the creation of all liens provided for therein: (a) are within Borrower's limited liability company power; (b) have been duly authorized by all necessary or proper limited liability company action; (c) do not contravene any provision of Borrower's certificate of formation and limited liability company agreement; (d) do not violate any law or regulation, or any order or decree of any court or governmental authority; (e) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which Borrower is a party or by which Borrower or any of its property is bound; (f) do not result in the creation or imposition of any lien upon any of the property of Borrower other than those in favor of Lender pursuant to the Loan Documents; and (g) do not require the consent or approval of any governmental authority or any other Person. Each Loan Document constitutes a legal, valid and binding obligation of Borrower enforceable against it in accordance with its terms.

**4.4    Material Adverse Effect.**  No event has occurred, which alone or together with other events, could reasonably be expected to have a Material Adverse Effect.

**4.5    Ownership of Property; Liens.**  Borrower owns no material property other than the Assigned Receivables and related rights purchased or granted pursuant to the Sale Agreement.  Borrower has good and marketable title to such assets, and none of such assets is subject to any liens not held by Lender or an Affiliate of Lender.

**4.6    Taxes.**  All tax returns, reports and statements, including information returns, required by any governmental authority to be filed by Borrower have been filed with the appropriate governmental authority and all taxes have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof (or any such fine, penalty, interest, late charge or loss has been paid).

## 5.    AFFIRMATIVE COVENANTS

To induce Lender to make the Receivables Loans, Borrower agrees that from and after the date hereof and until the Facility Termination Date.

DZB004342

**5.1    Maintenance of Existence and Conduct of Business**.  Borrower shall: (a) do or cause to be done all things necessary to preserve and keep in full force and effect Borrower's limited liability company existence, and its rights and franchises necessary to the proper conduct of its business; (b) continue to conduct Borrower's business solely for the purpose of conducting Receivables Sales financed by Lender or an Affiliate of Lender; (c) at all times maintain, preserve and protect all of Borrower's assets and properties used or useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear); (d) transact business only in Borrower's legal name; and (e) conduct Borrower's operations in a manner that complies with all of the terms and covenants in this Agreement and other Loan Documents.

**5.2    Books and Records**.  Borrower shall keep adequate books and records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with generally accepted accounting principles consistently applied. Borrower shall deliver to Lender financial statements, reports, notices and other information regarding Borrower, Originator and Receivables Sales financed by Lender as Lender shall request in its discretion from time to time.  Borrower shall promptly report to Lender the occurrence of any event that could reasonably expect to have a Material Adverse Effect, including any litigation, judgments or liens.

**5.3    Insurance.**  Borrower shall maintain, at its sole cost and expense, policies of casualty and liability insurance as are typically maintained by similar companies engaged in similar businesses, naming Lender as a loss payee and additional insured.  In addition, Borrower shall maintain credit insurance, on an equal cost-shared basis with Lender unless otherwise agreed, with respect to any Receivables Loan to the extent and on the terms specified in the related loan proposal as accepted by Lender.  In addition, Borrower with respect to such credit insurance, will take all appropriate steps to preserve and pursue all claims under such policies. In the event Borrower fails to maintain such insurance, Lender may, in its discretion, procure such insurance and charge the Borrower for the cost thereof (subject to such equal cost-sharing with respect to credit insurance).

**5.4    Compliance with Laws**.  Borrower shall comply with all federal, state, local, and foreign laws and regulations applicable to them, except to the extent that the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.5    Further Assurances**.  Borrower agrees that it shall and shall request any Seller and any Buyer to, at Borrower's expense and upon request of Lender, duly execute and deliver, or cause to be duly execute and delivered, to Lender such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out the provisions and purposes of this Agreement or any other Loan Document; provided however, that Lender agrees to file a financing statement substantially in the form attached hereto as Exhibit C.  Without limiting the foregoing, Borrower shall take all actions necessary such that the liens granted to Lender pursuant to the Loan Documents will at all times be fully perfected first priority liens in and to the Collateral described therein.

DZB004343

**5.6     No Liens.**  Borrower shall cause the Originator to warrant to Borrower that, upon payment to a Seller using the proceeds of a Receivables Loan which, taken together with any contribution from the Originator, shall be used to pay a portion of the purchase price of the related Receivables Sale, the Originator shall be the owner of Inventory subject to the related Originator Purchase Order, free and clear of any adverse claims, liens and encumbrances other than those in favor of Borrower or Lender.

**5.7     Operational Limitations.**  For at least one year and one day after the date that all Loans shall have been paid in full, Borrower shall comply with the following:

(a)     Borrower shall own no assets, and will not engage in any business, other than the assets and transactions specifically contemplated by this Agreement.

(b)     Borrower shall not incur any indebtedness or obligation, secured or unsecured, direct or indirect, absolute or contingent (including any guaranty of any such obligation), other than in connection with Receivables Sales financed by Lender or an Affiliate of Lender and as otherwise permitted under this Agreement.

(c)     Borrower shall not make any loans or advances to any third party and shall not acquire obligations (other than pursuant to the Servicing Agreement and the Sale Agreement) or securities of any of its Affiliates.

(d)     Borrower shall pay Borrower's debts and liabilities only from Borrower's assets.

(e)     Borrower shall do all things necessary to observe organizational formalities and preserve Borrower's existence and will not amend, modify or otherwise change its certificate of formation or limited liability company agreement, or suffer the same to be amended, modified or otherwise changed, without the prior written consent of Lender.

(f)     Borrower shall maintain all of Borrower's books, records, financial statements and bank accounts separate from those of the Originator or any of its other Affiliates.

(g)     Borrower shall be, and at all times will, hold itself out to the public as a legal entity separate and distinct from any other entity (including Originator and any other Affiliate of Borrower) and shall correct any known misunderstanding regarding Borrower's status as a separate entity, shall conduct its business in the name of Borrower, and shall not identify itself or any of its Affiliates as a division or part of the other and shall maintain and utilize separate invoices and checks.

(h)     Borrower shall maintain adequate capital, as determined in Borrower's reasonable discretion, for the normal obligations reasonably foreseeable in a business of Borrower's size and character and in light of Borrower's contemplated business operations.

(i)     Borrower shall not engage in or suffer any dissolution, winding-up, liquidation, consolidation or merger in whole or in part.

DZB004344

(j)    Borrower shall not commingle Borrower's funds or other assets with those of Originator or any other Affiliate of Borrower or any other person or entity.

(k)    Borrower shall maintain Borrower's assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify Borrower's individual assets from those of Originator or any other Affiliate or any other person or entity.

(l)    Borrower shall not hold itself out to be responsible for the debts or obligations of any other person or entity (other than as contemplated by the Servicing Agreement and the Sale Agreement).

(m)    Borrower shall maintain an independent director as set forth in its limited liability company agreement.

(n)    Borrower shall maintain, at its sole cost and expense, policies of casualty and property insurance with respect to the Inventory which is subject to each Originator Purchase Order which shall (i) provide for coverage in an amount which shall be equal to the price for which the related Seller has agreed to sell such Inventory under the related Seller Purchase Order, (ii) be continuously in effect during the period from the date the Lender shall advance the proceeds of the related Receivables Loan to the Borrower through and including the date that the related Buyer shall irrevocably accept delivery of such Inventory and agree to be responsible for the purchase price therefor; (iii) name the Lender and its successors and assigns as loss payee parties thereunder; and (iv) otherwise be in form and substance acceptable to the Lender and shall be from one or more insurance companies acceptable to the Lender.

## 6.    NEGATIVE COVENANTS

To induce Lender to make the Receivables Loans, Borrower agrees that, without the prior written consent of Lender, from and after the date hereof until one year and one day after the Facility Termination Date:

**6.1    Mergers, Subsidiaries, Etc.**   Borrower shall not directly or indirectly, by operation of law or otherwise, (a) form or acquire any subsidiary, or (b) merge with, consolidate with, acquire all or substantially all of the assets or capital stock of, or otherwise combine with or acquire, any Person; provided however, that the acquisition of any assets by Borrower pursuant to the Sale Agreement shall not be a violation of this covenant.

**6.2    Purchase Orders.**   Borrower shall not amend, modify, supplement, or assent to noncompliance with any material term, provision or condition of any Buyer Purchase Order, or permit Originator to do so.

**6.3    Investments; Loans and Advances.**   Borrower shall not make or permit to exist any investment in, or make, accrue or permit to exist loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise.

**6.4    Indebtedness.**   Borrower shall not create, incur, assume or permit to exist any indebtedness or liabilities, except: (a) obligations owing to Lender or to Other Lenders as described in Section 8.11; (b) contingent liabilities arising out of endorsements of checks and

DZB004345

other negotiable instruments for deposit or collection in the ordinary course of business; and (c) indebtedness or liabilities under the Servicing Agreement.

**6.5    Affiliate Transactions**.  Borrower shall not enter into or be a party to any transaction with any Affiliate other than payments to Affiliates permitted by Section 6.9 and as otherwise contemplated by this Agreement (including, without limitation, the Sale Agreement and the Servicing Agreement).

**6.6    Capital Structure and Business**.  Borrower shall not make any changes to its capital structure which results in Thomas J. Petters, directly or indirectly, owning less than 100% of the equity and financial interest of Borrower, or to its business objectives or purposes, or make any material change in its operations.

**6.7    Guaranteed Indebtedness**.  Borrower shall not create, incur, assume or permit to exist any obligation to guaranty any indebtedness or other obligation of any other Person in any manner except by endorsement of instruments or items of payment for deposit to the general account of Borrower.

**6.8    Liens**.  Borrower shall not create, incur, assume or permit to exist any lien on or with respect to the any of its properties or assets (whether now owned or hereafter acquired) except (i) liens in favor of Lender pursuant to the Loan Documents and liens in favor of Other Lenders, and (ii) liens for taxes not yet due.

**6.9    Restricted Payments**.   Borrower shall not make any Restricted Payment, provided that so long as no Event of Default has occurred and is continuing, Borrower may, with respect to the proceeds of any Receivables financed by Lender, after re-paying in full that portion of the obligations to Lender that relate to such Receivables, pay the remainder of the proceeds of that Receivable to Originator as distributions with respect to the equity of Borrower.

6.10    Change of Corporate Name or Location.  Borrower shall not (a) change its name or jurisdiction of organization, or (b) change its chief executive office, principal place of business, other business offices, warehouses or other locations, or the location of its records concerning any Collateral, in any case without at least 30 days' prior written notice to Lender and after completing or taking any reasonable action requested by Lender in connection therewith.

## 7.    EVENTS OF DEFAULT: RIGHTS AND REMEDIES; TERM

**7.1    Events of Default**.  The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)    Borrower (i) fails to make any required payment on any Receivables Loan or any of the other obligations under the Promissory Notes when due and payable, unless such due date has been extended in writing by Lender, and such failure remains unremedied for one (1) business day; or (ii) fails to pay or reimburse Lender for any expense reimbursable under any Loan Document within ten (10) days following Lender's demand for such reimbursement or payment of expenses.

DZB004346

(b)     Borrower or Originator shall fail or neglect to perform, keep or observe any other provision of any Loan Documents (other than any provision embodied in or covered by any other clause of this Section) and the same shall remain unremedied for a period ending on the first to occur of five (5) business days after Borrower or Originator shall receive written notice of any such failure from Lender or five (5) business days after Borrower or Originator shall become aware thereof; provided however, that if Originator or Borrower fails to transmit funds as required in Section 2.2(b), such five-day grace period shall not apply and there shall be no grace period.

(c)     Any representation or warranty in any Loan Document or in any written statement, report, financial statement or certificate made or delivered to Lender by Borrower is untrue or incorrect in any material respect as of the date when made or deemed made.

(d)     Any assets of Borrower or Originator shall be attached, seized or levied upon, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of Borrower.

(e)     A case or proceeding shall have been commenced against Borrower or Originator (i) under Title 11 of the United States Code or any other applicable federal, state or foreign bankruptcy or other similar law; (ii) requesting the appointment of a custodian, receiver or trustee (or similar official) of Borrower or Originator or of any substantial part of its assets; or (iii) requesting the winding-up or liquidation of the affairs of Borrower or Originator, and such case or proceeding shall remain undismissed or unstayed for sixty (60) days or such court shall enter a decree or order granting the relief sought in such case or proceeding.

(f)     Borrower or Originator (i) shall file a petition seeking relief under Title 11 of the United States Code, or any other applicable federal, state or foreign bankruptcy or other similar law; (ii) shall fail to contest in a timely and appropriate manner or shall consent to the institution of proceedings thereunder or to the filing of any such petition or to the appointment of or taking possession by a custodian, receiver or trustee (or similar official) of Borrower or Originator or of any substantial part of its assets; (iii) shall make an assignment for the benefit of creditors; or (iv) shall take any action in furtherance of any of the foregoing; or (v) shall admit in writing its inability to, or shall be generally unable to, pay its debts as such debts become due.

(g)     A final judgment or judgments for the payment of money shall be rendered against Borrower and the same shall not, within thirty (30) days after the entry thereof, have been discharged or execution thereof stayed or bonded pending appeal, or shall not have been discharged prior to the expiration of any such stay.

(h)     A Change of Control Date shall have occurred

(i)     Any other event shall have occurred that has a Material Adverse Effect.

**7.2    Remedies.**

(a)     If any Event of Default shall have occurred and be continuing, Lender may, without notice, (i) suspend or terminate this facility with respect to further Receivables Loans, and, upon written notice, terminate this Agreement (in which case the Facility

DZB004347

Termination Date shall be the termination date set forth in such notice); (ii) declare all or any portion of the Promissory Notes due; and (iii) exercise any rights and remedies provided to Lender under the Loan Documents and/or at law or equity, including all remedies provided under the Code; provided, that upon the occurrence of an Event of Default specified in Sections 7.1 (d),(e) or (f), all of the obligations shall become immediately due and payable automatically without declaration, notice or demand by any Person. Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies which Lender may have under any other agreement, including the other Loan Documents, by operation of law or otherwise. Recourse to any Collateral shall not be required. Borrower hereby irrevocably appoints Lender and its successors and assigns as Borrower's attorney-in-fact, coupled with an interest, to take all actions and perform all obligations required of Borrower under this Agreement after the occurrence and during the continuance of an Event of Default.

(b)   If any Event of Default shall have occurred and be continuing and if Lender determines that Originator is unwilling or unable to complete any inventory sale as required under any Originator Purchase Order or Buyer Purchase Order, then Lender or its successors and assigns may assume control of, and conduct and complete, such inventory sale pursuant to the terms of such Originator Purchase Order or Buyer Purchase Order, as the case may be.

7.3   **Term.**  The financing arrangements contemplated hereby shall be in effect until the Facility Termination Date.  In addition to Lender's rights under Section 7.2(a)(i), either Borrower or Lender may also terminate this Agreement on thirty (30) days prior written notice, and the Facility Termination Date shall be the thirtieth day after such notice (unless otherwise agreed by Borrower and Lender); provided that such termination shall not affect: (a) Borrower's obligations to make any payments due and owing to Lender pursuant to this Agreement; and (b) the indemnification provisions under Section 2.6, all of which shall remain operative and in full force and effect. Upon payment in full in cash and performance of all of Borrower's obligations to Lender (other than indemnification obligations hereunder), Lender shall deliver to Borrower and Originator termination statements, release of Collateral and guaranties and other documents necessary or appropriate to evidence termination of the liens and guaranties securing payment of the amounts owed to Lender hereunder.

## 8.   MISCELLANEOUS

8.1   **Complete Agreement; Modification of Agreement.**  The Loan Documents constitute the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in Section 8.2 below.  Any prior agreement, whether written or oral, between Borrower and Lender or any of their respective affiliates, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement.

8.2   **Amendments.**  No amendment, modification, or termination of any provision of any Loan Document, or any consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and Borrower.

**8.3    Fees and Expenses.** Borrower shall reimburse Lender for all fees, filing fees, costs and expenses, including the fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(a)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrower or any other Person as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection therewith or herewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to Lender by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any workout or restructuring of the Receivables Loans during the pendency of one or more Events of Default;

(b)    any attempt to enforce any remedies of Lender against Borrower or any other Person that may be obligated to Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any workout or restructuring of the Receivables Loans during the pendency of one or more Events of Default; and

(c)    efforts to perfect, verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

including all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in any way or respect arising in connection with or relating to any of the events or actions described in this Section, all of which shall be payable, on demand, by Borrower to Lender. If Borrower shall fail to pay any of such items upon demand, interest under Section 2.4 shall apply to such items until payment in full.

**8.4    No Waiver.** Lender's failure, at any time or times, to require strict performance by Borrower of any provision of this Agreement and any of the other Loan Documents shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or or of a different type. None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the other Loan Documents and no default or Event of Default by Borrower shall be deemed to have been suspended or waived by Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of Lender and directed to Borrower specifying such suspension or waiver.

**8.5    Successors and Assigns.** This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of Borrower, Lender and their respective successors and assigns (including a debtor-in-possession on behalf of Borrower or Originator). Borrower may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written

DZB004349

consent of Lender.  Any such purported assignment, transfer, hypothecation or other conveyance by Borrower without the prior express written consent of Lender shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of Borrower and Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

**8.6     GOVERNING LAW.  THE LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MINNESOTA WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.   BORROWER HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN HENNEPIN COUNTY, MINNESOTA SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED, LENDER MAY BRING SUIT OR TAKE OTHER ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.**

**8.7     Notices.**  Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered (a) upon the earlier of actual receipt and three business days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by email, telecopy or other similar facsimile transmission (with such email, telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section); (c) one business day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to:

If to Borrower:

> PC Funding, LLC
> 7585 Equitable Drive
> Eden Prairie, MN 55344
> Attn: Thomas J. Petters
> Fax: 952-975-2295
> email: Tom.Petters@redtagbiz.com

If to Lender:

DZB004350

Opportunity Finance, LLC
60 South Sixth Street
Minneapolis, MN 55402
Attn: Jon R. Sabes
Fax: 612-339-8922
email: sabesjon@qwest.net

or to such other address or person (or facsimile number) as may be substituted by notice given as herein provided.

**8.8    Counterparts.**  This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.

**8.9    WAIVER OF JURY TRIAL.  THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN LENDER AND BORROWER ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.**

**8.10    No Joint Venture.**  Nothing contained herein shall be deemed or construed to create a partnership or joint venture between Borrower and Lender or Originator and Lender.

**8.11    Other Lenders.**  The parties contemplate that from time to time Borrower may enter into financing agreements with Affiliates of Lender ("**Other Lenders**").  Lender may act as an agent for Other Lenders and Lender may appoint one or more Other Lenders or other Affiliates of Lender to act as agent for Lender for such purposes under this Agreement as Lender shall designate in a written notice to Borrower.  Borrower may not grant any Other Lender a lien on any Receivables Sale (or related asset) with respect to which Lender has made a Receivables Loan unless Lender consents to such grant in writing.  Any default or event of default under any financing agreement with any Other Lender shall constitute an Event of Default under this Agreement.

**8.12    Confidentiality.**  Lender agrees to use reasonable efforts (equivalent to the efforts Lender applies to maintain as confidential its own confidential information) to maintain as confidential all information provided by Borrower or Originator to Lender and designated as confidential; provided however, that Lender, may disclose such information to (i) any entity providing financing to Lender or any assignee of Lender (a "**Funding Source**"); (ii) any credit-enhancement provider of (a) Lender, (b) any assignee of Lender, or (c) any Funding Source (a "**Credit Enhancement Provider**"); or (iii) any rating agency; provided further that Lender or any such other party or person may disclose such information to Persons employed or engaged by Lender, such Funding Source, such Credit Enhancement Provider, or such rating agency in evaluating, approving, structuring or administering the Receivables Loans and the financing facility provided hereunder; provided however, that any such party or person to whom such information will be provided agrees to maintain such information as confidential as set forth

DZB004351

above, and provided that Lender or any such party or person may disclose such information (a) as required or requested by any governmental authority or reasonably believed by Lender, any Funding Source, any Credit Enhancement Provider, or any rating agency to be compelled by any court decree, subpoena or legal or administrative order or process; (b) as, in the opinion of counsel to Lender, any Funding Source, any Credit Enhancement Provider, or any rating agency required by law; (c) in connection with the exercise of any right or remedy under the Loan Document or in connection with any litigation to which Lender, any Funding Source, any Credit Enhancement Provider or rating agency is a party; or (d) which ceases to be confidential through no fault of Lender, any Funding Source, any Credit Enhancement Provider or any rating agency.

**8.13   Consent to Sale or Transfer.**   Borrower and Originator hereby consent, and agree to be bound by, any sale, transfer, assignment or pledge of any or all right, title and interest of Lender in, to or under the Receivables, Loans, Collateral, Loan Documents and any or all related rights, privileges and entitlements therein, and hereby further consents to the Lender's transfer, assignment, and pledge of any or all of its rights as a third-party beneficiary under the Sale Agreement. Borrower and Originator further consent to, and agree to be bound by, any subsequent sales, transfers, assignments or pledges of any or all of the foregoing by any transferee, assignee or pledge of Lender.

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

PC FUNDING, LLC

By: _____
Thomas J. Peters
President

OPPORTUNITY FINANCE, LLC

By: _____
Jon R. Sabes
Chief Manager and President

DZB004352

## ACKNOWLEDGMENT AND AGREEMENT

The undersigned hereby consents to the foregoing Credit Agreement and agrees to be bound by, perform those obligations imposed on it by, and be responsible for the representations and warranties by it in, the Credit Agreement.

PETTERS COMPANY, INC.
a Minnesota corporation

By: _____
(Thomas J. Petters)
President

DZB004353

# EXHIBIT T-28

Message

| | |
|---|---|
| **From:** | Vincent Salerno [CN=Vincent Salerno/OU=Branch/OU=New York/O=DZ BANK] |
| **Sent:** | 1/14/2004 11:42:12 AM |
| **To:** | Jennifer Wikoff [CN=Jennifer Wikoff/OU=Branch/OU=New York/O=DZ BANK@DZBANK] |
| **Subject:** | RE: Re: Opportunity Finance |

-------------------- Forwarded by Vincent Salerno/Branch/New York/DZ BANK on 01/14/2004 11:47 AM --------------------------



jenniferwikoff@onebox.com on 02/20/2003 10:14:08 AM

To:      vincent.salerno@dzbank.de, Howard.OBrien@dzbank.de
cc:
Subject:  RE: Re: Opportunity Finance


The last site review of Opportunity finace was conducted August 22nd and 23rd by myself, Vinny
and Patrick.  Four items of concern were noted during our review - three of which have been
resolved as follows:

Liability insurance was scheduled to lapse on 9/1/02.  The compliance worksheet was updated
to ensure that that insurance is current and a new decleration page was obtained.  A ticker
was also put in place to monitor the status of Cargo Insurance.

PC funding Agent Detail (Section on the monthly report).  During our review, we noted that a
receivable is aged based on the number of days that it is past due (i.e. the term for Opportunity's
receivable is 60 days).  If a receivable goes beyond the 60 days then it is placed in the
corresponding aging bucket.  Therefore, all of the receivables are in the 0-30 because they
are 0-30 days past due the inital 60 days (CONFUSING I KNOW).  It was my recommendation that
they begin tracking/trending the days an AR is outstanding  not those past due.  I believe it
is a better indicator of things that may go wrong (i.e. money going to Peters and not deposited
timely) - This has been changed on the reports and Stacey in monitoring monthly.

There is however one huge open item.  All monies received by Peters is flowing through its
operating accounts before they are transfered to the lockbox.  There are numerous memos and
discussions that have taken place concerning the appropriate way to correct this issue (One
of the reasons why we are currently doing background checks on Tom Peters).  ASG's due diligence
team (ME at the time) imposed a resolution date of 60 days - this has not been met but not by
lack of trying on the part of myself and the deal team.

Please touch base with Vinny - he has a diagram which depicts the flow of outgoing cash and
the controls in place at US Bank.  Also, it is probably very beneficial to sit down with Stacey
when she is funding the transaction to get an understanding of the other controls and backstops
in the facility.

Anyhow we are on target since the next site review was scheduled to occur February 22nd (six
mons after the previous review date give or take.)

Still working on the schedule but this should get you started.

Jennifer
--
Jennifer Wikoff
jenniferwikoff@onebox.com - email
(781) 685-1490 - voicemail/fax




-----Original Message-----
From:      vincent.salerno@dzbank.de
Sent:      Thu, 20 Feb 2003 09:08:46 -0500
To:        Howard.OBrien@dzbank.de
Cc:        Jenniferwikoff@onebox.com
Subject:   Re: Opportunity Finance

DZB059533

Sounds good to me - last visit was in late August 2002, so they're about
due anyway.  Let's coordinate with Jen.
VS




Howard O'Brien
02/20/2003 09:04 AM

To:     Vincent Salerno/Branch/New York/DZ BANK@DZBANK
cc:     Jenniferwikoff@onebox.com
Subject:    Opportunity Finance

The AUP Memo looks good.  I would like the opportunity to visit Opportunity
and to validate a monthly report.  The methodology will entail examination
of the purchase and sale documents that support the collateral values on
the Monthly Remittance Report.  In addition to the testing of the documents
in support of the values, I would plan on verifying the serial number of
the items that were sold to a customer and tieing the sn's to the shipping
and invoice documents.

Additional procedures would also be employed to validate the cash receipts
into the controlled accoount.  I would welcome your thoughts.

I will plan to go to Minneapolis as soon as I return from CA.  This will
probably be around 3/3 for about 3-4 days.

DZB059534

# EXHIBIT T-29

# INTENTIONALLY OMITTED

# EXHIBIT T-30

# WITHHELD PURSUANT TO PROTECTIVE ORDER

# EXHIBIT T-31

# WITHHELD PURSUANT TO PROTECTIVE ORDER

# EXHIBIT T-32



## GALLAGHER FINANCIAL PRODUCTS
## MEMORANDUM

Date:       January 17, 2003

To:         Jon Sabes / Opportunity Finance
            Pat Preece / DZ Bank
            Vinny Salerno / DZ Bank

From:       Robert J. Benvenuto

RE:         Fraud Insurance Questions


In addition to AIG who is working hard on this deal, I presented the deal to ACE.  They quickly got into the deal and expressed interest in working with us.  Below is a list of some of the questions/clarifications that they need us to provide written responses to.   Other questions that they have raised I have already satisfied.  The questions below are ones that I need your collective help responding to in order to ensure accurate representations.

Questions 1 to 3 are best suited for Jon to respond to.  Questions 4 to 7 are more directed at DZ Bank with input from Jon.  Please provide me a written response to these questions and I will have ACE up to speed along side AIG.

I am trying to confirm a meeting with AIG for us on Wednesday January 29th.  I think it will be productive to also set up a meeting with ACE for that same day while Jon and I are in NYC.  Therefore I would like to get these responses back to ACE as soon as possible.

Questions 1 – 3 for Jon

1.  Provide a written detailed description on the relationship between Opportunity Finance & Petters (extend of cross ownership, extent of business relationships, other relationships)?

    a.  The formal relationship between Opportunity and Petters is that of a commercial lender and its borrower.  There is no cross ownership between the companies, with the following exception.  Tom Petters founded a company called Redtag in which he raised money from outside shareholders.  The Sabes family has invested in Redtag and is a 10% shareholder.  Petters Company, the borrower of Opportunity is not a shareholder of Redtag.  Tom Petters serves as the chairman of Redtag.

2.  Describe how Opportunity Finance wins the business from Petters.  Is it a competitive bidding process or another type of arrangement?  What other companies does Petters use for financing and why?

1

DZB040676

a. Opportunity has won the business of Petters by being there when needed, in good times and in bad, and through loyalty and honest business dealings. While the business is a relationship based business, there is a competitive nature to it in which Opportunity is continually innovating in such a way to offer additional capacity, lower financing costs, and financing services. Petters obtains financing from other specialty lending companies who have designed programs similar to Opportunity to provide Petters with funding. Petters prefers to have multiple lending sources as opposed to a single lender to reduce reliance on any one financing source and maintain competitiveness between his lenders.

3. Provide details on the financials and capital structures of these companies (including the financing SPV) and of the principals (or capital) behind Opportunity Finance. *Please note that I gave AIG the originals that you provided and did not retain a complete copy that included the footnotes.*

a. The capital structure of Opportunity and its subsidiary SPV are quite simple. Opportunity is capitalized to approximately $50 million through the issuance of notes to members of the Sabes family. The notes pay the noteholder their pro-rata share of the net interest margin defined as gross interest earned less facility financing costs. This net interest margin earned is accrued and held in the investors account until such time a withdraw request is made – the note and interest earned function exactly like a partnership's capital account. Opportunity invests the $50 million in notes its subsidiary as a capital contribution to its SPV to support the facility. Members of the Sabes family have acquired their wealth over many decades of owning and investing in successful business ventures.

Questions 4 – 7 for Pat and Vinny with Jon

4. The financing from Opportunity Financing (on the surface) appears to be quite expensive (i.e. commitment fees 0-5% and interest rates of 15-45%) - especially given the zero defaults, short term nature of the loans, and access to DZ Bank's CP conduit. What is the basis and support for the fees (risk level, DZ Bank fees, limited competition)? In addition, the margin on Petters' products sold to a wholesaler like Sam's Cub would not appear to be able to support this cost of financing. (Please help clarify our understanding)

a. The financing Opportunity provides is expensive relative to other traditional sources of financing. However, this is not a traditional situation and grew from a venture relationship whereby Opportunity provided unlevered capital (Petters is only required to put up 2% of the cost of goods sold) and Petters provided the deals – accordingly the nominal interest rate was designed to reflect a profit sharing – rather than traditional bank financing. Over the years as the business has grown this model has changed to more closely resemble traditional bank financing, and will continue to do so in the future. The basis to support the level of fees and business is several factors – historical business relationship, flexible capital, limited competition, continued innovation, and ever improving terms.

See following table for financing costs/margins:

2

| | | |
|---|---|---|
| Sell Price | $ 115.00 | |
| Buy Price | $ 100.00 | |
| Gross Profit | $ 15.00 | |
| | | |
| Financing Cost | $ (7.13) | |
| | | |
| Profit After Financing | $ 7.88 | |
| | | |
| Interest Rate | 30% | |
| Loan Amount | $ 90.00 | |
| Loan Days | 95 | |

5. We need to better understand DZ Bank's motivations. What is DZ Bank charging for their facility? What is the basis for the premium and reason for the $30 million limit levels that they are considering?

The Borrower's all-in gross spread currently is 275 bps over CP. This figure will increase with the new transaction wherein DZ Bank assumes the credit risk in the transaction versus Royal & SunAlliance. These fees were/are meant to compensate DZ BANK for the significant upfront (and ongoing) effort associated with structuring a facility that worked for all parties. Given the protections already established in this transaction (i.e. structuring a "closed-loop" system with respect to cash flow and approvals) DZ BANK feels that $30 million of 'external' fraud protection is the adequate level.

6. We need DZ Bank to give us a specific description of the coverage that they want (i.e. fraud events that they wish to have covered). Since blanket "fraud" is not an area that is typically covered by traditional crime policies, so we need to understand exactly what DZ Bank needs for coverage so we can broaden the traditional coverage to meet the bank's needs.

As in the current Royal & SunAlliance policy, DZ BANK requires coverage with respect to fraud perpetrated by either Opportunity or Petters. We do not want to begin conversations on what types of fraud are covered (it'd be difficult to name every single instance that could occur because we designed the structure to eliminate any fraud we could contemplate happening).

7. In the DZ Bank Deal Book we read that the receivables appear to be only with 4 counter parties. It would seem that it would be relatively easy to verify the receivables, contracts, etc. as part of DZ Bank's due diligence. Why is DZ Bank only focusing in on Opportunity Finance/Petters in the conduit? Is their something in DZ Bank's due diligence report that is a concern? We would like to get a copy of DZ Bank's due diligence report. Please clarify.

3

DZB040678

The objective in structuring this facility was to satisfy the Company's financing needs with minimal impact on its day to day operations.  Adding an additional 'confirmation' step to the funding process, which already contains numerous operational controls, would have proven problematic for Opportunity Finance.  This would have pushed Opportunity Finance into the category of a more traditional lender and their fees to Petters would not be acceptable at that point.

It is our policy to not share actual due diligence reports with third-parties.  We view this as giving an insurance company an out if there is anything wrong in our analysis.  We don't want determinations to be made due to what is or isn't in our reports.

Thank you for committing the time to this necessary underwriting process.  As we discussed, this product is being customized for your specific needs and is not something that comes off of the shelf.  Therefore thorough underwriting is required to ensure that there are no moral hazards in this deal.

4

# EXHIBIT T-33

Page 1

1                     JENNIFER WIKOFF
2           UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF MINNESOTA
3                    NO. 08-45257
4      IN RE: PETTERS COMPANY, INC., et al.,)
                                            )
5           Debtors.                        )
                                            )
6                                           )
       DOUGLAS A. KELLEY, in his capacity as)
7      the Trustee of the PCI Liquidating   )   Court File Nos.
       Trust,                               )   08-45258 (KHS)
8                                           )   08-45326 (KHS)
            Plaintiff,                       )   08-45327 (KHS)
9                                           )   08-45328 (KHS)
            vs.                             )   08-45329 (KHS)
10                                          )   08-45330 (KHS)
       OPPORTUNITY FINANCE, LLC; OPPORTUNITY)   08-45331 (KHS)
11     FINANCE SECURITIZATION, LLC;         )   08-45371 (KHS)
       OPPORTUNITY FINANCE SECURITIZATION   )   08-45392 (KSH)
12     II, LLC; OPPORTUNITY FINANCE         )
       SECURITIZATION III, LC; INTERNATIONAL)
13     INVESTMENT OPPORTUNITIES, LLC; SABES )
       FAMILY FOUNDATION; SABES MINNESOTA   )
14     LIMITED PARTNERSHIP; ROBERT W. SABES;)
       JANET F. SABES; JON R. SABES; STEVEN )
15     SABES; DEUTSCHE                       )
       ZENTRALGENOSSENSCHAFTBANK AG; AND    )
16     THE  MINNEAPOLIS FOUNDATION,         )
                                            )
17          Defendants.                      )
       _____)
18
19
20          VIDEOTAPED DEPOSITION OF JENNIFER WIKOFF
21                 Amsterdam, Netherlands
22              Thursday, November 29, 2018
23
24     REPORTED BY: RICH ALOSSI, RPR, CCRR, CSR NO. 13497
25     Job No. 150586

Page 37

1                        JENNIFER WIKOFF

2       A    Correct.

3            Sort of correct.

4       Q    Why do you say "sort of"?

5       A    Because if it -- the tenor of the terms, as

6  our portfolio grew, you would be -- maybe you didn't

7  originate a deal, but you had a portfolio of ten deals

8  that were generating an income.  So it could be the

9  same bonus.

10      Q    Because revenue was coming from deals that

11 had been originated in prior years; correct?

12      A    Correct.

13      Q    Did you yourself originate any deals?

14      A    I didn't.

15      Q    Just because that wasn't your role; correct?

16      A    That was not my role.

17      Q    Now, you said before -- just coming back to

18 understanding the business and issues of collateral.

19 You said that to understand -- if, in a particular

20 transaction, receivables were collateral, you would

21 want to understand what those receivables are; correct?

22      A    Yes.

23      Q    And you would want to make sure that those

24 receivables actually exist; correct?

25      A    Correct.

JENNIFER WIKOFF

1

2    Q   And what about in a deal where the collateral
3  is inventory?  Would you want to understand what the
4  inventory is?

5    A   Yes.

6    Q   And would you want to confirm that the
7  inventory exists?

8    A   Yes.

9    Q   And how would you go about confirming that
10 the inventory exists in those types of deals?

11   A   Well, you would visit a warehouse that was
12 housing the inventory.

13   Q   And you would physically look at the
14 inventory and make sure that it's real?

15   A   At a warehouse.  Correct.

16   Q   Is that referred to as "stepping on the
17 goods"?  Are you familiar with that term?

18   A   I am not familiar with that term.

19   Q   I heard that somewhere before.

20       And in that case, you wouldn't rely only on
21 documentation showing that inventory exists; correct?

22   A   If you were financing inventory; correct.

23   Q   If you're not financing inventory but
24 financing receivables, is the existence of the
25 underlying products completely irrelevant?

# EXHIBIT T-34



**FREDRIKSON & BYRON, P.A.**

*Attorneys and Advisors*

Minneapolis
London
Washington DC      1100 International Centre
*Affiliates*              900 Second Avenue South
Mexico City           Minneapolis, MN 55402-3397
Warsaw                (612) 347-7000
Montreal              FAX (612) 347-7077
Toronto               www.fredlaw.com
Vancouver            Direct Dial No.
                           (612) 347-7105
                           sroot@fredlaw.com

December 13, 2001

Mr. Jon Sabes
Opportunity Finance LLC
60 South Sixth Street, Suite 2540
Minneapolis, MN 55402

**Re:   Petters**

Dear Jon:

To follow up on recent discussions in connection with finalizing the documentation for the new facility between Opportunity Finance and PC Funding, LLC:

1.  The existing credit facility (under the April 17, 2001 Credit Agreement for Petters Finance, LLC) will be wound down, and instead, the new facility will take over (under the new Credit Agreement with PC Funding, LLC). The existing Credit Agreement provides that either party may terminate the facility on 30 days' notice, and it remains completely discretionary (i.e., neither party is obligated to borrow nor lend unless both agree to do so on mutually agreed terms). The new Credit Agreement has similar provisions. At this point I do not see a pressing need for either party to give written notice of termination, but we may want to consider the benefits of a formal termination of the current facility.

2.  As referenced above, the new Credit Agreement continues to maintain complete discretion on both the borrower's part to borrow funds and the lender's part to lend funds. Further, there continues to be complete discretion on the economic terms of each advance. I understand you have had some discussions with Petters regarding the expected reductions in the cost of capital, but the economic terms continue to not be addressed in the documents. In light of the discretionary nature of the facility and the fact that it can be terminated by either party on 30 days notice, I do not see the need to address the economics in the documents themselves. However, I would urge you and Petters to have a mutual understanding as to what the economic terms will be going forward.

3.  You have informed me that your lender will require that Petters fund at least 2% of each purchase so that no transaction is 100% debt financed by this new facility. This 2% requirement is not reflected in the documents, but, as I understand it, is part of the internal credit approval procedures. Again, I would urge you and Petters to have a

PCI_S_SC_OppFin_0032715

**FREDRIKSON & BYRON, P.A.**
*Attorneys and Advisors*

December 13, 2001
Page 2

mutual understanding about these and other lending requirements that are not reflected in the documents.

4. I want to emphasize the concern that Petters has expressed about lenders and others contacting Petters customers. The revised documentation allows contact after an event of default (but not before). In light of the concerns that Petters has expressed in this regard, I would hope that Opportunity Finance and its lenders (and any other interested parties) would honor both the spirit and the terms of the contact restrictions, and that Opportunity Finance would communicate Petters concerns to these third parties.

5. The Credit Agreement allows limited disclosure of Petters' confidential information of Petters to your lenders and others. While I understand the need to do this, and believe it is critical from all parties' perspective to have full disclosure of the terms and risks involved to all interested parties, I would again urge you and Petters to have a mutual understanding of what information will be provided to your lenders and others to balance Petters' legitimate concerns on confidentiality and the need of such interested parties to have access to important information..

6. To confirm our discussions, neither Fredrikson & Byron nor Petters is providing any representations, warranties or assurances whether or not the new deal structure meets (or does not meet) the requirements for "true sale," "bankruptcy remote" or "substantive non-consolidation." It is our understanding that Opportunity Finance has worked with its advisors, and your lender and others have worked with their advisors, in structuring this facility to your satisfaction, and that you and they are not relying upon Fredrikson & Byron or Petters in connection with such matters.

Please feel free to contact me should you have any comments or questions on any of these matters.

Sincerely,

Simon C. Root

SCR/ver/2594668

cc:   Thomas J. Petters
      Thomas Hay
      Heather Thayer

# EXHIBIT T-35

Message

| | |
|---|---|
| **From:** | Nancy O'Connor [CN=Nancy O'Connor/OU=Branch/OU=New York/O=DZ BANK] |
| **Sent:** | 7/11/2003 10:44:11 AM |
| **To:** | Patrick Preece [CN=Patrick Preece/OU=Branch/OU=New York/O=DZ BANK@DZBANK] |
| **Subject:** | Re: Opportunity Finance |

it seemed that way i was trying to prevent anyone else getting that impression as well!

Patrick Preece
07/11/2003 10:41 AM

To:      Nancy O'Connor/Branch/New York/DZ BANK@DZBANK
cc:
Subject:  Re: Opportunity Finance

Hi Nancy,

No issue with discussing the possible financing with West LB if we can do it with out getting messy.   I just didn't want you to think that I was trying to hide anything relevant from Germany.

Regards,

Patrick

Nancy O'Connor
07/11/2003 10:33 AM

To:      Patrick Preece/Branch/New York/DZ BANK@DZBANK
cc:
Subject:  Re: Opportunity Finance

Patrick,
What I don't have with me is the version of the credit application I already reviewed, with my comments, so let' s talk on Monday.   We can talk further and I am not looking to "air our dirty laundry" but we make this sound like this is a new financing to replace our existing and it does not address how the company will finance the "other" business going forward. I am only talking about a 2 paragraph background about the changes and the possible financing Opportunity will get from West LB.   What the issue becomes is that we close our deal, they close their's and the 12/31/2003 consolidiated financials show $200 mio in financing.

Let me know what time on Monday morning.

Nancy

Patrick Preece
07/11/2003 10:08 AM

DZB057221

To:     Nancy O'Connor/Branch/New York/DZ BANK@DZBANK

cc:

Subject:  Re: Opportunity Finance

Hi Nancy,

I would be more than happy to e-mail the application to you if you want to do this today, or we can wait until Monday. Either way, I do want to discuss your comment about lack of transparency.   I completely disagree with this comment. The lock box issue has nothing to do with our desire to modify this deal to a receivable only transaction.   The reason we need to modify this deal is that Ken now is saying that he is not comfortable with the way the "diverted goods" business works.   Although it was my understanding (and Jen, Rich and Vinny's) that we could not confirm our collateral in this deal and that is the reason we brought in the Royal, Ken does not like the idea that on some of the deals (although the docs require perfection at all times), DZ Bank could be unperfected for a few days due to the fraud of the Manufacturers (sellers of the goods).   I did not want to get into all of this in the write-up because I consider it an ASG problem and not one to discuss for Germany.   The reality of the matter is that I believe we could have solved the lockbox issue before Opportunity Finance stopped originating deals in our facility if they believed that this deal was not going down anyway (do to the issues discussed above).   As for West LB, this is not a done deal.   A verbal commitment was made three weeks ago, but nothing in writing.   Subsequent to the verbal commitment, the chairman of West LB (US?) lost his head and all new deals were put on hold.   WEST LB/Dain Rauscher/Opportunity Finance all have high hopes of getting this process started again in a couple of weeks, but nothing is certain.   I didn't want to say that West LB was taking over our deal with the diverted goods because we were stupid (again bringing up the internal ASG problems), and I didn't want to mention it because it might not happen (Jon told me last Monday that he has been left at the alter before and is not holding his breath).

Please give me a call so we can discuss.

Patrick



Nancy O'Connor
07/11/2003 08:54 AM

To:     Vincent Salerno/Branch/New York/DZ BANK@DZBANK, Patrick Preece/Branch/New York/DZ BANK@DZBANK

cc:

Subject:  Re: Opportunity Finance

Hi Vinny and Patrick,
It turns out I am working from home today and I do not have the credit application with me.   If you are both available Monday morning, can we sit down at 10:30 or 11? ( I need to be available for Frankfurt earlier than that since Wolfgang is on vacation).

We could talk today about the lack of transparency with this application and deal with the application specifics on Monday, but I think it makes more sense to talk on Monday if you re both available.   Let me know.

Nancy



Nancy O'Connor
07/10/2003 08:26 PM

To:     Vincent Salerno/Branch/New York/DZ BANK@DZBANK, Patrick Preece/Branch/New York/DZ BANK@DZBANK

cc:

Subject:  Re: Opportunity Finance

11 is fine and I'll see you in Pat's office.   We need to talk about the West LB facility, because in my opinion that impacts

DZB057222

our analysis.   See you in the AM.
Nancy



Vincent Salerno
07/10/2003 05:32 PM

Sent by:  Vincent Salerno

To:      Nancy O'Connor/Branch/New York/DZ BANK@DZBANK
cc:      Patrick Preece/Branch/New York/DZ BANK@DZBANK
Subject:  Re: Opportunity Finance

Nancy - 11:00 AM tomorrow should work.   It probably makes sense to just meet in Pat's office.

Let us know if this doesn't work for you.

Vinny



Nancy O'Connor
07/10/2003 03:34 PM

To:      Patrick Preece/Branch/New York/DZ BANK@DZBANK, Vincent Salerno/Branch/New York/DZ BANK@DZBANK
cc:
Subject:  Opportunity Finance

Let me know if you are available at 10:30 or 11:00 am tomorrow morning to review the credit application.   I am a bit
surprised in reading this that we make no mention of the wind down of the existing facility, the lock box issues now
resolved with this structure or the fact that Opportunity will now have two $100 mio facilities in place.!

Let me know when you are available.

Nancy

DZB057223

# EXHIBIT T-36

Message

| | |
|---|---|
| **From:** | Vincent Salerno [CN=Vincent Salerno/OU=Branch/OU=New York/O=DZ BANK] |
| **Sent:** | 1/14/2004 11:40:16 AM |
| **To:** | Jennifer Wikoff [CN=Jennifer Wikoff/OU=Branch/OU=New York/O=DZ BANK@DZBANK] |
| **Subject:** | FW: Opportunity Finance - Vendors |

--------------------- Forwarded by Vincent Salerno/Branch/New York/DZ BANK on 01/14/2004 11:45 AM ---------------------



jenniferwikoff@onebox.com on 03/03/2003 04:31:07 PM

To:      Vincent.salerno@dzbank.de
cc:      Patrick.preece@dzbank.de
Subject: FW: Opportunity Finance - Vendors


    Vinny - call me to discuss.
--
Jennifer Wikoff
jenniferwikoff@onebox.com - email
(781) 685-1490 - voicemail/fax




    -----Original Message-----
From:    Teresa.Zariczny@dzbank.de
Sent:    Mon, 3 Mar 2003 16:22:34 -0500
To:      jenniferwikoff@onebox.com; Howard.OBrien@dzbank.de
Subject: Opportunity Finance - Vendors



btw, just want to update you on this whole petters vendor thing...

as you are well aware, howard and I are investigating the existence of
opportunity's vendors.

1) Nationwide International Resources, Inc. Number: C2044833 - license was
suspended on 2/1/2002 for
    missing the filing deadline. - source of info: California Secretary of
State Website as well as a
    follow up conversation I had  with a gentleman named Don  of the
Corporations Records Group of the Cali Sec of State.
    I was also informed that this particular Nationwide International
Resources, Inc. is listed as a clothing manufacturer
    and distributor.  Finally, note the different street addresses.

    On the Wire Transfer:                California Secretary of State
Website
    Nationwide International Resources, Inc.              Nationwide
International Resources, Inc.
    2346 Westwood Blvd #6                5370 West Jefferson Blvd.
    Los Angeles, CA  90064               Los Angeles, CA  90016

2) I had Pam Johnson of 1st West do a search on Nexus Lexus for me.
    same results..Nationwide International Resources, Inc. Number C20448833
    license was suspended on 2/1/2002

    several wire disbursements have gone out to the Account Name of
Nationwide International Resources, Inc.
    since  2/1/2002.  Here are a two actual dates...12/24/2002,
12/30/2002...

DZB059498

Jennifer, let's catch up tomorrow..
-Teresa

DZB059499

# EXHIBIT T-37

Message

| | |
|---|---|
| **From:** | Vincent Salerno [CN=Vincent Salerno/OU=Branch/OU=New York/O=DZ BANK] |
| **Sent:** | 1/14/2004 11:40:50 AM |
| **To:** | Jennifer Wikoff [CN=Jennifer Wikoff/OU=Branch/OU=New York/O=DZ BANK@DZBANK] |
| **Subject:** | FW: UNIVERSAL CAPITAL GROUP, LLC: D&B Comprehensive Report |

-------------------- Forwarded by Vincent Salerno/Branch/New York/DZ BANK on 01/14/2004 11:45 AM --------------------------



jenniferwikoff@onebox.com on 03/06/2003 10:04:39 AM

To:       vincent.salerno@dzbank.de, teresa.zariczny@dzbank.de
cc:
Subject:  FW: UNIVERSAL CAPITAL GROUP, LLC: D&B Comprehensive Report

--
Jennifer Wikoff
jenniferwikoff@onebox.com - email
(781) 685-1490 - voicemail/fax

-----Original Message-----
From:     jenniferwikoff@onebox.com
Sent:     Wed, 5 Mar 2003 22:46:56 -0500 (EST)
To:       jenniferwikoff@onebox.com; kenneth.bradt@dzbank.de;patrick.preece@dzbank.de
Subject:  UNIVERSAL CAPITAL GROUP, LLC: D&B Comprehensive Report

Have not looked through these this yet.
***************************************************************
This report was sent to you by jenniferwikoff@onebox.com.
Visit www.dnb.com to learn how D&B can help you Decide with Confidence.
***************************************************************

        COPYRIGHT 2003 DUN & BRADSTREET INC. - PROVIDED UNDER CONTRACT
             FOR THE EXCLUSIVE USE OF SUBSCRIBER 001-029903.


                        COMPREHENSIVE REPORT

DUNS: 01-013-6641
UNIVERSAL CAPITAL GROUP, LLC
   UNIVERSAL CAPITAL GROUP              FINANCIAL STRESS CLASS: 3
                                       CREDIT SCORE CLASS:     4
4400 BAKER RD
MOVED FROM: 11610 WAYZATA                        KEY
BLVD, HOPKINS, MN         ============================= HOPKINS MN 55343
LOWEST RISK       HIGHEST RISK
TEL: 952 541-8111                  1    2    3    4    5

SIC:       53 11 73 89
LINE OF BUSINESS: RETAIL LIQUIDATION AND EVALUATION
YEAR STARTED:      1996
CONTROL DATE:      1996                    DATE PRINTED: MAR 05 2003

CHIEF EXECUTIVE: MICHAEL CATAIN, PRESIDENT

=============================================================================== EXECUTIVE
SUMMARY

- The Financial Stress Class of 3 for this company shows that during the
  previous year, firms with this classification had a failure rate of

DZB059526

3.73% (373 per 10,000), which is 2.66 times higher than the national average.
- The Credit Score Class of 4 for this company shows that during the previous
  year, 24.7% of the firms with this classification paid one or more bills
  severely delinquent, which is 1.44 times higher than the national average.
- Subject company pays its bills an average 39 days beyond terms.
- Subject company's industry pays its bills an average 11 days beyond terms.
- Subject company pays its bills slower than the average for its industry.
- Special events are reported for this business.
- UCC filing(s) are reported for this business.
- Under present management control 7 years.
- No record of open Suit(s), Lien(s), or Judgment(s) in the D&B database.
- History is clear.

================================================================== CREDIT
CAPACITY SUMMARY

D&B Rating:     2R3                Payment Activity
                                     (based on 12 experiences):
                                     Average High Credit:    $2,120
# of Employees                       Highest Credit:        $20,000
Total:          7                    Total Highest Credits: $25,450

Worth:          -
Working Capital: -

================================================================== SPECIAL
EVENTS

12/09/02     Business address has changed from 11610 Wayzata Blvd, Hopkins,
    MN, 55305 to 4400 Baker Rd, Hopkins, MN, 55343.

================================================================== FINANCIAL
STRESS SUMMARY

The Financial Stress Model predicts the likelihood of a firm ceasing business
without paying all creditors in full, or reorganizing or obtaining relief from
creditors under state/federal law over the next 12 months. Scores were
calculated using a statistically valid model derived from D&B's extensive data
files.


  Financial Stress Class:                        3
  (Highest Risk: 5; Lowest Risk: 1)

  Incidence of Financial Stress Among
  Companies with this Classification:            3.73% (373 per 10,000)

  Incidence of Financial Stress:                 1.40% (140 per 10,000)
  - National Average

  Financial Stress National Percentile:          9
  (Highest Risk: 1; Lowest Risk: 100)

  Financial Stress Score:                        1346
  (Highest Risk: 1,001; Lowest Risk: 1,850)

The Financial Stress Class for this company is based on the following factors:

  - Payment experiences exist for this firm which are greater than 60 days
    past due.
  - 17% of trade experiences indicate slow payment(s) are present.
  - No record of open suit(s), lien(s), or judgement(s) in the D&B files.
  - Control age or date entered in D&B files indicates higher risk.

 Notes:

- The Financial Stress Class indicates that this firm shares some of
the same business and financial characteristics of other companies with
this classification.  It does not mean the firm will necessarily
experience financial stress.

- The Incidence of Financial Stress shows the percentage of firms in a

DZB059527

given Class that discontinued operations over the past year with loss
to creditors.  The Incidence of Financial Stress - National Average
represents the national failure rate and is provided for comparative
purposes.

- The Financial Stress National Percentile reflects the relative
ranking of a company among all scorable companies in D&B's file.

- The Financial Stress Score offers a more precise measure of the level
of risk than the Class and Percentile.  It is especially helpful to
customers using a scorecard approach to determining overall business
performance.

- All Financial Stress Class, Percentile, Score and Incidence
statistics are based on 2002.

============================================================================ FINANCIAL
                                                                            STRESS NORMS
                                                                            National
Norms for Companies in the Same ...                                         Percentile

     - Region  (WEST NORTH CENTRAL)                                 58

     - Industry: GENERAL RETAIL                                     45

     - Employee Range (1-9)                                         54

     - Years in Business Range (6-10)                               39

     - Subject Company                                              9

Key Comparisons
The subject company has a Financial Stress Percentile that shows:

  - Higher risk than other companies in the same region.
  - Higher risk than other companies in the same industry.
  - Higher risk than other companies in the same employee size range.
  - Higher risk than other companies with a comparable number of years in
    business.

============================================================================ CREDIT SCORE
SUMMARY

The Credit Score Class predicts the likelihood of a firm paying in a severely
delinquent manner (90+ Days Past Terms) over the next twelve months.  It was
calculated using statistically valid models and the most recent payment
information in D&B's files.

Credit Score Class:                              4

Incidence of Delinquent Payment Among
Companies with this Classification:              24.70%

Percentile:                                      14

The Credit Score Class for this company is based on the following factors:

  - Payment experiences exist for this firm which are greater than 60 days past
    due.
  - 17% of trade experiences indicate slow payment(s) are present.
  - No record of open suit(s), lien(s) or judgment(s) in the D&B files.
  - Control age or date entered in D&B files indicates higher risk.
  - Business does not own facilities.

Notes:

  - The Incidence of Delinquent Payment is the percentage of companies with
    this classification that were reported 90 days past due or more by
    creditors. The calculation of this value is based on an inquiry weighted
    sample.

  - The Percentile ranks this firm relative to other businesses. For example,

DZB059528

a firm in the 80th percentile has a lower risk of paying in a severely
delinquent manner than 79% of all scorable companies in D&B's files.

=========================================================================== CREDIT SCORE

|  | NORMS National Percentile |
|---|---|
| Norms for Companies in the Same ... |  |
| - Region  (WEST NORTH CENTRAL) | 61 |
| - Industry: GENERAL RETAIL | 43 |
| - Employee Range (1-9) | 53 |
| - Years in Business Range (6-10) | 46 |
| - Subject Company | 14 |

Key Comparisons
The subject company has a Credit Score Percentile that shows:

- Higher risk than other companies in the same region.
- Higher risk than other companies in the same industry.
- Higher risk than other companies in the same employee size range.
- Higher risk than other companies with a comparable number of years in
  business.

=========================================================================== PAYMENT
TRENDS

PAYDEX scores below are based on dollar weighted trade in most recent 12 mos.

|  | '01 JUN | '01 SEP | '01 DEC | '02 MAR | '02 APR | '02 MAY | '02 JUN | '02 JUL | '02 AUG | '02 SEP | '02 OCT | '02 NOV | '02 DEC | '03 JAN | '03 FEB | '03 MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FIRM | 78 | 77 | 52 | 52 | 55 | 55 | 52 | 52 | 52 | 51 | 50 | 49 | 49 | 49 | 49 | 47 |
| Industry Quartiles |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Upper | 79 | 79 | 79 | 79 |  |  | 79 |  |  | 79 |  |  | 79 |  |  |  |
| Median | 73 | 73 | 72 | 73 |  |  | 73 |  |  | 73 |  |  | 73 |  |  |  |
| Lower | 64 | 61 | 62 | 62 |  |  | 63 |  |  | 63 |  |  | 62 |  |  |  |

    Industry PAYDEX based on:      KEY TO PAYDEX SCORES:
    SIC:  5311                     79   2 Days Beyond Terms
    1,250 Firms                    73  11 Days Beyond Terms
                                   47  39 Days Beyond Terms

=========================================================================== SUMMARY OF
PAYMENT HABITS

Dollar Range Comparisons:

| Suppliers That Extend Credit of... | Number of Experiences: | Total Amount | % of Dollars Within Terms |
|---|---|---|---|
|  | # | $ | % |
| OVER $100,000 | 0 | 0 | 0 |
| $50,000 - 99,999 | 0 | 0 | 0 |
| $15,000 - 49,999 | 1 | 20,000 | 50 |
| $ 5,000 - 14,999 | 0 | 0 | 0 |
| $ 1,000 - 4,999 | 4 | 4,000 | 75 |
|    Under 1,000 | 7 | 1,450 | 100 |

=========================================================================== PAYMENT
ANALYSIS BY INDUSTRY

There are 12 payment experiences in D&B's file for the most recent 12 months,
with 6 experiences reported during the last three month period.

DZB059529

| | Total Recd # | Dollar Amount $ | Highest Credit $ | Within Terms | Slow 1-30 | Slow 31-60 | Slow 61-90 | Slow 91+ |
|---|---|---|---|---|---|---|---|---|
| | | | | --- | | % of dollar amount | | --- |
| Total in D&B's File | 12 | 25,450 | 20,000 | | | | | |
| | | | | | | | | |
| Industry | | | | | | | | |
| | | | | | | | | |
| Mfg upholstered furn | 2 | 21,000 | 20,000 | 47 | 5 | 0 | 0 | 48 |
| Data processing svcs | 2 | 300 | 250 | 100 | 0 | 0 | 0 | 0 |
| Telephone communictns | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Whol office supplies | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Nonclassified | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Electric services | 1 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Help supply service | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Radiotelephone commun | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Ret mail-order house | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Ret misc merchandise | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |

```
OTHER PAYMENT CATEGORIES:
Cash Experiences         0          0
Paying Record Unknown    0          0
Unfavorable Comments     0          0
Placed for Collection
  with D&B               0          0
  other                  0        N/A
```

Indications of slowness can be the result of disputes over merchandise, skipped
invoices, etc.

============================================================================ PUBLIC
FILINGS SUMMARY

The following data includes both open and closed filings found in
D&B's database on the subject company.

| Record Type | # | Most Recent Filing Date |
|---|---|---|
| Bankruptcy Proceedings | 0 | - |
| Judgments | 0 | - |
| Liens | 0 | - |
| Suits | 0 | - |
| UCC's | 3 | 06/08/2000 |

============================================================================ PUBLIC
FILINGS DETAIL

The following data is for information purposes only and is not the
official record.  Certified copies can only be obtained from the
official source.

----------------------------------------------------------------------------
* * * UCC FILING(S) * * *
----------------------------------------------------------------------------
COLLATERAL: Inventory including proceeds and products - Account(s) including
            proceeds and products - General intangibles(s) including proceeds
            and products - Chattel paper including proceeds and products - and
            OTHERS
FILING NO: 2234948                    DATE FILED:            06/08/2000
TYPE:      Original                   LATEST INFO RECEIVED:  06/30/2000
SEC. PARTY: ANCHOR BANK, NATIONAL     FILED WITH: SECRETARY OF
            ASSOCIATION, WAYZATA, MN              STATE/UCC DIVISION,
DEBTOR:    UNIVERSAL CAPITAL PARTNERS, LLC        MN
----------------------------------------------------------------------------
COLLATERAL: RIGHT, TITLE AND INTEREST including proceeds and products
FILING NO: 0026581                    DATE FILED:            05/01/2000
TYPE:      Original                   LATEST INFO RECEIVED:  05/17/2000
SEC. PARTY: GENERAL ELECTRIC CAPITAL  FILED WITH: SECRETARY OF
            CORPORATION, ATLANTA, GA              STATE/UCC DIVISION,
DEBTOR:    UNIVERSAL CAPITAL PARTNERS LLC         DE
----------------------------------------------------------------------------

DZB059530

```
COLLATERAL: RIGHT TITLE AND INTEREST and proceeds
FILING NO:  2224726                  DATE FILED:              05/03/2000
TYPE:       Original                 LATEST INFO RECEIVED: 05/22/2000
SEC. PARTY: GENERAL ELECTRIC CAPITAL FILED WITH: SECRETARY OF
            CORPORATION, ATLANTA, GA             STATE/UCC DIVISION,
DEBTOR:     UNIVERSAL CAPITAL PARTNERS LLC        MN
```
--------------------------------------------------------------------------

        The public record items contained in this report may have been
        paid, terminated, vacated or released prior to the date this
        report was printed.

=========================================================================== BUSINESS
BACKGROUND

                              HISTORY
        ----------------------------------------------------------------

        The Corporate Details provided below may have been submitted by the
        management of the subject business and may not have been verified with
        the government agency which records such data.

        BUSINESS TYPE: CORPORATION -   DATE INCORPORATED: 09/19/1997
                       PROFIT          STATE OF INCORP:   NORTH CAROLINA
        ----------------------------------------------------------------
12/09/02
        MICHAEL CATAIN, PRESIDENT
        DIRECTOR(S):  THE OFFICER(S)

            Registered in the state of Minnesota as a limited liability
        company.
            Business started 1996 by Mike Catain and others.  100% of capital
        stock is owned by officers.
            MICHAEL CATAIN born 1955.  Active here since 1996.  Has been
        active in this industry for years.
            Business address has changed from 11610 Wayzata Blvd, Hopkins,
        MN, 55305 to 4400 Baker Rd, Hopkins, MN, 55343.

                            OPERATIONS

12/09/02     Operates as a liquidator of retail merchandise and also does
        evaluation and consulting of retail inventories.
            Terms are cash and net 30 days.  Sells to general public and
        retailers.  Territory : United States.
            EMPLOYEES:  7 which includes officer(s).
            FACILITIES:  Leases premises in building.

=========================================================================== FINANCIAL
SUMMARY

                          KEY BUSINESS RATIOS

NOTE:
D&B has been unable to obtain sufficient financial information from this
company to calculate business ratios.  Our check of additional outside sources
also found no information available on its financial performance.

To help you in this instance, ratios for other firms in the same industry are
provided below to support your analysis of this business.

                (Industry Norms Based on 20 Establishments)

|  | Profitability % | | Short-Term Solvency | | Efficiency (%) | | Utilization (%) |
|---|---|---|---|---|---|---|---|
|  | Return on Sales | Return on Net Worth | Curr Ratio | Quick Ratio | Assets/ Sales | Sales/ Net working Capital | Total Liabs/ Net Worth |
| Firm | UN | UN | UN | UN | UN | UN | UN |
| Industry Median | 1.5 | 7.3 | 3.0 | 0.5 | 43.2 | 4.1 | 65.3 |

DZB059531

```
Industry      UN        UN        UN        UN        UN        UN          UN
Quartile
```

UN = Unavailable

<center>FINANCIAL INFORMATION</center>

11/19/02       Through 11/19/02, attempts to contact the management of this
               business have been unsuccessful. Inside sources confirmed operation
               and location.

```
==============================================================================
```
CUSTOMER SERVICE
If you need any additional information, or have any questions regarding this
report, please call our Customer Service Center at (800) 234-3867 from
anywhere within the U.S.  From outside the U.S., please call your local D&B
office.

<center>END OF COMPREHENSIVE REPORT</center>

DZB059532

# EXHIBIT T-38

Message

| | |
|---|---|
| **From:** | Vincent Salerno [CN=Vincent Salerno/OU=Branch/OU=New York/O=DZ BANK] |
| **Sent:** | 1/14/2004 11:40:25 AM |
| **To:** | Jennifer Wikoff [CN=Jennifer Wikoff/OU=Branch/OU=New York/O=DZ BANK@DZBANK] |
| **Subject:** | FW: PETTERS COMPANY, INC: D&B Comprehensive Report |

-------------------- Forwarded by Vincent Salerno/Branch/New York/DZ BANK on 01/14/2004 11:45 AM --------------------------



jenniferwikoff@onebox.com on 03/06/2003 10:01:46 AM

To:      vincent.salerno@dzbank.de, teresa.zariczny@dzbank.de
cc:
Subject:  FW: PETTERS COMPANY, INC: D&B Comprehensive Report

```
--
Jennifer Wikoff
jenniferwikoff@onebox.com - email
(781) 685-1490 - voicemail/fax


-----Original Message-----
From:     jenniferwikoff@onebox.com
Sent:     Wed, 5 Mar 2003 23:02:48 -0500 (EST)
To:       jenniferwikoff@onebox.com; kenneth.bradt@dzbank.de;patrick.preece@dzbank.de
Subject:  PETTERS COMPANY, INC: D&B Comprehensive Report

Did not look at yet
***********************************************************************
This report was sent to you by jenniferwikoff@onebox.com.
Visit www.dnb.com to learn how D&B can help you Decide with Confidence.
***********************************************************************

        COPYRIGHT 2003 DUN & BRADSTREET INC. - PROVIDED UNDER CONTRACT
             FOR THE EXCLUSIVE USE OF SUBSCRIBER 001-029903.



                        COMPREHENSIVE REPORT


DUNS: 86-871-6317
PETTERS COMPANY, INC
  PETTERS WAREHOUSE DIRECT                FINANCIAL STRESS CLASS: 1
                                          CREDIT SCORE CLASS:     1
4400 BAKER RD
HOPKINS MN 55343                                  KEY
TEL: 952 934-9918                       ==============================
LOWEST RISK    HIGHEST RISK
                                          1    2    3    4    5
SIC:    51 99
LINE OF BUSINESS: WHOLESALES CONSUMER GOODS
YEAR STARTED:     1987
CONTROL DATE:     1987                   DATE PRINTED: MAR 05 2003

CHIEF EXECUTIVE: THOMAS PETTERS, CEO-CHB


============================================================================ EXECUTIVE
SUMMARY

- The Financial Stress Class of 1 for this company shows that during the
  previous year, firms with this classification had a failure rate of
  .49% (49 per 10,000), which is lower than the national average.
```

DZB059500

- The Credit Score Class of 1 for this company shows that during the previous
  year, 2.3% of the firms with this classification paid one or more bills
  severely delinquent, which is lower than the national average.
- Subject company pays its bills an average 18 days beyond terms.
- Subject company's industry pays its bills an average 8 days beyond terms.
- Subject company pays its bills slower than the average for its industry.
- Financial information from a fiscal statement dated 12/31/01 is included.
- Operations are profitable.
- UCC filing(s) are reported for this business.
- Financing is secured.
- Under present management control 16 years.
- No record of open Suit(s), Lien(s), or Judgment(s) in the D&B database.
- History is clear.

======================================================================== CREDIT
CAPACITY SUMMARY

D&B Rating:     5A3              Payment Activity
                                   (based on 16 experiences):
Sales ($):      888,739,230      Average High Credit:   $61,913
# of Employees                   Highest Credit:        $400,000
Total:          16               Total Highest Credits: $933,700

As of 12/31/01  Worth:           $54,064,733
                Working Capital:  $46,841,550

Note: The Worth amount in this section may have been adjusted by D&B to reflect
typical deductions, such as certain intangible assets.

======================================================================== FINANCIAL
STRESS SUMMARY

The Financial Stress Model predicts the likelihood of a firm ceasing business
without paying all creditors in full, or reorganizing or obtaining relief from
creditors under state/federal law over the next 12 months. Scores were
calculated using a statistically valid model derived from D&B's extensive data
files.

 Financial Stress Class:                         1
 (Highest Risk: 5; Lowest Risk: 1)

 Incidence of Financial Stress Among
 Companies with this Classification:             0.49% (49 per 10,000)

 Incidence of Financial Stress:                  1.40% (140 per 10,000)
 - National Average

 Financial Stress National Percentile:           98
 (Highest Risk: 1; Lowest Risk: 100)

 Financial Stress Score:                         1559
 (Highest Risk: 1,001; Lowest Risk: 1,850)

The Financial Stress Class for this company is based on the following factors:

   - No record of open suit(s), lien(s), or judgement(s) in the D&B files.
   - Net Profit After Taxes suggests lower risk of financial stress.
   - 13% of trade experiences indicate slow payment(s) are present.
   - D&B files indicate a net worth of $54,064,733.
   - Change in Net Worth suggests lower risk of financial stress.
   - Financial Statement is more than 12 months old.
   - Change in Quick Ratio suggests lower risk of financial stress.
   - Change in Current Ratio suggests lower risk of financial stress.

 Notes:

- The Financial Stress Class indicates that this firm shares some of
the same business and financial characteristics of other companies with
this classification.  It does not mean the firm will necessarily
experience financial stress.

- The Incidence of Financial Stress shows the percentage of firms in a
given Class that discontinued operations over the past year with loss
to creditors.  The Incidence of Financial Stress - National Average
represents the national failure rate and is provided for comparative
purposes.

- The Financial Stress National Percentile reflects the relative
ranking of a company among all scorable companies in D&B's file.

- The Financial Stress Score offers a more precise measure of the level
of risk than the Class and Percentile.  It is especially helpful to
customers using a scorecard approach to determining overall business
performance.

- All Financial Stress Class, Percentile, Score and Incidence
statistics are based on 2002.

======================================================================== FINANCIAL
                                                                         STRESS NORMS
                                                                         National
Norms for Companies in the Same ...                                      Percentile

     - Region  (WEST NORTH CENTRAL)                                          58

     - Industry: WHOLESALE                                                   51

     - Employee Range (10-19)                                                57

     - Years in Business Range (11-25)                                       73

     - Subject Company                                                       98

Key Comparisons
The subject company has a Financial Stress Percentile that shows:

     - Lower risk than other companies in the same region.
     - Lower risk than other companies in the same industry.
     - Lower risk than other companies in the same employee size range.
     - Lower risk than other companies with a comparable number of years in
       business.

======================================================================== CREDIT SCORE
SUMMARY

The Credit Score Class predicts the likelihood of a firm paying in a severely
delinquent manner (90+ Days Past Terms) over the next twelve months.  It was
calculated using statistically valid models and the most recent payment
information in D&B's files.

Credit Score Class:                      1

Incidence of Delinquent Payment Among
Companies with this Classification:      2.30%

Percentile:                              94

The Credit Score Class for this company is based on the following factors:

     - No record of open suit(s), lien(s) or judgment(s) in the D&B files.
     - D&B files indicate a net worth of $54,064,733.
     - Business does not own facilities.
     - Quick ratio is 1.1.

Notes:

     - The Incidence of Delinquent Payment is the percentage of companies with
       this classification that were reported 90 days past due or more by
       creditors. The calculation of this value is based on an inquiry weighted
       sample.

     - The Percentile ranks this firm relative to other businesses. For example,
       a firm in the 80th percentile has a lower risk of paying in a severely

DZB059502

delinquent manner than 79% of all scorable companies in D&B's files.

```
=============================================================================== CREDIT SCORE
                                                              NORMS
                                                              National
Norms for Companies in the Same ...                           Percentile

     - Region  (WEST NORTH CENTRAL)                              61

     - Industry: WHOLESALE                                       56

     - Employee Range (10-19)                                    60

     - Years in Business Range (11-25)                           61

     - Subject Company                                           94
```

Key Comparisons
The subject company has a Credit Score Percentile that shows:

- Lower risk than other companies in the same region.
- Lower risk than other companies in the same industry.
- Lower risk than other companies in the same employee size range.
- Lower risk than other companies with a comparable number of years in
  business.

```
=============================================================================== PAYMENT
TRENDS

PAYDEX scores below are based on dollar weighted trade in most recent 12 mos.

         '01 '01 '01 '02 '02 '02 '02 '02 '02 '02 '02 '02 '02 '03 '03 '03
         JUN SEP DEC MAR APR MAY JUN JUL AUG SEP OCT NOV DEC JAN FEB MAR

FIRM     52  58  65  72  74  74  72  77  79  79  80  80  79  79  66  67

Industry
Quartiles
---------
Upper        78  79  79  78      79          79          79
Median       73  73  73  74      74          75          75
Lower        67  66  67  67      68          68          68

    Industry PAYDEX based on:      KEY TO PAYDEX SCORES:
    SIC:  5199                     80   Within terms
    979 Firms                      73   11 Days Beyond Terms
                                   52   29 Days Beyond Terms
```

```
=============================================================================== SUMMARY OF
PAYMENT HABITS

Dollar Range Comparisons:

Suppliers That          Number of        Total        % of Dollars
Extend Credit of...     Experiences:     Amount       Within Terms

                        #                $            %

OVER $100,000           3                850,000      53
$50,000 - 99,999        0                0            0
$15,000 - 49,999        3                65,000       88
$ 5,000 - 14,999        1                7,500        100
$ 1,000 - 4,999         2                5,000        100
    Under 1,000         6                1,200        100
```

```
=============================================================================== PAYMENT
ANALYSIS BY INDUSTRY
```

There are 16 payment experiences in D&B's file for the most recent 12 months,
with 14 experiences reported during the last three month period.

```
            Total      Dollar     Highest    Within Slow Slow  Slow Slow
```

| | Recd # | Amount $ | Credit $ | Terms --- % of dollar amount --- | 1-30 | 31-60 | 61-90 | 91+ |
|---|---|---|---|---|---|---|---|---|
| Total in D&B's File | 16 | 933,700 | 400,000 | | | | | |

Industry

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nonclassified | 4 | 8,250 | 7,500 | 100 | 0 | 0 | 0 | 0 |
| Telephone communictns | 3 | 27,750 | 25,000 | 100 | 0 | 0 | 0 | 0 |
| Data processing svcs | 2 | 200 | 100 | 100 | 0 | 0 | 0 | 0 |
| Gravure printing | 1 | 400,000 | 400,000 | 0 | 100 | 0 | 0 | 0 |
| Prepackaged software | 1 | 250,000 | 250,000 | 100 | 0 | 0 | 0 | 0 |
| Whol computers/softwr | 1 | 200,000 | 200,000 | 100 | 0 | 0 | 0 | 0 |
| Newspaper-print/publ | 1 | 25,000 | 25,000 | 100 | 0 | 0 | 0 | 0 |
| Whol nondurable goods | 1 | 15,000 | 15,000 | 50 | 50 | 0 | 0 | 0 |
| Truck rental/leasing | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |

OTHER PAYMENT CATEGORIES:

| | | | |
|---|---|---|---|
| Cash Experiences | 1 | 5,000 | |
| Paying Record Unknown | 0 | 0 | |
| Unfavorable Comments | 0 | 0 | |
| Placed for Collection | | | |
|   with D&B | 0 | 0 | |
|   other | 0 | N/A | |

Indications of slowness can be the result of disputes over merchandise, skipped
invoices, etc.

=========================================================================== PUBLIC
FILINGS SUMMARY

The following data includes both open and closed filings found in
D&B's database on the subject company.

| Record Type | # | Most Recent Filing Date |
|---|---|---|
| Bankruptcy Proceedings | 0 | - |
| Judgments | 0 | - |
| Liens | 0 | - |
| Suits | 0 | - |
| UCC's | 2,165 | 11/13/2002 |

=========================================================================== PUBLIC
FILINGS DETAIL

    The following data is for information purposes only and is not the
official record.  Certified copies can only be obtained from the
official source.

-----------------------------------------------------------------------------
                     * * * UCC FILING(S) * * *
-----------------------------------------------------------------------------
COLLATERAL: All Accounts receivable and proceeds - All Inventory and proceeds
FILING NO: 200000213478            DATE FILED:              09/18/2000
TYPE:      Original                LATEST INFO RECEIVED: 10/06/2000
SEC. PARTY: INTERNATIONAL INVESTMENT    FILED WITH: SECRETARY OF
            OPPORTUNITIES LLC, MINNEAPOLIS,    STATE/UCC DIVISION,
            MN                                 FL
DEBTOR:    PETTERS COMPANY INC
-----------------------------------------------------------------------------
COLLATERAL: All Inventory including proceeds and products - All Account(s)
            including proceeds and products
FILING NO: 200100188718            DATE FILED:              08/29/2001
TYPE:      Amendment               LATEST INFO RECEIVED: 09/10/2001
SEC. PARTY: INTERNATIONAL INVESTMENT    ORIG. UCC FILED: 09/18/2000
            OPPORTUNITIES LLC, MINNEAPOLIS,    ORIG. FILING NO: 200000213478
            MN                                 FILED WITH: SECRETARY OF
DEBTOR:    PETTERS COMPANY INC                 STATE/UCC DIVISION,
                                               FL
-----------------------------------------------------------------------------
COLLATERAL: All Inventory including proceeds and products

DZB059504

```
FILING NO:   200100188719              DATE FILED:              08/29/2001
TYPE:        Amendment                 LATEST INFO RECEIVED: 09/10/2001
SEC. PARTY:  INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
             OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
             MN                         FILED WITH: SECRETARY OF
DEBTOR:      PETTERS COMPANY INC        STATE/UCC DIVISION,
                                        FL
------------------------------------------------------------------------
COLLATERAL: All Inventory including proceeds and products - All Account(s)
            including proceeds and products
FILING NO:   20020077265X              DATE FILED:              04/01/2002
TYPE:        Amendment                 LATEST INFO RECEIVED: 07/01/2002
SEC. PARTY:  INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
             OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
             MN                         FILED WITH: SECRETARY OF
DEBTOR:      PETTERS COMPANY INC        STATE/UCC DIVISION,
                                        FL
------------------------------------------------------------------------
COLLATERAL: All Inventory including proceeds and products - All Account(s)
            including proceeds and products
FILING NO:   200200958788              DATE FILED:              04/23/2002
TYPE:        Amendment                 LATEST INFO RECEIVED: 07/01/2002
SEC. PARTY:  INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
             OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
             MN                         FILED WITH: SECRETARY OF
DEBTOR:      PETTERS COMPANY INC        STATE/UCC DIVISION,
                                        FL
------------------------------------------------------------------------
COLLATERAL: All Inventory including proceeds and products - All Account(s)
            including proceeds and products
FILING NO:   200201032447              DATE FILED:              05/02/2002
TYPE:        Amendment                 LATEST INFO RECEIVED: 07/01/2002
SEC. PARTY:  INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
             OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
             MN                         FILED WITH: SECRETARY OF
DEBTOR:      PETTERS COMPANY INC        STATE/UCC DIVISION,
                                        FL
------------------------------------------------------------------------
COLLATERAL: All Inventory including proceeds and products - All Account(s)
            including proceeds and products
FILING NO:   200201032382              DATE FILED:              05/02/2002
TYPE:        Amendment                 LATEST INFO RECEIVED: 07/01/2002
SEC. PARTY:  INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
             OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
             MN                         FILED WITH: SECRETARY OF
DEBTOR:      PETTERS COMPANY INC        STATE/UCC DIVISION,
                                        FL
------------------------------------------------------------------------
COLLATERAL: All Inventory including proceeds and products - All Account(s)
            including proceeds and products
FILING NO:   200201032374              DATE FILED:              05/02/2002
TYPE:        Amendment                 LATEST INFO RECEIVED: 07/01/2002
SEC. PARTY:  INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
             OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
             MN                         FILED WITH: SECRETARY OF
DEBTOR:      PETTERS COMPANY INC        STATE/UCC DIVISION,
                                        FL
------------------------------------------------------------------------
FILING NO:   200201219911              DATE FILED:              05/23/2002
TYPE:        Amendment                 LATEST INFO RECEIVED: 07/01/2002
SEC. PARTY:  INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
             OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
             MN                         FILED WITH: SECRETARY OF
DEBTOR:      PETTERS COMPANY INC        STATE/UCC DIVISION,
                                        FL
------------------------------------------------------------------------
FILING NO:   200201552130              DATE FILED:              07/01/2002
TYPE:        Amendment                 LATEST INFO RECEIVED: 08/27/2002
SEC. PARTY:  INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
             OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
             MN                         FILED WITH: SECRETARY OF
DEBTOR:      PETTERS COMPANY INC        STATE/UCC DIVISION,
```

DZB059505

FL

```
--------------------------------------------------------------------------
FILING NO:  200201647379          DATE FILED:             07/12/2002
TYPE:       Amendment             LATEST INFO RECEIVED:   08/27/2002
SEC. PARTY: INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
            OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
            MN                    FILED WITH: SECRETARY OF
DEBTOR:     PETTERS COMPANY INC              STATE/UCC DIVISION,
                                             FL
--------------------------------------------------------------------------
FILING NO:  200201750048          DATE FILED:             07/24/2002
TYPE:       Amendment             LATEST INFO RECEIVED:   08/27/2002
SEC. PARTY: INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
            OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
            MN                    FILED WITH: SECRETARY OF
DEBTOR:     PETTERS COMPANY INC              STATE/UCC DIVISION,
                                             FL
--------------------------------------------------------------------------
COLLATERAL: All Negotiable instruments including proceeds and products - All
            Inventory including proceeds and products - All Account(s)
            including proceeds and products
FILING NO:  200201984537          DATE FILED:             08/22/2002
TYPE:       Amendment             LATEST INFO RECEIVED:   09/09/2002
SEC. PARTY: INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
            OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
            MN                    FILED WITH: SECRETARY OF
DEBTOR:     PETTERS COMPANY INC              STATE/UCC DIVISION,
                                             FL
--------------------------------------------------------------------------
FILING NO:  200202017689          DATE FILED:             08/27/2002
TYPE:       Termination           LATEST INFO RECEIVED:   09/26/2002
SEC. PARTY: INTERNATIONAL INVESTMENT  ORIG. UCC FILED: 09/18/2000
            OPPORTUNITIES LLC, MINNEAPOLIS,  ORIG. FILING NO: 200000213478
            MN                    FILED WITH: SECRETARY OF
DEBTOR:     PETTERS COMPANY INC              STATE/UCC DIVISION,
                                             FL
--------------------------------------------------------------------------
COLLATERAL: Negotiable instruments including proceeds and products - Accounts
            receivable including proceeds and products - Inventory including
            proceeds and products - Chattel paper including proceeds and
            products
FILING NO:  20011542411           DATE FILED:             09/13/2001
TYPE:       Original              LATEST INFO RECEIVED:   12/31/2001
SEC. PARTY: BOOMBUY, INC., EDEN PRAIRIE, MN   FILED WITH: SECRETARY OF
DEBTOR:     PETTERS COMPANY, INC.            STATE/UCC DIVISION,
                                             MN
--------------------------------------------------------------------------
COLLATERAL: Negotiable instruments including proceeds and products - Accounts
            receivable including proceeds and products - Inventory including
            proceeds and products - Account(s) including proceeds and products
            - and OTHERS
FILING NO:  20011182631           DATE FILED:             07/23/2001
TYPE:       Original              LATEST INFO RECEIVED:   12/31/2001
SEC. PARTY: METRO GEM CAPITAL, LLC,  FILED WITH: SECRETARY OF
            MINNEAPOLIS, MN                  STATE/UCC DIVISION,
DEBTOR:     PETTERS I, INC.                  MN
--------------------------------------------------------------------------
COLLATERAL: Negotiable instruments including proceeds and products - Inventory
            including proceeds and products - Account(s) including proceeds and
            products - Computer equipment including proceeds and products - and
            OTHERS
FILING NO:  0112960610            DATE FILED:             05/07/2001
TYPE:       Original              LATEST INFO RECEIVED:   05/30/2001
SEC. PARTY: CAPITAL STRATEGIES FUND, LTD.,  FILED WITH: SECRETARY OF
            AS AGENT, MINNEAPOLIS, MN        STATE/UCC DIVISION,
DEBTOR:     PETTERS LTD., INC.              CA
```

This data is for informational purposes only, certification can only be
obtained through the Sacramento Office of the California Secretary of State.

```
--------------------------------------------------------------------------
FILING NO:  0112960610            DATE FILED:             06/14/2001
TYPE:       Assignment            LATEST INFO RECEIVED:   07/10/2001
```

DZB059506

```
SEC. PARTY: STAFFORD TOWNE, LTD., AS AGENT,   ORIG. UCC FILED: 05/07/2001
            MINNEAPOLIS, MN                    ORIG. FILING NO: 0112960610
ASSIGNEE:   NO NAME AVAILABLE                  FILED WITH: SECRETARY OF
DEBTOR:     PETTERS LTD., INC.                 STATE/UCC DIVISION,
                                               CA


This data is for informational purposes only, certification can only be
obtained through the Sacramento Office of the California Secretary of State.
--------------------------------------------------------------------------
COLLATERAL: Negotiable instruments including proceeds and products - Inventory
            including proceeds and products - Accounts receivable including
            proceeds and products - Chattel paper including proceeds and
            products
FILING NO:  2226219                            DATE FILED:            05/09/2000
TYPE:       Original                           LATEST INFO RECEIVED: 05/22/2000
SEC. PARTY: THE ARON COMPANIES, HOUSTON, TX    FILED WITH: SECRETARY OF
DEBTOR:     PETTERS COMPANY, INC.              STATE/UCC DIVISION,
                                               MN
--------------------------------------------------------------------------
FILING NO:  2341531                            DATE FILED:            06/12/2001
TYPE:       Termination                        LATEST INFO RECEIVED: 02/27/2002
SEC. PARTY: THE ARON COMPANIES, HOUSTON, TX    ORIG. UCC FILED: 05/09/2000
DEBTOR:     PETTERS COMPANY, INC.              ORIG. FILING NO: 2226219
                                               FILED WITH: SECRETARY OF
                                               STATE/UCC DIVISION,
                                               MN
--------------------------------------------------------------------------
COLLATERAL: Negotiable instruments including proceeds and products - Inventory
            including proceeds and products - Accounts receivable including
            proceeds and products - Chattel paper including proceeds and
            products
FILING NO:  2193013                            DATE FILED:            01/12/2000
TYPE:       Original                           LATEST INFO RECEIVED: 02/08/2000
SEC. PARTY: THE ARON COMPANIES, HOUSTON, TX    FILED WITH: SECRETARY OF
DEBTOR:     PETTERS COMPANY, INC.              STATE/UCC DIVISION,
                                               MN
--------------------------------------------------------------------------
FILING NO:  2223089                            DATE FILED:            04/27/2000
TYPE:       Termination                        LATEST INFO RECEIVED: 05/22/2000
SEC. PARTY: THE ARON COMPANIES, HOUSTON, TX    ORIG. UCC FILED: 01/12/2000
DEBTOR:     PETTERS COMPANY, INC.              ORIG. FILING NO: 2193013
                                               FILED WITH: SECRETARY OF
                                               STATE/UCC DIVISION,
                                               MN
--------------------------------------------------------------------------
COLLATERAL: Negotiable instruments including proceeds and products - Inventory
            including proceeds and products - Accounts receivable including
            proceeds and products - Account(s) including proceeds and products
            - and OTHERS
FILING NO:  2165254                            DATE FILED:            09/27/1999
TYPE:       Original                           LATEST INFO RECEIVED: 10/26/1999
SEC. PARTY: THE ARON COMPANIES, HOUSTON, TX    FILED WITH: SECRETARY OF
DEBTOR:     PETTERS COMPANY, INC.              STATE/UCC DIVISION,
                                               MN
--------------------------------------------------------------------------
FILING NO:  2220333                            DATE FILED:            04/18/2000
TYPE:       Termination                        LATEST INFO RECEIVED: 05/02/2000
SEC. PARTY: THE ARON COMPANIES, HOUSTON, TX    ORIG. UCC FILED: 09/27/1999
DEBTOR:     PETTERS COMPANY, INC.              ORIG. FILING NO: 2165254
                                               FILED WITH: SECRETARY OF
                                               STATE/UCC DIVISION,
                                               MN
--------------------------------------------------------------------------
COLLATERAL: Negotiable instruments including proceeds and products - Accounts
            receivable including proceeds and products - Inventory including
            proceeds and products - Assets including proceeds and products -
            and OTHERS
FILING NO:  9811360253                         DATE FILED:            04/22/1998
TYPE:       Original                           LATEST INFO RECEIVED: 04/30/1998
SEC. PARTY: GENERAL ELECTRIC CAPITAL           FILED WITH: SECRETARY OF
            CORPORATION, CHICAGO, IL           STATE/UCC DIVISION,
DEBTOR:     PETTERS CAPITAL, INC.              CA
```

This data is for informational purposes only, certification can only be
obtained through the Sacramento Office of the California Secretary of State.

--------------------------------------------------------------------------------
COLLATERAL: Negotiable instruments including proceeds and products - Accounts
            receivable including proceeds and products - Inventory including
            proceeds and products - Assets including proceeds and products -
            and OTHERS
FILING NO:  2018940                        DATE FILED:          03/10/1998
TYPE:       Original                       LATEST INFO RECEIVED: 04/22/1998
SEC. PARTY: GENERAL ELECTRIC CAPITAL       FILED WITH: SECRETARY OF
            CORPORATION, CHICAGO, IL                   STATE/UCC DIVISION,
DEBTOR:     PETTERS CAPITAL, INC.                       MN

--------------------------------------------------------------------------------
COLLATERAL: Negotiable instruments and proceeds - Accounts receivable and
            proceeds - Inventory and proceeds - Chattel paper and proceeds
FILING NO:  20011082937                    DATE FILED:          07/31/2001
TYPE:       Original                       LATEST INFO RECEIVED: 12/28/2001
SEC. PARTY: BOOMBUY, INC, EDEN PRAIRIE, MN FILED WITH: SECRETARY OF
DEBTOR:     PETTERS COMPANY, INC.                      STATE/UCC DIVISION,
                                                       MN

--------------------------------------------------------------------------------

        There are additional UCC's in D&B's file on this company
        available by contacting 1-800-234-3867.

        The public record items contained in this report may have been
        paid, terminated, vacated or released prior to the date this
        report was printed.

================================================================================ BUSINESS
BACKGROUND

                              HISTORY
        ------------------------------------------------------------------
        CORPORATE AND BUSINESS REGISTRATIONS REPORTED BY THE SECRETARY
        OF STATE OR OTHER OFFICIAL SOURCE AS OF 12/18/2002:

        BUSINESS TYPE: CORPORATION -    DATE INCORPORATED: 03/04/1998
                       PROFIT          STATE OF INCORP:   MINNESOTA
        ------------------------------------------------------------------
12/17/02
        THOMAS PETTERS, CEO-CHB         DEANNA MUNSON, VICE PRESIDENT-
                                        OPERATIONS-TREASURER
        THOMAS HAY, GENERAL COUNSEL     ROBERT WHITE, CFO
        DIRECTOR(S):  THE OFFICER(S)

            Business started 1987 by Thomas Petters.  100% of capital stock
        is owned by Thomas Petters.
            .         ----MANAGEMENT BACKGROUND----          .

            THOMAS PETTERS born 1957.  Graduated from St Cloud State
        University. 1978-84 employed by Schaak Electronics, St Paul, MN.
        1984-89 employed by Top Brass, Long Island, NY.  Started here in 1987.
         1989-96 president of Digi-Tel Holdings, Inc, Minnetonka, MN.
        1992-1998 active as president of Trio Marketing, Inc, Eden Prairie,
        MN.  1995-present president-CEO of Petters Warehouse Direct, Eden
        Prairie, MN.
            DEANNA MUNSON.  Graduated from Moorhead State University with a
        degree in Business Education.  Started here in 1992.
            THOMAS HAY.  General Counsel, 35 years as Senior Dorsey & Whitney
        Law Firm Partner.
            ROBERT WHITE.  1995-present, Petters Company CFO: 1970-84 IBM
        Corp.; 1984-89 Munsingwear.  1990-1994 CFO Kennedy Matthews Stock
        Brokerage Firm.
            AFFILIATES: The following are related through common principals,
        management and/or ownership.
            Petters Warehouse Direct, Inc, started 1995.  DUNS #94-525-6477.
        Operates as a retail discount department stores offering new and
        refurbished brand name merchandise at prices below retail prices.
        Thomas Peters is first secured creditor to the stores.  Resort
        Ventures LLC, Eden Prairie, MN, started 1996.  Owns land and

DZB059508

condominiums in Keystone, CO.  Redtag Biz, Inc.-b2b Global Trading
Company, Eden Prarie, MN.  Thomas Petters owns approximately 47%.
DUNS #04-133-5576

## OPERATIONS

12/17/02    Operates as a wholesaler of consumer goods, specializing in
           close-out electronics, sporting goods, clothing and housewares.
           Terms vary according to account and range from wire transfer to net
           170 days. Has 30 account(s).  Sells to wholesalers an retail chains.
           Territory : United States.
                EMPLOYEES:  16 which includes officer(s).
                FACILITIES:  Rents 56,000 sq. ft. in a two story brick building.
                LOCATION:  Suburban business section on well traveled street.

## OTHER CORPORATE DETAILS

CORPORATE STATUS:  ACTIVE
STATE ID NO:      DCX 10A-972

============================================================================== FINANCIAL
SUMMARY

## KEY BUSINESS RATIOS

### Based on a Financial Statement Dated December 31, 2001

#### (Industry Norms Based on 10 Establishments)

|  | Profitability % | | Short-Term Solvency | | Efficiency (%) | | Utilization (%) |
|---|---|---|---|---|---|---|---|
|  | Return on Sales | Return on Net Worth | Curr Ratio | Quick Ratio | Assets/ Sales | Sales/ Net working Capital | Total Liabs/ Net Worth |
| Firm | 2.0 | 33.2 | 1.2 | 1.1 | 29.9 | 19.0 | 390.7 |
| Industry Median | 4.0 | 14.3 | 2.8 | 1.0 | 84.1 | 4.9 | 188.5 |
| Industry Quartile | 3 | 1 | 4 | 2 | 1 | 1 | 3 |

## FINANCIAL INFORMATION

| 12/17/02 | Fiscal Dec 31 1998 | Fiscal Dec 31 2001 |
|---|---|---|
| Curr Assets | 125,710,395 | 258,078,751 |
| Curr Liabs | 108,563,371 | 211,237,201 |
| Current Ratio | 1.16 | 1.22 |
| Working Capital | 17,147,024 | 46,841,550 |
| Other Assets | 7,213,035 | 7,223,183 |
| Worth | 24,360,059 | 54,064,733 |
| Sales | 385,111,496 | 888,739,230 |
| Long Term Liab | 0 | 0 |
| Net Profit (Loss) | 16,486,029 | 17,964,868 |

Fiscal statement dated DEC 31 2001:

| Cash | $ 18,727,608 | Accts Pay | $ 11,069,414 |
|---|---|---|---|
| Accts Rec | 221,065,660 | Notes Pay | 194,167,787 |
| Inter-Companies |  | L.T. Liab-(1yr) | 6,000,000 |
| Loans | 7,472,683 |  |  |
| Loan To Officer | 22,151 |  |  |
| Note-Subsidiary | 6,374,140 |  |  |
| Subsidiary-Int |  |  |  |
| Balance/Mangt Fee | 4,416,509 |  |  |
|  | --------------- |  | --------------- |
| Curr Assets | 258,078,751 | Curr Liabs | 211,237,201 |
| Fixt & Equip | 159,385 | COMMON STOCK | 5,000 |
| Investments-Other | 7,043,710 | DIVIDEND PAYMENT | (2,600,000) |
| Deposits | 20,088 | RETAINED EARNINGS | 38,694,865 |
|  |  | NET INCOME | 17,964,868 |

DZB059509

```
       Total Assets          265,301,934   Total                      265,301,934
```

From JAN 01 2001 to DEC 31 2001 annual sales
$888,739,230; cost of goods sold $868,749,624.  Gross profit
$19,989,606; operating expenses $2,024,738.  Operating income
$17,964,868.  Net income $17,964,868.
    Extent of audit, if any, not indicated.
                --0--
    Fixed assets shown net less $96,527 depreciation.
    Attempts to contact the management of this business have been
unsuccessful. Those on premises confirmed operation and location.

===========================================================================

CUSTOMER SERVICE
If you need any additional information, or have any questions regarding this
report, please call our Customer Service Center at (800) 234-3867 from
anywhere within the U.S.  From outside the U.S., please call your local D&B
office.

              END OF COMPREHENSIVE REPORT

DZB059510

# EXHIBIT T-39

# 1st WEST

Box 2 of 5

DZB000095

# RISK PROFILE REPORT™

Prepared By

1STWEST FINANCIAL CORPORATION
Montrose, Colorado
Kansas City, Missouri
(800) 411-6975
(888) 803-9378

DZB000096

# 1st WEST

**PERSONAL AND CONFIDENTIAL**

DATE:      March 13, 2003

TO:        Ms. Teresa Zariczny
           DZ Bank
           609 Fifth Avenue, Suite 911
           New York, NY  10017

FROM:      1stWest Financial Corporation

SUBJECT:   **Petters Company Inc.; Thomas J. Petters**

Pursuant to your engagement of 1stWest Financial Corporation ("1stWest") on 02/12/2003 for a **Level 1 RISK PROFILE REPORT™** of the above referenced subject(s), and in accordance with your instructions under the engagement, the following details the results of our findings to date.

The information contained herein has been obtained from sources utilized by 1stWest in the past, however, other than as expressly stated herein, no verification has been performed as to the accuracy or completeness of such information. Such information may be inaccurate or incomplete. Utilization of the information is at the user's sole risk. User agrees to release and discharge 1stWest from any and all liability of 1stWest's work in searching for and/or reporting of such information.

## RISK PROFILE SUMMARY

## GENERAL INFORMATION:

Name:      Thomas J. Petters
SSN:
DOB:       **Redacted - Confidential**
Address:   6429 Margarets Lane
           Edina, MN  55439                    (Hennepin County)
Phone:     (952) 829-7130

Business:  Petters Company Inc.
Address:   4400 Baker Road
           Minnetonka, MN  55343               (Hennepin County)
Phone:     (952) 934-9918

**See Section 1 of RISK PROFILE REPORT™ for detail - Pages 11 - 12**

*1stWest Financial Corporation*
*318 South 7th Street*
*Montrose, CO 81401*
*(970) 240-1102  (800) 411-6975*
*Fax (800) 411-6976*
*Email: 1stwest@1stwest.com*

*Kansas City Office*
*7 NW 72nd St., Suite 2-E*
*Kansas City, MO 64118*
*(816) 436-0673  (888) 803-9378*
*Fax (888) 241-9378*
*Email: kc1stwest@sprintmail.com*

## NATIONWIDE SECRETARY OF STATE
### Petters Company Inc.

State:           MN
Company Name:    PETTERS, COMPANY INC.

Principal Office:   7585 EQUITABLE DRV
                    EDEN PRAIRIE, MN

Registered Address:  7585 EQUITABLE DRV
                     EDEN PRAIRIE, MN 55344

Company ID Number:   X8F-657DC
Incorporated Date:   04/28/1994
Current Status:      ACTIVE
Corporation Type:    DOMESTIC CORPORATION
Duration:            PERPETUAL

Stock Information
-----------------
Shares:          1,000

Other Information
-----------------
Annual Report 1:    1999    250966
Annual Report 2:    2000    210763
Annual Report 3:    2001    332478

Officers & Directors
--------------------
CEO:             THOMAS PETTERS
Address:         7585 EQUITABLE DRV
                 EDEN PRAIRIE, MN

Previous Address:   11610 WAYZATA BLVD
                    MTKA, MN

Previous Address:   11900 WAYZATA BLVD #132
                    MTKA, MN

DZB000162

```
---------------------------------------------------------------------------
                        History Transaction(s)
Date      Number      Description
--------- ----------- ------------------------------------------------------
```

04/13/2001 RI-91813    OTHER
                       ARTICLES OF CORRECTION
04/13/2001 RI-91813    NAME CHANGED

03/29/1999 RI-635078   REGISTERED OFFICE
                       7585 EQUITABLE DRV
                       EDEN PRAIRIE MN 55344

10/23/1996 RI-311494   REGISTERED OFFICE
                       11610 WAYZATA BLVD
                       MTKA MN 55305-

01/27/1995 RI-65600    CONSENT
                       PETTERS LTD., INC.

04/28/1994 RI-42102    ORIGINAL DATE FILED
                       11900 WAYZATA BLVD #132
                       MTKA MN 55305-
04/28/1994 RI-42102    NAME CHANGED
04/28/1994 RI-42102    NAME CHANGED
                       PRIOR NAME
                       Other Company Name: PETTERS, COMPANY INC.

Prev. Company Name:  PETTERS, COMPANY INC.

Prev. Prin. Office:  11610 WAYZATA BLVD
             MTKA, MN

Prev. Prin. Office:  11900 WAYZATA BLVD #132
             MTKA, MN

Prev. Reg. Addr.:    11610 WAYZATA BLVD
             MTKA, MN 55305

Prev. Reg. Addr.:    11900 WAYZATA BLVD #132
             MTKA, MN 55305

Prev. Reg. Agent:    THOMAS PETTERS
Effective Date:      04/28/1994

DZB000163

State:              WA
Company Name:       PETTERS, COMPANY INC.

Company ID Number:   01375278
Incorporated Date:   02/26/2001
Corporation Type:    FOREIGN PROFIT
Business Type:       REGULAR
Originated State:    MINNESOTA
Duration:            PERPETUAL
UB Identifier:       602101140
Lic. Exp. Dt:        02/28/2002

Registered Agent
----------------
Name:               CHRIS WHITE
Address:             18405 72ND AVE S
                     KENT, WA 98032

Previous Address:    18405 72ND AVE S
                     KENT, WA 98032

-----------------------------------------------------------------
                       History Transaction(s)
Date      Number      Description
--------- ----------- --------------------------------------------

02/26/2001            ARTICLES PROFIT FOREIGN


Previous Status:     ACTIVE

DZB000164

State:              MN
Company Name:       PETTERS COMPANY, THE

Registered Address:   26TH 5TH AVE S
                      ST CLOUD, MN

Company ID Number:    2I-843DCI
Incorporated Date:    10/25/1973
Current Status:       INACTIVE
Corporation Type:     DOMESTIC CORPORATION
Duration:             PERPETUAL

Stock Information
-----------------
Value:                $25,000

---------------------------------------------------------------------
                      History Transaction(s)
Date       Number     Description
---------  ---------- ------------------------------------------------

10/08/1991 9138859    STATUTORY DISSOLUTION

10/25/1973 P-41 476   ORIGINAL DATE FILED
                      26TH 5TH AVE S
                      ST CLOUD MN
10/25/1973 P-41 476   NAME CHANGED

DZB000165

State:              MN
Company Name:        RESOURCE CAPITAL MANAGEMENT, INC.

Company ID Number:   RN-29555RNI
Incorporated Date:   10/04/2000
Current Status:      INACTIVE
Corporation Type:    RESERVED NAME
Duration:            10/04/2001

Registered Agent
----------------

Nameholder:         PETTERS COMPANY INC
Address:            7585 EQUITABLE DRV
                    EDEN PRAIRIE, MN 55331

DZB000166

# EXHIBIT T-40

EXHIBIT C

## FORM OF MONTHLY REMITTANCE REPORT

<u>Attached</u>

30421230 WPD

DZB018811

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| | | | |
|---|---|---|---|
| Remittance Period: | January-02 | Borrowing Limit: | 100,000,000 |
| Remittance Date: | 10-Feb-02 | | |

**I.   Eligible Receivables**

| | | | |
|---|---|---|---|
| A | Aggregate Outstanding Principal Balance ("OPB") of Pledged Receivables - beginning of Remittance Period | - | |
| B. | plus  Receivables Pledged during Remittance Period (see Schedule II, Item B.) | - | |
| C. | minus:  Collections allocable to principal (scheduled amortization, voluntary prepayments, servicer advances) | - | |
| D. | (+/-)  Other Principal adjustments [Servicer to provide detail] | - | |
| E. | OPB of Pledged Receivables - end of Remittance Period | - | |
| F. | minus:  OPB of Pledged Receivables that are Defaulted Receivables  (see Item L. below) | - | |
| G. | minus:  OPB of Pledged Receivables that are Ineligible Receivables - end of Remittance Period | - | |
| H. | OPB of Eligible Receivables Pledged to Lender - end of Remittance Period | - | |
| | | | |
| | **Defaulted Receivable Summary:** | | |
| I | OPB of Pledged Receivables that were Defaulted Receivables - beginning of Remittance Period | - | |
| J. | plus:  OPB of Receivables that became Defaulted during the Remittance Period | - | |
| K. | minus:  OPB of Defaulted Receivables repurchased or released in accordance with RLSA guidelines | - | |
| L. | Balance of Defaulted Receivables - end of current Remittance Period | - | |

**II.   Net Eligible Receivables Balance  (to be calculated w/o duplication of Concentration deductions)**

| | | | |
|---|---|---|---|
| A | OPB of Eligible Receivables (Item I  H. above) | - | |
| B. | minus   Overconcentration Amount (see Schedule III) | #DIV/0! | |
| C. | minus   Excess Extended Term Receivable Amount (see Schedule III) | #DIV/0! | |
| D. | minus   Aggregate Delinquent Retailer Excluded Amount (see Schedule III) | - | |
| E. | minus   Excess Maximum Individual Loan Amount (see Schedule III) | - | |
| F. | Sub-total | #DIV/0! | |
| G. | Multiplied by | 80 0% | |
| H. | Net Eligible Receivables Balance - end of current Remittance Period | | #DIV/0! |

**III.   Collection Account Activity**

| | | | |
|---|---|---|---|
| A | Collection Account Balance - beginning of current Remittance Period | - | |
| B | plus  Collections on Pledged Receivables | | |
| | Principal collections | - | |
| | Interest & Fee Collections | - | |
| | Collections on Defaulted Receivables | - | |
| | Pre-payment proceeds on Pledged Receivables | - | |
| | Liquidation Proceeds | - | |
| | Payments under any insurance policies | - | |
| | Investment proceeds from amounts on deposit in the Collection Account | - | |
| | Other transfers into the Collection Account (provide detail) | - | |
| C | minus  Disbursements from the Collection Account in accordance with Section 2.05 of the RLSA | | |
| | Amounts paid with respect to the Loans (Principal / Yield) | - | |
| | Remittance Date transfers in accordance with Section 2.05(c) of the RLSA | - | |
| | Release of Borrowing Base surplus to the Borrower | - | |
| | Other transfers from the Collection Account (provide detail) | - | |
| D. | Collection Account Balance - end of current Remittance Period | | - |

**IV.   Capital Limit**

| | | | |
|---|---|---|---|
| A. | Net Eligible Receivables Balance (II  H. above) | #DIV/0! | |
| B. | plus  amounts on deposit in the Collection Account (III  D. above) | - | |
| C. | Capital Limit - end of current Remittance Period | #DIV/0! | |
| D. | minus  Remittance Date Transfers in accordance with Section 2.05 of the RLSA (see Item VII. M ) | (35.444 44) | |
| E. | Capital Limit - Post Remittance Date Transfers | | #DIV/0! |

**V.   Program Deficiency Test**

| | | | |
|---|---|---|---|
| A | Facility Amount - end of current Remittance Period  (see Schedule II) | - | |
| B | Capital Limit - Post Remittance Date Transfers (Item IV. E. above) | #DIV/0! | |
| C. | Borrowing Limit | 100,000.000 00 | |
| D. | Program Deficiency [excess, if any, of V. A. over the lesser of V. B  and V. C.] | | #DIV/0! |
| | | | |
| E. | Face Value of CP Notes issued to fund Loans to the Borrower - end of Remittance Period  (see Schedule II) | - | |
| F. | Amount available to be drawn under Liquidity/Enhancement Facility | 102,000.000 00 | |
| G. | Face Value of CP exceeds amount available to be drawn under Liquidity/Credit Enhancement Facility ? | | No |

**VI.   Borrowing Base Surplus [Excess of V. B  over V. A ]**                                                                                       #DIV/0!

**VII.   Remittance Date Transfers pursuant to Section 2.05(c) of the RLSA**

| | | | |
|---|---|---|---|
| A | Post-Servicing transfer, to the Backup Servicer, the Backup Servicer's Fees (plus Transition Costs not already reimbursed) | - | |

Page 1 of 3

DZB018812

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| Remittance Period: | January-02 | Borrowing Limit: | 100,000,000 |
|---|---|---|---|
| Remittance Date: | 10-Feb-02 | | |

| | | | |
|---|---|---|---|
| B | To the Custodian, accrued and unpaid Custodian's Fees (plus reimburseable expenses) | - | *(see Schedule I)* |
| C | To the Trustee, accrued and unpaid Trustee Fees (plus reimburseable expenses) | - | *(see Schedule I)* |
| D | To the Backup Servicer, accrued and unpaid Backup Servicer Standby Fees | 1,000.00 | *(see Schedule I)* |
| E | To the Facility Insurer, accrued and unpaid Premiums (prior to a Type I or Type II Default) | - | *(see Schedule I)* |
| F | To the Agent for the Lender's account, Fees, Applicable Margin and Yield on Non-CP Rate Loans | 34,444.44 | *(see Schedule I)* |
| G | To the Agent for the Lender's account, the Borrowing Base Deficiency as of the Remittance Date | - | |
| H | To the Agent for the Lender's account, all other obligations of the Borrower to the Lender, Agent or any Affected Party | - | |
| I | To the Servicer (if Opportunity or an Affiliate), so long as no Program Deficiency would result, the Servicing Fee | - | *(see Schedule I)* |
| J | After the occurrence of the EACD, to the Agent for the Lender's account, any amounts required to pay the Loans in full | - | |
| K | To the Facility Insurer, an amount equal to the Accrued Liability on the Loans then due and payable | - | |
| L | To the Borrower, any remaining amounts | - | |
| M | Total Remittance Date Transfers | | 35,444.44 |

**VIII. Early Amortization Events**

Pledged Receivables Aging:

| Days Past Due | Outstanding Principal Balance | % of Total | Count | % of Total |
|---|---|---|---|---|
| 0 - 30 days | - | 0.00% | - | 0.00% |
| 31 - 60 days | - | 0.00% | - | 0.00% |
| 61 - 90 days | - | 0.00% | - | 0.00% |
| 91 - 120 days | - | 0.00% | - | 0.00% |
| 121 - 150 days | - | 0.00% | - | 0.00% |
| 150+ days | - | 0.00% | - | 0.00% |
| Totals | - | 0.00% | - | 0.00% |

Retailer Receivables Aging:

| Days Past Due | Outstanding Principal Balance | % of Total | Count | % of Total |
|---|---|---|---|---|
| 0 - 30 days | - | 0.00% | - | 0.00% |
| 30 - 60 days | - | 0.00% | - | 0.00% |
| 61 - 90 days | - | 0.00% | - | 0.00% |
| 90+ days | - | 0.00% | - | 0.00% |
| Totals | - | 0.00% | - | 0.00% |

**Default Percentage**

| | | |
|---|---|---|
| A | Aggregate OPB of all Retailer Receivables that became Defaulted Retailer Receivables - current Remittance Period | - |
| B | Aggregate amount of Collections on Defaulted Retailer Receivables - current Remittance Period | - |
| C | Aggregate OPB of all Eligible Retailer Receivables as of the first day of the current Remittance Period | - |
| D | Default Percentage - current Remittance Period | 0.00% |
| E | Default Percentage - prior Remittance Period | 0.00% |
| F | Default Percentage - second prior Remittance Period | 0.00% |
| G | Three month-rolling average Default Percentage | 0.00% |
| H | Limit | 5.00% |
| I. | **Early Amortization Event ?** | **No** |

**Dilution Percentage**

| | | |
|---|---|---|
| J | Aggregate amount of Retailer Receivables that became Diluted Receivables - current Remittance Period | - |
| K | OPB of all Eligible Retailer Receivables as of the first day of the current Remittance Period | - |
| L | Dilution Percentage - current Remittance Period | 0.00% |
| M | Dilution Percentage - prior Remittance Period | 0.00% |
| N | Dilution Percentage - second prior Remittance Period | 0.00% |
| O | Three month-rolling average Dilution Percentage | 0.00% |
| P | Limit | 5.00% |
| Q. | **Early Amortization Event ?** | **No** |

| | | |
|---|---|---|
| R | Facility Insurer Rating - Royal Indemnity Company | |
| | Moody's | A1 |
| | S&P | A+ |
| | Fitch (if rated by Fitch) | AA- |

| | | |
|---|---|---|
| S. | **Is the Facility Insurer an Approved Facility Insurer ?** | **Yes / No** |
| | *(Must be rated 'A2' or higher by Moody's / 'A' or higher by S&P and 'A' or higher by Fitch (if rated by Fitch))* | |

| | | |
|---|---|---|
| T. | **Other Early Amortization Event has occurred ? (Servicer to provide detail)** | **Yes / No** |

**IX. Events of Default**

| | | |
|---|---|---|
| A. | **Program Deficiency has occurred ? [see Item V. D above]** | **#DIV/0!** |
| B | Borrower Tangible Net Worth *(to be calculated in accordance with GAAP)* | |
| C. | Consolidated net worth of Borrower (including subordinated debt acceptable to Agent and Facility Insurer) | - |

DZB018813

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| Remittance Period: | January-02 | Borrowing Limit: | 100,000,000 |
|---|---|---|---|
| Remittance Date: | 10-Feb-02 | | |

| | | |
|---|---|---|
| D | Consolidated intangibles of Borrower (inc goodwill, trademarks, copyrights, etc) | - |
| E | Tangible Net Worth | |
| F | Minimum | 12 000 000 |
| G. | **Event of Default ?** | |
| | | |
| H | Change in Control has occurred ? | Yes / No |
| | | |
| I | Either (i) the Facility Insurer has made a payment under the Facility Insurance Policy or (ii) a Facility Insurer Default Type I or Type II has occurred ? | Yes / No |
| | | |
| J. | Other Event of Default has occurred ?  (Servicer to provide detail) | Yes / No |

**X.  Servicer Default**

| | | |
|---|---|---|
| A | Servicer Tangible Net Worth *(to be calculated in accordance with GAAP)* | |
| B | Consolidated net worth of Servicer (including subordinated debt acceptable to Agent and Facility Insurer) | - |
| C | Consolidated intangibles of Servicer (inc goodwill, trademarks, copyrights, etc) | - |
| D | Tangible Net Worth | - |
| E | Minimum | 12 000 000 |
| F. | **Servicer Default ?** | |
| | | |
| G. | Event of Default has occurred ? | Yes / No |
| | | |
| H. | Three month rolling average Default Percentage exceeds 5.0% ? | No |
| | | |
| I. | Other Servicer Default has occurred ?  (Servicer to provide detail) | Yes / No |

**XI.  Exclusivity**

| | | | Loans Outstanding |
|---|---|---|---|
| A | Subject Borrowers (other than an Opportunity Loan Borrower) | | |
| | Subject Borrower #1 | | - |
| | Subject Borrower #2 | | - |
| B | Aggregate Loans outstanding to all Subject Borrowers | | - |
| C | Maximum | | 45 000 000 00 |
| D. | Exclusivity breached ? | | No |

---

The undersigned hereby represents and warrants that this report is a true and accurate accounting of the Pledged Receivables as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001 among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent and as Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated from time to time

BY          Opportunity Finance, LLC as Servicer

Name        _____

Title       _____

ATTACHMENTS:   EXHIBIT I     FEE CALCULATIONS
               EXHIBIT II    FACILITY AMOUNT CALCULATION / COMMERCIAL PAPER ACTIVITY
               EXHIBIT III   CONCENTRATION ANALYSIS
               EXHIBIT IV    APPROVED DISTRIBUTOR / RETAILER STATUS

DZB018814

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule I*
*Fee Calculations*

**A.  Applicable Margin**

| | | |
|---|---|---|
| Average Outstanding Principal Balance of Loans Outstanding to Borrower | - | |
| Applicable Margin | 2.35% | |
| Number of days during Remittance Period | 31 | |
| | Yield Attributable to Applicable Margin. | - |

**B.  Non-Use Fees** (not applicable after the occurrence of the Early Amortization Commencement Date)

| | | |
|---|---|---|
| Borrowing Limit (or average Borrowing Limit if applicable) | 100,000,000.00 | |
| Average unused position | 100,000,000.00 | |
| Non-Use Fee Rate | 0.40% | |
| Number of days during Remittance Period | 31 | |
| | Non-Use Fees. | 34,444.44 |

| | |
|---|---|
| **Total Yield (Applicable Margin only) & Fees due Lender on Remittance Date** | **34,444.44** |

**C.  Premium**

| | | |
|---|---|---|
| Average Outstanding Principal Balance of Covered Loans | - | |
| Premium Rate | 0.40% | |
| | Premium Due Facility Insurer: | - |

**D.  Servicing Fee**

| | | |
|---|---|---|
| Net Eligible Receivables Balance - first day of current Remittance Period | - | |
| Servicing Fee Rate | 0.50% | |
| Number of days during Remittance Period | 31 | |
| | Servicing Fee: | - |

**E.  Backup Servicer Standby Fee**

| | | |
|---|---|---|
| Net Eligible Receivables Balance - first day of current Remittance Period | - | |
| Backup Servicer Standby Fee Rate | 0.02% | |
| Number of days during Remittance Period | 31 | |
| | Backup Servicer Standby Fee (subject to $1,000 floor): | 1,000.00 |

**F.  Custodian's Supplemental Fee** (pursuant to Collection Account Agreement)                     -

**G.  Custodian's Fees** (pursuant to Custodial Agreement)                     -

**H.  Other Fees payable for the current Remittance Period** (Servicer to provide detail)                     -

| | |
|---|---|
| **TOTAL APPLICABLE MARGIN & FEES PAYABLE - CURRENT REMITTANCE PERIOD** | **35,444.44** |

DZB018815

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule II*
*Facility Amount Calculation & Commercial Paper Activity*

**A. FACILITY AMOUNT  [not including Yield attributable to Applicable Margin and Non-Use Fees]**

Face value of Commercial Paper Outstanding - end of Remittance Period                                    -
minus:  Discount scheduled to accrue thereon through stated maturity                                      -
plus:  Aggregate Loans Outstanding bearing interest at the Non-CP Rate                                    -
plus:  accrued Yield and Fees with respect to Loans bearing interest at the Non-CP Rate                   -

Facility Amount - end of Remittance Period                                                         [      -    ]

| B. | Date | OPB of Receivables Pledged ($) | OPB of Eligible Retailer Receivables | Coverage | COMMERCIAL PAPER (FACE VALUE) | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Beginning | (+) Issuances | (-) Maturities | Ending |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | xx/xx/xx | - | - | | - | - | - | - |
| | **Total** | **-** | **-** | | | **-** | **-** | |
| | **Average** | | | | | | | **-** |

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

### Overconcentration Amounts

| | | | | |
|---|---|---|---|---|
| Approved Retailer Limits | Level IV | < Baa3/BBB- or NR | 5.00% | |
| | Level III | < A2/A but <= Baa3/BBB- | 10.00% | |
| | Level II | < Aa2/AA but <= A2/A | 20.00% | |
| | Level I | >= Aa2/AA | 25.00% | |

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | Type | Limit | Excess |
|---|---|---|---|---|---|---|---|
| Fleming | - | #DIV/0! | - | #DIV/0! | Level IV | 5.0% | #DIV/0! |
| Rex Stores Corporation | - | #DIV/0! | - | #DIV/0! | Level IV | 5.0% | #DIV/0! |
| **Totals** | **-** | **#DIV/0!** | **-** | **#DIV/0!** | | | **#DIV/0!** |

### Special Concentration Approved Retailers

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | Limit | Excess |
|---|---|---|---|---|---|---|
| BJ's Wholesale Club | - | #DIV/0! | - | #DIV/0! | 22.5% | #DIV/0! |
| Costco | - | #DIV/0! | - | #DIV/0! | 25.0% | #DIV/0! |
| Sam's Club | - | #DIV/0! | - | #DIV/0! | 50.0% | #DIV/0! |
| Boscov's | - | #DIV/0! | - | #DIV/0! | 15.0% | #DIV/0! |
| **Totals** | **-** | **#DIV/0!** | **-** | **#DIV/0!** | | **#DIV/0!** |

### Eligible Receivables secured by Retailer Receivables to Government Entities

| | |
|---|---|
| Eligible Receivables relating to Approved Retailers which are Government Entities | - |
| Outstanding Principal Balance of all Eligible Receivables | - |
| Percentage | #DIV/0! |
| Maximum % | 2.00% |
| Overconcentration | #DIV/0! |

### Eligible Receivables secured by Retailer Receivables from Approved Retailers with a Debt Rating below A3/A-

*\*Excludes Special Concentration Approved Retailers*

| | |
|---|---|
| Eligible Receivables relating to Approved Retailers with a Debt Rating of below A3/A- | - |
| Outstanding Principal Balance of all Eligible Receivables | - |
| Percentage | #DIV/0! |
| Maximum % | 20.00% |
| Overconcentration | #DIV/0! |

### Minimum Opportunity Loan Coverage Overconcentration

| | |
|---|---|
| Aggregate principal amount of all outstanding Eligible Retailer Receivables | - |
| Outstanding Principal Balance of all Eligible Receivables | - |
| Percentage | #DIV/0! |
| Minimum % | 111 11% |
| Overconcentration | #DIV/0! |

### Maximum Inventory Stage Eligible Receivables

| | |
|---|---|
| Subject Inventory Insurance Policy in full force and effect ? | Yes |
| Supplemental Inventory Insurance Policy in full force and effect ? | No |
| Outstanding Principal Balance of all Inventory Stage Eligible Receivables | - |

Schedule III - Page 1 of 3

DZB018817

**OPPORTUNITY FINANCE SECURITIZATION LLC**

*Monthly Remittance Report - Schedule III*

*Concentration Analysis*

| | |
|---|---:|
| Outstanding Principal Balance of all Eligible Receivables | - |
| Percentage | #DIV/0! |
| Maximum % | 30.00% |
| **Overconcentration** | #DIV/0! |

**Maximum Eligible Receivables Extended by Servicer**

| | |
|---|---:|
| Outstanding Principal Balance of all Eligible Receivables w/ original terms of 120 days extended to 150 days | - |
| Outstanding Principal Balance of all Eligible Receivables | - |
| Percentage | #DIV/0! |
| Maximum % | 15.00% |
| **Overconcentration** | #DIV/0! |

| | |
|---|---:|
| **TOTAL OVERCONCENTRATION AMOUNT (must be without duplication)** | #DIV/0! |

**Excess Extended Term Receivable Amount**  (due more than 120 days but less than 151 days after date of Opportunity Loan)

| | |
|---|---:|
| Outstanding Principal Balance of all Eligible Receivables which are Extended Term Receivables | - |
| Outstanding Principal Balance of all Eligible Receivables | - |
| Percentage | #DIV/0! |
| Maximum % | 25.00% |
| **Overconcentration** | #DIV/0! |

Schedule III - Page 2 of 3

DZB018818

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

**Delinquent Retailer Excluded Amount**

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | # of Delinquent Retailer Rec. | Excluded Amount |
|---|---|---|---|---|---|---|
| Fleming | - | #DIV/0! | - | #DIV/0! | 0 | - |
| Rex Stores Corporation | - | #DIV/0! | - | #DIV/0! | 0 | - |
| BJ's Wholesale Club | - | #DIV/0! | - | #DIV/0! | 0 | - |
| Costco | - | #DIV/0! | - | #DIV/0! | 0 | - |
| Sam's Club | - | #DIV/0! | - | #DIV/0! | 0 | - |
| Boscov's | - | #DIV/0! | - | #DIV/0! | 0 | - |
| Totals | - | #DIV/0! | - | #DIV/0! | | - |

**Excess Maximum Individual Loan Amount**

| Eligible Receivable | Approved Retailer | Outstanding Principal Balance | Limit | Excess |
|---|---|---|---|---|
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| Totals | | - | | - |

Schedule III - Page 3 of 3

DZB018819

# EXHIBIT T-41

DOCUMENT PRODUCED NATIVELY

DZB045366

## Opportunity Finance LLC
### Portfolio Data

*Todays Date:*      12/31/2002

| Deal No. | Note No. | Note Principal | Issuance Date | Org. Note Term | Maturity Date | UCC Filing Date | UCC Filing No. | Note Rate |
|---|---|---|---|---|---|---|---|---|
| 191 | 051101-01 | $ 1,900,000 | 5/11/01 | 120 | #REF! | | | 3.50% |
| 192 | 051101-02 | $ 3,700,000 | 5/11/01 | 120 | #REF! | | | 3.50% |
| 193 | 051601-01 | $ 3,400,000 | 5/16/01 | 120 | #REF! | | | 3.50% |
| 194 | 060501-01 | $ 2,300,000 | 6/5/01 | 120 | #REF! | | | 3.50% |
| 195 | 060501-02 | $ 2,273,000 | 6/5/01 | 120 | #REF! | | | 3.50% |
| 196 | 060501-03 | $ 1,300,000 | 6/5/01 | 120 | #REF! | | | 3.50% |
| 197 | 060501-04 | $ 4,200,000 | 6/5/01 | 120 | #REF! | | | 3.50% |
| 198 | 060601-01 | $ 2,400,000 | 6/6/01 | 120 | #REF! | | | 3.50% |
| 199 | 060701-01 | $ 3,000,000 | 6/7/01 | 120 | #REF! | | | 3.50% |
| 200 | 062001-01 | $ 3,000,000 | 6/20/01 | 120 | #REF! | | | 3.50% |
| 201 | 062801-01 | $ 3,600,000 | 6/28/01 | 120 | #REF! | | | 3.50% |
| 202 | 062801-02 | $ 1,200,000 | 6/28/01 | 120 | #REF! | | | 3.50% |
| 203 | 070301-01 | $ 5,000,000 | 7/3/01 | 120 | #REF! | | | 3.50% |
| 204 | 071601-01 | $ 1,300,000 | 7/16/01 | 120 | #REF! | | | 3.50% |
| 205 | 072301-01 | | | | #REF! | | | 0.00% |
| 206 | 072301-02 | $ 2,100,000 | 7/23/01 | 120 | #REF! | | | 3.50% |
| 207 | 080101-01 | $ 6,000,000 | 8/1/01 | 120 | #REF! | | | 3.50% |
| 208 | 080601-01 | | | | #REF! | | | |
| 209 | 080701-01 | $ 4,200,000 | 8/7/01 | 120 | #REF! | | | 3.50% |
| 210 | 080801-01 | $ 1,500,000 | 8/8/01 | 120 | #REF! | | | 3.50% |
| 211 | 081001-01 | $ 2,400,000 | 8/10/01 | 120 | #REF! | | | 3.50% |
| 212 | 081001-02 | $ 2,700,000 | 8/10/01 | 120 | #REF! | | | 3.50% |
| 213 | 081301-01 | $ 2,600,000 | 8/13/01 | 120 | #REF! | | | 3.50% |
| 214 | | | | | #REF! | | | |

# Opportunity Finance LLC
## Portfolio Data

*Todays Date:*        12/31/2002

| Deal No. | Note No. | Note Principal | Issuance Date | Org. Note Term | Maturity Date | UCC Filing Date | UCC Filing No. | Note Rate |
|---|---|---|---|---|---|---|---|---|
| 215 | 081401-01 | $ 2,800,000 | 8/14/01 | 120 | #REF! | | | 3.50% |
| 216 | 081501-01 | $ 5,200,000 | 8/15/01 | 120 | #REF! | | | 3.50% |
| 217 | 082101-01 | $ 2,700,000 | 8/21/01 | 120 | #REF! | | | 3.50% |
| 218 | 082201-01 | $ 1,600,000 | 8/22/01 | 120 | #REF! | | | 3.50% |
| 219 | 082201-02 | $ 2,900,000 | 8/22/01 | 120 | #REF! | | | 3.50% |
| 220 | 082701-01 | $ 4,000,000 | 8/27/01 | 120 | #REF! | | | 3.50% |
| 221 | 082701-02 | $ 2,000,000 | 8/27/01 | 120 | #REF! | | | 3.50% |
| 222 | 090501-01 | $ 2,700,000 | 9/5/01 | 120 | #REF! | | | 3.50% |
| 223 | 091701-01 | $ 4,000,000 | 9/17/01 | 120 | #REF! | 9/19/01 | 20011599247 | 3.50% |
| 224 | 091701-02 | $ 1,300,000 | 9/17/01 | 120 | #REF! | | | 3.50% |
| 225 | 092401-01 | $ 1,000,000 | 9/24/01 | 120 | #REF! | 9/26/01 | 20011671345 | 3.50% |
| 226 | 092401-02 | $ 2,300,000 | 9/24/01 | 120 | #REF! | 9/26/01 | 20011670608 | 3.50% |
| 227 | 092601-01 | $ 2,700,000 | 9/26/01 | 150 | #REF! | 9/28/01 | 20011709369 | 3.50% |
| 228 | 092601-02 | $ 2,200,000 | 9/26/01 | 150 | #REF! | 9/28/01 | 20011709370 | 3.50% |
| 229 | 100401-01 | $ 1,900,000 | 10/4/01 | 120 | #REF! | 10/8/01 | 20011771326 | 3.50% |
| 230 | 101101-01 | $ 2,500,000 | 10/11/01 | 120 | #REF! | 10/17/01 | 20011886825 | 3.00% |
| 231 | 101501-01 | $ 3,000,000 | 10/15/01 | 120 | #REF! | 10/17/01 | 20011886858 | 3.50% |
| 232 | 102201-01 | $ 2,200,000 | 10/22/01 | 120 | #REF! | 12/13/01 | 20012439239 | 3.50% |
| 233 | 102501-01 | $ 3,700,000 | 10/25/01 | 120 | #REF! | 10/29/01 | 20011981507 | 3.50% |
| 234 | 103101-01 | $ 1,400,000 | 10/31/01 | 120 | #REF! | 11/5/01 | 20012069595 | 3.50% |
| 235 | 103101-02 | $ 1,500,000 | 10/31/01 | 120 | #REF! | 11/5/01 | 20012069654 | 3.50% |
| 236 | 103101-03 | $ 3,700,000 | 10/31/01 | 120 | #REF! | 11/5/01 | 20012069621 | 3.50% |
| 237 | 092001-01 | $ 2,100,000 | 9/20/01 | 120 | #REF! | 9/21/01 | 20011627663 | 3.50% |
| 238 | 110501-01 | $ 1,400,000 | 11/5/01 | 120 | #REF! | 11/13/01 | 20012124882 | 3.50% |
| 239 | 110501-02 | $ 3,000,000 | 11/5/01 | 120 | #REF! | 11/13/01 | 20012124907 | 3.50% |

**Opportunity Finance LLC**
**Portfolio Data**

*Todays Date:*      12/31/2002

| Deal No. | Note No. | Note Principal | Issuance Date | Org. Note Term | Maturity Date | UCC Filing Date | UCC Filing No. | Note Rate |
|---|---|---|---|---|---|---|---|---|
| 240 | 110901-01 | $ 1,700,000 | 11/9/01 | 120 | #REF! | 11/15/01 | 20012168057 | 3.50% |
| 241 | 111301-01 | $ 3,500,000 | 11/13/01 | 120 | #REF! | 11/15/01 | 20012168091 | 3.50% |
| 242 | 111501-01 | $ 3,000,000 | 11/15/01 | 120 | #REF! | 11/19/01 | 20012190881 | 3.50% |
| 243 | 111901-01 | $ 3,800,000 | 11/19/01 | 120 | #REF! | 11/21/01 | 20012221476 | 3.50% |
| 244 | 112001-01 | $ 1,200,000 | 11/20/01 | 120 | #REF! | 11/27/01 | 20012261285 | 3.50% |
| 245 | 112101-01 | $ 2,700,000 | 11/21/01 | 120 | #REF! | 11/26/01 | 20012266126 | 3.50% |
| 246 | 112601-01 | $ 900,000 | 11/26/01 | 120 | #REF! | 11/28/01 | 20012280241 | 3.50% |
| 247 | 112601-02 | $ 2,800,000 | 11/26/01 | 120 | #REF! | 11/28/01 | 20012280104 | 3.50% |
| 248 | 113001-01 | $ 2,700,000 | 11/30/01 | 120 | #REF! | 12/3/01 | 20012320352 | 3.50% |
| 249 | 113001-02 | $ 2,900,000 | 11/30/01 | 120 | #REF! | 12/3/01 | 20012320411 | 3.50% |
| 250 | 120601-01 | $ 2,400,000 | 12/6/01 | 120 | #REF! | 12/10/01 | 20012403991 | 3.50% |
| 251 | 121801-01 | $ 2,800,000 | 12/18/01 | 120 | #REF! | 12/18/01 | 20012534704 | 3.50% |
| 252 | 010702-01 | $ 4,000,000 | 1/7/02 | 120 | #REF! | 1/4/02 | 20022630456 | 2.50% |
| 253 | 011502-01 | $ 2,400,000 | 1/15/02 | 120 | #REF! | 1/15/02 | 20022715228 | 2.50% |
| 254 | 011502-02 | $ 3,000,000 | 1/15/02 | 120 | #REF! | 1/15/02 | 20022715583 | 2.50% |
| 255 | 011502-03 | $ 4,800,000 | 1/15/02 | 120 | #REF! | 1/15/02 | 20022715789 | 2.50% |
| 256 | 012202-01 | $ 2,500,000 | 1/22/02 | 120 | #REF! | 1/17/02 | 20022785719 | 2.50% |
| 257 | 012202-02 | $ 3,600,000 | 1/22/02 | 120 | #REF! | 1/17/02 | 20022785878 | 2.50% |
| 258 | 012502-01 | $ 2,400,000 | 1/25/02 | 120 | #REF! | 1/24/02 | 20022843987 | 2.50% |
| 259 | 012502-02 | $ 2,000,000 | 1/25/02 | 120 | #REF! | 1/24/02 | 20022844185 | 2.50% |
| 260 | 012502-03 | $ 2,200,000 | 1/25/02 | 120 | #REF! | 1/24/02 | 20022844369 | 2.50% |
| 261 | 020402-01 | $ 4,300,000 | 2/4/02 | 120 | #REF! | 1/31/02 | 20022924072 | 2.50% |
| 262 | 020402-02 | $ 3,100,000 | 2/4/02 | 120 | #REF! | 1/31/02 | 20022924566 | 2.50% |
| 263 | 020402-03 | $ 1,700,000 | 2/4/02 | 120 | #REF! | 1/31/02 | 20022925937 | 2.50% |
| 264 | 020402-04 | $ 1,400,000 | 2/4/02 | 120 | #REF! | 1/31/02 | 20022926227 | 2.50% |

**Opportunity Finance LLC**
**Portfolio Data**

*Todays Date:*      12/31/2002

| Deal No. | Note No. | Note Principal | Issuance Date | Org. Note Term | Maturity Date | UCC Filing Date | UCC Filing No. | Note Rate |
|---|---|---|---|---|---|---|---|---|
| 265 | 021102-01 | $ 1,500,000 | 2/11/02 | 120 | #REF! | 2/8/02 | 20023018982 | 2.50% |
| 266 | 021102-02 | $ 2,400,000 | 2/11/02 | 120 | #REF! | 2/8/02 | 20023019249 | 2.50% |
| 267 | 021102-03 | $ 2,600,000 | 2/11/02 | 120 | #REF! | 2/8/02 | 20023017153 | 2.50% |
| 268 | 021102-04 | $ 3,800,000 | 2/11/02 | 120 | #REF! | 2/8/02 | ########## | 2.50% |
| 269 | 021102-05 | $ 3,300,000 | 2/11/02 | 120 | #REF! | 2/8/02 | 20023018258 | 2.50% |
| 270 | 021102-06 | $ 1,300,000 | 2/11/02 | 120 | #REF! | 2/8/02 | 20023018649 | 2.50% |
| 271 | 022002-01 | $ 3,400,000 | 2/22/02 | 120 | #REF! | 2/20/02 | 20023138389 | 2.50% |
| 272 | 022002-02 | $ 3,700,000 | 2/22/02 | 120 | #REF! | 2/20/02 | 20023138345 | 2.50% |
| 273 | 022002-03 | $ 3,000,000 | 2/22/02 | 120 | #REF! | 2/20/02 | 20023138334 | 2.50% |
| 274 | 022002-04 | $ 2,200,000 | 2/22/02 | 120 | #REF! | 2/20/02 | 20023138323 | 2.50% |
| 275 | 022002-05 | $ 1,700,000 | 2/22/02 | 120 | #REF! | 2/20/02 | 20023138286 | 2.50% |
| 276 | 022802-01 | $ 3,000,000 | 2/28/02 | 120 | #REF! | 2/26/02 | 20023203965 | 2.50% |
| 277 | 022802-02 | $ 2,500,000 | 2/28/02 | 120 | #REF! | 2/26/02 | 20023204107 | 2.50% |
| 278 | 022802-03 | $ 3,000,000 | 2/28/02 | 120 | #REF! | 2/26/02 | 20023203172 | 2.50% |
| 279 | 030602-01 | $ 2,300,000 | 3/6/02 | 120 | #REF! | 3/4/02 | 20023265024 | 2.50% |
| 280 | 030602-02 | $ 1,750,000 | 3/6/02 | 120 | #REF! | 3/4/02 | 20023264929 | 2.50% |
| 281 | 030802-01 | $ 2,000,000 | 3/8/02 | 120 | #REF! | 3/5/02 | 20023285842 | 2.50% |
| 282 | 030802-02 | $ 3,600,000 | 3/8/02 | 120 | #REF! | 3/5/02 | 20023285716 | 2.50% |
| 283 | 030802-03 | $ 3,000,000 | 3/8/02 | 120 | #REF! | 3/5/02 | 20023285750 | 2.50% |
| 284 | 031302-01 | $ 4,000,000 | 3/13/02 | 120 | #REF! | 3/12/02 | 20023357444 | 2.50% |
| 285 | 031302-02 | $ 3,500,000 | 3/13/02 | 120 | #REF! | 3/12/02 | 20023357488 | 2.50% |
| 286 | 031302-03 | $ 2,600,000 | 3/13/02 | 120 | #REF! | 3/12/02 | 20023357525 | 2.50% |
| 287 | 031302-04 | $ 1,700,000 | 3/13/02 | 120 | #REF! | 3/12/02 | 20023357569 | 2.50% |
| 288 | 031802-01 | $ 3,500,000 | 3/18/02 | 120 | #REF! | 3/14/02 | 20023384201 | 2.50% |
| 289 | 032602-01 | $ 3,100,000 | 3/26/02 | 120 | #REF! | 3/22/02 | 20023474627 | 2.50% |

# Opportunity Finance LLC
## Portfolio Data

*Todays Date:*    12/31/2002

| Deal No. | Note No. | Note Principal | Issuance Date | Org. Note Term | Maturity Date | UCC Filing Date | UCC Filing No. | Note Rate |
|---|---|---|---|---|---|---|---|---|
| 290 | 032602-02 | $ 3,600,000 | 3/26/02 | 120 | #REF! | 3/22/02 | 20023474638 | 2.50% |
| 291 | 032602-03 | $ 3,300,000 | 3/26/02 | 120 | #REF! | 3/22/02 | 20023474672 | 2.50% |
| 292 | 040102-01 | $ 3,500,000 | 4/1/02 | 120 | #REF! | 3/28/02 | 20023528508 | 2.50% |
| 293 | 040102-02 | $ 3,400,000 | 4/1/02 | 120 | #REF! | 3/28/02 | 20023528450 | 2.50% |
| 294 | 040102-03 | $ 3,900,000 | 4/1/02 | 120 | #REF! | 3/28/02 | 20023528483 | 2.50% |
| 295 | 040102-04 | $ 2,000,000 | 4/1/02 | 120 | #REF! | 3/28/02 | 20023528449 | 2.50% |
| 296 | 041102-01 | $ 1,700,000 | 4/11/02 | 120 | #REF! | 4/10/02 | 20023669529 | 2.50% |
| 297 | 041102-02 | $ 2,800,000 | 4/11/02 | 120 | #REF! | 4/10/02 | 20023671269 | 2.50% |
| 298 | 041102-03 | $ 3,600,000 | 4/11/02 | 120 | #REF! | 4/10/02 | 20023670533 | 2.50% |
| 299 | 042602-01 | $ 4,600,000 | 4/26/02 | 120 | #REF! | 4/25/02 | 20023841893 | 2.50% |
| 300 | 042602-02 | $ 1,400,000 | 4/26/02 | 120 | #REF! | 4/25/02 | 20023841930 | 2.50% |
| 301 | 042602-03 | $ 2,800,000 | 4/26/02 | 120 | #REF! | 4/25/02 | 20023841826 | 2.50% |
| 302 | 050302-01 | $ 4,300,000 | 5/3/02 | 120 | #REF! | 5/1/02 | 20023913233 | 2.50% |
| 303 | 050302-03 | $ 1,700,000 | 5/3/02 | 120 | #REF! | 5/1/02 | 20023913473 | 2.50% |
| 304 | 050302-02 | $ 3,900,000 | 5/9/02 | 120 | #REF! | 5/9/02 | 20023913288 | 2.50% |
| 305 | 050302-04 | $ 2,300,000 | 5/9/02 | 120 | #REF! | 5/9/02 | 20023913532 | 2.50% |
| 306 | 050902-01 | $ 1,200,000 | 5/9/02 | 120 | #REF! | 5/9/02 | 20023995545 | 2.50% |
| 307 | 050902-02 | $ 3,100,000 | 5/9/02 | 120 | #REF! | 5/9/02 | 20023995578 | 2.50% |
| 308 | 050902-03 | $ 2,500,000 | 5/9/02 | 120 | #REF! | 5/9/02 | 20023995589 | 2.50% |
| 309 | 050902-04 | $ 3,100,000 | 5/9/02 | 120 | #REF! | 5/9/02 | 20023995648 | 2.50% |
| 310 | 052102-01 | $ 2,200,000 | 5/21/02 | 120 | #REF! | 5/20/02 | 20024108595 | 2.50% |
| 311 | 052102-02 | $ 2,100,000 | 5/21/02 | 120 | #REF! | 5/20/02 | 20024108702 | 2.50% |
| 312 | 052102-03 | $ 4,800,000 | 5/21/02 | 120 | #REF! | 5/20/02 | 20024108827 | 2.50% |
| 313 | 052102-04 | $ 1,400,000 | 5/21/02 | 120 | #REF! | 5/20/02 | 20024108919 | 2.50% |
| 314 | 052102-05 | $ 2,300,000 | 5/21/02 | 120 | #REF! | 5/20/02 | 20024108975 | 2.50% |

**Opportunity Finance LLC**
**Portfolio Data**

*Todays Date:*     12/31/2002

| Deal No. | Note No. | Note Principal | Issuance Date | Org. Note Term | Maturity Date | UCC Filing Date | UCC Filing No. | Note Rate |
|---|---|---|---|---|---|---|---|---|
| 315 | 052102-06 | $ 2,100,000 | 5/21/02 | 120 | #REF! | 5/20/02 | 20024109014 | 2.50% |
| 316 | 053002-01 | $ 4,800,000 | 5/30/02 | 120 | #REF! | 5/29/02 | 20024199389 | 2.50% |
| 317 | 053002-02 | $ 3,300,000 | 5/30/02 | 120 | #REF! | 5/29/02 | 20024199415 | 2.50% |
| 318 | 053002-03 | $ 4,600,000 | 5/30/02 | 120 | #REF! | 5/29/02 | 20024199471 | 2.50% |
| 319 | 053002-04 | $ 3,800,000 | 5/30/02 | 120 | #REF! | 5/29/02 | 20024199493 | 2.50% |
| 320 | 060602-01 | $ 4,000,000 | 6/6/02 | 120 | #REF! | 6/4/02 | 20024260381 | 2.50% |
| 321 | 060602-02 | $ 3,700,000 | 6/6/02 | 120 | #REF! | 6/4/02 | 20024260691 | 2.50% |
| 322 | 060602-03 | $ 2,200,000 | 6/6/02 | 120 | #REF! | 6/4/02 | 20024260820 | 2.50% |
| 323 | 060602-04 | $ 4,400,000 | 6/6/02 | 120 | #REF! | 6/4/02 | 20024260934 | 2.50% |
| 324 | 061702-01 | $ 3,500,000 | 6/17/02 | 120 | #REF! | 6/13/02 | 20024355855 | 2.50% |
| 325 | 061702-02 | $ 2,700,000 | 6/17/02 | 120 | #REF! | 6/13/02 | 20024355936 | 2.50% |
| 326 | 061702-03 | $ 2,400,000 | 6/17/02 | 120 | #REF! | 6/13/02 | 20024355992 | 2.50% |
| 327 | 061702-04 | $ 4,200,000 | 6/17/02 | 120 | #REF! | 6/13/02 | 20024358541 | 2.50% |
| 328 | 062602-01 | $ 2,200,000 | 6/26/02 | 120 | #REF! | 6/25/02 | 20024467314 | 2.50% |
| 329 | 062602-02 | $ 4,400,000 | 6/26/02 | 120 | #REF! | 6/25/02 | 20024467299 | 2.50% |
| 330 | 062602-03 | $ 3,700,000 | 6/26/02 | 120 | #REF! | 6/25/02 | 20024467347 | 2.50% |
| 331 | 070202-01 | $ 5,100,000 | 7/2/02 | 120 | #REF! | 7/2/02 | 20024521827 | 2.50% |
| 332 | 071102-01 | $ 4,200,000 | 7/11/02 | 120 | #REF! | 7/9/02 | 20024587744 | 2.50% |
| 333 | 071102-02 | $ 1,750,000 | 7/11/02 | 120 | #REF! | 7/9/02 | 20024587814 | 2.50% |
| 334 | 071102-03 | $ 4,850,000 | 7/11/02 | 120 | #REF! | 7/9/02 | 20024587711 | 2.50% |
| 335 | 071702-01 | $ 4,800,000 | 7/17/02 | 120 | #REF! | 7/16/02 | 20024644219 | 2.50% |
| 336 | 071702-02 | $ 3,200,000 | 7/17/02 | 120 | #REF! | 7/16/02 | 20024644275 | 2.50% |
| 337 | 071702-03 | $ 3,400,000 | 7/17/02 | 120 | #REF! | 7/16/02 | 20024644138 | 2.50% |
| 338 | 072502-01 | $ 3,000,000 | 7/25/02 | 120 | #REF! | 7/23/02 | 20024703630 | 2.50% |
| 339 | 072502-02 | $ 3,900,000 | 7/25/02 | 120 | #REF! | 7/23/02 | 20024703629 | 2.50% |

**Opportunity Finance LLC**
**Portfolio Data**

*Todays Date:*      12/31/2002

| Deal No. | Note No. | Note Principal | Issuance Date | Org. Note Term | Maturity Date | UCC Filing Date | UCC Filing No. | Note Rate |
|---|---|---|---|---|---|---|---|---|
| 340 | 080102-01 | $ 2,250,000 | 8/1/02 | 120 | #REF! | 7/31/02 | 20024767047 | 2.50% |
| 341 | 080102-02 | $ 3,600,000 | 8/1/02 | 120 | #REF! | 7/31/02 | 20024767081 | 2.50% |
| 342 | 080102-03 | $ 2,100,000 | 8/1/02 | 120 | #REF! | 7/31/02 | 20024767003 | 2.50% |
| 343 | 080502-01 | $ 3,100,000 | 8/5/02 | 120 | #REF! | 8/2/02 | 20024797213 | 2.50% |
| 344 | 080702-01 | $ 2,600,000 | 8/7/02 | 120 | #REF! | 8/6/02 | 20024822644 | 2.50% |
| 345 | 080702-02 | $ 2,800,000 | 8/7/02 | 120 | #REF! | 8/6/02 | 20024823439 | 2.50% |
| 346 | 081402-01 | $ 2,900,000 | 8/14/02 | 120 | #REF! | 8/13/02 | 20024871483 | 2.50% |
| 347 | 081402-02 | $ 2,300,000 | 8/14/02 | 120 | #REF! | 8/13/02 | 20024871599 | 2.50% |
| 348 | 081402-03 | $ 2,100,000 | 8/14/02 | 120 | #REF! | 8/13/02 | 20024871359 | 2.50% |
| 349 | 082102-01 | $ 5,500,000 | 8/21/02 | 120 | #REF! | 8/20/02 | 20024932383 | 2.50% |
| 350 | 082202-01 | $ 3,900,000 | 8/22/02 | 120 | #REF! | 8/22/02 | 20024952075 | 2.50% |
| 351 | 082802-01 | $ 3,200,000 | 8/28/02 | 120 | #REF! | 8/26/02 | 20024980029 | 2.50% |
| 352 | 082802-02 | $ 3,600,000 | 8/28/02 | 120 | #REF! | 8/26/02 | 20024980100 | 2.50% |
| 353 | 082802-03 | $ 4,400,000 | 8/28/02 | 120 | #REF! | 8/26/02 | 20024980155 | 2.50% |
| 354 | 090502-01 | $ 2,800,000 | 9/5/02 | 120 | #REF! | 9/4/02 | 20025042644 | 2.50% |
| 355 | 090502-02 | $ 5,200,000 | 9/5/02 | 120 | #REF! | 9/4/02 | 20025042699 | 2.50% |
| 356 | 090502-03 | $ 1,900,000 | 9/9/02 | 120 | #REF! | 9/4/02 | 20025042714 | 2.50% |
| 357 | 090902-01 | $ 4,300,000 | 9/9/02 | 120 | #REF! | 9/5/02 | 20025051654 | 2.50% |
| 358 | 091802-01 | $ 1,950,000 | 9/18/02 | 120 | #REF! | 9/17/02 | 20025150116 | 2.50% |
| 359 | 091802-02 | $ 4,800,000 | 9/18/02 | 120 | #REF! | 9/17/02 | 20025150208 | 2.50% |
| 360 | 091802-03 | $ 1,950,000 | 9/18/02 | 120 | #REF! | 9/17/02 | 20025150024 | 2.50% |
| 361 | 092502-01 | $ 2,150,000 | 9/25/02 | 120 | #REF! | 9/23/02 | 20025206872 | 2.50% |
| 362 | 092502-02 | $ 2,550,000 | 9/25/02 | 120 | #REF! | 9/23/02 | 20025206909 | 2.50% |
| 363 | 092502-03 | $ 2,100,000 | 9/25/02 | 120 | #REF! | 9/23/02 | 20025206932 | 2.50% |
| 364 | 092502-04 | $ 4,850,000 | 9/25/02 | 120 | #REF! | 9/23/02 | 20025207015 | 2.50% |

**Opportunity Finance LLC**
**Portfolio Data**

*Todays Date:*      12/31/2002

| Deal No. | Note No. | Note Principal | Issuance Date | Org. Note Term | Maturity Date | UCC Filing Date | UCC Filing No. | Note Rate |
|---|---|---|---|---|---|---|---|---|
| 365 | 092502-05 | $ 3,950,000 | 9/25/02 | 120 | #REF! | 9/23/02 | 20025207093 | 2.50% |
| 366 | 100202-01 | $ 4,050,000 | 10/2/02 | 120 | #REF! | 10/1/02 | 20025285743 | 2.50% |
| 367 | 100202-02 | $ 2,400,000 | 10/2/02 | 120 | #REF! | 10/1/02 | 20025285994 | 2.50% |
| 368 | 100202-03 | $ 3,250,000 | 10/2/02 | 120 | #REF! | 10/1/02 | 20025286088 | 2.50% |
| 369 | 100202-04 | $ 2,900,000 | 10/2/02 | 120 | #REF! | 10/1/02 | 20025285651 | 2.50% |
| 370 | 101002-01 | $ 5,850,000 | 10/10/02 | 120 | #REF! | 10/9/02 | 20025352596 | 2.50% |
| 371 | 101002-02 | $ 3,800,000 | 10/10/02 | 120 | #REF! | 10/9/02 | 20025352677 | 2.50% |
| 372 | 101002-03 | $ 1,500,000 | 10/10/02 | 120 | #REF! | 10/9/02 | 20025352736 | 2.50% |
| 373 | 101002-04 | $ 2,150,000 | 10/10/02 | 120 | #REF! | 10/9/02 | 20025352482 | 2.50% |
| 374 | 101602-01 | $ 3,900,000 | 10/16/02 | 120 | #REF! | 10/15/02 | 20025403404 | 2.50% |
| 375 | 101602-02 | $ 4,700,000 | 10/16/02 | 120 | #REF! | 10/15/02 | 20025402712 | 2.50% |
| 376 | 101602-03 | $ 5,350,000 | 10/16/02 | 120 | #REF! | 10/15/02 | 20025402767 | 2.50% |
| 377 | 102302-01 | $ 4,900,000 | 10/23/02 | 120 | #REF! | 10/22/02 | 20025476120 | 2.50% |
| 378 | 102302-02 | $ 4,800,000 | 10/23/02 | 120 | #REF! | 10/22/02 | 20025476201 | 2.50% |
| 379 | 102302-03 | $ 2,050,000 | 10/23/02 | 120 | #REF! | 10/22/02 | 20025476256 | 2.50% |
| 380 | 111202-01 | $ 1,450,000 | 11/12/02 | 120 | #REF! | 11/12/02 | 20025655029 | 2.50% |
| 381 | 111202-02 | $ 2,650,000 | 11/12/02 | 120 | #REF! | 11/12/02 | 20025655096 | 2.50% |
| 382 | 111202-03 | $ 3,400,000 | 11/12/02 | 120 | #REF! | 11/12/02 | 20025655155 | 2.50% |
| 383 | 111202-04 | $ 5,200,000 | 11/12/02 | 120 | #REF! | 11/12/02 | 20025655203 | 2.50% |
| 384 | 111202-05 | $ 2,600,000 | 11/12/02 | 120 | #REF! | 11/12/02 | 20025655270 | 2.50% |
| 385 | 112102-01 | $ 3,800,000 | 11/21/02 | 120 | #REF! | 11/20/02 | 20025740777 | 2.50% |
| 386 | 112102-02 | $ 2,850,000 | 11/21/02 | 120 | #REF! | 11/20/02 | 20025740766 | 2.50% |
| 387 | 120402-01 | $ 1,750,000 | 12/4/02 | 120 | #REF! | 12/2/02 | 20025836298 | 2.50% |
| 388 | 120402-02 | $ 4,150,000 | 12/4/02 | 120 | #REF! | 12/2/02 | 20025836313 | 2.50% |
| 389 | 121102-01 | $ 3,000,000 | 12/11/02 | 120 | #REF! | 12/10/02 | 20025907924 | 2.50% |

**Opportunity Finance LLC**
**Portfolio Data**

*Todays Date:*     12/31/2002

| Deal No. | Note No. | Note Principal | Issuance Date | Org. Note Term | Maturity Date | UCC Filing Date | UCC Filing No. | Note Rate |
|---|---|---|---|---|---|---|---|---|
| 390 | 121102-02 | $ 3,200,000 | 12/11/02 | 120 | #REF! | 12/10/02 | 20025907979 | 2.50% |
| 391 | 121102-03 | $ 4,200,000 | 12/11/02 | 120 | #REF! | 12/10/02 | 20025908029 | 2.50% |
| 392 | 121102-04 | $ 2,600,000 | 12/11/02 | 120 | #REF! | 12/10/02 | 20025907854 | 2.50% |
| 393 | 121702-01 | $ 4,750,000 | 12/17/02 | 120 | #REF! | 12/16/02 | 20025970972 | 2.50% |
| 394 | 121702-02 | $ 3,500,000 | 12/17/02 | 120 | #REF! | 12/16/02 | 20025970938 | 2.50% |
| 395 | 121902-01 | $ 3,950,000 | 12/19/02 | 120 | #REF! | 12/17/02 | 20025994813 | 2.50% |
| 396 | 121902-03 | $ 3,850,000 | 12/19/02 | 120 | #REF! | 12/17/02 | 20025994776 | 2.50% |
| 397 | 121902-02 | $ 4,600,000 | 12/23/02 | 120 | #REF! | 12/17/02 | 20025994846 | 2.50% |
| 398 | 122302-01 | $ 2,150,000 | 12/23/02 | 120 | #REF! | 12/19/02 | 20026009059 | 2.50% |
| 399 | 122402-01 | $ 4,050,000 | 12/24/02 | 120 | #REF! | 12/23/02 | 20026043213 | 2.50% |
| 400 | 122402-02 | $ 3,600,000 | 12/24/02 | 120 | #REF! | 12/23/02 | 20026039258 | 2.50% |
| 401 | 122402-03 | $ 2,650,000 | 12/24/02 | 120 | #REF! | 12/23/02 | 20026039306 | 2.50% |
| 402 | 123002-01 | $ 2,300,000 | 12/30/02 | 120 | #REF! | 12/27/02 | 20026079805 | 2.50% |
| 403 | 123002-02 | $ 4,500,000 | 12/30/02 | 120 | #REF! | 12/27/02 | 20026079850 | 2.50% |
| 404 | 123002-03 | $ 3,950,000 | 12/30/02 | 120 | #REF! | 12/27/02 | 20026079724 | 2.50% |

| | | | | |
|---|---|---|---|---|
| **Test #1** | $ | - | 1/0/00 | |
| **Test #2** | $ | - | 1/0/00 | |
| **Test #3** | $ | - | 1/0/00 | |
| **Test #4** | $ | - | 1/0/00 | |
| **Test #5** | $ | - | 1/0/00 | |

| **TOTAL** | $ 640,973,000 |
|---|---|

# EXHIBIT T-42

Message

| | |
|---|---|
| **From**: | Wolfgang Bollmann [W_BOLL@compuserve.com] |
| **Sent**: | 9/11/2003 10:23:08 PM |
| **To**: | Nancy O'Connor [nancy.oconnor@dzbank.de] |
| **CC**: | Wolfgang Bollmann [wolfgang.bollmann@dzbank.de] |
| **Subject**: | Opportunity Finance |

Hello Nancy,

I just read ASG's paper and have the following suggestions / comments:

The "summary of salient points" does not really address and/or explain the difficult points of the new deal and is therefore not very value added.  I had hoped that this would be the place to focus on the crucial points and nothing else.

The last paragraph on page 1 is again pretty talk.  Why don't we mention's Best Buy's results after non-recurring items?
Is Royal Indemnity really down to BB- rating? (page 2).

The answers to the questions are fairly good and read much quicker than I thought. They are basically ok, except:

Q 1:  I would mention as value added that they provide significant funding. Don't they also do some due diligence or administrative functions that are value added?

Q 3  What did the sabes do before 1998?

Q 7  We should mention at least once that we do expect some dilution (or how else do they handle defunct goods?)

Q 9  Eligibility BBB vs. BBB-.  ....., i.e. we will not be able to ever get insurance from radian as the new deal as BBB- and concentration are both outside of the insurer's risk parameters.  In addition, I doubt that we can get the deal rated.  Not rated and not insured - what would be our prospect to syndicate future increases?  Why do we leave it up to Mr. Westhoff to connect these dots?

Q 12  Why are covenants for equity / sub.debt so low if actual amounts are high?  Questions is not answered at all.  I assume that they will insist on a small amount as only this is "permanent" equity while subordinated debt could be replaced by (cheaper) financing from us.  Anyway:  Not explained.

Q 15  First a sales contract and then purchases from manufacturer? Question is not answered.  We insist that it doesn't matter anyway.  Ergo: answer would be negative or we don't know.

Q 22  I still don't understand what Petters is all doing and where they make money.  Did they really buy Fingerhut?

Q 29  Minimum first loss protection of 17%  versus 15% and 23% in Q 17?????

All other points are ok, including the (actually very fact based) last one.


I recomend that you look into my comments and then send it to Mr. Westhoff (OdO should see the final results).  It should be sent by you in our both name.  Indicate that the answers were prepared by ASG but that we reviewed them and are satisfied with the responses (after we have responses to Q12 and Q 15) and that we continue to support the deal.
What about the $25 mio limit on Best Buy? Do we completely ignore it?

regards

Wolfgang

DZB058241

# EXHIBIT T-43

APR-10-2003  12:23                                                              P.15/28



 **Small Business**
**Solutions**

**BOSCOV'S DEPARTMENT STORE, LLC**
4500 PERKIOMEN AVE
READING,PA196063202
Phone: (610) 779-2000
D-U-N-S® Number: 01-449-2508

> **Report as of:**
> **April 07, 2003**
> This Report is < 1 Month Old

**Included with this Comprehensive Report are 8 months of continuous tracking of key business changes and free Alert messages in your Tracking Folders. You can also choose to receive e-mail notifications of the important changes. IMPORTANT NOTE: You will not receive e-mail alerts if you have opted out of receiving communications from D&B.

**Business Summary**

BOSCOV'S DEPARTMENT STORE,                    DUNS: 01-449-2508
LLC                              FINANCIAL STRESS CLASS: 1
                                 CREDIT SCORE CLASS:     3

BOX 4116
READING PA 19606                             KEY
4500 PERKIOMEN AVE              ==============================
AND BRANCH(ES) OR DIVISION(S)   LOWEST RISK      HIGHEST RISK
READING PA 19606                  1     2     3     4     5
TEL: 610 779-2000

SIC:      53 11 59 95 59 99
LINE OF BUSINESS: DEPARTMENT STORES
YEAR STARTED:     1911
CONTROL DATE:     1911                  DATE PRINTED: APR 07 2003

CHIEF EXECUTIVE: KENNETH S. LAKIN, CEO-CHB

========================================================================
**Executive Summary**

- The Financial Stress Class of 1 for this company shows that during the
  previous year, firms with this classification had a failure rate of
  .49% (49 per 10,000), which is lower than the national average.
- The Credit Score Class of 3 for this company shows that during the previous
  year, 12.3% of the firms with this classification paid one or more bills
  severely delinquent, which is lower than the national average.
- Subject company pays its bills an average 15 days beyond terms.
- Subject company's industry pays its bills an average 9 days beyond terms.
- Subject company pays its bills slower than the average for its industry.
- Financial information from a fiscal consolidated statement dated 02/02/02
  is included.
- Net worth for the fiscal year ending February 2002 is up by 3.5%.
- UCC filing(s) are reported for this business.
- Financing is secured-unsecured.
- Under present management control 92 years.
- Evidence of open Suit(s) in the D&B database.
- History is clear.

========================================================================
**Credit Capacity Summary**

D&B Rating:      5A2              Payment Activity
                                 (based on 390 experiences):

DZB001051

```
Sales ($):      1,000,000,000     Average High Credit:   $174,814
# of Employees                    Highest Credit:        $8,000,000
Total:          10,000            Total Highest Credits: $66,809,950
                (850 Here)

As of 02/02/02  Worth:          $241,658,280
                Working Capital: $204,784,562
```

Note: The Worth amount in this section may have been adjusted by D&B to reflect typical deductions, such as certain intangible assets.

===================================================================

## Financial Stress Summary

The Financial Stress Model predicts the likelihood of a firm ceasing business without paying all creditors in full, or reorganizing or obtaining relief from creditors under state/federal law over the next 12 months. Scores were calculated using a statistically valid model derived from D&B's extensive data files.

```
Financial Stress Class:                          1
(Highest Risk: 5; Lowest Risk: 1)

Incidence of Financial Stress Among
Companies with this Classification:              0.49% (49 per 10,000)

Incidence of Financial Stress:                   1.40% (140 per 10,000)
- National Average

Financial Stress National Percentile:            76
(Highest Risk: 1; Lowest Risk: 100)

Financial Stress Score:                          1479
(Highest Risk: 1,001; Lowest Risk: 1,850)
```

The Financial Stress Class for this company is based on the following factors:

- 43% of trade experiences indicate slow payment(s) are present.
- Payment experiences exist for this firm which are greater than 60 days past due.
- Control age or date entered in D&B files indicates lower risk.
- Evidence of open suit(s) in D&B Database.
- D&B files indicate a net worth of $241,658,280.
- Change in Net Worth suggests lower risk of financial stress.
- Financial Statement is more than 12 months old.
- Change in Quick Ratio suggests lower risk of financial stress.

Notes:

- The Financial Stress Class indicates that this firm shares some of the same business and financial characteristics of other companies with this classification. It does not mean the firm will necessarily experience financial stress.

- The Incidence of Financial Stress shows the percentage of firms in a given Class that discontinued operations over the past year with loss to creditors. The Incidence of Financial Stress - National Average represents the national failure rate and is provided for comparative purposes.

- The Financial Stress National Percentile reflects the relative ranking of a company among all scorable companies in D&B's file.

- The Financial Stress Score offers a more precise measure of the level of risk than the Class and Percentile. It is especially helpful to customers using a scorecard approach to determining overall business

DZB001052

performance.

- All Financial Stress Class, Percentile, Score and Incidence
statistics are based on 2002.

===========================================================================
**Financial Stress Norms**

|  |  | National Percentile |
|---|---|---|
| Norms for Companies in the Same ... | | |
| - Region  (MIDDLE ATLANTIC) | | 60 |
| - Industry: GENERAL RETAIL | | 45 |
| - Employee Range (500+) | | 41 |
| - Years in Business Range (26+) | | 82 |
| - Subject Company | | 76 |

Key Comparisons
The subject company has a Financial Stress Percentile that shows:

- Lower risk than other companies in the same region.
- Lower risk than other companies in the same industry.
- Lower risk than other companies in the same employee size range.
- Higher risk than other companies with a comparable number of years in business.

===========================================================================
**Credit Score Summary**

The Credit Score Class predicts the likelihood of a firm paying in a severely delinquent manner (90+ Days Past Terms) over the next twelve months.  It was calculated using statistically valid models and the most recent payment information in D&B's files.

Credit Score Class:                       3

Incidence of Delinquent Payment Among
Companies with this Classification:       12.30%

Percentile:                               36

The Credit Score Class for this company is based on the following factors:

- Payment experiences exist for this firm which are greater than 60 days past due.
- 43% of trade experiences indicate slow payment(s) are present.
- Control age or date entered in D&B files indicates lower risk.
- Evidence of open Suit(s) in the D&B database.
- D&B files indicate a net worth of $241,658,280.
- Business does not own facilities.
- Quick ratio is 0.5.

Notes:

- The Incidence of Delinquent Payment is the percentage of companies with this classification that were reported 90 days past due or more by creditors. The calculation of this value is based on an inquiry weighted sample.

- The Percentile ranks this firm relative to other businesses. For example, a firm in the 80th percentile has a lower risk of paying in a severely delinquent manner than 79% of all scorable companies in D&B's files.

DZB001053

```
====================================================================
```
**Credit Score Norms**

|                                          | National Percentile |
|------------------------------------------|---------------------|
| Norms for Companies in the Same ...      |                     |
| - Region  (MIDDLE ATLANTIC)              | 43                  |
| - Industry: GENERAL RETAIL               | 43                  |
| - Employee Range (500+)                  | 26                  |
| - Years in Business Range (26+)          | 70                  |
| - Subject Company                        | 36                  |

Key Comparisons
The subject company has a Credit Score Percentile that shows:

- Higher risk than other companies in the same region.
- Higher risk than other companies in the same industry.
- Lower risk than other companies in the same employee size range.
- Higher risk than other companies with a comparable number of years in
  business.

```
====================================================================
```
**Payment Trends**

PAYDEX scores below are based on dollar weighted trade in most recent 12 mos.

|       | '01 JUN | '01 SEP | '01 DEC | '02 MAR | '02 MAY | '02 JUN | '02 JUL | '02 AUG | '02 SEP | '02 OCT | '02 NOV | '02 DEC | '03 JAN | '03 FEB | '03 MAR | '03 APR |
|-------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| FIRM  | 71 | 72 | 69 | 69 | 69 | 70 | 71 | 70 | 71 | 70 | 70 | 69 | 69 | 71 | 71 | 70 |

Industry
Quartiles
----------

| | '01 JUN | '01 SEP | '01 DEC | '02 MAR | '02 MAY | | '02 JUL | | '02 SEP | | '02 NOV | | '03 JAN | | '03 MAR | |
|-------|----|----|----|----|----|--|----|--|----|--|----|--|----|--|----|--|
| Upper  | 76 | 76 | 76 | 77 | 77 | | 77 | | 77 | | 77 | | | | | |
| Median | 73 | 72 | 72 | 72 | 73 | | 73 | | 74 | | 74 | | | | | |
| Lower  | 68 | 69 | 68 | 68 | 69 | | 69 | | 68 | | 68 | | | | | |

|                              |                           |
|------------------------------|---------------------------|
| Industry PAYDEX based on:    | KEY TO PAYDEX SCORES:     |
| SIC:  5311                   | 77   5 Days Beyond Terms  |
| 87 Firms                     | 73  11 Days Beyond Terms  |
|                              | 68  17 Days Beyond Terms  |

```
====================================================================
```
**Summary Of Payment Habits**

Dollar Range Comparisons:

| Suppliers That Extend Credit of... | Number of Experiences: | Total Amount | % of Dollars Within Terms |
|------------------------------------|------------------------|--------------|---------------------------|
|                                    | #                      | $            | %                         |
| OVER $100,000                      | 86                     | 62,100,000   | 64                        |
| $50,000 - 99,999                   | 21                     | 1,515,000    | 78                        |
| $15,000 - 49,999                   | 58                     | 1,420,000    | 73                        |
| $ 5,000 - 14,999                   | 58                     | 390,000      | 73                        |
| $ 1,000 -  4,999                   | 53                     | 101,000      | 65                        |
| Under 1,000                        | 99                     | 29,450       | 70                        |

```
====================================================================
```

DZB001054

**Payment Analysis By Industry**

There are 390 payment experiences in D&B's file for the most recent 12 months, with 263 experiences reported during the last three month period.

| | Total Recd # | Dollar Amount $ | Highest Credit $ | Within Terms | Slow 1-30 | Slow 31-60 | Slow 61-90 | Slow 91+ |
|---|---|---|---|---|---|---|---|---|
| | | | | --- % of dollar amount --- | | | | |
| Total in D&B's File | 390 | 66,809,950 | 8,000,000 | | | | | |
| **Industry** | | | | | | | | |
| Trucking non-local | 24 | 225,400 | 100,000 | 97 | 2 | 0 | 0 | 1 |
| Nonclassified | 22 | 2,065,850 | 900,000 | 30 | 46 | 0 | 1 | 23 |
| Whol homefurnishings | 13 | 136,500 | 95,000 | 93 | 7 | 0 | 0 | 0 |
| Short-trm busn credit | 12 | 23,302,000 | 8,000,000 | 69 | 30 | 1 | 0 | 0 |
| Mfg sporting goods | 11 | 692,000 | 300,000 | 47 | 50 | 0 | 0 | 3 |
| Mfg men's trousers | 8 | 4,320,250 | 2,000,000 | 40 | 60 | 0 | 0 | 0 |
| Whol nondurable goods | 8 | 182,850 | 100,000 | 100 | 0 | 0 | 0 | 0 |
| Electric services | 8 | 82,500 | 15,000 | 100 | 0 | 0 | 0 | 0 |
| Telephone communictns | 7 | 665,250 | 600,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg elect housewares | 6 | 2,745,250 | 2,000,000 | 58 | 6 | 36 | 0 | 0 |
| Mfg soap/detergents | 6 | 45,750 | 45,000 | 99 | 1 | 0 | 0 | 0 |
| Mfg women's underwear | 6 | 5,750 | 2,500 | 78 | 0 | 0 | 0 | 22 |
| Misc publishing | 6 | 1,350 | 1,000 | 63 | 37 | 0 | 0 | 0 |
| Mfg men's clothing | 5 | 3,707,500 | 2,000,000 | 43 | 31 | 19 | 7 | 0 |
| Mfg games/toys | 5 | 735,000 | 600,000 | 100 | 0 | 0 | 0 | 0 |
| Whol women/child wear | 5 | 392,750 | 300,000 | 99 | 1 | 0 | 0 | 0 |
| Mfg refrig/heat equip | 5 | 155,250 | 100,000 | 84 | 16 | 0 | 0 | 0 |
| Help supply service | 5 | 30,000 | 15,000 | 17 | 50 | 33 | 0 | 0 |
| Natural gas distrib | 5 | 20,300 | 15,000 | 63 | 0 | 0 | 0 | 37 |
| Civic/social assoc. | 5 | 27,500 | 7,500 | 100 | 0 | 0 | 0 | 0 |
| Gas transmission dist | 5 | 8,500 | 2,500 | 85 | 15 | 0 | 0 | 0 |
| Linen supply service | 5 | 1,850 | 1,000 | 84 | 16 | 0 | 0 | 0 |
| Lithographic printing | 4 | 1,101,100 | 800,000 | 100 | 0 | 0 | 0 | 0 |
| Knit underwear mill | 4 | 1,352,500 | 600,000 | 100 | 0 | 0 | 0 | 0 |
| Whol footwear | 4 | 1,095,000 | 500,000 | 31 | 69 | 0 | 0 | 0 |
| Mfg audio/video equip | 4 | 605,000 | 400,000 | 67 | 0 | 0 | 0 | 33 |
| Data processing svcs | 4 | 115,750 | 90,000 | 50 | 48 | 0 | 2 | 0 |
| Mfg silver/plate-ware | 4 | 58,250 | 55,000 | 49 | 51 | 0 | 0 | 0 |
| Radiotelephone commun | 4 | 6,300 | 5,000 | 21 | 79 | 0 | 0 | 0 |
| Whol electrical equip | 4 | 11,000 | 5,000 | 0 | 100 | 0 | 0 | 0 |
| Mfg industrial gases | 4 | 1,150 | 750 | 44 | 13 | 0 | 43 | 0 |
| Mfg women's dresses | 3 | 5,210,000 | 5,000,000 | 50 | 50 | 0 | 0 | 0 |
| Newspaper-print/publ | 3 | 2,205,000 | 2,000,000 | 100 | 0 | 0 | 0 | 0 |
| Ret shoes | 3 | 1,300,000 | 600,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg men's footwear | 3 | 1,100,000 | 600,000 | 68 | 32 | 0 | 0 | 0 |
| Mfg men's suits/coats | 3 | 700,000 | 400,000 | 71 | 29 | 0 | 0 | 0 |
| Truck rental/leasing | 3 | 220,050 | 200,000 | 0 | 100 | 0 | 0 | 0 |
| Whol jewelry | 3 | 267,500 | 200,000 | 97 | 0 | 0 | 3 | 0 |
| Mfg broadcastng equip | 3 | 231,000 | 200,000 | 50 | 44 | 0 | 6 | 0 |
| Mfg toiletries | 3 | 200,250 | 100,000 | 75 | 25 | 0 | 0 | 0 |
| Cotton broadwvn mill | 3 | 170,000 | 100,000 | 79 | 21 | 0 | 0 | 0 |
| Ret mail-order house | 3 | 190,750 | 95,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg hosiery | 3 | 72,500 | 55,000 | 57 | 43 | 0 | 0 | 0 |
| Whol service paper | 3 | 26,250 | 25,000 | 100 | 0 | 0 | 0 | 0 |
| Whol general grocery | 3 | 31,000 | 20,000 | 98 | 0 | 0 | 2 | 0 |
| Whol lumber/millwork | 3 | 5,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Coating/engrave svcs | 3 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Mfg home furniture | 2 | 1,000,500 | 1,000,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg misc footwear | 2 | 310,000 | 250,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg prsnl leather prd | 2 | 350,000 | 250,000 | 50 | 0 | 50 | 0 | 0 |
| Whol durable goods | 2 | 115,000 | 100,000 | 57 | 0 | 0 | 43 | 0 |
| Mfg costume jewelry | 2 | 82,500 | 75,000 | 100 | 0 | 0 | 0 | 0 |
| Whol appliances | 2 | 75,000 | 60,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg photograph equip | 2 | 41,000 | 40,000 | 51 | 49 | 0 | 0 | 0 |

DZB001055

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Whol flowers/supplies | 2 | 25,500 | 25,000 | 98 | 0 | 1 | 0 | 1 |
| Mfg millwork | 2 | 30,000 | 20,000 | 0 | 100 | 0 | 0 | 0 |
| Whol sporting goods | 2 | 25,000 | 20,000 | 20 | 0 | 0 | 0 | 80 |
| Mfg comp peripherals | 2 | 27,500 | 20,000 | 27 | 73 | 0 | 0 | 0 |
| Mfg misc products | 2 | 20,000 | 15,000 | 25 | 75 | 0 | 0 | 0 |
| Mfg converted paper | 2 | 15,000 | 10,000 | 67 | 33 | 0 | 0 | 0 |
| Mfg misc office eqpt | 2 | 7,750 | 7,500 | 3 | 97 | 0 | 0 | 0 |
| Whol plumb/hydronics | 2 | 1,050 | 1,000 | 0 | 98 | 0 | 0 | 2 |
| Mfg signs/ad specltys | 2 | 1,250 | 750 | 80 | 0 | 0 | 0 | 20 |
| Ret men's clothing | 1 | 1,000,000 | 1,000,000 | 50 | 50 | 0 | 0 | 0 |
| State commercial bank | 1 | 750,000 | 750,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg leather gloves | 1 | 600,000 | 600,000 | 100 | 0 | 0 | 0 | 0 |
| Ret jewelry | 1 | 500,000 | 500,000 | 100 | 0 | 0 | 0 | 0 |
| Aluminum foundry | 1 | 500,000 | 500,000 | 50 | 50 | 0 | 0 | 0 |
| Whol office equipment | 1 | 400,000 | 400,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg women's outerwear | 1 | 300,000 | 300,000 | 50 | 0 | 0 | 50 | 0 |
| Knit outerwear mill | 1 | 300,000 | 300,000 | 0 | 100 | 0 | 0 | 0 |
| Mfg house slippers | 1 | 300,000 | 300,000 | 50 | 0 | 50 | 0 | 0 |
| Mfg upholstered furn | 1 | 300,000 | 300,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg women's suit/coat | 1 | 300,000 | 300,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg home cook equipt | 1 | 300,000 | 300,000 | 50 | 50 | 0 | 0 | 0 |
| Facilities support | 1 | 250,000 | 250,000 | 100 | 0 | 0 | 0 | 0 |
| Misc investor | 1 | 200,000 | 200,000 | 100 | 0 | 0 | 0 | 0 |
| Motion picture dist. | 1 | 200,000 | 200,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg curtain/drapes | 1 | 200,000 | 200,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg carpets/rugs | 1 | 100,000 | 100,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg dry dairy product | 1 | 100,000 | 100,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg women's blouses | 1 | 100,000 | 100,000 | 50 | 50 | 0 | 0 | 0 |
| Whol medical equip | 1 | 100,000 | 100,000 | 50 | 50 | 0 | 0 | 0 |
| Wool broadwoven mill | 1 | 90,000 | 90,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg men's neckwear | 1 | 85,000 | 85,000 | 100 | 0 | 0 | 0 | 0 |
| Whol men's clothing | 1 | 65,000 | 65,000 | 50 | 0 | 50 | 0 | 0 |
| Street/hwy builder | 1 | 55,000 | 55,000 | 0 | 100 | 0 | 0 | 0 |
| Mfg press/blown glass | 1 | 45,000 | 45,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg misc plastic prdt | 1 | 40,000 | 40,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg robes/gowns | 1 | 40,000 | 40,000 | 100 | 0 | 0 | 0 | 0 |
| Paperboard mill | 1 | 40,000 | 40,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg china kitchenware | 1 | 40,000 | 40,000 | 0 | 50 | 0 | 50 | 0 |
| Whol furniture | 1 | 25,000 | 25,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg cocoa products | 1 | 25,000 | 25,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg laminated paper | 1 | 20,000 | 20,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg pin/button/fasten | 1 | 20,000 | 20,000 | 100 | 0 | 0 | 0 | 0 |
| Electrical contractor | 1 | 20,000 | 20,000 | 0 | 50 | 50 | 0 | 0 |
| Mfg jeweler materials | 1 | 20,000 | 20,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg textile goods | 1 | 20,000 | 20,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg canned seafood | 1 | 15,000 | 15,000 | 100 | 0 | 0 | 0 | 0 |
| Whol toys/hobbies | 1 | 15,000 | 15,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg misc wire prdts | 1 | 15,000 | 15,000 | 100 | 0 | 0 | 0 | 0 |
| Whol hardware | 1 | 10,000 | 10,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg motorcycles/bikes | 1 | 10,000 | 10,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg mixing fertilizer | 1 | 10,000 | 10,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg confectionery | 1 | 7,500 | 7,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg ceramic tile | 1 | 7,500 | 7,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg nonwoven fabrics | 1 | 5,000 | 5,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg wood home furn | 1 | 5,000 | 5,000 | 100 | 0 | 0 | 0 | 0 |
| Ret building material | 1 | 5,000 | 5,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg ophthalmic goods | 1 | 5,000 | 5,000 | 100 | 0 | 0 | 0 | 0 |
| Management consulting | 1 | 5,000 | 5,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg cookies/crackers | 1 | 5,000 | 5,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg men's underwear | 1 | 5,000 | 5,000 | 0 | 0 | 100 | 0 | 0 |
| Mfg corrugated boxes | 1 | 2,500 | 2,500 | 0 | 100 | 0 | 0 | 0 |
| Mfg manifold forms | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg shoes-rubber/plas | 1 | 2,500 | 2,500 | 0 | 0 | 0 | 50 | 50 |
| Ret-direct selling | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Whol plastic material | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg pottery products | 1 | 2,500 | 2,500 | 50 | 50 | 0 | 0 | 0 |
| Mfg pencils/art prdts | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |

DZB001056

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mfg nonwd office furn | 1 | 1,000 | 1,000 | 0 | 100 | 0 | 0 | 0 |
| Mfg power handtools | 1 | 1,000 | 1,000 | 0 | 0 | 0 | 100 | 0 |
| Mfg plane engine/part | 1 | 1,000 | 1,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg misc primary mtl | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg paint/allied prdt | 1 | 1,000 | 1,000 | 50 | 0 | 50 | 0 | 0 |
| Whol tires/tubes | 1 | 1,000 | 1,000 | 0 | 50 | 50 | 0 | 0 |
| Ret groceries | 1 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Books-print/publish | 1 | 500 | 500 | 0 | 0 | 0 | 0 | 100 |
| Lace/warp knit mill | 1 | 250 | 250 | 0 | 0 | 100 | 0 | 0 |
| Whol industrial suppl | 1 | 250 | 250 | 0 | 100 | 0 | 0 | 0 |
| Whol computers/softwr | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Ret camera supplies | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Mfg misc special mach | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Mfg snacks/chips | 1 | 250 | 250 | 50 | 50 | 0 | 0 | 0 |
| Management services | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Whol misc profsn eqpt | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Manmade broadwvn mill | 1 | 250 | 250 | 50 | 50 | 0 | 0 | 0 |
| Whol industrial equip | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| R.V./trailer rentals | 1 | 100 | 100 | 0 | 0 | 100 | 0 | 0 |
| Mfg cleaning products | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Mfg canned fruit/veg | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Air courier service | 1 | 50 | 50 | 100 | 0 | 0 | 0 | 0 |
| Misc general gov't | 1 | 50 | 50 | 100 | 0 | 0 | 0 | 0 |
| Whol electronic parts | 1 | 50 | 50 | 100 | 0 | 0 | 0 | 0 |

```
OTHER PAYMENT CATEGORIES:
Cash Experiences        0            0
Paying Record Unknown  10    1,254,500
Unfavorable Comments    0            0
Placed for Collection
  with D&B               0            0
  other                 0          N/A
```

Indications of slowness can be the result of disputes over merchandise, skipped invoices, etc.


=============================================================================
**Public Filings Summary**

The following data includes both open and closed filings found in
D&B's database on the subject company.

| Record Type | # | Most Recent Filing Date |
|---|---|---|
| Bankruptcy Proceedings | 0 | - |
| Judgments | 0 | - |
| Liens | 0 | - |
| Suits | 13 | 11/26/2002 |
| UCC's | 63 | 11/12/2002 |

=============================================================================
**Public Filings Detail**

        The following data is for information purposes only and is not the
        official record.  Certified copies can only be obtained from the
        official source.

------------------------------------------------------------------------------
        If it is indicated that there are defendants other than the
        report subject, the lawsuit may be an action to clear title
        to property and does not necessarily imply a claim for money
        against the subject.
------------------------------------------------------------------------------
                         * * * SUIT(S) * * *
------------------------------------------------------------------------------

DZB001057

```
CASE NO.: 021103791
PLAINTIFF:   WALKER, SIGNORA              STATUS: Pending
DEFENDANT:   BOSCOVS DEPARTMENT STORES INC,  DATE STATUS ATTAINED: 11/26/2002
             PHILADELPHIA, PA             DATE FILED:          11/26/2002
CAUSE:       2S PREMISES LIABILTY, SLIP/FALL  LATEST INFO RECEIVED: 02/11/2003
WHERE FILED: PHILADELPHIA COUNTY COMMON
             PLEAS COURT, PHILADELPHIA, PA
-----------------------------------------------------------------------------
CASE NO.: 2440C02
SUIT AMOUNT: IN EXCESS OF $100,000         STATUS: Pending
PLAINTIFF:   KAREN AND WILLIAM TROWBRIDGE  DATE STATUS ATTAINED: 03/22/2002
DEFENDANT:   BOSCOV S DEPARTMENT STORE,    DATE FILED:          03/22/2002
             WILKES BARRE, PA             LATEST INFO RECEIVED: 05/08/2002
WHERE FILED: LUZERNE COUNTY PROTHONOTARY,
             WILKES BARRE, PA
-----------------------------------------------------------------------------
CASE NO.: 2155C02
SUIT AMOUNT: LESS THAN $50,000             STATUS: Pending
PLAINTIFF:   MARTHA O KEANE                DATE STATUS ATTAINED: 03/13/2002
DEFENDANT:   BOSCOVS DEPT STORE, WILKES    DATE FILED:          03/13/2002
             BARRE, PA                     LATEST INFO RECEIVED: 04/08/2002
WHERE FILED: LUZERNE COUNTY PROTHONOTARY,
             WILKES BARRE, PA
-----------------------------------------------------------------------------
DOCKET NO.: 01-S-3895
PLAINTIFF:   MARY WEBSTER                  STATUS: Pending
             JAMES WEBSTER                 DATE STATUS ATTAINED: 08/22/2001
DEFENDANT:   BOSCOVS DEPARTMENT STORES,    DATE FILED:          08/22/2001
             INCORPORATED, HARRISBURG, PA  LATEST INFO COLLECTED: 03/26/2003
WHERE FILED: DAUPHIN COUNTY PROTHONOTARY,
             HARRISBURG, PA
-----------------------------------------------------------------------------
DOCKET NO.: 00 07720
PLAINTIFF:   REGINA MINNER                 STATUS: Pending
DEFENDANT:   BOSCOV'S DEPARTMENT STORE INC,  DATE STATUS ATTAINED: 12/04/2000
             BENSALEM, PA                  DATE FILED:          12/04/2000
             and OTHERS                    LATEST INFO COLLECTED: 03/26/2003
WHERE FILED: BUCKS COUNTY PROTHONOTARY,
             DOYLESTOWN, PA
-----------------------------------------------------------------------------
DOCKET NO.: 02207 JUL 00
PLAINTIFF:   EDWARD J ABRAM SR             STATUS: Pending
             HELEN R ABRAM                 DATE STATUS ATTAINED: 07/19/2000
DEFENDANT:   BOSCOVS DEPARTMENT STORE INC  DATE FILED:          07/19/2000
             and OTHERS                    LATEST INFO COLLECTED: 03/18/2003
WHERE FILED: PHILADELPHIA COUNTY COMMON
             PLEAS COURT, PHILADELPHIA, PA
-----------------------------------------------------------------------------
DOCKET NO.: 00-1382
PLAINTIFF:   IRMA DAVIDSON                 STATUS: Pending
DEFENDANT:   BOSCOV'S DEPARTMENT STORE     DATE STATUS ATTAINED: 07/10/2000
WHERE FILED: SCHUYLKILL COUNTY PROTHONOTARY,  DATE FILED:       07/10/2000
             POTTSVILLE, PA               LATEST INFO COLLECTED: 03/25/2003
-----------------------------------------------------------------------------
DOCKET NO.: 00-CL292
SUIT AMOUNT: $50,000                       STATUS: Pending
PLAINTIFF:   PEARL EVELYN NOLTE            DATE STATUS ATTAINED: 04/13/2000
DEFENDANT:   BOSCOV DEPARTMENT STORE,      DATE FILED:          04/13/2000
             JOHNSTOWN, PA                 LATEST INFO COLLECTED: 03/26/2003
WHERE FILED: ARLINGTON COUNTY CIRCUIT COURT,
             ARLINGTON, VA
-----------------------------------------------------------------------------
DOCKET NO.: 99-3271
PLAINTIFF:   $24,484-RAYMOND J CHESSA JR   STATUS: Pending
             $24,484-CATHERINE ANN CHESSA  DATE STATUS ATTAINED: 09/17/1999
DEFENDANT:   BOSCOV'S DEPARTMENT STORE INC  DATE FILED:         09/17/1999
             and OTHERS                    LATEST INFO COLLECTED: 03/26/2003
```

DZB001058

```
WHERE FILED: CAMBRIA COUNTY PROTHONOTARY,
             EBENSBURG, PA
--------------------------------------------------------------------------
DOCKET NO.: 10003 98 AD
PLAINTIFF:   KIM LUPPINO                  STATUS: Pending
             JOSEPH J. LUPPINO            DATE STATUS ATTAINED: 09/15/1998
DEFENDANT:   BOSCOVS DEPRTMENT STORES, INC.  DATE FILED:          09/15/1998
             and OTHERS                   LATEST INFO COLLECTED: 04/03/2003
WHERE FILED: BERKS COUNTY PROTHONOTARY,
             READING, PA
--------------------------------------------------------------------------
               * * * UCC FILING(S) * * *
--------------------------------------------------------------------------
COLLATERAL: All Accounts receivable and proceeds - All Account(s) and proceeds
            - All General intangibles(s) and proceeds - All Chattel paper and
            proceeds - All Contract rights and proceeds
FILING NO: 9965730                        DATE FILED:           12/07/1999
TYPE:      Original                       LATEST INFO RECEIVED: 12/27/1999
SEC. PARTY: L.I.D. LTD., NEW YORK, NY     FILED WITH: SECRETARY OF
DEBTOR:    BOSCOV DEPARTMENT STORES INC.,            STATE/UCC DIVISION,
           AS CONSIGNEE                              DE
--------------------------------------------------------------------------
COLLATERAL: All Accounts receivable and proceeds - All Account(s) and proceeds
            - All General intangibles(s) and proceeds - All Chattel paper and
            proceeds - All Contract rights and proceeds
FILING NO: 99245573                       DATE FILED:           12/07/1999
TYPE:      Original                       LATEST INFO RECEIVED: 12/28/1999
SEC. PARTY: L.I.D. LTD., NEW YORK, NY     FILED WITH: SECRETARY OF
DEBTOR:    BOSCOV'S DEPARTMENT STORES INC.           STATE/UCC DIVISION,
                                                     NY
--------------------------------------------------------------------------
COLLATERAL: Inventory including proceeds and products - Account(s) including
            proceeds and products - General intangibles(s) including proceeds
            and products - Contract rights including proceeds and products -
            Chattel paper including proceeds and products
FILING NO: 00000181043599                 DATE FILED:           04/24/2000
TYPE:      Original                       LATEST INFO RECEIVED: 06/20/2000
SEC. PARTY: BOSCOV'S RECEIVABLES FINANCE  FILED WITH: SECRETARY OF
           CORP., WILMINGTON, DE                     STATE/DEPARTMENT OF
ASSIGNEE:  THE BANK OF NEW YORK (DELAWARE),          ASSESSMENT AND
           AS TRUSTEE, NEW YORK, NY                  TAXATION/UCC DIVISION
DEBTOR:    BOSCOV'S DEPARTMENT STORE, LLC.           MD
--------------------------------------------------------------------------
COLLATERAL: Accounts receivable and proceeds - Account(s) and proceeds -
            General intangibles(s) and proceeds - Chattel paper and proceeds -
            and OTHERS
FILING NO: 00000181029321                 DATE FILED:           12/09/1999
TYPE:      Original                       LATEST INFO RECEIVED: 02/16/2000
SEC. PARTY: L.I.D. LTD., NEW YORK, NY     FILED WITH: SECRETARY OF
DEBTOR:    BOSCOV'S DEPARTMENT STORES INC.           STATE/DEPARTMENT OF
                                                     ASSESSMENT AND
                                                     TAXATION/UCC DIVISION
                                                     MD
--------------------------------------------------------------------------
COLLATERAL: Accounts receivable and proceeds - Account(s) and proceeds -
            General intangibles(s) and proceeds - Chattel paper and proceeds -
            and OTHERS
FILING NO: 1944B92                        DATE FILED:           12/07/1999
TYPE:      Original                       LATEST INFO RECEIVED: 01/03/2000
SEC. PARTY: L.I.D. LTD., NEW YORK, NY     FILED WITH: SECRETARY OF
DEBTOR:    BOSCOV'S DEPARTMENT STORES INC.           STATE/UCC DIVISION,
                                                     NJ
--------------------------------------------------------------------------
COLLATERAL: Accounts receivable and proceeds - Account(s) and proceeds -
            General intangibles(s) and proceeds - Chattel paper and proceeds -
            and OTHERS
FILING NO: 31020071                       DATE FILED:           12/07/1999
```

APR-10-2003  12:24                                                                    P.24/28

```
TYPE:        Original                    LATEST INFO RECEIVED:  01/04/2000
SEC. PARTY:  LID LTD CONSIGNOR, NEW YORK, NY   FILED WITH: SECRETARY OF
DEBTOR:      BOSCOV'S DEPARTMENT STORES INC    STATE/UCC DIVISION,
                                               PA
```

This data is for informational purposes only and is not an official record.
Certified copies may be obtained from the Pennsylvania Department of State.
--------------------------------------------------------------------------

```
COLLATERAL:  All Account(s) including proceeds and products - All General
             intangibles(s) including proceeds and products - All Contract
             rights including proceeds and products - All Chattel paper
             including proceeds and products
FILING NO:   0024632                     DATE FILED:            04/25/2000
TYPE:        Original                    LATEST INFO RECEIVED:  05/11/2000
SEC. PARTY:  BOSCOV'S RECEIVABLES FINANCE  FILED WITH: SECRETARY OF
             CORP., WILMINGTON, DE          STATE/UCC DIVISION,
ASSIGNEE:    THE BANK OF NEW YORK (DELAWARE), DE
             AS TRUSTEE C/O THE BANK OF NEW
             YORK, NEW YORK, NY
DEBTOR:      BOSCOV'S DEPARTMENT STORE, LLC
             F/K/A BOSCOV'S DEPARTMENT STORE,
             INC.
```
--------------------------------------------------------------------------
```
COLLATERAL:  All Account(s) including proceeds and products - All General
             intangibles(s) including proceeds and products - All Contract
             rights including proceeds and products - All Chattel paper
             including proceeds and products
FILING NO:   00080033                    DATE FILED:            04/21/2000
TYPE:        Original                    LATEST INFO RECEIVED:  05/08/2000
SEC. PARTY:  BOSCOV'S RECEIVABLES FINANCE  FILED WITH: SECRETARY OF
             CORP., WILMINGTON, DE          STATE/UCC DIVISION,
ASSIGNEE:    THE BANK OF NEW YORK (DELAWARE), NY
             AS TRUSTEE C/O THE BANK OF NEW
             YORK, NEW YORK, NY
DEBTOR:      BOSCOE'S DEPARTMENT STORE, LLC,
             F/K/A BOSCOV'S DEPARTMENT STORE,
             INC.
```
--------------------------------------------------------------------------
```
COLLATERAL:  Account(s) including proceeds and products - General intangibles(s)
             including proceeds and products - Contract rights including
             proceeds and products - Chattel paper including proceeds and
             products
FILING NO:   36440147                    DATE FILED:            07/11/2002
TYPE:        Original                    LATEST INFO RECEIVED:  09/19/2002
ASSIGNEE:    BANK OF NEW YORK (DELAWRE) AS  FILED WITH: SECRETARY OF
             TRUSTEE THE, NEW YORK, NY      STATE/UCC DIVISION,
DEBTOR:      BOSCOV'S DEPARTMENT STORE LLC  PA
```

This data is for informational purposes only and is not an official record.
Certified copies may be obtained from the Pennsylvania Department of State.
--------------------------------------------------------------------------
```
COLLATERAL:  Account(s) including proceeds and products - General intangibles(s)
             including proceeds and products - Contract rights including
             proceeds and products - Chattel paper including proceeds and
             products
FILING NO:   1971372                     DATE FILED:            04/27/2000
TYPE:        Original                    LATEST INFO RECEIVED:  05/25/2000
SEC. PARTY:  BOSCOV'S RECEIVABLES FINANCE  FILED WITH: SECRETARY OF
             CORP., WILMINGTON, DE          STATE/UCC DIVISION,
ASSIGNEE:    THE BANK OF NEW YORK (DELAWARE), NJ
             AS TRUSTEE C/O THE BANK OF NEW
             YORK, NEW YORK, NY
DEBTOR:      BOSCOV'S DEPARTMENT STORE, LLC
             F/K/A BOSCOV'S DEPARTMENT STORE,
             INC.
```
--------------------------------------------------------------------------

There are additional suits, liens, or judgments in D&B'S
file on this company available by contacting 1-800-234-3867.

There are additional UCC's in D&B's file on this company
available by contacting 1-800-234-3867.

The public record items contained in this report may have been
paid, terminated, vacated or released prior to the date this
report was printed.

=================================================================
**Business Background**

<div align="center">HISTORY</div>

03/07/03
KENNETH S. LAKIN, CHB-CEO          ALBERT BOSCOV, SR VICE PRES
EDWIN A LAKIN, SR VICE PRES+       BURTON KRIEGER, PRESIDENT
DIRECTOR(S):  The officers identified by (+) and Alma Lakin and Eunice
Boscov.

     Authorized preferred consists of 10,000 shares Class A, 200,000
shares Class B and 20,000 shares Class C, all having a par value of
$100.
     Class A preferred stock is entitled to a 12% non cumulative
preferred dividend if declared, has voting rights and preference in
the event of liquidation.  Class B preferred stock is entitled to a
10-1/2% non cumulative preferred dividend if declared, has preference
in the event of liquidation second to the rights of Class A preferred
shareholders and is convertible into common stock at any time at the
option of the shareholder.  Class C preferred stock is entitled to a
6% cumulative preferred dividend if declared, has preference in the
event of liquidation after Class A and Class B preferred shareholders
and shall be subject to redemption at the discretion of the Company.
     OUTSTANDING CAPITAL STOCK:  At Jan 29 2000, there were 5,358
shares Class A preferred, 119,641 shares Class B preferred and 15,000
shares Class C preferred issued and outstanding with a stated valued
of $535,800, $11,964,100 and $1,500,000, respectively.  This company
was registered as a Limited Liability Company in the State of
Pennsylvania on March 31st, 2000; Status is Active; Registration ID
#2933725.
     BOSCOV'S DEPARTMENT STORE, LLC, was registered as a Limited
Liability Company in the State of PA on 03/31/2000; Status-Active;
Registration ID #2933725.
     Business started 1911 by Solomon Boscov.
     Solomon Boscov continued until 1932 when the business was turned
over to his wife, Ethel.  She operated individually, trading as
Boscov's Department Store, until present corporation was formed in
1960.
     100% of the outstanding capital stock is owned by the Boscov and
Lakin families.  Albert Boscov and Edwin A Lakin have been
stockholders of this company since 1960.
          ......MANAGEMENT BACKGROUND......
     KENNETH S LAKIN born 1954.  1988 to present active here.
     ALBERT BOSCOV born 1930.  Served in US Army 1951-1953.
1953-present here.
     EDWIN A LAKIN born 1923.  1946 Brooklyn College, BA.  1946-1948
attended New York University, Graduate School of Business.  He is a
certified public accountant.  1948-1950 self-employed as an
accountant.  1950-1956 employed by Julius Lefkowitz & Co, CPAs, New
York, NY.  1956-present here.
     BURTON KRIEGER born 1947.  1978 to present active here.
     ACQUISITIONS:  On Jan 31 1996, the Company entered into a
Combination Agreement with Ports of the World, Inc. (Ports).  Under
this agreement, the shareholders of Ports exchanged each of their
respective shares of Ports Class A and Class B common stock for shares
of the Company's common stock.
     AFFILIATED CONCERNS:  Through similarity of control, subject is

DZB001061

related to the following:
   (1)  Pike Distributors, Inc, Reading, PA.  Formed 1959.
Wholesales toys, sporting goods and jewelry.  Also owns some real
estate which is leased to Boscov's Department Store, Inc.

## OPERATIONS

03/07/03     Operates non-discount department stores (98%), retailing a
moderate-priced line of men's, women's, and children's clothing and
shoes, house furnishings, garden supplies and hardware, sporting
goods, toys, jewelry, appliances, confectionery, stationery, and other
department store items.  Also operates retail optical goods stores,
retailing eyeglasses and contact lenses and hearing aids (2%).
Sells for cash 46% balance revolving charge and major credit cards.
Sells to local trade.  Territory : Pennsylvania, New York, New Jersey,
Maryland and Delaware.
Season peaks pre-holidays.
   EMPLOYEES:  10,000 which includes officer(s).  850 employed here.
Part-time employees range between 5,750-6,750.
   FACILITIES:  Leases 200,000 sq. ft. in two story brick block
building. A retail store is located at headquarters. Has parking lot
for about 3,500 cars.
   LOCATION:  Commercial section on well traveled street.
   BRANCHES:  This business has multiple branches, detailed
branch/division information is available in Dun & Bradstreet's linkage
or family tree products.
   SUBSIDIARIES:  The Company has the four subsidiaries described
below:.
   (1)  Boscov's Vision Center Inc, Reading, PA (100%).  Formed
1975.  Operates retail optical goods stores.  No intercompany
relations.  This subsidiary merged with the parent company as of Jan
28, 2000.
   (2)  Boscov's Credit Corporation, Reading, PA (100%).  Delaware
corporation which became active Dec 1 1983.  Formerly purchased the
Company's receivables.  Became inactive Jan 1 1997.
   (3)  Boscov's Investment Corp, Reading, PA (100%).  Owns the
Company's trademarks.
   4) Boscov's Receivables Finance Corporation (Finance Corp).
Started 1996.  Finance Corp purchases primarily without recourse,
certain customer receivables of Boscov's Department Store, Inc.  Under
the agreement, Finance Corp charges the Company a discount on the
receivables purchased.  Regular settlements are made.

======================================================================
**Banking Relationships Reported**

03/03     Account maintained.

     May 2001:  The Company maintains a revolving credit facility with
a group of banks with borrowings available up to $160,000,000.  The
facility expires on Nov 29, 2002.  The outstanding principal of this
credit facility bears interest principally at the adjusted LIBOR rate
(6.09% at Jan 29 2000).  As of Feb 3 2001, the Company had
$118,201,997 available to draw upon, which is net of open letters of
credit.

======================================================================
**Financial Summary**

### KEY BUSINESS RATIOS

Based on a Financial Statement Dated February 2, 2002

(Industry Norms Based on 29 Establishments)

DZB001062

APR-10-2003  12:25                                                           P.27/28

| | Profitability & | | Short-Term Solvency | | Efficiency (%) | | Utilization (%) |
|---|---|---|---|---|---|---|---|
| | Return on Sales | Return on Net Worth | Curr Ratio | Quick Ratio | Assets/ Sales | Sales/ Net working Capital | Total Liabs/ Net Worth |
| Firm | UN | UN | 3.3 | 0.5 | 44.0 | UN | 82.0 |
| Industry Median | 1.0 | 4.4 | 2.3 | 0.3 | 56.0 | 5.0 | 149.3 |
| Industry Quartile | UN | UN | 1 | 2 | 2 | UN | 1 |

UN = Unavailable

## FINANCIAL INFORMATION

| 03/07/03 | Fiscal Consolidated Jan 29 2000 | Fiscal Consolidated Feb 3 2001 | Fiscal Consolidated Feb 2 2002 |
|---|---|---|---|
| Curr Assets | 277,572,014 | 290,408,362 | 293,035,399 |
| Curr Liabs | 83,617,143 | 86,773,126 | 88,250,837 |
| Current Ratio | 3.32 | 3.35 | 3.32 |
| Working Capital | 193,954,871 | 203,635,236 | 204,784,562 |
| Other Assets | 113,925,942 | 120,527,601 | 146,670,185 |
| Long Term Liabs | 87,142,639 | 90,727,894 | 109,796,467 |
| Worth | 220,738,174 | 233,434,943 | 241,658,280 |

Fiscal Consolidated statement dated FEB 02 2002:

| | | | | | |
|---|---|---|---|---|---|
| Cash | $ | 4,617,029 | Accts Pay | $ | 19,754,299 |
| Accts Rec | | 35,827,605 | Accruals | | 58,950,849 |
| Inventory | | 230,052,038 | L.T. Liab-(1yr) | | 6,864,269 |
| Due From Affiliated Companies | | 4,229,799 | Subordinated Debt | | 2,681,420 |
| Prepaid | | 18,308,928 | | | |
| | | --------------- | | | --------------- |
| Curr Assets | | 293,035,399 | Curr Liabs | | 88,250,837 |
| Fixt & Equip | | 139,847,588 | Subordinated Debt | | 2,895,977 |
| Investments-Other | | 6,822,597 | Deferred Income Taxes | | 9,996,084 |
| | | | L.T. Liab-Other | | 96,904,406 |
| | | | PREFERRED STOCK | | 13,999,900 |
| | | | ADDIT. PD.-IN CAP | | 41,580 |
| | | | RETAINED EARNINGS | | 227,616,800 |
| | | --------------- | | | --------------- |
| Total Assets | | 439,705,584 | Total | | 439,705,584 |

Prepared from statement(s) by Accountant: PricewaterhouseCoopers LLP, Philadelphia, PA.

ACCOUNTANTS OPINION: A review of the accountant's opinion indicates that the financial statement meets generally accepted accounting principles and the audit contains no qualifications.

--0--

Accounts receivable shown net less $2,901,611 allowance. Fixed assets shown net less $163,262,308 depreciation.

On MAR 07 2003 Cheryl Boyce, Executive Assistant, referred to the above figures as still representative.

===========================================================================
**Customer Service**
If you need any additional information, or have any questions regarding this report, please call our Customer Service Center at (800) 234-3867 from anywhere within the U.S. From outside the U.S., please call your local D&B office.
===========================================================================

DZB001063

APR-10-2003  12:25   P.28/28

*All credit information reported is for the headquarters only.
This report prepared and provided under the contract for the exclusive use of Jon Sabes,Opportunity Finance.
This report may not be reproduced in whole or in part by any means of reproduction.

DZB001064

# EXHIBIT T-44

DOCUMENT PRODUCED NATIVELY

DZB051979

**Opportunity Finance LLC**
Portfolio Data

*Today's* 12/31/2002

Added by
Trustee

| Deal No. | Note Principal | Issuance Date | Note Rate | Goods Cost | Approved Seller | Goods Sale Price | Gross Margin | Approved Buyer | Goods Description |
|---|---|---|---|---|---|---|---|---|---|
| #### | $ 2,400,000 | 1/25/02 | 2.50% | $ 2,449,207.45 | Universal | $ 2,816,486.21 | 13.04% | SAM'S | HP Electronics |
| #### | $ 2,000,000 | 1/25/02 | 2.50% | $ 2,111,532.75 | Nationwide | $ 2,428,028.40 | 13.04% | BOSCOV | Sony /Microsoft |
| #### | $ 2,200,000 | 1/25/02 | 2.50% | $ 2,255,287.50 | Nationwide | $ 2,593,566.56 | 13.04% | BJ'S | JVC Camcorder |
| #### | $ 4,300,000 | 2/4/02 | 2.50% | $ 4,421,665.60 | Nationwide | $ 5,084,915.44 | 13.04% | SAM'S | Pioneer HDTV |
| #### | $ 3,100,000 | 2/4/02 | 2.50% | $ 3,228,860.00 | Nationwide | $ 3,713,189.00 | 13.04% | BJ'S | Pionr HDTV/DVD |
| #### | $ 1,700,000 | 2/4/02 | 2.50% | $ 1,763,195.84 | Nationwide | $ 2,027,633.84 | 13.04% | BOSCOV | Delta Saw |
| #### | $ 1,400,000 | 2/4/02 | 2.50% | $ 1,451,600.00 | Nationwide | $ 1,669,340.00 | 13.04% | BJ'S | RCA TV |
| #### | $ 1,500,000 | 2/11/02 | 2.50% | $ 1,567,772.25 | Universal | $ 1,802,910.85 | 13.04% | REX | Philips TV |
| #### | $ 2,400,000 | 2/11/02 | 2.50% | $ 2,512,000.00 | Universal | $ 2,888,800.00 | 13.04% | BJ'S | Golf Sets |
| #### | $ 2,600,000 | 2/11/02 | 2.50% | $ 2,731,273.75 | Universal | $ 3,140,958.20 | 13.04% | SAM'S | Exercise Equip. |
| #### | $ 3,800,000 | 2/11/02 | 2.50% | $ 3,960,067.75 | Nationwide | $ 4,554,064.00 | 13.04% | BJ'S | Pnsc TV |
| #### | $ 3,300,000 | 2/11/02 | 2.50% | $ 3,467,357.95 | Nationwide | $ 3,987,436.90 | 13.04% | BOSCOV | Pnsc TV |
| #### | $ 1,300,000 | 2/11/02 | 2.50% | $ 1,355,387.25 | Nationwide | $ 1,558,693.30 | 13.04% | SAM'S | Sony TV |
| #### | $ 3,400,000 | 2/22/02 | 2.50% | $ 3,538,896.75 | Nationwide | $ 4,069,686.80 | 13.04% | SAM'S | BOSE DVD |
| #### | $ 3,700,000 | 2/22/02 | 2.50% | $ 3,854,418.00 | NATIONWIDE | $ 4,431,916.00 | 13.03% | SAM'S | SONY CAMCORDER |
| #### | $ 3,000,000 | 2/22/02 | 2.50% | $ 3,138,421.75 | NATIONWIDE | $ 3,609,173.35 | 13.04% | BJ'S | SONY TV |
| #### | $ 2,200,000 | 2/22/02 | 2.50% | $ 2,303,579.71 | NATIONWIDE | $ 2,639,431.36 | 12.72% | BOSCOV | LEATHER JACKETS |

**Opportunity Finance LLC**
Portfolio Data

*Today's* 12/31/2002

Added by
Trustee

| Deal No. | Note Principal | Issuance Date | Note Rate | Goods Cost | Approved Seller | Goods Sale Price | Gross Margin | Approved Buyer | Goods Description |
|---|---|---|---|---|---|---|---|---|---|
| #### | $ 1,700,000 | 2/22/02 | 2.50% | $ 1,834,113.09 | NATIONWIDE | $ 2,136,610.69 | 14.16% | BOSCOV | TV COMPUTER STANDS |
| #### | $ 3,000,000 | 2/28/02 | 2.50% | $ 3,126,339.75 | NATIONWIDE | $ 3,595,283.25 | 13.04% | SAM'S | RCA  TVs |
| #### | $ 2,500,000 | 2/28/02 | 2.50% | $ 2,609,062.50 | NATIONWIDE | $ 3,000,413.35 | 13.04% | SAM'S | JVC CAMCORDER |
| #### | $ 3,000,000 | 2/28/02 | 2.50% | $ 3,112,926.50 | PAR | $ 3,579,838.65 | 13.04% | BJ'S | WHIRLPOOL WASHER |
| #### | $ 2,300,000 | 3/6/02 | 2.50% | $ 2,420,927.50 | Universal | $ 2,784,055.25 | 13.04% | BOSCOV | PHILLIPS TV |
| 280 | $ 1,750,000 | 3/6/02 | 2.50% | $ 1,837,337.75 | Universal | $ 2,112,914.25 | 13.04% | BJ'S | Phillips TV |
| 281 | $ 2,000,000 | 3/8/02 | 2.50% | $ 2,100,821.85 | Nationwide | $ 2,415,870.20 | 13.04% | SAM'S | Bushnell |
| 282 | $ 3,600,000 | 3/8/02 | 2.50% | $ 3,802,467.50 | Nationwide | $ 4,372,804.95 | 13.04% | SAM'S | Denon Audio |
| 283 | $ 3,000,000 | 3/8/02 | 2.50% | $ 3,242,085.25 | Universal | $ 3,728,372.53 | 13.04% | BJ'S | Fitness Equipment |
| 284 | $ 4,000,000 | 3/13/02 | 2.50% | $ 4,210,353.50 | Nationwide | $ 4,841,886.30 | 13.04% | SAM'S | Sony TV |
| 285 | $ 3,500,000 | 3/13/02 | 2.50% | $ 3,605,198.00 | Nationwide | $ 4,145,975.45 | 13.04% | SAM'S | Toshiba TV |
| 286 | $ 2,600,000 | 3/13/02 | 2.50% | $ 2,712,827.50 | Nationwide | $ 3,119,749.50 | 13.04% | BJ'S | Toshiba TV |
| 287 | $ 1,700,000 | 3/13/02 | 2.50% | $ 1,812,750.00 | Universal | $ 2,084,662.50 | 13.04% | SAM'S | Canon Printer |
| 288 | $ 3,500,000 | 3/18/02 | 2.50% | $ 3,629,900.00 | Nationwide | $ 4,174,378.00 | 13.04% | REX | JVC Camera/Video |
| 289 | $ 3,100,000 | 3/26/02 | 2.50% | $ 3,209,900.00 | Nationwide | $ 3,691,385.00 | 13.04% | BOSCOV | Bose Ent. System |
| 290 | $ 3,600,000 | 3/26/02 | 2.50% | $ 3,676,125.00 | Nationwide | $ 4,227,543.75 | 13.04% | SAM'S | Hitachi TV |
| 291 | $ 3,300,000 | 3/26/02 | 2.50% | $ 3,424,429.25 | Nationwide | $ 3,938,081.90 | 13.04% | SAM'S | Pioneer Receiver |
| 292 | $ 3,500,000 | 4/1/02 | 2.50% | $ 3,623,894.25 | Nationwide | $ 4,167,476.35 | 13.04% | BJ'S | Bose Home Ent/DVD |

**Opportunity Finance LLC**
**Portfolio Data**

*Today's* 12/31/2002

Added by
Trustee

| Deal No. | Note Principal | Issuance Date | Note Rate | Goods Cost | Approved Seller | Goods Sale Price | Gross Margin | Approved Buyer | Goods Description |
|---|---|---|---|---|---|---|---|---|---|
| 293 | $ 3,400,000 | 4/1/02 | 2.50% | $ 3,506,584.50 | Nationwide | $ 4,032,551.29 | 13.04% | SAM'S | Panasonic Camcorder |
| 294 | $ 3,900,000 | 4/1/02 | 2.50% | $ 4,006,856.85 | Nationwide | $ 4,607,851.30 | 13.04% | SAM'S | Panasonic TV/DVD |
| 295 | $ 2,000,000 | 4/1/02 | 2.50% | $ 3,151,157.00 | Nationwide | $ 3,623,816.30 | 13.04% | BOSCOV | RCA TV |
| 296 | $ 1,700,000 | 4/11/02 | 2.50% | $ 1,789,565.25 | Nationwide | $ 2,057,906.65 | 13.04% | SAM'S | Panasonic Phone |
| 297 | $ 2,800,000 | 4/11/02 | 2.50% | $ 2,963,329.05 | Nationwide | $ 3,407,815.44 | 13.04% | BJ'S | Sony Camcorder |
| 298 | $ 3,600,000 | 4/11/02 | 2.50% | $ 3,732,379.40 | Universal | $ 4,292,190.21 | 13.04% | SAM'S | GE TV/Air Purifier |
| 299 | $ 4,600,000 | 4/26/02 | 2.50% | $ 4,770,339.65 | Par Group | $ 5,485,851.78 | 13.04% | SAM'S | Whirlpool & Frigidaire Applianc |
| 300 | $ 1,400,000 | 4/26/02 | 2.50% | $ 1,505,322.75 | Nationwide | $ 1,731,108.80 | 13.04% | SAM'S | Sony Personal Organizers |
| 301 | $ 2,800,000 | 4/26/02 | 2.50% | $ 2,945,799.10 | Universal | $ 3,407,710.00 | 13.55% | SAM'S | Wilson Golf Club Sets |
| 302 | $ 4,300,000 | 5/3/02 | 2.50% | $ 4,444,471.50 | Enchanted | $ 5,111,122.95 | 13.04% | Sam's | Polk & Yamaha Home Audio, Z |
| 303 | $ 1,700,000 | 5/3/02 | 2.50% | $ 1,786,500.00 | Enchanted | $ 2,054,475.00 | 13.04% | BJ's | Kitchenaid Mixers |
| 304 | $ 3,900,000 | 5/9/02 | 2.50% | $ 4,072,186.25 | Nationwide | $ 4,683,003.00 | 13.04% | Sam's | Hitachi TVs |
| 305 | $ 2,300,000 | 5/9/02 | 2.50% | $ 2,552,545.50 | Nationwide | $ 2,935,412.60 | 13.04% | BJ's | Panasonic Palmcorders |
| 306 | $ 1,200,000 | 5/9/02 | 2.50% | $ 1,232,968.75 | Enchanted | $ 1,417,880.45 | 13.04% | Rex | GE TVs |
| 307 | $ 3,100,000 | 5/9/02 | 2.50% | $ 3,259,126.50 | Enchanted | $ 3,747,968.10 | 13.04% | Boscov | Casio TV, Phillips TV, Pioneer I |
| 308 | $ 2,500,000 | 5/9/02 | 2.50% | $ 2,642,500.16 | Nationwide | $ 3,036,557.21 | 12.98% | Boscov | Assorted Shoes |
| 309 | $ 3,100,000 | 5/9/02 | 2.50% | $ 3,200,448.95 | Enchanted | $ 3,680,484.58 | 13.04% | Boscov | Sharp TVs |

**Opportunity Finance LLC**
**Portfolio Data**

*Today's* 12/31/2002

Added by
Trustee

| Deal No. | Note Principal | Issuance Date | Note Rate | Goods Cost | Approved Seller | Goods Sale Price | Gross Margin | Approved Buyer | Goods Description |
|---|---|---|---|---|---|---|---|---|---|
| 310 | $ 2,200,000 | 5/21/02 | 2.50% | $ 2,341,091.10 | Enchanted | $ 2,692,219.44 | 13.04% | BJ's | Alpine Auto CDs |
| 311 | $ 2,100,000 | 5/21/02 | 2.50% | $ 2,178,850.00 | Enchanted | $ 2,505,677.50 | 13.04% | BJ's | Mitsubishi TVs |
| 312 | $ 4,800,000 | 5/21/02 | 2.50% | $ 4,907,172.50 | Nationwide | $ 5,643,240.00 | 13.04% | Sam's | RCA TVs |
| 313 | $ 1,400,000 | 5/21/02 | 2.50% | $ 1,504,671.95 | 2nd Millennium | $ 1,730,223.80 | 13.04% | BJ's | Coleman Grills |
| 314 | $ 2,300,000 | 5/21/02 | 2.50% | $ 2,427,176.75 | Nationwide | $ 2,791,246.20 | 13.04% | Boscov | Canon Digital Cameras |
| 315 | $ 2,100,000 | 5/21/02 | 2.50% | $ 2,188,133.75 | Enchanted | $ 2,516,341.70 | 13.04% | Rex | Samsung TVs |
| 316 | $ 4,800,000 | 5/30/02 | 2.50% | $ 4,979,381.75 | Nationwide | $ 5,726,273.18 | 13.04% | BJ's | Sony TVs |
| 317 | $ 3,300,000 | 5/30/02 | 2.50% | $ 3,422,828.75 | Nationwide | $ 3,936,236.50 | 13.04% | Boscov | Sony Tvs |
| 318 | $ 4,600,000 | 5/30/02 | 2.50% | $ 4,741,036.50 | Enchanted | $ 5,452,150.34 | 13.04% | Sam's | Sharp TVs |
| 319 | $ 3,800,000 | 5/30/02 | 2.50% | $ 3,941,237.20 | Enchanted | $ 4,532,412.36 | 13.04% | Sam's | Panasonic TVs |
| 320 | $ 4,000,000 | 6/6/02 | 2.50% | $ 4,104,593.25 | Nationwide | $ 4,720,275.65 | 13.04% | Sam's | Bose Speakers & Home Audio |
| 321 | $ 3,700,000 | 6/6/02 | 2.50% | $ 3,818,673.00 | Nationwide | $ 4,391,447.14 | 13.04% | Sam's | Sony Camcorder |
| 322 | $ 2,200,000 | 6/6/02 | 2.50% | $ 2,303,378.75 | Nationwide | $ 2,648,869.00 | 13.04% | Boscov | Sony Camcorder |
| 323 | $ 4,400,000 | 6/6/02 | 2.50% | $ 4,589,297.00 | Enchanted | $ 5,094,101.16 | 9.91% | BJ's | Denon DVD & Home Audio |
| 324 | $ 3,500,000 | 6/17/02 | 2.50% | $ 3,618,461.25 | Enchanted | $ 4,161,213.60 | 13.04% | BJ's | Panasonic TV |
| 325 | $ 2,700,000 | 6/17/02 | 2.50% | $ 2,837,042.35 | Enchanted | $ 3,262,574.40 | 13.04% | Sam's | Zenith TV |
| 326 | $ 2,400,000 | 6/17/02 | 2.50% | $ 2,504,611.30 | Enchanted | $ 2,880,280.33 | 13.04% | BJ's | HP Scanner/Printer |
| 327 | $ 4,200,000 | 6/17/02 | 2.50% | $ 4,382,403.65 | Nationwide | $ 5,039,745.76 | 13.04% | Sam's | Sony TV |

**Opportunity Finance LLC**
Portfolio Data

*Today's* 12/31/2002

Added by
Trustee

| Deal No. | Note Principal | Issuance Date | Note Rate | Goods Cost | Approved Seller | Goods Sale Price | Gross Margin | Approved Buyer | Goods Description |
|---|---|---|---|---|---|---|---|---|---|
| 328 | $ 2,200,000 | 6/26/02 | 2.50% | $ 2,405,899.75 | Nationwide | $ 2,766,769.15 | 13.04% | BJ's | Sony Home Audio |
| 329 | $ 4,400,000 | 6/26/02 | 2.50% | $ 4,596,896.50 | 2nd Millennium | $ 5,286,416.65 | 13.04% | Sam's | Pioneer & Denon Audio |
| 330 | $ 3,700,000 | 6/26/02 | 2.50% | $ 3,965,755.00 | Enchanted | $ 4,560,595.94 | 13.04% | BJ's | Samsung TV&Camcorder |
| 331 | $ 5,100,000 | 7/2/02 | 2.50% | $ 5,227,057.50 | Nationwide | $ 6,011,092.70 | 13.04% | BJ's | RCA TV |
| 332 | $ 4,200,000 | 7/11/02 | 2.50% | $ 4,300,625.00 | Enchanted | $ 4,945,718.75 | 13.04% | Boscov | Mitsubishi TV |
| 333 | $ 1,750,000 | 7/11/02 | 2.50% | $ 1,828,875.00 | Enchanted | $ 2,103,206.25 | 13.04% | Rex | Mitsubishi TV |
| 334 | $ 4,850,000 | 7/11/02 | 2.50% | $ 4,978,966.25 | Nationwide | $ 5,725,792.50 | 13.04% | Sam's | RCA TV |
| 335 | $ 4,800,000 | 7/17/02 | 2.50% | $ 4,930,363.60 | Enchanted | $ 5,669,894.21 | 13.04% | Sam's | Whirlpool Refrigerators |
| 336 | $ 3,200,000 | 7/17/02 | 2.50% | $ 3,310,692.25 | 2nd Millennnium | $ 3,807,269.05 | 13.04% | Sam's | Harman Kardon DVD&Receiver |
| 337 | $ 3,400,000 | 7/17/02 | 2.50% | $ 3,533,873.75 | Nationwide | $ 4,063,921.50 | 13.04% | BJ's | Sony Camcorder, Printer, Came |
| 338 | $ 3,000,000 | 7/25/02 | 2.50% | $ 3,242,084.00 | 2nd Millennium | $ 3,728,389.60 | 13.04% | Sam's | Dewalt Tool |
| 339 | $ 3,900,000 | 7/25/02 | 2.50% | $ 4,211,333.50 | 2nd Millennium | $ 4,842,992.05 | 13.04% | Sam's | Generac Generator |
| 340 | $ 2,250,000 | 8/1/02 | 2.50% | $ 2,337,925.00 | Nationwide | $ 2,688,607.00 | 13.04% | Rex | Toshiba TV |
| 341 | $ 3,600,000 | 8/1/02 | 2.50% | $ 3,696,862.50 | Nationwide | $ 4,251,388.90 | 13.04% | Sam's | Hitatchi TV |
| 342 | $ 2,100,000 | 8/1/02 | 2.50% | $ 2,177,486.25 | Enchanted | $ 2,504,100.45 | 13.04% | Sam's | Yahama System |
| 343 | $ 3,100,000 | 8/5/02 | 2.50% | $ 3,200,526.50 | Nationwide | $ 3,680,589.69 | 13.04% | Sam's | JVC Camcorder |
| 344 | $ 2,600,000 | 8/7/02 | 2.50% | $ 2,687,742.50 | Nationwide | $ 3,090,894.30 | 13.04% | Boscov | Toshiba TV |

**Opportunity Finance LLC**
**Portfolio Data**

Today: 12/31/2002

Added by
Trustee

| Deal No. | Note Principal | Issuance Date | Note Rate | Goods Cost | Approved Seller | Goods Sale Price | Gross Margin | Approved Buyer | Goods Description |
|---|---|---|---|---|---|---|---|---|---|
| 345 | $ 2,800,000 | 8/7/02 | 2.50% | $ 2,878,307.50 | Nationwide | $ 3,309,972.60 | 13.04% | BJ's | Kitchenaid Appl. |
| 346 | $ 2,900,000 | 8/14/02 | 2.50% | $ 3,012,010.00 | Nationwide | $ 3,463,808.25 | 13.04% | Sam's | Sony TV |
| 347 | $ 2,300,000 | 8/14/02 | 2.50% | $ 2,410,996.50 | 2nd Millenium | $ 2,773,776.00 | 13.08% | Sam's | Palm Organizer |
| 348 | $ 2,100,000 | 8/14/02 | 2.50% | $ 3,108,162.50 | Nationwide | $ 3,574,371.15 | 13.04% | BJ's | Exercise Equip. |
| 349 | $ 5,500,000 | 8/21/02 | 2.50% | $ 5,663,376.25 | Enchanted | $ 6,512,864.40 | 13.04% | Sam's | Samsung TV |
| 350 | $ 3,900,000 | 8/22/02 | 2.50% | $ 3,987,967.50 | 2nd Millenium | $ 4,586,154.45 | 13.04% | Sam's | Sony System |
| 351 | $ 3,200,000 | 8/28/02 | 2.50% | $ 3,309,899.50 | Enchanted | $ 3,806,371.75 | 13.04% | Boscov | Panasonic TV |
| 352 | $ 3,600,000 | 8/28/02 | 2.50% | $ 3,675,021.00 | Enchanted | $ 4,226,245.85 | 13.04% | BJ's | Zenith TV |
| 353 | $ 4,400,000 | 8/28/02 | 2.50% | $ 4,500,610.00 | Nationwide | $ 5,175,687.35 | 13.04% | Sam's | Canon Camera/corder |
| 354 | $ 2,800,000 | 9/5/02 | 2.50% | $ 2,874,352.50 | 2nd Millenium | $ 3,305,490.80 | 13.04% | Sam's | JVC VCR/TV/CD |
| 355 | $ 5,200,000 | 9/5/02 | 2.50% | $ 5,322,951.00 | Nationwide | $ 6,121,373.34 | 13.04% | BJ's | RCA TV |
| 356 | $ 1,900,000 | 9/9/02 | 2.50% | $ 1,987,784.25 | Nationwide | $ 2,285,923.11 | 13.04% | Rex | Sony Home Audio & Video |
| 357 | $ 4,300,000 | 9/9/02 | 2.50% | $ 4,437,500.00 | 2nd Millennium | $ 5,103,125.00 | 13.04% | Sam's | Hitachi TV |
| 358 | $ 1,950,000 | 9/18/02 | 2.50% | $ 2,018,746.00 | Enchanted | $ 2,250,848.57 | 10.31% | Sam's | Sentry Safes |
| 359 | $ 4,800,000 | 9/18/02 | 2.50% | $ 4,903,794.50 | Enchanted | $ 5,639,359.60 | 13.04% | Sam's | Denon/Bose System |
| 360 | $ 1,950,000 | 9/18/02 | 2.50% | $ 2,017,753.70 | 2nd Millenium | $ 2,320,400.22 | 13.04% | Boscov | Pioneer System |
| 361 | $ 2,150,000 | 9/25/02 | 2.50% | $ 2,221,620.70 | Enchanted | $ 2,554,830.45 | 13.04% | Boscov | Audiovox Video/Monito |
| 362 | $ 2,550,000 | 9/25/02 | 2.50% | $ 2,645,850.00 | Nationwide | $ 3,042,727.50 | 13.04% | BJ's | T. Bahama Clothing |

DZB051979.XLS

**Opportunity Finance LLC**
**Portfolio Data**

*Today's* 12/31/2002

Added by
Trustee

| Deal No. | Note Principal | Issuance Date | Note Rate | Goods Cost | Approved Seller | Goods Sale Price | Gross Margin | Approved Buyer | Goods Description |
|---|---|---|---|---|---|---|---|---|---|
| 363 | $ 2,100,000 | 9/25/02 | 2.50% | $ 2,165,066.25 | Nationwide | $ 2,489,817.00 | 13.04% | Boscov | Toshiba TV |
| 364 | $ 4,850,000 | 9/25/02 | 2.50% | $ 4,953,233.75 | Nationwide | $ 5,696,202.40 | 13.04% | Sam's | Toshiba TV |
| 365 | $ 3,950,000 | 9/25/02 | 2.50% | $ 4,074,338.50 | Enchanted | $ 4,685,464.95 | 13.04% | Sam's | Sharp TV |
| 366 | $ 4,050,000 | 10/2/02 | 2.50% | $ 4,136,294.70 | 2nd Millenium | $ 4,756,738.91 | 13.04% | Sam's | Radio & Heasets |
| 367 | $ 2,400,000 | 10/2/02 | 2.50% | $ 2,543,030.00 | 2nd Millenium | $ 2,924,474.00 | 13.04% | Rex | Sony Digital Camera |
| | | | | Minimum Maximum Average | | | | | |
| Test #1 | $ - | | | $ - | | $ - | | SAM'S | SAM'S |
| Test #2 | $ - | | | $ - | | $ - | | BOSCOV | BOSCOV |
| Test #3 | $ - | | | $ - | | $ - | | REX | REX |
| Test #4 | $ - | | | $ - | | $ - | | BJ'S | BJ'S |
| Test #5 | $ - | | | $ - | | $ - | | COSTCO | COSTCO |
| **TOTAL** | $ 336,550,000 | | | ############# | | $404,505,432.14 | | | |

# EXHIBIT T-45

1          UNITED STATES BANKRUPTCY COURT
               DISTRICT OF MINNESOTA
2                 NO. 08-45257
3      IN RE: PETTERS COMPANY, INC., ET AL.
                    Debtors.
4

       (Includes:                    Court File Nos.
5      Petters Group Worldwide, LLC:    08-45258 (KHS)
       PC Funding, LLC:                 08-45326 (KHS)
6      Thousand Lakes, LLC;             08-45327 (KHS)
       SPF Funding, LLC;                08-45328 (KHS)
7      PL Ltd., Inc.:                   08-45329 (KHS)
       Edge One, LLC:                   08-45330 (KHS)
8      MGC Finance, Inc.:               08-45331 (KHS)
       PAC Funding, LLC:                08-45371 (KHS)
9      Palm Beach Finance Holdings, Inc.) 08-45392 (KHS)
       DOUGLAS A. KELLEY, in his capacity
10     As the Trustee of the PCI Liquidating Trust,
11                   Plaintiff,
12               V.
13     OPPORTUNITY FINANCE, LLC; OPPORTUNITY FINANCE
       SECURITIZATION, LLC; OPPORTUNITY FINANCE
14     SECURITIZATION II, LLC; OPPORTUNITY FINANCE
       SECURITIZATION, III, LC; INTERNATIONAL INVESTMENT
15     OPPORTUNITIES, LLC; SABES FAMILY FOUNDATION;
       SABES MINNESOTA LIMITED PARTNERSHIP;
16     ROBERT W. SABES; JANET F. SABES; JON R. SABES;
       STEVEN SABES; DEUTSCHE ZENTRALGENOSSENSCHAFT BANK
17     AG; AND THE MINNEAPOLIS FOUNDATION,
18                   Defendants.
19     --------------------------------------------------------
20          VIDEOTAPED DEPOSITION OF THOMAS PETTERS
              TAKEN ON BEHALF OF THE DEFENDANTS
21                  DECEMBER 11TH, 2018
                  LEAVENWORTH, KANSAS
22

23

24     Reported by: Mary Lynn Cushing, CSR #0677
25     Job No. 152529

Page 255

THOMAS PETTERS

1

2          Q.       And you were asked earlier today if DZ

3     Bank continued to finance transactions with PCB.  Do

4     you recall that?

5          A.       Yes.

6          Q.       And do you recall Mr. Preece

7     testifying about financing of PCB transactions at

8     trial?

9          A.       I think he said Polaroid, but it's

10    PCB.

11         Q.       And do you recall him saying that they

12    were able to look at the goods in the Polaroid

13    transaction?

14         A.       Yes.

15         Q.       And that was a distinction from the

16    PCI transaction?

17         A.       That is correct.

18         Q.       So that would be with respect to

19    Polaroid's transactions or PCB deals, they were able

20    to inspect the inventory, right?

21         A.       Right.  We owned Polaroid and we were

22    manufacturing Polaroid and you could walk in the

23    warehouse and look at it.

24         Q.       Do you recall testifying at your trial

25    that the diverting business is one that is filled

Page 256

1                       THOMAS PETTERS

2    with nonsensical excuses and stories?

3          A.      Saying what?

4          Q.      Nonsensical excuses and stories,

5    something along that line?

6          A.      I could have said that.

7          Q.      Okay.

8          A.      I don't remember.

9          Q.      Do you recall testifying that when

10   you're dealing with diversion transactions, every

11   transaction you would find out that something was

12   wrong with the transaction?

13         A.      Uh-huh.  I use to say there's always

14   hair on the deal.

15         Q.      And that often transactions wouldn't

16   ship when they said they were going to ship?

17         A.      That's exactly right.  That's how this

18   whole thing started.

19         Q.      And I think you -- do you recall

20   testifying that you were suppose to get brown, but

21   sometimes you would get green?

22         A.      Yes.

23         Q.      And sometimes it was suppose to be

24   eight inches and it would be 12 inches?

25         A.      I don't remember that, but it sounds

Page 257

1                          THOMAS PETTERS

2    like something --

3            Q.    And that people would send you bad

4    inventories or issue you bad checks?

5            A.    We were offered or sometimes -- our

6    own inventory was stolen twice from trailers.

7    Stolen, and somebody else would try to sell them to

8    us, our goods.

9            Q.    And so would you consider diversion or

10   diverting to be a very risky business?

11           A.    To be a what?

12           Q.    A very risky business.

13           A.    Yes.

14           Q.    One in which a lot of different things

15   could go wrong with the transaction?

16           A.    If you weren't doing it from front to

17   end yourself, I mean yourself, a singular person is

18   the way it started out, then I would say, yes, I see

19   that.  I don't know.  I'd have to rethink that.

20           Q.    Some things would often go wrong in

21   diversion transactions?

22           A.    Yes.

23           Q.    And sometimes goods would be

24   defective?

25           A.    Defective, not what they said when

1                          THOMAS PETTERS

2     they sealed the trailer, stolen, thievery, all kinds

3     of shortages.  It's not uncommon for electronic --

4     trucks full of electronics to have the seal cut and

5     try to --

6                 REPORTER:  I'm sorry, I didn't hear

7     what you said.  Have the seal cut and what?

8           A.     My apologies.

9                 REPORTER:  The doors.

10          A.     The seal cut on the truck.  They put

11    seals on the back of trucks when they closed the

12    doors.  We had every excuse in the world over the

13    years in the business of having no inventory in the

14    truck that was suppose to have inventory in the truck

15    to having stolen inventory to anything.

16          Q.     (By Mr. Loigman)  So it wouldn't be

17    possible to have thousands of diverting deals

18    including electronic deals and never have anything go

19    wrong, would it?

20          A.     No.

21          Q.     And it wouldn't be possible?

22          A.     Not in my life.

23          Q.     It wouldn't be possible to always have

24    the goods delivered perfectly as advertised, right?

25          A.     No.

1                    THOMAS PETTERS

2              MR. HAVELES:  Sorry, I didn't hear the

3   answer.

4        A.     I'm sorry, I said no.

5              MR. HAVELES:  Okay.

6        A.     I mean it happened.

7              MR. HAVELES:  No, I just didn't hear

8   the answer.

9        A.      No, it did happen, but you said would

10  it be all the time, no.

11       Q.     (By Mr. Loigman) And never have

12  defective goods or never have goods broken in

13  transit, that wouldn't be possible over thousands of

14  transactions?

15       A.     It all happens.

16       Q.     And so if a company financed hundreds

17  of deals with PCI, it would be implausible that there

18  would be no dilution or problems across any of those

19  deals?

20             MR. HAVELES:  Objection, foundation.

21       A.     I -- I would agree with that

22  consensus.

23       Q.     (By Mr. Loigman) And anybody who knew

24  anything about the diversion business would

25  understand that, right?

1                          THOMAS PETTERS

2                    MR. HAVELES:  Objection, foundation.

3           A.     I know about the diversion business

4     and my answer I'll give you is I would agree with

5     that 100 percent.

6           Q.     (By Mr. Loigman)  Now we spoke earlier

7     today about Deanna Munson, right?

8           A.     Yes.

9           Q.     And she was also known as Deanna

10    Coleman?

11          A.     Right.

12          Q.     And she was employed by PCI from about

13    1993 through 2008?

14          A.     Yes.

15          Q.     So that was for much of the company's

16    life?

17          A.     Yes.

18          Q.     And was she involved in the day-to-day

19    operations of the company for that entire time?

20          A.     Very much so.

21          Q.     Was she more involved in the

22    day-to-day operations of the company than you were?

23          A.     Was she more involved?

24          Q.     Yes.

25          A.     Oh, yes, yes, she can tell you that.

# EXHIBIT T-46

DOCUMENT PRODUCED NATIVELY

DZB051973

**Opportunity Finance LLC**
**Portfolio Data**
*Todays Da* 11/13/2019
Portfolio D

| | F | H | R | AB | AD | AH | Added by Trustee | AJ | AN |
|---|---|---|---|---|---|---|---|---|---|
| Deal No. | Note Principal | Issuance Date | Note Rate | Goods Cost | s Approved Seller | Goods Sale Price | Gross Margin | Approved Buyer | Goods Description |
| 258 | $ 2,400,000 | 1/25/2002 | 2.50% | $ 2,449,207 | Universal | $ 2,816,486 | 13.04% | SAM'S | HP Electronics |
| 259 | $ 2,000,000 | 1/25/2002 | 2.50% | $ 2,111,533 | Nationwide | $ 2,428,028 | 13.04% | BOSCOV | Sony /Microsoft |
| 260 | $ 2,200,000 | 1/25/2002 | 2.50% | $ 2,255,288 | Nationwide | $ 2,593,567 | 13.04% | BJ'S | JVC Camcorder |
| 261 | $ 4,300,000 | 2/4/2002 | 2.50% | $ 4,421,666 | Nationwide | $ 5,084,915 | 13.04% | SAM'S | Pioneer HDTV |
| 262 | $ 3,100,000 | 2/4/2002 | 2.50% | $ 3,228,860 | Nationwide | $ 3,713,189 | 13.04% | BJ'S | Pionr HDTV/DVI |
| 263 | $ 1,700,000 | 2/4/2002 | 2.50% | $ 1,763,196 | Nationwide | $ 2,027,634 | 13.04% | BOSCOV | Delta Saw |
| 264 | $ 1,400,000 | 2/4/2002 | 2.50% | $ 1,451,600 | Nationwide | $ 1,669,340 | 13.04% | BJ'S | RCA TV |
| 265 | $ 1,500,000 | 2/11/2002 | 2.50% | $ 1,567,772 | Universal | $ 1,802,911 | 13.04% | REX | Philips TV |
| 266 | $ 2,400,000 | 2/11/2002 | 2.50% | $ 2,512,000 | Universal | $ 2,888,800 | 13.04% | BJ'S | Golf Sets |
| 267 | $ 2,600,000 | 2/11/2002 | 2.50% | $ 2,731,274 | Universal | $ 3,140,958 | 13.04% | SAM'S | Exercise Equip. |
| 268 | $ 3,800,000 | 2/11/2002 | 2.50% | $ 3,960,068 | Nationwide | $ 4,554,064 | 13.04% | BJ'S | Pnsc TV |
| 269 | $ 3,300,000 | 2/11/2002 | 2.50% | $ 3,467,358 | Nationwide | $ 3,987,437 | 13.04% | BOSCOV | Pnsc TV |
| 270 | $ 1,300,000 | 2/11/2002 | 2.50% | $ 1,355,387 | Nationwide | $ 1,558,693 | 13.04% | SAM'S | Sony TV |
| 271 | $ 3,400,000 | 2/20/2002 | 2.50% | $ 3,538,897 | Nationwide | $ 4,069,687 | 13.04% | SAM'S | BOSE DVD |

| 272 | $ | 3,700,000 | 2/20/2002 | 2.50% | $ | 3,854,418 | NATIONWID | $ | 4,431,916 | 13.03% | SAM'S | SONY CAMCOF |
| 273 | $ | 3,000,000 | 2/20/2002 | 2.50% | $ | 3,138,422 | NATIONWID | $ | 3,138,422 | 0.00% | BJ'S | SONY TV |
| 274 | $ | 2,200,000 | 2/20/2002 | 2.50% | $ | 2,303,580 | NATIONWID | $ | 2,639,431 | 12.72% | BOSCOV | LEATHER JACK |
| 275 | $ | 1,700,000 | 2/20/2002 | 2.50% | $ | 1,834,113 | NATIONWID | $ | 2,136,611 | 14.16% | BOSCOV | TV COMPUTER |
| 276 | $ | 3,000,000 | 2/28/2002 | 2.50% | $ | 3,126,340 | NATIONWID | $ | 3,595,283 | 13.04% | SAM'S | RCA  TVs |
| 277 | $ | 2,500,000 | 2/28/2002 | 2.50% | $ | 2,609,063 | NATIONWID | $ | 3,000,413 | 13.04% | SAM'S | JVC CAMCORD |
| 278 | $ | 3,000,000 | 2/28/2002 | 2.50% | $ | 3,112,927 | PAR | $ | 3,579,839 | 13.04% | BJ'S | WHIRLPOOL W |
| 279 | $ | 2,300,000 | 3/6/2002 | 2.50% | $ | 2,420,928 | Universal | $ | 2,784,055 | 13.04% | BOSCOV | PHILLIPS TV |
| 280 | $ | 1,750,000 | 3/6/2002 | 2.50% | $ | 1,837,338 | Universal | $ | 2,122,914 | 13.45% | BJ'S | Phillips TV |
| 281 | $ | 2,000,000 | 3/8/2002 | 2.50% | $ | 2,100,822 | Nationwide | $ | 2,415,870 | 13.04% | SAM'S | Bushnell |
| 282 | $ | 3,600,000 | 3/8/2002 | 2.50% | $ | 3,802,468 | Nationwide | $ | 4,372,805 | 13.04% | SAM'S | Denon Audio |
| 283 | $ | 3,000,000 | 3/8/2002 | 2.50% | $ | 3,242,085 | Universal | $ | 3,728,373 | 13.04% | BJ'S | Fitness Equipme |
| 284 | $ | 4,000,000 | 3/13/2002 | 2.50% | $ | 4,210,354 | Nationwide | $ | 4,841,886 | 13.04% | SAM'S | Sony TV |
| 285 | $ | 3,500,000 | 3/13/2002 | 2.50% | $ | 3,605,198 | Nationwide | $ | 4,145,975 | 13.04% | SAM'S | Toshiba TV |
| 286 | $ | 2,600,000 | 3/13/2002 | 2.50% | $ | 2,712,828 | Nationwide | $ | 3,119,750 | 13.04% | BJ'S | Toshiba TV |
| 287 | $ | 1,700,000 | 3/13/2002 | 2.50% | $ | 1,812,750 | Universal | $ | 2,084,663 | 13.04% | SAM'S | Canon Printer |
| 288 | $ | 3,500,000 | 3/18/2002 | 2.50% | $ | 3,629,900 | Nationwide | $ | 4,174,378 | 13.04% | REX | JVC Camera/Vic |
| 289 | $ | 3,100,000 | 3/26/2002 | 2.50% | $ | 3,209,900 | Nationwide | $ | 3,691,385 | 13.04% | BOSCOV | Bose Ent. Syste |
| 290 | $ | 3,600,000 | 3/26/2002 | 2.50% | $ | 3,676,125 | Nationwide | $ | 4,227,544 | 13.04% | SAM'S | Hitachi TV |

| 291 | $ | 3,300,000 | 3/26/2002 | 2.50% | $ | 3,424,429 | Nationwide | $ | 3,938,082 | 13.04% | SAM'S | Pioneer Receive |
| 292 | $ | 3,500,000 | 4/1/2002 | 2.50% | $ | 3,623,894 | Nationwide | $ | 4,167,476 | 13.04% | BJ'S | Bose Home Ent |
| 293 | $ | 3,400,000 | 4/1/2002 | 2.50% | $ | 3,506,585 | Nationwide | $ | 4,032,551 | 13.04% | SAM'S | Panasonic Cam |
| 294 | $ | 3,900,000 | 4/1/2002 | 2.50% | $ | 4,006,857 | Nationwide | $ | 4,607,851 | 13.04% | SAM'S | Panasonic TV/D |
| 295 | $ | 2,000,000 | 4/1/2002 | 2.50% | $ | 3,151,157 | Nationwide | $ | 3,623,816 | 13.04% | BOSCOV | RCA TV |
| 296 | $ | 1,700,000 | 4/11/2002 | 2.50% | $ | 1,789,565 | Nationwide | $ | 2,057,907 | 13.04% | SAM'S | Panasonic Phon |
| 297 | $ | 2,800,000 | 4/11/2002 | 2.50% | $ | 2,963,329 | Nationwide | $ | 3,407,815 | 13.04% | BJ'S | Sony Camcorde |
| 298 | $ | 3,600,000 | 4/11/2002 | 2.50% | $ | 3,732,379 | Universal | $ | 4,292,190 | 13.04% | SAM'S | GE TV/Air Purifi |
| 299 | $ | 4,600,000 | 4/26/2002 | 2.50% | $ | 4,770,340 | Par Group | $ | 5,485,852 | 13.04% | SAM'S | Whirlpool & Frig |
| 300 | $ | 1,400,000 | 4/26/2002 | 2.50% | $ | 1,505,323 | Nationwide | $ | 1,731,109 | 13.04% | SAM'S | Sony Personal C |
| 301 | $ | 2,800,000 | 4/26/2002 | 2.50% | $ | 2,945,799 | Universal | $ | 3,407,710 | 13.55% | SAM'S | Wilson Golf Club |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| Test #1 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | SAM'S | 0 |
| Test #2 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | BOSCOV | 0 |
| Test #3 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | REX | 0 |
| Test #4 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | BJ'S | 0 |
| Test #5 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | COSTCO | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| 0 | $ | - | 1/0/1900 | 0.00% | $ | - | 0 | $ | - | 0 | 0 | 0 |
| **TOTAL** | $ 122,150,000 | | | | $ 128,473,317 | | | $ 147,319,582 | | | | |

# EXHIBIT T-46A

# Asset Securitization Group



Originator: Opportunity Finance, LLC
Borrower: Opportunity Finance Securitization, LLC
Account Officer: Patrick Preece
Report Date: January 31, 2002

**Compliance Worksheet**

| As of 01/31/02: | (✓) | Notes |
|---|---|---|
| **Borrowing Base:** | | |
| **Capital Limit** means at any time, an amount equal to the Net Eligible Receivables Balance plus the amount of Collections on deposit in the Collection Account.<br><br>A **Program Deficiency** exists if the Facility Amount exceeds the lesser of the Borrowing Limit and the Capital Amount.<br><br>Borrowing Limit: $100,000,000<br><br>**Capital Amount** = Net Eligible Receivables Balance and the amounts deposited in the Collection Account. | ✓ | As of 1/31/02:<br><br>Net Eligible Receivables Balance: $57,868,000.00<br>Collection Account Balance: $5,906,982.92<br><br>Capital Limit (Post Remittance Date Transfers): $63,580,800.86 (a)<br><br>Facility Amount: $59,901,931.75 (b)<br><br>Borrowing Base Surplus/(Deficiency): $3,678,869.11 (a – b)<br><br>*See Exhibit I (Monthly Remittance Report)* |
| • Face Value of CP not to exceed the amount available to be drawn under Liquidity/Credit Enhancement Facility. | ✓ | Face Value of CP as of 1/31/02: $60,095,000.00<br><br>Liquidity/Credit Enhancement Facility: $102,000,000 |
| • The Scheduled Purchase Commitment Termination Date has not occurred or extended.<br><br>➤ Extension must be requested no more than 90 days and no less than 30 days prior to each Liquidity Provider's Scheduled Purchase Commitment Termination Date. | ✓ | Scheduled Purchase Commitment Termination Date = 12/27/02 (DZ BANK).<br><br>* Extension must be requested not earlier than **9/27/02** and not later than **11/27/02.** |
| **Overconcentration Amounts:** | | |
| The sum of the Outstanding Principal Balances of all Eligible Receivables which are related to any one Level IV Approved Retailer at such time exceeds **5%** of the sum of the Outstanding Principal Balances of all Eligible Receivables.<br><br>* *Level IV Approved Retailer means an Approved Retailer whose debt rating is below Baa3/BBB- or no credit rating or any credit rating has been withdrawn or cancelled.* | ✓ | As of 1/31/02:<br><br>Approved Retailer(s): Rex Stores Corporation<br>Overconcentration Amount: $915,000.00<br><br>*See Exhibit 1 (Monthly Remittance Report) Schedule III* |
| The sum of the Outstanding Principal Balances of all Eligible Receivables which are related to any one Level III Approved Retailer at such time exceeds **10%** of the sum of the Outstanding Principal Balances of all Eligible Receivables.<br><br>* *Level III Approved Retailer means an Approved Retailer whose debt rating is below A2/A but greater than Baa3/BBB-.* | ✓ | As of 1/31/02:<br><br>Approved Retailer(s):<br>Overconcentration Amount: $0.00<br><br>*See Exhibit 1 (Monthly Remittance Report) Schedule III* |
| The sum of the Outstanding Principal Balances of all Eligible Receivables which are related to any one Level II Approved Retailer at such time exceeds **20%** of the sum of the Outstanding Principal Balances of all Eligible Receivables.<br><br>* *Level II Approved Retailer means an Approved Retailer whose debt rating is below Aa2/AA but greater than A2/A.* | ✓ | As of 1/31/02:<br><br>Approved Retailer(s):<br>Overconcentration Amount: $0 00<br><br>*See Exhibit 1 (Monthly Remittance Report) Schedule III* |
| The sum of the Outstanding Principal Balances of all Eligible Receivables which are related to any one Level 1 Approved Retailer at such time exceeds **25%** of the sum of the Outstanding Principal Balances of all Eligible Receivables.<br><br>* *Level 1 Approved Retailer means an Approved Retailer whose debt rating is Aa2/AA or better.* | ✓ | As of 1/31/02:<br><br>Approved Retailer(s):<br>Overconcentration Amount: $0.00<br><br>*See Exhibit 1 (Monthly Remittance Report) Schedule III* |

\\dznyfs\AssetSec\Surveillance\Opportunity Finance\Opportunity Finance Compliance Worksheet 1.31 02.doc



# Asset Securitization Group

Originator: Opportunity Finance, LLC
Borrower: Opportunity Finance Securitization, LLC
Account Officer: Patrick Preece
Report Date: January 31, 2002

**Compliance Worksheet**

| | ✓ | |
|---|---|---|
| The sum of the Outstanding Principal Balances of all Eligible Receivables related to any one **Special Concentration Approved Retailer** at such time exceeds the Special Concentration Limit.<br><br>Special Concentration Approved Retailer   Concentration Limit (%)<br>BJ's   22.5%<br>Costco   25.0%<br>Sam's Club   50.0%<br>Boscov's   15.0% | ✓ | As of 1/31/02:<br><br>Approved Retailer(s): Sam's Club<br>Overconcentration Amount: $6,450,000.00<br><br><br>*See Exhibit 1 (Monthly Remittance Report) Schedule III* |
| The sum of the Outstanding Principal Balances of all Eligible Receivables where the Approved Retailer is a **Government Entity** exceeds 2% of the Outstanding Principal Balance of all Eligible Receivables. | ✓ | As of 1/31/02:<br><br>Eligible Receivables of Government Entities: $0.00<br>Overconcentration Amount: $0.00<br><br>*See Exhibit 1 (Monthly Remittance Report) Schedule III* |
| The sum of the Outstanding Principal Balances of all Eligible Receivables where the **Approved Retailers** (other than Special Concentration Approved Retailers) whose Debt Rating is below **A3/A-** exceeds **20%** of the sum of the Outstanding Principal Balances of all Eligible Receivables. | ✓ | As of 1/31/02:<br><br>Eligible Receivables of Debt Rating below A3/A-: $4,900,000.00<br>Overconcentration Amount: $0.00<br><br>*See Exhibit 1 (Monthly Remittance Report) Schedule III* |
| **Minimum Opportunity Loan Coverage**<br><br>The Aggregate principal amount of all outstanding Eligible Retailer Receivables divided by the Outstanding Principal Balance of all Eligible Receivables must not be less than **111%**. | ✓ | As of 1/31/02:<br><br>(a) Aggregate principal amount of all outstanding Eligible Retailer Receivables: $99,348,661.45<br>(b) Outstanding Principal Balance of all Eligible Receivables: $79,700,000.00<br><br>Percentage: 124.65% (a)/(b)<br><br>Overconcentration Amount: $0.00<br><br>*See Exhibit 1 (Monthly Remittance Report) Schedule III* |
| **Maximum Inventory Stage Eligible Receivables**<br><br>The sum of the Outstanding Principal Balance of all Inventory Stage Eligible Receivables exceeds **30%** of the Outstanding Principal Balance of all Eligible Receivables | ✓ | As of 1/31/02:<br><br>(a) Outstanding Principal Balance of all Inventory Stage Receivables: $29,700,000.00<br>(b) Outstanding Principal Balance of all Eligible Receivables: $79,700,000.00<br><br>Percentage: 37.26% (a)/(b)<br><br>Overconcentration Amount: $5,790,000.00<br><br>*See Exhibit 1 (Monthly Remittance Report) Schedule III* |

**DZ BANK**

DZB009655

# Asset Securitization Group

Originator: Opportunity Finance, LLC
Borrower: Opportunity Finance Securitization, LLC
Account Officer: Patrick Preece
Report Date: January 31, 2002

## Compliance Worksheet

| | | |
|---|---|---|
| **Maximum Eligible Receivables Extended by Servicer**<br><br>The sum of the Outstanding Principal Balance of all Eligible Receivables with original terms of 120 days extended to 150 days exceeds **15%** of the Outstanding Principal Balance of all Eligible Receivables. | ✓ | As of 1/31/02:<br><br>(a) Outstanding Principal Balance of all Eligible Receivables w/ original terms of 120 days extended to 150 days: $0.00<br>(b) Outstanding Principal Balance of all Eligible Receivables: $79,700,000.00<br><br>Percentage: 0% (a)/(b)<br><br>Overconcentration Amount: $0.00<br><br>*See Exhibit 1 (Monthly Remittance Report) Schedule III* |
| **Eligible Receivables:** | | |
| Defaulted Receivable means any Receivable which is not paid in full, when due, in accordance with the Contract related thereto.<br><br>Receivable original term is generally 120 days but can be up to 150 days subject to certain concentration limits. | ✓ | No Defaulted Receivables to date. |
| **Defaulted Retailer Receivables:**<br><br>Any Retailer Receivable remains unpaid for ninety (**90**) or more days after the due date.<br><br>Any Retailer Receivable has been written off as a result of the occurrence of a Bankruptcy Event with respect to the Retailer obligated to pay such Retailer Receivable.<br><br>Any Retailer Receivable has been deemed uncollectible by the Servicer<br><br>Any Retailer Receivable has been repossessed. | ✓ | No Defaulted Retailer Receivables to date. |
| **Delinquent Retailer Receivables:**<br><br>Any Retailer Receivable that remains unpaid for sixty (60) or more days after the due dated therefor set forth in such Retailer Purchase Order. | ✓ | No Delinquent Retailer Receivables to date. |
| **Minimum Equity Test**<br><br>Opportunity Loan not to exceed 98% of the Purchase Price of the Subject Inventory.<br><br>This test applies to each receivable. | ✓ | Maximum Ratio: 98.19% (a)<br><br>Average Ratio: 95.03%<br><br>(a)   Note No. 112001-01 was issued 11/20/01 for $1,200,000.00, which was before the start of the Facility. This note was "grandfathered" into the program. There have been no other notes issued that have an advance rate higher than 98%. |
| **General & Financial Covenants: (Section 5.01 of the RLSA)** | | |
| • The Servicer shall at all times maintain a Tangible Net Worth in an amount which shall not be less than $12,000,000.00. | ✓ | Tangible Net Worth as of 1/31/02: $59,922,500.00 |
| **Events of Default: (Section 7.01 of the RLSA)** | | |
| • A Program Deficiency has occurred and has remained unremedied for **2** business days. | ✓ | No Program Deficiency exists. |
| • A Bankruptcy Event has occurred. | ✓ | No Bankruptcy Event has occurred to date. |

**DZ BANK**

DZB009656

# Asset Securitization Group

**Originator:** Opportunity Finance, LLC
**Borrower:** Opportunity Finance Securitization, LLC
**Account Officer:** Patrick Preece
**Report Date:** January 31, 2002

## Compliance Worksheet

| | | | |
|---|---|---|---|
| • | The occurrence of a Servicer Default. | ✓ | No Servicer Default exists. |
| • | The Borrower or Opportunity shall have suffered any material adverse change to its financial condition or operations. | ✓ | No material adverse change reported by the Borrower or Opportunity to date. |
| • | The Loan Purchase Agreement shall cease to be in full force and effect. | ✓ | Loan Purchase Agreement is in full force and effect. |
| • | The Tangible Net Worth of the Borrower is at any time less than $12,000,000.00 | ✓ | Tangible Net Worth as of 1/31/02: $23,208,584.50 |
| • | A Change of Control shall occur. | ✓ | No Change in Control has occurred to date. |
| **Reporting:** | | | |
| • | On the 5th day of every month, a Monthly Remittance Report. | ✓ | Monthly Remittance Report for January 2002 received – see attached Exhibit I. |
| • | On or before **January 15** of each year (beginning with January 15, 2003), an Officers Certificate. | ✓ | Next due: January 15, 2003 |
| • | On or before **March 31** of each year (beginning with March 31, 2003), an Accountants' Report, which is addressed to the Board of Directors of the Servicer, that states that the Independent Accountants have examined all reports of the Servicer during a 12 month period and that no errors were found. This report is to be done in accordance with generally accepted auditing standards. | ✓ | Next due:  March 31, 2003 |
| • | Within **45 days** after the end of each calendar quarter, a consolidated and consolidating balance sheet of Opportunity and its consolidated subsidiaries and shall be prepared in accordance with GAAP. | ✓ | Next due:  February 14, 2002 |
| • | Within **45 days** after the end of each calendar quarter, consolidated and consolidating statements of income, stockholders equity and cash flow of Opportunity and its consolidated subsidiaries prepared in accordance with GAAP. | ✓ | Next due:  February 14, 2002 |
| • | Within **120 days** after the end of each fiscal year, audited consolidated and consolidating statements of income, stockholders equity and cash flow of Opportunity and its consolidated subsidiaries (including the Borrower) prepared in accordance with GAAP. | ✓ | Next due:  April 30, 2002 |
| • | Within **120 days** after the end of each fiscal year, audited consolidated and consolidating statements of income, stockholders equity and cash flow of Opportunity and its consolidated subsidiaries (including the Borrower) prepared in accordance with GAAP. | ✓ | Next due:  April 30, 2002 |
| • | Within **120 days** after the end of each fiscal year, an audited balance sheet of the Borrower prepared in accordance with GAAP. | ✓ | Next due:  April 30, 2002 |
| • | Within **120 days** after the end of each fiscal year, audited statements of income, stockholders equity and cash flows of the Borrower prepared in accordance with GAAP. | ✓ | Next due: April 30, 2002 |
| • | Within **30 days** after the end of each month, a balance sheet of the Borrower prepared in accordance with GAAP. | ✓ | Next due: March 4, 2002 |
| • | Within **30 days** after the end of each month, statements of income, stockholders equity and cash flow of the Borrower prepared in accordance with GAAP. | ✓ | Next due: March 4, 2002 |

**DZ BANK**

DZB009657

# Asset Securitization Group

Originator: Opportunity Finance, LLC
Borrower: Opportunity Finance Securitization, LLC
Account Officer: Patrick Preece
Report Date: January 31, 2002

**Compliance Worksheet**

| | | | |
|---|---|---|---|
| • | Within **120 days** after the end of each fiscal year of each Approved Distributor and Approved Distributor SPV, copies of audited financial statements prepared in accordance with GAAP. | ✓ | Next due: April 30, 2002 |
| • | Within **45 days** after the end of each calendar quarter in each fiscal year of each Approved Distributor and Approved Distributor SPV, copies of the unaudited financial statements. | ✓ | Next due: February 14, 2002 |
| • | Within **30 days** after the end of each month of each Approved Distributor and Approved Distributor SPV, copies of the unaudited financial statements. | ✓ | Next due: March 4, 2002 |
| • | Prior to each Remittance Date, the Back-up Servicer shall deliver a certification letter certifying the accuracy of the Monthly Remittance Report. | ✓ | Next due: February 2002 |
| • | On a **quarterly basis**, an updated Dunn & Bradstreet report with respect to Boscov's and any other Approved Retailer whose stock is not publicly traded. | ✓ | Next due: April 2002 for 1Q02 |

Prepared By: _____
Date: _____

Reviewed By: _____
Date: _____

**DZ BANK**

DZB009658

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| Remittance Period: | January-02 | Borrowing Limit: | 100,000,000 |
|---|---|---|---|
| Remittance Date: | 11-Feb-02 | | |

**I.   Eligible Receivables**

| | | | |
|---|---|---|---|
| A. | Aggregate Outstanding Principal Balance ("OPB") of Pledged Receivables - beginning of Remittance Period | | |
| B. | plus:  Receivables Pledged during Remittance Period (see Schedule II, Item B.) | 95,900,000.00 | |
| C. | minus:  Collections allocable to principal (scheduled amortization, voluntary prepayments, servicer advances) | (16,200,000.00) | |
| D. | (+/-) Other Principal adjustments [Servicer to provide detail] | | |
| E. | OPB of Pledged Receivables - end of Remittance Period | 79,700,000.00 | |
| F. | minus:  OPB of Pledged Receivables that are Defaulted Receivables  (see Item L. below) | - | |
| G. | minus:  OPB of Pledged Receivables that are Ineligible Receivables - end of Remittance Period | - | |
| H. | OPB of Eligible Receivables Pledged to Lender - end of Remittance Period | | 79,700,000.00 |

**Defaulted Receivable Summary:**

| | | | |
|---|---|---|---|
| I. | OPB of Pledged Receivables that were Defaulted Receivables - beginning of Remittance Period | - | |
| J. | plus:  OPB of Receivables that became Defaulted during the Remittance Period | - | |
| K. | minus:  OPB of Defaulted Receivables repurchased or released in accordance with RLSA guidelines | - | |
| L. | Balance of Defaulted Receivables - end of current Remittance Period | - | |

**II.   Net Eligible Receivables Balance   (to be calculated w/o duplication of Concentration deductions)**

| | | | |
|---|---|---|---|
| A. | OPB of Eligible Receivables (Item I. H. above) | 79,700,000.00 | |
| B. | minus:  Overconcentration Amount (see Schedule III) | (7,365,000.00) | |
| C. | minus:  Excess Extended Term Receivable Amount (see Schedule III) | - | |
| D. | minus:  Aggregate Delinquent Retailer Excluded Amount (see Schedule III) | - | |
| E. | minus:  Excess Maximum Individual Loan Amount (see Schedule III) | - | |
| F. | Sub-total | 72,335,000.00 | |
| G. | Multiplied by: | 80.0% | |
| H. | Net Eligible Receivables Balance - end of current Remittance Period | | 57,868,000.00 |

**III.   Collection Account Activity**

| | | | |
|---|---|---|---|
| A. | Collection Account Balance - beginning of current Remittance Period: | - | |
| B. | plus:  Collections on Pledged Receivables: | | |
| | Principal collections | 16,200,000.00 | |
| | Interest & Fee Collections | 2,206,982.92 | |
| | Collections on Defaulted Receivables | - | |
| | Pre-payment proceeds on Pledged Receivables | - | |
| | Liquidation Proceeds | - | |
| | Payments under any insurance policies | - | |
| | Investment proceeds from amounts on deposit in the Collection Account | - | |
| | Other transfers into the Collection Account (provide detail) | - | |
| C. | minus:  Disbursements from the Collection Account in accordance with Section 2.05 of the RLSA: | | |
| | Amounts paid with respect to the Loans (Principal / Yield) | - | |
| | Remittance Date transfers in accordance with Section 2.05(c) of the RLSA | - | |
| | Release of Borrowing Base surplus to the Borrower | - | |
| | Reinvestment withdrawals in accordance with Section 2.05 (f) of the RLSA | (11,900,000.00) *reinvest* | |
| | Other transfers from the Collection Account (provide detail) | (600,000.00) | |
| D. | Collection Account Balance - end of current Remittance Period | | 5,906,982.92 |

**IV.   Capital Limit**

| | | | |
|---|---|---|---|
| A. | Net Eligible Receivables Balance (II. H. above) | 57,868,000.00 | |
| B. | plus:  amounts on deposit in the Collection Account (III. D. above) | 5,906,982.92 | |
| C. | Capital Limit - end of current Remittance Period | 63,774,982.92 | |
| D. | minus:  Remittance Date Transfers in accordance with Section 2.05 of the RLSA  (see Item VII. M.) | (194,182.06) | |
| E. | Capital Limit - Post Remittance Date Transfers | | 63,580,800.86 |

**V.   Program Deficiency Test**

| | | | |
|---|---|---|---|
| A. | Facility Amount - end of current Remittance Period  (see Schedule II) | 59,901,931.75 | |
| B. | Capital Limit - Post Remittance Date Transfers (Item IV. E. above) | 63,580,800.86 | |
| C. | Borrowing Limit | 100,000,000.00 | |
| D. | Program Deficiency [excess, if any, of V. A. over the lesser of V. B. and V. C.] | | - |
| E. | Face Value of CP Notes issued to fund Loans to the Borrower - end of Remittance Period  (see Schedule II) | 60,095,000.00 | |
| F. | Amount available to be drawn under Liquidity/Enhancement Facility | 102,000,000.00 | |
| G. | Face Value of CP exceeds amount available to be drawn under Liquidity/Credit Enhancement Facility ? | | No |

**VI.   Borrowing Base Surplus  [Excess of V. B. over V. A.]** | | | 5,678,869.11 |

**VII.   Remittance Date Transfers pursuant to Section 2.05(c) of the RLSA**

| | | | |
|---|---|---|---|
| A. | Post-Servicing transfer, to the Backup Servicer, the Backup Servicer's Fees (plus Transition Costs not already reimbursed) | - | |
| B. | To the Custodian, accrued and unpaid Custodian's Fees (plus reimburseable expenses) | 2,000.00 | (see Schedule I) |
| C. | To the Trustee, accrued and unpaid Trustee Fees (plus reimburseable expenses) | 1,076.50 | (see Schedule I) |
| D. | To the Backup Servicer, accrued and unpaid Backup Servicer Standby Fees | 1,000.00 | (see Schedule I) |
| E. | To the Facility Insurer, accrued and unpaid Premiums (prior to a Type I or Type II Default) | 10,244.44 | (see Schedule I) |
| F. | To the Agent for the Lender's account, Fees, Applicable Margin and Yield on Non-CP Rate Loans | 129,372.22 | (see Schedule I) |

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| Remittance Period: | January-02 | Borrowing Limit: | 100,000,000 |
|---|---|---|---|
| Remittance Date: | 11-Feb-02 | | |

| | | | |
|---|---|---|---|
| G | To the Agent for the Lender's account, the Borrowing Base Deficiency as of the Remittance Date | - | |
| H. | To the Agent for the Lender's account, all other obligations of the Borrower to the Lender, Agent or any Affected Party | - | |
| I. | To the Servicer (if Opportunity or an Affiliate), so long as no Program Deficiency would result, the Servicing Fee | 22,488.89 | (see Schedule I) |
| J. | After the occurrence of the EACD, to the Agent for the Lender's account, any amounts required to pay the Loans in full | - | |
| K. | To the Facility Insurer, an amount equal to the Accrued Liability on the Loans then due and payable | - | |
| L. | To the Borrower, any remaining amounts | - | |
| N. | Other Fees payable for the current Remittance Period (to US Bank - Closing Fees - see Sched.   / H.) | 19,000.00 | |
| M. | Total Remittance Date Transfers | 194,182.06 ✓ | |

**VIII. Early Amortization Events**

Pledged Receivables Aging:

| Days Outstanding | Outstanding Principal Balance | % of Total | Count | % of Total |
|---|---|---|---|---|
| 0 - 30 days | 26,900,000.00 | 33.75% | 9.00 | 30.00% |
| 31 - 60 days | 5,200,000.00 | 6.52% | 2.00 | 6.67% |
| 61 - 90 days | 29,600,000.00 | 37.14% | 12.00 | 40.00% |
| 91 - 120 days | 18,000,000.00 | 22.58% | 7.00 | 23.33% |
| 121 - 150 days | - | 0.00% | - | 0.00% |
| 150+ days | - | 0.00% | - | 0.00% |
| Totals | 79,700,000.00 ✓ | 100.00% | 30.00 | 100.00% |

Retailer Receivables Aging:

| Days Past Due | Outstanding Principal Balance | % of Total | Count | % of Total |
|---|---|---|---|---|
| 0 - 30 days | 99,348,861.45 | 100.00% | 30.00 | 100.00% |
| 30 - 60 days | - | 0.00% | - | 0.00% |
| 61 - 90 days | - | 0.00% | - | 0.00% |
| 90+ days | - | 0.00% | - | 0.00% |
| Totals | 99,348,861.45 ✓ | 100.00% | 30.00 ✓ | 100.00% |

**Default Percentage**

| | | |
|---|---|---|
| A. | Aggregate OPB of all Retailer Receivables that became Defaulted Retailer Receivables - current Remittance Period | - |
| B. | Aggregate amount of Collections on Defaulted Retailer Receivables - current Remittance Period | - |
| C. | Aggregate OPB of all Eligible Retailer Receivables as of the first day of the current Remittance Period | - |
| D. | Default Percentage - current Remittance Period | 0.00% |
| E. | Default Percentage - prior Remittance Period | 0.00% |
| F. | Default Percentage - second prior Remittance Period | 0.00% |
| G. | Three month-rolling average Default Percentage | 0.00% |
| H. | Limit | 5.00% |
| I. | Early Amortization Event ? | No ✓ |

**Dilution Percentage**

| | | |
|---|---|---|
| J. | Aggregate amount of Retailer Receivables that became Diluted Receivables - current Remittance Period | - |
| K. | OPB of all Eligible Retailer Receivables as of the first day of the current Remittance Period | - |
| L. | Dilution Percentage - current Remittance Period | 0.00% |
| M. | Dilution Percentage - prior Remittance Period | 0.00% |
| N. | Dilution Percentage - second prior Remittance Period | 0.00% |
| O. | Three month-rolling average Dilution Percentage | 0.00% |
| P. | Limit | 5.00% |
| Q. | Early Amortization Event ? | No ✓ |

| | | | |
|---|---|---|---|
| R | Facility Insurer Rating - Royal Indemnity Company | | |
| | Moody's | A1 ✓ | |
| | S&P | A+ ✓ | |
| | Fitch (if rated by Fitch) | AA- ✓ | *negative watch* |

| | | |
|---|---|---|
| S. | Is the Facility Insurer an Approved Facility Insurer ?<br>*(Must be rated 'A2' or higher by Moody's / 'A' or higher by S&P and 'A' or higher by Fitch (if rated by Fitch))* | Yes |
| T. | Other Early Amortization Event has occurred ?   (Servicer to provide detail) | No |

**IX. Events of Default**

| | | |
|---|---|---|
| A. | Program Deficiency has occurred ?   [see item V. D. above] | No |
| B. | Borrower Tangible Net Worth  (to be calculated in accordance with GAAP):  *as of 12/31/01* | |
| C. | Consolidated net worth of Borrower (including subordinated debt acceptable to Agent and Facility Insurer) | 26,150,565.29 |
| D. | Consolidated intangibles of Borrower (inc. goodwill, trademarks, copyrights, etc) | 2,941,980.79 |
| E. | Tangible Net Worth | 23,208,584.50 |
| F. | Minimum | 12,000,000 |
| G. | Event of Default ? | No |
| H. | Change in Control has occurred ? | No ✓ |
| I. | Either (i) the Facility Insurer has made a payment under the Facility Insurance Policy or (ii) a Facility Insurer Default<br>Type I or Type II has occurred ? | No ✓ |

DZB009660

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report*

| Remittance Period: | January-02 | Borrowing Limit: | 100,000,000 |
|---|---|---|---|
| Remittance Date: | 11-Feb-02 | | |

J.   Other Event of Default has occurred ?   (Servicer to provide detail)                          No

X.   **Servicer Default**

A.   Servicer Tangible Net Worth  *(to be calculated in accordance with GAAP):  *as of 12/31/01*
B.   Consolidated net worth of Servicer (including subordinated debt acceptable to Agent and Facility Insurer)     59,922,500.00
C.   Consolidated intangibles of Servicer (inc. goodwill, trademarks, copyrights, etc)     -
D.   Tangible Net Worth     59,922,500.00
E.   Minimum     12,000,000
F.   Servicer Default ?     No

G.   Event of Default has occurred ?     No

H.   Three month rolling average Default Percentage exceeds 5.0% ?     No

I.   Other Servicer Default has occurred ?   (Servicer to provide detail)     No

XI.   **Exclusivity**

A.   Subject Borrowers (other than an Opportunity Loan Borrower):          Loans Outstanding

| | Loans Outstanding |
|---|---|
| Redtag Finance, LLC | 1,062,500 00 |
| Subject Borrower #2 | |

B.   Aggregate Loans outstanding to all Subject Borrowers     1,062,500.00
C.   Maximum     45,000,000.00
D.   Exclusivity breached ?     No

The undersigned hereby represents and warrants that this report is a true and accurate accounting of the Pledged Receivables as of the date hereof, in accordance with the terms and conditions of the Receivables Loan and Security Agreement ("RLSA") dated as of December 28, 2001 among Opportunity Finance Securitization LLC as the Borrower, Opportunity Finance, LLC as the Servicer, Autobahn Funding Company LLC as a Lender, DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt AM Main as Agent and as Collateral Agent, Royal Indemnity Company as Facility Insurer and US Bank National Association as the Custodian and Backup Servicer, as may be amended and restated from time to time.

BY.          Opportunity Finance, LLC as Servicer

Name:

Title:          CEO

| ATTACHMENTS: | EXHIBIT I | FEE CALCULATIONS |
|---|---|---|
| | EXHIBIT II | FACILITY AMOUNT CALCULATION / COMMERCIAL PAPER ACTIVITY |
| | EXHIBIT III | CONCENTRATION ANALYSIS |
| | EXHIBIT IV | APPROVED DISTRIBUTOR / RETAILER STATUS |

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule I*
*Fee Calculations*

**A. Applicable Margin**

| | |
|---|---|
| Average Outstanding Principal Balance of Loans Outstanding to Borrower | 54,125,000.00 |
| Applicable Margin | 2.35% |
| Number of days during Remittance Period | 32 |

Yield Attributable to Applicable Margin:   113,061.11

**B. Non-Use Fees** (not applicable after the occurrence of the Early Amortization Commencement Date)

| | |
|---|---|
| Borrowing Limit (or average Borrowing Limit if applicable) | 100,000,000.00 |
| Average unused position | 45,875,000.00 |
| Non-Use Fee Rate | 0.40% |
| Number of days during Remittance Period | 32 |

Non-Use Fees:   16,311.11

Total Yield (Applicable Margin only) & Fees due Lender on Remittance Date   129,372.22

**C. Premium**

| | |
|---|---|
| Average Outstanding Principal Balance of Covered Loans | 54,125,000.00 |
| Premium Rate | 0.40% |
| Number of days during Remittance Period | 32 |

Premium Due Facility Insurer:   19,244.44

**D. Servicing Fee**

| | |
|---|---|
| Net Eligible Receivables Balance - first day of current Remittance Period | 50,600,000.00 |
| Servicing Fee Rate | 0.50% |
| Number of days during Remittance Period | 32 |

Servicing Fee:   22,488.89

**E. Backup Servicer Standby Fee**

| | |
|---|---|
| Net Eligible Receivables Balance - first day of current Remittance Period | 50,600,000.00 |
| Backup Servicer Standby Fee Rate | 0.02% |
| Number of days during Remittance Period | 32 |

Backup Servicer Standby Fee (subject to $1,000 floor):   1,000.00

**F. Custodian's Supplemental Fee** (pursuant to Collection Account Agreement)   1,076.50

**G. Custodian's Fees** (pursuant to Custodial Agreement)   2,000.00

**H. Other Fees payable for the current Remittance Period**(Servicer to provide detail)   19,000.00
* US Bank Closing Fees (Custodial Legal $5,500; Trustee $8,500; and Backup Servicer $5,000)

TOTAL APPLICABLE MARGIN & FEES PAYABLE - CURRENT REMITTANCE PERIOD   194,182.06

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule II*
*Facility Amount Calculation & Commercial Paper Activity*

**A. FACILITY AMOUNT [not including Yield attributable to Applicable Margin and Non-Use Fees]**

| | |
|---|---:|
| Face value of Commercial Paper Outstanding - end of Remittance Period | 60,095,000.00 |
| minus:  Discount scheduled to accrue thereon through stated maturity | (193,068.25) |
| plus:  Aggregate Loans Outstanding bearing interest at the Non-CP Rate | - |
| plus:  accrued Yield and Fees with respect to Loans bearing interest at the Non-CP Rate | - |
| **Facility Amount - end of Remittance Period** | **59,901,931.75** |

**B.**

| Date | OPB of Receivables Pledged ($) | OPB of Eligible Retailer Receivables | Coverage | COMMERCIAL PAPER (NOT FACE VALUE) | | | |
|---|---|---|---|---|---|---|---|
| | | | | Beginning | (+) Issuances | (-) Maturities | Ending |
| 12/31/2001 | 69,000,000.00 | 87,053,088.00 | 126.16% | - | 50,600,000.00 | - | 50,600,000.00 |
| 1/1/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/2/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/3/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/4/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/5/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/6/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/7/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/8/2002 | 4,000,000.00 | 5,168,350.39 | 129.21% | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/9/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/10/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/11/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/12/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/13/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/14/2002 | - | - | | 50,600,000.00 | - | - | 50,600,000.00 |
| 1/15/2002 | 10,200,000.00 | 12,353,342.90 | 121.11% | 50,600,000.00 | 3,900,000.00 | - | 54,500,000.00 |
| 1/16/2002 | - | - | | 54,500,000.00 | - | - | 54,500,000.00 |
| 1/17/2002 | - | - | | 54,500,000.00 | - | - | 54,500,000.00 |
| 1/18/2002 | - | - | | 54,500,000.00 | - | - | 54,500,000.00 |
| 1/19/2002 | - | - | | 54,500,000.00 | - | - | 54,500,000.00 |
| 1/20/2002 | - | - | | 54,500,000.00 | - | - | 54,500,000.00 |
| 1/21/2002 | - | - | | 54,500,000.00 | - | - | 54,500,000.00 |
| 1/22/2002 | 6,100,000.00 | 7,442,158.80 | 122.00% | 54,500,000.00 | 2,900,000.00 | - | 57,400,000.00 |
| 1/23/2002 | - | - | | 57,400,000.00 | - | - | 57,400,000.00 |
| 1/24/2002 | - | - | | 57,400,000.00 | - | - | 57,400,000.00 |
| 1/25/2002 | 6,600,000.00 | 7,838,081.26 | 118.76% | 57,400,000.00 | 2,500,000.00 | - | 59,900,000.00 |
| 1/26/2002 | - | - | | 59,900,000.00 | - | - | 59,900,000.00 |
| 1/27/2002 | - | - | | 59,900,000.00 | - | - | 59,900,000.00 |
| 1/28/2002 | - | - | | 59,900,000.00 | - | - | 59,900,000.00 |
| 1/29/2002 | - | - | | 59,900,000.00 | - | - | 59,900,000.00 |
| 1/30/2002 | - | - | | 59,900,000.00 | - | - | 59,900,000.00 |
| 1/31/2002 | - | - | | 59,900,000.00 | - | - | 59,900,000.00 |
| **Total** | 95,900,000.00 | 119,855,021.35 | | | 59,900,000.00 | - | |
| **Average** | | | | | | | 54,125,000.00 |

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

## Overconcentration Amounts

| Approved Retailer Limits: | Level IV | < Baa3/BBB- or NR | 5.00% |
|---|---|---|---|
| | Level III | < A2/A but <= Baa3/BBB- | 10.00% |
| | Level II | < Aa2/AA but <= A2/A | 20.00% |
| | Level I | >= Aa2/AA | 25.00% |

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | Type | Limit | Excess |
|---|---|---|---|---|---|---|---|
| Fleming | - | 0.00% | - | 0.00% | Level IV | 5.0% | - |
| Rex Stores Corporation | 4,900,000.00 | 6.15% | 5,974,155.98 | 6.01% | Level IV | 5.0% | 915,000.00 |
| **Totals** | **4,900,000.00** | **6.15%** | **5,974,155.98** | **6.01%** | | | **915,000.00** |

*79,700* *99,348,661.45*

## Special Concentration Approved Retailers

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | Limit | Excess |
|---|---|---|---|---|---|---|
| BJ's Wholesale Club | 17,300,000.00 | 21.71% | 21,027,275.91 | 21.17% | 22.5% | - |
| Costco | 0.00% | 0.00% | | 0.00% | 25.0% | - |
| Sam's Club | 46,300,000.00 | 58.09% | 58,445,069.84 | 58.83% | 50.0% | 6,450,000.00 |
| Boscov's | 11,200,000.00 | 14.05% | 13,902,159.72 | 13.99% | 15.0% | - |
| **Totals** | **74,800,000.00** | **93.85%** | **93,374,505.47** | **93.99%** | | **6,450,000.00** |

## Eligible Receivables secured by Retailer Receivables to Government Entities

| | |
|---|---|
| Eligible Receivables relating to Approved Retailers which are Government Entities | - |
| Outstanding Principal Balance of all Eligible Receivables | 79,700,000.00 |
| Percentage | 0.00% |
| Maximum % | 2.00% |
| Overconcentration | - |

## Eligible Receivables secured by Retailer Receivables from Approved Retailers with a Debt Rating below A3/A-
*Excludes Special Concentration Approved Retailers*

| | |
|---|---|
| Eligible Receivables relating to Approved Retailers with a Debt Rating of below A3/A- | 4,800,000.00 |
| Outstanding Principal Balance of all Eligible Receivables | 79,700,000.00 |
| Percentage | 6.15% |
| Maximum % | 20.00% |
| Overconcentration | - |

## Minimum Opportunity Loan Coverage Overconcentration

| | |
|---|---|
| Aggregate principal amount of all outstanding Eligible Retailer Receivables | 99,348,661.45 |
| Outstanding Principal Balance of all Eligible Receivables | 79,700,000.00 |
| Percentage | 124.65% |
| Minimum % | 111.11% |
| Overconcentration | - |

## Maximum Inventory Stage Eligible Receivables

| | |
|---|---|
| Subject Inventory Insurance Policy in full force and effect ? | Yes |
| Supplemental Inventory Insurance Policy in full force and effect ? | No |
| Outstanding Principal Balance of all Inventory Stage Eligible Receivables | 29,700,000.00 |
| Outstanding Principal Balance of all Eligible Receivables | 79,700,000.00 |
| Percentage | 0.37 |
| Maximum % | 30.00% |
| Overconcentration | 5,790,000.00 |

DZB009664

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

**Maximum Eligible Receivables Extended by Servicer**

| | |
|---|---:|
| Outstanding Principal Balance of all Eligible Receivables w/ original terms of 120 days extended to 150 days | - |
| Outstanding Principal Balance of all Eligible Receivables | 79,700,000.00 |
| Percentage | - |
| Maximum % | 15.00% |
| Overconcentration | - |

**TOTAL OVERCONCENTRATION AMOUNT (must be without duplication)**                    7,365,000.00  ✓
\* Does not include Over Concentration Amount for Maximum Inventory Stage Eligible Receivables

**Excess Extended Term Receivable Amount** (due more than 120 days but less than 151 days after date of Opportunity Loan)

| | |
|---|---:|
| Outstanding Principal Balance of all Eligible Receivables which are Extended Term Receivables | - |
| Outstanding Principal Balance of all Eligible Receivables | 79,700,000.00 |
| Percentage | 0.00% |
| Maximum % | 25.00% |
| Overconcentration | - |

DZB009665

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule III*
*Concentration Analysis*

**Delinquent Retailer Excluded Amount**

| Approved Retailer | Eligible Rec. Balance | % of Total | Eligible Retailer Rec. Balance | % of Total | # of Delinquent Retailer Rec. | Excluded Amount |
|---|---|---|---|---|---|---|
| Fleming | - | 0.00% | - | 0.00% | 0 | - |
| Rex Stores Corporation | 4,900,000.00 | 6.15% | 5,974,155.98 | 6.01% | 0 | - |
| BJ's Wholesale Club | 17,300,000.00 | 21.71% | 21,027,275.91 | 21.17% | 0 | - |
| Costco | - | 0.00% | - | 0.00% | 0 | - |
| Sam's Club | 46,300,000.00 | 58.09% | 58,445,069.84 | 58.83% | 0 | - |
| Boscov's | 11,200,000.00 | 14.05% | 13,902,159.72 | 13.99% | 0 | - |
| **Totals** | **79,700,000.00** | **100.00%** | **99,348,661.45** | **100.00%** | | **-** |

**Excess Maximum Individual Loan Amount**

| Eligible Receivable | Approved Retailer | Outstanding Principal Balance | Limit | Excess |
|---|---|---|---|---|
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| OF ID# | | - | 6,000,000.00 | - |
| **Totals** | | **-** | | **-** |

DZB009666

**OPPORTUNITY FINANCE SECURITIZATION LLC**
*Monthly Remittance Report - Schedule IV*
*Approved Distributor(s) & Approved Retailer(s) Status*

| Approved Distributor(s) | Net Income Most recent FQE (cannot be negative) | Tangible Net Worth | Minimum TNW | Financials Delivered as per 6.12(g)(i) and (ii) ? | MAC has occurred ? | Approved ? |
|---|---|---|---|---|---|---|
| Petters Company, Inc. | 6,507,437.69 | 54,064,733.06 | 30,000,000.00 | Yes | No | Yes |

| Approved Retailer(s) | Net Income Most recent FYE (cannot be negative) | Most recent FQE | Prior FQE (cannot be negative for two consecutive quarters) | Delinquent Retailer ? | MAC has occurred ? | Approved ? |
|---|---|---|---|---|---|---|
| Sam's Club (Wal-Mart) | $ 6,295,000,000 | $ 1,461,000,000 | $ 1,622,000,000 | No | No | Yes |
| BJ's Wholesale, Inc. | $ 131,501,000 | $ (33,464,000) | $ 36,497,000 | No | No | Yes |
| Boscov's Department Stores, Inc.  * | NA | NA | NA | No | No | Yes |
| Costco Wholesale Corp. | $ 602,089,000 | $ 129,656,000 | $ 200,182,000 | No | No | Yes |
| Fleming Companies, Inc. | $ (122,142,000) | $ 19,075,000 | $ (13,458,000) | No | No | No |
| Rex Stores Corporation | $ 18,736,000 | $ 4,438,000 | $ 3,870,000 | No | No | Yes |

| | Financial Stress Class | | Credit Score | |
|---|---|---|---|---|
| | Current Quarter End | Prior Quarter End | Current Quarter End | Prior Quarter End |
| Boscov's Department Stores, Inc. | 1 | 1 | 4 | 4 |

DZB009667

9:02 AM
02/19/02
Accrual Basis

# Opportunity Finance, LLC
# Balance Sheet
### As of December 31, 2001

|  | Dec 31, 01 |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Checking/Savings | |
| Opt Finance - Checking - 4888 | -48,196.53 |
| Sweep Acct - OF #12148144 | 47,730,605.88 |
| **Total Checking/Savings** | 47,682,409.35 |
| | |
| Accounts Receivable | |
| Redtag Biz Finance | 1,262,500.00 |
| **Total Accounts Receivable** | 1,262,500.00 |
| | |
| Other Current Assets | |
| Investment in Opp Fin Sec, LLC | 26,126,065.29 |
| MN - UCC account | 335.00 |
| Prepaid Interest | -4,785,095.00 |
| **Total Other Current Assets** | 21,341,305.29 |
| | |
| **Total Current Assets** | 70,286,214.64 |
| | |
| **TOTAL ASSETS** | 70,286,214.64 |
| | |
| **LIABILITIES & EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Credit Cards | |
| Visa - JRS | 7,137.43 |
| Visa - SFS | 4,077.21 |
| **Total Credit Cards** | 11,214.64 |
| | |
| Other Current Liabilities | |
| Other Investors - Variable | 9,690,000.00 |
| Series C Note Holders | 59,910,000.00 |
| Other | 662,500.00 |
| **Total Other Current Liabilities** | 70,262,500.00 |
| | |
| **Total Current Liabilities** | 70,273,714.64 |
| | |
| **Total Liabilities** | 70,273,714.64 |
| | |
| Equity | |
| Capital Stock | 12,500.00 |
| Opening Bal Equity | -112.30 |
| Net Income | 112.30 |
| **Total Equity** | 12,500.00    59,922,500.00 |
| | |
| **TOTAL LIABILITIES & EQUITY** | 70,286,214.64 |

Page 1 of 1

DZB009668

9:03 AM
02/19/02
Accrual Basis

# Opportunity Finance Securization, LLC
# Balance Sheet
### As of December 31, 2001

|  | Dec 31, 01 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| US Bank - SPV Opt Acct - 721 | 12,500.00 |
| **Total Checking/Savings** | 12,500.00 |
| | |
| **Accounts Receivable** | |
| Petters | 73,785,095.00 |
| **Total Accounts Receivable** | 73,785,095.00 |
| | |
| **Total Current Assets** | 73,797,595.00 |
| | |
| **Other Assets** | |
| Prepaid Closing Expenses | 2,941,980.79 |
| **Total Other Assets** | 2,941,980.79 |
| | |
| **TOTAL ASSETS** | 76,739,575.79 |
| | |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Due to DZ Bank | 50,601,010.50 |
| Due to Opportunity Fin.- Parent | -12,000.00 |
| **Total Other Current Liabilities** | 50,589,010.50 |
| | |
| **Total Current Liabilities** | 50,589,010.50 |
| | |
| **Total Liabilities** | 50,589,010.50 |
| | |
| **Equity** | |
| Opening Bal Equity | 0.00 |
| Opp Finance, LLC invest in SPV | 26,150,565.29 |
| **Total Equity** | 26,150,565.29 |
| | |
| **TOTAL LIABILITIES & EQUITY** | 76,739,575.79 |

DZB009669

**Opportunity Finance Securitization LLC**
Compliance Charts
January 31, 2002





DZB009670

**Opportunity Finance Securitization LLC**
Portfolio Data
DZ Summary - Originations

**Report Date:**        *1/31/02*

| Note No. | Issuance Date | Note Principal | Goods Cost | Loan as % of Cost of Goods | Receivable from Buyer | Loan as % of Rec. from Buyer | Approved Buyer | Goods Description | Days Outstanding |
|---|---|---|---|---|---|---|---|---|---|
| 010702-01 | 1/7/02 | $ 4,000,000 | 4,455,490.85 | 89.78% | $ 5,168,350.39 | 77.39% | SAM'S | Philips/Magix TV | 24.00 |
| 011502-01 | 1/15/02 | $ 2,400,000 | 2,518,455.00 | 95.30% | $ 2,920,028.95 | 82.19% | SAM'S | Pansnc TV,DVD | 16.00 |
| 011502-02 | 1/15/02 | $ 3,000,000 | 3,131,840.00 | 95.79% | $ 3,632,934.40 | 82.58% | SAM'S | Sony TV | 16.00 |
| 011502-03 | 1/15/02 | $ 4,800,000 | 5,000,337.25 | 95.99% | $ 5,800,379.55 | 82.75% | SAM'S | Panasonic TV | 16.00 |
| 012202-01 | 1/21/02 | $ 2,500,000 | 2,594,540.60 | 96.36% | $ 3,081,687.48 | 81.12% | BJ'S | Toshiba/Pioneer | 10.00 |
| 012202-02 | 1/21/02 | $ 3,600,000 | 3,759,027.00 | 95.77% | $ 4,360,471.32 | 82.56% | BOSCOV | Sony TV | 10.00 |
| 012502-01 | 1/25/02 | $ 2,400,000 | 2,449,207.45 | 97.99% | $ 2,816,486.21 | 85.21% | SAM'S | HP Electronics | 6.00 |
| 012502-02 | 1/25/02 | $ 2,000,000 | 2,111,532.75 | 94.72% | $ 2,428,028.40 | 82.37% | BOSCOV | Sony /Microsoft | 6.00 |
| 012502-03 | 1/25/02 | $ 2,200,000 | 2,255,287.50 | 97.55% | $ 2,593,566.56 | 84.83% | BJ'S | JVC Camcorder | 6.00 |
| **January Originations:** | | $ 26,900,000 | 28,275,718.40 | 95.47% | $ 32,801,933.26 | 82.33% | | | 12 |

**January Summary:**

| | |
|---|---|
| Total Note Principal Balance: | $ 26,900,000 |
| Number of Loans: | 9 |
| Average Outstanding Loan Balance: | $ 2,988,889 |
| Weighted Average Days Outstanding: | 12 days |
| Ratio of Unpaid Principal Balance of Cost of Goods Financed: | 95.47% |
| Ratio of Unpaid Principal Balance to Receivable from Buyer: | 82.33% |

DZB009671

# EXHIBIT T-47

Page 1

2              UNITED STATES BANKRUPTCY COURT

3                 DISTRICT OF MINNESOTA

4                    NO. 08-45257

     ------------------------------------------------x

5    In Re:  Petters Company, Inc., et al.,

6                         Debtors,

7    (Includes:                   Court File Nos.

     Petters Group Worldwide, LLC;    08-45258 (KHS)

8    PC Funding, LLC;                 08-45326 (KHS)

     Thousand Lakes, LLC;            08-45327 (KHS)

9    SPF Funding, LLC;               08-45328 (KHS)

     PL Ltd., Inc.;                  08-45329 (KHS)

10   Edge One LLC;                   08-45330 (KHS)

     MGC Finance, Inc.;              08-45331 (KHS)

11   PAC Funding, LLC;               08-45371 (KHS)

     Palm Beach Finance Holdings, Inc.) 08-45392 (KHS)

12   ------------------------------------------------x

     DOUGLAS A. KELLEY, in his capacity as the Trustee

13   of the PCI Liquidating Trust,

14                         Plaintiff,

15           vs.

16   OPPORTUNITY FINANCE, LLC, et al.,

17                         Defendants.

18   ------------------------------------------------x

19       VIDEOTAPED DEPOSITION OF BRUCE MILLER

20        New York, New York

21        Friday, October 4, 2019

22

23   Reported by:

24   Amy A. Rivera, CSR, RPR, CLR

25   JOB NO. 167332

BRUCE MILLER

1

2    MR. HAVELES:  Well, because there's

3    nothing in here suggesting that DZ Bank was

4    involved in negotiating a transaction.  It's

5    just describing it.

6    So how you characterized it as to what

7    it reflects as opposed to transactions that

8    were brought to it for financing.

9    MR. WALDMAN:  Okay.  And that's

10    helpful because that's not what I mean to

11    say.  Let me ask it a different way.

12    BY MR. WALDMAN:

13    Q.   Do these first two steps accurately

14    describe the part of the underlying transaction

15    that consisted of PCI's negotiation of the

16    purchase and sale of goods?

17    A.   Yes.

18    Q.   Okay.  And it's your understanding

19    that PCI claimed to negotiate with certain sellers

20    of goods and then to negotiate with certain buyers

21    of goods?

22    A.   Yes.

23    MR. WALDMAN:  Okay.  You can actually

24    put that aside for the moment, but I will

25    probably refer back to it, so...

# EXHIBIT T-48

Message
---

**From:**      Patrick Preece [CN=Patrick Preece/OU=Branch/OU=New York/O=DZ BANK]
**Sent:**      1/28/2003 5:52:14 PM
**To:**        Kenneth Bradt [CN=Kenneth Bradt/OU=Branch/OU=New York/O=DZ BANK@DZBANK]; Vincent Salerno [CN=Vincent Salerno/OU=Branch/OU=New York/O=DZ BANK@DZBANK]; Richard Wisniewski [CN=Richard Wisniewski/OU=Branch/OU=New York/O=DZ BANK]; Jennifer Wikoff [CN=Jennifer Wikoff/OU=Branch/OU=New York/O=DZ BANK@DZBANK]; Daniel Marino [CN=Daniel Marino/OU=Branch/OU=New York/O=DZ BANK@DZBANK]
**CC:**        Teresa Zariczny [CN=Teresa Zariczny/OU=Branch/OU=New York/O=DZ BANK@DZBANK]
**Subject:**   Opportunity Finance

The analysis from the paid receivables is as follows:

Largest single day's receipts:          $13.6 mio

Largest 7 day's receipts:                $28.7 mio

I would propose the following:

1)   Immediate electronic access to Petters Company's bank account
2)   Background check on Tom Petters in process (will ask for a rush)
3)   Daily review of payments received and the corresponding wire to Petters Funding account
4)   Require monthly financial statements versus quarterly, and switch the termination event from a quarterly Peters loss to a monthly (during the interim period)
5)   Give Opportunity Finance 120 days to put in place the fix we discussed (i.e. a bank stripping off DZ Bank's payments) Increase in pricing of 100 bps (or a 5% drop in advance rate) until the task is complete.   The drop in advance is probably the more prudent path because it immediately increases DZ Bank enhancement by $5.0 mio (it is also the most painful for Jon and likely to push him the quickest)

DZB056774

# EXHIBIT T-48A

## MEMORY TRANSMISSION REPORT

```
PAGE      : 001
TIME      : FEB-12-03  03:01PM
TEL NUMBER1: 212 745 1651
NAME      : DZ BANK - ASG
```

| | | |
|---|---|---|
| FILE NUMBER | : | 408 |
| DATE | : | FEB-12 02:57PM |
| TO | : ☎918882419378 |
| DOCUMENT PAGES | : | 013 |
| START TIME | : | FEB-12 02:57PM |
| END TIME | : | FEB-12 03:01PM |
| SENT PAGES | : | 013 |
| STATUS | : | OK |

FILE NUMBER    : 408          *** SUCCESSFUL TX NOTICE ***

# DZ BANK

### ASSET SECURITIZATION GROUP

#### FACSIMILE TRANSMITTAL SHEET

| TO:<br>Kelli Clayton | FROM:<br>Teresa Zariczny |
|---|---|
| COMPANY:<br>1st West | DATE:<br>Wednesday, February 12, 2003 |
| FAX NUMBER:<br>(888) 241-9378 | TOTAL NO. OF PAGES INCLUDING COVER:<br>13 |
| PHONE NUMBER:<br>(888) 803-9378 | SENDER'S PHONE NUMBER:<br>(212) 745-1663 |
| RE:<br>Background Release Information | SENDER'S FAX NUMBER:<br>(212) 745-1651 |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Kelli –

I am sending you authorization to begin performing Level 1 background check on Petters Company, Inc. located in Minnetonka, MN and the following individual.

The management team to be reviewed is:

Thomas J. Petters

DZ Bank would greatly appreciate it if you verified at least three of the professional references listed. If you have any questions or are having difficulty reading the fax, please contact me on 212-745-1663.

Regards,

Teresa Zariczny

*Teresa Zariczny*

609 FIFTH AVENUE, SUITE 911
NEW YORK, NY 10017

DZB000547

# DZ BANK

### ASSET SECURITIZATION GROUP

---

### FACSIMILE TRANSMITTAL SHEET

| TO | FROM |
|---|---|
| Kelli Clayton | Teresa Zariczny |
| **COMPANY** | **DATE** |
| 1st West | Wednesday, February 12, 2003 |
| **FAX NUMBER** | **TOTAL NO. OF PAGES INCLUDING COVER** |
| (888) 241-9378 | 13 |
| **PHONE NUMBER** | **SENDER'S PHONE NUMBER** |
| (888) 803-9378 | (212) 745-1663 |
| **RE.** | **SENDER'S FAX NUMBER** |
| Background Release Information | (212) 745-1651 |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS·

**Kelli -**

**I am sending you authorization to begin performing Level 1 background check on Petters
Company, Inc. located in Minnetonka, MN and the following individual.**

**The management team to be reviewed is:**

| Thomas J. Petters | Redacted - Confidential |
|---|---|

**DZ Bank would greatly appreciate it if you verified at least three of the professional references
listed. If you have any questions or are having difficulty reading the fax, please contact me on
212-745-1663.**

**Regards,**

**Teresa Zariczny**

*[signature]*

---

609 FIFTH AVENUE, SUITE 911
NEW YORK, NY 10017

DZB000548

FROM :FINGERHUT                952-936-5068              2003.02-12    11:23    #809 P.01/12

4400 Baker Road, Suite 200
Minnetonka, MN 55343
P) 952-974-8223 (Direct)
F) 952-832-3370 (General)
F) 952-975-4046 (Direct)
Email: debbie.lindstrom@redtag.com

## PETTERS COMPANY, INC.

# Fax

| To: _Teresa Brucony_ | From: Debbie Lindstrom |
|---|---|
| Fax: _212-745-1651_ | Pages: _12_ |
| Phone: | Date: _2-12-03_ |
| Re: | CC: |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

_Will also send via fed. ex._

_Debbie_

DZB000549

FROM :FINGERHUT                    952-935-5068                    2003,02-12    11:23    #809 P.02/12



**PETTERS**COMPANY, INC
4400 Baker Road, Suite 200
Minnetonka, MN 55343
952-934-9918 *(phone)*
952-975-2295 *(fax)*

February 12, 2003

Ms. Teresa Zariczny                    Via facsimile and Federal Express
DZ Bank
609 5th Avenue
7th Floor
New York, NY  10017-1021

Dear Teresa:

I am enclosing the documents on the background checks for Tom Petters.  Mr. Petters is requesting that you please give me a call at least one day prior to your making calls to the references he has listed.  This will allow me to call them and advise them that you will be calling and it is alright to release information to you.

You may reach me at 952.974.8223.  Thank you in advance for your cooperation.

Sincerely,

Debbie Lindstrom
Assistant to Tom Petters

Encl.

DZB000550

FROM :FINGERHUT                     952-936-5068                    2003.02-12     11:23     #809 P.03/12

## AUTHORITY TO RELEASE INFORMATION

To whom it may concern:

I hereby authorize any authorized representative of DZ Bank AG Deutsche Zentral-Genossenschaft ("DZ BANK") bearing this release, or copy thereof, within six months from the date below, to obtain any information in your files pertaining to my employment, military, credit or educational records including, but not limited to, criminal history, academic achievement, attendance, athletic, personal history, and disciplinary records, medical records, and credit records. I hereby direct you to release such information upon request to the bearer. This release is executed with full knowledge and understanding that the information is for the official use of DZ BANK. I hereby release you as the custodian of such records, and any school, college, university, or educational institution, consumer reporting agency, or retail business establishment including its officers, employees, or related personnel, both individually and collectively, from any and all liability for damages of whatever kind, which may at any time result to me, my heirs, family or associates because of compliance with the authorization and request to release information, or any attempt to comply with it. I am furnishing my Social Security Account Number on a voluntary basis with the understanding that it is not required by Federal statute or regulation. I have been advised DZ BANK will utilize this number only to facilitate the location of employment, military, credit and educational records and criminal records (if any) concerning me in connection with your application. Should there be any question as to the validity of this release, you may contact me as indicated below.

Full Name: _____          Date: 2-12-03
                (Your Signature)

Date of Birth: | Redacted - Confidential |          Social Security #: | Redacted - Confidential |

Current Address: 6429 Margarets Lane
Edina MN 55439

Employment History: (Last 10 years)
Note: You may provide the information requested below by attaching a resume or professional biography.

| Time Period | Employer | Location (Business Address) |
|---|---|---|
| | Petters Company, Inc | 4400 Baker Rd #200 Minnetonka, MN 55343 |
| | | |
| | | |
| | | |
| | | |
| | | |

Professional References (Five)

| Name | Title | Address | Phone Number |
|---|---|---|---|
| | | | |
| | See attached | | |
| | | | |
| | | | |
| | | | |

DZB000551

FROM :FINGERHUT          952-935-5068          2003.02-12    11:24    #809 P.04/12

**Personal References (Five)**

| Name | Title | Address | Phone Number |
|------|-------|---------|--------------|
|  |  |  |  |
|  |  |  |  |
|  | *See Attached* |  |  |
|  |  |  |  |
|  |  |  |  |

DZB000552

FROM :FINGERHUT  952-936-5068  2003,02-12  11:24  #809 P.05/12

## BUSINESS BACKGROUND QUESTIONNAIRE

1. Company Name: Petters Company, Inc

Principal place of business: 4400 Baker Rd, Ste 200

Are you conducting business using a DBA?  NO

If yes, provide DBA name:

Is the firm a corporation, a sole proprietorship or a partnership?  Corporation

When was the firm first organized?  1994

Have you conducted business under any other name?  Yes

If yes, please provide the firm's name, dates in business and reason(s) for the business ending or changing name.

| Firm Name | Dates in Business | Reason for ending or name change |
|---|---|---|
| S.P.E. | | |
| | | |
| | | |

2. Provide the dates of incorporation and state(s) in which you have registered to conduct business. Please attach your certificate of incorporation or state registration form.

| State of Incorporation | Date | Certificate Attached |
|---|---|---|
| Minnesota | 4-28-94 | Yes |
| | | |
| | | |

1

DZB000553

FROM :FINGERHUT                    952-936-5068                2003.02-12    11:24    #809 P.06/12

3.  Provide the exact address and phone number of each business location (Use additional paper, if necessary).

| Name of Business | Address | Phone Number |
|---|---|---|
| 4400 Baker Rd | Minnetonka MN | 952934.9918 |
|  |  |  |
|  |  |  |

4.  Has this firm been the subject of a criminal investigation or found guilty of a crime?  *NO*

5.  Is this firm currently, or has it been a plaintiff or defendant, in any civil action including liens,
    suits, judgments or bankruptcy?  *Yes, Civil Suits, 4*

    If yes, give details including the reason the action was commenced and its disposition. Please include all
    matters which have been settled prior to trial.

*Only open matter is a lawsuit against Oneida - please contact*
*our Legal. Dept if you need to.*
*Anything else is a matter of Public Record*

6.  Provide the names of three business references (individuals or companies for which you have provided
    services).

| Name | Address | Phone Number |
|---|---|---|
|  |  |  |
| *See Attached* |  |  |
|  |  |  |

7.  Identify your current bank.

| Name | Location | Phone Number | Type of Account | Account Number |
|---|---|---|---|---|
| M+I | 6625 Lyndale Ave So. Richfield, MN 55423 | 612-798-3345 | Checking | 195-9018 |
| Crown | 6600 France Ave So. Edina, MN 55435 | 952.985-5800 | Checking | 1102227 |

2

DZB000554

8.   List below each individual having ownership in the company. Please have each owner complete the
attached "Ownership Questionnaire and Authorization for Release of Information" forms.

Thomas J. Petters

9.    List below those persons who do not have ownership, however, are considered part of company
management (include title).

Robert White , CEO

Deanna Munson , VP Operations

10.    List below all States in which the company is licensed to currently conduct business.
          (PLEASE ATTACH COPIES OF ALL LICENSES LISTED)

ALL INDIVIDUALS MAINTAINING OWNERSHIP INTEREST MUST SIGN BELOW. PLEASE BE
REMINDED THAT ANY MISSTATEMENTS MADE ON THIS APPLICATION WILL RESULT IN
VENDOR DISQUALIFICATION.

Dated: 2-10-03

_____
Signature of Owner

_____
Signature of Owner

_____
Signature of Owner

3

DZB000555

FROM :FINGERHUT                     952-936-5068              2003.02-12   11:25   #809 P.08/12

## *OWNERSHIP QUESTIONNAIRE*

1. True Name: *Thomas Joseph Petters*

   Other names used the past ten years:

   Social Security No: Redacted - Confidential

   Street Address: 6429 Margarets Lane, Edina, MN 55439

   Phone: 952-829-7130

   Driver's License No: P-362-792-441-549

   Date of Birth: Redacted - Confidential

   State Issued: MN

2. Date business ownership acquired: 1994

   Percentage of Ownership: 100%

3. Have you ever been convicted of a criminal offense or violation of law? *1 divorce related issue*
   *no criminal activity*

4. Are you the subject of a criminal matter currently before a court? NO

   Number of shares issued:

5. Have you been, or are you currently, a party to a civil lawsuit as either a plaintiff or defendant? NO

   If yes, give details including the reason the action was commenced and its disposition.

   *Include all matters which have been settled prior to trial. It should be noted that failure to include all matters, whether intentionally or inadvertently, will automatically result in vendor disqualification.*

6. Have you ever filed a Petition for Bankruptcy? *1989 - 1990 due to divorce; no bankruptcy action ever occurred; was discharged, only Filed, then dismissed (never took place)*

7. On an attached page, list all other businesses in which you are a principal, owner or officer. *questions please call.*

   If the answer to 3, 4, 5, or 6 is yes, provide full details on attached page.

Dated: 2-12-03 _____                                    _____
                                                                   Signature of Owner

DZB000556

FROM :FINGERHUT                    952-936-5068              2003,02-12    11:25    #809 P.09/12

0099

## State of Minnesota

# SECRETARY OF STATE

### CERTIFICATE OF INCORPORATION

I, Joan Anderson Growe, Secretary of State of Minnesota, do certify that: Articles of Incorporation, duly signed and acknowledged under oath, have been filed on this date in the Office of the Secretary of State, for the incorporation of the following corporation, under and in accordance with the provisions of the chapter of Minnesota Statutes listed below.

This corporation is now legally organized under the laws of Minnesota.

Corporate Name: PETTERS, COMPANY INC.

Corporate Charter Number: .8F-657

Chapter Formed Under: 302A

This certificate has been issued on 04/28/1994.



*Joan Anderson Growe*
Secretary of State.

DZB000557

**PROFESSIONAL REFERENCES:**

Mr. John Koneck                    *One of the operating officers in a 250 person law firm
Partner
Fredrikson & Byron
4000 Pillsbury Center
200 So. 6th St.
Minneapolis, MN 55402
Phone: 612-492-7038

Mr. James Wehmhoff, CPA            Kevin Howk
Shareholder                        Exec. VP
Blanski Peter Kronlage & Zoch, PA  Crown Bank
7500 Olson Memorial Hwy            6600 France Ave. So., Ste. 125
Suite 200                          Edina, MN 55435
Minneapolis, MN 55427             Phone: 952-285-5800
Phone: 763-546-6211

Don Aron                           Mr. Walter Mondale
The Aron Companies                 Former United States Vice President
109 No. Post Oak Lane              Ambassador to Japan
Suite 500                          Dorsey & Whitney
Houston, TX 77024                  50 So. 6th St., 20th Floor
Phone: 713-963-8300                Minneapolis, MN 55402
                                   Phone: 612-340-6307

Senator Norm Coleman
United States Senate
Washington, D.C. 20510
Phone: 202-224-5641

**PERSONAL REFERENCES:**

Mr. Theodore (Ted) Deikel          Mr. Mark Knoblach
Partner with Fingerhut             CEO of Capital Investors
2323 Hyde Street                   4107 Thielman Lane, Ste. 107.
San Francisco, CA 94109            St. Cloud, MN 56302
Phone: 415-885-2121                Phone: 320-251-6961

DZB000558

Mr. John Hagan
Former VP of MCI
5209 Old Gallows Way
Naples, FL 34105
Phone: 941-430-0150

Mr. Pat Liska
President of Rainbow Foods
8000 Excelsior Blvd.
Hopkins, MN 55343
Phone: 952-945-5379

Mr. Dean Vlahos
Owner of Redstone American Grill
Former owner of Champs
681 E. Lake Street, Suite 262
Wayzata, MN 55391
Phone: 952-745-0333 ext. 100

**Business References:**

Mr. Don Aron
The Aron Companies
109 No. Post Oak Lane
Suite 500
Houston, TX 77024
Phone: 713-963-8300

Mr. Larry Reynolds
Nationwide International
2346 Westwood Blvd, Ste. 6
Los Angeles, CA 90064
Phone: 310-470-3910

Mr. Jim Fry
Arrowhead Capital Management
120 So. 6th St.
Suite 2650
Minneapolis, MN 55402
Phone: 612-607-5200

DZB000559

## Ownership Questionnaire #7:

Petters Affliated Companies

Polaroid Electronics / Petters Brands, LLC

FAC (Fingerhut Acquisition Corporation)

Fingerhut Direct Marketing

Liquid 8 Records

BoomBuy, Inc.

Redstone American Grill

Resort Ventures (Real Estate)

2J Group

DZB000560

# EXHIBIT T-48B

## Jon Sabes

| | |
|---|---|
| From: | vincent.salerno@dzbank.de |
| Sent: | Thursday, February 20, 2003 10:06 AM |
| To: | sabesjon@qwest.net |
| Subject: | Background Search - Thomas J. Petters - 1st West Reply |

Jon,

As per your request.

Vin

---------------------- Forwarded by Vincent Salerno/Branch/New York/DZ BANK on 02/20/2003 11:09 AM
---------------------------


Teresa Zariczny
02/19/2003 11:41 AM

To:   Patrick Preece/Branch/New York/DZ BANK@DZBANK, Vincent
    Salerno/Branch/New York/DZ BANK@DZBANK, jenniferwikoff@onebox.com,
    patrick_preece@msn.com, Howard O'Brien/Branch/New York/DZ
    BANK@DZBANK
cc:
Subject:   Background Search - Thomas J. Petters - 1st West Reply


---------------------- Forwarded by Teresa Zariczny/Branch/New York/DZ BANK on 02/19/2003 11:42 AM
---------------------------


"Kelli Clayton" <k.clayton@1stwest.com> on 02/19/2003 10:57:48 AM

To:   <teresa.zariczny@dzbank.de>
cc:
Subject:   Background Search


Teresa,

Per our conversation, following is an update on the background search on Thomas Petters:

Stearns County, Minnesota returned a criminal case that was filed on 02/23/1990 by the State of Minnesota
against a Thomas J. Petters (no date of birth, or other identifers).  The case was a Felony Forgery and was
extradited to El Paso County, Colorado in March 1990.  Stearns County (MN) says it has no documents on file,
that everything was sent to Colorado.

The criminal search in Colorado is pending, however, a civil petition was found to have been filed in El Paso
County (CO) on 01/31/2003 by Thomas J. Petters, date of birth ▮▮▮▮ 1957 (same as the subject's), to have a
criminal case sealed.  We are awaiting copies of documents from the civil file, as well as any documents that
might be available from the criminal file - IF it hasn't already been sealed!

1

OpFin-00000011

Also, two released federal tax liens - as discussed earlier - were found filed in El Paso County, both are for the same tax period, ended 03/1988. Additionally, there are two unsatisfied state tax liens totaling $780 and three unpaid civil judgments totaling $16,342.89.

When I receive any updates on the criminal case, I will email that information to you as well.

Thank you,
Kelli Clayton
Vice President
1stWest Financial Corporation
(888) 803-9378
(888) 241-9378 - Fax
k.clayton@1stwest.com

2

# EXHIBIT T-48C



# MESHBESHER & ASSOCIATES

### ATTORNEYS AT LAW

**STEVEN J. MESHBESHER**
CERTIFIED CRIMINAL TRIAL SPECIALIST BY
THE NATIONAL BOARD OF TRIAL ADVOCACY
LICENSED TO PRACTICE IN WISCONSIN

GREGORY S. SOFIO

February 21, 2003

Patrick Preese
DZ Bank AG
3 Roosevelt Avenue
Larchmont, NY 10538

re:    <u>CONFIDENTIAL INFORMATION; FOR PATRICK PREESE ONLY</u>

Dear Mr. Preese:

Enclosed, please find the requested documentation regarding the felony theft charges against Mr. Tom Petters in El Paso County Colorado that were ultimately dismissed in 1993, the records of which were expunged (sealed) by judicial order in 1995. I apologize that these documents do not contain more detail, but it is all that I have. These documents show that Mr. Petters was implicated due to his association (partnership) with Mr. Alan Dale Chamberlin and Jerome Greenberg. Mr. Petters was, unfortunately, forced to bear the brunt of the financial responsibility for the actions of Mr. Chamberlin and Mr. Greenberg. However, the charges against Mr. Petters were dismissed (and the records expunged) because Mr. Petters was not the benefactor of any of the proceeds of the wrongdoings at issue.

I thank you for your patience and for your assistance. Please contact my office at your earliest possible convenience should you have any questions or concerns.

Very truly yours,

Steven J. Meshbesher

SJM:kg
Enclosures

225 LUMBER EXCHANGE BLDG   10 SOUTH FIFTH STREET   MINNEAPOLIS MN 55402

**TEL** 612 332 2000   **FAX** 612 332 2077   **TOLL FREE** 1 888 332 2004

DZB013618

DISTRICT COURT, EL PASO COUNTY, COLORADO
Case No. 89CR 3085  & 89CR 3086  Division 8

# I N F O R M A T I O N

THE PEOPLE OF THE STATE OF COLORADO, Plaintiff,

v.

THOMAS J. PETTERS (89CR 3085),
and ALAN DALE CHAMBERLIN (89CR 3086, Defendant(s).

The District Attorney, representing the People of the State of Colorado,
accuses the Defendant of committing the following offense(s):

COUNT ONE: THEFT(F-3)
From January, 1989, through October, 1989, THOMAS J. PETTERS and ALAN
DALE CHAMBERLIN did unlawfully, knowingly and feloniously take a thing of
value, to-wit: money and other property, with a value of ten thousand dollars
or more of LIBERTY MILITARY SALES, INC., TEPITO, INC., DIANE BURDICK, PAT
PERRY, RON HATFIELD, and TOM BOOTH; In violation of Colorado Revised Statutes
18-4-401, as amended, Theft (F-3)

COUNT TWO: OBTAINING SIGNATURE BY DECEPTION(M-2)
On or about November, 1987, THOMAS J. PETTERS, by deception and with the
intent to defraud the victim, CHUCK STURGIS, and to acquire a benefit for any
person, did unlawfully cause CHUCK STURGIS to sign and execute a written
instrument, to-wit: American Express Credit/Charge Application; In violation
of Colorado Revised Statutes 18-5-112, as amended, Obtaining Signature by
Deception (M-2)

COUNT THREE: THEFT(F-4)
From November, 1987, through October, 1989, THOMAS J. PETTERS did
unlawfully, knowingly and feloniously take a thing of value, to-wit: money
and other property, with a value of three hundred dollars or more but less
than ten thousand dollars of CHUCK STURGIS and AMERICAN EXPRESS; In violation
of Colorado Revised Statutes 18-4-401, as amended, Theft (F-4)

COUNT FOUR: THEFT(F-4)                    *amend to include Chamberlin*
From October, 1988, through March, 1989, THOMAS J. PETTERS did
unlawfully, knowingly and feloniously take a thing of value, to-wit: money
and other property, with a value of three hundred dollars or more but less
than ten thousand dollars of NATIONAL T.V. and STEREO, INC., and JEROME
GREENBERG; In violation of Colorado Revised Statutes 18-4-401, as amended,
Theft (F-4)

# MESHBESHER ◼ BIRRELL & ◼ DUNLAP, LTD.

2450 PARK AVENUE
MINNEAPOLIS, MINNESOTA 55404
612 871-7000
800 368-4529
FAX 612 871-3215

STEVEN J. MESHBESHER*
ANDREW S. BIRRELL*
JOHN C. DUNLAP

JAMES A. LAVOIE
JOHN J. LEUNIG**
IAN CHRIS RITTS

* CERTIFIED AS A CRIMINAL TRIAL SPECIALIST
BY THE NATIONAL BOARD OF TRIAL ADVOCACY

OF COUNSEL
JAMES E. OSTGARD

** ALSO ADMITTED IN WISCONSIN

July 12 1993

David H. Zook
El Paso District Attorney
326 South Tejom
Colorado Springs, CO  80903


RE:  Thomas Joseph Petters


Dear Mr. Zook:

Pursuant to our telephone conversation on July 8, 1993 and subsequent agreement to continue the suspended prosecution and ultimate dismissal of the above-referenced matter I have enclosed a money order from Mr. Petters in the amount of $7,300.00 made payable to El Paso County. This check shall serve as final settlement and satisfaction in this matter.

It is also my understanding that Mr. Petters will be entitled to expungement of his record upon completion of this agreement.

Please feel free to contact me if you have any questions.

Very truly yours,

Steven J. Meshbesher

SJM:ww
Enclosure

DISTRICT COURT, EL PASO COUNTY, COLORADO
Case No. 89CR3085, Division No. 8

MOTION TO DISMISS (Nolle Prosequi)

PEOPLE OF THE STATE OF COLORADO,

Plaintiff,

vs.

THOMAS J. PETTERS,

Defendant.

JOHN W. SUTHERS, District Attorney of the Fourth
Judicial District of the State of Colorado, on behalf of the
People of the State of Colorado and pursuant to Rule 48(a) of
the Colorado Rules of Criminal Procedure, declares he no
longer wishes to prosecute and moves to dismiss:

As to all Counts.

The grounds for the requested dismissal are:

(1)  Defendant has paid full restituion of $40,000.00.

                    JOHN W. SUTHERS
                    DISTRICT ATTORNEY (8492)


                    DAVID P. ZOOK  (3031)
                    Chief Deputy District Attorney
                    Colorado Springs, CO  80903
                    Telephone:  (719) 520-6002

DZB013621

# EXHIBIT T-49

From:  Thayer, Heather B.
Sent:  Thursday, December 13, 2001 9:04 AM
To:    'Jon Sabes ' <sabesjon@qwest.net>; Root, Simon C <sroot@fredlaw.com>; Thayer,
Heather B. <hthayer@fredlaw.com>
Subject:  RE: Docs

I am not actively aware of any impediments, I do know that we probably won't have
the tax id numbers, but the LLC should be qualified to business in Minnesota by
then.

You may have given this to Simon, but do we have the name and contact information
for the Rent-a-Director so we can get the resolutions approved?  Also, is
Opportunity Finance or PC Funding going to pay the director's fees or has it been
discussed?

Heather

-----Original Message-----
From: Jon Sabes
To: Simon Root; Heather Thayer
Sent: 12/12/01 8:25 PM
Subject: Docs

Thank you for getting the documents to me, and keeping the comments
light.
I have turned the documents around to the group and expect to have
return
comments tomorrow afternoon.

Let me know if it is reasonable to assume that upon receiving return
comments, and assuming those return comments are acceptance to your
client,
we can execute documents on Friday.  Thanks.


Jon R. Sabes
Opportunity Finance LLC
60 South Sixth Street
Suite 2540
Minneapolis, MN 55402
612.339.8992
612.339.8922 fax
612.388.2223 mobile

# EXHIBIT T-50

**Execution Copy**

**AUTOBAHN FUNDING COMPANY LLC**

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY
OPERATING AGREEMENT**

**Dated as of July 10, 2008**

Confidential

DZB173548

# TABLE OF CONTENTS

Page

ARTICLE I  GENERAL DEFINITIONS ........................................................................1

    1.1    Definitions ..............................................................................................1
    1.2    Interpretation .........................................................................................3

ARTICLE II  ORGANIZATION ....................................................................................4

    2.1    Formation ...............................................................................................4
    2.2    Name .......................................................................................................4
    2.3    Duration .................................................................................................4
    2.4    Registered Office and Registered Agent; Principal Office ....................4
    2.5    Qualification in Other Jurisdictions ......................................................4

ARTICLE III  PURPOSES, POWERS AND RESTRICTIONS .....................................4

    3.1    Purposes of the Company ......................................................................4
    3.2    Powers of the Company .........................................................................5
    3.3    Restrictions on Operations .....................................................................6

ARTICLE IV  SOLE MEMBER .....................................................................................8

    4.1    Sole Member ...........................................................................................8
    4.2    Capital Contribution ..............................................................................8
    4.3    Initial Membership Interests ..................................................................8
    4.4    Withdrawals ............................................................................................8
    4.5    Authority; Liability to Third Parties ......................................................8
    4.6    Issuance and Transfer of Membership Interests ....................................8
    4.7    Amendment of Independent Manager .....................................................8

ARTICLE V  MANAGEMENT OF THE COMPANY ...................................................9

    5.1    Management of Business ........................................................................9
    5.2    Management Committee .........................................................................9
    5.3    Independent Manager .............................................................................9
    5.4    General Powers of Management Committee ...........................................9
    5.5    Place of Meetings ................................................................................10
    5.6    Regular Meetings ................................................................................10
    5.7    Special Meetings .................................................................................10
    5.8    Quorum of and Action by Management Committee ..............................10
    5.9    Reimbursement ...................................................................................10
    5.10   Resignation and Removal ...................................................................11
    5.11   Vacancies ............................................................................................11
    5.12   Action by Written Consent .................................................................11
    5.13   Other Business ....................................................................................11

i

5.14    Power of Attorney ..................................................................................11
5.15    Standard of Care; Liability .....................................................................11
5.16    Appointment of Officers; President .......................................................11

ARTICLE VI  ALLOCATION OF INCOME AND LOSS, OWNERSHIP OF
COMPANY PROPERTY .........................................................................................12

6.1    Allocation of Income and Loss ...............................................................12
6.2    Ownership of Company Property ............................................................12

ARTICLE VII  FISCAL MATTERS; BOOKS AND RECORDS ...............................12

7.1    Investments .............................................................................................12
7.2    Records Required by Act; Right of Inspection .......................................12
7.3    Books and Records of Account ...............................................................13
7.4    Fiscal Year ..............................................................................................13

ARTICLE VIII  INDEMNIFICATION AND INSURANCE .....................................13

8.1    Indemnification and Advancement of Expenses .....................................13
8.2    Insurance .................................................................................................15
8.3    Limit on Liability of Members ...............................................................15
8.4    No Recourse ............................................................................................15

ARTICLE IX  DISSOLUTION AND WINDING UP .................................................15

9.1    Events Causing Dissolution ....................................................................15
9.2    Winding Up ..............................................................................................16
9.3    Compensation of Liquidator ...................................................................17
9.4    Distribution of Company Property and Proceeds of Sale Thereof .........17

ARTICLE X  MISCELLANEOUS PROVISIONS .....................................................17

10.1    Counterparts ............................................................................................17
10.2    Entire Agreement ....................................................................................17
10.3    Partial Invalidity .....................................................................................17
10.4    Amendment ..............................................................................................18
10.5    Binding Effect .........................................................................................18
10.6    Governing Law ........................................................................................18

Confidential

DZB173550

**AUTOBAHN FUNDING COMPANY LLC**
**AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING**
**AGREEMENT**

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY **OPERATING AGREEMENT** is made and entered into as of July 10, 2008 by and between Autobahn Funding Company LLC, a Delaware limited liability company (the "Company"), and BSCS XVI, Inc., a Delaware corporation, as the sole Member of the Company (the "Member").

## PRELIMINARY STATEMENTS

WHEREAS, the Member has heretofore filed a Certificate of Formation with the Secretary of State of the State of Delaware to organize the Company under and pursuant to the Delaware Limited Liability Company Act;

WHEREAS, upon the terms and subject to the conditions set forth herein, the Member is concurrently with the execution of this Agreement acquiring 100% of the Membership Interests (as herein defined) in the Company;

WHEREAS, in accordance with the Delaware Limited Liability Company Act, each of the Company and the Member desires to enter into this Agreement to set forth the rights, powers and interests of the Member with respect to the Company and its Membership Interests therein and to provide for the management of the business and operations of the Company;

WHEREAS, the Company and the Member are parties to the Limited Liability Company Operating Agreement dated as of September 17, 1999 (as heretofore amended, the "Original Limited Liability Agreement"); and

WHEREAS, the Company and the Member desire to amend and restate the Original Limited Liability Agreement in the form of this agreement;

NOW, THEREFORE, in consideration of the mutual promises and agreements made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

## GENERAL DEFINITIONS

1.1   **Definitions**.  As used in this Agreement, the following terms shall each have the meaning set forth in this Article I, unless the context otherwise requires.

"**Act**" means the Delaware Limited Liability Company Act, as it may be amended from time to time, and any successor to such Act.

"**Agreement**" means this Amended and Restated Limited Liability Company Agreement, including Schedule I, as originally executed and as subsequently amended from time to time in accordance with the provisions hereof.

1

"**Capital Contribution**" has the meaning specified in Section 4.2.

"**Certificate of Formation**" means the Certificate of Formation of the Company described in Section 2.1.

"**Company**" means Autobahn Funding Company LLC, the limited liability company formed by the filing of the Certificate of Formation, as constituted from time to time.

"**Company Property or Properties**" means all interests, properties, whether real or personal, and rights of any type owned or held by the Company, whether owned or held by the Company at the date of its formation or thereafter acquired.

"**Dissolution Event**" shall be deemed to have occurred with respect to any Person upon the earlier of the adoption of a plan of liquidation by such Person or the effective dissolution of such Person in accordance with applicable law.

"**Independent Manager**" means a natural person who is a duly appointed member of the Management Committee, and who, for the five-year period prior to his or her appointment as Independent Manager has not been, and during the continuation of his or her service as Independent Manager will not be, a stockholder, director, officer, employee or associate, or any relative of the foregoing, of DZ Bank AG Deutsche Zentral-Genossenschaftsbank ("DZ Bank") or any Affiliate of DZ Bank, in each case except (i) in such person's capacity as an independent director or manager of DZ Bank or such Affiliate or (ii) as the holder of equity interests in DZ Bank or any such Affiliate representing less than 5% of all equity interests in DZ Bank or such Affiliate.

"**Insolvency Event**" means with respect to any Person, any of the following events: such Person shall generally not pay its debts as such debts become due or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any case or proceeding shall be instituted by or against such Person seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property.

"**Majority Vote**" means, with respect to actions to be taken by the Management Committee, the affirmative vote or consent of at least a majority of the Managers then serving on the Management Committee.

"**Management Committee**" means, at any time, the Management Committee designated in accordance with Section 5.2.

"**Managers**" means at any time the Persons appointed in accordance with Sections 5.2 and 5.3 to serve on the Management Committee.

"**Material Action**" means to consolidate or merge the Company with or into any Person, or sell all or substantially all of the assets of the Company, or to institute proceedings to

2

DZB173552

have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take substantive action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

"**Member**" means BSCS XVI, Inc. and its successors.

"**Membership Interest**" means, with respect to any Member at any time, the entire interest of such Member in the Company at such time. Such interest includes, without limitation, (a) all rights of a Member to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under this Agreement and (b) all management rights, voting rights or rights to consent.

"**Notification**" means all notices permitted or required to be given to any Person hereunder. Such Notifications must be given in writing and will be deemed to be duly given on the date of delivery if delivered in person or sent by facsimile transmission or on the earlier of actual receipt or three (3) Business Days after the date of mailing if mailed by registered or certified mail, first class postage prepaid, return receipt requested, to such Person, at the last known address of such Person on the Company records.

"**Obligations**" means the indebtedness, liabilities and obligations of the Company under or in connection with this Agreement or any of the Program Documents or any other agreement, instrument or document to which the Company is a party pursuant thereto.

"**Person**" means any general partnership, limited partnership, corporation, limited liability company, joint venture, trust, business trust, governmental agency, cooperative, association, individual or other entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such person, as the context may require.

    **1.2**    **Interpretation**. Each definition in this Agreement includes the singular and the plural, and reference to the neuter gender includes the masculine and feminine where appropriate. References to any statute or Treasury Regulations means such statute or regulations as amended at the time and include any successor legislation or regulations. The headings to the Articles and Sections are for convenience of reference and shall not affect the meaning or interpretation of this Agreement. Except as otherwise stated, reference to Articles, Sections and Schedules mean the Articles, Sections and Schedules of this Agreement. The Schedules are hereby incorporated by reference into and shall be deemed a part of this Agreement.

3

DZB173553

## ARTICLE II

## ORGANIZATION

2.1     **Formation**.  The Company has been organized as a Delaware limited liability company under and pursuant to the Act by the filing of a Certificate of Formation with the Office of the Secretary of State of Delaware as required by the Act. In the event of a conflict between the terms of this Agreement and the Certificate of Formation, the terms of the Certificate of Formation shall prevail.

2.2     **Name**.  The name of the company is Autobahn Funding Company LLC.

2.3     **Duration**.  The Company shall continue in existence perpetually or until the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.

2.4     **Registered Office and Registered Agent; Principal Office**.  (a) The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Management Committee may designate from time to time in the manner provided by the Act.

(b)     The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Management Committee may designate in the manner provided by the Act.

(c)     The principal office of the Company shall be c/o Lord Securities Corporation, 48 Wall Street, 27th Floor, New York, New York 10005, or at such place as the Management Committee may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there for inspection as required by the Act. The Company may have such other offices as the Management Committee may designate from time to time.

2.5     **Qualification in Other Jurisdictions**.  The Management Committee shall have authority to cause the Company to do business in jurisdictions other than the State of Delaware.

## ARTICLE III

## PURPOSES, POWERS AND RESTRICTIONS

3.1     **Purposes of the Company**.  The nature of the business or purposes to be conducted or promoted by the Company are:

(a)     to (i) purchase or otherwise acquire or make loans secured by, or otherwise finance, interests in, or in pools of, accounts, general intangibles, chattel paper, instruments, certificated and uncertificated securities, inventory, investment property or other financial assets, including without limitation, publicly or privately issued securities secured by or

4

Confidential                                                                                    DZB173554

representing interests in any of the foregoing (collectively, the "Underlying Assets", such Underlying Assets, including ownership interests and security interests therein, are referred to herein as "Asset Interests") in accordance with the Company's investment policies and guidelines, (ii) sell Asset Interests and (iii) enter into any agreement to facilitate such purchase, acquisition, loan, financing or sale by the Company;

(b)    to enter into any agreement providing for the authorization, issuance, sale and delivery of commercial paper issued by the Company, under an exemption from registration under applicable securities laws;

(c)    to enter into any loan, credit, asset purchase or other agreement enabling the Company to borrow money or assign its assets in order to facilitate any activity authorized herein, and to pledge any assets to secure such borrowing and/or assign such assets pursuant to such agreements from time to time;

(d)    to purchase or otherwise acquire certificates of deposit, repurchase agreements, bankers' acceptances, commercial paper, obligations of, or guaranteed by the United States, shares in money market funds and other similar instruments and obligations, and to make any other investments as may be determined by the Company's Management Committee or any manager, member, officer or agent exercising authority delegated by the Management Committee;

(e)    to enter into any agreement with third-parties, whether or not affiliated with the Company, to provide services as may be required from time to time by the Company, including, without limitation, legal, investment, accounting, data processing, administrative and management services; and

(f)    to engage in any lawful act or activity and to exercise any powers permitted to companies organized under the Act that, in either case, are incidental to and necessary or suitable for the accomplishment of the purposes described in clauses (a) through (e), inclusive, above.

**3.2**    **Powers of the Company**.  In furtherance of the purposes of the Company as set forth in Section 3.1, the Company shall have the power and authority to take in its name all actions necessary, useful or appropriate in the Management Committee's discretion to accomplish its purposes, including, but not limited to, the power:

(a)    to conduct its business, carry on its operations and have and exercise the powers granted by the Act in any state, territory, district or possession of the United States, or in any foreign country which may be necessary or convenient to effect any or all of the purposes for which it is organized; and

(b)    to sell, convey, assign, encumber, mortgage, pledge, lease, exchange, transfer and otherwise dispose of all or any part of its property and assets.

Confidential                                                                            DZB173555

**3.3**     **Restrictions on Operations**.

(a)     The Company shall not engage in any business or activity other than as set forth in Section 3.1.

(b)     The Company shall not dissolve or liquidate, in whole or in part, except as specified in Article 9.

(c)     The Company shall not be, become or hold itself out as being liable for the debts of any other party.

(d)     The Company shall not pledge its assets for the benefit of any other party or make loans or advances to any other party.

(e)     The Company shall act solely in its Company name and through its duly authorized officers, agents or attorneys-in-fact in the conduct of its business, shall prepare all Company correspondence in the Company name, and shall conduct its business so as not to mislead others as to the identity of the entity with which they are concerned.

(f)     The Company shall keep company records and books of account, in accordance with Section 2.4.(c) and shall not commingle the company records and books of account with the corporate records and books of account of any other corporation or entity and such books and records shall reflect the separate existence of the Company. The books of the Company may be kept (subject to any provision contained in any applicable statutes and except as required by Section 2.4.(c)) inside or outside the State of Delaware as such place or places as may be designated from time to time by the Company.

(g)     The Company shall take all actions required to maintain the Company's status as a separate legal entity and to make it manifest to third parties that the Company is an entity with assets and liabilities distinct from any of its affiliates. Without limiting the generality of the foregoing, the Company shall (i) maintain books and records separate from those of any of its affiliates; provided that such books and records may be kept at the same location as Lord Securities Corporation ("Lord"), and may be kept by Lord personnel pursuant to the Management Agreement, (ii) maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets, (iii) hold regular Management Committee and Member meetings, as appropriate, to conduct the business of the Company, and observe all other formalities required by the Certificate of Formation, this Agreement and the Act, (iv) hold itself out to creditors and the public as a legal entity separate and distinct from any other entity, (v) allocate and charge fairly and reasonably any common employee or overhead shared with affiliates; provided that Lord may pay rental and certain related expenses for the Company's office pursuant to the Management Agreement dated as of the date hereof (the "Management Agreement"), (vii) transact all business with affiliates on an arm's-length basis and pursuant to enforceable agreements; other than actions Lord has agreed to take, on behalf of the Company, pursuant to the Management Agreement, (viii) conduct business in its own name; provided that Lord has agreed to take certain actions on behalf of the Company pursuant to the Management Agreement, and (ix) not commingle its assets or funds with those of any other Person, except as

6

Confidential

DZB173556

may be required pursuant to the terms of any of the instruments, documents or agreements referred to in Section 3.1(b).

(h)     The Company shall not, without the unanimous approval of the Management Committee, (i) make a general assignment for the benefit of creditors of the Company, institute any proceedings to adjudicate the Company a bankrupt or insolvent, consent to the institution of bankruptcy or insolvency proceedings against the Company, file a petition seeking or consenting to reorganization or relief under any applicable federal or state law relating to bankruptcy, petition or apply to any tribunal for, or consent to, the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, admit its inability to pay its debts generally as they become due or authorize any of the foregoing to be done or taken on behalf of the Company, (ii) dissolve or liquidate, in whole or in part, or (iii) consolidate with or merge into any other entity or convey, transfer or lease its properties and assets substantially as an entirety to any entity, or permit any entity to merge into the Company or permit any entity to convey, transfer or lease its properties and assets substantially as an entirety to the Company. In any situation involving the foregoing, each Manager shall take into account the interests of the Company's creditors as well as those of the Member.

(i)     The Company shall not incur any debt (other than the Obligations) unless (a) S&P rates the additional debt the same as the issue credit rating requested for the Commercial Paper Notes in a given transaction (at the time of issuance and at all times thereafter), or (b) the additional debt is fully subordinated to the Commercial Paper Notes and, in either case (x) is nonrecourse to the Company or any of its assets other than cash flow in excess of amounts necessary to pay holders of the Commercial Paper Notes, and (y) does not constitute a claim against the Company to the extent that funds are insufficient to pay such additional debt.

(j)     The Company shall not (notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company) and the Member, the Management Committee, any Officer or any other Person, shall not nor shall the Member nor the Management Committee nor any Officer nor any other Person be, authorized or empowered, nor shall they permit the Company, without the prior unanimous written consent of the Member and the Management Committee (including all Independent Managers), to take any Material Action, provided, however, that the Management Committee may not vote on, or authorize the taking of, any Material Action, unless there are at least two Independent Managers then serving in such capacity.

(k)     The Company shall pay its own liabilities only out of its own funds.

(l)     The Company shall correct any known misunderstanding regarding its identity as separate from the identity of the Member and any other Person.

(m)     The Company shall maintain adequate capital in light of its contemplated business purpose, transactions and liabilities.

Confidential

DZB173557

# ARTICLE IV

## SOLE MEMBER

**4.1** **Sole Member**.  The sole Member of the Company is BSCS XVI, Inc., a Delaware corporation, and the address of the Member is c/o Lord Securities Corporation, 48 Wall Street, 27th Floor, New York, New York 10005. As of the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership of the Company.

**4.2** **Capital Contribution**.  The Member has previously contributed to the capital of the Company the amount set forth as the Member's Capital Contribution (the "Capital Contribution") on Schedule I.  Such Capital Contribution was in the form of cash, as specified on Schedule I.

**4.3** **Initial Membership Interests**.  Upon making the Capital Contribution specified on Schedule I, the Member was issued the Membership Interests set forth opposite the Member's name on Schedule I.

**4.4** **Withdrawals**.  Except as otherwise provided herein or in the Act, the Member shall not have the right to withdraw, or receive any return of, all or any portion of the Member's Capital Contribution. The Company shall not make any distribution to the Member if, immediately after giving effect to such distribution, all liabilities of the Company, other than liabilities to the Member with respect to its Membership Interests, exceed the fair value of the Company Property.

**4.5** **Authority; Liability to Third Parties**.  No Member has the authority or power to act for or on behalf of the Company (except as herein provided), to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

**4.6** **Issuance and Transfer of Membership Interests**.  No additional Membership Interests shall be issued without the unanimous approval of the Management Committee. No Membership Interests may be sold, assigned, pledged, transferred, conveyed or otherwise disposed of (including through any merger, share exchange or consolidation) (collectively, "Transfer") without the unanimous approval of the Management Committee. Any attempted Transfer of a Membership Interest or any interest therein without such consent shall be entirely null and void.

**4.7** **Amendment of Independent Manager.**  The Member shall not, so long as any Obligation is outstanding, amend, alter, change or repeal the definition of "Independent Manager" or Sections 1.1, 3.1, 3.2, 3.3, 4.4, 4.6, 5.3, 8.1, 8.3, 9.1, 9.2, 9.3, 9.4 or 10.4 of this Agreement without the unanimous written consent of the Management Committee (including all Independent Managers). Subject to this Article IV and Section 3.3, the Member reserves the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with Section 10.4.

Confidential

DZB173558

## ARTICLE V

## MANAGEMENT OF THE COMPANY

**5.1    Management of Business**.  Except as otherwise expressly provided in this Agreement, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a management committee (the "Management Committee") as described herein.

**5.2    Management Committee**.  The Management Committee shall consist of three (3) Managers. The initial Managers shall be Orlando Figueroa, Benjamin B. Abedine and Albert J. Fioravanti.  Subsequent Managers shall be appointed by the Member where, at all times,  at least two (2) Managers of the Management Committee are Independent Managers.

**5.3    Independent Manager.**  As long as any Obligation is outstanding, the Member shall cause the Company at all times to have at least two (2) Independent Managers who will be appointed by the Member to the Management Committee. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, the Independent Managers shall consider only the interests of the Company, including its creditors, in acting or otherwise voting on the matters referred to in Section 3.3(h). No resignation or removal of an Independent Manager, and no appointment of a successor Independent Manager, shall be effective until such successor shall have accepted his or her appointment as an Independent Manager by a written instrument, which may be a counterpart signature page to the Management Agreement. In the event of a vacancy in the position of Independent Manager, the Member shall, as soon as practicable, appoint a successor Independent Manager. All right, power and authority of the Independent Managers shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement. Except as provided in the second sentence of this definition of Independent Manager, in exercising their rights and performing their duties under this Agreement, any Independent Manager shall have a fiduciary duty of loyalty and care with respect to the Company similar to that of a director of a business corporation organized under the General Corporation Law of the State of Delaware. No Independent Manager shall be under any obligation to the Member to take any Material Action. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, neither the Company nor Member shall have any claim for breach of duty or otherwise against any Independent Manager for failing to take any Material Action. No Independent Manager shall at any time serve as trustee in bankruptcy for any affiliate of the Company.

**5.4    General Powers of Management Committee**.  Except as may otherwise be expressly provided in this Agreement, the Management Committee shall have complete and exclusive discretion in the management and control of the business and affairs of the Company, including the right to make and control all ordinary and usual decisions concerning the business and affairs of the Company. The Management Committee shall possess all power, on behalf of the Company, to do or authorize the Company or to direct the executive officers of the Company, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company in accordance with the terms of this Agreement. Notwithstanding the foregoing and any other provision contained in this Agreement to the contrary, the Management Committee shall not take any action, or authorize the Company or any of its officers to take any

9

DZB173559

action, that would be inconsistent with the restrictions set forth in Article III. With the consent of the sole Member, which consent the sole Member believes to be in the best interest of the sole Member and the Company, none of the Managers shall owe a fiduciary duty or other obligation to the Member with regard to any action to be taken under or in connection with the management of the business or affairs of the Company (except as may specifically be required by the law of any applicable jurisdiction). Instead, each Manager's fiduciary duty and other obligations with regard to such action shall be owed to the Company (including its creditors).

 **5.5** **Place of Meetings**. Meetings of the Management Committee may be held either within or without the State of Delaware at whatever place is specified in the call of the meeting. In the absence of specific designation, the meetings shall be held at the principal office of the Company as provided in Section 2.4. The Managers serving on the Management Committee may appoint from among themselves a chairperson to preside at meetings of the Management Committee. Any Manager shall be permitted to attend any meeting of the Management Committee in person or by conference telephone call. Participation in a meeting by means of conference telephone shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business thereat on the ground that the meeting is not lawfully called or convened.

 **5.6** **Regular Meetings**. The Management Committee shall meet at least annually. No notice need be given to Managers of regular meetings for which the Managers have previously designated a time and place for the meeting.

 **5.7** **Special Meetings**. Special meetings of the Management Committee may be held at any time upon the request of the President of the Company or Majority Vote of the Managers. A Notification of any special meeting shall be sent to the last known address of each Manager at least two (2) days before the meeting. Notification of the time, place and purpose of such meeting may be waived in writing before or after such meeting, and shall be equivalent to the giving of a Notification. Attendance of a Manager at such meeting shall also constitute a waiver of Notification thereof, except where such Manager attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Management Committee need be specified in the Notification or waiver of Notification of such meeting.

 **5.8** **Quorum of and Action by Management Committee**. The presence of a majority of the Managers shall constitute a quorum for the transaction of business at any meeting of the Management Committee. Except as otherwise expressly set forth in this Agreement, any action to be taken or approved by the Management Committee hereunder must be taken or approved by Majority Vote of the Management Committee (or, to the extent required by this Agreement, the affirmative vote or consent of all members of the Management Committee) and any action so taken or approved shall constitute the act of the Management Committee.

 **5.9** **Reimbursement**. Managers shall be entitled to reimbursement for their reasonable out-of-pocket expenses incurred in attending any meeting.

Confidential
DZB173560

**5.10    Resignation and Removal**.  Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Company. The Member may remove any Manager at any time either for or without cause.

**5.11    Vacancies**.  Any vacancy occurring with respect to a Manager shall be filled by the Member pursuant to Sections 5.2 and 5.3.

**5.12    Action by Written Consent**.  Any action that may be taken at a meeting of the Management Committee may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of those Persons entitled to vote at that meeting, and such consent shall have the same force and effect as a unanimous vote of the Management Committee at a meeting duly called and held. No notice shall be required in connection with the use of a written consent pursuant to this Section 5.12.

**5.13    Other Business**.  The Managers may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others. Neither the Company nor the Member shall have any rights in or to such independent ventures of the Managers or the income or profits therefrom by virtue of this Agreement.

**5.14    Power of Attorney**.  Without limitation of the powers and duties of the Management Committee, the Member hereby appoints the Management Committee and Managers serving thereon (and any Liquidator pursuant to Article IX), acting together, as the Member's attorney-in-fact for the purpose of executing, swearing to, acknowledging, and delivering all certificates, documents, and other instruments as may be necessary, appropriate, or advisable in the judgment of the Management Committee (or the Liquidator) in furtherance of the business of the Company or complying with applicable law. This power of attorney is irrevocable and is coupled with an interest. On request by the Management Committee (or the Liquidator), the Member shall confirm its grant of this power of attorney or any use thereof by the Management Committee (or the Liquidator) and shall execute, swear to, acknowledge, and deliver any such certificate, document, or other instrument.

**5.15    Standard of Care; Liability**.  Every Manager shall discharge his or her duties as a manager in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interests of the Company. A Manager shall not be liable for any monetary damages to the Company for any breach of such duties except for receipt of a financial benefit to which the Manager is not entitled or a knowing violation of the law.

**5.16    Appointment of Officers; President**.  The Management Committee shall have the right to appoint officers of the Company, including a President of the Company, to assist with the day-to-day management of the business affairs of the Company. Any President so appointed shall be the Chief Executive Officer of the Company, subject at all times to the direction of the Management Committee. No officer shall have greater power and authority than the Management Committee and shall not, on behalf of the Company, take or authorize any other Person to take any action on behalf of the Company that would be inconsistent with the

11

restrictions set forth in Article III. The Management Committee shall have the right to remove any officer of the Company, either for or without cause, at any time, provided, however, that nothing contained herein shall limit any rights of any officer under any employment agreement which such officer may have entered into with the Company. In addition to the President, the Company shall initially have the following executive officers: Vice President and Secretary. The President shall be Orlando Figueroa, the Vice President shall be [Philip A. Martone] and the Secretary shall be Lori Gebron] The appointment of new or substitute officers shall be made by the Management Committee in accordance with this Agreement.

## ARTICLE VI

## ALLOCATION OF INCOME AND LOSS,
## OWNERSHIP OF COMPANY PROPERTY

      6.1    **Allocation of Income and Loss**. Because the Company is a business entity that has a single owner and is not a corporation, it is disregarded as an entity separate from its owner for federal income tax purposes under Section 301.7701-2(c)(2)(i) of the U.S. Treasury Regulations. Accordingly, all items of income, gain, loss, deduction and credit of the Company for all taxable periods will be treated for federal income tax purposes, and for state and local income and other tax purposes to the extent permitted by applicable law, as realized or incurred directly by the Member.

      6.2    **Ownership of Company Property**. Company Property shall be deemed to be owned by the Company as an entity, and no Member or Manager, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Management Committee may determine. All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

## ARTICLE VII

## FISCAL MATTERS; BOOKS AND RECORDS

      7.1    **Investments**. Capital Contributions, revenues and any other Company funds shall be invested by the Company, at the direction of the Management Committee. The Management Committee is authorized to select and compensate, at Company expense, one or more investment advisors, brokers or other agents in furtherance of the purposes of the Company.

      7.2    **Records Required by Act; Right of Inspection**. (a) During the term of the Company's existence and for a period of four (4) years thereafter, there shall be maintained in the Company's principal office as provided in Section 2.4 all records required to be kept pursuant to the Act, including, without limitation, copies of federal, state and local tax information or income tax returns for each of the Company's tax years, copies of this Agreement and the Certificate of Formation, including all amendments or restatements, and correct and complete books and records of account of the Company.

Confidential

DZB173562

(b)     On written request stating the purpose, any authorized representative of the Member may examine and copy in person, at any reasonable time, for any proper purpose reasonably related to the Member's interest in the Company, and at the Member's expense, records required to be maintained under the Act and such other information regarding the business, affairs and financial condition of the Company as is just and reasonable for the Member to examine and copy. Upon written request by the Member made to the Company at the address of the Company's principal office specified in <u>Section 2.4</u>, the Company shall provide to the Member without charge true copies of (i) this Agreement and the Certificate of Formation and all amendments or restatements, and (ii) any of the tax returns of the Company described above.

      **7.3**    <u>**Books and Records of Account**</u>.  The Company shall maintain adequate books and records of account that shall be maintained on the accrual method of accounting and on a basis consistent with applicable law.

      **7.4**    <u>**Fiscal Year**</u>.  The Company's fiscal year shall end on March 31 of each calendar year. Each fiscal year shall consist of four quarters ending on March 31, June 30, September 30 and December 31 of each fiscal year. Each such quarter shall be referred to as a "fiscal quarter".

## ARTICLE VIII

## INDEMNIFICATION AND INSURANCE

      **8.1**    <u>**Indemnification and Advancement of Expenses**</u>.  (a) The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company), by reason of the fact that he, she or it is or was a Manager, Independent Manager, Member, officer, employee, representative or agent of the Company, or is or was serving at the request of the Company as a director, officer, manager, employee, representative or agent of another corporation, limited liability company, general partnership, limited partnership, joint venture, trust, business trust or other enterprise or entity, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually incurred by him, her or it in connection with such action, suit or proceeding if he, she or it acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his, her or its conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement or conviction, or upon a plea of <u>nolo</u> <u>contendere</u> or its equivalent, shall not, of itself, create a presumption that such Person did not act in good faith and in a manner which he, she or it reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his, her or its conduct was lawful.

      (b)     The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that he, she or it is

13

DZB173563

or was a Manager, Independent Manager, Member, officer, employee, representative or agent of the Company, or is or was serving at the request of the Company as a director, officer, manager, employee, representative or agent of another corporation, limited liability company, general partnership, limited partnership, joint venture, trust, business trust or other enterprise or entity, against expenses (including attorneys' fees) actually incurred by him, her or it in connection with the defense or settlement of such action or suit if he, she or it acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company, except that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable to the Company unless and only to the extent that a Delaware state court or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

(c)     To the extent that a Manager, Independent Manager, Member, officer, employee, representative or agent of the Company has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in paragraphs (a) and (b) of this Section 8.1, or in defense of any claim, issue or matter therein, he, she or it shall be indemnified against expenses (including attorneys' fees) actually incurred by him, her or it in connection therewith.

(d)     Any indemnification under paragraphs (a) and (b) of this Section 8.1 (unless ordered by a court of competent jurisdiction) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of any Manager, Independent Manager, Member, officer, employee, representative or agent is proper in the circumstances because he, she or it has met the applicable standard of conduct set forth in paragraphs (a) and (b) of this Section 8.1.    Such determination shall be made (i) by the Management Committee by a majority vote of Managers who were not parties to such action, suit or proceeding (even if such Managers constitute less than a quorum of Managers) or (ii) by the Member.

(e)     Expenses (including attorneys' fees) incurred by any Manager, Independent Manager or the Member in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of any Manager, Independent Manager or the Member, respectively, to repay such amount if it shall ultimately be determined that he, she or it is not entitled to be indemnified by the Company pursuant to this Section 8.1. Such expenses (including attorneys' fees) incurred by other officers, employees, representatives and agents shall be so paid upon such terms and conditions, if any, as the Management Committee deems appropriate.

(f)     The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 8.1 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any by-law, agreement, vote or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office.

14

DZB173564

(g)     For purposes of this Section 8.1, any reference to the "Company" shall include, in addition to the resulting or surviving entity, any constituent entity (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, managers, members, employees, representatives or agents, so that any Person who is or was a director, officer, manager, member, employee, representative or agent of such constituent entity, or is or was serving at the request of such constituent entity as a director, officer, manager, employee, representative or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Section 8.1 with respect to the resulting or surviving entity as he or she would have with respect to such constituent entity if its separate existence had continued.

(h)     The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 8.1 shall continue as to a Person who has ceased to be a Manager, Independent Manager, Member, officer, employee, representative or agent and shall inure to the benefit of the heirs, executors and administrators of such Person.

(i)     Notwithstanding anything in this Article to the contrary, the Company will not have the obligation of indemnifying any Person with respect to proceedings, claims or actions initiated or brought voluntarily by such Person and not by way of defense.

**8.2     Insurance**.   The Company shall purchase and maintain insurance or another arrangement on behalf of any Person who is or was a Manager, Independent Manager, Member, officer, employee, agent or other Person identified in Section 8.1 against any liability asserted against such Person or incurred by such Person in such capacity or arising out of the status of such a Person, whether or not the Company would have the power to indemnify such Person against that liability under Section 8.1 or otherwise.

**8.3     Limit on Liability of Members**.   The indemnification set forth in this Article VIII shall in no event cause the Member to incur any personal liability beyond its Capital Contributions, nor shall it result in any liability of the Member to any third party.

**8.4     No Recourse**.   Notwithstanding anything in this Article VIII to the contrary, the Company shall have no obligation to indemnify any Person except to the extent that the Company has funds available for such purpose in excess of the funds needed to pay any creditors of the Company under any of the instruments, documents or agreements described in Section 3.1(b).

## ARTICLE IX

## DISSOLUTION AND WINDING UP

**9.1     Events Causing Dissolution**.   The Company shall be dissolved upon the first of the following events to occur:

(a)     The written consent of the Member at any time to dissolve following the payment in full of all the obligations of the Company to its creditors and other third parties; or

15

(b)    The occurrence of any other event that causes the dissolution of a limited liability company under the Act.

A Dissolution Event or any Insolvency Event with respect to any or all Members shall not cause the dissolution of the Company.

9.2    **Winding Up**.  If the Company is dissolved pursuant to Section 9.1, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)    The winding up of the Company's affairs shall be supervised by a liquidator (the "Liquidator"). The Liquidator shall be the Management Committee or, if the Management Committee prefers, a liquidator or liquidating committee selected by the Management Committee.

(b)    In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, in the name of and for and on behalf of the Company to:

(i)    Prosecute and defend civil, criminal or administrative suits;

(ii)    Collect Company assets, including obligations owed to the Company;

(iii)    Settle and close the Company's business;

(iv)    Dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions;

(v)    Pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property;

(vi)    Discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

(vii)    Distribute any remaining proceeds from the sale of Company Property to the Member;

(viii)    Prepare, execute, acknowledge and file articles of dissolution under the Act and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and

(ix)    Exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Management Committee under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties

16

DZB173566

and functions. The Liquidator (if not the Management Committee) shall not be liable as a Manager to the Member and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in Article VIII.

**9.3    Compensation of Liquidator.**    The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and the Management Committee.

**9.4    Distribution of Company Property and Proceeds of Sale Thereof.**    (a) Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

      (i)    to satisfy Company liabilities to creditors, including the Member and any Manager or Independent Manager if they are creditors, to the extent otherwise permitted by law (other than for past-due Company distributions), whether by payment or establishment of reserves;

      (ii)    to satisfy Company obligations to the Member for past-due Company distributions; and

      (iii)    to the Member with respect to its Membership Interests.

All distributions required under this Section 9.4 shall be made by the end of the taxable year in which the liquidation occurs or, if later, within 90 days after the date of such liquidation.

      (b)    The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group. If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Membership Interests of each Member in such group.

### ARTICLE X

### MISCELLANEOUS PROVISIONS

**10.1    Counterparts.**    This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same.

**10.2    Entire Agreement.**    This Agreement constitutes the entire agreement among the parties hereto and contains all of the agreements among such parties with respect to the subject matter hereof.  This Agreement supersedes any and all other agreements, either oral or written, between such parties with respect to the subject matter hereof.

**10.3    Partial Invalidity.**    Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or

Confidential

DZB173567

unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

10.4    **Amendment**.  Except as expressly provided herein, no provision of this Agreement may be amended, modified or repealed except by a written agreement executed by the Member and each member of the Management Committee.

10.5    **Binding Effect**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective successors and assigns.

10.6    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Delaware. In particular, this Agreement is intended to comply with the requirements of the Act and the Certificate of Formation. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the Act or any provision of the Certificate of Formation, the Act and the Certificate of Formation, in that order of priority, will control.

18

Confidential

DZB173568

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the dates set below their names, to be effective on the date first above written.

AUTOBAHN FUNDING COMPANY LLC

By: _____
Name:   Philip A. Martone
Title:   Vice President

**SOLE MEMBER:**

**BSCS XVI, INC.**

By: _____
Name:   MARY L. BRADY
Title:   VICE PRESIDENT

Signature Page to A&R Limited Liability Company Operating Agreement

NY1 6660781v.6

Confidential

DZB173569

Schedule I

## MEMBER CAPITAL CONTRIBUTIONS

| Member | Capital Contribution | Membership Interests |
|---|---|---|
| BSCS XVI, Inc.<br>c/o Lord Securities Corporation<br>New York, New York 10005 | $25,000 | 100% |

NY1 6660781

Confidential

DZB173570

# EXHIBIT T-51

**WRITTEN ACTION IN LIEU OF MEETING
BY THE BOARD OF GOVERNORS OF
PC FUNDING, LLC**

The following action is taken by all of the members of the Board of Governors of **PC FUNDING, LLC**, a Delaware limited liability company (the "**Company**"), without a meeting, by authorizing the same in writing signed by all of the members and all of the members of the Board of Directors of the Company.

**WHEREAS**, there has been presented to the Governors a Sale Agreement between the Company and Petters Company, Inc., a Minnesota corporation ("Petters"), attached hereto as Exhibit A, under which the Company shall purchase from time to time Receivables from Petters created in connection with goods sold or to be sold by Petters; and

**WHEREAS**, there have been presented to Governors a Credit Agreement between the Company and Opportunity Finance, LLC, a Delaware limited liability company ("OF"), and a Security Agreement between the Company and OF, attached hereto as Exhibit B and Exhibit C, respectively, under which OF will provide the Company with a credit facility to finance the purchase of the Receivables and the Company will, in turn, grant a continuing lien on certain collateral;

**NOW, THEREFORE, BE IT RESOLVED**, that Thomas J. Petters is authorized to execute, in the name and on behalf of the Company, the Sale Agreement, the Credit Agreement and the Security Agreement and to deliver to the appropriate parties the Sale Agreement, the Credit Agreement and the Security Agreement and each other agreement, instrument, promissory note, certificate, financing statement or document contemplated by such agreements, substantially in the form of those presented to the Governors, except for such changes, additions or deletions as such officer shall deem proper; execution by such officer of the Sale Agreement, the Credit Agreement and the Security Agreement and related documents to be conclusive evidence that such officer deems all of the terms and provisions thereof to be proper; and

**FURTHER RESOLVED**, that the officers of the Company shall be and are hereby authorized to take such action from time to time on behalf of the Company as such officers may deem necessary, advisable or proper in order to carry out and perform the obligations of the Company under the Sale Agreement, the Credit Agreement and the Security Agreement, and all related instruments, documents and agreements; and

**FURTHER RESOLVED,** that all authority conferred by these resolutions shall be deemed to be retroactive and any and all acts authorized hereunder performed prior to the adoption of this resolution are hereby ratified, affirmed, adopted and approved; and

**FURTHER RESOLVED,** the Secretary of the Company is authorized to certify to all appropriate parties a copy of these resolutions and such parties are hereby authorized to rely upon such certificate until formally advised by a like certificate of any change therein, and are hereby authorized to rely on any such additional certificates.

The above action is taken without a meeting by authorization in writing signed by all of the members and all of the members of the Board of Governors of the Company, which action is to be effective on December 17, 2001.

**DIRECTORS:**

_____
Thomas J. Petters

_____
Thomas S. Hay

_____
Benjamin B. Abedine

468589/1

DZB002786

**WRITTEN ACTION IN LIEU OF MEETING**
**BY THE BOARD OF GOVERNORS OF**
**PC FUNDING, LLC**

The following action is taken by all of the members of the Board of Governors of **PC FUNDING, LLC**, a Delaware limited liability company (the "**Company**"), without a meeting, by authorizing the same in writing signed by all of the members and all of the members of the Board of Directors of the Company.

**WHEREAS**, there has been presented to the Governors a Sale Agreement between the Company and Petters Company, Inc., a Minnesota corporation ("Petters"), attached hereto as Exhibit A, under which the Company shall purchase from time to time Receivables from Petters created in connection with goods sold or to be sold by Petters; and

**WHEREAS**, there have been presented to Governors a Credit Agreement between the Company and Opportunity Finance, LLC, a Delaware limited liability company ("OF"), and a Security Agreement between the Company and OF, attached hereto as Exhibit B and Exhibit C, respectively, under which OF will provide the Company with a credit facility to finance the purchase of the Receivables and the Company will, in turn, grant a continuing lien on certain collateral;

**NOW, THEREFORE, BE IT RESOLVED**, that Thomas J. Petters is authorized to execute, in the name and on behalf of the Company, the Sale Agreement, the Credit Agreement and the Security Agreement and to deliver to the appropriate parties the Sale Agreement, the Credit Agreement and the Security Agreement and each other agreement, instrument, promissory note, certificate, financing statement or document contemplated by such agreements, substantially in the form of those presented to the Governors, except for such changes, additions or deletions as such officer shall deem proper; execution by such officer of the Sale Agreement, the Credit Agreement and the Security Agreement and related documents to be conclusive evidence that such officer deems all of the terms and provisions thereof to be proper; and

**FURTHER RESOLVED**, that the officers of the Company shall be and are hereby authorized to take such action from time to time on behalf of the Company as such officers may deem necessary, advisable or proper in order to carry out and perform the obligations of the Company under the Sale Agreement, the Credit Agreement and the Security Agreement, and all related instruments, documents and agreements; and

**FURTHER RESOLVED**, that all authority conferred by these resolutions shall be deemed to be retroactive and any and all acts authorized hereunder performed prior to the adoption of this resolution are hereby ratified, affirmed, adopted and approved; and

**FURTHER RESOLVED**, the Secretary of the Company is authorized to certify to all appropriate parties a copy of these resolutions and such parties are hereby authorized to rely upon such certificate until formally advised by a like certificate of any change therein, and are hereby authorized to rely on any such additional certificates.

The above action is taken without a meeting by authorization in writing signed by all of the members and all of the members of the Board of Governors of the Company, which action is to be effective on December 17, 2001.

**DIRECTORS:**

_____          _____
Thomas J. Petters                           Thomas S. Hay

_____
Benjamin B. Abedine

468589/1

DZB002787

# EXHIBIT T-52

Page 1

1            UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
2
              CASE NO. 08-45257
3

4  IN RE:  PETTERS COMPANY, INC., et al.,
5              Debtors,
   (Includes:                        Court File Nos.
6  Petters Group Worldwide, LLC;      08-45258 (KHS)
   PC Funding, LLC;                   08-45326 (KHS)
7  Thousand Lakes, LLC;               08-45327 (KHS)
   SPF Funding, LLC;                  08-45328 (KHS)
8  PL Ltd., Inc.;                     08-45329 (KHS)
   Edge One LLC;                      08-45330 (KHS)
9  MGC Finance, Inc.                  08-45331 (KHS)
   PAC Funding, LLC;                  08-45371 (KHS)
10 Palm Beach Finance Holdings, Inc.) 08-45392 (KHS)
11 DOUGLAS A. KELLEY, in his capacity
   as the Trustee of the PCI Liquidating
12 Trust,
13              Plaintiff,
   vs.                               ADV. NO. 10-04301
14
   OPPORTUNITY FINANCE, LLC; OPPORTUNITY FINANCE
15 SECURITIZATION, LLC; OPPORTUNITY FINANCE
   SECURITIZATION II, LLC; OPPORTUNITY FINANCE
16 SECURITIZATION III, LC; INTERNATIONAL INVESTMENT
   OPPORTUNITIES, LLC; SABES FAMILY FOUNDATION;
17 SABES MINNESOTA LIMITED PARTNERSHIP;
   ROBERT W. SABES; JANET F. SABES; JON R. SABES;
18 STEVEN SABES; DEUTSCHE ZENTRALGENOSSENSCHAFTBANK
   AG; AND THE MINNEAPOLIS FOUNDATION,
19
              Defendants.
20 _____/
21     VIDEOTAPED DEPOSITION OF THOMAS SHERIDAN HAY
22          Palm Beach Gardens, Florida
            Thursday December 6, 2018
23
24 Reported by:  Darline Marie West, RPR, FPR
25 Job No. 151806

Page 264

THOMAS SHERIDAN HAY

1        you.  Hang on one second.

2                MR. HAVELES:  It's Exhibit 17.

3                MR. WALDMAN:  Thank you, Mr. Haveles.

4        BY MR. WALDMAN:

5            Q.   It's Exhibit 17.  And I'm not going to ask

6        you to read anything --

7            A.   That's not a name that people were

8        generally familiar with.  Sixteen, 17.

9            Q.   Okay.  And I'm not going to ask you about

10       the document.  I'm just showing it to you to refresh

11       your recollection that we talked about it.

12               And I think Mr. Haveles asked you if you

13       have signed down at the bottom as a director.  And

14       that is -- that's your signature, as far as you know?

15           A.   Yes.

16           Q.   Okay.  Do you recall, did your -- to the

17       extent that you had a position as a director of PC

18       Funding, do you recall whether it had a set term,

19       say, a year, two years, three years?

20           A.   I don't.

21           Q.   Okay.  Do you recall being appointed to the

22       board of PC Funding, LLC?

23           A.   Well, I recall -- I mean, I signed this

24       paper.  I mean, that was an appointment, as it were.

THOMAS SHERIDAN HAY

1  I mean --

3      Q.   Okay.  Do you recall ever subsequently

4  being reappointed to the board of PC Funding?

5      A.   No.

6      Q.   Okay.  Do you recall attending -- ever

7  attending a meeting of the board of PC Funding?

8      A.   No.

9      Q.   PC Funding, LLC, didn't have regular board

10  meetings, so far as you recall?

11         MR. HAVELES:  Objection.  Form.

12         THE WITNESS:  I question how long this

13      even lasted.

14  BY MR. WALDMAN:

15      Q.   So the answer is, no, no regular board

16  meetings?

17         MR. HAVELES:  He didn't indicate.  He

18      just kind of shook his head.

19  BY MR. WALDMAN:

20      Q.   Oh.  Sorry.

21         Just so the record is clear:  As far as you

22  recall, PC Funding did not have regular meetings of

23  the board of directors?

24      A.   That's true.

25      Q.   Okay.  Did you ever receive mail at an

Page 266

THOMAS SHERIDAN HAY

1    address specific to PC Funding?

2

3        A.   No.

4        Q.   Okay.  And do you recall PC Funding having

5    a separate address from where you worked at Petters?

6        A.   No.

7        Q.   Do you remember anybody trying to call you

8    at a number for PC Funding that --

9        A.   No.

10       Q.   A number -- do you remember doing anything

11   in particular in your capacity as a director of PC

12   Funding?

13       A.   No.

14       Q.   Okay.

15       A.   It was nonexistent, virtually.  I mean, to

16   the broader group of people.

17       Q.   And you were essentially a director in name

18   only; is that fair?

19           MR. HAVELES:  Objection.  Leading.

20           THE WITNESS:  I would say that's

21       correct.

22   BY MR. WALDMAN:

23       Q.   That's my first topic.  I think you also

24   testified, generally, that you spent a fair amount of

25   time in the -- on the Petters real estate entity; is

1                    THOMAS SHERIDAN HAY

2          THE WITNESS:  No, that -- that is

3      correct.

4  BY MR. WALDMAN:

5      Q.   Okay.  And I actually -- sorry, I had one

6  other question about PC Funding, or two other

7  questions.

8      A.   Yeah.

9      Q.   The document that we looked at has two

10 other signatories.  It looks like Tom -- Tom Petters

11 and Benjamin Abadine.

12          So far as you knew, were they also

13 directors, essentially, in name only?

14          MR. HAVELES:  Objection.  Foundation.

15          THE WITNESS:  No, Tom Petters, of

16      course, being -- well, Tom Petters, being

17      the principal and owner of the business, was

18      a more normal director, if you want to call

19      it that.  The other fellow, I've never met.

20 BY MR. WALDMAN:

21     Q.   Okay.  He wasn't at any of the nonexistent

22 board meetings?

23     A.   I don't know who he is.

24          MR. HAVELES:  Objection.  Foundation.

25          MR. WALDMAN:  Okay.  That's all I've

# EXHIBIT T-53

**DZ BANK**

**Internal**

| | Department / Initials | Extension | Date |
|---|---|---|---|
| **New York Branch** | ASSET SECURITIZATION / PP, VS | 1665,1659 | 04.18.2002 |

Reference:

**Opportunity Finance, LLC – Request for $70.0 mio Increase in Commercial Paper Program.**

| For | | |
|---|---|---|
| O | Attention | D'Oelsnitz. Bollmann. Bannmann |
| O | Comment | |
| X | Decision | Gesamtvorstand über Herrn Flach, |
| X | Information | H.O.: Ziese/IZ, Michael Wolf F/REAU |

**I.  Executive Summary**

- DZ Bank's conduit, Autobahn Funding Company, LLC ("Autobahn"), closed a $100.0 mio revolving senior secured credit facility (the "Facility") for Opportunity Finance, LLC ("Opportunity Finance" or the "Company"). The Company, headquartered in Minneapolis, is a Delaware Limited Liability Corporation engaged in the business of providing inventory and receivables financing to businesses ("Distributors") requiring interim financing for wholesale inventory trading transactions. Historically, electronics goods have made up 70.0% of the transactions, and appliances 10.0%

- DZ BANK currently provides a $102.0 mio (102.0% of the $100.0 mio commitment size) 364-day backstop liquidity facility, renewable annually, to facilitate the issuance of commercial paper by Autobahn. The liquidity facility will not subject DZ BANK to BIS capital charges due to the short-term nature of its commitment (< 1 year).

- In order to facilitate its growth, the Company has requested that Autobahn increase its existing $100.0 mio Facility to $170.0 mio

- It is anticipated that the lowest risk tranche of this structure will be shadow rated at least "A2" by Moody's.



Opportunity Finance's $108 mio Receivables: (As of 2/28/02)

$75 mio Commercial Paper

$33 mio Equity

$50 mio "First Loss" Policy

**DZ's RISK:**

94% "AAA"

4% "AA"

2% "A"

- The Company, started in 1998, has been profitable every year since 1998 – net earnings were $13.7 mio, $16.5 mio and $21.5 mio for the fiscal years ended 12/31/99, 12/31/00 and 12/31/01, respectively.

- The ultimate obligors on receivables financed by Opportunity Finance (buyers of the financed inventory) have traditionally been large discount retailers. Sam's Club, a division of Wal-Mart ("Aa2" by Moody's), and BJ's Wholesale Club (not rated, $658 mio of net worth, FY 2000 net income of $132 mio), and Costco ("A2" by Moody's, $5.0 bio net worth) have accounted for almost 80% of the portfolio.

DZB040825

- As of February 28, 2002, the Company's portfolio consisted of 40 loans with an outstanding principal balance of $108.3 mio secured by $75.0 mio in inventory and accounts receivable. Since its inception, the Company has originated $600.0 mio in loans secured by over $1.0 bio in inventory and accounts receivable and **has never experienced a default or dilution.**

- DZ Bank's credit enhancement in this transaction will be provided by (i) minimum 20% overcollateralization generated by an 80% advance against loans originated by Opportunity Finance and (ii) a $50 mio "first loss[1]" insurance policy from Royal & SunAlliance ("RSA"), rated A1/AA- by Moody's/Fitch. Additionally, DZ Bank receives 2.0% recourse from Opportunity Finance ($27.7 mio net worth as of 12/31/01) as well as from Petters ($54.1 mio net worth as of 12/31/01). **Credit enhancement is 61.8% on a fully funded basis** (see *Section IV*). These calculations **do not place any value** on the limited recourse being provided by the Company and Petters.

- For its commitment, DZ BANK will earn Facility Fees of 2.15% on the outstanding face amount of commercial paper and a non-use fee of 0.30%. Based upon expected utilization, DZ BANK will earn over $3.0 mio per annum in fee income.

## II.  Terms and Conditions

**Borrower** ................................. Opportunity Finance Funding Corporation ("OFFC" or the "Borrower"), a bankruptcy-remote subsidiary of Opportunity Finance.

**Facility** ................................... $170 mio senior secured revolving commercial paper warehouse program for which the **lowest risk tranche** is expected to be rated no lower than "A2" by Moody's.

**Term** ....................................... Five years revolving.

**Credit Enhancement** ............. (a)  minimum of **20.0%** overcollateralization generated through the 80.0% advance rate against Opportunity Finance's <u>principal investment</u>; this equates to overcollaterlization of **32.4%** on the purchase price of the goods by the Retailer (see *Section IV*);

(b)  **$50 mio, first loss insurance policy, from Royal SunAlliance ("A1" Moody's and "AA-" Fitch);**

(c)  2.0% recourse from Petters Company, Inc. ($54.1 mio net worth as of 12/31/00) and Opportunity Finance ($27.7 mio net worth as of 8/31/01).

**Back-up Servicer** ................... US BANK, N.A. (rated "Aa3" by Moody's).

**Pricing** ................................... (a)  Facility Fees of 2.15% per annum on the outstanding face value of CP;

(b)  A Non-Use Fee of 0.30%;

(c)  Funded liquidity rate (during a CP disruption) of 1 MO LIBOR plus 3.15% (or the Base Rate if LIBOR is unavailable).

**Facility Exclusivity** ............... Opportunity Finance will be required to fund the origination of all trade finance loans originated by it through DZ's commercial paper program for the tenor of the Facility.

## III.  Company Overview

Opportunity Finance, LLC is engaged in the business of lending money to Distributors which purchase merchandise from wholesalers for immediate re-sale to retailers (a "Wholesale Goods Transaction"). The Company, organized in 1998 and headquartered in Minneapolis, Minnesota, currently finances its loan originations through investor notes, provided primarily by the family and friends of CEO Jon Sabes (see **Exhibit I** for Senior Management Profiles). The Facility proceeds will refinance a majority of these notes, giving Opportunity Finance the ability to institute an 80% debt / 20% equity capital structure versus the more expensive 100% equity capital structure currently in place. It is important to note that any investor notes issued by the

---

[1] "First Loss" implies that, should the overcollateralization inherent in the structure prove insufficient to cover losses on the financed receivables, RSA will be required to absorb the first $50 mio of losses over and above what the program can sustain before DZ BANK would incur a dollar of loss.

DZB040826

**DZ BANK**

**Internal**

Company (which will serve as credit enhancement for Autobahn as lender) will be **subordinate to the debt outstanding under the Facility** in terms of repayment priority.

Petters Company, Inc., Opportunity Finance's primary Distributor, has been in the wholesale business since 1993. Petters finances its wholesale business through Opportunity Finance and various other financing sources that provide advance rates in excess of traditional funding sources and quick transaction specific turn-around timing. As of 12/31/01, Petters had approximately $297.0 mio in financing,  $54.1 mio in net worth and had net income of $18.0 mio for FYE 2001.

The Wholesale Goods Transactions originated by Petters and financed by the Company are structured to be short-term loans (3-5 month terms) collateralized by tangible assets and accompanying receivables (typically sized at 80-85% of the underlying receivable amount).  They involve only new, name brand merchandise in their original packaging and none of the inventories involve merchandise that has been damaged in any way.  The Distributors are firms that specialize in the bulk acquisition and disposition of wholesale consumer product inventories.

To date, the Company has successfully completed over 200 Wholesale Goods Transactions, totaling over $500 million in loan originations.  **The Company has never experienced a single credit loss, nor has it experienced any losses due to dilution on the underlying inventories and accounts receivable** (refer to **Exhibit V** for the Company's loan portfolio performance).  The following flow chart illustrates the process by which the Company originates new Wholesale Goods Transactions:

### Structure of Underlying Trade Transaction



1 - The Distributor, acting as a broker, sources excess inventory, typically referred to as "overstock" goods, from a seller such as RCA or Sony (the "Wholesaler") and then seeks to find a buyer looking to purchase the inventory for re-sale to consumers at the retail level (a "Retailer", i.e. Costco, Sam's Club, etc.).

2 - Once a Retailer has been found, purchase orders for both the purchase from the Wholesaler and the sale to the Retailer are contemporaneously issued.  The profit margin generated by the Distributor from the difference between the cost of inventory and the price to the Retailer averages 16.0%.

3 - These purchase orders are then assigned to a financial source (like DZ Bank's customer, Opportunity Finance), who in turn lends funds to the Distributor to complete the wholesale inventory trade.  A UCC1 is filed by the financing source to perfect its security interest in the inventory purchased.

4 - The mechanics of the financing to the Distributor typically requires the financing source to lend 98.0% of the cost of goods and 2.0% equity from the Distributor.  The term of the financing is under 150 days and carries an annualized coupon of between 15.0% and 45.0%.

DZB040827

**DZ BANK**

**Internal**

5 - The financing source will obtain its financing from Autobahn Funding Company, LLC. Autobahn will finance 80.0% of the financing source's loan, requiring the financing source to provide 20.0% equity on its loan to the Distributor. With the profit margin from the sale, the Distributor equity and the financing source equity, Autobahn has 32.4 overcollateralization (see *Section IV* for a credit enhancement calculation).

6 - Proceeds from the financing source's loan are forwarded directly to the Wholesaler for the purchase of the merchandise – **at no time do proceeds get advanced directly to the Distributor**. The Distributor then arranges for shipment of the merchandise directly to the Retailer (the Distributor **never takes possession** of the merchandise).

7 - Upon receipt of the merchandise by the Retailer, an account receivable owed to the Distributor is created and pledged to the financing source as collateral for the advance to the Distributor. The pledge of the receivable is in addition to the Distributor's obligation to repay the loan from the financing source.

8 - The Retailer pays on the account receivable directly to the financing source – the proceeds of the payment are applied against the outstanding principal and interest of the loan.

The total time elapsed in which a Wholesale Goods Transaction occurs is approximately 100 days. The loans originated by the Borrower mature at the earlier of (i) the payment of the receivable by the Retailer or (ii) 150 days from the note's origination date. The size of a Wholesale Goods Transaction typically ranges from $0.5 million to $6.0 million. For a stratification of the Company's loan portfolio, please refer to **Exhibit III**.

Financial Performance
Opportunity Finance has had strong revenue and income performance over the past three years – please refer to the following table:

| Selected Financial Data ($ mio) | FYE 1999 | FYE 2000 | FYE 2001 |
|---|---|---|---|
| Revenues | 14.0 | 16.7 | 25.8 |
| Income (before distributions) | 13.7 | 16.5 | 21.5 |
| Total Assets | 47.5 | 56.4 | 47.0 |

Please refer to **Exhibit II** for the Company's financial statements as of 12/31/01.

## IV.  Securitization Structure

Autobahn Funding Company LLC provides a five year, $100 mio senior secured revolving credit facility on the closing date, the proceeds of which are used to fund Opportunity Finance's direct origination of loans to Distributors secured by inventory and accounts receivable. These loans are then sold, on a true-sale basis, to OFFC, DZ Bank's bankruptcy-remote Borrower under the Facility. OFFC pledges these loans to Autobahn in order to receive commercial paper proceeds raised in the capital markets. Opportunity Finance also pledges to OFFC both the $50 mio RSA insurance policy and a first priority perfected security interest in the underlying inventory and accounts receivable (see **Exhibit IV** for a transaction diagram).

DZ BANK provides a 364-day backstop liquidity facility sized to cover 102% of Autobahn's commitment. For this reason, ASG has a $102 mio to cover $100 in principal advances and up to $2.0 mio in discount on commercial paper issued to fund loans under the Facility. The liquidity facility has a term of 364 days and is renewable annually.

The loans against which Autobahn advances funds are subject to eligibility tests via a "borrowing base calculation" that mitigates exposure to concentrations in the underlying portfolio related to (i) individual non-rated Retailers and (ii) aggregate non-rated Retailers, among others.

The Facility is used by the Company to (i) leverage its balance sheet more effectively, (ii) provide ongoing financing for its origination of trade finance loans and (iii) expand its Distributor lending base. To date, the Company has utilized its own un-leveraged capital to fund loan originations rather than borrowing funds from traditional sources (commercial banks, specialty finance companies etc.).

DZB040828

**DZ BANK**

**Internal**

## Credit Enhancement

The Company's 80.0-85.0% advance to Distributors against the value of the accompanying receivable and Autobahn's proposed 80.0% advance against the Company's principal investment yields overcollateralization under the Facility of approximately 32.4% (as measured on the outstanding loans advanced Autobahn). The following illustrates the credit enhancement using a hypothetical Wholesale Goods Transaction:

| | | | |
|---|---|---|---|
| Sale Price to Retailer (receivable | $ | 116.0 | (a) |
| Cost of Goods to Distributor | $ | 100.0 | (b) |
| Profit Margin | | 16.0% | ((a - b) / b) |
| Opportunity Finance Advance @ 98.0% of OBS | $ | 98.0 | (c) = (0.98 * b) |
| Autobahn Advance @ 80% of OF | $ | 78.4 | (d) = (0.80 * c) |
| Overcollateralization *(on balance of receivable from retailer)* | $ | 37.6 | (e) = (a - d) |
| **Overcollateralization Percentage** | | **32.4%** | (e / a) |

The above illustration does not take into account the RSA policy – after giving effect to the $50 mio first loss policy being provided by RSA, the total credit enhancement in the structure increases to 61.8% assuming full Facility utilization – please refer to the following:

### Full Utilization Scenario:

| | |
|---|---|
| Overcollateralization | 32.4% |
| Advances under Facility | 170,000,000 |
| RSA Policy | 50,000,000 |
| Percentage | 29.4% |
| **Enhancement Percentage** | **61.8%** |

Please note that the credit enhancement percentages depicted above <u>do not factor in the 2.0% recourse from both Opportunity Finance and Petters</u>.

Based on the above analysis, ASG anticipates the lowest risk tranche of the Facility to be rated at least "A2" by Moody's Investors Service. This expectation is based on (i) the lack of any gross defaults or dilution with respect to Opportunity Finance's portfolio, (ii) the $50 mio "first loss" policy provided by 'A1'/'AA-' rated RSA, (iii) 20.0% minimum overcollateralization resulting from the 80.0% advance rate and (iv) other standard protections found in highly rated securitizations, including a bankruptcy remote Borrower, segregated cashflow accounts and a dedicated back-up servicer that can be called upon immediately to assume servicing of the portfolio if Opportunity Finance does not meet its obligations as servicer.

## Royal & SunAlliance Insurance Group, plc

Royal & SunAlliance, created in 1996 with the merger of two of Britain's largest insurance companies, is providing a $50 mio "first loss" insurance policy to the structure, under which Autobahn shall be named as loss payee. The lawyers of both Moody's Investors Service and Fitch IBCA have reviewed the proposed policy and have concluded that the policy has no "outs" and can be viewed as equivalent to a letter of credit in the transaction.

Sun Insurance was founded in 1710, Alliance founded in 1824, and Royal founded in 1845. The combined entity, RSA, had $4.8 bio in shareholders' funds as of 12/31/01 and generated an operating profit of $16.1 mio in

DZB040829

**DZ BANK**

2001. The Group is one of the top 10 largest multi-line insurers in the world, with over $11.7 bio in premiums written in 2001.

## V. Transaction Risks and Mitigants

The following is a discussion of the risks associated with this asset class. The structure incorporates protective features designed to mitigate these and all risks associated with the transaction.

Asset/Credit Risk: The risk that the credit quality of the financed receivables deteriorates due to dilution or default by Retailers to such a degree that the total credit enhancement (61.8% based upon the $50 mio RSA insurance policy) is not sufficient to cover losses.

In evaluating the credit protection supporting DZ BANK's exposure, ASG stressed the level of defaults that could occur before DZ Bank's credit enhancement would be exhausted. **Giving no value to recoveries, DZ Bank's structure can withstand defaults of at least 98.0% before the credit enhancement would be exhausted.** It is important to view this number in the context of Company's strong historical portfolio performance (the Company has not experienced a single default since its inception in 1998).

Additionally, the structure incorporates performance triggers that measure dilution and default on the underlying portfolio. Breach of these performance triggers (i) causes the cessation of funding under the Facility (ii) allows DZ BANK to replace the Company as servicer with US BANK and (iii) causes all cash flow from the underlying receivables to be trapped until the Facility has completely amortized.

Operational Risk: The operational risk in this transaction is that Opportunity Finance, as servicer, fails to properly originate and service the loans in a manner consistent with its past performance. The transaction is structured with several procedural and performance-related triggers that give DZ Bank the ability to replace Opportunity Finance with US BANK as servicer if Opportunity Finance does not perform in a satisfactory manner.

Interest Rate Risk: Due to the short term nature of the assets being financed, the risk resulting from the basis mismatch between the fixed-rate collateral and floating rate liabilities of the Facility is minimal.

## VI. Syndication

ASG is currently in discussions with banks to participate $25.0 mio in order to comply with the sell down requirement.

## VII. Conclusion/Recommendation

DZ BANK was engaged by the Company due to ASG's ability to understand this asset class and develop a financing facility that will enable the Company to capitalize on its potential in the wholesale inventory trading industry. This request provides DZ BANK with a further opportunity to support the client's growth, with no additional risk to DZ Bank's structure, with the opportunity to earn above market risk-adjusted returns on high quality assets.

Given the risk/return profile of this transaction and the strategic importance of building our presence as an innovator in the wholesale inventory trade loan market, ASG recommends approval of this application on these or very similar terms.

Preece _____     Bollmann _____

Salerno _____     d'Oelsnitz _____

Bradt _____

**DZ BANK**

**VIII.**      **Exhibits**

| | |
|---|---|
| Exhibit I | Senior Management Profiles |
| Exhibit II | Financial Statements |
| Exhibit III | Portfolio Stratification @ 8/31/01 |
| Exhibit IV | Transaction Diagram |
| Exhibit V | Portfolio Loan Performance |
| Exhibit VI | Arthur Andersen Procedural Review - Petters Company, Inc. |

DZB040831

**DZ BANK**

**Internal**

# EXHIBIT I

Senior Management Profiles

DZB040832

**DZ BANK**

Internal

<u>Jon R. Sabes, CEO/Manager.</u> Mr. Sabes, 35, has over twelve years experience in investment banking, business development, corporate law and consulting in a variety of industries. Mr. Sabes is responsible for the general business oversight and underwriting of the Company. Mr. Sabes is a founding partner of Jon Adams Financial Co., LLP, a law firm and business advisory firm specializing in providing small and medium size businesses with professional services related to mergers and acquisitions and corporate finance. Prior to joining Jon Adams Financial Co., Mr. Sabes served as a tax consultant with Ernst & Young LLP. In addition, Mr. Sabes' professional experience includes serving as Vice President of Business Development for Gaming Corporation of America and investment banking with Jefferies & Company, Inc. Mr. Sabes earned a Juris Doctor, Cum Laude, from the University of Minnesota and holds a BA from the University of Colorado.

<u>Steve Sabes, Administration and Servicing Manager.</u> Mr. Sabes, 33, has been associated with Opportunity Finance as its portfolio administrator since 1999. As portfolio administer, Mr. Sabes initiates and confirms the movement of money between investors, the Company, and its clients. In addition, Mr. Sabes tracks the status of each loan with Larry McGough, communicating with clients on a daily basis, coordinating corporate bookkeeping, and seeking to ensure portfolio payouts occur properly. Mr. Sabes performs cash management and maintains all files for the Company's portfolio. Mr. Sabes holds a Ph. D. in Organic Chemistry from the University of Minnesota and a BA from The Colorado College.

<u>Larry McGough, Controller.</u> Mr. McGough, 46, is charged with designing and overseeing internal accounting and computer-related systems and information reporting to senior level management. Mr. McGough oversees internal financial statement reporting systems, tax return preparation, and general back office functions related to receivable and accounts payable management. Mr. McGough provides necessary support services to members of the senior management team as needed. Mr. McGough coordinates fixed asset acquisitions and arranges for financing of related fixed assets, and for the maintenance and update of the corporate computer network as needed. Mr. McGough holds a MBA from Mankato State University and a BS from Northwest Missouri State University.

<u>Sandy Quigley, Bookkeeper/Receptionist.</u> Ms. Quigley is responsible for accounts payable recording, payment and reconciliation, accounts receivable recording, payment and reconciliation. Ms. Quigley assists in the preparation of financial statements through general ledger, brokerage account reconciliation. In addition, Ms. Quigley oversees the daily operations of the business office, greeting guests, handling mail, and other general administrative duties.

DZB040833

**DZ BANK**

# EXHIBIT II

Opportunity Finance Financial Statements as of 8/31/01

DZB040834

**DZ BANK**

**Internal**

## Opportunity Finance, LLC

Balance Sheet (as of 8/31/01)

Assets
| | | |
|---|---|---|
| | Cash | 18,570,947 |
| | Accounts Receivable | 72,200,000 |
| | Other Assets | 5,000 |

Total Assets                90,575,947

Liabilities
| | | |
|---|---|---|
| | Investor Notes | 72,908,920 |

Equity                      17,667,027

Total Liabilities & Equity  90,575,947

Income Statement (for period 1/1/01-8/31/01)

Revenue
| | | |
|---|---|---|
| | Interest Income | 18,069,830 |

Expenses
| | | |
|---|---|---|
| | Direct Expenses | 209,914 |

Income (before distributions)   17,859,916

DZB040835

**DZ BANK**

**Internal**

# EXHIBIT III

## Portfolio Stratification as of 8/31/01

DZB040836

**DZ BANK**

The following are stratifications of the Company's outstanding trade finance loan portfolio as of August 31, 2001.

### Summary of Loan Portfolio:

| | |
|---|---|
| Total Unpaid Principal Balance of Loans: | $72,200,000 |
| Number of Loans: | 24 |
| Average Outstanding Loan Balance: | $3,008,333 |
| Weighted Average Original Term to Maturity: | 120 days |
| Ratio of Unpaid Principal Balance to Cost of Goods Financed: | 98.0% |
| Ratio of Unpaid Principal Balance to Receivable from Buyer: | 83.8% |
| Weighted Average Days Outstanding | 37 days |

| Note Issuance Date | Note Principal Balance | Cost of Goods Financed | Loan as % of Cost of Goods | Receivable from Buyer | Loan as % of Rec. from Buyer | Goods Buyer | Goods Description | Days Outstanding |
|---|---|---|---|---|---|---|---|---|
| 6/5/2001 | 4,200,000 | 4,212,471 | 99.7% | 4,949,653 | 84.9% | BJ's Wholesale Club | Samsonite Luggage | 87 |
| 6/6/2001 | 2,400,000 | 2,421,510 | 99.1% | 2,845,274 | 84.4% | Sam's Club | Samsonite Luggage | 86 |
| 6/7/2001 | 3,000,000 | 3,401,640 | 88.2% | 4,005,186 | 74.9% | BJ's Wholesale Club | Panasonic TVs and VCRs | 85 |
| 6/20/2001 | 3,000,000 | 3,057,816 | 98.1% | 3,547,032 | 84.6% | BJ's Wholesale Club | Panasonic Video Equipment | 72 |
| 6/28/2001 | 3,600,000 | 3,639,643 | 98.9% | 4,221,980 | 85.3% | Sam's Club | Panasonic Video Equipment | 64 |
| 6/28/2001 | 1,200,000 | 1,260,998 | 95.2% | 1,462,757 | 82.0% | Sam's Club | Panasonic Video Equipment | 64 |
| 7/3/2001 | 5,000,000 | 5,070,863 | 98.6% | 5,932,936 | 84.3% | Sam's Club | Whirlpool Appliances | 59 |
| 7/16/2001 | 1,300,000 | 1,301,742 | 99.9% | 1,524,741 | 85.3% | Sam's Club | Men's Coats | 46 |
| 7/23/2001 | 3,000,000 | 3,071,874 | 97.7% | 3,592,282 | 83.5% | Boscov's | SONY TVs | 39 |
| 7/23/2001 | 2,100,000 | 2,278,185 | 92.2% | 2,619,693 | 80.2% | BJ's Wholesale Club | Small Appliances | 39 |
| 8/1/2001 | 6,000,000 | 6,025,471 | 99.6% | 7,052,688 | 85.1% | Sam's Club | RCA HDTV'S | 30 |
| 8/6/2001 | 2,800,000 | 2,805,066 | 99.8% | 3,281,903 | 85.3% | Boscov's | A/V Equipment | 25 |
| 8/7/2001 | 4,200,000 | 4,206,972 | 99.8% | 4,921,067 | 85.3% | Sam's Club | Cameras | 24 |
| 8/8/2001 | 1,500,000 | 1,529,387 | 98.1% | 1,789,324 | 83.8% | Boscov's | Phones | 23 |
| 8/10/2001 | 2,400,000 | 2,418,376 | 99.2% | 2,829,414 | 84.8% | Boscov's | Tents | 21 |
| 8/10/2001 | 2,700,000 | 2,718,279 | 99.3% | 3,175,830 | 85.0% | Sam's Club | Palm Pilots | 21 |
| 8/13/2001 | 2,600,000 | 2,629,129 | 98.9% | 3,076,063 | 84.5% | BJ's Wholesale Club | RCA Stereo TVs | 18 |
| 8/14/2001 | 2,800,000 | 2,820,371 | 99.3% | 3,295,761 | 85.0% | Sam's Club | HP Printeres | 17 |
| 8/15/2001 | 5,200,000 | 5,323,994 | 97.7% | 6,228,840 | 83.5% | BJ's Wholesale Club | Toshiba/Hitachi TVs | 16 |
| 8/21/2001 | 2,700,000 | 2,717,335 | 99.4% | 3,179,107 | 84.9% | Rex | Denon Digital Receivers | 10 |
| 8/22/2001 | 1,600,000 | 1,615,901 | 99.0% | 1,937,881 | 82.6% | Sam's Club | Toys | 9 |
| 8/22/2001 | 2,900,000 | 2,920,655 | 99.3% | 3,414,621 | 84.9% | Sam's Club | Furniture | 9 |
| 8/27/2001 | 4,000,000 | 4,014,475 | 99.6% | 4,696,917 | 85.2% | Sam's Club | SONY TVs | 4 |
| 8/27/2001 | 2,000,000 | 2,204,167 | 90.7% | 2,578,857 | 77.6% | Rex | RCA TVs | 4 |
| Total | 72,200,000 | 73,666,320 | 98.0% | 86,159,823 | 83.8% | | | 37 |

### By Unpaid Principal Balance:

| Range of UPB | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| $1,000,000 - $1,999,999 | 4 | 16.7% | 5,600,000 | 7.8% |
| $2,000,000 - $2,999,999 | 10 | 41.7% | 25,400,000 | 35.2% |
| $3,000,000 - $3,999,999 | 4 | 16.7% | 12,600,000 | 17.5% |
| $4,000,000 - $4,999,999 | 3 | 12.5% | 12,400,000 | 17.2% |
| $5,000,000 - $6,000,000 | 3 | 12.5% | 16,200,000 | 22.4% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |



**Internal**

## By Days Outstanding:

| Days Outstanding | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| 1-30 Days Outstanding | 13 | 54.2% | 37,400,000 | 51.8% |
| 31-60 Days Outstanding | 5 | 20.8% | 17,400,000 | 24.1% |
| 61-90 Days Outstanding | 6 | 25.0% | 17,400,000 | 24.1% |
| 91-120 Days Outstanding | 0 | 0.0% | 0 | 0.0% |
| >90 Days Outstanding | 0 | 0.0% | 0 | 0.0% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

## By Types of Goods Financed:

| Goods Type | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| Electronics | 16 | 66.7% | 50,300,000 | 69.7% |
| Appliances | 2 | 8.3% | 7,100,000 | 9.8% |
| Luggage | 2 | 8.3% | 6,600,000 | 9.1% |
| Furniture | 1 | 4.2% | 2,900,000 | 4.0% |
| Outdoor Goods | 1 | 4.2% | 2,400,000 | 3.3% |
| Toys | 1 | 4.2% | 1,600,000 | 2.2% |
| Clothes | 1 | 4.2% | 1,300,000 | 1.8% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

## By Ratio of Loan Amount to Cost of Goods Financed:

| UPB % of Cost of Goods Financed | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| 88.01% - 89.00% | 1 | 4.2% | 3,000,000 | 4.2% |
| 90.01% - 91.00% | 1 | 4.2% | 2,000,000 | 2.8% |
| 92.01% - 93.00% | 1 | 4.2% | 2,100,000 | 2.9% |
| 95.01% - 96.00% | 1 | 4.2% | 1,200,000 | 1.7% |
| 97.01% - 98.00% | 2 | 8.3% | 8,200,000 | 11.4% |
| 98.01% - 99.00% | 5 | 20.8% | 15,700,000 | 21.7% |
| 99.01% - 100.00% | 13 | 54.2% | 40,000,000 | 55.4% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

## By Ratio of Loan Amount to Receivable from Retailer:

| UPB % of Receivable from Buyer | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB |
|---|---|---|---|---|
| 74.01% - 75.00% | 1 | 4.2% | 3,000,000 | 4.2% |
| 77.01% - 78.00% | 1 | 4.2% | 2,000,000 | 2.8% |
| 80.01% - 81.00% | 1 | 4.2% | 2,100,000 | 2.9% |
| 82.01% - 83.00% | 2 | 8.3% | 2,800,000 | 3.9% |
| 83.01% - 84.00% | 3 | 12.5% | 9,700,000 | 13.4% |
| 84.01% - 85.00% | 9 | 37.5% | 28,000,000 | 38.8% |
| 85.01% - 86.00% | 7 | 29.2% | 24,600,000 | 34.1% |
| Total | 24 | 100.0% | 72,200,000 | 100.0% |

**DZ BANK**

**Internal**

## Loan Portfolio by Retailer:

| Buyer | Number of Contracts | % of Total Contracts | Unpaid Principal Balance | % of UPB | Ticker | S&P | Moody's | Fitch |
|---|---|---|---|---|---|---|---|---|
| Sam's Club | 12 | 50.0% | $37,700,000 | 52.2% | WMT | AA | Aa2 | AA |
| BJ's Wholesale Club | 6 | 25.0% | $20,100,000 | 27.8% | BJ | NR | NR | NR |
| Boscov's | 4 | 16.7% | $9,700,000 | 13.4% | Private | NR | NR | NR |
| Rex Stores Corporation | 2 | 8.3% | $4,700,000 | 6.5% | RSC | NR | NR | NR |
| Costco Wholesale Corp. | 0 | 0.0% | 0 | 0.0% | COST | A | A2 | A+ |
| Fleming Companies Inc. | 0 | 0.0% | 0 | 0.0% | FLM | BB | Ba2 | NR |
| Target Corp. | 0 | 0.0% | 0 | 0.0% | TGT | A+ | A2 | A |
| Toys R Us | 0 | 0.0% | 0 | 0.0% | TOY | BBB+ | A1 | BBB |
| Best Buy | 0 | 0.0% | 0 | 0.0% | BBY | BBB- | Baa3 | BBB |
| Home Depot | 0 | 0.0% | 0 | 0.0% | HD | AA | Aa3 | AA |
| Kmart Corp. | 0 | 0.0% | 0 | 0.0% | KM | BB+ | Baa3 | BB+ |
| Total | 24 | 100.0% | 72,200,000 | 100.0% | | | | |

**DZ BANK**

**Internal**

# EXHIBIT IV

## Transaction Diagram

**DZ BANK**

Internal



1. The Distributor sources excess inventory from a seller such as RCA or Sony (the "Wholesaler") and then seeks to find a buyer looking to purchase the inventory for re-sale to consumers at the retail level (a "Retailer"). Once a Retailer has been found, purchase orders for both the purchase from the Wholesaler and the sale to the Retailer are contemporaneously issued.

2. These purchase orders are then assigned to Opportunity Finance, who in turn lends funds to the Distributor to complete the wholesale inventory trade.

3. Proceeds of the loan to the Distributor are forwarded directly to the Wholesaler for the purchase of the merchandise – **at no time do proceeds get advanced directly to the Distributor.**

4. The Distributor then arranges for shipment of the merchandise directly to the Retailer (the Distributor **never takes possession** of the merchandise). Upon receipt of the merchandise, an account receivable ("AR") owed to Opportunity Finance is created.

5. Opportunity Finance then sells its interest in the merchandise and accounts receivable into a bankruptcy remote Special Purpose Vehicle ("SPV") on a **true-sale basis.** This protects Autobahn Funding Company ("Autobahn") as Lender in the unlikely event of a bankruptcy on the part of Opportunity Finance.

6. The SPV then pledges receivables purchased from Opportunity Finance to Autobahn as collateral in order to draw down under the facility. Autobahn will issue commercial paper in order to fund its obligations under the loan agreement, advancing against Opportunity Finance's principal investment in the merchandise and accounts receivable.

7. Payments on the underlying accounts receivable will be made by the Retailer to a segregated Lockbox Account under the control of DZ Bank. Funds deposited into the Lockbox Account will be swept to a central Collection Account held by the Trustee for the benefit of the Lender on a daily basis. The SPV can use funds in the Collection Account to either (i) purchase additional receivables from Opportunity Finance or (ii) pay down the loan balance under the facility.

8. 364-day Liquidity will be provided to Autobahn by P-1/F1-rated financial institutions.

DZB040841

**DZ BANK**

**Internal**

# EXHIBIT V

Portfolio Loan Performance

DZB040842

**DZ BANK**

The following is an analysis of the Company's historical loan portfolio performance.

## Portfolio Roll-Forward:

| Month | Beginning Unpaid Principal Balance | New Contracts[1] | Principal Collections | Write-Offs | Ending Unpaid Principal Balance |
|---|---|---|---|---|---|
| May-98 | - | 1,000,000 | - | - | 1,000,000 |
| Jun-98 | 1,000,000 | 1,000,000 | - | - | 2,000,000 |
| Jul-98 | 2,000,000 | 1,000,000 | (1,000,000) | - | 2,000,000 |
| Aug-98 | 2,000,000 | 1,314,000 | (2,000,000) | - | 1,314,000 |
| Sep-98 | 1,314,000 | 11,610,000 | - | - | 12,924,000 |
| Oct-98 | 12,924,000 | 12,735,000 | (12,924,000) | - | 12,735,000 |
| Nov-98 | 12,735,000 | 12,791,000 | - | - | 25,526,000 |
| Dec-98 | 25,526,000 | 24,263,199 | (14,926,000) | - | 34,863,199 |
| Jan-99 | 34,863,199 | 28,434,005 | (26,958,469) | - | 36,338,735 |
| Feb-99 | 36,338,735 | 19,032,260 | (19,632,260) | - | 35,738,735 |
| Mar-99 | 35,738,735 | 3,150,000 | (13,718,350) | - | 25,170,385 |
| Apr-99 | 25,170,385 | 19,650,000 | (25,170,385) | - | 19,650,000 |
| May-99 | 19,650,000 | 17,100,000 | (3,300,000) | - | 33,450,000 |
| Jun-99 | 33,450,000 | 10,100,000 | (10,600,000) | - | 32,950,000 |
| Jul-99 | 32,950,000 | 21,650,475 | (13,650,000) | - | 40,950,475 |
| Aug-99 | 40,950,475 | 16,700,000 | (27,400,475) | - | 30,250,000 |
| Sep-99 | 30,250,000 | 9,899,503 | (2,650,000) | - | 37,499,503 |
| Oct-99 | 37,499,503 | 20,550,000 | (10,900,000) | - | 47,149,503 |
| Nov-99 | 47,149,503 | 11,600,000 | (18,499,503) | - | 40,250,000 |
| Dec-99 | 40,250,000 | 15,399,503 | (8,100,000) | - | 47,549,503 |
| Jan-00 | 47,549,503 | 18,449,503 | (25,349,503) | - | 40,649,503 |
| Feb-00 | 40,649,503 | 22,000,000 | (14,600,000) | - | 48,049,503 |
| Mar-00 | 48,049,503 | 17,600,000 | (13,600,000) | - | 52,049,503 |
| Apr-00 | 52,049,503 | 21,449,503 | (21,949,503) | - | 51,549,503 |
| May-00 | 51,549,503 | 22,250,000 | (18,500,000) | - | 55,299,503 |
| Jun-00 | 55,299,503 | 11,600,000 | (14,250,000) | - | 52,649,503 |
| Jul-00 | 52,649,503 | 15,650,000 | (14,000,000) | - | 54,299,503 |
| Aug-00 | 54,299,503 | 27,149,503 | (27,049,503) | - | 54,399,503 |
| Sep-00 | 54,399,503 | 6,650,000 | (14,250,000) | - | 46,799,503 |
| Oct-00 | 46,799,503 | 13,000,000 | (13,000,000) | - | 46,799,503 |
| Nov-00 | 46,799,503 | 11,349,503 | (8,599,503) | - | 49,549,503 |
| Dec-00 | 49,549,503 | 8,550,000 | (11,550,000) | - | 46,549,503 |
| Jan-01 | 46,549,503 | 18,250,000 | (9,650,000) | - | 55,149,503 |
| Feb-01 | 55,149,503 | 4,000,000 | (6,000,000) | - | 53,149,503 |
| Mar-01 | 53,149,503 | 8,472,350 | (7,100,000) | - | 54,521,853 |
| Apr-01 | 54,521,853 | - | - | - | 54,521,853 |
| May-01 | 54,521,853 | 9,000,000 | (22,299,503) | - | 41,222,350 |
| Jun-01 | 41,222,350 | 23,273,000 | (4,500,000) | - | 59,995,350 |
| Jul-01 | 59,995,350 | 13,400,000 | (19,122,350) | - | 54,273,000 |
| Aug-01 | 54,273,000 | 43,400,000 | (25,473,000) | - | 72,200,000 |

(1) Aggregate principal balance of loans originated in each period.

DZB040843

 **DZ BANK**

**Internal**

## Monthly Loan Originations:

| Month | New Contracts[1] | Month | New Contracts[1] |
|-------|------------------|-------|------------------|
| May-98 | 1,000,000 | Jan-00 | 18,449,503 |
| Jun-98 | 1,000,000 | Feb-00 | 22,000,000 |
| Jul-98 | 1,000,000 | Mar-00 | 17,600,000 |
| Aug-98 | 1,314,000 | Apr-00 | 21,449,503 |
| Sep-98 | 11,610,000 | May-00 | 22,250,000 |
| Oct-98 | 12,735,000 | Jun-00 | 11,600,000 |
| Nov-98 | 12,791,000 | Jul-00 | 15,650,000 |
| Dec-98 | 24,263,199 | Aug-00 | 27,149,503 |
| Jan-99 | 28,434,005 | Sep-00 | 6,650,000 |
| Feb-99 | 19,032,260 | Oct-00 | 13,000,000 |
| Mar-99 | 3,150,000 | Nov-00 | 11,349,503 |
| Apr-99 | 19,650,000 | Dec-00 | 8,550,000 |
| May-99 | 17,100,000 | Jan-01 | 18,250,000 |
| Jun-99 | 10,100,000 | Feb-01 | 4,000,000 |
| Jul-99 | 21,650,475 | Mar-01 | 8,472,350 |
| Aug-99 | 16,700,000 | Apr-01 | - |
| Sep-99 | 9,899,503 | May-01 | 9,000,000 |
| Oct-99 | 20,550,000 | Jun-01 | 23,273,000 |
| Nov-99 | 11,600,000 | Jul-01 | 13,400,000 |
| Dec-99 | 15,399,503 | Aug-01 | 43,400,000 |

(1) Aggregate principal balance of loans originated in each period.

## Portfolio Turnover:

| | 8 Months Ended August 31, | | 12 Months Ended December 31, | | |
|---|---|---|---|---|---|
| | 2001 | 2000 | 2000 | 1999 | 1998 |
| Loans Originated[1] | $119,795,350 | $156,148,509 | $195,698,012 | $193,265,746 | $65,713,199 |
| Average Unpaid Principal Balance[2] | 55,629,177 | 51,118,253 | 49,887,003 | 35,578,903 | 11,545,275 |
| Turnover[3] | 3.23 | 4.58 | 3.92 | 5.43 | 5.69 |
| Average Days Outstanding[4] | 111.45 | 78.57 | 91.77 | 66.27 | 63.25 |

(1) Sum of the aggregate loans originated during each month of the stated period

(2) Sum of the aggregate loans outstanding at the end of each month of the stated period divided by the respective number
   of months in the stated period.

(3) Annualized Loans Originated divided by Average Unpaid Principal Balance

(4) 360 days divided by Turnover

## Aging Experience:

| | August 31, 2001 | | December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2000 | | 1999 | | 1998 | |
| | Total | % of Total | Total | % of Total | Total | % of Total | Total | % of Total |
| 1-30 Days Outstanding | $37,400,000 | 51.80% | $8,550,000 | 18.37% | $15,399,503 | 32.39% | $22,763,199 | 68.23% |
| 31-60 Days Outstanding | 17,400,000 | 24.10% | 7,849,503 | 16.86% | 11,600,000 | 24.40% | 10,600,000 | 31.77% |
| 61-90 Days Outstanding | 17,400,000 | 24.10% | 16,500,000 | 35.45% | 17,900,000 | 37.64% | 0 | 0.00% |
| 91-120 Days Outstanding | 0 | 0.00% | 6,650,000 | 14.29% | 2,650,000 | 5.57% | 0 | 0.00% |
| >120 Days Outstanding | 0 | 0.00% | 7,000,000 | 15.04% | 0 | 0.00% | 0 | 0.00% |
| Total | $72,200,000 | 100.00% | $46,549,503 | 100.00% | $47,549,503 | 100.00% | $33,363,199 | 100.00% |

NOTE: The data in the table above reflects the age of each outstanding loan as of each of the dates shown (i.e. the number of days since the loan was originated)
   The original term to maturity is typically 90-120 days on each of the Company's loans.

**DZ BANK**

**Default Experience:**

| | 8 Months Ended August 31, | | 12 Months Ended December 31, | | |
|---|---|---|---|---|---|
| | 2001 | 2000 | 2000 | 1999 | 1998 |
| Average Unpaid Principal Balance [1] | $55,629,177 | $51,118,253 | $49,887,003 | $35,578,903 | $11,545,275 |
| Gross Charge-Offs [2] | 0 | 0 | 0 | 0 | 0 |
| Average Portfolio Default Ratio [3] | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

(1) Sum of the aggregate loans outstanding at the end of each month of the stated period divided by the respective number of months in the stated period.

(2) Sum of the aggregate gross charge-offs during the stated period.

(3) Annualized Gross Charge-Offs divided by the Average Unpaid Principal Balance for each of the periods shown.

DZB040845

**DZ BANK**

**Internal**

# EXHIBIT VI

Arther Andersen Procedural Review – Petters Company, Inc.

DZB040846

# EXHIBIT T-54

Message

| | |
|---|---|
| **From**: | Patrick Preece [CN=Patrick Preece/OU=Branch/OU=New York/O=DZ BANK] |
| **Sent**: | 8/28/2002 12:50:03 PM |
| **To**: | DZCOM [paul.joshi@radiangroupinc.com @] |
| **CC**: | Vincent Salerno [CN=Vincent Salerno/OU=Branch/OU=New York/O=DZ BANK@DZBANK] |
| **BCC**: | Jennifer Wikoff [CN=Jennifer Wikoff/OU=Branch/OU=New York/O=DZ BANK] |
| **Subject**: | Facility |
| **Attachments**: | S&P Analysis_2.xls |

Hi Paul,

The name of DZ Bank's conduit is Autobahn Funding Company LLC, the name of the SPV is Opportunity Finance Securitization, LLC and the name of the new Opportunity Finance SPV is going to be Opportunity Finance Funding Corporation.   If you have any other questions, please let me know.   In addition, I would like to discuss your methodology for the 90% advance.   Given your comfort level with the way business is handled by both Petters and Opportunity Finance, the 26.6% "first loss" equity in the deal at my proposed advance levels, the fact that the rating agencies are on board at a higher advance than I proposed, the obligors are all rated at least as high as the deal, and that there has never been dilution or a default in the deal since inception, I would think we could get closer to my number.   Please let me know.   And finally, as to the "unused fee", how about a concept of a make whole instead.

I have attached the original analysis for your review.

Regards,

Patrick



S&P
Analysis_2.xls

DZB055810

# EXHIBIT T-55

**Internal**

RECEIVED
MAY 2 9 2002

**DZ BANK**

| | |
|---|---|
| **Mr. O. d'Oelsnitz** | |

| From | Date |
|---|---|
| Kenneth Bradt, DZ NA ASG | 03/13/02 |

| To | Contact Partner |
|---|---|
| Bannmann: F/KRIA | |

| Information | Comment | Decision |
|---|---|---|
| d'Oelsnitz: DZ NA | Bollmann | Credit Committee via |
| Ziese: IZ | | Messrs. Flach and |
| Mueller: SF | | Panner |

*Agree to any means of selling down risk, preferable option 1.*

*Ø.*

## Risk Mitigation and Risk Transfer Tools in Asset Securitization

As a follow-up to Mr. Flach's and Mr. Hilgert's visit to New York and our discussion on methods of transferring risk from ASG's securitization transactions to other market participants, we would like to revisit and address the risks inherent in ASG's portfolio, and the tools we can use to transfer those risks. This is especially important as DZ Bank's Autobahn conducts business that is, in some major aspects, different from other bank's commercial paper conduits.

## A. Typical Transaction Structure:



In every transaction DZ Bank NY underwrites, the client's equity in the transaction supports DZ Bank's exposure, is junior to DZ Bank's position, and is comprised of additional performing receivables ( = "Overcollateralization"). The amount of the equity required in each deal is a function of the riskiness of the receivables, and is generally sized to be 3-5 times the historical cumulative losses experienced by the receivables.

When DZ ASG underwrites an entire transaction for one of its clients, DZ Bank's risk in the deal is characterized above as the tranches which are rated, and which are senior to the equity provided by the client. The risk ratings assigned by the ratings agencies are based, among other things, on 1st loss/waterfall of distribution of receivables' cash flows--i.e., AAA tranche

ASG Syndications memo V 3.19.02.doc

# DZ BANK

receives all cash flows until fully paid off, followed by AA tranche, etc. In ASG's transactions, DZ Bank only takes risk that is overcollateralized by fully performing receivables.

It is because the level of overcollateralization provided by our client is a multiple of 3-5 times each deal's historical losses that the dollars-at-risk in any given transaction are so low. In addition to equity in the deal, our clients often provide additional credit enhancement in the form of guarantees. Overall, DZ Bank's ASG portfolio of transactions has a weighted average risk rating of AA, on which it earns 1.12%.

## B. The basic characteristics of our market are:

- We do customer driven business and must tailor the size of our transactions according to the needs of our clients. Our clients want to work with a large, dependable bank with strong securitization experience, with which they can do "one stop shopping," i.e., the entire deal.

- Our customers are generally smaller specialty finance companies with a limited number of receivables that are used to structure highly rated transactions. As a result of the size of our clients and their portfolio of receivables, we must arrange and do entire transactions for our customers. Our conduit transactions range in size from $30 mio to $200 mio--sometimes exceeding the nominal amount of the DZ Bank's strategic risk limits, but often too small for <u>standard</u> syndication.

- Autobahn is a bankruptcy remote vehicle. It is not rated on its own, but each securitization must be rated single A or better by the rating agencies based on its own merits. This is an important difference from other bank's conduits where the banks that sponsor those conduits provide "conduit wide" credit enhancement in the amount of 5%-10% of the conduit commitments (in our case that would be $140 mio - $280 mio). The minimum A rating does not mean that it is not acceptable to put a BBB tranche of a credit into the conduit (as in the above example where $2 mio of the deal is rated BBB), but rather that all commercial paper must be supported by backstop liquidity facilities written by banks rated A1/P1/F1.

- Currently, providing liquidity backup to other banks such as DZ Bank is economically not a very attractive product for banks in the Asset Backed Commercial Paper ("ABCP") market because virtually all banks who are active in ABCP (minimum short term rating requirement of A1/P1/F1) reserve backstop liquidity facilities for their own conduit transactions. It is a constant topic at securitization conferences that there is "NO" liquidity in the market, or that if it can be found, it is "extremely expensive."

- Even if DZ Bank ASG offers exceptionally high pricing to attract liquidity backstop facilities in support of its risk reduction efforts, "Syndicates" of banks in the traditional sense do not exist in the market in which ASG specializes due to the small size of our deals.

- Specialized securitization risk takers such as multiline and monoline insurance companies are huge players in our market and are equipped to take on all of the credit risk of many of our deals, but are not interested in transactions less than $100 mio in size.

- There is strong appetite for $25 mio and $50 mio portions of our deals from well capitalized, BBB and BBB+ banks which do not carry the short term ratings sufficient to have their own commercial paper programs.

Seite 3

# DZ BANK

**C. Based on the above market characteristics, we would like to demonstrate several risk mitigation options we have at our disposal when mandated by the board to reduce risk:**

1) *Traditional syndication to banks with short term ratings of A1/P1/F1.*
Purchaser of liquidity commitment takes pro-rata portion of BBB, A, AA, and AAA tranches in the deal. Only in a few very large transactions do we expect this to be an effective tool.

2) *Traditional syndication to banks with short-term ratings of A2/P2/F2 (minimum long-term rating of BBB).*
Purchaser of liquidity commitment takes pro-rata portion of BBB, A, AA, and AAA tranches in the deal. Because the A2/P2/F2 bank doesn't have the short-term liquidity ratings necessary to issue A1/P1/F1 commercial paper from DZ Bank's conduit, DZ Bank "fronts" for that bank for a substantial fee. If the long-term rating of the A2/P2/F2 bank is downgraded one notch to BBB-, the contract calls for that bank to immediately fund its portion of the transaction on its balance sheet for the entire length of time of DZ Bank's underlying commitment. In this situation, DZ Bank sheds all of the risk associated with the transaction. There are a large number of banks which have long-term ratings of A-, BBB+ and BBB which have appetites for our transactions in the $25 mio - $50 mio range.

3) *Transfer of risk to insurance companies (typically rated AA or AAA) who "wrap" (unconditionally guarantee) asset backed transactions.*
Purchaser takes 100% of the credit risk in the deal and 100% of DZ Bank's exposure becomes AA or AAA. Due to minimum "revenue per transaction" constraints, these institutions typically guarantee transactions which are $200 mio or greater—larger than the vast majority of our deals.

4) *Transfer of risk via sale of a "first loss" piece to insurance companies (typically rated A and AA) whereunder the insurance provider absorbs all losses up to the amount of the first loss piece prior to DZ Bank taking a loss.*
Purchaser of the credit risk takes the riskiest tranches of the transaction up to the amount of the guarantee. This is the equivalent of having subordinated debt or equity underneath DZ Bank's exposure.

When DZ Bank's board mandates risk reduction, ASG would like to avail itself of all possible channels to meet those requirements while maintaining high risk-adjusted returns. It is also DZ Bank NY's desire to broaden the base of potential participants in its facilities in order to continue to grow at the same controlled pace that it has for the last three years—each of these different tools lend themselves to different types of transactions.

Therefore, when the board mandates a sell down, we request that the board recognize any of the four aforementioned risk transfer methodologies as satisfying the sell down requirement, and the flexibility to decide in NY which of these four tools to employ on a case-by-case basis.

Bradt  _____   d'Oelsnitz _____

Bollmann  _____

Confidential

**Seite 4**

**DZ BANK**

Confidential

DZB001134

# EXHIBIT T-56

121211BANKRUPTCY-Petters.txt

1

```
 1              UNITED STATES BANKRUPTCY COURT

 2                  DISTRICT OF MINNESOTA

 3   ---------------------------------------------------

 4   In Re:                    BKY No: 08-45257

 5   Petters Company, Inc.,

 6          Debtor.

 7   ---------------------------------------------------

 8

 9        BEFORE THE HONORABLE GREGORY F. KISHEL

10           United States Bankruptcy Judge

11

12

13                     * * *

14           TRANSCRIPT OF PROCEEDINGS

15               December 12, 2011

16                     * * *

17

18   Proceedings recorded by electronic sound recording,
     transcript prepared by transcription service.
19

20
             NEIL K. JOHNSON REPORTING AGENCY
21           Six West 5th Street, Suite 700
                 St. Paul, MN 55102
22               Neil K. Johnson

23

24

25

     (651) 681-8550 phone    1-877-681-8550 toll free
             www.johnsonreporting.com
```

2

```
 1            A P P E A R A N C E S

 2

 3       MR. MARK D. LARSEN, MS. KIRSTIN D.
```

Page 1

121211BANKRUPTCY-Petters.txt

11    monies in on that day are the first monies out,

12    or make some type of assumption like that?

13 A   Well, because -- I wish I could, but we can't

14    because we don't have from the bank data, this is

15    not like a FIFO inventory type of situation where

16    the first funds in are the first funds out.  I'd

17    love to have been able to have done that.  But

18    when you look at the bank data you have no way of

19    knowing the timing of the receipt of those funds.

20    It simply does not work that way.

21 Q   Now, did you determine of all of the funds that

22    were coming in from the various investors, I mean

23    all the money that was coming into the M&I

24    account that PCI had, how much of those funds

25    were being used to pay off prior investors?

249

1 A   I would say the percentage, 85 percent of the

2    monies that were collected -- I would say that

3    the funds that were deposited with the PCI M&I

4    account, about 90 percent came from investors,

5    SPE and nonSPE investors.

6         Eighty-five percent of that total was paid

7    out to SPE and nonSPE investors, 85 percent.

8 Q   Okay.  And that's 85 percent of a total of

9    40 billion in, 40 billion out?

10 A   Those are the gross numbers.  If you look at the

11    net numbers, because you had monies going back

12    and forth with PCI so you have to use the net,

13    that would be roughly, be 85 percent of almost

14    $30 billion.

121211BANKRUPTCY-Petters.txt

15  Q   Another factor that you am lies the was had

16      whether there was adequate capitalization for the

17      SPE's.

18          What did you conclude about had a?

19  A   That largely there was little, if any,

20      capitalization in the SPE's.

21  Q   How did you determine that?

22  A   Once again going back through the corporate data

23      sheets, the corporate records that were kept buy

24      Lois Cruse and as well as, I recall having to go

25      back to look at the original accounting entries

          (651) 681-8550 phone      1-877-681-8550 toll free
                    www.johnsonreporting.com

                                                          250

1       to verify if there was any sort of like a paid-in

2       capital or some form of capital account that had

3       been set up at the time, because in some

4       instances there was -- in fact, in certain cases

5       we found no capitalization.

6   Q   What did you determine with regard to the factor

7       of common domination control?

8   A   Well, you basically had three people that were --

9       I mean you probably had a total of five

10      employees, three of which were probably really

11      running the fraud day-to-day in Tom, Deanna and

12      Bob White.

13          I mean that was the common control.  I

14      mean those were the three people that were

15      involved in the day-to-day fraud, operations of

16      the fraud.

17  Q   What did you conclude with regard to the factor

18      concerning the common source of cost of doing

                    Page 218

121211BANKRUPTCY-Petters.txt
19    business?

20  A   Well, basically the SPE's were all housed I mean

21      at 4400 Baker Road in Minnetonka, Minnesota and

22      they really were no -- I mean the employees, I

23      believe as Ms. Indahl and Ms. Coleman testified

24      earlier today, and there were just a handful of

25      employees, maybe five.  The only other person who

(651) 681-8550 phone     1-877-681-8550 toll free
www.johnsonreporting.com

251

1       hasn't been mentioned today is Debbie Lindstrom,

2       and Debbie would handle pretty much the notes and

3       the papering of the notes in the files there and

4       then Sandy would do the accounting.

5           But everything was all housed under one

6       roof on the third floor at 4400 Baker Road and

7       all the salaries, all the funding, all of

8       whatever out-of-pocket expenses there might be,

9       that was all funded at PCI.

10  Q   Are you talking about the out-of-pocket expenses

11      of the SPE's?

12  A   That's correct.

13  Q   Okay.  Mr. Martens, the final topic I would like

14      to address with you is this issue about

15      accounting for the fraud.  First of all, did you

16      determine in conducting the forensic analysis

17      whether the records that you found at PCI,

18      whether they were reliable or not?

19  A   We learned early on that the record at PCI were

20      not reliable.

21  Q   And what were those records?

22  A   The quick book records in particular.  We found

Page 219

# EXHIBIT T-57

- - - - - - - - - - - - - - - - - - - - - - - - - -

In re:                    Court File No. 08-45257

Petters Company, Inc., et al.,

Debtors.

                              Court File No.'s:
(includes:
Petters Group Worldwide, LLC;        08-45258(GFK)
PC Funding, LLC;                     08-45326(GFK)
Thousand Lakes, LLC;                 08-45327(GFK)
SPF Funding, LLC;                    08-45328(GFK)
PL Ltd., Inc.;                       08-45329(GFK)
Edge One, LLC;                       08-45330(GFK)
MGC Finance, Inc.;                   08-45331(GFK)
PAC Funding, LLC;                    08-45371(GFK)
Palm Beach Finance Holdings, Inc.)   08-45392(GFK)

- - - - - - - - - - - - - - - - - - - - - - - - - -


---------------------------------------------------

            VIDEOTAPED DEPOSITION OF

                 JON R. SABES

---------------------------------------------------





Taken July 7, 2011          By Paula Richter, RPR

In re: Petters Company, Inc., et al., Debtors
JON R. SABES   July 7, 2011

Page 86

1  A. I believe they are.
2  Q. Right. What I'd prefer to do, with you and
3     your counsel's permission, is have that
4     appended to the back of the beginning of
5     Exhibit Number 23. Those are actually the
6     wire transfer instructions to Enchanted that
7     I had earlier alluded to. So that -- that
8     should just be part of paragraph -- part of
9     Exhibit Number 23.
10          And if the court reporter then
11    would mark this December 7th, 2001, letter as
12    Exhibit 24 and correct the old 24, that would
13    be helpful.
14          (Exhibit 24 was re-marked for
15    identification.)
16 BY MR. LARSEN:
17 Q. If you would now look with us as what we've
18    more recently marked as Exhibit 24, a
19    December 7th, 2001 letter. Now, are you
20    familiar with Exhibit 24?
21 A. I am.
22 Q. Okay. And what is it?
23 A. It's an engagement letter from Lord
24    Securities Corporation preparing to designate
25    an independent director for PC Funding, I

Page 87

1     believe, yes.
2  Q. Okay. Now, was there a reason why PC Funding
3     was going to utilize the services of an
4     independent director?
5  A. Yes.
6  Q. And what was that reason?
7  A. It was required as part of the charter of PC
8     Funding.
9  Q. And why was it required as part of the
10    charter of PC Funding?
11 A. It's my understanding that the charter of PC
12    Funding required a unanimous vote by all of
13    its directors for a voluntary bankruptcy
14    filing.
15 Q. Okay. And that would have included a vote by
16    its independent director, correct?
17 A. That's what I understood.
18 Q. Now, did you know the independent director
19    for PC Funding?
20 A. No.
21 Q. Okay. But that person was provided by Lord
22    Securities Corporation; is that correct?
23 A. That's correct.
24 Q. Now let's take a look at Exhibit 25, if we
25    can.

Page 88

1          (Exhibit 25 was marked for
2     identification.)
3          THE WITNESS: (Reviews document.)
4  BY MR. LARSEN:
5  Q. Are you familiar with Exhibit 25?
6  A. I am now.
7  Q. Okay. Do you recall it as you sit here?
8  A. Not really.
9  Q. Did you speak with Heather Thayer regarding
10    this independent director element of PC
11    Funding?
12 A. I don't recall a conversation specifically on
13    that.
14 Q. Okay. So when she refers within the text of
15    this December 13, 2001, e-mail to the
16    rent-a-director, was that the director being
17    provided by Lord Securities Corp.?
18 A. I believe that's her reference.
19 Q. And did you ask her what she meant when she
20    said the rent-a-director?
21 A. I don't believe I did.
22 Q. This independent director, was he able to
23    fulfill his fiduciary duties to PC Funding?
24          MR. PETROSINELLI: Object to the
25    form.

Page 89

1          MR. KELLER: Same objection.
2          THE WITNESS: I don't know.
3  BY MR. LARSEN:
4  Q. Twenty-six, next in order.
5          (Exhibit 26 was marked for
6     identification.)
7          THE WITNESS: (Reviews document.)
8  BY MR. LARSEN:
9  Q. And are you familiar with Exhibit 26?
10 A. I am now.
11 Q. And, again, I'll ask you the same question.
12    Do you have any recollection of it as you sit
13    here, sir?
14 A. Not necessarily.
15 Q. I note an e-mail from you within this string,
16    December 17th, 2001, 11:57 a.m. Does this
17    address the independent director for both PC
18    Funding and also an independent director for
19    Opportunity Finance Securitization?
20 A. I'm -- I'm sorry. What -- what are you
21    referring to and asking me?
22 Q. Does your e-mail refer to an independent
23    director for PC Funding and also one for
24    Opportunity Finance Securitization?
25 A. Yes.

23 (Pages 86 to 89)

Page 90

1    Q. And did it make any difference to you which
2    independent director was assigned to which of
3    those two companies?
4    A. No.
5    Q. Now, next is Exhibit 27. And I'll just tell
6    you in advance, it's -- you'll have three
7    stapled sets of bank statements before you to
8    be marked collectively as Exhibit 27, so I
9    don't make the same mistake I made just a
10   moment ago.
11   A. Are you referring to --
12   Q. Yes, sir.
13   A. -- these -- these statements?
14   Q. Yes, sir.
15   A. Okay.
16         (Exhibit 27 was marked for
17   identification.)
18   BY MR. LARSEN:
19   Q. Now, Mr. Sabes, again, I will just represent
20   to you that instead of giving you a
21   three-foot-high stack of bank statements,
22   I've selected a few from interspersed points
23   in time, okay? The first of those being a
24   statement of account ending December 31st,
25   2003. Can you tell us who did this account

Page 91

1    statement come to? Who was it sent to?
2    A. This particular statement is addressed to
3    Steve Sabes at Opportunity Finance, LLC.
4    Q. And is this the account that was held in the
5    name of PC Funding?
6    A. I don't believe it was. Let me look.
7    Q. Absolutely.
8    A. (Reviews document.) I stand corrected. It
9    may -- it may very well be the PC Funding
10   account.
11   Q. And this is the account that the Account
12   Control Agreement pertained to perhaps?
13   A. That's correct, yeah.
14   Q. And if we look to, within this first little
15   compilation of materials, the fifth page
16   that's captioned Transactions From November
17   30th, '03 to December 31st, '03?
18   A. The last page?
19   Q. Actually, the second to the last page. It's
20   got a Bates of 8115 in the lower right-hand
21   corner.
22   A. Got it.
23   Q. Got it? Okay. We can see, can we not,
24   transactions coming in from Petters Company;
25   is that correct?

Page 92

1    A. Yes.
2    Q. Okay. So was it apparent then to Opportunity
3    Finance at the time that all of the dollars
4    coming into that PC Funding account were
5    sourced in PCI?
6    A. I don't know about sourced from PCI. We
7    would look at the bank statement of PCI to
8    trace their incoming wire, which would then
9    be forwarded to PC Funding. So it would
10   definitely flow through PCI to get to PC
11   Funding.
12   Q. And it would flow through PCI with respect to
13   every dollar that came into the PC Funding
14   account?
15   A. The retailer payment amount would flow
16   through PCI, yes, sir.
17   Q. Okay. And then would that also be the case,
18   as time elapsed, as reflected in the last two
19   sets of bank statements that we have ending
20   January 31, '06 and May 19, '08? And take
21   your time and take a look at these.
22         MR. PETROSINELLI: I don't
23   understand the question. The question is:
24   Do all the incoming deposits into this
25   account reflected on these statements come

Page 93

1    from PCI?
2         MR. LARSEN: Right, right.
3         THE WITNESS: No. I mean, I --
4    I'd have to study these accounts in
5    greater -- these statements in detail to
6    really know what's going on with them. It's
7    hard for me to -- if you want, I can go study
8    them and try and tell you what I see going on
9    with them, but it's a little blurry and hard
10   to read, but --
11   BY MR. LARSEN:
12   Q. That -- that's fair enough.
13   A. Yeah.
14   Q. Let me see if I can help narrow this down a
15   little bit.
16   A. Thank you.
17   Q. I'm not trying to direct your attention to
18   one part of the exhibit as opposed to
19   another, but for example, on the page that
20   ends in the Bates number 11520, do you have
21   that page before you, sir?
22   A. Yes, I do.
23   Q. For example, on January 11, 2006, is noted a
24   transfer from another trust.
25   A. I'm sorry. On what date are you seeing

24 (Pages 90 to 93)

# EXHIBIT T-58

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 08-CV-5348 (ADM/JSM) |
| | ) | |
| THOMAS JOSEPH PETTERS, et al.; | ) | |
| | ) | |
| Defendants. | ) | |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                  **Jointly Administered under
                                                          Case No. 08-45257**

Petters Company, Inc., et al.,                          Court File No. 08-45257

                        Debtors.
                                                        Court Files No.'s:
(includes:
Petters Group Worldwide, LLC;                           08-45258 (GFK)
PC Funding, LLC;                                         08-45326 (GFK)
Thousand Lakes, LLC;                                    08-45327 (GFK)
SPF Funding, LLC;                                        08-45328 (GFK)
PL Ltd., Inc.;                                           08-45329 (GFK)
Edge One LLC;                                            08-45330 (GFK)
MGC Finance, Inc.;                                       08-45331 (GFK)
PAC Funding, LLC;                                        08-45371 (GFK)
Palm Beach Finance Holdings, Inc.)                       08-45392 (GFK)


                                                        Chapter 11 Cases
                                                        Judge Gregory F. Kishel

# <u>PwC INTERIM REPORT</u>
# <u>DECEMBER 15, 2010</u>

CONFIDENTIAL

402.    Our analysis continues and we anticipate providing a final report on our

procedures and findings at a later date (as directed by the court).  The information contained

in this report is based on analyses completed through September 30, 2010.  These

observations may change based on our continuing analysis and/or the receipt of additional

information or documentation.


_____

Theodore F. Martens
Partner, PwC


December 15, 2010

CONFIDENTIAL

EXHIBIT 10

Possible Uses of Interlachen Harriet Investments, Ltd. Funds

Source: PwC Analysis

Petters Company, Inc. (PCI) - M&I Bank Account (Account Number 1959018)
April 18, 2008 Transactions

| DATE | PAYOR | PAYEE | IN AMOUNT | OUT AMOUNT | MATCHED ENTITY |
|---|---|---|---|---|---|
| 4/18/2008 | PCI | THOUSAND LAKES, LLC | - | 4,233,267.50 | THOUSAND LAKES, LLC |
| 4/18/2008 | PCI | THOUSAND LAKES, LLC | - | 4,663,823.75 | THOUSAND LAKES, LLC |
| 4/18/2008 | PCI | THOUSAND LAKES, LLC | - | 5,054,360.00 | THOUSAND LAKES, LLC |
| 4/18/2008 | PCI | THOUSAND LAKES, LLC | - | 5,889,097.50 | THOUSAND LAKES, LLC |
| 4/18/2008 | PCI | EDGE ONE CAPITAL LP | - | 1,803,830.00 | EDGE ONE, LLC |
| 4/18/2008 | PCI | EDGE ONE CAPITAL LP | - | 2,800,200.00 | EDGE ONE, LLC |
| 4/18/2008 | PCI | PC FUNDING, LLC | - | 3,830,321.90 | PC FUNDING, LLC |
| 4/18/2008 | PCI | PC FUNDING, LLC | - | 4,466,553.35 | PC FUNDING, LLC |
| 4/18/2008 | INTERLACHEN HARRIET | PCI | 50,000,000.00 | - | INTERLACHEN |
| 4/18/2008 | THOUSAND LAKES, LLC | PCI | 10,719,716.50 | - | THOUSAND LAKES, LLC |
| 4/18/2008 | THOUSAND LAKES, LLC | PCI | 11,880,283.50 | - | THOUSAND LAKES, LLC |
| 4/18/2008 | PALM BEACH CAPITAL CORP | PCI | 46,279.58 | - | PALM BEACH FINANCE HOLDINGS, INC. |
| 4/18/2008 | PCI | THOUSAND LAKES, LLC | - | 2,575,800.00 | THOUSAND LAKES, LLC |
| 4/18/2008 | PCI | PC FUNDING, LLC | - | 5,044,395.00 | PC FUNDING, LLC |
| 4/18/2008 | PCI | PBFF HOLDINGS, LLC | - | 323,422.92 | PALM BEACH FINANCE HOLDINGS, INC. |
| 4/18/2008 | PCI | PBFF HOLDINGS, LLC | - | 2,838,870.75 | PALM BEACH FINANCE HOLDINGS, INC. |
| 4/18/2008 | PCI | PBFF HOLDINGS, LLC | - | 4,395,740.75 | PALM BEACH FINANCE HOLDINGS, INC. |
| 4/18/2008 | PCI | PCI/RED TAGBIZ | - | 5,000,000.00 | APRIVEN PARTNERS, LP |
| 4/18/2008 | PCI | PCI/RED TAGBIZ | - | 5,379,166.67 | APRIVEN PARTNERS, LP |
| 4/18/2008 | PCI | PCI/RED TAGBIZ | - | 5,391,666.67 | APRIVEN PARTNERS, LP |
| 4/18/2008 | PCI | THOUSAND LAKES, LLC | - | 4,468,262.50 | THOUSAND LAKES, LLC |
| 4/18/2008 | PCI | PCI/RED TAGBIZ | - | 5,000,000.00 | APRIVEN PARTNERS, LP |
| | | 4/18/2008 Total | $ 72,646,279.58 | $ 73,158,799.26 | |
| | | Net Cash Inflow/ (Outflow) | $ (512,519.68) | | |

**Petters Company, Inc. (PCI) - M&I Bank Account (Account Number 1959018)**
April 22, 2008 Transactions

| DATE | PAYOR | PAYEE | IN AMOUNT | OUT AMOUNT | MATCHED_ENTITY |
|---|---|---|---|---|---|
| 4/22/2008 | NATIONWIDE INTERNATIONAL RESOURCES | PCI | 3,552,000.00 | - | - |
| 4/22/2008 | ENCHANTED FAMILY BUYING COMPANY | PCI | 4,000,000.00 | - | - |
| 4/22/2008 | INTERLACHEN HARRIET | PCI | 10,000,000.00 | - | INTERLACHEN |
| 4/22/2008 | THOUSAND LAKES, LLC | PCI | 6,841,280.25 | - | THOUSAND LAKES, LLC |
| 4/22/2008 | THOUSAND LAKES, LLC | PCI | 13,758,719.75 | - | THOUSAND LAKES, LLC |
| 4/22/2008 | PCI | METRO GEM, INC. | - | 97,211.92 | METRO GEM, INC. |
| 4/22/2008 | PCI | METRO GEM, INC. | - | 222,040.00 | METRO GEM, INC. |
| 4/22/2008 | PCI | METRO GEM, INC. | - | 4,316,325.00 | METRO GEM, INC. |
| 4/22/2008 | PCI | FIDELIS FOUNDATION | - | 5,427,550.55 | FIDELIS FOUNDATION (F/K/A HARVEST FOUNDATION) |
| 4/22/2008 | PCI | FIDELIS FOUNDATION | - | 5,561,904.17 | FIDELIS FOUNDATION (F/K/A HARVEST FOUNDATION) |
| 4/22/2008 | PCI | THOUSAND LAKES, LLC | - | 3,442,800.00 | THOUSAND LAKES, LLC |
| 4/22/2008 | PCI | THOUSAND LAKES, LLC | - | 3,829,856.25 | THOUSAND LAKES, LLC |
| 4/22/2008 | PCI | THOUSAND LAKES, LLC | - | 4,149,156.25 | THOUSAND LAKES, LLC |
| 4/22/2008 | PCI | THOUSAND LAKES, LLC | - | 5,457,555.00 | THOUSAND LAKES, LLC |
| 4/22/2008 | PCI | THOUSAND LAKES, LLC | - | 5,711,885.00 | THOUSAND LAKES, LLC |
| 4/22/2008 | PCI | PC FUNDING, LLC | - | 57,522.87 | PC FUNDING, LLC |
| | | 4/22/2008 Total | $ 38,152,000.00 | $ 38,273,807.01 | |
| | | Net Cash Inflow/(Outflow) | | $ (121,807.01) | |

# EXHIBIT T-59

M&I MARSHALL & ILSLEY BANK            0001959018        Page 1 of 7
P O BOX 2045                          0001959018        PAGE
MILWAUKEE WI 53201-2045
www.mibank.com

                                                        Call 414-259-9929
                                                        or 1-888-464-5463
                                                        For 24-Hour Account
                                                        Information or
                                                        Current Rates

PETTERS COMPANY INC
4400 BAKER RD                                           Statement Closing Date
MINNETONKA MN 55343-8684                                April 30, 2008


IF YOU ARE A BUSINESS ORIGINATING ACH (AUTOMATED CLEARING HOUSE) ENTRIES,
YOUR CONTINUED ORIGINATION OF SUCH TRANSACTIONS IS EVIDENCE OF YOUR
AGREEMENT TO BE BOUND BY THE NACHA OPERATING RULES, AS AMENDED FROM TIME
TO TIME, AND TO NOT INITIATE ANY ENTRY THAT VIOLATES THE LAW OF THE UNITED
STATES.

COMMERCIAL  Account no. 1959018                         Analysis Type: 51480
CHECKING    Beginning balance on April 1, 2008      $    1,615,794.00
            Deposits and other additions            +  596,177,782.42
            Checks paid and other subtractions      -  597,677,938.96
            Ending balance on April 30, 2008        $      115,637.46
                            Average balance     1,100,147.66


Daily activity on your account

Date        Amount          Description      Control Number        Balance
                            Beginning Balance                    1,615,794.00
Apr 1       485,126.97+     AUTOMATIC RECALL     00000000000000
                            RECALL FROM EURO SWEEP ACCOUNT

Apr 1          233.43+      TRANSFER OF INTEREST999999999999999
                            FROM ACCOUNT NO. ███████████
Apr 1       492,336.40-     AUTOMATIC TRANSFER   00000000000000
                            TRANSFER TO EURO SWEEP ACCOUNT
                            ████████                           1,608,818.00
Apr 2       399,000.00-     CHECK  9580          00006256164800
Apr 2        40,500.00-     CHECK  9581          00006256164801
Apr 2        69,000.00-     CHECK  9582          00006256165105
Apr 2       492,336.40-     AUTOMATIC RECALL     00000000000000
                            RECALL FROM EURO SWEEP ACCOUNT
                            0022334037
Apr 2     8,884,040.63+     INCOMING WIRE        80402000005008
Apr 2     4,497,500.00+     INCOMING WIRE        80402000004367
Apr 2     3,415,959.37+     INCOMING WIRE        80402000005007
Apr 2     3,398,300.00+     INCOMING WIRE        80402000004372
Apr 2       398,541.33+     INCOMING WIRE        80402000006407
Apr 2       306,996.67+     INCOMING WIRE        80402000006826
Apr 2     4,725,675.00-     OUTGOING RPT WIRE    80402000005106
Apr 2     4,691,505.00-     OUTGOING RPT WIRE    80402000006151
Apr 2     4,632,875.00-     OUTGOING RPT WIRE    80402000005104

Kelley_DZ_00063488

1959018



0001959018

Page 2 of 7
PAGE

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|---|---|---|---|---|
| Apr 2 | 3,367,218.00- | OUTGOING RPT WIRE | 80402000005099 | |
| Apr 2 | 3,012,240.00- | OUTGOING RPT WIRE | 80402000005100 | |
| Apr 3 | 3,042,331.00+ | OUTGOING RPT WIRE | 80402000005098 | |
| Apr 3 | 2,455,600.00+ | INCOMING WIRE | 80403000003032 | |
| Apr 3 | | INCOMING WIRE | 80403000003937 | |
| Apr 3 | 236,567.11+ | INCOMING WIRE | 80403000005993 | |
| Apr 3 | 34,310.00- | OUTGOING RPT WIRE | 80403000004752 | |
| Apr 3 | 1,426,875.51+ | OUTGOING RPT WIRE | 80403000004792 | |
| | | AUTOMATIC TRANSFER | 00000000000000 | 1,314,479.40 |
| | | TRANSFER TO EURO SWEEP ACCOUNT | | |
| Apr 4 | 1,426,875.51+ | AUTOMATIC RECALL | 00000000000000 | 1,600,000.00 |
| | | RECALL FROM EURO SWEEP ACCOUNT | | |
| Apr 4 | 11,106,162.00+ | INCOMING WIRE | 80404000004254 | |
| Apr 4 | 7,693,838.00+ | INCOMING WIRE | 80404000004253 | |
| Apr 4 | 7,396,150.00+ | INCOMING WIRE | 80404000002911 | |
| Apr 4 | 243,776.53+ | INCOMING WIRE | 80404000004997 | |
| Apr 4 | 5,051,205.00- | OUTGOING RPT WIRE | 80404000005534 | |
| Apr 4 | 4,978,755.00- | OUTGOING RPT WIRE | 80404000005527 | |
| Apr 4 | 4,970,710.00- | OUTGOING RPT WIRE | 80404000005525 | |
| Apr 4 | 4,385,847.50- | OUTGOING RPT WIRE | 80404000005519 | |
| Apr 4 | 4,880,623.20- | OUTGOING RPT WIRE | 80404000005763 | |
| Apr 4 | 4,759,569.34- | AUTOMATIC TRANSFER | 00000000000000 | |
| | | TRANSFER TO EURO SWEEP ACCOUNT | | |
| Apr 7 | 25,000.00- | CHECK 9538 | 00006255406896 | |
| Apr 7 | 52.80- | CHECK 9585 | 00006256434701 | |
| Apr 7 | 91,928.36- | CHECK 9588 | 00006256442901 | |
| Apr 7 | 912,500.00- | CHECK 9590 | 00006256442902 | |
| Apr 7 | 4,759,569.34+ | AUTOMATIC RECALL | 00000000000000 | -1,600,000.00 |
| | | RECALL FROM EURO SWEEP ACCOUNT | | |
| Apr 7 | 15,968,672.10+ | INCOMING WIRE | 80407000004425 | |
| Apr 7 | 2,177,997.94+ | INCOMING WIRE | 80407000004424 | |
| Apr 7 | 5,482,125.00- | OUTGOING RPT WIRE | 80407000004325 | |
| Apr 7 | 5,106,630.00- | OUTGOING RPT WIRE | 80407000005023 | |
| Apr 7 | 4,754,011.00- | OUTGOING RPT WIRE | 80407000005141 | |
| Apr 7 | 4,751,675.00- | OUTGOING RPT WIRE | 80407000005135 | |
| Apr 7 | 3,191,643.75- | OUTGOING RPT WIRE | 80407000005132 | |
| Apr 7 | 3,037,392.50- | OUTGOING RPT WIRE | 80407000005019 | |
| Apr 7 | 10,000.00- | AUTOMATIC WITHDRAWAL | 11201467476639 | |
| | | AMERICAN EXPRESS DEANNA MGNSON | | |
| Apr 7 | 3,009.78- | ELEC REMIT 080407 | | 643,171.15 |
| Apr 8 | 780.00- | CHECK 9583 | 00006256565755 | |
| Apr 8 | 50.00- | CHECK 9586 | 00006256593019 | |
| Apr 8 | 589.80- | CHECK 9591 | 00006256590704 | |
| Apr 8 | 11,546,600.00+ | INCOMING WIRE | 80408000004653 | |
| Apr 8 | 1,000,000.00+ | INCOMING WIRE | 80408000003456 | |
| Apr 8 | 2,653,670.25+ | INCOMING WIRE | 80408000004653 | |
| Apr 8 | 1,321,622.33+ | INCOMING WIRE | 80408000005006 | |
| Apr 8 | 5,370,198.00- | OUTGOING RPT WIRE | 80408000004849 | |
| Apr 8 | 5,279,659.00- | OUTGOING RPT WIRE | 80408000004844 | |
| Apr 8 | | OUTGOING RPT WIRE | 80408000004102 | |

0001959018

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| Apr 8 | 3,350,520.00- | OUTGOING RPT WIRE | 80408000004841 | |
| Apr 8 | 500,730.83- | RELATED ACCT-DR | 80408000005581 | 220,379.60 |
| Apr 9 | 15,217,500.00+ | INCOMING WIRE | 80409000005076 | |
| Apr 9 | 539,968.75+ | INCOMING WIRE | 80409000006300 | |
| Apr 9 | 335,492.92+ | INCOMING WIRE | 80409000003130 | |
| Apr 9 | 100,000.00+ | INCOMING WIRE | 80409000005745 | |
| Apr 9 | 15,217,500.00- | OUTGOING RPT WIRE | 80409000005340 | |
| Apr 9 | 540,900.00- | RELATED ACCT-DR | 80409000005819 | 654,941.27 |
| Apr 10 | 100.54- | CHECK  9584 | 00006256759506 | |
| Apr 10 | 45,073.17- | CHECK  9587 | 00006256762264 | |
| Apr 10 | 379.00- | CHECK  9589 | 00006256761875 | |
| Apr 10 | 32,000.00- | CHECK  9592 | 00006256765846 | |
| Apr 10 | 7,254,189.00+ | INCOMING WIRE | 80410000003871 | |
| Apr 10 | 3,944,850.00+ | INCOMING WIRE | 80410000004898 | |
| Apr 10 | 3,809,381.25+ | INCOMING WIRE | 80410000004224 | |
| Apr 10 | 3,445,811.00+ | INCOMING WIRE | 80410000003870 | |
| Apr 10 | 2,514,000.00+ | INCOMING WIRE | 80410000004040 | |
| Apr 10 | 184,815.71+ | INCOMING WIRE | 80410000005890 | |
| Apr 10 | 139,885.43+ | INCOMING WIRE | 80410000005905 | |
| Apr 10 | 108,978.60+ | INCOMING WIRE | 80410000005896 | |
| Apr 10 | 4,081,967.50- | OUTGOING RPT WIRE | 80410000004208 | |
| Apr 10 | 3,831,345.00- | OUTGOING RPT WIRE | 80410000005026 | |
| Apr 10 | 3,631,250.00- | OUTGOING RPT WIRE | 80410000004215 | |
| Apr 10 | 3,201,660.00- | OUTGOING RPT WIRE | 80410000005024 | |
| Apr 10 | 2,973,120.00- | OUTGOING RPT WIRE | 80410000004225 | |
| Apr 10 | 2,666,802.00- | OUTGOING RPT WIRE | 80410000004229 | |
| Apr 10 | 394,485.00- | OUTGOING RPT WIRE | 80410000003260 | |
| Apr 10 | 380,938.13- | OUTGOING RPT WIRE | 80410000003249 | |
| Apr 10 | 251,400.00- | OUTGOING RPT WIRE | 80410000003245 | |
| Apr 10 | 5,446.00- | ANALYSIS SERVICE CHG | 00000000000000 | |
| | | ANALYSIS ACTIVITY | | |
| | | FOR 03/08 | | 560,885.92 |
| Apr 11 | 13,266,418.12+ | INCOMING WIRE | 80411000003864 | |
| Apr 11 | 5,033,581.88+ | INCOMING WIRE | 80411000003865 | |
| Apr 11 | 4,335,000.00+ | INCOMING WIRE | 80411000004788 | |
| Apr 11 | 3,381,300.00+ | INCOMING WIRE | 80411000004785 | |
| Apr 11 | 283,166.00+ | INCOMING WIRE | 80411000006202 | |
| Apr 11 | 258,319.73+ | INCOMING WIRE | 80411000006203 | |
| Apr 11 | 235,898.18+ | INCOMING WIRE | 80411000006172 | |
| Apr 11 | 180,612.00+ | INCOMING WIRE | 80411000006167 | |
| Apr 11 | 5,436,090.00- | OUTGOING RPT WIRE | 80411000005209 | |
| Apr 11 | 4,763,726.00- | OUTGOING RPT WIRE | 80411000005093 | |
| Apr 11 | 4,176,217.50- | OUTGOING RPT WIRE | 80411000005492 | |
| Apr 11 | 4,076,101.95- | OUTGOING RPT WIRE | 80411000005087 | |
| Apr 11 | 3,448,332.00- | OUTGOING RPT WIRE | 80411000005495 | |
| Apr 11 | 2,968,660.00- | OUTGOING RPT WIRE | 80411000005220 | |
| Apr 11 | 433,500.00- | OUTGOING RPT WIRE | 80411000003738 | |
| Apr 11 | 338,130.00- | OUTGOING RPT WIRE | 80411000003742 | |
| Apr 11 | 200,000.00- | OUTGOING RPT WIRE | 80411000005498 | 1,694,424.38 |
| Apr 14 | 8,682,400.80+ | INCOMING WIRE | 80414000005468 | |
| Apr 14 | 8,517,599.20+ | INCOMING WIRE | 80414000005467 | |
| Apr 14 | 3,522,187.50+ | INCOMING WIRE | 80414000004690 | |
| Apr 14 | 2,275,875.00+ | INCOMING WIRE | 80414000004700 | |
| Apr 14 | 174,871.11+ | INCOMING WIRE | 80414000005898 | |
| Apr 14 | 5,337,200.00- | OUTGOING RPT WIRE | 80414000005884 | |
| Apr 14 | 4,454,640.00- | OUTGOING RPT WIRE | 80414000005330 | |

Kelley_DZ_00063490

1959018

0001959018

Page 4 of 7
PAGE

Daily activity on your account



| Date | Amount | Description | Control Number | Balance |
|---|---|---|---|---|
| Apr 14 | 4,435,265.50- | OUTGOING RPT WIRE | 80414000005880 | |
| Apr 14 | 4,373,400.00- | OUTGOING RPT WIRE | 80414000005877 | |
| Apr 14 | 3,229,680.00- | OUTGOING RPT WIRE | 80414000005880 | |
| Apr 14 | 957,366.24- | AUTOMATIC TRANSFER | 80414000006532 | |
| Apr 14 | 957,366.24+ | TRANSFER TO EURO SWEEP ACCOUNT | 00000000000000 | 1,600,000.00 |
| Apr 15 | 8,000.00- | CHECK 3540 | 000062570541115 | |
| Apr 15 | 957,366.24+ | AUTOMATIC RECALL | 00000000000000 | |
| | | RECALL FROM EURO SWEEP ACCOUNT | | |
| Apr 15 | 16,104,416.63+ | INCOMING WIRE | 80415000005640 | |
| Apr 15 | 12,929,310.00+ | INCOMING WIRE | 80415000005641 | |
| Apr 15 | 3,765,273.37+ | INCOMING WIRE | 80415000005642 | |
| Apr 15 | 3,485,950.70+ | INCOMING WIRE | 80415000006936 | |
| Apr 15 | 763,271.74+ | INCOMING WIRE | 80415000006939 | |
| Apr 15 | 225,680.13+ | INCOMING WIRE | 80415000007113 | |
| Apr 15 | 5,915,060.00- | OUTGOING RPT WIRE | 80415000006307 | |
| Apr 15 | 5,558,555.00- | OUTGOING RPT WIRE | 80415000006368 | |
| Apr 15 | 4,851,080.00- | OUTGOING RPT WIRE | 80415000006369 | |
| Apr 15 | 4,331,630.00- | OUTGOING RPT WIRE | 80415000006378 | |
| Apr 15 | 3,930,700.00- | OUTGOING RPT WIRE | 80415000006371 | |
| Apr 15 | 3,937,560.00- | OUTGOING RPT WIRE | 80415000006998 | |
| Apr 15 | 2,776,411.25- | OUTGOING RPT WIRE | 80415000006761 | |
| Apr 15 | 743,095.00- | OUTGOING RPT WIRE | 80415000003852 | |
| Apr 16 | | RELATED ACT-CTR | 80416000004064 | 1,044,312.20 |
| Apr 16 | 13,698,329.50+ | INCOMING WIRE | 80416000004054 | |
| Apr 16 | 12,933,358.75+ | INCOMING WIRE | 80416000004055 | |
| Apr 16 | 4,335,000.00+ | INCOMING WIRE | 80416000003571 | |
| Apr 16 | 1,891,650.00+ | INCOMING WIRE | 80416000004436 | |
| Apr 16 | 2,278,311.75+ | INCOMING WIRE | 80416000004053 | |
| Apr 16 | 210,990.80+ | INCOMING WIRE | 80416000005062 | |
| Apr 16 | 96,825.00+ | OUTGOING RPT WIRE | 80416000006438 | |
| Apr 16 | 6,000,000.00- | OUTGOING RPT WIRE | 80416000004433 | |
| Apr 16 | 5,946,733.00- | OUTGOING RPT WIRE | 80416000004369 | |
| Apr 16 | 5,089,097.50- | OUTGOING RPT WIRE | 80416000004289 | |
| Apr 16 | 4,874,155.50- | OUTGOING RPT WIRE | 80416000004275 | |
| Apr 16 | 3,884,196.25- | OUTGOING RPT WIRE | 80416000005226 | |
| Apr 17 | 3,199,202.20+ | INCOMING WIRE | 80417000004456 | |
| Apr 17 | 6,033,405.00- | OUTGOING RPT WIRE | 80417000004437 | 992,783.75 |
| Apr 17 | 4,818,255.00- | OUTGOING RPT WIRE | 80417000005080 | |
| Apr 17 | 2,311,100.50- | OUTGOING RPT WIRE | 80417000005087 | |
| Apr 17 | 2,935,350.00- | OUTGOING RPT WIRE | 80417000005091 | |
| Apr 18 | 50,009,000.00+ | INCOMING WIRE | 80417000005076 | |
| Apr 18 | 11,889,281.50+ | INCOMING WIRE | 80418000007023 | |
| Apr 18 | 10,713,019.00+ | INCOMING WIRE | 80418000004068 | |
| Apr 18 | 46,275.58+ | INCOMING WIRE | 80418000004407 | |
| Apr 18 | 5,889,097.50- | OUTGOING RPT WIRE | 80418000006227 | 887,626.25 |
| Apr 18 | 5,391,666.67- | OUTGOING RPT WIRE | 80418000004768 | |
| Apr 18 | 5,175,161.67- | OUTGOING RPT WIRE | 80418000006840 | |
| Apr 18 | 5,054,380.00- | OUTGOING RPT WIRE | 80418000006010 | |
| Apr 18 | | OUTGOING RPT WIRE | 80418000005099 | |

Kelley_DZ_00063491

1959018

Daily activity on your account

0001959018                Page 5 of 7
                          PAGE



| Date | Amount | Description | Control Number | Balance |
|---|---|---|---|---|
| Apr 18 | 5,044,395.00- | OUTGOING RPT WIRE | 8041800005621 | |
| Apr 18 | 5,000,000.00- | OUTGOING RPT WIRE | 8041800006690 | |
| Apr 18 | 5,000,000.00- | OUTGOING RPT WIRE | 8041800006931 | |
| Apr 18 | 4,663,823.75- | OUTGOING RPT WIRE | 8041800005091 | |
| Apr 18 | 4,468,262.50- | OUTGOING RPT WIRE | 8041800004785 | |
| Apr 18 | 4,293,297.56- | OUTGOING RPT WIRE | 8041800005620 | |
| Apr 18 | 2,830,321.90- | OUTGOING RPT WIRE | 8041800005662 | |
| Apr 18 | 2,800,200.00- | OUTGOING RPT WIRE | 8041800006103 | |
| Apr 18 | 1,903,830.00- | OUTGOING RPT WIRE | 8041800006107 | |
| Apr 18 | 1,903,830.00- | OUTGOING RPT WIRE | 8041800006100 | |
| Apr 18 | 4,395,740.75- | RELATED ACCT-DR | 8041800006851 | 375,106.57 |
| Apr 18 | 2,939,870.75- | RELATED ACCT-DR | 8041800006847 | |
| Apr 21 | 12,072,499.00+ | INCOMING WIRE | 8042100004762 | |
| Apr 21 | 10,000,000.00+ | INCOMING WIRE | 8042100002874 | |
| Apr 21 | 1,527,510.00+ | INCOMING WIRE | 8042100003202 | |
| Apr 21 | 1,288,295.12+ | INCOMING WIRE | 8042100005149 | |
| Apr 21 | 1,118,741.62+ | INCOMING WIRE | 8042100005167 | |
| Apr 21 | 1,075,170.00+ | INCOMING WIRE | 8042100006166 | |
| Apr 21 | 666,341.70+ | INCOMING WIRE | 8042100006165 | |
| Apr 21 | 321,622.33+ | INCOMING WIRE | 8042100003638 | |
| Apr 21 | 294,662.76+ | INCOMING WIRE | 8042100003634 | |
| Apr 21 | 221,396.00+ | INCOMING WIRE | 8042100003636 | |
| Apr 21 | 179,351.67+ | INCOMING WIRE | 8042100005915 | |
| Apr 21 | 174,199.67+ | INCOMING WIRE | 8042100006602 | |
| Apr 21 | 149,522.17+ | INCOMING WIRE | 8042100006601 | |
| Apr 21 | 130,701.75+ | INCOMING WIRE | 8042100003885 | |
| Apr 21 | 91,161.17+ | INCOMING WIRE | 8042100003884 | |
| Apr 21 | 40,430.41+ | DEPOSIT | 0000625438400 | |
| Apr 21 | 5,509,400.00- | OUTGOING RPT WIRE | 8042100005900 | |
| Apr 21 | 5,280,600.00- | OUTGOING RPT WIRE | 8042100005899 | |
| Apr 21 | 5,280,600.00- | OUTGOING RPT WIRE | 8042100005808 | |
| Apr 21 | 4,721,247.50- | OUTGOING RPT WIRE | 8042100003451 | |
| Apr 21 | 4,536,540.00- | OUTGOING RPT WIRE | 8042100003456 | |
| Apr 21 | 5,645,989.00- | RELATED ACCT-DR | 8042100003536 | |
| Apr 21 | 4,845,610.50- | RELATED ACCT-DR | 8042100003528 | |
| Apr 22 | 13,738,719.05+ | INCOMING WIRE | 8042200005564 | |
| Apr 22 | 6,841,280.25+ | INCOMING WIRE | 8042200005470 | |
| Apr 22 | 4,000,000.00+ | INCOMING WIRE | 8042200005465 | |
| Apr 22 | 3,752,985.00+ | INCOMING WIRE | 8042200004920 | |
| Apr 22 | 5,561,904.17- | OUTGOING RPT WIRE | 8042200004714 | |
| Apr 22 | 5,457,555.00- | OUTGOING RPT WIRE | 8042200005259 | |
| Apr 22 | 4,316,325.00- | OUTGOING RPT WIRE | 8042200005671 | |
| Apr 22 | 4,149,156.25- | OUTGOING RPT WIRE | 8042200003073 | |
| Apr 22 | 3,829,856.25- | OUTGOING RPT WIRE | 8042200005806 | |
| Apr 22 | 3,432,000.00- | OUTGOING RPT WIRE | 8042200005659 | |
| Apr 22 | 222,040.00- | OUTGOING RPT WIRE | 8042200005064 | |
| Apr 22 | 97,211.92- | OUTGOING RPT WIRE | 8042200003071 | |
| Apr 22 | 57,522.87- | OUTGOING RPT WIRE | 8042200003068 | 1,147,670.67 |

Kelley_DZ_00063492

1959018

0001959018

Page 6 of 7
PAGE 6

Daily activity on your account



| Date | Amount | Description | Control Number | Balance |
|---|---|---|---|---|
| Apr 23 | 16.14- | CHECK 9593 | 0000625762215 | |
| Apr 23 | 16,000.00- | CHECK 9596 | 0000625763695952 | |
| Apr 23 | 1,000.00- | CHECK 9597 | 0000625765635678 | |
| Apr 23 | 12,884,475.45+ | INCOMING WIRE | 80423000004424 | |
| Apr 23 | 10,111,624.25+ | INCOMING WIRE | 80423000004425 | |
| Apr 23 | 4,970,000.00+ | INCOMING WIRE | 80423000003037 | |
| Apr 23 | 4,350,000.00+ | INCOMING WIRE | 80423000003033 | |
| Apr 23 | 2,725,000.00+ | INCOMING WIRE | 80423000003536 | |
| Apr 23 | 1,694,740.00+ | INCOMING WIRE | 80423000004591 | |
| Apr 23 | 157,047.00+ | INCOMING WIRE | 80423000005791 | |
| Apr 23 | 5,923,146.00- | OUTGOING RPT WIRE | 80423000003118 | |
| Apr 23 | 5,176,503.00- | OUTGOING RPT WIRE | 80423000004516 | |
| Apr 23 | 4,941,800.00- | OUTGOING RPT WIRE | 80423000004517 | |
| Apr 23 | 4,719,927.50- | OUTGOING RPT WIRE | 80423000006058 | |
| Apr 23 | 4,476,591.75- | OUTGOING RPT WIRE | 80423000004519 | |
| Apr 23 | 4,125,473.05- | OUTGOING RPT WIRE | 80423000004525 | |
| Apr 23 | 2,800,000.00- | OUTGOING RPT WIRE | 80423000004535 | |
| Apr 23 | 2,796,002.00- | OUTGOING RPT WIRE | 80423000004536 | |
| Apr 23 | 250,000.00- | OUTGOING NONRPT WIRE | 80423000004505 | |
| Apr 23 | | AUTOMATIC TRANSFER | 00000000000000 | |
| Apr 23 | 738,708.28- | TRANSFER TO EURO SWEEP ACCOUNT | | 1,629,576.00 |
| Apr 24 | 100,396.54- | CHECK 9598 | 0000625771203357 | |
| Apr 24 | 11,963.72- | CHECK 9599 | 0000625771276719 | |
| Apr 24 | 12,500.00- | CHECK 9600 | 0000625771276718 | |
| Apr 24 | 738,708.28+ | AUTOMATIC RECALL FROM EURO SWEEP ACCOUNT | 00000000000000 | |
| Apr 24 | 15,500,000.00+ | INCOMING WIRE | 80424000003854 | |
| Apr 24 | 4,300,000.00+ | INCOMING WIRE | 80424000002688 | |
| Apr 24 | 4,988,062.50- | OUTGOING RPT WIRE | 80424000004108 | |
| Apr 24 | 4,902,570.00- | OUTGOING RPT WIRE | 80424000004112 | |
| Apr 24 | 4,744,128.00- | OUTGOING RPT WIRE | 80424000004109 | |
| Apr 24 | 4,700,000.00- | OUTGOING RPT WIRE | 80424000002877 | |
| Apr 24 | 2,622,334.50- | OUTGOING RPT WIRE | 80424000002878 | |
| Apr 24 | 250,000.00- | OUTGOING NONRPT WIRE | 80424000004080 | |
| Apr 24 | 200,000.00- | OUTGOING RPT WIRE | 80424000004099 | |
| Apr 25 | 398.34- | CHECK 9555 | 0000625777294651 | |
| Apr 25 | 91.87- | CHECK 9601 | 0000625777977960 | |
| Apr 25 | 10,752,039.00+ | INCOMING WIRE | 80425000004965 | |
| Apr 25 | 10,112,757.75+ | INCOMING WIRE | 80425000004966 | |
| Apr 25 | 4,550,000.00+ | INCOMING WIRE | 80425000003044 | |
| Apr 25 | 4,500,000.00- | OUTGOING RPT WIRE | 80425000003044 | |
| Apr 25 | 525,357.92+ | INCOMING WIRE | 80425000006122 | |
| Apr 25 | 242,243.44+ | INCOMING WIRE | 80425000006469 | |
| Apr 25 | 5,761,945.00- | OUTGOING RPT WIRE | 80425000003656 | |
| Apr 25 | 4,849,141.25- | OUTGOING RPT WIRE | 80425000005105 | |
| Apr 25 | 4,694,000.00- | OUTGOING RPT WIRE | 80425000005110 | |
| Apr 25 | 4,694,000.00- | OUTGOING RPT WIRE | 80425000005099 | |
| Apr 25 | 4,065,964.00- | OUTGOING RPT WIRE | 80425000005510 | |
| Apr 25 | 3,531,580.00- | OUTGOING RPT WIRE | 80425000005098 | |
| Apr 25 | 1,500,000.00- | OUTGOING RPT WIRE | 80425000005835 | |
| Apr 25 | 527,209.58- | RELATED ACCT-DR | 80425000006255 | 699,023.65 |

Kelley_DZ_00063493

0001959018

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|---|---|---|---|---|
| Apr 28 | 12,720,840.75+ | INCOMING WIRE | 80428000006236 | |
| Apr 28 | 6,879,159.25+ | INCOMING WIRE | 80428000006237 | |
| Apr 28 | 5,811,624.00− | OUTGOING RPT WIRE | 80428000006479 | |
| Apr 28 | 5,368,850.50− | OUTGOING RPT WIRE | 80428000006489 | |
| Apr 28 | 3,829,856.25− | OUTGOING RPT WIRE | 80428000006483 | |
| Apr 28 | 3,616,511.25− | OUTGOING RPT WIRE | 80428000006476 | 1,672,181.65 |
| Apr 29 | 33.95− | CHECK  9598 | 0000625800111099 | |
| Apr 29 | 13,560,460.00+ | INCOMING WIRE | 80429000006136 | |
| Apr 29 | 4,239,540.00+ | INCOMING WIRE | 80429000006135 | |
| Apr 29 | 3,300,000.00+ | INCOMING WIRE | 80429000003156 | |
| Apr 29 | 5,152,400.00− | OUTGOING RPT WIRE | 80429000006624 | |
| Apr 29 | 4,616,400.00− | OUTGOING RPT WIRE | 80429000004483 | |
| Apr 29 | 4,579,279.17− | OUTGOING RPT WIRE | 80429000006817 | |
| Apr 29 | 4,266,540.00− | OUTGOING RPT WIRE | 80429000006627 | |
| Apr 29 | 2,557,528.53− | AUTOMATIC TRANSFER | 00000000000000 | |
| | | TRANSFER TO EURO SWEEP ACCOUNT | | |
| | | ▓▓▓▓▓▓▓ | | 1,600,000.00 |
| Apr 30 | 2,557,528.53+ | AUTOMATIC RECALL | 00000000000000 | |
| | | RECALL FROM EURO SWEEP ACCOUNT | | |
| | | ▓▓▓▓▓▓ | | |
| Apr 30 | 16,325,870.63+ | INCOMING WIRE | 80430000007563 | |
| Apr 30 | 8,874,129.38+ | INCOMING WIRE | 80430000007562 | |
| Apr 30 | 4,175,000.00+ | INCOMING WIRE | 80430000003410 | |
| Apr 30 | 2,448,575.00+ | INCOMING WIRE | 80430000005210 | |
| Apr 30 | 200,000.00+ | INCOMING WIRE | 80430000004983 | |
| Apr 30 | 5,967,120.00− | OUTGOING RPT WIRE | 80430000007539 | |
| Apr 30 | 5,823,155.00− | OUTGOING RPT WIRE | 80430000004513 | |
| Apr 30 | 5,477,150.00− | OUTGOING RPT WIRE | 80430000007714 | |
| Apr 30 | 4,048,128.00− | OUTGOING RPT WIRE | 80430000007549 | |
| Apr 30 | 3,557,922.25− | OUTGOING RPT WIRE | 80430000007727 | |
| Apr 30 | 3,199,167.50− | OUTGOING RPT WIRE | 80430000007543 | |
| Apr 30 | 2,908,500.00− | OUTGOING RPT WIRE | 80430000007723 | |
| Apr 30 | 2,636,510.00− | OUTGOING RPT WIRE | 80430000004511 | |
| Apr 30 | 2,447,813.33− | RELATED ACCT-DR | 80430000006247 | 115,637.46 |

Kelley_DZ_00063494

# EXHIBIT T-60

 **First Regional Bank**



```
Date  10/31/07        Page      1
Account Number
Enclosures                      20
```

NATIONWIDE INTL RESOURCES INC
2346 WESTWOOD BL STE #6
LOS ANGELES CA  90064

---- CHECKING ACCOUNTS ----

Thank you for choosing First Regional Bank.

```
BUSINESS CHECKING                        Number of Enclosures              20
Account Number                           Statement Dates 10/01/07 thru 10/31/07
Previous Balance        13,795,975.28    Days in the statement period      31
   61 Deposits/Credits  274,765,334.75   Average Ledger            13,621,827
   83 Checks/Debits     284,339,230.03   Average Collected         13,621,539
Service Charge                 .00
Interest Paid                  .00
Ending Balance           4,222,080.00
```

Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
| 10/01 | INCOMING WIRE TRANSFER<br>E AND S INTERNATIONAL ENT, | 35,160.00 |
| 10/01 | INCOMING WIRE TRANSFER<br>EDGE ONE, LLC | 3,900,000.00 |
| 10/01 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,064,000.00 |
| 10/01 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,667,000.00 |
| 10/03 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 3,179,000.00 |
| 10/03 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,777,000.00 |
| 10/03 | INCOMING WIRE TRANSFER<br>THOUSAND LAKES, LLC | 11,476,665.00 |
| 10/04 | INCOMING WIRE TRANSFER<br>MINNEAPOLIS MN | 3,843,700.00 |
| 10/04 | INCOMING WIRE TRANSFER<br>MINNEAPOLIS MN | 4,118,250.00 |
| 10/04 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 5,072,000.00 |
| 10/05 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 3,296,000.00 |
| 10/05 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,949,000.00 |

FRB100000337

Kelley_DZ_00053853

**First Regional Bank**

FDIC

Date  10/31/07            Page     2
Account Number
Enclosures                        20

NATIONWIDE INTL RESOURCES INC
2346 WESTWOOD BL STE #6
LOS ANGELES CA  90064

BUSINESS CHECKING                        (Continued)

Deposits and Additions
| Date | Description | Amount |
|---|---|---|
| 10/09 | INCOMING WIRE TRANSFER<br>MINNEAPOLIS MN | 4,826,895.00 |
| 10/09 | INCOMING WIRE TRANSFER<br>THOUSAND LAKES, LLC | 11,479,188.38 |
| 10/11 | INCOMING WIRE TRANSFER<br>MINNEAPOLIS MN | 4,208,432.25 |
| 10/11 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,324,000.00 |
| 10/11 | INCOMING WIRE TRANSFER<br>THOUSAND LAKES, LLC | 6,987,549.12 |
| 10/12 | INCOMING WIRE TRANSFER<br>WELLS FARGO BANK, NA | 2,300,000.00 |
| 10/12 | INCOMING WIRE TRANSFER<br>THOUSAND LAKES, LLC | 2,763,486.00 |
| 10/12 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,941,000.00 |
| 10/15 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 2,368,000.00 |
| 10/15 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 3,653,000.00 |
| 10/16 | INCOMING WIRE TRANSFER<br>MINNEAPOLIS MN | 2,890,000.00 |
| 10/16 | INCOMING WIRE TRANSFER<br>MINNEAPOLIS MN | 3,251,160.00 |
| 10/16 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 3,491,000.00 |
| 10/16 | INCOMING WIRE TRANSFER<br>THOUSAND LAKES, LLC | 9,771,221.25 |
| 10/17 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 2,853,000.00 |
| 10/17 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,784,000.00 |
| 10/17 | INCOMING WIRE TRANSFER<br>EDGE ONE, LLC | 9,721,520.00 |
| 10/18 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 2,781,000.00 |
| 10/18 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 3,409,000.00 |

FRB100000338

Kelley_DZ_00053854

**First Regional Bank**



```
Date  10/31/07        Page      3
Account Number
Enclosures                        20
```

NATIONWIDE INTL RESOURCES INC
2346 WESTWOOD BL STE #6
LOS ANGELES CA  90064

BUSINESS CHECKING                        (Continued)

Deposits and Additions

| Date | Description | Amount |
|------|-------------|-------:|
| 10/18 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 5,009,000.00 |
| 10/18 | INCOMING WIRE TRANSFER<br>THOUSAND LAKES, LLC | 14,032,654.00 |
| 10/19 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,501,000.00 |
| 10/19 | INCOMING WIRE TRANSFER<br>MINNEAPOLIS MN | 4,976,218.75 |
| 10/19 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 5,027,000.00 |
| 10/22 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 3,476,000.00 |
| 10/22 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 3,653,000.00 |
| 10/22 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,366,000.00 |
| 10/22 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,584,000.00 |
| 10/22 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 5,086,000.00 |
| 10/23 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,145,000.00 |
| 10/23 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,876,000.00 |
| 10/24 | INCOMING WIRE TRANSFER<br>CHRISLAN INVESTMENTS LLC | 6,000.00 |
| 10/24 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 3,526,000.00 |
| 10/24 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 4,525,000.00 |
| 10/24 | INCOMING WIRE TRANSFER<br>THOUSAND LAKES, LLC | 9,782,188.13 |
| 10/26 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 2,311,000.00 |
| 10/26 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 2,685,000.00 |
| 10/26 | INCOMING WIRE TRANSFER<br>PALM BEACH GARDENS FL | 3,761,000.00 |

FRB100000339

Kelley_DZ_00053855

First Regional Bank



Date 10/31/07    Page    4
Account Number
Enclosures                20

NATIONWIDE INTL RESOURCES INC
2346 WESTWOOD BL STE #6
LOS ANGELES CA  90064

BUSINESS CHECKING                    (Continued)

Deposits and Additions
| Date | Description | Amount |
|------|-------------|--------|
| 10/26 | INCOMING WIRE TRANSFER PALM BEACH GARDENS FL | 4,212,000.00 |
| 10/26 | INCOMING WIRE TRANSFER PALM BEACH GARDENS FL | 4,642,000.00 |
| 10/26 | INCOMING WIRE TRANSFER PALM BEACH GARDENS FL | 5,057,000.00 |
| 10/26 | INCOMING WIRE TRANSFER THOUSAND LAKES, LLC | 5,607,538.75 |
| 10/29 | INCOMING WIRE TRANSFER THOUSAND LAKES, LLC | 4,901,303.12 |
| 10/29 | DEPOSIT | 8,930.00 |
| 10/30 | INCOMING WIRE TRANSFER PALM BEACH GARDENS FL | 2,146,000.00 |
| 10/30 | INCOMING WIRE TRANSFER PALM BEACH GARDENS FL | 2,745,000.00 |
| 10/30 | INCOMING WIRE TRANSFER PALM BEACH GARDENS FL | 3,464,000.00 |
| 10/30 | INCOMING WIRE TRANSFER MINNEAPOLIS MN | 3,894,275.00 |
| 10/31 | INCOMING WIRE TRANSFER PALM BEACH GARDENS FL | 3,578,000.00 |

Checks and Withdrawals
| Date | Description | Amount |
|------|-------------|--------|
| 10/01 | OUTGOING WIRE TRANSFER PCI | 3,475,100.00 |
| 10/01 | OUTGOING WIRE TRANSFER PCI | 4,707,800.00 |
| 10/01 | OUTGOING WIRE TRANSFER PCI | 5,034,500.00 |
| 10/02 | OUTGOING WIRE TRANSFER UBID COM HOLDINGS INC | 34,281.00 |
| 10/02 | OUTGOING WIRE TRANSFER PCI | 3,898,000.00 |
| 10/02 | OUTGOING WIRE TRANSFER PCI | 4,061,900.00 |

FRB100000340

Kelley_DZ_00053856

**First Regional Bank**



Date  10/31/07      Page      5
Account Number
Enclosures                      20

NATIONWIDE INTL RESOURCES INC
2346 WESTWOOD BL STE #6
LOS ANGELES CA  90064

BUSINESS CHECKING                          (Continued)

Checks and Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 10/02 | OUTGOING WIRE TRANSFER PCI | 4,664,600.00 |
| 10/04 | OUTGOING WIRE TRANSFER PCI | 3,177,400.00 |
| 10/04 | OUTGOING WIRE TRANSFER PCI | 4,774,600.00 |
| 10/04 | OUTGOING WIRE TRANSFER PCI | 11,470,800.00 |
| 10/05 | OUTGOING WIRE TRANSFER PCI | 3,841,700.00 |
| 10/05 | OUTGOING WIRE TRANSFER PCI | 4,116,100.00 |
| 10/05 | OUTGOING WIRE TRANSFER PCI | 5,069,500.00 |
| 10/09 | OUTGOING WIRE TRANSFER PCI | 3,294,300.00 |
| 10/09 | OUTGOING WIRE TRANSFER PCI | 4,946,500.00 |
| 10/10 | OUTGOING WIRE TRANSFER PCI | 4,824,400.00 |
| 10/10 | OUTGOING WIRE TRANSFER PCI | 11,470,300.00 |
| 10/12 | OUTGOING WIRE TRANSFER PCI | 4,206,300.00 |
| 10/12 | OUTGOING WIRE TRANSFER PCI | 4,321,800.00 |
| 10/12 | OUTGOING WIRE TRANSFER PCI | 6,984,000.00 |
| 10/15 | OUTGOING WIRE TRANSFER PCI | 2,298,800.00 |
| 10/15 | OUTGOING WIRE TRANSFER PCI | 2,762,000.00 |
| 10/15 | OUTGOING WIRE TRANSFER PCI | 4,938,500.00 |
| 10/16 | OUTGOING WIRE TRANSFER PCI | 2,366,800.00 |
| 10/16 | OUTGOING WIRE TRANSFER PCI | 3,651,100.00 |

FRB100000341

Kelley_DZ_00053857

**First Regional Bank**



```
Date    10/31/07    Page    6
Account Number
Enclosures                     20
```

NATIONWIDE INTL RESOURCES INC
2346 WESTWOOD BL STE #6
LOS ANGELES CA  90064

BUSINESS CHECKING                    (Continued)

Checks and Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 10/17 | XFER 9721 LARRY REYNOLDS | 44,000.00 |
| 10/17 | XFER 421954 DBPP ANTOINETT | 44,000.00 |
| 10/17 | OUTGOING WIRE TRANSFER<br>PCI | 2,888,500.00 |
| 10/17 | OUTGOING WIRE TRANSFER<br>PCI | 3,249,400.00 |
| 10/17 | OUTGOING WIRE TRANSFER<br>PCI | 3,489,200.00 |
| 10/17 | OUTGOING WIRE TRANSFER<br>PCI | 9,766,300.00 |
| 10/18 | OUTGOING WIRE TRANSFER<br>PCI | 2,851,500.00 |
| 10/18 | OUTGOING WIRE TRANSFER<br>PCI | 4,781,600.00 |
| 10/18 | OUTGOING WIRE TRANSFER<br>PCI | 9,716,600.00 |
| 10/19 | OUTGOING WIRE TRANSFER<br>PCI | 2,779,600.00 |
| 10/19 | OUTGOING WIRE TRANSFER<br>PCI | 3,407,300.00 |
| 10/19 | OUTGOING WIRE TRANSFER<br>PCI | 5,006,500.00 |
| 10/19 | OUTGOING WIRE TRANSFER<br>PCI | 14,025,600.00 |
| 10/22 | OUTGOING WIRE TRANSFER<br>PCI | 4,498,700.00 |
| 10/22 | OUTGOING WIRE TRANSFER<br>PCI | 4,973,718.00 |
| 10/22 | OUTGOING WIRE TRANSFER<br>PCI | 5,024,500.00 |
| 10/23 | OUTGOING WIRE TRANSFER<br>PCI | 3,474,200.00 |
| 10/23 | OUTGOING WIRE TRANSFER<br>PCI | 3,651,200.00 |
| 10/23 | OUTGOING WIRE TRANSFER<br>PCI | 4,363,800.00 |
| 10/23 | OUTGOING WIRE TRANSFER<br>PCI | 4,581,700.00 |

FRB100000342

Kelley_DZ_00053858

**First Regional Bank**



Date 10/31/07    Page 7
Account Number
Enclosures      20

NATIONWIDE INTL RESOURCES INC
2346 WESTWOOD BL STE #6
LOS ANGELES CA 90064

BUSINESS CHECKING ████████ (Continued)

Checks and Withdrawals

| Date | Description | Amount |
|---|---|---|
| 10/23 | OUTGOING WIRE TRANSFER PCI | 5,083,400.00 |
| 10/24 | OUTGOING WIRE TRANSFER PCI | 4,142,900.00 |
| 10/24 | OUTGOING WIRE TRANSFER PCI | 4,873,500.00 |
| 10/25 | OUTGOING WIRE TRANSFER PCI | 3,524,200.00 |
| 10/25 | OUTGOING WIRE TRANSFER PCI | 4,522,700.00 |
| 10/25 | OUTGOING WIRE TRANSFER PCI | 9,777,200.00 |
| 10/29 | OUTGOING WIRE TRANSFER PCI | 2,309,300.00 |
| 10/29 | OUTGOING WIRE TRANSFER PCI | 2,683,600.00 |
| 10/29 | OUTGOING WIRE TRANSFER PCI | 3,759,100.00 |
| 10/29 | OUTGOING WIRE TRANSFER PCI | 4,209,900.00 |
| 10/29 | OUTGOING WIRE TRANSFER PCI | 4,639,700.00 |
| 10/29 | OUTGOING WIRE TRANSFER PCI | 5,054,500.00 |
| 10/29 | OUTGOING WIRE TRANSFER PCI | 5,605,000.00 |
| 10/30 | OUTGOING WIRE TRANSFER PCI | 4,898,800.00 |
| 10/31 | OUTGOING WIRE TRANSFER PCI | 2,144,900.00 |
| 10/31 | OUTGOING WIRE TRANSFER PCI | 2,743,600.00 |
| 10/31 | OUTGOING WIRE TRANSFER PCI | 3,462,200.00 |
| 10/31 | OUTGOING WIRE TRANSFER PCI | 3,802,200.00 |

FRB100000343

Kelley_DZ_00053859

 **First Regional Bank**



```
                                        Date  10/31/07      Page       8
                                        Account Number
                                        Enclosures                    20
```

NATIONWIDE INTL RESOURCES INC
2346 WESTWOOD BL STE #6
LOS ANGELES CA  90064

BUSINESS CHECKING                  ████████  (Continued)

Checks in Serial Number Order

| Date | Check No. | Amount | Date | Check No. | Amount |
|------|-----------|--------|------|-----------|--------|
| 10/05 | 4733 | 20000.00 | 10/05 | 4762* | 3,000.00 |
| 10/23 | 4736* | 1872.00 | 10/17 | 4764* | 147.60 |
| 10/26 | 4746* | 780.00 | 10/10 | 4765 | 5,000.00 |
| 10/12 | 4752* | 940.00 | 10/18 | 4770* | 26.92 |
| 10/10 | 4755* | 879.00 | 10/18 | 4771 | 550.00 |
| 10/10 | 4756 | 7400.00 | 10/22 | 4772 | 11,374.15 |
| 10/23 | 4757 | 6345.60 | 10/24 | 4776* | 55.00 |
| 10/04 | 4758 | 30.45 | 10/24 | 4777 | 490.00 |
| 10/03 | 4759 | 14790.31 | 10/30 | 4782* | 10,000.00 |
| 10/04 | 4760 | 850.00 | 10/29 | 4783 | 9,000.00 |

*Indicates Skip in Check Number

Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 10/01 | 13,244,735.28 | 10/12 | 10,577,530.27 | 10/24 | 18,365,713.13 |
| 10/02 | 585,954.28 | 10/15 | 6,599,230.27 | 10/25 | 541,613.13 |
| 10/03 | 20,003,828.97 | 10/16 | 19,984,711.52 | 10/26 | 28,816,371.88 |
| 10/04 | 13,614,098.52 | 10/17 | 17,861,683.92 | 10/29 | 5,456,505.00 |
| 10/05 | 8,808,798.52 | 10/18 | 25,743,061.00 | 10/30 | 12,796,980.00 |
| 10/09 | 16,874,081.90 | 10/19 | 15,028,279.75 | 10/31 | 4,222,080.00 |
| 10/10 | 566,102.90 | 10/22 | 21,684,987.60 | | |
| 10/11 | 16,086,084.27 | 10/23 | 9,543,470.00 | | |

FRB100000344

Kelley_DZ_00053860

# EXHIBIT T-61

Date 10/19/07          Page   11
Primary Account          3227170
Enclosures                   18

Community Checking                    3227170  (Continued)

DEPOSITS AND CREDITS
Date      Description                          Amount
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 101607 INSTRUCTION FROM
10/16     Wire Transfer Credit              5,728,778.75
          THOUSAND LAKES, LLC
          C/O LANCELOT INVESTMENT MGT.,
          1033 SKOKIE BLVD SUITE 620
          NORTHBROOK IL 60062
10/17     Wire Transfer Credit              4,380,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 101707 INSTRUCTION FROM
10/17     Wire Transfer Credit              4,633,031.25
          MINNEAPOLIS MN
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          OPPORTUNITY FINANCE
10/17     Wire Transfer Credit              5,278,480.00
          EDGE ONE, LLC
          C O ATOZ INVESTMENT MANAGEMENT
          70 W MADISON STE 1500
          CHICAGO IL 60602
10/18     Wire Transfer Credit              2,727,798.75
          MINNEAPOLIS MN
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000

Kelley_DZ_00040184

Date 10/19/07          Page  12
Primary Account              3227170
Enclosures                        18

Community Checking                  3227170   (Continued)

DEPOSITS AND CREDITS
Date        Description                     Amount
            OPPORTUNITY FINANCE
10/18       Wire Transfer Credit        3,666,000.00
            PALM BEACH GARDENS FL
            TRUST OUTGOING WIRE DB300
            ATTN BONNIE GOETZ ZELINSKI
            MK-WI-S300
            ,   ,00000
            PER 10182007 INSTRUCTION FR
10/18       Wire Transfer Credit        4,434,000.00
            PALM BEACH GARDENS FL
            TRUST OUTGOING WIRE DB300
            ATTN BONNIE GOETZ ZELINSKI
            MK-WI-S300
            ,   ,00000
            PER 101807 INSTRUCTION FROM
10/18       Wire Transfer Credit       10,967,346.00
            THOUSAND LAKES, LLC
            C/O LANCELOT INVESTMENT MGT.,
            1033 SKOKIE BLVD SUITE 620
            NORTHBROOK IL 60062
10/19       Wire Transfer Credit        2,588,000.00
            PALM BEACH GARDENS FL
            TRUST OUTGOING WIRE DB300
            ATTN BONNIE GOETZ ZELINSKI
            MK-WI-S300
            ,   ,00000
            PER 10192007 INSTRUCTION FR
10/19       Wire Transfer Credit        4,118,000.00
            PALM BEACH GARDENS FL
            TRUST OUTGOING WIRR DB300
            ATTN BONNIE GOETZ ZELINSKI
            MK-WI-S300
            ,   ,00000
            PER10192007 INSTRUCTION FRO

Kelley_DZ_00040185

Date 10/19/07        Page  13
Primary Account        3227170
Enclosures              18

Community Checking                3227170  (Continued)

--------------------------------------------------------------------

WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 9/21 | Wire Transfer Debit | 15,040,401.00- |
|      | Petters Company |  |
|      | 075000051 |  |
|      | 195-9018 |  |
|      | M & I Bank |  |
|      | Milwakee WI |  |
| 9/21 | Wire Transfer Fee | 12.00- |
| 9/21 | Wire Transfer Fee | 12.00- |
| 9/21 | Wire Transfer Fee | 12.00- |
| 9/21 | Wire Transfer Fee | 20.00- |
| 9/24 | Wire Transfer Debit | 9,630,579.00- |
|      | Petters Company Inc |  |
|      | 075000051 |  |
|      | 195-9018 |  |
|      | M & I Bank |  |
|      | Milwauke WI |  |
| 9/24 | Wire Transfer Fee | 12.00- |
| 9/24 | Wire Transfer Fee | 12.00- |
| 9/24 | Wire Transfer Fee | 20.00- |
| 9/25 | Wire Transfer Debit | 7,461,134.00- |
|      | Petters Company Inc |  |
|      | 075000051 |  |
|      | 1959018 |  |
|      | M & I Bank |  |
|      | Milwaukee WI |  |
| 9/25 | Wire Transfer Fee | 12.00- |
| 9/25 | Wire Transfer Fee | 12.00- |
| 9/25 | Wire Transfer Fee | 12.00- |
| 9/25 | Wire Transfer Fee | 12.00- |
| 9/26 | Wire Transfer Debit | 23,621,780.50- |
|      | Petters Company Inc |  |
|      | 075000051 |  |
|      | 195-9018 |  |

Kelley_DZ_00040186

```
                              Date 10/19/07        Page   14
                              Primary Account         3227170
                              Enclosures                  18
```

Community Checking                    3227170  (Continued)

WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
|      | M & I Bank  |        |
|      | Milwaukee  WI |      |
| 9/26 | Wire Transfer Fee | 12.00- |
| 9/26 | Wire Transfer Fee | 12.00- |
| 9/26 | Wire Transfer Fee | 12.00- |
| 9/26 | Wire Transfer Fee | 20.00- |
| 9/27 | Wire Transfer Debit | 9,248,687.00- |
|      | Petters Company Inc |  |
|      | 075000051 |  |
|      | 195-9018 |  |
|      | M & I Bank |  |
|      | Milwaukee  WI |  |
| 9/27 | Wire Transfer Fee | 12.00- |
| 9/27 | Wire Transfer Fee | 12.00- |
| 9/27 | Wire Transfer Fee | 12.00- |
| 9/27 | Wire Transfer Fee | 12.00- |
| 9/27 | Wire Transfer Fee | 20.00- |
| 9/28 | Wire Transfer Debit | 19,950,080.38- |
|      | Petters Company Inc |  |
|      | 075000051 |  |
|      | 195-9018 |  |
|      | M & I Bank |  |
|      | Milwaukee  WI |  |
| 9/28 | Wire Transfer Fee | 12.00- |
| 9/28 | Wire Transfer Fee | 20.00- |
| 10/01 | Wire Transfer Debit | 3,485,818.00- |
|      | Petters Company Inc |  |
|      | 075000051 |  |
|      | 195-9018 |  |
|      | M & I Bank |  |
|      | Milwaukee  WI |  |
| 10/01 | Wire Transfer Fee | 12.00- |
| 10/01 | Wire Transfer Fee | 12.00- |
| 10/01 | Wire Transfer Fee | 12.00- |
| 10/02 | Wire Transfer Debit | 12,273,931.00- |
|      | Petters Company Inc |  |

Kelley_DZ_00040187

Date 10/19/07        Page   15
Primary Account          3227170
Enclosures                    18

Community Checking              3227170  (Continued)

WITHDRAWALS AND DEBITS
| Date | Description | Amount |
|------|-------------|--------|
|      | 075000051 | |
|      | 195-9018 | |
|      | M & I Bank | |
|      | Milwaukee WI | |
| 10/02 | Wire Transfer Fee | 12.00- |
| 10/02 | Wire Transfer Fee | 12.00- |
| 10/03 | Wire Transfer Debit | 6,451,387.00- |
|      | Petters Company Inc | |
|      | 075000051 | |
|      | 195-9018 | |
|      | M & I Bank | |
|      | Milwaukee  WI | |
| 10/03 | Wire Transfer Fee | 12.00- |
| 10/03 | Wire Transfer Fee | 20.00- |
| 10/04 | Wire Transfer Debit | 2,000.00- |
|      | ALQUILERES VISTA DE MAR | |
|      | 021000021 | |
|      | 325-750-1 | |
|      | SAN JOSE COSTA RICA | |
|      | CHASE NYC | |
|      | NEW YORK | |
| 10/04 | Wire Transfer Debit | 18,518,704.00- |
|      | Petters Company Inc | |
|      | 075000051 | |
|      | 195-9018 | |
|      | M & I Bank | |
|      | Milwaukee WI | |
| 10/04 | Wire Transfer Fee | 10.00- |
| 10/04 | Wire Transfer Fee | 12.00- |
| 10/04 | Wire Transfer Fee | 12.00- |
| 10/04 | Wire Transfer Fee | 20.00- |
| 10/05 | Wire Transfer Debit | 6,658,483.75- |
|      | Petters Company Inc | |
|      | 075000051 | |
|      | 195-9018 | |

Kelley_DZ_00040188

Date 10/19/07          Page   16
Primary Account             3227170
Enclosures                       18

Community Checking                    3227170   (Continued)

WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
|      | M & I Bank |  |
|      | Milwaukee WI |  |
| 10/05 | per mike/edp-way | 19,000,000.00- |
| 10/05 | Wire Transfer Fee | 12.00- |
| 10/05 | Wire Transfer Fee | 12.00- |
| 10/05 | Wire Transfer Fee | 12.00- |
| 10/05 | Wire Transfer Fee | 12.00- |
| 10/05 | Wire Transfer Fee | 20.00- |
| 10/09 | Wire Transfer Debit | 19,301,741.75- |
|      | Petters Company Inc |  |
|      | 075000051 |  |
|      | 1959018 |  |
|      | M & I Bank |  |
|      | Milwaukee WI |  |
| 10/09 | Wire Transfer Fee | 12.00- |
| 10/09 | Wire Transfer Fee | 12.00- |
| 10/09 | Wire Transfer Fee | 12.00- |
| 10/10 | Wire Transfer Debit | 20,188,763.62- |
|      | Petters Company Inc |  |
|      | 075000051 |  |
|      | 195-9018 |  |
|      | M & I Bank |  |
|      | Milwaukee  WI |  |
| 10/10 | Wire Transfer Fee | 12.00- |
| 10/10 | Wire Transfer Fee | 12.00- |
| 10/10 | Wire Transfer Fee | 12.00- |
| 10/10 | Wire Transfer Fee | 20.00- |
| 10/11 | Wire Transfer Debit | 10,903,273.00- |
|      | Petters Company Inc |  |
|      | 075000051 |  |
|      | 195-9018 |  |
|      | M & I Bank |  |
|      | Milwaukee WI |  |
| 10/11 | Wire Transfer Fee | 12.00- |
| 10/11 | Wire Transfer Fee | 12.00- |
| 10/11 | Wire Transfer Fee | 12.00- |

Kelley_DZ_00040189

Date 10/19/07              Page   17
Primary Account           3227170
Enclosures                    18

Community Checking                3227170   (Continued)

WITHDRAWALS AND DEBITS
| Date  | Description         | Amount          |
|-------|---------------------|-----------------|
| 10/11 | Wire Transfer Fee   | 12.00-          |
| 10/11 | Wire Transfer Fee   | 12.00-          |
| 10/11 | Wire Transfer Fee   | 12.00-          |
| 10/12 | Wire Transfer Debit | 31,525,474.13-  |
|       | Petters Company Inc |                 |
|       | 075000051           |                 |
|       | 195-9018            |                 |
|       | M & I Bank          |                 |
|       | Milwaukee WI        |                 |
| 10/12 | Wire Transfer Fee   | 12.00-          |
| 10/12 | Wire Transfer Fee   | 12.00-          |
| 10/12 | Wire Transfer Fee   | 20.00-          |
| 10/15 | Wire Transfer Debit | 10,614,860.00-  |
|       | Petters Company Inc |                 |
|       | 075000051           |                 |
|       | 195-9018            |                 |
|       | M & I Bank          |                 |
|       | Milwaukee WI        |                 |
| 10/15 | Wire Transfer Fee   | 12.00-          |
| 10/15 | Wire Transfer Fee   | 12.00-          |
| 10/15 | Wire Transfer Fee   | 12.00-          |
| 10/15 | Wire Transfer Fee   | 12.00-          |
| 10/15 | Wire Transfer Fee   | 20.00-          |
| 10/16 | Wire Transfer Debit | 16,521,868.00-  |
|       | Petters Company Inc |                 |
|       | 075000051           |                 |
|       | 195-9018            |                 |
|       | M & I Bank          |                 |
|       | Milwaukee WI        |                 |
| 10/16 | Wire Transfer Fee   | 12.00-          |
| 10/16 | Wire Transfer Fee   | 12.00-          |
| 10/16 | Wire Transfer Fee   | 12.00-          |
| 10/16 | Wire Transfer Fee   | 12.00-          |
| 10/16 | Wire Transfer Fee   | 12.00-          |
| 10/17 | Wire Transfer Debit | 22,476,857.78-  |
|       | Petters Company Inc |                 |

Kelley_DZ_00040190

Date 10/19/07          Page   18
Primary Account            3227170
Enclosures                      18

Community Checking                3227170  (Continued)

WITHDRAWALS AND DEBITS
Date      Description                              Amount
          075000051
          195-9018
          M & I BANK
          MILWAUKEE WI
10/17     Wire Transfer Fee                        12.00-
10/17     Wire Transfer Fee                        12.00-
10/17     Wire Transfer Fee                        12.00-
10/18     Wire Transfer Debit              14,287,938.25-
          Petters Company Inc
          075000051
          195-9018
          M & I bank
          Milwaukjee WI
10/18     Wire Transfer Fee                        12.00-
10/18     Wire Transfer Fee                        12.00-
10/18     Wire Transfer Fee                        12.00-
10/18     Wire Transfer Fee                        12.00-
10/19     Wire Transfer Debit              21,789,695.75-
          Petters Company Inc
          075000051
          195-9018
          M & I Bank
          Milwaukee   WI
10/19     Wire Transfer Fee                        12.00-
10/19     Wire Transfer Fee                        12.00-
10/19     Wire Transfer Fee                        20.00-
10/19     Total Account Service Fee                 5.00-

-------------------------------------------------------------------

DETAILED ITEMIZATION OF ACCOUNT SERVICE FEE TOTAL LISTED ABOVE

10/19     Image Statement Fee                       5.00

-------------------------------------------------------------------

Kelley_DZ_00040191

Date 10/19/07        Page   19
Primary Account           3227170
Enclosures                    16

Community Checking                    3227170  (Continued)

CHECKS

| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|------|----------|--------|
| 9/24 | 3518 | 846.84 | 10/11 | 3528 | 6.93 | 10/19 | 3536* | 104.36 |
| 9/21 | 3520* | 1,500.00 | 10/11 | 3530* | 3,537.11 | 10/16 | 3621* | 4,200.00 |
| 9/24 | 3523* | 40,724.69 | 10/11 | 3531 | 1,891.58 | 10/16 | 3622 | 2,500.00 |
| 9/26 | 3525* | 200.00 | 10/12 | 3532 | 5,000.00 | 10/16 | 3623 | 6,000.00 |
| 9/27 | 3526 | 7,600.00 | 10/17 | 3533 | 4,014.45 | | | |
| 9/28 | 3527 | 8,600.00 | 10/18 | 3534 | 2,927.23 | | | |

* Indicates Serial Number out of Sequence

--------------------------------------------------------------------

DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 9/21 | 9,735,436.50 | 10/02 | 6,460,593.97 | 10/12 | 10,661,799.35 |
| 9/24 | 7,476,241.97 | 10/03 | 18,840,509.97 | 10/15 | 16,572,871.35 |
| 9/25 | 23,634,147.47 | 10/04 | 6,692,995.72 | 10/16 | 22,520,722.10 |
| 9/26 | 9,263,110.97 | 10/05 | 341,012.72 | 10/17 | 14,331,325.11 |
| 9/27 | 19,961,825.35 | 10/09 | 20,233,046.59 | 10/18 | 21,835,556.38 |
| 9/28 | 3,498,402.97 | 10/10 | 10,950,226.97 | 10/19 | 6,751,707.27 |
| 10/01 | 12,289,548.97 | 10/11 | 31,574,803.48 | | |

Kelley_DZ_00040192

746 1

Anchor Bank, N.A.
1055 East Wayzata Blvd
Wayzata MN 55391

(952) 473-4606

| ENCHANTED FAMILY BUYING COMPANY | Date 10/19/07 | Page | 1 |
| 1161 WAYZATA BLVD E | Primary Account | | 3227170 |
| WAYZATA MN 55391-1935 | Enclosures | | 18 |

## C H E C K I N G   A C C O U N T S

| Community Checking | | Number of Enclosures | 18 |
| Account Number | 3227170 | Statement Dates | 9/21/07 thru 10/21/07 |
| Previous Balance | 15,094,393.50 | Days in the statement period | 31 |
| 64 Deposits/Credits | 310,751,411.88 | Average Ledger | 10,827,471.95 |
| 112 Checks/Debits | 319,094,093.11 | Average Collected | 10,827,471.95 |
| Service Charge | 5.00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 6,751,707.27 | | |

--------------------------------------------------------------------------------

DEPOSITS AND CREDITS

| Date | Description | Amount |
|------|-------------|--------|
| 9/21 | Wire Transfer Credit | 2,907,000.00 |
| | PALM BEACH GARDENS FL | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | ,  ,00000 | |
| | PER 9212007 INSTRUCTION FRO | |
| 9/21 | Wire Transfer Credit | 3,337,000.00 |
| | PALM BEACH GARDENS FL | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | ,  ,00000 | |
| | PER 92107 INSTRUCTION FROM | |
| 9/21 | Wire Transfer Credit | 3,439,000.00 |
| | PALM BEACH GARDENS FL | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | ,  ,00000 | |
| | PER 9212007 INSTRUCTION FRO | |
| 9/24 | Wire Transfer Credit | 2,980,000.00 |
| | PALM BEACH GARDENS FL | |

Kelley_DZ_00040193

Date 10/19/07          Page    2
Primary Account          3227170
Enclosures                   13

Community Checking                    3227170  (Continued)

DEPOSITS AND CREDITS
Date      Description                        Amount
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 92407 INSTRUCTION FROM
  9/24    Wire Transfer Credit          4,483,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 9242007 INSTRUCTION FRO
  9/25    Wire Transfer Credit          2,704,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 9252007 INSTRUCTION FRO
  9/25    Wire Transfer Credit          2,843,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 92507 INSTRUCTION FROM
  9/25    Wire Transfer Credit           4,129,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 9252007 INSTRUCTION FRO
  9/25    Wire Transfer Credit         13,951,687.50
          THOUSAND LAKES, LLC

Kelley_DZ_00040194

Date 10/19/07              Page    3
Primary Account            3227170
Enclosures                      16

Community Checking              3227170   (Continued)

DEPOSITS AND CREDITS
Date      Description                          Amount
          C/O LANCELOT INVESTMENT MGT.,
          1033 SKOKIE BLVD SUITE 620
          NORTHBROOK IL 60062
9/26      Wire Transfer Credit             2,960,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 9262007 INSTRUCTION FRO
9/26      Wire Transfer Credit             3,059,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 92607 INSTRUCTION FROM
9/26      Wire Transfer Credit             3,232,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 9262007 INSTRUCTION FRO
9/27      Wire Transfer Credit             2,601,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 9272007 INSTRUCTION FRO
9/27      Wire Transfer Credit             3,465,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI

Kelley_DZ_00040195

```
                                        Date 10/19/07         Page    4
                                        Primary Account          3227170
                                        Enclosures                    18
```

Community Checking                 3227170   (Continued)

DEPOSITS AND CREDITS
Date     Description                        Amount
         MK-WI-S300
         ,  ,00000
         PER 92707 INSTRUCTION FROM
9/27     Wire Transfer Credit          4,280,000.00
         PALM BEACH GARDENS FL
         TRUST OUTGOING WIRE DB300
         ATTN BONNIE GOETZ ZELINSKI
         MK-WI-S300
         ,  ,00000
         PER 92707 INSTRUCTION FROM
9/27     Wire Transfer Credit          9,609,069.38
         THOUSAND LAKES, LLC
         C/O LANCELOT INVESTMENT MGT.,
         1033 SKOKIE BLVD SUITE 620
         NORTHBROOK IL 60062
9/28     Wire Transfer Credit          3,486,690.00
         MINNEAPOLIS MN
         TRUST OUTGOING WIRE DB300
         ATTN BONNIE GOETZ ZELINSKI
         MK-WI-S300
         ,  ,00000
         OPPORTUNITY FINANCE
10/01    Wire Transfer Credit          2,922,000.00
         PALM BEACH GARDENS FL
         TRUST OUTGOING WIRE DB300
         ATTN BONNIE GOETZ ZELINSKI
         MK-WI-S300
         ,  ,00000
         PER 10107 INSTRUCTION FROM
10/01    Wire Transfer Credit          4,296,000.00
         PALM BEACH GARDENS FL
         TRUST OUTGOING WIRE DB300
         ATTN BONNIE GOETZ ZELINSKI
         MK-WI-S300
         ,  ,00000

Kelley_DZ_00040196

Date 10/19/07          Page    5
Primary Account            3227170
Enclosures                     18

Community Checking                    3227170   (Continued)

DEPOSITS AND CREDITS

| Date | Description | Amount |
|------|-------------|--------|
| | PER 1012007 INSTRUCTION FRO | |
| 10/01 | Wire Transfer Credit | 5,057,000.00 |
| | PALM BEACH GARDENS FL | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | ,  ,00000 | |
| | PER 10107 INSTRUCTION FROM | |
| 10/02 | Wire Transfer Credit | 2,552,000.00 |
| | PALM BEACH GARDENS FL | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | ,  ,00000 | |
| | PER 1022007 INSTRUCTION FRO | |
| 10/02 | Wire Transfer Credit | 3,901,000.00 |
| | PALM BEACH GARDENS FL | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | ,  ,00000 | |
| | PER1022007 INSTRUCTION FROM | |
| 10/03 | Wire Transfer Credit | 18,523,335.00 |
| | THOUSAND LAKES, LLC | |
| | C/O LANCELOT INVESTMENT MGT., | |
| | 1033 SKOKIE BLVD SUITE 620 | |
| | NORTHBROOK IL 60062 | |
| 10/04 | Wire Transfer Credit | 3,020,550.00 |
| | MINNEAPOLIS MN | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | ,  ,00000 | |
| | OPPORTUNITY FINANCE | |
| 10/04 | Wire Transfer Credit | 3,639,593.75 |
| | MINNEAPOLIS MN | |

```
                                         Date 10/19/07          Page    6
                                         Primary Account           3227170
                                         Enclosures                     18
```

Community Checking                  3227170   (Continued)

DEPOSITS AND CREDITS

| Date | Description | Amount |
|------|-------------|--------|
|  | TRUST OUTGOING WIRE DB300 | |
|  | ATTN BONNIE GOETZ ZELINSKI | |
|  | MK-WI-S300 | |
|  | , ,00000 | |
|  | OPPORTUNITY FINANCE | |
| 10/04 | Deposit | 5,500.00 |
| 10/04 | Deposit | 7,600.00 |
| 10/05 | Wire Transfer Credit | 4,572,000.00 |
|  | PALM BEACH GARDENS FL | |
|  | TRUST OUTGOING WIRE DB300 | |
|  | ATTN BONNIE GOETZ ZELINSKI | |
|  | MK-WI-S300 | |
|  | , ,00000 | |
|  | PER 1052007 INSTRUCTION FRO | |
| 10/05 | Wire Transfer Credit | 4,730,568.75 |
|  | MINNEAPOLIS MN | |
|  | TRUST OUTGOING WIRE DB300 | |
|  | ATTN BONNIE GOETZ ZELINSKI | |
|  | MK-WI-S300 | |
|  | , ,00000 | |
|  | OPPORTUNITY FINANCE | |
| 10/05 | Wire Transfer Credit | 4,913,000.00 |
|  | PALM BEACH GARDENS FL | |
|  | TRUST OUTGOING WIRE DB300 | |
|  | ATTN BONNIE GOETZ ZELINSKI | |
|  | MK-WI-S300 | |
|  | , ,00000 | |
|  | PER 10507 INSTRUCTION FROM | |
| 10/05 | Wire Transfer Credit | 5,091,000.00 |
|  | PALM BEACH GARDENS FL | |
|  | TRUST OUTGOING WIRE DB300 | |
|  | ATTN BONNIE GOETZ ZELINSKI | |
|  | MK-WI-S300 | |
|  | , ,00000 | |
|  | PER 10507 INSTRUCTION FROM | |
| 10/09 | Transfer per Mike | 19,000,000.00 |

Kelley_DZ_00040198

Date 10/19/07          Page    7
Primary Account        3227170
Enclosures             18

Community Checking                    3227170   (Continued)

DEPOSITS AND CREDITS
| Date | Description | Amount |
|------|-------------|--------|
| 10/09 | Wire Transfer Credit | 2,853,000.00 |
|  | PALM BEACH GARDENS FL | |
|  | TRUST OUTGOING WIRE DB300 | |
|  | ATTN BONNIE GOETZ ZELINSKI | |
|  | MK-WI-S300 | |
|  | ,  ,00000 | |
|  | PER 10907 INSTRUCTION FROM | |
| 10/09 | Wire Transfer Credit | 3,820,000.00 |
|  | PALM BEACH GARDENS FL | |
|  | TRUST OUTGOING WIRE DB300 | |
|  | ATTN BONNIE GOETZ ZELINSKI | |
|  | MK-WI-S300 | |
|  | ,  ,00000 | |
|  | PER 1092007 INSTRUCTION PRO | |
| 10/09 | Wire Transfer Credit | 13,520,811.62 |
|  | THOUSAND LAKES, LLC | |
|  | C/O LANCELOT INVESTMENT MGT., | |
|  | 1033 SKOKIE BLVD SUITE 620 | |
|  | NORTHBROOK IL 60062 | |
| 10/10 | Wire Transfer Credit | 1,500,000.00 |
|  | EDGE ONE, LLC | |
|  | C O ATOZ INVESTMENT MANAGEMENT | |
|  | 70 W MADISON STE 1500 | |
|  | CHICAGO IL 60602 | |
| 10/10 | Wire Transfer Credit | 4,335,000.00 |
|  | PALM BEACH GARDENS FL | |
|  | TRUST OUTGOING WIRE DB300 | |
|  | ATTN BONNIE GOETZ ZELINSKI | |
|  | MK-WI-S300 | |
|  | ,  ,00000 | |
|  | PER 101007 INSTRUCTION FROM | |
| 10/10 | Wire Transfer Credit | 5,071,000.00 |
|  | PALM BEACH GARDENS FL | |
|  | TRUST OUTGOING WIRE DB300 | |
|  | ATTN BONNIE GOETZ ZELINSKI | |

Kelley_DZ_00040199

Date 10/19/07          Page    8
Primary Account          3227170
Enclosures                    18

Community Checking                    3227170   (Continued)

DEPOSITS AND CREDITS
Date        Description                        Amount
            MK-WI-S300
            ,  ,00000
            PER 101107 INSTRUCTION FROM
10/11       Wire Transfer Credit            2,805,000.00
            PALM BEACH GARDENS FL
            TRUST OUTGOING WIRE DB300
            ATTN BONNIE GOETZ ZELINSKI
            MK-WI-S300
            ,  ,00000
            PER 101107 INSTRUCTION FROM
10/11       Wire Transfer Credit            3,034,000.00
            PALM BEACH GARDENS FL
            TRUST OUTGOING WIRE DB300
            ATTN BONNIE GOETZ ZELINSKI
            MK-WI-S300
            ,  ,00000
            PER 101107 INSTRUCTION FROM
10/11       Wire Transfer Credit            4,307,906.25
            MINNEAPOLIS MN
            TRUST OUTGOING WIRE DB300
            ATTN BONNIE GOETZ ZELINSKI
            MK-WI-S300
            ,  ,00000
            OPPORTUNITY FINANCE
10/11       Wire Transfer Credit            4,340,000.00
            PALM BEACH GARDENS FL
            TRUST OUTGOING WIRE DB300
            ATTN BONNIE GOETZ ZELINSKI
            MK-WI-S300
            ,  ,00000
            PER 101107 INSTRUCTION FROM
10/11       Wire Transfer Credit            4,934,000.00
            PALM BEACH GARDENS FL
            TRUST OUTGOING WIRE DB300
            ATTN BONNIE GOETZ ZELINSKI

Date 10/19/07        Page    9
Primary Account          3227170
Enclosures                18


Community Checking              3227170  (Continued)

DEPOSITS AND CREDITS
Date      Description                      Amount
          MK-WI-S300
          ,  ,00000
          PER 101107 INSTRUCTION FROM
10/11     Wire Transfer Credit          12,112,450.68
          THOUSAND LAKES, LLC
          C/O LANCELOT INVESTMENT MGT.,
          1033 SKOKIE BLVD SUITE 620
          NORTHBROOK IL 60062
10/12     Wire Transfer Credit           3,381,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 10122007 INSTRUCTION FR
10/12     Wire Transfer Credit           7,236,514.00
          THOUSAND LAKES, LLC
          C/O LANCELOT INVESTMENT MGT.,
          1033 SKOKIE BLVD SUITE 620
          NORTHBROOK IL 60062
10/15     Wire Transfer Credit           3,598,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 101507 INSTRUCTION FROM
10/15     Wire Transfer Credit           4,009,000.00
          PALM BEACH GARDENS FL
          TRUST OUTGOING WIRE DB300
          ATTN BONNIE GOETZ ZELINSKI
          MK-WI-S300
          ,  ,00000
          PER 10152007 INSTRUCTION FR
10/15     Wire Transfer Credit           4,277,000.00
          PALM BEACH GARDENS FL

Kelley_DZ_00040201

```
Date 10/19/07          Page  10
Primary Account        3227170
Enclosures             18
```

Community Checking                    3227170  (Continued)

DEPOSITS AND CREDITS

| Date | Description | Amount |
|------|-------------|--------|
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | , ,00000 | |
| | PER10152007 INSTRUCTION FRO | |
| 10/15 | Wire Transfer Credit | 4,642,000.00 |
| | PALM BEACH GARDENS FL | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | , ,00000 | |
| | PER 10152007 INSTRUCTION FR | |
| 10/16 | Wire Transfer Credit | 3,739,000.00 |
| | PALM BEACH GARDENS FL | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | , ,00000 | |
| | PER 10162007 INSTRUCTION FR | |
| 10/16 | Wire Transfer Credit | 3,843,700.00 |
| | MINNEAPOLIS MN | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | , ,00000 | |
| | OPPORTUNITY FINANCE | |
| 10/16 | Wire Transfer Credit | 4,226,000.00 |
| | PALM BEACH GARDENS FL | |
| | TRUST OUTGOING WIRE DB300 | |
| | ATTN BONNIE GOETZ ZELINSKI | |
| | MK-WI-S300 | |
| | , ,00000 | |
| | PER10162007 INSTRUCTION FRO | |
| 10/16 | Wire Transfer Credit | 4,945,000.00 |
| | PALM BEACH GARDENS FL | |

Kelley_DZ_00040202

# EXHIBIT T-62

## M&I BANK MONEY TRANSFER STATEMENT

October 17, 2007

00001959018

PETTERS COMPANY INC
ATTN: DEANNA MUNSON
4400 BAKER RD STE 200
MINNETONKA, MN  55342

| | | |
|---|---|---|
| FWI: | TRN: 071017-003289 | $22,476,857.78 |
| IMAD: | 1017QMGFT0070005211017T111FT01 | |
| ORG: | ENCHANTED FAMILY BUYING COMPANY | |
| | 1161 WAYZATA BLVD E PMB 223 | |
| | WAYZATA MN 55391-1935 | |
| FROM: | ANCHOR BANK, N.A. | |
| | WAYZATA, MN | |
| ABA: | 091014267 | |

| | | |
|---|---|---|
| FWI: | TRN: 071017-004465 | $691,234.47 |
| IMAD: | 1017A1B7A41C00102110171308FT01 | |
| ORG: | THOUSAND LAKES, LLC | |
| | C/O LANCELOT INVESTMENT MGT., LLC | |
| | 1033 SKOKIE BLVD SUITE 620 | |
| | NORTHBROOK IL 60062 | |
| FROM: | RBS CITIZENS, N.A. | |
| | PROVIDENCE, RI | |
| ABA: | 011500120 | |
| RFB: | 2007101700005490 | |

| | | |
|---|---|---|
| FWI: | TRN: 071017-004466 | $398,720.50 |
| IMAD: | 1017A1B7A41C00102210171308FT01 | |
| ORG: | THOUSAND LAKES, LLC | |
| | C/O LANCELOT INVESTMENT MGT., LLC | |
| | 1033 SKOKIE BLVD SUITE 620 | |
| | NORTHBROOK IL 60062 | |
| FROM: | RBS CITIZENS, N.A. | |
| | PROVIDENCE, RI | |
| ABA: | 011500120 | |
| RFB: | 2007101700005491 | |

Kelley_DZ_00068673

## M&I BANK MONEY TRANSFER STATEMENT                                          Page 2/10

October 17, 2007

00001959018

PETTERS COMPANY INC
ATTN: DEANNA MUNSON
4400 BAKER RD STE 200
MINNETONKA MN  55342

| | | |
|---|---|---|
| FWI: | TRN: 071017-004467 | $651,991.80 |
| IMAD: | 1017A1B7A41C001023101171308FT01 | |
| ORG: | THOUSAND LAKES, LLC | |
| | C/O LANCELOT INVESTMENT MGT., LLC | |
| | 1033 SKOKIE BLVD SUITE 620 | |
| | NORTHBROOK IL 60062 | |
| FROM: | RBS CITIZENS, N.A. | |
| | PROVIDENCE, RI | |
| ABA: | 011500120 | |
| RFB: | 2007101700005492 | |

| | | |
|---|---|---|
| FWI: | TRN: 071017-004941 | $2,888,500.00 |
| IMAD: | 1017MMQFMP2000004210171417FT01 | |
| ORG: | NATIONWIDE INTL RESOURCES INC | |
| | 2346 WESTWOOD BL STE #6 | |
| | LOS ANGELES, CA 90064-0000 | |
| FROM: | FIRST REGIONAL BANK | |
| | CENTURY CITY, CA | |
| ABA: | 122037760 | |
| RFB: | 071017110853LG01 | |

| | | |
|---|---|---|
| FWI: | TRN: 071017-004943 | $9,766,300.00 |
| IMAD: | 1017MMQFMP2000004310171418FT01 | |
| ORG: | NATIONWIDE INTL RESOURCES INC | |
| | 2346 WESTWOOD BL STE #6 | |
| | LOS ANGELES, CA 90064-0000 | |
| FROM: | FIRST REGIONAL BANK | |
| | CENTURY CITY, CA | |
| ABA: | 122037760 | |
| RFB: | 071017111226LG01 | |

PCI-SW-029-000882

Kelley_DZ_00068674

## M&I BANK MONEY TRANSFER STATEMENT

Page 3/10

October 17, 2007

00001959018

PETTERS COMPANY INC
ATTN: DEANNA MUNSON
4400 BAKER RD STE 200
MINNETONKA MN  55342

FWI:  TRN: 071017-004944                                        $3,489,200.00
IMAD: 1017MMQFMP2000004410171418FT01
ORG:  NATIONWIDE INTL RESOURCES INC
      2346 WESTWOOD BL STE #6
      LOS ANGELES, CA 90064-0000
FROM: FIRST REGIONAL BANK
      CENTURY CITY, CA
ABA:  122037760
RFB:  071017111253LG01

FWI:  TRN: 071017-004945                                        $3,249,400.00
IMAD: 1017MMQFMP2000004510171418FT01
ORG:  NATIONWIDE INTL RESOURCES INC
      2346 WESTWOOD BL STE #6
      LOS ANGELES, CA 90064-0000
FROM: FIRST REGIONAL BANK
      CENTURY CITY, CA
ABA:  122037760
RFB:  071017111316LG01

FWI:  TRN: 071017-004971                                          $487,388.00
IMAD: 1017L3LF151C00187110171421FT01
ORG:  MINNEAPOLIS MN
FROM: US BANK N.A.
      MINNEAPOLIS
      MN
ABA:  091000022
RFB:  071017017726
OBI:  OPPORTUNITY FINANCE

Kelley_DZ_00068675

## M&I BANK MONEY TRANSFER STATEMENT    Page 4/10

October 17, 2007

00001959018

```
PETTERS COMPANY INC
ATTN: DEANNA MUNSON
4400 BAKER RD STE 200
MINNETONKA MN  55342
```

```
FWI:  TRN: 071017-005773                                $163,931.50
IMAD: 1017I1Q73AGC0024371017I1552FT01
ORG:  PALM BEACH GARDENS FL
FROM: US BANK N.A.
      MINNEAPOLIS
      MN
ABA:  091000022
RFB:  071017022341
OBI:  PER 101707 INSTRUCTION FROM
```

```
FWI:  TRN: 071017-005903                                $292,928.33
IMAD: 1017L3LF151C00246210171607FT01
ORG:  PALM BEACH GARDENS FL
FROM: US BANK N.A.
      MINNEAPOLIS
      MN
ABA:  091000022
RFB:  071017023044
OBI:  PER 101707 INSTRUCTION FROM
```

```
FWI:  TRN: 071017-005904                                $273,456.25
IMAD: 1017J1Q5040C00265210171607FT01
ORG:  PALM BEACH GARDENS FL
FROM: US BANK N.A.
      MINNEAPOLIS
      MN
ABA:  091000022
RFB:  071017023045
OBI:  PER 101707 INSTRUCTION FROM
```

PCI-SW-029-000884

Kelley_DZ_00068676

# M&I BANK MONEY TRANSFER STATEMENT

Page 5/10

October 17, 2007

00001959018

PETTERS COMPANY INC
ATTN: DEANNA MUNSON
4400 BAKER RD STE 200
MINNETONKA MN  55342

```
FWI:  TRN: 071017-006339                              $157,676.00
IMAD: 1017L3LF151C00264010171651FT01
ORG:  PALM BEACH GARDENS FL
FROM: US BANK N.A.
      MINNEAPOLIS
      MN
ABA:  091000022
RFB:  071017024978
OBI:  PER 101707 INSTRUCTION FROM
```

```
FWI:  TRN: 071017-006340                              $194,116.17
IMAD: 1017J1Q5040C00283010171651FT01
ORG:  PALM BEACH GARDENS FL
FROM: US BANK N.A.
      MINNEAPOLIS
      MN
ABA:  091000022
RFB:  071017024979
OBI:  PER 101707 INSTRUCTION FROM
```

```
FWO:  TRN: 071017-003267                              $108,031.25
IMAD: 1017G1QX261C000377
TO:   US BANK N.A.
      MINNEAPOLIS
      MN
ABA:  091000022
BNF:  173103322058
      PC FUNDING LLC
      NO ADDRESS GIVEN
OBI:  REF: F/C #788574001
```

PCI-SW-029-000885

Kelley_DZ_00068677

# M&I BANK MONEY TRANSFER STATEMENT

October 17, 2007

00001959018

PETTERS COMPANY INC
ATTN: DEANNA MUNSON
4400 BAKER RD STE 200
MINNETONKA MN  55342

```
FWO:  TRN: 071017-003269                              $3,204,432.75
IMAD: 1017G1QX261C000493
 TO:  RBS CITIZENS, N.A.
      CLEVELAND, OH
ABA:  241070417
BNF:  4503527001
      THOUSAND LAKES LLC
      440 BAKER RD #200
      MINNETONKA MN  55343
OBI:  REF:
BBI:  CHICAGO BRANCH


FWO:  TRN: 071017-003274                              $5,238,945.00
IMAD: 1017G1QX261C000494
 TO:  RBS CITIZENS, N.A.
      CLEVELAND, OH
ABA:  241070417
BNF:  4503527001
      THOUSAND LAKES LLC
      440 BAKER RD #200
      MINNETONKA MN  55343
OBI:  REF:
BBI:  CHICAGO BRANCH


FWO:  TRN: 071017-003278                              $5,596,626.25
IMAD: 1017G1QX261C000495
 TO:  RBS CITIZENS, N.A.
      CLEVELAND, OH
ABA:  241070417
BNF:  4503527001
      THOUSAND LAKES LLC
      440 BAKER RD #200
      MINNETONKA MN  55343
OBI:  REF:
BBI:  CHICAGO BRANCH
```

Kelley_DZ_00068678

# M&I BANK MONEY TRANSFER STATEMENT

October 17, 2007

00001959018

PETTERS COMPANY INC
ATTN: DEANNA MUNSON
4400 BAKER RD STE 200
MINNETONKA, MN  55342

| | | |
|---|---|---|
| FWO: | TRN: 071017-003892 | $5,485,509.00 |
| IMAD: | 1017G1QX261C000671 | |
| TO: | US BANK N.A. | |
| | MINNEAPOLIS | |
| | MN | |
| ABA: | 091000022 | |
| BNF: | 173103322058 | |
| | PC FUNDING LLC | |
| | NO ADDRESS GIVEN | |
| OBI: | REF: F/C #788574001 | |

| | | |
|---|---|---|
| FWO: | TRN: 071017-003906 | $2,894,764.00 |
| IMAD: | 1017G1QX261C000615 | |
| TO: | US BANK N.A. | |
| | MINNEAPOLIS | |
| | MN | |
| ABA: | 091000022 | |
| BBKID: | 180121167365 | |
| BBK: | US BANK NATIONAL ASSOCIATION | |
| BNF: | 47300017 | |
| OBI: | ATTN: CDR MELANIE CRESS 44383 | |
| | RE: PETTERS CAPITAL/HOLDING | |
| | COLLATERAL ACCT | |

Kelley_DZ_00068679

# M&I BANK MONEY TRANSFER STATEMENT
Page 8/10

October 17, 2007

00001959018

CONFIDENTIAL VCC1

PETTERS COMPANY INC
ATTN: DEANNA MUNSON
4400 BAKER RD STE 200
MINNETONKA MN  55342

| | | |
|---|---|---|
| FWO: | TRN: 071017-003911 | $117,396.92 |
| IMAD: | 1017G1QX261C000617 | |
| TO: | HOME FEDERAL SAVINGS BANK | |
| | ROCHESTER, MN | |
| ABA: | 291270050 | |
| BBK: | EAGLE CREST CAPITAL BANK | |
| | EDINA | |
| | MN | |
| BNF: | 1529000734 | |
| | METRO GEM INC | |
| | NO ADDRESS GIVEN | |
| OBI: | REF: | |

| | | |
|---|---|---|
| FWO: | TRN: 071017-004913 | $5,333,125.00 |
| IMAD: | 1017G1QX261C001124 | |
| TO: | US BANK N.A. | |
| | MINNEAPOLIS | |
| | MN | |
| ABA: | 091000022 | |
| BBKID: | 180121167365 | |
| BBK: | US BANK NATIONAL ASSOCIATION | |
| BNF: | 47300017 | |
| OBI: | ATTN: CDR MELANIE CRESS 44383 | |
| | RE: PETTERS CAPITAL/HOLDING | |
| | COLLATERAL ACCT | |

PCI-SW-029-000888

Kelley_DZ_00068680

## M&I BANK MONEY TRANSFER STATEMENT

October 17, 2007

00001959018

PETTERS COMPANY INC
ATTN: DEANNA MUNSON
4400 BAKER RD STE 200
MINNETONKA MN 55342

| | | |
|---|---|---|
| FWO: | TRN: 071017-004917 | $5,012,325.00 |
| IMAD: | 1017G1QX261C001126 | |
| TO: | US BANK N.A. | |
| | MINNEAPOLIS | |
| | MN | |
| ABA: | 091000022 | |
| BBKID: | 180121167365 | |
| BBK: | US BANK NATIONAL ASSOCIATION | |
| BNF: | 47300017 | |
| OBI: | ATTN: CDR MELANIE CRESS 44383 | |
| | RE: PETTERS CAPITAL/HOLDING | |
| | COLLATERAL ACCT | |

| | | |
|---|---|---|
| FWO: | TRN: 071017-004922 | $4,957,977.78 |
| IMAD: | 1017G1QX261C001125 | |
| TO: | PRIVATE BANK MINNESOTA | |
| | MINNEAPOLIS, MN | |
| ABA: | 091005836 | |
| BNF: | 2013563 | |
| | FIDELIS FOUNDATION | |
| | NO ADDRESS GIVEN | |
| OBI: | REF: | |

| | | |
|---|---|---|
| FWO: | TRN: 071017-005741 | $3,542,007.00 |
| IMAD: | 1017G1QX261C001441 | |
| TO: | US BANK N.A. | |
| | MINNEAPOLIS | |
| | MN | |
| ABA: | 091000022 | |
| BBKID: | 180121167365 | |
| BBK: | US BANK NATIONAL ASSOCIATION | |
| BNF: | 47300017 | |
| OBI: | ATTN: CDR MELANIE CRESS 44383 | |
| | RE: PETTERS CAPITAL/HOLDING | |
| | COLLATERAL ACCT | |

Kelley_DZ_00068681

## M&I BANK MONEY TRANSFER STATEMENT

October 17, 2007

00001959018

PETTERS COMPANY INC
ATTN: DEANNA MUNSON
4400 BAKER RD STE 200
MINNETONKA MN  55342

```
FWO:   TRN: 071017-005751                        $3,522,246.00
IMAD:  1017G1QX261C001521
TO:    US BANK N.A.
       MINNEAPOLIS
       MN
ABA:   091000022
BBKID: 180121167365
BBK:   US BANK NATIONAL ASSOCIATION
BNF:   47300017
OBI:   ATTN: CDR MELANIE CRESS 44383
       RE: PETTERS CAPITAL/HOLDING
       COLLATERAL ACCT
```

```
SUMMARY OF WIRES                                      TOTALS
=============================================================
DEBITS       12                                  $45,013,385.95
CREDITS      14                                  $45,181,700.80

Please direct inquiries to 414-765-8075
```

Kelley_DZ_00068682

# EXHIBIT T-63

M&I MARSHALL & ILSLEY BANK
P O BOX 2045
MILWAUKEE WI 53201-2045
www.mibank.com

0001959018                 Page 1 of 12
0001959018                 PAGE

Call 414-259-9929
or 1-888-464-5463
For 24-Hour Account
Information or
Current Rates

PETTERS COMPANY INC
4400 BAKER RD
MINNETONKA MN 55343-8684

Statement Closing Date
October 31, 2007

COMMERCIAL Account no. 1959018                                    Analysis Type: 51480
CHECKING   Beginning balance on October 1, 2007            $        810,829.48
           Deposits and other additions                    +     858,057,752.06
           Checks paid and other subtractions              -     858,708,090.01
           Ending balance on October 31, 2007              $        160,491.53
                        Average balance       855,444.01

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| | | Beginning Balance | | 810,829.48 |
| Oct 1 | 1,079.72+ | TRANSFER OF INTEREST999999999999999 FROM ACCOUNT NO. ▮▮▮▮▮ | | |
| Oct 1 | 5,034,500.00+ | INCOMING WIRE | 71001000004625 | |
| Oct 1 | 4,707,800.00+ | INCOMING WIRE | 71001000004622 | |
| Oct 1 | 4,291,650.00+ | INCOMING WIRE | 71001000006510 | |
| Oct 1 | 3,485,818.00+ | INCOMING WIRE | 71001000003659 | |
| Oct 1 | 3,475,100.00+ | INCOMING WIRE | 71001000004621 | |
| Oct 1 | 638,760.03+ | INCOMING WIRE | 71001000006808 | |
| Oct 1 | 560,549.58+ | INCOMING WIRE | 71001000006815 | |
| Oct 1 | 360,502.15+ | INCOMING WIRE | 71001000006424 | |
| Oct 1 | 174,592.75+ | INCOMING WIRE | 71001000008048 | |
| Oct 1 | 150,240.00+ | INCOMING WIRE | 71001000006012 | |
| Oct 1 | 4,287,536.00- | OUTGOING RPT WIRE | 71001000005083 | |
| Oct 1 | 4,219,333.02- | OUTGOING RPT WIRE | 71001000006919 | |
| Oct 1 | 4,192,130.00- | OUTGOING RPT WIRE | 71001000005081 | |
| Oct 1 | 4,110,574.00- | OUTGOING RPT WIRE | 71001000006807 | |
| Oct 1 | 2,816,750.00- | OUTGOING RPT WIRE | 71001000004719 | |
| Oct 1 | 2,566,280.00- | OUTGOING RPT WIRE | 71001000005089 | |
| Oct 1 | 429,165.00- | OUTGOING RPT WIRE | 71001000003863 | 1,069,653.69 |
| Oct 2 | 40,500.00- | CHECK  9422 | 00006243466228 | |
| Oct 2 | 399,000.00- | CHECK  9423 | 00006243466224 | |
| Oct 2 | 69,000.00- | CHECK  9425 | 00006243467874 | |
| Oct 2 | 12,273,931.00+ | INCOMING WIRE | 71002000002779 | |
| Oct 2 | 4,664,600.00+ | INCOMING WIRE | 71002000004037 | |
| Oct 2 | 4,061,900.00+ | INCOMING WIRE | 71002000004043 | |
| Oct 2 | 4,060,000.00+ | INCOMING WIRE | 71002000003378 | |
| Oct 2 | 3,898,000.00+ | INCOMING WIRE | 71002000004036 | |
| Oct 2 | 3,016,798.75+ | INCOMING WIRE | 71002000005207 | |
| Oct 2 | 724,245.21+ | INCOMING WIRE | 71002000004866 | |
| Oct 2 | 691,781.04+ | INCOMING WIRE | 71002000003781 | |

Kelley_DZ_00057335

0001959018

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| Oct 2 | 677,001.93+ | INCOMING WIRE | 71002000004867 | |
| Oct 2 | 303,473.25+ | INCOMING WIRE | 71002000006152 | |
| Oct 2 | 295,307.22+ | INCOMING WIRE | 71002000004865 | |
| Oct 2 | 204,501.67+ | INCOMING WIRE | 71002000006613 | |
| Oct 2 | 5,781,993.75- | OUTGOING RPT WIRE | 71002000003458 | |
| Oct 2 | 5,404,772.00- | OUTGOING RPT WIRE | 71002000003454 | |
| Oct 2 | 5,268,975.75- | OUTGOING RPT WIRE | 71002000004800 | |
| Oct 2 | 4,617,703.35- | OUTGOING RPT WIRE | 71002000003155 | |
| Oct 2 | 3,642,087.98- | OUTGOING RPT WIRE | 71002000004803 | |
| Oct 2 | 3,528,160.00- | OUTGOING RPT WIRE | 71002000005296 | |
| Oct 2 | 2,666,403.20- | OUTGOING RPT WIRE | 71002000004805 | |
| Oct 2 | 2,360,392.50- | OUTGOING RPT WIRE | 71002000004799 | |
| Oct 2 | 350,000.00- | OUTGOING RPT WIRE | 71002000005522 | |
| Oct 2 | 301,679.88- | OUTGOING RPT WIRE | 71002000003154 | |
| Oct 2 | 53,804.25- | OUTGOING RPT WIRE | 71002000003153 | 1,456,721.10 |
| Oct 3 | 35.70- | CHECK 9429 | 00006243588865 | |
| Oct 3 | 750.00- | CHECK 9433 | 00006243591575 | |
| Oct 3 | 6,451,387.00+ | INCOMING WIRE | 71003000003343 | |
| Oct 3 | 3,986,200.00+ | INCOMING WIRE | 71003000004649 | |
| Oct 3 | 3,365,705.00+ | INCOMING WIRE | 71003000005490 | |
| Oct 3 | 3,210,000.00+ | INCOMING WIRE | 71003000003359 | |
| Oct 3 | 2,705,000.00+ | INCOMING WIRE | 71003000003358 | |
| Oct 3 | 669,099.92+ | INCOMING WIRE | 71003000004467 | |
| Oct 3 | 508,518.73+ | INCOMING WIRE | 71003000004690 | |
| Oct 3 | 482,504.80+ | INCOMING WIRE | 71003000004689 | |
| Oct 3 | 475,757.96+ | INCOMING WIRE | 71003000005025 | |
| Oct 3 | 332,655.00+ | INCOMING WIRE | 71003000006520 | |
| Oct 3 | 5,557,667.50- | OUTGOING RPT WIRE | 71003000005587 | |
| Oct 3 | 4,537,781.25- | OUTGOING RPT WIRE | 71003000003502 | |
| Oct 3 | 4,474,530.00- | OUTGOING RPT WIRE | 71003000003689 | |
| Oct 3 | 3,865,306.25- | OUTGOING RPT WIRE | 71003000003507 | |
| Oct 3 | 3,181,751.45- | OUTGOING RPT WIRE | 71003000004902 | |
| Oct 3 | 735,390.50- | OUTGOING RPT WIRE | 71003000003497 | |
| Oct 3 | 73,032.17- | OUTGOING RPT WIRE | 71003000003493 | 1,219,304.69 |
| Oct 4 | 12,500.00- | CHECK 9431 | 00006243659020 | |
| Oct 4 | 18,518,704.00+ | INCOMING WIRE | 71004000003230 | |
| Oct 4 | 11,470,800.00+ | INCOMING WIRE | 71004000003606 | |
| Oct 4 | 4,774,600.00+ | INCOMING WIRE | 71004000003616 | |
| Oct 4 | 3,667,410.00+ | INCOMING WIRE | 71004000005004 | |
| Oct 4 | 3,431,875.00+ | INCOMING WIRE | 71004000005010 | |
| Oct 4 | 3,177,400.00+ | INCOMING WIRE | 71004000003617 | |
| Oct 4 | 691,953.56+ | INCOMING WIRE | 71004000005576 | |
| Oct 4 | 686,021.73+ | INCOMING WIRE | 71004000004669 | |
| Oct 4 | 669,069.92+ | INCOMING WIRE | 71004000004666 | |
| Oct 4 | 481,518.00+ | INCOMING WIRE | 71004000004365 | |
| Oct 4 | 460,761.00+ | INCOMING WIRE | 71004000005577 | |
| Oct 4 | 313,173.75+ | INCOMING WIRE | 71004000004982 | |
| Oct 4 | 264,655.83+ | INCOMING WIRE | 71004000004983 | |
| Oct 4 | 206,316.67+ | INCOMING WIRE | 71004000004984 | |
| Oct 4 | 5,848,354.75- | OUTGOING RPT WIRE | 71004000005951 | |
| Oct 4 | 5,622,637.50- | OUTGOING RPT WIRE | 71004000003941 | |
| Oct 4 | 5,559,562.50- | OUTGOING RPT WIRE | 71004000003461 | |
| Oct 4 | 5,453,400.00- | OUTGOING RPT WIRE | 71004000003943 | |
| Oct 4 | 5,166,715.90- | OUTGOING RPT WIRE | 71004000005937 | |
| Oct 4 | 4,579,264.00- | OUTGOING RPT WIRE | 71004000003458 | |
| Oct 4 | 4,491,040.00- | OUTGOING RPT WIRE | 71004000003952 | |

Kelley_DZ_00057336

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| Oct 4 | 4,474,500.00- | OUTGOING RPT WIRE | 71004000003455 | |
| Oct 4 | 4,005,960.00- | OUTGOING RPT WIRE | 71004000003469 | |
| Oct 4 | 3,599,610.00- | OUTGOING RPT WIRE | 71004000003946 | |
| Oct 4 | 709,928.50- | OUTGOING RPT WIRE | 71004000002966 | |
| Oct 4 | 347,093.75- | OUTGOING RPT WIRE | 71004000002968 | |
| Oct 4 | 43,802.50- | OUTGOING RPT WIRE | 71004000002964 | |
| Oct 4 | 2,636.48+ | CHECK 9426 | 00006243745934 | 119,194.75 |
| Oct 5 | 6,658,483.75+ | INCOMING WIRE | 71005000003357 | |
| Oct 5 | 5,069,500.00+ | INCOMING WIRE | 71005000004326 | |
| Oct 5 | 4,116,100.00+ | INCOMING WIRE | 71005000004230 | |
| Oct 5 | 3,980,975.00+ | INCOMING WIRE | 71005000004840 | |
| Oct 5 | 3,841,700.00+ | INCOMING WIRE | 71005000004323 | |
| Oct 5 | 3,223,850.00+ | INCOMING WIRE | 71005000004841 | |
| Oct 5 | 752,215.20+ | INCOMING WIRE | 71005000004853 | |
| Oct 5 | 576,126.54+ | INCOMING WIRE | 71005000004855 | |
| Oct 5 | 479,547.20+ | INCOMING WIRE | 71005000004854 | |
| Oct 5 | 442,394.48+ | INCOMING WIRE | 71005000004167 | |
| Oct 5 | 345,489.75+ | INCOMING WIRE | 71005000003497 | |
| Oct 5 | 303,285.90+ | INCOMING WIRE | 71005000003498 | |
| Oct 5 | 226,668.67+ | INCOMING WIRE | 71005000005769 | |
| Oct 5 | 5,967,360.00- | OUTGOING RPT WIRE | 71005000004551 | |
| Oct 5 | 4,571,165.00- | OUTGOING RPT WIRE | 71005000004537 | |
| Oct 5 | 4,376,645.78- | OUTGOING RPT WIRE | 71005000004986 | |
| Oct 5 | 3,987,792.00- | OUTGOING RPT WIRE | 71005000004981 | |
| Oct 5 | 3,804,955.00- | OUTGOING RPT WIRE | 71005000004772 | |
| Oct 5 | 2,953,158.75- | OUTGOING RPT WIRE | 71005000003826 | |
| Oct 5 | 2,940,982.50- | OUTGOING RPT WIRE | 71005000006085 | |
| Oct 5 | 720,482.50- | OUTGOING RPT WIRE | 71005000003820 | |
| Oct 5 | 350,000.00- | OUTGOING RPT WIRE | 71005000003686 | |
| Oct 5 | 200,639.75- | OUTGOING RPT WIRE | 71005000003672 | |
| Oct 5 | 105,568.75- | OUTGOING RPT WIRE | 71005000003678 | 154,144.73 |
| Oct 9 | 45,073.17- | CHECK 9428 | 00006243979135 | |
| Oct 9 | 282.28- | CHECK 9432 | 00006243970195 | |
| Oct 9 | 19,301,741.75+ | INCOMING WIRE | 71009000002144 | |
| Oct 9 | 4,946,500.00+ | INCOMING WIRE | 71009000004223 | |
| Oct 9 | 4,335,000.00+ | INCOMING WIRE | 71009000002074 | |
| Oct 9 | 3,785,800.00+ | INCOMING WIRE | 71009000004754 | |
| Oct 9 | 3,348,736.50+ | INCOMING WIRE | 71009000004756 | |
| Oct 9 | 3,294,300.00+ | INCOMING WIRE | 71009000004222 | |
| Oct 9 | 727,719.45+ | INCOMING WIRE | 71009000005320 | |
| Oct 9 | 681,033.67+ | INCOMING WIRE | 71009000003883 | |
| Oct 9 | 496,790.58+ | INCOMING WIRE | 71009000003888 | |
| Oct 9 | 465,275.69+ | INCOMING WIRE | 71009000003890 | |
| Oct 9 | 450,549.84+ | INCOMING WIRE | 71009000005321 | |
| Oct 9 | 316,176.78+ | INCOMING WIRE | 71009000006362 | |
| Oct 9 | 310,511.62+ | INCOMING WIRE | 71009000006363 | |
| Oct 9 | 258,258.00+ | INCOMING WIRE | 71009000006705 | |
| Oct 9 | 168,362.50+ | INCOMING WIRE | 71009000002924 | |
| Oct 9 | 5,868,375.00- | OUTGOING RPT WIRE | 71009000002905 | |
| Oct 9 | 5,567,301.70- | OUTGOING RPT WIRE | 71009000004492 | |
| Oct 9 | 5,494,047.50- | OUTGOING RPT WIRE | 71009000005211 | |
| Oct 9 | 5,472,632.45- | OUTGOING RPT WIRE | 71009000004488 | |
| Oct 9 | 4,579,858.50- | OUTGOING RPT WIRE | 71009000003037 | |
| Oct 9 | 3,610,062.50- | OUTGOING RPT WIRE | 71009000002908 | |
| Oct 9 | 3,340,960.00- | OUTGOING RPT WIRE | 71009000003034 | |
| Oct 9 | 3,128,909.00- | OUTGOING RPT WIRE | 71009000003026 | |

Kelley_DZ_00057337

Page 4 of 12
0001959018      PAGE

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| Oct 9 | 2,742,498.00- | OUTGOING RPT WIRE | 71009000004498 | |
| Oct 9 | 713,453.65- | OUTGOING RPT WIRE | 71009000002902 | |
| Oct 9 | 101,895.00- | OUTGOING RPT WIRE | 71009000002896 | |
| Oct 9 | 58,548.67- | OUTGOING RPT WIRE | 71009000005215 | |
| Oct 9 | 717,005.69- | AUTOMATIC TRANSFER | 00000000000000 | |
| | | TRANSFER TO EURO SWEEP ACCOUNT | | 1,600,000.00 |
| Oct 10 | 41.52- | CHECK  9427 | 00006244056756 | |
| Oct 10 | 16.67- | CHECK  9430 | 00006244056552 | |
| Oct 10 | 717,005.69+ | AUTOMATIC RECALL | 00000000000000 | |
| | | RECALL FROM EURO SWEEP ACCOUNT | | |
| Oct 10 | 20,188,763.62+ | INCOMING WIRE | 71010000003599 | |
| Oct 10 | 11,470,300.00+ | INCOMING WIRE | 71010000004194 | |
| Oct 10 | 5,150,000.00+ | INCOMING WIRE | 71010000002988 | |
| Oct 10 | 4,824,400.00+ | INCOMING WIRE | 71010000004196 | |
| Oct 10 | 3,666,687.50+ | INCOMING WIRE | 71010000005252 | |
| Oct 10 | 3,160,850.00+ | INCOMING WIRE | 71010000005258 | |
| Oct 10 | 628,044.63+ | INCOMING WIRE | 71010000004237 | |
| Oct 10 | 513,763.57+ | INCOMING WIRE | 71010000004352 | |
| Oct 10 | 426,850.32+ | INCOMING WIRE | 71010000004239 | |
| Oct 10 | 422,667.00+ | INCOMING WIRE | 71010000005520 | |
| Oct 10 | 293,060.50+ | INCOMING WIRE | 71010000006170 | |
| Oct 10 | 251,524.50+ | INCOMING WIRE | 71010000005984 | |
| Oct 10 | 224,959.90+ | INCOMING WIRE | 71010000005983 | |
| Oct 10 | 223,595.25+ | INCOMING WIRE | 71010000006171 | |
| Oct 10 | 211,037.00+ | INCOMING WIRE | 71010000006169 | |
| Oct 10 | 5,131,800.50- | OUTGOING RPT WIRE | 71010000004772 | |
| Oct 10 | 4,866,420.00- | OUTGOING RPT WIRE | 71010000003654 | |
| Oct 10 | 4,771,725.00- | OUTGOING RPT WIRE | 71010000003858 | |
| Oct 10 | 4,450,952.00- | OUTGOING RPT WIRE | 71010000003065 | |
| Oct 10 | 4,409,029.17- | OUTGOING RPT WIRE | 71010000006444 | |
| Oct 10 | 4,285,125.00- | OUTGOING RPT WIRE | 71010000005783 | |
| Oct 10 | 4,200,075.00- | OUTGOING RPT WIRE | 71010000003854 | |
| Oct 10 | 3,963,047.40- | OUTGOING RPT WIRE | 71010000003931 | |
| Oct 10 | 3,939,694.00- | OUTGOING RPT WIRE | 71010000004778 | |
| Oct 10 | 3,637,187.00- | OUTGOING RPT WIRE | 71010000004776 | |
| Oct 10 | 3,357,446.20- | OUTGOING RPT WIRE | 71010000004771 | |
| Oct 10 | 3,269,391.67- | OUTGOING RPT WIRE | 71010000004782 | |
| Oct 10 | 2,854,624.00- | OUTGOING RPT WIRE | 71010000003850 | |
| Oct 10 | 682,753.75- | OUTGOING RPT WIRE | 71010000003429 | |
| Oct 10 | 93,648.75- | OUTGOING RPT WIRE | 71010000005777 | |
| Oct 10 | 6,255.40- | AUTOMATIC WITHDRAWAL | 31201463475433 | |
| | | AMERICAN EXPRESS DEANNA MUNSON | | |
| | | ELEC REMIT 071010 | | 54,276.45 |
| Oct 11 | 1,467.27- | CHECK  9434 | 00006244147702 | |
| Oct 11 | 10,903,273.00+ | INCOMING WIRE | 71011000002990 | |
| Oct 11 | 4,635,000.00+ | INCOMING WIRE | 71011000003000 | |
| Oct 11 | 4,110,000.00+ | INCOMING WIRE | 71011000003124 | |
| Oct 11 | 3,490,000.00+ | INCOMING WIRE | 71011000002999 | |
| Oct 11 | 3,334,337.50+ | INCOMING WIRE | 71011000005236 | |
| Oct 11 | 3,030,000.00+ | INCOMING WIRE | 71011000003121 | |
| Oct 11 | 2,191,800.00+ | INCOMING WIRE | 71011000005803 | |
| Oct 11 | 725,603.14+ | INCOMING WIRE | 71011000004041 | |
| Oct 11 | 712,594.66+ | INCOMING WIRE | 71011000004042 | |

Kelley_DZ_00057338

Page 5 of 12
0001959018          PAGE

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| Oct 11 | 685,232.99+ | INCOMING WIRE | 71011000004102 | |
| Oct 11 | 677,607.85+ | INCOMING WIRE | 71011000004104 | |
| Oct 11 | 259,434.50+ | INCOMING WIRE | 71011000005287 | |
| Oct 11 | 218,795.73+ | INCOMING WIRE | 71011000006739 | |
| Oct 11 | 216,506.50+ | INCOMING WIRE | 71011000006646 | |
| Oct 11 | 5,847,915.00- | OUTGOING RPT WIRE | 71011000003263 | |
| Oct 11 | 5,806,732.50- | OUTGOING RPT WIRE | 71011000003264 | |
| Oct 11 | 4,601,322.00- | OUTGOING RPT WIRE | 71011000003293 | |
| Oct 11 | 4,591,032.30- | OUTGOING RPT WIRE | 71011000003259 | |
| Oct 11 | 4,573,950.00- | OUTGOING RPT WIRE | 71011000003262 | |
| Oct 11 | 3,910,606.15- | OUTGOING RPT WIRE | 71011000005980 | |
| Oct 11 | 3,027,210.25- | OUTGOING RPT WIRE | 71011000005851 | |
| Oct 11 | 552,613.75- | OUTGOING RPT WIRE | 71011000003291 | |
| Oct 11 | 550,000.00- | OUTGOING RPT WIRE | 71011000004255 | |
| Oct 11 | 216,338.50- | OUTGOING RPT WIRE | 71011000003206 | |
| Oct 11 | 178,300.75- | OUTGOING RPT WIRE | 71011000004262 | |
| Oct 11 | 5,079.35- | ANALYSIS SERVICE CHG | 00000000000000 | |
| | | ANALYSIS ACTIVITY | | |
| | | FOR 09/07 | | 1,381,894.50 |
| Oct 12 | 31,525,474.13+ | INCOMING WIRE | 71012000003610 | |
| Oct 12 | 6,984,000.00+ | INCOMING WIRE | 71012000004446 | |
| Oct 12 | 4,648,225.00+ | INCOMING WIRE | 71012000005070 | |
| Oct 12 | 4,562,587.50+ | INCOMING WIRE | 71012000005069 | |
| Oct 12 | 4,321,800.00+ | INCOMING WIRE | 71012000004403 | |
| Oct 12 | 4,206,300.00+ | INCOMING WIRE | 71012000004442 | |
| Oct 12 | 3,699,200.00+ | INCOMING WIRE | 71012000006182 | |
| Oct 12 | 2,691,312.50+ | INCOMING WIRE | 71012000005073 | |
| Oct 12 | 705,747.08+ | INCOMING WIRE | 71012000004393 | |
| Oct 12 | 691,358.93+ | INCOMING WIRE | 71012000004819 | |
| Oct 12 | 641,115.00+ | INCOMING WIRE | 71012000004400 | |
| Oct 12 | 539,900.90+ | INCOMING WIRE | 71012000004821 | |
| Oct 12 | 534,899.05+ | INCOMING WIRE | 71012000004395 | |
| Oct 12 | 445,577.50+ | INCOMING WIRE | 71012000006107 | |
| Oct 12 | 382,510.50+ | INCOMING WIRE | 71012000004818 | |
| Oct 12 | 299,607.92+ | INCOMING WIRE | 71012000006384 | |
| Oct 12 | 275,954.40+ | INCOMING WIRE | 71012000006382 | |
| Oct 12 | 251,524.50+ | INCOMING WIRE | 71012000006383 | |
| Oct 12 | 239,898.07+ | INCOMING WIRE | 71012000006381 | |
| Oct 12 | 211,522.50+ | INCOMING WIRE | 71012000006379 | |
| Oct 12 | 170,625.08+ | INCOMING WIRE | 71012000006380 | |
| Oct 12 | 5,555,220.00- | OUTGOING RPT WIRE | 71012000004047 | |
| Oct 12 | 5,414,542.18- | OUTGOING RPT WIRE | 71012000005188 | |
| Oct 12 | 5,341,135.00- | OUTGOING RPT WIRE | 71012000005191 | |
| Oct 12 | 5,233,930.34- | OUTGOING RPT WIRE | 71012000006558 | |
| Oct 12 | 5,160,606.00- | OUTGOING RPT WIRE | 71012000004245 | |
| Oct 12 | 4,884,964.40- | OUTGOING RPT WIRE | 71012000004725 | |
| Oct 12 | 4,772,820.00- | OUTGOING RPT WIRE | 71012000004068 | |
| Oct 12 | 4,450,952.00- | OUTGOING RPT WIRE | 71012000005189 | |
| Oct 12 | 4,295,520.00- | OUTGOING RPT WIRE | 71012000004240 | |
| Oct 12 | 4,283,000.00- | OUTGOING RPT WIRE | 71012000004042 | |
| Oct 12 | 4,227,191.40- | OUTGOING RPT WIRE | 71012000004744 | |
| Oct 12 | 3,753,120.00- | OUTGOING RPT WIRE | 71012000004723 | |
| Oct 12 | 3,583,909.45- | OUTGOING RPT WIRE | 71012000004079 | |
| Oct 12 | 3,074,884.75- | OUTGOING RPT WIRE | 71012000004051 | |
| Oct 12 | 3,009,268.00- | OUTGOING RPT WIRE | 71012000004741 | |
| Oct 12 | 1,560,132.50- | OUTGOING RPT WIRE | 71012000004055 | |

Kelley_DZ_00057339

Page 6 of 12
0001959018 PAGE

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| Oct 12 | 92,455.83- | OUTGOING RPT WIRE | 71012000004716 | |
| Oct 12 | 13,150.68- | OUTGOING RPT WIRE | 71012000004721 | 704,242.53 |
| Oct 15 | 10,614,860.00+ | INCOMING WIRE | 71015000003616 | |
| Oct 15 | 5,055,000.00+ | INCOMING WIRE | 71015000003393 | |
| Oct 15 | 5,015,000.00+ | INCOMING WIRE | 71015000003126 | |
| Oct 15 | 4,938,500.00+ | INCOMING WIRE | 71015000004846 | |
| Oct 15 | 2,762,000.00+ | INCOMING WIRE | 71015000004845 | |
| Oct 15 | 2,298,800.00+ | INCOMING WIRE | 71015000004837 | |
| Oct 15 | 503,634.18+ | INCOMING WIRE | 71015000004012 | |
| Oct 15 | 459,501.58+ | INCOMING WIRE | 71015000004011 | |
| Oct 15 | 287,599.25+ | INCOMING WIRE | 71015000006361 | |
| Oct 15 | 272,208.00+ | INCOMING WIRE | 71015000004283 | |
| Oct 15 | 261,483.77+ | INCOMING WIRE | 71015000006359 | |
| Oct 15 | 237,593.33+ | INCOMING WIRE | 71015000006360 | |
| Oct 15 | 191,371.25+ | INCOMING WIRE | 71015000006358 | |
| Oct 15 | 5,196,798.00- | OUTGOING RPT WIRE | 71015000004096 | |
| Oct 15 | 4,787,368.75- | OUTGOING RPT WIRE | 71015000003593 | |
| Oct 15 | 4,696,982.10- | OUTGOING RPT WIRE | 71015000003780 | |
| Oct 15 | 4,154,220.00- | OUTGOING RPT WIRE | 71015000003785 | |
| Oct 15 | 3,680,926.50- | OUTGOING RPT WIRE | 71015000003590 | |
| Oct 15 | 3,576,995.00- | OUTGOING RPT WIRE | 71015000006448 | |
| Oct 15 | 3,464,520.00- | OUTGOING RPT WIRE | 71015000004191 | |
| Oct 15 | 3,047,360.00- | OUTGOING RPT WIRE | 71015000003778 | |
| Oct 15 | 249,497.67- | OUTGOING RPT WIRE | 71015000004201 | 747,125.87 |
| Oct 16 | 16,521,868.00+ | INCOMING WIRE | 71016000003227 | |
| Oct 16 | 3,745,000.00+ | INCOMING WIRE | 71016000002643 | |
| Oct 16 | 3,651,100.00+ | INCOMING WIRE | 71016000003781 | |
| Oct 16 | 2,366,800.00+ | INCOMING WIRE | 71016000003643 | |
| Oct 16 | 619,558.53+ | INCOMING WIRE | 71016000004357 | |
| Oct 16 | 575,043.16+ | INCOMING WIRE | 71016000004358 | |
| Oct 16 | 449,917.25+ | INCOMING WIRE | 71016000004937 | |
| Oct 16 | 291,023.97+ | INCOMING WIRE | 71016000005479 | |
| Oct 16 | 273,713.75+ | INCOMING WIRE | 71016000006179 | |
| Oct 16 | 178,666.75+ | INCOMING WIRE | 71016000003943 | |
| Oct 16 | 5,232,867.30- | OUTGOING RPT WIRE | 71016000004226 | |
| Oct 16 | 5,142,568.50- | OUTGOING RPT WIRE | 71016000003413 | |
| Oct 16 | 4,977,592.50- | OUTGOING RPT WIRE | 71016000003404 | |
| Oct 16 | 4,963,365.00- | OUTGOING RPT WIRE | 71016000003399 | |
| Oct 16 | 4,952,187.50- | OUTGOING RPT WIRE | 71016000005598 | |
| Oct 16 | 3,226,334.25- | OUTGOING RPT WIRE | 71016000002789 | |
| Oct 16 | 234,960.00- | OUTGOING RPT WIRE | 71016000002786 | |
| Oct 16 | 121,894.51- | OUTGOING RPT WIRE | 71016000004223 | 568,147.72 |
| Oct 17 | 32,000.00- | CHECK 9442 | 00006244616272 | |
| Oct 17 | 22,476,657.78+ | INCOMING WIRE | 71017000003289 | |
| Oct 17 | 9,766,300.00+ | INCOMING WIRE | 71017000004943 | |
| Oct 17 | 3,489,200.00+ | INCOMING WIRE | 71017000004944 | |
| Oct 17 | 3,249,400.00+ | INCOMING WIRE | 71017000004945 | |
| Oct 17 | 2,888,500.00+ | INCOMING WIRE | 71017000004941 | |
| Oct 17 | 691,234.47+ | INCOMING WIRE | 71017000004465 | |
| Oct 17 | 651,991.80+ | INCOMING WIRE | 71017000004467 | |
| Oct 17 | 487,388.00+ | INCOMING WIRE | 71017000004971 | |
| Oct 17 | 398,720.50+ | INCOMING WIRE | 71017000004466 | |
| Oct 17 | 292,928.33+ | INCOMING WIRE | 71017000005903 | |
| Oct 17 | 273,456.25+ | INCOMING WIRE | 71017000005904 | |
| Oct 17 | 194,116.17+ | INCOMING WIRE | 71017000006340 | |
| Oct 17 | 163,931.50+ | INCOMING WIRE | 71017000005773 | |

Kelley_DZ_00057340

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|---|---|---|---|---|
| Oct 17 | 157,676.00+ | INCOMING WIRE | 71017000006339 | |
| Oct 17 | 5,596,626.25- | OUTGOING RPT WIRE | 71017000003278 | |
| Oct 17 | 5,485,509.00- | OUTGOING RPT WIRE | 71017000003892 | |
| Oct 17 | 5,333,125.00- | OUTGOING RPT WIRE | 71017000004913 | |
| Oct 17 | 5,238,945.00- | OUTGOING RPT WIRE | 71017000003274 | |
| Oct 17 | 5,012,325.00- | OUTGOING RPT WIRE | 71017000004917 | |
| Oct 17 | 4,957,977.78- | OUTGOING RPT WIRE | 71017000004922 | |
| Oct 17 | 3,542,007.00- | OUTGOING RPT WIRE | 71017000005741 | |
| Oct 17 | 3,522,246.00- | OUTGOING RPT WIRE | 71017000005751 | |
| Oct 17 | 3,204,432.75- | OUTGOING RPT WIRE | 71017000003269 | |
| Oct 17 | 2,894,764.00- | OUTGOING RPT WIRE | 71017000003906 | |
| Oct 17 | 117,396.92- | OUTGOING RPT WIRE | 71017000003911 | |
| Oct 17 | 108,031.25- | OUTGOING RPT WIRE | 71017000003267 | 704,462.57 |
| Oct 18 | 105.53- | CHECK   9443 | 00006244716218 | |
| Oct 18 | 14,287,938.25+ | INCOMING WIRE | 71018000002757 | |
| Oct 18 | 9,716,600.00+ | INCOMING WIRE | 71018000003983 | |
| Oct 18 | 4,940,000.00+ | INCOMING WIRE | 71018000002593 | |
| Oct 18 | 4,781,600.00+ | INCOMING WIRE | 71018000003997 | |
| Oct 18 | 3,333,342.50+ | INCOMING WIRE | 71018000003934 | |
| Oct 18 | 2,851,500.00+ | INCOMING WIRE | 71018000003981 | |
| Oct 18 | 743,825.62+ | INCOMING WIRE | 71018000004091 | |
| Oct 18 | 641,614.74+ | INCOMING WIRE | 71018000004093 | |
| Oct 18 | 559,144.27+ | INCOMING WIRE | 71018000004092 | |
| Oct 18 | 373,804.00+ | INCOMING WIRE | 71018000004739 | |
| Oct 18 | 344,009.58+ | INCOMING WIRE | 71018000005673 | |
| Oct 18 | 271,198.70+ | INCOMING WIRE | 71018000005672 | |
| Oct 18 | 258,138.37+ | INCOMING WIRE | 71018000005671 | |
| Oct 18 | 164,561.50+ | INCOMING WIRE | 71018000005016 | |
| Oct 18 | 5,946,753.00- | OUTGOING RPT WIRE | 71018000003362 | |
| Oct 18 | 5,613,825.00- | OUTGOING RPT WIRE | 71018000004272 | |
| Oct 18 | 5,139,420.00- | OUTGOING RPT WIRE | 71018000003356 | |
| Oct 18 | 4,775,751.20- | OUTGOING RPT WIRE | 71018000004379 | |
| Oct 18 | 4,611,184.20- | OUTGOING RPT WIRE | 71018000004271 | |
| Oct 18 | 4,478,325.00- | OUTGOING RPT WIRE | 71018000003358 | |
| Oct 18 | 4,154,766.00- | OUTGOING RPT WIRE | 71018000004268 | |
| Oct 18 | 2,912,091.25- | OUTGOING RPT WIRE | 71018000006034 | |
| Oct 18 | 2,742,624.00- | OUTGOING RPT WIRE | 71018000003373 | |
| Oct 18 | 333,334.25- | OUTGOING RPT WIRE | 71018000003353 | |
| Oct 18 | 178,671.76- | OUTGOING RPT WIRE | 71018000004387 | |
| Oct 18 | 77,798.75- | OUTGOING RPT WIRE | 71018000003363 | |
| Oct 18 | 1,407,090.16- | AUTOMATIC TRANSFER | 00000000000000 | |
|  |  | TRANSFER TO EURO SWEEP ACCOUNT | | 1,600,000.00 |
| Oct 19 | 26.00- | CHECK   9436 | 00006244758624 | |
| Oct 19 | 6,903.00- | CHECK   9438 | 00006244776521 | |
| Oct 19 | 78,538.20- | CHECK   9440 | 00006244776500 | |
| Oct 19 | 12,500.00- | CHECK   9444 | 00006244776501 | |
| Oct 19 | 1,407,090.16+ | AUTOMATIC RECALL | 00000000000000 | |
|  |  | RECALL FROM EURO SWEEP ACCOUNT | | |
| Oct 19 | 21,789,695.75+ | INCOMING WIRE | 71019000002931 | |
| Oct 19 | 14,025,600.00+ | INCOMING WIRE | 71019000004414 | |
| Oct 19 | 5,006,500.00+ | INCOMING WIRE | 71019000004413 | |
| Oct 19 | 3,407,300.00+ | INCOMING WIRE | 71019000004415 | |
| Oct 19 | 2,779,600.00+ | INCOMING WIRE | 71019000004416 | |
| Oct 19 | 2,760,000.00+ | INCOMING WIRE | 71019000003738 | |

Page 8 of 12
0001959018    PAGE

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| Oct 19 | 633,123.19+ | INCOMING WIRE | 71019000003742 | |
| Oct 19 | 473,732.11+ | INCOMING WIRE | 71019000003741 | |
| Oct 19 | 439,764.10+ | INCOMING WIRE | 71019000003740 | |
| Oct 19 | 306,827.25+ | INCOMING WIRE | 71019000004979 | |
| Oct 19 | 292,132.00+ | INCOMING WIRE | 71019000005812 | |
| Oct 19 | 287,056.67+ | INCOMING WIRE | 71019000004980 | |
| Oct 19 | 267,315.00+ | INCOMING WIRE | 71019000005811 | |
| Oct 19 | 232,159.00+ | INCOMING WIRE | 71019000005807 | |
| Oct 19 | 226,455.42+ | INCOMING WIRE | 71019000005810 | |
| Oct 19 | 220,221.00+ | INCOMING WIRE | 71019000005809 | |
| Oct 19 | 159,842.83+ | INCOMING WIRE | 71019000005813 | |
| Oct 19 | 90,000.00+ | INCOMING WIRE | 71019000005218 | |
| Oct 19 | 5,663,927.25- | OUTGOING RPT WIRE | 71019000003426 | |
| Oct 19 | 5,258,087.00- | OUTGOING RPT WIRE | 71019000004212 | |
| Oct 19 | 5,150,275.00- | OUTGOING RPT WIRE | 71019000003429 | |
| Oct 19 | 5,091,255.00- | OUTGOING RPT WIRE | 71019000003423 | |
| Oct 19 | 4,811,840.00- | OUTGOING RPT WIRE | 71019000004196 | |
| Oct 19 | 4,110,004.00- | OUTGOING RPT WIRE | 71019000004215 | |
| Oct 19 | 4,041,920.00- | OUTGOING RPT WIRE | 71019000004219 | |
| Oct 19 | 3,909,516.00- | OUTGOING RPT WIRE | 71019000004586 | |
| Oct 19 | 3,805,340.00- | OUTGOING RPT WIRE | 71019000003422 | |
| Oct 19 | 3,617,341.25- | OUTGOING RPT WIRE | 71019000004580 | |
| Oct 19 | 3,533,400.00- | OUTGOING RPT WIRE | 71019000003421 | |
| Oct 19 | 2,845,653.25- | OUTGOING RPT WIRE | 71019000004583 | |
| Oct 19 | 2,756,772.00- | OUTGOING RPT WIRE | 71019000006194 | |
| Oct 19 | 500,000.00- | OUTGOING RPT WIRE | 71019000003412 | |
| Oct 19 | 191,218.75- | OUTGOING RPT WIRE | 71019000003410 | |
| Oct 19 | 144,495.25- | OUTGOING RPT WIRE | 71019000003419 | 875,402.53 |
| Oct 22 | 40,319.08- | CHECK  9435 | 00006244845207 | |
| Oct 22 | 52.24- | CHECK  9437 | 00006244879876 | |
| Oct 22 | 6,704,323.00+ | INCOMING WIRE | 71022000003444 | |
| Oct 22 | 5,024,500.00+ | INCOMING WIRE | 71022000004330 | |
| Oct 22 | 4,973,718.00+ | INCOMING WIRE | 71022000004332 | |
| Oct 22 | 4,498,700.00+ | INCOMING WIRE | 71022000004334 | |
| Oct 22 | 3,900,000.00+ | INCOMING WIRE | 71022000003995 | |
| Oct 22 | 703,387.07+ | INCOMING WIRE | 71022000004632 | |
| Oct 22 | 675,318.87+ | INCOMING WIRE | 71022000004631 | |
| Oct 22 | 307,786.25+ | INCOMING WIRE | 71022000005568 | |
| Oct 22 | 257,768.75+ | INCOMING WIRE | 71022000005567 | |
| Oct 22 | 157,898.67+ | INCOMING WIRE | 71022000003322 | |
| Oct 22 | 6,020,910.00- | OUTGOING RPT WIRE | 71022000004203 | |
| Oct 22 | 5,651,215.00- | OUTGOING RPT WIRE | 71022000004430 | |
| Oct 22 | 5,603,920.00- | OUTGOING RPT WIRE | 71022000004205 | |
| Oct 22 | 5,469,201.35- | OUTGOING RPT WIRE | 71022000005954 | |
| Oct 22 | 4,661,470.00- | OUTGOING RPT WIRE | 71022000004444 | |
| Oct 22 | 334,817.34- | OUTGOING RPT WIRE | 71022000006057 | 296,898.13 |
| Oct 23 | 3,770.00- | CHECK  9439 | 00006245015277 | |
| Oct 23 | 245.00- | CHECK  9445 | 00006245013439 | |
| Oct 23 | 14,880,279.00+ | INCOMING WIRE | 71023000002808 | |
| Oct 23 | 5,083,400.00+ | INCOMING WIRE | 71023000004255 | |
| Oct 23 | 4,581,700.00+ | INCOMING WIRE | 71023000004032 | |
| Oct 23 | 4,363,800.00+ | INCOMING WIRE | 71023000004030 | |
| Oct 23 | 4,017,733.75+ | INCOMING WIRE | 71023000004898 | |
| Oct 23 | 3,651,200.00+ | INCOMING WIRE | 71023000004026 | |
| Oct 23 | 3,474,200.00+ | INCOMING WIRE | 71023000004033 | |
| Oct 23 | 2,934,374.25+ | INCOMING WIRE | 71023000004902 | |

Kelley_DZ_00057342

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| Oct 23 | 601,441.96+ | INCOMING WIRE | 71023000004298 | |
| Oct 23 | 594,371.06+ | INCOMING WIRE | 71023000004300 | |
| Oct 23 | 527,492.00+ | INCOMING WIRE | 71023000004887 | |
| Oct 23 | 467,389.02+ | INCOMING WIRE | 71023000004301 | |
| Oct 23 | 359,742.91+ | DEPOSIT | 00006245029150 | |
| Oct 23 | 320,265.52+ | INCOMING WIRE | 71023000004299 | |
| Oct 23 | 301,385.00+ | INCOMING WIRE | 71023000005621 | |
| Oct 23 | 299,957.18+ | INCOMING WIRE | 71023000002727 | |
| Oct 23 | 288,317.25+ | INCOMING WIRE | 71023000004922 | |
| Oct 23 | 170,625.08+ | INCOMING WIRE | 71023000004921 | |
| Oct 23 | 168,071.37+ | INCOMING WIRE | 71023000005622 | |
| Oct 23 | 5,557,685.00- | OUTGOING RPT WIRE | 71023000004375 | |
| Oct 23 | 5,219,539.75- | OUTGOING RPT WIRE | 71023000003786 | |
| Oct 23 | 5,218,445.30- | OUTGOING RPT WIRE | 71023000005510 | |
| Oct 23 | 5,007,640.00- | OUTGOING RPT WIRE | 71023000002907 | |
| Oct 23 | 4,775,657.75- | OUTGOING RPT WIRE | 71023000003790 | |
| Oct 23 | 3,897,810.00- | OUTGOING RPT WIRE | 71023000003794 | |
| Oct 23 | 3,755,350.00- | OUTGOING RPT WIRE | 71023000002905 | |
| Oct 23 | 3,012,199.70- | OUTGOING RPT WIRE | 71023000004372 | |
| Oct 23 | 3,009,268.00- | OUTGOING RPT WIRE | 71023000003784 | |
| Oct 23 | 2,849,281.60- | OUTGOING RPT WIRE | 71023000005505 | |
| Oct 23 | 2,544,073.00- | OUTGOING RPT WIRE | 71023000002910 | |
| Oct 23 | 695,210.81- | OUTGOING RPT WIRE | 71023000002900 | |
| Oct 23 | 139,874.83- | OUTGOING RPT WIRE | 71023000004378 | 1,696,592.74 |
| Oct 24 | 353.61- | CHECK  9446 | 00006245100300 | |
| Oct 24 | 5,192,701.00+ | INCOMING WIRE | 71024000003388 | |
| Oct 24 | 4,873,500.00+ | INCOMING WIRE | 71024000004252 | |
| Oct 24 | 4,282,800.00+ | INCOMING WIRE | 71024000005557 | |
| Oct 24 | 4,142,900.00+ | INCOMING WIRE | 71024000003890 | |
| Oct 24 | 3,979,530.00+ | INCOMING WIRE | 71024000004512 | |
| Oct 24 | 675,688.21+ | INCOMING WIRE | 71024000004582 | |
| Oct 24 | 531,247.65+ | INCOMING WIRE | 71024000005789 | |
| Oct 24 | 508,125.07+ | INCOMING WIRE | 71024000004584 | |
| Oct 24 | 282,395.30+ | INCOMING WIRE | 71024000003496 | |
| Oct 24 | 162,465.77+ | INCOMING WIRE | 71024000003495 | |
| Oct 24 | 5,156,699.25- | OUTGOING RPT WIRE | 71024000005969 | |
| Oct 24 | 4,510,310.00- | OUTGOING RPT WIRE | 71024000004354 | |
| Oct 24 | 4,282,800.00- | OUTGOING RPT WIRE | 71024000003590 | |
| Oct 24 | 4,282,800.00- | OUTGOING RPT WIRE | 71024000004724 | |
| Oct 24 | 3,743,577.15- | OUTGOING RPT WIRE | 71024000004352 | |
| Oct 24 | 3,278,127.00- | OUTGOING RPT WIRE | 71024000003983 | |
| Oct 24 | 397,953.00- | OUTGOING RPT WIRE | 71024000003589 | |
| Oct 24 | 218,031.91- | OUTGOING RPT WIRE | 71024000006486 | 456,493.82 |
| Oct 25 | 24,613,606.93+ | INCOMING WIRE | 71025000002832 | |
| Oct 25 | 9,777,200.00+ | INCOMING WIRE | 71025000003771 | |
| Oct 25 | 4,522,700.00+ | INCOMING WIRE | 71025000003775 | |
| Oct 25 | 3,793,125.00+ | INCOMING WIRE | 71025000004931 | |
| Oct 25 | 3,641,400.00+ | INCOMING WIRE | 71025000004930 | |
| Oct 25 | 3,524,200.00+ | INCOMING WIRE | 71025000003774 | |
| Oct 25 | 708,868.14+ | INCOMING WIRE | 71025000003747 | |
| Oct 25 | 679,274.21+ | INCOMING WIRE | 71025000004575 | |
| Oct 25 | 619,385.02+ | INCOMING WIRE | 71025000003746 | |
| Oct 25 | 481,250.00+ | INCOMING WIRE | 71025000005781 | |
| Oct 25 | 402,513.17+ | INCOMING WIRE | 71025000005379 | |
| Oct 25 | 303,472.58+ | INCOMING WIRE | 71025000005879 | |
| Oct 25 | 283,320.08+ | INCOMING WIRE | 71025000003362 | |

Kelley_DZ_00057343

0001959018

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|---|---|---|---|---|
| Oct 25 | 280,119.00+ | INCOMING WIRE | 71025000004960 | |
| Oct 25 | 259,426.33+ | INCOMING WIRE | 71025000004962 | |
| Oct 25 | 211,145.00+ | INCOMING WIRE | 71025000004961 | |
| Oct 25 | 172,180.80+ | INCOMING WIRE | 71025000005878 | |
| Oct 25 | 163,970.35+ | INCOMING WIRE | 71025000004959 | |
| Oct 25 | 5,881,905.00- | OUTGOING RPT WIRE | 71025000003239 | |
| Oct 25 | 5,720,772.75- | OUTGOING RPT WIRE | 71025000003934 | |
| Oct 25 | 5,557,686.75- | OUTGOING RPT WIRE | 71025000005074 | |
| Oct 25 | 5,477,489.25- | OUTGOING RPT WIRE | 71025000003284 | |
| Oct 25 | 5,164,719.00- | OUTGOING RPT WIRE | 71025000003948 | |
| Oct 25 | 5,106,400.00- | OUTGOING RPT WIRE | 71025000003240 | |
| Oct 25 | 4,630,286.75- | OUTGOING RPT WIRE | 71025000003944 | |
| Oct 25 | 4,534,185.00- | OUTGOING RPT WIRE | 71025000003231 | |
| Oct 25 | 3,890,345.00- | OUTGOING RPT WIRE | 71025000003285 | |
| Oct 25 | 3,127,683.30- | OUTGOING RPT WIRE | 71025000005068 | |
| Oct 25 | 2,738,901.60- | OUTGOING RPT WIRE | 71025000003941 | |
| Oct 25 | 743,452.50- | OUTGOING RPT WIRE | 71025000003228 | |
| Oct 25 | 400,000.00- | OUTGOING RPT WIRE | 71025000005059 | |
| Oct 25 | 45,675.83- | OUTGOING RPT WIRE | 71025000005062 | |
| Oct 25 | 474,028.70- | AUTOMATIC TRANSFER | 00000000000000 | |
| | | TRANSFER TO EURO SWEEP ACCOUNT | | 1,600,119.00 |
| Oct 26 | 474,028.70+ | AUTOMATIC RECALL | 00000000000000 | |
| | | RECALL FROM EURO SWEEP ACCOUNT | | |
| Oct 26 | 4,779,805.00+ | INCOMING WIRE | 71026000003610 | |
| Oct 26 | 518,161.46+ | INCOMING WIRE | 71026000004128 | |
| Oct 26 | 4,175,925.00- | OUTGOING RPT WIRE | 71026000003899 | |
| Oct 26 | 1,014,973.93- | OUTGOING RPT WIRE | 71026000003263 | |
| Oct 26 | 271,513.58- | OUTGOING RPT WIRE | 71026000003297 | |
| Oct 26 | 104,530.00- | OUTGOING RPT WIRE | 71026000003296 | |
| Oct 26 | 205,052.65- | AUTOMATIC TRANSFER | 00000000000000 | |
| | | TRANSFER TO EURO SWEEP ACCOUNT | | 1,600,119.00 |
| Oct 29 | 205,052.65+ | AUTOMATIC RECALL | 00000000000000 | |
| | | RECALL FROM EURO SWEEP ACCOUNT | | |
| Oct 29 | 18,141,455.25+ | INCOMING WIRE | 71029000003542 | |
| Oct 29 | 5,605,000.00+ | INCOMING WIRE | 71029000004286 | |
| Oct 29 | 5,054,500.00+ | INCOMING WIRE | 71029000004281 | |
| Oct 29 | 4,639,700.00+ | INCOMING WIRE | 71029000004276 | |
| Oct 29 | 4,209,900.00+ | INCOMING WIRE | 71029000004275 | |
| Oct 29 | 3,807,575.00+ | INCOMING WIRE | 71029000004991 | |
| Oct 29 | 3,759,100.00+ | INCOMING WIRE | 71029000004279 | |
| Oct 29 | 3,569,150.00+ | INCOMING WIRE | 71029000004633 | |
| Oct 29 | 3,451,743.75+ | INCOMING WIRE | 71029000004627 | |
| Oct 29 | 3,128,845.50+ | INCOMING WIRE | 71029000004640 | |
| Oct 29 | 2,940,575.00+ | INCOMING WIRE | 71029000005759 | |
| Oct 29 | 2,907,975.00+ | INCOMING WIRE | 71029000005761 | |
| Oct 29 | 2,683,600.00+ | INCOMING WIRE | 71029000004287 | |
| Oct 29 | 2,601,000.00+ | INCOMING WIRE | 71029000004989 | |
| Oct 29 | 2,309,300.00+ | INCOMING WIRE | 71029000004277 | |
| Oct 29 | 739,970.18+ | INCOMING WIRE | 71029000004280 | |
| Oct 29 | 729,570.47+ | INCOMING WIRE | 71029000005599 | |
| Oct 29 | 674,478.45+ | INCOMING WIRE | 71029000004588 | |
| Oct 29 | 583,291.13+ | INCOMING WIRE | 71029000004578 | |

Kelley_DZ_00057344

0001959018          Page 11 of 12
                    PAGE

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| Oct 29 | 570,358.44+ | INCOMING WIRE | 71029000005597 | |
| Oct 29 | 570,301.99+ | INCOMING WIRE | 71029000004246 | |
| Oct 29 | 520,855.73+ | INCOMING WIRE | 71029000005598 | |
| Oct 29 | 500,691.25+ | INCOMING WIRE | 71029000005572 | |
| Oct 29 | 383,918.80+ | INCOMING WIRE | 71029000005571 | |
| Oct 29 | 300,024.17+ | INCOMING WIRE | 71029000006180 | |
| Oct 29 | 271,509.17+ | INCOMING WIRE | 71029000006477 | |
| Oct 29 | 255,080.03+ | INCOMING WIRE | 71029000006901 | |
| Oct 29 | 209,525.00+ | INCOMING WIRE | 71029000006181 | |
| Oct 29 | 204,633.50+ | INCOMING WIRE | 71029000006179 | |
| Oct 29 | 189,815.67+ | INCOMING WIRE | 71029000006177 | |
| Oct 29 | 175,705.00+ | INCOMING WIRE | 71029000006178 | |
| Oct 29 | 160,262.23+ | INCOMING WIRE | 71029000006176 | |
| Oct 29 | 10,000.00+ | INCOMING WIRE | 71029000005601 | |
| Oct 29 | 5,979,699.00- | OUTGOING RPT WIRE | 71029000004527 | |
| Oct 29 | 5,694,022.50- | OUTGOING RPT WIRE | 71029000004857 | |
| Oct 29 | 5,683,991.25- | OUTGOING RPT WIRE | 71029000004874 | |
| Oct 29 | 5,160,707.50- | OUTGOING RPT WIRE | 71029000005108 | |
| Oct 29 | 4,966,923.60- | OUTGOING RPT WIRE | 71029000003737 | |
| Oct 29 | 4,946,825.00- | OUTGOING RPT WIRE | 71029000004535 | |
| Oct 29 | 4,781,019.20- | OUTGOING RPT WIRE | 71029000006359 | |
| Oct 29 | 4,518,994.00- | OUTGOING RPT WIRE | 71029000003788 | |
| Oct 29 | 4,426,892.80- | OUTGOING RPT WIRE | 71029000004539 | |
| Oct 29 | 4,349,214.00- | OUTGOING RPT WIRE | 71029000003789 | |
| Oct 29 | 4,283,000.00- | OUTGOING RPT WIRE | 71029000004532 | |
| Oct 29 | 3,865,086.00- | OUTGOING RPT WIRE | 71029000005113 | |
| Oct 29 | 3,849,480.00- | OUTGOING RPT WIRE | 71029000004859 | |
| Oct 29 | 3,828,093.50- | OUTGOING RPT WIRE | 71029000003739 | |
| Oct 29 | 3,608,784.00- | OUTGOING RPT WIRE | 71029000004853 | |
| Oct 29 | 2,999,295.00- | OUTGOING RPT WIRE | 71029000005106 | |
| Oct 29 | 2,468,588.90- | OUTGOING RPT WIRE | 71029000004847 | |
| Oct 29 | 1,225,712.50- | OUTGOING RPT WIRE | 71029000003784 | 1,028,253.61 |
| Oct 30 | 9,596,296.88+ | INCOMING WIRE | 71030000002994 | |
| Oct 30 | 4,698,800.00+ | INCOMING WIRE | 71030000004670 | |
| Oct 30 | 461,982.50+ | INCOMING WIRE | 71030000003804 | |
| Oct 30 | 430,565.36+ | INCOMING WIRE | 71030000004423 | |
| Oct 30 | 5,180,560.00- | OUTGOING RPT WIRE | 71030000003281 | |
| Oct 30 | 4,000,689.00- | OUTGOING RPT WIRE | 71030000005072 | |
| Oct 30 | 3,459,200.00- | OUTGOING RPT WIRE | 71030000003285 | |
| Oct 30 | 2,676,880.56- | OUTGOING RPT WIRE | 71030000005065 | |
| Oct 30 | 289,685.67- | OUTGOING RPT WIRE | 71030000003275 | |
| Oct 30 | 205,620.00- | OUTGOING RPT WIRE | 71030000003277 | 603,263.12 |
| Oct 31 | 187.00- | CHECK  9441 | 00006245570339 | |
| Oct 31 | 7,500.00- | CHECK  9448 | 00006245548436 | |
| Oct 31 | 32,000.00- | CHECK  9449 | 00006245572347 | |
| Oct 31 | 25,986,847.00+ | INCOMING WIRE | 71031000003881 | |
| Oct 31 | 3,802,200.00+ | INCOMING WIRE | 71031000005001 | |
| Oct 31 | 3,462,200.00+ | INCOMING WIRE | 71031000005012 | |
| Oct 31 | 2,743,600.00+ | INCOMING WIRE | 71031000005230 | |
| Oct 31 | 2,655,000.00+ | INCOMING WIRE | 71031000003320 | |
| Oct 31 | 2,144,900.00+ | INCOMING WIRE | 71031000005233 | |
| Oct 31 | 1,002,456.00+ | INCOMING WIRE | 71031000006542 | |
| Oct 31 | 704,004.00+ | INCOMING WIRE | 71031000004840 | |
| Oct 31 | 496,654.83+ | INCOMING WIRE | 71031000004841 | |
| Oct 31 | 439,723.74+ | INCOMING WIRE | 71031000004839 | |
| Oct 31 | 299,630.50+ | INCOMING WIRE | 71031000007292 | |

Kelley_DZ_00057345

Page 12 of 12
0001959018    PAGE

1959018

Daily activity on your account

| Date | Amount | Description | Control Number | Balance |
|------|--------|-------------|----------------|---------|
| Oct 31 | 283,050.68+ | INCOMING WIRE | 71031000007293 | |
| Oct 31 | 260,961.08+ | INCOMING WIRE | 71031000006556 | |
| Oct 31 | 240,484.67+ | INCOMING WIRE | 71031000006555 | |
| Oct 31 | 231,505.67+ | INCOMING WIRE | 71031000004204 | |
| Oct 31 | 223,896.50+ | INCOMING WIRE | 71031000004928 | |
| Oct 31 | 156,019.77+ | INCOMING WIRE | 71031000006554 | |
| Oct 31 | 68,072.26+ | DEPOSIT | 0000624559952 | |
| Oct 31 | 5,765,550.00- | OUTGOING RPT WIRE | 71031000004401 | |
| Oct 31 | 5,439,319.25- | OUTGOING RPT WIRE | 71031000005631 | |
| Oct 31 | 5,272,529.85- | OUTGOING RPT WIRE | 71031000005625 | |
| Oct 31 | 4,843,929.00- | OUTGOING RPT WIRE | 71031000004408 | |
| Oct 31 | 4,571,248.00- | OUTGOING RPT WIRE | 71031000004421 | |
| Oct 31 | 4,261,333.33- | OUTGOING RPT WIRE | 71031000005700 | |
| Oct 31 | 4,068,470.00- | OUTGOING RPT WIRE | 71031000004402 | |
| Oct 31 | 3,601,630.00- | OUTGOING RPT WIRE | 71031000004405 | |
| Oct 31 | 2,842,935.60- | OUTGOING RPT WIRE | 71031000004417 | |
| Oct 31 | 2,504,023.10- | OUTGOING RPT WIRE | 71031000007509 | |
| Oct 31 | 2,319,974.00- | OUTGOING RPT WIRE | 71031000003818 | |
| Oct 31 | 80,312.50- | OUTGOING RPT WIRE | 71031000003815 | |
| Oct 31 | 33,036.66- | OUTGOING RPT WIRE | 71031000005634 | 160,491.53 |

Kelley_DZ_00057346

# EXHIBIT T-64

```
 1              UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF MINNESOTA
 2                   No. 08-45257
        ---------------------------------------------x
 3   IN RE:  PETTERS COMPANY, INC., et al.

 4              Debtors.

 5   (Includes:                     Court File Nos.
     Petters Group Worldwide, LLC;   08-45258 (KHS)
 6   PC Funding, LLC;                08-45326 (KHS)
     Thousand Lakes, LLC;            08-45327 (KHS)
 7   SPF Funding, LLC;               08-45328 (KHS)
     PL Ltd., Inc.;                  08-45329 (KHS)
 8   Edge One LLC;                   08-45330 (KHS)
     MGC Finance, Inc.;              08-45331 (KHS)
 9   PAC Funding, LLC;               08-45371 (KHS)
     Palm Beach Finance Holdings, Inc.) 08-45392 (KHS)
10
                        Chapter 11 Cases
11                      Judge Kathleen H. Sanberg
        --------------------------------------------------
12
     Douglas A. Kelley, in his capacity
13   as the Trustee of the PCI Liquidating Trust,

14              Plaintiff,

15        v.

16   Opportunity Finance, LLC, et al.,

17              Defendants.

18      --------------------------------------------------

19

20        VIDEOTAPED DEPOSITION OF LANCE BREILAND

21             Minneapolis, Minnesota

22           Wednesday, February 27, 2019

23

24   Reported by:  Amy L. Larson, RPR

25   Job No: 154994
```

Page 194

```
 1                        BREILAND

 2        foundation.

 3                   THE WITNESS:  Yes.

 4                   MR. LOIGMAN:  Okay.

 5   BY MR. LOIGMAN:

 6   Q.   And this chart shows that on this day here,

 7        April 18th, 2008, Interlachen transferred

 8        $50 million to PCI, right?

 9   A.   Yes.

10   Q.   Okay.  And is that accurate, to your

11        understanding?

12   A.   Yes.  If I understand the question, yes,

13        that's accurate.

14   Q.   Okay.  And the chart shows that on the same

15        day, several transfers were made by PCI to

16        PC Funding, right?

17                   MR. HAVELES:  Objection;

18        leading --

19                   THE WITNESS:  I -- I see --

20                   MR. HAVELES:  -- no foundation.

21                   THE WITNESS:  Yeah, I see three

22        here off the top of my head.  So, yeah, if

23        three -- several means three, then, yes, I

24        see three transactions to or transfers to

25        PC Funding.
```

1                          BREILAND

2                  MR. LOIGMAN:  Okay.

3    BY MR. LOIGMAN:

4    Q.  And those transfers, as you can tell, appear

5        to total something over $13 million, right?

6                  MR. HAVELES:  Objection; leading.

7                  THE WITNESS:  Yes, right around

8        13.

9                  MR. LOIGMAN:  Okay.

10   BY MR. LOIGMAN:

11   Q.  Now, when -- when Interlachen lent

12       $60 million to PCI in April of 2018, was it

13       ever told that PCI would use the money being

14       loaned in this way?

15   A.  No, absolutely not.

16   Q.  You were told that Petters was going to use

17       the money to purchase TVs, right?

18   A.  That's correct.

19   Q.  Okay.  Did you ever authorize PCI to use

20       Interlachen to pay the money back to other

21       lenders?

22   A.  No.

23   Q.  Okay.  Now, you filed Proofs of Claim on

24       behalf of Interlachen in various of the

25       Petters bankruptcy cases, right?

1                          BREILAND

2    A.   Yes, we did.

3    Q.   Okay.  And among those Proofs of Claim, you

4         asserted claims on behalf of Interlachen

5         against various of the special purpose

6         entities that were related to Petters?

7    A.   Yes, that is correct.

8    Q.   Okay.  And one of those was PC Funding,

9         right?

10   A.   Yes.

11   Q.   Okay.  So let me ask you to take a look at

12        what was marked earlier today as Exhibit 6.

13             And this is -- we already discussed

14        this this morning.  This is the Proof of

15        Claim that Interlachen filed in the

16        PC Funding bankruptcy, right?

17   A.   Yes, this was.

18   Q.   Okay.  Now, Interlachen didn't loan money

19        directly to PC Funding, did it?

20   A.   It did not.

21   Q.   Okay.  Let me ask you to turn to paragraph 6

22        and the attachment to the Proof of Claim

23        that's on page 2 of the attachment.

24   A.   (Complies.)

25   Q.   And do you -- and do you see in the -- the

1                          BREILAND

2        sentence that says, "Instead, PCI used

3        Interlachen's investment to fund Petters'

4        other business ventures, retire other debt

5        and personally enrich the owners and

6        executives of PCI, PGW, and others"?

7   A.   Yes, I see that.

8   Q.   Okay.  And where it says, "Retire other

9        debt," are you referring to PCI's use of

10       Interlachen's money to pay other lenders to

11       Petters?

12                   MR. HAVELES:  Objection; leading.

13                   THE WITNESS:  Yes, that's exactly

14       what we meant this to be.  We meant it to

15       encompass things like we see on the

16       April 18th transaction statement and the

17       April 22nd transaction statement where our

18       monies went in and all of the monies going

19       out, or substantially all the monies going

20       out, were monies going out to other investors

21       and not to go out to pay for the goods we

22       thought PCI was purchasing with our money.

23   BY MR. LOIGMAN:

24   Q.   And -- and -- and would that include the --

25       the payments that were being paid over to

```
 1                    BREILAND

 2     PC Funding?

 3                    MR. HAVELES:  Objection; leading.

 4                    THE WITNESS:  Absolutely.

 5                    MR. LOIGMAN:  Okay.

 6   BY MR. LOIGMAN:

 7   Q.  And when PCI used Interlachen's money to pay

 8       PC Funding and its lenders, did that cause

 9       harm to Interlachen?

10                    MR. HAVELES:  Objection to

11       foundation.

12                    THE WITNESS:  Absolutely.

13                    MR. LOIGMAN:  Okay.

14   BY MR. LOIGMAN:

15   Q.  When you filed Interlachen's Proof of Claims,

16       was it your understanding that Petters was

17       operating PCI and his various special purpose

18       entities in one large conspiracy that was

19       harming the various lenders to Petters,

20       including Interlachen?

21                    MR. HAVELES:  Objection; leading.

22                    THE WITNESS:  Yes.  It was a

23       conspiracy -- it was my understanding it was

24       a conspiracy, and I'm sure there are numerous

25       other legal theories under which the special
```

1                         BREILAND

2        purpose entities were assisting, aiding,

3        abetting what Tom Petters was doing and what

4        PCI were doing to defraud people like us.

5    BY MR. LOIGMAN:

6    Q.  And when you filed Interlachen's claim

7        against PC Funding, did you believe it was

8        appropriate to file a claim against

9        PC Funding?

10   A.  Yes.

11   Q.  Okay.  I'll put that claim aside now.

12               Prior to joining Interlachen, going

13       back in time, there's a period when you were

14       an attorney at the firm of Fredrikson &

15       Byron, right?

16   A.  That's correct.

17   Q.  And at that time, Tom Petters and some of his

18       companies were clients of Fredrikson & Byron?

19   A.  That's correct.

20   Q.  Okay.  And -- and you were staffed on some of

21       those matters for -- for Petters' companies?

22   A.  That's correct.

23   Q.  Okay.

24   A.  And, again, Petters companies being Petters

25       entities, not Petters Company, Inc.

1                          BREILAND

2        we were shown that transaction by Tom Petters

3        because he needed us and he needed a

4        financing party to help him, and he was,

5        therefore, willing to let us into what we

6        believed to -- to be one of the most

7        lucrative parts of his business, or at least

8        the bread and butter of how Tom Petters had

9        made his money.

10   Q.   And in that April 2008 transaction there

11        wasn't any intellectual property element, was

12        there?

13   A.   There was not.

14   Q.   And there wasn't any real estate element, was

15        there?

16   A.   That's correct.  Or any joint venture that

17        governed the real estate or -- or litigation

18        that -- that was the subject of -- you know,

19        that the IP was the subject of.

20   Q.   And those all would have been elements of the

21        transaction in August 2008?

22   A.   That's correct.

23   Q.   Prior to Petters' arrest and -- and the

24        collapse of PCI, did Interlachen ever receive

25        a single transfer from PCI or any related

Page 223

                              BREILAND

1

2     entity?

3  A.  It did not.

4  Q.  It lost its entire $60 million?

5                 MR. HAVELES:  Objection; leading.

6                 THE WITNESS:  Yes, that's correct.

7                 MR. LOIGMAN:  I have no further

8     questions.

9                 MR. HAVELES:  I have a few.

10                THE WITNESS:  Okay.

11                MR. HAVELES:  We don't need to

12    take a break.

13

14                 FURTHER EXAMINATION

15  BY MR. HAVELES:

16  Q.  Let me ask you to go back to Exhibit 44, the

17    exhibit that Mr. Loigman marked at the

18    inception of his examination.

19           And you had testified you had seen

20    Exhibit 44 before.  Do you recall that?

21  A.  Yes.

22  Q.  When did you first see Exhibit 44?

23  A.  I believe I saw it when or shortly after the

24    PwC interim report was first released.

25  Q.  And how did you -- who -- who provided you a

# EXHIBIT T-65

# PROOF OF CLAIM

Please indicate the debtor against which you assert a claim by checking the appropriate box below. Check **only one** Debtor per proof of claim form. If you have claims against multiple debtors, please complete one claim form per debtor.

| Name of Debtor and Case Number: | NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.* |
|---|---|
| ☒ **PC Funding, LLC**   08-45326 (GFK) | |
| ☐ | |
| ☐ | |
| ☐ | |
| ☐ | |
| ☐ | |
| ☐ | |
| ☐ | |

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):

Interlachen Harriet Investments Limited

☐ Check this box to indicate that this claim amends a previously filed claim.

**Name and address where notices should be sent**

Interlachen Harriet Investments Limited, c/o Mark Kalla
Dorsey & Whitney LLP, 50 South Sixth Street
Minneapolis, MN 55402
Telephone number: 612-343-7961

Court Claim Number:_____

Filed on:_____

**Name and address where payment should be sent** (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $60,000,000.00   See Attachment

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** See Attachment
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

    **3a. Debtor may have scheduled account as:** _____
    (See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide requested information.
Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:

Value of Property:$_____ Annual Interest Rate_____%
Amount of arrearage and other charges as of time case filed included in secured claim,
if any: $_____ Basis for perfection:_____
Amount of Secured Claim: $_____ Amount Unsecured: $_____

**5. Amount of the Claim Entitled to Priority under 11 U.S.C. § 507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)
☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier — 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan — 11 U.S.C. § 507(a)(5).
☐ Up to $2,425* of deposits toward purchase, lease or rental of property or services for personal, family or household use — 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units — 11 U.S.C. § 507(a)(8).
☐ Other — specify applicable paragraph of 11 U.S.C. § 507(a)(___).

☐ Amount entitled to priority:

* *amounts subject to adjustment on 4/1/10 and every 3 years thereafter.*

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

DATE: 12/28/09   SIGNATURE: The person filing this claim must sign it. Sign and Print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from above. Attach copy of power of attorney, if any.

Mark J. Kalla, as attorney for Interlachen Harriet Investments Limited

EXHIBIT
6
Breiland
227-18

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

PC FUNDING, LLC,                          Court File No. 08-45326

      Debtor.                            Chapter 11

## ATTACHMENT TO PROOF OF CLAIM OF
## INTERLACHEN HARRIET INVESTMENTS LIMITED

    1.    This proof of claim ("Proof of Claim") is filed by Interlachen Harriet Investments

Limited ("Interlachen") against PC Funding, LLC (the "Debtor") in an amount no less than $60

million, as set forth in more detail below.

    2.    On October 11, 2008 (the "Petition Date"), the Debtor and certain of its affiliates

(collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the United

States Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota.

    3.    Interlachen files this Proof of Claim in connection with Interlachen's $60 million

investment described in the complaint attached to this Proof of Claim.

    4.    As more fully set forth in the attached complaint, in April 2008, Interlachen

entered into a Note Purchase Agreement with Petters Company, Inc. ("PCI") and Thomas J.

Petters ("Petters"), as co-borrowers, to facilitate Interlachen's $60 million investment. Under the

Note Purchase Agreement, PCI and Petters entered into an interest-bearing Promissory Note in

favor of Interlachen for its $60 million investment.[1]

    5.    Interlachen relied on representations made by PCI, Petters, and representatives of

certain Petters affiliates, including Petters Group Worldwide, LLC ("PGW"). In addition,

Interlachen relied on the promise that PCI would use Interlachen's $60 million investment to

---

[1]    The agreements and related documents supporting this Proof of Claim are voluminous,
and will be provided on request.

purchase high-end electronic merchandise at a discounted price, which merchandise PCI would then sell to various retailers for a substantial profit.

6.      To further protect its investment, Interlachen entered into a Security Agreement with PCI, pursuant to which Interlachen was to receive a perfected, first-priority security interest in the purchased merchandise.  Instead, PCI used Interlachen's investment to fund Petters' other business ventures, retire other debt, and personally enrich the owners and executives of PCI, PGW, and others.

7.      As a direct result of the breaches of contract and fraudulent misrepresentations described above and in the attached complaint, Interlachen suffered a complete loss of its investment.  As of the Petition Date, the obligations to Interlachen were not less than $60 million, plus interest, attorneys' fees, and other charges to be calculated in accordance with the terms of the agreements and relevant law.

8.      Based upon the foregoing, Interlachen has filed claims against PCI and PGW. Interlachen also asserts and is filing claims against each of the remaining Debtors and certain of their bankrupt affiliates up to the amounts set forth in the PCI and PGW claims, for the reasons set forth in the PCI and PGW claims, and for any other losses, expenses, or fees that are not otherwise identified and/or asserted in this Proof of Claim or the PCI and PGW claims, or which have not otherwise been discovered, incurred, or liquidated on the date hereof.  However, by so doing, Interlachen does not intend to assert or seek duplicate recoveries on its claims. [2]

9.      To the extent its claims are determined to be oversecured, Interlachen's claims shall continue to accrue fees and interest post-petition, and Interlachen reserves the right to make

---

[2]     In addition, the filing of this Proof of Claim is without prejudice to Interlachen's ability to seek recoveries from any court-appointed receiver acting on behalf of any Debtor or its bankrupt affiliates, as part of any judgment of restitution or forfeiture in any criminal proceedings, or otherwise related to the Debtors or any of their bankrupt affiliates, Petters, or the transactions described in the attached complaint.

a claim for all such fees and interest until its claims are paid in full.  To the extent its claims are

determined to be undersecured, Interlachen hereby asserts an unsecured claim under Section

506(a) of the Bankruptcy Code for the unsecured portion of its claims.

10.     Interlachen reserves all rights accruing to it, and the filing of this Proof of Claim

is not intended to be and shall not be construed as:  (1) an election of remedies; (2) a waiver of

any past, present, or future events of default; or (3) a waiver or limitation of any of its rights.

11.     This Proof of Claim is not subject to set-off or counterclaim.  Interlachen reserves

all rights to set-off, recoupment, netting, and similar rights under contract, statutes, common law,

or equitable principles.

12.     By filing this Proof of Claim, Interlachen does not submit to the jurisdiction of

this Court for any purpose other than with respect to this Proof of Claim.

13.     Interlachen reserves the right to amend and/or supplement this Proof of Claim and

to assert any and all other claims of whatever kind or nature that it has, or may have, against the

Debtor or any of its bankrupt affiliates that come to the attention of Interlachen or arise after the

filing of this Proof of Claim. The filing of this Proof of Claim shall not be deemed a waiver of

any such claims.

14.     All notices concerning this Proof of Claim should be sent to:

Mark J. Kalla
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868


**[THE REMAINDER OF THIS PAGE INTENTIONALLY IS LEFT BLANK.]**

# EXHIBIT T-66

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:                                    **Jointly Administered under**
                                          **Case No. 08-45257**

Petters Company, Inc., et al.

      Debtors.                          Case No. 08-45257


(includes:                                Court File Nos.:
Petters Group Worldwide, LLC;             08-45258 (GFK)
PC Funding, LLC;                          08-45326 (GFK)
Thousand Lakes, LLC;                      08-45327 (GFK)
SPF Funding, LLC;                         08-45328 (GFK)
PL Ltd., Inc.;                            08-45329 (GFK)
Edge One LLC;                             08-45330 (GFK)
MGC Finance, Inc.;                        08-45331 (GFK)
PAC Funding, LLC;                         08-45371 (GFK)
Palm Beach Finance Holdings, Inc.)        08-45392 (GFK)


                                          Chapter 11 Cases
                                          Judge Gregory F. Kishel

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED APRIL 8, 2016

WHEREAS, Douglas A. Kelley ("Kelley"), solely in his capacity as Chapter 11 Trustee[1], Greenpond South, LLC, Ronald R. Peterson, solely in his capacity as the Chapter 7 Trustee of Lancelot Investors Fund, LP, et al.[2], and Barry E. Mukamal, solely in his capacity as the Liquidating Trustee of the Palm Beach Finance Partners Liquidating Trust and the Palm Beach Finance II Liquidating Trust, collectively, the Plan Proponents, and as "proponent[s] of the plan" within the meaning of section 1129

---

[1] Capitalized terms not defined herein shall have the meaning set forth in the Plan, a copy of which is attached hereto as Exhibit A.

[2] Ronald R. Peterson is the duly-appointed Lancelot Trustee (as defined in the Plan) in affiliated bankruptcy cases venued in the Northern District of Illinois jointly administered as Case No. 08-28225.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *04/15/2016*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

Case 09-45861    Doc 3305    Filed 04/15/16    Entered 04/15/16 16:14:13    Desc Main
Document    Page 2 of 77

of the Bankruptcy Code, filed the Second Amended Chapter 11 Plan of Liquidation

dated April 8, 2016 (as such plan may be amended or modified from time to time,

together with all addenda, exhibits, schedules, supplements, or attachments, if any, the

"Second Amended Plan" or the "Plan") [Docket No. 3263] which Second Amended Plan

modified the Amended Chapter 11 Plan of Liquidation dated February 22, 2016 (the

"First Amended Plan"). The Plan Proponents also filed the Amended Disclosure

Statement in Support of the Amended Chapter 11 Plan of Liquidation dated February

22, 2016 ("Disclosure Statement") [Docket No. 3131]; and

WHEREAS, the Bankruptcy Court held hearings to approve the Disclosure

Statement on February 17, 2017 and February 23, 2016 (collectively, the "Disclosure

Statement Hearing") after which it entered an order (the "Disclosure Statement Order")

[Docket No. 3142] on February 25, 2016, which, among other things, (i) approved the

Disclosure Statement as containing adequate information under section 1125 of the

Bankruptcy Code and Bankruptcy Rule 3017; (ii) established April 12, 2016, at 9:30 a.m.

(Central Time) as the date and time of the hearing pursuant to section 1129 of the

Bankruptcy Code to consider Confirmation of the Plan (the "Confirmation Hearing");

(iii) approved the form and method of notice of the Confirmation Hearing (the

"Confirmation Hearing Notice"); and (iv) established certain procedures for soliciting

and tabulating votes with respect to the Plan; and

WHEREAS, the Disclosure Statement, the First Amended Plan, the Disclosure

Statement Order, the appropriate form of Ballot(s) and the Trustee's transmittal notice

and disclosure letter (collectively, the "Solicitation Package") were distributed by the

Chapter 11 Trustee to the Holders of Claims and Interests and other parties in interest

in accordance with the Disclosure Statement Order as set forth in the Certificates of Service filed with the Bankruptcy Court; and

WHEREAS, the Chapter 11 Trustee, Lancelot Trustee, Palm Beach Liquidating Trustee and Ark Discovery II Trustee filed a joint motion requesting temporary allowance of claims for purposes of voting on the Second Amended Plan (the "Voting Motion") [Docket No. 3160]. On March 22, 2016, the Bankruptcy Court entered the Order granting the Voting Motion which temporarily allowed the claims of Lancelot, the Palm Beach Liquidating Trustee and Ark Discovery II, LP for the purpose of voting to accept or reject the Second Amended Plan (the "Voting Order") [Docket No. 3197]; and

WHEREAS, the Chapter 11 Trustee filed a motion requesting temporary allowance of claims of Ritchie Capital Management, Ltd. for purposes of voting on the Second Amended Plan (the "Ritchie Voting Motion") [Docket No. 3236]. On April 13, 2016, the Bankruptcy Court entered the Order granting the Ritchie Voting Motion which temporarily allowed the claims of Ritchie Capital Management, Ltd. for the purpose of voting on the Second Amended Plan (the "Ritchie Voting Order") [Docket No. 3285]; and

WHEREAS, on April 8, 2016, the Plan Proponents filed the Second Amended Plan, which includes their amendments to the First Amended Plan (the "Plan Amendment"). See Second Amended Plan [Docket No. 3263] and the Ballot Acceptance Motion [Docket No. 3264]; and

WHEREAS, objections to confirmation of the Plan were filed and served by (i) John Stoebner, as Chapter 7 Trustee in the Polaroid bankruptcy cases, Bky No. 08-44617

3

et al. [Docket No. 3241] (the "Stoebner Objection"), (ii) DZ Bank AG, Deutsche Zentral Genossenschaftsbank, Frankfurt am Main [Docket No. 3246] (the "DZ Bank Objection"], (iii) Opportunity Finance, LLC and its related defendants [Docket No. 3247] (the "Opportunity Finance Objection") and (iv) the Epsilon/Westford Defendants [Docket No. 3255] (the "Epsilon/Westford Objection" and, with the Stoebner Objection, the DZ Bank Objection and the Opportunity Finance Objection, the "Objections"); and

WHEREAS, on April 8, 2016, the Chapter 11 Trustee filed the Ballot Tabulation Report summarizing the voting on the Plan [Docket No. 3265] (the "Ballot Report"). The Ballot Report provides the results of the ballot tabulation for Class 3 claims entitled to vote to accept or reject the Plan; and

WHEREAS, the Chapter 11 Trustee filed his Memorandum of Law in his response to the Objections (the "Objection Response") [Docket No. 3267]; and

WHEREAS, the Chapter 11 Trustee filed the Motion for an Expedited Hearing and Motion for an Order Determining that Modifications of the Amended Plan Complies with 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019(a) (the "Ballot Acceptance Motion") [Docket No. 3264] and on April 13, 2016, the Bankruptcy Court entered an Order granting the Ballot Acceptance Motion [Docket No. 3286] and ruling that the Holders of Claims who voted to accept the First Amended Plan are deemed to have voted to accept the Second Amended Plan.

NOW THEREFORE, based upon the Bankruptcy Court's review and consideration of (i) the Plan, the Disclosure Statement and the Ballot Report and the other pleadings of record and other documents before the Bankruptcy Court in connection with the confirmation of the Plan, (ii) the Objections and the Objection

Response and the Bankruptcy Court having found and determined that the Objections are hereby overruled to the extent not otherwise resolved as set forth in this order, (iii) the record of the Confirmation Hearing (including the statements of counsel in support of confirmation at the Confirmation Hearing and all testimony proffered or presented and evidence admitted at the Confirmation Hearing), (iv) the entire record of these Chapter 11 Cases, and (v) the Bankruptcy Court finding that (A) notice of the Voting Deadline, Objection Deadline, and Confirmation Hearing and the opportunity of any party in interest to object were adequate and appropriate, in accordance with Bankruptcy Rule 2002(b) and the Disclosure Statement Order, as to all parties affected by the Plan and the transactions contemplated thereby, and (B) the legal and factual bases presented at the Confirmation Hearing and as set forth in this Confirmation Order establish just cause for the relief granted herein; and after due deliberation thereon, and good cause appearing therefor, the Bankruptcy Court makes the following findings of fact and conclusions of law and issues this Confirmation Order.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]

THE COURT FINDS AND CONCLUDES THAT:

A.    <u>Jurisdiction; Venue; Core Proceeding</u>. This Bankruptcy Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Bankruptcy Court has jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code, to determine whether the Plan should be confirmed and the

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

presiding bankruptcy judge has the constitutional authority to enter a final order with respect hereto.

B.    <u>Commencement of Bankruptcy Cases</u>. Between October 11 and October 19, 2008, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors were and are qualified to be chapter 11 debtors under section 109 of the Bankruptcy Code. By an Order dated October 22, 2008, the Cases were jointly administered under In re Petters Company, Inc., Case No. 08-45257 [Docket No. 21]. On December 24, 2008 the Office of the United States Trustee for the District of Minnesota appointed Kelley (the "<u>Chapter 11 Trustee</u>") as the Chapter 11 Trustee for all of the Debtors in the Bankruptcy Cases. On February 26, 2009 the Bankruptcy Court approved Kelley's appointment. Kelley is the duly-appointed Chapter 11 Trustee for these Bankruptcy Cases.

C.    <u>Judicial Notice</u>. The Court takes judicial notice of the dockets of the Chapter 11 Cases (including the docket in each adversary proceeding in the jointly administered Chapter 11 Cases) maintained by the Clerk of the Court and its duly-appointed agents, including, without limitation, all pleadings and other documents filed, all orders entered, and transcripts of, and all evidence and arguments made, proffered, or adduced at, the hearings held before the Court during the pendency of the Chapter 11 Cases (and the foregoing are deemed admitted into evidence). Any resolutions of objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference.

D.    <u>Standing</u>. The Plan Proponents have standing under section 1121 of the Bankruptcy Code to file a plan. The Plan is dated and identifies the entities submitting

it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the Disclosure Statement
with the Court satisfies Bankruptcy Rule 3016(b).

E.     Filing of Chapter 11 Plan and Adequacy of Disclosure Statement. On
January 15, 2016, the Plan Proponents filed the initial Chapter 11 Plan of Liquidation
(the "Initial Plan") [Dkt. No. 3078] and the initial Disclosure Statement (the "Initial
Disclosure Statement") [Dkt. No. 3079]. A hearing to determine the adequacy of the
Initial Disclosure Statement was initially held on February 17, 2016, and continued to
February 23, 2016. As a result of the Disclosure Statement Hearing, certain revisions
were noted on the record to be made to the proposed Initial Plan and Initial Disclosure
Statement and the Court overruled objections to the adequacy of the Disclosure
Statement filed by General Electric Capital Corporation, Opportunity Finance, LLC and
related defendants, the Epsilon/Westford Defendants and DZ Bank AG and, Deutsche
Zentral Genosenschanfsbank, Frankfurt am Main. On February 22, 2016, after making
the revisions noted above and other revisions that resolved the remaining objections of
the US Trustee and Randall Seaver, as Chapter 7 Trustee of Petters Capital, LLC to the
adequacy of the Disclosure Statement, the Plan Proponents filed the First Amended
Plan and the Amended Disclosure Statement in Support of Chapter 11 Plan of
Liquidation (the "Amended Disclosure Statement") and the US Trustee and Randall
Seaver withdrew their objections.

F.     Transmittal and Mailing of Materials, Notice. The Chapter 11 Trustee
served the Solicitation Package, including the notice in conspicuous language that the
Plan provides for the continuation of existing injunctions and stays required by
Bankruptcy Rule 2002(c), upon all interested parties in compliance with the Disclosure

7

Statement Order, the Bankruptcy Rules and the Local Bankruptcy Rules, and such

transmittal and service was adequate and sufficient. Notice of the Confirmation

Hearing and all deadlines in the Disclosure Statement Order was given in compliance

with the Bankruptcy Rules and the Disclosure Statement Order. Due, adequate and

sufficient notice of the Disclosure Statement, the First Amended Plan, and Confirmation

Hearing, together with all deadlines for voting on or objecting to the First Amended

Plan, has been given to known Holders of Claims and Interests, parties that requested

notice in accordance with Bankruptcy Rule 2002, all counterparties to unexpired leases

and executory contracts with the Debtors, and all taxing authorities listed on the

Debtors' Schedules or claims register, in substantial compliance with Bankruptcy Rule

2002, 3017, and 3020, and the Local Rules, and no other or further notice is or shall be

required.

G.    Solicitation. The Chapter 11 Trustee solicited votes for acceptance or

rejection of the First Amended Plan in good faith, and such solicitation complied with

sections 1125 and 1126 and all other applicable sections of the Bankruptcy Code and

Bankruptcy Rules 3017 , 3018 and 3019, the Disclosure Statement Order, and all other

rules, laws and regulations.

H.    Plan Modification. On April 8, 2016, the Plan Proponents filed the Plan

Amendment, which was served on the service list. The Plan Amendment does not

materially or adversely affect or change the treatment of any Holders of Claims or

Interests. Accordingly, pursuant to Bankruptcy Rule 3019, the Plan Amendment does

not require additional disclosure under section 1125 of the Bankruptcy Code or re-

solicitation of acceptances or rejections under section 1126 of the Bankruptcy Code, nor

8

does the Plan Amendment require that Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Disclosure of the Plan Amendment in the filing and service on April 8, 2016, and on the record at the Confirmation Hearing, constitutes due and sufficient notice thereof under the circumstances of the Chapter 11 Cases.

I.  Burden of Proof. The Plan Proponents have met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

J.  Substantive Consolidation. The substantive consolidation of the previously consolidated Estate of Petters Company, Inc. with the Estate of Petters Group Worldwide, LLC is just and proper under the Eighth Circuit Giller test. See In re Giller, 962 796 (8th Cir. 1992), as applied by this Court previously in this case in In re Petters Company Inc., 506 B.R. 784 (Bankr. D. Minn. 2013).

1.  This Court has previously found that Thomas Petters operated a Ponzi scheme through PCI and its wholly owned Special Purpose Entity (SPE) subsidiaries. In re Petters, 506 B.R. at 800-802, 804-807. This Court previously and thoroughly analyzed and determined that Theodore Martens of PricewaterhouseCoopers ("PwC") is an expert qualified to testify regarding the issues relating to the Ponzi scheme and the interrelatedness of the PCI and the SPEs, including with respect to their corporate governance, financial dependence on the funds generated by the Ponzi Scheme, and the cost, time and ability to unwind the accounting records to account for the fraud. The Court finds that Theodore Martens is equally qualified to opine on the interrelatedness of PGW with PCI and the SPEs, the role of

PGW within the Ponzi scheme, the corporate governance of PGW and its financial

dependence on the Ponzi Scheme, and the cost, time and ability to account for the fraud

within the books and records of PGW and its subsidiaries.

2.     Based on the testimony and evidence offered by the Chapter 11

Trustee through Theodore Martens, and Mark Laumann, the former controller of PGW,

the Court finds that the Chapter 11 Trustee established the first *Giller* factor--the

interrelatedness of PGW with the PCI and PCI SPE Debtors for which the bankruptcy

estates were substantively consolidated previously--weighs in favor of substantive

consolidation.   The Court's determination regarding the interrelatedness element is

based upon the following specific findings of fact:

> a)     The corporate data sheets confirm that PGW was wholly owned by
> Tom Petters, and as a result PCI and PGW were under common
> ownership.
>
> b)     PCI and PGW both maintained offices at 4400 Baker Road,
> Minnetonka, MN.
>
> c)     PCI funds would be used routinely to pay PGW expenses.   The
> substantial dependence of PGW on PCI for funding its accounts payable
> and payroll is evidenced by the amount of PGW officers and employee
> salaries and bonuses that were funded, either directly or indirectly, by
> PCI.
>
> d)     Corporate records further evidence Tom Petters' control over the
> PGW operations and ability to approve written actions and significant
> transactions that were dependent upon funds obtained from PCI from
> inception.
>
> e)     The testimony of Theodore Martens and Mark Laumann
> established that PGW was utilized by Tom Petters as a parent umbrella of
> approximately 99 subsidiaries that were held out by Tom Petters to the
> external world as operating entities, which were reflected on the
> Organizational Chart of PGW.   PGW, however, was never designed to be
> an independent, revenue-generating company.   Rather, PGW provided a
> set of "shared-services" to the PGW subsidiaries that PGW was not

10

capable of providing absent ongoing infusions of cash funds from PCI and the Petters Ponzi Scheme.

f)      Thomas Petters was not only the sole owner of both PCI and PGW, but given PGW's substantial dependence on PCI for funds, held a great deal of oversight, management, and control of both company's operations. Tom Petters was able to direct PCI funds to be infused into and provided to PGW and its subsidiaries as and when needed and as approved by Thomas Petters.

g)      PGW would also, in turn and under Thomas Petters's direction or approval, forward funds obtained from PCI to its respective subsidiaries as needed.

h)      PCI also would separately, on occasion, provide funds directly to PGW subsidiaries.

i)      Internal correspondence of PGW employees and the testimony of Mark Laumann confirmed that PGW and its subsidiaries would routinely make cash funding requests to Deanna Munson (Coleman) of PCI on a bi-weekly basis in order to fund ongoing operations.

j)      The testimony of Ted Martens established that PGW was not adequately capitalized in that the initial $10,020,000 million capital contribution into PGW was exhausted within approximately one year of operations and was never replenished.  Because PGW in operation did not generate revenues in an amount sufficient to satisfy its accounts payable plus payroll, PGW early on became dependent on PCI to fund its operations.  This empowered Thomas Petters to exercise further control over PGW and its ability to continue operations.

k)      PGW and PCI did not abide by corporate formalities.  An example of this corporate disregard includes the transactions involving the Ritchie-related entities, which advanced $189 million directly to PCI in 13 transactions, from February 1, 2008 through May 9, 2008.  Ten notes were issued under the name of PGW and Thomas Petters; two notes were issued under the name of PCI, PGW and Tom Petters; and two notes were issued under the name of PCI and Tom Petters.  Regardless of the named issuer of the notes, all funds advanced on these transactions were paid directly to PCI.  Simultaneously, PGW's debt to PCI increased. No transfers were made directly from Ritchie to PGW, despite PGW being the named note issuer in the majority of instances. Emails between PGW employees and employees of Ritchie equally confirmed that advances of funds were directed into PCI bank accounts, rather than PGW accounts.

11

l)      Similar commingling and corporate disregard occurred on smaller scales, including for example the Dean Vlahos transactions, which reflect that although Dean Vlahos agreed to loan funds to PGW, the funds again were disbursed directly to PCI, as reflected on the PCI-PGW General Ledger.

m)     Extensive commingling occurred between PGW and PCI. According to the testimony of Theodore Martens, throughout the period of PGW's operations, a net cash position of in excess of $105,000,000 from PCI to PGW existed.  This further confirms PGW's substantial financial dependence upon PCI.

n)      In 2007, PCI assigned and transferred to PGW more than 338 million shares of preferred stock in Fingerhut Direct Marketing n/k/a Bluestem Brands ("Bluestem").  The Chapter 11 Trustee has received $134.8 million from dividends and the liquidation of the Bluestem stock. Today, the proceeds from the Bluestem stock are an asset of the PGW Estate in the amount of approximately $132,569,582.00.  Upon the consolidation of the PCI and PGW estates, these proceeds ($132,569,582) would become an asset of the consolidated estate and would be available to the creditors of the consolidated entities.  This would avoid litigation between the PCI and PGW estates on the propriety of the original stock transfer, a factor that weighs heavily in favor of substantively consolidating the estates of PGW and PCI.

3.      With respect to the first *Giller* factor, interrelatedness, the evidence established that PCI and PGW commingled funds and failed to properly account for intercompany transactions.  PGW's business operations yielded little or no profit or earnings.  PGW was undercapitalized because its initial capitalization was depleted in less than a year and its retained deficit grew exponentially over the years. In a process of forensic accounting, it would be difficult and cost-prohibitive to reconstruct stand-alone financial statements and accounting records from the inception of PGW and its subsidiaries, to accurately reflect the intercompany transactions.  The evidence further established that substantive consolidation is necessary as a result of the interrelatedness.  Substantive consolidation will allow for approximately $132,000,000

in assets within the PGW estate to be made available to the creditors of the consolidated estate.  Further, the testimony of Theodore Martens established that accounting for all of the inter-company transfers that resulted from the interrelatedness would be a significant, time-intensive, and costly task.  Because the primary assets of the PGW estate were sourced in an intercompany transfer with PCI, the interrelatedness factor supports substantive consolidation in the consideration of equity.  To the extent the assets of PGW were funded by or provided by PCI, as a beneficiary of the Petters Ponzi scheme, equity compels that those assets be available to the creditors of an estate consolidated between PGW and PCI.

4.      The Court further finds that the second and third *Giller* factors equally warrant and require the substantive consolidation of PGW and PCI.  The benefits of substantive consolidation significantly outweigh any harm to creditors, because substantive consolidation will bring into the consolidated estate more than $132,000,000 in assets for distribution to creditors of the consolidated estate.  Substantive consolidation will alleviate the need for any further accounting effort to reconcile or resolve the complicated intercompany transfers as between PCI and PGW and the PGW subsidiaries.   The benefits are not outweighed by harm to creditors.  Based upon the claims registers of the PCI and PGW bankruptcy cases, approximately 76% of the claims filed in the PCI Bankruptcy Case are duplicative of those filed in the PGW Bankruptcy Case; and approximately 92% of the claims filed in the PGW Bankruptcy Case are duplicative of the claims filed in the PCI Bankruptcy Case.  Thus, the claims registers in both cases confirm that a very significant number and amount of

the claims filed in each case are duplicative; and as a result they will not be diminished through the consolidation of the estates.

5.      For all the foregoing reasons, and based upon a thorough review of all the evidence, testimony and exhibits offered by the Chapter 11 Trustee, the Court finds that the substantive consolidation of the estate of PGW with the previously consolidated estates of PCI and the PCI SPEs is just, equitable, warranted and necessitated by the historical interrelatedness of PCI and PGW, and it will benefit both the creditors and administration of the bankruptcy estates in excess of any harm to creditors that may result.

K.      Ballot Report. Prior to the Confirmation Hearing, counsel for the Chapter 11 Trustee and the Creditors' Committee tabulated the ballots and prepared the Ballot Report filed by the Chapter 11 Trustee. All procedures used to tabulate the Ballots were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

L.      Impaired Classes under the Plan. As set forth more fully in the Plan, the Claims under Classes 3, 4, 5 and 6 are impaired under the Plan as that term is defined in section 1124 of the Bankruptcy Code.

M.      Impaired Classes Voting to Accept the Plan. As evidenced by the Ballot Report, which certified both the method and results of the voting, the Claims treated under Class 3 of the Plan for each of the PCI and PGW Debtors are impaired.  The Holders of Allowed Claims in Class 3 have voted to accept the Plan pursuant to the requirements of sections 1124 and 1126 of the Bankruptcy Code. Thus, at least one impaired class of Claims has voted to accept the Plan.

N.    <u>Classes Deemed to Accept the Plan</u>. The Claims treated under Class 1, Class 2 and Class 2A of the Plan are not impaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

O.    <u>Classes Voting or Deemed to Reject the Plan</u>. Pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims under Class 4, Class 5 and Class 6 of the Plan are deemed to have rejected the Plan, because such holders are not entitled to receive or retain any Distribution or property under the Plan on account of such Claims or Interests. (the "<u>Rejecting Classes</u>").

P.    <u>Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. For the reasons stated below, the Plan complies with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and the orders of this Bankruptcy Court with respect to the Plan, thus satisfying the requirements of section 1129(a)(1) of the Bankruptcy Code:

(1)    <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>. In addition to Administrative Expense Claims, including Professional Claims, and Priority Tax Claims, which need not be classified, the Plan designates separate Classes of Claims and Interests. The Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class. As stated above, substantive consolidation of the Debtors' Estates is appropriate under section 1123(a)(5)(C) of the Bankruptcy Code because the Debtors were operated as a single, unified fraudulent scheme and all creditors will benefit from such substantive consolidation. Substantive consolidation is likewise appropriate for the efficient administration of the Debtors' estates. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Interests. Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(2)    <u>Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>. Article III of the Plan identifies unclassified Claims that are unimpaired and the

15

treatment of those Claims. Article IV of the Plan identifies that Claims in Class 1, Class 2 and Class 2A are unimpaired, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(3)     Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Articles IV of the Plan specifies the Classes of Claims and Interests that are Impaired under the Plan and the treatment of Claims and Interests in those Classes. Accordingly, the Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

(4)     No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(5)     Implementation of Plan (11 U.S.C. § 1123(a)(5)). Article VI of the Plan entitled "Substantive Consolidation" and Article VIII of the Plan, entitled "Implementation of the Plan," set forth numerous provisions to facilitate implementation of the Plan, including, but not limited to, (i) the substantive consolidation of previously substantively consolidated estates of PCI and the SPEs and of PGW, (ii) the creation and governance of the Liquidating Trusts and appointment of LT Trustee, (iii) contribution of Trust Assets to the Liquidating Trusts, (iv) the approval of settlements, (v) procedures for making distributions, and (vi) the establishment of the PCI Liquidating Trust Committee and the BMO Litigation Trust Committee for the purpose, among others, of litigating the Causes of Action. The Plan provides adequate and proper means for its implementation, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

(6)     Prohibition Against Issuance of Non-Voting Equity Securities and Provisions for Voting Power of Classes of Securities (11 U.S.C. § 1123(a)(6). The Plan contemplates the liquidation of the Debtors and the vesting of their assets in the PCI Liquidating Trust and the BMO Litigation Trust on the Effective Date. Accordingly, section 1123(a)(6) of the Bankruptcy Code is satisfied.

(7)     Selection of Officers, Directors and the LT Trustee (11 U.S.C. § 1123(a)(7)). The Plan contemplates the liquidation of the Debtors and the vesting of substantially all of their assets in the Liquidating Trusts on the Effective Date. The Plan properly and adequately discloses the identity and affiliation of all individuals proposed to serve on or after the Effective Date as PCI Liquidating Trustee and BMO Litigation Trustee. The appointment of such trustees is consistent with the interests of the holders of claims against and Interests in the Debtors, and with public policy. Pursuant to Sections 8.4 and 8.21 of the Plan, Kelley, not individually, but

solely as a fiduciary for the respective Liquidating Trusts, shall be the Trustee for each of the PCI Liquidating Trust and the BMO Litigation Trust. In his capacity as the Chapter 11 Trustee, Kelley has acted in a fiduciary capacity throughout these cases, and has led efforts to maximize value to the Estates. Thus, the Plan is consistent with the interests of creditors and equity security holders and with public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

(8)     <u>Compliance with Bankruptcy Rule 3016</u>. The Plan is dated and identifies the entities submitting it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the Disclosure Statement with the Court satisfies Bankruptcy Rule 3016(b). The Plan describes in specific and conspicuous language all acts to be enjoined under the Plan and identifies all entities that are subject to the injunctions set forth in Article X of the Plan in accordance with Bankruptcy Rule 3016(c).

(9)     <u>Compliance with Bankruptcy Rule 3018</u>. The solicitation of votes to accept or reject the Plan satisfies Bankruptcy Rule 3018. The Solicitation Materials, including the Plan, were transmitted to all creditors entitled to vote on the Plan (i.e., holders of Impaired Claims, other than those in Classes deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, sufficient time was prescribed for such Creditors to accept or reject the Plan, and the Solicitation Materials and related solicitation procedures comply with section 1126 of the Bankruptcy Code, thereby satisfying the requirements of Bankruptcy Rule 3018.

Q.     <u>Plan Proponents' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and the orders of this Bankruptcy Court with respect to the solicitation of acceptances or rejections of the Plan, including, without limitation, sections 1123, 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 2002, 3017, 3018 and 3019, thus satisfying the requirements of section 1129(a)(2) of the Bankruptcy Code.

R.     <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>. The Plan, and the compromises and settlements embodied therein, has been proposed in good faith and not by any means forbidden by law, thus satisfying the requirements of section

1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 cases and the formulation of the Plan. The Plan was proposed with the legitimate purpose of maximizing the value of the estates of each of the Debtors and the recovery to Holders of Allowed Claims under the circumstances of these Chapter 11 Cases.

S.    <u>Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>. All payments that have been made or are to be made by the Debtors, the Liquidating Trusts or the LT Trustee under the Plan or by any person acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or will be subject to the approval of, the Bankruptcy Court as reasonable, thus satisfying the requirements of section 1129(a)(4) of the Bankruptcy Code.

T.    <u>Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5))</u>. The Plan Proponents have made available all necessary information with respect to the identity of individuals and entities proposed to serve after confirmation of the Plan. The PCI Liquidating Trustee shall be appointed as each Debtor's Chief Executive Officer in the Plan, and the appointment to, or continuance in, such office of such individuals is consistent with the interests of holders of Claims and Interests and with public policy, thus satisfying the requirements of section 1129(a)(5) of the Bankruptcy Code.

U.    <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. The Debtors' business does not involve the establishment of rates over which any regulatory commission has

jurisdiction or will have jurisdiction after confirmation. Thus, section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

V.    Best Interest Test (11 U.S.C. § 1129(a)(7)). Section 1129(a)(7) of the Bankruptcy Code requires that each holder of a Claim or Interest in an impaired class accept the Plan, or receive or retain under the Plan property having a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive on account of such Claim or Interest if such Debtor were liquidated under Chapter 7 of the Bankruptcy Code. The Claims under Classes 3, 4, 5 and 6 are impaired under the Plan. The Disclosure Statement and the other evidence proffered or adduced at the Confirmation Hearing (i) are persuasive, credible and accurate as of the dates they were prepared, presented or proffered, (ii) have not been controverted by other evidence or challenged in any objection to confirmation of the Plan, and/or (iii) establish that each holder of an impaired Claim in Classes 3, 4, 5 and 6 has either accepted the Plan, or will receive or retain under the Plan property having a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if such Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date, thus satisfying the requirements of section 1129(a)(7) of the Bankruptcy Code.

W.    Acceptance or Rejection by Certain Classes (11 U.S.C. § 1129(a)(8)). Section 1129(a)(8) of the Bankruptcy Code requires that for each Class of Claims or Interests under the Plan, such Class has either accepted the Plan or is not impaired under the Plan. Claims in Classes 1, 2 and 2A are unimpaired and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Class 3 has voted to accept

19

the Plan in accordance with section 1126(c) of the Bankruptcy Code. The percentages of

Holders of Claims in Class 3 entitled to vote that voted to accept the Plan are as follows:

| PCI | | |
|---|---|---|
| Class Entitled to Vote | Percentage Accepting (Dollar Amount) | Percentage Accepting (Number of Claims) |
| Class 3 | 100% | 100% |

| PGW | | |
|---|---|---|
| Class Entitled to Vote | Percentage Accepting (Dollar Amount) | Percentage Accepting (Number of Claims) |
| Class 3 | 99.99% | 93% |

| COMBINED[4] | | |
|---|---|---|
| Class Entitled to Vote | Percentage Accepting (Dollar Amount) | Percentage Accepting (Number of Claims) |
| Class 3 | 99.99% | 93% |

The Holders of Claims and Interests in Classes 4, 5 and 6 are receiving no recovery on

account of their Claims and Interests and are deemed to have rejected the Plan.

X.      Treatment of Administrative, Priority and Tax Claims (11 U.S.C.

§ 1129(a)(9)). The treatment of Administrative Expense and Priority Tax Claims

pursuant to Article III of the Plan satisfies the requirements of section 1129(a)(9) of the

Bankruptcy Code.

Y.      Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)). The Plan has been

accepted by impaired Class 3, determined without consideration of any acceptance of

_____

[4] Includes ballots cast for both Debtors, without duplication for identical claims filed in each estate.

the Plan by insiders, thus satisfying the requirement of section 1129(a)(10) of the

Bankruptcy Code.

Z.      Feasibility (11 U.S.C. § 1129(a)(11)). Confirmation of the Plan is not likely

to be followed by the liquidation, or the need for further financial reorganization of the

Debtors, as the Plan is itself a liquidating plan that provides for the payment of all

Allowed Administrative and Priority Claims, as and to the extent required by the

Bankruptcy Code. Holders of Allowed Claims shall receive distributions consistent with

the priority scheme of the Bankruptcy Code and the provisions of the Plan, thus

satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

AA.     Payment of Fees (11 U.S.C. § 1129(a)(12)). The Chapter 11 Trustee has

paid, or will pay on the Effective Date, all amounts presently due under 28 U.S.C. §

1930, thus satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

BB.     Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)-(16)). The Debtors

do not have any obligations with respect to retiree benefits, the Debtors are not required

to pay domestic support obligations, the Debtors are not individuals, and transfers of

property under the plan will be made in accordance with any applicable provisions of

nonbankruptcy law that govern the transfer of property by a trust that is not a

moneyed, business or corporation or trust. Therefore, the requirements of sections

1129(a)(13) - (16) of the Bankruptcy Code are inapplicable.

CC.     No Unfair Discrimination; Fair and Equitable ((11 U.S.C. § 1129(b)).

Holders of Claims and Interests in the Rejecting Classes are Impaired and are deemed

to have rejected the Plan. The Plan Proponents have established that the Plan does not

discriminate unfairly and is fair and equitable with respect to the holders of Claims

21

under each of Class 4, 5, and 6, thereby satisfying section 1129(b) of the Bankruptcy
Code.

DD.     <u>Binding on Rejecting Classes</u>. Thus, the Plan may be confirmed
notwithstanding the Proponents' failure to satisfy section 1129(a)(8) of the Bankruptcy
Code. Upon Confirmation and the occurrence of the Effective Date, the Plan shall be
binding upon the members of the Rejecting Classes.

EE.     <u>No Other Plan (11 U.S.C. § 1129(c))</u>. The Plan is the only plan filed in these
Chapter 11 Cases, thereby satisfying section 1129(c) of the Bankruptcy Code.

FF.     <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>. The Plan Proponents have
solicited votes for the Plan in good faith and in compliance with the provisions of the
Bankruptcy Code. Based on the record before the Court in these Chapter 11 Cases, the
Plan Proponents and each of their respective  agents, advisors, accountants, investment
bankers, consultants, attorneys, and other representatives have acted in good faith
within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the
applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with
all of their respective activities relating to the solicitation of acceptances of the Plan and
their participation in the activities described in section 1125 of the Bankruptcy Code and
are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and
the exculpation and release provisions set forth in Article XII of the Plan.

GG.     <u>Satisfaction of Confirmation Requirements</u>. The Plan satisfies the
requirements for confirmation set forth in section 1129 of the Bankruptcy Code and the
conditions to confirmation set forth in Article X of the Plan.

HH.   <u>Retention of Jurisdiction</u>. Subject to the provisions of this Order, the Bankruptcy Court finds that it may properly retain jurisdiction over the matters set forth in section 1142 of the Bankruptcy Code and below:

1.   <u>Claims and Equity Securities.</u> To hear and determine the allowance, classification, priority, estimation or subordination of Claims or Equity Securities, including the resolution of any and all objections by the Chapter 11 Trustee or the PCI Liquidating Trustee or any other party in interest;

2.   <u>Causes of Action.</u> To hear, determine and adjudicate on *a non-exclusive basis*, any and all Trust Claims and BMO Litigation Trust Assets;

3.   <u>Injunction.</u> To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Bankruptcy Cases on or before the Effective Date with respect to any Entity;

4.   <u>Professional Fees.</u> To hear and determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods before the entry of the Confirmation Order, and to resolve disputes concerning Liquidating Trust Expenses, as provided for in the Plan;

5.   <u>Certain Priority Claims.</u> To hear and determine the allowance and classification of any Priority Tax Claims, Administrative Claims or any request for payment of an Administrative Claim;

6.   <u>Dispute Resolution.</u> To hear and resolve any dispute arising under or related to the implementation, execution, consummation, interpretation or enforcement of the Plan, Confirmation Order, or Liquidating Trust Agreements and the making of distributions hereunder and thereunder or any agreement, instrument or other document governing or relating to any of the foregoing;

7.   <u>Executory Contracts and Unexpired Leases.</u> To hear and determine any and all motions for the rejection, assumption, or assignment of Executory Contracts or Unexpired Leases, and to determine the allowance of any Claims resulting from the rejection of Executory Contracts and Unexpired Leases;

8.   <u>Actions.</u> To hear and determine all applications, motions, adversary proceedings (including the Adversary Proceedings), contested matters, actions, and any other litigated matters instituted in the Bankruptcy Cases on behalf of the Debtors,

23

including, but not limited to, the Causes of Action commenced by the Chapter 11 Trustee or an LT Trustee, and any remands;

9.    General Matters. To hear and determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code;

10.    Plan Modification. To modify the Plan under Section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

11.    Aid Consummation. To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

12.    Settlements. To hear and determine any matters concerning the enforcement of the provisions of Article V of the Plan and any other releases, exculpations, limitations of liability or injunctions set forth in and contemplated by the Plan or settlements entered into by the Chapter 11 Trustee and any Person in the Bankruptcy Cases;

13.    Protect Property. To protect the Property of the Estates and Property transferred to the PCI Liquidating Trust pursuant to the Plan from adverse Claims or interference inconsistent with the Plan, including to hear actions to quiet or otherwise clear title to such property based upon the terms and provisions of the Plan or to determine a purchaser's exclusive ownership of Claims and Causes of actions retained and preserved under the Plan;

14.    Abandonment of Property. To hear and determine matters pertaining to abandonment of Property of the Estates or the PCI Liquidating Trust;

15.    Taxes. To hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes and matters with respect to any taxes payable by the Liquidating Trusts or any other trust or reserve as may be established in furtherance of the Plan or the Liquidating Trust Agreements;

16.    Implementation of Confirmation Order. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

17.    Liquidating Trustee's Exercise of Power. To enter and implement such orders as may be appropriate to enforce the terms of the Plan or the Liquidating Trust Agreements in order to resolve any disagreement between an LT Trustee and the relevant Liquidating Trust Committee over any exercise of powers;

18. <u>Other Matters</u>. To determine any other matters contemplated by the Plan to the Bankruptcy Court after the Effective Date; and

19. <u>Close the Bankruptcy Cases</u>. To enter any Final Order closing the Bankruptcy Cases.

II. <u>Releases and Exculpation</u>. Each of the release, indemnification, and exculpation provisions set forth in Section 12.13 and 12.14 of the Plan (i) falls within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), (b) and (d), (ii) are important aspects of the Plan, and (iii) are fair, reasonable, and appropriate under the circumstances of this case.

JJ. <u>Modifications to the Plan</u>. The modifications to the First Amended Plan constitute do not materially adversely affect or change the treatment of any Claims or Equity Interests. Accordingly, pursuant to Bankruptcy Rule 3019, such modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan, thereby satisfying the requirements of section 1127 of the Bankruptcy Code.

KK. <u>Assumption and Rejection</u>. Article VII of the Plan governing assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code.

LL. <u>Objections</u>. All parties have had a full and fair opportunity to litigate all issues raised in the Objections, or which might have been raised, and the Objections have been fully and fairly litigated and are either denied or resolved as set forth herein.

IT IS ORDERED, ADJUDGED AND DECREED:

1.      <u>Confirmation</u>. The Second Amended Plan dated April 8, 2016 and filed the same day [Docket No. 3263], including all exhibits, provisions, terms and conditions thereto and the Plan Amendment, is approved and confirmed under section 1129 of the Bankruptcy Code. The terms of the Second Amended Plan are incorporated herein by reference and are an integral part of this Confirmation Order.

2.      <u>References to Plan Provisions</u>. The failure to specifically include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety.

3.      <u>Modifications to the Plan</u>. The modifications to the First Amended Plan as provided in the Plan, meet the requirements of sections 1127(a) and (c) of the Bankruptcy Code and do not adversely change the treatment of the Claim of any creditor or any equity security holder within the meaning of Bankruptcy Rule 3019, and therefore, no further solicitation or voting is required.

4.      <u>Objections</u>. The Court hereby overrules or otherwise resolves the Objections as follows: (i) the Stoebner Objection has been resolved through agreed-upon language incorporated into this Confirmation Order; and (ii) to the extent not otherwise resolved as set forth herein, the DZ Bank Objection, the Opportunity Finance Objection, the Epsilon/Westford Objection and the DZ Bank Objection are each overruled on the merits pursuant to this Order

5.    <u>Severability</u>. Each term and provision of the Plan, as it may have been altered or interpreted by the Bankruptcy Court in accordance with section 12.22 of the Plan, is valid and enforceable pursuant to its terms.

6.    <u>Plan Classification Controlling</u>. The classifications of Claims and Interests for purposes of the Distributions to be made under the Plan shall be governed solely by the terms of the Plan.

7.    <u>Substantive Consolidation</u>. The Plan Proponents' motion for substantive consolidation of the previously consolidated Estates of Petters Company, Inc. and special purpose entities PC Funding, LLC, Thousand Lakes, LLC, SPF Funding, LLC, PL Ltd., Inc., Edge One LLC, MGC Finance, Inc., PAC Funding, LLC, Palm Beach Finance Holdings, Inc. with the Estate of Petters Group Worldwide, LLC, as made in Section 6.1 of the Plan, is granted.  Subject to the occurrence of the Effective Date, pursuant to section 1123 (a)(5)(C) of the Bankruptcy Code, the Estate of Debtor Petters Group Worldwide, LLC shall be substantively consolidated with the Estate of Debtor Petters Company, Inc. solely for purposes of administering the resulting consolidated Estate of all of the Debtors in these cases, and to the sole effect that (a) all assets and liabilities of the Debtors and their Estates shall be pooled, and (b) any and all Intercompany Claims shall be disregarded. Accordingly, duplicative Claims Filed against the Debtors, including guaranty claims, claims sounding in tort that purport to recover the same, or substantially the same, damages as other Claims, and Claims that purport to establish joint and several liability, shall be disallowed upon the Effective Date, and the Holder of any Claims shall receive a single recovery from the Consolidated Debtors on account of any such joint or duplicative obligations. The treatment of the Estates as if they were

substantively consolidated solely for the purpose of administering the Consolidated

Estates and making distributions under this Plan shall not, and shall not be deemed to,

affect or constitute a waiver of the mutuality requirement for setoff under Section 553 of

the Bankruptcy Code, except to the extent otherwise expressly waived by the Chapter

11 Trustee or the PCI Liquidating Trustee in writing. All Claims, Causes of Action or

rights of the Chapter 11 Trustee under applicable law to avoid transfers of the property

of any of the Debtors are and shall be preserved under the Plan.

8.      <u>Binding Effect</u>.  The  Plan,  and  all  compromises  and  settlements

contemplated thereby or incorporated by reference therein, shall be binding upon and

inure to the benefit of the Plan Proponents, the Debtors, the PCI Liquidating Trustee,

the PCI Liquidating Trust Committee, the BMO Litigation Trustee, the BMO Litigation

Trust Committee, any entity acquiring or receiving property or a distribution under the

Plan, and any present and former Holder of a Claim against or Equity Interest in the

Debtors, including all governmental entities, whether or not the Claim or Equity

Interest of such holder (a) is impaired under the Plan or (b) has accepted the Plan.

Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code and the provisions of

this Confirmation Order, the Plan, and all Plan-related documents shall apply and be

enforceable notwithstanding any otherwise applicable non-bankruptcy law.

9.      <u>Clarification Regarding Certain Plan Provisions</u>:

<u>Dissolution of Debtors</u>.  Until  each  of  the  Debtors  are  dissolved  in

accordance with state law, or merged, as the case may be, the PCI Liquidating Trustee

will be appointed the Chief Executive Officer of each Debtor to administer any Retained

Assets pursuant to section 8.3 of the Plan for the benefit of the applicable Liquidating Trusts.

10.   Distributions; Reserves. The provisions of the Plan governing Distributions, reserves and the procedures for resolving and treating Disputed Claims under the Plan are approved and found to be fair and reasonable.

11.   Liquidating Trusts. On or prior to the Effective Date, the PCI Liquidation Trust Agreement and the BMO Litigation Trust Agreement shall be executed, and all other necessary steps shall be taken to establish the Liquidating Trusts without any requirement of further action by the Chapter 11 Trustee. The Liquidating Trusts shall be established for the sole purpose of liquidating and distributing their respective assets with no objective to continue or engage in the conduct of a trade or business. This Confirmation Order authorizes (a) the creation and implementation of the PCI Liquidating Trust and the BMO Litigation Trust in accordance with the terms of this Confirmation Order, the Plan, and the Liquidating Trust Agreements, (b) in accordance with Section 8.4 of the Plan, the appointment of Douglas A. Kelley as the PCI Liquidating Trustee, (c) in accordance with Section 8.21 of the Plan, the appointment of Douglas A. Kelley as the BMO Litigation Trustee, and (d) the PCI Liquidating Trustee and the BMO Litigation Trustee to accomplish the purposes of the respective Liquidating Trusts as set forth in the Plan and each of the Liquidating Trust Agreements, notwithstanding any otherwise applicable nonbankruptcy law.

12.   Vesting of Assets. Pursuant to Article VIII of the Plan, and except as otherwise provided in the Plan, on the Effective Date, or as soon thereafter as practicable, the Trust Assets shall be transferred to the respective Liquidating Trusts.

Upon transfer of the Trust Assets to the respective Liquidating Trusts, except as otherwise provided in the Liquidating Trust Agreements, the Debtors and the Estates shall have no interest in or with respect to the Trust Assets or the Liquidating Trusts; *provided, however*, that, notwithstanding such transfer to the Liquidating Trusts, any claims belonging to any of the Debtors or the Estates shall not be merged, but shall be deemed asserted on behalf of, each applicable Estate holding such claim immediately prior to contribution, and shall remain separate and distinct from other Estates in connection with the prosecution thereof. From and after the Effective Date, (i) the PCI Liquidating Trustee may dispose of the PCI Liquidating Trust Assets free of any restrictions of the Bankruptcy Code but solely in accordance with the provisions of the Plan and the PCI Liquidating Trust Agreement, and (ii) the BMO Litigation Trustee may dispose of the BMO Litigation Trust Assets free of any restrictions of the Bankruptcy Code but solely in accordance with the provisions of the Plan and the BMO Litigation Trust Agreement. Assets transferred to the Liquidating Trusts shall not revest in the Debtors or the Estates on or following the Confirmation Date or Effective Date. As of the Effective Date, all assets of the Debtors, the Estates, the PCI Liquidating Trust and the BMO Litigation Trust shall be free and clear of all Claims and Encumbrances, except as provided in the Plan and this Confirmation Order.

13.    <u>Retained Assets</u>. Certain assets of the Debtors set forth on Exhibit D to the Plan will not be Contributed Assets and will not be included in the Asset Contribution to the Liquidating Trusts, but shall be retained by the Debtors on the Effective Date and subsequently contributed to the PCI Liquidating Trust following their administration

and monetization by the PCI Liquidating Trustee in his capacity as the Debtors' chief

executive officer

14.     <u>Transfers of Property</u>. The Transfers of property by the Chapter 11

Trustee: (i)   to the Liquidating Trusts (a) are and will be legal, valid and effective

transfers of property, (b) vest and will vest the LT Trustee and the Liquidating Trusts

with good title to such property free and clear of all liens, charges, Claims,

encumbrances or interests, except as expressly provided in the Plan or Confirmation

Order, (c) do not and will not constitute avoidable transfers under the Bankruptcy Code

or under applicable bankruptcy or non-bankruptcy law, and (d) do not and will not

subject the Liquidating Trusts or the LT Trustee to any liability by reason of such

transfer under the Bankruptcy Code or under applicable non-bankruptcy law,

including, without limitation, any laws affecting successor, transferee or stamp or

recording tax liability; and (ii) Holders of Claims or Equity Securities under the Plan are

for good consideration and value.

15.     <u>Assumption or Rejection of Executory Contracts and Unexpired Leases (11</u>

<u>U.S.C. § 1123(b)(2))</u>. In accordance with Section 7.1 of the Plan, on the Effective Date, all

executory contracts and unexpired leases of the Debtors shall be deemed rejected in

accordance with, and subject to, the provisions and requirements of sections 365 and

1123 of the Bankruptcy Code, except those executory contracts and unexpired leases

that (i) previously shall have been assumed, assumed and assigned, or rejected by the

Chapter 11 Trustee, (ii) previously shall have expired or terminated pursuant to their

own terms before the Effective Date, or (iii) are the subject of a pending motion to

assume or reject on the Confirmation Date. Entry of this Confirmation Order shall

constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

16.     <u>Bar Date for Rejection Damage Claims</u>. Pursuant to Section 7.2 of the Plan, if the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not previously evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, the PCI Liquidating Trust, the PCI Liquidating Trustee, the BMO Litigation Trust, the BMO Litigation Trustee or any property to be distributed under the Plan unless a proof of claim is filed with the Bankruptcy Court and served upon the PCI Liquidating Trustee or the BMO Litigation Trustee on or before the date that is 30 days after the later of (a) entry of an order approving the rejection of such Executory contract or unexpired lease, or (b) entry of the Confirmation Order, or the claimant shall be forever barred from receiving a Distribution or otherwise being treated as a creditor in these Chapter 11 Cases in respect of such Claim.

17.     <u>Bar Date for Administrative Expense Claims</u>. Notwithstanding section 3.4 of the Plan, any requests for payment of Administrative Expense Claims must be filed with the Bankruptcy Court and served on the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable, and its counsel, the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable, and its counsel and the other notice parties no later than thirty (30) days after the Effective Date for all other Administrative Claims (the "<u>Administrative Expense Claims Bar Date</u>"). Any requests for payment of Administrative Expense Claims that are not properly filed and served by the

Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Claim against the Debtors, the Estates, the Liquidating Trusts or their respective property and from participating in distributions under the Plan on account thereof, and any such Claim shall be deemed discharged as of the Effective Date.

18.    Professional Fee Claims. All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by application filed with the Bankruptcy Court and served on the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable, and its counsel, the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable, and its counsel, and such other Entities who are designated by the Bankruptcy Rules no later than sixty (60) days after the Effective Date. Any requests for payment of a Professional Fee Claim that is not properly filed and served by the Professional Fee Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Claim against the Debtors, the Estates, the Liquidating Trusts or their respective property and from participating in distributions under the Plan on account thereof, and any such Claim shall be deemed discharged as of the Effective Date

19.    General Authorizations. Pursuant to the Plan, the Chapter 11 Trustee, the PCI Liquidating Trustee, the BMO Litigation Trustee or the Liquidating Trust Committees, as the case may be, shall be authorized to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Except as otherwise provided in the Plan or the Liquidating

Trust Agreements, the LT Trustee, and the members of the Liquidating Trust
Committees, and their agents and attorneys are authorized and empowered to issue,
execute, deliver, file or record any agreement, document, or security, and to take any
action necessary or appropriate to implement, effectuate and consummate the Plan in
accordance with its terms, or take any or all corporate actions authorized to be taken
pursuant to the Plan, and any release, amendment, or restatement of any bylaws,
certificates of incorporation or other organization documents of the Debtors, whether or
not specifically referred to in the Plan, without further order of the Court, and any or all
such documents shall be accepted by each of the respective state filing offices and
recorded in accordance with applicable state law and shall become effective in
accordance with their terms and the provisions of state law.

20. <u>Corporate Action</u>. Prior to, on, or after the Effective Date (as appropriate),
all matters that would otherwise require approval of the stockholders, members,
directors or managers of one or more of the Debtors shall be deemed to have occurred,
or shall occur upon the action of the Chief Executive Officer of the Debtors, and shall be
in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the
applicable law of the states in which the Debtors are incorporated or formed without
any requirement of further action by the stockholders, members, directors or managers,
as applicable, of the Debtors. Upon the Effective Date, the PCI Liquidating Trustee shall
be appointed as the Debtors' Chief Executive Officer and charged with administering
and monetizing the Retained Assets and transferring the applicable proceeds of the
Retained Assets to the PCI Liquidating Trust or BMO Litigation Trust pursuant to the
Plan and the Liquidating Trust Agreements.

21.    <u>Plan Documents</u>. There being no objections to any of the Plan Documents
contemplated by the Plan, and any amendments, modifications and supplements
thereto, and all documents and agreements introduced therein or contemplated by the
Plan (including all exhibits and attachments thereto and documents referred to therein),
the execution, delivery and performance thereof by the Chapter 11 Trustee are
authorized and approved without need for further corporate action or further order or
authorization of the Court.

22.    <u>Term of Injunctions and Automatic Stay</u>. Pursuant to Section 12.11 of the
Plan, unless otherwise expressly provided in the Plan or the Confirmation Order, all
injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of
the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall
remain in full force and effect until the Bankruptcy Cases are closed; <u>provided</u>;
<u>however</u>, that, if any Avoidance Actions pursued by the PCI Liquidating Trustee are
dismissed pursuant to a Final Order or withdrawn, all injunctions or stays arising under
or entered during the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy
Code, or otherwise, including under this Plan, shall be deemed to have been lifted with
respect thereto and such claims may be pursued by Promissory Note Lenders directly
without further order of the Bankruptcy Court.

23.    <u>Injunction</u>. Except as otherwise specifically provided in the Plan or the
Confirmation Order, all Entities who have held, hold, or may hold Claims, rights or
Causes of Action against or Equity Securities in the Debtors, other than governmental
entities and agencies exercising their police or regulatory powers, are precluded and
permanently enjoined from taking any of the following actions against the Covered

35

Parties, the Estates, the Retained Assets, the Liquidating Trusts, or any Trust Assets on

account of any such Claims or Equity Securities, whether or not such Person is the

Holder of a Claim that is Impaired or Allowed and whether or not such Person has

affirmatively voted to accept the Plan: (a) commencing or continuing, in any manner or

in any place, any claim, action or other proceeding of any kind (whether directly,

indirectly, derivatively or otherwise); (b) enforcing, attaching, collecting, or recovering

by any manner or means any judgment, award, decree, or order; (c) creating, perfecting,

or enforcing any Lien or encumbrance of any kind; (d) the assertion of any Claims

released in or by the Plan; and (e) commencing or continuing in any manner or in any

place, any action that does not comply with or is inconsistent with the provisions of the

Plan; provided, however, that (x) nothing contained herein shall preclude such Persons

from exercising their rights pursuant to and consistent with the terms of the Plan, and

(y) any rights of setoff or recoupment, to the extent valid, are preserved, and (z) except

as otherwise provided in the Plan, no Holder of any Claim or Equity Security shall be

deemed to have released the Debtors in any way for accepting the terms of the Plan or

accepting distributions pursuant to the Plan.

24.    _Disallowance of Certain Claims_.  John Stoebner, as the Chapter 7 Trustee

of PBE Corporation f/k/a Polaroid Corporation (the "_PBE Trustee_"), filed a motion

seeking to allow a timely proof of claim in the PCI Bankruptcy Case (the "_PBE Claim_

_Motion_") [Docket No. 2664]. A hearing on the PBE Claim Motion is rescheduled for

April 26, 2016. On March 30, 2016, the PBE Trustee filed Claim No. 117 in the PCI

Bankruptcy Case in the amount of $31,093,806.74 ("_PBE Claim 117_"). Unless otherwise

agreed between the PBE Trustee and the LT Trustee, section 9.2 of the Plan deeming

36

Claims filed after the applicable Bar Date to be deemed disallowed on the Effective Date will not apply to PBE Claim 117.  Until entry of a Final Order regarding the PBE Claim Motion determining whether PBE Claim 117 is or is not deemed timely filed, PBE Claim 117 will be treated as a Disputed Claim under the Plan.

25.     <u>Settlements, Compromises and Releases</u>. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019(a), the Court approves the following settlements pursuant to the Plan as in the best interests of Creditors and the Estates, fair, equitable, and reasonable, and made in good faith:

a)     <u>The Lancelot Settlement</u>. The Lancelot Settlement is authorized and approved, and the terms thereof are binding on the Chapter 11 Trustee, the Lancelot Trustee, the Liquidating Trusts and the LT Trustee. In accordance with the terms of the Lancelot Settlement, Lancelot (i) will pay the amount of $10,495,000 as the Lancelot Payment in resolution of the Lancelot Avoidance Action, which amount will be paid, at such Creditor's option, either by (x) Cash payment from such Creditor to the Estates on the Effective Date or (y) withholding of such amount from the first distributions to be made from the PCI Liquidating Trust and (ii) Lancelot will have an Allowed Class 3 General Unsecured Claim in the amount of $764,620,000.00 plus the amount of the Lancelot Payment.

b)     <u>The Palm Beach Settlement</u>. The Palm Beach Settlement is authorized and approved, and the terms thereof are binding on the Chapter 11 Trustee, the Palm Beach Trustee, the Liquidating Trusts and the LT Trustee. In accordance with the terms of the Palm Beach Settlement, the Palm Beach Trustee

(i) will pay the amount of $8,100 as the PBF Payment and $5,095,000 as the PBF II

Payment in resolution of the Palm Beach Avoidance Action, which payments will

be made, at such Creditor's option, either by (x) Cash payment from such

Creditor to the Estates on the Effective Date or (y) withholding of such amount

from the first distributions to be made from the PCI Liquidating Trust, and (ii)

the PBF Claim will be Allowed as a Class 3 General Unsecured Claim in the

amount of $85,987,311.00 plus the amount of the PBF Payment and PBF II , will

have an Allowed Class 3 General Unsecured Claim in the amount of

$565,755,364.00 plus the amount of the PBF II Payment.

c)      The Interlachen Settlement. The Interlachen Settlement is

authorized and approved, and the terms thereof are binding on the Chapter 11

Trustee, Interlachen, the Liquidating Trusts and the LT Trustee. In accordance

with the terms of the Interlachen Settlement, the Interlachen Claim shall be

Allowed as a Class 3 Claim in the amount of $60,000,000 and shall be entitled to

treatment identical to other Allowed Class 3 General Unsecured Claims

d)      The Ark Discovery Claim Settlement. The Ark Discovery Claim

Settlement is authorized and approved, and the terms thereof are binding on the

Chapter 11 Trustee, the Ark Discovery Trustee, the Liquidating Trusts and the

LT Trustee. In accordance with the terms of the Ark Discovery Claim Settlement,

the Ark Discovery Claim will be Allowed as a Class 3 General Unsecured Claim

in the aggregate amount of $107,207,101.00; provided, however, notwithstanding

the treatment provided for in Section 4.3 or otherwise of the Plan, the Ark

Discovery Trustee will be paid the amount of $8,400,000 as a one-time fixed

distribution on the Initial Distribution Date pursuant to the Plan in full satisfaction of the Allowed Ark Discovery Claim and thereafter, no further distributions shall be made on account of the Ark Discovery Claim.

e)      The Petters Capital Settlement. The Petters Capital Settlement is authorized and approved, and the terms thereof are binding on the Chapter 11 Trustee, the Petters Capital Trustee, the Liquidating Trusts and the LT Trustee. In accordance with the terms of the Petters Capital Settlement, (i) Claim No. 2 of PCI in the Petters Capital Chapter 7 Case filed as a General Unsecured Claim in the amount of $107,850,221 will be Allowed as a General Unsecured Claim in the Petters Capital Chapter 7 Case in the reduced amount of $106,807,721, which is the net amount after setoff of Claim No. 50 filed by the Petters Capital Chapter 7 Trustee in the PCI Bankruptcy Case in the amount of $1,042,500, (ii) the following Claims Filed by the Petters Capital Trustee, Claim No. 47 in the PGW Bankruptcy Case in the amount of $259,534,414, Claim No. 50 Filed in the PCI Bankruptcy Case in the amount of $1,042,500 and Claim No. 17 Filed in the Thousand Lakes Bankruptcy Case in the amount of $1,500,000,000 shall be withdrawn by the Petters Capital Chapter 7 Trustee and the Claim filed by the Chapter 11 Trustee as Claim No. 3 Filed of PGW in the Petters Capital Chapter 7 Case in the amount of $3,019,058 will be withdrawn by the Chapter 11 Trustee.

26.     Notice to PBE Trustee. Consistent with Bankruptcy Rule 9019, the PCI Liquidating Trustee shall give not less than 21 days' notice to the PBE Trustee with respect to any proposed compromise or settlement of any of the following: (i) *Douglas A. Kelley, Trustee v. Opportunity Finance, LLC, et al.*, Adv. P. No. 10-04301, (ii) *Douglas A.*

*Kelley, Trustee v. Opportunity Finance, LLC*, Adv. P. No. 10-04375, (iii) *Ritchie Capital Management, LLC, et al., v. Opportunity Finance, LLC, et al.*, Case No. 27-CV-13-17424 (Minn. D. Ct., Henn. Co.), and (iv) *Douglas A. Kelley, Trustee v. JPMorgan Chase & Co., et al.*, Adversary Proceeding No. 10-04446.

27.     <u>Releases, Exculpation and Limitation of Liability</u>. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019(a), the releases, exculpations and injunctions set forth in the Plan, including, but not limited to, the releases set forth in section 12.14 of the Plan and the exculpation and limitation of liability provisions set forth in section 12.13 of the Plan and implemented by this Confirmation Order, are incorporated in this Confirmation Order as if set forth in full herein, are approved as fair, equitable, reasonable and in the best interests of the Debtors and their Estates, Creditors and interest holders, are approved in their entirety, and the terms of such provisions shall have the same full force and effect an power of enforcement as an order of this Court.

28.     <u>Effects of Confirmation; Immediate Effectiveness; Binding Effect</u>. Upon satisfaction of all conditions precedent including but not limited to those set forth in Article X of the Plan, the Plan Proponents are hereby authorized but not directed to make the Plan effective and to consummate the Plan at any time following entry of this Confirmation Order. On the Effective Date, the provisions of the Plan and this Confirmation Order shall be binding against the Debtors, the Estates, the Chapter 11 Trustee, the Liquidating Trusts, the LT Trustee, any and all holders of Claims against or Interests in the Debtors, including all governmental entities or recording offices (irrespective of whether such Claims or Interests are impaired under the Plan or

whether the holders of such Claims or Interests accepted, rejected or are deemed to

have accepted or rejected the Plan), any and all non-debtor parties to executory

contracts or unexpired leases with the Debtors, and any and all entities that are parties

to or are subject to the settlements, compromises, releases, discharges and injunctions

described in the Plan, and any parties in interest. Accordingly, as permitted by

Bankruptcy Rule 3020(e), the stay for a fourteen (14) day period provided by such rule

is hereby abrogated in its entirety. Upon the occurrence of the actions to be taken on the

Effective Date, the Plan shall be deemed to be substantially consummated under section

1101 of the Bankruptcy Code.

29.     <u>Non-Occurrence of Effective Date</u>. If the Effective Date has not occurred

within the time provided in Section 10.5 of the Plan, upon written notification

submitted by a majority of the Plan Proponents, the Plan Proponents may seek an order

from the Court directing that this Confirmation Order be vacated and that the Plan be

declared null and void in all respects.

30.     <u>Securities Laws Exemption.</u> The beneficial interests in the Liquidating

Trusts (i.e. the rights of holders of Allowed Claims to receive distributions under the

Plan) are exempt from the provisions of section 5 of the Securities Act of 1933, as

amended, and any state or local law requiring registration for the offer, issuance,

distribution or sale of a security by reason of section 1145(a) of the Bankruptcy Code.

The beneficial interests in the Liquidating Trusts shall not be certificated.

31.     <u>Exemption from Certain Taxes</u>. Pursuant to section 1146(a) of the

Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities

under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other

security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer, or in connection with, the Plan, any merger agreements; agreements of consolidation, restructuring, disposition, liquidation or dissolution; deeds; bills of sale; and transfers of tangible property, shall not be subject to any stamp tax, recording tax, transfer tax, or other similar tax exempted under section 1146(a) of the Bankruptcy Code.

32.     <u>Dissolution of the Creditors' Committee</u>. On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with these Chapter 11 Cases and the Plan and its implementation except for the limited purposes of filing any remaining fee applications. The retention or employment of the Creditors' Committee's attorneys, accountants and other agents shall terminate. except for the limited purposes of filing any remaining fee applications.

33.     <u>Notice of Entry of Confirmation Order</u>. The Plan Proponents or their authorized agent shall serve notice of (a) entry of this Confirmation Order, (b) the last date to file Administrative Claims, and (c) the last date to file Professional Fee Claims substantially in the form annexed hereto as <u>Exhibit 1</u>, which form is hereby approved, as required by Bankruptcy Rule 3020.

34.     <u>Retention of Jurisdiction</u>. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court, except as otherwise provided in the Plan or herein, shall retain exclusive jurisdiction over all matters arising out of or related to the

Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, but not limited to, the matters set forth in Article XI of the Plan.

35.     Inconsistency. In the event of an inconsistency between the Plan and any other agreement, instrument, or document intended to implement the provisions of the Plan, the provisions of the Plan shall govern unless otherwise expressly provided for in such agreements, instruments, or documents. In the event of any inconsistency between the Plan, any agreement, instrument or document intended to implement the Plan and this Confirmation Order, the provisions of this Confirmation Order shall govern.

36.     Enforceability. Pursuant to Bankruptcy Code sections 1123(a), 1141(a) and 1142(a) and subject to the occurrence of the Effective Date, the provisions of this Confirmation Order, the Plan, the Plan Amendment and all Plan-related documents shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

37.     Effect of the Confirmation Order and Plan on Prior Agreements and Court Orders. Except as expressly provided herein, entry of this Confirmation Order shall not supersede or rescind any prior Orders of the Bankruptcy Court approving agreements in which the Chapter 11 Trustee and the PBE Trustee are parties, including but not limited to: (a) the Coordination Agreement by and among the Chapter 11 Trustee, the Receiver, the United States and the PBE Trustee and approved by the Bankruptcy Court on September 14, 2010 [Docket No. 453], (b) the Settlement Agreement by and between the Chapter 11 Trustee and the PBE Trustee regarding recoveries on Claims against the Opportunity Finance Defendants and approved by the Bankruptcy Court on May 28, 2013 [Docket No. 1923], (c) the Joint Reimbursement and Recovery Agreement by and

43

among the Chapter 11 Trustee, the PBE Trustee and Randall Seaver, as the Chapter 7

Trustee of Petters Capital, LLC, including the amendment thereto, with each having

been approved by orders entered by the Bankruptcy Court [Docket Nos. 741 and 2421]

April 15, 2016

/e/ Gregory F. Kishel

---

**CM/ECF New Attorney Registration and Change User Information**

If you are registering for CM/ECF please check the **New Participant** box and complete by typing in all fields. A user name and password will be issued to you. If you are already registered in CM/ECF please check the **Change Account Information** box, enter your name then **enter only information you want changed in your account.**

◯ New participant     ◯ Change account information

| Last Name | | First Name | |
| --- | --- | --- | --- |

Middle Initial [            ]     Bar ID [            ]

Date of admission to practice before the U.S. District Court for the District of Minnesota [    ]

Address 1

Address 2

City

Phone

Primary email address for noticing [            ]

Secondary email address (s) for noticing [            ]

If someone in your firm is already certified you can be certified immediately. Name of certified attorney, if applicable. [            ]

Please select how you want to receive email notices. Select only one which will be the default for all filings.

◯ Send a notice for each filing.     ◯ Send a Daily Summary Report

Please select one of the following email formats. The default is Html format.

◯ Html format for Netscape or ISP email service
◯ Text format for cc:Mail, GroupWise, other email service

If you are currently registered in CM/ECF and want to change your password please enter the new password here. Your password must be 6 or more characters and/or numbers. [            ] Enter again [            ]

Click the Submit button as a PDF document and email to Woody_Parks@mnb.uscourts.gov and/or Margaret Dostal-Fell@mnb.uscourts.gov. Please refer registration or change of information questions to Woody Parks at 612-664-5200 or Margaret Dostal-Fell at 612-664-5273. We no longer accept fax copies.

---

**2006 Eighth Circuit Human Resource Council**
**2006 Annual Conference**
**Agenda**

**Thursday, May 4th**

| 8:00 a.m. | Welcome | EDMO Unit Executives |
| --- | --- | --- |
| | (Multi-Purpose Room - 22nd floor) | Conference Committee |
| 8:30 a.m. | Role of HR in the Future | Lori Murphy, FJC |
| | | Senior Education Specialist |
| | | Beth Pfister |
| | | Human Resources Specialist |
| | | Bankruptcy, Eastern Missouri |
| 10:30 a.m. | Break | |
| 10:45 a.m. | Sharpening Your HR Skills Using | Callie Crull |
| | the Judiciary On-Line University | Human Resources Specialist |
| | (JOU) | Bankruptcy, Iowa Northern |
| 11:15 a.m. | Court Compensation Study Update | Ann Fessenden, |
| | | Circuit Librarian |
| 11:45 p.m. | Group Lunch | |
| | (Restaurant - 1st Floor) | |
| 12:15 p.m. | Courthouse Tours | |
| | (En Banc Courtroom - 28th floor) | |
| 12:45 p.m. | Group Picture | |
| | (Lobby - 1st Floor) | |
| 1:15 p.m. | HRMIS Hands-on Demo | Nate Crump, AO |
| | (Group Only) | Supervisory IT Specialist |
| | (Jury Assembly Room) | |
| 1:15 p.m. | Sharing of Best Practices | Council Members |
| | In Small Groups | |
| | (Group Two) | |
| | (Multi-Purpose Room - 22nd Floor) | |

Case 00-04301   Doc 321   Filed 02/07/20   Entered 02/07/20 15:49:09   Desc Main
Document   Page 45 of 47

# EXHIBIT 1

# THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | **Jointly Administered under Case No. 08-45257** |
| PETTERS COMPANY, INC., ET AL., | |
| Debtors. | Case No. 08-45257 |
| (includes: | Court File Nos.: |
| Petters Group Worldwide, LLC; | 08-45258 (GFK) |
| PC Funding, LLC; | 08-45326 (GFK) |
| Thousand Lakes, LLC; | 08-45327 (GFK) |
| SPF Funding, LLC; | 08-45328 (GFK) |
| PL Ltd., Inc.; | 08-45329 (GFK) |
| Edge One LLC; | 08-45330 (GFK) |
| MGC Finance, Inc.; | 08-45331 (GFK) |
| PAC Funding, LLC; | 08-45371 (GFK) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (GFK) |
| | **Chapter 11 Cases** |
| | **Judge Gregory F. Kishel** |

---

### NOTICE OF (I) ENTRY OF ORDER CONFIRMING DEBTORS' SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, (II) THE EFFECTIVE DATE, (III) THE ADMINISTRATIVE CLAIMS BAR DATE, AND (IV) THE PROFESSIONAL FEE CLAIMS BAR DATE

**TO ALL CREDITORS, EQUITY HOLDERS AND OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE that on April ___, 2016 (the "Confirmation Date"), the United States Bankruptcy Court for the District of Minnesota entered its Order (the "Confirmation Order") confirming the Amended Chapter 11 Plan of Liquidation as defined in the Confirmation Order (the "Plan") in the above-captioned bankruptcy cases. [Docket No. _____].

PLEASE TAKE FURTHER NOTICE that, pursuant to, and as defined in, the Plan, the Effective Date of the Plan is April ___, 2016.

PLEASE TAKE FURTHER NOTICE that several important deadlines are established under the Plan and which deadlines are based upon the Effective Date of the Plan. These deadlines include:

Case 08-45327   Doc 3805   Filed 02/07/20   Entered 02/07/20 16:49:09   Desc Main
Document   Page 817 of 91

1.  _____, 2016, is the deadline for any Person asserting a Professional Fee Claim to file a fee application with the Court. Any Professional Fee Claim not filed on or before this deadline shall be forever barred.

2.  _____, 2016, is the deadline for any Person asserting an Administrative Claim to file a claim with the Court. Any Administrative Claim not filed on or before this deadline shall be forever barred.

3.  _____, 2016 is the deadline for asserting Claims arising as a result of the rejection of a contract or lease. Any such Claim not filed on or before this deadline shall be forever barred.

DATED:     April \_\_, 2016          **LINDQUIST & VENNUM LLP**

                                    By:

                                    _____

                                    Daryle L. Uphoff (0111831)
                                    James A. Lodoen (0173605)
                                    George H. Singer (0262043)
                                    Adam C. Ballinger (0389058)
                                    Jeffrey D. Smith (0387035)

                                    4200 IDS Center
                                    80 South Eighth Street
                                    Minneapolis, MN 55402-2274
                                    (612) 371-3211
                                    (612) 371-3207 (facsimile)

                                    duphoff@lindquist.com
                                    jlodoen@lindquist.com
                                    gsinger@lindquist.com
                                    jsmith@lindquist.com
                                    aballinger@lindquist.com

                                    **ATTORNEYS FOR
                                    DOUGLAS A. KELLEY,
                                    AS THE CHAPTER 11 TRUSTEE**

# EXHIBIT T-67

B10 (Official Form 10) (12/08)

| United States Bankruptcy Court - **DISTRICT OF MINNESOTA** | **PROOF OF CLAIM** |
|---|---|
| Name of Debtor:**PC Funding, LLC** | Case Number:**08-45326 (GFK)** |

*NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>**Lancelot Investors Fund, LP** | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>**Ronald R. Peterson, as Chapter 7 Bankruptcy Trustee**<br>**Jenner & Block LLP**<br>**330 N. Wabash Avenue**<br>**Chicago, IL 60611-7603**<br>Telephone number: **312-222-9350** | **Court Claim Number:** _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br><br>Telephone number: | ☒ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

**1. Amount of Claim as of Date Case Filed: $ $268,435,399.00**

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:  See Attachment**
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

   **3a. Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

**Value of Property:$** _____ **Annual Interest Rate** _____

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $ _____ **Basis for perfection:** _____

**Amount of Secured Claim: $** _____ **Amount Unsecured: $** _____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).

**Amount entitled to priority:**

$ _____

*\* Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**FOR COURT USE ONLY**

| Date:<br>**4/20/2009** | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*Ron Peterson*<br>**Ronald R. Peterson, not individually, but as Trustee** |
|---|---|

*Peterson*
**EXHIBIT NO. 5**
*2/11/19*
**P. CAMPBELL**

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

PETTERS COMPANY, INC., et al.,

Debtors.

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.;
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

**JOINTLY ADMINISTERED UNDER
CASE NO. 08-45257**

Court File No. 08-45257

Court Files No.'s:

08-45258 (GFK)
08-45326 (GFK)
08-45327 (GFK)
08-45328 (GFK)
08-45329 (GFK)
08-45330 (GFK)
08-45331 (GFK)
08-45371 (GFK)
08-45392 (GFK)

Chapter 11 Cases
Judge Gregory F. Kishel

## Attachment to the Lancelot / Colossus Funds Proofs of Claim

1.    These proofs of claim are executed by Ronald R. Peterson, not individually, but solely as the chapter 7 Trustee (the "Lancelot / Colossus Trustee") for Lancelot Investors Fund, LP (f/k/a Granite Investors Fund, LP), Lancelot Investors Fund II, L.P., Lancelot Investors Fund, Ltd., Colossus Capital Fund, L.P., Colossus Capital Fund, Ltd., and RWB Services LLC (the "Lancelot / Colossus Funds"). The Lancelot / Colossus Trustee is duly authorized to execute these proofs of claim on behalf of the Lancelot / Colossus Funds.

2.    On October 20, 2008, each of the Lancelot / Colossus Funds, along with 13 related entities, filed a petition for relief under chapter 7 of title 11 of the United States Code in the Bankruptcy Court for the Northern District of Illinois. The cases are being jointly

administered under the caption *In re Lancelot Investors Fund, L.P., et al.*, case no. 08-28225. Following the bankruptcy filing of the Lancelot / Colossus Funds, the United States Trustee for the Northern District of Illinois appointed Ronald R. Peterson as the Lancelot / Colossus Trustee. The facts contained in the individual proofs of claim and this Attachment are provided upon information and belief, based upon the facts as known to the Lancelot / Colossus Trustee and his counsel. The Lancelot / Colossus Trustee's investigation of the Lancelot / Colossus Funds and their relationship with the above-captioned debtors (the "Debtors") remains ongoing, and this information is subject to confirmation as further facts are ascertained.

3.    From at least 2002 through the commencement of the above-captioned bankruptcies, the Lancelot / Colossus Debtors served as commercial lenders to certain of the Debtors as detailed below. The basic framework for these loans is set forth in the Master Loan Agreement among Thousand Lakes LLC, Lancelot Investors Fund, LP as Initial Lender, and RWB Services, LLC ("RWB") as Administrative Agent, dated as of October 11, 2002 (the "Master Loan Agreement").

4.    Pursuant to the Master Loan Agreement, the lenders under the agreement would loan funds to Thousand Lakes to purchase certain durable goods that were to be sold to certain agreed upon retailers on credit, thereby generating a receivable payable by such retailer to the order of Thousand Lakes. In exchange for loans under the Master Loan Agreement, Thousand Lakes would issue promissory notes to RWB ("Thousand Lake Notes"). The Master Loan Agreement required Thousand Lakes to direct customers purchasing inventory from it to make payment on such purchases by wiring funds to an account in which RWB had a security interest and over which RWB had control. RWB would then be authorized to transfer such funds to lenders under the Master Loan Agreement in payment of the Thousand Lake Notes.

2

5. RWB, in its capacity as Administrative Agent under the Master Loan Agreement, has been granted a security interest in all of Thousand Lakes' assets as security for all loans made pursuant to the Master Loan Agreement to Thousand Lakes.

6. Repayment of all principal, accrued interest, attorney's fees, collection costs and enforcement expenses on all loans and notes made under the Master Loan Agreement were absolutely and unconditionally guaranteed by Petters Company, Inc. (the "Guaranty") and by Thomas J. Petters under separate Guaranties date October 11, 2002.

7. Pursuant to a Security Agreement by Thousand Lakes and in favor of RWB, dated October 11, 2002 (the "Security Agreement"), payment of all present and future debts, liabilities and obligations of every type and description owed by Thousand Lakes to RWB and any lender under the Master Loan Agreement were secured by a grant of a security interest in all of Thousand Lakes' present and after acquired: Accounts; Chattel Paper; Commercial Tort Claims; Controlled Property; Deposit Accounts; Documents; Equipment and Fixtures; General Intangibles; Instruments; Inventory; Investment Property; Letter of Credit Rights; Proceeds (whether cash or non-cash Proceeds, including Insurance Proceeds and non-cash Proceeds of all types); Products of all the foregoing; and Supporting Obligations (as those terms are defined in the Security Agreement). On October 16, 2002, a financing statement was filed with the Delaware Department of State, perfecting RWB's security interest in Thousand Lakes' assets (the "Financing Statement"). On August 30, 2007, an amendment and continuation statement was filed with the Delaware Department of State, continuing the perfection of RWB's security interest.

3

8.    In accordance with the Master Loan Agreement, in many instances the right to repayment on various loans and notes made under the Master Loan Agreement has been assigned between the Lancelot / Colossus Funds pursuant to written agreements.

9.    The loan documents supporting the Lancelot / Colossus Funds' claims are voluminous, are available upon request and are incorporated herein by this reference and made a part hereof. For each note issued under the Master Loan Agreement, the Lancelot / Colossus Trustee has documents, which may include, but are not limited to, promissory notes, amendments of promissory notes, and assignments by and among the Lancelot / Colossus Funds. Furthermore, the Lancelot / Colossus Trustee has attached the Master Loan Agreement, the Security Agreement, the Financing Statement, and the Guaranty to the proof of claim filed on behalf of RWB Services LLC – the administrative agent for the Lancelot / Colossus Funds -- against Thousand Lakes, LLC. Those documents are incorporated into this proof of claim by reference.

10.    Schedule A attached to the RWB Services LLC proof of claim against Thousand Lakes, LLC ("Schedule A") details the Thousand Lakes Notes issued under the Master Loan Agreement.

4

11.   Schedule B attached to the RWB Services LLC proof of claim against Thousand
Lakes, LLC ("Schedule B") details those Thousand Lakes Notes with known outstanding
balances, and the current Lenders entitled to repayment on such notes. As set forth in Schedule
B, the total amounts of principal and interest owed by Thousand Lakes to the Lancelot / Colossus
Funds for loans and notes made under the Master Loan Agreement are as follows:

|  | Principal | Interest | Total |
|---|---|---|---|
| Lancelot Investors Fund, LP | $258,450,000.00 | $7,874,300.00 | $266,324,300.00 |
| Lancelot Investors Fund II, L.P | $246,082,691.99 | $21,398,846.29 | $267,481,538.28 |
| Lancelot Investors Fund, Ltd. | $917,126,781.30 | $72,811,460.17 | $989,938,241.47 |
| Colossus Capital Fund, LP | $2,850,000.00 | $410,326.00 | $3,260,326.00 |
| Colossus Capital Fund, Ltd. | $28,694,482.43 | $4,286,288.63 | $32,980,771.06 |
| Grand Total: |  |  | $1,559,985,176.81 |

12.   Petters Company, Inc. is indebted to the Lancelot / Colossus Funds under its
October 11, 2002 Guaranty in the same amounts.

13.   To the extent over secured, the Lancelot / Colossus Funds' claim shall continue to
accrue fees and interest post-petition and the Lancelot / Colossus Trustee reserves the right to
make a claim for all such fees and interest until the Lancelot / Colossus Trustee's claim is paid in
full.  To the extent under secured, the Lancelot / Colossus Trustee hereby asserts unsecured
claims under § 506(a)(1) of the Bankruptcy Code for any unsecured portion of the amounts
claimed herein.

14.   In addition, non-Debtor affiliate of the Debtors, Petters Capital, LLC, is indebted
to the Lancelot / Colossus Funds as follows:

- Lancelot Investors Fund, LP is owed $2,111,099[1] pursuant to a Promissory Note
  dated October 22, 2007 between RWB Services LLC and Petters Capital, LLC.

---

[1] $2,000,000 of principal and $111,099 of interest.

5

- Lancelot Investors Fund, Ltd. is owed $2,111,100[2] pursuant to a Promissory Note dated October 22, 2007 between RWB Services LLC and Petters Capital, LLC.

- Lancelot Investors Fund II, LP is owed $2,109,766[3] pursuant to a Promissory Noted dated October 29, 2007 between RWB Services LLC and Petters Capital, LLC.

- Lancelot Investors Fund, Ltd. is owed $4,212,865[4] pursuant to a Promissory Note dated October 29, 2007 between RWB Services LLC and Petters Capital, LLC.

15.    Each Lancelot / Colossus Fund also asserts, on information and belief, a claim based on civil conspiracy against each of the Debtors herein for the full amount of all outstanding loans owed by any entity formerly controlled by Thomas J. Petters ("Petters") to the Lancelot / Colossus Funds. On October 3, 2008, Petters was arrested and charged in a criminal complaint with mail and wire fraud, money laundering and obstruction of justice.    On information and belief, the much of the inventory that served as the collateral for the loans made by the Lancelot / Colossus Funds to certain of the Debtors never existed, and much of the receivables that served as collateral for those loans was never generated or owed by any account debtor.    On information and belief, Petters and several entities controlled by Petters, including each of the Debtors herein, planned and carried out a scheme to defraud, among others, the Lancelot / Colossus Funds by inducing them to provide certain of the Debtors with commercial loans, including those referenced in Schedules A and B, and those referenced in paragraph 14 hereof, based on an extensive and long running pattern of knowingly false and fraudulent statements.    Already, Petters Company, Inc., Petters Group Worldwide, Thomas J. Petters, and

---

[2] $2,000,000 of principal and $111,100 of interest.
[3] $2,000,000 of principal and $109,766 of interest.
[4] $4,000,000 of principal and $212,865 of interest.

6

certain individuals involved with the Petters entities have been indicted or are the subject of a criminal information in the United States District Court of Minnesota.    Additionally, the Lancelot / Colossus Trustee asserts that the Debtors may be jointly liable under an alter ego theory, or that the Debtors estates should be substantively consolidated.

16.    In total, by these proofs of claim, the Lancelot / Colossus Funds assert the following amounts against each of the Debtors under a theory of civil conspiracy, as well as the contracts and agreements referenced herein:

|  | Principal | Interest | Total |
|---|---|---|---|
| Lancelot Investors Fund, LP | $260,450,000.00 | $7,985,399.00 | $268,435,399.00 |
| Lancelot Investors Fund II, L.P | $248,082,691.99 | $21,508,612.29 | $269,591,304.28 |
| Lancelot Investors Fund, Ltd. | $923,126,781.30 | $73,135,425.17 | $996,262,206.47 |
| Colossus Capital Fund, LP | $2,850,000.00 | $410,326.00 | $3,260,326.00 |
| Colossus Capital Fund, Ltd. | $28,694,482.43 | $4,286,288.63 | $32,980,771.06 |
| Grand Total: |  |  | $1,570,530,006.81 |

17.    Out of an abundance of caution, the Lancelot / Colossus Trustee is filing separate proofs of claim against each of the Debtors herein, and separate proofs of claim on behalf of each of the Lancelot / Colossus Funds.  Such filings are of necessity duplicative, but the Lancelot / Colossus Trustee does not intend, by the resulting duplication, to purport to assert multiples of the aggregate claims referenced in paragraph 16 hereof.

18.    The filing of these proofs of claim is not intended and should not be construed as (a) a statement of all claims or facts supporting the claims of the Lancelot / Colossus Funds, (b) an election of remedies, (c) a waiver of any past, present, or future default or events of default, or (d) a wavier or limitation of any right, claims or causes of action of the Lancelot / Colossus Funds.

19.    The Lancelot / Colossus Funds, and the Lancelot / Colossus Trustee, do not waive, and expressly reserve, all rights, claims and remedies at law or in equity that the Lancelot

7

/ Colossus Funds, or the Lancelot / Colossus Trustee, whether individually or collectively, have or may have against the Debtors and/or any of the Debtors' affiliates and subsidiaries, or any other person or entity.

20.    These proofs of claim are not subject to any set-off or counterclaim.    The Lancelot / Colossus Funds and the Lancelot / Colossus Trustee reserve all rights to set-off and recoupment which they may have.

21.    The Lancelot / Colossus Funds also reserve the right to amend or supplement these claims in any respect, in any manner and for any purpose.    Furthermore, the Lancelot / Colossus Funds reserve the right to amend or supplement these claims after the last date set for filing claims in this proceeding and/or contest the valuation of the Debtors' collateral securing these claims.

22.    In submitting these claims, the Lancelot / Colossus Funds do not submit to the jurisdiction of this Court for any purpose other than with respect to their claims.

8

# EXHIBIT T-67A

B10 (Official Form 10) (12/08)

| United States Bankruptcy Court - **DISTRICT OF MINNESOTA** | **PROOF OF CLAIM** |
|---|---|

| Name of Debtor:**PC Funding, LLC** | Case Number: **08-45326 (GFK)** |
|---|---|

*NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (The person or other entity to whom the debtor owes money or property):
**Lancelot Investors Fund II, L.P**

☐ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:

**Ronald R. Peterson, as Chapter 7 Bankruptcy Trustee
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611-7603**
Telephone number: **312-222-9350**

**Court Claim Number:** _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):

☒ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:

**1. Amount of Claim as of Date Case Filed: $ $269,591,304.28**

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** **See Attachment**
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

**Value of Property:$** _____ **Annual Interest Rate** _____

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $ _____ **Basis for perfection:** _____

**Amount of Secured Claim: $** _____ **Amount Unsecured: $** _____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)( _____ ).

**Amount entitled to priority:**

$ _____

*\* Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**FOR COURT USE ONLY**

| Date:
**4/20/2009** | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

**Ronald R. Peterson, not individually, but as Trustee** |

Peterson

EXHIBIT NO. 10

2/7/19
**P. CAMPBELL**

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

PETTERS COMPANY, INC., et al.,

Debtors.

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.;
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

**JOINTLY ADMINISTERED UNDER
CASE NO. 08-45257**

Court File No. 08-45257

Court Files No.'s:

08-45258 (GFK)
08-45326 (GFK)
08-45327 (GFK)
08-45328 (GFK)
08-45329 (GFK)
08-45330 (GFK)
08-45331 (GFK)
08-45371 (GFK)
08-45392 (GFK)

Chapter 11 Cases
Judge Gregory F. Kishel

---

### Attachment to the Lancelot / Colossus Funds Proofs of Claim

---

1.      These proofs of claim are executed by Ronald R. Peterson, not individually, but

solely as the chapter 7 Trustee (the "Lancelot / Colossus Trustee") for Lancelot Investors Fund,

LP (f/k/a Granite Investors Fund, LP), Lancelot Investors Fund II, L.P., Lancelot Investors Fund,

Ltd., Colossus Capital Fund, L.P., Colossus Capital Fund, Ltd., and RWB Services LLC (the

"Lancelot / Colossus Funds"). The Lancelot / Colossus Trustee is duly authorized to execute

these proofs of claim on behalf of the Lancelot / Colossus Funds.

2.      On October 20, 2008, each of the Lancelot / Colossus Funds, along with 13

related entities, filed a petition for relief under chapter 7 of title 11 of the United States Code in

the Bankruptcy Court for the Northern District of Illinois. The cases are being jointly

administered under the caption *In re Lancelot Investors Fund, L.P., et al.*, case no. 08-28225. Following the bankruptcy filing of the Lancelot / Colossus Funds, the United States Trustee for the Northern District of Illinois appointed Ronald R. Peterson as the Lancelot / Colossus Trustee. The facts contained in the individual proofs of claim and this Attachment are provided upon information and belief, based upon the facts as known to the Lancelot / Colossus Trustee and his counsel. The Lancelot / Colossus Trustee's investigation of the Lancelot / Colossus Funds and their relationship with the above-captioned debtors (the "Debtors") remains ongoing, and this information is subject to confirmation as further facts are ascertained.

3.      From at least 2002 through the commencement of the above-captioned bankruptcies, the Lancelot / Colossus Debtors served as commercial lenders to certain of the Debtors as detailed below. The basic framework for these loans is set forth in the Master Loan Agreement among Thousand Lakes LLC, Lancelot Investors Fund, LP as Initial Lender, and RWB Services, LLC ("RWB") as Administrative Agent, dated as of October 11, 2002 (the "Master Loan Agreement").

4.      Pursuant to the Master Loan Agreement, the lenders under the agreement would loan funds to Thousand Lakes to purchase certain durable goods that were to be sold to certain agreed upon retailers on credit, thereby generating a receivable payable by such retailer to the order of Thousand Lakes. In exchange for loans under the Master Loan Agreement, Thousand Lakes would issue promissory notes to RWB ("Thousand Lake Notes"). The Master Loan Agreement required Thousand Lakes to direct customers purchasing inventory from it to make payment on such purchases by wiring funds to an account in which RWB had a security interest and over which RWB had control. RWB would then be authorized to transfer such funds to lenders under the Master Loan Agreement in payment of the Thousand Lake Notes.

2

5.     RWB, in its capacity as Administrative Agent under the Master Loan Agreement, has been granted a security interest in all of Thousand Lakes' assets as security for all loans made pursuant to the Master Loan Agreement to Thousand Lakes.

6.     Repayment of all principal, accrued interest, attorney's fees, collection costs and enforcement expenses on all loans and notes made under the Master Loan Agreement were absolutely and unconditionally guaranteed by Petters Company, Inc. (the "Guaranty") and by Thomas J. Petters under separate Guaranties date October 11, 2002.

7.     Pursuant to a Security Agreement by Thousand Lakes and in favor of RWB, dated October 11, 2002 (the "Security Agreement"), payment of all present and future debts, liabilities and obligations of every type and description owed by Thousand Lakes to RWB and any lender under the Master Loan Agreement were secured by a grant of a security interest in all of Thousand Lakes' present and after acquired: Accounts; Chattel Paper; Commercial Tort Claims; Controlled Property; Deposit Accounts; Documents; Equipment and Fixtures; General Intangibles; Instruments; Inventory; Investment Property; Letter of Credit Rights; Proceeds (whether cash or non-cash Proceeds, including Insurance Proceeds and non-cash Proceeds of all types); Products of all the foregoing; and Supporting Obligations (as those terms are defined in the Security Agreement). On October 16, 2002, a financing statement was filed with the Delaware Department of State, perfecting RWB's security interest in Thousand Lakes' assets (the "Financing Statement"). On August 30, 2007, an amendment and continuation statement was filed with the Delaware Department of State, continuing the perfection of RWB's security interest.

3

8.    In accordance with the Master Loan Agreement, in many instances the right to repayment on various loans and notes made under the Master Loan Agreement has been assigned between the Lancelot / Colossus Funds pursuant to written agreements.

9.    The loan documents supporting the Lancelot / Colossus Funds' claims are voluminous, are available upon request and are incorporated herein by this reference and made a part hereof. For each note issued under the Master Loan Agreement, the Lancelot / Colossus Trustee has documents, which may include, but are not limited to, promissory notes, amendments of promissory notes, and assignments by and among the Lancelot / Colossus Funds. Furthermore, the Lancelot / Colossus Trustee has attached the Master Loan Agreement, the Security Agreement, the Financing Statement, and the Guaranty to the proof of claim filed on behalf of RWB Services LLC – the administrative agent for the Lancelot / Colossus Funds -- against Thousand Lakes, LLC. Those documents are incorporated into this proof of claim by reference.

10.    Schedule A attached to the RWB Services LLC proof of claim against Thousand Lakes, LLC ("Schedule A") details the Thousand Lakes Notes issued under the Master Loan Agreement.

4

11.     Schedule B attached to the RWB Services LLC proof of claim against Thousand Lakes, LLC ("Schedule B") details those Thousand Lakes Notes with known outstanding balances, and the current Lenders entitled to repayment on such notes. As set forth in Schedule B, the total amounts of principal and interest owed by Thousand Lakes to the Lancelot / Colossus Funds for loans and notes made under the Master Loan Agreement are as follows:

|                                  | Principal         | Interest        | Total              |
|----------------------------------|-------------------|-----------------|--------------------|
| Lancelot Investors Fund, LP      | $258,450,000.00   | $7,874,300.00   | $266,324,300.00    |
| Lancelot Investors Fund II, L.P  | $246,082,691.99   | $21,398,846.29  | $267,481,538.28    |
| Lancelot Investors Fund, Ltd.    | $917,126,781.30   | $72,811,460.17  | $989,938,241.47    |
| Colossus Capital Fund, LP        | $2,850,000.00     | $410,326.00     | $3,260,326.00      |
| Colossus Capital Fund, Ltd.      | $28,694,482.43    | $4,286,288.63   | $32,980,771.06     |
| Grand Total:                     |                   |                 | $1,559,985,176.81  |

12.     Petters Company, Inc. is indebted to the Lancelot / Colossus Funds under its October 11, 2002 Guaranty in the same amounts.

13.     To the extent over secured, the Lancelot / Colossus Funds' claim shall continue to accrue fees and interest post-petition and the Lancelot / Colossus Trustee reserves the right to make a claim for all such fees and interest until the Lancelot / Colossus Trustee's claim is paid in full. To the extent under secured, the Lancelot / Colossus Trustee hereby asserts unsecured claims under § 506(a)(1) of the Bankruptcy Code for any unsecured portion of the amounts claimed herein.

14.     In addition, non-Debtor affiliate of the Debtors, Petters Capital, LLC, is indebted to the Lancelot / Colossus Funds as follows:

*    Lancelot Investors Fund, LP is owed $2,111,099[1] pursuant to a Promissory Note dated October 22, 2007 between RWB Services LLC and Petters Capital, LLC.

---

[1] $2,000,000 of principal and $111,099 of interest.

5

- Lancelot Investors Fund, Ltd. is owed $2,111,100[2] pursuant to a Promissory Note dated October 22, 2007 between RWB Services LLC and Petters Capital, LLC.

- Lancelot Investors Fund II, LP is owed $2,109,766[3] pursuant to a Promissory Noted dated October 29, 2007 between RWB Services LLC and Petters Capital, LLC.

- Lancelot Investors Fund, Ltd. is owed $4,212,865[4] pursuant to a Promissory Note dated October 29, 2007 between RWB Services LLC and Petters Capital, LLC.

15.     Each Lancelot / Colossus Fund also asserts, on information and belief, a claim based on civil conspiracy against each of the Debtors herein for the full amount of all outstanding loans owed by any entity formerly controlled by Thomas J. Petters ("Petters") to the Lancelot / Colossus Funds. On October 3, 2008, Petters was arrested and charged in a criminal complaint with mail and wire fraud, money laundering and obstruction of justice.     On information and belief, the much of the inventory that served as the collateral for the loans made by the Lancelot / Colossus Funds to certain of the Debtors never existed, and much of the receivables that served as collateral for those loans was never generated or owed by any account debtor. On information and belief, Petters and several entities controlled by Petters, including each of the Debtors herein, planned and carried out a scheme to defraud, among others, the Lancelot / Colossus Funds by inducing them to provide certain of the Debtors with commercial loans, including those referenced in Schedules A and B, and those referenced in paragraph 14 hereof, based on an extensive and long running pattern of knowingly false and fraudulent statements. Already, Petters Company, Inc., Petters Group Worldwide, Thomas J. Petters, and

---

[2] $2,000,000 of principal and $111,100 of interest.
[3] $2,000,000 of principal and $109,766 of interest.
[4] $4,000,000 of principal and $212,865 of interest.

certain individuals involved with the Petters entities have been indicted or are the subject of a criminal information in the United States District Court of Minnesota. Additionally, the Lancelot / Colossus Trustee asserts that the Debtors may be jointly liable under an alter ego theory, or that the Debtors estates should be substantively consolidated.

16.    In total, by these proofs of claim, the Lancelot / Colossus Funds assert the following amounts against each of the Debtors under a theory of civil conspiracy, as well as the contracts and agreements referenced herein:

|  | Principal | Interest | Total |
| --- | --- | --- | --- |
| Lancelot Investors Fund, LP | $260,450,000.00 | $7,985,399.00 | $268,435,399.00 |
| Lancelot Investors Fund II, L.P | $248,082,691.99 | $21,508,612.29 | $269,591,304.28 |
| Lancelot Investors Fund, Ltd. | $923,126,781.30 | $73,135,425.17 | $996,262,206.47 |
| Colossus Capital Fund, LP | $2,850,000.00 | $410,326.00 | $3,260,326.00 |
| Colossus Capital Fund, Ltd. | $28,694,482.43 | $4,286,288.63 | $32,980,771.06 |
| Grand Total: |  |  | $1,570,530,006.81 |

17.    Out of an abundance of caution, the Lancelot / Colossus Trustee is filing separate proofs of claim against each of the Debtors herein, and separate proofs of claim on behalf of each of the Lancelot / Colossus Funds. Such filings are of necessity duplicative, but the Lancelot / Colossus Trustee does not intend, by the resulting duplication, to purport to assert multiples of the aggregate claims referenced in paragraph 16 hereof.

18.    The filing of these proofs of claim is not intended and should not be construed as (a) a statement of all claims or facts supporting the claims of the Lancelot / Colossus Funds, (b) an election of remedies, (c) a waiver of any past, present, or future default or events of default, or (d) a wavier or limitation of any right, claims or causes of action of the Lancelot / Colossus Funds.

19.    The Lancelot / Colossus Funds, and the Lancelot / Colossus Trustee, do not waive, and expressly reserve, all rights, claims and remedies at law or in equity that the Lancelot

7

/ Colossus Funds, or the Lancelot / Colossus Trustee, whether individually or collectively, have or may have against the Debtors and/or any of the Debtors' affiliates and subsidiaries, or any other person or entity.

20. These proofs of claim are not subject to any set-off or counterclaim. The Lancelot / Colossus Funds and the Lancelot / Colossus Trustee reserve all rights to set-off and recoupment which they may have.

21. The Lancelot / Colossus Funds also reserve the right to amend or supplement these claims in any respect, in any manner and for any purpose. Furthermore, the Lancelot / Colossus Funds reserve the right to amend or supplement these claims after the last date set for filing claims in this proceeding and/or contest the valuation of the Debtors' collateral securing these claims.

22. In submitting these claims, the Lancelot / Colossus Funds do not submit to the jurisdiction of this Court for any purpose other than with respect to their claims.

8

# EXHIBIT T-67B

B10 (Official Form 10) (12/08)

| United States Bankruptcy Court - **DISTRICT OF MINNESOTA** | PROOF OF CLAIM |
|---|---|
| Name of Debtor:**PC Funding, LLC** | Case Number: **08-45326 (GFK)** |

*NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>**Lancelot Investors Fund, Ltd.** | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>**Ronald R. Peterson, as Chapter 7 Bankruptcy Trustee**<br>**Jenner & Block LLP**<br>**330 N. Wabash Avenue**<br>**Chicago, IL 60611-7603**<br>Telephone number:  **312-222-9350** | **Court Claim Number:** _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br><br><br>Telephone number: | ☑ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:** $  **$996,262,206.47**<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:  See Attachment** _____<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B) |
| **3. Last four digits of any number by which creditor identifies debtor:** _____<br><br>**3a. Debtor may have scheduled account as:** _____<br>(See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4). |
| **4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:**   ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>Describe:<br><br>**Value of Property:**$_____  **Annual Interest Rate**_____<br><br>Amount of arrearage and other charges as of time case filed included in secured claim, if any: $_____  Basis for perfection: _____<br><br>**Amount of Secured Claim: $**_____  **Amount Unsecured: $**_____ | ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).<br><br>☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).<br><br>☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).<br><br>**Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **FOR COURT USE ONLY** |

| Date:<br><br>**4/20/2009** | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*(signature)*<br><br>**Ronald R. Peterson, not individually, but as Trustee** | Peterson<br>EXHIBIT NO. 7<br>3/7/19<br>**P. CAMPBELL** |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:
                                        **JOINTLY ADMINISTERED UNDER**
                                        **CASE NO. 08-45257**

PETTERS COMPANY, INC., et al.,          Court File No. 08-45257

        Debtors.
                                        Court Files No.'s:
(includes:
Petters Group Worldwide, LLC;           08-45258 (GFK)
PC Funding, LLC;                        08-45326 (GFK)
Thousand Lakes, LLC;                    08-45327 (GFK)
SPF Funding, LLC;                       08-45328 (GFK)
PL Ltd., Inc.;                          08-45329 (GFK)
Edge One LLC;                           08-45330 (GFK)
MGC Finance, Inc.;                      08-45331 (GFK)
PAC Funding, LLC;                       08-45371 (GFK)
Palm Beach Finance Holdings, Inc.)      08-45392 (GFK)

                                        Chapter 11 Cases
                                        Judge Gregory F. Kishel

---

**Attachment to the Lancelot / Colossus Funds Proofs of Claim**

---

1.      These proofs of claim are executed by Ronald R. Peterson, not individually, but

solely as the chapter 7 Trustee (the "Lancelot / Colossus Trustee") for Lancelot Investors Fund,

LP (f/k/a Granite Investors Fund, LP), Lancelot Investors Fund II, L.P., Lancelot Investors Fund,

Ltd., Colossus Capital Fund, L.P., Colossus Capital Fund, Ltd., and RWB Services LLC (the

"Lancelot / Colossus Funds"). The Lancelot / Colossus Trustee is duly authorized to execute

these proofs of claim on behalf of the Lancelot / Colossus Funds.

2.      On October 20, 2008, each of the Lancelot / Colossus Funds, along with 13

related entities, filed a petition for relief under chapter 7 of title 11 of the United States Code in

the Bankruptcy Court for the Northern District of Illinois. The cases are being jointly

administered under the caption *In re Lancelot Investors Fund, L.P., et al.*, case no. 08-28225. Following the bankruptcy filing of the Lancelot / Colossus Funds, the United States Trustee for the Northern District of Illinois appointed Ronald R. Peterson as the Lancelot / Colossus Trustee. The facts contained in the individual proofs of claim and this Attachment are provided upon information and belief, based upon the facts as known to the Lancelot / Colossus Trustee and his counsel. The Lancelot / Colossus Trustee's investigation of the Lancelot / Colossus Funds and their relationship with the above-captioned debtors (the "Debtors") remains ongoing, and this information is subject to confirmation as further facts are ascertained.

3.      From at least 2002 through the commencement of the above-captioned bankruptcies, the Lancelot / Colossus Debtors served as commercial lenders to certain of the Debtors as detailed below. The basic framework for these loans is set forth in the Master Loan Agreement among Thousand Lakes LLC, Lancelot Investors Fund, LP as Initial Lender, and RWB Services, LLC ("RWB") as Administrative Agent, dated as of October 11, 2002 (the "Master Loan Agreement").

4.      Pursuant to the Master Loan Agreement, the lenders under the agreement would loan funds to Thousand Lakes to purchase certain durable goods that were to be sold to certain agreed upon retailers on credit, thereby generating a receivable payable by such retailer to the order of Thousand Lakes. In exchange for loans under the Master Loan Agreement, Thousand Lakes would issue promissory notes to RWB ("Thousand Lake Notes"). The Master Loan Agreement required Thousand Lakes to direct customers purchasing inventory from it to make payment on such purchases by wiring funds to an account in which RWB had a security interest and over which RWB had control. RWB would then be authorized to transfer such funds to lenders under the Master Loan Agreement in payment of the Thousand Lake Notes.

2

5.      RWB, in its capacity as Administrative Agent under the Master Loan Agreement, has been granted a security interest in all of Thousand Lakes' assets as security for all loans made pursuant to the Master Loan Agreement to Thousand Lakes.

6.      Repayment of all principal, accrued interest, attorney's fees, collection costs and enforcement expenses on all loans and notes made under the Master Loan Agreement were absolutely and unconditionally guaranteed by Petters Company, Inc. (the "Guaranty") and by Thomas J. Petters under separate Guaranties date October 11, 2002.

7.      Pursuant to a Security Agreement by Thousand Lakes and in favor of RWB, dated October 11, 2002 (the "Security Agreement"), payment of all present and future debts, liabilities and obligations of every type and description owed by Thousand Lakes to RWB and any lender under the Master Loan Agreement were secured by a grant of a security interest in all of Thousand Lakes' present and after acquired: Accounts; Chattel Paper; Commercial Tort Claims; Controlled Property; Deposit Accounts; Documents; Equipment and Fixtures; General Intangibles; Instruments; Inventory; Investment Property; Letter of Credit Rights; Proceeds (whether cash or non-cash Proceeds, including Insurance Proceeds and non-cash Proceeds of all types); Products of all the foregoing; and Supporting Obligations (as those terms are defined in the Security Agreement). On October 16, 2002, a financing statement was filed with the Delaware Department of State, perfecting RWB's security interest in Thousand Lakes' assets (the "Financing Statement"). On August 30, 2007, an amendment and continuation statement was filed with the Delaware Department of State, continuing the perfection of RWB's security interest.

3

8.      In accordance with the Master Loan Agreement, in many instances the right to repayment on various loans and notes made under the Master Loan Agreement has been assigned between the Lancelot / Colossus Funds pursuant to written agreements.

9.      The loan documents supporting the Lancelot / Colossus Funds' claims are voluminous, are available upon request and are incorporated herein by this reference and made a part hereof. For each note issued under the Master Loan Agreement, the Lancelot / Colossus Trustee has documents, which may include, but are not limited to, promissory notes, amendments of promissory notes, and assignments by and among the Lancelot / Colossus Funds. Furthermore, the Lancelot / Colossus Trustee has attached the Master Loan Agreement, the Security Agreement, the Financing Statement, and the Guaranty to the proof of claim filed on behalf of RWB Services LLC – the administrative agent for the Lancelot / Colossus Funds -- against Thousand Lakes, LLC. Those documents are incorporated into this proof of claim by reference.

10.      Schedule A attached to the RWB Services LLC proof of claim against Thousand Lakes, LLC ("Schedule A") details the Thousand Lakes Notes issued under the Master Loan Agreement.

4

11.     Schedule B attached to the RWB Services LLC proof of claim against Thousand Lakes, LLC ("Schedule B") details those Thousand Lakes Notes with known outstanding balances, and the current Lenders entitled to repayment on such notes. As set forth in Schedule B, the total amounts of principal and interest owed by Thousand Lakes to the Lancelot / Colossus Funds for loans and notes made under the Master Loan Agreement are as follows:

|  | Principal | Interest | Total |
|---|---|---|---|
| Lancelot Investors Fund, LP | $258,450,000.00 | $7,874,300.00 | $266,324,300.00 |
| Lancelot Investors Fund II, L.P | $246,082,691.99 | $21,398,846.29 | $267,481,538.28 |
| Lancelot Investors Fund, Ltd. | $917,126,781.30 | $72,811,460.17 | $989,938,241.47 |
| Colossus Capital Fund, LP | $2,850,000.00 | $410,326.00 | $3,260,326.00 |
| Colossus Capital Fund, Ltd. | $28,694,482.43 | $4,286,288.63 | $32,980,771.06 |
| Grand Total: |  |  | $1,559,985,176.81 |

12.     Petters Company, Inc. is indebted to the Lancelot / Colossus Funds under its October 11, 2002 Guaranty in the same amounts.

13.     To the extent over secured, the Lancelot / Colossus Funds' claim shall continue to accrue fees and interest post-petition and the Lancelot / Colossus Trustee reserves the right to make a claim for all such fees and interest until the Lancelot / Colossus Trustee's claim is paid in full. To the extent under secured, the Lancelot / Colossus Trustee hereby asserts unsecured claims under § 506(a)(1) of the Bankruptcy Code for any unsecured portion of the amounts claimed herein.

14.     In addition, non-Debtor affiliate of the Debtors, Petters Capital, LLC, is indebted to the Lancelot / Colossus Funds as follows:

- Lancelot Investors Fund, LP is owed $2,111,099[1] pursuant to a Promissory Note dated October 22, 2007 between RWB Services LLC and Petters Capital, LLC.

---

[1] $2,000,000 of principal and $111,099 of interest.

5

- Lancelot Investors Fund, Ltd. is owed $2,111,100[2] pursuant to a Promissory Note dated October 22, 2007 between RWB Services LLC and Petters Capital, LLC.

- Lancelot Investors Fund II, LP is owed $2,109,766[3] pursuant to a Promissory Noted dated October 29, 2007 between RWB Services LLC and Petters Capital, LLC.

- Lancelot Investors Fund, Ltd. is owed $4,212,865[4] pursuant to a Promissory Note dated October 29, 2007 between RWB Services LLC and Petters Capital, LLC.

15.    Each Lancelot / Colossus Fund also asserts, on information and belief, a claim based on civil conspiracy against each of the Debtors herein for the full amount of all outstanding loans owed by any entity formerly controlled by Thomas J. Petters ("Petters") to the Lancelot / Colossus Funds. On October 3, 2008, Petters was arrested and charged in a criminal complaint with mail and wire fraud, money laundering and obstruction of justice.    On information and belief, the much of the inventory that served as the collateral for the loans made by the Lancelot / Colossus Funds to certain of the Debtors never existed, and much of the receivables that served as collateral for those loans was never generated or owed by any account debtor. On information and belief, Petters and several entities controlled by Petters, including each of the Debtors herein, planned and carried out a scheme to defraud, among others, the Lancelot / Colossus Funds by inducing them to provide certain of the Debtors with commercial loans, including those referenced in Schedules A and B, and those referenced in paragraph 14 hereof, based on an extensive and long running pattern of knowingly false and fraudulent statements. Already, Petters Company, Inc., Petters Group Worldwide, Thomas J. Petters, and

---

[2] $2,000,000 of principal and $111,100 of interest.
[3] $2,000,000 of principal and $109,766 of interest.
[4] $4,000,000 of principal and $212,865 of interest.

6

certain individuals involved with the Petters entities have been indicted or are the subject of a criminal information in the United States District Court of Minnesota. Additionally, the Lancelot / Colossus Trustee asserts that the Debtors may be jointly liable under an alter ego theory, or that the Debtors estates should be substantively consolidated.

16.     In total, by these proofs of claim, the Lancelot / Colossus Funds assert the following amounts against each of the Debtors under a theory of civil conspiracy, as well as the contracts and agreements referenced herein:

|  | Principal | Interest | Total |
| --- | --- | --- | --- |
| Lancelot Investors Fund, LP | $260,450,000.00 | $7,985,399.00 | $268,435,399.00 |
| Lancelot Investors Fund II, L.P | $248,082,691.99 | $21,508,612.29 | $269,591,304.28 |
| Lancelot Investors Fund, Ltd. | $923,126,781.30 | $73,135,425.17 | $996,262,206.47 |
| Colossus Capital Fund, LP | $2,850,000.00 | $410,326.00 | $3,260,326.00 |
| Colossus Capital Fund, Ltd. | $28,694,482.43 | $4,286,288.63 | $32,980,771.06 |
| Grand Total: |  |  | $1,570,530,006.81 |

17.     Out of an abundance of caution, the Lancelot / Colossus Trustee is filing separate proofs of claim against each of the Debtors herein, and separate proofs of claim on behalf of each of the Lancelot / Colossus Funds. Such filings are of necessity duplicative, but the Lancelot / Colossus Trustee does not intend, by the resulting duplication, to purport to assert multiples of the aggregate claims referenced in paragraph 16 hereof.

18.     The filing of these proofs of claim is not intended and should not be construed as (a) a statement of all claims or facts supporting the claims of the Lancelot / Colossus Funds, (b) an election of remedies, (c) a waiver of any past, present, or future default or events of default, or (d) a wavier or limitation of any right, claims or causes of action of the Lancelot / Colossus Funds.

19.     The Lancelot / Colossus Funds, and the Lancelot / Colossus Trustee, do not waive, and expressly reserve, all rights, claims and remedies at law or in equity that the Lancelot

7

/ Colossus Funds, or the Lancelot / Colossus Trustee, whether individually or collectively, have or may have against the Debtors and/or any of the Debtors' affiliates and subsidiaries, or any other person or entity.

20.     These proofs of claim are not subject to any set-off or counterclaim.   The Lancelot / Colossus Funds and the Lancelot / Colossus Trustee reserve all rights to set-off and recoupment which they may have.

21.     The Lancelot / Colossus Funds also reserve the right to amend or supplement these claims in any respect, in any manner and for any purpose.  Furthermore, the Lancelot / Colossus Funds reserve the right to amend or supplement these claims after the last date set for filing claims in this proceeding and/or contest the valuation of the Debtors' collateral securing these claims.

22.     In submitting these claims, the Lancelot / Colossus Funds do not submit to the jurisdiction of this Court for any purpose other than with respect to their claims.

8

# EXHIBIT T-67C

B10 (Official Form 10) (12/08)

| United States Bankruptcy Court - **DISTRICT OF MINNESOTA** | **PROOF OF CLAIM** |
|---|---|

| Name of Debtor:**Thousand Lakes, LLC** | Case Number:**08-45327 (GFK)** |
|---|---|

*NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>**RWB Services LLC, as agent** | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>**Ronald R. Peterson, as Chapter 7 Bankruptcy Trustee**<br>**Jenner & Block LLP**<br>**330 N. Wabash Avenue**<br>**Chicago, IL 60611-7603**<br>Telephone number:  **312-222-9350** | **Court Claim Number:** _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br><br><br>Telephone number: | ☒ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed: $** $1,570,530,006.81 | **5.  Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.** |
| If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. | |
| If all or part of your claim is entitled to priority, complete item 5. | Specify the priority of the claim. |
| ☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B) |
| **2. Basis for Claim:  See Attachment**<br>(See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4). |
| **3.** Last four digits of any number by which creditor identifies debtor:_____ | |
| **3a.** Debtor may have scheduled account as:_____<br>(See instruction #3a on reverse side.) | ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5). |
| **4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information. | ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7). |
| **Nature of property or right of setoff:**    ☒ Real Estate   ☒ Motor Vehicle   ☒ Other<br>**Describe: See Attachment** | ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8). |
| **Value of Property:$** Unknown          **Annual Interest Rate**_____ | ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(_____). |
| Amount of arrearage and other charges as of time case filed included in secured claim,<br>if any: $_____  Basis for perfection: **See Attachment** | **Amount entitled to priority:**<br><br>$ _____ |
| **Amount of Secured Claim: $**_____  **Amount Unsecured: $**_____ | * *Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **FOR COURT USE ONLY** |
| **Date:**<br><br>4/20/2009 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*Ronald R. Peterson, not individually, but as Trustee* | |

Peterson

EXHIBIT NO. 8

2/7/19

P. CAMPBELL

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

**JOINTLY ADMINISTERED UNDER
CASE NO. 08-45257**

PETTERS COMPANY, INC., et al.,

Court File No. 08-45257

Debtors.

Court Files No.'s:

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.;
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

08-45258 (GFK)
08-45326 (GFK)
08-45327 (GFK)
08-45328 (GFK)
08-45329 (GFK)
08-45330 (GFK)
08-45331 (GFK)
08-45371 (GFK)
08-45392 (GFK)

Chapter 11 Cases
Judge Gregory F. Kishel

### Attachment to the Lancelot / Colossus Funds Proofs of Claim

1.      These proofs of claim are executed by Ronald R. Peterson, not individually, but solely as the chapter 7 Trustee (the "Lancelot / Colossus Trustee") for Lancelot Investors Fund, LP (f/k/a Granite Investors Fund, LP), Lancelot Investors Fund II, L.P., Lancelot Investors Fund, Ltd., Colossus Capital Fund, L.P., Colossus Capital Fund, Ltd., and RWB Services LLC (the "Lancelot / Colossus Funds"). The Lancelot / Colossus Trustee is duly authorized to execute these proofs of claim on behalf of the Lancelot / Colossus Funds.

2.      On October 20, 2008, each of the Lancelot / Colossus Funds, along with 13 related entities, filed a petition for relief under chapter 7 of title 11 of the United States Code in the Bankruptcy Court for the Northern District of Illinois. The cases are being jointly

administered under the caption *In re Lancelot Investors Fund, L.P., et al.*, case no. 08-28225.
Following the bankruptcy filing of the Lancelot / Colossus Funds, the United States Trustee for
the Northern District of Illinois appointed Ronald R. Peterson as the Lancelot / Colossus Trustee.
The facts contained in the individual proofs of claim and this Attachment are provided upon
information and belief, based upon the facts as known to the Lancelot / Colossus Trustee and his
counsel. The Lancelot / Colossus Trustee's investigation of the Lancelot / Colossus Funds and
their relationship with the above-captioned debtors (the "Debtors") remains ongoing, and this
information is subject to confirmation as further facts are ascertained.

3.      From at least 2002 through the commencement of the above-captioned
bankruptcies, the Lancelot / Colossus Debtors served as commercial lenders to certain of the
Debtors as detailed below. The basic framework for these loans is set forth in the Master Loan
Agreement among Thousand Lakes LLC, Lancelot Investors Fund, LP as Initial Lender, and
RWB Services, LLC ("RWB") as Administrative Agent, dated as of October 11, 2002 (the
"Master Loan Agreement").

4.      Pursuant to the Master Loan Agreement, the lenders under the agreement would
loan funds to Thousand Lakes to purchase certain durable goods that were to be sold to certain
agreed upon retailers on credit, thereby generating a receivable payable by such retailer to the
order of Thousand Lakes. In exchange for loans under the Master Loan Agreement, Thousand
Lakes would issue promissory notes to RWB ("Thousand Lake Notes"). The Master Loan
Agreement required Thousand Lakes to direct customers purchasing inventory from it to make
payment on such purchases by wiring funds to an account in which RWB had a security interest
and over which RWB had control. RWB would then be authorized to transfer such funds to
lenders under the Master Loan Agreement in payment of the Thousand Lake Notes.

2

5.     RWB, in its capacity as Administrative Agent under the Master Loan Agreement, has been granted a security interest in all of Thousand Lakes' assets as security for all loans made pursuant to the Master Loan Agreement to Thousand Lakes.

6.     Repayment of all principal, accrued interest, attorney's fees, collection costs and enforcement expenses on all loans and notes made under the Master Loan Agreement were absolutely and unconditionally guaranteed by Petters Company, Inc. (the "Guaranty") and by Thomas J. Petters under separate Guaranties date October 11, 2002.

7.     Pursuant to a Security Agreement by Thousand Lakes and in favor of RWB, dated October 11, 2002 (the "Security Agreement"), payment of all present and future debts, liabilities and obligations of every type and description owed by Thousand Lakes to RWB and any lender under the Master Loan Agreement were secured by a grant of a security interest in all of Thousand Lakes' present and after acquired: Accounts; Chattel Paper; Commercial Tort Claims; Controlled Property; Deposit Accounts; Documents; Equipment and Fixtures; General Intangibles; Instruments; Inventory; Investment Property; Letter of Credit Rights; Proceeds (whether cash or non-cash Proceeds, including Insurance Proceeds and non-cash Proceeds of all types); Products of all the foregoing; and Supporting Obligations (as those terms are defined in the Security Agreement). On October 16, 2002, a financing statement was filed with the Delaware Department of State, perfecting RWB's security interest in Thousand Lakes' assets (the "Financing Statement"). On August 30, 2007, an amendment and continuation statement was filed with the Delaware Department of State, continuing the perfection of RWB's security interest.

3

8.    In accordance with the Master Loan Agreement, in many instances the right to repayment on various loans and notes made under the Master Loan Agreement has been assigned between the Lancelot / Colossus Funds pursuant to written agreements.

9.    The loan documents supporting the Lancelot / Colossus Funds' claims are voluminous, are available upon request and are incorporated herein by this reference and made a part hereof.  For each note issued under the Master Loan Agreement, the Lancelot / Colossus Trustee has documents, which may include, but are not limited to, promissory notes, amendments of promissory notes, and assignments by and among the Lancelot / Colossus Funds. The Master Loan Agreement is attached hereto as Exhibit A. The Security Agreement is attached hereto as Exhibit B. The Financing Statement is attached hereto as Exhibit C. The Guaranty is attached hereto as Exhibit D.

10.    Schedule A attached hereto ("Schedule A") details the Thousand Lakes Notes issued under the Master Loan Agreement.

4

11.     Schedule B attached hereto ("Schedule B") details those Thousand Lakes Notes with known outstanding balances, and the current Lenders entitled to repayment on such notes. As set forth in Schedule B, the total amounts of principal and interest owed by Thousand Lakes to the Lancelot / Colossus Funds for loans and notes made under the Master Loan Agreement are as follows:

|  | Principal | Interest | Total |
|---|---|---|---|
| Lancelot Investors Fund, LP | $258,450,000.00 | $7,874,300.00 | $266,324,300.00 |
| Lancelot Investors Fund II, L.P | $246,082,691.99 | $21,398,846.29 | $267,481,538.28 |
| Lancelot Investors Fund, Ltd. | $917,126,781.30 | $72,811,460.17 | $989,938,241.47 |
| Colossus Capital Fund, LP | $2,850,000.00 | $410,326.00 | $3,260,326.00 |
| Colossus Capital Fund, Ltd. | $28,694,482.43 | $4,286,288.63 | $32,980,771.06 |
| Grand Total: |  |  | $1,559,985,176.81 |

12.     Petters Company, Inc. is indebted to the Lancelot / Colossus Funds under its October 11, 2002 Guaranty in the same amounts.

13.     To the extent over secured, the Lancelot / Colossus Funds' claim shall continue to accrue fees and interest post-petition and the Lancelot / Colossus Trustee reserves the right to make a claim for all such fees and interest until the Lancelot / Colossus Trustee's claim is paid in full. To the extent under secured, the Lancelot / Colossus Trustee hereby asserts unsecured claims under § 506(a)(1) of the Bankruptcy Code for any unsecured portion of the amounts claimed herein.

14.     In addition, non-Debtor affiliate of the Debtors, Petters Capital, LLC, is indebted to the Lancelot / Colossus Funds as follows:

- Lancelot Investors Fund, LP is owed $2,111,099[1] pursuant to a Promissory Note dated October 22, 2007 between RWB Services LLC and Petters Capital, LLC.

---

[1] $2,000,000 of principal and $111,099 of interest.

5

- Lancelot Investors Fund, Ltd. is owed $2,111,100[2] pursuant to a Promissory Note dated October 22, 2007 between RWB Services LLC and Petters Capital, LLC.

- Lancelot Investors Fund II, LP is owed $2,109,766[3] pursuant to a Promissory Noted dated October 29, 2007 between RWB Services LLC and Petters Capital, LLC.

- Lancelot Investors Fund, Ltd. is owed $4,212,865[4] pursuant to a Promissory Note dated October 29, 2007 between RWB Services LLC and Petters Capital, LLC.

15.    Each Lancelot / Colossus Fund also asserts, on information and belief, a claim based on civil conspiracy against each of the Debtors herein for the full amount of all outstanding loans owed by any entity formerly controlled by Thomas J. Petters ("Petters") to the Lancelot / Colossus Funds. On October 3, 2008, Petters was arrested and charged in a criminal complaint with mail and wire fraud, money laundering and obstruction of justice. On information and belief, the much of the inventory that served as the collateral for the loans made by the Lancelot / Colossus Funds to certain of the Debtors never existed, and much of the receivables that served as collateral for those loans was never generated or owed by any account debtor. On information and belief, Petters and several entities controlled by Petters, including each of the Debtors herein, planned and carried out a scheme to defraud, among others, the Lancelot / Colossus Funds by inducing them to provide certain of the Debtors with commercial loans, including those referenced in Schedules A and B, and those referenced in paragraph 14 hereof, based on an extensive and long running pattern of knowingly false and fraudulent statements. Already, Petters Company, Inc., Petters Group Worldwide, Thomas J. Petters, and

---

[2] $2,000,000 of principal and $111,100 of interest.
[3] $2,000,000 of principal and $109,766 of interest.
[4] $4,000,000 of principal and $212,865 of interest.

6

certain individuals involved with the Petters entities have been indicted or are the subject of a
criminal information in the United States District Court of Minnesota. Additionally, the
Lancelot / Colossus Trustee asserts that the Debtors may be jointly liable under an alter ego
theory, or that the Debtors estates should be substantively consolidated.

16. In total, by these proofs of claim, the Lancelot / Colossus Funds assert the
following amounts against each of the Debtors under a theory of civil conspiracy, as well as the
contracts and agreements referenced herein:

|  | Principal | Interest | Total |
|---|---|---|---|
| Lancelot Investors Fund, LP | $260,450,000.00 | $7,985,399.00 | $268,435,399.00 |
| Lancelot Investors Fund II, L.P | $248,082,691.99 | $21,508,612.29 | $269,591,304.28 |
| Lancelot Investors Fund, Ltd. | $923,126,781.30 | $73,135,425.17 | $996,262,206.47 |
| Colossus Capital Fund, LP | $2,850,000.00 | $410,326.00 | $3,260,326.00 |
| Colossus Capital Fund, Ltd. | $28,694,482.43 | $4,286,288.63 | $32,980,771.06 |
| Grand Total: |  |  | $1,570,530,006.81 |

17. Out of an abundance of caution, the Lancelot / Colossus Trustee is filing separate
proofs of claim against each of the Debtors herein, and separate proofs of claim on behalf of each
of the Lancelot / Colossus Funds. Such filings are of necessity duplicative, but the Lancelot /
Colossus Trustee does not intend, by the resulting duplication, to purport to assert multiples of
the aggregate claims referenced in paragraph 16 hereof.

18. The filing of these proofs of claim is not intended and should not be construed as
(a) a statement of all claims or facts supporting the claims of the Lancelot / Colossus Funds, (b)
an election of remedies, (c) a waiver of any past, present, or future default or events of default, or
(d) a wavier or limitation of any right, claims or causes of action of the Lancelot / Colossus
Funds.

19. The Lancelot / Colossus Funds, and the Lancelot / Colossus Trustee, do not
waive, and expressly reserve, all rights, claims and remedies at law or in equity that the Lancelot

7

/ Colossus Funds, or the Lancelot / Colossus Trustee, whether individually or collectively, have or may have against the Debtors and/or any of the Debtors' affiliates and subsidiaries, or any other person or entity.

20.     These proofs of claim are not subject to any set-off or counterclaim.  The Lancelot / Colossus Funds and the Lancelot / Colossus Trustee reserve all rights to set-off and recoupment which they may have.

21.     The Lancelot / Colossus Funds also reserve the right to amend or supplement these claims in any respect, in any manner and for any purpose.  Furthermore, the Lancelot / Colossus Funds reserve the right to amend or supplement these claims after the last date set for filing claims in this proceeding and/or contest the valuation of the Debtors' collateral securing these claims.

22.     In submitting these claims, the Lancelot / Colossus Funds do not submit to the jurisdiction of this Court for any purpose other than with respect to their claims.

8

# EXHIBIT T-68

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

_____

In re:                              Jointly Administered
                                    Case No. 08-45257

PETTERS COMPANY, INC., et al.,

        Debtors.


(includes:                          Court File Nos.
PETTERS GROUP WORLDWIDE, LLC        08-45258 (KHS)
PC FUNDING, LLC                     08-45326 (KHS)
THOUSAND LAKES, LLC                 08-45327 (KHS)
SPF FUNDING, LLC                    08-45328 (KHS)
PL LTD., INC.                       08-45329 (KHS)
EDGE ONE, LLC                       08-45330 (KHS)
MGC FINANCE, INC.                   08-45331 (KHS)
PAC FUNDING, LLC                    08-45371 (KHS)
PALM BEACH FINANCE HOLDINGS, INC.)  08-45392 (KHS)

                                    Chapter 11 Cases
                                    Judge Kathleen H. Sanberg
_____

CAPTION CONTINUED ON THE NEXT PAGE



        VIDEOTAPED DEPOSITION OF RONALD PETERSON
                  Chicago, Illinois
              Thursday, February 7, 2019


Reported by:
PAULA CAMPBELL, CSR, RDR, CRR, CRC
JOB NO. 154481

Page 45

1                          R. PETERSON

2              If you could, please turn to Page 3 and

3     look at Paragraph 9 of this document.  Paragraph 9

4     reads as follows, "Beginning on or about

5     February 26, 2008, after Thousand Lakes had been

6     delinquent in repaying various notes, Bell joined

7     the ponzi scheme.  Bell, through the management

8     companies including LIM, and Petters, through PCI,

9     concocted a series of round trip payments to conceal

10    Thousand Lakes' delinquencies.  On multiple

11    occasions Bell and his management companies,

12    including LIM, sent fund money directly to PCI under

13    the pretense that money was for investment in a new

14    note.  PCI then returned the money to the fund's

15    accounts, typically on the same day, to satisfy one

16    or more outstanding notes owed to the funds."

17             Did you believe that these allegations were

18    true at the time you authorized this complaint to be

19    filed?

20       A.  Yes.

21       Q.  And do you recall the basis for the facts

22    alleged in that paragraph?

23       A.  The sources that I gave you in previous

24    testimony.

25       Q.  Has your understanding changed since the

Page 46

1                       R. PETERSON

2      filing of the complaint?

3         A.  Yes.

4         Q.  And in what respect?

5         A.  We could never establish that Bell had

6      knowledge of the Petters ponzi scheme.  And where

7      the term "ponzi scheme" became confusing is that

8      Bell, in his round tripping, could be considered its

9      own ponzi scheme.  But one of the things that has

10     always tantalized me in this case was whether Bell

11     knew what Petters was doing.

12              And that's why I had the interview with

13     Deanna Coleman in April of 2010.  And we could never

14     establish that Bell had such knowledge.  And Bell

15     denies that he had such knowledge when I interviewed

16     him.

17        Q.  If you could now please look at --

18        A.  Can I change my testimony, please?  You

19     asked me about my interviews with Bell.  After he

20     got out of prison, we were prosecuting actions

21     against professionals, and I did sit down with Ed

22     Joyce and Bell, and we interviewed them with respect

23     to that -- that type of litigation against the

24     professionals.  I had forgotten about it, because it

25     was after everything was over.

# EXHIBIT T-69

B10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT  DISTRICT OF MINNESOTA | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: Petters Company, Inc. | Case Number: 08-45257 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Ark Discovery II, LP

Name and address where notices should be sent:

Mr. Steve Golan
Golan & Christie LLP
70 West Madison Street
Suite 1500
Chicago, IL. 60602-4206

Telephone number:
(312) 263-2300

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:
(*If known*)

Filed on:

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

| 1. Amount of Claim as of Date Case Filed:    $ 104,609,465.00 | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount. |
|---|---|

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

**2. Basis for Claim:** Money Loaned
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

    **3a. Debtor may have scheduled account as:** _____
    (See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**

**Value of Property:$**_____ **Annual Interest Rate**___%

**Amount of arrearage and other charges as of time case filed included in secured claim,**

**if any: $**_____ **Basis for perfection:** _____

**Amount of Secured Claim: $**_____ **Amount Unsecured: $** 104,609,465.00

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**

$_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date: 11 DEC. 2008 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.   *[signature]* ALLISON HANSLIK | FOR COURT USE ONLY Send original to: U.S. Bankruptcy Court 301 U.S. Courthouse 300 South Fourth St. Minneapolis, MN 55415 |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# PETTERS COMPANY, INC.
## BANKRUPTCY CASE NUMBER 08-45257
DISTRICT OF MINNESOTA
ATTACHMENT TO PROOF OF CLAIM
CASE FILED 10-11-2008

## CREDITOR: ARK DISCOVERY II, LP

| LOAN NUMBER | DATE OF LOAN | PRINCIPAL AMOUNT | PAYMENTS ON PRINCIPAL | INTEREST THROUGH 10-11-2008 | TOTAL |
|---|---|---|---|---|---|
| 7.03.05.08 | 03/05/08 | $12,500,000 | ($3,164,550) | $964,273 | $10,299,723 |
| 8.03.10.08 | 03/10/08 | 6,000,000 | | 604,800 | 6,604,800 |
| 9.03.12.08 | 03/12/08 | 4,500,000 | | 449,400 | 4,949,400 |
| 10.04.02.08 | 04/02/08 | 5,500,000 | | 495,367 | 5,995,367 |
| 11.04.03.08 | 04/03/08 | 4,500,000 | | 403,200 | 4,903,200 |
| 12.04.22.08 | 04/22/08 | 9,250,000 | | 746,783 | 9,996,783 |
| 13.05.01.08 | 05/01/08 | 1,100,000 | | 84,186 | 1,184,186 |
| 15.05.07.08 | 05/07/08 | 2,975,000 | | 219,355 | 3,194,355 |
| 16.06.03.08 | 06/03/08 | 10,850,000 | | 663,296 | 11,513,296 |
| 17.06.04.08 | 06/04/08 | 5,100,000 | | 309,400 | 5,409,400 |
| 19.06.10.08 | 06/10/08 | 4,900,000 | | 283,547 | 5,183,547 |
| 20.06.30.08 | 06/30/08 | 13,250,000 | | 643,065 | 13,893,065 |
| 21.07.01.08 | 07/01/08 | 6,250,000 | | 300,417 | 6,550,417 |
| 22.07.02.08 | 07/02/08 | 1,250,000 | | 59,500 | 1,309,500 |
| 23.07.30.08 | 07/30/08 | 1,600,000 | | 55,253 | 1,655,253 |
| 24.08.04.08 | 08/04/08 | 2,900,000 | | 93,380 | 2,993,380 |
| 27.08.08.08 | 08/08/08 | 3,400,000 | | 103,133 | 3,503,133 |
| 28.09.03.08 | 09/03/08 | 5,300,000 | | 170,660 | 5,470,660 |
| **TOTAL** | | **$101,125,000** | **($3,164,550)** | **$6,649,015** | **$104,609,465** |

# PETTERS COMPANY, INC.
# BANKRUPTCY CASE NUMBER 08-45257
## DISTRICT OF MINNESOTA
## ATTACHMENT TO PROOF OF CLAIM
## CASE FILED 10-11-2008

# CREDITOR: ARK DISCOVERY II, LP

## Index of Supporting Documents Provided:

Master Loan Agreement between Edge One, LLC and A to Z Investors Fund, LP (now known as Ark Discovery II, LP)

First Amendment to Master Loan Agreement

Security Agreement

Corporate Guaranty Agreement by Petters Company, Inc.

Complete set of Loan Documents for Loan 7.03.05.08 (executed pursuant to the Master Loan Agreement)

The loan documents for each of the following loans are the same as those for Loan 7.03.05.08; however, pursuant to the Court's request, we have attached only the Registered Promissory Note for:

    Loan  8.03.10.08
    Loan  9.03.12.08
    Loan  10.04.02.08
    Loan  11.04.03.08
    Loan  12.04.22.08
    Loan  13.05.01.08
    Loan  15.05.07.08
    Loan  16.06.03.08
    Loan  17.06.04.08
    Loan  19.06.10.08
    Loan  20.06.30.08
    Loan  21.07.01.08
    Loan  22.07.02.08
    Loan  23.07.30.08
    Loan  24.08.04.08
    Loan  27.08.08.08
    Loan  28.09.03.08

If the Court would like to see any other documentation related to these loans, we would be happy to provide it.

## MASTER LOAN AGREEMENT

THIS MASTER LOAN AGREEMENT (the "Agreement"), dated as of July 5, 2007, is by and among EDGE ONE, LLC, a Delaware limited liability company ("Borrower"), AtoZ Investors Fund, L.P., a Delaware limited partnership (the "Initial Lender") on behalf of itself and each of its permitted assigns pursuant to Section 8.15 below, and each of the successors thereof (all of whom collectively shall be referred to herein as the "Lender" or "Lenders"), and AWB SERVICES, LLC, a Delaware limited liability company on behalf of itself and as the agent for the Initial Lender and the Lenders (in such capacity, the "Administrative Agent").

## ARTICLE 1.
### DEFINITIONS

1.1     Defined Terms. In addition to the terms defined elsewhere in this Agreement, the following terms shall have the following meanings in this Agreement:

(a)     "Account(s)" shall mean the Borrower's "Accounts" as defined in Article I of the Security Agreement.

(b)     "Account Debtor" shall mean any Person who is or who may become obligated to the Borrower under, with respect to, or on account of an Account or other Collateral.

(c)     "Administrative Agent" shall mean AWB Services, LLC, or such other entity as may be designated by the Requisite Lenders, in writing, who shall serve as the Lenders' agent with respect to this Loan facility and with respect to the Collateral, all as more fully described in Article 8 below.

(d)     "Adverse Event" shall mean the occurrence of any event that would have a material adverse effect on the business, operations, property, assets or condition (financial or otherwise) of the Borrower (or such other party to which the term applies in context) or on the ability of the Borrower (or such other party) to perform its obligations under the Loan Documents.

(e)     "Business Day" shall mean any day other than a Saturday, a Sunday or any day that banks in Chicago, Illinois are required or permitted to close.

(f)     "Closing Date" shall mean any date on which a Loan is made pursuant to Section 2.2 below.

(g)     "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(h)     "Collateral" shall mean any property in which the Lenders as the Administrative Agent have been granted a Lien pursuant to any Loan Document.

(i)     "Corporate Guarantor" shall mean Petters Company, Inc., a Minnesota corporation.

(j)     "Corporate Guaranty" shall mean the Corporate Guaranty of even date herewith executed by Petters Company, Inc.

(k)     "Default" shall mean any event which, with the giving of notice to the Borrower or lapse of time, or both, would constitute an Event of Default.

(l)     "Depository Account" shall mean Account No. _____ maintained by Borrower at the Depository Bank.

(m)    "Deposit Pledge and Account Control Agreement" shall mean the Deposit Pledge and Account Control Agreement of even date herewith made by the Borrower in favor of the Administrative Agent, for the benefit of the Lenders, pursuant to which the Borrower has granted a security interest in the Depository Account, as originally executed and as it may be amended, modified, supplemented, restated or replaced from time to time.

(n)     "Depository Bank" shall mean Charter One Bank, N.A., a national banking association.

(o)     "Eligible Account" shall mean an Account owing to the Borrower which meets the requirements set forth on Exhibit B attached hereto.

(p)     "Eligible Inventory" shall mean the inventory of the Borrower which (1) the Borrower will purchase with the proceeds of a Loan pursuant to purchase orders issued by it to a vendor, which purchase orders are in all respects acceptable to Administrative Agent in its sole and absolute discretion and complete copies of which have been provided to Administrative Agent, and further provided that no such vendor is a Related Party; and (2) meets the following requirements:

> i.     It is owned by the Borrower and, except as the Administrative Agent may otherwise consent, is not subject to any prior assignment, claim or Lien other than a first priority Lien in favor of the Administrative Agent;
>
> ii.    Except as the Administrative Agent may otherwise consent, it is not stored with a bailee, warehouseman or similar party; or, if so stored, with the consent of the Administrative Agent, such bailee, warehouseman or similar party has issued and delivered to the Administrative Agent, in form and substance acceptable to the Administrative Agent, warehouse receipts therefor in the name of the Administrative Agent, and any other such documents and agreements as the Administrative Agent may require;
>
> iii.   The Administrative Agent has determined, in its reasonable business judgment, that it is not unacceptable due to age, type, category, quality and/or quantity;

10614v4

2

iv.     It is not held by the Borrower on "consignment" and is not subject to any other repurchase or return agreement;

v.      It complies with all standards imposed by any governmental agency having regulatory authority over such goods and/or their use, manufacture or sale;

vi.     It does not, in any way, violate or fail to meet any warranty, representation or covenant contained in the Loan Documents relating directly to the Borrower's Inventory; and

vii.    Inventory of the Borrower which is at any time Eligible Inventory, but which subsequently fails to meet any of the foregoing requirements shall immediately and without need for any further action cease to be Eligible Inventory.

The value of Eligible Inventory shall be the U.S. dollar amount thereof computed at the lower of the cost, determined on a first in first out basis, or market value of such Inventory, as determined by the Administrative Agent after deduction of such reserves and allowances as the Administrative Agent, in its reasonable business judgment, deems proper and necessary.

(q)     "Event of Default" shall mean any event described in Section 7.1 below which has not been cured to the satisfaction of, or waived by, the Administrative Agent.

(r)     "GAAP" shall mean United States generally accepted accounting principles as in effect from time to time and as consistently applied.

(s)     "Indebtedness" shall mean, without duplication, all obligations, contingent or otherwise, which in accordance with GAAP should be classified upon the Borrower's balance sheet as liabilities, but in any event including the following (whether or not they should be classified as liabilities upon such balance sheet):

i.      Obligations secured by any mortgage, pledge, security interest, lien, charge or other encumbrance existing on property owned or acquired subject thereto, whether or not the obligation secured thereby shall have been assumed and whether or not the obligation secured is the obligation of the owner or another party;

ii.     Any obligation on account of deposits or advances;

iii.    Any obligation for the deferred purchase price of any property or services, except trade accounts payable;

iv.     Any obligation as lessee under any capitalized lease;

v.      All guaranties, endorsements and other contingent obligations in respect to Indebtedness of others; and

vi.     Undertakings or agreements to reimburse or indemnify issuers of letters of credit.

For all purposes of this Agreement, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer unless such Indebtedness is non-recourse to such Person. Notwithstanding the

10614v4

3

foregoing, the Indebtedness of a Person shall not include the Indebtedness of any limited liability company in which such Person holds a membership interest.

(t) "Initial Lender" shall mean AtoZ Investors Fund, L.P., a Delaware limited partnership.

(u) "Insolvent" shall mean, with respect to any Person on any date of determination, that on such date:

     i. The fair value of such Person's tangible and intangible assets is not in excess of the total amount of such Person's liabilities including, without limitation, contingent obligations; and

     ii. Such Person is not then able to pay its debts as they mature; or such Person does not have capital sufficient to carry on its business.

(v) "Inventory" shall mean the Borrower's "Inventory" as defined in Article I of the Security Agreement.

(w) "Investment" shall mean the acquisition, purchase, making or holding of any stock or other security, any loan, advance, contribution to capital, extension of credit (except for trade and customer accounts receivable for Inventory sold or services rendered in the ordinary course of business and payable in accordance with customary trade terms), any acquisitions of real or personal property (other than real and personal property acquired in the ordinary course of business) and any purchase or commitment or option to purchase stock or other debt or equity securities of, or any interest in, another Person or any integral part of any business or the assets comprising such business or part thereof.

(x) "Lender" shall mean the Initial Lender and each of its permitted assigns pursuant to Section 8.15 of this Agreement, and each of the successors thereof, all of whom collectively shall be referred to herein as "Lenders." Each such permitted assign and successor shall execute a Joinder Agreement in the form attached hereto as Exhibit E prior to such permitted assign or successor becoming a Lender under the terms of this Agreement.

(y) "Lender Affiliate" means with respect to any Lender:

     i. Each Person that is directly or indirectly controlling, controlled by, or under common control with such Lender;

     ii. Each Person that, directly or indirectly owns or holds fifty percent (50%) or more of any equity interest in such Lender; or

     iii. Fifty percent (50%) or more of whose voting stock or other equity interest is directly or indirectly owned or held by such Lender.

For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by" and "under common control with") means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a

1061.3v.1

4

Person, whether through the ownership of voting securities, by board of director participation or by contract or otherwise.

(z)     "Liabilities" shall mean, at any date of determination, the aggregate amount of liabilities appearing on the Borrower's balance sheet at such date prepared in accordance with GAAP.

(aa)    "Lien" shall mean any encumbrance, lien, deed of trust, pledge, charge, lease, easement, servitude, right of others or security interest of any kind.

(bb)    "Loan" shall mean any loan as described in Section 2.2 below.

(cc)    "Loan Documents" shall mean this Agreement, any Note issued and outstanding from time to time, the Security Agreement, the Deposit Pledge and Account Control Agreement, the Corporate Guaranty, and each other instrument, document, guaranty, security agreement, mortgage, or other agreement executed and delivered by the Borrower pursuant to which the Borrower incurs any liability to a Lender with respect to the Obligations, agrees to perform any covenant or agreement with respect to the Obligations or grants any security interest to secure the Obligations.

(dd)    "Maturity Date" shall mean any date designated in any Note as the final date on which all principal and accrued interest, if any, thereunder is due and payable to the holder thereof.

(ee)    "Note" shall mean any Promissory Note or Zero Coupon Promissory Note of the Borrower, issued to Initial Lender (or subsequently re-issued by Borrower to an assignee of Initial Lender pursuant to Section 8.15 below) substantially in the form attached hereto as Exhibit A-1 or Exhibit A-2, respectively, and accepted by Lender, as such promissory note may be amended, modified or supplemented from time to time, and such term shall include any substitutions for, or renewals of, such promissory note.

(ff)    "Obligations" shall mean all Loan advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to a Lender of any kind or nature, present or future, which arise under this Agreement or any other Loan Document or by operation of law, whether or not evidenced by any note, guaranty or other instrument, whether or not for the payment of money, whether arising by reason of an extension of credit, opening, guarantying or confirming of a letter of credit, guaranty, indemnification or in any other manner, whether joint, several, or joint and several, direct or indirect (including those acquired by assignment or purchases), absolute or contingent, due or to become due, and however acquired. The term includes, without limitation, all principal, interest, fees, charges, expenses, attorneys' fees, and any other sum chargeable to the Borrower under this Agreement or any other Loan Document.

(gg)    "Origination Fee" shall mean any origination fee established by agreement between the Borrower and Initial Lender as provided in Section 2.7 below in connection with the making of any Loan hereunder.

10614v4

5

(hh)   "Person" shall mean any natural person, corporation, partnership, joint venture, firm, association, trust, unincorporated organization, government or governmental agency or political subdivision, or any other entity, whether acting in an individual, fiduciary or other capacity.

(ii)   "Register" shall have the meaning set forth in Section 8.16 below of this Agreement.

(jj)   "Related Party" shall mean any Person: (a) which directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the Borrower or any Corporate Guarantor; (b) which beneficially owns or holds five percent (5%) or more of the equity interest of the Borrower or any Corporate Guarantor; or (c) five percent (5%) or more of the equity interest of which is beneficially owned or held by the Borrower. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or by contract or otherwise. Additionally, notwithstanding the foregoing, the parties acknowledge and agree that neither Petters Consumer Brands, LLC, a Delaware limited liability company, Polaroid Consumer Electronics, LLC, a Delaware limited liability company, nor Polaroid Hospitality and Commercial, LLC, a Delaware limited liability company, shall be deemed to be a "Related Party" for purposes of this Agreement.

(kk)   "Requisite Lenders" shall mean the Lender or group of Lenders who are holding Loans which constitute a majority of the aggregate outstanding principal amount of all Loans at such time.

(ll)   "Security Agreement" shall mean the Security Agreement of even date herewith, made by the Borrower in favor of the Lenders and the Administrative Agent.

(mm)   "Subsidiary" shall mean any Person of which or in which the Borrower and its other Subsidiaries, if any, own directly or indirectly more than fifty percent (50%) of:

    i.   The combined voting power of all classes of stock having general voting power under ordinary circumstances to elect a majority of the board of directors of such Person, if it is a corporation,

    ii.   The capital interest or profit interest of such Person, if it is a partnership, joint venture or similar entity, or

    iii.   The beneficial interest of such Person, if it is a trust, association or other unincorporated organization.

(nn)   "Term": The period of time commencing on the date hereof and ending on the last to occur of (i) July 5, 2012, as such date may be extended by written agreement of the Borrower and the Administrative Agent; or (ii) the date each Note issued hereunder is paid in full pursuant to its terms and all other obligations of the Borrower to the Lenders hereunder and under the Notes and the Loan Documents have been paid in full.

10614v4

6

1.2     Accounting Terms and Calculations. Except as may be expressly provided to the contrary herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with GAAP consistently applied for the Borrower as used in the preparation of the Borrower's financial statements.

1.3     Other Definitional Provisions. The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to Sections, Exhibits, Schedules and like references are to this Agreement unless otherwise expressly provided.

## ARTICLE 2.
## TERMS OF LENDING

2.1     No Commitment to Lend. Notwithstanding any provision of this Agreement to the contrary, the Administrative Agent and the Initial Lender have not committed and do not commit hereunder to make any Loan, to advance any moneys, to purchase any Note or evidence of indebtedness of Borrower or to otherwise provide any credit to Borrower.

2.2     Loans. Subject to the terms and conditions hereof and in reliance upon the warranties of the Borrower herein, a Lender may in its sole and absolute discretion make loans to Borrower from time to time during the Term (each, a "Loan") by purchasing a Note issued by Borrower at a price and/or with an interest rate determined by Borrower and such Lender at the time of sale. All Loans shall be advanced by the applicable Lender directly to the Depository Account.

2.3     Borrowing Procedures.

(a)     The Borrower will make a request for a Loan from the Administrative Agent in such manner as the Administrative Agent may from time to time prescribe. In the absence of further Administrative Agent instruction, any request by the Borrower for a Loan shall be in writing, on the form attached hereto as Exhibit C, or by telephone promptly confirmed in writing, and must be given so as to be received by the Administrative Agent not later than 10:00 a.m., Chicago time, on the third (3rd) Business Day prior to the requested date of funding of the Loan. Each request for a Loan shall specify the Closing Date (which shall be a Business Day) and the amount of such Loan. Each request for a Loan shall be deemed a representation and warranty by the Borrower that all conditions precedent specified in Section 3.2 to such Loan are satisfied on the date of such request and shall remain satisfied through and including the Closing Date and (ii) no breach or default under, and no Event of Default defined or described in, this Agreement or any of the Loan Documents will exist.

(b)     Immediately upon receipt of a request for a Loan in accordance with Section 2.3(a), Administrative Agent shall present such request to such Lender for consideration.

(c)     The Lender, in its sole discretion, shall determine if it will make a Loan and the amount of any such Loan pursuant to the terms of this Agreement. The Borrower

10614v4

7

acknowledges that Lender may make Loans under the Loan Documents or any other basis deemed appropriate by Lender and Borrower from time to time. Subject to change at Lender's discretion, the Borrower shall not request Loans to purchase inventory other than Eligible Inventory.

(d)    All Lenders must be "accredited investors," as defined in Rule 501(a) of Regulation D of the Securities and Exchange Act of 1933, as amended (the "Act").

(e)    The Administrative Agent may maintain from time to time, at its discretion, records as to any and all Loans made or repaid and interest accrued or paid under this Agreement. All entries made on any such record shall be presumed correct until the Borrower establishes the contrary. On demand by the Administrative Agent, the Borrower will promptly certify in writing the exact principal balance which Borrower then asserts to be outstanding to Lenders for Loans under this Agreement.

2.4    Interest on Loans. Each such Loan shall bear interest at the rate as set forth in the related Note. No provision of this Agreement or any Note shall require the payment of interest in excess of the rate permitted by applicable law.

2.5    No Default Rate. There shall not be a "Default Rate" on any Note.

2.6    Payment of Loans. Within one (1) Business Day after proceeds from the sale of inventory financed by a Loan are deposited into the Depository Account, the Administrative Agent shall direct payment of such proceeds (a) to the Lender or Lenders that own such Loan in an amount owed to such Lender or Lenders, and (b) provided that no Event of Default then exists, the balance of such proceeds, if any, to Borrower or such party or parties as Borrower may direct to Administrative Agent in writing.

2.7    Origination Fee. If it be a condition of the making of any Loan that the Borrower pay to a Lender an origination fee (the "Origination Fee"), such fee shall be non-refundable and payable in full at the time of the making of the Loan. No termination or reduction of any Loan and no failure of the Borrower to satisfy any conditions set forth herein shall entitle the Borrower to a refund of any portion of the Origination Fee. If there is an Origination Fee owing to a Lender from Borrower in connection with any Loan, at such Lender's discretion, it may wire the purchase price for any Note in an amount net of the Origination Fee owing from Borrower.

2.8    Net Payments.
(a)    All payments made by the Borrower hereunder and under any Note will be made without setoff or counterclaim. All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding any tax imposed on or measured by the net income or net profits of a Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Lender is located or any subdivision thereof or therein), and all interest, penalties or similar liabilities with respect to such taxes, levies,

10614v4

8

imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "<u>Taxes</u>"). If any Taxes are so levied or imposed, the Borrower agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Note.

(b)     The parties acknowledge that certain Lender Affiliates of Initial Lender to whom Loans may be sold may not be U.S. Persons within the meaning of Section 7701(a)(30) of the Code (hereafter, an "<u>Offshore Lender</u>"). It is the intention of the parties that (x) all interest accrued and paid on any Note sold by Initial Lender to an Offshore Lender will qualify for exemption from United States withholding tax as "portfolio interest," because the obligations evidenced thereby are either in "registered form" within the meaning of Sections 871(h)(2)(B) and 881(c)(2)(B) of the Code or such note is a short term note having a maturity of less than 183 days, and (y) as such, all interest accrued and paid hereunder will be exempt from United States information reporting under Sections 6041 and 6049 of the Code and United States backup withholding under Section 3406 of the Code. The parties agree to cooperate with one another, and to execute and file such forms or other documents, or to do or refrain from doing such other acts, as may be required, to secure such exemptions from United States withholding tax, information reporting, and backup withholding. In furtherance of the foregoing, the Administrative Agent hereby represents, warrants and covenants to the Borrower that: (i) any such Offshore Lender is or will, at the time of any such assignment, be eligible for the portfolio interest exception of either 871(h)(2) or 881(c)(2) of the Code; (ii) no Offshore Lender is (or will be as long as any amounts due under any Note held by such Person have not been paid in full), a "United States person" within the meaning of Section 7701(a)(30) of the Code; (iii) no Offshore Lender is (or will be as long as any amounts due under any Note held by such Person have not been paid in full), a person described in Section 881(c)(3) of the Code; (iv) the Administrative Agent will not permit any Lender to transfer any Note with a stated term of more than 182 days, unless such Note is surrendered to the Borrower and the Borrower reissues this Note to the transferor, or the Administrative Agent maintains a book entry system on behalf of the Borrower that identifies the new beneficial owner of the principal and interest under this Note; (v) on or prior to the date hereof and on or prior to each anniversary of the date hereof until all amounts due hereunder have been paid in full, each Offshore Lender shall provide the Administrative Agent with a properly executed U.S. Internal Revenue Service ("<u>IRS</u>") Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (or any successor form, certificate or other evidence with respect to United States withholding that is required under the Code), certifying as to such Offshore Lender's status as a non-U.S. Person for purposes of determining exemption from U.S. withholding tax, information reporting and backup withholding with respect to all payments to be made to such Offshore Lender under such Note(s) held by such Person; and (vi) if an event occurs that would require a change in the exempt status of any Offshore Lender or any of the other information provided on the most recent IRS Form W-8BEN (or successor form) previously submitted with respect to any Offshore Lender hereunder, the Administrative Agent will so inform the Borrower in writing (or by submitting to Borrower a new IRS Form W-8BEN or successor form) within 30 days after the occurrence of such event.

11061.1vd

9

## ARTICLE 3.
## CONDITIONS PRECEDENT

3.1    Conditions of Initial Loan. The initial Loan made hereunder shall be subject to the satisfaction of the conditions precedent, in addition to the applicable conditions precedent set forth in Section 3.2 below, that the Administrative Agent shall have received all of the following, in form and substance satisfactory to the Administrative Agent, each duly executed and certified or dated the Closing Date or such other date as is satisfactory to the Administrative Agent:

(a)    The Note appropriately completed and duly executed by the Borrower;

(b)    The Loan Documents appropriately completed and duly executed by the Borrower and the other parties thereto;

(c)    One or more UCC-1 Financing Statements in a form acceptable to the Administrative Agent appropriately completed in favor of the Administrative Agent, describing the Collateral and intended to perfect the security interest of the Administrative Agent, on behalf of the Lenders, in the Collateral;

(d)    Recent UCC searches in a from acceptable to the Administrative Agent from the filing offices in all states required by the Administrative Agent which reflect that no Person other than the Administrative Agent, on behalf of the Lenders, holds a Lien on the Borrower's assets;

(e)    A certificate of the Secretary of the Borrower having attached (a) a copy of the resolution of the Borrower authorizing the execution, delivery and performance of the Loan Documents, certified by the Secretary or an Assistant Secretary of the Borrower; (ii) an incumbency certificate showing the names and titles, and bearing the signatures of, the officers of the Borrower authorized to execute the Loan Documents; and (iii) a copy of the Borrower's certificate of formation and operating agreement with all amendments thereto;

(f)    A copy of the certificate of formation of the Borrower with all amendments thereto, certified by the appropriate governmental official of the jurisdiction of its organization as of a date acceptable to the Administrative Agent;

(g)    Certificates of good standing for the Borrower in the jurisdiction of its organization and such other states as the Borrower is required to qualify to do business, certified by the appropriate governmental officials as of a date acceptable to the Administrative Agent;

(h)    Evidence of insurance for all insurance required by the Loan Documents; and

(j)    Such other approvals, opinions or documents as the Administrative Agent may reasonably request.

10614v4

10

Provided, however, that Initial Lender may elect to advance the purchase price for the Note to the Depository Account prior to satisfaction of all conditions in this Section 3.1 and the act of doing so shall not be deemed a waiver of any theretofore unsatisfied condition unless Administrative Agent expressly waives such condition in writing.

    3.2    Conditions to Each Loan. Each Loan shall be subject to Borrower's satisfaction of all the following conditions precedent:

    (a)    Initial Lender shall have received a Note, duly executed by Borrower with all information completed accurately describing the Borrower's Obligation thereunder;

    (b)    The Borrower's representations and warranties contained in Article 4 shall be true and correct, as though made on the Closing Date;

    (c)    Before and after giving effect to such Loan, no Default or Event of Default shall have occurred and be continuing;

    (d)    Such Loan shall be for the sole purpose of making payment on an invoice for merchandise being acquired for Borrower's inventory;

    (e)    The Administrative Agent shall have received the Borrower's written request for such Loan in the form set forth in Exhibit C prior to the proposed Closing Date. Borrower's written request for such Loan shall include the following information:

    (i)    the proposed Closing Date;

    (ii)    a complete copy (including all attachments and schedules) of any purchase order for merchandise to be purchased issued by Borrower to the merchandise vendor that will be paid in part with the Loan;

    (iii)    if not stated in such purchase order, wire transfer instructions for direct payment of the Loan from the Depository Account to the account of such vendor; provided however, that funds shall not be wired to such vendor without the express written authorization of the Borrower;

    (iv)    a complete copy (including all attachments and schedules) of the purchase order(s) received by Borrower from its customer(s) pursuant to which Borrower is selling all merchandise to be purchased to such vendor; and

    (v)    the location(s) of the merchandise to be purchased with the proceeds of the Loan, including street address and county.

    (f)    A certification that the amount of such Loan shall not exceed ninety percent (90%) of the Borrower's cost of merchandise to be purchased with such funds;

10614v4

11

(g)    The Administrative Agent shall have received evidence in a form satisfactory to Administrative Agent of Borrower's ability to pay the remaining balance of the purchase price of the merchandise to be purchased with the Loan from funds other than a Loan;

(h)    Upon its purchase by the Borrower, the merchandise will be Eligible Inventory;

(i)    Borrower shall have provided evidence satisfactory to Administrative Agent that it has instructed its customer in writing to make all payments on amounts owing from such customer by wire transfer directly to the Depository Account;

(j)    Upon request of Administrative Agent, in the event Borrower is to purchase merchandise with a Loan pursuant to purchase orders issued to the Corporate Guarantor or a Related Party, Borrower shall file a UCC Financing Statement against such Corporate Guarantor or Related Party in favor of the Borrower, describing the assignment of such purchase orders to the Borrower and the Administrative Agent;

(k)    If Initial Lender shall so request, it shall have received a Certificate of the Borrower in a form acceptable to Initial Lender stating that the Note has been duly issued;

(l)    One or more UCC-1 Financing Statements in a form acceptable to the Administrative Agent appropriately completed in favor of the Administrative Agent, describing the Collateral and intended to perfect the security interest of the Administrative Agent, on behalf of the Lenders, in the Collateral; and

(m)    Recent UCC searches in a form acceptable to the Administrative Agent from the filing offices in all states required by the Administrative Agent which reflect that no Person other than the Administrative Agent, on behalf of the Lenders, holds a Lien on the Collateral and the Borrower's assets;

3.3    Withdrawal of Funds from Depository Account.   Pursuant to the terms of the Deposit Pledge and Account Control Agreement, the Borrower may not withdraw funds from the Depository Account in the absence of prior written consent of the Administrative Agent. Borrower acknowledges and agrees that the Administrative Agent, without seeking the consent of the Borrower, will withdraw funds from the Depository Account under the terms of the Deposit Pledge and Account Control Agreement from time to time in order to make payments due and payable on the Notes.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES

To induce the Lenders to make Loans and purchase the Notes, the Borrower represents and warrants to the Administrative Agent and to each Lender as follows:

4.1    Organization, Standing, etc.   The Borrower is a limited liability company duly organized and validly existing and in good standing under the laws of the State of its organization

10614v4

12

and has all requisite power and authority to carry on its business as now conducted, to enter into the Loan Documents to which it is a party and to perform its obligations under such Loan Documents. The Borrower is duly qualified and in good standing as a foreign corporation in each jurisdiction in which the character of the properties owned, leased or operated by it or the business conducted by it makes such qualification necessary and where the failure to qualify could constitute an Adverse Event.

4.2     Authorization and Validity. The execution, delivery and performance by the Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary company action. The Loan Documents to which the Borrower is a party constitute the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their respective terms, subject to limitations as to enforceability which might result from bankruptcy, insolvency, moratorium and other similar laws affecting creditors' rights generally and subject to limitations on the availability of equitable remedies.

4.3     No Conflict, No Default. The execution, delivery and performance by the Borrower of the Loan Documents to which it is a party will not: (a) violate any provision of any law, statute, rule or regulation or any order, writ, judgment, injunction, decree, determination or award of any court, governmental agency or arbitrator presently in effect having applicability to the Borrower; (b) violate or contravene any provisions of the Borrower's certificate of formation or operating agreement; or (c) result in a breach of or constitute a default under any indenture, loan or credit agreement or any other agreement, lease or instrument to which the Borrower is a party or by which it or any of its properties may be bound or result in the creation of any Lien on any asset of the Borrower except for Liens created by the Loan Documents. The Borrower is not in default under or in violation of any such law, statute, rule or regulation, order, writ, judgment, injunction, decree, determination or award or any such indenture, loan or Loan Agreement or other agreement, lease or instrument in any case in which the consequences of such default or violation constitute an Adverse Event. No Default or Event of Default has occurred and is continuing.

4.4     Agreements with Affiliates. The Borrower is not a party to any agreements with the Corporate Guarantor or any entities controlled by the Corporate Guarantor that have not been disclosed in writing to Administrative Agent prior to the date hereof.

4.5     Government Consent. No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any governmental or public body or authority is required on the part of the Borrower to authorize, or is required in connection with the execution, delivery and performance of, or the legality, validity, binding effect or enforceability of, the Loan Documents to which it is a party.

4.6     Litigation. There are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower, or any of its properties, before any court or arbitrator, or any governmental department, board, agency or other instrumentality.

4.7     Contingent Obligations. The Borrower does not have any contingent obligations, except as contemplated hereby.

10614v4

13

4.8   Compliance. The Borrower is in compliance with all statutes and governmental rules and regulations applicable to it.

4.9   Ownership of Property; Leases; Liens. The Borrower owns no real estate, and has good and marketable title to its personal property. Borrower has provided to Administrative Agent true and accurate copies of any and all written real property or personal property leases to which it is party, and has accurately described in writing to Administrative Agent any and all unwritten real property or personal property leases to which it is subject, including any leases with Related Parties. None of the properties, revenues or assets of the Borrower is subject to a Lien except for Liens granted to the Administrative Agent as required by the Loan Documents.

4.10   Indebtedness. The Borrower does not have any Indebtedness except for Indebtedness to Lenders pursuant to Notes.

4.11   Guaranty or Suretyship. The Borrower is not a party to any contract of guaranty or suretyship and none of its assets are subject to such a contract.

4.12   Taxes. The Borrower has filed all federal, state and local tax returns required to be filed and has paid or made provision for the payment of all taxes due and payable pursuant to such returns and pursuant to any assessments made against it or any of its property and all other taxes, fees and other charges imposed on it or any of its property by any governmental authority. No tax Liens have been filed and no claims are being asserted with respect to any such taxes, fees or charges against Borrower. The sum of the charges, accruals and reserves on the books of the Borrower in respect of taxes and other governmental charges are adequate to pay and discharge all such taxes.

4.13   Subsidiaries. The Borrower does not have any Subsidiaries.

4.14   Partnerships and Joint Ventures. The Borrower is not a partner (limited or general) or joint venturer in any partnerships or joint ventures.

4.15   Use of Proceeds. The Loan will be used solely to acquire merchandise from vendors approved by the Administrative Agent that are not Related Parties of the Borrower or the Corporate Guarantor, which merchandise when purchased shall have been contracted for sale by Borrower to customers approved in advance by the Administrative Agent.

4.16   Property Purchased From Vendors. Unless otherwise agreed in writing by the Lender, all Inventory purchased by Borrower with the proceeds of a Loan shall be purchased from vendors who are not Related Parties and whose interest therein is not subject to any Lien or encumbrance superior to Borrower's interest therein.

4.17   Insurance. Upon request, the Borrower will provide evidence of the property and casualty insurance and credit insurance carried by the Borrower.

4.18    Contracts. The Borrower is not a party to any contract or agreement, or subject to any charge, corporate restriction, judgment, decree or order, the performance of which could constitute an Adverse Event.

4.19    Accuracy of Information. All factual information heretofore or herewith furnished by the Borrower to the Administrative Agent for purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all other such factual information hereafter furnished by the Borrower to the Administrative Agent will be, true and accurate in every material respect on the date as of which such information is dated or certified and no such information contains any material misstatement of fact or omits to state any fact necessary to make the statements contained therein not misleading.

4.20    Ownership. As of the Closing Date, all of the outstanding membership interests of the Borrower are owned by Petters Company, Inc. and all of the outstanding capital stock of the Corporate Guarantor is owned by Thomas J. Petters. All of the issued and outstanding membership interests or shares of common stock, as applicable, of the Borrower and of the Corporate Guarantor are duly authorized, validly issued, fully paid and nonassessable.

4.21    Survival of Representations. All representations and warranties contained in this Article 4 shall survive the delivery of all Notes delivered in connection herewith for the period that such Notes remains outstanding.

## ARTICLE 5.
## AFFIRMATIVE COVENANTS

During the Term, unless the Administrative Agent and all Lenders shall otherwise expressly consent in writing, the Borrower will do all of the following:

5.1    Financial Statements and Reports. Furnish to the Administrative Agent:

(a)    As soon as available and in any event within thirty (30) days after the end of each month of each fiscal year, a copy of the unaudited financial statements of the Borrower prepared in conformity with GAAP (except for the omission of footnotes and prior period comparative data required by GAAP and for variations from GAAP which in the aggregate are not material) consisting of a balance sheet as of the close of such month and related statements of operations and retained earnings and cash flow for such month and from the beginning of such fiscal year to the end of such month together with the other monthly reports required by the Administrative Agent.

(b)    By no later than two (2) Business Days after becoming aware of any Default or Event of Default, a notice describing the nature thereof and what action the Borrower proposes to take with respect thereto.

(c)    By no later than two (2) Business Days after becoming aware of the occurrence thereof, notice of the institution of any litigation, arbitration or governmental proceeding against the Borrower or the Corporate Guarantor or any of their property which, if

10614v4

15

determined adversely to the Borrower or the Corporate Guarantor would constitute an Adverse Event, or the rendering of a judgment or decision in such litigation or proceeding which constitutes an Adverse Event, and the steps being taken by the defendant with respect thereto.

(d)    As soon as available and in any event within thirty (30) days after the end of each month of each fiscal year, a copy of the account records relating to the Depository Account as regularly furnished by the Depository Bank.

(e)    If any customer of Borrower shall at any time make payments to any account of the Borrower other than the Depository Account or any account of a Related Party (although such payments are required hereunder to be made to the Depository Account directly), as soon as available and in any event within thirty (30) days after the end of each month of each fiscal year, a copy of the account records relating to such account for as many months as Administrative Agent may request in its sole discretion.

(f)    From time to time, such other information regarding the business, operation and financial condition of the Borrower as the Administrative Agent may reasonably request.

5.2    Company Existence. Maintain its company existence and good standing under the laws of its jurisdiction of organization and its qualification to transact business in each jurisdiction in which the character of the properties owned, leased or operated by it or the business conducted by it makes such qualification necessary and where the failure to so qualify could constitute an Adverse Event.

5.3    Insurance. Maintain with financially sound and reputable insurance companies such insurance as may be required by any Loan Document or by law and such other insurance in such amounts and against such hazards as is customary in the case of reputable corporations or companies engaged in the same or similar business and similarly situated. At the request of Lender, Borrower shall purchase credit insurance with respect to account debtors for Accounts of the Borrower and assign benefits payable thereunder to Lender in a form acceptable to Lender, provided that Lender shall have agreed to reimburse Borrower for the cost of such insurance.

5.4    Payment of Taxes and Claims. File all tax returns and reports which are required by law to be filed by it and pay before they become delinquent all taxes, assessments and governmental charges and levies imposed upon it or its property and all claims or demands of any kind (including, without limitation, those of suppliers, mechanics, carriers, warehouses, landlords and other like Persons) which, if unpaid, might result in the creation of a Lien upon its property (other than taxes, fees or charges the amount or validity of which are being contested in good faith by appropriate proceedings and with respect to which reserves in accordance with GAAP have been provided on the books of the Borrower).

5.5    Inspection. Permit any Person designated by the Administrative Agent to visit and inspect any of its properties, company books and financial records, or, on behalf of the Borrower with its permission deemed granted by execution hereof, and to discuss the affairs, finances and accounts of the Borrower with, and to be advised as to the same by, its officers at such reasonable times and intervals as the Administrative Agent may designate. Administrative Agent

10614v4

16

specifically acknowledges that other entities may share properties with the Borrower, and any inspections shall be specifically limited to properties, company books and financial records of, or directly relating to, the Borrower, its business or operations.

5.6    Maintenance of Properties. Provide copies or descriptions of all real property or personal property leases it enters into during the Term within thirty (30) days of commencement of such lease. Borrower shall maintain its properties used or useful in the conduct of its business in good condition, repair and working order, and supplied with all necessary equipment, and make all necessary repairs, renewals, replacements, betterments, and improvements thereto, all as may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

5.7    Books and Records. Keep adequate and proper records and books of account in which full and correct entries will be made of its dealings, business and affairs.

5.8    Bills of Sale. If the Administrative Agent shall so request, deliver to the Administrative Agent an executed Bill of Sale from each merchandise vendor with respect to the Inventory purchased by the Borrower in the form set forth in Exhibit D not later than three (3) Business Days following the making of the Loan financing such purchase.

5.9    Compliance. Comply in all material respects with all laws, rules, regulations, orders, writs, judgments, injunctions, decrees or awards to which it may be subject.

## ARTICLE 6.
## NEGATIVE COVENANTS

During the Term, unless the Administrative Agent shall otherwise expressly consent in writing, the Borrower will not do any of the following:

6.1    Merger. Merge or consolidate or enter into any analogous reorganization or transaction with any Person.

6.2    Sale of Assets. Sell, transfer, lease, or otherwise convey all or any part of its assets except for sales of Inventory in the ordinary course of business and for the fair market value thereof.

6.3    Change in Nature of Business. Make any material change in the nature of its business as carried on at the date hereof.

6.4    Subsidiaries. Partnerships and Joint Ventures. Either: (a) form or acquire any corporation or company which would thereby become a Subsidiary; or (b) form or enter into any partnership as a limited or general partner or form or enter into any joint venture.

6.5    Other Agreements. Enter into any agreement, bond, note or other instrument with or for the benefit of any Person other than the Administrative Agent or the Lenders which would: (a) prohibit the Borrower from granting, or otherwise limit the ability of the Borrower to grant to

10614v4

17

the Administrative Agent, or any other Person designated by Administrative Agent, any Lien on any assets or properties of the Borrower; or (b) be violated or breached by the Borrower's performance of its obligations under the Loan Documents.

6.6    Payment Terms. Materially change its selling terms of payment on accounts as in effect on the date of this Agreement.

6.7    Investments. Acquire for value, make, have or hold any Investments, except deposits in the Depository Account or such other Investments authorized by Administrative Agent in writing.

6.8    Indebtedness. Incur, create, issue, assume or suffer to exist any Indebtedness except:

(a)    Indebtedness to a Lender;

(b)    Current liabilities, other than for borrowed money, incurred in the ordinary course of business; and

(c)    Indebtedness consisting of endorsements for collection, deposit or negotiation and warranties of products or services, in each case incurred in the ordinary course of business.

6.9    Liens. Create, incur, assume or suffer to exist any Lien with respect to any property, revenues or assets now owned or hereafter arising or acquired, except:

(a)    Liens granted for the benefit of the Lenders;

(b)    Deposits or pledges to secure payment of workers' compensation, unemployment insurance, pensions or other social security obligations, in the ordinary course of business of the Borrower;

(c)    Liens for taxes, fees, assessments and governmental charges not delinquent;

(d)    Liens of carriers, warehousemen, mechanics and materialmen, and other like Liens arising in the ordinary course of business, for sums not due; and

(e)    Deposits to secure the performance of bids, trade contracts, leases, statutory obligations and other obligations of a like nature incurred in the ordinary course of business.

6.10    Contingent Liabilities. Either: (a) endorse, guarantee, contingently agree to purchase or to provide funds for the payment of, or otherwise become contingently liable upon, any obligation of any other Person, except by the endorsement of negotiable instruments for deposit or collection (or similar transactions) in the ordinary course of business; or (b) agree to maintain the net worth or working capital of, or provide funds to satisfy any other financial test applicable to, any other Person.

10614v4

18

6.11   Unconditional Purchase Obligations. Enter into or be a party to any contract for the purchase or lease of materials, supplies or other property or services if such contract requires that payment be made by it regardless of whether or not delivery is ever made of such materials, supplies or other property or services.

6.12   Purchase Orders and Accounts. Cancel or modify, or permit a customer to cancel or modify, any purchase order received by the Borrower from any customer; provided however, that Borrower and customers may make minor adjustments and modifications in the ordinary course of business to such purchase orders.

## ARTICLE 7.
## EVENTS OF DEFAULT AND REMEDIES

7.1   Events of Default. The occurrence of any one (1) or more of the following events shall constitute an Event of Default upon the expiration of the cure period, if any, described in the relevant event:

(a)   The Borrower shall fail to make when due, whether by acceleration or otherwise, (i) any payment of principal of, or interest on, any Note or (ii) any fee or other amount required to be made to the Initial Lender or to the Administrative Agent pursuant to any Loan Document and such payment default shall continue for longer than ten (10) business days;

(b)   Any representation or warranty made or deemed to have been made by or on behalf of the Borrower or the Corporate Guarantor in any of the Loan Documents by or on behalf of the Borrower or the Corporate Guarantor in any certificate, statement, report or other writing furnished by or on behalf of the Borrower to the Administrative Agent or any Lender pursuant to the Loan Documents shall prove to have been false or misleading in any material respect on the date as of which the facts set forth are stated or certified or deemed to have been stated or certified;

(c)   The Borrower shall fail to comply with Section 5.3, hereof and such failure shall continue for a period of three (3) days after notification of such failure;

(d)   The Borrower shall fail to comply with any agreement, covenant, condition, provision or term contained in the Loan Documents on its part to be performed (and such failure shall not constitute an Event of Default under any of the other provisions of this Section 7.1) and such failure to comply shall continue for ten (10) calendar days after notice thereof to the Borrower by the Administrative Agent or any Lender;

(e)   The Borrower or the Corporate Guarantor shall become Insolvent or shall generally not pay its or his debts as they mature or shall apply for, shall consent to, or shall acquiesce in the appointment of a custodian, trustee or receiver of the Borrower or the Corporate Guarantor, or for a substantial part of the property of any one (1) of them or, in the absence of such application, consent or acquiescence, a custodian, trustee or receiver shall be appointed for

10614v4

19

the Borrower or the Corporate Guarantor, or for a substantial part of the property of anyone of them and shall not be discharged within thirty (30) days;

(f) Any bankruptcy, reorganization, debt arrangement or other proceedings under any bankruptcy or insolvency law shall be instituted by or against the Borrower or the Corporate Guarantor, and, if so instituted, shall have been consented to or acquiesced in by the Borrower or the Corporate Guarantor, or shall remain undismissed for sixty (60) days, or an order for relief shall have been entered against the Borrower or the Corporate Guarantor, or such debtor shall take any corporate action to approve institution of, or shall have acquiesced in, such a proceeding;

(g) Any dissolution or liquidation proceeding shall be instituted by or against the Borrower or the Corporate Guarantor, and, if so instituted, shall be consented to or acquiesced in by the Borrower or the Corporate Guarantor shall remain for sixty (60) days undismissed, or the Borrower or the Corporate Guarantor shall take any corporate action to approve institution of, or acquiescence in, such a proceeding;

(h) A judgment or judgments for the payment of money in excess of the sum of One Hundred Thousand Dollars ($100,000.00) in the aggregate shall be rendered against the Borrower or the Corporate Guarantor and the Borrower or the Corporate Guarantor shall not discharge the same or provide for its discharge in accordance with its terms, or procure a stay of execution thereof, prior to any execution on such judgments by such judgment creditor, within thirty (30) days from the date of entry thereof, and within said period of thirty (30) days, or such longer period during which execution of such judgment shall be stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal;

(i) The maturity of any Indebtedness of the Borrower or the Corporate Guarantor (other than Indebtedness under this Agreement or the Loan Documents) shall be accelerated, or the Borrower or the Corporate Guarantor shall fail to pay any such Indebtedness when due and any applicable grace period shall have expired or, in the case of such Indebtedness payable on demand, when demanded, or any event shall occur or condition shall exist and shall continue for more than the period of grace, if any, applicable thereto and shall have the effect of causing, or permitting (any required notice having been given and grace period having expired) the holder of any such Indebtedness or any trustee or other Person acting on behalf of such holder to cause such Indebtedness to become due prior to its stated maturity or to realize upon any collateral given as security therefor;

(j) Petters Company, Inc. shall cease to own all of the issued and outstanding membership interest in the Borrower or all of the issued and outstanding capital stock on a fully-diluted basis of the Corporate Guarantor;

(k) Thomas J. Petters shall die, become mentally incapacitated or otherwise become unable to fulfill his duties as chief executive officer of either the Borrower or the Corporate Guarantor;

10614v4

20

(l)     If the validity or enforceability of any of the Loan Documents shall be challenged by the Borrower or any other party thereto, or shall fail to remain in full force and effect; or

(m)    The Administrative Agent shall have determined in good faith the interest of the Administrative Agent or any Lender in any material Collateral has been materially adversely affected or impaired, or the value thereof to the Lenders has been diminished to a material extent, regardless if the condition giving rise to such determination does not constitute an Event of Default under any of the other subsections of this Section 7.1 and the Administrative Agent shall have given such Lender written notice of such adverse condition, afforded such Lender ten (10) days to cure such adverse condition (provided such adverse condition is curable) and such adverse condition shall still remain (as determined by Administrative Agent) after such cure period.

7.2     Remedies. If: (a) any Event of Default described in Sections 7.1(e), (f) or (g) shall occur, the outstanding unpaid principal balance of the Note, the accrued interest thereon and all other Obligations under the Loan Documents shall automatically become immediately due and payable; or (b) any other Event of Default shall occur and be continuing, then the Administrative Agent may take any or all of the following actions: (i) declare that the outstanding unpaid principal balance of any or all Notes, the accrued and unpaid interest thereon and all other Obligations under the Loan Documents to be forthwith due and payable, whereupon the Notes, all accrued and unpaid interest thereon and all such Obligations shall immediately become due and payable, in each case without demand or notice of any kind, all of which are hereby expressly waived, anything in this Agreement or in any Note to the contrary notwithstanding; (ii) exercise all rights and remedies under any other instrument, document or agreement between the Borrower and Administrative Agent, Administrative Agent and/or any Lender; and (iii) enforce all rights and remedies under any applicable law.

7.3     Offset. In addition to the remedies set forth in Section 7.2, upon the occurrence of any Event of Default or at any time thereafter while such Event of Default continues, the Administrative Agent, any Lender or any other holder of any Note may offset any and all balances, credits, deposits (general or special), time or demand, provisional or final), accounts or monies of the Borrower then or thereafter with such Lender or such other holder, or any obligations of such Lender or such other holder of such Note, against the Indebtedness then owed by the Borrower to such Lender. The Borrower hereby grants to the Lenders and each Note holder a security interest in all such balances, credits, deposits, accounts or monies.

## ARTICLE 8.
## ADMINISTRATIVE AGENT; ASSIGNMENTS

8.1     Appointment. The Lenders hereby designate and appoint AWB Services, LLC as Administrative Agent and as their Administrative Agent (for purposes of this Article 8, the term "Administrative Agent" also shall include AWB Services, LLC, in its capacity as Secured Party under the Security Agreement and the Deposit Pledge and Account Control Agreement) on their collective behalf to act as specified herein and in the Loan Documents. Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be

deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the Loan Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto, including, without limitation, to execute and deliver the Security Agreement and the Deposit Pledge and Account Control Agreement and any Loan Document necessary or useful in connection with the Obligations and Lenders' security interests relating thereto. The Administrative Agent may perform any of its duties hereunder by or through its officers, directors, agents, employees or affiliates. The Lenders agree that Borrower shall have the right to rely on the direction given by the Administrative Agent or its successor.

8.2 Nature of Duties. The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the Loan Documents. Neither the Administrative Agent nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by any of them hereunder or under any Loan Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). The duties of the Administrative Agent shall be mechanical and administrative in nature. The Administrative Agent shall not have by reason of this Agreement or any Loan Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any Loan Document except as expressly set forth herein or therein.

8.3 Lack of Reliance on the Agreement. Independently and without reliance upon the Administrative Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrower in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Borrower and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectibility, priority or sufficiency of this Agreement or any Loan Document or the financial condition of the Borrower or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any Loan Document, or the financial condition of the Borrower or the existence or possible existence of any Default or Event of Default.

8.4 Certain Rights of the Agent. If the Administrative Agent requests instructions from the Lenders with respect to any act or action (including failure to act) in connection with

11614v4

22

this Agreement or any Loan Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any Loan Document in accordance with the instructions of the Lenders.

8.5     Reliance. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

8.6     Indemnification. To the extent the Administrative Agent (or any affiliate thereto) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective percentage of principal amount of Notes held by them for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in performing its duties hereunder or under any Loan Document or in any way relating to or arising out of this Agreement or any Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

8.7     Holders. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor. Notwithstanding anything in this Section, no Note or interest in any Note may be transferred unless such transfer complies with Section 8.15 of this Agreement.

8.8     Resignation by the Administrative Agent.

(a)     The Administrative Agent may resign from the performance of all its functions and duties hereunder and/or under the Loan Documents at any time by giving fifteen (15) Business Days' prior written notice to the Lenders and the Borrower. Such resignation shall

10614v4

23

take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation by the Administrative Agent, the Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (provided that the Borrower's approval shall not be required if a Default or an Event of Default then exists).

8.9    Release of Collateral. The Lenders hereby irrevocably authorize Administrative Agent, at its option and in its discretion, to release any lien granted to or held by it upon any Collateral (i) upon payment and satisfaction of all obligations under the Notes (other than contingent indemnification obligations to the extent no claims giving rise thereto have been asserted); (ii) constituting property being sold or disposed of if Borrower certifies to Administrative Agent that the sale or disposition is made in compliance with the provisions of the applicable Collateral Document (and Administrative Agent may rely in good faith conclusively on any such certificate, without further inquiry); (iii) in accordance with the terms of the Security Agreement, or (iv) having a fair market value not greater than twenty five percent (25%) of the total fair market value of all Collateral, either in a single transaction or in a series of related transactions.

8.10    Confirmation of Authority; Execution of Releases. Without in any manner limiting Administrative Agent's authority to act without any specific or further authorization or consent by Lenders, each Lender agrees to confirm in writing, upon request by Administrative Agent, the authority to release any Collateral conferred upon Administrative Agent hereunder. Upon receipt by Administrative Agent of any required confirmation from the Requisite Lenders of its authority to release any particular item or types of Collateral, Administrative Agent shall (and is hereby irrevocably authorized by Lenders to) execute such documents as may be necessary to evidence the release of the liens granted to Administrative Agent upon such Collateral; provided, however, that (i) Administrative Agent shall not be required to execute any such document on terms which, in Administrative Agent's opinion, would expose Administrative Agent to liability or create any obligation or entail any consequence other than the release of such liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the indebtedness evidenced by the Notes or any liens upon (or obligations of Borrower, in respect of), all interests retained by Borrower, including (without limitation) the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

8.11    Absence of Duty. Administrative Agent shall have no obligation whatsoever to any Lender or any other Person to assure that the property covered by the Security Agreement exists or is owned by Borrower or is cared for, protected or insured or has been encumbered or that the Liens granted to Administrative Agent have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to such Agent in any of the Loan Documents, it being understood and agreed that in respect of the property covered by the Security Agreement, the Deposit Pledge and Account Control Agreement or any act,

10614vd

24

omission or event related thereto, Administrative Agent may act in any manner it may deem appropriate, in its discretion and provided that Administrative Agent shall exercise the same care which it would in dealing with loans for its own account.

8.12    Agent for Perfection. Each Lender hereby appoints Administrative Agent as agent for the purpose of perfecting such Lender's security interest in that portion of the Collateral which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control. Each Lender agrees that it will not have any right individually to enforce or seek to enforce the Security Agreement or to realize upon any Collateral for the Notes unless consented to by Administrative Agent, it being understood and agreed that such rights and remedies may be exercised only by Administrative Agent. Nothing herein is intended or shall be construed to limit any Lender's rights under its Note, including the right to enforce, accelerate, amend, compromise or otherwise administer such Note.

8.13    Fees. Each Lender agrees to pay to Administrative Agent, for its services as Administrative Agent hereunder such Lender's pro rata share of the Administrative Agent Fees.

8.14    Amendments, Consents and Waivers.

Except as otherwise provided herein and except as to matters set forth in other subsections hereof or in any Loan Document as requiring only Administrative Agent's consent, the consent of Requisite Lenders will be required to amend, modify, terminate, or waive any provision of this Agreement or any of the Loan Documents; provided however, that if such amendment, modification, termination or waiver applies only to a certain Loan or Loans, only the consent of the Lender or Lenders with respect to such Loans shall be required.

In the event Administrative Agent requests the consent of a Lender and does not receive a written consent or denial thereof within ten (10) Business Days after such Lender's receipt of such request, then such Lender will be deemed to have given such consent.

8.15    Assignments.

(a)    Each Lender may from time to time assign, subject to the terms of an Assignment and Acceptance Agreement and this Section 8.15 hereof, a Loan to another Person; provided, however, that no Lender will offer, sell or otherwise dispose of all or any part of a Note except under circumstances which will not result in a violation of the Act or applicable state securities laws. In the case of an assignment authorized hereunder, the assignee shall have, as to the Loan assigned, the same rights, benefits and obligations as it would if it were a Lender hereunder and the assigning Lender shall be relieved of its obligations hereunder with respect to such Loan or assigned portion thereof.

(b)    Borrower hereby acknowledges and agrees that any assignment will give rise to a direct obligation of Borrower to the assignee and that the assignee shall be considered to be a Lender hereunder. Neither the Administrative Agent nor any Lender may assign its rights and obligations under this Agreement and the Loan Documents to any Person without the prior written consent of the Borrower, which consent shall not be unreasonably withheld, delayed or

1061434

25

conditioned; provided, however, that Initial Lender may sell, transfer or assign Loans and corresponding Notes to its Lender Affiliates without Borrower's consent so long as such sale or assignment complies with sections (a)(1) and (a)(2) of Rule 904 of the Code. If any Lender assigns its rights and interest under any of the Loan Documents to a Person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code; such assignee shall deliver to the Borrower on or before the date of such an assignment an IRS Form W-8BEN (or any successor or form) certifying as to such assignee's status for purposes of determining exemption from United States withholding tax, information reporting and backup withholding with respect to all payments to be made to such assignee. In addition, all assignees shall comply with the requirements of Sections 2.3(d) and 8.16 of this Agreement. Any attempted assignment in violation of this Section 8.15(b) shall be void and of no force and effect.

8.16    Recording of Assignments. Administrative Agent shall maintain at its office a copy of each Assignment and Acceptance Agreement delivered to it and a register for the recordation of the names and addresses of Lenders, and the commitments of, and principal amount of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be presumptive evidence of the amounts due and owing to Lender in the absence of manifest error. Borrower, Administrative Agent and each Lender may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrower and any Lender, at any reasonable time upon reasonable prior notice.

8.17    Acceptance of Assignment by Administrative Agent. Upon its receipt of a duly completed Assignment and Acceptance Agreement executed by an assigning Lender and its assignee (together with the Note(s) subject to such assignment), evidence satisfactory to the Administrative Agent and Borrower that such assignment complies with Section 8.15, and receipt of the Borrower's written consent to assignment if required by Section 8.15, Administrative Agent shall (1) accept such Assignment and Acceptance Agreement, (2) record the information contained therein in the Register and (3) other than in connection with assignments to Lender Affiliates not requiring Borrower's consent, give prompt notice thereof to Borrower and the other Lenders. If requested by Administrative Agent, Borrower shall promptly execute and deliver to Administrative Agent new Note(s) evidencing the Obligations owed by Borrower to the assignee and, if applicable, the assigning Lender, after giving effect to the assignment. Administrative Agent shall cancel the Notes delivered to it by the assigning Lender and deliver the new Notes to the assignee and, unless the assigning Lender has assigned all of its interests under this Agreement, the assigning Lender.

8.18    Security Interests in Obligations; Assignments to Affiliates. Any Lender may at any time, following written notice to Administrative Agent, (1) with the written consent of Borrower, pledge the Obligations held by it or create a security interest in all or any portion of its rights under this Agreement or the Loan Documents in favor of any Person; provided, however, that (a) no such pledge or grant of security interest to any Person shall release such Lender from its obligations hereunder or under any Loan Document and (b) the acquisition of title to such Lender's Obligations pursuant to any foreclosure or other exercise of remedies by such Person shall be subject to the provisions of this Agreement and the Loan Documents in all respects; and (2) assign all or any portion of its funded Loans to a Lender Affiliate of such Lender, to one or

10614v4

26

more other Lenders or to a Lender Affiliate of such other Lender, provided however, that such assignment must be otherwise in accordance with Section 8.15 of this Agreement.

8.19 Other Matters. Except as otherwise provided herein, no Lender shall, as between Borrower and that Lender, be relieved of any of its obligations hereunder as a result of any sale, assignment, transfer or negotiation of, or granting of a participation in, all or any part of the Loans, the Notes or other Obligations owed to such Lender. Each Lender may furnish any information concerning Borrower in possession of that Lender from time to time to Borrower, approved assignees and participants and to any Lender Affiliate of such Lender or its parent company.

## ARTICLE 9.
## MISCELLANEOUS

9.1 Waiver and Amendment. No failure on the part of the Administrative Agent, any Lender or the holder of any Note to exercise and no delay in exercising any power or right hereunder or under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right. The remedies herein and in any other instrument, document or agreement delivered or to be delivered to the Administrative Agent or any Lender hereunder or in connection herewith are cumulative and not exclusive of any remedies provided by law. No notice to or demand on the Borrower not required hereunder or under any Note or any Loan Document shall in any event entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Administrative Agent, any Lender or the holder of any Note to any other or further action in any circumstances without notice or demand. No amendment, modification or waiver of any provision of this Agreement or any Note or consent to any departure by the Borrower therefrom shall be effective unless the same shall be in writing and signed by the Administrative Agent, on behalf of all Lenders, and then such amendment, modification, waiver or consent shall be effective only in the specific instances and for the specific purpose for which given.

9.2 Expenses and Indemnities.

(a) Loan Documents. The Borrower agrees to pay and reimburse the Administrative Agent for all expenses paid or incurred by the Administrative Agent (including reasonable fees and expenses of legal counsel, who may be employees of the Administrative Agent or an affiliate) in connection with the collection and enforcement of the Loan Documents (including the Security Agreement and the Deposit Account Pledge Agreement). The Borrower agrees to pay, and save the Administrative Agent and all Lenders harmless from all liability for, any stamp or other taxes which may be payable with respect to the execution or delivery of the Loan Documents.

(b) General Indemnity. In addition to the payment of expenses pursuant to Section 9.2(a), whether or not the transactions contemplated hereby shall be consummated, the Borrower hereby indemnifies, and agrees to pay and hold the Administrative Agent, the Lenders, their affiliates and any holder of any Note, and their respective officers, directors, employees,

10614v4

27

agents, successors and assigns (collectively, the "Indemnitees") harmless from and against, any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for any of such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not any of such Indemnitees shall be designated a party thereto), that may be imposed on, incurred by, or asserted against the Indemnitees (or any of them), in any manner relating to or arising out of the Loan Documents, the statements contained in any letters delivered by the Administrative Agent or any Lender, or the use or intended use of the proceeds of any of the Loan (the "Indemnified Liabilities"); provided, however, that the Borrower shall have no obligation to an Indemnitee hereunder with respect to Indemnified Liabilities arising from the material breach of this Agreement or the Loan Documents by an Indemnitee or arising from the gross negligence or willful misconduct of an Indemnitee. To the extent that the undertaking to indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.

(c)   Survival. The obligations of the Borrower under this Section 9.2 shall survive any termination of this Agreement.

9.3   Notices. Except when telephonic notice is expressly authorized by this Agreement, any notice or other communication to any party in connection with this Agreement shall be in writing and shall be sent by manual delivery, telegram, telex, facsimile transmission, overnight courier or United States mail (postage prepaid) addressed to such party at the address specified on the signature page hereof, or at such other address as such party shall have specified to the other party hereto in writing. All periods of notice shall be measured from the date of delivery thereof if manually delivered, from the date of sending thereof if sent by telegram, telex or facsimile transmission, from the first Business Day after the date of sending if sent by overnight courier, or from four (4) days after the date of mailing if mailed; provided, however, that any notice to the Administrative Agent under Section 2.3 hereof shall be deemed to have been given only when received by the Administrative Agent. The Borrower hereby authorizes the Administrative Agent and any Lender to rely upon the telephone or written instructions of any person identifying himself or herself as an authorized officer of the Borrower and upon any signature which the Administrative Agent or such Lender believes to be genuine, and the Borrower shall be bound thereby in the same manner as if the Borrower were authorized or such signature were genuine.

9.4   Successors and Assignment. This Agreement shall be binding upon the Borrower, the Administrative Agent, the Lenders and their respective successors and assigns, and shall inure to the benefit of the Borrower, the Administrative Agent, the Lenders and the successors and permitted assigns of the Borrower, the Administrative Agent and the Lenders. The Borrower shall not assign its rights or duties hereunder without the consent of the Administrative Agent, on behalf of the Lenders.

10614v4

28

9.5    Participations. Any Lender may sell participation interests in any or all of the Loan and in all or any portion of the Note.

9.6    Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

9.7    Captions. The captions or headings herein and any table of contents hereto are for convenience only and in no way define, limit or describe the scope or intent of any provision of this Agreement.

9.8    Confidentiality. The parties acknowledge that information about parties with whom the Borrower and the Lender transact business, existing and potential investors, the structure of the transactions contemplated hereby, plans for future development, promotional methods and any other information of a similar nature not available to the public, including, without limitation, all documentation related thereto constitute confidential information of the parties (collectively, "Confidential Information"). The parties shall use the Confidential Information exclusively for the purposes of this Agreement and shall use their best efforts to safeguard the secrecy and confidentiality of the Confidential Information, which the parties acknowledge constitute "trade secrets" or "Confidential Information" of each party, and shall not disclose any of the Confidential Information to any third party, during the term of this Agreement or thereafter, except: (a) information which at the time of disclosure is part of the public knowledge or literature and is readily accessible to such third party; provided that any combination of features shall not be deemed within this exception merely because individual features are part of the public knowledge or literature and readily accessible to such third party, but only if the combination itself and its principle of operation are part of the public knowledge or literature and are readily accessible to such third party; (b) information required by law to be disclosed; or (c) with the express prior written consent of the party to whom the information pertains.

9.9    Entire Agreement. This Agreement, the Notes and the Loan Documents embody the entire agreement and understanding between the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof. This Agreement supersedes all prior oral and written agreements and understandings relating to the subject matter hereof.

9.10    Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and either of the parties hereto may execute this Agreement by signing any such counterpart.

9.11    Governing Law. This Agreement shall be deemed to be a contract made under the laws of the State of Illinois and for all purposes shall be construed in accordance with the laws of the State of Illinois.

9.12    JURISDICTION; WAIVER. BORROWER ACKNOWLEDGES THAT THIS AGREEMENT IS BEING SIGNED BY THE ADMINISTRATIVE AGENT ON BEHALF OF

10614v4

29

THE LENDERS IN PARTIAL CONSIDERATION OF LENDERS' RIGHT TO ENFORCE THIS AGREEMENT AS STATED BELOW. BORROWER CONSENTS TO EXCLUSIVE JURISDICTION IN THE STATE OF ILLINOIS AND VENUE IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF COOK FOR SUCH PURPOSES AND WAIVES ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND ANY OBJECTION THAT SAID COUNTY IS NOT CONVENIENT. BORROWER WAIVES ANY RIGHTS TO COMMENCE ANY ACTION AGAINST LENDER IN ANY JURISDICTION EXCEPT THE AFORESAID COUNTY AND STATE. LENDER AND BORROWER HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY WITH RESPECT TO ANY MATTER WHATSOEVER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE LOANS, THE LOAN DOCUMENTS AND/OR THE TRANSACTIONS WHICH ARE THE SUBJECT OF THE LOAN DOCUMENTS.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above.

"Borrower":

EDGE ONE, LLC

By: _____
Its: _____

4400 Baker Road
Minnetonka, MN 55343
Attn: Deanna Munson
With a copy to:  Legal Department

"Initial Lender"

ATOZ INVESTORS FUND, L.P.

By: AtoZ Investment Management, LLC,
a Delaware limited liability company
Its: General Partner

By: _____
One of its Managers

"Administrative Agent":

AWB SERVICES, LLC

By: _____
Its: _____

1061.1v1

30

## Exhibit A-1
## FORM OF REGISTERED PROMISSORY NOTE

$_____

Chicago, Illinois
[Date]

FOR VALUE RECEIVED, Edge One, LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to _____, or its assigns (the "Lender"), to the account set forth below, the principal sum of _____ AND 00/100 DOLLARS on the Maturity Date (as defined below).

The Borrower promises also to pay on the Maturity Date interest on the unpaid principal amount hereof in like money at said office from the date funds are advanced hereunder until paid at the rate of _____ percent (___%) per month.

The "Maturity Date" is the first to occur of (1) _____ , 200___, or (2) the date that payments received by the Borrower on those certain Accounts arising from the sale of any Inventory purchased by Borrower in part with the proceeds of this Loan equal or exceed, in the aggregate, the unpaid principal and accrued interest on this Note.

This Note is one of the Notes referred to in that certain Master Loan Agreement dated as of July 5, 2007 (herein called the "Master Loan Agreement") among the Borrower, the Lender and AWB Services, LLC, as Administrative Agent, to which Master Loan Agreement and all agreements supplemental thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Borrower and the Lender and of the terms upon which this Note is delivered. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Master Loan Agreement. This Note is secured by and the Lender hereof is entitled to the benefits provided under the Loan Documents (as defined in the Master Loan Agreement). This Note is entitled to the benefits of the Corporate Guaranty (as defined in the Master Loan Agreement). This Note is subject to prepayment prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

In the case of a default in payment of principal upon acceleration, upon redemption or repayment or at the Maturity Date, the overdue principal of this Note shall bear interest at a rate of _____ percent (____%) per calendar day accruing from the Maturity Date to the date payment of such principal has been made or duly provided for. In the event that the Maturity Date is not a Business Day, the principal otherwise payable on such Maturity Date will be paid on the next succeeding Business Day with the same force and effect as if made on such Maturity Date.

If an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may become or be declared to be due and payable in the manner and with the effect provided in the Master Loan Agreement.

The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

10614v4

1

No reference herein to the Master Loan Agreement and no provision of this Note or of the Master Loan Agreement shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of (and premium, if any) and interest on this Note at the times, place and rate, and in the coin or currency, herein prescribed.

The transfer of this Note is registrable in the register maintained by the Administrative Agent, upon surrender of this Note for registration of transfer in accordance with Article 8 of the Master Loan Agreement. Prior to due presentment of this Note for registration of transfer, the Borrower and Administrative Agent may treat the Person in whose name this Note is registered in such register as the owner hereof for all purposes, whether or not this Note be overdue, and neither the Borrower nor the Administrative Agent shall be affected by notice to the contrary. This Note is a registered instrument. A manually signed copy of this Note shall be evidence of the Lender's rights and is not a bearer instrument.

This Note may be transferred only in accordance with the Master Loan Agreement, including without limitation, Section 8.15 of the Master Loan Agreement. This Note shall be governed exclusively by and construed in accordance with the laws of the State of Illinois. The venue, jurisdiction and jury trial waiver provisions set forth in the Master Loan Agreement are applicable to the Note as if fully set forth herein.

Payment of the principal of and interest, if any, on this Note will be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payment of the principal of and interest, if any, on this Note due on the Maturity Date will be made in immediately available funds on the Maturity Date (whether or not this Note has been presented), with such funds transferred by wire to the following account:

_____
_____
_____

or such other account or place as the Administrative Agent shall direct the Borrower in writing.

IN WITNESS WHEREOF, the Borrower has caused this instrument to be duly executed.

EDGE ONE, LLC

By: _____
     Thomas J. Petters, President

10614v4

2

## Exhibit A-2

# FORM OF ZERO COUPON REGISTERED PROMISSORY NOTE

Principal Amount                                                Original Issue Date: _____
Due at Maturity: $ _____                                     Chicago, Illinois

FOR VALUE RECEIVED, Edge One, LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to _____, or assigns (the "Lender"), to the account set forth below, the principal sum of _____ AND 00/100 DOLLARS on the Maturity Date (as defined below).

The Maturity Date is _____, 200__.

The principal of this Note shall not bear interest except in the case of a default in payment of principal upon acceleration or at the Maturity Date, and in such case the overdue principal of this Note shall bear interest at a rate of _____ percent (___ %) per calendar day accruing from the Maturity Date to the date payment of such principal has been made or duly provided for. Any such interest on any overdue principal that is not so paid on demand shall bear interest at the same rate as the interest on the overdue principal (to the extent that the payment of such interest shall be legally enforceable), which shall accrue from the date of such demand for payment to the date payment of such interest has been made or duly provided for, and such interest shall also be payable upon demand. In the event that the Maturity Date is not a Business Day, the principal otherwise payable on such Maturity Date will be paid on the next succeeding Business Day with the same force and effect as if made on such Maturity Date.

This Note is one of the Notes referred to in that certain Master Loan Agreement dated as of July 5, 2007 (herein called the "Master Loan Agreement") among the Borrower, the Lender and AWB Services, LLC, as Administrative Agent, to which Master Loan Agreement and all agreements supplemental thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Borrower and the Lender and of the terms upon which this Note is delivered. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Master Loan Agreement. This Note is secured by and the Lender hereof is entitled to the benefits provided under the Loan Documents (as defined in the Master Loan Agreement). This Note is entitled to the benefits of the Corporate Guaranty (as defined in the Master Loan Agreement)..

The principal amount of this Note due at Maturity may be prepaid in full at any time, without premium or penalty.

If an Event of Default with respect to this Note shall occur and be continuing, the Principal Amount Due at Maturity (as set forth above) may be declared due and payable in the manner and with the effect provided in the Master Loan Agreement. Upon payment (i) of the amount of principal so declared due and payable and (ii) of interest on any overdue principal and overdue interest (in each case to the extent that the payment of such interest shall be legally

10614v4

1

enforceable), all of the Borrower's obligations in respect of the payment of the principal of and interest, if any, on this Note shall terminate.

No reference herein to the Master Loan Agreement and no provision of this Note or of the Master Loan Agreement shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of (and premium, if any) and interest on this Note at the times, place and rate, and in the coin or currency, herein prescribed.

The transfer of this Note is registrable in the register maintained by the Administrative Agent, upon surrender of this Note for registration of transfer in accordance with Article 8 of the Master Loan Agreement. Prior to due presentment of this Note for registration of transfer, the Borrower and Administrative Agent may treat the Person in whose name this Note is registered in such register as the owner hereof for all purposes, whether or not this Note be overdue, and neither the Borrower nor the Administrative Agent shall be affected by notice to the contrary. This Note is a registered instrument. A manually signed copy of this Note shall be evidence of the Lender's rights and is not a bearer instrument.

This Note may be transferred only in accordance with the Master Loan Agreement, including without limitation, Section 8.15 of the Master Loan Agreement. This Note shall be governed exclusively by and construed in accordance with the laws of the State of Illinois. The venue, jurisdiction and jury trial waiver provisions set forth in the Master Loan Agreement are applicable to the Note as if fully set forth herein.

Payment of the principal of and interest, if any, on this Note will be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payment of the principal of and interest, if any, on this Note due on the Maturity Date will be made in immediately available funds on the Maturity Date (whether or not this Note has been presented), with such funds transferred by wire to the following account:

_____
_____
_____

or such other account or place as the Administrative Agent shall direct the Borrower in writing.

IN WITNESS WHEREOF, the Borrower has caused this instrument to be duly executed.

EDGE ONE, LLC

By: _____
    Thomas J. Petters, President

10614v4

2

### Exhibit B
## REQUIREMENTS FOR ELIGIBLE ACCOUNTS

An Eligible Account is an Account owing to the Borrower which meets the following requirements:

(a)    it is genuine and in all respects what it purports to be;

(b)    it arises from the sale of goods by the Borrower and (A) such goods comply with such Account Debtor's specifications (if any) and have been shipped, or delivered to and accepted by, such Account Debtor, (B) the Borrower has possession of, has delivered to the Administrative Agent, at its request, shipping and delivery receipts evidencing such shipment, delivery and acceptance, and (C) such goods have not been returned to the Borrower;

(c)    it is evidenced by an invoice rendered to the Account Debtor with respect thereto which: (i) is dated not earlier than the date of shipment or performance, (ii) has payment terms reasonably acceptable to the Administrative Agent, and (iii) requires Account Debtor to make payment by wire transfer only directly to the Depository Account;

(d)    (i) it must not be unpaid on the date that is the earlier of eighty (80) days after the date of the invoice evidencing such Account or twenty (20) days after the original due date stated in such invoice; or (ii) it must not be an Account owed by any Account Debtor which has not paid ten percent (10%) or more of its Accounts within the time period specified in subsection (i) above;

(e)    it is not subject to any assignment, claim or Lien other than a first priority Lien in favor of the Administrative Agent, for the benefit of the Lenders;

(f)    the Administrative Agent has approved the Account Debtor in advance;

(g)    Administrative Agent has received written notice of the terms of such Account from Borrower not less than three (3) Business Days prior to the date of Borrower's acceptance of Account Debtor's purchase order giving rise to such Account and does not object to the transaction by written notice to Borrower within two (2) Business Days of receipt of such notice;

(h)    Assuming all documentation related to the Account has been duly executed by Account Debtor and subject to limitations on the availability of equitable remedies, it is a valid, legally enforceable and unconditional obligation of the Account Debtor with respect thereto and is not subject to setoff, counterclaim, credit or allowance (except any credit or allowance which has been deducted in computing the net amount of the applicable invoice as shown in the original schedule furnished to the Administrative Agent identifying or including such Account) or adjustment by the Account Debtor with respect thereto, or to any claim by such Account Debtor denying liability thereunder in whole or in part, and such Account Debtor has not refused to accept any of the goods or services which are the subject of such Account or offered or attempted to return any of such goods;

10614v4

1

(i)      there are no proceedings or actions which are then threatened or pending against the Account Debtor with respect thereto or to which such Account Debtor is a party which might result in any material adverse change in such Account Debtor's financial condition or in its ability to pay any Account in full when due;

(j)      it does not arise out of a contract or order which, by its terms, forbids, restricts or makes void or unenforceable the assignment by the Borrower to the Administrative Agent of such Account;

(k)      it does not arise from a "sale on approval," "sale or return" or "consignment," nor is it subject to any other repurchase or return agreement; it is not an Account with respect to which possession and/or control of the goods sold giving rise thereto is held, maintained or retained by the Borrower, any Subsidiary or any Related Party (or by any Administrative Agent or custodian of the Borrower, any Subsidiary or Related Party) for the account of or subject to further and/or future direction from the Account Debtor with respect thereto;

(l)      it is not an Account with respect to which possession and/or control of the goods sold giving rise thereto is held, maintained or retained by the Borrower, any Subsidiary or any Related Party (or by any Administrative Agent or custodian of the Borrower, any Subsidiary or Related Party) for the account of or subject to further and/or future direction from the Account Debtor with respect thereto;

(m)      it does not, in any way, violate or fail to meet any warranty, representation or covenant contained in the Loan Documents relating directly or indirectly to the Borrower's Accounts;

(n)      it arises in the ordinary course of the Borrower's business;

(o)      if the Administrative Agent, in its reasonable business judgment, has established a credit limit for the Account Debtor with respect thereto, the aggregate dollar amount of Accounts due from such Account Debtor, including such Account, does not exceed such credit limit; provided that the parties acknowledge that no such limit has been established that limits the Initial Accounts;

(p)      if it is evidenced by chattel paper or instruments, (i) the Administrative Agent shall have specifically agreed to include such Account as an Eligible Account, (ii) only payments then due and payable under such chattel paper or instrument shall be included as an Eligible Account and (iii) the originals of such chattel paper or instruments have been assigned and delivered to the Administrative Agent in a manner satisfactory to the Administrative Agent.

An Account which is at any time an Eligible Account but which subsequently fails to meet any of the foregoing requirements shall forthwith cease to be an Eligible Account. Further, with respect to any Account, if the Administrative Agent at any time or times hereafter determines, in its reasonable business judgment, that the prospect of payment or performance by the Account Debtor with respect thereto is or will be impaired for any reason whatsoever, notwithstanding anything to the contrary contained above, such Account shall forthwith cease to

be an Eligible Account. The amount of Eligible Accounts shall be the net United States dollar amount (as determined by the Administrative Agent after deduction of such reserves and allowances as the Administrative Agent, in its reasonable business judgment, deems proper and necessary).

1061464

3

## Exhibit C
## FORM OF REQUEST FOR LOAN

AWB Services. LLC
70 West Madison, Suite 1500
Chicago, Illinois 60602

Attention: _____

The undersigned is the Borrower under that certain Master Loan Agreement. dated July 5. 2007 (as the same may be amended, modified or supplemented from time to time, herein called the "Agreement;" capitalized terms not otherwise defined herein being used as therein defined) among Edge One, LLC, as Borrower (the "Borrower"), Lender, and AWB Services. LLC, as Administrative Agent (the "Administrative Agent").

The Borrower hereby reaffirms all representations and warranties in the Agreement and certifies as follows:

(1)     That such representations and warranties shall be true and correct, as though made on the Closing Date both before and after giving effect to such Loan;

(2)     That no Default or Event of Default has occurred and is continuing; that the Loan shall be for the sole purpose of making payment on an invoice for merchandise being acquired for Borrower's inventory;

(3)     The proposed Closing Date of the Loan is _____;

(4)     Attached as Exhibit 1 is a complete copy (including all attachments and schedules) of the purchase order duly and validly issued by Borrower to each merchandise vendor that will be paid in part with the proceeds of the Loan;

(5)     Attached as Exhibit 2 is a complete copy (including all attachments and schedules) of the invoice for purchased merchandise issued to Borrower from each merchandise vendor that will be paid in part with the proceeds of the Loan (the "Purchased Merchandise");

(6)     The Borrower reaffirms that the merchandise vendor is not a Related Party of the Borrower or the Corporate Guarantor;

(7)     The Security Agreement is hereby acknowledged and reaffirmed;

(8)     The Borrower hereby grants a continuing first-priority purchase-money security interest to Administrative Agent in and to all of the Purchased Merchandise, as well as all repairs, replacements, substitutions, additions, attachments, accessories, proceeds, accounts, accounts receivable, payment intangibles, instruments, documents, chattel paper, general intangibles and other rights arising out of or related to such Purchased Merchandise, and Administrative Agent is hereby irrevocably authorized to file at any time and from time to time

10614v4

1

in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto with respect to such purchased merchandise and any accounts associated therewith;

(9)     Set forth below are wire transfer instructions for direct payment of the Loan to the account of each merchandise vendor that will be paid in part with the proceeds of the Loan:

(10)    The merchandise to be purchased with the Loan is currently in the possession of _____ and such merchandise is located, including street address and county, as follows:

(11)    The Borrower acknowledges that the amount of such Loan does not exceed ninety percent (90%) of the Borrower's cost of merchandise to be purchased with such funds;

(12)    Attached as Exhibit 3 is a complete copy (including all attachments and schedules) of the purchase order(s) received by Borrower from its customer(s) pursuant to which Borrower is selling all merchandise to be purchased to such vendor; and

(13)    Upon its purchase by the Borrower, the merchandise will be Eligible Inventory.

EDGE ONE, **LLC**

By: _____
       **Thomas J. Petters,** President

1061454

### Exhibit D
### FORM OF BILL OF SALE

This BILL OF SALE is made as of [DATE OF LOAN] by [NAME AND ADDRESS OF MERCHANDISE VENDOR] ("Seller").

For $ _____ [TOTAL PURCHASE PRICE FOR GOODS, MATCHING PRICE ON BORROWER PURCHASE ORDER], the receipt of which is hereby acknowledged, Seller does hereby sell, transfer, convey, assign and deliver to Edge One, LLC, a Delaware limited liability company ("Buyer"), its successors and assigns, forever, free and clear of all mortgages, pledges, liens and security interests of any kind or nature (whether or not of record), good and merchantable right, title and interest of Seller in and to the following goods (the "Goods"):

### [DESCRIPTION OF GOODS FROM PURCHASE ORDER]

Seller acknowledges that Buyer has granted a security interest in the Goods to AWB Services, LLC, as Administrative Agent for the actual lender ("Secured Party"), and acknowledges that it holds possession of the goods for the benefit of Buyer and Secured Party pending shipment. Seller authorizes Buyer or Secured Party as bailor to file a precautionary UCC Financing Statement describing the Goods if either so elects, and Seller will take all reasonable and necessary actions to cause Secured Party to have a security interest that is prior to any other existing or future security interest that may arise through Seller in the Goods or other goods previously sold to Buyer.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed by its duly authorized officer or representative.

[SELLER]

By:_____
Its:_____

10614v4

1

**EXHIBIT E**
**FORM OF JOINDER AGREEMENT**

**JOINDER**

[LENDER], a[n] _____ hereby agrees to abide by all of the terms and conditions contained in the Master Loan Agreement dated as of July 5, 2007, among Edge One, LLC, as Borrower, AtoZ Investors Fund, L.P., as Initial Lender, AWB Services, LLC, as Administrative Agent, and the additional Lenders party thereto from time to time, as if an original signatory thereto, a copy of which is attached hereto and incorporated herein by reference.

Dated: _____

**[LENDER]**

By: _____
Its: _____

11614x4

1

# EXHIBIT T-69A

B10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT  DISTRICT OF MINNESOTA | 7  11  12 ○ ◉ ○ | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:  Petters Company, Inc. | Case Number: 08-45257 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Ark Discovery II, LP

Name and address where notices should be sent:

Frances Gecker, as Chapter 7 Trustee
Frank/Gecker LLP
325 N. LaSalle Street, Ste. 625
Chicago, Illinois 60654

Telephone number:
312-276-1400

☑ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: 7
(*If known*)

Filed on: Dec. 16, 2008

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

| 1. Amount of Claim as of Date Case Filed:    $ 111,795,449.00 | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount. |
|---|---|

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

**2. Basis for Claim:** See Attached
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

   **3a. Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☑ Other
**Describe:**

**Value of Property:**$ Unknown    **Annual Interest Rate___%**

**Amount of arrearage and other charges as of time case filed included in secured claim,**

if any: $ 104,792,324.00   **Basis for perfection:** Security Agreement and UCC-1 Filing

**Amount of Secured Claim:** $ 104,792,324.00   **Amount Unsecured:** $ 7,185,984.00

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date: 10 2 09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Frances Gecker, not individually, but as Ch. 7 trustee of Ark Discovery II, LP | FOR COURT USE ONLY
Send original to:
U.S. Bankruptcy Court
301 U.S. Courthouse
300 South Fourth St.
Minneapolis, MN 55415 |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## ADDENDUM TO PROOF OF CLAIM OF ARK DISCOVERY II, LP

Frances Gecker, not individually, but as chapter 7 trustee (the "Trustee") of Ark

Discovery II, LP ("Ark"), hereby asserts claims in an amount not less than $111,795,449.00

against Petters Company, Inc. and certain associated debtors[1] (collectively, the "Debtors"). The

Trustee is duly authorized to execute these proofs of claim on behalf of Ark.

1.     On May 11, 2009, Ark filed a petition for relief under chapter 7 of title 11 of the

United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the Northern District

of Illinois, commencing Case No. 09-17079.

2.     On June 24, 2009, the United States Trustee for the Northern District of Illinois

appointed Frances Gecker to serve as trustee of Ark. The Trustee's investigation of Ark and its

relationship with the Debtors remains ongoing, therefore, the facts contained herein are provided

upon information and belief.

3.     From at least July 2007 through the commencement of the Debtors' bankruptcies,

Ark served as commercial lenders to certain of the Debtors. The basic framework for these loans

is set forth in the Master Loan Agreement between Edge One, LLC ("Edge One"), as borrower,

AtoZ Investors Fund, L.P. as initial lender, and AWB Services, LLC ("AWB"), as administrative

agent, dated July 5, 2007 (the "Master Loan Agreement"). A copy of the Master Loan

Agreement and various related documents are attached hereto as **Group Exhibit A**.

4.     Pursuant to the Master Loan Agreement, the lenders under the agreement would

loan funds to Edge One for the purchase of certain durable goods that were to be sold to various

"big box" retailers on credit, thereby generating a receivable payment by such retailer to Edge

One.

---

[1] Ark is asserting claims against the following Debtors: Petters Company, Inc., Case No. 08-45257; Petters
Group Worldwide, LLC, Case No. 08-45258; and Edge One LLC, Case No. 08-45330.

5.    The Master Loan Agreement required Edge One to direct the retailers purchasing inventory from it to make payment on such purchases by wiring funds to AWB.

6.    AWB would then transfer such funds to the lenders under the Master Loan Agreement.

7.    Repayment of all principal, accrued interest, attorneys' fees and expenses of collection on all loans and notes made under the Master Loan Agreement were unconditionally, absolutely and irrevocably guaranteed (the "Guaranty") by the Petters Company, Inc. A copy of the Guaranty is attached hereto as **Exhibit B**.

8.    In addition, on July 5, 2007, Edge One granted AWB, on behalf of itself and as administrative agent on behalf of the lenders under the Master Services Agreement, a security interest in, among other things, all of Edge One's present and after acquired: accounts, inventory, goods, software; securities, investment property and deposit accounts; chattel paper; instruments; letter of credit rights; proceeds; insurance policies; and general intangibles.

9.    Pursuant to the Master Loan Agreement, Ark made loans to Edge One and various Debtors exceeding $107 million for which it has not been paid.

10.    Charts detailing the outstanding balances and the total amounts of principal and interest owed to Ark for loans and notes made under the Master Loan Agreement are attached hereto as **Group Exhibit C**.

11.    The Trustee is informed and believes that Ark holds claims against several of the Debtors. Thus, in order to appropriately protect Ark's entitlement to its claims, the Trustee is asserting separate identical claims against each of the Debtors. The Trustee acknowledges that Ark shall be limited in its aggregate recoveries from the Debtors' estates to the total amount set forth in this claim, plus any interest to which Ark is entitled.

12.    Prior to the Trustee's appointment, Ark's attorneys filed proofs of claims as

follows:

| Claimant: | Debtor: | Claim No.: | Amount: | Date Filed: |
|---|---|---|---|---|
| Ark Discovery II, LP | Petters Company, Inc. | 7 | $104,609,465.00 | 12/16/2008 |
| Ark Discovery II, LP | Petters Group Worldwide, LLC | Unknown | $7,185,984.00 | 12/16/2008 |
| Ark Discovery II, LP | Edge One, LLC | 1 | $104,609,465.00 | 12/16/2008 |

File stamped copies of these proofs of claim are attached hereto as **Group Exhibit D**.  To the

extent this claim is duplicative of Ark's previously filed claims the Trustee acknowledges that

Ark's recovery shall be limited in its aggregate recoveries from the Debtors' estates to the total

amount set forth in this claim.

13.    The Trustee reserves the right to amend this proof of claim at any time.

# GROUP EXHIBIT A

## MASTER LOAN AGREEMENT

THIS MASTER LOAN AGREEMENT (the "Agreement"), dated as of July 5, 2007, is by and among EDGE ONE, LLC, a Delaware limited liability company ("Borrower"), AtoZ Investors Fund, L.P., a Delaware limited partnership (the "Initial Lender") on behalf of itself and each of its permitted assigns pursuant to Section 8.15 below, and each of the successors thereof (all of whom collectively shall be referred to herein as the "Lender" or "Lenders"), and AWB SERVICES, LLC, a Delaware limited liability company on behalf of itself and as the agent for the Initial Lender and the Lenders (in such capacity, the "Administrative Agent").

### ARTICLE 1.
### DEFINITIONS

1.1     Defined Terms. In addition to the terms defined elsewhere in this Agreement, the following terms shall have the following meanings in this Agreement:

(a)     "Account(s)" shall mean the Borrower's "Accounts" as defined in Article I of the Security Agreement.

(b)     "Account Debtor" shall mean any Person who is or who may become obligated to the Borrower under, with respect to, or on account of an Account or other Collateral.

(c)     "Administrative Agent" shall mean AWB Services, LLC, or such other entity as may be designated by the Requisite Lenders, in writing, who shall serve as the Lenders' agent with respect to this Loan facility and with respect to the Collateral, all as more fully described in Article 8 below.

(d)     "Adverse Event" shall mean the occurrence of any event that would have a material adverse effect on the business, operations, property, assets or condition (financial or otherwise) of the Borrower (or such other party to which the term applies in context) or on the ability of the Borrower (or such other party) to perform its obligations under the Loan Documents.

(e)     "Business Day" shall mean any day other than a Saturday, a Sunday or any day that banks in Chicago, Illinois are required or permitted to close.

(f)     "Closing Date" shall mean any date on which a Loan is made pursuant to Section 2.2 below.

(g)     "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(h)     "Collateral" shall mean any property in which the Lenders as the Administrative Agent have been granted a Lien pursuant to any Loan Document.

1061343

(i)     "Corporate Guarantor" shall mean Petters Company, Inc., a Minnesota corporation.

(j)     "Corporate Guaranty" shall mean the Corporate Guaranty of even date herewith executed by Petters Company, Inc.

(k)     "Default" shall mean any event which, with the giving of notice to the Borrower or lapse of time, or both, would constitute an Event of Default.

(l)     "Depository Account" shall mean Account No. _____ maintained by Borrower at the Depository Bank.

(m)     "Deposit Pledge and Account Control Agreement" shall mean the Deposit Pledge and Account Control Agreement of even date herewith made by the Borrower in favor of the Administrative Agent, for the benefit of the Lenders, pursuant to which the Borrower has granted a security interest in the Depository Account, as originally executed and as it may be amended, modified, supplemented, restated or replaced from time to time.

(n)     "Depository Bank" shall mean Charter One Bank, N.A., a national banking association.

(o)     "Eligible Account" shall mean an Account owing to the Borrower which meets the requirements set forth on Exhibit B attached hereto.

(p)     "Eligible Inventory" shall mean the inventory of the Borrower which (1) the Borrower will purchase with the proceeds of a Loan pursuant to purchase orders issued by it to a vendor, which purchase orders are in all respects acceptable to Administrative Agent in its sole and absolute discretion and complete copies of which have been provided to Administrative Agent, and further provided that no such vendor is a Related Party; and (2) meets the following requirements:

    i.   It is owned by the Borrower and, except as the Administrative Agent may otherwise consent, is not subject to any prior assignment, claim or Lien other than a first priority Lien in favor of the Administrative Agent;

    ii.   Except as the Administrative Agent may otherwise consent, it is not stored with a bailee, warehouseman or similar party; or, if so stored, with the consent of the Administrative Agent, such bailee, warehouseman or similar party has issued and delivered to the Administrative Agent, in form and substance acceptable to the Administrative Agent, warehouse receipts therefor in the name of the Administrative Agent, and any other such documents and agreements as the Administrative Agent may require;

    iii.   The Administrative Agent has determined, in its reasonable business judgment, that it is not unacceptable due to age, type, category, quality and/or quantity;

10814v4

2

     iv.   It is not held by the Borrower on "consignment" and is not subject to any other repurchase or return agreement;

     v.   It complies with all standards imposed by any governmental agency having regulatory authority over such goods and/or their use, manufacture or sale;

     vi.   It does not, in any way, violate or fail to meet any warranty, representation or covenant contained in the Loan Documents relating directly to the Borrower's Inventory; and

     vii.   Inventory of the Borrower which is at any time Eligible Inventory, but which subsequently fails to meet any of the foregoing requirements shall immediately and without need for any further action cease to be Eligible Inventory.

The value of Eligible Inventory shall be the U.S. dollar amount thereof computed at the lower of the cost, determined on a first in first out basis, or market value of such Inventory, as determined by the Administrative Agent after deduction of such reserves and allowances as the Administrative Agent, in its reasonable business judgment, deems proper and necessary.

     (q)   "Event of Default" shall mean any event described in Section 7.1 below which has not been cured to the satisfaction of, or waived by, the Administrative Agent.

     (r)   "GAAP" shall mean United States generally accepted accounting principles as in effect from time to time and as consistently applied.

     (s)   "Indebtedness" shall mean, without duplication, all obligations, contingent or otherwise, which in accordance with GAAP should be classified upon the Borrower's balance sheet as liabilities, but in any event including the following (whether or not they should be classified as liabilities upon such balance sheet):

     i.   Obligations secured by any mortgage, pledge, security interest, lien, charge or other encumbrance existing on property owned or acquired subject thereto, whether or not the obligation secured thereby shall have been assumed and whether or not the obligation secured is the obligation of the owner or another party;

     ii.   Any obligation on account of deposits or advances;

     iii.   Any obligation for the deferred purchase price of any property or services, except trade accounts payable;

     iv.   Any obligation as lessee under any capitalized lease;

     v.   All guaranties, endorsements and other contingent obligations in respect to Indebtedness of others; and

     vi.   Undertakings or agreements to reimburse or indemnify issuers of letters of credit.

For all purposes of this Agreement, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer unless such Indebtedness is non-recourse to such Person. Notwithstanding the

10614v4

foregoing, the Indebtedness of a Person shall not include the Indebtedness of any limited liability company in which such Person holds a membership interest.

(t)    "Initial Lender" shall mean AtoZ Investors Fund, L.P., a Delaware limited partnership.

(u)    "Insolvent" shall mean, with respect to any Person on any date of determination, that on such date:

> i.    The fair value of such Person's tangible and intangible assets is not in excess of the total amount of such Person's liabilities including, without limitation, contingent obligations; and
>
> ii.    Such Person is not then able to pay its debts as they mature; or such Person does not have capital sufficient to carry on its business.

(v)    "Inventory" shall mean the Borrower's "Inventory" as defined in Article I of the Security Agreement.

(w)    "Investment" shall mean the acquisition, purchase, making or holding of any stock or other security, any loan, advance, contribution to capital, extension of credit (except for trade and customer accounts receivable for Inventory sold or services rendered in the ordinary course of business and payable in accordance with customary trade terms), any acquisitions of real or personal property (other than real and personal property acquired in the ordinary course of business) and any purchase or commitment or option to purchase stock or other debt or equity securities of, or any interest in, another Person or any integral part of any business or the assets comprising such business or part thereof.

(x)    "Lender" shall mean the Initial Lender and each of its permitted assigns pursuant to Section 8.15 of this Agreement, and each of the successors thereof, all of whom collectively shall be referred to herein as "Lenders." Each such permitted assign and successor shall execute a Joinder Agreement in the form attached hereto as Exhibit E prior to such permitted assign or successor becoming a Lender under the terms of this Agreement.

(y)    "Lender Affiliate" means with respect to any Lender:

> i.    Each Person that is directly or indirectly controlling, controlled by, or under common control with such Lender;
>
> ii.    Each Person that, directly or indirectly owns or holds fifty percent (50%) or more of any equity interest in such Lender; or
>
> iii.    Fifty percent (50%) or more of whose voting stock or other equity interest is directly or indirectly owned or held by such Lender.

For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by" and "under common control with") means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a

17614-v3

4

Person, whether through the ownership of voting securities, by board of director participation or by contract or otherwise.

    (z)    "Liabilities" shall mean, at any date of determination, the aggregate amount of liabilities appearing on the Borrower's balance sheet at such date prepared in accordance with GAAP.

    (aa)    "Lien" shall mean any encumbrance, lien, deed of trust, pledge, charge, lease, easement, servitude, right of others or security interest of any kind.

    (bb)    "Loan" shall mean any loan as described in Section 2.2 below.

    (cc)    "Loan Documents" shall mean this Agreement, any Note issued and outstanding from time to time, the Security Agreement, the Deposit Pledge and Account Control Agreement, the Corporate Guaranty, and each other instrument, document, guaranty, security agreement, mortgage, or other agreement executed and delivered by the Borrower pursuant to which the Borrower incurs any liability to a Lender with respect to the Obligations, agrees to perform any covenant or agreement with respect to the Obligations or grants any security interest to secure the Obligations.

    (dd)    "Maturity Date" shall mean any date designated in any Note as the final date on which all principal and accrued interest, if any, thereunder is due and payable to the holder thereof.

    (ee)    "Note" shall mean any Promissory Note or Zero Coupon Promissory Note of the Borrower, issued to Initial Lender (or subsequently re-issued by Borrower to an assignee of Initial Lender pursuant to Section 8.15 below) substantially in the form attached hereto as Exhibit A-1 or Exhibit A-2, respectively, and accepted by Lender, as such promissory note may be amended, modified or supplemented from time to time, and such term shall include any substitutions for, or renewals of, such promissory note.

    (ff)    "Obligations" shall mean all Loan advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to a Lender of any kind or nature, present or future, which arise under this Agreement or any other Loan Document or by operation of law, whether or not evidenced by any note, guaranty or other instrument, whether or not for the payment of money, whether arising by reason of an extension of credit, opening, guarantying or confirming of a letter of credit, guaranty, indemnification or in any other manner, whether joint, several, or joint and several, direct or indirect (including those acquired by assignment or purchases), absolute or contingent, due or to become due, and however acquired. The term includes, without limitation, all principal, interest, fees, charges, expenses, attorneys' fees, and any other sum chargeable to the Borrower under this Agreement or any other Loan Document.

    (gg)    "Origination Fee" shall mean any origination fee established by agreement between the Borrower and Initial Lender as provided in Section 2.7 below in connection with the making of any Loan hereunder.

10614v4

5

(hh)    "Person" shall mean any natural person, corporation, partnership, joint
venture, firm, association, trust, unincorporated organization, government or governmental
agency or political subdivision, or any other entity, whether acting in an individual, fiduciary or
other capacity.

(ii)    "Register" shall have the meaning set forth in Section 8.16 below of this
Agreement.

(jj)    "Related Party" shall mean any Person: (a) which directly or indirectly,
through one or more intermediaries, controls, or is controlled by, or is under common control
with, the Borrower or any Corporate Guarantor; (b) which beneficially owns or holds five
percent (5%) or more of the equity interest of the Borrower or any Corporate Guarantor; or (c)
five percent (5%) or more of the equity interest of which is beneficially owned or held by the
Borrower. For purposes of this definition, "control" (including with correlative meanings, the
terms "controlling", "controlled by" and "under common control with") means the possession
directly or indirectly of the power to direct or cause the direction of the management and policies
of a Person, whether through the ownership of voting securities or by contract or otherwise.
Additionally, notwithstanding the foregoing, the parties acknowledge and agree that neither
Petters Consumer Brands, LLC, a Delaware limited liability company, Polaroid Consumer
Electronics, LLC, a Delaware limited liability company, nor Polaroid Hospitality and
Commercial, LLC, a Delaware limited liability company, shall be deemed to be a "Related
Party" for purposes of this Agreement.

(kk)    "Requisite Lenders" shall mean the Lender or group of Lenders who are
holding Loans which constitute a majority of the aggregate outstanding principal amount of all
Loans at such time.

(ll)    "Security Agreement" shall mean the Security Agreement of even date
herewith, made by the Borrower in favor of the Lenders and the Administrative Agent.

(mm)    "Subsidiary" shall mean any Person of which or in which the Borrower
and its other Subsidiaries, if any, own directly or indirectly more than fifty percent (50%) of:

      i.     The combined voting power of all classes of stock having general
voting power under ordinary circumstances to elect a majority of
the board of directors of such Person, if it is a corporation,

      ii.    The capital interest or profit interest of such Person, if it is a
partnership, joint venture or similar entity, or

      iii.   The beneficial interest of such Person, if it is a trust, association or
other unincorporated organization.

(nn)    "Term": The period of time commencing on the date hereof and ending on
the last to occur of (i) July 5, 2012, as such date may be extended by written agreement of the
Borrower and the Administrative Agent; or (ii) the date each Note issued hereunder is paid in full
pursuant to its terms and all other obligations of the Borrower to the Lenders hereunder and
under the Notes and the Loan Documents have been paid in full.

10514v4

6

1.2     Accounting Terms and Calculations. Except as may be expressly provided to the contrary herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with GAAP consistently applied for the Borrower as used in the preparation of the Borrower's financial statements.

1.3     Other Definitional Provisions. The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to Sections, Exhibits, Schedules and like references are to this Agreement unless otherwise expressly provided.

### ARTICLE 2.
### TERMS OF LENDING

2.1     No Commitment to Lend. Notwithstanding any provision of this Agreement to the contrary, the Administrative Agent and the Initial Lender have not committed and do not commit hereunder to make any Loan, to advance any moneys, to purchase any Note or evidence of indebtedness of Borrower or to otherwise provide any credit to Borrower.

2.2     Loans. Subject to the terms and conditions hereof and in reliance upon the warranties of the Borrower herein, a Lender may in its sole and absolute discretion make loans to Borrower from time to time during the Term (each, a "Loan") by purchasing a Note issued by Borrower at a price and/or with an interest rate determined by Borrower and such Lender at the time of sale. All Loans shall be advanced by the applicable Lender directly to the Depository Account.

2.3     Borrowing Procedures.

(a)     The Borrower will make a request for a Loan from the Administrative Agent in such manner as the Administrative Agent may from time to time prescribe. In the absence of further Administrative Agent instruction, any request by the Borrower for a Loan shall be in writing, on the form attached hereto as Exhibit C, or by telephone promptly confirmed in writing, and must be given so as to be received by the Administrative Agent not later than 10:00 a.m., Chicago time, on the third (3rd) Business Day prior to the requested date of funding of the Loan. Each request for a Loan shall specify the Closing Date (which shall be a Business Day) and the amount of such Loan. Each request for a Loan shall be deemed a representation and warranty by the Borrower that all conditions precedent specified in Section 3.2 to such Loan are satisfied on the date of such request and shall remain satisfied through and including the Closing Date and (ii) no breach or default under, and no Event of Default defined or described in, this Agreement or any of the Loan Documents will exist.

(b)     Immediately upon receipt of a request for a Loan in accordance with Section 2.3(a), Administrative Agent shall present such request to such Lender for consideration.

(c)     The Lender, in its sole discretion, shall determine if it will make a Loan and the amount of any such Loan pursuant to the terms of this Agreement. The Borrower

acknowledges that Lender may make Loans under the Loan Documents or any other basis deemed appropriate by Lender and Borrower from time to time. Subject to change at Lender's discretion, the Borrower shall not request Loans to purchase inventory other than Eligible Inventory.

(d)     All Lenders must be "accredited investors," as defined in Rule 501(a) of Regulation D of the Securities and Exchange Act of 1933, as amended (the "Act").

(e)     The Administrative Agent may maintain from time to time, at its discretion, records as to any and all Loans made or repaid and interest accrued or paid under this Agreement. All entries made on any such record shall be presumed correct until the Borrower establishes the contrary. On demand by the Administrative Agent, the Borrower will promptly certify in writing the exact principal balance which Borrower then asserts to be outstanding to Lenders for Loans under this Agreement.

2.4     Interest on Loans. Each such Loan shall bear interest at the rate as set forth in the related Note. No provision of this Agreement or any Note shall require the payment of interest in excess of the rate permitted by applicable law.

2.5     No Default Rate. There shall not be a "Default Rate" on any Note.

2.6     Payment of Loans. Within one (1) Business Day after proceeds from the sale of inventory financed by a Loan are deposited into the Depository Account, the Administrative Agent shall direct payment of such proceeds (a) to the Lender or Lenders that own such Loan in an amount owed to such Lender or Lenders, and (b) provided that no Event of Default then exists, the balance of such proceeds, if any, to Borrower or such party or parties as Borrower may direct to Administrative Agent in writing.

2.7     Origination Fee. If it be a condition of the making of any Loan that the Borrower pay to a Lender an origination fee (the "Origination Fee"), such fee shall be non-refundable and payable in full at the time of the making of the Loan. No termination or reduction of any Loan and no failure of the Borrower to satisfy any conditions set forth herein shall entitle the Borrower to a refund of any portion of the Origination Fee. If there is an Origination Fee owing to a Lender from Borrower in connection with any Loan, at such Lender's discretion, it may wire the purchase price for any Note in an amount net of the Origination Fee owing from Borrower.

2.8     Net Payments.
(a)     All payments made by the Borrower hereunder and under any Note will be made without setoff or counterclaim. All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding any tax imposed on or measured by the net income or net profits of a Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Lender is located or any subdivision thereof or therein), and all interest, penalties or similar liabilities with respect to such taxes, levies,

10614v4

8

imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes"). If any Taxes are so levied or imposed, the Borrower agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Note.

(b) The parties acknowledge that certain Lender Affiliates of Initial Lender to whom Loans may be sold may not be U.S. Persons within the meaning of Section 7701(a)(30) of the Code (hereafter, an "Offshore Lender"). It is the intention of the parties that (x) all interest accrued and paid on any Note sold by Initial Lender to an Offshore Lender will qualify for exemption from United States withholding tax as "portfolio interest," because the obligations evidenced thereby are either in "registered form" within the meaning of Sections 871(h)(2)(B) and 881(c)(2)(B) of the Code or such note is a short term note having a maturity of less than 183 days, and (y) as such, all interest accrued and paid hereunder will be exempt from United States information reporting under Sections 6041 and 6049 of the Code and United States backup withholding under Section 3406 of the Code. The parties agree to cooperate with one another, and to execute and file such forms or other documents, or to do or refrain from doing such other acts, as may be required, to secure such exemptions from United States withholding tax, information reporting, and backup withholding. In furtherance of the foregoing, the Administrative Agent hereby represents, warrants and covenants to the Borrower that: (i) any such Offshore Lender is or will, at the time of any such assignment, be eligible for the portfolio interest exception of either 871(h)(2) or 881(c)(2) of the Code; (ii) no Offshore Lender is (or will be as long as any amounts due under any Note held by such Person have not been paid in full), a "United States person" within the meaning of Section 7701(a)(30) of the Code; (iii) no Offshore Lender is (or will be as long as any amounts due under any Note held by such Person have not been paid in full), a person described in Section 881(c)(3) of the Code; (iv) the Administrative Agent will not permit any Lender to transfer any Note with a stated term of more than 182 days, unless such Note is surrendered to the Borrower and the Borrower reissues this Note to the transferor, or the Administrative Agent maintains a book entry system on behalf of the Borrower that identifies the new beneficial owner of the principal and interest under this Note; (v) on or prior to the date hereof and on or prior to each anniversary of the date hereof until all amounts due hereunder have been paid in full, each Offshore Lender shall provide the Administrative Agent with a properly executed U.S. Internal Revenue Service ("IRS") Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (or any successor form, certificate or other evidence with respect to United States withholding that is required under the Code), certifying as to such Offshore Lender's status as a non-U.S. Person for purposes of determining exemption from U.S. withholding tax, information reporting and backup withholding with respect to all payments to be made to such Offshore Lender under such Note(s) held by such Person; and (vi) if an event occurs that would require a change in the exempt status of any Offshore Lender or any of the other information provided on the most recent IRS Form W-8BEN (or successor form) previously submitted with respect to any Offshore Lender hereunder, the Administrative Agent will so inform the Borrower in writing (or by submitting to Borrower a new IRS Form W-8BEN or successor form) within 30 days after the occurrence of such event.

11614vd

9

## ARTICLE 3.
## CONDITIONS PRECEDENT

3.1    Conditions of Initial Loan. The initial Loan made hereunder shall be subject to the satisfaction of the conditions precedent, in addition to the applicable conditions precedent set forth in Section 3.2 below, that the Administrative Agent shall have received all of the following, in form and substance satisfactory to the Administrative Agent, each duly executed and certified or dated the Closing Date or such other date as is satisfactory to the Administrative Agent:

(a)    The Note appropriately completed and duly executed by the Borrower;

(b)    The Loan Documents appropriately completed and duly executed by the Borrower and the other parties thereto;

(c)    One or more UCC-1 Financing Statements in a form acceptable to the Administrative Agent appropriately completed in favor of the Administrative Agent, describing the Collateral and intended to perfect the security interest of the Administrative Agent, on behalf of the Lenders, in the Collateral;

(d)    Recent UCC searches in a from acceptable to the Administrative Agent from the filing offices in all states required by the Administrative Agent which reflect that no Person other than the Administrative Agent, on behalf of the Lenders, holds a Lien on the Borrower's assets;

(e)    A certificate of the Secretary of the Borrower having attached (a) a copy of the resolution of the Borrower authorizing the execution, delivery and performance of the Loan Documents, certified by the Secretary or an Assistant Secretary of the Borrower; (ii) an incumbency certificate showing the names and titles, and bearing the signatures of, the officers of the Borrower authorized to execute the Loan Documents; and (iii) a copy of the Borrower's certificate of formation and operating agreement with all amendments thereto;

(f)    A copy of the certificate of formation of the Borrower with all amendments thereto, certified by the appropriate governmental official of the jurisdiction of its organization as of a date acceptable to the Administrative Agent;

(g)    Certificates of good standing for the Borrower in the jurisdiction of its organization and such other states as the Borrower is required to qualify to do business, certified by the appropriate governmental officials as of a date acceptable to the Administrative Agent;

(h)    Evidence of insurance for all insurance required by the Loan Documents; and

(i)    Such other approvals, opinions or documents as the Administrative Agent may reasonably request.

1061-lv4

10

Provided, however, that Initial Lender may elect to advance the purchase price for the Note to the Depository Account prior to satisfaction of all conditions in this Section 3.1 and the act of doing so shall not be deemed a waiver of any theretofore unsatisfied condition unless Administrative Agent expressly waives such condition in writing.

3.2    Conditions to Each Loan. Each Loan shall be subject to Borrower's satisfaction of all the following conditions precedent:

(a)    Initial Lender shall have received a Note, duly executed by Borrower with all information completed accurately describing the Borrower's Obligation thereunder;

(b)    The Borrower's representations and warranties contained in Article 4 shall be true and correct, as though made on the Closing Date;

(c)    Before and after giving effect to such Loan, no Default or Event of Default shall have occurred and be continuing;

(d)    Such Loan shall be for the sole purpose of making payment on an invoice for merchandise being acquired for Borrower's inventory;

(e)    The Administrative Agent shall have received the Borrower's written request for such Loan in the form set forth in Exhibit C prior to the proposed Closing Date. Borrower's written request for such Loan shall include the following information:

   (i)     the proposed Closing Date;
   (ii)    a complete copy (including all attachments and schedules) of any purchase order for merchandise to be purchased issued by Borrower to the merchandise vendor that will be paid in part with the Loan;
   (iii)   if not stated in such purchase order, wire transfer instructions for direct payment of the Loan from the Depository Account to the account of such vendor; provided however, that funds shall not be wired to such vendor without the express written authorization of the Borrower;
   (iv)    a complete copy (including all attachments and schedules) of the purchase order(s) received by Borrower from its customer(s) pursuant to which Borrower is selling all merchandise to be purchased to such vendor; and
   (v)     the location(s) of the merchandise to be purchased with the proceeds of the Loan, including street address and county.

(f)    A certification that the amount of such Loan shall not exceed ninety percent (90%) of the Borrower's cost of merchandise to be purchased with such funds;

10614v4

11

(g)    The Administrative Agent shall have received evidence in a form satisfactory to Administrative Agent of Borrower's ability to pay the remaining balance of the purchase price of the merchandise to be purchased with the Loan from funds other than a Loan;

(h)    Upon its purchase by the Borrower, the merchandise will be Eligible Inventory;

(i)    Borrower shall have provided evidence satisfactory to Administrative Agent that it has instructed its customer in writing to make all payments on amounts owing from such customer by wire transfer directly to the Depository Account;

(j)    Upon request of Administrative Agent, in the event Borrower is to purchase merchandise with a Loan pursuant to purchase orders issued to the Corporate Guarantor or a Related Party, Borrower shall file a UCC Financing Statement against such Corporate Guarantor or Related Party in favor of the Borrower, describing the assignment of such purchase orders to the Borrower and the Administrative Agent;

(k)    If Initial Lender shall so request, it shall have received a Certificate of the Borrower in a form acceptable to Initial Lender stating that the Note has been duly issued;

(l)    One or more UCC-1 Financing Statements in a form acceptable to the Administrative Agent appropriately completed in favor of the Administrative Agent, describing the Collateral and intended to perfect the security interest of the Administrative Agent, on behalf of the Lenders, in the Collateral; and

(m)    Recent UCC searches in a form acceptable to the Administrative Agent from the filing offices in all states required by the Administrative Agent which reflect that no Person other than the Administrative Agent, on behalf of the Lenders, holds a Lien on the Collateral and the Borrower's assets;

3.3    Withdrawal of Funds from Depository Account.  Pursuant to the terms of the Deposit Pledge and Account Control Agreement, the Borrower may not withdraw funds from the Depository Account in the absence of prior written consent of the Administrative Agent. Borrower acknowledges and agrees that the Administrative Agent, without seeking the consent of the Borrower, will withdraw funds from the Depository Account under the terms of the Deposit Pledge and Account Control Agreement from time to time in order to make payments due and payable on the Notes.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES

To induce the Lenders to make Loans and purchase the Notes, the Borrower represents and warrants to the Administrative Agent and to each Lender as follows:

4.1    Organization, Standing, etc.  The Borrower is a limited liability company duly organized and validly existing and in good standing under the laws of the State of its organization

10614v8

12

and has all requisite power and authority to carry on its business as now conducted, to enter into the Loan Documents to which it is a party and to perform its obligations under such Loan Documents. The Borrower is duly qualified and in good standing as a foreign corporation in each jurisdiction in which the character of the properties owned, leased or operated by it or the business conducted by it makes such qualification necessary and where the failure to qualify could constitute an Adverse Event.

4.2 Authorization and Validity. The execution, delivery and performance by the Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary company action. The Loan Documents to which the Borrower is a party constitute the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their respective terms, subject to limitations as to enforceability which might result from bankruptcy, insolvency, moratorium and other similar laws affecting creditors' rights generally and subject to limitations on the availability of equitable remedies.

4.3 No Conflict, No Default. The execution, delivery and performance by the Borrower of the Loan Documents to which it is a party will not: (a) violate any provision of any law, statute, rule or regulation or any order, writ, judgment, injunction, decree, determination or award of any court, governmental agency or arbitrator presently in effect having applicability to the Borrower; (b) violate or contravene any provisions of the Borrower's certificate of formation or operating agreement; or (c) result in a breach of or constitute a default under any indenture, loan or credit agreement or any other agreement, lease or instrument to which the Borrower is a party or by which it or any of its properties may be bound or result in the creation of any Lien on any asset of the Borrower except for Liens created by the Loan Documents. The Borrower is not in default under or in violation of any such law, statute, rule or regulation, order, writ, judgment, injunction, decree, determination or award or any such indenture, loan or Loan Agreement or other agreement, lease or instrument in any case in which the consequences of such default or violation constitute an Adverse Event. No Default or Event of Default has occurred and is continuing.

4.4 Agreements with Affiliates. The Borrower is not a party to any agreements with the Corporate Guarantor or any entities controlled by the Corporate Guarantor that have not been disclosed in writing to Administrative Agent prior to the date hereof.

4.5 Government Consent. No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any governmental or public body or authority is required on the part of the Borrower to authorize, or is required in connection with the execution, delivery and performance of, or the legality, validity, binding effect or enforceability of, the Loan Documents to which it is a party.

4.6 Litigation. There are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower, or any of its properties, before any court or arbitrator, or any governmental department, board, agency or other instrumentality.

4.7 Contingent Obligations. The Borrower does not have any contingent obligations, except as contemplated hereby.

10814v3

13

4.8    Compliance. The Borrower is in compliance with all statutes and governmental rules and regulations applicable to it.

4.9    Ownership of Property; Leases; Liens. The Borrower owns no real estate, and has good and marketable title to its personal property. Borrower has provided to Administrative Agent true and accurate copies of any and all written real property or personal property leases to which it is party, and has accurately described in writing to Administrative Agent any and all unwritten real property or personal property leases to which it is subject, including any leases with Related Parties. None of the properties, revenues or assets of the Borrower is subject to a Lien except for Liens granted to the Administrative Agent as required by the Loan Documents.

4.10    Indebtedness. The Borrower does not have any Indebtedness except for Indebtedness to Lenders pursuant to Notes.

4.11    Guaranty or Suretyship. The Borrower is not a party to any contract of guaranty or suretyship and none of its assets are subject to such a contract.

4.12    Taxes. The Borrower has filed all federal, state and local tax returns required to be filed and has paid or made provision for the payment of all taxes due and payable pursuant to such returns and pursuant to any assessments made against it or any of its property and all other taxes, fees and other charges imposed on it or any of its property by any governmental authority. No tax Liens have been filed and no claims are being asserted with respect to any such taxes, fees or charges against Borrower. The sum of the charges, accruals and reserves on the books of the Borrower in respect of taxes and other governmental charges are adequate to pay and discharge all such taxes.

4.13    Subsidiaries. The Borrower does not have any Subsidiaries.

4.14    Partnerships and Joint Ventures. The Borrower is not a partner (limited or general) or joint venturer in any partnerships or joint ventures.

4.15    Use of Proceeds. The Loan will be used solely to acquire merchandise from vendors approved by the Administrative Agent that are not Related Parties of the Borrower or the Corporate Guarantor, which merchandise when purchased shall have been contracted for sale by Borrower to customers approved in advance by the Administrative Agent.

4.16    Property Purchased From Vendors. Unless otherwise agreed in writing by the Lender, all Inventory purchased by Borrower with the proceeds of a Loan shall be purchased from vendors who are not Related Parties and whose interest therein is not subject to any Lien or encumbrance superior to Borrower's interest therein.

4.17    Insurance. Upon request, the Borrower will provide evidence of the property and casualty insurance and credit insurance carried by the Borrower.

10614v4

14

4.18   Contracts. The Borrower is not a party to any contract or agreement, or subject to any charge, corporate restriction, judgment, decree or order, the performance of which could constitute an Adverse Event.

4.19   Accuracy of Information. All factual information heretofore or herewith furnished by the Borrower to the Administrative Agent for purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all other such factual information hereafter furnished by the Borrower to the Administrative Agent will be, true and accurate in every material respect on the date as of which such information is dated or certified and no such information contains any material misstatement of fact or omits to state any fact necessary to make the statements contained therein not misleading.

4.20   Ownership. As of the Closing Date, all of the outstanding membership interests of the Borrower are owned by Petters Company, Inc. and all of the outstanding capital stock of the Corporate Guarantor is owned by Thomas J. Petters. All of the issued and outstanding membership interests or shares of common stock, as applicable, of the Borrower and of the Corporate Guarantor are duly authorized, validly issued, fully paid and nonassessable.

4.21   Survival of Representations. All representations and warranties contained in this Article 4 shall survive the delivery of all Notes delivered in connection herewith for the period that such Notes remains outstanding.

## ARTICLE 5.
## AFFIRMATIVE COVENANTS

During the Term, unless the Administrative Agent and all Lenders shall otherwise expressly consent in writing, the Borrower will do all of the following:

5.1   Financial Statements and Reports. Furnish to the Administrative Agent:

(a)   As soon as available and in any event within thirty (30) days after the end of each month of each fiscal year, a copy of the unaudited financial statements of the Borrower prepared in conformity with GAAP (except for the omission of footnotes and prior period comparative data required by GAAP and for variations from GAAP which in the aggregate are not material) consisting of a balance sheet as of the close of such month and related statements of operations and retained earnings and cash flow for such month and from the beginning of such fiscal year to the end of such month together with the other monthly reports required by the Administrative Agent.

(b)   By no later than two (2) Business Days after becoming aware of any Default or Event of Default, a notice describing the nature thereof and what action the Borrower proposes to take with respect thereto.

(c)   By no later than two (2) Business Days after becoming aware of the occurrence thereof, notice of the institution of any litigation, arbitration or governmental proceeding against the Borrower or the Corporate Guarantor or any of their property which, if

determined adversely to the Borrower or the Corporate Guarantor would constitute an Adverse Event, or the rendering of a judgment or decision in such litigation or proceeding which constitutes an Adverse Event, and the steps being taken by the defendant with respect thereto.

(d)     As soon as available and in any event within thirty (30) days after the end of each month of each fiscal year, a copy of the account records relating to the Depository Account as regularly furnished by the Depository Bank.

(e)     If any customer of Borrower shall at any time make payments to any account of the Borrower other than the Depository Account or any account of a Related Party (although such payments are required hereunder to be made to the Depository Account directly), as soon as available and in any event within thirty (30) days after the end of each month of each fiscal year, a copy of the account records relating to such account for as many months as Administrative Agent may request in its sole discretion.

(f)     From time to time, such other information regarding the business, operation and financial condition of the Borrower as the Administrative Agent may reasonably request.

5.2     Company Existence. Maintain its company existence and good standing under the laws of its jurisdiction of organization and its qualification to transact business in each jurisdiction in which the character of the properties owned, leased or operated by it or the business conducted by it makes such qualification necessary and where the failure to so qualify could constitute an Adverse Event.

5.3     Insurance. Maintain with financially sound and reputable insurance companies such insurance as may be required by any Loan Document or by law and such other insurance in such amounts and against such hazards as is customary in the case of reputable corporations or companies engaged in the same or similar business and similarly situated. At the request of Lender, Borrower shall purchase credit insurance with respect to account debtors for Accounts of the Borrower and assign benefits payable thereunder to Lender in a form acceptable to Lender, provided that Lender shall have agreed to reimburse Borrower for the cost of such insurance.

5.4     Payment of Taxes and Claims. File all tax returns and reports which are required by law to be filed by it and pay before they become delinquent all taxes, assessments and governmental charges and levies imposed upon it or its property and all claims or demands of any kind (including, without limitation, those of suppliers, mechanics, carriers, warehouses, landlords and other like Persons) which, if unpaid, might result in the creation of a Lien upon its property (other than taxes, fees or charges the amount or validity of which are being contested in good faith by appropriate proceedings and with respect to which reserves in accordance with GAAP have been provided on the books of the Borrower).

5.5     Inspection. Permit any Person designated by the Administrative Agent to visit and inspect any of its properties, company books and financial records, or, on behalf of the Borrower with its permission deemed granted by execution hereof, and to discuss the affairs, finances and accounts of the Borrower with, and to be advised as to the same by, its officers at such reasonable times and intervals as the Administrative Agent may designate. Administrative Agent

10614v4

16

specifically acknowledges that other entities may share properties with the Borrower, and any inspections shall be specifically limited to properties, company books and financial records of, or directly relating to, the Borrower, its business or operations.

5.6     Maintenance of Properties. Provide copies or descriptions of all real property or personal property leases it enters into during the Term within thirty (30) days of commencement of such lease. Borrower shall maintain its properties used or useful in the conduct of its business in good condition, repair and working order, and supplied with all necessary equipment, and make all necessary repairs, renewals, replacements, betterments, and improvements thereto, all as may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

5.7     Books and Records. Keep adequate and proper records and books of account in which full and correct entries will be made of its dealings, business and affairs.

5.8     Bills of Sale. If the Administrative Agent shall so request, deliver to the Administrative Agent an executed Bill of Sale from each merchandise vendor with respect to the Inventory purchased by the Borrower in the form set forth in Exhibit D not later than three (3) Business Days following the making of the Loan financing such purchase.

5.9     Compliance. Comply in all material respects with all laws, rules, regulations, orders, writs, judgments, injunctions, decrees or awards to which it may be subject.

## ARTICLE 6.
## NEGATIVE COVENANTS

During the Term, unless the Administrative Agent shall otherwise expressly consent in writing, the Borrower will not do any of the following:

6.1     Merger. Merge or consolidate or enter into any analogous reorganization or transaction with any Person.

6.2     Sale of Assets. Sell, transfer, lease, or otherwise convey all or any part of its assets except for sales of Inventory in the ordinary course of business and for the fair market value thereof.

6.3     Change in Nature of Business. Make any material change in the nature of its business as carried on at the date hereof.

6.4     Subsidiaries, Partnerships and Joint Ventures. Either: (a) form or acquire any corporation or company which would thereby become a Subsidiary; or (b) form or enter into any partnership as a limited or general partner or form or enter into any joint venture.

6.5     Other Agreements. Enter into any agreement, bond, note or other instrument with or for the benefit of any Person other than the Administrative Agent or the Lenders which would: (a) prohibit the Borrower from granting, or otherwise limit the ability of the Borrower to grant to

10614v4

17

the Administrative Agent, or any other Person designated by Administrative Agent, any Lien on any assets or properties of the Borrower; or (b) be violated or breached by the Borrower's performance of its obligations under the Loan Documents.

6.6     Payment Terms. Materially change its selling terms of payment on accounts as in effect on the date of this Agreement.

6.7     Investments. Acquire for value, make, have or hold any Investments, except deposits in the Depository Account or such other Investments authorized by Administrative Agent in writing.

6.8     Indebtedness. Incur, create, issue, assume or suffer to exist any Indebtedness except:

    (a)     Indebtedness to a Lender;

    (b)     Current liabilities, other than for borrowed money, incurred in the ordinary course of business; and

    (c)     Indebtedness consisting of endorsements for collection, deposit or negotiation and warranties of products or services, in each case incurred in the ordinary course of business.

6.9     Liens. Create, incur, assume or suffer to exist any Lien with respect to any property, revenues or assets now owned or hereafter arising or acquired, except:

    (a)     Liens granted for the benefit of the Lenders;

    (b)     Deposits or pledges to secure payment of workers' compensation, unemployment insurance, pensions or other social security obligations, in the ordinary course of business of the Borrower;

    (c)     Liens for taxes, fees, assessments and governmental charges not delinquent;

    (d)     Liens of carriers, warehousemen, mechanics and materialmen, and other like Liens arising in the ordinary course of business, for sums not due; and

    (e)     Deposits to secure the performance of bids, trade contracts, leases, statutory obligations and other obligations of a like nature incurred in the ordinary course of business.

6.10     Contingent Liabilities. Either: (a) endorse, guarantee, contingently agree to purchase or to provide funds for the payment of, or otherwise become contingently liable upon, any obligation of any other Person, except by the endorsement of negotiable instruments for deposit or collection (or similar transactions) in the ordinary course of business; or (b) agree to maintain the net worth or working capital of, or provide funds to satisfy any other financial test applicable to, any other Person.

10614v4

6.11    Unconditional Purchase Obligations. Enter into or be a party to any contract for the purchase or lease of materials. supplies or other property or services if such contract requires that payment be made by it regardless of whether or not delivery is ever made of such materials, supplies or other property or services.

6.12    Purchase Orders and Accounts. Cancel or modify, or permit a customer to cancel or modify, any purchase order received by the Borrower from any customer; provided however, that Borrower and customers may make minor adjustments and modifications in the ordinary course of business to such purchase orders.

## ARTICLE 7.
## EVENTS OF DEFAULT AND REMEDIES

7.1    Events of Default. The occurrence of any one (1) or more of the following events shall constitute an Event of Default upon the expiration of the cure period, if any, described in the relevant event:

(a)    The Borrower shall fail to make when due, whether by acceleration or otherwise, (i) any payment of principal of, or interest on, any Note or (ii) any fee or other amount required to be made to the Initial Lender or to the Administrative Agent pursuant to any Loan Document and such payment default shall continue for longer than ten (10) business days;

(b)    Any representation or warranty made or deemed to have been made by or on behalf of the Borrower or the Corporate Guarantor in any of the Loan Documents by or on behalf of the Borrower or the Corporate Guarantor in any certificate, statement, report or other writing furnished by or on behalf of the Borrower to the Administrative Agent or any Lender pursuant to the Loan Documents shall prove to have been false or misleading in any material respect on the date as of which the facts set forth are stated or certified or deemed to have been stated or certified;

(c)    The Borrower shall fail to comply with Section 5.3, hereof and such failure shall continue for a period of three (3) days after notification of such failure;

(d)    The Borrower shall fail to comply with any agreement, covenant, condition, provision or term contained in the Loan Documents on its part to be performed (and such failure shall not constitute an Event of Default under any of the other provisions of this Section 7.1) and such failure to comply shall continue for ten (10) calendar days after notice thereof to the Borrower by the Administrative Agent or any Lender;

(e)    The Borrower or the Corporate Guarantor shall become insolvent or shall generally not pay its or his debts as they mature or shall apply for, shall consent to, or shall acquiesce in the appointment of a custodian, trustee or receiver of the Borrower or the Corporate Guarantor, or for a substantial part of the property of any one (1) of them or, in the absence of such application, consent or acquiescence, a custodian, trustee or receiver shall be appointed for

1061464

19

the Borrower or the Corporate Guarantor, or for a substantial part of the property of anyone of them and shall not be discharged within thirty (30) days;

(f)    Any bankruptcy, reorganization, debt arrangement or other proceedings under any bankruptcy or insolvency law shall be instituted by or against the Borrower or the Corporate Guarantor, and, if so instituted, shall have been consented to or acquiesced in by the Borrower or the Corporate Guarantor, or shall remain undismissed for sixty (60) days, or an order for relief shall have been entered against the Borrower or the Corporate Guarantor, or such debtor shall take any corporate action to approve institution of, or shall have acquiesced in, such a proceeding;

(g)    Any dissolution or liquidation proceeding shall be instituted by or against the Borrower or the Corporate Guarantor, and, if so instituted, shall be consented to or acquiesced in by the Borrower or the Corporate Guarantor shall remain for sixty (60) days undismissed, or the Borrower or the Corporate Guarantor shall take any corporate action to approve institution of, or acquiescence in, such a proceeding;

(h)    A judgment or judgments for the payment of money in excess of the sum of One Hundred Thousand Dollars ($100,000.00) in the aggregate shall be rendered against the Borrower or the Corporate Guarantor and the Borrower or the Corporate Guarantor shall not discharge the same or provide for its discharge in accordance with its terms, or acquiesced in by the execution thereof, prior to any execution on such judgments by such judgment creditor, within thirty (30) days from the date of entry thereof, and within said period of thirty (30) days, or such longer period during which execution of such judgment shall be stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal;

(i)    The maturity of any Indebtedness of the Borrower or the Corporate Guarantor (other than Indebtedness under this Agreement or the Loan Documents) shall be accelerated, or the Borrower or the Corporate Guarantor shall fail to pay any such Indebtedness when due and any applicable grace period shall have expired or, in the case of such Indebtedness payable on demand, when demanded, or any event shall occur or condition shall exist and shall continue for more than the period of grace, if any, applicable thereto and shall have the effect of causing, or permitting (any required notice having been given and grace period having expired) the holder of any such Indebtedness or any trustee or other Person acting on behalf of such holder to cause such Indebtedness to become due prior to its stated maturity or to realize upon any collateral given as security therefor;

(j)    Petters Company, Inc. shall cease to own all of the issued and outstanding membership interest in the Borrower or all of the issued and outstanding capital stock on a fully-diluted basis of the Corporate Guarantor;

(k)    Thomas J. Petters shall die, become mentally incapacitated or otherwise become unable to fulfill his duties as chief executive officer of either the Borrower or the Corporate Guarantor;

10614v4

20

(l)     If the validity or enforceability of any of the Loan Documents shall be
challenged by the Borrower or any other party thereto, or shall fail to remain in full force and
effect; or

(m)     The Administrative Agent shall have determined in good faith the interest
of the Administrative Agent or any Lender in any material Collateral has been materially
adversely affected or impaired, or the value thereof to the Lenders has been diminished to a
material extent, regardless if the condition giving rise to such determination does not constitute
an Event of Default under any of the other subsections of this Section 7.1 and the Administrative
Agent shall have given such Lender written notice of such adverse condition, afforded such
Lender ten (10) days to cure such adverse condition (provided such adverse condition is curable)
and such adverse condition shall still remain (as determined by Administrative Agent) after such
cure period.

7.2     Remedies. If: (a) any Event of Default described in Sections 7.1(e), (f) or (g) shall
occur, the outstanding unpaid principal balance of the Note, the accrued interest thereon and all
other Obligations under the Loan Documents shall automatically become immediately due and
payable; or (b) any other Event of Default shall occur and be continuing, then the Administrative
Agent may take any or all of the following actions: (i) declare that the outstanding unpaid
principal balance of any or all Notes, the accrued and unpaid interest thereon and all other
Obligations under the Loan Documents to be forthwith due and payable, whereupon the Notes,
all accrued and unpaid interest thereon and all such Obligations shall immediately become due
and payable, in each case without demand or notice of any kind, all of which are hereby
expressly waived, anything in this Agreement or in any Note to the contrary notwithstanding; (ii)
exercise all rights and remedies under any other instrument, document or agreement between the
Borrower and Administrative Agent, Administrative Agent and/or any Lender; and (iii) enforce
all rights and remedies under any applicable law.

7.3     Offset. In addition to the remedies set forth in Section 7.2, upon the occurrence of
any Event of Default or at any time thereafter while such Event of Default continues, the
Administrative Agent, any Lender or any other holder of any Note may offset any and all
balances, credits, deposits (general or special, time or demand, provisional or final), accounts or
monies of the Borrower then or thereafter with such Lender or such other holder, or any
obligations of such Lender or such other holder of such Note, against the Indebtedness then owed
by the Borrower to such Lender. The Borrower hereby grants to the Lenders and each Note
holder a security interest in all such balances, credits, deposits, accounts or monies.

## ARTICLE 8.
## ADMINISTRATIVE AGENT; ASSIGNMENTS

8.1     Appointment. The Lenders hereby designate and appoint AWB Services, LLC as
Administrative Agent and as their Administrative Agent (for purposes of this Article 8, the term
"Administrative Agent" also shall include AWB Services, LLC, in its capacity as Secured Party
under the Security Agreement and the Deposit Pledge and Account Control Agreement) on their
collective behalf to act as specified herein and in the Loan Documents. Each Lender hereby
irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be

11614v4

21

deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the Loan Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto, including, without limitation, to execute and deliver the Security Agreement and the Deposit Pledge and Account Control Agreement and any Loan Document necessary or useful in connection with the Obligations and Lenders' security interests relating thereto. The Administrative Agent may perform any of its duties hereunder by or through its officers, directors, agents, employees or affiliates. The Lenders agree that Borrower shall have the right to rely on the direction given by the Administrative Agent or its successor.

8.2     Nature of Duties. The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the Loan Documents. Neither the Administrative Agent nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by any of them hereunder or under any Loan Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). The duties of the Administrative Agent shall be mechanical and administrative in nature. The Administrative Agent shall not have by reason of this Agreement or any Loan Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any Loan Document except as expressly set forth herein or therein.

8.3     Lack of Reliance on the Agreement. Independently and without reliance upon the Administrative Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrower in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Borrower and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectibility, priority or sufficiency of this Agreement or any Loan Document or the financial condition of the Borrower or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any Loan Document, or the financial condition of the Borrower or the existence or possible existence of any Default or Event of Default.

8.4     Certain Rights of the Agent. If the Administrative Agent requests instructions from the Lenders with respect to any act or action (including failure to act) in connection with

11614v4

22

this Agreement or any Loan Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any Loan Document in accordance with the instructions of the Lenders.

8.5     Reliance. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

8.6     Indemnification. To the extent the Administrative Agent (or any affiliate thereto) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective percentage of principal amount of Notes held by them for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in performing its duties hereunder or under any Loan Document or in any way relating to or arising out of this Agreement or any Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

8.7     Holders. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor. Notwithstanding anything in this Section, no Note or interest in any Note may be transferred unless such transfer complies with Section 8.15 of this Agreement.

8.8     Resignation by the Administrative Agent.

(a)     The Administrative Agent may resign from the performance of all its functions and duties hereunder and/or under the Loan Documents at any time by giving fifteen (15) Business Days' prior written notice to the Lenders and the Borrower. Such resignation shall

10614v4

23

take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)      Upon any such notice of resignation by the Administrative Agent, the Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (provided that the Borrower's approval shall not be required if a Default or an Event of Default then exists).

8.9      Release of Collateral. The Lenders hereby irrevocably authorize Administrative Agent, at its option and in its discretion, to release any lien granted to or held by it upon any Collateral (i) upon payment and satisfaction of all obligations under the Notes (other than contingent indemnification obligations to the extent no claims giving rise thereto have been asserted); (ii) constituting property being sold or disposed of if Borrower certifies to Administrative Agent that the sale or disposition is made in compliance with the provisions of the applicable Collateral Document (and Administrative Agent may rely in good faith conclusively on any such certificate, without further inquiry); (iii) in accordance with the terms of the Security Agreement, or (iv) having a fair market value not greater than twenty five percent (25%) of the total fair market value of all Collateral, either in a single transaction or in a series of related transactions.

8.10      Confirmation of Authority; Execution of Releases. Without in any manner limiting Administrative Agent's authority to act without any specific or further authorization or consent by Lenders, each Lender agrees to confirm in writing, upon request by Administrative Agent, the authority to release any Collateral conferred upon Administrative Agent hereunder. Upon receipt by Administrative Agent of any required confirmation from the Requisite Lenders of its authority to release any particular item or types of Collateral, Administrative Agent shall (and is hereby irrevocably authorized by Lenders to) execute such documents as may be necessary to evidence the release of the liens granted to Administrative Agent upon such Collateral; provided, however, that (i) Administrative Agent shall not be required to execute any such document on terms which, in Administrative Agent's opinion, would expose Administrative Agent to liability or create any obligation or entail any consequence other than the release of such liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the indebtedness evidenced by the Notes or any liens upon (or obligations of Borrower, in respect of), all interests retained by Borrower, including (without limitation) the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

8.11      Absence of Duty. Administrative Agent shall have no obligation whatsoever to any Lender or any other Person to assure that the property covered by the Security Agreement exists or is owned by Borrower or is cared for, protected or insured or has been encumbered or that the Liens granted to Administrative Agent have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to such Agent in any of the Loan Documents, it being understood and agreed that in respect of the property covered by the Security Agreement, the Deposit Pledge and Account Control Agreement or any act,

10614v4

24

omission or event related thereto, Administrative Agent may act in any manner it may deem appropriate, in its discretion and provided that Administrative Agent shall exercise the same care which it would in dealing with loans for its own account.

8.12    Agent for Perfection. Each Lender hereby appoints Administrative Agent as agent for the purpose of perfecting such Lender's security interest in that portion of the Collateral which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control. Each Lender agrees that it will not have any right individually to enforce or seek to enforce the Security Agreement or to realize upon any Collateral for the Notes unless consented to by Administrative Agent, it being understood and agreed that such rights and remedies may be exercised only by Administrative Agent. Nothing herein is intended or shall be construed to limit any Lender's rights under its Note, including the right to enforce, accelerate, amend, compromise or otherwise administer such Note.

8.13    Fees. Each Lender agrees to pay to Administrative Agent, for its services as Administrative Agent hereunder such Lender's pro rata share of the Administrative Agent Fees.

8.14    Amendments, Consents and Waivers.

Except as otherwise provided herein and except as to matters set forth in other subsections hereof or in any Loan Document as requiring only Administrative Agent's consent, the consent of Requisite Lenders will be required to amend, modify, terminate, or waive any provision of this Agreement or any of the Loan Documents; provided however, that if such amendment, modification, termination or waiver applies only to a certain Loan or Loans, only the consent of the Lender or Lenders with respect to such Loans shall be required.

In the event Administrative Agent requests the consent of a Lender and does not receive a written consent or denial thereof within ten (10) Business Days after such Lender's receipt of such request, then such Lender will be deemed to have given such consent.

8.15    Assignments.

(a)    Each Lender may from time to time assign, subject to the terms of an Assignment and Acceptance Agreement and this Section 8.15 hereof, a Loan to another Person; provided, however, that no Lender will offer, sell or otherwise dispose of all or any part of a Note except under circumstances which will not result in a violation of the Act or applicable state securities laws. In the case of an assignment authorized hereunder, the assignee shall have, as to the Loan assigned, the same rights, benefits and obligations as it would if it were a Lender hereunder and the assigning Lender shall be relieved of its obligations hereunder with respect to such Loan or assigned portion thereof.

(b)    Borrower hereby acknowledges and agrees that any assignment will give rise to a direct obligation of Borrower to the assignee and that the assignee shall be considered to be a Lender hereunder. Neither the Administrative Agent nor any Lender may assign its rights and obligations under this Agreement and the Loan Documents to any Person without the prior written consent of the Borrower, which consent shall not be unreasonably withheld, delayed or

conditioned; provided, however, that Initial Lender may sell, transfer or assign Loans and corresponding Notes to its Lender Affiliates without Borrower's consent so long as such sale or assignment complies with sections (a)(1) and (a)(2) of Rule 904 of the Act. If any Lender assigns its rights and interest under any of the Loan Documents to a Person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code; such assignee shall deliver to the Borrower on or before the date of such an assignment an IRS Form W-8BEN (or any successor or form) certifying as to such assignee's status for purposes of determining exemption from United States withholding tax, information reporting and backup withholding with respect to all payments to be made to such assignee. In addition, all assignees shall comply with the requirements of Sections 2.3(d) and 8.16 of this Agreement. Any attempted assignment in violation of this Section 8.15(b) shall be void and of no force and effect.

8.16    Recording of Assignments. Administrative Agent shall maintain at its office a copy of each Assignment and Acceptance Agreement delivered to it and a register for the recordation of the names and addresses of Lenders, and the commitments of, and principal amount of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be presumptive evidence of the amounts due and owing to Lender in the absence of manifest error. Borrower, Administrative Agent and each Lender may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrower and any Lender, at any reasonable time upon reasonable prior notice.

8.17    Acceptance of Assignment by Administrative Agent. Upon its receipt of a duly completed Assignment and Acceptance Agreement executed by an assigning Lender and its assignee (together with the Note(s) subject to such assignment), evidence satisfactory to the Administrative Agent and Borrower that such assignment complies with Section 8.15, and receipt of the Borrower's written consent to assignment if required by Section 8.15, Administrative Agent shall (1) accept such Assignment and Acceptance Agreement, (2) record the information contained therein in the Register and (3) other than in connection with assignments to Lender Affiliates not requiring Borrower's consent, give prompt notice thereof to Borrower and the other Lenders. If requested by Administrative Agent, Borrower shall promptly execute and deliver to Administrative Agent new Note(s) evidencing the Obligations owed by Borrower to the assignee and, if applicable, the assigning Lender, after giving effect to the assignment. Administrative Agent shall cancel the Notes delivered to it by the assigning Lender and deliver the new Notes to the assignee and, unless the assigning Lender has assigned all of its interests under this Agreement, the assigning Lender.

8.18    Security Interests in Obligations; Assignments to Affiliates. Any Lender may at any time, following written notice to Administrative Agent, (1) with the written consent of Borrower, pledge the Obligations held by it or create a security interest in all or any portion of its rights under this Agreement or the Loan Documents in favor of any Person; provided, however, that (a) no such pledge or grant of security interest to any Person shall release such Lender from its obligations hereunder or under any Loan Document and (b) the acquisition of title to such Lender's Obligations pursuant to any foreclosure or other exercise of remedies by such Person shall be subject to the provisions of this Agreement and the Loan Documents in all respects; and (2) assign all or any portion of its funded Loans to a Lender Affiliate of such Lender, to one or

more other Lenders or to a Lender Affiliate of such other Lender, provided however, that such assignment must be otherwise in accordance with Section 8.15 of this Agreement.

8.19     Other Matters. Except as otherwise provided herein, no Lender shall, as between Borrower and that Lender, be relieved of any of its obligations hereunder as a result of any sale, assignment, transfer or negotiation of, or granting of a participation in, all or any part of the Loans, the Notes or other Obligations owed to such Lender. Each Lender may furnish any information concerning Borrower in possession of that Lender from time to time to Borrower, approved assignees and participants and to any Lender Affiliate of such Lender or its parent company.

## ARTICLE 9.
## MISCELLANEOUS

9.1     Waiver and Amendment. No failure on the part of the Administrative Agent, any Lender or the holder of any Note to exercise and no delay in exercising any power or right hereunder or under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right. The remedies herein and in any other instrument, document or agreement delivered or to be delivered to the Administrative Agent or any Lender hereunder or in connection herewith are cumulative and not exclusive of any remedies provided by law. No notice to or demand on the Borrower not required hereunder or under any Note or any Loan Document shall in any event entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Administrative Agent, any Lender or the holder of any Note to any other or further action in any circumstances without notice or demand. No amendment, modification or waiver of any provision of this Agreement or any Note or consent to any departure by the Borrower therefrom shall be effective unless the same shall be in writing and signed by the Administrative Agent, on behalf of all Lenders, and then such amendment, modification, waiver or consent shall be effective only in the specific instances and for the specific purpose for which given.

9.2     Expenses and Indemnities.

(a)     Loan Documents. The Borrower agrees to pay and reimburse the Administrative Agent for all expenses paid or incurred by the Administrative Agent (including reasonable fees and expenses of legal counsel, who may be employees of the Administrative Agent or an affiliate) in connection with the collection and enforcement of the Loan Documents (including the Security Agreement and the Deposit Account Pledge Agreement). The Borrower agrees to pay, and save the Administrative Agent and all Lenders harmless from all liability for, any stamp or other taxes which may be payable with respect to the execution or delivery of the Loan Documents.

(b)     General Indemnity. In addition to the payment of expenses pursuant to Section 9.2(a), whether or not the transactions contemplated hereby shall be consummated, the Borrower hereby indemnifies, and agrees to pay and hold the Administrative Agent, the Lenders, their affiliates and any holder of any Note, and their respective officers, directors, employees,

10614v4

27

agents, successors and assigns (collectively, the "Indemnitees") harmless from and against, any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for any of such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not any of such Indemnitees shall be designated a party thereto), that may be imposed on, incurred by, or asserted against the Indemnitees (or any of them), in any manner relating to or arising out of the Loan Documents, the statements contained in any letters delivered by the Administrative Agent or any Lender, or the use or intended use of the proceeds of any of the Loan (the "Indemnified Liabilities"); provided, however, that the Borrower shall have no obligation to an Indemnitee hereunder with respect to Indemnified Liabilities arising from the material breach of this Agreement or the Loan Documents by an Indemnitee or arising from the gross negligence or willful misconduct of an Indemnitee. To the extent that the undertaking to indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.

(c)     Survival. The obligations of the Borrower under this Section 9.2 shall survive any termination of this Agreement.

9.3     Notices. Except when telephonic notice is expressly authorized by this Agreement, any notice or other communication to any party in connection with this Agreement shall be in writing and shall be sent by manual delivery, telegram, telex, facsimile transmission, overnight courier or United States mail (postage prepaid) addressed to such party at the address specified on the signature page hereof, or at such other address as such party shall have specified to the other party hereto in writing. All periods of notice shall be measured from the date of delivery thereof if manually delivered, from the date of sending thereof if sent by telegram, telex or facsimile transmission, from the first Business Day after the date of sending if sent by overnight courier, or from four (4) days after the date of mailing if mailed; provided, however, that any notice to the Administrative Agent under Section 2.3 hereof shall be deemed to have been given only when received by the Administrative Agent. The Borrower hereby authorizes the Administrative Agent and any Lender to rely upon the telephone or written instructions of any person identifying himself or herself as an authorized officer of the Borrower and upon any signature which the Administrative Agent or such Lender believes to be genuine, and the Borrower shall be bound thereby in the same manner as if the Borrower were authorized or such signature were genuine.

9.4     Successors and Assignment. This Agreement shall be binding upon the Borrower, the Administrative Agent, the Lenders and their respective successors and assigns, and shall inure to the benefit of the Borrower, the Administrative Agent, the Lenders and the successors and permitted assigns of the Borrower, the Administrative Agent and the Lenders. The Borrower shall not assign its rights or duties hereunder without the consent of the Administrative Agent, on behalf of the Lenders.

110614v4

28

9.5     Participations. Any Lender may sell participation interests in any or all of the Loan and in all or any portion of the Note.

9.6     Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

9.7     Captions. The captions or headings herein and any table of contents hereto are for convenience only and in no way define, limit or describe the scope or intent of any provision of this Agreement.

9.8     Confidentiality. The parties acknowledge that information about parties with whom the Borrower and the Lender transact business, existing and potential investors, the structure of the transactions contemplated hereby, plans for future development, promotional methods and any other information of a similar nature not available to the public, including, without limitation, all documentation related thereto constitute confidential information of the parties (collectively, "Confidential Information"). The parties shall use the Confidential Information exclusively for the purposes of this Agreement and shall use their best efforts to safeguard the secrecy and confidentiality of the Confidential Information, which the parties acknowledge constitute "trade secrets" or "Confidential Information" of each party, and shall not disclose any of the Confidential Information to any third party, during the term of this Agreement or thereafter, except: (a) information which at the time of disclosure is part of the public knowledge or literature and is readily accessible to such third party; provided that any combination of features shall not be deemed within this exception merely because individual features are part of the public knowledge or literature and readily accessible to such third party, but only if the combination itself and its principle of operation are part of the public knowledge or literature and are readily accessible to such third party; (b) information required by law to be disclosed; or (c) with the express prior written consent of the party to whom the information pertains.

9.9     Entire Agreement. This Agreement, the Notes and the Loan Documents embody the entire agreement and understanding between the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof. This Agreement supersedes all prior oral and written agreements and understandings relating to the subject matter hereof.

9.10    Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and either of the parties hereto may execute this Agreement by signing any such counterpart.

9.11    Governing Law. This Agreement shall be deemed to be a contract made under the laws of the State of Illinois and for all purposes shall be construed in accordance with the laws of the State of Illinois.

9.12    JURISDICTION; WAIVER. BORROWER ACKNOWLEDGES THAT THIS AGREEMENT IS BEING SIGNED BY THE ADMINISTRATIVE AGENT ON BEHALF OF

10614v4

29

# EXHIBIT T-69B

B 10 (Official Form 10) (12/12)

| UNITED STATES BANKRUPTCY COURT       District of Minnesota | **PROOF OF CLAIM** |
|---|---|

| Name of Debtor:  Petters Company, Inc. | Case Number:  08-45257 |
|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Ark Discovery II, LP

**COURT USE ONLY**

Name and address where notices should be sent:
Frances Gecker, as Chapter 7 trustee, FrankGecker LLP
325 North LaSalle Street, Suite 625
Chicago, Illinois  60654

Telephone number:  (312) 276-1404     email:   mkrohn@fgllp.com

☑ Check this box if this claim amends a previously filed claim.

Court Claim Number:  __41__
   *(if known)*

Filed on:  __12/16/2008__

Name and address where payment should be sent (if different from above):

Telephone number:                email:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**        $_____107,207,101.00_____

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**   __See Attached__
   (See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:**  _____ (See instruction #3a) | **3b. Uniform Claim Identifier (optional):**  _____ (See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☑ Other
Describe:

Value of Property: $__Unknown__

Annual Interest Rate_____% ☐ Fixed  or  ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

$_____

Basis for perfection:   __Security Agt. and UCC-1__

Amount of Secured Claim:   $__107,207,101.00__

Amount Unsecured:   $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B 10 (Official Form 10) (12/12)

2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.  ☑ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor,  ☐ I am a guarantor, surety, indorser, or other codebtor.
or their authorized agent.  (See Bankruptcy Rule 3005.)
(See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Frances Gecker, as Chapter 7 trustee
Title: Chapter 7 trustee of Ark Discovery II, LP
Company:
Address and telephone number (if different from notice address above):  (Signature)  12/12/2012  (Date)

Telephone number:  email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the

claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

# EXHIBIT T-70

Page 1

```
 1                         DEIKEL
 2            UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF MINNESOTA
 3    -------------------------------------------------
      In re                        Jointly Administered
 4                                  Case No. 08-45257
 5    Petters Company, Inc., et al.,
 6                         Debtors.
 7    (includes:                     Court File Nos.
      Petters Group Worldwide, LLC;     08-45258(KHS)
 8    PC Funding, LLC;                  08-45326(KHS)
      Thousand Lakes, LLC;              08-45327(KHS)
 9    SPF Funding, LLC;                 08-45328(KHS)
      PL Ltd., Inc.;                    08-45329(KHS)
10    Edge One LLC;                     08-45330(KHS)
      MGC Finance, Inc.;                08-45331(KHS)
11    PAC Funding, LLC;                 08-45371(KHS)
      Palm Beach Finance Holdings, Inc.  08-45392(KHS)
12
                                 Chapter 11 Cases
13                         Judge Kathleen H. Sanberg
      -------------------------------------------------
14    Douglas A. Kelley, in his
      capacity as the Trustee of
15    the PCI Liquidating Trust,
16               Plaintiff,
                                 ADV. NO.  10-04301
17      VS.
18    Opportunity Finance, LLC,
      Opportunity Finance
19    Securitization, LLC;
      Opportunity Finance
20    Securitization III, LLC;
      International Investment
21    Opportunities, LLC; Sabes
      Family Foundation; Sabes
22    Minnesota Limited
      Partnership; Robert W.
23    Sabes; Janet F. Sabes; Jon
      R. Sabes; Steven Sabes;
24    Deutsche
      Zentralgenossenschaftbank
25    AG; and The Minneapolis
```

1                              DEIKEL

2             then the proceedings continued as follows:)

3                    THE VIDEO OPERATOR:  And we are back

4             on the record at 4:48 p.m.

5                              EXAMINATION

6     BY MR. WALDMAN:

7             Q.    Welcome back, Mr. Deikel, and thank

8     you very much for your time today.  I only have

9     a couple of quick questions.

10                   I think you testified during the

11    deposition that in connection with the

12    $10 million loan that you made, you met one or

13    more times with Mr. Petters and I think

14    Mr. Discala; is that fair?

15            A.    Yes.

16            Q.    Okay.  And during those meetings,

17    you got an understanding that the loan that you

18    were going to make was going to be used to fund

19    the purchase and sale of electronics; is that

20    correct?

21            A.    That is correct.

22            Q.    Okay.

23                   MR. CHIACHETTI:  Objection; form.

24    BY MR. WALDMAN:

25            Q.    And did you get that

Page 207

1                          DEIKEL

2    understanding -- you got that understanding

3    from Mr. Petters and from Mr. Discala; is that

4    right?

5         A.    Yes.

6              MR. CHIACHETTI:  Objection to form.

7    BY MR. WALDMAN:

8         Q.    And in making the loan to them, did

9    you rely on that representation?

10        A.    Yes.

11        Q.    Okay.  And did you at a certain

12   point learn that that representation was false?

13             MR. CHIACHETTI:  Objection to form.

14             THE WITNESS:  Yes.

15   BY MR. WALDMAN:

16        Q.    And in making the loan, ultimately

17   were you damaged by -- in connection with

18   making the loan and in connection with the

19   misrepresentations made by Mr. Petters and

20   Mr. Discala, were you subsequently damaged

21   through the loss of funds?

22        A.    Yes.

23             MR. CHIACHETTI:  Objection;

24        foundation, leading.

25             MR. WALDMAN:  It's Cross.  I can

# EXHIBIT T-71

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re | **Jointly Administered under<br>Case No. 08-45257** |
| Petters Company, Inc., et al., | Court File No. 08-45257 |
| Debtors. | Court File Nos.: |
| (Includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (KHS) |
| PC Funding, LLC; | 08-45326 (KHS) |
| Thousand Lakes, LLC; | 08-45327 (KHS) |
| SPF Funding, LLC; | 08-45328 (KHS) |
| PL Ltd., Inc.; | 08-45329 (KHS) |
| Edge One LLC; | 08-45330 (KHS) |
| MGC Finance, Inc.; | 08-45331 (KHS) |
| PAC Funding, LLC; | 08-45371 (KHS) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (KHS) |
| | |
| | Chapter 11 Cases<br>Judge Kathleen H. Sanberg |

Douglas A. Kelley, in his capacity as the
Trustee of the PCI Liquidating Trust,

          Plaintiff,

vs.                                                          ADV. NO. 10-04301

Opportunity Finance, LLC; Opportunity Finance
Securitization, LLC; Opportunity Finance
Securitization II, LLC; Opportunity Finance
Securitization III, LLC; International Investment
Opportunities, LLC; Sabes Family Foundation;
Sabes Minnesota Limited Partnership; Robert W.
Sabes; Janet F. Sabes; Jon R. Sabes; Steven
Sabes; Deutsche Zentralgenossenschaftsbank AG;
and The Minneapolis Foundation,

          Defendants.

# Expert Report of Andrew D. Richmond
## July 5, 2019

# Table of Contents

I.   Introduction ........................................................................................................................1

   A.   My Assignment .............................................................................................................1

   B.   Summary of My Qualifications .....................................................................................1

   C.   Professional Standards Applicable to My Work in this Matter .....................................3

   D.   Compensation ...............................................................................................................3

II.   Background .........................................................................................................................3

   A.   Overview of the Petters Scheme ...................................................................................3

   B.   Opportunity Finance .....................................................................................................6

   C.   DZ Bank and Autobahn Funding Company ................................................................10

   D.   The Collapse of PCI ...................................................................................................15

   E.   My Understanding of the Allegations Against DZ Bank..............................................16

III.   Summary of Opinions........................................................................................................17

IV.   Discussion of Fraud, Fraud Theory, Fraud Schemes, How Fraud is Typically Detected and Ponzi Schemes........................................................................................................................18

   A.   Definitions of Fraud ...................................................................................................18

   B.   Fraud Theory ..............................................................................................................19

   C.   Concealment of Fraud Schemes ..................................................................................20

   D.   Occupational Fraud Schemes ......................................................................................21

   E.   Fraud Detection ..........................................................................................................21

   F.   Ponzi Schemes............................................................................................................22

V.   PCI was Designed and Operated to Execute and Conceal its Fraud....................................23

   A.   Prior to its Collapse, PCI Appeared to be a Successful Enterprise..............................23

      1.   Petters's Reputation and Standing in the Community.............................................24

      2.   Leveraging the Legitimate Aspects of Petters Enterprise Helped Conceal the Scheme............................27

      3.   Leveraging Petters's Reputation and Legitimate Businesses was Effective ...............................30

   B.   Petters Recruited Co-Conspirators to Assist with the Scheme ....................................31

      1.   Internal Collusion at PCI......................................................................................31

      2.   PCI External Collusion .........................................................................................33

      3.   The Impact of Internal and External Collusion .....................................................34

   C.   PCI and the Petters Related Companies had a Complicated Corporate Structure that Concealed Roles, Responsibilities and the Flow of Funds....................................................................................................34

      1.   Overview of the Various Petters Entities ...............................................................35

      2.   The Use of the Corporate Structure to Conceal Misconduct..................................36

      3.   The Impact of Complicated Corporate Structure ..................................................36

   D.   The Participants Concealed the Improper Use of Investor/Lender Funds ....................36

E.   Petters Disbursed Substantial Funds to Co-Conspirators to Incentivize their Participation in and Concealment of the Scheme ................................................................................................37

F.   Concealment of the Fraud via the Falsification of Financial and Other Business Records ..........................39

   1.   Fabricated PCI Financial Statements ................................................................................42

   2.   Falsified Tax Returns and Tax Documents ........................................................................44

   3.   Falsified PCI Bank Statements..........................................................................................45

   4.   Falsified PC Funding Financial Statements and Related Documents ........................................47

   5.   Impact of the Falsification of Financial Records ......................................................................49

G.   Concealment of the Fraud by Creating False Promissory Notes and Supporting Deal Documents ..............49

H.   Additional False Deal-Related Documents Created After the Funding of a Promissory Note......................52

I.   Concealment of the Fraud through False Audit Confirmations......................................................................56

J.   Petters and his Co-Conspirators Concealed the Fraud via Lies and/or Misrepresentations............................56

VI.   Evidence of False Information Provided to DZ Bank .............................................................................58

   1.   False Information Provided to DZ Bank Prior to the Execution of the RLSA .........................................58

   2.   False Information Provided to DZ Bank After the Execution of the RLSA...............................................61

VII.   Critiques of the Martens Report ..............................................................................................67

VIII.   Conclusion..................................................................................................................68

scheme to the Federal Bureau of Investigation, Petters and his various corporate entities either were or appeared to be legitimate and successful.

14.     Beginning in approximately 1996, Petters induced numerous parties to lend money directly to PCI or to one or more Special Purpose Entities ("SPEs") that he created, owned and controlled to finance the purported purchase of merchandise, such as electronic goods or other wholesale inventory that manufacturers were purportedly unable to sell to retail stores.[2]  Lenders were told that PCI would "divert" or sell these goods to "big box" retailers, such as Costco and Sam's Club.[3]  Lenders were also told that they had an interest in the receivable created by the sale of the goods to the big box retailer and the payment of the receivable would fund the repayment of their loan (often referred to as a promissory note) plus interest.[4]

15.     Petters and his co-conspirators fabricated a variety of documents to support the non-existent merchandise deals.  For example, the fraudsters created two false purchase orders ("P.O.s") for each purported deal, one showing that PCI had purchased goods from a "vendor" and one showing that PCI had re-sold the same goods at a profit to a retailer.[5]  These "vendors" were, in fact, entities operated by co-conspirators who were actively assisting in the execution and concealment of the fraud.[6]  The two primary "vendors" utilized in the scheme were Nationwide International Resources (hereafter "Nationwide"), operated by Larry Reynolds, and Enchanted Family Buying Company (hereafter "Enchanted"), operated by Michael Catain.[7]  P.O.s associated with alleged purchases of goods from Nationwide and Enchanted were fabricated by co-conspirators Deanna Coleman (also known as Deanna Munson) and Robert White, both longtime employees of PCI.[8]

16.     During the duration of the scheme, PCI's primary source of cash came from various outside parties (such as Opportunity Finance, Lancelot, Metro Gem, Epsilon, and Acorn) that loaned funds via promissory notes offered by several PCI-owned SPEs such as PC Funding,

---

[2] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, pp.6-7, 11; Opportunity Finance, LLC Trade Finance Loan-Backed Conduit Facility Disclosure Book, 9/17/01, DZB017635-667 at 635.
[3] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, p. 11.
[4] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, p. 11.
[5] Deposition of Deanna Coleman, 11/15/18, ("Coleman Deposition"), pp. 48-49.
[6] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, pp. 11-12.
[7] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, pp. 11-12.
[8] Trial Testimony of Deanna Coleman in U.S.A. v. Petters, 11/2/09-11/4/09, ("Coleman Trial Testimony"), pp. 532, 549-550; Trial Testimony of Robert White in U.S.A. v. Petters, 11/5/09-11/6/09, 11/10/09, ("White Trial Testimony"), p. 1179.

### 2.   PCI External Collusion

75.     A few key individuals and entities outside of PCI were also implicated in the fraud
scheme and its concealment.  This type of participation by parties outside of the organization is
called external collusion.  External collusion is an effective concealment technique that makes
fraud schemes more difficult to detect by non-participants (both inside and outside the
organization).  For example, the Petters fraud was executed with assistance from two entities that
claimed to be wholesalers of consumer goods, Nationwide and Enchanted.[173]  Nationwide and
Enchanted were the alleged vendors from which Petters arranged to purchase goods to be sold to
retailers.[174]

#### a)     Larry Reynolds – Nationwide

76.     Nationwide was owned and operated by Larry Reynolds.  Reynolds caused a bank
account to be opened in Nationwide's name that was the recipient of investor/lender funds.[175]
Reynolds pled guilty to one count of conspiracy to commit money laundering and was sentenced
to over 10 years in prison.[176]

#### b)     Michael Catain – Enchanted

77.     Enchanted was owned and operated by Michael Catain.  Catain caused a bank account to
be opened in Enchanted's name that was the recipient of investor/lender funds.[177]  Catain pled
guilty to one count of conspiracy to commit money laundering and was sentenced to seven years
and six months in prison.[178]

78.     The involvement and close coordination of these external third parties was critical to the
execution and concealment of the Petters fraud scheme.  Co-conspirators at PCI worked closely
with Reynolds and Catain to execute and conceal the fraud.  For example, when PCI directed
investor/lender funds to Nationwide or Enchanted, they often received an email from PCI
indicating how much would be received and how much should be returned.[179]  The difference
between the amount received by Nationwide or Enchanted and the amount returned to PCI was

---

[173] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, p. 11.
[174] Fourth Amended Complaint, ¶¶ 82-84.
[175] Fourth Amended Complaint, ¶ 83.
[176] Sentencing Judgement in U.S.A. v. Larry Reynolds, pp. 1-2.
[177] Fourth Amended Complaint, p. ¶ 83.
[178] Sentencing Judgement in U.S.A. v. Michael Catain, pp. 1-2.
[179] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, pp. 12-13.

Reynolds's and Catain's "commission" (bribe) for allowing the money to move through their accounts.[180]  According to the Plaintiff, Nationwide's and Enchanted's commissions on each fake transaction gave the appearance of a legitimate transaction.[181]

### 3.      The Impact of Internal and External Collusion

79.      ACFE research indicates that collusion makes fraud more difficult to detect.  In my opinion, collusion involving senior management, key customers and/or vendors to conceal a scheme is especially significant.  This type of collusion not only overrides the internal controls within the organization, it also overrides important external controls over the organization.  In my opinion, the combined and coordinated internal and external collusion among a small group of co-conspirators was a critical aspect of the concealment of the scheme from individuals inside and outside of PCI who were not recruited to participate in the scheme.

### C.      PCI and the Petters Related Companies had a Complicated Corporate Structure that Concealed Roles, Responsibilities and the Flow of Funds

80.      According to PwC in its Interim Report, "the sheer complexity of the Petters Ponzi Scheme [was] staggering, involving dozens of Petters Entities (including two charitable foundations), hundreds of bank accounts, and spanning more than 10 years."[182]  According to an organizational chart of all the Petters-related entities included in the audit work papers of Eide Bailly, there were 54 different entities within the Petters enterprise.[183]  This organizational chart reflects 24 separate entities underneath "Thomas J. Petters".[184]  These 24 entities in-turn have another 27 separate entities as subsidiaries.[185]  The companies were almost entirely owned by Petters as the sole shareholder.[186]  In addition, there were three charitable foundations reflected on the organizational chart.[187]

---

[180] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, pp. 12-13.
[181] Fourth Amended Complaint, ¶ 85.
[182] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, p. 119.
[183] Organization Chart of Thomas J. Petters, EB002092.  Eide Bailly was the auditor of Thousand Lakes. There is a note included on this organization chart indicating that it was not completely up to date at the time. Wehmhoff Deposition, pp. 172-177.
[184] Organization Chart of Thomas J. Petters, EB002092.
[185] Organization Chart of Thomas J. Petters, EB002092.
[186] Organization Chart of Thomas J. Petters, EB002092.
[187] Organization Chart of Thomas J. Petters, EB002092.

### 1.      Overview of the Various Petters Entities

81.      A separate organization chart dated June 18, 2003 located within PwC's files, reflects several entities organized under Petters Group, LLC.[188]  Many of these entities were legitimate operating businesses.  For example, this organizational chart includes the following companies:[189]

- uBid, Inc.
- RedTag, LLC
- 2J Group, LLC
- Petters Consumer Brands, LLC
- Petters International, Inc. / Petters Consumer Brands International, LLC
- Integrity Marketing & Sales, LLP
- Vision Media Group, LLP
- Liquid8 Records

82.      In addition to the entities above organized under Petters Group, LLC, PCI (the primary entity involved with the fraud) formed and owned several different SPEs.  These SPEs were used by PCI as part of the financing structure with certain lenders.  For example, the following SPEs were deemed by PwC to have been part of the Petters fraud scheme:[190]

- MGC Finance, Inc.
- PL Ltd., Inc.
- SPF Funding, LLC
- PC Funding, LLC
- Edge One, LLC
- PAC Funding, LLC
- Thousand Lakes, LLC
- Palm Beach Finance Holdings, Inc.

---

[188] Petters Group, LLC and IOC's, 6/18/03, Kelley_Micro_0004738.
[189] Petters Group, LLC and IOC's, 6/18/03, Kelley_Micro_0004738.
[190] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, p. 7.

## 2.    The Use of the Corporate Structure to Conceal Misconduct

83.    The complicated corporate structure of the Petters-related entities masked the flow of funds and made it difficult for non-participating employees and those external to the organization to detect the scheme.  As part of its investigation into the finances of the Petters-related entities, PwC identified 648 separate bank accounts related to the Petters enterprise that PwC had to evaluate.[191]  From this listing of bank accounts, PwC ultimately identified a total of 87 accounts from 21 banks through which both fraudulent and legitimate activity occurred.[192]

84.     In addition to the multitude of bank accounts through which fraudulent and legitimate transactions flowed, the Petters-related entities also maintained several disparate accounting software systems.  PwC identified at least the following different accounting software systems in use at Petters-related entities and Polaroid at the time of the raid: QuickBooks, Epicore, and SAP.[193]

## 3.    The Impact of Complicated Corporate Structure

85.    Petters and his co-conspirators appear to have utilized the complicated corporate structure of the Petters enterprise to make it more difficult for innocent insiders and outsiders to uncover the scheme.  In my opinion, the design and utilization of a complex corporate structure can conceal roles, responsibilities and the flow of funds of an enterprise and can be an integral part of the concealment of fraud.  A complex corporate structure such as the Petters enterprise: (1) limits the amount of information available to various internal and external parties; and (2) makes it more difficult to trace and understand corporate transactions, thereby reducing the risk of non-participants both inside and outside of the enterprise discovering the scheme.

## D.    The Participants Concealed the Improper Use of Investor/Lender Funds

86.    To avoid detection of their scheme, fraudsters need to conceal the impact of any misapplied cash or misappropriated assets.  One common concealment technique used in asset misappropriation schemes such as the Petters fraud is for the fraudsters to use multiple transfers

---

[191] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, p. 31.
[192] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, p. 33.
[193] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, p. 31.

lower dollar values) while the falsified "after alteration" statements reflected high account activity (more transactions and higher dollar values), consistent with the existing promissory notes.

112.    I identified the before and after versions of a PCI Highland Banks statement for the month of January 2000.[259]  Both statements are on the same "Highland Banks" letterhead, correspond to the same client (Petters Company, 7585 Equitable Drive, Eden Prairie, MN 55344), reflect the same account number (Highland Commercial Account #3004853), and reflect the same date range (January 1st – January 31st, 2000).  However, the falsified version added numerous fictitious cash transactions to make it appear that the inventory deals were valid.[260]

113.    I also identified evidence in the record that the altered bank statements (rather than the valid versions) were provided to investors, lenders and accounting firms.  For example, an altered Highland Banks PCI bank statement from January 2000 appears in a fax from Coleman to Frank Vennes, another PCI lender, dated September 20, 2000.[261]  In her trial testimony, Coleman specifically testified about preparing fabricated bank statements to send to Vennes.[262]

### 4.  Falsified PC Funding Financial Statements and Related Documents

114.    In addition to creating false PCI financial statements, Petters and his co-conspirators also created false financial statements and related business records for the various SPEs that were utilized as part of the scheme.  For example, for PC Funding, the SPE that was established for the Opportunity Finance transactions,[263] the following documents were created and/or manipulated by the fraudsters and provided to PC Funding's independent external auditors:

- False unaudited PC Funding financial statements presenting "accounts receivables" on the balance sheets associated with fake sales to retailers;[264]

---

[259] Original Highland Banks Statement for Petters Company, 1/1/00-1/31/00, Kelley_Micro_0131798; Falsified Highland Banks Statement for Petters Company, 1/1/00-1/31/00, Kelley_Micro_0276180-181.
[260] Original Highland Banks Statement for Petters Company, 1/1/00-1/31/00, Kelley_Micro_0131798; Falsified Highland Banks Statement for Petters Company, 1/1/00-1/31/00, Kelley_Micro_0276180.
[261] Falsified Highland Banks Statement for Petters Company, 1/1/00-1/31/00, Kelley_Micro_0276180-182.  See Original Highland Banks Statement for Petters Company, 1/1/00-1/31/00, Kelley_Micro_0131798 for the original statement.
[262] Coleman Trial Testimony, pp. 651-652.
[263] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, p. 62.
[264] See for example BPK&Z Audit File, 3/11/04, Kelley_Micro_0125992-254 at 185-187.

- PC Funding bank statements showing false cash activity (for example, deposits associated with purported cash receipts from the sale of goods);[265]

- False PC Funding Amended and Restated Certificate of Formation;[266]

- False PC Funding Board Resolutions;[267]

- False Certificate Regarding Opinion of Counsel;[268]

- False Sale Agreement between PCI and PC Funding;[269]

- False Security Agreement between PC Funding and Opportunity Finance;[270] and

- False Servicer Agreement between PC Funding and Petters Company, Inc.[271]

115.    For years 2002 through 2007, PC Funding issued audited financial statements.  For example, for the fiscal years ended 2002 and 2003, PC Funding retained Blanski Peter Kronlage & Zoch, P.A. ("BPK&Z") to perform an audit of its financial statements.[272]  In the BPK&Z Independent Auditor's Report dated March 11, 2004, BPK&Z reported the following:

- BPK&Z conducted its audits of PC Funding's 2002 and 2003 financial statements in accordance with GAAS;

- GAAS required BPK&Z to plan and perform the audits to obtain reasonable assurance about whether PC Funding's financial statements were free from material misstatement;

- PC Funding's only assets at year-end 2002 and 2003 were $171.6 million and $47.5 million of outstanding Accounts Receivable.  The Accounts Receivable were purchased from PCI, a related party to PC Funding.  The receivables originated from the sale of specific goods by PCI to PCI's customers.

- In BPK&Z's opinion, the financial statements of  PC Funding were fairly presented in conformity with GAAP.[273]

116.    During the audits of its financial statements, PC Funding's management repeatedly lied to its auditors.  For example, on March 11 and 12, 2004, BPK&Z interviewed White and Indahl

---

[265] See for example BPK&Z Audit File, 3/11/04, Kelley_Micro_0125992-254 at 133.
[266] See for example BPK&Z Permanent File Index, 3/12/03, Kelley_Micro_0126457-552 at 462-463.
[267] See for example BPK&Z Permanent File Index, 3/12/03, Kelley_Micro_0126457-552 at 475-476.
[268] See for example BPK&Z Permanent File Index, 3/12/03, Kelley_Micro_0126457-552 at 521-522.
[269] See for example BPK&Z Permanent File Index, 3/12/03, Kelley_Micro_0126457-552 at 523-531.
[270] See for example BPK&Z Permanent File Index, 3/12/03, Kelley_Micro_0126457-552 at 533-545.
[271] See for example BPK&Z Permanent File Index, 3/12/03, Kelley_Micro_0126457-552 at 548-552.
[272] See for example BPK&Z Independent Auditor's Report of 2003 and 2002 P.C. Funding, L.L.C. Financial Statements, 3/11/04, Kelley_Micro_0125995-005 at 997.
[273] See for example BPK&Z Independent Auditor's Report of 2003 and 2002 P.C. Funding, L.L.C. Financial Statements, 3/11/04, Kelley_Micro_0125995-005 at 997-998, 003.

regarding "risks of fraud" and "how the company addresses those risks."[274]  White falsely represented that he was not aware of any risks of fraud affecting PC Funding.[275]  In addition, on March 15, 2004, PC Funding issued a (false) management representation letter to BPK&Z claiming that PC Funding's financial statement were fairly stated and management had no knowledge of fraud.[276]

### 5.  Impact of the Falsification of Financial Records

117.    In my opinion, the false PCI and PC Funding financial records were critical aspects of the concealment of the Petters fraud scheme.  The co-conspirators were able to anticipate the types of financial records that they would need to falsify for various parties in order to conceal the fraud and actively assisted Petters with altering/fabricating the requisite documents.  Petters and his co-conspirators were able to make it appear that PCI was both solvent and profitable through the falsified documents, which presented a false picture of PCI's and PC Funding's financial condition to potential investors, existing investors, lenders, non-participating employees, and outsiders such as DZ Bank.[277]

### G.    Concealment of the Fraud by Creating False Promissory Notes and Supporting Deal Documents

118.    To perpetuate the fraud, Petters and his co-conspirators fabricated a variety of documents in addition to financial statements, bank statements and tax documents to mislead investors, lenders, and other third parties.  These falsified documents were given to investors such as Opportunity Finance, lenders such as Autobahn, and their agents such as DZ Bank and U.S. Bank to maintain the illusion that the inventory deals were real.  Each investor entered into a promissory note executed by Petters that included a unique note number, the beginning date of the note, the investment amount, the name of the borrower, name of the note holder, interest rate, and the maturity date.[278]

---

[274] See for example BPK&Z Audit File, 3/11/04, Kelley_Micro_0125992-254 at 090-094.
[275] See for example BPK&Z Audit File, 3/11/04, Kelley_Micro_0125992-254 at 090-094.
[276] See for example BPK&Z Audit File, 3/11/04, Kelley_Micro_0125992-254 at 045-047.
[277] See for example, Wikoff Deposition, pp. 338-344 and Exhibit 31 discussing DZ Bank's receipt of the PC Funding 2002 audited financial statements.
[278] In re: Petters Company, Inc., et al. Debtors, PwC Interim Report, 12/15/10, p. 41; In re: Petters Company, Inc., et al. Debtors, Affidavit of Theodore F. Martens Regarding (1) the Existence of the Petters Ponzi Scheme and (2) the Identification of Persons and Entities that Received Transfers in Furtherance of the Ponzi Scheme, 10/24/14, p. 6.